# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 2

## DOCUMENT 16

---

002010

XIX 03S01-9712-CR-00147

~~03C01-9611-CR-00408~~

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

V. ) CASE NO. 58183A

CHRISTA PIKE )

FILED
BY MARTHA PHILLIPS, CLERK
DEC 26 1996
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XVI OF XXVII VOLUMES

FILED
FEB 5 - 1997
Clerk of the Courts
MAILED
CERTIFIED
REGISTERED
REC'D BY

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

# TABLE OF CONTENTS

VOL. XVI


| | PAGE |
|---|---|
| Jury Selection | 1501 |
| Opening Statements | 1558 |
| STATE'S CASE | |
| DUNCAN SUTHERLAND: | |
| Direct Examination | 1567 |
| Cross-examination | 1577 |
| JOHN TERRY JOHNSON: | |
| Direct Examination | 1580 |
| ROBERT RECTOR: | |
| Direct Examination | 1591 |

THE COURT: I would like to bring in the three jurors who have expressed some concern to the bailiffs.

MR. TALMAN: One at a time, Judge?

THE COURT: Yes, one at a time.

Would you have them bring Mr. Glassman in, please?

(Mr. Glassman entered open Court.)

THE COURT: Mr. Glassman, if you will take your accustomed seat right there, sir?

Mr. Glassman, it is my understanding that during the course of the evening and today you talked to a couple of the bailiffs and expressed some concerns about service on this panel.

Can you tell me what those concerns are, please?

Mr. Glassman: Ah, I think something during these proceedings, the best way I can explain it, has kind of jogged my memory, ah--

THE COURT: Okay.

Mr. Glassman: --I remember some additional details. I don't know if they are right or wrong. But, you know, sometimes--

THE COURT: Tell me what they are.

Mr. Glassman: Ah, I recall that there was a satanic ritual involved, something to that effect. I recall that three boys, three girls, I mean, were involved. And I recall that, that, ah, there was some disfigurement, carvings, some satanic symbols carved on somebody chest, the victim's chest, I take it, I guess I would have to say.

And, I mean, it is just like, sitting there and sitting there and the proceedings are going on and--

THE COURT: That's the reason we are asking all these questions, to see what happens as we go through this, if you remember these things.

Mr. Glassman: I felt obligated to, I mean, I stood here, sat here before and told you that I didn't really remember anything about this and, you know, thinking through this I felt through this, now that I

recall some additional details, had I remembered them before these proceedings started I, ah, I guess the best way to say this, I would have said something before. But I recall them now. The proceedings haven't started and based on my knowledge of this process you are to talk about what you know before the proceedings begin.

THE COURT: That's, that's just what I've, that's why we have ask you to come back in here.

Now, we have gone through this and I am going to go through it with you and, and I don't know if I did this with you or not, because you have been an experienced juror, and you remember that you must set aside anything you may or may not have heard, anything you may or may not remember, and you must consider only the proof in the Court and the Court's instructions.

Can you do that based upon what you now remember?

Mr. Glassman: I will judge the case by the facts that are presented here to the best of my ability if I am selected for this panel.

THE COURT: You are not asking

me to relieve you from the panel because of what you remember, you feel obligated to tell me that you do remember these things, is that it?

Mr. Glassman: Yes.

THE COURT: And they are pretty graphic in detail, at least what you remember from the, ah, the media, I take it? That's where you--

Mr. Glassman: From way back then. Yeah.

THE COURT: General, do you have any questions you would like to ask Mr. Glassman?

MR. CRABTREE: No, Your Honor.

MR. TALMAN: We do, Your Honor.

Good afternoon, Mr. Glassman.

Mr. Glassman: Good afternoon.

MR. TALMAN: I believe we have done this before but I'm not sure whether it was one day or two days ago.

Mr. Glassman: Time just flies.

THE COURT: We've noticed.

MR. TALMAN: When you are having fun.

You say you recall some additional facts--

Mr. Glassman: Uh-huh, the proceedings have a way of jogging--

MR. TALMAN: --details, whatever.

Okay.

And you told the Judge you feel like you could put that out of your mind and only decide this case based on the evidence you hear in the Courtroom, is that correct?

Mr. Glassman: Yes.

MR. TALMAN: Okay.

Do you feel like, if you were instructed by the Court that you were to put those out of your mind and you went back in the jury room, and say, you didn't hear those things you think you remember, or that you do remember, say you didn't hear anything about that in the courtroom, do you feel like you would have to discuss those things you remember hearing outside the courtroom back in the jury room?

Mr. Glassman: ----well---

THE COURT: Take your time and answer it. It is not an easy question and it's--

MR. TALMAN: Take your time-- and there is no right or wrong answer.

THE COURT: --that's right.

MR. TALMAN: Sorry, Judge. I'm sorry.

THE COURT: That's okay.

Mr. Glassman: ---What, ah, happens when you are in the courtroom is, you immerse yourself in the facts, as I understand it from my service before, you have to clean your slate when you walk out of here until you are impaneled.

MR. TALMAN: I am going to defer to the Court to answer your questions.

THE COURT: Mr. Glassman, I will remind you, has previously served in this Court on a jury. And I think what you are referring to, sir, is that the Judge repeatedly instructs you not to discuss the matter--

Mr. Glassman: Right. I would never do that.

THE COURT: --you have to absorb the facts but you can't, can't formed opinions about those facts.

Is that, is that what you are

dealing with, struggling with at this point? To some extent?

Mr. Glassman: Yeah, but you have to, you have to keep telling yourself not to form an opinion until this process is over.

THE COURT: That's right.

Mr. Glassman: And do I feel like I can do that?

THE COURT: That's the question.

Mr. Glassman: Yes, I can.

THE COURT: Have you formed an opinion, having thought over the facts, I don't mean to jump on Mr. Talman's parade here, but have you formed an opinion at this point about either the facts or the guilt or innocence of the Defendant in your own mind at this time?

Mr. Glassman: No.

THE COURT: Okay.

Mr. Talman, do you have any other questions you would like to ask, sir?

MR. TALMAN: I don't think I have any further questions.

Thank you for your candor and for bringing it to our attention.

THE COURT: Mr. Glassman, I need to talk to one or two other of your fellow jurors on the panel that you are presently on.

And then I think we are going to be ready to go forward with further jury rounds and hopefully get toward the end of the jury selection process.

We appreciate your candor and your honesty, sir. And exactly what you felt was necessary to do is what we have been looking for, that people do tell us what they remember.

This is not an easy case. And we understand that.

Mr. Glassman: Well, I felt obligated. I mean, these things just pop into your head and I felt obligated.

THE COURT: Do you think you could stay with us and give each side a fair trial?

MR. Glassman: Yes.

THE COURT: If you are chosen as a juror, that is?

Mr. Glassman: (Shook head, "Yes".)

THE COURT: All right, sir.

Thank you.

If you will go back to wherever you were.

And if you will ask Mr. Rutherford to come in?

(Mr. Glassman left open Court.)

(Mr. Rutherford entered open Court.)

THE COURT: Mr. Rutherford, if you will just take a seat right there, please.

Mr. Rutherford, good afternoon.

Mr. Rutherford, the bailiffs have informed me that you have expressed some concerns just as I asked you all to do if you feel like you had some, or if problems arose.

And they have indicated that they feel like that you may want to talk to me and the lawyers about these concerns.

Can you tell me what is going on, sir?

Mr. Rutherford: Yes, ah, I had a little concern about the death penalty with her being as young as she is.

THE COURT: In other words, you, you, of course, now, as we have explained to you, there's, ah, I think we have explained the process of what it is, and that the jury, if they should find the necessary requirements, that would be their obligation and will have to sign their names to that obligation.

Ah, are you telling me that you don't know if you can do that, or you think you can, or you think you can't, I, I need you to tell me how you feel.

Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.

THE COURT: In terms of, of how you are feeling about it?

Mr. Rutherford: Yes.

THE COURT: Okay.

Do you understand that the Court's instructions, ah, ah, may include such factors as what happened, the record of someone, the age of someone, all those things for you to consider? That's one of your considerations, and, and when I get through the proof in this case I

will figure out what the aggravating and mitigating factors are and I will give those to the jury to consider.

Do you think that, ah, that would keep you from following the Court's instructions, your concern about this?

Mr. Rutherford: Well, see, I work with a lot of kids.

THE COURT: Yes, sir, you do.

Mr. Rutherford: And, ah, I know how easy--they're led one way or the other--

THE COURT: Okay.

Mr. Rutherford: --a lot of times, because of the immaturity and all that--

THE COURT: This is a difficult process for everybody.

Mr. Rutherford: Yes.

THE COURT: And I know every, I know every prospective juror and every, every prospective juror in the courthouse that sits upon a jury works at what they do.

Let me ask the lawyers ask you some questions and see what, where we go.

MR. CRABTREE: Good afternoon, Mr. Rutherford.

You recall when we talked about the aggravating circumstances and the mitigating circumstances?

Mr. Rutherford: Uh-huh.

MR. CRABTREE: And we went through how you weigh those and you had to make a determination beyond a reasonable doubt.

And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.

Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?

Mr. Rutherford: I have problems just because of the death penalty.

MR. CRABTREE: That's what we are talking about. I'm not talking about anything else now. I'm just talking about the death penalty.

Are you saying because of this individual's age you could not return a death sentence?

Mr. Rutherford: I, I don't think I could.

MR. CRABTREE: Okay.

Now, we are not talking, I understand that it would be difficult. I mean, we are not talking, it should be difficult, don't get me wrong on that. It would certainly be difficult to return a death penalty against anyone.

So let's see if we can make it clear--as far as her, the sole factor of her age, that that would be something that you could not do?

Mr. Rutherford: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem--

MR. CRABTREE: I, I, understand that.

And I'm really not, you know, I'm not asking you to explain yourself. Because you don't have to explain yourself to us. Because you are entitled to your beliefs and your feelings and the only reason we are interested in them, is because of this particular case, and trying to pick a jury in such a fashion, you know, that the law can be complied with.

So, let me ask again.

I understand you to be saying that because of her age that one factor would keep you from returning the death penalty, is that correct?

Mr. Rutherford: I think so.

THE COURT: Ms. Martin?

MS. MARTIN: Just one little clarification.

Mr. Crabtree talked about that there is a possibility that age will be a mitigating factor, that the Judge may instruct you on that.

And I just want to be clear.

Are you saying that, are you saying that if there are aggravating factors and just this age mitigating factor you could not return a sentence of death?

Mr. Rutherford: I don't think I could.

MS. MARTIN: Thank you.

MR. CRABTREE: I have nothing further.

MR. TALMAN: I think we are probably in agreement.

THE COURT: Mr. Rutherford,

you, you have been honest and forthright with us. You have stuck with us for several days now. And we are not going to require you to remain on this panel, ah, against your, let's call it your moral value.

You are excused from further service. And I very much appreciate all of your time and attention, sir, and your honesty with us.

I am sure we will see you on other juries in the next few weeks.

Thank you, sir.

MR. CRABTREE: Mr. Rutherford, we also want to thank you for bringing this to our attention at this time, too.

Thank you very much.

MR. TALMAN: Thank you, sir.

(Mr. Rutherford left open Court.)

THE COURT: I would like to see Ms. Cunningham, please.

(Ms. Cunningham entered open Court.)

THE COURT: Ms. Cunningham?

Ms. Cunningham: Yes.

THE COURT: You have expressed

concerns and you thought yesterday you didn't think you would be able to work things out, and I asked you to wait until today and this is the first chance I have had to get you here.

Tell me what happened and where we are.

Ms. Cunningham: Well, I called her last night and, ah, she, it is a small company of 30. And it is--

THE COURT: And your job--

Ms. Cunningham: I'm the assistant office manager.

THE COURT: Okay.

Ms. Cunningham: My job is to collect the money and the payables, doing the banking, and if she is busy I have to do the payroll.

THE COURT: And you are the only person that can do that?

Ms. Cunningham: The only one.

THE COURT: And you have been told that you are needed at work?

Ms. Cunningham: I talked to her yesterday and she has got a close, we have two companies within a company. She has to close her

year end on one of them this month.

And that puts her behind on everything. And she can't do both my job and her job, which is to run the whole thing.

THE COURT: I am also going to add that I understand my officer received a call from Ms. Cunningham's company begging the mercy of the Court.

So, ah--

MR. CRABTREE: I think everything was contingent upon her making that phone call, so--

THE COURT: I think so.

Do you have any problem?

Ms. Cunningham, I am sorry to have held you all day to do this, but you are excused from further service on this panel.

Thank you for your time.

Ms. Cunningham: Thank you.

(Ms. Cunningham left open Court.)

THE COURT: All right.

Are we ready to start rounds?

MR. CRABTREE: Yes.

THE COURT: Bring in your jury,

just your jury. (To an officer)

THE COURT: With your permission I am going to, as I call them we will just fill up the box wherever they, and then fill the seats here?

MR. CRABTREE: And you are going to pull their name and read off their name?

THE COURT: I'm going to read their name as they get called in.

MR. TALMAN: Your Honor, we've got the jury that was here last night to, a certain seat arrangement that is already--are you saying that we are going to--

THE COURT: They are going back. That's what I'm putting right now. I am going to put them right back where they are, and the empty seat--I will pull the name, set them somewhere in the box, and we will take it from there.

MR. CRABTREE: Does the Court have someone seated in number twelve?

THE COURT: Yes. Ms. Halcomb.

MR. CRABTREE: Okay.

THE COURT: Do you want me to run through it real quick?

MR. CRABTREE: We just weren't sure about that one.

(Whereupon, the prospective jurors entered open Court. After the call of the jurors was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Good afternoon.

Ladies and gentlemen, here we are again.

Are you ready?

We have been spending the day collecting other jurors and doing exactly what they have been doing now for a few days, and we are ready to start filling the box and doing rounds, just like we did yesterday evening.

James L. Green.

(The following jurors entered open Court as they were called.)

MS. HELM: One at a time?

THE COURT: Yeah, I think that will make sense.

(Mr. Green to 10)

Priscilla Evans. She will go next to Ms. Weaver.

(Ms. Evans to 2)

And then Anthony Loveday, please. He will go in 13.

After Mr. Loveday, Christopher Matthews.

After Mr. Matthews, Eugene Stevens, please.

And last, James Lambert, please.

And by the way, for those of you who just now walked in, this isn't General Helm, obviously, this is General Harper.

General Helm stepped out for a little while.

General Harper has come to help General Crabtree.

Sir, if you will come down here and sit right down here in front. We are going to play musical chairs here in just a minute.

All right, Counsel, whenever you are ready.

(Round 17)

THE COURT: Ms. Evans, you are excused from further service. And I am very grateful for you coming and taking your time today.

Thank you, ma'am.

Ms. Evans: Thank you.

(Ms. Evans left open Court.)

THE COURT: Okay.

Now, Mr. Matthews, I am going to ask you to move into the empty seat in the box.

(Mr. Matthews to 2)

THE COURT: Just bear with me.

And Mr. Stevens and Mr. Lambert, if you will move down a seat, please.

Call in LaVaughn Davis.

(Mr. LaVaughn entered open Court.)

Mr. Davis, if you will just have a seat right here.

Thank you.

(Round 18)

THE COURT: Mr. Glassman, you are excused from this jury.

Thank you very much for your

time and for your patience since last Monday, sir.

(Mr. Glassman left open Court.)

Mr. Stevens, would you please move right back up there in that vacated seat, please, sir?

(Mr. Stevens to 11)

THE COURT: And Mr. Lambert and Mr. Davis, if you will move over one?

Bring in Mark Sheaffer, please.

(Round 19)

THE COURT: Mr. Stevens, you are excused from service on this panel.

Thank you, sir.

We appreciate your time.

(Mt. Stevens left open Court.)

Thank you.

Mr. Lambert, would you please move up into the vacated seat?

(Mr. Lambert to 11)

THE COURT: We are getting there.

Gentlemen, would you please

move down a seat?

Bring in Shirley Weatherstone, please?

Ms. Weatherstone, if you would just have a seat right there in the very first seat right there?

(Round 20)

THE COURT: Mr. Loveday, you are excused from further service on this panel, sir. And I very much appreciate your time today, too.

You don't need this card back because you are now back on Circuit Jury duty.

Thank you, sir.

(Mr. Loveday left open Court.)

Mr. Davis, if you will move into that seat?

This doesn't make a lot of sense to you. But whoever is left is going to understand because I am going to explain it to them.

(Mr. Davis to 13)

THE COURT: Jeffrey Robbins, please? Bring him in.

Counsel, would you approach the bench, please?

BENCH CONFERENCE

THE COURT: You have just picked a jury. There are fifteen.

Would you like me to excuse the others first?

MR. CRABTREE: I think that is the procedure.

MR. CRABTREE: I would also like to renew for the record our motion for change of venue.

THE COURT: Then, we will send the jury out and I will let you do that.

I am not going to impanel them or swear them. I will give them instructions.

(Discussion about timing.)

END OF BENCH CONFERENCE

THE COURT: I believe we have one juror left.

Would you ask that, ah, juror,

Mr. Sparks, to come in for a minute, please?

(Mr. Sparks entered open Court.)

MR. CRABTREE: May we approach the bench just a moment?

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. CRABTREE: You are not going to swear these until in the morning?

Could I make a suggestion?

These four that we have done this with, if you would instruct them not to read anything or listen to anything in case something did happen overnight?

I think that would be a good precaution.

I don't want to impanel them now.

THE COURT: Yeah, I don't mind doing that.

MR. CRABTREE: But do you see what I'm talking about?

MS. MARTIN: Are you saying

that the others are going to be sequestered?

THE COURT: Well, see, that is the problem.

MR. CRABTREE: Yeah, we will get them sequestered--

THE COURT: The others won't be sequestered so--

MR. CRABTREE: They don't have to be sequestered. They are not part of the jury yet. The jury has not been sworn and so if something were to happen we could bring these back in with that precaution.

THE COURT: Well, if something happened to one we would just have two alternates.

MR. CRABTREE: I was just trying to make sure that we didn't run--because you know we have had people overnight develop some problems.

MR. TALMAN: Judge, I don't think, I think if we let these people go, that the situation, if the situation changes could we just--

MR. CRABTREE: Well, what's wrong with just saying, "Okay, don't read the paper and don't listen to local news tonight?"

THE COURT: If the situation should change--

MR. TALMAN: I think that sequestration--

THE COURT: Well, why don't we just--

MR. CRABTREE: Well, we have released them every night up till now.

THE COURT: Why don't we just release them and then if the situation changes we will go to the next alternates we've got.

MR. CRABTREE: We could lose two or three.

THE COURT: Then I will bring in another venire. We haven't impaneled them. I will wait till Monday and bring in a venire.

MR. CRABTREE: It just seems that these people that we have gone through this with, that there would be absolutely no harm in doing that, and it would be a nice precaution.

THE COURT: Why don't we do this--

MR. CRABTREE: It doesn't hurt anything.

MR. TALMAN: We can keep them

all sequestered in case--I mean, what is the difference in just sequestering them, I mean--

THE COURT: Well, I need to impanel them--is that what you are--

MR. TALMAN: Are we going to impanel the jury or--

MR. CRABTREE: They are going to be released.

MS. MARTIN: Well, go ahead and release them and if there is not a problem--

MR. CRABTREE: They are going to be released today.

THE COURT: I am going to release them.

If there is an emergency we can take the next alternate. But I am going to admonish them--

MR. CRABTREE: That is all I am asking.

THE COURT: --but we have the three alternates--

MR. CRABTREE: That is all I am asking, just as a precaution.

THE COURT: --just as a precaution.

MR. TALMAN: Then call in a venire.

THE COURT: Well, we will worry about that later.

END OF BENCH CONFERENCE

THE COURT: Mr. Sparks and Mr. Robbins and Ms. Weatherstone and Mr. Sheaffer, I am going to instruct you all as I did at lunch time. That you are not to read the newspapers, local or national, tonight.

That you are not to watch local or national news tonight or in the morning.

You are still prospective jurors.

And let me explain what is going on so all of you understand.

The rest of you--

MR. TALMAN: Your Honor, could we approach? Could we approach the bench one more time?

THE COURT: Okay.

BENCH CONFERENCE

MR. TALMAN: Rather than announcing we have a jury tonight, why not just--

THE COURT: Sequester them?

MR. TALMAN: No, no, I'm not asking you to do that. I'll back off from what I was saying, let 16, 17, and 18, let them go home, let them go home--

THE COURT: I am going to let them go home.

MR. TALMAN: That's what I said. I said, let them go home but rather than announce that we have got a jury and making them tempted to watch the news, just wait and announce that we have a jury in the morning and then impanel them.

MR. CRABTREE: I don't understand.

MS. MARTIN: To avoid temptation by letting them think that they are going to be on the jury.

THE COURT: Could you do me a favor?

Come around here like Judge Ito does. (laughter)

MR. CRABTREE: Are we going to

have a salad bar conference?

THE COURT: We are going to have a salad bar and maybe a soup bar, too.

(Whereupon, there was a side, side bar conference away from a recorder and court reporter.)

END OF BENCH CONFERENCE

THE COURT: I never did that before. That's fun. I will have to do that another time sometime, but not tonight. (laughter)

As to you four, do you understand my admonition?

You may not talk to anyone about this.

You are to have no contact with, ah, anyone at this point about this case.

If anyone attempts to contact you you need to let us know.

And what I am going to, I am going to instruct the bailiff as to how, what you are to do as far as tomorrow morning.

Okay?

And he will tell you.

Otherwise, you all are excused to leave.

(Four prospective jurors left open Court.)

END OF BENCH CONFERENCE

THE COURT: Come on back up here.

MR. CRABTREE: Over there?

THE COURT: Yeah, over there. I like that.

MR. CRABTREE: It is a whole lot further. (laughter)

BENCH CONFERENCE

(Whereupon, side, side bar bench conference away from recorder and court reporter.)

END OF BENCH CONFERENCE

THE COURT: Ladies and

gentlemen, here is how it works.

In accordance with the rules we have now selected the fifteen of you as the jury.

Obviously, most of you remember your constitution, twelve people are on the jury.

Three of you will be alternate jurors but you won't know that until the end of the trial, which means, until the end of this trial you won't know whether or not you are alternates or you are the jurors for the case.

So all of you are going to be able to listen real carefully and work hard at it.

Now, what is going to happen next is, that it is 5:30 in the evening, and for one, I think you all would like to take care of your own business for a while.

Because out of an abundance of caution there are some technical things that I don't want to have happen until tomorrow morning.

I will not do what we call impanelling you and that is why I cautioned the other jurors.

Tomorrow morning I am going to

ask you all to be back in the courthouse around 10:00 o'clock.

When you are back--and the reason we are going to start a little late, is a couple of things.

Everybody is really tired.

The lawyers need to take care of some things in order to make these proceedings a little briefer in the long run.

And they have asked me to do that. And I am going to go ahead and let them do that before we begin the trial.

When we begin we will do what we call impanelling the jury.

Now those of you who have ever been on a criminal jury have already gone through this.

It sounds like it takes forever. It takes five minutes.

You will hear the charges read.

You will hear the Defendant's Attorneys enter a plea on her behalf.

We will then swear you or impanel you.

And, ah, then we will begin swearing witnesses.

You are going to hear the opening statements of the lawyers.

And we are going to start proof tomorrow morning.

So, ladies and gentlemen, in the words of the inimitable Judge Ito and all other Judges in the world, you may have no contact with anyone other than letting your family know where you are and how you are.

You may not read local newspapers. You may not watch local television news.

You may not watch national television news or read national newspapers.

Tomorrow when you get here very likely there will be cameras set up in the courtroom.

Don't be too shocked as you come in. As I told you before, they may not take pictures of you.

Also, the alternate, the three extras are going to be over here, not down there in the middle.

And we will rearrange this a little bit to make it more comfortable for all of you and to make it easier for you to hear and see a little bit.

MR. CRABTREE: Your Honor, may I address the Court about one thing?

THE COURT: Yes, sir.

MR. CRABTREE: Could the Court make it clear that as of this time there are no alternate jurors.

THE COURT: That's correct.

All you are the jurors for this case.

Until the end there are no alternate jurors.

And that's different than most of the time that we have dealt with this in the Courts.

Usually, during a trial we pick alternates and they know they are the alternates.

You are the jurors of this case.

Okay?

Please stay with the officers.

Have no contact with anyone.

If you have a problem, again, communicate that to the officers.

And, ah, please have a good nights rest because we have got a lot to do tomorrow. And you are going to find this to become a much more interesting and enlightening case.

The jury selection is always the hardest. It is always the most tedious, especially for the jurors. But the rest of us have had a long tedious week, too.

And I hope that we can move along and get this case heard and get it concluded well within the time frame that I have given you previously.

And, ah, we are going to work toward doing that. And we appreciate all of your patience. And I know you have had a lot of patience.

And I thank you very much.

Go with Officer Beeler and good evening.

(Whereupon, the prospective jurors left open Court at

5:34 P.M.)

THE COURT: I believe you have a motion, Mr. Talman.

MR. TALMAN: Yes, Your Honor.

At this time I renew my motion for change of venue.

THE COURT: Hold on just a moment.

(Mr. Beeler talked with the Court.)

THE COURT: Do we want the other four jurors to come into the courthouse in the morning?

Or may we call them?

MR. CRABTREE: Call them, I think--

THE COURT: You've got their numbers. And ask them to be available until they hear from you. (To Mr. Beeler.)

Okay?

MR. TALMAN: Your Honor, at this time I renew my motion for change of venue as I have done several times.

THE COURT: Yes, sir, you have done it at the bench repeatedly.

Obviously, you couldn't do that in front of the jury.

And so for the purposes of the record you have repeatedly renewed that motion and we have reserved it until this point.

MR. TALMAN: Yes, Your Honor.

And I would submit that as Your Honor just heard from one prospective juror who came back in here, I believe it was Mr. Glassman, he came back in and said that he recalled hearing some things and he was candid enough and honest and open, and I'm not saying any of the other jurors would not be, but he came back in and he expressed his reservations and his concerns about what he had heard, and, ah, and, I believe the other day, earlier this week, this has been a long week, and I'm rather tired right now,--

THE COURT: I know.

MR. TALMAN: --but earlier this week there was a gentleman that came in, and I think he pretty well summed up the problem with jury selection in this type of case that has had the media coverage that this case has had.

He said, "You can't unring a

bell."

And, Your Honor, frankly once you have heard information about this case that's been in the news media you can't unhear it. You can't forget that you have heard it.

And if Your Honor would consider the affidavit that Dr. Bebber had filed, it is in the records, it is part of the record, it goes right along--

THE COURT: And for the record, the Court has read the affidavit. And there are other accompanying affidavits.

MR. TALMAN: Yes, Your Honor.

Some of the media coverage and transcripts of, of, ah, television proceedings and newspaper articles and so on are in the record.

And, respectfully, Your Honor, we would submit that, that although I believe this jury, and I would submit that this jury will probably do their best to be fair and impartial, but just the coverage in this case has just been extreme. It has been excessive.

You know, for them to say, "Well, we will be totally open and unbias and not give any weight to anything we heard outside," I

think it is just asking too much of people.

And I just don't think you can unring the bell.

And for that I would ask that the Court, ah, reconsider the motion for change of venue.

MR. CRABTREE: Your Honor, if I may, concerning the change of venue.

And, again, I would cite for the Court Rule 21 of the Rules of Criminal Procedure.

THE COURT: Let me look at it, please.

I looked at it about three days ago when I was doubtful. But I want to look at it again.

(Court looked at the Rule.)

THE COURT: Go ahead, sir.

MR. CRABTREE: It sets out, "In all criminal prosecution the venue may be changed upon motion of the Defendant or upon the Court's own motion, with the consent of the Defendant, if it appears to the Court that due to undue excitement against the Defendant in the county where the offense was committed or any

other county would cause a fair trial improbable."

We would submit to the Court that there has been no showing at all of, ah, undue excitement against the Defendant.

The jurors who have testified have all testified that they have heard something about this case. They have not testified that they feel anything negative toward the Defendant as a result of that.

Certainly there has been no showing of undue excitement.

And we have just proven that we can get a fair and impartial jury in this county.

That is what we have been doing for the last week.

Nothing says that a juror is required to have heard nothing about the case.

You know, we are getting to a situation people have dealt with in small counties for a long time, in that, when a high visibility case occurs everybody in the county knows about it.

Well, now, the media is getting interested in the courtrooms in a county

the size of Knoxville.

A lot of coverage is given and people have heard about it.

But that does not mean that they cannot be fair jurors.

And that is all the Defendant is entitled to, is a fair jury, not one that knows nothing, absolutely nothing about the case.

And we would submit that there is no requirement for a change of venue in this matter.

MR. TALMAN: Well, Your Honor, as to the statements by the General about undue excitement about this Defendant, as Your Honor is well aware, this case alleges many things that's unusual to this community, probably new to this area, I would submit, is new to this area, and, ah, and rather bizarre allegations.

We are talking about alleged satanic activity, where alleged, the State has used the term "rituals", satanic ritual and devil worship.

We have heard about allegations of, of carvings on the, on the body. Ah, there's been all this publicity about this

stuff. And this come from the jury, from the prospective jurors. This is what they have heard.

This is not an average, if there is such a thing, an average murder case, or an average homicide.

As, as I use the term--

THE COURT: If there is such a thing.

MR. TALMAN: If there is such a thing.

THE COURT: You use it advisedly, I'm sure.

MR. TALMAN: Yes.

Very reserved, Your Honor.

But this, this goes into the realm of, of bizarre and somehow I don't see how you can, I mean, there's been lots of people here that have been prospective jurors that said that they had formed opinions.

Now, if that doesn't constitute excitement about a case I, I don't understand what does.

And I would submit that there, that there has been a showing and, ah, we would ask the Court to consider that motion.

THE COURT: All right.

Ah, Rule 21, of course, is the applicable rule regarding change of venue.

Mr. Talman's motion has been pending in an appropriately filed manner.

It is clear to the Court that we have gone through some 250, something like that, prospective jurors.

The Court has inquired with each of those jurors regarding their opinion, regarding what they know.

Ah, and I believe that we have found a jury that has at least made a promise to all of you, and during the course of voir dire, to keep an open mind. Jurors that had no opinion. And jurors who had or expressed an opinion or thought they had an opinion were released from service in this case.

This is a highly publicized case, though it is no different from any other highly publicized case.

The alleged facts, ah, such alleged facts as you raised, like satanic worship, and other things, were raised by certain jurors.

That's true.

They raised the issues that, things that they read in the paper.

They weren't asked about them nor did any of them express the feeling that they could not give a fair hearing in this case based upon any of those issues.

The, ah, Court believes firmly that we have picked a jury, without even calling in a special venire, we picked a jury with all the available resources we had at the time.

But there was no special venire called.

It was possible to pick a jury and we have done so.

And there is, I have seen no, other than the media, which, of course, has their right to cover these things, quote, "undue excitement" in accordance with the rules. So, ah, there have not been crowds down here or individuals, you know, interested in the case.

There has been a lot of news media. They are very interested. There have been a lot of Generals and witnesses and individuals that are a part of both Ms. Slemmer's family and Ms. Pike's family.

But, but no one else, really, that, in terms of the, of a highly excited atmosphere.

Ah, I think these jurors, as I think of all jurors in this County, take their job very seriously. They understand it.

These jurors that we have selected, I think, are and will be open minded and will listen to the proof.

And the motion for change of venue is denied at this time.

And, obviously, your objections are noted for the purposes of appeal.

And for the record, I would like to say that you have renewed those objections at the bench, in case that somehow that these--

MR. TALMAN: Thank you, Your Honor.

THE COURT: --things didn't transmit.

Now, you all need some time tomorrow morning.

And, so, I am going to come to the courthouse somewhere around 9:00. If you need my services I will be here.

And the jury should be here around 10:00.

MR. CRABTREE: At 10:00 we will be ready to start?

THE COURT: If you will, if you are ready then we will impanel the jury and we will be doing opening statements.

How much time would you all like to have per side for opening statements? Have you thought about it or--

MR. CRABTREE: Thirty minutes?

THE COURT: Just remember, on a Saturday, it is going to be harder to get transportation for lunch and all these other things.

Thirty minutes a side?

Do you think you can manage it with thirty minutes?

MR. TALMAN: That's fine.

MS. HELM: I think so.

THE COURT: Okay.

That's fine.

Anything else, Counsel?

MR. CRABTREE: The State has nothing.

MR. TALMAN: No, Your Honor.

THE COURT: Court is adjourned till 9:00 A.M. tomorrow morning, Saturday, March 23rd of 1996.

(Whereupon, Court adjourned at 5:56 P.M.)

COURT ADJOURNED AND RECONVENED AT 9:00 A.M. ON MARCH 23RD, 1996.

THE COURT: I know it is a little strange, folks, but I am going to put the three extras right there.

Is that okay?

It might be a little difficult to move around but--

All right.

We have the jurors.

And we are ready to impanel them, I take it, unless there is something else you all would like to take up at this point?

MR. CRABTREE: Your Honor, we would, I think, need to get this on the record.

I met with Mr. Talman this morning for the purposes of showing him some evidence that he had not seen.

We opened the boxes and it

seems that the, ah, lab did not send us all of what we had, ah, requested be sent back.

We have advised him of that.

I know most of these items he has seen photographs of.

I have talked today with Bill Darbee, who is head of the TBI Lab. And, ah, we have made arrangements to have an officer there when they open on Monday morning to, ah, retrieve those items and return them to Knox County.

And as I say, we have advised Mr. Talman of all this.

It is my understanding, we are still in a position to go ahead.

I think these items, there are no secrets there. We have a list of them.

MR. TALMAN: Your Honor, there's, ah, no basis at this point as far as the motion for suppression.

Of course, we will preserve all our rights to object to the evidence being introduced and any irrelevancy.

THE COURT: Obviously, you are going to have to have the opportunity to see those things in case you do wish to make objections or

request rulings.

So we will work that out so that you have ample time to see it in the course of the trial.

MR. TALMAN: Thank you, Your Honor.

THE COURT: Anything else you want to take up?

MR. CRABTREE: The State has nothing else.

THE COURT: Okay.

I am going to, we have all of our jurors and they are all ready to go.

So, once we have impaneled them Mr. Beeler will call the others and release them, if that is okay.

MR. CRABTREE: Your Honor, if I might, I don't know quite how to phrase this, so I will try to do it the best I can.

The Court has made a comment again this morning about the extras seated over there.

THE COURT: No, they are not extras.

MR. CRABTREE: Okay.

THE COURT: Of the, the additional jurors over the number of twelve.

MR. CRABTREE: Why don't we just say, the jurors who don't have good seats or something like that.

THE COURT: Okay.

I understand.

I, I, they are, you are right, and, of course, this is the first time we have done it this way.

MR. CRABTREE: Okay.

I just wanted to be--

THE COURT: And quite frankly, General, I like it. I think we want to keep doing it this way.

MR. CRABTREE: I do, too.

And I just don't want these people to think that they are any less than the ones who are in the box.

THE COURT: Well, if you like, since they are all, well, no, we have to keep them in the jury numbers.

MR. TALMAN: Your Honor, also, I would suggest that it might be appropriate to advise them that none of us know who are going to

be the alternates, either.

It is to be totally random at the end.

THE COURT: I thought we did that, already.

MR. CRABTREE: I thought you said that yesterday.

MR. TALMAN: I think the Court can explain to them that they would know at the end of the trial.

But that we don't know, either, who the alternates are.

THE COURT: Well, I think I explained to them how they find out. So, I guess they assume that.

If you want me to I will be glad to do that.

MR. TALMAN: It doesn't matter. Just at the Court's convenience.

THE COURT: General, are you ready to proceed to trial?

MR. CRABTREE: The State is ready.

MR. TALMAN: The Defense is ready.

THE COURT: Ms. Pike, are you ready?

MS. PIKE: Yes, ma'am.

THE COURT: Bring in the jury.

(Whereupon, the jury entered open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ladies and gentlemen, good morning.

We are ready to proceed in the trial of this cause.

And, as I told you yesterday we are going to begin with what we call impaneling the jury.

The Attorney General will stand and read the indictment, one of the Attorneys General will stand and read the indictment.

And as I'm sure I explained to you during the course of jury selection, the indictment is the charging document. It is not evidence, but it will inform you as it has informed the Defendant as to what the charges are

against her.

Ms. Pike's Attorneys will enter a formal plea on her behalf.

And you will be asked, then, to be sworn and we will then swear any witnesses that may be here. Probably, we will be swearing witnesses at a later time as they come in, because as you already heard, there is quite a list, and not all of them are present.

At that time we will begin with opening statements. Each side will give you an overview of what they understand their case to be, and what they hope the case will show.

Statements and remarks of Attorneys, and Judges, even, unless I am giving you the law and making rulings, ah, are not evidence.

But the Attorneys will hopefully provide you a good road map as to what you might be looking for during the course of the trial, and a little idea of what is going on.

So, I urge you to listen to their statements carefully.

And, of course, following that we begin by calling the first witness.

General, please read the indictment.

MS. HELM: The State of Tennessee, County of Knox, Criminal Court for Knox County, March term, 1995, the grand jurors for the State of Tennessee, upon their oath, present that Christa Pike and Shadolla Peterson, alias, and Tadaryl Shipp, alias, a juvenile, over the age of sixteen years, jurisdiction of which juvenile has been transferred by the Juvenile Court for Knox County, Tennessee, to the Criminal Court for Knox County, Tennessee, in accordance with the provisions of Tennessee Code Annotated, Section 37-1-134, heretofore, to-wit: That on or about the 12th of January, 1995, in the State and County, aforesaid, did unlawfully, intentionally, deliberately, and with premeditation, kill Colleen Slemmer in violation of TCA 39-13-202, and against the peace and dignity of the State of Tennessee.

Second count: And the grand jurors aforesaid, upon their oath aforesaid, do further present that Christa Pike and Shadolla Peterson, alias, and Tadaryl Shipp, alias, a juvenile over the age of sixteen years, jurisdiction of which juvenile has been

transferred by the Juvenile Court of Knox County, Tennessee, to the Criminal Court for Knox County, Tennessee, and in accordance with the provisions of Tennessee Code Annotated, section 37-1-134, heretofore, to-wit: On or about the 12th day of January, 1995, in the State and County aforesaid, unlawfully did conspire to intentionally, deliberately, and with premeditation, commit the first degree murder of Colleen Slemmer, and in furtherance of said conspiracy, the said Christa Pike and Shadolla Peterson, alias, and Tadaryl Shipp, alias, did commit the following acts, to-wit: Christa Pike and Shadolla Peterson, alias, and Tadaryl Shipp, alias, left the Job Corps Center, together with the victim, Colleen Slemmer.

2. Christa Pike and Shadolla Peterson, alias, and Tadaryl Shipp, alias, walked with the victim, Colleen Slemmer, to an isolated location on the University of Tennessee campus.

3. Christa Pike and Shadolla Peterson, alias, and Tadaryl Shipp, alias, while at the isolated location, attacked the victim, Colleen Slemmer, with cutting instruments including a box cutter in violation of TCA 39-12-103, and against the peace and dignity of the

State of Tennessee.

Signed/ Randall D. Nichols,
Attorney General.

THE COURT: Mr. Talman, how does the Defendant, Ms. Pike, plead to the first count of the indictment, sir?

MR. TALMAN: Not guilty, Your Honor.

THE COURT: And to the second count?

MR. TALMAN: Not guilty.

THE COURT: Thank you.

Ladies and gentlemen of the jury, please stand and raise your right hands to be sworn.

(Whereupon, 15 jurors were so sworn.)

THE COURT: Please be seated, ladies and gentlemen.

Are there witnesses who are present that you wish me to swear at this time?

MR. CRABTREE: Not at this time.

THE COURT: All right, sir.

If you will, we have to

remember, obviously, to swear the witnesses as they come in.

I don't know which of you is going to make the opening statement, but whichever one of you is going to do that, feel free to begin.

MR. CRABTREE: Thank you, Your Honor.

Good morning, ladies and gentlemen.

During the selection of the jury there may have been occasions where there was some degree of levity or humor that came out.

But at this point in time as far as this case is concerned that is no more.

We are here today about serious business.

We are here today about the tragic death of Colleen Slemmer.

We are here today about the business of a murder.

And this case is not the Job Corps case. This case is the Job Corps murder case.

The testimony of the witnesses

that you are going to hear, the exhibits that you are going to see, the evidence that is going to be introduced to you is going to show you an act that is so vile, so heinous, so atrocious, so despicable, as bad or worse than anything you've ever seen in a movie, read in a novel, or your worse nightmare.

That is what you are getting ready to hear.

Witnesses are going to be called.

We are going to hear from such people as Duncan Sutherland. It just happens to be an individual who was at work, and was at a particular place at a particular time.

Officer Johnson, of the University of Tennessee Police Department. Officer Rector of the Knoxville Police Department. Sandra Elkins, the pathologist. Randy York.

And from the testimony of these witnesses the proof is going to show you that upon the 12th day of January, 1995, Colleen Slemmer was a living person, a student at the Job Corps.

And it is going to show you

that at that evening she went to an area of Knoxville, across Kingston Pike, or Cumberland whatever you refer to that area, from Tyson Park, out in the general vicinity behind the University of Tennessee Ag. campus.

And she went there with this Defendant and a couple of friends of this Defendant, Tadaryl Shipp, Shadolla Peterson. And that while she was there these people, led by this Defendant, the primary mover in this event, that they used a knife to slash her entire body.

That they used pieces of asphalt to crush her skull.

And then when they got through doing these things to her they dragged her body to a pile of asphalt and dumped it there.

The next morning Mr. Sutherland comes along and sees this body, nude from the waist up, completely covered with blood. The head completely distorted from what these individuals had done to her.

Law enforcement agents come. They do an investigation at the scene. Talking about blood and parts of the victim's clothing found over sixty, seventy, eighty feet from the

body, an area of seventy-five by seventy-five where this occurred.

And then you are going to hear from Dr. Elkins.

And Dr. Elkins is going to tell you that the way she does a particular report she uses letters to indicate the injuries when she examines it for the purposes of autopsy. That when she did the physical examination on Colleen Slemmer that she went all the way to "x", 24 separate injuries that she identified.

She will also tell you that if she had identified the minor ones she could have gone through the alphabet two or three more times.

This is the degree of injuries that we are talking about inflicted on Colleen Slemmer.

She is going to tell you that there are ten slash wounds to her throat. That her throat was actually cut ten separate times.

She is going to tell you about and show you the pentagram that was carved on her chest.

She is going to tell you about and show you the slashes that run all the way

across her back, and the stab wounds on her back.

And the fact that her head was beat to the extent that it actually split her skull into.

And as significant as describing these injuries to you she is also going to tell you that except for the injuries to the head, the beating that completely broke the skull into, that Colleen Slemmer was alive when all these other injuries were inflicted on her.

She was alive when she had this pentagram carved on her chest.

And she was alive when this person is slicing her throat ten times!

And then she is going to tell you that probably at this time Colleen Slemmer died.

And she died because of these injuries that were inflicted by the Defendant and her friends.

And then you are going to hear a statement of this Defendant, a recorded statement that she gave at the Police Department.

And she, in her own statement, is going to tell you that Colleen Slemmer is alive

while they are cutting her and while they are carving a pentagram on her chest.

And in that statement she tells how she would jump up and try to run and she would throw something and hit her in the head and knocked her down.

And how they were cutting her throat and she won't die. She is laying there moaning and groaning and she will not die!

She is going to tell you about then picking up a piece of asphalt and bashing her head in.

But she's not through.

After she does this to this person she knows her friend, Tadaryl Shipp, they take the body by the legs and they drag her and they dump her on this pile of asphalt.

And then the last vile despicable act that the State is going to show you that this person did, she doesn't leave this person that she has killed and maimed.

She reaches down into this bloody mass of Colleen Slemmer's head and she takes a piece of skull as a souvenir.

That's the business we are

here about. Very serious business.

And we are going to show you that this person that is seated over here is not some twenty year old little girl everyone is looking at.

This is a vile, despicable human being who has committed a vile, despicable act, the act of murder in the first degree.

THE COURT: Mr. Talman, Ms. Martin?

MS. MARTIN: The State may or may not be able to prove some of the essential elements of the offense charged, murder in the first degree.

We believe that they will not be able to prove each and every one of the essential elements required that they prove.

Those essential elements are: That Ms. Pike unlawfully killed the alleged victim,

and

2. That Ms. Pike acted intentionally.

A person acts intentionally with respect to the nature of the conduct, or the

result of the conduct when it is a person's conscious objective or desire to engage in a conduct that causes a result.

and

3. That the killing was deliberate.

A deliberate act is one performed with cool purpose.

and

4. That the killing was premeditated.

A premeditated act is one done after the exercise of reflection and judgment.

Premeditation means that the intent to kill must have been formed prior to the act, itself.

It is not necessary that the purpose to kill preexists in the mind of the accused for any period of time.

It is sufficient that it preceded the act, however short the interval, as long as it is the result of reflection and judgment.

The mental state of the accused at the time that she allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from the excitement and passion as to be capable of premeditation.

If the design to kill was formed with deliberation and premeditation it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect.

Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion but the accused commits the act after the passion has subsided.

Some of the evidence that you will see in here may be gruesome, may be graphic, may be absolutely horrible.

But remember you must set aside your emotions and decide this case only on the facts and the evidence. And you must find that the State has proven each and every essential element beyond a reasonable doubt before you may convict of first degree murder.

Thank you for your time and

your attention.

THE COURT: General, are you ready to call your first witness?

MR. CRABTREE: Your Honor, the State would call as its first witness, Mr. Duncan Sutherland.

MR. CRABTREE: Come up, Mr. Sutherland.

Your Honor, this witness has not been sworn.

(Whereupon, Mr. Sutherland was so sworn.)

N. DUNCAN WHITAKER SUTHERLAND, JR., having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Mr. Sutherland, I think if you will talk to me back here that everyone will be able to hear you.

MR. CRABTREE: Your Honor, I would ask the Court to instruct the jury that if they don't hear any testimony to please advise us and we will repeat it.

Sutherland - direct

THE COURT: Will you do that?

Q Would you please state your full name for the Court, sir?

A My full name is N. Duncan Whitaker Sutherland, Jr.

Q Okay.

And where do you work, Mr. Sutherland?

A U. T. Grounds Department.

Q And, ah, how long have you been employed with the U.T. Grounds Department?

A For three years, but I've been employed with U.T. for nearly thirteen and a half years.

Q Now, I would ask you if on the morning of the 13th day of January of 1995, if you were in the area of the, ah, U.T. Ag campus?

A Yes, sir.

Q And what were you doing there, sir?

A Well, at 8:00 o'clock I clocked in, well not say, clocked in, but that's when I come into work.

And then we usually get our

Sutherland - direct

trash bags and go around to police up the area, to pick up trash, to pick up sticks, ah, things that, you know, that don't look very good.

Q And what area of the U.T. Ag campus are we talking about, where you clock in?

A Well, usually the Agricultural campus.

Q Okay.

But what part of the Agricultural campus?

A Over near the greenhouses.

Q Now, you clocked in?

And then you started going around and policing up the area?

A Yes, sir.

Q And as you were policing up the area did you see anything?

A Well, ah, about five minutes after I begin to police up I got near the old steam plant and I thought I saw a dead dog. But, it, you know, it didn't make any sense, and then I was taking about five more steps and I saw some, some clothes in the trees.

Q Okay.

And then what did you do then?

A I thought, my goodness, this does not, this picture is not right and, you know, I looked back at the dead dog and it wasn't a dead dog.

Q What was it?

A It was a human body.

Q Now how far, approximately, were you from this body at the time you saw it?

A From the first time I saw it, about fifteen feet, but I, I, I closed within ten feet.

Q Now, you said this was a human body?

A Yes, sir.

Q Describe how it appeared.

A Well, it was awful gory and bloody. There--were knife wounds all over the back, just knife wounds everywhere.

Q Any other wounds that you observed?

MR. TALMAN: Your Honor, I am going to object until there is some foundation laid that this, that what we are talking about is

the body of the alleged victim, Colleen Slemmer, that there is some identification, I have an objection.

Q Please continue.

THE COURT: I am going to overrule the objection at this time.

But, obviously, unless it is connected to Ms. Slemmer--we are not talking about this--

MR. CRABTREE: I can assure the Court it is going to be.

THE COURT: Okay.

Q Did you notice any other wounds to the body?

A No, sir.

Q Could you tell from where you were whether the person was alive or dead?

A Well, there was no movement. There was quite a bit of blood. I mean, I didn't believe that whoever it was was alive.

Q Could you tell whether it was a male or female?

A It was a female because I saw a, a protruding breast.

Sutherland - direct

Q Did you say that clothes were hanging in a tree in the area where the body was located?

A Yes, sir. Ah, a sweater, a jacket.

Q And what did you do then?

A Well, I looked at her for about five minutes, you know, to, to make sure I was seeing what I thought I was seeing, and I kind of freaked out and went and then found a couple of plumbers that were working in a manhole right across the street from Morgan Hall and asked them to come down, you know, and observe it with me, to make sure that I was seeing what I thought I was seeing.

And they came down there with me and the plumbers were Jerry Chadwick and Junior Payne.

Q And then the police arrived?

A Yes, sir, about a minute later.

Q Okay.

And do you know if the first police officers there were with the U.T. Police or

Sutherland - direct

the City Police?
A U.T. Police.
It was Officer Johnson.
MR. CRABTREE: Your Honor, we would ask to mark this as exhibit one for identification.
THE COURT: All right, sir.
Q Sir, I will show you what has been marked as exhibit one for identification and ask if this photograph accurately depicts what you saw on the University of Tennessee Ag. campus on the morning of the 13th of January, 1995?
A Yes, sir, it does.
Q And the clothes that you have referred to in the trees, are they hanging there in the trees?
A Yes, sir, that's them right there.
THE COURT: May I see that, General?
MR. CRABTREE: Yes, ma'am.
THE COURT: Thank you, sir.
Q Now, did you notice anything around the neck of the person that was lying

Sutherland - direct

there?

A Well, at first I thought it was a rag that they had strangled her with, but the, it, ah, it just, it, it looked more like a, a rag or something.

MR. CRABTREE: Let's mark this as exhibit two for identification.

Q I will show you what has been marked as exhibit two for identification and ask if that photograph actually depicts the same scene that you have identified in photograph one except it shows the rag that you are referring to?

A Yes, sir, it does.

THE COURT: Thank you, sir.

If you want to hand it to the court reporter.

THE COURT: Would you all approach the bench, please?

BENCH CONFERENCE

(Discussion about timing.)

END OF BENCH CONFERENCE

Sutherland - direct

THE COURT: Go right ahead, General, whenever you are ready.

Q Now, you, yourself, did you know this person that you saw lying there?

A No, sir.

Q Do you now know who it is?

A Yes.

Q And who is that?

MR. TALMAN: Your Honor, I object. There has been no foundation laid.

THE COURT: Would you lay a foundation for how he knows, sir?

MR. CRABTREE: Well, if he knows.

Q How do you know?

A The paper. I read it in the paper.

MR. TALMAN: Your Honor, I object as to the accuracy and the relevance.

THE COURT: General, you will be required, obviously, to make it more accurate and relevant later on, but I will allow the question.

Q Do you know the name of the

Sutherland - direct

individual?

A Yes, sir.

Q And what's that?

A Her name was Colleen Slemmer.

Q Thank you.

MR. CRABTREE: Your Honor, I would ask to file these as exhibit one and exhibit two to this witness' testimony.

THE COURT: Yes, sir.

They will be made exhibits one and two.

MR. TALMAN: Your Honor, we renew the objection. To preserve that we will make it again.

THE COURT: Yes, sir.

MR. TALMAN: Thank you.

(Exhibit 1 marked and filed.)

(Exhibit 2 marked and filed.)

Q You didn't do anything to disturb or touch the body while you were there did you?

A No, sir.

Q Thank you.

MR. CRABTREE: Pass this

Sutherland - direct witness.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Good morning, Mr. Sutherland. Sir, what time of day was this?

A When I found the body? About five minutes after 8:00.

Q Okay. All right. And you say this was near the old steam plant?

A Right across the street.

Q Okay. Is this on the U.T. Agricultural campus?

A Yes, sir.

Q Okay. Now, you say you did not disturb this body at all?

A No, sir.

Q Did anyone else disturb this body that you saw?

A No, sir.

Sutherland - cross

Q Okay.

So nobody disturbed it till authorities arrived?

A Correct.

MR. TALMAN: No further questions, Your Honor.

THE COURT: May the witness be excused?

MR. TALMAN: As far as we are concerned, yes.

MR. CRABTREE: Come down, sir.

Thank you.

THE COURT: Thank you, Mr. Sutherland, you are excused, sir.

MR. CRABTREE: Call Officer John Johnson.

Your Honor, we would ask that exhibits one and two be passed, please.

THE COURT: All right.

Please pass exhibits one and two around to the jury.

(Exhibits 1 and 2 passed to the jury.)

THE COURT: General, while we

are bringing in Officer Johnson I am going to ask you all one more time to approach the bench. There is something I want to be sure we take care of.

If Officer Johnson will wait just a minute I will swear him in just a minute.

BENCH CONFERENCE

THE COURT: The reason I asked you to pass those photographs up to me is that obviously these are going to be hard for the jury, and I wanted them to see me look at them first.

Okay?

MR. CRABTREE: Well, I usually do that.

THE COURT: I would like you to do that. I need to see them anyway.

END OF BENCH CONFERENCE

THE COURT: Officer Johnson, would you please stand, sir, and come on up a little closer and raise your right hand to be sworn?

Johnson - direct

(Whereupon, Officer Johnson was so sworn.)

JOHN TERRY JOHNSON, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Mr. Johnson, would you please state your name for the Court and jury?
A Yes. My name is John Terry Johnson.
Q And, Mr. Johnson, what is your occupation, sir?
A I'm a police officer for the University of Tennessee.
Q And how long have you been a police officer with the University of Tennessee?
A Ah, approximately 27 years and nine months.
Q And what are your duties as a police officer for the University of Tennessee?
A Well, to, ah, patrol the University and adjacent areas, and, ah, to protect and serve the public in that area.

Johnson - direct

Q Sir, I would ask you if on the morning of the 13th day of January of 1995, you were working in that capacity with the University of Tennessee?

A Yes, sir, I was.

Q And did you get a call?

A Ah, yes, sir.

Q And as a result of that call did you have occasion to go to an area on the Ag. campus at U.T.?

A Yes, sir, I did.

Q Where were you when you got the call?

A Sir, I was over on U.T. Drive, ah, in a parking lot behind the steam plant which is at the junction of Neyland Drive and Lake Loudon Boulevard.

Q And where did you go to when you got this call?

A I went directly to the steam plant, the old steam plant over on the Ag. campus.

Q And that is located on the Agriculture campus?

Johnson - direct

A Yes, sir, uh-huh.

Q And where on the Ag. campus is the old steam plant located?

Can you give us some idea of the relationship to Neyland Drive?

A Relationship to Neyland Drive, I would say it would be approximately, ah, two blocks to the north of Neyland Drive, straight line distance.

Q Toward the University?

A Yes, sir.

Q And when you got there what did you see?

A Well, when I got there there was some, ah, University employees standing in this area and they summoned me by hand motion and hollering at me to come down to where they were.

Q Mr. Sutherland, who just left here, was he one of those people?

A Ah, yes, sir. Mr. Sutherland was in the group.

Q And were you directed to something there?

A Yes, sir, I was.

Johnson - direct

Q And what was that?

A It was a, ah, female body that was nude from the waist up lying face down on a mound of debris in that area.

Q And could you describe more specifically how this individual appeared?

A Ah, yes, sir, I can.

The individual had, ah, blood and dirt all over the exposed part of her body and also on the remaining clothing that she had on.

Q Did you observe the head of the individual?

A Ah, yes, sir, I did.

Q And how did that appear?

A The head was completely, ah, it had been bludgeoned. It was just, ah, a bloody mass of hair and every, and blood.

Q And what did you do then?

A Well, after, ah, observing this and observing the rest of the body I started immediately moving the people out of the area and commenced securing the crime scene.

Q Did you touch the body yourself at any time?

Johnson - direct

A No, sir, I did not.

Q What was the closest that you went to it, actually?

A Ah, sir, I would say somewhere between three and five feet, just enough to get down where I could look at the, ah, head of the face of the body.

Q Okay.

Could you see the face?

A Ah, I believe that was what I was looking at, Your Honor.

Q Thank you.

A It was so mutilated.

Q Were you joined by other officers?

A Ah, yes, sir, almost immediately upon me arriving there, maybe two or three minutes in between, Officer Rector of the Knoxville Police Department joined me there.

Q And when Officer Rector joined you there did you and he do anything?

A Ah, yes, sir, we, ah, were securing the crime scene, putting up tape where nobody could get in, enter into the crime scene.

Johnson - direct

Q Now, the area where you were putting up tape, ah, was this a small area, a large area, or what?

A It was rather a large area, sir.

Q And why was it so large?

A Well, we initially secured the crime scene at not such a great area, but on our findings of looking through the crime scene--

Q Let's start out with initially, are you referring to the crime scene where the body was located?

That is what you were securing?

A Yes, sir, to the, ah, oh, maybe--ah, twenty or thirty feet, something like that, on each side of the, where the body was laying.

Q And then you expanded it further?

A Yes, sir.

We extended the crime scene out.

Johnson - direct

Q Why were you extending the crime scene?

A We kept finding more and more blood spots and more and more evidence in the area, sir.

Q What type of evidence are we referring to that you were finding?

A Well, one thing in particular that we found a considerable distance away, was a bra that we assumed belonged to this person.

Q Anything else?

Any blood spots or--

A Oh, yes, sir. There was all kinds of blood spots on the foliage, on the ground, all around the area.

Q And how big are we talking about, this area finally got?

A I would say, sir, that that area got to be approximately a hundred feet, at least, long, and maybe sixty feet wide, something like that. It was quite an enormous area.

Q And all this area you have expanded is because you found things that you think relate to this particular crime scene?

Johnson - direct

A Yes, sir.

Q So you and Officer Rector are securing the crime scene.

Do other people arrive then?

A Ah, yes, sir.

Officer Don Cook from the University of Tennessee Police Department was the next officer to arrive on the scene.

Q And, ah, did other officers also continue to arrive?

A Yes, sir.

Q And what did you do as far as your duties after these other officers got there?

A I continued to assist with the, ah, investigation of the area, searching for anything I could find in there pertaining to the case.

Q And were you pointing that out to someone?

A Sir?

Q Anything that you would find, when you would find it would you point it out to someone or direct someone to--

A Yes, sir.

Johnson - direct

The, ah, City had, ah, detectives over there and, ah, crime scene personnel, and I would point it out to them as I went along.

Q Were you there when the body was moved?

A I was in the area when the body was moved. But I did not see the body moved.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Sure.

Q I will show you what has been marked as exhibit one and ask if you recognize that photograph?

A Yes, sir, that is the body.

Q And does that accurately depict the way it appeared when you saw it there on the morning of January the 13th of 1995?

A Yes, sir.

Q And I will show you what has been marked as exhibit two and ask you if that, when you stepped closer and were able to see, if that is what you saw?

Does that accurately depict

Johnson - direct

what you were able to see?

A Yes, sir, it is.

MR. CRABTREE: May I have just a moment, Your Honor?

THE COURT: Yes, sir.

MR. CRABTREE: I would like to mark this exhibit three for identification.

THE COURT: All right, sir.

Q Sir, I will show you what has been marked as exhibit three for identification.

I believe that you have indicated that you bent down to look at the face of the individual, is that correct?

A Yes, sir.

Q Does that photograph that you have in your hand, marked as exhibit three, does that accurately depict what you saw when you looked down?

A To the best of my remembrance, yes, sir.

Q Thank you.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit three.

THE COURT: All right, sir.

Johnson - direct

MR. TALMAN: Your Honor, that would be the subject of the same objection I made to it being established this is the body of Colleen Slemmer.

THE COURT: All right, sir.

Thank you.

That will be made exhibit three subject to your objection.

(Exhibit 3 marked and filed.)

MR. TALMAN: Thank you.

MR. CRABTREE: Your Honor, we would pass this witness for cross-examination and ask at the conclusion of his cross-examination that exhibit three be passed to the jury.

THE COURT: Yes, sir.

MS. MARTIN: No questions, Your Honor, at this time.

THE COURT: May Officer Johnson be excused from the courthouse?

MR. TALMAN: Yes, Your Honor.

THE COURT: Thank you, sir.

You are free to go.

MR. CRABTREE: Call Officer Robert Rector.

Rector - direct

THE COURT: Call Robert Rector, please?

You need to go ahead and pass that exhibit while Officer Rector is coming in.

(Exhibit 3 passed to the jury.)

(Whereupon, Officer Rector was so sworn.)

ROBERT M. RECTOR, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Sir, would you please state your full name for the Court and the jury?

A Robert M. Rector.

Q And what is your occupation?

A Police Officer.

Q Officer Rector, that microphone does not amplify your voice, so if you will just speak up. That just goes into the recording machine.

A Yes, sir.

Q How long have you been a police officer?

Rector - direct

A 18 years.

Q And by whom are you employed?

A Knoxville Police Department.

Q And what are your duties with the Knoxville Police Department?

A I'm currently assigned to the motorcycle division.

Q Sir, I would ask, if you would look back on the, I believe, the morning of the 13th of January of 1995, you had an occasion to be in the area of the University of Tennessee Agricultural campus?

A Yes, sir.

Q And what were you doing there, sir?

A Ah, my normal duties.

Q Had you received a call directing you to that area?

A Ah, no, sir.

Q Did you go to a particular location on the Agricultural campus?

A Yes, sir.

Q Okay.

And were you directed to a

Rector - direct

particular area of the Agricultural campus?

A Yes, sir.

Q So, you were patrolling in the general area when the call came in?

A Yes, sir. Yes, sir.

Q And where did you go to, the best you recall?

A Not being that familiar with the specific buildings in the area, it was to the rear of the Agricultural campus, on a roadway, behind some, what I consider to be abandoned buildings.

Q And when you got to the locations were there other persons there?

A Yes, sir.

Q Do you remember any of the persons?

A What I do remember--

Q Yes.

A --seeing Officer Johnson, a U.T. officer.

Q The individual that just walked out of the courtroom?

A Yes, sir. Yes, sir.

Rector - direct

Q And he was there when you arrived?

A Yes, sir.

Q And what type of transportation did you have at that particular time?

A I had a four wheel vehicle, an automobile.

Q And when you got there what did you see?

A I saw Officer Johnson, my first view was Officer Johnson and his car.

I then exited my vehicle and walked, ah, a short distance where I observed, ah, a, a white female, ah, lying on a mound of dirt, ah, it was obvious to me that, ah, she was deceased.

Q Why was it obvious to you that she was deceased?

A Ah, the position of the body, the color of the body, the amount of blood, ah, the injuries.

Q What injuries did you observe?

A I observed, ah, injuries to

Rector - direct

the head and the body. A large amount of blood around the head area. A large amount of blood on the ground in the general area of the body.

Q Did you notice any injuries to the torso?

A Yes, I did.

Q What type of injuries did you see to the torso?

A What appeared to me were cuts and slashes.

Q In your capacity as a police officer I would imagine you had seen numerous cuts and slashes before?

A Yes, sir.

Q And when you observed this what did you do then?

A I then recruited Officer Johnson and we secured the crime scene with crime scene tape.

Q Now explain to the jury what you do when you secure a crime scene.

A What you do, is you try to secure any witnesses, evidence and you try to secure the specific area where the crime occurred

Rector - direct

so as not to, ah, spoil it or tamper with anything within the crime scene, preserve it as best you can.

Q And how do you make a determination as to what the crime scene is?

A In my own mind, my own opinion is, ah, briefly scan the area looking for evidence, ah, victims, suspects, witnesses, and generalize that location and secure that particular area.

Q Okay.

Now, when you started securing the crime scene in this particular location what did, where did you start securing it?

A I believe our first position was, ah, immediately in front of Officer Johnson's car, ah, which would probably be the northern, or the southern most area of the roadway from, it would be from the direction I entered.

Q Okay.

A Before you approach, before I would have approached the crime scene.

Q So that is where you started the crime scene area?

Rector - direct

A Yes, sir.

Q What did the crime scene area include at that time?

A It included, ah, the body of the female, articles of clothing, ah, puddles of blood, hair.

Q Did the crime scene remain that location, or that size that you originally secured?

A No, sir, it did not.

Q What happened?

A As the investigation continued it probably tripled at least in size to the northerly direction.

Q And what was causing the crime scene's size to increase?

A The discovery of, ah, ah, other spots of blood, other puddles of blood, other, ah, articles of clothing, ah, footprints, ah, foliage being, ah, broken down, just things that didn't look ordinary to that particular area.

Q So how large an area are you finally ending up with that you have determined is a crime scene area to be secured?

Rector - direct

A The final measurements probably in the neighborhood of, ah, a hundred to a hundred and twenty feet in length by fifty to sixty feet wide, maybe.

Q And that was determined by things that you have described here that you found such as blood spots and clothing and things of that nature that you thought might relate to this particular offense?

A Yes, sir.

Q Because it is obvious that an offense has occurred, is it not?

A Yes, sir.

Q Now, what do you do to secure the area?

A What I started doing was securing it with what I call crime scene tape.

Q The yellow tape?

A The yellow tape. High visibility yellow tape, ah, not allowing anyone in or out unless they are escorted with an officer, or unless they are an officer, or an investigator.

Q Now, at the time that you arrived at the scene I believe you indicated that

Rector - direct

you saw Officer Johnson.

Did you see other individuals there?

A Yes, sir.

Q Were they officers, civilian type or what?

A Civilian types.

Q Now, after you arrived did other officers of the Knoxville Police Department arrive?

A Yes, sir.

Q Who was the next to get there, if you know?

A Sir, I really can't remember the next one.

I do remember several of the officers and investigators that did arrive.

Ah, Investigator York, and Investigator Brock, and Investigator Clowers.

There were crime technicians.

Ah, Officer Steve Roberts.

As to what order they did arrive in I couldn't place them in order.

Q Did anyone else as far as law