# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 2

## DOCUMENT 17

---

XX 03S01-9712-CR-00147

~~03C01-9611-CR-00408~~

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

FILED BY MARTHA PHILLIPS, CLERK

V. ) CASE NO. 58183A

CHRISTA PIKE )

DEC 26 1996

KNOX COUNTY CRIMINAL COURT KNOXVILLE, TN

FILED Clerk of the Courts FEB 5 - 1997 MAILED CERTIFIED REGISTERED REC'D BY

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XVII OF XXVII VOLUMES

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

# TABLE OF CONTENTS

VOL. XVII


| | PAGE |
|---|---|
| ROBERT RECTOR: | |
| Cross-examination | 1612 |
| DONALD COOK: | |
| Direct Examination | 1625 |
| Cross-examination | 1644 |
| Redirect Examination | 1653 |
| LARRY ROBERTS: | |
| Direct Examination | 1656 |
| SANDRA ELKINS: | |
| Direct Examination | 1674 |
| Jury Out | 1699 |

Rector - direct

enforcement officers arrive, also, from other agencies?

A I believe there were, ah, other U.T. officers arriving.

Q So after you secured this area, and I assume, again, we are talking, you stretched the yellow tape around the area and secured the area there--so after you secured this area, what did you do after that?

A I, at that point, after the crime scene was secured, I attempted and located other forms of evidence, ah,--basically, that's really all my functions were at that point in time.

Q And you have indicated there were trampled areas?

A Yes, sir.

Q Would you describe what you are referring to as trampled areas?

A At that, on that morning the ground was wet and muddy in that particular area, and the mud had been, ah, appeared to me that a scuffle had ensued in that particular area. The mud, ah, was--rather than being undisturbed it had

Rector - direct

been, ah, trampled in, ah, scuffed up where it had been smeared, ah--

MR. TALMAN: Your Honor, I am going to object to him testifying about what he believed to be a scuffle.

If he knows it was a scuffle that's fine. If he doesn't know it was a scuffle I have an objection.

Q Just tell us what you saw.

THE COURT: The officer testified that, that, ah, he, ah, he testified that he saw what appeared to be footprints and so forth.

If you will testify, sir, to what you observed.

Q Was this entire area trampled and footprints and stuff, the whole area that we are talking about, that you secured?

A There were some within the whole area, yes, sir.

Q Now, after that, did you do anything else?

Were you there when the body was removed?

Rector - direct

A Yes.

Q Okay.

Did you see the body when it was turned over?

A Yes, I did.

Q Did you make any observations at that particular time?

Did you notice any wounds or anything to the torso when the body was turned over?

A It appeared that the throat had been cut.

Ah, just numerous stab and slash wounds on the torso.

MR. CRABTREE: If I may, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit one, and ask if you recognize what is depicted in exhibit one there?

A Yes, sir, I do.

Q And what does that show?

A That shows what I saw when I arrived.

Rector - direct

Q And the clothing that you referred to today, does that appear in this photographs?

A Yes, sir.

Q Would you please point to where the clothing was located?

A This is a green coat, an outer coat, and what appeared to be a sweater or a blouse--

MR. TALMAN: Your Honor, may I approach, also?

THE COURT: Yes, sir.

Hold on just a second, General, so Mr. Talman can see what he is pointing to, also.

A A green coat, woolish looking blend. And either a sweater or a blouse right here.

Q And they were hanging in the trees or foliage there?

A Yes, sir.

Q Does this accurately depict it the morning you were there?

A Yes, sir.

Rector - direct

Q And I will show you what has been marked as exhibit two and ask you if that accurately depicts what you indicated when you, ah, as far as the wounds to the back and--

A Yes, sir. Yes, sir.

MR. CRABTREE: May I have just a moment?

THE COURT: Yes, sir.

MR. TALMAN: Your Honor, may we approach?

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. TALMAN: Your Honor, I have an objection. I don't think this photograph has nothing to do with--I think it is just what they have already seen, what has already been introduced.

THE COURT: For what reason is this one being introduced?

MR. CRABTREE: To show that her throat was slashed. To see the extent of the slashing of the throat.

Rector - direct

MR. TALMAN: I think it would be more appropriate for Dr. Elkins to--

THE COURT: May I see the other three exhibits?

MR. CRABTREE: Uh-huh.

I am trying not to duplicate.

THE COURT: Okay.

MR. CRABTREE: There's three of them there.

THE COURT: Are there other photographs that you intend to introduce that shows this as well?

MR. CRABTREE: I've got, I have one that, ah, one other photograph that, ah, I intend to use that shows the slashes that would be in Dr. Elkins' testimony, but they are after it is cleaned up and everything and they don't show what he saw at the scene.

THE COURT: So you are not going to introduce it through him?

MR. CRABTREE: Not the other one, the one that is cleaned up.

THE COURT: Do you want to see them?

Rector - direct

MR. CRABTREE: I will get them out.

I thought I would go ahead and bring the other one. This shows the chest wounds.

THE COURT: Did he see this?

MR. CRABTREE: Yeah, when she was turned over, I think he indicated that he saw the cutting on the chest.

MR. TALMAN: When he is at the scene?

MR. CRABTREE: This one is, yeah.

MR. TALMAN: I mean, when he was at the scene?

MR. CRABTREE: Yeah.

This is the one cleaned up.

THE COURT: All right.

MR. TALMAN: This other one, is that at the scene?

MR. CRABTREE: Yeah.

MR. TALMAN: As it looked?

MR. CRABTREE: That is my understanding, that it was taken at the scene, that is the way it looked, that is what he will

Rector - direct

testify to.

MR. TALMAN: Did he take the photograph?

MR. CRABTREE: No, he didn't take the photograph.

MR. TALMAN: Objection.

MR. CRABTREE: Now, Your Honor, there is nothing that requires that the person takes the photograph.

MR. TALMAN: Is, is this an accurate depiction?

MR. CRABTREE: I will ask him that.

MR. TALMAN: When the body was turned over it would not be able to go back and--

THE COURT: Now, these two that you are going to show--

MR. CRABTREE: These two show different things.

THE COURT: You are showing these two--

MR. CRABTREE: Uh-huh, with the throat cut.

THE COURT: Dr. Elkins will

Rector - direct

testify as to these two--

MR. CRABTREE: Now, well, I, now I have another with Dr. Elkins on the chest that is cleaned up that shows the pentagram, but it is cleaned up this one. And it only shows, it doesn't show the face.

THE COURT: Okay.

MR. CRABTREE: And there is not one that shows everything.

THE COURT: Are there other pictures that show that and--

MR. CRABTREE: I think that is about it.

I have really tried to cut these down.

THE COURT: Your objection is noted.

I will allow him to show these because they demonstrate different things.

MR. TALMAN: After we finish with cross-examination can we take a brief recess?

THE COURT: I intended to.

MR. CRABTREE: I thought we were going to recess for lunch.

Rector - direct

MR. TALMAN: That would be fine.

And I am going to renew my motion for the record about identification.

THE COURT: Yes, sir.

END OF BENCH CONFERENCE

MR. CRABTREE: I would like to mark this as exhibit four for identification.

Q I will show you what has been marked as exhibit four for identification and ask if you can tell the Court and jury what that photograph shows?

A It shows the cut around the throat.

Q And does that accurately depict what you observed when the body was moved there at the scene and turned over?

A I didn't see it at this angle or at this distance, but--

MR. TALMAN: Your Honor, we have an objection to it then.

Q The question is, does it

Rector - direct

accurately depict what you saw?

A Yes, sir.

THE COURT: I will allow it in subject to your objection.

MR. CRABTREE: Your Honor, we ask that it be marked as exhibit four.

THE COURT: Exhibit four.

(Exhibit 4 marked and filed.)

MR. TALMAN: Your Honor, we would renew the same objection as to there being some foundation laid and identification established.

THE COURT: I think that is a continuing objection. And I understand what you are saying and when we get down to it we will deal with it.

MR. TALMAN: That's fine.

Thank you, Your Honor.

THE COURT: You are not required to renew it for the record.

It will continue subject to all of that happening.

MR. TALMAN: Very well.

Thank you, Your Honor.

Rector - direct

THE COURT: Okay.

Q So that is a little closer than you actually were?

A Yes, sir.

Q Okay.

And I believe you indicated that when the body was turned over you also saw wounds to the upper torso, is that correct?

A Yes, sir.

MR. CRABTREE: Your Honor, I would ask to mark this as exhibit five for identification.

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit five for identification and ask if you recognize that photograph?

A Yes, sir.

Q And what does that photograph show?

A It shows numerous slashes and lacerations on the front of the body.

Q And does that accurately depict what you saw when this body was turned over there at the scene?

Rector - direct

A Yes, sir.

MR. CRABTREE: Ask to file this as exhibit five.

THE COURT: Yes, sir. That will be exhibit five.

(Exhibit 5 marked and filed.)

Q Approximately what time was it that you got to the scene out there, if you recall?

A Between 8:00 and 8:30 in the morning.

Q And how long were you there?

A Two, three hours.

Q On this date and in this location were there any other female bodies that were found in that area?

A No, sir.

Q And none with their throats cut or anything, a head had been bashed in or anything?

A No.

Q That's the only one you know of in that area at that particular time?

A Yes, sir.

Rector - direct

Q And where we are talking about there, that is within the confines of Knox County, Tennessee, is it not?

A Yes, sir.

MR. CRABTREE: Pass this witness.

And we would ask that these exhibits be passed at the conclusion of the cross-examination.

THE COURT: Yes, sir.

Mr. Talman?

MR. TALMAN: Thank you.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Good morning, Officer Rector.

A Good morning.

Q Now you said you did not receive a call but that you were directed to this area of the U.T. campus.

A I, specifically, was not assigned the call.

Q Okay.

How were you directed to this

Rector - cross

area?

A I overheard the call being dispatched to another KPD unit.

Q Okay.

So, it wasn't somebody flagging you down or anything?

A No, sir.

Q Then you say when you got there, I take it you were the first Knoxville Police Department officer on the scene?

A As far as I know, yes, sir.

Q Okay.

And when you arrived at the scene, as I understood your testimony you secured, with the help of Officer Johnson from the U.T. Police Department, secured the crime scene? Correct?

A Yes, sir.

Q All right.

Now, you said this area was about one hundred and twenty feet in length by about fifty to sixty feet wide.

A Estimating, yes, sir.

Q Okay.

Rector - cross

Did you measure that area?

A I, myself, did not.

Q Okay.

So, it is just an estimate?

A Yes, sir.

Q Okay.

All right.

And then you said when you arrived there there were, in addition to yourself and Officer Johnson, there were some other people there, civilian type people?

A Yes, sir.

Q Do you know approximately how many people were there?

A Four or five, a small group.

Q A small group?

A It wasn't a large crowd.

Q Where were they located?

A Ah, probably within, ah, fifteen to twenty feet from where the body was found.

Q Okay.

And they were just standing there looking at the body?

Rector - cross

A Yes, sir.

Q Okay.

So, essentially, your function at this scene was just to help secure the scene and preserve it until the investigators or detectives arrived?

A Yes, sir.

Q Okay.

You didn't, ah, actually do anything with the body yourself did you?

A No, sir.

MR. TALMAN: No further questions, Your Honor, of Officer Rector.

And we have no objection to him being excused.

Thank you, sir.

THE COURT: Thank you.

Any other questions, General?

MR. CRABTREE: No, we just ask that the exhibits be passed.

THE COURT: All right.

If you will go ahead and pull out the correct exhibits to be passed, I believe they would be four and five.

Thank you, Officer Rector.

You are excused, sir.

(Exhibits 4 & 5 passed to the jury.)

THE COURT: Counsel, would you approach the bench for just a moment?

BENCH CONFERENCE

(Whereupon, timing was discussed at the bench.)

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, ah, we have been moving along fairly well this morning.

And based upon what the Attorneys tell me about some of the length of testimony of some of the other witnesses--it is a quarter till 12:00--and what I am going to do at this time, don't jump up yet, is take a lunch recess and let you all go out and get something to eat and come back and we will hear some more testimony this afternoon.

We will probably not work terribly late this afternoon because we have moved along fairly well.

We have a certain number of witnesses that were called and asked to come today. and I am not going to go and round them up this afternoon.

You all are going to need a little bit of a, a weekend as well.

So, ah, before you go, the officers have made some arrangements for you to go get something to eat.

Understand you may not discuss this matter amongst yourselves. You may not attempt in your own mind to deliberate about this case. You have certainly not heard all the evidence, and you are not ready to do that.

You have not heard the Court's instructions as to the law.

Kind of set it aside and don't have any contact with anyone.

Stay with the officers. Please do not pick up newspapers or watch television should you have that opportunity wherever it is you are going.

And we will be ready to begin as soon as you are back in the courthouse, about 1:00 or 1:15, whenever you are ready we will be ready.

Thank you.

You may go to lunch.

(Whereupon, the jurors left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Anything else anyone would like to take up before we take a recess?

MR. CRABTREE: Not from the State, Your Honor. No, one thing I do.

I have a chart here. Can I go ahead and mark this for identification and leave it here?

THE COURT: Sure.

Also, I have ordered a tripod but haven't gotten it yet.

MR. CRABTREE: We brought one.

THE COURT: Okay.

Court is in recess until the jury returns which should be around 1:00 to 1:15.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Okay.

Are we doing okay with where we are at here?

Are you ready to begin?

MR. CRABTREE: We just wanted to advise the Court that, ah, we have probably two more witnesses that are going to be available this afternoon.

THE COURT: Are they available now?

MR. CRABTREE: Yes. They are available now.

THE COURT: Okay.

MR. CRABTREE: And we are not making any effort to call any additional people if that is okay with the Court.

THE COURT: That's fine with me.

Any problem--you all--are there still things that you need to review or go over together or separately that you--

MR. CRABTREE: Those can't be

done this afternoon.

THE COURT: There will be some things to do?

MR. CRABTREE: There will be certain things.

THE COURT: While we are on this subject. Monday morning I've got to deal with, I think, a couple of cases, a couple of jail cases that will take me about two minutes, three minutes to deal with. And then we will be ready to go at 9:00 or close to 9:00, as soon as you are.

MR. CRABTREE: The officer who is, ah, we are going to be putting on, ah, we probably would have put on this afternoon, is the officer who has to go pick up his stuff that we have not received.

He is going to go and take that up and bring it back Monday.

And we don't think that we can put him out without having that available. That is one reason we don't want to go any further tonight.

THE COURT: Okay.

MR. CRABTREE: And Counsel

obviously needs to see that before we put it on.

THE COURT: But he won't be the next witness Monday? We don't have to wait for him to get that?

MR. CRABTREE: We will substitute somebody else so we won't have to wait, sure.

THE COURT: That's fine.

MS. HELM: I think he will be here sometime Monday. But definitely not at the beginning.

THE COURT: Well, that's all right.

But I'm saying, we are not going to wait until he arrives, are we?

MS. HELM: Oh, no.

THE COURT: Okay.

Are we ready to bring the jurors back?

MR. CRABTREE: The State is ready.

MR. TALMAN: The Defense is ready, Your Honor.

THE COURT: Okay.

(Whereupon, the jury returned

to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ladies and gentlemen, as I told you, we are going to go forward with some proof this afternoon. We are not going to go very late.

I think all of us, including you, could use a little bit of a break and a little bit of a weekend.

And, so, if you are ready we are ready to proceed with some further proof today and then we will be, at the close of what we are going to do today we will be adjourning for Monday.

And I will explain to you what we are going to do at that point as soon as possible.

MR. CRABTREE: This witness has not been sworn, Your Honor.

THE COURT: All right.

(Whereupon, Mr. Cook was so sworn.)

DONALD R. COOK, having been

Cook - direct

duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Sir, would you please state your name for the Court and jury, please?

A My name is Donald R. Cook.

Q And what is your occupation?

A I'm a detective for the University of Tennessee Police Department.

Q Okay.

How long have you been with the University of Tennessee Police Department?

A 28 years, sir.

Q Sir, I would ask you, if you would, to recall your attention to the 13th day of January, 1995, and I will ask if on that date were you employed by the University of Tennessee Police Department?

A I was, sir.

Q And in what capacity at that time?

A At that time I was a patrolman.

Cook - direct

Q And in your capacity as a patrol officer with the University of Tennessee Police Department did you have an occasion to go to a location on the Agricultural campus in the morning of the 13th?

A Yes, I did.

Q And why did you go there?

A I received a radio transmission, ah, that a body had been reported, ah, near the bike trail on the Ag. campus, and all units were dispatched to that area.

Q At approximately what time did you arrive there?

A Approximately 8:20.

Q And you say this is on the Ag. campus at the University of Tennessee?

A Yes, sir.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit six for identification, and ask if you can tell the Court and jury what that is?

A Okay.

Cook - direct

This is a map of the Agriculture campus on Neyland Drive.

Q Okay.

A Near Alcoa Highway.

Q And does this show basically the way the Agriculture campus was laid out as of the 13th day of January, 1995?

A Yes, sir, with the exception of, ah, one road, driveway.

MR. CRABTREE: May I approach?

THE COURT: Yes, sir.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit six to this officer's testimony.

THE COURT: Could we let Mr. Talman see it?

MR. CRABTREE: Yes. I'm sorry.

THE COURT: Okay.

MR. CRABTREE: And, Your Honor, if I may bring the tripod up to put this on?

THE COURT: Yes, sir.

MR. CRABTREE: And I would ask

Cook - direct

the witness to come down to the tripod.

THE COURT: Okay.

That will be exhibit six.

And, Mr. Cook, if you want to come down.

(Exhibit 6 marked and filed.)

Q Now, I would ask you, in referring to exhibit six, if you would take this pointer and point on this map to the area where the body was located?

A Yes, sir. This area right here.

Q Okay.

You are indicating an area between the power plant.

What is this line that comes around right here?

A That's a creek.

Q Okay.

That is Third Creek?

A Yes, sir.

Q You are pointing to an area between the power plant and Third Creek, is that right?

Cook - direct

A Yes, sir.

Q Okay.

And if I may have a marker from the court reporter?

If you would, why don't you take this red marker and just put an X there in the area that you are referring to as where the body was found?

A Okay.

Q Okay.

And you have put a red X which marks the general area of where the body was located, is that correct, sir?

A Yes, sir.

Q All right.

Now, there does not appear on this map to be a road that shows how to get there.

Would you take this pointer and show the way that you get through there?

If you will step around a little bit so that the jurors over here can see?

THE COURT: If any of you can't see feel free to stand up and look.

MR. CRABTREE: Now, Your Honor,

Cook - direct

I am going to have him draw in everything he has testified to.

THE COURT: Okay.

MR. CRABTREE: So they will have the opportunity to see it.

THE COURT: Okay.

A It is not a street like these other streets. It is kind of an access road used by University vehicles to get into certain areas.

It starts right here in this area, runs through here near this building, ah, through this open area right here to, ah, roughly this area right here.

At that point a paved portion of it goes down to the bike trail which runs along this creek.

There is a gravel portion that runs up to these greenhouses and then back up to this other parking lot.

Q Why don't you take this blue marker and just rough in the area where this road that you are referring to, ah, is?

A Okay.

Q Okay.

Cook - direct

The blue that you have drawn in, that marks the road that we are referring to, is that correct?

A Yes, sir.

Q Okay.

And I also believe that the bike trail comes through there somewhere, too, is that right?

A Yes, sir.

Q And, ah, where does that come through?

A Okay.

It generally follows this creek. It comes from Tyson Park. It goes around this--it comes up underneath Cumberland Avenue, follows this creek here and round, all the way along the creek and ends up out here on Neyland Drive.

Q Why don't you take this green marker and just draw in the bike trail?

A Okay.

Q Now, if you would, would you please take, ah, the pointer here and point to Neyland Drive?

Cook - direct

Okay.

And Alcoa Highway?

Okay.

And Tyson Park?

All right.

And the main campus of the University of Tennessee? I think there is a portion of it up there.

A Yes.

MR. CRABTREE: Now, if we may, Your Honor, if I could take this and move back before the jury and have him point out the individual things at each end maybe everyone can see it better.

THE COURT: Okay.

Q Just come over here with me.

Now, the green represents what?

A Ah, the bike trail.

Q And the blue represents what?

A An access road, partially paved, some of it gravel.

Q And the red X?

A That is where the body was

Cook - direct

found.

It wasn't actually on the trail but that is the general area.

Q And, again, the green represents?

A The bike trail.

Q And the blue line?

A The access road.

Q And the red X?

A That was where the body was found.

THE COURT: Would you turn it around?

MR. CRABTREE: I'm sorry, Your Honor.

THE COURT: Show me the red X. Oh, there it is.

Okay.

Thank you.

MR. TALMAN: Your Honor, could we have just a moment so Ms. Martin and Ms. Pike could see that, also?

THE COURT: Yes, sir.

Go ahead, General, when you

Cook - direct

are ready.

Q At approximately what time did you arrive at the location that you marked with the red X, where the body was found?

A At approximately 8:20.

Q Okay.

And at the time that you arrived there were there other persons there?

A Ah, two other police officers, Officer Johnson, from the University of Tennessee Police Department and Officer Rector, of the Knoxville Police Department.

Also, had about five, ah, University employees.

Q You are talking about civilian employees?

A Yes, sir.

Q Okay.

And what were Officer Rector and Officer Johnson doing, if you recall?

A Ah, they were moving these employees back away from the body, and had started them up the street toward where my car was parked.

I parked about, probably about

Cook - direct

five or six car lengths away from the body.

Q And would you describe what you saw as far as where the body was located and how it appeared?

A Okay.

Ah, this particular area is used for storage a lot of times.

Ah, in the area where the body is there were piles of dirt and, ah, things like that that they had used during excavation that were left over and they just dump them there.

And then at a later date if they need some fill dirt they go back down and picked it up.

There was, ah, a young white female laying on one of those piles of dirt.

Q And describe how she appeared.

A Ah, a young white female. She was laying with her feet uphill on a pile of dirt. Her feet were facing towards the east.

She had on a pair of blue jeans and white tennis shoes.

She was nude from the waist up.

Cook - direct

I recall a gold chain around her neck and also a piece of cloth of some sort around her neck.

Q Did you observe any injuries to her body?

A Yes, sir, I did.

Q And what injuries did you observe?

A Ah, cuts, cuts all over the back. Ah, she was laying mainly on her stomach but she was turned slightly to the right, to her right, and you could see part of her chest and you could also see cuts there.

She was covered with blood from her waist to her head.

Ah, there was a lot of damage to her head.

Q You indicated that her feet were uphill and her head was downhill, is that correct?

A Yes, sir.

Q Now, what did you do as far as the role that you performed when you got to the scene?

Cook - direct

A Okay.

When I got to the scene, ah, Johnson had already got the, ah, crime scene tape out of the trunk of his car.

I took the employees back up the hill to where my car was.

And he and Rector started roping off the crime scene.

MR. CRABTREE: May I approach, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit one and ask if you recognize that photograph?

A Yes, sir.

Q And what is that?

A That is the body we found in this location we were talking about.

Q Does that accurately depict the area that you referred to there, the location and position of the body when you saw it on the 13th day of January of 1995?

A Yes, sir, it does.

Q And I will show you what has

Cook - direct

been marked as exhibit two and ask you if you recognize that?

A Yes, sir.

Q And what does that photograph show?

A That is a picture of the body that we found at that location.

Q And likewise, does that accurately depict the way it appeared to you, the wounds and so forth that you described to the jury that you observed when you arrived at the scene?

A Yes, sir.

Q And the blood that appeared on the body, that is the way it was at that time?

A Yes, sir.

We didn't touch it.

Q Now, you indicated that you moved these other people back.

And what did you do after that, sir?

A I got, ah, names, addresses, information we might need from each person and tried to ascertain, ah, why they were in that area.

Cook - direct

Q And were you there when the body was actually moved?

A Yes, sir.

Q And did you go with it when it was taken from the scene?

A Yes, sir, I went to the hospital.

Q Went where?

A Went to the morgue at U.T. Hospital.

Q The morgue at U.T. Hospital?

What did you do there at the morgue?

What was your role there?

A Mainly, I just went with the body until some Criminalistics people from KPD got there because I didn't want to leave it alone.

Q So, sir, you were staying with the body, that was the role you performed?

A Yeah.

Q When the body was turned over did you notice any injuries to the front part of the torso?

A Yes, sir.

Cook - direct

Q What injuries did you observe to the front part of the torso?

A A lot of cuts, ah, especially around the neck. There was a large cut on, on the throat area.

Q Now, when you went to the hospital was the body cleaned up while you were there?

A No, sir.

Q Did you stay there for a while and then leave?

A Yes, sir, I stayed there while, ah, ah, Crenshaw from KPD Criminalistics, ah, fumed the body and while he took prints from the victim, fingerprints.

Q Now, what do you mean by fuming the body?

A Ah, it is a process where you use, ah, fumes off of super glue to go over the body--

MR. TALMAN: Your Honor, I am going to object unless he has some qualification as an expert in this area.

MR. CRABTREE: He can testify

Cook - direct

what he was doing. This is an investigator. He has testified to that. He is a detective and he has testified as to what he--

MR. TALMAN: His testimony about the actual procedure.

THE COURT: He can't testify as to results, but he can testify as to what he observed happened, I guess.

Q What did you observe?

A Okay.

These fumes are, are, ah, blown over the body and, ah, they, ah, raise fingerprints where somebody may have touched the body.

Q And that is the process that you were referring to as to fuming the body?

A Yes, sir.

Q Then did you leave after that?

A After they took the, ah, after Crenshaw took the fingerprints from the victim. I left at about somewhere between 11:30 and 12:00.

And did you have an occasion to go back later?

A Yes, sir.

Cook - direct

Q And at the time that you went back, about what time was that?

A Ah, about 3:00 o'clock, 3:00 P.M. in the afternoon.

Q And did you see the body again?

A Yes, sir.

Q And was this the same body that you had gone to the morgue with earlier?

A Yes, sir.

Q And had anything changed as far as the condition of the body?

A Yes, sir.

Q What had changed?

A They had cleaned her up somewhat. Washed the blood off.

Q And as a result of this change did you see anything that you hadn't observed earlier?

A Yes, sir.

Q And what was that?

A I saw a design cut into her chest.

Q And would you describe the

Cook - direct

design?

A The design was a five pointed star with the one point down two points up in a circle.

Q Now, you had seen the chest part earlier, is that correct?

A Yes, sir.

Q Could you see that design earlier?

A No, sir, too much blood.

Q Pardon?

A Too much blood.

MR. CRABTREE: I would ask that this be marked as exhibit seven for identification.

THE COURT: Yes, sir.

MR. CRABTREE: And may I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q Sir, I will show you what has been marked as exhibit seven for identification.

If you can tell the jury what that is?

A Yes, sir.

Cook - direct

That's the marks we were just talking about, the five pointed star within the circle.

Q And does that photograph accurately depict the way it appeared when you went back to the hospital here on the 13th day of January of 1995?

A Yes, sir, it does.

MR. CRABTREE: Your Honor, I ask to file this as exhibit seven.

THE COURT: It would be exhibit seven.

(Exhibit 7 marked and filed.)

Q And how long did you stay at the hospital this time?

A Probably about a half hour.

MR. CRABTREE: Pass this witness for cross-examination.

And we ask that the exhibit be passed to the jury upon finish of the cross-examination.

THE COURT: All right.

CROSS-EXAMINATION

BY MR. TALMAN:

Cook - cross

Q Detective Cook, how long have you been a detective?
A About a year.
Q About a year?
As you said, you were a patrol officer at this time?
A Yes, sir.
Q Okay.
Now, did you actually help remove this body from the location?
A No, sir.
Q Do you know who done that?
A Ah, a couple of guys from the ambulance service were the ones that loaded it up and moved it. Criminalistics were there when they moved it.
Q Okay.
So Criminalistics didn't actually move it?
A I don't recall.
Q Okay.
Did you actually watch the body as it was being moved? Watch them move it?
A No, sir.

Cook - cross

Q Okay.

Did anyone else accompany the body besides you?

A Yes, sir, one of the medical examiners.

Q One of the medical examiners?

A I rode to the hospital with the medical examiner.

Q Okay.

Who was that?

A May I consult my notes?

Q Certainly.

I would like to look at the notes if you are going to consult them to refresh your recollection.

MR. CRABTREE: Your Honor, he has asked him to consult them. I don't know if he is entitled if he asked him to do it.

MR. TALMAN: Your Honor, he has got a--

THE COURT: You want to see the notes?

MR. TALMAN: Yes, I would.

THE COURT: Well, come on up

Cook - cross

and approach the witness.

A It was Dr. Gary Lethco.

THE COURT: All right.

The witness has testified that Dr. Gary Lethco was the name of the medical examiner.

Q Was there anybody else with you besides you and Dr. Lethco?

A No, I rode with him in his vehicle.

Q Okay.

So was the body transported in his vehicle?

A No, sir, in the ambulance.

Q An ambulance?

All right.

So were you actually with the body?

A No, sir.

Q Okay.

So who actually had the body?

A The ambulance service.

Q Okay.

Do you know who that was?

Cook - cross

A No, sir, I don't recall the name.

Q Okay.

So you were not actually in the ambulance with the body?

A No, sir.

Q Okay.

And you followed it back to the hospital?

A Yes, sir.

Q Did you ever lose sight of it?

A No, sir.

Q Okay.

All right.

And then it went straight to the hospital into the morgue?

A Yes, sir.

Q Okay.

Now, this fuming the body you were talking about, who was actually doing that?

A Ah, Crenshaw, of the Knoxville Police Department.

Q Officer of Criminalistics?

A Dan Crenshaw, Criminalistics.

Cook - cross

Q Dan Crenshaw?

A Yes, sir.

Q Okay.

Then you also said that, ah, they had cleaned the body up somewhat.

Who was they?

A I would assume the medical examiners or the city officers that I left with it when I left it around 12:00.

Q Okay.

So you actually left the morgue?

A Yes, sir.

Q And did not see them clean the body up?

A No, sir.

Q Okay.

And then you had a chance to come back down there?

A Yes, sir.

Q Okay.

Why did you leave?

A Because there were people there to take care of the situation. And that way

Cook - cross

none of the evidence would be disturbed.

Q Okay.

A Because they were there to gather evidence.

Q Pardon me?

A The Criminalistics were there to gather evidence from the body.

That was my reason for going to the hospital to see that nobody disturbed any evidence that might be connected with the body.

Q Okay.

I understand that.

I'm talking about at the hospital.

You say "they" cleaned her up.

I was asking who they were?

And you said you assumed the medical personnel.

A That's the people I left--

Q That's who you left the body with?

A With Criminalistics and, and, ah, ah, the, ah, medical examiners.

Q Okay.

Cook - cross

Did you actually leave the hospital after that?
A Yes, sir.
Q Where did you go?
A I went back to my office.
Q Okay.
Which was?
A University of Tennessee Police Department, 1115 U.T. Drive, on the main campus.
Q Do you recall about what time of the day that was?
A Probably around 12:00, noon.
Q All right.
Then, now, you have testified about this photograph.
Did you go back to the hospital?
A Yes, sir.
Q Why did you go back?
A We had, ah, during the period when I went back to my office we had, ah, a lot of missing person calls when word got out about this body.
And we were having to run

Cook - cross

these calls down and locate people, ah, to determine that they weren't the victim.

Q All right.

So you went back to do other matters?

A Ah, yes, sir.

Q All right.

What I was asking was, why did you go back to the hospital after you completed what you were doing at your office?

A One of these missing person calls, a lady had called in--

Q Okay.

I'm not asking you what somebody said. I'm asking you why you went back.

You went back to your office?

THE COURT: I think he is trying to answer that. Let the witness answer the question.

A We took, we took a lady over there to view the body. She thought it might be her sister. She had mentioned something in her complaint to us about a small mole in the abdominal area that her sister had.

Cook - cross

And I recalled that the victim had a mole on her stomach.

Q Okay.

Did this lady look at the body?

A Yes, sir.

Q And was this her sister?

A No, it wasn't.

Q Okay.

So, you were taking somebody back over there to see if this was their relative?

A Yes, sir.

Q Okay.

All right.

If I could have just one moment, Your Honor?

A Yes, sir.

Q No further questions.

Thank you, Detective Cook.

MR. CRABTREE: A couple of questions if I may?

REDIRECT EXAMINATION

BY MR. CRABTREE:

Q The body that you saw there

Cook - redirect

behind the power plant, there at U.T., was that the same one that you followed to the hospital?
A Yes, sir.
Q And when you got to the hospital was the same body still in the ambulance?
A Yes, sir.
Q And then when you left and came back later on and saw the body cleaned up, was that the same body you had seen at the scene and seen at the hospital earlier?
A Yes, sir, it was. There were certain wounds on that body that I could identify even if it had been cleaned up.
Q And what wounds are we referring to?
A The throat wounds and the injury to the head.
Q You did not have any question it was the same person?
A No, sir.
Q Thank you.
MR. TALMAN: No further questions.
THE COURT: May the witness be

Cook - redirect

excused to leave the courthouse?

MR. TALMAN: No objection.

THE COURT: Thank you, sir. You are free to go.

MR. COOK: Yes, ma'am.

MR. CRABTREE: Your Honor, if we may, we would ask at this time if we could go ahead and publish both exhibit six and exhibit seven?

THE COURT: Yes, sir.

Go right ahead.

(Exhibits 6 and 7 to the jury.)

THE COURT: while that is going around do you all want to approach the bench for just a minute for some planning purposes here?

BENCH CONFERENCE

(Whereupon, a bench conference was had concerning timing.)

END OF BENCH CONFERENCE

THE COURT: Would you raise your right hand to be sworn?

(Whereupon, Mr. Roberts was so sworn.)

LARRY ROBERTS, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Would you please state your name for the Court?

A I'm Officer Larry Roberts.

Q And what is your occupation, sir?

A I'm a police officer with the City of Knoxville Police Department.

Q And how long have you been employed in that capacity?

A Since November the 11th, 1974.

Q Sir, if you would, I would ask you to recall back to the 13th day of January, of 1995, and ask you if on that date you were working with the City of Knoxville as a police officer?

A Yes, sir, I was.

Q And were you a patrol officer?

A Yes.

Roberts - direct

Q And what area of the town were you responsible for patrolling at that time?

A The general U.T. area, Alcoa Highway.

Q And did you receive a call?

A Yes, sir, I did.

Q And did that call direct you to go to a location?

A Yes.

Q And where were you to go?

A Ah, off the Ag. campus of the U.T. property, ah, adjacent to some railroad tracks and a bike trail.

Q Were you familiar with the area that you were being dispatched to?

A Yes, sir.

Q And why were you familiar with that particular area?

A I rotate shifts and I patrol that mornings, afternoon, and nights, and I travel that area sometimes at night.

Q Why don't you describe to the jury this area, where it is located, exactly, and how it appears there?

Roberts - direct

First, let's start out, where are we talking about, as far as this area being located?

A It's, the general area is, ah, from Neyland Drive, ah, northeast toward the railroad tracks and south of Kingston Pike.

Q And in relationship to the bike trail, is this where the bike trail runs through?

A The bike trail originates from Tyson Park and travels in a southerly direction, ah, along those railroad tracks to the south side of Kingston Pike.

Q And is there a creek through there?

A Yes, sir.

Q And which creek are we talking about?

A I think that is Second or Third Creek.

Q Third Creek?

A Yes, sir.

Q Now, what is that area like as far as the terrain and the foliage?

Roberts - direct

A It is hilly and there's a lot of scrub trees and, ah, scruff grasses and, ah, a gravel roadway and embankments.

Q Any dwellings or anything in this particular area?

A No, there's some buildings that belong to U.T. property, some, ah, maintenance buildings there.

Q And how about the lighting in the area at night?

A There is hardly any lighting at night.

Q And, ah, why do you patrol this area at night if there is nothing in it?

A Well, it is a secluded area and, and people sometimes like to go to secluded areas.

MR. TALMAN: Your Honor, I object to what some people sometimes like to do.

Q A secluded area is sufficient.

THE COURT: Okay.

MR. CRABTREE: Thank you.

Q So, you knew where you were going to, is that correct?

Roberts - direct

A I didn't--

Q You knew the general area?

A Right.

I knew the general area I was going to.

Q Now, when you arrived there, and about what time are we talking about?

A It was around ten after 8:00.

Q What did you see when you got there?

Were there any kind of officers there?

A Yes, sir. There was, ah, I think, a couple of U.T. officers there and one KPD officer.

Q Who was the KPD officer, do you know?

A It was a motorcycle unit, Bob Rector.

Q And, ah, do you, ah, recall, ah, who the U.T. officers were?

A I don't recall their names. I know their faces.

Q What else did you see when you

Roberts - direct

got there?

A When I arrived I saw those, the police cars that were already there.

As I drove down that narrow roadway, I didn't want to get trapped in that area, so I didn't go directly down to the scene. I parked back about thirty yards and off to the side of the road and exited my car and walked down to that area.

Q And what did you see when you got into the area that attracted your attention, if anything, there?

A Well, the other officers were there and Officer Rector was attempting to secure the crime scene and pointed me in the direction of where the body was and I walked to where I could see and walked over there to survey the crime scene and I did observe the body of a white female.

Q Did you touch the person, the body, or anything?

A No, sir, I didn't.

Q And what did you observe about this body of this white female?

Roberts - direct

A My first observation was that this was a lifeless white female that was suffering some serious wounds.

Q And what area of the body were the wounds to, could you tell?

Did you get that close?

A The most obvious that I could see was directly on her back and the head area.

Q And, ah, do you recall anything about her dress?

A Well, she only had on, ah, pants. She was nude from the waist up.

Q So once you made this observation what did you do then?

A Okay.

My, I turned my attention to survey the area around me and behind me.

And, ah, just to look at the scene for any type of evidence or anything there.

Q And what did you observe?

A I saw a large puddle of blood in the roadway. And, ah--

Q How far was this puddle of blood from the body, if you know?

Roberts - direct

A I would guesstimate, about thirty feet.

Q Okay.

Go on.

What else did you observe?

A And then my concern came to securing the crime scene. So, I walked back up the trail which would have been the major entrance to anybody else coming in, toward my car, and, ah, to make sure that no one else entered that area without me knowing about it and, ah, made preparation to start an initial preliminary investigation report.

Q And that was your role as far as this incident?

A Right.

I made a log of the people who came and went from there.

I summoned, ah, the, ah, paramedics to come and stand by and the investigators to come and crime technicians.

Q And when they came you checked them in and took care of that?

A Right.

Roberts - direct

I logged the time that they arrived.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has previously been marked as exhibit six and would point you to this general area around here, in the vicinity of the red X.

Is that the area that we are talking about, that you have been testifying about?

A Yes, sir.

That was the general area where the body was.

Q Thank you.

MR. CRABTREE: Pass this witness.

MS. MARTIN: No questions.

And he may be excused as far as we are concerned.

THE COURT: Thank you, sir.

MR. ROBERTS: Yes.

THE COURT: General, I take it

that this is the number of witnesses that you had originally gathered for today?

MR. CRABTREE: That is correct, Your Honor, without making phone calls and whatever to try to bring some more people in here at this particular time.

We will comply with the dictates of the Court.

THE COURT: Do you all want to approach the bench for a minute, please?

BENCH CONFERENCE

(Whereupon, a bench conference was had concerning timing.)

END OF BENCH CONFERENCE

THE COURT: All right.

Ladies and gentlemen of the jury, ah, it would take quite some time to bring another witness in, and we are all tired, and I think we all need a break.

I am going to adjourn therefore after you have left until 9:00 o'clock

on Monday.

I have to do a few things with a couple of other cases and I will be ready to begin this trial again at 9:30.

So, will you all be here and ready to do that at 9:30 on Monday morning?

Ladies and gentlemen, again, you have not heard all the evidence. You have not heard the Court's instructions.

Do not attempt to make any decisions in your own mind about this case.

You are not to deliberate with each other or, ah, or allow anyone to discuss this matter with you.

Do not read local or national newspapers.

Do not watch local or national television news.

If you all want to watch the ball games it's okay. They are real good.

Please, ah, stay with the officers and again if you have any kind of problems please let us know.

And unless there is something else, Counsel, I am going to release the jury for

the afternoon.

MR. CRABTREE: The State has nothing else at this time, Your Honor.

MR. TALMAN: The Defense has nothing.

THE COURT: Okay.

Thank you, ladies and gentlemen.

Have a good afternoon, and we will get started Monday and do a good day's work.

Thank you.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Counsel, is there anything we need to take up or can take up to make things go a little smoother come next week?

MR. CRABTREE: I can't think of anything. I would advise the Court that we are going to go ahead, and we will try to have everyone else lined up before Monday so we can move right straight through.

THE COURT: Okay.

I don't exactly know how much

longer you anticipate your evidence to take, but certainly, Mr. Talman, you need to do what you need to do to get whatever witnesses you want to call together so we can--

MR. CRABTREE: Well, obviously, we didn't predict very well today.

THE COURT: No, we didn't.

But it went fairly smoothly, so, ah, if there is nothing else to take up Court is adjourned until 9:00 Monday, March 25th.

MR. TALMAN: Thank you, Your Honor.

COURT ADJOURNED AND RECONVENED AT 9:00 A.M. ON MARCH 25TH, 1996.

THE COURT: Okay.

The jury is here and they are ready to proceed.

Is there anything we need to take up before bringing them back?

MR. TALMAN: Briefly, Your Honor.

Your Honor, it is our understanding, I think, that Dr. Elkins is the next witness to testify.

And we have an objection to

her testifying in this case because according to her autopsy report she did not identify this body as being that of Colleen Slemmer.

And there is no witness on the indictment that did make this identification.

According to the autopsy protocol the identification was made by two dentists who are not listed as witnesses.

MR. CRABTREE: Your Honor, I assume, if we don't prove the person who was killed is Colleen Slemmer then the Court will not let this case go to the jury.

But as the Court is well aware in the proof of a case you have to start somewhere.

And, hopefully, from the time we get through we will have proven everything required of us.

MR. TALMAN: Well, Your Honor--

MR. CRABTREE: The fact that she has not specifically identified this person by herself at this time does not preclude her testimony.

MR. TALMAN: Well, Your Honor,

we would, ah, note the objection for the record, and we also note the objection as to Dr. Elkins referring to this body as that of Colleen Slemmer until it is identified, for the record, we just--

MR. CRABTREE: Your Honor, if I may, I think that it would be appropriate, if I can refer to, ah, the person that she did the autopsy on as identified to her as Colleen Slemmer.

She will not say it is Colleen Slemmer.

THE COURT: I think it would be appropriate for you to point out that she made no identification and, ah, I think that would be appropriate for the jury to understand.

Obviously, the General is right, Mr. Talman. If he doesn't prove this is Colleen Slemmer then the indictment fails and, ah, and he needs to do that prior to the close of his proof and tie everything together.

MR. TALMAN: Certainly, Your Honor.

THE COURT: Your objection is noted for the record.

In the event of his failure to

prove that--I think it needs to be made clear to the jury that Dr. Elkins did not identify, ah, Ms. Slemmer, and, ah, or did not identify the decedent as Ms. Slemmer.

And, obviously, that will have to be done at a later time.

But since she did perform the autopsy on the body that we have been talking about now for a day, ah, I think she can fairly testify as to what she found.

MR. TALMAN: Certainly, Your Honor.

We just felt it was, that we needed to raise the objection timely.

THE COURT: I think the objection should be reserved for a later ruling.

MR. TALMAN: Certainly.

THE COURT: And if you want to reraise it at the appropriate time.

MR. TALMAN: Thank you.

THE COURT: Okay.

Is there anything else we need to take up before we bring the jury in?

MR. CRABTREE: The State is ready.

MR. TALMAN: The Defense is ready, Your Honor, for the jury.

THE COURT: All right.

Go ahead and send for the jury, please.

Oh, one other thing before the jury comes in.

No one ever asked for the rule in this case, did they?

MR. TALMAN: Yes, Your Honor, we did it pretrial.

MR. CRABTREE: It was asked for originally.

THE COURT: And would you please check because I don't know who your witnesses are.

We haven't sworn witnesses. I just want to make sure there are no witnesses in the courtroom.

MR. TALMAN: I think the only witness here is Dr. Elkins and she is about to be called.

THE COURT: Well, Dr. Elkins is here ready to testify, but that's all right.

Are we ready to bring in the

jury?

MR. CRABTREE: The State is ready.

MR. TALMAN: The Defense is ready.

THE COURT: Thank you.

Go ahead and bring in the jury.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties, the following proceedings were had, to-wit:)

THE COURT: Good morning, ladies and gentlemen.

I hope you have had a restful Sunday.

And if you are ready to commence with the continuation of the proof in this case we are ready to begin.

General, call your next witness.

MR. CRABTREE: The State would call Dr. Sandra Elkins.

Elkins - direct

(Whereupon, Dr. Elkins was so sworn.)

SANDRA K. ELKINS, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Would you please state your full name for the Court?

A Sandra K. Elkins.

Q And what is your occupation?

A I am director of Autopsy Services and Forensic Pathology at the University of Tennessee. And I also serve as the Knox County Medical Examiner.

Q How long have you been in that capacity at the University of Tennessee?

A Since July of '94.

Q And how long have you been the Knox County Medical Examiner?

A Since the end of May, '95.

Q And, Dr. Elkins, what type of doctor are you?

A I am a M.D., a medical doctor.

Q And where did you obtain your

Elkins - direct

degree?

A At the University of Tennessee College of Medicine in Memphis.

Q And when was that?

A 1987.

Q And your undergraduate degree?

A I obtained that in 1983 from the University of Tennessee at Chattanooga.

Q And what was your undergraduate degree in?

A I got bachelor degrees in biology and chemistry.

Q Now, upon the obtaining of your medical degree did you do a residency?

A Yes.

Q And what did you do a residency in?

A I did two years of post-graduate training in the fields of general and trauma surgery at the University of Tennessee Unit in Chattanooga.

I then did three years of training in anatomic pathology at the University of Tennessee, Memphis.

Elkins - direct

I then did a year's training in the field of forensic pathology also at U.T., Memphis.

Q Are you board certified?

A In the field of anatomic pathology, yes.

Q And are you board qualified in the field of forensic pathology?

A Yes.

Q Okay.

Would you please tell the jury what a pathologist does?

A Pathology simply means the study of disease.

Obviously, disease can take many forms, with traumatic injuries being one form of injury to the human.

Q And what does the pathologist hisself, do, as far as studying these diseases?

What type, how is that done?

A Well, there are various types of pathologists.

There are pathologists that, when, if you have a biopsy taken in surgery, there

Elkins - direct

are pathologists called surgical pathologists that look at that and tell you whether or not it is cancer.

There are cyto pathologists who look at pap smears, individual cells, to see if they are cancerous.

Q And what type of work have you specifically done?

A Forensic pathology.

Q And what does forensic pathology consist of?

A Well, as I said, pathology is the study of disease. And forensic pathology, forensic means basically of or pertaining to the law.

So a forensic pathologist basically studies those deaths that are considered suspicious and that there is some legal interest in.

Q And is one way that you perform this study is through the performance of autopsies?

A Yes.

Q And have you performed

Elkins - direct

autopsies?

A Yes.

Q And how many are we talking about, roughly?

A Roughly, between six and seven hundred.

Q And through those autopsies what information are you usually trying to obtain?

A Well, obviously, the one thing you want to find from an autopsy is the cause of the person's death.

But in addition, it is a very systematic study of the entire human body.

And you, also, discover any coexisting disease processes.

Q And do you, as part of this, also attempt to determine if there is evidence that shows what may have caused the actual cause of death?

A Yes.

MR. CRABTREE: Your Honor, at this time we would offer Dr. Elkins as an expert in the field of anatomical pathology and forensic pathology.

Elkins - direct

MR. TALMAN: Your Honor, I am familiar with Dr. Elkins. I've spoke with her before. And she is the Knox County Medical Examiner. And we would stipulate that she would be an expert in this field.

THE COURT: All right.

The Court recognizes Dr. Elkins as qualified as an expert witness in the fields of anatomical pathology and forensic pathology.

Q Now, Dr. Elkins, I would ask you if on January the 13th of 1995, if you performed an autopsy on an individual that was identified to you as Colleen Slemmer?

A On January the 13th, 1995, I performed an autopsy on the body of a young female that was later identified as Colleen Slemmer.

Q Now, you did not make the determination as to identification yourself, did you?

A No, sir.

Q And would you please explain where you first saw this body? Or tell us, I guess, where you first saw the body?

Elkins - direct

A I first saw the body in the, ah, early morning hours in the morgue on January 13th.

Q And what was the condition of the body when you first saw it there?

Just describe how it appeared to you.

A The body was brought in in a body bag. When I went down to the morgue she was still in the body bag.

She, when we unzipped the body bag she was covered with mud, dirt, leaves, twigs.

Q And what is a body bag?

A A body bag is just a plastic bag that you place a body in and zip it up.

Q For the purpose of transporting?

A Yes.

Q Okay.

So after you opened the body bag and saw the body that was in there what did you do with it after that?

A We then removed her from the body bag, placed her on the autopsy table and

Elkins - direct

began our examination.

Q And are you talking about an examination of the body as it appeared at that time, externally?

A Yes.

Q Would you please describe to the jury what you observed, what your examination revealed?

A Well, prior to cleaning the body we noted that there was a tied cloth, gag, around the victim, and we also examined her, her, the clothing that was remaining on the victim.

Q What clothing was remaining on her?

A She had, she was nude from the waist up. However, she did, she still had on her blue jeans, her panties, ah, she also had socks and tennis shoes on.

MR. CRABTREE: May I have a moment, Your Honor?

THE COURT: Uh-huh.

MR. CRABTREE: May I approach the witness?

THE COURT: Yes, sir.

Elkins - direct

Q I will show you what has previously been marked as exhibit two and ask if you would look at that, please, ma'am?

And I would ask you, is that the body that you are referring to?

A Yes.

Q And is that the way it appeared when you saw it as far as physically?

Now, I'm not talking about the surroundings. I realize this was taken in another location.

But is that basically the way it appeared as far as dress was concerned?

A Yes.

Q And as far as the condition that you can observe in that photograph, that is the way it appeared when you removed it from the body bag?

A Yes.

Q Now, please continue with your observations.

Did you remove the clothing at that time?

A Yes.

Elkins - direct

Obviously, with all this mud and grass and twigs on the body we were going to have to, ah, do extensive cleaning of the body.

And so we always clean the body after we get all the clothing removed.

Q And, so, you went ahead and removed the clothing at that time?

A Yes.

Q And then did you begin to clean the body?

A Yes.

Q And after you cleaned the body what was your next step of your procedure?

A To begin the process of documenting all the injuries on the body.

Q And did you go over the body closely and document the injuries?

A Yes.

Q Would you please tell the jury what injuries you documented?

A There were multiple injuries.

Obviously, the head, ah, I basically saved for last because that was obviously where the most extensive injuries were.

Elkins - direct

So, I started on the torso and the upper extremities trying to document the major sharp force or slash and stab wounds.

And, ah, I would, as I would come to what I considered to be a fairly major wound I would assign it a letter, measure it, document it, photograph it, and basically, ah, that took up quite a bit of time.

Q Now, I believe that you have a list there of the wounds that you documented, is that correct?

A Yes.

I've diagrams and also a chart.

Q If you would, just referring to your wound chart, and I believe you start out and you have a wound that is listed as A, is that correct?

A That is correct.

Q And would you describe that wound, and where it was located, and the wound, itself?

A It was a linear slash wound or a superficial wound made with a sharp object.

Elkins - direct

It was four and one quarter inches in length.

And it was on the victim's upper back.

Q And I believe you referred to that as a slash wound?

A Yes.

Q And the upper back is where you are referring to on this one?

A Yes.

Q Okay.

How about what you have labeled as wound B?

A B was also a slash wound.

It was to the right side of the back and measured three and a half inches in length.

Q And C?

A C, also a slash wound, running diagonally across the back.

And C measured eight and a half inches in length.

Q D?

A D, also a slash wound, running

Elkins - direct

diagonally across the back.

And measured four inches in length.

Q And E?

A E is a stab wound and, and--let me explain first between slash and stab.

Q The next question.

The difference between slash and stab?

A Ah, both a slash and a stab are made by a sharp instrument.

However, a slash wound is longer than it is deep in contrast to a stab wound, that is deeper than it is long.

So, a slash wound is more of a motion like that (gestured) whereas a stab wound is more like a motion like that (gestured).

Q And the wound that we are referring to as wound E, ah, what were the dimensions of that as far as length?

A Stab wound E on the back was just a little over a third of an inch in length and three-quarters of an inch in depth.

Q And then you have wound F?

Elkins - direct

A Wound F is a slash wound to the right arm, above the elbow.

Q And what is the length of that?

A Wound F measures 4.8 inches in length.

Q G?

A G is a slash wound to the right lower arm and measures 0.34 inches in length.

Q H?

A H is a slash wound to the right arm and measures approximately one half inch in length.

Q Okay.

I?

A I is a slash wound to the right arm and measured 1.7 inches in length.

Q Now, at this particular time, can you say whether the wounds that we have been referring to up to this time, whether or not the victim was alive at the time they were inflicted on her?

A All of these wounds we've

Elkins - direct

described the victim is alive when they are inflicted.

Q And how can you tell that?

A The, basically, if a wound is inflicted while the heart is still beating, while you still have a blood pressure there is what is called a vital reaction around that wound.

And it has somewhat of a red appearance. Because the blood vessels in the skin are reacting to the injury.

A wound inflicted after death, when a heart has quit pumping and there is no blood pressure, has, basically, no bleeding, ah, there is no tissue reaction to the injury because the person is no longer, ah, pumping blood.

So there is no pressure to get the blood out to the injured area.

So, mostly, when a wound is inflicted after death it has a very, just, bland parchment like color, just a yellow or brown color.

Q Do all of these wounds at this point in time that we are talking about here, you can say, because of that, that the victim was

Elkins - direct

alive at the time that they were inflicted?

A Yes.

Q Okay.

Did we do I?

THE COURT: Yes, sir.

Q J?

A J is a stab wound to the lower left side of the abdomen and was approximately eight tenths of an inch in depth.

Q K?

A K, K is a long slash wound to the front of the chest that also went, basically, longitudinally from the chest, between the breast all the way down to the abdomen and ended right about where the navel is. It measured eleven and a half inches in length.

Q L?

A L is another slash wound to the front of the chest and abdominal area, and measured 7.2 inches in length.

Q M?

A M is a slash wound running horizontally across the upper abdomen and measured five centimeters in length.

Elkins - direct

Q N?

A N is another slash wound to the upper abdominal region going across the upper abdomen measuring 5.5 inches in length.

Q And O?

A O is another slash wound running basically diagonally across the upper abdomen, measuring five inches in length.

Q Okay.

And up until this time was the victim alive when the entirety of these wounds were inflicted upon her?

A Yes.

Q P?

A P is another slash wound running horizontally across the abdomen measuring four and a half inches in length.

Q Q?

A Q is another slash wound running horizontally across the abdomen just above the navel and measured three inches in length.

Q R?

Elkins - direct

A R is a slash wound running across the lower back, measuring three and one half inches in length.

Q And S?

A S is a gaping incised wound across the middle of the neck and measured six inches in length.

Q Now, would you describe how a gaping incised wound differs from a slash wound and a stab wound?

A The slash wound, as I said, is usually very superficial, where the gaping incised wound across the victim's neck, ah, was, was deeper.

It had gone through the fat and muscles of the front of the neck and so at autopsy it was a, an open incision, basically, and could look and see, ah, the muscles of the neck without having to, ah, stretch it apart.

Q Now, as far as the wounds that you have recorded, this is not all the wounds to the body, is it, that you have recorded on this chart?

A No.

Elkins - direct

Q No?
Which wounds are these, that you have recorded?
A Just the largest and the ones that I assigned a, ah, letter.
Q I want to ask you at this time, specifically, about the neck. Because I notice on your chart, that you have listed only two slash wounds to the neck.
Were there other wounds to the neck?
A Yes.
Q Okay.
Did you count those other wounds?
A Yes.
Q And how many are we talking about, total slash wounds to the neck or the throat area?
A Ten.
Q T?
A T is a slash wound running across the left side of the face under the eye.
Basically, it started at the

Elkins - direct

bridge of the nose and the slash went something like that, across the left side of the face, under the eye, and measured 2.9 inches in length.

Q And now I want to jump to X.

A X is a slash wound to the left side of the face, and, ah, ran under the left ear, and measured 2.8 inches in length.

Q Now, up to this point in time can you say whether the entirety of these wounds were inflicted while the victim was still alive?

A All of the wounds I have described are while the victim is still alive.

Q And as far as the wounds that you have described, are any of those wounds to the extent that they would cause the victim to lose consciousness?

A No.

Q So concerning the wounds that you have described here, it would be your opinion within a reasonable degree of medical certainty that the victim would be conscious for the infliction of those wounds?

A Yes.

Q Now, concerning U?

Elkins - direct

THE COURT: You mean the letter U?

Q The letter U. I'm sorry.

A U is a laceration and the wounds I've described thus far have been slashes or stabs made with a sharp instrument.

A laceration is different, in that, a laceration is caused by actual tearing of the skin when a blunt object hits the skin with enough force to exceed the elasticity of the skin so that it just tears.

So a laceration is different. It is not being cut. It is actual, just tearing of the tissue from a blunt force.

So U is a laceration. It is above the right eye on the right fore--I'm sorry--it's on the right brow, in the eyebrow region.

And in greatest dimension it measured 2.37 inches.

Q So this is not a clean cut, it is a tear?

A It is a ragged tear.

Q V?

A V is another laceration. It

Elkins - direct

is on the right forehead and measured 1.65 inches in greatest dimension.

Q And W?

A W--I designated most of the left side of the victim's head W, and it was a large tissue defect that basically ran from this region up here around toward the back of the left side of the head, curved around the left ear, what was left of it, it was very mangled, hanging down, and so I, I knew I was dealing with more than one laceration, but since it was all connected, I just assigned it the letter W.

Q And that was the area beginning behind the left, back of the left eye and back around the left ear?

A It basically involved most of the left side of the head.

Q And is that where the massive damage was done that you are referring to, is in that location?

A Yes.

Q Now, at the time that the wounds U, V, and W were inflicted was the victim alive?

Elkins - direct

A Yes.

Q And how can you tell that?

A The scraping or abrasions around the wounds on the head were red. Again, the vital reaction, the heart pumping. You have a blood pressure.

And also the wounds that produce breaking or fracturing of the skull, the victim is still alive, because when the bottom part of the skull fractures or the base of the skull fractures you get, you begin to get blood into the sinus region if the victim is still breathing. They aspirate that blood down the airway into the lungs, which is what I saw in this case.

Q So at the time that these wounds were inflicted, for that reason, you can say the victim was still alive?

A Yes.

Q At the time that those wounds were inflicted had there been any injuries that had been inflicted upon this body that would cause her to have lost consciousness?

A No.

Elkins - direct

Q Now, describe what happened when the wounds U, V, and W were inflicted upon the victim, as far as the effect that it had on the skull.

A The--ask that question again.

Q I said, what effect did the wounds, I know I lumped three of them together, U, V, and W, when they were inflicted did they, in fact, fracture the skull?

A Yes.

Q That would cause a skull fracture?

MR. CRABTREE: Your Honor, as requested, may we approach at this time?

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. CRABTREE: I think it was requested that we approach the Court before we attempted to introduce the skull.

THE COURT: The whole skull or the fragment?

MR. CRABTREE: Both.

Elkins - direct

MR. TALMAN: We would request a jury out hearing.

THE COURT: You want a jury out hearing?

MR. TALMAN: Yes, Your Honor.

THE COURT: We will send the jury out.

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, at this time the Court needs to take up an issue prior to, ah, going forward with further proof.

You have not heard all the evidence and please do not dwell upon it at this point. Don't attempt to make any decisions. And as soon as we are ready for you we will call you back in here.

If you will go to the jury room with the officers they will let you know.

And it might be a good time to take a Coke break or whatever if the jurors wish to do so.

Elkins - direct - jury out

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Let the record reflect that Dr. Elkins asked for a glass of water and I just gave her a glass of the best jail tea you can ever imagine.

Dr. Elkins, if you want some water we have that available, too, so just stop us and I will be glad to get it for you.

DR. ELKINS: This is fine. Thank you.

THE COURT: All right.

General, you had indicated while you were at the bench that at this time there is some evidence that, ah, that there had been some motions regarding, and they include the skull and the skull fragments.

And you are going to be hauling them out right now.

So, if there is any member of the audience that wishes to withdraw at this time they are welcome to do so.

Elkins - direct - jury out

Go ahead, General.

And if you will go forward we will be able to hear the motions.

MR. CRABTREE: Your Honor, if I may, I would ask to mark this box and I want to ask the Doctor, here, a question.

Your Honor, we would ask to file this box and the contents of it at this particular time as the next exhibit for identification.

MR. TALMAN: What would that number be?

THE COURT: Exhibit number eight.

MR. CRABTREE: And we would also ask to mark as exhibit number nine this paper bag that has the number 995-2 as exhibit nine for identification.

MR. TALMAN: Is that a collective exhibit, Your Honor?

MR. CRABTREE: Yes.

MR. TALMAN: I've seen these before.

THE COURT: If you would like