**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 2**

**DOCUMENT 18**

---

03S01-9712-CR-00147

XXI ~~03C01-9611-CR-00408~~

002216

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

V. ) CASE NO. 58183A

CHRISTA PIKE )

FILED
BY MARTHA PHILLIPS, CLERK
DEC 26 1996
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XVIII OF XXVII VOLUMES

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

FILED
Clerk of the Courts
FEB 5 - 1997
MAILED
CERTIFIED
REGISTERED
REC'D BY

# TABLE OF CONTENTS

VOL. XVIII


| | PAGE |
|---|---|
| SANDRA ELKINS: | |
| Cross-examination | 1719 |
| Jury In | 1728 |
| Direct Examination (con't) | 1729 |
| ROBERT ALFRED POLLOCK: | |
| Direct Examination | 1797 |

Elkins - direct - jury out

to see them, Ms. Martin, if you want to come up now and take a look.

MR. CRABTREE: I would ask to mark the next item that I have in my possession, a plastic bag which contains a piece of bone, as exhibit ten for identification.

THE COURT: Now, if I understand correctly, exhibit nine for identification is portions of skull fragment, is that correct?

MR. CRABTREE: That is what it is. I didn't say but that is what it is.

THE COURT: Okay.

THE COURT: I expect I need to look at the exhibits.

(Court looked at the exhibits.)

THE COURT: All right.

Mr. Talman, it is your motion. Go ahead.

MR. TALMAN: Well, Your Honor, we object to the introduction of these items, altogether, but especially at this point in time, in that Dr. Elkins did not, ah, it is our

Elkins - direct - jury out

understanding that Dr. Elkins did not prepare these items as they sit here today. That it was done through another part of the University of Tennessee.

It is our understanding that Dr. Elkins, ah, had removed the head of the victim and gave it to another, ah, department of the University of Tennessee, ah, who allegedly processed this, ah, skull, which, ah, ah, I think that processing and that procedure is relevant before these items are introduced, if, in fact, they are introduced at all.

THE COURT: That is a chain of evidence objection. You had filed a motion to suppress regarding the skull, the body parts and soft tissue samples, ah, and I guess we need to address the issue of suppression if you are continuing with that motion.

MR. TALMAN: Yes, Your Honor, we are.

THE COURT: And then we will deal with chain of custody and preparation. I guess I--

MR. CRABTREE: Well, I object

Elkins - direct - jury out

to dealing with the suppression motion at this time. It was my understanding that all of our suppression motions were taken care of prior to the swearing of the jury.

That was what was told to me. And that was my understanding of what we were doing. And that this was a, a question of relevancy. And I think that that statement was made, of relevancy not suppression.

THE COURT: Then our issue needs to be relevance.

MR. TALMAN: Yes, Your Honor.

As to the, what is the relevance--

THE COURT: The motions were styled that way. We had reserved issues regarding those.

MR. TALMAN: It was my understanding and I think the General is correct, in that Your Honor had appropriately held that this was an issue more to relevancy at the time of introduction than as to an actual issue for suppression.

THE COURT: And you are raising

Elkins - direct - jury out

the issue of relevance based upon--

MR. TALMAN: Yes, Your Honor.

THE COURT: --Dr. Elkins not having prepared these items?

MR. TALMAN: Yes, Your Honor.

And we also, according to the report and interview with the people from the Anthropology Department these items are not substantially the same as they were at the time that Dr. Elkins examined them.

They have been doused with Adolf's Meat Tenderizer, boiled in a crock pot, and then allegedly reconstructed.

And we think that that is relevant to the people from the Anthropology Department, I think, to testify, would need to be required first before they are introduced, if they are introduced at all.

MR. CRABTREE: Your Honor, if I may, with all due respect to Counsel, again, we have to start somewhere. And it seems to me that the logical place to start is with the autopsy and the removing of the skull.

Now, the Anthropology

Elkins - direct - jury out

Department can't get it until that happens.

THE COURT: Could you please ask Dr. Elkins up to the point where--

MR. CRABTREE: Well, I--

THE COURT: --how we got to this point and let me, your--

MR. CRABTREE: And I will show relevancy to this, too, Your Honor.

THE COURT: Yes, sir. If you could do that.

MR. TALMAN: Your Honor, if I might suggest, if Dr. Elkins is going to testify to the point that she actually removed the head and what she done with it, ah, then at that time I would think, it would be appropriate for the people from the Anthropology Department--I'm not telling the State how to do their case--but--

MR. CRABTREE: Good.

MR. TALMAN: --we would object to Dr. Elkins, ah, this being introduced through Dr. Elkins.

THE COURT: For the purpose of the Court making a ruling I am going to allow Dr. Elkins to go into testimony about these objects.

Elkins - direct - jury out

MR. CRABTREE: Let me respond to what Counsel may be--we are not, I--I have never run into a situation where Counsel apparently wants to put them on, take them off, put them on, take them off.

Well, that's not the way a lawsuit goes.

THE COURT: I understand that, General.

But I still need to hear the information--

MR. CRABTREE: Okay.

THE COURT: --I need to make a ruling.

Q Dr. Elkins, as part of your autopsy, did you make a determination that it was necessary to preserve the skull for the purposes of, of whatever?

A Yes.

Q Okay.

And what led to your making that determination?

A Due to the, due to the extensive injuries to the head, at autopsy you are

Elkins - direct - jury out

faced with all this deformation and you are trying to sort out what is going on while that head is still covered with soft tissue, skin, fat, muscle, blood.

And, basically, you can get an idea what is going on, but you can't tell exactly what is going on.

Q And that was the purpose that you decided to preserve the skull, is that correct?

A At that point I felt like I was not seeing the whole picture.

I decided to remove the head so Forensic Anthropology, at my direction, could process the head so that we could see the skull in much more detail.

Q And is that what the Forensic, as far as the role of this situation, that is part of their role as opposed to your role, is the actual preparation, is that correct?

A Right.

They are acting as consultants to the Forensic Pathologist.

Q And upon their completion of,

Elkins - direct - jury out

ah, their preparation, did part of that completion include a reconstruction?

A Yes.

MR. TALMAN: Your Honor, I object unless she was there and witnessed it.

I object to her testifying as to what Forensic Anthropology may have done.

THE COURT: The doctor testified that they acted at her direction.

If we can qualify whether or not this was done at her direction.

I think she can testify that that is what she directed done and--

MR. CRABTREE: And, also, Your Honor--

Q And this was done at your direction?

A Correct.

Q And, also, you saw the head and the skull before you sent it to Anthropology, did you not?

A Yes.

Q Okay.

And besides the process of

removing the head, did you take anything from the brain for the purposes of being sent to the Anthropology Department?

A No, I removed the entire brain before the head was removed.

Q I understand that.

But was there anything that was located in the brain that you sent to the Anthropology Department with the skull?

A Yes.

There were multiple loose pieces of skull that were driven into the left side of the brain, and I removed as many of those pieces as possible and--

Q And sent--

A --and sent with the skull.

Q --those with the skull, too?

A I sent those with the head.

Q And who did you send them to?

A Well, actually, they came to the morgue.

Q Well, who is the person, I am referring to?

A I called Dr. Murray Marks and

Elkins - direct - jury out

he came to the morgue.

Q And who is Dr. Murray Marks?

A He is a Forensic Anthropologist with the University of Tennessee.

Q And do you work with Dr. Marks in these kinds of cases?

A He acts as a consultant to the Forensic Pathologist and the Medical Examiner on cases that involve injury to bone.

Q And did you ask him to do this reconstruction that was done?

A Dr. Marks did the reconstruction at my direction.

Q And when the reconstruction had been completed was the skull returned to you?

A Yes.

Once he cleaned the skull and began to fit the loose pieces back into place he brought the skull back to me.

He brought it over to the hospital, I believe, the Monday after the autopsy was done on Friday.

Q And, ah, you, with your experience as a pathologist and specifically, a

Elkins - direct - jury out
Forensic Pathologist, had you seen skulls before?
A Yes.
Q And had you seen skulls that had been reconstructed before?
A Many times.
Q And can you tell where the reconstructed area of this skull is?
A Yes.
Q Now, the skull, as it is reconstructed, will that aid you, assist you in illustrating to the jury what occurred to this body, as far as the injuries to the head?
A Yes.
Q Will it allow you to direct them as to, or to show them as to the amount of force that was applied?
A Yes.
Q And, ah, does it indicate in any way what type of weapon was used?
A In this case, yes, it does.
Q And how does it do that?
A Because there is still asphalt embedded in the skull.
Q There is what?

Elkins - direct - jury out

A There is asphalt embedded in the skull.

Q Now, I would also show you, if I may, what has previously been marked as exhibit ten for identification and ask if you recognize that?

A Yes.

Q And when was the first time you actually saw that particular object?

A Photographically or in person?

Q First in person?

A This past Friday.

Q Okay.

Now, you had seen it before photographically, is that correct?

A Yes.

Q Did you remove that piece of bone when you were doing the autopsy and removing these skull fragments?

A No.

Q Was that piece of bone with the skull when you were doing the autopsy and removing the skull fragments?

A No.

Elkins - direct - jury out

Q Can you say within a reasonable degree of medical certainty whether this piece of bone came from this skull that we are referring to?

A Yes.

Q And will the skull and that piece of bone assist you in explaining to the jury and illustrate your testimony about this piece of bone coming from that skull?

A Yes.

Q And I will show you what has previously been marked as exhibit nine for identification and ask if you will tell the Court what that is?

A These are, well, first of all, within the sack there are the top two cervical vertebra, the top two vertebra of the neck.

And within here are several small skull fragments, fragments that, ah, I removed from the deceased's brain, and fragments that Dr. Murray Marks was not able to fit--

MR. TALMAN: Your Honor, I would object to what Dr. Marks couldn't do. It is based on what he told her.

Elkins - direct - jury out

MR. CRABTREE: Well, she can testify--

THE COURT: For the purposes of this offer of proof regarding relevancy I will allow the testimony.

Q Were these skull fragments that you sent to Dr. Marks?

A Yes.

Q Were these skull fragments that you got back that weren't put in the reconstruction?

A Yes.

Q Now, if you would, I would ask if you would remove the skull and show the Judge the area that we are talking about as far as where the injuries were inflicted.

(Witness removed the skull from the box.)

THE COURT: If you would like to approach please do so. (To the Defense.)

Q Just point to the area there we are referring to.

A First of all, this clean cut is a saw cut made at autopsy to remove the brain,

Elkins - direct - jury out

so that is an autopsy artifact.

Let's start with the left side of the skull.

We have all of this, it was missing at the time of the autopsy. So--

Q Now, what do you mean by "missing"?

A It was not present in the skull but was present, fragments driven into the brain.

So, this, these fragments taken from the brain were glued back together where they fit.

THE COURT: Like puzzle pieces.

THE WITNESS: Right.

A Back here, see these little divots in the skull, and then this little divot still contains a piece of asphalt.

So, this is the side of the head that, where the soft tissue was obscuring my view. I knew that there was, there was a large defect in the skull and I wanted to know how many blows could have caused this damage to the left side of the head. And so cleaning up the skull

Elkins - direct - jury out

aided me in determining, and Dr. Marks, in determining that there were at least two blows causing this damage to the left side of the skull.

More asphalt up here. Ah--

Q And by this asphalt you are referring to, you are referring to embedded directly into the skull?

A Embedded blackish particles.

Q Now concerning the wound to the front of the head?

A The front of the head, I had, as I described earlier, a wound to the right brow area, and then I had a wound up a bit higher on the skin.

The wound to the brow area caused this fracture line running into the right eye socket and running across the front of the skull.

Another wound, a blow to the nasal bridge, fracturing the nasal bones, with the fracture radiating out into both sides of the face.

The blows to this side of the head were with enough force that the skull split

Elkins - direct - jury out

into across the base of the skull, at the bottom of the skull, the brain would normally sit on that area, fracturing the skull all the way across, to the right side, up the right side, all the way up into this area, basically, you can take the front and back half of the skull and just--it is called a hinge fracture, and that is what it is. It is a hinge.

THE COURT: It doesn't include this right here?

THE WITNESS: No, ma'am.

Q The injury that you have, the showing of the fracture on the right side, how did that occur? What does that tell you?

A The base of the skull fractures in the direction of the force. So when the base of the skull fractures across this way you know it is a side to side force.

For the whole base to fracture that produces a hinge fracture to the side of the head not receiving the force; has to be against a solid object.

Q So--

A So that it can't--

Elkins - direct - jury out

Q --such as a roadway?

A --such as a roadway, or asphalt, or concrete.

When the blows are applied to this side of the head the skull gives and you get this fracturing across the entire base, actually radiating up on the right side.

Q Now, Dr. Elkins, concerning what we referred to, I think exhibits eight and nine, the skull, you, you actually removed the fragments that you refer to in eight and nine, that are in the skull now and have not been put back in, those you actually removed from the brain, yourself, is that correct?

A Yes.

Q Okay.

So the only part that you didn't remove yourself is what we looked at earlier here, which has been marked as exhibit ten for identification.

And you did not take this out?

A No.

Q Okay.

But you can say that that is

Elkins - direct - jury out

part of this skull, in fact, if you would, just-- well, we will do that later.

MR. CRABTREE: Your Honor, we would submit at this time that we have shown that this is relevant and that Dr. Elkins is qualified to testify about this, and that it is important to the jury to see this so that they can understand what occurred.

MR. TALMAN: Your Honor, can I cross-examine Dr. Elkins?

THE COURT: Yes, by all means.

MR. TALMAN: Thank you.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Dr. Elkins, do you know how many pieces of fragments that you actually removed during your autopsy procedure and sent to Dr. Marks?

A I can count the ones in the bag.

Q Okay.

Did you actually send all of those fragments over there, or did Dr. Marks recover any of those?

Elkins - cross - jury out

A I recovered these from the brain.

Q Those are all from the brain, what, what you are holding as exhibit nine?

A Yes.

And these were fragments, ah,--did I collect each and every fragment that was in the brain, I doubt it. Some were very small, ah, small shards that broke loose and--no, I would not say I collected every single fragment that was in the brain.

Q But what has been identified there as exhibit nine, that you were just holding, are you saying that you collected each and every one of those fragments?

A Yes.

Q Okay.

All right.

Now, is any of your testimony based upon Dr. Marks' report that you have read?

A Yes.

Q Okay.

And from consultation with Dr. Marks, that you've had?

Elkins - cross - jury out

A Yes.

Q All right.

So you did not actually process this skull or, ah, do the actual reconstruction yourself, correct?

A Correct.

Dr. Marks did that at my direction.

Q Okay.

Can you testify that the processing procedure would not damage the skull in any way, within a reasonable doubt, or beyond a reasonable doubt?

MR. CRABTREE: Your Honor, if I may, that is not the standard.

THE COURT: Within a reasonable degree of medical certainty.

Q Within a reasonable degree of medical certainty, is what I meant to say?

A Are you talking about, in general, or on this specific case?

Q On this specific case?

A The skull has not been damaged by processing.

Elkins - cross - jury out

Q Okay.

And the processing procedure, how, how can you say it has not been damaged by the processing procedure?

A I don't see any damage except that due to trauma and the autopsy.

Q Okay.

So, is it your testimony that the processing of this skull could not have produced any additional fragments or damage to the skull?

A Correct.

Q Okay.

All right.

Now, what is entailed in processing, if you know, by Dr. Marks?

A I know that the skull has to be processed in various chemicals over a degree of time to, in order to, ah, deflesh it so you can see the bone.

Exactly what chemicals are used I am not sure.

Q Okay.

And then after it is processed

Elkins - cross - jury out

in these chemicals what is done then, if you know?

A Once it is completely defleshed, and you have all bone exposed, ah, then Dr. Marks, ah, would begin his reconstruction.

Q Okay.

And you were not present when this was done on this skull, is that correct?

A Correct.

Q All right.

MR. TALMAN: Your Honor, I would still respectfully stand on my objection, that, ah, Dr. Elkins, although she has testified that, ah, in her opinion the skull has not been damaged in any way, that, that Dr., Dr. Marks did, in fact, process this, that, ah, that this, ah, skull was defleshed with chemicals, ah, and it is our understanding it was boiled, and, and it is our, ah, position that, ah, we, that Dr. Marks should testify prior to this coming in.

And we would object, Your Honor.

MR. CRABTREE: If I may?

Dr. Marks will be testifying.

But that I would say to the

Court, based upon the testimony of Dr. Elkins, she obviously knows this is the skull.

She says this is the damage she saw, and that she had it reconstructed for the purpose of saving this evidence for these purposes.

And we would submit that she is perfectly qualified to testify as to this situation.

And we would ask the Court to so hold.

If the Court needs some authority, of course, we have the, probably the most recent case is State v. Cazes, C A Z E S, ah, 875 S.W. 2nd, 253--

THE COURT: James Victor Cazes?

MR. CRABTREE: Cazes.

THE COURT: Uh-huh.

I sat on an appellate part of Mr. Kazes.

MR. CRABTREE: Then the Court should be aware of--did you sign off on this opinion?

THE COURT: I don't think so.

MR. CRABTREE: Then the Court

should be aware of this particular opinion wherein they allowed, ah, the victim's cleaned and reconstructed skull into evidence, ah, to, ah, in that case it was used to establish identity and they found a signature for the murder weapon in that.

And we have, in effect, a portion of the murder weapon actually embedded in this particular skull.

We would submit that it is relevant at this particular time.

And concerning Counsel and the, ah, the fact as to whether the skull was processed properly, ah, he will have the opportunity to ask Dr. Marks, and that would, we submit, go to the weight of the admissibility of it.

THE COURT: Subject to the Defense's objection regarding identification, which still is in effect, and subject to the bringing together the chain of evidence through Dr. Marks and/or other witnesses as far as what has happened to this, and whether or not there has been any damage, the Court finds, based upon what it has seen, that the, ah, skull and the fragment

parts are relevant, and, ah, also, ah, appropriate for Dr. Elkins to testify from, ah, in terms of damage, in terms of, ah, cause of death.

And I will allow the skull and skull fragments, ah, to be testified to before the jury at this time, subject to those things coming into evidence further on.

Obviously, their failure to come into evidence will reraise the issue.

Do you all want to take a brief recess before we bring the jury back?

MR. CRABTREE: It is probably going to be a good time because I'm not going to be through for a while yet.

THE COURT: Why don't we do that and then the jury doesn't come in and out?

The Court is in recess for a few minutes.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

Let's take up a brief matter first.

If we are going to demonstrate

these items before the jury, they are fragile items.

Is there any problem with having Dr. Elkins just stand in front of the jury and show them, is that how you want to do that?

MR. CRABTREE: That is what I intend to do, Your honor.

I told her that I would serve as her, ah, whatever, if she wanted, but I would prefer her to do as much as possible.

And, yes, these do not need to be passed.

THE COURT: You know, they go back? (to the jury room)

MR. CRABTREE: You know the Court has some discretion in that.

And we may talk about that discretion sometime.

THE COURT: I understand.

We will need to talk about that.

But at this point, rather than have jurors handling these items, for the purposes of preserving them as much as anything else--

MR. CRABTREE: Your Honor, if

I forget, and sometimes I do, when we are showing the jury here, if the Court would instruct the jurors, if they need to get a closer view or something like that, we can arrange that.

But, again, I prefer that they not actually be passed.

THE COURT: I will.

Are you ready?

MR. CRABTREE: The State is ready.

THE COURT: Dr. Elkins, are you ready?

THE WITNESS: Yes, ma'am.

THE COURT: Do you need something else to drink?

THE WITNESS: I'm fine.

THE COURT: Okay.

Bring in the jury, please.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: General, please go ahead with your testimony.

Elkins - direct

DIRECT EXAMINATION (CON'T)

BY MR. CRABTREE:

Q Now, Dr. Elkins, I believe that we, that you were testifying about what you were doing as far as observing the body and doing the autopsy.

And you testified about the specific wounds that you had observed, ah, externally.

Is that correct?

A Correct.

Q Now, once you made the external observation of the body what do you do then as far as your, ah, examination?

A Basically, once we have diagramed, measured all the wounds that we can see on the surface of the body then we proceed to the next step of the autopsy which is the examination of the internal organs or the inside of the body.

Q And how do you go about doing that?

A It is basically a surgical dissection of the human body.

Q And do you examine each of the

Elkins - direct

organs?

A Yes.

Q And through that are you able to make a determination as to cause of death?

A In most cases, yes.

Q Now, in this particular case did you perform a complete autopsy?

A Yes.

Q And were you able to make a determination as to the cause of death?

A Yes.

Q Okay.

And in your opinion within a reasonable degree of medical certainty what was the cause of death?

A Blunt force injuries to the head, or blows.

Q So, and up until those blows were actually inflicted on the victim were any of the other injuries, wounds, lacerations, whatever, that you observed on the body sufficient to have caused death?

A No.

Q Were they sufficient to have

Elkins - direct

caused a loss of consciousness in a relatively short period of time?

A No.

Q Would they have been painful, within a reasonable degree of medical certainty?

A Yes.

Q Now, as part of an autopsy, do you not only try to determine what the cause of death is, but the way the cause was inflicted?

A Yes, if possible.

Q And were you able to come up with some information concerning the wounds and how they may have been inflicted in this particular case?

A Yes.

Q And in doing that was it necessary to take the skull of the person that you were doing the autopsy on, the body identified to you as Colleen Slemmer?

A Yes.

Q And did you do that?

A Yes.

Q And once that had been done did you have the skull prepared?

Elkins - direct

A Yes.

Q And who actually did the preparation of, of the skull?

A Dr. Murray Marks, who is a Forensic Anthropologist at the University of Tennessee.

Q Do you and Dr. Marks work together on cases such as this?

A Yes.

Q And, ah, is his work done under your, ah, at your request and your supervision or whatever?

A Yes. Dr. Marks does work on, basically, skeletal evidence at my direction.

Q And you requested his assistance in this particular case?

A Yes, I did.

Q And after requesting that did you, in fact, send him, ah, the head of the body?

A Dr. Marks came to the morgue and retrieved the head.

Q And sometime after that did you receive the skull back?

A Yes.

Elkins - direct

Q Now, when you, ah, observed the skull there, and the head, during the autopsy was there portions of the skull that were distorted--or whatever?

A Yes.

Q And were you able to locate portions of that pieces of skull?

A The--pieces no longer attached?

Q The pieces no longer attached?

A Yes.

I recovered several of the skull, or bone fragments, from the victim's brain.

Q Okay.

And did this give you an indication, could you describe to the jury, within a reasonable degree of medical certainty, how these bone fragments got into the brain?

A They were driven in during blows to the head.

Q And is that, along with seeing the distortion of the head and finding these bone fragments, that caused you to want Dr. Marks to review this and prepare the skull?

Elkins - direct

A Yes.

Q And, ah, that skull was, in fact, prepared and returned, is that correct?

A Yes.

MR. CRABTREE: May I approach, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit eight and ask if you can tell the Court and jury what this is?

A This is the skull from the victim later identified as Colleen Slemmer that was processed after I removed the head at autopsy.

Q Would you please remove the skull from the box, please?

(Witness removed the skull from the box.)

Q Now, there is a piece left in the box, is that correct?

A Yes.

Q And what is that?

A The jaw.

Q And that is not relevant to what we are talking about? You don't need that

Elkins - direct

for what we are talking about here, is that correct?

A There was no trauma to the jaw.

Q Now, what is the, if you would point to the long line across the front of the skull there, and if you could just explain to the jury what that is.

A This--

Q The cut, no, the cut across the top there.

This area right here.

A The autopsy, obviously, in order to examine the brain we have to remove the brain.

We do that by taking an electric saw and taking what is known as the skull cap off of the remainder of the skull.

Once we get the skull cap off of the skull with the saw then we can see, actually, we can first of all remove the brain which rests in this area and then we can get an idea of what is going on down in the base or bottom of the skull.

Elkins - direct

Q So this cut that you are referring to here, or this breakage in the skull that you are referring to here, that is done during the autopsy and you are responsible for that, is that correct, or under your supervision?

A Correct.

Q Now, if you would, would you please turn the skull in such a fashion so that the jury can see the left side?

(Witness turned the skull.)

THE COURT: Can all the jurors see?

We are going to give you, we are not going to pass it around because it is a very fragile item, but demonstrate it for you in front of you, so--but as Dr. Elkins testifies to the different items, can everybody see from here?

Okay.

Go ahead.

I'm sorry.

Q There is what appears to be a hole toward the left rear of the skull, is that correct?

A Correct.

Elkins - direct

Q And how does that hole relate to the injuries that you described that you saw during the soft tissue, or the skin and the scalp?
Is that the same area?

A Yes.

Q Okay.
And it also appears to be almost like a puzzle through here.
Can you explain to the jury what those lines are?

MR. TALMAN: Your Honor, may I approach?

THE COURT: Yes, sir.

A You'll need to point out which lines you mean.

Q I'm talking, I'm talking about this area right here, I believe this area of reconstruction.

A Okay.
Ah, once you get closer you can see, in case you can't see now, the, ah, there is an obvious line here. There is a line running down in this area and this is basically where the skull has been put back together, pieces recovered

Elkins - direct

from the brain put back together where they fit.

Q And these pieces that you are referring to having been put back together, do you know where those pieces came from?

A From the victim's brain.

Q And are these the pieces that you removed from the victim's brain?

A Yes.

Q And are they the pieces that you sent for Dr. Marks for the purposes of reconstruction?

A Yes.

Q Now, if you would, if you would come down here and let's stop about here, and if you could show the jury exactly where we are referring to here?

(Witness showed the jury.)

Q And if you would point to the lines of the pieces that you are talking about there so everyone can see?

A Basically, where you see this line here at the top left of the skull, the line comes around into this area of missing skull, circles back around in the area where you would,

Elkins - direct

basically, where your left ear would be, comes back up. There is a tiny fracture line running in this area, then back up to where we started.

This is all bone that was missing because it was not present, attached to the skull, at the time of autopsy because these fragments were, had been, basically, driven into the brain, so that when these fragments were removed from the brain substance and given to Dr. Marks, who was able to reconstruct by gluing together where these fragments fit.

Q Show these people on this end--

A The fracture line--goes back up this way, then back up around this way--

Q And while you are here would you go ahead and remove the skull cap so that the jurors can see the thickness that we are talking about as far as the skull is concerned?

(Witness removed the skull cap.)

Q Okay.

And when you say these were missing you don't mean they were missing from the

Elkins - direct

body, you mean they were missing from the skull, is that correct?

A Correct.

Q That they were in the brain, is where you removed them from?

A Yes.

Q Okay.

Now, while we are down here we might as well go on and do all of this, I guess.

Ah, let's make sure these three sitting down here can see, also.

A Starts here and goes around-- see the thickness?

Q Okay.

Now, there is also a fracture to the front of the skull, is that correct?

A Yes.

Q Okay.

Would you please point to the fractures in the front of the skull?

A There is, as I said, and looking at the face at autopsy there were two lacerations or tearing of the skin, one above, one at the right brow and one above it.

Elkins - direct

The laceration to the right brow, the blow inducing that laceration has fractured the right frontal area of the skull, going down into the right eye socket, the fracture line running across the front to the left side of the skull.

Q And is there also a fracture to the nose, to the nasal bone?

A Yes.

A separate blow to the, basically, to the bridge of the nose area has caused fracturing to the nasal bone, with these fractures radiating out on either side of the cheek bone.

Q I believe, also, there is a fracture to the right side of the skull, is that correct?

A Yes.

Q Could you show that, please?

A When--

Q Well, let me ask you this first--is the fracture to the right side, does that indicate that the right side, that a blow was actually suffered there?

Elkins - direct

A No.

Let me explain.

First of all, when--okay--the portion of the skull the brain rests on is called the base of the skull which you are looking at when you are looking into an open skull, after the brain is removed.

The base of the skull fractures in the direction in which the force is applied. So if force is applied to one side of the head the base of the skull fractures from side to side.

Whereas, if you have a very forceful fracture to the front of the head the skull basically splits down the middle if the opposite side is against a firm surface, and there is no resistance.

So, what we have, when you look into the base of the skull we have a fracture running from side to side, across the base, telling us that the blows to the left side of the head while the right side is against a, a very resistant surface, a firm surface.

Q Would a roadway suffice for

Elkins - direct

that firm surface?

A Roadway, sidewalk, any firm surface.

The force coming in from the left side is causing the skull to split literally into two so there is a front half and a back half.

And the force was great enough to not only cause the skull to splint into two but to cause that fracture to run up the opposite side from where the force is being applied. The ear would be in this area. It is going up, and if you look closely, you can see the fracture line coming up the right side of the skull into this area.

At the base of the skull, the fracture line running across the mid base of the skull dividing the skull into a front and back down, the fracture coming along up the right side into this area.

The base of the skull, the front and back halves, fractured--force coming up the right side which is against a firm surface, causing fractures on the right side.

Q Now, did this skull, did this skull actually split into two parts?

Elkins - direct

A Yes.

Q Why is it in two parts?

A The, obviously, it is in two parts this way because of autopsy.

Q I am talking about the other way.

A It is in two parts because the base and the bottom of the skull has been completely fractured into a front and back half due to a strong force coming in from the side.

Q And also while you are down here--does this skull tell you anything about the instrument that was used to inflict these blows?

A Yes.

Q And what does it tell you?

A At the time of autopsy in the soft tissue surrounding this massive area of destruction on the left side of the skull there were black firm particles within the soft tissue.

Once the skull was processed and we were able to see the bone clearly we could see two areas representing two areas of a separate blow.

And if you look closely you

Elkins - direct

can see little divots in the skull, one of these divots retaining a black particle.

And this is from the asphalt chunk that was used to administer the blows.

Again up here another blow, you can see again that grayish black piece embedded into the skull. Divots back here, one of them retaining one of these dark pieces. One of the dark particles embedded in the skull.

Q And these dark particles that you have referred to here, are they consistent with asphalt?

A Yes.

Q Would you return to your seat, please?

THE COURT: Counsel, would you approach the bench?

Please be seated, Dr. Elkins, when you are ready.

<u>BENCH CONFERENCE</u>

THE COURT: That redheaded girl sitting by the jury looks as if she is getting

Elkins - direct

ready to pass out.

MR. CRABTREE: Well, that's the victim's father that is sitting next to her. I don't know who she is either.

THE COURT: I just wanted to stop a second. The jury is fine. I don't want somebody saying something about it at this time.

MS. MARTIN: Thank you.

THE COURT: Thank you.

END OF BENCH CONFERENCE

THE COURT: I'm sorry for the interruption, General.

Please go ahead.

Q Now, Dr. Elkins, strictly from the skull, and I'm talking about the bone of the skull only, are you able to tell the minimum number of blows that were struck to the head?

A Yes.

Q And what is, from the skull, what is the minimum number of blows that were struck to the head?

A The skull shows a minimum

Elkins - direct

number of four blows to the head.

Q And you have pointed out those four fractures.

Would you point out those four fractures to the jury, please?

A Basically, on the left side, as I showed you, there are two, at least a minimum of two separate blows causing this massive fracture in the left side of the skull.

From the skull you can tell that there was at least one other separate blow impacting over the right eye. And you can also tell that at least one separate blow is impacting the nose area, spreading, radiating into both sides of the face, along the cheek region.

Q Now, consider your observations on the soft tissue and the bone.

Can you give the minimum number of blows that were struck to the head?

A Taking into account soft tissue and skull I could say that there were a minimum of five blows to the head.

Q And where is the additional blow? Where was it located on the skull?

Elkins - direct

A There is an additional blow to the right forehead region.

Q But that did not cause a fracture in the skull itself, is that correct?

A No.

Q Now, when I refer to soft tissue, what, what are we talking about when we talk about soft tissue?

A Basically, talking about the covering of the skull, skin, some fat, muscle.

Q Now, when you were doing the autopsy and when you were removing this bone fragment from the brain did that appear to be all of the bone that should have been there?

A I, I wasn't sure, I suspected that--it was not. Obviously, I was dealing with a very massive, ah, distortion of the whole left side of the head and I recovered a number of fragments from the brain, and--I, I wasn't sure that it was all there. I, I--I didn't, I wasn't sure. I didn't know.

Q But the force, how was the force applied to this area of the head?

A The force to the left side

Elkins - direct

causing the destruction of the left side of the skull, ah, basically is applied to the left side of the head while the right side is against a firm surface.

Q And is it an external force inward to the head? Inward toward the brain?

A Yes.

It is a force coming from, externally onto the right, onto the left side of the head with the right side of the head against the surface. So, it is coming, it is driving inward.

Q And what soft tissue actually covers the skull of this location where you are talking about, the massive wound occurring?

A Again, mainly skin, ah, a slight degree of fat and muscle.

Q Is there any layer of anything over the skull itself?

A There is a very firm outer layer to the skull called the galea. It is, basically, a very thin, ah, firm, almost ligamentous type tissue that covers the skull.

Q And has it been cleaned off of

Elkins - direct

this skull?

A It has been cleaned off.

Q Now, is that easy to get off?

A It takes a lot of, ah, unless you chemically process the skull it takes a great deal of scraping with a sharp edge which can, ah, distort your findings.

Q So when you have a fracture of the skull this holds the pieces together?

A Yes. In some cases, yes.

Q So should not all the pieces have been in the brain, or attached to the skull there?

A Yes.

Q But they weren't you don't think, at the time you were doing the autopsy?

A At the time of the autopsy I was, as I said, I wasn't sure. It seemed like there was a larger hole than the number of pieces I recovered from the brain would fill.

Q I will show you what has been marked as exhibit ten and ask you if you recognize that?

A Yes.

Elkins - direct

Q Can you tell the jury what that is, please?

A This is a portion of skull.

Q And when was the first time you actually saw that piece of skull?

A Personally?

Q Personally?

A The first time I actually saw it was this past Friday.

Q Had you seen photographs of it before?

A Yes.

Q And when you received that piece of skull this past Friday what did you do with it?

A I, they, I obviously already had the skull. I took the piece and placed it where it belonged on the skull.

Q And can you say within a reasonable degree of medical certainty that the piece of skull that you have and has been filed as exhibit ten, is a piece of the skull that you have that has been filed as exhibit eight?

A Yes.

Elkins - direct

Q And can you show the jury where that fits in that area?

A Yes.

Q Would you please remove it from the bag and do so?

A I may have to get closer to individual jurors.

MR. CRABTREE: If she may, Your Honor, so that they can see this?

THE COURT: If Dr. Elkins will stand where she is and if any of the jurors wish to stand up and look closer or move forward to look closer that's fine.

MR. TALMAN: May I also approach, Your Honor?

THE COURT: Yes, sir.

Of course.

A Can you see back on the back?

Q Now, let's return that piece to the plastic bag.

MR. CRABTREE: Did you see it, Your Honor?

THE COURT: I didn't see Dr. Elkins hold it up quite like that.

Elkins - direct

I see it.

Thank you.

And that piece is exhibit ten--exhibit eight. Okay.

Q I will show you what has been marked as exhibit nine and ask if you would tell the Court and jury what that is?

A Within the sack are the top two vertebra of the neck upon which the skull rests and numerous other small and a couple of mid size skull pieces that were recovered from the victim's brain but were not able to be fitted back on the skull during the reconstruction.

THE COURT: Do you want Dr. Elkins to demonstrate that?

MR. CRABTREE: Why don't you just come down and hold it up?

Q And these were items that I believe you indicated that you had removed from the brain and also this was sent to Dr. Marks?

A Yes.

MR. CRABTREE: Could I have just a moment, Your Honor?

THE COURT: Yes, sir.

Elkins - direct

Would you approach the bench?

BENCH CONFERENCE

THE COURT: This is really fragile. So if you want to cross-examine her about it I don't want to put it back in the box until after.

MR. CRABTREE: I can't just leave it sitting out here, no, no, no.

THE COURT: Okay.

END OF BENCH CONFERENCE

THE COURT: Go ahead, sir.

Q Shall we go ahead and return it to the box, please?

MR. CRABTREE: May I have just a moment?

THE COURT: Sure.

MR. CRABTREE: Ask to mark this as exhibit eleven for identification.

THE COURT: Yes, sir.

Q Dr. Elkins, I would show you

Elkins - direct

what has been marked as exhibit eleven for identification and ask if you can tell the Court and jury what that is?

A This is one of the body diagrams I used during the autopsy on Colleen Slemmer.

Q Did you do this diagram yourself?

A This was done with my own hand.

Q And this was done as part of the autopsy, as part of your examination of the body?

A Yes.

MR. CRABTREE: Your Honor, we would ask to offer this as exhibit eleven at this time.

THE COURT: It would be exhibit eleven.

MR. TALMAN: We have seen it, Your Honor.

THE COURT: Okay.

MR. TALMAN: Subject to our continuing objection.

Elkins - direct

THE COURT: I understand.

(Exhibit 11 marked and filed.)

MR. CRABTREE: Ask to mark this as exhibit twelve for identification.

THE COURT: Yes, sir.

Q Dr. Elkins, I would show you what has been marked as exhibit twelve for identification and ask if you would tell the Court and jury what that is?

A That is a diagram of the front of the face and neck injuries, made with my own hand.

MR. CRABTREE: Your Honor, we would offer this as exhibit twelve.

THE COURT: That would be exhibit twelve to the testimony.

(Exhibit 12 marked and filed.)

MR. CRABTREE: Your Honor, offer this as exhibit thirteen for identification, the photograph.

THE COURT: All right, sir.

MR. CRABTREE: And exhibit fourteen for identification.

THE COURT: All right, sir.

Elkins - direct

MR. CRABTREE: Has Your Honor seen these?

THE COURT: Not up close. But I saw what they were as you walked up. So, yes, sir.

MR. TALMAN: Your Honor, may we approach for a moment?

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. TALMAN: I just want to object to these photographs. There's already one in like that one.

MR. CRABTREE: This is the cleaned up one.

MR. TALMAN: I understand but the--

THE COURT: This one is after the body was cleaned up. This is during the autopsy.

MR. TALMAN: I understand, but--

MR. CRABTREE: We are about

Elkins - direct

through with these photographs, anyway.

THE COURT: Okay.

The ones that are on your table need to be turned over.

MR. CRABTREE: They are exhibits.

THE COURT: The little one.

MR. CRABTREE: Oh, okay.

I think they are exhibits, too.

THE COURT: But if you would just flip them right now?

MR. CRABTREE: Okay.

THE COURT: I think the TV camera zoomed in on some of these yesterday.

MR. CRABTREE: Okay.

MR. TALMAN: Thank you, Judge.

THE COURT: Thank you.

<u>END OF BENCH CONFERENCE</u>

Q I will show you what has been marked as exhibit thirteen for identification and ask if you can tell the Court and jury what that

Elkins - direct

shows?

A This is an enlargement of a Polaroid photograph that I took at autopsy of the wounds on the victim's back.

MR. CRABTREE: Your Honor, we would offer that--

Q This is at autopsy after the body was cleaned up, is that correct?

A Correct.

MR. CRABTREE: Your Honor, we would offer this as exhibit thirteen.

THE COURT: That will be exhibit thirteen, sir.

(Exhibit 13 marked and filed.)

Q I will show you what has been marked as exhibit fourteen for identification and ask you if you can tell the Court and jury what that is?

A This is, again, a blowup, or an enlargement of a Polaroid photograph taken by me at autopsy showing the slash wounds to the neck.

MR. CRABTREE: Offer this as exhibit fourteen, Your Honor.

Elkins - direct

THE COURT: It will be exhibit fourteen, sir.

(Exhibit 14 marked and filed.)

MR. CRABTREE: Ask to mark this as exhibit fifteen for identification.

THE COURT: Could I see it, please, sir?

(Exhibit shown to the Court.)

Q I will show you what has been marked as exhibit fifteen for identification and ask if you can tell the Court and jury what this is?

A This a Polaroid photograph taken by myself at autopsy showing various wounds to the right arm.

MR. CRABTREE: We would ask to file this as exhibit fifteen.

THE COURT: Yes, sir.

(Exhibit 15 marked and filed.)

MR. CRABTREE: Your Honor, may we approach just a moment?

THE COURT: Yes, sir.

BENCH CONFERENCE

Elkins - direct

MR. CRABTREE: What are we going to do as far as the luncheon break is concerned?

I'm getting ready to start another portion of my examination.

MR. TALMAN: It might be better to send the jury to lunch before--

MR. CRABTREE: This is a good place for me to stop, and that is what I wanted to know, rather than going on--

THE COURT: Right here?

MR. CRABTREE: Yes, Your Honor.

THE COURT: Okay.

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, the Attorney has informed me that, ah, there will be some additional, obviously, some additional testimony by Dr. Elkins, and that that is going to take a little while.

It is now ten minutes till

Elkins - direct

12:00, and because I think this will take, ah, the additional testimony will take longer than an hour or so I am going to release you all to go to lunch as soon as Mr. Beeler has made his phone call.

You have not heard all the evidence in this case. You have not heard the Court's instructions. You may not deliberate about this case with each other or even in your own minds to try to come to any opinions or conclusions.

And you may have no contact with anyone except for the officers. Please avoid news, newspapers, as we have discussed before, both local and national. And, ah, we will move forward with, ah, Dr. Elkins' testimony at the conclusion of the lunch recess.

And if you will go with Officer Bieber at this time?

Thank you very much.

(Whereupon, the jury left open Court after which the following proceedings were had, to-wit:)

THE COURT: Anything you would

Elkins - direct

like to take up before I take a lunch recess?

MR. CRABTREE: The State has nothing, Your Honor.

MR. TALMAN: The Defense has nothing, Your Honor.

Thank you.

THE COURT: Okay.

Dr. Elkins, I'm sorry to interrupt your testimony but we will proceed with it immediately as soon as the jury is back.

The Court is in recess until approximately 1:15.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

Is there anything we need to take up prior to bringing the jury back and continuing Dr. Elkins' testimony?

MR. CRABTREE: The State is ready to start, Your Honor.

MR. TALMAN: No, Your Honor.

THE COURT: Okay.

Would you please bring the

Elkins - direct

jury back?

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: General, whenever you are ready to proceed with Dr. Elkins' testimony I think the ladies and gentlemen of the jury are ready to continue.

Q Dr. Elkins, I believe you have given us some testimony already concerning the wounds as they appeared on the body when you made your initial examination and after you cleaned the body up, is that correct?

A Yes.

Q And these charts that were previously filed as exhibit eleven and exhibit twelve, were these blowups of the charts that you, ah, yourself, did when you were doing this autopsy and examining this body?

A Yes.

Q And, Dr. Elkins, if you would, and with the permission of the Court, Your Honor,

Elkins - direct

I would ask that she come down and point out some things--

THE COURT: Yes, sir.

Could you back that up just a little bit, General, so I can see?

I'm sorry it is such a small courtroom.

That's fine.

MR. CRABTREE: And, Your Honor, if I may, we will pass this after we finish with it.

Q Dr. Elkins, now you have referred to a number of wounds that, ah, are located on the torso, is that correct?

A Yes.

Q And would you point to the wounds as they are now and give the corresponding letter that relates to the wounds that you are talking about on the upper torso there?

A We will start on the back of the body, you see, as I described, slash wound A, a superficial slash wound running length-wise down between the shoulder blades.

Slash wound B running from the

Elkins - direct

right side of the back in a more or less diagonal direction.

Slash wound C from mid to lower back and running diagonally.

Slash wound D intersects slash wound C, running pretty much diagonally and across the right lower back.

Wound E, as I said before, was a stab wound.

And then over to the back of the right arm, wound F, again, is a slash wound.

Wound G and H were, ah, and I, were slashes to the right forearm.

Q Well, let's stop right there, if you would.

And I will show you what previously has been marked as exhibit thirteen.

And I will ask you if that photograph shows the wounds that you have just referred to in A, B, C, D, and E?

A Yes, it does.

Q And this is the actual photograph that you took of the body that is represented in this diagram, is that correct?

Elkins - direct

A Correct.

MR. CRABTREE: And, Your Honor, if I may, there are a number of these wounds that we are going to go through and to keep up with it, I think the jury, it would probably be beneficial if they can see them after she testifies about them.

THE COURT: That's fine.

MR. CRABTREE: So if I could go on and pass this at this time and give them an opportunity to see it?

THE COURT: Any objection, Mr. Talman?

MR. TALMAN: No.

THE COURT: Okay.

That's number thirteen.

(Exhibit 13 to the jury.)

MR. CRABTREE: If I can I will go ahead and start one more.

Q Also, you have testified about, ah, G, H, I and F, which are wounds to the back of the right arm, is that correct?

A F, G, H and I, yes.

Q Okay.

Elkins - direct

And I would show you what was previously marked as exhibit fifteen and ask if that shows the wounds that appear on the back of the right arm, or on the right arm?

A Yes. F, you can barely see the tape at the very top left-hand corner of the photograph.

MR. CRABTREE: Your Honor, we would ask that exhibit fifteen be passed, too.

THE COURT: All right.

(Exhibit 15 to the jury.)

Q Now, Dr. Elkins, I noticed that on the back of the right arm there are what you have listed as contusions, ah, purple, that you did not give letters to, is that correct?

A Correct.

Q Would you describe those wounds and injuries to the jury?

A As you can see on the right arm as well as the right hand, you see in the elbow area, abrasions and contusions, an abrasion being a scrape which just scrapes off the most external layer of the skin as if your child fell and scraped its knee.

Elkins - direct

And, also, there are contusions which is a fancy word for bruise where you actually have bleeding into the skin. It's tissue fat under the skin.

As we move down the arm again we have more of the bruises, purple bruises. On the forearm, on the arm where the wrist area is, on down into the right hand itself.

Q Well, what is the significance of the fact that you have labeled these contusions as being purple?

A Purple, ah, is, I always document what color the contusion is because over a period of time contusions, or bruises, change color.

The first fresh stage is purple.

Q So these are fresh bruises?

A Yes.

Q Okay.

Now, also, on the left arm I believe you have listed some abrasions and contusions and on the back of the left, on the left hand, is that correct?

Elkins - direct

A Yes.

Q And are they the same type of injuries as you have described as being on the right arm?

A Yes.

Q Now these injuries that we are referring to on the right arm here, is there a name in forensic pathology that you give to those types of injuries on the arms?

A We call them defense wounds.

Q Now, what do you mean by defense wounds?

A Basically, ah, during either a fight or an attack with a knife or some other weapon instinctively we would all try to use our arms to shield off the weapon coming at us.

So, when you see wounds on the hands or the forearms when someone is basically trying to counter the blows or the knife, or whatever is coming in at them, we call them defense wounds.

Elkins - direct

Q And that is what these type of wounds, these appear to be here?
A Yes.
Q Okay.
And, also, it appears on the upper left-hand shoulder, there is another wound up there that you have labeled a slash, is that correct?
A Yes.
Q Okay.
That one you did not give a letter to, is that correct?
A No.
Q And also a contusion on the right upper neck?
A Behind the right ear, ah, there was a purple area discoloration which is commonly seen when the base of the skull is fractured.
Q Okay.
Now, is that the extent of the injuries that you recall and that you have observed concerning the back?

Elkins - direct

I notice you have a note there, numerous more superficial--what are you referring to there?

A Yes.

At some point it was obvious that, ah, as we kept giving letters to wounds, it was obvious we were going to have to begin starting back through the alphabet and so, basically, unless we wanted to stay there for three days, I just basically threw up my hands and just said, enumerable more superficial slash wounds on the back arms and chest.

Q And so concerning your observation of the back at this time and the chest, so there are a number of wounds that you didn't even list here?

A Right.

Q Now, let's go to, ah, the, the front part of the person and let's go ahead and do the knees first.

I believe that you have those, and those haven't been given letters, either, I don't think.

A Right.

Elkins - direct

Again, you see the purple contusions as to both knees, as well as a contusion on the right, ah, basically, over the right shin.

Again, these were purple contusions consistent with fresh.

Q They were fresh bruises?

A Yes.

Q Are these wounds consistent with crawling on the ground or asphalt or something of that nature?

A Well, yes.

It could have been a fall onto the knees on a hard surface.

Or crawling.

Q Now concerning the front part of the torso there.

Would you go through those injuries and describe those, please?

A Okay.

There were, as I said, there were slash wounds here and I never gave them a letter.

Then we see, starting after,

Elkins - direct

where we left off on the alphabet, J was a stab wound to the left lower part of the abdomen.

K is a slash wound running from this region, between the breasts, and ending just above the naval.

L is another slash wound running from this region, again, ending just above the naval.

M is a slash wound running across the upper abdomen, lower chest area, across.

N is another slash wound running across the same region, and actually crossing M, in its path.

O, another slash wound, across the mid portion of the abdominal area, upper abdominal area.

P, again, basically making a cross and intersecting O, making more of an X shape.

Q is just a slash wound across the abdomen, right above the naval.

Q Now, if I may, I will show you what has been marked previously as exhibit five

Elkins - direct

and ask if that shows the wounds that you are referring to on the front part of the chest before, in fact, that you cleaned them up for the purpose of your examination?

A Yes.

Q Okay.

If I may--up here in the upper right-hand part of the torso, the right breast, what is that mark right there, the reddish mark right there?

Does that have any significance?

A Those are, basically scraps.

Q Okay.

A Or abrasions.

Q Drag marks?

MR. TALMAN: Your Honor, I object to the term, drag marks, unless--

THE COURT: I think you need to ask a question.

Q Would it be consistent--

THE COURT: Thank you.

Q --with someone being dragged across an asphalt surface by their feet?

Elkins - direct

A That's one explanation.

Q Okay.

Thank you.

And you have testified, now, that, ah, the person was alive at the time these wounds were inflicted, is that correct?

A Correct.

Q And how is that, that you can tell that?

A Well, you can see the red color. And in this area this wound is still even bleeding. Ah, and so, what we have, is a vital reaction we talked about earlier today.

A dead body without a blood pressure does not give you this red color to your, to wounds on the skin.

Q And, ah, I will show you, also what has been marked as exhibit seven, and does that show these wounds after they were cleaned up?

A Yes.

Q Now, as you cleaned off these wounds was there any pattern that began to emerge on any of them?

A As we began to clean the body

Elkins - direct

of all the mud, twigs, leaves, ah, we immediately saw on the chest between the breasts a very specific pattern to these slash or incised wounds of the skin.

Q And what was that pattern?

A It is what most people refer to as a pentagram. A five pointed star in a circle.

Q And is that, does that show up again here in exhibit seven, would you point to that if you can see it in exhibit seven?

A It is there.

MR. CRABTREE: And, Your Honor, we would ask that these photographs be punished, also, at this time.

THE COURT: Yes, sir.

MR. CRABTREE: Now, you have made a notation here.

What is the significance of that notation?

A Mud with drag marks on the right of the torso.

Ah, they were very distinctive.

Elkins - direct

In the mud you could tell that, ah, there were linear etches in the mud, ah, representing where the body had been dragged 190 through the mud.

Q And, also, you had a notation concerning a necklace there, is that correct?

A Yes.

Q All right.

And what is that?

A She was wearing a yellow metal necklace with several beads.

Q And a bloody fabric was tied in a knot around her neck?

A Yes.

THE COURT: Go ahead, General.

Q I believe that is the extent of the injuries that you actually labeled on the front, is that correct?

A Pretty much so, yeah.

Q Now, are there other injuries there that you also didn't label as well as were on the back?

A Yes.

MR. CRABTREE: If I may, Your

Honor?

Q I will show you what has been marked as exhibit twelve.

And I believe you have identified that as part of the documented chart that you prepared concerning the injuries to the face and neck, is that correct?

A Correct.

Q Would you please describe those injuries for the jury?

A Well, I guess we can start at the top and move down.

All this, basically, linear stuff I shaded in is abrasion, or the scraping of the skin, surrounding areas of lacerations, as we talked about, that's a blunt force impacting the skin, enough force to actually tear or rip the skin open.

We have lacerations here, here, ah, bordering the right eye, and then we get to our labeled, ah, lacerations, U, to the right brow, which, remember, did cause a fracture of the skull.

V was a laceration on the

Elkins - direct

right forehead which did not result in an underlying skull fracture.

There is a slash wound across, running diagonally, from about the middle of the right eye down towards the nose.

There is another laceration with a surrounding abrasion to the bridge of the nose, and again, remember, we saw the underlying fracture on the skull of the nasal bone, radiating into the facial bone.

We have, ah, ecchymosis around the eye, purple discoloration around the eye, around the left eye.

We have two slash wounds, one over the left eye and one slash wound, T, under the left eye.

It was obvious, ah, from feeling at autopsy that, ah, the left, well, first of all, there was a nasal fracture that I could feel.

And there was a left maxillary fracture that I could also feel, which is basically this region in here that you saw with a clean skull, where it radiated out from the nasal

Elkins - direct

fracture.

There is a slash wound to the tip of the nose.

We have bruising of the inner part of the upper lip as well as multiple small lacerations of the inner part of the lower lip consistent with some kind of overlying object, force on the lip up against the teeth and causing bruising and tearing there.

We have abrasions, red abrasions on the chin area.

We have a red abrasion under the chin.

Now, we get into the ten slash wounds to the front of the neck, two of which I assigned letters, R down here, at the base of the neck.

And then S was our gaping incise wound to the neck.

Q Doctor, concerning these slash wounds that you have testified to on the neck here and around the eyes and I believe on the nose, can you tell us whether or not the same instrument was used to cause those that was used to cause the

Elkins - direct

injuries like lacerations that you labeled up here, U and V, are we talking about two different kind of instruments being used?

A Two different type of forces.

Q Okay.

And the slash wounds are caused by what type of instrument?

A A sharp object.

Q All right.

And the lacerations?

A Are caused by a blunt object.

Q So from that you can tell us it appears that two types of weapons were used to the face of this individual, is that correct?

A Yes.

Q Now, I believe that, ah, you told us about the ten slash wounds to the neck, and I would ask you if, ah, this photograph that has been filed as exhibit fourteen, does that show those wounds?

A Yes.

Q And, ah, does this photograph show those wounds after they were, in fact, cleaned up during the autopsy?

Elkins - direct

A Yes.

Q And these are slashes to the throat, is that right?

A Correct.

Q And, Doctor, concerning the injuries you have diagramed on this chart, these injuries were inflicted while the individual was still alive, is that correct?

A Correct.

Q Okay.

And also the injuries to the face?

A Correct.

Q Now these diagrams do not show the injuries to the side of the head that you testified about and demonstrated through the use of the skull?

A No.

They do not show the injuries to the left side of the head.

Q Thank you.

If you will return to the witness stand?

Dr. Elkins, I believe you have

Elkins - direct

testified that, concerning the clothing that you removed from the body, is that correct?

A From the waist down.

Q From the waist down?

That is the clothing I am referring to.

And, ah,--if I may, Your Honor--I will show you exhibit two and ask if that is the body that we are referring to?

A Yes.

Q And at least the jeans, the shoes, and the socks can be seen in that photograph, is that correct?

A Yes.

Q And those are the jeans and socks that you removed?

A Correct.

MR. CRABTREE: I would ask to mark this bag and the contents therein as exhibit sixteen for identification.

Q Doctor, I will show you this bag and what appears to be jeans--

MR. TALMAN: Your Honor, may I approach, also?

Elkins - direct

THE COURT: Yes, sir.

Q And ask you, if those are the jeans that you did remove and the bag?

A Yes.

Q Okay.

And this is the condition they were in when you removed them?

A Well, they weren't this dry, but, ah, yes, we had the tear here.

Q The tear or the cut here in the leg?

A Right.

And it is covered with mud.

Q Still wet at the time?

A Wet, yes.

MR. CRABTREE: Your Honor, rather than passing this, I will just walk down and hold these.

THE COURT: I think that is a good idea.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit sixteen.

THE COURT: That would be exhibit number sixteen.

Elkins - direct

(Exhibit 16 marked and filed.)

MR. CRABTREE: Your Honor, we ask to mark this bag and contents therein as collective exhibit seventeen for identification.

THE COURT: All right, sir.

Q I will show you what has been marked as collective exhibit seventeen for identification and ask if you will look in this bag and tell us what that is?

A Those are the victim's Nike tennis shoes.

Q And did you remove those from the victim?

A Yes.

Q And is this the condition they were in except possibly the mud being dry as opposed to wet when you removed them from the body?

A Yes.

MR. CRABTREE: May I again walk in front of the jury?

THE COURT: Yes, sir.

MR. CRABTREE: Your Honor, we

Elkins - direct

would ask to file these as collective exhibit seventeen.

THE COURT: Exhibit seventeen, sir.

(Col. 17 marked and filed.)

MR. CRABTREE: Your Honor, we would ask to mark this bag as exhibit eighteen for identification.

THE COURT: All right, sir.

Q Dr. Elkins, I show you what has been marked as exhibit eighteen for identification and ask you if would look in the bag and tell the jury what is in here?

A These are the socks that I removed from the victim.

Q Are these the socks we are referring to here?

A Yes.

MR. CRABTREE: Again, Your Honor, I ask if I could pass these?

THE COURT: Yes, sir, please.

MR. CRABTREE: Your Honor, we would offer these as exhibit eighteen.

THE COURT: All right, sir.

Elkins - direct

Thank you.

That would be exhibit eighteen.

(Exhibit 18 marked and filed.)

MR. CRABTREE: Your Honor, we would offer this as exhibit nineteen for identification.

THE COURT: All right, sir.

Q Dr. Elkins, I will show you what has been marked as nineteen for identification and ask if you can tell the Court and jury what this is?

A These are the panties I removed from the victim.

Q Are these the condition they were in at the time you removed them?

A Yes.

MR. CRABTREE: Your Honor, I ask if I may do the same with this?

THE COURT: Yes, sir.

MR. CRABTREE: Your Honor, we would offer this as exhibit nineteen.

THE COURT: That would be exhibit nineteen to Dr. Elkins' testimony.

Elkins - direct

(Exhibit 19 marked and filed.)

MR. CRABTREE: Your Honor, I offer this plastic bag and the contents therein as exhibit twenty for identification.

THE COURT: Yes, sir.

Q Dr. Elkins, I will show you what has been offered as exhibit twenty for identification and ask if you can tell the Court and jury what that is?

A That is the yellow metal necklace with beads that I remember from the victim.

MR. CRABTREE: May I pass this, also?

A Yes, sir.

MR. CRABTREE: Your Honor, we offer this as exhibit twenty to this witness' testimony.

THE COURT: That will be made exhibit twenty, sir.

Thank you.

(Exhibit 20 marked and filed.)

Q Dr. Elkins, I will show you what has been marked as exhibit four and ask you

Elkins - direct

to look at this photograph, please.

And the red object here below the slash, do you recognize that red object?

A Yes.

Q What is that?

A That's the bloody cloth with a knot tied in it that was around the victim's neck when I received the body, which I removed.

Q And you did remove that cloth from the victim's neck, is that correct?

A Correct.

Q Ask to mark this as exhibit twenty-one.

THE COURT: Yes, sir.

Q The bag and contents therein.

Dr. Elkins, I will show you what has been marked as twenty-one for identification and ask if you can tell me what that is?

A That's the, when I saw it it was wet with blood, a cloth tied in a knot with the victim's hair caught in the knot.

And I made the cut mark to remove the cloth from the body.

Elkins - direct

Q Is that the way you removed it, from actually cutting it off the neck?

A Yes.

Q And the hair that we have here, that is actually tied into the knot?

A Yes.

Q Is that the victim's hair?

A That is the victim's hair.

MR. CRABTREE: Your Honor, we would offer this as exhibit twenty-one to the witness' testimony at this time.

THE COURT: That will be made exhibit twenty-one, sir.

(Exhibit 21 marked and filed.)

THE COURT: Thank you.

MR. CRABTREE: And may I pass this in the same fashion?

THE COURT: Yes.

Thank you.

May Dr. Elkins take the witness stand again?

MR. CRABTREE: Please.

I'm sorry.

THE COURT: Thank you.

Elkins - direct

Q Dr. Elkins, the person that you did the autopsy on and that you have been testifying about is the same person who is shown in exhibit two, is that correct?

A Right.

Q And this is the person that you referred to in your autopsy report as Colleen Slemmer, is that correct?

A Correct.

MR. CRABTREE: Your Honor, I would ask if we could pass exhibits two and four that she has referred to in her testimony?

THE COURT: All right.

Please pass them.

(Exhibits 2 & 4 passed to the jury.)

THE COURT: General, if you won't be using the tripod if we could get it out of the way?

Thank you.

MR. CRABTREE: May we approach the bench a moment?

THE COURT: Yes, sir.

Elkins - direct

BENCH CONFERENCE

MR. CRABTREE: After these exhibits are passed may we take a five minute recess for me to go wash? I would like to do that first.

THE COURT: Yes.

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury we are going to take about a ten minute recess and let everybody have a chance to stretch a little and visit the facilities or whatever.

And then we will proceed until we reach the conclusion of Dr. Elkins' testimony before we take another recess.

So, if all of you will please go with your officers and as soon as you are ready please let me know.

(Whereupon the jury left open Court after which the following proceedings were

Elkins - direct

had, to-wit:)

THE COURT: You are free to step down, Dr. Elkins.

Anything else?

MR. CRABTREE: No.

THE COURT: Court is in recess until the jury is ready.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

Bring in the jury, please.

Is there anything else you want to take up before we bring the jury in?

MR. CRABTREE: No, Your Honor.

THE COURT: Okay.

(Whereupon, the jury entered open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Go ahead, General, whenever you are ready.

Q Dr. Elkins, at the time that

Elkins - direct

the wounds were inflicted that you have testified about here, ah, to the body that you have testified about in the photographs, was the person who received those wounds alive at the time those were inflicted?

A Yes.

Q Thank you.

MR. CRABTREE: Your Honor, at this time we would pass Dr. Elkins.

However, I would ask the Court, ah, to advise the jury if there is any exhibit that I walked by too fast for them to view, or if there is anything specifically that they would like to see again, if they would let us know then we would certainly give them that opportunity.

THE COURT: Okay.

Why don't we go forward with cross-examination and I will make sure the jury is satisfied that it has seen everything before we go.

MR. TALMAN: We have no questions of Dr. Elkins, Your Honor.

But we would like to hold her

subject to recall if we need to call her back.

THE COURT: Do you have a problem with putting her on call as opposed to requiring her to take--

MR. TALMAN: Certainly. Certainly.

We don't expect her to wait here.

THE COURT: Okay.

MR. TALMAN: Thank you.

THE COURT: Thank you, Dr. Elkins.

Ladies and gentlemen, are there any of the exhibits that you wish to see prior to going forward with the next witness?

Okay.

General?

MS. HELM: The State would call Robert Pollock, please.

THE COURT: Okay.

(Whereupon, Mr. Pollock was so sworn.)

THE COURT: Please come up and have a seat, sir.

ROBERT ALFRED POLLOCK, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HELM:

Q State your name, please.

A Robert A. Pollock. P O L L O C K.

Q And, Mr. Pollock, in January of 1995 and days prior to that where were you living?

A At the Knoxville Job Corps Center.

Q And what was your job there?

A My primary job duty was orientation, specialist in, ah, every new student that came in the Job Corps program, spent the first week with myself in the daytime hours and I acquainted them to the center and saw that they had physicals and made their I.D.'s and toured the city and taught them all the things they need to know and introduced them to the key staff at the center so they would be well adjusted when they entered the actual academic and vocational program.

Pollock - direct

Q And in January of 1995 was the Defendant, Christa Pike, a student at the Job Corps?

A Ah, say when, please?

January of 1995?

A Yes, ma'am.

Q And she had been for some months?

A Yes, ma'am.

Q You were acquainted with Ms. Pike?

A Yes, ma'am.

Q And drawing your attention to January the 13th of 1995, that was a Friday, wasn't it?

A Yes, ma'am.

Q And on that day did you have occasion to see and talk to Christa Pike?

A Yes, ma'am, I did.

Q Where was that?

A In the orientation room.

Q And about what time if you recall?

A It was approximately 3:15,

Pollock - direct

maybe 3:20.

Q And what was she doing there?

A Ah, she had misplaced or lost or had her I.D. card stolen and she came for a replacement.

Q And was her paperwork in order?

A Yes, ma'am.

Q And was she given a new I.D. card?

A Yes, ma'am.

Q Now, what were, what were the conditions of the orientation office at that particular time?

A Well, ah, it being a holiday weekend, Dr. King's birthday, extended weekend, the students had to have an I.D. card on the 17th of January to be paid, and they couldn't be made one on the 17th, so everybody tried to come on Thursday or Friday prior to payday so they were sure to have their I.D. cards, ready to be paid, and it was relatively busy.

There were probably, it fluctuated from three to ten, twelve students at

Pollock - direct

a time.

Q And as a result of that did you ask Ms. Pike to do something?

A Ah, meaning what, please?

Q Because of the conditions there in the office were you able to process her I.D. card immediately?

A No, ma'am.

I, ah, asked her to please have a seat and, ah, all the students that were waiting, to keep the confusion down.

I had them all take a seat.

Q And, ah, did you notice where she sat?

A She sat in the very first, ah, seat when you come in the front door of the orientation room.

Q Okay.

And, ah, did you eventually process her card?

A Yes, ma'am.

Q Did that entail taking a picture?

A Yes, ma'am.