# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 2

## DOCUMENT 19

---

XXII 03S01-9712-CR-00147
~~03C01-9611-CR-00408~~

0023[illegible]

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

V. ) CASE NO. 58183A

CHRISTA PIKE )

FILED
BY MARTHA PHILLIPS, CLERK
DEC 26 1996
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

FILED
Clerk of the Courts
FEB 5 - 1997
MAILED
CERTIFIED
REGISTERED
REC'D BY

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XIX OF XXVII VOLUMES

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

# TABLE OF CONTENTS

VOL. XIX


| | | PAGE |
|---|---|---|
| ROBERT ALFRED POLLOCK: | | |
| Cross-examination | XIX | 1805 |
| WILLIAM HUDSON: | | |
| Direct Examination | | 1810 |
| Cross-examination | | 1816 |
| ARTHUR BOHANAN: | | |
| Direct Examination | | 1818 |
| MURRAY KELVIN MARKS: | | |
| Direct Examination | | 1825 |
| Cross-examination | | 1849 |
| Redirect Examination | | 1854 |
| KIMBERLY ANN ILOILO: | | |
| Direct Examination | | 1871 |
| Cross-examination | | 1888 |

Pollock - direct

Q Do you remember what she was wearing when the picture was taken?

A It seemed like she had, ah, a light colored top and, and, ah, some jewelry and--that's, when I took the photograph that is what she had on.

Q When she came into the office had she been wearing something else?

A I believed that, she had, ah--

MR. TALMAN: Your Honor, I object to what he believed.

He can testify as to what he knows.

That's fine.

But what he believed or what he is not sure of I object to.

THE COURT: Mr. Pollock may testify as to what he recalls.

Q Do you recall?

THE COURT: If you know, sir.

A I--ah, cannot recall.

THE COURT: All right.

Q Now, when Ms. Pike left did you observe anything about the chair she had been

Pollock - direct

sitting in?

A Yes, ma'am, there was a black, short black leather jacket hanging on the chair where she had eventually sat when she came in.

Q All right.

And, what, if anything, did you do about that jacket?

A Well, there were still five or six students, ah, or maybe only three or four, I can recall several names, and I asked several of the students to please go out and find Ms. Pike because it was a long weekend and she had left her jacket on the chair where she had sat, and if she didn't get it by 4:00, 4:05, I was locking up and she wouldn't be given access to the room until Tuesday.

Q And about 4:00 or 4:05 did you, in fact, lock that room up?

A On Friday the 13th, yes, ma'am.

Q When did you next return to that room?

A Approximately at 7:30 on Tuesday, the 17th of January.

Pollock - direct

Q What, if anything, did you observe about that black jacket?

A It was hanging exactly where it was when I first discovered it.

Q And what, if anything, did you do with that jacket?

A Initially I went to the Center Director's office, ah, having, ah, seen the news on Sunday, to alert someone that the jacket was in my room and, and, ah, within five minutes, carried it to Captain Hudson, head of Safety and Security.

Q And who is Captain Hudson?

A Captain Hudson is head of Safety and Security, or was, at the Knoxville Job Corps at the time.

Q Did you do anything with it in terms of looking through that jacket?

A No, ma'am.

Q Where did you turn the jacket over to Captain Hudson?

A In his office.

Q And you left it there with him?

A Yes, ma'am.

Pollock - direct

Q Who was with Ms. Pike when she came in to have her picture made on the 13th?

A There was a young man named Tadaryl Shipp with her.

Q And while Ms. Pike was there on the 13th, ah, how was her demeanor?

A It seemed relatively--

MR. TALMAN: Your Honor, Your Honor, I object to, to him testifying as to her demeanor unless there is some foundation laid or something.

A --I was busy, but she--

THE COURT: General, the witness can testify if he can recall, he can testify as to what he saw of, of her demeanor.

I don't think he can speculate.

MS. HELM: Very well.

Q Did, ah, Ms. Pike appear to be upset?

A No, ma'am.

Q Did she appear to be frightened?

A No, ma'am.

Pollock - direct

Q Was she frightened of Tadaryl Shipp, that you could tell?

A Repeat, please?

Q Did she appear to be frightened of Tadaryl Shipp?

A No, ma'am.

Q Was she crying?

A No, ma'am.

Q And your office is located, or was located at the Job Corps Center in Knoxville, Tennessee, is that correct?

A Yes, ma'am.

MS. HELM: I have no further questions at this time, Your Honor.

THE COURT: Mr. Talman?

MR. TALMAN: Thank you, Your Honor.

Your Honor, if I could have just one moment?

THE COURT: Uh-huh.

<u>CROSS-EXAMINATION</u>

<u>BY MR. TALMAN</u>:

Q Mr. Pollock, was it unusual for students to come into the, ah, into your

Pollock - cross

office to get new I.D. cards made?

A No, sir.

Q So, would it be fair to say that a lot of students lost their I.D. cards?

A Fair to say, yes, sir.

Q Okay.

Now, you said at the time that Ms. Pike came into your office that there was three to twelve students in your office?

A It fluctuated. Yes, sir.

Q And you said that, ah, that you, ah, were not sure, excuse me, that you were not sure whether Ms. Pike had anything else on or not besides this outfit that she was wearing when you took her photograph?

Is that correct?

A I meant that in response to the, ah, if, if the jacket was on at the time, if she wore that jacket when she came in because of the situation. I didn't actually, I don't have a, a recollection of her with that jacket on. I, I knew she had slacks or pants and shoes and so on.

Q So can you testify that this black jacket that you say you saw on this chair is

Pollock - cross

Christa Pike's jacket or is not, can you say, do you know?

A Does it have to be yes or no?

THE COURT: Say what you know, sir. If you know.

A I had seen Christa on Center in a jacket like it, and, ah, since it was on the chair where she sat, and assumed, from looking at it, it looked the same size as Christa, I assumed that it was her jacket. And, I--

Q Did you actually see Christa Pike with this jacket on the day she was in your office?

A No. Not that I can recollect.

Q Now, you say that this was on the Martin Luther King holiday, on that weekend, a long weekend.

A Friday the 13th, yes, sir.

Q And did anyone else have access to your office during this weekend?

A Ah there's three, probably two, three, four different keys available to other staff that could have entered the room.

Q So, you were not the only

Pollock - cross

person that had a key to this room?

A I was prior to about six months till this time, but, ah, the director of Group Life had extra keys made and given to Group Life and recreational staff, and, and, ah, recruiting people, recruiting keys open my door, and so there were three, at least three other keys that someone could have come into the room.

Q But you don't know if anyone was actually in or out of that office during that long weekend or not, do you, sir?

A My belief is that no one was in the office. Then, again, I know I am not supposed to say my belief, but I always, when I leave, the first thing I do whenever I come back, is to look to see that things are as I left them and there hasn't been any problem.

Q But you can't actually say--

A No, sir.

Q --for certain?

Okay.

MR. TALMAN: No further questions of Mr. Pollock.

And we have no problem with

Pollock - cross

him being released, Your Honor.

THE COURT: Any other questions, General?

MS. HELM: No.

THE COURT: Thank you, Mr. Pollock.

You are free to leave the courthouse.

MS. HELM: Call Captain Hudson.

THE COURT: Captain Hudson.

MR. TALMAN: Your Honor, may we approach while Captain Hudson is coming in?

THE COURT: Sure.

BENCH CONFERENCE

MR. TALMAN: Your Honor, if the State is going to try to introduce this leather jacket, I object. Mr. Pollock said he could not say that he saw, that he could place Christa Pike with this jacket.

THE COURT: They haven't tried to introduce it yet so--

MR. TALMAN: I understand.

I just wanted to make my objection.

THE COURT: No. He can't.

END OF BENCH CONFERENCE

(Mr. Hudson was so sworn.)

WILLIAM HUDSON, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HELM:

Q State your name, please.

A William Hudson.

Q And, Mr. Hudson, when we refer to you as Captain Hudson, are you still a captain?

A Well, I don't have to carry that title anymore. They call me Chief now.

Q Okay.

What were you captain of in January of 1995, sir?

A I was, ah, manager of Safety and Security at the Knoxville Job Corps Center.

Q And, ah, how long had you been

Hudson - direct

employed at the Knoxville Job Corps Center?

A Ever since August of 1991.

Q Did you know the Defendant, Christa Pike?

A Yes.

Q And is that the lady you know as Christa Pike?

A Yes.

Q Now, directing your attention to January 17th, 1995, did you have occasion to receive an item from Mr. Pollock?

A Yes.

Q Do you know what that item was?

A It was a black leather jacket.

Q Where did you receive that jacket?

A Where?

Q Yes.

A In my office.

Q Where is your office located?

A It was located on the, ah, west side of the Center.

MS. HELM: May I approach,

Hudson - direct

Your Honor?

THE COURT: Yes, ma'am.

MS. HELM: Ask to mark this as the next exhibit for identification.

THE COURT: Twenty-two.

Q And I would ask you to pull this out of the bag and--

MR. TALMAN: Your Honor, I would make an objection here to this jacket.

There has not been anything tying this jacket to Christa Pike.

And we would object to it being introduced. I do not see where the State is going with this.

THE COURT: Can you lay a foundation?

MS. HELM: Your Honor, we will make it relevant. It is just that, again, Mr. Talman is trying to decide the order of the State's proof.

THE COURT: Come on up.

<u>BENCH CONFERENCE</u>

Hudson - direct

THE COURT: You need to tie it--

MS. HELM: I've got witnesses who can identify that jacket as belonging to Christa pike.

MR. TALMAN: Well, Your Honor, I think to try to get it in--it is my understanding that, something about something in this jacket, that's what he's testified to, and unless it is established that it is her jacket I don't think it is relevant. And I think it would be prejudicial.

THE COURT: Is there anything wrong with my saying to them that it is subject to identification as Ms. Pike's jacket?

MR. TALMAN: Well, Your Honor, --

THE COURT: --and I will admonish them that they may not consider--

MR. TALMAN: --you cannot, you can't--

THE COURT: Okay.

I am going to, obviously, require them to tie it to Christa Pike.

Hudson - direct

END OF BENCH CONFERENCE

MS. HELM: If you would remove that item from the bag, please?

Have a look at that. And I will ask you if you recognize that?

A Yes.

Q What is this?

A It is the leather jacket I received from Mr. Pollock on the date in question.

Q On the 17th of January?

A Yes.

Q And except for these markings which are from some other procedure, is it substantially the same as it was when you saw it that day?

A Yes.

Q And what did you do with this jacket?

A I kept it in my office and I called the police department.

Q Did you speak to someone specifically or just called the police department?

A I, ah, called, I think it was

Hudson - direct

Detective York, I think, was the detective's name, his name was familiar.

Q Okay.

And what did you do with this jacket?

A I turned it over to him when he came to, ah, to pick it up.

Q Do you know who came to pick it up from you?

A Ah, I don't see the gentleman in the courtroom.

Q Was it Arthur Bohanan?

A Yeah, it was "Bo".

Q Okay.

Is that how you know him?

A Yes.

Q And he was with the Knoxville Police Department?

A Yes.

Q Now, did you in any way search or alter this jacket while it was in your possession?

A I did not search it.

Q Did you, ah, keep it safe from

Hudson - direct

other people while it was in your possession?

A Yes.

MS. HELM: Your Honor, at this time we would make this an exhibit pending the precautionary--

THE COURT: All right.

The exhibit would be twenty-two with the understanding that, ah, at this time there has been, as has been raised in the objection, no foundation laid for this jacket to be that of Christa Pike.

(Exhibit 22 marked and filed.)

MS. HELM: I have no further questions.

THE COURT: Okay.

Mr. Talman?

<u>CROSS-EXAMINATION</u>

<u>BY MR. TALMAN</u>:

Q Captain Hudson, ah, you say you received this jacket from Mr. Pollock?

A Yes, sir.

Q All right.

Do you remember when that was?

A The 17th of January.

Hudson - cross

Q Was it in the morning or afternoon, or do you remember the time of day?

A I think it was about the close of the morning that I received it.

Q Do you know at approximately what time?

A I don't recall the exact time, sir.

Q Okay.

After you received this jacket did you lock it up, secure it, do anything with it?

A It was locked inside my office. And my office is a separate office and it was locked inside there.

Q Okay.

Anyone else have access to that office?

A None at the time.

Q Okay.

So nobody else but you had access to that office?

A Ah, my secretary would have had access to it.

Hudson - cross

Q Okay.

Anyone else?

A No. Not during that time, no.

MR. TALMAN: No further questions of Captain Hudson, Your Honor.

And we have no objection to him being released.

THE COURT: Any other questions you wish to ask?

MS. HELM: No.

May he be excused, Your Honor, please?

THE COURT: Sure.

Thank you.

You are excused to leave the courthouse.

MS. HELM: Call Art Bohanan.

(Witness was so sworn.)

ARTHUR BOHANAN, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HELM:

Q State your name, please.

A Arthur Bohanan.

Bohanan - direct

Q And where are you employed?

A Knoxville Police Department.

Q And in what specialty?

A I'm a specialist in the Crime Lab.

Q And how long have you been so employed?

A Ah, twenty-one years, working on twenty-one years in Knoxville.

Q Were you so employed in January of 1995?

A I was.

Q Were you assigned to help on the Job Corps murder case?

A Yes, I was.

Q On January the 17th of 1995, did you have occasion to go to the Job Corps Center?

A Yes, I did.

Q And when you got there who did you encounter?

A I was told to contact Captain Hudson, that he had a coat for me to pick up, and some articles inside it.

Bohanan - direct

Q And when you got there did you obtain from him a coat?

A Yes, I did.

MS. HELM: May I approach, Your Honor?

THE COURT: Yes, ma'am.

Q I will show you what has been marked as exhibit 22, Specialist Bohanan, and ask you if you recognize that?

A Yes, this has my initials in it. It is the coat I got from Captain Hudson shortly after 8:00 o'clock on this Tuesday.

Q And that would be the 17th of January?

A That is correct.

Q Now, did you search that coat--

THE COURT: Excuse me.

Was that 8:00 o'clock in the morning?

Mr. Bohanan: 8:00 o'clock in the morning, yes, ma'am.

THE COURT: Okay.

Thank you.

Bohanan - direct

Q Did you search that coat?

A I did.

Q Does it have a pocket?

A Yes, it does.

Q Many or few?

A It has, ah, four, three pockets, I'm sorry. Three pockets.

Q And in one of those pockets--

MR. TALMAN: Your Hoñor, I am going to object. There's some, here, again, the same objection I've been making as to, ah, tying it into this Defendant in any way.

Second of all, there's no consent, no search warrant, nothing of that nature.

And I would make an objection to any further testimony about, about this article.

THE COURT: Subject to your continuing objection and to proof that this is, in fact, a coat that belonged to Christa Pike, subject to that proof coming into evidence, ah, there is no requirement that there be a search warrant, or that there be consent. It was left at

Bohanan - direct

the Job Corps office, and the Job Corps turned it over to the police department.

So, your objection is noted for the record and is overruled.

Go ahead, General.

MR. TALMAN: Thank you.

Q Did you check out the coat?

A I did.

Q And what, if anything, did you find?

A The, the right front pocket had some, ah, cough drops.

The left front pocket outside has nothing.

The inside pocket, inside the left breast, has a pocket that had a fork in it, a cigarette butt, and a small piece of bone.

MS. HELM: May I approach?

THE COURT: Yes.

Q I will show you what has been marked as exhibit number ten, Specialist Bohanan, do you recognize that?

A Yes.

Q What is it?

Bohanan - direct

A This is a piece of skull that I removed from the inside left pocket of this coat.

Q Of the coat that is laying there before you?

A That is correct.

Q The coat that you received from Captain Hudson?

A That is correct.

Q What did you do with that piece of bone, Specialist Bohanan?

A I brought it back to the office and contacted Dr. Murray Marks at U.T. Anthropology and immediately took it over and he had the rest of the skull and we matched this back into the piece of skull perfectly.

Q Now, I will ask you to look at the skull, that section of skull that you have in that plastic bag, sir, and ask you if it is in any way altered at all from the way you found it in that coat?

A No, except it has turned a little browner with age. I didn't clean it up or wash it or do anything. It hadn't been washed, to

my knowledge.

Q So it is exactly identical to the way you found it?

A Yes.

Q Now, after you took it to Dr. Marks what happened to that piece of skull?

A I kept control of it continuously up until Saturday, I'm sorry, Friday.

MS. HELM: No further questions.

MR. TALMAN: No questions of Officer Bohanan.

And no objection to him being excused.

THE COURT: Thank you, Specialist Bohanan. You are excused to leave the courthouse.

Mr. Bohanan: Thank you, Judge.

THE COURT: Yes, sir.

MR. CRABTREE: Call Dr. Marks.

THE COURT: Did you say, Dr. Marks?

MR. CRABTREE: Yes.

(Witness was so sworn.)

MURRAY KELVIN MARKS, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Would you please state your full name for the Court and jury?

A Murray Kelvin Marks.

Q And what is your occupation, sir?

A I'm a Physical Anthropologist.

Q And, ah, by whom are you employed?

A University of Tennessee.

Q And what is a physical anthropologist?

A A physical anthropologist is a, ah, a subfield. Physical anthropology is a subfield with anthropology.

Anthropology is comprised of archaeology, cultural anthropology and physical anthropology.

Q Okay.

And, specifically, what does a Physical Anthropologist do?

Marks - direct

A Well, there is a specialty within physical anthropology that is termed, forensic anthropology. And that's particularly, ah, the work I do, by looking at, ah, human remains that are in a medical/legal situation.

Q And is that your particular area of expertise?

A Yes.

Q And what is your educational background, sir?

A I have a Bachelor of Science degree in anthropology. I have a Master of Arts degree in biological anthropology and a PhD in physical anthropology.

Q And how long have you been in this profession of forensic anthropology? That is the correct term, forensic anthropology?

A That's correct.

Ah, with a PhD I've been doing it for almost three years.

But I have been doing it about fifteen years as a student prior to that time.

Q Now, sir--Your Honor, at this time we would offer Dr. Marks as an expert in the

Marks - direct
field of Forensic Anthropology.
MR. TALMAN: No objection, Your Honor.
THE COURT: Okay.
Dr. Marks will be recognized as an expert in the field of Forensic Anthropology.
MR. CRABTREE: Forensic Anthropology.
Q Now, Dr. Marks, in your capacity as an expert in the field of Forensic Anthropology, did you have an occasion to receive from Dr. Elkins in January of 1995, the head of a young lady?
A Yes, sir, I did.
Q And you and Dr. Elkins had worked together before, is this correct?
A Yes, sir.
Q And is it correct that you work under her supervision as part of a team in this particular area?
A Right. Within the medical/legal system, medical examiner cases, it's her, it's her case.

Marks - direct

Q Now, when you received the head did you have specific instructions, or had you discussed with Dr. Elkins what she requested of you concerning this head?

A Yes, sir.

Q And what was that?

A That was to look at the remains, analyze the bones, and determine what kind of trauma is happening, reconstruct.

Q And to do that did you have to prepare the head?

A Yes, sir.

Q Okay.

And did you, in fact, do that?

A Yes, sir.

Q Besides the head, itself, did you receive anything else from Dr. Elkins?

A Ah, no, sir. I believe there were two, ah, cervical vertebra involved as well.

Q Okay.

Any parts that had been, that she had taken out during an autopsy or anything?

A No. No. Just that.

MR. CRABTREE: If I may, Your

Marks - direct

Honor?

THE COURT: Okay.

Q I will show you what has been marked as exhibit eight and ask if you will tell the Court and jury what this is?

A This is the--shall I remove it?

Q Please. If you need to--

A This is the skull, the case that I worked on early in 1995, ah, performing the work that Dr. Elkins requested me to do.

Q Okay.

And as far as the identification of this particular skull, were you working under the assumption of a particular name assigned to this?

A Ah, yes. We, we determined--

MR. TALMAN: Your honor,--

Q I'm not asking what you determined.

I'm asking if you, were you using a particular name that you were relating to this, yourself?

A Correct.

Marks - direct

Q Okay.
What was that name?
A Ah, Colleen Slemmer.
Q Okay.
Thank you.
MR. CRABTREE: And if I may, Your Honor?
THE COURT: Yes, sir.
Q I will show you what has been marked as exhibit nine and ask if you recognize what is in there?
A Right. Those are the remains that went with this.
Q Okay.
You received all of that--
A All of that together.
Q All that you have there, you received from Dr. Elkins?
A Right.
Q Is that correct?
A Yes, sir.
Q Now, when you prepared the skull, would you just describe to the jury what injuries you found to the skull?

Marks - direct

A After the, ah, remains were in a state to where I could examine the skeletal injury, ah, I found two main areas, ah, that had had injury.

And this was, this was the side, the left side region, ah, behind the ear.

You can see here that it has been reconstructed.

And, also, some fracturing on the front of the face.

So, skeletal, two areas represent trauma that occurred in a paramortum (phonetically) sense.

Q Now, when you had the skull in a condition that you could observe these trauma areas that you referred to, did it appear as it does now?

A Yes, sir.

Q Or did you have to do some reconstruction?

A Well, I had to reconstruct--

Q Okay.

Prior to your reconstructure, before your reconstruction how did it appear?

Marks - direct

Can you describe that?

A The condition of the remains when I received them?

Q Yes, uh-huh. And before you actually did your reconstruction?

A Okay.

The remains were flesh. There was a lot of soft tissue trauma. And then through processing we, ah, removed the soft tissue, ah, allowed the remains to dry, and then could reconstruct, ah, the traumatic events.

Q Okay.

Now, once you had removed the soft tissue and before you had commenced your reconstruction, how did it appear at that time?

A Just as it does now.

Q Okay.

But, not, what I am referring to is, before you did the reconstruction, on the side here?

A Okay.

So the parts that were broken off--

Q Yes.

Marks - direct

A There is about seven or eight pieces, ah, that would be missing along this side.

And I believe one or two pieces that were missing along the side region here.

Q All right.

MR. CRABTREE: Your Honor, may I have him step down?

THE COURT: Sure.

Q And please bring the skull with you, please.

Now, if you would, sir, concerning this area across through here.

What is that caused by? And I am referring to this cut here, the skull cap.

A That, ah, is a result of autopsy.

Q Okay.

And so that is the reason the skull cap is removed?

A Right.

Q Because of the autopsy, is that correct?

A Correct.

Marks - direct

Q And, again, the period of time that we are talking about, is after you have the soft tissue removed and before you actually did the reconstruction.

Would you just show the jury how big a hole there was in the side of the skull?

A Okay.

This region right through here, back around, under here, back here, and right here on this piece.

Q And that is the area that you filled in when you did the reconstruction, is that correct?

A That is correct.

Q And how many pieces have you put in there?

A Ah, there's probably about seven or eight, maybe as many as ten pieces were reconstructed in the skull.

Q That is what I wanted you to show.

Again, if you will just point to the areas that you were showing?

A This region.

Marks - direct

Q Now, the pieces that you found that you used to do the reconstruction, where did you get those?

A Those were contained in the soft tissue.

Q And so you received that when you received the skull, all that was received from Dr. Elkins?

A Yes.

Q Now, you have indicated that there is a trauma to the front.

A Yes.

Q Would you point to that, please?

A Right in here and also to the nasal bone.

Q Show that down here, too.

Now there is a fracture on this side, also, is that correct?

A Yes, sir.

Q Would you explain how this fracture occurred?

A Yes, sir.

The fracture on this side of

Marks - direct

the head is not a result of impact trauma. The fracture on this side of the head is a result of the head being against a hard surface.

Q Okay.

So, in which direction is the force being applied to cause a fracture on this side?

A The force is applied from the left side, with the head being on a hard surface, and this crack associated to this trauma from that force.

Q That is the reason the fracture is on this side?

A Right.

Q So that is the reason there is no wound to this side--

A Right.

Q --or no blow to this side.

A Right.

Q And I believe that shows up in the skull cap, also, is that correct?

A This matches here, which is a fracture that runs all the way up there.

Q All right.

One other thing, for the jury's edification--now, the line such as this across the back, what are those?

A Those are suture lines.

Those are normally appearing in the skull, where the bones grow together. Those are not traumatic at all.

Q Have a seat.

MR. CRABTREE: Your Honor, we would ask to mark this photograph as exhibit twenty-three for identification.

THE COURT: All right, sir.

MR. CRABTREE: If I might approach the witness?

THE COURT: Yes, sir.

Q Sir, I will show you what has been marked as exhibit twenty-three for identification and ask you if you recognize that photograph?

A Yes, sir, I do.

Q And what is that, please?

A That is, ah, the skull that was just described, sitting in the laboratory. It is actually drying.

Marks - direct

Q Does that show the area where you did the reconstruction before you actually commenced the reconstruction?

A Prior to reconstruction. This shows the hole in the side of the skull.

Q Hole in the left side.

And that is the way it appeared after you had completed the processing before you began the reconstruction?

A Yes, sir.

MR. CRABTREE: Your Honor, we offer this as exhibit twenty-three.

THE COURT: All right, sir.

That will be exhibit twenty-three.

(Exhibit 23 marked and filed.)

Q Now, Dr. Marks, as a result of your observations of the skull, and I am talking about from the bone only, and not from soft tissue, can you tell us the minimum number of blows that this head received?

A The minimum number of blows, ah, received, ah, from the skull was at least four.

Marks - direct

Q At least four?

A At least four.

Q And would you please tell us where those four were inflicted?

A At least two were inflicted on the side, this fractured ridge in here that I mentioned.

And two on the front of the face. One associated with the fracture in the forehead, above the eyes, and one associated with the fracture of the nasal bones, the bridge of the nose.

Q Now, this is strictly from the observation of the skull?

A Right.

Q This is not from any soft tissue?

A This is just the bone. Right. Right.

Q And, also, does this skull, itself, give you any indication of what was used to cause these wounds or to inflict these wounds?

A Ah, there appears to be, ah, ah, two types of weapon. One being a sharp force.

Marks - direct

One being--

Q No, I'm referring to, the blunt trauma.

Is there anything embedded in this skull?

A Oh, yes.

Q Would you please tell us what?

A There is a small piece of some type of rock like material that is embedded in this region of the bone here.

And there are other scratches around that, and some other perforations down in the bottom of this area here that are consistent with the same pitting you see on this bone here.

Q Would that be consistent with, say, asphalt?

A Could be. Yes.

Q Now, after you had received this skull, processed it, done the reconstruction, did you have an occasion to see another piece of bone?

A Yes, sir.

Q And who did you receive that from?

Marks - direct

A That came from Arthur Bohanan.

Q Sir, I will show you what has been marked as exhibit ten and ask if you can tell us what that is?

A It is a piece of bone from a skull.

Q And is that the piece of bone that you received from Arthur Bohanan?

A Yes, it is.

Q And can you tell us what skull that piece of bone belongs to or came from?

A Well, I, I fitted it on this reconstruction here.

So, it fit with that.

Q Would you show us how it fits there?

A Sure.

I have to get it oriented properly.

Did you want me to walk around and show it?

Q Yes, please do.

A Okay.

(Skull shown to the jury.)

Marks - direct

THE COURT: Dr. Marks, would you show me what you just demonstrated to the jury, please?

Dr. Marks: Yes, ma'am.

This right here.

THE COURT: All right, sir.

Thank you, sir.

Q And, Dr. Marks, within a reasonable degree of scientific certainty, do you have an opinion as to whether or not that piece of bone belongs to this skull?

A There is no doubt whatsoever, that fits there.

Q Pardon?

A There is no doubt in my mind, that fits there.

MR. CRABTREE: Your Honor, I would ask to mark this as exhibit twenty-four for identification.

THE COURT: All right, sir.

Q I will show you what has been marked as exhibit twenty-four for identification and ask if you recognize that?

A Yes, sir. That's the region

Marks - direct

here, ah, with this piece of bone that was brought to me. That is actually my thumb fitting the piece onto there.

Q Would you just take this red marker and mark the piece of bone that is exhibit number ten?

A Just--

Q Just make a big X on the photograph.

And the X on the center, that is the piece of bone that is exhibit ten, is that correct?

A Yes, sir.

Q And where it is fitted in there, is that, ah, the portion of the skull that was reconstructed?

A Yes, sir.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit twenty-four to his testimony.

THE COURT: Yes, sir, that will be exhibit twenty-four to his testimony.

(Exhibit 24 marked and filed.)

Q Now, concerning this piece of

Marks - direct

bone here, exhibit ten, the piece of skull that you said you received later, is that the condition you received it in?

A Yes, sir, it is.

Q Okay.

You have not cleaned that up or anything?

A No, that was in my office a very short period of time.

Q Then you returned it to Arthur Bohanan?

A Right.

Q Now, if I may, I will show you what has also previously been marked as exhibit nine, and ask, those bone fragments there, what are they?

A These, there's, well, actually, in the brown bag, there are two vertebra. The first and second vertebra of the neck.

And when the head was removed from the body that is where the section was made. Ah, it is much simpler to, ah, remove the head at that junction than to dissect up way underneath

Marks - direct

and just remove the skull.

Q The film canister?

A The film canister contains bone fragments that were too small to reconstruct in the hole. Their edges were so damaged that without any reliability I couldn't, they didn't have the nice fit that the other ones did, didn't have the jigsaw puzzle effect.

Q And where did you receive, or were did you get the bone fragments that are in the canister?

A All of this came from the soft tissue.

Q All right.

So, that was all taken from the soft tissue?

A Right. Right.

Q Everything in exhibit nine?

A Yes, sir.

Q And then when you completed this reconstruction, ah, what did you do with this skull?

A Ah, this, when the reconstruction was completed then an analysis was

Marks - direct

done, look at the fractures, look at the cracks, try to figure something about direction, try to figure something about, ah,--

Q No.

I'm just asking you, once you completed this and your examination, did you return the skull to Dr. Elkins?

A Right.

MR. CRABTREE: Your Honor, we would offer exhibits eight, nine, and ten at this time.

THE COURT: As?

MR. CRABTREE: As exhibits.

THE COURT: Were they not made exhibits previously?

MR. CRABTREE: I don't know. The Court Reporter told me I had not moved them into evidence before. And we had had that discussion.

So I am moving them at this time if I have not done so.

MR. TALMAN: Your Honor, may we approach?

THE COURT: Yes.

Marks - direct

You are right. You didn't.

BENCH CONFERENCE

THE COURT: You can make them exhibits subject to them being identified--

MR. CRABTREE: Well, now, they have been identified as being the skull of the person in this photograph. But this is what we are working on at this time.

MR. TALMAN: But it has not been identified as Ms. Pike's jacket.

MR. CRABTREE: We will take care of that.

MR. TALMAN: Okay.

We make an objection for the record as to chain of custody as to that jacket.

MS. MARTIN: The jacket was left over the weekend where there was access to it. Also, it was locked up and his secretary had a key.

THE COURT: If it is, if it is, should be--

MR. CRABTREE: This is not an item that is subject to chain of custody because

Marks - direct

it is not a changing item, as the Court knows. It is a piece of bone.

MR. TALMAN: Mr. Pollock said he could not say it was Christa Pike's jacket.

MR. CRABTREE: That's not the basis of what you were saying, though. You were saying the chain of custody.

MS. MARTIN: But it was taken out of the jacket and the jacket is subject to the chain.

THE COURT: Is there any way you can show that that is her jacket--

MR. CRABTREE: To connect the jacket to her?

MR. TALMAN: Yes, subject to our objection.

MR. CRABTREE: We have already connected it to the skull.

And it is relevant as a result of that.

THE COURT: That is correct.

END OF BENCH CONFERENCE

Marks - direct

THE COURT: All right.

Subject to the proof regarding identification of the victim I will admit exhibits eight, nine and ten, ah, that is the skull, the package containing the skull fragments and the piece of bone in a single package as exhibits subject to those bits of evidence coming in.

(Exhibit eight marked and filed.)

Exhibit nine marked and filed.)

(Exhibit ten marked and filed.)

MR. CRABTREE: Pass this witness for cross-examination, Your Honor.

THE COURT: Mr. Talman?

MR. TALMAN: Thank you.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Dr. Marks, you said you received this, ah, head from Dr. Elkins and that you processed it?

A Yes, sir.

Q What do you mean by

Marks - cross

processing?

A Processing, ah, means that the soft tissue is removed so that we can analyze the bone.

Q Okay.

And how is that done?

A Processing, ah, can be done in a variety of ways, which, what we use is, ah, ah, heat, heat and water. And with that and, ah, some mild chemicals over a period of three or four hours.

Q And you say--

A And the soft tissue falls away.

Q You say heat and water?

A Right.

Q Such as boiling?

A No, it doesn't really boil.

Ah, it's low heat for several hours. It's, it's checked periodically. It doesn't boil or anything.

Q And you say chemicals? What kind of chemicals?

A Chemicals, a mild detergent

Marks - cross

and some bleach, a combination of those two things. And that tends to decrease the remains, it gets the grease out of the bones so that they can be reconstructed and then be analyzed.

Q Okay.

Sir, can you testify within a reasonable degree of scientific certainty that, that, ah, putting chemicals on this head can, putting it in water and heat could not dâmage it, or did not damage it?

A I suppose it could, maybe, alter the histological structure of the outer surface of the bone, but it can't alter or destroy types of, ah, cracks, it, it, it has never, ah, in my experience, destroyed any type of normal features to the bone or pathological features to bone.

Q Now, I notice with the exhibit that has been introduced as exhibit nine, that's the fragments that you were looking at, you said those were removed from the, ah, those came from the soft tissue--

A Correct.

Q --I'm sorry--

Marks - cross

A Yeah. Correct.

Q Did you remove those from the soft tissue prior to putting these chemicals, ah, and treating this, ah, this head?

A Right. What, what one does, ah, is dissect off as much soft tissue as possible.

Okay?

So that when it is subjected to the water, ah, you don't have a lot of, ah, material in there, so it doesn't have to be in there for a long period of time.

Those remains, or those pieces of soft tissue that include those bones were put in, ah--

Q So you don't actually pick the bone fragments out prior to--

A No, no.

Q Okay.

All right.

Were there any other chemicals used besides a mild detergent and a bleach?

A No. No, sir.

Q Okay.

Marks - cross

All right.

After this, ah, processing is completed, how long does the whole processing take, the procedure?

A Well, it actually depends on the body part. Ah, a skull doesn't take very long because most of the tissue is, ah, on the face are thin. Besides the region of the jaw, ah, most of the very thin, ah, thin tissue, coupled with the fact that there is a lot of laceration, then that gets processed much sooner than if there was, ah, no, no cuts or no, ah, opened areas on the skull.

So, you are talking, as far as time is concerned, ah, several hours, okay, for the soft tissue to come away. An hour or two for it to dry properly. And then you can start reconstructing the skull, the piecing together of the parts.

Q All right.

MR. TALMAN: I don't think I have any further questions of Dr. Marks and have no objection to him being excused.

THE COURT: General?

MR. CRABTREE: I have one

Marks - redirect

further question, a couple, if I may, Your Honor?

If I may approach, Your Honor?

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. CRABTREE:

Q Dr. Marks, this, ah, reconstruction that you talked about here, I believe you talked about in cross-examination, about the process of cleaning those and removing the soft tissue.

A Uh-huh.

Q What soft tissue, again, are we talking about removing here?

A There is, ah, a fibrous coating that is adjacent to the bone. It is called the periostoma, meaning around the bone.

It is a fibrous connective tissue.

And on top of that, if we are talking about, ah, the head part, the top, ah, there is the scalp, which is several, maybe a centimeter thick in area, and then the hair.

And then when you move down to the face there is some more musculature in the

Marks - redirect

face, particularly the lower part of the jaw.

Q So, that soft tissue you removed from this particular, this particular bone, is that correct?

A Correct.

Q Now, this item that has been filed as exhibit ten, it doesn't look any different than those.

Has it been cleaned, also?

A I would say so. I didn't, I didn't process it.

Q But you didn't clean it?

A No, sir, I didn't.

It came in in that state. It had been, it has been altered in some, it has been cleaned or something, because, ah--

Q But it wasn't done by you or in your processing?

A No.

Q Nothing further.

MR. TALMAN: Nothing further on recross, Your Honor.

THE COURT: May Dr. Marks be excused?

Marks - redirect

MR. CRABTREE: Please.

MR. TALMAN: Yes, Your Honor.

THE COURT: Thank you, sir.

You are free to leave.

Dr. Marks: Thank you.

MR. CRABTREE: Your Honor, we have a couple of exhibits that need to be passed to the jury that the jury hasn't seen.

Twenty-four and--

THE COURT: I don't recall that you passed the diagram that Dr. Elkins testified about, either.

MR. CRABTREE: That is correct, Your Honor. I didn't. So we would ask to pass twenty-four and twenty-three and these two large diagrams.

THE COURT: Okay.

Why don't we go ahead and do that at this time?

And while they are doing that if we could--

MR. CRABTREE: And these are--excuse me, I didn't mean to cut you off--

THE COURT: That's okay. I'm

used to it.

MR. CRABTREE: Eleven and twelve. Exhibits eleven and twelve.

THE COURT: Okay.

Go ahead.

(11, 12, 23, 24 passed to the jury.)

THE COURT: Now, while we are passing those if you all will approach, please?

I'm only kidding, General.

BENCH CONFERENCE

MS. HELM: We are now at the point where we are going to be getting into the physical evidence that they haven't seen.

THE COURT: So we need to take a recess?

MS. HELM: Yeah, so that they can--

(Discussion concerning timing.)

END OF BENCH CONFERENCE

THE COURT: All the jurors have an opportunity to see the exhibits?

Okay.

Ladies and gentlemen of the jury, ah, we believe there is still some more things that we can get accomplished today. But I need to take a recess in order for the Attorneys to, ah, do a few things in order to, perhaps, shorten up and make a little more efficient some of the things that will come next.

This recess will take a little while. Please bear with us.

And as soon as they are ready and I am ready, because there are some things that I am going to need to be working on as well, I will call you back in here and hopefully hear some more proof before we conclude this afternoon, and get you out to relax.

Ladies and gentlemen, you haven't heard all the evidence.

Please do not deliberate. Do not attempt to come to any conclusions. And don't discuss the matter with each other, and as soon as I'm told everybody is ready, then we will bring you back in the courtroom and proceed.

Thank you very much.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Anything you would like to take up before we take a break?

MS. MARTIN: When we had that last side-bar, I just wanted to make sure I understood the Court's ruling on the piece of skull, exhibit number ten, that even though our argument that it was breaking the chain of custody regarding the jacket, was the Court allowing that in even--

THE COURT: I'm allowing that in as part of the physical evidence that is probably not subject to chain of custody, but I believe that it will be ultimately tied in anyway.

But I am going to allow it subject to certain objections regarding who the jacket belongs to and identification.

MR. CRABTREE: Your Honor, we would submit to the Court, also, that, obviously, we have proven that that piece of bone goes with the skull that is part of this particular case.

And that, in and of itself, makes it relevant. And the Doctor has, in fact, testified, two of them, that it specifically came from that.

THE COURT: Each of the witnesses, Dr. Elkins and Dr. Marks, testified that there was no question that that was a piece of the skull.

Now, subject to the skull being proven is that of the victim and sûbject to all this being tied together, that will be a part of the, ah, proof.

And I will allow it in.

Does that answer the question?

MS. MARTIN: Sort of. Yes. Thank you.

THE COURT: Okay.

Now, you all have some business to do.

And if you will let me know as soon as you are ready, and I would like to go a little further forward.

MR. CRABTREE: Do we have to? (laughed)

THE COURT: Uh-huh. A little

further.

MR. CRABTREE: Well, it gets difficult.

And I would advise the Court, that again, ah, our determination of how long a witness is going to take has proven to be inaccurate. I thought I was fairly accurate as far as the direct examination of Dr. Elkins.

But I was a little off on the cross-examination of Dr. Elkins.

The situation that we have is that, ah, we have some items that Mr. Talman wishes to see.

THE COURT: Yes, sir.

MR. CRABTREE: We have a number of people--

THE COURT: And that he has a right to see, since we are on the record.

MR. CRABTREE: --and he has a right to see. No question about that.

Ah, we have, ah, a number of witnesses who have been, who have come in from out of town that we have not had a real opportunity to spend any time with up till now because of where they had to be transported from.

If we were to put on another witness at this time, and I don't want to do this this way, I'm talking about a witness that could possibly take as long or longer than Dr. Elkins did on direct.

And that's not something that I really want to get into at this particular time.

THE COURT: May I suggest that you all go and look and see what you have? If there are problems with any of the evidence and any motions that need to be brought to the Court's attention, and then come down and talk to me, and we will figure out the time frame.

MR. CRABTREE: And I apologize to the Court, but this is, obviously, moving a great deal quicker than we thought it was going to, and we tried to stagger--

THE COURT: And I'm happy to keep it going as quickly as it is moving.

MR. CRABTREE: --and I don't like to stop, either.

THE COURT: All right.

MR. CRABTREE: --but, but, ah--

THE COURT: I will be glad, if

we need to stop for the day, once you have done these things, and explain to the jury that it would be better to go ahead and stop and make some arrangements for them, ah--I don't know how long it is going to take you all to do what you have got to do.

But why don't you take a break and then go do it and let me know?

MR. CRABTREE: Thank you, Your Honor.

THE COURT: All right.

Thank you.

(Whereupon, a recess was had, after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

MR. CRABTREE: If it please the Court, as we have stated in chambers, it was our intention to call Ms. Kimberly Ann Iloilo as our next witness.

Since that discussion we have been in the courtroom. There is a thirty-nine page statement that she has given that Counsel has requested as Jencks material.

Mr. Talman had suggested the

possibility of doing the direct this afternoon and then splitting it and doing the cross in the morning, after we give him the, ah, the, ah, Jencks material.

Your Honor, I have gone ahead and given him the Jencks material at this time.

I have already provided him with a copy of her statement.

But I don't like the idea of splitting the witness up.

If we are going to do that, it is fine with me, I think he can have the statement to work with overnight, and let's just do the whole examination in the morning. I think it makes more sense that way.

THE COURT: I, this, do you anticipate this to be a very long witness?

MR. CRABTREE: No, Your Honor.

I don't think it will be that long a witness.

MR. TALMAN: Your Honor, I have no problem in doing it all tomorrow.

But I have not yet received the Jencks material.

MR. CRABTREE: Your Honor, I

just gave it to him.

THE COURT: You just gave it to him?

MR. TALMAN: No, You haven't.

MR. CRABTREE: I thought I handed it to you.

MR. TALMAN: No, you haven't. (laughed) You said you were going to give it to me but you haven't given it to me yet.

MR. CRABTREE: No, I thought I put it up there on the table, to you. I'm sorry. He has it now.

MR. TALMAN: I have it now, Judge.

THE COURT: I would prefer, it would be my preference, and I would imagine yours, not to split a witness, really.

MR. TALMAN: That's fine.

THE COURT: So that the jury hears all the witness' testimony at one time.

And I take it there isn't another witness of similar length that you could put on?

MR. CRABTREE: No, Your Honor. If we had one we would go ahead.

THE COURT: Let's bring the jury in and release them.

I know they have some good arrangements for dinner--and let them relax this evening.

Otherwise, I think it would make it harder for them to get through all the proof.

MR. TALMAN: Pardon me, Judge?

THE COURT: We are making it harder for them to process the proof in their minds if we break up stuff.

MR. CRABTREE: Well, like I say, we have gone ahead and even though the, ah, as the Court is aware of the rule, we are not required to give it to him until after the direct examination, so that they can have it to review overnight.

THE COURT: I appreciate that, sir.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ladies and gentlemen of the jury, it is about thirteen till 5:00, if our clock is right.

And I think it is pretty close.

The Attorneys have been working diligently in the last hour or so on some matters and, ah, I believe that it might be best, knowing the length of some of the next witnesses, to go ahead and adjourn for the evening.

I know Mr. Beeler and Ms. Bieber have found you all a good place to eat supper.

And, ah, I think that for the--so that we don't break up the testimony of a witness tonight and tomorrow, it would be best if we went ahead and adjourned this evening, and start up in the morning.

There is nothing else on my docket tomorrow morning.

So, I will be ready to start, if you all think you can be, right around 9:00.

Will that be okay?

We will be ready to start at 9:00 o'clock and move right through the day.

We made a lot of progress today and I expect that we are going to make a lot of progress tomorrow.

And, ah, again, I must caution you not to read or view local news media or national news media.

Please stay with the officers.

Any problems, whatsoever, of any kind, and you need them communicated to me or to them, please do so.

Let them know and they will tell me. There are no secrets between me and my officers.

So, any of you that have any kind of problem and you need me to know and take care of it, we, we will do our best to do that.

Just tell the officers.

And, ah, again, ah, please do not deliberate or attempt to make any decisions.

We are a good ways, still, from hearing all of the proof. But as I say, I think we are making excellent progress and I'm pleased with it, and, ah, I think that when we get, ah, as we go through this we will find that we are really moving along, and, hopefully,

tomorrow will be as good a work day as today.

And I thank you all very much for your time and attention today.

And please go with the officers and have a good evening.

(Whereupon, the jury left
open Court, after which
the following proceedings
were had, to-wit:)

THE COURT: Are there any other matters that you all wish to take up prior to adjourning for the evening?

MR. TALMAN: We have nothing, Your Honor.

MR. CRABTREE: Can't think of anything.

THE COURT: Court is adjourned until 9:00 o'clock tomorrow morning.

COURT ADJOURNED AND RECONVENED ON MARCH 16TH, 1996, AT 9:00 A.M.

THE COURT: Thank you.

Are we ready to proceed with proof?

MR. CRABTREE: The State is ready.

We would ask, though, if we could, at this time waive the presence of Detective York for a while?

THE COURT: Yes, sir. Be glad to do that.

MR. TALMAN: The Defense is ready, Your Honor.

THE COURT: The question is, is the Judge ready? Let me get the bench rearranged for a minute, and if you will line up the jurors, please?

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: General, are you ready to call your next witness, sir?

MR. CRABTREE: The State is ready.

THE COURT: Okay.

MR. CRABTREE: The State would call Ms. Kim Iloilo.

THE COURT: Is Ms. Iloilo in the courtroom?

Iloilo - direct

Ms. Iloilo, if you will stop right there and raise your right hand to be sworn?

(Whereupon, the witness was so sworn.)

KIMBERLY ANN ILOILO, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Would you please state your full name for the Court?
A Kimberly Ann Iloilo.
Q And would you spell your last name for the court reporter, please?
A I L O I L O.
Q Ms. Iloilo, how old are you, please?
A I'm eighteen.
Q Are you a little nervous about being here this morning?
A Yes.
Q And certainly nervous about testifying?
A Yes.

Iloilo - direct

Q Now, I would ask you, at this time, where do you live?

A I live in Shelby, North Carolina.

Q Now, if you would, would you recall back to the month of January of 1995?

And in January of 1995, where did you live?

A I lived at 621 Dale Avenue.

Q And what was located at 621 Dale Avenue?

A Knoxville Job Corps Center.

Q And were you a student there?

A Yes, sir.

Q And as a student at the Knoxville Job Corps Center, did you know the Defendant before these proceedings, Christa Pike?

A Yes, sir.

Q Did you know Colleen Slemmer?

A Yes, sir.

Q Did you know Shadolla Peterson?

A Yes, sir.

Q Did you know Tadaryl Shipp?

Iloilo - direct

A Yes.

Q Were all of these students with you?

A Yes.

Q Now, were you close friends with any of these people?

A Christa Pike.

Q Colleen Slemmer. Were you close with her?

A No.

Q Mr. Shipp?

A No.

Q Ms. Peterson?

A No.

Q And how long had you known Christa Pike?

A I had known her for, roughly, about three or four months.

Q And how long had you known Ms. Slemmer?

A About, about a month and a half, two months.

Q Now, did you have an occasion to talk to Christa Pike on the eleventh day of

Iloilo - direct

January, 1995?

A Yes.

Q Did you have an occasion to talk to her on the eleventh day of January, 1995, about Colleen Slemmer?

A Yes.

Q And where did this conversation occur?

A In my room.

Q And about what time of the day are we talking about?

A It was in the evening.

Q And what did she tell you about Ms. Slemmer?

What did she say about her?

A She said that she was going to kill her.

Q She said she was what?

A Going to kill her.

Q Did she say why she was going to kill Colleen Slemmer?

A At that point she had said that she had just felt mean that day.

Q She what?

Iloilo - direct

A Felt mean.

Q And that's all, the only reason that she gave you at that time, for wanting to kill Ms. Colleen Slemmer?

A At that time.

Q Now, was anything else said about it then?

A Not then.

Q Now, did you see her again on the twelfth day of January, of 1995?

A Yes.

Q And where did you see her on the twelfth day of January?

A I seen her at, in the parking lot.

Q Did you have a discussion with her, with Christa Pike on the twelfth day of January, of 1995, about Shadolla Peterson?

A Yes.

Q And what did Ms. Pike say to you about Shadolla Peterson?

A She said she needed to find her, Shadolla Peterson.

And I asked her why.

Iloilo - direct

And she said because she needed to talk to her.

And I said, "Okay".

And then she left.

Q And that was the extent of the conversation that occurred at that time?

A Uh-huh.

Q About what time of the day are we talking about there?

A It was about 4:00 o'clock.

Q Now, did you see her again on the twelfth day of January of 1995?

A Yes.

Q And where was she when you saw her again, or later on?

A It was in the parking lot, still.

Q And, ah, approximately what time are we talking about?

A It was about 8:00 o'clock.

Q And what was she doing?

Could you tell?

A She was walking, just--

Q In what direction?

Iloilo - direct

A Towards the, 17th Street.

Q Away from the Job Corps Center there?

A Yes.

Q Did you see anyone with her?

A Colleen Slemmer, Tadaryl Shipp and Shadolla Peterson.

Q Colleen Slemmer, Tadaryl Shipp, and Shadolla Peterson and Christa Pike?

Those are the four you saw?

A Yes.

Q And were they leaving campus?

A Yes.

Q Okay.

And going in what direction?

A Ah, up 17th Street.

Q And this is about--

A 8:15.

Q Did you see any of these people later on, again, the evening of the twelfth day of January of 1995?

A Yes.

Q Who did you see?

A I seen Shadolla Peterson,

Iloilo - direct

Tadaryl Shipp and Christa Pike.

Q Shadolla Peterson, Tadaryl Shipp and Christa Pike?

A Yes.

Q Where did you see them?

A They were coming back toward the campus.

Q Was Colleen Slemmer with them?

A No.

Q In fact, did you ever see Colleen Slemmer again after you saw her leave campus with these three other individuals that night?

A No.

Q Now, when you saw, ah, Shadolla Peterson, Tadaryl Shipp and Christa Pike coming back to the campus, were they walking together?

A No.

Q Describe how they were walking.

A Ah, Tadaryl was in front of them, I guess, about five minutes. And Christa was walking with Shadolla.

Iloilo - direct

Q They were coming back down 17th Street?
A Uh-huh.
Q Did you see Christa Pike later on?
A Yes.
Q I may have asked this, I don't recall.
When you saw them coming back toward campus, about what time are we talking about?
A About 10:15.
Q When did you see Christa Pike again that evening?
A When she came upstairs.
Q Where did she come to upstairs?
A My room.
Q And did you talk to her?
A Yes.
Q And did you talk to her about Colleen Slemmer?
A Yes.
Q Please tell us what she told

Iloilo - direct

you.

A She told me, she said, "Kim, I have something to tell you," and I asked her, "What?"

And she said, "But first, you can't say anything." And I said, "Okay".

And she told me that she had just killed Colleen Slemmer.

Q She told you she had just killed Colleen Slemmer?

A Yeah.

Q What else did she tell you?

A She said that she had brought back a souvenir with her.

Q A souvenir?

A Yes.

Q Did she say what this souvenir was?

A She said it was a piece of Colleen's skull.

Q Did she show it to you?

A Yes.

Q Now, after she told you that she had brought back a souvenir and showed you

Iloilo - direct

this piece of Colleen Slemmer's skull, did she tell you how she killed her?

A Yes.

Q What did she tell you?

A She told me that she had killed, she had cut Colleen's throat, and she had, they had beat her up, and she had thrown asphalt at her head.

Q At her what?

A At her head.

Q Did she tell you how many times they had cut her throat?

A Six.

Q Did she tell you what Colleen Slemmer was doing while they were cutting her throat?

A She was asking them not to do that.

Q She was what?

A Asking them not to do that.

Q Not to do what?

A To beat her and cut her throat.

Q Did she say anything else

Iloilo - direct

about why they cut her throat?

A She said that, ah, they kept cutting her throat because that she was a witch, because she was still talking.

Q They were trying to stop her from talking?

A Yes.

Q And did she tell you about, when they were hitting her in the head, when they were hitting Colleen Slemmer in the head with the asphalt?

A Yes.

Q What did she tell you about that?

A She said that they were, ah, at first it was a big piece of asphalt. And then it broke, and they kept throwing it at her.

Q And what was she doing while she was telling you about the asphalt?

A She was dancing around in a circle.

Q Who was dancing around in a circle?

A Christa.

Iloilo - direct

Q Dancing around in a circle while she was telling you about this?

A Yes.

Q Was she doing anything else?

A She was smiling.

Q Was she making any other noises or anything?

A She was--kind of singing, la, la, la.

Q Dancing in a circle and la, la, la, and smiling, while she was telling you about this?

A Yes.

Q Now, after, is there anything else that she told you there at this time about the killing of Colleen Slemmer?

A Yes.

Q What else?

A She said that they had, ah, cut a pentagram in her forehead and in her chest.

Q Okay.

Anything else that you can recall?

A And that they had used a meat

Iloilo - direct

cleaver to cut her back.

Q Did they tell you what they had used to cut her throat?

A A box cutter.

Q Anything else you recall about this conversation?

A No.

Q Now, did she leave your room then?

A Yes.

Q And when was the next time you saw her?

A At breakfast the next morning.

Q And did you have a discussion with her at breakfast about this the next morning?

A Yes.

Q Would you please tell us what that discussion was?

A I asked her what she had done with the piece of skull. And she said it was in her pocket.

Q She said what?

A It was in her pocket.

Q And then did she say anything

Iloilo - direct

else?

A She said, "And, yes, I'm eating breakfast with it."

Q "And, yes, I'm eating breakfast with it?"

A Yes.

Q Did you see the piece of skull again at this time?

A No.

Q Did you talk with Christa Pike again about this after that, after the breakfast?

A No.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q Ms. Iloilo, I will show you what has been marked as exhibit ten and ask if you will look at that and see if you recognize that?

A Yes.

Q And what is that, please?

A That is Colleen's piece of skull that Christa showed me.

Q This is the piece of skull that Christa Pike showed you in your room on the

12th of January of 1995, sometime after 10:00 P.M.?

A Yes, sir.

Q And does it appear to be--

THE COURT: Can you all hear? Okay.

Could you speak up just a little bit louder, Ms. Iloilo?

Q And does it appear to be in the same condition now that it was then?

A Yes.

Q And this is the piece of bone, piece of skull, that she showed you when she told you about keeping a souvenir?

A Yes, sir.

MR. CRABTREE: Ask to mark this photograph as exhibit twenty-five for identification.

Q I will show you what has been marked as exhibit twenty-five for identification and ask if you recognize the person in that photograph?

A Yes, sir.

Q And who is that, please?

Iloilo - direct

A Colleen Slemmer.

Q And is that the way Colleen Slemmer appeared when you last saw her?

A Yes.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit number twenty-five.

THE COURT: Yes, sir, that will be exhibit twenty-five.

May I see it, please?

Yes, sir.

(Exhibit 25 marked and filed.)

MR. CRABTREE: And we would also ask that this be passed to the jury at this time.

THE COURT: Yes, sir.

( Exhibit 25 passed to jury.)

Q Ms. Iloilo, I will show you what has been marked as exhibit twenty-two, and I would ask you if you have ever seen the Defendant, Christa Pike, wearing this jacket?

A Yes.

MR. CRABTREE: Your Honor, has this been made an exhibit already?

Iloilo - direct

THE COURT: Yes, sir. I believe it was subject to it being identified.

Let me verify that, General.

Yes, sir, it was made an exhibit.

MR. CRABTREE: And, Your Honor, now that this piece of skull has been identified and been connected, we would ask that it be passed in the bag that it is in.

THE COURT: Any objection?

MR. CRABTREE: Exhibit ten.

THE COURT: All right.

(10 passed to the jury.)

MR. CRABTREE: The State would pass Ms. Iloilo for cross-examination purposes, Your Honor.

THE COURT: All right.

Thank you.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Good morning, Ms. Iloilo.

A Hi.

Q You say you were at Job Corps how long?

Iloilo - cross

A I was there for about six months.

Q About six months?

When did you first arrive?

A August 16th.

Q August 16th of 1990--

A 5.

Q 5? '94?

A Yeah, '94.

Q Okay.

So, how long did you know, ah, Christa Pike?

A About four months.

Q About four months?

Do you remember when she first got there?

A No.

Q Was it after you got there?

A Yes.

Q Or before?

A It was after.

Q She got there after you did?

A Yes.

Q You say you were good friends

Iloilo - cross

with her?

A Yes.

Q Did you talk about lots of things?

A Yes.

Q Share secrets?

A Yes.

Q Okay.

Consider yourselves close friends?

A Yes.

Q Okay.

How would you describe life at Job Corps, living there?

A It wasn't easy.

MR. CRABTREE: Objection, Your Honor, irrelevant.

MR. TALMAN: Well, Your Honor, it is relevant, and if, if I can--

THE COURT: I think you need to ask more specific questions, Mr. Talman, as opposed to a generalized, general characterizations.

MR. TALMAN: I will try to

Iloilo - cross

rephrase it, Your Honor.

THE COURT: All right, sir.

Q Was life at Job Corps easy?

A No.

MR. CRABTREE: Objection.

THE COURT: It is leading.

MR. CRABTREE: Well, he can lead. But easy, what's easy?

MR. TALMAN: Well, if he will give me a chance I will try to get to that, Judge.

THE COURT: I'll let you ask it.

Go ahead.

MR. TALMAN: Okay.

Q Was life at Job Corps easy?

A No.

Q Okay.

Would you say it was difficult?

A Yes.

Q How would you describe it as difficult?

MR. CRABTREE: Your Honor, if I may--I apologize for interrupting Counsel.

Iloilo - cross

But life at Job Corps is not being tried here.

We are trying a murder case.

And how is life at Job Corps relevant to this particular case?

THE COURT: Would you approach the bench, please?

MR. TALMAN: Certainly.

BENCH CONFERENCE

MR. TALMAN: Your Honor, I am trying to lead into the weapons, that other people carried weapons.

MR. CRABTREE: What has that got to do with anything?

THE COURT: How is that relevant, that other people carried weapons? I think he can ask her if she knows if people carried weapons.

MR. CRABTREE: What if somebody carried a weapon, in general? We are talking about four people.

MR. TALMAN: Whether it was

Iloilo - cross

common.

MR. CRABTREE: What is that relevant to?

MR. TALMAN: It is relevant if it was not unusual at Job Corps for students to carry a weapon.

THE COURT: I think that's--

MR. CRABTREE: If we are talking about these four people, I don't have a problem with that.

THE COURT: Ah--too broad and general. If you want to direct it to her as to these people, that's one thing, but, whatever--I'm the Judge. I can't tell you what to ask.

MR. TALMAN: Let me try it again.

END OF BENCH CONFERENCE

Q Ms. Iloilo, you say you have known Christa Pike for three to four months?

A Yes.

Q All right.

Iloilo - cross

During this time have you ever seen her get into a fight with anyone else?
A No.
Q Never?
A Not that I recall.
Q Okay.
Now, you made a statement that you, on January the 11th, that you were talking with Ms. Pike about Colleen Slemmer?
A Yes.
Q And you said that she said that she was going to kill Colleen?
A Yes.
Q That she felt mean about, that she felt mean? Is that correct?
A Yes.
Q Okay.
What did you do about that?
A At the time, nothing.
Q Why?
A Because we were all, it was, four of us in the room and we were--just talking, and it just didn't--it was blown off as soon as it was said.

Iloilo - cross

Q Why?

A Ah, when it was said, we, ah, another conversation started.

Q Okay.

And you say there was four of you in a room?

A Well, no, they were not my roommates. They were in my room.

Q Okay.

Who was in your room?

A Ah, Brandy Rogers, Christa Pike, myself, and, ah, Jennifer McCrary.

Q All right.

And without saying what you were talking about as such, what was the general scope of your conversation?

A School and friends and--outside activities.

Q Now, when you say that, ah, Christa Pike said that she was going to kill Colleen, did you take that as a serious threat?

A Not at the time.

Q Okay.

Had you ever heard her say

anything like that before?

A No.

Q So you didn't take that as a serious threat?

A No.

Q Never heard her say she was going to kill anybody, or anything of that nature?

A No.

Q Did you ever hear her say she was going to beat anybody up?

A No.

Q Never in this three or four month period that you knew her?

A No.

Q Okay.

Would, ah, how long did this conversation last?

A Ah, roughly about an hour or an hour and a half.

Q Okay.

Was it limited to Colleen Slemmer or were you talking about other things?

A Mostly other things.

Q Okay.

Iloilo - cross

All right.

And can you describe more of how the, how Colleen Slemmer came into the picture, what was being discussed?

A I don't remember exactly how it came about.

Q Okay.

Do you remember what else was being discussed at the time?

A I believe we were talking about Tadaryl.

Q About Tadaryl?

Okay.

Do you remember any more specifically?

A Not really.

Q Okay.

And at this time you say she just, when she made this comment was she saying, "I'm going to kill Colleen," or just how did she say it?

A She, basically, how you said it.

Q Calm?

Iloilo - cross

A Calm.

Q Okay.

Just in a conversation with four girls?

A Yes.

Q Okay.

And you didn't take this as a serious threat?

A No.

Q Okay.

Did you ever talk anymore about to, ah, to Christa Pike about killing Colleen Slemmer, anything else about it?

A No.

Q Okay.

Just that one time?

A Yes.

Q And you did nothing as a result of that, as a result of that conversation?

A No.

Q You didn't go tell anybody at security or call the police or anything like that?

A No.

Q And you didn't do that because

Iloilo - cross

you didn't believe her, is that correct?

A Yes.

Q Okay.

Did, ah, was it your, was it your impression she was just blowing off steam, talking?

A Yes.

Q Did Christa generally talk and act tough?

A No.

Q No?

Okay.

Now, you say that you were, that she was talking about Tadaryl Shipp.

Was that who she was dating at the time?

A Yes.

Q Okay.

And had you been around them as far as going out with them or anything like that?

A Once or twice.

Q Okay.

Iloilo - cross

Q Do you know how long she had been seeing Tadaryl Shipp?
A I think for about a week or two, a week or two weeks after she had gotten there.
Q So, for approximately three or four months you knew her?
A Yes.
Q Minus a week or two?
A Yes.
Q Okay.
Have you ever seen Christa mad over Tadaryl before?
A Yes.
Q Can you describe that incident, or occasion?
A She was usually upset as far as that. They had gotten into an argument.
Q Pardon me? I didn't hear you.
A They had gotten into an argument over this or that.
Q When was that?
A Ah, I don't remember.
Q Okay.