**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 2**

**DOCUMENT 20**

---

XXIII 03S01-9712-CR-00147

~~03C01-9611-CR-00408~~

002422

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

V. ) CASE NO. 58183A

CHRISTA PIKE

FILED
BY MARTHA PHILLIPS, CLERK
DEC 26 1996
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

FILED
Clerk of the Courts
FEB 5 - 1997
MAILED
CERTIFIED
REGISTERED
REC'D BY

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XX OF XXVII VOLUMES

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

# TABLE OF CONTENTS

VOL. XX


| | PAGE |
|---|---|
| KIMBERLY ANN ILOILO: | |
| Redirect Examination | 1912 |
| STEPHANIE WILSON: | |
| Direct Examination | 1914 |
| Cross-examination | 1924 |
| CHAS TERRY: | |
| Direct Examination | 1934 |
| RANDY YORK: | |
| Direct Examination | 1938 |
| Cross-examination | 1997 |

Iloilo - cross

Do you recall whether it was around that time period, or before, or how long before, or anything?

A No, I don't.

Q Okay.

Now, how many times would you say you have seen her upset over Tadaryl?

A Maybe twice.

Q Maybe twice?

Okay.

Ah, was she really upset, or, or--how would you describe her attitude and demeanor?

A She was just upset and a little mad at him.

Q Okay.

Do you know what it was about?

A No. They just had a petty fight about something.

Q Okay.

And how would you characterize their relationship?

A They had a good relationship.

Q Had a good relationship?

Iloilo - cross

Okay.

Ah, would you, ah,--excuse me, just a second, Your Honor--have you ever, ah, seen Tadaryl, ah, ah, telling Christa what to do or anything of that nature, or bossing her around, or anything like that?

A No.

Q Never?

A No.

Q Okay.

And you had never seen Tadaryl and Christa fight or anything like that?

A No.

Q And never seen Christa fight with anybody else over Tadaryl?

A No.

Q Okay.

Now, when you said that you, ah, saw Christa, and Shadolla, and Tadaryl returning to the Job Corps Center, I think you said that was about 10:15, is that correct?

A Yes.

Q When you saw them returning, did you say Tadaryl was walking ahead of them?

Iloilo - cross

A Yes.

Q And I couldn't hear your answer when you said how far ahead of them he was walking.

A I guess, maybe, about from here to the door.

Q From here to the door of this courtroom?

A Yes.

Q So, approximately, I don't know what this would be, ah, fifty feet, General?

MR. CRABTREE: Thirty or forty.

Q Thirty or forty feet ahead--

A Yes.

Q --something like that?

Okay.

Let me ask you now, you say that, ah, Christa Pike came to your room and talked to you after they got back, after this 10:15 time when you say you saw them coming back to Job Corp.

That was in your room?

A Yes.

Iloilo - cross

Q Okay.
Was anybody else there with you?
A No.
Q Okay.
Just the two of you?
A Yes.
Q Okay.
Now, you said that, ah, Christa Pike had, ah, ah, said that while, did I understand you right, when you said that while they were supposed to be hitting her with this rock she was saying something about la, la, la, la, la?
A Yes.
Q What was that?
A I don't know.
Q Okay.
And how was her demeanor at that time?
A I didn't understand.
Q How, how was she acting at that time, when--
A She was happy.

Iloilo - cross

Q Happy?

A I mean, she wasn't happy, but she wasn't--she was in a good spirit.

Q Okay.

A At that time.

Q Okay.

Now this, when you say, la, la, la, was that at the time that she was talking to you that you said she was doing that?

A Yes.

Q Okay.

Now, are you saying that while she was telling you that she had just killed somebody, she was going, la, la, la, la, la, dancing in a circle?

A Yes.

Q Had you ever seen her act like that before?

A No.

Q Was it unusual behavior for her?

A Not really.

Q Okay.

You hadn't seen her act like

that, so, can you give me another instance of--how she acted, or something--

A Well, she was usually a happy person.

Q I'm sorry?

A She was usually a happy person.

Q She was usually a happy person?

Did she have a lot of friends?

A Yes.

Q Okay.

Or seemed to have a lot of people around her?

MR. CRABTREE: Object to relevancy, Your Honor.

MR. TALMAN: Strike the question.

Excuse me for just one moment.

Q Now, you say that Christa had a lot of friends?

A Yes.

Q Okay.

Do you recall talking to

Iloilo - cross

Officer York back on January the 20th of 1995?

A Yes.

Q Okay.

Do you recall him asking you who else, "Who else is a good friend of Christa's besides you, that she is real close to?" And you said, ah, "Just me and Tadaryl?"

Is that correct?

A I don't remember.

Q Okay.

MR. TALMAN: Your Honor, may I approach the witness?

A Yes, sir.

Q Just to refresh your recollection--(showed her a document.)

A Yes.

Q Okay.

So at the time you talked to Officer York, ah, you and, and Christa and, I guess, Tadaryl, you and Tadaryl were Christa's only close friends, is that correct?

A Yes.

Q Okay.

Now, these other friends that

Iloilo - cross

she had, were they close friends, or were they just acquaintances, or--

MR. CRABTREE: Object to relevancy, Your Honor.

THE COURT: I will allow that question.

Go ahead.

Q The, the other, ah, ah, friends that you say Christa had, were these close friends, or were they acquaintances, or how would you reconcile (sic) that?

A Ah, they were just friends, people she knew.

Q Just people she knew at Job Corps?

A Yeah.

Q Okay.

So, it was pretty much, you and Tadaryl were her close friends?

A Yes.

Q Okay.

Now, did I understand you right, that you said that, ah, Christa had told you that she had cut a pentagram in, ah, Colleen's

Iloilo - cross

forehead and her chest?
A Yes.
Q Okay.
Did you see any weapon at any time?
A No.
Q She never showed you anything of that nature?
A No.
Q Okay.
Now, after she told you this, what did you do?
A I, ah, I don't really remember. I was in shock.
Q Did you tell anyone? Did you go to security or call the police?
A No.
Q Why?
A I, I didn't believe it. I didn't want to believe it.
Q Okay.
Let me ask you, if we can go back to this, ah, Wednesday, January the 11th, 1995, ah, you had said that Christa had said that

Iloilo - cross

she was going to kill Colleen, and that she felt mean.

A Yes.

Q Correct?

Was that statement made at the same time or at a different time, was that two different statements? That she felt mean, and that she was going to kill Colleen?

A The same time.

Q They were made at the same time?

MR. TALMAN: Your Honor, if I could--just let me read it to her.

Q Ms. Iloilo, in this conversation with, ah, Detective York, you had, ah, ah, made a statement that Christa had come into your room and told you that she felt mean and that she just wanted to do something. Then you said, "Later on that night she came back and said, 'I'm going to kill Colleen.'"

Is that correct?

A Yeah.

Q Okay.

Did she tell you these at the

Iloilo - cross

same time, or was it a different time?

A She said them--to me at two different times, but she said them both at two different times.

Q Okay.

Now, you had just told me that she said both at the same time.

Do you remember what she had said, or not?

A I remember she told me that she was feeling mean that day and she just wanted to do something.

Q Okay.

Had she ever said anything like that before?

A No.

Q Never, in the whole time you had known her?

A No.

Q Okay.

And that was a Wednesday, is that correct?

A Yes.

Q Okay.

Iloilo - cross

MR. TALMAN: Your Honor, if we could have just one moment?

THE COURT: Yes, sir.

MR. TALMAN: Your Honor, I don't think I have any further questions of Ms. Iloilo. Thank you.

REDIRECT EXAMINATION

BY MR. CRABTREE:

Q Ms. Iloilo, I believe you indicated that on the 11th of January, 1995, when Ms. Christa Pike made the threat to kill Colleen Slemmer, that you didn't take it serious at that time, is that right?

A Yes.

Q Have you since found out that you were wrong?

A Yes.

Q And, also, that when she told you about killing Colleen Slemmer, in your room on the evening of the 12th of January of 1995, that you didn't report it to the police or anything at that time?

A Yes.

Q And you said you didn't want

Iloilo - redirect

to believe it, was the reason why?

A Yes.

Q Has it caused you difficulty that you didn't?

A Yes.

Q Okay.

MR. TALMAN: Nothing further, Judge.

And no objection to her being excused.

THE COURT: Any problem with that, General?

MR. CRABTREE: No.

THE COURT: Ms. Iloilo, you are free to leave the courthouse.

Thank you very much.

Call your next witness, General.

MR. CRABTREE: Pardon me?

THE COURT: Call your next witness.

MR. CRABTREE: Stephanie Wilson.

(Witness was so sworn.)

Wilson - direct

STEPHANIE LEIGH WILSON, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Ms. Wilson, I want you to talk to me back here, okay?
A Okay.
Q All right.
Good.
Keep your voice up.
Would you please state your full name for the Court and jury?
A Stephanie Leigh Wilson.
Q And, Ms. Wilson, where do you live, please?
A Gastonia, North Carolina.
Q Now, if you would, I would ask you to remember back to the month of January of 1995.
And where were you living at that particular time?
A The Knoxville Job Corps Center.

Wilson - direct

Q And how long had you been living at the Knoxville Job Corps Center?
A Ah, going on five months.
Q And while living there at the Job Corps Center did you meet the Defendant before these proceedings, ah, Christa Pike?
A Yes, sir.
Q And as of January, 1995, how long had you known Christa Pike?
A Ah, about, since I got there.
Q And did you know Shadolla Peterson?
A Yes, yes, sir.
Q And did you know Tadaryl Shipp?
A Yes, sir.
Q And Colleen Slemmer? Did you know her?
A Yes, sir.
Q And can you talk just a little bit louder? Okay?
A Okay.
Q Were you close friends with any of these people?

Wilson - direct

A Ah, well,--I was more closer to Christa than most of them.

Q Now, did you have classes with Christa?

A Yes.

Q And on the 13th day of January, of 1995, were you in class with her?

A Yes, sir.

Q And during the morning hours of that date, in your class in the morning, did you have a conversation with her?

A Yes, sir.

Q And would you tell us what that was about? Just tell us how it started, first.

A Well, we was talking, and, ah, she, ah, asked me not to tell nobody if she told me, ah, she had something to tell me. And, ah, she, ah, look at her shoes, and, ah, she said, "That ain't mud on my shoes." She said, "That's blood."

Q Did you look at her shoes?

A Yes, sir.

Q And what did you see on her

Wilson - direct

shoes?

A Just little, ah, spots on them.

Q Okay.

And then what did Ms. Pike say after that?

A Ah, she said she had something to show me. And I said, and I said, what was it, and, ah, she pulled a napkin out of her jacket and it had, ah, ah, something in the napkin.

Q And did she show you what was in the napkin?

A Yes, sir.

Q And what did she tell you it was?

A A piece of a human skull.

Q Did she tell you whose skull it was a piece of?

A Yes, sir.

Q Who did she tell you?

A Colleen Slemmer.

Q Now, did she tell you what had happened to Colleen Slemmer?

A Yes, sir.

Wilson - direct

Q What did she tell you about what had happened to Colleen Slemmer?

A She said, ah, her and Tadaryl and Colleen went walking, and she, ah, slashed her throat six times.

Q She said what, now?

A She slashed her throat.

Q Who slashed her throat?

A Christa.

Q Slashed whose throat?

A Colleen's.

Q Okay.

How many times?

A Six.

Q Okay.

And then go on.

What else did she say?

A She said she, ah, beat her in the head with a rock.

Q Did she say why she beat her in the head with a rock?

A No.

Q Go on.

What else?

Wilson - direct

A Ah, she said that she got a piece of her skull and that's what she was showing me.

Q Now, when she said she beat her in the head with a rock, did she tell you what happened to Ms. Slemmer's head?

A She said blood and brains were pouring out.

Q I'm sorry. What?

A Her blood and her brains were pouring out.

Q And did she tell you how she got this piece of skull?

A She picked it up.

Q Picked it up from where? Did she tell you that?

A Ah,--

THE COURT: I'm sorry. But you are going to have to speak up a little bit, Ms. Wilson. They have got to be able to hear you. Okay?

Q She said she hit her in the head with a rock? Is that right?

A Yes, sir.

Wilson - direct

Q And what did she say happened when she hit her in the head with a rock?

A Ah, she said her brains and her blood was, ah, coming out of her head.

Q And did she tell you how she got this piece of skull?

A She picked it up.

Q Did she say where she picked it up from?

A No, sir.

Q And you saw this piece of skull?

A Yes, sir.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit ten for identification and I would ask you to look at that.

And do you recognize that?

A Yes, sir.

Q And what is that?

A The piece of a skull.

Q And when was the last time

Wilson - direct

that you saw that?

A Ah, that day in class.

Q Is that what she pulled out of the napkin and showed you?

A Yes, sir.

Q And the person that did that, is that Christa Pike, seated over here?

A Yes, sir.

THE COURT: Let the record reflect she has identified the Defendant.

MR. CRABTREE: Pass this witness.

I would like the record to reflect that we are delivering the 16.2 material at this time.

MR. TALMAN: And, Your Honor, we would like an opportunity to review it before we do cross-examination.

THE COURT: All right. This may be a good time to take a brief recess.

Ladies and gentlemen of the jury, again, you have not heard all the evidence.

Please do not deliberate or discuss this matter or attempt to form opinions as

to the evidence, in your own mind.

Please go with the officers and as soon as we are ready we will call you back in here and we will proceed with further testimony.

Just sit right where you are, Ms. Wilson.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: All right. Ms. Wilson, you can step off the witness stand, and, of course, you are still under oath and giving testimony. Please do not discuss this matter with anyone as you come in and out of the courtroom unless it is one of the Attorneys.

All right.

Now, anything else we want to take up before we recess?

You need some time to do that.

MR. CRABTREE: The State has nothing at this time.

THE COURT: Would you please let me know when you are ready?

Court is in recess.

Thank you.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

Now once again, folks, the jurors, even the ones up close, have indicated they are having a hard time hearing. Please speak up so that they can hear everybody.

And, Ms. Wilson, if you would please speak up as loud as you can so that they can hear you. It is important that they hear everything that goes on.

Okay?

Are we ready to bring in the jury?

MR. CRABTREE: The State is ready.

MR. TALMAN: Yes, Your Honor.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

Wilson - cross

THE COURT: Mr. Talman, are you ready to go forward?

MR. TALMAN: Yes, Your Honor. Thank you.

THE COURT: Go right ahead.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Good morning, Ms. Wilson.
A Good morning.
Q Are you doing okay?
A Yes, sir.
Q How long did you say you had been at Job Corps?
A Five months.
Q Five months?
A And how long have you known Christa Pike?
A Five months.
Q So, during the time you were at Job Corps you knew Christa Pike?
A Yes, sir.
Q Okay.

Now, did you know Tadaryl Shipp?

Wilson - cross

A Yes, sir.

Q And how long did you know him?

A Ah, about five months.

Q About the same time?

A Yes.

Q And how about Shadolla Peterson?

A Five months.

Q And Colleen Slemmer?

A I don't know how long I knew her, about a month or two.

Q Only knew her about a month or two?

A Yes.

Q Okay.

How well did you know Christa Pike?

A We were friends.

Q Do things together?

A Sometimes.

Q Okay.

Did you ever do anything with her and Tadaryl?

A No, sir.

Wilson - cross

Q Okay.
Did you ever see her and Tadaryl together?

A Yes, sir.

Q Did you ever see her and Tadaryl fight?

A No, sir.

Q Okay.
Have you ever seen Christa Pike out of control or in any kind of a fight with anyone?

A No, sir.

Q Okay.
Do you remember when we talked in North Carolina, when Ms. Martin and I came over and talked with you?

A Yes, sir.

Q Okay.
Do you not recall telling us that you had seen Ms. Pike out of control and in arguments or fights?

A I heard that she was out of control.

Q Okay.

Wilson - cross

And that is what you told us, is that correct?

A Yes.

Q Okay.

Had you ever actually saw it?

A No, sir.

Q Okay.

What you told us is what you heard from somebody else?

A Heard. Yes, sir.

Q Okay.

Did you ever see Christa act up?

A No, sir.

Q Okay.

How about Tadaryl?

What kind of temper did he have? Did you know?

A ----All I know, he was nice to me.

Q Okay.

Do you recall telling Officer Gary Price, on January the 14th of 1995, that, "Tadaryl has a bad temper," that, "he hits on

Wilson - cross

Christa and stuff like that, treats her very badly?"

A I don't remember.

Q You don't recall telling Officer Price that?

A No, sir.

MR. TALMAN: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q If you would--why don't we mark this for identification?

THE COURT: Twenty-six.

Q Ms. Wilson, I will show you what has been marked for identification as exhibit twenty-six.

Would you look at that and see if that was your statement to Officer Price?

Go ahead and take your time and read it.

(Witness looked at document.)

A Yeah.

Q Now that you have read that, do you recall the statement?

A Yes, sir.

Wilson - cross

Q Okay.

Do you recall telling Officer Pressley, or excuse me, Officer Price that, ah, ah, "Tadaryl has a bad temper and he gets on Christa and treats her badly?"

A Yes, sir.

Q Okay.

But you couldn't remember that until you looked at your statement?

A Well, it takes time to think of things-- I, ah, you know.

Q Had you read your statement before you testified today?

A Yes.

Q But you didn't recall that part of it?

A I probably just breezed through that part, you know, just trying to read it.

Q Pardon me?

A I was trying to read it and remember it, you know, as much as I could.

Q Do you recall telling Ms. Martin and I, when we were in North Carolina with

Wilson - cross

you, that, ah, when Tadaryl was gone that she would carry something of Tadaryl's, or when Tadaryl was gone that Christa would carry something of Tadaryl's with her?

A Yes.

Q And can you explain that a little further?

A I don't remember what she actually carried. But I know she carried something of his, you know, with her.

Q Do you know why she did that?

A She was obsessed over him, probably.

Q Okay.

And you said before that he had treated her badly.

Had you seen any of that?

A I seen him have a temper a few times.

Q Okay.

With Christa Pike?

A Yes.

Q What did you see?

A He would pull her over to the

side and talk to her--

MR. CRABTREE: Your Honor, I would object to relevance. I have allowed Counsel to go on for some period of time but I object to relevancy.

THE COURT: I will allow the answer to the last question.

MR. TALMAN: Fine, Your Honor.

A Ah, he would just pull her off to the side and, ah, you know, talk with her about things if he was mad at her.

Q Okay.

Let me ask you about this time that you say that, ah, Ms. Pike showed you this piece of skull.

You say you were in class in the morning?

A Yes, sir.

Q And that was on a Friday morning?

A Yes, sir.

Q Okay.

Do you recall what time that class was?

Wilson - cross

A About 10:00 o'clock.

Q Okay.

And were there other people around?

A Yes, sir.

Q Okay.

Was she talking to you or talking to a group of people?

A Just me.

Q Were you two alone?

A We were sitting at, like, a big desk, you know, like, a table and chairs.

Q Okay.

Do you know how many other people were in the classroom?

A Probably--I don't know, probably about ten.

Q Were they sitting there with you or were you to yourself, or--

A Me and her were to ourselves, but there were other people at the table and chairs.

Q Okay.

Now, did, ah, Ms. Pike tell

Wilson - cross

you that they had planned this incident with Colleen Slemmer?

A No, sir.

Q Okay.

Didn't tell you it had been planned?

A No, sir.

Q Do you recall telling Gary Price, ah, also, on that January 14th, 1995, interview that, ah, she had said it was a spur of the moment thing?

A Yes, sir.

Q Did she say that?

A Yes, sir.

Q That it was not a planned action, that it was a spur of the moment thing?

A Yes.

Q Did she say anything else along with that?

A She said because she felt like it.

Q I'm sorry. I didn't hear your answer.

A Because she felt like it.

Terry - direct

Q Okay.

All right.

MR. TALMAN: Your Honor, could I have just one moment?

THE COURT: Uh-huh.

MR. TALMAN: Nothing further.

Thank you, Ms. Wilson.

THE COURT: Any other questions that you have of Ms. Wilson, General?

MR. CRABTREE: No, Your Honor.

May she be excused, also?

MR. TALMAN: We have no objection.

THE COURT: Ms. Wilson, you are free to leave the courthouse. Thank you very much.

Ms. Wilson: Thank you.

MS. HELM: Call Mr. Terry.

CHAS TERRY, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HELM:

Q Would you state your name, please?

Terry - direct

A Chas Terry.

THE COURT: Mr. Terry, would you please spell your first name for the court reporter?

A C H A S.

THE COURT: Thank you, sir.

Q Mr. Terry, in 1994, and the first month of 1995, where were you employed?

A Ah, Knoxville Job Corps Center.

Q What was your job?

A I was Complex Supervisor.

Q And, ah, as such did you come into contact with the students there at the Job Corps Center?

A Yes.

Q All of them?

A All of them.

Q And during that period of time was there a student at the Job Corps Center by the name of Colleen Slemmer?

A Yes, there was.

MS. HELM: And may I approach, Your Honor?

Terry - direct

THE COURT: Yes, ma'am.

Q I will show you what has been labeled as exhibit twenty-five and ask you who that is?

A That's Colleen Slemmer.

Q And is that a picture of her as you recall her during her student days at the Job Corps Center?

A Yes.

Q I am also going to show you, Mr. Terry, two photographs that have previously been admitted into evidence in this cause, labeled exhibits two and three, and ask you if you recognize the person depicted in those two photographs?

A Yes.

Q And who is that?

A That's Colleen.

Q Colleen who?

A Colleen Slemmer.

Q The same person that is pictured in exhibit number twenty-five?

A Yes.

MS. HELM: We would pass this

witness. And ask to pass these pictured to the jury.

THE COURT: Thank you.

(Exhibits 2, 3, 25 passed to the jury.)

MR. TALMAN: Your Honor, we have no questions of Mr. Terry.

THE COURT: May Mr. Terry be excused from the courthouse?

MR. TALMAN: Yes, Your Honor.

MS. HELM: Yes, Your Honor.

THE COURT: Mr. Terry, you are free to leave. Thank you.

THE COURT: Counsel, while the jury is looking at the exhibits would you all please approach the bench?

BENCH CONFERENCE

(A discussion about planning was had at the bench.)

END OF BENCH CONFERENCE

THE COURT: All right, General,

York - direct

if you will call your next witness, please?

MR. CRABTREE: Call Detective Randy York.

THE COURT: Detective York, I don't think you were previously sworn.

(Whereupon, Detective York was so sworn.)

RANDY YORK, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Sir, would you please state your full name for the Court and jury?

A My name is Randy York.

Q And what is your occupation?

A Criminal Investigator with the Knoxville Police Department.

Q And how long have you been with the Knoxville Police Department?

A I will begin my twenty-fifth year next month.

Q And how long have you been a criminal investigator?

A Approximately eighteen years.

York - direct

Q And what does a criminal investigator do?

A Ah, a criminal investigator, in the particular area I'm in, is a major crime investigator and we, ah, investigate murders, rapes, ah, armed robberies and crimes against persons.

Q So your present assignment is the Violent Crimes Unit, is that correct?

A That's correct.

Q And how long have you been working in that particular area?

A Ah, approximately eighteen years.

Q Now, sir, in your capacity as an investigator with the Knoxville Police Department, assigned to the Violent Crimes Unit, were you assigned to a case on the 13th day of January, of 1995?

A Ah, yes, I was.

Q And at approximately what time of the day did you receive your assignment?

A Somewhere shortly, ah, after 8:00 o'clock, at approximately 8:15, I would

York - direct

estimate.

Q And when you received that assignment did you go to a particular location in Knox County, Tennessee?

A That is correct.

Q And where did you go?

A That's the area on Morgan Street. I think the correct address was, ah, 2710.

Q Now describe for us a little more specifically where that is.

A It is an area behind the, ah, old steam plant. It's, ah--

Q Whose old steam plant?

A That is all I have ever heard it termed, the old steam plant. It's, it's on the U.T. Ag. campus area, and near a jogging trail.

Q And you went to this location?

A Yes, I did.

Q And at approximately what time did you arrive at the location?

A At approximately 8:30 in the morning I arrived there.

Q Now, would you describe the

York - direct

general area that we are talking about?

What type of area is this that you went to?

A Well, it's buildings that I think is owned by U.T. in the area. There is a large smokestack. And there is kind of a roadway, and it angles into the, what we call the jogging trail, or bike trail, and there is also a creek that runs along that area, along side of the trail.

Q Is this a populated area?

A No, it is not.

Q And vegetation? What is it like?

A There's quite a bit, ah, of vegetation. It's, ah, along side the creek. And there's trees, a lot of brush in that area, behind the buildings. There's a, kind of a dump site for dirt and pavement and things like that.

Q Would it be fair to call it a somewhat secluded area?

A Yes, it is secluded.

Q Now, when you arrived at this location on the 13th day of January were there

York - direct

other people there?

A Yes, there was.

Q And did you know some of these people?

A Ah, yes. There was some U.T. officers and also some of our patrol officers on the scene.

Q Did you know, before you arrived at the location, what type of, what the assignment was?

A Ah, the information I had, was that there was a, ah, body found in this particular area.

Q Would you please describe to us what you saw when you got there?

A Well, ah, when I arrived at the scene the area had been secured by the officers. It was taped off and I was led to a area where a body was located.

Q Now, would you describe this body that you were led to?

A The body in particular was that of a young female, I estimated about that time, nineteen to twenty-one. Ah, the body was

York - direct

clad in blue jeans and tennis shoes, ah, was nude from the waist up. It had several, well, it was very bloody and dirty, and what appeared to be several cuts and abrasions about the body, and also a massive injury to the, to the head.

Q Concerning the abrasions and cuts, when you first saw the body what position was it laying in?

A The, ah, the feet, actually the body was laying, there was a dirt pile there, and the body was laying at the base of that between some brush and a dirt pile.

The feet, ah, would be pointing toward a southeast direction, kind of parallel with the creek in that area. And the head was facing the roadway.

Q Was the body laying level or was there an elevation difference between the head and the feet?

A There was a slight elevation of the feet, ah, with the head in a downward position.

Q You mentioned wounds.

When you first got there what

York - direct

area of the body could you see as far as wounds?

A Ah, all the parts that were exposed from the waist up had, ah, ah, many wounds to it.

Q Now, when, ah, when you observed the body there what did you do as far as your investigation was concerned?

A Once we determine that it is, in fact, a body then my job, I notify the medical examiner, have the medical examiner brought to the scene, ah, before it is moved.

Q Did you know who this person was at that time?

A No, I did not.

Q Have any idea who it was?

A No, sir, I did not.

Q So, tell us, what did you do in furtherance of your investigation here at the scene?

A We, we assign officers, ah, to, ah, canvas the area for any possible items of evidence.

Q And are these, are these officers assigned to a particular unit with the

York - direct

police department?

A Ah, some, some of it is Criminalistics Units and some of them were the officers that were on the scene to assist in combing the area for any evidence.

Q Now, what Criminalistics officers, if any, were assigned to the, ah, the case?

A Ah, in totality, ah, there would be, ah, Mark Waggoner, ah, Lanny Janeway and Arthur Bohanan.

Q And were there other uniformed officers there at the same time working?

A Yes.

Q Okay.

And what did you all do there at the scene?

A Well, we canvased the crime scene looking for items of evidence.

Q And did you find anything?

A Several items.

Q Okay.

What did you find that you can recall?

York - direct

A Well, there was blood spots in different areas. There was some trampled bushes. There was a bloody bra. Ah, there was a bloody piece of pavement. There was some, ah, hand prints and knee prints in the mud. Ah, there were some drag marks from a location in the roadway where there was a puddle of blood. And several other things that was documented by our Criminalistics Unit.

Q And you say, documented by the Criminalistics Unit.

Are they a unit, also, that is responsible for collecting these items?

A Collecting and maintaining, yes.

Q So that was what was going on here at the scene, is that correct?

A That's correct.

Q And, approximately, how long were you at the scene?

A I would estimate approximately four hours.

Q So, you are getting away sometime in the early afternoon?

York - direct

A That's correct.

Q Now, where did you go then?

A I went to U.T. Hospital.

Q And what did you do at U.T. Hospital?

A I viewed the body again at U.T. Hospital.

Q Now, at the time that you viewed this body at U.T. Hospital, was it in the same condition as it was when you had seen it there at the scene?

A That's correct.

Q Did you ever see it after it was cleaned up?

A Ah, I did leave and was called back a short time later.

Q And was the condition different at the time you were called back?

A Yes.

Q So, now, as far as this case, on that particular day, did you do anything else in furtherance of it at that particular time?

A Basically, that's the scenario of what we did that day.

York - direct

Q Now, early the next morning did you have an occasion to come into contact with the Defendant over here, Christa Pike?

A Yes, I did.

Q And where was that that you came in contact with Ms. Pike?

A That was at the Job Corps Center.

Q And, also, while you were at the Job Corps Center, did you come in contact with anyone else?

A Ah, yes.

Q And who else did you come in contact with?

A A young man by the name of Tadaryl Shipp.

Q And at approximately what time of the morning are you talking about?

A Around 5:30 P.M.

Q And, ah, did you request that they accompany you somewhere?

A Yes, I did.

Q And where did you request that they accompany you to?

York - direct

A To the police department.

Q And they did?

A Yes.

Q Now, did you advise Ms. Christa Pike of her, what is referred to as Miranda warning, her rights?

A Yes, I did.

Q Did you use a form to do that?

A Yes, I did.

Q And how did you advise her?

A Ah, read it to her and then let her read it and asked her if she understood all the portions of it and she indicated she did.

Q And after you had advised her of her rights did she waive those rights and talk to you?

A She said she would give me a statement under certain conditions.

Q And what were the conditions?

A That, ah, she wouldn't have to mention who else was with her.

Q Now after she did this did you, in fact, take a statement from her?

A I did.

York - direct

Q And how did you record that statement, what fashion was it recorded in?

A I, ah, it was on a cassette recorder.

Q You actually did a tape recording of the statement she gave you?

A I did.

Q And in that statement did she talk to you about what had occurred in the area where you had found the body on the night of the 12th of January of 1995?

A Yes, pretty much in detail.

Q And did she tell you about her participation in what occurred?

A Yes, she did.

Q Did she also identify the person who had been killed?

A Yes, she did.

Q And who did she tell you that person was?

A Colleen Slemmer.

Q Up until this particular time did you know the identity of the body that you had found?

York - direct

A No.

Q But Christa Pike is the one who told you that it was Colleen Slemmer?

A Yes, she did.

Q Now, did you also talk to Ms. Pike about searching her residence?

A Yes, I did.

Q And what did you discuss with her concerning the search of her residence?

A In her statement she told us about a pair of blue jeans that, ah, she had had on at the time, and, ah, that she had rubbed mud on them to cover the blood and that they were folded up in her room.

So, I asked her for a consent to search and she gave me a consent to search and to obtain those items.

Q Now, after she had given you a statement, and after she had given you this consent to search did you go anywhere with Ms. Pike?

A Yes, we did.

Q And where did you go?

A Ah, we started to go back and

York - direct

go over the scene and she had told us about some items she had discarded at the Texaco Station.

Q Okay.

Now, where did you go to start going over the scene?

A I believe we got to 17th Street and, and was on the way to Job Corps, just to retrace the steps they took that morning.

Q Okay.

And what happened there?

A Well, we decided, we had got the information that there was some items that she had discarded at the Texaco--

Q Who gave you that information of some items she had discarded?

A Christa Pike.

Q She told you she had discarded some items?

A Yes.

Q And where did she say she had discarded these items?

A At a Texaco Service Station at 22nd and Cumberland.

Q And did she tell you what

York - direct

items she had discarded?

A Yes.

Q And what items did she say she had discarded?

A Ah, two pieces of I.D. belonging to Colleen Slemmer and a pair of black gloves that belonged to the victim.

Q Did she say where they were there at this Texaco Station?

A Ah, she stated that they were in a garbage can inside the bathroom.

Q Now, when you went to the service station and when you were going to go through this offense with her again at the scene of the crime who was with you besides you and Ms. Pike?

A Ah, riding in the car with me and Ms. Pike was, ah, was one of the female officers, ah,--

Q And was there another car?

A There was another car following along. There was Lanny Janeway and, I think, Mark Waggoner and another Criminalistics specialists in the car with him.

York - direct

Q Now, when you got to the Texaco Station did you leave someone there to, ah, look for these items there at the Texaco Station?

A We left specialists, Mark Waggoner, at the Texaco Station to take care of that.

Q And when, after you left specialist Waggoner there, did you and the other people go somewhere else?

A If my memory serves me correctly I think we went back to the Job Corps driving and then started driving the direction as she was directing us to--

Q Who was directing you to?

A Christa Pike.

Q And what was she directing you to do? What were you trying to reconstruct here?

A Ah, we were trying to retrace the, the steps they took as they left the Job Corps the morning they left with Colleen Slemmer.

Q Okay.

Now, had, ah, Ms. Pike told you who was with her when she left the Job Corps the night of the 12th?

York - direct

A Other than Colleen she wouldn't mention names.

Q Okay.

Did she say other people but wouldn't mention names?

A That's correct.

Q So, you are tracing the route.

What route did she take you on the best you recall?

A Well, up 17th, ah, some side streets, and then we came out on, ah, the area she calls the Strip, Cumberland Avenue, to Tyson Park, under Tyson Park--

Q Well, let's see--Tyson Park. And you are going west on Cumberland?

A That's correct.

Q Now, what direction do you turn in to get into Tyson Park?

A You would turn right.

Q Okay.

And once you get into Tyson Park, explain to the jury where she directed you then.

Q There was a walkway that went

York - direct

under Kingston Pike and, ah, once you get on the walkway going the direction she indicated it would, then we were going in, I believe, the direction, south.

Q Okay.

Now, what type of walkway?

Is this a trail or what, that you are going through there?

A It's, it's some kind of jogging trail. Some call it the bicycle trail. Ah, and it goes under, under, ah, Cumberland Avenue, or right where Kingston Pike adjoins Cumberland Avenue. And, ah, you go under the, on the trail and you come out into a, ah, like a little park area on the, it would be the left side if you are going west.

Q So, actually, you turn right to get into Tyson Park, go down, and then go back underneath--

A That's correct.

Q --and you end up on the left side of Kingston Pike, where you turn right to get into Tyson Park? Is that correct?

A That's correct.

York - direct

Q Okay.

Now, where did she direct you to along this jogging trail down through there?

A We traveled south, ah, for a distance till we came to the location where we had actually, ah, found the body.

Q And was this the area that she directed you to?

A Yes, it is.

Q And is it the exact same area where the morning before you had seen the body of what you now know to be Colleen Slemmer?

A Exactly the same place. Yes.

Q And did she go through, again, and talk to you and tell you what had happened?

A Yes, she did.

Q Now, how long were you there at the scene with her?

A I would, I would estimate an hour, probably.

Q And after you had done that, been up at the scene with her, what did you do then?

A I then, ah, took her back to

York - direct

the police department.

Q Okay.

And then?

A Ah, after I got her back to the police department, ah, I started interviewing some other suspects involved.

Q And, ah, what other individuals did you interview?

A Interviewed a subject by the name of Tadaryl Shipp and another female by the name of Shadolla Peterson.

Q Now, I would ask if you would, if you would stand and look around the courtroom and if you see the person that we have referred to as Christa Pike, if you would point to that individual.

A This is the young lady sitting at the end of the Defense table here.

MR. CRABTREE: Your Honor, we would ask that the record reflect he has identified the Defendant before these proceedings.

THE COURT: Let the record so reflect.

Thank you.

York - direct

Q And this is, this is the person who led you to the scene of this offense, is that correct?

A That is correct.

Q And this is the person who gave you the statement about what had happened?

A It is.

Q Now, once she had given you this statement and she had taken you to the scene did you direct any other officers of the police department to do anything?

A Ah, yes. I had the consent to search and I asked the officers to go to, to her room and, ah, maintain, or secure those items that she had told us was there.

Q I'm sorry, and that was officers who?

A Ah, Lanny Janeway was one of them and I'm not sure if it was Bohanan or Waggoner was the other one.

Q But you directed the Criminalistics people to go to her room--

A And to secure those items.

Q --and to secure those items?

York - direct

A That's correct.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit one and ask if you recognize that photograph?

A Ah, yes, I do.

Q And what does that photograph show?

A This depicts the, ah, scene as I saw it where the body is located and some clothing items later identified to be the clothing of the victim hanging in some bushes.

Q And is that the way it first appeared when you arrived there on the morning of January the 13th of 1995?

A That's exactly the way it was located.

Q And that is the location of the body?

A Yes, it is.

Q I believe you indicated as far as the elevation was concerned the feet are

York - direct

slightly higher than the head?

A That is correct.

Q Does that photograph also show that?

A Ah, yes.

Q And the clothing and the tree were there as they appear in that photograph?

A That is exactly the way it was, yes.

MR. TALMAN: Your Honor, could we approach?

THE COURT: Yes.

BENCH CONFERENCE

MS. MARTIN: Ah, I'm not totally sure where Mr. Crabtree is going with this but if he intends to show these once again I think for the eleventh time to the jury I am going to object. It is repetitive and prejudicial and--

MR. CRABTREE: Pardon?

THE COURT: Are you going to show these again?

MR. CRABTREE: I am planning

York - direct

to prove my case and I think that this officer-- they have complained, they said we had not identified the person who was killed. They have said that we have not shown that this is her and we have got to do this through each of these witnesses and we are not going to shortcut it. If I do it improperly then let them object.

THE COURT: I am going to allow it. Exhibit one has not been passed repeatedly. It has only been passed once or twice. Exhibit 21 has been passed several times to the jury. I will be glad to let you pass them but let's get through his testimony before we pass them.

MR. CRABTREE: I intend to.

Pardon?

THE COURT: At the end of cross-examination.

MR. CRABTREE: It is going to be a while then.

THE COURT: Okay.

END OF BENCH CONFERENCE

MR. CRABTREE: If I may, Your

Honor?

THE COURT: Yes, sir.

Q Detective York, I will show you what has been marked as exhibit two and ask if that photograph, if you recognize that?

A Ah, this is just a closer view of the same picture we saw, covered more of the crime scene. This is a close-up of the body as we seen it.

Q And in that photograph are you able to see the wounds that you have referred to in your testimony?

A You can see a portion of the wounds under these conditions. You can see some of them.

Q And I will show you what has been marked as exhibit three and ask if you can tell the Court and jury what that is?

A This is the, ah, upper portion of the victim's body. It covers a portion of the chest and the head.

Q And is that the way it appeared at the time that you saw it?

A Yes, it is.

York - direct

Q And how about that around the throat there, the--

A It's a, it's a cloth of some sort that's, ah, around the neck and tied at the back.

Q And was that there at the time you saw it, also?

A Yes, it was.

Q Now, I would ask you, as far as these three photographs, that you have seen the area that is shown in these photographs, is that the same exact location that Christa Pike led you to?

A It is the same place.

Q Now, I believe you indicated that you went back to the hospital, you went to the hospital, actually, on two occasions, and that you saw the body once it was cleaned up and before it was cleaned up, is that correct?

A That is correct.

Q Now, I would show you this photograph and ask you if you will tell the Court and jury what that is?

A This is a, ah, portion of the

York - direct

victim's body after the victim was cleaned and washed at the, ah, University of Tennessee morgue.

Q And is that the same person, is that the same person that you have identified as being in the exhibits twenty-two and three that I have shown you previously?

A Yes, it is.

Q And the only difference here is that the body has been cleaned up and some of the wounds are more visible?

A That is correct.

Q And is this the same person that you had seen at the location earlier?

A Yes, the same body.

Q And is that the body that was at the exact same location that Christa Pike led you to the next day? Is that correct?

A That's correct.

Q Now, sir, I would ask you, also, as far as this area is concerned, were any other dead bodies found in that area around this time?

A That's the only body that has been found at that location.

York - direct

Q Sir, I will show you what has been marked as exhibit six and ask if you recognize this?

A This map depicts, ah, the particular surrounding area and area as to where the body was located.

Q And does this show Cumberland Avenue where you have referred to, that you came down, I believe you indicated that you came down and turned into Tyson Park?

A Yes.

Q Okay.

Where is that?

A This would be, ah, this would be Kingston Pike, in this area right here.

Q Well, we are going to mark this in a minute. So just locate Tyson Park, if you would, please.

A Okay.

Well, actually--this would be the Cumberland area right here and right in this area is where it turns into Kingston Pike. And Tyson Park is off to the right here.

Q Does it happen to be there

York - direct

where it says Tyson Park?

A Yes.

Q And does that green line, does that follow pretty much what you referred to as the jogging trail?

A Yes, it is.

Q And the location of the body in relation to the red X there, where was the body located?

A Right in this area.

Q And when you went there with Christa Pike, does the route that you took show on this map?

A Yes, it, not, not the first part of it but the last part of it.

Q But after you got to Tyson Park?

A Yes, it does.

Q If you would, sir, if you would just take this red pencil right, and just using dotted lines, show where you are talking about turning into Tyson Park and coming down Cumberland.

A This area right here is, is

York - direct

where we turned into Tyson Park. Ah, this area comes under--

Q Just use the pencil and make a dotted line all the way down there and take you back to where she took you to.

A Okay.

Okay.

This is the area here that, ah, we traveled along the bike trail, jogging trail, and, ah, this is actually the roadway that angles into it. This area right here.

Q And the dark line there that falls along the creek, is that right?

A Yes.

MR. CRABTREE: If I might make this a little darker, Your Honor?

THE COURT: Yes, sir.

Q And that dotted line, does that depict the way that you all went down there when you were directed by Ms. Pike?

A Yes, it does.

Q Thank you.

MR. CRABTREE: Could we approach a moment, Your Honor?

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. CRABTREE: Your Honor, we are getting ready to get to the statement and it is about an hour and a half long. So I think it would be best to stop now and pick up after lunch.

THE COURT: All right.

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, we have some distance to go with the testimony of Officer York.

And because it is already a quarter till 12:00 I think this might be a good place to stop and we will pick up his testimony immediately following the lunch recess.

Again, you have not heard all the evidence. Please do not deliberate or attempt to come to any conclusions. You haven't heard the law the Court will instruct you in this case.

In addition, please stay with the officers. Have no contact with anyone. Do

not read or see local news media or national news media.

Please go with the officers. Have a good lunch. And as soon as you all are ready to come back and commence hearing further testimony we will be ready to start.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Are we ready to proceed with Detective York's testimony?

MR. CRABTREE: Your Honor, if I may. What our intentions are at this time is, is after a few introductory questions we intend to, ah, play the Defendant's statement. We have provided copies, we have made a transcript of this statement. We will qualify that through, ah, Detective York as being an accurate transcript and we have prepared copies so that each juror plus the court reporter, each Defense counsel, and the Defendant, may have a copy of that in their

possession to follow through. And I think it will assist everyone in following the tape recording.

THE COURT: That's fine. And I guess we need to collect them all and--

MR. CRABTREE: What I would suggest we do, is, if I may, once the jury is in here, I will qualify one of these as being the, ah, the document that we are working from, file it, and then file the others as a collective exhibit so that the Court will maintain control of all of the copies that we have here, and then we will collect them back when we are through with it.

THE COURT: You've got fifteen for them, three and then for you all and myself?

MR. CRABTREE: I have a total of twenty-one documents right here. And I say, we will file one as a exhibit, and then the others collectively as copies of that exhibit.

THE COURT: That's fine, sir.

MR. TALMAN: Your Honor, we have no problem with the, ah, transcript being used in conjunction with the tape as long as they are going to hear the tape recorded statement.

THE COURT: I will admonish the

jury that it is the tape recorded statement that is the proof in the matter. That the transcript is being furnished only to assist them and then, of course, the transcript is to be collected. That the tape is, is, if there is any discrepancy, the tape is what they are to use as the evidence.

MR. TALMAN: Your Honor, I assume that the State is intending to introduce the tape as an exhibit, also?

MR. CRABTREE: Oh, that is correct. Yes.

MR. TALMAN: Okay.

THE COURT: Okay.

Bring them back.

Court Reporter: And exhibit twenty-six is only for I.D., right?

THE COURT: Twenty-six?

MR. TALMAN: Yes, that's correct, Your Honor. That is the statement of Stephanie Wilson that I used for cross-examination.

Court Reporter: I.D. only?

MR. TALMAN: I.D. only.

THE COURT: Yes.

Okay.

York - direct

(Exhibit 26 for I.D. only and never passed to the jury.)

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ladies and gentlemen of the jury, we are ready to commence with Detective York's further testimony.

General, whenever you are ready.

(Direct testimony was continued.)

Q You are the same Randy York who was testifying before lunch, is that correct?

A I am.

Q And you realize that you are still under oath, is that right?

A Yes, I am.

Q And I would ask you, sir, I believe you testified previously that, ah, on the morning of the 14th of, ah, January of 1995, that

York - direct

you had occasion to come into contact with the Defendant before these proceedings, Christa Pike, is that correct?

A Yes, I did.

Q And I believe that you did indicate that you had advised her of her, of her, what often is referred to as Miranda warning?

A That's correct.

Q And you told us how you did that.

And after being so advised did she, ah, give you a statement telling you her version of what had occurred on the night of the 12th of January of 1995?

A Yes, she did give me a tape recorded statement.

Q And you have that tape with you, is that correct?

A I do.

MR. CRABTREE: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

MR. CRABTREE: Your Honor, I would ask to mark this tape as exhibit twenty-

York - direct

seven for identification.

THE COURT: All right, sir. That will be exhibit twenty-seven for identification.

Q Detective York, I will show you what has been marked as exhibit twenty-seven for identification and ask you if that is the cassette tape recording that contains the statement that Christa Pike gave to you on the 14th day of January of 1995?

A Yes, it is.

Q Your Honor, at this time we would offer this as a exhibit twenty-seven.

THE COURT: All right, sir.

(Exhibit 27 marked and filed.)

Q Did you also cause a, Detective York, did you also cause a, that tape to be transcribed?

A I did.

MR. CRABTREE: Your Honor, ask to mark this as exhibit twenty-eight for identification.

THE COURT: All right, sir.

Q I will show you what has been

York - direct

marked as exhibit twenty-eight for identification and ask if you can tell the Court and jury what that is?

A This is the transcribed statement from Christa Gail Pike, ah, from the tape recorded session that we had.

Q And have you listened to this tape and compared it with this transcription?

A I have.

Q And is it an accurate transcription of what appears on the tape?

A It is.

MR. CRABTREE: Your Honor, we would offer this as exhibit 28.

THE COURT: All right, sir. That will be exhibit twenty-eight.

(Exhibit 28 marked and filed.)

MR. CRABTREE: And, Your Honor, if I could, at this time, if I may at this time, before we start to play this recording, we have caused twenty copes of exhibit twenty-eight to be made and we would ask permission of the Court to give one of these to each juror, one to the Court, one to the court reporter, and one to

York - direct

the Defendant and each of her Counsel for the purpose of assisting them in listening to this tape.

THE COURT: All right.

Ladies and gentlemen of the jury, you will be receiving a copy of the transcript so that as the tape is played you can follow along more easily.

The evidence in this case is the transcribed tape, is the tape, itself, and, ah, the statements that are made on the tape.

If you find any discrepancies between what you hear and what you see, ah, you are to disregard the transcript and consider the tape, itself.

MR. CRABTREE: And, Your Honor, we would ask that these twenty copies be filed as collective exhibit twenty-nine, and upon conclusion of the playing of the tape that all of them be returned to the possession of the court reporter.

THE COURT: Yes, sir, that will be fine, except for my copy.

MR. CRABTREE: Yes, twenty

York - direct

copies, except for the Court's copy.

(Col. 29 marked and filed.)

MR. CRABTREE: If I may, Your Honor, I will deliver the fifteen copies to the court officers so they may be distributed to the jury.

THE COURT: Okay.

MR. CRABTREE: May I approach the bench?

THE COURT: Yes, sir.

Thank you.

MR. CRABTREE: We are delivering three to the Defense table.

Does everyone have one?

THE COURT: I believe so.

Go right ahead, sir.

MR. CRABTREE: With the permission of the Court if I could start the tape recorder?

(Tape was started, played, turned to side B and played.)

MR. TALMAN: Your Honor, may we approach for a moment?

York - direct

THE COURT: Would the ladies and gentlemen of the jury please pass back the transcripts?

And then I will be glad to let you approach.

(Transcripts were collected.)

MR. CRABTREE: Your Honor, I have received fifteen back from the jury. If I may return those to the court reporter?

THE COURT: And that is collective exhibit twenty-nine.

MR. CRABTREE: I believe she has one of them. Now the court reporter has twenty.

THE COURT: All right.

You asked to approach the bench, Mr. Talman.

Please come up.

BENCH CONFERENCE

(Discussion about timing.)

END OF BENCH CONFERENCE

York - direct

THE COURT: All right, General, if you have any other questions of Detective York, or Investigator York, rather?

Q Detective York, the statement that you have just heard that has been played here in the courtroom, would you please stand and look around the courtroom and see if you can see the person that gave that statement to you?

A Yes.

Q Please point to that individual.

A That young lady sitting at the end of Counsel table here. (Witness pointed.)

MR. CRABTREE: Your Honor, I would ask the record to reflect that he has identified the Defendant before these proceedings, Christa Pike.

THE COURT: Let the record so reflect.

Q Now, Detective York, I believe that you had indicated that you had, ah, ah, talked to Ms. Pike about a consent to search her room, is that correct?

A That is correct.

York - direct

Q And did she give you such a consent?

A She did.

Q And did she give it to you in writing?

A Yes, she did.

Q Do you have that with you?

A Yes, sir, I do.

MR. CRABTREE: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

MR. CRABTREE: I would ask to mark this as exhibit thirty for identification.

Q Sir, I will show you what has been marked as exhibit thirty for identification and ask if you can tell the Court and jury what that is?

A This is a standard form used by the Knoxville Police Department, it is a consent to search, ah, permission to search a residence or even a vehicle.

Q And I believe that there is a name that appears under that consent, is that correct? It says, where signature is located?

York - direct

A Yes, sir.
Q What name appears there?
A Signature of Christa Pike.
Q And who placed that signature on there?
A Ms. Pike, the Defendant.
Q The same person you previously identified in this Court?
A It is.
Q Okay.
Is it signed? Have you signed this, also?
A Yes, sir, I did.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit thirty.

THE COURT: Yes, sir, exhibit thirty.

(Exhibit 30 marked and filed.)

Q And one thing I want to ask you about here, is the date of that.
What is the date?
A I put January the 14th, 1994.
Q Did you talk to Ms. Pike on January the 14th, of 1994?

York - direct

A No, it is 1995.

Q So that is an incorrect date, is that correct?

A Ah, that's just an error I made, it was the beginning of the year and I--

Q So, the actual date that you did take this was 1995, January the 14th of 1995?

A That is correct.

MR. CRABTREE: We would ask to mark this photograph as exhibit 31 for identification.

THE COURT: Okay.

MR. CRABTREE: If I may approach?

THE COURT: Yes, sir.

Q I will show you what has been marked as exhibit thirty-one for identification and ask if you can tell the jury what that is.

A This is a picture of Christa Pike in our conference room, on the third floor of the Detective Division, Knoxville Police Department.

Q And does that accurately depict the way she was on January the 14th of

York - direct

1995?

A It does.

MR. CRABTREE: Your Honor, we ask that that be filed as exhibit thirty-one.

THE COURT: All right, sir.

(Exhibit 31 marked and filed.)

MR. CRABTREE: And we would ask to mark this photograph as exhibit thirty-two for identification.

THE COURT: All right, sir.

Q I will show you what has been marked as exhibit thirty-two for identification and ask if you recognize that photograph?

A I do.

Q And what is that photograph, sir?

A This is a photograph of Tadaryl Shipp. Ah, it was made, ah, the same time as this other picture.

Q And does that accurately depict the way he appeared on January the 14th of 1995?

A Yes, it does.

MR. CRABTREE: I would ask to

York - direct

file this as exhibit thirty-two.

THE COURT: All right, sir.

(Exhibit 32 marked and filed.)

THE COURT: I would like to see both of those, please, sir.

(Photographs shown to the Court.)

THE COURT: Thank you.

Q Sir, I would show you exhibit thirty-one, and it appears that Ms. Pike has something around her neck, is that true?

A That's correct.

Q Would you please describe what the object is that she has around her neck?

A Well, there's, there's several, ah, necklaces, one of which is most prominent is a, ah, what we term, is a pentagram. It is a, ah, it is a circle with a star in it.

MR. CRABTREE: Your Honor, I would ask to mark this as collective exhibit--

THE COURT: Thirty-three.

MR. CRABTREE: Thirty-three, consisting of a plastic bag, an identification card, and what appears to be a necklace.

York - direct

THE COURT: Okay.

Q Sir, I will show you what has been marked as exhibit thirty-three for identification and ask if you can tell the Court and jury what that is?

A One is a identification card of Christa G. Pike from the U.S. Department of Labor. And the other one is a, is a necklace with a, ah, it is a pentagram, it is a star in a circle with a snake, which forms what we call a pentagram.

There's--

Q And--I'm sorry. Go ahead.

A There is also another, another type necklace, ah, with a, like a crystal ball and a piece of crystal hanging from it.

Q And where were these items obtained from?

A From, ah, Christa Pike.

Q And are those the same items that are shown in exhibit thirty-one, that Ms. Pike has around her neck when that photograph was taken?

A Ah, yes, it is.

York - direct

MR. CRABTREE: Your Honor, we would ask that these be filed as exhibit thirty-three.

THE COURT: Yes, sir. They will be made exhibit thirty-three to the witness' testimony.

(Col. 33 marked and filed.)

Q I will show you what has previously been filed as exhibit thirty-two, and I believe you have identified as a photograph of Tadaryl Shipp.

Is that correct?

A That's correct.

Q And would you describe any object that he has around his neck?

A He has a same type of necklace. It is a star with a circle, ah, surrounded by a circle.

Q Does he have other necklaces on, too?

A Yes.

There's, a, appears to be another necklace here. I can't make it out from the picture.

York - direct

MR. CRABTREE: Ask to mark this next item as exhibit thirty-four for identification. It also will be a collective exhibit.

THE COURT: All right, sir.

Q I will show you what has been marked as exhibit thirty-four for identification and ask if you can tell the Court and jury what that is?

A It is an I.D. card of Tadaryl Shipp, U.S. Department of Labor.

There's a, ah, necklace that I just described, a star with a, ah, serpent surrounding it, making up the circle around the star. There's two other type necklaces there that, ah, one is, ah, some similarances (sic) of claw hands holding a crystal ball.

The other one is, ah, something similar to that, but it looks like to be, ah, maybe a serpent that is actually holding or supporting the crystal ball.

MR. TALMAN: Your Honor, I'm going to pose an objection to what it looks like.

If he knows what it is that's

fine. Otherwise, it speaks for itself.

THE COURT: Well, the jury will determine what they find in the bag. Clearly, the Detective is identifying the contents of the bag and the jury can see for itself what it appears to be.

Q I will show you exhibit thirty-two and ask if those items that you identified in that bag appear in exhibit thirty-two, the photograph of Mr. Tadaryl Shipp?

A These, these are the same necklaces on Mr. Shipp that's in the picture.

Q And were those items obtained from Mr. Shipp?

A Yes, they were.

MR. CRABTREE: Your Honor, we would ask to file this as exhibit thirty-four.

THE COURT: All right, sir.

(Col. 34 marked and filed.)

MR. CRABTREE: And, Your Honor, at this time I would ask if I may be allowed to remove from, ah, exhibit thirty-three, the collective exhibit thirty-three the necklace with, ah, what has been described as a pentagram

York - direct

on it?

THE COURT: Yes, sir.

MR. CRABTREE: And I would ask if I might have this particular item by itself marked, the necklace with the pentagram, there is also another crystal on it that has been identified as exhibit thirty-three-A.

THE COURT: That's fine.

(Exhibit 33-A marked and filed.)

MR. CRABTREE: And, likewise, in exhibit thirty-four I would ask if I may be allowed to remove the necklace and ask that, the necklace with the pentagram on it, and ask that that necklace be filed as exhibit thirty-four-A.

Here is what appears to be an earring that has fallen out of the plastic bag.

(Exhibit 34-A marked and filed.)

Q Detective York, I will show you what has been marked as exhibit thirty-four-A and exhibit thirty-three-A.

I believe you testified that these are the necklaces that came from Ms. Pike

York - direct

and Mr. Shipp, is that correct?

A Ah, yes, it is.

Q And look at the object, the round object with a star in it, does each one of these appear to be the same?

A They're identical as far as I can tell.

Q And, sir, I would ask you, did you or did you not see that same design on the body of Colleen Slemmer?

A I did.

Q And where was that design?

A On the chest area between the breasts.

Q Was it what has been testified as having been carved on her chest?

A That's correct.

Q I will show you exhibit seven and ask if that shows the design that you are referring to?

A Yes, it is.

MR. CRABTREE: Your Honor, I would ask if we could pass exhibits 33-A and 34-A and 31 and 32 at this time?

York - direct

THE COURT: All right, sir. Go ahead.

(33-A, 34-A, 31, 32 passed to the jury.)

THE COURT: While those are going around if you would approach the bench, please?

MR. CRABTREE: May I have just a moment before we do because I want to seal these up and ask that these be passed at the same time.

THE COURT: Go right ahead, sir.

Now, we are passing what is left of 33 and 34?

MR. CRABTREE: We are passing the rest of 33 and 34.

THE COURT: Okay.

MR. CRABTREE: And I think these are sealed.

(33 and 34 passed to the jury.)

MR. CRABTREE: Your Honor, if I may, will the Court instruct the jury not to remove anything from the bags?

THE COURT: Yes.

Please don't remove anything from the bags. If you wish to do so please tell me and we will do that.

BENCH CONFERENCE

THE COURT: I presume we are close.

I don't know how long your cross-examination is going to take.

Are you still wanting a recess or do you want to move on to cross-examination?

MS. MARTIN: Please, Your Honor.

THE COURT: Okay.

END OF BENCH CONFERENCE

MR. TALMAN: Judge, may we approach for another moment?

THE COURT: Sure.

BENCH CONFERENCE

MR. TALMAN: During this recess could she be sent downstairs and get some Tylenol?

THE COURT: Okay.

MS. MARTIN: Thank you.

END OF BENCH CONFERENCE

THE COURT: All right, General.

MR. CRABTREE: If it please the Court, this would conclude our direct examination of Officer York.

THE COURT: All right.

Ladies and gentlemen, ah, we have been in here about an hour and a half and it is probably a very good time to take a brief recess and give you all a chance to stretch and the smokers to smoke.

Please do not deliberate, and not contemplate this matter and when we come back we will conclude the cross-examination of Detective York, ah, Investigator York.

Thank you very much.

Please go with the officers.

(Whereupon, the jury left

open Court, after which the following proceedings were had, to-wit:)

MR. CRABTREE: If it please the Court, we would ask the record to reflect that we are delivering 26.2 material to Counsel at this time.

THE COURT: All right, sir. That's fine.

Anything else?

MR. TALMAN: We will need an opportunity, of course, to review it.

THE COURT: I am going to give you enough break to do a couple of things. One is to take Ms. Pike downstairs and bring her back up.

MR. TALMAN: Thank you, Judge.

THE COURT: Go ahead and do that.

Court is in recess until you all tell me you are ready, in effect.

MR. TALMAN: Thank you, Judge.

THE COURT: Then we will be ready to proceed.

MR. TALMAN: Thank you.

MR. CRABTREE: Thank you, Your

Honor.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Detective York, do you want to come back up and take the witness stand again?

Was Ms. Pike able to get some medication?

MS. PIKE: Yes, ma'am.

Thank you.

THE COURT: Okay.

MR. CRABTREE: Your Honor, Mr. Talman needs to inform you about something.

THE COURT: Do you, Mr. Talman?

MR. TALMAN: I don't think so, no.

Thank you.

THE COURT: Are you ready?

MR. CRABTREE: The State is ready.

MR. TALMAN: Yes, Your Honor.

THE COURT: Bring in the jury, please.

York - cross

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: All right.

The State has concluded its examination of Investigator York.

Whenever you are ready, Mr. Talman.

MR. TALMAN: Thank you.

CROSS-EXAMINATION

BY MR. TALMAN:

Q Good afternoon, Detective York.

A Good afternoon.

Q Sir, ah, briefly, you, ah, stated that when you took this statement from Christa Pike that she was, ah, ah, being protective of other people? Is that correct?

A Well, yes, to a certain degree, she was, yes.

Q Okay.

And those other people

York - cross

actually turned out to be Tadaryl Shipp and Shadolla Peterson?

A That's correct.

Q Okay.

All right.

And did she cooperate with you when you were doing this?

A Yes, sir, she did.

Q You didn't force her, coerce her, or do anything like that?

A No, sir, I did not.

Q Okay.

In fact, she actually took you back to the scene where this was supposed to have happened, is that correct?

A She did.

Q And told you everything, basically, that, that had gone on there?

A Pretty much. Pretty much covered it.

Q Okay.

You didn't have to, at anytime, threaten her or force her to do anything?

A No. No, sir, I did not.

York - cross

Q She done it of her own free will?

A Yes, she did.

MR. TALMAN: If I could have just one moment, Your Honor?

No further questions of Officer York, Your Honor.

MR. CRABTREE: Come down, sir.

May I go get the next witness?

THE COURT: Yes, sir.

Thank you.

MR. CRABTREE: Call Mark Waggoner.

Your Honor, this witness needs to be sworn.

(Whereupon, the witness was so sworn.)

MARK A. WAGGONER, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRABTREE:

Q Sir, would you please state your full name for the Court and jury?

A Mark A. Waggoner.

Waggoner - direct

Q And what is your occupation?

A I'm a police officer with the City of Knoxville.

Q And how long have you been a police officer with the City of Knoxville?

A Ah, nearly eighteen years.

Q Do you have a specific assignment at this particular time?

A Yes, sir. I work in the Criminalistics Division.

Q And how long have you been with Criminalistics?

A Ah, almost seven years.

Q So, as of the month of January of 1995, you were employed by the Knoxville Police Department and in Criminalistics, is that correct?

A Yes, sir, I was.

Q Now, sir, I believe you had an occasion to go to a location on the Agriculture campus on the University of Tennessee on the 13th day of January, of 1995, is that correct?

A Yes, sir, that's correct.

Q And were you working there in conjunction with another, or other members of the