**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 2**

**DOCUMENT 22**

---

002628

XXV 03S01-9712-CR-00147
~~03C01-9611-CR-00408~~

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

V. ) CASE NO. 58183A

CHRISTA PIKE )

FILED BY MARTHA PHILLIPS, CLERK
DEC 26 1996
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XXII OF XXVII VOLUMES

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FILED
Clerk of the Courts
FEB 5 - 1997
MAILED
CERTIFIED
REGISTERED
REC'D BY

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

TABLE OF CONTENTS

VOL. XXII


| | PAGE |
|---|---|
| MARGARET BASH: | |
| Direct Examination | 2132 |
| STATE RESTS | 2145 |
| MOTION FOR JUDGMENT OF ACQUITTAL | 2146 |
| RULING | 2148 |
| DEFENDANT'S PROOF | |
| DR. ERIC S. ENGUM: | |
| Direct Examination | 2166 |
| Direct Examination (con't) | 2175 |
| Cross-examination | 2173 |

Janeway - cross
that star upside down?
A No, this one, this one has a point between the, ah, man's legs here, and this one, the point is, the top points, or upper points, are not pointing directly straight up there, slightly at a, probably a forty-five degree angle.
Q Looking at that again, does that statue not have six points?
A One, two, three, four, five--no.
MR. TALMAN: Your Honor, at the conclusion of my cross-examination I would like to pass these to the jury again.
THE COURT: I would be glad to do that.
Q Officer Janeway, you are not familiar with satanism or anything like that, are you?
A I am familiar somewhat with it but I'm not an expert or anything in the field of satanism.
Q Do you have any formal training or anything of that nature?

Janeway - cross

A No.

Q Okay.

MR. TALMAN: Your Honor, I don't believe I have any further questions of Officer Janeway.

And at the conclusion of his testimony I would like to pass, ah, exhibits seventy-three and seventy-six to the jury.

THE COURT: General, do you have any other questions?

MR. CRABTREE: No, Your Honor, I do not.

May this witness be excused?

MR. TALMAN: No objection, Your Honor.

THE COURT: Thank you, Officer Janeway.

Would you please, Mr. Talman, take the exhibits you wish to pass and--

MR. TALMAN: Yes, ma'am.

THE COURT: --the contents of the bag are being passed to the jury.

MR. CRABTREE: The contents are being passed.

(Exhibits 73 and 76 to the jury.)

MR. TALMAN: Your Honor, could we approach while the jury is reviewing the exhibits?

THE COURT: Yes, sir.

BENCH CONFERENCE

(Discussion concerning a recess.)

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, this is a good time to take a mid morning recess, and so I'm going to take a break, and give you all some time to stretch and smoke, and such as that.

Please do not attempt to form any opinions or deliberate at this point, together or alone.

And if you will go with the officers, as soon as you are ready to come back and go back to work we will be glad to start back up.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Anything we need to bring up before we take a breaK?

MR. CRABTREE: The State has nothing.

MS. MARTIN: Yes, could we approach, Your Honor?

THE COURT: Yes, ma'am.

BENCH CONFERENCE

(Discussion concerning timing.)

END OF BENCH CONFERENCE

THE COURT: The Court is in recess.

(Whereupon, a recess was had, after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

I am going to ask this for the benefit of the news media.

We now are projecting, as you can tell, is that bothering anybody?

Are we having any problem with feedback or anything?

Okay.

Are we ready to bring in the jury?

MR. TALMAN: Yes, Your Honor.

MR. CRABTREE: Yes, Your Honor.

THE COURT: Okay.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Call your next witness.

MS. HELM: Call Special Agent Raymond DePriest.

He has not been sworn, Your Honor.

THE COURT: Okay.

DePriest - direct

(Witness was so sworn.)

RAYMOND A. DEPRIEST, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HELM:

Q Would you state your name for the Court and jury, please?

A My name is Raymond A. DePriest.

Q Mr. DePriest, where are you employed?

A I'm employed by the Tennessee Bureau of Investigation in Nashville, Tennessee, as a Special Agent Forensic Scientist, specializing in the field of Forensic Serology and DNA Analysis.

Q What is forensic serology?

A Serology is the study of human body fluids such as blood, semen, and saliva.

My job is to take known standards and compare them to unknown stains that are retrieved from crime scenes in an attempt, and analyze those, in an attempt to either include or

DePriest - direct

exclude a subject for matters of law.

Q And what is your educational background and training in this field?

A I hold a Bachelor of Science degree from Michigan State University, where I majored in biology and physics.

And I also hold a Masters degree from Middle Tennessee State University, where I majored in chemistry and education.

Upon completion of my Masters requirements I was hired as a Professor at Belmont University in Nashville, Tennessee, where I taught for almost three years in the Chemistry Department.

After that time I was employed by TBI.

Q How long have you been employed by TBI?

A Since 1989.

Q And how long have you been doing Forensic Serology and DNA work?

A Ah, since that time. Six and a half years.

Q And have you, ah, been called

DePriest - direct

upon to testify regarding your findings as a Forensic Serologist or a DNA Expert?

A Yes, ma'am.

Q And is that in the Courts of this state?

A Yes.

Q And how many times, if you know?

A Over fifty times.

Q Have you testified in Court out of state?

A No, ma'am.

MS. HELM: Your Honor, we would submit Mr. DePriest as an expert in the field of forensic serology at this time.

MR. TALMAN: Your Honor, I've spoken with Mr.--

THE COURT: And DNA analysis?

MS. HELM: He will not be testifying as to DNA, Your Honor.

THE COURT: All right.

MR. TALMAN: Your Honor, I've spoken with Mr. DePriest before, and we would stipulate he would be an expert in that field.

DePriest - direct

THE COURT: All right.

Mr. DePriest, or Special Agent DePriest will be recognized as an expert in the field of Forensic Serology.

Q Mr. DePriest, in the course of your duties as a TBI Special Agent, have you had occasion to receive evidence in the case of State of Tennessee v. Christa Pike, Tadaryl Shipp & Shadolla Peterson?

A Yes, I did.

Q And from whom did you receive that evidence?

A It is standard procedure in the TBI Crime Lab that evidence is received by the crime lab, ah, and then, it is received by an evidence technician, ah, that evidence technician then forwards that evidence to the vault.

It is from that evidence technician vault that I would receive the evidence.

And that individual was a person named Libby Hoffman.

Q And did you receive a request for a type of testing to be done on the evidence

DePriest - direct

submitted to you in this case?

A Yes, I did.

I received a request from the District Attorney's office here, ah, which asked for, for, ah, the evidence to be examined for blood, and then, ah, that evidence should be also tested for DNA.

Q As a preliminary matter you test to see if there is or is not blood present on a particular item, is that correct?

A That is correct.

Q And why is that necessary as a preliminary matter for DNA testing?

A Ah, the, the DNA test is principally a test that is testing human genetic material.

Ah, in this case it was my job to determine which exhibits, or which items, had human blood on them. And once I concluded human blood was present I was to forward that on to the DNA unit.

Q Now, in the course of doing this examination did you assign numbers to the evidence you received?

DePriest - direct

A Yes.

Unique exhibit numbers are assigned to every exhibit.

Q All right.

MS. HELM: Your Honor, may I approach the witness?

THE COURT: Yes, ma'am.

Q Let me ask you this, also, Mr. DePriest.

In the course of, ah, getting these items ready for examination did you also receive known blood samples from the, taken from the three Defendants in this case?

A Yes, I did.

Q And that is necessary for the purpose of the subsequent testing that was done, is that correct?

A Yes, ma'am.

Q I would ask you now to refer to your item number, exhibit 5000, and then 5467 on your report, and tell the ladies and gentlemen of the jury what that exhibit number refers to in your report?

A In my report it refers to, ah,

DePriest - direct

one pair of white Fila tennis shoes.

I examined both the right and the left shoe and I can identify the shoe because I placed my identification on the side of the shoe with magic marker.

Q All right.

And I will show you what has been marked as exhibit seventy-one in these proceedings and ask you if you recognize what is contained in the bag of exhibit seventy-one?

A This is the bag that contains the exhibit.

I can recognize it because this evidence tape has my initials, R.A.D. at the bottom.

It also has a sticker that is placed on the bag at the time that it is received by the evidence technician.

Q Would you take those items out and tell the ladies and gentlemen of the jury if you recognize these?

A This is the pair of Fila tennis shoes that I examined for blood.

I can identify the shoes by

DePriest - direct

the, ah, identification that I placed on the back of the shoes with magic marker, my initials, the TBI case number, the unique exhibit number, are in place.

Q And did you test those shoes for the presence or absence of human blood?

A Yes, I did.

The first thing I did was to make a visual exam of the shoe and actually look for what could be blood stains.

I did observe some reddish brown staining across the tops of the shoes intertwined in, or in the laces, and along the tongue.

Q And did that, ah, was that substance analyzed?

A Yes, it was.

I preformed three chemical tests, ah, two presumptive tests and one conclusive test for human blood on these areas, and this did prove to be human blood.

Q Did you preform any further tests on those shoes after you determined that there was human blood on them?

DePriest - direct

A No, ah--

Q What did you cause to happen to those shoes?

A What I did was, ah, I removed some of the staining. I actually, as the jury can see, in areas, in areas where the stain was thicker, and there was a chance that we could, ah, perform the DNA testing to get results I did cut out some of the laces and placed those cuttings of the laces with the human blood stain in a petri dish which was wrapped and sealed by me and forwarded on to the DNA unit.

MS. HELM: If I may approach, Your Honor?

THE COURT: Yes, ma'am.

Q Would you show the jury where on the other shoe you took this cut out?

A Yes.

In the areas where you can see the laces were cut, are cuts, those cuts were made by me, cuts with scissors, and then that shoelace was, portion was placed in a petri dish and forwarded to the DNA unit.

MS. HELM: May I show this to

DePriest - direct

the jury, Your Honor?

THE COURT: Yes, ma'am.

MS. HELM: May I approach the witness, Your Honor?

MR. TALMAN: Your Honor, could I see those?

THE COURT: Sure.

MS. HELM: Sorry, Mr. Talman.

Q I will show you two objects and ask you to tell everyone what those are.

A What you see here are two petri dishes, one represents the blood staining from the right shoe and one represents staining from the left shoe, and I separated those because I received information that, ah, there may have been more than one person bleeding, so I went ahead and separated them, ah, to maybe help the case in the long run.

Ah, what you will see inside are some Q-tip like swabs where I actually applied some distilled water and tried to, ah, remove the blood from some of the more leather like areas on the shoe what are circled with magic marker.

Then you will also see cotton

DePriest - direct

cuttings, or remnant remains of the shoelaces that are in each of these two packages.

Q And those are cuttings from those two shoes?

A Yes, they are.

MS. HELM: Your Honor, I would ask that they be marked as the next exhibit. Do we want to make them a collective exhibit?

THE COURT: Collective, General, I think would be good.

Do you want to move those into evidence at this time?

MS. HELM: Yes, Your Honor.

THE COURT: Okay.

Collective exhibit seventy-seven.

(Col. 77 marked and filed.)

Q Mr. DePriest, I would refer you again to your report.

If you would move on to exhibit number 5468?

And in your report what is that exhibit number?

A This is a second pair of

DePriest - direct

tennis shoes.

These are black canvas Converse All Star 10, with a green tongue, with a possible reddish brown staining on the front laces and sides, which I tested for the presence of human blood.

MS. HELM: May I approach the witness, Your Honor?

THE COURT: Yes, ma'am.

Q I will show you what has been marked and entered into evidence in this trial as exhibit seventy-four and ask you if you recognize those?

A This is the brown paper bag that contained the shoes. And I can recognize it by my initials that are placed on the evidence tape and the TBI sticker that is placed in the corner.

Inside we have the black Converse tennis shoes with the green tongue, as mentioned.

Once again there are areas that have been cut by me with scissors where the reddish brown staining was present.

DePriest - direct

On this left shoe you will also notice that there is a large cut in the side that was made by me.

This is another area where human blood stain was present.

There's other reddish brown staining on the sides.

But I selected the area with the thickest or highest quality stain to forward over to DNA, given my conclusion was that that stain was human blood.

MS. HELM: May I approach the witness?

THE COURT: Yes, ma'am.

Q I will show you another set of petri dishes and ask you if you recognize these?

A Similar to the last exhibit, these are two separate petri dishes that contain cuttings from individual left and right shoes.

There's also, one has a Q-tip swab in it, where I was attempting to, attempting to wet the swab and actually remove the blood from the side area of the shoe.

Sometimes that is a better

DePriest - direct

technique than actually just cutting and using the material.

But these are remnants of the two shoe cuttings.

Q So these two items are associated with this pair of shoes, is that right?

A Yes, they are.

MS. HELM: We would enter these as the next collective exhibit, Your Honor.

THE COURT: Seventy-eight.

(Col. 78 marked and filed.)

MS. HELM: And if I might exhibit the shoes once again to the jury?

THE COURT: Yes, ma'am.

Q And I believe, Special Agent DePriest, you said that your testing indicated that the staining on the shoes was blood and that it was of human origin, is that correct?

A That is correct.

Q I will show you a jacket, Special Agent DePriest, which has been marked as exhibit twenty-two in this case, and ask you if you recognize it?

A Yes, I do.

DePriest - direct

Q Does it correspond with any exhibit number on your report?

A Yes.

500,5469.

Q If you will, tell the jury what the white circles on the jacket mean.

A Okay.

Ah, to begin with I can identify the jacket by the, my--I can identify the jacket that I tested, ah, by the TBI case number, exhibit number, and my initials that were placed on the inside of that label that's present.

Ah, my job was to search for blood staining and identify it as human if possible.

What you can see that I have done, given that the jacket is black--I have in my repertoire of tools a white paint marker, and I used it, I chose it in this case to circle the areas where there was reddish brown staining, blood staining.

Ah, all the white circles were made by me. Those are areas where I observed reddish brown staining.

DePriest - direct

I then went ahead, in those areas, with a wet Q-tip swab, ah, which is sterile, and I tried to remove the blood from these areas.

I know from my experience in both DNA and serology that we cannot make a cutting in leather material and process that and expect to get good results.

The reason why is because of all the tanning materials, the different acids that they use to tan leather, ah, give adverse reactions in our different types of serology tests.

So it was best for me to take Q-tip swabs, remove the blood staining but then leave the circle, ah, for the jurors, for the Court to see where I have removed the stain.

Q And so, everywhere there is a circle you have removed a stain?

A Yes.

Q Was that stain blood?

A Yes.

Ah, the swabs were treated, ah, as a group, as one exhibit in the end, and

DePriest - direct

then I tested those swabs.

Q And was the blood of human origin?

A Yes, it was.

MS. HELM: If I may exhibit this in front of the jury?

THE COURT: Yes, ma'am.

Q Mr. DePriest, I will show you another object and ask you if you can identify that?

A This is a petri dish that I made, ah, inside, I can identify it because of the TBI case number, exhibit number, and my initials, and inside you will see the swabs that I used to try and remove the reddish brown stains from the jacket.

Q And that petri dish is associated with the black jacket?

A Yes, it is.

MS. HELM: Your Honor, we would move this into evidence as the next exhibit.

THE COURT: Seventy-nine.

(Exhibit 79 marked and filed.)

Q Mr. DePriest, I would like you

DePriest - direct

to refer now to your exhibit number 5472.

What is associated with your exhibit number 5472?

A This would be three separate items.

A pair of Nike sweat pants.

A Spalding hooded sweat shirt, and a black shirt with long sleeves with the tag, Honors, in the neck area.

Q If I could ask you to put the tennis shoes back in the bag you got them from and I will retrieve them from you?

I ask you to look at what has been marked as exhibit seventy-five in this trial, and ask you if you recognize those items?

A I can recognize the packaging by the label that is present that has my identification on it.

These are the three exhibits that I examined, tested for the purposes of human blood.

I can identify the pair of sweat pants by the TBI case number and my initials that were placed inside.

DePriest - direct

In terms of the areas where I found, ah, reddish brown stain which was human blood, principally it was in the lower leg area on both sides.

I know it is difficult to see because this material was black and the blood is dark red or almost black.

Ah, the area where the highest quality of blood staining was would be on this leg, it would be the left leg.

I made a cutting of that area and tested it and proved it was human blood, placed that cutting in a petri dish and forwarded it to the DNA unit for further testing.

There was also some human blood staining back on the back of the, it would be the right leg, so that would be still part of the area that I cut out, and that was also forwarded to the DNA unit.

The second item is this black Honors tee shirt with long sleeves that I can identify by the label that I placed on the neck.

The areas of blood staining are, the jurors can see, ah, mostly in the front.

DePriest - direct

It looks like a, maybe a muddied or shadowed area there, an unclean area on the black shirt, the area where the highest quality of blood stain was present was right in here, and this is where I made my cut, to forward the blood stain on to the DNA unit.

There was a third item that was in the same brown paper bag, the Spalding hooded sweat shirt, I can identify, because it has my label that I placed on the arm, my identification.

I did not do any, ah, chemical blood tests on this shirt.

What I did was, looked at it under a very good light conditions. I didn't see any stains that represented, that were representative of the stains on the shirt and the pants, previously worked, there was nothing of the same color.

There were white stains which I did not test on this shirt.

I have no idea what they may be.

Ah, I did, at that time, think

DePriest - direct

that I had high quality stains coming from this black shirt and this black pair of pants, and therefore I did not do any further chemical testing on this black shirt that was also wrapped as part of the exhibit.

Q If I may show you this item and ask you if you can identify that and what it is?

A This is the cutting that I made from the athletic pants with the human blood stain.

I packaged it this way to forward it on to the DNA unit.

MS. HELM: If we may introduce this as the next exhibit?

THE COURT: Exhibit eighty.

(Exhibit 80 marked and filed.)

Q And ask you if you can identify this item?

A This is the cutting that I made from this black tee shirt, ah, with human blood staining, that I packaged and forwarded on to the DNA unit.

MS. HELM: If we may submit

DePriest - direct

this as the next exhibit?

THE COURT: Exhibit eighty-one.

(Exhibit 81 marked and filed.)

Q And, again, the test that you did indicated to you that the substance that you were looking at was blood?

A Yes.

Q And it was human blood?

A Yes.

MS. HELM: If I may show this to the jury?

THE COURT: Yes, ma'am.

Q If you will put these back in that bag?

And this is the shirt that you tested?

A Yes.

MS. HELM: If I may show that to the jury as well?

THE COURT: Yes, ma'am.

Q If you would now, Special Agent DePriest, refer to your exhibit number 55495, and what does your 55495 consist of?

A It is one pair of blue jeans

DePriest - direct

labeled with the tag, Guess, with a black belt with a silver buckle.

There was also associated with this exhibit a small coin purse that contained some miscellaneous material.

Q Did you test both of those items?

A Yes, I did.

Q Did you find anything at all on the coin purse?

A The coin purse was negative for the presence of blood.

MS. HELM: If I may approach--

THE COURT: Yes, ma'am.

Q --and show you what has been marked as our exhibit seventy-two and ask you if you recognize the contents of that bag?

A I can recognize the bag because of the TBI case number and my initials that are placed on the tag in the upper corner.

This is the pair of jeans that I examined for the presence of blood.

I can recognize them by the initials that are placed on the right-hand side,

DePriest - direct

R. A. D., and also on the inside pocket area, the TBI case number, exhibit number, and my initials that are present.

Q And on your report, sir, who do these jeans belong to?

A These were labeled and given to me as jeans and purse of Christa Pike.

Q Did you examine those jeans, sir?

A Yes, I did.

I examined them for the presence of human blood, ah, the blood on this item was, is very obvious, ah, ah, one can see that there are reddish brown stains, splatters, ah, on the front of the jeans, along the bottom.

Ah, the area of the highest quality I had cut out with scissors and forwarded on to the DNA unit, once I was able to, ah, to determine that it was human blood.

MS. HELM: May I approach, Your Honor?

THE COURT: Yes, ma'am.

Q I will show you this item, sir, and ask you if you recognize it?

DePriest - direct

A This is the cutting that I made from the jeans and that I packaged and forwarded on to the DNA unit.

MS. HELM: May we mark this as the next item for exhibit, please?

THE COURT: Eighty-two.

(Exhibit 82 marked and filed.)

MS. HELM: Your Honor, may I show the jeans to the jury?

THE COURT: Yes, ma'am.

Q If you will put these back in the bag, sir?

One other question, sir--did you also receive a known blood sample from the victim in this matter, Ms. Colleen Slemmer?

A Yes, I did.

Q And you say you packaged those petri dishes and plastic boxes and sent them to the DNA lab, did you send them to a specific person?

A Yes, I did.

Q And who was that?

A They were forwarded to DNA analyst, Margaret Bash.

Bash - direct

Q And that was at your direction and under your control?

A Yes, ma'am.

MS. HELM: I don't have anything further.

MR. TALMAN: Your Honor, we have no cross-examination for Agent DePriest.

MS. HELM: May he be excused, Your Honor, please?

MR. TALMAN: We have no objection.

THE COURT: Thank you, sir.

You are free to leave.

MS. HELM: Call Margaret Bash.

Your Honor, this witness, likewise, has not been sworn.

(Whereupon, the witness was so sworn.)

MARGARET BASH, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HELM:

Q Would you state your name, please?

Bash - direct

A My name is Margaret Bash. B A S H.

Q And where are you employed?

A I'm employed by the Tennessee Bureau of Investigation Crime Laboratory in Nashville.

Q And what is your present assignment?

A I'm currently assigned to the DNA unit.

Q And have you had other assignments within the TBI laboratory?

A Yes, ma'am.

Previously, I was assigned to the serology unit.

Q And what are your responsibilities now in the DNA unit?

A I examine evidence for the presence of DNA, ah, I prepare a report on my findings and go to Court and testify on those findings.

Q What is your educational background and training, Ms. Bash?

A I have a Bachelor of Science

Bash - direct

degree in biology with a minor in chemistry, from the University of Tennessee at Martin.

I have seven graduate credit hours in Forensic Anthropology from U.T., Knoxville.

I have fifteen graduate credit hours in Criminal Justice, from the University of Virginia.

I completed three two week training courses at the FBI Academy regarding Forensic Serology.

A two week training course in Forensic Serology with the Serological Research Institute of Emeryville, California.

I completed a two week training course in PCR, DNA analysis with Cetus Corporation of Emeryville, California.

I've completed a one month and a one week school in DNA analysis with the FBI Academy at Quantico, Virginia.

I've audited classes at Vanderbilt University in molecular biology and population genetics.

I've been employed full-time

Bash - direct

with the TBI Crime Laboratory since April the 1st of 1982.

Q And are you a member of any professional organizations?

A Yes.

I'm a member of the Southern Association of Forensic Scientists and a member of the International Society for Forensic Hemogenetics.

Q Special Agent Bash, does the TBI DNA Laboratory follow a quality assurance program to assure, insure high standards for DNA analysis?

A Yes, we do.

Q And how many DNA cases has the lab examined?

Do you know?

A Approximately one thousand.

Q And have you testified before concerning DNA analysis?

A Yes, I have.

Q And where has that been?

A I've testified in Dyer County, in Bedford County, in Haywood County, ah,

Bash - direct

Williamson County, Davidson County--how many was that?

Q I lost count.

A Ah, there may be--

Q Let's say, you have testified across the state?

A Yes, I have.

Q Have you testified out of state?

A Yes, I have.

MS. HELM: Your Honor, at this time we would submit that Special Agent Bash is an expert for the purpose of DNA testing and analysis.

MR. TALMAN: No objection, Your Honor.

THE COURT: All right.

Special Agent Bash will be, ah, deemed as an expert in DNA analysis.

Q Special Agent Bash, just briefly, what is DNA?

A DNA is the basic part your genetic makeup that makes you an individual.

Ah, DNA stands for

Bash - direct

deoxyribonucleic acid. That's why we say DNA.

DNA is the part of your cellular material that makes you human. It makes you alike, it makes you all people, but it also makes you different.

DNA controls things like whether your earlobes are attached, whether you have brown hair or green eyes, ah, it controls things like whether this finger is longer than this finger.

It controls many of the things that make you an individual as well as the things, like I said, that make you human.

Q And what is meant by forensic DNA profiling?

A Forensic DNA profiling, ah, is done by a method called RFLP analysis. RFLP analysis stands for restriction fragment length polymorphism.

That's the method that I use to determine the origin of blood stains or semen stains.

Q And how is the forensic DNA comparison made?

Bash - direct

A I take known blood samples from individuals and blood stains from pieces of evidence and I put them all through the same series of analyses.

Would you like me to describe the analyses?

Q Briefly.

A Briefly, what I do is isolate just the DNA away from all the other cellular material.

Then I use a chemical that works like molecular scissors that cuts the DNA at specific points along the strand.

I then separate the DNA into different lengths of the strands using a method called electrophoresis.

That just means that you run an electric current over through the DNA and it separates them out. Small pieces will travel very far and long pieces will not travel nearly as far.

I then subject these pieces of DNA to four different chemicals that are specific for four different sites, four different genes.

I can compare the profiles

Bash - direct

that I get from evidentiary material to known samples to determine if stains matched a person, or they did not match a person.

Q And what is the statistical significance of a DNA, how is it determined, the statistical significance?

A I do a statistical analysis based on a data base that was created at the TBI Crime Laboratory.

We collected, ah, nine hundred blood samples and did DNA profiles on those samples.

From that information I got a statistical data base, and I compare my results to that statistical data base, to determine statistically, the probability of an unrelated individual having deposited a, a blood stain.

Q Now, if you would, please, refer to your report, and, specifically, to your exhibit number 5467.

A Yes.

Q And what is that item on your report?

A Tennis shoes of Christa Pike.

Bash - direct

Q And did you attempt to do DNA testing on those shoes?

A Yes, I did.

Q What was your result?

A An insufficient amount of high-molecular weight DNA was recovered for our RFLP analysis.

Q I will show you what has been marked as exhibit seventy-seven in our case, and ask you if you recognize those two items?

A Yes, ma'am.

These are the cuttings from exhibit 5467.

Q And referring to exhibit 5468, what was that?

A Tennis shoes from Tadaryl Shipp.

Q And what was your result there?

A Again, I found an insufficient amount of high-molecular weight DNA.

Q I will show you what has been entered as exhibit seventy-eight, and ask you if you recognize that?

Bash - direct

A Yes, ma'am.

These are the cuttings from the tennis shoes.

Q And referring to your exhibit number 5469, I will ask you what that refers to?

A The coat of Christa Pike.

Q And what kind of coat was it-- well, you didn't see it?

A I didn't see the coat.

Q Okay.

Let me show you our exhibit seventy-nine, and ask you if you recognize that?

A Yes, ma'am.

These are swabbings taken from the coat.

Q And what was your result on that?

A An insufficient amount of high-molecular weight DNA.

Q Referring to your exhibit, 5472, what was that?

A Clothing of Tadaryl Shipp.

Q And what does your results indicate there?

Bash - direct

A The results were, that, ah, the DNA profile matched my exhibit 5463, which is the--

Q What is that?

A The known blood sample from Colleen Slemmer, for low side D2S44D10S28D4S139, Locus D1S7 was inconclusive.

Q And what is the probability of selecting an unrelated individual at random with the DNA profile of Colleen Slemmer?

A From the caucasian population it is approximately one in two hundred and forty-seven thousand. From the black population it is approximately one in six hundred and eighteen thousand.

MS. HELM: May I approach, Your Honor?

THE COURT: Yes, ma'am.

Q I will show you what has been labeled as exhibit eighty-one.

Do you recognize that?

A Yes, ma'am.

Q What is that?

A That is a cutting from the

Bash - direct

shirt of Tadaryl Shipp.

Q And I will refer you now to your exhibit number 5475.

What is that?

A Jeans and purse of Christa Pike.

Q And did you, likewise, submit the cutting sent to you by Mr. DePriest to RFLP analysis?

A Yes, I did.

Q And what did your RFLP analysis produce?

A The DNA profile matched exhibit 5463, the known blood sample from Colleen Slemmer, for low side D2S44D10S28 and D4S179, ah, 139. Locus D1S7 was inconclusive.

Q And what is the probability, statistically, of selecting an unrelated individual at random to have a profile like Colleen Slemmer's?

A In the caucasian population it is approximately one in two hundred and forty-seven thousand. And in the black population it is approximately one in six hundred and eighteen

Bash - direct

thousand.

Q I will show you what has been marked as exhibit eighty-two and ask if you recognize that?

A Yes, ma'am.

These are the jeans cuttings that I received.

Q Those are the jeans cuttings that correspond with your exhibit number 5475, jeans of Christa Pike?

A That's correct.

Q Agent Bash, can you say within a reasonable degree of scientific certainty whether or not Colleen Slemmer's blood was that blood which was found on the warm-up pants of Tadaryl Shipp and the jeans of Christa Pike?

A Not without, without any doubt. The probability, ah, again, is one in two hundred and forty-seven thousand in the caucasian population and one in six hundred and eighteen thousand in the black population.

Q Thank you.

One other thing.

The three inconclusives that

Bash - direct

you received, on the two pairs of shoes and the black leather jacket--

A Yes.

Q --you are not saying there wasn't blood there?

A No.

Q What, what was the difficulty you had with those three items?

A Often when, ah, items have been, especially things like shoes, that have been in the dirt, or are very dirty, have contact with microorganisms which are found naturally occurring in the dirt, ah, DNA is degraded, ah, it is possible to do the chemical tests which allow you to determine that something is blood and is human blood, but as far as obtaining a DNA profile from items like that, ah, degradation would not allow that.

Q Thank you very much.

MS. HELM: Your witness.

MR. TALMAN: No questions, Your Honor.

THE COURT: May Special Agent Bash be excused to leave?

MR. TALMAN: We have no objection.

THE COURT: Thank you very much, ma'am.

MS. HELM: May it please the Court, the State of Tennessee rests its case in chief.

THE COURT: Thank you, General.

Ladies and gentlemen, it is a quarter till 12:00.

The State has rested its case in chief.

We still have more to go.

But this will be a good time to recess for lunch, or allow you to recess for lunch.

Ladies and gentlemen, you have not heard all of this case.

You have not heard the Court's instructions.

Please do not deliberate. Do not attempt to reach any conclusions until the Court has instructed you to do so.

Stay with the officers. Please do not, ah, read or observe local or

national news, and, ah, I will give you a weather forecast when you get back.

It is going to rain until Sunday. That is the weather forecast.

And if you will go with Officers Beeler and Bieber and get some lunch we will have you back here, we will be ready to begin as soon as you are back, I hope.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Mr. Talman, I believe you need to make a motion at this time.

MR. TALMAN: Your Honor, at this time we would make a Motion for Judgment of Acquittal as to each count of the indictment.

Specifically, we would argue that in count two the State has not proven, ah, that there has been a box cutter involved in this offense. There has been no box cutter introduced and that is a specific element of the charged indictment.

So, we would ask for a Judgment of Acquittal on that, Your Honor.

MR. CRABTREE: Your Honor, if I may, concerning the box cutter. I will take care of that first.

I believe in Ms. Pike's statement she says specifically that a box cutter was used.

So, we would submit to the Court that there has been evidence concerning the box cutter.

We would submit to the Court that at this time the State has shown that, ah, we have proven that this individual acted intentionally, premeditatedly, and, ah, that this was done in a deliberate fashion.

We would submit, that as far as the first count to the jury is concerned that is what is necessary for us to show, and this matter should go to the jury.

Concerning the second count, the issue of conspiracy, we have shown that four people left the Job Corps Center together. That three of them come back together.

The statement of Ms. Pike, who has testified as to what happened, her statement shows what happened, saying that at least she and

Mr. Shipp were acting in concert as far as this is concerned.

We submit that we have shown sufficient proof and this matter should go to the jury, also, and ask the Court to so hold.

MR. TALMAN: Your Honor, as to the, ah, ah, argument of the State, that the, regarding the box cutter and the statement of Ms. Pike, this is, as to the box cutter it is uncorroborated.

And we would submit that a Defendant's statement is insufficient by itself, without corroboration to sustain a conviction, and we would ask the Court to, for a Judgment of Acquittal in the second count, specifically.

THE COURT: All right.

As to the Motion for Judgment of Acquittal, the Court taking this proof in the light most favorable to the State, the Court finds that there is sufficient evidence to take both of these counts to the jury.

And as to the issue raised regarding the box cutter in count two, the jury has heard proof regarding sharp instruments from the witnesses who have testified, and the doctors

who have testified, and, ah, also from Ms. Pike's statement, and the jury can analyze the proof and make its own conclusions.

And I think there is sufficient evidence to allow both of these counts to go to the jury.

Upon the completion of the lunch recess and a charge conference, therefore, Mr. Talman and Ms. Martin will be ready to go forward with any proof you wish to put forward, and we will take it from there.

Is there anything else we need to take up?

MR. CRABTREE: The State has nothing at this time.

MR. TALMAN: The Defense has nothing, Your Honor.

THE COURT: The Court is in recess.

(Whereupon, a luncheon recess was had, after which the following proceedings were had, to-wit:)

THE COURT: Mr. Talman, are you ready to begin the Defense's proof?

MR. TALMAN: Yes, Your Honor.

THE COURT: All right, sir.

Let's bring the jury in, if there is nothing else.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ladies and gentlemen of the jury, I'm sorry to have delayed you. There were some matters that the lawyers and I needed to take care of to make the balance of the trial go a little bit more smoothly for you.

And this was as good a time as any to do that.

We are ready to proceed with the Defense's proof.

Mr. Talman, if you are ready to call your first witness, or Ms. Martin, as the case may be.

MS. MARTIN: Call Dr. Eric Engum.

He needs to be sworn, Your Honor.

(Witness was so sworn.)

THE COURT: Please come up and have a seat, sir.

MR. CRABTREE: Your Honor, may we approach a moment?

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. CRABTREE: Concerning Dr. Engum's testimony, we have not received a notice of an insanity defense if that is where we are going.

MR. TALMAN: It is not an insanity defense.

MR. CRABTREE: What are we getting into?

THE COURT: What is he going to testify?

MR. TALMAN: He is going to testify as to the tests he administered. It doesn't go to the right or wrong of the action, but, ah, to explain it.

Do we need to do a side-bar conference?

THE COURT: Uh-huh.

(Side-bar, tape recorder further away from jury.)

MR. TALMAN: We have filed a notice of intent to introduce expert testimony as to her mental state. We are not using that on insanity. We are not pleading not guilty by reason of insanity. But we do have expert testimony regarding her mental state. We have filed that notice, and we have given it to the State.

MR. CRABTREE: Maybe I'm getting a little lost here, but concerning mental state I'm not sure what we are referring to and what period we are talking about this coming in for.

I mean, you're coming in for insanity you are saying or you are not saying--

THE COURT: Is it diminished capacity, is that what you are talking about?

MR. TALMAN: It is along that line but it is not an insanity defense. It doesn't--

THE COURT: Does it go to prove, ah--

MR. CRABTREE: If it is not insanity and, ah, diminished capacity, and if it doesn't go to either one of those I don't see what relevance it has--

MR. TALMAN: It does go to diminished capacity--

THE COURT: Maybe we should just send the jury out and do this on the open record.

MR. CRABTREE: I think that would make it a little easier for everyone.

MR. TALMAN: We would like to make a proffer of testimony anyway.

THE COURT: Let's find out what we are about to get into first.

MR. TALMAN: Okay.

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, it is clear to me that there is a matter that I need to resolve prior to going forward with Dr. Engum's testimony.

And I am going to ask all of you to go back into the jury room and patiently

wait, and I will let you know as soon as I am ready.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: All right.

Now, it is my understanding, Mr. Talman, from our side-bar conference, that you are offering Dr. Engum regarding a notice that you have given.

Do you have a copy of your notice?

MR. TALMAN: Yes, Your Honor.

It was filed January the 19th.

THE COURT: Okay.

Hold on.

I take it, knowing Dr. Engum's various expertises, that he is being offered here as an expert witness.

Would you like to tell me the areas which you intend to go into with him in a general way and explain where we are going here?

MR. TALMAN: I will let Ms. Martin do that, Your Honor. She was going to

examine him.

THE COURT: I am still looking for your notice. But I have seen your copy so I know what we are talking about.

MR. TALMAN: Your Honor, it's, I'm not sure exactly what the State's objection is.

We filed a notice required under Rule 12.2 (b), regarding expert testimony as to the Defendant's mental condition.

It says that, "If a Defendant intends to introduce expert testimony relating to a mental disease or defect, or any other mental condition of the Defendant bearing upon the issue of his or her guilt he shall within the time provided for the following pre-trial motions or at such a later time that the Court may direct, notify the District Attorney in writing of such intention, file a copy of such notice with the Court."

Your Honor, that has been done.

THE COURT: So you are relying upon mental disease or defect?

MR. TALMAN: As to

culpability, Your Honor.

It does not go to, we are not filing a notice under Rule 12.2 (a), as far as defense of insanity.

We are not offering an insanity defense.

But it would go to, ah, her culpability, or her ability to form, ah, premeditation, if you will, Your Honor.

And that notice has been filed. The State has been provided a copy of Dr. Engum's report, and that notice was filed on January the 19th, Your Honor.

THE COURT: The State has already been provided a copy of that notice?

MR. TALMAN: Yes, Your Honor.

We provided a copy that day.

THE COURT: All right.

MR. CRABTREE: Your Honor, there is no question that we have received notice that the Court has referred to, which sets out, ah,--"Comes the Defendant, Christa Gail Pike, by and through counsel, who respectfully gives notice pursuant to Rule 12.2 (b), Tennessee Rules of Criminal Procedure. The Defense intends to offer

an expert during the trial of this cause."

As to--but that, in and of itself, does not make the testimony of this witness relevant.

And we are asking, what is the relevance of this particular witness' testimony?

We have the report.

And in reviewing that report I don't see any relevant evidence.

Surely, there is not another report that we have not been provided with that has the relevant evidence in it.

MR. TALMAN: Well, Your Honor, we would submit that, ah, Dr. Engum should be allowed to, ah, to testify. And if for some reason relevancy is not established then the Court can so admonish the jury.

But it would go to the, ah, Dr. Engum's, ah, opinion, ah, that he has performed his diagnosis and his opinion that he has reached within a reasonable degree of psychological certainty.

So, it's--

THE COURT: May I see Dr. Engum's report?

MR. TALMAN: Yes, Your Honor, if I might approach?

THE COURT: That might assist me in some way.

(The Court reviewed the report.)

THE COURT: As I understand this report, and I will let you ask Dr. Engum some questions as we get along here, but Dr. Engum administered a number of, ah, psychological and neuropsychological tests and examinations on Ms. Pike, and basically has presented in this report, ah, his findings as a result of those examinations, has not offered an opinion in any way as to, ah, the, ah, charges, or Ms. Pike's ability or inability, ah,--to have committed this offense.

Now, I take it that you are relying, Mr. Talman, on the intention to introduce expert testimony on, quote, "Other mental condition of the Defendant, bearing upon the issue of his or her guilt."

This report does not go into that issue, specifically, although there are parts of this report that, from a, ah, physician's point

of view, or psychologist's point of view, ah, may go to state of mind.

General, do you want to voice your objection regarding this?

MR. CRABTREE: Your Honor, it is my understanding, for this testimony to come in we are talking about one of two things here.

We are talking about the issue of whether or not, ah, the Defendant was insane at the time of the commission of the offense.

It is my understanding that it has been stated that that is not an issue in this particular case--

THE COURT: That has not been--

MR. CRABTREE: --so we don't have to deal with that.

THE COURT: --that has not been raised as an issue, no, sir.

MR. CRABTREE: The second phase of where I understand that this type of potential testimony could come in, is a situation where we are talking about what has been referred to in at least one case out of the Court of Criminal Appeals, as the evidentiary issue of diminished capacity.

And it is my understanding that for that issue to be a relevant issue it is necessary that there be a showing of some kind that the Defendant was unable to form the requisite intent to commit the offense.

Ah, and, it was my understanding that is the theory of the introduction of that type of testimony in the area of diminished capacity.

Again, I can't see whether either one of these particular situations exists in this report or the information that we have available.

And unless we are talking about that, unless counsel has some authority to proceeding in a different fashion I don't know what the relevancy of this testimony is, and I think we are entitled to know that.

MR. TALMAN: Your Honor, the, the statement of the Defendant that was introduced in evidence by the State, ah, I think quite clearly shows the, ah, Defendant in a state of excitement, and of, I think her state of mind.

It goes exactly to her state of mind.

And this report and Dr. Engum's testimony would, ah, would go to that, Your Honor, and--

THE COURT: How does her state of excitement indicate a, ah,--

MR. TALMAN: Her ability to form premeditation, Your Honor.

THE COURT: Well, that wasn't exactly the question.

MR. TALMAN: I'm sorry.

THE COURT: --indicate diminished capacity in any way, or mental defect?

MR. TALMAN: Well, Your Honor, if she is under such extreme influence or excitement so as to not be able to, ah, form premeditation we think that would go to, to her, ah, that would be an issue of diminished capacity.

THE COURT: Isn't that ultimately a jury issue? Isn't that ultimately the jury's issue, to determine whether or not Ms. Pike is guilty of the offense charged or one of the lesser offenses?

MR. TALMAN: Well, yes, Your Honor, that is exactly correct.

So is the testimony of

witnesses, to weigh and to determine, ah, ah, credibility and what weight to be given to their testimony.

And, and we think that Dr. Engum's testimony would be relevant, and we would like to make a proffer of that testimony, for the record, anyway.

MR. CRABTREE: Your Honor, again, if, all I am saying, and, and we would admit that at this particular time, apparently the law that was in existence at the time of the commission of the offense, if an expert is allowed to testify they probably can testify to the ultimate issue, even under present law they can.

But that the situation is, can the expert testify to relevant evidence?

Relevant issue one, insanity.

We say that is not an issue.

Two, whether or not the Defendant can form the requisite intent?

THE COURT: According to the report of Dr. Engum, Ms. Pike is an extremely bright young woman.

It is not a matter of, ah, mental defect, in the sense of mental retardation

or anything like that, from what I very quickly read of this rather detailed report that Dr. Engum has prepared.

MR. TALMAN: Your Honor, before you rule it might be appropriate if you read it.

THE COURT: Well, I haven't. I was just handed it.

MR. TALMAN: And I apologize. I wasn't trying to tell the Court what to do.

MR. CRABTREE: Maybe we should take a few minutes and give the Court the opportunity to read this and see where we can go.

THE COURT: I think that might be a good idea.

All right.

The Court is going to be in recess for a few minutes.

I'm sorry, Dr. Engum, if you will just bear with us.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: Please be seated.

General Harper is not back,

right?

MR. CRABTREE: No.

Are you referring to that case?

THE COURT: Yes, sir.

MR. CRABTREE: Ah, Your Honor, I just went over and checked with the librarian, and apparently they are having computer problems, and, ah--

THE COURT: We can't seem to pull it out of Westlaw yet.

MR. CRABTREE: We can't get it right yet.

But as far as, I would state to the Court, that Ms. Martin earlier let me ask a question of Dr. Engum, and based upon his response to that question I think that we can go ahead and bring the jury in and have a hearing on this matter, and we are ready to do so.

I believe the case that Your Honor is referring to may have to do more with charge and things of that nature than what we are talking about here.

THE COURT: I think that is probably true.

And the ruling would have been, for the record, that Dr. Engum may testify as to his findings, and of course, the jury will determine how all that connects, assuming that you qualify Dr. Engum.

And is there going to be an issue regarding Dr. Engum's qualification, ladies and gentlemen?

MR. CRABTREE: I think it will be necessary to go through the qualifications.

THE COURT: Yes, sir, I think it will, too. But we can do that relatively briefly, I take it.

MR. CRABTREE: Although we may not have demonstrated it up to this time we believe in brevity.

THE COURT: Actually, I think you have done a pretty good job of that.

Are you ready?

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ms. Martin, I think

Engum - direct

you were about to ask Dr. Engum some questions?

MS. MARTIN: Thank you, Your Honor.

ERIC S. ENGUM, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MARTIN:

Q Would you state your name for the record, please?

A Eric S. Engum.

Q Okay.

And you will need to speak up.

A Yes.

Q Can you tell us a little bit about your work background, Dr. Engum?

A Yes.

I have a PhD in Clinical Psychology. And basically I have worked over the last few years in private practice, majoring primarily in Neuropsychology and Forensic Psychology.

Before that I was the director of Lakeshore Service Systems out of Birmingham, Alabama, as director of Clinical Neuropsychology,

Engum - direct

working with brain injured individuals.

Before that I was the director of Ft. Sanders Regional Medical Center Psychology Department for approximately six years.

I've also worked for approximately two years in Iowa at Iowa Methodist Medical Center, and specifically in the Enchor Memorial Rehabilitation Center.

Q Okay.

And would you give us a little bit about your educational background?

A Yes.

I have a Bachelor of Science in Psychology from Waggoner College in New York, which I received in 1971, a Master of Science in Experimental Psychology from Tulane University, which I received in 1973. I also possess a PhD in Clinical Psychology from the University of South Dakota, which I received in 1977.

Contemporaneous with obtaining the PhD I also completed a year long clinical internship at the University of Alabama Medical Center in Birmingham, Alabama, and that went from 1976 through 1977.

Engum - direct

I also possess a law degree which I received from the University of Tennessee, here in Knoxville, and I received that in 1982.

Q And what portion of your time has been spent in Forensic Psychology?

A Approximately twenty to thirty percent of my, maybe even up to forty percent of my time is spent in what is called Forensic Psychology, which is that area of psychology which deals with the legal system.

For instance, I may see people who suffered brain injuries and may be involved in getting disability or personal injury suits.

I obviously have seen people who have been charged in a capital crime, such as the one we are here for today.

Ah, I see people who have legal problems and have major psychiatric or psychological issues related to those problems.

Q And, ah, exactly what licenses do you have?

A I have a license to practice psychology, clinical specialty here in the state of Tennessee. I also have a license to practice

Engum - direct

clinical psychology in the state of Alabama. I'm listed in the National Health Registry of Health Service Providers in psychology, which is national.

Q Okay. And are you board certified in any areas?

A Yes. Two areas. Number one is the American Board of Medical Psychotherapists and the other one is the American Board of Professional Disability Examiners.

Q And are you a member of any special organizations?

A Yes. The American Psychological Association, the American Bar Association, and I also sit on the Board of Directors for Federal Defender Services of East Tennessee.

Q Okay. Have you had any publications to your credit, sir?

A A number of them. I guess it runs about ten or

Engum - direct

twelve publications, primarily in two areas.

Number one, the area where the law interfaces with psychology.

And number two, I spent approximately seven years as the head of a research team in developing a test battery to determine whether brain injured individuals could safely return to driving, people who have had strokes and head injuries and whether they could drive a car safely.

Q And have you ever testified before?

A Yes, I have.

Q In the state?

A Yes, on a number of occasions.

Q Okay.

And out of state?

A Yes.

Missouri, Indiana, Kentucky, ah, Mississippi once. I've also testified in Alabama and in Nebraska.

Q Have you ever testified or defended someone for the prosecution?

A Ah, not for the State. I have

Engum - direct

twice for the Federal Government in criminal cases.

Q And for the Defense?

A That's primarily what I do. Ah, I would say that I probably testified in criminal capital murder cases on about fifteen occasions over the past five or six years.

Q That was in state and out of state?

A Yes. And it may be a bit more than that, it might be up to twenty where I have also testified, like, in the sentencing parts.

MS. MARTIN: At this time, Your Honor, we would offer Dr. Engum as an expert in Clinical Psychology with a specialty in Neuropsychology.

THE COURT: General?

MR. CRABTREE: Just a couple of questions, if I may?

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. CRABTREE:

Engum - cross

Q I believe that you indicated that you had testified on numerous occasions before, is that correct?
A That is correct.
Q And in the Criminal Courts of the state of Tennessee?
A Yes, sir.
Q And that has been primarily on behalf of the Defense, is that correct?
A That is true.
Q Of the fifteen cases that you are referring to, is that what you said, fifteen--
A It may be more.
Q --okay.
And has that been exclusively Defense cases that you are referring to there?
A Yes, sir.
Q And in capital cases that's exclusively for the Defense, is that correct?
A That is correct.
Q Now, you are not a Forensic Psychologist, is that correct?
A There is a board certification for that. I am not a Forensic--

Engum - cross

Q Pardon?

A There is a board certification for that which I do not hold.

Q So, you are not a Forensic Psychologist?

A Not in the technical sense. I practice in the area because of the people that I see.

Q So your letterhead stating that you are a Forensic Psychologist is incorrect?

A It doesn't say that. It says I provide forensic psychology services.

Q Well, it says Clinical Neuropsychology which you have been introduced as an expert in, is that correct?

A Correct.

Q And it says, Forensic Psychology, also, is that correct?

A Correct. But it doesn't say that I am a Forensic Psychologist. It says those are the two areas.

Q You are not planning to be a Forensic Psychologist then?

A I don't have the board

Engum - cross

certification. I practice in the area.

Q Sir, the question is, are you planning to be a Forensic Psychologist?

A No, sir.

Q Thank you.

THE COURT: Would you approach the bench, please?

BENCH CONFERENCE

THE COURT: There is a difference between neuropsychology and psychology.

Are you asking that he be certified as an expert in Clinical Neuropsychology? He has never testified about neuropsychology. He is board certified in clinical psychology. I have no problem with that.

Would you please ask about neuropsychology?

MS. MARTIN: About what?

THE COURT: Neuropsychology.

END OF BENCH CONFERENCE

MS. MARTIN: One moment, please, Your Honor.

DIRECT EXAMINATION (CON'T)

BY MS. MARTIN:

Q Dr. Engum, are you board certified in Clinical Neuropsychology?

A No, ma'am.

Q Okay.

Are you qualified as an expert in Clinical Neuropsychology?

A Yes, ma'am.

THE COURT: Maybe I can clear this up.

Dr. Engum, as I understand it, what you just testified to, you are board certified in Clinical Psychology, you have worked extensively in the field, is that correct?

THE WITNESS: Let me--

THE COURT: Back up and tell me that part.

THE WITNESS: Okay.

I'm a Clinical Psychologist, been licensed for almost twenty years.

THE COURT: Yes, sir.

THE WITNESS: I've practiced

Engum - direct

in the subspecialities of Clinical Neuropsychology and Forensic Psychology.

There are specific board certifications and some people do that. That is not the requisite for practicing in those areas.

You do not have to be board certified in Clinical Neuropsychology to practice as a Neuropsychologist.

You do not have to be board certified in Forensic Psychology to practice in that area.

The APA standards are clear on that.

MR. CRABTREE: Well, if I may, the question is not what area the Doctor practices in, it is what area he is an expert in.

And I think that is what we are trying to clarify.

THE COURT: The Court will recognize Dr. Engum as an expert in Clinical Psychology, and will further recognize that Dr. Engum practices in the areas of Neuropsychology and Forensic Psychology.

Now, go ahead, Ms. Martin.

Engum - direct

MS. MARTIN: Thank you.

Q Dr. Engum, will you tell us when you saw Christa Pike?

A Yes, ma'am.

My first contact was May 24th, 1995.

Q And who referred her to you?

A Ah, Mr. Bill Talman.

Q And how long did you see her on that occasion?

A Ah, if you will give me just a second to check my notes?

I spent approximately six hours that day, including doing clinical interviewing and some formal testing.

Q And what were you asked to do?

A Basically address four issues.

Ah, number one, whether she was competent to stand trial, a determination based upon an assessment of her intellectual and cognitive abilities.

Number two, to determine whether she suffered from a major mental disease or defect, which might exonerate her from criminal

Engum - direct

culpability for the crime that she committed.

In other words, was she insane, legally?

Number three, whether she suffered any psychological conditions which might relate to what is defined as diminished capacity or diminished culpability.

And number four, to identify any potential mitigating factors that might relate to her situation.

Q Okay.

And what procedure, or how exactly did you do your evaluation?

A Basically, and it was over a number of sessions. I saw her on, ah, at least four separate occasions for fairly lengthy testing and interviews.

And basically we do four things.

Number one, is clinical interviewing and what I call extended mental status examination which is a way of just finding out how well your client processes information, remembers, interacts with the examiner.

Engum - direct

Number two is an intellectual assessment basically establishing an IQ, to address issues of competency and mental defect.

Number three is academic testing, to just find out how well she can deal with the written and spoken word.

And number four, well--number four, neuropsychological assessment, which is to determine whether there are any signs of organisity or brain damage.

And then number five is personality and emotional assessment. What you would consider, testing of emotional status.

Q Can you tell us briefly the results in each of those four areas?

THE COURT: Well, actually, there were five areas.

A Five areas.

THE COURT: Okay.

A The clinical interview and mental status examination revealed an extremely intelligent young woman, ah, the kinds of things that I assess are attention and concentration and memory--and, again, we are talking in a very quick

Engum - direct

way, not in a real detailed manner.

That's done later in neuropsychological assessment.

But, ah, we have an extremely bright young woman. She is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustain concentration, can sequence, ah, has excellent receptive and expressive language skills.

In other words, a fairly remarkable young woman in terms of what I call cognitive ability, the ability to think and process information.

So that was essentially the first area.

Ah, there were indications during the mental status examination of some degree of depression.

And there were also at least some indications to me of potential personality disorders, but you don't make that diagnosis based just on a clinical interview.

The second area which we talked about was more in terms of intellectual

Engum - direct

functioning. And that, to a great degree, confirmed my opinions from the clinical interview.

She had a full scale IQ of 111. And just to give you some idea--that places her in approximately the 77th percentile, which means out of 100 people she would do better than 77, and only 23 would do better than she.

Ah, again, a fairly remarkable IQ in light of the fact that she had only completed ninth grade.

She had a verbal IQ of 112 and a performance IQ of 106. So, again, that tells us that she is smart and sharp both in verbal and in nonverbal areas.

The third area was academic skills and ability.

In virtually all areas with the exception of spelling she was at or above her stated level of academic achievement. In fact, in areas of general information and reading recognition and reading comprehension she was above grade 12.9, which means she would do better than the average high school graduate.

And, ah, even in mathematics

Engum - direct

she was up about a grade 11.5. So overall she had far exceeded academic expectations.

The fourth area primarily deals with what we call neuropsychological assessment.

And as I indicated earlier that simply is an assessment of whether there are any signs of brain damage.

People can accrue brain damage from substance abuse, from being, having blows to the head, from, ah, birth defects. The results unequivocally showed that she did not suffer any signs of brain damage.

In fact, the results were remarkable for how well she really did in the areas of sequencing and problem solving and memory and language skills and perceptual skills.

And, again, I'm kind of running through things quickly, but the results were remarkable for how well she really did. She is a very intelligent young woman.

The fifth area is--

Q The last area?

A Yes.

Engum - direct

The last area is primarily where our findings were significant.

We gave four different objective personality tests. They were called the Carlson Psychological Survey, the Minnesota Multiphasic Personality Inventory, the Personality Assessment Inventory, and the Millon Clinical Multiaxial Inventory.

And cutting through all of that, those are tests which are based on true/false responses from the client.

They have reliability and validity checks built into the tests so you can determine whether the person is responding to the inventory items appropriately, whether they are trying to misrepresent themselves.

And, ah, summarizing all the tests results, they show a very severe borderline personality disorder.

And that finding came through the MMPI, the CPS, the Millon, and even the Personality Assessment Inventory.

Q Did you refer to any clinical manuals while you were performing this evaluation?

Engum - direct
A Yes, ma'am, I did.
Q And what was that?
A The <u>Diagnostic and Statistical Manual</u>, fourth edition. And it basically is the textbook which is the summary of all recognized diagnoses in psychology and psychiatry, and it is the way in which a clinician makes diagnoses, and it is a shorthand for us to communicate with each other.
If I make a diagnosis and send my report to somebody they will know what I am talking about.
Q Okay.
Now based on your interviews with Ms. Pike, the tests and results, did you form a diagnostic opinion or conclusion based on a reasonable degree of psychological certainty?
A Yes, ma'am, I did.
Q And what is that?
A May I take a minute and just explain the way we do diagnoses, because it makes a little difference in understanding what is here?
Q That's fine.
A Okay.

Engum - direct

There are basically five axes upon, and that is A X E S, upon which we make diagnoses.

The first one is called Axes I.

And it simply identifies the active psychological condition. The one that you see. The one that everybody sees.

And in those areas we diagnosed a depressive disorder not otherwise specified, what is called cannabis dependence, or history of marijuana dependence, and also inhalant abuse by history, which means that she had inhaled toxic fumes from things like, ah, rubber cement, Rush white out and air freshener.

So those were the active diagnoses.

Axes II deals with the personality disorder. In other words, it is what is there underneath the surface, but it essentially defines who that individual is.

And we defined what is called a borderline personality disorder in Ms. Pike.

And we will talk about that in

a little bit.

The third Axes deals with any active medical conditions.

Does she suffer from any sort of injuries or illnesses?

And the answer to that question was, "No".

Axes IV deals with what are called psychosocial stressors.

And it is simply a way of looking at those factors which, from the environment, are acting upon the client.

So, for instance, her incarceration, her pending charges of first degree murder, all of those are stressors that are impinging upon her, her poor vocational, educational background are also similar factors that were considered.

And then finally, Axes V is called global assessment, a functioning scale.

It is a scale from zero to a hundred, which is an attempt to take all of the data that we talked about and try to combine it into one number which in some way conveys

Engum - direct

information about how this person is functioning in social, interpersonal, vocational, and academic areas.

Q And what does a zero represent on that scale?

A The kind of person that is so deteriorated that they may be either acutely psychotic and need hospitalization and a straight jacket, or somebody who is, ah, acutely suicidal, I mean, they are an immediate threat to themselves, those kinds of things.

Those kind of things.

They are the kinds of folks who, what I say, need a hundred percent care, hands-on care.

Usually you find those folks in psychiatric institutions.

And one hundred, of course, reflects a superior functioning in a wide range of life experiences.

I have never met anybody who is a hundred.

Okay?

Most people fall in the eighty

Engum - direct

to ninety range.

Q And what was your determination for Ms. Pike?

A She was fifty-five, which deals with moderate symptoms or moderate difficulties and social occupational school functioning. Talks about difficulty with peers, talks about difficulty, ah, with her personality stability. But she is not so dysfunctional that you need to institutionalize her.

And yet at the same time she has a multiplicity of problems in interpersonal relationships and in controlling her behavior, and in achieving vocational and academic kinds of goals.

Q And based on all of this that you have discussed, if we can go back to what, your diagnostic opinion based on a reasonable degree of psychological certainty--

A Right.

The important one for what we have talked about is the borderline personality disorder, recognized also under Axes I, we had the depressive disorder not otherwise specified and

Engum - direct

the history of inhalant abuse and the history of cannabis, or marijuana dependence.

Q So there is a specific diagnosis, borderline personality disorder?

A Yes, ma'am. It is in this text. There is a code number that goes with it. It is, ah, 301.83, and that is simply the number that is assigned to borderline personality disorder.

Q Can you tell us, please, about the relevant characteristics of borderline personality disorder?

A Yes.

And in Ms. Pike--let me back up for a second.

When one makes a diagnosis of anything, whether it be a physical or mental condition one looks to see whether there are certain elements or characteristics.

And the DSM-IV says that you have to have a variety of these factors, in fact, you have to have five or more of these characteristics to warrant this diagnosis and distinguish it from other diagnoses.

Engum - direct

Ms. Pike really, in my opinion, ah, fits eight of the nine elements.

And the only one that she really doesn't fit is the one of recurrent suicidal behaviors.

She has been self-destructive, but not by my definition, has she been suicidal in the recent--the keynote of borderline personality disorder is a highly unstable identity.

These are individuals who basically draw their identity, ah, from those around them.

And they are highly dependent upon others, and because they have so little sense of self they fear abandonment by those individuals who are important in their life.

So, for instance, in a love interest kind of situation they may fall deeply and passionately in love with somebody but always be frantic that that person is going to do something that will leave or abandon them.

And so they are always afraid that they are going to be abandoned. And they are always looking for signs to confirm that.

Engum - direct

So somebody showing up, the lover showing up late for an appointment, or the, the love object being somewhat crass or unfeeling are signs to them that they are being rejected, and they have tremendous difficulty with that, and will do anything to maintain that love relationship.

So that's one--

MR. CRABTREE: Your Honor, I am going to object to the use of the word "they" and have him testify specifically as to this individual that we are here about today.

THE COURT: All right.

Dr. Engum, if you could, ah, be specific as to Ms. Pike--and I know you are trying to characterize, to define what you are talking about, but if you will be specific as to Ms. Pike's, ah, elements that you've, that you've gone into?

THE WITNESS: Sure.

A This is particularly relevant with relation to her, with her relationship with Tadaryl Shipp, who was, ah, a young man that she met at Job Corps, and basically fell deeply,

Engum - direct

deeply in love with, I mean, almost to the point of infatuation, almost a captive, and it serves as the basis for what I think happened in this particular situation, in this crime that was committed.

Ah, her fear of losing him, her fear of having him taken by the victim, Colleen Slemmer, was so threatening, so overwhelming to her that it caused this huge reaction, and she saw Colleen Slemmer as a direct threat to her ability to maintain her relationship with her boyfriend, Tadaryl Shipp.

These--and Christa Pike, like almost all people with borderline personality disorders, because they can't maintain relationships to other people they appear emotionally unstable.

If you are infatuated and in love one minute and you are angry and bitter and hostile and resentful the next because of the perception that you are being abandoned, then your emotions swing alternately, and so you can be very, very unpredictable in your behavior, your emotional status, and that, I think, is certainly

Engum - direct

reflective of Ms. Pike throughout her life, particularly in the months preceding and leading up to this offense.

Q Okay.

Any other characteristics?

A Lack of identity.

No direction.

No knowing who you are, where you are going, ah, changing vocational goals, changing interpersonal goals--pretty much, and in Ms. Pike's situation somebody else sets the agenda. Somebody else sets the expectations, and she kind of goes along with that, because every time she gets one she changes it a week or a month later.

Ah, for that reason people like Ms. Pike, and I think her history reflects, very impulsive, almost to the point of being self-destructive in terms of drug abuse, in terms of sexual promiscuity, in terms of risky activities, things that might be potentially threatening to herself, or even to others.

And so these people are, are, to some degree, they have difficulty in

Engum - direct

controlling and keeping themselves within certain boundaries.

Q Any other of these characteristics that are applicable?

A Yeah. And I think we have touched on some of them.

Obviously, if you look, and again consider this relationship with Tadaryl Shipp, anybody who would be perceived as, anybody who knows Tadaryl, particularly a female, would be perceived as very threatening. So there is a strong degree of what I call paranoid idealization. There is a sense that other people who may just be making small talk with Tadaryl are, in fact, trying to seduce him literally. And that's the way her mind works. That they are trying to rip away that love object.

And the result of this paranoid idealization, particularly, and specific relationship to the death of Colleen Slemmer, is that, with that misinterpretation, goes incredible levels of anger and hostility towards the person that they perceive as potentially separating them from the lover, from Tadaryl Shipp.

Engum - direct

And so that person gets imbued with all of the negative anger and hostility. It becomes almost a rage. It is almost uncontrollable, and that is typical of the borderline personality--

MR. CRABTREE: Object to "typical", Your Honor. We would ask that the witness confine his testimony as to this case.

THE COURT: Again, Dr. Engum, if you will be specific as to Ms. Pike. Typical cases, or others, in general, are not the subject here.

THE WITNESS: Correct.

A It is, it exactly defines the way I found Ms. Christa Pike. I mean, the diagnosis, it fits like a glove, is what I am trying to say.

Q Okay.

Now, again, you have had an opportunity to review her statements, the tests, the scores, and have you formed an opinion to a reasonable degree of psychological certainty, as to her conduct or actions on the night in question?

Engum - direct

A Yes, I have.

Q And--

MR. CRABTREE: Object to that question, Your Honor. That was so broad.

THE COURT: I would like you to approach the bench.

BENCH CONFERENCE

THE COURT: I'm sorry, but I don't think he can give us a psychological assessment as to what she did that night, in terms of her conduct. That is for the jury to make the ultimate decision.

MR. TALMAN: We will rephrase the question.

THE COURT: And how would you rephrase it, while we are here?

MS. MARTIN: Well, I--

(Discussion about how the question should be asked.)

END OF BENCH CONFERENCE

Engum - direct

THE COURT: Ms. Martin, if you would rephrase that question?

I will give you a minute to consult with counsel.

MS. MARTIN: Thank you, Your Honor.

Q You have had an opportunity to review all her statements and all the other tests and everything you've done?

A Yes, ma'am.

Q Have you formed an opinion to a reasonable degree of psychological certainty as to Ms. Pike's state of mind on the night in question?

A Yes, ma'am.

Q And what is that opinion?

A My opinion is, and it is particularly based on the test results and on a review of her statement, that she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, borderline personality disorder, which meant that she basically went out of control. She basically lost any sense of what she was doing.

Engum - direct

She simply acted, based on the exigencies of the situation that she found herself in, and that she found herself in with Ms. Slemmer.

Q Okay.

And there has been some testimony in this Court as to some rather bizarre behaviors after this event, specifically, dancing around while demonstrating what occurred.

What about this?

A Afterwards?

Q Afterwards.

A Afterwards?

The way that I see that is, and as gruesome as this might seem, she had basically killed the individual that she saw as her primary challenge to the affections of Tadaryl Shipp.

She had an emotional release, basically, almost a sense of relief from having assured through the killing of Ms. Slemmer that she could maintain her relationship with Tadaryl Shipp.

And, so, the euphoria, the giddiness, the dancing around, in my opinion, is

Engum - direct

simply a reflection of that relief, that sense that she has now established and secured her relationship with Tadaryl Shipp.

Q Okay.

There's also been some testimony about her showing a piece of skull around.

What about that behavior?

A Again, recognize that in Ms. Pike, somebody who has no identity, you get your identity, you get your acknowledgement from those around you, and it was basically, "Here, look what I did, give me, give me recognition for what I did."

Again, I'm not saying that it's, it's rational. I'm not saying that it is something that people do. But people with her condition do that, because it is their way of getting some recognition no matter how distorted that recognition is, from people in her environment.

MS. MARTIN: May I have a moment, Your Honor?

THE COURT: Uh-huh.

Engum - cross

MS. MARTIN: We pass the witness, Your Honor.

THE COURT: General?

MR. CRABTREE: Is there any other 26.2 material that I have not been provided with?

MR. TALMAN: No.

CROSS-EXAMINATION

BY MR. CRABTREE:

Q Let's get one thing out of the way, first, sir.

There is no question, is there, that Christa Pike killed Colleen Slemmer? You don't have any question about that?

A I have no question about that. Her statement confirms that.

Q She did that and that's, you are not testifying she didn't, in any way, shape, fashion, or form?

A That is correct.

Q And, basically, the way I understand your testimony here, is that you are saying that she was jealous of Tadaryl Shipp?

A At an extreme level, yes, sir.