**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 2**

**DOCUMENT 23**

---

002731

XXVI 03S01-9712-CR-00147

~~03C01-9612-CR-00408~~

IN THE CRIMINAL COURT, DIVISION III, FOR KNOX COUNTY, KNOXVILLE, TENNESSEE

STATE OF TENNESSEE )

FILED
BY MARTHA PHILLIPS, CLERK

V. ) CASE NO. 58183A

CHRISTA PIKE

DEC 26 1996

KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

FILED
Clerk of the Courts
FEB 5 - 1997
MAILED
CERTIFIED
REGISTERED
REC'D BY

THE TRANSCRIPT OF THE EVIDENCE

VOLUME XXIII OF XXVII VOLUMES

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, JUDGE

FOR THE STATE:

WILLIAM CRABTREE
S. JO HELM
Assistant Attorneys General
District Attorney General's Office
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

WILLIAM C. TALMAN
Attorney-at-law
P. O. Box 506
Knoxville, Tn. 37901-0506

JULIE A. MARTIN
Attorney-at-law
P. O. Box 426
Knoxville, Tn. 37901-0426

## TABLE OF CONTENTS

VOL. XXIII


| | PAGE |
|---|---|
| DR. ERIC S. ENGUM: | |
| Cross-examination (con't) | 2200 |
| Redirect Examination | 2230 |
| Juror Matthews Excused | 2259 |
| WILLIAM BERNET: | |
| Direct Examination | 2268 |

Engum - cross

Q And, ah, that as a result of this jealously she impulsively killed Colleen Slemmer?

A That is the way that I see it from her statement and from the psychological test results.

Q Now, you have read the statement that she has given, is that correct?

A Yes, sir.

Q And, ah, that statement says, that according to her, all the acts that she did to Colleen Slemmer took thirty to sixty minutes, do you recall that?

A Yes, sir.

Q Does this impulse last for that extended period of time?

A Ah, yes, sir, I believe that she was in a, what you would almost consider to be a frenzy. There are statements, there are certain statements that she makes that really reflect that she was so mad, so angry, that she was, like she had never been before.

Q So, did something in Tyson Park, according to her, cause her to go into this

Engum - cross

frenzy?

A I think it was, once the attack started, that it caused her simply to escalate and literally be out of control.

Q So, once the attack started she couldn't stop, is that what you are saying?

A Essentially, yes, sir.

Q And this impulse, was it triggered by something there in Tyson Park?

A The, again, extreme jealously of Tadaryl Shipp and Ms. Slemmer--if you will remember in her statement she said she cut her in the crotch near the end of the attack, near the end of the killing. And that was an attempt to send a message, I think she said in the report, that she said in her statement, and that that was just a continuation of the unbelievable level of anger and hostility that she had toward Ms. Slemmer, who she perceived as threatening her relationship with Tadaryl Shipp.

Q And so once she started she couldn't stop?

A She just kept going.

Q Okay.

But when did the impulse to start occur?

What triggered that?

A The starting of the beating, and, basically, the starting of the beating, and she had two other people who were there watching, which, in my mind, added some impetus to what she was doing.

Q So, she started, are you saying that she took, Christa Pike took Colleen Slemmer to Tyson Park to beat her up?

A Yes. No question about that in my mind.

Q Now, taking her to Tyson Park to beat her up, that was a deliberate act, was it not?

A No question.

Q And taking her to Tyson Park to beat her up was a premeditated act, was it not?

A That was. Yes, sir.

Q So this is something that she planned, to take her there to beat her up, and that's what we are talking about, we are talking about deliberation and premeditation, is that

Engum - cross

correct?
A To take her to Tyson Park to beat her up. Yes, absolutely.
Q And, Doctor, I would ask you, did you know that she had told someone two days before this killing occurred that she intended to kill Colleen Slemmer?
A I have heard that that statement was made.
Q Does that affect your opinion in any way, if that occurred?
A My belief is--the answer is, "No, it doesn't affect my opinion," because when kids talk about beating up each other they say, "I'm going to kill that person."
Q But you don't know that is what happened.
She did kill that person, didn't she?
A She did kill that person.
Q And you said that when she took her there to beat her up that was premeditated and deliberate, did you not?
A That is correct.

Engum - cross

Q And you based that upon what this Defendant told you, did you not?

A And on her statement to the police.

Q And yet you sit here and refuse to believe if a witness has testified that she told them two days earlier she intended to kill someone? Is that what you are saying?

A Yes, sir.

Q So, if in fact, she did tell them, you are discounting that entirely as far as your diagnosis?

A Yes, sir, because both by her statement and by the statement to the police she indicated that after the attack started she basically got out of control.

Q <u>She</u> said she got out of control.

This is a very intelligent person you are talking to, isn't it?

A Correct.

Q She, at the time you talked to her, had been charged with an offense, had she not?

Engum - cross

A She had.

Q She knew you were there to help her, did she not?

A She knew that I was there to assess her and determine whether she had any legal defenses.

Q And does it surprise you that she would tell you that she got out of control?

A Does it surprise me?

Q Yes.

A I don't know whether it surprises me, but what she told me, again, is consistent with the statement that she had made to the police twenty-four hours after the crime.

Q And you choose to believe that over sworn testimony in this Court?

A Her, to my, I haven't heard sworn testimony in this Court.

Q If I tell you it is sworn testimony in this Court are you saying you choose to believe what she told you when she was in jail, and she had killed someone, over sworn testimony in this Court?

A I do believe what she told me

Engum - cross

about going out of control. Yes, sir.

Q Doctor, I believe you have indicated that you have testified in how many of these capital type cases?

A Approximately fifteen over the last five years.

Q Fifteen?

And you have testified for the Defense consistently, have you not?

A That is correct.

Q Are you compensated for being here today, sir?

A Absolutely.

Q How much are you paid for being in this case?

A For testifying, or for the evaluation?

Q For the evaluation and the testimony, the entire deal, what you have been paid for participating in this case?

A I've been paid about $3,900.00. And my charge today will be $800.00 for the day.

Q $800.00 for being here today?

Engum - cross

A Yes, sir.

Q So, we are talking $4,000.00 some dollars?

A About $4,748.00.

Q And is that what you get for testifying in these cases for the Defendant, generally?

A Not usually. No, sir.

Q Do you get more?

A Generally, far less.

Q And this is, how much of your income does this type of situation make up?

A In capital cases?

Q Yeah.

A Or in criminal cases, in general?

Q How much of your income are you talking about?

A About twenty percent.

Q About twenty percent of your income comes from testifying in criminal cases?

A From doing evaluations and consulting with attorneys and if necessary for testifying in criminal cases, yes, sir.

Engum - cross

Q About twenty percent?

Does a fact that a case has high visibility or gets a great deal of publicity, does that help your business?

A No. It hurts it.

Q It doesn't help it at all?

A It hurts it.

Q It hurts it?

A Yes, sir.

Q Your reputation, is it not enhanced by your coming in here and testifying in these cases?

A No, sir.

My primary practice is in clinical neuropsychology which I depend upon referrals from physicians in the community and other psychologists.

Q Now, you have testified, have you not,--excuse me--in your report you say that her underlying thought processes appear clear, logical, sequential, with no sign of circumstantiality, tangentiality, disorganization, fragmentation, confusion or gross retardation of thought process, is that correct, sir?

Engum - cross

A That is correct.

Q And you say that with respect to memory and information processing Ms. Pike performed extremely well, is that correct?

A Yes, sir.

Q Ah, in fact, she performed in the superior range on the Selective Reminder test?

A Yes, sir.

She truly did.

Q Basic problem solving skills also appeared intact and she obtained a TONI IQ of 124?

A Correct.

It placed her in the 95th percentile.

Q In the 95th percentile?

I think she did tell you that she had had temper tantrums in the past, is that correct?

A That is correct.

Q Her full scale IQ was 111, placing her in the 77th percentile?

A Yes, sir.

Q She performed in the very

Engum - cross

superior range with respect to abstract reasoning and verbal concept formation?

A Yes, sir.

Q Excellent performance in neuropsychological assessment?

A Yes, sir.

Q With regard to the integration of sensory information, a high level of sensory skills performed extremely well?

A Yes, sir.

Q Performed in the very superior range with regard to basic memory skills?

A Yes, sir.

She had a very high memory quotient. A 135 plus, basically off the scale.

Q Performed in the average to above average range with regard to basic learning skills?

A Yes, sir.

She has all the skills and abilities to succeed.

Q But you did decide that she was lonely, unhappy, and unloved?

A Clearly, all of her life.

Engum - cross

Q Personality assessment. Did not reveal any sign of sycosis?

A That is correct.

I have never made the statement that she was insane.

Q And you are not saying that she is insane?

A I am not making the statement that she is insane.

Q She is clearly intact with each of the four basic functional units including attention, concentration, and resistant to cognitive interference, sensory input, motor output, higher level perceptual skills, conceptional skills, and speech and language skills, memory and sequencing, and executive skills, including problem solving and learning abilities.

A Unequivocally.

Q But she is aggressive?

A Yes, in many situations she can be quite aggressive.

Q And she is impulsive?

A Very much so. Both self

Engum - cross

directed and other directed.

Q And can be unleashed against both herself and others? Is that correct?

A Yes, sir.

Q And you are saying that as a result of a personality disorder?

A Correct, sir.

Q That she could not form, or that she was not acting in a premeditated or deliberate manner?

A For the killing, not for--

Q And you are basing that upon the statement that she gave you and the statement that she gave the police?

A And the psychological test results which make the diagnosis. Yes, sir.

Q And the psychological test results.

Now, what is this book you have that you are referring to here?

A It is called the <u>Diagnostic and Statistical Manual, IV</u>.

It is basically the listing and description of all of these

Engum - cross

psychiatric/psychological diagnoses that clinicians make.

Q So, in this book you have people who have psychiatric/psychological difficulties, is that correct?

A Correct.

It gives you the diagnoses and defines how you go about making the diagnoses.

Q Okay.

Now, I believe at the beginning of this book there is a precautionary statement, is that correct?

A Yes, sir.

Q Would you go to that cautionary statement?

A There are a number of them.

Which one?

Q I am referring to the one just labeled cautionary statement.

And, I guess, specifically, I can go ahead and say it.

I believe the last line of that reads, "The clinical--"

MR. TALMAN: Well, Your Honor,

Engum - cross

objection. What--because he has asked Dr. Engum to look at it--

MR. CRABTREE: This is cross-examination. I can ask the questions.

THE COURT: I will allow him to ask. It is cross-examination.

Q Does it not state under precautionary statement, at the beginning of the text, "The clinical and scientific considerations involved in the counteractions of these conditions as mental disorders may not be wholly relevant to legal judgements, for example, taking into account such issues as individual responsibility, disability, determination and competency?"

A That is correct.

And that is why you also have to add the clinician's judgment and the use of collateral information such as statements and reports.

Q Now, as far as disorders that are listed in this text that you referred to, it lists, what, nicotine addiction as a disorder?

A Yes, sir, it is.

It is a treatable psychiatric

Engum - cross

disorder, psychological disorder.

Q Inhalant intoxication?

A Yes.

People who huff paint, ah, white out, gasoline, is certainly a major psychiatric disorder.

Q People who drink too much coffee?

A There are people who are addicted to--

Q --or other caffeine, ah--

A Yes.

Q --substances?

A There are certainly people who are addicted to caffeine for whom it becomes a problem.

Q Now, this disorder that you have referred to, this personality disorder, there is no way you can see that disorder, is there, I mean, you can't take a instrument and look at Ms. Pike and see that disorder, can you?

A No, sir.

You have to do it through formal testing, really.

Engum - cross

Q It doesn't affect the blood pressure in any way?

A Oh, no.

Q It doesn't affect the temperature?

A No.

Q So, an examination that a doctor would usually do, you can't do it in this type of situation as far as looking for some physical manifestation of it?

A Right.

There are no physical manifestations, but there are psychological, or psychiatric manifestations, which is why there is expertise in psychiatry and psychology.

Q And that is based upon your determination, is that correct?

A That is correct.

Q And all of this evidence that we have lying here in this courtroom you have not seen any of this, have you?

A No, sir, I have not.

Q So, as to what this shows about the actions of the Defendant as it pertains

Engum - cross

to Colleen Slemmer, you don't know what any of this stuff is, do you?

A I haven't been in the courtroom, no, sir.

Q If, when you interviewed her, she wasn't telling you the truth?

A That would affect my opinion. Sure.

Q And you are saying that you believed her and that is why you based your opinion on what she told you?

A Yes.

Q And if she were lying to you then your opinion is for naught, isn't it?

A It might be changed, yes, sir. It wouldn't change as to the diagnosis but it might change as to her state of mind at the time of the commission of the murder.

Q Okay.

At the time of the commission of the murder it could change your opinion in that respect?

A Yes, sir, it could have.

Q Now, you did say that you read

Engum - cross

her opinion, did you not, ah, her statement, did you not?

A Yes, sir.

Q There is one place in there where she makes reference to, "If you let her go and you let her go back, and you are going to be in deep shit, Christa."

A Could you refer me to a page, please?

Q I will refer you to page 18.

A Yes.

Q And it goes on to say, "You gotta, you gotta do something, you've got to do something so that she can't tell on you."

A Correct.

I see that.

Q "Don't let her get up and go tell on you."

A Correct.

Q "And then I just started thinking, that's true."

A Correct.

Q Now, doesn't that sort of sound like someone that is giving some rational

Engum - cross

thought to their position?

A It does, but you have to read the paragraph that's right above it, where--and may I read it?

Q Which one are you talking about?

A "She's just screamed and screamed and screamed?"

Q Uh-huh.

A "And then I just kept, I mean, I just kept hearing somebody talking, I mean, there wasn't anybody really there, but I just kept hearing somebody say, quote, 'she is going to tell on you, you are going to prison, you are going to jail, you are going to do this.'"

It was almost like she was having auditory hallucinations, kind of a disassociate of state.

Q So, isn't what she is saying there, though, "If I don't do something I'm going to jail,"--

A Yes.

Q --isn't, wasn't that a correct determination on her part?

Engum - cross

I mean, she has cut someone, she is going to jail if she doesn't do something?

A She might go to jail--

Q And then she--

A --but she was almost--

Q --and then she decides, I need to do more, I need to keep this person from telling on me?

Now, that is a logical thought process, is it not?

A But in an disassociate kind of way, because it's, what she is saying is, it is almost like somebody is telling her to do that.

There is a later statement that is almost like she was outside herself watching this happen.

Q But that is what she has told you, isn't it?

A Correct.

But that--

Q You have not talked to anyone else that was there?

A That is true.

Q And this design that was

Engum - cross

carved on this young lady's chest?

A I'm aware that there was a pentagram carved on her chest.

Q Have you seen it?

A Yes.

Q Okay.

That's somewhat of a deliberate act, isn't it?

A Yes.

Q Isn't that somewhat of a premeditated act?

A Yes.

Q And when you have cut someone's throat ten times, and you say, "I cut her throat and they won't quit talking," so you go to another way of killing them.

Is that not, if you are wanting to kill someone, a logical thought process?

A It could be construed in that fashion.

I see it as a frenzy, as a complete loss of control.

Q But, let me ask you this--in

Engum - cross

a point in this statement she says, "I thought I heard something, I get up to go see if anyone is coming."

I mean, this is a break. This is not a continuing frenzy.

She stopped. She has gone to see if someone is coming before she finishes her victim off.

Is that not a deliberate act?

A That may be.

Q And if she were in a frenzy is this not the opportunity to calm down?

A There might have been an opportunity to calm down.

Q And then if she comes back and then bashes her victim's head in, that's deliberate, isn't it?

A The act was deliberate.

The mind set behind the act was, in my opinion, still driven by the extreme level of jealousy and hate and anger that she had towards the victim.

Q So, it is jealousy and hate and anger that has caused this?

Engum - cross

A Yes, sir!

Q And jealousy can make you plan, can it not?

A It can.

Q And it can make you premeditate, can it not?

A It can and certainly we understand that she planned and premeditated to take Colleen Slemmer out to the park.

Q And it can make you deliberate, commit a premeditated deliberate act?

A It can.

But I believe it is inconsistent with her statement and the results.

Q Inconsistent with her statement?

Is that what you are saying?

A And the test results, yes, sir.

Q And the tests results?

The fact that it took place over, up to an hour?

A Yes.

Q That doesn't give some type of

Engum - cross

cooling off period in here?

A There may have been.

I guess I've not talked to the other two witnesses to know whether there really was a cooling off period.

And I'm assuming that there was not a cooling off period.

Q So, you are basing your opinion, possibly, on incomplete information?

A That is always possible in this practice, yes, sir.

Q In fact, there is no question that you may very well be doing that?

A I don't know that there is no question, but it is certainly possible.

Q At another point in time, I believe she gave in her statement, about how she made Colleen Slemmer take off her shirt so she couldn't run,--

A Yes, so she couldn't--

Q --couldn't run away?

A --get away.

Q Isn't that a deliberate act?

A Yes.

Engum - cross

I think we can find elements of things that look deliberate and look planned, but I think when you take the situation into its totality you see there was an attack that once it started it wasn't going to end except in the death of Colleen Slemmer.

Q But it did end?

She told you. It ended while she went to look and see if anyone was coming.

It ended when she cut her throat and she didn't die.

It ended a number of times, according to her statement during this thirty to sixty minute period of time.

But she keeps coming back.

A The anger.

Q Anger is not what you said was her intent.

You said she couldn't form these--

A Right.

She was caught up in the heat of the attack such that she wasn't going to stop.

Q So, you are saying, and

Engum - cross

correct me if I'm wrong here, that if you get angry and kill someone it is not premeditated and deliberate?

A No, I didn't say that.

Q Well, what is it? That is what you said--

A No.

I'm saying, she was caught up in a passion, and anger, a hostility--

Q So, if you--

A --that was so great that it overwhelmed her ability to really sit down and consider the consequences of what she was doing.

She--

Q But she did sit down and consider the consequences when she invited Colleen Slemmer down there, didn't she?

A She considered that she was going to administer a very severe beating.

Q Oh, a severe beating, she told you?

A That's my understanding, yes, sir.

Q What about when she took the

Engum - cross

weapons with her?

A The--box cutter?

Q The weapons, the box cutter and the meat cleaver, or whatever it is?

Isn't that a little bit deliberate, premeditated?

A Yes.

Q And you don't need the box cutter and the, ah, meat cleaver if you're just going to administer a severe beating to this person, do you?

A Maybe not, no.

Q Does the fact that she took the box cutter and the meat cleaver with her, does that affect your opinion of whether she premeditated or deliberated?

A It certainly indicates that she meant to severely threaten this girl.

It may indicate that she meant to kill her.

Q So, she may have intended to kill her when she went down there with these items?

A With those, with those two

Engum - cross

facts it may have indicated that.

Sure.

Q And then if you consider the fact that she told someone two days before she was going to kill her, that may indicate that she intended to kill her?

A It could add to it.

Sure.

MR. CRABTREE: May I have a moment, Your Honor?

THE COURT: Uh-huh.

MR. CRABTREE: No further questions, Your Honor.

THE COURT: Ms. Martin, do you have any further questions of the witness?

MS. MARTIN: One moment, please.

Just a couple, Your Honor.

REDIRECT EXAMINATION

BY MS. MARTIN:

Q Dr. Engum, why don't you testify for the prosecution in the Tennessee State Courts?

A They have their own

Engum - redirect

psychologists.

Q Okay.

A State hired, I mean, on the payroll.

Q So they don't need to hire you?

A Correct.

Q Ah, these tests that you have given, the MMPI and the others, ah, are they easily tricked?

A Easily tricked? They can be tricked. But there are validity indicators, what we call scales, which try to measure whether somebody is faking good, faking bad, faking a mental illness or not.

So, there are scales which assess that. Those scales for Ms. Pike's testing were all within acceptable ranges and did not indicate any intent to distort or play with the test results.

Q Thank you.

MR. CRABTREE: I have nothing further.

MR. TALMAN: He may be

Engum - redirect

excused, Your honor.

THE COURT: Any problem with excusing Dr. Engum at this time?

MR. CRABTREE: No.

THE COURT: Thank you, sir.

You are free to go.

Counsel, will you approach the bench, please?

BENCH CONFERENCE

THE COURT: Would you all like to quit for the evening now?

MS. MARTIN: Yes.

MR. CRABTREE: Yes, Your Honor.

THE COURT: I'm hoping that charges will be done after we adjourn.

MR. CRABTREE: Thank you.

END OF BENCH CONFERENCE

THE COURT: Ladies and gentlemen of the jury, it is now seven after 5:00,

or eight after 5:00, by the time I finish talking it will be ten after.

You have not heard all of this case and therefore, you must wait until you have completed hearing the case and hear the Court's instructions before you can consider it.

Do not deliberate.

Do not discuss the matter among yourselves to attempt to form any opinions about this matter at this time.

Once again, please stay with the officers and have no contact with media news, national or local. Have a good evening and good dinner, and if you want to go with Officers Beeler and Bieber now, and even if you don't want to you need to go with them, anyway. (laughed)

Good night.

(Whereupon, the jury left open Court, after which the following proceedings were had, to-wit:)

THE COURT: Anything else before we adjourn for the evening?

MR. CRABTREE: No.

MR. TALMAN: No, Your Honor.

THE COURT: Court is adjourned until 9:00 o'clock tomorrow morning. And you all need to be back here and ready by about 9:30. There is a very brief docket.

COURT ADJOURNED AND RECONVENED AT 9:00 A.M. ON THE 28TH OF MARCH, 1996.

THE COURT: All right.

Please be seated.

I am going to require that the cameras be turned off a little while. It is temporary, ah, there is a matter that has arisen regarding some jurors, and I need to talk to them, and therefore the cameras need to be off.

Are we ready to call in the individual jurors that we need to call in?

MR. CRABTREE: The State is ready.

MR. TALMAN: Yes, Your Honor.

THE COURT: Call juror, Melissa Perry, please.

MR. CRABTREE: Your Honor, while the juror is being brought in, we have provided the court reporter with individual plastic bags. If we could put some of this evidence in some of those bag, because it is very

loose and very fragile and is starting to fall out of the paper bags.

THE COURT: Let's get these jurors done, and then, sure, let's do that before we begin the next witness.

(Ms. Perry entered the courtroom.)

THE COURT: Ms. Perry, if you will sit in that first seat?

First of all, let me tell you that the cameras are off, and that is the reason I am using your name.

Ms. Perry, you are called, you are under oath as a juror.

Ms. Perry, I don't mean to single you out, but it is my understanding from the officers that you have reported to them that one of your fellow jurors, Mr. Matthews, has indicated to you, or to others that you have heard, that, ah, he is, ah, in opposition to the death penalty, and has an opinion about that already formed, is that correct?

MS. PERRY: Yes.

THE COURT: All right.

Can you tell me what you

heard, and in what context?

MS. PERRY: Ah, I heard him speak that he was not in favor of capital punishment.

THE COURT: Who did you hear him say that to?

MS. PERRY: Ah--

THE COURT: Do you recall?

MS. PERRY: There were, there were several, it wasn't really in reference to--

THE COURT: This case?

MS. PERRY: --this case.

THE COURT: But he has expressed a view, and, of course, we asked each one of you about that.

MS. PERRY: That's why I went to the officer.

THE COURT: And, and you have done exactly what I have asked the jurors to do, and I'm very, I'm very grateful that you have done that.

Have you heard anyone else express such a view during the course of this event, or were the other jurors discussing the matter at all?

MS. PERRY: (Nodded head, "No".)

THE COURT: General, would you like to ask any questions?

MR. CRABTREE: No, Your Honor.

THE COURT: Mr. Talman?

MR. TALMAN: Yes, Your Honor.

Good morning, Ms. Perry.

You say you overheard this, one of your fellow jurors saying he was not in favor of capital punishment?

MS. PERRY: Yes.

MR. TALMAN: Did he say he could not impose capital punishment or was just not in favor of it?

MS. PERRY: He said he did not believe in capital punishment.

MR. TALMAN: Okay.

Thank you.

THE COURT: Ms. Perry, please do not discuss this matter with your fellow jurors.

And please go back to the jury room, and we will call you all in here in just a little bit.

Please bring me juror, Matthews.

Thank you very much for your candor and honestly. That was necessary.

(Ms. Perry left open Court.)

MR. TALMAN: Your Honor, may we approach?

THE COURT: Uh-huh.

BENCH CONFERENCE

MR. TALMAN: Your Honor, it comes to his not believing in capital punishment, or being--

THE COURT: We will have to elicit what his view is.

MR. CRABTREE: He was asked what his belief was, specifically, that's my question. I have written it out.

MR. TALMAN: But the standard is, can he consider it?

MR. CRABTREE: Not anymore.

THE COURT: We'll ask the questions.

MR. TALMAN: Certainly.

END OF BENCH CONFERENCE

(Mr. Matthews entered the courtroom.)

THE COURT: Mr. Matthews, please have a seat, sir.

I don't mean to single you out, Mr. Matthews, but, ah, I need to remind you, sir, that you are under oath this morning, and the answers that you are going to give me will, of course, be under oath.

It is my understanding, Mr. Matthews, that, ah, you have expressed to several of the jurors a belief, or opinion, regarding capital punishment.

Would you tell me what your belief or opinion regarding the death penalty or capital punishment is, sir?

MR. MATTHEWS: Ah, I don't, I don't really believe in it.

THE COURT: Do you understand that, ah, you were asked this question a little bit earlier by the lawyers and your response was that you could consider capital punishment--

MR. MATTHEWS: I could

consider it--

THE COURT: --in the course of this--

MR. MATTHEWS: --I don't know--just really kind of undecided. When, when they brought us in here and asked us if, ah, to raise our hand if we believed in it, I didn't raise my hand.

THE COURT: I don't think anybody asked you if you believed in it.

MR. MATTHEWS: Oh, really?

THE COURT: They asked you if you were against capital punishment. You didn't raise your hand then either?

MR. MATTHEWS: No.

THE COURT: Okay.

General, would you like to ask Mr. Matthews some questions?

MR. CRABTREE: Sir, I believe the question you were asked is, do you have any personal beliefs or views, religious or otherwise, against the death penalty?

And you did not indicate at that time that you did, is that correct?

MR. MATTHEWS: Uh-huh.

MR. CRABTREE: But are you stating now that you do have?

MR. MATTHEWS: I'm really kind of confused.

MR. CRABTREE: Well, sir, the confusion--could you please just answer the question?

Have you expressed your views to other members of the jury that you are against capital punishment?

MR. MATTHEWS: No.

MR. CRABTREE: You have not said that?

MR. MATTHEWS: No.

MR. CRABTREE: You are sitting under oath, and saying that you have not stated to another juror, other jurors, that you do not believe in capital punishment?

MR. MATTHEWS: No.

THE COURT: Mr. Matthews, isn't that what you testified to a minute ago, when I asked you that very question, that you did, in fact, state to other jurors, that you opposed capital punishment?

MR. MATTHEWS: I thought, I

thought we were talking about, when they first brought us in, if we were for or against capital punishment.

THE COURT: No, sir.

A little while ago I asked you, when I brought you in here first, whether or not you had expressed your view to other jurors that you had opposed capital punishment, and I understood your answer to be, "Yes," you had expressed that view, and that, in fact, you have some opposition to it, that you don't believe in it, isn't that what you just told me?

MR. MATTHEWS: Yes--but I was kind of confused, I mean, you know--

THE COURT: Are you telling the Attorney General something different than what you have just told me, that you don't oppose capital punishment, in fact?

MR. MATTHEWS: Well------no, I don't oppose it.

THE COURT: Go ahead, General, I didn't mean to interrupt your colloquy.

MR. CRABTREE: Please tell us what your feelings are concerning capital punishment.

MR. MATTHEWS: -----I think-- that the, ah, the punishment should fit the crimes, I guess.

MR. CRABTREE: Then why did you say before, sir--and I, this is very important. We spent a lot of time here, and we wish that this had been brought up before now when we had the opportunity to do so.

And all we are trying to do is to get a fair jury to try this case.

And if you can't be fair please tell us. And there is nothing wrong with that. But please, please tell us. Don't, don't hedge with us, and don't play games, okay?

MR. MATTHEWS: I'm not playing games.

MR. CRABTREE: So, are you saying, you told the Judge before, that you didn't believe in it. And then you say you do. Which is it?

MR. MATTHEWS: I do believe in it.

MR. CRABTREE: Are you just saying that, or are you being honest with us?

MR. MATTHEWS: No, I'm being

honest.

MR. CRABTREE: And you say--

MR. MATTHEWS: I'm just, I'm just really kind of, I was just kind of confused when I first come in--

MR. CRABTREE: But you are not confused now?

MR. MATTHEWS: No.

MR. CRABTREE: No confusion at all?

MR. MATTHEWS: No.

MR. CRABTREE: And you weren't confused when you told the Judge that you believed that you didn't believe in it?

MR. MATTHEWS: (No answer.)

THE COURT: For what reason, sir, did you discuss this with other jurors?

MR. MATTHEWS: (No answer.)

THE COURT: Did other jurors discuss it with you, or were you just expressing your opinion?

MR. MATTHEWS: I guess I was just kind of expressing my opinion.

THE COURT: Okay.

Any reason to do that,

particularly?

MR. MATTHEWS: No.

MR. TALMAN: Good morning, Mr. Matthews.

MR. MATTHEWS: Good morning.

MR. TALMAN: Sir, as I understand what you are saying, and correct me if I'm wrong--are you saying that you have mixed feelings about the death penalty?

MR. MATTHEWS: Ah, I, I believe in it.

MR. TALMAN: Are you saying that, ah, you feel like you could consider the death penalty in this case, if the State proves beyond a reasonable doubt, if we get to that stage of the proceedings, and you understand this is a, as it was explained to you earlier, this is a bifurcated trial. In other words we are doing the guilt phase first, and then if the Defendant should be convicted of murder in the first degree, then we go to the punishment phase.

And I think you just indicated that the punishment should fit the crime.

MR. MATTHEWS: Uh-huh.

MR. TALMAN: Is that correct?

MR. MATTHEWS: Yes.

MR. TALMAN: So, with that answer, do you feel that if the State proves beyond a reasonable doubt the existence of aggravating factors that outweigh any mitigating factors in this case, do you feel that you could consider imposition of the death penalty in this case?

MR. MATTHEWS: Yeah, I can consider it.

MR. TALMAN: Thank you.

THE COURT: Mr. Matthews, could you vote for it and sign your name on the document, should you find that it is warranted?

MR. MATTHEWS: Do what?

THE COURT: Should you find that that penalty would be warranted, assuming we got all that way to there, could you vote for it and also sign your name to the document that you would have to give back to the Court?

MR. MATTHEWS: Yes.

MR. CRABTREE: Your Honor, if we may, could we ask that this juror be removed from the courtroom at this time but be held out in the hall separate from everyone else while we

discuss this with the Court?

THE COURT: Yes, please.

Would you please do that, Mr. Beeler?

(Mr. Matthews left open Court.)

MR. CRABTREE: Your Honor, I would submit to the Court that this juror's views concerning the death penalty have quickly become totally irrelevant.

He has stated to the Court that he has lied under oath in here.

THE COURT: He just, he just said two different things under oath. You're right.

MR. CRABTREE: First, he said he didn't discuss it with anyone, and then he made the statement, when the Court asked him about discussing it, and he said, "I was just expressing my opinion with others."

He has also indicated that he has violated the Court's--

THE COURT: Is someone there with him? (To the officer)

MR. CRABTREE: --that he has

violated the Court's instructions about discussing this matter. And I don't think, concerning his statement about the death penalty one way or the other, that it can be said that that is unequivocal, the way he has made the statements.

But regardless of the death penalty I think this juror has indicated to the Court by his actions and by his responses that he is not qualified to sit on this case.

MR. TALMAN: Your Honor--

THE COURT: Before you make a response I'm also wondering whether or not the juror now is placed in a situation where there is certain pressure to himself.

Think about that a minute before you respond.

MR. TALMAN: Your Honor, we have thought about that, and we would respectfully submit that this juror has not been disqualified as to having formed an opinion in this case.

There has been no proof that he has talked about this case, or violated the Court's instructions about talking about this case, and I would suggest that, ah, Mr. Matthews, as any normal person would wonder about the death

penalty, wonder about whether it was right, whether it is wrong, whether they could impose it, whether they could not, but he has said unequivocally that the punishment should fit the crime. He has said if the State carries their burden, and if we get to the second part of this trial, ah, that if the State carries their burden proofing that the aggravating circumstances outweigh the mitigating circumstances that he could consider the imposition of the death penalty in this case.

There has been no showing that he has been talking about this case.

And I suggest, Your Honor, that his, ah, comments are just that of second guessing or wondering about what he could do if in that situation.

And I suggest that there has not been a showing about this case, Your Honor.

And we would suggest he should not be summarily dismissed.

MR. CRABTREE: I notice that Counsel has not made any reference to the juror's lack of candor with the Court in response to the questions that have been asked here.

Further, Your Honor, this juror has indicated that he has, in fact, concealed information that was requested specifically of him during voir dire. And that, in and of itself, in certain situations, not this situation, but possible, has been held to be grounds for a mistrial, if a juror is removed for those purposes.

Of course, we are not in that situation because we have alternate jurors. And as we do have alternate jurors, and based upon this witness' testimony, the fact that I think it is obvious, obvious that he has not been truthful with the Court, that he was not truthful with Counsel during voir dire, we have alternate jurors that can replace this individual and not prejudice anyone's rights at all. And both sides are entitled to a fair and impartial trial, and I think this individual has indicated that they are not a proper juror.

THE COURT: All right.

Mr. Beeler, would you come here, please?

MR. TALMAN: May I respond

very briefly, Your Honor?

THE COURT: Yes, sir.

And then I am going to take a recess because I want to go back and look at the references that I looked up before in light of the fact that the juror has, has spoken in Court two different views.

Go ahead.

MR. TALMAN: Your Honor, I would suggest that as to the remarks made by General Crabtree about the lack of candor, ah, of this Defendant--

THE COURT: Juror.

MR. TALMAN: --of this juror, ah, his comments in Court of not having been candid with Counsel, or candid during voir dire, I would suggest, Your Honor, that there's a lot of people here. We feel, I would suggest that it would be normal to be nervous, to be confused, to be a little bit intimidated by these proceedings.

THE COURT: It might be, Mr. Talman, and that may well be true. But this is the tenth day of trial, and he, he, ah, among others, went through a considerable length of, of jury sequestration, and he understood what the

rules were.

He came in and has testified, when I asked him, that he had an opinion. That he was opposed to the death penalty--well, he said he was, I guess we will have to look at the record, to say it exactly right.

Then when the General asked him, he said, "No," he was for it.

And then when you pressed him a little harder he decided that he was definitely for it.

I have a lot of concern about that.

And I would like to go back and once again look at the law that we had looked at earlier.

MR. TALMAN: Your Honor, I would also like to look at the record, as to what, exactly he said.

My recollection, he said he was confused. But I think it would be appropriate to look at the record.

MR. CRABTREE: But I also think that there isn't any question, that he said first he had not said what was stated, that

another juror stated that he did, and then he later on said, "Yes," he had, he was just expressing his view.

THE COURT: That is what the Court's recollection of his statement was. And he was testifying under oath, basically.

Please allow me to take a brief recess.

MR. CRABTREE: And if I may--

THE COURT: And I am going to ask the media, please, to keep the cameras off until we have resolved this issue, and then, of course, I will--

MR. CRABTREE: And this juror will be kept separate?

THE COURT: This juror is separated from the other jurors, and he is in a room with an officer who knows--

MR. CRABTREE: Your Honor, if I may, I do have some cases that I had told the Court about and those are State v. Spears, 466 S.W. 2nd, 543.

THE COURT: I am not going to write all of this down. Just put it in the record and give me copies.

MR. CRABTREE: I am going to give you copies, but I just wanted to read it into the record. And State v. Milbrooks, 819 S.W. 2nd, 441. State v. Livingston, 607, S.W. 2nd, 489. And State v. Bobo, 814, S.W. 2nd, 353.

THE COURT: Thank you, sir. Court is in recess.

MR. TALMAN: What was that first case?

MR. CRABTREE: Spears, 466, 543.

THE COURT: If you all want to come and look in my computer you are welcome.

(Whereupon, a recess was had after which the following proceedings were had, to-wit:)

THE COURT: In this circumstance we have fifteen jurors of which three have been alternative jurors.

It is within the Court's discretion to determine whether or not there has been an expression of bias or prejudice such that the juror can be, ah, such that the juror will not render a fair verdict, and, ah, should be removed.

In this circumstance, ah, it

is clear that, ah, Mr. Matthews, on voir dire, indicated he had no opinion, and, no opinion in opposition to the death penalty.

He was not asked if he was for the death penalty.

When he came and the Court inquired of him, after another juror had inquired of him, or right after another juror had overheard him express an opinion, he stated that he did, in fact, express an opinion, an opposition to the death penalty.

When the Attorney General inquired of him he stated that he was confused and that he didn't have an opinion, and hadn't expressed an opinion.

Mr. Talman inquired of him, if he stated, not just that he didn't have an opinion, and didn't express an opinion, but that he was, in fact, for the death penalty.

I'm not sure to whom that inures to the benefit or prejudice of.

However, it is clear to the Court that this juror, ah, has not been entirely candid with the Court, and that, in fact, he has expressed the views of bias with regard to each

side, in effect, at one time or another within the period of a few minutes.

And, therefore, I am going to call Mr. Matthews in and discharge him from Service, so we will be down to fourteen jurors.

MR. CRABTREE: Your Honor, this may not be the appropriate time frame, except that I would point out to the Court, also, that concerning Mr. Matthews, he may have, in fact, committed a criminal offense, and that he may have perjured himself.

And I don't know if the Court wants to deal with this at this time or not, but we would ask the Court that at sometime in the future, to consider whether he is, in fact, a proper juror, not just for this case, but for any case.

THE COURT: I think, General, based upon what you have said, that it would be appropriate for your office to determine whether it wishes to file a motion with regard to juror, Matthews.

MR. CRABTREE: Thank you, Your Honor.

THE COURT: It is also my

intention, in light of the fact that jurors have come forward, and have done their duty, although it wasn't easy, that I am going to caution that he is to have no contact with those jurors now or later.

Bring Mr. Matthews back in, please.

I have gone over the cases which the State has presented, ah, and, ah, several of those cases, State v. Bobo, and State v. Harlas, ah, seem to touch upon this as well as State v. Milbrooks. I thought you were saying Middlebrooks, but it is actually Milbrooks.

In addition the Court has reviewed the, ah, Michie, ah--

MR. TALMAN: Before Mr. Matthews comes in, ah, and of course, I can't give any advice or anything to Mr. Matthews, but I would suggest that if the Court is going to do, if there is a possibility now that the State may prosecute him for perjury, that certainly the Court might want to Mirandize him, and I'm not--

MR. CRABTREE: We are not going to ask any more questions of him, are we?

THE COURT: However you want to

raise it.

(Mr. Matthews returned to open Court.)

THE COURT: Mr. Matthews, please have a seat right there in the corner, sir.

Mr. Matthews, you have served hard for ten days as a juror, and you and the other jurors have sat through an awful lot--

MR. MATTHEWS: Uh-huh--

THE COURT: --and I appreciate that service.

In this case, sir, there is a, I guess, a legal term which described what happens when a juror has expressed an opinion of bias in a case.

In this situation, Mr. Matthews, if I heard what you said a few minutes ago correctly, I heard three different opinions.

It is necessary, and I think you understand that, and also, ah, the Court's great concern that this case proceed with a totally impartial jury.

You have, apparently, expressed your opinion to your fellow jurors, whether it was directed particularly at this case,

or upon the issues bearing on this case, and although I have no problem with you having an opinion, ah, we were, when we inquired with you originally, seeking jurors who, ah, felt that they could, ah, handle this case without an opinion until the Court had instructed them.

And as a result of all that I'm going to discharge you from service on this jury at this time, sir.

I must caution you that you may have no contact with your fellow jurors at this time, or later on, as a result of your expression of opinion, ah, and I do that to protect the sanctity of this case, and the jury verdict whenever it shall come.

Thank you very much, sir, for your time and service.

Would you notify Ms. Smith as to what has happened and have her to return Mr. Matthew's jury card to him?

You will need to check out with Ms. Smith, please.

Would you please do that right now?

He will have to check out with

Ms. Smith. And he is to have no contact with the other jurors at this time.

MR. BEELER: We will keep him my himself until we get the others in here.

MR. CRABTREE: And I assume arrangements will be made to get whatever stuff he has without being in contact with the others.

THE COURT: Yes, sir.

We will see to his arrangements.

(Mr. Matthews left open Court.)

THE COURT: Now, anything else anybody wants to say about this issue?

MR. CRABTREE: Not as to this issue.

MR. TALMAN: Not about this issue.

But I would like to approach before we get started.

THE COURT: Yes, sir.

BENCH CONFERENCE

MR. TALMAN: For the Court's information and planning purposes we have one more

witness. We should be resting after cross-examination.

THE COURT: Okay.

MR. TALMAN: It is just for planning purposes.

MR. CRABTREE: We don't know who this witness is.

MR. TALMAN: It is Dr. William Bernet. He is a Forensic Psychiatrist from Vanderbilt. He is going to testify regarding satanic ritualistic abuse and satanic ceremonies.

MR. CRABTREE: What is it relevant to?

MR. TALMAN: You have opened the door. You got the satanic stuff in.

MR. CRABTREE: I never said satanism at all. I used stuff for identification purposes.

THE COURT: What is a satanic bible?

MR. CRABTREE: I know what it is but we don't ever say anything about that. What I did was show the pentagram.

THE COURT: Maybe we better have a jury out--

MR. CRABTREE: Is there a report from this individual?

MR. TALMAN: No, there is no report.

THE COURT: He is a Forensic Psychiatrist.

MR. TALMAN: He has not done an examination. He has not done--

MR. CRABTREE: He knows nothing about the case?

MR. TALMAN: He has referred to Dr. Engum's report and referred to the autopsy report of Dr. Elkins. He has referred to the anthropology report by Dr. marks.

He has referred to Christa Pike's statement--

MS. MARTIN: And has done some research.

MR. TALMAN: --and he has done some research on the issue of The Satanic Bible. And he does not have a report for any examination. He has never met Christa Pike.

THE COURT: Under the theory that?

MR. TALMAN: Under the theory

that even though this stuff comes in, The Satanic Bible, they brought The Satanic Bible in--they have opened the door on it.

THE COURT: Brought the pentagram in.

MR. TALMAN: He will testify that this is not any type of satanic ceremony.

Of course, he can cross-examine.

MR. CRABTREE: I don't think that we ever tried to indicate that it was.

MR. TALMAN: I think there is a reasonable inference by bringing all this stuff in, the pentagrams.

MS. MARTIN: The statute.

THE COURT: I will let him testify and let you cross-examine him.

MR. CRABTREE: Okay.

THE COURT: He doesn't know the facts of this case.

MR. CRABTREE: I have tried to be very careful in my examination not to say anything about satanism, and I referred everything specifically to the pentagram.

Every question had to do with

the pentagram.

MR. TALMAN: Well, I think the fact that the young lady had a pentagram on her chest and there has been a satanic bible introduced--

THE COURT: Can we confine his testimony to, with regard to the symbol of the pentagram?

MR. TALMAN: I want to ask him, is this a ritualistic abuse, can he say within a reasonable degree of psychiatric certainty.

THE COURT: And he is going to say, "No".

MR. TALMAN: He is going to say, "No", but I would like to get that on the record, and let the jury hear that.

MR. CRABTREE: Just be careful what we get into, because we have been very careful not to talk about satanism, but if we get into satanism, we may go into it real deep, now.

MR. TALMAN: I understand.

MR. CRABTREE: Okay.

MR. TALMAN: And I understand that, and I just, I think our qualification here

is going to be limited, but I think he--

THE COURT: Dr. William Bernet, a Forensic Psychiatrist?

MR. TALMAN: Yes, and we will get him qualified, and, of course, they can voir dire--

THE COURT: I've just got to change the expert charge.

MR. TALMAN: I'm sorry, Judge. I apologize.

THE COURT: That's okay. I'm prepared.

THE COURT: Is that a correct spelling of the gentleman's name?

MS. MARTIN: No. B E R N E T.

MR. TALMAN: Yes.

And we are going to ask him if he has an opinion regarding the reports he has read.

MR. CRABTREE: What opinion, about what reports?

MR. TALMAN: Whether this was ritualistic abuse.

MR. CRABTREE: Well, you are going to have to explain something here to me,

then.

You say that on the reports that he's read, and you said, that he read Dr.--

MR. TALMAN: Engum's--

MR. CRABTREE: What does that have to do with his opinion on satanism?

MR. TALMAN: Well, he has read the report as to this offense, as to whether this offense--he has read the report on that. He has read Christa's statement. He has read Dr. Elkins' report, Dr. Marks' report, and that stuff--

MR. CRABTREE: We will have to see if he is an expert first.

END OF BENCH CONFERENCE

THE COURT: All right.

May I permit the cameras to go back on?

Hearing no objection the press is ready to do whatever it wants to, go right ahead.

May we bring back the jury?

MR. CRABTREE: That's pretty broad. (laughed)

THE COURT: Oh, well, within the bounds of the rules, of the local and state rules of Court.

Is that better, General?

MR. CRABTREE: Much better, Your Honor.

THE COURT: Are we ready to bring the jury in?

MR. CRABTREE: Yes, Your Honor.

THE COURT: Do you want me to fill the box?

MR. CRABTREE: No, Your Honor.

THE COURT: Just leave everybody where they were sitting?

MR. CRABTREE: Let's just leave it the way it is.

THE COURT: I think I need to caution the jury that Juror Matthews is no longer among them, but that they are to take no significance in this fact.

MR. CRABTREE: Fine.

THE COURT: And that we are going to proceed.

MR. TALMAN: Your Honor is

going to admonish them about any conversations?

THE COURT: I will.

(Whereupon, the jury returned to open Court. After the call of the jury was waived by all parties the following proceedings were had, to-wit:)

THE COURT: Ladies and gentlemen of the jury, we are going to continue with the Defense's proof this morning.

First, as you can see, Juror 2 is not among the jury, and he, ah, has, ah, been discharged from service of the jury at this time.

This is a decision rendered by the Court, and you are to place no significance in this fact. It has nothing to do with the parties in this case, and we are going to proceed with the trial.

Mr. Talman, are you ready to call your next witness?

MR. TALMAN: Yes, Your Honor.

THE COURT: Go ahead.

MR. TALMAN: The Defense would call William Bernet.

THE COURT: William Bernet, please.

(Witness was so sworn.)

WILLIAM BERNET, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. TALMAN:

Q State your name for the record, sir.

A William Bernet.

Q And are you employed?

A Yes, I am.

Q And where at?

A I'm employed at Vanderbilt University.

Q In what capacity?

A I do two things at Vanderbilt. I am, first of all, the Medical Director of the hospital there, of the psychiatric hospital at Vanderbilt.

And my second job is, I teach Forensic Psychology.

Q Sir, what is your educational background?

Bernet - direct

A I went, ah, to medical school at Harvard. And after graduating from medical school I did an internship in New York City. And I did a psychiatric residency. Actually, I did both in a general adult psychiatric residency at Massachusetts Mental Health Center. And also a fellowship in Child Psychiatry at Massachusetts Mental Health Center, which is in Boston.

Q Okay.

Any other professional training that you have had, sir?

A Well, I've, of course, ah, attended a lot of meetings and, ah, I've taken courses in forensic psychiatry, and then that was the basis for, ah, being board certified. I'm board certified in three different things. In general psychiatry, and in child psychiatry, and in forensic psychiatry.

Q What is forensic psychiatry?

A Well, it's, a, ah, specialty within psychiatry. And forensic means court. Forensic psychiatry is when we do evaluations, and we use psychiatry information as it might apply to some kind of legal situation, or court situation.

Bernet - direct

Q And what licenses do you hold, sir?

A Well, I'm licensed to practice medicine in Tennessee.

Q So you are an M.D., a medical doctor?

A Yes, I am.

Q All right, sir.

And do you hold any certifications or anything of that nature?

A Well, I'm board certified, as I said, in those three things.

But in addition I'm also certified in the state of Tennessee, ah, to do, ah, forensic evaluations, to do what's called pre-trial, ah, evaluations of people who have been arrested, and so sometimes they have evaluations to see if they are ready to go to trial.

Q And who do you do those evaluations for, sir?

A Well, this is arranged through the Department of Mental Health and Mental Retardation, which is a department of Tennessee State Government.

Bernet - direct

But I do them in Nashville.

In other words, we do all the evaluations that come through Davidson County in Nashville.

Q Okay.

And when you say we, are you referring to your hospital that you are the director of?

A Ah, well, I'm the director of this program, so, ah, and I have a staff, I have some other doctors who help me with it. But, ah, together, I supervise them, and do these evaluations.

Q And these evaluations are primarily for the court system, or the state, or the defense, who are they for?

A Well, we are asked by the Court. In all of these evaluations we are ordered by the court and essentially hired by the Court to do, ah, evaluations, psychiatric evaluations.

Those people who have been arrested. And then the report, you know, the evaluation belongs to the court, so the report goes both to the defense and the prosecution and

Bernet - direct

to the court.

MR. CRABTREE: Your Honor, if Counsel wishes to tell us what he wants to qualify this person as we may be able to agree to it.

MR. TALMAN: Well, I think I need to go just a little bit further into his publications.

MR. CRABTREE: Okay.

MR. TALMAN: But, essentially, what we want to qualify him as is as an expert in the field of Forensic Psychiatry.

THE COURT: I will allow you to go into his publications, but at this time I think that there is no question that Dr. Bernet is qualified as an expert in the field of Forensic Psychiatry.

Q Dr. Bernet, in the field of Forensic Psychiatry have you done any particular studies as to ritualistic abuse, or satanic, ah, activity?

A Yes, I have.

Q Would you explain that a little bit, sir?

A Well, I've studied, and I've

Bernet - direct

written several things that pertain to either satanism, or satanic ritual activities, to witchcraft. In particular, I've written a paper about the differential diagnosis of ritual abuse.

In other words, when something looks like a satanic activity, or a ritualistic activity there are actually a number of different possible explanations for why this activity might be taking place. And so I've studied that, and I've written a paper about that. And I've made presentations on that subject at national meetings.

Q How many times have you done that, sir?

A Well, on that particular topic I've made at two different national meetings, to two different organizations.

Q And have you ever testified in Court before, sir?

A Yes, I have.

Q Can you briefly describe that? You prior experience, and who you have testified for?

MR. CRABTREE: Are we talking

Bernet - direct

about testifying as a forensic psychiatrist, or testifying as an expert in satanism?

MR. TALMAN: We are talking about the field of Forensic Psychiatry. And I think I can go into a little further qualification as to the satanism and that sort of thing.

MR. CRABTREE: I'm not sure that connection has been made at this particular time. That as a forensic psychiatrist he is an expert in satanism.

So we may be talking about two areas of expertise here.

Q Dr. Bernet, would you explain, ah, if you will, to the Attorney General's objection here as to being an expert in satanism, or in ritualistic abuse, and why, if you are, why you consider yourself to be an expert in that field?

A Well, ritualistic activities is part of what forensic psychiatrists do.

In forensic psychiatry we study, among other things, how crimes take place, and how people are motivated, and how they come about. And one part of that is, that at sometimes

Bernet - direct

people commit crimes because of satanic beliefs, or because of ritualistic behaviors, or ritualistic practice.

So, ah, in general, forensic psychiatry includes the study of satanic and ritualistic activities.

But in addition to that I have a particular interest in it, so I have done some research and some, ah, writing on that subject.

Q Would you consider yourself an expert in that field, sir?

A Yes, I do.

MR. TALMAN: Any objection from the State?

MR. CRABTREE: I think the important thing is whether the Court considers him an expert, not whether he does or not.

I will leave that up to the Court.

THE COURT: I think that Dr. Bernet is an expert in the field of Forensic Psychiatry, and having studied and read, and written with regard to this area, and may testify about the area of satanism as it relates to

Bernet - direct

forensic psychiatry, or satanic worship, ritualistic behavior, as it relates to forensic psychiatry.

MR. TALMAN: Thank you, Your Honor.

Q And, Dr. Bernet, you said you had testified in Court before, and you had testified for the defense, the prosecution, the Court.

Would you explain your background in that, sir?

A Well, ah, of course, in my work I testify six, seven, eight times a year, and for a lot of different purposes.

But in terms of criminal, ah, activities, I sometimes end up testifying for the defense, or sometimes I've testified, ah, for the prosecution.

Q In most of these evaluations I have done, I'm asked by the Court to do the evaluation, and actually, in the vast majority of them, the results of the evaluation would favor the prosecution's point of view.

In some cases, when we are

Bernet - direct

actually asked to testify, ah, we might be testifying for the defense, or occasionally for the prosecution.

MR. CRABTREE: Your Honor, if I may, the witness keeps using the word "evaluation".

Is there an evaluation in this case?

MR. TALMAN: No, Your Honor.

And I'll get to that, if we can continue.

THE COURT: Okay.

Go ahead, Mr. Talman.

Q One other area I wanted to cover, sir.

You are being paid to be here, is that correct?

A Yes, I am.

Q And I think you said you were employed by Vanderbilt?

A Yes, that is correct.

Q Who are you being paid by to be here?

A Well, I was, ah, contacted by

Bernet - direct

the Defense in this case, and, ah, we're being paid by the Defense.

The money actually goes to Vanderbilt, and then I eventually get paid by Vanderbilt.

Q So, you are paid your salary through Vanderbilt?

A Yes, I am.

Q All right.

Now, sir, as regards to this case, ah, in preparation for your testimony today, what have you reviewed in this case to prepare for testimony today?

A I reviewed, ah, some statements that, ah, you provided to me, specifically, a statement made by Christa Pike to, ah, a police investigator.

I also reviewed a statement made by Kimberly Iloilo to an investigator.

In addition to that I reviewed some professional documents, for instance, there were some psychological testing. That was done by Dr. Eric Engum.

And I reviewed those.

Bernet - direct

And, also, the autopsy report by Dr. Sandra Elkins.

Finally, I saw a copy of the anthropology report by Dr. Marks.

Q And in addition to that did you do any research, sir?

A Yes, I did.

Q Okay.

You also had an opportunity to review the audio tape, or tape recorded cassette of the statement made by Christa Pike?

A Yes. The statement of Christa Pike, I both read the transcript, and I also listened to the audio tape.

MR. TALMAN: Your Honor, ah, as I understand it, the Court has already recognized Dr. Bernet as an expert in Forensic Psychiatry, and as an expert in ritual abuse and satanic ceremonies, is that correct?

THE COURT: I recognized him as an expert in the field of Forensic Psychiatry.

And he has testified that he has knowledge and has studied that area, and I will allow him to testify as to that area, but I'm

Bernet - direct

going to qualify him as an expert in Forensic Psychiatry.

I think that will cover your issue.

If that is acceptable?

MR. TALMAN: Yes. Thank you.

If I could approach the witness, Your Honor?

THE COURT: Yes, sir.

Q Dr. Bernet, I will show you what has been marked as exhibit seventy-six.

Are you familiar with that document, sir?

A Yes, I am.

Q What is that, sir?

A Well, this is a book, ah, the name of it is <u>The Satanic Bible</u>. And it is written by a man named Anton LaVey.

Q Have you studied that book, and are you familiar with the contents of that book?

A Yes, I am.

Q Dr. Bernet, I will show you what has been marked for identification, or as

Bernet - direct

exhibit eleven.

Are you familiar with that document, sir?

A Yes, I've seen that before.

Q That exhibit?

A I have seen that before, yes.

Q Where did you see that?

A Well, that was part of the, ah, autopsy report by Dr. Elkins that I reviewed.

Q Yes, sir.

And I will show you a particular, ah, drawing here, or something on this body.

Are you familiar with that?

A Yes, I am.

Q And what is that, sir?

A Well, that's a mark that was cut into this body, and the mark is in a shape of a star that has a circle around it.

Q Do you know what that item is, Dr. Bernet?

A Well, it's the shape of, of a satanic star.

In other words, it has five

Bernet - direct

points to it, and it is pointed down.

It is actually the same shape as the star that is on the cover of this book.

Q Dr. Marks, in your review, Dr. Bernet, I'm sorry, I apologize.

Dr. Bernet, in your review of, ah, this document marked as exhibit eleven, can you say within a reasonable degree of psychiatric certainty as to whether or not, ah, in review of the documentation of this case, within a reasonable degree of psychiatric certainty as to whether or not this killing fits any known pattern of ritualistic abuse, satanic ceremony?

A Yes.

Q You can say it?

A Yes.

Q And do you have an opinion on that, sir?

A Yes, I do.

Q And would you state that, sir?

A Well, I think, ah, there is this satanic, ah, mutilation of this body, so I think there are satanic elements in this crime.

However, I do not think that

Bernet - direct

the whole picture fits the pattern of a satanic ceremony, or a satanic sacrifice, or a planned satanic sacrifice.

Q Do you have any other opinion within a reasonable degree of psychiatric certainty as to this document?

A Well, you know, in the various things that I reviewed, the statement made by Christa, and the autopsy, ah, I didn't think that it looked like, the description of what happened that night, on January the 12th, it did not look like to me to be a satanic ceremony, or a satanic sacrifice.

It did look like something else. I think it fit very well--

MR. CRABTREE: Your Honor, if I may, I think this witness has been called to testify to specific things concerning satanism.

And now it sounds like we are getting outside of that particular opinion.

THE COURT: I think we are talking about the Doctor's opinion within a reasonable degree of psychiatry certainty, whether or not the killing fit a known pattern of satanic

Bernet - direct

abuse.

And I think the Doctor has testified that--

MR. TALMAN: He is trying to answer the question, Your Honor.

MR. CRABTREE: I thought he said that it didn't.

THE COURT: Let me finish my ruling. Okay?

MR. TALMAN: I'm sorry.

I apologize.

THE COURT: I think the Doctor has testified that although there are satanic elements, that he does not find any known pattern.

Please ask the next question.

MR. TALMAN: Your Honor, I asked him if he had an opinion as to this killing, within a reasonable degree of psychiatric certainty, from the documents that he has reviewed.

THE COURT: What do you mean, by an opinion as to the killing?

MR. TALMAN: As to, whether this killing was any type of ritualistic abuse.

Bernet - direct

He was trying to answer the question as to, he thought, no, it did not fit that pattern, but it did fit another pattern.

And he is trying to answer that.

MR. CRABTREE: Are we talking about another pattern besides satanism?

THE COURT: Of ritualistic abuse? Is that the question?

MR. CRABTREE: Yes.

MR. TALMAN: We are going into ritualistic abuse, a type--

MR. CRABTREE: Now, I have stated--

THE COURT: Okay.

That is not how I heard the question.

Therefore, if I understand correctly, your question is, whether Dr. Bernet has an opinion within a reasonable degree of medical certainty regarding any other pattern of ritualistic abuse?

Is that your question?

MR. TALMAN: Well,

Bernet - direct

essentially, yes, Your Honor.

He, he was trying to answer the question, and--

THE COURT: Well, he was answering a compound question.

Is that your question, Mr. Talman?

Because if it is, I will allow him to answer that question.

MR. CRABTREE: But may I say something, based on that statement?

THE COURT: Yes.

MR. CRABTREE: Your Honor, again, as far as the expertise of this witness, it is my understanding, as a forensic psychiatrist, and who has done studies in satanism--that is the ritualistic, ah, aspects that we are talking about at this time.

If we are talking about another ritual, then are we talking about additional qualifications?

I don't know. I don't know where we are going.

THE COURT: I don't, either.

Bernet - direct

I am going to allow him to answer the question I posed a minute ago, if that's your question.

Let's answer that.

But before the Doctor gives an opinion as to what that might be, you have to qualify him.

MR. TALMAN: Your Honor, Dr. Bernet has reviewed the statements in this case.

He has reviewed the report of Dr. Engum.

He has reviewed the report of Dr. Elkins, the report of Dr. Marks.

He has been qualified as an expert in Forensic Psychiatry.

THE COURT: Do you all want to come up to the bench, please?

<u>BENCH CONFERENCE</u>

THE COURT: He didn't evaluate Christa Pike, and we are about to get into that.

And I'm not going to let him answer questions about whether or not Christa

Pike just went off and--he can answer the questions as an expert in Forensic Psychiatry as to ritualistic abuse, but I'm not going to let him go any further. He can answer these questions regarding ritualistic abuse or satanic abuse, but I'm not going to let him go any further. He can give his opinion within a reasonable degree of medical certainty about her ability to form--

MR. TALMAN: Your Honor, he has reviewed these documents. The State can cross-examine him on it.

MR. CRABTREE: But he is not an expert--

THE COURT: But he has not evaluated her.

MS. MARTIN: He was about to say why not--

MR. TALMAN: Why not--

THE COURT: He was about to do that. But that was not what you asked him.

What you asked him was, what his opinion was with regard to this killing.

He can't give an opinion with regard to this killing.

Bernet - direct

Is that what you are asking?

MR. CRABTREE: That was not what I objected to. He was saying this was some other type of ritual--

THE COURT: I think he can describe why this is not a satanic--what he bases that opinion on, but he can't go into another area, if that is where you are going.

END OF BENCH CONFERENCE

MR. TALMAN: Your Honor, if I could, I would like to approach the witness again?

THE COURT: Yes, sir.

Q Dr. Bernet, I will show you what has been marked as exhibit seventy-three.

Sir, there's a diagram there on that.

Are you familiar with that diagram?

A Well, I've seen that kind of diagram before. Ah, there's a diagram with a star. And I've seen diagrams exactly like that on other occasions.

Bernet - direct

Q Sir, is that diagram identical to that diagram in exhibit seventy-six?

A No.

I think this is something, ah, that's, that's quite different from the star. It is a different kind of star than the star that is on The Satanic Bible.

Q Thank you.

Dr. Bernet, you were going to explain why this was not a satanic ritualistic type killing.

Would you explain that, sir?

A Well, you know, there are several kinds of satanic ritualistic, ah, abuse activities, or crimes that happen.

And there are four or five different kinds. And I think they get confused. They are all ritualistic, and they all can be satanic.

And I, I think it might help to clarify which, where this one fits.

MR. CRABTREE: Your Honor, if I may, I believe Counsel asked a specific question.

Bernet - direct

And the witness is not being responsive to that question.

MR. TALMAN: Your Honor, he is trying to answer the question.

THE COURT: I would, I would like him to answer your question, and then I will be glad to let the witness explain his answer, if I may.

Would you please repeat your question, if you can?

Q I had asked Dr. Bernet--he had stated that this did not, ah, from what he has reviewed in this case, within a reasonable degree of psychiatric certainty, that, ah, whether this case was a ritualistic abuse or some type of satanic ceremony.

He had said, he had answered originally, "No, it did not fit that particular, any particular pattern, but," then he started to explain--

THE COURT: I understand that.

MR. TALMAN: What my question is now--

THE COURT: What you asked was-

Bernet - direct

-

Q --why, Dr. Bernet, why does this not fit into any type of satanic ceremony or ritualistic abuse? If you can explain, sir.

THE COURT: If you can tell us an answer to that, and then explain it, that might help us, if you would, sir.

A Well, there are several kinds of ritualistic abuse that it doesn't fit into.

It does not fit into, ah, what I called the activities of organized, ah, satanic churches.

And this book, called, <u>The Satanic Bible</u>, describes, and another one that goes with it, called, <u>Satanic Rituals</u>, describes, ah, the ceremonies and the rituals of organized, disorganized satanic religion.

They consist of ceremonies.

They consist of a thing called the black mask.

During these things there are readings and people dress up in a particular way.

And this does not fit that description.

Bernet - direct

There is another kind of satanic ritual abuse which, ah, is not part of this kind of religious ceremony, but which people do on their own.

And it is usually called ritual abuse, or satanic ritual abuse.

Ah, this, this crime does not fit that pattern, either.

In ritual abuse there is usually a repetitive pattern in which people are abused over and over again, and it is done in a ceremonial way, and the purpose of it is some kind of, ah, religious purpose.

Now, this, what happened in this crime does not fit that.

And there's finally a third kind of ritualistic abuse that this doesn't fit, which sometimes is confused with the other two that I mentioned.

And this is called pseudoritualistic abuse.

In pseudoritualistic abuse people abuse, it is usually a group of people that abuse a group of victims, and there are, ah, there

Bernet - direct

is a satanic aspect to it. The purpose of it is not ceremonial, but the purpose of it is sex abuse, or physical abuse of these people.

So, it doesn't fit that pattern, either.

This, this doesn't fit any of the known patterns as satanic or ritualistic sacrifice, or abuse.

And it does fit other things.

Q Can you explain what you are referring to, sir?

What other things?

A This fits the pattern of adolescent dabbling in satanism.

And that is a common thing, unfortunately, that teenagers get into.

And some of them get into it more than others.

And they get into it for particular reasons.

Sometimes things they do, antisocial acts they do--

MR. CRABTREE: Your Honor, I going to object to "they". If he knows these

Bernet - direct

individuals involved, they were doing what they were doing, I would not object to it.

I object to the generalization.

THE COURT: I think the witness must confine his discussion to individuals involved in this case.

MR. TALMAN: Yes, Your Honor.

And I think I will also qualify--

Q Dr. Bernet, you have not examined Christa Pike, you have never met Christa Pike, is that correct?

A That's correct.

Q Okay.

You are basing your opinion upon the information you previously testified to, is that correct?

A Yes, it is.

Q All right, sir.

Now, you were starting to explain, and you have to limit that to how it affects, to Christa Pike, and your review of the documents that you read.

Bernet - direct

Can you continue with that, or--

A Yes.

I think that Christa and one of the other, ah, one of the other people accused of this crime, whose name is Tadaryl, were what are called adolescent dabblers in satanism.

Q Okay.

And what do you mean by that, sir?

A What I mean by that, is that, ah, teenagers sometimes get interested in satanic books, satanic ideas for a number of different reasons.

And I think that is what these two individuals did.

Q Sir, from your, ah, when you say they are dabblers, ah, can you expand anymore on that, or do you feel that you should, or--

A Well, what it means is, that they read up on it. They, they identify it, and sometimes these are very disturbed, angry children, who, I think, fits the people in this case.

Bernet - direct

And that the satanism is a way for them to express their rage, and their antiauthoritarian attitudes.

Ah, that doesn't mean, though, that they practice sacrifices or satanic sacrifices.

And the things that they do may have a satanic color to it, or may superficially look satanic, but that's not the same thing as conducting a planned satanic activity.

Q Now, in your review of these documents, did this fit into any pattern of ritualistic abuse, or any type of satanic abuse, or anything, any other pattern that you have studied, as far as abuse goes?

A Well, it didn't fit, ah, to a ritualistic or satanic pattern.

I think it fits into a totally different thing.

Q Okay.

Can you say what that different thing is that you are referring to?

MR. CRABTREE: Your Honor, we

Bernet - direct

would object at this time unless Counsel qualifies in some way.

We have never seen this person before.

We don't have access to any of this.

THE COURT: I think the Doctor has already testified the answer to this, which was, that it fits into--

MR. TALMAN: Well, Your Honor, he was--

MR. CRABTREE: Dabbling, is that what we are getting to?

THE COURT: The dabbling, that's, if that's the answer I think we have already gone through that.

MR. TALMAN: He was testifying as to, I believe where he was going with that, was, he was starting to say this fits another type of pattern of abuse, and that is what I was trying to elicit from him.

Q Is that correct, Dr. Bernet?

A Yes.

Q Okay.

Bernet - direct

A different type of abuse?

THE COURT: Other than this description Dr. Bernet has already given us regarding the teenagers dabbling in satanism?

Another abuse other than that, sir?

And I am going to confine your answer to yes or no.

THE WITNESS: Yes.

THE COURT: Okay.

Approach the bench, please.

<u>BENCH CONFERENCE</u>

THE COURT: Here's you another expert witness charge.

MR. TALMAN: Okay.

Judge, he is going to testify as to an area of abuse. If he can testify within a reasonable degree of psychiatric certainty I think he can render an opinion as to what he reviewed.

MR. CRABTREE: What is he getting into?

Bernet - direct

THE COURT: What is he getting into?

MR. TALMAN: He is going to talk about, ah, aggressive disorder, that type of thing, and aggressive behavior--I don't know that it is a diagnosis, from the data that he has reviewed.

MS. MARTIN: He has been talking in patterns.

MR. TALMAN: He is talking--

MS. MARTIN: That's all we are asking.

MR. CRABTREE: But patterns are not admissible. It is this individual.

MS. MARTIN: Well, he is asking about the pattern--

MR. CRABTREE: He is going to get into this individual--without ever seeing her.

Your Honor, we probably need to get this done, that we are talking about.

THE COURT: We will have a jury out hearing.