003394

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| Respondent. | ) | |

---

## ADDENDUM 3

## DOCUMENT 1

---

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

STATE OF TENNESSEE,           ]

       Appellee,              ]

v.                            ]     No.: 03C01-9611-CR-00408

CHRISTA GAIL PIKE,       ]     KNOX COUNTY CRIMINAL

       Appellant.           ]

### *ON APPEAL AS A MATTER OF RIGHT FROM THE JUDGMENT OF THE KNOX COUNTY CRIMINAL COURT*

---

### *BRIEF OF THE APPELLANT, CHRISTA GAIL PIKE*

---

WILLIAM C. TALMAN
Supreme Court BPR# 012262
Attorney for Appellant
P.O. Box 506
Knoxville, Tennessee 37901-0506

Telephone: (423) 579-9060

JULIE A. MARTIN
Supreme Court BPR# 015546
P.O. Box 426
Knoxville, Tennessee 37901-0426

Telephone: (423) 281-0210

### ORAL ARGUMENT REQUESTED

Case 1:12-cv-00035-HSM-SKL   Document 8-16   Filed 08/01/12   Page 2 of 75 PageID #: 3422

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Issue presented for review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument:

I. *The evidence presented in its entirety and as contained in the record was insufficient as a matter of law to support the verdict of the jury finding the Defendant guilty of murder in the first degree and conspiracy to commit murder in the first degree. Additionally, the evidence presented was insufficient to justify the jury's verdict sentencing the Defendant to death by electrocution* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II. *The trial court erred by refusing to grant Defendant's motion to deny television and photographic coverage of pretrial proceedings in order to minimize the public's exposure to the details of this case* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III. *The trial court erred by failing to grant the Defendant's motion for a change of venue in this case* . . . . . . . . . . . . . . . . . . . . . . 42

IV. *The trial court erred by failing to allow the Defendant to select a jury composed of a fair cross section of the citizens of the State of Tennessee* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

V. *Whether the trial court erred by allowing the introduction of the skull of the victim into evidence where such use of the skull was duplicative of other evidence, was wholly unnecessary in light of other admitted evidence, was*

i

003397

*destined to arouse and incite the passions of the jury against Defendant, and whose probative value was substantially outweighed by its highly prejudicial effect* .......................................... 51

VI. *Whether the trial court erred by refusing to enter a judgment of acquittal as to the second count of the indictment charging conspiracy where the State failed to prove each and every element charged in the indictment* ........... 54

VII. *Whether the punishment imposed in this case, death by electrocution, is cruel and unusual punishment under both the United States and Tennessee Constitutions* ................ 56

VIII. *Whether the trial court erred in allowing the State the same number of peremptory challenges as Defendant in violation of the ex post facto clauses of the United States and Tennessee Constitutions* ..................... 58

IX. *Whether the trial court erred in sentencing Defendant to the maximum sentence allowed under Count 2 of the indictment charging conspiracy to commit first-degree murder and running it consecutively to the death sentence imposed under Count 1* .......................... 60

Conclusion ............................................. 63

Certificate of Service ................................. 64

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 4 of 75
PageID #: 3424

# TABLE OF AUTHORITIES

*Case Law Cited*:

Adams v. Texas,
    448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) . . . . . . . . . . . . . . 48

Braziel v. State,
    529 S.W.2d 501 (Tenn.Crim.App., 1975) . . . . . . . . . . . . . . . . . . . . . 38

Davis v. Georgia,
    429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) . . . . . . . . . . . . . . 48

Farmer v. State,
    574 S.W.2d 49 (Tenn.Crim.App., 1978) . . . . . . . . . . . . . . . . . . . . . 38

Franklin v. State,
    513 S.W.2d 146 (Tenn.Crim.App., 1974) . . . . . . . . . . . . . . . . . . . . 54

Hawkins v. State,
    555 S.W.2d 876 (Tenn.Crim.App., 1977) . . . . . . . . . . . . . . . . . . . . 52

Irvin v. Dowd,
    366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) . . . . . . . . . 43, 44, 45

Jackson v. Virginia,
    433 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) . . . . . . . . . . . . . 36

Liakas v. State,
    199 Tenn. 298, 286 S.W.2d 856 (Tenn., 1956) . . . . . . . . . . . . . . . . . 38

Lockett v. Ohio,
    438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) . . . . . . . . . . . . . 48

Louisiana ex rel. Frances v. Resweber,
    329 U.S. 459, 67 S.Ct. 374 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . 57

Murphy v. Florida,
    421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) . . . . . . . . . . . . . 45

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 5 of 75
PageID #: 3425

003399

State v. Alley,
776 S.W.2d 506 (Tenn., 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

State v. Ashby,
823 S.W.2d 166 (Tenn., 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

State v. Bates,
804 S.W.2d 868 (Tenn., 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 42, 51

State v. Black,
815 S.W.2d 166 (Tenn., 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

State v. Bohanan,
745 S.W.2d 892 (Tenn., 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Brown,
836 S.W.2d 530 (Tenn., 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Bullington,
532 S.W.2d 556 (Tenn., 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Cabbage,
571 S.W.2d 832 (Tenn., 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

State v. Cazes,
875 S.W.2d 253 (Tenn., 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Coleman,
865 S.W.2d 455 (Tenn., 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

State v. Grace,
493 S.W.2d 474 (Tenn., 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Harbison,
704 S.W.2d 314 (Tenn., 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

State v. Harrington,
627 S.W.2d 345 (Tenn., 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

State v. Harris,
839 S.W.2d 54 (Tenn., 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 38, 51

iv

State v. Hatchett,
     560 S.W.2d 627 (Tenn., 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Hooper,
     594 S.W.2d 743 (Tenn.Crim.App., 1979) . . . . . . . . . . . . . . . . . . 42, 43

State v. Howell,
     868 S.W.2d 238 (Tenn., 1993) . . . . . . . . . . . . . . . . . . . . . . 42, 43, 58

State v. King,
     718 S.W.2d 241 (Tenn., 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

State v. Melson,
     638 S.W.2d 342 (Tenn., 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

State v. Morgan,
     825 S.W.2d 113 (Tenn.Crim.App., 1991) . . . . . . . . . . . . . . . . . . . . 45

State v. Nichols,
     877 S.W.2d 722 (Tenn., 1994) . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

State v. Ricci,
     914 S.W.2d 475 (Tenn., 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

State v. Shepherd,
     902 S.W.2d 895 (Tenn., 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

State v. Stacy,
     601 S.W.2d 696 (Tenn., 1980) . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

State v. West,
     844 S.W.2d 144 (Tenn., 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Wainwright v. Witt,
     469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) . . . . . . . . . . . . . 49

Witherspoon v. Illinois,
     391 U.S. 510, 88 S.Ct. 1770, 30 L.Ed.2d 776 (1968) . . . . . . . . . . . 48, 49

Case 1:12-cv-00035-HSM-SKL     Document 8-16     Filed 08/01/12     Page 7 of 75
                              PageID #: 3427

*Rules Cited*:

Rule 13(e), <u>Tennessee Rules of Appellate Procedure</u> . . . . . . . . . . . . . . . . . . . 35

Rule 30, <u>Tennessee Supreme Court Rules</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Rule 24(d), <u>Tennessee Rules of Criminal Procedure</u> (West, 1995) . . . . . . . . . . . . 58

Rule 24(d), <u>Tennessee Rules of Criminal Procedure</u> (West, 1996) . . . . . . . . . . . . 58

*Statutes Cited*:

<u>Tennessee Code Annotated</u> § 39-13-202 . . . . . . . . . . . . . . . . . . . . . . . . . . 37

<u>Tennessee Code Annotated</u> § 40-35-210(c) . . . . . . . . . . . . . . . . . . . . . . . . . 60

<u>Tennessee Code Annotated</u> § 40-35-210(d) . . . . . . . . . . . . . . . . . . . . . . . . . 60

<u>Tennessee Code Annotated</u> § 40-35-401(d) . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Tennessee Constitutional Provision Cited*:

Article 1 § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Other Authorities Cited*:

T.P.I. - Crim., 4.03 (4th Edition, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

T.P.I. - Crim., 7.01(a) (4th Edition, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 37

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 8 of 75
PageID #: 3428

## INTRODUCTION

In this cause, the Appellant, Christa Gail Pike, appeals as a matter of right the judgment of the Criminal Court for Knox County, Tennessee denying her motion for new trial challenging her convictions, by jury verdict, of murder in the first degree and conspiracy to commit murder in the first degree. Additionally, the Defendant challenges the jury's verdict sentencing her to death by electrocution and the sentence imposed as a result of her conviction for conspiracy to commit murder in the first degree.

The record on appeal consists of thirty two (32) volumes and thirty one (31) exhibits. Volumes I through III comprise the technical record. Volumes IV through XXX is the transcript of the Defendant's jury trial on the merits. Volume XXXI is the transcript of the sentencing hearing on the conspiracy conviction. Volume XXXII is the transcript of the motion for new trial. References to the record shall be by volume and page number of the record. For clarity, all references to the parties shall hereinafter be referred to as "the State" and "the Defendant" or by the Defendant's name.

vii

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 9 of 75
PageID #: 3429

## ISSUES PRESENTED FOR REVIEW

I.    *Whether the evidence presented in its entirety and as contained in the record was insufficient as a matter of law to support the verdict of the jury finding the Defendant guilty of murder in the first degree and conspiracy to commit murder in the first degree. Additionally, the evidence presented was insufficient to justify the jury's verdict sentencing the Defendant to death by electrocution.*

II.   *The trial court erred by refusing to grant Defendant's motion to deny television and photographic coverage of pretrial proceedings in order to minimize the public's exposure to the details of this case.*

III.  *The trial court erred by failing to grant the Defendant's motion for a change of venue in this case.*

IV.   *The trial court erred by failing to allow the Defendant to select a jury composed of a fair cross section of the citizens of the State of Tennessee.*

V.    *Whether the trial court erred by allowing the introduction of the skull of the victim into evidence where such use of the skull was duplicative of other evidence, was wholly unnecessary in light of other admitted evidence, was destined to arouse and incite the passions of the jury against Defendant, and whose probative value was substantially outweighed by its highly prejudicial effect.*

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 10 of 75
PageID #: 3430

VI. *Whether the trial court erred by refusing to enter a judgment of acquittal as to the second count of the indictment charging conspiracy where the State failed to prove each and every element charged in the indictment.*

VII. *Whether the punishment imposed in this case, death by electrocution, is cruel and unusual punishment under both the United States and Tennessee Constitutions.*

VIII. *Whether the trial court erred in allowing the State the same number of peremptory challenges as Defendant in violation of the ex post facto clauses of the United States and Tennessee Constitutions.*

IX. *Whether the trial court erred in sentencing Defendant to the maximum sentence allowed under Count 2 of the indictment charging conspiracy to commit first-degree murder and running it consecutively to the death sentence imposed under Count 1.*

ix

003405

## STATEMENT OF THE CASE

On April 10, 1995, Appellant Christa Gail Pike (hereinafter referred to as "Defendant") was indicted by the Knox County Grand Jury on one count of first degree murder and one count of conspiracy to commit first degree murder. (Technical Record Vol. I, pp 2-3). Defendant's trial began on March 18, 1996, and after the jury returned a verdict of guilt as to both counts listed in the Indictment, Defendant was sentenced to death on March 30, 1996, at the end of the trial. (III, 395, 439). On June 6, 1996, Defendant was sentenced on the second count of the Indictment to twenty-five years as a Standard Range I Offender, said sentence to be served consecutively to the death sentence given in the First Count of the Indictment. (III, 409-410).

On April 29, 1996, Defendant filed her Motion for Judgment of Acquittal or, Alternatively, Motion for New Trial. (III, 402-405). On July 25, 1996, Defendant filed an Amendment to Motion for New Trial. (III, 417-18). Defendant's Motion for New Trial was overruled on July 25, 1996. (III, 418-19).

Defendant filed a Notice of Appeal on August 20, 1996. (III, 420-21). Defendant's Designation of Record on Appeal was filed on November 27, 1996. (III, 427-28).

Page 1

003406

## STATEMENT OF THE FACTS

### I. VOIR DIRE:

Originally 65 jurors were called in, and 39 were excused mostly for problems with sequestration. (IV, 58-65, 67-80). Of the 26 remaining, 18 were put into the jury box and questioned about publicity with only 3 having heard nothing about the case. (IV, 94). This pattern was repeated again on another day wherein 15 of another set of 18 seated in the box had heard about this case. (VIII, 409-414).

An additional set of 130 new prospective jurors was called in, and only 26 remained after asking questions about sequestration. (VI, 287, 326). When these 26 were eventually brought back to court and asked about publicity on this case, all 26 had heard about this case. (XI, 751-53, 755).

### II. GUILT PHASE:

Duncan Sutherland was working for the U.T. Grounds Department in January of 1995. (XIX, 1569). At approximately 8:00 a.m., Mr. Sutherland clocked in over near the greenhouse on the U.T. Agricultural Campus and thought he saw a dead dog and some clothes in the trees. (XIX, 1569-70). Mr. Sutherland went back to look at the "dead dog" and determined it was a female human surrounded by blood, whom he did not believe to be alive. (XIX, 1571-72). Mr. Sutherland stared at the body for a few minutes, and he went to get some plumbers. (XIX,

Page 2

1573). When he returned to the scene, the U.T. Police were arriving. (XIX, 1573-74). Mr. Sutherland identified photographic Exhibits 1 and 2 showing the scene that he found on the U.T. Agricultural Campus on January 13, 1995, and the closeup of a "rag" around the neck of the body. (XIX, 1574-75).

John Johnson is a police officer who has been with the University of Tennessee approximately 27 years, and he was working for the U.T. Police on January 13, 1995. (XIX, 1581-82). On that date, he was in a parking lot behind the Steam Plant over on the Agricultural Campus. (XIX, 1582). After being summoned to a location where some employees were standing around, Officer Johnson found a female body that was nude from the waist up lying face-down on a mound of debris. (XIX, 1583-84). After observing the body, Officer Johnson began moving people out of the area and securing the crime scene although he did not touch the body. (XIX, 1584-85). About two or three minutes after he began, Officer Rector of the Knoxville Police Department arrived and began helping him secure the scene. (XIX, 1585). Although the initial crime scene he secured began 20 to 30 feet on either side of the body, it was later expanded to an area approximately 100 feet long by 60 feet wide. (XIX, 1586-87). As he was securing the scene, more officers from the University Police Department arrived. (XIX, 1588). Officer Johnson continued to assist in the investigation and point out things he found to crime scene personnel. (XIX, 1588-89). Officer Johnson identified Exhibit 3 as the face of the individual as he saw it on the day in question. (XIX, 1590).

Robert Rector has been a police officer for 18 years, and he works for the Knoxville Police Department. (XIX, 1592-93). On January 13, 1995, he was directed to a particular area

Page 3

of the Agricultural Campus behind some "abandoned buildings." (XIX, 1593-94). His first view was Officer Johnson and his car. (XIX, 1595). Then Officer Rector saw injuries to the head and body of the victim, a large amount of blood around the head area, and on the ground in the general area of the body. (XIX, 1596). He also observed cuts and slashes to the torso area. (XIX, 1596). He then assisted in securing the crime scene with crime scene tape. (XIX, 1596). According to Officer Rector, as the investigation around the initial crime scene continued, the area secured "probably tripled" in size. (XIX, 1598). While he was on the scene, several other officers and investigators from the Knoxville Police Department arrived. (XIX, 1600). Officer Rector observed that the ground was wet and muddy in that particular area, and the mud had been trampled in and scuffed up and smeared. (XX, 1601-1602). When the body was turned over, Officer Rector noticed the throat had been cut along with numerous stab and slash wounds on the torso (XX, 1603). Officer Rector also identified photographic Exhibits 1 and 2. (XX, 1603-1605). Officer Rector also identified photographs showing the cut around the throat, the wounds to the upper torso, and the slashes and lacerations to the front of the body. (XX, 1610-12). Initially, Officer Rector overheard a call being dispatched to the KPD unit, and he proceeded to the scene. (XX, 1614-15). Officer Rector arrived between 8:00 and 8:30 in the morning and remained on the scene for two to three hours. (XX, 1613). When Officer Rector arrived, there was a small group of four to five civilians within 15 to 20 feet of the body. (XX, 1616). Officer Rector further stated that the body was located within the confines of Knox County, Tennessee. (XX, 1614).

Donald Cook has been with the University of Tennessee Police Department for 28 years,

Page 4

and he was a patrolman on January 13, 1995. (XX, 1625). He received a radio call that a body had been found on the bike trail on the Ag Campus, and he arrived there at that scene around 8:20. (XX, 1626). At trial, Officer Cook identified a map of the U.T. Agricultural Campus and proceeded to mark a red X in the general location of the body and identified other features in that area. (XX, 1627-33). Officer Cook went on to describe the same scene as the previous witnesses as regards the position of the body and the injuries to the body. (XX, 1634-36). Officer Cook moved the civilian personnel at the scene back and got information that was needed from each of them. (XX, 1637-38). Later, Officer Cook went with the body to the morgue at U.T. Hospital, and he remained with the body while someone from criminalistics fumed the body. (XX, 1639-41). Officer Cook left the body around noon, and he returned around 3:00 when the body had been cleaned up somewhat (XX, 1641-42). At that time, he saw a design cut into the victim's chest, that design being a five-pointed star with one point down and two points up in a circle. (XX, 1642-43). Officer Cook identified a photograph containing that design. (XX, 1643-44).

Larry Roberts is a police officer with the Knoxville Police Department, and he has been since 1974. (XX, 1656). In January of 1995, he received a call to go to the Ag Campus of U.T. adjacent to some railroad tracks and a bike trail. (XX, 1657). Officer Roberts arrived on the scene around ten after eight. (XX, 1660). He saw a couple of U.T. officers and one KPD officer there. (XX, 1660). Officer Roberts saw a white female at the scene suffering from various wounds, and he turned his attention afterward to surveying the area. (XX, 1662). He found a large puddle of blood in the roadway, about 30 feet from the body. (XX, 1662-63).

Page 5

Officer Roberts made a log of the people who came and went from the area, as well as summoning the paramedics, the investigators, and the crime technicians. (XX, 1663). Officer Roberts used the previous map exhibit to identify the area. (XX, 1664).

Sandra Elkins is the Director of Forensic Pathology at U.T., and she serves as the Knox County Medical Examiner. (XX, 1674). She has been the Knox County Medical Examiner since May of 1995. (XX, 1674). Ms. Elkins is board qualified in the field of anatomic pathology as well as forensic pathology. (XX, 1676). Dr. Elkins was qualified as an expert witness in the fields of anatomical pathology and forensic pathology. (XX, 1679). On January 13, 1995, Dr. Elkins performed an autopsy on the body of a young female who was later identified to her as Colleen Slemmer. (XX, 1679).

When Dr. Elkins first saw the body, it was covered with mud, dirt, leaves, twigs, and the victim had a tied cloth around her neck and was nude from the waist up. (XX, 1680-81). The clothing was removed, and the body was cleaned after an external examination. (XX, 1683). Dr. Elkins next began documenting the major wounds by assigning each one a letter, measuring it, documenting it, and photographing it. (XX, 1684). Beginning with the letter "A," Dr. Elkins assigned letters for the largest wounds to the body which ran through the letter "S." (XX, 1684-92). Dr. Elkins also pointed out there were ten total slash wounds to the neck or throat area. (XX, 1692). Wounds "T" and "X" were described as wounds on the face. (XX, 1792-93). Dr. Elkins opined to a reasonable degree of medical certainty that the victim would have been conscious for the infliction of the wounds to this point in the testimony. (XX, 1693). Dr. Elkins went on to describe more wounds designated as "U," "V," and "W" which she

Page 6

further opined were inflicted when the victim was still alive. (XX, 1694-96). Dr. Elkins opined that at the time of the skull injuries, there had been no injuries inflicted upon the body that would have caused the victim to lose consciousness. (XX, 1696).

After a jury-out hearing in which Dr. Elkins testified using the actual skull of the victim, along with various pieces of the skull, the Court ruled that the skull and fragment parts were relevant and appropriate for Dr. Elkins to use to testify in terms of damage and the cause of death. (XXI, 1706-26). After the jury was brought back in, Dr. Elkins went on to describe the next step in the autopsy. (XXI, 1729). Dr. Elkins opined within a reasonable degree of medical certainty that the cause of death for this victim was blunt force injuries to the head, i.e. blows. (XXI, 1730). Dr. Elkins went on to opine that up until the blows to the head, the other injuries which were observed to the body were not sufficient to cause death or to have caused a loss of consciousness, although they would have been painful. (XXI, 1730-31). After explaining why she wanted Dr. Marks to assist her in reconstructing the skull, Dr. Elkins stated that she recovered several of the bone fragments from the victim's brain as the result of the blows to the head. (XXI, 1732-34). Dr. Elkins identified the area of the skull relating to the damage she described earlier, and she pointed out the pieces removed from the brain which had been reassembled in the skull. (XXI, 1735-39). Dr. Elkins also pointed out fractures to the eye socket area and the nasal bone. (XXI, 1740-41). Finally, Dr. Elkins described how the skull was split into two parts as a result of a "strong force coming in from the side." (XXI, 1742-44). Dr. Elkins opined that the instrument used to inflict the blows to the head was asphalt based on finding some black particles within the soft tissue during the autopsy as well as the asphalt

Page 7

particles remaining in the skull itself. (XXI, 1744-45).

Based upon observations of the bones of the skull as well as the soft tissues, Dr. Elkins opined that there were a minimum of five blows to the victim's head. (XXI, 1746-48). According to her, the force to cause the destruction of the left side of the skull was coming externally onto the left side of the head with the right side of the head against a surface. (XXI, 1749). Dr. Elkins described how bone fragments should have been in the brain or attached to the skull, but she suspected at the time of autopsy that there were missing pieces. (XXI, 1750). After identifying Exhibit 10, Dr. Elkins stated that she had taken the piece of skull and placed it where it belonged on the reconstructed skull. (XXI, 1751). Dr. Elkins then proceeded to remove Exhibit 10 from its bag and fit it into the area on Exhibit 8. (XXI, 1752).

Dr. Elkins identified two diagrams that she made during the autopsy on the victim. (XXI, 1755-56). Next, Dr. Elkins identified several polaroid photographs that she took at the time of autopsy. (XXI, 1759-60). Once that was completed, Dr. Elkins went back and re-identified the wounds on the body as presented in her diagram and related them to the photographic exhibits. (XXI, 1765-68). Dr. Elkins described also contusions on the arms and labelled them as defensive wounds. (XXI, 1768-70). Dr. Elkins stated that at one point, she just listed numerable superficial slash wounds because she was running out of letters. (XXI, 1772). Dr. Elkins found bruises on the knees which could have come from falling or crawling. (XXI, 1773). Again, Dr. Elkins went back to her chart and described the lettered wounds and related them to a photographic exhibit. (XXI, 1774-75). She opined that "scraps" or abrasions on the torso would be consistent with someone being dragged by his or her feet. (XXI, 1775-

Page 8

76). Dr. Elkins identified the "pentagram" on the chest between the breasts of the victim, drag marks on the right of the torso, as well as a necklace and bloody fabric on the neck. (XXI, 1777-78). The prosecution had Dr. Elkins go back to her diagrams and go over the lacerations to the face and neck area again. (XXI, 1779-81). Dr. Elkins opined that the slash wounds were caused by a sharp object, while the lacerations were caused by a blunt object. (XXI, 1782).

Dr. Elkins identified all of the clothing that she removed from the victim's body along with the rag tied around the neck of the victim. (XXI, 1785-91). Lastly, Dr. Elkins opined that the victim was alive at the time the wounds to which she had testified were inflicted. (XXI, 1795).

The State next called Robert Pollock who in January of 1995 was the Orientation Specialist at the Knoxville Job Corps Center. (XXI, 1797). Mr. Pollock saw the Defendant, Christa Pike, on January 13 in the orientation room at around 3:15 in the afternoon. (XXI, 1798). Mr. Pollock gave Ms. Pike a new ID card as a replacement for her old one. (XXI, 1799). According to Mr. Pollock, there were anywhere from three to twelve students in his office at the time, and he asked Ms. Pike to wait with the others. (XXI, 1799-1800). Although Mr. Pollock remembered the color of the blouse Ms. Pike was wearing when he took her photograph, he could not recall if she was wearing anything else. (XXI, 1801). Specifically, Mr. Pollock could not recall whether he actually saw Christa Pike wearing a black leather jacket on the date she was in his office. (XXII, 1807). Mr. Pollock requested that some students go find Ms. Pike regarding the black jacket left on the chair, but when he locked up for the weekend, the jacket was still on the chair. (XXII, 1802-1803). On January 17, after the long

Page 9

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 20 of 75
PageID #: 3440

weekend, Mr. Pollock took the jacket to Captain Hudson, head of Safety and Security. (XXII, 1802-1803). The jacket had remained in Mr. Pollock's room from Friday the 13th through Tuesday the 17th, a room to which two, three or four different staff members had keys or access. (XXII, 1802, 1807). Mr. Pollock could not say for certain whether or not anyone had actually been in or out of his office during that long weekend. (XXII, 1808).

William Hudson was manager of Safety and Security at the Knoxville Job Corps Center in January of 1995. (XXII, 1810). He did know the Defendant, Christa Pike. (XXII, 1811). On January 17, 1995, he received a black leather jacket from Mr. Pollock in his office at the Job Corps Center. (XXII, 1811). Mr. Hudson identified the leather jacket, and he stated that he kept it at his office while he called the police department. (XXII, 1814). While waiting for the policeman to whom he turned over the jacket, Mr. Hudson kept the jacket in his office to which his secretary also had access. (XXII, 1815, 1817). Mr. Hudson did not search the jacket at the time. (XXII, 1815).

Arthur Bohanan is a crime lab specialist with the Knoxville Police Department by whom he has been employed for 21 years. (XXII, 1818-1819). He was so employed on January 17, 1995, when he went to the Job Corps Center to pick up the coat from Captain Hudson. (XXII, 1819). Specialist Bohanan was told that Mr. Hudson had a coat with some articles inside it. (XXII, 1819). Specialist Bohanan identified the jacket and said that when he searched the jacket, he found a small piece of skull, previously identified as Exhibit 10, in the left inside pocket. (XXII, 1820-23). Specialist Bohanan took the piece of bone to his office, called Dr. Marks at U.T., took the piece over to Dr. Marks, and matched the piece into the skull of the victim.

Page 10

(XXII, 1823).

Murray Marks is a physical anthropologist employed by U.T. (XXII, 1825). Dr. Marks was offered and accepted as an expert in the field of forensic anthropology. (XXII, 1827). In January of 1995, he received the head of a young lady from Dr. Elkins. (XXII, 1847). He was instructed by Dr. Elkins to take a look at the remains and reconstruct them. (XXII, 1828). Dr. Marks identified Exhibit 8 as the skull that he worked on at Dr. Elkins' request. (XXII, 1829). Dr. Marks also identified Exhibit 9 as the remains that went with the skull which he received from Dr. Elkins. (XXII, 1830). After the skull was processed and reduced to a state to where he could examine the skeletal injury, he found two main areas with injuries, the left region behind the ear and the front of the face. (XXII, 1831). Dr. Marks described the procedure that he used to get the skull to the point that he could reconstruct it as well as how he obtained the pieces to do the reconstruction. (XXII, 1832-35). He further identified the fracture lines caused by the trauma. (XXII, 1835-36). Dr. Marks identified photographs of the skull going through the process which he followed. (XXII, 1838). He opined that the minimum number of blows received by the skull was four. (XXII, 1838). Dr. Marks also noted the pieces of "rock-like material" embedded in the skull which he opined could be consistent with asphalt. (XXII, 1840). Later on, Dr. Marks received a piece of bone from Arthur Bohanan which he fitted into the reconstructed skull. (XXII, 1841). Dr. Marks opined that there was no doubt whatsoever that the piece of skull from Arthur Bohanan fit into the skull that he had received from Dr. Elkins. (XXII, 1842). Dr. Marks marked photographic exhibits showing exactly how the pieces fit into the skull. (XXII, 1843). After completing his examination, Dr. Marks returned the

Page 11

skull to Dr. Elkins. (XXII, 1846). While discussing the procedure used to prepare the skull for reconstruction, Dr. Marks opined that the process itself could alter the histological structure of the outer surface of the bone, although in his experience, it had not destroyed any normal features to the bone. (XXII, 1851).

Kimberly Iloilo lived at the Job Corps Center in January of 1995. (XXII, 1872). As a student, she knew the Defendant, Christa Pike, Colleen Slemmer, Shadolla Peterson, and Tadaryl Shipp. (XXII, 1872-73). She was a close friend of Christa Pike, whom she had known approximately three to four months. (XXII, 1873). Ms. Iloilo stated she had a conversation with the Defendant on January 11, 1995, wherein the Defendant said she was going to kill Colleen Slemmer. (XXII, 1874). Around 4:00 in the afternoon on January 12, 1995, Ms. Iloilo spoke again with the Defendant, who said she needed to find Shadolla Peterson to talk to her. (XXII, 1875-76). Approximately four hours later, Ms. Iloilo saw the Defendant walking away from the Job Corps Center with Colleen Slemmer, Tadaryl Shipp, and Shadolla Peterson. (XXII, 1876-77). Around 10:15 that same evening, Ms. Iloilo testified that she saw Peterson, Shipp, and the Defendant coming back to the Job Corps Center from 17th Street. (XXII, 1877-79). According to Ms. Iloilo, the Defendant came upstairs and told her she had just killed Colleen Slemmer, and she had brought back a "souvenir" which she said was a piece of Colleen's skull. (XXII, 1879-80). The Defendant showed this piece of skull to Ms. Iloilo. (XXII, 1880). According to Ms. Iloilo, the Defendant stated she had cut the victim's throat, beat her up, and thrown asphalt at her head. (XXII, 1881). According to Ms. Iloilo, the Defendant stated that the victim was still talking while her throat was being cut, and the victim

Page 12

was asking them to stop. (XXII, 1881-82). According to Ms. Iloilo, the Defendant was kind of singing, dancing, and smiling during this recitation. (XXII, 1883). According to Ms. Iloilo, the Defendant stated that she had cut a pentagram in the victim's forehead and chest, used a meat cleaver to cut her back, and a box cutter to cut her throat. (XXII, 1883-1884). The next morning at breakfast, Ms. Iloilo heard the Defendant state that she still had the skull, and she was having breakfast with it. (XXII, 1884-85). Ms. Iloilo identified Exhibit 10 as the piece of skull Defendant had shown her. (XXII, 1885). Ms. Iloilo also identified photographs of Colleen Slemmer as she appeared when Ms. Iloilo last saw her. (XXII, 1886-87). Finally, Ms. Iloilo was shown the jacket, and she stated she had seen the Defendant wearing that jacket. (XXII, 1887).

At the time Ms. Iloilo heard the statement on January 11th about killing Colleen because the Defendant felt mean, Ms. Iloilo did nothing because it was just four girls in a room chatting, and "it was blown off as soon as it was said." (XXII, 1894-96). Ms. Iloilo opined that Defendant was just blowing off steam and talking at the time she made the statement on January 11th, and Ms. Iloilo did not take this as a serious threat, call security, or call the police. (XXII, 1897-99). Ms. Iloilo related that she had seen the Defendant mad at Tadaryl Shipp before, and she described the Defendant as "usually upset" as far as their relationship. (XXII, 1900). Ms. Iloilo had stated she had never seen Tadaryl and Defendant fight or anything like that. (XXIII, 1902).

At the time of their conversation after the killing, Ms. Iloilo did not see any weapons on the Defendant, and the Defendant never showed her anything of that nature. (XXIII, 1909).

Page 13

And at that same time, Ms. Iloilo never reported this conversation to the police because she did not believe it. (XXIII, 1909). While Ms. Iloilo initially stated that the Defendant mentioned killing Colleen and "feeling mean" at the same time, when confronted with her prior statement to Detective York that those two statements by Defendant came at two different times, Ms. Iloilo tried to correct herself. (XXIII, 1909-11).

Stephanie Wilson lived at the Job Corps Center in January of 1995, and she had been there approximately five months at that time. (XXIII, 1914-15). She did know Ms. Peterson, Mr. Shipp, Ms. Slemmer, and the Defendant, although she was closer to the Defendant than the others. (XXIII, 1915-16). According to Ms. Wilson, on the morning of January 13, 1995, she was in class with the Defendant when the Defendant said she had blood on her shoe, showed her a piece of skull wrapped in a napkin, and told her that the piece of skull belonged to Colleen Slemmer. (XXIII, 1916-17). According to Ms. Wilson, the Defendant told her that she slashed Ms. Slemmer's throat, beat her in the head with a rock, and picked up the piece of skull. (XXIII, 1918-20). Ms. Wilson then identified Exhibit 10 as the piece of skull which she was shown on that occasion. (XXIII, 1920-21).

Upon reflection, Ms. Wilson recalled telling Officer Price that Tadaryl had a bad temper and had hit on the Defendant, treating her badly. (XXIII, 1927-29). Ms. Wilson went on to relate when Tadaryl was absent, Defendant would carry something of his with her because she was obsessed over him. (XXIII, 1930). Ms. Wilson did admit she had seen Tadaryl "have a temper a few times" and pull Christa over and speak to her as if he was mad. (XXIII, 1930-31).

Page 14

Finally, Ms. Wilson related that at the time the Defendant made these statements to her in the classroom and showed her the piece of skull, the Defendant said that the killing was not a planned action, but was a spur of the moment thing because she felt like it. (XXIII, 1933).

Chas Terry was Complex Supervisor of the Knoxville Job Corps Center in January of 1995. (XXIII, 1935). Mr. Terry identified Colleen Slemmer as the person in photographic Exhibit 25, as well as the person depicted in Exhibits 2 and 3. (XXIII, 1936).

Randy York is a criminal investigator who had been with the Knoxville Police Department for almost 25 years. (XXIII, 1938). At the time of trial, he was in the Violent Crimes Unit. (XXIII, 1939). On January 13, 1995, he received an assignment to go to the old Steam Plant on the U.T. Ag Campus near a jogging trail around 8:15 in the morning. (XXIII, 1939-40). When Officer York arrived, the area had been secured by the other officers, and he was led to the body. (XXIII, 1942). After viewing the body and calling for the Medical Examiner, he had certain criminalistics officers assigned to work the scene. (XXIII, 1942-45). He also assisted in canvassing the crime scene, looking for items of evidence which were located and documented by the Criminalistics Unit. (XXIII, 1945-46). After approximately four hours on the scene, Officer York went to U.T. Hospital to view the body again. (XXIII, 1946-47).

Early the next morning, Officer York came in contact with the Defendant and Tadaryl Shipp around 5:30, when they accompanied him to the police department. (XXIII, 1948-49). The Defendant was advised of her Miranda Rights, and the Defendant's statement was recorded. (XXIII, 1949-50). In that statement, the Defendant pretty much detailed what had occurred in the area where the body was found on the night of the killing, stated her participation in those

Page 15

events, and identified the person who had been killed as Colleen Slemmer. (XXIII, 1950). Defendant signed a Consent Form to search her residence for a pair of blue jeans worn at the time. (XXIII, 1951). Afterwards, the officer and the Defendant went to the scene, as well as to a Texaco station to locate certain items that Defendant had discarded at the Texaco station. (XXIII, 1951-53). Officer York related that the Defendant directed him in reconstructing the route the participants took as they left the Job Corps Center with Colleen Slemmer. (XXIII, 1954-57). Officer York estimated he was with the Defendant probably an hour at the scene before taking her back to the police department. (XXIII, 1957-58).

In Court, Officer York identified the Defendant as the person who made the statement, led him to the scene, and gave permission to search. (XXIII, 1958-59). After returning to the police department with the Defendant, Officer York had other officers go to her room and secure the items pursuant to the consent to search. (XXIII, 1959). Once again, the State showed photographic Exhibits 1, 2, and 3 to Detective York and had him identify them as being from the scene. (XXIII, 1960-64). Officer York further identified this as the same person he saw in Exhibits 22 and 23. (XXIII, 1965). On Exhibit 6, Officer York indicated with a red dotted line the route taken with the Defendant back to the scene. (XXIII, 1966-68).

Officer York stated he made a tape-recorded statement given by the Defendant on January 14, 1995, which was marked as Exhibit 27. (XXIII, 1973-75). Officer York identified the transcribed statement from the tape-recorded session which he opined was an accurate transcription of what appears on the taped statement. (XXIII, 1976). Copies of the transcribed statement were passed to the jury, the Court, the Defendant, and defense counsel for their

Page 16

perusal while the statement itself was being played audibly. (XXIII, 1976-78). At that time, the taped confession was played after which Officer York identified the Defendant as the person making that taped statement. (XXIII, 1978, 1980). At the conclusion of the taped statement, Officer York identified the Consent to Search given by Defendant, a photograph of the Defendant taken on January 14, 1995, a photograph of Tadaryl Shipp taken on the same day, a necklace taken from the Defendant's neck at that time, the identification card of the Defendant, a necklace of Tadaryl Shipp, and the identification card for Tadaryl Shipp. (XXIII, 1981-90). Finally, Officer York identified the pentagram on the necklaces as being the same design carved on the chest area between the breasts of the body. (XXIII, 1991).

On cross-examination, Officer York agreed that the Defendant was being protective of other people, i.e. Tadaryl Shipp and Shadolla Peterson, even though she was cooperative and took him back out to the scene of the crime. (XXIII, 1997-98). According to Officer York, the Defendant pretty much covered everything that occurred at the scene of her own free will. (XXIII, 1998-99).

Mark Wagner is an officer with the Knoxville Police Department who has been in the Criminalistics Division almost seven years. (XXIII, 1999-2000). On January 13, 1995, he went to a location on the Ag Campus at U.T. (XXIII, 2000). On January 14, 1995, he went to a Texaco station on Cumberland Avenue at the direction of Officer York who was with the Defendant. (XXIV, 2001-2002). Officer Wagner was directed to look inside the garbage can and the waste basket at that Texaco station for ID cards, a knife, and a pair of gloves. (XXIII, 2002). Officer Wagner took possession of the garbage bag in the women's restroom from which

Page 17

he recovered a pair of black gloves with two ID cards. (XXIV, 2003). Officer Wagner identified the exhibits of the gloves and a Job Corps Center ID card for Colleen Slemmer, as well as the driver's license for Colleen Slemmer that he found. (XXIV, 2005-2006).

Lanny Janeway is an Evidence Technician for the Knoxville Police Department, and at the time of trial, he had been such for a little over a year. (XXIV, 2008). He also went to the location on the Ag Campus of U.T. at approximately 8:10 a.m. as a specialist with the Criminalistics Division. (XXIV, 2008). When Officer Janeway arrived at the crime scene, he observed patrol cars as well as officers from various agencies in the area. (XXIV, 2010). At trial, Officer Janeway described various pieces of evidence which he found as he was investigating at the scene of the crime, including pools of blood and chunks of asphalt with hair on them. (XXIV, 2010-15). Officer Janeway caused numerous photographs of the scene to be taken, and then he did a diagram for a crime scene sketch of all the evidence that was discovered before it was moved. (XXIV, 2017-18).

At the time of trial, Officer Janeway took the blowup of the diagram that he completed, marked as Exhibit 38, and went over it item-by-item to show all the evidence that had been found at the crime scene area and noted for the record. (XXIV, 2019-43). This diagram showed various places where blood, hair, and other physical evidence were located at the crime scene. Officer Janeway then proceeded to identify all of the physical pieces of evidence which he gathered from the crime scene, such as hair, chunks of asphalt, blood samples, and et cetera, and identified them for the jury. (XXIV, 2044-63).

Officer Janeway also seized the tennis shoes worn by the Defendant the morning of

Page 18

January 14th at the police station which appeared to have mud and/or blood stains on them. (XXIV, 2070-71). Officer Janeway further identified a pair of blue jeans taken from the locker of the Defendant. (XXIV, 2072-73). Officer Janeway also identified a statue with pentagram taken from the Defendant's room. (XXIV, 2074-75).

Officer Janeway also identified the tennis shoes received from Tadaryl Shipp at the police station on January 14, which were later forwarded to the TBI lab for testing. (XXIV, 2077-78). According to Officer Janeway, there were three items of clothing he seized from Mr. Shipp's room, a black T-shirt, nylon jogging pants, and a black hooded sweat shirt. (XXIV, 2079-80). Officer Janeway further identified the Satanic Bible recovered Tadaryl Shipp's room. (XXIV, 2081). The remainder of Officer Janeway's direct testimony concerned pointing out the markings on his diagram exactly where various pieces of physical evidence were found and identifying them with the actual exhibits at trial. (XXIV, 2083-95).

Although Officer Janeway did not speak directly with the Defendant, from his observations and from talking with Officer York, he opined that she was cooperating with Officer York. (XXIV, 2098). After looking further at the statue from the Defendant's room and the Satanic Bible from Tadaryl Shipp's room, Office Janeway admitted that the two stars on those items were not the same. (XXIV, 2100-XXV, 2101).

Raymond DePriest is a special agent forensic scientist specializing in the field of forensic serology employed by the TBI. (XXV, 2106). He was stipulated as an expert in that field. (XXV, 2108-2109). Mr. DePriest received evidence in this case from a technician vault. (XXV, 2109). Mr. DePriest testified about a couple of pair of tennis shoes that he examined

Page 19

and took samples from for forwarding to the DNA testing unit. (XXV, 2110-19). His testing on the staining on the shoes indicated the blood was of human origin. (XXV, 2119). Mr. DePriest also did similar testing on the black leather jacket from which he removed blood stains on swabs which stains were of human origin. (XXV, 2120-22). Mr. DePriest also tested the sweatpants, sweatshirt, and black shirt previously identified as coming from Tadaryl Shipp. (XXV, 2123-27). Mr. DePriest also performed the examination on the jeans and purse of the Defendant and determined that the jeans did contain human blood. (XXV, 2129-30). After taking all the samples, Mr. DePriest forwarded all of this to DNA Analyst Margaret Bash. (XXV, 2130).

Margaret Bash is employed by the TBI in the DNA Unit. (XXV, 2132). Ms. Bash was deemed an expert in DNA analysis by the Court. (XXV, 2135). Ms. Bash's results on the Defendant's tennis shoes, Mr. Shipp's tennis shoes, and the black leather jacket revealed an insufficient amount of DNA for identifying. (XXV, 2138-40). However, Ms. Bash did identify the blood from the clothing of Tadaryl Shipp as matching the known sample from Colleen Slemmer. (XXV, 2140-41). Also, samples from the shirt of Tadaryl Shipp and the jeans and purse of Defendant matched the known blood samples from Colleen Slemmer. (XXV, 2141-42). According to Ms. Bash, the probability is more than 247,000 of the caucasian population, and 1 in 618,000 in the black population that Colleen Slemmer's blood was in fact on the warm-up pants of Tadaryl Shipp and the jeans of the Defendant. (XXV, 2143).

Eric Engum has a Ph.D. in clinical psychology, and he practices primarily in neuropsychology and forensic psychology. (XXV, 2166). Dr. Engum is Board Certified in the

Page 20

areas of medical psychotherapist and professional disability examiner. (XXV, 2169). The Court recognized Dr. Engum as an expert in clinical psychology with practices in the area of neuropsychology and forensic psychology. (XXV, 2176). Dr. Engum first saw Defendant on May 24, 1995, where he spent approximately six hours on clinical interviewing and formal testing. (XXV, 2177). He saw and interviewed Defendant on at least four separate occasions for "fairly lengthy testing and interviews." (XXV, 2178). During the clinical interview and mental status examination, Dr. Engum discovered an extremely bright young woman with some degree of depression and an indication of personality disorders. (XXV, 2179-80). In terms of intellectual functioning, the Defendant ranks in approximately the 77th percentile as far as I.Q. (XXV, 2180-81). In the area of academic skills and ability, Defendant was at or above her stated level of academic achievement. (XXV, 2181). The fourth area examined indicated that there were no signs of brain damage in Defendant. (XXV, 2182).

In the last area of analysis, Dr. Engum administered four different objective personality tests which indicated to him that the Defendant suffered a very severe borderline personality disorder. (XXV, 2183). After discussing the different psychological axes, Dr. Engum opined that on a scale of zero to one hundred, the Defendant was a fifty-five, which would indicate moderate symptoms or moderate psychological problem, not to such a degree as to require institutionalization. (XXV, 2184-88). Dr. Engum's diagnostic opinion based on a reasonable degree of psychological certainty is the Defendant suffers from borderline personality disorder. (XXV, 2188). Dr. Engum then discussed how the Defendant fit eight of the nine elements or characteristics which are specifically outlined for a diagnosis of borderline personality disorder.

Page 21

(XXV, 2189-95). Based on all of the information available to him, it was Dr. Engum's opinion, formed to a reasonable degree of psychological certainty, that the Defendant did not act with deliberation or premeditation on the night in question, but instead acted in a manner consistent with a borderline personality disorder, i.e. loss of control. (XXV, 2197). Dr. Engum also opined that the "dancing around" of the Defendant which was testified to earlier by Ms. Iloilo was simply a reflection of the relief felt as a result of being able to maintain the relationship with Tadaryl Shipp through the killing of Ms. Slemmer. (XXV, 2198-99). Finally, it was Dr. Engum's opinion that the Defendant showing a piece of skull around related to her lack of identity as part of the borderline personality disorder, by which act she was seeking recognition and validation of who she was. (XXV, 2199).

On cross-examination, Dr. Engum opined that the jealous impulse which led the Defendant to kill Colleen Slemmer could last for an extended period of time and would be consistent with a "frenzy." (XXVI, 2201-2202). It was Dr. Engum's further opinion that this uncontrolled impulse began at the start of the beating and was egged on by the two other people watching. (XXVI, 2203). Dr. Engum admitted that taking the victim to Tyson Park to beat her up was a deliberate act as well as being premeditated. (XXVI, 2203). Dr. Engum opined that the Defendant's statement before the event that she was going to kill the victim could be discounted as proof of premeditation because support for the impulsiveness of the actual killing was found in both her statements to him and her statement to the police. (XXVI, 2205). Dr. Engum admitted that the borderline personality disorder has no physical manifestations, but there

Page 22

are psychological or psychiatric manifestations to this disorder. (XXVI, 2217). Dr. Engum admitted that if the Defendant lied to him, it might change his opinion as to her state of mind at the time of the commission of the murder, but it would not change his opinion as to the diagnosis. (XXVI, 2218). Dr. Engum opined that Defendant's statements regarding having to do something so the victim would not tell on her were made in a dissociative state wherein the Defendant was having something like auditory hallucinations and someone was telling her what to do. (XXVI, 2219-21). Although Dr. Engum admitted that there was at least one slight break in the action on that night and that certain parts of the events leading to that night could have been planned, his opinion remained that Defendant's passion, anger, and hostility were "so great that it overwhelmed her ability" to really consider the consequences of her actions. (XXVI, 2222-27). Finally, Dr. Engum admitted that if in fact Defendant took a box cutter and a meat cleaver with her, it could indicate Defendant meant to kill the victim. (XXVI, 2228).

William Bernet is the Medical Director of the psychiatric hospital at Vanderbilt, and he teaches forensic psychology. (XXVI, 2268). Dr. Bernet is Board Certified in three areas, general psychiatry, child psychiatry, and forensic psychiatry. (XXVI, 2269). He is also certified in the State of Tennessee to do forensic evaluations of people through the Department of Mental Health and Mental Retardation. (XXVI, 2270). Within the field of forensic psychiatry, Dr. Bernet has studied satanism and witchcraft. (XXVI, 2272-73). Dr. Bernet explained that ritualistic activity is a part of forensic psychiatry. (XXVI, 2274-75). The Court found Dr. Bernet to be an expert in the field of forensic psychiatry who could testify about the

area of satanism as it relates to ritualistic behavior in forensic psychiatry. (XXVI, 2275-76).

Page 23

In preparation for his testimony, Dr. Bernet reviewed the Defendant's statement, Kimberly Iloilo's statement, Dr. Engum's report, Dr. Elkins' autopsy report, and Dr. Marks' anthropology report. (XXVI, 2278-79). He also reviewed the audiotaped statement of the Defendant. (XXVI, 2279). Having reviewed these items, it was Dr. Bernet's opinion within a reasonable degree of psychiatric certainty that while there were satanic elements in the crime, it did not fit the pattern of a planned satanic sacrifice. (XXVI, 2282-83). Dr. Bernet went on to explain that of the several kinds of ritualistic abuse, this crime did not fit the pattern of 1) activities of an organized satanic church, 2) ritual abuse conducted on their own outside of an organized church, or 3) pseudoritualistic abuse, whose purpose is sex abuse or physical abuse rather than ceremonial. (XXVI, 2292-94). According to Dr. Bernet, the crime at issue fits the pattern of adolescent dabbling is satanism, which is a common thing that teenagers are doing. (XXVI, 2294). Dr. Bernet opined that Tadaryl Shipp and Defendant were adolescent dabblers in satanism in this case, as a way to express their rage and antiauthoritarian attitudes. (XXVI, 2296-97).

While the crime did have a "satanic color" to it, it was still not a planned satanic activity. (XXVI, 2297). Dr. Bernet opined that the pattern of this crime fitted a phenomenon called collective aggression. (XXVII, 2315). Collective aggression, according to Dr. Bernet, is what happens when a group of people are together, become emotionally aroused, and the end result is that they engage in extremely violent activity together. (XXVII, 2315-16). Some

characteristics of this collective aggression are that there is a sense of contagiousness and that

Page 24

there is a tendency to act out in a way in which one ordinarily would not. (XXVII, 2316). Based on the limited information that he reviewed, Dr. Bernet did not have a medical or psychiatric opinion on the Defendant's mens rea on the evening in question. (XXVII, 2318).

Dr. Bernet did have available for his review a police evidence processing report, statements by Deputy Tarbull and Officer Wolfe, and the statement of Co-Defendant Tadaryl Shipp. (XXVII, 2343). Dr. Bernet opined that the length of time that the activities continued and the fact that the Defendant at one point apparently left the action and returned was not inconsistent with collective aggression and heightened frenzy involved. (XXVII, 2345-47). Although he admitted that at some point the "frenzy" would cease, the taking of the piece of skull would not be relevant as to whether or not the collective aggression had occurred. (XXVII, 2347-48). Also, Dr. Bernet indicated that the continuation while the victim is talking is still part of the frenzy and could include such acts as putting a gag on the victim. (XXVII, 2349-50). While Dr. Bernet admitted he was not an expert in satanic theology, he did state he was an expert in the way satanism involves teenagers, affects their behavior, and the different kinds of ritualistic behavior involved. (XXVII, 2352).

Dr. Bernet went on to clarify that "frenzy" as he referred to it is a very aroused situation which would not necessarily stay at a high level of arousal for the entire time, but would instead have peaks and valleys prior to the eventual cessation of the frenzied activity. (XXVII, 2355).

After the Defense rested, both the State and the Defense put on argument; the jury was

Page 25

charged and retired to deliberate. (XXVII, 2373 - XXVIII, 2463). The jury found Defendant guilty of murder in the first degree and conspiracy to commit murder in the first degree, and these verdicts were unanimous. (XXVIII, 2462-63).

## II. PENALTY PHASE FOR COUNT ONE:

At the penalty phase for Count 1 on the Indictment, the Court instructed the jury that it could consider all the evidence previously admitted and could review any of the exhibits previously seen. (XXVIII, 2482-83). After those remarks by the Court, the State rested its case in chief in the sentencing phase. (XXVIII, 2483).

Carrie Ross is Defendant's aunt. (XXVIII, 2484). She has known Defendant all of the Defendant's life. (XXVIII, 2484). Ms. Ross was present when Defendant was born prematurely and whisked away from her mother for the first days of her life. (XXVIII, 2485-86). Defendant's Grandmother Pike came to live with Defendant's mother at the time Defendant came home from the hospital, and Grandmother Pike assumed care for the Defendant at that time. (XXVIII, 2486). Defendant's maternal grandfather was a Talwin addict, and her maternal grandmother was a severe alcoholic. (XXVIII, 2490). According to Ms. Ross, the maternal grandmother was very verbally abusive and very physically abusive to Defendant, and she would administer punishment for every little thing. (XXVIII, 2490). The maternal grandmother would constantly berate the Defendant, calling her stupid, and confine Defendant to her room for long

periods of time. (XXVIII, 2491).

Page 26

According to Ms. Ross, Defendant was not raised by her mother, Carissa Ferguson, but was in fact brought up by her grandmother. (XXVIII, 2495). Defendant's mother worked two jobs and when she was not at one of them, she was out "partying." (XXVIII, 2495). Ms. Ross observed the actual house in which Defendant was living with her mother, and she stated that it was never clean in that house. (XXVIII, 2496). In fact, the house was "filthy," and at one point, Ms. Ross found Defendant crawling around through piles of dog stool which were all over the house. (XXVIII, 2496). Ms. Ross observed that her sister needed "a lot of nice clothes to go and party," and Defendant rarely had decent clothes. (XXVIII, 2496). Ms. Ross stated there were many days that she had brought Defendant to her house so she would get a decent meal. (XXVIII, 2497). One particular event stood out in Ms. Ross' mind which illustrated Defendant's mother's lack of concern over Defendant. When Defendant was basically a toddler, her mother and Ms. Ross were at a bar and received a phone call indicating that Defendant was having seizures. (XXVIII, 2497-99). Ms. Ross had to force her sister to go home to check on Defendant, and as a result of the seizures, Defendant had to be hospitalized. (XXVIII, 2499). According to Ms. Ross who had observed the Defendant's relationship with her mother, Ms. Ross stated unequivocally there were no disciplinary measures imposed upon Defendant; there were "no rules." (XXVIII, 2499).

During all of the years that she has observed her own sister's relationship with Defendant, Ms. Ross stated that her sister, Defendant's mother, always put herself first before her own child, the Defendant. (XXVIII, 2500). Ms. Ross related one incident wherein

Page 27

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 38 of 75
PageID #: 3458

Defendant's mother chose her husband over Defendant, and "shuffled" Defendant off to her father. (XXVIII, 2500 - XXIX, 2501). According to Ms. Ross, Defendant reverts to being a little girl when she visits her aunt's house. (XXIX, 2501). Defendant plays Barbie with Ms. Ross' daughter and plays dress-up, generally acting like a kid herself. (XXIX, 2501).

Defendant's paternal grandmother was the primary caregiver for Defendant, and the two of them were "inseparable." (XXIX, 2503). According to Ms. Ross, Defendant and her paternal grandmother did everything together, and Defendant was hysterical when her paternal grandmother died around 1988. (XXIX, 2503-2504). Ms. Ross admitted that in her opinion Defendant was a pathological liar who has been out of control since she was twelve or so. (XXIX, 2506-2507). According to Ms. Ross, Defendant's mother did not try to control her, the authorities did not try to control her, and Ms. Ross herself did not try to control her. (XXIX, 2507). Finally, Ms. Ross reaffirmed that Defendant's mother gave her no discipline, while Defendant's maternal grandmother was too strict on Defendant. (XXIX, 2508-2509).

Emil Glenn Pike is Defendant's father, and he has been married to Defendant's mother twice. (XXIX, 2510-11). During both times he was married to Defendant's mother, he did not see Defendant a lot due to his job. (XXIX, 2512). During one of his marriages, Mr. Pike had what he referred to as a long-distance relationship with Defendant. (XXIX, 2512-13). Around 1989, there was some accusation made against Defendant, and Mr. Pike informed her that she could not come back to his house, although she had been living with him at that time. (XXIX, 2513-14). When Defendant asked to come see her father, Mr. Pike informed her she was no

Page 28

longer welcome at his house which upset the Defendant. (XXIX, 2514). According to Mr. Pike, during the time the Defendant lived with him, he would spank or otherwise punish her in a fairly strict manner. (XXIX, 2515).

On a second occasion, Mr. Pike "couldn't seem to make [Defendant] do good in school," so he once again rejected Defendant and sent her back to her mother. (XXIX, 2515). Finally, just prior to Defendant's eighteenth birthday, Mr. Pike once again rejected Defendant, and he signed papers for her to be adopted. (XXIX, 2516).

On cross-examination, Mr. Pike reiterated that he could "control" Defendant when she was physically around him, but he could not control her activities when she was away from him. (XXIX, 2517). Mr. Pike stated that Defendant lied, was manipulative, and had "normal disciplinary problems." (XXIX, 2517-18). Mr. Pike did not know about the terrible conditions with Defendant's mother, and that Defendant's mother drank and used marijuana. (XXIX, 2519). Again, Mr. Pike confirmed that when asked to choose between his new family and his daughter, the Defendant, Mr. Pike chose his new family over Defendant. (XXIX, 2520-21).

Carissa Hansen is Defendant's mother, and she is a Licensed Practical Nurse. (XXIX, 2522-23). Mrs. Hansen confirmed that during both of her marriages to Glenn Pike, there really was not much of a relationship between the Defendant and her father. (XXIX, 2523-24). Moreover, because Mrs. Hansen was working two full-time jobs, Defendant was left with both her maternal and paternal grandmothers. (XXIX, 2524).

Mrs. Hansen married Danny Thompson in 1983, and at one point in her relationship with

Page 29

him, Mrs. Hansen was told to choose either her husband or Defendant. (XXIX, 2525). Mrs. Hansen chose her husband over Defendant. (XXIX, 2525). According to Mrs. Hansen, her husband at that time was abusive to Defendant. (XXIX, 2525).

After Defendant's paternal grandmother died in 1988, Defendant spent about ninety-five percent of her time with her mother, and five percent of the time with her father, Mr. Pike. (XXIX, 2526). This time was not spent continuously with either parent, but Defendant was shuttled back and forth between the two of them. (XXIX, 2526).

Prior to Defendant leaving for Job Corps, Mrs. Hansen tried to establish a "friendship" with Defendant. (XXIX, 2527). Mrs. Hansen wanted to be her daughter's friend, and she smoked marijuana with Defendant in an effort to be closer. (XXIX, 2527).

When Defendant's Grandmother Pike died, Defendant was devastated. (XXIX, 2528). At some point, Defendant was living in West Virginia and actually caring for her Grandmother Pike. (XXIX, 2528). Prior to her grandmother's death, Defendant's father sent Defendant away once more to live with her mother, and according to Mrs. Hansen, Defendant felt that "by not being able to take care of her grandmother, her grandmother had died." (XXIX, 2528). After her grandmother's funeral, Defendant cried for days, did not go to school, ran away, and ultimately tried to kill herself by means of an overdose. (XXIX, 2528). Even though Defendant was apparently having all these problems, her mother did not seek regular psychiatric help for Defendant. (XXIX, 2530). Mrs. Hansen took Defendant to a psychiatrist the day the Defendant overdosed as well as for a few outpatient visits, but that was pretty much all she did. (XXIX,

Page 30

003435

2530).

At one point, Mrs. Hansen took a tour of the Job Corps Center. (XXIX, 2531). She saw all sorts of gang writing on the walls and writings about the different gang colors and numbers. (XXIX, 2531). She even saw blood all over the doorway of a men's bathroom and trailing down the hall. (XXIX, 2531).

According to Mrs. Hansen, Defendant did not stay at home when she was supposed to be living there. (XXIX, 2531). Defendant was on the street, ran away each way the police brought her back to Mrs. Hansen, and generally did not want to be in her house. (XXIX, 2532). Each time Mrs. Hansen had these difficulties, Mrs. Hansen did nothing except drink and feel sorry for herself. (XXIX, 2532).

In 1989, Mrs. Hansen was again in a relationship with a man who abused Defendant. (XXIX, 2532). This man had whipped the Defendant with a belt, and she in turn had had him arrested by the police at some point. (XXIX, 2532). When Defendant was twelve years old, she had threatened this man with a butcher knife. (XXIX, 2534).

Mrs. Hansen admitted she had found a butcher knife in Defendant's pocketbook in 1991 and had told the staff at Kiser Permanente that Defendant had been troubled for ten years. (XXIX, 2535). Mrs. Hansen stated she had no real control over Defendant since Defendant was eight years old because she had not been there for her and had been a terrible mother. (XXIX, 2536).

Mrs. Hansen allowed Defendant to have a live-in boyfriend in Mrs. Hansen's home and also allowed her to grow marijuana in her home. (XXIX, 2537-38). Although Defendant was

Page 31

institutionalized with the authorities on a couple of occasions and did well while she was there, Defendant just went back to her same friends and did what they wanted when she was released. (XXIX, 2538).

Mrs. Hansen has talked to the Defendant since the murder and was never told that Defendant liked the notoriety, and in fact she had been very remorseful, stating that she was so sorry and crying. (XXIX, 2539-40). When asked if her daughter taking two friends to see the body sounded remorseful to her, Mrs. Hansen stated that it did not sound like her daughter's normal behavior. (XXIX, 2540). Mrs. Hansen explained further about the butcher knife that Defendant was provoked. (XXIX, 2540). Finally, Mrs. Hansen admitted that Defendant had run away numerous times, stayed away, quit school before high school, lied, and stolen. (XXIX, 2541).

In rebuttal, the State called Harold James Underwood, Jr. Mr. Underwood is a police officer with the University of Tennessee, and he has been on the police force for four years. (XXIX, 2546-47). In January of 1995, he was assigned to help secure the crime scene at the Ag Campus of U.T., and he was stationed approximately twenty to thirty feet north of the actual scene. (XXIX, 2548-49). Officer Underwood was present at the scene from three and eleven, and between four and five, he saw the Defendant at the scene. (XXIX, 2549-50). According to Officer Underwood, Defendant came up and asked him several questions about why the area was taped off, if the officer knew who the victim was, if they had any suspects, and if they had any clues. (XXIX, 2550-51). Officer Underwood stated that Defendant seemed amused and was "looking over us" trying to see the crime scene. Defendant was there approximately fifteen

Page 32

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 43 of 75
PageID #: 3463

minutes, and Officer Underwood noted her necklace with a pentagram design, which he identified as Exhibit 33a. (XXIX, 2552-54). The next day, Officer Underwood heard at roll call that there was a pentagram carved into the body, and at that point, he remembered the necklace and the Defendant's behavior at the scene. (XXIX, 2554). Upon conclusion of Officer Underwood's testimony, the State rested in rebuttal. (XXIX, 2555).

After hearing argument and being charged by the Court, the jury left to deliberate. (XXIX, 2556-85). An hour and twenty-five minutes later, the jury delivered its sentence of death, which the Court then imposed upon the Defendant. (XXIX, 2586-88).

## SENTENCING HEARING ON CONSPIRACY COUNT:

On June 6, 1996, a hearing was held to sentence Defendant on the second count of the Indictment, conspiracy to commit first degree murder. (XXXI). The State called Debbie Wade as a witness at that hearing. (XXXI, 7). Ms. Wade is a Corrections Officer with the Knox County Sheriff's Department, and she came into contact with the Defendant on the day the jury returned the death sentence against her. (XXXI, 8). On that occasion, Defendant handed her a letter and asked her to pass it on to Tadaryl Shipp. (XXXI, 8-9). Officer Wade gave it to her lieutenant, and he told Officer Wade it would not be given to Mr. Shipp. (XXXI, 9). Officer Wade identified the letter in open court, described how it was folded over two times, then passed to her, and was never sealed. (XXXI, 10-11). In the letter, Defendant told Tadaryl Shipp she loved him, that he should tell people he lied in his statement, that she only had ten months to

Page 33

003438

live, and missed him very much. (XXXI, 12). In this letter, Defendant went on to write that she had killed the victim quickly instead of letting her bleed to death and suffer more, and as a result, she was going to "fry." (XXXI, 12-13). In the letter, Defendant also stated she would testify on behalf of Mr. Shipp and would love him for the rest of her life. (XXXI, 13).

The defense offered no further proof, and the Defendant did not choose to say anything at the time. (XXXI, 13-14, 18). When sentencing the Defendant to twenty-five years as a Standard Range I Offender on the second count of the Indictment, the Court considered the following as enhancement factors: (1) that Defendant was a leader in the commission of the offense, (2) that this was a case of "more than exceptional cruelty," (3) that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure and excitement, (4) that the Defendant possessed a deadly weapon during the commission of the offense, and (5) that the crime was committed under circumstances in which the potential for bodily injury was great. (XXXI, 19-22). The Court found no mitigating factors. (XXXI, 23). Finally, based upon Factor 4, that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life, the Trial Court ran the sentence on the second count consecutive to the death sentence on the first count. (XXXI, 23).

Page 34

003439

# **ARGUMENT**

·*I.*    *THE EVIDENCE PRESENTED IN ITS ENTIRETY AND AS CONTAINED IN THE*
*RECORD WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE*
*VERDICT OF THE JURY FINDING THE DEFENDANT GUILTY OF MURDER*
*IN THE FIRST DEGREE AND CONSPIRACY TO COMMIT MURDER IN THE*
*FIRST DEGREE.  ADDITIONALLY, THE EVIDENCE PRESENTED WAS*
*INSUFFICIENT TO JUSTIFY THE JURY'S VERDICT SENTENCING THE*
*DEFENDANT TO DEATH BY ELECTROCUTION.*

The Defendant would respectfully argue that the evidence presented on the whole was insufficient to support the jury's verdict finding her guilty of murder in the first degree and of conspiracy to commit murder in the first degree.  The Defendant would submit that the record on its face fails to support the jury's verdict and that no rational trier of fact could have found her guilty of said offense.  The Defendant would further submit that, by looking at the record as a whole, the jury verdict was contrary to the greater weight of the evidence.

Rule 13(e) of the <u>Tennessee Rules of Appellate Procedure</u> (T.R.A.P.) states that . . .

> *"Findings of guilt in criminal actions whether by the trial court or jury*
> *shall be set aside if the evidence is insufficient to support the findings*
> *by the trier of fact of guilt beyond a reasonable doubt."*

In <u>State v. Stacy</u>, 601 S.W.2d 696 (Tenn., 1980), Justice Henry, in a dissenting opinion,

Page 35

003440

states that "This [Rule 13(e)] is the mandate of <u>Jackson v. Virginia</u>, 433 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)." [1]   In <u>Jackson</u>, the significant question for the Court was "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [2]

The Defendant would respectfully argue that the evidence introduced at trial does not support the trier of facts conclusion and verdict in this case.  The Defendant would further assert that the essential elements of murder in the first degree and conspiracy to commit murder in the first degree, which would have to be proven beyond a reasonable doubt in order for any conviction for such offense(s) to stand, are as follows:

Murder in the First Degree is defined as:

*"(1) That the Defendant unlawfully killed the alleged victim; and,*

*(2) that the Defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result; and,*

*(3) that the killing was deliberate. A deliberate act is one performed with cool purpose; and,*

*(4) that the killing was premeditated.*

*A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the*

---

[1]   Id. at 704.

[2]   443 U.S. 307 at 319.

Page 36

accused for any definite period of time. It is sufficient that it preceded the act as long as it was the result of reflection and judgment. The mental state of the accused at the time she allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided." [3]

Conspiracy to commit murder in the first degree is defined as:

(1) that the Defendant entered into an agreement with one (1) or more people to commit the offense of murder in the first degree. It is not necessary that the object of the agreement be attained; and,

(2) that each of the parties to the conspiracy had the intent to commit the offense of murder in the first degree; and,

(3) that each party acting for the purpose of promoting or facilitating the commission of the offense of murder in the first degree agreed that one (1) or more of them would engage in conduct which constitutes the offense of murder in the first degree; and,

(4) that one (1) of the parties to the conspiracy committed an overt act in furtherance of the conspiracy. [An overt act is an act done by one of the parties to carry out the intent of the conspiracy and it must be a step toward the execution of the conspiracy [4]

While Counsel for the Defendant would concede that this Court has previously held . . .

"In determining the sufficiency of the evidence we do not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn., 1978), State v.

---

[3] Quoting from T.P.I.-CRIM. 7.01(a) (4th Ed., 1995). See also, T.C.A. § 39-13-202.

[4] Quoted from T.P.I.-CRIM. 4.03 (4th Ed., 1995).

Page 37

*Hatchett, 560 S.W.2d 627, 630 (Tenn., 1978), State v. Grace, 493 S.W.2d 474, 476 (Tenn., 1973, Braziel v. State, 529 S.W.2d 501, 505 (Tenn.Crim.App., 1975). Nor may we substitute our inferences for those drawn by the trier of fact in circumstantial evidence cases. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn., 1956), Farmer v. State, 574 S.W.2d 49, 51 (Tenn.Crim.App., 1978)."* [5] *See also, State v. Cazes, 875 S.W.2d 253, 259 (Tenn., 1994) and State v. Harris, 839 S.W.2d 54, 75 (Tenn., 1992).*

the Defendant would respectfully submit to the Court that the State did not prove every essential element beyond a reasonable doubt in this case and more specifically that the State did not introduce any evidence relating to deliberation or of the Defendant having the opportunity to reflect upon her actions after the mind was free from the influence of excitement or passion [emphasis added]. See State v. Brown, 836 S.W.2d 530 at 538 (Tenn., 1992). The Defendant would respectfully argue that without proof that the Defendant's actions were the result of reflection at a time when her mind was free from the influence of excitement or passion is a failure by the State to prove the essential element of deliberation. The law in Tennessee is clear that a homicide, once it is established, is presumed to be murder in the second degree. State v. West, 844 S.W.2d 144, 147 (Tenn., 1992); State v. Brown, supra, State v. Bullington, 532 S.W.2d 556, 560 (Tenn., 1976).

The Defendant would respectfully assert that this Court should conclude that the evidence is insufficient to support the verdict finding her guilty of murder in the first degree and of conspiracy to commit murder in the first degree. In the event that this Court should disagree with the Defendant's argument and assertions regarding the sufficiency of the evidence of her

---

[5]   Citing from State v. Bohanan, 745 S.W.2d 892 (Tenn., 1987), at 895.

Page 38

guilt, the Defendant would then submit that the proof was insufficient to justify the jury's sentence of death by electrocution. Furthermore, the jury failed to properly consider and weigh the mitigating factors against the aggravating factors in this case. The Defendant would argue and maintain that this Court should reverse and remand this case for a new trial, or in the alternative, a new sentencing hearing on the merits.

Page 39

*II.* *THE TRIAL COURT ERRED BY REFUSING TO GRANT DEFENDANT'S MOTION TO DENY TELEVISION AND PHOTOGRAPHIC COVERAGE OF PRETRIAL PROCEEDINGS IN ORDER TO MINIMIZE THE PUBLIC'S EXPOSURE TO THE DETAILS OF THIS CASE.*

The Defendant would assert that the trial court erred by refusing to grant her motion to deny television and photographic coverage of the pretrial proceedings in this case. Said motion was made in order to minimize the public's exposure to the specific details of the case. The Defendant, by and through Counsel, objected to the presence of television and newspaper photographers during pretrial proceedings, which objections were repeatedly overruled by the trial court. The basis for allowing cameras in the courtroom was the then experimental rule promulgated by the State Supreme Court testing the feasibility of allowing cameras in the courtroom during proceedings. [6] In light of the fact that the Tennessee Supreme Court has seen fit to promulgate Rule 30 of the Rules of the Supreme Court of Tennessee, the Defendant would acknowledge that the argument objecting to cameras in the courtroom is probably without merit in and of itself; however, the Defendant would suggest that media coverage in this case made jury selection difficult and the result thereof was a jury panel that was already familiar with the

---

[6] Tennessee Supreme Court Rule 30, allowing cameras in the courtroom was made permanent by the Tennessee Supreme Court.

Page 40

Case 1:12-cv-00035-HSM-SKL     Document 8-16     Filed 08/01/12     Page 51 of 75
PageID #: 3471

facts, or more correctly, alleged facts as reported by the news media, of this case.

The basis for the Defendant's objection to cameras in the courtroom was to preclude problems with jury selection and to minimize the public's exposure to the alleged facts in this case. Additionally, the Defendant made said objection to preserve the argument that she was denied a fair trial by an impartial jury. The Defendant would further argue that the presence of cameras in the courtroom had a detrimental effect on her receiving a fair trial since the mandatory rule allowing cameras in the courtroom arguably affected witness testimony and was generally disruptive of the proceedings. Since the mandatory rule allowing cameras in the courtroom is so new, Counsel was unable to find any case law on the subject and would submit that this issue is a case of first impression for this Court to consider. The Defendant would argue and maintain that her right to a fair trial by a neutral and impartial jury outweighs the rights of the news media to cover pretrial proceedings. Furthermore, a denial of her right to a fair trial is a violation of her rights as guaranteed by the United States and Tennessee constitutions.

Page 41

## III. THE TRIAL COURT ERRED BY FAILING TO GRANT THE DEFENDANT'S MOTION FOR A CHANGE OF VENUE IN THIS CASE.

The Defendant avers that the trial court erred by failing to grant her motion for change of venue in this case. The pretrial publicity generated in this case was substantial and the news media clearly identified her as being guilty in this case. [7] Due to the nature and extent of the media coverage in this case, the Defendant sought a motion for change of venue, (I, 61-63), which was denied by the trial court. During jury selection, it was ascertained that an overwhelming majority of the prospective jurors had heard detailed information about this case. Some jurors expressed remembering "facts" about the case, (V, 123-124), while others gave specific details, (IX, 508-533) and some of the prospective jurors had been discussing the media details of the case in the hallway during jury selection, (IX, 515-516; XVI, 1244). In the case of State v. Howell, 868 S.W.2d 238 (Tenn., 1993), the Tennessee Supreme Court stated that . . .

> *". . . The matter of a change of venue addresses itself to the sound discretion of the trial court and a denial of change of venue will only be reversed on appeal for an affirmative and clear abuse of discretion. State v. Bates, 804 S.W.2d 868, 877 (Tenn., 1991); and State v. Melson, 638 S.W.2d 342, 360 (Tenn., 1982)." and . . . "In State v. Hooper, 594 S.W.2d 743, 746 (Tenn.Crim.App., 1979), the court listed a group of 17 factors to be considered in determining whether to grant a change of venue. Among these are the*

---

[7] See the transcripts of news media coverage in the technical record, (I, 103 through III, 245).

Page 42

003447

*nature, extent, and timing of the pretrial publicity.* " [8]

As stated in Howell, supra, quoting from the Hooper case, supra, the nature, extent, and timing of the pretrial publicity is crucial in determining whether or not the trial court should have granted a motion for change of venue. The Defendant would submit that from the time this case was first reported in the media up until the time of, and during, the trial of this case that there was substantial media coverage. Television media as well as newspaper media repeatedly broadcast and published stories relating to this case and to the Defendant in particular. As the Court should note from the transcripts relating to jury selection, an overwhelming majority of all jurors reported hearing and remembering details about this case. Furthermore, the Defendant would suggest that this Court, which sits in Knoxville, could take judicial notice of the media coverage in this case. Citing from the United States Supreme Court case of Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Tennessee Supreme Court stated in Howell, supra, that . . .

> ". . . *two-thirds of the jurors actually seated had been exposed to a barrage of pretrial publicity right up until the time of trial, had already formed an opinion that the defendant was guilty, and acknowledged familiarity with material facts and circumstances of the case. Irvin, 366 U.S. at 725-28, 81 S.Ct. at 1644-45. In addition, even the headlines of one of the local newspapers reported during jury selection that 'impartial jurors are hard to find', Id., 366 U.S. at 727, 81 S.Ct. at 1645. Although each of the jurors said that he could be impartial, the U.S. Supreme Court concluded that '[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt."* Id., 366 U.S. at 728, 81 S.Ct. at 1645." [9]

---

[8]   868 S.W.2d 238, at 249.

[9]   868 S.W.2d 238, at 249-250.

Page 43

The circumstances in this case are similar to the circumstances in the Dowd case, supra, wherein a majority of the jurors in the case had stated that they had heard of the case and were familiar with the details of the case. Even though each of the prospective jurors stated in Dowd, supra, that they could be impartial, the U.S. Supreme Court reversed the case due to the trial court's failure to grant a change of venue. In the instant case, almost every prospective juror indicated that they had heard about the case and could recall details of the case. While the jury actually seated consisted of people who stated that they could be impartial, the Defendant would submit that with her life at stake, she, just as the Defendant in Dowd, supra, should have been tried in an atmosphere undisturbed by so huge a wave of public passion. As the Court should note, one particular prospective juror when asked if he could disregard what he had heard about this case in the media, responded that . . .

> *"Juror 16: I can sit here and tell you that I am not bias and I have no preconceived opinion but you can't unring a bell.*
>
> *A.G.: Now, would you explain that a little bit further?*
>
> *Juror 16: Once you have drawn in information into your information processing system, like a computer, you can't push that button and wipe it out.*
>
> *A.G.: Let me ask you a question in that context. If the Judge tells you if you are selected as a juror in this case you can only consider the evidence presented here in court, do you think you can do that?*
>
> *Juror 16: I would attempt to, but--*
>
> *A.G.: You think it would be difficult for you to? And I realize that these questions are putting you on the spot but we are just trying to make a determination--*
>
> *Juror 16: I can't, I can't blank out what is in my, what is in my memory bank."*

(IX, 532-533).

Case 1:12-cv-00035-HSM-SKL    Document 8-16    Filed 08/01/12    Page 55 of 75
PageID #: 3475

This prospective juror was courageous because he clearly stated that he would try to be fair and try to put what he had heard out of his mind, but that you "can't unring a bell". We would respectfully suggest that when a majority of the prospective jurors stated that they would not consider what they had heard about this case outside the courtroom that they were being honest and genuinely thought that they would not consider what they had heard. However, given the seriousness of this case, the allegations of torture and abuse as well as the sensationalism generated by the media attention, it is impractical to believe that it is humanly possible to simply forget everything that one has heard about a case and only consider what is heard in the courtroom. In a less serious case, this standard might possibly be acceptable, but certainly not in a capital case where literally a defendant's life is at stake. In the United States Supreme Court case of Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court stated . . .

> *". . . the publicity may be such that the court may presume that the jury panel is tainted, regardless of their professed ability to set aside what they have seen. See Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."* [10]

In the instant case, had the trial judge felt that a total change of venue, as requested by the Defendant, was not warranted, the Tennessee Supreme Court in the case of State v. Nichols, 877 S.W.2d 722, at 729 (Tenn., 1994), has created an alternative way to select untainted jurors from another county and then transport those jurors to the county wherein the alleged crime was committed. In this case, clearly the trial judge should have presumed that the jury panel was

---

[10] Cited from the case of State v. Morgan, 825 S.W.2d 113, 118 (Tenn.Crim.App., 1991).

Page 45

tainted by the media publicity in this case and even though each juror professed their ability to set aside all that they had heard and seen, the trial court should have granted the motion for change of venue, or should, on it's own motion, have followed the procedures set forth in Nichols, supra. "

In an effort to avoid pretrial publicity, the Defendant sought to prohibit cameras in the courtroom. When the request to allow cameras in the courtroom was denied and media attention to this case persisted, the Defendant filed an affidavit of Dr. Charles Bebber, the Defendant's jury selection expert, in support of the defense motion for change of venue. The Defendant would submit that the trial court totally disregarded Dr. Bebber's affidavit without giving sufficient reasons therefor and proceeded to select a jury from a prospective pool of presumably tainted jurors, i.e., jurors who were familiar with the case, and had discussed the case with other prospective jurors during the jury selection process, (XVI, 1244).

The Defendant would submit that if the circumstances, nature and details of this case together with the sensationalism caused by the media coverage as well as the fact that what is at stake in this case is, literally, her life, does not warrant a change of venue then in what type of case is a change of venue ever warranted? The Defendant would submit that since her life is at stake that the Court should hold the review of the issues in this case to the highest possible standards and that the constitutions of both the United States and Tennessee require, in the

---

" See also, State v. Shepherd, 902 S.W.2d 895 at 905 (Tenn., 1995).

Page 46

interest of justice and fairness, that this Court hold that the jury selection process utilized by the trial court was inadequate and should, with all due respect, be reversed and remanded for a new trial on the merits.

**IV.** **THE TRIAL COURT ERRED BY FAILING TO ALLOW THE DEFENDANT TO SELECT A JURY COMPOSED OF A FAIR CROSS SECTION OF THE CITIZENS OF THE STATE OF TENNESSEE.**

The Defendant asserts that the trial court erred by failing to allow her to select a jury composed of a fair cross section of the citizens of the State of Tennessee. Namely, the Defendant avers that the trial court impanelled a jury that was pro-death penalty and improperly excused for cause those prospective jurors that indicated that they were opposed to the death penalty. In an attempt to obtain a truly fair cross section of citizens, the Defendant proposed a "don't ask, don't tell" procedure regarding jury selection. In other words, the Defendant sought to have a jury impanelled that had not told the court about their personal feelings toward the imposition of the death penalty.

In the case of State v. Harrington, 627 S.W.2d 345 (Tenn., 1981), the Tennessee Supreme Court stated that . . .

> ". . . Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 30 L.Ed.2d 776 (1968), and it's progeny, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), establish the general proposition 'that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). Where veniremen are excluded on 'any broader basis . . . the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion.' Witherspoon v. Illinois, supra, at 522 n.

Page 48

003453

*21, 88 S.Ct. at 1776 n. 21."* [12] [13]

Although the Tennessee Supreme Court stated in State v. Alley, 776 S.W.2d 506 (Tenn., 1989) that Harrington, supra, was decided four years before Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and on the juror bias issue is no longer of precedential value [14], the Defendant would submit that the root question at issue in the instant case deals with the exclusion of prospective jurors on the basis of their opposition to the death penalty. In this case the trial court examined the prospective jurors at length regarding their feelings and thoughts about the death penalty and also allowed Counsel to examine the prospective jurors who indicated that they had a problem with the imposition of the death penalty. The Defendant would suggest that the questioning of only the jurors who indicated a problem with the imposition of the death penalty denied her a jury composed of a fair cross section of the citizens of the State of Tennessee, i.e., those jurors who are opposed to the death penalty. The Defendant would propose that it is time for the Courts to re-visit the manner in which prospective jurors are selected and that the better way to select potential jurors in a capital case to insure that a fair cross section of citizens is selected to sit on a jury would be not to ask them their feelings concerning the death penalty. This proposal would presuppose that there are citizens who would always favor imposition of the death penalty and those citizens that would always oppose the imposition of the death penalty. Does not the exclusion of citizens that would

---

[12] 627 S.W.2d 345 at 349.

[13] See also, Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

[14] 776 S.W.2d 506, at 518.

Page 49

always oppose the imposition of the death penalty violate the Defendant's right to have her case heard by a fair cross section of the citizens of the State?

Certainly, we would think that the State would argue that selecting citizens for a capital murder case that would always be opposed to the imposition of the death penalty would violate the State's right to a fair trial. And, under the present system of questioning in *voir dire* such a selection process may ultimately deny the State of a fair trial. For this reason, the "don't ask, don't tell" procedure proposed by the Defendant would be the most fair method of selecting a jury composed of a true cross section of the citizens of the State since both sides would be at a certain risk during the jury selection process. Under the present system of selecting jurors that agree that they can impose the death penalty, the system unfairly stacks the deck in capital cases in favor of the State. The Defendant would suggest that the present system is violative of her constitutional rights to a fair trial as guaranteed by the United States and Tennessee constitutions. This Court should promulgate a new procedure for selecting jurors that insures that all citizens, both those in favor of the death penalty as well as those opposed to it, have an equal opportunity to sit on a jury. Defendant asks this Court to reverse and remand this case for a new trial on the merits.

Page 50

*V.* *WHETHER THE TRIAL COURT ERRED BY ALLOWING THE INTRODUCTION OF THE SKULL OF THE VICTIM INTO EVIDENCE WHERE SUCH USE OF THE SKULL WAS DUPLICATIVE OF OTHER EVIDENCE, WAS WHOLLY UNNECESSARY IN LIGHT OF OTHER ADMITTED EVIDENCE, WAS DESTINED TO AROUSE AND INCITE THE PASSIONS OF THE JURY AGAINST DEFENDANT, AND WHOSE PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY ITS HIGHLY PREJUDICIAL EFFECT?*

The admission of evidence lies in the discretion of the trial court, and such decision shall not be reversed on appeal absent an abuse of discretion. State v. Harris, 839 S.W.2d 54, 60 (Tenn. 1992). Further, relevant evidence is generally admissible, but it may be excluded under Rule 403 of the Rules of Evidence if its probative value is substantially outweighed by a danger of unfair prejudice, undue delay, waste of time, or needless presentation of cumulative evidence. State v. Bates, 804 S.W.2d 868, 879 (Tenn. 1991).

In this case, the actual skull was admitted into evidence over the Defendant's objections. (XXI, 1706-26). Prior to the admission of the skull itself, there were numerous photographs submitted which showed the damage to the skull and which were gruesome in their own rights. (XIX, 1574-75, 1590; XX, 1603-1605, 1610-12). Then, along with diagrams and sketches by the pathologist at the time of autopsy which also indicated the massive damage to the skull of the victim, Dr. Elkins used the skull itself. (XXI, 1735-39, 1755-56, 1759-60). Later when Dr.

Page 51

Marks, the forensic anthropologist, testified, he actually identified and used photographs of the skull to point out and illustrate the procedure he followed and his results, including how the piece of skull found in the black leather jacket fit into the rest of the skull. (XXII, 1838, 1843). In fact, counsel for Defendant would submit that the State used Dr. Marks to get those particular photographs into evidence because the the unlikelihood the trial court would allow the actual skull to go back to the jury room. The photographs alone in this case were gruesome although admittedly necessary, but the additional parading of the victim's skull was a move calculated to be nothing more than highly prejudicial, extremely offensive and inflammatory.

This is not a case where the skull was used in lieu of gruesome pictures of a decomposed body as was true in State v. King, 718 S.W.2d 241 (Tenn. 1986). The victim's skull in the present case was used in addition to a whole collection of gruesome pictures. The court in State v. King found that the skull and its fragments could be useful to a jury in visualizing the massive injury which resulted in the death of the victim. State v. King, 718 S.W.2d at 251. The jury here had more than enough photographic and non-inflammatory demonstrative evidence to visualize the massive injuries to the skull and what caused this victim's death.

Although this case involves the admission of a skull, cases discussing the admission of gruesome photographs are analogous. In these cases, when photographs are likely to appeal to a jury's emotions and are not probative of a contested fact, they are generally held to be inadmissible. See, State v. Harbison, 704 S.W.2d 314 (Tenn. 1986); Hawkins v. State, 555 S.W.2d 876 (Tenn. Crim. App. 1977).

Page 52

In the present case, the damage to the skull was clearly and more than amply demonstrated by more than one individual using photographs and diagrams. There was no contesting that the victim was dead, that her skull had been essentially crushed, and that massive head trauma was caused as the photographs, diagrams and testimony indicated. The skull was simply the most inflammatory tool for the State to use to illustrate repetitively the damage inflicted. By failing to exclude the skull because its probative value was substantially outweighed by undue prejudice, the trial court erred.

**Page 53**

**VI.** *WHETHER THE TRIAL COURT ERRED BY REFUSING TO ENTER A JUDGMENT OF ACQUITTAL AS TO THE SECOND COUNT OF THE INDICTMENT CHARGING CONSPIRACY WHERE THE STATE FAILED TO PROVE EACH AND EVERY ELEMENT CHARGED IN THE INDICTMENT?*

In the present case, count two of the indictment charged Defendant with conspiracy to commit first-degree murder. (I, 2-4). As part of the offense, the State elected to charge three overt acts in furtherance of the conspiracy -- (1) leaving the Job Corps Center together with the victim, (2) walking with the victim to an isolated location on the U.T. campus, and (3) attacking the victim with cutting instruments, including a box cutter. (I, 3).

Defendant contends that the State failed to prove each and every element which it chose to charge in the conspiracy count of the indictment, and as a result, the trial court erred by refusing to enter a judgment of acquittal on that count. Specifically, there was no proof outside of the uncorroborated statement of Defendant, that a box cutter had been used on the victim. Moreover, there was no proof that Shadolla Peterson and Tadaryl Shipp attacked the victim with cutting instruments.

A confession can be used to sustain a conviction if there is some other evidence sufficient to show the commission of the crime by someone. Franklin v. State, 513 S.W.2d 146, 151 (Tenn. Crim. App. 1974). Conversely, it follows that an uncorroborated confession is insufficient to sustain a conviction. In the present case, there was no evidence presented outside

Page 54

of Defendant's own statement that a box cutter was used on the victim. Moreover, although there was some proof from Ms. Iloilo that Defendant wanted to talk with Peterson and was seen leaving with Peterson, Shipp and the victim, there was still no proof that Defendant, Peterson and Shipp "attacked the victim . . . with cutting instruments" in furtherance of any conspiracy to commit first-degree murder. Finally, there was no proof that Peterson and Shipp "conspired" with Defendant to commit first-degree murder or that they knew what, if anything, Defendant intended to do to the victim.

For these reasons, the proof is insufficient to sustain Defendant's conviction for conspiracy to commit first-degree murder, and the trial court erred in refusing to enter a judgment of acquittal as to that count of the indictment.

Page 55

## VII. WHETHER THE PUNISHMENT IMPOSED IN THIS CASE, DEATH BY ELECTROCUTION, IS CRUEL AND UNUSUAL PUNISHMENT UNDER BOTH THE UNITED STATES AND TENNESSEE CONSTITUTIONS?

Defendant contends the the punishment imposed upon her, death by electrocution, is barbaric, torturous and constitutes cruel and unusual punishment under both the United States and Tennessee Constitutions. Although throughout current caselaw, the appellate courts of Tennessee have upheld the punishment of electrocution as being constitutional, Defendant contends that such caselaw flies in the face of reality as embodied in the phrase "cruel and unusual." Moreover, it is distinctly the privilege of the courts to determine the meaning of the phrase "cruel and unusual" in the United States and Tennessee Constitutions. State v. Black, 815 S.W.2d 166, 188-89 (Tenn. 1991). And while the legislative decisions over the forms of punishment can be given some deference as they are due, it is the Tennessee appellate courts' duty to declare void any statute violating our constitution, and legislative pronouncements alone do not make an act constitutional. State v. Black, 815 S.W.2d 166, 199 (Tenn. 1991).

Defendant contends that any realistic discussion of whether this form of execution constitutes cruel and unusual punishment must begin with the method itself rather than its stated purposes. Defendant would suggest that numerous instances exist, of which the court may take judicial notice, where the execution of a prisoner by means of the electric chair was botched. In fact only recently, the news reports carried the story of a prisoner's head basically exploding

Page 56

in flames as he was being executed in the electric chair in another state. Defendant would submit that no one can say whether or not this person felt the pain associated with this explosion. In fact, as Justice Reid so eloquently stated in his separate opinion in State v. Black,

> "[t]he literature, with its descriptions of repeated failures to achieve swift execution and of the multiple electric shocks endured by prisoners before death finally results, suggests that electrocution involves suffering beyond that necessary 'in any method employed to extinguish life humanely.'"

State v. Black 815 S.W.2d 166, 199 (Tenn. 1991)(quoting from Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 376(1947)). Thus, Defendant contends that under any rational definition, such electrocution must constitute cruel and unusual punishment.

Here in Tennessee we do not condone electrocution of unwanted animals. If someone were to ask the average citizen on the street if stray animals should be electrocuted as a means of putting them to death, Defendant suggests the answer would overwhelmingly be "no." (Decent citizens have even been known to get "riled up" over the electrocution of minks for their pelts.) Yet, the courts of this state have tried to rationalize that public sentiment is in favor of electrocution of human beings. Defendant would respectfully suggest that, if anything, it is the end result and not the means which John Q. Public favors.

Because of the known problems inherent in the proscribed form of punishment, death by electrocution, Defendant contends that in this day and age electrocution is uniquely and extremely cruel and unusual punishment in violation of the United States and Tennessee Constitutions.

Page 57

*VIII.* *WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE THE SAME*
*NUMBER OF PEREMPTORY CHALLENGES AS DEFENDANT IN VIOLATION*
*OF THE EX POST FACTO CLAUSES OF THE UNITED STATES AND*
*TENNESSEE CONSTITUTIONS?*

Peremptory challenges are creatures of statute. State v. Howell, 868 S.W.2d. 238, 248 (Tenn. 1993). And as such, in order to be in violation of the ex post facto provision of the Tennessee Constitution, such statute must apply to events which occurred prior to its enactment, and it must cause disadvantage to the offender affected by it. State v. Ricci, 914 S.W.2d 475, 480 (Tenn. 1996).

In the instant case, the statute in effect at the time the offense was committed, January 12, 1995, gave a greater number of peremptory challenges to the Defendant (fifteen) than it did the State (eight). See Tenn. R. Crim. P. 24(d)(West 1995). At the time of trial, the legislature had revised the rule to give an equal number of peremptory challenges to both Defendant and the State. See Tenn. R. Crim. P. 24(d)(West 1996). The trial court in the instant case applied the new law and gave Defendant and the State the same number of peremptory challenges to exercise. Thus, the first prong of the ex post facto analysis is satisfied in that the rule covering peremptory challenges as revised by the legislature was applied to a trial of events occurring prior to its enactment.

Article 1, § 9 of the Tennessee Constitution guarantees the accused a fair and impartial

Page 58

trial which necessarily includes a fair and impartial jury. State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993). As part and parcel of achieving that fair and impartial jury, a defendant has a certain number of peremptory challenges which he or she is to use in an attempt to "level the playing field" against the full powers of the state as prosecutor and thereby insure a fair and impartial trial. When the Defendant in the case at bar is alleged to have committed the offense in question, the rule covering peremptory challenges allowed her seven more challenges than the State as part of her right to have her case heard by a fair and impartial jury in a fair and impartial trial. Defendant would submit that these extra peremptory challenges were an integral part of the legislature's efforts to guarantee a fair and impartial trial by a fair and impartial jury and the disproportionate number was considered necessary to secure a defendant's right to same. By applying the new rule and allowing the State to have the same number of peremptory challenges as Defendant, Defendant's ability to secure that right was affected to Defendant's disadvantage. In fact, Defendant would contend that she was denied a trial by and fair and impartial jury because the State was granted the power to strike those additional jurors which it would not have been able to strike had the old rule been enforced.

Page 59

*IX.* *WHETHER THE TRIAL COURT ERRED IN SENTENCING DEFENDANT TO THE MAXIMUM SENTENCE ALLOWED UNDER COUNT TWO OF THE INDICTMENT CHARGING CONSPIRACY TO COMMIT FIRST-DEGREE MURDER AND RUNNING IT CONSECUTIVELY TO THE DEATH SENTENCE IMPOSED UNDER COUNT ONE?*

The standard of review for the appeal of a sentence imposed by the trial court is de novo with a presumption of correctness for the determinations made by the trial court. Tenn. Code Ann. § 40-35-401(d). During this de novo review, the appellate court must consider the evidence adduced at the sentencing hearing, any presentence report, the principles of sentencing, arguments concerning sentencing alternatives, mitigating and enhancement factors, the defendant's statement, and the potential for rehabilitation. State v. Ashby 823 S.W.2d 166, 168 (Tenn. 1991).

For felony cases, the presumptive sentence is the minimum in the range if enhancement and mitigative factors are absent. Tenn. Code Ann. § 40-35-210(c). However, if enhancement but no mitigating factors are present, the trial court "may" increase the sentence above the minimum. Tenn. Code Ann. § 40-35-210(d). In the case at bar, Defendant contends that although there were enhancement factors which were applicable, there were also mitigating factors which should have been considered by the trial court in setting Defendant's sentence within the appropriate range. The failure to even consider the mitigating factors, as well as

Page 60

considering an improper enhancement factor, was error by the trial court.

The trial court heard the evidence at both stages of the capital trial as well as additional proof at the sentencing hearing on the second count. Defense counsel argued that Defendant's age as well as other mitigating factors brought out in the capital case should be considered, and further, defense counsel argued that consecutive sentencing was inappropriate as this offense arose out of the same incidents for which Defendant had already been sentenced to death. (XXXI, 16-17). The trial court agreed that the appropriate range of punishment for Defendant was 15-25 years. (XXXI, 19).

Although the trial court initially stated it would not be using the aggravating factors found by the jury to enhance Defendant's sentence, the trial court did in fact use at least one of those factors, that the murder was heinous, atrocious and cruel, to give Defendant a higher sentence within the range. (XXXI, 19, 21). After going over other enhancement factors, the trial court just stated there were "no mitigating factors" at all even though there was clear proof of mitigating factors, such as Defendant's age at the time the offense was committed as well as her family background and mental health status. (XXXI, 23). The trial court summarily sentenced Defendant to the maximum in the range based upon the erroneous decision that there were no mitigating factors.

Additionally, the trial court sentenced the Defendant to serve that 25-year sentence consecutively to the death sentence previously imposed upon her based upon only one factor -- that the person is a dangerous offender with little or no regard for human life and no hesitation about committing a crime when the risk to human life is high. (XXXI, 23). Defendant contends

Page 61

that this particular factor is by definition necessarily subsumed in this case by the other factors the trial court and the jury already used not only to sentence the Defendant to death, but also to give her the maximum sentence within the range for the conspiracy conviction. By using this factor to order consecutive sentencing, the trial court erred.

Defendant would request that in light of the errors committed by the trial court, her sentence on the second count of the indictment be reduced to twenty years and run concurrently with the death sentence imposed in count one.

Page 62

## CONCLUSION

For all the foregoing reasons set forth herein, the Defendant respectfully requests that this Court reverse her convictions for murder in the first degree and conspiracy to commit murder in the first degree and remand her case back to the trial court for a new trial on the merits.

This the 28th day of April, 1997.

CHRISTA GAIL PIKE

BY: _____

WILLIAM C. TALMAN
Supreme Court BPR# 012262
Attorney for Defendant
P.O. Box 506
Knoxville, Tennessee 37901-0506

Telephone: (423) 579-9060
Facsimile: (423) 573-2032

BY: _____

JULIE A. MARTIN
Supreme Court BPR# 015546
Attorney for Defendant
P.O. Box 426
Knoxville, Tennessee 37901-0426

Telephone: (423) 281-0210

Page 63

## CERTIFICATE OF SERVICE

I, William C. Talman, Attorney for the Defendant, hereby certify that I have served a true and correct copy of the foregoing Brief, by personally depositing same in the U.S. Mail, with sufficient postage to reach its destination, upon Hon. John Knox Walkup, Attorney General and Reporter, c/o Hon. Amy Tarkington, Assistant Attorney General, 450 James Robertson Parkway, Nashville, Tennessee 37243-0485.

This the 28th day of April, 1997.

William C. Talman, Attorney

Page 64