# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| Respondent. | ) | |

---

**ADDENDUM 3**

**DOCUMENT 2**

---

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

| | |
|---|---|
| STATE OF TENNESSEE, ) | |
| ) | |
| Appellee, ) | |
| ) | KNOX COUNTY |
| v. ) | C.C.A. NO. |
| ) | 03C01-9611-CR-00408 |
| CHRISTA GAIL PIKE, ) | (Death Penalty) |
| ) | |
| Appellant. ) | |

## ON APPEAL AS OF RIGHT FROM THE JUDGMENT OF THE KNOX COUNTY CRIMINAL COURT

---

## BRIEF OF THE STATE OF TENNESSEE

---

**JOHN KNOX WALKUP**
Attorney General & Reporter

**MICHAEL E. MOORE**
Solicitor General

**KATHY MORANTE**
Deputy Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, Tennessee 37243-0493
615-741-6439
B.P.R. No. 9616

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    I. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE
    CONVICTIONS FOR MURDER IN THE FIRST-DEGREE AND
    CONSPIRACY TO COMMIT MURDER AND SUPPORTS THE
    SENTENCE OF DEATH. (Defendant Issues I and VI). . . . . . . . . . . 21

    II. THE TRIAL COURT CORRECTLY COMPLIED WITH
    SUPREME COURT RULE 30. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    III. THE TRIAL COURT DID NOT ERR IN REFUSING TO
    CHANGE VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    IV. JURORS WHO SAID THEY COULD NOT FOLLOW THE
    LAW WERE CORRECTLY EXCLUDED FROM THE JURY AND
    THIS DOES NOT DENY THE DEFENDANT ANY RIGHTS. . . . . 35

    V. THE SKULL OF THE VICTIM WAS CORRECTLY
    ADMITTED INTO EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . 38

    VI. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE
    CONVICTIONS FOR MURDER IN THE FIRST-DEGREE AND
    CONSPIRACY TO COMMIT MURDER. (Defendant's Issues I
    and VI have been combined in Issue I on pages 21 - 28). . . . . . . . . . 41

    VII. DEATH BY ELECTROCUTION DOES NOT VIOLATE THE
    CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

i

VIII. THE NUMBER OF PEREMPTORY CHALLENGES GIVEN
TO THE STATE WAS PROPER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

IX. THE SENTENCE FOR CONSPIRACY TO COMMIT FIRST-
DEGREE MURDER IS APPROPRIATE. . . . . . . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Case 1:12-cv-00035-HSM-SKL   Document 8-17   Filed 08/01/12   Page 4 of 55
PageID #: 3499

003473

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Butler v. State,*
789 S.W.2d 898 (Tenn. 1990) ............................. 35

*Franklin v. State,*
513 S.W.2d 146 (Tenn. Crim. App. 1974) ..................... 24

*Houston v. State,*
593 S.W.2d 267 (Tenn. 1980) ............................. 36

*Irvin v. Dowd,*
366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961) .......... 31

*Kagle v. State,*
507 S.W.2d 121 (Tenn. Crim. App. 1973) .................... 38

*Kee v. Shelter Insurance,*
852 S.W.2d 226 (Tenn. 1993) ............................. 43

*State Department of Human Services v. Defriece,*
937 S.W.2d 954 (Tenn. App. 1996) ......................... 44

*State v. Banks,*
564 S.W.2d 946 (Tenn. 1978) ............................. 38

*State v. Bates,*
804 S.W.2d 868 (Tenn. 1981) ............................. 28

*State v. Black,*
815 S.W.2d 166 (Tenn. 1991) ............................. 42

*State v. Cazes,*
875 S.W.2d 253 (Tenn. 1994) ......................... 21,39,42

*State v. Evans,*
838 S.W.2d 185 (Tenn. 1992) ............................. 31

iii

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

### I

Is the evidence sufficient to sustain the verdict of guilt and the sentence of death by electrocution?

### II

Did the trial court err by following the mandate of Supreme Court Rule 30 in denying Pike's motion to prohibit the news media from covering the case?

### III

Did the trial court properly deny the motion for change of venue?

### IV

Was Pike denied a fair cross-section of citizens on her jury because the trial court excluded potential jurors who could not follow the law in considering whether to impose the death penalty?

### V

Was the evidence consisting of the victim's skull properly admitted into evidence?

### VI

Did the trial court err in refusing to enter a judgment of acquittal on the count of conspiracy since the evidence was sufficient to sustain this count?

1

Case 1:12-cv-00035-HSM-SKL   Document 8-17   Filed 08/01/12   Page 6 of 55
PageID #: 3501

## VII

Is death by electrocution cruel and unusual punishment under the federal and state constitutions?

## VIII

Were the correct number of preemptory challenges afforded the State?

## IX

Is the sentence for conspiracy to commit first-degree murder excessive?

2

## STATEMENT OF THE CASE

Eighteen year-old Christa Pike was indicted for first-degree murder and conspiracy to commit the first-degree murder of Colleen Slemmer. Shadolla Peterson and Tadaryl Shipp were also indicted on the same counts. (I. 2-3). On May 23, 1995, the District Attorney indicated that he intended to seek the death penalty against Pike under Tenn. Code Ann. §§39-13-204(i)(5), (6) and (7). (I. 9). Numerous pre-trial motions were filed. (I. 10-III. 377).

Jury selection began on March 20, 1996. It was completed on March 23, 1996, and the trial began at that time. (III. 379-386). The guilt phase portion of the trial concluded on March 29, 1996, and a verdict of guilty to first-degree murder and conspiracy to commit first-degree murder was returned by the jury on March 29, 1996. The sentencing phase then began and, on March 30, 1996, the jury found that death by electrocution was the appropriate punishment for Pike. The jury found two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, §39-13-204(i)(5), and that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another, §39-13-204(I)(6). (III. 393-394).

---

The record on appeal consists of thirty-two volumes of testimony and thirty-one exhibits. The record will be referred to by volume and page number.

3

003477

Pike filed a motion for new trial on April 29, 1996. (III. 402-405). That motion was overruled in July, 1996. (III. 418-419). Pike was sentenced to twenty-five years as a standard offender for the conspiracy to commit first-degree murder conviction and the Court ordered that sentence to run consecutively with the death sentence. (III. 409).

Notice of appeal was filed on August 20, 1996. (III. 420). The trial judge's report required by Supreme Court Rule 12 is contained in the record (III. 429-439).

4

## STATEMENT OF THE FACTS

### Guilt Phase

On January 13, 1995, Duncan Southerland, an employee of the University of Tennessee Grounds Department, was walking through the Agriculture Campus when he saw what he thought was a dead dog. Then he saw that there were clothes hanging in a tree and went to investigate. What he saw was a semi-nude body that was very "gory". He summoned police. (XVI. 1565-75).

The victim was later identified as Colleen Slemmer, a nineteen-year Job Corps student. Various officers who arrived at the scene after the body was discovered described Slemmer as "covered" with blood and dirt. She had been completely bludgeoned. One officer noted that she was so mutilated he was not sure he was looking at a face. (XVI. 1581-1591). Colleen had what looked like a rag wrapped around her neck. She was lying face down in debris. A bra with blood on it was found a distance from the body. Officers secured the scene and had to keep extending the crime scene because they kept finding more and more evidence, particularly pools of blood. In fact, the scene tripled in size because of the amount of additional blood, clothes and footprints found. By the end, the crime scene was 120 feet by 60 feet in size.

5

It was clear that Slemmer's throat had been cut and that she had numerous cuts all over her body. A five pointed star in a circle, commonly known as a pentagram, was carved on her chest. There was also a large puddle of blood about thirty feet from where Colleen's body was found. (XVI. 1575, 1596-1599; XVII. 1603, 1645). In addition, the crime scene was wet and muddy, and it was clear there had been a scuffle. (XVII. 1601). The area in which Slemmer was found was somewhat secluded. There were trampled bushes, hand and knee prints in the mud, and drag marks from the roadway where a puddle of blood stood. (XXIII. 1938-1946).

The pathologist testified that Colleen's body was covered with dirt and twigs and a cloth was tied around her mouth as a gag. She was nude from the waist up, but was wearing jeans, socks and shoes. The pathologist attempted to catalog the slash wounds and other injuries to Colleen, but there were so many wounds that she cataloged only the most serious. Some of those included a slash wound and a stab wound on Colleen's back which would have been made by a sharp instrument while Colleen was alive. (XVII. 1674-1688). There was also a gaping incisive wound around Colleen's neck and numerous cut wounds to the throat area which would have been made while Colleen was alive and before she lost consciousness. Her left ear was mangled and there was not much of the ear left. There was also damage to the left side of Colleen's head. The skull was

6

fractured. These injuries would have been made while Colleen was alive as well. (XVII. 1694-1697).

The cause of death was blunt trauma to the head with a resulting loss of consciousness in a short period of time. But the death would have been very painful. Several skull fragments were found in the brain matter. Colleen was hit from the left side onto a firm surface such as a road, with great force. There were divots, that is black particles of asphalt, imbedded in the brain matter. (XX. 1732-1745). Her skull was split in two and there were a minimum of five blows to the head. There were defensive wounds on her right arm. There were innumerable superficial slash wounds on her back and chest. It was clear that her body had been dragged through the mud. It was also clear that one blunt object and one sharp object had been used to inflict the injuries to Colleen. She would have been alive through all of this. (XX. 1746-1795). The pathologist sent the skull pieces, including fragments which were removed from Colleen's brain, to an anthropologist, Dr. Marks, for reconstruction. (XXI. 1738).

On the same day that Colleen's body was found, Pike was in the Knox County Job Corps Center because she, as well as the victim and the others involved in this crime, were Job Corps students. A Job Corps counselor spoke with her at about 3:15 that afternoon and took a photograph of her at that time. When Pike left, she left a short black leather jacket on a chair. The counselor

7

told another student to go get Pike because the room would be locked up for the holiday weekend at 4:00 p.m. and she would be unable to get the jacket When the office reopened on January 17, the jacket was still where it was. He took the jacket to Security. He further noted that Tadaryl Shipp was with Pike that afternoon and Pike was not frightened or crying or emotional in any way when he saw her. (XXI. 1796-XXII. 1806).

The leather jacket was given to the manager of Security at the Job Corps and then given to a crime lab specialist. Inside the breast pocket was a fork, a cigarette butt, a small piece of bone, and a piece of skull. (XXII. 1816, 1818-1823).

The physical anthropologist who got the skull pieces removed the soft tissue from the brain and let the skull dry. He put the skull together but there were seven or eight pieces missing along one side. It was clear that two weapons were used in the attack, one blunt and one sharp. The rock-like material that was embedded in the skull were pieces of asphalt. The anthropologist received the piece of the skull from the crime lab specialist that had been taken from Pike's jacket. It fit perfectly into the reconstructed skull.

Apparently, Pike had decided to kill Colleen days prior to the actual murder. She told Kimberly Ann Iloilo on January 11, 1995, that she was going to kill Colleen because she "had just felt mean that day". (XXII. 1874). On the

8

003482

day of the murder, January 12, she saw Colleen, Shadolla Patterson, Tadaryl Shipp and Pike walking away from the Job Corps Center up 17th Street. At about 10:15 p.m., she saw Shipp, Patterson and Pike coming back. Colleen was not with them and she never saw Colleen again. (XXII. 1878-1879).

Later that night, Pike came to Iloilo's room to talk. She made Iloilo promise not to talk about what she was going to tell her. Pike then said she killed Colleen and brought back a souvenir. She showed Iloilo a piece of skull. Pike said she had cut Colleen's throat, beat her up, and thrown asphalt at her head. Pike said she cut Colleen's throat six times. Pike said that Colleen was asking them not to do that to her, but they kept cutting her throat because Colleen was a "witch". She knew Colleen was a witch because Colleen kept talking even after all of these injuries and she was trying to stop Colleen from talking. Pike said the asphalt was a big piece at first, but then it kept breaking as they kept throwing it at her. While Pike was telling this to Iloilo, Pike was smiling and dancing around in a circle, while talking about the asphalt. She was also singing "la la". Pike told her about the pentagram carved into Colleen's chest. Pike said that she used a meat cleaver to cut Colleen's back and a box cutter to cut her throat. (XXII, 1879-1884).

The next morning at breakfast, Iloilo asked Pike what she had done with the piece of skull. Pike said it was in her pocket and added, "And yes, I'm

9

eating breakfast with it." Iloilo also testified that Pike had been dating Shipp for three or four months. (XXII. 1885-1901).

Another Job Corps student. Stephanie Wilson, recounted that on the day after the murder was committed Pike pointed to little spots on her shoes and said. "That ain't mud on my shoes, that's blood." She then showed Wilson a piece of skull which Pike had in a napkin in her pocket, said that it was human skull, and that it came from Colleen's skull. Pike said that she slashed Colleen's throat six times and beat her in the head with a rock. Pike told Wilson that Colleen's blood and brains were "pouring out" and that she, Pike, did it because "she felt like it." (XXIII. 1913-1935).

On the day after the murder an investigator with the Knox County Police Department, Randy York, talked to both Shipp and Pike at the Police Station. They were given *Miranda* warnings. Pike said that she would give a statement, but only if she didn't have to mention who was with her when the crime was committed. She said she killed Colleen Slemmer and signed a consent to search her room for bloody jeans. York took Pike to the scene to retrace what occurred. Pike also said she discarded some items at a nearby Texaco station. (XXIII. 1947-1952). Subsequently, Colleen's identification card and a pair of gloves were located in the Texaco station's wastebasket. (XXIV. 2002-2005).

10

Pike said that she and Colleen and the others came down the jogging trail, and she directed York to where the body was found. Later, at the station, Pike gave a confession which was tape-recorded. (XXIII. 1954-1987).

Her confession[2] discussed many details of the crime. In fact, the transcription of the statement is some 46 pages long. In part, Pike said that she was originally from North Carolina, was eighteen years old and was a participant in the Job Corps Program in Knoxville. She said that Colleen had been calling her names and talking about her to other students, and that Colleen would "run her mouth and run her mouth and be all in my face". She said she was planning on taking Colleen up "there" and "probably fighting her, beating her up . . . basically because I don't feel like putting up with this." On the ruse of going to Blockbuster Music, she got the victim to go with her. When they got her in the isolated area, she claimed she told Colleen that she did not know why she was doing things to "bug" her. At that point, Colleen started calling her a bitch. Pike admitted that "I just hit her and hit her and hit her and hit her" with her fist. She admitted that she "lashed out cause she made me so mad." While she was hitting her, Colleen kept saying "Please stop. Please stop". At first, Pike claimed

---

The confession appears in the record as Exhibit 28. However, the Knox County's Clerk Office retained the tape and the transcription of the statement in its office. Since no other transcription appears in the record, the State has contemporaneously filed a motion with the Court to require that the tape and a transcription of the confession be transmitted to this Court

11

not to have hit Colleen with anything else. She admitted that she was with other people, but refused to say who they were.

Pike told the police that Colleen was still alive when she left. Pike denied having a little piece of Colleen's skull, stating "Why would I want a piece of her skull?". When asked again whether she had taken a piece of her skull, Pike replied, "That's disgusting, no. I did not."

She later said that she banged Slemmer's head on her knee. But Colleen kept screaming and screaming. Pike told Colleen that she didn't want Colleen to touch her. Pike that said she just lost control. She said she threw Colleen on the ground and starting "kicking her and kicking her and kicking her" and "I picked her head up and hit her head into the concrete but it never hurt her." She said it did not hurt Colleen because it did not knock her unconscious. Colleen was lying there and saying, "why are you doing this to me". Pike responded that she knew what Colleen was doing and saying to Tadaryl. Colleen kept saying, "Just fuck you." Pike said that she told Colleen to shut up and kicked her in the face and just kept kicking her. "I don't know where all I kicked her. I just kept kicking her. I know I kicked her in her face and in her side and I don't know where all else. But she was just crying."

The other person, identified by Pike as "he", pushed Colleen down on the ground while Colleen was trying to get back up. They dragged Colleen to

12

003486

another area up the road. Pike cut Colleen's stomach because Colleen grabbed her. Pike cut Colleen with a box cutter which Pike had in her hand. She cut Colleen because Colleen "almost made me cut my face. I just like reflex, uh. [sic] went down and I cut across her stomach." Colleen "screamed and screamed and screamed." Pike continued: "I just kept, I mean I just kept hearing somebody talking about. I mean there wasn't anybody really there but I just kept hearing somebody say 'she's going to go tell on you. You're going to prison. You're going to jail, you're to do this.'"

Pike kept thinking that she had to do something to avoid jail for what she had done up to that point. She felt she was "as good as gone" if she let Colleen live. Since she had already cut Colleen, "that'd be attempted murder, you know" She said the other person cut Colleen's chest, but Pike cut her stomach. After all of this, Colleen rolled over and got up and tried to run again, so Pike cut her on the back with a big, long cut. Still, Colleen kept trying to run and run. They threw her in some bushes.

Colleen continued to beg her "to talk about it" in order to save her life. Pike told her to shut up. As Colleen continued to beg for her life, Pike said she told her, "But I'm not about to let you go from here and go tell on me and get me in a big shit load of trouble. Now I'm not going to be rotting in prison

13

because of your stupid ass." Colleen promised to leave and not tell anyone but Pike told her to shut up.

She kicked Colleen in the face and told her to "shut up" repeatedly because Pike did not want to hear her talking. It got to the point that Pike could not hear Colleen anymore because she was hearing a voice telling her to find a way to get herself out of this. She made Colleen take off her T-shirt and cut off her bra. Colleen's face was bleeding "real bad". Finally, Colleen was just lying there, but then she got up and took off running. Pike picked up a rock and threw it at her because she knew she could not catch Colleen. The rock hit Colleen in the back of the head and she fell and her head was bleeding. Colleen was still breathing and gurgling and jerking. So Pike kept hitting her and hitting her. At the end, Pike asked Colleen, "Colleen, do you know who's doing this to you?" According to Pike, Colleen was making moaning and groaning noises after this. She and the person with her then walked over to a mud puddle to wash their hands of blood. She also washed off her shoes a little bit. She said that they threw the box cutter away but she could not recall where. The other person had a miniature meat cleaver that Pike used to cut Colleen in the back. Before leaving, she and the other person picked up Colleen by the leg and drug her off to the side of the road. They left her in a pile of dirt.

14

003488

Pike denied knowing who carved the pentagram into Colleen's chest. She and Shipp both wear pentagram necklaces, however. When asked if she practiced Satanism she said "No, no. I mean, I believe in God, you know? I'm not going to . . . no, there is no way." Shipp has a Satanic Bible that she saw him reading one day.

Pike cut Colleen's jeans in the crotch with the meat cleaver because Colleen had said to Tadaryl that she [Colleen] wanted to "fuck him". Cutting Colleen's crotch represented that now she [Colleen] could not do that and "I just wanted to scare her, you know?" The piece of white cloth around Colleen's mouth had been a hair band Pike was using.

Numerous pieces of physical evidence were introduced, including photographs of Colleen's body, a photograph of Pike wearing a pentagram necklace, and a photograph of Shipp with the same type of necklace. (XXIII. 1980-87). In addition, a piece of asphalt with blood and hair on it, Pike's shoes with blood on them, and a Satanic Bible found in Shipp's room were also introduced into evidence. (XXIV. 2007-2081). The blood on Pike's shoes and coat was insufficient to confirm or deny that it was Colleen's. But the blood on Shipp's coat and the blood on Pike's jean and purse matched the victim's. There is a 1 chance in 200,047 in the Caucasian community that there would be such

15

003489

a match of this blood and 1 chance in 600,018 in the African-American community that there could be such a match. (XXV. 2106-2144).

Dr. Eric Engrum, who has his doctorate but is not a forensic psychologist (even though his letterhead says he provides forensic psychological services) testified for the defendant. He found Pike to be very bright. She tested in the 77th percentile on her I.Q., which is remarkable since she only completed the ninth grade. He believes that Pike has a personality disorder. She has difficulties in controlling her behavior because she is afraid she will be abandoned. Pike, according to Engrum, was deeply in love with Shipp and feared he would be taken away by Colleen. In his opinion, Pike didn't act with deliberation or premeditation. Rather, she was "out of control". (XXV. 2172-2197).

He characterized Pike's dancing when she was talking about how she had murdered Colleen as an "emotional release". Once Pike started the attack she was unable to stop it. He believes that there is no question that Pike took Colleen to Tyson Park to beat her up and there was no question *that* was a deliberate act. The fact that Pike said days before the murder that she would kill Colleen did not change his opinion of premeditation. He did not believe this threat; nevertheless, his diagnosis of Pike's mental status is based entirely on her words. She told him that she had gotten out of control. If she was lying, that might change his opinion of her state of mind at the time of the murder.

16

003490

At one point, Engrum admitted under cross-examination that when Pike stopped the attack because she thought someone was coming and then continued it when she realized the coast was clear, what occurred afterward "may be" deliberate. He admitted that bashing in Colleen's head was deliberate, but said that Pike was acting out of jealousy, hate and anger. He admitted that the fact that Pike took the box cutter and the meat cleaver to the crime scene indicates a deliberate act. (XXVI. 2200-2228).

Pike also called Dr. William Bernet, a forensic psychologist, to testify that while there was Satanic mutilation on Colleen's body the murder itself does not fit a pattern of Satanic ceremony or planned sacrifice. It does, however, fit the pattern of "adolescent dabbling in Satanism". (XXVI. 2274-2294). He could form no expert opinion about Pike's ability to form intent or premeditation with any degree of medical certainty. He admitted that pentagrams are used on sacrifices in Satanic ceremonies in order to allow the soul to escape the victim. He believes that taking a piece of the skull could be considered Satanic. (XXVI. 2318-2348).

### Sentencing Phase

#### State's Proof

The State rested upon the evidence introduced during the guilt phase. (XXVIII. 2483).

17

## Defendant's Proof

Various persons[1] testified about the difficult childhood Pike experienced. She was born premature and very sick. There was no maternal bonding because her mother had to work and, therefore, Pike's grandmother cared for her. There is a family history of substance abuse. The grandmother was verbally abusive and an alcoholic. Pike's mother kept a filthy house. There were no rules in the house. Pike's aunt admitted that she "may have said" that she was afraid to have Pike around her children. She said that Pike is a pathological liar and has been totally out of control since the age of twelve. (XXVIII. 2483-2507).

Pike's father was not around a lot and he signed adoption papers right before Pike's fifteenth birthday because he did not want her to use his name. When Pike was thirteen, she sexually abused her two year-old step-sister. (XXVIII. 2511-2521).

Pike's mother sent Pike to live with her ex-husband because she could not get along with Pike. She admitted smoking marijuana with Pike. Pike was devastated when her grandmother died. As a result Pike tried to kill herself. Pike also threatened her mother's boyfriend with a butcher knife when Pike was twelve. No one has had control over Pike since she was eight years old. Pike has been institutionalized "a couple of times." (XXVIII. 2522-2539).

---

[1] Carrie Ross, Pike's aunt; Glenn Pike, Pike's father; Carissa Hansen, Pike's mother

18

## State's Rebuttal

A University of Tennessee police officer, Harold Underwood, testified that he was one of the officers who secured the murder scene after discovery of the body. At that time, he saw Pike thirty feet from the crime scene between 4:00 and 5:00 p.m. the day the body was found. Pike came up to him and started asking questions about why the area had been taped. She then asked who the victim was, whether there were any suspects, and whether they had any clues. Pike seem amused at the time; she was giggling and moving around. She kept trying to walk around him to see the crime scene. She was there about fifteen minutes and she had three to five friends with her. She did not appear remorseful or even appropriate in manner considering the gravity of the crime that was being investigated. She was wearing a pentagram necklace. At the time, of course, Office Underwood had no way of knowing that she had murdered the victim. (XXVIII. 2547-2553).

### Sentencing Hearing on Conspiracy Charge

During the sentencing hearing on the conspiracy to murder charge, a letter was introduced into evidence that Pike wrote to Tadaryl Shipp following the return of her death sentence. She declared her love for Shipp, asked him to change his story to agree with hers and then said, "You see what I get for trying

19

003493

to be nice to that hoe [sic]". She wrote that she was going to "fry" for what she did and "ain't that some shit". (XXXI. 13).

20

## ARGUMENT

I. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE CONVICTIONS FOR MURDER IN THE FIRST-DEGREE AND CONSPIRACY TO COMMIT MURDER AND SUPPORTS THE SENTENCE OF DEATH. (Defendant Issues I and VI).

In her first issue, Pike attacks the sufficiency of the evidence to support her conviction for murder in the first-degree and conspiracy to commit murder in the first-degree. Additionally, in her Argument VI, she again attacks the evidence to support the conspiracy to commit murder in the first-degree conviction, but with greater specificity. Under this issue, she also asserts that the evidence is insufficient to support the jury's death. In fact, the evidence is more than sufficient to support the conviction and sentence.

## A. First-degree murder conviction

As this Court knows, a finding of guilt must be affirmed on appeal unless the Court determines that the evidence is "insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."[4] In determining whether the standard has been met, this Court may not reweigh or reevaluate the evidence, nor may it substitute its inferences for those drawn by the trier of fact.[5]

---

[4] Tenn. R. App. P. 13(e).

[5] State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992).

21

Specifically, Pike contends that the State did not introduce sufficient evidence regarding deliberation or that she had an opportunity to reflect upon her actions. Accordingly, she maintains that she is guilty of only murder in the second-degree. But in making this argument, Pike ignores substantial evidence to the contrary. Indeed, the evidence established that she told a fellow Job Corps student at least one day prior to the actual murder that she was going to kill Colleen because she "had just felt mean that day."[?]

Further, in her confession, she told the police that the victim, Colleen Slemmer, had been calling her names and talking about her to other students and that Colleen would "run her mouth and run her mouth and be all in my face." She admitting planning to take Colleen to the area in which the body was subsequently found to beat her because "basically I don't like putting up with this."[?] Additionally, the confession recounts in great detail the many incidents of torture inflicted upon Colleen by Pike. During this time, Colleen repeatedly begged for her life which only appeared to get on Pike's nerves. Although it is not entirely clear exactly how long it took from the first time Pike attacked Colleen until her eventual death, it is quite clear by the events recounted

:
:

---

^XXII. 1874

Exhibit 28

22

by Pike that it was not a slow process so that she had plenty of time to determine that she should stop.

In fact, she said that the reason she did not stop was because she wanted to get herself out of any trouble for the beating that had taken place up to that point. She told Colleen as she begged for her life: "I'm not about to let you go from here and go tell on me and get me in a big shit load of trouble. Now I'm not going to be rotting in prison because of your stupid ass." Quite obviously, in making this assessment Pike was rational and in control of her thought process and simply chose to murder Colleen. Finally, even Pike's own expert indicated that the fact that Pike took a box cutter and meat cleaver to the crime scene indicates a deliberate act and that bashing in Colleen's head was deliberate -- only that the motives were jealousy, hate and anger.[9]

Accordingly, there was overwhelming evidence in this case that Pike made plans ahead of time to kill Colleen and then coldly and brutally carried her plan out.

## B. Conspiracy to commit first-degree murder

Pike's primary complaint is that there was no evidence that Peterson and Shipp were involved in the attack or that they in any way conspired with

---

Exhibit 28.

XXVI 2200-2228.

23

Pike to commit murder. The proof established, however, that a box cutter and meat cleaver were used, in part, to kill Colleen. Pike asserts that there is no proof beyond her "uncorroborated statement" that a box cutter had been used on Colleen. But even slight evidence can be used to corroborate a confession.[10]

Here, a pathologist and forensic anthropologist testified that two instruments had been used to kill Colleen, in addition to the asphalt rock, one blunt and one sharp. A box cutter and meat cleaver both meet these characteristics. Further, a Job Corps student testified that on the night of the murder, Pike told her that she had used a meat cleaver to cut Colleen's back and a box cutter to cut her throat.[11] Accordingly, there is more than sufficient evidence to corroborate Pike's admission that she used a meat cleaver and box cutter to kill Colleen. It is also clear from her confession that two persons went with her when she took Colleen to be killed. It is further clear that one of those persons, referred by Pike as "he" throughout her confession, participated in some of the torture. A witness testified that shortly before the murder, she saw Colleen, Patterson, Shipp and Pike leaving the Job Corps Center. Later, she saw Shipp, Patterson and Pike returning but never saw Colleen again.[12] Thus, there

---

[10] *Franklin v State*, 513 S.W.2d 146, 151 (Tenn. Crim. App. 1974).

[11] XXII 1879-1884.

[12] XXII 1878-1879

24

is more than sufficient circumstantial evidence to establish that there was a conspiracy to commit murder and that Patterson and Shipp were involved.

## C. Death sentence

Pike's entire argument that the evidence is insufficient to support her sentence is: ". . . the proof was insufficient to justify the jury's sentence of death by electrocution. Furthermore, the jury failed to properly consider and weigh the mitigating factors against the aggravating factors in this case."[13] The defendant does not say why the evidence was insufficient to support the aggravating circumstances, nor does she suggest why it is that the jury failed to properly weigh the mitigating factors against the aggravating factors in this case. In fact, if a record were ever to establish that the death sentence was appropriate, the evidence in this case does just that.

Briefly, the pathologist testified that Colleen was covered with dirt and twigs and that she was gagged. She was nude from the waist up, but was wearing jeans, socks and shoes. While the pathologist attempted to catalog the slash wounds and other injuries to Colleen, there were so many wounds that she could catalog only the most serious. Those included a slash wound and a stab wound on Colleen's back which would have been made while Colleen was alive.[14]

[13] Defendant's Brief at 38-39.

[14] XVII 1674-1688

25

Case 1:12-cv-00035-HSM-SKL    Document 8-17    Filed 08/01/12    Page 30 of 55
PageID #: 3525

There was also a gaping, incisive wound around Colleen's neck and numerous cut wounds to the throat area which were made while Colleen was alive and before she lost consciousness. Her left ear was mangled and there was not much of the ear left. Her skull was fractured and these injuries would have been made while Colleen was alive as well.[15] Colleen's death would have been very painful, according to the pathologist. Several skull fragments, as well as asphalt bits, were found inside the brain matter. Her skull was split in two from a minimum of five blows to the head. There were defensive wounds on her right arm, establishing that Colleen was fighting for her life. She would have been alive through all of this.[16] After the murder, Pike told a friend about what she had done, while smiling and dancing in a circle and showing her friends a piece of Colleen's skull. She continued to show off this skull fragment at breakfast.[17] She was singing at the time. She also bragged about the fact that a pentagram had been carved in Colleen's chest.[18]

In Pike's confession, she recounted at length how Colleen continually begged for her life. It is also clear from the confession that Colleen

---

[15] XVII. 1694-1697.

[16] XX 1746-1795.

[17] XXII. 1885-1901.

[18] XXII 1879-1884

26

was alive and conscious through the vast majority, if not all, of the indignities she suffered.[19]

It cannot be seriously contended that there is insufficient evidence to support the jury's finding of the aggravating circumstance that the murder was especially heinous, atrocious, and cruel and that it involved torture or serious physical abuse beyond that necessary to produce death.[20]

In addition, the jury returned the aggravating circumstance that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another. Again, the evidence is more than sufficient to establish this aggravator. In her confession, she said that she knew Colleen was going to tell on her and that she would "go to prison". She said that she kept thinking that "she had to do something to avoid jail for what she had done up to that point. She felt that she was 'as good as gone' if she let Colleen live". She told the police that since she had already cut Colleen "that'd be attempted murder you know." As Colleen continued to beg for her life. Pike told her that she was not about to let her go and get her in "a big shit load of trouble" and that she was not going to be "rotting in prison because of your

_____

[19] Exhibit 26.

[20] Torture similar to that inflicted on Colleen has previously been held sufficient to support a death penalty. *See e.g State v Middlebrooks*, 840 S.W 2d 317 (Tenn. 1992), *cert. dismissed*. 114 S. Ct 651 (1993)

27

stupid ass."²¹   Again, any rational person could have concluded that this aggravating circumstance had been proven beyond a reasonable doubt.

The mitigating circumstances offered to the jury were that Pike was young and that she did not premeditate the crime. But, as detailed in sub-section A, the evidence was more than sufficient to establish premeditation and her own expert made statements indicating that premeditation was present. In addition, she maintained that her difficult childhood should be considered as mitigation. But all of the relatives who testified for her also indicated that Pike had been out of control at a very early age. Further, they testified about other acts of violence, including an attempted attack with a butcher knife on her mother's boyfriend and a sexual attack on her two-year-old step-sister.²² Given this relatively weak mitigation and extremely strong proof in favor of the aggravating circumstances, any rational juror could have concluded, based upon the evidence before it, that the aggravating circumstances were met and outweigh the mitigating factors.²³

---

²¹Exhibit 26

²²XXVIII 2483-2539.

²³See e.g. State v. Bates, 804 S.W.2d 868 (Tenn. 1981)

28

## II. THE TRIAL COURT CORRECTLY COMPLIED WITH SUPREME COURT RULE 30.

Pike next asserts that the trial court erred by refusing to grant her motion to deny television photographic coverage of the pre-trial proceedings in this case. Since the Supreme Court promulgated Rule 30, Rules of the Supreme Court of Tennessee, the defendant "acknowledges that the argument objecting to cameras in the courtroom is probably without merit in and of itself."[24] The State agrees that the argument is without merit in and of itself.

Pike does not object to the manner in which the trial court regulated news media coverage, nor does she assert that the trial court did not follow of the criteria and safeguards found in Rule 30. She merely asserts that media coverage in this case made jury selection "difficult". While jury selection was lengthy, in part due to extensive media coverage of the case, there is no assertion that any particular juror was biased because of the media coverage. Furthermore, there is absolutely no reason to believe that there would have been less media coverage had the courtroom been closed. It is simply a fact that Pike committed a crime in a most sensational and brutal manner and, not surprisingly, media coverage for the pre-trial proceedings as well as the trial was substantial, just as they often are in these cases with or without the courtroom being open to cameras.

---

'Defendant's Brief at 40

29

Pike also asserts that she was denied a fair trial since the mandatory rule allowing cameras in the courtroom "arguably affected witnesses testimony and was generally disruptive of the proceedings."[25] But there is no citation to the record nor any specifics given as to the ways in which any testimony was affected or the proceedings disrupted. There is certainly no indication from reading the transcript that anything disruptive occurred. Since Pike has failed to cite any authority or any part of the record to support her argument. it has been waived.

---

[25] Defendant's Brief at 41

30

## III. THE TRIAL COURT DID NOT ERR IN REFUSING TO CHANGE VENUE.

Next. Pike maintains that the trial court erred in not changing venue. The record, however, supports the trial judge's decision. Venue may be changed "if it appears to the court that due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had."[26] The decision to change venue rests in the sound discretion of the trial court and will not be overturned absent a clear abuse of that discretion.[27]

In order to reverse her conviction on the basis of the denial of a motion for change of venue, Pike must prove that the jurors who actually sat on her jury and heard the case were biased or prejudiced against her.[28] Prejudice may not be presumed because of a simple showing that there was considerable pre-trial publicity.[29] To the contrary, the United States Supreme Court has stated that a juror is sufficiently qualified "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[30]

---

[26] Tenn. R Crim. P. 21(a).

[27] *State v Melson*, 638 S.W.2d 342, 360 (Tenn. 1982), *cert. denied* 459 U S 1137 (1983)

[28] *State v Evans*, 838 S W.2d 185, 192 (Tenn. 1992).

[29] *State v Kyger*, 787 S W 2d 13, 19 (Tenn. Crim. App. 1989).

[30] *Irvin v Dowd*, 366 U S 717, 723, 6 L.Ed.2d 751, 81 S.Ct. 1639 (1961).

31

In this case. although many potential jurors had indicated that they had heard something about the case in the media, every juror who was familiar with the case from news reports said that they could disregard the reports and render an impartial decision based on the evidence. Any potential juror who indicated that he or she could not disregard what they had heard were excused for cause by the trial court.

Pike asserts that this Court "which sits in Knoxville. could take judicial notice of media coverage in this case."[31] Such a fact is in appropriate for judicial notice. [32]Nevertheless, all of the parties and the trial judge agreed that there had been media coverage. But Pike points to no specific responses from jurors who actually sat on her jury which are troublesome. The only exchange quoted is from a juror who was, in fact, excused for cause by the trial judge.[33] This merely establishes that the trial court handled the issues properly on a juror-by-juror basis. While Pike complains that almost every prospective juror indicated that they heard about the case, that fact does not mean that they had formed any opinion about Pike's guilt. In denying Pike's renewed motion for a change of venue after jury selection was completed, the trial court found:

---

[31] Defendant's Brief at 43.

[32] *See* Rule 201(b). Tenn. R. Evid.

[33] Defendant's Brief at 44.

32

It is clear to the Court that we have gone through some 250, something like, prospective jurors.

Your Court has inquired with each of those jurors regarding their opinion, regarding what they know.

Ah, and I believe that we have found a jury that has at least made a promise to all of you, and during the course of *voir dire*, to keep an open mind. Jurors that had no opinion. And jurors who had or expressed an opinion or thought they had an opinion were released from service in this case.

This is a highly publicized case, though it is no different from any other highly publicized case.

The alleged facts, ah, such alleged facts as you raised, like Satanic worship, and other things were raised by certain jurors. That's true.

They raised the issues that, things that they read in the paper.

They weren't asked about them nor did any of them express the feeling that they could not give a fair hearing in this case based upon any of the issues.

The, ah, Court believes firmly that we have picked a jury, without even calling in a special venire, we picked a jury with all the available resources we had at the time. But there was no special venire called.

It was possible to pick a jury and we have done so.

And there is, I have seen no, other than the media, which, of course has the right to cover these things, "undue excitement" in accordance with the

33

Case 1:12-cv-00035-HSM-SKL    Document 8-17    Filed 08/01/12    Page 38 of 55
PageID #: 3533

rules. So, ah, there have not been crowds down here or individuals, you know, interested in the case. . . .. I think these jurors, as I think of all jurors in this county, take their job very seriously. They understand it. These jurors that we have selected, I think, are and will be opened minded and listen to the proof.[34]

As the judge noted, while there was media coverage, there was no "undue excitement" as required by the rules. The trial judge's thoughtful fact finding makes it quite clear that she did not abuse her discretion in determining that the motion be denied.

---

[34]XIX. 1545-1547.

## IV. JURORS WHO SAID THEY COULD NOT FOLLOW THE LAW WERE CORRECTLY EXCLUDED FROM THE JURY AND THIS DOES NOT DENY THE DEFENDANT ANY RIGHTS.

Pike makes a generalized attack upon the composition of her jury. First, she asserts there was not a fair cross-section of citizens, but specifically complains only that the jury was "pro death penalty" because jurors were excluded for cause if they could not consider imposition of the death penalty. But it has long been settled that the right to a fair and impartial jury in a capital case *prohibits* the inclusion of jurors who not will impose a death sentence without regard to the law or the facts.[35]

The United States Supreme Court, as well as the Tennessee Supreme Court, has rejected the notion that there is any violation of a defendant's constitutional rights where a prospective juror indicates that he or she is incapable of following the law.[36] Pike proposes a "don't ask, don't tell" procedure where jurors are not asked about their personal feelings toward the imposition of the death penalty.[37] But this suggestion ignores the fact that a defendant would not be served by such a rule because some jurors may wish to

---

[35]*Butler v State.* 789 S.W 2d 898, 899 (Tenn. 1990).

[36]*Witherspoon v Illinois.* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 1776 (1968); *Wainwright v. Witt.* 469 U S. 412. 105 S Ct 844, 83 L.Ed.2d 841 (1985).

[37]Defendant's Brief at 48.

35

automatically impose a death sentence in every instance where a murder has occurred. It also ignores the State's right to a fair trial.[18] Having persons on the jury who cannot follow the law with regard to the imposition of a death sentence impairs both the defendant's and the State's right to a fair trial.

Pike acknowledges that the trial court examined prospective jurors at length regarding their feelings and thoughts about the death penalty and also "allowed counsel to examine the prospective jurors who indicated that they had a problem with the imposition of the death penalty."[19] Accordingly, by Pike's own admission, the trial judge did exactly what was required of her under both state and federal law. Pike then asserts once again that there was not a fair cross-section of the citizens and that this Court should "revisit" the question of excluding those persons who cannot consider imposition of a death sentence. Of course, this Court is bound by the precedents of the Tennessee Supreme Court which have clearly held that there is no violation of either the state or federal constitution by application of the *Witherspoon* rule. Therefore, this Court is not free to revisit the matter.

Once again, Pike does not cite to any particular prospective juror who was excluded that should not have been. Rather, she merely makes a

---

[18]*See Houston v. State*, 593 S.W.2d 267, 272 (Tenn. 1980).

[19]Defendant's Brief at 49.

36

generalized attack on excluding those who cannot apply the law. Quite clearly.

under the prevailing law. the issue is without merit.

37

## V. THE SKULL OF THE VICTIM WAS CORRECTLY ADMITTED INTO EVIDENCE.

The victim's skull, as reconstructed by a forensic anthropologist, was admitted into evidence over Pike's objections. She asserts that there was no justification for admitting the skull and that it was simply admitted to be prejudicial and offensive.

Like photographs, the admission of physical evidence is to be determined by "the trial court in the exercise of its sound discretion. Absent a clear showing of abuse of discretion, a trial court's ruling will not be overturned."[40] Tenn. R. Evid. 401 defines relevant evidence as that evidence "having any tendency to make the existence of any fact that is of consequence more probable or less probable then it would be without the evidence." Rule 403 provides that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudicial, confusion of the issues, or misleading of the jury, or by considerations of waste of time, or needless presentation of cumulative evidence."

The introduction of the skull was an important portion of the medical testimony. The medical examiner testified that she had the skull pieces sent to a forensic anthropologist to be reconstructed. She did this because she

---

[40] *Kagle v. State*, 507 S.W.2d 121, 132 (Tenn. Crim. App. 1973); *State v. Banks*, 564 S.W.2d 946, 949 (Tenn. 1978).

38

could not tell exactly what had happened without the reconstruction. The skull was needed in order to see "the whole picture."[41] She also testified that the reconstructed skull would assist her in illustrating to a jury what occurred to the victim as far as the injuries to the head and would allow her to direct the jury's attention to the amount of force that was applied as well as the type of weapon that was used. Indeed, "there is still asphalt embedded in the skull" indicating that at least part of one of the murder weapons was actually contained in the skull.[42] In addition, Dr. Elkins the forensic pathologist, used the skull extensively in his testimony in order to illustrate where the injuries occurred and the type of force that was used. The Court found that the skull and the fragments were relevant and that it was appropriate to use the skull in testimony in order to establish damage and the cause of death.[43]

The Supreme Court held in *State v. Cazes*,[44] that it was appropriate in that case to allow a reconstructed skull into evidence to establish identity and because there was a "signature mark" for the murder weapon in the skull. Here, a portion of one of the murder weapons was actually embedded in the skull. Clearly, it was relevant for that reason as well as to show the force and scope of

---

[41] XXI. 1707.

[42] XXI. 1711-1712.

[43] XXI. 1725-1726.

[44] 875 S.W.2d 253 (Tenn. 1994).

39

injuries to the victim. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

40

VI. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE CONVICTIONS FOR MURDER IN THE FIRST-DEGREE AND CONSPIRACY TO COMMIT MURDER. (Defendant's Issues I and VI have been combined in Issue I on pages 21 - 28).

41

## VII. DEATH BY ELECTROCUTION DOES NOT VIOLATE THE CONSTITUTION.

Pike next contends that death by electrocution violates the cruel and unusual punishment clauses of the United States and Tennessee Constitutions. Pike admits, however, that the courts in this State have consistently upheld the punishment of electrocution as being constitutional. This Court, is of course, bound by the Tennessee Supreme Court's repeated holdings that electrocution as a means of carrying out the death sentence is not a violation of the cruel and unusual punishment clause.[45]

---

[45]*State v. Howell*, 868 S.W.2d 283, 258 (Tenn. 1993); *State v. Cazes*, 875 S.W.2d 253, (Tenn. 1994); *State v. Black*, 815 S.W.2d 166 (Tenn. 1991).

42

## VIII. THE NUMBER OF PEREMPTORY CHALLENGES GIVEN TO THE STATE WAS PROPER.

At the time Pike murdered Colleen, the Rules of Criminal Procedure awarded fifteen peremptory challenges to the defendant and eight for the State.[*] But by the time of trial, the legislature had revised the Rule to give an equal number of peremptory challenges to both the defendant and the State.[+] The trial judge applied the Rule as revised and gave the State and the defendant an equal number of peremptory challenges. Pike argues that this violates the *ex post facto* clause of the Tennessee Constitution and impaired her right to a fair trial because she was denied an impartial jury.

While it is true that statutes are generally presumed to operate prospectively, an exception exists for statutes that are procedural in nature.[+] The number of peremptory challenges accorded to the State is clearly procedural in nature. The substantive right involved is that both parties have an opportunity to secure a fair and impartial jury. But the specific number of challenges accorded, whether to the State or the defendant, is clearly procedural.

---

[*]Tenn. R. Crim. P. 24(d)(1995).

[+]Tenn. R. Crim. P. 24(d)(1966).

[+]*Kee v. Shelter Insurance*, 852 S.W.2d 226, 228 (Tenn. 1993).

43

Further, there are only three instances in which a procedural enactment *cannot* be applied retroactively. It cannot be applied retroactively where (1) the legislature has a manifested a contrary intention; (2) application of the new law would impair a vested right or contractual obligation; or (3) immediate application of the statute would produce an unjust result.[47] None of these exceptions applies here. Pike argues that having seven more peremptory challenges then the State was "integral" to her having a fair and impartial jury trial. But she cites no evidence whatsoever that having the same number of peremptory challenges resulted in a biased jury. Her assertion that these extra peremptory challenges are integral to the guarantee of a fair and impartial jury and that a disproportionate number is necessary to secure a defendant's right to a fair trial, is not so much an attack upon the retroactivity of the change in the rule but on the new the rule in general. Again, Pike presents no evidence nor any citations to the record to indicate that this jury was anything but fair and impartial.

Since the legislature did not manifest a contrary intention that the procedural change be applied immediately, because the application of the new rule does not impair a vested right or contractual obligation and because the

---

[47] *State Department of Human Services v. Defriece*, 937 S.W.2d 954, 958 (Tenn. App. 1996)

44

Case 1:12-cv-00035-HSM-SKL    Document 8-17    Filed 08/01/12    Page 49 of 55
PageID #: 3544

003518

immediate application does not produce an unjust result. the trial court was correct in applying the change in the rule immediately.

45

## IX. THE SENTENCE FOR CONSPIRACY TO COMMIT FIRST-DEGREE MURDER IS APPROPRIATE.

Finally, Pike complains that the trial judge should not have sentenced her to the maximum, twenty-five years, for conspiracy to commit first-degree murder and ordered the sentence to run consecutively to her death sentence.

Pike complains that although the trial court initially stated that it would not use the aggravating factors found by the jury in support of the death sentence to enhance this sentence, the trial court did use at least one of those factors, the cruelty of the murder. But Pike reaped a windfall to the extent that the trial judge did not use other factors supporting the death sentence, since there is absolutely no legal requirement to prohibit her from doing so. No case law is cited by Pike to indicate that it is inappropriate to consider the same factors. Indeed, because a jury in a death case is charged with considering all of the evidence regarding the nature and circumstances of the crime as well as the defendant, it is difficult to understand how a judge could put aside all of that information when sentencing on an additional conviction.

In finding applicable enhancement factors, the trial judge found that Pike was the leader in the commission of the offense involving two or more actors, that exceptional and cruelty was used in the commission of the offense, and that

46

the murder was committed to gratify Pike's desire for pleasure and excitement. The trial court supported the last enhancement factor by pointing out that the testimony established that Pike returned to the crime scene, carried a piece of the skull around and bragged about it, and was observed laughing and carrying on about the torture and murder. The judge also found that a deadly weapon was employed, and that the crime was committed under circumstances for which the potential for bodily injury was great. The trial court found no mitigating factors.

The trial court supported its finding that the sentence should run consecutively on the basis that Pike is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The Court stated that "there is absolutely no question in this Court's mind that you cared nothing about the human life of Ms. Slemmer or anyone else other then yourself in this situation."[50]

Given the heinous nature of the crime, the fact that the defendant never showed any remorse, and the other enhancement factors relied upon by the judge, the enhancement factors outweigh any possible mitigating circumstances Pike may assert.

---

[50] XXX 23

47

The final evidence of Pike's lack of any regard for human life is the letter she sent to her boyfriend and partner in crime, Tadaryl Shipp. She wrote this letter on the same day that she received her sentence of death. It reads:

> Tadaryl,
>
> Hey love! I just want you to know how much I love you! I have ten mos. left to live! Imagine that! I'd spend every moment with you if I could! Baby! I want you to tell them you lied in your statement and go along with mine! Do you have a copy of mine? If not, I'll get you one! "K"? I love you Big Bunches Baby and no matter WHAT they do to me, they can't change what's in my heart! Please write me! I miss you so much! Ya see what I get for tryin to be nice to that hoe? I went ahead and bashed her brains out so she'd die quickly instead of letting her bleed to death and suffer more, and they fuckin FRY me!!! Ain't that some shit? Please write and tell me what you're feeling? Baker said he'd give you some paper and shit while your out there! Also, tell your lawyer if he wants me to testify for you . . . I WILL! Love you for the rest of my life!
>
> [Signed] Lil Devil

(Emphasis in original).

Clearly Pike has no remorse for nor understanding of the brutal and heinous crime she committed. She is quite clearly a dangerous offender.

48

003522

## CONCLUSION

For these reasons, the State of Tennessee requests that the judgement of the trial court be affirmed.

Respectfully submitted,

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

KATHY MORANTE
Deputy Attorney General
Criminal Justice Division
425 Fifth Avenue North
Second Floor, Cordell Hull Building
Nashville, Tennessee 37243-0493
(615) 741-6439
B.P.R. No. 9616

49

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been

forwarded by first class mail, postage paid, to William Talman, P.O. Box 506,

Knoxville, Tennessee, 37901-0506 and Julie A. Martin, P.O. Box 426, Knoxville,

Tennessee, 37901-0426 on this the 9 day of June, 1997.

KATHY MORANTE
Deputy Attorney General

50