# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

CHRISTA GAIL PIKE )
)
    Petitioner, )
)
v. )    No. 1:12-CV-35
)    **DEATH PENALTY CASE**
DEBRA JOHNSON, WARDEN )
)
    Respondent. )

---

## ADDENDUM 3

## DOCUMENT 7

---

# IN THE SUPREME COURT OF TENNESSEE

## AT KNOXVILLE

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | KNOX COUNTY |
| v. | ) | S.CT. NO. |
| | ) | 03S01-9712-CR-00147 |
| CHRISTA GAIL PIKE, | ) | (Death Penalty) |
| | ) | |
| Appellant. | ) | |

## ON APPEAL AS OF RIGHT FROM THE JUDGMENT
## OF THE COURT OF CRIMINAL APPEALS

---

### BRIEF OF THE STATE OF TENNESSEE

---

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

KATHY MORANTE
Deputy Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, Tennessee 37243-0493
615-741-6439
B.P.R. No. 9616

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 2 of 90
PageID #: 3637

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.   THE EVIDENCE IS SUFFICIENT TO SUPPORT THE CONVICTIONS AND THE SENTENCE OF DEATH AND THE SENTENCE IS NEITHER EXCESSIVE OR DISPROPORTIONATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    II.   THE TRIAL COURT CORRECTLY COMPLIED WITH SUPREME COURT RULE 30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    III.  THE TRIAL COURT DID NOT ERR IN REFUSING TO CHANGE VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    IV.  JURORS WHO SAID THEY COULD NOT FOLLOW THE LAW WERE CORRECTLY EXCLUDED FROM THE JURY. . . . . . . 39

    V.   THE SKULL OF THE VICTIM WAS CORRECTLY ADMITTED INTO EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    VI.  THE EVIDENCE IS SUFFICIENT TO SUPPORT THE CONVICTIONS FOR MURDER IN THE FIRST-DEGREE AND CONSPIRACY TO COMMIT MURDER. . . . . . . . . . . . . . . . . . . . . 43

    VII.  DEATH BY ELECTROCUTION DOES NOT VIOLATE THE CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    VIII.  THE NUMBER OF PEREMPTORY CHALLENGES GIVEN TO THE STATE WAS PROPER. . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    IX.  THE SENTENCE FOR CONSPIRACY TO COMMIT FIRST-DEGREE MURDER IS APPROPRIATE. . . . . . . . . . . . . . . . . . . . . 47

i

CONCLUSION ........................................ 50

CERTIFICATE OF SERVICE ................................. 51

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 4 of 90
PageID #: 3639

# TABLE OF AUTHORITIES

## CASES

*Butler v. State,*
789 S.W.2d 898 (Tenn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Franklin v. State,*
513 S.W.2d 146 (Tenn. Crim. App. 1974) . . . . . . . . . . . . . . . . . . . 23

*Houston v. State,*
593 S.W.2d 267 (Tenn. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Irvin v. Dowd,*
366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961) . . . . . . . . . . 35

*Kagle v. State,*
507 S.W.2d 121 (Tenn. Crim. App. 1973) . . . . . . . . . . . . . . . . . . . 41

*Kee v. Shelter Insurance,*
852 S.W.2d 226 (Tenn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*State Department of Human Services v. Defriece,*
937 S.W.2d 954 (Tenn. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . 46,48

*State v. Banks,*
564 S.W.2d 946 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*State v. Bates,*
804 S.W.2d 868 (Tenn. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,30

*State v. Black,*
815 S.W.2d 166 (Tenn. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,44

*State v. Bland,*
___ S.W.2d ___ (Tenn., filed December 1, 1997) . . . . . . . . . . . . . 28

*State v. Cazes,*
875 S.W.2d 253 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 21,42,44

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 5 of 90
PageID #: 3640

003614

*State v. Coe,*
     665 S.W.2d 903 (Tenn. 1983) ........................... 29

*State v. Cone,*
     665 S.W.2d 87 (Tenn. 1984) ........................... 29

*State v. David Duncan,*
     698 S.W.2d 63 (Tenn. 1985) ........................... 29

*State v. Evans,*
     838 S.W.2d 185 (Tenn. 1992) ........................ 30,35

*State v. Harris,*
     839 S.W.2d 54 (Tenn. 1992) ........................... 21

*State v. House,*
     743 S.W.2d 141 (Tenn. 1987) ......................... 29

*State v. Howell,*
     868 S.W.2d 283 (Tenn. 1993) ......................... 44

*State v. Kyger,*
     787 S.W.2d 13 (Tenn. Crim. App. 1989) ................. 35

*State v. McCormick,*
     728 S.W.2d 48 (Tenn. 1989) ........................... 30

*State v. Melson,*
     638 S.W.2d 342 (Tenn. 1982) ........................ 30,35

*State v. Middlebrooks,*
     840 S.W.2d 317 (Tenn. 1992) ......................... 29

*State v. OGuinn,*
     709 S.W.2d 561 (Tenn. 1986) ......................... 29

*State v. Gaile K. Owens,*
     746 S.W.2d 441 (Tenn. 1988) ....................... 30, 31

iv

*State v. Smith,*
 868 S.W.2d 561 (Tenn. 1993) ............................. 30

*State v. Strouth,*
 620 S.W.2d 467 (Tenn. 1981) ............................. 29

*Wainwright v. Witt,*
 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) .......... 39

*Witherspoon v. Illinois,*
 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 1776 (1968) ......... 39

## STATUTES

Tenn. Code Ann. §§39-13-204(i)(5), (6) and (7) ..................... 3

Tenn. Code Ann. § 39-13-204(i)(6) ............................. 30

Tenn. Code Ann. § 39-13-206 ............................... 20

## OTHER AUTHORITIES

Tenn. R. App. P. 13(e) ...................................... 20

Tenn. R. Crim. P. 21(a) ................................. 35,45

Tenn. R. Evid. 401 ....................................... 41

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 7 of 90
PageID #: 3642

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

### I

Is the evidence sufficient to sustain the verdict of guilt and the sentence of death by electrocution?

### II

Did the trial court err by following the mandate of Supreme Court Rule 30 in denying Pike's motion to prohibit the news media from covering the case?

### III

Did the trial court properly deny the motion for change of venue?

### IV

Was Pike denied a fair cross-section of citizens on her jury because the trial court excluded potential jurors who could not follow the law in considering whether to impose the death penalty?

### V

Was the evidence consisting of the victim's skull properly admitted into evidence?

### VI

Did the trial court err in refusing to enter a judgment of acquittal on the count of conspiracy since the evidence was sufficient to sustain this count?

1

## VII

Is death by electrocution cruel and unusual punishment under the federal and state constitutions?

## VIII

Were the correct number of peremptory challenges afforded the State?

## IX

Is the sentence for conspiracy to commit first-degree murder excessive?

2

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 9 of 90
PageID #: 3644

## STATEMENT OF THE CASE

Eighteen year-old Christa Pike was indicted for first-degree murder and conspiracy to commit the first-degree murder of Colleen Slemmer. Shadolla Peterson and Tadaryl Shipp were also indicted on the same counts. (I. 2-3).[1] On May 23, 1995, the District Attorney indicated that he intended to seek the death penalty against Pike under Tenn. Code Ann. §§39-13-204(i)(5), (6) and (7). (I. 9). Numerous pre-trial motions were filed. (I. 10-III. 377).

Jury selection began on March 20, 1996. It was completed on March 23, 1996, and the trial began at that time. (III. 379-386). The guilt phase portion of the trial concluded on March 29, 1996, and a verdict of guilty to first-degree murder and conspiracy to commit first-degree murder was returned by the jury on March 29, 1996. The sentencing phase then began and, on March 30, 1996, the jury found that death by electrocution was the appropriate punishment for Pike. The jury found two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, §39-13-204(i)(5), and that the murder was committed for the purpose of avoiding, interfering with or

---

[1] The record on appeal consists of thirty-two volumes of testimony, thirty-one exhibits, and one supplemental volume consisting of the tape and transcription of Pike's confession. The record will be referred to by volume and page number.

3

preventing a lawful arrest or prosecution of the defendant or another, §39-13-204(i)(6). (III. 393-394).

Pike filed a motion for new trial on April 29, 1996. (III. 402-405). That motion was overruled in July, 1996. (III. 418-419). Pike was sentenced to twenty-five years as a standard offender for the conspiracy to commit first-degree murder conviction, and the Court ordered that sentence to run consecutively with the death sentence. (III. 409).

Notice of appeal was filed on August 20, 1996. (III. 420). The trial judge's report required by Supreme Court Rule 12 is contained in the record. (III. 429-439). On November 26, 1997, the Court of Criminal Appeals affirmed Pike's conviction and sentence in all respects.

4

## STATEMENT OF THE FACTS

### Guilt Phase

On January 13, 1995, Duncan Southerland, an employee of the University of Tennessee Grounds Department, was walking through the Agriculture Campus when he saw what he thought was a dead dog. Then he saw that there were clothes hanging in a tree and went to investigate. He found a very "gory" semi-nude body and summoned the police. (XVI. 1565-75).

The victim was later identified as Colleen Slemmer, a nineteen-year Job Corps student. Various officers who arrived at the scene after the body was discovered described Slemmer as "covered" with blood and dirt. She had been completely bludgeoned. One officer noted that she was so mutilated he was not sure he was looking at a face. (XVI. 1581-1591). Colleen had what looked like a rag wrapped around her neck. She was lying face down in debris. A bra with blood on it was found a distance from the body. Officers secured the scene but had to keep extending the crime scene because they kept finding more and more evidence, particularly pools of blood. In fact, the scene tripled in size because of the amount of additional blood, clothes and footprints found. By the end, the crime scene was 120 feet by 60 feet in size.

It was clear that Slemmer's throat had been slashed and that she had numerous cuts all over her body. A five pointed star in a circle, commonly known

5

as a pentagram, was carved on her chest. There was also a large puddle of blood about thirty feet from where Colleen's body was found. (XVI. 1575, 1596-1599; XVII. 1603, 1645). In addition, the crime scene was wet and muddy, and it was clear there had been a scuffle. (XVII. 1601). The area in which Slemmer was found was somewhat secluded. There were trampled bushes, hand and knee prints in the mud, and drag marks from the roadway where a puddle of blood stood. (XXIII. 1938-1946).

The pathologist testified that Colleen's body was covered with dirt and twigs and a cloth was tied around her mouth as a gag. She was nude from the waist up, but was wearing jeans, socks and shoes. The pathologist attempted to catalog the slash wounds and other injuries to Colleen, but there were so many wounds that she cataloged only the most serious. Some of those included a slash wound and a stab wound on Colleen's back, which would have been made by a sharp instrument while Colleen was alive. (XVII. 1674-1688). There was also a gaping incisive wound around Colleen's neck and numerous cut wounds to the throat area which would have been made while Colleen was alive and before she lost consciousness. There was not much remaining of her mangled left ear. There was also damage to the left side of Colleen's head. The skull was fractured. These injuries would have been made while Colleen was alive as well. (XVII. 1694-1697).

6

The cause of death was blunt trauma to the head with a resulting loss of consciousness in a short period of time. But the death would have been very painful. Several skull fragments were found in the brain matter. Colleen was hit from the left side onto a firm surface, such as a road, with great force. There were divots, that is black particles of asphalt, imbedded in the brain matter. (XX. 1732-1745). Her skull was split in two and there were a minimum of five blows to the head. There were defensive wounds on her right arm. There were innumerable superficial slash wounds on her back and chest. It was clear that her body had been dragged through the mud. It was also clear that one blunt object and one sharp object had been used to inflict the injuries to Colleen. She would have been alive through all of this. (XX. 1746-1795). The pathologist sent the skull pieces, including fragments which were removed from Colleen's brain, to an anthropologist, Dr. Marks, for reconstruction. (XXI. 1738).

On the same day that Colleen's body was found, Pike was in the Knox County Job Corps Center because she, as well as the victim and the others involved in this crime, were Job Corps students. A Job Corps counselor spoke with her at about 3:15 that afternoon and took a photograph of her at that time. When Pike left, she left a short black leather jacket on a chair. The counselor told another student to go get Pike because the room would be locked up for the holiday weekend at 4:00 p.m. and she would be unable to get her jacket. When

7

the office reopened on January 17, the jacket was still there. He took the jacket to Security. He further noted that Tadaryl Shipp was with Pike that afternoon, and Pike was not frightened or crying or emotional in any way when he saw her. (XXI. 1796-XXII. 1806).

The leather jacket was given to the Job Corps security manager and then to a crime lab specialist. Inside the breast pocket was a fork, a cigarette butt, a small piece of bone, and a piece of skull. (XXII. 1816, 1818-1823).

The physical anthropologist who was sent the skull pieces removed the soft tissue from the brain and let the skull dry. He put the skull together but there were seven or eight pieces missing along one side. It was clear that two weapons were used in the attack, one blunt and one sharp. The rock-like material that was embedded in the skull were pieces of asphalt. The anthropologist received the piece of the skull from the crime lab specialist that had been taken from Pike's jacket. It fit perfectly into the reconstructed skull.

Apparently, Pike had decided to kill Colleen days prior to the actual murder. She told Kimberly Ann Iloilo on January 11, 1995, that she was going to kill Colleen because she "had just felt mean that day". (XXII. 1874). On the day of the murder, January 12, Iloilo saw Colleen, Shadolla Patterson, Tadaryl Shipp and Pike walking away from the Job Corps Center up 17th Street. At

8

about 10:15 p.m., she saw Shipp, Patterson and Pike coming back. Colleen was not with them and was never seen again. (XXII. 1878-1879).

Later that night, Pike came to Iloilo's room to talk. She made Iloilo promise not to report what she was going to tell her. Pike then said she killed Colleen and brought back a souvenir. She showed Iloilo a piece of skull. Pike said she had cut Colleen's throat, beat her up, and thrown asphalt at her head. Pike said she cut Colleen's throat six times. Pike said that Colleen was asking them not to do that to her, but they kept cutting her throat because Colleen was a "witch". She knew Colleen was a witch because Colleen kept talking, even after all of these injuries, and she was trying to stop Colleen from talking. Pike said the asphalt was a big piece at first, but then it kept breaking as they kept throwing it at her. While Pike was telling this to Iloilo, Pike was smiling and dancing around in a circle, while talking about the asphalt. She was also singing "la la". Pike told her about the pentagram carved into Colleen's chest. Pike said that she used a meat cleaver to cut Colleen's back and a box cutter to cut her throat. (XXII. 1879-1884).

The next morning at breakfast, Iloilo asked Pike what she had done with the piece of skull. Pike said it was in her pocket and added, "And yes, I'm eating breakfast with it." Iloilo also testified that Pike had been dating Shipp for three or four months. (XXII. 1885-1901).

9

Another Job Corps student, Stephanie Wilson, recounted that on the day after the murder, Pike pointed to little spots on her shoes and said, "That ain't mud on my shoes, that's blood." She then showed Wilson a piece of skull which Pike had in a napkin in her pocket, said that it was human skull, and that it came from Colleen. Pike said that she slashed Colleen's throat six times and beat her in the head with a rock. Pike told Wilson that Colleen's blood and brains were "pouring out" and that she, Pike, did it because "she felt like it." (XXIII. 1913-1935).

On the day after the murder an investigator with the Knox County Police Department, Randy York, talked to both Shipp and Pike at the Police Station. They were given *Miranda* warnings. Pike said that she would give a statement, but only if she didn't have to mention who was with her when the crime was committed. She said she killed Colleen Slemmer and signed a consent to search her room for bloody jeans. York took Pike to the scene to retrace what occurred. Pike also said she discarded some items at a nearby Texaco station. (XXIII. 1947-1952). Subsequently, Colleen's identification card and a pair of gloves were located in the Texaco station's wastebasket. (XXIV. 2002-2005).

Pike said that she and Colleen and the others came down the jogging trail, and she directed York to where the body was found. Later, at the station, Pike gave a confession which was tape-recorded. (XXIII. 1954-1987).

10

Her confession discussed many details of the crime. In fact, the transcription of the statement is some 46 pages long. In part, Pike said that she was originally from North Carolina, was eighteen years old and was a participant in the Job Corps Program in Knoxville. She said that Colleen had been calling her names and talking about her to other students, and that Colleen would "run her mouth and run her mouth and be all in my face". She said she was planning on taking Colleen up "there" and "probably fighting her, beating her up . . . basically because I don't feel like putting up with this." On the ruse of going to Blockbuster Music, she got the victim to go with her. When they got her in the isolated area, she claimed she told Colleen that she did not know why she was doing things to "bug" her. At that point, Colleen started calling her a bitch. Pike admitted that "I just hit her and hit her and hit her and hit her" with her fist. She admitted that she "lashed out cause she made me so mad." While she was hitting her, Colleen kept saying "Please stop. Please stop". At first, Pike claimed not to have hit Colleen with anything but her hands.

Pike told the police that Colleen was still alive when she left. Pike denied having a little piece of Colleen's skull, stating "Why would I want a piece of her skull?". When asked again whether she had taken a piece of her skull, Pike replied, "That's disgusting, no. I did not."

11

She later said that she banged Slemmer's head on her knee. But Colleen kept screaming and screaming. Pike told Colleen that she didn't want Colleen to touch her. Pike that said she just lost control. She said she threw Colleen on the ground and starting "kicking her and kicking her and kicking her" and "I picked her head up and hit her head into the concrete but it never hurt her." She said it did not hurt Colleen because it did not knock her unconscious. Colleen was lying there and saying, "why are you doing this to me". Pike responded that she knew what Colleen was doing and saying to Tadaryl. Colleen kept saying, "Just fuck you." Pike said that she told Colleen to shut up and kicked her in the face and just kept kicking her. "I don't know where all I kicked her. I just kept kicking her. I know I kicked her in her face and in her side and I don't know where all else. But she was just crying."

The other person, identified by Pike as "he", pushed Colleen down on the ground while Colleen was trying to get back up. They dragged Colleen to another area up the road. Pike cut Colleen's stomach because Colleen grabbed her. Pike cut Colleen with a box cutter which Pike had in her hand. She cut Colleen because Colleen "almost made me cut my face. I just like reflex, uh, [sic] went down and I cut across her stomach." Colleen "screamed and screamed and screamed." Pike continued: "I just kept, I mean I just kept hearing somebody talking about, I mean there wasn't anybody really there but I just kept hearing

12

somebody say 'she's going to go tell on you. You're going to prison. You're going to jail, you're to do this.'"

Pike kept thinking that she had to do something to avoid jail for what she had done up to that point. She felt she was "as good as gone" if she let Colleen live. Since she had already cut Colleen, "that'd be attempted murder, you know". She said the other person cut Colleen's chest, but Pike cut her stomach. After all of this, Colleen rolled over and got up and tried to run again, so Pike cut her on the back with a big, long cut. Still, Colleen kept trying to run and run. They threw her in some bushes.

Colleen continued to beg her "to talk about it" in order to save her life. Pike told her to shut up. As Colleen continued to beg for her life, Pike said she told her, "But I'm not about to let you go from here and go tell on me and get me in a big shit load of trouble. Now I'm not going to be rotting in prison because of your stupid ass." Colleen promised to leave and not tell anyone but Pike told her to shut up.

She kicked Colleen in the face and told her to "shut up" repeatedly because Pike did not want to hear her talking. It got to the point that Pike could not hear Colleen anymore because she was hearing a voice telling her to find a way to get herself out of this. She made Colleen take off her T-shirt and cut off her bra. Colleen's face was bleeding "real bad". Finally, Colleen was just lying

13

there, but then she got up and took off running. Pike picked up a rock and threw it at her because she knew she could not catch Colleen. The rock hit Colleen in the back of the head and she fell and her head was bleeding. Colleen was still breathing and gurgling and jerking. So Pike kept hitting her and hitting her. At the end, Pike asked Colleen, "Colleen, do you know who's doing this to you?" According to Pike, Colleen was making moaning and groaning noises after this. She and the person with her then walked over to a mud puddle to wash their hands of blood. She also washed off her shoes a little bit. She said that they threw the box cutter away but she could not recall where. The other person had a miniature meat cleaver that Pike used to cut Colleen in the back. Before leaving, she and the other person picked up Colleen by the leg and drug her off to the side of the road. They left her in a pile of dirt.

Pike denied knowing who carved the pentagram into Colleen's chest. She and Shipp both wear pentagram necklaces, however. When asked if she practiced Satanism she said "No, no. I mean, I believe in God, you know? I'm not going to . . . no, there is no way." Shipp has a Satanic Bible that she saw him reading one day.

Pike cut Colleen's jeans in the crotch with the meat cleaver because Colleen had said to Tadaryl that she [Colleen] wanted to "fuck him". Cutting Colleen's crotch represented that now she [Colleen] could not do that and "I just

14

wanted to scare her, you know?" The piece of white cloth around Colleen's mouth had been a hair band Pike was using.

Numerous pieces of physical evidence were introduced, including photographs of Colleen's body, a photograph of Pike wearing a pentagram necklace, and a photograph of Shipp with the same type of necklace. (XXIII. 1980-87). In addition, a piece of asphalt with blood and hair on it, Pike's shoes with blood on them, and a Satanic Bible found in Shipp's room were also introduced into evidence. (XXIV. 2007-2081). The blood on Pike's shoes and coat was insufficient to confirm or deny that it was Colleen's. But the blood on Shipp's coat and the blood on Pike's jean and purse matched the victim's. There is a 1 in 200,047 chance in the Caucasian community that there would be such a match of this blood and 1 chance in 600,018 in the African-American community that there could be such a match. (XXV. 2106-2144).

Dr. Eric Engrum, who has his doctorate but is not a forensic psychologist (even though his letterhead says he provides forensic psychological services) testified for the defendant. He found Pike to be very bright. She tested in the 77th percentile on her I.Q., which is remarkable since she only completed the ninth grade. He believes that Pike has a personality disorder. She has difficulties in controlling her behavior because she is afraid she will be abandoned. Pike, according to Engrum, was deeply in love with Shipp and feared he would be

15

taken away by Colleen. In his opinion, Pike didn't act with deliberation or premeditation. Rather, she was "out of control". (XXV. 2172-2197).

He characterized Pike's dancing when she was talking about how she had murdered Colleen as an "emotional release". Once Pike started the attack she was unable to stop it. He believes that there is no question that Pike took Colleen to Tyson Park to beat her up, and there was no question *that* was a deliberate act. The fact that Pike said days before the murder that she would kill Colleen did not change his opinion of premeditation. He did not believe this threat; nevertheless, his diagnosis of Pike's mental status is based entirely on her own words. She told him that she had gotten out of control. If she was lying, that might change his opinion of her state of mind at the time of the murder.

At one point, Engrum admitted under cross-examination that when Pike stopped the attack because she thought someone was coming, and then continued it when she realized the coast was clear, what occurred afterward "may be" deliberate. He admitted that bashing in Colleen's head was deliberate, but said that Pike was acting out of jealousy, hate and anger. He admitted that the fact that Pike took the box cutter and the meat cleaver to the crime scene indicates a deliberate act. (XXVI. 2200-2228).

Pike also called Dr. William Bernet, a forensic psychologist, to testify that, while there was Satanic mutilation on Colleen's body, the murder

16

clear exactly how long it took from the first time Pike attacked Colleen until her eventual death, it is quite clear by the events recounted by Pike that it was not a slow process. Pike had plenty of time to determine that she should stop.

In fact, the reason she did not stop was because she wanted to get herself out of any trouble for the beating that had taken place up to that point. She told Colleen as she begged for her life: "I'm not about to let you go from here and go tell on me and get me in a big shit load of trouble. Now I'm not going to be rotting in prison because of your stupid ass."[8] Quite obviously, in making this assessment, Pike was rational and in control of her thought process and simply chose to murder Colleen. Finally, even Pike's own expert indicated that the fact that Pike took a box cutter and meat cleaver to the crime scene indicates a deliberate act, and that bashing in Colleen's head was deliberate.[9]

Accordingly, there was overwhelming evidence in this case that Pike made plans ahead of time to kill Colleen and then coldly and brutally carried out her plan.

## B. Conspiracy to commit first-degree murder

Pike's primary complaint is that there was no evidence that Peterson and Shipp were involved in the attack or that they in any way conspired with

---

[8]Exhibit 28.

[9]XXVI. 2200-2228.

22

Pike to commit murder. The proof established, however, that a box cutter and meat cleaver were used, in part, to kill Colleen. Pike asserts that there is no proof beyond her "uncorroborated statement" that a box cutter had been used on Colleen. But even slight evidence can be used to corroborate a confession.[10]

Here, a pathologist and forensic anthropologist testified that two instruments had been used to kill Colleen, in addition to the asphalt rock: one blunt instrument and one sharp instrument. A box cutter and meat cleaver meet these descriptions. Further, a Job Corps student testified that on the night of the murder, Pike told her that she had used a meat cleaver to cut Colleen's back and a box cutter to cut her throat.[11] Accordingly, there is more than sufficient evidence to corroborate Pike's admission that she used a meat cleaver and box cutter to kill Colleen. It is also clear from her confession that two persons went with her when she took Colleen to be killed. It is further clear that one of those persons, referred by Pike as "he" throughout her confession, participated in the torture. A witness testified that shortly before the murder, she saw Colleen, Patterson, Shipp, and Pike leaving the Job Corps Center. Later, she saw Shipp, Patterson, and Pike returning but never saw Colleen again.[12] Thus, there is more

---

[10]*Franklin v. State*, 513 S.W.2d 146, 151 (Tenn. Crim. App. 1974).

[11]XXII. 1879-1884.

[12]XXII. 1878-1879.

23

than sufficient circumstantial evidence to establish that there was a conspiracy to commit murder, and that Patterson and Shipp were involved.

## C. Sufficiency of evidence to support death sentence

Pike's entire argument that the evidence is insufficient to support her sentence is: ". . . the proof was insufficient to justify the jury's sentence of death by electrocution. Furthermore, the jury failed to properly consider and weigh the mitigating factors against the aggravating factors in this case."[13] The defendant does not say why the evidence was insufficient to support the aggravating circumstances, nor does she suggest why it is that the jury failed to properly weigh the mitigating factors against the aggravating factors in this case. In fact, if a record were ever to establish that the death sentence was appropriate, the evidence in this case does just that.

Briefly, the pathologist testified that Colleen was covered with dirt and twigs, was gagged, and was nude from the waist up. While the pathologist attempted to catalog the slash wounds and other injuries to Colleen, there were so many wounds that she could catalog only the most serious. Those included a slash wound and a stab wound on Colleen's back which would have been made while Colleen was alive.[14]

---

[13]Defendant's Brief at 37-38.

[14]XVII. 1674-1688.

24

There was also a gaping, incisive wound around Colleen's neck and numerous cut wounds to the throat area which were made while Colleen was alive and before she lost consciousness. There was not much remaining of her mangled left ear. Her skull was fractured, and these injuries would have been made while Colleen was alive as well.[15] Colleen's death would have been very painful, according to the pathologist. Several skull fragments, as well as asphalt bits, were found inside the brain matter. Her skull was split in two from a minimum of five blows to the head. There were defensive wounds on her right arm, establishing that Colleen fought for her life. She would have been alive through all of this.[16] After the murder, Pike told a friend about what she had done, while smiling and dancing in a circle, and showing off a piece of Colleen's skull. She continued to show off this skull fragment at breakfast.[17] She also bragged about the fact that a pentagram had been carved in Colleen's chest.[18]

In Pike's confession, she recounted at length how Colleen continually begged for her life. It is also clear from the confession that Colleen

---

[15]XVII. 1694-1697.

[16]XX. 1746-1795.

[17]XXII. 1885-1901.

[18]XXII. 1879-1884.

25

was alive and conscious through the vast majority, if not all, of the indignities she suffered.[19]

It cannot be seriously contended that there is insufficient evidence to support the jury's finding of the aggravating circumstance that the murder was especially heinous, atrocious, and cruel and that it involved torture or serious physical abuse beyond that necessary to produce death.

In addition, the jury returned the aggravating circumstance that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another. Again, the evidence is more than sufficient to establish this aggravator. In her confession, she said that she knew Colleen was going to tell on her and that she would "go to prison". She said that she kept thinking that "she had to do something to avoid jail for what she had done up to that point. She felt that she was 'as good as gone' if she let Colleen live". She told the police that since she had already cut Colleen "that'd be attempted murder you know." As Colleen continued to beg for her life, Pike told her that she was not about to let her go and get her in "a big shit load of trouble" and that she was not going to be "rotting in prison because of your

---

[19]Exhibit 26.

26

stupid ass."[20]   Again, any rational person could have concluded that this aggravating circumstance had been proven beyond a reasonable doubt.

The mitigating circumstances offered to the jury were that Pike was young and that she did not premeditate the crime.  But, as detailed in sub-section A, the evidence was more than sufficient to establish premeditation, and her own expert made statements indicating that premeditation was present.  In addition, she maintained that her difficult childhood should be considered as mitigation. But all of the relatives who testified for her also indicated that Pike had been out of control at a very early age.  Further, they testified about other acts of violence, including an attempted attack with a butcher knife on her mother's boyfriend, and a sexual attack on her two-year-old step-sister.[21]  Given this relatively weak mitigation and extremely strong proof in favor of the aggravating circumstances, any rational juror could have concluded, based upon the evidence before it, that the aggravating circumstances were met and outweigh the mitigating factors.[22]

---

[20]Exhibit 26.

[21]XXVIII. 2483-2539.

[22]*See e.g. State v. Bates*, 804 S.W.2d 868 (Tenn. 1981).

27

003638

## D. Proportionality analysis

In the recent case of *State v. Bland*,[23] this Court took an in-depth look at Tennessee's statutorily-mandated proportionality review and decided to maintain the precedent-seeking approach in conducting disproportionality review. This Court clarified that the statutory review requires a comparison only of those cases in which a capital sentencing hearing was actually conducted.[24] The goal of the review is to eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty.[25] Accordingly, proportionality review considers the nature and circumstances of the crimes that are claimed to be similar, including the statutory aggravating circumstances found by the jury and the evidence of mitigating circumstances.[26] Additionally, the character and record of the defendants involved should be considered.[27] The sentence of death is not disproportionate unless "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been

---

[23] ___ S.W.2d ___ (Tenn., filed December 1, 1997) (for publication) slip op. at p. 23 (relevant portion of opinion attached).

[24]*Id.*, at 28.

[25]*Id.*, at 22.

[26]*Id.*, at 27.

[27]*Id.*

28

imposed."[28]  A review of the nature and circumstances of this murder, along with

the character and record of the defendant, supports the finding that the sentence

of death by electrocution was not disproportionate in Pike's case.

### 1. Nature and circumstances of the offense

As set out earlier, the evidence of torture in this case is

overwhelming.  It was premeditated and carried out in a manner that was

calculated to cause a tremendous amount of physical and emotional pain to the

victim.

This Court has affirmed numerous death sentences on the basis that

the murder was especially heinous, atrocious or cruel as set out in subsection

(i)(5).  Many of those cases involve far less torture than occurred here.  A few

include: *State v. Strouth*, 620 S.W.2d 467 (Tenn. 1981) (victim knocked

unconscious and throat slit); *State v. Coe*, 665 S.W.2d 903 (Tenn. 1983) (child

raped, strangled, stabbed); *State v. Cone*, 665 S.W.2d 87 (Tenn. 1984) (elderly

couple killed by infliction of 16-22 blows to head); *State v. David Duncan*, 698

S.W.2d 63 (Tenn. 1985) (raped and killed clerk by slitting throat); *State v.

O'Guinn*, 709 S.W.2d 561 (Tenn. 1986) (victim brutally beaten and strangled);

*State v. House*, 743 S.W.2d 141 (Tenn. 1987) (victim's body covered with severe

bruises); *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992) (victim tortured for

---

[28]*Id.*, at 28.

29

three and one-half hours). In one case, a female was given the death sentence for procuring another to kill her husband. The victim suffered 21 blows to the head from a tire iron. The skull was crushed and bone fragments were driven into the victim's brain. *State v. Gaile K. Owens*, 746 S.W.2d 441 (Tenn. 1988).

The jury also found that Pike committed the murder in part to avoid detection or arrest. Tenn. Code Ann. § 39-13-204(i)(6). This Court has upheld this aggravating circumstance under similar facts as well. *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993) (step-children murdered to prevent arrest for killing wife); *State v. Evans*, 838 S.W.2d 185 (Tenn. 1992) (killed clerk during robbery); *State v. Black*, 815 S.W.2d 166 (Tenn. 1991) (killed child to avoid arrest for killing girlfriend); *State v. Bates*, 804 S.W.2d 868 (Tenn. 1991); *State v. McCormick*, 728 S.W.2d 48 (Tenn. 1989); *State v. Melson*, 638 S.W.2d 342 (Tenn. 1982) (killed employer's wife who threatened to expose theft of gasoline).

## 2. Characteristics of the defendant

In *Bland*, slip op. at 26-27, this Court listed several criteria relevant to a comparison of characteristics of defendants on death row. One of those considerations was the age of the defendant. Pike was 18 at the time of the offense. In *State v. Mann*, ___S.W.2d___ (Tenn., filed December 8, 1997) (for publication), slip op. at p. 23, fn. 5 (copy attached in relevant portion), this Court noted that at least 44 persons sentenced to death in Tennessee since 1977 were

30

between the ages of 19 and 25 when they committed murder. At least ten of those on death row were 18 or 19 years old when the offense was committed. *Id.* Accordingly, the fact that Pike was 18 when she committed this crime does not place her in any unique category nor suggest that the sentence is disproportionate. Upon her conviction, Pike became the second woman to receive a death sentence in Tennessee.[29] *Bland* lists the sex of the defendant as a consideration in conducting a proportionality analysis, but does not set out in what way this factor is to be considered. It would appear, however, that the gender of the defendant would be significant only if it appeared that the sentence was based, in part, on her sex. But, in this case, there can be no question that the person convicted of this crime--as horrible as it was--would receive a death sentence, whether the perpetrator was male or female. Accordingly, it cannot be said that the sentence is disproportionate because of Pike's gender.

Finally, another consideration established in *Bland* is to look at the defendant's remorse. This record establishes an astounding lack of remorse. After brutally killing Slemmer, Pike bragged about her deeds to friends, carried a piece of the victim's skull with her, and laughed and danced when recounting the slaying. She wrote a letter to her boyfriend and partner in crime, Tadaryl Shipp,

---

[29]Gaile K. Owens was sentenced to death in 1988. *State v. Owens, supra.*

31

immediately after being sentenced to death.  Pike signed the letter "Lil Devil",

and said, in part, in the letter:

> "Ya see what I <u>get</u> for tryin to be nice to that hoe?  I went ahead and bashed her brains out so she'd die quickly instead of letting her <u>bleed</u> to death and suffer more, and they fuckin <u>FRY</u> me!!!  Aint that some shit?

Unquestionably, the sentence of death in this case is neither

excessive or disproportionate.

32

Case 1:12-cv-00035-HSM-SKL     Document 8-22     Filed 08/01/12     Page 34 of 90
PageID #: 3669

## II. THE TRIAL COURT CORRECTLY COMPLIED WITH SUPREME COURT RULE 30.

Pike next asserts that the trial court erred by refusing to grant her motion to deny television coverage of the pre-trial proceedings in this case. Of course, this Court has promulgated a rule which permits media coverage with certain safeguards. Rule 30, Rules of the Supreme Court of Tennessee. Pike "acknowledges that the argument objecting to cameras in the courtroom is probably without merit in and of itself"[30] in light of this rule.

Pike does not object to the manner in which the trial court regulated news media coverage, nor does she assert that the trial court did not follow of the criteria and safeguards found in Rule 30. Rather, she simply asserts that the media should have been barred despite Rule 30. In response to the finding of the Court of Criminal Appeals that there was nothing in the record to suggest any adverse effect from having cameras in the courtroom during the pre-trial proceedings, Pike "suggests that the record of jury selection demonstrates that intense media coverage made it impossible to get a fair trial."[31] But, while jury selection was lengthy in part due to extensive media coverage, there is no assertion that any particular juror was biased because of the media coverage.

---

[30]Defendant's Brief at 40.

[31]Defendant's brief at 40.

33

Case 1:12-cv-00035-HSM-SKL   Document 8-22   Filed 08/01/12   Page 35 of 90
PageID #: 3670

Furthermore, there is no reason to believe that there would have been less intense media coverage had the courtroom been closed. It is simply a fact that Pike committed a crime in a very sensational and brutal manner and, not surprisingly, media coverage for the pre-trial proceedings, as well as the trial, was substantial--just as they often are in these kinds of cases with or without the courtroom being open to cameras.

Pike also asserts that she was denied a fair trial since the mandatory rule allowing cameras in the courtroom "arguably affected witnesses testimony and was generally disruptive of the proceedings."[32] But there is no citation to the record nor any specifics given as to the ways in which any testimony was affected or the proceedings disrupted. There is certainly no indication from reading the transcript that anything disruptive occurred. Since Pike has failed to cite any authority or any evidence in the record to support her argument, it has been waived.

---

[32]Defendant's Brief at 41.

34

003645

### III. THE TRIAL COURT DID NOT ERR IN REFUSING TO CHANGE VENUE.

Next, Pike maintains that the trial court erred in not changing venue. The record, however, supports the trial judge's decision. Venue may be changed "if it appears to the court that due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had."[33] The decision to change venue rests in the sound discretion of the trial court and will not be overturned absent a clear abuse of that discretion.[34]

In order to reverse her conviction on the basis of the denial of a motion for change of venue, Pike must prove that the jurors who actually sat on her jury and heard the case were biased or prejudiced against her.[35] Prejudice may not be presumed because of a simple showing that there was considerable pre-trial publicity.[36] To the contrary, the United States Supreme Court has stated that a juror is sufficiently qualified "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[37]

---

[33]Tenn. R. Crim. P. 21(a).

[34]*State v. Melson*, 638 S.W.2d 342, 360 (Tenn. 1982), *cert. denied* 459 U.S. 1137 (1983).

[35]*State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992).

[36]*State v. Kyger*, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989).

[37]*Irvin v. Dowd*, 366 U.S. 717, 723, 6 L.Ed.2d 751, 81 S.Ct. 1639 (1961).

35

In this case, although many potential jurors indicated that they had heard something about the case in the media, every juror who was familiar with the case from news reports said that they could disregard the reports and render an impartial decision based on the evidence. Any potential juror who indicated that he or she could not disregard what they had heard was excused for cause by the trial court.

Pike fails to point to even one response from any of the jurors who actually sat on her jury that is troublesome. The only exchange quoted is from a juror who was, in fact, excused for cause by the trial judge.[38] This merely establishes that the trial court handled the issues properly on a juror-by-juror basis. While Pike complains that almost every prospective juror indicated that they heard about the case, that does not mean that they had formed any opinion about her guilt. In denying Pike's renewed motion for a change of venue after jury selection was completed, the trial court found:

> It is clear to the Court that we have gone through some 250, something like, prospective jurors.
>
> Your Court has inquired with each of those jurors regarding their opinion, regarding what they know.
>
> Ah, and I believe that we have found a jury that has at least made a promise to all of you, and during the course of *voir dire*, to keep an open mind. Jurors

---

[38]Defendant's Brief at 43.

36

that had no opinion. And jurors who had or expressed an opinion or thought they had an opinion were released from service in this case.

This is a highly publicized case, though it is no different from any other highly publicized case.

The alleged facts, ah, such alleged facts as you raised, like Satanic worship, and other things were raised by certain jurors. That's true.

They raised the issues that, things that they read in the paper.

They weren't asked about them nor did any of them express the feeling that they could not give a fair hearing in this case based upon any of the issues.

The, ah, Court believes firmly that we have picked a jury, without even calling in a special venire, we picked a jury with all the available resources we had at the time. But there was no special venire called.

It was possible to pick a jury and we have done so.

And there is, I have seen no, other than the media, which, of course has the right to cover these things, "undue excitement" in accordance with the rules. So, ah, there have not been crowds down here or individuals, you know, interested in the case. . . ., I think these jurors, as I think of all jurors in this county, take their job very seriously. They understand it. These jurors that we have selected, I think, are and will be opened minded and listen to the proof.[39]

---

[39]XIX. 1545-1547.

37

As the judge noted, while there was media coverage, there was no "undue excitement" as required by the rules. The trial judge's thoughtful fact finding makes it quite clear that she did not abuse her discretion in determining that the motion be denied.

38

## IV. JURORS WHO SAID THEY COULD NOT FOLLOW THE LAW WERE CORRECTLY EXCLUDED FROM THE JURY.

Pike makes a generalized attack upon the composition of her jury. First, she asserts there was not a fair cross-section of citizens, but specifically complains only that the jury was "pro death penalty" because jurors were excluded for cause if they could not consider imposition of the death penalty. But it has long been settled that the right to a fair and impartial jury in a capital case *prohibits* the inclusion of jurors who will refuse to impose a death sentence, under any circumstances.[40]

The United States Supreme Court, as well as this Court, has rejected the notion that there is any violation of a defendant's constitutional rights where a prospective juror is removed because he or she is incapable of following the law.[41] Pike proposes a "don't ask, don't tell" procedure where jurors are not asked about their personal feelings toward the imposition of the death penalty.[42] But this suggestion ignores the fact that a defendant would not be served by such a rule since some jurors may wish to automatically impose a death sentence in every instance where a murder has occurred. It also ignores the State's right to a fair

---

[40]*Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990).

[41]*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 1776 (1968); *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

[42]Defendant's Brief at 49.

39

trial.[43] Having persons on the jury who cannot follow the law with regard to the imposition of a death sentence impairs both the defendant's and the State's right to a fair trial.

Pike acknowledges that the trial court examined prospective jurors at length regarding their feelings and thoughts about the death penalty and also "allowed counsel to examine the prospective jurors who indicated that they had a problem with the imposition of the death penalty."[44] Accordingly, by Pike's own admission, the trial judge did exactly what was required of her under both state and federal law.

Once again, Pike does not cite to any particular prospective juror who was excluded but should not have been. Rather, she merely makes a generalized attack on excluding those who could not apply the law. Quite clearly, under the prevailing law, the issue is without merit.

---

[43]See *Houston v. State*, 593 S.W.2d 267, 272 (Tenn. 1980).

[44]Defendant's Brief at 49.

40

## V. THE SKULL OF THE VICTIM WAS CORRECTLY ADMITTED INTO EVIDENCE.

The victim's skull, as reconstructed by a forensic anthropologist, was admitted into evidence over Pike's objections. She asserts that there was no justification for admitting the skull and that it was simply admitted to be prejudicial and offensive.

Like photographs, the admission of physical evidence is to be determined by "the trial court in the exercise of its sound discretion. Absent a clear showing of abuse of discretion, a trial court's ruling will not be overturned."[45] Tenn. R. Evid. 401 defines relevant evidence as that evidence "having any tendency to make the existence of any fact that is of consequence more probable or less probable then it would be without the evidence." Rule 403 provides that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of waste of time, or needless presentation of cumulative evidence."

The introduction of the skull was an important portion of the medical testimony. The medical examiner testified that she had the skull pieces sent to a forensic anthropologist to be reconstructed. She did this because she

---

[45]*Kagle v. State*, 507 S.W.2d 121, 132 (Tenn. Crim. App. 1973); *State v. Banks*, 564 S.W.2d 946, 949 (Tenn. 1978).

41

could not tell exactly what had happened without the reconstruction. The skull was needed in order to see "the whole picture."[46] She also testified that the reconstructed skull would assist her in illustrating to a jury what occurred to the victim and would allow her to direct the jury's attention to the amount of force that was applied, and the type of weapon that was used. Indeed, "there is still asphalt embedded in the skull", indicating that at least part of one of the murder weapons was actually contained in the skull.[47] In addition, the forensic pathologist used the skull extensively in his testimony to illustrate where the injuries occurred and the type of force that was used. The court found that the skull and the fragments were relevant, and that it was appropriate to use the skull in testimony in order to establish damage and the cause of death.[48]

This Court held in *State v. Cazes*[49] that it was appropriate to allow a reconstructed skull into evidence to establish identity and because there was a "signature mark" for the murder weapon in the skull. Here, a portion of one of the murder weapons was actually embedded in the skull. Clearly, it was relevant for that reason, as well as to show the force and scope of injuries to the victim. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

---

[46]XXI. 1707.

[47]XXI. 1711-1712.

[48]XXI. 1725-1726.

[49]875 S.W.2d 253 (Tenn. 1994).

42

VI. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE CONVICTIONS FOR MURDER IN THE FIRST-DEGREE AND CONSPIRACY TO COMMIT MURDER. (Defendant's Issues I and VI have been combined in Issue I on pages 21 - 28).

43

## VII. DEATH BY ELECTROCUTION DOES NOT VIOLATE THE CONSTITUTION.

Pike next contends that death by electrocution violates the cruel and unusual punishment clauses of the United States and Tennessee Constitutions. Pike admits, however, that the courts in this State have consistently upheld the punishment of electrocution as being constitutional.[50]

---

[50]*State v. Howell*, 868 S.W.2d 283, 258 (Tenn. 1993); *State v. Cazes*, 875 S.W.2d 253, (Tenn. 1994); *State v. Black*, 815 S.W.2d 166 (Tenn. 1991).

44

## VIII. THE NUMBER OF PEREMPTORY CHALLENGES GIVEN TO THE STATE WAS PROPER.

At the time Pike murdered Colleen, the Rules of Criminal Procedure awarded fifteen peremptory challenges to the defendant and eight to the State.[51] But by the time of trial, the legislature had revised the Rule to give an equal number of peremptory challenges to both the defendant and the State.[52] The trial judge applied the Rule as revised, and gave the State and the defendant an equal number of peremptory challenges. Pike argues that this violates the *ex post facto* clause of the Tennessee Constitution and impaired her right to a fair trial because she was denied an impartial jury.

While it is true that statutes are generally presumed to operate prospectively, an exception exists for statutes that are procedural in nature.[53] While a substantive right is involved that both parties have an opportunity to secure a fair and impartial jury---the specific number of challenges accorded, whether to the State or the defendant, is clearly procedural.

Further, there are only three instances in which a procedural enactment *cannot* be applied retroactively. It cannot be applied retroactively

---

[51]Tenn. R. Crim. P. 24(d)(1995).

[52]Tenn. R. Crim. P. 24(d)(1966).

[53]*Kee v. Shelter Insurance*, 852 S.W.2d 226, 228 (Tenn. 1993).

45

where (1) the legislature has a manifested a contrary intention; (2) application of the new law would impair a vested right or contractual obligation; or (3) immediate application of the statute would produce an unjust result.[54] None of these exceptions applies here. Pike argues that having seven more peremptory challenges then the State was "integral" to her having a fair and impartial jury trial. But she cites no evidence that having the same number of peremptory challenges resulted in a biased jury. Her assertion that these extra peremptory challenges are "integral to the guarantee of a fair and impartial jury," and that a disproportionate number is necessary to secure a defendant's right to a fair trial, is not so much an attack upon the retroactive application of the change but on the new rule generally. Again, Pike presents no evidence nor cites to any portion of the record to indicate that this jury was anything but fair and impartial.

Since the legislature did not manifest a contrary intention that the procedural change be applied immediately, because the application of the new rule does not impair a vested right or contractual obligation, and because the immediate application does not produce an unjust result, the trial court was correct in applying the change in the rule immediately.

---

[54]*State Department of Human Services v. Defriece*, 937 S.W.2d 954, 958 (Tenn. App. 1996).

46

# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

FOR PUBLICATION

STATE OF TENNESSEE,              )

    Appellee,              )

v.              )

GLENN BERNARD MANN,              )

    Appellant,              )

**Filed: December 8, 1997**

DYER CRIMINAL

Hon. Joe G. Riley
Judge

**FILED**

DEC 08 1997

Clerk of the Courts
Rec'd By MH

Supreme Court
No. 02-S01-9609-CC-00077

FOR APPELLANT:

William P. Redick, Jr.
Whites Creek, Tennessee

Peter D. Heil
Nashville, Tennessee

Charles S. Kelly
Dyersburg, Tennessee
(Trial Only)

Lyman Ingram
Assistant District Public Defender
Dyersburg, Tennessee
(Trial Only)

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Amy L. Tarkington
Assistant Attorney General
Nashville, Tennessee

C. Phillip Bivens
District Attorney General

# OPINION

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.              DROWOTA, J.

## COMPARATIVE PROPORTIONALITY REVIEW

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The defendant is therefore, asserting that his claim is comparatively disproportionate. In the recent case of State v. Bland, ___ S.W.2d ___ (Tenn. 1997), we discussed in detail the precedent-seeking analysis this Court has employed over the past eighteen years in determining whether the death sentence imposed in a particular case is *disproportionate* to the sentence imposed in similar cases. In conducting comparative proportionality review, we begin with the presumption that the sentence of death is proportional to the crime of first degree murder. Therefore, as we emphasized in Bland the purpose of comparative proportionality review is to "eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty." Id., ___ S.W.2d at ___.

As we had previously explained, and reaffirmed in Bland, comparative proportionality review is not a rigid, objective test. Id., ___ S.W.2d at ___, Slip Op. at 23; Cazes, 875 S.W.2d 253, 270 (Tenn. 1994). We do not employ a mathematical formula or scientific grid, nor are we bound to consider only those cases in which exactly the same aggravating circumstances have been found by the jury. State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). After identifying a pool of similar cases, we consider a multitude of variables, some of which were listed in Bland, in light of the experienced judgment and intuition of the members of this Court. Bland, ___ S.W.2d at ___.

-22-

003659

Applying that analysis, we conclude that imposition of the death penalty for the senseless, brutal, premeditated killing of this innocent elderly woman is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Mann's actions showed a total disregard for human life. The victim, a sixty-two year old widow, lived near the defendant and had befriended Mann and his family. As a result of her kindness toward him, the defendant knew that the victim lived alone and was hearing impaired. In fact, he chose to burglarize her home because he had specific knowledge about her vulnerability and about her property. When the victim walked out of her bedroom and surprised Mann in the act of burglarizing her home, he did not hesitate to brutally assault and murder her. He had no provocation, except her recognition of him. The defendant inflicted *at least* forty wounds upon the victim, including fifteen blows to the head, eleven stab wounds to the chest, and fourteen puncture wounds to her abdomen, all of which resulted in pain for the victim. In addition, the defendant digitally raped and manually strangled the victim. Throughout the entire ordeal, according to the defendant's own statement the victim was alive and conscious and calling out her attacker's name. Other proof indicates that the victim was alive and conscious for *at least* some part of the attack. Following the murder, Mann was calm. He went home, washed himself, changed clothes, and went to bed. He calmly spoke to the police the next day. Though the defendant was young at the time of the killing, only twenty-two years old, many others have arrived on death row at an earlier age.[5] Considering the nature of this crime and the character of this defendant, this murder places Mann into the class of defendants for whom the death penalty is an appropriate punishment. Based upon

---

[5]At least 44 of the persons sentenced to death in Tennessee since 1977 were between the ages of 19 and 25 when they committed the murder and at least ten were 18 or 19 when the offense was committed.

-23-

our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Bush, 942 S.W.2d 489 (Tenn. 1997), the eighteen-year-old defendant was sentenced to death for the murder of a helpless seventy-nine year old widow. There, the defendant used the victim's friendship with his grandmother to gain access to her home. Therefore, Bush, like the defendant in this case, was aware that the victim lived alone and was vulnerable. Once inside, Bush, like the defendant in this case, brutally murdered the helpless victim without any provocation by savagely beating her with a stick and by stabbing her forty-three times. He later boasted to acquaintances about practicing karate on the victim. As in this case, the jury found two aggravating circumstances including that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. 39-13-204(i)(5) & (I)(6) (1991 Repl).[6] The jury imposed the death penalty even though Bush, unlike the defendant in this case, presented substantial proof in mitigation relating to his youth, troubled childhood, mental disease or defect, and lack of a prior criminal record.

In State v. Sylvester Smith, 893 S.W.2d 908 (Tenn. 1994), the forty-one-year-old defendant was sentenced to death for the murder of an elderly widow who lived

---

[6]Although the trial judge erroneously charged the jury in the language of the 1989 statute, in Bush we held that the error was harmless beyond a reasonable doubt, concluding that the proof established that the murder was heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-13-203(i)(5) (1977 & 1982) (Repealed).

- 24 -

003661

alone in her home in Shelby County. During the course of robbing her home, the defendant beat the victim over her entire body. Her throat had been cut twice. She had been raped, and her body placed in a tub of water one to two inches deep, with a blanket wrapped around her head. The proof showed that Smith carried a weapon with him to commit the crime, a knife he had taken from his sister's home. In mitigation, the defendant introduced proof of his low IQ and attempted to establish that he was mentally retarded. As in this case, Smith sexually assaulted and brutally murdered the elderly female victim in her own home, without any provocation or justification. The jury found three aggravating circumstances, including that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind,[7] Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), the twenty-seven-year-old defendant was sentenced to death for the murder of a helpless, elderly woman who lived alone. Cazes worked sporadically as a welder for the victim's step-grandson, and like the defendant in this case, Cazes had been to the home of his victim on prior occasions. Like the defendant in this case, Cazes struck his victim in the head numerous times with a blunt object, most likely a welder's chipping hammer which he had taken with him to the scene of the crime. Her skull was virtually crushed, but the proof showed, as it does in this case, that she was alive and conscious during a portion of the attack. As did the defendant in this case, Cazes sexually assaulted the

---

[7]The jury also found two other aggravating circumstances: that the defendant had been previously convicted of violent felony offenses and that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39-2-203 (i)(2) & (7) (1982). Even though it was error under State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992) (Drowota, J. & O'Brien, J., Dissenting) for the jury to consider the felony murder aggravating circumstance since Smith was convicted of first degree felony murder, this Court determined that the error was harmless beyond a reasonable doubt.

-25-

victim, raping her both anally and vaginally at or near the time of death. Cazes presented a great deal of proof about his troubled childhood, and he presented expert testimony about his impaired mental abilities. The jury found three aggravating circumstances, including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.[8] Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), the twenty-nine-year-old defendant was sentenced to death for the murder of a helpless seventy-five year old woman who lived alone. Barber and his brother decided to rob the victim. Barber's brother knew the victim because he had worked for her on several prior occasions. To gain entry into her home, the defendant broke out the back window with a crescent wrench. When the victim recognized Barber's brother and started toward the phone to call the police, Barber repeatedly hit her on the head with the crescent wrench. She was alive and conscious during the attack as evidenced by the defensive wounds on her arms and hands. As in this case, the defendant was aware, because of the relationship between the victim and his brother, that the victim was in bad health and used a walker. As did Mann in this case, Barber had no hesitation about brutally murdering the victim upon no more provocation than her recognition of one of her assailants. As mitigation, Barber, like Mann, relied upon his youth, and also his capacity for rehabilitation. As in this case, the jury found that the murder was

---

[8]As in Smith, supra, the jury also found that the defendant had been previously convicted of violent felony offenses and that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39-2-203 (i)(2) & (7) (1982). As in Smith, this Court found that the jury's consideration of the felony murder aggravating circumstance was harmless error beyond a reasonable doubt.

-26-

especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982).[9]

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the twenty-nine-year-old defendant was sentenced to death for the murder of a seventy-year-old widow, who was frail, weighing less than one hundred pounds, but still capable of living alone. McNish, on the other hand, weighed one hundred and sixty-five pounds and held a black belt in karate. Like the defendant in this case, McNish was acquainted with his victim and was aware of her physical limitations. Also like the defendant in this case, McNish struck the victim in the head many times with an object he found in her home, a glass vase. Her skull was fractured in several places, but she was partially conscious when she was found by a neighbor. Therefore, as in this case, she recognized her attacker and suffered pain from the injuries he inflicted. McNish, a heavy user of prescription drugs, apparently was attempting to borrow money from the victim when the attack began. The jury found one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1982).

In State v. Harbison, 704 S.W.2d 314 (Tenn. 1986), the twenty-seven-year-old defendant was sentenced to death for the murder of a sixty-two year old woman. Harbison, like the defendant in this case, was a casual acquaintance of the victim. As in this case, Harbison was surprised by the victim while he was burglarizing her

---

[9]The jury also relied upon the felony-murder aggravating circumstance as a basis for imposition of the death penalty. In Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994), this Court held the jury's consideration of that aggravating circumstance harmless error beyond a reasonable doubt.

-27-

home. When the victim reached for her purse, Harbison said that he thought she was reaching for a gun and after they began "tusslin," he grabbed a marble vase and hit her in the head with it. The medical testimony showed that the victim was struck at least three times, causing massive skull fractures. The blows were inflicted with such force that the victim's face was literally crushed and disfigured beyond recognition and brain tissue was protruding through the lacerations. As mitigation, the defendant asked the jury to consider that he had no significant prior criminal record, as in this case, and also that death was instantaneous and that he did not bring a weapon to the crime scene. The jury found one aggravating circumstance, that the murder was committed while the defendant was engaged in committing burglary. Tenn. Code Ann. § 39-2-203(i) (7) (1982).

In State v. Cone, 665 S.W.2d 87 (Tenn. 1984), the thirty-three-year-old defendant was sentenced to death for the murder of an elderly couple. Hiding and attempting to escape the police after he had burglarized a jewelry store, Cone entered the home of Mr. Todd, ninety-three years of age, and his wife, seventy-nine years of age, by breaking a latch on the rear door. The elderly couple were repeatedly beaten about the head with a blunt instrument, with multiple crushing blows to the head. Based on the defensive wounds which appeared on their arms and hands, the victims, as in this case, were conscious during some part of the attack. Also like this case, the defendant admitted the killing, but asserted that his mental capacity was impaired by drug use and service in Vietnam. The jury found four aggravating circumstances, including that the murder was especially heinous,

-28-

003665

home. When the victim reached for her purse, Harbison said that he thought she was reaching for a gun and after they began "tusslin," he grabbed a marble vase and hit her in the head with it. The medical testimony showed that the victim was struck at least three times, causing massive skull fractures. The blows were inflicted with such force that the victim's face was literally crushed and disfigured beyond recognition and brain tissue was protruding through the lacerations. As mitigation, the defendant asked the jury to consider that he had no significant prior criminal record, as in this case, and also that death was instantaneous and that he did not bring a weapon to the crime scene. The jury found one aggravating circumstance, that the murder was committed while the defendant was engaged in committing burglary. Tenn. Code Ann. § 39-2-203(i) (7) (1982).

In State v. Cone, 665 S.W.2d 87 (Tenn. 1984), the thirty-three-year-old defendant was sentenced to death for the murder of an elderly couple. Hiding and attempting to escape the police after he had burglarized a jewelry store, Cone entered the home of Mr. Todd, ninety-three years of age, and his wife, seventy-nine years of age, by breaking a latch on the rear door. The elderly couple were repeatedly beaten about the head with a blunt instrument, with multiple crushing blows to the head. Based on the defensive wounds which appeared on their arms and hands, the victims, as in this case, were conscious during some part of the attack. Also like this case, the defendant admitted the killing, but asserted that his mental capacity was impaired by drug use and service in Vietnam. The jury found four aggravating circumstances, including that the murder was especially heinous,

-28-

003666

atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1982).[10]

In State v. Melson, 638 S.W.2d 342 (Tenn. 1982), the defendant, a farm foreman, was sentenced to death for murdering the farm owner's wife. A blunt instrument, probably a hammer or crescent wrench, was used to repeatedly beat the victim about the head with such force that pieces of her cranium were embedded into her brain. Trauma to her arms and hands demonstrated that, as in this case, she was conscious and attempting to defend herself during some portion of the ordeal. The only motivation the defendant had for committing the murder was that his victim had discovered him stealing gasoline from the farm supply. Melson had no prior record of significant criminal activity. The jury found two aggravating circumstances including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1977).[11]

As we have emphasized again and again, no two cases are identical, but the above cases have many similarities with Mann. In all eight of the cases, the victims were repeatedly beaten about the head with a blunt instrument causing or contributing to their death. Without any provocation, all eight defendants gained entry into the home of the helpless victims and viciously attacked them. In seven of

---

[10]The three additional aggravating circumstances found by the jury include: (1) the defendant had previously been convicted of one or more felonies involving the use or threat of violence to the person; (3) the defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder; (2) the murders were committed for the purpose of preventing a lawful arrest or prosecution. Tenn. Code Ann. § 39-2-203(i)(2) & (3) & (6) (1977).

[11]The jury also found that the murder was committed for the purpose of preventing a lawful arrest or prosecution. Tenn. Code Ann. § 39-2-203(i)(6) (1977).

-29-

atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1982).[10]

In State v. Melson, 638 S.W.2d 342 (Tenn. 1982), the defendant, a farm foreman, was sentenced to death for murdering the farm owner's wife. A blunt instrument, probably a hammer or crescent wrench, was used to repeatedly beat the victim about the head with such force that pieces of her cranium were embedded into her brain. Trauma to her arms and hands demonstrated that, as in this case, she was conscious and attempting to defend herself during some portion of the ordeal. The only motivation the defendant had for committing the murder was that his victim had discovered him stealing gasoline from the farm supply. Melson had no prior record of significant criminal activity. The jury found two aggravating circumstances including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1977).[11]

As we have emphasized again and again, no two cases are identical, but the above cases have many similarities with Mann. In all eight of the cases, the victims were repeatedly beaten about the head with a blunt instrument causing or contributing to their death. Without any provocation, all eight defendants gained entry into the home of the helpless victims and viciously attacked them. In seven of

---

[10]The three additional aggravating circumstances found by the jury include: (1) the defendant had previously been convicted of one or more felonies involving the use or threat of violence to the person; (3) the defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder; (2) the murders were committed for the purpose of preventing a lawful arrest or prosecution. Tenn. Code Ann. § 39-2-203(i)(2) & (3) & (6) (1977).

[11]The jury also found that the murder was committed for the purpose of preventing a lawful arrest or prosecution. Tenn. Code Ann. § 39-2-203(i)(6) (1977).

-29-

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 59 of 90
PageID #: 3694

the eight cases, as in this case, the victims were conscious and experienced the pain and terror of the attacks. In six of the eight cases the defendant, as in this case, knew his victim and was aware of the victim's specific frailties and vulnerabilities. Like this case, there was great disparity of strength between the victims and the defendants. The victims were sexually assaulted in two of the eight cases, as was the victim in this case. In seven of the eight cases, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity. Similarly, in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. In many of the cases, the murder occurred while the defendant was engaged in a robbery or burglary. Like Mann, many of the defendants relied upon their youth and mental disabilities as mitigation of the punishment. After reviewing the cases discussed above and many other cases not herein detailed,[12] we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

---

[12]We also have reviewed other cases in which the defendants received a sentence of life imprisonment. However, there are few life sentence cases which bear similarities to the circumstances of this crime and this defendant. The two most similar are easily distinguishable. In State v. Sepulveda, No. 03C01-9402-CR-00069, (Tenn. Crim. App., at Knoxvile, June 26, 1997) (application filed August 25, 1997), the nineteen-year-old defendant burglarized the home of his ninety-five-year-old neighbor looking for money, or for property to sell to buy drugs. During the course of the burglary, he beat the victim with his hands and kicked her in the head. She was alive when found by friends and taken to a hospital and later to a nursing home. She died some weeks later from her injuries. The defendant had a longstanding drug problem, evidenced by an extensive juvenile record for drug offenses. He had only an eighth grade education; his father had died when he was four months old, and his sister had committed suicide at an early age. The jury sentenced the defendant to life imprisonment. Though the killing in that case was reprehensible, the defendant did not utilize a weapon, such as a knife, as did the defendant in this case, and he had a long history of drug problems. Likewise, in State v. Whitmore, No. 03C01-9404-CR-00141 (Tenn. Crim. App., at Knoxville, June 19, 1997)(application filed August 18, 1997), the eighty-year-old neighbor of the defendant's grandparents was found dead in his home, stabbed thirteen times in the neck and chest. The defendant, and a co-defendant robbed the man to obtain money for drugs. When the victim recognized them, Whitmore's co-defendant killed him with Whitmore's knife. The co-defendant was found to be mentally retarded and not subject to the death penalty. The State sought the death penalty with respect to Whitmore, but the jury returned a sentence of life imprisonment. Unlike the defendant in this case, Whitmore did not actually inflict the fatal wounds.

-30-

003669

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1991 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C) (1991 Repl. & 1996 Supp.). We have considered the defendant's assignments of error and determined that none have merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes, and joined in by Judge Jerry L. Smith and Special Judge Lynn W. Brown. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 15th day of April, 1998, unless otherwise ordered by this Court or other proper authorities.

Frank F. Drowota, III,
Justice

**CONCUR:**
Anderson, C. J.,
Birch, Holder, JJ.

Reid, J., -Concurring in the Results Only.

-31-

003670

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON



FILED

DEC 01 1997

Clerk of the Courts
Rec'd By _m H_

FOR PUBLICATION

STATE OF TENNESSEE,      )

     Appellee,        )

v.                     )

ANDRE S. BLAND,      )

     Appellant,      )
                       )

**Filed: December 1, 1997**

SHELBY COUNTY

Hon. Arthur T. Bennett
Judge

Supreme Court
No. 02-S01-9603-CR-00032

FOR APPELLANT:

William L. Johnson
Patricia A. Odell
50 North Front St., Suite 1150
Memphis, Tennessee

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Darian B. Taylor
William David Bridgers
Assistant Attorneys General
Criminal Justice Division
Nashville, Tennessee

John W. Pierotti
District Attorney General

Thomas D. Henderson
David C. Henry
Assistant District Attorneys General
Memphis, Tennessee

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.     DROWOTA, J.

## PROPORTIONALITY REVIEW

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The defendant is therefore asserting that his sentence is comparatively disproportionate. Initially, we emphasize that statutory comparative proportionality review must be distinguished from traditional Eighth Amendment proportionality analysis, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." Pulley v. Harris, 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). By contrast, comparative proportionality review "presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." Id., 465 U.S. at 42-43, 104 S.Ct. at 875-76.

As a general principle, comparative proportionality review can be properly understood only if considered in light of its jurisprudential origins. We begin our review with a 1972 decision of the United States Supreme Court which, in effect, invalidated all of the death penalty statutes of the states and the federal government. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In Furman, the Court held that the Georgia statute was violative of the Eighth Amendment's prohibition against cruel and unusual punishment because the Georgia system left the decision of whether a defendant lived or died to the unfettered discretion of the jury. According to Furman, under the Georgia system, which was representative of the other statutes in effect throughout the country, a sentence of death was unconstitutional because "wantonly and . . . freakishly imposed" and cruel and

-16-

unusual "in the same way that being struck by lightning is cruel and unusual." Id., 408 U.S. at 309-10, 92 S.Ct. at 2762-63 (Stewart, J., concurring).

Four years later, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976),[7] the Court again reviewed the Georgia capital sentencing statutes which had been amended in response to Furman to limit jury discretion and avoid arbitrary and inconsistent imposition of the death penalty. Among the features of the amended statutory scheme was a requirement that the Georgia Supreme Court "review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.'" Id., 428 U.S. at 204, 96 S.Ct. at 2939-40. After rejecting the argument that the death penalty is prohibited by the Eighth Amendment regardless of the circumstances of the offense, the character of the offender, or the procedure followed, the Court upheld the amended Georgia statutory scheme, concluding that "the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary and capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." Id., 428 U.S. at 195, 96 S.Ct. at 2935-36. One aspect of the Georgia statute cited with approval by the United States Supreme Court in Gregg was the appellate review feature which was described as "a check against

---

[7]On the same day that Gregg was decided, the United States Supreme Court also approved the statutory capital sentencing schemes of Florida and Texas. See Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

-17-

the random or arbitrary imposition of the death penalty." Id., 428 U.S. at 206, 96 S.Ct. at 2940-41.

Responding to the United States Supreme Court decision in Gregg, supra, the Tennessee General Assembly, in 1977, enacted a capital sentencing scheme which contained a comparative proportionality review provision that was based upon the Georgia statute.[8] See David Raybin, "New Death Penalty Statute Enacted," Judicial Newsletter, University of Tennessee College of Law pp. 11-12 (May 1977). Because of the approval given such provisions in Gregg, at the time of its enactment, the comparative proportionality provision included in the Tennessee capital sentencing scheme was considered to be constitutionally required. See Judicial Newsletter at p. 11 ("These appellate review procedures appear to be constitutionally required to insure, at least on a statewide level, that the death penalty is not imposed in an arbitrary fashion.").[9] That view was commonly held until the United States

---

[8]In response to Furman, Tennessee enacted a capital sentencing scheme in 1973, Public Acts 1973, Ch. 192, § 2, which was held unconstitutional under Art. II, § 17 of the Tennessee Constitution because its provisions embraced more than one subject and not all of the subject matter was set forth in the caption. State v. Hailey, 505 S.W.2d 712 (Tenn. 1974). As a result, the General Assembly that same year amended the definition of first degree murder and provided a mandatory death penalty for all persons convicted of that offense or as an accessory before the fact of that crime. Public Acts 1974, Ch. 462. In Collins v. State, 550 S.W.2d 643 (Tenn. 1977), however, the 1974 statute was held unconstitutional under three United States Supreme Court decisions invalidating, as violative of the Eighth and Fourteenth Amendments, statutes prescribing a mandatory sentence of death upon conviction of first degree murder. See Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Williams v. Oklahoma, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976). Thereafter, on February 8, 1977, the Governor commuted the sentence of all death row prisoners to life imprisonment, and on April 11, 1977, the death penalty statute became effective when passed over the Governor's veto. See Miller v. State, 584 S.W.2d 758, 762-63 (1979). Although the capital sentencing scheme has been modified somewhat over the intervening twenty years, the 1977 enactment is the basis of the current capital sentencing statute. See e.g. Public Acts 1981, Ch. 33; Public Acts 1989, Ch. 591, and Public Acts 1990, Ch. 1038.

[9]This view was commonly held by other state legislatures as well. Those states adopting statutory provisions requiring comparative proportionality review include: **Alabama**, Ala. Code § 13A-5-53(b)(3); **Connecticut**, Conn. Gen. Stat. § 53a-46b(3); **Delaware**, Del. Code Ann. tit. II, § 4209(g); **Georgia**, Ga. Code Ann. § 17-10-35(c)(3); **Idaho**, Idaho Code § 19-2827(c); **Kentucky**, Ky. Rev. Stat. Ann. § 532.075(3); **Louisiana**, La. Code Crim. Pro. Ann. art. 905.9 and La. Sup. Ct.

-18-

003674

Supreme Court explicitly rejected the idea that comparative proportionality review is constitutionally required. Pulley, 465 U.S. at 50-51, 104 S.Ct. at 879-80 ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); see also Walton v. Arizona, 497 U.S. 639, 655-56, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990); McCleskey v. Kemp, 481 U.S. 279, 306-308, 107 S.Ct. 1756, 1774-75, 95 L.Ed.2d 262 (1987) (presumption that sentence not disproportionate where it is imposed under a system which furnishes sufficient guidance to the sentencer through constitutionally valid aggravating and mitigating circumstances, and a federal court does not review the conclusions of the state's highest court so long as the proportionality review was undertaken in good faith).[10] While important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required.[11] Therefore, in

R. 28, Section 1; **Maryland**, Md. Code Ann. [Crim. Law] § 414(e); **Mississippi**, Miss. Code Ann. § 99-19-105(3); **Missouri**, Mo. Rev. Stat. § 565.035(3); **Montana**, Mont. Code Ann. § 46-18-310(3); **Nebraska**, Neb. Rev. Stat. § 29-2521.03; **Nevada**, Nev. Rev. Stat. § 177.055(2)(d); **New Hampshire**, N.H. Rev. Sat. Ann. § 630.5(XI); **New Jersey**, N.J. Rev. Stat. § 2C:11-3(e); **New Mexico**, N.M. Stat. Ann. § 31-20A-4(c); **New York**, N.Y. Crim. Proc. § 470.30(3); **North Carolina**, N.C. Gen. Stat. § 15A-2000(d); **Ohio**, Ohio Rev. Code Ann. 2929.05(A); **Oklahoma**, Okla. Stat. tit. 21, § 701.13(c)(3); **Pennsylvania**, 42 Pa. Cons. Stat. 9711(H); **South Carolina**, S.C. Code Ann. § 16-3-25(c); **South Dakota**, S.D. Codified Laws Ann. § 23A-27A-12; **Virginia**, Va. Code Ann. § 17-110.1; **Washington**, Wash. Rev. Code § 10-95-130(2); **Wyoming**, Wyo. Stat. § 6-4-103(d). Three other states, by judicial decision, required comparative proportionality review including: **Arkansas**, Sheridan v. State, 855 S.W.2d 772, 780 (Ark. 1993); **Arizona**, State v. Richmond, 560 P.2d 41 (Ariz. 1976); **Florida**, Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla. 1981).

[10]The Tennessee statutory capital sentencing scheme has been repeatedly upheld against constitutional attack, and, from the raw numbers, appears to be performing its intended purpose of reserving the death sentence for the "worst of the bad." In 1996, approximately 492 persons were named in first degree murder indictments in this State. 102 persons were convicted of first degree murder in that year. Five death sentences were returned, with 33 individuals receiving a sentence of life imprisonment without the possibility of parole, while 64 individuals received a sentence of life imprisonment with the possibility of parole.

[11]Indeed, in the wake of Pulley, supra, nine of the twenty-nine other states which initially conducted comparative proportionality review have either repealed the statutory provisions or overruled court decisions mandating it. See, **Arkansas** Willett v. State, 911 S.W.2d 937, 945-46 (Ark. 1995) (stating that Arkansas Supreme Court will no longer conduct proportionality reviews); **Arizona**, State v. Salazar, 844 P.2d 566, 583-84 (Az. 1992) (stating that the Arizona Supreme Court

-19-

adopting an approach to comparative proportionality review, a state appellate court must evaluate the statutory language at issue and the legislative intent in light of the jurisprudential background of Furman and Gregg. See State v. Webb, 680 A.2d 147, 200 (Conn. 1996).

Despite the lack of any federal constitutional standard, there are two basic approaches to statutory comparative proportionality review: (1) the frequency method; and (2) the precedent-seeking method. Webb, 680 A.2d at 209; State v. Marshall, 613 A.2d 1059 (N.J. 1992). Both approaches share a common goal which is to determine whether a particular sentence is disproportionate to the sentences imposed for similar crimes and similar defendants. Id. While the goal is the same, the approaches are fundamentally different in principle and application. In general, the frequency method[12] employs a complicated statistical analysis that attempts and purports to quantify, with near mathematical precision, the various factors leading to

---

will discontinue proportionality reviews); **Connecticut**, 1995 Conn. Acts 16, §3(b) (Reg. Sess.); **Idaho**, 1994 Idaho Sess. Laws 127 (S.B. 1302); **Maryland**, 1992 Md. Laws 331 (H.B. 590); **Nevada**, 1985 Nev. Stat. 527; **Oklahoma**, 1985 Okla. Sess. Laws, Ch. 265, § 1; **Pennsylvania**, 1997 Pa.Legis.Serv. Act 1997-28, § 1 (S.B. 423); **Wyoming**, Wyo. Stat. § 6-4-103(d).

[12]No state has applied a "pure" frequency method approach when conducting comparative proportionality review. Although it appeared New Jersey would do so in Marshall, supra, that Court opted instead to utilize both the frequency method and the precedent-seeking method. State v. DiFrisco, 662 A.2d 442 (N.J. 1995). The New Jersey Supreme Court has acknowledged that it relies "more heavily" on precedent-seeking review than on frequency analysis, and it has explicitly refused to set an arbitrary numerical standard at which defendants "generally" receive the death penalty. Id. at 460. Although the Washington Supreme Court appears to utilize the frequency approach to some degree, by quantifying for comparison the number of aggravating circumstances, victims, and prior convictions, that Court recently stated:

> We have quantified those factors that are easily quantifiable in order to be as objective as possible. By this we do not suggest proportionality is a statistical task or can be reduced to numbers, but only that numbers can point to areas of concern. At its heart, proportionality review will always be a subjective judgment as to whether a particular death sentence fairly represents the values inherent in Washington's sentencing scheme for aggravated murder.

State v. Pirtle, 904 P.2d 245, 276 (Wash. 1995).

-20-

the imposition or nonimposition of the death penalty and the frequency with which the death penalty is imposed in certain circumstances. See e.g., Marshall, supra; State v. Pirtle, 904 P.2d 245 (Wash. 1995). This approach has been criticized as an unworkable attempt "to quantify the unquantifiable." See Webb, 680 A.2d at 209; see also State v. Ramsey, 864 S.W.2d 320, 327-28 (Mo. 1993) (en banc). By contrast, a reviewing court employing the precedent-seeking approach compares the case before it to other cases in which the defendants were convicted of the same or similar crimes by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. See e.g. Webb, supra; Tichnell v. State, 468 A.2d 1, 13-23 (Md. 1983).

Without explicitly adopting the nomenclature, this Court has applied the precedent-seeking approach for the past eighteen years. See e.g., State v. Barber, 753 S.W.2d 659, 665-66 (Tenn. 1988); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). The Tennessee statute was modeled after the Georgia scheme approved in Gregg. The frequency approach had not even surfaced within published death penalty jurisprudence in 1977 when our statute was enacted and it is inconsistent with the type of fact specific analysis employed by Georgia and described and approved by the United States Supreme Court in Gregg. There is no indication that our Legislature contemplated a complicated statistical inquiry when it enacted the statutory proportionality review provision in 1977. See Webb, 680 A.2d at 209. Moreover, the General Assembly has never amended the statute to eliminate or modify the precedent-seeking approach which has been utilized by this Court since the comparative review provision was enacted.

-21-

We are mindful that the purposes of comparative proportionality review are to eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty.[13] As we have previously stated, comparative review of capital cases insures rationality and consistency in the imposition of the death penalty. Barber, 753 S.W.2d at 665-66; see also State v. Kandies, 467 S.E.2d 67, 86 (N.C. 1996). In light of the jurisprudential background against which our statutory provision was adopted, combined with the General Assembly's use of the word "disproportionate," it is clear that our function in performing comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence. Id.; State v. Groseclose, 615 S.W.2d 142, 150 (Tenn. 1981) (trial court reports are designed to prevent the arbitrary or capricious imposition of the death penalty); see also Webb, 680 A.2d at 211; State v. Bey, 645 A.2d 685 (N.J. 1994). If the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death in the case being reviewed is disproportionate. State v. Ramsey, 864 S.W.2d 320, 328 (Mo. banc 1993).[14] Even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence. See State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986). Moreover, where there is

---

[13]Gregg, 428 U.S. at 206; 96 S.Ct. at 2940; State v. Welcome, 485 So.2d 1235, 1258 (La. 1983); Tichnell, 468 A.2d at 15; State v. McNeill, 485 S.E.2d 284, 289 (N.C. 1997); State v. Rhines, 548 N.W.2d 415, 457 (S.D. 1996); Pirtle, 904 P.2d at 276.

[14]Justice Reid singles out in his dissent the above quote from State v. Ramsey, and concludes that "applying that standard, the sentence of death in this case is disproportionate." He fails to cite the remainder of this paragraph. The full paragraph speaks for itself and does not support Justice Reid's conclusion.

-22-

no discernible basis for the difference in sentencing, the death sentence is not necessarily disproportionate. This Court is not required to determine that a sentence less than death was never imposed in a case with similar characteristics. On the contrary, our duty under the similarity standard is to assure that no abberant death sentence is affirmed. Webb, 680 A.2d at 203. "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." Cf. Gregg, 428 U.S. at 203, 96 S.Ct. at 2939.

In our view, the precedent-seeking method effectively enables this Court to achieve the goal of comparative proportionality review -- identifying aberrant sentences. If a reviewing court allowed its comparative proportionality analysis to be governed by statistical and quantitative analysis, the concept of "individualized consideration" expounded in Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)(Burger, C.J., plurality opinion), would be frustrated. State v. Williams, 301 S.E.2d 355, 356 (N.C. 1983); State v. Copeland, 300 S.E.2d 63, 72 (S.C. 1982).

In performing our comparative proportionality function, we are guided by the language of the statute which provides that appellate courts reviewing capital cases should determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and

-23-

the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D) (1991 Repl. & Supp. 1996).[15] Though the statute itself is silent on the issue,[16] the universe from which we choose the pool of "similar cases" for comparison includes "all cases in which the defendant is convicted of first degree murder." Tenn. Sup. Ct. Rule 12.

For purposes of comparative proportionality review, we eliminate from the "universe" and include in the more narrow "pool" for comparison only those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of

---

[15]Previously codified at Tenn. Code Ann. § 39-2-205(c)(4) (1982) and Tenn. Code Ann. § 39-2406(c)(4) (Supp. 1977).

[16]Some states, either by statute or judicial decision limit the pool for comparison to only cases in which a sentence of death has been imposed. See **Alabama**, Beck v. State, 396 So.2d 645, 664 (Ala. 1980); **Arkansas**, Sanders v. State, 878 S.W.2d 391, 400 (Ark. 1994); **Arizona**, State v. White, 815 P.2d 869, 884 (Ariz. 1991); **Florida**, Williams v. State, 437 So.2d 133, 137 (Fla. 1983); **Kentucky**, Gall v. Commonwealth, 607 S.W.2d 97 (Ky. 1980); **Mississippi**, King v. State, 421 So.2d 1009 (Miss. 1982); **Nebraska**, State v. Palmer, 399 N.W.2d 706, 733 (Neb. 1986); **New Jersey**, N.J. Stat. Ann. § 2C:11-3; **Ohio**, State v. Steffen, 509 N.E.2d 383, 395 (Ohio 1987); **South Carolina**, State v. Copeland, 300 S.E.2d 63 (S.C. 1982). Other states include in the pool cases in which the State sought the death penalty and a sentencing hearing was held, regardless of the sentence imposed. See **Connecticut**, Practice Book § 4066A(b); **Delaware**, Flamer v. State, 490 A.2d 104, 139 (Del. 1983); **Maryland**, Tichnell, 468 A.2d at 13-23; **Missouri**, State v. Whitfield, 837 S.W.2d 503, 515 (Mo. 1992) (en banc); **Montana**, State v. Smith, 931 P.2d 1272, 1285 (Mont. 1996); **Nevada**, Biondi v. State, 699 P.2d 1062 (Nev. 1985); **New Mexico**, State v. Garcia, 664 P.2d 969 (N.M. 1983); **North Carolina**, Williams, 301 S.E.2d at 355; **Oklahoma**, Liles v. State, 702 P.2d 1025, 1036 (Okla. Crim. App. 1985); **South Dakota**, Rhines, 548 N.W.2d at 455; **Virginia**, Jenkins v. Commonwealth, 423 S.E.2d 360, 371 (Va. 1992); **Washington**, Wash. Rev. Code Ann. § 10.95.130(2)(b). Finally, some states include in the pool all death-eligible homicide convictions or indictments. **Georgia**, Ga. Code Ann. § 17-10-37(a); **Idaho**, State v. Creech, 670 P.2d 463, 476 (Idaho 1983); **Louisiana**, State v. Martin, 376 So.2d 300, 312-13 (La. 1979); **New York**, N.Y. Jud. Law § 211-a (death-eligible indictments); **Pennsylvania**, Commonwealth v. Frey, 475 A.2d 700, 707 (Pa. 1984); **Wyoming**, Engberg v. State, 686 P.2d 541, 555 (Wyo. 1984). Of the twenty states which still require comparative review, eight limit the pool for comparison to cases in which a death sentence was imposed; eight consider cases in which a capital sentencing hearing was held regardless of the sentence imposed; and three include in the pool all death-eligible homicides. One other state, New Hampshire has not defined the pool for comparison because it has no death penalty cases, though it has a capital sentencing scheme. The United States Supreme Court has approved more limited "universes" than that provided by our Rule 12. See Gregg 428 U.S. at 205, n. 56, 96 S.Ct. at 2940, n. 56; Proffitt, 428 U.S. at 259, 96 S.Ct. at 2969-70.

- 24 -

Case 1:12-cv-00035-HSM-SKL    Document 8-22    Filed 08/01/12    Page 71 of 90
PageID #: 3706

parole, or death by electrocution, regardless of the sentence actually imposed.[17]

See Footnote 14, supra (listing other states with the same limitation). "[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination." Tichnell, 468 A.2d at 15-16; Whitfield, 837 S.W.2d at 515; Smith, 931 P.2d at 1285; Rhines, 548 N.W.2d at 455-56. Accord, Flamer v. State, 490 A.2d at 139.

Selecting similar cases from the pool for comparison is not an exact science. No two cases or defendants are precisely identical. Though consideration of the aggravating and mitigating circumstances as revealed by the Rule 12 reports is a crucial element of the process, we are not limited to only those cases in which exactly the same aggravating circumstances have been found. Barber, 753 S.W.2d at 667; State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). In choosing and comparing similar cases, this Court considers many variables which are not readily subject to

---

[17]We do not include in the pool for comparison first degree murder cases in which the State did not seek the death penalty or a sentence other than death was agreed upon as part of a plea bargaining agreement. See Webb, 680 A.2d at 211, Whitfield, 837 S.W.2d at 515 (including in the pool for comparison first degree murder cases in which the State did not seek the death penalty or agree upon a sentence less than death without a hearing amounts to implicitly reviewing prosecutorial discretion which is generally not subject to judicial review). Under current law a sentencing hearing may be conducted to determine whether the sentence should be life imprisonment or life imprisonment without the possibility of parole, even if the State does not seek the death penalty. Tenn. Code Ann. § 39-13-204(a) (1996 Supp.) Under prior law, a penalty hearing was held only if the State sought the death penalty. We include in the pool for comparison only those first degree murder cases in which the State seeks the death penalty and a sentencing hearing is held. Of course, the decision to prosecute or seek the death penalty may not be deliberately based upon an impermissible consideration "such as race, religion or other arbitrary classification." Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). By this decision, defendants are in no way precluded from relying upon and utilizing the entire "universe" of first degree murder cases when attempting to establish a claim for selective prosecution under the Equal Protection Clause, see Wayte v. United States, 470 U.S. 598, 608, 105 S,Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

-25-

complete enumeration and definition. Barber, 753 S.W.2d at 665; Williams, 301 S.E.2d at 355. This Court has not previously attempted to explicitly enumerate factors, other than aggravating and mitigating circumstances, which are relevant to identifying similar cases and conducting proportionality review. However, clearly discernible from a review of the comparative proportionality discussions contained in our prior decisions are several other factors relevant to the process of identification and comparison of similar cases which include: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. See Barber, supra; see also State v. Hodges, 944 S.W.2d 346 (Tenn. 1997); State v. Bush, 942 S.W.2d 489 (Tenn. 1997); State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); Brimmer, supra; Cazes, supra; State v. Smith, 868 S.W.2d 561 (Tenn. 1993); State v. Howell, 868 S.W.2d 238 (Tenn. 1993); State v. Tran, 864 S.W.2d 465 (Tenn. 1993); State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Harris, 839 S.W.2d 54 (Tenn. 1992); State v. Black, 815 S.W.2d 166 (Tenn. 1991). Compare Marshall, 613 A.2d at 1083.

Also evident from a reading of our prior cases are several criteria relevant to a comparison of the characteristics of defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the

-26-

defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Id.; see also Tenn. Sup. Ct. Rule 12, Report of Trial Judge in Capital Cases. While by no means an exhaustive list, examination and consideration of these and other salient factors allows this Court to identify similar cases and determine whether the sentence of death in the case under review should be invalidated as disproportionate.

To assist this Court in fulfilling our statutory duty, the State and the defendant in each case must fully brief the issue by specifically identifying those similar cases relevant to the comparative proportionality inquiry.[18] When addressing proportionality review, the briefs of the parties shall contain a section setting forth the nature and circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted, including the statutory aggravating circumstances found by the jury and the evidence of mitigating circumstances. In addition, the parties shall include in the section a discussion of the character and record of the defendants involved in the crimes, to the extent ascertainable from the Rule 12 reports, appellate court decisions, or records of the trials and sentencing hearings in those cases.[19]

---

[18] Presently we locate similar cases for comparative proportionality review by using traditional research methods and by reviewing the more than five hundred Rule 12 reports on file in the Clerk's office in Nashville. We are in the process of selecting the specific criteria to be used in the preparation of a Tennessee CD-Rom death penalty database which will be used by this Court and accessible to the litigants.

[19] Cf. Webb, 680 A.2d 207, n. 75; Section 4, La.Sup. Ct. R. 905.9.1 (requiring the prosecution and defense to file a "sentence review memoranda" addressing the propriety of the sentence and discussing each first degree murder case in the district in which the sentence was imposed, along with a synopsis of the facts about the crime and the defendant in the case on appeal).

-27-

Comparative proportionality review is not a rigid, objective test. Cazes, 875 S.W.2d at 270. In conducting proportionality review, we do not attempt to employ mathematical or scientific techniques. Williams, 301 S.E.2d at 355. In evaluating the comparative proportionality of the sentence in light of the factors delineated above, a reviewing court must also rely upon the experienced judgment and intuition of its own members. Ramsey, 864 S.W.2d at 327-28; State v. East, 481 S.E.2d 652, 668 (N.C. 1997); Williams, 301 S.E.2d at 356; see also Marshall, 613 A.2d at 1075. As previously explained, the sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.

In this case, Justice Reid agrees that the proof shows premeditation and torture and that the evidence supports the jury's finding that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt, but he concludes that the sentence of death is disproportionate, stating that "the proof does not show this defendant to possess the characteristics most repulsive to society's sense of decency, and most destructive to the very fabric of society." Since Justice Reid does not enumerate the characteristics which are most repulsive and destructive to society, we can only assume that he has utilized his own subjective judgment to make the determination. In our view, jurors are better equipped to decide, in the first instance, whether a particular defendant should receive the death penalty. The appellate task under § 206(c)(1)(D) is to compare similar cases, not to gauge, in isolation, the culpability of a specific defendant or the heinousness of a particular crime. See Webb, 680 A.2d at 204. Our role in conducting comparative

-28-

proportionality review is not to second-guess the jury's decision, but to identify and invalidate aberrant death sentences.

As a result of this fundamental disagreement about the role of this Court, Justice Reid, beginning in State v. Harris, 839 S.W.2d 54, 84-85 (Tenn. 1992) (C.J. Reid, dissenting), has repeatedly charged the majority with failing "to articulate and apply a standard for comparative review. . ." However, as in the present dissent, in Harris, Justice Reid did not articulate a proposed standard nor offer any constructive advice to the majority on a methodology to correct the alleged error. This trend of criticizing the majority's comparative proportionality review analysis, while at the same time offering no specific suggestions for improvement has continued over the intervening five years.[20]

Even in the three prior direct appeal decisions of this Court where Justice Reid has agreed that the sentence of death is not disproportionate, see Bush, 942 S.W.2d at 527; Smith, 868 S.W.2d at 585; Howell, 868 S.W.2d at 271, Justice Reid has

---

[20]See State v. Middlebrooks, 840 S.W.2d 317, 354-55 (Tenn. 1992)(Reid, C.J., concurring and dissenting); State v. Van Tran, 864 S.W.2d 465, 485 (Tenn. 1993) (Reid, C.J., concurring and dissenting); State v. Howell, 868 S.W.2d 238, 271 (Tenn. 1993)(Reid, C.J., concurring); State v. Smith, 868 S.W.2d 561, 585 (Tenn. 1993) (Reid, C.J., concurring); State v. Hurley, 876 S.W.2d 57, 71 (Tenn. 1993) (Reid, C.J., dissenting); State v. Cazes, 875 S.W.2d 253, 272 (Reid, C.J., dissenting); State v. Nichols, 877 S.W.2d 722, 744 (Tenn. 1994) (Reid, C.J., dissenting); State v. Smith, 893 S.W.2d 908, 932 (Tenn. 1994) (Reid, J., concurring and dissenting); State v. Bush, 942 S.W.2d 489, 527 (Tenn. 1997) (Reid, J., concurring); State v. Hodges, 944 S.W.2d 346, 362 (Tenn. 1997) (Reid, J., dissenting). The basis for Justice Reid's prior assertion that it is not possible to articulate an alternative approach for comparative review in a dissenting opinion is not clear. Howell, 868 S.W.2d at 272 (Reid, C.J., concurring) ("An adequate structure for comparative proportionality review cannot be set forth in a dissent.") Jurists in other states have taken on the task. See e.g. State v. Rhines, 548 N.W.2d 415, 461 (S.D. 1996) (Amundson, J., dissenting); State v. Brett, 892 P.2d 29, 71 (Wash. 1995) (Utter, J., dissenting); State v. Lord, 822 P.2d 177, 228 (Wash. 1991) (Utter and Smith, JJ., dissenting); State v. Jeffries 717 P.2d 722, 731 (Wash. 1986 ) (Utter, J., dissenting). Indeed, many majority decisions actually begin as dissenting opinions.

-29-

003685

Case 1:12-cv-00035-HSM-SKL     Document 8-22     Filed 08/01/12     Page 77 of 90
PageID #: 3712

provided no express guidance as to the objective criteria and structured analysis he employed to conclude that the sentence of death was not disproportionate. In fact, the explanations for the conclusion in Howell, Smith, and Bush that the sentence is not disproportionate appear to be well-written explanations of how the facts surrounding the commission of the offense demonstrate the rationality of the sentence imposed, similar to the analysis which consistently has been employed by a majority of this Court and often criticized by Justice Reid. One distinction from a majority discussion of comparative proportionality review is apparent, however. The prior concurring opinions do not discuss or even cite a single similar first degree murder case, considered in comparison, which supports the finding of proportionality. See Bush, 942 S.W.2d at 527; Smith, 868 S.W.2d at 585; Howell, 868 S.W.2d at 272-73. Likewise, in those prior cases in which Justice Reid has found the sentence of death to be disproportionate, he has articulated no objective criteria or framework for analysis, nor has he cited or discussed similar first degree murder cases to support the finding. See e.g., Hodges, 944 S.W.2d at 346; Nichols, 877 S.W.2d at 744; Cazes, 875 S.W.2d at 272.

In this case, a majority of this Court has carefully articulated many factors relevant to comparative proportionality review, and engaged in a lengthy discussion of its history and purpose. Justice Reid continues to characterize our prior discussions of comparative proportionality review as "conclusory" and "perfunctory." Without the benefit of specific suggestions or guidance,[21] however, the analysis

---

[21]As is stated in footnote 1 of Justice Reid's dissenting opinion, the discussion of proportionality review in this opinion was revised and expanded after the initial drafts of the dissenting opinions were received. The expansion primarily was a response to Justice Reid's dissenting opinion. We note that, as a result of our response, Justice Reid's dissenting opinion was revised and expanded.

-30-

employed by the majority in this case has unaccountably gained Justice Reid's guarded approval.[22]

In fact, Justice Reid applies the factors enumerated by the majority in determining that the sentence is disproportionate. However, in applying the analysis, Justice Reid considers specific facts in isolation and fails to recognize that the factors are to be applied in the context of the circumstances of the offense. For example, Justice Reid states that the "means of death was a handgun, undoubtedly the most commonly used instrument of homicide. Use of this weapon does not weigh for or against culpability." Justice Reid fails to mention anywhere in his analysis that the gunshot wounds causing death were inflicted during the course of a chase in which the unarmed, injured victim fled for his life. The other factors relied upon by Justice Reid in support of his conclusion are also suspect. Particularly bothersome is Justice Reid's statement that "the victim could reasonably expect the possibility of violence" because the "place of death was the parking lot of an apartment complex in South Memphis, a location at which unlawful activity, including drug dealing, dice games, robbery, assault and public drunkenness, was not unexpected." A law abiding citizen is free to travel anywhere he or she chooses. Where, as here, a citizen is randomly murdered in a high crime area and a perpetrator is convicted and sentenced to death, the citizen's decision to travel into the neighborhood has no bearing on whether the death penalty is disproportionate. Also troublesome is Justice Reid's observation that the defendant had no adult criminal record. Considering the defendant's extensive

---

[22]Justice Reid states: "The proportionality procedure outlined by the majority in this case answers many of the problems raised in those prior decisions. The majority sets a course which could develop into a procedure which complies with the statute and the constitutions."

-31-

juvenile record and that he was nineteen-years-old at the time of this offense, his lack of a criminal adult record has little relevance. Finally, Justice Reid's assertion that the defendant has a capacity for rehabilitation is completely without support in the record.

For the first time in a dissenting or concurring opinion Justice Reid cites and discusses three other cases to support his finding. However, the State did not seek the death penalty in two of the cases. Therefore, they are not similar cases for comparative proportionality review. With respect to the third case, the State sought the death penalty, but the defendant was sentenced to life imprisonment without the possibility of parole. Though the details of the case are not clear from Justice Reid's opinion, we emphasize that the isolated decision of the sentencer to afford mercy does not render the death sentence in this case disproportionate. In sum, Justice Reid's analysis does not demonstrate that this case, taken as a whole, is plainly lacking in circumstances consistent with those cases in which the death penalty has been imposed.

Application of the principles of comparative proportionality review convinces us that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D) (1991 Repl. & 1996 Supp.). We have studied, compared, and analyzed cases and conducted a meaningful proportionality review as outlined herein and in Barber, 753 S.W.2d at 663-68. We have made an independent, conscientious, and thorough review of this case, as we have in every other capital case which has come before this Court over the past

-32-

eighteen years. As a result of that review, we are of the opinion that the premeditated killing of this victim warrants imposition of the death penalty.

Without provocation or explanation, the defendant shot an unresisting, retreating victim and then chased the injured man some 91 yards, shooting him once more during the course of the chase. The defendant was not deterred when the severely injured victim sought refuge under a pickup truck; instead, he knelt down and shot the helpless man several more times. The defendant ignored the victim's pleas for help and left him dying under the pickup truck. The victim remained alive, conscious, and in pain for at least three to four minutes, and perhaps for as long as ten or fifteen minutes according to the testimony of eyewitnesses. Unaffected by the exceptional cruelty of his actions toward Terry Sanders, the defendant returned to the scene of the ongoing robbery, watched the group of men drag Nugent from the car, and did not hesitate to shoot Nugent twice when he tried to escape. When the robbery was completed the defendant disposed of the gun he had used and went to his girlfriend's apartment and slept. The defendant described the shooting as a spur of the moment decision. He said that he had been drinking and selling drugs prior to the shooting. Though young when the murder was committed, only nineteen years old, and lacking a prior adult criminal record, the defendant had a criminal history which dated back eight years and included numerous assaults and batteries.

The defendant argues that the death penalty is disproportionate in this case because this Court has generally affirmed only those death sentences imposed for more "atrocious" murders. While it is true that this Court has reviewed and affirmed the death penalty in cases involving more atrocious killings than the present crime,

-33-

this fact does not invalidate as disproportionate the penalty imposed in this case. Barber, 753 S.W.2d at 664-65. Moreover, as we have previously recognized, the fact that there are cases in which a life sentence has been given for murders that were also perhaps "more atrocious" than the murder in this case does not mean the death penalty is disproportionate in this case. Barber, 753 S.W.2d at 664-65 (citing and discussing cases). In conducting our review in this case, we have certainly found examples of more atrocious killings in which the jury declined to impose the death penalty.[23]

For instance in State v. Jack Jay North, No. 02C01-9512-CC-00369 (Tenn. Crim. App., at Jackson, Dec. 12, 1996), app. denied (Tenn. 1997), the defendant and a co-defendant entered the home of the forty-five year old victim in the early morning hours and shot the victim multiple times using a single shot sawed-off shotgun. The first shot was to the victim's arm and occurred in the living room. The victim then fled into the bathroom and was shot two times more as he lay on the floor begging the defendants to spare his life. The cause of death was a gunshot wound to the victim's head. Both North and his co-defendant admitted to being at the scene. However, both denied being the trigger man and each blamed the other person for planning and instigating the killing. The proof showed that the defendants were engaged in gang activity and committed the murder to prove their worthiness to other gang members. Neither North nor his co-defendant were acquainted with the victim, but there was some proof that North's mother had socialized with the victim during

---

[23]As we stated in Barber, a comparative proportionality review is conducted by this Court in all death penalty cases. Id., 753 S.W.2d at 668, n. 5. Though we do not always include citations to or discussions of other first degree murder cases in which the State sought the death penalty and the defendant received a life sentence, this Court always considers those cases when conducting comparative proportionality review.

-34-

a time period when North was living with his father. North was twenty years old at the time of the killing. Though he did not graduate from high school, North had received a GED. North had a prior conviction for burglary. In the course of the investigation, North gave conflicting statements to the police, initially denying any involvement in the killing. According to the trial judge, North testified both at the trial and at sentencing in a "tearful, emotional manner." The jury found North guilty of first degree premeditated murder and also found that the State had proven the existence of three aggravating circumstances[24] beyond a reasonable doubt, including the circumstance returned by the jury in this case, that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204 (i)(5) (1991 Repl.). However, the jury declined to impose the death penalty, returning instead a sentence of life imprisonment without the possibility of parole. The jury's decision to impose a sentence less than death on North, even though the circumstances of the crime reveal, in the words of the trial judge, that he was "a cold, callous person with absolutely no regard for human life," does not render Bland's sentence disproportionate. Cf. Gregg, supra, 428 U.S. at 203, 96 S.Ct. at 2939.

In conducting our review, we also have reviewed other cases bearing similarities to the circumstances of this crime and the character of this defendant, in which the defendants received a life sentence. For example, in State v. James

---

[24]The jury also found that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;" and that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb." Tenn. Code Ann. § 39-13-204(i)(6) & (7) (1991 & Supp. 1996).

-35-

Morning Craft, Jr. and Lewis Moorlet, C.C.A. No. 31, (Tenn. Crim. App., at Jackson, Mar. 8, 1989), app. denied (Tenn. 1989), the seventy year old victim, owner and operator of a liquor store in Memphis, closed his business at 11 p.m. and went to his car. Finding a tire flat, he drove the car from the parking lot to the front of the store to change the tire. Craft, along with several other persons, helped the victim change the tire, and when the task was nearly completed, the victim was shot three times. Craft was observed running from the scene with the wounded victim firing a gun at him. The victim died from the gunshot wounds a short time later, one of which severed his aorta. The proof showed that Craft and Moorlet had discussed robbing the victim shortly before the crime was committed. Craft had named Moorlet as the triggerman to several witnesses that testified for the State. The jury found both Craft and Moorlet guilty of first degree murder committed in the perpetration of a robbery. The State relied upon only the felony murder aggravating circumstance at the sentencing hearing. Craft, twenty at the time the offense was committed, had a low IQ and only a seventh grade education. The trial judge characterized Craft as "easily led." Three years earlier, Craft had been convicted of burglary. Moorlet had a twelfth grade education and no prior criminal record. Though his IQ was listed as not known by the trial judge, his conduct during the trial was described as "excellent." There was no evidence of drug or alcohol influence in the killing. Considering the proof, the jury declined to impose the death penalty and instead imposed a life sentence upon each defendant. Unlike this case, there was no evidence that the murder committed by Craft and Moorlet involved torture. Unlike the unexplained, senseless murder committed by Bland, the murder committed by Craft and Moorlet occurred during the perpetration of a spur of the moment robbery. Though the killing was certainly reprehensible, it was not an act of complete random violence as was the killing in this

-36-

case. Despite Bland's assertions that he decided to shoot Sanders on the spur of the moment, the assault upon the helpless victim continued for sometime and covered some distance. The assault by Craft and Moorlet ended quickly and the victim was not defenseless. One of the persons who had been helping the victim change the flat tire testified for the State against Craft and Moorlet. He said when the task was nearly completed, he began to walk away, leaving Craft and the victim behind tightening the lug bolts. After taking only 15 or 20 steps, the witness heard three shots and turned to see the wounded victim firing a gun at a fleeing Craft. Clearly, the manner of the killing and the motive for the murder committed by Craft and Moorlet are distinguishable and support the lesser sentence given.

Likewise, in State v. Horace Jones, C.C.A. No. 117, (Tenn. Crim. App., at Jackson, Dec. 4, 1980), app. denied (Tenn. 1981), the jury imposed a life sentence in a case with facts somewhat similar to the instant case. There, the forty-one year old victim was in a pool hall in Memphis when the defendant came in and shot him three times. The victim fell to the floor, and as he lay there face down, the defendant again pulled the trigger, but the gun misfired. The defendant fired the gun two more times and then reloaded it. The victim got up from the floor and ran to a room in the back of the establishment where he broke a window with a cue stick in an attempt to escape the defendant's assaults. When the victim ran towards the back of the pool hall, the witnesses present ran outside, but then heard three more shots. When they returned inside, the victim was deceased. Over a month later, the police apprehended the defendant in an apartment where he was hiding in a closet. At trial, the defense offered proof to show that the victim had been looking for the defendant during the months before the murder and intended to harm him because of a dispute

-37-

over a "crap game." The case proceeded to a sentencing hearing at which the defense offered expert testimony that the defendant could be rehabilitated and would profit from participation in a long term psychotherapy counseling group. Other mitigating circumstances relied upon by the defendant included victim participation, moral justification, and extreme emotional disturbance. The defendant was twenty-four at the time the offense was committed. Based upon the proof, the jury declined to impose the death penalty and returned a sentence of life imprisonment. Jones, unlike the defendant in this case, offered proof of his capacity for rehabilitation. Proof was also offered to show that the victim and Jones were acquainted and that the victim had been threatening Jones. While certainly no justification for the murder, it is a circumstance which reflects upon the character of the defendant. In contrast, the victim in this case was a stranger to the defendant and posed no threat when he asked simply "what's up?" Although the circumstances of the two murders are somewhat similar, the mitigation proof offered, and the relationship between the defendant and the victim explain the lesser sentence given Jones.

Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case. In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), this Court affirmed the death sentence of a nineteen year old defendant who, after shooting another victim, killed a seventy-four year old woman during the course of a robbery. As in this case, the victim had already been shot and was lying on the floor. Without provocation or explanation, Van Tran, like the defendant in this case, put a gun to the back of the unresisting and helpless victim's head and pulled the trigger. Van Tran was born in Viet Nam, the son of an American soldier who was killed in the war. As in this case, Van Tran had

-38-

grown up without his father, and had little education. Along with his mother, Van Tran was resettled in Memphis by a Catholic relief agency and attended school for only a short time before dropping out. Van Tran had a good employment record, and he had no prior criminal record. In addition, he cooperated with the authorities and expressed remorse for the killings. As in this case, the jury returned a single aggravating circumstance--the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind. Tenn. Code Ann. § 39-2-203(i) (1982) (repealed). Finding that the evidence supported this aggravating circumstance and that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance, the jury sentenced Van Tran to death.

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the victim, a seventy year old widow, was beaten about the face and head with a glass flower vase by the defendant. The victim was alive when she was found, but died a short time later. As in this case, McNish was young, twenty-nine, when he committed the offense. He had no prior criminal record. Previously, McNish had sustained head injuries in an automobile accident and was using prescription drugs heavily to combat headaches. Similar to Bland, who said he had been drinking when he killed Terry Sanders, McNish had been using drugs when he committed the murder. As in this case, the jury imposed the death sentence upon finding a single aggravating circumstance -- that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) (repealed).

In State v. Cooper, 718 S.W.2d 256 (Tenn. 1986), the defendant, age thirty-three, shot his estranged wife four times while she was trapped inside a glass and

-39-

and seeking refuge underneath the truck. Barber was twenty-nine years old when he committed the murder. As mitigation, he relied upon his capacity for rehabilitation and, like Bland, his youth. As in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) (Repealed). In addition, the jury determined that the murder was committed during the course of a felony. See Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994) (concluding that the jury's consideration of felony-murder aggravating circumstance was harmless error).

Finally, though the jury in State v. Taylor, 771 S.W.2d 387 (Tenn. 1989) found three aggravating circumstances[25] in addition to finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, the circumstances of the offense and the character of the defendant in that case bear similarities to the circumstances of this killing and the character of this defendant. While incarcerated, Taylor attacked a guard with a hand-made knife. As in this case, the attack was without provocation. The victim fled down the hall, but was pursued by the defendant. Though the victim pled for mercy, the defendant continued with the assault. Eventually, the defendant ended the assault, leaving the victim alive and conscious, but severely wounded. Blinded by the assault, but conscious, the victim called out in pain to other prison inmates until he was removed to the hospital. As was Bland, Taylor was calm after the killing, returning to his cell, concealing the weapon, and changing clothes. The victim died forty minutes later from internal bleeding. Like Bland, Taylor relied upon his youth as mitigation of the offense: he

---

[25]The jury found that the defendant had committed prior violent felonies, that the defendant was in lawful confinement when he committed the murder, and that the victim was a corrections employee. Tenn. Code Ann. § 39-2-23(i)(2),(8) & (9) (1982) (repealed).

-41-

was twenty-one when he committed the murder. Also like Bland, Taylor had a juvenile record.

As stated earlier, though no two cases are identical, the above six cases have many similarities with Bland. In each case, the defendant assaulted an unresisting and defenseless victim without provocation or explanation. In each case multiple wounds were inflicted upon the victim, causing pain and suffering. Like Terry Sanders, the victims in at least two of the cases, Cooper and Taylor, were trapped and unable to get away from the defendant's assault. Like Bland, two of the defendants were very young[26] when the offense was committed -- nineteen and twenty-one. Also like Bland, two of the defendants had been drinking or using drugs on the day of the murder. After reviewing the cases discussed above, and many other cases not herein described, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1)(A) & (D) (1991 Repl. & 1996 Supp.), and the principles previously discussed, we have considered the entire record in this cause and find that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports, as previously discussed, the jury's findings of the statutory aggravating circumstance and that the evidence supports the jury's finding that the aggravating circumstance outweighed mitigating

---

[26]This Court has reviewed 116 capital cases since 1977 involving 110 defendants. Of the 110, at least 46 were between the ages of 19 and 25 when the offense was committed. At least 9 were 19 years old when the offense was committed.

-42-

circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)-(C) (1991 Repl. & 1996 Supp.). We have considered the defendant's assignments of error and have determined that none have merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Paul G. Summers and joined in by Judge David H. Welles and Judge William M. Barker. The defendant's sentence of death by electrocution is affirmed. The sentence of death will be carried out as provided by law on the 6th day of April 1998, unless otherwise ordered by this Court or other proper authorities.

Frank F. Drowota, III,
Justice

**Concur:**
Anderson, C. J. and Holder, J.

Reid, J. - separate concurring and dissenting opinion.

Birch, J. - separate concurring and dissenting opinion.

-43-