# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| CHRISTA GAIL PIKE | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| DEBRA JOHNSON, WARDEN | ) | |
| | ) | |
| Respondent. | ) | |

---

## ADDENDUM 3

## DOCUMENT 11

---

No.: _____

IN THE

## SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 1998

◆

CHRISTA GAIL PIKE,

*Petitioner,*

v.

STATE OF TENNESSEE,

*Respondent*

◆

**Petition for a Writ of Certiorari
to the Tennessee Supreme Court**

◆

## PETITION FOR A WRIT OF CERTIORARI

◆

WILLIAM C. TALMAN
*Counsel of Record*
P.O. Box 506
Knoxville, Tennessee 37901-0506
Telephone (423) 579-9000

JULIE A. RICE
P.O. Box 426
Knoxville, Tennessee 37901-0426
Telephone (423) 577-3254

*Attorneys for Petitioner, Christa Gail Pike*

Case 1:12-cv-00035-HSM-SKL     Document 8-26     Filed 08/01/12     Page 2 of 29
PageID #: 3741

## QUESTIONS PRESENTED - CAPITAL CASE

1     *Does Tennessee's use of the "avoiding arrest" aggravating circumstance, defined in the statute as "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another," Tennessee Code Annotated § 39-13-204(i)(6),(1997 Repl.) violate the 8th Amendment, where the victim was neither a law enforcement officer, nor a witness to, victim of, or in possession of knowledge concerning any separate offense by Petitioner or her co-defendants?*

2     *Does the inclusion of "intuitive feelings" of the Justices on the Tennessee Supreme Court about the Petitioner's race and gender as considerations for proportionality review violate the 8th Amendment?*

Case 1:12-cv-00035-HSM-SKL    Document 8-26    Filed 08/01/12    Page 3 of 29 PageID #: 3742

# TABLE OF CONTENTS

Questions Presented ................................................. i

Table of Contents .................................................. ii

Table of Authorities ............................................... iv

Opinions Below ..................................................... 2

Jurisdiction ....................................................... 2

Constitutional Provisions Involved ................................. 2, 3

Statement of the Case .............................................. 4

Reasons for Allowing the Writ

    I. Tennessee's application of the aggravating factor that "the murder was
    committed for the purpose of avoiding, interfering with, or preventing a
    lawful arrest or prosecution of the Defendant or another" violates the 8th
    and 14th Amendments to the United States Constitution as defined by
    this Court, and conflicts with numerous decisions of other State Courts of
    last resort that have addressed this issue ................................ 7

    II. By including in its proportionality review intuitive feelings about
    Petitioner's race and gender, the Tennessee Supreme Court injects into a
    capital sentencing decision arbitrary factors renounced by this Court and
    United States Courts of Appeals ......................................... 14

Conclusion ......................................................... 19

## APPENDIX

Opinion of the Supreme Court of Tennessee, dated October 5, 1998
    affirming Petitioner's conviction and death sentence ............. App. 1

## TABLE OF CONTENTS - Continued

**Opinion of the** Tennessee Court of Criminal Appeals, dated November 26
1997 affirming Petitioner's conviction and death sentence . . . . . . App 59

**Order of the** Supreme Court of Tennessee denying Petitioner's application
for Rehearing, dated November 23, 1998 . . . . . . . . . . . . . . . . App 92

<u>Tennessee</u> Code Annotated § 49-13-204(1)(6) . . . . . . . . . . . . . . App 93

<u>Tennessee</u> Code Annotated § 39-13-206(c)(1)(D) . . . . . . . . . . . . App 94

**Rule 12,** Rules of the Supreme Court of Tennessee . . . . . . . . . . . App 95

iii

Case 1:12-cv-00035-HSM-SKL   Document 8-26   Filed 08/01/12   Page 5 of 29
PageID #: 3744

003718

# TABLE OF AUTHORITIES

CASES

Alexander v. Louisiana, 405 U.S. 625 (1972) . . . . . . . . . . . . . . . . 14

Alston v. State, 723 So.2d 148 (Fla., 1998) . . . . . . . . . . . . . . . 12

Batson v. Kentucky, 476 U.S. 79 (1986) . . . . . . . . . . . . . . . . 14

Cavanaugh v. State, 729 P.2d 481 (Nevada, 1986) . . . . . . . . . . . . . 12

Clark v. State, 443 So.2d 973 (Fla., 1983) . . . . . . . . . . . . . . . . 12

Commonwealth v. Christy, 515 A.2d 832 (Pa., 1990) . . . . . . . . . . . . 12

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . 14

Ex parte Johnson, 399 So.2d 873 (Ala., 1979) . . . . . . . . . . . . . 11

Furman v. Georgia, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . 9, 17, 18

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . 10

Gregg v. Georgia, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . 9, 17, 18

Griffin v. State, 474 So.2d 777 (Fla., 1985) . . . . . . . . . . . . . . . 12

Irvin v. Dowd, 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . 14

Kemp v. State, 919 S.W.2d 943 (Ark., 1996) . . . . . . . . . . . . . . 12

Maynard v. Cartwright, 486 U.S. 356 (1988) . . . . . . . . . . . . . . 9

Case 1:12-cv-00035-HSM-SKL   Document 8-26   Filed 08/01/12   Page 6 of 29
PageID #: 3745

McCleskey v. Kemp, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . 15

Menendez v. State, 368 So.2d 1278 (Fla., 1979) . . . . . . . . . . . . 12

Oyler v. Boles, 368 U.S. 448 (1962) . . . . . . . . . . . . . . . . . . 14

People v. Brownell I, 404 N.E.2d 181 (Ill., 1980) . . . . . . . . . . . 12

People v. Stanley, 897 P.2d 481 (Cal., 1995) . . . . . . . . . . . . . 12

Riley v. State, 366 So.2d 19 (Fla., 1978) . . . . . . . . . . . . . . . 12

Ristaino v. Ross, 424 U.S. 589 (1976) . . . . . . . . . . . . . . . . . 14

Rose v. Mitchell, 443 U.S. 545 (1979) . . . . . . . . . . . . . . . . . 14

State v. Bland, 958 S.W.2d 651 (Tenn., 1997) . . . . . . . . . . . . . 16

State v. Byrne, 483 So.2d 564 (La., 1986) . . . . . . . . . . . . . . . 12

State v. Harris, 839 S.W.2d 54 (Tenn., 1992) . . . . . . . . . . . . . 15

State v. Pike, 978 S.W.2d 904 (Tenn., 1998) . . . . . . . . . . . . . passim

Turney v. Murray, 476 U.S. 28 (1986) . . . . . . . . . . . . . . . . . 14

United States v. Batchelder, 442 U.S. 114 (1979) . . . . . . . . . . . 14

United States v. Chandler, 996 F.2d 1073 (11th Cir., 1993) . . . . . . 15

United States v. Webster, 162 F.3d 308 (5th Cir., 1998) . . . . . . . 15

Vasquez v. Hillery, 474 U.S. 254 (1986) . . . . . . . . . . . . . . . . 14

Zant v. Stephens, 462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . 15

v

003720

STATUTE

28 U.S.C. § 1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Tennessee Code Annotated § 39-13-204(1)(6) . . . . . . . . . . . . . . . . . . *passim*

Tennessee Code Annotated § 39-13 206(c)(1)(D) . . . . . . . . . . . . . . . . 15

CONSTITUTIONAL PROVISIONS

U.S. Constitution, Amendment VIII . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S. Constitution, Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . 3

RULES

U.S. Supreme Court Rule 10.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. Supreme Court Rule 13.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

U.S. Supreme Court Rule 14 1(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tennessee Supreme Court, Rule 12 . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Case 1:12-cv-00035-HSM-SKL   Document 8-26   Filed 08/01/12   Page 8 of 29
PageID #: 3747

003721

No.: _____

———— ◆ ————

IN THE

## SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 1998

———— ◆ ————

CHRISTA GAIL PIKE,

*Petitioner,*

v.

STATE OF TENNESSEE,

*Respondent*

———— ◆ ————

**Petition for a Writ of Certiorari
to the Tennessee Supreme Court**

———— ◆ ————

### PETITION FOR A WRIT OF CERTIORARI

———— ◆ ————

The Petitioner, Christa Gail Pike, respectfully prays that a writ of certiorari issue to

review the judgments of the Tennessee Supreme Court and the Tennessee Court of Criminal

Appeals in this case

———— ◆ ————

1

## OPINIONS BELOW

On October 5, 1998, the Supreme Court of Tennessee entered its opinion affirming the conviction and death sentence in this case, which is reported at 978 S.W.2d 904 (Tenn. 1998), and is included in the Appendix, at App. 1. Rehearing was denied on November 23, 1998, which is noted in the caption at 978 S.W.2d 904, and is included in the Appendix, at page App. 92. On November 26, 1997, the Tennessee Court of Criminal Appeals entered its opinion in this case, which is unreported and is included in the Appendix, at App. 59.

———————◆———————

## JURISDICTION

The Supreme Court of Tennessee entered its judgment on October 5, 1998. A timely petition for rehearing was denied on November 23, 1998. Petitioner would submit that this Petition for a Writ of Certiorari is timely filed within the ninety day time period permitted by Supreme Court Rule 13.1. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1257 and 1651.

———————◆———————

## CONSTITUTIONAL PROVISIONS INVOLVED

U.S. Constitution, Amendment VIII.

*Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.*

2

U.S. Constitution, Amendment XIV.

*All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

———————— ◆ ————————

## STATEMENT OF THE CASE

The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the Petitioner, Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with the victim, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center. The victim was not with them.

Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed the victim and had brought back a piece of the skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat, beaten her, and thrown asphalt at the victim's head. Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk. Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she

3

had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest.

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of skull.

Though neither Iloilo nor Wilson immediately reported Pike's statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered the victim's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He immediately notified law enforcement officials from the Knoxville and U.T. Police Departments who were summoned to the scene.

Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso.

As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and broken foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle, with trampled bushes, hand and knee prints in the mud, and drag marks.

Det. Randy York of the Knoxville Police Department separately interviewed the Petitioner and Shipp at the Knoxville Police Department on January 14th. He advised Pike of

4

her <u>Miranda</u> rights, but she chose to waive them and make a statement. Pike explained in detail how the killing had occurred. Pike's statement was tape-recorded and transcribed in some forty-six pages.

In her statement, Pike said that she and the victim had been having problems for some time. Pike claimed to have awakened one night to find the victim standing over her with a box cutter. She claimed she had not planned to kill the girl. However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she, the victim, and unidentified "others" left the Job Corps Center and began walking toward the U.T. campus. Once in a secluded area, the attack on Slemmer began. The victim tried to run away, but another person with Pike caught her, pushing her to the ground, where the attack resumed. In the midst of this furious attack, Pike began to hear voices telling her that she had to do something to prevent the victim from telling on her and sending her to prison. At another point in the attack upon the victim, Pike heard a noise, investigated briefly, and rejoined the attack on the victim.

After giving her statement, Pike gave Det. York consent to search her room at the Job Corps Center and then accompanied him to the Center. From there Pike retraced her steps, describing what had occurred on the night of the killing. Det. York testified that Pike eventually directed him to the exact location where the victim's body was found.

Dr. Engum opined that the defendant had not acted with deliberation or premeditation in this killing but rather in a manner consistent with her borderline personality disorder which caused her to lose control. However, Dr. Engum admitted that Pike had deliberately enticed the victim to the park, helped carve a pentagram on her chest, bashed the victim's head against the concrete, and beaten the victim's head with the asphalt. Dr. Engum also agreed that Pike's

5

003726

act of carrying weapons with her indicates deliberation. Finally, he acknowledged Pike could have had time to calm down when investigating the noise she heard.

Based on this evidence offered during the guilt phase of the trial, the jury found Pike, guilty of first-degree, premeditated murder and conspiracy to commit first- degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called several family members to relate how Pike's life had been a "disaster" from her earliest beginnings as an infant through her teenage years and last chance for life at the Job Corps Center.

In rebuttal, Harold James Underwood, Jr., a U.T. police officer assigned to the crime scene, testified Pike was at the scene asking him questions about the crime, seemingly amused and wearing an unusual necklace he later identified as a pentagram. He reported Pike's appearance and actions later during the investigation.

Based on the proof submitted at the sentencing hearing, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors

6

003727

assigned by the defendant, the Tennessee Supreme Court affirmed the judgment of the Court of Criminal Appeals. Christa Gail Pike now respectfully presents this petition for *a Writ of Certiorari* to this Honorable court, which is being timely filed within the ninety day period required by Supreme Court Rule 13.1.

Pursuant to Supreme Court Rule 14.1(h), the federal questions sought to be raised in this court were raised below, decided adversely to Petitioner by the Supreme Court of Tennessee, and have been properly preserved and litigated below.

————————◆————————

## REASONS FOR ALLOWING THE WRIT

I.    *Tennessee's application of the aggravating factor that "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Defendant or another" violates the 8th and 14th amendments to the United States Constitution as defined by this Court, and conflicts with numerous decisions of other State Courts of last resort that have addressed this issue.*

A.    Overview

The Tennessee Supreme Court decision below upholds the jury's finding that Petitioner killed Colleen Slemmer, a fellow student at the Job Corps center in Knoxville, Tennessee, "for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Defendant or another." Tenn. Code Ann. § 39-13-204(i)(6). In doing so, that decision conflicts with decisions of this Court and numerous State courts of last resort. See Rule 10.1 (b) and (c)

7

of the Rules of the Supreme Court of the United States.

Petitioner was charged, along with two others, in a two-count indictment. The first count alleged that Petitioner, Shadolla Peterson and Tadaryl Shipp "did unlawfully, intentionally, deliberately and with premeditation kill" the victim. In the second count Petitioner, Peterson and Shipp were charged with having conspired to commit the aforesaid intentional and deliberate murder. The Petitioner was found guilty of both counts. 978 S.W.2d at 912, 914-16; Appendix at App. 16, and App. 21-25. The verdict in this case is plain, straight-forward, and unambiguous. The jury accepted the State's theory that Petitioner and her co-defendants planned to kill the victim prior to the act of killing, more particularly even prior to going to the secluded area where the victim died, and that Petitioner and her co-defendants intentionally and deliberately killed the victim there. 978 S.W.2d 914-916; Appendix at App. 21-25.

Yet, despite this simple, single-minded plot to kill and the carrying out of the intended plan to kill one particular individual, the Tennessee Supreme Court upheld the (i)(6) aggravator as applied to Petitioner's case. The Tennessee Supreme Court stated that it had upheld this aggravating factor in previous decisions as long as the State proved that avoiding prosecution was at least one of the motives for the killing. 978 S.W.2d at 918; Appendix, at App. 28-31. The court then noted Pike admitted to police that during the middle of the assault on the victim, Pike heard a voice telling her to kill the victim to prevent the victim from reporting the assault. Noting further that Pike had told the victim she was not going to be rotting in prison because of the victim, the court held these two statements to be sufficient evidence for the jury to apply the (i)(6) aggravator in Pike's case notwithstanding the State's theory that the conspiracy was

8

for the sole purpose of killing the victim. 978 S.W.2d 915-16, 918; Appendix, at App. 23-25, and App. 28-31.

This expansive definition of the "to avoid prosecution" aggravating factor fails to narrow the class eligible for death and thus violates the commands of this Court which have been consistent since Gregg v. Georgia, 428 U.S. 153 (1976).

B.     The Failure of the Tennessee Supreme Court to Narrow the Applicability of the "Avoid Arrest" Aggravating Factor Contradicts the Clear Dictates of This Court and Numerous Decisions of State Courts of Last Resort.

In Gregg v. Georgia, the Court approved the Georgia death penalty by noting that Georgia's death sentencing scheme had properly focused the jury's attention on the "particularized nature of the crime and the particularized characteristics of the individual defendant." 428 U.S. at 207. In upholding the Georgia statute the Court emphasized that while certain of the aggravating factors were "susceptible of an overly broad interpretation," the Georgia Supreme Court had narrowed their applicability. Id. at 202. This Court also observed in Maynard v. Cartwright, that

> Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in Furman v. Georgia, 408 U.S. 238 (1972). Furman held that Georgia's then-standardless capital punishment statute was being applied in an arbitrary and capricious manner; there was no principled means provided to distinguish those that received the penalty from those that did not. [citations omitted]. Since Furman, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental

9

003750

constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.

486 U.S. 356, 361-62(1988). Moreover, in Godfrey v. Georgia, the Court held, in relation to the "outrageously or wantonly vile, horrible and inhuman" aggravating factor, that "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." 446 U.S. 420, 428-29.

Clearly, this Court has repeatedly held that the Constitution requires that aggravating circumstances narrow the class of persons convicted of first-degree murder to a smaller, more culpable, subset of murderers who are eligible for the harshest penalty exacted upon these offenders, a death sentence. Aggravating circumstances should perform this narrowing function by focusing the jury's attention on the particulars of the crime and the individual defendant, and where a state court's interpretation of an aggravating circumstance allows its application to a much wider range of cases and offenders, the application of that aggravating factor violates the Eighth and Fourteenth Amendments because it is no longer winnowing the field of murderers for the death sentence. To maintain the constitutionality of aggravating circumstances similar to the "avoiding arrest" aggravator, numerous state courts of last resort have limited their application to cases where the victim is a police officer or evidence demonstrates that a desire to avoid arrest was the sole or a dominant motive for the killing. Others preclude application where the murder victim is also the victim of the original crime for which the killer sought to avoid arrest.

Alabama Code § 13 A-5-49(1975) establishes as one of its aggravating factors that "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or

10

effecting an escape from custody." In Ex parte Johnson, 399 So.2d 873 (Ala. 1979), the

Alabama Supreme Court acknowledged that the language of this factor was susceptible of an

unconstitutionally broad interpretation, and it therefore limited is application.

> One interpretation of this provision would enable it to be applied in all felony cases in which death has ensued, for it could be said that one of the purposes of inflicting any death would be to prevent identification by the victim. The language of the provision, grouped as it is with other specific circumstances of aggravation, cannot have been intended by the legislature to have such an expansive application. . . . Utilizing the clear language of the provision to determine the circumstances to which it is applicable we conclude that it applies to "lawful arrest" or "escape from custody" situations. . . . Undoubtedly the legislature, by adopting the provision in question, placed special emphasis upon the protection of persons effecting lawful arrests or who would be endangered during escapes from lawful custody, and thus sought to deter such conduct by applying the extreme sanction to it.

399 So.2d at 874.

Similarly, in considering a like circumstances, the Arkansas

Supreme Court stated:

> At least one commentator has recognized that the statutory aggravating circumstance at issue is "apparently designed to deter deliberate murderous acts subversive of the criminal justice system in particular and social order in general, and to protect certain persons deemed especially important to the integrity of both, including law enforcement officers, prison guards, and actual or potential witnesses in judicial proceedings." See. Thomas M. Fleming, Sufficiency of the Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Committed to Avoid Arrest or Prosecution, to Effect Escape from Custody, to Hinder Governmental Function or Enforcement of Law, and the Like--Post-Gregg Cases, 64 S.L.R.4th 755, 763(1988 and Supp. 1995)(footnotes omitted). Many courts, according to this commentator, follow the rule that, where the victim is not a law enforcement officer, the State must clearly show that prevention of detection and arrest for the offense was the dominant or only motive for the killing. Id. at 766.
>
> We recognize that a consequence of every murder is the elimination of the victim as a potential witness. However, avoiding arrest is not necessarily an invariable

11

motivation for killing. [citations omitted]. A common thread in many of our prior decisions involving the "avoiding arrest" aggravating circumstance is that the murder was committed in order to avoid arrest or eliminate a witness to another offense committed in connection with the murder. [citations omitted].

Kemp v. State, 919 S.W.2d 943, 954 (Ark. 1996).

Consistent with the reasoning expressed by the Alabama and Arkansas Supreme Courts, numerous state courts of last resort hold that a factor such as the "avoiding arrest" factor applies only where the victim is a police officer or evidence demonstrates that avoiding arrest is the sole or dominant motive for the killing. See Alston v. State, 723 So.2d 148 (Fla. 1998), 1998 WL 574303, p. 12, rehrg. denied December 17, 1998; Griffin v. State, 474 So.2d 777 (Fla. 1985, cert. denied, 474 U.S. 1094 (1986); Clark v. State, 443 So.2d 973 (Fla. 1983), cert. denied, 467 U.S.1210 (1984); Menendez v. State, 368 So.2d 1278, 1281 (Fla. 1979)(multiple stabbing of a robbery victim was a sign the crime "got out of hand" rather than an attempt to avoid identification by the victim); Riley v. State, 366 So.2d 19, 22 (Fla 1978)("[T]he mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement officer. Proof of the requisite intent to avoid arrest and detection must be very strong in these cases."); Cavanaugh v. State, 729 P.2d 481 (Nevada 1986); Commonwealth v. Christy, 515 A.2d 832 (Pa. 1990), cert. denied, 481 U.S. 1059 (1987). Other state courts of last resort further limit application of circumstances such as the "avoiding arrest" factor by precluding its application where the murder victim is also the victim of the substantive crime on which the killer sought to avoid arrest. People v. Stanley, 897 P.2d 481, 502 (Cal. 1995), cert. denied, 479 U.S. 871 (1986); State v. Byrne, 483 So.2d 564 (La. 1986)(victim may not be witness to his own victimization); People v. Brownell I, 404 N.E.2d 181 (Ill. 1980), cert. dismissed, 449 U.S. 811 (1980).

12

In stark contrast to these decisions, the Tennessee Supreme Court's decision in Petitioner's case allows application of the "avoiding arrest" factor where the victim is not a police officer; where the victim is also the victim of the underlying crime on which the killer seeks to avoid arrest; and where limited evidence indicates that a desire to avoid arrest motivated the killer while the jury's finding that the killer planned in advance to kill the victim refutes such scant evidence.

In finding the evidence sufficient to support a conviction for premeditated murder, the Tennessee Supreme Court listed the facts that supported the intentional murder conviction as including "declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, . . ." 978 S.W.2d at 914; Appendix, at App. 21. The court stated further that "Pike told a friend one day before the killing that she was going to kill the victim. The defendant procured weapons to accomplish the crime. . . ." 978 S.W. 2d at 915; Appendix, at App. 22. Where premeditation to commit murder is found to have been formed a day before the killing took place, where there is no separate crime contemplated by Petitioner against the victim or another, and no other crime to which the intended victim is a witness, it appears impossible to then hold that the desire to avoid arrest or prosecution can be said to provide even the slightest motive for the homicide. However, through the use of this same faulty logic, the Tennessee Supreme Court decision allows for a sweeping application of the "avoiding arrest" factor in derogation of decisions of this Court and numerous state courts of last resort.

13

### C. Conclusion

Obviously, it defies reason and logic to argue that a defendant would kill a person to prevent that person from testifying against her or him for that very same, planned and deliberate homicide. Yet, the Tennessee Supreme Court's opinion in Pike's case adopts that exact reasoning with the application of the (i)(6) aggravating factor. This Court must therefore review Tennessee's interpretation of the (i)(6) aggravating circumstance to ensure that this circumstance provides for the narrowing of death-eligible offenders that the Eighth and Fourteenth Amendments require.

II. *By including in its proportionality review intuitive feelings about Petitioner's race and gender, the Tennessee Supreme Court injects into a capital sentencing decision arbitrary factors renounced by this Court and United States Courts of Appeals.*

    A. This Court and United States Courts of Appeals preclude the consideration of a Defendant's race and gender in capital sentencing decisions.

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." Rose v. Mitchell, 443 U.S. 545, 555 (1979). Thus, this Court has committed itself to "unceasing efforts" seeking to eradicate from the criminal justice process any consideration of race. See, Batson v. Kentucky, 476 U.S. 79, 85 (1986); Turner v. Murray, 476 U.S. 28 (1986); Vasquez v. Hillery, 474 U.S. 254 (1986); United States v. Batchelder, 442 U.S. 114 (1979); Ristaino v. Ross, 424 U.S. 589 (1976); Donnelly v. DeChristoforo, 416 U.S. 637 (1974); Alexander v. Louisiana, 405 U.S. 625 (1972); Oyler v. Boles, 368 U.S. 448 (1962); Irvin v. Dowd, 366 U.S. 717 (1961). In the context of capital proceedings this Court has explicitly acknowledged the illegitimacy of race as a consideration during sentencing decisions.

14

Zant v. Stephens, 462 U.S. 862, 885 (1983). Thus, this Court has held a death sentence invalid when racial considerations enter into any such decision. McCleskey v. Kemp, 481 U.S. 279, 308 (1987).

Similarly, consistent with this Court's efforts aimed at eliminating the consideration of any arbitrary factor, not just race, from capital sentencing decisions, the Fifth and Eleventh Circuits have held gender to be an invidious factor which also cannot enter into any such sentencing decision. United States v. Webster, 162 F.3d 308, 355 (5th Cir. 1998); United States v. Chandler, 996 F.2d 1073, 1083 (11th Cir. 1993). Indeed, the Fifth Circuit has found that capital sentencing procedures are constitutional only if they eliminate gender from consideration during sentencing decisions. Webster, 162 F.3d at 355.

Contrary to the pronouncements of this Court and the efforts by it and the Fifth and Eleventh Circuits to remove arbitrary factors from capital sentencing decisions, the Tennessee Supreme Court includes in its calculus when performing the proportionality review in a capital case the intuitive feelings its members harbor about the defendant's race and gender.

      **B.**      **Contrary to decisions of this Court and United States Courts of Appeals, the Tennessee Supreme Court includes in its proportionality review intuitive feelings its members harbor about the Defendant's race and gender.**

Tenn. Code Ann. § 39-13-206(c)(1)(D) requires that on direct review of a capital case, Tennessee's appellate courts determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Apparently spurred by repeated criticism that no criteria existed to perform this analysis, see, e.g., State v. Harris, 839 S.W.2d 54, 84 (Tenn. 1992)(Reid, C.J., dissenting),

15

cert. denied, 507 U.S. 954 (1993), in State v. Bland, 958 S.W.2d 651(Tenn. 1997), the

Tennessee Supreme Court elaborated about how it performs this proportionality review. It stated

that it employs a "precedent-seeking approach" in which

> a reviewing court . . . compares the case before it to other cases in which the
> defendants were convicted of the same or similar crimes by examining the facts
> of the crimes, the characteristics of the defendants, and the aggravating and
> mitigating factors involved.

Bland, 958 S.W.2d at 664. As to the prong requiring consideration of the defendant's

characteristics, the Tennessee Supreme Court specifically stated that "criteria relevant to a

comparison of the characteristics of defendants . . . include . . . the defendant's. . . race and

gender . . .." Bland, 958 S.W.2d at 667. The court finished by noting that when it performs

its proportionality review, it is not engaged in an "objective test," and it does not employ

"mathematical or scientific techniques." Rather, in comparing cases and considering, among

other things, the heritage and sex of the defendants, the Tennessee Supreme Court relies "upon

the experienced judgment and intuition of its own members." Bland, 958 S.W.2d at 668. Thus,

in Bland, the Tennessee Supreme Court admits and acknowledges that when it performs a

proportionality review, its members include in their assessment their intuitive feelings,

necessarily subjective, about the defendant's race and gender.

On direct appeal of Petitioner's conviction, the Tennessee Supreme Court performed the

comparative proportionality review state law requires. To assist it in performing this review,

the trial court provided it a form, required by Rule 12, Rules of the Tennessee Supreme Court,

which specifically asked for Petitioner's race and gender, and informed the Tennessee Supreme

Court that Petitioner is a caucasian female. In performing the proportionality review in

Petitioner's case, the Tennessee Supreme Court stated that it would consider various factors,

16

including a comparison of Petitioner's race and gender with the race and gender of other first-degree murder defendants. State v. Pike, 978 S.W.2d at 919; Appendix, at App. 32. While the Tennessee Supreme Court did not elaborate on just how Petitioner's status as a white female affected the decision-making process of its members, what this Court does know is what the Tennessee Supreme Court specifically said: in making its decision, it took into consideration Petitioner's race and gender. Id. It therefore cannot be disputed that considerations of race and gender entered into the decision that Petitioner's death sentence was proportionate to sentences given others in Tennessee.

      C.      By including considerations of a Defendant's race and gender in its proportionality review, the Tennessee Supreme Court transforms a valued safeguard against arbitrariness into a guarantee that arbitrary factors will infect a capital sentencing procedure.

While injecting racial and sexual predilections into any capital sentencing decision offends the Constitution, incorporating such biases into proportionality review is particularly disturbing. In Furman v. Georgia this Court held unconstitutional death penalty statutes as then written concluding they were

> cruel and unusual in the same way that being struck by lightening is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in Furman were] among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . ..[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

Furman v. Georgia, 408 U.S. 238, 309-310 (1972)(Stewart, J., concurring). In Furman's wake, state legislatures drafted statutes which sought to incorporate procedural safeguards addressing the arbitrary imposition of the death penalty which that opinion condemned. In Gregg v.

17

Georgia, 428 U.S. 153 (1976), this Court held that on its face Georgia's post-Furman statute created a process consistent with Furman. This Court based its holding primarily on two components of the Georgia statute.

First, the Georgia statute enumerated specific, narrowly-defined aggravating circumstances which had to be found prior to the infliction of the death penalty. Gregg, 428 U.S. at 196. Second, this Court noted that the Georgia statute contained "an important additional safeguard against arbitrariness and caprice." Gregg, 428 U.S. at 198.

> [T]o guard further against a situation comparable to that presented in Furman, the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate.

Id. This Court therefore concluded that "[o]n their face these procedures seem to satisfy the concerns of Furman." Id.

Like the Georgia statute, Tennessee's death penalty statute (1) requires that a sentencing jury must find an aggravating circumstance before it can impose a death sentence; and (2) provides for automatic proportionality review. In Tennessee, however, racial and sexual prejudices infect the second process, transforming it from an additional safeguard against arbitrariness and caprice into a guarantee that the arbitrary and irrelevant factors of the defendant's race and gender will enter into Tennessee's capital sentencing procedure.

D.     Conclusion

In determining whether to affirm Petitioner's death sentence, the Tennessee Supreme Court included in its decision-making process "intuitive feelings" its individual justices harbored about Petitioner's race and gender. This Court should grant certiorari to further the efforts of this Court and the United States Courts of Appeals aimed at eliminating arbitrary factors such

18

as race and gender from capital sentencing decisions.

————————◆————————

## CONCLUSION

Petitioner, Christa Gail Pike, respectfully requests that this Court grant the *Petition for a Writ of Certiorari*, review the issues presented herein, and upon considering those issues, grant her the relief that the Court feels is appropriate and just under the circumstances of this case.

Respectfully submitted,

WILLIAM C. TALMAN
 *Counsel of Record*
P.O. Box 506
Knoxville, Tennessee  37901-0506
Telephone:  (423) 579-9060
Facsimile:  (423) 573-2032


JULIE A. RICE
P.O. Box 426
Knoxville, Tennessee  37901-0426
Telephone:  (423) 577-3254

*Attorneys for Petitioner, Christa Gail Pike*

19

No.: _____

———————◆———————

IN THE

STATE OF TENN.
ATTORNEY GENERAL

FEB 2 9 1999

CRIMINAL JUSTICE DIV

## SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 1998

———————◆———————

CHRISTA GAIL PIKE,

*Petitioner,*

v.

STATE OF TENNESSEE,

*Respondent.*

———————◆———————

**Certificate of Service of
Petition for *Writ of Certiorari***

———————◆———————

I, William C. Talman, a member of the bar of this Honorable Court, hereby certify that

I have served a true and correct copy of the Petition for a Writ of Certiorari, by personally

depositing or causing same to be deposited in the U.S. Mail, with sufficient first class postage,

prepaid, to reach it's destination, upon Hon. Paul G. Summers, Attorney General and Reporter,

Case 1:12-cv-00035-HSM-SKL    Document 8-26    Filed 08/01/12    Page 28 of 29
PageID #: 3767

425 Fifth Avenue, Nashville, Tennessee 37243.

I further certify that all parties required to be served have been served.

This the 22nd day of Feburary, 1999.

CHRISTA GAIL PIKE

BY: _____

WILLIAM C. TALMAN
*Counsel of Record*
P.O. Box 506
Knoxville, Tennessee 37901-0506

Telephone: (423) 579-9060
Facsimile: (423) 573-2032

**Page 2**