# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 4

## DOCUMENT 1

---

003743

E2009-00016-CCA-R3-PD

Recd. 4/3/09

I

VOLUME I OF V

# TECHNICAL RECORD

NO. 68280

FILED
APR 07 2009
Clerk of the Courts
Rec'd By RG...

Tech-5
Trans-25
Ex-75
(6 are DVDs + Need motion + order to c/out)

DEFENDANT: CHRISTA GAIL PIKE, PETITIONER
(Defendant Indigent)

## APPEALED FROM

## KNOX COUNTY CRIMINAL COURT

## AT KNOXVILLE, TENNESSEE

HON. MARY BETH LEIBOWITZ, JUDGE – DIVISION III

JOY R. MCCROSKEY CLERK

IN THE CASE OF

CHRISTA GAIL PIKE, PETITIONER

VS.

STATE OF TENNESSEE, RESPONDENT

PETITION DISMISSED

CHARGE: PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

## TO THE

## COURT OF CRIMINAL APPEALS

## KNOXVILLE, TENNESSEE

TN Prison For Women
TDOC# 261368
Indigent
Plus Supplements
Trans-2
Ex-3

HONORABLE DONALD DAWSON, Attorney-at-Law
530 Church Street
~~Suite 600~~
Nashville, TN 37243

Attorneys for Appellant

HONORABLE RANDALL E. NICHOLS, District Attorney General
HONORABLE LELAND PRICE, Assistant Attorney General
~~City-County Building~~
Knoxville, TN 37902

Attorneys for Appellee

FILED 3 DAY OF April 2009

CRIMINAL COURT JOY R. MCCROSKEY CLERK

NO. 68280 SHEILA MELTABARGER DEP. CLERK

APPELLANT PRISON NO. 2612368
3881 Stewarts Lane
Nashville, TN 37243

Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 2 of 153 PageID #: 3773

CHRISTA GAIL PIKE, PETITIONER          NO. 68280

VS

STATE OF TENNESSEE, RESPONDENT          PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

T O   T H E

S U P R E M E   C O U R T

K N O X V I L L E,   T E N N E S S E E

APPEARANCES:

FOR THE APPELLANT:

HONORABLE DONALD DAWSON, Attorney-at-Law
530 Church Street
Suite 600
Nashville, TN 37243
(615) 741-9385

FOR THE APPELLEE:

HONORABLE RANDALL E. NICHOLS, District Attorney General
HONORABLE LELAND PRICE, Assistant District Attorney General
City-County Building
Knoxville, TN 37902
(865) 215-2515

FILED THIS 3 DAY OF april, 2009.

CONVICTED: First Degree Murder

DEFENDANT: Prison No. 2612368
3881 Stewarts Lane
Nashville, TN 37243

CHRISTA GAIL PIKE, PETITIONER NO. 68280

VS

STATE OF TENNESSEE, RESPONDENT PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

# I N D E X

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 232-233

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 234-235

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 236-237

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 238-239

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 240-241

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 242-243

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 244-245

Affidavit of Catherine Y. Brockenborough . . . . . . . . . 246-247

Bill of Costs . . . . . . . . . . . . . . . . . . . . . . . 726

Certificate of Materiality . . . . . . . . . . . . . . . 210-212

Certificate of Materiality . . . . . . . . . . . . . . . 213-215

Certificate of Materiality . . . . . . . . . . . . . . . 216-218

Certificate of Materiality . . . . . . . . . . . . . . . 219-221

Certificate of Materiality . . . . . . . . . . . . . . . 222-224

Certificate of Materiality . . . . . . . . . . . . . . . 225-226

Certificate of Materiality . . . . . . . . . . . . . . . 227-229

Certificate of Materiality . . . . . . . . . . . . . . . 230-232

Certificate of Materiality . . . . . . . . . . . . . . . 358-359

Certificate of Materiality . . . . . . . . . . . . . . . 360-361

Certificate of Materiality . . . . . . . . . . . . . . . 362-363

Certificate of Materiality . . . . . . . . . . . . . . . 364-365

Certificate of Materiality . . . . . . . . . . . . . . . 366-367

Certificate of Materiality . . . . . . . . . . . . . . . 368-369

Certificate of Materiality . . . . . . . . . . . . . . . 370-371

Certificate of Materiality . . . . . . . . . . . . . . . 372-373

Certificate of Materiality . . . . . . . . . . . . . . . 374-375

Certificate of Materiality . . . . . . . . . . . . . . . 376-377

Certificate of Materiality . . . . . . . . . . . . . . . 378-379

Certificate of Materiality . . . . . . . . . . . . . . . 380-381

Certificate of Materiality . . . . . . . . . . . . . . . 390-391

Certificate of Materiality . . . . . . . . . . . . . . . 392-393

Certificate of Materiality . . . . . . . . . . . . . . . 394-395

Certificate of Materiality . . . . . . . . . . . . . . . 396-397

Certificate of Materiality . . . . . . . . . . . . . . . 398-399

Certificate of Materiality . . . . . . . . . . . . . . . 400-401

Certificate of Materiality . . . . . . . . . . . . . . . 402-403

Certificate of Materiality . . . . . . . . . . . . . . . 404-405

Certificate and Seal . . . . . . . . . . . . . . . . . . 718-725

Consolidated Petition for Post Conviction Relief . . . . 274-326

Denied - Motion for Declaration . . . . . . . . . . . . . . . 339

Finding of Fact and Conclusions of Law . . . . . . . . . . 599-701

Granted - Motion for Extension of Time . . . . . . . . . . . . 339

Granted - Motion for State of Tennessee to Produce the Video Recording . . . . . . . . . . . . . . . . . . . . . 431

Joint Motion to Release Skull of Colleen Slemmer from Custody and Control of Trial Court to May Martinez . . . . . . . . . . . . . . . . . . . . . . 704-709

Motion for Approval of Out-of State Travel . . . . . . . . 438-439

Motion for Continuance of Evidentiary Hearing Until After the 2006 Judicial Elections . . . . . . . . . . . 73-80

Motion to Enter an Order Appointing Catherine Y.-Brockenborough . . . . . . . . . . . . . . . . . . . . 418-420

Motion for Interlocutory Rule 9 Appeal . . . . . . . . . . 191-204

Motion Not to House Ms. Pike at Knox County Penal Farm for Women . . . . . . . . . . . . . . . . . . . . . 85-86

Motion Not to House Ms. Pike at Knox County Penal Farm for Women . . . . . . . . . . . . . . . . . . . . 271-273

Motion by State of Tennessee to Quash Subpoenas Issued To State Court Judges Richard R. Baumgartner and Ray Lee Jenkins . . . . . . . . . . . . . . . . . . . 127-131

Motion to Waive Appearance at Motion Hearing . . . . . . . 256-257

Motion to Wiothdraw as Petitioner's Counsel . . . . . . . . 442-443

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . 702-703

Notice of Filing of Authority Regarding Standards for Defense Counsel in Death Penalty Cases . . . . . . . . . 421-424

Order for Advance Travel Expenses . . . . . . . . . . . . . 251-252

Order Allowing Catherine Y. Brockenborough to Withdraw As Counsel . . . . . . . . . . . . . . . . . . . . . . . 444-445

Order Appointing Catherine Y. Brockenborough . . . . . . . 415-417

Order Appointing Catherine Y. Brockenborough . . . . . . . 435-437

Order Approving Out-of-State Investigative Travel . . . . 440-441

Order from Supreme Court Remanding Petition . . . . . . . . . 17-28

Order Concerning the Copying of an Audio Tape
Previously Entered Into Evidence . . . . . . . . . . . . 432-434

Order of Court of Criminal Appeals Denying Motion for
Interlocutory Rule 9 Appeal . . . . . . . . . . . . . . 208-209

Order of Court of Criminal Appeals Denying Motion for
Interlocutory Rule 9 Appeal . . . . . . . . . . . . . . 342-345

Order of Court of Criminal Appeals Granting Motion to
Supplement Record . . . . . . . . . . . . . . . . . . . 552-553

Order Denying Fourth Motion for Recusal . . . . . . . . . . 406-407

Order Directing Knox County Jail to Allow Contact
Visits . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

Order Granting Permission to Appeal . . . . . . . . . . . . 206-207

Order Granting Petitioner's Motion for Declaration . . . . . 341

Order Granting Petitioner's Pro Se Motion for Appointment
Of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Order to Release Skull of Colleen Slemmer from Custody
And Control of Trial Court to May Martinez . . . . . . . 710-712

Petition for Relief from Conviction or Sentence . . . . . . . 1-12

Petition for Relief from Conviction or Sentence heard . . . . 413

Petition for Relief from Conviction or Sentence heard . . . . 414

Petition for Relief from Conviction or Sentence heard . . . . 425

Petition for Relief from Conviction or Sentence heard . . . . 446

Petition for Relief from Conviction or Sentence heard . . . . 447

Petition for Relief from Conviction or Sentence heard . . . . 448

Petition for Relief from Conviction or Sentence heard . . . . 449

Petition for Relief from Conviction or Sentence heard . . . . 450

Petitioner/Appellant's Designation of Record on Appeal . . . . . . . . . . . . . . . . . . . . . . . . 713-715

Petitioner's Brief in Reply to the State's Post Hearing Memorandum and Motion to Deny Post-Conviction Relief . . . . . . . . . . . . . . . . . . . . . . . . 591-598

Petitioner's Emergency Motion for Continuance . . . . . . . 408-411

Petitioner's Ex Parte Motion for Certificate of Materiality for Out-of-State Witnesses . . . . . . . . 248-250

Petitioner's Fourth Motion to Disqualify the Office Of Knox County District Attorney General . . . . . . . . 346-356

Petitioner's Fourth Motion to Disqualify the Office Of Knox County District Attorney General . . . . . . . . . . 357

Petitioner's Further Amendments to Petition for Post Conviction Relief . . . . . . . . . . . . . . . . . 81-84

Petitioner's Motion for Declaration that She Retains Her Fifth Amendment Right Against Self-Incrimination and To Limit Cross-Examination . . . . . . . . . . . . . . . 258-270

Petitioner's Motion for Extension of Time to Provide The Reports of Her Expert Witnesses to the State . . . 253-255

Petitioner's Motion to Recuse this Honorable Court From Serving as Judge and Fact-Finder in This case . . . 29-72

Petitioner's Motion to Secure the Attendant of Out-Of-State Witnesses . . . . . . . . . . . . . . . . . 382-389

Petitioner's Motion for State of Tennessee to Produce The Video Recording of the January 14, 1995 Crime Scene Visit . . . . . . . . . . . . . . . . . . . . . . 426-427

Petitioner's Motion to Transcribe the Contents of an Audio Mini-Cassette Previously Entered Into Evidence . . . . . . . . . . . . . . . . . . . . . . . . 428-430

Petitioner's Post Conviction Closing Argument . . . . . . . 451-551

Petitioner's Renewed Motion to Disqualify the Office
Of the Knox County District Attorney General . . . . . . 87-102

Pre-Evidentiary Hearing Scheduling Order . . . . . . . . . . . 205

Pro Se Motion for Appointment of Counsel . . . . . . . . . . 13-15

Respondent/Appellee's Designation of Record on
Appeal . . . . . . . . . . . . . . . . . . . . . . . . 716-717

State's Motion to Quash Subpoenas of Randall Nichols,
William Crabtree, Jo Helm and Jeff Blevins . . . . . . . 103-126

State's Post Hearing Memorandum and Motion to Deny
Post-Conviction Relief . . . . . . . . . . . . . . . . . 554-590

State's Response to Consolidated Petition for Post
Conviction Relief . . . . . . . . . . . . . . . . . . . 328-338

State's Response to Motion to Recuse Honorable Court
From Serving as Judge and Fact-Finder in this Case . . 149-190

State's Response to Petitioner's Renewed Motion to
Disqualify the Office of the Knox County District
Attorney General . . . . . . . . . . . . . . . . . . . . 132-148

Waiver of Appearance . . . . . . . . . . . . . . . . . . . . . 327

IN THE CRIMINAL COURT OF KNOX COUNTY, TENNESSEE
FOR THE SIXTH JUDICIAL DISTRICT
DIVISION ______

FILED
BY MARTHA PHILLIPS, CLERK
JUN 03 1999
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | **DEATH PENALTY** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Post-Conviction** |
| | ) | **Case No.** 68280 |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |

**PETITION FOR RELIEF FROM CONVICTION OR SENTENCE**

Mailing Address of Petitioner 3881 Stewarts Lane
(including zip code) Nashville, TN 37243-0468

Place of Confinement Tennessee Prison for Women

Department of Correction Number 261368

NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.

1. Name and location (city and county) of court which entered the judgment of conviction or sentence challenged Knoxville, Knox County

2. Date of judgment of conviction March 30, 1996

3. Case number Knox Co. Case No. 58183A, Supreme Court No. 03S01-9712CR-00147

4. Length of sentence First Degree Premeditated Murder: Death by Electrocution
Conspiracy to Commit First Degree Murder: 25 years

5. Offense convicted of First Degree Murder, Conspiracy to Commit First Degree Murder

6. What was your plea? (Check One)
   (a) Guilty ___
   (b) Not Guilty _X_
   (c) Not Guilty by reason of mental disease or defect ___
   (d) Not Guilty and Not Guilty by reason of mental disease or defect _____
   (e) Nolo contendere ____
   (f) None ___

If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, specify:

   (a) Guilty plea counts: ____________________
   (b) Not guilty plea counts: ________________

7. Kind of trial: (Check One)

   (a) Jury _X_
   (b) Judge only ___

8. Did you testify at the trial

   Yes ___ No _X_

9. Did you appeal from the judgment of conviction?

   Yes _X_ No ___

10. If you did appeal, answer the following:

   (a) As to the state court to which you first appealed, give the following information:

   (1) Name of court ___Court of Criminal Appeals, Knoxville Div.___

   (2) Result ___Conviction and Sentence Affirmed___

   (3) Date of result ___November 26, 1997___

   (4) Grounds raised on appeal:

      1. THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT THE VERDICT OF FIRST DEGREE MURDER AND CONSPIRACY TO COMMIT FIRST DEGREE MURDER AND THE SENTENCE OF DEATH

      2. THE TRIAL COURT ERRED BY REFUSING TO PROHIBIT THE NEWS MEDIA FROM COVERING PRETRIAL PROCEEDINGS

      3. THE TRIAL COURT ERRED BY REFUSING TO GRANT THE DEFENDANT'S MOTION FOR A CHANGE OF VENUE

4. THE TRIAL COURT ERRED BY FAILING TO ALLOW THE DEFENDANT TO SELECT A JURY COMPOSED OF A CROSS-SECTION OF THE CITIZENS OF TENNESSEE

5. THE TRIAL COURT ERRED BY ALLOWING THE SKULL INTO EVIDENCE

6. DEATH BY ELECTROCUTION IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE FEDERAL AND STATE CONSTITUTIONS

7. THE TRIAL COURT ERRED IN ALLOWING THE STATE AND THE DEFENDANT THE SAME NUMBER OF PEREMPTORY CHALLENGES

8. THE TRIAL COURT ERRED IN ITS SENTENCING ON THE CONSPIRACY TO COMMIT FIRST DEGREE MURDER CONVICTION

(b) If you appealed to any other court, then as to the second court to which you appealed, give the following information:

(1) Name of court TN. Supreme Court

(2) Result Conviction and Sentence Affirmed, State v. Pike, 978 S.W.2d 904 (Tenn. 1998)

(3) Date of result October 5, 1998 , Rehearing denied, November 23, 1998

(4) Grounds raised on appeal:

1. THE EVIDENCE PRESENTED IN ITS ENTIRETY AND AS CONTAINED IN THE RECORD WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE VERDICT OF THE JURY FINDING THE DEFENDANT GUILTY OF MURDER IN THE FIRST DEGREE AND CONSPIRACY TO COMMIT MURDER IN THE FIRST DEGREE. ADDITIONALLY, THE EVIDENCE PRESENTED WAS INSUFFICIENT TO JUSTIFY THE JURY'S VERDICT SENTENCING THE DEFENDANT TO DEATH BY

ELECTROCUTION

2. THE TRIAL COURT ERRED BY REFUSING TO GRANT DEFENDANT'S MOTION TO DENY TELEVISION AND PHOTOGRAPHIC COVERAGE OF PRETRIAL PROCEEDINGS IN ORDER TO MINIMIZE THE PUBLIC'S EXPOSURE TO THE DETAILS OF THIS CASE

3. THE TRIAL COURT ERRED BY FAILING TO GRANT THE DEFENDANT'S MOTION FOR A CHANGE OF VENUE IN THIS CASE

4. THE TRIAL COURT ERRED BY FAILING TO ALLOW THE DEFENDANT TO SELECT A JURY COMPOSED OF A FAIR CROSS SECTION OF THE CITIZENS OF THE STATE OF TENNESSEE

5. WHETHER THE TRIAL COURT ERRED BY ALLOWING THE INTRODUCTION OF THE SKULL OF THE VICTIM INTO EVIDENCE WHERE SUCH USE OF THE SKULL WAS DUPLICATIVE OF OTHER EVIDENCE, WAS WHOLLY UNNECESSARY IN LIGHT OF OTHER ADMITTED EVIDENCE, WAS DESTINED TO AROUSE AND INCITE THE PASSIONS OF THE JURY AGAINST THE DEFENDANT, AND WHOSE PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY ITS HIGHLY PREJUDICIAL EFFECT

6. WHETHER THE TRIAL COURT ERRED BY REFUSING TO ENTER A JUDGEMENT OF ACQUITTAL AS TO THE SECOND COUNT OF THE INDICTMENT CHARGING CONSPIRACY WHERE THE STATE FAILED TO PROVE EACH AND EVERY ELEMENT CHARGED IN THE INDICTMENT

7. WHETHER THE PUNISHMENT IMPOSED IN THIS CASE, DEATH BY ELECTROCUTION, IS CRUEL AND UNUSUAL PUNISHMENT UNDER BOTH THE UNITED STATES AND TENNESSEE CONSTITUTIONS

8. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE THE SAME NUMBER OF PEREMPTORY CHALLENGES AS DEFENDANT IN VIOLATION OF THE EX POST FACTO CLAUSES OF THE UNITED STATES AND TENNESSEE CONSTITUTIONS

9. WHETHER THE TRIAL COURT ERRED IN SENTENCING DEFENDANT TO THE MAXIMUM SENTENCE ALLOWED UNDER COUNT TWO OF THE INDICTMENT CHARGING CONSPIRACY TO COMMIT FIRST DEGREE MURDER AND RUNNING IT CONSECUTIVELY TO THE DEATH SENTENCE IMPOSED UNDER COUNT ONE

(c) If you appealed to any other court, then as to the third court to which you appealed, give the following information:

(1) Name of court United States Supreme Court

(2) Result Petition for Certiorari Denied, 1999 WL 105661

(3) Date of result June 1, 1999

(4) Grounds raised on appeal:

1. DOES TENNESSEE'S USE OF THE "AVOIDING ARREST" AGGRAVATING CIRCUMSTANCE, DEFINED IN THE STATUTE AS "[T]HE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING, INTERFERING WITH OR PREVENTING A LAWFUL ARREST OR PROSECUTION OF THE DEFENDANT OR ANOTHER," TENNESSEE CODE ANNOTATED § 39-13-204(i)(6)(1997 REPL.) VIOLATE THE EIGHTS AMENDMENT WHERE THE VICTIM WAS NEITHER A LAW ENFORCEMENT OFFICER, NOR A WITNESS TO, VICTIM OF, OR IN POSSESSION OF KNOWLEDGE CONCERNING ANY SEPARATE OFFENSE BY PETITIONER OR HER DO-DEFENDANT'S?

2. DOES THE INCLUSION OF "INTUITIVE FEELINGS" OF THE JUSTICES ON THE TENNESSEE SUPREME COURT ABOUT THE PETITIONER'S RACE AND GENDER AS CONSIDERATIONS FOR PROPORTIONALITY REVIEW VIOLATE THE EIGHTH AMENDMENT?

11. If more than one (1) year has passed since the date of final action on your direct appeal by the state appellate courts, state why the one (1) year statute of limitations should not bar your claim. N/A

12. Other than a direct appeal from the judgment(s) of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to the judgment(s) in any state or federal court?

Yes ___ No _X_

13. If your answer to Question 12 was Yes, then give the following information in regard to the first such petition, application, or motion you filed:

(a) (1) Name of court n/a

(2) Nature of proceeding n/a

(3) Grounds raised n/a

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ___ No ___

(5) Result n/a

(6) Date of result n/a

(b) As to any second petition, application, or motion, give same information:

(1) Name of court n/a

(2) Nature of proceeding n/a

(3) Grounds raised n/a

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ___ No ___

(5) Result n/a

(6) Date of result n/a

(c) Did you appeal the result of the action taken on any petition, application, or motion identified above to any appellate court:

(1) First petition, etc. Yes __ No __
(2) Second petition, etc. Yes __ No __

(d) If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did into appeal: n/a

14. If you did not raise the grounds you raise here in your original prosecution and on your appeal from that prosecution, explain why your claim in this case has not been waived for failure to raise it on appeal. If the claim was raised, explain why your claim is not previously determined.

To the extent that a ground for relief presented below has not, but arguably could have been presented to this Court, the Tennessee Court of Criminal Appeals, or the Tennessee Supreme Court in prior proceedings, the ground has not been waived within the meaning of T.C.A. §40-30-206(g) because: (1) of state action in violation of the federal and state constitutions -- specifically, some of Petitioner's ground(s) for relief have as their basis the allegation that state authorities withheld evidence favorable to Petitioner on the issues of guilt and sentencing as required by the Eighth and Fourteenth Amendments to the United States Constitution; (2) of rulings of the trial court on the manner and scope of discovery and the content of the record which prevented or impeded the Petitioner and/or her attorney from presenting the ground(s) for relief; (3) the law regarding the ground(s) for relief was not established at the time; (4) Petitioner and/or her attorney have never had a full and fair opportunity to raise the ground(s) for relief previously; (5) trial and/or appellate counsel provided constitutionally inadequate assistance, an allegation that could not have been presented for determination in any prior proceeding; (6) the Petitioner, personally or through her attorney, did not knowingly or understandingly fail to present the ground(s) for relief for determination because she was not advised of or did not reasonably understand: (i) the existence of the ground(s) for relief; (ii) the legal principles implicated by the ground(s) for relief; (iii) the facts relating to the ground(s) for relief; (iv) the reasons why the ground(s) for relief should not be presented; and/or, (v) the effect of failing to present the ground(s) for relief in a timely manner on the scope of state or federal post-conviction review; (7) there are facts that exist that have not yet been discovered that have never been considered by any court that support Petitioner's ground(s) for relief and the failure to discover those facts is not attributable to any action or inaction on the Petitioner's part but to factors beyond her control, such as ineffective assistance of counsel and/or state misconduct; (8) Tennessee courts have not uniformly applied the waiver provisions of the Post-Conviction Procedure Act and to find the ground(s) for relief waived in Petitioner's case and not others would constitute a violation of Petitioner's right to equal treatment under the law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article XI, § 8 of the Tennessee Constitution.

To the extent that one or more of the grounds has been presented to either this Court, the Tennessee Court of Criminal Appeals, or the Tennessee Supreme Court in prior proceedings, the ground has not been previously determined within the meaning of T.C.A. §40-30-206(h) because

of: (1) prosecutorial misconduct in delaying and denying discovery and in unduly expanding the obligations of petitioner's trial and/or appellate which impeded or prevented counsel from researching, investigating, and presenting the ground(s) for relief fully and completely; (2) rulings by the trial court on the manner and scope of discovery which impeded or prevented trial and/or appellate counsel from researching, investigating, and presenting the ground(s) for relief fully and completely; (3) the procedures or standards employed by the courts in the prior review of the ground(s) for relief were themselves deficient, defective, in violation of state law, and/or unconstitutional; and/or (4) Petitioner's counsel was ineffective in investigating, researching, and presenting the ground(s) for relief pre-trial, at trial, in the new trial motion, or on appeal and/or her counsel failed to advise her of the ground(s) for relief or their relevance to her case.

15. If you have previously filed a petition, application, or motion with respect to the judgment(s) in any court, explain why your claim in this case has not been waived for failure to raise it in that prior proceeding. If the claim was raised, explain why your claim is not previously determined.

n/a

16. Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information or by attaching separate pages.

## GROUNDS OF PETITION

Listed below are possible grounds for relief. Consider the ground(s) that apply in your case, and follow the instruction under the ground(s):

__ (1) Conviction was based on unlawfully induced guilty plea or guilty plea involuntarily entered without understanding of the nature and consequences of the plea.

X (2) Conviction was based on use of coerced confession.

Petitioner's custodial interrogated statement was involuntary and unreliable due to petitioner's pronounced intoxication at the time, the denial of her right to counsel and the illegal interrogation tactics of interrogating officers.

X (3) Conviction was based on use of evidence gained pursuant to an unconstitutional search and seizure.

Law enforcement gathered evidence in this case illegally and without valid warrants to search.

__ (4) Conviction was based on use of evidence obtained pursuant to an unlawful arrest.

_X_ (5) Conviction was based on a violation of the privilege against self incrimination.

Statements of petitioner were introduced in violation of her 5th and 6th Amendment rights to counsel and her rights to remain silent.

_X_ (6) Conviction was based on the unconstitutional failure of the prosecution to disclose to defendant evidence favorable to defendant.

The prosecution failed to disclose exculpatory evidence prior to and at trial including, but not limited to: 1), written and oral reports from prosecution interviews with witnesses whose statements cast serious doubt on the degree of Petitioner's culpability; 2), written and oral reports from prosecution interviews with witnesses who implicate petitioner's co-defendants and other, un-charged, suspects, including evidence of other suspects' motive and plan to kill the victim; 3), failure to reveal all promises, deals, agreements, understandings, tacit, explicit or implicit made by on, or behalf of the state to any witness or potential witness; 4), failure to reveal exculpatory-impeachment material related to credibility of prosecution witnesses.

___ (7) Conviction was based on a violation of the protection against double jeopardy.

___ (8) Conviction was based on action of a grand or petit jury that was unconstitutionally selected and impaneled.

_X_ (9) Denial of effective assistance of counsel.

Trial counsel provided ineffective assistance, to petitioner's substantial prejudice, in the following ways [this list is non-exhaustive]:

a. Failing to make pre-trial and in-limine motions in a timely manner;
b. failing to move to suppress petitioner's interrogated statements;
c. failing to provide adequate factual basis for pre-trial motions;
d. failing to request evidentiary hearing on certain motions;
e. failing to preserve objections to motions overruled by the trial court;
f. failing to provide adequate factual basis in support of motion for change of venue;
g. failing to challenge pre-trial the constitutionality of the (i)(6) *avoid arrest* aggravating factor;
h. failing to challenge applicability of conspiracy charge;
i. failing to adequately question prospective jurors regarding publicity, issues of race, and extra-judicial knowledge of the case;
j. failing to question prospective jurors about counsel's own publicized difficulties with the state bar association;
k. failing to effectively voir dire jurors regarding the death penalty [both *death-*

*qualification* pursuant to Witherspoon v. Illinois, and *life-qualification* pursuant to Morgan v. Illinois];

l. failing to challenge certain jurors for cause;

m. failing to object to the elimination of certain jurors for cause;

n. failing to investigate or present evidence of co-defendant Shipp's control over petitioner, his motive and actual participation in the offense, and prior record;

o. failing to investigate or present evidence of co-defendant Peterson's actual participation in the offense;

p. failing to investigate or present evidence of petitioner's diminished capacity and state of mind around the time of the offense;

q. failing to present available medical and psychiatric evidence on petitioner's functioning and mental status at both phases of trial;

r. failing to move the court for certain forensic expert services;

s. failing to move the court in a timely manner for expert funds;

t. failing to move for a continuance, where such was needed to prepare for the guilt and sentencing phase of trial,

u. failing to consult with or prepare defense expert witnesses at both phases of trial;

v. failing to present to the jury available records and testimony regarding petitioner's medical and psycho-social history, including evidence of traumatic birth and its effects, childhood sexual abuse, and childhood psychiatric treatment;

w. failing to investigate or present certain statutory and non-statutory mitigation evidence;

x. failing to prepare penalty phase witnesses;

y. failing to object to admissibility of prejudicial evidence at guilt phase, including evidence of uncharged bad acts;

z. failing to object to improper prosecutorial argument;

aa. failing to raise all relevant issues in petitioner's motion for new trial;

bb. failing to raise all relevant issues on appeal to the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court.

___ (10) Newly discovered evidence.

___ (11) Illegal evidence.

___ (12) Other grounds.

THE LIST ABOVE DOES NOT INCLUDE ALL CONSTITUTIONAL VIOLATIONS. YOU MAY ADD ANY OTHERS YOU DEEM APPROPRIATE. ATTACH A SEPARATE SHEET OF PAPER LISTING EACH CONSTITUTIONAL VIOLATION THAT YOU CLAIM, WHETHER OR NOT IT IS LISTED ABOVE. UNDER EACH CLAIMED VIOLATION, LIST EACH AND EVERY FACT YOU FEEL SUPPORTS THIS GROUND. EXPLAIN IN DETAIL HOW YOU ARE PREJUDICED BY THE VIOLATION AND WHY YOU ARE ENTITLED TO RELIEF. BE SPECIFIC.

IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS: TENN. CODE ANN. § 40-30-202(c) LIMITS YOU TO ONLY ONE PETITION. TENN. CODE ANN. § 40-30-202(c) PROVIDES:

> This chapter contemplates the filing of only one (1) petition for post-conviction relief. In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment. If a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed.

17. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ___ No _X_

18. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing William Lee Brown, 706 Walnut St., Ste. 902, Knoxville, TN 37902

(b) At arraignment and plea William Lee Brown, 706 Walnut St., Ste. 902, Knoxville, TN 37902

(c) At trial William C. Talman, P.O. Box 506, Knoxville, TN. 37901-0506, and Julie Martin-Rice, 706 Walnut St., Ste. 900A, P.O. Box 426, Knoxville, TN 37901-0426

(d) At sentencing William C. Talman, P.O. Box 506, Knoxville, TN. 37901-0506, and Julie Martin-Rice, 706 Walnut St., Ste. 900A, P.O. Box 426, Knoxville, TN 37901-0426

(e) On appeal William C. Talman, P.O. Box 506, Knoxville, TN. 37901-0506, and Julie Martin-Rice, 706 Walnut St., Ste. 900A, P.O. Box 426, Knoxville, TN 37901-0426

(f) In any post-conviction proceeding n/a

(g) On appeal from adverse ruling in a post-conviction proceeding n/a

19. Are you currently represented by counsel?

Yes ___ No _X_

(a) If Yes, give name and address, if known, of the attorney representing you. n/a

(b) If No, do you wish to have an attorney appointed?

Yes _X_ No __

(c) Has any attorney assisted in drafting or given advice regarding petition for post-conviction relief?

Yes _X_ No __

If Yes, give name and address of attorney(s). Stefanie M. McArdle and Donald E. Dawson, Office of the Post-Conviction Defender, 460 James Robertson Pkwy., 2nd Floor; Nashville, TN 37243-0505 (615) 741-9331 / FAX (615) 741-9430

20. In the judgment you are attacking, were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _X*_ No __

* Petitioner was convicted in a jury trial on charges of first degree murder and conspiracy to commit first degree murder.

21. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes __ No _X_

(a) If so, give name and location of court which imposed sentence to be served in the future: n/a

(b) Give date and length of sentence to be served in the future: n/a

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes __ No _X_

22. What date is this petition being given to prison authorities for mailing? Mailed to Knox County Criminal Court on Wednesday, June 2, 1999.

Wherefore, Petitioner prays that the court grant him relief to which he may be entitled in this proceeding.

**PETITIONER'S VERIFICATION UNDER OATH**
**SUBJECT TO PENALTY FOR PERJURY**

I swear (or affirm) under penalty of perjury that the foregoing is true and correct. Executed on June 2, 1999 .

Christa Pike
Signature of Petitioner

**Appendix B.**

**Affidavit of Indigency**

I, CHRISTA GAIL PIKE, do solemnly swear and affirm that because of my poverty, I am not able to bear the expenses of the action which I am about to commence. I further swear (or affirm) that, to the best of my knowledge, I am justly entitled to the relief sought.

Christa Pike
CHRISTA GAIL PIKE, Petitioner

SWORN TO AND SUBSCRIBED before me this the 2nd day of June, 1999.

Dana Basil
Notary Public

My commission expires: Nov. 24, 2001

IN THE CRIMINAL COURT OF KNOX COUNTY, TENNESSEE
FOR THE SIXTH JUDICIAL DISTRICT
DIVISION ______

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, Petitioner, | ) | DEATH PENALTY |
| v. | ) | Post-Conviction Case No. 68280 |
| STATE OF TENNESSEE, Respondent. | ) | EXECUTION SET FOR JUNE 10, 1999 |

FILED BY MARTHA PHILLIPS CLERK
JUN 03 1999
KNOX COUNTY CRIMINAL COURT KNOXVILLE

## *PRO SE* MOTION FOR APPOINTMENT OF COUNSEL

Christa Gail Pike files this *pro se* Motion seeking the appointment of counsel to represent her in her post-conviction proceedings.

## INTRODUCTION

On March 30, 1996, Christa Pike was convicted of first degree murder and conspiracy to commit murder, and was sentenced to death by electrocution. On November 26, 1997, the Tennessee Court of Criminal Appeals affirmed Christa Pike's conviction and death sentence. On October 5, 1998, the Tennessee Supreme Court affirmed the conviction and sentence. 978 S.W.2d 904 (Tenn.1998). Ms. Pike's Petition for a Writ of Certiorari was denied by the Supreme Court of the United States on June 1, 1999. 1999 WL 105661.

The Supreme Court of Tennessee, which had stayed Ms. Pike's execution pending the Supreme Court's consideration of the petition for a Writ of Certiorari, ordered her execution to be carried out on **June 10, 1999.**

## LEGAL STANDARD AND ARGUMENT

"If a petitioner not represented by counsel requests counsel and the court is satisfied that the petitioner is indigent as defined in § 40-14-201, the court **shall** appoint counsel to represent the

petitioner." Tenn. Code Ann. § 40-30-207(b)(1) (emphasis added). Christa Pike has filed, along with this *pro se* Motion, a *pro se* Post-Conviction Petition which complies with the requirements of Tenn. S. Ct. Rule 28. In this *pro se* Post-Conviction Petition Ms. Pike has requested the appointment of counsel and she has asserted that she is indigent and unable to pay the costs of the post-conviction proceedings. A copy of Christa Pike's *pro se* Petition and attached Affidavit of Indigency is attached to this Motion. **Pursuant to Tenn. Code Ann. § 40-30-207, the appointment of counsel is mandatory upon the filing of such a petition.**

It is appropriate for the Court to appoint, pursuant to this pro se motion, the Office of the Post-Conviction Defender, 460 James Robertson Parkway, Second Floor, Nashville, TN 37243. "It is the primary responsibility of the post-conviction defender to represent, . . . any person convicted and sentenced to death in this state who is without counsel and who is unable to secure counsel due to indigency . . ." Tenn. Code Ann. § 40-30-306(a). Rule 13(h) of the Rules of the Tennessee Supreme Court also mandates the appointment of the Post-Conviction Defender in this matter. It is clear that the intent of Tenn. Code Ann. § 40-30-306(a) and Rule 13(h) is that the Office of the Post-Conviction Defender should be appointed unless there is a conflict. The Office of the Post-Conviction Defender is presumptively the appropriate public defender organization to be appointed in a post-conviction case filed by an indigent petitioner under a sentence of death.

## CONCLUSION

Pursuant to the filing of the attached *pro se* Post-Conviction Petition and Affidavit of Indigency, Christa Pike is statutorily entitled to have the Office of the Post-Conviction Defender appointed to represent her in her post-conviction proceedings.

Christa Pike respectfully asks that this Motion be heard at the Court's earliest convenience.

Respectfully submitted,

Christa G. Pike, #261368
Tennessee Prison for Women
3881 Stewarts Lane
Nashville, TN 37243-0468

**CERTIFICATE OF SERVICE**

A copy of the foregoing Motion was mailed first class postage pre-paid to the Office of the District Attorney General, 6th Judicial District, 400 Main St., Knoxville, TN 37901 on this the 2nd day of June, 1999.

CHRISTA GAIL PIKE

IN THE CRIMINAL COURT OF KNOX COUNTY, TENNESSEE
FOR THE SIXTH JUDICIAL DISTRICT
DIVISION III

FILED
BY MARTHA PHILLIPS, CLERK

JUN 4 1999

KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | **DEATH PENALTY** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Post-Conviction** |
| | ) | **Case No.** 68280 |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | **EXECUTION SET FOR JUNE 10, 1999** |

**ORDER GRANTING PETITIONER'S *PRO SE* MOTION FOR APPOINTMENT OF COUNSEL**

Before the Court is Petitioner's *Pro Se* Motion for Appointment of Counsel.

**IT IS HEREBY ORDERED:**

Petitioner's ***PRO SE* MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED.** Petitioner has filed a *pro se* Post-Conviction Petition in this Court with an attached Affidavit of Indigency. The filing of this *pro se* Petition mandates the appointment of counsel. Tenn. Code Ann. § 40-30-207(b)(1).

Pursuant to Tenn. Code Ann. § 40-30-305(a), the Office of the Post-Conviction Defender, 460 James Robertson Parkway, Second Floor, Nashville, TN 37243, is appointed to represent Petitioner in her post-conviction proceedings.

**IT IS SO ORDERED** this 4th day of June, 1999.

Mary Beth Leibowitz
Criminal Court Judge for the 6th Judicial District

# MANDATE

## STATE OF TENNESSEE

---

*To the Honorable Judge of the Knox County Criminal Court*

*Whereas, in our* ***Supreme Court, Eastern Division*** *at* ***Knoxville,*** *it was adjudged and ordered in the cause of* ***Christa Gail Pike v. State of Tennessee*** *appealed to our said Court that the same be remanded thereto for further proceedings and final determination therein.*

*These are, therefore, to require you, the* ***Knox County Criminal Court*** *as aforesaid, that you proceed with the execution of this Judgment of our said* ***Supreme Court*** *by such further proceedings in your Court as shall effectuate the objects of this order to remand, and attain the ends of justice.*

***Witness,*** *Michael W. Catalano,* ***Clerk of said Court at office in Nashville.***

***Michael W. Catalano, Clerk***

***By*** Joanne Sutton ***, Deputy Clerk***

IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
(Heard at Nashville)
February 3, 2005 Session

FILED
BY MARTHA PHILLIPS, CLERK
JUN 01 2005
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

## CHRISTA GAIL PIKE v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 68280, Mary Beth Leibowitz, Judge**

---

**No. E2003-00766-SC-R11-PD - Filed May 12, 2005**

---

FILED
MAY 12 2005
Clerk of the Courts

**JUDGMENT**

This cause came to be heard upon the record on appeal from the Court of Criminal Appeals and briefs and argument of counsel; and upon consideration thereof, this Court is of the opinion that post-conviction review is not mandatory and may be waived by a competent death-sentenced inmate, and that a competent death-sentenced inmate may revoke a waiver of post-conviction review so long as the revocation occurs within thirty days of the trial court's order permitting the inmate to waive post-conviction review. Our holding is limited to death-sentenced inmates who seek to revoke an initial waiver of post-conviction relief and does not apply to death-sentenced inmates who attempt to manipulate and to delay the judicial process by repeatedly seeking to waive and thereafter to reinstate post-conviction review.

In accordance with the opinion filed herein, it is hereby ORDERED AND ADJUDGED that the judgment of the Court of Criminal Appeals is REVERSED, and this case is REMANDED to the trial court with instructions to reinstate the petition for post-conviction relief and to schedule an evidentiary hearing.

Costs of this appeal are taxed to the State of Tennessee for which execution may issue if necessary.

I, Michael W. Catalano, Clerk, hereby certify that this is a true and exact copy of the original Judgment filed in the cause.
This 31 day of May, 2005
CLERK OF COURT
By: J Sutton D.C.

IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
(Heard at Nashville)
February 3, 2005 Session

# CHRISTA GAIL PIKE v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 68280, Mary Beth Leibowitz, Judge**

FILED
MAY 12 2005
Clerk of the Courts

---

**No. E2003-00766-SC-R11-PD - Filed May 12, 2005**

---

This appeal presents two determinative issues: (1) whether post-conviction review of a death sentence should be mandatory and should proceed over the objection of a competent death-sentenced inmate; and if not, (2) whether, and under what circumstances, a competent death-sentenced inmate may revoke her waiver of post-conviction review. We conclude that post-conviction review is not mandatory and may be waived by a competent death-sentenced inmate. We also conclude that a competent death-sentenced inmate may revoke a waiver of post-conviction review so long as the revocation occurs within thirty days of the trial court's order permitting the inmate to waive post-conviction review. Our holding is limited to death-sentenced inmates who seek to revoke an initial waiver of post-conviction relief. Our holding does not apply to death-sentenced inmates who attempt to manipulate and to delay the judicial process by repeatedly seeking to waive and thereafter to reinstate post-conviction review. Applying this rule, we conclude that Christa Gail Pike may revoke her waiver and reinstate her post-conviction petition. Pike filed a motion seeking to revoke her waiver on the twenty-ninth day after the trial court filed its order permitting her to waive post-conviction review. Pike had not previously waived post-conviction review. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand this case to the trial court with instructions to reinstate the petition for post-conviction relief and to schedule an evidentiary hearing.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed; Remanded to the Trial Court**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined.

Donald E. Dawson, Post-Conviction Defender, and Catherine Y. Brockenborough, Assistant Post-Conviction Defender, Nashville, Tennessee, for the appellant, Christa Gail Pike.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General, Alice B. Lustre, Assistant Attorney General; and Leland Price and S. Jo Helm, Assistant District Attorneys

Wade V. Davies, Knoxville, Tennessee, for Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for Amicus Curiae, National Association of Criminal Defense Lawyers.

Bradley A. MacLean, Nashville, Tennessee, for Amicus Curiae, National Alliance for the Mentally Ill.

## OPINION

### I. Procedural History

A jury convicted Christa Gail Pike of first degree murder and imposed a sentence of death for her role in the brutal killing of a fellow student at the Job Corps Center in Knoxville.[1] The Court of Criminal Appeals and this Court affirmed Pike's convictions and sentences, and the United States Supreme Court denied her petition for a writ of certiorari. State v. Pike, 978 S.W.2d 904 (Tenn. 1998), cert. denied, 526 U.S. 1147 (1999).

On June 3, 1999, Pike timely filed a pro se petition seeking post-conviction relief.[2] The trial court appointed the Office of the Post-Conviction Defender to represent Pike. During a hearing on June 25, 2001, Pike orally advised the trial court of her desire to withdraw her post-conviction petition and to schedule an execution date. The trial court advised Pike to discuss her options with her attorneys and to listen to their advice and instructed her to file a written motion seeking waiver if she persisted in her desire to waive post-conviction review.

Approximately two months later, on September 4, 2001, Pike submitted to the trial court a letter reiterating her desire to withdraw her post-conviction petition and to schedule an execution date. At an October 2001 hearing, the trial court pointed out that the courts of this State had not previously adjudicated a death-sentenced inmate's request to waive post-conviction review.[3] After

---

[1]The evidence offered to establish Pike's guilt was summarized in State v. Pike, 978 S.W.2d 904 (Tenn. 1998). The jury found two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-13-204(i)(5), (6) (1997). The jury also convicted Pike of conspiracy to commit first degree murder, and the trial judge imposed a twenty-five-year sentence for that conviction.

[2]As grounds for post-conviction relief, Pike alleged that her trial attorneys had been ineffective, that her confession had been coerced, that the prosecution had introduced illegally-seized evidence, and that the prosecution had failed to disclose evidence favorable to the defense.

[3]The trial court commented, "We are all plowing fairly new ground." The initial hearings in this case occurred prior to this Court's November 21, 2002, Order which added section 11 to Tennessee Supreme Court Rule 28. Section 11 delineates procedures which trial courts must follow when a death-sentenced inmate seeks to withdraw a post-conviction petition and to waive post-conviction review.



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 29 of 153 PageID #: 3800

questioning Pike and confirming that Pike remained unchanged in her desire to waive post-conviction review, the trial court concluded that Pike has the right to make that choice "as long as she is competent." The trial court then appointed Dr. William Kenner to conduct a psychiatric evaluation to determine Pike's competency and directed Dr. Kenner to submit to the trial court a written report of his findings.

Dr. Kenner interviewed Pike, reviewed Pike's psychological records and submitted his written report to the trial court. On June 25, 2002, one year after Pike orally announced her desire to withdraw her post-conviction petition, the trial court conducted an evidentiary hearing to determine Pike's competence. The trial court considered Dr. Kenner's written report and heard testimony from several witnesses. Dr. Kenner did not testify at the hearing. Neither the district attorney general nor counsel for Pike received Dr. Kenner's written report until the morning of the hearing.[4] Ultimately, the trial court found that Pike had "freely and voluntarily" decided to withdraw her petition and to waive post-conviction review. The trial court commented: "Miss Pike has the right as a competent individual . . . to make a decision about her case, whatever all of us feel about that decision, and I grant her . . . motion to withdraw her appeals."

On June 27, 2002, the trial court filed a written judgment dismissing Pike's petition and setting an execution date. One day later, the trial court filed an amended judgment. On July 8, 2002, Pike's attorneys filed a notice of appeal. On July 26, 2002, the twenty-ninth day after the trial court filed its order finding Pike competent and granting her request to withdraw her petition, Pike's attorneys filed a second notice of appeal, and a supporting affidavit, each of which Pike had signed. Also on July 26, Pike filed in the trial court through her attorneys a motion seeking to vacate the order dismissing her petition, to reinstate her post-conviction petition, and to set a date for an evidentiary hearing on her post-conviction petition. Attached to this motion was Pike's sworn statement explaining that she had changed her mind and that she wished to "go forward" with the post-conviction proceeding. Pike's handwritten addendum to the sworn statement explained: "I still feel conflicted about what I want to do, but as of now I feel this is the only logical decision."

The State filed a motion to dismiss the appeal, arguing that the trial court's June 27 and June 28 orders were not appealable as of right and that Pike's attorneys lacked standing to pursue an appeal. On August 1, 2002, the Court of Criminal Appeals denied the State's motion to dismiss, granted a stay of execution, and remanded the case to the trial court for a hearing on Pike's motion to vacate the order dismissing her post-conviction petition.

The hearing on remand occurred on February 20, 2003. Pike's attorneys urged the trial court to grant the motion and to reinstate Pike's post-conviction petition. Relying upon Tennessee

---

[4]Pike has challenged several procedural aspects of the competency hearing, arguing that certain procedures did not comport with due process. Pike complains in particular about the timing of the disclosure of Dr. Kenner's written report and the fact that Dr. Kenner did not testify at the hearing. Because we are directing the trial court to reinstate Pike's petition and resume post-conviction proceedings, we need not address Pike's challenges to the procedures employed at the competency hearing. We also deny as moot Pike's motion to supplement the record on appeal with Dr. Kenner's Addendum to Psychiatric Report.

Supreme Court Rule 28, section 11, they argued that the order dismissing Pike's petition had not been final when Pike moved to reinstate her petition. Pike's attorneys relied in particular upon section 11(A)(4), which provides in pertinent part that "[a]n order of the trial court granting withdrawal and dismissing the petition shall become final thirty days after its entry."

Testifying at this hearing, Pike confirmed that she had changed her mind about waiving post-conviction review and emphasized that it was her desire to reinstate her post-conviction petition. Pike explained that she had not fully understood "exactly how final" her decision to withdraw her post-conviction petition and waive further appeals would be. Pike also maintained that she had not understood how her decision to waive post-conviction review would affect her family. Pike testified that she then realized that her life meant more "than being stuck in that little room" and that she had reasons to pursue post-conviction relief. Pike assured the trial judge that no one had influenced her decision-making—she stated that she had decided on her own to withdraw her post-conviction petition and that she later decided on her own to revoke her withdrawal. Pike also reported experiencing "great improvement" in her mental health since Dr. Kenner had prescribed for her an anti-depressant in addition to lithium.

The trial court denied Pike's motion to vacate the order dismissing her post-conviction petition, stating:

> Again, we are in a court of law bound by rules. To me this is most akin to a decision to waive one's right to enter . . . a plea. When one does that and . . . make[s] a binding decision and the Court accepts that decision, just like in this case, even five minutes later, they cannot change their mind unless they can show that their will has been overborne or . . . they did not understand their rights. Only then would a guilty plea be overturned.

The trial court further found that Pike's will had not been overborne "then or now" and that Pike had simply changed her mind. The trial court commented, "Unfortunately, I do not think she can just do that under this situation." Accordingly, the trial court denied Pike's motion seeking to vacate the dismissal order and to reinstate her post-conviction petition. Pike appealed, and the Court of Criminal Appeals affirmed. We granted Pike's application for permission to appeal.

## II. Waiver of Post-Conviction Review

We first consider Pike's argument that post-conviction review of death sentences should be mandatory, regardless of a competent death-sentenced inmate's desire to waive post-conviction review. Pike argues that mandatory review is necessary to ensure the reliability of the process by which death sentences are imposed.

We have previously recognized that post-conviction procedures are not constitutionally required. Serrano v. State, 133 S.W.3d 599, 604 (Tenn. 2004) (citing cases). The Post-Conviction

Procedures Act[5] is a statutory remedy, and the nature and availability of post-conviction relief lies within the discretion of the legislature. Id.; see also Blair v. State, 969 S.W.2d 423, 425 (Tenn. Crim. App. 1997); Oliphant v. State, 806 S.W.2d 215, 217 (Tenn. Crim. App. 1991). "When there is no constitutional or statutory mandate, and no public policy prohibiting, an accused may waive any privilege which he is given the right to enjoy." Serrano, 133 S.W.3d at 604 (quoting Schick v. United States, 195 U.S. 65, 72 (1904)). Although the Tennessee General Assembly has mandated limited appellate review of a sentence of death, even if a defendant chooses not to appeal the conviction of first degree murder,[6] no similar statute mandates post-conviction review of a death sentence. Like all other inmates, death-sentenced inmates must initiate post-conviction proceedings by filing within the statutorily prescribed time period a petition seeking post-conviction relief. See Tenn. Code Ann. § 40-30-102(a) (2003) ("Except as provided in subsections (b) and (c), a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred."). Although the legislature has provided death-sentenced inmates an opportunity to seek post-conviction relief, the legislature has not mandated post-conviction review.

Pike nonetheless asserts that this Court should mandate post-conviction review of death sentences. We decline to do so. Courts have long recognized the right of competent defendants to make decisions concerning their available legal remedies. See, e.g., Jones v. Barnes, 463 U.S. 745, 751 (1983) (recognizing that competent defendants may choose "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal"); Serrano, 133 S.W.3d at 604 (holding that an inmate in a non-capital case may waive post-conviction review); State v. Smith, 993 S.W.2d 6, 13-16 (Tenn. 1999); Momon v. State, 18 S.W.3d 152, 161 (Tenn. 1999) (recognizing the right of a defendant to waive personally the fundamental right to testify); Zagorski v. State, 983 S.W.2d 654, 658-59 (Tenn. 1998) (recognizing the right of a competent defendant to forego the presentation of mitigating evidence at a capital sentencing hearing); Collins v. State, 670 S.W.2d 219, 221 (Tenn. 1984) (holding that a defendant may waive the right of direct appeal).

Furthermore, the United States Supreme Court has recognized the right of a mentally competent death-sentenced inmate to waive further appellate review. Demosthenes v. Baal, 495 U.S. 731, 735 (1990); Whitmore v. Arkansas, 495 U.S. 149, 165 (1990); Gilmore v. Utah, 429 U.S. 1012, 1016 (1976). In addition, this Court has implicitly recognized the right of a competent death-sentenced inmate to forgo post-conviction review. On November 26, 2002, this Court affirmed the convictions and death sentences of Paul Dennis Reid and, in accordance with a statutory directive,

[5] Tenn. Code Ann. §§ 40-30-101-122 (2003).

[6] Tenn. Code Ann. § 39-13-206(a)(2) (2003).

scheduled Reid's execution for April 29, 2003.[7] State v. Paul Dennis Reid, Jr., No. M1999-00803-SC-DDT-DD, slip op. at *1 (Tenn. 2003) (memorandum opinion and order). On March 26, 2003, Reid filed pro se in this Court a notice indicating that he did not intend to pursue available post-conviction remedies. Id. Nineteen days before Reid's scheduled execution, the assistant public defender who had represented Reid on direct appeal filed a motion seeking a stay of execution and a remand to the trial court for an evidentiary hearing to determine Reid's competence. Id. at *2. In denying the motion, this Court stated:

> Mr. Reid has clearly indicated that he has no desire to pursue any post-conviction remedies. The reasons given for this choice—that he has lost confidence in the judicial system, and that he has been convicted of seven "egregious" homicides—are certainly not irrational. As the United States Court of Appeals for the Sixth Circuit has observed: "We must not assume that it is impossible for even a death-sentenced prisoner to recognize the justice of his sentence and to acquiesce in it."

Id. at *3 (quoting West v. Bell, 242 F.3d 338, 343 (6th Cir. 2001)). Although we noted that Reid could initiate post-conviction proceedings prior to the scheduled execution date, should he so choose, we refused to grant Reid a stay or to order further proceedings in the absence of any new factual assertions calling Reid's competency into question. Id. at *3. Our adoption of Tennessee Supreme Court Rule 28, section 11, which sets out procedures trial courts must follow when a death-sentenced inmate seeks to withdraw a post-conviction petition, also implicitly recognizes the right of a competent death-sentenced inmate to waive post-conviction review.

Nevertheless, as support for her assertion that death-sentenced inmates should not be permitted to waive post-conviction review, Pike relies upon State v. Martini, 677 A.2d 1106 (N.J. 1996). In Martini, a death-sentenced inmate sought to waive post-conviction review by dismissing the application for post-conviction relief filed on his behalf by the Office of the Public Defender. Id. at 1108. Following a court-ordered psychiatric evaluation and a competency hearing, the trial court found Martini to be competent and determined that Martini had voluntarily chosen to forgo further appeals. Id. The New Jersey Supreme Court affirmed the trial court's findings but nonetheless refused to permit Martini to waive post-conviction review, citing the Court's state constitutional duty to "ensure the integrity of death sentences in New Jersey." Id. at 1112. The Court reviewed New Jersey precedent which precluded competent capital defendants from waiving either the presentation of mitigation evidence or the direct appeal of their convictions and sentences. Id. at 1109. Characterizing post-conviction review as a continuation of "meaningful appellate review" and as a safeguard essential to ensuring the reliability of capital sentencing, the Court refused to permit competent inmates to waive post-conviction review. Id. at 1112-13. The Court explained its ruling as follows:

---

[7]Tennessee Code Annotated section 40-30-120(a) (2003) provides in relevant part:

> When affirming a conviction and sentence of death on direct appeal, the Tennessee supreme court shall contemporaneously set a date for an execution. Such date shall be no less than four (4) months from the date of the judgment of the Tennessee Supreme Court.

> Under our form of government it is not the inmate on death row or the accused who determines when and whether the State shall execute a prisoner; rather, the law itself makes that determination. The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants.

Id. at 1107.

In urging this Court to follow Martini, Pike asserts that allowing a death-sentenced inmate to waive post-conviction review "denies the people of the State of Tennessee the right to ensure that only individuals who have received a death sentence through a constitutional process are executed." Pike maintains that the public's interest in ensuring the fair, reliable, and consistent administration of the death penalty in Tennessee outweighs a death-sentenced inmate's interest in discontinuing litigation.

We decline to mandate post-conviction review of a death sentence over the objection of a competent death-sentenced inmate. As the State points out, New Jersey is the only jurisdiction to adopt such a rule, and such a rule is not mandated by United States Supreme Court precedent. Furthermore, as one commentator has explained:

> A defendant seeking to waive proceedings for the first time at the post-conviction relief stage is more likely to have been appropriately convicted and sentenced than a defendant seeking to waive proceedings at the early stages. Such a defendant has received a full trial, full sentencing hearing and full appellate review. Every stage serves as a checkpoint, an additional safeguard filtering out the impurities. A defendant is less likely to be wrongfully sentenced to death after each stage. Information is gained at the completion of each stage. Any other conclusion would suggest that each proceeding serves no valuable purpose and would degrade the entire capital proceeding to nothing more than a random game of chance. Therefore, because each stage reduces the chance that a defendant has been inappropriately sentenced to death, the risk of arbitrary application of the death penalty is much lower at the post-conviction relief stage than at previous stages.

Anthony J. Casey, Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings, 30 Am. J. Crim. L. 75, 103 (2002). Mandatory post-conviction review could possibly ensure a greater degree of reliability in the process by which death sentences are imposed. Without question, mandatory post-conviction review would eliminate the delay[8] and expense occasioned by hearings and litigation to determine whether a death-sentenced inmate is competent to waive post-conviction review and whether a death-sentenced inmate may revoke a waiver of post-conviction review. See O'Rourke v. State, 778 S.W.2d 938, 939 (Ark. 1989) (Glaze, J., dissenting) (opining that justice would be better served and

[8] For example, should the legislature mandate post-conviction review of death sentences, this litigation, which began in June of 2001, would have been unnecessary.

delays avoided were the Arkansas Supreme Court to mandate post-conviction review in capital cases and to refuse to permit waiver of post-conviction review by competent death-sentenced inmates). These are policy considerations that are more appropriately directed to the legislature. State v. Godsey, 60 S.W.3d 759, 772 (Tenn. 2001). Upon weighing the competing policy considerations, the legislature may choose to mandate post-conviction review in death penalty cases, just as it has mandated limited direct appellate review of death sentences. Nevertheless, in the absence of a constitutional or statutory imperative, we decline to mandate post-conviction review, and we hold that such review may be waived by a competent death-sentenced inmate. Our holding is consistent with the rule applied in numerous other jurisdictions. See, e.g., Sanchez-Velasco v. Sec'y of Dept. of Corr., 287 F.3d 1015, 1033 (11th Cir. 2002); Smith v. Armontrout, 812 F.2d 1050, 1059 (8th Cir. 1987); Rumbaugh v. Procunier, 753 F.2d 395, 398-99 (5th Cir. 1985); Groseclose ex rel. Harries v. Dutton, 594 F.Supp. 949, 959 (M.D. Tenn. 1984); O'Rourke, 778 S.W.2d at 938-39; In Re Ross, 866 A.2d 554, 562 (Conn. 2005); Durocher v. Singletary, 623 So.2d 482, 483 (Fla. 1993); Corcoran v. State, 820 N.E.2d 655, 664 (Ind. 2005); State v. Ashworth, 706 N.E.2d 1231, 1236 (Ohio 1999); Bryant v. Thompson, 922 P.2d 1219, 1223 (Or. 1996); Commonwealth v. Bronshtein, 729 A.2d 1102, 1106 (Pa. 1999); cf. Serrano, 133 S.W.3d at 604 (holding that, in the absence of a constitutional or statutory mandate, inmates in non-capital cases may waive post-conviction review); Murray v. Giarratano, 492 U.S. 1, 10 (1989) (refusing to hold that the Eighth Amendment requires that appointed counsel be provided death-sentenced inmates in state post-conviction proceedings and commenting that "[t]he additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the reliability of the process by which the death penalty is imposed").

## III. Revocation of Waiver

Pike next contends that her petition for post-conviction relief was never legally withdrawn because she moved to vacate the order dismissing her petition before the order became final. Pike argues that a death-sentenced inmate should be allowed thirty days within which to revoke a waiver of post-conviction review. Pike claims that affording a death-sentenced inmate thirty days to revoke or to withdraw a waiver of post-conviction relief is consistent with Tennessee Rule of Criminal Procedure 32(f) ("Rule 32(f)"). Rule 32(f) provides:

> A motion to withdraw a plea of guilty may be made upon a showing by the defendant of any fair and just reason only before sentence is imposed; but to correct manifest injustice, the court after sentence, but before the judgment becomes final, may set aside the judgment of conviction and permit the defendant to withdraw the plea.

Applying the analytical framework of Rule 32(f), the trial court denied Pike's motion to vacate. The trial court found that permitting Pike to reinstate her post-conviction petition was not necessary "to correct manifest injustice." The Court of Criminal Appeals affirmed.

The State maintains that the lower courts appropriately analogized the circumstances of this case to Rule 32(f) and correctly applied its "manifest injustice" standard. According to the State, Pike "offered nothing beyond a change of heart and deference to her family's feelings in support of

her request to withdraw her motion to dismiss." Therefore, the State avers that Pike failed to support her motion by a showing of manifest injustice and that, in the absence of such a showing, the trial court properly denied Pike's motion to vacate her waiver and to reinstate her post-conviction petition.

Whether and under what circumstances a competent death-sentenced inmate may revoke a waiver and resume post-conviction review is a question of first impression. "Neither the Tennessee Rules of Civil Procedure nor the Tennessee Rules of Criminal Procedure apply to post-conviction proceedings" except as specifically provided by the Supreme Court Rules. See Tenn. S. Ct. R. 28, § 3(B). However, Tennessee Supreme Court Rule 28, section 11 does not answer this question. Nor do other generally applicable rules of procedure provide an answer.

Nonetheless, when an issue arises for which no procedure is specifically prescribed, Tennessee courts have inherent power to adopt appropriate rules of procedure. State v. Mallard, 40 S.W.3d 473, 480-81 (Tenn. 2001); Van Tran v. State, 6 S.W.3d 257, 264-65 (Tenn. 1999); State v. Reid, 981 S.W.2d 166, 170 (Tenn. 1998); see also Tenn. Code Ann. § 40-30-118 (2003) (recognizing this Court's authority to promulgate "rules of practice and procedure" for post-conviction proceedings). As we explained in Reid, such supplementary rules "must be consistent with constitutional principles, statutory laws, and generally applicable rules of procedure," and "trial courts should pattern such rules upon analogous generally applicable rules of procedure." Reid, 981 S.W.2d at 170.

The trial court herein adhered to the principles enunciated in Reid.[9] In dealing with Pike's motion to vacate, the trial court identified Rule 32(f) as the most analogous generally applicable rule of procedure. We agree that Rule 32(f) is the most analogous generally applicable rule of procedure and that it is a proper point of departure for our analysis. However, the analogy breaks down insofar as Rule 32(f) applies a lenient standard to motions filed before imposition of sentence and a stricter standard to motions filed after imposition of sentence. Imposition of sentence does not occur in post-conviction proceedings, and there is no readily comparable procedural event in post-conviction proceedings. Thus, in determining whether to permit Pike to revoke her waiver, the courts below had no clear basis on which to choose between the lenient "any fair and just reason" standard and the strict "to prevent manifest injustice" standard. The courts below apparently equated the order dismissing Pike's petition with the imposition of sentence and therefore evaluated Pike's motion under the strict "to prevent manifest injustice" standard of Rule 32(f). Upon careful consideration, we are not convinced that either of the Rule 32(f) standards provides the appropriate framework for analysis in the context of this case.

Admittedly, we have herein declined to mandate post-conviction review of death sentences. Nevertheless, in exercising our inherent power to fashion an appropriate rule of procedure, we must be mindful that "a sentence of death is final, irrevocable, and 'qualitatively different' than any other form or level of punishment." Van Tran v. State, 66 S.W.3d 790, 809 (Tenn. 2001). We also must

[9]Furthermore, the procedures the trial court applied when faced with Pike's request to waive post-conviction review closely resemble the procedures thereafter adopted and included in Supreme Court Rule 28, section 11.

take into account the existing statutory limitations on post-conviction remedies, which likely would bar a second post-conviction petition by a death-sentenced inmate who has sought and obtained dismissal of an initial post-conviction petition.[10] Given the unique nature of the death sentence and the existing statutory limitations on post-conviction remedies, we hold that a death-sentenced inmate whose request to waive post-conviction has been granted must be allowed thirty days from the trial court's order dismissing the petition to revoke the waiver.[11]

We emphasize the limited scope of our holding. Pike had not previously waived or attempted to waive post-conviction review. Had she done so, a very different case would have been presented. We need not and do not in this appeal adopt a rule which applies in such cases. Our holding herein affords to death-sentenced inmates a single thirty-day period to unilaterally revoke an initial waiver of post-conviction review. This holding does not afford, and should not be applied to afford, death-sentenced inmates a means by which to manipulate and to delay the judicial process.

In this case, Pike filed within thirty days her motion seeking to vacate the trial court's order dismissing her post-conviction, to reinstate her post-conviction petition, and to schedule an evidentiary hearing. Therefore, applying our holding, Pike's petition for post-conviction must be reinstated and an evidentiary hearing must be scheduled. Counsel for Pike should prepare for and proceed with the evidentiary hearing as expeditiously as possible and make every effort to avoid unnecessary delay.

## IV. Conclusion

Having concluded that the July 26, 2002, motion to vacate shall be granted, we remand this case to the trial court with instructions to reinstate Pike's post-conviction petition, to schedule an evidentiary hearing, and to resume post-conviction proceedings. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

[signature]

FRANK F. DROWOTA, III,
CHIEF JUSTICE

---

[10]The legislature has imposed a one-year statute of limitations for the filing of a petition for post-conviction relief, has provided a one-petition rule, and has prescribed limited grounds for re-opening. Tenn. Code Ann. § 40-30-102 (2003).

[11]In so holding, we follow the lead of the Pennsylvania Supreme Court which permitted a death-sentenced inmate to retract his waiver and to reinstate his petition for post-conviction relief. See Commonwealth v. Saranchak, 810 A.2d 1197, 1200 (Pa. 2002) ("In light of the subject matter, considering the existing restraints on serial petitions, given that the General Assembly has not spoken to the present situation, and recognizing the guiding preference for merits review in capital cases, we believe that the better course lies with the reinstatement alternative.")

I, Michael W. Catalano, Clerk, hereby certify that this is a true and exact copy of the original Opinion filed in the cause.
This 31 day of May, 20 05
CLERK OF COURT
By: [signature] D.C.

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, Petitioner, | ) | CASE NO. 68280 |
| VS. | ) | |
| STATE OF TENNESSEE, Respondent. | ) | DEATH PENALTY POST-CONVICTION |

FILED
BY MARTHA PHILLIPS, CLERK
2006 JAN 27 AM 11:31
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**PETITIONER'S MOTION TO RECUSE THIS HONORABLE COURT FROM SERVING AS JUDGE AND FACT-FINDER IN THIS CASE[1]**

Petitioner, Christa Gail Pike, through undersigned counsel, and for the reasons set forth in the memorandum below, moves this Honorable Court to recuse itself from sitting as judge and fact-finder in this case. Ms. Pike makes this motion pursuant to Article I, §§ 8, 9, 16, 17 and Article XI, § 16 of the Tennessee Constitution and Amendments V, VIII, and XIV to the United States Constitution.

**MEMORANDUM IN SUPPORT OF MOTION**

Ms. Pike submits that this Court should recuse itself for two reasons. First, Ms. Pike has claimed in her Preliminary Amendments to Petition for Post-Conviction Relief, Subsection I, ¶¶ 6 and 8(d), and in her Petitioner's Second Amended Petition for Post-Conviction Relief Subsection I, ¶ A(1), that she was denied the effective assistance of counsel due to the actual

---

[1] Counsel for Ms. Pike has struggled with the decision to file this motion for the duration of their representation of Ms. Pike. However, when preparing for the presently scheduled evidentiary hearing in Ms. Pike's case, it became evident that the appearance of a conflict and potential bias is so substantial in this matter that it cannot be ignored. It is for this reason that Ms. Pike now files this motion.

conflict of interest of her lead counsel resulting from the ongoing investigation into his over billing the indigent defense fund during the time that he represented Ms. Pike. Counsel for Ms. Pike have a good faith belief that at the time the Court appointed Mr. Talman, the Court was aware or should have been aware that Mr. Talman was under investigation. In fact, within two weeks of his appointment, articles concerning the investigation and specifically naming Mr. Talman were published in major newspapers across the State of Tennessee, including the *Knoxville News Sentinel*. Therefore, in ruling on this issue, the Court is faced with considering its own failure to ensure that Ms. Pike was represented by conflict free counsel.[2] Consequently, there is a least an appearance of a conflict for the Court on this issue.

Second, Ms. Pike has alleged in her Preliminary Amendments to Petition for Post-Conviction Relief, Subsection I, ¶ 10(b), and in her Petitioner's Second Amended Petition for Post-Conviction Relief Subsection I, ¶ A(4), that she was denied the effective assistance of counsel due to the actual conflict of interest of her lead counsel created by his misrepresentation to the Court concerning his failure to timely provide mitigation materials prepared by Dr. Diana McCoy to the prosecution. Upon investigation, counsel for Ms. Pike have a good faith understanding and belief that the discussion regarding the timeliness of the production of these documents took place during a conference in chambers that is not in the record. It is further the understanding and belief of Ms. Pike's counsel that the individuals present at said in-chambers meeting included, and are limited to, both defense counsel, both prosecutors and the Court.

[2] See Petitioner's Third Amended Petition for Post-Conviction Relief filed contemporaneously with this motion, raising the issue of the Court's failure to ensure that Ms. Pike was represented by conflict free counsel.

Under these circumstances, this Court has become a witness in these post-conviction proceedings.

**Disqualification due to interest in the outcome**

At trial Christa Pike had "[a]n absolute right to conflict-free representation of counsel" under the Sixth Amendment to the United States Constitution and Article 1, § 9 of the Tennessee Constitution. *Wilcoxson v. State*, 22 S.W.3d 289, 320 (Tenn.Crim.App. 1999). Moreover, "[t]o protect a defendant's right to conflict-free counsel, a trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest." *Bonin v. California*, 494 U.S. 1039, 1041-1042, 110 S.Ct. 1506, 1507, 108 L.Ed.2d 641 (1990), citing *Wood v. Georgia,* 450 U.S. 261, 272, and n. 18, 101 S.Ct. 1097, 1104 and n. 18, 67 L.Ed.2d 220 (1981); see also *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980); *United States v. Krebs*, 788 F.2d 1166, 1172 (6th Cir. 1986) ("when a trial court becomes aware of a potential conflict of interest, it is obligated to pursue the matter even if counsel does not"). The Court held in *Wood*, that when, as in Ms. Pike's case, "the *possibility* of a conflict of interest [is] sufficiently apparent at the time of the [proceeding] [it] impose[s] upon the court a duty to inquire further." *Wood v. Georgia,* 450 U.S. at 272, 101 S.Ct. at 1104 (emphasis in original).

The investigation by Ms. Pike's counsel has revealed that on March 15, 1994, the Comptroller of the Treasury was informed that there was a possibility that private attorneys paid by the state to represent indigent criminal defendants had submitted improper billings to the Administrative Office of the Courts. Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995 (hereinafter

Comptroller's Report), p. 1 (Comptroller's Report attached). The report of the Comptroller noted that in their investigation the auditors discovered that two attorneys were paid significantly more in calendar year 1993 than any other attorney. One of these was Ms. Pike's lead counsel, Mr. Talman, who, at a time when the reimbursement rate (not even considering the per case caps) was $20 per hour out-of-court and $30 per hour in-court, billed over $100,000 in a single year. Comptroller's Report at 5. The auditors also found that Mr. Talman often billed for 30 or more hours per day. *Id.* at 7-8. The Comptroller's Report indicates that Mr. Talman reimbursed the state in the amount of $62,223 on April 25, 1995. *Id.* at 9. This amount was collected by the District Attorney General in Knox County. *Id.* May 31,1995, cover letter by W.R. Snodgrass, Comptroller of the Treasury, p. 2. The report further reveals that, in March 1994, the Administrative Office of the Courts issued a press release concerning the investigation and naming Mr. Talman as a suspect. *Id.* at 9-10. The report states that all three Knox County criminal court judges and District Attorney General Randall Nichols were interviewed in or before January 1995. *Id.* at 15. Upon information and belief, the results of the Comptroller's report were published in newspapers across the State of Tennessee on or about June 7, 1995, including stories in the Knoxville News Sentinel. Moreover, copies of the Comptroller's report were sent to the Board of Professional Responsibility and to the Knox County District Attorney General. Audit Reveals Lawyers Overcharges, *The Tennessean*, June 7, 1995 (Copy Attached). Mr. Talman's case was not finally closed until November 24, 1998, when the Tennessee Supreme Court issued an Order of Enforcement suspending Mr. Talman's license to practice law for a period of 11 months and 29 days and probating that suspension for 11 months and 29 days. Tennessee Supreme Court Order of Enforcement, November 24, 1998 (Copy Attached).

Under the above related factual situation, at the time he was appointed to represent Ms. Pike, the Court either knew or should have known that Mr. Talman was being investigated for the theft of over $60,000 from the State of Tennessee's indigent defense fund. According to the records in this case, this Court appointed Mr. Talman on May 23, 1995. One month prior to the appointment Mr. Talman had paid $62,223 back to the State through the Knox County Office of the District Attorney General. Comptroller's Report, at Snodgrass letter, 2. These facts triggered the requirement that the Court, at a minimum, inform Ms. Pike on the record of the existence of the conflict of interest facing Mr. Talman.[3] It would have been better to appoint counsel whose representation was not impeded by a conflict of interest.

The facts related above demonstrate the conflict now facing the Court which create at least an appearance of impropriety should this Court remain on Ms. Pike's case. At the time Mr. Talman served as lead counsel for Ms. Pike he faced the possibility of prosecution by the Office of the District Attorney General that was prosecuting Ms. Pike.[4] Mr. Talman's law license remained in jeopardy during the entirety of his representation of Ms. Pike placing a chill on zealous advocacy. His status as an attorney regularly appointed in the Knox County courts was, or at least should have been, in jeopardy, and the manner in which the Knox County courts were administered was implicated by the findings of the Comptroller. Simply put, this Court cannot grant relief to Ms. Pike on this issue without implicating the Court's own failure to ensure that

[3] If the Court was unaware of Mr. Talman's theft from the indigent defense fund at the time of the appointment, the Court was certainly but on notice by the publication of the information on or about June 7, 1995 and, therefore, as of that date the Court had a duty to advise Ms. Pike of the conflict and offer her the appointment of conflict free counsel.

[4] In addition, since the Office of the Administrative Office of the Courts to whom the fraudulent billing was submitted is in Nashville, he also could have been prosecuted in Davidson County. Even if a decision not to prosecute had been made and communicated to Mr. Talman prior to appointment an appearance of impropriety remains as to whether the State was now expecting a quid pro quo for its largess in declining prosecution.

Ms. Pike was represented by conflict free counsel. The Court has a vested interest in either ignoring the conflict or in finding that no conflict exists in order to avoid considering the Court's own role in denying Ms. Pike her right to conflict free counsel; thus, the Court has an interest in the outcome of the pending proceeding. Therefore, the Court is incompetent to hear further proceedings in this matter pursuant to Tenn. Code Ann. § 17-2-101. In addition, the Court has a vested interest in affirming its own prior conduct which interest in the outcome of the pending proceeding renders the Court incompetent to hear further proceedings in this matter pursuant to Tenn. Code Ann. 17-2-101. Under these circumstances the Court must recuse itself. Tenn. Sup. Ct. R. 10 Canon 3(E).

**The Court as a witness.**

After the jury returned the guilty verdict following the guilt/innocence phase of Ms. Pike's capital trial, the Court conducted a meeting with counsel in chambers. This meeting does not appear to have been recorded. (Transcript of Trial, TT., Vol. XXVII, at 2462-2464.) It appears that among the issues that the Court and counsel discussed at that non-recorded in camera meeting was the three volume mitigation evidence report that had been prepared by Diana McCoy, Ph.D. (*Id.* at 2464-2465, 2468-2469.) Based upon the post-conviction investigation conducted on behalf of Ms. Pike, Ms. Pike's counsel have a good faith belief that Mr. Talman made material misstatements regarding his receipt of these reports from Dr. McCoy and that Dr. McCoy's refusal to support those misstatements was the cause of her not being called as a witness in the sentencing phase of Ms. Pike's trial.

Ms. Pike's counsel have been informed that neither Mr. Crabtree nor Ms. Helm remember the details of this in chambers conference and Ms. Pike anticipates that the content of

Mr. Talman's claims to the court on this issue will be a disputed issue of fact in this post-conviction case. The only neutral observer involved in that in chambers meeting was the Court. Therefore, the Court will be a necessary witness in Ms. Pike's post conviction case.

When the Court has knowledge that it is likely to be a material witness in the proceeding before it, the Court must recuse itself from hearing the case. *See* Code of Judicial Conduct, Canon 3(E)(1)(d)(iv), Tenn.Sup.Ct.R. 10.

## CONCLUSION

WHEREFORE, in light of the heightened due process required in capital proceedings and for the reasons presented above, Ms. Pike respectfully requests that this Honorable Court disqualify herself as the judge in this case.

Moreover, Ms. Pike submits that this matter should be handled a judge outside of the Knox County bench. The Comptroller reported that the procedures of the Sixth Judicial Circuit, including the policy of numbering each charge or individual count as separate indictment and the procedures for approving attorney vouchers in appointed cases, contributed to the ability of Mr. Talman to over bill the state by $67,000. Comptroller's Report at 6-7. In addition, the report relates that all three criminal court judges in the 6th Judicial District were interviewed concerning the overbilling. *Id.* at 15-16. Therefore, all members of the Knox County Criminal Court bench are potential witnesses in this matter. Consequently, there is an appearance of impropriety for all three Knox County Criminal Court judges in hearing this matter.

Therefore, Ms. Pike respectfully requests that this matter be assigned to a judge who is unrelated to the Knox County Criminal Court.

Respectfully Submitted,

Donald E. Dawson BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough BPR #18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331

Counsel for Petitioner Christa Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing motion was sent by UPS to Leland Price, Assistant District Attorneys General, Office of the District Attorney General, City-County Building, 400 Main Avenue, Knoxville, TN 37902, on this the 26th day of January, 2006.

Donald E. Dawson

# ATTACHMENT

# ONE –

# Comptroller's Report

# SPECIAL REPORT

OFFICE COPY
DO NOT REMOVE

## COURT SYSTEM
## ADMINISTRATIVE OFFICE OF THE COURTS
## REVIEW OF IMPROPER BILLINGS BY APPOINTED COUNSEL
## MAY 1995

## STATE OF TENNESSEE
## COMPTROLLER OF THE TREASURY

### Department of Audit

### Division of State Audit

*Arthur A. Hayes, Jr., CPA*
Director

*Glen McKay, CIA*
Assistant Director

*Chas Taplin, CPA*
Audit In-Charge

*Brenda Blackstock*
Editor

*Joe Berry*
*Christopher Freeze*
*Ron Hickman, CPA*
*Hellen Sergio*
Audit Investigators

STATE OF TENNESSEE

William R. Snodgrass
Comptroller

COMPTROLLER OF THE TREASURY

STATE CAPITOL
NASHVILLE, TENNESSEE 37243-0264
PHONE (615) 741-2501

May 31, 1995

The Honorable Don Sundquist, Governor
and
Members of the General Assembly
State Capitol
Nashville, Tennessee 37243
and
The Honorable Riley Anderson
Chief Justice of the Supreme Court
Room 319, Supreme Court Building
Nashville, Tennessee 37219

Ladies and Gentlemen:

Transmitted herewith is a special report on our review of improper billings submitted by counsel appointed to represent indigent individuals. The review was conducted jointly with the Tennessee Bureau of Investigations and was initiated after staff of the Administrative Office of the Courts notified us that an attorney had apparently overbilled for services rendered to an indigent client. Following this notification, we determined that six other attorneys had also apparently overbilled the state. The improper billings by these seven attorneys resulted in overpayments of $228,601 from the Administrative Office of the Courts during the calendar years 1990 through 1993. Of these overpayments, $178,152 was paid to two attorneys practicing law in Knox County.

This report was submitted to the District Attorney General of the 20th Judicial District (Davidson County) and to the District Attorney General of the Sixth Judicial District (Knox County). The District Attorney General of the 17th Judicial District (Bedford, Marshall, Moore, and Lincoln counties) and the District Attorney General of the 11th Judicial District (Hamilton County) have also been contacted regarding the attorneys from their districts who were involved in the apparent overbillings.

May 31, 1995
Page Two

The District Attorney General in Knox County has collected $171,148 due from the two attorneys from Knox County who owed the $178,152. Processed claims totaling $7,004 for these two attorneys were not paid by the Administrative Office of the Courts and were used to offset the remaining amounts they owed. In addition, we have been advised by the District Attorney General in Knox County that in consideration for partial reimbursement of costs associated with this review, these two attorneys have waived their rights to claims they have not submitted to the Administrative Office of the Courts, which are estimated by the attorneys to represent billings of $33,000. Since these claims have not been submitted for review, the correctness of the amounts has not been substantiated.

In addition to the $171,148 from these two attorneys, the state has collected the entire $2,793 due from an attorney from Hamilton County.

Four of the seven attorneys have not made any restitution to date. Two of these four were from Knox County and two were from Bedford County. The District Attorneys General from these counties, the State Attorney General's Office, and this office are continuing efforts to collect the improper billing amounts from these four attorneys. The Administrative Office of the Courts is withholding $25,913 in processed claims pending these four attorneys' payment of the $47,656 due from them.

This report was also referred to the State Board of Professional Responsibility for any actions they may deem appropriate.

Very truly yours,

W. R. Snodgrass
Comptroller of the Treasury

WRS/ct

State of Tennessee

# Audit Highlights

Comptroller of the Treasury — Division of State Audit

**Special Report**
Court System
Administrative Office of the Courts
Review of Improper Billings By Appointed Counsel
May 1995

## AUDIT OBJECTIVES

The objectives of the review were to determine whether fee petitions submitted to the state by private attorneys representing indigent criminal defendants contained excessive hours (hours over actual hours worked), were duplicates of previous billings, or were not properly prorated between charges or clients; to establish the propriety of fee petitions; to determine any amounts of apparent overbillings by attorneys other than amounts attributable to inadvertent errors; to review the Administrative Office's policies and procedures and the internal control structure related to the disbursement of funds for fee petitions; to refer our findings to the Office of the Attorney General and the District Attorney General; and to refer our findings to the Administrative Office of the Courts and recommend appropriate actions to correct any deficiencies.

## RESULTS OF THE REVIEW

This review was coordinated with the Tennessee Bureau of Investigation and was initiated after the staff of the Administrative Office of the Courts noted that an appointed attorney had essentially billed the state 20 times for the same services. The attorney had represented an indigent individual on 20 charges which were all combined into one case (trial). Rather than dividing the actual hours of service between the 20 charges or billing the state only once, the attorney billed the state 20 times for the same services.

Our review identified seven attorneys who apparently overbilled the state in a similar manner for services rendered in representing indigent defendants. These overbillings resulted in overpayments of $228,601 in state funds from the Administrative Office of the Courts during the calendar years 1990 through 1993. Of these overpayments, $178,152 was overbilled between two attorneys practicing law in Knox County. These two attorneys billed the state multiple times for cases involving more than one charge against an indigent individual, and therefore in effect they frequently billed the state for over 24 hours of service in a single day. The billings submitted by the remaining five attorneys were less frequent but were still material.

*Tennessee Code Annotated,* Section 40-14-207, entitles attorneys to be paid in accordance with Rule 13, Rules of the Supreme Court, by the Administrative Office of the Courts for representing persons in preliminary hearings and trials who cannot afford legal counsel. Rule 13 states that appointed counsel can appropriately file separate claims in each case if the attorney prorates hours of service between the various claims relating to the multiple charges against a defendant or defendants. However, for many of the fee petitions we reviewed, the attorneys had not prorated the hours; they had billed without regard to their other claims for the same days. The Administrative Office of the Courts did not have a review system in place to detect the lack of proration between billings. The office did ensure that the maximum limit per claim was not exceeded. However, by billing separately for each count, the attorneys were able to effectively exceed the maximum, multiple times, for any one case. For example, an attorney representing an indigent client in one trial on 10 felony counts in general sessions court would have been eligible for a maximum payment of $500, the basis of the payment being 25 hours of service at $20 per hour. By billing the state for each count, the attorney would effectively increase the maximum payment for the case to $5,000. The ten billings would reflect 250 hours of service, which would not be the actual hours spent on the case. The attorneys identified in this review apparently took advantage of the state's payment system because the overbillings would not be detected. This manner of billing appears to be inconsistent with the billing guidelines set forth in the American Bar Association Formal Ethics Opinion 93-379, dated December 1993, and appears to violate Rule 13. Our review also disclosed that many of the attorneys were apparently claiming whole hours as a standard charge for various services rather than claiming their actual time in increments of an hour as required by Rule 13.

In addition to the apparent overbillings, our review noted that numerous fee petitions submitted by attorneys were not signed by elected judges. Instead, the fee petitions were signed by other attorneys who had served as general sessions court special judges. The attorneys were appointed by elected judges or court clerks to serve as judges, usually for a portion of a day, in general sessions court. It appears inappropriate that special judges were signing fee petitions because the judges often had been present in only one of many court appearances for a particular case. It appears more appropriate for elected judges to review hours claimed by attorneys.

A number of circumstances regarding billings and their subsequent approval and payment made the submission and payment of improper fees difficult to detect. These circumstances include the failure of elected judges and special judges to adequately review appointments and charges and the failure of the Administrative Office of the Courts to adequately review the fee petitions. However, these circumstances do not mitigate the actions of the attorneys who submitted the fee petitions. These attorneys are ultimately responsible for the improper billings.

A contributing factor to the number of improper fee petitions submitted from attorneys appears to be the system that was used in 19 of the 31 judicial districts across the state of assigning case numbers to each charge (count) rather than combining all similar charges into one case. The assignment of separate case numbers to each charge enabled attorneys to avoid detection in billing multiple times (once for each charge) for related cases which actually required no additional time.

This report was submitted to the District Attorney General of the 20th Judicial District (Davidson County) and to the District Attorney General of the Sixth Judicial District (Knox County). The District Attorney General of the 17th Judicial District (Bedford, Marshall, Moore, and Lincoln counties) and

the District Attorney General of the 11th Judicial District (Hamilton County) have also been contacted regarding the attorneys from their districts who were involved in the apparent overbillings.

The District Attorney General in Knox County has collected $171,148 due from the two attorneys from Knox County who owed the $178,152. Processed claims totaling $7,004 for these two attorneys were not paid by the Administrative Office of the Courts and were used to offset the remaining amounts they owed. In addition, we have been advised by the District Attorney General in Knox County that in consideration for partial reimbursement of costs associated with this review, these two attorneys have waived their rights to claims they have not submitted to the Administrative Office of the Courts, which are estimated by the attorneys to represent billings of $33,000. Since these claims have not been submitted for review, the correctness of the amounts has not been substantiated.

In addition to the $171,148 from these two attorneys, the state has collected the entire $2,793 due from an attorney from Hamilton County.

Four of the seven attorneys have not made any restitution to date. Two of these four were from Knox County and two were from Bedford County. The District Attorneys General from these counties, the State Attorney General's Office, and this office are continuing efforts to collect the improper billing amounts from these four attorneys. The Administrative Office of the Courts is withholding $25,913 in processed claims pending these four attorneys' payment of the $47,656 due from them.

This report was also referred to the State Board of Professional Responsibility for any actions they may deem appropriate.

In October 1993, the Supreme Court created the Indigent Defense Commission to develop and recommend to the Court a comprehensive plan for the delivery of legal services to indigent defendants in the state court system. The recommendations in this report regarding billings, special judge appointments, and changes to fee petitions and review controls should be considered by the committee to strengthen controls over the disbursements from the indigent defense fund. The implementation of stronger controls in the Administrative Office of the Courts becomes more critical with the amendment to the Rules of the Supreme Court, effective September 1, 1994, which increases the hourly rates and maximum compensation to be paid to private attorneys.

Effective January 1, 1995, Rule 11(2) of Rules of the Supreme Court was amended to bring uniformity to the system of assigning case numbers. The amendment defines a criminal case as "a criminal proceeding against one individual at one level of court." Accordingly, all charges consolidated into a single proceeding will be included under one case (docket) number. Consolidating the charges will essentially eliminate an attorney's ability to bill multiple times for the same charges.

Furthermore, the Executive Director of the Administrative Office of the Courts has initiated the process for implementing computer software to maintain records of bills received and to enable staff to monitor for multiple billings or unreasonable hours billed in a single day. The director anticipates that the cost of implementing this software will not exceed $10,000 and that it will be implemented by July 1, 1995.

# Court System
# Administrative Office of the Courts
# Review of Improper Billings by Appointed Counsel
# May 1995

TABLE OF CONTENTS


| | Page |
|---|---|
| **INTRODUCTION** | 1 |
| Objectives of the Review | 1 |
| Scope of the Review | 2 |
| Background | 2 |
| Criteria | 4 |
| **DETAILS OF THE REVIEW** | 5 |
| Attorneys Assuming Roles as Special Judges | 5 |
| Circumstances Relative to the Submission and Subsequent Approval of Improper Billings | 6 |
| Overbillings by the Attorneys | 7 |
| Schedule of Improper Fee Petitions | 14 |
| Interviews | 15 |
| Weaknesses in the Internal Control Structure | 18 |
| Changes Implemented by the Supreme Court | 19 |
| **RECOMMENDATIONS** | 20 |
| **APPENDIX** | 21 |

# Court System
# Administrative Office of the Courts
# Review of Improper Billings by Appointed Counsel
# May 1995

## INTRODUCTION

On March 15, 1994, our office was informed of possible improper billings by private attorneys paid by the state to represent indigent criminal defendants. We were notified after the staff of the Administrative Office of the Courts noted that an attorney had apparently overbilled for services rendered to an indigent client. The client had been charged with 20 counts, all of which were related to instances of aggravated burglary and theft of property, and all of which were tried in court at the same time. However, the attorney submitted 20 separate fee petitions for this single indigent client with identical hours indicated for all 20 counts. - In effect, the attorney charged the state 20 times for the same services, rather than dividing the actual hours of service between the fee petitions.

From an initial review of fee petitions submitted from throughout the state, it was determined that other attorneys apparently had also engaged in this type of practice. We discussed these findings with Mr. Victor S. Johnson, III, District Attorney General of the 20th Judicial District (Davidson County), who requested that we further review the fee petitions jointly with the Tennessee Bureau of Investigation. We also discussed these findings with the State Attorney General.

### *OBJECTIVES OF THE REVIEW*

The objectives of the review were

1. to determine whether fee petitions for attorneys' services contained excessive hours (hours over actual hours worked), duplicated previous billings, or were not properly prorated between charges or clients;

2. to establish the propriety of fee petitions, including (a) whether the attorneys had been properly appointed to represent the indigent clients, (b) whether the indicated court dates could be substantiated by court records, (c) whether the fee petitions were signed by judges who had jurisdiction over the case as provided by statute, and (d) whether the fee petitions paid were submitted by the attorneys in a timely manner;

3. to determine any amounts of apparent overbillings by attorneys other than inadvertent errors;

4. to review the Administrative Office's policies and procedures and the internal control structure related to the disbursement of funds for fee petitions;

5. to refer our findings to the Office of the Attorney General and the District Attorney General; and

6. to refer our findings to the Administrative Office of the Courts and recommend appropriate actions to correct any deficiencies.

## *SCOPE OF THE REVIEW*

We began our review on March 16, 1994, by obtaining a listing of appointed attorneys and state payments made to each attorney from the State of Tennessee Accounting and Reporting System (STARS). It was decided that our review would initially include fee petitions submitted for those individuals who had received payments exceeding $20,000 for the calendar year 1993, and would include the fee petitions of four attorneys specifically noted by the Administrative Office of the Courts as having apparently billed the state for excessive hours. Twenty-three attorneys and one expert witness from various counties were identified as having received over $20,000 or as having billing problems noted by the Administrative Office of the Courts. The 1993 fee petitions for these attorneys were obtained from the Administrative Office of the Courts. The dates indicated on these fee petitions were then transferred to calendars for each attorney and witness. The individual calendar days were then reviewed for reasonableness. The fee petitions were also arranged in numerical order according to defendant and docket number to determine whether duplicate billings had occurred or whether the attorney was properly dividing hours between multiple counts against the defendant.

The scope of our review was expanded to include those fee petitions submitted by 7 of the 23 attorneys for calendar years 1990 through 1992 which appeared to contain excessive hours. Our review was expanded for these seven attorneys because of the large number of billings they submitted during these years and because of the apparent problems in their 1993 billings.

## *BACKGROUND*

The Indigent Defendants' Counsel is 1 of the 11 divisions of the Administrative Office of the Courts. The division was created in 1965 by the Tennessee General Assembly to pay for the legal counsel of people who are unable to afford it. *Tennessee Code Annotated*, Section 40-14-202, states that in all felony cases, if the accused is not represented by counsel and the court determines that he/she is an indigent person who has not competently waived his/her right to counsel, the court must appoint to represent the accused, in the absence of a public defender, a competent attorney licensed in Tennessee. The indigent defendant is required to make a sworn statement that he/she is financially unable to afford counsel.



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 56 of 153 PageID #: 3827

Section 40-14-207, *Tennessee Code Annotated*, entitles appointed attorneys, other than public defenders, to reasonable compensation and expenses in accordance with *Tennessee Court Rules Annotated*, Rules of the Supreme Court. Attorneys are required to submit fee petitions according to Rule 13, Section 2A, Rules of the Supreme Court, to receive compensation. In regard to filing claims, Rule 13 states:

> In a single trial of separate indictments and/or defendants, appointed counsel can appropriately file separate claims in each case, but cannot charge separately for time spent on all the cases. Time may be prorated, cross-referencing each case on claims, but time spent exclusively on any one case may properly be charged only on the claim for that case.
>
> All claims for compensation covering work in a preliminary hearing or for trial preparation shall be specific as to the service performed, the date performed, timed in hours, and tenths of hours, and submitted by the attorney on a form approved by the Executive Secretary to the Supreme Court to the judge having jurisdiction of the case at the time the services were rendered for consideration in determining the compensation to be awarded. The judge must sign the claim. A facsimile signature will not be accepted.
>
> The Executive Secretary to the Supreme Court shall examine and audit all claims for attorneys' fees and expenses to insure compliance with these rules and other statutory requirements. After such examination and audit and giving due consideration to state revenues, the Executive Secretary shall make a determination as to the compensation to be paid to each attorney and/or expert and cause payment to be issued in satisfaction thereof. The determination by the Executive Secretary shall be final, except as provided in Section D.
>
> All claims must be submitted to the Executive Secretary within ninety (90) days from final disposition of the case. Final disposition means the last activity of the attorney in relation to the case, not the end of the trial.

The fee structure prescribed for appointed counsel is determined by the original criminal charge. The fee structure is set forth in Rule 13. The fees presented below were those in effect during the period under review. Effective September 1, 1994, the structure was amended to increase the compensation to attorneys representing indigent clients.

The maximum hourly rates for time spent in court and for time spent in trial preparation were $30 and $20, respectively. Fees are also limited to a maximum amount per case. The maximum compensation for all services involved in an adult or juvenile misdemeanor case was

$100, in contempt cases was $250, in juvenile felony (non-capital) and adult felony cases in general sessions and municipal courts was $500, and in adult felony cases (non-capital) in trial courts was $1,000. Compensation for capital cases was to be determined by the court and approved by the Executive Secretary and the Chief Justice.

*CRITERIA*

To determine what would be a reasonable number of in-court and out-of-court hours for an attorney to claim for one day, we spoke with the Executive Director of the Administrative Office of the Courts, the Administrative Office's counsel, the Attorney General's Office, several district attorneys general, and several general sessions judges and clerks. We set our daily threshold at eight in-court hours and 12 total hours. The hours billed over these amounts were classified as excessive. Available in-court hours were determined from applicable court clerks' and bailiffs' time sheets and from court reporters' billings to the state. On those few days when the available in-court hours exceeded eight hours, the available hours were substituted as our threshold. Generally, the available in-court hours were less than eight hours in one day.

Our review focused on only the attorneys' billings to the state. However, we noted that many of the attorneys performed services for paying clients on the days in which their services billed to the state for indigent representation exceeded our criteria. It should be noted that the excessive hours in this report do not include the attorneys' hours of service for paying clients.

The initial step in determining the billing amounts over our threshold was to prepare a calendar for each year and each attorney. The hours of service from each attorney's fee petitions were then plotted on the respective calendars. The days in which the hours billed by the attorney exceeded our threshold were then reviewed. The in-court hours were compared with the actual time the courts were in session. Conservatively, if the billing for in-court hours was within the actual time the court was in session, the hours were not questioned. In addition, billed hours for which the attorney had not received compensation because the total hours on the fee petitions exceeded the maximum allowed by the Administrative Office of the Courts were also not questioned. The remaining days were then scheduled onto attachments which showed the days in question, the defendants, and the hours per defendant. The attachments were then sent to the respective attorneys. The attorneys were asked to explain the methodology they had used in calculating the hours billed and to provide a written description of the services they had provided. They were also asked to provide documentation to support the in-court hours. After receiving their responses, we reviewed their explanations for reasonableness and made appropriate corrections to dates or hours of service indicated in the billings.

## DETAILS OF THE REVIEW

From our review of fee petitions submitted by the 24 individuals who had received payments exceeding $20,000 in 1993, we determined that the billing practices of seven attorneys included apparently excessive hours which were paid by the Administrative Office of the Courts. The improper billings by two attorneys notably exceeded the billings of the other five. The two attorneys, Mr. David Poss and Mr. William Talman, were each paid in excess of $100,000 for representing indigent clients in 1993. In our review of fee petitions submitted for 1993, we found 148 days of apparently excessive billings for Mr. Poss and 81 days for Mr. Talman. Attorneys Poss and Talman frequently billed the state for over 24 hours of service in a single day. The billings submitted by the remaining five attorneys were less frequent but were still material.

The Administrative Office of the Courts paid approximately $2,940,000 in total indigent fee petitions to 1,036 attorneys, psychologists, and expert witnesses during the calendar year 1993. The aggregate payments to the 24 individuals examined in our review totaled $792,085, which amounted to 27% of the total amount paid for indigent defense during the 1993 calendar year. Of those aggregate payments, $83,128 (10%) represented apparent overbillings, based on our criteria.

An additional $145,473 in apparent overbillings was identified from our review of payments for calendar years 1990 through 1992. Thus, for the four-year period, the seven attorneys identified in our review apparently overbilled the state $228,601. Of this amount, $178,152 was paid to attorneys Poss and Talman.

The majority of the attorneys included in our review were practicing law in East Tennessee, including attorneys Poss and Talman. The billings from appointed attorneys in Knox County were particularly numerous, apparently because the county lacked a public defenders office until 1992. Without a public defenders office, practically all indigent defendants were represented by appointed counsel.

### *ATTORNEYS ASSUMING ROLES AS SPECIAL JUDGES*

Most of the fee petitions identified as containing improper billings were submitted for cases disposed of in general sessions courts. Many of these fee petitions were signed by attorneys serving as general sessions court special judges. The attorneys were appointed by elected judges or court clerks to serve as judges, usually for a portion of a day in general sessions court. Special judges are not compensated and are appointed when elected judges take vacation, are ill, or have emergencies. Special judges are also appointed to assist in handling the daily load of cases on the court docket which are heard in "backup" general sessions courts. These backup courts are set up when the case load is so voluminous that the judge deems it necessary to divide the docket into


Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 59 of 153 PageID #: 3830

two courts. The special judges are basically given the same authority as the elected judges. The special judges dispose of cases and may appoint other attorneys to represent indigent clients.

Section 17-2-118, *Tennessee Code Annotated*, states that special judges are to be elected by a majority of the attorneys present in court that day. From our interviews with elected judges and attorneys appointed to sit as special judges, it was apparent that the appointments in Knoxville were generally not made through elections held by attorneys present but rather by an elected judge or court clerk. From our review of fee petitions, it was also apparent that attorneys included in our review were appointed to sit as special judges and had appointed and signed fee petitions for other attorneys in our review.

According to the Administrative Office of the Courts, there is no specific language in Rule 13 which addresses special judges' signing of fee petitions. Rule 13, Section 2A, states that attorneys should submit claims for compensation "on a form approved by the Executive Secretary to the Supreme Court to the judge having jurisdiction of the case at the time services were rendered." In addition, the approved form to be signed by the judge states, "I hereby certify that I appointed the above named attorney to represent the herein listed indigent." Although Rule 13 refers to the judge with jurisdiction and the form refers only to the appointment, technically it would appear that the special judge would have partial jurisdiction of the case if he/she sat as a special judge on one or more of the court appearances of that case, including when the defendant was first appointed counsel. Currently, the general sessions judges in Knoxville have requested that special judges refrain from signing fee petitions until the appropriateness of this activity can be reviewed by the Administrative Office of the Courts.

## *CIRCUMSTANCES RELATIVE TO THE SUBMISSION AND SUBSEQUENT APPROVAL OF IMPROPER BILLINGS*

A number of circumstances regarding billings and their subsequent approval and payment made the submission and payment of improper fees difficult to detect. These circumstances include the failure of elected judges or special judges signing fee petitions to adequately review appointments and charges and the failure of the Administrative Office of the Courts to adequately review the fee petitions. However, these circumstances do not mitigate the actions of the attorneys who submitted the fee petitions. These attorneys are ultimately responsible for the improper billings.

The large number of fee petitions submitted from attorneys in Knoxville appears to be related to the system used by the district in assigning a separate case number to each count against a defendant rather than combining all similar counts into one case. There are 31 judicial districts in the state. The Sixth Judicial District, which comprises Knox County, is among the 19 districts that assign separate case numbers to each count against a defendant. The Administrative Office of the Courts makes payments for indigent representation based on case numbers. The assignment of separate case numbers to each count enables attorneys to bill multiple times (once for each count) for related cases which actually required no additional time. In the remaining 12

judicial districts, all the counts against one defendant are consolidated into one case and attorneys can only bill by the case.

Because the improper billings for multiple counts were not detected by the Administrative Office of the Courts, attorneys continued to submit multiple billings which were not properly prorated.

## *OVERBILLINGS BY THE ATTORNEYS*

Based on our review, the seven attorneys' apparent overbillings were created by their failure to properly divide the actual hours they had worked between multiple fee petitions for numerous defendants or between numerous counts for one defendant. Some of the overbillings resulted from the attorneys' use of standardized hours for various services or specific cases regardless of the actual time they had spent on the case. In addition, some attorneys appear to have added hours to the actual time spent on the case in order to reach the maximum allowed payment for a single case. But in most cases, the overbilling was the result of the attorney's billing for multiple counts under different case numbers for one court appearance. The Administrative Office of the Courts did not have a review system in place to detect the lack of proration between billings. The office did ensure that the maximum limit per claim was not exceeded. However, by billing separately for each count, the attorneys were able to effectively exceed the maximum, multiple times, for any one case. For example, an attorney representing an indigent client in one trial on 10 felony counts in general sessions court would have been eligible for a maximum payment of $500, the basis of the payment being 25 hours of service at $20 per hour. By billing the state for each count, the attorney would effectively increase the maximum payment for the case to $5,000. The ten billings would reflect 250 hours of service, which would not be the actual hours spent on the case. Our review also noted several inconsistencies between billing dates of the services indicated by appointed counsel and the actual dates of the services.

The attorneys have used the following reasons to justify incorrect billing: the low hourly billing rates for appointed attorneys; the Administrative Office of the Courts' past approval of improper billings; and the cost and time saved in not keeping accurate records. However, such billing practices appear to violate the Rules of the Supreme Court and appear to be inconsistent with the billing guidelines set forth in the American Bar Association Formal Ethics Opinion 93-379, dated December 1993. (Opinion 93-379 is presented in the appendix of this report.)

After reviewing the documentation from the courts relating to several of the hundreds of fee petitions for attorneys Poss and Talman, we decided to perform a detailed review of eight days for each attorney. This detailed review included matching docket numbers and dates from fee petitions to information on warrants held by the court. We also ensured that the order of appointments and affidavits of indigency were on file with the court, and investigated any discrepancies. Four days chosen were days in which the attorneys indicated their largest number of hours worked, which for Mr. Poss was between 50 and 75 hours a day and for Mr. Talman was between 30 and 32.5 hours a day. The remaining four days were days in which the attorneys not

only indicated they had worked as many as 30 hours as indigent counsel, but also indicated they had acted as special judges for portions of those same days.

A summary of billing amounts over our threshold by calendar year is displayed on page 14 in the Schedule of Improper Fee Petitions.

Review of Fee Petitions Submitted by Mr. David Poss (Knoxville)

Mr. Poss' fee petitions submitted for 1993 exceeded our criteria by $60,835. His fee petitions for 1990, 1991, and 1992, appear to have exceeded our criteria by $2,310, $26,290, and $21,690, respectively. Thus, his apparent overbillings for the four-year period total $111,125.

Pending our review, the Administrative Office of the Courts had withheld payments for $2,200 in fee petitions submitted by Mr. Poss. According to office staff, Mr. Poss has not submitted any claims since the initiation of our review. On April 28, 1995, Mr. Poss reimbursed the State of Tennessee $108,925 ($111,125 less the $2,200 in claims held by the Administrative Office of the Courts). In lieu of any state assessment against him to recoup the administrative costs of this review, Mr. Poss also waived his rights to all unsubmitted claims pertaining to his work in general sessions court prior to April 13, 1995. He had withheld these claims after the initiation of our review.

Our detailed review of the fee petitions for the eight days selected revealed that Mr. Poss billed the state for over 24 hours on all eight days. It appears that Mr. Poss failed to prorate the hours he billed between defendants or between multiple claims for one defendant. On four of these days, the hours he claimed exceeded 50. Most of Mr. Poss' fee petitions for these eight days reached or exceeded the total hours required to reach the maximum allowed payment. In light of the large number of claims he submitted in this manner, it appears that Mr. Poss overstated both the in-court and out-of-court hours in an effort to reach or exceed the maximum payment. On the fee petitions submitted by Mr. Poss that exceeded the state's maximum, the amount of services generally exceeded the maximum allowed by $100. Furthermore, on three occasions, Mr. Poss submitted duplicate fee petitions. However, two of the duplications were discovered and were only paid once by the Administrative Office of the Courts. The third was paid twice and has been added to Mr. Poss' improper billings.

No evidence was found that Mr. Poss fabricated any warrant numbers or did not represent the defendant on the fee petitions as stated. In most cases, the dates on the warrants located in the courthouse in Knoxville agreed with Mr. Poss' fee petitions related to in-court dates. However, several dates on the fee petitions appeared to be in error and related to other court dates. All claims for the eight days appear to have been properly signed by general sessions or criminal court judges. Based on the attorney appointments on file in the courthouse, in most cases a judge did appoint Mr. Poss to represent the defendants for which he submitted fee petitions. There were a few cases in which the order of appointment indicated that the appointment was made to the Public Defenders Office or to another attorney; however, the warrants for those cases indicate that Mr. Poss represented the defendant although the order of appointment was apparently not revised.

The number of hours Mr. Poss claimed on multiple claims for defendants were, for the most part, identical. There did not appear to be any attempt on his part to properly divide his time of services between the multiple claims. Furthermore, it was noted that on one occasion Mr. Poss submitted fee petitions for a client involving a general sessions court case which was bound over to the criminal court. Except for the initial hearing, the trial was held in the criminal court and not in general sessions court. Mr. Poss claimed identical court hours and dates for both the general sessions court and the criminal court.

Review of Fee Petitions Submitted by Mr. William Talman (Knoxville)

Mr. Talman's fee petitions submitted for 1993 exceeded our criteria by $17,295. His fee petitions for 1990, 1991, and 1992, appear to have exceeded our criteria by $20,123, $11,147, and $18,462, respectively. Thus, his apparent overbilling for the four-year period total $67,027.

Pending our review, the Administrative Office of the Courts had withheld payments for $4,804 in fee petitions submitted by Mr. Talman. On April 25, 1995, Mr. Talman reimbursed the State of Tennessee $62,223 ($67,027 less the $4,804 in claims withheld by the Administrative Office of the Courts). In lieu of any state assessment against him to recoup the administrative costs of this review, Mr. Talman also waived his rights to all unsubmitted claims pertaining to his work in general sessions court prior to April 13, 1995. He had withheld these claims after the initiation of our review.

Our detailed review of the fee petitions for the eight days selected revealed that Mr. Talman billed the state for over 24 hours on six of these eight days. All of Mr. Talman's fee petitions for these eight days reached or exceeded the total hours required to reach the maximum allowed payment. In light of the large number of claims he submitted in this manner, it appears that Mr. Talman overstated both the in-court and out-of court hours in an effort to reach or exceed the maximum. On the fee petitions submitted by Mr. Talman that exceeded the state's maximum, the amount of services generally exceeded the maximum allowed by $10 to $20.

No evidence was found that Mr. Talman fabricated any warrant numbers or did not represent or have his wife, Ms. Martha Weems, Attorney at Law, represent the defendants on the fee petitions as indicated. Mr. Talman's fee petitions generally contained similar hours claimed for different defendants on a single day or similar hours for multiple fee petitions for a single defendant. The hours Mr. Talman reported on multiple fee petitions differed only slightly, apparently to give the appearance of proration. In addition, all his claims related to general sessions cases for these eight days were signed by specially appointed judges. These appointed judges included attorneys Thomas Slaughter and David Poss, both of whose billings were part of our review.

Attempts to Interview Attorneys Poss and Talman

In a press release in March 1994, the Administrative Office of the Courts revealed that billing practices of certain appointed attorneys were being reviewed. This act precluded us from immediately interviewing Mr. Poss and Mr. Talman because they knew about the investigation

and had already retained legal counsel before we could contact them for an interview. Neither Mr. Poss nor Mr. Talman would consent to an interview. Attempts to contact Mr. Poss through his attorney, Mr. Don Bosch, and Mr. Talman through his attorney, Mr. Charles Fels, were unsuccessful.

Billings for Remaining Five Attorneys

From our review of fee petitions submitted for services provided in 1993, five other attorneys were identified as having submitted improper billings. These five attorneys, in order of having the greatest questionable hours to the least, are Mr. Randall Reagan, Mr. Andrew Dearing, Mr. Thomas Slaughter, Mr. Robert Stovall, and Mr. Paul Bergmann.

Review of Fee Petitions Submitted by Mr. Randall Reagan (Knoxville)

Mr. Reagan's fee petitions submitted for 1993 only exceeded our criteria by $90. But, we found numerous petitions for calendar years 1990, 1991, and 1992 which contained hours that were apparently excessive. These petitions exceeded our criteria by $11,310, $8,325, and $894, respectively. Thus, Mr. Reagan apparently overbilled the state $20,619.

Mr. Reagan used standard hours instead of actual hours in completing fee petitions and failed to properly prorate hours between multiple claims. He billed the state for over 24 hours of service on 12 days in 1990 and eight days in 1991. He also submitted several fee petitions signed by Mr. Talman and Mr. Slaughter as special judges.

On November 14, 1994, Mr. Reagan was contacted regarding these petitions. He said that he generally reconstructed from memory his fee petitions for misdemeanor cases he had worked in general sessions courts and that he billed his time in one-hour increments because it was not cost effective to maintain records to bill in tenths of hours. He also stated that although he had not performed all the work on the days claimed, he had performed it on other days.

Mr. Reagan further indicated that he had signed fee petitions as a special judge and that he thought elected judges were aware special judges were signing fee petitions. Mr. Reagan reasoned that since he had appointed counsel to some cases as a special judge, it was proper for him to sign the fee petitions for those cases.

Mr. Reagan has not been able to provide us with documentation for the billings in question ($20,619). Therefore, collection efforts have been initiated. The Administrative Office of the Courts has withheld payment of $8,177 to Mr. Reagan for fee petitions he submitted in 1994.

Review of Fee Petitions Submitted by Mr. Andrew Dearing (Shelbyville)

Mr. Andrew Dearing's fee petitions submitted for 1993 exceeded our criteria by $675. His petitions for 1990, 1991, and 1992 exceeded our criteria by $3,235, $9,955, and $6,480, respectively. Thus, Mr. Dearing apparently overbilled the state $20,345.

Mr. Dearing apparently failed to properly prorate hours between multiple claims. He billed the state for over 24 hours of service on two days in 1990, nine days in 1991, and nine days in 1992.

On August 31, 1994, and March 24, 1995, Mr. Dearing was contacted regarding these petitions. He said that he had done his paperwork in a hurry and that his billings did include some errors. He also stated that although he had not performed all the work on the days claimed, he had performed it on other days. He stated that he prepared his fee petitions at the end of each month and used his client files, notes, and memory to fill out the claims.

Mr. Dearing has not been able to provide us with documentation for his 1990-1993 billings in question ($20,345); therefore, collection efforts have been initiated. The Administrative Office of the Courts has withheld payment of $12,369 to Mr. Dearing for fee petitions he submitted in 1994.

Review of Fee Petitions Submitted by Mr. Thomas Slaughter (Knoxville)

Mr. Slaughter's fee petitions submitted for 1993 only exceeded our criteria by $26. But, we found numerous petitions for calendar years 1990 and 1991 which contained hours that were apparently excessive. These petitions exceeded our criteria by $2,946 and $530, respectively. Thus, Mr. Slaughter apparently overbilled the state $3,502.

In a conversation on October 25, 1994, Mr. Slaughter stated that his fee petitions contained hours which appeared excessive because he waited to prepare his fee petitions until the case was disposed of rather than immediately after he provided services. According to Mr. Slaughter, he would "load up" the hours on the first two or three court dates indicated on his claims because he believed he had already reached the maximum number of hours for which he would get paid. Mr. Slaughter indicated that it was cumbersome to fill out the numerous fee petitions with the exact dates and hours and that he did not always keep track of the hours as he should. He said that he often worked long hours on cases set for trial and worked many hours for which he did not bill the state. Therefore, Mr. Slaughter said that he was sure he did the work on the case although his billings did not reflect accurate dates and times.

Mr. Slaughter also stated that a number of years ago, after he had submitted his first fee petition to be signed, a Knoxville judge had instructed him not to prorate his hours because he would not be able to recover his costs. According to Mr. Slaughter, the judge instructed him to bill under each count (multiple charges) but with different times on each claim. In this manner, the multiple billings would not be obvious. We could not determine whether any of the judges in Knoxville were instructing attorneys not to prorate their hours. However, even if a judge instructed Mr. Slaughter not to prorate his hours, Mr. Slaughter is ultimately responsible for correctly filing his fee petitions.

Mr. Slaughter submitted numerous fee petitions signed by Mr. Talman as a special judge. He also signed numerous fee petitions himself as a special judge. In an interview on November 2,



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 65 of 153 PageID #: 3836

1994, Mr. Slaughter stated that as a special judge, he was given the authority to sentence defendants to jail and felt this authority also extended to signing fee petitions.

Mr. Slaughter has not been able to provide us with documentation for his 1990, 1991, and 1993 billings in question ($3,502); therefore, collection efforts have been initiated. The Administrative Office of the Courts has withheld payment of $5,367 to Mr. Slaughter for fee petitions he submitted in 1994.

Review of Fee Petitions Submitted by Mr. Robert Stovall, Jr. (Shelbyville)

Mr. Stovall's fee petitions submitted for 1993 exceeded our criteria by $2,830. His petitions for 1992 exceeded our criteria by $360. We also reviewed Mr. Stovall's fee petitions for 1990-1991 but noted no problems. Thus, the total amount questioned from Mr. Stovall's fee petitions was $3,190. It appears that he failed to properly prorate hours between multiple fee petitions for defendants.

On August 9, 1994, Mr. Stovall responded to an inquiry we made regarding his billing methodology. According to Mr. Stovall, his fee petitions contained several typographical errors and incorrect dates which caused the hours to appear excessive on many days. On September 14, 1994, after correcting his fee petitions accordingly, we sent Mr. Stovall an additional listing of days in question, including several days in 1992, and requested that he supply us with further documentation to support these days.

Mr. Stovall has not been able to provide us with documentation for these billings ($3,190); therefore, collection efforts have been initiated.

Mr. Stovall has not submitted any fee petitions to the Administrative Office of the Courts since our review began in March 1994. Thus, none of his fee petitions have been withheld.

Review of Fee Petitions Submitted by Mr. Paul Bergmann (Chattanooga)

Mr. Bergmann's fee petitions submitted for 1993 and 1992 exceeded our criteria by $1,377 and $1,416, respectively. We also reviewed Mr. Bergmann's fee petitions for 1990-1991 but noted no problems. Thus, the total amount questioned from Mr. Bergmann's fee petitions was $2,793. It appears that he failed to properly prorate hours between multiple fee petitions for defendants. Mr. Bergmann also submitted 20 claims for various counts against one defendant with identical hours indicated on all 20 claims. However, these identical hours were discovered and subsequently disallowed by the Administrative Office of the Courts.

In a phone conversation on May 19, 1994, Mr. Bergmann stated that he made an inadvertent error in billing identical claims for 20 counts relating to one defendant. He said that his former secretary mistakenly attached the same list of charges to each of the billing sheets. Mr. Bergmann acknowledged that he should have billed the state only once for $144 but that as a result of his error he billed for $2,880. The 19 erroneous petitions were not paid by the Administrative Office of the Courts.

On October 12, 1994, we requested documentation for Mr. Bergmann's hours which were apparently excessive. On November 4, 1994, we received Mr. Bergmann's written statement that his secretary inadvertently failed to prorate hours between multiple petitions. On January 24, 1995, Mr. Bergmann made a full reimbursement of $2,793 to the Administrative Office of the Courts.

## SCHEDULE OF IMPROPER FEE PETITIONS

| | Attorney | County | 1993 | 1992 | 1991 | 1990 | Total | Action Taken |
|---|---|---|---|---|---|---|---|---|
| 1 | Poss, David | Knox | $60,835 | $21,690 | $26,290 | $ 2,310 | $111,125 | (1) $108,925 Collected |
| 2 | Talman, William | Knox | $17,295 | $18,462 | $11,147 | $20,123 | $ 67,027 | (1) $ 62,223 Collected |
| 3 | Reagan, Randall | Knox | $ 90 | $ 894 | $ 8,325 | $11,310 | $ 20,619 | (2) |
| 4 | Dearing, Andrew | Bedford | $ 675 | $ 6,480 | $ 9,955 | $ 3,235 | $ 20,345 | (2) |
| 5 | Slaughter, Thomas | Knox | $ 26 | 0 | $ 530 | $ 2,946 | $ 3,502 | (2) |
| 6 | Stovall, Robert | Bedford | $ 2,830 | $ 360 | 0 | 0 | $ 3,190 | (2) |
| 7 | Bergmann, Paul | Hamilton | $ 1,377 | $ 1,416 | 0 | 0 | $ 2,793 | $ 2,793 Collected |

Notes:

(1) The attorney declined to be interviewed, and documentation has not been collected from the attorney to support the hours claimed. At the request of the District Attorney General for the 20th Judicial District (Davidson County), questioned fee petitions were not sent to the attorney to request explanations for the apparently excessive billings.

(2) The attorney has been advised of the apparently excessive billing amount, and collection efforts are proceeding.

*INTERVIEWS*

Interview with Mr. Charles Ferrell, Executive Director of the Administrative Office of the Courts

Mr. Charles Ferrell, the current Executive Director of the Administrative Office of the Courts, was interviewed on July 27 and November 23, 1994. Mr. Ferrell acknowledged that one of the greatest problems with the indigent criminal justice system was the lack of uniformity among the districts in filing fee petitions.

When questioned about the Administrative Office of the Courts' failure to adequately review fee petitions, Mr. Ferrell stated that his staff did not have an adequate system in place to scrutinize the fee petitions for unreasonable hours billed in a single day or to detect multiple billings for the same case. However, he stated that the office plans to implement computer software to maintain records of billings received and to enable staff to monitor for multiple billings or unreasonable hours. He also stated that he anticipates the cost of implementing this software will not exceed $10,000 and that it will be implemented by July 1, 1995.

When asked about judges' responsibility to review claims, Mr. Ferrell said that the elected judges should be reviewing fee petitions to ensure that the hours billed are reasonable and that the attorneys were appointed to the indigent defendants. According to Mr. Ferrell, special judges should not be signing fee petitions, although this activity is not in violation of the Administrative Office of the Court's policies and procedures or of state law, because the special judges would not likely be familiar enough with the cases to adequately review the related claims.

Summary of Our Interviews with the Attorneys

The response we received from the attorneys was generally that they inadvertently listed erroneous hours or dates on their fee petitions. Many attorneys admitted failing to maintain adequate records of time spent on cases. Others stated that it was nearly impossible to accurately divide times between defendants because of the large number of cases handled in a single day. The attorneys generally stated that although the hours on a particular day may have been incorrectly reported on their fee petitions, they believed that they had served those hours on other days. In addition, the attorneys stated that they had spent many hours on cases without compensation which would offset any time not properly prorated. In regard to incorrect hours and dates indicated on claims, many attorneys stated that because cases can continue for up to two years before being disposed of and because the attorney must wait until the disposition of the case to fill out the fee petition, errors are likely to occur.

Interviews with Judges in Knoxville

During the last weeks of July and the first week of August 1994, all four Knox County general sessions court judges and two of the three criminal court judges were interviewed. The third criminal court judge was interviewed in January 1995. In addition, District Attorney General Randall Nichols (Knox County), who was a former criminal court judge, was interviewed. None of the judges nor General Nichols recalled giving any attorneys instructions on



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 69 of 153 PageID #: 3840

former Director of the Indigent Compensation Unit. The clerks used the procedures and the language in Rule 13 as the basis for their answers. The two clerks of the Indigent Compensation Unit currently report to the Director of Fiscal Services, Mr. Tim Townsend.

Interview with Ms. Georgia Wilson (former Director of the Indigent Compensation Unit of the Administrative Office of the Courts)

On September 22, 1994, when we interviewed Ms. Wilson, she did not recall the distribution of the "Compensation Procedures for Counsel of Indigent Defendants." She also did not recall any direct mailings to attorneys. Ms. Wilson stated that she would refer most of the attorneys calling into the office with questions to *Tennessee Code Annotated* and that in her opinion, the code clearly states that attorneys should prorate their time.

Regarding the Indigent Compensation Unit's review of fee petitions, Ms. Wilson stated that the various fee petitions from one attorney were not organized together to be reviewed but rather were reviewed individually from the stacks of fee petitions submitted. She said that her unit consisted of three to four clerks reviewing the numerous claims and that each clerk was assigned a stack of claims. According to Ms. Wilson, partial information from the claims (defendant and docket number) were put on three- by five-inch index cards. Each new claim reviewed would then be compared to the information on other claims submitted by attorneys. The claims were kept in card files to control duplicate billings.

## *WEAKNESSES IN THE INTERNAL CONTROL STRUCTURE*

The following weaknesses in the internal control structure of the Administrative Office of the Courts resulted in the payment of overbilled fee petitions:

1. The Administrative Office of the Courts' internal control structure did not provide for the proper analysis of fee petitions. Specifically, fee petitions submitted by an attorney were not matched with others submitted by the attorney to establish the total hours the attorney had claimed for a single day. A single fee petition may look reasonable on the surface, that is the hours claimed may appear appropriate. But a comparison of that petition with others might reveal multiple claims and unreasonable hours.

2. Staff were able to override computer controls which would have otherwise prohibited duplicate payments for claims. Document numbers effect these controls. The office's computer essentially will not allow more than one payment to be processed for a single docket number. Occasionally two payments are required for one docket number. One docket number is sometimes used for cases involving codefendants with separate counsel. One number might also be used for cases that have been closed but are reopened following the defendant's violation of his/her probationary terms. Under both these circumstances, a second claim for a single docket number would be warranted. Therefore, the staff would add letters

to the docket numbers in their files to enable two payments to be processed. In our review of the petitions defined as excessive, we noted that staff had overridden the computer controls on one occasion, which resulted in a duplicate payment to an attorney. The two claims had not been submitted at the same time. Staff added a letter to the docket numbers of the second claim without verifying the reason for the second claim, and a subsequent payment was made to the attorney for services which had already been paid. The submission of the second claim by the attorney appeared to be an inadvertent error.

It was also noted that the fee petition forms did not include a space for the disclosure of amounts indigent defendants were ordered to pay appointed attorneys. These payments should offset any fees owed by the state. Once a defendant is determined indigent by the court and seeks counsel, a public defender or private attorney is appointed to represent the indigent defendant. During the course of proceedings of the defendant's case, the defendant may gain employment. The courts may then deem that the defendant can bear some of the costs of representation and order the defendant to make payments to the court or to the appointed attorney. If payments from indigent defendants are not indicated on the claim form to allow the staff to offset any amounts owed to the attorney by the state, the state may overpay the attorney.

### *CHANGES IMPLEMENTED BY THE SUPREME COURT*

On August 17, 1994, the Supreme Court of Tennessee at Nashville created the Indigent Defense Commission of the Supreme Court to establish a constitutional, adequate, and effective indigent criminal justice system. The commission was formed in response to a petition submitted to the Supreme Court on October 5, 1993, by the Tennessee Bar Association, the Tennessee Association of Criminal Defense Lawyers, the Tennessee Trial Lawyers Association, the Criminal Justice Funding Crisis Group, the Tennessee District Public Defenders Conference, and the Capital Case Resource Center of Tennessee. The commission consists of 11 members appointed by the Court and is responsible for developing and recommending to the Court a comprehensive plan for the delivery of legal services to indigent defendants in the state court system. According to this plan, the commission will collect information regarding cases, set standards and reasonable compensation for appointed counsel, determine the total funds to be budgeted to represent indigent defendants, and prepare appropriate procedures for reviewing claims submitted by private attorneys.

Effective September 1, 1994, Rule 13(2)(B) of Rules of the Supreme Court was amended to change the maximum hourly rates and maximum compensation to be paid to private attorneys. The maximum hourly rate for out-of-court services was raised from $20 to $40 an hour, and that for in-court services from $30 to $50 an hour. The maximum compensation per claim for misdemeanor cases was raised from $100 to $200; for adult and juvenile felony cases in general sessions and municipal courts, from $500 to $1,000; and for all other adult and juvenile felony cases, from $1,000 to $2,000.



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 71 of 153 PageID #: 3842

Effective January 1, 1995, Rule 11(2) of Rules of the Supreme Court was amended to bring uniformity to the system in which district attorneys assign case numbers. The amendment defines a criminal case as "a criminal proceeding against one individual at one level of court." Accordingly, all charges consolidated into a single proceeding will be included under one case (docket) number. Consolidating the charges will essentially eliminate an attorney's ability to bill multiple times for the same charges.

## RECOMMENDATIONS

The Administrative Office of the Courts should implement the following recommendations:

- Revise the billing and billing review procedures for cases disposed of at the general sessions level, given the lack of proper record keeping by attorneys, the lack of review of fee petitions by judges, and the inherent setting of the general sessions courts which does not always permit a case to be followed exclusively by one judge
- Establish guidelines for judges' reviews and distribute those guidelines as well as policies and procedures manuals to all judges for dissemination to appointed attorneys
- Consider revising fee petitions to include defendant payments to appointed attorneys
- Ensure that the fee petitions processed by the accounting clerks are adequately reviewed by the supervisor of the Indigent Claims Division and that duplicate billings are not paid
- Consider the necessity of using special judges and establish guidelines for appointing counsel and signing fee petitions
- Continue its efforts to evaluate and implement computer software which will enable the office to adequately monitor the numerous fee petitions submitted for payment



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 72 of 153 PageID #: 3843

## APPENDIX

### ABA Formal Ethics Opinion 93-379, December 6, 1993

"Consistent with the Model Rules of Professional Conduct, a lawyer must disclose to a client the basis on which the client is to be billed for both professional time and any other charges. Absent a contrary understanding, any invoice for professional services should fairly reflect the basis on which the client's charges have been determined. In matters where the client has agreed to have the fee determined with reference to the time expended by the lawyer, a lawyer may not bill more time that [sic] she actually spends on a matter, except to the extent that she rounds up to minimum time periods (such as one-quarter or one-tenth of an hour). A lawyer may not charge a client for overhead expenses generally associated with properly maintaining, staffing and equipping an office; however, the lawyer may regroup expenses reasonably incurred in connection with the client's matter for services performed in-house, such as photocopying, long distance telephone calls, computer research, special deliveries, secretarial overtime, and other similar services, so long as the charge reasonably reflects the lawyer's actual cost for the services rendered. A lawyer may not charge a client more than her disbursements for services provided by third parties like court reporters, travel agents or expert witnesses, except to the extent that the lawyer incurs costs additional to the direct cost of the third-party services."

"The first set of practices involves billing more than one client for the same hours spent. In one illustrative situation, a lawyer finds it possible to schedule court appearances for three clients on the same day. He spends a total of four hours at the courthouse, the amount of time he would have spent on behalf of each client had it not been for the fortuitous circumstance that all three cases were scheduled on the same day. May he bill each of the three clients, who otherwise understand that they will be billed on the basis of time spent, for the four hours he spent on them collectively? In another scenario, a lawyer is flying cross-country to attend a deposition on behalf of one client, expending travel time she would ordinarily bill to that client. If she decides not to watch the movie or read her novel, but to work instead on drafting a motion for another client, may she charge both clients, each of whom agreed to hourly billing, for the time during which she was traveling on behalf of one and drafting a document on behalf of the other? A third situation involves research on a particular topic for one client that later turns out to be relevant to an inquiry from a second client. May the firm bill the second client, who agreed to be charged on the basis of time spent on his case, the same amount for the recycled work product that it charged the first client?"

"The questions presented to the Committee require us to determine what constitute reasonable billing procedures; that is, what are the services and costs for which a lawyer may legitimately charge, both generally and with regard to the specific scenarios? This inquiry requires an elucidation of the Rule of Professional Conduct 1.5, and the Model Code of Professional Responsibility DR 2-106."

"A lawyer who spends four hours of time on behalf of three clients has not earned twelve billable hours. A lawyer who flies for six hours for one client, while working for five hours on behalf of another, has not earned eleven billable hours. A lawyer who is able to reuse old work product has not re-earned the hours previously billed and compensated when the work product was first generated. Rather than looking to profit from the fortuity of coincidental scheduling, the desire to get work done rather than watch a movie, or the luck of being asked the identical question twice, the lawyer who has agreed to bill solely on the basis of time spent is obliged to pass the benefits of these economies on to the client. The practice of billing several clients for the same time or work product, since it results in the earning of an unreasonable fee, therefore is contrary to the mandate of the Model Rules."

# ATTACHMENT

# TWO –

# *Tennessean* article

Citation | Search Result | Rank 8 of 10 | Database
6/7/95 TNNHVL 1B | | | TNNHVL
6/7/95 Tennessean-Nashville 1B
1995 WL 9038338

The Tennessean
Copyright 1995

Wednesday, June 7, 1995

Local

# Audit reveals lawyers' overcharges

DUREN CHEEK Staff Writer

State auditors say one lawyer billed the state 20 times for the same service. Two other attorneys frequently billed the state for more than 24 hours of service each in a single day.

Those were some of the practices state auditors say they uncovered as part of an audit of bills submitted to the state by attorneys appointed to represent indigent clients in criminal cases.

The audit by the state Comptroller's Office and the Tennessee Bureau of Investigation charged that seven attorneys overbilled the state $228,601 during a four-year period beginning in 1990.

Auditors said most of the overpayments went to two Knoxville lawyers, David Poss and William Talman. The audit said Poss had overbilled by $111,125 and Talman had overcharged by $67,027.

According to the audit, the other overpayments went to Randall Reagan of Knox County, $20,619; Andrew Dearing of Bedford County, $20,345; Thomas Slaughter of Knox County, $3,502; Robert Stovall of Bedford County, $3,190; and Paul Bergmann of Hamilton County, $2,793.

Efforts to reach the attorneys late yesterday were unsuccessful, but auditors reported talking to some of them.

''The response we received from the attorneys was generally that they inadvertently listed erroneous hours or dates" on bills, the audit said.

''Many attorneys admitted failing to maintain adequate records of time spent on cases. Others stated that it was nearly impossible to accurately divide times between defendants because of the large number of cases handled in a single day."

Still others said they were encouraged by judges to pad the number

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

of hours worked because of low pay at the time $20 an hour for out-of-court work and $30 an hour for in-court work.

The audit said the state has collected $108,925 from Poss, $62,223 from Talman, and $2,793 from Bergman and is proceeding with collection efforts on the others.

The audit recommended a number of changes, including revisions in billing and billing review procedures to prevent payment when bills for excessive fees are submitted.

Copies of the report have been submitted to the Board of Professional Responsibility, the state's disciplinary board for lawyers, and the district attorneys of the counties in which the seven lawyers practice.

Under the 30-year-old Indigent Defendants' Counsel program, an indigent defendant is required to make a sworn statement that he or she is financially unable to afford legal representation.

The law entitles appointed attorneys ''reasonable compensation and expenses. The compensation was $20 an hour for out of court work and $30 an hour for in-court work during the time of the audit.

The Administrative Office of the Courts paid $2.9 million in 1993 to 1,036 attorneys, psychologists and expert witnesses involved in cases in which the defendant was indigent.

The audit was initiated after the staff of the Administrative Office of the Courts noticed Bergmann had apparently overbilled for services rendered to an indigent client.

''The client had been charged with 20 counts, all of which were related to instances of aggravated burglary and theft of property, and all of which were tried in court at the same time," the audit said.

''However, the attorney submitted 20 separate fee petitions for this single indigent client with identical hours for all 20 counts. In effect, the attorney charged the state 20 times for the same services."

Bergmann blamed the snafu on a former secretary. He said she should have billed the state once for $144 but instead billed for $2,880.

''From our review of fee petitions submitted by the 24 individuals who had received payments exeeding $20,000 in 1993, we determined that the billing practices of seven attorneys included apparently

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

excessive hours which were paid," the audit said.

''In our review of fee petitions submitted for 1993, we found 148 days of apparently excessive billings for Mr. Poss and 81 days for Mr. Talman. Attorneys Poss and Talman frequently billed the state for over 24 hours of service in a single day."

Talman claimed to have worked up to 32.5 hours a day and Poss up to 75 hours a day.

---- INDEX REFERENCES ----

REGION: Tennessee; United States; North America (TN US NME)

Word Count: 667
6/7/95 TNNHVL 1B
END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

# ATTACHMENT

# THREE –

# Tennessee Supreme Court Order of Enforcement

FILED
NOV 24 1998
Clerk of the Courts

IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

IN RE: WILLIAM C. TALMAN, Respondent, An Attorney Licensed and Admitted to Practice Law in Tennessee (Knox County)

DOCKET NO. 98-1037-2-SG

01S01-9804-BP-00075

## ORDER OF ENFORCEMENT

This matter is before the Court upon the Board of Professional Responsibility's Petition for Discipline against the Respondent, William C. Talman. Respondent has submitted a Conditional Guilty Plea and the Board of Professional Responsibility has approved the plea. A copy of the Respondent's Conditional Guilty Plea is attached to this Order as Exhibit A.

It is therefore, **ORDERED, ADJUDGED and DECREED** that: William C. Talman's Guilty Plea is approved and entered for enforcement by this Court. The Respondent, William C. Talman, is suspended from the practice of law for a probationary period of eleven months, twenty nine days, with all time suspended, conditioned upon the absence of any finding by a court, the Board of Professional Responsibility or Hearing Panel during this eleven month, twenty nine probation that the Respondent has violated the Code of Professional Responsibility.

If a finding is made by any court, the Board of Professional Responsibility or Hearing Panel during this eleven month, twenty nine day probationary period that the Respondent has violated the Code of Professional Responsibility, then the Respondent's probation shall be immediately revoked and his suspension from the practice of law will be for the entire period of eleven months, twenty nine days, taking immediate effect.

It is further **ORDERED, ADJUDGED and DECREED** that the Respondent shall have a monitor, Julie Martin, who shall review Respondent's fee petitions and shall make monthly reports to the Board of Professional Responsibility for the probationary period regarding the Respondent's compliance.

It is further **ORDERED, ADJUDGED and DECREED** that the Respondent shall attend the Board of Professional Responsibility's Ethics School and a continuing legal education course regarding ethics and professionalism in criminal defense litigation. The Respondent shall also be available to the Board of Professional Responsibility for two (2) speaking engagements regarding the Respondent's previous inappropriate fee petitions.

It is further **ORDERED, ADJUDGED and DECREED** that the Respondent shall pay the costs of these proceedings in the amount of $622.67, for which execution may issue if necessary.

The Board of Professional Responsibility shall cause notice of this suspension to be published pursuant to Section 18.5 of Rule 9.

Entered this 24th day of November, 1998.

FOR THE COURT:

Adolpho A. Birch, Jr., Justice

APPROVED FOR ENTRY:

Sandy Garrett
Sandy Garrett, BOPR #13863
Disciplinary Counsel
1101 Kermit Drive, Suite 730
Nashville, TN 37217

TalmanOrdEnf.SG

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED BY MARTHA PHILLIPS, CLERK
2006 JAN 27 AM 11:30
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MOTION FOR CONTINUANCE OF EVIDENTIARY HEARING UNTIL AFTER THE 2006 JUDICIAL ELECTIONS**

Christa Gail Pike, by counsel, pursuant to Article I, §§ 8, 9, 16, and 17, Article XI, § 8 of the Tennessee Constitution, Amendments 4, 5, 6, 8 and 14 to the United States Constitution, T.C.A. 40-30-201, *et seq.*, her rights to a full and fair hearing and due process, submits this motion to continue the evidentiary hearing currently set for February 27, 2006, until after the 2006 judicial elections.

**MEMORANDUM IN SUPPORT OF MOTION TO CONTINUE**

The concept that a party is entitled to have her case heard and decided by an independent and unencumbered judicial officer is fundamental to the administration of justice. *See* Tenn. Sup. Ct. R. 10, Preamble ("Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us."); *Summers v. Thompson*, 764 S.W.2d 182, 188 (Tenn. 1988)(an independent judiciary is "one of the most

fundamental principles of American constitutional government"). As set out below, Ms. Pike submits that no elected jurist can remain unaffected by the pressures of an upcoming election.

While there may be valid reasons for maintaining an elected judiciary, the election of judges does presents a serious challenge to the independence of the judiciary and has been severely criticized. As noted by Justice O'Connor, in *Republican Party of Minnesota v. White*, 536 U.S. 765, 788-789, 122 S.Ct. 2528, 2542, 153 L.Ed.2d 694 (2002), "if judges are subject to regular elections they are likely to feel that they have at least some personal stake in the outcome of every publicized case." The American Bar Association has repeatedly questioned the election of judges and recommended a "merit system" appointment process. *See An Independent Judiciary, Report of the Commission on Separation of Powers and Judicial Independence, Executive Summary*, http://www.abanet.org/govaffairs/judiciary/execprob.html. The ABA Commission on Separation of Powers and Judicial Independence notes that, "Retention elections (in which judges run unopposed) and reelections (in which opponents are permitted) have resulted in judges being challenged, and in some cases turned out of office, for unpopular decisions in individual cases." *Id.* This danger is particularly strong in a high profile death penalty post-conviction in which the decision to set aside the conviction or sentence falls squarely on the shoulders of a single judge. Beyond question Ms. Pike's case is high profile. Even the most mundane of pre-hearing proceedings has brought out the media. Local media regularly produce stories about Ms. Pike's case.[1] Ms. Pike emphasizes that this motion is by no means a personal attack on the integrity of the Court. Rather, it is premised on human nature and

[1] During the current month, January 2006, counsel for Ms. Pike have been contacted by a writer for the *Metro Pulse* newspaper regarding a planned article on the 10th anniversary of Ms. Pike's trial.

the inability of any person to be oblivious to the fact that granting relief to a death sentenced inmate may have adverse political consequences.[2]

Justice O'Connor recognized this reality in her concurring opinion in *Republican Party of Minnesota v. White*, 536 U.S. at 788-789, 122 S.Ct. at 2542, in which she wrote:

> We of course want judges to be impartial, in the sense of being free from any personal stake in the outcome of the cases to which they are assigned. But if judges are subject to regular elections they are likely to feel that they have at least some personal stake in the outcome of every publicized case. Elected judges cannot help being aware that if the public is not satisfied with the outcome of a particular case, it could hurt their reelection prospects. *See* Eule, *Crocodiles in the Bathtub: State Courts, Voter Initiatives and the Threat of Electoral Reprisal*, 65 U. Colo. L.Rev. 733, 739 (1994) (quoting former California Supreme Court Justice Otto Kaus" statement that ignoring the political consequences of visible decisions is "'like ignoring a crocodile in your bathtub'"); Bright & Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 B.U.L.Rev. 759, 793-794 (1995) (citing statistics indicating that judges who face elections are far more likely to override jury sentences of life without parole and impose the death penalty than are judges who do not run for election). Even if judges were able to suppress their awareness of the potential electoral consequences of their decisions and refrain from acting on it, the public's confidence in the judiciary could be undermined simply by the possibility that judges would be unable to do so.

Justice Stevens addressed the political reality for judges making the final decision in imposing the death penalty in his dissenting opinion in *Harris v. Alabama,* colorfully noting,

> The "higher authority" to whom present-day capital judges my be "too responsive" is the political climate in which judges who covet higher office -- or who merely wish to remain judges -- must constantly profess their fealty to the death penalty . . . .
> The danger that they will bend to political pressures when pronouncing sentence in highly publicized capital cases is the same danger confronted by judges beholden to King George III.

---

2 On point is the defeat of former Tennessee Supreme Court Justice Penny White in 1996.

513 U.S. 504, 520, 115 S.Ct. 1031, 1039, 130 L.Ed.2d 1004 (1995) (Stevens, J., dissenting). While Justice Stevens was specifically referring to the Alabama practice of the judge having complete sentencing authority in capital cases, including complete authority to override a jury decision for a life sentence, his comments are equally applicable to judicial decisions concerning whether to set aside a conviction or death sentence on post-conviction.

Professor Julian Eule quite aptly defined the issue in his University of Colorado Law Review article examining the perils for elected judges in ruling on the constitutionality of voter initiatives. Professor Eule reported that two former California Supreme Court justices had acknowledged the likelihood that subconsciously they may have been affected by voter pressure in ruling on voter initiatives. Eule, *Crocodiles in the Bathtub: State Courts, Voter Initiatives and the Threat of Electoral Reprisal*, 65 U. Colo. L.Rev. 733, 739 (1994). He further reported that a then recent survey in 10 states in which judges periodically face retention elections had found a "high percentage of judges [] acknowledge that retention elections exert a major influence on their behavior." *Id.* In fact, 27.6 % stated that facing election made them "more sensitive to public opinion" and 15.4 % conceded that facing election "prompts them to "avoid controversial cases and rulings.'" *Id.* Finally, "the survey suggests 'that fear of losing plays a role even when losing is highly unlikely.'" *Id.* While these figures discuss the general effect that the election of judges has on judicial decision making, Ms. Pike's case involves a more specific and immediate problem: whether a judicial election within six months of the hearing impermissibly taints the outcome of the case or, more aptly, raises a question about its fairness. The reported statement of one of the former California Supreme Court justices referenced above poignantly speaks directly to this question. As Professor Eule explains:

> A judge may hope that conscience will triumph over retention anxiety, but as Otto Kaus put it so well, ignoring the political consequences of visible decisions is "like ignoring a crocodile in your bathtub." [footnote omitted] The ability to ignore the crocodile, of course, doubtless depends on how long before one has to bathe.

*Id.* (emphasis added). In the instant matter, the Court must bathe only once every eight years; however, that time will be within six months of the scheduled hearing.

The adverse effect on judicial careers of making unpopular decisions in death penalty cases has been well documented. In 1986, three justices on the California Supreme Court lost retention elections when the Governor challenged them due to decisions overturning death sentences. Bright & Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 B.U.L.Rev. 759, 760-761 (1995) In Texas in the Republican Party decided to take over the courts by running pro death penalty campaigns after the Texas Court of Criminal Appeals reversed the death penalty in a particularly notorious case. *Id.* at 761-762. Similarly two justices were voted off the Mississippi Supreme Court for allegedly being soft on the death penalty for a ruling that the death penalty was not permitted in the case of a rape that did not result in the loss of life. Neither the voters nor the opponents of the judges were appeased by the fact that the United States Supreme Court had declared the death penalty unconstitutional in such cases over ten years before, thus binding the hands of the Mississippi court. *Id.* at 763-765.

Much closer to home, in 1996, Tennessee Supreme Court Justice Penny White stood for a retention vote. In the June prior to the election, she concurred in the opinion that affirmed the conviction of Richard Odom but reversed his death sentence. In fact, the court was unanimous that the sentence had to be set aside; however the Justices disagreed, in part, on the reason. *State*

*v. Odom*, 928 S.W.2d 18 (Tenn. 1996). At the time, Justice White was the newest member of the Court and the only member facing a retention vote. Justice White was attacked for the decision she did not write and that campaign lead to her defeat and removal from the Court. *See*, Bright, *Can Judicial Independence Be Attained in the South? Overcoming History, Elections, and Misperceptions About the Role of the Judiciary*, 14 Ga. State L. Rev. 817, 847-848 (1998). The same groups that successfully attacked Justice White, then went after United States District Court Judge John Nixon, successfully obtaining a vote in the Tennessee Senate urging the United States Congress to begin impeachment proceedings against Judge Nixon and a resolution in the Tennessee House of Representatives urging that Judge Nixon not be permitted to hear any more death penalty cases. *Id.* at 854-855. Both houses of the Tennessee Legislature ignored the fact that neither one had any jurisdiction over Judge Nixon or the federal courts making the time spent on both resolutions a complete waste of their time and the money of Tennessee taxpayers. They also ignored the fact that the United States Court of Appeals for the Sixth Circuit had upheld the very decisions for which the public was clamoring for Judge Nixon's impeachment. While the vote in the Tennessee legislature was certainly a waste of time for any practical purpose, the members of our legislative body understood all too well the politics of the death penalty. The distinction between the role of the legislature and the role of the courts is that while the legislature's actions are bound by neither legal precedent nor logic, a court's opinions and decisions are bound by both. As Justice White and the other jurists mentioned above discovered, following the law and precedent in death penalty cases, all too often leads to ouster from office.

What is particularly important about the turbulent seas faced by judges who make unpopular decisions in death penalty cases is that those decisions are necessarily compelled by

the facts of the cases and by clear legal precedent; yet these necessities of the law are irrelevant to those who attempt to remove the judges who were forced by their judicial oaths to grant relief in high profile capital cases. The history of the electoral defeat of judges who make unpopular decisions in death penalty cases offers strong support of the position of the American Bar Association advocating that judges, given their unique role in our constitutional system of checks and balances should not stand for election. It is this undue pressure on elected judges which undermines their independence that, in part, drives the opinion of the American Bar Association opposing the election of judges and favoring a merit selection system. *See Republican Party of Minnesota v. White*, 536 U.S. at 787-788, 122 S.Ct. at 2541, *citing* ABA Model Code of Judicial Conduct, Canon 5(C)(2), Comment (2000) ("('[M]erit selection of judges is a preferable manner in which to select the judiciary'); An Independent Judiciary: Report of the ABA Commission on Separation of Powers and Judicial Independence 96 (1997) ('The American Bar Association strongly endorses the merit selection of judges, as opposed to their election .... Five times between August 1972 and August 1984 the House of Delegates has approved recommendations stating the preference for merit selection and encouraging bar associations in jurisdictions where judges are elected ... to work for the adoption of merit selection and retention')").

## CONCLUSION

Ms. Pike submits that for the reasons set forth above the independence of this court's decision making in this high profile death penalty case remains under a cloud until after the upcoming judicial elections. Therefore, to avoid any appearance of unfairness or impropriety this Court must continue the hearing in this case until after the upcoming judicial election.

Respectfully submitted,

Donald E. Dawson, BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR # 18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
Tel.: (615) 741-9331
Fax: (615) 741-9430

Counsel for Christa Gail Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing motion sent by UPS, to Assistant District Attorney Leland Price, Office of the District Attorney General, 400 Main Street, Suite 168, Knoxville, TN 37901, on this the 26th day of January, 2006.

Donald E. Dawson

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

FILED
BY MARTHA PHILLIPS, CLERK
2006 JAN 27 AM 11:31
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITIONER'S FURTHER AMENDMENTS TO PETITION FOR POST-CONVICTION RELIEF

Petitioner Christa Pike, through counsel, files these further amendments to her petition for post-conviction relief from her 1996 first degree murder and conspiracy convictions and death sentence. For the reasons outlined below, in addition to those claims raised in Ms. Pike's *pro se* petition and prior amendments, Ms. Pike's conviction and sentence are void or voidable due to violations of her rights guaranteed by the Constitution of Tennessee and the Constitution of the United States. See Tenn. Code Ann. § 40-30-103.

Ms. Pike hereby adopts, by reference, all of the claims previously raised in her *pro se* petition, Amendments to Petition for Post-Conviction Relief, and Secondary Amendments to Petition for Post-Conviction Relief, with the following exception: Ms. Pike specifically withdraws all claims concerning allegations of a relationship between Assistant District Attorney General William Crabtree and Ms. Pike's trial mitigation expert, Diana McCoy, Ph.D. (See Secondary Amendments, Part I, Ineffective Assistance of Counsel, A(3) and B, and Part II, Prosecutory Misconduct.) Ms. Pike submits the following additional claim for relief:

## I. TRIAL COURT'S VIOLATION OF PETITIONER CHRISTA PIKE'S CONSTITUTIONAL RIGHT TO CONFLICT-FREE COUNSEL

From the day of his appointment as lead trial counsel for Ms. Pike, through the conclusion of proceedings in the trial court before the beginning of direct appeal, attorney William Talman worked under an actual conflict of interest. The Office of the Comptroller for the State of Tennessee investigated Mr. Talman for over billing the state in his claims for reimbursement from the indigent defense fund for his work in appointed cases. The three criminal court judges for Knox County – including this Court – were interviewed as part of the investigation. The interviews had been conducted by the end of January 1995. The Comptroller's report on the investigation was issued in late May 1995. In the report, Mr. Talman is specifically mentioned as one of the most egregious offenders in the over billing practices.

This Court appointed Mr. Talman to represent Ms. Pike on or about May 23, 1995. On information and belief, the findings of the Comptroller were published in three major Tennessee newspapers – including the *Knoxville News Sentinel* – on June 7, 1995. In light of the facts that the Court was interviewed as part of the investigation and that the results of the investigation were published in the local newspaper, Ms. Pike must believe that the Court knew of Mr. Talman's over billing. At no time during the course of pre-trial, trial or post-trial proceedings in Ms. Pike's capital case did this Court inquire of Ms. Pike (1) whether she was aware that Mr. Talman was the subject of a state investigation; (2) whether she was aware that Mr. Talman had repaid to the Knox County Office of the District Attorney General more than $60,000 in over billed fees; and (3) whether she waived the conflicts arising from this state of affairs. The Court violated Ms. Pike's constitutionally guaranteed right to conflict-free counsel in two ways: first, in failing to ensure that Ms. Pike was informed of the actual conflict of interest infecting Mr.

Talman's representation of her and second, by failing to obtain from Ms. Pike a knowing and intelligent waiver of the conflict before allowing Mr. Talman to remain on the case.

Ms. Pike has not waived this claim. Mr. Talman represented Ms. Pike during the trial proceedings and throughout the direct appeal. Those proceedings ended on June 1, 1999, with the denial by the United States Supreme Court of Ms. Pike's petition for certiorari. The conflict was not resolved until the Tennessee Supreme Court entered its Order of Enforcement on November 24, 1998. Consequently, these post-conviction proceedings present Ms. Pike with the first opportunity to raise this issue.

## CONCLUSION

For the foregoing reasons, Petitioner Christa Pike submits that she is entitled to an evidentiary hearing on all claims and to have her conviction and sentence set aside.

Respectfully Submitted,

Donald E. Dawson, BPR No. 010723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR No. 018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331 / FAX (615) 741-9430

Counsel for Petitioner Christa G. Pike

## CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing Motion has been sent via UPS overnight delivery to Leland Price, Office of the District Attorney General, 6th Judicial District, 400 Main Street, PO Box 1468, Knoxville, Tennessee 37901-1468 on this the 26th day of January, 2006.

Catherine Y. Brockenborough

# IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
## DIVISION III

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

FILED 2006 FEB - AM 11:21 BY MARTHA PHILLIPS, CLERK KNOX COUNTY CRIMINAL COURT KNOXVILLE, TN

## MOTION NOT TO HOUSE MS. PIKE AT KNOX COUNTY PENAL FARM FOR WOMEN

Christa Gail Pike, by counsel, for the reasons set forth below, moves this Honorable Court to enter an Order requiring that Ms. Pike not be housed at the Knox County Penal Farm for Women during her required presence at any proceeding in this matter. Ms. Pike and her counsel have learned that there have been both specific and non-specific threats made against Ms. Pike by both staff and inmates at the Knox County facility.

Ms. Pike and her counsel have been told that an inmate at the Penal Farm for Women overheard a corrections officer commenting that "if Christa comes back she needs to be placed in protective custody because there are lots of people who want to hurt her, guards and inmates alike." In addition, a current inmate at the Knox County Penal Farm, Sonnie Graves, was a student at Job Corps in Knoxville at the time of the incident in this case and was a friend of the victim, Colleen Slemmer. The informant who provided this information to Ms. Pike and her counsel has advised that Ms. Graves told the informant that she plans to do to Christa what Christa did to Colleen.

Further, Ms. Pike has indicated that the most logical alternatives to confinement in the Knox County Penal Farm for Women are the county facilities for women in either Sevier County or Blount County. It is Ms. Pike's understanding that the Sevier County facility is presently overcrowded and she suggests that she be housed at the Blount County Jail during any court proceedings in this matter that require her presence.

Respectfully submitted,

Donald E. Dawson, BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR #18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
Tel.: (615) 741-9331
Fax: (615) 741-9430

Counsel for Christa Gail Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing motion sent by UPS, to Assistant District Attorney Leland Price, Office of the District Attorney General, 400 Main Street, Suite 168, Knoxville, TN 37901, on this the 31st day of January, 2006.

Donald E. Dawson

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB -1 AM 11:22
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**PETITIONER'S RENEWED MOTION TO DISQUALIFY THE OFFICE OF THE KNOX COUNTY DISTRICT ATTORNEY GENERAL**

Petitioner, Christa Gail Pike, by counsel, pursuant to Article I, §§ 8, 9, 16, and 17 and Article XI, § 8 of the Tennessee Constitution, Amendments 6, 8 and 14 to the United States Constitution, her rights to a full and fair hearing and due process of law, moves this Court to issue an Order disqualifying the Office of the Knox County District Attorney General from further involvement in this matter.

On or about, March 2, 2002, Ms. Pike filed her Motion to Disqualify Office of Knox County District Attorney General Because of a Variety of Conflicts of Interest and Appearances of Impropriety Each of Which Alone Mandates Disqualification. In light of the change in counsel and the intervening proceedings involving Ms. Pike's attempts to withdraw her petition, the undersigned are renewing the motion and relying on issues that have not been rendered moot in the interim period.[1]

District Attorney General Nichols, his assistants William Crabtree and William Jeff Blevins,

[1] Issues included in the prior motion to recuse members of the Knox County District Attorney's Office not repeated herein have been abandoned by Petitioner.

and perhaps unknown others are essential witnesses in this matter. Sometime between March 15, 1994, and November 24, 1998,[2] Mr. Nichols and other members of his staff, believed to include at least William Crabtree, met with representatives from the Comptroller of Treasury to discuss allegations of over billing of the indigent defense fund by other members of the Knox County bar. Included among the attorneys under investigation was William Talman, the lead trial and direct appeal attorney for Ms. Pike. On or about April 25, 1995, the Office of the Knox County District Attorney General collected a total of $171,148, including $62,223 from Mr. Talman which sum was collected on or about April 25, 1995. (Comptroller's Report at 9 and Snodgrass letter, page 2.)

The May 31, 1995, Special Report of the Comptroller of the Treasury, Department of Audit, Division of Audit indicates that the actions of Mr. Talman could subject him to criminal prosecution. Upon information and belief, the issue of possible prosecution was discussed with Mr. Nichols and/or members of his staff, including but not limited to Mr. Crabtree. The matter of Mr. Talman's over billing of the indigent defense fund was not finally resolved until November 24, 1998, at which time the Tennessee Supreme Court entered an Order of Enforcement approving Mr. Talman's conditional guilty plea. Notice of the Order of Enforcement was published pursuant to Tenn. S. Ct. R. 9 § 18.5. The trial in Ms. Pike's case was held in March 1996. Mr. Talman was appointed to represent Ms. Pike on May 23, 1995. (Technical Record, Case No. 58183, Vol. I, p.8, Order of Appointing Legal Counsel.) His representation ended with the denial of a writ of certiorari by the United States Supreme Court on June 1, 1999. Pike v. Tennessee, 526 U.S. 1147, 119 S.Ct. 2025, 143 L.Ed.2d 1036 (1999).

[2] March 15, 1994, was the date on which the possible improper billing by private attorneys paid by the indigent defense fund was reported to the Comptroller of the Treasury. November 24, 1998, was the date that the Order of Enforcement concerning Mr. Talman was entered by the Tennessee Supreme Court.



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 97 of 153 PageID #: 3868

Whether conflicts of interest affected Mr. Talman's representation of Ms. Pike is an important claim in this post-conviction proceeding. District Attorney General Nichols and others from his office are therefore indispensable witnesses in this matter. In addition, Mr. Blevins has represented to the undersigned attorneys that the Office of the Knox County District Attorney General has no records pertaining to their collection from Mr. Talman of the $62,223 he had purloined from the indigent defense fund. Whether such records exist is also now an issue in this matter which will require the testimony of Mr. Blevins.

Furthermore, when this Court appointed Mr. Talman to represent Ms. Pike, Mr. Nichols – as the District Attorney General – and Mr. Crabtree and Ms. Helm – as the prosecutors in Ms. Pike's case – had a duty to inform the Court of the conflict of interest that would affect Mr. Talman's representation in the case.[3] See, e.g., Tenn. S. Ct. R. 8, RPC 3.8. Their failure to inform the Court may be a serious issue in this post-conviction proceeding.

Finally, Mr. Crabtree and Ms. Helm were witnesses to Mr. Talman's representation to the Court concerning the timing of his receipt of Dr. McCoy's three-volume mitigation study. This representation occurred during the in-chambers, off-the-record meeting that immediately followed the return of the guilt phase verdict. As a result, both Mr. Crabtree and Ms. Helm are potential witnesses on this issue at the post-conviction hearing.

For all these reasons, the Knox County District Attorney General must withdraw from this case and his entire office must be disqualified from further representation of the State in this matter. See Tenn. S. Ct. R. 8, RPC 3.7.

---

3 If, however, the existence of the conflict was so recognized that the Court clearly knew the same information that was known by the Knox County District Attorney, that office's duty toinform the Court arguably ceased to exist.

## LEGAL ARGUMENT

The leading Tennessee case on the issue of when to disqualify a district attorney general is State v. Tate, 925 S.W.2d 548 (Tenn.1995). In Tate, a defendant indicted for several crimes, including murder, moved the trial court to disqualify the district attorney's office. The trial court denied the request and the defendant appealed. The Court of Criminal Appeals reversed the lower court's decision, finding both that the district attorney general had an actual conflict of interest and the existence of the appearance of impropriety. The court also found that the circumstances of the case further necessitated disqualification of the whole office.

Tate soundly places the decision to disqualify a district attorney and, if necessary, the entire district attorney's office, within the discretion of the trial court. Tate, 925 S.W.2d at 549. Tate also articulated the considerations a trial court is to weigh when determining whether a district attorney general should be disqualified. Two years after the Tate decision, the Court of Criminal Appeals relied on these standards when it found that the trial court had erred in failing to disqualify the district attorney's office from prosecution in a case. State v. Mason, 1997 WL 311900 (Tenn.Crim.App.)(copy attached). The Mason court discussed the Tate factors:

> In evaluating whether disqualification is necessary, three considerations are relevant. First, we must consider whether the circumstances establish an actual conflict of interest; if so, there must be disqualification. If no actual conflict is discovered, we must determine whether there is an appearance of impropriety warranting disqualification. Finally, if disqualification is required **under either theory**, we must consider whether the entire staff of the district attorney's office must be disqualified.

Mason, at 6 (citations omitted)(emphasis added).

The Tennessee Supreme Court confirmed its earlier Tate holding in State v. Culbreath, 30 S.W.3d 309 (Tenn.2000). The Court directed therein:

> In determining whether to disqualify a prosecutor in a criminal case, the trial court must determine whether there is an actual conflict of interest which includes any circumstances in which an attorney cannot exercise his or her independent judgment free of "compromising interests and loyalties." See Tenn. R. Sup.Ct. 8, EC 5-1. If there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety. See Tenn. R. Sup.Ct. 8, EC 9-1, 9-6.
>
> If disqualification is required under either theory, the trial court must also determine whether the conflict of interest or appearance of impropriety requires disqualification of the entire DA's Office. See State v. Tate.

Culbreath, 30 S.W.3d at 312-313.

Accordingly, this Court must determine whether there is an actual conflict of interest or whether an appearance of impropriety exists. Either one of these factors warrants disqualification of Mr. Nichols, Mr. Blevins, Ms. Helm, and/or Mr. Crabtree. If the Court concludes that any of these parties are disqualified, the Court must then determine whether the entire Office of the Knox County District Attorney must also be disqualified.

Mr. Nichols, Mr. Crabtree, Mr. Blevins and possibly Ms. Helm[4] are essential witnesses concerning the issue of Mr. Talman's defrauding the indigent defense fund and the threat of criminal prosecution that hovered about him before, during, and after his representation of Ms. Pike in the trial for her life. The need for this testimony creates a conflict of interest between the duty Mr. Nichols and his office owes to their client, the State of Tennessee, and the need in these post-conviction proceedings to ensure the inviolability of Ms. Pike's constitutional guarantees. This conflict cannot be overcome without disqualifying the office, since the testimony in question will be prejudicial to the interest the State of Tennessee has in maintaining Ms. Pike's conviction and death sentence. Consequently, this Court must disqualify the Office of the Knox County District Attorney

4 Because Assistant Attorney General Helm was a member of the prosecution team, Ms. Pike infers that Ms. Helm has knowledge of these issues as well.

General.

Having District Attorney General Nichols and a number of his assistants called by Petitioner to testify as material witnesses in this matter while another assistant from the same office prosecutes the case creates an unacceptable appearance of impropriety.[5] One commentator has described the duties inherent in the office of a prosecuting attorney and the relationship between those duties and improper conduct:

> To ensure and maintain public confidence in the integrity of the government, public officials, including prosecutors, must act impartially and responsibly. Government officials must be held to high ethical standards to make certain their activities are conducted in the public's interests. Furthermore, 'governments have a responsibility to the public to avoid even the appearance of impropriety and to act to reduce the opportunities and incentives for unethical behavior by their officials and employees.' This is true of the prosecuting attorney because 'an appearance of impropriety on the part of a government attorney will inevitably harm not only the individual attorney, but also the entire system of government that allows such improprieties to take place.'

Flowers, What You See is What You Get: Applying the Appearance of Impropriety Standard to Prosecutors, 63 Mo. L.Rev. 60, 68 (1998) (citations omitted), quoted in Culbreath, supra, at 316.

Serious questions exist as to the constitutional integrity of the proceedings leading to Christa Pike's convictions and death sentence. Consequently, the reliability of those convictions and the sentence of death are in grave doubt. The post-conviction process is designed to ferret out constitutional error to insure that a person sentenced to the ultimate punishment has been afforded every constitutional right necessary to ensure a fair trial and a just result. The United States Supreme Court famously stated, a prosecutor

---

[5] The significance of the potential for conflicts of interest to contaminate a prosecutor's representation is recognized by the profession at the national level. The ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-1.2 (3d ed. 1993) state that "[a] prosecutor should avoid the appearance or reality of a conflict of interest with respect to official duties."

> is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law the twofold aim of which is that guilt shall not escape nor innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones.

Berger v. United States, 295 U.S. 78,88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

WHEREFORE, Petitoner Christa Pike respectfully requests this Court conduct an evidentiary hearing on this motion and enter an order disqualifying Knox County District Attorney General Randall E. Nichols and his entire office from further participation in this case.

Respectfully submitted,

Donald E. Dawson, BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR #18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615)741-9331/ FAX, (615)741-9340

Counsel for Petitioner Christa G. Pike

## CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing MOTION was sent by UPS overnight delivery to Assistant District Attorney General Leland Price, Office of the District Attorney General, City-County Building, 400 Main Avenue, Knoxville, TN 37902, on this the 31st day of January, 2006.

Catherine Y. Brockenborough

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Nashville.
STATE of TENNESSEE, Appellee,
v.
Steve MASON, Appellant.
**No. 01C01-9603-CC-00103.**

June 6, 1997.
Permission to Appeal Denied Feb. 23, 1998.

OPINION

WILLIAM M. BARKER, Judge.

*1 The appellant, Steve Mason, appeals as of right his convictions in the Maury County Circuit Court of first degree premeditated murder and attempted first degree premeditated murder. He was sentenced to life in prison for the first degree murder conviction and received a sixty (60) year consecutive sentence as a career offender on the attempted offense. The jury also assessed a $50,000 fine.

Appellant argues on appeal that:

(1) count two of the indictment is insufficient because it does not contain necessary facts to comprise every element of attempted first degree murder;
(2) the trial court erred by failing to disqualify the District Attorney's office from prosecution in his case;
(3) the evidence was insufficient to prove the elements of premeditation and deliberation on both counts;
(4) the trial court erred in admitting appellant's prior convictions for aggravated robbery and attempted aggravated robbery; and
(5) the trial court erred in imposing consecutive sentences.

Finding that no reversible error was committed by the trial court, we affirm appellant's convictions and sentences.

FACTUAL BACKGROUND

On August 4, 1994, Timothy McGill and Jesse Tate Jones were shot numerous times following a crap game which took place on Broadway Avenue in Mt. Pleasant. McGill suffered three gunshot wounds and died from these injuries. Jones, McGill's stepfather, was shot twice. After surgery and hospitalization, he recovered fully and suffered no permanent injuries. Jones and other eyewitnesses identified appellant as the assailant. Several days after the incident, appellant turned himself in to authorities in Louisville, Kentucky and was returned to this State for prosecution.

The State's proof demonstrated that shooting dice, or "craps" as it is commonly called, was played regularly in and around the Broadway Avenue area of Mt. Pleasant. The location is a "high crime area." On the evening of August 3, 1994, a game began at about 8:00 p.m. and continued well into the morning hours of August 4, concluding around 3:00 a.m. The victims were in control of the game, at least one of them acting as "houseman" of the game at all times. The "houseman" is the person who supplies the dice and oversees the betting. Throughout the evening, the game had varying numbers of participants, including as many as twelve people at one point. Appellant arrived on Broadway around 11:0O p.m. [FN1] and remained until the game's conclusion, but he only participated in the game for a short while. He left the area once around 2:00 a.m. and was gone for about 20 to 30 minutes. Upon his return, those present at the game noticed that appellant had changed clothes. Prior to leaving, appellant had been dressed in light-colored clothing, primarily a white T-shirt and white pants, When he returned, he was dressed in all black, including his shoes, shorts, shirt and jacket.

The testimony of Jesse Tate Jones, the surviving victim, revealed that appellant was present as the game began to draw to a close. Anthony Webster, appellant's roommate and friend, had just lost a sum of money and declined to play the game any longer. Jones urged Webster to continue playing. Webster responded that he might play again tomorrow. Jones replied, "It may not be no tomorrow." Appellant then jumped up from where he was sitting, pulled out a gun and said, "That's what I say, won't be no tomorrow." He then began firing the weapon.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appellant first shot Jones in the jaw, who fell facedown on the street. Appellant then turned the gun on McGill and shot him once in the upper portion of his chest, just below the neck. He immediately whirled back toward Jones and shot him again in the back of the neck, as Jones lay facedown on the street. By that time, McGill had fled on foot and was running down the street. Jones watched appellant chase after McGill, firing the pistol. Two shots struck McGill, one in the lower back and one near the upper arm. The men disappeared from Jones' sight.

***2** By then, all the remaining participants had left the scene. Fortunately, Jones was able to walk to his truck parked nearby and drive the short distance to the police station. He reported the incident and was then taken to the hospital for treatment. Jones testified that no argument or cross words were exchanged prior to the shooting. He also stated that appellant's weapon looked like a .25 caliber automatic pistol.

The testimony of Terrence Williams and Vincent Wilson, who were both eyewitnesses to the shooting, substantiated the events detailed by Jones. Wilson added that he lost approximately $160 to McGill that night. He also stated that he had played the game for four or five hours that night and there had been no arguments or fights. Anthony Webster, appellant's roommate, testified in similar fashion. However, he stated that he and appellant did not arrive on Broadway until after 1:00 a.m. when they both got off work. He further explained that appellant lost $30 in the game and then borrowed money from him, which he also lost. It was then that appellant left and went home. He returned wearing the black clothing. Webster likewise denied that any argument occurred prior to the shooting.

Appellant's uncle by marriage, Vernon Johnson, Sr., also testified for the State. He reported that appellant appeared on his doorstep in the early morning hours of August 4, 1994. Appellant was very nervous and had a silver .25 caliber automatic pistol in his hands. He proceeded to tell Johnson that he had shot McGill and Jones. Appellant then asked Johnson to help him leave town. Johnson first declined, but was afraid for his family's safety and offered to take appellant wherever he needed to go. Johnson then took appellant to Columbia and left him there. He said that *en route,* they made one stop and appellant disposed of the gun at another person's home.

Law enforcement officials who investigated the crime scene discovered McGill's body on the sidewalk of Broadway Avenue in front of a funeral home, approximately 230 to 240 feet from the place where the shooting began. The body was found facedown on the pavement and the victim was dead when officials arrived. A pair of green shorts, later identified as McGill's, were found next to the body. The pockets contained cigarettes, a lighter, and 32 cents in change. McGill's flip flops were also recovered near the scene of the initial shooting. Bullet casings were found several feet from where the shooting began and one spent casing was also found on the porch of the funeral home. These were identified as having been fired from a .25 caliber firearm and all were fired from the same weapon. The medical examiner reported at trial that McGill died from loss of blood, primarily as a result of the first gunshot wound which pierced his right lung.

Although appellant did not deny shooting the victims, his trial testimony described a somewhat different turn of events. He stated that on August 3, he worked from 3:30 p.m. until 1:00 a.m. at Shipper's Paper Products along with Anthony Webster. After work, someone drove him and Webster to Broadway where he then walked to his house nearby. He changed from his work clothes and put on black shoes, white socks, black shorts, black jacket, black shirt and black toboggan. Appellant was carrying the weapon with him at this time. He then proceeded to the crap game.

***3** After arriving at the game, he watched for a while and noticed that a lot of cheating was occurring, accomplished by either Jones or McGill "switching the dice." He testified that everyone was losing money to them. He departed the game, went home and procured his own dice. Appellant then returned to participate in the game using his own dice. However, Jones and McGill refused to use his dice and he walked up the street to the corner. After about five minutes, appellant returned to the game to convince Jones and McGill to gamble with his dice. This time they agreed. Appellant stated that he began to win some money. As a result, he claimed that McGill got angry, started cursing him and made derogatory comments about appellant's father. While McGill was "yapping," appellant noticed Jones was reaching around behind his back, which made appellant think Jones had a gun. Jones also commented to the effect that if McGill tried anything he would "watch his back."

Appellant testified that McGill started coming

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

towards him and he was scared. [FN2] He stated that he pulled out his pistol and just started shooting; he remembers firing five shots. Appellant denied chasing McGill with the gun, saying instead that all the shots were fired in one location. He then ran down the street and ducked into an alleyway because he was afraid Jones was going to run over him with his truck. Appellant insisted that he shot Jones first because he thought Jones was reaching for a gun. He also explained that McGill was well-known as a drug dealer who always carried a gun.

On cross-examination, appellant stated that he took the pistol with him to work that day and carried it in his right front pocket. He denied going home to get the gun, alleging instead that he had it with him throughout the game. He also professed that the gun belonged to Webster. Furthermore, he declared that Webster, Wilson and Williams could not have heard the argument between him and McGill because they were down the street when it happened. He also expressed his belief that Webster did not testify truthfully about the evening's events. Specifically, he repudiated Webster's testimony that he borrowed money from him.

Under continued cross-examination, appellant was unable to explain why the bullet casings were found in different areas. However, he claimed that he shot McGill as he ran away because he was scared and he "just commenced to shooting." In addition, appellant insisted that Johnson was mistaken about him having the gun when he asked for help because he threw the gun "to a certain person" as he ran from Jones' truck. The State concluded its cross-examination by introducing appellant's previous convictions: four convictions for aggravated robbery and two for attempted aggravated robbery.

The manager of the temporary employment agency for whom appellant worked also testified. She introduced copies of appellant's time records which reflected that on August 3, 1994, appellant worked from 3:30 p.m. until 1:00 a.m. Finally, appellant recalled Anthony Webster to the stand to provide evidence of the victim's reputation for violence. Webster also opined that appellant could not have taken the gun to work with him that day, and that he must have brought it back to the game when he changed clothes.

***4** The jury returned verdicts finding appellant guilty of the first degree premeditated murder of Timothy McGill and the attempted first degree murder of Jesse Tate Jones. It also imposed a $50,000 fine on the attempted murder conviction. Immediately thereafter, a jury sentencing hearing was held for the murder conviction. The State sought life imprisonment of appellant without the possibility of parole. It introduced evidence of two aggravating circumstances: (1) that appellant was previously convicted of one or more felonies involving the use of violence and (2) that the murder was committed during an attempted robbery or attempted murder. *See* Tenn.Code Ann. § 39- 13-204(i)(2), (7) (Supp.1996). Appellant presented a substantial amount of evidence in mitigation through the testimony of teachers and relatives. Although the jury found that both aggravating factors were supported by the proof, it nevertheless sentenced appellant to life in prison. At a later sentencing hearing on the attempted murder conviction, the trial court sentenced appellant to sixty (60) years as a career offender and ordered that sentence be served consecutively to the life sentence and appellant's previous unserved sentences.

ANALYSIS

Appellant first challenges the sufficiency of the indictment charging him with the attempted first degree murder of Jesse Tate Jones. He contends that the indictment did not contain factual allegations sufficient to state the elements of the offense and urges dismissal of the conviction. We find the indictment sufficient.

Count two of the indictment states:

> And the Grand Jurors aforesaid, upon their oath aforesaid, to [sic] further present that on or about the 4th day of August, 1994, in the State of Tennessee and County of Maury, that Steve Mason, before the finding of this indictment, did unlawfully, intentionally, deliberately and with premeditation attempt to kill Jesse Jones, in violation of *Tennessee Code Annotated* 39-12-101, and *Tennessee Code Annotated* 39-13-202 ...

It is well-settled law in this State that, to be valid, an indictment must accomplish three purposes:

> (1) provide notice to the defendant of the precise charges against which he or she has to defend;
> (2) notify the trial court of the charges against the defendant so the trial court can enter an appropriate judgment and sentence; and
> (3) protect the defendant against double jeopardy.

*State v. Trusty*, 919 S.W.2d 305, 309 (Tenn.1996); *State v. Haynes*, 720 S.W.2d 76, 82 (Tenn.Crim.App.1986).

In the present case, we find that the indictment meets the three requirements of *Trusty*. It clearly states the

crime with which the appellant is charged, attempted first degree premeditated murder. The indictment also names the victim and the date of the offense. In addition, the indictment avers the culpable mental state of the accused. This is sufficient to notify the appellant of the precise charges. *State v. Davis,* 748 S.W.2d 206, 207 (Tenn.Crim.App.1987) (holding that an indictment which tracked the statutory language on premeditated murder and named the victim, as well as the date of the offense, is sufficient).

***5** Appellant contends, however, that more factual averments were necessary to constitute a valid indictment, such as how the attempt upon Jones' life was perpetrated. We do not agree. If it were necessary for appellant's defense to know more particular facts about the commission of the offense, a request for a bill of particulars would have been available. *See* Tenn. R.Crim. P. 7(c); *State v. Hicks,* 666 S.W.2d 54, 56 (Tenn.1984) (holding that a bill of particulars is to provide defendant with information about the details of the charge that are necessary to the preparation of his or her defense and to avoid prejudicial surprise at trial).

The indictment also notified the trial court that a judgment and sentence for attempted first degree murder was proper upon conviction. Finally, the indictment protects the appellant from double jeopardy by providing enough detail about the offense to prevent a duplicate prosecution. This issue is without merit.

Appellant next argues that the trial court erred in failing to disqualify the District Attorney's office from prosecuting his case. The record reflects that at his preliminary hearing, the appellant was represented by Larry Nickell of the Public Defender's office. Approximately two months after the preliminary hearing, Nickell left the Public Defender's Office and joined the District Attorney's Office. It is upon these facts that appellant contends the entire office of the District Attorney should have been disqualified from the prosecution.

The trial court held a hearing on appellant's disqualification motion during which the appellant and Nickell testified. That testimony revealed that the appellant talked with Nickell on two occasions. He discussed all aspects of his case with Nickelll in preparation for the preliminary hearing. He further asserted he would only have disclosed such information in confidence to his attorney.

Nickell testified that he met with appellant and represented him at the preliminary hearing. He informed the trial court that he had not participated in the prosecution of appellant or divulged any information regarding appellant to anyone in the District Attorney's office. In fact, he had never discussed appellant's case in that office. Additionally, Nickell explained that, upon beginning employment in the District Attorney's office, District Attorney Bottoms instructed him not to have any contact with the prosecutors on any case in which the Public Defender was involved. He declared that he, as well as all the other members of the District Attorney's staff, had scrupulously followed this instruction. No member of the office attempted to speak to him about appellant's case. Appellant's counsel declined to question Nickell at this hearing.

The trial court found that there was no proof that Nickell had participated in or had any contact in any way, shape, form or fashion, with appellant's case. Therefore, he saw no reason to disqualify the entire District Attorney's office.

***6** When this Court reviews a decision by the trial court on disqualification of a district attorney, we may not reverse the decision unless we find that an abuse of discretion has occurred. *State v. Tate,* 925 S.W.2d 548, 550 (Tenn.Crim.App.1995). In evaluating whether disqualification is necessary, three considerations are relevant. *Id.* First, we must consider whether the circumstances establish an actual conflict of interest; if so, there must be disqualification. If no actual conflict is discovered, we must determine whether there is an appearance of impropriety warranting disqualification. Finally, if disqualification is required under either theory, we must consider whether the entire staff of the district attorney's office must be disqualified. *Id.* Applying this test in appellant's case, we find that it was unnecessary to disqualify the entire District Attorney's office.

It is patently obvious that had Nickell been involved in appellant's prosecution, there would have been an actual conflict of interest requiring his disqualification. *See* Tate, 925 S.W.2d at 552; *State v. Locust,* 914 S.W.2d 554, 557 (Tenn.Crim.App.1995), *perm. to appeal denied* (Tenn.1995); *State v. Phillips,* 672 S.W.2d 427 (Tenn.Crim.App.1984); *State v. Robert West,* No. 01CO1-9107-CC-00202 (Tenn.Crim.App. at Nashville, March 31, 1992). However, appellant did not make such a contention. Rather, he asserted that Nickell's mere presence in the District Attorney's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

office while in possession of privileged, confidential information pertaining to appellant warranted disqualification of the entire office. We disagree.

Generally, the entire office of the district attorney need not be disqualified as long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution. Tate, 925 S.W.2d at 556 (citing *Mattress v. State*, 564 S.W.2d 678, 680 (Tenn.Crim.App.1977)). In the absence of proof to the contrary, broad disqualification is unnecessary to preserve the appearance of a fair trial or to protect the appellant's rights. Mattress, 564 S.W.2d at 680. There is absolutely no proof in appellant's case that Nickell shared any information with the prosecutor for the case or that he participated in any capacity in the prosecution of appellant. The trial court did not abuse its discretion in denying appellant's motion to disqualify the entire District Attorney' office. [FN3]

Appellant also argues that the evidence at trial was insufficient to support the premeditation and deliberation elements of first degree murder. [FN4] When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1979).

***7** All murder is presumed to be in the second degree and the State bears the burden of proving that the killing was premeditated and deliberate. *State v. Brown*, 836 S.W.2d 530, 543 (Tenn.1992). Statutorily, premeditation is defined as an act done after the exercise of reflection and judgment. It requires that the intent to kill be formed prior to the act itself, although it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. Tenn.Code Ann. § 39- 13-202(d) (Supp.1996). In a similar vein, deliberation requires that the offense be committed with cool purpose, free of the passions of the moment. *State v. West*, 844 S.W.2d 144, 147 (Tenn.1992). *See also Brown*, 836 S.W.2d at 541. Premeditation and deliberation are determinations for the jury and may be inferred from the manner and circumstances of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn.Crim.App.1995), *perm. to appeal denied* (Tenn.1995) (citation omitted). The proof at trial supported these elements.

In evaluating the sufficiency of the evidence, we are compelled to consider the evidence in the light most favorable to the State. *Jackson*, 443 U.S. at 319. The State's theory of the case, credited by the jury's verdict, was that appellant formed the intent to kill when he lost his money to the victims, which he believed was a result of their cheating. This proof of motive is relevant to an inference of premeditation and deliberation. *Bordis*, 905 S.W.2d at 222 (quoting 2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* § 7.7 (1986)). The State's theory was that appellant decided to murder the victims, went to his home, changed clothes to reduce the likelihood of detection, procured a firearm to accomplish the task, and then returned to the game. Facts about what the appellant did before the killing which show he was engaged in planning activity also support an inference of premeditation and deliberation. *Id. See also Brown*, 836 S.W.2d at 541 (recognizing that procuring a weapon to commit the homicide is circumstantial evidence of premeditation and deliberation).

Although no quantifiable time is necessary, it is apparent that appellant had ample time to reflect upon the intent to kill. At least twenty minutes passed after he obtained the gun and before he executed the plan. We also find that the killing was committed with a cool purpose. Although the appellant testified that he and McGill exchanged heated words, none of the eyewitnesses testified to such a disagreement. Their testimony reflected that appellant acted wholly without provocation. Moreover, appellant's conduct did not correlate with his theory of self-defense, thus yielding credence to the State's theory. While we cannot infer premeditation and deliberation from appellant's concealment of the weapon after the shooting, concealment does contradict the appellant's theory of self-defense by illustrating fear of detection. *West*, 844 S.W.2d at 151. Similarly, appellant's efforts to leave town to avoid law enforcement officials is contrary to a theory of self-defense. The jury's guilty verdict discredited appellant's theory and demonstrates the ample evidence supporting a finding of premeditation and deliberation. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973).

***8** Appellant's next issue challenges the trial court's ruling on the admissibility of his prior convictions for impeachment purposes. His contention is two-fold.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First, appellant contends that the trial court applied an incorrect standard when determining their admissibility. Alternatively, he argues that the prior convictions were similar to the crime on trial and for that reason the convictions should have been excluded. Although we find that the trial court did incorrectly apply the standard for admissibility, it was not error to admit evidence of the prior convictions.

At the close of the State's proof, the trial court held a hearing to determine whether appellant's prior convictions would be admissible in the event he chose to testify. The State sought to introduce proof of appellant's four previous convictions for aggravated robbery and two previous convictions for attempted aggravated robbery. After hearing argument, the court ruled:

The crime on trial is first degree murder and attempted first degree murder, which is a crime of extreme violence. The similarity to that, in the Court's opinion, and the prior convictions that are listed in the State's notice is the extreme act of violence; that is, that the aggravated robbery is a crime of violence, and suggests violence, so that similarity would be sufficient.

The relevance. The Court should analyze the relevance that the impeaching conviction has to the issue of credibility, and I think certainly any crime of violence, especially aggravated robbery and/or homicide, would certainly go to a person's credibility.

So for those reasons, the Court is going to allow it.

Following the court's ruling, appellant's counsel requested that the court provide the jury with a limiting instruction, which it did.

Tennessee Rule of Evidence 609 sets forth specific procedures to be followed before prior convictions of a criminal accused may be admitted into evidence for impeachment purposes. Prior to trial, the State must provide the accused with written notice of the impeaching conviction(s). Tenn. R. Evid. 609(a)(3). When requested to do so, the trial court must determine that the convictions' probative value on credibility outweigh their unfair prejudicial effect on the substantive issues. *Id.* This ruling must be given prior to the accused's testimony. *Id. See also State v. Farmer,* 841 S.W.2d 837, 839 (Tenn.Crim.App.1992).

In weighing the probative value of prior convictions against their prejudicial effect, the court should analyze two considerations: (1) the similarity between the crime on trial and the crime underlying the impeaching conviction; and (2) the relevance the impeaching conviction has on the issue of credibility. *Farmer,* 841 S.W.2d at 839 (quoting Neil P. Cohen et al, *Tennessee Law of Evidence* § 609.9 at 288 (2d. ed.1990)). Often, the similarity between the prior convictions and the offense on trial make admissibility more prejudicial than probative of credibility. *State v. Tune,* 872 S.W.2d 922, 927 (Tenn.Crim.App.1993). The greater the similarity between the crimes, the more likely the prejudicial effect, i.e. that the jury would consider the convictions on issues other than credibility. *See* Neil P. Cohen et al, *Tennessee Law of Evidence* § 609.9 at 376 (3d. ed.1995); *Farmer,* 841 S.W.2d at 840.

*9 We may only reverse the decision of the trial court, however, if we find that it abused its discretion in admitting the convictions. Tune, 872 S.W.2d at 927. Here, it is apparent from the court's ruling that it incorrectly applied the proper standard. The trial court erroneously concluded that similarity between the crimes favored admissibility. Although the trial judge employed an incorrect analysis, he nevertheless did not err in admitting the convictions.

Comparing the crime on trial here to the impeaching convictions, we find that they are inherently dissimilar. Appellant was being tried for first degree murder and attempted first degree murder. The impeaching convictions all involved aggravated robbery. Apart from the violence present in both, the elements of these crimes are quite different.

Of far more substantial significance is the probative value the convictions have on the defendant's credibility. Courts frequently admit the impeaching conviction when it is particularly probative of credibility, even if it is identical to the crime being tried. *See e.g. State v. Goad,* 692 S.W.2d 32, 37 (Tenn.Crim.App.1985) (admitting robbery conviction for impeachment in trial for armed robbery); *State v. Norris,* 684 S.W.2d 650, 654 (Tenn.Crim.App.1984) (admitting armed robbery conviction as impeachment in trial on armed robbery charge); *State v. Fluellen,* 626 S.W.2d 299, 300 (Tenn.Crim.App.1981) (permitting armed robbery conviction to be used for impeachment in trial for armed robbery); *State v. Bobby Baker,* No. 02C01- 9511-CC-00347 (Tenn.Crim.App. at Jackson, January 27, 1997) (admitting burglary and theft convictions for impeachment in trial for aggravated burglary); *State v. Mario A. Lavender and Eric L. Hobbs,* No. 01CO1-9506-CR-00202 (Tenn.Crim.App. at Nashville, November 8, 1996) (admitting prior robbery, burglary and theft conviction as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

impeachment in trial for robbery and theft); *State v. Larry Van Davis,* No. 01CO1-9111-CC-00348 (Tenn.Crim.App. at Nashville, July 23, 1992) (upholding the admission of six prior burglary convictions in a trial for burglary and theft). Appellant's argument that he was prejudiced by the similarity between the prior convictions and evidence that appellant robbed McGill during commission of this offense [FN5] is without merit. [FN6]

Here, all of appellant's prior convictions were highly probative of credibility. Each one involved robbery which implicates the critical element of dishonesty. *State v. Caruthers,* 676 S.W.2d 935, 941 (Tenn.1984), *cert. denied* 469 U.S. 1197, 105 S.Ct. 981, 83 L.Ed.2d 982 (1985) (citations omitted); *Goad,* 692 S.W.2d at 37. As a testifying witness who contradicted much of the State's proof, his credibility was crucial. The strong probative value of these convictions outweighs any prejudicial effect. [FN7] *See Caruthers,* 676 S.W.2d at 941 (holding that admission of defendant's previous armed robbery conviction was proper in trial for first degree murder). The trial court did not abuse its discretion in admitting the convictions, albeit the result of an incorrect analysis.

***10** Appellant's final issue challenges the imposition of consecutive sentences. Appellant contends that the statutory factors found by the trial court were not supported by the evidence. We affirm the trial court's judgment.

In its ruling, the trial court relied upon three statutory factors in concluding that the sixty (60) year sentence should run consecutive to the jury's sentence of life imprisonment. The trial court found that (1) the defendant is a professional criminal; (3) the defendant is a dangerous mentally abnormal person; and (4) the defendant is a dangerous offender. *See* Tenn.Code Ann. § 40-35-115(b) (1990).

When we review an order of consecutive sentencing, the principles of sentencing review apply. When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. Tenn.Code Ann. § 40-35-401(d) (1990). The burden of showing that the sentence is improper is upon the appealing party. Tenn.Code Ann. § 40-35- 401(d) Sentencing Commission Comments. This presumption, however, is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991).

A portion of the Sentencing Reform Act of 1989, codified at Tennessee Code Annotated section 40-35-210, established a number of specific procedures to be followed in sentencing. This section mandates the court's consideration of the following:

> (1) The evidence, if any, received at the trial and the sentencing hearing; (2)[t]he presentence report; (3)[t]he principles of sentencing and arguments as to sentencing alternatives; (4)[t]he nature and characteristics of the criminal conduct involved; (5)[e]vidence and information offered by the parties on the enhancement and mitigating factors in § § 40-35-113 and 40-35- 114; and (6)[a]ny statement the defendant wishes to make in his own behalf about sentencing.

Tenn.Code Ann. § 40-35-210 (Supp.1996).

Appellant disputes the trial court's finding that appellant was a professional criminal because there was no finding that his criminal acts were "a major source of livelihood." *See* Tenn.Code Ann. § 40-35-115(b)(1) (1990). Although not specifically stated by the trial court, the record supports such a finding. Four of appellant's prior convictions were for aggravated robberies in which he took various sums of money. In at least one of the robberies, appellant took over $1000. Although appellant was employed at the time the instant offenses were committed, the presentence report reflects that appellant's employment history was sporadic. It reflected only brief periods of work for three other employers. The record reflects no other source of income. This leads to a reasonable inference that appellant used his criminal activity as a "major source of livelihood." This factor is appropriate.

Appellant also argues that the trial court erred in finding that he is a dangerous mentally abnormal person. Such a finding requires proof that appellant has been so declared by a competent psychiatrist as the result of an investigation ordered prior to sentencing. Tenn.Code Ann. § 40-35-1 15(b)(3) (1990). Appellant asserts that no such information was before the court and the factor was inappropriately considered. We agree. Without the specific proof required by the statute, this factor may not be applied. *State v. Hallock,* 875 S.W.2d 285, 295 (Tenn.Crim.App.1993).

***11** Appellant also challenges the trial court's classification of him as a dangerous offender. As required by the statute, the court found that appellant had little or no regard for human life and that he had no hesitation about committing a crime where the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

risk to human life is high. Tenn.Code Ann. § 40-35-115(b)(4) (1990). The circumstances of his prior offenses, as well as those of the instant offenses, justify these findings. However, appellant faults this classification because the trial court did not make additional findings in accordance with *State v. Wilkerson,* 905 S.W.2d 933 (Tenn.1995). Although *Wilkerson* had not been decided at the time of appellant's sentencing, we find that the *Wilkerson* factors are present in appellant's case.

Before a court may find a defendant to be a dangerous offender in accordance with the statutory definition, it must also be demonstrated that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offenses committed. *Id* at 938-39. At the time of trial, appellant was twenty-one years of age. He had been convicted of six felonies. Each robbery was perpetrated at a convenience store or fast food restaurant in which the appellant used a firearm to threaten employees. Such severe and violent criminal acts committed repetitiously so early in adulthood demonstrate that an extended sentence is necessary to protect the public from further criminal conduct by this appellant. Additionally, the sentences reasonably relate to the severity of the offenses. Not only did appellant fatally wound McGill with his first gunshot, he continued to fire at McGill as he ran away, hitting McGill twice in the back. His other victim was also severely wounded. After failing to end Jones' life with the first shot, he again shot Jones in the back of the head as he lay on the ground. Appellant's cruelty and cold-blooded brutality demonstrated by these offenses indicate that the sentences are reasonable.

CONCLUSION

Upon a thorough review of the record, we find no error requiring reversal. Appellant's convictions and sentences are affirmed.

FN1. This was the time provided by Jones. The other witnesses provided varying, but much later, estimates of the time of appellant's arrival.

FN2. Proof reflected that both McGill and Jones were approximately 6'3" in height and weighed 300 pounds. Appellant's size is not apparent in the record.

FN3. We are mindful that a determination on disqualification of the entire office rests in part on a showing that screening procedures were in place at the District Attorney's office in question. *State v, Willie Claybrook,* No. 3 (Tenn.Crim.App. at Jackson, February 5, 1992). Nickell's testimony demonstrated that measures were taken in this regard which reinforces the trial court's conclusion.

FN4. The 1995 statutory amendments to the first degree murder statute delete the element of deliberation. Tenn.Code Ann. § 39-13- 202(a)(1) (Supp.1996) (providing that first degree murder is "a premeditated and intentional killing of another"). However, at the time of this offense deliberation remained an element and the State was required to prove its presence.

FN5. This proof was circumstantial. McGill had won certain sums of money during the night in the craps game. Vincent Wilson specifically testified that he lost about $160 to McGill that night. Jones testified that McGill should have been in possession of about $200. To support its theory of robbery, the State relied upon the fact that McGill's shorts were found lying beside his body and had been removed prior to his death. The only items found in those shorts were cigarettes, a lighter, and 32 cents in change. No wallet or any sum of cash was discovered on or near the body.

FN6. At the sentencing phase, the jury found as an aggravating circumstance that the "murder was committed while the defendant was engaged in committing any *attempted murder"* (emphasis added). The jury did not find that the murder occurred during a robbery as the State also argued.

FN7. We also note that the trial court provided a limiting instruction to the jury which further reduced the potential for prejudice to the appellant.

Not Reported in S.W.2d, 1997 WL 311900 (Tenn.Crim.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FILED
MARTHA PHILLIPS, CLERK
2006 FEB 24 AM 8:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| CHRISTA GAIL PIKE,<br>Petitioner, | ) | |
| v. | ) | No. 68280 |
| STATE OF TENNESSEE,<br>Respondent | ) | |

**STATE'S MOTION TO QUASH SUBPOENAS OF RANDALL NICHOLS, WILLIAM CRABTREE, JO HELM AND JEFF BLEVINS**

Comes the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, and moves this Honorable Court to quash certain subpoenas issued by the Defendant for the following attorneys from the Knox County District Attorney General's Office: (1) Randall E. Nichols, District Attorney General; (2) William Crabtree, Assistant District Attorney General and lead counsel in the original trial of Petitioner; (3) Jo Helm, Assistant District Attorney General and assistant counsel in the original trial of Petitioner; and (4) Jeff Blevins, Assistant District Attorney General. These subpoenas have been issued for appearance on February 27, 2006. As grounds for its motion, State relies on the following legal memorandum.

**FAILURE TO COMPLY WITH RULE 17**

The subpoenas should be quashed as Petitioner failed to follow proper procedure in seeking their issuance. The subpoenas in question were issued upon an ex parte application of the Petitioner who is indigent. Accordingly, the procedure for the issuance of the subpoenas was governed by Rule 17(b) of the Tennessee Rules of Criminal Procedure. Rule 17(b) requires that

the Petitioner make a satisfactory showing that the presence of the witness "is necessary to an adequate defense". Because Petitioner failed to make such a showing, the State respectfully submits the subpoenas must be quashed.

**EVIDENCE SOUGHT IS IMMATERIAL**

Additionally, the subpoenas should be quashed because the four attorneys in question have no admissible testimony to offer establishing a valid ground for relief in this case. "[T]he constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.". State v. Manning, 2003 Tenn. Crim. App. LEXIS 117, *32. Trial courts have the duty to abate subpoenas for witnesses whose testimony would be immaterial. Id. "Material testimony is that which is exculpatory - - evidence that if admitted would create reasonable doubt that did not exist without the evidence." State v. Easterly, 2001 Tenn. Crim. App. LEXIS 150, *24. Rule 17 of the Tennessee Rules of Criminal Procedure "places the burden of demonstrating materiality upon indigent defendants." Id. at *20. Thus, unless Petitioner can show that the testimony sought is admissible and would establish by clear and convincing evidence a valid ground for relief the subpoenas should be quashed.

None of the four individuals subpoenaed from the Knox County District Attorney General's Office could offer admissible testimony which would establish a valid ground for relief. By agreement of all parties and the Court, evidence will be heard in two areas on February 27, 2006. Those areas are: (1) the over billing situation involving Bill Talman and (2) the furnishing of materials collected by Dr. Diana McCoy to the District Attorney General's Office

during the original trial. In these two areas, the four attorneys subpoenaed from the Knox County District Attorney General's Office have very limited knowledge. What little knowledge they possess is based almost entirely on inadmissible hearsay. Most importantly, even if one assumes these four attorneys had unique testimony to present, their testimony still would not establish a valid ground for relief. Neither Mr. Talman's over billing nor the furnishing of materials collected by Dr. Diana McCoy is a reason to overturn Petitioner's conviction.

**EVIDENCE SOUGHT IS CUMULATIVE**

The subpoenas in question should be quashed as they seek testimony which is cumulative of other anticipated testimony. See, State v. Caruthers, 676 S.W.2d 935 (Tenn. 1984)(Holding that testimony of prosecutor was properly excluded as being cumulative and unnecessary.). See also, State v. Easterly, 2001 Tenn. Crim. App. LEXIS 150, *24 ("Testimony will not be material if merely cumulative or repetitive of other evidence in the case.")

In this case, the testimony of the four prosecutors from the Knox County District Attorney General's Office will be cumulative, unnecessary and repetitive of other evidence in the case. Bill Talman, Julie Rice, and Diana McCoy have all been subpoenaed for February 27, 2006. Their testimony will address the over billing issue and the furnishing of Dr. McCoy's materials during the original trial. In light of the issues raised by Petitioner and the anticipated testimony of Talman, Rice and McCoy, the testimony from the District Attorney's office will not present any unique evidence.

WHEREFORE, PREMISES CONSIDERED, the State prays that the Court quash the subpoenas issued for Randall Nichols, William Crabtree, Jo Helm and Jeff Blevins for February 27, 2006.

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: Leland L Price
LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

CERTIFICATE

I hereby certify that I have delivered a true and exact copy of the above-captioned pleading via fax and first-class mail, postage prepaid, to:

Donald E. Dawson
Catherine Y. Brockenborough
Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

Attorneys for the Defendant, this the 24 day of February, 2006.

Leland L Price
LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

LEXSEE

# STATE OF TENNESSEE v. CONNIE EASTERLY

**No. M2000-00077-CCA-R10-CO**

**COURT OF CRIMINAL APPEALS OF TENNESSEE, MIDDLE SECTION, AT NASHVILLE**

*2001 Tenn. Crim. App. LEXIS 150*

**March 1, 2001, Filed**

**PRIOR HISTORY:** [*1] Extraordinary Appeal by Permission from the Circuit Court for Sequatchie County. No. 3879. Robert Steven Bebb, Special Judge.

**DISPOSITION:** Tenn. R. App. P. 10 Extraordinary Appeal by Permission; Judgment of the Circuit Court is Affirmed and Modified in Part and Reversed in Part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The State applied for extraordinary appeal from a decision of the Circuit Court for Sequatchie County, Tennessee which refused to quash subpoenas issued by appellant, a county employee who had been indicted for official misconduct and forgery, to compel attendance and testimony of the commissioner of the state department of safety and the comptroller of the state treasury at trial.

**OVERVIEW:** A state employee reported that title records to his vehicles had been altered. The report was investigated by the office of the comptroller. The alterations were traced to the computer identification number and password assigned to appellee. Appellee was indicted for official misconduct and forgery. Appellee subpoenaed the commissioner of the department of safety and the state comptroller. The trial court denied the State's motion to quash the subpoenas. The State appealed. Preliminarily, the court of criminal appeals concluded that the trial court erred in failing to modify the subpoenas to require the officer's attendance at deposition rather than at trial. Appellee possessed a constitutional and statutory right to compulsory process if the desired testimony was relevant, material, and vital to the defense. The trial court abused its discretion by not quashing appellee's subpoena of the comptroller, because his testimony, if even material, would have been purely cumulative. However, the testimony expected of the commissioner could reflect materially on the prejudice of a State's witness, so the trial court properly refused to quash that subpoena.

**OUTCOME:** The court affirmed denial of the State's motion to quash the subpoena of the commissioner, modifying that order to require his attendance at a deposition. The court reversed denial of the motion to quash the subpoena of the comptroller, noting that the trial courts should take particular care to ensure that the proposed testimony of a high ranking government official subpoenaed by a criminal defendant would be material.

**LexisNexis(R) Headnotes**

***Governments > State & Territorial Governments > Claims By & Against***

[HN1] *Tenn. Code Ann. § 24-9-101* (2000) states that an officer of this state is exempt from subpoena to trial but subject to subpoena to a deposition. There exists no absolute procedural or evidentiary bar to the use of such depositions at trial.

***Criminal Law & Procedure > Discovery & Inspection > Depositions***

[HN2] See Tenn. R. Crim. P. 15(a).

***Criminal Law & Procedure > Discovery & Inspection > Depositions***

[HN3] Tenn. R. Crim. P. 15(e) indicates that depositions taken under authority of Tenn. R. Crim. P. 15(a)may be used as substantive evidence at trial if the witness is unavailable in that he is absent from the trial and immune from process.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
[HN4] U.S. Const. amend. VI grants an accused a right to compulsory process for obtaining witnesses in her favor. Moreover, because the rights guaranteed by U.S. Const. amend. VI, including the right to compulsory process, are basic to our adversary system of criminal justice, they are part of the due process of law that is guaranteed by U.S. Const. XIV to defendants in the criminal courts of the states.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
[HN5] A criminal defendant's right to compulsory process is not absolute; rather, the United States Constitution only prohibits a state from denying a defendant the ability to present testimony that is relevant and material, and vital to the defense.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
[HN6] The Tennessee Constitution affords a defendant facing criminal prosecution the right to have compulsory process for obtaining witnesses in her favor. Tenn. Const. art. I, § 9. Like the United States Constitution, the Tennessee State Constitution only extends to a defendant a right to compulsory process if a prospective witness is or probably will be a material one. The matter turns on whether the issuance of process would in fact be an abuse of process, and, if the court finds such is the case the court has power to prevent such abuse.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
[HN7] See *Tenn. Code Ann. § 40-17-105* (1997).

*Criminal Law & Procedure > Discovery & Inspection > Subpoenas*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
[HN8] *Tenn. Code Ann. § 40-17-107(a)* (1997) generally directs the clerks of courts in which criminal cases are pending to issue subpoenas at any time, to any part of the state, for such witnesses as either the district attorney general or the defendant may require. Moreover, *Tenn. Code Ann. § 40-17-122* (1997) specifically designates Tenn. R. Crim. P. 17 as the mechanism by which a defendant may realize his constitutional and statutory right to compulsory process.

*Criminal Law & Procedure > Discovery & Inspection > Subpoenas*
[HN9] See Tenn. R. Crim. P. 17.

*Criminal Law & Procedure > Discovery & Inspection > Subpoenas*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
[HN10] A defendant possesses a constitutional and statutory right to compulsory process when the desired testimony is relevant and material, and vital to the defense. However, a court has the power and the duty to prevent abuse of its process by abating subpoenas for witnesses whose testimony would be immaterial. This power and duty extends to proceedings involving all defendants, although Tenn. R. Crim. P. 17(b) places the initial burden of demonstrating materiality upon indigent defendants.

*Criminal Law & Procedure > Discovery & Inspection > Subpoenas*
[HN11] In the case of non-indigent defendants, when a motion is made to quash a subpoena issued at the instance of an accused, the burden is upon the movant to make a prima facie showing by acceptable evidence that the issuance of the subpoena was an abuse of the processes of the court because the witness is without information as to any material issue in the case. Until abuse of process has been shown factually, there is no ground for quashing a properly issued and executed subpoena.

*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN12] In reviewing a trial court's exercise of its power and duty to prevent the abuse of its process, appellate courts in Tennessee have generally applied an abuse of discretion standard. The application of an abuse of discretion standard by appellate courts is, perhaps, an acknowledgment that the trial court has first-hand exposure to the witnesses and evidence as a whole, and is familiar with the case and able to gauge the likely impact of the proposed testimony in the context of the entire proceeding.

*Evidence > Relevance > Relevant Evidence*
[HN13] Material testimony consists of important information directly related to the charges in the indictment and to the defendant's anticipated defenses to those charges. In other words, material testimony is that which is exculpatory, evidence that if admitted would create reasonable doubt that did not exist without the evidence.

Generally, such testimony must comply with established rules of evidence and procedure as required by the state to assure both fairness and reliability in the ascertainment of guilt and innocence. Testimony will not be material if merely cumulative or repetitive of other evidence in the case.

***Criminal Law & Procedure > Witnesses > Impeachment***

[HN14] Testimony concerning possible bias or prejudice on the part of key witnesses may, indeed, constitute material testimony, i.e., evidence that if admitted would create reasonable doubt that did not exist without the evidence. Moreover, Tenn. R. Evid. 616 permits a party to offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness.

**COUNSEL:** Paul G. Summers, Attorney General and Reporter, David M. Himmelreich, Deputy Attorney General, William C. Bright, Assistant Attorney General, and James Michael Taylor, District Attorney General, for the appellant, State of Tennessee.

Charles J. Gearhiser and Sam D. Elliott, Chattanooga, Tennessee, for the appellee, Connie Easterly.

**JUDGES:** NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

**OPINIONBY:** NORMA McGEE OGLE

**OPINION:** In this case, we granted the State's application for extraordinary appeal to determine whether the Sequatchie County Circuit Court erred in denying the State's motion to quash subpoenas issued by the appellee, Connie Easterly, in defense of an indictment charging her with five counts of official misconduct and five counts of forgery. The disputed subpoenas require the attendance and testimony of Michael C. Greene, [*2] the Commissioner of the Tennessee Department of Safety, and John Morgan, the Comptroller of the Treasury, at the appellee's trial. Following a thorough review of the record and the parties' briefs, we affirm and modify in part and reverse in part the trial court's order.

**I. Factual Background**

On March 3, 1998, Terry Thomas, an investigator with the Criminal Investigation Division of the Tennessee Department of Safety, discovered that someone had altered title records pertaining to his 1979 Ford truck. Thomas reported the alterations to the Division of Title and Registration of the Department of Safety. Martha Irwin, the Director of the Division of Title and Registration, in turn communicated the complaint to the Division of State Audit of the Office of the Comptroller of the Treasury. The Office of the Comptroller of the Treasury investigated Thomas' complaint and, in February 1999, submitted a "Special Report" to Governor Don Sundquist, the Tennessee Department of Safety, the Office of the Attorney General and Reporter, and the Office of the District Attorney General for the Twelfth Judicial District.

According to the "Special Report," computer transaction data relating [*3] to the title records of Thomas' 1979 Ford truck reflected that, on February 19, 1998, someone had improperly listed the vehicle as stolen and that, on February 28, 1998, someone had altered the record of the vehicle's former license plate number from "LHL382" to "666DVL." Moreover, computer transaction data relating to the title records of a state-owned Chevrolet Blazer assigned to Thomas for use during undercover operations reflected that the owner's name had been changed on March 14, 1998, from Ronald Baker to Arnold Baker and on March 21, 1998, from Arnold Baker to Benedict Arnold. Investigators traced the alterations to the computer identification number and password assigned to the appellee, Connie Easterly, who was then the Sequatchie County Clerk.

The authors of the report conceded that anyone with access to the Tennessee Department of Safety's title and registration computer data base could have acquired the appellee's computer identification number and password, and, therefore, the alterations could not "be tied conclusively" to the appellee. They also noted, however, that the appellee was "the only person with the ability, access, and incentive to improperly change . . . [*4] Thomas' title records. " This latter conclusion was based, in part, upon a May 22, 1998 interview between Thomas and investigators. During this interview, Thomas stated that, until December 1997, he had been a close friend of the appellee and had also enjoyed a good professional relationship with her. Subsequently, however, Thomas' personal and professional relationship with the appellee deteriorated, and the appellee began engaging in a pattern of "harassing behavior," including leaving copious telephone messages on Thomas' state-assigned pager. Additionally, in January 1998, the appellee threatened to ruin Thomas "personally, professionally, and politically." Due to this threat and an earlier comment by the appellee concerning her ability to alter title records, Thomas reviewed title records pertaining to his 1979 Ford truck, thereby discovering the alterations.

Investigators also interviewed the appellee, who denied altering the title records pertaining to Thomas' vehicles. Moreover, the appellee provided the investigators a list of individuals who knew her computer identification

number and password. She further remarked that she was typically the first person to arrive at her [*5] office every morning and, therefore, used her computer identification number and password to connect all the computers in her office to the Tennessee Department of Safety's title and registration computer data base. The appellee asserted that, therefore, all title transactions conducted by her staff would be traceable to her computer identification number and password.

The appellee did not initially include Thomas in her list of individuals who knew her computer identification number and password, nor did she otherwise identify Thomas as a suspect. Nevertheless, sometime later during the course of the investigation, the appellee expressed her belief that Thomas had himself altered the title records. The appellee explained that she had previously contacted Art Quarles, Thomas' supervisor, and submitted complaints concerning improper sexual advances that Thomas had made toward her. According to the appellee, she had successfully requested that Thomas be assigned to another county.

Investigators interviewed the individuals listed by the appellee as knowing her computer identification number and password. These individuals uniformly denied making the illicit alterations to the title [*6] records, and some also denied any knowledge of the appellee's computer identification number and password. Similarly, investigators interviewed the appellee's staff, who, contrary to the appellee's assertions, stated that the appellee was typically the last person to arrive at the office and rarely, if ever, used her computer identification number and password to connect the computers in the office to the pertinent data base.

As to Thomas' supervisor, Quarles denied that the appellee had ever submitted a complaint to him concerning improper sexual advances made by Thomas toward the appellee. Rather, Quarles recalled that the appellee had submitted a complaint to him on February 5, 1998, concerning Thomas' confiscation of a vehicle. Upon investigation, Quarles had determined that the confiscation was proper and within the scope of Thomas' job responsibilities. The appellee had additionally submitted a second complaint concerning Thomas' confiscation of another vehicle, and the complaint had again proved to be unfounded. Finally, the appellee had complained to Quarles that Thomas had driven his child to school in a state-owned vehicle. On the occasion of this complaint, Thomas had acknowledged [*7] the truth of the appellee's allegation. Accordingly, Quarles had issued a warning to Thomas and reported the incident to Sam Nelson, the Director of the Criminal Investigation Division of the Department of Safety.

Quarles confirmed that Thomas was ultimately transferred to another county. However, Quarles noted that the transfer stemmed from the appellee's apparently vindictive behavior toward Thomas and not from any request by the appellee. Indeed, according to Quarles, the appellee contacted him following the transfer and asked that Thomas be reassigned to Sequatchie County.

On August 18, 1999, following the Comptroller's submission of the "Special Report" to the Office of the District Attorney General for the Twelfth Judicial District, a Sequatchie County Grand Jury indicted the appellee for five counts of official misconduct and five counts of forgery. In defense of the indictment and in preparation for trial, the appellee issued subpoenas requiring the attendance and testimony of Michael C. Greene, the Commissioner of the Department of Safety (hereinafter "the Commissioner"), and John Morgan, the Comptroller of the Treasury (hereinafter "the Comptroller"), at her trial. In response, [*8] the State submitted a motion to quash the subpoenas, arguing that the Commissioner and the Comptroller are statutorily exempt from subpoena to trial. Moreover, the State asserted that the appellee had failed to establish that the testimonies of the Commissioner and the Comptroller were either material or relevant to her defense, thereby warranting subpoenas to depositions.

The State attached to its motion affidavits completed by both the Commissioner and the Comptroller. The Commissioner's affidavit stated, in relevant part:

> I am currently the Commissioner for the Tennessee Department of Safety . . . . My responsibilities include managing, supervision and prescribing under the law the guidelines and policies of the Tennessee Department of Safety.
>
> . . . I have met Connie Easterly on a few occasions. To my knowledge, I met with her on April 3, 1995, April 27, 1995, and August 14, 1997. On a few occasions, Ms. Easterly made unscheduled visits to my office. On these occasions our conversation revolved around the general operations of the Division of Title and Registration, its working operations and relation with the various county clerks offices.
>
> . . . I do not have any direct [*9] knowledge of the facts or circumstances concerning the allegations contained in the State's case against Ms. Easterly.
>
> . . . My office received three letters from individuals concerning Ms. Easterly which I have attached to my affidavit. I do

not personally remember seeing these letters. A member of my support staff sent them to the Criminal Investigation Division and Internal Affairs Division of my office.

Attached to the Commissioner's affidavit were five letters, apparently written by citizens of Sequatchie County and addressed to Governor Sundquist. The letters were received by the Governor's office in April and May of 1998 and immediately forwarded to the Commissioner. The letters essentially expressed appreciation for the appellee's performance of her duties as the Sequatchie County Clerk and expressed concern that the Director of the Division of Title and Registration of the Department of Safety and an investigator with the Criminal Investigation Division were "trying to make this fine clerk look bad."

The Comptroller's affidavit stated in relevant part:

I am currently Comptroller of the Treasury. My responsibilities include managing, supervision and prescribing [*10] under the law the guidelines and policies of the Department of Audit.

. . . To my knowledge, I do not know and have never met Connie Easterly.

. . . I do not have any direct knowledge of the facts or circumstances concerning the allegations contained in the State's case against Ms. Easterly. Upon information and belief, the Division of State Audit did investigate the circumstances concerning this case. This investigation was conducted by Glen McKay, Assistant Director, and Tommy Sneed, an Audit Investigator. I reviewed a report submitted by them and signed the report as our office's official report concerning these events. I have never talked to Ms. Easterly. The only knowledge that I possess of this case is the information which I reviewed in the report of this incident.

On January 11, 2000, the trial court conducted a hearing on the State's motion to quash the subpoenas of the Commissioner and the Comptroller. At the hearing, the appellee initially clarified that she was willing to take the testimonies of the Commissioner and the Comptroller by deposition. Moreover, the appellee disputed the State's assertion that the testimonies of the Commissioner and the Comptroller were [*11] immaterial and irrelevant to her defense. She explained that she expected the Commissioner to testify concerning his office's transmission of the aforementioned letters to the Criminal Investigation Division. According to the appellee, this testimony would be relevant to possible prejudice on the part of Thomas, a principal witness for the State. Additionally, she expected the Commissioner to testify concerning his receipt of a complaint about Martha Irwin, the Director of the Division of Title and Registration, from the appellee and his communication of that complaint to Irwin. The appellee argued that this testimony would be relevant to possible prejudice on the part of Irwin, another witness for the State. n1 As to the Comptroller, the appellee expected him to testify that, following an investigation by his office, the appellee could not be tied conclusively to the illicit alterations to the title records.

n1 The State effectively conceded at the hearing that, in fact, the Commissioner had received such a complaint and communicated the complaint to Irwin.

[*12]

At the conclusion of the hearing, the trial court noted that "the issuing of subpoenas in this case and the seeking of depositions go to somewhat of a fishing expedition." Nevertheless, the trial court denied the State's motion. Moreover, the trial court indicated that it would not grant an interlocutory appeal pursuant to Tenn. R. App. P. 9. Accordingly, the State sought an extraordinary appeal in this court pursuant to Tenn. R. App. P. 10. This court granted the State's application on February 3, 2000, to determine whether the Sequatchie County Circuit Court erred in denying the State's motion to quash the subpoenas to trial of the Commissioner and the Comptroller.

**II. Analysis**

[HN1] In reviewing the trial court's decision to enforce the subpoenas to trial of the two state officers, we initially note the appellee's acknowledgment of *Tenn. Code Ann. § 24-9-101* (2000), which statutory provision states that "an officer of this state" is "exempt from subpoena to trial but subject to subpoena to a deposition." We further note that there exists no absolute procedural [*13] or evidentiary bar to the appellee's use of such depositions at trial. n2 Finally, we note that, as in the trial court, the appellee offers no objection on appeal to taking the state officers' testimonies by deposition. Accordingly, we must conclude that, at a minimum, the trial court erred in failing to modify the subpoenas to require the officers' attendance at depositions.

n2 [HN2] Tenn. R. Crim. P. 15(a) provides that,

> whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition.

[HN3]
Subsection (e) of Rule 15 further indicates that such depositions may be used as substantive evidence at trial if the witness is unavailable in that he is absent from the trial and immune from process. Cf. Tenn. R. Evid. 804(a) & (b).

[*14]

That having been said, the State also disputes that the officers were subject to subpoenas to depositions. In addressing the propriety of subpoenas to depositions in this case, it is useful to identify the parameters of both a defendant's right to compulsory process and a trial court's authority to control a defendant's utilization of its subpoena power. [HN4] The Sixth Amendment to the United States Constitution grants an accused a right to compulsory process for obtaining witnesses in her favor. *Faretta v. California, 422 U.S. 806, 816, 95 S. Ct. 2525, 2532, 45 L. Ed. 2d 562 (1975).* Moreover, because the rights guaranteed by the Sixth Amendment, including the right to compulsory process, "are basic to our adversary system of criminal justice, they are part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States." *Faretta, 422 U.S. at 818, 95 S. Ct. at 2532;* see also *Washington v. Texas, 388 U.S. 14, 18-19, 87 S. Ct. 1920, 1922-1923, 18 L. Ed. 2d 1019 (1967).* In Washington [*15] , the Supreme Court explained the integral role of a defendant's right to compulsory process in securing justice:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*388 U.S. at 19, 87 S. Ct. at 1923.* [HN5] However, a criminal defendant's right to compulsory process is not absolute; rather, the United States Constitution only prohibits a state from denying a defendant the ability to present testimony that is "'relevant and material, and . . . vital to the defense.'" *United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 3446, 73 L. Ed. 2d 1193 (1982)*(quoting *Washington, 388 U.S. at 16, 87 S. Ct. at 1922)); [*16]* see also, e.g., *United States v. Williamson, 202 F.3d 974, 979 (7th Cir. 2000); United States v. Soape, 169 F.3d 257, 268* (5th Cir.), cert. denied, *527 U.S. 1011, 119 S. Ct. 2353, 144 L. Ed. 2d 249 (1999); Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997); United States v. North, 285 U.S. App. D.C. 343, 910 F.2d 843, 889 (D.C. Cir. 1990),* withdrawn and superceded in part on other grounds by *United States v. North, 287 U.S. App. D.C. 146, 920 F.2d 940 (D.C. Cir. 1990).*

> [HN6] The Tennessee Constitution similarly affords a defendant facing criminal prosecution the right "to have compulsory process for obtaining witnesses in [her] favor." TENN. CONST. art. I, § 9. Moreover, like the United States Constitution, our state constitution only extends to a defendant a right to compulsory process if a prospective witness is or probably will be a material one . . . . The matter turns on whether the issuance of process would in fact be an abuse of process, and, if the Court finds such is [*17] the case the Court has power to prevent such abuse.

*Bacon v. State, 215 Tenn. 268, 385 S.W.2d 107, 109 (Tenn. 1964);* see also *State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982)*("'The constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.'").

Our legislature has also created a statutory right to compulsory process that is coextensive with the right guaranteed by our constitution. [HN7] *Tenn. Code Ann. § 40-17-105* (1997) states:

> As provided by the Constitution of Tennessee, the accused, in all criminal prosecutions, has a right . . . to have com-

> pulsory process for obtaining witnesses in the accused's favor.

[HN8] Consistent with this right, *Tenn. Code Ann. § 40-17-107(a)* (1997) generally directs the clerks of courts in which criminal cases are pending to issue subpoenas [*18] "at any time, to any part of the state, for such witnesses as either the district attorney general or the defendant may require." Moreover, *Tenn. Code Ann. § 40-17-122* (1997) specifically designates Tenn. R. Crim. P. 17 as the mechanism by which a defendant may realize his constitutional and statutory right to compulsory process.

[HN9] Tenn. R. Crim. P. 17 provides:

> (a) For Attendance of Witnesses; Form; Issuance. - Every subpoena shall be issued by the clerk or other authorized officer of the court. It shall state the name of the court and the title of the proceeding, and it shall command each person to whom it is directed to attend and give testimony at the time and place and for the party specified therein. The clerk or other authorized officer shall issue a subpoena, or a subpoena for the production of documentary evidence, signed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served.
>
> (b) Defendants Unable to Pay. - The court shall order at any time that a subpoena be issued for service on a named witness upon an [*19] ex parte application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. . . .
>
> (c) For Production of Documentary Evidence and of Objects. - A subpoena may also command a person to whom it is directed to produce the books, papers, documents, or tangible things designated therein. The court, upon motion made promptly and in any event by the time specified in the subpoena for compliance therewith, may quash or modify the subpoena if compliance would be unreasonable or oppressive.

[HN10] In sum, a defendant possesses a constitutional and statutory right to compulsory process when the desired testimony is "'relevant and material, and . . . vital to the defense.'" *Valenzuela-Bernal, 458 U.S. at 867, 102 S. Ct. at 3446;* see also *Bacon, 385 S.W.2d at 109; Tenn. Code Ann. § 40-17-105*. However, "a court has the power and the duty to prevent abuse of its process by abating subpoenas for witnesses whose [*20] testimony would be immaterial." *State v. Womack, 591 S.W.2d 437, 443 (Tenn. App. 1979);* see also *Bacon, 385 S.W.2d at 109*. Obviously, this power and duty extends to proceedings involving all defendants, although Tenn. R. Crim. P. 17(b) places the initial burden of demonstrating materiality upon indigent defendants. Cf. *United States v. Moore, 917 F.2d 215, 231 (6th Cir. 1990)*(interpreting *Fed. R. Crim. P. 17* and observing that "neither rich nor poor defendants have an unfettered right to subpoenas without discretionary review by the [trial] court"); *United States v. Bennett, 675 F.2d 596, 598 (4th Cir. 1982)*(asserting the identical proposition). [HN11] In the case of non-indigent defendants,

> when a motion is made to quash a subpoena issued at the instance of an accused . . .,the burden is upon the movent to make a prima facie showing by acceptable evidence that the issuance of the subpoena was an abuse of the processes of the court because the witness is without information as to any material issue in the case. . [*21] . . .
>
> Until abuse of process has been shown factually, there is no ground for quashing a properly issued and executed subpoena.

*Womack, 591 S.W.2d at 443-444.*

[HN12] In reviewing a trial court's exercise of its power and duty to prevent the abuse of its process, appellate courts in Tennessee have generally applied an abuse of discretion standard. See, e.g., *State v. Burrus, 693 S.W.2d 926, 929 (Tenn. Crim. App. 1985)*(finding no abuse of discretion in the trial court's denial of an indigent defendant's motion to subpoena and advance costs for four prospective defense witnesses); *Womack, 591 S.W.2d at 446* ("The abuse of the privilege of calling witnesses . . . is familiar to all participants [in our judicial system], and its restraint must depend upon the integrity, common sense and discretion of lawyers and judges all within the bounds of due process."); *State v. Cage, 1999 Tenn. Crim. App. LEXIS 62, No. 01 C01-9605-CC-00179, 1999 WL 30595,* at *9 (Tenn. Crim. App. at Nashville, January 26, 1999)(finding [*22] no abuse of discretion in trial court's order quashing the defendant's subpoena duces tecum for materials in the possession of the State's DNA expert); *State v. Click, 1991 Tenn. Crim. App. LEXIS 796, No. 162, 1991 WL*

*188882,* at *2 (Tenn. Crim. App. at Knoxville, September 26, 1991)("Where there is no record showing that testimony would have been helpful to [a defendant], there is no abuse of discretion in denying a motion to subpoena defense witnesses."). The application of an abuse of discretion standard by appellate courts is, perhaps, an acknowledgment that the trial court has "'first-hand exposure to the witnesses and evidence as a whole, and . . . [is] familiar[] with the case and able to gauge the likely impact of the [proposed testimony] in the context of the entire proceeding.'" *United States v. Lloyd, 71 F.3d 1256, 1268 (7th Cir. 1995);* but cf. *Soape, 169 F.3d at 267* (emphasizing that discretion is afforded only "'within the limits imposed by the Constitution,'" and that the specific question of whether a trial court's refusal to subpoena a witness violates a defendant's right to compulsory process [*23] is a question of law, which an appellate court reviews de novo); cf. also *Bacon, 385 S.W.2d at 109.*

Upon reviewing the record before this court, we conclude that the trial court abused its discretion in denying the State's motion to quash the appellee's subpoena of the Comptroller but correctly denied the State's motion with respect to the Commissioner. In reaching this conclusion, we note our agreement with the observation of the federal district court of the District of Columbia that,

> if the head of a government agency were subject to having his deposition taken concerning any litigation affecting his agency . . .,we would find that the heads of government departments . . . would be spending their time giving depositions and would have no opportunity to perform their functions.

*Capitol Vending Co. v. Baker, 36 F.R.D. 45, 46 (D.D.C. 1964).* Thus, as a matter of public policy we agree with the State that a trial court should take particular care in ensuring that the proposed testimony of high-ranking government officials subpoenaed by a criminal defendant is or probably will be material to the defendant's case. Cf. *United States v. Poindexter, 732 F. Supp. 142, 147 (D.D.C. 1990).* [*24]

[HN13] Material testimony consists of "important information directly related to the charges in the indictment and to [the defendant's] anticipated defenses to those charges." *Id. at 149.* In other words, "material [testimony] is that which is exculpatory - - evidence that if admitted would create reasonable doubt that did not exist without the evidence." *Richmond, 122 F.3d at 872.* Generally, such testimony must "comply with established rules of evidence and procedure as required by the state 'to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Id. at 871-872;* cf. *State v. Brown, 29 S.W.3d 427, 432-436* (Tenn.), cert. denied, *148 L. Ed. 2d 200, 531 U.S. 916, 121 S. Ct. 275 (2000).* Testimony will not be material if merely cumulative or repetitive of other evidence in the case. *United States v. Bertoli, 854 F. Supp. 975, 1083-1084 (D. N.J. 1994),* vacated in part on other grounds by *United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994).* [*25]

As conceded by the appellee at the January 11, 2000 hearing, the sole testimony that the Comptroller could proffer at a deposition would comprise his confirmation that he had read and approved the "Special Report" prepared by Glen McKay, the Assistant Director of the Division of State Audit, and Tommy Sneed, an Audit Investigator, and that the report indicated that the alterations to Thomas' vehicle title records could not be "tied conclusively" to the appellee. The State noted at the hearing that both McKay and Sneed had been subpoenaed to testify at the appellee's trial. Accordingly, assuming that the Comptroller's testimony would be otherwise material and admissible at the appellee's trial, the testimony would be purely cumulative, and the subpoena to deposition of the Comptroller is an abuse of process.

[HN14] As to the Commissioner, testimony concerning possible bias or prejudice on the part of key State witnesses may, indeed, constitute "material" testimony, i.e., "evidence that if admitted would create reasonable doubt that did not exist without the evidence." *Richmond, 122 F.3d at 872;* [*26] cf. *State v. Caughron, 855 S.W.2d 526, 547-548 (Tenn. 1993)*(observing that, in the distinct context of a violation of the rule announced in *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),* evidence impeaching a government witness' credibility may be material). Moreover, Tenn. R. Evid. 616 permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." In this case, however, it is unclear to this court how the transmission by the Commissioner's office to the Criminal Investigation Division of letters written by various citizens of Sequatchie County and addressed to the Governor would prejudice Thomas against the appellee. Even assuming that Thomas read the letters at issue, the letters merely commended the appellee for her performance of her duties as the Sequatchie County Clerk and expressed concern about, and disbelief of, any accusations made by both Thomas and Irwin.

Nevertheless, the Commissioner's communication to Irwin of a complaint made by the appellee concerning Irwin's job performance could certainly have [*27] inspired prejudice on the part of Irwin. Moreover, as noted earlier, the record indicates that Irwin first requested the

investigation by the Division of State Audit of the alterations to Thomas' vehicle title records. The record also suggests that Irwin would testify at the appellee's trial concerning the appellee's access to computer transaction codes necessary to make the illicit alterations. The State did not indicate at the January 11, 2000 hearing whether or not Irwin could testify concerning the Commissioner's communication to her of the complaint at issue. Finally, contrary to the State's argument on appeal, the Commissioner's testimony concerning his communication of the complaint to Irwin would not constitute hearsay, as the appellee would be proffering the testimony in order to demonstrate the effect of the communication upon Irwin, regardless of the truth of the communication or the truth of the complaint. Tenn. R. Evid. 801(c). Accordingly, the record fails to establish that a subpoena to deposition of the Commissioner would constitute an abuse of process.

**III. Conclusion**

For the foregoing reasons, we affirm the order of the trial court denying the State's [*28] motion with respect to the Commissioner and modify the order to require the Commissioner's attendance at a deposition. However, we reverse the order of the trial court denying the State's motion to quash the subpoena of the Comptroller.

NORMA McGEE OGLE, JUDGE

LEXSEE

# STATE OF TENNESSEE v. PAUL GRAHAM MANNING

**No. M2002-00547-CCA-R3-CD**

**COURT OF CRIMINAL APPEALS OF TENNESSEE, AT NASHVILLE**

***2003 Tenn. Crim. App. LEXIS 117***

**January 15, 2003, Assigned on Briefs**
**February 14, 2003, Filed**

**SUBSEQUENT HISTORY:** Appeal denied by *State v. Manning, 2003 Tenn. LEXIS 1231* (Tenn., Dec. 15, 2003)

**PRIOR HISTORY:** [*1] Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed. Appeal from the Criminal Court for DeKalb County. No. 98-89. Leon Burns, Judge.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant was found guilty by a Criminal Court for DeKalb County (Tennessee) jury of first degree premeditated murder and felony reckless endangerment. Defendant appealed.

**OVERVIEW:** The appellate court found that the proof was more than sufficient to demonstrate that defendant killed the victim intentionally and with premeditation. The appellate court held that the evidence was sufficient to support defendant's conviction of felony reckless endangerment. It determined that the trial court's error, if any, in failing to instruct the jury on additional lesser-included offenses of aggravated assault and assault was harmless. The appellate court concluded that the trial court's instruction on the definition of intentional was erroneous, but was harmless beyond a reasonable doubt. The appellate court held there was no abuse of discretion by the trial court in denying defendant's motions for a speedy trial. It found that defendant never objected to the amount of his bail until after trial and waived the issue. The appellate court found that defendant failed to demonstrate that the trial court abused its discretion in quashing his subpoena for the attendance of numerous medical personnel that he intended to call to question about the medical records generated in conjunction with the victim's death.

**OUTCOME:** The appellate court affirmed the judgment of the trial court.

**LexisNexis(R) Headnotes**

***Evidence > Criminal Evidence > Weight & Sufficiency***
[HN1] See Tenn. R. App. P. 13(e).

***Evidence > Criminal Evidence > Weight & Sufficiency***
[HN2] Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient.

***Criminal Law & Procedure > Witnesses > Credibility***
***Evidence > Criminal Evidence > Weight & Sufficiency***
[HN3] In its review of the evidence, an appellate court must afford the State of Tennessee the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom. An appellate court may not re-weigh or re-evaluate the evidence in the record below. Likewise, should the reviewing court find particular conflicts in the trial testimony, the appellate court must resolve them in favor of the jury verdict or trial court judgment. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder***

[HN4] First degree premeditated murder is defined as the "premeditated and intentional killing of another." *Tenn. Code Ann. § 39-13-202(a)(1)*. A premeditated killing is one "done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." *Tenn. Code Ann. § 39-13-202(d)*.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder***
***Criminal Law & Procedure > Scienter > Specific Intent***

[HN5] See *Tenn. Code Ann. § 39-13-202*.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder***
***Criminal Law & Procedure > Scienter > Specific Intent***

[HN6] Factors supporting a finding that the accused killed the victim with premeditation include declarations by the accused of an intent to kill, evidence of the accused's procurement of a weapon, and the use of a deadly weapon where the victim is unarmed. The killing must be intentional as well as premeditated.

***Criminal Law & Procedure > Scienter > Specific Intent***

[HN7] See *Tenn. Code Ann. § 39-11-302(a)*.

***Criminal Law & Procedure > Scienter > Recklessness***
***Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Reckless Endangerment***

[HN8] Reckless endangerment is committed when the accused "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." *Tenn. Code Ann. § 39-13-103(a)*. If the conduct at issue is committed with a deadly weapon, the offense is felony reckless endangerment. *Tenn. Code Ann. § 39-13-103(b)*.

***Criminal Law & Procedure > Scienter > Recklessness***

[HN9] See *Tenn. Code Ann. § 39-11-302(c)*.

***Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses***

[HN10] Trial courts are under a duty to instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense.

***Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Lesser Included Offenses***
***Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses***

[HN11] An offense is a lesser-included offense if: (a) all of its statutory elements are included within the statutory elements of the offense charged; or (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest; or (c) it consists of (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder***
***Criminal Law & Procedure > Criminal Offenses > Crimes Against the Person > Assault & Battery***
***Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Lesser Included Offenses***

[HN12] First degree premeditated murder is the "premeditated and intentional killing of another." *Tenn. Code Ann. § 39-13-202(a)(1)*. An aggravated assault is committed, on the other hand, when the accused intentionally, knowingly, or recklessly causes serious bodily injury to another. *Tenn. Code Ann.. § 39-13-102(a)(1)(A)*, (a)(2)(A). Similarly, an assault is committed when one "intentionally, knowingly or recklessly causes bodily injury to another." *Tenn. Code Ann. § 39-13-101(a)(1)*. The mens rea of intentional includes the mens rea of knowing and reckless. *Tenn. Code Ann. § 39-11-301(a)(2)*. A killing certainly includes serious bodily injury (as well as "mere" bodily injury). Thus, all of the statutory elements of these forms of aggravated assault and assault are included within the statutory elements of first degree premeditated murder, and they are therefore lesser-included offenses under the Burns test.

***Criminal Law & Procedure > Appeals > Reversible Error***
***Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Lesser Included Offenses***
***Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses***

[HN13] An erroneous failure to give a lesser-included offense instruction will result in reversal unless a review-

ing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial.

***Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses***
***Criminal Law & Procedure > Appeals > Standards of Review > Harmless & Invited Errors***
[HN14] Where a jury rejects lesser-included offenses which occur higher on the lesser-included hierarchy than the challenged lesser-include offense, the failure to charge the challenged offense is harmless error beyond a reasonable doubt.

***Criminal Law & Procedure > Scienter***
***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder***
[HN15] First degree premeditated murder, like second degree murder, is a result-of-conduct offense.

***Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Constitutional Right***
***Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Statutory Right***
***Constitutional Law > Criminal Process > Speedy Trial***
[HN16] A criminal defendant is guaranteed the right to a speedy trial by federal and State constitutions and by State statute. U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Tenn. Code Ann. § 40-14-101*; Tenn. R. Crim. P. 48(b). The right to a speedy trial protects the accused from oppressive pretrial incarceration, anxiety and concern arising from unresolved criminal charges, and the possibility that the accused's defense will be impaired by fading memories and the loss of exculpatory evidence. The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial. In determining whether a defendant's right to a speedy trial has been compromised, four factors must be weighed: the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and any prejudice to the defendant caused by the delay. The most important of these factors is whether the defendant was prejudiced by the delay, and the most important issue concerning prejudice to the defendant is whether his or her ability to prepare a defense was impaired. To trigger the Barker analysis, the interval between accusation and trial must be presumptively prejudicial. A delay of at least one year crosses this threshold.

***Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Excludable Time Periods***
[HN17] In a speedy trial analysis, the possible reasons for the delay of a defendant's trial fall into four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense.

***Criminal Law & Procedure > Pretrial Motions > Speedy Trial***
[HN18] Prejudice should be assessed in the light of the interests the speedy trial right was designed to protect, which are: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. The last of these three is the most serious because of its potential to skew the fairness of the entire system.

***Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion***
***Constitutional Law > Criminal Process > Compulsory Process***
***Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process***
[HN19] Defendants to criminal prosecution have the right under both federal and State constitutions to compulsory process for obtaining witnesses in their favor. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This right is further codified in *Tenn. Code Ann. § 40-17-105*. The right, however, is not absolute. The constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Thus, trial courts have the power and the duty to prevent abuse of their process by abating subpoenas for witnesses whose testimony would be immaterial. In reviewing a trial court's exercise of its power and duty to prevent abuse of its process, appellate courts applies an abuse of discretion standard.

**COUNSEL:** Terry D. Dycus and John Nisbett, Assistant Public Defenders, Cookeville, Tennessee, for the Appellant, Paul Graham Manning.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William E. Gibson, District Attorney General; and Ben Fann and William Locke, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**JUDGES:** DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

**OPINIONBY:** DAVID H. WELLES

**OPINION:**

The Defendant, Paul Graham Manning, was convicted by a jury of first degree premeditated murder and felony reckless endangerment. In this direct appeal, the Defendant raises six issues: (1) whether the evidence is sufficient to support his convictions; (2) whether the trial court properly instructed the jury on lesser-included offenses; (3) whether the trial court properly instructed the jury on the culpable mental state required for premeditated murder; (4) whether [*2] the Defendant was denied his constitutional right to a speedy trial; (5) whether the trial court erred by not reducing his bond; and (6) whether the trial court erred in quashing the Defendant's subpoena for certain witnesses. We affirm the judgment of the trial court.

On the night of December 15, 1997, the Defendant and his wife, Jackie Manning, attended a basketball game in which their son, fourteen-year-old Josh Manning, was playing. On their way home, the Defendant stopped at a liquor store and purchased a fifth of whiskey. According to Josh, the Defendant began drinking the liquor as soon as he returned to the car.

When the family got home, Josh went to his room and eventually to bed. He was awakened later by the sounds of his parents arguing. Josh testified that he heard the Defendant say something about getting a gun. Josh then heard his father go to the closet where he kept his shotgun. Alarmed, Josh got up and went into the living room. He saw his father seated on the couch with the shotgun nearby; his mother was standing at the front door to the house, directly across from the couch. Josh testified that the Defendant was accusing his wife of infidelity and calling her vulgar [*3] names. Josh began arguing with the Defendant, telling him to leave his mother alone. Josh told the Defendant that "he thought he was big and bad because he had a gun." In response to this taunt, the Defendant fired the shotgun over Josh's head, striking the wall. A pellet from the blast grazed Josh's cheek. The Defendant then stated, "That proves my point."

Following the shot Mrs. Manning stated, "I can't take this anymore" and began to turn to leave the house. According to Josh, the Defendant responded by saying, "If you move another inch, I'll blow your head off." As Mrs. Manning continued her attempt to leave the house, the Defendant fired the gun again. Mrs. Manning fled outside, and Josh ran out to check on her. Josh found his mother lying on the ground with a gunshot wound to her torso.

Josh returned to the house to call 911. He found the Defendant in the Defendant's bedroom gathering more shotgun shells. Josh begged the Defendant not to get any more shells, and the Defendant eventually dropped the ones he already had in his hand. Josh called 911. While Josh was speaking with the dispatcher, the Defendant yanked on the phone wires leading to the wall jack, disconnecting the [*4] call.

Josh told the Defendant that he (the Defendant) had shot the victim and that he (Josh) had to call 911. Josh took the gun from the Defendant, and the Defendant went outside. Josh hid the shotgun under his bed and again called 911 on the cordless headset of the phone. Josh told the 911 dispatcher that his father had shot his mother, but he said that the shooting had been accidental. At trial, Josh explained that this report was not true, but that he was afraid to report the shooting as deliberate. He subsequently told investigating officer Billy Miller that the shooting had not been accidental, and he reiterated this at trial.

Josh returned to his mother and found the Defendant with her. Josh testified that he heard the Defendant say, "Oh, my God. What have I done? Help, help; somebody help. I'm sorry; I'm sorry." Josh testified that he "guessed" his father was drunk that night, and he further testified that the Defendant did not initially realize that he had shot his wife. When Josh found the Defendant with Mrs. Manning, the Defendant was applying pressure to the gunshot wound and was crying and upset. The Defendant told Josh at that point to call 911.

Officer Miller testified [*5] that when he arrived on the scene, the Defendant was crouched over Mrs. Manning, saying "I'm sorry" and "help her." Josh told Officer Miller that the Defendant had shot at him and then shot his mother. Josh showed Officer Miller where he had hidden the gun, and Officer Miller confiscated the weapon, a 12 gauge shotgun. Officer Miller also recovered from the living room three shotgun shells and two empty shell cartridges. He took photographs of the hole in the wall occasioned by the Defendant shooting over Josh's head. Officer Miller testified that the Defendant was "combative and upset" at the scene but did not appear drunk. Officer Miller stated that the Defendant appeared to know what was going on.

After the Defendant was taken into custody, he gave a short statement to Officer Miller. According to Officer Miller, the Defendant told him that he had been asleep that night and "heard a pop. He got up, walked outside and saw his wife, Jackie, laying in the driveway and stayed there with her until somebody came. He didn't know who they was, who it was that responded, and he

said at that point in time he did not remember anything else." The Defendant told Officer Miller nothing else [*6] about the incident.

Officer Miller performed a gunshot residue test on the Defendant, but this occurred fifteen or sixteen hours after the shooting. TBI forensic scientist James Russell Davis II testified that the test results were "inconclusive," but he explained that the length of time between the gun being fired and the test being performed was "very important." He testified that a long-barreled gun also reduced the chances of the test being positive.

TBI forensic scientist Donald I. Carman testified that the empty shell casings recovered from the scene had been fired from the shotgun recovered from the scene.

Dr. Charles W. Harlan performed the autopsy on the victim and testified that she died as the result of a shotgun wound to her abdomen. Dr. Harlan recovered multiple shotgun pellets from the victim's body. He testified that the distance from the shotgun to the victim at the time of firing was probably four to six feet, more probably six feet.

Cindy Krupp, the 911 dispatcher who took Josh's calls, testified that the first call came in at about 11:55 p.m. on December 15, 1997. She explained that a boy stated that his mother had been shot and they needed an ambulance. During [*7] the call, the phone went dead; however, the caller called back "seconds later." Ms. Krupp confirmed that the caller had described the shooting to her as accidental.

Stephanie Lee, the victim's daughter, testified that her mother and the Defendant began living together when she was in the third grade. She stated that there was a lot of arguing, that the Defendant was "very, very, very jealous," and repeatedly accused the victim of cheating on him and lying to him. Ms. Lee testified that it was common for the Defendant to tell the victim, "If you ever leave me, I'll kill you." Ms. Lee explained that she left the couple when she was thirteen or fourteen to go live with her father. She explained that she left to avoid the constant fighting between her mother and the Defendant.

The Defendant testified that he did not know how his wife came to be shot. He explained that he "woke up" beside her on the ground in the driveway. He stated that he "rolled over and put [his] arm around her and when [he] did that [he] felt the wound." He explained that he "held the wound" and that it was "devastating" to him: "the most traumatic moment in [his] whole life." He testified that the last thing [*8] he remembered before waking up was setting his drink on the night stand. He explained that, while Josh was making the second 911 call, he "was in a mental state that [he] couldn't hardly keep conscious. It was all [he] could do to keep [his] mind. [He] kept going in and out conscious, like [he] was drugged or something." With respect to Josh's testimony, the Defendant testified, "I don't remember any incident that he's testified to. I don't have any recollection to that whatsoever." On cross-examination the Defendant stated that he "didn't pull the phone jack out" and that Josh was lying about that. He further stated that he "didn't get a gun that night."

The Defendant admitted on cross-examination that he wrote letters to Josh after his arrest that included the following statements:

> If they prove that I didn't do it, you'll be the number one suspect.
>
> And they'll come and get you and jail you for first degree murder and put you away for the rest of your life.
>
> I have a lawyer who will come to see you and tell you exactly what to do.
>
> I have not told the cops anything and even haven't told my lawyer all I know.
>
> You may think all is well but I can assure you that you [*9] are in for some surprises if you don't listen to me.
>
> I am your dad and I love you, but I won't take a 15 to 25 year sentence for you.

The Defendant denied that he was trying to get his son to admit to the killing, and he testified that he "was trying to get him to keep his mouth shut." The Defendant maintained his lack of recollection of the events surrounding his wife's death, but he stated that "I don't think I shot her at all." He claimed to have taken a "truth serum test" that indicated that, "if I did shoot my wife, it was probably an accident." No further evidence of this "test" was proffered. The Defendant also admitted on cross-examination that his statement to Officer Miller had been false.

### SUFFICIENCY OF THE EVIDENCE

In his first issue the Defendant contends that the evidence is not sufficient to support his convictions of first degree premeditated murder and felony reckless endangerment. Tennessee Rule of Appellate Procedure 13(e) prescribes that [HN1] "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." [HN2] Evidence [*10] is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia, 443 U.S. 307, 319, 61 L.*

*Ed. 2d 560, 99 S. Ct. 2781 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000).* In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See *McBee v. State, 213 Tenn. 15, 372 S.W.2d 173, 176 (Tenn. 1963);* see also *State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).*

[HN3] In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *Tuggle, 639 S.W.2d at 914;* see also *Smith, 24 S.W.3d at 279.* The court may not "re-weigh [*11] or re-evaluate the evidence" in the record below. *Evans, 838 S.W.2d at 191;* see also *Buggs, 995 S.W.2d at 105.* Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See *Tuggle, 639 S.W.2d at 914.* All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See *State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).*

[HN4] First degree premeditated murder is defined as the "premeditated and intentional killing of another." *Tenn. Code Ann. § 39-13-202(a)(1).* A premeditated killing is one "done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Id. § 39-13-202(d). However,

[HN5] it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state [*12] of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. [HN6] Factors supporting a finding that the accused killed the victim with premeditation include declarations by the accused of an intent to kill, evidence of the accused's procurement of a weapon, and the use of a deadly weapon where the victim is unarmed. See *State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).* The killing must be intentional as well as premeditated. [HN7] "'Intentional' refers to a person who acts intentionally with respect to . . . a result of the [person's] conduct when it is the person's conscious objective or desire to . . . cause the result." *Tenn. Code Ann. § 39-11-302(a).*

The proof in this case established that the Defendant and the victim were arguing, and the Defendant decided to retrieve his shotgun from the closet. Josh testified that the Defendant kept this weapon loaded "at all times." The Defendant returned to the living room couch with the gun. When Josh taunted him about it, the Defendant [*13] fired the gun over Josh's head, grazing his son's face with one of the shotgun pellets. Obviously, the Defendant then knew that the gun was, indeed, loaded. When the victim then protested that she "[couldn't] take this anymore," the Defendant told her that if she moved another inch, he would "blow [her] head off." When the victim then attempted to leave the house, the Defendant followed through on his threat and fired the shotgun at her, hitting her in the abdominal area. The Defendant then walked into the bedroom, retrieved more shells for the gun, and violently disconnected Josh's call to 911.

This proof is more than sufficient to demonstrate that the Defendant killed the victim intentionally and with premeditation. This issue is, accordingly, without merit.

The Defendant also questions the sufficiency of the evidence supporting his conviction of felony reckless endangerment. [HN8] Reckless endangerment is committed when the accused "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." *Tenn. Code Ann. § 39-13-103(a).* If the conduct at issue is committed with a deadly weapon, the [*14] offense is felony reckless endangerment. See id. § 39-13-103(b). [HN9] A person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Tenn. Code Ann. § 39-11-302(c).*

In this case, the Defendant fired a shotgun over Josh's head from just a few feet away, grazing the boy on the face with one of the shotgun pellets. Obviously, firing a shotgun over someone's head from a short distance away puts the person "in imminent danger of death or serious bodily injury" and is reckless conduct, at best. Indeed, during closing argument, defense counsel stated, "There's no doubt that drinking and weapons creates a reckless endangerment. No doubt. I'm not even going to argue that." We agree with trial counsel: the evidence is sufficient to support [*15] the Defendant's conviction of felony reckless endangerment, and this issue is therefore without merit.

**LESSER-INCLUDED OFFENSES**

The trial judge instructed the jury on the following lesser-included offenses of first degree premeditated murder: second degree murder, voluntary manslaughter, reckless homicide and criminally negligent homicide. The jury returned a verdict of first degree premeditated murder. The Defendant now contends that the trial court committed reversible error by failing to charge as additional lesser-included offenses of first degree premeditated murder, the offenses of aggravated assault and assault. We respectfully disagree.

[HN10] Trial courts are under a duty to "'instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense.'" *State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999)* (quoting *State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999))*. In Burns, our Supreme Court adopted a new three-part test for determining whether an offense is a lesser-included offense. See *6 S.W.3d at 466-67*. Under the new test, which was largely [*16] derived from the Model Penal Code, [HN11] an offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. The Defendant contends that aggravated assault and assault are lesser-included offenses of first degree premeditated murder under part (a) of the Burns test.

We agree. As set forth above, [HN12] first degree premeditated [*17] murder is the "premeditated and intentional killing of another." *Tenn. Code Ann. § 39-13-202(a)(1)*. An aggravated assault is committed, on the other hand, when the accused intentionally, knowingly, or recklessly causes serious bodily injury to another. See id. § 39-13-102(a)(1)(A), (a)(2)(A). Similarly, an assault is committed when one "intentionally, knowingly or recklessly causes bodily injury to another." Id. § 39-13-101(a)(1). The mens rea of intentional includes the mens reas of knowing and reckless. See id. § 39-11-301(a)(2). A killing certainly includes serious bodily injury (as well as "mere" bodily injury). Thus, all of the statutory elements of these forms of aggravated assault and assault are included within the statutory elements of first degree premeditated murder, and they are therefore lesser-included offenses under part (a) of the Burns test. n1 The trial court therefore erred when it failed to instruct the jury on these forms of aggravated assault and assault.

n1 Aggravated assault and assault can also be committed in ways which would not meet the definition of a lesser-included offense of first degree premeditated murder under part (a) of Burns. For instance, an assault is committed when one "intentionally or knowingly causes another to reasonably fear imminent bodily injury." *Tenn. Code Ann. § 39-13-101(a)(2)*. The statutory elements of first degree premeditated murder do not include the element of fear. Similarly, an aggravated assault is committed when the accused commits an assault with a deadly weapon. See id. § 39-13-102(a)(1)(B). The statutory elements of first degree premeditated murder do not include the use of a deadly weapon.

[*18]

[HN13] "An erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." *State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002)*. In this case, the trial court instructed the jury on the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. In spite of these choices, the jury returned a verdict finding the Defendant guilty of first degree premeditated murder. [HN14] Where a jury rejects lesser-included offenses which occur higher on the lesser-included hierarchy than the challenged lesser-include offense, the failure to charge the challenged offense is harmless error beyond a reasonable doubt. See id. (noting that "the error may be harmless when the jury, by finding the defendant guilty of the highest offense to

the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses.") (citing *State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998))*. Accordingly, the Defendant is entitled to no relief on this issue.

**JURY [*19] INSTRUCTION ON "INTENTIONAL"**

The Defendant next contends that the trial court erred in its charge to the jury on the definition of "intentionally" as that term is used in the offense of first degree premeditated murder. In pertinent part, the trial court charged the jury that, in order to find the Defendant guilty of first degree premeditated murder, it had to determine that the Defendant "acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" The Defendant contends that the trial court committed reversible error by referring to "the nature of the conduct." The Defendant argues that, pursuant to this Court's decision in *State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002)*, the trial court should have charged the jury as follows: "A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim." *Id. at 790* app. The State concedes that the trial court's instruction was erroneous, but maintains that the error is harmless [*20] beyond a reasonable doubt.

In Page, the defendant was convicted of second degree murder: the "knowing killing of another." *Tenn. Code Ann. § 39-13-210(a)(1)*. This Court reversed the Defendant's conviction because the trial court instructed the jury that a person acts "knowingly" if the person acts with an awareness: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result. See *Page, 81 S.W.3d at 786*. Recognizing that second degree murder is a result-of-conduct crime, see *State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)*, this Court determined that "the result of the conduct is the only conduct element of the offense; the 'nature of the conduct' that causes death is inconsequential." *Page, 81 S.W.3d at 787*. Because the jury charge permitted the jury to convict the defendant based upon his awareness of the nature of his conduct or upon the circumstances surrounding his conduct, the State's burden of proof was improperly lessened. See *id. at 788*. Applying a constitutional harmless error [*21] analysis, see *id. at 789*, this Court determined that the error required reversal because the defendant's mens rea was "the disputed issue at trial." Id.

This Court has previously considered the holding of Page in the context of a conviction for first degree premeditated murder. See *State v. Antoinette Hill, 2002 Tenn. Crim. App. LEXIS 1074, No. E2001-02524-CCA-R3-CD, 2002 WL 31780718* (Tenn. Crim. App., Knoxville, Dec. 13, 2002). As set forth above, the mens rea requirement for this form of murder is premeditated and intentional. Our criminal code defines "intentional" as referring to a person "who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Tenn. Code Ann. § 39-11-302(a)* (emphasis added). However, [HN15] first degree premeditated murder, like second degree murder, is a result-of-conduct offense. See *State v. Antoinette Hill, 2002 Tenn. Crim. App. LEXIS 1074, 2002 WL 31780718*, at *5. Therefore, with respect to first degree premeditated murder, the first of the two disjunctive definitions is irrelevant.

Thus, the jury [*22] instruction provided in this case contained an irrelevant definition. More importantly, the irrelevant definition given in this case was erroneous because it provided the jury an opportunity to convict the Defendant based only on his awareness of the nature of his conduct: an improper lessening of the State's burden of proof. See *Page, 81 S.W.3d at 788*. To be convicted of first degree premeditated murder, a defendant must be aware that his or her conduct is reasonably certain to cause death. See id.

Given that the trial court's instruction on the definition of intentional was erroneous, we must now determine whether that error was harmless beyond a reasonable doubt. We conclude that it was. As noted by this Court in Antoinette Hill, a conviction of first degree premeditated murder indicates that the jury necessarily concluded that the defendant "displayed a previously formed design or intent to kill." *2002 Tenn. Crim. App. LEXIS 1074, 2002 WL 31780718*, at *5. As set forth above, the jury's conclusion in this regard is supported by sufficient evidence. Moreover, the Defendant's theory of defense in this case did not hinge on his mens rea, as did the theory of defense in Page [*23] . In Page, the defendant conceded that he had committed the killing. See *81 S.W.3d at 789*. He contended, however, that he had been drunk when he hit the victim with a baseball bat, and he hadn't meant to hit the victim "that hard." Id. The Defendant in this case did not concede that he had committed the killing but claimed that he couldn't remember what had happened to his wife or how she came to be shot. Prior to trial, the Defendant tried to place the blame for the killing on his own son. In short, the Defendant's theory of defense was that he didn't think he shot the victim "at all," not that he shot her while in a drunken rage. In light of these factors, we hold that the trial court's erroneous instruction to the jury was harmless beyond a reasonable doubt, and this issue is therefore without merit.

The Defendant makes the same argument with respect to the trial court's instruction on the "knowing" element of the lesser-included offense of second degree murder. Because the Defendant was not convicted of this offense, this issue is moot and we will not address it.

**SPEEDY TRIAL**

In his fourth issue, the Defendant complains that he was denied his constitutional [*24] rights to a speedy trial. He points out that he was arrested in 1997 but not brought to trial until 2001.

[HN16] A criminal defendant is guaranteed the right to a speedy trial by our federal and state constitutions and by state statute. See U.S. const. amend. VI; Tenn. const. art. 1, § 9; *Tenn. Code Ann. § 40-14-101*. See also Tenn. R. Crim. P. 48(b). The right to a speedy trial protects the accused from oppressive pretrial incarceration, anxiety and concern arising from unresolved criminal charges, and the possibility that the accused's defense will be impaired by fading memories and the loss of exculpatory evidence. See *Doggett v. United States, 505 U.S. 647, 654, 120 L. Ed. 2d 520, 112 S. Ct. 2686 (1992); State v. Simmons, 54 S.W.3d 755, 758 (Tenn. 2001).* "The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." *State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997).* In determining whether a defendant's right to a speedy trial has been compromised, four factors must be weighed: the length of the delay, the reason [*25] for the delay, the defendant's assertion of his right to a speedy trial, and any prejudice to the defendant caused by the delay. See *Barker v. Wingo, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972); State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973).* The most important of these factors is whether the defendant was prejudiced by the delay, and the most important issue concerning prejudice to the defendant is whether his or her ability to prepare a defense was impaired. See *Barker, 407 U.S. at 532.* To trigger the Barker analysis, the interval between accusation and trial must be "presumptively prejudicial." *Doggett, 505 U.S. at 651-52.* A delay of at least one year crosses this threshold. *Id., 505 U.S. at 652 n.1; Vickers, 985 S.W.2d at 5.*

The Defendant was arrested on December 16, 1997. He was tried on March 7, 2001. Thus, a period of approximately thirty-nine months passed between his arrest and trial. However, a review of the technical record reveals that the Defendant's mental competency was at issue for approximately twenty-two of those thirty-nine months. The Defendant [*26] was originally found competent to stand trial in April 1998. In April 1999, defense counsel filed a motion to have the Defendant's mental competence reevaluated. The trial court ordered evaluations in May, June and July 1999. The Defendant was eventually judicially committed to hospitalization in November 1999. The trial court did not find the Defendant again competent to stand trial until March 2, 2001. The Defendant's trial began a few days later.

On July 15, 1999 and again on November 8, 1999, the Defendant filed pro se motions for a speedy trial. Neither of these motions was granted. Our standard of review is abuse of discretion. See *State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996).*

Obviously, a delay of thirty-nine months crosses the one-year threshold necessary to find that the delay was "presumptively prejudicial." However, while the delay was substantial in length, that does not, in and of itself, establish a constitutional violation. See, e.g., *Vickers, 985 S.W.2d at 7* (affirming the trial court's denial of the defendant's motion to dismiss for lack of a speedy trial where delay was three years and nine months). We turn, [*27] then, to weighing the three remaining Barker factors to determine whether the Defendant's rights to a speedy trial were violated.

The second Barker factor is the reason for the delay. [HN17] The possible reasons for the delay of a defendant's trial fall into four categories:

(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant;

(2) bureaucratic indifference or negligence;

(3) delay necessary to the fair and effective prosecution of the case; and

(4) delay caused, or acquiesced in, by the defense.

*Vickers, 985 S.W.2d at 5-6.* The trial court made no findings of fact that are present in the record before us as to the cause(s) of the delay(s) in bringing the Defendant to trial. The record does make independently clear, however, that the majority of the delay experienced in this case was due to the Defendant's mental illness and was therefore necessary to the fair and effective prosecution of the case. This type of delay is justifiable and therefore not weighed against either party. See *State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996).*

The third Barker factor is the Defendant's [*28] assertion of his right to a speedy trial. The Defendant filed two pro se motions asserting his right to a speedy trial, one in July 1999 and one in October 1999. The first of these motions was filed while the Defendant was undergoing a forensic evaluation at Middle Tennessee Mental Health Center. The second was filed following the State's motion to have the Defendant hospitalized and shortly before the trial court granted the State's motion. Given

the questions surrounding the Defendant's mental competency during this time, and given that no motion for a speedy trial was ever filed by defense counsel, we give this factor no weight.

The fourth Barker factor - whether the Defendant was prejudiced by the delay - is the most important. [HN18] "Prejudice . . . should be assessed in the light of the interests . . . the speedy trial right was designed to protect," which are "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker, 407 U.S. at 532.* The last of these three is the most serious because of its potential to skew the fairness of the entire system. [*29] See id.

The Defendant states in his brief that the delay "created difficulties in interviewing witnesses, gathering information, and . . . 'finding out the truth.'" These vague assertions do not demonstrate prejudice of any sort. The Defendant was convicted primarily upon the testimony of an eyewitness to the murder. The Defendant offers no explanation of how the delay affected this witness's testimony to his detriment. Certainly, the physical evidence and the medical records were unaffected in this case by the passage of time. There is no allegation - or evidence - that defense counsel were hamstrung in their efforts to prepare for trial by any delay. In short, the record before this Court does not demonstrate any prejudice suffered by the Defendant as a result of the delay in his being tried.

There being no abuse of discretion by the trial court in denying the Defendant's motions for a speedy trial, this issue is without merit.

**EXCESSIVE BAIL**

In his fifth issue the Defendant argues that the trial court violated his constitutional right against excessive bail. See Tenn. Const. art. I, § 16; see also *Tenn. Code Ann. § 40-11-102* [*30] . The technical record indicates that the Defendant's bail was set at 1.5 million dollars. The technical record also indicates, however, that the Defendant never objected to the amount of his bail until after trial. Accordingly, this issue has been waived. See Tenn. R. App. P. 36(a); see also *Tenn. Code Ann. § § 40-11-143*, -144; *State v. Melson, 638 S.W.2d 342, 358 (Tenn. 1982)* (defendant's only effective remedy for setting of bail at $ 200,000 was to follow Rule 8 of the Tennessee Rules of Appellate Procedure promptly after bail was set - not to wait until after conviction).

**QUASHED SUBPOENA**

In his sixth and final issue, the Defendant contends that the trial court committed reversible error when it quashed his subpoena for persons he intended to call at trial to question about the medical records generated in conjunction with the victim's death. The witnesses included five doctors from Erlanger Hospital, five employees of the Life Force Air Medical Service, and five nurses from Erlanger. In his brief, the Defendant states that "the trial court's action prohibited the Defendant from arguing that his wife was not dead." [*31]

At the hearing on the motion to quash, defense counsel explained that the witnesses were necessary to explain discrepancies in the medical records generated in conjunction with the victim's emergency treatment and death. As examples of the discrepancies, defense counsel pointed out differences in the operating room numbers and a discrepancy in the time of death. Two different doctors apparently "signed off" as chief surgeon. The trial court determined that the medical records would be admitted at trial and that "any discrepancies can be pointed out by anyone," rendering the presence of the medical personnel "unnecessary." The court explained that, even if the witnesses "freely admitted that somebody made an error in the record[,] that would have very little bearing upon what the crux of this case is, and that's whether or not the deceased is dead and who was the cause of the death." The trial court specifically stated that it "[did not] see that [the Defendant's] defense is jeopardized by the State's motion to quash."

We acknowledge, of course, that [HN19] defendants to criminal prosecution have the right under both our federal and state constitutions to compulsory process for obtaining [*32] witnesses in their favor. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This right is further codified in our criminal code. See *Tenn. Code Ann. § 40-17-105*. The right, however, is not absolute. As previously recognized by this Court, "the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible." *State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982)* (quoting *Bacon v. State, 215 Tenn. 268, 385 S.W.2d 107, 109 (1964))*. Thus, trial courts have "the power and the duty to prevent abuse of [their] process by abating subpoenas for witnesses whose testimony would be immaterial." *State v. Womack, 591 S.W.2d 437, 443 (Tenn. App. 1979)*. In reviewing a trial court's exercise of its power and duty to prevent abuse of its process, this Court applies an abuse of discretion standard. See *State v. Connie Easterly, 2001 Tenn. Crim. App. LEXIS 150, No. M2000-00077-CCA-R10-CO, 2001 WL 208514,* at *7 (Tenn. Crim. App., Nashville, Mar. 1, 2001).

The Defendant has failed to demonstrate that the trial court [*33] abused its discretion in quashing his subpoena for the attendance of numerous medical personnel. The victim's daughter testified that she saw the victim's body, made the funeral arrangements, and at-

tended the funeral. A certified copy of the victim's death certificate was admitted at trial. There was no proffer of proof at trial that any of the witnesses attempted to be subpoenaed by the Defendant would have cast any doubt on the victim's death. In short, the Defendant has failed to demonstrate that any of these witnesses would have offered material evidence and has failed to demonstrate that the trial court thereby abused its discretion in quashing his subpoena. Accordingly, this issue is without merit.

The judgment of the trial court is affirmed.

DAVID H. WELLES, JUDGE

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB 27 AM 9: 38
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

CHRISTA GAIL PIKE, )
Petitioner, )
)
v. ) No. 68280
)
STATE OF TENNESSEE, )
Respondent )

**MOTION BY STATE OF TENNESSEE TO QUASH SUBPOENAS ISSUED TO STATE COURT JUDGES RICHARD R. BAUMGARTNER AND RAY LEE JENKINS**

Comes the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, and moves this Honorable Court to quash certain subpoenas issued by the Defendant for Judge Richard R. Baumgartner and Judge Ray Lee Jenkins of the Criminal Court of the State of Tennessee for the Sixth Judicial District (Knox County). They have each been subpoenaed to give testimony as witnesses in this case on Monday, February 27, 2006. The subpoenas were addressed to each judge in his court. The State moves to quash the subpoenas on the following grounds: (1) T.C.A. §24-0-101 exempts the judges from appearing in court to give live testimony; (2) Any orders or judicial actions by the judges speak for themselves; and (3) The testimony sought is immaterial.

## I. T.C.A. §24-9-101 EXEMPTS JUDGE BAUMGARTNER AND JUDGE JENKINS FROM APPEARING IN COURT TO GIVE LIVE TESTIMONY.

Tenn. Code Ann. §24-9-101[1] exempts officer of the state and of any court within the state

1 Tenn. Code Ann. §24-9-101 states:

> Deponents exempt from subpoena to trial but subject to subpoena to deposition. Deponents exempt from subpoena to trial but subject to subpoena to a deposition are: (1) An officer of the United States; (2) An officer of this state; (3) An officer of any court or municipality within the state; (4) The clerk of any court of record other than that in which the suit is pending; (5) A member

from subpoena to trial. The purpose of this statute is clear – to prevent officers of the state from being interfered with in the performance of their official duties. Not only do Petitioner's subpoenas interfere with the judges from performing their officials duties, they threaten the judges with court action from even attempting to do so.

Tenn Const. art. VI, §4 creates the offices of Judges of the Circuit and Chancery Courts. Pursuant to 1976 Tenn. Pub. Acts 518, the Criminal Court of the Third Judicial Circuit of Tennessee (Knox County) was divided in Division I, II, and III. Judges Baumgartner and Jenkins are officers of this state.

As officers of the state, Judges Baumgartner and Jenkins must carry out the duties mandated by Tenn. Const. art. VI, §4 and state law. The subpoenas were served less than a week before the February 27, 2006 hearing. Judges Baumgartner and Jenkins are both scheduled to hear cases, including trials, on the day they have been subpoenaed. The subpoenas disregard any cases that Judges Baumgartner and Jenkins are scheduled to hear and require that each judge appear to give testimony instead. The subpoenas state, "Failure to appear may result in court action against you by the court before whom you are to appear." Thus, in essence, the subpoenas notify the judges that carrying out their sworn judicial duties on 9:00 A.M. on February 27, 2006 could result in court action against them.

---

of the general assembly while in session, or clerk of officer thereof; (6) A practicing physician, psychologist, chiropractor, dentist or attorney; (7) A jailer or keeper of a public prison in any county other than that in which the suit is pending; and (8) A custodian of medical records, if such custodian files a copy of the applicable records and an affidavit with the court and follows the procedures provided in title 68, chapter 11, part 4, for the production of hospital records pursuant to a subpoena duces tecum. [Acts 1986, ch. 750 §1; 1991, ch. 456, §1.]

## II. ANY ORDERS OR JUDICIAL ACTIONS BY THE JUDGES SPEAK FOR THEMSELVES.

The subpoenas do not indicate the subject matter for which the judges' testimony is sought. However, they are addressed to Judges Baumgartner and Jenkins at their courts, Division I and II respectively. The subpoenas therefore are directed at the official place of business of these courts, and seek testimony from these courts.

"A Court speaks only through its written judgments, duly entered upon its minutes." Evans v. Perkey, 647 S.W.2d 636, 641 (Tenn Ct. App. 1982), quoting Sparkle Laundry & Cleaners Inc. v. Kelton, 595 S.W.2d 88, 93 (Tenn Ct. App. 1979) (internal quotations omitted). See also Ladd by Ladd v. Honda Motor Co., Ltd., 939 S.W.2d 83, 104 (Tenn Ct. App. 1996). It is improper to question the judges about their judicial acts, or about how they might rule in matters before them now or in the future. Protecting the judges' deliberative process and making it confidential ensures the open and frank deliberation of issues that courts must make. C.F. Swift v. Campbell, 159 S.W.3d 565, 578 (Tenn Ct. App. 2004) (citing United States v. Weber Aircraft Corp., 465 U.S. 792, 802, 104 S.Ct. 1488, 1494, 79 L.Ed.2d 814 (1984) (Protecting the confidentiality of deliberations by high government officials ensures frank and open discussions). Requiring judges to respond to subpoenas regarding their judicial acts violates this important policy.

## IV. EVIDENCE SOUGHT IS IMMATERIAL

Additionally, the subpoenas should be quashed because they seek testimony which is immaterial. "[T]he constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible."

State v. Manning, 2003 Tenn. Crim. App. LEXIS 117, *32. Trial courts have the duty to abate subpoenas for witnesses whose testimony would be immaterial. Id. "Material testimony is that which is exculpatory - - evidence that if admitted would create reasonable doubt that did not exist without the evidence." State v. Easterly, 2001 Tenn. Crim. App. LEXIS 150, *24. Unless Petitioner can show that the testimony sought is admissible and would establish by clear and convincing evidence a valid ground for relief the subpoenas should be quashed.

Judges Jenkins and Baumgartner can offer no admissible testimony which would establish a valid ground for relief. By agreement of all parties and the Court, evidence will be heard in two areas on February 27, 2006. Those areas are: (1) the over billing situation involving Bill Talman and (2) the furnishing of materials collected by Dr. Diana McCoy to the District Attorney General's Office during the original trial. Undersigned counsel for the State has been unable to find any record of either judge being involved in these two areas in any way. Even if the judges were involved, the State respectfully submits such involvement would not establish a ground for relief for Petitioner.

WHEREFORE, PREMISES CONSIDERED, the State prays that the Court quash the subpoenas issued for Judges Baumgartner and Jenkins.

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: [signature]
LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

CERTIFICATE

I hereby certify that I have delivered a true and exact copy of the above-captioned pleading via fax and first-class mail, postage prepaid, to:

Donald E. Dawson
Catherine Y. Brockenborough
Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

Attorneys for the Defendant, this the 27 day of February, 2006.

LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB 27 AM 9:38
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, Petitioner, | ) | |
| v. | ) | No. 68280 |
| STATE OF TENNESSEE, Respondent | ) | |

**STATE'S RESPONSE TO PETITIONER'S RENEWED MOTION TO DISQUALIFY THE OFFICE OF THE KNOX COUNTY DISTRICT ATTORNEY GENERAL**

Comes the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, in response to Petitioner's Renewed Motion to Disqualify the Office of the Knox County District Attorney General and states the motion is without merit and should be denied. Petitioner argues that the Knox County District Attorney General's Office should be recused as several attorneys in the office are proposed witnesses for Petitioner. However, the testimony of these prosecutors has very limited value to Petitioner and would not be prejudicial to the State of Tennessee. Consequently, recusal of the Knox County District Attorney General's Office is unwarranted.

## I. PROSECUTORS' PROPOSED TESTIMONY VERY LIMITED IN VALUE

Recusal of the Knox County District Attorney General's Office rests in the sound discretion of the trial court. Bowman v. State, 598 S.W.2d 809, 811 (Tenn. Crim. App. 1980). Petitioner's motion to disqualify the Knox County District Attorney General's Office is based on her proposal to call Randall Nichols, William Crabtree, Jo Helm, and Jeff Blevins, as witnesses in this case. "The focus on whether to a district attorney or any assistants within the office

should be disqualified often depends on the value of their potential testimony." State v. Baker, 931 S.W.2d 232, 237 (Tenn. Crim. App. 1996). Testimony which can be duplicated by other witnesses or which goes to areas not in dispute, has very little value and does not require recusal. Id. at 238. See also, State v. Kilburn, 1989 WL 89333 (Tenn.Crim.App.)(Prosecutor properly not disqualified from case where his testimony would be cumulative to that of other witnesses).

Petitioner first contends the prosecutors in question are needed to testify to establish certain facts about Bill Talman's involvement in over billing the indigent defense fund. However, the basis facts of Talman's involvement can be established by the Report of the Comptroller and the Board of Professional Responsibility record. The four prosecutors in question will not be able to add any additional information relevant and valuable to Petitioner's grounds for relief.

Petitioner next contends the prosecutors in question are needed to testify about the failure of the Knox County District Attorney's Office to inform the Court of Talman's alleged conflict of interest at the time he was appointed to represent Petitioner. The record speaks for itself on this issue. The four witnesses do not have any information to offer outside what is already contained in the record on this issue.

Finally, Petitioner states the testimony of the prosecutors is needed to establish Talman's alleged "misstatement" about when he received Dr. Diana McCoy's three volume mitigation study. This allegedly took place in chambers. However, Talman's statement on the issue was repeated when the parties returned to open court. "[A]s I explained in chambers, I had just received this documentation earlier this week myself." Transcript, p. 2468. Consequently, the testimony of the four prosecutors in question is not needed on this issue either.

State v. Baker,931 S.W.2d 232 (Tenn. Crim. App. 1996) provides the best guidance in determining whether the Knox County District Attorney General's Office should be recused in this case. In State v. Baker, the prosecutor was the only witness called by the defendant at trial. Id. at 238. His testimony covered over forty-five pages and addressed unique factual matters which only the prosecutor could address. Id. Despite these facts, the trial court's denial to recuse the district attorney's office was upheld. Id. The Baker court noted that much of the prosecutor's testimony could have been covered by other witnesses. Id. That portion of the testimony which could not have been presented by other witnesses, was of little value. Id. Consequently, there was no need to recuse the district attorney's office. Id. at 238. Likewise in this case, the proposed testimony of the prosecutors will be covered by other evidence and will be of little value. Therefore, recusal of the Knox County District Attorney General's Office is unnecessary.

## II. PROSECUTORS' PROPOSED TESTIMONY NOT PREJUDICIAL TO THE STATE

Even if they were called, the proposed testimony of Randall Nichols, William Crabtree, Jo Helm and Jeff Blevins would not be prejudicial to the State. When called by the other party, a prosecutor is not required to withdraw "unless it is apparent that his testimony is or may be prejudicial to his client." State v. Browning, 666 S.W.2d 80, 86-87 (Tenn. Crim. App. 1983); See also, State v. Baker, 931 S.W.2d 232, 238 (Tenn. Crim. App. 1996); Makoka v. State, 1997 Tenn. Crim. App. LEXIS 769, * 24 ("An attorney who is called to the witness stand by his client's adversary has no obligation to withdraw from representation until his testimony is or may be prejudicial to his Client.").

The proposed testimony of the four prosecutors, if allowed, will not undermine the State's position in any way. The basic facts of Talman's over billing will be established by the Comptroller's Report and the Board of Professional Responsibility record on the matter. Likewise, if the record reflects that Talman's over billing was not brought to the Court's attention by the District Attorney's Office, the proposed testimony of the prosecutors will not differ from that. Finally, Talman's statement concerning the timing of when he received Dr. McCoy's mitigation study is on the record. The proposed testimony of the four prosecutors will not be different then what is already on the record. In sum, the proposed testimony will not add any key evidence prejudicial to the State's cause and, therefore, does not require recusal of the Knox County District Attorney General's Office.

WHEREFORE, PREMISES CONSIDERED, the State prays that Petitioner's Renewed Motion to Disqualify the Office of the Knox County District Attorney General be denied.

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: Leland L Price
LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY



Case 1:12-cv-00035-HSM-SKL Document 9-1 Filed 08/01/12 Page 144 of 153 PageID #: 3915

CERTIFICATE

I hereby certify that I have delivered a true and exact copy of the above-captioned pleading via fax and first-class mail, postage prepaid, to:

Donald E. Dawson
Catherine Y. Brockenborough
Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

Attorneys for the Defendant, this the 27 day of February, 2006.

Leland L Price

LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Jackson.

STATE of Tennessee, Appellee,
v.
Billy Ernest KILBURN, Appellant.

Aug. 9, 1989.
Permission to Appeal Denied by Supreme Court November 27, 1989.

C.C.A. NO. 2, Lake County, Joe P. Riley, Jr., Judge. (First Degree Murder While Employing a Firearm).

James O. Lanier, William K. Randolph, Assistant Public Defender, Dyersburg, for appellant.

Charles W. Burson, Attorney General and Reporter, Janice Bossing, Assistant Attorney General, Nashville, Jim Horner, District Attorney General, Dyersburg, for appellee.

OPINION

REID, Judge.

*1 This case presents an appeal as of right from a conviction of first degree murder and a sentence of life imprisonment plus a five year enhancement for employing a firearm in the commission of the offense.

The appellant assigns for review the trial court's refusal to suppress incriminating statements, the sufficiency of the evidence and the court's refusal to disqualify the assistant district attorney general who prosecuted the case.

The record does not show reversible error.

MOTION TO SUPPRESS

The evidence on the suppression hearing was the transcript of a telephone call made by Appellant to the sheriff of Lake County, the transcript of a statement given by Appellant to the sheriff, the transcript of a statement given by Appellant to a T.B.I. agent in the presence of the sheriff, a hand-written summary of the statement given to the T.B.I. agent signed by Appellant and the testimony of the T.B.I. agent and the sheriff.

Appellant admits that he was warned of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). He also admits that he did not request an attorney. He claims the statements admitted into evidence, a transcript of the tape of the statement given the T.B.I. agent and the written summary, were not voluntary, and were obtained in violation of the due process provision of the Fourteenth Amendment to the United States Constitution.

The victim, who had been shot and whose body had been partially burned at a garbage dump in a remote area of Lake County, had last been seen with Appellant at a night club in Dyersburg. The assistant district attorney general had expressed the opinion that it was "a case for the electric chair."

Appellant, who was incarcerated in another county jail on unrelated charges, telephoned the sheriff of Lake County, with whom he had been good friends for several years, and told the sheriff he would rather be in the Lake County jail "where I know some people" and also stated he would "tell you everything I know about [this] case ... and have that there off my mind." The sheriff told Appellant, "they're building a first degree and that's the electric chair," and strongly admonished Appellant to tell him the truth.

Five days later, the sheriff interviewed the appellant at the Lake County jail. Appellant was nervous and complained of headaches resulting from the discontinued use of liquor and drugs. He stated he was scared because he had "messed up his life" and "I'm scared to tell the truth cause I don't really realize what happened. I was just so drunk and so high and so messed up Joe. My mind was just coming and going, and I stood out there and was so scared I didn't know any place to go." He told the sheriff, "I know that I should tell it to somebody, but I just ain't ready to believe it happened." The appellant explained why he returned to Lake County, "my brother got to talking to me and stuff about the Lord and one night I prayed and hoped that everything would be different with me, and the next day I woke up feeling a lot different about myself. In about two days on Thursday, just something told me to go back to Lake County, back down there where all the trouble is and

see it the best I could and the way that's right, and here I am back, and that's what I'm doing." Initially he said he could not remember, but, in response to patient and persistent but friendly encouragement by the sheriff, he began to recount some of the events of the day and night before the victim was shot. Later the same day, in response to questioning by the T.B.I. agent, Appellant stated the victim was shot at the garbage dump with a shotgun held by Appellant, but he claimed that the fatal shot was fired accidentally when he was passing the weapon to the victim. He denied that he burned the body.

*2 The voluntariness of a confession is determined by examining the totality of the circumstances under which the statement was made. State v. Burtis, 664 S.W.2d 305 (Tenn.Crim.App.1983). Appellant complains that the sheriff told him, "I'm trying to keep [you] out of the electric chair" and that he was "goaded by [the T.B.I. agent] regarding the slaying and burning." The facts known by the sheriff indicated a brutal slaying and a shocking mutilation by burning and animals. The sheriff had known the appellant well for many years, and there is nothing in the record to suggest the sheriff was not genuinely concerned and was not being truthful. The evidence in the record does not show that the appellant's "will was overborne." State v. Matson, 666 S.W.2d 41, 43 (Tenn.1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 225 (1984). Appellant, though obviously undergoing mental anguish, was under no physical or mental disability. The transcripts of the statements and the testimony of the officers do not indicate that the officers made any threats or promises or engaged in any deceit.

The record supports the trial judge's finding that the statements were voluntary.

SUFFICIENCY OF THE EVIDENCE

There was little conflict in the testimony. On a Saturday afternoon in November, the appellant and the victim, 26 and 25 respectively, and several of their friends were "drinking," "smoking dope" and "partying" at one of the couple's residence. Later in the evening, the appellant and the victim drove in Appellant's automobile to Century 21 in Dyersburg, where they drank beer (the victim was "cut-off" after he went to sleep at the bar) until about 12:45 a.m. A waitress at Century 21, testifying on behalf of Appellant, stated that he told her he was having "girlfriend" troubles and seemed depressed. They left the drinking area together, but were not seen by any of the witnesses leaving the building together.

According to the appellant's statement given to the T.B.I. agent, they drove to a location in Dyersburg where the victim purchased some "pills" and cocaine and, after using the drugs, they drove the back-roads towards Tiptonville drinking beer. They decided to "spot-light" rabbits. Appellant stopped his vehicle at a garbage dump beside the road in a remote area (where the victim's body was found several days later) and got out of the vehicle with the spot- light and battery in one hand and a shotgun in the other. As he handed the weapon to the victim, who was getting out of the vehicle on the passenger side, it accidentally fired. The recoil knocked Appellant to the ground where he lay "passed-out" for awhile. When he saw the victim lying on the ground, he placed the shotgun in his car and drove away. Later he threw the shotgun into the Obion River. Even though there was a gasoline can in the trunk of his car, he denied that he burned the body. In his statement, he said, "I can't place it in my mind that I burned the body. I can't picture it in my mind that I did it. I can't remember burning the body, if I did it."

*3 A prisoner, who was in a cell adjoining Appellant's, testified that Appellant told him that he killed the victim and asked, "Do you think God would forgive me for what I did?" After being assured that God would forgive him, Appellant related the details of the homicide. Appellant became angry with the victim because he understood he had asked Appellant's girlfriend to have sex with him. After the victim passed out en route home from Century 21, Appellant drove to a graveyard, where he shot the victim and took his money. He later transported the body to the dump and set it on fire with gasoline.

The State proved that the victim's keys, suspender snaps and the top portion of a metal chain which fastened the victim's "trucker-type" wallet to his belt were found at the scene, but the lower portion of the chain and the wallet, which contained "a lot" of money, were not found. Two of Appellant's friends and the T.B.I. agent testified that Appellant told them, before the victim's body had been discovered, that he left the victim at Century 21.

On appeal a guilty verdict approved by the trial judge accredits the testimony of the witnesses for the State; the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences therefrom; the verdict removes the presumption of innocence and raises a presumption of guilt; and the appellant has the burden of showing that the evidence preponderates against the verdict. State v. Cabbage, 571 S.W.2d 832 (Tenn.1978); State v. Hatchett, 560

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

S.W.2d 627 (Tenn.1978); *State v. Townsend*, 525 S.W.2d 842 (Tenn.1975); *State v. Grace*, 493 S.W.2d 474 (Tenn.1973); and *Anglin v. State*, 553 S.W.2d 616 (Tenn.Crim.App.1977).

The proof required the jury to determine if the killing was intentional or accidental. For the purpose of appellate review, the evidence supports the State's position that the appellant killed the victim because he had made advances toward his girlfriend (premeditated murder) and also he killed the victim in the course of a robbery (felony-murder). The evidence supports the jury's verdict of guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Williams*, 657 S.W.2d 405 (Tenn.1983); and Rule 13(e), T.R.A.P.

MOTION TO DISQUALIFY PROSECUTING ATTORNEY

Appellant's pre-trial motion to disqualify the district attorney general and all of his assistants was based on the assertion that the assistant district attorney general assigned to try the case "will be called as a witness by the defendant at the trial." The prosecuting attorney, who was the only witness called on the hearing of the motion, testified that he was present during the investigation at the location where the body was found, he supervised the collection and examination of debris, ashes and other substances at the dump, saw some keys, a portion of a small chain and other items which were introduced into evidence and examined the body of the victim after it was removed from the scene. He testified the actual investigation was made by police officers and he had no information which was not known by the officers. He stated he would not be a witness on the State's case-in-chief and could not envision any circumstances which would require that he testify on rebuttal.

***4** The Court found that the prosecutor was not a material witness, that his testimony would be cumulative to that of the police investigators and that disqualifying the attorney assigned to the case would impose a "hardship" on the State.

The trial court properly found that a prosecuting attorney is not disqualified from participating in the trial of a case because he was involved in the investigation of the crime. *See State v. Claybrook*, 736 S.W.2d 95 (Tenn.1987), *State v. Caruthers*, 676 S.W.2d 935 (Tenn.1984).

The judgment of the trial court is affirmed.

DUNCAN, P.J., and WADE, J., concur.

1989 WL 89333 (Tenn.Crim.App.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

LEXSEE

**TONY A. MAKOKA, Appellant, vs. STATE OF TENNESSEE, Appellee.**

**No. C.C.A. 01C01-9603-CC-00124**

**COURT OF CRIMINAL APPEALS OF TENNESSEE, AT NASHVILLE**

***1997 Tenn. Crim. App. LEXIS 769***

**August 15, 1997, Opinion Filed**

**PRIOR HISTORY:** [*1]

Rutherford County. Honorable J.S. Daniel, Judge. (Post-Conviction).

**DISPOSITION:**

AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant sought review of a judgment from the Rutherford County Circuit Court (Tennessee), which convicted defendant for attempted first degree murder and attempted second degree murder and denied defendant's petition for post-conviction relief.

**OVERVIEW:** Defendant was convicted for attempted first degree murder and attempted second degree murder in after he shot a woman that he was having an extra-marital relationship with and her friend after a car chase. Defendant's convictions were previously affirmed by the court and the court had also modified defendant's sentence. The state supreme court denied defendant's request to appeal and defendant filed a petition for post-conviction relief, which was denied by the trial court. On appeal, the court affirmed defendant's convictions. The court held that defendant was not denied effective assistance of counsel by: (1) the failure of his trial counsel to move for suppression of a warrantless search because defendant failed to preserve the issue by presenting it to the trial court and that the search was valid; (2) his trial counsel's investigation, which was adequate; and (3) the failure of his trial counsel to object to the prosecutor's characterization of one of defendant's witnesses as a liar because he failed to preserve the issue and the comment did not constitute prosecutorial misconduct. The court also held that defendant made an informed decision not to testify.

**OUTCOME:** The court affirmed defendant's convictions for attempted first degree murder and attempted second degree murder.

**LexisNexis(R) Headnotes**

***Constitutional Law > Criminal Process > Assistance of Counsel***
[HN1] U.S. Const. amend. XI and Tenn. Const. art. I, § 9 both require that a defendant in a criminal case receive effective assistance of counsel.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
[HN2] When a defendant claims ineffective assistance of counsel, the standard applied by the courts of Tennessee is whether the advice given or the service rendered by the attorney is within the range of competence demanded by attorneys in criminal cases.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
[HN3] To establish an ineffective assistance of counsel claim, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and must demonstrate that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the constitution. Second, a defendant must show that counsel's performance prejudiced him and that errors were so serious as to deprive the defendant of a fair trial, calling into question the reliability of the outcome.

***Criminal Law & Procedure > Appeals > Standards of Review***

*Criminal Law & Procedure > Counsel > Effective Assistance > Trials*
[HN4] A petitioner's burden of proof in all cases filed after May 10, 1995 is by clear and convincing evidence. *Tenn. Code Ann. § 40-30-210(f)* (Supp. 1996). The appellate court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance and must evaluate counsel's performance from counsel's perspective at the time of the alleged error and in light of the totality of the evidence.

*Criminal Law & Procedure > Appeals > Standards of Review > Standards Generally*
*Criminal Law & Procedure > Counsel > Effective Assistance > Tests*
[HN5] To establish an ineffective assistance of counsel claim, a petitioner must demonstrate that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A trial court's findings of fact following a post-conviction hearing have the weight of a jury verdict. On appeal, those findings are conclusive unless the evidence preponderates against the judgment.

*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review*
[HN6] When an issue is not raised in the trial court it is not a proper ground for relief in the appellate court. Tenn. R. App. P. 36(a)

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches*
[HN7] U.S. Const. amend. IV and Tenn. Const. art. I, § 7 guarantee individuals the right to be free of unreasonable governmental searches and seizures. A warrantless search is per se an unreasonable search, unless one of the well-defined exceptions to the warrant requirement applies.

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Vehicle Searches*
[HN8] A warrantless search of a vehicle in a public place, in the aftermath of a crime and when there is probable cause to believe the vehicle contains items that are subject to seizure is entitled to a conclusive presumption of exigency, permitting the warrantless search, even absent actual likelihood of risk of delay in obtaining a warrant.

*Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response*
[HN9] A prosecutor is within the proper bounds where his argument is based upon inferences supported by the evidence of record, including argument pertaining to the veracity of a witness's testimony. Although an attorney may not express his personal opinion of a witness's credibility, he may argue based upon his analysis of the evidence and the conclusion supported by the evidence. Tenn. Sup. Ct. R. 8, Model Code of Prof'l Responsibility DR 7-106(C)(4).

*Legal Ethics > Client Relations > Accepting Representation*
[HN10] Model Code of Prof'l Responsibility DR 5-101 and 5-102 provides in part: A lawyer shall not accept employment in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer or a lawyer in the lawyer's firm ought to be called as a witness, except that the lawyer may undertake the employment and the lawyer or a lawyer in the lawyer's firm may testify: (1) If the testimony will relate solely to an uncontested matter. (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony. Tenn. Sup. Ct. R. 8, Model Code of Prof'l Responsibility), DR 5-101 and 5-102.

*Legal Ethics > Client Relations > Conflicts of Interest*
*Legal Ethics > Client Relations > Accepting Representation*
[HN11] Model Code of Prof'l Responsibility DR 5-101 and 5-102 provide: If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in the lawyer's firm ought to be called as a witness on behalf of the client, the lawyer shall withdraw from the conduct of the trial and the firm, if any, shall not continue representation in the trial, except that the lawyer may continue the representation and the lawyer or a lawyer in the lawyer's firm may testify in the circumstances enumerated. If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in the lawyer's firm may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client. Tenn. Sup. Ct. R. 8, Model Code of Prof'l Responsibility, DR 5-101 and 5-102.

*Legal Ethics > Client Relations > Conflicts of Interest*

***Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion***

[HN12] The purpose of the rules on attorney and law firm disqualification is not to protect a litigant from opposing counsel, but to protect the attorney's own client. An attorney who is called to the witness stand by his client's adversary has no obligation to withdraw from representation until his testimony is or may be prejudicial to his client. The trial court's determination with respect to disqualification of an attorney based upon undisputed facts and conduct not taking place in court is a matter within the trial court's sound discretion, and it is not to be disturbed on appeal absent an abuse of discretion.

**COUNSEL:**

For APPELLANT: RUSS EAGLE (Appeal), Attorney at Law, Murfreesboro, TN. JACK G. HEFFINGTON (Hearing), Attorney at Law, Murfreesboro, TN.

For APPELLEE: JOHN KNOX WALKUP, Attorney General & Reporter. DARYL J. BRAND, Assistant Attorney General, Criminal Justice Division, Nashville, TN. WILLIAM C. WHITESELL, JR., District Attorney General, Murfreesboro, TN.

**JUDGES:** CURWOOD WITT, JUDGE, CONCUR: GARY R. WADE, DAVID H. WELLES, JUDGE.

**OPINIONBY:** CURWOOD WITT

**OPINION:**

**OPINION**

The petitioner, Tony A. Makoka, appeals the Rutherford County Circuit Court's denial of post-conviction relief. The petitioner was convicted by a jury of his peers of attempted first degree murder of his paramour, Jane Rhodes, and attempted second degree murder of her friend, Dwight Cooper, following a car chase and shooting incident which ended on the steps of the Murfreesboro Police Department. The petitioner is serving concurrent 20 year and 10 year sentences for these convictions. *State v. Makoka, 885 S.W.2d 366 (Tenn. Crim. App. 1994).* In this appeal, the petitioner raises four issues pertaining to ineffective assistance of [*2] counsel -- (1) failure to move for suppression of evidence obtained pursuant to a warrantless search, (2) failure to adequately investigate, (3) failure to object to the prosecution's characterizations of the petitioner's wife as untruthful, and (4) that counsel prevented the petitioner from testifying in support of his defense. In addition, the petitioner contends the trial court should have disqualified the district attorney's office from representing the state in post-conviction proceedings because one of the police officers who testified for the state at trial is now a member of the district attorney's office and was called to testify for the defense at the post-conviction hearing. On review, we affirm.

The petitioner, married and a father, was involved in an extramarital relationship with one of the victims, Jane Rhodes. This relationship, tempestuous at times, apparently ended in late 1991, although the petitioner and Ms. Rhodes attempted to maintain a platonic friendship. In December 1991, the petitioner and Ms. Rhodes attended a Christmas party together and exchanged gifts. However, they quarreled on at least two occasions prior to January 3, 1992. On that date, the petitioner [*3] shot Ms. Rhodes and Dwight Cooper, and as a result he faced trial for two counts of attempted first degree murder. The petitioner was represented at trial by attorney Richard McGee of Nashville. He was convicted of the attempted first degree murder of Rhodes and attempted second degree murder of Cooper. That judgment was affirmed by this court, and the sentence was modified. The petitioner's appellate counsel in this court was Karen Hornsby of Murfreesboro. n1 The supreme court denied the petitioner's pro se request for permission to appeal. The petitioner has now brought a petition for post-conviction relief, which was denied by the court below. The matter is before us for appellate review.

n1 The petitioner has made no allegation of ineffectiveness with respect to the services provided by Hornsby.

**I**

[HN1] The Sixth Amendment of the United States Constitution and Article I, § 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. [*4] *Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975).* [HN2] When a defendant claims ineffective assistance of counsel, the standard applied by the courts of Tennessee is "whether the advice given or the service rendered by the attorney is within the range of competence demanded by attorneys in criminal cases." *Summerlin v. State, 607 S.W.2d 495, 496 (Tenn. Crim. App. 1980).*

In Strickland v. Washington, the United States Supreme Court defined the Sixth Amendment right to effective assistance of counsel. *466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).* First, [HN3] the appellant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and must demonstrate that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Constitution. *Strickland, 466 U.S. at*

*687, 104 S. Ct. at 2064.* Second, the petitioner must show that counsel's performance prejudiced him and that errors were so serious as to deprive the defendant of a fair trial, calling into question the reliability of the outcome. *Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.*

[HN4] The petitioner's burden of proof in all cases filed [*5] after May 10, 1995 is by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (Supp. 1996). The court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance and must evaluate counsel's performance from counsel's perspective at the time of the alleged error and in light of the totality of the evidence. *Strickland, 466 U.S. at 690, 695, 104 S. Ct. at 2066, 2069.* [HN5] The petitioner must demonstrate that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.* A trial court's findings of fact following a post-conviction hearing have the weight of a jury verdict. *Bratton v. State, 477 S.W.2d 754, 756 (Tenn. Crim. App. 1971).* On appeal, those findings are conclusive unless the evidence preponderates against the judgment. *Butler v. State, 789 S.W.2d 898, 900 (Tenn. 1990).*

**A**

In his first argument, the petitioner contends his trial counsel was ineffective because he failed to move for suppression or otherwise object to introduction of evidence obtained pursuant to a warrantless [*6] search. This allegation pertains to a search of the petitioner's truck which took place shortly after the shootings outside the Murfreesboro Police Department. In the petition and at the hearing below, this Issue was not raised as an ineffective assistance claim. The pro se petition raises the introduction of the evidence as "judicial misconduct." n2 Counsel in the proceedings below did not amend the petition to include error of trial counsel in failing to pursue suppression of the evidence obtained in the search. n3 The post-conviction court found "no reasonable basis to claim . . . the defendant was convicted as a result of some constitutional right that he would have had as regards to evidence within the vehicle." The court went on to find the search was justified as a search incident to arrest. [HN6] Because this issue was not raised below, it is not a proper ground for relief in this court. Tenn. R. App. P. 36(a); Alonzo Williams v. State, slip op., No. 1100, slip op. at 2 (Tenn. Crim. App., Knoxville, Mar. 4, 1987) (in post-conviction proceedings, "the rule is that questions not raised by the pleadings and then litigated in the trial court are not reviewable on appeal") (citation omitted), [*7] perm. app. denied (Tenn. 1987). Thus, this issue is without merit.

n2 It is clear from the context, however, the petitioner's allegation is one of erroneous admission of the evidence by the trial court.

n3 Counsel at the post-conviction hearing made the following statement on the record:

> *The petition, your Honor, being all-inclusive, covers several areas. One is that it covers the ineffective assistance of counsel issue. It covers the search and seizure issue of the physical evidence.* It also covers the sentencing of the Court. It also covers it.
>
> . . .
> Your Honor, there is the issue that he covered in his petition as to his statements given to Detective Peel. His position is that those statements were taken under some type of trickery or coercion or certainly without his understanding that they would be used against him in a court of law. *The petition also covers certain things that he calls inappropriate conduct of the trial judge, your Honor.* It also covers the inappropriate or prosecutorial misconduct of the District Attorney. And that's basically the things that he's covered in the petition, and we would like, your Honor, to cover as many of those issues as the Court would allow. (emphasis added)

Additionally, post-conviction counsel's summation at the hearing treats the search and seizure issue as a free-standing deprivation of constitutional rights, separate from the constitutional claim of ineffective assistance of counsel. It is apparent from counsel's statements that the search and seizure issue was raised as a separate allegation and not as part of the ineffective assistance of trial counsel claim.

[*8]

Even though the petitioner failed to preserve this issue for our review by first presenting it to the trial court, we would nevertheless decline to grant the requested relief if the issue was properly before us.

The record reflects that within moments of the shootings, the appellant was detained in handcuffs, first in a police cruiser and then in the basement of the police station, until a detective arrived to question him. According to both the detective and the petitioner, the petitioner was not formally advised he was under arrest until after he was questioned, although he clearly was not free to leave. At some time during these events, in all likelihood before the petitioner was formally placed under arrest, the passenger compartment of his truck was searched. This search yielded ammunition matching that used in the shootings and a receipt for ammunition dated approximately two weeks prior to the shootings. The petitioner contends this search was improper either (1) because it was not a search incident to arrest, or alternatively, (2) even if it was a search incident to arrest, no exigent circumstances existed. On the other hand, the state argues the search was proper (1) as [*9] an inventory search, or (2) as a search incident to arrest. In our view, the record supports a finding that the warrantless search was justified, although not on either ground advanced by the state.

[HN7] The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee individuals the right to be free of unreasonable governmental searches and seizures. A warrantless search is per se an unreasonable search, unless one of the well-defined exceptions to the warrant requirement applies. *Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967); State v. Tyler, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980).*

In this case, the petitioner's vehicle was parked in a public place, a public street immediately in front of the Murfreesboro police station, within the area in which the shooting had just taken place. Two individuals were present at the scene with obvious gunshot wounds, and at least one police officer saw the petitioner standing in the area either holding a gun or near a gun that was on the ground. n4 A less than full box of ammunition could be seen on the seat of the petitioner's truck. As our [*10] supreme court has recently recognized, [HN8] a warrantless search of a vehicle in a public place, in the aftermath of a crime and when there is probable cause to believe the vehicle contains items that are subject to seizure n5, is entitled to a conclusive presumption of exigency, permitting the warrantless search, even absent actual likelihood of risk of delay in obtaining a warrant. *State v. Leveye, 796 S.W.2d 948 (Tenn. 1990)* (adopting the rule of *California v. Carney, 471 U.S. 386, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985)).* In this case, probable cause dearly existed because the crime was committed in the immediate area and the box of ammunition was in plain view, and the exception applies to authorize a warrantless search under the vehicle-search exception to the warrant requirement. See *Carroll v. U.S., 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925).* n6 Accordingly, there is no basis for an ineffective assistance claim premised upon counsel's failure to challenge this warrantless search. If this issue were properly before us, we would find it without merit.

n4 The evidence is conflicting on this point. Which version is correct is immaterial to our determination.

[*11]

n5 The Laveye holding is not limited to contraband; it extends to other types of evidence that may otherwise be obtained by search warrant, as well. *State v. Ronald Edward Parrish, 1995 Tenn. Crim. App. LEXIS 915,* No. 01C01-9309-CC-00292, slip op. at 4 (Tenn. Crim. App., Nashville, Nov. 16, 1995),. perm. app. denied (Tenn. 1996).

n6 Because Leveye supports the warrantless search of the petitioner's truck, we express no opinion regarding the applicability of the search incident to arrest and inventory search exceptions to the warrant requirement.

**B**

The petitioner's next claim is that his attorney failed to conduct an adequate investigation. First, he complains of trial counsel's alleged failure to investigate victim Cooper's criminal history and possible gun ownership. Had such evidence been uncovered, it presumably could have (1) been used for impeachment purposes, and/or (2) would have supported the petitioner's Claim Cooper shot at him during the car chase. n7 Second, the petitioner takes issue with trial counsel's alleged failure to investigate and bring to the court's attention his claim he [*12] told a police officer he did not want to make a statement shortly before he was interrogated by a detective.

n7 No physical evidence supported this theory at trial. The victims denied Cooper was armed. No gun was ever recovered from the area where the petitioner alleged he saw Cooper throw the gun. The petitioner claimed he sustained property damage to his truck as a result of the alleged shot, but one of the police officers testified the dent in question could not have been caused by a recently fired bullet because the dent was rusty.