**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ADDENDUM 4**

**DOCUMENT 2**

E2007-00016-CCA-R3-PD

II

VOLUME II OF V

# TECHNICAL RECORD

NO. 68280

DEFENDANT: CHRISTA GAIL PIKE, PETITIONER
(Defendant Indigent)

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGO

## APPEALED FROM

## KNOX COUNTY CRIMINAL COURT

## AT KNOXVILLE, TENNESSEE

HON. MARY BETH LEIBOWITZ JUDGE – DIVISION III

JOY R. MCCROSKEY CLERK

IN THE CASE OF

CHRISTA GAIL PIKE, PETITIONER

VS.

STATE OF TENNESSEE, RESPONDENT

PETITION DISMISSED

CHARGE: ~~PETITION FOR RELIEF FROM CONVICTION OR SENTENCE~~

## TO THE

## COURT OF CRIMINAL APPEALS

## KNOXVILLE, TENNESSEE

HONORABLE DONALD DAWSON, ATTORNEY -at LAW
~~530 Church Street~~
Suite 600
Nashville, TN 37243

Attorneys for Appellant

~~HONORABLE RANDALL E. NICHOLS, District Attorney General~~
HONORABLE LELAND PRICE, Assistant Attorney General
~~City County Building~~
Knoxville, TN 37902

Attorneys for Appellee

FILED 3 DAY OF April 2009

CRIMINAL COURT JOY R. MCCROSKEY CLERK

NO. 68280 SHEILA MELTABARGER DEP. CLERK

APPELLANT PRISON NO. 2612368
3881 Stewarts Lane
Nashville, TN 37243

At the hearing, trial counsel testified he investigated Cooper by talking with people who knew him, obtaining a "rap" sheet, attempting to talk with him personally n8 and examining him at the preliminary hearing. The petitioner did not directly contradict his former attorney's testimony; he merely alleged counsel never advised him of the results of the investigation. Moreover, the petitioner failed to present any evidence at his post-conviction hearing regarding Cooper which [*13] would have supported his defense, had his attorney discovered it and presented it at trial. The post-conviction court found, "Mr. McGee performed a very thorough and effective investigation in this cause and was very effective in representing [the petitioner]." We cannot say the evidence preponderates against this finding. Not only has the petitioner failed to establish his attorney's ineffective assistance, he has failed to demonstrate any prejudice therefrom. See *Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.*

n8 According to trial counsel, Cooper refused to talk to him.

The petitioner also complains his attorney failed to investigate and bring to the court's attention an invocation of Fifth Amendment privilege the petitioner allegedly made when he was detained outside the police station and placed in a police cruiser. The petitioner does not deny he later waived his rights and gave a statement after he was inside the police station. At the hearing, the petitioner alleged he had signed a written [*14] statement invoking his rights while in the police cruiser and that he had asked his trial attorney to look into this matter. Trial counsel was not asked by either party whether he had investigated the existence of such a written or oral statement, although he testified he was given "the total open file" by the state months prior to trial. Detective Eddie Peel, who interrogated the petitioner inside the police station, testified he did not recall seeing a document signed by the petitioner stating he did not want to give a statement and he had never heard of the existence of any statement by the petitioner asserting Fifth Amendment privilege prior to the post-conviction hearing. The evidence does not preponderate against the finding of the trial court that counsel conducted a thorough investigation. The petitioner has brought forward no evidence that his counsel did not investigate the alleged invocation of privilege, at least in the "open file" provided by the state. Further, the petitioner has failed to demonstrate that the suppression of his subsequent statement would have resulted in a different outcome. n9 The evidence against the petitioner was overwhelming. Both victims testified [*15] in great detail about the petitioner's actions. Police officers and a police department employee provided further corroboration of the petitioner's guilt. The physical evidence points to the petitioner. The petitioner's statement was essentially cumulative of the overwhelming evidence of his guilt. n10 Accordingly, neither prong of the Strickland test has been satisfied. This issue lacks merit.

n9 It is not necessary for us to determine at this stage whether the subsequent statement should have been suppressed if the facts are as the petitioner alleges. We express no opinion in that regard.

n10 If anything, the petitioner's statement that was part of the state's evidence lends support to the self-defense theory he alleges should have been more vigorously pursued. Had counsel successfully challenged the admission of the statement, the petitioner would likely be before us complaining counsel should have allowed the statement into evidence because it supported a self-defense theory.

**C**

The petitioner's [*16] next appellate argument is with his trial counsel's failure to object to the prosecutor's alleged characterizations of the petitioner's wife as a liar. This issue was not raised below as one of ineffective assistance of counsel. Rather, the pro se petition raised it as an issue of "judicial misconduct" of the prosecutor. The petitioner's counsel made no comment on the record in the court below indicating a desire that this issue be considered as one of ineffectiveness of counsel. The post-conviction court treated the issue as one of prosecutorial misconduct and found "no basis for a finding that [the district attorney] engaged in any act of prosecutorial misconduct" and that the prosecutor's "representation, statements and argument appear and are found to be well within the grounds of propriety in the prosecution of this case and in the arguing of facts and issued raised by the proof to the jury." Because the petitioner did not raise this issue as one of ineffective assistance in the court below, that court did not have the opportunity to make findings of fact and rule on it accordingly. As a court of appellate review, we are precluded from contravening the province of the trier [*17] of fact. Tenn. R. App. P. 36(a) (party who caused error or failed to take action to prevent error is not entitled to appellate relief); Alonzo Williams, slip op. at 2. Thus, this issue is not properly before us.

Notwithstanding the petitioner's failure to properly present this issue in the court below, we would find it without merit if it was properly before us. The trial record reveals that one of the petitioner's strongest witnesses was his wife, Wendy Makoka, and she was subject to vigorous cross-examination by the district attorney. That questioning includes the following by the prosecutor:

> Q. Now, I don't mean to be ugly, but you don't have trouble remembering the answers to Mr. McGee's questions. Why don't you remember the answer to that one?
>
> A. It all depends with, you know, what type of question.
>
> Q. Yes, ma'am.
>
> A. Or how it's asked.
>
> Q. Isn't it true it all depends on whether it helps your husband or hurts him?
>
> A. No, that's not true.

Immediately thereafter, on redirect examination, defense counsel questioned Mrs. Makoka.

> Q. Would you lie under oath, Ms. Makoka? That's just what he's accused you of doing, ma'am.
>
> District [*18] Attorney: Your Honor, I haven't accused her of that.
>
> Defense Counsel: That's exactly what that question was designed to do.
>
> Q. Would you lie under oath?
>
> A. I'm not here to lie. I'm not lying. I'm not here to lie. I wouldn't be here if I was going to tell you all lies.

During closing argument, the district attorney said, "And, ladies and gentlemen, contrary to what Mr. McGee says, I am not calling Wendy Makoka a liar, but I do not understand her testimony -- maybe you do . . . ." Later, he said, "If I have insinuated she's a liar, I apologize to her, but I do not and am not ashamed to tell you that I believe the proof shows she is a biased witness. And if you show me a wife that's not biased in favor of her husband, then I'll show you a wife that's not worth having." Defense counsel later addressed the issue in his summation, acknowledging, "Yesterday. . . I got angry when I felt Wendy Makoka was being called a liar." He went on to argue the veracity of Mrs. Makoka's testimony and why the jury should accept it as reliable.

The issue the petitioner presents is whether counsel was ineffective for failing to object to these statements. Whether there was prosecutorial [*19] misconduct is determinative of whether a valid objection could be interposed. The supreme court has said [HN9] a prosecutor is within the proper bounds where his argument is based upon inferences supported by the evidence of record, *State v. Brown, 836 S.W.2d 530, 552 (Tenn. 1992)*, including argument pertaining to the veracity of a witness's testimony. *State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976)*. Although an attorney may not express his personal opinion of a witness's credibility, he may argue based upon his analysis of the evidence and the conclusion supported by the evidence. Tenn. Sup. Ct. R. 8 (Code of Prof'l Responsibility), DR 7-106(C)(4); *Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978)*. The trial court found there was no prosecutorial misconduct, and we cannot say the evidence preponderates against this finding. n11 Absent prosecutorial misconduct, which would have formed the basis for a proper objection, there can be no ineffective assistance of counsel. The petitioner would not be entitled to relief on this issue if it was properly before us.

> n11 As an aside, we note that trial counsel effectively dealt with any arguably objectionable expression of personal opinion by addressing it on redirect examination of Mrs. Makoka and in his closing argument.

[*20]

**D**

In his final argument relating to ineffective assistance of counsel, the petitioner contends his trial counsel prevented him from testifying in his own defense. The petitioner does not contend counsel refused to let him testify; rather, he says counsel convinced him not to take the stand and only gave him the option of testifying less than 24 hours before trial, at which time it was too late for him to prepare his testimony. Trial counsel testified he discussed this issue with the petitioner at great length. Counsel was concerned the petitioner might fail to connect with the jury, which would destroy the positive impact of Mrs. Makoka's testimony, as well as that of the

petitioner's treating psychiatrist. Counsel considered the testimony of Mrs. Makoka and the psychiatrist to be particularly strong for the petitioner's case. According to counsel, the ultimate decision whether to testify was petitioner's. The post-conviction court found, "Defendant was dearly made aware of his decision to testify or not to testify and made a wise decision in not testifying." Although neither party discussed it in the briefs to this court, the record of trial memorializes that the petitioner [*21] was examined outside the presence of the jury regarding this issue. He acknowledged consulting his attorney and expressed satisfaction with his election not to testify. The evidence does not preponderate against the determination of the post-conviction court that the petitioner made an informed decision not to testify. Counsel was not ineffective in this regard.

II

In his final issue, the petitioner contends the post-conviction court should have disqualified the Rutherford County District Attorney General's office from representing the state in this post-conviction proceeding. A current member of the district attorney's office, Jack Robinson, was formerly a police officer with the Murfreesboro Police Department. In the latter capacity, Robinson had some contact with the case.

Immediately following the offenses, Robinson responded to the scene outside the police station and collected the petitioner's revolver and some ammunition shells from the ground near where the victim Rhodes was lying. The petitioner called Robinson to testify about these facts at the post-conviction hearing. Robinson was also questioned about the search of the petitioner's truck, but he was unable to [*22] relay any facts to the trial court which are pertinent to resolution of issue IA above. n12 Robinson was not cross-examined by the state at the post-conviction hearing. Prior to the post-conviction hearing, the court ruled against the petitioner's motion for disqualification of the district attorney's office, reasoning

> Well, I think that the way this is written, DR 5-102 envisions a lawyer acting as a witness in their [sic] own cause. And in this particular case, the lawyer is not being presented as a witness in their [sic] cause. You may be calling them but not by [sic] the State.

n12 Robinson's testimony was, at best, marginally relevant to the matters before the post-conviction court.

The petitioner cites Disciplinary Rules 5-101 and 5-102(A) in support of his argument. [HN10] Those rules provide in pertinent part

> A lawyer shall not accept employment in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer or a lawyer in the lawyer's firm ought to be [*23] called as a witness, except that the lawyer may undertake the employment and the lawyer or a lawyer in the lawyer's firm may testify:
>
> (1) If the testimony will relate solely to an uncontested matter.
>
> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
>
> [other exceptions omitted].
>
> . . .
>
> [HN11] If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in the lawyer's firm ought to be called as a witness on behalf of the client, the lawyer shall withdraw from the conduct of the trial and the firm, if any, shall not continue representation in the trial, except that the lawyer may continue the representation and the lawyer or a lawyer in the lawyer's firm may testify in the circumstances enumerated [above].
>
> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in the lawyer's firm may be called as a witness other than on behalf of the Client, the lawyer may continue the representation until [*24] it is apparent that the testimony is or may be prejudicial to the client.

Tenn. Sup. Ct. R. 8 (Code of Prof'l Responsibility), DR 5-101 and 5-102. [HN12] The purpose of the rules on attorney and law firm disqualification is not to protect a litigant from opposing counsel, but to protect the attorney's own Client. *Coakley v. Daniels, 840 S.W.2d 367,*

*371 (Tenn. Crim. App. 1992).* An attorney who is called to the witness stand by his client's adversary has no obligation to withdraw from representation until his testimony is or may be prejudicial to his Client. *State v. Browning, 666 S.W.2d 80 (Tenn. Crim. App. 1983);* see generally *State v. Baker, 931 S.W.2d 232 (Tenn. Crim. App. 1996),* perm. app. denied (Tenn. 1996). The trial court's determination with respect to disqualification of an attorney based upon undisputed facts and conduct not taking place in court is a matter within the trial court's sound discretion, and it is not to be disturbed on appeal absent an abuse of discretion. n13 *State v. Baker, 931 S.W.2d 232, 238 (Tenn. Crim. App. 1996),* perm. app. denied (Tenn. 1996).

> n13 But see *In Re Ellis, 822 S.W.2d 602, 605-06 (Tenn. App. 1991).* In Ellis, a civil case, the court applied a standard of review found in Rule 13(d), Tenn. R. App. P., de novo review with a presumption of correctness. In the case now before us, the trial court's ruling on the disqualification issue would be approved even under the less deferential scope of Rule 13(d).

[*25]

In this case, Robinson, a state's witness at the trial, was called to testify by the petitioner at the post-conviction hearing. His testimony was consistent with that which he had given previously, and it was in no way prejudicial to the district attorney general's client, the State of Tennessee. It was within the trial court's discretion to rule that the district attorney's office should not be disqualified from representing the state in the petitioner's case.

In summary, we find all of the petitioner's issues inappropriate for appellate relief. The judgment of the trial court is affirmed.

CURWOOD WITT, JUDGE

CONCUR:

GARY R. WADE, JUDGE

DAVID H. WELLES, JUDGE

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB 27 AM 9:38
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, Petitioner, | ) | |
| | ) | |
| v. | ) | No. 68280 |
| | ) | |
| STATE OF TENNESSEE, Respondent | ) | |

**STATE'S RESPONSE TO MOTION TO RECUSE HONORABLE COURT FROM SERVICNG AS JUDGE AND FACT-FINDER IN THIS CASE**

Comes the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, in response to Petitioner's Motion to Recuse This Honorable Court From Serving As Judge and Fact-Finder In this Case, and says the Motion should be denied. As grounds for its response, the State submits that: (1) Recusal is not required simply because it will be reviewing its own prior actions in a case; and (2) The Judge is not a material witness such that her recusal is required in this proceeding.

**I. TEST FOR DETERMINING NECESSITY OF RECSAL**

A trial judge should recuse him or herself whenever the judge "has any doubt as to his [or her] ability to preside impartially in a criminal case or whenever his [or her] impartiality can reasonably be questioned." Pannell v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). While the first inquiry is a subjective test, the second is an objective standard. Alley v. State, 882 S.W.2d 810, 820-21 (Tenn. Crim. App. 1994). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the



Case 1:12-cv-00035-HSM-SKL Document 9-2 Filed 08/01/12 Page 7 of 157 PageID #: 3931

judge, would find a reasonable basis for questioning the judge's impartiality." Id., at 820.

The trial judge retains discretion over his or her recusal. State v. Smith, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995) Reasons which warrant recusal include:

> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it

Tenn. R. Sup. Ct. 10, Code of Judicial Conduct, Canon 3E(l)(a), (b).

A judge's determination whether she will disqualify herself from sitting on a case is a matter within that judge's sound discretion. Kinard v. Kinard, 986 S.W.2d 220 (Tenn. App. 1998). No precise procedure is contemplated by the Code of Judicial Conduct nor established through case law for determining a motion for recusal, though the Tennessee Supreme Court has recognized that the "accepted practice" is the filing of a motion for recusal with supporting affidavits of prejudice with the judge whose removal is sought. See State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002) "There is no authority for issuance of subpoenas, or other discovery procedures, in support of one's motion to disqualify a judge." Id. Indeed, there is no absolute right, by rule, statute or otherwise, to an evidentiary hearing or oral argument on *any motion* filed in the course of a post-conviction proceeding. And where, as in this case, the record already before the court provides a sufficient basis upon which to deny a petitioner's motion for recusal, no evidentiary hearing is required.

## II. INSUFFICIENT BASIS FOR RECUSAL

Petitioner's first ground for recusal centers on this Court's appointment of Bill Talman to represent Petitioner in the original trial. Petitioner argues that Talman had an obvious conflict of interest arising from his involvement in over billing the State's indigent defense fund. His appointment to Petitioner's case violated Petitioner's right to conflict free counsel. Since the Court is going to have to review the propriety of its own action in appointing Talman to the case, Petitioner argues this Court should be recused.

Contrary to Petitioner's argument, the fact that this Court performed the official function of appointing Talman to the case does not warrant recusal. It is well established that a judge is in no way disqualified because she tried and performed certain functions in previous litigation. State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1996); King v. State, 216 Tenn. 215, 391 S.W.2d 637, 642 (1965). Simply because the Court previously determined that Talman did not have a conflict of interest and appointed him to the case, does not mean she should be recused. Prior rulings which are adverse to one party's position in a case do not warrant disqualification. Alley v. State, 882 S.W.2d 810, 822 (Tenn. Crim. App. 1994)("Adverse ruling by a trial court are not usually sufficient grounds to establish bias.") Indeed, if a court was required to recuse itself every time the court was going to review its own action for error, no court could hear a motion for new trial arising from a case over which it presided. Such an outcome is clearly not contemplated by Tenn. R. Crim. Proc. 33. Courts are frequently called to reexamine their own actions for error in many different contexts and this has never been determined, by itself, to require recusal. See e.g. Henderson v. State, 2005 Tenn. Crim. App. LEXIS 667, *80 (Court's expression of confidence in trial counsel's performance did not disqualify court from sitting as post-conviction judge and

resolving effectiveness of counsel issues.)

Petitioner also argues that the Court should recuse herself because the Court participated in a meeting with trial counsel in chambers which was not recorded. Petitioner alleges that in that meeting, her trial counsel lied about when they received certain materials from Dr. Diana McCoy. This lie was made to explain why trial counsel was so tardy in turning the materials over to the State. When Dr. McCoy refused to back this lie on the stand, Petitioner's trial counsel decided not to call Dr. McCoy, meaning that critical mitigation evidence was not presented to the jury.

Even if one assumes these allegations to be true, the Court's recusal is not required. Following the conference in chambers, all the parties returned to the Courtroom and Mr. Talman told the Court, "[A]s I explained in chambers, I had just received this documentation earlier this week myself." Transcript, p. 2468. Consequently, there is no need for the Court to testify about what was said in chambers. The record is clear. Since the Court can add no other significant information and there is other evidence to address Petitioner's allegation, there is no need for recusal. See State v. Harris, 947 S.W.2d 156, 173 (Tenn. Crim. App. 1996)(Recusal not required when judge not a significant source of information and other witnesses available to address the factual issues.)

**CONCLUSION**

For all of the above reasons, the Petitioner's Motion to Recuse This Honorable Court From Serving As Judge and Fact-Finder In This Case should be denied.

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: [signature]
LELAND L. PRICE, BPR# 018853
Assistant District Attorney General
Suite 168, City-County Building
P.O. Box 1468
Knoxville, TN 37901
Telephone: (865) 215-2515

CERTIFICATE

I hereby certify that I have delivered a true and exact copy of the above-captioned pleading via fax and first-class mail, postage prepaid, to:

Donald E. Dawson
Catherine Y. Brockenborough
Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

Attorneys for the Defendant, this the 27 day of February, 2006.

[signature]
LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY



Case 1:12-cv-00035-HSM-SKL Document 9-2 Filed 08/01/12 Page 11 of 157
PageID #: 3935

LEXSEE

# KENNATH HENDERSON v. STATE OF TENNESSEE

**No. W2003-01545-CCA-R3-PD**

**COURT OF CRIMINAL APPEALS OF TENNESSEE, AT JACKSON**

*2005 Tenn. Crim. App. LEXIS 667*

**June 28, 2005, Filed**

**PRIOR HISTORY:** [*1] Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed. Direct Appeal from the Circuit Court for Fayette County. No. 4465. Jon Kerry Blackwood, Judge. *State v. Henderson, 24 S.W.3d 307, 2000 Tenn. LEXIS 390 (Tenn., 2000)*

**DISPOSITION:** Judgment of the Circuit Court Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner pleaded guilty in the Circuit Court for Fayette County (Tennessee) to first degree premeditated murder, especially aggravated kidnapping, aggravated robbery, attempted especially aggravated kidnapping, aggravated assault, and felonious escape. The trial court imposed the death sentence and denied postconviction relief. The petitioner appealed.

**OVERVIEW:** The petitioner argued, inter alia, that the postconviction court erred by failing to recuse itself because it demonstrated bias by its attitude and behavior regarding a defense expert witness. The court of appeals disagreed. At the conclusion of the expert's testimony, the postconviction court questioned the expert about his motives for changing careers from teaching at a university to becoming a mitigation specialist and sentencing consultant. The petitioner argued that, by questioning the witness at length, taking notes during his testimony and "smiling" at the prosecutor during the testimony, the postconviction judge created the appearance that he was taking sides. However, the judge presided over the postconviction hearing, without a jury, and while expressing those sentiments before a jury might have given rise to concern that the trial judge's statements or actions prejudiced the finder of fact, that concern was not present where the trial judge was the trier of fact. Therefore, it was not error for the postconviction judge to fail to recuse himself for questioning the expert.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

***Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review***
***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
***Criminal Law & Procedure > Postconviction Proceedings > Postconviction Generally***
***Criminal Law & Procedure > Trials > Burdens of Proof > Defense***
***Criminal Law & Procedure > Witnesses > Credibility***

[HN1] Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. *Tenn. Code Ann. § 40-30-103*. The petition challenging the conviction for first-degree murder herein is governed by the 1995 Tennessee Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. *Tenn. Code Ann. § 40-30-110(f)*. Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. An appellate court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. As such, review is de novo, and the appellate court accords the conclusions reached below no presumption of correctness.

***Criminal Law & Procedure > Appeals > Reviewability > Waiver***
***Criminal Law & Procedure > Postconviction Proceedings > Postconviction Generally***
[HN2] A ground for relief is waived if a post-conviction petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless it is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right or the failure to present the ground was the result of state action in violation of the federal or state constitution. *Tenn. Code Ann. § 40-36-106(g).*

***Criminal Law & Procedure > Guilty Pleas > Waiver of Defenses***
[HN3] A guilty plea waives all non-jurisdictional constitutional inequalities.

***Criminal Law & Procedure > Trials > Defendant's Rights > Right to Due Process***
***Criminal Law & Procedure > Trials > Defendant's Rights > Right to Fair Trial***
***Legal Ethics > Judicial Ethics***
[HN4] A fair trial in a fair tribunal is a basic requirement of due process. The principles of impartiality, disinterestedness and fairness are fundamental concepts in our jurisprudence. Tenn. Const. art. I, § 17 and the Fourteenth Amendment guarantee all litigants a hearing before an impartial decision-maker. Tenn. Const. art. VI, § 11 states that judges cannot participate in cases in which they might have even the slightest interest. A similar restriction appears in *Tenn. Code Ann. § 17-2-101(1).* The purpose of these provisions is to guard against the prejudgement of a litigant's rights and to avoid situations in which the litigants might believe that the court reached a prejudiced conclusion because of interest, partiality or favor. A trial before a biased or prejudiced judge is a denial of due process.

***Legal Ethics > Judicial Ethics***
[HN5] Judges must not only be impartial, but also appear impartial because judicial fairness is violated when the appearance of fairness is ignored. This is not merely an idealistic sentiment. Deference to the judgments and rulings of the courts depends upon public confidence in the integrity and independence of the judges that make them.

***Criminal Law & Procedure > Pretrial Motions > Disqualification & Recusal***
***Legal Ethics > Judicial Ethics***
[HN6] Tenn. Sup. Ct. R. 10, Canon 2A requires judges to conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Similarly, Tenn. Sup. Ct. R. 10, Canon 3(E)(1) requires judges to disqualify themselves in cases where their impartiality might reasonably be questioned. The strict application of Canon 3(E)(1) may result in the disqualification of a judge who has no actual bias and who believes that he or she can try a case fairly. The test is not whether the judge believes he or she can be impartial but rather whether others might reasonably question the judge's impartiality. Thus, even where a just result is achieved, the appearance of justice is lost when the judge appears biased or partial to one party.

***Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion***
***Criminal Law & Procedure > Pretrial Motions > Disqualification & Recusal***
[HN7] A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. This is an objective standard. The appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly. Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality. The trial judge retains discretion over his or her recusal. Unless the evidence in the record indicates that the failure to recuse was an abuse of discretion, the appellate court will not interfere with that decision.

***Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion***
***Criminal Law & Procedure > Pretrial Motions > Disqualification & Recusal***
[HN8] It is difficult, if not impossible, for an appellate court to conduct a meaningful review of a trial court's discretionary decision without knowing the basis for the trial court's action. In no circumstance is this more true than when the impartiality of a judge is in question. In these cases, it is simply not sufficient for an appellate court to presume that there exists adequate support for the trial court's decision. The integrity of the judicial

system demands actual reviewability in these matters. Thus, an appellate court must view the facts and circumstances through the eyes of the average man on the street.

***Criminal Law & Procedure > Pretrial Motions > Disqualification & Recusal***

[HN9] In the context of a motion for recusal, adverse rulings are usually an insufficient basis upon which to find bias.

***Evidence > Witnesses > Judges & Jurors***

[HN10] Tenn. R. Evid. 605 provides that a judge may not testify in a trial over which the judge is presiding.

***Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review***
***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
***Criminal Law & Procedure > Postconviction Proceedings > Postconviction Generally***

[HN11] A claim of ineffective assistance of counsel is a mixed question of law and fact. A post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. However, a post-conviction court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely de novo standard, with no presumption of correctness given to the post-conviction court's conclusions. The standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure.

***Constitutional Law > Criminal Process > Assistance of Counsel***

[HN12] The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense. This right to counsel is so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment. Inherent in the right to counsel is the right to effective assistance of counsel.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
***Criminal Law & Procedure > Postconviction Proceedings > Postconviction Generally***
***Criminal Law & Procedure > Trials > Burdens of Proof > Defense***

[HN13] When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that: (a) the services rendered by trial counsel were deficient; and (b) that the deficient performance was prejudicial. In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases. In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim.

***Criminal Law & Procedure > Appeals > Standards of Review > Standards Generally***
***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***

[HN14] On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. An appellate court may not second-guess a reasonably-based trial strategy, and it cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case.

***Criminal Law & Procedure > Counsel > Effective Assistance > Pleas***
***Criminal Law & Procedure > Guilty Pleas > Knowing & Intelligent Requirement***
***Criminal Law & Procedure > Guilty Pleas > Voluntariness***
***Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances***
***Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances***

[HN15] Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. In the context of a guilty plea, to satisfy the second prong of Strickland, the petitioner must show that

there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. Moreover, when challenging a death sentence, the petitioner must show that there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.

***Constitutional Law > Criminal Process > Assistance of Counsel***
***Criminal Law & Procedure > Counsel > Assignment***
[HN16] The Sixth Amendment does not grant a defendant, who does have the absolute and unqualified right to appointed counsel, the additional right to counsel of his own choosing.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
***Criminal Law & Procedure > Criminal Offenses > Homicide > Capital Murder***
[HN17] Special skills are necessary to assure adequate representation of defendants in death penalty cases. However, there is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case.

***Criminal Law & Procedure > Counsel > Assignment***
***Criminal Law & Procedure > Criminal Offenses > Homicide > Capital Murder***
[HN18] See Tenn. Sup. Ct. R. 13, § 1 (prior to amendment in 1997).

***Constitutional Law > Criminal Process > Assistance of Counsel***
***Criminal Law & Procedure > Counsel > Effective Assistance > Pleas***
[HN19] A successful claim of ineffectiveness requires more than just a showing that trial counsel was inexperienced. Rather, the petitioner must demonstrate with specificity that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Even if a defendant meets this threshold, he or she must also prove that such error prejudiced the defense. Furthermore, in the context of a guilty plea, the petitioner must show that there is a reasonable probability he would have not pleaded guilty if not for trial counsel's error.

***Constitutional Law > Criminal Process > Assistance of Counsel***
[HN20] The right to counsel as guaranteed by the Sixth Amendment does not include the right to a meaningful attorney-client relationship. No court could possibly guarantee that a defendant will develop this kind of rapport with his attorney.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
***Criminal Law & Procedure > Guilty Pleas > Waiver of Defenses***
[HN21] An attorney's advice to his client to waive the client's right to a trial by jury is a classic example of a strategic trial judgment, the type of act for which Strickland requires that judicial scrutiny be highly deferential. It constitutes a conscious, tactical choice between two viable alternatives. Thus, for counsel's advice to rise to the level of constitutional ineffectiveness, the decision to waive a jury must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
[HN22] A defendant asserting that his counsel was ineffective must show more than that counsel's advice was merely wrong. He must also show that it was completely unreasonable so that it bears no relationship to a possible defense strategy.

***Criminal Law & Procedure > Guilty Pleas > Waiver of Defenses***
***Criminal Law & Procedure > Jurisdiction & Venue > Venue***
[HN23] A valid please of guilty waives the issue of change of venue.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Capital Murder***
***Criminal Law & Procedure > Sentencing > Imposition > Evidence***
[HN24] In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. Evidence about the defendant's background and character is relevant because of the belief that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. The right that capital defendants have to present a vast array of personal

information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
***Criminal Law & Procedure > Sentencing > Appeals***
***Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances***
***Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances***
[HN25] In a capital murder case, although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. To determine whether or not trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Second, it must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Third, it must consider whether there was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination.

***Criminal Law & Procedure > Counsel > Effective Assistance > Appeals***
***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
[HN26] The same principles apply in determining the effectiveness of both trial and appellate counsel.

***Criminal Law & Procedure > Counsel > Effective Assistance > Appeals***
***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
[HN27] A petitioner alleging ineffective assistance of appellate counsel must prove both that: (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal; and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

***Criminal Law & Procedure > Counsel > Effective Assistance > Appeals***
***Criminal Law & Procedure > Counsel > Effective Assistance > Tests***
[HN28] In the context of a determination of whether appellate counsel was ineffective, there is a non-exhaustive list to consider: (1) Were the omitted issues significant and obvious? (2) Was there arguably contrary authority on the omitted issues? (3) Were the omitted issues clearly stronger than those presented? (4) Were the omitted issues objected to at trial? (5) Were the trial court's rulings subject to deference on appeal? (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable? (7) What was appellate counsel's level of experience and expertise? (8) Did the petitioner and appellate counsel meet and go over possible issues? (9) Is there evidence that counsel reviewed all the facts? (10) Were the omitted issues dealt with in other assignments of error? (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

***Criminal Law & Procedure > Counsel > Effective Assistance > Appeals***
[HN29] An appellate attorney is neither duty bound nor required to raise every possible issue on appeal. An attorney's determination as to the viability of the issues should be given considerable deference.

***Criminal Law & Procedure > Appeals > Standards of Review > Standards Generally***
***Evidence > Criminal Evidence > Judicial Notice***
[HN30] An appellate court is able to take judicial notice of its own records.

***Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion***
***Evidence > Criminal Evidence > Expert Testimony***
[HN31] The admissibility of expert testimony, the qualification of expert witnesses, and the relevancy and com-

petency of expert testimony are matters which rest within the sound discretion of the trial court. A witness who is qualified in a particular field may testify in the form of an opinion if the specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue. Tenn. R. Evid. 702. A trial court's ruling will not be overturned on appeal absent a clear abuse of discretion in admitting or excluding the expert testimony.

**COUNSEL:** Donald E. Dawson, Nashville, Tennessee, and Catherine Y. Brockenborough, Nashville, Tennessee, for the appellant, Kennath Henderson.

Paul G. Summers, Attorney General and Reporter; Alice B. Lustre, Assistant Attorney General; Elizabeth T. Rice, District Attorney General and Walt Freeland, Assistant District Attorney General, for the appellee, State of Tennessee.

**JUDGES:** JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and, J.C. MCLIN, JJ., joined.

**OPINIONBY:** JERRY L. SMITH

**OPINION:**

The petitioner, Kennath Henderson, appeals as of right from the May 21, 2003 judgment of the Fayette County Circuit Court denying his petition for post-conviction relief. The petitioner entered guilty pleas to first degree premeditated murder, two (2) counts of especially aggravated kidnapping, aggravated robbery, attempted especially aggravated kidnapping, aggravated assault, and felonious escape. The petitioner waived his right to jury sentencing. After a capital [*2] sentencing hearing, the trial court imposed the death sentence for the murder count and an effective sentence of twenty-three (23) years in prison for the noncapital offenses. The petitioner's convictions and sentences, including the sentence of death, were affirmed on direct appeal by the Tennessee Supreme Court. See *State v. Henderson, 24 S.W.3d 307 (Tenn. 2000)*, cert. denied, *531 U.S. 934, 148 L. Ed. 2d 257, 121 S. Ct. 320 (2000)*. A pro se petition for post-conviction relief was filed on February 12, 2001, which was followed by an amended petition on November 30, 2001. An evidentiary hearing was held on April 28-29, 2003, and, on May 21, 2003, the trial court denied relief and dismissed the petition. The petitioner appeals, presenting for our review the following claims: (1) the trial judge erred in failing to recuse himself at both the trial and the post-conviction hearings; (2) the post-conviction court's findings were clearly erroneous; (3) trial counsel was ineffective; (4) appellate counsel was ineffective; (5) the post-conviction court erred in prohibiting a witness from testifying; and (6) the imposition of the death penalty is unconstitutional. After [*3] a careful and laborious review of the record, this Court concludes that there is no error requiring reversal. Accordingly, the order of the post-conviction court denying post-conviction relief is affirmed.

***Background***

The proof, as set forth in our supreme court's decision, *State v. Henderson, 24 S.W.3d at 310*, established the following:

> At the time of the events giving rise to this case, the appellant, Kennath Henderson, was incarcerated at the Fayette County Jail serving consecutive sentences for felony escape and aggravated burglary. On April 26, 1997, as the appellant was planning an escape from jail, he had a .380 semi-automatic pistol smuggled into the jail through his girlfriend. A couple of days later, the appellant requested dental work on a tooth that needed to be pulled, and an appointment was made for May 2 with Dr. John Cima, a dentist practicing in Somerville. Dr. Cima had practiced dentistry in Somerville for more than thirty years, and he had often seen inmate patients. In fact, this was not the appellant's first visit to see Dr. Cima.
>
> On May 2, 1997, Deputy Tommy Bishop, who was serving in his official capacity as a transport officer [*4] for the Fayette County Sheriff's office, took the appellant and another inmate, Ms. Deloice Guy, to Dr. Cima's Office in a marked police car. Upon their arrival at the dentist's office, Dr. Cima placed the appellant and Ms. Guy in separate treatment rooms, and each patient was numbed for tooth extraction. Deputy Bishop remained in the reception area and talked with the receptionist during this time.
>
> When Dr. Cima and his assistant returned to the appellant's treating room to begin the tooth extraction, the appellant pulled out his .380 pistol. Dr. Cima immediately reached for the pistol, and he and the appellant struggled over the weapon. During this brief struggle, Dr. Cima called out for Deputy Bishop, and the deputy hurried back to the treatment room. Just as the deputy arrived at the door, the appellant regained control of the pistol and fired a shot at Deputy Bishop,

which grazed him on the neck. Although not fatal, this shot caused the deputy to fall backwards, hit his head against the doorframe or the wall, and then fall to the floor face down, presumably unconscious.

The appellant then left the treating room and came back with the receptionist in his custody. The appellant [*5] reached down and took Deputy Bishop's pistol, and he took money, credit cards, and truck keys from Dr. Cima. The appellant then ordered Dr. Cima and the receptionist to accompany him out of the building, but just before he turned to leave the building, the appellant went back to the treatment room, leaned over Deputy Bishop, and shot him through the back of the head at point-blank range. The deputy had not moved since first being shot in the neck moments earlier and was still lying face-down on the floor by the door to the treatment room when the appellant fatally shot him.

Once outside of the office, the appellant was startled by another patient, and Dr. Cima and his receptionist were able to escape back into the office. Once inside, Dr. Cima locked the door and called the police. The appellant, in the meantime, stole Dr. Cima's truck and drove away at a slow speed so as not to attract any attention to himself. When police officers began to follow him, the appellant sped away, and eventually drove off the road and into a ditch. The officers took the appellant into custody, and upon searching the truck, they found the murder weapon, Deputy Bishop's gun, and personal items taken from [*6] Dr. Cima's office.

On May 13, 1997, the appellant was indicted by a Fayette County Grand Jury in a ten-count indictment, which alleged one count of premeditated murder, three counts of felony murder, two counts of especially aggravated kidnaping, and one count of attempted especially aggravated kidnaping, aggravated robbery, aggravated assault, and felonious escape. After three continuances, the appellant pled guilty on the day of trial to all of the charges except for the three counts of felony murder.

On July 13, 1998, the circuit court held the sentencing hearing, and the appellant waived his right to have a jury empaneled for purposes of determining his sentence. Several witnesses testified for the State at the sentencing hearing, including Deloice Guy, the inmate taken with the appellant to the dentist by Deputy Bishop; Dr. John Cima; Donna Feathers, Dr. Cima's dental assistant; and Peggy Riles, Dr. Cima's receptionist. In addition, Dr. O.C. Smith, a forensic pathologist, testified as to his investigation of the crime scene and of his autopsy of Deputy Bishop. Dr. Smith stated that based on his examination of Deputy Bishop's wounds, along with witness testimony, it was likely [*7] that the first shot fired by the appellant hit the deputy in the neck, and caused the deputy to hit his head against the doorframe of the examination room. Dr. Smith opined that this blow to the deputy's head could have rendered him unconscious. Moreover, Dr. Smith testified that the second shot fired by the appellant entered at the back of the deputy's head and exited near the left eye. This second shot caused "significant and severe brain damage," and the blood from this wound seeped from the skull fractures into the deputy's sinuses, and ultimately, was breathed into his windpipe. Finally, Dr. Smith testified that the bullets used by the appellant could have "easily" penetrated the thin walls of the dentist's office.

In mitigation, the appellant testified on his own behalf. According to his testimony, he was 24 years old at the time of the offense. He was a high-school graduate and has four younger brothers. While in elementary school, the appellant received numerous academic awards and certificates, and he was heavily involved in extracurricular activities and sports while in high school. Although the appellant expressed sorrow and remorse over his actions, he admitted that "there's [*8] no reason" for the murder of Tommy Bishop. While he acknowledged that he extensively planned his escape from prison, including procuring the .380 pistol, his only excuse for the shooting was that he "wasn't thinking clearly that day."

The appellant also testified that he had some "problems" in high school, and although he was never cited to the juvenile court, he stated that he felt like his problems were never addressed. He also testified that while in jail in 1996, he requested counseling because he "felt like [he] needed help psychologically." His mother testified, however, that she did not believe that the appellant needed any help or intervention of any kind during his high school years. In addition, the appellant's mother testified that though she remembered that the appellant requested help while in jail in 1996, she never pursued the matter because he "seemed to be doing fine when [she] talked to him."

Finally, Dr. Lynne Zager, a forensic psychologist, testified as to her findings and conclusions based on two interviews with the appellant, a personality test administered to the appellant, and other information supplied by the defense. From this pool of information, Dr. [*9] Zager concluded that the appellant was suffering from dissociative disorder at the time of the murder, and that the appellant possessed an unspecified personality disorder which exhibited some narcissistic and anti-social traits. She also testified that based upon her testing, she believed that the appellant's dissociative state began after the first shot was fired and lasted at least 24 hours following. While in this state, Dr. Zager stated that it was not uncommon for individuals to feel as though they are in a dream-like state and are not "an integral part of what the person is [really] doing." Although she refused to give an opinion as to whether the appellant was aware of his actions at the time of the murder, the appellant, in her opinion, "was [acting] under duress, and that his judgment was not adequate." In addition, while Dr. Zager considered him to be "impaired at the time," she testified that the appellant's condition at the time of the murder would not support a legal finding of insanity.

The State argued that four aggravating factors applied to warrant imposing the death sentence: (1) that the defendant created a great risk of death to two or more persons during [*10] the act of murder, *Tenn. Code Ann. § 39-13-204(i)(3)*; (2) that the murder was committed for the purpose of avoiding an arrest, *Tenn. Code Ann. § 39-13-204(i)(6)*; (3) that the murder was committed during the defendant's escape from lawful custody, *Tenn. Code Ann. § 39-13-204(i)(7)*; and (4) that the murder was committed against a law enforcement officer, who was engaged in the performance of official duties, *Tenn. Code Ann. § 39-13-204(i)(9)*.

The appellant argued that four statutory mitigating factors should be considered by the court: (1) the lack of significant criminal history by the defendant; *Tenn. Code Ann. § 39-13-204(j)(1)*; that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, *Tenn. Code Ann. § 39-13-204(j)(2)*; (3) that the defendant acted under extreme duress; *Tenn. Code Ann. § 39-13-204(j)(6)*; and (4) that the murder was committed while the defendant's mental capacity, while not deficient to the point of raising [*11] a defense, was substantially impaired, *Tenn. Code Ann. § 39-13-204(j)(8)*. In addition, the defense argued for application of an additional non-statutory mitigating circumstance, i.e., that the failure to recognize and treat the mental health disorders of the defendant allowed such to remain untreated by any form of intervention.

At the conclusion of the hearing, the circuit court found that all four of the aggravating circumstances were proven beyond a reasonable doubt by the State. Although the circuit court did not make a specific finding as to which mitigating circumstances were supported by the evidence, the court found that the aggravating circumstances had been proven beyond a reasonable doubt to "outweigh the mitigating circumstances." The circuit court then imposed the sentence of death for the premeditated murder of Deputy Tommy Bishop.

All of the prison terms, except the term imposed for felonious escape, were ordered to run concurrently with each other, but to run consecutively with the sentences then being currently served by

> the appellant. The prison term for felonious escape was ordered to run consecutively to all of the non-capital offenses. [*12] Accordingly, the effective sentence ordered by the court in this case is death and a prison term totaling 23 years, which is to run consecutively to the current prison sentence.

*Henderson, 24 S.W.3d at 310-12* (internal footnotes omitted).

***Evidence Presented at Post-Conviction Hearing***

Michael Robbins was appointed by the trial court to represent Petitioner Henderson on direct appeal. He stated that for the past twelve (12) or thirteen (13) years "forty percent or more" of his practice has been state and federal appeals. He added that he annually attended the national habeas seminar "put on" by the federal defenders.

Mr. Robbins testified that only one issue was raised on direct appeal, i.e., the proportionality of the imposition of the death penalty in this case. The focus of his appellate argument relied upon the premise that the death penalty was reserved for the "worst of the worst," distinguishing the case herein from other such cases. He added that he spoke to both Mr. Mosier and Mr. Johnston, the petitioner's trial counsel, during the early stages of the appeal. Regarding his failure to raise appellate challenges to the denial of various pretrial [*13] motions, Mr. Robbins explained that "there was no significant motion practice in that sense. Most of the motions were generalized objections to the death sentence or selection of the jury panel . . . and there was argument on the motion. . . ." No error as to the rulings on these motions was argued on direct appeal because Mr. Robbins "did not consider the motions to be well grounded." He explained that the law in Tennessee and in the United States was well-settled as to these issues.

On cross-examination, Mr. Robbins stated that he only raised the proportionality issue on direct appeal because "it was [his] professional judgment that that was the only viable issue." He further acknowledged that he did "file a motion seeking a remand for the purpose of conducting an evidentiary hearing in the Court of Criminal Appeals" based upon what he perceived to be a "motion to withdraw [Henderson's] plea of guilty." Mr. Robbins asserted that his appellate experience was "virtually entirely criminal." He testified that, during the course of his representation, he did consult with David Keefe and Jefferson Dorsey, whom he believed to be associated with the predecessor office to the Office [*14] of the Post-Conviction Defender. On re-direct, Mr. Robbins admitted that these individuals recommended raising issues relating to the constitutionality of the death penalty statutes. Mr. Robbins later opined that this case "was peculiar because never . . . [had he] ever even heard of an attorney waiving a jury for sentencing in a capital case." He added that a decision to waive a jury and submit a capital sentencing case to a single person was "woefully uninformed."

Kathryn Pryce, an investigator and legal clerk with the Office of the Post-Conviction Defender, was assigned to work on Petitioner Henderson's case. Her duties as an investigator include locating and requesting a client's records. In the present case, Ms. Pryce requested the Petitioner's (1) institutional records, including school, medical, psychiatric, court records, attorneys' files, prosecution files, and law enforcement files, (2) medical and psychiatric records of family members, and (3) school records of family members. In this regard, Ms. Pryce acknowledged that she received records for Herbert Henderson, the petitioner's uncle; Cora Lee Johnson, the petitioner's aunt; Glenn Johnson, the petitioner's second [*15] cousin; and Veaster Hill, the petitioner's paternal grandmother. These records reference other family members that had been treated at Western Mental Health Institute, J.B. Summers Counseling Center, and Methodist Hospital. Ms. Pryce also possessed law enforcement records relating to Shelby County rapes involving the petitioner and relating to prior offenses occurring in Fayette County, specifically contributing to the delinquency of a minor. Ms. Pryce stated that she began collecting the various records in April 2001.

Andrew Johnston, second chair counsel at the petitioner's trial, testified that he was appointed to represent the petitioner in June 1997. Lead counsel, Michael Mosier, had already been appointed at this time. Mr. Johnston stated that he was to serve as "local counsel." In other words, he was to file documents prepared by Mr. Mosier and he would meet with the petitioner's family if necessary. In this regard, Mr. Johnston testified that he met with the petitioner's family about three (3) or four (4) times. He added that he met with the petitioner on numerous occasions prior to trial.

At the time of his appointment, Mr. Johnston had been licensed as an attorney for [*16] two (2) years and eight (8) months. Mr. Johnston stated that this was his first capital case. Prior to this appointment, the most serious case handled by Mr. Johnston was either an aggravated robbery or aggravated burglary. His practice was forty percent (40%) criminal, mostly handled in General Sessions Court. Post-conviction counsel informed Mr. Johnston that the standards for capital representation went into effect July 1, 1997, after Mr. Johnston's appointment in this matter. These standards express requirements for capital counsel in regards to the number

of trials in which they have to participate, among other things. Mr. Johnston conceded that, at the time of his appointment, his experience did not satisfy the requirements of Tennessee Supreme Court Rule 13. Mr. Johnston admitted that, prior to his appointment, he had never met Mr. Mosier.

Regarding his participation in the case, Mr. Johnston recalled being particularly involved in the motion for change of venue. Mr. Johnston collected various newspaper articles and attempted to procure affidavits from other attorneys verifying that it would be difficult to have a fair trial in Fayette County. He stated that he also assisted [*17] in numerous ex parte motions at the beginning of the representation in order to get a defense team together, i.e., investigator, clinical psychologist, and jury/mitigation expert. He stated that he provided no input as to what experts would be sought. Ultimately, the defense team consisted of Tammy Askew, the investigator; Dr. Lynn Zager, the clinical psychologist; and Julie Fenyes, the mitigation/jury consultant.

Mr. Johnston testified that he had few interactions with Ms. Askew. He did not provide her with instructions as to what to do or who to interview. Mr. Johnston did not recall meeting Dr. Zager "until the very end." However, he did recall a time in July when he had to take an "MMPI test up [to Tipton County], so I would have been working . . . with her at that time . . . ." Regarding Ms. Fenyes, he testified that Ms. Fenyes prepared the juror questionnaire. Mr. Johnston could not recall any conclusions regarding the jury based on Ms. Fenyes' work. Mr. Johnston stated that he was not in a position where he was trying to provide the experts with direction. Rather, he was "trying to do what I was asked to do by Mr. Mosier . . . ."

In May 1998, when a jury trial was still [*18] contemplated, Mr. Mosier asked Mr. Johnston whether he would be willing to present the closing argument. Mr. Johnston, however, informed Mr. Mosier that he would be more comfortable if Mr. Mosier presented closing argument. Mr. Johnston stated that he was involved regarding the decision of whether to enter a plea and whether jury sentencing should be waived.

Regarding the waiver of a jury trial and entrance of a guilty plea, Mr. Johnston stated that they:

> Were in a position at the point where we were fairly certain as to in terms of the probability that we'd be in a sentencing hearing, and I know that at that point we wanted to have as much mitigation as we could. And entering a plea certainly would have been a mitigating factor to be considered by the Court. So I think it dealt with an analysis at that point of aggravating factors, mitigating factors, and the likelihood that we would ultimately be in a sentencing hearing, given the proof that had been developed at that point.
>
> In terms of waiving a jury for sentencing, I think it was a situation where we wanted . . . at least we thought it would be in Mr. Henderson's best interest to have the Court do the sentencing.

[*19]

It was the opinion of the defense team that Judge Blackwood was personally opposed to the death penalty and that was a point to consider regarding a plea. He added:

> From what I recall, we met with [the petitioner] and we talked about where we were. And it was decided that we would want the judge to do the sentencing in the event we ended up in a sentencing hearing. And I think there would have been a conversation at that point that we felt that the facts were not in our favor and that it was going to be very difficult to avoid a sentencing hearing.
>
> . . . .
>
> And there was a decision made at that point that if the State agreed to allow the Court to do the sentencing, that that would be the way to proceed. And one thing led to another thing, and we were in court that afternoon and we entered the plea.

Mr. Johnston acknowledged the fact that they were no more prepared for sentencing at the time the plea was entered than they were earlier that morning when they had asked for and received a continuance from the court. The sentencing phase was scheduled for the following week. A meeting was held in Jackson with the entire defense team. At the meeting, all members [*20] presented the information they had gathered. The information was assimilated and organized in order to present a defense.

With regard to the petitioner, Mr. Johnston recalled that, during their initial meeting, the petitioner was "calm, . . . respectful, . . . pleasant . . . ." His opinion after this meeting was that the petitioner was going to be pleasant to work with during the case. Mr. Johnston

stated that he was not satisfied with the results in this case. He expressed concern that the petitioner's family was not present at the time his plea was entered. In hindsight, he "wished" that a jury would have been empaneled and that they would have fought the case on the merits." Notwithstanding his belief, he could not state what else could have been done by the defense team related to sentencing.

On cross-examination, Mr. Johnston stated that the petitioner's mother never indicated that the petitioner had any sort of mental health issues or was mentally deficient. Mr. Johnston, through his interaction with the petitioner, was not able to discern any obvious indicators that the petitioner was unable to assist in his representation or suffered from any mental illness. Any information [*21] related to possible mental illnesses or deficiencies were solely limited to the opinions of Dr. Zager. Mr. Johnston conceded that the evidence as to the petitioner's guilt was overwhelming. He added that the defense team presented all evidence that they considered to be of mitigation value at the sentencing hearing.

On re-direct, Mr. Johnston stated that information that four (4) second cousins of the petitioner had been diagnosed with mental illnesses would have been very relevant and this information would have been passed to the clinical psychologist. He further conceded that information that the mother of these four (4) second cousins had a mental illness would be not only relevant to defense counsel but also to the court as well.

Mr. Johnston conceded that he had no prior knowledge or training as to what issues might raise flags to lead counsel when reviewing information on a capital defendant. He admitted that the fact that the petitioner stood accused of raping the mother of the woman he considered his girlfriend would certainly "raise a flag."

Lead counsel in this matter, Michael Mosier, testified that he had been a licensed attorney for twenty-seven (27) years. He explained [*22] that he was contacted by Judge Blackwood regarding appointment in this matter as there was no attorney in the district that could represent the petitioner due to potential conflicts. Mr. Mosier testified that the defense of a capital case is a "pretty awesome responsibility" and that he "considered Mr. Johnston's role to be more than just local liason." He stated that he relied upon Mr. Johnston for the initial information about the case. Mr. Johnston was advised as to Mr. Mosier's normal procedure in a capital case, motions that would be filed, and expert assistance that would be sought. Mr. Mosier prepared all of the motions. Mr. Mosier selected the experts and investigators. He stated that he believed that expert services were granted in August 1997. He stated that Ms. Askew's function as the investigator was to make contact with persons having factual knowledge of the offense and to contact members of the petitioner's family. Ms. Fenyes' function as the jury/mitigation consultant was to conduct a social background investigation of the petitioner in order to prepare a mitigation investigation for possible use at a sentencing hearing. Ms. Fenyes also compiled jury questionnaires, [*23] reviewed the responses, and made recommendations as to which prospective venire members would be good jurors. Mr. Mosier stated that he visited the petitioner at Riverbend Maximum Security Institution approximately three (3) to four (4) times. He added that he visited the petitioner prior to his transfer to Riverbend.

Mr. Mosier recalled the petitioner informing the trial court by letter, dated June 24, 1998, that he was dissatisfied with Mr. Mosier's and Mr. Johnston's representation. Mr. Mosier visited the petitioner at Riverbend on June 30, 1998, in part, to discuss this letter with the petitioner.

On July 6, 1998, Ms. Fenyes informed Mr. Mosier that the mitigation evidence that she had gathered was not helpful and that she would need more time. Mr. Mosier "felt like that all that there was left for him was to try to demonstrate to the judge his acceptance of responsibility, and by putting him on the stand, let him show remorse for what he did." This information formed part of the basis for counsel's motion for continuance submitted on July 6. After the continuance was granted on July 6, Mr. Mosier, at the petitioner's request, approached the prosecution in an attempt to seek [*24] a life sentence in exchange for a guilty plea. Mr. Mosier stated, however, that the possibility of entering a guilty plea was discussed in December 1997. Indeed, the petitioner wrote counsel a letter asking about the benefits of entering a guilty plea. Specifically, he inquired as to whether his showing of remorse would persuade the judge to spare him the death penalty and get him a life sentence. Counsel received three (3) or four (4) letters of this nature. The first letter dated December 21, 1997, made inquiry as to pleading guilty and hoping for mercy. The next letter dated January 11, 1998, evidenced an apology to Deputy Bishop and his family, but noting that the death penalty should not be imposed. On January 14, 1998, a third letter was written by the petitioner asking what would happen to the other charges if he pled guilty to first degree murder. The petitioner added that the victim's family would be assured that he would never be eligible for parole. The letter further asked that the trial be moved to another county at a later date from the scheduled March 9, 1998, trial. The petitioner penned a fourth letter on January 23, 1998. In this letter, he again indicated a desire [*25] for a change of venue and recusal of the trial judge. Mr. Mosier stated that he discussed the trial judge's recusal with the petitioner and provided the petitioner with his strong recommendation that he not ask the trial judge to recuse himself. First, there was

nothing in the record to warrant the request. Second, Judge Blackwood had previously stated on the record that he was morally and philosophically opposed to the death penalty. In other words, Mr. Mosier concluded that if he were able to hand-select a judge in a death penalty case, he would have selected Judge Blackwood. For these reasons, he did not seek recusal of Judge Blackwood. Mr. Mosier stated that he did seek a change of venue in this matter. He stated that contact was made with Deputy Bishop's family. Investigator Pugh and Sheriff Kelly wrote a letter recommending that the death penalty not be imposed. The District Attorney's Office was informed on numerous occasions about the petitioner's willingness to accept a life sentence. In other words, Mr. Mosier "acted on what was valid, and what had no basis in law or fact, I took no action on."

Mr. Mosier testified that Dr. Zager was provided with everything in Mr. Mosier's [*26] file. Mr. Mosier stated that there is some indication that as of July 6, 1998, Dr. Zager had not yet evaluated the petitioner. Mr. Mosier stated, however, that at the time the plea was entered, he was mainly concerned about the insanity issue. There was no indication at this time that insanity would be a viable defense. The petitioner was not lacking in mental capacity, he was cooperative, well-mannered, polite, and his attorney worked with him easily.

Mr. Mosier stated that it was the petitioner's decision to waive a jury for sentencing. Mr. Mosier merely advised the petitioner of the advantages and disadvantages of waiving a jury in a capital sentencing trial. He stated that this case involved the "senseless killing of a law-enforcement officer." Mr. Mosier believed that the petitioner's "chances before a jury in any county were [not] good at all." In his opinion allowing Judge Blackwood to impose the sentence was the best chance that the petitioner had to avoid the death penalty.

Mr. Mosier stated that there were many difficulties with this case, primarily the status of the victim as a law enforcement officer and communication with the petitioner's family. The petitioner's mother, [*27] for example, refused to believe that her son could commit any criminal acts. Mr. Mosier was not aware of the incident alleging that the petitioner had kidnapped and raped his girlfriend's mother. He further conceded that the mitigation report failed to indicate that one of the petitioner's victims in a prior incident was his art teacher and the mother of his friends. Notwithstanding, Mr. Mosier could not say that knowledge of these factors would have been indicators for the need of further psychological or psychiatric testing.

Dr. Frank Einstein, a self-employed sentencing consultant and mitigation specialist, stated that there are two purposes of mitigation in capital cases. "One is to be able to present a picture of the client as a full human being to the sentencer. The second related part is to - the purpose of mitigation is to reduce the moral culpability of the defendant for the crime of murder for which he or she has been found guilty." In satisfying the second purpose, the person's entire life must be examined to determine whether there is anything biological, physiological or medical that may have interfered with a rational, constructive decision-making process.

In completing [*28] a mitigation investigation, Dr. Einstein testified that he begins two ways. One is to interview the client and the second involves reviewing life history records collected by the attorney. Under either method, a chronological history of the defendant's life is formulated. Any records from schools, medical facilities, etcetera, are then collected to support the chronology. A picture of the family is then drawn. A list of names is created of people to interview. Where immediate family members fail to cooperate, extended family members should be interviewed. Moreover, records provide valuable information about the client. Finally, the investigator should continue an attempt to establish a rapport with immediate family members. Records of family members are also sought to establish certain familial patterns, for example of mental illness, abuse or molestation.

Dr. Einstein testified that once this information is gathered the mitigation specialist pieces the information into a chronological time line. The information is then synthesized to show patterns. This presents the mitigation specialist with a likely theme in the case or in the client's life. A social history is then compiled of [*29] the collected data to show the sequential development of the client's life. Dr. Einstein distinguished between the social history compiled by a mitigation specialist and that contained in medical records. He stated that social histories contained in medical records are based upon information provided by the patient and one or two family members. This type of social history is "totally uncorroborated." Thus, reliance upon this type of social history alone leads to the high possibility that one would miss serious clues that would trigger the need for further evaluation. Dr. Einstein stated that the compilation of an accurate social history could be completed in as short a time as one (1) year or could take as long as two (2) to three (3) years. It is highly unlikely that it could be completed in less than one (1) year.

Post-conviction counsel asked Dr. Einstein to review the work completed at the trial level in the petitioner's case and the adequacy thereof and compare that work with the investigation completed by the post-conviction team. In reviewing Ms. Fenyes' work, Dr. Einstein found it remarkable that almost all the work completed in her investigation was done two (2) weeks [*30] prior to the

entry of the guilty plea. Dr. Einstein concluded that there was no mitigation work completed from June 1997 through December 1997. Ms. Fenyes only met with the petitioner four (4) times, and never alone. This is important because the ability to gain sensitive information is hindered when a third party is present. Ms. Fenyes did not meet with the petitioner until February 1998. There is no indication of any further meetings until June 1998. The petitioner entered a guilty plea on July 6, 1998. It is Dr. Einstein's opinion that the amount of time spent preparing a mitigation defense "would definitely not [have] been enough time in this case." Dr. Einstein acknowledged that Ms. Fenyes was not authorized to begin work until September 1997. Dr. Einstein further faulted Ms. Fenyes's practice of interviewing persons by telephone rather than in person. Basically, all of the mitigation work was completed in the week between entry of the plea and the sentencing hearing.

In comparing the mitigation investigation completed by the trial team and the mitigation investigation completed by the post-conviction team, Dr. Einstein observed information not discovered by the trial team [*31] that was available and useful in preparing a mitigation defense. Dr. Einstein separated the "missing" information into two categories, (1) information about Petitioner Henderson and (2) information about the petitioner's extended family. Information regarding the petitioner consisted of the following: (1) changes in the petitioner's behavior during high school years; (2) radical changes in the petitioner's behavior during the two (2) years preceding the murder including but not limited to the alleged rape and kidnapping of his girlfriend's mother; (3) exhibitions of signs of depression and suicidal thoughts; and (4) indication of a strange sort of religious ideation, consisting of spirits that affect his behavior. Information about the petitioner's extended family included: a significant history of mental illness and instability, where at least nine (9) extended family members on both his maternal and paternal side suffered from mental illness. His report indicated that the petitioner should have been examined by a psychiatrist.

On cross-examination, Dr. Einstein conceded that his fee in this case would amount to $ 30,000 or $ 40,000. He stated that the fact that the petitioner has [*32] been diagnosed with a mental illness and the fact that this information was omitted at the trial level was prejudicial to the petitioner. He added that information regarding the family history of mental illness should have been presented. Dr. Einstein explained that this case was difficult for two (2) reasons. First, the petitioner was not honest regarding his family history, because he presented a picture of having a perfect family. Second, his family was very guarded and closed to outsiders.

Dr. Einstein conceded that the petitioner did not have an abusive childhood. Although the petitioner did have two (2) incidents of significant physical trauma, this information was procured by the trial team. There is no indication of childhood malnutrition. He further conceded that, at the time of trial, there was no mental health history of the petitioner and there was no evidence that he was mentally retarded. There is no evidence of fetal alcohol syndrome or effects. There is no evaluation completed by an addictionologist nor is there any indication that the petitioner had any kind of addiction. He agreed that there is no indication as to whether the petitioner had been exposed to lead, [*33] agricultural chemicals, or environmental toxins. Although these initial questions were answered negatively, Dr. Einstein stated that mitigation investigation does not end. Dr. Einstein conceded that, in any given case, there may exist several arguable issues that should be eliminated for the purpose of focusing on one (1) or two (2) stronger issues.

The trial judge himself made inquiry as to Dr. Einstein's qualifications. Dr. Einstein affirmed under questioning by the trial judge that his Ph.D. was in English. He further stated that he went from teaching English at Fisk University to being a specializing consultant and mitigation specialist. The trial court further questioned Dr. Einstein as to the manner of action taken when after interviewing four (4) or five (5) people there is nothing unusual discovered about the client. In response to questioning by the trial court, Dr. Einstein stated that he would continue to work for free in some cases, acknowledging that a court would refuse to grant more funds when there is no reason to support further investigation. The trial court also inquired as to the financial reasons motivating an investigator to continue seeking mitigation evidence [*34] if initial efforts prove unproductive.

David Louis Chearis testified that in late 1996 and early 1997 he was confined in the Fayette County Jail. Mr. Chearis served six (6) months in the jail, leaving the jail about a month and a half before the murder of Deputy Bishop. During his confinement, he had the opportunity to observe the petitioner. Chearis knew the petitioner prior to incarceration, however, as the two men were "supposed to be some kin" and, generally, from "being on the streets." He also recalled publicity the petitioner received from playing basketball in high school.

Mr. Chearis noted that the petitioner was "like laid back and didn't really associate . . . with other inmates . . .and mostly stayed to himself, drawing . . . listening to his music. . . ." He observed that the petitioner slept most of the time, not rising until time to "get his 12 o'clock sandwich." This behavior of staying to himself persisted for about five-and-one-half (5 1/2) months. He then changed. The petitioner started playing games, card games, arm wrestling, and other things. He starting get-

ting out of bed earlier. He began associating with the other inmates. Mr. Chearis described the petitioner's [*35] changed behavior as "risky," explaining that when you started playing games you ran the risk of being in a fight. He further observed that the petitioner stopped "drawing as much." Previously, he would draw pictures of his girlfriend, his mother and Michael Jordan, all people that he liked. After his behavioral change, he "got into a lot of tattoos."

On cross-examination, Mr. Chearis conceded that it was possible that the fact that the the petitioner was in possession of a handgun and was planning a murder was the reason behind his change in behavior.

Barbara Weddle, a retired school teacher, testified that she first encountered the petitioner in elementary school. Ms. Weddle was the fourth and fifth grade teacher at Central Elementary. Although the petitioner was not a student of hers, she knew of him because he "had a real good personality." In 1981, Ms. Weddle transferred to Fayette-Ware High School. At the high school, the petitioner was in Ms. Weddle's art class. Ms. Weddle recognized the petitioner's talent for drawing. She encouraged him to enter a contest about drawing the courthouse. The petitioner won the contest and won a dinner at a restaurant. Ms. Weddle always thought [*36] of the petitioner as "another Eddie Murphy. . . . He just liked to say funny things and make the kids laugh." She described him as playful, not disruptive. Ms. Weddle could not recall the petitioner's character other than that displayed in her classroom. Ms. Weddle could not recall being contacted by any person on the petitioner's trial team.

Larry Ransom, a teacher and the basketball coach at Fayette-Ware High School, testified that the petitioner played basketball under him at the high school. At the time, Coach Ransom was the assistant coach. He related that the petitioner was a very talented athlete and played hard. The petitioner was present at all practices and got along well with the other players. Coach Ransom could not recall any complaints about the petitioner from any of the teachers. He did state that, during his senior year, the petitioner concentrated more on his art work than on basketball. Despite the petitioner's passion for artwork, Coach Ransom was of the opinion that the petitioner could succeed at basketball at the college level.

On cross-examination, Coach Ransom recalled an incident where the petitioner placed something on the driveway of the school secretary. [*37] He also recalled an incident where the petitioner was involved in a fight on a school bus.

Although Tonya Whitmore went to high school with the petitioner, she did not actually meet him until after graduation when he was working at Sonic. Ms. Whitmore began dating the petitioner in 1993. She stated that, during the time they dated, she spent time with the petitioner and his family. She described the family as "pretty close," "pretty normal," and "nothing seemed out of the ordinary . . . ." During the first few months of their relationship, the couple would go places, have fun together, and the petitioner would paint pictures of Ms. Whitmore. At some point, the petitioner changed. He became very violent with her. Ms. Whitmore described one incident in January 1995 where the petitioner had come to her place of employment, broken into her vehicle, and waited for her. When Ms. Whitmore got into her car, he drove around beating [her]." Ms. Whitmore ended up in the emergency room as a result of this incident. Ms. Whitmore initially did not tell anyone that the petitioner was the person that had inflicted the injuries upon her. Later that evening, Ms. Whitmore returned to the hospital [*38] and informed them that the petitioner beat her up and that he would kill her. Ms. Whitmore was placed in a room at the hospital until law enforcement officers arrived and made the petitioner leave. Ms. Whitmore later sought a protection order against the petitioner. Ms. Whitmore did have contact with the petitioner via telephone calls. She described these conversations as "twisted, very twisted." She described the petitioner as being like two (2) different people. A few weeks later, the petitioner kidnapped Ms. Whitmore's younger sister, Tina. Ms. Whitmore testified that she broke up with the petitioner after the January 1995 beating, but later reconciled with the petitioner. She stated that she stayed with the petitioner after he started abusing her because he was a "good manipulator and a good conner . . . ."

Tempie Whitmore, Tina and Tonya Whitmore's mother, testified that her initial impression of the petitioner was that he was "odd, strange." She explained, "he just would stare at you and look at you right hard. . . . Looked like he was a little bit withdrawn . . . ." After the incident where Tonya was taken to the hospital, the petitioner telephoned Mrs. Whitmore at her place [*39] of employment, stating that he was sorry that he "beat Tonya up like that."

Willie Mae Henderson Armour, the petitioner's "great auntie," testified that her daughter, Cora Johnson, and two (2) of Cora's sons lived with her. Mrs. Armour stated that Cora was at Western State due to a nervous breakdown at the time of the birth of her twins, Penn and Glenn. Glenn Johnson, one of Cora's sons, was currently confined in the Somerville jail. Glenn had previously been hospitalized for mental problems. Mrs. Armour explained that Glenn had "been in and out of different places, and he got hurt in Cookeville, Tennessee, and that could be some of his problem." She stated that Glenn had been raped and it did something to his spine. Mrs. Armour was in the process of trying to get Glenn

back into a mental hospital. She described particular incidents of Glenn's behavior, including an incident where he tore her front door off and stabbed his sister in the head.

In addition to Cora and her children's known mental illnesses, Mrs. Armour stated that another aunt, Amelia Winfrey, had "nerve - mental trouble," and her son, Arthur Peter Winfrey "died in Western State Hospital from mental illness." She [*40] added that her "great great auntie, Aunt Liza Winfrey, "lost her mind." Aunt Liza's son, Albert Springfield also "lost his mind, and he died in New York." She explained that "they'd just go wild." The mental illness apparently ran on both the maternal and paternal sides of the family.

Margaret Simmons is the sister of Elton Henderson. Ms. Simmons has never met the petitioner and only knows of him through articles relating the murder of Deputy Bishop.

Shirley Shelby testified that she had known the petitioner since he was eight or ten years old. The petitioner was friends with Ms. Shelby's sons. Ms. Shelby was also the petitioner's art teacher. She described him as an "exceptionally talented student." She added that he was also a talented athlete, specifically basketball.

Ms. Shelby related an incident where someone broke into her home and held a towel over her face. The person was wearing a ski mask and the house was dark as it was two o'clock in the morning. After chasing the intruder out of the house, Ms. Shelby and her daughters realized that their telephone lines had been cut. They decided to leave in her vehicle. The intruder chased the family away. The intruder then returned [*41] to Ms. Shelby's home and took "whatever purse he could find." Ms. Shelby then learned of checks having been written on her account. At some point, someone was able to identify the person who was writing the checks on Ms. Shelby's bank account. The person was identified as the petitioner. Ms. Shelby confirmed that in her recommendations for sentencing of the petitioner in this crime against her she recommended that he be provided psychological counseling.

Tammy Askew was retained as the investigator by the trial team in this case. She specifically recalled being contacted by Mr. Mosier prior to August 1997. She was instructed by both Mr. Mosier and Mr. Johnston to interview witnesses. Her understanding was that her investigation was limited to solely the guilt phase of the trial. Ms. Askew's records of her investigation reveal that on August 27, 1997, she interviewed Ms. Guy, Mr. Holmes, and Sally and TL Johnson. Her records also reveal that she attempted to interview Dr. Cima, Peggy Wilde and Donna Feathers; these witnesses refused to be interviewed. As advised by Mr. Mosier, Ms. Askew again attempted to interview these witnesses; they again declined.

Ms. Askew testified that [*42] she interviewed the petitioner's parents Sally and TL Johnson at their home. The couple were interviewed separately. An interview of the petitioner was then conducted. This was Ms. Askew's only interview with the petitioner. Ms. Askew conducted no additional investigative activities in this matter until June 1998. She explained that she had interviewed all of the persons that defense counsel had asked her to interview, with the exception of those individuals that declined. She stated that defense counsel never asked her to interview anyone from the Sheriff's Department. Ms. Askew explained that after a defense team meeting on July 8, 1998, she researched criminal records of the petitioner and picked up some medical records on the petitioner.

Judge Blackwood was then called as a witness by post-conviction counsel. Judge Blackwood testified that from 1974 to 1976 he was in private practice in Fayette County. In 1975, he became a part-time assistant district attorney, going full-time in 1976. Judge Blackwood remained in this position until November 1985 at which time he was appointed to the bench. Judge Blackwood acknowledged that he had applied for the position of District Attorney [*43] General while employed with the District Attorney's Office.

Regarding an in camera conference between Judge Blackwood and Ms. Fenyes during the July 6, 1998, motion for continuance, Judge Blackwood stated that he questioned Ms. Fenyes as to how much more time she needed with regard to preparation of a mitigation defense. Trial counsel did not object to the conference.

Dr. Lynn Zager, a clinical psychologist, was retained by trial counsel to evaluate the petitioner. Dr. Zager testified that her evaluation of the petitioner began on November 4, 1997. Actually, Dr. Zager had previously traveled to Mark Luttrell in Shelby County to interview the petitioner, but he had already been transferred to another institution. On November 4, Dr. Zager spent three (3) hours at Riverbend completing a forensic evaluation of the petitioner. The purpose of this evaluation involved informing the petitioner of the purpose of the evaluation and the limits of confidentiality. She explained that her evaluation consisted of a social history, a competency assessment, and a "mental condition at the time the offense is said to have happened" assessment. Throughout this process, Dr. Zager is looking for signs [*44] and symptoms of a mental illness, personality disorder or other mental issues. Dr. Zager testified that, on this date, she did not complete any social history information.

On January 7, 1998, Dr. Zager reviewed the petitioner's medical records from LeBonheur Children's

Hospital. Dr. Zager recalled the petitioner being involved in a bicycle accident when he was twelve (12) years old. The Petitioner had been hit by a car and was rendered unconscious. At this point, Dr. Zager provided her opinion to defense counsel that the petitioner was competent to stand trial and there was insufficient evidence to support a defense of insanity. She added that she did not have information to diagnose a major mental illness.

Dr. Zager testified that after the entry of the petitioner's guilty plea, the defense held a team meeting. During this meeting, there was discussion about the possibility of a personality disorder existing, specifically with narcissistic and antisocial traits. Dr. Zager decided to further pursue these disorders. Prior to July 8, 1997, Dr. Zager did not conduct any formal psychological testing. After this meeting, Dr. Zager administered the MMPI to the Petitioner and evaluated [*45] the results. Between the team meeting and the administration of the MMPI, Dr. Zager had not been provided any more social history information on the petitioner. Dr. Zager had not been provided letters written to trial counsel by the petitioner. Notwithstanding, Dr. Zager testified that she felt comfortable with the amount of social history she had been provided. She did concede, however, that in other cases, the mitigation specialist had provided her with information as to the client's social history. Dr. Zager stated that information as to extended family histories involving alcoholism, mental health, and other issues are helpful and valuable tools. She added that, depending on the case, information gained from interviews with extended family members and people in the client's community could be significant in looking at a person's mental health.

A team meeting held on July 10 consisted of Dr. Zager, Mr. Mosier, Mr. Johnston, and Ms. Fenyes. The petitioner's mother attended this meeting and brought with her a box of things thought to be helpful or valuable in terms of preparing for the sentencing hearing. Dr. Zager could recall items of artwork most vividly. She recalled that a [*46] plan was formulated as to what would be presented at the hearing. Dr. Zager had determined that the petitioner suffered from a personality disorder with narcissistic and antisocial traits. This information was discussed at the meeting. Her evaluations, however, did not meet the specific diagnosis for these disorders. Dr. Zager testified that she was surprised that she was asked to testify at the sentencing hearing because her diagnosis of the petitioner did not constitute a major mental illness, in other words, her diagnosis was not very valuable in asserting a defense.

Since the initiation of post-conviction proceedings, Dr. Zager had been advised of additional information regarding the petitioner that she was not aware of at the time of her diagnosis. She stated that she learned "a whole lot of additional background information," including details of the different crimes for which the petitioner had been charged and convicted. Specifically, she was provided the victim's point of view of the incidents. Dr. Zager noted that the petitioner's art teacher was the victim of one of his prior crimes. She stated that any additional information would have been used in evaluating or refining [*47] her diagnosis

Dr. Zager testified that she was aware that the petitioner had been diagnosed with a Bipolar 2 disorder. She stated that this diagnosis was not inconsistent with the MMPI previously administered to the petitioner. On cross-examination, Dr. Zager explained that Bipolar 2 is a mood disorder and is not a psychosis. She added that a person can be diagnosed as Bipolar 2 and be a functioning member of society without antisocial or criminal traits.

Although Dr. Zager stated that she had not made a new diagnosis in this case based on new information, she agreed that it would be prudent to continue to look and see if there was a reason to change her prior diagnosis.

Dr. Pamela Auble, a clinical psychologist, explained that the role of an expert is to evaluate the client, sometimes recommending further experts. A major part of the function is to consult with the attorneys and the mitigation specialist. She described the role as an "ongoing process," because the evaluation may lead to new questions, additional records, additional consultations with the team, new information, and so on.

Dr. Auble stated that the MMPI is a personality test consisting of 567 true or false questions. [*48] Mainly, the questions are about various aspects of human experience. The test has some mental ability limitations, that is, you have to be able to read and understand the questions. Additionally, the test is only a "snapshot" of how the person taking the test is at that moment. She stated that the MMPI, on its own, is not a sufficient tool for providing a full picture of a person's psychology because; (1) it does not measure a person's abilities, thinking, reasoning or memory; (2) it is dependent upon the person's ability to describe themselves; and (3) no single test is the answer for everything. Dr. Auble confirmed the importance of the evaluator personally interviewing the client.

Dr. Auble testified that she was involved in the petitioner's case. She interviewed the petitioner, performed a battery of tests, and reviewed some records about his history. She further attested that she had consulted with post-conviction counsel and talked with various persons about the case, their findings, and other aspects of the petitioner's history. Specifically, Dr. Auble administered the Wechsler Memory Scale Third Edition, the Weschler Adult Intelligence Scale Third Edition, the Test of Memory [*49] Malingering, the Wisconsin Card Sort, Trail-

making, the Speech Perception Test, the Seashore Rhythm Test, the Tactual Performance Test, the California Verbal Learning Test, the Rey-Osterrieth Complex Figure, the Delis-Kaplan Executive Functioning System, the Finger Oscillation Test, the Grooved Pegboard Test, the Rorschach, the Personality Assessment Inventory, and the Incomplete Sentences Blank. Dr. Auble further reviewed the testimony and notes of Dr. Zager, the records from LeBonheur Children's Medical Center, the report of Dr. Einstein, and a transcript of the sentencing hearing. The review of these materials was completed after Dr. Auble's report was prepared but had no affect on her conclusions. Dr. Auble provided the following test results:

> The testing of the mental abilities told me that [the petitioner] does not have what I would call global or general deficits, but does have some specific problems in his mental abilities.
>
> To be exact, he has some difficulties learning information that he's told. That's a problem for him. He also had some problem in a test of manual dexterity, and he had some variable problems on tests which measure his ability to go back and forth [*50] between different ideas, to form hypotheses and test them, and to abstract reasoning.
>
> From the personality testing, [the petitioner] has a desire to present himself as a very normal, even maybe supernormal individual. He is likely to minimize or even be unaware of his own problems. He likes people and wants interaction with people. He - in my testing he was less distressed than he was when Dr. Zager saw him. I guess that's sort of a quick summary.

Dr. Auble explained that her findings of neuropsychological deficits was significant because they affect his functioning. She stated that:

> From the personality testing it was hard for me to draw a lot of conclusions because of his tendency to shut down and to minimize problems, to . . . I don't know that he really has much insight into what his real problems are. So from the personality testing I'm not sure I got underneath, underneath his sort of mask of normalcy that he wants to portray to everyone. . . . I don't think he was as depressed at the time I saw him [as he was when Dr. Zager saw him].

There were indications however that his functioning was not right and his portrayal of himself and his family is [*51] inconsistent with reality. Dr. Auble believes that the petitioner is not "aware of his own emotional dynamics."

In comparing her results with those reached by Dr. Zager, Dr. Auble noted that Dr. Zager did not perform some of the testing of mental ability and, therefore, she did not talk about the problems with the petitioner's memory and his rigidity. She did concede that the personality style identified by Dr. Zager was similar to the personality style observed in her evaluation. Dr. Auble further agreed with Dr. Zager's diagnosis as to the petitioner's narcissistic traits and antisocial personality. She conceded that she was unable to diagnosis the petitioner with an Axis I diagnosis of a major mental disorder.

Dr. William Kenner, a psychiatrist engaged by post-conviction counsel in this case, testified that in formulating his opinion he reviewed:

> Quite a stack of material . . . which involved the interviews that had been done with his family members. I also - and other individuals who had known him over the years. I also had a chance to talk with Shirley Cobb and Tina Whitmore and Tina's mother, Tempie Whitmore, to get their views and experiences with [the petitioner]. [*52]

In Dr. Kenner's opinion, the petitioner suffered from a bipolar type 2 disorder at the time of Deputy Bishop's murder. He continued to describe bipolar disorder:

> One way to think about bipolar disorder is in terms of the cruise control on a car. The human brain has its own cruise control that sets the pace of our lives, the pace at which we think, act, and so forth. And, you know, some of us have cruise controls that are set quite differently. Some people are slow talking, and others talk very quickly and move on to things and so forth.
>
> But when that cruise control becomes defective, some interesting changes take place in an individual. They begin to feel

too good. Their thinking can race ahead, oblivious to any warning signs that they would otherwise have heeded when they were in their normal state. They don't need as much sleep as others. And the more manic they get, the less sleep they will need. What often goes with the fast thinking is extremes in the manic's opinion of himself, that it will become grandiose, his thinking will become expansive, and he will feel wonderful in circumstances that most folks would feel pretty just the opposite.

The manic patients have [*53] the normal human appetites, but they go overboard in terms of pleasure seeking, in terms of having a good time, and they will do this heedless of any consequences. . . . The manic will be unable to use good judgment to slow down and reflect on a particular course of action. . . . He may break the law in ways that he would not have done when he was on a more even keel.

Dr. Kenner related the traits of a manic to those of one with a narcissistic personality disorder, stating that a "manic is like a narcissist on methamphetamines." He stated, however, that a narcissist is one who puts himself out as being a rather special person, while a manic, when the mania is over, will resume their normal personality. Regarding the diagnosis of antisocial personality disorder, Dr. Kenner stated that symptoms of this trait begin at age fifteen (15). These traits were not evident in the petitioner. The petitioner was very conscientious and hard working in school.

Dr. Kenner stated that the marked change in the petitioner's personality in early adulthood suggests several things including the use of drugs or the start of a mental illness. There was no indication that the petitioner abused drugs. [*54] Dr. Kenner based his diagnosis primarily upon the petitioner's behavior during childhood and high school compared to his behavior in his early adulthood years. Dr. Kenner considered the petitioner's extracurricular activities, noting that he played basketball all four (4) years, he ran track, he was president of the 4-H and the student body at high school, he participated in the art club, he coached and played in the Fayette County Athletic League. Based upon his performance to this point, the petitioner showed great promise, that is, before his bipolar symptoms came into play. There were some signs in high school, specifically sleep disorder systems. His criminal career began with the forging of a Tennessee Department of Employment Security check. The check was made for $ 104, and the petitioner added a five (5) in front of the amount, making it $ 5,104. In February 1995, he raped Shirley Cobb, the mother of his girlfriend. The petitioner described his girlfriend Natonya as his wife. In March 1995, he broke into Shirley Shelby's home and stole some purses. In May 1995, he abducted the younger sister of a former girlfriend.

Other events proved insightful in making a diagnosis. In [*55] October 1995, the petitioner placed a wedding announcement in the local paper stating he and Natonya were to be married and giving her last name as Boyland. The announcement further provided that the wedding was to take place on October 14, 1995, at the Adams Mark Hotel with an elegant reception afterwards. Information in the announcement also indicated that the couple were soon to be parents of a baby boy, that Natonya was going to sign a contract with a modeling agency, and that the petitioner was pursuing his art career at the Naegele Outdoor Advertising Company. There was absolutely no truth in the announcement. They were not getting married; she was not pregnant; he was working at Target; he was not pursuing an art career; and Natonya was not signing a modeling contract.

On December 27, 1995, the petitioner was released from jail at 1:17 p.m. By 4:00 pm, he had again abducted Shirley Cobb and raped her. The abduction was in daylight in front of somebody's house. The petitioner began to serve a sentence for aggravated burglary in January 1996. He was on work release in February 7, 1996, when he again abducted Shirley Cobb. On February 9, he released her. Two (2) months later, [*56] the petitioner was arrested in Conway, Arkansas, with Natonya Cobb.

Dr. Kenner opined that these events are significantly different from behavior earlier in his life. His family history is heavily loaded for bipolar disorder. The murder of Deputy Bishop occurred during a period of difficulty in sleeping. Moreover, like the other crimes committed by the petitioner, this offense did not make any sense, shooting a deputy and escaping through the middle of town. He stated that Mr. Chearis' description of the petitioner's behavior while at the Fayette County Jail was consistent with a diagnosis of bipolar disorder 2.

Dr. Kenner concluded that, in his opinion, the petitioner was suffering from a major medical illness that affected his abilities to control his behavior in this case. He added that someone suffering from a bipolar disorder would have more difficulty in avoiding this type of criminal behavior than a person without a mental illness. Dr. Kenner stated that the most convincing evidence as to the diagnosis that the petitioner was suffering from bipolar disorder at the time of the murder is the presence of the sleep disorder. However, he placed equal impor-

tance on the family [*57] history of mental illness and the petitioner's presentation that he had a perfect family. He stated that the illness could be supported without the two (2) year history of criminal behavior, but it is much more convincing with the history.

On cross-examination, Dr. Kenner conceded that his information of the petitioner's sleep history was based on the self-report of the petitioner. He related, however, that bipolar disorder was not a mental illness easily or readily "faked" by persons. Dr. Kenner further admitted that none of the petitioner's first-degree biological relatives had bipolar disorder. He stated, however, that there is relevance of a second cousin suffering from a mental illness, but he conceded, this relevance is not recognized in the DSM4.

***Findings of the Post-Conviction Court***

In its order denying post-conviction relief, the post-conviction court summarized the facts supporting the petitioner's conviction for the first degree murder of Deputy Bishop. The post-conviction court noted that numerous pre-trial motions were filed by defense counsel, including motions for ex parte services. These motions were granted by the trial court. The post-conviction court [*58] further acknowledged that the trial was originally scheduled for July 6, 1998, but, immediately prior to the commencement of the trial, defense counsel sought and was granted a continuance. Later that day, after an extensive hearing, the petitioner entered a plea of guilty to first degree murder. After further questioning, the petitioner waived his right to have a jury impose punishment. A capital sentencing hearing was conducted one (1) week later. At the conclusion of which, the trial court imposed a sentence of death.

The post-conviction court acknowledged the petitioner's claims regarding the ineffective assistance of trial and appellate counsel. In this regard, the post-conviction court made the following findings of fact and conclusions of law:

> First, this case occurred before Rule 13 of the Supreme Court became applicable. Nevertheless, Mr. Mosier had experience in capital cases, and Mr. Johnston had impressed the Court with his legal acumen, despite his lack of experience. Secondly, there is nothing in the record to suggest that the Petitioner did not voluntarily, knowingly, and intelligently waive his right to a jury trial on the issue of punishment. The record indicates [*59] that he initially suggested to trial counsel that he plead guilty. Thirdly, there are very few factual issues of importance that are disputed. Lastly, the Court, having been the trier of fact during the punishment phase, is in a unique position to be able to hear any additional mitigating evidence and weight [sic] it against the evidence at trial. This is important in determining whether any additional mitigating evidence would have changed the Court's sentence.
>
> The Court finds that Petitioner was not denied effective assistance of counsel. Counsel filed all the appropriate motions. Counsel was provided with expert services. Counsel allowed the investigative and mitigation expert to conduct their investigation and report to counsel their findings. It is true that trial counsel was not aware of all the history of mental illness in the Petitioner's family. Also true was that counsel was not completely aware of some of the violent events that the Petitioner engaged in shortly before this incident. It is true that counsel was aware from the expert clinical psychologist that Petitioner was diagnosed with a personality disorder, not otherwise specified, with narcissistic traits. However, [*60] their expert did not see any bipolar tendency, and counsel, under the circumstances, acted in a competent manner in presenting this psychological proof to the Court. It is true that counsel's mitigation expert did not make as an extensive mitigation investigation as Post-conviction mitigation expert opined was necessary. However, two points need to be addressed. One, there was a mitigation investigation and a review of the trial transcript revealed that various witnesses testified on Petitioner's behalf in an effort to produce mitigation. Secondly, the Court places little weight on the testimony of Petitioner's mitigation expert, especially when he opined that it would take two to three years to do a proper mitigation investigation. Lastly, as trial counsel stated, this was a case where finding mitigation was difficult, and as explained hereinafter, also a double-edged sword. Therefore, the Court concludes that counsel was not ineffective.
>
> . . . .

The Court can now look to the additional mitigation proof offered at this hearing in assessing whether the result would have been different. . . . The Petitioner was a normal student in grammar and high school. He was a talented basketball [*61] player and had a talent for art. About two years prior to this event, his behavior changed. He became violent. He viciously assaulted one girlfriend. He was convicted of some lesser felonies. Thereafter, he abducted the mother of his girlfriend on several occasions while masked. He also raped the mother. Petitioner's clinical psychologist opined that he had a personality disorder, but did not . . . disagree with trial counsel's clinical psychologist, other than she administered more tests. Finally, Dr. Kenner diagnosed the Petitioner as bipolar. . . . Dr. Kenner opined that in order to fully explain the nature of Petitioner's bipolar diagnosis, the trier of fact would have to hear all the details of Petitioner's various assaults, abductions and rapes.

. . . .

The statutory aggravating circumstances . . . by the State were simply overwhelming. The Court considered the mitigating testimony, especially the testimony regarding this personality disorder. This proffered new mitigating testimony regarding Dr. Kenner's bipolar diagnosis, only reinforces the Court's opinion that the aggravating circumstances outweighed, in fact overwhelmed, any mitigating evidence. . . . The Court is [*62] assuming . . . that Dr. Kenner's diagnosis is correct. Had this testimony been offered at the trial, the State, of course, would have had the opportunity to rebut same. . . . Secondly, the evidence presented regarding the defendant's abduction of his girlfriend's mother, the rapes, the assaults, lead the Court to the conclusion that the Petitioner's acts were calculated, cold and deliberate. These are the same calculated and deliberate actions that led to the death of Tommy Bishop. Whether or not they were the result of a bipolar condition would not have changed the Court's decision to impose a sentence of death.

Lastly, Appellate counsel was not ineffective given the history of the case. The only viable issue to appeal was pre [sic] portionality.

***Post-Conviction Standard of Review***

[HN1] Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. *Tenn. Code Ann. § 40-30-103*. The petition challenging the conviction for first-degree murder herein is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by [*63] clear and convincing evidence. See *Tenn. Code Ann. § 40-30-110(f)*. Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)*.

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003)*; *State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002)* (citing *State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)*). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols, 90 S.W.3d at 586*. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing *Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)*). Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance [*64] present mixed questions of law and fact. *Wallace, 121 S.W.3d at 656*; *Nichols, 90 S.W.3d at 586*. As such, our review is de novo, and we accord the conclusions reached below no presumption of correctness. *Wallace, 121 S.W.3d at 656*, *Nichols, 90 S.W.3d at 586*.

***I. Issues Waived by Guilty Plea and/or Failure to Raise Them on Direct Appeal***

In this appeal, the petitioner raises a number of issues centering around both the trial court's refusal to recuse itself during both the guilt and the sentencing phase as well as constitutional error with the imposition of the death penalty. Specifically, with regard to the death penalty, the petitioner argues that: (1) his sentence of death violates international law; (2) his sentence of death violates due process; (3) his waiver of jury sentencing was invalid; (4) the death penalty itself is unconstitutional; and (5) the system of appointing capital defense counsel is unconstitutional. [HN2] A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which [*65] the ground could have been presented unless it is based upon "a constitutional right not recognized as ex-

isting at the time of trial if either the federal or state constitution requires retroactive application of that right" or the failure to present the ground "was the result of state action in violation of the federal or state constitution." *Tenn. Code Ann. § 40-30-106(g)*. Neither of the exceptions is present herein. Further, the petitioner pled guilty. [HN3] A guilty plea waives all non-jurisdictional constitutional inequalities. See *State v. McKinney, 74 S.W.3d 291 (Tenn. 2002)*. Thus, these issues are waived. Accordingly, the only remaining issues properly before this Court involve the trial court's failure to recuse itself at the post-conviction proceeding, the effectiveness of trial and appellate counsel, and the post-conviction court's decision to exclude the testimony of Kelly Gleason.

***II. Recusal of the Court at the Post-conviction Level***

The petitioner complains that the post-conviction judge erred in failing to recuse himself from the post-conviction proceedings. As basis for recusal, the petitioner asserts that: (1) the [*66] judge predetermined post-conviction issues at the petitioner's original trial; (2) the post-conviction judge demonstrated bias by its attitude and behavior regarding defense witness Dr. Einstein; (3) the post-conviction judge refused to permit the defense to call his secretary as a witness so as to not disrupt its office, although defense counsel had properly subpoenaed her; and (4) the judge's disparate treatment of witnesses.

In support of these claims, the petitioner offers the following. The petitioner alleges that the judge began predetermining post-conviction issues during the original trial of this matter. Specifically, the petitioner cites to the trial judge's questioning of Ms. Fenyes with hypothetical questions regarding whether there was sufficient mitigation investigation to support a finding that trial counsel was effective. The petitioner further asserts that the judge's predetermination of counsel's effectiveness is evidenced by the post-conviction judge's conduct during the testimony of Dr. Frank Einstein, the post-conviction defense mitigation specialist. The petitioner claims that the trial judge took notes during Dr. Einstein's testimony and contemporaneously "smiled" [*67] at the prosecutors. The petitioner also cites to the post-conviction judge's questioning of Dr. Einstein concerning his change of careers from a teacher to the more lucrative career of a sentencing mitigation specialist. The following is an excerpt from the post-conviction judge's questioning of Dr. Einstein:

> THE COURT: I wonder why you left the position [teaching] at Fisk to go into the criminal justice system.
>
> DR. EINSTEIN: Well, there were very many reasons. I made a career change at that time. To continue teaching, I would have had to have moved around, you know, out of Nashville. And by that time my wife and I had two small children. And this, an opportunity came up which I decided to take advantage of.
> THE COURT: Would it also be fair to say that about that time that the criminal justice system's compensation became more lucrative?
> DR. EINSTEIN: I don't know about that.
> THE COURT: Would it be fair to say that since 1997, when Tennessee has adopted the federal rules which have all these funds for mitigation experts and so forth, that your income has greatly increased since 1997?
> DR. EINSTEIN: I don't think it has greatly increased.
> THE COURT: If you go and you [*68] interview four or five witnesses and you find no mitigation or nothing to help you, one of the reasons that you would continue to try to find mitigation experts is if you're being paid, the cash register will continue to run, won't it?
> DR. EINSTEIN: That wouldn't be the reason. The reason would be that I would have taken on the commitment to do a task and there being four or five people in that task.

The petitioner also challenges the post-conviction judge's refusal to allow post-conviction counsel to call Becky Pitts, the judge's secretary, as a witness. Ms. Pitts had been properly subpoenaed by post-conviction counsel. Ms. Pitts' testimony was allegedly necessary in regards to a letter sent by the petitioner to the trial judge requesting new attorneys. Despite the petitioner's protest to the contrary, the post-conviction judge stated that anything relating to the petitioner's letter was already contained in the record and there was no need for more evidence about that issue. The post-conviction judge further stated that "it is disrupting my office for her to be over here." When post-conviction counsel argued that the petitioner had a right to confront and to present testimony [*69] in his behalf, the post-conviction judge responded that "I rule that Ms. Pitts' testimony is not relevant."

Additionally, although not specifically challenged by the petitioner, the record indicates that the post-conviction judge was a witness in this case. Post-conviction counsel announced their intent to call the

post-conviction judge as a witness. The following colloquy occurred:

> MR. DAWSON: Your Honor, we do have some questions that we intended to ask the Court . . . that we indicated that we needed the Court as a witness. We do have questions for the Court, if the Court would allow that.
>
> THE COURT: It's never happened before, I suppose. All right, sir.
>
> Swear me, Mr. German.
>
> GENERAL FREELAND: Your Honor, I think I'm going to object unless there's some waiver on the part of the petitioner that this will not be in itself a basis for recusal of Your Honor. It seems to me that this is all part of the process that's been renewed today from yesterday to have Your Honor recuse himself. And if you're called by him as a witness and he says --
>
> THE COURT: I think I have to recuse myself.
>
> GENERAL FREELAND: Yes, sir. Your Honor, I understand his basis, . . . for [*70] Your Honor to recuse yourself, in which Your Honor has already ruled. But if a further basis is going to be that Your Honor is a witness, I'm going to object to his calling you as a witness.
>
> THE COURT: All right, sir.
>
> MR. DAWSON: Your Honor, that was, of course, what we had indicated prehearing or at the beginning of the hearing, is that we would need to call the Court as a witness, and that was, of course, one of the grounds that we gave for recusal. The Court denied that motion, and we still need the Court as a witness.
>
> GENERAL FREELAND: I take that as a waiver, Your Honor.
>
> MR. DAWSON: Your Honor, I don't think that's a waiver. We made the motion. We had indicated the Court needed to recuse itself for that reason. The Court refused to. I think [the petitioner] still needs the Court as a witness, and if that means the Court cannot then do the opinion in this case, then that's where we are in this matter.
>
> GENERAL FREELAND: Yes, sir. And, Your Honor, rather than this just being a fishing expedition, since this is unprecedented as far as I know, I'd like to have some sort of offer of proof as to what Mr. Dawson is going to ask.
>
> THE COURT: Yes, sir.

[*71]

The judge was sworn and testified regarding his legal career and political aspirations. Post-conviction counsel questioned the judge regarding the in-chambers conference with Ms. Fenyes. In this regard, the judge responded that there had been no objection to this procedure by trial counsel. He related that the in-chambers conference was limited to a discussion regarding how much more time Ms. Fenyes would need to procure mitigation evidence. At the conclusion of this testimony, post-conviction counsel unsuccessfully renewed the motion for the court's recusal.

[HN4] A fair trial in a fair tribunal is a basic requirement of due process. The principles of impartiality, disinterestedness and fairness are fundamental concepts in our jurisprudence. See *State v. Bondurant, 4 S.W.3d 662, 668 (Tenn. 1999)* (quoting *State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996)). Article I, Section 17 of the Tennessee Constitution* and the *Fourteenth Amendment to the United States Constitution* guarantee all litigants a hearing before an impartial decision-maker. *In re Cameron, 126 Tenn. 614, 151 S.W. 64, 76 (1912)*; see also *Tumey v. Ohio, 273 U.S. 510, 532, 71 L. Ed. 749, 47 S. Ct. 437, 5 Ohio Law Abs. 159, 5 Ohio Law Abs. 185, 25 Ohio L. Rep. 236 (1927)* [*72] (stating that "every procedure which would offer a possible temptation to the average man as a judge [to forget the burden of proof required to convict the defendant, or which might lead him] not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law"). *Article VI, Section 11 of the Tennessee Constitution* states that judges cannot participate in cases in which they might have even the slightest interest. *Neely v. State, 63 Tenn. 174, 182 (1874).* A similar restriction appears in *Tennessee Code Annotated section 17-2-101(1)*. The purpose of these provisions is to guard against the prejudgement of a litigant's rights and to avoid situations in which the litigants might believe that the court reached a prejudiced conclusion because of

interest, partiality or favor. *Chumbley v. People's Bank & Trust Co., 165 Tenn. 655, 57 S.W.2d 787, 788 (Tenn. 1933)*. A trial before a biased or prejudiced judge is a denial of due process. *Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998)*.

[HN5] Judges must not only be impartial, but also appear impartial because judicial [*73] fairness is violated when the appearance of fairness is ignored. See *State ex rel. McFerran v. Justice Court of Evangeline Starr, 32 Wn.2d 544, 202 P.2d 927 (Wash. 1949)*. This is not merely an idealistic sentiment. Deference to the judgments and rulings of the courts depends upon public confidence in the integrity and independence of the judges that make them. As our supreme court has acknowledged:

> It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity.

*In re Cameron, 151 S.W. at 76*. Since what the public perceives may be substantially different from what actually exists, it is the appearance of impartiality that will often undermine or resurrect society's faith in the judicial system. See *Bondurant, 4 S.W.3d at 668* (quoting *State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1993)* [*74] (citing *Offutt v. United States, 348 U.S. 11, 14, 99 L. Ed. 11, 75 S. Ct. 11 (1954)*)). Thus, "justice must satisfy the appearance of justice." Id.

[HN6] Canon 2(A), Tennessee Supreme Court Rule 10, requires judges to conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Similarly, Canon 3(E)(1), Tennessee Supreme Court Rule 10, requires judges to disqualify themselves in cases where their "impartiality might reasonably be questioned." The strict application of Canon 3(E)(1) may result in the disqualification of a judge who has no actual bias and who believes that he or she can try a case fairly. See *In re Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955)*. The test is not whether the judge believes he or she can be impartial but rather whether others might reasonably question the judge's impartiality. *Lackey v. State, 578 S.W.2d 101, 104 (Tenn. Crim. App. 1978)*. Thus, even where a just result is achieved, the appearance of justice is lost when the judge appears biased or partial to one party. See generally *Offutt, 348 U.S. at 14* (stating that "justice must [*75] satisfy the appearance of justice").

[HN7] A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. *Pannell v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001)*. This is an objective standard. *Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)*. The appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly. See *Liteky v. United States, 510 U.S. 540, 553, n.2, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)* (determining that "the judge does not have to be subjectively biased or prejudiced, so long as he appears to be so"). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley, 882 S.W.2d at 820*. [*76] The trial judge retains discretion over his or her recusal. *State v. Smith, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995)*. Unless the evidence in the record indicates that the failure to recuse was an abuse of discretion, this Court will not interfere with that decision. *State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995)*.

[HN8] It is difficult, if not impossible, for an appellate court to conduct a meaningful review of a trial court's discretionary decision without knowing the basis for the trial court's action. In no circumstance is this more true than when the impartiality of a judge is in question. In these cases, it is simply not sufficient for an appellate court to presume that there exists adequate support for the trial court's decision. The integrity of our judicial system demands actual reviewability in these matters. Thus, an appellate court must view the facts and circumstances through the eyes of the average man on the street.

The issue of a post-conviction judge's partiality or the appearance of it when the judge himself testifies was addressed previously by this Court in *Harris v. State, 947 S.W.2d 156 (Tenn. Crim. App. 1996)*. [*77] In Harris, the petitioner sought the recusal of the post-conviction judge because: (1) the judge was seeking the office of the United States Senator; (2) the judge was a material witness with respect to the issues raised in the post-conviction proceeding; and (3) the impartiality of the judge could reasonably be questioned. *Harris, 947 S.W.2d at 171*. Specifically, the petitioner argued that the

post-conviction judge had personal knowledge of disputed facts because he served as the trial judge. Id. Although not contained in this Court's opinion, it appears that the post-conviction judge made comments during the post-conviction proceedings that led the petitioner to believe that he was biased in favor of the State. While acknowledging that a trial judge cannot both preside at a post-conviction proceeding and serve as a witness in that proceeding, this Court concluded that "the judge was not a significant source of information at the hearing, nor was the judge's decision ultimately influenced by that information." *Id. at 173*. This Court also noted that [HN9] adverse rulings are usually an insufficient basis upon which to find bias. Id. While not [*78] condoning the judge's actions and remarks at the post-conviction hearing, this Court concluded that the judge's conduct did not "diminish the overall fairness of the proceeding, even applying the heightened standards of due process applicable in a capital case." Id. (internal citations and footnote omitted).

In the present case, the petitioner asserts that the post-conviction court advocated the State's interests by openly attacking the credibility of Dr. Einstein and by refusing to permit the petitioner to call the judge's secretary as a witness. He contends that these actions are exacerbated by the trial court's apparent predetermination of post-conviction issues during the trial proceedings and the post-conviction judge's disparate treatment of witnesses.

At the conclusion of Dr. Einstein's testimony, the post-conviction judge questioned Dr. Einstein about his motives for changing careers from teaching at a university to becoming a mitigation specialist and sentencing consultant. The petitioner argues that, by questioning the witness at length, taking notes during his testimony and "smiling" at the prosecutor during the testimony, the post-conviction judge created the appearance [*79] that he was taking sides.

A trial judge ordinarily has a duty to question a witness to clarify any issues for the jury. See *State ex rel. Com'r Dept. of Trans. v. Williams, 828 S.W.2d 397, 403 (Tenn. Ct. App. 1991)*. In the case herein, however, there was no jury. In *Bowling v. Commonwealth, 80 S.W.3d 405 (Ky. 2002)*, the Kentucky Supreme Court upheld the trial court's refusal to recuse itself after the trial court questioned certain witnesses at length. The defendant in Bowling posited an argument similar to the petitioner herein, that, by questioning the witnesses, the trial court became a material witness at the hearing and should have recused itself. *Id. at 420*. The supreme court of Kentucky disagreed with the argument, determining that in most cases, the judge's actions could have had a negative impact on a jury, but that, in the absence of a jury, there were no jury impact concerns. Id. Further, the court determined that the trial court did not "exceed its authorization to interrogate witnesses." *Id.* We agree. The trial judge presided over the post-conviction hearing, without a jury, and even though he questioned [*80] the witness at length without a jury there can be no argument that the trial judge's actions prejudiced the petitioner. Unquestionably trial judges as human beings may often find themselves forming opinions as to the credibility of witnesses. While expressing those sentiments before a jury may give rise to concern that the trial judge's statements or actions have prejudiced the finder of fact, this concern is not present where the trial judge is the trier of fact. We conclude that it was not error for the post-conviction judge to fail to recuse himself for questioning Dr. Einstein.

The petitioner also argues that the post-conviction judge at trial predetermined post-conviction issues concerning the effectiveness of counsel, specifically by sending a letter to defense counsel to acknowledge his participation in such a "thankless task" and by noting on the form for first degree murder cases required to be completed by the trial court pursuant to Tennessee Supreme Court Rule 12, that trial counsel's representation had been "very capable." While the statements about trial counsel were clearly complimentary, the statements were made well before any claim of ineffective assistance of counsel [*81] had been presented. This Court will not infer from those comments alone that the trial court could not be impartial in a subsequent post-conviction claim. See *Montooth v. State, 1997 Tenn. Crim. App. LEXIS 643, No. 01C01-9604-CC-00126, 1997 WL 381907, at *2 (Tenn. Crim. App., at Nashville, Jul. 11, 1997)*, perm. app. denied (Tenn. 1998) (determining that trial judge who had been complimentary of trial counsel's performance did not abuse its discretion in failing to recuse himself from a post-conviction claim alleging ineffective assistance of counsel).

On the whole, we find the facts before this Court similar to those presented in *Harris*. While we do not sanction the conduct of the post-conviction judge, specifically his participation as a witness, we conclude that the judge's conduct did not diminish the overall fairness of the proceeding. Nevertheless, while not requiring a reversal in this case, a judge's continued role as presiding over a proceeding in which he or she is or is likely to become a witness is a course fraught with peril and should be avoided whenever possible. See [HN10] Tenn. R. Evid. 605 (providing that a judge may not testify in a trial over which the judge is [*82] presiding).

***III. Challenges to the Post-Conviction Court's Findings***

*A. Standard of Review*

The petitioner contends that a contradiction exists in the current status of the law governing review of ineffective assistance of counsel claims. In *State v. Burns, 6 S.W.3d 453 (Tenn. 1999)*, our supreme court held that [HN11] a claim of ineffective assistance of counsel is a mixed question of law and fact. See *Burns, 6 S.W.3d at 461*. In *Fields v. State, 40 S.W.3d 450 (Tenn. 2001)*, our supreme court explained the standard of review in cases of ineffective assistance of counsel:

> [A post-conviction] court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. However, a [post-conviction] court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely de novo standard, with no presumption of correctness given to the [post-conviction] court's conclusions. [*83]

*Id. at 458* (citations omitted).

In clarifying the standard, our supreme court noted that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Rules of Appellate Procedure. See *Id. at 456*.

Petitioner asserts that the standard utilized in *Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)*, which states the post-conviction court's findings are given the "weight of a jury verdict," cannot be reconciled with the Rule 13(d) standard "de novo upon the record of the trial court, accompanied by a presumption of correctness." The petitioner then contends that this Court must apply the more relaxed de novo standard of review espoused in Fields. First, we note that the Henley standard invoked the Rules of Appellate Procedure regarding standards to be applied upon review. *Henley, 960 S.W.2d at 578-79*. Additionally, both the Henley and the Fields standards of review presume the trial court's findings are correct unless the evidence preponderates otherwise. See *Fields, 40 S.W.3d at 458*; *Henley, 960 S.W.2d at 578*. [*84] Finally, this Court is perplexed by the petitioner's complaint because the standard he seeks imposed is the standard employed by the appellate courts of this state.

*B. Findings of Post-Conviction Court Not Supported by a Preponderance of the Evidence*

The petitioner next asserts that the post-conviction court's findings are not entitled to the presumption of correctness because its findings are not supported by a preponderance of the evidence. In support of his argument, the petitioner relies upon several statements in the trial court's order to support his allegation:

> (1) Post-conviction court's recitation of the underlying facts of the murder, specifically the court's characterization of the actions of Dr. Cima as "quick thinking." Petitioner asserts that this characterization demonstrates the fact that the court's concern was on the death of Deputy Bishop and not on the claims for relief from an unconstitutional conviction and sentence;
> (2) Post-conviction court's description of the sentencing hearing as "long." Petitioner asserts that the sentencing hearing was conducted in one day and consists of 214 pages of trial transcript.
> (3) Post-conviction court summarily [*85] concluded that the post-conviction petition revolves around trial counsel's deficiencies in the mitigation stages of the proceeding. Petitioner asserts that the court ignored other issues raised. Petitioner further asserts that the post-conviction court applied an erroneous standard and incorrectly stated that Petitioner's argument was that bipolar disorder would have been a mitigating factor.
> (4) Post-conviction court erroneously concluded that Petitioner voluntarily waived his right to a jury trial on the issue of punishment.
> (5) Post-conviction court erroneously concluded that "counsel filed all appropriate motions;" "counsel allowed the investigative and mitigation expert to conduct their investigation and report to counsel their findings;" counsel "acted in a competent manner in presenting the psychological proof to the Court."
> (6) Post-conviction court disregarded testimony of Dr. Frank Einstein, the Petitioner's expert as to mitigation investigation.
> (7) Post-conviction court mischaracterized Dr. Auble's testimony.

(8) Post-conviction court's treatment of Dr. Kenner's diagnosis and testimony is "frankly astonishing."

The statements relied upon by the petitioner to [*86] support his assertion that the evidence preponderates against the post-conviction court's findings do not constitute viable challenges to the veracity of the lower court's findings of fact. Specifically, Petitioner's first three (3) claims are attacks against the court's choice of words. The terminology employed by the lower court does not affect the accuracy of the court's factual findings. In this regard, this challenge to the presumption of the lower court's findings fails. Similarly, the petitioner's allegations that the post-conviction judge improperly characterized all ineffective claims as claims attacking counsel's failure to prepare for mitigation, that the court mischaracterized Dr. Auble's testimony, and that the court discredited Dr. Kenner's testimony fail to impact the propriety of the court's factual findings. The petitioner has merely challenged the trial court's characterization of the evidence; he has failed to assert that the actual evidence preponderates against the factual findings. Finally, we conclude that the remainder of the petitioner's challenges to the "presumption of correctness" are actually challenges to the post-conviction court's "conclusions of law" [*87] concerning trial counsel's effectiveness and/or the voluntariness of the petitioner's plea and the submission of the punishment issue to the trial court. This Court reviews these issues de novo with no presumption of correctness and will do so as such issues are raised infra.

*IV. Ineffective Assistance of Counsel*

[HN12] The *Sixth Amendment* provides, in pertinent part, that, "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." *U.S. Const. amend. VI.* This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the *Fourteenth Amendment.*" *Gideon v. Wainwright, 372 U.S. 335, 350, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963)* (quoting *Betts v. Brady, 316 U.S. 455, 465, 86 L. Ed. 1595, 62 S. Ct. 1252 (1942)*). Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan, 446 U.S. 335, 344, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980)*; *McMann v. Richardson, 397 U.S. 759, 771 n.14, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970)*; see also *Strickland v. Washington, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).* [*88]

[HN13] When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. See *Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996).* In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).* In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See *Strickland, 466 U.S. at 694.* "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley, 960 S.W.2d at 580.*

As noted above, this Court will afford the post-conviction [*89] court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. See *id. at 578.* However, as stated above, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . .; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns, 6 S.W.3d at 461.*

Furthermore, [HN14] on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. See *Adkins v. State, 911 S.W.2d 334, 347 (Tenn. 1994).* This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. See id. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. See *Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).*

[HN15] Once a guilty plea has been entered, effectiveness of counsel [*90] is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. See *Hill v. Lockhart, 474 U.S. 52, 56, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985)* (citing *North Carolina v. Alford, 400 U.S. 25, 31, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970)*). As stated above, in order to successfully challenge the effectiveness of counsel, the petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. See *Baxter, 523 S.W.2d at 936.* Under *Strickland, 466 U.S. at 687,* the petitioner must establish deficient representation and prejudice resulting from the deficiency. However, in the context of a guilty plea, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty

and would have insisted on going to trial." *Hill, 474 U.S. at 59*; see also *Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997)*. [*91] Moreover, when challenging a death sentence, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Henley, 960 S.W.2d at 579-80 (Tenn. 1997)* (citing *Strickland, 466 U.S. at 695*).

**A. Claims Before this Court**

On appeal, the petitioner claims that trial counsel, Michael Mosier and Andrew Johnston, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, the petitioner asserts that Mr. Mosier and Mr. Johnston denied him effective assistance of counsel by breaching acceptable standards for capital representation in that:

> (1) Mr. Johnston was not qualified to represent Petitioner in a capital proceeding;
> (2) Trial counsel failed to provide timely and sufficient funding for a mitigation specialist and failed to monitor and direct the mitigation investigation;
> (3) Trial counsel failed to develop a relationship with the Petitioner, failed to consult with the Petitioner and failed to involve Petitioner in the [*92] preparation of the defense;
> (4) Trial counsel was ineffective in permitting Petitioner to enter a guilty plea and waive jury sentencing;
> (5) Trial counsel failed to pursue a change of venue;
> (6) Trial counsel failed to inform themselves of developments in capital litigation; and
> (7) Trial counsel failed to develop and make use of mitigation evidence. Trial counsel failed to present evidence that Petitioner was a good father and for failing to present other good acts of the Petitioner.

We proceed to review each of the petitioner's arguments and analyze them in light of trial counsel's conduct and performance.

**1. Mr. Johnston was not qualified to represent the petitioner in a capital proceeding.**

The petitioner asserts that Andrew Johnston, second chair counsel, was not qualified to represent him in a capital proceeding. While the petitioner acknowledges that appointment in this case was made prior to the effective date of the standards for appointment of counsel contained in the current version of Rule 13, Rules of the Tennessee Supreme Court, he asserts that the necessary qualifications of counsel in capital cases was standard. See ABA Guidelines for the Appointment [*93] and Performance of Counsel in Death Penalty Cases (February 1989). The petitioner asserts that Mr. Johnston "did not come close to meeting these standards." In support of this position, the petitioner relies upon a letter from the trial court to lead counsel dated June 3, 1997, in which the court states, "I'm going to attempt to appoint a local lawyer this week, who can do most of your housekeeping, babysitting, and logistical work." The petitioner interprets this statement as inferring that the trial court was more interested in appointing someone to file documents and keep up with the docket, rather than appointing an attorney capable of assisting in the difficult and complex representation of an individual facing the death penalty.

The petitioner recognizes that the core question is whether Mr. Johnston's performance was deficient to the prejudice of the petitioner. He responds that the fact that he was only provided one qualified attorney to his capital defense amounted to per se deficient performance.

[HN16] "The *Sixth Amendment* does not grant a defendant, who does have the absolute and unqualified right to appointed counsel, the additional right to counsel of his own choosing. [*94] " However, since *Gregg v. Georgia, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976)*, it has become apparent that [HN17] special skills are necessary to assure adequate representation of defendants in death penalty cases. See ABA, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases at 5.1. However, there is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case. See *Russell v. State, 849 So. 2d 95, 122 (Miss. 2003)*.

At the time of appointment in the present case, there was no specific criteria required of an attorney prior to receiving appointment in a capital case. Indeed, prior to July 1, 1997, the rule merely provided, [HN18] "in a capital case two attorneys may be appointed for one defendant." Tenn. Sup. Ct. R. 13, § 1 (prior to amendment in 1997) (emphasis added); see also *Brimmer v. State, 29 S.W.3d 497, 503 (Tenn. Crim. App. 1998)*. Thus, under the applicable rule, the petitioner was not entitled to second chair counsel as of right. Moreover, no qualifying criteria was specified as to lead counsel. While we recognize that ABA standards as to capital representation [*95] were in place at the time of the appointment and while it must be conceded that Mr. Johnston failed to satisfy all of the suggested criteria established by the ABA, these guidelines are not binding upon the trial

courts of this state. The trial court appointed Mr. Johnston as second-chair counsel, noting that the court had been impressed with Mr. Johnston's "legal acumen." Accordingly, the petitioner's argument that Mr. Johnston's lack of experience results in per se deficient performance is not supported in law.

In addition to Mr. Johnston's failure to satisfy any criteria relating to the appointment of capital counsel, the petitioner cites to numerous other factors indicating that his lack of experience constituted deficient performance, for example: (1) counsel did not have any experience in working with experts; (2) counsel failed to timely secure sufficient funds for the mitigation specialist; and (3) lead counsel was not qualified to handle a capital case under Rule 13, Rules of the Tennessee Supreme Court. Again, we refuse to conclude that these allegations automatically result in a finding of deficient performance. [HN19] A successful claim of ineffectiveness requires more than [*96] just a showing that trial counsel was inexperienced. Rather, the petitioner must demonstrate with specificity that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the *Sixth Amendment*." *Strickland, 466 U.S. at 687*. Even if a defendant meets this threshold, he or she must also prove that such error prejudiced the defense. Id. Furthermore, in the context of a guilty plea, the petitioner must show that there is a reasonable probability he would have not pleaded guilty if not for trial counsel's error. *Hill, 474 U. S. at 59*. We proceed therefore to examine the petitioner's specific allegations of deficient performance.

**2. Counsel's performance as it related to obtaining funding for and monitoring the mitigation investigation.**

Trial counsel's motions for court-appointed expert assistance were granted. The petitioner complains, however, that "asking for services does not absolve defense counsel of the duty to properly utilize those services." The petitioner asserts that trial counsel failed to adequately and timely move for additional funds for the mitigation specialist. Specifically, [*97] he refers to the motion for continuance conducted on July 6, 1998, the day trial was scheduled to begin.

At the motion for continuance, Ms. Fenyes testified that she had only spent forty (40) hours working on the case, noting specifically that she had only been granted funds to complete twenty (20) hours of work. She stated that it was not her policy to continue to work absent funding. As of July 6, 1998, Ms. Fenyes estimated that she needed to complete an additional thirty (30) to forty (40) hours of work to adequately prepare for this case. She added that funding for these services had not been approved until the week prior to the July 6 trial date.

Mr. Johnston informed the trial court that trial counsel "made application for additional funds on May, the 7th, in this case and Your Honor immediately signed those orders . . . ." He explained that the request for funds was then forwarded to the Administrative Office of the Courts ("AOC") for the signature of the Chief Justice. Mr. Johnston later contacted the AOC to determine the status of the fund request, at which time, he was informed that the request had yet to be signed by the Chief Justice. From this point, Mr. Johnston spent [*98] the next "three weeks to four weeks . . . calling up to the Chief Justice's office to determine where the orders were." He explained that his contact at the AOC was on vacation and that she was the only one that could assist him with funding requests. Mr. Johnston's office continued to make contact with the AOC regarding the status of the fund request. The Monday prior to July 6, the AOC contacted Ms. Fenyes, informing her that the requests "are going to be signed; go ahead; get it done."

The trial record does nothing to bolster the petitioner's assertion that counsel failed to timely file motions requesting funds and failed to file motions requesting sufficient funds. Counsel cannot be found deficient for actions beyond their control. The request was made two (2) months prior to the scheduled commencement of the trial. It was unforeseeable that the request would not be granted until two (2) months after its submission. The petitioner is not entitled to relief as to this claim. We also find without merit petitioner's two-sentence argument that "had defense counsel understood the development of mitigation and directed their experts they would have been able to supply information critical [*99] to reaching a reliable diagnosis of a serious bi-polar illness." The substance of this argument, regarding the lack of mitigation evidence, will be addressed infra.

**3. Counsel failed to develop a relationship with the petitioner, failed to consult with the petitioner and failed to involve the petitioner in the preparation of a defense.**

The petitioner contends that trial counsel failed to consult and involve the petitioner in the defense of his own life. He states that the limited visits between himself and his counsel prohibited either attorney from developing any type of relationship with the petitioner. Thus, the petitioner argues that he was precluded from developing a trusting relationship with the very people entrusted with his life. He adds that counsels' failure to consult with the petitioner prohibited them from monitoring the petitioner's mental health and prohibited the petitioner from being involved in his defense. This lack of contact with the petitioner also impacted counsels' relationship with the petitioner's mother, Sally Johnson. The fact that counsel failed to develop a relationship with Mrs. Johnson denied counsel critical information regarding the

family [*100] dynamics and the existence of the petitioner's mental illness.

The United States Supreme Court has stated that [HN20] the right to counsel as guaranteed by the *Sixth Amendment to the United States Constitution* does not include "the right to a meaningful attorney-client relationship." See *Morris v. Slappy, 461 U.S. 1, 13, 75 L. Ed. 2d 610, 103 S. Ct. 1610 (1983)*. Indeed, the Court stated that "no court could possibly guarantee that a defendant will develop this kind of rapport with his attorney." Id.

According to the petitioner, Mr. Mosier met with him on at least six (6) occasions and Mr. Johnston met with the petitioner on at least four (4) occasions. The record reveals a large amount of correspondence between the petitioner and counsel. A large portion of this correspondence involved the petitioner's questions regarding the possibility of entering a guilty plea and the consequences of having the jury impose the sentence compared to having the judge impose the sentence. Mr. Mosier acknowledged that, on one occasion, it was brought to his attention that the petitioner was dissatisfied with their representation. Within several days of receiving this information, Mr. Mosier visited the [*101] petitioner at Riverbend. The petitioner expressed no further dissatisfaction with counsel until after a sentence of death was imposed by the trial court. Trial counsel cited no other occasions where they had difficulty with the petitioner. Rather, both trial counsel found the petitioner respectful and pleasant. At his guilty plea proceeding, the petitioner informed the trial court that Mr. Mosier and Mr. Johnston had met with him and that he was satisfied with their representation. Finally, the petitioner failed to testify at the post-conviction evidentiary hearing. The petitioner has failed to demonstrate what he could have communicated to his attorney that would have aided in his defense had counsel established a greater level of communication. See *Lloyd v. State, 669 N.E.2d 980 (Ind. 1996)*; cf. *State v. Creech, 132 Idaho 1, 966 P.2d 1, 19-20 (Idaho 1998)*, cert. denied, *526 U.S. 1147, 143 L. Ed. 2d 1036, 119 S. Ct. 2025 (1999)* (determining that it was not ineffective assistance of counsel where counsel did not spend a lot of time with a client who was unwilling to listen to counsel's advice). Moreover, there is nothing demonstrating that the petitioner [*102] was prohibited from effective communication with trial counsel. See *Washington v. Meachum, 238 Conn. 692, 680 A.2d 262, 282 (Conn. 1996)* (holding that the right to assistance of counsel includes the right to communicate effectively with counsel in preparation of one's defense). Accordingly, he has failed to satisfy his burden of establishing that he did not have a working relationship with counsel. Further, the petitioner has not shown that he was prejudiced by his relationship with counsel or that had counsel spent more time with him, he would not have pled guilty and insisted on going to trial.

The petitioner also faults counsel for failing to develop a relationship with the petitioner's mother. The record indicates, as does the trial transcript, that the petitioner's mother was interviewed by the defense team. Her testimony, as well as that of other witnesses, indicates that Sally Johnson was defensive regarding claims against the petitioner and maintained his innocence, faulting others for mistakes that he had made. Additionally, the petitioner has failed to assert that his mother would have been more forthcoming had counsel "actively wooed" her. The petitioner's [*103] own post-conviction expert, Dr. Frank Einstein, described Mrs. Johnson as "very, very guarded." The petitioner has also failed to produce any family member, extended or otherwise, who provided insight into his alleged mental illness. Accordingly, we conclude there is no evidence that counsel would have gained insight into the petitioner's alleged mental illness if they had more actively pursued a relationship with the petitioner's mother. Petitioner is not entitled to relief as to this claim.

**4. Trial counsel's advice to the petitioner to enter guilty plea and waive jury sentencing.**

The petitioner's trial was scheduled to commence on July 6, 1998. That morning, trial counsel moved for and was granted a continuance until August 17, 1998. Later that afternoon, the petitioner entered a guilty plea to first degree murder and waived jury sentencing in this matter. On appeal, the petitioner asserts that this action was permitted absent "serious evaluation by his counsel, thus, violating counsel's duty to investigate the case and intelligently advise [his] client." In support of his claim, the petitioner makes several assertions, including: (1) the petitioner received "absolutely [*104] nothing" in return for his pleading guilty; (2) trial counsel was misinformed in his belief that Judge Blackwood was "philosophically opposed to the death penalty;" (3) trial counsel acquiesced to the trial court's in camera proceeding with its mitigation expert, during which Ms. Fenyes informed the trial court that there was no significant mitigation evidence; and (4) trial counsel failed to attempt to obtain a change of venue.

As noted supra, under *Strickland, 466 U.S. at 687*, the petitioner must establish deficient representation and prejudice resulting from the deficiency. However, in the context of a guilty plea, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill, 474 U.S. at 59*; see also *Walton, 966 S.W.2d at 55*. Under the first prong of the Strickland test, a defendant must show that his attorney "made er-

rors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the *Sixth Amendment*." *Strickland, 466 U.S. at 687.* [*105] Moreover, in evaluating an ineffectiveness claim, this Court must presume that the "challenged action 'might be considered sound trial strategy.'" *Id. at 689* (quoting *Michel, 350 U.S. 91 at 101, 100 L. Ed. 83, 76 S. Ct. 158*). The petitioner bears the burden of overcoming this presumption. Id.

[HN21] An attorney's advice to his client to waive the client's right to a trial by jury is a classic example of a strategic trial judgment, "the type of act for which Strickland requires that judicial scrutiny be highly deferential." *Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995)* (quoting *Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir.)*, cert. denied, *493 U.S. 831, 107 L. Ed. 2d 66, 110 S. Ct. 102 (1989)* (per curiam). It constitutes a conscious, tactical choice between two viable alternatives. *Hatch, 58 F.3d at 1459* (citing *Carter v. Holt, 817 F.2d 699, 701 (11th Cir. 1987)*); *United States v. Ortiz Oliveras, 717 F.2d 1, 3 (1st Cir. 1983)* (holding that tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance of counsel). [*106] Thus, for counsel's advice to rise to the level of constitutional ineffectiveness, the decision to waive a jury must have been "completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Hatch, 58 F.3d at 1459.*

Regarding the decision to enter the guilty plea, it is beyond question that the evidence establishing the petitioner's guilt was overwhelming. Thus, Mr. Johnston recalled that they believed that the petitioner's guilty plea would be considered as a mitigating factor by the trial court. In relation to waiving jury sentencing, Mr. Johnston testified that "we thought it would be in Mr. Henderson's best interest to have the court do the sentencing." The opinion of the defense team was that Judge Blackwood was personally opposed to the death penalty, and this opinion was influential in guiding their advice to the petitioner. In hindsight, Mr. Johnston conceded that he "wished that a jury would have been empaneled and that they would have fought the case on the merits."

Mr. Mosier testified that the petitioner made inquiry as to the possibility of entering a guilty plea in December 1997. The petitioner penned at [*107] least three (3) or four (4) more letters discussing the advantages of entering a guilty plea. Mr. Mosier verified Mr. Johnston's opinion that Judge Blackwood was opposed to the death penalty. However, he testified that the decision of whether to waive a jury trial was left entirely to the petitioner. Trial counsel advised him of the advantages and disadvantages of waiving a jury in a capital sentencing trial. These factors included weighing the circumstances of this particular case, which included the senseless killing of a law enforcement officer. Mr. Mosier stated that the decision to waive jury sentencing and permit Judge Blackwood to impose the sentence was the best chance that the petitioner had to avoid the death penalty. Again is should be noted that the petitioner did not testify at the post-conviction evidentiary hearing, so there is no direct evidence in this record that but for counsel's alleged deficiencies he would not have pled guilty or submitted his case to the trial judge for sentencing.

Prior to entry of the plea, the trial court extensively questioned the petitioner regarding his decision to enter a guilty plea and to waive jury sentencing. This colloquy, which [*108] covers nearly twenty (20) full pages of transcript, reveals that the trial court made every attempt to discern that: (1) the petitioner was fully aware of and understood the nature of the charges and potential sentences against him; (2) the petitioner understood that he had the right to plead not guilty as to all of the charges and have a jury determine his guilt or innocence, explaining that a jury could find the petitioner guilty of some, all, or none of the charges; (3) the petitioner understood that he could be convicted of a lesser-included offense of the charged offense; (4) the petitioner understood that he had the right to have a jury determine his sentence if he was convicted of first degree murder; (5) the petitioner understood the nature and dynamics of a capital sentencing hearing; (6) the petitioner understood the impact of waiving his right to have a jury impose sentence in his first degree murder conviction; (7) the petitioner understood that, as part of the plea, the State would dismiss three counts of the indictment charging the petitioner with felony murder; (8) the petitioner had discussed the decision to enter a guilty plea and waive jury sentencing with his attorneys, [*109] (9) the petitioner was satisfied with the representation provided him by appointed counsel and by the appointed experts; and (10) the petitioner was not suffering from any mental illness or disorder. On at least five (5) separate occasions, the trial court asked the petitioner whether his decision to waive his right to a jury trial as to guilt and to waive his right to a jury trial as to capital sentencing were entered freely and voluntarily. The record preponderates against any conclusion that the petitioner had no knowledge as to the impact of his decision to enter guilty pleas and waive jury sentencing.

[HN22] A defendant asserting that his counsel was ineffective must show more than that counsel's advice was merely wrong. He must also show that it was completely unreasonable so that it bears no relationship to a possible defense strategy. See *Hatch, 58 F.3d at 1459.* Further, the petitioner must show that but for trial counsel's advice, he would not have pled guilty and would have insisted on going to trial. There is no dispute that

the evidence establishing the petitioner's guilt as to the first degree murder of Deputy Bishop was overwhelming. Also, the petitioner has [*110] failed to establish that trial counsel's advice regarding entry of a guilty plea was unreasonable.

We are left to address counsel's advice regarding the decision to waive jury sentencing as to the punishment of first degree murder. In *People v. Montgomery, 192 Ill. 2d 642, 736 N.E.2d 1025, 249 Ill. Dec. 587 (Ill. 2000)*, the Illinois Supreme Court addressed whether counsel's advice to a capital defendant to waive jury sentencing was deficient performance. In Montgomery, defense counsel advised the defendant to enter a guilty plea and waive jury sentencing in light of alleged assurances from the trial court that a sentence of death would not be imposed. *Montgomery, 736 N.E.2d at 1033-34*. The defendant entered guilty pleas to two (2) murders and, following a bench trial for sentencing, the trial court imposed a death sentence. *Id. at 1035*. At the post-conviction evidentiary hearing, the trial judge and his court reporter denied making any assurances that a sentence less than death would be imposed upon defendant's entry of guilty pleas. *Id. at 1035-36*. The post-conviction court rejected counsel's allegations that the trial judge had made [*111] ex parte assurances regarding a sentence less than death. *Id. at 1036*. Regardless, the defendant stated that trial counsel had only informed him that this particular judge had never before sentenced a defendant to death in a bench proceeding, and that counsel therefore encouraged him to waive a jury for the sentencing hearing. *Id. at 1037*. This assertion by trial counsel was later proven untrue. *Id. at 1039*. Notwithstanding the mistaken beliefs and assertions of trial counsel, the Illinois supreme court found that trial counsel were not deficient in their advice to the defendant. Id.; see also *People v. Maxwell, 173 Ill. 2d 102, 670 N.E.2d 679, 219 Ill. Dec. 1 (Ill. 1996)* (determining that trial counsel's advice to waive jury for capital sentencing was not deficient). The Illinois Supreme Court acknowledged that counsel's belief that a judge was less likely than a jury to impose the death penalty is a legitimate ground on which to base jury waiver in a capital sentencing trial. *Montgomery, 736 N.E.2d at 1038*.

Similarly, in *Fields v. Gibson, 277 F.3d 1203 (10th Cir. 2002)*, the Tenth Circuit addressed whether counsel's [*112] advice to waive jury sentencing constituted deficient performance. Trial counsel believed that if the defendant accepted a blind plea that he would be sentenced to less than death. *Fields, 277 F.3d at 1209*. Her belief was based upon several conversations with the trial judge. *Id. at 1209-10*. Notwithstanding, there was no guarantee that the trial court would not impose a sentence of death. *Id. at 1210*. Counsel then persuaded defendant, with the assistance of several of his family members, to enter a guilty plea. Id. The trial court accepted the plea and after a bench sentencing hearing imposed a sentence of death. Id. Defendant later attempted to withdraw his plea, but his attempt was rejected by the trial court and the court's decision was upheld on appeal. *Id. at 1211*. The Tenth Circuit determined that the defendant's plea was voluntarily entered and that trial counsel's advice regarding the decision to waive jury sentencing did not constitute deficient performance. *Id. at 1214-15*. In finding counsel's advice not deficient, the court acknowledged that "the fact that the desired result was [*113] not reached in this case does not render defense counsel ineffective." *Id. at 1216* (citing *Fields v. State, 1996 OK CR 35, 923 P.2d 624, 635 (Okla. Crim. App. 1996)*).

Lawyers are supposed to draw conclusions from all the evidence in a case and recommend what they think is in their clients' best interest. *Fields, 277 F.3d at 1216*. "The Supreme Court has recognized that because representation is an art and not a science, even the best criminal defense attorneys would not defend a particular client in the same way." Id. (quoting *Waters v. Thomas, 46 F.3d 1506, 1522 (11th Cir. 1995)* (en banc)). The record indicates that trial counsel made no guarantee to the petitioner that the trial court would not impose a death sentence. The evidence against the petitioner was overwhelming, as was the evidence of the statutory aggravating factors. Moreover, it is clear from the colloquy at the guilty plea hearing that the petitioner was informed that the trial court could impose a sentence of life, life without parole, or death. Thus, the petitioner made a conscious decision between two (2) viable options. Without more, the petitioner has failed [*114] to prove that counsel's advice was completely unreasonable. He is not entitled to relief on this issue.

**5. Trial counsel failed to adequately pursue a motion for change of venue.**

Prior to trial, trial counsel filed a motion requesting a change of venue. At argument on the motion, trial counsel argued that:

> Due to the extensive pretrial publicity; due to the nature of the case; the very fact that it's a death penalty case; due to the nature of Deputy Bishop . . . being well-liked by everybody in this community. . . . We've attached copies of some newspaper articles in the Fayette County paper. . . . But the one headline that I think compels this Court to move this case from Fayette County is one attached, which is from the Wednesday, May 7, 1997 Edition, front page of the Fayette County Review, and

> the headlines show the photograph of Deputy Bishop. It shows a picture of a multitude of law enforcement vehicles, going . . . to the funeral home. . . . And the headline says this: "County Mourns Loss of Deputy Bishop." . . . I just don't feel like that Mr. Henderson can get a fair trial in Fayette County.

Mr. Mosier further related other media reports detailing [*115] the petitioner's history of escape attempts. The trial court denied the motion, reserving final ruling on the matter until the conclusion of the voir dire process. The trial court noted that, if at the conclusion of voir dire of the venire that it appeared that it would be difficult to get a jury in this case, the trial court would then move the case.

Again, counsel sought a change of venue and the trial court reserved final determination until it was shown that it would be impossible to impanel an impartial jury. The petitioner entered an informed and counseled guilty plea prior to the trial court's ruling on the motion to change venue. The petitioner has waived any claim regarding change of venue by virtue of his voluntary guilty plea. See *State v. McKinney, 74 S.W.3d 291, 306 (Tenn. 2002)*; *State v. House, 44 S.W.3d 508, 513 (Tenn. 2001)*; See also *Recor v. State, 489 S.W.2d 64, 69 (Tenn. Crim. App. 1972)* (holding [HN23] valid please of guilty waives issue of change of venue). The petitioner has failed to show that further efforts by counsel in seeking a change of venue would have created a situation where he would not have entered a guilty [*116] plea. Accordingly, the petitioner has failed to meet the standard for ineffective assistance of counsel in the guilty plea setting. Therefore, he is not entitled to relief as to this claim.

**6. Trial counsel failed to inform themselves of developments in capital litigation.**

The petitioner next asserts that trial counsel were deficient by their failure to stay abreast of developments in capital representation. The petitioner argues that trial counsel's failures impaired their ability to work with experts properly and ensure that the experts were performing the necessary tasks. In support of his position, the petitioner asserts that both Mr. Mosier and Mr. Johnston admitted their deficiency regarding working with experts. The petitioner asserts that this deficiency resulted in the loss of vital mitigation evidence. As stated earlier, issues addressing the failure to present mitigation evidence will be addressed as such. Our review as to this claim is merely as to whether Mr. Mosier's and Mr. Johnston's failure to inform themselves of developments in capital litigation constituted deficient performance.

The record reflects that Mr. Mosier had previous experience in capital litigation. [*117] Additionally, his testimony established that he was familiar with the use of experts and that the experts in this matter were hand-selected by him. The petitioner has failed to make specific allegations referencing the developments in the area of capital litigation of which trial counsel was unaware. Rather, the petitioner relies upon alleged deficiencies in the area of mitigation proof. We refuse to adopt a per se finding of deficiency based upon an allegation of counsel's lack of knowledge regarding recent developments in the law, especially in light of the absence of any reference by the petitioner of what legal developments counsel was allegedly unaware. The petitioner is not entitled to relief as to this claim.

**7. Trial counsel failed to develop and introduce mitigation evidence.**

The petitioner asserts that trial counsel failed to adequately utilize the services of a mitigation specialist to prepare a social history and timeline relating to the petitioner's life. In support of his allegations, the petitioner relies upon the testimony of his expert, Dr. Frank Einstein, who testified that Ms. Fenyes, the mitigation specialist, spent less than 38.5 hours working on mitigation [*118] from the time of her appointment until June 30, 1998. Dr. Einstein calculated that Ms. Fenyes spent an additional 28.9 hours on the case from June 30, 1998, until July 6, 1998, the date of the petitioner's guilty plea. Dr. Einstein testified that Ms. Fenyes worked an additional 43.5 hours between the date of the guilty plea on July 6 and the sentencing hearing held on July 13.

The petitioner contends that he has established his assertion through the testimony of lay witnesses and the introduction of medical records. He argues that evidence existed that would have raised serious issues about the existence of a mental disease or defect and would have provided significant mitigation. Specifically, the petitioner asserts that the need for further psychiatric evaluation would have been triggered had the defense team secured information relating to the history of mental illness in his extended family members and the petitioner's behavior during the two (2) years prior to the murder of Deputy Bishop. In this regard, the petitioner relies upon the diagnosis of Dr. Kenner that the petitioner suffers from bipolar disorder 2.

At the sentencing hearing, the defense team presented the testimony [*119] of four (4) witnesses. The petitioner testified that he was a twenty-four-year-old high school graduate and that he was the eldest of five (5) sons. Trial counsel introduced evidence of the petitioner's achievements in both elementary and high school, including fourteen (14) achievement awards from Central Elementary School during the period between

1985 and 1988 and two (2) awards related to the petitioner's participation in the Fayette County Athletic League. n1 The petitioner also testified to being very involved in extracurricular activities during high school, including the following: basketball team, 4-H Club president, student body president, track and baseball. Miles Wilson, the principal of Fayette-Ware High School, further testified that the petitioner was an officer in the library club and a member of the Esquire club. He participated both as an athlete and a coach in the Fayette County Athletic League. The petitioner's talent as an artist was also explored, emphasizing that he had won a contest naming Sonic Restaurant's newspaper and drawing the cover for the paper and winning first place in an art contest with his drawing of the Fayette County Courthouse. The petitioner [*120] also testified that he drew the logo and designed the window for Somerville Electronics.

n1

These awards include the following:

| | |
|---|---|
| May 1988 | Outstanding Speaker |
| May 1988 | Honorable Mention Math |
| May 1988 | High Achievement Reading and Spelling |
| February 1988 | Fayette County Spelling Bee |
| May 1987 | Honor Roll History |
| May 1987 | Academic Achievement |
| May 1987 | Honorable Mention Math |
| May 1987 | Highest Academic Average |
| May 1987 | Outstanding Performance in Basketball |
| May 1986 | Honor Roll |
| May 1986 | Highest Academic Average in Spelling |
| May 1986 | Highest Academic Average |
| June 1985 | Great Helper |
| June 1985 | Honor |
| August 1990 | First Place Coach |
| August 1991 | Fayette County Athletic Leagur Award |

When testifying, the petitioner expressed his remorse and apologies to Deputy Bishop's family and to the Fayette County Sheriff's Department. He stated that, while incarcerated in Arkansas, he asked his mother to inquire as to obtaining him psychological help because "things that I was going [*121] through mentally wasn't normal." He stated that his mother contacted the sheriff but that nothing was done.

The petitioner's high school principal, Miles Wilson, stated that the petitioner was respectful to faculty members and that he had positive interaction with the other students, with the exception of two incidents. Mr. Wilson stated that the petitioner's mother was in denial that the petitioner could do anything wrong.

The petitioner's mother, Sally Johnson, testified that she was fifteen (15) years old when the petitioner was born. She did not marry the petitioner's father. She did not recall the petitioner having any problem with other students during high school, although she remembered one incident when the petitioner left the campus with his girlfriend. She also vaguely recalled the petitioner requesting psychological treatment. She could not recall what happened. Mrs. Johnson blamed the petitioner's girlfriend, Natonya Cobb, for his behavior.

Dr. Lynn Zager, a clinical psychologist, testified regarding her meetings and evaluations of the petitioner. She diagnosed the petitioner with a dissociative state, narcissitic traits and antisocial traits.

Trial counsel testified [*122] at the post-conviction hearing that they presented all of the mitigating evidence that they had collected. The petitioner now alleges that trial counsel was ineffective for failing to present a complete mitigation profile. His complaints include counsel's: (1) failure to interview extended family members to reveal a family history of mental illness; (2) failure to seek additional psychological evaluation to reveal a diagnosis of bipolar disorder; and (3) failure to complete investigation to sufficiently indicate marked change in

behavior, including (a) a change in sleep patterns, (b) the fact that his victims were people that he knew, (c) exhibitions of depression, and (d) indication of religious ideation.

[HN24] In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "Evidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown, 479 U.S. 538, 545, 93 L. Ed. 2d 934, 107 S. Ct. 837 (1987)*; [*123] see *Eddings v. Oklahoma, 455 U.S. 104, 113-15, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982)*; *Lockett v. Ohio, 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978)* (plurality opinion); *Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998)*; *Goad, 938 S.W.2d 363 at 369*. The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. [HN25] Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. See *Goad, 938 S.W.2d at 369-70*.

To determine whether or not trial counsel was ineffective for failing [*124] to present mitigating evidence, the reviewing court must consider several factors. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. *Goad, 938 S.W.2d at 371* (citing *Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991)*; *Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988)*; *State v. Adkins, 911 S.W.2d 334 (Tenn. Crim. App. 1994)*; *Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)*). Second, the court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing *Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992)*, cert. denied, *515 U.S. 1165, 132 L. Ed. 2d 865, 115 S. Ct. 2624 (1995)*; *Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990)*, cert. denied, *499 U.S. 913, 113 L. Ed. 2d 231, 111 S. Ct. 1123(1991)*; *Melson, 772 S.W.2d 417 at 421*). Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have [*125] affected the jury's determination. *Id.* (citing *Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991)*, cert. denied, *502 U.S. 1112, 117 L. Ed. 2d 456, 112 S. Ct. 1219 (1992)*); *Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987)*, cert. denied, *485 U.S. 1014, 99 L. Ed. 2d 715, 108 S. Ct. 1487 (1988)*).

It appears that the crux of the petitioner's complaint is the failure to introduce evidence regarding the alleged existence of a bipolar type 2 mental illness. The existence of such a mental illness would have been apparent, suggests the petitioner, had trial counsel discovered a family history of mental illness and evidence of the petitioner's erratic criminal behavior. Dr. Zager failed to diagnosis the petitioner with anything more severe than a personality disorder. The petitioner blames this diagnosis on trial counsel's failure to gather sufficient information. The petitioner ignores the fact that Dr. Zager's diagnosis remained the same even after reviewing the additional information. Moreover, the petitioner's own post-conviction witness, Dr. Auble, arrived at essentially the same diagnosis as Dr. Zager. While Dr. Kenner eventually diagnosed [*126] the petitioner as Bipolar Type 2, his diagnosis would have necessitated the introduction of evidence regarding the petitioner's escalating history of violent crime, which is a tactic with considerable risk. The petitioner's claim, at best, amounts to an assertion that counsel should have obtained an expert who would have diagnosed the petitioner as Bipolar Type 2. The Constitution does not require attorneys to "shop around" for more favorable expert testimony. *Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir. 1992)*. Additionally, the necessary introduction of the petitioner's violent criminal behavior could have undermined this mitigating factor and outweighed any beneficial mitigating impact of the mental illness evidence. This "undiscovered" mitigation evidence raised by the petitioner was correctly characterized by the post-conviction court as being a "double-edged sword."

Given the strength of the proof of the aggravating circumstances relied upon by the State, the mitigation evidence that was presented at sentencing and the possible negative impact of the "undiscovered" mitigation evidence, we conclude that had this information been presented to the court there [*127] is little reason to believe the trial judge would impose a sentence other than death. The petitioner is not entitled to relief on this basis. Indeed, in this case, unlike the situation where a jury imposes a death sentence, we are not left to speculate to some degree as to the effect this evidence might have had on the sentencer. The sentencer in this case, the trial judge himself, found this evidence would not have altered the result of the sentencing hearing.

***V. Appellate Counsel was Ineffective***

Michael Robbins was appointed to represent the petitioner on direct appeal of his sentence. The petitioner implies that Mr. Robbins was not qualified to pursue a direct appeal because this was Mr. Robbins's first capital appeal. In support of his allegation, the petitioner refers to Mr. Robbins's failure to raise any issue other than proportionality. He states that Mr. Robbins failed to raise issues raised in pre-trial motions, specifically those challenging the constitutionality of the death penalty. He asserts that Mr. Robbins should have made the following challenges on direct appeal: (1) the indictment should be dismissed due to illegality and unconstitutionality of *Tennessee Code Annotated sections 39-13-205* [*128] and *39-13-206*; (2) the death penalty violates *article I, section 19 of the Tennessee Constitution*; (3) the State failed to declare publicly the standards which it applies in determining whether to seek the death penalty of any individual defendant; (4) the trial court erred in denying his motion for discovery of dispositions of all first degree murder prosecutions in the State of Tennessee; (5) the death penalty statute violates the *Eighth* and *Fourteenth amendments of the United States Constitution*; (6) the Tennessee death penalty statute impinges upon the petitioner's right to life; and (7) Tennessee's death penalty statute is unconstitutional in that it involves torture. The petitioner also complains that Mr. Robbins failed to competently argue the only issue raised on appeal, proportionality. Finally, the petitioner asserts that Mr. Robbins failed to follow through with "the business of the letter," relating to several attempts made by the petitioner to withdraw his guilty plea.

[HN26] The same principles apply in determining the effectiveness of both trial and appellate counsel. *Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).* Criminal appellate work constitutes [*129] approximately forty percent (40%) of Mr. Robbins' legal practice. He attended national habeas seminars focusing on capital cases. At the post-conviction hearing, Mr. Robbins asserted that he considered the proportionality issue the only viable issue for appellate purposes.

[HN27] A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. See e.g., *Smith v. Robbins, 528 U.S. 259, 285, 145 L. Ed. 2d 756, 120 S. Ct. 746 (2000)*; *Aparicio v. Artuz, 269 F.3d 78, 95 (2nd Cir. 2001)*; *Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994)*. To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. *Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004)* (citing *Kimmelman v. Morrison, 477 U.S. 365, 375, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986))*. Obviously, if an issue has [*130] no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. *Carpenter, 126 S.W.3d at 888* (citing *United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993))*. Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

*Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)*, established a test for determining whether counsel was deficient in Strickland terms for failing to raise particular claims on direct appeal, i.e, "significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those [*131] presented, will the presumption of effective counsel be overcome." Id.

In Carpenter v. State, our supreme court refused to hold that the Gray v. Greer standard was the conclusive test of finding deficient performance. *Carpenter, 126 S.W.3d at 888*. Our supreme court noted that the relative strength of the omitted issue is only one among many factors to be considered. Indeed, the court noted the numerous factors relied upon the Sixth Circuit Court of Appeals in evaluating appellate counsel's failure to raise issues. n2 Id. The non-exhaustive list includes:

> [HN28] 1) Were the omitted issues "significant and obvious"? 2) Was there arguably contrary authority on the omitted issues? 3) Were the omitted issues clearly stronger than those presented? 4) Were the omitted issues objected to at trial? 5) Were the trial court's rulings subject to deference on appeal? 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable? 7) What was appellate counsel's level of experience and expertise? 8) Did the petitioner and appellate counsel meet and go over possible issues? 9) Is there evidence [*132] that counsel reviewed all the facts? 10) Were the omitted issues dealt with in other assignments of error? 11) Was the decision to omit an issue an unreasonable one

> which only an incompetent attorney would adopt?

*Carpenter, 126 S.W.3d at 888* (citing *Mapes v. Coyle, 171 F.3d 408, 427-28 (6th Cir. 1999))*.

> N2 Our supreme court did acknowledge, however, that the Sixth Circuit's final factor addresses the ultimate issue under the first prong of Strickland and is therefore not helpful in deciding whether appellate counsel's performance was deficient. *Id. at 888-89*.

Again, the petitioner complains that appellate counsel failed to raise issues concerning the constitutionality of the death penalty, for example: (1) the death penalty is arbitrarily imposed; (2) the sentencer does not have unlimited discretion not to impose death; (3) the death penalty is not imposed fairly; (4) the death penalty statute impinges upon the petitioner's fundamental right to life; and (5) [*133] the death penalty statute is unconstitutional because it imposes torture. These are essentially the same arguments that we have already determined that the petitioner waived for failure to assert them on direct appeal. These issues have been repeatedly rejected by the appellate courts of this state on numerous occasions. See e.g., *State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004)* (determining that the death penalty is not unconstitutional under international law); *State v. Holton, 126 S.W.3d 845 (Tenn. 2004)* (holding that a sentence of death does not violate due process where the indictment fails to include language of the statutory aggravating circumstances that elevate the offense to capital murder); *State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995)*, cert. denied, *519 U.S. 847, 136 L. Ed. 2d 82, 117 S. Ct. 133 (1996)* (concluding that unlimited discretion is vested in the prosecutor and that the death penalty was not imposed in a discriminatory manner). Further, the petitioner asserts no argument and cites no new authority requiring reversal of this precedent and does not show how he was prejudiced by counsel's failure to raise [*134] these issues. Mr. Robbins testified that he did not raise these issues on appeal because the law as to the claims was well-settled. Mr. Robbins was experienced in appellate matters and his decision to omit these issues and focus upon what he considered the single meritorious issue was reasonable.

[HN29] An appellate attorney is neither duty bound nor required to raise every possible issue on appeal. *Carpenter, 126 S.W.3d at 887* (citing *King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)*); *Campbell v. State, 904 S.W.2d 594, 596-97 (Tenn. 1995)*. Mr. Robbins, an experienced appellate advocate, focused on the only issue he felt had merit. See generally *Cooper, 849 S.W.2d 744 at 747* (determining that it is standard practice for advocates to weed out weak arguments in order to focus on one central issue). An attorney's determination as to the viability of the issues should be given considerable deference. *Carpenter, 126 S.W.3d at 887*; *Campbell, 903 S.W.3d at 597*. Application of the *Carpenter* factors indicate that counsel's decision was not deficient. Accordingly, no prejudice resulted. The petitioner [*135] is not entitled to relief as to his claim that appellate counsel was ineffective.

We proceed to address the petitioner's claim that appellate counsel was deficient for failing to "follow through with the business of the letter." In this allegation, the petitioner asserts that he filed various letters and pleadings with the trial court after the notice of appeal was filed. Appellate counsel, Mr. Robbins, believed that these pleadings amounted to an attempt to withdraw his guilty plea. Mr. Robbins filed a motion in this Court seeking remand to the trial court. This Court denied the motion and no review by the Tennessee Supreme Court was sought. Mr. Robbins stated that, upon further review, "the decision of the Court of Criminal Appeals was imminently sustainable because of the peculiar posture the record was in. And that is why I did not file a Rule 11."

No evidence regarding these subsequent pleadings was introduced at the post-conviction evidentiary hearing other than Mr. Robbins's testimony. [HN30] This Court, however, is able to take judicial notice of its own records. Looking at this Court's records, it appears that the petitioner filed a pro se motion for remand on October 14, 1998. The [*136] substance of this motion reiterated the petitioner's dissatisfaction with counsel's advice and service. This motion was denied by this Court on November 3, 1998. On December 28, 1998, Mr. Robbins filed a motion to remand to the trial court for the purpose of developing a record regarding pleadings by the petitioner indicating that he wished to withdraw his guilty pleas. This Court denied the motion by order entered January 27, 1999. Given the procedural posture of the case at this point, we, as Mr. Robbins, conclude that further review would have been futile. Accordingly, we conclude that Mr. Robbins's decision not to seek further review of this Court's decision was reasonable. The petitioner is not entitled to relief as to this claim.

***VI. Post-Conviction Court Erred by Excluding Testimony of Kelly Gleason***

Kelly Gleason was called by post-conviction counsel as a witness. Ms. Gleason a former employee of the Capital Division of the Tennessee District Public Defender's Conference, was to testify as to the standards of practice expected of defense attorneys in capital cases.

The post-conviction court refused to permit Ms. Gleason to testify. However, the court did grant the [*137] petitioner's request to submit a proffer of Ms. Gleason's testimony. That proffer was submitted in writing on May 7, 2003, in the form of a five-page memorandum of law regarding the need for the evidence, a thirty-three (33) page affidavit of Ms. Gleason, and one hundred-twenty-nine pages of attachments. By order of June 19, 2003, the trial court found that the proffer of evidence from Ms. Gleason would be of assistance and admitted it into evidence in the post-conviction proceedings.

We acknowledge that both parties have cited to cases from our sister jurisdictions, both federal and state, supporting their respective positions regarding the admissibility of a legal expert on capital case representation. Interestingly, both parties apparently overlook the legal standard for reviewing the admissibility of an expert's testimony.

[HN31] "The admissibility of expert testimony, the qualification of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." *State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992)*. A witness who is qualified in a particular field may testify in the form of an opinion [*138] if the specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue. Tenn. R. Evid. 702. A trial court's ruling will not be overturned on appeal absent a clear abuse of discretion in admitting or excluding the expert testimony. *State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002)*. In the present case, the post-conviction judge stated that he had considerable experience in the area of capital cases and excluded the testimony of Ms. Gleason. The court, however, permitted a proffer by the petitioner. Subsequently, the post-conviction court entered an order, specifically finding that the proffer would be of assistance in the court's determination of the post-conviction claims. There is no indication that the post-conviction court was not qualified as a legal expert to render findings and conclusions of law without Ms. Gleason's testimony. Moreover, it appears that the post-conviction judge did consider the petitioner's comprehensive proffer regarding Ms. Gleason's proposed testimony. We conclude that the post-conviction court did not abuse its discretion in prohibiting Ms. Gleason's testimony. The [*139] petitioner is not entitled to relief as to this issue.

**Conclusion**

After a thorough review of the record and the law applicable to the issues raised herein, we find that the petitioner has failed to prove the allegations contained in his post-conviction petition. The judgment of the trial court is affirmed.

JERRY L. SMITH, JUDGE

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB 27 PM 3:38
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **VS.** | ) | |
| | ) | **DEATH PENALTY POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |

## MOTION FOR INTERLOCUTORY RULE 9 APPEAL

Petitioner, Christa Pike, pursuant to Rule 9, Tennessee Rules of Appellate Procedure, and for the reasons set forth below, moves this Court to grant an interlocutory appeal to the Court of Criminal Appeals from the Court's order on February 27, 2006, denying Petitioner's Motion To Recuse This Honorable Court From Serving As Judge And Fact-Finder In This Case.

### I. THE GRANT OF AN INTERLOCUTORY APPEAL IN THIS MATTER IS ESSENTIAL TO PROTECT VITAL INTERESTS THAT CANNOT BE PROTECTED BY A LATER APPEAL FROM THE FINAL DECISION IN THIS CASE.

Under Rule 9, Tennessee Rules of Appellate Procedure, an interlocutory appeal is appropriate when there exists "the need to prevent irreparable injury, giving consideration to the severity of the potential injury, the probability of its occurrence, and the probability that review upon entry of final judgment will be ineffective." T.R.A.P. 9(a). In this high profile death penalty case, Petitioner, the State and the public have an interest in there not being any suggestion of impropriety in the final decision. As the Tennessee Supreme Court stated in *In re Cameron*, 151 S.W. 64, 76 (Tenn. 1912), "The fundamental principle is that parties litigant are

entitled to an impartial judge. It is only when the people are satisfied that impartial judges decide their controversies that they entertain feelings of reverence for the judgments of the courts of the land." This principle is embedded in Article VI, § 11 of the Tennessee Constitution, Tenn. Code Ann. § 17-2-101, and Tenn. Sup. Ct. R. 10 Canons 2 and 3.

This case raises the following questions for which T.R.A.P., Rule 9 appeal is appropriate:

1. Does a court's appointment of an attorney to represent a defendant in a high profile death penalty case deny the defendant her right to conflict-free counsel where that attorney is under investigation by the State Comptroller, the Board of Professional Responsibility, the District Attorneys General for both Knox and Davidson Counties, and the Tennessee Bureau of Investigation concerning over billing the indigent defense fund for $67,000?

2. If the court making the appointment has knowledge that the attorney it appoints to represent a defendant in a high profile death penalty case is currently under investigation for over billing the state indigent defense fund, did the court violate the defendant's right to conflict free counsel?

3. Does the court's complicity in denying the defendant conflict-free counsel create an interest for that court in its post-conviction ruling on the issue whether counsel's conflict of interest denied the petitioner her right to the effective assistance of counsel?

4. Does the court's interest rise to the level required for disqualification under Article VI, § 11, of the Tennessee Constitution, Tenn. Code Ann. § 17-2-101, and Tenn. Sup. Ct. R. 10, Canons 2 and 3?

5. If the interest of the court does not require disqualification under the applicable constitutional, statutory and rule provisions, does it, nevertheless, create an appearance of

impropriety that requires the court to recuse itself from the post-conviction proceedings.?

All criminal defendants have "[a]n absolute right to conflict-free representation of counsel" under the Sixth Amendment to the United States Constitution and Article 1, § 9 of the Tennessee Constitution. *Wilcoxson v. State*, 22 S.W.3d 289, 320 (Tenn.Crim.App. 1999). Moreover, "[t]o protect a defendant's right to conflict-free counsel, a trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest." *Bonin v. California*, 494 U.S. 1039, 1041-1042, 110 S.Ct. 1506, 1507, 108 L.Ed.2d 641 (1990), citing *Wood v. Georgia,* 450 U.S. 261, 272, and n. 18, 101 S.Ct. 1097, 1104 and n. 18, 67 L.Ed.2d 220 (1981); see also *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980); *United States v. Krebs*, 788 F.2d 1166, 1172 (6th Cir. 1986) ("when a trial court becomes aware of a potential conflict of interest, it is obligated to pursue the matter even if counsel does not"). The Court held in *Wood*, that when, as in Ms. Pike's case, "the *possibility* of a conflict of interest [is] sufficiently apparent at the time of the [proceeding] [it] impose[s] upon the court a duty to inquire further." *Wood v. Georgia,* 450 U.S. at 272, 101 S.Ct. at 1104 (emphasis in original).

In this death penalty post-conviction case, a key issue involves whether the representation provided by Ms. Pike's lead counsel, William Talman, was constrained by a conflict of interest which resulted from his being under investigation for over billing the indigent defense fund $67,000 between 1991 and 1994. The record is clear that at the time this Court appointed Mr. Talman in this case, it knew that Mr. Talman was under investigation. Therefore, it is the Court's failure to protect Ms. Pike's right to conflict free counsel that is at issue here, and

whether this failure creates an interest for the Court in the final decision in this case.

The evidence presented at the hearing on Ms. Pike's motion to recuse revealed the following:

- On March 15, 1994, the Comptroller of the Treasury was informed that there was a possibility that private attorneys paid by the state to represent indigent criminal defendants had submitted improper billings to the Administrative Office of the Courts. Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995 (hereinafter Comptroller's Report), p. 1.
- The Comptroller's Report noted that in the investigation the auditors discovered that two attorneys were paid significantly more in calendar year 1993 than any other attorney. One of these was Ms. Pike's lead counsel, Mr. Talman, who, at a time when the reimbursement rate (not even considering the per-case caps) was $20 per hour out-of-court and $30 per hour in-court, billed over $100,000 in a single year. Comptroller's Report at 5.
- The auditors also found that Mr. Talman often billed for 30 or more hours per day. *Id.* at 7-8.
- The Comptroller's Report indicates that Mr. Talman reimbursed the state in the amount of $62,223 on April 25, 1995. *Id.* at 9.
- This amount was collected by the District Attorney General in Knox County. *Id.* May 31, 1995, cover letter by W.R. Snodgrass, Comptroller of the Treasury, p. 2.
- In March 1994, the Administrative Office of the Courts issued a press release concerning the investigation. That release either named Mr. Talman as a suspect or led him to believe his billing practices implicated him. *Id.* at 9-10; Board of Professional

Responsibility file, Statement of Background History Relative to Complaint.

- The report states that all three Knox County criminal court judges and District Attorney General Randall Nichols were interviewed during or before January 1995. *Id.* at 15.
- In addition to the Knox County District Attorney General, the auditors from the Comptroller's Office spoke with the District Attorney General for Davidson County, who requested that the findings of the Comptroller's Office be reviewed with the Tennessee Bureau of Investigation. *Id.* at 1.
- The District Attorney General is the only authority who can make a decision to prosecute an offense committed within his or her district. *Ramsey v. City of Oliver Springs*, 998 S.W.2d 207, 209 (Tenn. 1999); Art. VI § 5; Tenn. Code Ann. § 8-7-193. In this matter, exclusive jurisdiction to prosecute rested in Knox County, where the fee petitions were prepared, and Davidson County, where the fee petitions were processed and paid.
- Mr. Talman reports that immediately after March 1994, he "sought permission of various courts to withdraw from appointed cases, including two death penalty cases," apparently citing the ongoing investigation into his over billing as the reason to withdraw. Board of Professional Responsibility file, Statement of Background History Relative to Complaint. *See also*, *Collins v. State*, CCA No. 03C01-9806-CR-00209, 1999 WL 446612, May 28, 1999, perm. app. denied Oct. 11, 1999.
- In March 1995, Mr. Talman advised "the Knox County Criminal Court judges" that he was willing to begin accepting appointments again. Board of Professional Responsibility file, Statement of Background History Relative to Complaint.
- Mr. Talman's case was not finally closed until November 24, 1998, when the Tennessee Supreme Court issued an Order of Enforcement suspending Mr. Talman's license to

practice law for a period of 11 months and 29 days and probating that suspension for 11 months and 29 days. Board of Professional Responsibility file. Tennessee Supreme Court Order of Enforcement, November 24, 1998.

- This Court appointed Mr. Talman to represent Christa Pike on May 23, 1995. Appointment order.

Under the above related factual situation, at the time he was appointed to represent Ms. Pike, it is apparent that this Court either knew or should have known that Mr. Talman was being investigated for the theft of over $67,000 from the State of Tennessee's indigent defense fund, and that his law license and potentially his liberty were at risk. There is every appearance that this Court was aware that there was a chill on Mr. Talman's ability to advocate zealously for Ms. Pike. His status as an attorney regularly appointed in the Knox County courts was, or at least should have been, in jeopardy, and the manner in which the Knox County courts were administered was implicated by the findings of the Comptroller. Simply put, this Court cannot grant relief to Ms. Pike on this issue without implicating the Court's own failure to ensure that Ms. Pike was represented by conflict-free counsel. The Court has a vested interest either in ignoring the conflict or in finding that no conflict exists in order to avoid addressing the Court's own role in denying Ms. Pike her right to conflict-free counsel; thus, the Court has an interest in the outcome of the pending proceeding. Consequently, the Court is incompetent to hear further proceedings in this matter pursuant to Article VI § 11, Tenn. Code Ann. § 17-2-101, and Tenn. Sup. Ct. R. 10 Canons 2 and 3

Even if this Court did not find that it was disqualified under Article VI § 11, Tenn. Code Ann. § 17-2-101, it erred by failure to recuse itself due to the appearance of impropriety. "When a motion to recuse is made, a judge should grant the motion whenever his or her 'impartiality

might reasonably be questioned.'" *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (citing, Code of Judicial Conduct, Cannon 3(C), Tenn. Sup. Ct. R. 10, *State v. Jimmy D. Dillingham*, No. 03C01-9110-CR-319, 1993 WL 221555 (Tenn. Crim. App., Knoxville, Feb. 3, 1993)). "[R]ecusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 820. The failure of this Court to recuse itself under this objective standard constitutes an abuse of discretion and must be reviewed on interlocutory appeal.

In this matter, Rule 9 interlocutory appeal is appropriate because failure of this Court to recuse itself denies Ms. Pike due process of law in her post-conviction proceeding. *See State ex rel. Anglin v. Mitchell*, 575 S.W.2d 284 (Tenn. 1975). Consequently, this Court lacks jurisdiction to hear this matter. Should this Court go forward with the proceeding and should the appellate courts on direct appeal agree with Ms. Pike, the entire process would have to be repeated before a new court.

WHEREFORE, Petitioner, Christa Pike, respectfully requests the Court enter an order granting permission to appeal to the Court of Criminal Appeals at Knoxville, pursuant to Rule 9, Tennessee Rules of Appellate Procedure. Interlocutory appeal of the Order of this Court denying the motion to recuse is necessary to prevent irreparable injury to the Petitioner's right to due

process in her post-conviction proceedings and to prevent undo delay and needless, expensive and protracted litigation, and to protect the interests of the public.

Respectfully Submitted,

Donald E. Dawson BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough BPR #18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331

Counsel for Petitioner Christa Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing motion was hand-delivered to Assistant District Attorney General Leland Price, in Division 3 of the Knox County Criminal Court, 400 Main Avenue, Knoxville, TN 37902, on this the 27th day of February, 2006.

Donald E. Dawson

**H**
Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at
______________.

Glenn Thomas COLLINS, Appellant,
v.
STATE of Tennessee, Appellee.
**No. 03C01-9806-CR-00209.**

May 28, 1999.
Permission to Appeal Denied Oct. 11, 1999.
Paul G. Whetstone, Morristown, TN, Thomas Richard Spradlin, Morristown, TN, for the Appellant.

John Knox Walkup, Attorney General and Reporter, R. Stephen Jobe, Assistant Attorney General, Nashville, TN, Randall E. Nichols, District Attorney General, Robert Jolley, Assistant District General, Knoxville, TN, for the Appellee.

*OPINION*

SMITH, J.

KNOX COUNTY

HON. RAY L. JENKINS JUDGE

(Post-Conviction)

AFFIRMED

***1** On April 22, 1992, Appellant Glenn Thomas Collins was charged in an eight count presentment with two counts of first degree premeditated murder, two counts of first degree felony murder during the perpetration of a robbery, two counts of first degree felony murder during the perpetration of a theft, and two counts of aggravated robbery. On November 14, 1994, Appellant pled guilty to the two counts of first degree felony murder during the perpetration of a robbery in return for the State's agreement to dismiss the other six counts. Pursuant to agreement, Appellant was sentenced to two consecutive life sentences to be served consecutively to other sentences that had previously been imposed in other cases. On November 13, 1995, Appellant filed a petition for post-conviction relief. That same day, the post-conviction court conducted a hearing on the petition. On March 3, 1998, the post-conviction court dismissed the petition. Appellant challenges the dismissal of his petition for post-conviction relief, raising the following issues:

1) whether the post-conviction judge abused his discretion when he denied Appellant's motion for recusal;
2) whether the post-conviction court erred when it determined that Appellant's guilty plea was not the product of coercion without examining the autopsy photographs that Appellant claimed were the source of the coercion;
3) whether the post-conviction court erred when it failed to grant relief on the ground that Appellant had given an incriminating statement to police in the absence of his appointed counsel; and
4) whether the post-conviction court erred when it determined that Appellant had received effective assistance of counsel.

After a review of the record, we affirm the judgment of the post-conviction court.

I. BACKGROUND

On July 1, 1992, the trial court appointed Mark Stephens of the Knox County Public Defender's Office to represent Appellant. On August 24, 1992, the State gave notice of intent to seek the death penalty. On December 15, 1992, Mark Stephens was allowed to withdraw due to a conflict of interest and Bill Talman was appointed to represent Appellant. On January 15, 1993, Tom Slaughter was appointed as co-counsel. On February 8, 1994, Tom Slaughter was allowed to withdraw and Kim Parton was appointed as co-counsel. On May 17, 1994, Bill Talman was allowed to withdraw and Robert Scott was appointed lead counsel. On June 20, 1994, Robert Scott was allowed to withdraw and James Bell was appointed lead counsel.

At the hearing on his petition, Appellant testified that his guilty plea was not entered "knowingly" and he was not satisfied with the representation he received from Bell. Appellant testified that during one of his meetings with Bell, Bell showed him some "gory" autopsy photographs of the victims and told him that when the jury saw the photographs, it would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

probably impose the death penalty. Appellant also stated that Bell never explained the rules of evidence to Appellant and never discussed the likelihood that the jury would be allowed to see the photographs. Shortly thereafter, Appellant asked Bell to enter into plea negotiations with the State. Appellant testified that he subsequently entered into a plea agreement with the State in order to avoid receiving the death penalty and in order to "save [his] mother a lot of hardship."

*2 On cross-examination, Appellant testified that he had lied to the trial court when he told the court that Bell had informed him about all possible defenses and alternatives he had in the case. Appellant also testified that he had been untruthful when he signed a document indicating that he was completely satisfied with the legal advice and representation that he had received in the case.

Bill Talman testified that when he represented Appellant, he interviewed witnesses, examined the physical evidence, visited Appellant at the prison, and explained the case to Appellant. Talman explained that he had withdrawn from Appellant's case because at that time he was being audited by the State and he felt it would be in Appellant's best interest if he withdrew. Talman also testified that he had given his entire file to Scott when Scott became Appellant's counsel and he had also discussed the case with Bell when Bell became Appellant's counsel. Talman testified that because his investigation led him to believe that if Appellant's case went to trial Appellant would likely receive the death penalty, he recommended that Appellant seriously consider accepting the State's offer of two consecutive life sentences in return for a guilty plea.

Robert Scott testified that he had only represented Appellant for a few weeks. Scott also testified that he subsequently spoke to Bell and one of Bell's associates in order to maintain continuity of representation.

James Bell testified that he had investigated Appellant's case from both the guilt and punishment perspectives. Bell testified that he had reviewed the very detailed file that had been given to him and he had directed his investigator to conduct further investigation in certain areas. Bell testified that he had used the entire resources of his office to prepare Appellant's case for trial.

Bell testified that he had shown Appellant approximately seventy-five photographs, including approximately ten autopsy photographs, and had explained that under the rules of evidence, some of the photographs would be admissible while others would certainly be excluded. At that time, Appellant asked Bell to pursue a plea agreement with the State. Bell subsequently discussed the plea agreement with Appellant and he felt that Appellant fully understood the agreement.

On cross-examination, Bell stated that Appellant had become agitated and upset after viewing the autopsy photographs. However, Bell also testified that he did not lead Appellant to believe that the autopsy photographs would be admissible. Bell also testified that Appellant's decision to enter a guilty plea was partially based on Appellant's concern about possible testimony from his former co-defendant.

Kim Parton testified that she had represented Appellant as co-counsel from the time when Talman was lead counsel until the time when Appellant entered his guilty plea. Parton testified that she had investigated Appellant's case as to both guilt and punishment perspectives. Parton stated that as a result of her investigation, she "had a very real fear" that if the case went to trial, Appellant would be convicted and would receive the death penalty. Parton also testified that she expressed that opinion to Appellant. Parton testified that Appellant was "very comfortable with the plea" and appeared to be relieved that the case was going to be resolved. Parton testified that although she was not present when Appellant viewed the autopsy photographs, she did not think that Appellant pled guilty because he had viewed the photographs.

## II. MOTION FOR RECUSAL

*3 Appellant contends that the post-conviction judge abused his discretion when he failed to recuse himself from Appellant's case. We disagree.

Whether to grant a motion to recuse is discretionary with the judge. Caruthers v. State, 814 S.W.2d 64, 67 (Tenn.Crim.App.1991). This Court may reverse only when the judge has clearly abused that discretionary authority. State v. Cash, 867 S.W.2d 741, 749 (Tenn.Crim.App.1993). The judge should recuse herself whenever "her 'impartiality might reasonably be questioned." ' Alley v. State, 882 S.W.2d 810, 820 (Tenn.Crim.App.1994) (quoting Code of Judicial Conduct, Canon 3(c)). Recusal is appropriate "when a person of ordinary prudence in the judge's position ... would find a reasonable basis for questioning the judge's impartiality." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appellant claims that the post-conviction judge, who was also the trial judge, was biased against him. Appellant contends that bias was shown by the fact that the judge appointed Robert Scott to represent Appellant even though Scott did not have sufficient experience to serve as lead counsel in a capital case. The record indicates that when the State filed notice of intent to seek the death penalty, the trial court appointed Bill Talman to represent Appellant. When Talman withdrew from Appellant's case, the trial court appointed Scott. After a few weeks, the court apparently discovered that Scott did not have the requisite experience to try a capital case. The court therefore appointed James Bell, who had twenty years of criminal defense experience. Contrary to Appellant's assertions, these circumstances do not indicate any bias whatsoever. These circumstances merely indicate that the judge inadvertently appointed an attorney who was not "death qualified" and then quickly rectified the situation when the error was discovered. Because these circumstances do not provide any basis for questioning the judge's impartiality, it is clear that the post-conviction judge did not abuse his discretion when he failed to recuse himself from the case. This issue has no merit.

III. VOLUNTARINESS OF THE GUILTY PLEA

Appellant contends that the post-conviction court erred when it determined that his plea was given knowingly and voluntarily without viewing the autopsy photographs. We again disagree with Appellant's position. [FN1]

FN1. Initially, Appellant contends that the post-conviction court erred when it failed to grant his pre-hearing motion to order the prosecutor to produce the autopsy photographs. The record indicates that the post-conviction court denied this motion because Appellant could obtain the photographs independently. Indeed, we conclude that the trial court correctly denied the motion because Appellant's post-conviction counsel could have obtained the photographs by making a request under the Tennessee Public Records Act, Tennessee Code Annotated sections 10-7-501, et seq.

Under the principles of due process, a guilty plea must be knowing and voluntary in order to be valid. *Dixon v. State*, 934 S.W.2d 69, 71 (Tenn.Crim.App.1996). In evaluating the knowing and voluntary nature of a plea, this Court must look to the totality of the circumstances. *Powers v. State*, 942 S.W.2d 551, 556 (Tenn.Crim.App.1996). "It is a well-established principle of law that a plea of guilty induced by coercion, terror, inducements, [or] subtle or blatant threats, is not voluntary." *Parham v. State*, 885 S.W .2d 375, 380 (Tenn.Crim.App.1994) (citations and internal quotations omitted). However, the entry of a guilty plea to avoid a death sentence does not, standing alone, make the plea involuntary. *Id.* at 381. Moreover, this Court "is bound by the post-conviction court's findings unless the evidence preponderates otherwise." *Bates v. State*, 973 S.W.2d 615, 631 (Tenn.Crim.App.1997). "This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court." *Id.* In addition, "questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution by the post-conviction court." *Id.*

***4** The totality of the circumstances in this case indicates that Appellant's plea was given both knowingly and voluntarily. The record indicates that at the plea hearing, the trial court explained the charges to which Appellant would be pleading guilty, and explained the possible sentences for those charges. The trial court also explained that Appellant had the right to a jury trial, he had the right to confront the witnesses against him, and he had a privilege against self-incrimination. [FN2] The trial court then asked Appellant if he knew that he would be giving up those rights by entering a guilty plea, and Appellant responded that he did. The trial court then asked Appellant whether he was giving his plea freely and voluntarily, and Appellant responded that he was. The trial court then found that Appellant's guilty plea was freely, voluntarily, and knowingly given.

FN2. We note that the trial court's acceptance of Appellant's plea complied with the requirements of *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969) (holding that before a guilty plea can be considered knowing and voluntary, the defendant must be advised of the privilege against self-incrimination, the right to a trial by jury, and the right to confront one's accusers).

Moreover, the record contains other evidence which indicates that Appellant's plea was not coerced by viewing the autopsy photographs. Bell testified that although he did show many photographs to Appellant, including the autopsy photographs, he also explained that some of the photographs would be admissible while others would certainly be excluded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under the rules of evidence. Bell also testified that he did not lead Appellant to believe that the autopsy photographs would be admissible. In addition, Parton testified that Appellant was very comfortable with the plea agreement and he was relieved that the matter was going to be resolved. Parton also testified that she had previously expressed her opinion to Appellant that if he proceeded to trial, he would likely be convicted and would receive the death penalty. Parton also testified that she did not think that viewing the photographs was what persuaded Appellant to plead guilty. Talman likewise testified that he had believed that Appellant would likely receive the death penalty if he went to trial and Talman recommended that Appellant seriously consider accepting the State's plea offer. Further, Appellant testified during direct examination that "It was either take the plea or go to death row. And out of respect for my mother, to save my mother a lot of hardship, I signed my life away."

Although not expressly stated in the order denying Appellant's petition, it is clear that the post-conviction court did not believe Appellant's claim that he was coerced into making his plea and rather, the court accredited the testimony of Appellant's former attorneys that Appellant knew what he was doing and he entered his guilty plea in order to avoid the death penalty. Indeed, the post-conviction court expressly referred to the testimony of Bell and Parton as a basis for its decision.

We conclude that under the totality of these circumstances, the post-conviction court properly determined that Appellant's plea was entered knowingly and voluntarily. We also conclude that under these circumstances, the post-conviction court did not need to view the autopsy photographs in order to make this determination. [FN3] This issue has no merit.

> FN3. We note that the post-conviction court was provided with Appellant's description about the nature of the photographs and a description of what they depicted.

IV. INVOLUNTARY STATEMENT

*5 Appellant contends that the post-conviction court erred when it dismissed his petition without addressing his claim that the police had illegally obtained an incriminating statement [FN4] from him in the absence of his appointed counsel. We disagree.

> FN4. This statement does not appear in the record.

It is well-established that a guilty plea constitutes a waiver of all non-jurisdictional and procedural defects or constitutional infirmities. *State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn.1996); *State v. Griffin*, 914 S.W.2d 564, 567 (Tenn.Crim.App.1995); *State v. Bilbrey*, 816 S.W.2d 71, 75 (Tenn.Crim.App.1991). Further, Appellant's plea agreement specifically states that "I understand that by pleading guilty I am waiving or giving up my right to appeal all non-jurisdictional defects or errors in these proceedings, including any complaints that ... my right against self-incrimination or right to counsel were violated." By pleading guilty, Appellant clearly waived any complaints about the circumstances surrounding the allegedly incriminating statement. Thus, the post-conviction court was not required to address Appellant's complaint about the alleged statement. This issue has no merit.

V. ASSISTANCE OF COUNSEL

Appellant contends that the post-conviction court erroneously determined that he had received effective assistance of counsel.

Article I, Section 9 of the Tennessee Constitution provides "that in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel." Tenn. Const. art I, § 9. Similarly, the Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. Const. amend. VI. "These constitutional provisions afford to the accused in a criminal prosecution the right to effective assistance of counsel." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn.1997).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial. *Powers v. State*, 942 S.W.2d 551, 558 (Tenn.Crim.App.1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1984). [FN5] "In the case of a guilty plea, to satisfy the requirement of prejudice, the petitioner must demonstrate a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Bentley v. State,* 938 S.W.2d 706, 710-11 (Tenn.Crim.App.1996). "Moreover, on appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them." *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn.Crim.App.1994). "The burden is on the petitioner to show that the evidence preponderated against those findings." *Id.*

FN5. "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley,* 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." *Id.*

A. Changes in Counsel

***6** Initially, Appellant contends that he received ineffective assistance of counsel because there were several changes in counsel. However, the record does not bear out this assertion.

Appellant's only explanation for why these changes constituted ineffective assistance of counsel is the unsupported conclusory allegation that the changes created a lack of continuity. This allegation is not supported by the record. Talman testified that when he represented Appellant, he interviewed witnesses and examined the physical evidence and he subsequently gave his entire file to Scott when Scott became Appellant's counsel. Talman also testified that he had discussed the case with Bell when Bell became Appellant's counsel. In addition, Scott testified that after he withdrew from the case, he talked to Bell and Bell's associate in order to assure continuity of representation. Further, Bell testified that he had reviewed the very detailed file that had been given to him and he had directed his investigator to conduct further investigation in certain areas. Finally, the record indicates that Parton remained on the case as co-counsel from before Talman's withdrawal through Appellant's decision to plead guilty.

In this case, Appellant has simply failed to show that the changes in counsel caused him to receive any services that were deficient. Appellant has also failed to show that there is a reasonable probability that without the changes in counsel, he would not have pled guilty and would have insisted on going to trial. Thus, this issue has no merit.

B. Representation by Robert Scott

Appellant also contends that he received ineffective assistance of counsel from Robert Scott. However, Appellant has failed to identify anything that Scott did that was deficient in any manner. Indeed, the record indicates that Scott only represented Appellant for a few weeks and when Scott withdrew from the case, he gave the case file to Bell and he discussed the case with Bell and Bell's associate. Further, Appellant has failed to identify any manner in which he was prejudiced by Scott's representation. Thus, this issue has no merit.

C. Representation by James Bell

Appellant also contends that he received ineffective assistance of counsel because James Bell displayed an "antagonistic and cavalier attitude" toward Appellant. However, this does not appear to be the case.

Appellant's first complaint about Bell's conduct relates to a letter Bell sent to Appellant when Bell was appointed lead counsel in the case. We have reviewed the letter and while it exhibits a surprising level of conceit and arrogance on the part of Mr. Bell, considering the numerous spelling and syntactical errors contained in it, we do not believe that Appellant was prejudiced by it. Indeed, Appellant has failed to even allege that this letter had anything to do with his decision to plead guilty.

Appellant's next complaint about Bell's conduct is that Bell failed to adequately investigate the case. This allegation is not supported by the record. Bell testified that he had assumed that Appellant's case would go to trial and he had used all of the resources of his office to prepare the case for trial. Although Bell testified that he did not personally interview witnesses, he testified that he had reviewed the witness interviews that were in the well-organized, detailed case file that had been given to him. Bell also testified that he had directed his investigator to go back and talk with the witnesses for further information. In addition, Bell testified that he had met with a court-appointed psychologist and he had talked to both Talman and Scott about the case and had conferred with Parton on a number of occasions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bell also testified that when Appellant directed him to pursue a plea agreement, Bell entered into negotiations and secured an offer that had previously been withdrawn. Finally, Bell testified that he fully explained the plea agreement to Appellant, and Appellant unquestionably understood the agreement. Under these circumstances, we conclude that Appellant has failed to demonstrate that Bell's investigation of the case was deficient or that he was prejudiced by the way that Bell investigated the case.

*7 In Appellant's final complaint about Bell's conduct, Appellant essentially rehashes his previous argument in which he alleged that Bell coerced him into pleading guilty by showing him the autopsy photographs. As previously stated, the record supports the post-conviction court's conclusion that Appellant's guilty plea was entered knowingly and voluntarily and was not coerced by the autopsy photographs.

In short, Appellant has failed to show either that he received deficient representation from Bell or that there is a reasonable possibility that he would not have pled guilty and would have insisted on going to trial if it had not been for the alleged deficiencies. Thus, this issue has no merit.

Accordingly, the judgment of the post-conviction court is AFFIRMED.

CONCUR: GARY R. WADE, Presiding Judge, L.T. LAFFERTY, Senior Judge.

Not Reported in S.W.2d, 1999 WL 446612 (Tenn.Crim.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE

## DIVISION THREE

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB 28 AM 11:55
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CHRISTA GAIL PIKE,** )
Petitioner, )
v. ) Case No. 68280
**STATE OF TENNESSEE,** )
Respondent. )

## PRE-EVIDENTIARY HEARING SCHEDULING ORDER

On February 27, 2006, the court heard motions related to the disqualification of the court and the district attorney general's office and various motions to quash subpoenas filed in this case. After resolution and determination of these matters, a scheduling conference was held in which the court set the following schedule regarding matters leading up to and including the evidentiary hearing in this case:

(1) Ex parte requests and out of state subpoena filings shall be filed by April 28, 2006;

(2) Expert reports shall be provided by May 31, 2006;

(3) Transcripts from pretrial hearings will be provided to the parties by May 31, 2006;

(4) Final amendments to the post-conviction petition shall be filed no later than July 7, 2006;

(5) The state shall file the answer to any amendments no later than August 4, 2006; and

(6) The evidentiary hearing is scheduled for the week of September 11, 2006.

ENTERED this the 28th day of February, 2006.

Mary Beth Leibowitz
Mary Beth Leibowitz
Criminal Court Judge, Division III

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**

**DIVISION THREE**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 68280 |
| **STATE OF TENNESSEE,** | ) | |
| Respondent. | ) | |

FILED
BY MARTHA PHILLIPS, CLERK
2006 FEB 28 AM 11:55
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**ORDER GRANTING PERMISSION TO APPEAL PURSUANT TO T.R.A.P. 9 FROM THE COURT'S DENIAL OF PETITIONER'S MOTION TO DISQUALIFY THE COURT FROM FURTHER CONSIDERATION OF POST-CONVICTION PROCEEDING**

On February 27, 2006, a hearing was held regarding the petitioner's motion to disqualify the court from further consideration of the above-referenced post-conviction proceeding. After full consideration of the arguments of counsel, the court denied the petitioner's motion. Thereafter, the petitioner requested interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure.

After due consideration, the court grants this interlocutory appeal pursuant to T.R.A.P. 9(a)(2) in the interest of preventing needless, expensive and protracted litigation. If this court has erred in failing to disqualify itself from these proceedings, the expense of another evidentiary hearing would be burdensome in both time and money to the petitioner, the state and, more particularly, to the judicial system. However, the court notes that this case is presently set for evidentiary hearing for the week of September 11, 2006 and the parties have agreed that no stay shall issue with this court's order. Therefore, the defendant's application for interlocutory appeal of the

court's February 27, 2006 denial of the motion to disqualify is GRANTED for consideration of the following questions:

(1) Does the allegation of the court's complicity in denying the defendant conflict-free counsel create an interest for the court in its post-conviction ruling on the issue of whether counsel's alleged conflict of interest denied the petitioner her right to effective assistance of counsel?

(2) Does this alleged interest rise to the level required for disqualification under Article VI, § 11, of the Tennessee Constitution, Tenn. Code Ann. § 17-2-101, and Tenn. Sup. Ct. R. 10, Canons 2 and 3?

and

(3) If the alleged interest of the court does not require disqualification under the applicable constitutional, statutory and rule provisions, does it, nevertheless, create an appearance of impropriety that requires the court to recuse itself from further consideration of these post-conviction proceedings?

ENTERED this the 28th day of February, 2006.

Mary Beth Leibowitz
Criminal Court Judge, Div. III

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 12 PM 2:33
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

**CHRISTA GAIL PIKE v. STATE OF TENNESSEE**

**Criminal Court for Knox County**
**No. 68280**

---

**No. E2006-00520-CCA-R9-PD**

---

FILED
MAY 11 2006
Clerk of the Courts
Rec'd by

**ORDER**

The petitioner, Christa Gail Pike, through counsel, seeks an interlocutory appeal from the order of the trial court denying the petitioner's motion to recuse the trial court from continuing to preside over the petitioner's post-conviction case. See Rule 9, T.R.A.P. The state opposes the application.

A jury convicted the petitioner of first degree murder and imposed a sentence of death. The judgment was affirmed on appeal. See State v. Pike, 978 S.W.2d 904 (Tenn. 1998), cert. denied, 526 U.S. 1147, 119 S. Ct. 2025 (1999). The petitioner filed for post-conviction relief, later moved to withdraw the petition, then changed her mind and attempted to reinstate her petition. Following an evidentiary hearing, the trial court declined to reinstate the petition and this court affirmed the judgment. On further review, the Tennessee Supreme Court reversed and remanded for reinstatement of the petition. See Pike v. State, 164 S.W.3d 257 (Tenn. 2005). On remand, the petitioner filed a motion seeking recusal of the trial court based on the trial court's initial appointment of Mr. William Talman as the petitioner's lead counsel at a time when Mr. Talman's billing practices relating to his representation of indigent defendants had been under investigation. The trial court heard the motion in a February 27, 2006 evidentiary hearing.

Briefly summarized, the evidence showed that in early 1994, the State Comptroller was informed by the Administrative Office of the Courts of possible over billing by several private attorneys, including Mr. Talman, who were paid by the state to represent indigent criminal defendants in appointed cases from 1990 - 1993. In April 1995, Mr. Talman reimbursed the state the entire amount of the challenged fees. On May 23, 1995, the trial court appointed Mr. Talman as lead counsel to the petitioner in her prosecution for capital murder. At the hearing, the petitioner asserted that by appointing Mr. Talman, the trial court denied the petitioner her fundamental right to conflict-free counsel. The petitioner argued that the "very core nature" of the attorney/client relationship, particularly in a "high profile" capital murder case, and the court's appointment of an attorney with a known, "serious conflict," made the appointment of counsel a decision fundamentally different than the other decisions that a post-conviction court is routinely called upon to make. The petitioner concluded that the interest of the court in protecting its decision disqualified the trial court from presiding further over the petitioner's case.

Following arguments, the trial court issued a bench ruling denying the motion for recusal. The trial court found that its appointment of Mr. Talman presented no valid reason to recuse itself from the petitioner's post-conviction case. On February 28, 2006, the trial court granted the petitioner's application for permission to appeal pursuant to Rule 9, T.R.A.P., citing the need to prevent needless, expensive and protracted litigation in the event its decision not to recuse itself was erroneous. As reflected in the hearing transcript, the court expressly granted the application "on the basis of judicial economy not irreparable harm," noting that the issue was reviewable on direct appeal. See Rule 9(a)(1), (2).

Upon due consideration of the pleadings and record before us, we conclude that no issue is presented which requires our immediate review. As the trial court recognized, the petitioner suffers no irreparable harm as a result of our denial of interlocutory review. The challenged order is reviewable upon entry of a final judgment and a denial of this application in no way prejudices the petitioner's right to pursue an appeal under Rule 3(b), T.R.A.P. Moreover, we conclude that the probability of reversal of the challenged ruling is low. See Rule 9(a)(2), T.R.A.P. A motion to recuse is addressed to the sound discretion of the trial court and will not be reversed absent clear abuse appearing on the face of the record. State v. Conway, 77 S.W.3d 213, 224 (Tenn. Crim. App. May 8, 2001) (citing Owens v. State, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999) (citations omitted)). In our view, it is most unlikely that interlocutory review in this case would result in a net reduction in the duration and expense of the litigation. See Rule 9(a)(2), T.R.A.P.

Based on the foregoing, it is ORDERED that the application for interlocutory appeal is hereby DENIED. It appearing that the petitioner is indigent, costs on appeal are taxed to the state.

The clerk shall send a copy of this order to the Honorable Mary Beth Leibowitz, Criminal Court for Knox County, in addition to the parties.

Norma McGee Ogle

NORMA MCGEE OGLE, JUDGE

Gary R. Wade

GARY R. WADE, PRESIDING JUDGE

Joseph M. Tipton

JOSEPH M. TIPTON, JUDGE

~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Debbie Howell, now being at Asheville, County of Buncombe, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She is a social worker and she met Petitioner while a counselor at a juvenile residential facility;
B. She has personal knowledge of Petitioner's history of being physically and sexually abused and of Petitioner's substance abuse;
C. She observed Petitioner's erratic behaviors and mood swings, including depression and suicidality;
D. She observed and can describe the dynamics of the relationship between Petitioner and Petitioner's mother; and

E. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Debbie Howell will be required on September 12, 2006, (or another date during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Debbie Howell, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Buncombe, State of North Carolina, where said Debbie Howell now is, upon proceedings to compel said Debbie Howell to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

269

# ~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

## CERTIFICATE OF MATERIALITY

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Kerry Sherrill, now being at Carrboro, County of Orange, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She is a social worker who knows Petitioner through her work;
B. Petitioner's history of neglect and abuse by Petitioner's mother and Boyfriends caused Petitioner permanent psychological damage;
C. Petitioner's mother never took responsibility for her role in Petitioner's behavior;
D. She knows that Petitioner engaged in regular "huffing"; and
E. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Kerry Sherrill will be required from September 12-14, 2006, (or a like three-day period during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Kerry Sherrill, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Orange, State of North Carolina, where said Kerry Sherrill now is, upon proceedings to compel said Kerry Sherrill to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III



Case 1:12-cv-00035-HSM-SKL Document 9-2 Filed 08/01/12 Page 72 of 157 PageID #: 3996

Prepared for Entry:

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Faye Johnson Guy, now being at Carrboro, County of Orange, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She is a long-time friend of Petitioner's mother and saw Petitioner throughout her childhood;

B. She recognizes and is familiar with the symptoms exhibited by a person with bi-polar disorder because her mother has the illness;

C. Her observations of Petitioner's mood and behavior during adolescence (including rapid shifts between cheerfulness and despondency, hyperactivity, extended periods of both sleeping and sleeplessness) are consistent with a person having bi-polar disorder;

D. Petitioner's maternal grandfather was violent and an alcoholic;
E. Petitioner's mother blamed Petitioner for all of her break-ups with men;
F. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Faye Johnson Guy will be required from September 12-14, 2006, (or a like three-day period during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Faye Johnson Guy, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Orange, State of North Carolina, where said Faye Johnson Guy now is, upon proceedings to compel said Faye Johnson Guy to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz
HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

~~TO BE FILED EX PARTE AND UNDER SEAL~~

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Rosemary Wilson, now being at Hillsborough, County of Orange, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She is a psychologist;
B. She treated Petitioner when Petitioner was a teenager;
C. She still has her files related to the case; and
D. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Rosemary Wilson will be required from September 12-14, 2006, (or a like three-day period during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Rosemary Wilson, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Orange, State of North Carolina, where said Rosemary Wilson now is, upon proceedings to compel said Rosemary Wilson to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

[signature]

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

929

# ~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Kristina Hargiss, now being at Black Mountain, County of Buncombe, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She was Petitioner's counselor while Petitioner was placed at a juvenile residential facility;
B. She still has her original notes from her case file;
C. She observed that Petitioner's moods cycled frequently and severely, alternating between happy and depressed;
D. She believes these mood swings were the result of a chemical imbalance in Petitioner; and

E. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Kristina Hargiss will be required on September 12, 2006, (or another date during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Kristina Hargiss, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Buncombe, State of North Carolina, where said Kristina Hargiss now is, upon proceedings to compel said Kristina Hargiss to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

[signature]

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

PC9

**~~TO BE FILED EX PARTE AND UNDER SEAL~~**

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Peggy Hamlett, now being at Hillsborough, County of Orange, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She was Petitioner's juvenile probation officer relating to a misdemeanor charge of breaking and entering a community building;

B. She never knew Petitioner to be violent;

C. She has personal information concerning Petitioner's history of truancy and "huffing";

D. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Peggy Hamlett will be required from September 12-14, 2006, (or a like three-day period during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Peggy Hamlett, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Orange, State of North Carolina, where said Peggy Hamlett now is, upon proceedings to compel said Peggy Hamlett to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

Catherine Y. Brockenborough

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

JCJ

~~TO BE FILED~~ **EX PARTE** ~~AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Carol Goehring, now being at Creedmoor, County of Granville, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. She is a friend of Petitioner and they met in seventh grade;
B. She remembers that Petitioner was not popular in school and often tried to Seek attention;
C. She knows of more than one traumatic incident in Petitioner's childhood, including the abuse by a live-in boyfriend of Petitioner's mother facilitated by the fact that Petitioner's mother was aware of this and did nothing to prevent or stop the abuse;
D. She observed and can describe the dynamics of the relationship between

Petitioner and Petitioner's mother;

E. Petitioner is loyal to a fault, resulting in repeated experiences of betrayal;

F. She would have testified at Petitioner's original trial if trial counsel had asked her;

4. That the presence of Carol Goehring will be required from September 12-14, 2006, (or a like three-day period during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Carol Goehring, as such witness, comes into the State of Tennessee in obedience to a summons directing her to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives her protection from arrest or the service of process upon her, civil or criminal, in connection with matters which arose before her entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Granville, State of North Carolina, where said Carol Goehring now is, upon proceedings to compel said Carol Goehring to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15th day of May, 2006.

Mary Beth Leibowitz

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

[signature]

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

359

~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | **Certificate of Judge Adjudicating Named** |
| **Petitioner,** | ) | **Person to be Material Witness** |
| | ) | |
| **v.** | ) | |
| | ) | **CASE NO. 68280** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:53
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CERTIFICATE OF MATERIALITY**

I, Judge Mary Beth Leibowitz, of the Criminal Court for Knox County, Division III, Knoxville, Tennessee, a court of record, do hereby certify:

1. That there is now pending in this Court the above entitled action for post-conviction relief, wherein Petitioner Christa Pike stands convicted of first degree murder and has been sentenced to death;

2. That the hearing in Petitioner's cause has been set by the Court to be held before said Court beginning on the 11th of September, 2006, at the City-County Building, Knoxville, Tennessee, commencing at 9:00 A.M.;

3. That Shelton Freeman, now being at Mebane, County of Alamance, State of North Carolina, is a necessary and material witness for Petitioner by reason of the following:

A. That he is an old friend of Petitioner, having met her in middle school;
B. That he observed how Petitioner's mother neglected Petitioner;
C. That he has personal knowledge of Petitioner's severe mood swings, Substance abuse, and self-mutilation;

4. That the presence of Shelton Freeman will be required from September 12-14, 2006, (or a like three-day period during that week to be confirmed with the witness) for the purpose of giving testimony on Petitioner's behalf;

5. That if said Shelton Freeman, as such witness, comes into the State of Tennessee in obedience to a summons directing him to testify at said hearing, the laws of the State of Tennessee and of any other state through which the witness may be required to pass, gives him protection from arrest or the service of process upon him, civil or criminal, in connection with matters which arose before his entrance into said state, pursuant to said summons; and

6. That this certificate is made for the purpose of being presented to a judge of a court of record of the County of Alamance, State of North Carolina, where said Shelton Freeman now is, upon proceedings to compel said Shelton Freeman to attend and testify at the post-conviction hearing before this Court, in Knox County, State of Tennessee, upon the dates and days herein set forth.

WITNESS this Honorable Judge of the Knox County Criminal Court, Division III, this 15 day of May, 2006.

HON. MARY BETH LEIBOWITZ
Knox County Criminal Court Judge
Division III

Prepared for Entry:

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
Counsel for Petitioner Christa Pike

# TO BE FILED EX PARTE AND UNDER SEAL

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

COUNTY OF DAVIDSON )
)
STATE OF TENNESSEE )

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Faye Johnson Guy, is located in or about Granville County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Ms. Guy currently resides at 400 Davie Road, Apt. 14, Carrboro, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Ms. Guy will testify as follows:

   A. She is a long-time friend of Petitioner's mother and saw Petitioner throughout her childhood;
   B. She recognizes and is familiar with the symptoms exhibited by a person with bi polar disorder because her mother has the illness;

C. Her observations of Petitioner's mood and behavior during adolescence (including rapid shifts between cheerfulness and despondency, hyperactivity, extended periods of both sleeping and sleeplessness) are consistent with a person having bi-polar disorder;
D. Petitioner's maternal grandfather was violent and an alcoholic;
E. Petitioner's mother blamed Petitioner for all of her break-ups with men; and
F. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Ms. Guy the night before she testifies. As a result, counsel anticipate that Ms. Guy will need two nights of hotel accommodation. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $130.00 for lodging, $77.50 for her per diem and $281.40 for roundtrip travel in her personal car from her residence in Carrboro, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 670 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $488.90.

FURTHER AFFIANT SAYETH NAUGHT.

Catherine Y. Brockenborough

Sworn to and subscribed before me
this 5th day of May, 2006.

Cheryl L. York
NOTARY PUBLIC

My Commission Expires:

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires JULY 25, 2009

~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

| | |
|---|---|
| COUNTY OF DAVIDSON | ) |
| | ) |
| STATE OF TENNESSEE | ) |

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Peggy Hamlett, is located in or about Orange County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Ms. Hamlett's current office address is 110 E. King Street, Hillsborough, North Carolina. Ms. Hamlett works as a juvenile probation officer for the North Carolina Department of Juvenile Justice and Delinquency Prevention.

4. Upon information and belief, based upon the investigation conducted by myself and others, Ms. Hamlett will testify as follows:

   A. She was Petitioner's juvenile probation officer relating to a misdemeanor charge of breaking and entering a community building;
   B. She never knew Petitioner to be violent;

C. She has personal information concerning Petitioner's history of truancy and "huffing";

D. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Ms. Hamlett the night before she testifies. As a result, counsel anticipate that Ms. Hamlett will need two nights of hotel accommodation. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $130.00 for lodging, $77.50 for her per diem, and $273.84 for roundtrip travel in her personal car from her place of employment in Hillsborough, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 652 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $481.34.

FURTHER AFFIANT SAYETH NAUGHT.

[signature]
Catherine Y. Brockenborough

Sworn to and subscribed before me
this 5th day of May, 2006.

[signature]
NOTARY PUBLIC

My Commission Expires: ______

CHERYL L. YORK
STATE OF TENNESSEE NOTARY PUBLIC
DAVIDSON COUNTY, TENN.
My Commission Expires JULY 25, 2009

JCP

**~~TO BE FILED EX PARTE AND UNDER SEAL~~**

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

| | |
|---|---|
| COUNTY OF DAVIDSON | ) |
| | ) |
| STATE OF TENNESSEE | ) |

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Kristina Hargiss, is located in or about Buncombe County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Ms. Hargiss currently resides at 106 Swannanoa Avenue, Black Mountain, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Ms. Hargiss will testify as follows:

A. She was Petitioner's counselor while Petitioner was placed at a juvenile residential facility;
B. She still has her original notes from her case file;
C. She observed that Petitioner's moods cycled frequently and severely, alternating

between happy and depressed;

D. She believes these mood swings were the result of a chemical imbalance in Petitioner; and

E. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Ms. Hargiss the day that she testifies. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $23.25 for her per diem and $109.20 for roundtrip travel in her personal car from her residence in Black Mountain, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 260 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $132.45.

FURTHER AFFIANT SAYETH NAUGHT.

Catherine Y. Brockenborough

Catherine Y. Brockenborough

Sworn to and subscribed before me this 5th day of May, 2006.

Cheryl York

NOTARY PUBLIC

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires: My Commission Expires JULY 25, 2009

# TO BE FILED EX PARTE AND UNDER SEAL

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

## AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH

COUNTY OF DAVIDSON )
)
STATE OF TENNESSEE )

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Debbie Howell, is located in or about Buncombe County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Ms. Howell currently resides at 30 Maple Ridge Lane, Asheville, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Ms. Howell will testify as follows:

A. She is a social worker and she met Petitioner while a counselor at a juvenile residential facility;

B. She has personal knowledge of Petitioner's history of being physically and sexually abused and of Petitioner's substance abuse;

C. She observed Petitioner's erratic behaviors and mood swings, including depression and suicidality;

D. She observed and can describe the dynamics of the relationship between Petitioner and Petitioner's mother; and

E. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Ms. Howell the day that she testifies. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $23.25 for her per diem and $94.92 for roundtrip travel in her personal car from her residence in Asheville, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 226 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $118.17.

FURTHER AFFIANT SAYETH NAUGHT.

Catherine Y. Brockenborough

Sworn to and subscribed before me this 5th day of May, 2006.

NOTARY PUBLIC

My Commission Expires:

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires JULY 25, 2009

~~TO BE FILED EX PARTE AND UNDER SEAL~~

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

COUNTY OF DAVIDSON )
)
STATE OF TENNESSEE )

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Kerry Sherrill, is located in or about Orange County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Ms. Sherrill's current place of employment is Carrboro Elementary School, 400 Shelton Street, Carrboro, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Ms. Sherrill will testify as follows:

A. She is a social worker who knows Petitioner through her work;
B. Petitioner's history of neglect and abuse by Petitioner's mother and boyfriends caused Petitioner permanent psychological damage;
C. Petitioner's mother never took responsibility for her role in Petitioner's behavior;

D. She knows that Petitioner engaged in regular "huffing"; and
E. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Ms. Sherrill the night before she testifies. As a result, counsel anticipate that Ms. Sherrill will need two nights of hotel accommodation. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $130.00 for lodging, $77.50 for her per diem and $281.40 for roundtrip travel in her personal car from her place of work in Carrboro, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 670 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $488.90.

FURTHER AFFIANT SAYETH NAUGHT.

Catherine Y. Brockenborough

Sworn to and subscribed before me
this 5th day of May, 2006.

NOTARY PUBLIC

My Commission Expires:

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires JULY 25, 2009

~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

COUNTY OF DAVIDSON )
)
STATE OF TENNESSEE )

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Rosemary Wilson, is located in or about Orange County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Dr. Wilson currently resides at 5620 Schley Road, Hillsborough, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Dr. Wilson will testify as follows:

   A. She is a psychologist;
   B. She treated Petitioner when Petitioner was a teenager;
   C. She still has her files related to the case; and
   D. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Dr. Wilson the night before she testifies. As a result, counsel anticipate that Dr. Wilson will need two nights of hotel accommodation. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $130.00 for lodging, $77.50 for her per diem and $273.84 for roundtrip travel in her personal car from her residence in Hillsborough, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 652 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $481.34.

FURTHER AFFIANT SAYETH NAUGHT.

Catherine Y. Brockenborough

Sworn to and subscribed before me
this 5th day of May, 2006.

NOTARY PUBLIC

My Commission Expires:

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires JULY 25, 2009

~~TO BE FILED EX PARTE AND UNDER SEAL~~

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:55
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

COUNTY OF DAVIDSON )
)
STATE OF TENNESSEE )

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Shelton Freeman, is located in or about Alamance County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Mr. Freeman currently resides at 120 Frazier, Lot 15, Mebane, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Mr. Freeman will testify as follows:

A. That he is an old friend of Petitioner, having met her in middle school;
B. That he observed how Petitioner's mother neglected Petitioner;
C. That he has personal knowledge of Petitioner's severe mood swings, substance abuse, and self-mutilation; and
D. He would have testified at Petitioner's original trial if counsel had asked him.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Mr. Freeman the night before he testifies. As a result, counsel anticipate that Mr. Freeman will need two nights of hotel accommodation. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $130.00 for lodging, $77.50 for his per diem, and $267.12 for his round trip travel in his personal car from his residence in Mebane, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 636 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $474.62.

FURTHER AFFIANT SAYETH NAUGHT.

Catherine Y. Brockenborough

Sworn to and subscribed before me
this 5th day of May, 2006.

NOTARY PUBLIC

My Commission Expires:

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires JULY 25, 2009

# TO BE FILED EX PARTE AND UNDER SEAL

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**AFFIDAVIT OF CATHERINE Y. BROCKENBOROUGH**

COUNTY OF DAVIDSON )
)
STATE OF TENNESSEE )

Affiant, Catherine Y. Brockenborough, after being duly sworn according to law, states as follows:

1. Along with co-counsel Donald E. Dawson, I represent Petitioner Christa Pike pursuant to appointment of this Court.

2. A necessary and material witness in Ms. Pike's case, Carol Goehring, is located in or about Granville County, North Carolina. The testimony of this witness is required to show that Ms. Pike's state and federal constitutional rights were violated at her capital trial.

3. Upon information and belief, Ms. Goehring currently resides at 682 Cameron Drive, Creedmoor, North Carolina.

4. Upon information and belief, based upon the investigation conducted by myself and others, Ms. Goehring will testify as follows:

A. She is a friend of Petitioner and they met in seventh grade;
B. She remembers that Petitioner was not popular in school and often tried to seek attention;
C. She knows of more than one traumatic incident in Petitioner's childhood,

including the abuse by a live-in boyfriend of Petitioner's mother facilitated by the fact that Petitioner's mother was aware of this and did nothing to prevent or stop the abuse;

D. She observed and can describe the dynamics of the relationship between Petitioner and Petitioner's mother;

E. Petitioner is loyal to a fault, resulting in repeated experiences of betrayal; and

F. She would have testified at Petitioner's original trial if trial counsel had asked her.

5. The above testimony is necessary and material to demonstrate that original counsel were ineffective in representing Ms. Pike at sentencing. Furthermore, had counsel presented this testimony, it is likely that the outcome of Ms. Pike's sentencing would have produced a different result.

6. The above-named witness has agreed to testify at Ms. Pike's hearing, if properly subpoenaed.

7. The evidentiary hearing is scheduled to begin at 9:00 A.M., on the 11th day of September, 2006. At this time, counsel have not finalized the order of witnesses. They expect they will conduct final witness presentation with Ms. Goehring the night before she testifies. As a result, counsel anticipate that Ms. Goehring will need two nights of hotel accommodation. Pursuant to T.C.A. § 40-17-208, and T.C.A. § 24-4-102, the compensation cost for the attendance of this out-of-state witness is $130.00 for lodging, $77.50 for her per diem and $290.64 for roundtrip travel in her personal car from her residence in Creedmoor, North Carolina to the City-County Building in Knoxville, Tennessee – a distance of 692 miles with a reimbursement rate of $0.42 per mile. Thus, the total advance witness fee is $498.14.

FURTHER AFFIANT SAYETH NAUGHT.

[signature]
Catherine Y. Brockenborough

Sworn to and subscribed before me
this 5th day of May, 2006.

[signature]
NOTARY PUBLIC

My Commission Expires:

CHERYL L. YORK STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN.

My Commission Expires JULY 25, 2009

~~TO BE FILED EX PARTE AND UNDER SEAL~~

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:55
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **v.** | ) | |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

**PETITIONER'S EX PARTE MOTION FOR CERTIFICATES OF MATERIALITY FOR OUT-OF-STATE WITNESSES**

Comes now Petitioner, Christa Pike, by undersigned counsel, pursuant to T.C.A. § 40-17-201 *et seq*., Article I, §§ 8, 9, 16, and 17, Article XI, § 8 of the Tennessee Constitution, the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and her rights to a full and fair hearing and due process, and respectfully requests that the Court issue Certificates of Materiality to compel the production of the following individuals who will testify on her behalf in the above-styled case: Kenny Andrews, Glenda Blackwood, Andrew Drace, Shelton Freeman, Carol Goehring, Faye Johnson Guy, Peggy Hamlett, Carissa and Gerard Hansen, Kristina Hargiss, Debbie Howell, Adam Lentz, Matthew Martin, Marshall Muse, Brandie Parker, Onas Perry, Glenn Pike, Orlando Powell, Kim Rhodes, Carrie Ross, Kerry Sherill, Brian Wilson, and Rosemary Wilson. Ms. Pike presents the following as grounds for this motion:

1. There is now pending before the Court Ms. Pike's pro se and amended petitions for post-

conviction relief from her conviction for first degree murder, and from her sentence of death.

2. This cause is scheduled for an evidentiary post-conviction hearing to begin on the 11th day of September, 2006.

3. The following are all necessary and material witnesses for Ms. Pike for the reasons set forth with particularity in the attached Affidavits of counsel, and their presence is required for purposes of giving testimony on her behalf during the evidentiary hearing: Shelton Freeman of Alamance County, North Carolina; Kristina Hargiss, Debbie Howell, Matthew Martin, Marshall Muse, and Onas Perry, all of Buncombe County, North Carolina; Andrew Drace of Cabarrus County, North Carolina; Brandie Parker and Orlando Powell, both of Durham County, North Carolina; Carol Goehring of Granville County, North Carolina; Kenny Andrews, Glenda Blackwood, Faye Johnson Guy, Peggy Hamlett, Adam Lentz, Kerry Sherill, Brian Wilson, and Rosemary Wilson, all of Orange County, North Carolina; Kim Rhodes of Union County, North Carolina; Carissa and Gerard Hansen of Lubbock County, Texas; and Glenn Pike and Carrie Ross, both of Raleigh County, West Virginia.

4. If said individuals come into the State of Tennessee in obedience to summonses directing them to attend and testify at said hearing, the laws of the State of Tennessee and of any other state through which the witnesses may travel give them protection from arrest or the service of process, civil or criminal, in connection with matters which arose before their entrances into said state pursuant to said summonses.

5. Ms. Pike has previously been declared indigent by this Court and is unable to pay the witness fees required to effect process.

WHEREFORE, Petitioner Christa Pike requests the Court certify to the above and

foregoing by the issuance of Certificates thereto for the purposes of being presented to a judge of a court of record in the home counties of the individual witnesses in proceedings to compel their attendance as witnesses at the above-referenced hearing for the time and date set forth and pursuant to governing laws. Petitioner further requests that the Court order advance witness fees be paid by the State of Tennessee pursuant to Rule 17(b), Tennessee Rules of Criminal Procedure.

Respectfully submitted;

Donald E. Dawson, BPR #010723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331
(615) 741-9430, *fax*

Counsel for Petitioner Christa Pike

**CERTIFICATE OF NON-SERVICE**

Because of the ex parte nature of this MOTION, a copy has not been served upon counsel for the State.

Catherine Y. Brockenborough



Case 1:12-cv-00035-HSM-SKL Document 9-2 Filed 08/01/12 Page 108 of 157 PageID #: 4032

~~TO BE FILED EX PARTE AND UNDER SEAL~~

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| **Petitioner,** | ) | |
| | ) | **CASE NO. 68280** |
| **v.** | ) | |
| | ) | |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | **DEATH PENALTY** |
| | ) | **Post-Conviction** |

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 15 AM 11:58
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**ORDER FOR ADVANCE TRAVEL EXPENSES**

Proper petition having been made by counsel for Petitioner Christa Pike, who has been found indigent, and upon due consideration, the Court finds that Rosemary Wilson of Hillsborough, Orange County, North Carolina, is a necessary and material witness in the above-styled case. It is, therefore, the Order of the Court that said witness' expenses be advanced by the Knox County Criminal Court Clerk as provided by law.

Said expenses are as follows:

| | |
|---|---|
| Travel expenses: | $273.84 (652 miles round trip @ $0.42 per mile) |
| Lodging: | $130.00 |
| Meals: | $77.50 |
| **TOTAL:** | **$481.34** |

It is hereby ordered that the a check for the sum of $481.34, made payable to Rosemary Wilson, 5620 Schley Road, Hillsborough, Orange County, North Carolina be delivered to counsel for Petitioner forthwith so that Petitioner's counsel may make delivery to an Orange

County, North Carolina court of record pursuant to the Uniform Act to Secure the Attendance of Witnesses.

SO ORDERED THIS 15th DAY OF May, 2006.

MARY BETH LEIBOWITZ, Judge
Knox County Criminal Court
Division III

Prepared for Entry:

Catherine Y. Brockenborough, BPR #018340
Assistant Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9336
(615) 741-9430, *fax*

Counsel for Petitioner Christa Pike

FILED
BY MARTHA PHILLIPS, CLERK
2006 MAY 31 PM 12:56
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION THREE

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| | ) | |
| Petitioner, | ) | CASE NO. 68280 |
| | ) | |
| VS. | ) | |
| | ) | DEATH PENALTY |
| | ) | POST-CONVICTION |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S MOTION FOR EXTENSION OF TIME TO PROVIDE THE REPORTS OF HER EXPERT WITNESSES TO THE STATE**

Christa Gail Pike, by counsel, for the reasons set forth below, moves this Honorable Court for an extension of time to provide additional expert reports to the State. On February 28, 2006, the Court ordered that Ms Pike provide all of her expert reports to the State by May 31, 2006.

The Court also ordered that all ex parte requests for expert services be filed on or before April 28. Subsequently, due to the schedules of undersigned counsel, the date for requests for ex parte services was extended to May 5. On May 15, the Court conducted an ex parte meeting with counsel for Ms. Pike and approved the request for the services of Dr. William Kenner as a defense expert and the request for additional funds for the services of Dr. Jonathan Pincus. The orders granting these services were delivered to the Administrative Office of the Courts on May 16. The approval of the services of Dr. Diana McCoy was deferred pending additional

information. As of the date of this motion, the Administrative Office of the Court has not given final approval for the services of Dr. Kenner or the continued services of Dr. Pincus. Consequently no additional reports have been prepared at this time.

Nevertheless, Ms. Pike submits that the State is presently in possession of the reports necessary to make such decisions as are necessary to adequately prepare for the hearing on September 11. The preliminary report of Dr. Pincus was provided prior to the scheduled evidentiary hearing that was to have taken place in June 2001. On June 25, 2002, the State was provided a copy of Dr. Kenner's report that was prepared in has capacity as the Court's expert. On February 2, 2005, Assistant District Attorney General Price was mailed a copy of Dr. Kenner's January 19, 2005 Addendum to Psychiatric Report as an attachment to Ms. Pike's Motion to Supplement the Record and Reconsider Findings. Dr. Kenner's Addendum was also attached to the Brief of Amicus Curiae filed in Ms. Pike's case in the Tennessee Supreme by the National Alliance on Mental Illness. The three volume social history on Ms. Pike that was prepared by Dr. McCoy has been in the possession of the State since Ms. Pike's trial. These documents comprise the vast majority of expert reports and work product that will be used at the post-conviction hearing. 024

Ms. Pike anticipates that Dr. Kenner will provide an additional report related to his opinion concerning various trial and pretrial issues. Dr. Pincus is not expected to conduct any further evaluation of Ms. Pike until after his arrival in Knoxville for the hearing. Dr. McCoy may or may not provide an additional report depending upon the approval of her services in the capacity of a post-conviction expert as opposed to serving as a fact witness to the events that occurred before or during Ms. Pike's trial. Ms. Pike submits that the State's preparation will not

be prejudiced by a later discloser of any supplemental reports. Ms. Pike proposes that date for providing supplemental reports be extended to July 13 which will be 60 days prior to the hearing.

## CONCLUSION

For the foregoing reasons, Ms. Pike prays this Court will grant the requested extension of time and enter an order extending the time for supplemental reports of experts to July 13, 2006.

Respectfully submitted,

Donald E. Dawson # 10723
Post-Conviction Defender

Catherine Y. Brockenborough # 18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331

Counsel for Petitioner

FILED
BY MARTHA PHILLIPS, CLERK
2006 JUL 26 PM 2:05
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MOTION TO WAIVE APPEARANCE AT MOTION HEARING SET ON AUGUST 21, 2006**

Petitioner, Christa Gail Pike, by counsel, moves this Honorable Court to permit her to waive her presence at the motions hearing set in this Court of August 21, 2006. Petitioner will provide an affidavit to the Court stating her desire to waive her appearance and not be transported to our housed in Knox County.

Respectfully submitted,

Donald E. Dawson, BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR # 18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
Tel.: (615) 741-9331
Fax: (615) 741-9430

Counsel for Christa Gail Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing Motion has been set by email to Leland Price, Assistant District Attorney General, Office of the District Attorney General, 6th Judicial District, P.O. 1468, Knoxville, Tennessee 37901-1468 on this the 26th day of January, 2006, as well as mailed, first-class postage prepaid.

Donald E. Dawson

FILED
BY MARTHA PHILLIPS, CLERK
2006 JUL 26 PM 2:05
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**PETITIONER'S MOTION FOR DECLARATION THAT SHE RETAINS HER FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION AND TO LIMIT CROSS-EXAMINATION**

Petitioner, Christa Gail Pike, through undersigned counsel, pursuant to Article I, §§ 8, 9, and 16 of the Tennessee Constitution and the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, moves this Honorable Court to limit any cross-examination of Petitioner, if called to testify on his own behalf, during any hearing on his post-conviction petition to the scope of the direct examination and, in particular to preclude questions directly related to the factual allegations of the criminal charges for which he was convicted in this case. Ms. Pike may testify regarding her relationship with counsel, her understanding of the proceedings against her and the judicial process, her social history and other matters related to her post-conviction petition but does not intend to discuss in any way the factual circumstances related to the crimes for which she was charged or convicted. She asserts that she retains her right to remain silent and not give evidence against herself and the her right not to give evidence against herself is protected by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution.

Ms. Pike further moves the Court to permit her to invoke the privilege against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution if called to testify by the State.

**MEMORANDUM IN SUPPORT OF MOTION**

The question of whether a petitioner in state post-conviction retains her right against self–incrimination, remains an unsettled question in Tennessee. The issue of whether a post-conviction petitioner retains her right to remain silent under the Fifth Amendment to the United States Constitution or Article I, § 9 of the Tennessee Constitution was before the Tennessee Supreme Court in *Nichols v. State*, 90 S.W.3d 576 (2002). In *Nichols* the post-conviction court had permitted the petitioner, who had been called to testify by the state, to invoke his right to remain silent. The state did not appeal that decision. *Id.* at 607. Nevertheless, the Court of Criminal Appeals held that the trial court erred in allowing the petitioner to invoke his right against self-incrimination, reasoning "that there is no right against self-incrimination in a post-conviction case under the Fifth Amendment to the United States Constitution or Article I, §§ 8 and 9 of the Tennessee Constitution because the petitioner had already been convicted of the offenses being challenged." *Id.* The Court of Criminal Appeals further found "that a reviewing court may draw a negative inference from a petitioner's failure to testify in support of the post-conviction allegations." *Id.* After granting permission to appeal and specifically ordering the parties to brief this issue the Tennessee Supreme Court determined that the Court of Criminal Appeals had erred by ruling on this issue and that the ruling had no effect of the outcome. Therefore, the Court declined to decide the issue stating, "[a]ccordingly, our review of whether a right against self-incrimination applies in post-conviction cases under the facts and

circumstances of this case would amount to an advisory opinion." *Id.*

Courts in other states are split on the issue whether a petitioner retains his or her Fifth Amendment privilege against self-incrimination during post-conviction proceedings. Many courts across the country address the issue only in dicta. Ms. Pike submits that, because the result of a successful post-conviction challenge to a conviction and sentence is to render the initial trial and sentencing void due to denial of one or more of the petitioner's constitutional rights, the better analysis is to conclude that the right continues to attach during post-conviction proceedings. If a petitioner chooses to testify regarding her relationship with her attorneys, or other issue related to the petition for post-conviction relief, cross-examination-must be limited to the subject matter of the direct examination. If the petitioner is called to testify by the State, she must be able to invoke the privilege against self-incrimination. In that the post-conviction proceeding is a matter that is preliminary to a retrial or resentencing, "[t]he [petitioner should] not by testifying of a preliminary matter become subject to cross-examination as to other issues in the case." Tenn. R. Evid. 104(d).

Courts have long recognized the right of a defendant to testify on specific matters while retaining the right to remain silent as to other matters that are not directly related to the subject matter of the proceeding or testimony. In *Lee v. Illinois*, the Court observed that a codefendant's testimony during a suppression hearing had not afforded the petitioner the right to cross-examine that codefendant because "[T]he function of a suppression hearing is to determine the voluntariness, and hence the admissibility for Fifth Amendment purposes, of a confession. The truth or falsity of the statement is not relevant to the voluntariness inquiry, and no such testimony was given by [the codefendant]." 476 U.S. 530, 546 n.6, 106 S.Ct. 2056, 2065 n.6, 90 L.Ed.2d

514 (1986). *See, also, Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d. 424 (1999)(*holding* a guilty plea does not waive the privilege against self-incrimination and no adverse inference can be drawn from silence in the sentencing proceeding); *Simmons v. United States*, 390 U.S. 377, 389-394, 88 S.Ct. 967, 973-976, 19 L.Ed.2d 1247 (1968)(holding a prosecutor cannot use a defendant's testimony is a suppression hearing, that was presented to establish standing, against a defendant at trial).

In addition to the analogy that the testimony of a petitioner in post-conviction is like that of a defendant testifying in a preliminary matter, if testifying about such matters as his or her relationship to trial counsel, the subject matter in post-conviction is like that in a sentencing phase if the petitioner is testifying about areas of mitigation. The Tennessee Supreme Court has recognized that under the principles of the Fifth and Eighth Amendments to the United States Constitution, a capital defendant can testify during the sentencing phase of a death penalty trial about matters not directly related to the offense without becoming subject to cross-examination on matters outside the subject matter of his or her direct examination. *See State v. Cazes*, 875 S.W.2d 253, 264-266 (Tenn. 1994), citing with approval, *Lesko v. Lehman*, 925 F.2d 1527, 1542 (3rd Cir.) *cert denied* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 266 (1991).

Those jurisdictions that conclude the privilege is still applicable during post-conviction proceedings include: *People v. Edgeston*, 623 N.E.2d 329, 340 (Ill. 1993) (holding that witness' intent to file post-conviction and seek rescission of plea agreement was not too remote and privilege still applicable); *State v. Creviston*, 646 P.2d 750, 752-53 (Utah 1982) (concluding in dicta that privilege is preserved through post-conviction proceedings); and *Myers v. Sanders*, 526 S.E.2d 320, 326 (W.V. 1999) (holding the privilege applicable in habeas corpus proceedings);

*People v. Villa*, 671 P.2d 971, 973 (Colo. App. 1983)(holding "when a defendant is appealing his conviction, or seeking other post-conviction relief, the privilege continues in order to protect him from the subsequent use of self-incriminating statements in the event relief is granted"); and *Landeverde v. State*, 769 S.2d 457, 464 (Fla.Ct.App. 2000)(explaining in dicta that post-conviction relief is not so remote and the privilege is available). The rationale supporting these holdings that the privilege is still available in post-conviction proceedings is that there is a real risk of future prosecution if relief is granted. *See, e.g., Edgeston*, 623 N.E.2d at 340. By recognizing that the result of post-conviction proceedings – *i.e.* to place the petitioner in the same position he was in before the start of the now void trial - this reasoning-accurately reflects the liberal approach that the United States Supreme Court has applied to the Fifth Amendment right against self-incrimination. When the result of the proceeding is to enable a new prosecution, then the risk is not too remote and certainly is a possibility.

The common theme that unites the reasoning of those court's holding the privilege is no longer available in post-conviction proceedings is a misapplication of United States Supreme Court dicta saying: "It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final." *Mitchell v. United States*, 526 U.S. at 326, 119 S.Ct. at 1314, citing *Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960). In *State v. Johnson-Howell*, 881 P.2d 1288, 1300 (Kan. 1994), the court, without further analysis simply recited the general rule articulated in *Mitchell* and *Reina*. Equally, in *Gall v. Commonwealth*, 702 S.W.2d 37, 45 (Ky. 1986), although holding the petitioner was not permitted to assert the privilege in post- conviction proceeding the

court failed to engage in any analysis of the issue. However, the court in *State v. Barone,* 986 P.2d 5, 20-22 (Or. 1999), did engage the issue and found that a witness who had been convicted, sentenced and completed direct appeal did not retain his Fifth Amendment privilege simply because he **might file** a state post-conviction or federal habeas corpus petition at sometime in the future. The court in *Barone*, articulated the question as "whether a witness, who has been convicted of a crime and has exhausted his direct appeals from that crime, nevertheless possesses a privilege against self-incrimination and may refuse to answer questions about the crime, **if he intends at some time in the future to attack his conviction through post-conviction or habeas corpus proceedings**." *Id.* at 20 (Emphasis added). Under these circumstances the court found that the witness's risk of self-incrimination was "remote and improbable" rather than "real and appreciable" at the time he asserted the privilege. *Id.*

In addressing the witness's expressed intention to seek post-conviction relief in the future, the *Barone* court, finding that this intention did not "render the danger of self-incrimination 'real' and 'appreciable'," reasoned that,

> Defendant in effect argued to the trial court that [the witness] **might in the future** petition for post-conviction or habeas corpus relief, **on some basis unknown to the trial court**; that some or all of [the witness's] claims for relief **might be successful**; that, as a result, [the witness] **might receive a new trial**; and that **his testimony** from defendant's trial **might be used to incriminate him** during that new trial. Those speculations did not-- and do not--establish that [the witness] faced real and appreciable danger of self-incrimination at the time when he was asked to testify. The **possibility of future prosecution** based on his testimony in defendant's trial was **too remote** to resurrect [the witness's] Fifth Amendment privilege.

*Id.* at 21 (Emphasis added).

As is set out below, this analysis is inconsistent with the Fifth Amendment jurisprudence of the

United States Supreme Court which dictates that even a possibility of prosecution triggers the privilege, and, although the *Barone* court used the language of "possibility", the court more precisely was engaged in the improper analysis of determining probability. Moreover, Ms. Pike's case is clearly distinguishable because she has filed a post-conviction petition and, therefore, neither the filing nor the issues presented are speculative.

In *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644 (1896), the Court held that the appropriate analysis to determine whether the Fifth Amendment privilege against self-incrimination remains applicable is to examine whether there is any ***possibility*** the testimony can be used as the basis for a prosecution. *Id.* at 612. The United States Supreme Court has since consistently upheld this expansive interpretation to the circumstances in which the privilege is available. *See*, *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141-1142, 79 L.Ed.2d 409 (1984); *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). Those courts that have declined to apply the privilege against self-incrimination in post-conviction have plainly misapplied the governing standards.

The Supreme Court of the United States has recognized the Fifth Amendment privilege as a basic principle of our legal order that does not permit "men...to be exploited for the necessary information to condemn them before the law." *Culombe v. Connecticut*, 367 U.S. 568, 581-82, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961). As the Supreme Court has explained, the "essence of this basic constitutional principle is 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.'" *Mitchell*, 526 U.S. 314, 326, 119 S.Ct. 1307, 1314, 143 L.Ed.2d 424 (1999) (quoting *Estelle v. Smith*, 451 U.S.

454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (emphasis in original) (quoting *Culombe*, 367 U.S. at 581-582, 81 S.Ct. 1860.)). Because of the importance of this basic principle in our legal order, the Court has held that "[t]his provision...must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486 71 S.Ct. 814, 818 (1951) (citing *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 197 (1892); *Arndstein v. McCarthy*, 254 U.S. 71, 72-73, 41 S.Ct. 26 (1920)). The Tennessee Supreme Court has described the right against self-incrimination as "so fundamental that this right should be protected at all stages of the criminal process." *State v. Munn*, 56 S.W.3d 486, 501 (Tenn. 2001). Moreover, the Court has recognized a three-tiered process in death penalty eases that includes the direct appeal, state post-conviction and federal habeas corpus. *State v. Coe*, 17 S.W.3d 193, 200 n.3 (Tenn. 2000). This recognition that the criminal process includes state post-conviction and federal habeas would be meaningless if a petitioner could be compelled to give evidence against herself during the post-conviction hearing.

As recognized by the *Barone* court, *supra*, the test to determine whether the Fifth Amendment privilege against self-incrimination is available in any given situation is whether the danger of prosecution is "real and appreciable" or "remote and improbable." *See Brown*, 161 U.S. at 599-600, 16 S.Ct. 644. In first articulating this test for the privilege in 1896, the Court explained the limits of the availability of the privilege as follows:

> "[W]e are of the opinion that the danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things; not a danger of an imaginary and unsubstantial character, having reference to some **extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct**. We think that a merely remote and naked possibility, out of the ordinary course of the law, and such as no reasonable man

> would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is no afford to a party, called upon to give evidence in a proceeding inter alios, protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however, remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice."

*Id.* (quoting *Queen v. Bolyes*, 1 B. & S. 311, 321. (1861)) (Emphasis supplied).

The Court has defined "incrimination" in terms of whether an individual's statements may "incriminate" her in a criminal prosecution - not simply statements that tend to disparage or disgrace the witness. *Id.* at 612, 16 S.Ct. 644. In *Brown*, the petitioner was brought before the grand jury during a grand jury investigation to testify about violations of the interstate commerce act by officers of a railway company for which he was the auditor. During questioning, the petitioner refused to answer several questions on the grounds that the responses might tend to incriminate him. The district court held petitioner in contempt and he petitioned for a writ of habeas corpus. *Id.* at 593.

The Court explained that this issue revolves around whether the purpose of the Fifth Amendment protection against self-incrimination is to be interpreted in the broadest sense, as "authorizing the witness to refuse to disclose any fact which might tend to incriminate, disgrace or expose him to unfavorable comments," or in a more limited fashion, "to secure the witness against a criminal prosecution…" *Id.* at 595. The Court began the analysis by examining those situations in which the protection simply does not apply. The Court explained that the privilege does not apply when "the testimony sought *cannot possibly* be used as a basis for, or in aid of, a criminal prosecution against the witness." *Id.* at 597 (emphasis added). These situations include

when a witness waives the privilege; when the statute of limitations has run on any criminal prosecution relating to the testimony; when the testimony merely has the effect of disgracing the witness or bringing the witness into disrepute; and if the witness has "already received a pardon." *Id.* at 597-98.

When the Court decided *Brown*, there were cases that had set some limits on the availability of the privilege. *Id.* at 598 (citing *Commonwealth v. Pratt*, 126 Mass. 462, 2 (Mass. 1879) (witness may waive privilege); *Connors v. People*, 50 N.Y. 240, 242 (N.Y. 1872) (defendant may be cross-examined if taking the stand); *Mahanke v. Cleland*, 76 Iowa 401, 41 N.W. 53, 54 (Iowa 1888) (prosecution barred by statute of limitations); *Queen v. Boyes*, 1 B. & S. 311, 321 (1861) (a pardon prevents the use of the privilege) (other citations omitted)). These limits were all found to be based upon the idea that, if the testimony sought ***cannot possibly be used*** as a basis for, or in aid of, a criminal prosecution against the witness, the rule ceases to apply…" *Id.* at 598 (emphasis added). The United States Supreme Court has consistently used the language of *possibility* and did not use the language of *probability* when articulating the proper analysis that should be used to determine whether the Fifth Amendment privilege is available. *See*, *Mitchell*, 526 U.S. 314 at 326 326, 119 S.Ct. 1307 (holding a guilty plea does not waive the right to assert the Fifth Amendment privilege against self-incrimination at a sentencing hearing); and *Minnesota v. Murphy*, 465 U.S. 420, 435, 104 S.Ct. 1136, 1146 (1984) (explaining the Fifth Amendment applies in "classic penalty" situation–when an individual is forced to incriminate himself in order to prevent imposition of a "penalty" against him).

Federal courts consistently have used the remoteness test to only limit the availability of the right against self-incrimination to situations in which no possibility for incrimination exists.

*See*, *e.g.*, *United States v. Smith*, 245 F.3d 538, 542 (6th Cir. 2001) (recognizing that dismissal of charges bars prosecution and privilege may not be asserted); *Ibarra v. Martin*, 143 F.3d 286, 288-89 (7th Cir. 1998) (holding an acquittal precludes reliance on right against self-incrimination); *Phelps v. U.S. Federal Government,* 15 F.3d 735, 739 (8th Cir.1994) (same); *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 872 (7th Cir. 1979) (explaining statute of limitations is bar to prosecution and privilege against self-incrimination may not be asserted); *United States v. Blumberg*, 787 F.Supp. 67 (S.D.N.Y. 1992) (same); *United States v. Pardo,* 636 F.2d 535, 542 (D.C.Cir.1980) (same); *Lefkowitz v. Turley*, 414 U.S. 70, 81, 94 S.Ct. 316, 324 (1973) (holding a grant of immunity barred prosecution and privilege could not be asserted).

These cases rest on the reasoning that once there "can be no further incrimination, there is no basis for the assertion of the privilege." *Smith*, 245 F.3d at 542 (quoting *Mitchell*, 526 U.S. at 326, 119 S.Ct. 1307.) Significantly, these cases illustrate that federal courts have held the privilege inapplicable only when prosecution is completely barred. Under this approach, the privilege must still be available in post-conviction as the successful petitioner will almost certainly again face prosecution for the same charge.

The purpose of a post-conviction proceeding is to provide a remedy for those individuals who have been unconstitutionally deprived of a fair trial. Because the result of a successful petition is often a new trial – another prosecution – there is certainly a possibility that the petitioner's testimony could be used against him. This premise warrants the availability of the right against self-incrimination. An analysis of the probabilities that the post-conviction petition will result in a new trial is inconsistent with the test articulated by the Supreme Court and unworkable.

Finally, requiring individuals to choose between vindicating a constitutional right through pursuit of a post-conviction petition and the right against self-incrimination creates an unconstitutional Hobson's choice which impermissibly discourages the exercise of constitutional rights. This forced choice is the kind of situation the Supreme Court in *Simmons* held that cannot exist if both constitutional rights are to remain meaningful. *United States v. Simmons*, 390 U.S. at 392-394, 88 S.Ct. at 975-976. The United States Supreme Court has held that "'the availability of the [Fifth Amendment] privilege does not turn on the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the *exposure* which it invites.'" Estelle, 451 U.S. at 462, 101 S.Ct. 1866 (quoting In re Gault, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455 (1967) (emphasis added). The Post-Conviction Procedure Act was passed "solely for the purpose of allowing presentation of error of constitutional dimension, which if true would make the convicting proceedings void." Frazier v. State, 480 S.W.2d 551 (Tenn. Crim. App. 1972). The result of the post-conviction proceeding in which a constitutional violation has been found is to render the conviction void, placing the petitioner in the same position as he was before and enabling a new trial to occur. The remedy for this type of violation contemplates another prosecution. Therefore, holding that the threat of prosecution is too remote to apply the privilege against self-incrimination in post-conviction proceedings is inconsistent with the very purpose of these proceedings.

Further, because the purpose of a post-conviction proceeding is to vacate the conviction when constitutional violations are found to have occurred, giving the prosecution the opportunity to examine the defendant at the post-conviction hearing will transform the defendant's "new" trial into an exercise in futility instead of a fresh new start absent constitutional error. The

prosecution would be fully armed with statements from the defendant as well as potentially indirect leads to evidence the defendant may supply, transforming the defendant into a witness against herself at the subsequent trial. In essence, a post-conviction proceeding could serve as a discovery tool by the prosecution if they are forced to retry a case in which the defendant's constitutional rights were violated with information they could not possibly have obtained in the first proceeding because of the privilege.

Respectfully Submitted,

Donald E. Dawson BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough BPR #18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331

Counsel for Petitioner Tyrone Chalmers

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing Motion has been set by email to Leland Price, Assistant District Attorney General, Office of the District Attorney General, 6th Judicial District, P.O. 1468, Knoxville, Tennessee 37901-1468 on this the 26th day of January, 2006, as well as mailed, first-class postage prepaid.

Donald E. Dawson

FILED
BY MARTHA PHILLIPS CLERK
2006 JUL 26 PM 2:05
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MOTION NOT TO HOUSE MS. PIKE AT**
**KNOX COUNTY PENAL FARM FOR WOMEN**
**OR**
**TO PERMIT OFFICERS EMPLOYED BY THE KNOX COUNTY SHERIFF'S DEPARTMENT TO TRANSPORT MS. PIKE**

Christa Gail Pike, by counsel, for the reasons set forth below, moves this Honorable Court to enter an Order requiring that Ms. Pike not be housed at the Knox County Penal Farm for Women during her required presence at any proceeding in this matter.

Further, Ms. Pike moves this Court to enter an order requiring that Ms. Pike be transported only be employees of the Tennessee Department of Correction.

Prior to the hearing in this Court that took place on February 27, 2006, Ms. Pike filed a motion that she not be housed at the Knox County Penal Farm for Women. That motion was based upon the following information:

1. Ms. Pike and her counsel had learned that there have been both specific and non-specific threats made against Ms. Pike by both staff and inmates at the Knox County facility.

2. Ms. Pike and her counsel have been told that an inmate at the Penal Farm for Women

overheard a corrections officer commenting that "if Christa comes back she needs to be placed in protective custody because there are lots of people who want to hurt her, guards and inmates alike." In addition, a then current inmate at the Knox County Penal Farm, Sonnie Graves, was a student at Job Corps in Knoxville at the time of the incident in this case and was a friend of the victim, Colleen Slemmer. The informant who provided this information to Ms. Pike and her counsel has advised that Ms. Graves told the informant that she plans to do to Christa what Christa did to Colleen.

In order to protect Ms. Pike this Court met with the Knox County Sheriff, who assured this Court that he would be personally responsible for Ms. Pike's safety.

Regardless of this assurance to the Court, Ms. Pike was assaulted while in the custody of Knox County officers. Therefore, it is clear that the Knox County Sheriff has no ability to protect Ms. Pike.

Wherefore, Ms. Pike moves this Court to ensure her safety and to enter an order that her care, both for housing during any mandatory appearance in court and during any transportation to or from court, be provided by employees of the Tennessee Department of Correction.

Respectfully submitted,

Donald E. Dawson, BPR # 10723
Post-Conviction Defender

Catherine Y. Brockenborough, BPR # 18340
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
Tel.: (615) 741-9331
Fax: (615) 741-9430

Counsel for Christa Gail Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing Motion has been set by email to Leland Price, Assistant District Attorney General, Office of the District Attorney General, 6th Judicial District, P.O. 1468, Knoxville, Tennessee 37901-1468 on this the 26th day of January, 2006, as well as mailed, first-class postage prepaid.

Donald E. Dawson

821

FILED
BY MARTHA PHILLIPS, CLERK
2006 JUL 26 PM 2:05
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| **VS.** | ) | |
| | ) | **DEATH PENALTY POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| **Respondent.** | ) | |

## CONSOLIDATED PETITION FOR POST-CONVICTION RELIEF

Petitioner, Christa Pike, through counsel, submits the claims set forth below as those issues on which she intends to rely in her petition for post-conviction relief. As directed by the Court, this pleading consolidates all prior petitions in this matter and incorporates by reference the identifying information for Petitioner's current address, Department of Corrections number and paragraphs 1-15 and 17-22 of Ms. Pike's *pro se* petition in order to satisfy the requirements of Tenn. Sup. Ct. R. 28, § 5(E) and Appendix A.

## PROCEDURAL HISTORY

On the night of January 12, 1995, Colleen Slemmer was beaten and killed. Christa Pike, Tadaryl Shipp, and Shadolla Peterson were each charged with first-degree intentional murder and conspiracy to commit murder. On or about March 15, 1996, Ms. Peterson entered a plea to accessory after the fact and was sentenced to six years imprisonment, which sentence was suspended. Ms. Peterson was placed on probation.

Tadaryl Shipp's case went to trial in January 1997. The jury found him guilty of both charges. Because Mr. Shipp was a juvenile at the time of the murder, he was ineligible for the death penalty. The state sought a sentence of life without the possibility of parole. Following a



274

sentencing trial, the jury sentenced him to life imprisonment for the murder. This Court imposed a consecutive sentence of twenty-five (25) years imprisonment for the conspiracy charge.

Petitioner Christa Pike's trial was in March 1996. The jury convicted her of both charges. Following a sentencing trial, in which the defense called only three witnesses (Trial Transcript, TR Trial, Vol. XXVII, 2483 - Vol. XXIX, 2547.)[1] The jury sentenced the nineteen-year-old to death. For the conspiracy conviction, this Court sentenced Ms. Pike to serve twenty-five years consecutive to her death sentence.

The Court of Criminal Appeals and the Tennessee Supreme Court affirmed Ms. Pike's convictions and sentences. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998). The United States Supreme Court denied her petition for writ of certiorari. *Pike v. Tennessee*, 526 U.S. 1147 (1999). On June 3, 1999, Ms. Pike filed her *pro se* petition for post-conviction relief. The Court appointed the Office of the Post-Conviction Defender to represent her.

**CLAIM I: TRIAL COURT'S VIOLATION OF PETITIONER CHRISTA PIKE'S CONSTITUTIONAL RIGHT TO CONFLICT-FREE COUNSEL**

From the day of his appointment as lead trial counsel for Ms. Pike, through the conclusion of the direct appeal, attorney William Talman proceeded under an actual conflict of interest. The Office of the Comptroller for the State of Tennessee investigated Mr. Talman for over billing the state in his claims for reimbursement from the indigent defense fund for his work in appointed cases. The three criminal court judges for Knox County – including this Court – were interviewed as part of the investigation. The interviews had been conducted by the end of January 1995. The Comptroller's report on the investigation was issued in late May 1995. In the report, Mr. Talman is specifically mentioned as the second most egregious offender in the over

[1] In this petition for post-conviction relief, the record from the trial will be referred to as TR Trial and the volume references will be to the numbering used in the appellate court record.

billing practices, having over billed the Indigent Defense Fund of the Administrative Office of the Courts, from 1990-1993, by a total of $67,027. Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit (hereinafter Comptroller's Report), at 9.

This Court appointed Mr. Talman to represent Ms. Pike on or about May 23, 1995. During a hearing in that matter on February 27, 2006, the Hon. Mary Beth Leibowitz acknowledged having known, at the time she appointed Mr. Talman to represent Ms. Pike that she was aware of the problems involving Mr. Talman's being under investigation for having over billed the indigent defense fund. (PC Transcript, February 27th, 2006 Motions Hearing, Vol. I, at 30-32, Vol. II at 113[2].) On information and belief, the findings of the Comptroller were published in three major Tennessee newspapers – including the *Knoxville News Sentinel* – on June 7, 1995. At no time during the course of pre-trial, trial or post-trial proceedings in Ms. Pike's capital case did this Court inquire of Ms. Pike (1) whether she was aware that Mr. Talman was the subject of a state investigation; (2) whether she was aware that Mr. Talman had been forced to repay this indigent defense fund through the Knox County Office of the District Attorney General more than $60,000 in over billed fees; and (3) whether she waived the conflicts arising from his misconduct. The Court violated Ms. Pike's constitutionally guaranteed right to conflict-free counsel in two ways: first, in failing to ensure that Ms. Pike was informed of the actual conflict of interest infecting Mr. Talman's representation of her and second, by failing to

---

2 In addition to noting, at Vol. II, at 113, that it everyone in Knox County was aware of Mr. Talman's over billing problem the court makes reference to Mr. Talman's also having been appointed during the same period to represent another death sentenced inmate, Mr. Irick, This statement was in error. The Irick represented by Mr. Talman was

obtain from Ms. Pike a knowing and intelligent waiver of the conflict before allowing Mr. Talman to remain on the case.

Further, the Court failed in its duty to ensure that Ms. Pike was made aware of the conflict. If counsel's actual conflict is waivable, the Court failed to explain the conflict to Ms. Pike and enter her waiver on the record. However, Ms. Pike submits that this structural defect in the constitutionality of her trail and direct appeal are not subject to waiver, or, in the alternative, due to her age, prior trauma, abuse and neglect, and her existing mental illness, she was not able to waive this defect even had she been made aware of it and been questioned by the Court with a finding made on the record.

Ms. Pike has not waived this claim. Mr. Talman represented Ms. Pike during the trial proceedings and throughout the direct appeal. Those proceedings ended on June 1, 1999, with the denial by the United States Supreme Court of Ms. Pike's petition for certiorari. The conflict was not resolved until the Tennessee Supreme Court entered its Order of Enforcement on November 24, 1998. Consequently, these post-conviction proceedings present Ms. Pike with the first opportunity to raise this issue. In addition, Ms. Pike submits that the appointment of counsel who was known by the appointing court to be handicapped by a serious conflict of interest is a structural defect in the constitutionality of the trial mechanism and appellate process which defies harmless error analysis and is cognizable for the first time in state post-conviction.

---

Larry Irick, who had filed a pro se petition for a writ of mandamus in a vehicular homicide case and who had previously been represented by Mr. Talman. *See State v. Larry Irick*, 861 S.W.2d 375 (Tenn. Crim. App. 1993.

## CLAIM II. INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

Petitioner's 1996 first degree murder conviction and death sentence and conviction for conspiracy to commit murder are invalid and should be vacated because she did not receive effective assistance of counsel, as required by or necessary to the enforcement of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 6, 8, 9, 16, 17 and 19 of the Tennessee Constitution. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). At trial, Ms. Pike was represented by appointed counsel from the private Knox County, Tennessee bar, William C. Talman (hereinafter, Talman), and Julie Martin (now Julie Martin Rice, hereinafter Rice). Ms. Rice replaced attorney William Brown (hereinafter Brown), whose motion to withdraw was granted by the trial court on January 23, 1996, just 8 weeks before trial. (TR Trial Vol. I at 59-60.) The deficiencies in Counsel's performance and the prejudice resulting from such deficiencies include, but are not limited to, the following:

1. Counsel failed to establish the proper working relationship with Petitioner. Counsel met with Petitioner an insufficient number of times prior to trial and failed to discuss crucial defense matters with Petitioner. Had counsel fulfilled this duty (ABA Def. Funct. 4-3.1; 1989 ABA Death Penalty Guidelines 11.4.2), Petitioner would have been able to provide Counsel with valuable investigative assistance, including the names of witnesses whose testimony would support defense theories and serve as mitigation evidence. Petitioner also would have been able to provide assistance toward Counsel's duty to gather mitigation records by providing the names of individuals, doctors and institutions with which she had contact throughout her childhood and adolescence. Mr. Brown represented Petitioner at her preliminary hearing and remained as co-





278

counsel until he was relieved on January 23, 1996. Yet, aside from a brief consultation around the time of the preliminary hearing, he failed to meet and consult with Petitioner.

2. Counsel failed to adequately prepare for their representation of Petitioner. Counsel failed to properly investigate (ABA Def. Funct. 4-4.1; 1989 ABA Death Penalty Guidelines 11.4.1), including but not limited to the failure to identify, locate and interview all relevant witnesses (1989 ABA Death Penalty Guidelines 11.4.1(D)(1)(3)(a)-(c)), including but not limited to: persons who were in contact with Petitioner around the time of the crime at the Job Corps program – both students and staff; Petitioner's co-defendants; the state's witnesses against Petitioner, law enforcement officers involved in every aspect of Petitioner's case, witnesses familiar with aspects of the client's life history and members of the victim's family. Thomas v. Lockhart, 738 F.2d 304 (8th Cir. 1984).

Had Counsel fulfilled this duty they would have uncovered legitimate defenses for Petitioner including lesser-participation and diminished capacity based on the aggressive and violent history (remote and recent) of the two co-defendants, and the emotional control which co-defendant Shipp exercised over Petitioner. Proper preparation also would have produced valuable evidence tending to impeach the testimony and credibility of the state's witnesses. Proper preparation also would have enabled Counsel to present comprehensive and compelling mitigation evidence, including evidence of Petitioner's traumatic birth and its effects, childhood poverty, parental abandonment, early exposure to violence, crime, drugs and alcohol, and evidence of Petitioner's neurological deficits and mental illness. Although three people were involved in the events that led to Colleen Slemmer's death, only Petitioner received a death sentence. Co-defendant Shipp, a juvenile at the time of the murder, was ineligible for the death penalty. Co-defendant Peterson, whose actual level of involvement has never been made public,

is presently free and clear of the criminal justice system, having entered a plea to accessory after the fact and receiving a suspended sentence of six years. Had Counsel prepared properly, they also would have strengthened Petitioner's position in any plea negotiations. Campbell v. Marshall, 769 F.2d 314, 318 (6th Cir. 1985).

3. Counsel failed to engage in the motions practice necessary to protect Petitioner's rights (ABA Def. Funct. 4-3.6; 1989 ABA Death Penalty Guidelines 11.5.1(B)), including but not limited to:

a) Counsel failed to file pre-trial motions challenging Petitioner's interrogation. Counsel filed no pre-trial motion seeking to suppress evidence (including Petitioner's post-arrest statement), which was obtained by the state in violation of Petitioner's state and federal constitutional rights. Trial counsel should have challenged the custodial statement of Christa Pike by raising as issues the violations of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed2d 694 (1966), and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and the involuntariness of Petitioner's statement. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (determination of voluntariness to be made by judge, or by jury other than jury determining guilt or innocence).

Petitioner's custodial statement was taken in the early morning hours of January 14, 1995. In the hours immediately prior to her arrest and interrogation, Petitioner had consumed large amounts of alcohol and used illicit drugs. Moreover, her ability to make a voluntary statement was impinged by her then existing mental disease or defect. It is evident from that tape recorded statement that she under grave psychiatric or psychological stress at the time the statement was made. Her recorded statement was given in a manic and hysterical tone, and was replete with facts which directly contradicted those details of the crime recounted in the

statements of co-defendants Tadaryl Shipp and Shadolla Peterson. In her statement, Ms. Pike attempts to take all the blame for the series of events leading to the death of Colleen Slemmer. Petitioner would not even provide law enforcement with the name of co-defendant Shipp, who was her boyfriend at the time of the offense.[3] Ms. Pike refers to Shipp, stating: "I don't want to see anything happen to him because I mean he has potential to be somebody and...I don't feel I have just because of everything I've tried and done I've always fucked it up somehow." [4] Petitioner's tape recorded statement was played for the jury in this case, and was a crucial, damaging piece of evidence. In this capital case, with so many reasons to question the voluntariness and reliability of Christa Pike's statement, the failure to move for its suppression cannot be the product of reasonable strategy.

---

[3] Ms. Pike's refusal to reveal the name of either co-defendant and to accept blame for the entire incident is diagnostically consistent with Dr. Engum's diagnosis of borderline personality disorder. Yet, trial counsel inexplicably did not request that Dr. Engum discuss the reliability of Petitioner's statement, in terms of the borderline personality diagnosis. Trial counsel's ineffective preparation and presentation of Dr. Engum is raised herein as a separate constitutional claim of error. Had counsel thoroughly investigated and provided a full and complete social history to Dr. Engum and had counsel utilized Dr. Bernet as a psychiatric expert rather than simply and as a teaching expert in collective aggression, and permitted Drs, Engum, Bernet and McCoy to collaborate on this case, the defense would have developed the diagnosis of bipolar disorder and would have produced both diminished capacity or insanity evidence at the time of trial, Ms. Pike's incompetence to waive her right to remain silent after arrest, and the unreliability of her statement.

[4] January 14, 1995 Statement of Christa Pike, p. 35.

b) Petitioner's counsel also should have asserted as a ground for suppression that the search of her dormitory room violated her state and federal rights constitutional which protect against unreasonable searches and seizures. Had Counsel done so, Petitioner's interrogated statement to police may have been suppressed as the fruit of the poisonous tree.

c) Counsel failed to move for production of the juvenile records of co-defendants Shipp and Peterson. Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Counsel also failed by not asking for court-ordered psychiatric evaluations of these individuals (which the juvenile records of each would have supported). Trial counsel failed to conduct any investigation whatsoever into co-defendants Shipp and Peterson. If counsel had requested the records of Shipp, they would have discovered that he had been committed to a private Memphis, Tennessee mental institution at the age of eleven [11], that he had a propensity for violence toward teenage girls and women, and that he had stalked and threatened girls in his Memphis hometown. Most importantly, Counsel would have learned that Shipp used the adolescent jealousy of teenage girls as his *modus operandi*: to manipulate them and exercise control over them.

d) Counsel failed to file a pre-trial motion seeking a bill of particulars. Tenn. R. Crim. P. 7(c). Had Counsel fulfilled this duty they would have been able to identify evidence supporting viable defense theories possibly resulting in Petitioner's acquittal, conviction of a lesser charge, or a sentence of less than death.

e) Counsel failed to file a motion to withdraw due to actual conflicts of interest in this case. Counsel also failed to request that a guardian *ad litem* be appointed to advise Christa Pike as to counsel's conflicts of interest and the repercussions of same from Talman's representation of her in this capital case.

(i) Through investigation, Petitioner has formed a good faith belief that during the time that Mr. Talman was representing her, the Office of the District Attorney General for the 6th Judicial District was involved in the investigation of William Talman for over billing the Indigent Defense Fund of the Administrative Office of the Courts for his representation in appointed cases. According to a May 1995 report prepared by the State of Tennessee, Comptroller of the Treasury, Department of Audit, the District Attorney for Knox County was involved in the investigation of this over billing and in the collection of funds from William Talman. According to an order entered by the Tennessee Supreme Court, this matter was not concluded until November 24, 1998. Given the dual role of attorney for Ms. Pike and suspect in the over billing matter, Mr. Talman had an actual conflict of interest that affected the zeal with which he represented Ms. Pike.

(ii) While representing Christa Pike at trial and/or while on appeal, William Talman discussed with others the possibility of co-authoring a book on Ms. Pike and her case and encouraged, assisted and facilitated others including Hard Copy and Grey Fox Entertainment in producing video programs or publishing books or articles about Christa Pike and her case. Mr. Talman's interest in publicity or other benefits from the publication or production of the story of Ms. Pike and her trial created an actual conflict of interest which affected the performance of Mr. Talman as counsel for Petitioner.

(iii) Through investigation, Petitioner has developed a good faith belief that Mr. Talman's representation, including the decision not to call Dr. Diana McCoy as a witness in the sentencing phase of the trial, was infected by a conflict of interest. Petitioner has been advised that at least one reason that Dr. McCoy was not called as a witness was Mr. Talman's concern that her testimony would reveal that he had misled the Court concerning when he had received Dr. McCoy's report. Ms. Pike, therefore, contends that Mr. Talman's performance at trial was infected by an actual conflict of interest.

f) Counsel failed to request a continuance when Mr. Brown withdrew less than two months prior to trial. Ms. Rice, who accepted appointment to replace him, had never tried a capital case. Talman acquiesced to the insistence of both the prosecutor and the trial court that the change in counsel not be used as a reason to request a continuance of the trial date. Christa Pike's trial for her life went ahead, as scheduled, on the first trial setting, less than one year after her arraignment.

g) Counsel failed to file a motion to continue the trial of this case after the State on February 26, 1996 (20 days before trial), amended the indictment to include fifty-one (51) additional witnesses, including six (6) witnesses in North Carolina, two (2) in Georgia, and numerous others in far-western Tennessee. Brown v. State, 553 S.W.2d 94 (Tenn. Crim. App. 1977); State v. Covington, 845 S.W.2d 784 (Tenn. Crim. App. 1992). Had Counsel fulfilled this duty they could have used the additional time to meet the State's proof, investigate and prepare legal arguments supportive of defense theories and mitigation.

h) Counsel failed to file motions seeking to challenge the facial constitutionality of the heinous, atrocious or cruel aggravating circumstance.

i) Counsel failed to challenge the avoid arrest aggravating circumstance as unconstitutional, both on its face and as applied to the facts of this case.

j) Counsel failed to file a motion for the State to elect which theory it would present at trial, to wit: whether they would seek a conviction for conspiracy to commit murder, or would attempt to prove the avoid arrest aggravating circumstance. The two theories are logically and legally inconsistent. The jury in this case convicted Ms. Pike of conspiracy to commit murder, and also found the avoid arrest aggravating circumstance in this case.

k) Counsel failed to file a motion for exculpatory evidence. A motion should have been filed for the production of: the identification of all law enforcement officers involved in the case, all police reports, exculpatory evidence (particularly the statements of eye-witnesses), evidence material to Petitioner's sentence, and evidence of a promise of leniency toward a state witness(es). Tenn. R. Crim. P. 16; Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) Brady v. Maryland, 373 U.S. 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 S.Ct. L.Ed.2d 305 (1986).

l) Counsel failed to file a motion seeking information regarding the decedent, Colleen Slemmer, in this case, including information concerning her relationships with each of the three co-defendants.

4. Counsel were ineffective both for failing to file motions in a timely manner and for failing to ensure that they were heard in a timely manner. The majority of the motions that were

filed in this case were heard immediately prior to the start of the trial, far too late to allow counsel to devise strategy depending upon the outcome of motion practice. Counsel also failed to adequately cite federal and state constitutional bases for positions taken in the motions.

5. Counsel failed to obtain and use experts in a manner consistent with effective representation. The expert testimony Counsel presented at the guilt/innocence phase of trial was presented in such a poor manner as to constitute sub-standard performance. Furthermore, Counsel failed to call any experts at the sentencing trial.

a) The testimony of psychologist Dr. Eric Engum at the guilt phase failed to establish Petitioner's diminished capacity or insanity at the time of the offense. Dr. Engum had not been prepared by counsel to testify on this issue, with one of the main deficiencies in preparation being that trial counsel had never investigated Petitioner's actual degree of participation relative to the participation of Shipp and Peterson. Trial counsel accepted Petitioner's interrogated statement at face value as true, and never raised any question as to Ms. Pike's degree of participation in preparing Dr. Engum for trial. As a result, the cross-examination of Dr. Engum elicited that Ms. Pike's participation, as described in her statement, was premeditated:

> On cross-examination, Dr. Engum stated that there was no question that the defendant had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

*State v. Pike*, 978 S.W.2d 904, 912 (Tenn.1998). Had trial counsel conducted an investigation into the circumstances surrounding the crime and the relative participation of the two co-defendants, Dr. Engum would have been equipped to fend off the State's cross-examination. The questions asked by the State on cross-examination focus upon the version of events in petitioner's interrogated statement. If trial counsel had fulfilled their duty to investigate the circumstances of the crime, Dr. Engum likely would have been able to offer an unrebuttable professional opinion that Ms. Pike suffered from a mental illness resulting in diminished capacity at the time of the crime, and that her exaggerated statement of her own participation was consistent with, and symptomatic of, Dr. Engum's diagnosis of borderline personality disorder.

b) Had counsel properly informed Dr. Engum of Ms. Pike's full social history and her behavior at the time of the offense, Dr. Engum could have reached the conclusion that Ms. Pike suffered from bipolar illness rather than or in addition to borderline personality disorder. Dr. Engum's work was further compromised by the failure of counsel to use Dr. Bernet in his capacity as a psychiatrist and counsel's failure to ensure that Drs. Engum, Bernet and McCoy collaborated concerning Ms. Pike's mental health. Had counsel properly utilized these experts it would have enhanced the proof both of a defense in the guilt/innocence phase and also provided additional mitigation in the sentencing phase. Had counsel done so, Ms. Pike either would not have been convicted of first degree murder or would have not been sentenced to death.

c) Ineffective Use of Psychiatrist William Bernet, M.D.: Counsel failed to prepare for trial by researching and attempting to understand the proper and effective use of a psychiatrist as an expert witness in the following ways:

(i) Counsel failed to develop a strategy of how to effectively use Dr. Bernet, including but not limited to:

(a) failing to distinguish between an expert on Satanism and an expert in forensic psychiatry who had studied the differences between satanic ritual abuse, and behaviors that are often confused with ritual abuse, but are actually examples of collective aggression. As a result of this failure, counsel allowed the State to characterize Dr. Bernet as an expert in Satanism. Subsequently, Dr. Bernet, in answer to a question by the prosecutor, indicated that he was not an expert in Satanist theology (Tr. 2352, "I'm not holding myself out to be an expert in satanic theology"). On redirect, counsel for Ms. Pike undermined that answer by insisting that Dr. Bernet was an expert in satanic theology (TR Trial Vol. XXVII, at 2356, "Now, you had said that you are an expert in satanic theology. What is satanic theology"); and

(b) failing to determine prior to putting Dr. Bernet on the witness stand whether to use him to attempt to undermine the State's theory that this was first degree murder by showing that Ms. Pike could not have developed the necessary intent, premeditation or deliberation[5] to constitute first degree murder. This is evidenced by Mr. Talman's question to Dr. Bernet, "have you formed an opinion with a reasonable degree of medical

[5] In 1995, this language was changed to read "a premeditated and intentional killing of another" and defining premeditation as "an act done after the exercise of reflection and judgment." T.C.A. §39-13-202 [1991] amended by Acts 1995, ch. 460, §4, effective July 1, 1995.

or psychiatric certainty as to Ms. Pike's ability on that evening to form intent, premeditation, or deliberation?" To which Dr. Bernet answers, "Ah, not having interviewed her, and with the limited information I have, I, I do not have an opinion with that degree of certainty." (TR Trial Vol. XXVII at 2318.)

(ii) Counsel failed to obtain for or provide to Dr. Willian Bernet all pertinent information that would have enabled him to be prepared for his testimony, including but not limited to:

(a) the statements of codefendants Tadaryl Shipp and Shadolla Peterson;

(b) all prior juvenile court records, school records and psychological and psychiatric treatment records pertaining to Tadaryl Shipp; such records would have been necessary for Dr. Bernet to be prepared to testify concerning the respective roles in the relationship between Tadaryl Shipp and Christa Pike;

(c) all prior juvenile, criminal, educational, psychiatric and psychological records pertaining to Shadolla Peterson; such records were necessary to inform Dr. Bernet concerning Ms. Peterson's role in the offense; and

(d) a social history of Christa Pike, Tadaryl Shipp, Shadolla Peterson and Colleen Slemmer in order to enable Dr. Bernet to better understand the relationship between these individuals in order to support his conclusion of "collective aggression".

(iii) Counsel failed to effectively utilize the services of the defense psychiatric expert by failing to provide him with an opportunity to interview and evaluate Christa Pike. Such an evaluation which would have been necessary to make a determination of her mental state at the time that Colleen Slemmer was killed.

(iv) Counsel failed to conduct a sufficient investigation and to provide the mental health experts with sufficient information about Ms. Pike to permit their concluding that Ms. Pike suffered from a manic-depressive, bipolar, illness.

6. Mr. Talman, lead counsel for Ms. Pike, was ineffective for operating under an actual conflict of interest in that, at the time of Petitioner's trial, he was the subject of an ongoing investigation by the Administrative Office of the Courts, State Bar Association, and the Knox and Davidson County District Attorney General's office for over-billing the state for his representation of indigent defendants. At the time that Mr. Talman was representing Ms. Pike in a trial for her life, he was burdened by the following actual conflicts of interest which affected his representation of Ms. Pike in violation of the principles set out in Cuyler v. Sullivan, 446 U.S. 335, 349-350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)(if actual conflict adversely affected performance then no requirement to prove prejudice) and Wood v. Georgia, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981)(right to counsel of undivided loyalty).

(i) Through investigation, Petitioner has formed a good faith belief that during the time that Mr. Talman was representing her, the Office of the District Attorney General for the 6th Judicial District was involved in the investigation of William Talman for over billing the Indigent Defense Fund of the Administrative Office of the Courts for his representation in appointed cases. According to a May 1995 report prepared by the State of

Tennessee, Comptroller of the Treasury, Department of Audit, the District Attorney for Knox County was involved in the investigation of this over billing and in the collection of funds from William Talman. According to an order entered by the Tennessee Supreme Court, this matter was not concluded until November 24, 1998. Given the dual role of attorney for Ms. Pike and suspect in the over billing matter, Mr. Talman had an actual conflict of interest that affected the zeal with which he represented Ms. Pike.

(ii) While representing Christa Pike at trial and/or while on appeal, William Talman discussed with others the possibility of co-authoring a book on Ms. Pike and her case and encouraged, assisted and facilitated others including Hard Copy and Grey Fox Entertainment in producing video programs or publishing books or articles about Christa Pike and her case. Mr. Talman's interest in publicity or other benefits from the publication or production of the story of Ms. Pike and her trial created an actual conflict of interest which affected the performance of Mr. Talman as counsel for Petitioner.

(iii) Through investigation, Petitioner has developed a good faith belief that Mr. Talman's representation, including the decision not to call Dr. McCoy as a witness in the sentencing phase of the trial, was infected by a conflict of interest. Petitioner has been advised that at least one reason that Dr. McCoy was not called as a witness was Mr. Talman's concern that her testimony would reveal that he had misled the Court concerning when he

had received Dr. McCoy's report. Petitioner, therefore, contends that Mr. Talman's performance at trial was inffected by an actual conflict of interest.

7. Counsel were ineffective in their voir dire of prospective jurors, including death-qualification, life-qualification, issues of race and inter-racial relationships, attitudes about Job Corps and Job Corps participants, and knowledge of or opinion about Mr. Talman's over billing problem:

a) Counsel failed to conduct an adequate voir dire, especially with respect to the death qualification of the jurors. Counsel failed to object to the exclusion of jurors who held general opposition to the death penalty and failed to properly voir dire those jurors in an effort to rehabilitate them as viable panelists. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Had Counsel fulfilled this duty, Petitioner's jury would have been composed of a fair cross-section of society, including those with reservations about capital punishment.

b) Counsel failed to exclude jurors whose opinions would lead them to not listen to or give effect to mitigating evidence. Counsel failed to conduct an adequate voir dire on the meaning of mitigating circumstances with the entire venire pursuant to Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) and Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

c) Counsel failed to voir dire jurors for racial bias. Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). The proof at trial would bring out that Petitioner, a Caucasian female, was involved in a sexual relationship with co-defendant Tadaryl Shipp, who is African-

American. The prospective jurors should have been questioned as to their views on race issues, particularly on the controversial issue of inter-racial relationships. Had Counsel fulfilled this duty, they would have been able to empanel a jury free from the taint of racial biases.

d) Counsel failed to question prospective jurors regarding what they had heard about counsel Talman's well publicized ongoing investigation by the Board of Professional Responsibilty, the Knox and Davidson County District Attorneys General's Offices and the Comptroller of the Treasury. Talman was being investigated for over-billing the courts and ultimately the taxpayers of Tennessee in his representation of indigent defendants.

e) Counsel's general voir dire failed to ask questions that would elicit for the venire any matters of substance that would assist them in making peremptory challenges.

f) Counsel failed to effectively utilize their jury consultant during the voir dire and jury selection and their questions asked during general voir dire failed to develop useful information that would have assisted the jury consultant in assisting with the exercise of peremptory challenges.

g) Counsel failed to object to the state's discriminatory use of its peremptory challenges to strike African-Americans, women, poor people or the unemployed, and other cognizable groups. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Butler, 795 S.W.2d 680 (Tenn. Crim. App. 1990). All but one juror was Caucasian. The lone African-American juror was ultimately designated as an alternate. The composition of the jury that ultimately convicted and sentenced Ms. Pike was constitutionally infirm. Had Counsel fulfilled their duty, the jury in Petitioner's case would have represented a fair cross-section of the community.

h) Counsel failed to object to the State's questions regarding whether the juror would be influenced not to impose the death penalty due to Petitioner's age. Moreover, Counsel failed to assert that Petitioner's age was a statutory mitigating factor, which alone could have been found be the jury to justify a sentence other than death.

i) Trial counsel provided ineffective assistance of counsel by their failure to object to he ease at which the Court excused jurors do to personal concerns. During the opening portion of the voir dire of each panel of jurors the Court excused jurors for little or no reason. Essentially all a juror was required to say was that serving on the jury would be inconvenient. The result of this practice was that the jury was not composed of a fair cross-section of the community but rather only those who were interested enough in being jurors in a death penalty trial to set aside their personal concerns for a two to three week period. The result was a jury that was more likely to be both conviction prone and death penalty prone.

9. Trial counsel were ineffective for failing to investigate or present evidence of petitioner's diminished capacity and state of mind around the time of the offense. This investigation would have produced evidence of Shipp's control over petitioner, generally and at the time of this offense. This investigation would have supported Dr. Engum's diagnosis of petitioner as suffering from borderline personality disorder and would have supported that she acted with diminished capacity at the time of the offense. Counsel provided ineffective assistance by their failure to develop and present substantial evidence that Ms. Pike, at the time of the killing of Ms. Slemmer, was under the influence and substantial domination of Tadaryl Shipp. Insight into the control of Petitioner by her codefendant was available to counsel. This material could have been presented to the jury through Dr. McCoy, or through the material collected by Dr. McCoy had that information been provided to Dr. Engum, and Dr. Bernet.

Further evidence demonstrating the control and influence exercised by Mr. Shipp on Ms. Pike was available through additional investigation concerning both Mr. Shipp's and Ms. Pike's background, including but not limited to juvenile records, mental health records, school records, job corps records, and interviews with family, friends, teachers and others who were familiar with these individuals. Through the use of such evidence counsel could have laid a foundation to argue diminished capacity or insanity at the time of the offense and to challenge the state's theory underpinning the conspiracy charge. Moreover, such evidence would have supported Dr. Bernet's theory regarding "collective aggression." Finally, such evidence would have supported an instruction at sentencing concerning the statutory mitigating factor that Ms. Pike "acted ... under the substantial domination of another person." (T.C.A. 39-13-204(j)(6).)

10. Counsel were ineffective in the penalty phase of petitioner's trial for not presenting expert testimony or lay testimony on compelling mitigation in petitioner's life history.

(a) Counsel did not present expert testimony regarding Christa Pike's life history, although there was a wealth of information available to counsel which would have provided significant reasons for the jury to spare her life. Counsel did not give meaning to Dr. Engum's testimony in the guilt phase regarding Christa Pike's borderline personality disorder, although there was substantial evidence from which to do so. For instance, counsel was aware of petitioner having been sexually abused and the victim of childhood rape. The incidence of sexual abuse trauma in adults with borderline personality disorder is estimated to range from 60 to 80 percent.[6] In addition to this statistical correlation, borderline personality disorder is listed as one of

[6] E. Bleiberg, M.D., Identity Problems and Borderline Disorders, in Comprehensive Textbook of Psychiatry, 6th Ed., H. Kaplan and M. Sadock, Eds.(1995), p. 2489.

the indicators of child sexual abuse.[7] There was no testimony before the jury of these traumatic abuse incidents or their effects upon development and functioning.

(b) Trial counsel provided ineffective assistance by failing to request that mitigation specialist Diana McCoy, Ph.D., testify to the sentencing jury regarding Christa Pike's developmental history.

(c) Counsel's failure to call Dr. McCoy was the result of an actual conflict of interest. Further, counsel was ineffective for providing to the State Dr. McCoy's voluminous social history of petitioner as a replacement for having Dr. McCoy prepare a report, pursuant to Rule 16, Tenn. R. Crim. P. In light of counsel's failure to call Dr. McCoy as an expert witness, the giving of her social history notes and documents to the State was particularly egregious and harmful to Ms. Pike. This failure was made all the more damaging to Ms. Pike due to counsel's ill advised earlier decision to rely exclusively on Dr. McCoy's testimony to present the mitigation evidence rather than to subpoena friends, family and other mitigation witnesses and present the testimony through available lay witnesses with substantial knowledge of Ms. Pike's life and professional witnesses who had taught, treated or otherwise been involved with Ms. Pike during her childhood and adolescence.

(d) Trial counsel's assistance was ineffective due to the failure to call a sufficient number of lay witnesses to support the mitigation evidence that had been developed through Dr. McCoy's investigation. This lay testimony was required even if counsel had also called Dr. McCoy as a witness and was indispensable in light of counsel's failure to call Dr. McCoy.

(e) Trial counsel failed to prepare the few witnesses who were called at the penalty phase for their testimony. Through petitioner's birth-father Glen Pike, counsel elicited information

[7] J. Young, M.D., D. Kaplan, Ph.D., et al, Psychiatric Examination of the Infant, Child and Adolescent, in in Comprehensive Textbook of Psychiatry, 6th Ed., H. Kaplan and M. Sadock, Eds.(1995), p 2178.

on direct examination which not only was not mitigation, but provided a non-statutory aggravating circumstance in this case. Mr. Pike told the jury that petitioner had been suspected by his wife of sexually molesting their daughter, Ms. Pike's half-sister. Counsel had done no investigation of this alleged incident. The decision to call this witness was not the result of strategy, but of counsel's basic failure to prepare their mitigation witnesses.

(f) Counsel's penalty phase presentation was woefully inadequate, and did not provide an accurate or informed view of petitioner's traumatic life history. If counsel had presented the information available to them, the sentencing jury would have had significant mitigation evidence in support of a sentence less than death. As it stood at the end of the penalty phase proceedings, the sentencing jury had no information regarding the numerous traumatic events that eighteen year old Chrita Pike had suffered through in life. If evidence of these events had reached the sentencing jury, they would not have sentenced Christa Pike to death.

(g) Trial counsel failed to utilize the services of Dr. Engum in the penalty phase. Had counsel effectively used Dr. Engum, the defense could have presented evidence on the connection between Ms. Pike's childhood trauma and the offense. Moreover, had Dr. Engum been provided a full social history he would have understood and been able to present evidence of Ms. Pike's bipolar illness and its role in the offense. Had counsel thus enabled Dr. Engum, Ms. Pike would have either not been convicted of first degree murder or, if convicted, not sentence to death.

(i) Along with counsel's failure to explain the effect of traumatic childhood and adolescent events upon Ms. Pike, counsel failed to inform the jury of Christa Pike's medical problems, which had begun *in utero* and affected her birth and development. The prejudice from counsel's failure to have Dr. Bernet, a medical doctor, evaluate petitioner is again evident in the penalty phase where no medical or physiological evidence was presented to the jury to explain Christa Pike's development and behavior.

11. Counsel failed to be aware (through experience, training or research) of the law applicable to Petitioner's case, as evidenced by the deficiencies in counsel's performance outlined in this petition. Had counsel fulfilled this duty (ABA Def. Funct. 4-3.8; 1989 ABA Death Penalty Guidelines 9.1) they would have prepared and presented the legitimate defenses available to Petitioner. Counsel also would have presented adequate mitigation on Petitioner's behalf.

12. Counsel rendered ineffective assistance of counsel regarding the jury instructions in both the guilt/innocence phase and the penalty phase of Ms. Pike's trial:

(a) by failing to object to that portion of the conspiracy to commit first degree murder instruction that stated, in defining first degree murder, that "premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided." (TR Trial Vol. XXVIII at 2433.) While this part of the instruction is necessary in the instruction on first degree murder itself, it is both inconsistent with the State's theory of conspiracy in this case and with any evidence supporting conspiracy in this case. The State, by the proof presented, advanced two theories of first degree murder in this case. First, it suggested that the murder was planned by Ms. Pike and her co-defendants prior to inviting Ms. Slemmer to join them the evening of the crime. If the jury accepted this theory then it would support the State's theory of a conspiracy. The second theory of first degree murder advanced by the prosecution was that during the course of the assault on Ms. Slemmer, Ms. Pike formed the intent to kill and then after a period of reflection (when she went to see if a noise she heard was someone else in the area) she carried out the intent to kill.



Case 1:12-cv-00035-HSM-SKL Document 9-2 Filed 08/01/12 Page 156 of 157 PageID #: 4080

This theory is inconsistent with the State's theory of conspiracy and yet this instruction invites the jury to find that both the intent to kill and the conspiracy to kill were formed during the assault on Ms. Slemmer;

(b) by failing to object at trial to the instruction that equated "reasonable doubt" with "moral certainty";

(c) by failing to object to instructions which required the jury to presume the truthfulness of witnesses, thereby violating the jury's prerogative to assess the credibility of witnesses and determine the facts;

(d) by failing to object to an instruction that misstated the role of the finding of an aggravating factor by the jury, in that, after instructing the jury as to the heinous, atrocious or cruel aggravating factor and the interfering with arrest aggravating factor, the Court stated, "You shall not take into account of any other facts or circumstances as the basis for deciding whether the death penalty or imprisonment for life without parole would be appropriate punishment in this case."[8] (TR Trial Vol. XXIX at 2578.) (emphasis added). By suggesting that finding an aggravating factor beyond a reasonable doubt makes the death penalty or life without parole "appropriate" rather than simply making the Petitioner eligible to receive a penalty of death or life without parole, prejudices the Petitioner by creating a presumption that death or life without parole is the "appropriate" sentence in this case, thus shifting the burden to the Petitioner to prove by mitigating evidence that such sentence is not the "appropriate" sentence.

[8] This instruction as given by the Court was in conformity with the T.P.I.-Crim. Intruction 7.04(a).