UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 4**

**DOCUMENT 4**

---

E2001-00016-CCA-R3-PD

004206

IV

VOLUME IV OF V

# TECHNICAL RECORD

NO. 68280

DEFENDANT: CHRISTA GAIL PIKE, PETITIONER
(Defendant Indigent)

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGDougal

## APPEALED FROM

## KNOX COUNTY CRIMINAL COURT

## AT KNOXVILLE, TENNESSEE

HON. MARY BETH LEIBOWITZ JUDGE – DIVISION III

JOY R. MCCROSKEY CLERK

IN THE CASE OF

CHRISTA GAIL PIKE, PETITIONER

VS.

STATE OF TENNESSEE, RESPONDENT

PETITION DISMISSED

CHARGE: PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

## TO THE

## COURT OF CRIMINAL APPEALS

## KNOXVILLE, TENNESSEE

HONORABLE DONALD DAWSON, Attorney -at- Law
530 Church Street
Suite 600
Nashville, TN 37243

Attorneys for Appellant

HONORABLE RANDALL E. NICHOLS, District Attorney General
HONORABLE LELAND PRICE, Assistant Attorney General
City County Building
Knoxville, TN 37902

Attorneys for Appellee

FILED 3 DAY OF April 2009

CRIMINAL COURT JOY R. MCCROSKEY CLERK

NO. 68280 SHEILA MELTABARGER DEP. CLERK

APPELLANT PRISON NO. 2612368
3881 Stewarts Lane
Nashville, TN 37243

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION THREE**

FILED 2000 SEP 22 PM 2:15 KNOX COUNTY CRIMINAL COURT KNOXVILLE, TN

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| Petitioner, | ) | CASE NO. 68280 |
| VS. | ) | |
| | ) | DEATH PENALTY POST-CONVICTION |
| STATE OF TENNESSEE, | ) | |
| Respondent. | ) | |

# PETITIONER'S POST-CONVICTION CLOSING ARGUMENT

Petitioner, Christa Gail Pike, through counsel, respectfully submits at the close of the evidentiary portion of her post-conviction hearing the following closing argument, which summarizes the evidence, statutory law and case law that supports her many grounds upon which relief must be granted. Most clearly, the evidence presented during post-conviction conclusively establishes that Ms. Pike's trial counsel provided constitutionally ineffective assistance of counsel as a result of an actual conflict of interest which substantially prejudiced the outcome of Ms. Pike's trial.

## I. Christa Gail Pike - The Person About Whom the Jury Was Never Informed



Christa Pike was born in Beckley, West Virginia, on March 10, 1976. Prior to birth, her developing brain was damaged when the migration of specific cells was interrupted creating what is

know as a heterotopia. While the cause is not specifically known, the most likely cause was her mother's ingestion of alcoholic beverages during pregnancy. Her mother, Carissa Hansen, loved to party and would always put her needs above those of her daughter. Her father, Glenn Pike, was a Vietnam Veteran who was subjected to Agent Orange and who would spend his life chronically unemployed or underemployed. To him, discipline meant severe spankings, often numerous times a day and often out of control.

Regrettably, the insults to Ms. Pike's developing brain did not end with the damage caused during gestation. She was neglected by her parents, who divorced soon after her birth, remarried and then divorced again. Christa spent a considerable amount of time with her paternal grandmother, and she thought her maternal grandmother was the only person who loved and cared about her. Christa was devastated when Grandmother Pike died when Christa was 12 years old. Christa was also raised by her maternal grandparents. Her maternal grandmother, Zola Fotos, was already responsible for raising Christa's half sister, Alicia. Grandmother Fotos, herself an alcoholic, resented being saddled with yet a second of Carissa's children. Zola Fotos made it clear to Christa that she did not want Christa. While with her maternal grandparents, Christa Pike was psychologically and physically abused. She was also inappropriately exposed to the slaughter of animals. Grandfather Fotos ran a small slaughterhouse and permitted Christa, even as a toddler, to watch the slaughter and play in the "gut bucket".

Additional damaging insult to Ms. Pike's immature brain involved watching age inappropriate horror movies, such as the Reanimator and Mutilator, with her mother while Christa was still in grammar school and then using the same movies for baby sitters while Mom was away. Carissa's many boyfriends and husbands physically, sexually and psychologically

abused young Christa. At one point, a husband informed Carissa that she had to choose between him and Christa - Christa was sent to live with her father. Christa was raped by a stranger when she was 11 years old and again when she was 17, thus destroying any hope of psychological stability. Ms. Pike was a young woman whose options in life and hope for a healthy future were taken from her by those who were legally and morally obligated to protect her. During the trial for her life, those who were again legally obligated to protect her, Mr. Talman and Ms. Rice, let her down by failing to provide this information to the jury.

## A. Christa Pike's Mental Problems Began in the Womb as a Result of a Heterotopic Lesion Caused by her Mother's Alcoholism and Disregard for her Unborn Child.

### 1. Heterotopia

Christa Pike suffers from a condition called heterotopia, a neurological disorder wherein certain brain cells do not migrate to the proper place during fetal development. Dr. Jonathan Pincus testified before this Court concerning Ms. Pike's condition. (TR PC January, 2007 PCR Proceedings Vol. III at 206.)

Dr. Pincus's diagnosis of Christa's heterotopia is important for three reasons:

First, the diagnosis of heterotopia in Christa's case is based entirely upon objective findings. The MRI findings are incontrovertible and indicate that there is a lesion in the front part of Christa's brain. (TR PC January, 2007 PCR Proceedings Vol. III at 238.) This lesion was also present in the EEG taken when Christa suffered seizures at the age of 14 months. (*Id.* at 240.) In fact, the seizures, according to Dr. Pincus, were probably caused by the heterotopia. (*Id.* at 245.) It is significant that the heterotopic lesion was large enough to be imaged on the MRI. (*Id.* at 244.) Dr. Pincus told the court that such a lesion is rare, and indicates that there is a

lot more heterotopia that you cannot see on the MRI, indicating a severe case of heterotopia with pronounced impairments. (*Id.* at 245.)

Christa's heterotopia was also diagnosed through the implementation of objective neurological testing. Dr. Pincus explained that Christa suffered from hyperflexia, where the deep tendon reflexes are too active. (*Id.* at 231.) Hyperflexia is indicative of heterotopia, as is "spooning" of an individual's hands or fingers, such as exhibited by Christa Pike. (*Id.* at 233.) Furthermore, Dr. Pincus testified that Christa suffered choreiform movements (she could not hold her hands still when asked to hold them straight out in front of her) (*Id.* at 234) and irregularities in her nucocephalic reflex (her head did not follow her shoulders when her shoulders were turned from left to right with her eyes closed). (*Id.* at 237.) Dr. Pincus testified that all of these clinical findings were consistent with Christa Pike experiencing deficits with the basal ganglia (gray matter masses in the brain that influence movement and thinking). (*Id.* at 240.)

The diagnosis of heterotopia is also important because it directly contradicts the testimony by Dr. Engum at trial. Dr. Engum unequivocally testified to the jury at Christa's original trial that she suffered no brain damage. (*Id.* at 248.) It is clear from Dr. Pincus's testing and diagnosis that Dr. Engum overstated the results of his testing. (*Id.* at 250.) Dr. Pincus told this Court that Dr. Engum could have only testified properly that his testing did not reveal any brain damage, not that no brain damage existed. (*Id.* at 284.) Although Dr. Engum's psychological discipline, neuropsychology testing, failed to find the brain damage, Dr. Pincus's medical discipline, neurology, did identify the damage. Consequently, Dr. Engum overstated the ability of neuropsychological testing to diagnose brain damage when he testified to the jury. Nonetheless, Dr. Engum's testimony left the jurors with a misleading and harmful impression.

Finally, the diagnosis of heterotopia is significant because, as Dr. Pincus explained to this Court, the area of Christa's brain that is damaged by her heterotopia is that area of the brain that affects her moral and ethical decision-making (executive functioning), the frontal lobe. (*Id.* at 243.) Dr. Pincus said that there are two components to "morality" -- 1) a child must be exposed to the right social influences (as we will discuss later, Christa Pike clearly was not) and, 2) the child must have a place to encode the social lessons. (*Id.* at 243.) Christa Pike's damaged frontal lobe did not provide a good place for proper moral imprinting. (*Id.* at 243.) Thus, through no fault of her own, before she was born Christa already suffered from a condition that would severely limit her ability to make moral and ethical decisions, and to control her own behavior.

**2. Prenatal Neglect caused Christa Pike's Heterotopia.**

Ms. Pike also suffered pre-natal neglect in the form of exposure to alcohol. Her mother, Carissa Hansen, was a self-absorbed alcoholic, and the evidence strongly suggests that Ms. Hansen made no effort to limit her drinking while pregnant with Christa. Ms. Pike's father, Glenn Pike, testified that he did not remember Carissa slowing her drinking anytime during their marriage, a period which included her pregnancy with Christa. (TR PC January, 2007 PCR Proceedings Vol. V at 438.) He testified that Carissa was a heavy drinker, drinking as many as ten drinks during a night when they would frequent nightclubs or while playing cards with friends. (TR PC January, 2007 PCR Proceedings Vol. V at 437.)

There is other ample evidence on the record to support the proposition that Carissa Hansen was and is an alcoholic. For instance, Ms. Hansen's oldest child, Alicia Wills, testified that she recalls that Ms. Hansen always drank a lot and that she often attended parties where there was drinking when her children were small. (TR PC January, 2007 PCR Proceedings Vol. IV at 375.) She went on to testify that, while food was sometimes scarce, Ms. Hansen always

had alcohol available in her home. (*Id.* at 380.) Her sister, Carrie Ross, testified at the post-conviction hearing that Ms. Hansen drank a lot as she approached adulthood, and that Ms. Hansen continues to drink to this day. (TR PC January, 2007 PCR Proceedings Vol. II at 166-167.) She further testified that Carissa Hansen's heavy drinking began when she was a teenager. (*Id.* at 167.)

Further evidence of Ms. Hansen's alcoholism is on the record. This Court heard sworn testimony from Faye Guy, a close friend of Carissa Hansen, who discussed Ms. Hansen's problems with alcohol in more detail. She recalled that she and some of the other people at work would get together with Ms. Hansen for picnics and beach outings. There was always alcohol present at these gatherings, and Ms. Hansen always overindulged at each of these gatherings. Ms. Hansen never showed any concern about getting drunk in front of her children. (TR PC January, 2007 PCR Proceedings Vol. V at 487.) Ms. Hansen also was drunk at Ms. Guy's wedding rehearsal and ceremony, even though she was designated as the maid of honor. (*Id.* at 499.) The extent to which she was intoxicated that weekend is underscored by Ms. Guy's testimony that on two occasions at the rehearsal dinner that night Ms. Hansen was caught having sex with the brother of the groom in a bathroom. (*Id.* at 499.)

This court also heard the opinion of Dr. Jonathan Pincus, a world renowned neurologist and someone who has treated hundreds of patients with alcoholism, regarding his observations of Ms. Hansen and his opinion about her relationship with alcohol. (TR PC January, 2007 PCR Proceedings Vol. III at 261.) He testified that Ms. Hansen is still an alcoholic. He reported that he saw her drinking wine in the cafeteria during the post-conviction hearing before she reported to him that she had consumed three rum and cokes prior to their meeting. (*Id.* at 261.)



Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 8 of 150 PageID #: 4242

Apart from anecdotal testimony, this Court heard evidence at the post-conviction hearing that was strongly indicative of Ms. Hansen's alcohol problems during her pregnancy with Christa and her prenatal neglect through alcohol abuse. As mentioned above, Dr. Pincus's uncontroverted testimony is that Ms. Pike was born with heterotopia, which Dr. Pincus explained was a congenital brain defect most often caused by the use of alcohol during pregnancy. (*Id.*, 242.) Additionally, this court has heard testimony of Carissa Hansen's sister and Ms. Pike's aunt, Carrie Ross, who explained that Christa's cesarean section birth was very traumatic, and that Christa was very unhealthy upon birth. (TR PC January, 2007 PCR Proceedings Vol. II at 148.) In fact, Christa spent several days in neonatal intensive care, starting her life as she would live it: alone and separated from any meaningful, caring contact. Further evidence of Ms. Pike's prenatal neglect was a severe seizure at the age of 14 months, which, he testified, was likely the result of heterotopia (see below). (TR PC January, 2007 PCR Proceedings Vol. III at 242.)

### B. Christa Pike at the Time of this Crime was Suffering from Complex Posttraumatic Stress Disorder Caused by the Trauma and Isolation of her Heartbreaking Childhood.

The prenatal neglect suffered by Ms. Pike immediately turned into neonatal neglect when she was released from intensive care. The frightening and chaotic world in which she grew up, where she could find little or no security and safety in the form of a stable, loving family created extraordinary stress for young Christa. Dr. Kenner explained to this Court the lifelong effect of this constant stress.

Many of the stressors affecting Christa occurred at a vital period of her development. Dr. Kenner testified to this Court that the first six or seven years of life are when the child is learning languages, music and motor skills. (TR PC April, 2008 PCR Proceedings Vol. I of II at 93.) The child is also, unfortunately for Christa, learning at this stage what to expect from their

environment and how to interact with the world. Dr. Kenner discussed how important it is for a child to bond with her mother or primary caregiver, and how children who, like Christa Pike, do not develop this bond fail to thrive and grow appropriately, both physically and emotionally. (*Id.* at 93.) This phenomenon was dramatically explained by Dr. Kenner when he compared the PET scan of a normal brain with that of an abused child. The clearly demonstrated result was that the brain of an abused child does not develop properly; the child is often unable because of an activity deficit in the temporal lobes to function normally emotionally or cognitively. (*Id.* at 93.)

Dr. Kenner testified that the constant response of anger or indifference to a child's needs and wants create a downward spiral negative feedback loop, resulting in a child who is dysfunctional in her ability to interact productively with others. (TR PC April, 2008 PCR Proceedings Vol. II of II at 137.) Additionally, chronic stress, such as that suffered by an abused and neglected Christa Pike, causes a continuous release of neurohormones, which are toxic to brain development. (*Id.* at 140.) Unfortunately, the sort of maltreatment discussed in this section and which was suffered by Christa is toxic and damaging to parts of the brain that are most responsible for executive function, i.e. behavior control. (TR PC April, 2008 PCR Proceedings Vol. II of II at 142.) According to Dr. Kenner, Ms. Pike's complex posttraumatic stress disorder was caused by the following early stressors:

### 1. Christa Pike Experienced Neonatal Neglect.

# Normal vs. Abused Brain




Testimony was offered during the post-conviction hearing that Glenn Pike was an absentee father (TR PC January, 2007 PCR Proceedings Vol. V at 442) and that Carissa Hansen was far too wrapped up in herself and in alcohol consumption to care for Christa. (TR PC January, 2007 PCR Proceedings Vol. II at 175.) Ms. Ross testified that Ms. Hansen's first priority was never her children. (*Id.* at 175.) Ms. Hansen's husbands' happiness was always her main concern. (*Id.* at 175.) Ms. Hansen always liked nice clothes. (*Id.*, 175.) If Ms. Hansen's husbands were happy and she had nice clothes and alcohol, then her children would get what was left. (*Id.* at 175.) Ms. Ross testified that there was rarely anything left. (*Id.* at 175.)

Christa was initially denied the opportunity to bond with her mother because of a one-week stay in the neonatal intensive care unit. (TR PC January, 2007 PCR Proceedings Vol. II at

149. After that, Ms. Pike was unable to form a lasting bond with her parents because she was shuttled from one home to the next. Carrie Ross's testimony was that Carissa Hansen was more concerned with partying and husbands and boyfriends than she was with being a parent to Christa, and that she could not be bothered with the responsibilities of motherhood. (TR PC January, 2007 PCR Proceedings Vol. II at 175. Her father, Glenn Pike, was by his own admission absent and aloof. (TR PC January, 2007 PCR Proceedings Vol. V at 442) As a result, Christa was often kept by her grandmother, Zola Fotos.

Grandmother Fotos, however, already resented being involuntarily thrust into the role of primary caregiver for Carissa's first daughter, and, according to Carrie Ross, told anyone who would listen about her resentment that she was left to care for Christa. (TR PC January, 2007 PCR Proceedings Vol. II at 182.) Grandmother Fotos was also a alcoholic who was very strict and violent (*Id.* at 183) (TR PC April, 2008 PCR Proceedings Vol. VIb at 572) Carrie Ross testified that at least part of her resentment toward Christa was that her role as caregiver for Christa did not afford her with the time to "lay around drunk" (*Id.* at 183) There was testimony from several family members that Ms. Fotos greatly favored Christa's sister, Alicia. (*Id.* at 182) All of these factors conspired to result in Christa Pike's failure to bond with any primary caregiver during her formative years.

## 2. Ms. Pike was Unwanted by her Parents.



Ms. Pike's failure to bond with a primary caregiver during her early years also resulted in a failure to put down roots. She never felt like she really belonged anywhere. It was also made painfully obvious to her that neither of her parents wanted to take responsibility for her. At the post-conviction hearing, Carrie Ross testified that Carissa Hansen was always focused on her own selfish interests. (TR PC January, 2007 PCR Proceedings Vol. II at 175) She was married at least five times, and lived with several other men, despite any negative effects that these relationships had upon Christa. (*Id.* at 176) Whenever Christa became a problem for Carissa and/or one of her love interests, Carissa would ship her off to her father. (*Id.* at 169) Glenn Pike, in turn, would leave Christa's care in the hands of his mother whenever possible. (*Id.* at 183) Each parent readily chose others over Christa. Carissa Hansen sent Christa away from her home when her then husband Danny Thompson told her that he did not like children. (*Id.* at 169.) Later, Glenn Pike actually went so far as to ban Christa from his house after his new wife made

an unsupported and scurrilous allegation that Christa may have abused their child. (TR PC January, 2007 PCR Proceedings Vol. V at 457.) These incidences only served to further demonstrate to Christa that she was not only unimportant to her parents, but was an impediment to their happiness. Christa's older sister, Alicia Wills, confirmed this in her testimony before this Court when she testified that Christa always felt rejected by her mother and father, and that she had tried to get their attention by getting into trouble, but neither of them cared. (*Id.* at 421.)

When Christa finally did get into enough trouble to attract the attention of the authorities, she was sent to Swannanoa Juvenile Facility, in Swannanoa, North Carolina. Debbie Burchfield was Christa's social worker at Swannanoa, and testified before this Court that Christa felt isolated from and unwanted by her parents. (TR PC January, 2007 PCR Proceedings Vol. VII at 629.) Ms. Burchfield read from her notes that Christa's mother was unavailable to Christa emotionally. (*Id.* at 619.) In fact, Christa's mother was so emotionally distant from her that Christa was unable to draw a picture of herself and her mother doing something together when asked to do so by Ms. Burchfield. (*Id.* at 629.) She was instead allowed to draw something that she would like to do with her mother. (*Id.* at 629.) Ms. Burchfield further testified that Christa never felt close to her mother, and, further, that Christa was emotionally abused by her father. (*Id.* at 619.) Ms. Burchfield gave other testimony that underscored Christa's parents' lack of emotional support for their daughter when she stated to this Court that Christa received only eight out of a possible sixty family visits while she was at Swannanoa. (*Id.* at 616.)

The constant rejection of Ms. Pike by her parents created the very situation discussed during Dr. Kenner's testimony -- a negative feedback loop of rejection and withdrawal.

## MOTHER

**Carissa Fotos Ferguson Pike Thompson Hansen's**

**Marriages and Relationships**




m. = married
D. = divorced
——— = married
-------- = dating relationship/unmarried
* = cohabited
/ = separation

ii

### 3. Christa Pike was Sexually Abused.



Ms. Pike was the victim of repeated sexual abuse as a child. Indeed, there was testimony at the post-conviction hearing strongly suggesting that she had been sexually abused while on vacation with her Grandmother Pike and her Grandmother Pike's boyfriend. (TR PC January, 2007 PCR Proceedings Vol. II at 185.) Additionally, this Court has heard evidence (and the sentencing jury did not) concerning Claude Davis's sexual assault of Christa when she was nine or ten years old, which include violating Christa vaginally with sticks and allowing his dog to lick her genitalia. (TR PC January, 2007 PCR Proceedings Vol. III at 257.) These charges were later reduced when Mr. Davis shaved his beard after the attack and Christa's identification of him was deemed to be "unreliable". (TR PC January, 2007 PCR Proceedings Vol. I at 67.) Shockingly, both Carissa Hansen and Christa's sister Alicia expressed doubt that Christa was telling the truth when she first related this horrifying experience. (TR PC January, 2007 PCR Proceedings Vol. III at 257.) Later, when Christa was 16 or 17 years old, she was raped by a man who grabbed her when she was going to the store. (TR PC January, 2007 PCR Proceedings Vol. I at 66.) The uncontroverted testimony at the post-conviction hearing that a rape kit was administered strongly corroborates this incident. (*Id.* at 66.) There was also testimony before this tribunal that one of her mother's boyfriends, Steve Kyaw, sexually assaulted Christa by pinching and twisting her breasts before punching her in the face. (TR PC January, 2007 PCR Proceedings Vol. III at 263.) These sexual attacks and other abuses are important parts of Christa's history that the jury never had a chance to consider. It is undeniable that these traumatic insults took a heavy toll on Christa's psyche. ("Childhood 'maltreatment' (which includes sexual, physical, and emotional abuse) "represents an extreme traumatic insult to the developing child." Indeed, the trauma is considered so severe that it is "comparable to that of military combat." Brief of Amicus, by Attorney's General of Texas, Alabama, Colorado, Idaho,


Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 16 of 150 PageID #: 4250

Mississippi, Missouri, Oklahoma, South Carolina, and Washington, in *Kennedy v. Louisiana*, U.S. Supreme Court No. 07-343 (internal citation omitted).)

### 4. Christa Pike was Verbally and Physically Abused.

Ms. Pike suffered verbal abuse as a child, particularly when she was left in the care of her Grandmother Fotos. According to Carrie Ross, Ms. Fotos resented the fact that Christa was ever born. (TR PC January, 2007 PCR Proceedings Vol. II at 184) Ms. Fotos was an alcoholic and would chastise Christa when she failed to behave according to her expectations. (*Id.* at 181.) Christa would often sit mute, staring into space when she was chastised by Grandmother Fotos and others. (*Id.* at 182.) This behavior was best described at the post-conviction hearing by her aunt, Carrie Ross, when she recalled a time when, as a three-year-old, Christa was throwing billiard balls at a glass door in Carrie's home. (*Id.* at 179.) Ms. Ross explained that, although Christa was told repeatedly that what she was doing was dangerous and likely to result in damaging either person or property, Christa would stare into space and seemed not to comprehend what she was being told. (*Id.* at 179.) Ms. Ross said that Christa was not being willful or disobedient, but was instead in a non-comprehending, trance-like state. (*Id.* at 181.) Christa's sister, Alicia Wills, testified similarly. Ms. Wills told this Court that Christa did not stay with Grandmother Fotos as often as she did with Grandmother Pike because Grandmother Fotos was "frustrated by Christa's failure to comprehend when she was being told what to do". (TR PC January, 2007 PCR Proceedings Vol. IV at 362.) Alicia confirmed that Christa greeted scolding from her Grandmother Fotos with a "blank stare." (*Id.* at 362.)

In addition, it has been plainly demonstrated to the Court during petitioner's hearing that Christa suffered extreme physical abuse as a child. Glenn Pike admitted during his testimony that he would whip Christa with belts when she disobeyed him. (TR PC January, 2007 PCR

Proceedings Vol. V at 448.) He testified that he would beat her when she did not complete her homework. (*Id.* at 451.) On at least one occasion he beat her five or six times on the same day because she did not complete her homework to his satisfaction. (*Id.* at 452.)

While Mr. Pike downplayed these beatings as routine discipline, the observations and testimony of Dr. Pincus clearly demonstrate that Mr. Pike has grossly understated the violent nature of these whippings. Dr. Pincus testified to this Court about his observation of scars on Christa's back that were most likely caused by a belt or switch wielded by a right-handed assailant. (TR PC January, 2007 PCR Proceedings Vol. III at 252.) Christa was unable to explain these scars on her back to Dr. Pincus. (*Id.* at 252.)

The violence to which Ms. Pike was subjected was not only from her father's savage beatings. In addition, Alicia Wills was an overbearing big sister, four years Christa's senior, who bullied and beat Christa and even burned her with a curling iron on one occasion. (TR PC January, 2007 PCR Proceedings Vol. IV at 393.) Christa also suffered violent physical assaults at the hands of grown men. Her mother's boyfriend, Steve Kyaw, was charged with assaulting Christa when he punched her in the nose. (TR PC January, 2007 PCR Proceedings Vol. I at 61.) Alicia's boyfriend, Brian Hammond, gave Christa a bloody nose when he was dispatched to Carissa's home to find that Christa was having a party there while her mother was out of town with Gerard Hansen, Christa's mother's current husband. (TR PC January, 2007 PCR Proceedings Vol. III at 252.) Time and time again Christa's disobedience and misbehavior resulted in swift, severe violence directed towards her. Christa was learning the lesson that extreme violence was the way that assertive people dealt with those who had wronged them. As will be developed further *infra.*, the use of violence against those who had slighted you was a long-established and well-taught family tradition.



Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 18 of 150 PageID #: 4252

### C. Other Emotionally Stressful Social Problems Impacted Christa Pike as a Teenager and in the Months before the Crime.

Ms. Pike's early onset of mental illnesses rendered her unprepared to cope emotionally with a number of challenges that presented themselves later in her childhood, along all with the physical and sexual abuse she suffered, as explained above.

#### 1. Christa Pike Experienced Deep Personal Loss.

Ms. Pike suffered a deep, profound sense of loss when her Grandmother Pike died. (TR PC January, 2007 PCR Proceedings Vol. V at 448.) Grandmother Pike was the only person who ever loved Christa unconditionally. (*Id.* at 472.) Unfortunately, Carissa Hansen took Christa away from her Grandmother Pike while Grandmother Pike was battling cancer, and forced Christa to move hundreds of miles away in North Carolina with yet another of Carissa's boyfriends/husbands. (TR PC January, 2007 PCR Proceedings Vol. I at 52.) Grandmother Pike died while Christa was living in North Carolina. (*Id.* at 52.) Christa was "devastated" by the death of her grandmother. (TR PC January, 2007 PCR Proceedings Vol. V at 448.) Christa's behavior took a turn for the worse following Grandmother Pike's death, and as she reached her teenage years.

#### 2. Christa Pike Abused Chemical Substances.

Christa Pike was a regular marijuana smoker. In fact, this Court has heard testimony that she smoked marijuana with her mother on at least one occasion. (TR PC January, 2007 PCR Proceedings Vol. I at 59.) She also was known to engage in the ultra-dangerous activity of "huffing" intoxicating fumes from aerosol cans. ((TR PC January, 2007 PCR Proceedings Vol. VII at 601.) This Court also heard testimony from other witnesses that indicated that Ms. Pike was a heavy drinker, and was in fact drinking so heavily the night before she was arrested that it

can be inferred that she was still under the influence of alcohol the morning she was interrogated by the police about the death of Colleen Slemmer. (TR PC January, 2007 PCR Proceedings Vol. VII at 687.) By any definition, Christa was an out-of-control teenager who was heavily influenced by drugs and alcohol.

### 4. Christa Pike was Involved in a Domineering Relationship.



Because Ms. Pike never experienced unconditional love from anyone other than her grandmother Pike, she longed for close, intimate relationships. Because of this human need, she

instinctively clung to the young men with whom she had sexual relationships, trying unsuccessfully again and again to manufacture closeness and intimacy with them. (TR PC April, 2008 PCR Proceedings Vol. VIII at 722.) Unfortunately, the last and most intense of these sexual relationships was with a malevolent, domineering, and violent gang member who professed to be a Satanist. Tadaryl Shipp, Ms. Pike's boyfriend and codefendant, was a violent and abusive person. (TR PC January, 2007 PCR Proceedings Vol. VII at 683; 687.) He was a member of the violent street gang, the Gangster Disciples. (TR PC July, 2007 PCR Proceedings Vol. I at 87.) He also had a long history of physically abusing and manipulating his girlfriends. (TR PC July, 2007 PCR Proceedings Vol. III at 215 -219.) His manipulative tendencies and strategies found an easy target in the emotionally vulnerable Ms. Pike. As with her other boyfriends, Ms. Pike would do anything to try to please Mr. Shipp. (See the testimony of Jermaine Bishop, (TR PC July, 2007 PCR Proceedings Vol. III at 255.)

**4. Christa Pike had an Intense Desire to Belong.**

Because of her lifetime of neglect, rejection and abuse, Ms. Pike had an overwhelming desire to be liked, and to "fit in." Often this need to "fit in" was satisfied, in Christa's mind at least, by becoming involved in a violent altercation in an effort to impress her friends. (TR PC April, 2008 PCR Proceedings Vol. IX at 812.) It was this very intense desire to belong that helped motivate her to engage in the very sort of violent behavior that she thought would impress her new gang member friends, Tadaryl Shipp and Shadolla Peterson, on the night that Colleen Slemmer was attacked.

### 5. Christa Pike was Overstimulated as a Child by Exposure to Blood and Gore.

As a young child Christa Pike was exposed to frighteningly-graphic, violent horror movies.



The testimony at this hearing revealed that Carissa Hansen would not only watch these movies with her daughter Christa, but would use them as "babysitters," leaving Christa alone to watch them for hours. (TR PC April, 2008 PCR Proceedings Vol. II of II at 116.) Dr. William Kenner told the court of the effect that these grisly and graphic movies would have on Christa, calling the repeated exposure to these disturbing films "overstimulation". (*Id.* at 118.)

While these graphic and violent movies would normally frighten a child, it is not surprising that Christa instead enjoyed the movies as an opportunity to bond with her mother. (*Id.*, 116.) She was certainly accustomed to bonding with a family member in the context of

violence and gore. Christa had forged what little relationship she had with her Grandfather Fotos by spending countless hours with him as he slaughtered and disemboweled cattle in the family slaughterhouse. (TR PC April, 2008 PCR Proceedings Vol. VIb at 580.) While the Fotos family thought of the slaughterhouse as a family business, Dr. Kenner explained how the bloody and violent scenes Christa witnessed there on a daily basis would also be likely to overstimulate a young child. (TR PC April, 2008 PCR Proceedings Vol. II of II at 114.) In fact, it was this early exposure to the butchering of animals that likely caused Ms. Pike's fascination with blood. (TR PC April, 2008 PCR Proceedings Vol. II of II at 160.)





### 6. From a Very Early Age Christa Pike was Subjected to "Violence Coaching" from her Culture, Family and Friends.

In order for the jury to have understood Christa's life and social history, they would have to understand that, underlying all of these events was the constant reinforcement by Christa's family of the cultural and family value associated with violence and revenge. Uncontroverted testimony was given about the "West Virginia mentality," which demands revenge when one is wronged. (TR PC April, 2008 PCR Proceedings Vol. VIII at 710.) Christa, as a child, was commonly told by her maternal grandparents not to start fights but "if someone starts one with you and you don't finish it I will kick your ass when you get home." (TR PC April, 2008 PCR Proceedings Vol. VIb at 577.) Carrie Ross testified that petitioner's mother, Carissa Hansen, would commonly threaten physical violence whenever she was angry. (TR PC January, 2007

PCR Proceedings Vol. II at 165.) Christa's Grandfather Fotos was the subject of admiration based upon several family legends related to extracting violent revenge. From the time that Christa was a small child, she was regaled with stories of how her Grandfather Fotos cut the cable on a mine car filled with nonunion workers at the West Virginia coal mines who were working in spite of a strike, killing dozens. (TR PC April, 2008 PCR Proceedings Vol. VIb at 567.) He himself told her how he had explained to a man who was trying to hire him to kill another individual that he would have to kill the man who hired him, too, so that he would leave no witnesses to his crime. (*Id.* at 570.) Christa also heard stories about Grandfather Fotos impaling another man's hand on a butcher block with a knife when he became annoyed with him. (*Id.* at 570.) The family also told the story of Grandfather Fotos's smuggling of a gun into a federal courtroom to threaten the judge hearing his case with the IRS. (TR PC January, 2007 PCR Proceedings Vol. II at 165.) All of these stories were told fondly, "around the kitchen table" by members of the Fotos family. (TR PC April, 2008 PCR Proceedings Vol. VIb at 576.) The message was clear: violence was the way to solve conflict, and being wronged or slighted by others was not to be tolerated.

Ms. Pike's Grandmother Fotos also helped instill a code of violence in her granddaughter. Grandmother Fotos, who was a severe alcoholic who was often called upon to be Christa's primary caretaker, was often seen in the afternoon shuffling around her unkempt home with a loaded pistol, drunk and mumbling threats to unseen trespassers. (TR PC April, 2008 PCR Proceedings Vol. VIb at 574.)

Finally, and importantly, Ms. Pike gained the approval of a respected judicial officer after the young man named Kenny Clyde that she lured away with one of her friends and assaulted because of his threats to her and her mother was later convicted of pedophilia. (TR PC January,

2007 PCR Proceedings Vol. III at 269.) "You did society a favor," said the judge when Christa's assault case was dismissed. (*Id.* at 270) This event only served to reinforce in Christa her family's training that it was acceptable to respond with violence when one is wronged by another. This event was also quite significant in its striking similarity to the current case. However, in the Kenny Clyde incident, when Christa lost control her friend Mandy was there to lend Christa her "brakes," both figuratively and literally, by forcing her foot onto the brakes of the vehicle that Christa was using in an attempt to run over Kenny Clyde. Contrast this with the night of Colleen Slemmer's murder, when Shadolla Peterson and Tadaryl Shipp, who both were involved in the attack, did nothing to try to help Christa regain control, but instead actively participated in the assault.

### 7. Christa Pike was Exposed to a Frightening, Violent and Stressful Atmosphere while a Student at Job Corps.

In the months preceding this crime, Ms. Pike was a student at Job Corps in Knoxville, Tennessee. While she agreed to attend classes Job Corps in what she perceived to be a final, desperate attempt to make something out of her life, she soon discovered that the Job Corps was a very frightening and violent place. (TR PC January, 2007 PCR Proceedings Vol. III at 192.) This Court heard testimony that Christa reported to her mother during one of her mother's infrequent visits to Christa at the Job Corps that the stains found on the walls of the bathroom were the remnants of a violent stabbing. (TR PC January, 2007 PCR Proceedings Vol. I at 71.) There was also testimony during the post-conviction hearing that most of the people at Job Corps were gang members with violent histories. (TR PC January, 2007 PCR Proceedings Vol. VII at 676.) Andrew Drace testified that gang members came into his room and beat him after covering his face with a towel because he was white. (*Id.* at 680.) Mr. Drace singled out Tadaryl Shipp as one of the most violent gang members at the Job Corps. He told this tribunal that Tadaryl Shipp

and four others tried to throw Mr. Drace over onto railroad tracks over 200 feet above the ground. (*Id.* at 682.) He explained that the Job Corps staff did not care about violence.

In addition, this Court heard from other witnesses regarding the gravely violent conditions at the Job Corps. One of the instructors at Job Corps, Joe Mode, testified that he was hit or slapped by students at Job Corps on several occasions. (TR PC January, 2007 PCR Proceedings Vol. VIII at 760.) He further recalled being called upon to break up fights, and that he received one death threat from a student while he was an instructor at Job Corps. (*Id.* at 762.) He also testified that the administration and Job Corps was well aware of the violence, but did not care. (*Id.* at 764.)

Kimberly Rhodes testified that the Job Corps was "scary and nerve wrecking" because of the animosity between different groups of people. (*Id.* at 793.) She testified that there was a lot of drug use at job core, and that she was always concerned for our personal safety while a student there. (*Id.* at 794.)

Christa herself was also subject to violence and intimidation at Job Corps. Christa's mother, Carissa Hansen, testified during the post-conviction hearing that Christa told her while she was home for Christmas just before the murder of Colleen Slemmer that she had been threatened there by another girl. (TR PC January, 2007 PCR Proceedings Vol. I at 73.) Christa reported that she would wake up at night to find this girl hovering over her bed with a knife. (*Id.* at 73.)

## D. Christa Pike Suffers from Bipolar II Disorder.

Both Dr. Kenner and Dr. Pincus testified that they were in agreement that Ms. Pike suffers from bipolar II disorder, and that she has suffered from that condition since before the death of Colleen Slemmer. Dr. Kenner explained that the bipolar condition was not diagnosed



Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 27 of 150 PageID #: 4261

by previous mental health experts because it is difficult to diagnose unless the psychologist or psychiatrist observes the individual over long-range, longitudinal periods. (TR PC April, 2008 PCR Proceedings Vol. I of II at 87.) Because Ms. Pike never saw a mental health professional more than once or twice during her teenage years, she was never properly diagnosed with bipolar II disorder or medicated as a teenager. (*Id.* at 87.) Additionally, because the psychiatrist hired by trial counsel was not afforded the opportunity to review Ms. Pike's history or even interview her, she was not properly diagnosed with bipolar II disorder before her trial. (*Id.* at 36.)

Bipolar II disorder was explained by Dr. Kenner as being marked by periods of extreme alertness and mental activity -- the hypomanic phase. (TR PC April, 2008 PCR Proceedings Vol. I of II at 39.) Dr. Kenner testified that the hypomanic phase typically lasts two to four days, and the bipolar individual rarely sleeps during this time. (*Id.* at 44.) During the hypomanic phase, the individual often feels omnipotent or indestructible, as if they are not vulnerable to any kind of damage or risk. (*Id.* at 40.) These feelings of omnipotence, when coupled with extreme sleep deprivation that accompanies the hypomanic phase, also create in the bipolar individual an extreme irritability. During this phase the bipolar individual is quite prone to violence. (*Id.* at 40.) This is particularly true when one considers the current case of Christa Pike, who had been taught throughout her entire life that violence is not only acceptable, but is the proper response when someone crosses or angers her.

Dr. Kenner and Dr. Pincus both cite several factors to support their diagnosis of bipolar II disorder. Among the factors they cited were excessive spending, irritability, loss of appetite, sleeplessness, poor hygiene during a manic phase, drug use, alcohol use, long periods of depression, truancy, weight fluctuation, crying, suicidal tendencies and family history. (TR PC January, 2007 PCR Proceedings Vol. III at 271.) Dr. Pincus testified that Christa's was a

textbook diagnosis. (*Id.* at 274) Dr. Kenner also based his opinion regarding his diagnosis upon several visits with Ms. Pike where he observed her behavior as an independent expert appointed by this Court. (TR PC April, 2008 PCR Proceedings Vol. I of II at 24.)

Both doctors opined that Ms. Pike was in the final stages of a lengthy, sleep-deprived hypomanic stage at the time that this crime occurred. (TR PC April, 2008 PCR Proceedings Vol. I of II at 44.) (TR PC January, 2007 PCR Proceedings Vol. III at 274.) Dr. Kenner testified that Christa's intense irritability from the hypomanic phase was peaking the night that Colleen Slemmer died. (TR PC April, 2008 PCR Proceedings Vol. I of II at 45.)

### E. Christa Pike Exhibited all Three Factors Cited by Dr. Pincus as "Prevalent Factors" Found in his Research to be Common Among the Most Violent Individuals.

During the post-conviction hearing, Dr. Jonathan Pincus, testified to the Court concerning his research with violent criminals, and in particular what insights he has gained regarding common traits among violent criminals as patients. Dr. Pincus testified that he has seen 100 to 150 violent criminals. (TR PC January, 2007 PCR Proceedings Vol. III at 220.) Most of these violent individuals, according to Dr. Pincus, had diseased frontal lobes. (*Id.* at 220.) He describes this as a "relatively constant feature" among violent criminals. (*Id.* at 220.) Another relatively constant feature, according to Dr. Pincus, is that these individuals had been "horrendously abused," either physically or sexually or both. (*Id.* at 220.) The third prevalent factor among violent criminals examined by Dr. Pincus is mental illness. (*Id.* at 220.) Dr. Pincus testified that bipolar disorder, such as that suffered by Ms. Pike, is the most frequent mental illness among violent criminals. (*Id.* at 221.) Dr. Pincus also pointed out that most people with only one of the above conditions are not violent. However, when all three factors are present together, they do not, in the opinion of Dr. Pincus, add together the propensity for

violence, but, instead, seem to multiply one another. He described during his testimony that an individual with all three factors present as a "very dangerous situation". (*Id.* at 221.)

It was the opinion of Dr. Pincus during his testimony to this Court that Christa Pike was "under the influence of a mental disease and defect that prevented her from being able to consider what she was doing, and to prevent herself from giving into this impulse of killing". (*Id.* at 278.) Dr. Pincus also testified that the origin of the damage to her frontal lobe occurred in utero. (*Id.* at 279.) He testified that the bipolar II disorder from which she suffers was hereditary, and, therefore, beyond her control. (*Id.* at 279.) Dr. Pincus said out that the physical and sexual abuse she suffered was nothing that she could control. He opined further that she was a "magnet" for abuse because of her hypomanic episodes that were part of her bipolar II disorder. (*Id.* at 279.) Finally, Dr. Pincus told this Court that there was evidence of all three factors present and available at the time of the original trial, if only trial counsel had properly used the experts approved by the court. (*Id.* at 279.)

## II. The Relevance of the Story the Jury Never Heard. To Answer Ms. Rice's Question to the Jury During Her Closing - "How do you Convey a Lifetime of Abuse and Rejection in a Little More than an Hour?" - You Can't And Her Thinking That She Could Deprived Ms. Pike of Her Right to the Effective Assistance of Counsel.

Had the jury learned the real story about Ms. Pike, they would have had a greater understanding of the factors that resulted in the death of Colleen Slemmer, and why Ms. Pike was less morally culpable and blameworthy than she appeared to be. The jury would have learned that, because of mental illness and/or brain damage in utero, Christa was especially susceptible to irritability and violence. A properly presented case would have focused on the conditions at the Job Corps, where fights and beatings occurred every day. The jury would have heard about some of the provocations that preceded the attack in which Christa participated. In

addition, had her social history been placed in the proper context and testified to by the relevant appropriate witness, a jury would have had an understanding of Ms. Pike's deep-seated desire to belong, and how this desire manifested itself in the company of violent gang members.

A proper presentation by trial counsel at the guilt/innocence phase would have left the jury informed about Ms. Pike's social and familial coaching for violence, and how she had learned that it was not only acceptable, but laudable, to exact revenge in the form of violence. She had learned from her father and grandmother that beatings were the way to impose your will upon another. She had been taught by family example, lore and legend that if someone crosses her, it is appropriate and necessary to obtain retribution through extreme violence. She had learned from her experience with the law that it is admirable to lure someone away to a remote location where she and her friends could administer "rough justice." Had her social and life history been properly presented to the jury, the jury would have realized that Ms. Pike had been taught throughout her life that violence such as her participating in the beating of Colleen Slemmer with two gang affiliated friends on January 12, 1995, was the right thing to do.

These provocations, pressures, and her poor life lessons conspired to set in motion a freight train. Her social history and violent upbringing demanded that she respond to the stressful situation at Job Corps and to Colleen Slemmer's provocations with violence. The hypomanic phase of her bipolar II disorder made her especially irritable. Ms. Pike came up with what seemed to her to be a legitimate way of dealing with her situation. It was a disastrous plan, but a properly informed jury would have understood how Ms. Pike arrived at this decision.

During the planned assault of Colleen Slemmer, Christa Pike's real problems manifested with fatal consequences for Ms. Slemmer. The "freight train" picked up speed. However, when it came time to stop the train, to stop the violence after the "lesson" had been taught to Ms.

Slemmer, Ms. Pike did not have any "brakes." As Dr. Pincus testified, the function of curbing or "braking" violent impulse lies within the frontal lobe of the brain, where the brain controls executive functioning, morality and ethics. As both Dr. Pincus and Dr. Kenner testified, these were the very things that Ms. Pike needed on that occasion to stop the impulse "freight train," but this was the very area of her brain that was damaged by her heterotopia and complex post-traumatic stress disorder.

What happened next, in the learned opinion of Dr. Pincus, was the inevitable result of Christa's inability to control her impulses. Dr. Pincus testified that she was in the third day of a hypomanic stage on the day of the murder, and that she and was very irritable and angry that day, as a result. Colleen Slemmer had called her a slut and a whore -- words that Dr. Pincus described as "codewords" that made Christa even more irritable and angry than she would normally have been in a hypomanic phase, going back to when Steve Kyaw had called her those names. Dr. Pincus testified that, in his opinion, Christa's intent was to beat up Colleen Slemmer, but not to kill her. However, when she lost control, she did want to kill her. Dr. Pincus testified that the difference between the assault on Ms. Slemmer and the one on Kenny Clyde was that she had more effective accomplices. Christa's friend Mandy had held her back when she tried to run over Kenny Clyde, while Shadolla Peterson and Tadaryl Shipp assisted with the assault on Ms. Slemmer. Dr. Pincus said that Tadaryl Shipp even struck the first blow.

While the blood and gore of the attack on Colleen Slemmer would have shocked most people into stopping the assault, Ms. Pike had long ago been desensitized to violence through exposure as a small child to grisly horror films, and as a toddler to Grandfather Fotos's slaughterhouse. As the Court now knows, it was during these unfortunate instances that Christa experienced some of the only meaningful bonding that she ever had with her grandfather and her

mother. These early life experiences created for Christa not only desensitization to violence, but also a fascination with blood and gore. She felt comfortable bonding with her boyfriend, Tadaryl Shipp, through this frightening carnage, and Tadaryl (with whom Christa often exchanged tastes of each other's blood during intimacy) not only encouraged, but significantly participated in, the violence. The result was that the "freight train" ran completely off the track. Colleen Slemmer was killed in a horrible tragedy.

# LEGAL ARGUMENT IN SUPPORT OF POST-CONVICTION RELIEF

## I. Christa Pike Was Denied the Most Important Element of a Defense - Conflict Free Representation.

In *Argersinger v. Hamlin*, 407 U.S. 25 (1972), the Court held that the right to counsel is a fundamental right. The Court, emphasizing the need for competent counsel, recognized that "[t]he assistance of counsel is often a requisite to the very existence of a fair trial." *Id.* at 31. In *Cuyler v. Sullivan,* 446 U.S. 335, 343 (1980), the Court stated that without counsel representing the accused "a serious risk of injustice infects the trial itself." The Court further noted that "the Sixth Amendment does more than require the States to appoint counsel for indigent defendants," rather it requires "adequate legal assistance." *Id.* at 344.

In *Strickland v. Washington*, the Court defined a fair trial as

> one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled.

466 U.S. 668, 685 (1984). Writing for the majority in Strickland, Justice O'Connor held that when the effective assistance of counsel is missing there is "the absence of one of the crucial assurances that the result of the proceeding is reliable." *Id.* at 694.

The importance of representation by a trained advocate has long been recognized in our legal system. Not only must the advocate be trained and experienced but also must have an undivided loyalty to the person on trial. As set out below, in this case Ms. Pike was denied both fundamental elements of representation from the beginning.

**In any case, but in particular in a death penalty prosecution, the trial judge has a duty to understand the training and experience needed by defense counsel and to ensure she appoints attorneys who meet those requirements. Failure of the Court to do so in the instant case denied Ms. Pike her fundamental right to a fair trial.**

At trial, Ms. Pike was represented by appointed counsel from the private Knox County, Tennessee bar, William C. Talman (hereinafter, Mr. Talman), and Julie Martin (now Julie Martin Rice)[1], (hereinafter Ms. Rice). Ms. Rice replaced attorney William Brown (hereinafter Mr. Brown), whose motion to withdraw was granted by the trial court on January 23, 1996, just eight weeks before trial. (TR Trial Vol. I at 59-60.) Initially, the court provided Ms. Pike counsel who was, by his own admission, woefully unqualified to represent Ms. Pike in this complex trial for her life. .. (TR PC April , 2008 PCR Proceedings Vol. III at 261.) Not only had Mr. Brown requested the assistance of qualified counsel, but with less than two months before trial, he withdrew. Mr. Brown was then replaced by Ms. Rice who was equally unqualified to represent Ms. Pike.[2]

At the time Ms. Rice was appointed to represent Ms. Pike she has been practicing a little less than 4 years, having graduated from law school in 1992. (TR PC April 7, 2008 PCR Proceedings Vol. 1 at 22, 29.) She had a general criminal practice with a few civil cases. (*Id.* at

[1] At the time of the trial Ms. Rice was Julie Martin. After trial she married Barry Rice and gave up her maiden name. Since she is identified in the Post-Conviction Record as Julie Rice, her married name will be used in this closing brief.

[2] It is a false argument to suggest that, because the Tennessee Supreme Court had not established the standards now set out in Tenn. Sup. Ct. R. 13 §3, these attorneys were qualified under the governing rules at the time of appointment. Standards for the appointment of defense counsel promulgated by the National Legal Aid and Defender Association (NLADA) were published in 1988 and by the American Bar Association (ABA) in 1989. *See* Standards for the Appointment and Performance of Counsel in Death Penalty Cases, NLADA, Amended November 16, 1988, Standard 5.1 Attorney Eligibility (attached); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, February 1989, Guideline 5.1 Attorney Eligibility (attached). The publication of these standards and guidelines were preceded by numerous drafts, articles in legal literature and in various court decisions. Thus, by 1995, the serious, specialized and complex nature of death penalty defense and the requirements for effective representation were well known.

29.) She had worked as a contract public defender in Blount County, Tennessee, for a little less than a year before going into solo private practice. (*Id.* at 30.) During her year at the public defender's office she received no training or mentoring for the work she did. (*Id.* at 31.) Prior to being appointed to represent Ms. Pike, she did not recall handling any cases above a class B felony and had not handled any murder cases. (*Id.* at 32-33.) She further testified that prior to her appointment to represent Ms. Pike she did not recall any work with experts or having actually used an expert to testify in trial. She thought she might have used an investigator and may have used expert services to determine "competency at trial or for use later" but was not certain. (*Id.* at 33-34.) She had no training or education in mental health issues. (*Id.* at 34.) While in law school she had attended a 2 or 3 day death penalty seminar presented by the Tennessee Capital Case Resource Center. (*Id.* at 35.) Fundamentally, by education, training, practice and experience Ms. Rice was utterly unqualified to represent Ms. Pike in the trial at which her life was at stake.

Thus the only representation that Ms. Pike received was provided by Mr. Talman, himself at best only marginally qualified, whose advocacy was compromised by serious and complex conflicts of interest that, among other things, resulted in the failure to provide that jury any reason to return a sentence other than death. Mr. Talman had been licensed to practice since 1986. (TR PC April 8, 2008 PCR Proceedings Vol. 3 at 254.) However he had never handled a capital trial and to the best of his recollection he had never handled a capital case. (*Id.* at 255.) While the Knoxville area is known to have one of the best criminal defense bars in the state, Mr. Talman was not held in high regard. Instead, he was known as a lawyer who had not handled any cases of any significance and was accepting a lot of court-appointed cases. (TR PC April 7-11, 2008 PCR Proceedings Vol. 11 at 1010.)

Since the local bar included such well respected lawyers as Bob Ritchie, Tom Dillard, Wade Davies, Charles Fels, Ralph Harwell, Jim Bell and others, (*Id.* at 1007), it is difficult to understand why a court would appoint an unqualified or, at best, marginally qualified lawyer in this complex high profile case. It becomes further is unfathomable when the was under the cloud of a publicly known conflict. The denial of qualified and conflict free counsel denied Ms. Pike a fair trial and require that the conviction and sentence in this matter be set aside.

### A. The Trial Court's Appointment of an Attorney Whose Legal Future Was Under a Cloud Due to His Being Under Investigation for Over Billing the Indigent Defense Fund by More than $60,000 Violated Christa Pike's Constitutional Right To Conflict-Free Counsel.

In *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980), the Court stated that when a "trial court knows or should have known that a particular conflict exists," it has a duty to initiate inquiry into that conflict. In *Wood v. Georgia*, 450 U.S. 261, 272 (1981), the Court found that because it "was sufficiently apparent" from the record that counsel who was paid by Wood's employer might be representing the interests of the employer and not Wood, the Court found a duty on the trial judge to inquire further. In *State v. White*, the Tennessee Supreme Court held that even when the attorney is selected and retained by the defendant, "courts have an independent interest in ensuring that criminal trials are conducted with the ethical standards of the profession and that legal proceedings appear fair to all who observe them." 114 S.W.3d 469 (Tenn. 2003) quoting *Wheat v. United States*, 486 U.S.153,160 (1988). The Court in *White* also stated, "it is axiomatic that the rights of the criminal defendant demand that there be no actual or perceived conflict of interest that would have any effect whatsoever upon the defense of the charges pending." *Id.* at 479, quoting *State v. Jones*, 520 S.W.2d 515 (Tenn. 1987). Certainly it is equally axiomatic that

when the defendant is on trial for her life, the duty of the court to ensure the absence of actual or perceived conflict is that much greater.

The Court in *Mickens v. Taylor*, 535 U.S. 162, 171-172 (2002), held that the rule in *Cuyler v. Sullivan* requires proof that an actual conflict exists, *i.e.*, that the conflict actually affected the representation. If it is shown that the conflict affected the representation, then it is unnecessary to show *Strickland* prejudice.[3] However, the Court made clear that its holding, that once an actual conflict is shown the conflict alone excuses the need to show prejudice, is limited to the representation of multiple defendants. The Court expressly left for another day a decision as to whether the *Cuyler v. Sullivan* rule can be applied to other matters, such as counsel's own financial interests, as it had been extended by numerous lower courts. *Id.* at 174-176.

In *Mickens*, while indicating that the rule established from *Cuyler v. Sullivan* was presently limited to conflicts created by representing multiple defendants, Justice Scalia, writing for the majority, noted that several Circuit Courts of Appeal had

> applied *Sullivan* "unblinkingly" to "all kinds of alleged attorney ethical conflicts," *Beets v. Scott*, 65 F.3d 1258, 1266 (C.A.5 1995) (en banc). They have invoked the *Sullivan* standard not only when (as here) there is a conflict rooted in counsel's obligations to *former* clients, see, *e.g.*, *Perillo v. Johnson*, 205 F.3d 775, 797-799 (C.A.5 2000); *Freund v. Butterworth*, 165 F.3d 839, 858-860 (C.A.11 1999); *Mannhalt v. Reed*, 847 F.2d 576, 580 (C.A.9 1988); *United States v. Young*, 644 F.2d 1008, 1013 (C.A.4 1981), but even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal, *United States v. Hearst*, 638 F.2d 1190, 1193 (C.A.9 1980), a job with the prosecutor's office, *Garcia v. Bunnell*, 33 F.3d 1193, 1194-1195, 1198, n. 4 (C.A.9 1994), the teaching of classes to Internal Revenue Service agents, *United States v. Michaud*, 925 F.2d 37, 40-42 (C.A.1 1991), a romantic "entanglement" with the prosecutor, *Summerlin v. Stewart*, 267 F.3d 926, 935-941 (C.A.9 2001), or fear of antagonizing the trial judge, *United States v. Sayan*, 968 F.2d 55, 64-65 (C.A.D.C.1992).

[3] *See Strickland v. Washington*, 466 U.S. 668 (1984), to show ineffective assistance of counsel, petitioner must show both deficient performance and prejudice.

*Id.* at 174-175. While Justice Scalia left as an open question whether any of these conflicts fall within the *Cuyler v. Sullivan* exceptions, the conflicts in this case, since as with representing multiple defendants they deprive Ms. Pike of the threshold requirement of a fair proceeding, should be subject to those exceptions. Thus, Ms. Pike, having demonstrated that the actual conflict exists, is entitled to a new trial.

Of particular importance here is the fact that there is no one to bring the conflicts to the attention of the Court or to Ms. Pike. It is only the Court, the adverse party and Mr. Talman himself who have knowledge of the conflict. Each had an independent duty to Ms. Pike and to the fairness of the criminal justice system to inquire into the conflict; yet each failed to do so. When those with knowledge failed to speak, Mr. Talman's myriad conflicts became the silent weight tilting the scales of justice and incubating the injustice that infected the trial itself.

From the day of his appointment as lead trial counsel for Ms. Pike, through the conclusion of the direct appeal, attorney William Talman proceeded under an actual conflict of interest. The Office of the Comptroller for the State of Tennessee investigated Mr. Talman for over billing the state in his claims for reimbursement from the Indigent Defense Fund for his work in appointed cases. The three criminal court judges for Knox County – including this Court – were interviewed as part of the investigation. The interviews had been conducted by the end of January 1995. The Comptroller's report on the investigation was issued in late May 1995. In the report, Mr. Talman is specifically mentioned as the second most egregious offender in the over billing practices, having over billed the Indigent Defense Fund of the Administrative Office of the Courts, from 1990-1993, by a total of $67,027. (PC Exhibit 1, Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit,

Division of State Audit (hereinafter Comptroller's Report), at 9.)

This Court appointed Mr. Talman to represent Ms. Pike on or about May 23, 1995, approximately a month after Mr. Talman had repaid approximately $67,000 through the Knox County District Attorney. (Comptroller's, Exhibit 1 to Feb. 27, 2006 hearing.) During a hearing in this matter on February 27, 2006, this Court acknowledged having known, at the time she appointed Mr. Talman to represent Ms. Pike, that she was aware of Mr. Talman being under investigation for having over billed the indigent defense fund. (PC Transcript, February 27, 2006 Motions Hearing, Vol. I, at 30-32, Vol. II at 113[4].) The findings of the Comptroller were published in three major Tennessee newspapers – including the *Knoxville News Sentinel* – on June 7, 1995. (TR PC April 8, 2008 PCR Proceedings Vol. 3 at 255-258.) At no time during the course of pre-trial, trial or post-trial proceedings in Ms. Pike's capital case did this Court inquire of Ms. Pike (1) whether she was aware that Mr. Talman was the subject of a state investigation; (2) whether she was aware that Mr. Talman had been forced to repay the indigent defense fund through the Knox County Office of the District Attorney General more than $60,000 in over billed fees; or (3) whether she waived the conflicts arising from his misconduct. When an actual conflict of interest exists it can only be waived after a "full disclosure of the conflict of interest and an effective waiver by the client." *McCullough v. State*, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003) perm. app. denied. However, when the conflict raises questions about the fairness of the proceeding as a whole, the court can disqualify counsel even if the defendant has waived the conflict and even if the client has hired the attorney. *State v. White*, 114 S.W.3rd 469, 476 (Tenn.

[4] In addition to noting that "it's pretty obvious that everyone in Knox County knew that Mr. Talman had problems with his billing," the court makes reference to Mr. Talman's also having been appointed during the same period to represent another death sentenced inmate, Mr. Irick, (PC Transcript, February 27, 2006 Motions Hearing, Vol. II at 113.) This statement was in error. The Irick represented by Mr. Talman was Larry Irick, who had filed a pro se petition for a writ of mandamus in a vehicular homicide case and who had previously been represented by Mr. Talman. *See State v. Larry Irick*, 861 S.W.2d 375 (Tenn. Crim. App. 1993).

2003). The conflict here is fundamental to the fairness of the proceedings; therefore, it cannot be waived.

For the purpose of post-conviction review Ms. Pike has not waived this claim. Mr. Talman represented Ms. Pike during the trial proceedings and throughout the direct appeal. Those proceedings ended on June 1, 1999, with the denial by the United States Supreme Court of Ms. Pike's petition for certiorari. The conflict was not resolved until the Tennessee Supreme Court entered its Order of Enforcement on November 24, 1998.[5] (PC Exhibit 2A.) Consequently, these post-conviction proceedings present Ms. Pike with the first opportunity to raise this issue. In addition, Ms. Pike submits that the appointment of counsel who was known by the appointing court to be handicapped by a serious conflict of interest is a structural defect in the constitutionality of the trial mechanism and appellate process. Therefore, this claim is not subject to harmless error analysis and is cognizable for the first time in state post-conviction.

By the appointment of Mr. Talman, this Court denied Ms. Pike her right to the effective assistance by conflict free counsel and a fair trail secured by the due process clause of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8, 9 and 16 of the Tennessee Constitution. She is entitled to a new trial.

### B. Christa Pike Was Denied Her Rights to a Fair Trial and the Effective Assistance of Counsel Due to the Numerous Conflicts of Interest that Plagued the Effectiveness of Her Trial Counsel.

[5] In what can only be described as an alarming coincidence, the Supreme Court's order concluding Mr. Talman's problems before the Board of Professional Responsibility was issued on November 24, 1998, (PC Feb. 27, 2006 Exhibit 3), one day after the Tennessee Supreme Court denied permission to appeal concluding Mr. Talman's involvement in this case with the exception of filing the Petition for a Writ of Certiorari in the United States Supreme Court. *See State v. Pike*, 978 S.W.2d 904 (Tenn. 1998)(decided October 5, 1998 - petition for rehearing denied November 23, 1998).

In *McCullough v. State*, 144 S.W.3d 382 (Tenn. Crim. App. 2003), the Court, citing *State v. Culbreath*, 30 S.W.3d 309, 312 (Tenn. 2000), held that "where an attorney is placed in a position of divided loyalties – here between himself and his client – an actual conflict is created. In *State v. Culbreath* a conflict had been created because a special prosecutor was being paid by a private interest group and thus "could not exercise his independent professional judgment free of 'compromising influences and loyalties.'" 30 S.W.3d at 316. The Tennessee Court of Appeals upheld a chancery court decision disqualifying an attorney from being the guardian ad litem for a woman with Alzheimer's disease when the attorney's firm represented the parties seeking to be appointed conservator. *In Re Ellis*, 822 S.W.2d 602 (Tenn. App. 1991). In so holding, the court noted that the "disqualification implicate[d] two of the **most fundamental** aspects of the attorney-client relationship – a lawyer's authority to represent a client and a client's right to be represented by a lawyer whose loyalty is to the client alone." *Id.* at 606 (emphasis added). As is set out below, in the instant case Mr. Talman and Ms. Rice advanced their personal interests above the interests of Ms. Pike and thereby denied Ms. Pike the "most fundamental aspect of the attorney-client relationship."

### 1. Mr. Talman's Pending Discipline/Prosecution for Over Billing the Indigent Defense Fund in Excess of $60,000 Denied Ms. Pike Her Fundamental Right to Due Process.

As lead counsel for Ms. Pike, Mr. Talman owed her the duty of loyalty. This duty required him to decline to represent her unless he was assured that neither his interest nor that of any other person would adversely affect his representation of Ms. Pike. *See* Tenn. Sup. Ct. R. 8,

RPC RPC 1.7(b) and Comments. Once appointed, this duty of loyalty also required that he move to withdraw before trial and again during the appeal.

At the time of Petitioner's trial, Mr. Talman was the subject of an ongoing investigation by the Administrative Office of the Courts, the Board of Professional Responsibility, and the Knox and Davidson County District Attorneys General's offices for over billing the state for his representation of indigent defendants. This deprived Ms. Pike of her right to the undivided loyalty of her counsel. *Wood v. Georgia*, 450 U.S. at 272.

To put this issue into perspective, according to the Comptroller's report, Mr. Talman was determined to have over billed the State for his representation of indigent defendants a total of $67,027 from 1990-1993. Pursuant to Tenn. Sup. Ct. R. 13 § 2(B) (Michie 1994-1995 Ed.), the hourly fee for appointed cases was capped at $20 per hour for work out-of-court and $30 per hour for work in-court. There were also substantial per case limitations beginning at a $100 maximum for misdemeanor cases and increasing to a $1000 maximum for felony cases in the trial courts. Ignoring the per case caps and assuming that Mr. Talman could legitimately be compensated for every hour he worked, Mr. Talman billed for an additional 2,234 hours (assuming only in-court time at $30 per hour) to 3,351 hours (assuming only out-of-court time at $20 per hour). Thus, in billing the Administrative Office of the Courts for his work on indigent cases, Mr. Talman was claiming that he worked between 70 to 105 full 8 hour days per year more than he actually worked. Therefore, as Mr. Talman was preparing to represent Christa Pike in this very high profile and complex death penalty case, he was facing possible suspension of his law license and perhaps prosecution.[6]

---

[6] The proof at the hearing indicated that the sanction against Mr. Talman was the suspension of his license for one year and that suspension was suspended. (*See* PC Feb. 27, 2006 Exhibit 3, 1998 Order of Tenn. Sup. Ct.) This

Three aspects of Mr. Talman's over billing of the Indigent Defense Fund adversely effected his representation of Ms. Pike. First, there was the prospect that he might be prosecuted for fraud or theft. Because he was aware that Mr. Crabtree, the very prosecutor who was seeking the death penalty for Ms. Pike, was also involved in collecting the funds from him for the over billing and otherwise involved in deciding how the District Attorney's office would respond to the situation, he had ample reason not to attack or aggressively challenge the prosecutor. (TR PC April 8, 2008 PCR Proceedings Vol. 3 at 260.) Second, even if the threat of prosecution had largely subsided by the time Mr. Talman accepted the appointment to represent Ms. Pike, he certainly still faced a high likelihood of his license to practice law being suspended. As a result, to avoid risking another sanction or condemnation by the court, he had to conservatively represent Ms. Pike. Third, he relied upon court appointments as a major part of his livelihood. Prior to his appointment to Ms. Pike's case, he had not taken appointments for some time due to the pending action before the Board of Professional Responsibility. (TR PC April 8, 2008 PCR Proceedings Vol. 3 at 262.) Under these circumstances Mr. Talman could not afford to continue not accepting appointments and could hardly risk alienating his patron, the courts of Knox County, by zealously representing Ms. Pike. As will be further set out below, Mr. Talman's need to avoid sanction or to otherwise risk alienating the courts became particularly acute when he misrepresented his reasons for not having earlier provided Mr. Crabtree with Dr. McCoy's

---

rather lenient treatment of Mr. Talman's offense was credited to the role played by the General Sessions and Criminal Courts in Knox County in the over billing. The courts both established a system that allowed multiple charges that could be combined into a single indictment to be charged in multiple indictments leading to multiple opportunities to bill for a single court appearance or single out-of-court task and failed to adequately monitor how attorneys were billing this time to the indigent defense fund. The role of the courts in facilitating Mr. Talman's fraudulent over billing and then appointing him to represent Ms. Pike while the cloud remained over his head undermines the public's trust and confidence in the judiciary. This fact exacerbates the error of appointing Mr. Talman in this case.

report on Ms. Pike's social history. This led to Mr. Talman's catastrophic decision to omit over 90% of the available sentencing phase proof: together with providing the State with ammunition to annihilate the witnesses who were called. (See, TR PC April, 2008 Proceedings Vol. VIII at 740.)

Pending actions concerning Mr. Talman's over billing crippled him from providing the level of representation in a death penalty case that is required by the Sixth Amendment to the United States Constitution and Art. I § 9 of the Tennessee Constitution. Significantly, Mr. Talman never advised Ms. Pike of this conflict and not a single question was asked during voir dire or in pretrial questionnaires that would have elicited from the members of the venire whether they had read any of the articles that had been written naming Mr. Talman in the over billing matter or if they had learned of it in any other way. Consequently there was a severe risk that one or more jurors may have been aware of Mr. Talman's fraudulent billing practices and therefore determined that they could not trust him or anything that he said or did in court. Perhaps most illustrative of the effect of the conflict is that it would be virtually impossible to know what damage Mr. Talman's publically reported legal and ethical problems would have on Ms. Pike's case without any knowledge as to what the jurors knew, had read or had heard.

This cloud hung over Mr. Talman for duration of representation of Ms. Pike. As Mr. Talman was representing Ms. Pike in the trial court, his law license and livelihood were in jeopardy. As his represented Ms. Pike in the Court of Criminal Appeals he had no assurance he would be permitted to continue to practice law. Only on the day after the Tennessee Supreme Court deny the motion to rehear, did he learn that the only sanction he would receive would be

having his license suspended for a year and that suspension itself suspended.[7] At each stage of the proceeding Mr. Talman had a duty to withdraw from the representation of Ms. Pike and the courts had a duty to ensure Ms. Pike had counsel who owed loyalty to her alone. Mr. Talman's appointment in this case and his representation of Ms. Pike was a fundamental denial of due process.

### 2. The Defense Failure to Present the Testimony of Dr. Diana McCoy, Its Principal Sentencing Phase Witness, Was the Result of an Actual Conflict of Interest.

Ms. Pike will leave for argument below that it was ineffective assistance to plan to present almost the entirety of the mitigation evidence through Dr. McCoy rather than subpoena and present testimony from the people who knew Ms. Pike and had observed her over the 18 years of her life prior to this offense. Here, she will address the failure of trial counsel to call Dr. McCoy because of Mr. Talman's actual conflict of interest.

Prior to and during the trial Mr. Talman had made it clear that he planned on presenting the mitigation evidence through Dr. McCoy, the mitigation specialist who had gathered the documents and who had interviewed the individuals who knew or had known Ms. Pike. (See, TR PC April, 2008 Proceedings Vol. VIII at 715.) After the jury had returned its verdict convicting Ms. Pike of first degree murder, there was an in-chambers meeting between the Court and counsel for both parties. Regrettably, counsel for Ms. Pike failed to request that all discussions about the case be recorded, and this meeting, which took place out of the presence of the court reporter, is not contained in the transcript. Nevertheless, following the in-chambers portion of the meeting, with the matter again on the record, it is clear that Dr. McCoy's three

[7] See note 5, above, indicating that the complaint before the Board of Professional Responsibility was not resolved until the day after the Tennessee Supreme Court denied rehearing on the direct appeal.

volume social history had just been provided to the State and that the lead prosecutor was not happy. (TR Trial Vol. XXIX at 2468.) After leaving court, Mr. Talman contacted Dr. McCoy. He informed her that he was in trouble because he had told the Court and the prosecutors that he had delayed providing her three volume social history to the State because she, Dr. McCoy, had only provided it to him that morning. He requested that, if asked during her testimony, she testify that she had in fact provided it to him on that Friday. (See, TR PC April, 2008 Proceedings Vol. VIII at 740.) She informed him that she could not and would not lie on the witness stand. (*Id.* at 740.) In fact, she even contacted a highly respected Knoxville attorney to ask what her options might be and he supported her decision that she could not lie.. (TR PC April 10, 2008 PCR Proceedings Vol. 10 at 998-1000 and TR PC April 10, 2008 PCR Proceedings Vol. 11 at 1001-1003.) Upon learning of this ethical decision by Dr. McCoy, Mr. Talman announced that she would not be called as a witness and he began frantically restructuring the sentence phase of Ms. Pike's trial. As a result only three witnesses, Ms. Pike's mother, father and maternal aunt, were called and very little of the evidence that had been collected by Dr. McCoy was presented. In fact, because Mr. Talman had provided the entire work product of Dr. McCoy to the State, the most damaging portions its contents were presented through the State's cross-examination of the defense witnesses without any explanation as to the mitigating nature of the evidence. (*See* TR Trial Vols. XXIX and XXX at 2483 -2547.)

Mr. Talman and his co-counsel, Julie Rice, contended in their testimony at the post-conviction hearing that they had legitimate reasons for not calling Dr. McCoy. The first reason makes no sense; the second and third prove grossly ineffective assistance of counsel. The first excuse provided relates to the dating relationship between Dr. McCoy and the lead prosecutor, Bill Crabtree. (*See* TR PC April, 2008 Proceedings Vol. IV at 352 (testimony of Talman) Ms.

Rice insisted that she had no knowledge of the relationship until the eve of trial. (TR PC April, 2008 PCR Proceedings Vol. I at 86.) Mr. Talman testified that he first learned of the relationship a week or two before trial. (TR PC April, 2008 PCR Proceedings Vol. IV at 354.) These answers were contradicted by Dr. McCoy, who testified that she told Mr. Talman about her then past relationship with Mr. Crabtree when she was first contacted prior to accepting the appointment. (TR PC April, 2008 PCR Proceedings Vol. VIII at 748.) Dr. McCoy's recollection of the matter was supported by Mr. Moncier's testimony that Dr. McCoy had contacted him to ask whether she should accept the appointment to work on Ms. Pike's case (TR PC Apr. 2008 Vol. XX at 995-998), and attorney Gregory Issaacs' testimony that he recalled Mr. Talman telling him that there was no problem with Dr. McCoy having dated Mr. Crabtree (TR PC Apr. 11, 2008 Vol. 1 at 9.) Dr. McCoy testified that the dating relationship had been brief and had ended prior to her involvement in Ms. Pike's trial defense team. (TR PC April 2008 Vol VIII at 747-748.) Although Mr. Crabtree could not remember when the relationship had ended, he agreed that it had been brief, and he said that he first learned that Dr. McCoy was involved in Ms. Pike's defense when he received her report. (TR PC April 2008 PCR Proceedings Vol III at 237.)

In evaluating the truthfulness of this excuse for not calling Dr. McCoy, the Court must ask: if Mr. Talman knew at least a week before trial of Mr. Crabtree and Dr. McCoy's dating relationship, then why did he delay until the night before the start of the sentencing hearing to decide not to call her as a witness? Why did he not subpoena the necessary lay witnesses who Dr. McCoy had interviewed and whose statements he had planned to present through Dr. McCoy? Why had he not questioned Mr. Crabtree about the relationship before trial and, after Mr. Crabtree had responded, if there still seemed to be a problem, why had he not moved to

recuse Mr. Crabtree? Why had he not informed the Court of the problem or asked for a continuance? The answer to all of these questions is quite clear. The dating relationship between Dr. McCoy and the lead prosecutor in the State's case against Ms. Pike was irrelevant to the reason for not calling Dr. McCoy.

The second excuse, if true, proves the ineffective assistance of counsel claim. Both Mr. Talman and Ms. Rice offered a second reason for not calling Dr. McCoy - that the State had shown up Saturday morning to start the sentencing phase with all three volumes of Dr. McCoy's social history littered with "yellow sticky notes." (TR PC April 2008 PCR Proceedings Vol. I at 77.) That is, after they gave Mr. Crabtree far more information than he was entitled to receive had they simply provided the State with a report from Dr. McCoy, *see State v. Nichols,* 877 S.W.2d 722, 730 (Tenn. 1994)("when a psychologist or psychiatrist does not prepare a summary report, but instead relies on extensive memoranda to record not only observations and hypotheses but also evaluations, such records are discoverable under Rule 16(b)(1)(B)), the prosecutors prepared for the cross-examination of the expert whom, they now had every reason to believe, was a key defense witness.

Both Ms. Rice and Mr. Talman offered yet a third reason, that like others fails when subjected to the evidence in the record. Both claimed that they were concerned because Dr. McCoy could not corroborate what Dr. Engum had said. (TR PC April 2008 PCR Proceedings Vol. I at 77, 79-80; Vol. IV at 348, 352.) Ms. Rice thought it may have been that Dr. McCoy would not agree as to whether Ms. Pike had dissociated at the time of the offense. (TR PC April 2008 PCR Proceedings Vol. I at 80.) Mr. Talman testified that immediately prior to the sentencing phase the "had a little huddle" and he told Dr. McCoy "'I'm going to have you corroborate Dr. Engum's report and go through things.' And she said, 'I can't do that; I didn't

conduct an evaluation of Miss Pike.'" He said at that point he made his decision. (TR PC April 2008 Vol. IV at 352. However, both admitted having met with Dr. McCoy and having discussed the case. Both said they had planned to use her as their primary mitigation witness right until the last minute. (TR PC April 2008 Vol. I at 60; Vol. IV at 349-351.) Both presumably, if they had been even marginally diligent should have known what part of Dr. Engum's report she could or could not agree with before turning her social history over to the State. If they had a major problem it was deficient performance not to work that out well before trial. If there was not a major problem, this is not a reason not to use this critical witness. The only conclusion that can be drawn is that this rationale was manufactured after the fact.

Mr. Talman further demonstrated his non-qualification to be defense counsel in a death penalty case by advancing yet a fourth reason for not calling Dr. McCoy. He was concerned about calling Dr. McCoy as a witness because there was harmful information in Dr. McCoy's three volumes. (TR PC April, 2008 PCR Proceedings Vol. IV at 348.) This testimony proves either both ignorance of what constitutes mitigation[8] and gross neglect of their responsibilities in

[8] Ms. Rice had attended a seminar presented by the Capital Case Resource Center at which she obtained a copy of the 1992 edition of Tools for the Ultimate Trial. A copy of the three volume set was then entered into evidence on the request of the State. In Chapter 14 regarding the sentencing phase, at page 14.7, the text states:

> Other than limiting and rebutting the state's proof, [the sentencing phase] is the defendant's opportunity to tell his/her story - a story calculated to "emphasize the positive", i.e., the "good guy" evidence, and **to "explain the negative", i.e., the reasons outside the defendant's free volition describing why s/he committed this crime and possibly other bad acts.**
>
> **Typically, there is more negative [information about the client] to explain and less positive to emphasize.** Emphasizing the positive is easier than explaining the negative; and, consequently, it is not unusual for counsel to neglect to explain the negative as it should be done - but the jury wants to know and **the explanation of the negative may involve substantial mitigation evidence that should be presented.** The explanation of the negative typically requires more commitment and creativity from defense counsel, sometimes has the potential for inviting damaging cross-examination in rebuttal form the state, which must be avoided, and involves extra-legal medical, psychological and sociological expertise and an intensive investigation - thus the need for the "team" approach and specialized expertise in capital cases.

representing Ms. Pike or that they were simply lying[9] to the Court. Both Mr. Talman and Ms. Rice had an obligation to know what was in the materials they gave to Mr. Crabtree. If, in fact, they were concerned about the negative material, which they claim justified not calling Dr. McCoy, then the material should have never been turned over to the State.

However, as was demonstrated at the post-conviction evidentiary hearing through the testimony of Drs. McCoy and Kenner, it would have been unlikely that the social history of a person who suffered the childhood trauma experienced by Ms. Pike, her prenatal brain damage, and her serious mental illness would not contain this negative information. (TR PC April 2008 Vol. VII at 638; TR PC Apr. 11, 2008 Vol. 2 at 171.) Consequently, the negative information that Mr. Talman and Ms. Rice professed to fear proved that Ms. Pike suffered from a serious mental illness. This information was classic mitigation and it needed to be presented. (TR PC April 2008 Vol. VII at 638) The fact that the three volumes of social history were provided to the State proves without question that on the Friday afternoon prior to the start of the penalty phase on Saturday, Talman and Rice planned on presenting the vast majority, if not all, of the sentencing phase evidence through Dr. McCoy.

Based on their proffered rationale for not calling Dr. McCoy, Mr. Talman and Ms. Rice ask this Court to find that they provided the three volume social history to the State on the eve of Ms. Pike's sentencing trial: a) hoping the prosecutor would not review them; b) because Dr. McCoy had dated Mr. Crabtree - something which Mr. Talman says he learned a week or two before trial; c) because the materials contained negative information. They ask the Court to

(PC April 2008 Exhibit 14B, Tools for the Ultimate Trial, Vol. II, p. 14.7.)(emphasis added)

[9] Undersigned counsel do not lightly accuse other members of the bar of outright dishonesty. However, in this matter the only real conclusion is that Mr. Talman and Ms. Rice were grossly derelict in their duty to Ms. Pike by not being aware of the content of Dr. McCoy's social history before providing it to Mr. Crabtree, a position which is contradicted in the record, or they are simply lying. Since, Ms. Pike's life is at stake, undersigned counsel refrain from denying the obvious.

further find that they did not know any of the above or expect the prosecutor to prepare so it was reasonable, prior to the afternoon before the sentencing phase, to base there sentencing strategy entirely on Dr. McCoy testifying and, thus, not subpoena any lay witnesses. In short, their stated strategy was to present all the extensive information obtained from interviewing numerous individuals - family, friends, juvenile justice professionals, etc. - through Dr. McCoy with the plan that if the prosecutor did decide to review the materials provided to him they would simply refrain from presenting the evidence. It is hard to imagine more deficient performance. Given the wealth of mitigation not presented at trial that was presented in post-conviction, the likelihood of a different outcome is irrefutable.

Thus, this Court could accept Mr. Talman's and Ms. Rice's rationale for not calling Dr. McCoy and simply grant relief based upon ineffective assistance of counsel. What this Court cannot do, consistent with this Court's duty to uphold the integrity of the judiciary, Tenn. Sup. Ct. R. 10, Code of Judicial Conduct, Canon 1, is to stand idly by and tolerate the denial of Ms. Pike's fundamental right to a fair trial.

While, as stated above, the Court could find ineffective assistance of counsel simpliciter, this would require ignoring the obvious truth. The only explanation for failing to call Dr. McCoy is that Mr. Talman had misrepresented to the Court and the State when he had received Dr. McCoy's three volumes of social history materials from her. This created a serious conflict for Mr. Talman - call Dr. McCoy and risk the Court's learning that he had lied in chambers the day before or not call his principal mitigation witness and fail to defend Ms. Pike. He had to choose: Give his loyalty to his client or to himself. He chose himself, and this choice was aided and abetted by Ms. Rice. Not only would a misrepresentation to the Court be a problem on its own, Mr. Talman faced a larger dilemma - his law license was already under review for having over

billed the Indigent Defense Fund.

In this case, with his lying to the court conflict being aggravated by his theft from the Indigent Defense Fund conflict, the rule in *Cuyler v. Sullivan*, that once the actual conflict is shown prejudice is assumed, must apply to protect the integrity of the legal system. Nevertheless, as set out below, regardless of the application of the rule *Cuyler v. Sullivan,* the failure to present Dr. McCoy or a substitute for both the factual information in Ms. Pike's social history she was to present and the social/psychological ramifications of that social history that she could have provided resulted in severe prejudice to Ms. Pike.

### 3. Both Mr. Talman and Ms. Rice Ignored Ms. Pike's Interest While Pursuing Their Own by Trying to Benefit Financially From Her Story.

As noted above, the most fundamental right of a client is that her attorney's loyalty is to her alone. In the instant case it is clear that the loyalty of both Mr. Talman and Ms. Rice was first to themselves. The breach of the duty of loyalty to Ms. Pike demonstrates that in accepting the appointment in this matter, Mr. Talman was not considering Ms. Pike's best interest but rather his own. He ignored any adverse effect on Ms. Rice that might result from his personal circumstances from the over billing scandal. As Mr. Talman explained, he had not taken an appointment for sometime. (TR PC April 2008 Vol. III at 262.) Since appointed work was his mainstay, he undoubtedly needed this appointment. In addition, this was to be a very high profile case with a great deal of publicity. Surely that would be good advertising.

Equally problematic was the decision of Julie Rice to accept the appointment less than two months before trial with an agreement with the Court that her late appointment would not be cause for a continuance. Ms. Rice's involvement in this case can only be understood as an

attorney with no qualifications for the daunting task of representing a client facing the death penalty agreeing to handle the case without sufficient time to prepare for trial. Under these circumstances, could she possibly be considering the best interests of Christa Pike?

If there remained any doubt that neither Mr. Talman nor Ms. Rice had an interest in this case other than to advance his or her own career or income, that doubt vanishes when, shortly after trial, Ms. Rice and Mr. Talman had their client, who had just turned twenty and been sentenced to death, sign a waiver to allow them to make a profit by selling her tragic story. (PC Apr. 2008, Exhibit 13; TR PC Apr. 2008, Vol. 2 at 159-160.) The ABA Standards for Criminal Justice, Second Edition, 1980, The Defense Function, Standard 4-3.4 states:

> It is unprofessional conduct for a lawyer, prior to conclusion of all aspects of the matter giving rise to his or her employment, to enter into any agreement or understanding with the client or a prospective client by which the lawyer acquires an interest in publication rights with respect to the subject matter of the employment or proposed employment.

Mr. Talman explained the request by indicating that they were trying to write a book and wanted to make sure the waiver covered the profits. (TR PC April 2008 Vol. VI at 536.) Ms. Rice's explanation was equally suspect. She admitted planning to write a book, but thought it might be a "teaching tool" and claimed that release merely was indicating that they would use any privileged information. (TR PC Apr. 2008 Vol. 2 at 159-161.) Unfortunately there is nothing in the release that mentions not using privileged information. (PC April 2008 Exhibit 13.)

Mr. Talman had also asked Christa's aunt to co-author a book about Christa with him. (TR PC April 2008 Vol. 5 at 414.) Therefore, the facts clearly establish the true interest in representing Ms. Pike – personal profit by selling her story. Admittedly, proving that due to this personal interest and divided loyalty they permitted Ms. Pike to be sentenced to death is a very

difficult task. While it is true that if Ms. Pike were not convicted of first degree murder or if she had not received the death penalty, her story would be less newsworthy and less valuable. On the other hand, nothing that either Mr. Talman or Ms. Rice did or did not do cannot be equally explained by incompetence or by one or more of the other conflicts that denied Ms. Pike the effective assistance of counsel and a fair trial.

What has been proven in this case is that Ms. Pike was denied her state and federal constitutional rights to a fair trial and to representation by counsel whose loyalty is to her alone. Moreover, the evidence demonstrates that due to one or more existing conflicts the vast majority of the mitigating evidence about Ms. Pike's life was not presented and no witness was called to explain, in a mitigating way, the evidence that was presented.

The existence of a series of conflicts in this matter deprived Ms. Pike of a fair trial. Therefore, this Court must grant Ms. Pike's Petition for Post-Conviction Relief and grant her a new trial.

### C. The District Attorney General of Knox County Denied Ms. Pike Her Right to a Fair Trial by Failing in Its Duty to Bring to the Court's Attention the Severe Disability that Encumbered Mr. Talman's Representation of Ms. Pike.

Because the District Attorney General of Knox County was involved in the collection of the funds from Mr. Talman as a result of his having over billed the indigent defense fund, *see Comptroller's Report*[10] and had been in communication with the District Attorney General of Davidson County regarding potential prosecution of Mr. Talman for what clearly constituted theft from the State, *see* Correspondence with Victor S. Johnson, (PC April 2008 Exhibit 1; TR

[10] The Comptroller's report was Exhibit 1 to the Hearing on February 27, 2006, and included in the record of the evidentiary hearing by judicial notice on April 7, 2008. (TR PC Apr. 2008 vol. 1 at 13-14.)

PC April 2008 Vol. 1 at 15-16), the District Attorney General had a duty to object to the appointment of Mr. Talman to protect the integrity of the process. *See, generally, State v. White*, 114 S.W.3d 469 (Tenn. 2003). By failing to take any steps to protect Ms. Pike's right to conflict free counsel, the State unconstitutionally participated in denying Ms. Pike her right to conflict free counsel.

Because the Court, the State and defense counsel themselves failed to protect Ms. Pike's right to conflict free counsel and to an attorney whose undivided loyalty was to the client, this Court must grant Ms. Pike's petition for post-conviction relief and set aside her convictions and sentences.

## II. The Performance of Trial Counsel Fell Well Below that Required by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I §§ 8, 9 and 16 of the Tennessee Constitution; Denying Ms. Pike a Fair Trial and the Effective Representation of Counsel.

### A. Standards to apply for finding that Ms. Rice and Mr. Talman failed to provide assistance as required by the Tennessee and United States Constitutions.

In *Gideon v. Wainwright*, Justice Black, writing for the Court reviewed the Court's jurisprudence beginning with *Powell v. Alabama*, 287 U.S. 45 (1932), to conclude that the right to counsel is a fundamental right under the Fourteenth Amendment to the United States Constitution. *Gideon v. Wainwright*, 372 U.S. 335, 343-344 (1963). Justice Black concluded that counsel for the accused is necessary to assure a fair trial. *Id.* at 344. In *Stickland v. Washington*, 466 U.S. 668, 685 (1984), the Court recognized "[t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the

constitutional command." The Court further held that the sentencing proceeding in a death penalty case "is sufficiently like a trial in its adversarial format and in the standards for decision [citation omitted] that counsel's role in the proceeding is comparable to counsel's role at trial – to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* at 686-687. Consequently the same standard applies to counsel's performance in the guilt innocence phase and the penalty phase of a death penalty trial. *Id.*

The Strickland Court held that to violate the Sixth Amendment's guarantee of the effective assistance of counsel a petitioner must show that counsel's performance was both deficient and that counsel's deficient performance prejudiced the petitioner. *Id.* at 687. The Court then held that the proper standard to show deficient performance was that counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. The Court went on to hold:

> More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See *Michel v. Louisiana*, 350 U.S. 91, 100-101, 76 S.Ct. 158, 163-164, 100 L.Ed. 83 (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

*Id.* The Court then stated "[t]hat prevailing norms of practice are reflected in American Bar Association Standards and the like ...." *Id.*

Almost a decade earlier the Tennessee Supreme Court had reached the same conclusion. The Court held in *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), that the appropriate standard of attorney performance was "within the range of competence demanded of attorneys in criminal cases." The Court further held that in deciding whether the performance met the

standard "[t]rial courts and defense counsel should look to and be guided by the American Bar Association's Standards relating to the Administration of Criminal Justice in general, and specifically to those portions of the Standards which relate to the Defense Function." *Id.*

While the ABA Standards for Criminal Justice outlined the national standards for criminal defense in 1975 and 1984, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases establish reasonable performance today. *See Wiggins v. State*, 539 U.S. 510, 524 (2003); *Rompilla*, 545 U.S. 374, 388, n.7. Therefore, the performance of Mr. Talman and Ms. Rice must be measured by these standards and by those set out by the NLADA. Relevant parts of these standards were provided at the Court's request during the proceedings on this matter conducted on July 30, 2007 and are now a part of the technical record. (*See* TR PC July 2007 Vol. 1 at 67-70 (reference to Compendium of Guidelines/References Regarding the Performance of Counsel in Death Penalty Cases, Vol. 1 at 68; reference to Notice of Filing, Vol. 1 at 69).)

In determining that trial counsel's performance prejudiced Ms. Pike, this Court must use the low standard of whether counsel's deficient performance "undermined confidence in the outcome." The *Strickland* Court held that the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Justice O'Connor, writing for the majority, further explained the standard.

> On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in

> criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence. [Citation omitted] Nevertheless, the standard is not quite appropriate.
>
> Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The **high standard** for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. [Citation omitted.] An ineffective assistance claim asserts the absence of one of the critical assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. **The result of a proceeding can be rendered unreliable and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.**

*Strickland*, 466 U.S. at 693-694 (emphasis added). Justice O'Connor further elaborated on this standard in *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000), explaining:

> Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held *Strickland* that the prisoner need only demonstrate a "reasonable probability that. . . the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. 2052.

529 U.S. 362, 405-406 (2000).

Set out below are numerous factual examples of deficient performance by trial counsel. Some, standing alone, deprived Ms. Pike of her right to the effective assistance of counsel. Others exacerbated the prejudice caused by the failure to present the mitigation evidence while others, when viewed collectively, denied Ms. Pike her right to the effective assistance of counsel. For example, failure to conduct an adequate voir dire resulted in a jury that was less able to understand the nature of mitigation. Further, defense counsel's failure to object to the State's

insistence that Ms. Pike's age should not considered mitigating exacerbated the failure to present significant mitigating evidence. Therefore, the Court must consider the accumulation of the deficiencies, not simply the effect of each deficiency in isolation.

## B. Failure to Present Mitigation Evidence

This element of deficient performance is set forth in the section I(B)(2) above and the information and argument therein is herein incorporated by reference. As mentioned in that prior section, due to a conflict of interest Mr. Talman elected not to call Dr. McCoy and thereby decided not to present significant mitigating evidence. However, not only did Mr. Talman and Ms. Rice fall woefully below the required standard of performance by failing to call Dr. McCoy, their performance was deficient by their anticipated counsel of action to present all of the mitigation evidence through the mitigation specialist, rather than through the lay witnesses she had interviewed. Moreover, the evidence from the post-conviction hearing makes clear that neither Mr. Talman nor Ms. Rice understood the concept of presenting mitigation evidence, which rendered their performance both deficient and in violation of the ethical requirement that attorneys must either decline work for which they are not qualified or associate attorneys who are qualified.

It is clear that as the sentencing phase of the trial approached, Mr. Talman and Ms. Rice intended to present the bulk of their sentencing phase evidence through Dr. McCoy. They had not subpoenaed any witnesses for the penalty phase. Dr. McCoy testified that until the Friday night before the sentencing trial began on Saturday morning, Mr. Talman had told her that his plan was to present the sentencing phase evidence through her. Mr. Talman had her prepare enlargements of the family tree and other items to use as demonstrative aids to her testimony.

(TR PC April 2008 Vol. VII at 676.) However, if there is any ambiguity about Mr. Talman and Ms. Rice's intent to use Dr. McCoy for this purpose, that ambiguity is resolved by the irrefutable fact that Mr. Talman turned Dr. McCoy's three volumes of materials over to the prosecutors immediately following the verdict on the guilt/innocence trial. (TR Trial Vol. XXIX at 2468.) The act of turning this material over to the State is inexplicable if Mr. Talman had not at that time both intended to call Dr. Mc Coy and intended to introduce many of the documents contained in those volumes, or perhaps all three volumes themselves, into evidence. Tenn. R. Crim. P. 16 requires only that the report of a defense expert and any documents in the possession of the defense which they plan to introduce into evidence be turned over to the State. Therefore, there are only two possibilities, Mr. Talman and Ms. Rice were planning on putting the documents contained in the social history volumes into evidence through Dr. McCoy, or they were totally incompetent. Either way, planning to present all or even most of the client's social history into evidence through an expert, rather than by calling the lay witnesses - relatives, friends, juvenile justice worker, etc., constitutes ineffective assistance of counsel.

Ms. Rice insisted that they were aware of the three-volume *Tools for the Ultimate Trial-The Tennessee Death Penalty Defense Manual*, Third Edition, 1992. (TR PC April 2008 Vol I at 37.) In fact, this manual was placed in evidence at the request of the State during its cross-examination of Ms. Rice. (TR PC April 2008 Vol. II at 194; PC Exhibit 14(A), (B) and (C).) The manual states the obvious, that "[p]erfectly investigated and substantiated mitigation is absolutely useless without credible, coherent witnesses who can bring the information before the jury." *Tools for the Ultimate Trial* at 14.61. The manual then speaks to the use of witnesses who can provide a "narrative recounting" of the client's life, i.e. the family members, friends, social workers, etc. who can testify to the factual issues and provide anecdotal content regarding the

client's background, and witnesses who can "interpret the effect of specific life events on the client." *Id.* Thus trial counsel cannot be excused for not recognizing the importance of presenting the lay witnesses and professionals who had worked with Ms. Pike rather than simply presenting hearsay through Dr. McCoy.

As early as 1973, professional literature questioned whether jurors accepted the testimony of defense experts on issues involving the mental health issues of the type involved in death penalty cases. Aronson, *Should the Privilege Against Self-Incrimination Apply to Compelled Psychiatric Examinations?*, 26 Stanford L. Rev. 55, 63 (1973) (noting that it was not unusual for jurors to accept the testimony of lay prosecution witnesses over that of multiple defense experts on the issue of whether a defendant is competent or insane). Aronson also noted that in one study 68% of 71 juries chosen to decide the same case for an experimental study rejected the testimony of the defendant's two psychiatrists in favor of the prosecution's lay witnesses. *Id.* at 63 n.45. Later studies confirmed that jurors discredited the testimony of defense experts. Sundby, *The Jury As Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109, 1144, 1145 (1997)(studies of juror reactions to defense experts in the penalty phase of a capital trial demonstrate the importance of developing the factual support for experts testimony through lay witnesses that the jurors see as more credible than hired-gun experts, "In post-trial interviews of capital jurors, two thirds of the witnesses who were perceived to "back-fire" on the defense were expert witnesses"); Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Columbia L. Rev. 1538, 1543-1544 (1998) (Through the work of the Capital Jury Project, we know that jurors who are open to being persuaded that the death penalty is not appropriate place more trust in lay witnesses than they do in experts); Crocker, *Childhood Abuse and Adult Murder: Implications For*, 77 North Carolina

L. Rev. 1143, 1192 n.213 (1999)(studies have found that it is important to use different types of witnesses including experts, family and friends to create a coherent defense theme).

In addition, the method adopted by trial counsel to introduce the mitigation evidence was relying entirely on hearsay. While reliable hearsay is admissible at the sentencing phase, its admissibility is not without limits. *See State v. Stephenson*, 195 S.W.3d 574, 589-590 (Tenn. 2006)(Rules of Evidence, including rule against hearsay, do not limit testimony in a capital sentencing proceeding); Tenn. Code Ann. § 13-13-204(c). In *State v. Reid*, 91 S.W.3d 247, 305 (Tenn. 2002), the Court explained that the admission of hearsay evidence in a death penalty sentencing hearing "is not without constraints" and "may be excluded if it is so-unduly prejudicial that it renders the trial fundamentally unfair." The Court further stated that the admission of evidence is left to the sound discretion of the trial court. *Id.* Perhaps more importantly, using only hearsay evidence weakens its probative value to the jurors.

There was simply no logical explanation for not calling the lay and professional witnesses to build Ms. Pike's social history and then using either Dr. McCoy, Dr. Engum and/or Dr. Bernet as expert witnesses to explain how her social history was consistent with a diagnosis, be it either borderline personality disorder as Dr. Engum had concluded at trial or bipolar II disorder as Dr. Kenner found during post-conviction.

Consequently, trial counsel's preparation for the sentencing phase was woefully deficient for failing to ensure that the necessary witnesses were available in court and then calling only those family members who happened to be present.

Contrast the evidence presented at the trial with that presented at post-conviction. At trial the defense called only three witnesses, Carrie Ross, Ms. Pike's aunt, Emil Glenn Pike, Ms Pike's father, and Carissa Hanson, Ms. Pike's mother. (TR Trail Vol. XXIX - XXX at 2483-

2547.) Notably absent was any attempt to explain the significance of Ms. Pike's social history either through an expert witness or even by counsel in closing. (TR Trial Vol. 26 at 2560- 2565.) No information was presented correlating even the limited social history that was presented to Dr. Engum's diagnosis of borderline personality disorder; not to mention the bipolar and complex PTSD diagnoses, and the existence of brain damage, the heterotopia, that interfered with impulse control. At the post-conviction evidentiary hearing, twenty-three lay witnesses and professionals who had worked with Ms. Pike in the North Carolina juvenile justice system were called to provide background information regarding Ms. Pike's social history. These included family, social and juvenile workers, friends and adults who had observed Ms. Pike and her circumstances as she was growing up. In addition, three expert witnesses, Drs. Pincus, McCoy and Kenner, provided medical and psycho/social information explaining how neglect, physical, sexual and emotional abuse, exposure to the slaughter of animals as a toddler, and exposure to violent videos as an elementary school age child would serve to restructure Ms. Pike's developing brain.

## C. Trial Counsel's Performance Was Deficient in the Utilization of Expert Witnesses Prejudicing Ms. Pike.

Trial counsel further crippled Ms. Pike's defense by failing to effectively use Drs. Engum, McCoy and Bernet. Both the evidence presented at post-conviction and gleaned from the trial record indicates that Mr. Talman and Ms. Rice did not understand the use of expert witnesses. This is not surprising given their lack of experience working with experts. Yet it is well understood by experienced and competent capital defense attorneys and widely published in legal periodicals that the effective use of expert witnesses is crucial to defending a client facing

the death penalty. In both the 1989 and 2003 editions of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter ABA Guidelines), the importance of knowledge and experience in utilizing the services of experts is emphasized. 1989 ABA Guidelines, Guideline 5.1(A)(v); 2003 ABA Guidelines, Guideline 5.1(B)(2)(e)(reprinted at 31 Hofstra L. Rev. 913, 962 (2003). In fact, issues such as the need for experience in working with experts drive the need for using qualitative standards for counsel rather than the quantitative standards adopted by the Tennessee Supreme Court. *Compare* ABA Guidelines, Guideline 5.1 *Commentary*(31 Hofstra L.Rev, at 963-964) with Tenn. Sup. Ct. R. 13 § 3; *see generally* Redick, MacLean and Truett, *Pretend Justice – Defense Representation in Tennessee Death Penalty Cases,* 38 Univ. of Memphis L. Rev. 308, 408 Appendix F 411-414 (2008)(Appendix E from The Tennessee Bar Association Report to the Board of Governors and the House of Delegates of the Study Committee on Effective Assistance of Counsel in Capital Cases (December 2004)) (copy attached). The supreme courts of other states have recognized the need articulated in the ABA Guidelines for counsel who understand the use of expert witnesses and have experience utilizing then. *Pretend Justice* Appendix F, 38 Memphis L. Rev. at 414 (referencing standards set by the Washington Supreme Court).

Rather than utilize the expert services by Drs. Engum, McCoy and Bernet in a collaborative fashion, ensuring that each benefited from the work of the other, counsel limited the effectiveness of the experts by having them work in isolation. It is clear that Dr. Engum, the neuropsychologist who tested Ms. Pike and declared at her trial that she did not suffer from any brain damage[11] and missed both the bipolar illness and the complex PTSD, (TR Trial Vol. XXVI

[11] Neurologist, Dr. Jonathan Pincus, testified in the post-conviction hearing that Ms. Pike had brain damage that occurred before birth while her brain was developing during gestation and that this brain damage interfered with her

at 2182), did not have the benefit of the social history prepared by Dr. McCoy. (TR PC April Vol. VII at 673-675 and PC Exhibit 23B.) As Dr. Kenner explained at the post-conviction hearing, diagnosing a bipolar illness requires evaluating the patient over time to observe behavior, sleep and other patterns that indicate the illness. (Cite to Dr. Kenner)

The correct and accepted use of expert witnesses together with an effective investigation would have developed evidence of Ms. Pike's diminished capacity and state of mind around the time of the offense. The trial experts could have developed proof that Ms. Pike suffered from bipolar II and complex PTSD, both serious mental illnesses, had trial counsel ensured that the following tasks had been conducted: Dr. McCoy's social history had been completed sufficiently before trial and had been provided to both its team psychiatrist and psychologist; a complete examination for mental illness had been conducted; and interviews of fellow students and faculty member at Job Corps had been conducted and provided to the experts. The completion of these necessary tasks would have enabled trial counsel to demonstrate that Ms. Pike had not slept for several days leading up to the day of the offense and that she was in a state of hypomania on the day of the offense. They further could have demonstrated the likelihood that, during the planned assault on Ms. Slemmer, Ms. Pike either dissociated or entered the psychotic state of full mania and, due to a diminished capacity, was unable to form the requisite intent to commit first degree murder. (*See* TR PC April 11, 2008 Vol. 1 at 90-91); *see State v. Phipps*, 883 S.W.2d 138 (Tenn. Crim. App. 1994)(explaining diminished capacity).

ability to control impulse. (TR PC Jan 2007 Vol. III at 278-279.) As Dr. Pincus explained, all Dr. Engum could say is that his testing had shown no brain damage. Dr. Pincus stated that Dr. Engum had gone well beyond his area of expertise by stating that Ms. Pike had no brain damage. All he could actually state was that his testing had not found any brain damage. (*Id.* at 280-283.)



 514

Although Mr. Talman and Ms. Rice did attempt to present the defense that Ms Pike could not form the mental intent to commit first degree murder, due to their failure to adequately prepare Dr. Engum and their decision to prevent Dr. Bernet from evaluating Ms. Pike at all, this effort completely failed. Because Dr. Engum was not provided with Ms. Pike's social history, interviews conducted with fellow Job Corps students and faculty members, nor permitted to collaborate with a psychiatrist who had evaluated Ms. Pike, he had no knowledge of the severity of Ms. Pike's mental illness. Because he did not have the benefit of a neurologist testing Ms. Pike and reviewing that EEG that had been conducted when Ms. Pike was 14 months old and had suffered a seizure (TR PC Jan. 2007 Vol. 3 at 238-240), he was unaware of her mental defect.

Further Dr. Engum's lack of substantial information deprived him of having any insight into Ms. Pike's actual role in the offense, as opposed to the exaggerated role she accepted for herself in her statement. This allowed the prosecutor to elicit from Dr. Engum in cross-examination damaging testimony that Ms. Pike's participation, as described in her statement, was premeditated.

> On cross-examination, Dr. Engum stated that there was no question that the defendant had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

*State v. Pike*, 978 S.W.2d 904, 912 (Tenn.1998).

The evidence presented at post-conviction through Ms. Pike's friends at Job Corps and two prior girlfriends of Tadaryl Shipp described him as manipulative and violent. Ms. Pike's

friends further described the control he exercised over Ms. Pike. Additional witnesses testified that Ms. Pike craved the knowledge that someone cared about her and that this need added to Mr. Shipp's ability to control her. Of course, to evaluate these questions, Dr. Engum would have required access to Ms. Pike's full social history - access which he was denied by trial counsel.

Mr. Talman and Ms. Rice did attempt to present a defense that due to mental disease or defect Ms. Pike could not form the intent required for first degree murder. But, as a result of their failure to equip Dr. Engum with the necessary information and because they never actually utilized the services of Dr. Bernet as a psychiatrist, they were unable to present sufficient evidence to prove Christa's inability to form the intent or that it was the result of a mental disease or defect. (*Compare* TR Trial Vol. XXVI at 2177 - 2200 with TR PC Apr. 11, 2008 Vol. 1, at 25 - Vol. 2 at184.)

Moreover, not only would appropriate use of the experts have provided additional proof of inability to form the intent to commit first degree murder, it would have served to supplement Dr. Bernet's theory of collective aggression.

The availability of Ms. Pike's complete social history, interviews with her friends and associates with whom she grew up, and the interviews with her fellow students and faculty at Job Corps would have developed and availed trial counsel of the added defense and statutory mitigating circumstance of being under substantial domination of another person, i.e., Tadaryl Shipp. *See* Tenn. Code Ann. § 39-13-204(j)(6). Of course, the same evidence that should have been used to develop the theory of inability to form the requisite intent in the guilt/innocence trial would have served to develop the statutory mitigating factors of (1) being under the influence of extreme mental or emotional disturbance and (2) that her capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law were

substantially impaired as a result of mental disease or defect. *See* Tenn. Code Ann. § 39-13-204(j)(2) and (8).

**Misuse of the Services of the Defense Psychiatrist**

The errors made by trial counsel in the use of the expert witnesses was compounded by the manner in which they limited the use of their psychiatrist, Dr. Bernet. As noted above, counsel did not permit Dr. Bernet to evaluate Ms. Pike at all and they limited his testimony to a discussion of collective aggression and Satanism. (TR Trial Vol. XXVII at 2272 - Vol. XXVIII 2318.) When Dr. Bernet was called to testify about the concept of collective aggression, his testimony was limited to hypothetical issues because he had never evaluated Ms. Pike. (TR Trial Vol. XXVIII at 2315-2318.) To further undermine any utility in having called Dr. Bernet to testify, Mr. Talman, despite ensuring that Dr. Bernet had not examined Ms. Pike nor questioned her about the crime, asked him whether he had an opinion about her mental state at the time of the offense. (*Id.* at 2318.) Mr. Talman asked Dr. Bernet, "have you formed an opinion with a reasonable degree of medical or psychiatric certainty as to Ms. Pike's ability on that evening to form intent, premeditation, or deliberation?" Being put on the spot by the attorney by whom he had been retained, Dr. Bernet answered, "Ah, not having interviewed her, and with the limited information I have, I, I do not have an opinion with that degree of certainty." (TR Trial Vol. XXVII at 2318.)

By the end of Mr. Talman's inept direct examination of Dr. Bernet, any contribution the witness had made to the defense had been eliminated. Nevertheless, the damage caused by Mr. Talman's direct examination had just begun. Because Mr. Talman opened the door to Dr. Bernet's knowledge of Satanic worship, on cross-examination, the prosecutor was allowed to characterize Dr. Bernet as an expert in Satanism. Subsequently, Dr. Bernet, in answer to a

question by the prosecutor, indicated that he was not an expert in Satanist theology (TR. Trial Vol. XXVIII at 2352, "I'm not holding myself out to be an expert in satanic theology"). On redirect, counsel for Ms. Pike showed their ineptness and undermined that answer by insisting that Dr. Bernet was an expert in satanic theology (TR Trial Vol. XXVII, at 2356, "Now, you had said that you are an expert in satanic theology. What is satanic theology"). Not only did Mr. Talman's incompetent questioning of Dr. Bernet render his testimony useless, by opening the door to a flood of questions about Satanic worship, Mr. Talman enabled the State to paint Ms. Pike not only as a killer and a white young woman dating an African American man, but to define her as a worshipper of Satan to bring out the worst fears of the jurors in the Buckle of the Bible Belt.

As a result of trial counsel's lack of knowledge and competence in the use of expert witnesses, Ms. Pike was denied her right to the effective assistance of counsel under Article I, § 9 of the Tennessee Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. Trial counsel's deficient performance in the use of expert witnesses prejudiced Ms. Pike's defense by denying her both valuable guilt/innocence phase defenses – including demonstrating that due to her severe mental disease she was unable to form the requisite intent for first degree murder and due to her mental defect she was unable to reflect, [12] and significant mitigation evidence – including (a) the substantial domination by another person, (b) being under the influence of extreme mental or emotional disturbance at the time of the offense and (c) being unable to appreciate the wrongfulness of the offence or to conform her actions to the

[12] Tenn. Code Ann. §39-13-202(a)(1) requires both intent to kill and reflection.

requirements of the law due to a serious mental disease and defect.[13] Consequently, this Court must grant her petition for post-conviction relief and set aside Ms. Pike's conviction and sentence.

[13] Tenn. Code Ann. §39-13-204(j)(2),(6) and (8).

## III. Additional Deficient Performance that, Either Standing Alone or in Junction with the Deficient Performance Set Forth in Section II, Denied Ms. Pike Her Right to the Effective Assistance of Counsel.

### A. Deficiencies in Motion Practice

Trial counsel's motion practice fell below the standards required in a death penalty case, and failed to protect Ms. Pike's right to a fair trial. ABA Def. Funct. 4-3.6; 1989 ABA Death Penalty Guidelines 11.5.1(B).

#### 1. Failure to File Motion to Suppress Statement

Counsel failed to file pre-trial motions challenging Ms. Pike's interrogation. Counsel filed no pre-trial motion seeking to suppress evidence (including Ms. Pike's post-arrest statement), which was obtained by the state in violation of Ms. Pike's state and federal constitutional rights. Trial counsel should have challenged the custodial statement of Christa Pike by raising as issues the violations of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed2d 694 (1966), and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and the involuntariness of Ms. Pike's statement. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (determination of voluntariness to be made by judge, or by jury other than jury determining guilt or innocence).

Ms. Pike's custodial statement was taken in the early morning hours of January 14, 1995. In the hours immediately prior to her arrest and interrogation, Petitioner had consumed large amounts of alcohol. (TR PC January, 2007 PCR Proceedings Vol. VII at 688). Moreover, her ability to make a voluntary statement was impinged by her then existing mental disease or defect. It is evident from that tape recorded statement that she under grave psychiatric or psychological

stress at the time the statement was made. (PC Exhibit 38). Her recorded statement was given in a manic and hysterical tone, and was replete with facts which directly contradicted those details of the crime recounted in the statements of co-defendant Tadaryl Shipp. In her statement, Ms. Pike attempts to take all the blame for the series of events leading to the death of Colleen Slemmer. Petitioner would not even provide law enforcement with the name of co-defendant Shipp, who was her boyfriend at the time of the offense.[1] Ms. Pike refers to Shipp, stating: "I don't want to see anything happen to him because I mean he has potential to be somebody and...I don't feel I have just because of everything I've tried and done I've always fucked it up somehow." [2] Ms. Pike's tape recorded statement was played for the jury in this case, and was a crucial, damaging piece of evidence. (TR Trial, Vol. XXIV at 1978.) In this capital case, with so many reasons to question the voluntariness and reliability of Christa Pike's statement, the failure to move for its suppression cannot be the product of reasonable strategy.

### 2. Failure to Challenge Search of Ms. Pike's Room.

Ms. Pike's counsel also should have asserted as a ground for suppression that the search of her dormitory room violated her state and federal rights constitutional which protect against

---

[1] Ms. Pike's refusal to reveal the name of either co-defendant and to accept blame for the entire incident is diagnostically consistent with Dr. Engum's diagnosis of borderline personality disorder. Yet, trial counsel inexplicably did not request that Dr. Engum discuss the reliability of Ms. Pike's statement, in terms of the borderline personality diagnosis. Trial counsel's ineffective preparation and presentation of Dr. Engum is raised herein as a separate constitutional claim of error. Had counsel thoroughly investigated and provided a full and complete social history to Dr. Engum and had counsel utilized Dr. Bernet as a psychiatric expert rather than simply and as a teaching expert in collective aggression, and permitted Drs, Engum, Bernet and McCoy to collaborate on this case, the defense would have developed the diagnosis of bipolar disorder and would have produced both diminished capacity or insanity evidence at the time of trial, Ms. Pike's incompetence to waive her right to remain silent after arrest, and the unreliability of her statement.

[2] January 14, 1995 Statement of Christa Pike, p. 35.

unreasonable searches and seizures since Ms. Pike's consent to search her dorm room was, as detailed above, not informed consent because of her intoxication and mental illness.

### 3. Failure to Request Co-Defendant's Records

Counsel failed to move for production of the juvenile records of co-defendants Shipp and Peterson. Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Counsel also failed by not asking for court-ordered psychiatric evaluations of these individuals (which the juvenile records of each would have supported). Trial counsel failed to conduct any investigation whatsoever into co-defendants Shipp and Peterson. If counsel had requested the records of Shipp, they would have discovered that he had been committed to a private Memphis, Tennessee mental institution at the age of eleven [11], that he had a propensity for violence toward teenage girls and women, and that he had stalked and threatened girls in his Memphis hometown. (TR PC, July, 2007 hearing, Vol. 2 at 185; TR PC, July, 2007 hearing, Vol. 3 at 217.) Most importantly, Counsel would have learned that Shipp used the adolescent jealousy of teenage girls as his *modus operandi*: to manipulate them and exercise control over them. (TR PC, July, 2007 hearing, Vol. 3 at 231; TR PC, July, 2007 hearing, Vol. 2 at 187.)

### 4. Failure to Request a Bill of Particulars

Counsel failed to file a pre-trial motion seeking a bill of particulars. Tenn. R. Crim. P. 7(c). Had Counsel fulfilled this duty they would have been able to identify evidence supporting viable defense theories possibly resulting in Ms. Pike's acquittal, conviction of a lesser charge, or a sentence of less than death.

### 5. Failure to Seek Sufficient Time to Prepare After Mr. Brown Withdrew.

Counsel failed to request a continuance when Mr. Brown withdrew less than two months prior to trial. (TR PC, April, 2008 hearing, Vol. 1, 44). Ms. Rice, who accepted appointment to replace him, had never tried a case more serious than a class "B" felony prior to taking the case. (TR PC, April, 2008 hearing, Vol. 1, 31). Talman acquiesced to the insistence of both the prosecutor and the trial court that the change in counsel not be used as a reason to request a continuance of the trial date. Christa Pike's trial for her life went ahead, as scheduled, on the first trial setting, less than one year after her arraignment.

### 6. Failure to Seek Time to Investigate New Information Provided by the State Only Days Before Trial.

Counsel failed to file a motion to continue the trial of this case after the State on February 26, 1996 (20 days before trial), amended the indictment to include fifty-one (51) additional witnesses, including six (6) witnesses in North Carolina, two (2) in Georgia, and numerous others in far-western Tennessee. Brown v. State, 553 S.W.2d 94 (Tenn. Crim. App. 1977); State v. Covington, 845 S.W.2d 784 (Tenn. Crim. App. 1992). Had Counsel fulfilled this duty they could have used the additional time to meet the State's proof, investigate and prepare legal arguments supportive of defense theories and mitigation.

### 7. Failure to Attack the Tennessee Death Penalty as Unconstitutional

a) Counsel failed to file motions seeking to challenge the facial constitutionality of the heinous, atrocious or cruel aggravating circumstance.

b) Counsel failed to challenge the avoid arrest aggravating circumstance as unconstitutional, both on its face and as applied to the facts of this case. In the instant case this

aggravating factor is inconsistent with the State's theory that Ms. Pike and her co-defendants planned to kill Ms. Slemmer from the beginning. To use the aggravating factor in this manner would make every intentional murder eligible for the death penalty, thus failing to narrow the class of defendants eligible for the death penalty in violation of the Eighth Amendment to the Untied States Constitution and Article I, Section 16 of the Tennessee Constitution.

### 8. Failure to Request that the State Elect One of Two Inconsistent Theories

Counsel failed to file a motion for the State to elect which theory it would present at trial, to wit: whether they would seek a conviction for conspiracy to commit murder, or would attempt to prove the avoid arrest aggravating circumstance. The two theories are logically and legally inconsistent. The jury in this case convicted Ms. Pike of conspiracy to commit murder, and also found the avoid arrest aggravating circumstance in this case, thus increasing by one the number of aggravators that the jury considered when sentencing Ms. Pike.

### 9. Failing to File Motions in a Timely Manner and Failing to Request that the Motions Be Heard In a Timely Manner

Counsel were ineffective both for failing to file motions in a timely manner and for failing to ensure that they were heard in a timely manner. The majority of the motions that were filed in this case were heard immediately prior to the start of the trial, far too late to allow counsel to devise strategy depending upon the outcome of motion practice. (TR Trial, Vol. IV at 15 *et seq.*) Counsel also failed to adequately cite federal and state constitutional bases for positions taken in the motions.

### B. Deficient Conduct of Voir Dire

Counsel were ineffective in their voir dire of prospective jurors, including death-qualification, life-qualification, issues of race and inter-racial relationships, attitudes about Job Corps and Job Corps participants, and knowledge of or opinion about Mr. Talman's over billing problem:

Counsel failed to conduct an adequate voir dire, especially with respect to the death qualification of the jurors. Counsel failed to object to the exclusion of jurors who held general opposition to the death penalty and failed to properly voir dire those jurors in an effort to rehabilitate them as viable panelists. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Had Counsel fulfilled this duty, Ms. Pike's jury would have been composed of a fair cross-section of society, including those with reservations about capital punishment.

Counsel failed to exclude jurors whose opinions would lead them to not listen to or give effect to mitigating evidence. Counsel failed to conduct an adequate voir dire on the meaning of mitigating circumstances with the entire venire pursuant to Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) and Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

Counsel failed to voir dire jurors for racial bias. Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). The proof at trial would bring out that Petitioner, a Caucasian female, was involved in a sexual relationship with co-defendant Tadaryl Shipp, who is African-American. The prospective jurors should have been questioned as to their views on race issues, particularly on the

controversial issue of inter-racial relationships. Had Counsel fulfilled this duty, they would have been able to empanel a jury free from the taint of racial biases.

Counsel failed to question prospective jurors regarding what they had heard about counsel Talman's well publicized ongoing investigation by the Board of Professional Responsibilty, the Knox and Davidson County District Attorneys General's Offices and the Comptroller of the Treasury. Talman was being investigated for over-billing the courts and ultimately the taxpayers of Tennessee in his representation of indigent defendants.

Counsel's general voir dire failed to ask questions that would elicit from the venire any matters of substance that would assist them in making peremptory challenges. -

Counsel failed to effectively utilize their jury consultant during the voir dire and jury selection and their questions asked during general voir dire failed to develop useful information that would have assisted the jury consultant in assisting with the exercise of peremptory challenges.

Counsel failed to object to the state's discriminatory use of its peremptory challenges to strike African-Americans, women, poor people or the unemployed, and other cognizable groups. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Butler, 795 S.W.2d 680 (Tenn. Crim. App. 1990). All but one juror was Caucasian. The lone African-American juror was ultimately designated as an alternate. The composition of the jury that ultimately convicted and sentenced Ms. Pike was constitutionally infirm. Had Counsel fulfilled their duty, the jury in Ms. Pike's case would have represented a fair cross-section of the community.

Counsel failed to object to the State's questions regarding whether the juror would be influenced not to impose the death penalty due to Ms. Pike's age. (TR Trial, Vol. 7, 601).

Moreover, Counsel failed to assert that Ms. Pike's age was a statutory mitigating factor, which alone could have been found be the jury to justify a sentence other than death.

Trial counsel provided ineffective assistance of counsel by their failure to object to the ease at which the Court excused jurors do to personal concerns. (TR Trial, Vol. 1, 67-81) During the opening portion of the voir dire of each panel of jurors the Court excused jurors for little or no reason. Essentially all a juror was required to say was that serving on the jury would be inconvenient. The result of this practice was that the jury was not composed of a fair cross-section of the community but rather only those who were interested enough in being jurors in a death penalty trial to set aside their personal concerns for a two to three week period. The result was a jury that was more likely to be both conviction prone and death penalty prone.

### C. Counsel Failed to Maintain Competence in the Law Applicable to the Case.

Counsel failed to be aware (through experience, training or research) of the law applicable to Ms. Pike's case, as evidenced by the deficiencies in counsel's performance outlined in this petition. Had counsel fulfilled this duty (ABA Def. Funct. 4-3.8; 1989 ABA Death Penalty Guidelines 9.1) they would have prepared and presented the legitimate defenses available to Petitioner. Counsel also would have presented adequate mitigation on Ms. Pike's behalf. For example, defense counsel made no effort to oppose an objection made by the prosecution during the testimony of Ms. Pike's aunt, Carrie Ross, when Ms. Ross attempted to testify that Christa was unable to bond with her mother during the first days following her birth because of the fact that she was kept in neonatal intensive care. (TR Trial, Vol. 25, 2485)With an appropriate understanding of the rules of evidence, defense counsel could have contended that either the opinion being offered by Miss Ross was admissible as lay opinion evidence, or, in the

alternative, attempted to qualify Ms. Ross (a registered nurse who has worked many years as a neonatal care nurse- *See* TR PC, January 2007, Vol. 2, 147) as an expert qualified to render an opinion based upon years of study and observation of neonatal intensive care patients and mothers.

## D. Deficient Performance Regarding Jury Instructions

Counsel rendered ineffective assistance of counsel regarding the jury instructions in both the guilt/innocence phase and the penalty phase of Ms. Pike's trial:

> (1) by failing to object to that portion of the conspiracy to commit first degree murder instruction that stated, in defining first degree murder, that "premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided." (TR Trial Vol. XXVIII at 2433.) While this part of the instruction is necessary in the instruction on first degree murder itself, it is both inconsistent with the State's theory of conspiracy in this case and with any evidence supporting conspiracy in this case. The State, by the proof presented, advanced two theories of first degree murder in this case. First, it suggested that the murder was planned by Ms. Pike and her co-defendants prior to inviting Ms. Slemmer to join them the evening of the crime. If the jury accepted this theory then it would support the State's theory of a conspiracy. The second theory of first degree murder advanced by the prosecution was that during the course of the assault on Ms. Slemmer, Ms. Pike formed the intent to kill and then after a period of reflection (when she went to see if a noise she heard was someone else in the area) she carried out the intent to kill.

This theory is inconsistent with the State's theory of conspiracy and yet this instruction invites the jury to find that both the intent to kill and the conspiracy to kill were formed during the assault on Ms. Slemmer;

(2) by failing to object at trial to the instruction that equated "reasonable doubt" with "moral certainty";

(3) by failing to object to instructions which required the jury to presume the truthfulness of witnesses, thereby violating the jury's prerogative to assess the credibility of witnesses and determine the facts;

(4) by failing to object to an instruction that misstated the role of the finding of an aggravating factor by the jury, in that, after instructing the jury as to the heinous, atrocious or cruel aggravating factor and the interfering with arrest aggravating factor, the Court stated, "You shall not take into account of any other facts or circumstances as the basis for deciding whether the death penalty or imprisonment for life without parole would be appropriate punishment in this case." [3] (TR Trial Vol. XXIX at 2578.) (emphasis added). By suggesting that finding an aggravating factor beyond a reasonable doubt makes the death penalty or life without parole "appropriate" rather than simply making the Petitioner eligible to receive a penalty of death or life without parole, prejudices the Petitioner by creating a presumption that death or life without parole is the "appropriate" sentence in this case, thus shifting the burden to the Petitioner to prove by mitigating evidence that such sentence is not the "appropriate" sentence.

---

[3] This instruction as given by the Court was in conformity with the T.P.I.-Crim. Intruction 7.04(a).

(5) by failing to object to the instruction "The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. " This aggravating factor, as defined in Tennessee, fails to narrow the class of individuals that are eligible for a sentence of death because the statutory language, even with the definitions of "heinous", "atrocious", "cruel", and "torture" given in the instructions, plainly fails to provide any guidance for the jurors. In fact, the words and their definitions are a mere tautology with "atrocious" being defined as cruel, "cruel" being defined as inflicting pain, and "torture" being defined as the infliction of severe pain. Under this instruction, the jury could return a verdict of death by merely finding that the victim suffered momentary pain, which of course is an element present in nearly every first degree or felony murder.

(6) by failing to object to the instruction that stated that a unanimous verdict is necessary in order for Petitioner to receive a life sentence;

(7) by failing to request that the jury be instructed in the sentencing phase pursuant to T.C.A. 39-13-204(j)(6) and TPI Instruction 7.04(a) that Ms. Pike "acted ... under the substantial domination of another person. "

(8) By failing to request specific instructions concerning non-statutory mitigation including but not limited to the severe physical, sexual and psychological abuse that Petitioner encountered as a child, her low self-esteem and the causes therefore, the instability and neglect that she experienced as a child, her alcohol and drug abuse, her medical and psychological history including severe seizures as an infant, the poor role modeling of her parents and

the other significant adults in her life, and her predisposition to adverse influence by any who superficially appeared to care about her.

## E. Failing to Object to Prosecutorial Misconduct

Trial counsel were ineffective for failing to object to prosecutorial misconduct in the penalty phase closing argument to the jury. Had Counsel fulfilled this duty, the Court may have corrected the errors in the state's comments and presentation of evidence. Counsel failed to object to the state's improper, inflammatory, prejudicial, inappropriate, and misleading or inaccurate statements concerning the law, the evidence and Petitioner in the following ways:

a) The State extracted a promise during voir dire that jurors would not be influenced not to impose the death penalty due to Ms. Pike's age. (TR Trial, Vol. 7, 601). However, Ms. Pike's age (18 at the time of the offense) was mitigating evidence that alone would justify the return of a life sentence.

b) The State advanced to different theories of first-degree murder in this case. First, it suggested that the murder was planned by Miss Pike and her codefendants prior to inviting Ms. Slemmer to join them the evening of the crime. The second theory of first-degree murder advanced by the prosecution was that Miss Pike formed the intent to kill in order to eliminate a potential witness against her only after the assault upon Ms. Slemmer began. It is clear that both of these theories were inconsistent with one another. However, the prosecution not only advanced both theories, but urged the jury to find the second theory as an aggravating factor to be weighed in favor of the death penalty, while making no effort to explain to the jury that they could not find the aggravating factor of

eliminating a witness to a crime if they had previously found a pre-existing conspiracy to commit murder.

### F. Counsel Failed to Challenge the Constitutionality of the Death Penalty Statute Either with a Pretrial Motion or on Appeal.

Counsel failed to file pre-trial motions challenging the constitutionality of Tennessee's murder statute and its sentencing provisions, especially the portions relating to the death sentence and the manner in which it is to be carried out. Had Counsel fulfilled this duty Ms. Pike's indictment may have been dismissed and/or these constitutional issues would have been preserved in the record for consideration on appeal and in post-conviction. Specifically, Counsel did not file motions challenging the constitutionality of Tennessee's death penalty statutes (Tenn. Code Ann. § 39-13-204 and 206) which, for the following reasons, are arbitrary and capricious and are therefore a violation of the Eighth and Fourteenth Amendments to the United States Constitution; and Article I, §§ 6, 7, 8, 9,10, 16, 17 and 19 and Article XI, § 8 of the Tennessee Constitution:

(1) These statutes provide insufficient guidance to the jury concerning what standard of proof the jury should use in making the determination that the aggravating circumstances outweigh the mitigating circumstances.

(2) These statutes do not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death.

(3) These statutes do not sufficiently limit the exercise of the jury's discretion, because once the jury finds the existence of one aggravating factor, it can impose a sentence of death no matter what evidence of mitigation is shown.

(4) These statutes limit the jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if it finds that the aggravating factors outweigh the mitigating factors.

(5) These statutes fail to ensure that non-statutory mitigating factors are given the same weight as statutory mitigating factors by not requiring that the jury be given written instructions on the equal weight of non-statutory mitigating factors.

(6) These statutes do not require the jury to make the ultimate determination that the appropriate punishment is a death sentence.

(7) These statutes do not require that the jury be instructed in writing that it may impose a life sentence on the basis of mercy alone.

(8) These statutes do not provide a way to correct, by written instructions or the presentation of evidence, jurors' common misperceptions regarding the actual terms of life sentences and death sentences, the cost of incarceration and the cost of executions, the death penalty's deterrent value, and the painful nature of death by electrocution.

(9) These statutes prevent effective review on appeal because they do not require the jury to make specific findings with respect to the presence or absence of mitigating factors.

(10) These statutes provide for a punishment, death, which is cruel and unusual. Since petitioner was first charged with this offense, many nations across the world, including Russia and South Africa, as well as the European Economic Union, have abolished the death penalty. Thus, it is a punishment which has become increasingly unusual and contrary to evolving standards of decency and human rights.

(11) These statutes are applied in a discriminatory manner -- unfairly affecting racial, gender, geographic, economic and political classes.

(12) These statutes do not provide an adequate method for proportionality and arbitrariness review by the Tennessee Supreme Court.

(13) These statutes have been applied by prosecutors in a manner that abuses their discretion because the statutes do not provide uniform standards for application of the death sentence.

(14) These statutes have produced violations of the equal protection clauses of the state and federal constitutions because they do not provide uniform standards for qualifying jurors for service on capital juries.

(15) These statutes permit the introduction of unreliable evidence in support of aggravating factors and in rebuttal of mitigating factors.

(16) These statutes allow the state to make closing arguments to the jury in the penalty phase.

(17) These statutes do not require that the jury be instructed in writing regarding the consequences of its failure to reach a unanimous verdict in the penalty phase.

(18) These statutes require the jury to agree to a unanimous verdict in order to impose a life sentence.

(19) In 1998 the legislature amended TCA §40-23-114 to allow a person sentenced to death by electrocution for a crime committed prior to January 1, 1999, to elect lethal injection instead of electrocution. Nevertheless, petitioner submits that execution by electrocution constitutes cruel and unusual punishment in violation of Art. I, §16 of the Tennessee Constitution and the 8th Amendment to the U.S. Constitution. Similarly, petitioner submits that lethal injection is cruel and unusual punishment, also in violation of Art. I, §16 of the Tennessee Constitution and the 8th Amendment to the U.S. Constitution. Even if lethal injection were found to not be cruel and unusual, the choice between a constitutional and unconstitutional method of execution violates the 8th and 14th Amendments to the U.S. Constitution, and Art. I, §§8 and 16 of the Tennessee Constitution.

### G. Counsel Failed to Raise Claims Involving International Law

Counsel were ineffective for failing to move to strike the death penalty as punishment because it violates treaties which have been ratified by the United States and violates established international law, as set forth in Section V, below.

### F. Counsel Failed to Raise Claims that the Death Penalty in this Case Violates Ms. Pike's Constitutional Right to Life.

Counsel were ineffective for failing to move to strike the death penalty as punishment because it denies Ms. Pike her right to life under the State and Federal Constitutions. The State has

presented no compelling state interest in executing Ms. Pike. In fact, the state offered Ms. Pike a sentence less than death had she agreed to enter a plea of guilty. See Section V, below.

## IV. Ineffective Assistance Of Counsel On Appeal

Ms. Pike's 1996 first degree murder conviction and death sentence and conviction for conspiracy to commit murder are invalid and should be vacated because she did not receive effective assistance of counsel on appeal, as required by or necessary to the enforcement of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 6, 8, 9, 16, 17 and 19 of the Tennessee Constitution. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). Mr. Talman and Ms. Rice, Ms. Pike's appointed trial counsel, continued to represent Petitioner on appeal. The deficiencies in Counsel's performance on appeal and the prejudice resulting from such deficiencies include, but are not limited to, the following:

1. Counsel failed to include on the appeal many of the issues that counsel had earlier failed to raise by pretrial motion. These issues include, but are not limited to:

   a) Tennessee's death penalty statutes provide insufficient guidance to the jury concerning what standard of proof the jury should use in making the determination that the aggravating circumstances outweigh the mitigating circumstances.

   b) Tennessee's death penalty statutes do not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death.



Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 88 of 150 PageID #: 4322

c) Tennessee's death penalty statutes do not sufficiently limit the exercise of the jury's discretion, because once the jury finds the existence of one aggravating factor, it can impose a sentence of death no matter what evidence of mitigation is shown.

d) Tennessee's death penalty statutes limit the jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if it finds that the aggravating factors outweigh the mitigating factors.

e) Tennessee's death penalty statutes fail to ensure that non-statutory mitigating factors are given the same weight as statutory mitigating factors by not requiring that the jury be given written instructions on the equal weight of non-statutory mitigating factors.

f) Tennessee's death penalty statutes do not require the jury to make the ultimate determination that the appropriate punishment is a death sentence.

g) Tennessee's death penalty statutes do not require that the jury be instructed in writing that it may impose a life sentence on the basis of mercy alone.

h) Tennessee's death penalty statutes do not provide a way to correct, by written instructions or the presentation of evidence, jurors' common misperceptions regarding the actual terms of life sentences and death sentences, the cost of incarceration and the cost of executions, the death penalty's deterrent value, and the painful nature of death by lethal injection and electrocution.

i) Tennessee's death penalty statutes prevent effective review on appeal because they do not require the jury to make specific findings with respect to the presence or absence of mitigating factors.

j) Tennessee's death penalty statutes provide for a punishment, death, which is cruel and unusual.

k) Counsel failed to present evidence or argument challenging the manner in which the appellate courts of Tennessee conduct proportionality review.

l) To the extent that this case was on appeal at the time the legislature amended T.C.A. 40-23-114 in 1998 to allow a person sentenced to death by electrocution to elect to be executed by lethal injection, counsel failed to take any steps to protect Ms. Pike's right to be free from cruel and unusual punishment under Article I, § 16 of the Tennessee Constitution and the Eighth Amendment to the United States Constitution by raising the issue that lethal injection constitutes cruel and unusual punishment and that, if lethal injection does not violate Article I, § 16 of the Tennessee Constitution and the Eighth Amendment to the United States Constitution, then requiring Ms. Pike to choose to be executed in a constitutional manner rather that the unconstitutional manner or electrocution violates her rights under Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution.

m) Tennessee's death penalty statutes are applied in a discriminatory manner - unfairly affecting racial, gender, geographic, economic and political classes.

n) Tennessee's death penalty statutes and developed case law do not provide an adequate method for proportionality and arbitrariness review by the Tennessee Supreme Court.

o) Tennessee's death penalty statutes have been applied by prosecutors in a manner that abuses their discretion because the statutes do not provide uniform standards for application of the death sentence.

p) Tennessee's death penalty statutes have produced violations of the equal protection clauses of the state and federal constitutions because they do not provide uniform standards for qualifying jurors for service on capital juries.

q) Tennessee's death penalty statutes permit the introduction of unreliable evidence in support of aggravating factors and in rebuttal of mitigating factors.

r) Tennessee's death penalty statutes allow the state to make the final closing arguments to the jury in the penalty phase.

s) Tennessee's death penalty statutes do not require that the jury be instructed regarding the consequences of its failure to reach a unanimous verdict in the penalty phase.

t) Tennessee's death penalty statutes require the jury to agree to a unanimous verdict in order to impose a life sentence.

2. Counsel failed to raise on appeal issues concerning the jury instructions, including but not limited to the following:

a) By failing to raise on appeal a challenge to that portion of the conspiracy to commit first degree murder instruction that stated, in defining first degree murder, that "premeditation can be found if the decision to kill is first formed

during the heat of passion, but the accused commits the act after the passion has subsided." (TR Trial Vol. XXVIII at 2433.) While this part of the instruction was necessary in the instruction on first degree murder itself, it was both inconsistent with the State's theory of conspiracy in this case and with any evidence supporting conspiracy in this case. The State, by the proof presented, advanced two theories of first degree murder in this case. First it suggested that the murder was planned by Ms. Pike and her codefendants prior to inviting Ms. Slemmer to join them the evening of the killing. If the jury accepted this theory then it would support the State's theory of a conspiracy. The second theory of first degree murder advanced by the prosecution was that during the course of the assault on Ms. Slemmer, Ms. Pike formed the intent to kill and then after a period of reflection (when she went to see if a noise she heard was someone else in the area) she carried our the intent to kill. This theory does not support the State's theory of conspiracy and yet this instruction invited the jury to find that both the intent to kill and the conspiracy to kill were formed during the assault on Ms. Peterson. As such the giving of this instruction was error and should have been raised on appeal.

b) By failing to raise on appeal that the instruction that equated "reasonable doubt" with "moral certainty" denied her the right to a fair trial by jury.

c) By failing to raise on appeal a challenge to instructions which required the jury to presume the truthfulness of witnesses, thereby denying her a fair trial by violating the jury's prerogative to access the credibility of witnesses and determine the facts.

d) By failing to raise on appeal that an instruction that misstated the role of the finding of an aggravating factor by the jury, in that the Court, after instructing the jury as to the heinous, atrocious or cruel aggravating factor and the interfering with arrest aggravating factor, the Court stated, "You shall not take into account of any other facts or circumstances as the basis for deciding whether the death penalty or imprisonment for life without parole would be appropriate punishment in this case."[d] (TR Trial Vol. XXIX at 2578.) By suggesting that finding an aggravating factor, beyond a reasonable doubt makes the death penalty or life without parole "appropriate" rather than simply making the Petitioner eligible to receive a penalty of death or life without parole, prejudices the Petitioner by creating a presumption that death or life without parole is the "appropriate" sentence in this case, thus shifting the burden to the Petitioner to prove by mitigating evidence that such sentence is not the "appropriate" sentence.

e) By failing raise on appeal that the instruction the "The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death" violated Ms. Pike's rights under Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution on the ground that this aggravating factor as defined in Tennessee fails to narrow the class of individuals that are eligible for a sentence of death, in that the statutory language, even with the definitions of "heinous", "atrocious", "cruel", and "torture" given in the

[d] This instruction as given by the Court was in conformity with the T.P.I.-Crim. Intruction 7.04(a).

instructions, plainly fails to provide any guidance for the jurors. In fact the words and their definitions are a mere tautology with "atrocious" being defined as cruel, "cruel" being defined as inflicting pain, and "torture" being defined as the infliction of severe pain. Under this instruction, the jury could return a verdict of death by merely finding that the victim suffered momentary pain, which of course is an element present in nearly every first degree or felony murder.

f) By failing to raise on appeal that the instruction that stated that a unanimous verdict is necessary in order for Petitioner to receive a life sentence, violated her rights under Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution.

3. Counsel were ineffective for failing to raise on appeal that the death penalty violates treaties which have been ratified by United States, and violates established international law in violation or Article VI, clause 2 of the United States Constitution, the Supremacy Clause, and customary international law were disregarded. See Section V, below.

4. Counsel failed to raise on appeal that the death penalty in this case violates Ms. Pike's right to life as the State has not shown a compelling state interest in executing Ms. Pike.

## V. General Constitutional Issues Applicable To This Capital Case.

### A. The Tennessee Death Penalty Scheme is Unconstitutional.

The Tennessee death penalty sentencing statute and the imposition of the sentence of death in this state violate Amendments 5, 6, 8, and 14 to the U. S. Constitution, as well as Art. I,

§§ 8, 9, 16, and 17, Art. II, § 2, and Art. XI, § 8 of the Tennessee Constitution.[e] Tennessee's death scheme fails to meaningfully narrow the class of death eligible defendants. *State v. Harris*, 989 S.W.2d 307, 315 (Tenn. 1999); *Zant v. Stephens*, 462 U.S. 862 (1983); *State v. Pritchett*, 621 S.W.2d 127 (Tenn. 1981); *Furman v. Georgia*, 408 U.S 238(1972).

Tennessee's appellate review process in death penalty cases is constitutionally inadequate because it is not "meaningful" and because the statutorily mandated proportionality review is conducted in violation of due process and the law of the land. The appellate review process is not meaningful because: (a) the Court cannot reweigh proof due to the absence of written findings concerning mitigating circumstances; (b) the information relied upon by the Court for comparative review is inadequate and incomplete; (c) and, the Court's methodology is flawed.

By creating a statutory requirement that the appellate courts conduct proportionality review, there is constitutional right that the proportionality review be conducted consistent with the elements of due process. *See, e.g., Olim v. Wakinkona*, 461 U.S. 238 (1983). Tennessee's proportionality review process is not conducted in a manner sufficient to satisfy the federal due process clause or the state constitutional "law of the land" clause (Art. I, § 8).

Another problem with Tennessee's death penalty is that allowing each of Tennessee's 31 elected District Attorneys General to indiscriminately seek or forego the death penalty in any given case violates the principles set out in *Bush v. Gore,* 531 U.S.98 (2000) and *Furman v. Georgia*, 408 U.S. 238 (1972). This practice also ignores the long-held understanding that death is different in kind from all other punishments. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

---

[e] Except where otherwise noted, all issues raised herein are alleged to be in violation of all of the foregoing constitutional provisions.

In addition to violating Ms. Pike' rights to equal protection, this unfettered discretion of prosecutors to seek a death penalty results in a two-fold violation of Article II, § 2 of the Tennessee Constitution: granting this discretion is an improper delegation of judicial power and exercising the discretion constitutes an impermissible assumption of legislative power by the prosecutor (who obligates the State to spend millions of dollars in litigation and other costs, thereby usurping the legislative function of revenue appropriation).

### B. Executing Ms. Pike By Means Of Lethal Injection Would Violate His Rights Under Article I §§ 8 And 16 Of The Tennessee Constitution And Amendments 8 and 14 To The United States Constitution.f

Courts must read the cruel and unusual punishment clauses of the state and federal constitutions in a "flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171 (1976); *Estelle v. Gamble*, 429 U.S. 97 (1976). Central to the analysis is the *risk* of inflicting substantial and prolonged pain. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Helling v. McKinney*, 509 U.S. 25, 36 (1993). The prohibition against cruel and unusual punishment embraces unnecessary mental as well as physical pain and suffering during the execution process. *Trop v. Dulles*, 356 U.S. 86, 111 (1958) (Brennan, J., concurring); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). Article I, Section 16 of the Tennessee Constitution and Amendment 8 to the United States Constitution were specifically enacted to proscribe torturous and barbarous punishments. The significant risk of inflicting substantial and prolonged pain during a lethal injection execution in Tennessee falls clearly within the class of punishments

f Ms. Pike's counsel on direct appeal rendered ineffective assistance by failing to challenge the method of execution then in effect, electrocution. Subsequently, the authorized method of execution in Tennessee was changed to lethal injection. Tenn. Code Ann. § 40-23-114. As a result, this is Ms. Pike's first opportunity to challenge the constitutionality of the present method of execution. This issue is not waived because failure to raise the issue on direct appeal violated Ms. Pike's right the effective assistance on counsel on appeal and/or because lethal injection was not the method of execution at that time

proscribed by these constitutional provisions. Execution by lethal injection is likewise a violation of international customary law, international norms against cruel, inhuman, or degrading treatment now universally recognized as a violation of international law, and international treaty obligations. *See* Section E, *infra*.

Despite the typical juror's misconceptions concerning general deterrence and method of execution and the consequent arbitrary decision making that will necessarily derive therefrom, the Tennessee courts have excluded evidence relevant to these issues.g Restrictions on what information a capital defendant may present to the jury concerning the facts of Tennessee's lethal injection procedure violate the considerations expressed in *Gregg v. Georgia*, 428 U.S. at 190: "[A]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision."

### C. The Death Sentence Is Unconstitutional Because It Infringes Upon Ms. Pike's Fundamental Right To Life, And Imposition Of The Death Penalty Is Not Necessary To Promote Any Compelling Tennessee State Interest.

Pursuant to Amendments 4, 5, 6, 8, 9, and 14 to the United States Constitution and Article I §§ 6, 7, 8, 9, 16 and 17 of the Tennessee Constitution, the death sentence should be set aside because it unconstitutionally impinges upon Ms. Pike's fundamental right to life. Convicted murderers retain a fundamental right to life under Amendments 8 and 14 to the United States Constitution. *See Ford v. Wainwright*, 477 U.S. 399, 409 (1986).

g *See, e.g.*, on the subject of deterrence: *State v. Johnson* (Cecil), 632 S.W.2d 542 (Tenn. 1982); *State v. Simon*, 635 S.W.2d 498 (Tenn. 1982); *State v. Hartman*, 703 S.W.2d 106 (Tenn. 1985); *State v. Thompson*, 768 S.W.2d 239 (Tenn. 1989); on the subject of parole eligibility: *State v. Taylor (Richard)*, 771 S.W.2d 387 (Tenn. 1989); on the subject of method of execution: *State v. Adkins II*, 725 S.W.2d 387 (Tenn. 1987).

Fundamental constitutional rights are those rights "explicitly or implicitly guaranteed in the Constitution." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 33-34 (1973). The United States Constitution explicitly recognizes the right to life as fundamental in both the due process clause of Amendment 5 and the Due Process Clause Amendment 14. Article I § 8 of the Tennessee Constitution acknowledges life as a fundamental right, as does international law. *See* Articles 6 and 7 of the International Covenant on Civil and Political Right (ICCPR), G.A. res 2200A (XXI), 21 U.N. GAOR Supp. (No.16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171 (entered into force March 23, 1976).

Prior to Ms. Pike's capital trial, the State offered to settle the case with a sentence pf life sentence. (TR PC Vol 4 at 221.) Due to the fundamental nature of the right to life and the State's demonstrated lack of an interest sufficiently compelling to require taking Ms. Pike's life, this Court must set aside her death penalty and grant a new sentencing hearing.

### D. The Indictment Returned By The Grand Jury Was Unconstitutional.

Tennessee denied Ms. Pike her rights under Article I, §§ 8, 14 and 16 of the Tennessee Constitution and Amendments 5 and 8 to the United States Constitution because the aggravating factors making her eligible for a death sentence was neither in the indictment nor returned by the grand jury. *Compare State v. Berry*, 141 S.W.2d 549 (Tenn. 2004) *with Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Jones v. United States*, 526 U.S. 227 (1999). *See also*, *Capitol News Co., Inc. v. Metropolitan Government of Nashville and Davidson County*, 562 S.W.2d 430 (Tenn. 1978) and *Howard v. State*, 227 S.W. 36, 143 Tenn. 539 (1921). Therefore, this Court must set aside the sentence of death and return this matter to the trial court for resentencing.

## E. Ms. Pike's Convictions And Death Sentence Violate International Law and the Supremacy Clause of the United States Constitution.

Ms. Pike's convictions and death sentence violate her rights under international law, including, but not limited to international norms against cruel, inhuman, or degrading treatment now universally recognized as a violation of international law, Ms. Pike's rights under international customary law,[h] her rights under treaties ratified by the United States,[i] and her rights under treaties entered into and signed by the President of the United States[j] including international treaty obligations flowing from signature of the following treaties: The International Convention on the Elimination of All Forms of Racial Discrimination, adopted and opened for signature and ratification by the United Nations General Assembly Resolution 2106 (XX) of December 21, 1965, *entry into force* January 4, 1969, in accordance with Article 19; The International Covenant on Civil and Political Rights, adopted and opened for signature and ratification and accession by United Nations General Assembly Resolution 2200A (XXI) of December 16, 1966, *entry into force* March 23, 1976, in accordance with Article 49; The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted and opened for signature, ratification and accession by United Nations General

---

h Customary international law and *jus cogens* norms are binding upon the courts as the law of the land. "The law of nations...is part of the law of the land." *The Paquete Habana*, 175 U.S. 677, 700 (1900). Evidence of customary international laws can be found, *inter alia*, in treaties and international proclamations including those neither signed nor ratified by the United States (such as The American Declaration of the Rights and Duties of Man, May 2, 1948, Res. XXX, at 38, Final Act, Ninth Int'l Conf. of American States, Bogata, Columbia, Mar. 30-May 2, 1948 (Pan-Am 1948), O.A.S. Off. Rec. OEA/Ser. L./V./ II.23/Doc. 21 Rev. 6 (1979), Art. XX and the Universal Declaration of Human Rights, G.A. Res. 217, U.N. GAOR, 3d Sess., pt.1, U.N. Doc. A/810 (1948)).

i As such, these treaties are the supreme law of the land, and the rights guaranteed under them preempt any contradictory state laws. U. S. Const., art. VI, cl.2; *see, e.g.*, *Breard v. Greene*, 523 U.S. 371 (1998).

j The President's action in the area of foreign relations, including the rights guaranteed under these treaties, preempts any contradictory state law. *United States v. Belmont*, 301 U.S. 324 (1937).

Assembly Resolution 39/46 of December 10, 1984, *entry into force* June 26, 1987, in accordance with Article 27 (1).

The State violated Article VI, clause 2 of the United States Constitution, the Supremacy Clause, when it sought the death penalty and thus disregarded Ms. Pike's rights under customary international law and under treaties to which the United States is bound. *The Paquete Habana*, 175 U.S. 677, 700 (1900); *United States v. Belmont*, 301 U.S. 324 (1937); *Breard v. Greene*, 523 U.S. 371, 375-376 (1998).

### F. The Death Penalty Cannot Be Fairly Administered and Is Therefore Unconstitutional.

The death penalty is not and cannot be fairly administered and is therefore unconstitutional. Both Justice Scalia, in his concurring opinion, and Justice Blackmun, in his dissenting opinion, argue in Callins v. Collins, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), that the death penalty as currently structured is unworkable. The differences in the Justices' positions are that Justice Scalia, concurring in the Court's denial of certiorari, argues that the Court has gone too far in trying to both narrow the class of those eligible for the death penalty and maintain individualized sentencing, while Justice Blackmun finds that the requirements to narrow and individualize are constitutionally required but impossible to effectuate and thus the death penalty must be abandoned. Fundamentally, capital case jurisprudence has now come full circle and we are back to the problems that caused the Court to strike the death penalty as unconstitutional as applied in Furman v. Georgia, 408 S.Ct. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).



Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 100 of 150 PageID #: 4334

### G. The Tennessee Definition of "Torture" Renders the Tennessee Death Penalty Unconstitutional

Based upon the recent decisions of the Tennessee Supreme Court defining "torture" it is evident that the imposition of the penalty of death constitutes torture and therefore violates Ms. Pike's rights under Article I § 16 of the Tennessee Constitution and the Eighth Amendment to the United States Constitution.

### H. Recent United States Supreme Court Decisions Have Removed Ms. Pike From the Class of Persons Who Are Death Eligible.

Under the theory behind the decisions in Roper v. Simmons, 543 U.S. 551 (2005) and Atkins v. Virginia 536 U.S. 304 (2002), Ms. Pike is not constitutionally eligible for a sentence death. In Roper v. Simmons, the Court opined that offenders under the age of 18 were not within the class of the worst offenders who could be subject to the death penalty without violating the Eighth Amendment to the United States Constitution. The reasons given by the Court included that the immaturity of juveniles means that their irresponsible behavior is not as morally reprehensible as that of an adult, their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment, and that because juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. This same theory of lack of the ultimate culpability to justify the death sentence for the mentally retarded underlies the Court's decision in Atkins. (Footnote: the American Bar Association recently adopted a recommended statute for those jurisdictions that impose

the death penalty that would codify the principle of Atkins. It reads in pertinent part: "Defendants should not be executed or sentenced to death if, at the time of the offense, they had significant limitations in both their intellectual functioning and adaptive behavior, as expressed in conceptual, social, and practical adaptive skills, resulting from mental retardation, dementia, or a traumatic brain injury." The Tennessee Death Penalty Study Commission is also currently considering proposing legislation that closely tracks the American Bar Association's model statute.) Because Ms. Pike suffers from a severe mental illness that affects her ability to control her actions and the trauma, abuse and neglect she endured as a child and adolescent have the effect of delaying the development of many of the behavioral controls associated with adulthood, Ms. Pike's behavior similarly does not reach the level of culpability that perhaps the ultimate punishment of death which under the Eighth Amendment must be reserved for only a small number of the worst offenders. This issue is not waived because the law has developed since the direct appeal.

## CONCLUSION

Based on all the foregoing, Ms. Pike hereby respectfully submits that she was denied an opportunity for a fair and constitutionally sound trial and, is therefore entitled to having her petition for post-conviction relief granted.

Respectfully submitted,

Donald E. Dawson, BPR # 10723
Post-Conviction Defender

James W. Crowson, BPR #26766
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
Telephone: (615)741-9331
Fax: (615)741-9340

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing Closing Brief has been mailed, first-class postage prepaid, to Leland Price, Assistant District Attorney General, Office of the District Attorney General, 6th Judicial District, P.O. 1468, Knoxville, Tennessee 37901-1468 on this the 19th day of September, 2008.

Donald E. Dawson

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE

FILED
BY MARTHA PHILLIPS, CLERK
JUL 29 2003
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**CHRISTA GAIL PIKE v. STATE OF TENNESSEE**

**Criminal Court for Knox County**
**No. 68280**

---

**No. E2003-00766-CCA-R3-PD**

---

FILED
JUL 23 2003
Clerk of the Courts
Rec'd by

**ORDER**

The petitioner, through counsel, has moved this court pursuant to Rule 24(e) of the Tennessee Rules of Appellate Procedure for an order supplementing the record on appeal with transcripts of trial court proceedings held on June 25, October 10, and November 15 of 2001. The petitioner asserts that although she designated these transcripts for inclusion in the record on appeal, they had not been completed at the time that the record was transmitted to the clerk of this court.

Upon due consideration, the court concludes that the motion is well taken and should be granted.

Accordingly, it is ORDERED that the motion to supplement the record is GRANTED and that the transcripts are to be filed with the trial court on or before August 1, 2003.

Gary R. Wade, Presiding Judge

I, Cecil Crowson, Jr., Clerk, hereby certify that this is a true and exact copy of the original Order filed in the cause.
This 23 day of July, 2003
CLERK OF COURT
By: [signature] D.C.

Court of Criminal Appeals - Eastern Division 004309
P. O. Box 444
Knoxville, TN 37901-0444
(865)594-6700

JUL 23'03 TENN. U.S. POSTAGE 0.37 PB METER 6752473

Knox County Criminal Court Clerk
City-County Building
400 Main Street
Knoxville, TN 37902

37902+2406 30

**Date Printed:** 07/23/2003
**Notice Date:** 07/23/2003
**Case Style:** Christa Gail Pike v. State of Tennessee
**Case Number:** E2003-00766-CCA-R3-PD
**Action:** Date Filed: 07/23/2003 Date Received: 07/23/2003 Court Order Filed: Granting Motion to Supplement Appellate Record ::
**Trial Court:** Knox County Criminal Court **Trial Court Number:** 68280

The Appellate Court Clerk's office has entered the above action in the Justice Information Tracking System.

It is Ordered that the motion to supplement the record is Granted and the transcripts are to be filed with the trial court on or before August 1, 2003

**Effective August 1, 2003**
**New Street Address**
**505 Main Street**
**Suite 200**
**Knoxville, TN 37902**

JNM

C: Donald Edward Dawson
Catherine Y. Brockenborough
John H. Bledsoe, AAG

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| CHRISTA GAIL PIKE,<br>Petitioner, | ) | |
| | ) | |
| v. | ) | No. 68280 |
| | ) | |
| STATE OF TENNESSEE,<br>Respondent | ) | |

FILED
2008 NOV 14 PM 4:38
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN
JS

**STATE'S POST-HEARING MEMORANDUM AND MOTION TO DENY POST-CONVICTION RELIEF**

Comes the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, and submits the following Post-Hearing Memorandum and Motion to Deny Petitioner's Petition for Post-Conviction Relief.

**STANDARD FOR RELIEF**

In order for the petitioner to obtain relief in this cause, she must show that her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Cauthern v. State, 145 S.W.3d 571, 597 (Tenn. Crim. App. 2004)(citing T.C.A. § 40-30-103). The petitioner bears the burden of establishing all factual allegations by clear and convincing evidence such that there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Id. (citing T.C.A. §40-30-110(f) and Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

**I. Court violated Petitioner's right to conflict-free counsel.**

Petitioner alleges lead counsel, William Talman, proceeded under an actual conflict of interest throughout his involvement in the case. The conflict allegedly arose from Mr. Talman's

involvement in over billing the state's indigent defense fund for his work in appointed cases. Petitioner alleges the Court appointment of conflicted counsel violated her 6th Amendment right to effective counsel. She also alleges appointment of conflicted counsel constitutes a per se violation of her rights which defies harmless error analysis. According to Petitioner, if Mr. Talman proceeded under an actual conflict of interest, her petition must be granted.

This issue has been waived. The unchallenged evidence presented at the PCR hearing was that Petitioner was informed about Mr. Talman's involvement with over billing the state and had no problems with it.

> *Q: Do you think that during your representation of Miss Pike that that issue of over-billing affected your performance in any way?*
>
> *A It was never discussed. Nothing ever became--nothing ever came up about it. In fact, I think I did talk to Christa about that at some point. I don't know whether it's one-because I had been appointed by Judge Jenkins, and I know the over-billing issue was on my mind at the time. I don't recall the exact conversation, but I think I made some comment to Christa about--about having that going on and it being resolved. And I don't think she-as I recall, she didn't have any problem. In fact, I think she liked me better because of the allegation so—*

TR PC Apr 8, 2008 vol 5 @ 468-69

> *Q But you never told Christa that you had this pending; did you?*
>
> *A Yes, I believe I did.*

TR PC Apr 8, 2008 vol 6 @ 533

Having been informed of Mr. Talman's involvement with over billing the state, Petitioner took no steps to request new counsel be appointed, Petitioner has waived this claim.

Even if not waived, Petitioner has failed to present by clear and convincing evidence that Mr. Talman's involvement with over billing the indigent defense fund constituted an actual or apparent conflict of interest. Unless the Petitioner can establish that Mr. Talman "actively represented conflicting interests," she cannot succeed in her claim. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). To demonstrate this type of active and actual conflict, Petitioner must show that Mr. Talman made a choice between possible alternative courses of action [that were] helpful to himself but harmful to her. See Kirby v. State, 1994 Tenn. Crim. App. LEXIS 625. This Petitioner has failed to do.

The evidence presented at the hearing is that Mr. Talman's involvement in over billing the defense fund had no impact on his representation whatsoever. There is no proof that any decision he made, whether wrong or right in hindsight, was made because he sought his own interest over Petitioner's. The exhibits and testimony at the hearing indicate the investigation into over billing began on March 15, 1994. On March 30, 1994, Mr. Talman self-reported his potential involvement to the Board of Professional Responsibility. It is fair to say that at this point, Mr. Talman faced potential sanctions from the Board, potential civil liability, and potential criminal liability.

However, by the time of his appointment to Petitioner's case on May 23, 1995, these issues were resolved. The proof shows Mr. Talman resolved his civil liability by tendering a check for $62, 223 and waiving $4,804 in additional fees on April 13, 1995. According to Mr. Talman's testimony, the criminal liability was resolved prior to making restitution to the State. (TR PC Apr 8, 2008 vol 3 @ 263; vol. 5, 463-75). Finally, while the Board of Professional Responsibility would not formally conclude the Mr. Talman's self-reported complaint until November 24, 1998, the Tennessee Supreme Court signaled it saw no conflict of interest by

appointing him to represent an indigent client in March, 1995 (State v. Irick, 906 S.W.2d 440 (Tenn. 1995)).

Thus, having resolved his civil and criminal liability and with the Tennessee Supreme Court's stamp of approval, Mr. Talman saw no issue to accepting appointment to Petitioner's case. (TR PC Apr 8, 2008, vol. 5 463-68). The Court also was aware of Mr. Talman's situation, discussed the matter with him, and determined there was no conflict of interest. (TR PC Apr 2008 vol 6 @ 538-39)

Petitioner has not only failed to demonstrate a conflict of interest, she has failed to identify how the alleged conflict of interest affected her trial. Instead, Petitioner has only offered sheer speculation that Mr. Talman operated in fear of criminal prosecution or ethical sanctions. To establish a claim based upon conflict of interests, the conflict must be actual and significant, not "merely hypothetical." Hines v. State, 2004 Tenn. Crim. App. LEXIS 4 *73-4 (citing Kirby v. State, No. 03C01-9303-CR-00074, 1994 Tenn. Crim. App. LEXIS 625.

In her Post-Conviction Closing Argument memorandum, Petitioner presents an additional complaint against the Court for appointing Julie Rice and Mr. Talman. Petitioner argues their lack of qualifications and experience constitute a per se violation of her 6th Amendment right to effective counsel and require that her conviction and sentence be set aside. Identical attempts to find per se violations of the 6th Amendment based on inexperience of counsel have been rejected by Tennessee courts. See e.g., Starks v. State, 2006 Tenn. Crim. App. LEXIS 860; Chalmers v. State, 2008 Tenn. Crim. App. LEXIS 464 *68-71. In Chalmers, the Tennessee Court made the following observations about per se ineffectiveness:

> Prior to July 1, 1997, no qualifying criteria was specified as to lead counsel. Moreover, while the American Bar Association (ABA) standards as to capital representation were in place at the time of the appointment and while it must be conceded that [counsel] failed to satisfy all of the suggested criteria established by

> the ABA, these guidelines are not binding upon the trial courts of this state. The American Bar Association (ABA) standards as to capital representation "are not binding upon the trial courts of this state." There is no authority that the aspirational qualifications of counsel in a capital trial set forth in the ABA standards or that the required qualifications of capital counsel set forth in Rule 13, Rules of the Tennessee Supreme Court, are constitutionally compelled. The Fourteenth Amendment guidelines simply require the appointment of an attorney to a capital petitioner. While the Tennessee Supreme Court has put into place heightened requirements in Rule 13, including the requirements of two attorneys that meet certain specific eligibility criteria, the attorneys need not meet these stringent standards to pass constitutional muster.
>
> . . . . [T]here is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case. In other words, lack of experience does not equate to per se deficient performance. We refuse to conclude that mere allegations of inexperience automatically result in a finding of deficient performance. A successful claim of ineffectiveness requires more than just a showing that trial counsel was inexperienced. Rather, the petitioner must demonstrate with specificity that counsel made errors so serious that counsel was not functioning as counsel guaranteed the petitioner by the Sixth Amendment and that such errors prejudiced the defense.

2008 Tenn. Crim. App. LEXIS 464 *68-71 (citations omitted). Accordingly, Petitioner's claim of deficient performance based on qualification should be rejected.

**II. Ineffective Assistance of Counsel at Trial**

Petitioner has alleged her original trial counsel, William Talman and Julie Rice, failed to provide her effective assistance in violation of the Sixth Amendment to the U.S. Constitution and Article I, section 9 of the Tennessee Constitution. Petitioner's claim of ineffective assistance is evaluated with a two-part test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). This is a heavy burden as criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Courts in scrutinizing counsel's performance should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000)

**1. Counsel Failed To Establish Proper Working Relationship With Petitioner**

Petitioner alleges that counsel failed to establish a proper working relationship with her. Petitioner has failed to substantiate this claim. The testimony at the PCR hearing in this matter indicate Mr. Talman and Ms. Rice worked diligently with Petitioner and personally liked her. Both counsel felt they had a very positive working relationship with her. (TR PC Apr, 2008 vol. 2 @ 173; vol. 3 @ 275; vol. 5 @ 481). Furthermore, Mr. Talman's billing records reflect at least 23 personal meetings with Petitioner prior to trial totaling 38 hours. (Exhibit 18 to Apr 8, 2008 Hearing). He also had 8 phone calls with Petitioner totaling 2.3 hours. (Id.) These meeting began shortly after his appointment and continued regularly through trial. (Id.) Petitioner has offered no proof to the contrary. Petitioner has failed to establish deficiency, prejudice or both on this claim. It must be denied.

**2. Counsel Failed To Adequately Prepare For Their Representation**

Petitioner alleges counsel failed to adequately prepare for their representation. However, the evidence presented at the PCR hearing indicates Mr. Talman diligently worked on Petitioner's case from the moment he was appointed, if not before. His billing records reflect consistent and extensive work preparing the case. (Exhibit 18) He met and retained the services of Dr. Eric

Engum, a mental health expert, the same day he was appointed to the case, May 23, 1995. (Ex 17 to Apr 8, 2008). He met with and retained an investigator the next day. (Exhibit 18). Dr. Diana McCoy was retained by September 1, 1995. (Id.; TR PC Apr 8, 2008 vol 3 @ 280). The uncontradicted testimony is that Mr. Talman and Ms. Rice, once she was appointed, gave Petitioner's case the highest priority to prepare the case for trial. (TR PC Apr 2008 vol 5 @ 487).

Petitioner has failed to establish deficiency, prejudice or both on this claim. While Petitioner may complain of Ms. Rice's late appointment, Petitioner is not constitutionally required to have two attorneys. To prevail on this claim, Petitioner must establish that both attorneys failed to prepare the case and that absent this failure, the outcome would have been different. Petitioner has not met her burden and the claim should be denied.

**3. Counsel Failed To Engage In Motions Practice Necessary To Protect Petitioner's Rights**

a) Petitioner alleges counsel was ineffective for failing to file pre-trial motions challenging Petitioner's interrogation on Miranda grounds and involuntariness. However, Det. Randy York's testimony in the post-conviction hearing makes clear such a challenge would have been unsuccessful. He described Petitioner as "jovial and cooperative" before the January 14, 1995 interview. He did not detect that she was under the influence of anything. (TR PC Apr 10, 2008 vol 10 @ 918-20). She executed a written rights waiver before giving her statement. (Id. @ 920-21)(Exhibit 34 to PCR Proceedings Apr 10, 2008). Additionally, the audio recording of Petitioner's interview reflects that while she was emotional, her speech was not slurred. (Exhibit 38 to PCR Proceedings Apr 10, 2008). Indeed, she was able to provide great detail that matched the forensic evidence in the case. (Exhibit 38). She also maintained her intent not to identify Tadaryl Shipp by name throughout. (Exhibit 38). The video of Petitioner at the crime scene taken shortly after the interview also reflects Petitioner's sobriety. (Exhibit 37). In the video,

Petitioner is able to stand without wobbling and walk around the crime scene without stumbling. (Exhibit 37). Thus, the overwhelming evidence is that while Petitioner was emotional when she gave her statement to Inv. York, she provided the statement voluntarily after knowingly waiving her rights.

Mr. Talman's testimony shows that counsel considered a motion to suppress but felt there was not a good faith basis to proceed on one.

> A: *You know, Mr. Dawson, it's been a lot of years since I listened to that statement, but as I recall the investigator in the case continually asked Miss Pike if she wanted a lawyer. In fact, I think at one point--and the statement would speak for itself. But I think at one point in the statement he says to her, "Christa, you can stop talking to me; you need a lawyer." And at that point I just, frankly, didn't feel I hadn't any basis for it. . .*
>
> *A. Mr. Dawson, like I said, it's been a number of years since then. I don't recall the exact thinking. I do think--in recalling I believe I had some discussion with Miss Pike about the--about the giving of the statement. And I think she--she indicated that she was never coerced and knew what she was doing. . . .*

(TR PC Apr 8 2008 vol 5 @ 423-25). In another portion, Mr. Talman further explains why he saw no basis for filing a motion to suppress. He indicates that Petitioner was intelligent and articulate. She never indicated to him that she intoxicated. In reviewing the tapes, he found no evidence to suggest the statements were anything but voluntary. TR PC Apr 8, vol 5 @ 490-93. Julie Rice agreed with this assessment that a motion to suppress had no merit. (TR PC Apr 7, 2008 vol 2 @ 189-92)



Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 113 of 150 PageID #: 4347

Petitioner has failed to demonstrate her original trial counsel was deficient in failing to challenge the admissibility of the statement. She also has failed to show she suffered any prejudice.

b) Petitioner likewise suggests counsel was ineffective for failing to challenge the warrantless search of her dorm room following the June 14, 1995 interview. However, Det. York testified that during the interview, Petitioner also executed a consent to search giving permission for the officers to search her dorm room. (TR PC Apr 10, 2008 vol 10 @ 921-22)(Exhibit 36). A search warrant is not required if officers obtain a voluntary consent to search. Petitioner has again failed to demonstrate that this consent was given involuntarily. A motion to suppress the search would not have been successful in this matter for the same reasons outlined, supra Claim II. 3. b), and Petitioner's original trial counsel was not ineffective for deciding not to file such a motion.

c) Petitioner alleges counsel was ineffective for failing to move for production of the juvenile records of co-defendants Tadaryl Shipp and Shadolla Peterson. Petitioner contends that if counsel had requested these records, counsel could have could have shown that Shipp dominated and manipulated Petitioner during the course of Ms. Slemmer's murder. However, Petitioner fails to consider that her own social history was much worse in terms of a propensity to violence, fascination with violence, manipulative behavior, unruly behavior, and deceitfulness. It is impossible to understand how counsel could have presented Petitioner's far more damaging social history as excusing her conduct while at the same time arguing Shipp's social history condemns him as the bad guy truly responsible for Ms. Slemmer's gruesome murder. Additionally, Petitioner was not cooperative in pursuing this line of defense. (TR PC Apr 8, 2008 vol 5 @ 480)

Putting aside their respective social histories, even if Petitioner had more vigorously pursued the defense that she acted under the domination of Shipp, no rational jury could have believed it in light of the State's proof. As summarized by the Tennessee Supreme Court on direct appeal and contained within the trial record, the State's evidence at trial proved beyond a reasonable doubt that: (1) It was Petitioner who told Kim Iloilo the day before the murder that she was going to kill Ms. Slemmer; (2) It was Petitioner who brought the meat cleaver and box cutter to the crime scene; (3) It was Petitioner who asked Ms. Slemmer to accompany her to Blockbuster and then lured her to the park with promises of marijuana; (4) It was Petitioner slashed Ms. Slemmer's throat, cut her, and ultimately delivered the death blow by slamming a large chunk of asphalt on her head; (5) It was Petitioner who kept a piece of Ms. Slemmer's skull as a souvenir; (6) It was Petitioner who went to the crime scene some 16 hours later without Shipp and was seen by law enforcement to be amused and giggling; (7) It was Petitioner who made inquiries about how the investigation was going and whether the police had any suspects. State v. Pike, 904 S.W.2d 904 (Tenn. 1998). Thus, as the Tennessee Supreme Court noted, "Although others were present when the killing occurred and involved to some degree, **the proof reveals that Pike was the leader**." Id. at 919 (emphasis added).

Counsel was also concerned that if they called the witnesses needed to describe Petitioner's relationship with Shipp, it would open the door to other information very damaging to her case. For example, calling fellow job corps students might have opened the door to the fact that it was Petitioner who borrowed the meat cleaver from another student before the killing. Another student might have testified that Petitioner told her that she was the one who carved the pentagram on Ms. Slemmer's chest. (TR PC Apr 2008 vol 2 @ 182-84)(Exhibits 15 & 16 to PC Apr 2008 hearing)

Accordingly, Petitioner has failed to establish prejudice or deficiency on this claim.

d) Petitioner alleges counsel was ineffective for failing to file a pre-trial motion seeking a bill of particulars. Petitioner has failed to demonstrate how a bill of particulars could have aided in her defense in this case. Although Petitioner suggests a bill of particulars would have allowed counsel to identify evidence supporting viable defense theories, Petitioner has not identified any such evidence or how a bill of particulars would have led to that evidence.

Contrary to Petitioner's claim, the indictment in this case sufficiently identified the charges brought against Petitioner. The details of the crime including time, place and witnesses, were well known to all the parties. A bill of particulars was not necessary. Counsel was not ineffective for failing to ask for one.

e) Petitioner alleges counsel was ineffective for failing to file a motion to withdraw in the case due to conflict of interest. She also alleges counsel was ineffective for not seeking a guardian ad litem to advise Petitioner on counsel's alleged conflict of interest.

(i) Petitioner alleges Mr. Talman had an actual conflict of interest that affected the zealousness of his representation due to his involvement in over billing Tennessee's indigent defense fund. As outlined in the State's response to Claim I, this claim is waived. Even if not waived, Petitioner has failed to establish that Mr. Talman had a conflict of interest. Consequently, Mr. Talman was not ineffective for failing to withdraw in this case. Furthermore, Petitioner has failed to show any causal link between Mr. Talman's over billing issue and his performance in this case.

(ii) Petitioner alleges Mr. Talman had a conflict of interest because he allegedly discussed with others the possibility of co-authoring a book about Petitioner and encouraged other

types of publicity on the case. No evidence was presented linking any alleged deficiency by counsel to any desire to promote themselves for pecuniary gain. Both Mr. Talman and Ms. Rice were examined extensively on this issue and denied that their interests were in conflict with Petitioner's. (TR PC Apr 8, 2008 vol 2 @ 170; vol 5 @ 414; vol. 5 @ 475-78). While Exhibit 13 to Apr 2008 hearing does indicate counsel contemplated publishing Petitioner's story, the record does not reflect counsel's performance was affected in any way.

(iii) Petitioner alleges Mr. Talman had a conflict of interest because he had lied to the Court concerning when he had received Dr. McCoy's mitigation study. Petitioner alleges the lie was made during a conference in chambers between the guilt phase and the penalty phase of the trial. Petitioner suggests Mr. Talman then attempted to persuade Dr. McCoy to support this lie when and if she took the stand the next day. According to Dr. McCoy, it was her righteous refusal to commit perjury which led Mr. Talman to not call her. Because he was seeking to protect himself and not her, Petitioner alleges this amounted to a fatal conflict of interest.

The record does not support this allegation and calls into question Dr. McCoy's credibility. The record reflects that Dr. McCoy gave the mitigation study to Mr. Talman on Sunday, March 24, 1996. (Exhibit 8 to PCR Proceedings Apr 2008). On Friday, March 29, 1996, at 2:45 p.m., the jury returned guilty verdicts to all counts. (TR Trial Vol. XXV 2461-62). At this point, the Court recessed and requested the attorneys join her in chambers to plan for the penalty phase. (Id. at 2464). Following the chambers conference, the State made reference to receiving Dr. McCoy's materials and asked for a recess until the next morning to prepare. (Id. at 2465). After some discussion about Dr. McCoy's report, Mr. Talman states, "Your Honor, as I explained in chambers, I had just received this documentation earlier this week myself." (Id. at 2568). If Mr. Talman's statement in open court was in contradiction to what had been said in

chambers, there can be no question the court or the State would have corrected him. Thus, the record is crystal clear that Mr. Talman told everyone in chambers and in open court that he received Dr. McCoy's three volume report earlier that week. Far from being a lie, this was entirely accurate as documented in Dr. McCoy's letter to Mr. Talman. (Exhibit 8). Mr. Talman testimony in the PCR hearing also unequivocally refutes the allegation that lied to the Court. (TR PC Apr 8, 2008 vol 5 @ 496-499)

Since it is clear that Mr. Talman did not lie about receiving Dr. McCoy's study, Dr. McCoy's accusation that Mr. Talman pressured her to lie and cover for him is the true lie. Indeed, her determination to continue making this frivolous charge in light of the record suggests her entire testimony is not credible. It also provides insight into why Mr. Talman and Ms. Rice did not feel comfortable putting her on the stand with Petitioner's life at stake. There was no lie on the part of Mr. Talman and no conflict of interest. This claim is utterly without merit.

f) Petitioner alleges counsel was ineffective for not seeking a continuance of the trial date after Mr. Brown withdrew. Petitioner has failed to show why a continuance was needed in the case. The State would rely on its response to Claim II. 2., supra, for the assertion that counsel were prepared for trial and a continuance was not needed.

Furthermore, the evidence at the PCR hearing established that the decision to not seek a continuance was a tactical one. According to Ms. Rice, counsel were aware that the State had issued subpoenas to certain key witnesses that were incorrectly addressed. The most significant of those witnesses being Kim Iloilo. Hoping that the State might be unable to locate those witnesses, counsel decided to go forward with trial. (TR PC Apr 2008 vol 2 @ 171-72; vol 5 @ 488-89). Although the State ultimately produced Kim Iloilo at trial, it was a reasonable tactical decision to go forward with the trial. Their decision should receive great deference.

g) Petitioner alleges counsel was ineffective for failing to seek a continuance after the State added fifty-one additional witnesses twenty days before trial. Petitioner has failed to establish ineffectiveness or prejudice and the claim must be denied. The State would rely on its response to Claim II. 3. f).

h) Petitioner alleges counsel was ineffective for failing to challenge the facial constitutionality of the heinous, atrocious or cruel aggravating circumstance. The heinous, atrocious and cruel aggravator has consistently been upheld in Tennessee in the face of constitutional challenges. See Terry v. State, 46 S.W.3d 147 (Tenn. 2001); Strouth v. State, 999 S.W.2d 759, 764 (Tenn. 1999); State v. Middlebrooks, 995 S.W.2d 550, 555-56 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989); and State v. Williams, 690 S.W.2d 517, 527-30 (Tenn. 1985). Counsel was not deficient in failing to challenge this aggravator.

i) Petitioner alleges counsel was ineffective for failing to challenge the constitutionality of Tenn. Code Ann. § 39-13-204(i)(6) (1997 Repl.)(murder to avoid arrest aggravator). The Tennessee Supreme Court has repeatedly upheld the constitutionality of this aggravator. See e.g., State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Rollins, 188 S.W.3d 553 (Tenn. 2006).

Petitioner also alleges counsel was ineffective for failing to challenge this aggravator's application to the facts of this case. However, trial counsel did challenge this aggravator's application by challenging the sufficiency of the evidence. In response, the Tennessee Supreme Court found the following concerning the murder to avoid arrest aggravator:

> In this case, Pike repeatedly told police that as she was assaulting the victim, she heard a voice telling her that she had to do something to keep the victim from reporting the assault and causing her to go to prison for attempted murder. When the victim begged for her life, Pike responded that she was not going to be "rotting in jail because of [the victim's] stupid ass." Based upon our consideration of the record, we agree with the Court of Criminal Appeals that the evidence was

> sufficient to support the jury's finding that "the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another."

State v. Pike, 978 S.W.2d 904, 918 (Tenn. 1998)

Accordingly, the State submits the applicability of this aggravator to Petitioner's case has been previously determined. If not previously determined, the State submits counsel were not ineffective for challenging the application of this aggravator as there was proof beyond a reasonable doubt to support its application. Petitioner has not shown ineffectiveness or prejudice in this area and the claim should be denied.

j) Petitioner alleges counsel was ineffective for failing to request the State to elect whether it was seeking a conspiracy to commit murder conviction or whether it was seeking to apply the avoid arrest aggravator. Petitioner essentially argues the two theories are mutually inconsistent – she could not have conspired to commit the murder beforehand and also decide to commit the murder to avoid arrest once the assault on Ms. Slemmer began.

These two theories are not only consistent, the evidence is overwhelming to support them both. The Tennessee Supreme Court resolved this alleged issue indirectly in addressing the sufficiency of the evidence as follows:

> [T]he evidence is sufficient to support the jury's finding of premeditation and deliberation. Pike told a friend one day before the killing that she was going to kill the victim. The defendant procured weapons to accomplish the crime, arming herself with a box cutter and a miniature meat cleaver, which she borrowed from another individual. Pike then lured the victim to an isolated area to commit the crime by telling the victim that she would share drugs with her. Once they arrived at the isolated location, the defendant attacked the unarmed victim with not one, but two deadly weapons. The attack continued for thirty minutes to an hour. During this extended time, the defendant had ample opportunities in which to reflect upon her actions and choose a course of conduct. By her own admission, the defendant actually ceased the assault long enough to scout out the area and ensure that no one else was around. Certainly, this break in the chain of events provided the defendant time to reflect upon her actions. In fact, in her statement the defendant recounted how she carefully and repeatedly reflected upon her

> actions and chose to kill the victim to assure that the victim would not testify against her for "attempted murder." Without question, this killing was particularly cruel; in fact, particular cruelty is a phrase which merely begins to describe the nature and circumstances of this killing. The defendant attempted to conceal the offense by dragging the victim's body to a secluded area and removing and disposing of the victim's identification cards. The defendant also washed the tops of her shoes at the Texaco service station and rubbed the mud from the bottom of her shoes onto her blue jeans to conceal the blood. Pike calmly disposed of the box cutter and returned the miniature meat cleaver to the person from whom it had been borrowed. Later that same evening, Pike displayed her "souvenir," a piece of the victim's skull, and she gleefully recounted the events of the assault and killing to Iloilo, the same friend to whom, only one day earlier, Pike had proclaimed her intent to kill Colleen Slemmer because "she just felt mean that day."

State v. Pike, 978 S.W.2d at 915.

If these two theories were inconsistent as Petitioner contends, the Tennessee Supreme Court could not have found evidence to support both. Instead, as the court found, the evidence is clear that Petitioner planned the murder of Ms. Slemmer by arming herself with two weapons and luring Ms. Slemmer to an isolated area. Once there and the assault began, Petitioner had ample time to reflect and decide if she wanted to follow through with the murder. Ultimately, she decided to complete the planned murder because she did not want to be "rotting in jail because of [the victim's] stupid ass." Id. at 918. Thus, the jury rightly found that the murder was both preplanned and committed to avoid arrest. Under these circumstances, counsel cannot be deemed ineffective for failing to request that the State elect between the two theories. There is no legal authority that would require the State to make such an election.

k) Petitioner alleges counsel was ineffective for failing to file a motion for exculpatory evidence. Petitioner has failed to identify exculpatory evidence that was withheld as a result of trial counsel's failure to request it. Accordingly, Petitioner's claim in this area is without merit.

l) Petitioner alleges counsel was ineffective for failing to file a motion seeking information regarding the victim, Colleen Slemmer, and her relationship with the three co-defendants. Petitioner has again failed to identify information concerning Ms. Slemmer that, had it been introduced, would have produced a different outcome in this case. Petitioner's claim is without merit.

**4. Counsel Were Ineffective For Failing To File Motions In a Timely Manner and Ensuring A Hearing In A Timely Manner**

Petitioner alleges counsel was ineffective for failing to file motions in a timely manner and ensuring a timely hearing in order to prepare for trial. However, Petitioner has failed to identify which motions were not filed in a timely manner. Further, she has failed to demonstrate how hearing the motions earlier would have altered the outcome in this case. Accordingly, this claim must be denied.

**5. Counsel failed To Obtain And Use Experts In An Effective Manner**

Petitioner alleges counsel's preparation and use of expert testimony in her case was deficient. Petitioner alleges the testimony of Dr. Eric Engum failed to establish diminished capacity or insanity at the time of the offense. She alleges counsel's inadequate investigation of her participation in the crime caused Dr. Engum to be unequipped to fend off the State's cross-examination and explain Petitioner's mental illness. Petitioner alleges counsel failed to inform Dr. Engum of Petitioner's full social history and behavior at the time of the offense.

"Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Morris v. State, 2006 Tenn. Crim. App. LEXIS 782 * 174 (citing Wiggins v. Smith, 539 U.S. 510, 533, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). Nor is counsel expected to interview or call every possible witness. Id. (citing Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995)). Counsel's duty

to investigate and prepare is not limitless. Id. (citing Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981)).

Counsel's efforts in preparing and presenting expert testimony in this case were not deficient. Early on in this case, counsel retained the services of two mental health professionals, Drs. Engum and McCoy. Mr. Talman worked diligently with these professionals and reasonably relied on their expertise. He encouraged a team approach by meeting frequently with these experts and, on at least one occasion, organizing a four and a half hour team meeting with the whole mental health team on November 10, 1995 (Exhibit 18)( TR PC Apr 8, 2008 vol 3 @ 290, vol 5 @ 506-07). He also retained Dr. Bernet, a psychiatrist closer to trial in an attempt to refute the charge that the murder was committed as part of a Satanic ritual. While it is possible counsel could have done more, Petitioner is not entitled to a perfect defense.

At trial, counsel presented evidence through Dr. Engum that the Petitioner suffered from a very severe borderline personality disorder and exhibited signs of cannabis (marijuana) dependence and inhalant abuse. State v. Pike, 978 S.W.2d 904, 921 (Tenn. 1998). Counsel further presented through Dr. Engum that Petitioner had a "multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals." Id. Counsel called Dr. Bernet who testified that "although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism.". Id. Dr. Bernet further explained collective aggression, "whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior." Id.

For Petitioner to prevail on this claim, she must now show that the different expert testimony presented at the post-conviction hearing would have made a difference. Petitioner has failed to make this showing. Even if the full extent of Petitioner's mental disorders and

background were not presented to the jury, the jury did hear similar evidence about Petitioner's borderline personality disorder and difficult childhood. The jury rejected it, and rightfully so in light of the aggravating circumstances of this crime. Even if they had heard the more extensive social history and expert testimony presented at the post-conviction proceeding, it is still not sufficient to preclude the imposition of the death penalty when weighed against the aggravating circumstances in this case.

Moreover, much of Petitioner's social history and mental disorders as it now stands is supportive not of mitigation but aggravation. Her long fascination with violence and gore, her propensity to resolve conflict with violence, her lying and manipulative behavior, her manic episodes where she allegedly loses self-control for extensive periods of time, could easily be rejected as mitigation and used in tandem with the brutal circumstances of this crime to justify the death penalty. The evidence this Court heard at the PCR hearing is, in truth, a double-edged sword that cuts the one who wields it far more than the opponent.

**6. Mr. Talman Ineffective For Operating Under Actual Conflict Of Interest**

The State relies on its response to II. 3. e).

**7. Counsel Ineffective In Voir Dire of Jurors**

a) Petitioner alleges counsel failed to object to the exclusion of jurors who opposed the death penalty and failed to rehabilitate them as viable panelists. However, the exclusion of jurors who are unable to follow the court's instructions in a capital case is appropriate under Tennessee law. Furthermore, Petitioner failed to present any evidence as to which jurors could have been rehabilitated by trial counsel. This claim must fail.

b) Petitioner alleges counsel failed to exclude jurors whose opinions would lead them to not consider mitigating evidence. However, Petitioner failed to identify which jurors should have

been excluded in this case. She also failed to show that the jury's deliberations were tainted in any way or that the jury failed to follow the Court's instructions. Without prejudice, this claim too must fail.

c) Petitioner alleges counsel failed to voir dire jurors for racial bias. However, Petitioner failed to identify which jurors should have been excluded for racial bias or how deliberations were affected by racial bias. Unless the failure to voir dire on racial bias had an effect on the trial, this claim is without merit.

d) Petitioner alleges counsel should have questioned the venire about what they had heard about Mr. Talman's involvement with over billing the indigent defense fund. However, Petitioner has failed to present evidence as to how the failure to question the venire on this topic affected the trial in any way. Having failed to establish ineffectiveness, prejudice or both, Petitioner's claim must fail.

e) Petitioner alleges counsel failed to ask questions that would assist them in making peremptory challenges. However, she has failed to identify what additional questions should have been asked or present proof as to how additional questions would have changed the outcome of this trial. The claim should be denied.

f) Petitioner alleges counsel failed to effective utilize their jury consultant. However, she did not identify would additional information should have been developed for the jury consultant or how counsel's actions in this area affected the trial. The claim is without merit.

g) Petitioner alleges counsel should have raised a Batson challenge to the State's peremptory challenges. However, Petitioner has failed to establish any basis for raising a Batson challenge. Trial counsel failed to see any basis for raising Batson challenge. (TR PC Apr 2008 vol 5 @ 495) The fact that all but one juror was Caucasian does not establish a pattern of

discrimination on the part of a the prosecutor. Nor can it be plausibly argued that the prosecutor had any role in choosing the African-American juror as an alternate. Since there is no evidence to suggest a Batson challenge would have been successful or that the failure to raise such a challenge affected the composition of the jury, this claim must be denied.

h) Petitioner alleges counsel was ineffective for failing to object to the State's questions regarding whether the juror would be influenced not to impose the death penalty due to Petitioner's age. The State's voir dire on this topic was not objectionable. Rather than telling the venire not to consider her age as the Petitioner suggests, the State simply asked whether Petitioner's age alone would preclude any jurors from considering all three possible punishments for first degree murder. (TR Trial, Vol. VII, 602). Moreover, Petitioner failed to show that the jury's deliberations were affected in any way by the State's voir dire in this area. The Court properly instructed the jury on mitigation. The jury is presumed to have followed those instructions absent evidence to the contrary. This claim is without merit.

i) Petitioner alleges trial counsel should have objected to the ease in which the Court excused potential jurors due to personal concerns. However, Petitioner has failed to identify which specific jurors were improperly dismissed. Neither has Petitioner established that the outcome of the trial was affected by the Court's excusals. Therefore, the claim must be denied.

**9. Ineffective For Failing To Present Diminished Capacity and State of Mind Evidence**

Petitioner alleges counsel were ineffective for failing to present evidence of Tadaryl Shipp's control over petitioner. However, as discussed in more detail in the State's response to claim II. 3. c), Petitioner's contention that Shipp dominated her during the murder of Ms. Slemmer utterly fails in light of the evidence.

**10. Counsel Ineffective For Not Presenting Testimony In Mitigation On Petitioner's Life History**

The State relies on its response to Claim II. 5.

Additionally, on the charge that counsel were ineffective for failing to call Dr. McCoy during the mitigation phase, the State responds that counsel's decision was a tactical decision that was reasonable under the circumstances. As explained in testimony during the PCR hearing, counsel decided not to call Dr. McCoy because: (1) Counsel felt uncomfortable with Dr. McCoy's relationship to the State's prosecutor on the case; (2) Counsel felt uncomfortable after seeing Dr. McCoy on television once the trial started commenting on jury selection; (3) Counsel knew there was a great deal of damaging material in Dr. McCoy's report as well as the supporting materials that would come out if she testified; and (4) Dr. McCoy surprised counsel on the eve of her testimony with her refusal to endorse Dr. Engum's diagnosis. (TR PC Apr 8, 2008 vol 4 @ 348-49; 352; 358; vol 6 @ 502-03). Under the circumstances, this was understandable and does not establish ineffective assistance of counsel. Even if it did, Dr. McCoy's testimony would not have altered the outcome of the trial.

**11. Counsel Failed To Be Aware of Law Applicable to Petitioner's Case**

Petitioner alleges counsel failed to be aware of the law applicable to her case. Had counsel been aware, Petitioner contends counsel would have presented legitimate defenses and adequate mitigation. Petitioner has failed to identify in either her Consolidated Petition or her Closing Argument which defenses and mitigation could have been presented but for counsel's alleged ignorance of the law except for one. The lone example cited by Petitioner involved counsel's failure to respond to the State's objection during the testimony of Carrie Ross concerning Petitioner's bonding with her mother. However, the record does not reflect counsel needed to respond to the State's objections. The record reflects the Court allowed Ms. Ross' to

testify about what happened to Petitioner after she was born but simply limited the witness to testify as to what she knew. She also instructed the jury to disregard any opinions not supported by the evidence. (TR Trial, Vol 25, 2485). Since the testimony was not struck and the jury was not instructed to specifically disregard Mr. Ross' testimony, counsel did not need to respond to the State's objection. The information was presented to the jury. Petitioner has failed to establish effectiveness or prejudice.

**12. Counsel Ineffective Regarding Jury Instructions In Both Phases of the Trial**

(a) Counsel failed to object to premeditation instruction in conspiracy to commit first degree murder instruction. Petitioner alleges State's theory that Petitioner conspired with Tadaryl Shipp to murder Colleen Slemmer conflicts with the theory that Petitioner formed the intent to kill Ms. Slemmer after the initial assault. However, both theories are not only possible, they are supported by the evidence, the jury's verdict, and subsequent appeals of the case challenging the sufficiency of the evidence as discussed, supra Section 3. j). Accordingly, counsel was not ineffective for objecting to the conspiracy to commit first degree murder instruction.

(b) Petitioner alleges counsel was ineffective for failing to object to the instruction that equated reasonable doubt with moral certainty. This instruction is not objectionable and has been upheld by the Tennessee Supreme Court. State v. Hall, 976 S.W.2d 12 (Tenn. 1998).

(c) Petitioner alleges counsel was ineffective for failing to object to the instruction that witnesses are presumed truthful. This instruction is not objectionable. State v. Bigbee, 885 S.W.2d 797, 804 (Tenn. 1994).

(d) Petitioner alleges counsel was ineffective for failing to object to the use of the word "appropriate" in the court's instructions on weighing aggravating factors. (TR Trial Vol XXVI 2578). This instruction is not objectionable. State v. Keen, 31 S.W.3d 196, 232 (Tenn.

2000)(Approving use of the instruction by trial court so that the jury does not consider victim impact evidence in determining punishment).

(e) Petitioner alleges counsel were ineffective for failing to object to the instruction on the "heinous, atrocious, or cruel" aggravator. This instruction is not objectionable. The court's instruction on the heinous, atrocious and cruel aggravator was in conformance with Tennessee Law. See Terry v. State, 46 S.W.3d 147; Strouth v. State, 999 S.W.2d 759, 764 (Tenn. 1999); State v. Middlebrooks, 995 S.W.2d 550, 555-56 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989); and State v. Williams, 690 S.W.2d 517, 527-30 (Tenn. 1985).

(f) Petitioner alleges counsel were ineffective for failing to object to the instruction that a unanimous verdict is necessary in order for petitioner to receive a life sentence. This instruction is not objectionable. State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994).

(g) Petitioner alleges counsel was ineffective for failing to request the jury be instructed on the mitigating factor of acting under the domination of another person. However, the evidence presented at trial did not fairly raise this mitigating circumstance. It is error for the court to instruct a mitigating circumstance not raised by the evidence. T.C.A. § 39-13-204(e)(1); State v. Hartman, 703 S.W.2d 106, 118 (Tenn. 1985). As discussed in more detail in response to Claim II. 3. c), the State clearly established that Petitioner was the leader in the murder of Colleen Slemmer.

Assuming for the sake of argument that Shipp's domination was raised by the evidence, the jury was instructed it could consider "any aspect of the circumstances of the offense favorable to the Defendant". (TR Trial Vol. XXVI 2579). The jury is presumed to have followed this

instruction and would have considered the role of Tadaryl Shipp as mitigation. Counsel's failure to request a specific instruction did not prejudice the Petitioner.

Moreover, any alleged mitigation is outweighed by the aggravators in this case beyond a reasonable doubt. Accordingly, petitioner has failed to show that the failure to request this instruction was ineffective or that she was prejudiced by the instruction's absence.

(h) Petitioner alleges counsel were ineffective for failing to request instruction on various aspects of Petitioner's background. However, the evidence presented at trial did not justify a special instruction in this area. It is error for the court to instruct a mitigating circumstance not raised by the evidence. T.C.A. § 39-13-204(e)(1); State v. Hartman, 703 S.W.2d 106, 118 (Tenn. 1985). Furthermore, the jury was instructed it could consider "any aspect of the Defendant's character or record" (TR Trial Vol. XXVI 2579). The jury is presumed to have followed this instruction and would have considered Petitioner's background as mitigation if it provided any. Counsel's failure to request a specific instruction did not prejudice the Petitioner. The jury simply determined the mitigating circumstances were outweighed by the aggravators in this case beyond a reasonable doubt. A special jury instruction on Petitioner's background would not have changed this outcome.

**13. Ineffective For Failing To Maintain Acceptable Workload**

Petitioner alleges counsel failed to maintain an acceptable workload in order to prepare for trial. Petitioner has failed to present sufficient evidence to establish either deficiency, prejudice or both on this claim. Counsel maintained their workload within acceptable levels. (TR PC Apr 8, 2008 vol 2 @ 196; vol 5 @ 482) Accordingly, this claim must be denied.

**14. Ineffective For Failing To Object To State's Closing Argument In Penalty Phase**

Petitioner alleges counsel failed to object to prosecutorial misconduct in closing argument in the penalty phase. However, Petitioner has failed to identify or establish that the State presented unfairly prejudicial, inflammatory, inappropriate, misleading, improper, or inaccurate information to the jury in closing. Even if the State did present such information, the Petitioner has failed to establish that any alleged misconduct affected the outcome of the trial. Accordingly, this claim is without merit. The State also relies on its response to Claim V.

**15. Ineffective For Failing To Object During Voir Dire To State's Suggestion Jury Should Not Consider Petitioner's Age**

Petitioner alleges counsel was ineffective for failing to object to the State's questions regarding whether the juror would be influenced not to impose the death penalty due to Petitioner's age. The State's questions on this topic were not objectionable. The State never suggested the jury could not consider Petitioner's age. Nor did the State extract a promise during voir dire that the jury would not be influenced by Petitioner's age. On the contrary, the State specifically told the jury pool it could consider her age. (TR Trial, Vol. VII, 601-2)("Would the fact that she is young make, <u>certainly you would be able to consider her age</u>, but that sole factor, would that preclude you from considering and applying all three of these punishment as the law requires?") Asking the jury's opinions and feelings on the subject was entirely fair and proper. Moreover, Petitioner failed to show that the jury's deliberations were affected in any way by the State's voir dire in this area. The Court properly instructed the jury on mitigation. The jury is presumed to have followed those instructions absent evidence to the contrary. This claim is without merit.

**16. Ineffective For Failing To Challenge Constitutionality of Tennessee's Murder and Death Penalty Statutes**

Petitioner alleges counsel were ineffective for failing to object to Tennessee's murder and death penalty statutes. However, Tennessee's murder and death penalty statutes are constitutional. The objections raised by Petitioner in her Consolidated Petition have been consistently rejected by the Tennessee Supreme Court. These objections, however, have all been decided in the State's favor. See generally, State v. Thomas, 158 S.W.3d 361, 406-08 (Tenn. 2005); State v. Odom, 137 S.W.3d 572, 601-03 (Tenn. 2003) State v. Mann, 959 S.W.2d 503 (Tenn. 1997); State v.Hines, 919 S.W.2d 573, 582 (Tenn. 1995); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994) State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993); State v. Harris, 839 S.W.2d 54 (Tenn. 1992); State v. Thompson, 768 S.W.2d 239, 250-52 (Tenn. 1989); State v. Groseclose, 615 S.W.2d 142 (Tenn. 1981). Accordingly, it was not error for counsel to challenge the constitutionality of these statutes nor has Petitioner established she was prejudiced by counsel's failure to do so.

**17. Ineffective For Failing To Challenge Death Penalty Under International Law.**

Petitioner alleges trial counsel were ineffective for failing to move to strike the death penalty as violative of international law. However, identical challenges have been held to be without merit. See e.g., State v. Odom, 137 S.W.3d 572, 597-600 (Tenn. 2003); State v. Robert Faulkner, 2003 Tenn. Crim. App. LEXIS 836. Accordingly, it was not error for counsel not to challenge the death penalty as violative of international law.

**18. Ineffective For Failing To Move To Strike Death Penalty After State Offered Sentence Less Than Death**

Petitioner alleges counsel were ineffective for moving to strike the death penalty once the State offered a sentence less than death in plea negotiations. Petitioner contends the State's offer shows it has no compelling interest in executing Petitioner. However, the State's offer was

contingent on the Defendant's waiver of a jury trial and plea of guilty to the first degree murder of Colleen Slemmer. Once the Petitioner refused to acknowledge her guilt, the State was entitled to seek the maximum punishment justified by the circumstances of the case. The State had and continues to have a compelling interest in the execution of Petitioner for the murder of Colleen Slemmer in order to promote justice, deter others likely to violate similar crimes, maintain the dignity and value of human life, and other considerations. The Tennessee Supreme Court has previously rejected the same argument under identical circumstances in a capital case. State v. Mann, 959 S.W.2d 503, 509 (Tenn. 1998) ("If a plea offer is rejected, the State may prosecute the defendant to the fullest extent possible and seek whatever punishment is appropriate under the law"). See also, Cauthern v. State, 145 S.W.3d 571, 629 (Tenn. Crim. App. 2004); (citing Nichols v. State, 90 S.W.3d 576, 604 (Tenn. 2002); State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, the petitioner is not entitled to relief on this issue.

**III. Ineffective Assistance of Counsel On Appeal**

"To determine whether appellate counsel was constitutionally effective, we use the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984) – the same test that is applied to claims of ineffective assistance of trial counsel asserted under the Sixth Amendment to the United States Constitution." Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

Petitioner's claims of ineffective assistance of counsel on appeal are duplicative of claims Petitioner uses to assert ineffective assistance of counsel at trial. The State relies on its responses to the prior claims in support of its request that Petitioner's claim of ineffective assistance of appellate counsel be denied. These claims did not establish ineffective assistance of trial counsel,

prejudice to the Petitioner, or both. Likewise, the failure to raise these issues on appeal does not establish ineffective assistance of appellate counsel, prejudice to the Petitioner, or both.

**V. Independent Constitutional Claims**

Petitioner alleges the death penalty violates certain constitutional rights secured by the Tennessee and U.S. Constitutions. These claims are waived.

A. Petitioner alleges the death penalty cannot be fairly administered and is therefore unconstitutional. This claim has been waived. Even if not waived, this claim has been repeatedly rejected by the Tennessee Supreme Court. See. e.g., Nichols v. State, 90 S.W.3d 576, 604 (Tenn. 2002).

B. Petitioner alleges the death penalty violates Petitioner's right to life and her execution is not necessary to promote any compelling state interest. This claim has been waived. Even if not waived, this claim has been rejected by the Tennessee Supreme Court under identical circumstances in a capital case. State v. Mann, 959 S.W.2d 503, 509 (Tenn. 1998) ("If a plea offer is rejected, the State may prosecute the defendant to the fullest extent possible and seek whatever punishment is appropriate under the law").

C. Petitioner alleges lethal injection violates the ban against cruel and unusual punishment. This claim is waived. A corollary argument made by Petitioner is that recent decisions of the Tennessee Supreme Court defining "torture" would include imposition of the death penalty and therefore violate the ban against cruel and unusual punishment. This claim is waived. Even if not waived, the Tennessee Supreme Court has determined that lethal injection as administered in this state does not violate the ban against cruel and unusual punishment.

Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 314 (Tenn. 2005).1; State v. Robinson, 146 S.W.3d 469 (Tenn. 2004).

The State is compelled to note that the U.S. District Court's decision in Harbison v. Little does not provide Petitioner any relief on this issue. The federal district court in Harbison did find that Tennessee's new protocol violates the ban against cruel and unusual punishment. 511 F.Supp.2d 872 (M.D. Tenn. 2007). Although the Harbison decision criticized the Tennessee Supreme Court's decision in Abdur'Rahman v. Bredesen, it did not and cannot overrule Tennessee's highest state court for purposes of Petitioner's Post-Conviction Petition. This Court is obliged to follow Tennessee law. See State v. Pervis Payne, 2007 Tenn. LEXIS 1116 *3 ("Although decisions of United States District Courts and United States Courts of Appeal may provide guidance when interpreting the Constitution of the United States, this Court is bound only by decision of the United States Supreme Court.")(citing State v. Carruthers, 35 S.W.3d 516, 561 n. 45 (Tenn. 2000); Strouth v. State, 999 S.W.2d 759, 765 n.9 (Tenn. 1999); State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984)).

Furthermore, following the Harbison decision, the U.S. Supreme Court ruled that Kentucky's three-drug lethal injection protocol does not violate the Eighth Amendments ban against cruel and unusual punishment. Baze v. Rees, 128 S.Ct. 1520 (2008). All the safeguards that were relevant to U.S. Supreme Court's decision to uphold Kentucky's protocol are present in Tennessee as well. For example, Kentucky requires that one member of the IV team have one year of professional experience as a medical assistant, phlebotomist, EMT, paramedic or military corpsman. Baze, 128 S.Ct. at 1534. Tennessee requires that its IV Teams have EMTs with IV certification or certified paramedics. Workman, 486 F.3d at 903. Both states require regular

1 While the State has reviewed the lethal injection process since the Abdur'Rahman decision, it ultimately retained the same three drug protocol previously upheld by the Tennessee Supreme Court. Workman v. Bredesen, 486 F.3d 896, 902 (6th Cir. 2007),("Tennessee decided to retain the three-drug protocol it had adopted in 1998.").

execution training exercises. Baze at 1534; Workman at 903. While Kentucky simply requires the presence of the warden and deputy warden in the execution chamber to watch for signs of IV problems, Baze at 1534, Tennessee goes a step further and requires that a member of the IV team contemporaneously document the administration of lethal injection chemicals during the execution. Workman at 920. Tennessee also requires the executioner to have IV training and monitor the effectiveness of the IV during execution. Id. While Kentucky requires the preparation of a primary and backup IV line to ensure correct administration of the drugs, Baze at 1534, Tennessee uses a more precise "cut-down procedure" where a physician makes an incision to obtain IV access in the event a usable vein is difficult to locate. Workman, at 903. Consequently, Tennessee's protocol puts in place more safeguards than Kentucky. If Kentucky's protocol passed constitutional muster, there can be no question that Tennessee's does as well. See also recognizes that this claim is foreclosed by the holding of our supreme court in Abdur'Rahman v. Bredesen, 181 S.W.3d 292 (Tenn. 2005), cert. denied, 574 U.S. 1147, 126 S. Ct. 2288, 164 L. Ed. 2d 813 (2006).

The U.S. Supreme Court made clear that challenges to lethal injection protocols must meet a very heavy burden. Baze at 1537. A defendant challenging a protocol will fail unless the defendant establishes the State's lethal injection protocol creates a demonstrated and substantial risk of severe pain when compared to known and available alternatives. Id. The U.S. Supreme Court in Baze also added, "A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard." Id.

Since Tennessee's three-drug protocol is virtually identical to Kentucky's in all relevant aspects as discussed above, Petitioner's argument that lethal injection constitutes torture must fail.

D. Petitioner alleges she is not eligible for the death sentence under Roper v. Simmons, 543 U.S. 551 (2005)(holding that the death penalty for those who were under 18 years of age at the time of the offense constitutes cruel and unusual punishment) and Atkins v. Virginia, 536 U.S. 304 (2002)(holding that the execution of mentally retarded individuals is constitutionally prohibited). This claim is waived. Furthermore, Petitioner has failed to establish that she was under age 18 at the time of her offense or that she ever has been mentally retarded. Being functionally or mentally a minor has not been proven in this case nor is it relevant in any case. The evidence presented both at trial and at the post-conviction hearing was that Petitioner was an adult at the time of the offense and that she is of above-average intelligence. Consequently, this Atkins-Roper claim is without merit.

E. Petitioner claims that imposition of the death penalty violates due process and the right to a jury as set forth in Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584, 605 (2002). This claim is waived.

Furthermore, Federal and Tennessee appellate courts agree that Apprendi did not create a constitutional right that applies retroactively to cases, such as Petitioner's, on collateral review. See In re Clemmons, 259 F.3d 489, 493 (6th Cir. 2001)("[T]he Supreme Court has not held that Apprendi applies retroactively to cases on collateral review."); Greenup v. State, No. W2001-01764-CCA-R3-PC, 2002 Tenn. Crim. App. LEXIS 836 (Tenn. Crim. App. Oct. 2, 2002)("We conclude that the constitutional rule of criminal procedure announced in Apprendi does not apply retroactively on collateral review."). See also, Harris v. United States, 122 S.Ct. 2406, 2427, 153 L.Ed.2d 524 (2002)(Thomas, J., dissenting)("No Court of Appeals, let alone this Court, has held that Apprendi has retroactive effect.")(Ring v. Arizona, 122 S.Ct. 2428, 2450-51, 153 L.Ed.2d 556 (O'Connor, J., dissenting)(Noting that many death penalty appeals will be unsuccessful

because, having completed their direct appeals, "they will be barred from taking advantage of [the Ring decision] on federal collateral review."); Lovins v. State, 2007 Tenn. Crim. App. LEXIS 726 (Tenn. Crim. App. 2007) ("This Court has previously held that retrospective application of the rule announced in Blakely is not applicable to cases on collateral review. Roy Allen Burch v. State, No. E2004-02365-CCA-R3-PC, 2005 Tenn. Crim. App. LEXIS 689, 2005 WL 1584379, *2 (Tenn. Crim. App., at Knoxville, July 7, 2005) (no Tenn. R. App. P. 11 application filed) (citing Isaac Lydell Herron v. State, No. W2004-02533-CCA-R28-PC (Tenn. Crim. App., at Jackson, Nov. 22, 2004)).

Even if the claim was not waived and Apprendi and Ring did apply to Petitioner's post-conviction, those decisions would provide no relief. The Tennessee Supreme Court has repeatedly upheld the state's death penalty procedure and rejected arguments premised on Apprendi and Ring. See e.g., State v. Reid, 164 S.W.3d 286, 311-12 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 59 (Tenn. 2004); State v. Berry, 141 S.W.3d 549, 562 (Tenn. 2004); State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 466-67 (Tenn. 2002). The Tennessee Supreme Court has specifically held that "[t]he focus in Apprendi, Ring, and Blakely was on the Sixth Amendment right to trial by jury," and the U.S. Supreme Court "expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." Berry, 141 S.W.3d at 560. The petitioner is not entitled to relief on this issue..

F. Petitioner alleges she was denied a fair trial by the Court's insistence she be tried on the first setting. This claim is waived. Even if the claim was not waived, Petitioner has failed to demonstrate how going to trial on the first setting denied her right to a fair trial. Having failed to establish prejudice, Petitioner's claim is without merit.

G. The Petitioner alleges that the appellate review process in death penalty cases is constitutionally inadequate because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed. This argument is waived. If not waived, this argument has been specifically rejected by our supreme court many times. See e.g., Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77; Barber, 753 S.W.2d at 664. Additionally, the Tennessee Supreme Court has held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." Bland, 958 S.W.2d at 663.

H. The Petitioner complains that each of Tennessee's 31 elected District Attorneys General is allowed to indiscriminately seek or forego the death penalty violating principles set out in Bush v. Gore, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000). This issue has been waived. If not waived, the Tennessee Court of Criminal Appeals has rejected this claim. See David Keen v. State, No. W2004-02159-CCA-R3-PD, 2006 Tenn. Crim. App. LEXIS 442 (Tenn. Crim. App., at Jackson, June 5, 2006), perm. to appeal denied (Tenn. Oct. 30, 2006).

**V. Prosecutorial Misconduct**

A. Petitioner alleges the State engaged in prosecutorial misconduct by not objecting to the appointment of Mr. Talman to represent Petitioner based on his involvement in over billing the indigent defense fund. Petitioner alleges the State was involved in the collection of funds

from Mr. Talman and had prosecutorial authority over him which caused Mr. Talman to have a conflict of interest.

This claim is waived. Even if not waived, the Petitioner has failed to establish that Mr. Talman had a conflict of interest as further outlined the State's response to Claim I, supra. Even if he had a conflict of interest, Petitioner has failed to establish that the alleged conflict affected his representation and prejudiced her.

B. Petitioner alleges the State engaged in prosecutorial misconduct by getting a commitment from the jurors not to consider Petitioner's age as a sufficient reason to give her a life sentence. This claim is waived. Even if not waived, the State never suggested the jury could not consider Petitioner's age. Nor did the State extract a promise during voir dire that the jury would not be influenced by Petitioner's age. On the contrary, the State specifically told the jury pool it could consider Petitioner's age. (TR Trial, Vol. VII, 601-2)("Would the fact that she is young make, certainly you would be able to consider her age, but that sole factor, would that preclude you from considering and applying all three of these punishment as the law requires?") Asking the jury's opinions and feelings on the subject was entirely fair and proper. Moreover, Petitioner failed to show that the jury's deliberations were affected in any way by the State's voir dire in this area. The Court properly instructed the jury on mitigation. The jury is presumed to have followed those instructions absent evidence to the contrary. This claim is without merit. Even if not waived.

C. Petitioner alleges the State engaged in prosecutorial misconduct by making improper, inflammatory, prejudicial, inappropriate, misleading, or inaccurate statements during opening and closing arguments. This claim is waived. Even if not waived, Petitioner has only identified two examples of alleged prosecutorial misconduct – neither of which afford her any relief.

(1) The first area deals with the State's voir dire on Petitioner's age. The State has addressed this argument in its response to Claim V. B.

(2) The second area of alleged prosecutorial misconduct is one added in Petitioner's Post-Conviction Closing Argument memorandum. Petitioner alleges it was misconduct for the State to advance the theory that Petitioner preplanned the murder of Ms. Slemmer with her co-defendants while also advancing the theory that Petitioner murdered Ms. Slemmer to avoid arrest. This claim is waived. If not waived, the State relies on its response to Claim II. 3. j) to assert the two theories were not inconsistent. Consequently, it was not prosecutorial misconduct to advance the two theories and the Petitioner's claim should be denied.

**VI. Death Penalty Violates International Law**

Petitioner alleges imposition of the death penalty would violate certain treaties and customary international law which the United States is allegedly bound. This claim is waived. Even if it was not waived, the Tennessee Supreme Court has determined imposition of the death penalty does not violate international law. See State v. Faulkner, 154 S.W.3d 48, 71 (Tenn. 2005)(Incorporating lower court's holding that "no customary or international law or international treaty prohibits the State of Tennessee from invoking the death penalty as punishment".); State v. Odom, 137 S.W.3d 572, 597-600 (Tenn. 2003); Accordingly, it was not error for counsel not to challenge the death penalty as violative of international law. Accordingly, this claim must be denied.


Case 1:12-cv-00035-HSM-SKL Document 9-4 Filed 08/01/12 Page 141 of 150 PageID #: 4375

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: Leland L. Price

LELAND L. PRICE, BPR# 018853
Assistant District Attorney General
Suite 168, City-County Building
P.O. Box 1468
Knoxville, TN 37901
Telephone: (865) 215-2515

CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing pleading was forwarded, by electronic mail transmission, hand delivery or by placing the same in the U.S. Mail with sufficient postage thereon to the following attorneys for the Petitioner:

Donald E. Dawson
James W. Crowson
Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

this the 14 day of November, 2008.

BY: Leland L. Price

LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| | ) | |
| Petitioner, | ) | CASE NO. 68280 |
| | ) | |
| VS. | ) | |
| | ) | DEATH PENALTY |
| | ) | POST-CONVICTION |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Respondent. | ) | |

2006 DEC -8 PM 3: 24
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN
FILED

**PETITIONER'S BRIEF IN REPLY TO THE STATE'S POST-HEARING MEMORANDUM AND MOTION TO DENY POST-CONVICTION RELIEF**

Petitioner, by and through the undersigned counsel, submits the following Brief in Reply to the State's Post-Hearing Memorandum and Motion to Deny Post-Conviction Relief. This brief is being submitted in response to arguments and issues presented in the State's memorandum, and does not include all of Petitioner's arguments in favor of post-conviction relief. Please see the Petitioner's Closing Brief (submitted previously) for a complete discussion of Petitioner's claims.

**I. The State suggests in its memorandum that there is no merit to Petitioner's claim that her trial counsel were ineffective for not presenting testimony in the mitigation phase simply because Petitioner's trial counsel articulated excuses for failing to call Dr. McCoy, but fails to address Petitioner's argument that her trial counsel were ineffective because they failed to call available lay witnesses and properly utilize expert witnesses.**

As detailed in Petitioner's original closing brief, Petitioner's trial counsel presented only three ill-prepared lay witnesses during the penalty phase of Petitioner's trial. Petitioner clearly showed at the post-conviction hearing that there were literally dozens of witnesses available and willing to testify at trial concerning Petitioner's tragic life and social history. Additionally,

Petitioner presented at the post-conviction hearing several expert witnesses that discussed Petitioner's mental illness and organic brain damage, along with testimony that the psychiatrist and neuropsychologist originally retained by Petitioner's trial counsel were improperly utilized at Petitioner's trial. Petitioner has shown this Court her trial counsel were ineffective during the penalty phase of her capital murder trial by presenting a lackluster, hastily prepared mitigation case through family members who happened to be in attendance at the trial after deciding, at the last moment, not to call Dr. McCoy during the mitigation phase. (Please see pages 59-62 of Petitioner's Post-Conviction Closing Argument for a detailed discussion of how Petitioner's trial counsel's failure to call lay witnesses and professionals who had worked with Ms. Pike was ineffective assistance of counsel)

However, the State's response to Petitioner's detailed discussion of trial counsel's failure to present adequate lay witness and expert testimony does not even address those issues. Instead, the prosecution focuses upon Petitioner's trial counsel's excuses for their failure to call the sole expert witness that was prepared to testify at the penalty phase of Petitioner's trial. In an obvious effort to beg the question, the State's brief simply rehashes the very questionable reasons given by Petitioner's trial counsel for failing to call Dr. McCoy without acknowledging the more troubling question of why Ms. Pike's trial counsel did not have other experts and lay witnesses ready to testify during the penalty phase, whether or not they decided to call Dr. McCoy.

**II. The State, in its reply memorandum, repeatedly misstates the standard of review that this Court is to apply in its analysis of the ineffectiveness of Petitioner's trial counsel under *Strickland v. Washington,* suggesting an outcome determinative test, rather than the proper "rendered unreliable" standard of *Strickland.***

The proper standard of review to be applied by this Court regarding ineffective assistance of counsel is a two-pronged test first set forth by the United States Supreme Court in *Stickland v.*

*Washington.* 466 U.S. 668. 685 (1984). Under *Strickland,* Ms. Pike must show both that her trial counsel's performance was deficient and that she was prejudiced by counsel's deficient performance. However, the *Strickland* Court specifically defined "prejudice" in the context of this test to mean that the deficient performance of counsel was sufficient to render the result of Petitioner's trial "unreliable". *Id* at 693. The Court then goes on to further clarify this "prejudice prong" of its analysis and to specifically reject an "outcome determinative" test for prejudice:

> An ineffective assistance claim asserts the absence of one of the critical assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. **The result of a proceeding can be rendered unreliable and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.**

*Strickland,* 466 U.S. at 693-694 (emphasis added). Justice O'Connor further elaborated on this standard in *Williams v. Taylor,* 529 U.S. 362,405-406 (2000), explaining:

> Take, for example, our decision in *Strickland v. WashingtOn.* 466 U.S. 668. 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that. .. the result of the proceeding would have been different." *Id.,* at 694, 104 S.C!. 2052. 529 U.S. 362.405-406 (2000).

The Tennessee Supreme Court has also rejected the suggestion that the "prejudice prong" of Stricklandcould only be satisfied by an "outcome determinative" test. Justice Clark, in *Pylant v. State,* 263 S.W.3d 854, wrote that:

> (T)he test for prejudice under *Strickland* is not an inquiry into the sufficiency of the State's evidence adduced at trial. Indeed, "[t]he result of

a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." 466 U.S. at 694, 104 S.Ct. 2052.

Several times in its responsive memorandum the State improperly suggests to this Court that the proper standard of review for prejudice under *Strickland v. Washington* is whether the outcome of the Ms. Pike's trial would have been different had she received competent representation. For example, on page 7 of the State's brief, the prosecution instructs this Court that, in order for Ms. Pike to prevail on the issue of whether her trial counsel prejudiced her trial by failing to adequately prepare, she "must establish that both attorneys failed to prepare the case and that absent this failure, the outcome would have been different". On page 18 of its brief, the State again misstates the prejudice standard, instructing this Court that the burden is on Ms. Pike to show that her trial counsel's failure to obtain and use experts in an effective manner "would have made a difference" at trial. Further, on page 19 of the State's brief, the prosecution, while admitting that Ms. Pike's post-conviction counsel presented more extensive social history and expert testimony at her post-conviction hearing than was presented by her trial counsel to the jury that determined her sentence, seems to instruct this Court that, in order for Petitioner to prevail, this more extensive and compelling evidence must be "sufficient to preclude the imposition of the death penalty when weighed against the aggravating circumstances". Finally, when, on page 22 of its brief, the State is discussing Ms. Pike's trial counsel's disastrous decision not to call Dr. McCoy during the sentencing phase of her trial, the prosecution opines that "Dr. McCoy's testimony would not have altered the outcome of the trial".

In none of the above referenced instances does the State make any passing reference to the proper standard to be applied regarding prejudice caused by ineffective assistance of counsel under *Strickland*. Instead, the prosecution urges the Court to ignore the U.S. Supreme Court's "rendered unreliable" test for prejudice with a stricter "outcome determinative" test, but provides no precedent for such an analysis. The State's bare assertion that the court should apply a stricter analysis must be disregarded.

**III. The State suggests that this Court should consider the possibility that the jury that heard Petitioner's trial would have violated their oath by considering evidence of Ms. Pike's severe mental illness as a non-statutory aggravator in favor of a verdict of death.**

At her post-conviction hearing, Ms. Pike presented extensive and compelling evidence of long-standing and congenital brain damage and mental illness which should have been brought to light and presented by her original trial counsel at her capital trial. The failure of Ms. Pike's counsel to discover and present this significant evidence of mental illness and disease was ineffective and, as required under the "prejudice prong" of *Strickland*, thus renders the jury's verdict of death unreliable. However, on page 19 of the State's post-hearing memorandum, the prosecution suggests to this Court that Ms. Pike's severe mental illness "could easily be rejected (by a jury) and used in tandem with the brutal circumstances of this crime to justify the death penalty". The State is suggesting that this Court presume that jurors would violate their oath and ignore the law given to them by the court by considering a nonstatutory aggravator in their decision to impose a death penalty and, further, that this Court use that presumption of the jurors' violation of the law as a basis for ignoring the mitigation evidence that should have been presented on Ms. Pike's behalf.

This Court properly instructed the jury in Ms. Pike's trial that during the sentencing phase of deliberations they were only to consider those statutory aggravating factors contained in Tenn. Code Ann. §39-13-204 that the State had proven beyond any reasonable doubt. The State now suggests that the jury would have ignored this Court's instructions and unanimously agreed to apply a nonstatutory aggravator. Such analysis is in direct conflict with the established principle that juries are presumed to follow the instructions of the trial court. See *State v. Young*, 196 S.W.3d 85, 111 (Tenn.2006).

Not only should the State's suggestion that Ms. Pike's mental illness should be considered as an aggravating factor for the purpose of sentencing be rejected, but this Court must find that the new and compelling evidence of Petitioner's mental illness presented at the post-conviction hearing would necessarily have been considered by the jury had been presented. If any juror found some evidence - not rebutted beyond a reasonable doubt by the State - that a significant psychological disorder existed, that juror was *required,* in good faith, by the trial court's instruction, to *consider that mitigation* in determining punishment. *Morgan* v. *Illinois,* 504 U.S. 719, 728 (1992).

This Court must reject the State's suggestion that this Court presume that a lawless jury would use mitigating evidence as an aggravating factor in determining Petitioner's sentence and consider the effect that properly presented mitigation evidence of Ms. Pike's mental illness would have had upon the jury.

**IV. The State's suggestion to this Court that the petitioner must show how her trial counsel's ineffective voir dire prejudiced her by affecting jury deliberations is improper, since Rule 606(b) of the Tennessee Rules of Evidence does not allow jurors to discuss their deliberations.**

In its memorandum and motion to deny Petitioner's relief the State improperly suggests that Petitioner's claim of ineffective assistance of counsel during the voir dire of her trial must fail because Ms. Pike did not present evidence at the post-conviction hearing regarding how her trial attorney's ineffective voir dire affected juror deliberations (pages 19 -21), in essence claiming that Ms. Pike, in order to prevail on this claim, would be required to put jurors on the witness stand to discuss their deliberations.

However, Rule 606(b), Tenn. R. Evid., prohibits a juror from testifying regarding events that occurred during deliberations with the narrow exception that "a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion...."

None of the many issues raised by Ms. Pike in her post-conviction hearing involve allegations that would allow the jurors to testify under the narrow exception found in Rule 606(b), above. Accordingly, it is improper to the State to suggest that Ms. Pike has the burden of affirmatively showing that her counsel's deficient performance affected deliberations.

## CONCLUSION

For the reasons stated herein, the Petitioner, Christa Pike, respectfully submits, for the reasons set forth in her opening brief and in this reply brief, this Court must grant Ms. Pike's Petition for Post-Conviction Relief and set aside her conviction and sentence.

Respectfully submitted,

James W. Crowson, BPR #26766
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
Tel.: (615) 741-9331
Fax: (615) 741-9430

Counsel for Christa Gail Pike

## CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing motion sent by UPS, to Assistant District Attorney Leland Price, Office of the District Attorney General, 400 Main Street, Suite 168, Knoxville, TN 37901, on this the 5th day of December, 2008.

James W. Crowson