**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 4**

**DOCUMENT 5**

---

E2009-00016-CCA-R3-PD

004356

V

VOLUME V OF V

# TECHNICAL RECORD

NO. 68280

DEFENDANT: CHRISTA GAIL PIKE, PETITIONER
(Defendant Indigent)

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGDoyal

## APPEALED FROM

## KNOX COUNTY CRIMINAL COURT

## AT KNOXVILLE, TENNESSEE

HON. MARY ~~BETH LEIBOWITZ~~ JUDGE – DIVISION ~~III~~

JOY R. MCCROSKEY CLERK

IN THE CASE OF

CHRISTA GAIL PIKE, PETITIONER

VS.

STATE OF TENNESSEE

PETITION DISMISSED

CHARGE: ~~PETITION FOR RELIEF FROM CONVICTION OR SENTENCE~~

## TO THE

## COURT OF CRIMINAL APPEALS

## KNOXVILLE, TENNESSEE

HONORABLE DONALD DAWSON, Attorney -at- Law
530 Church Street
Suite 600
Nashville, TN 37243

Attorneys for Appellant

~~HONORABLE RANDALL E. NICHOLS, District Attorney~~ General
HONORABLE LELAND PRICE, Assistant Attorney General
~~City County Building~~
Knoxville, TN 37902

Attorneys for Appellee

FILED 3 DAY OF April 2009

CRIMINAL COURT JOY R. MCCROSKEY CLERK

NO. ~~68280~~ ~~SHEILA MELTABARGER~~ DEP. CLERK

APPELLANT PRISON NO. 2612368
3881 Stewart Lane
Nashville, TN 37243

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE

DIVISION THREE

FILED
2008 DEC 10 PM 1:32
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 68280 |
| STATE OF TENNESSEE, | ) | |
| Respondent. | ) | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 30, 1996, the petitioner, Christa Gail Pike, was convicted of the premeditated first degree murder of the victim, Colleen Slemmer. Additionally, she was convicted of conspiracy to commit premeditated first degree murder. At the capital sentencing hearing for the murder, the jury determined that a sentence of death was appropriate based upon its finding of two aggravating circumstances: that "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death" and that "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest of the defendant or another." Tenn. Code Ann. § 39-13-204 (i)(5) and (i)(6)(1997 Repl.). For the conspiracy conviction, the trial court imposed a consecutive twenty-five year sentence. The petitioner appealed to the Tennessee Court of Criminal Appeals, which affirmed her convictions and sentences. Subsequently, our supreme court reviewed the defendant's case on appeal and affirmed both the convictions and the sentences. State v. Pike, 978 S.W.2d 904 (Tenn. 1998).

This petition for post-conviction relief was originally filed on June 3, 1999, and subsequently amended with the assistance of counsel and consolidated into a final petition that was filed on July 26, 2006.[1] The petition contains allegations that the trial court violated the petitioner's constitutional right to conflict-free counsel, that the petitioner was denied the effective assistance of counsel at both the trial and appellate levels, that the death penalty is unconstitutional, and that there was prosecutorial misconduct.

## Standards

Relief under the Post-Conviction Procedure Act of 1995 is available when a petitioner's "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-203. "The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Tenn. Code Ann. § 40-30-206(d). Prior to any hearing, the court reviews the petition to determine if any issues raised should be dismissed as either previously determined and/or waived. Tenn. Code Ann. § 40-30-206. The procedural bars of previous determination and waiver are statutorily defined:

> (g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a

---

[1] During the pendency of this petition, Ms. Pike filed a pro se request to withdraw her post-conviction petition which was granted after the trial court determined that she was both competent and able to abandon her litigation if she wished to do so. After further litigation regarding her abandonment of proceedings in both the trial court and appellate courts, Ms. Pike indicated a desire to pursue her post-conviction petition. Upon reinstating the petition, preparation for her evidentiary hearing resumed. The completion of these post-conviction proceedings was delayed several years as a result of these collateral proceedings.

court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h) A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Tenn. Code Ann. § 40-30-106(g) and (h); see Tenn. S. Ct. R. 28, Section 2(D) and (E). No issues here were held pre-hearing to be either previously determined and/or waived. In a post-conviction proceeding, the petitioner has the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). The substantive allegations contained in the amended petition will be considered below.

## **Factual Background**

The following recitation from the Tennessee Supreme Court opinion affirming the petitioner's convictions and sentence provides a summary of the testimony and evidence presented at the petitioner's trial:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the defendant, Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she

"had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, Pike's boyfriend, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center. Slemmer was not with them.

Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk. Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that Pike was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw Pike at breakfast the next morning she asked Pike what she had done with the piece of the victim's skull. Pike replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of Slemmer's skull. Pike also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. Pike told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

Though neither Iloilo nor Wilson immediately reported Pike's statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered Slemmer's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal. Upon closer inspection, he saw the victim's clothes and her nude breast and realized it was the body of a human female. He immediately notified law enforcement officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated. Johnson removed all civilians from the area and secured the scene surrounding the body.

As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and broken foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle, with trampled bushes, hand and knee prints in the mud, and drag marks. A large pool of blood was found about 30 feet from the victim's body.

The victim's body was actually lying face down on a pile of debris. When officers turned the body over, they discovered that the victim's throat had been slashed. A bloody rag was around her neck. Detective Donald R. Cook, of the U.T. Police Department, accompanied the body to the morgue. He observed the body after it had been cleaned and noticed that a five pointed star in a circle, commonly known as a pentagram, had been carved onto the victim's chest.

Randy York, a criminal investigator with the Knoxville Police Department, began investigating this case on January 13, the day the victim's body was discovered. York separately interviewed the defendant and Shipp at the Knoxville Police Department on January 14th. Investigator York advised defendant Pike of her Miranda rights, but she chose to waive them and make a statement. Pike explained in detail how the killing had occurred. Pike's statement was tape-recorded and transcribed in some forty-six pages. Copies of the transcription were given to the jury, and the jurors were allowed to listen to the tape through individual headphones.

In her statement, Pike said that she and Slemmer had been having problems for some time. Pike claimed to have awakened one night to find Slemmer standing over her with a box cutter. Pike told Investigator York that Slemmer had been "trying to get [her] boyfriend" and had been "running her mouth" everywhere. Pike said that Slemmer had deliberately provoked her because Slemmer realized that Pike would be terminated from the Job Corps program the next time she became involved in a fight or similar incident.

Pike claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. Pike said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to Pike, she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, Pike told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though Pike refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, Pike and Slemmer exchanged words. Pike then began hitting Slemmer and banging Slemmer's head on her knee. Pike threw Slemmer to the ground and kicked her repeatedly. According to Pike, as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report Pike so she would be terminated from the Job Corps program, Pike again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with Pike caught Slemmer and pushed her to the ground.

Pike and the other person, who Pike referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where Pike cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," Pike recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point Pike said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, Pike cut Slemmer's back, "the big long cut on her back." Pike said Slemmer repeatedly tried to get up and run. Pike recounted how Slemmer bargained for her life,

begging Pike to talk to her and telling Pike that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. Pike told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." Pike said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked Pike what she was going to do to her, at which point Pike thought she heard a noise. Pike left the scene to check out the surrounding area to make sure no one was around. When she returned, Pike began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, Pike cut Slemmer's throat several other times. Pike said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that Pike and the other person would push her back on the ground.

Slemmer attempted to run away again, and Pike threw a rock which hit Slemmer in the back of the head. Pike stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, Pike continued to hit her. Eventually Pike said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but Pike "kept hitting her and hitting her and hitting her." Pike eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, Pike said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. Pike said the episode lasted "for about thirty minutes to an hour." Pike admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. Pike also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. Pike denied carving a pentagram in the victim's chest, but said that the other person had cut the victim on her chest.

After disposing of Slemmer's body, Pike and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and Pike returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. Pike never identified that individual. Pike told Investigator York that the blood-stained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. Pike also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. Pike gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there Pike retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that Pike eventually directed him to the exact location where the victim's body was found.

After Pike's statement was played for the jury, the State introduced pictures of Pike and Shipp taken at the Knoxville Police Department on the day the statement was given, January 14, 1995, two days after the murder. In the pictures, both Pike and Shipp were wearing pentagram necklaces.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had retrieved a pair of black gloves and two of Slemmer's I.D. cards from the Texaco station on Cumberland Avenue. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on

leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special Agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of Pike and Shipp. Those items that he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that she had been unable to perform a DNA analysis on the blood taken from the shoes of Pike and Shipp, but she had determined that the blood samples taken from the clothing of both Pike and Shipp matched the DNA profile of the victim.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer, a nineteen-year-old Job Corps student. Dr. Elkins described the victim's body as covered with dirt and twigs. Slemmer was nude from the waist up clothed only with jeans, socks, and shoes. After removing the victim's clothing and cleaning the body, Dr. Elkins had attempted to catalog the slash and stab wounds on the victim's torso by assigning a letter of the alphabet. There were so many wounds that eventually Dr. Elkins decided to catalog only the most serious and major wounds. Dr. Elkins explained that to catalog every wound she would have been required to go through the alphabet again, and stay in the morgue for "three days." Eventually, Dr. Elkins said she "basically threw up [her] hands and just said, enumerable [sic] more superficial slash wounds on the back, arms and chest." In addition, Dr. Elkins said the victim had purple contusions on her knees, indicating fresh bruising consistent with crawling, and defensive wounds on her right arm.

Dr. Elkins described the major slash and stab wounds she had cataloged on the victim's back, arms, abdomen, and chest. She found a six inch gaping wound across the middle of the victim's neck which had penetrated the fat and muscles of the neck. In addition, Dr. Elkins had found ten other slash wounds on the victim's throat. Other slash wounds were on the victim's face, and Dr. Elkins observed what appeared to be a pentagram carved onto the victim's chest. Because the area around each wound was red in appearance, Dr. Elkins concluded that the victim's heart had been beating when the wounds were inflicted and she said the victim would not have been rendered unconscious by any of the stab or slash wounds.

Dr. Elkins determined that the victim's death was caused by blunt force injuries to the head. The victim had suffered multiple and extensive skull fractures. From the autopsy, Dr. Elkins determined that the victim had sustained a minimum of four blows to her head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the victim's skull had been fractured as had the bridge of her nose. However, the major wound, labeled as injury "W", involved most of the left side of the victim's head. Dr. Elkins said that this injury, caused by blunt force to the left side of the victim's head while the right side of the victim's head was against a firm surface, also had fractured the right side of the skull and imbedded a portion of the skull into the victim's brain. Dr. Elkins found small divots in the victim's skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows. Finally, Dr. Elkins testified that blood in the victim's sinus cavity indicated she had been alive and probably conscious when the injuries were inflicted.

During her testimony, Dr. Elkins utilized the victim's skull to describe the injuries. She testified that in order

to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had removed the top of the victim's skull in order to remove the brain. Embedded inside the victim's brain as a result of the blunt force were portions of the victim's skull. Dr. Elkins removed those embedded pieces and forwarded them to Dr. Marks. Dr. Marks reconstructed the skull, fitting those loose portions into the left side area of the skull. However, those pieces had not completely filled one area on the left side of the victim's skull. Dr. Elkins then showed the jury a piece of skull that had been given to her shortly before the trial and demonstrated that it fit perfectly into the remaining area of the victim's skull. The piece of skull utilized by Dr. Elkins had been taken from the pocket of a jacket which witnesses identified as belonging to Pike.

Pike's jacket had been turned over to law enforcement officials by Job Corps employees. Robert A. Pollock, orientation specialist at Knoxville Job Corps, testified that he had spoken with Pike on January 13, 1995, concerning a misplaced I.D. card. After Pike left his office, Pollock noticed a black leather jacket hanging on the chair where she had sat. The jacket had been hanging on the chair when Pollock locked the room at approximately 4:00 p.m. on January 13th, and it was still there when he returned at 7:30 a.m. on January 17th. Because he had heard over the weekend that Pike was a suspect in this murder investigation, Pollock immediately turned the jacket over to the Job Corps' Safety and Security Captain, William Hudson. Hudson called the Knoxville Police Department and turned the jacket over to Officer Arthur Bohanan when he arrived a short time later.

Officer Bohanan identified the jacket, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the jacket and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which [**19] the victim's skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

Following the introduction into evidence of the victim's skull, numerous photographs, and items of the victim's clothing, the State rested its case-in-chief.

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the defendant. Dr. Engum described Pike as an "extremely bright young woman." Dr. Engum explained that Pike "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." Pike had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that Pike had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the defendant suffers from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the defendant is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals.

During direct examination, Dr. Engum opined that the defendant had not acted with deliberation or

premeditation in killing Slemmer. Instead Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the defendant's coat, Dr. Engum explained that the Defendant actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the defendant's way of getting recognition, "no matter how distorted" the recognition.

On cross-examination, Dr. Engum stated that there was no question that the defendant had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the defendant and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the defendant nor any of the other witnesses. Dr. Bernet admitted that he did not have enough information to offer an expert opinion as to whether Pike acted with intent or premeditation in killing the victim.

Based on this evidence offered during the guilt phase of the trial, the jury found Pike, guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, Pike's aunt as a witness. Ross testified that the defendant had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that Pike's family has a history of substance abuse and that Pike's maternal grandmother was an alcoholic who was verbally abusive to Pike. Following the death of Pike's paternal grandmother, Pike was shuffled between her mother and father. According to Ross, Pike's mother's home was very dirty. Pike's mother set no rules for her, and on the occasions that Pike had visited Ross, the defendant had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.

On cross-examination, Ross admitted that she had previously described Pike as a pathological liar and that she had been afraid to allow Pike to associate with her own children. Ross also admitted that Pike had been out of control since she was twelve years old.

Glenn Pike, the defendant's father, testified that he had kicked the defendant out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the defendant prior to her eighteenth

> birthday. On cross-examination, he admitted that he had forced Pike to leave his home in 1989 because there had been an allegation that the defendant had sexually abused his two-year-old daughter from his second marriage. According to her father, Pike had been disobedient, dishonest, and manipulative when she had lived with him.
>
> The defendant's mother, Carissa Hansen, a licensed practical nurse, testified that Pike had lived with her 95 percent of the time since her paternal grandmother's death. Hansen admitted that she had smoked marijuana with the defendant in order to "establish a friendship." Hansen related that the defendant had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped Pike with a belt. Hansen had the boyfriend arrested.
>
> On cross-examination, Hansen admitted that Pike's behavior had been problematic for years. The defendant had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, Pike had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that Pike had wielded a "butcher-knife" against the boyfriend, who had been arrested for whipping her. Hansen also said Pike had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that Pike had been out of control since she was eight years old.

State v. Pike, 978 S.W.2d 904 (Tenn. 1998).

## Evidence Presented at the Post-Conviction Proceedings

At the post-conviction hearings, 35 witnesses testified and numerous exhibits were introduced. [2]

Carissa (Fotos) Hansen, Glenn Pike, and Carrie (Fotos) Ross, the petitioner's mother, father, and aunt, respectively, all testified at the post-conviction proceedings.[3] Hansen testified that prior to marrying the petitioner's father, she had first been married to James Ferguson for 5 ½ years. They had a daughter, Alicia, who was the petitioner's older half sister. Mr. Pike

---

[2]Some of the witnesses' testimony will not be summarized here but rather will be discussed in the issues to which they are relevant to avoid duplication. These witnesses include the petitioner's trial attorneys, Herb Moncier, Gregory Isaacs, and William Crabtree.

[3]Portions of the testimony of some witnesses are discussed together to avoid overlap. In addition, the testimony of these three witnesses at trial is summarized below in this order.

testified that he had been drafted into the Army, went to Vietnam, and had been honorably discharged in 1966. He had returned to the Army in 1973 for the income due to the job market in West Virginia. He stated that after a brief first marriage to someone else, he had married Hansen in 1975. He recalled that he had met Hansen in a bar in Beckley where they both socialized. He stated that they would both have up to 10 drinks each of hard liquor when they went out. Mr. Pike testified that after they were married that they would still socialize some in the bars and that they still both drank, but fewer drinks usually. Hansen testified that she did not drink alcohol or use drugs during either of her own pregnancies. Mr. Pike, however, did not recall that Hansen ever stopped drinking completely when she was pregnant with the petitioner and stated that he did not know what she did when he was away. Mr. Pike was discharged from the Army before the petitioner was born on March 10, 1976. They testified that after about two years of marriage, the petitioner's parents divorced, but then, after a suicide attempt by Hansen, remarried for about two more years. They testified that they divorced the second time in 1982 when the petitioner was about 5 or 6 years old.

According to the testimony, at the time the petitioner was born, Hansen was working as an LPN and living in Beckley, West Virginia. She was injured by a patient at work causing problems with her amniotic fluid level. The evidence established that the petitioner was breech and born premature by C-section. The evidence further established that at birth, the petitioner had a hyaline membrane and bilateral hip dysplasias.[4] Records and testimony established that

[4]Dr. Jonathan Pincus, a neurologist whose testimony will be discussed more fully below, testified that the petitioner also suffers from heterotopia, which he described as a congenital brain defect most often caused by the use of alcohol during pregnancy.

due to these conditions, petitioner was immediately taken to another hospital, the Charleston Area Medical Center, where she spent about two weeks. It was the nearest neonatal intensive care facility to the hospital where the petitioner was born. Mr. Pike and Ross[5] testified that they accompanied the petitioner to Charleston. Ross stated that the petitioner had gone into respiratory arrest once before being transported to Charleston and once on the way in the ambulance. At the hospital, the petitioner was placed on a ventilator. Hansen, who was in the birth hospital, was first able to visit with the petitioner after about 4 to 7 days. Hansen, Mr. Pike, and Ross all testified that Hansen went back to work shortly thereafter. The evidence also established that in 1977, the petitioner suffered from fever and convulsions for which she was hospitalized, but the tests performed were inconclusive at the time.

Everyone agreed that after the petitioner was born, her paternal grandmother moved in with her parents to take care of the petitioner. Witnesses testified that Grandmother Pike did everything for the petitioner and spoiled her. There was testimony that in 1978, Grandmother Pike moved in with her boyfriend Ernest. Mr. Pike testified that the petitioner was everything to his mother. There was speculation that Ernest had sexually abused the petitioner as a small child but Mr. Pike doubted it could be true because he said if his mother had known this she would have killed Ernest. In interviews, the petitioner indicated she had no recollection of any such sexual abuse by Ernest.

Hansen testified that she and her daughters moved to North Carolina in 1982 after her divorce. She stated that she had moved back to West Virginia when her mother was sick to take

[5]At the time the petitioner was born, Ross was not a nurse. At the time of the trial, however, she was working as an RN and was neonatal intensive care certified.

care of her and then back to North Carolina again. She testified that both the petitioner and her sister Alicia stayed with her most of the time growing up but that the petitioner had stayed quite a bit with her Grandmother Pike and that both had stayed with their maternal Grandmother Fotos as well. She stated that both girls had been unhappy in North Carolina so they went back to West Virginia. When she married Danny Thompson, both girls were living with them for a period of time until they went back to West Virginia. She did not recall the petitioner telling her that Danny Thompson hit her.

When the petitioner was about 12 or 13, Hansen stated that she was living with Steve Kyaw. She testified that the petitioner also did not get along with Kyaw but stated that it was more of a problem when she was not home with them. She testified that Kyaw had hit the petitioner once and that it had ended up in court. She stated that she had told Dr. McCoy that the petitioner chased Kyaw with a butter knife, not a butcher knife. She also testified that Kyaw had hit the petitioner in the face with a belt buckle and that this was why the petitioner had chased him with the knife.

She recalled two suicide attempts by the petitioner with the first one being in the 3rd grade. She stated that the petitioner had seen therapists and psychologists over the years. In elementary school, she had been called to pick up the petitioner because the petitioner had told school officials that she had been raped the day before after school. She admitted she had not believed the petitioner but emphasized that she had called the police after the school officials had called her. As a result of this, a man named Claude Davis was arrested but not convicted because when he has come to court all cleaned up, the petitioner has not been able to identify him.

The petitioner also had told Hansen that she has been sexually molested on the way to the

store one night when she was about 16. Hansen stated that the petitioner's friends had told her about the incident the next day because they had taken the petitioner to the hospital the night before, just after it had happened.

She testified that Alicia, who had been living with her Aunt Carrie, had come to live with Hansen after she got pregnant as a teenager. Alicia's boyfriend, Bryan Hammond, and baby, Bryan Keith Hammond, all moved in with Hansen and had lived there for about 1 to 2 years until Alicia had finished high school, gotten a job and an apartment, and had married her boyfriend. The petitioner also had lived with Hansen during this time.

She recalled that the petitioner had gotten pregnant when Hansen was living with her husband, Gerard Hansen. The petitioner and a friend had told her and the friend also had told her that the petitioner had been using cocaine. She admitted she had no personal knowledge of the petitioner using cocaine but that it had worried her about how it would affect the baby. She stated that she had told the petitioner that if she had the baby that she would have to get a job and that she would help her but that she would not raise the child for her. She said she had not forced the petitioner but that the petitioner had an abortion. She admitted to having smoked marijuana with the petitioner when she was 17 and that she thought the petitioner was 17 when she has gotten pregnant.

She specifically recalled one weekend when she had gone to West Virginia and the petitioner had not gone, but has stayed home to stay with a friend. The friends's mother had called Hansen because the petitioner had never shown up at her friend's house. Hansen stated she had called Alicia's husband who went to Hansen's home to look for the petitioner. The petitioner had been having a party and Hammond broke it up. She recalled that the petitioner had

said that Hammond had hit her and given her a bloody nose. She recalled that both Alicia and Hammond had stayed with the petitioner until Hansen had gotten home.

She testified that overall she had lived in about 5 different places in North Carolina with the petitioner. The petitioner had constantly run away and skipped school. The petitioner had lived in a group home on 2 occasions. These were called Sheaffer House and Swannanoa (formerly JEC). After returning home, the petitioner had wanted to go to Job Corps to further her education and to work toward being a nurse. She stated that the petitioner loved to help others.

She testified that she had visited the petitioner at the Job Corps and that the dorm was dirty and there had been blood in the halls. She stated that she had tried to convince the petitioner to come home but she had not come. She recalled that at Christmas the petitioner had told her that a girl had been threatening her and that one night she had been hovering over the petitioner's bed with a knife or something threatening her. She stated that the petitioner, however, had stated that she was not worried because she was friends with Shipp and he would protect her. Hansen also recalled that the petitioner had some crystals that Shipp had given to her that were suppose to have had some magical powers. Hansen stated that she had tried to get the petitioner not to go back.

According to Hansen, before the Job Corps, the petitioner had worked several jobs. She recalled that Brian Wilson, the petitioner's homeless boyfriend, had lived with them for a while but that she had kicked him out because he had been sloppy and had not gotten a job. She stated that the petitioner had left with him. She recalled that Wilson and the petitioner had lived in a trailer for a short time.

She testified that she could only recall having met with Attorney William Talman, lead

counsel, on two occasions, and that she recalled meeting with Dr. Diana McCoy also on at least two occasions. She also recalled phone calls from Dr. McCoy. She recalled that jury selection had taken about one week and that no other family had been present for that part. The second week she recalled that her husband, Gerard Hansen, her ex-husband, Glenn Pike, and her sister, Carrie Ross, had been there. She stated that she had not known she was testifying before the trial started but admitted it was possible that she had been told pretrial that she might be a witness. She recalled that when the family members had met with the attorneys before testifying, the attorneys had told them that they were going to make the family look bad and to exaggerate any bad things because this would help the petitioner. She stated that she had done this.

She testified that she did not know if she agreed with the statement by Dr. Pincus that the petitioner was the product of an almost unbearably abusive background. She stated she had no personal knowledge of any sexual abuse of the petitioner and that she had never seen blood on the petitioner from a sexual attack. She agreed the petitioner had grown up around a slaughter house but so then stated that she had as well. She stated that the petitioner had wanted to be with her Grandfather Fotos at the slaughter house. She recalled that Kenny Clyde had threatened to rape Hansen and that the petitioner and a friend had beat him up. She described the petitioner as having been very rebellious and their home as having been a continuous battle zone. She testified that the petitioner had a bad temper.

She further recalled that the petitioner had run one of her friends, Breanna, off by beating her up and pushing her down the stairs. She stated that she did not recall the Beth Brown incident that she had recalled at trial and that she did not know the petitioner had been in trouble before leaving for the Job Corps. She did not recall anything about Wiccans. She stated that she

did recall having told Dr. McCoy that the petitioner had blown many second chances in her life.[6] She admitted that the petitioner had been lying from the time she had learned to talk.

Gerard Hansen, the petitioner's step-father, testified that he had been married to the petitioner's mother since 1992. He had moved in with the petitioner's mother in 1991 when the petitioner had been at Swannanoa and the petitioner had lived with them after she had been released and until she had gone to the Job Corps. He testified that Kenny Clyde, the man the petitioner had beaten up while she was living with them, was not a nice man. He stated that Clyde had called the petitioner's mother and had stalked the petitioner. He admitted that they had not reported Clyde to the police. He recalled that the Job Corps had been the petitioner's idea and that he had not been allowed in the dorm. He also recalled that the petitioner had not wanted to go back at Christmas.

He testified that the petitioner had always been very open and friendly with him and that she had never been violent with him. He stated he had attended the trial and had visited the petitioner in jail several times pretrial. He recalled having met the attorneys pretrial for background information and stated that Dr. McCoy had primarily met with the petitioner's mother. He recalled the family meeting with the attorneys after the guilt verdict but before testifying. He did not recall telling Dr. McCoy that the petitioner had been out of control. He did state that the petitioner likes the attention from her behavior. He also recalled that the petitioner had called and asked him to come and get her late on the night of the murder. He had no recollection of the petitioner's friend Breanna having fallen down the stairs.

Carrie Ross testified that she had met with both attorneys and Dr. McCoy pretrial in West

[6]This is contrary to her memory at trial.

Virginia and again at the trial. She also testified to multiple phone calls with the attorneys pretrial. She stated that she had known they wanted her at the trial and that she had been told she would be testifying sometime after the guilt verdict. She too recalled that she family members had met with the attorneys and Dr. McCoy the morning before the penalty phase to go over the types of questions they would be asked. She stated that this discussion had dealt with themes of questions rather than specific questions. She also stated that at some point she had asked Talman what the petitioner's chances were. She recalled Talman having said that there was no way she would get the death penalty and that he was leaving holes in the case so there would be plenty of room for appeals. She also recalled having discussed a book with Talman at some point.

Ross testified that she was 4 years younger than her sister, Carissa Hansen. She talked about her grandfather's violent tendencies and the stories that had always been told in her family about him. She testified that her father, Chris Fotos, who had been a butcher with his own slaughter house, had been addicted to Talwin from about 1960 to 1985 and had been out of touch with reality when on it. She described his violent nature and described how he had once pulled a gun on her, how he had taken a gun to the courthouse and threatened a judge over his problems with the IRS, how he had threatened to kill people who had given him a hard time, and how he had shot at Alicia's first husband once. She also described how he had liked having the kids, including the petitioner, around the slaughter house playing when he had been working. He had thought this was perfectly natural and Ross admitted that she had thought nothing about it until recently. Ross admitted that while her daughter had not been around the slaughter house, both she and her son had grown up around it. While she had never been around the petitioner at the slaughter house, she described how the petitioner had always wanted to be with her papaw and

how she had played with the cows for hours.

Ross described her mother, Zola Fotos, as a violent alcoholic who had been ill with hepatitis when the petitioner was young. She further described her mother as always talking about kicking someone's butt, using bad language, and carrying a gun with which she had threatened people. Ross testified that in the Fotos family you were taught that if someone starts something that you better finish it or you would get it when you came home.

Ross stated that the petitioner had spent a great deal of time with both of her grandmothers growing up. She described Zola Fotos as having been very loving and nurturing with the petitioner's sister Alicia, but not with the petitioner. She stated that her mother had been angry with the petitioner's mother when she had gotten pregnant with the petitioner. Grandmother Fotos had been taking care of Alicia all the time and had not wanted to take care of another baby. Ross stated that Grandmother Fotos had resented having to care for the petitioner because she had to watch her closely and she could not drink as much. As a result, the petitioner spent a great deal of her time with her Grandmother Pike and her boyfriend Ernest. She recalled that the petitioner would sleep between her Grandmother Pike and Ernest and that at the age of 2 or 3 that she had seen the petitioner caress Grandmother Pike's breasts inappropriately. Ross had thought this was suspicious. She also recalled that a maternal aunt, Norma Privitt, had babysat Alicia and the petitioner when they were small, but that this had stopped because of the aunt's behavior. This aunt had also babysat Carissa and Ross when they were small and she recalled that she had been abusive toward them as well.

Ross testified that there had always been a problem with the petitioner. She described the petitioner as not seeming to understand what she had been told and how she had never been able

to understand what "no" meant. She described the petitioner's affect as having been flat. She recalled that the petitioner had gone to counseling in the first grade because she had been drawing a penis at school. She thought the petitioner had never felt good enough. She also stated that the petitioner had been allowed to watch horror movies at much too young an age.

Ross then described her sister, the petitioner's mother. As teens, she stated that they had smoked pot, skipped school, drank and generally hung out. She stated that Carissa drank a lot as an adult, partied, and had been emotionally immature. She stated that the children had never been Carissa's first priority. She described her sister's priorities as having been men and clothing and stated that there had rarely been any time or money left for the children. She testified that Carissa had been married 5 times and that she had no idea how many men she had just lived with as well. She recalled that when Carissa had been married to Danny Thompson and he had written her a letter telling her he did not like kids. She stated that after that, Alicia, then 12 or 13, had gone to live with Ross and the petitioner had lived back and forth between her father (and Grandmother Pike) and her mother. She stated that at that time she had already had 4 children of her own and that she could not afford 2 more. At the age of 14, Alicia had gotten pregnant and had moved back with her mother, Carissa, because she had wanted to live with the baby's father and Ross had not approved. She recalled that Carissa had thought that Alicia should marry her boyfriend and live happily ever after. Ross recalled that Carissa had a very different attitude when the petitioner later had gotten pregnant.

She recalled that the petitioner had been afraid to go back to the Job Corps but that Carissa had said this was the petitioner's last ditch effort for an education. She also recalled that the petitioner had called her on a Sunday after the murder. This was when she had found out

about Shipp and the petitioner had talked about how he was the only person who had ever given her flowers.

She admitted that she thought the petitioner is a pathological liar and that she did not trust her. She also admitted that she had not wanted the petitioner around her kids if she could not follow the rules. She had thought the petitioner would end up dead.

Alicia Willis, the petitioner's older half sister, testified that she is currently married to a doctor, self-employed, has three children, and is very happy. She recalled having met with someone pretrial.

She testified that growing up she had no relationship with her father, James Ferguson, from the age of 8 to 17 because of the situation with her step-mom. She stated that she has a good relationship with him now. She stated that while growing up, she had stayed with her mom but that she had really lived with her Grandmother Fotos, who she admitted drank every day but stated that it was nothing that you could notice until the end of the day. She described Grandmother Fotos as always having been busy around the house but she stated that she had always felt loved by her. She recalled that Grandmother Fotos got frustrated with the petitioner as a child and that she specifically recalled her having shaken the petitioner once. She stated that the petitioner had spent most of her time with her Grandmother Pike who had been very loving to her. She described the petitioner as happy when she had been with her Grandmother Pike. She testified that their Grandfather Fotos had been fun and that he had given them candy and had spoiled them. She recalled that they both had gone to the slaughter house because they had wanted to go and she did not recall any abuse of the petitioner by Grandfather Fotos.

She recalled her mother, Carissa Hansen, coming once to visit when Grandmother Fotos

had been sick and that Hansen had been happy because she was going to Busch Gardens. She had not taken the girls with her. She had married someone that neither she nor the petitioner had known and when she had returned from the trip she had taken them back to North Carolina with her. She recalled that her mother's new husband, Danny Thompson, had been mean to them and that she had been very unhappy and depressed. She stated that her mother's happiness had always been more important to her than her children's needs had been. She recalled how Thompson had brought food and candy in the house and had not given any to them. She recalled man after man in her mother's life and said there had been nothing maternal about her mother. She stated that their mother was an alcoholic and had always been "friends" with the petitioner rather than her mother. Willis stated that she had actually felt like she was the mom. She stated that she could not recall her mother having ever shown physical affection to the petitioner.

Willis recalled having played beauty shop with the petitioner when they were children. She stated that the petitioner had beautiful hair and had loved playing. She recalled that when the petitioner had been 3 or 4, she had burned the petitioner on the chin with a curling iron while playing. She stated it had been an accident but understands that the petitioner thinks that she did it on purpose. She did not agree with saying that she had babysat the petitioner but rather felt that they had taken care of each other when they were small. She stated that she had not been abusive toward the petitioner. She did not recall having ever slammed a door on the petitioner's hand or having held the petitioner down and torturing her feet.

Willis testified that she had been very hurt and abandoned when her Grandmother Fotos had died. She stated that she had not understood why she had drank herself to death. Willis testified that after her death, she had not cared about anyone and she had felt like no one cared

about her. As a result, she testified that her life had taken a turn for the worse and that she had gotten into fighting and drugs and had seemed to stay in trouble. She stated that she had not really drank but instead had smoked pot. She stated that she had first smoked pot and gotten drunk when she was 12. In retrospect, she described herself as an overall happy child.

She described the petitioner as having had a big heart and having been good to people. She recalled that the petitioner had loved elderly people. The petitioner had gone back and forth between her parents. She further stated that she had not understood the petitioner and that the petitioner had been very different. She recalled how the petitioner had sometimes had a blank look on her face. Looking back, she stated that when the petitioner had been about 10 or 11 she had started noticing that the petitioner could go into a rage in an instant.

Willis testified that the petitioner had loved her son Keith when he was a baby. She recalled how the petitioner had done everything for Keith. She stated that while she admitted having been very protective of Keith because of the petitioner's history, she did not believe that the petitioner had ever molested Keith and she denied having ever said differently to Dr. McCoy.

She recalled an incident when she was 15 and the petitioner was about 11 and the petitioner had not done the dishes. Willis stated that she had forced the petitioner to do the dishes and that the petitioner had gotten very angry and chased her around the kitchen with a knife. She stated she had not felt threatened. She recalled that about a year later she and the petitioner had gotten into a fight when they had gotten off the bus and that the petitioner had ripped the buttons off of Willis' shirt.

While she admitted that the petitioner had always had problems and needed help, she stated that she had never thought the petitioner would kill anyone.

Glenn Pike, the petitioner's father, testified that he had met with the attorneys and Dr. McCoy pretrial. He recalled having been called a day or so before to come to testify but it had not really been a surprise to him that he would testify. He recalled the meeting with the attorneys the morning he testified.

Mr. Pike testified that when he was 13 his father, a West Virginia coal minor and plumber, had died. He recalled that his father had occasionally used a belt for discipline and that his mother had used either a belt or switch on him almost daily. He stated he had sworn never to use a switch on his own kids as a result. He testified that at 16 he had quit school and he and his mother had moved to Indiana for jobs in order to pay for their farm. As stated previously, he had later spent some time in the military. Part of the time he had been married to the petitioner's mother, he was stationed at Fort Bragg, North Carolina, and she had lived in a trailer next to her mother and father, Chris and Zola Fotos. He stated that at that time they had seen each other on the weekends. He testified that he currently receives VA benefits for Post Traumatic Stress Disorder and high blood pressure. He also stated that he had been exposed to agent orange in Vietnam and, that he was not sure of the details, but that he had been told that it caused some birth defects.

Mr. Pike testified like other witnesses that the petitioner's grandmothers had primarily raised her when they had been living. He also agreed with other witnesses that Grandmother Fotos had not liked the petitioner. He further stated that she had looked down on them. He stated that Grandmother Pike had loved the petitioner and had not disciplined the petitioner often. He recalled the petitioner had been devastated when she died. He recalled that when Carissa had married Danny Thompson that she had taken the petitioner with her to live in North

Carolina.

When asked about how he had disciplined the petitioner, he stated that he had spanked her with his hand and a belt. He stated that he would double the belt over and spank her bottom with her clothes on and that he had told her not to cry. He stated that she had not responded well to spankings and that he recalled having spanked her more than once on some days and specifically recalled one day when he had spanked her 5 or 6 times for not doing her homework. He stated that he had never targeted the petitioner's back with a belt and that he had never spanked her for 10 or 15 blows. He stated that any scars she might have were not from his spankings. He did not agree with the statement that the spankings had been severe enough to leave welts, bruises, and cuts and that this had occurred up to several times a week. He testified that when each of her parents had experienced problems with the petitioner, that they had sent her back to the other parent. He testified that he did not, however, agree with the statement that the petitioner had been shunted back and forth and had not really been loved by either parent.

He testified that he had married his former wife Kathleen Allman after his divorce from petitioner's mother and that they had two children. He testified that Allman, when seeing a therapist about her own sexual abuse as a teenager, had made accusations that the petitioner had sexually abused their daughter Lindsey. He stated that he had sent the petitioner away and she had not been allowed to come back. He testified that this had upset the petitioner. He testified that Allman had not liked the petitioner and that neither he nor Lindsey believe that the petitioner did anything to Lindsey.

He admitted that he had been more absent than present with the petitioner. He stated he had never visited her at the juvenile facility in North Carolina but thinks that he had talked to the

counselors by phone. He stated that the petitioner had known how to push his buttons to get him to do what she had wanted and that the petitioner had lied at times. He had not been aware of or had heard of any abuse by Carissa's boyfriends or Ernest. He had not found out about the Job Corps until the petitioner had already gone there. He recalled that she had wanted to go back because she had wanted to do a good job and finish.

Faye Johnson Guy testified that she had known the petitioner's mother and had known the petitioner. She testified about Hansen's relationships with men and the inappropriate things that she had seen happen around the petitioner, such as pornographic movies, horror movies, and drinking. She also testified that the relationship between Hansen and the petitioner had not really been a mother/daughter relationship but rather more of a friends type relationship. She recalled that she had told Hansen things she thought were inappropriate and that Hansen had disagreed.

A few of the petitioner's childhood and adolescent friends testified at the hearing. They generally testified to the petitioner's lack of a relationship with her mother, her less than favorable conditions at home, her quick temper, her high energy levels, her use of alcohol and drugs, and to her violence with others but not her friends. Jamie Robinson testified to the time when she had lived on the streets with the petitioner and their boyfriends. She stated there had been a time when she had shoplifted with the petitioner and that she once had been told by the petitioner's boyfriend that the petitioner had been raped.

Several people who had worked at Swannanoa and Sheaffer House as well as one of the petitioner's social workers testified. Some of the individuals testified that they had been contacted pretrial while others had not been. One described Swannanoa as a training school for

youths with delinquent behaviors. Some testified that the petitioner had been at Swannanoa longer than she should have been because she would get in trouble almost like she had been sabotaging herself because she had not wanted to go home. She was described as having seemed to get along with the staff but not really with her peers and that she had drastic mood swings. She was also described as having been very intelligent. There was also testimony regarding the petitioner having gotten in trouble once at Swannanoa for an incident which involved a satanic ritual or worship with other girls. The petitioner's mother had not visited her often. One person also testified that while there had been allegations of emotional abuse by the petitioner's father, she had never accused him of physical abuse. One person also indicated that the sex abuse counselor had thought there was no credible evidence that the petitioner had sexually abused her half sister.[7]

Several people who either worked or were students at the Job Corps also testified. None were spoken to pretrial but one said he had contacted defense counsel on his own. They testified to the generally violent atmosphere at the Job Corps and how the people at the Job Corps had done nothing about it. The victim was described as having been respectful, nice, and very skilled in doing her work. The petitioner was described as having been respectful, sharp, and as doing good work when present and awake, which had not been a lot. Shipp was described as having not been disrespectful but having always cut class and that he had been rumored to carry a weapon. Some of the students testified that they had not liked Shipp. Co-defendant Peterson was described as having had sharp-tongued. Andrew Drace, a student, testified that he had been

---

[7]This court agrees. There is no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise.

unaware of the petitioner's relationship with Shipp and that he had known who they both were.[8] There was testimony regarding the staff's knowledge of the petitioner and Shipp's participation in devil worshiping, etc. Reverend Jacqueline Olebe, a member of the staff at the Job Corps, testified that she had seen Shipp and the petitioner in the hall one day after the murder and that the petitioner had been crying. She stated that the petitioner had not seemed afraid of Shipp.

Tyrone comfort, a former Job Corps student, testified that he had been good friends with the petitioner. He admitted that the petitioner could sometimes snap and had a temper. He testified about the petitioner's relationship with Shipp and how he had heard them argue on more than one occasion. He recalled seeing bruises and marks on the petitioner at times and that Shipp had busted her lip once. He stated that he had never seen the petitioner hit Shipp. He admitted that he had not liked Shipp but that he had not known him well. He described Shipp as having been capable of violence. When shown a small statue that had been an exhibit at the petitioner's trial, he testified that it was a piece that could be used in role playing games such as Dungeons and Dragons (D&D). He had played D&D at the Job Corps, but did not recall either the petitioner or Shipp having ever played. He stated that the statue was a character that was like a dog soldier who fought magic and he also described it as a warrior for evil. He admitted that he had once thought about the petitioner romantically but that he had not pursued it because he had a girlfriend at home.

Jermaine Bishop, another student, testified that he was currently in prison for especially aggravated kidnapping and especially aggravated robbery. He stated that he had known Shipp

[8]As discussed previously in this order, Drace also testified that he had given the petitioner alcohol on Cumberland Avenue one night after the murder.

and that the had known about Shipp's relationship with the petitioner. He described Shipp as having been weird and the petitioner as having been moody but thought Shipp had been in control of the relationship. He stated that Shipp and the petitioner had argued frequently.

Kim Iloilo Rhodes, another student and friend of the petitioner, also testified. She confirmed that she had testified as a state's witness at the trial. She described the Job Corps as scary with animosity between groups that were there. She also referred to the excessive drug use there. She stated that she had become really close friends with the petitioner at the Job Corps. She stated that they had things in common such as families in which they did not fit. She described how they had shared their secrets and she had felt safe with the petitioner. She stated that she had never seen the petitioner violent. She recalled having been upset and crying to the petitioner one night. She had been unaware that the petitioner was sick and had learned later that the petitioner had been taken away by ambulance and that she had a miscarriage. She said the petitioner had not talked about it.

Rhodes testified about the statements that the petitioner had made to her after the murder. She admitted that it had been many years and that her first statement regarding these would be the most accurate. The petitioner had told her that she had cut the victim's throat, had beaten her up, and had thrown asphalt at her head. She had also told her that the victim had asked her to stop. She said the petitioner had told her that she had kept cutting her because the victim was a witch and she was still talking. She stated that Assistant District Attorney William Crabtree had told her not to have contact with the petitioner or her co-defendants. Rhodes testified that she did not, however, recall ever saying that the state had told her what to say.

Judge James Matthew Martin testified that he had been the petitioner's juvenile attorney

related to an incident in North Carolina when she was 17 and had been charged with assaulting Kenny Clyde.[9] The petitioner had been charged as an adult and acquitted of the charges but had been sent to training school. Martin testified that he had thought that training school was a mistake and that the petitioner would have benefitted more from some other type of services. He had considered the petitioner an abused child in need of help. He stated that he was not surprised that she was later diagnosed as Bipolar. He recalled that he had sent a letter to attorney Brown and that he had spoken with the petitioner's trial attorneys which is substantiated by other records.

Petitioner's co-defendant, Tadaryl Shipp, testified that he and co-defendant Peterson had been affiliated with the gang known as the gangster disciples but that the petitioner had not been affiliated with any gang. He testified that the 6-point stars on the earring and pin that had been introduced at the trials were actually symbols of the gangster disciples. He described the petitioner as having been his best friend and admitted that they had been romantically and sexually involved. He recalled that the first time he had seen the petitioner was in her first few days at the Job Corps and that she was crying. He stated that he had stopped and started talking to her. He described her further as having been a caring person but "edgy" or moody. He described their relationship as having been fairly calm and he described how she had talked in her sleep. He said she would say "no" and "stop" and had talked about her grandfather and animals.

He also stated that sometimes she had attempted to hit him for no apparent reason and

---

[9]Clyde was the person who the petitioner and her mother stated had threatened the petitioner's mother and stalked the petitioner.

that she had been edgy with others also. He described periods of both agitation and calm when she had been like two different people. He stated that before the murder, she had been a lot more agitated and he had not known why. He stated that the petitioner had been more open with her feelings than he had been and that she may have taken their relationship more seriously than he had because he had continued seeing other girls without the petitioner's knowledge. He admitted to physical arguments with the petitioner on one of two occasions and that the petitioner had busted his lip once when she hit him in the mouth. He stated that he had never known the petitioner's rage to last 24 hours, but rather described her rage as having been a spur of the moment kind of thing.

He admitted to his juvenile record in Memphis and stated that he had only gone to juvenile court once which the records also supported.

He tried to claim that he alone had carved the pentagram on the victim. When asked why he had told Detective York that Peterson and the petitioner had brought the weapons and had helped carve the pentagram, he just stated that the situation had been different then. He stated that he did not recall whose idea it had been to take the victim to the crime scene even though he had told York that it had been the petitioner's idea. He had heard that the petitioner had gone back to the crime scene the next day but he had not gone. He stated that when he had talked to York that he had been drunk, tired, and hung over.

Shipp further testified that he would have testified for the petitioner at her trial if he had been asked, even against the advise of counsel. Attorney Chris Coffey, Shipp's attorney, testified that he would have advised the petitioner not to testify or even to talk to the petitioner's attorneys.

Two of Shipp's former girlfriends from Memphis testified as to Shipp's physical and verbal abuse of them when they dated. One also testified to Shipp's interest in things satanic and to his gang affiliation with the gangster disciples. Both said they had feared Shipp.

Dr. Diana McCoy testified at the post-conviction hearings as an expert in the filed of clinical psychology as well as mitigation. She testified that she had been hired as a mitigation expert by Talman in early September 1995 to prepare for the petitioner's trial. She described her job as collecting information/records and interviewing people and analyzing the information in an effort to develop certain themes that the attorneys would present to the jury at the sentencing hearing. She also stated that her job included talking to the jury and humanizing the petitioner to them through her life history to try to get a sentence less than death. Later, she explained that until March 24, 1996, she only knew that there was a possibility she would testify and that it was on that date that Talman had told her she would be the only mitigation witness. She summarized that, in this case, she had not diagnosed but rather had been looking for mitigation. She stated that she had been told specifically by the attorneys to prepare a report but not to prepare opinions. She stated that it was the first time she had ever not prepared opinions for testimony and that she had felt like a fish out of water.

Dr. McCoy testified that the vast majority of her contact in the case had been with Talman but admitted that they had worked a lot and well together pretrial. She stated that the records established that she had talked with Talman by phone over 40 times and that she had met with him face to face on 14 occasions. She said she had as much or more collaboration with Talman than she had experienced on any other capital case she had worked. She stated that she had informed him as she went along about what she had learned and how she had felt it should

be presented.

Dr. McCoy testified to having met with the petitioner 9 times. She stated that she had wanted to build a rapport so the petitioner would tell her everything, both the good and the bad. She testified that she had known Dr. Engum's diagnosis and had agreed with it. She stated that she had not questioned it. She stated that she had provided a final bound version of her materials to Talman and Martin Rice on March 24, 1996.[10] She stated that she had been discussing witnesses all along and had assumed the witnesses she had suggested would be gotten for the penalty phase. She opined that the family members alone had not been enough to explain who the petitioner was and in addition that she had not agreed with her testifying as the only witness. She explained that she and Talman had regularly provided each other with documents and information. She and Talman had discussed satanic references in the Swannanoa records but both agreed it could not be overlooked because the records were what they were. She stated that Talman had not asked her to leave things out and that she would have been uncomfortable doing so. She testified that she had not thought that the satanic references were anything more than teenage girl nonsense and were not a big deal. She also stated that she thought the petitioner's interest in the satanic things had been based upon co-defendant Shipp's interest and that the petitioner would have been interested in anything that Shipp had been.

Dr. McCoy testified that while there were a few things she had not been able to get pretrial she felt she had done an adequate social history and that there was compelling mitigating evidence to be presented on the petitioner's behalf. She had not seen a need for a continuance

---

[10]She stated that she had met with the attorneys to go over her materials on March 15, 1996, but that she had not had the materials copied and bound to give the attorneys at that time.

and she did not recall having asked for more time. She reiterated that she and Talman had been exchanging information on a regular basis and that the fact that the "final" bound materials had not been turned over until the trial was well underway had not been a basis for a continuance. She actually stated that she and Talman had talked about all of it "ad nauseam." She described Talman as having been as familiar with the materials as she was. She stated that he had not been in a hurry to get the final report because he had wanted to give it to the state at the last possible minute.

Dr. McCoy explained in great detail that her first theme was Borderline Personality Disorder. She explained what it is and what it's characteristics are. Some of the characteristics she discussed were fear of abandonment, unstable relationships, mood swings, unstable self-image, and impulsivity.

Another theme Dr. McCoy had asserted in mitigation she had called the tough girl image. She stated that this was an image used to come across as fearless when the petitioner was really a pretty scared kid. She also opined that this related to her family history and the poor examples set by her family members.

The next theme Dr. McCoy asserted was the petitioner's need for attention which she related to the petitioner's issues with abandonment and lack of identity. She stated the petitioner would do anything for attention.

Another theme Dr. McCoy asserted was how the petitioner was self-destructive. Dr. McCoy gave an example of this through the petitioner's experiences at Swannanoa and how she would sabotage herself to avoid going home. Another example she asserted was the petitioner's past suicide attempts.

Three other themes she discussed were Job Corps stress, religious confusion, and poor parental role models. Dr. McCoy discussed examples of these which have been described previously. Several other listed themes in her materials were not specifically discussed.

She specifically testified that she had not told the attorneys that she could not support Dr. Engum's diagnosis of Borderline Personality Disorder and she stated that it had never come up.

Dr. McCoy testified that the petitioner was promiscuous and that the petitioner had admitted to twenty or more sexual partners. Dr. McCoy then described the petitioner meeting Shipp and how the petitioner had "basked in the glow of this attention and his affection and she ... was his woman."

Dr. McCoy talked about the rejection that the petitioner had felt with her father. She discussed the emotional and physical abuse by the petitioner's father. When she described the physical abuse, she stated that the petitioner had told her that her spankings were done with a switch or a belt when she was clothed. Dr. McCoy talked about what she described as the petitioner's rejection by her mother and physical abuse by Danny Thompson and Steve Kyaw. Dr. McCoy talked about the effect Carissa Hansen's lack of belief in the things the petitioner told her had on the petitioner.

Dr. McCoy testified that the petitioner had told her that her statement to Detective York was a bunch of crap and that she had just been covering for Shipp and Peterson.

She testified that she thought the petitioner's childhood friends Mandy and Brandy should have testified at the trial. She admitted that neither had testified at these hearings as well. She stated that she had seen Mandy at these hearings but that she had not testified and had been on drugs when seen. She stated she had not seen Brandy.

When asked why she had not testified at trial, Dr. McCoy stated that she had not been given a reason. She stated that she had learned she was not testifying on the night before the penalty phase. She recalled that Talman had called her very upset after the guilty verdict because when he had given her materials to the state, the prosecutor had gone ballistic about receiving the materials so late and he had argued that they were hearsay. She testified that Talman had asked her to lie about when she had given the materials to him and that she had refused. She stated that this had been when Talman decided not to use her as a witness. She testified that she had met with Talman for several hours that evening and that Talman decided to call the petitioner's parents and aunt Carrie as mitigation witnesses. Dr. McCoy testified that she had met with all of them at the attorney's office the following morning before the penalty phase to prepare.

Dr. McCoy testified that while she had not prepared opinions for trial, she had prepared opinions for these hearings. She testified to the following five opinions:

> (1) Petitioner is the product of a highly dysfunctional family with much of her subsequent developmental issues stemming from this;
> (2) Petitioner experienced a number of traumatic events during her childhood and adolescence, including rapes as well as physical abuse at the hands of her father and step-father, and physical and sexual abuse by one of her mother's boyfriends that further contributed to the exacerbation of psychiatric problems;
> (3) Petitioner's parents failed to adequately address their daughter's emotional problems;
> (4) Petitioner's psychological problems include:
>
> > (a) attachment issues with this significantly contributing to her dysfunctional relationships, including Tadaryl Shipp;
> > (b) inability to maintain emotional control, particularly during times of stress, with reliance on others to help her maintain boundaries;
> > (c) a constant need for attention;
> > (d) assumption of a tough girl image to compensate for poor self-esteem and a lack of self-respect; and

(e) a need to please others and a willingness to be influenced by others, no matter what the cost to herself; and

(5) Petitioner was experiencing considerable stress at the time of the homicide which contributed to her participation

Dr. McCoy then went on to testify to the various parts of the petitioner's social history which she believed supported these opinions.[11] She discussed in detail the dysfunctionality of the petitioner's family and the violent role models in her family.

Dr. McCoy then testified that she opined that at the time of the murder, the petitioner had felt that her identity which was centered around Shipp had been slipping away from her. She further stated that the petitioner's problems at the Job Corps, her problems with the victim, and Shipp's suspected infidelity all had made her feel not only like she was losing Shipp but also her own sense of self-esteem and identity. She opined that because of the Borderline Personality Disorder, petitioner had felt frantic and had experienced irrational anger. She then discussed various events in the petitioner's life where the petitioner or others stated that the petitioner had not recalled details of what had happened when she had been very angry.

Dr. McCoy opined that because the petitioner has sever Borderline Personality Disorder as diagnosed by Dr. Engum she does not have the controls a normal person would have. She, however, was not willing to opine that the petitioner had no control whatsoever as it related to criminal responsibility.

On cross, Dr. McCoy testified that she had never testified before a jury in a capital sentencing hearing at the time of the petitioner's trial. She had believed a psychologist was

---

[11]At these proceedings, petitioner's social history has already been provided through the testimony of others and is not repeated here.

needed for mitigation rather than an investigator because of the training needed to understand how things relate to Borderline Personality Disorder. She again admitted that she had not considered it part of her job to diagnose the petitioner, to do psychological tests on her, or to assess her for criminal responsibility or any of that type of information. She explained that the sentencing phase information she had gathered was basically built around Dr. Engum's diagnosis of Borderline Personality Disorder. She stated that her report was the first sixty pages of her materials but she did not mind the state having all her materials and that it was not anything new for her to hand those records over.

On cross, Dr. McCoy further explained that, while Borderline Personality Disorder is characterized by some psychotic elements, she was not saying that she had an opinion that the petitioner had a psychotic episode during the murder. She admitted that she really had not discussed the details of the murder with the petitioner because she considered that to be Dr. Engum's job. She admitted to having read Dr. Kenner's report but stated that she was not considering his diagnosis. She stated that she had not asked questions of the petitioner that she would normally ask when considering other diagnoses. She did not consider it her job to do things which might lead to a different diagnosis from Dr. Engum.

Dr. McCoy stated that she had suggested Dr. Bernet for the Satanic issues but that she had suggested no other experts. She stated that because Dr. Engum was a neuropsychologist she had assumed that if a neurologist was needed that he would have been the person to suggest it. She did state that she had thought that past health professionals who had dealt with the petitioner would be called at the penalty phase as well. She also referred to the petitioner's past efforts at treatment as mere window dressing and stated that the petitioner had not had any form of



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 40 of 128 PageID #: 4424

consistent mental health treatment.

Dr. McCoy pointed out that the inclusion in her materials of the interviews she had done in no way meant that she was vouching for their veracity. She stated that she was simply reporting what she had been told.

Dr. McCoy testified that she did not relate the petitioner's interest in the slaughter house or the horror movies to her Borderline Personality Disorder but rather more to her desire to spend time with her grandfather and mother and to get their attention. There were various other incidents of behavior for which Dr. McCoy stated she had no real explanation. She also admitted that she had not possessed the records of the Clyde Davis incident prior to working on this case for post-conviction. She also noted that the petitioner had not mentioned the Davis incident to some of her closest friends. She recalled that the petitioner had told her of at least one incident prior to the murder in which Shipp had told the petitioner to leave the victim alone. She also testified that the incident with Beth Brown just before the Job Corps had been explained to her as being related to the petitioner's questioning of Brown as to Brown's treatment of her small child.

On redirect, Dr. McCoy described the petitioner as the poster child for Borderline Personality Disorder.

Dr. Jonathan Henry Pincus, an expert in neurology, testified that he examined the petitioner on March 25, 2001, and that he had seen her again the Sunday before his testimony.[12] He testified that in his research and examinations of murderers he has found that three factors generally exist with each: brain damage, history of abuse, and the presence of mental illness. He published a book on this subject in 2001. He stated that the petitioner had all three factors and

---

[12]Sunday before his testimony would have been on January 30, 2007.

that evidence of each had been available at the time of trial.

He discussed the petitioner's reported history of abuse, including her family history, her rapes or abuse by others, and her treatment by the many men who came in and out of her mother's life. He thought the social history supported Dr. Kenner's diagnosis of Bipolar Disorder. He also testified in his opinion the family history was consistent with bipolar illness. He compared the petitioner with her sister Alicia and described Alicia as an attractive, nicely dressed, well put together person. He stated that while both Alicia and the petitioner had experienced much of the same abusive social history, that Alicia was not mentally ill and did not suffer from brain damage.

He stated that the petitioner's physical exam was normal with certain minor abnormalities, which included generalized hyperreflexia, spooning of her outstretched hands, choreiform movements, and a positive nuchocephalic reflex. These minor abnormalities indicated there was subcortical dysfunction involving the basal ganglia and possibly the thalamus of the petitioner's brain. An MRI exam showed an abnormality just lateral to the ventricle in the frontal lobe which he described as a heterotpia. An EEG from 1977, when the petitioner was approximately 14 months old, also showed an abnormality in that area of the brain. Dr. Pincus testified that his physical exam of the petitioner, the MRI, and the EEG all pointed to the same area of the brain. He stated that this type of consistency of test results in all tests in an examination of an individual is not always present. Heterotopias are generally invisible to the eye on test results but often occur during fetal development. He testified that a very common cause is maternal exposure to alcohol during pregnancy. He testified that the petitioner's heterotopia was clearly visible in the tests performed.

Dr. Pincus testified that the petitioner's frontal lobes are not put together properly. He stated that this is important because an important feature of the frontal lobe is a person's moral and ethical standards, which are developed though experiences and which are encoded or recorded into the brain. He testified that the petitioner's ability to do this was damaged "from the get go."

When asked about Dr. Engum's conclusions concerning a lack of evidence of brain damage, he stated that they only meant that the psychological tests performed by Dr. Engum did not show brain damage which was not at all unusual for damage in this part of the brain. He stated that the area of abnormality for the petitioner is notoriously difficult to test as far as functioning and that "there is no psychological test that reflects the abnormality of the super orbital cortex in the midline" as with the petitioner. He stated that he did not have any issue with Dr. Engum's findings but that he believed that Dr. Engum had over-interpreted his data and should have only stated that he had found no abnormality of the brain.

When discussing the murder, Dr. Pincus stated that it was his understanding that the petitioner had not slept well for the three days before and that she was in the midst of a very excited, irritable period. The victim had allegedly been calling her saying she was a whore and a slut. He described these words as triggers for the petitioner which upset her even though they are the same words that she would use to describe herself. He compared the murder to an incident in which the petitioner had assaulted a man named Kenny Clyde. The social history includes evidence that Clyde had been stalking and threatening the petitioner and her mother. When the petitioner went to assault the man, she had lost control in her physical attack on him and had wanted to run over him with a car. Dr. Pincus stated that she probably would have killed him if

her friend Mandy had not stopped her. Dr. Pincus stated that with the victim in this case, no one had stopped the petitioner when she lost control.

He stated that while he did not think that the death penalty was appropriate, he thought the petitioner should be in prison because she might very well kill again if she got angry. He admitted that while it was not his opinion in this case, he did think that the petitioner was capable of forming a plan to kill someone and following through with it. He also admitted that it is hard to argue that the petitioner did not mean her statement literally when she said she was going to kill the victim the day before the murder when she actually did kill the victim. He also testified that he does not think she is capable of remorse or empathy.

Dr. Pincus stated that while there has been some literature discussing the subject of his book from prior to the time of the trial, that there had been contrary literature as well. He stated that when he began his studies of violent criminals there was literature which indicated that there was nothing wrong with violent criminals neurologically or psychiatrically. He even admitted to having believed that other literature prior to getting involved in his own research. In 2001, he published his book which took the approach that killers have what he termed the trifecta of a history of abuse, brain damage, and mental illness.

In his report, before having seen the MRI, PET, and EEG, he opined that "abuse combined with mental illness (OCD and depression) and neurologic deficits became very dangerous because when [the petitioner] loses her temper she is not capable to check her response, regardless of the circumstances. Mental illness, neurologic deficits and abuse, the formative vulnerabilities that led to her violent acts, are not under her control."

Dr. William Kenner, an expert in forensic psychiatry, also testified at the post-conviction

proceedings. He reviewed a multitude of materials which he listed on his power point presentation for the court.[13] He also personally examined the petitioner on several dates.

Dr. Kenner testified that from his review of the petitioner's case he did not think that the experts had shared information pretrial. He discussed the limited use of Dr. Bernet and his limited ability to testify due to not having examined the petitioner and not having been provided with her social history. He stated that he believed at the time of trial there was data to suggest early onset Bipolar Disorder, data to help the jury understand the impact of trauma on the petitioner's personality development, and data to understand the petitioner's congenital brain abnormality. He opined that this data would have been available to a competent psychiatrist if there had been an exam and if a social history had been provided.

In December of 2001, Dr. Kenner made the following diagnoses:

| | |
|---|---|
| Axis I (active diagnoses): | Bipolar II Disorder, hypomanic recurrent |
| Axis II (personality disorders): | Borderline Personality Disorder<br>Antisocial Personality Disorder |
| Axis III (active medical conditions): | von Willibrand Disease |
| Axis IV (psychosocial stressors): | Problems with primary support group, social environment, incarceration |
| Axis V (global assessment): | 15 |

In reviewing her records and talking with the petitioner and her mother, Dr. Kenner had determined that there were signs of early onset bipolar disease in the petitioner. One sign was exhibited in the way the petitioner would sleep so very little from the age of 12 or 13 on and would have such high levels of energy. She was extremely talkative and restless. He described the petitioner like a car with the cruise control constantly set on about 95 to 120 miles per hour.

[13]The power point presentation is Exhibit 42 from the hearings in April of 2007.

He stated that another sign was the way that anytime the going got rough, she would make poor decisions because she would have "a sense of omnipotence and grandiosity and feel herself invulnerable to any kind of damage or risk." He gave several examples from her social history which he felt highlighted this in the petitioner. He also noted how her mother described an empty stare that the petitioner would have at times as well. He stated that this was indicative of a disassociative symptom, which is described as a defect in an individual's memory system. People who experience this, he explained, are often thought to be liars because they cannot recall things.

Dr. Kenner explained that it was his opinion that this was very important information for the jury because there is a critical connection between her condition and the offense. At the time of the offense, Dr. Kenner described the petitioner has having experienced a 2 to 4 day cycle of sleep deprivation with increasing irritability and this irritability peaking at the time of the offense.

He also described that petitioner's history of what he termed significant and repeated traumas in her childhood and adolescence that affected her ability to control her behavior during the crime. He discussed her attachment/abandonment traumas, her physical abuse by her father and stepfather, her chronic, horrific overstimulation, and her repeated sexual traumas. In discussing her attachment/abandonment issues, Dr. Kenner talked about the petitioner's moving back and forth between parents and grandparents, her mother's jobs, the number of men in and out of her mother's life, and her father's decision not to allow her to visit anymore. Dr. Kenner testified that the petitioner told him about the severe beatings she received from her father. With regards to the overstimulation, he talked about her early exposure to her grandfather's

slaughterhouse, her exposure to pornographic movies in the home, and her exposure to horror movies.

In his discussion of the petitioner's history of sexual abuse, he noted that she had been sexually abused by Grandmother Pike's boyfriend at the age of 5 or 6, she had been molested by a stranger at the age of 9, and she had been sexually assaulted again by a stranger at the age of 17.

Dr. Kenner also discussed the petitioner's history of seizure disorder at about 14 months of age and her head injury in adolescence and how these would prompt a psychiatrist to get the most sophisticated scans done on the petitioner to see if there was any brain damage. He explained that if the tests had been done pretrial, that it would have shown the abnormality discussed by Dr. Pincus. Dr. Kenner stated that there is a high correlation in the literature between the abnormality described by Dr. Pincus and teenagers who develop Bipolar Disorder, which he translated into an inability to control her behavior.

Sometime between March and May of 2002, the petitioner began taking Lithium. Dr. Kenner described her reaction to Lithium as dramatic.[14] He described In May of 2002,[15] Dr. Kenner made the following diagnoses:

| | |
|---|---|
| Axis I (active diagnoses): | Bipolar II Disorder, in partial remission with medication |
| Axis II (personality disorders): | Borderline Personality Disorder<br>Antisocial Personality Disorder |
| Axis III (active medical conditions): | von Willibrand Disease |

[14]After taking Lithium, the petitioner decided she did not want to withdraw her appeals.

[15]Although there was a diagnosis scale completed for March of 2002, the petitioner was psychotic at the time as a result of an adverse reaction to a drug which had been given in the wrong doses.

| | |
|---|---|
| Axis IV (psychosocial stressors): | Problems with primary support group, social environment, incarceration, inadequate health care services |
| Axis V (global assessment): | 15 |

Despite his diagnoses, he stated that he now thinks that the petitioner's personality disorders were in fact something that was part of her Bipolar Spectrum Disorder. He stated that when dealing with Bipolar Disorder, it is an illness that "doesn't have terribly clear borders." "[M]any of the things that we used to think of as personality disorders, and are described in DSM IV in that way, actually reflect part of the – Bipolar Spectrum." He stated that she is not borderline and she is not antisocial. He stated that there is ongoing argument in the mental health community as to whether borderline personality disorder is mis-diagnosed Bipolar Disorder or whether there is a Bipolar Personality Disorder. Despite the ongoing argument, he opined that in the petitioner's case, he thinks that what had been diagnosed, even by himself, as borderline personality disorder is actually something that was part of a Bipolar Spectrum Disorder.

He then discussed the fact that in the next DSM there will be a new diagnosis and it will either be called Developmental Trauma Disorder or Complex PTSD. He opined that if this were 2010, when the new DSM comes out, the petitioner's diagnosis would be Complex PTSD, or whatever name it receives. It would refer to a diagnosis dealing with layered traumas and the way in which they affects a person's brain and mental health.

Dr. Kenner also discussed the petitioner's relationship with co-defendant Shipp. He stated that the petitioner was infatuated with him and thought he was her soul mate. The fact that she was his girlfriend was all important to her. His opinion about Shipp was "not exactly

sterling." He believed that Shipp had significant gang related issues, came from a Creole culture and had flirted with voodoo and black magic and devil worship, and was apparently a violent person. It was also his understanding that Shipp had several "dalliances" with other girls, including the victim according to Shipp.

When asked about things that the petitioner's family members said at the penalty phase, Dr. Kenner stated that these statements could be explained by her early onset Bipolar Disorder. He stated that this would explain that she was severely mentally ill rather than just a bad girl.

On cross, Dr. Kenner stated that he thought that given the information that the defense team had that borderline personality disorder was a reasonable diagnosis back then. He also agreed that he thought collective aggression had played a part in what had happened, but that he was just skeptical of whether a jury would buy it in mitigation. He explained that it was through the petitioner's reaction to Lithium that it became clear to him that she did not suffer from a personality disorder and that led to the Bipolar Disorder diagnosis.

## I. Trial Court's Violation of Petitioner's Right to Conflict-Free Counsel[16]

The petitioner alleges that the trial court violated her constitutional right to conflict-free counsel throughout the trial and appeal of her case by appointing attorney William Talman who, it is alleged, worked under an actual conflict of interest. The basis of petitioner's argument stems

[16]In her post-hearing brief, the petitioner asserts several alleged conflicts of interest in discussing this issue. In her petition, however, petitioner only relied upon the over-billing issue for this claim. Accordingly, this court has addressed this issue only as it is related to the over-billing issue. Other alleged "conflicts" are addressed in other claims.

from the investigation of Talman by the Office of the Comptroller of the State of Tennessee for over-billing of the indigent defense fund for fees in court-appointed cases. The petitioner alleges that the trial court should have advised the petitioner of the investigation and that the trial court should have sought a knowing and intelligent waiver of the alleged conflict by the petitioner.

Initially, this court finds that this issue is waived. Talman testified that he had informed the petitioner of the issue and that she actually liked him more because of it. No issue was raised either pretrial or at trial.

Assuming the issue is not waived, this court will address the merits of the claim. The proof established that Talman was investigated by the Comptroller's Office and ordered to reimburse the state more than $60,000 in over-billed fees. Prior to appointing Talman, this court inquired of the status of the investigation related to the overbilling and Talman assured the court that the reimbursement had been paid in full. The actual investigation of Talman was concluded with the release of the Comptroller's Report in May 1995. Talman testified that the only unresolved issue at the time of his appointment was related to his having self-reported to the Board of Professional Responsibility. Talman was appointed to represent the petitioner on May 23, 1995. Talman also noted that he had been appointed by the Tennessee Supreme Court in an indigent matter in March of 1995 and that he had also believed that this indicated that any matters related to the over-billing issue had been concluded. Talman also remained a licensed attorney in good-standing throughout the investigatory proceedings on the over-billing issue.

Talman consistently testified that he considered the over-billing issue concluded before he was appointed by the court. He stated that he had been represented by counsel and that he had never spoken to anyone in the DA's office about this matter. He indicated that the matter would

not have been settled civilly if there were still any potential criminal charges. In his opinion, the matter had been resolved and the local DA's office was no longer involved. This court also conveyed to the parties its recollection of having inquired of Talman the status of the issue prior to his appointment. Talman further testified that while his recollection of specifics has faded over 12 years, he had some recollection of having mentioned the over-billing issue to the petitioner and the fact that it had been resolved. Again, he recalled that the petitioner actually seemed to like him more because of it. The petitioner did not testify in these proceedings.[17]

Despite petitioner's allegations to the contrary, the court cannot conclude that attorney Talman represented the petitioner while under any conflict of interest. The proof does not establish an actual and significant conflict. Petitioner's allegations are merely speculative as to counsel's motivation and counsel has testified to the contrary. Again, the petitioner did not testify. Therefore, petitioner has failed to carry her burden of proof on this issue.

## II. <u>Ineffective Assistance of Counsel at the Trial Level</u>

The petitioner contends that she was denied her right to the effective assistance of counsel at both the guilt and sentencing phases of her trial. In order to be granted relief on the grounds of ineffective assistance of counsel, the petitioner "must prove by a preponderance of the evidence that the advice given or services rendered by his counsel fell below the range of competence

[17]This court notes that the petitioner testified in a very limited capacity related to her motion to withdraw her post-conviction petition. Due to the collateral, limited nature of that testimony and the circumstances, it was not considered for purposes of this order as testimony related to this petition.

demanded of attorneys in criminal cases." King v. State, 989 S.W.2d 319, 330 (Tenn. 1999)(citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must also establish prejudice by showing that there is a reasonable probability that, but for counsel's errors, the result of the trial proceeding would have been different. Id. (citing Strickland v. Washington, 466 U.S. 668, 693 (1984)). Stated simply, the petitioner must prove both (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). " Failure to prove either deficiency or prejudice provides a sufficient basis to deny relief." Id. at 370.

In House v. State, 44 S.W.3d 508, 515 (Tenn. 2001)(citing Goad, at 369), the court held that "[t]o prove a deficiency, a petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." In Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996), our supreme court quoted Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), when it addressed some of the standards to be considered in making this determination:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence.... Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting consideration.... *Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner.* (Emphasis in original).

***



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 52 of 128 PageID #: 4436

> In reviewing counsel's conduct under the facts and circumstances of a case, a "fair assessment ... requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. 689, 104 S. Ct. 2065; see also Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (counsel's conduct will not be measured by "20-20 hindsight"). The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices are informed ones based upon adequate preparation. Hellard, 629 S.W.2d at 9; Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In Goad, our supreme court emphasized the duty of counsel in a capital sentencing hearing:

> Courts are "particularly cautious in preserving a defendant's right to counsel at a capital sentencing hearing." Deutscher v. Whitley, 884 F.2d 1152, 1160 (9th Cir. 1989); Cooper v. State, 847 S.W.2d at 529. The Eighth and Fourteenth Amendments to the United States Constitution mandate that a death sentence be based on a "particularized consideration of relevant aspects of the character and record of each ... defendant." Woodson v. North Carolina, 428 U.S. 280, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976). In this respect, evidence about the defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934 (1987). Thus, although there is a requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 53 of 128 PageID #: 4437

encompasses both the guilt and sentencing phases. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989); see Bertolotti v. Dugger, 883 F.2d 1503, 1516 (11th Cir. 1989)("greater duty of inquiry into a client's mental health imposed for the penalty phase of trial."); Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1991), cert. denied sub nom., Kubat v. Greer, 493 U.S. 874, 110 S. Ct. 206, 107 L. Ed. 159 (1989)("counsel may not treat the sentencing phase as nothing more than a mere postscript to the trial.").

* * *

... When challenging a death sentence, a petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

* * *

... In evaluating whether a petitioner has discharged the burden of establishing prejudice, a court

> must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been affected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect ....

Strickland, 466 U.S. at 696-97, 104 S. Ct. at 2069 (emphasis added).

Where the alleged prejudice under Strickland involves counsel's

> failure to present mitigating evidence in the penalty phase of a capital trial, several factors are significant. First, courts have analyzed the nature and extent of the mitigating evidence that was available but not presented. Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th cir. 1988); Cooper v. State, 847 S.W.2d at 532; Atkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1995). Second, courts have considered whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990); State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). Finally, the courts have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Fitzgerald Thompson, 943 F.2d 463, 470 (4th Cir. 1991); Elledge Dugger, 823 F.2d 1439 (11th Cir. 1987).

938 S.W.2d at 369-71.

Having discussed the law applicable to the petitioner's allegation of ineffective assistance of counsel, the court will now address each specific allegation as stated in the post-conviction petition.

**A. Counsel failed to establish the proper working relationship with the petitioner.**

This claim is simply not supported by the record. The attorneys' time records establish that Talman met or spoke to the petitioner well over 30 times over the less than 10 months he represented her pretrial.[18] This number does not include the times he

[18]Talman also testified that while he had tried to write down all his hours, he felt some hours had not been included on the fee claim because if he did not write it down immediately and

discussed matters with the petitioner in court . Ms. Julie Martin Rice,[19] co-counsel at trial, was appointed less than two months prior to trial and met with the petitioner in person 6 times pretrial and had additional contact with her on several occasions either by letter, phone, or in court. Petitioner also made reference to Attorney William Brown's failure to meet and consult with her. This court replaced Brown as counsel when an issue arose concerning the difficulty in the relationship between Brown and the petitioner. In addition, Brown's time records were not made an exhibit at this hearing and the petitioner did not testify. Both attorneys Talman and Martin Rice testified to a very positive relationship with the petitioner, who as stated did not testify. Under these circumstances, petitioner has failed to carry her burden of proof both as to deficiency and prejudice.

**B. Counsel failed to adequately prepare for the representation of the petitioner**

Here, petitioner asserts that counsel failed to properly investigate potential witnesses and potential impeachment evidence and that counsel failed to properly prepare to present mitigation proof. Petitioner claims the brief period Martin Rice was on the case pretrial was inadequate to properly prepare.

The testimony and evidence established that both attorneys gave the petitioner's case priority once appointed. Talman retained investigative, mitigation, and mental

---

he could not recall the time spent 100%, then he would not claim it.

[19]During these proceedings, Ms. Martin Rice filed a disciplinary complaint against the Post-Conviction Defender. As a result, the examination of Ms. Martin Rice and the completion of these hearings did not occur until the Board of Professional Responsibility had concluded that matter.

health experts promptly. Talman stayed in close contact with all members of the defense team while preparing the case. Talman and Martin Rice personally interviewed potential witnesses and made trips to other states to personally interview potential witnesses and individuals who had known the petitioner.

Although the final bound materials were not received from Dr. McCoy until the week before the trial, there had been regular meetings and calls discussing the progress and preparation of the case between Talman and Dr. McCoy and counsel had seen the original draft of the materials. Both Talman and Martin Rice testified to their readiness for trial.

At the hearing, Carrie Ross testified that Talman had told her that he was leaving plenty of room for appeals. Talman testified that he could not recall saying anything like this and that if she thought this that something he said to her must have been taken out of context. This court does not find that petitioner has established that Talman "fell on his sword" and purposefully failed to properly prepare or present her case.

This court cannot find that the petitioner has carried her burden to establish deficiency and prejudice on this issue.

**C. Counsel failed to engage in the motions practice necessary to protect the petitioner's rights**

Petitioner here claims that counsel failed to file various motions on behalf of the petitioner.

First, the petitioner claims that counsel was deficient in failing to move to

suppress the petitioner's pretrial statement to Detective Randy York based upon the petitioner's alleged drinking and use of drugs in the hours prior to her arrest, her alleged then existing mental disease or defect, her allegedly manic tone of voice in her statements, and the asserted contradictory nature of her statements with those of her co-defendants. Talman testified that, while in retrospect he thinks he could have filed a motion for the purpose of the record, he did not and still does not think that a motion to suppress the statement would have been successful. He described the petitioner as a very likable, intelligent, well-spoken young lady. After talking with her and listening to the statement, it was clear to Talman that there was no doubt that the petitioner had not been under the influence and that she had known what she was doing. He recalled that the petitioner had told him that she had been advised to get a lawyer but had refused because she wanted to talk. He could not recall the petitioner ever telling him she had been coerced or intoxicated. In fact, he recalled the petitioner having stated that she was not coerced and that she had known what she was doing. Martin Rice also testified that she had seen no basis for a suppression motion of the statement.

Petitioner presented Andrew Drace, a person who was attending Job Corp at the same time as the petitioner, who testified that he had seen the petitioner consume a large quantity of alcohol at around 10:00 P.M. the evening of January 13, 1995, the day after the murder. He described the petitioner's speech as slurred at the time she left.

Randy York, the lead investigator on the murder, testified that he had first met the petitioner at about 6:30 A.M. on the morning of January 14, 1995, at her room at the Job Corp Center. When he arrived at her room, she had been sleeping but got up and spoke to

him. He credibly testified that he did not observe any signs of her being under the influence in any way. He testified that her speech was fine and that she was very cooperative and somewhat jovial at times. The petitioner went to the Police Department with them and gave a statement at about 8:00 A.M. after signing a written waiver of her rights. While York agreed that there were some emotional moments during the statement where the petitioner was crying, he testified that her demeanor overall was level. The tape indicated that York had asked the petitioner if she was OK and that she had been given a break when she wanted one. Neither the audio of her statement or the video of the crime scene establish any intoxication of the petitioner as well.

Again, the petitioner did not testify.

This court finds that the petitioner has failed to establish that she was intoxicated at the time that she gave her statement to the police. In fact, York testified that there were no signs that the petitioner was under the influence at all. Petitioner, who has an IQ of 111, was well spoken and advised her own counsel that she had made the decision to talk to authorities. Under all the circumstances, this court does not find that counsel's failure to file a motion to suppress the statement was deficient. In addition, this court notes that even if counsel had been deficient in failing to file a motion, the petitioner has failed to establish any prejudice in that the evidence does not support any merit to the motion.

Second, the petitioner claims that counsel was deficient in failing to move for suppression of the search of her dormitory room based upon alleged violations of her state and federal rights against unreasonable searches and seizures. Petitioner further claims if this had been successful then the petitioner's pretrial statements could have been

challenged as fruit of the poisonous tree. The petitioner has made this very general allegation without any specific facts to support it. York testified that the petitioner was not under the influence when she gave her statement to the police and when she subsequently consented to the search of her room. Under these circumstances, this court cannot find that petitioner has established either deficiency or prejudice.

Third, the petitioner claims that counsel was deficient in failing to move for production of the co-defendants ' juvenile records and for not requesting court-ordered psychiatric evaluations of the co-defendants. Talman testified that he thought the petitioner protected co-defendant Shipp more than she should have and that the defendant would not cooperate with a defense of placing the blame on Shipp. The evidence established her leadership in the offense as well. The records of co-defendant Shipp introduced at the hearings in these proceedings were sparse and only discussed a couple of incidents when Shipp was 15 or younger. These records do not compare with the extensive history of assaultive and inappropriate conduct on the part of the petitioner. No records of co-defendant Peterson were presented. In his own testimony, Shipp testified that the petitioner had hit him once when angry and busted his lip. There is no indication that he responded with violence. This court finds that the petitioner has failed to carry her burden of proof on this issue to establish both deficiency and prejudice.

Fourth, the petitioner claims, very generally, that counsel was deficient in failing to move for a bill of particulars. Petitioner has failed to claim this issue with any specificity and has also failed to support this motion with proof. Therefore, this issue is also without merit due to petitioner's failure to establish either deficiency or prejudice.

Fifth, the petitioner claims that counsel (Talman) was deficient in failing to move to withdraw due to an actual conflict of interest. Alternatively, the petitioner argues that counsel was deficient in not requesting a guardian ad litem be appointed to advise the petitioner on the issue. In Issue I above, this court has already held that there was no conflict of interest related to the over-billing issue. The second alleged conflict petitioner asserts is related to an alleged pecuniary interest of the attorneys in publishing a book about the petitioner. While the attorneys admitted to discussion of a book about the defendant, Talman and the petitioner's aunt, Carrie Ross, testified that the reason for the discussion was to present the defendant's whole story so others could see a different side of the petitioner. Ross testified to having discussed the book with Talman but was unable to recall the exact timing. Martin Rice testified that she had thought they might be able to do a publication for a seminar on death penalty cases for others to use. Both attorneys denied any hopes of pecuniary gain from such a venture. They knew that the defendant signed a release which included language about pecuniary gain as well as other language for a release, but they stated that pecuniary gain was not their goal. In reality, no book was ever written. The petitioner has also failed to establish how she was prejudiced by this allegation. Lastly, the petitioner asserts conflict and alleges that Talman sought to have Dr. McCoy lie to the court about when she gave defense counsel her report. Petitioner claims that when Dr. McCoy would not lie that he did not have her testify. Talman credibly testified that he could not imagine asking a witness to lie. The record establishes that Dr. McCoy gave the report to Talman on March 24, 1996. Talman turned the report over to the state on March 29, 1996. The state objected to the timing of the



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 61 of 128 PageID #: 4445

discovery and the court had an in chambers hearing. Following that meeting in chambers, Talman stated on the record as follows:

> Your Honor, as I explained in chambers, I had just received this documentation earlier this week myself.

This in court statement was not corrected by either the court or the prosecution as being factually incorrect at the time. Talman testified that Dr. McCoy had been very upset that she had not testified. Talman testified that when he had received Dr. McCoy's report he had been unsure if he wanted to use it because of the information in it that he did not want to go to the jury. He stated that there were multiple reasons why Dr. McCoy did not testify but the main reason was because when talking to her about her testimony after the guilt verdict, she told them that she could not corroborate what Dr. Engum had said because she had not done an evaluation of the petitioner. He stated that in a nutshell the plan had been to have Dr. McCoy bring in all the social history and tie it in with Dr. Engum's report. He further stated that he thought it had all been previously discussed with the defense team but that he has no recollection of specifics now, after approximately 12 years. Talman stated that he recalled receiving a letter from Dr. McCoy post-trial and that she was upset with him. In addition to the above, Talman stated that Dr. McCoy was upset regarding rumors of her relationship with Assistant District Attorney William Crabtree, who prosecuted the case.[20] A letter from Dr. McCoy to

[20]Talman testified that he could not recall specifically when Dr. McCoy had informed him that she had a prior relationship with Crabtree but that he had thought "so what." He never doubted the integrity of either Dr. McCoy or Crabtree and he had never asked Crabtree about it. He did state, however, that Dr. McCoy had told him that she had not originally disclosed the relationship because she wanted to work on the case. Both Dr. McCoy and Crabtree testified that

Talman (exhibit 8) clearly demonstrated that Dr. McCoy was upset with Talman. Attorney Gregory Isaacs and Dr. McCoy both testified about a letter from Talman to Dr. McCoy which had predated exhibit 8 but no copy of that letter was introduced by either party.[21]

This court finds that the record does not demonstrate a basis on which Talman would have asked Dr. McCoy to lie. As stated, the record indicates that Talman correctly informed the court when he had received Dr. McCoy's report. Thus, as discussed above, the petitioner has failed to establish any conflict of interest claim and, therefore, no relief is warranted. The petitioner has failed to carry her burden of proof.

Sixth, the petitioner claims that counsel was deficient in failing to move to continue the case when Attorney William Brown withdrew less than 2 months before trial and Ms. Martin Rice, who replaced Brown, had never tried a capital case. Both attorneys Talman and Martin Rice testified that at the time of trial, they did not believe a continuance was needed. Both had devoted substantial time and effort to the defense of the petitioner. While counsel stated that in hindsight it may have been beneficial to have more time to discuss the plea offer with the petitioner, but that offer was believed to have been time sensitive to the trial date. In addition, counsel testified that they felt prepared otherwise. Talman had devoted great time and effort to the case for approximately 10

---

the relationship had ended before the offense. Attorneys Herbert Moncier and Gregory Isaacs also testified that the relationship had been prior to Dr. McCoy working on the petitioner's case.

[21] Although this court would have preferred to have been able to review the two attorneys' files in their entirety when considering these issues, neither the state nor the petitioner sought to have the entire files made exhibits to these proceedings.

months and felt ready for trial, and Martin Rice had worked the case almost exclusively for 2 months. There was also testimony that there were tactical reasons for wanting to go to trial at that time. Based upon all the evidence and the law, this court finds no deficiency or prejudice on this issue.

Seventh, the petitioner claims that counsel was deficient in failing to move to continue the case after receiving an amended indictment which included 51 additional witnesses less than a month before trial. Petitioner, however, has failed to establish exactly how counsel was deficient or how she was sufficiently prejudiced with regards to the specific individuals on the amended list. Accordingly, this issue is without merit.

Eighth, the petitioner claims that counsel was deficient in failing to file motions seeking to challenge the facial constitutionality of the heinous, atrocious or cruel aggravating circumstance. Our courts have repeatedly upheld the constitutionality of this aggravating circumstance. Accordingly, there is no prejudice and this issue is without merit.

Ninth, the petitioner claims that counsel was deficient in failing to challenge the avoid arrest aggravating circumstance as unconstitutional, both on its face and as applied to the facts of his case. Again, our courts have repeatedly upheld the constitutionality of this aggravating circumstance. As for the application of this factor to this case, as stated by the state, counsel challenged the application of this factor by challenging the sufficiency of the evidence. The evidence clearly supported the application of this factor as discussed by the Tennessee Supreme Court on direct appeal. Accordingly, there is no deficiency or prejudice shown and this issue is without merit.

Tenth, the petitioner claims that counsel was deficient in failing to move to have the state elect between whether they would seek a conviction for conspiracy to commit murder, or would attempt to prove the avoid arrest aggravating circumstance. The petitioner claims that the two theories are logically and legally inconsistent. While this court understands the petitioner's position, the evidence supported both the conspiracy charge as well as the factor that the petitioner committed the act to avoid arrest. By her own statement, the petitioner established proof of this factor. The law does not require that the petitioner's motive to avoid arrest be her sole motive. The evidence established that this motive was present at the time of the murder. Under these circumstances, clearly no prejudice has been established and the petitioner is not entitled to relief on this issue.

Eleventh, the petitioner claims that counsel was deficient in failing to move for exculpatory evidence. The petitioner, however, failed to present proof of what exculpatory evidence she claims was not produced and/or how this prejudiced her. Accordingly, this claim is without merit.

Twelfth, the petitioner claims that counsel was deficient in failing to move for information regarding the victim, including information concerning her relationships with each of the three co-defendants. Petitioner, however, has failed to establish a record to demonstrate how this was deficiency by counsel and how she was prejudiced. Therefore, this issue has no merit.

**D. Counsel were ineffective in failing to file motions in a timely manner and failing to ensure that motions were heard in a timely manner**

Petitioner has failed to demonstrate what specific prejudice she suffered as a result of the timing of the motion hearings and, therefore, this issue is without merit.

**E. Counsel failed to obtain and use experts in a manner consistent with effective representation and Counsel failed to adequately investigate or present evidence of the petitioner's diminished capacity and state of mind at the time of the offense[22]**

Petitioner argues that counsel's use of experts at the guilt/innocence phase of the trial was ineffective assistance of counsel. She criticizes the testimony of Dr. Eric Engum, a neuropsychologist, for having failed to establish her diminished capacity at the time of the offense. As part of this, petitioner asserts that counsel never investigated the petitioner's actual degree of participation relative to the participation of the two co-defendants, Shipp and Peterson, and that if counsel had provided this information to Dr. Engum it would have changed the results of his cross-examination by the state. Petitioner asserts that Dr. Engum "likely would have been able to offer" stronger testimony in support of a mental illness resulting in diminished capacity.

At trial[23], Dr. Eric S. Engum, a clinical psychologist, testified for the defense regarding his psychological evaluation of the petitioner. He explained that he evaluated

[22]This section addresses issues contained in both subsections (II)(E) and (H) as listed in this order.

[23]Dr. Engum's written report was an exhibit at the post-conviction proceedings, but not at trial.

the petitioner by performing a battery of psychological tests to determine her competency to stand trial, whether an insanity defense was warranted, whether she suffered from any mental disease or defect which might relate to her diminished culpability for the charged offense, and to identify any potential mitigation factors in the event the petitioner was convicted.

Dr. Engum described the petitioner as an extremely intelligent young woman who had only completed the ninth grade but who tested, with the exception of spelling, at or above her level of academic achievement. He testified that his testing placed her overall IQ score at 111 in the Bright Normal Range. As a result of his testing, he testified that the following diagnoses were warranted:

| | |
|---|---|
| Axis I (active diagnoses): | Depressive Disorder Not Otherwise Specified<br>Cannibus (Marijuana) Dependence<br>Inhalent Abuse by History |
| Axis II (personality disorders): | Borderline Personality Disorder |
| Axis III (active medical conditions): | No active medical illnesses or injuries |
| Axis IV (psychosocial stressors): | Present incarceration, pending trial, her poor vocational and educational background [24] |
| Axis V (global assessment): | 55 (Moderate) |

When asked what the global assessment meant, he stated that most people fall in the 80 to 90 range. The petitioner, while dysfunctional, was not so dysfunctional that she

[24]In his report, Dr. Engum also listed her history of severe psychosocial and interpersonal difficulties, history of primary support group impairments, and history of homelessness.

needed to be institutionalized. He stated that she did, however, have "a multiplicity of problems in interpersonal relationships and in controlling her behavior, and in achieving vocational and academic kinds of goals." At one point he described the petitioner as having been lonely, unhappy and unloved all of her life and that in many situations she could be quite aggressive both toward herself and others.

He further testified that the results unequivocally showed that she did not suffer any signs of brain damage. He did testify, however, that she suffered from a very severe borderline personality disorder. He explained that the DSM-IV lists a variety of characteristics of this diagnosis and in order to warrant its application to an individual that person must meet at least 5 of those characteristics. The petitioner met 8 out of 9 of them.

He explained that people with borderline personality disorder have a highly unstable identity. He stated that they basically draw their identity from those around them. They are highly dependent upon others and have such a small sense of self that they fear abandonment by those who are important to them. For example, in a love relationship they may always be frantic that a person is going to abandon them.

Dr. Engum explained that this was particularly relevant to the petitioner in her relationship with co-defendant Shipp. He described Shipp as a young man she met at Job Corps, and fell deeply in love with, "almost to the point of infatuation, almost a captive." He indicated that this served as the basis for what he thought happened in this offense. Dr. Engum said the petitioner's fear of losing Shipp or having him taken away from her by the victim was so overwhelming and threatening that it caused this to happen. He

opined that because of this disorder, the petitioner cannot maintain relationships with others and appears emotionally unstable. He described her emotions as swinging alternately from love to anger making her behavior very unpredictable. He further testified that this had been reflective of the petitioner her whole life and particularly in the months leading up to the offense. Her history also reflected that she was "very impulsive, almost to the point of self-destructive in terms of drug abuse, in terms of sexual promiscuity, in terms of risky activities, and things that might be potentially threatening to herself or even to others. Dr. Engum summarized that people like the petitioner "have difficulty in controlling and keeping themselves within certain boundaries." He also explained that as it related to Shipp and others interacting with him that she suffered a strong degree of paranoid idealization. For example, if a female just spoke to Shipp she might think the woman was trying to seduce Shipp. He opined that when petitioner thought this way, as with the victim here, she would experience incredible levels of anger and hostility toward the female who she perceived as a threat. The anger and hostility became almost a rage, almost uncontrollable, which he described as fitting the petitioner like a glove.

As for the offense, Dr. Engum opined that the petitioner

> basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, borderline personality disorder, which meant that she basically went out of control. She basically lost any sense of what she was doing. She simply acted based on the exigencies of the situation she found herself in ... with [the victim].

Dr. Engum opined that she was in a frenzy during the offense. The petitioner's

statements reflected that she was angry like she had never been before. He stated that once the attack started, she escalated and literally lost control and could not stop. The fact that two other people were there watching her also added impetus to what she was doing. In addition, he explained how the petitioner's statements included references to hearing a voice, when no one was there, telling her that she was going to jail, etc., almost like she was in a disassociative state. He described one of the petitioner's statements as a situation where it seemed like the petitioner thought she was outside herself watching the offense.

When the prosecution sought to discuss the issues of deliberation and premeditation with Dr. Engum, he agreed that the petitioner had deliberated and premeditated when she took the weapons with her, but he opined that, based upon the petitioner's statements to the police shortly after the murder and to him much later, that the petitioner had only deliberately and premeditatedly taken the victim to the park to inflict a severe beating on her. He also admitted that carving the pentagram on the victim was a deliberate and premeditated act. He had assumed from the information he had that there had not been a cooling off period during the offense. He admitted that he was relying on the petitioner's own statements and that if the petitioner had not been truthful then while it would not affect his diagnoses, it would affect his opinion as to the petitioner's state of mind at the time of the offense.

He described her "giddiness" and behavior afterwards as an emotional release, almost a sense of relief, at her relationship with Shipp having been maintained. He stated that she showed the skull as a way of recognition or identity. He explained that this

might not seem rational but that to someone like the petitioner any recognition is important.

Overall, however, he asserted that while small parts of the story could be separately interpreted as evidence of a deliberate and premeditated murder, you must look at the totality of the story and when you do, the petitioner had not intended the murder, but rather had lost control.

At trial, Dr. William Bernet, a forensic psychiatrist, testified for the defense as an expert in forensic psychiatry and was permitted to testify about the areas of Satanism and ritualistic behavior as it related to forensic psychiatry. Based on the information he had reviewed, he opined that there was satanic mutilation of the body, but that the whole picture of the murder did not fit the pattern of a planned satanic sacrifice, or satanic ceremony. He explained that it did fit a pattern of adolescent dabbling in Satanism. He opined that the petitioner and Shipp were dabbling in Satanism. He explained that this meant that they had read up on it and that they identify it. He stated that sometimes these are very disturbed, angry children as what seemed to be the case here. The Satanism was described as a way for them to express their rage, and their antiauthoritarian attitudes. He further explained, however, that it did not mean that they practiced Satanic sacrifices. He testified that it fit the pattern of collective aggression phenomenon. He described this as where "a particular kind of event, or kind of thing happens when there are several people, or a group of people together, and these ... people become emotionally aroused, agitated, extremely emotionally aroused, and the end result is that they engage together in some kind of violent, extremely violent activity." He discussed two things that happen in

collective aggression: a sense of contagiousness where one person's arousal spreads to the other people, and a tendency to act out things, such as sadistic aggressive feelings or impulses, that ordinarily would be kept in the unconscious. He testified that having never evaluated either the petitioner or Shipp, he could not testify to a reasonable degree of medical or psychiatric certainty as to the petitioner's state of mind at the time of the offense.

On cross, he agreed that collective aggression resembles mob violence. It was also emphasized that he had not spoken to the petitioner or any of her co-defendants and that he had based his opinion only on those items he had been provided by the defense. He had no personal knowledge of the offense because he had not been present. Throughout his cross, he reiterated that he thought the murder was part of a "frenzy" on the part of the petitioner. He also explained that there was probably a lot about Satanism that he did not know but that he was not holding himself out as an expert in Satanism but rather as an expert in the way that Satanism involves teenagers and how it affects people's behavior and how there are different kinds of ritualistic behavior.

As stated above, petitioner criticizes the testimony of Dr. Engum for having failed to establish her diminished capacity and possible reduced degree of participation at the time of the offense. Petitioner asserts that Dr. Engum "likely would have been able to offer" stronger testimony in support of a mental illness resulting in diminished capacity if counsel had provided him with more information.

Dr. Engum was not a witness at these proceedings, and thus, there is no proof as to what affect this information may or may not have had on his testimony. An assertion

of "Likely would have" does not meet the petitioner's evidentiary burden. In addition, Talman testified that he thought the petitioner protected co-defendant Shipp more than she should have and that she would not cooperate with a defense which attempted to place the primary responsibility for the offense on Shipp.

The record establishes that Talman sought expert assistance immediately upon his appointment to the case. Talman stated that, while he had thought the petitioner to be quite intelligent and very able to communicate and converse with others, he was not an expert in the field of mental health so he had sought the appointment of an expert to evaluate the petitioner. The evidence also establishes that counsel stayed in close contact with his experts. Talman testified that he received materials in an on-going fashion from Dr. McCoy. Talman also stated that he worked closely with both co-counsels who had been involved. He also credibly testified that he had told the experts to talk to each other. There were records of regular meetings and conversations with the experts. Talman relied upon the expertise of these individuals to do their jobs. Counsel identified the potential issue, retained an expert, and then relied upon the appointed expert for relevant information. This court finds no fault in counsel for relying on Dr. Engum in an area in which he had been retained as an expert.

In addition, many of the issues raised by petitioner concerning the use of or reliance upon experts faults counsel for not having questioned the expertise provided, or for not having known if more tests were needed or if some diagnosis was not sufficient. One additional point petitioner asserts in this regard is counsel's failure to request a full evaluation by Dr. Bernet. Counsel relied upon the experience of Dr. Engum to perform

the appropriate testing. When Dr. Engum indicated that there were no signs of brain damage counsel relied upon this information. Dr. Engum did not testify here and there is no indication that he advised that other experts were needed. Talman testified that he did not recall either Dr. Engum or Dr. McCoy suggesting that a psychiatrist needed to evaluate the petitioner. Dr. McCoy also testified that because Dr. Engum was a neuropsychologist that she would have assumed he would have been the person to make the call if a neurologist was needed. This court finds no deficiency in counsel for not instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not having questioned their opinions. See Farris Genner Morris v. State, 2006 Tenn. Crim. App. LEXIS 782 (Tenn. Crim. App., Oct. 10, 2006); see also, Byron Lewis Black v. State, 1999 Tenn. Crim. App. LEXIS 324 (Tenn. Crim. App. April 8, 1999) (Attorneys are not guarantors of the validity of an expert's results)(It is more the function of the mental health profession to determine the social history needed than it is the function of the defense attorneys).

Next, petitioner faults counsel for not having provided Dr. Engum with her full social history as prepared by Dr. McCoy and her behavior at the time of the offense and for not having retained Dr. Bernet for a complete evaluation of the petitioner pretrial. She claims that if counsel had done this, that Dr. Engum and/or Dr. Bernet could have reached the diagnosis of Bipolar Disorder rather than or in addition to Borderline Personality Disorder. This court finds no relief is warranted based on the fact that the opinions of Drs. Pincus and Kenner differed somewhat from that of Dr. Engum. The experts at all the proceedings opined that the petitioner acted without premeditation. Drs. Engum,

Pincus, and Kenner all testified that the petitioner lost control. Dr. Pincus specifically testified, as did Dr. Engum, to the petitioner's premeditation and deliberation in planning the beating, taking weapons, getting the victim to the park, carving a pentagram, and in delivering blows to the victim. They both also opined that the petitioner had not, however, premeditatedly and deliberately murdered the victim. They opined , as did Dr. Kenner, that once the beating began, she lost control and could not stop. Drs. Pincus and Engum also agreed that while they did think that a cooling off period had occurred, there had been time for that to occur. Dr. Pincus also admitted that the fact that the petitioner had told someone the day before the murder that she was going to kill the victim and then did in fact kill the victim makes it appear premeditated. This court will not fault counsel because the specific diagnosis by different experts differed. Counsel appropriately relied upon the retained expert's opinion. As made clear by Dr. Kenner's own testimony, the area of mental health is constantly changing. Dr. Kenner even had included Borderline Personality Disorder in his diagnoses and stated that it was a reasonable diagnosis at the time with what the defense had.

As related to the argument that counsel was deficient in failing to provide Dr. McCoy's prepared social history to Dr. Engum, this court does not agree. Dr. McCoy testified that she prepared her materials to support Dr. Engum's diagnosis and that she had not asked questions that she would have asked with a different diagnosis. Dr. Engum met with the petitioner and developed a social history. In addition, without the attorneys' files and without the testimony of Dr. Engum, this court is without sufficient proof to establish that Dr. Engum was not updated regarding the petitioner's social history as it

developed. Counsel testified that the experts were instructed that they could talk to each other as needed. This court notes that it is more the function of the mental health profession to determine the social history needed than it is the function of the defense attorney. Byron Lewis Black v. State, 1999 Tenn. Crim. App. LEXIS 324 (Tenn. Crim. App. April 8, 1999). Neither Dr. Engum nor Dr. Bernet testified at these hearings and it is speculative as to whether the diagnosis would have been Bipolar Disorder at the time based upon the factors asserted by the petitioner. As stated above, Dr. Kenner testified that opinions of experts in this field regularly differ on what to call things and what categories they fit. Again, Dr. Kenner stated that the diagnosis of Borderline Personality Disorder was reasonable at the time. In fact, Dr. Kenner stated that it was not until much later that he opined that his own diagnoses of Borderline Personality Disorder and Antisocial Personality Disorder were not correct.

This court also notes that experts must rely on what the client says as well. The evaluations performed have tests to determine if someone is malingering but in part it is up to the professionals to determine if someone is lying or telling the truth or partially lying, etc. Dr. Kenner relied upon what the petitioner told him in making his diagnoses and testimony. Dr. Pincus specifically stated that he had relied upon what the petitioner had told him related to the offense and that it was the basis for his opinion related to her state of mind at the time of the offense. He admitted that if she were lying that this would change his opinion as to whether she had premeditated but not as to her diagnosis. Dr. Engum also relied upon the petitioner's version of events and other than the specific diagnoses, their opinions were the same. There was testimony that the petitioner has now

stated that her original statement to the police was "a bunch of crap." The petitioner told some experts that she was spanked with her clothes on and others with her pants down. The petitioner did not testify here. This court cannot agree with the assertion by the petitioner that this court should fault Dr. Engum for believing her yet Dr. Pincus and Dr. Kenner are suppose to have believed everything she stated to them. This is problematic to say the least.

Counsel is also criticized for allegedly not establishing the dominance of Shipp over the petitioner. The record at both the trial and in these proceedings, however, does not support this position. Shipp and others testified to the petitioner's unpredictable behavior and to how she could get angry very fast. Some witnesses testified to how they could calm her down when she would get out of control. The experts for post-conviction testified that at the time of the murder no one there tried to calm her down. The mere fact that Shipp may not have attempted to stop the petitioner does not diminish her role in the offense. Shipp even testified that the petitioner when angry had once hit him and busted his lip. This does not support the position that she was dominated by him.

As for the testimony of Dr. Bernet and the theory of collective aggression, this court does not agree with the petitioner's assertions. While there may have been some misstatements by counsel in a question, Dr. Bernet was clear in his statements that he was not an expert in Satanic theology but rather in the way teenagers become involved in Satanism and how it affects people's behavior. He was qualified as an expert in forensic psychiatry and was allowed to testify concerning ritualistic behaviors as they related to forensic psychiatry. This court also cannot find that the petitioner is entitled to relief

because Dr. Bernet was not allowed to testify as to a reasonable degree of medical or psychiatric certainty as to the petitioner's state of mind at the time of the offense. Dr. Bernet was retained, not to evaluate the petitioner, but rather to try to explain certain aspects of the offense and how he interpreted them as an expert in forensic psychiatry. Talman testified that he believed that he had spoken to Dr. Bernet well before his actual retention on the case. The defense already had a favorable diagnosis from Dr. Engum to which he testified. He testified to his opinion of the petitioner's lack of premeditation and deliberation for the murder, just as Drs. Kenner and Pincus did in these proceedings. Again, this court does not fault counsel for relying upon Dr. Engum's expert opinion and not seeking other opinions.

While this court agrees that certainly there are additional things which counsel could have done in hindsight, no one is entitled to a "perfect" defense as viewed using 20-20 hindsight. Accordingly, this court finds that the petitioner has failed to carry her burden of proof on this issue and she is not entitled to relief.

**F. Attorney Talman was ineffective for operating under a conflict of interest**

As discussed in Issue One, the court finds that Talman did not operate under a conflict of interest. Therefore, this issue is without merit.

**G. Counsel failed to adequately voir dire prospective jurors**

The petitioner seeks relief for counsel's alleged failure to adequately voir dire prospective jurors on various issues, to effectively utilize their jury consultant, or to



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 78 of 128 PageID #: 4462

make certain motions during or related to voir dire. After a thorough review of the trial record and all other matters in this case, the court finds that the petitioner has failed to present sufficient evidence to support relief based upon these claims.

This court instructed the jury on the law concerning the burden of proof and other relevant issues including punishment. Any possible misstatement of the law by either party was appropriately remedied by the court's charge.

The length and scope of voir dire is an individual decision made by counsel on a case by case basis. The attorneys voiced no dissatisfaction with the jury ultimately selected. Petitioner also failed to offer any proof that any particular juror was either not qualified.

In addition, Talman specifically testified that there had been no basis for a Batson motion and the petitioner has failed to present any evidence of the same.

Thus, because petitioner has failed to establish both deficiency and prejudice as to these allegations, they are without merit.

**H. Counsel failed to adequately investigate or present evidence of the petitioner's diminished capacity and state of mind at the time of the offense**

This issue was previously addressed in section II(E) above.

**I. Counsel failed at the penalty phase of petitioner's trial to present expert and/or lay testimony on compelling mitigation in the petitioner's life history**

Here, petitioner argues that counsel failed to present expert testimony or sufficient lay testimony regarding the petitioner's life history.

In addition to Dr. Engum and Dr. Bernet having testified at the guilt phase of the trial,[25] the petitioner's mother, father and maternal aunt testified on her behalf at the penalty phase.

Carrie Ross, petitioner's maternal aunt testified at the penalty phase of the trial that she was a nurse and that she loved the petitioner. She stated that the petitioner had been born premature and had been very sick as an infant. She stated that right after the petitioner was born, she had been taken to another hospital away from the hospital where the petitioner's mother was recovering from the delivery and the petitioner's mother had not gotten to visit her for 4 days. Ross stated that shortly after birth, the petitioner's mother had gone back to work at her two jobs and petitioner's paternal grandmother had moved in the home and had cared for the petitioner as a newborn.

Ross stated that the petitioner had not really been raised by her mother but rather by her two grandmothers. She stated that her sister, the petitioner's mother, had never been home and, when she had not been working, she had been partying. She stated that the petitioner's home with her mother had been filthy. She stated that nearly every time she had gone into the house she had done some cleaning because she did not think a baby should be living in that environment. She gave an example of how there had been piles of dog stool all over the house and the petitioner would be crawling around. Ross further stated that her sister would buy clothes for herself to go partying but rarely had enough money to buy "decent clothes" for the petitioner and her older sister Alicia. She stated

[25]A summary of the testimony of Drs. Engum and Bernet is included elsewhere in this order.

that because she had not been married at the time that she often had taken her own money and had bought things the petitioner and her sister needed because their mother had not. She also stated that there had been many days when she had taken the girls home with her to have a good meal. Ross specifically recalled one night when she had been out at a bar with the petitioner's mother and they had received a phone call that the petitioner was having a seizure. The petitioner's mother had wanted to stay out but Ross insisted that they go home and check on the petitioner. After going home, they had taken the petitioner to the hospital.

When asked about the discipline that the petitioner's mother had used on the petitioner, Ross stated that there had been no discipline because there were no rules in her sister's house. In describing her sister, Ross stated that she had always put herself first, not the petitioner. To demonstrate this point, she testified about how she recalled one time when the petitioner had been pushed off on her father and petitioner's half-sister Alicia had come to live with Ross because their mother was living with a man named Danny Thompson. After Thompson had written a letter to petitioner's mother, the girls had been sent to stay with others. When asked about how the petitioner behaved at her house, she stated that when the petitioner had last visited, she had gotten down with Ross's then 10 year old and had played dress up. She stated that the petitioner just played with her daughter at her daughter's level and they had a good time.

Ross also testified to how the petitioner's family tree was full of substance abuse, including petitioner's maternal grandparents, and petitioner's mother specifically. She described the petitioner's maternal Grandmother Fotos as having been emotionally and

physically abusive toward the petitioner. Ross testified that the petitioner's paternal Grandmother Pike had been her primary care giver until she died in approximately 1988. She stated that the petitioner had been totally devoted to her Grandmother Pike and that she had loved her dearly. She described them as having been inseparable and how Grandmother Pike had done everything for the petitioner when they were together. She described the petitioner as having been hysterical when Grandmother Pike died.

On cross, Ross stated that she may have said she was afraid to have her children around the petitioner and that she had called her a pathological liar. She also stated that while she had taken in Alicia, she regrettably had not taken in the petitioner or tried to control her behavior.

Emil Glenn Pike, the petitioner's father, testified at the penalty phase of the trial that he was unemployed. He stated that he had been married to the petitioner's mother twice. He stated that while he thought his relationship with the petitioner had been good when he was married to her mother, he admitted that he had been working a lot and had not been around. He stated that his mother was actually the person who had taken care of the petitioner. He testified that he had married Kathleen Allman after his divorce from petitioner's mother. He described his relationship with the petitioner during that marriage as having been a long distance relationship. He stated that in approximately 1989 there had been accusations related to his daughter with Allman and the petitioner had been sent away and had not been allowed to come back. He testified that this had upset the petitioner.

When the petitioner had lived with him, he described himself as having been

fairly strict with discipline. When she would do something wrong, he stated that he had either spanked or punished her. He recalled one time when she had been living with him and he could not get her to do well in school so he had sent her back to her mother. He referred to this as a rejection of the petitioner on his part. He stated that just prior to her 18th birthday the petitioner had asked him to allow her to be adopted by someone else because she had no longer wanted him to be her father. He stated that he had signed the papers as requested.

On cross, he stated that he could not control the petitioner when she was not in the house. He described her problems as normal stuff but agreed she was manipulative. He stated that he had not known of the conditions with her mother when he had sent her back to live with her mom. He stated that he had not known that the petitioner's mother was drinking and used marijuana or that she allowed the petitioner to run the streets at all hours of the night and day. He agreed that when he had not allowed her to come back to his home it had been because of allegations of sexual abuse of the petitioner's 2 or 3-year-old half-sister by the 13 or 14-year-old petitioner. On redirect, he explained that when forced to choose between his new family and the petitioner, he had chosen his new family.

Carissa Hansen, the petitioner's mother testified at the penalty phase of the trial that she was a licensed practical nurse. She confirmed that she had been married twice to the petitioner's father and that the petitioner had primarily been taken care of by Grandmother Pike and some by her maternal Grandmother Fotos as well. She stated that the petitioner's father would not work and that this had been a problem and that he had

never been around. She admitted she had not been with the petitioner much when she was small. She stated that in 1983 she had married Danny Thompson. She stated that Thompson and the petitioner had not gotten along. She described Thompson as having been abusive to the petitioner. Thompson had told her it was either him or the petitioner and so she had sent the petitioner to live with her father and Grandmother Pike. She testified that this had been a mistake. Grandmother Pike died in 1988 and the petitioner had returned to live with her mother. She stated that the petitioner had been devastated by her death from cancer. She stated that the petitioner had thought of herself as her grandmother's caretaker and, when petitioner's father had sent the petitioner away, she could no longer care for her grandmother. She stated that the next time the petitioner had seen her had been at the funeral home. The petitioner had cried for days and had tried to commit suicide not long after that. She stated that she had taken the petitioner to see a psychiatrist for a few visits after the attempted suicide but that was it. Hansen admitted that the petitioner had been shuffled back and forth between her and the petitioner's father but stated that she had been with her about 95% of the time after Grandmother Pike had died. She said Glenn Pike had not been a good parent and that the petitioner had been in and out of school. When the petitioner had lived with her, petitioner had stayed on the streets and had run away more than once. Hansen stated that she had done nothing about it but would just drink and feel sorry for herself instead.

She testified that in 1989 she had a relationship with Steve Kyaw ans that he also had not gotten along with the petitioner. She recalled a big argument they had because he had whipped the petitioner with a belt and another time when the petitioner had Kyaw

arrested. When the petitioner was 12, she had threatened him with a butcher knife but Hansen said Kyaw had provoked her.

She admitted to having drank a lot and having abused drugs after the petitioner was born. She stated that before the petitioner went to Job Corps they had smoked marijuana together because she had been trying to be her daughter's friend and to develop a closer relationship. She testified that she went to the Job Corps with the petitioner once and had seen all kinds of gang writings on the walls and blood all around the boys bathrooms.

She admitted that no one had any control over the petitioner since she was about 8 years old. She stated that she had not been there for her daughter. She stated that she had been a terrible mother and that she should be punished for what the petitioner had done. She admitted that the petitioner had a live-in boyfriend at the age of 14 but stated that she had allowed this to keep the petitioner from living on the streets with him. She admitted the petitioner had a history of lying and stealing. She stated that the petitioner was remorseful for what had happened to the victim.[26] She admitted to having heard that prior to coming to the Job Corps that the petitioner with friends had kicked in a woman's door and gone in her residence. She had not recalled telling Dr. Diana McCoy that the petitioner had blown many second chances.

Petitioner makes several claims related to the alleged failure of counsel to present mitigating evidence at the penalty phase of her trial. She criticizes counsel for not using

[26]Dr. Pincus, however, stated that the petitioner is not capable of remorse or empathy.

Dr. McCoy[27] and the information contained in her mitigation materials prepared on the petitioner's behalf. She challenges counsel's various choices and decisions which included initially planning to use Dr. McCoy exclusively without any lay witnesses, turning over Dr. McCoy's entire set of materials to the prosecution the day before the penalty phase, ultimately not using Dr. McCoy at the penalty phase, failure to call additional lay witnesses, failure to properly prepare the witnesses called, failure to present evidence of the petitioner's traumatic life experiences, failure to recall Dr. Engum at the penalty phase to connect her traumas with his diagnoses, and failure to present the petitioner's medical history.

As previously explained, in determining whether or not trial counsel was ineffective for an alleged failure to present mitigating evidence, this court must consider three factors: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the trial; and (3) whether there was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.2d 363 (Tenn. 1996).

At the hearing in this matter, the petitioner introduced numerous witnesses and documentary evidence in support of her claim. Many individuals testified to the various aspects of the petitioner's birth, childhood, family history, and other life events. Some of these individuals testified that they were never approached by any member of the defense

[27]One issue raised claims counsel failed to call Dr. McCoy as a witness due to an alleged conflict of interest. This court held previously in this order that no conflict existed and this issue will not be readdressed here.

team prior to trial despite the fact that they claimed to have been available. The petitioner also introduced numerous medical and non-medical records of the petitioner and members of the petitioner's family evidencing the various mental and social issues which affected the petitioner.

As Dr. McCoy testified, at the time of trial attorney Talman knew the mitigation materials as well as she did. Talman understandably testified that while he was sure that decisions made had been based upon information known at the time, that some of the specifics are not in his immediate recall after 12 years. He specifically did recall that he had not been completely comfortable with the use of Dr. McCoy's materials because they contained a lot of material that he did not want the jury to hear about. He explained that the decision to use Dr. McCoy had been made but that there was still some discomfort in the choice. In a nutshell, the plan had been to have Dr. McCoy bring in all the social history and tie it in with Dr. Engum's report. He stated that he had thought that they (the defense team) had all discussed it. He credibly stated that the primary reason he had not called Dr. McCoy as a witness was because she had told him that she could not corroborate what Dr. Engum had said because she had not evaluated her independently. Talman further stated that finding this out after the guilt verdict had upset him and that this information, in combination with his original discomfort with the materials and other minor concerns,[28] had contributed to his final decision not to call Dr. McCoy as a witness.

[28]Among the other concerns was the issue related to the prior dating relationship between Dr. McCoy and General Crabtree. While Talman stated that he had not thought the relationship itself was a big deal, he also stated, and Dr. McCoy confirmed, that she had told him that she had not originally said anything because she did not want counsel not to consider her for the case because of the prior relationship.

Talman also specifically testified that the timing of the turning over of Dr. McCoy's materials had nothing to do with why she was not called as a witness.

The record also establishes that at the time of this trial that Dr. McCoy had never testified at a capital sentencing hearing. Talman stated that while he had not been dissatisfied with Dr. McCoy's work or preparation of materials, he had reached a decision that he did not feel comfortable with her testifying. As previously discussed. Talman stated that he had never asked Dr. McCoy to lie and that this had no part in his decision. While Dr. McCoy has now testified that she had never said that she was not willing to corroborate Dr. Engum, this could very easily be explained as a misunderstanding between the two. This court fully believes that Dr. McCoy would have stated that she had not evaluated the petitioner and therefore could not give a diagnosis or an opinion regarding the petitioner's mental state at the time of the offense. Dr. McCoy stated that she had not prepared any opinions and that she had felt like a fish out of water as a result. Talman and Dr. McCoy stated that they had discussed things "ad nauseam" and while specifics could not be recalled after a 12 year period, any sense of uneasiness on the part of Dr. McCoy would most likely have been part of these discussions. Dr. McCoy clearly states her opinion on matters as she should. Talman also testified that Dr. McCoy had later been upset about the rumors related to her prior relationship with General Crabtree as it related to this case and about the fact that she had not gotten another capital case that she had expected to get possibly as a result of those rumors.

Martin Rice also credibly testified that the reason for not calling Dr. McCoy as a witness was because she could not support Dr. Engum's report. She also stated that other

issues that stood out in her mind were the issues related to Dr. McCoy having dated the prosecutor and the great number of yellow stickers on the state's copy of Dr. McCoy's materials.[29] She also testified to a certain degree of a lack of trust in Dr. McCoy. Martin Rice also testified that she recalled Dr. McCoy saying that the petitioner did nothing but lie.

Considering all the circumstances and evidence, this court cannot fault counsel for having chosen not to use Dr. McCoy as a witness at the penalty phase of the petitioner's trial. Talman was understandably uncomfortable with Dr. McCoy's statements and materials and while a different decision may seem best in hindsight, this court cannot judge counsel's decision with the situation with 20-20 hindsight and find fault merely because another choice may seem to be preferable today. Counsel's decision was not unreasonable.

The petitioner also criticizes counsel for not using lay witnesses appropriately and sufficiently. Again, Talman had been receiving materials all along about lay witnesses and he had done some interviews himself. In addition to Dr. McCoy, another investigator had also been working on the case with counsel. Dr. McCoy stated that the investigator, Barry Rice, had spoken to people at the Job Corps but that she had never seen the information on this.[30] This, however, does indicate that counsel attempted to investigate

---

[29]Both Dr. McCoy and Talman stated that the decision was made the evening before the penalty phase and the stickers were seen on the materials the morning of the penalty phase.

[30]This court also has no information from either side as to what that investigator provided to counsel. Without testimony or the attorneys' files to establish this information, this court cannot speculate as to what the materials contained.

and speak to people at the Job Corps. Martin Rice testified that many witnesses presented two-edged swords. This court agrees that when reviewing the materials related to many of the lay witnesses, there is problematic information in many of the interviews done by Dr. McCoy. Some examples include the fact that the petitioner's sister had told Dr. McCoy that the petitioner was "crazy" and "dangerous" and that the petitioner had chased her once with a knife. People from the training school would have been questioned about her prior "dabbling" in Satanism before she ever met co-defendant Shipp. Dr. McCoy had stated that she had concerns about now Judge Martin because she thought he would come across as naive and easily taken in by the petitioner. Some of the petitioner's friends told Dr. McCoy about the petitioner's statements to them that she had committed the murder and things about the weapons involved. With the potential for much of this plus other information to harm the petitioner's case in mitigation, counsel made a reasonable choice to try to limit what came before the jury and from whom. Counsel's original choice to have the information explained by an expert rather than lay witnesses who could not explain the petitioner's behavior was understandable. Once the exigent decision was made that Dr. McCoy would not testify, counsel strategically decided to have the petitioner's parents and aunt testify to bring out the petitioner's life history to be considered in combination with the information that had already been provided to the jury regarding her Borderline Personality Disorder. Counsel knew that these three people had been at the trial and wanted to help the petitioner.

Petitioner also challenges counsel having turned over all of Dr. McCoy's materials to the state the day before the sentencing hearing. At the time the materials

were turned over, counsel had intended for Dr. McCoy to testify. Talman testified that in retrospect he believed that he possibly should have only turned over the report which was the first 60 pages, he also knew that Dr. McCoy would be testifying from all the materials. Dr. McCoy stated that she had no problem with the state having all her materials and that she regularly turned them over to the state. Talman also testified that he could not recall 100% but that he believed that the court may have ordered him to turn over all the materials in chambers.

Petitioner also claims that counsel was deficient in not recalling Dr. Engum to the stand at the penalty phase. Dr. Engum had previously testified at the guilt phase of the trial and as part of his testimony he had discussed the petitioner's history. This court does not find that counsel was deficient for not recalling Dr. Engum to restate his testimony. The jury is clearly instructed that they may consider all evidence from both phases of the trial as it may relate to mitigation for the petitioner.

Counsel is also criticized for failure to present the petitioner's medical history in mitigation. The petitioner's medical history as an infant was testified to by the petitioner's relatives. Issues related to the medical conditions found by Dr. Pincus were not known to counsel at the time of trial and counsel should not be criticized for having failed to present evidence of which they were not aware. As discussed previously, this court does not fault counsel for having relied upon the experts for opinions in the fields for which they have expertise.

Counsel is also criticized for not putting information in the record related to the petitioner's traumatic life events such as having been raped. This information was also

problematic due to the petitioner's family members not having believed her when she had told them about these events. This lack of credibility with her family members about such serious matters could have been a very negative factor for the jury as it related to the petitioner's credibility to other information which she had told other witnesses and experts. Dr. Engum had also already discussed the petitioner's difficult childhood and past in general terms during his testimony as it related to his diagnosis of the petitioner. Under all the circumstances, this court finds that the petitioner has failed to carry her burden of proof on this issue on both prongs. Petitioner has failed to establish that counsel's choice to limit what went before the jury was unreasonable at the time or that she was sufficiently prejudiced.

As stated previously, this court must consider three factors when considering claims related to claims of failure to present mitigating evidence. The first factor is the nature and extent of the mitigating evidence that was available but not presented. Dr. McCoy testified concerning various themes of mitigation that she thought should have been presented in mitigation. Some evidence of most of these themes was presented to the jury during the course of the trial. While this court finds that there may have been mitigating evidence that was not presented to the jury, this court has previously discussed counsel's decisions related to the decision to limit some mitigation and the negative aspects of some of that evidence. The second factor is whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the trial. As previously stated, much of the mitigating evidence presented by the petitioner here was presented to the jury in one of the phases of the trial, but this court notes that it

was not to the extent that the petitioner now asserts that she thinks it should have been. Some of the witnesses would have been redundant while others would have included some very negative information about the petitioner. The third factor is whether there was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination. This court agrees with attorney Talman's assessment that the jury's verdict would not have been affected by the mitigating evidence now offered due to the strength of the facts of this case for guilt and the strength of the aggravating factors. Even assuming that all the evidence had been presented to the jury that had been presented here, this court cannot find that the jury's sentencing verdict would have been any different.

Additionally, while this court understands that future dangerousness cannot be considered as an aggravating factor in Tennessee, some of the mitigating factors asserted by the petitioner may very well have opened the door to statements such as those made by Dr. Pincus as to the fact that the petitioner must be incarcerated or she may kill again. The petitioner asserts that she was dominated by co-defendant Shipp and that her actions are the result of a medical condition which is now being treated with medication. The discussion of these factors and the way the evidence is presented could easily open the door to the admissibility of evidence that would be viewed as relevant to the weight of the mitigator rather than as inadmissible evidence of a non-statutory aggravating factor.

Considering all the information and claims discussed, this court does not find that counsel was deficient on this claim. Even if this court assumed that counsel had been deficient, this court does not find that the petitioner has carried her burden as to prejudice.

**J. Counsel failed to be aware of the law applicable to the petitioner's case**

The petitioner claims counsel was ineffective in this regard as evidenced by all the matters counsel is alleged to be deficient in the petition. This court disagrees. Counsel diligently represented the petitioner and this court has addressed these various issues and found them to be without merit. As counsel testified, no trial is perfect. While counsel may have testified that they may have done some things differently in hindsight, this court does not second guess counsel's strategic decisions based on 20-20 hindsight. Counsel also testified that many of the issues raised could have been raised but they would not have made a difference because of the strength of the evidence. Petitioner has not carried her burden of proof on this issue ans it is without merit.

**K. Counsel rendered ineffective assistance of counsel relative to the jury instructions in both phases of the petitioner's trial**

The petitioner next alleges that counsel was ineffective when various jury instructions were either given without objection or not requested at both the guilt/innocence phase and the sentencing phase of the petitioner's trial.

First, the petitioner claims error in counsel's failure to object to that portion of the conspiracy to commit first degree murder instruction which stated that "premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided." The petitioner argues that this instruction was objectionable because it allows the jury to determine that both the conspiracy and the intent to kill were formed during the assault on the victim.

Second, the petitioner claims error in counsel's failure to object to the trial court's instruction that equated reasonable doubt with moral certainty.

Third, the petitioner claims error in counsel's failure to object to the trial court's instructions which required the jury to presume the truthfulness of witnesses, thereby violating the jury's prerogative to assess credibility of witnesses and determine the facts.

Fourth, the petitioner claims error in counsel's failure to object to the trial court's instruction, after instructing on the 2 statutory aggravating factors, that stated that "You shall not take into account any other facts or circumstances as the basis for deciding whether the death penalty or imprisonment for life without parole would be appropriate punishment in this case." (Emphasis added). The petitioner argues that this language created a presumption that the sentences of life without parole and death were appropriate sentences in this case, and thus shifting the burden of proof to the petitioner to prove by mitigation that they were not appropriate.

Fifth, the petitioner claims error in counsel's failure to object to the trial court's instruction and definitions on the aggravating factor found at Tenn. Code Ann. § 39-13-204(i)(5), because the language fails to narrow the class of individuals eligible for the death penalty.

Sixth, the petitioner claims error in counsel's failure to object to the trial court's instruction that a unanimous verdict is necessary in order for petitioner to receive a life sentence.

Seventh, the petitioner claims error in counsel's failure to request the statutory mitigating factor that the petitioner acted under the substantial domination of another

person, Tenn. Code Ann. § 39-13-204(j)(6) and T.P.I. Criminal 7.04(a).

Eighth, the petitioner claims error in counsel's failure to request specific instructions concerning non-statutory mitigation including but not limited the various issues related to the petitioner's life history as listed in the petitioner's brief.

This court has thoroughly reviewed the instructions given to the jury and finds that the charge was sufficient and that the petitioner would not be entitled to relief. As for the petitioner's claim that counsel was ineffective for not requesting the statutory mitigating factor of domination by another, this court finds no prejudice. The charge clearly allowed the jury to consider any other relevant factor. In addition, the evidence supported the theory that the petitioner was a leader in the offense. As there is no merit to the other claims related to jury instructions, petitioner is not entitled to relief on a claim of ineffective assistance of counsel related thereto.

## L. Counsel failed to maintain their workload at an acceptable level while representing a capital defendant

This claim is also not supported by the record. The attorneys' fee claims indicate that Mr. Talman spent over 500 out-of-court hours on the case and Ms. Martin Rice, who represented the petitioner for just over 2 months including the trial, spent over 260 out-of-court hours on the petitioner's case. Clearly the attorneys' respective workloads were at an acceptable level to allow considerable time to be spent on the petitioner's case. Talman even testified that, if anything, it was his other cases which would have been neglected.

**M. Counsel were ineffective in failing to object to prosecutorial misconduct in closing argument at the penalty phase of petitioner's trial**

Here, petitioner reasserts her claims related to the same content as the state's voir dire of jurors regarding the petitioner's age and alleged inconsistent theories which this court has addressed in other parts of this order. Arguing to the jury about weighing factors is not inappropriate. Having found that no prosecutorial misconduct occurred, counsel was not deficient and no prejudice has been shown. This issue is without merit.

**N. Counsel were ineffective in failing to object, during voir dire, to the state's suggestion that the jury should not consider the petitioner's age alone as mitigating evidence that would justify a life sentence**

Having reviewed the record, this court finds that the state's comments merely sought the assurance of the jurors that they would be open to all three sentencing options and that the petitioner's youth alone would not prevent them from considering each sentencing option. The law requires that jurors must be able to consider all three sentencing options, therefore, there was nothing objectionable about the state's comments. Assuming that counsel should have objected for the record and/or that it was objectionable, any misstatement would have been cured by the court's instructions to the jurors and no prejudice is shown. This issue is without merit.

**O. Counsel failed to file pretrial motions challenging the constitutionality of the Tennessee death penalty statute**

The petitioner claims counsel was deficient in failing to make numerous

allegations regarding the constitutionality of the death penalty. She challenges counsel's failure to challenge the statute on 19 separate grounds. The first 18 grounds raised by the petitioner have repeatedly been upheld by the state and federal courts and the issues have thus been held to be without merit. Accordingly, these issues do not support any relief for the petitioner on the basis of ineffective assistance of counsel.

As for the 19th issue raised, this issue would not have been available at the time of trial due to the fact that it relies on a 1998 amendment to Tenn. Code Ann. § 40-23-114 which became effective on January 1, 1999, and the petitioner's trial court proceedings were concluded well before this date. Accordingly, counsel was not deficient for not having filed a pretrial motion on this issue.

**P. Counsel were ineffective in failing to challenge Tennessee's death penalty statute as violating international law**

In issue VI below, the petitioner claims that the state seeking the death penalty in this case disregarded her rights under customary international law and the United States treaties thereby violating the Supremacy Clause of the United States Constitution. The petitioner also here claims that counsel was ineffective in not filing motions on this issue. Our courts have consistently held this substantive issue to be without merit. See e.g. State v. Odom, 137 S.W.3d 572, 597-600 (Tenn. 2003). Accordingly, the petitioner cannot establish any prejudice and, thus, this claim does not warrant relief.

**Q. Counsel were ineffective in failing to challenge Tennessee's death penalty statute as violating petitioner's right to life under both the state and federal constitutions**

The petitioner here claims counsel was deficient for not challenging the death penalty on the basis of the petitioner's right to life argument as raised in Issue IV below. Our courts have consistently held this substantive issue to be without merit. See e.g., State v. Mann, 959 S.W.3d 503, 536 (Tenn. 1997)(death penalty does not violate defendant's right to life). Accordingly, the petitioner cannot establish any prejudice and, thus, this claim does not warrant relief.

## III. Ineffective Assistance of Counsel on Appeal

The petitioner alleges that she was denied her right to the effective assistance of counsel at the appellate level of her prior proceedings. "To determine whether appellate counsel was constitutionally effective, we use the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984) - the same test that is applied to claims of ineffective assistance of trial counsel asserted under the Sixth Amendment to the United States Constitution." Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004). "A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court." Kenneth Henderson v. State, 2005 WL 1541855 (Tenn. Crim. App. 2005)(citing Smith v. Robbins, 528 U.S. 259, 285, 120 S.Ct. 746 (2000)). As

explained in Henderson:

> To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 1994). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Id. at 888. Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

Henderson, 2005 WL 1541855 at 44.

Having discussed the law applicable to the petitioner's allegation of ineffective assistance of counsel, the court will now address each specific allegation as stated in the post-conviction petition.

**A. Counsel failed to include on appeal many of the constitutional issues that counsel had failed to raise by pretrial motion**

In order to prevail on her claim of ineffective assistance of counsel on appeal, an omitted issue must be one in which counsel would have prevailed had it been properly raised. The numerous constitutional issues that the petitioner claims were erroneously omitted have been routinely rejected by our appellate courts. Therefore, the petitioner has

not established prejudice and she is not entitled to relief relative to this allegation.

### B. Counsel failed to raise challenges to jury instructions on appeal

Again, in order to prevail on her claim of ineffective assistance of counsel on appeal, an omitted issue must be one in which counsel would have prevailed had it been properly raised. This court has previously determined that the issues raised would not have prevailed at the trial level and that no prejudice has been established. Therefore, the petitioner is not entitled to relief relative to this allegation.

### C. Counsel failed to challenge on appeal that the death penalty violates international law

As also discussed in this court's discussion of counsel's performance at trial, in Issue VI below the petitioner claims that the state seeking the death penalty in this case disregarded her rights under customary international law and the United States treaties thereby violating the Supremacy Clause of the United States Constitution. The petitioner also now claims that counsel was ineffective in not filing motions on this issue on appeal. In order to prevail on her claim of ineffective assistance of counsel on appeal, an omitted issue must be one in which counsel would have prevailed had it been properly raised. This is not the case here. E.g. State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004). Therefore, the petitioner is not entitled to relief relative to this allegation.

**D. Counsel failed to challenge on appeal that the death penalty violates the petitioner's right to life**

In order to prevail on her claim of ineffective assistance of counsel on appeal, an omitted issue must be one in which counsel would have prevailed had it been properly raised. This issue is without merit. State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004). Therefore, the petitioner is not entitled to relief relative to this allegation.

**E. Attorney Talman operated under an actual conflict of interest during the appellate representation and in his failure to inform the petitioner of the same**

The court has concluded that Talman did not operate under an actual conflict of interest. Therefore, the petitioner is not entitled to relief for this allegation.

## IV. The Death Penalty is Unconstitutional

The petitioner makes various allegations regarding the constitutionality of the death penalty. Specifically, she contends that the death penalty cannot be fairly administered, that it violates her right to life, that it constitutes torture in violation of her rights under Article I § 16 of the Tennessee Constitution and the Eighth Amendment of the United States Constitution, that the petitioner is not eligible for the death penalty pursuant to Roper and Adkins, that the petitioner is entitled to relief based upon Apprendi and its progeny, and that the petitioner is entitled to relief because she was put to trial on her first setting and not allowed continuances like her co-defendants who were not facing the death penalty.

Initially, the court notes that these arguments are waived for failure to assert them on direct appeal. Furthermore, these challenges have been decided contrary to the petitioner's position by our appellate courts. See, e.g., Nichols v. State, 90 S.W.3d 576, 604 (Tenn. 2002)(upholding the constitutionality of Tennessee's death penalty statute); State v. Mann, 959 S.W.3d 503, 536 (Tenn. 1997)(death penalty does not violate defendant's right to life); Henderson v. State, 2005 WL 1541855 (Tenn. Crim. App. 2005)(rejecting allegation that death penalty is torture in violation of federal and state constitutions). Our capital punishment statutes have repeatedly been upheld by the state and federal courts. Accordingly, this issue does not support any relief for the petitioner.

## V. Prosecutorial Misconduct

**A. The petitioner claims that by failing to take any steps to protect petitioner's right to conflict free counsel, the State unconstitutionally participated in denying the petitioner's right to conflict free counsel.**

Initially, this court notes that this issue is waived. As to the substantive issue and as discussed above in various issues, this court has determined that counsel did not act under any conflict of interest. As such, this issue is without merit.

**B. The petitioner alleges Prosecutorial misconduct in seeking a pledge from the jurors regarding their use of the petitioner's age as a mitigating factor**

Initially, this court notes that this issue is waived. As to the substantive issue and as stated previously, having reviewed the record, this court finds that the state's comments merely sought the assurance of the jurors that they would be open to all three

sentencing options and that the petitioner's youth alone would not prevent them from considering each option. The law requires that jurors must be able to consider all three sentencing options therefore there was nothing objectionable about the state's comments. Assuming that the argument is objectionable, any misstatement would have been cured by the court's instructions to the jurors and no prejudice has been shown. This issue is without merit.

### C. The petitioner claims prosecutorial misconduct in opening and closing statements

Initially, this court notes that this issue is waived. As to the substantive issue and as discussed previously in this order, the petitioner has failed to establish that counsel's actions were inappropriate and/or that she was prejudiced. Accordingly, this issue is without merit.

## VI. The Death Penalty Violates International Law

The petitioner claims that the state seeking the death penalty in this case disregarded her rights under customary international law and the United States treaties thereby violating the Supremacy Clause of the United States Constitution. The petitioner also claimed above that counsel was ineffective in not filing motions on this issue both at trial and on appeal. Initially, the court notes that this argument is waived for failure to assert it on direct appeal. In addition, the substantive issue has been previously held to be without merit and does not entitle the petitioner to relief here. See e.g. State v. Odom, 137 S.W.3d 572, 597-600 (Tenn. 2003).

## Conclusion

After a full consideration of the evidence presented, the arguments of counsel and the applicable law, the court determines that the petitioner is not entitled to relief. Accordingly, it is hereby **ORDERED** that this petition for post-conviction relief is **DENIED**.

The Clerk shall provide copies of this order to all counsel of record.

**ENTERED** this the 10th day of December, 2008.

Mary Beth Leibowitz
Criminal Court Judge, Division III

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

FILED
2009 JAN -2 PM 3:30
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

**NOTICE OF APPEAL**

Notice is hereby given that Petitioner, Christa Gail Pike, hereby appeals to the Court of Criminal Appeals from the final judgment denying post-conviction relief entered in this cause on the 10th day of December 2008.

Respectfully submitted,

[signature]

Donald E. Dawson, BPR # 10723
Post-Conviction Defender
530 Church Street, Suite 600
Nashville, Tennessee 37243
(615) 741-9385 / FAX (615) 741-9430

**CERTIFICATE OF SERVICE**

I hereby certify that an exact copy of the foregoing Notice of Appeal has been sent by U.S. Mail, first-class postage pre-paid, to Leland Price, Assistant District Attorney General, Office of the Knox County District Attorney General, P.O. Box 1468, Knoxville, TN 37901-1468 and Office of the Attorney General and Reporter, Attn.: Criminal Justice Division, P.O. Box 20207, Nashville, Tennessee 37202-0207, on this the 31st day of December 2008.

Donald E. Dawson

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
2009 JAN 20 PM 4: 19
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

CHRISTA GAIL PIKE, )
Petitioner, )
)
v. ) No. 68280
) 58183A
STATE OF TENNESSEE, )
Respondent )

**JOINT MOTION TO RELEASE SKULL OF COLLEEN SLEMMER FROM CUSTODY AND CONTROL OF TRIAL COURT TO MAY MARTINEZ**

Comes the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, and Petitioner, by and through undersigned counsel, and herby jointly move the Court to release original trial Exhibit 8, identified as the skull of Colleen Slemmer, from the custody and control of the Knox County Criminal Court Clerk's Office to the custody and control of May Martinez, mother of Ms. Slemmer. As grounds for their joint motion, the parties would state as follows:

1. On March 25, 1996, during the original trial of Petitioner (Knox County Criminal Court Docket No. 58183), the skull of Colleen Slemmer was introduced as Exhibit 8. (TR Trial Mar 25, 1996 vol. XVII – XVIII, pp. 1700 – 1754). The skull was discussed extensively during the testimony of Drs. Sandra Elkins and Murray Marks.

2. On March 30, 1996, the jury returned a verdict of death against Petitioner for the murder of Colleen Slemmer.

3. On June 1, 1999, the Petitioner's Petition for writ of certiorari was denied by the U.S. Supreme Court, ending direct appellate review.



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 108 of 128 PageID #: 4492

4. On December 13, 2000, the Tennessee Supreme Court ordered the return of Exhibit 8 to the trial court "for a determination as to disposition of the evidence". (See Exhibit A to this motion).

5. On January 8, 2001, the State filed a motion indicating that although it's preference was for the court to maintain Exhibit 8 until the conclusion of all matters, it had no objection to its delivery to Ms. Martinez. (See Exhibit B to this motion).

6. On February 1, 2001, the Petitioner filed a response objecting to the return of the skull indicating she could not agree to the destruction of this crucial piece of evidence. (See Exhibit C to this motion).

7. On February 16, 2001, Ms. Martinez filed a motion seeking the return of her daughter's skull in order to have it cremated and "buried with Colleen's other remains". (See Exhibit D to this motion).

8. On March 20, 2001, this Court held a hearing to address the disposition of Exhibit 8. At the hearing, the State maintained its position that it would not object to the release of the evidence. However, Petitioner maintained its objection its release. The court subsequently denied the release of Exhibit 8 in a written order on March 26, 2001. (See Exhibit E to this motion.)

7. On May 13, 2005, counsel for Petitioner indicated by letter to the Court that Petitioner was withdrawing her objection to the return of Exhibit 8. (See Exhibit F to this motion.) At subsequent hearings, the State objected to the return of the evidence.

8. On December 10, 2008, this Court denied Petitioner's Petition for Post-Conviction Relief. The Court's order has been appealed.

9. Upon being informed of the trial court's decision to deny the post-conviction petition, Ms. Martinez again requested that her daughter's skull be returned to her for cremation and burial.

10. By signature below, Petitioner and the State respectfully ask the Court reconsider its prior ruling and return Exhibit 8 to Ms. Martinez. By personally joining in this motion, Petitioner understands she loses any opportunity for her, any of her attorneys or staff, or any potential witness called to testify on her behalf to examine the skull. Petitioner and the State personally waive any future objection to witness testimony regarding Exhibit 8 on grounds that Exhibit 8 is no longer available or has been destroyed. Petitioner and the State understand that such testimony may include, but is not limited to, testimony by medical experts as to the condition of Exhibit 8 during the autopsy of Ms. Slemmer, injuries suffered by Ms. Slemmer at the time of her death as revealed from an examination of Exhibit 8, and the relation of Exhibit 10 (the skull piece obtained from the alleged jacket of Petitioner) to Exhibit 8. Petitioner and the State waive any future objection to the use of a model, photographs, or other substitute for Exhibit 8. Petitioner and the State reserve the right to use a model, photographs, or other substitute for Exhibit 8 in any subsequent litigation in this case including any jury trial. Petitioner and the State reserve the right to object to testimony concerning Exhibit 8 on relevancy grounds. Petitioner and the State also reserve the right to object to testimony concerning Exhibit 8 on chain of custody grounds provided the objection is limited to the period of custody prior to it introduction at Petitioner's 1996 trial.

11. This motion constitutes the entire agreement between the Petitioner and the State concerning the return of Exhibit 8. There have been no promises made by either party to cause the other party to enter into this agreement. No coercion has been used by either party to cause the other party to enter into this agreement. Both the State and Petitioner have entered into this agreement knowingly and voluntarily. Both the State and Petitioner are satisfied with this agreement.

12. Petitioner and the State agree the Court has authority to order the release of Exhibit 8 to Ms. Martinez pursuant to Tenn. Code Ann. §§ 18-1-201, -206. See also, Ray v. State, 984 S.W.2d 236, 238 (Tenn. Crim. App. 1997)(Trial court has authority to determine the custody and control of evidence held in the clerk's office.)

**WHEREFORE, PREMISES CONSIDERED**, Petitioner and the State request the Court order the release original trial Exhibit 8, identified as the skull of Colleen Slemmer, from the custody and control of the Knox County Criminal Court Clerk's Office to the custody and control of May Martinez, mother of Colleen Slemmer.

LELAND L. PRICE, BPR# 018853
Assistant District Attorney General
Suite 168, City-County Building
P.O. Box 1468
Knoxville, TN 37901
Telephone: (865) 215-2515

DONALD E. DAWSON
Post-Conviction Defender
530 Church Street, Ste. 600
Nashville, TN 37243
Telephone: (615) 741-9385

JAMES W. CROWSON, BPR#26766
Assistant Post-Conviction Defender
530 Church Street, Ste. 600
Nashville, TN 37243
Telephone: (615) 741-9331

# AFFIDAVIT OF CHRISTA GAIL PIKE

STATE OF TENNESSEE )
)
COUNTY OF DAVIDSON )

Comes the affiant, Christa Gail Pike, and declares the following:

I, Christa Gail Pike, have discussed this joint motion to release the skull of Colleen Slemmer with my attorneys, Donald Dawson and James Crowson and I understand it. I personally join in the motion to return Exhibit 8, the skull of Colleen Slemmer, to May Martinez. I understand Exhibit 8 will no longer be available in this or any other case. This motion sets out the entire agreement between the State, my attorneys, and myself.

Further affiant sayeth naught.

[signature]
Christa Gail Pike

SWORN TO and subscribed before me
This 19th day of January, 2009.

[signature]
Notary Public

My commission expires:

DONALD E. DAWSON STATE OF TENNESSEE NOTARY PUBLIC DAVIDSON COUNTY, TENN. JULY 3, 2012

My Commission Expires JULY 3, 2012

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: *Leland L. Price*

LELAND L. PRICE, BPR# 018853
Assistant District Attorney General
Suite 168, City-County Building
P.O. Box 1468
Knoxville, TN 37901
Telephone: (865) 215-2515

CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing pleading was forwarded, by electronic mail transmission, hand delivery or by placing the same in the U.S. Mail with sufficient postage thereon to the following attorneys for the Petitioner:

Donald E. Dawson
James W. Crowson
Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

this the 20 day of January, 2009.

BY: *Leland L. Price*

LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
2009 JAN 22 AM 10: 23
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN
PT

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, Petitioner, | ) | |
| | ) | |
| v. | ) | No. 68280 |
| | ) | (Original Trial 58183A) |
| STATE OF TENNESSEE, | ) | |
| Respondent | ) | |

**ORDER TO RELEASE SKULL OF COLLEEN SLEMMER FROM CUSTODY AND CONTROL OF TRIAL COURT TO MAY MARTINEZ**

This case came to be heard on January 22, 2009 upon joint motion by the State and Christa Pike seeking the release the skull of Colleen Slemmer from the custody and control of the Knox County Criminal Court Clerk's Office to the custody and control of May Martinez, mother of Ms. Slemmer. After reviewing the joint motion, the Court finds it is well taken.

The skull was introduced in the original trial of this matter, Knox Co. Docket No. 58183A, as Exhibits 8, 9, and 10. The direct appeal in Docket No. 58183A was concluded on June 1, 1999. On December 13, 2000, the Tennessee Supreme Court ordered the return of Exhibit 8 to this Court "for a determination as to disposition of the evidence". While the order from the Tennessee Supreme Court references only Exhibit 8, it is clear the failure to include Exhibits 9 and 10 in the order was a clerical omission. The Tennessee Supreme Court clearly intended to convey the entire skull for disposition by this Court. Moreover, the entire skull was in actuality conveyed to the Knox County Clerk's Office at the time – including Exhibits 9 and 10.

Because post-conviction litigation was ongoing before the Court at the time the skull was returned to the Knox County Clerk's Office and an agreement concerning the disposition of the skull could not be reached, the Court regretfully determined it was not able to return the skull to

Ms Martinez, its owner, until the litigation was concluded. On December 10, 2008, this Court denied Ms. Pike's petition for post-conviction relief.

Although the Court's ruling has been appealed, both parties have now waived any objection to the skull being returned to Ms. Martinez. Both parties indicate they understand the skull will no longer be available for any purpose. Furthermore, both Ms. Pike and the State have agreed to substitute photographs or other demonstrative evidence in place of the skull should it become necessary in future litigation. The Court finds this to be an appropriate resolution in light of the current posture of the case and the need of Ms. Martinez to bury the remains of her daughter.

Additionally, the Court further finds since the skull was returned to it for disposition by the Tennessee Supreme Court, this Court has the inherent authority to return the skull to Ms. Martinez. Ray v. State, 984 S.W.2d 236, 238 (Tenn. Crim. App. 1997).

After consideration of the joint motion filed by both parties and the record in this case as outlined above, it is hereby **ORDERED** that the skull of Colleen Slemmer, introduced as Exhibits 8, 9 and 10 in Docket No. 58183A, be returned to May Martinez, its rightful owner, for disposition as she deems fit.

The Clerk shall provide copies of this order to all counsel of record.

ENTER this the 22nd day of Jan, 2009.

Mary Beth Leibowitz
Criminal Court Judge, Division III

By my signature below, I acknowledge personal receipt of Colleen Slemmer's skull, introduced in the original trial as Exhibits 8, 9, 10. The skull has been returned to me at my request. I accept full responsibility for transportation and disposition of my daughter's skull. I understand the skull will not be available as evidence in any further litigation. I understand the unavailability of this evidence may have consequences in future litigation that are contrary to my interests.

May Martinez

Jan 22nd 2009
Date

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**

**DIVISION THREE**

FILED 2009 FEB 23 PM 2:11

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 68280** |
| | ) | |
| **VS.** | ) | |
| | ) | **DEATH PENALTY** |
| | ) | **POST-CONVICTION** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITIONER/APPELLANT'S DESIGNATION OF RECORD ON APPEAL

Pursuant to Rule 24(a), Tenn. R. App. P., the Petitioner/Appellant, Christa Gail Pike, designates the following portions of the record as those necessary for the issues to be raised in this appeal. This appeal is from the denial of post-conviction relief. The documents required to review this decision are:

1. Petition for Relief from Conviction or Sentence filed June 3, 1999/

2. Order Granting Petitioner's *Pro Se* Motion for the Appointment of Counsel, entered June 4, 1999.

3. Consolidated Petition for Post-Conviction Relief filed July 26, 2006.

4. Petitioner's Motion to Recuse this Honorable Court from Serving as Judge and Fact-Finder in this Case, with attachments, filed on or about January 27, 2006.

5. State's Response to Motion to Recuse this Honorable Court from Serving as Judge and Fact-Finder in this Case, with attachments, filed on or about February 27, 2006.

6. Order Granting Permission to Appeal Pursuant to T.R.A.P. 9 From the Court's Denial of Petitioner's Motion to Disqualify the Court form Further Consideration of Post-Conviction Proceeding, Entered February 28, 2006.

7. All exhibits entered into the record during the Motion Hearing on February 27, 2006.

8. All exhibits entered into the record during the evidentiary hearing in this matter which was held on the following dates: January 29-31, 2007, July 30, 3007, and April 7-11, 2008.

9. Petitioner's Post-Conviction Closing Argument, filed on or about September 22, 2008.

10. State's Post-Hearing Memorandum and Motion to Deny Post-Conviction Relief.

11. Petitioner's Brief in Reply to the State's Post-Hearing Memorandum and Motion to Deny Post-Conviction Relief, filed on or about December 8, 2008.

12. Findings of Fact and Conclusions of Law, filed December 10, 2008.

13. Notice of Appeal

14. Designation of the Record

Transcripts Required for Appeal

1. Transcripts from evidentiary hearing which was held on the following dates: January 29-31, 2007, July 30, 3007, and April 7-11, 2008, including any objections, motions or arguments made during the proceedings.

2. Transcripts of hearing on Petitioner's Motion to Recuse this Honorable Court from Serving as Judge and Fact-Finder in this Case, held on February 27, 2006.

The designated portions of the record are in addition to any and all other portions of the record required to be included in the record transmitted to the Court of Criminal Appeals pursuant to Rule 24(a) of the Tennessee Rules of Appellate Procedure.

Respectfully submitted,

Donald E. Dawson # 10723
Post-Conviction Defender
Office of the Post-Conviction Defender
530 Church St, Suite 600
Nashville, TN 37243
(615) 741-9331, *voice*
(615) 741-9430, *fax*

Counsel for Ms. Pike

**CERTIFICATE OF SERVICE**

This is to certify that a true and exact copy of the foregoing designation of the record was mailed, first class postage prepaid, to Leland Price, Assistant District Attorney General, Office of the District Attorney General, 6th Judicial District, P.O. 1468, Knoxville, Tennessee 37901-1468, on this 19th day of February, 2009.

Donald E. Dawson

**IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE**
**DIVISION III**

FILED
BY JOY R. McCROSKEY
2009 MAR -2 AM 11:02
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, Petitioner, | ) | |
| | ) | |
| v. | ) | No. 68280 |
| | ) | |
| STATE OF TENNESSEE, | ) | |
| Respondent | ) | |

**RESPONDENT/APPELLEE'S DESIGNATION OF RECORD ON APPEAL**

Comes now the State of Tennessee, by and through the District Attorney General for the Sixth Judicial District, pursuant to Tenn. R. App. P. 24, and designates the following portions of record as those necessary for the issues to be raised on appeal in addition to those identified by the Appellant. This designation applies to all appearances before the Court by either party including all proceedings, hearings, argument of counsel, bench conferences, and testimony occurring prior to the post-conviction hearing, during the post-conviction hearing, and following the post-conviction hearing. This designation is in addition to any and all other portions of the record required to be included in the record transmitted to the Court of Criminal Appeals pursuant to Tenn. R. App. P. 24. The documents required to review the Court's decision are:

1. All papers filed in the Court including all of the Court's orders and all of the State's motions, notices, responses, memoranda, and other pleadings;

2. State's Post-Hearing Memorandum and Motion To Deny Post-Conviction Relief filed November 14, 2008;

3. All exhibits filed in the trial court by either party; including those introduced by either party prior to the actual post-conviction hearing;



Case 1:12-cv-00035-HSM-SKL Document 9-5 Filed 08/01/12 Page 120 of 128 PageID #: 4504

4. The transcript of proceedings and evidence in its entirety including pre-trial hearings, arguments of counsel, bench conferences and testimony.

RESPECTFULLY SUBMITTED,

RANDALL E. NICHOLS
DISTRICT ATTORNEY GENERAL

BY: *Leland L. Price*
LELAND L. PRICE, BPR# 018853
Assistant District Attorney General
Suite 168, City-County Building
P.O. Box 1468
Knoxville, TN 37901
Telephone: (865) 215-2515

CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing pleading was forwarded, by electronic mail transmission, hand delivery or by placing the same in the U.S. Mail with sufficient postage thereon to the following attorneys for the Petitioner:

Donald E. Dawson
James W. Crowson
Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243

this the 02 day of March, 2009.

BY: *Leland L. Price*
LELAND L. PRICE
ASSISTANT DISTRICT ATTORNEY

# CERTIFICATE OF APPELLATE RECORD

I, Joy R. McCroskey, Clerk of the Criminal Court of Knox County, Tennessee, do hereby certify that the following items herewith transmitted to the Appellate Court are originals or true and correct copies of all or the designated papers on file in my office in the captioned case.

1. Technical record attached to this certificate and consisting of 731 pages consisting of 5 volumes.

2. 9 Volumes of Transcript (January 29-31, 2007) filed in my office on February 27, 2009, and authenticated by the Trial Judge or automatically authenticated under T.R.A.P. Rule 24(f).

3. Exhibits filed in my office on January 31, 2007, and authenticated by the Trial Judge or as provided in T.R.A.P. Rule 24(f) and described as follows:

Ex. 1A, consisting of Dr. McCoy's Report. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 1B, consisting of Dr. McCoy's Report. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 1C, consisting of Dr. McCoy's Report. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 1D, consisting of Dr. McCoy's Report. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 1E, consisting of Dr. McCoy's Report. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 2, consisting of Photos of Christa Pike.

Ex. 3, consisting of Photo of the Brain.

Ex. 4, consisting of Dr. Pincus' Report.

Ex. 5, consisting of Warrant, Indictment and Judgment From South Carolina.

Ex. 6, consisting of UNC Hospital Records.

Ex. 7, consisting of Birth Records of Christa Pike.

Ex. 8, consisting of One 8X10 Photo of Ms. Pike.

Ex. 9, consisting of Counselor Notes.

4. 4 Volumes of Transcript (January 30, 2007) filed in my office on February 27, 2009, and authenticated by the Trial Judge or automatically authenticated under T.R.A.P. Rule 24(f).

5. Exhibits filed in my office on January 30, 2007, and authenticated by the Trial Judge or as provided in T.R.A.P. Rule 24(f) and described as follows:

Ex. 3D, consisting of Photograph of Brain.

Ex. 10, consisting of Vitae of James Martin.

Ex. 11, consisting of James Martin's File.

Ex. 12, consisting of Letters from Christa Pike.

Ex. 13, consisting of Juvenile Court Records.

Ex. 14, consisting of Mini Meat Cleaver.

Ex. 15, consisting of Letters from DeAndrea Gates.

Ex. 16, consisting of Letter from Tadarryl Shipp.

Ex. 17A, consisting of Letter from Amanda Robertson.

Ex. 17B, consisting of Two 8 ½ X 11 Photographs.

6. 11 Volumes of Transcript (April 7 - 11, 2008) filed in my office on February 27, 2009, and authenticated by the Trial Judge or automatically authenticated under T.R.A.P. Rule 24(f).

Ex. 1, consisting of Report from Over-billing.

Ex. 2A, consisting of Petition for Discipline.

Ex. 2B, consisting of Motion to Dismiss.

Ex. 3, consisting of Original Trial Transcript (2 Volumes)

Ex. 4, consisting of Billing Record of Julie Rice.

Ex. 5, consisting of Suggested Mitigation Witnesses.

Ex. 6, consisting of Suggested Mitigation Themes.

Ex. 7, consisting of Notes of Julie Rice.

Ex. 8, consisting of Letter to Mr. Talman.

Ex. 9, consisting of Motion filed by Ms. Rice.

Ex. 10, consisting of email from Ms. Rice,

Ex. 11, consisting of Affidavit of Julie Rice.

Ex. 12, consisting of Witness Statements.

Ex. 13, consisting of Release.

Ex. 14A, consisting of Training Manuals about Death Penalty. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 14B, consisting of Training Manuals about Death Penalty. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 14C, consisting of Training Manuals about Death Penalty. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 15, consisting of Statement of Brandi Rogers.

Ex. 16, consisting of Statement of Shandra Harris.

Ex. 17, consisting of Dr. Eric Engum's Report.

Ex. 18, consisting of Mr. Talman's Billing Record. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 19, consisting of Ex Parte Motions Filed Under Seal Regarding Dr. Bernet.

Ex. 20, consisting of Letter to Dr. Bernet.

Ex. 21, consisting of One Page of Notes.

Ex. 22, consisting of Ex Parte Motion about Funding.

Ex. 23A, consisting of Letter to Talman from Dr. McCoy.

Ex. 23B, consisting of Letter to Dr. McCoy from Talman.

Ex. 24, consisting of Letter to Mr. Talman.

Ex. 25, consisting of Letter to Board of Professions Responsibility.

Ex. 26, consisting of Letter from Mr. Talman to Sandy Garrett.

Ex. 27, consisting of CD/Photos of Fotos Slaughter House. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 28, consisting of CD/Video of Slaughtering Animals. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 29, consisting of Article Written by Dr. McCoy.

Ex. 30, consisting of Final Statement of Dr. McCoy.

Ex. 31, consisting of Calendar of March 1996.

Ex. 32, consisting of Dr. McCoy's Charts.

Ex. 33, consisting of Psychological Treatment.

Ex. 34, consisting of Waiver of Rights.

Ex. 35, consisting of Consent to Search Waiver.

Ex. 36, consisting of Transcript of Miss Pike's Statement. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 37, consisting of CD/Video of Mr. York and Miss Pike At Crime Scene. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 38, consisting of CD/Tape of Miss Pike's Statement Played in Court. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 39, consisting of Portion of Transcript.

7. 3 Volumes of Transcript (April 11, 009) filed in my office on February 27, 2009, and authenticated by the Trial Judge or automatically authenticated under T.R.A.P. Rule 24(f).

Ex. 40, consisting of Medical Records of Zola Fotos. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 41, consisting of Medical Records of Chris Fotos. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 42, consisting of CD of Dr. Kenner's Power Point Presentation. (Due to the large size/nature or exhibit - sent in separate cover)

Ex. 43, consisting of Time Line of Life.

Ex. 44, consisting of Polaroid Photograph.

Ex. 45, consisting of CD Horror Movies Viewed. (Due to the large size/nature or exhibit - sent in separate cover)

This 3 day of April, 2009.

Joy R McCroskey
Clerk, Criminal Court
of Knox County, Tennessee

CHRISTA GAIL PIKE, PETITIONER NO. 68280

VS

STATE OF TENNESSEE, RESPONDENT PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

JOY R. MCCROSKEY, CLERK

TRANSCRIPT COSTS

| | |
|---|---|
| 731 pages at $1.50 per page . . . . . . . . . . . . . . . | $1096.50 |
| Certificate and Seal . . . . . . . . . . . . . . . . . . . | $ 4.00 |
| TOTAL . . . . . . . . . . . . . . . . . . . . . . . . | $1100.50 |