# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 5**

**DOCUMENT 1**

---

E2009-00016-CCA-R3-PD

VI

004484

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGoual

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Volume 1

January 29-31, 2007 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Ms. S. Jo Helm
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Ms. Catherine Brockenborough
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS


| Volume 1 | Page |
|---|---|
| January 30th, 2007 Petition for Post-conviction Relief Proceedings: | |
| Preliminary Discussions | 1 |
| Brief Informal Opening Statement by Mr. Dawson | 22 |
| PETITIONER'S PROOF: | |
| CARISSA HANSEN: | |
| Direct Examination by Ms. Brockenborough | 27 |
| Cross-examination by Mr. Price | 83 |

## TABLE OF CONTENTS


Volume 2 — Page

PETITIONER'S PROOF:

CARISSA HANSEN: (continued)

Redirect Examination by Ms. Brockenborough 101

GERARD HANSEN:

Direct Examination by Mr. Brockenborough 112

Cross-examination by Mr. Price 128

Redirect Examination by Ms. Brockenborough 139

CARRIE ROSS:

Direct Examination by Mr. Dawson 144

Cross-examination by Mr. Price 194

# TABLE OF CONTENTS

Volume 3 | Page

PETITIONER'S PROOF:


CARRIE ROSS:

Cross-examination by Mr. Price (continued) 201

Redirect Examination by Mr. Dawson 202

JONATHAN HENRY PINCUS:

Direct Examination by Ms. Brockenborough 207

Cross-examination by Mr. Price 280

# TABLE OF CONTENTS


| Volume 4 | Page |
|---|---|
| PETITIONER'S PROOF: (continued) | |
| JONATHAN HENRY PINCUS: | |
| Cross-examination by Mr. Price (cont.) | 301 |
| Redirect by Ms. Brockenborough | 328 |
| Examination by the Court | 346 |
| Redirect by Ms. Brockenborough (cont.) | 348 |
| Reports to be Filed Discussed | 354 |
| ALICIA WILLIS: | |
| Direct Examination by Ms. Brockenborough | 362 |
| Cross-examination by Mr. Price | 397 |

TABLE OF CONTENTS

| Volume 5 | Page |
|---|---|
| PETITIONER'S PROOF: (continued) | |
| ALICIA WILLIS: | |
| Cross-examination by Mr. Price (cont.) | 401 |
| Redirect by Ms. Brockenborough | 413 |
| EMIL GLENN PIKE: | |
| Direct Examination by Mr. Dawson | 424 |
| Cross-examination by Mr. Price | 463 |
| Redirect by Mr. Dawson | 470 |
| Examination by the Court | 475 |
| Redirect by Mr. Dawson (continued) | 476 |
| Scheduling Discussed by the Parties | 479 |
| The Date of a Previous Hearing Discussed where Attorney Ken Irvine Testified | 482 |
| FAYE JOHNSON GUY: | |
| Direct Examination by Mr. Dawson | 487 |

TABLE OF CONTENTS

Volume 6 Page

PETITIONER'S PROOF: (continued)

FAYE JOHNSON GUY:

Direct Examination by Mr. Dawson (cont.) 501

Cross-examination by Mr. Price 509

ORLANDO POWELL:

Direct Examination by Ms. Brockenborough 511

Cross-examination by Mr. Price 522

Redirect by Ms. Brockenborough 530

CAROL GOEHRING:

Direct Examination by Mr. Dawson 533

(No Cross-examination)

JAMIE CHRISTINE ROBINSON:

Direct Examination by Ms. Brockenborough 548

Cross-examination by Mr. Price 563

KERRY CLEMENT SHERRILL:

Direct Examination by Mr. Dawson 567

Cross-examination by Mr. Price 582

Redirect by Mr. Dawson 586

PEGGY HAMLETT:

Direct Examination by Mr. Dawson 589

TABLE OF CONTENTS

Volume 7 Page

PETITIONER'S PROOF: (continued)

PEGGY HAMLETT:

Direct Examination by Mr. Dawson (cont.) 601

Cross-examination by Mr. Price 604

Redirect by Mr. Dawson 607

DEBBY BURCHFIELD

Direct Examination by Mr. Dawson 609

Cross-examination by Mr. Price 633

Redirect by Mr. Dawson 640

KRISTINA HARGIS:

Direct Examination by Mr. Dawson 645

Cross-examination by Mr. Price 656

Redirect by Mr. Dawson 659

FREDERIC MARSHALL MUSE:

Direct Examination by Mr. Dawson 662

Cross-examination by Mr. Price 672

Redirect by Mr. Dawson 674

ANDREW SCOTT DRACE:

Direct Examination by Ms. Brockenborough 676

Cross-examination by Mr. Price

694

TABLE OF CONTENTS

| Volume 8 | Page |
|---|---|
| PETITIONER'S PROOF: (continued) | |
| ANDREW SCOTT DRACE: | |
| Examination by the Court | 701 |
| Petitioner's Transportation Discussed | 704 |
| Scheduling Discussed | 715 |
| ONAS PERRY: | |
| Direct Examination by Mr. Dawson | 719 |
| Cross-examination by Mr Price | 737 |
| Redirect by Mr. Dawson | 743 |
| Examination by the Court | 746 |
| Redirect by Mr. Dawson | 747 |
| Examination by the Court | 748 |
| WILLIAM JOSEPH MODE: | |
| Direct Examination by Ms. Brockenborough | 751 |
| Cross-examination by Mr. Price | 769 |
| Examination by the Court | 771 |
| JACQUELINE OLEBE: | |
| Direct Examination by Ms. Brockenborough | 774 |
| Cross-examination by Mr. Price | 784 |
| KIM RHODES: | |
| Direct Examination by Ms. Brockenborough | 790 |
| Cross-examination by Mr. Price | 809 |
| Redirect by Ms. Brockenborough | 812 |

TABLE OF CONTENTS


| Volume 8 (continued) | Page |
| --- | --- |
| Scheduling Discussed | 818 |
| Court Reporter's Certificate | 821 |

# LIST OF EXHIBITS

(In January 29th - 31st, 2007 PCR Proceedings)


| NUMBER | ITEM | VOL. | PAGE |
|---|---|---|---|
| 1 | Dr. McCoy's Report | | |
| | (For Identification Only) | 1 | 27 |
| | (As Exhibit) (27 pages) | 2 | 111 |
| 2 | Photos of Christa Pike | | |
| | (As Exhibit) (4 pages) | 1 | 31 |
| 3 | Photo of the Brain (1 page) | | |
| | [TO BE LATE FILED by Ms. CB] | 3 | 214 |
| 4 | Dr. Pincus' Report | | |
| | (As Exhibit) (8 pages) | 3 | 225 |
| 5 | Warrant, Indictment and Judgment from South Carolina | | |
| | (As Exhibit) (about 5 pgs.) | 3 | 260 |
| 6 | UNC Hospital Records | | |
| | (As Exhibit) (about 30 pgs.) | 3 | 268 |
| 7 | Birth Records of Christa Pike | | |
| | (As Exhibit) (about 15 pgs.) | 4 | 357 |
| 8 | One 8" x 10" Photo of Ms. Pike | | |
| | (As Exhibit) (1 page) | 6 | 579 |
| 9 | Counselor Notes | | |
| | (As Exhibit) (multiple pgs.) | 7 | 650 |

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

This case came on to be heard and was heard on the 29, 30th and 31st days of January, 2007 before the Honorable Mary Beth Leibowitz, Judge, holding the Criminal Court for Knox County, Division III, when the following proceedings were had, to-wit:

THE COURT: Is Ms. Brockenborough here? There she is. Good morning, Miss Pike.

THE PETITIONER: Good morning.

THE COURT: Are you ready to begin this morning?

THE PETITIONER: I am.

MS. BROCKENBOROUGH: Your Honor, we had a couple of preliminary things.

THE COURT: Okay.

MS. BROCKENBOROUGH: Unopened bottle of

Excedrin, as last time that we were here, for Miss Pike's headaches.

THE COURT: You mean an unopened bottle?

MS. BROCKENBOROUGH: Yes, unopened box, unopened bottle.

THE COURT: Okay. If--

MS. BROCKENBOROUGH: I remember last time--

THE COURT: --that becomes a necessity, that's fine.

MS. BROCKENBOROUGH: --madame court reporter was the custodian.

THE COURT: Uh-huh (Affirmatively). I'd rather you were the custodian, but it's okay.

MS. BROCKENBOROUGH: That's fine with me, your Honor, whatever--

THE COURT: Go ahead.

MS. BROCKENBOROUGH: --whatever you want to do. Secondly, we--oh, never mind. That's already taken care of.

THE COURT: I've instructed that Miss Pike remain with only the shock bracelet around her ankle and otherwise she is--unless there's a problem, obviously, not to be restrained so that she can write and assist. Are you ready, General?

MR. PRICE: (Nodding affirmatively)

THE COURT: We are here to begin the hearing of witnesses of Miss Pike's post-conviction petition, which was filed a considerable long time ago; but, obviously, we've been through a whole lot since then. And you have witnesses that you're ready to call. You're going to call your witnesses first; am I correct?

MR. DAWSON: That's correct, your Honor.

THE COURT: And there are some technical difficulties that are going to result in us not being able to call some of the witnesses; is that correct, this round, in other words, this week?

MS. BROCKENBOROUGH: That is correct, your Honor.

THE COURT: Okay.

MS. BROCKENBOROUGH: Your Honor, I don't know if you want the details, but there were three witnesses that we'll need to call the second time.

THE COURT: Does that include the gentleman from North Carolina?

MS. BROCKENBOROUGH: Yes, they're all-- actually, all three are from North Carolina. The first is the one that you are aware of, Matthew Martin, who is a judge and had a trial set. The

second is Glenda Blackwood, who has a broken foot.

THE COURT: Okay. Well, we're going to be down a little ways anyway trying to--my--but those won't be the only three that will be called at a later date--

MS. BROCKENBOROUGH: No, ma'am.

MR. DAWSON: No.

THE COURT: --am I correct?

MS. BROCKENBOROUGH: No, we anticipate another dozen or 15.

THE COURT: So we probably need two or three days somewhere in the future?

MR. DAWSON: Yes.

MS. BROCKENBOROUGH: I would say three.

THE COURT: Think about it and when we get toward the end we'll have to set another chunk of time. So that's what I--I want to anticipate it so that we can actually finish, if at all possible, the hearing of the testimony at that point.

Plus, General, you have some witnesses and I don't know whether you wish to call those at a later date or not.

MR. PRICE: Yes, I do.

THE COURT: If I could suggest this, that perhaps if at some break that we take during the

day, we get our calendars and just sit down with me and let me go through my trial calendar, which is now back in my office, and see if we can pick some dates that we can block out as quickly as possible so that you have as much advance notice about what the witnesses need to do as possible and what you do.

MS. BROCKENBOROUGH: Right.

THE COURT: Okay. All--are all the witnesses who are to testify today here?

MR. DAWSON: No.

MS. BROCKENBOROUGH: Your Honor, I believe everyone is outside--

MR. DAWSON: Some of them are still at the hotel.

MS. BROCKENBOROUGH: --outside of the courtroom.

MR. DAWSON: Some of them are still at the hotel.

THE COURT: Do you want them all sworn together?

MS. BROCKENBOROUGH: Oh, and some of them--

MR. DAWSON: Your Honor, I think some of them that we didn't anticipate getting to until

this afternoon are still at the hotel. So they're not all present.

THE COURT: Well, that's fine; we can swear witnesses separately, but those who are here, let's go ahead and get them sworn.

MR. DAWSON: That's fine, your Honor.

THE COURT: So if you'll bring those in, please.

MR. DAWSON: Your Honor, one thing we wanted to do too before we get started with the witnesses--we have at this point Dr. Diana McCoy, Dr. Jonathan Pincus, and, of course, our investigator, Tammy Kennedy, are in the courtroom. We do not anticipate that we are going to call Ms. Kennedy unless we need to call her for rebuttal since she was our investigator. We would ask that she be allowed to remain in the courtroom because we--she's needed to assist us in both arranging witnesses and also to make sure that we have the documents we need.

As to Dr. Pincus and Dr. McCoy, since they're both experts, we've asked Dr. McCoy to be here to listen to the testimony of the lay witnesses because one of the things that we're going to ask her to do is to--is to utilize that

information when she testifies at a later point. What we've arranged, your Honor, and I should put on the record is that we intended to basically at this point call Dr. McCoy twice.

We're going to call her at the end of the proceedings this week to essentially present the testimony that she could have presented at the trial the last time based upon her social history that she prepared and the testimony that we'll later submit that she was intending to present at the last trial. Because the remainder of her testimony gets into, in a large part, some of the issues involving conflict, we would like to then call her again--

THE COURT: Later.

MR. DAWSON: --a second time. And we have talked with Mr. Price concerning this, and he has graciously agreed that he will limit his cross-examination this week to the materials related to the direct and related to her social history that was prepared, and--in other words, the testimony that generally would be related to what we're presenting, not necessarily--I mean he might have some cross-examination related to it that's not necessarily involved in our direct, but that he

would then reserve his normal cross that would be, of course, farther ranging until after he testifies the second time.

THE COURT: In other words, not cross her this time, but wait until then?

MR. PRICE: Well, I would cross-examine her but limit it to the subject matter of-

THE COURT: Sure.

MR. PRICE: --what she's talked about--

THE COURT: Okay.

MR. PRICE: --on her direct. But, your Honor-

MR. DAWSON: Your Honor-

THE COURT: And do you have any objection to Ms. McCoy--Dr. McCoy and Dr. Pincus remaining in the courtroom?

MR. PRICE: No, your Honor, I don't. You know, I would also ask--we need to resolve as well, Mr. Talman and Julie Rice, they're not here this morning that I'm aware of. At some point they may be in and out.

THE COURT: Ms. Rice has called and she will be present. She's just coming a little late, and Mr. Talman had indicated to me that--last week he stopped in and said he'd be on call if we needed

him here.

MR. PRICE: So I would ask the same courtesy be extended to them as well, that they be allowed to sit in and observe testimony and not be sequestered under the rule as well. I don't have an objection to their experts remaining in the courtroom this morning. Also, Investigator York--

THE COURT: I was going to raise Investigator York all by myself.

MR. PRICE: I talked to Mr. Dawson about that. They've asked that he be sequestered, and your Honor, if your Honor rules that way, that will be okay as well. He was designated as the State's representative at the original trial. But we're not asking that--

THE COURT: Well, he testified at the original trial rather extensively so-

MR. PRICE: But I--

THE COURT: If you all have no objection to--of course, Mr. York is the bailiff in this court.

MR. DAWSON: Yeah.

THE COURT: And if you have no objection to him being present for the purpose of doing other things--you're asking that he be sequestered for

this hearing; am I correct?

MR. DAWSON: We are, your Honor.

THE COURT: That means you can't stay, Mr. York; you understand.

COURT OFFICER YORK: I'm on my way out.

THE COURT: Wait a minute; let--I think--are you calling him today?

MR. DAWSON: We're not this time around, your Honor, no.

THE COURT: Not this week; is that correct?

MR. DAWSON: No, it will be the next setting of the hearing that we would call him. And Ms. Brockenborough mentioned to us, you know, it's not that important this time whether he's here or not. We think the next part he should be sequestered. This time we're just reviewing family history stuff.

THE COURT: It would--it would be helpful to me if he could remain for a variety of reasons, one of which is I'm now very short handed at this point; although, I have these officers who are dealing with Miss Pike.

MR. DAWSON: You know, we have no objection for the purpose of the hearing that's

going to take place this week.

THE COURT: Okay. So he can remain if he chooses.

MR. DAWSON: When we get back to the other issues, we do.

THE COURT: But, Mr. York, you may not discuss with anyone anybody's testimony nor may you, this week obviously, and at the time the rules of a sequestered witness will apply to you. If there comes a point where you feel he needs to be sequestered during this week, you tell me.

MR. DAWSON: I will, your Honor.

THE COURT: And then, of course, we'll do that and we'll set up extra staff for that week.

MR. DAWSON: Your Honor, I think we also should--I think--we had a phone conference and, of course, the Court knows we filed a motion to this effect. But we should put on the record that the reason that we're breaking it is that Ms. Rice has filed a complaint against with me the Board of Professional Responsibility--

THE COURT: I didn't know if you wanted to put that on the record--

MR. DAWSON: I do, your Honor.

THE COURT: --or not. I was going to let

you deal with that.

MR. DAWSON: I do, your Honor; I appreciate that. Your Honor, that has now gone to the petition for discipline stage. And until that's resolved, I think that I have a conflict with regard to the particular conflicts and the particular ineffective assistance of client-- assistance of counsel claims that involve Ms. Rice. And, therefore, also, at least according to the Board of Professional Responsibility, it also falls into those involving Mr. Talman, in that we had asked that an attorney who is with the Capital Case Research Center represent me before the Board. And the Board has stated that because he had consulted with Mr. Talman in 1995 about this case, it would be well before Ms. Rice was involved in the case, in which we told the Board, and the Research Center, in fact, was defunct by the time Ms. Rice was involved in this case. They determined that in their opinion, because Ms. Rice and Mr. Talman are now parties to this case, an issue that we've tried to engage with the Board and suggest they're not parties--

THE COURT: You tried to engage that issue in other cases as well.

MR. DAWSON: We have, your Honor--

THE COURT: Uh-huh. (affirmatively)

MR. DAWSON: --and the Board is remaining stubborn. The--however, until that's resolved, I think I have a conflict. And rather than have that conflict, we, of course, withdraw from the case since I've now been on it for eight years-

THE COURT: You've explained all this to Miss Pike; is that right?

MR. DAWSON: I have; she's aware of it.

THE COURT: And Miss Pike understands this issue and it's my understanding, Miss Pike, that you've instructed Ms. Brockenborough and Mr. Dawson that you'd like to go forward and at least begin this process and go forward--

THE PETITIONER: I have.

THE COURT: --with the proof? And--

THE PETITIONER: I understand.

THE COURT: --you don't have any question about that at this point?

THE PETITIONER: No, I don't.

MR. DAWSON: No. We just did not want Miss Pike to have to waive the entire conflict at this point, your Honor, especially-

THE COURT: Well, I agree--

MR. DAWSON: --while--

THE COURT: --and at least we will have put on part of this fairly lengthy hearing so-

MR. DAWSON: Yes, your Honor.

THE COURT: --that's fine. Anything else you want to put on the--

MR. DAWSON: Your Honor, one other--well, a couple of preliminary things. But one is that--and we've talked to Mr. Price about this as well. The Court may recall that back at the time of the trial, there was some discussion of a three volume social history that Dr. McCoy had prepared for use at the first trial--not the first trial, the only trial--the 1996--March '96 trial. And we're going to rely extensively on that during this hearing. Much of the records that we will rely on are in that report. And what we would ask the Court to allow us to do is to offer them as--for identification at this point into the record so that Dr. Pincus could refer to it. And that everyone will be aware then of what Dr. Pincus is referring to in terms of the record.

THE COURT: General, do you have a copy of that report?

MR. PRICE: I do.

MR. DAWSON: We-

THE COURT: Okay. So do you have any objection to doing that at this point?

MR. PRICE: No, your Honor, I mean I don't have any objection to it going ahead and being entered as evidence.

MR. DAWSON: Okay.

THE COURT: Okay. That's fine.

MR. DAWSON: Well, in that case that's fine, your Honor. Your Honor, and one thing that I'm doing-

THE COURT: So you want to make that--let's make that Exhibit 1 for identification at this point.

MR. DAWSON: And, your Honor, what we have is--

MS. BROCKENBOROUGH: Actually, before we --the court reporter does the exhibit number--I don't know--with all the motion hearings and then with what we were talking about last--the proceedings we had last January, I didn't know how your Honor was dealing with exhibit numbers.

THE COURT: Well, I would suggest they become an exhibit number to today's proceeding in numerical order.

MS. BROCKENBOROUGH: Okay. Great. Thank you.

THE COURT: I don't--there are so many exhibits--and by the way, are there--is there any need for any of the trial exhibits to be brought into the courtroom--

MR. DAWSON: Not today, your Honor.

THE COURT: --this week?

MR. DAWSON: I don't--no.

THE COURT: Okay. I was asked by the Clerk's Office whether or not they needed to be retrieved.

MR. DAWSON: There were some--well, the only ones that maybe, and I can let the Court know tomorrow morning. There may be some that--there were some family history charts, I think, that were put in that may, in fact, be copies of the things that are in the social history.

MS. BROCKENBOROUGH: They are.

MR. DAWSON: I'm told that they are.

THE COURT: Do you want to see them?

MR. DAWSON: So we don't need them, your Honor.

THE COURT: Okay.

MR. DAWSON: We've got the social history

and we can--I think that we need to be able to identify. This document is also Exhibit 83 as we go through. I think we can do that.

THE COURT: Okay.

MR. DAWSON: Your Honor, one of the things with regards to putting it in the record at this point, if I could have a couple of minutes before we actually do that, because when going through it with Dr. McCoy this morning, I recognized that we had a couple of pages out of order.

THE COURT: Oh, well go ahead and put them in order.

MR. DAWSON: I am.

THE COURT: Okay.

MR. DAWSON: And we're also missing three pages. And the three pages we're missing are the table of contents pages that Dr. McCoy prepared. I don't know why we don't have them in our copy, but they're not there. And so what I would suggest to the Court if we can submit this and then tomorrow we can offer--

THE COURT: Okay.

MR. DAWSON: --to put the three missing pages in.

THE COURT: And I take it the General's copy comes from your copy, so he doesn't have the same things; is that true?

MR. PRICE: I have an index.

MR. DAWSON: Okay. That's--your Honor, if I could make--

THE COURT: Uh-huh. (affirmatively)

(Whereupon, Mr. Dawson and Mr. Price conferred about missing pages.)

THE COURT: Could I--could you all show me the size of this? Is your notebook the whole thing, General?

MR. DAWSON: Yes, your Honor, what it is is it's going to be these. And that's--the additional problem is it was originally in three notebooks. It was falling apart in our office--

THE COURT: So you put it together.

MR. DAWSON: --it got put into five. So it's now five, but it's still in chronological order. And it's going to be basically this. (Showing the Court)

THE COURT: What we're going to do for our purposes with your permission--is that the only copy-

MR. PRICE: No, your Honor.
THE COURT: --besides what the General has?
MR. DAWSON: No, your Honor, we have other--
THE COURT: Can you provide us a copy for us to work with?
MR. PRICE: I could probably print one out from my e-mail I got.
THE COURT: Oh.
MR. DAWSON: We had several copies and I don't--
MS. BROCKENBOROUGH: When would you like it? Is it for--
THE COURT: Well, if we had it to work with as you all are talking about it--
MS. BROCKENBOROUGH: --as we go through it?
THE COURT: --it would probably help us but-
MS. BROCKENBOROUGH: I have a copy of it.
MR. DAWSON: Okay.
MS. BROCKENBOROUGH: I have a copy that we can use for these purposes, and in the meantime we'll get--

THE COURT: Well--

MS. BROCKENBOROUGH: --an additional copy to put in.

THE COURT: --your witness may need to look at that--

MR. DAWSON: Right.

THE COURT: --am I correct?

MR. DAWSON: That's correct, your Honor.

THE COURT: So you don't need me to hold it; you need to be able to--

MR. DAWSON: Right.

THE COURT: --retrieve it?

MR. DAWSON: That's correct.

MS. JONES (Court Clerk): Did he say he got it by e-mail?

THE COURT: Did you get it by e-mail?

MR. PRICE: I did. It's in five parts because it's so voluminous, but I do have it on digits.

MS. JONES: He could forward it to me.

THE COURT: And then we can print it out sometime today or have somebody print it?

MS. JONES: Or I can print it out in the morning from the office.

THE COURT: Have you got something high

speed?

MS. JONES: Yeah.

THE COURT: General, if you'll take Ms. Jones' e-mail and send your copy to her computer, she'll print it out and we'll have our copy in the morning. And in the meantime, if we need to use the exhibit, that's fine.

MR. DAWSON: Your Honor, when you get the copy, then we can explain where the pages are out of order because your copy will be out of order just as our's is out of order.

THE COURT: That's fine. We'll just rearrange.

MR. DAWSON: Then we can get it straightened out.

THE COURT: Are there any other documents like that we're going to need copies of potentially that we need to deal with?

MS. BROCKENBOROUGH: We have additional-- we have copies for the Court--

THE COURT: Of everything else?

MS. BROCKENBOROUGH: --as well as the original that will be admitted into evidence.

THE COURT: Okay. All right.

MR. DAWSON: Your Honor, we had copies of

these too, but due to my failure on Sunday, they are still in a drawer in our office so-

THE COURT: That's okay. We'll do that. I'll send the bill to the State so-

MR. DAWSON: That's fine, your Honor.

THE COURT: Okay. Are we ready to swear witnesses at this time?

MS. BROCKENBOROUGH: Yes, your Honor.

THE COURT: Are you going to be with us all this time, General? Are you going to share with us in this hearing?

MR. PRICE: Yes.

MS. HELM: Yeah.

MR. DAWSON: Your Honor, one other last thing that we would ask is that we had originally thought that we would prepare an opening statement just to give the Court some course of where we're going and all--

THE COURT: Uh-huh. (affirmatively)

MR. DAWSON: --and I think that for the purpose of today, I think it will suffice to say that what we are doing is we're putting on basically family members, friends from North Carolina when she was growing up, adults, including social workers and juvenile workers from North

Carolina that we'll put on this week.

THE COURT: All going to the psychological issues that we've--

MR. DAWSON: That's correct, your Honor--

THE COURT: --we've--

MR. DAWSON: --as well as Dr. Pincus on the neurological issues, and Dr. McCoy as to the social history that she was prepared to present. With that having been said, your Honor, we would ask that we be able to reserve making the formal part of the opening statement until the start of the next proceeding because that's when we'll be getting into all the legal issues regarding the post-conviction petition.

THE COURT: That's fair enough. We've gone--I have and I know Ms. Jones has, recently since she's got assigned this case, reviewed the entire consolidated petition and kind of put together sections in my own head. So I think we can--we can do that and then that will help us at that point consolidate the legal issues I think.

MR. DAWSON: Very good. Thank you, your Honor.

THE COURT: I'd like to consolidate some of them actually because I think in broad general

categories they kind of fall together.

MR. DAWSON: Right.

THE COURT: All right. If we could have the witnesses come in and, Ms. Brockenborough, do you want to call in whoever might testify on your behalf?

MS. BROCKENBOROUGH: Yes, and I've-- should we call in everyone to be sworn at the same time?

THE COURT: Why don't you go ahead and bring them in--

MS. BROCKENBOROUGH: Okay.

THE COURT: --and then we're going to-- and then I'll instruct them as to the rule.

(Whereupon, the witnesses were called into open court.)

THE COURT: All of you just step forward please for just a moment. And I'm going to swear everybody at one time, and then ask you--and then instruct you what I need you to do. Is this everybody we have available to us today?

MS. BROCKENBOROUGH: At the moment, yes.

THE COURT: And Dr. Pincus and Dr. McCoy are going to testify--

MS. BROCKENBOROUGH: Dr. Pincus will be

testifying today, so he could be sworn.

THE COURT: I think we ought to swear Dr. McCoy as well, even though she is going to be given permission to remain in the courtroom. Please raise your right hands to be sworn.

(Whereupon, the witnesses were sworn to tell the truth by the clerk and responded affirmatively.)

THE COURT: All right. Ladies and gentlemen, other than Dr. McCoy and Pincus, I'm going to ask each one of you to remain outside the courtroom. You may not discuss your testimony will anyone nor their testimony with anybody, and please stay outside the courtroom till we're ready to call you. And we'll try to get you in and out today as quickly as we can. Okay. So if you'll step outside, Mr. Coffey will show you where he needs to locate.

MS. BROCKENBOROUGH: Actually, Ms. Hansen will be our first witness so--

THE COURT: Ms. Hansen can stay then if she wants to do that.

MS. BROCKENBOROUGH: And Max Pike is not going to be a witness so--

THE COURT: I'm sorry?

MR. DAWSON: Your Honor, Max Pike is not going to be a witness and he can stay in.

THE COURT: This is Mr. Pike?

MR. DAWSON: Yes, your Honor.

THE COURT: Okay. That's fine. He can remain in the courtroom then if he chooses to do so.

MS. BROCKENBOROUGH: Okay.

THE COURT: Is that what you're saying?

MS. BROCKENBOROUGH: I'm sorry.

THE COURT: He can remain in the courtroom--

MS. BROCKENBOROUGH: Yes, ma'am.

THE COURT: --he just can't discuss testimony with anybody.

MR. DAWSON: Right.

MS. BROCKENBOROUGH: That's fine.

THE COURT: Okay.

MS. BROCKENBOROUGH: Our first witness will be Carissa Hansen.

THE COURT: Ms. Hansen, if you'll come forward please ma'am. Did we make that Exhibit 1 for ID or are we--I intend to make it that if we could-

MR. DAWSON: Your Honor, I now have it-

THE COURT: --for today's hearing when you're ready.

MR. DAWSON: --I now have it together, your Honor.

THE COURT: Okay.

MR. DAWSON: And it's ready.

THE COURT: Well, whenever, whenever you're ready. But I just want to be sure we do mark that one as Exhibit 1 for ID.

MR. DAWSON: Yes, your Honor.

(Exhibit No. 1, Dr. McCoy's 3-volume social history, was marked for identification only.)

THE COURT: Ms. Hansen, just have a seat; you've been sworn.

And whenever you're reading, Ms. Brockenborough.

MS. BROCKENBOROUGH: Thank you, Judge.

PETITIONER'S PROOF

CARISSA HANSEN, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Can you state your name for the record

please?

A Carissa Hansen.

Q And, Ms. Hansen, where do you live?

A Lubbock, Texas.

Q And how do you know Christa Pike?

A She's my daughter.

MS. BROCKENBOROUGH: If I could ask that these be--(Showing Mr. Price) Could I ask these--should I--should I approach the witness or-

THE COURT: Yes, go ahead.

MS. BROCKENBOROUGH: Okay.

THE COURT: Feel free to move around the courtroom, Ms. Brockenborough. I know we haven't done for awhile, but we'll try to keep the pathways clear.

MS. BROCKENBOROUGH: Every court has its own way of doing things.

Q Ms. Hansen, I've just given you a stack of documents. Can you tell us what those are?

A Pictures of Christa when she was a baby.

Q Okay. And you're referring to the first of the several pages--

A Yes.

Q --that are there; is that correct? Okay. And if you turn to the second page, can you

identify those?
A They're Christa.
Q Okay.
A And the bottom one is Christa and her sister Alicia.
Q Okay. And where were these photographs taken?
A The second page in Grand View at her grandmother's.
Q Okay. And that--the top picture is an outside shot; is that correct?
A Correct.
Q And the bottom picture appears to be a Christmas photo--
A Yes.
Q --inside? And both of those were at--
A Her grandmother's.
Q --her Grandmother Pike's--
A Yes.
Q --house; is that correct?
A Yes.
Q And the third page, can you identify those, please?
A The top one is Christa; the bottom one is Christa and Alicia.

Q And where were those photos taken?
A I think at our house in Beckley, West Virginia.
Q And then the fourth page, can you identify those?
A The top one is Christa and a friend. I can't remember the friend's name.
Q Okay. And where--
A Then the bottom one is Christa with her Grandmother Pike.
Q And there's a third person in that bottom picture.
A And Alicia.
Q That's Alicia? And the photo of Christa and her friend, where was that taken?
A That was in our dining room in Hillsborough, North Carolina.
Q And the next to the last page?
A The top one is Christa with her grandmother, and the bottom one is a picture that I have on my wall.
Q And this--the picture that you have on you wall, was that taken at your house?
A Yes.
Q The photo of the photo was taken at your

house--
A Yes, the photo of the photo--
Q --to clarify?
A --was taken.
Q And we will return to that photograph in a moment. And then finally on the last page can you tell us what those are?
A That's--the top one is my mother and father, myself, and my sister, and the bottom one is Grandmother Pike.
MS. BROCKENBOROUGH: Your Honor, I'd ask that these be entered as a Collective Exhibit.
THE COURT: 2.
(Collective Exhibit No. 2 was marked and filed.)
MS. BROCKENBOROUGH: And I said that we have copies of everything, only the photos we do not so==
THE COURT: That's all right. I can look at those.
MS. BROCKENBOROUGH: Okay.
THE COURT: If you're done with Ms. Hansen's testimony about them right now, I can look at them right now.
MS. BROCKENBOROUGH: Actually, I need--I

need her to keep it for a moment longer.

THE COURT: Okay. That's fine.

MS. BROCKENBOROUGH: If you return to--madam court reporter, are you ready?

THE COURT REPORTER: Uh-huh (Affirmatively) I'm ready.

MS. BROCKENBOROUGH: Okay.

THE COURT REPORTER: I don't know where to mark this.

THE COURT: What happened?

THE COURT REPORTER: Okay.

Q If you could turn to the next to the last page, please. And can you tell us the story behind this--can you tell us the events that led to the picture at the bottom being taken, the one that you said you have hanging on your wall?

A I think, if I remember correctly--it was a long time ago--but I think Mrs. Pike had Christa at the mall and they did this picture. And then my father was shopping in the mall and saw it on an easel in the hallway, and so he bought it.

Q And--

A We did not even know that the picture had been made but--

Q And do you--were you informed about any

of the events--anything that happened before the photo was taken at the mall?

A I think Mrs. Pike told me that she had been crying.

Q "She" being?

A That she had been crying before they did this picture.

Q And you're talking about Christa--

A Christa.

Q --when you say "she"?

A Yes.

MS. BROCKENBOROUGH: Okay. I'm done with the photos--

THE COURT: Okay.

MS. BROCKENBOROUGH: --if the Court would like to have them.

THE COURT: If you'll pass those up to me just for a second, Ms. Hansen, and let me take a look at them.

Q Before we talk some about your experiences with Christa throughout her life, I wanted to direct your attention back to the period between your daughter's arrest and the trial. Now, when did you become aware that she had been arrested?

A On Friday night, the--I guess that was--

no, I became aware that she was arrested on Saturday morning.

Q And where were you at the time?

A At home.

Q And where were you living then?

A In Cedar Grove, North Carolina.

Q What was the first event connected with these legal proceedings that you remember?

A Gosh, you mean like when I first talked to an attorney or--

Q Exactly, yes.

A I had--I called here and someone told me that it was going to be Mr. Brown. So I called his office several times. I don't think he ever called me back. If I remember correctly, I don't think he ever called me back. The next person I think I heard from--or maybe I met him here.

Q He--

A It's so long ago. I think I met him here.

Q Do--and when you say "him," are you--you're talking about Mr. Brown?

A Mr. Brown.

Q And that would be William Brown?

A Yes.

Q Okay. And did he represent--do you remember whether he represented Miss Pike at the preliminary hearing?

A He did not. That was Mr. Talman.

Q You believe it was Mr. Talman that was representing her then?

A I think.

Q Were you here for the preliminary hearing?

A No, I think I was just here for the trial.

Q Did you ever meet Mr. Brown?

A Yes.

Q And can you tell us the circumstances of that meeting?

A I think I met him the first day of the trial.

Q Here at the courthouse?

A Yes, he wasn't representing Christa, but he was here.

Q And when was the first time that you remember meeting Mr. Talman or having contact or communication with Mr. Talman?

A We talked on the phone, and I think-- (Pause) I think my husband and I came to Nashville

and we met him here.

Q You mean Knoxville?

A I meant Knoxville.

Q For the record, Miss Pike is housed in Nashville--

A Yes.

Q --is that correct?

A Yes, in Knoxville.

Q And do you remember when that was?

A No, I don't.

Q Were you--did you come to Knoxville specifically to meet with Mr. Talman?

A I think I came to visit Christa, and then we met with him while we were here.

Q Between that meeting and Miss Pike's trial, how many times did you meet with Mr. Talman in person?

A To the best of my recollection, I can remember two times, once in Raleigh and another time here in Knoxville.

Q Now the time in Knoxville was an additional visit, other than the one that you just mentioned; is that correct or is that--are you talking about the same--the same time?

A I think that's correct.

Q And can you tell us about the circumstances of your meeting with him in Raleigh?
A He asked us to meet with him there. He was staying in Raleigh and we were--
Q And this would be Raleigh, North Carolina?
A Raleigh, North Carolina. I'm sorry. We were supposed to meet with him at 6:00 o'clock, I think. So my husband and I both left work and drove straight there. Raleigh is about--it was about 40 miles from where we worked in Durham. We went straight there and when we got there he and his partner, Julie--I can't remember her last name. They were upstairs in the restaurant eating dinner. So we walked up to their table, and they'd just ordered a bottle of wine. And they asked us to have a seat back downstairs in the lobby until they finished their dinner.
Q And where did this happen? Was it--was it--
A I think--
Q --at a hotel where they were staying?
A --it was a hotel in Raleigh. It was like a Sheraton or--it was a nice hotel.
Q And did you ultimately meet with them

that evening?

A Yes.

Q How long--

A They finally came down to the lobby after they finished eating, and then we--we talked briefly.

Q And where did you talk?

A In the lobby.

Q And what was the nature of the conversation? What were you talking about?

A We were talking about--mainly what they were planning to do to represent Christa, and they asked us some questions. I don't remember what they were, but we didn't talk very long at all.

Q And was both Mr. Talman and--I guess she was Ms. Martin at the time.

A Julie Martin.

Q Were they both part of the conversation?

A Yes.

Q And that was with your husband as well?

A Yes.

Q Do you remember when that was in time frame, as compared to the start of the trial? I'm sorry; that was poorly worded. How early--how far before the trial was that meeting?

A Do you know I really don't remember. That was a long time ago.
Q Was it your understanding that you would be asked to testify during the trial?
A No, as a matter of fact in the beginning he told us not to be here.
Q And who is "he"?
A Mr. Talman told us not to be here because if he had to call us a witness, then we were not to be in the courtroom.
Q And--
A He called me the night before the trial was supposed to begin and told me to come.
Q And what day of the week was that that you received that phone call?
A It must have been Sunday.
Q And can you tell us a little bit more about what happened after you got that phone call?
A After I got the phone call I went to the grocery store because I didn't have any money to make the trip. So I went to the grocery store and wrote a check for over the amount, because I knew my husband would get paid before it would clear, to get the money to come up here. I had just enough basically to put gas in the car. And I laid down

for a couple of hours and slept. I got up about 2:00 a.m. and drove here just in time to make it for the trial. So I had been up all night the night before.

Q And you were living still in the triangle area in North Carolina?

A In Cedar Grove.

Q In Cedar Grove.

A It's a little outside the triangle area.

Q And so you arrived in Knoxville the day-- the start of jury selection?

A Yes, I did.

Q And were you present then for the remainder of the trial proceedings?

A Yes, I was.

Q And did you have any interaction with the trial attorneys during that week or those two weeks, I guess?

A Yes. We didn't talk very much, but I would see them in the coffee shop every morning. And then I usually went to lunch with them as well.

Q Were you--did you receive a subpoena from either the defense or the State?

A I did not.

Q Did you receive any funding for travel or

lodging while you were here?
A I did not.
Q Did you have contact with any other members of Miss Pike's trial defense team, outside of the attorneys?
A Yes, ma'am; Diana McCoy and--(Pause) I guess it's Ms. Martin's husband now.
Q Okay. Are you referring to Barry Rice?
A Yes, Barry Rice.
Q And do you know what was his capacity?
A I think he was an investigator on the case.
Q Did you have occasion to meet with him or can--
A Yes.
Q --you describe the nature of the contact?
A He--they went to lunch with us.
Q Okay. Did you discuss the case?
THE COURT: When you say "they," do you mean Dr. McCoy and Mr. Rice?
A Dr. McCoy-not Dr. McCoy, Mr. Rice, Julie Martin, Bill Talman, and myself.
Q And when you're referring to lunch, you're talking about lunches during the trial period--

A Yes, ma'am.
Q --is that right? And was that the first time that you met Mr. Rice?
A Yes.
Q Can you tell us about your interaction with Dr. McCoy?
A Like a--she came to our home and we had lunch together, and we talked about Christa and--
Q And do you recall about how much time you spent with her?
A I'm not sure, but I think we spent quite awhile together.
Q And was this over one--sort of one meeting or was it multiple meetings?
A We had one meeting at our house, one meeting at her office.
Q And did you have occasion to talk with her by phone in the interim?
A I probably did, but I don't remember definitely.
MS. BROCKENBOROUGH: Were--now, I believe the record will reflect that--and I'm sure that your Honor will correct me, but the jury selection began on a Monday and lasted for the duration of that first week.

THE COURT: Most of the first week.

MS. BROCKENBOROUGH: Most of the first week. And that the proof--opening statements and the proof began the following Monday; is that correct?

THE COURT: I think--and we can look--but I think that we selected a jury in four or five days and then we began opening statements. We worked on the Saturday as well.

MS. BROCKENBOROUGH: Okay. So you--

THE COURT: Part of the Saturday.

MS. BROCKENBOROUGH: Both Saturdays? I know the sentencing hearing--

THE COURT: Only one Saturday.

MS. BROCKENBOROUGH: Okay.

THE COURT: Yeah; right, we worked both Saturdays. So I think we were already into the proof by Monday.

MS. BROCKENBOROUGH: Okay. So--

THE COURT: I'm not--it's been a long time for me too. We can look on the original file if we want to retrieve it from upstairs.

MS. BROCKENBOROUGH: But the balance of the first week was jury selection?

THE COURT: Most of it.

MS. BROCKENBOROUGH: And the--

THE COURT: As I recall, most of it was jury selection. It took at least four days to select a jury and then the fifth or sixth day we began opening statements and the trial.

MS. BROCKENBOROUGH: And I believe the record reflects that the jury returned with guilt verdicts the second Friday?

THE COURT: The second Friday.

MS. BROCKENBOROUGH: And that was sort of mid-afternoon I believe--

THE COURT: And then we went into the hearings--

MS. BROCKENBOROUGH: --and the penalty phase--

THE COURT: Right.

MS. BROCKENBOROUGH: --started the following morning.

THE COURT: Right, and it concluded that Saturday.

Q And so during that first week were there any other members of Miss Pike's family here--

A Not the first--

Q --with you?

A --week.

Q Subsequently, did any other members come?
A In the second week--
Q And who--
A --my husband came; my sister; Christa's father, her biological father; and I think that was all.
Q And your husband is Gerard Hansen?
A Yes.
Q And Miss Pike's biological father is Glenn Pike, right?
A Correct.
Q And her--your sister was--is Carrie Ross--
A Yes.
Q --is that right? And with the exception of your husband, you all ended up testifying at the penalty phase--
A Yes.
Q --is that right? Can you tell us when you first learned that you would be called as a witness?
A (Pause) I don't remember.
Q Was it before you came to Knoxville?
A No.
Q Was it before the trial started?

A No.

Q Do you know whether--

A I think it was some--some time--I think it was the second week, but don't make that part of the record because I'm not sure.

Q Okay. And what--did you meet with any--with any of the trial team members to discuss your testimony after you learned that you were going to be testifying?

A Yes, we did.

Q And do you remember the circumstances of that meeting?

A They told us that they were going to make the family look bad because that would help Christa's case. They told us to make it look as bad as we could, to exaggerate anything bad that was wrong with our family because the jury would--the jury would look at Christa and think, "The poor girl, she grew up in a family like this; no wonder she turned out the way she did." So that's what we did.

MR. PRICE: Your Honor, she's talking about "they". I just--I wonder if she could be a little more specific about who's giving her this-

A Mr. Talman and Ms. Martin.

THE COURT: Okay.

MR. PRICE: And can you--if she can distinguish between the two, who's saying what, this might become important.

THE COURT: If you can.

A I can't. I'm sorry.

MR. PRICE: Okay.

A I just remember Mr. Martin--I mean Ms. Martin and Mr. Talman talking to us, and they were both--I think it was mostly Mr. Talman.

Q Where did this meeting take place?

A In one of their offices and maybe here at the courthouse too.

Q And when were those meetings?

A Hum, I--I guess--I don't remember.

Q Do you remember who else--who all was there at the meetings?

A Well, they talked to--Mr. Martin--Ms. Martin and Mr. Talman talked to my sister, but they did not talk to us together. And they also talked to Christa's father.

Q And do you remember whether they talked with your husband at all?

A I think they did, but I don't remember for sure.

Q And do you recall whether any other members of the defense team were there?
A I don't recall; I don't think so.
Q Do you remember what your response was when you were informed that you would be called to testify?
A I was nervous, like I am now. (Laughter)
Q Were you surprised at all?
A (Pause) No, I don't--I don't think so.
Q Now, we've talked about--you've mentioned that your husband was Gerard Hansen and that Miss Pike's biological father is Glenn Pike.
A Yes.
Q Can you tell us when you married Mr. Pike or--I'm assuming--were you married?
A We were married in 1975.
Q And when was Christa born?
A She was born in March of 1976.
Q And was--you indicated--in going through the photographs, you mentioned Alicia. Who is Alicia?
A Alicia is Christa's half-sister.
Q And what is--is she older or younger than Miss Pike?
A She's older than Christa.

Q And who is Alicia's father?
A Alicia's father is James Ferguson.
Q And were you married to Mr. Ferguson?
A Yes, I was.
Q For how long were you married to him?
A Five and a half years.
Q And when--now--and how long were you married to Mr. Pike?
A We were married two years, divorced for maybe a year. Then we remarried for two years and divorced.
Q And where were you living at the time when you were married with Mr. Pike?
A In Beckley, West Virginia.
Q And is that where you were born?
A Yes.
Q And is that where Christa was born?
A Yes.
Q And at the time that Christa was born, were you working?
A Yes.
Q Okay. And what was your job?
A I'm a licensed practical nurse.
Q And can you tell us a little bit about Christa's birth and coming into the world?

A I was working on a psychiatric unit, evening shift, and we had an alcoholic come in in DT's. And she'd gotten out of her restraints, and we were trying to catch her to get her back into the bed. She was just going down the hall screaming and threatening, and there were two med techs, another nurse, and myself trying to hold onto her. And she threw me through some double swinging doors and I landed on a supply cart--against it. And that's when I started leaking amniotic fluid, and they told me not to work. And it was not much longer after that that I went into labor.
Q And how far along in the pregnancy were you when the incident at the hospital occurred?
A Seven months I think.
Q And so was Christa born full term?
A No, she was a preemie.
Q And what--and how--was--how was she delivered?
A Caesarean section.
Q And how--did anything unusual occur after she was born?
A She was breech which is why they had to do the caesarean section. And as soon as she was

delivered, I--they brought her to my room and told me that they were taking her to Charleston Area Medical Center in Charleston, West Virginia because that was the nearest neonatal intensive care. She had a condition known as hyaline membrane where the lungs are not fully developed, and she was in respiratory distress. She also had bilateral hip dysplasias which is where her hip sockets were not formed.

Q How long was she in the hospital in Charleston?

A She was there for two weeks.

Q And were you--when were you released from the hospital following your surgery?

A I think I was released after one week, and then we drove to Charleston to get here when she was released. It was an hour away.

Q How old were you when--I'm sorry. How old was Christa when you and Mr. Pike divorced for the second time?

A The second time she was five or six.

Q Were you still living in West Virginia at that time?

A Yes.

Q And was Christa with you during that

entire period?

A Yes.

Q At some--when did you first move to North Carolina?

A I moved to North Carolina about 1980--(Pause)--I think maybe 1982. I think.

Q And have you been living in North Carolina ever since?

A Now, I moved back home for about two years when my mother was ill.

Q And--

A And then after my mother passed away in 1985, I moved back to North Carolina and that's where I lived.

Q And then--I'm sorry. I said "ever since", but at some point you did move to Texas--

A Yes.

Q --is that right?

A I moved to Texas in 2000.

Q I'd like to direct your attention to a few incidents from Christa's growing-up years.

MS. BROCKENBOROUGH: And I understand your Honor likes us to refer to Miss Pike as Miss Pike. But for purposes of her as a child, Christa comes out a--

THE COURT: It is proper to refer to everyone--

MS. BROCKENBOROUGH: --little bit more easily.

THE COURT: --by their last name and respectful, but if you want to discuss that that way with Miss Pike's mother, you feel free to do it.

MS. BROCKENBOROUGH: I appreciate that; thank you.

Q Did Alicia and Christa both live with you during their growing-up years?

A Most of the years. Christa stayed with her grandmother a lot.

Q And which grandmother is this?

A Her Grandmother Pike. And they both stayed with my mother a lot as well.

Q Where--

A Alicia spent most--she was at my mother's more than Christa, and Christa was at Mrs. Pike's more than she was at my mother's.

Q And is it correct that your parents and Mrs. Pike, your ex-husband's mother, all lived in Beckley--

A Yes.

Q --West Virginia? And did your sister Carrie live there at the time?

A Yes.

Q And after you moved to North Carolina, did--did Christa go with you or did she stay in West Virginia?

A She moved with me. Both girls moved with me, but they were really unhappy down there. They missed their grandparents, and they missed their friends. So they ended up going back to West Virginia.

Q And at some point did Christa come back to live with you in North Carolina?

A Yes, she did.

Q And when was that?

A (Pause) I can't remember what year. She was really young, maybe fourth or fifth grade.

Q And why did you move to North Carolina?

A I remarried.

Q And who was your husband?

A Danny Thompson.

Q And so Alicia and Christa both went with you and--when you went to marry--when you married Mr. Thompson and lived with the two of you--

A Yes.

Q --for a period before they returned to West Virginia?

A Yes.

Q And did Alicia ever live with you again after that?

A Yes.

Q Can you tell us about the circumstances of that?

A After Alicia's baby was born, she and her first husband-to-be moved in with me. And she graduated high school in North Carolina, and they were married.

Q And how old was Alicia when she got pregnant?

A Fifteen.

Q What was--what's the name of the father, her first husband?

A Bryan Hammond.

Q And so Alicia and Bryan moved in with you. Had the baby been born at that time?

A Yes.

Q And your--were they married at the time that they moved in with you?

A They were married shortly after.

Q Okay. And how old was Alicia at that

time?

A Sixteen, sixteen I think.

Q And do you know how old Bryan was?

A He was the same age. No, Bryan was a year older. I'm sorry.

Q How long did they live with you during--did they stay with you--

A They lived with me one or two years, and then they got their own apartment. Until Alicia finished high school. And when she finished high school and got a job, then they got their own apartment in North Carolina.

Q And did she have a boy or girl?

A She had a little boy.

Q Okay. And what is his name?

A Bryan Keith Hammond.

Q And did you--was Christa living with you and Alicia and--

A Yes.

Q --Bryan at the time? And were you married at that time?

A Married and separated.

Q Okay. Can you explain that please?

A (Laughter) When I left Danny Thompson and we got a place of our own--

Q And "we" is?
A --and we tried to get back together several times, but it never--it just didn't work out. So we were mostly separated. Finally, I got a divorce and--
Q And when you say "we" got a place of our own, who are you referring to?
A Alicia, Bryan--well, I had already left. I was separated when Alicia and Bryan moved in with me.
Q And so after you--when you left Danny Thompson, you and Christa moved into another place; is that correct? Was Christa living with you then?
A Yes. That was a long time ago. I hope--I hope I'm remembering that right.
Q Now, at some point did you become aware that Christa was pregnant?
A Yes, this was in--when we lived in Cedar Grove.
Q And who--were you married at that time?
A Yes, to my current husband, Gerard Hansen.
Q And can you tell us about what happened, how you found out, and what happened after that?
A Christa told me that she was pregnant.

She had a friend with her. I can't remember if it was Brandy or Mandy or--it was--one of her friends was with her; I don't remember which. But she told me she was pregnant. And I don't know when we actually started having a conversation, but we talked about whether she would keep the baby or not. She was under--I was under the impression and told by her friends that she was using cocaine and--

Q Did you ever--did you ever see Christa use cocaine?

A No, I did not. That's not something you'd do with your mother, I don't think. But she --I told her that if she had this baby, she would have to get a job and that she would have to be the one to raise it. That my husband and I would help her, but that we could not afford another child of our one. We could not--if the child were not healthy, that she would have--you know, it would be so many medical expenses that we couldn't deal with. And so I gave her a choice that--to think about what she wanted to do.

Q Did Christa have the baby?

A No, she did not.

Q You indicated that smoking--that using

cocaine was not something that you would do with your mother. But at some point you and Christa smoked marijuana together; isn't that correct?

A Yes, we did.

Q And how did that happen?

A I don't remember. We--we were at our house and Christa had friends and--over. And I don't remember how it started, but we did smoke marijuana together.

Q And how old was Christa at that time?

A Seventeen.

Q And how old was she when she got pregnant?

A I think 17.

Q Did you know the father of the baby?

A No, I did not.

Q Did you know who it was?

A No, I did not.

Q Do you recall an incident--I believe you were married to your current husband--where you went to West Virginia and--for a visit and Christa stayed behind?

A Yes.

Q Okay. Can you tell us about that please?

A She was supposed to be staying with a

friend. And I had already talked to the friend's mother, and she said that Christa could spend the weekend there because Christa didn't want to go with us. So as soon as--it wasn't--I guess it was that night after we'd gotten there, the friend's mother called me and told me that Christa did not make it to their house. So I called my son-in-law, Alicia's husband, and asked him to find--to go to my apartment and see what Christa was doing. And when he got there he found she was having a party and had lots of friends over. So he broke up the party and, of course, we went home and--

Q And--so your understanding was that Christa would get to her friend's house on her own when you and your husband left?

A I think the friend's--I think someone was going to take her there, if I remember correctly.

Q Okay. And do you--do you know what happened when your son-in-law arrived at the apartment?

A The only thing I know is he made everyone leave, and Christa told me that he hit her and gave her a bloody nose.

Q Hum--

A I think they stayed there until I got

home actually. It was a four-hour drive.
Q And Alicia and Bryan were living in the area?
A Yes.
Q When they moved out, they stayed in the area; is that correct?
A Yes.
Q Were--do you--were you involved with--did you have a relationship with a man named Steve Kyaw?
A Yes.
Q And when--how old was Christa when you had--when you were involved with Mr. Kyaw?
A Hum--(Pause)--12, 13 maybe.
Q And how long were you and Mr. Kyaw together?
A (Pause) About a year I think.
Q Did--were you ever married?
A No.
Q How would you describe Christa's relationship with Mr. Kyaw?
A She never--she did not get along with him.
Q Did you observe them together?
A Yes.

C. Hansen - Direct

Q Did you observe any altercations or arguments or happy discussions? What do you recall about how they interacted?

A We used to go--well, we'd go to church together; we'd go to his parents together; we'd go to my--you know, most of the time we had a good time. It's usually if I wasn't home and--the one time I do remember she got in a fight, I think. I don't remember what started it, but they argued and they ended up in court over that.

Q And were they in court because Mr. Kyaw punched Christa?

A Yes, because--yes.

Q And when Christa reported that to you, did you believe that Mr. Kyaw had, in fact, done that?

A Get--I'm--pardon?

Q Did you believe Christa when she told you that Mr. Kyaw had punched her?

A Yes.

Q Do you know whether any of your other--any of Christa's other step-fathers ever abused her or hit her?

A No.

Q You don't--do you have any--you don't

have any recollections of whether Danny Thompson hit her?

A I don't remember that--I don't remember him ever hitting her.

Q Do you remember Christa ever telling you that he had hit her?

A No.

Q Are you aware of any suicide attempts that Christa may have made?

A Yes.

Q Can you tell us about what you know?

A I think she was in the third grade, and she took an overdose of Tylenol. And the school called me. And at that time I took her to University of North Carolina Hospital to see a psychiatrist that day. And we were in outpatient treatment. And he told me that she was depressed.

Q And what was the course of treatment at that time?

A Just therapy. He did--he prescribed some medicines, but they made her feel worse instead of better so she didn't take them.

Q And were you aware that she wasn't taking them?

A She told me because she really did not

feel good on those medicines. She was lethargic. She couldn't do her school work, and so she said she felt better off of them so--

Q And you supported that decision?

A Yeah--well the psychiatrist did too.

Q And how did that course of treatment end?

A (Pause) I think once Christa was back in school--we had many therapists, but that--I think he discharged Christa as being okay. But then over the course of the years, we saw therapists, psychologists after that.

Q Okay. Are you aware of any time when Christa was sexually assaulted?

A Yes, when we lived in Chapel Hill she--the school called me and told me that--to come and pick up Christa, that she had said that she'd been raped after school the day before.

Q And how old was Christa at that time?

A She was still in elementary school. Probably around the same time as the suicide.

Q And was it--is it your recollection that the first that you heard about the rape was from the school official?

A Yes.

Q You don't have any recollection of

Christa telling you herself?

A She did not, not until I picked her up at the school.

Q And what was your response when you found out about what Christa had told the school personnel?

A I didn't know what to think. I guess I was in disbelief because I didn't know how it could have happened and she didn't say anything. And she hadn't mentioned it the night before, and she did not mention it the morning of before she went to school.

Q And did you observe anything unusual about her?

A No, I did not.

Q What happened after that? Was anyone ever found or arrested?

A Claude Davis was arrested.

Q And--

A And he did have a hearing, but Christa was unable to identify him in the line up so he was not charged. But he was ordered to stay away from children and school buses.

Q Are you aware of any other incidents in which your daughter may have been sexually

assaulted?

A She told me one night while she was spending the night with a friend that she was walking to the store and was sexually molested.

Q Do you know how old Christa was at the time of the incident?

A I think she might have been 16.

Q And was--do you know how much time passed between when the incident had occurred and when she told you?

A I was told by her friends the next day because they had taken her to the hospital, I think, for the rape.

Q And so you indicated that Christa told you that she had been sexually molested. Her friends told you that she had been raped. Did Christa give you any details about what had happened?

A She was walking to the store to get her friend's baby something that they were out of. And I think there were woods and some--and a man grabbed her from the street and took her into the woods and sexually molested her.

Q And do you know whether there was actually penetration, the extent of--

A I don't know.
Q --of what was done?
A I don't know.
Q Did you ever ask Christa about it?
A I don't remember.
Q Okay.
A I think--I'm sure I did.
Q Do you remember where you were living when Christa was assaulted by Claude Davis?
A In Chapel Hill.
Q And how--about how many different places in North Carolina have you lived with Christa?
A About five.
Q And where were--you've mentioned Chapel Hill and you've mentioned--was it Cedar--
A Snow--Snow Camp, Chapel Hill, and Cedar Grove.
Q Cedar Grove. Okay. And did you ever live in Hillsborough?
A Yeah, oh, and Hillsborough.
Q Now, during the time that Christa was with you in North Carolina, did you have any problems with her that--you've mentioned some psychological treatment off and on. Were there any other problems that you experienced with Christa?

A Yes. Christa-

THE COURT: For her--for Ms. Hansen or for--

MS. BROCKENBOROUGH: From--any problems that--

THE COURT: --psychological treatment for whom?

MS. BROCKENBOROUGH: I'm sorry.

Q In addition to the psychological treatment, were--did you have any other interaction with any other agencies--

A Yes--

Q --because of Christa?

A --because Christa kept running away from school and running away from home, skipping school, and it was always ongoing.

Q And did you ever discuss with Christa her reasons for running away?

A Yes, she just didn't want to go by the rules.

Q And at some point did Christa live in a group home or any kind of facility like that?

A She did on two different occasions.

Q Can you tell us about the first occasion?

A The first occasion was a group home in

Chapel Hill.

Q And do you remember the name of the place?

A I do not remember the name. I could--

Q Could it have been--

A --I could show you where it is, but I don't remember the name.

Q Could it have been Shaffer House?

A Yes, Shaffer House, that's it.

Q And do you remember how long she was there?

A (Pause) No, I don't remember now.

Q And at some point you--you indicate there was a second time--

A Yes.

Q --that she went away. And do you remember where she went for that occasion?

A To Swannanoa.

Q And how long was she at Swannanoa?

A She was at Swannanoa for about a year.

Q And do you remember when that was?

A She was still in school. I think tenth grade, I think.

Q At some point after she returned from Swannanoa, the idea of coming to the Job Corp

Program came up?

A Yes.

Q Can you tell us how that developed?

A Christa was working and she heard about the Job Corp Program, and she came in one night and told my husband and myself that she wanted to go to Job Corp because she could get her GED there, and she could train to be a nursing assistant so that she could further her education once she was done there by going to nursing school. And that it was a great opportunity because room and board was furnished; you get your schooling, and it's free. And she really wanted to go. So we thought about it, and told it would be okay.

Q Now, did Christa not already have her GED at this point?

A No, I don't--well--maybe she did. But she wanted to go to Job Corp to further her education.

Q Did she have a particular goal in mind?

A To be a nurse.

Q Was that a surprise to you, that she wanted to be a nurse?

A No.

Q And why not?

A Because I'm a nurse and she loved to go to work with me, and she always--she loved to help take care of people. She was always the person that took care of people. I'd take her--when I worked at the nursing homes, I would take her to work with me on the weekends when she was out of school. And she would sing to people and read stories to them, and they loved for her to come because she was always so happy and happy to do things like that for them. And it made them happy and made her happy.

Q And if--I believe that the records show that Christa arrived at the Job Corp in the fall of 1994?

A That's--

Q Does that sound about right?

A That sounds about right, yes.

Q Did you ever come and visit her?

A Yes.

Q And did you--how did the visit unfold? Did you spend time with her?

A She took us in--in the school and introduced us to several of her friends. And we took a walk downtown to the Walgreen and spent the day together.

Q When you say in the school, are you talking about the school building or are you talking about the dormitories?

A The dormitory, the Job Corp building.

Q And what was--did you have any particular observations about--

A Yes.

Q --the dormitories?

A The place was dirty. There was graffiti painted on the walls. There was blood on the walls, and Christa told me that there had been a boy stabbed in the bathroom like the weekend before, I think, and the blood was still there. And that's when we tried to talk Christa into coming home with us, but she wanted to stay.

Q Do you remember any other--whether Christa ever shared with you any reports of any other violence that had occurred?

A When she came home for Christmas, she told us that a girl had been threatening her. She would find her in--hovering over her bed at night with a knife or something threatening her. And that Tadarryl Shipp was her friend though, that he was going to protect her. And so she wasn't afraid to stay there.

Q So did she indicate that she didn't want to go back or that she--

A She did want to go back. We tried to talk her into staying. And when we took her to the bus that night that she left to go back, my husband said, "Christa, this is your chance. If you want to stay, just stay. You can just go back home with us." And she said, "No, I'll be all right."

Q Now, you indicated that when the idea of Job Corp came up that Christa had been working and she had heard that--am I correct that she had heard about the program at work?

A From some of her friends, I think, that she worked with.

Q And did Christa work regularly?

A Yes, she worked--

Q Did she hold jobs?

A --at a Waffle House for awhile, and then she worked in the mall at several--two or three different jobs, a steak house and--

Q And at some point, can you--well--do you remember a boy named--a young man named Brian Wilson?

A Yes.

Q Can you tell us about Brian Wilson?

A He was Christa's boyfriend for awhile.
Q And did he have occasion to live with you?
A Yes, he was homeless and Christa said, "Mom, if Brian can't stay here, then I'm leaving too." So I told him he could stay until he got a job and got on his feet.
Q And he moved in and lived with you?
A Yes.
Q And were you--you were married to your current husband at that time, right?
A Yes.
Q And he--now he--did he and Christa share a bedroom while they were living with you?
A Yes, they did.
Q And how long was Mr. Wilson there?
A Not a very long time because he didn't get a job, and he was sloppy, and I just couldn't stand it. So we made him leave.
Q And did Christa stay or did she leave as well?
A She left as well.
Q Do you know where they went?
A They rented a trailer in Hillsborough, a mobile home.

Q And how long were they there?
A Not very long. I don't remember for sure, but it wasn't very long.
Q Do you remember whether Christa was working at that time?
A Yes.
Q And what kind of contact were you having with her?
A We talked frequently, and we went to visit. And she was--she would be at our house and--
Q Now, I'd like to return to the incident when you and Christa smoked marijuana together. Is it--do you recall that this happened when you all were at the beach, at the Outer Banks?
A I don't think so. I think--it was at our house in Cedar Grove.
Q And do you remember that Christa was pregnant at the time?
A No, Christa was not pregnant at the time.
Q You don't remember whether she was--whether you were encouraging her to smoke the marijuana to help develop her appetite so that she would be able to eat and take care of the baby?
A No, that's not--not at all.

Q And subsequent to that, did you ever tell Christa that as a result of her smoking marijuana, she would have--she had messed with the baby and that the child might be deformed?
A No, it was the cocaine that I was worried about.
Q And did Christa agree that she was using cocaine or did she deny cocaine use?
A She didn't deny it.
Q She did not deny it?
A She did not deny it. I think I said, "Christa, I know you're using drugs and this baby is probably not going to be healthy." And I talked to the gynecologist OB-GYN doctor that I worked with at the time. And he also agreed with me that by her having used cocaine that the baby was going to be very high risk, and that she probably wouldn't even carry it to term.
Q She ended up--did she end up miscarrying the child?
A She had an abortion.
Q And after the abortion, did you tell her that you had exaggerated the effects of drug use while being pregnant?
A No.

Q Did you ever encourage her to have an abortion?
A I gave her an option.
Q So you don't--you didn't force her?
A I did not force her to have the abortion.
Q Well, now did you ever drink or use drugs when you were pregnant?
A No, I did not.
Q With either Alicia or--
A With either child.
Q --with Christa?
MS. BROCKENBOROUGH: One moment.
(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Miss Pike.)
Q And I'm going to ask you an age question. How old were you when Alicia was born?
A Nineteen.
Q And how old were you when Christa was born?
A Twenty-four.
Q So there's a five year age difference?
A Yes.
MS. BROCKENBOROUGH: I don't have any other questions at this time.

THE COURT: General.

MR. PRICE: Your Honor, at this time we'd ask to be provided any--

THE COURT: Jencks material.

MR. PRICE: --statements of witnesses, Jencks material under 26.2. I would say I've got statements from the--Dr. McCoy's report. I think there were two or three.

THE COURT: Do you have any Jencks material or statements of witnesses?

MS. BROCKENBOROUGH: Can you give us a moment?

THE COURT: Sure.

(Whereupon, Ms. Brockenborough and Mr. Dawson briefly conferred.)

MS. BROCKENBOROUGH: I apologize, your Honor. This was my responsibility to bring Ms. Hansen's file, and I do not have it. I do have them on--in a computer form. I have them on a jump disk that I brought with us and--

THE COURT: Is it wireless?

MS. BROCKENBOROUGH: Well, it's just--it's--if you have a UBS port--

THE COURT: Oh.

MS. BROCKENBOROUGH: --on the computer.

Is there--

MR. PRICE: Is it in Word format?

MS. BROCKENBOROUGH: It is in Word format.

MR. PRICE: Well, we've got--

MS. BROCKENBOROUGH: Is that useable here?

THE COURT: Do you want me to take a-

MR. PRICE: We can't print it from here.

THE COURT: --do you want me to take a recess? If we're going to have this problem with all the witnesses; however, that's going to be difficult.

MS. BROCKENBOROUGH: They are all on the jump drive and I would be happy, if we could take a recess, to provide the information for the future witnesses--

THE COURT: Okay. That will be fine.

MS. BROCKENBOROUGH: --at the same time.

THE COURT: That will be fine. We can--

MR. PRICE: We'll go up to our office and print them out.

THE COURT: Yeah, whatever has the fastest printer I think is probably what we need.

MS. BROCKENBOROUGH: Okay. I apologize.

THE COURT: Ms. Hansen, you're still on the witness stand. Please don't discuss your testimony with anyone because we'll need to talk to you a little bit further still yet. So if you would, let's take a brief recess.

And as soon as you're ready, if you all would let me know because we're still on the first witness and it's 11:18. And you have how many witnesses today?

MR. DAWSON: I think we have ten so we're--what?

MS. BROCKENBOROUGH: We don't have ten today.

MR. DAWSON: We don't have ten today.

THE COURT: Well, I want to be sure that we're moving as best we can, and so I--you know, I don't want to waste too much time.

MR. DAWSON: We have seven today, your Honor.

THE COURT: Seven today? How many do we have tomorrow? You have seven today.

MS. BROCKENBOROUGH: Yes.

THE COURT: I take it most of them are not going to be as long as Ms. Hansen, in light of the fact that she has so much knowledge over a long

period of time?

MR. DAWSON: That's probably correct. I think the other long one--well, Dr. Pincus will be fairly long--

THE COURT: Yes, I understand.

MS. BROCKENBOROUGH: Not that long.

MR. DAWSON: --as will her Aunt Carrie, I assume, will be long.

THE COURT: I understand. Okay. All right. Court's in recess. Do you all want to try doing an early lunch?

MS. JONES (Court Clerk): Then that way this will be cleared up and we can-

MR. PRICE: Let's see how long it's going to take, your Honor.

THE COURT: Okay. If it's not going to take long, that would probably be a good idea. We can take about 45 minutes or so and then keep going.

MR. PRICE: Okay.

(Whereupon, a recess was taken; afterwards the following proceedings were had, to-wit:)

THE COURT: I take it every--all the pieces of paper that needed to move around are

moved?

MR. PRICE: Just about, I think.

THE COURT: Just about? Okay, sir.

MR. PRICE: At least for this witness.

THE COURT: At least for this witness.

COURT OFFICER COFFEY: Are you ready for the witness, your Honor?

THE COURT: Yes, I'm ready for the witness, yes, ma'am--yes, sir.

MR. PRICE: We need Ms. McArdle.

MR. DAWSON: Your Honor, I have a missing co-counsel.

THE COURT: We need Ms. Brockenborough.

MR. PRICE: Yes, Brockenborough. Excuse me.

THE COURT: I was wondering who you were talking about. We don't need Ms. McArdle; we need Ms. Brockenborough.

MR. PRICE: Sorry about that.

THE COURT: Ms. Hansen, if you'll just have a seat up here for just a minute and let me get everybody organized, and then we'll take it from there. How cold is it outside?

MS. HELM: Twenty-four degrees.

THE COURT: Hi, General Helm; how are

you?

MS. HELM: Fine, thanks. Good morning, your Honor.

THE COURT: Glad to see you.

MS. HELM: Thank you.

THE COURT: Haven't seen you for awhile. All right. (Pause) Whenever you're ready, General.

CROSS-EXAMINATION

BY MR. PRICE:

Q Ms. Hansen, just a few questions here to follow up with some of your testimony. You explained that you had--you actually had meetings with Bill Talman before the trial--the original trial in this case?

A Yes, sir.

Q And you said that that was--you mentioned twice, and then I think there was a previous time. So we're talking about total meetings with Bill Talman of three times; is that correct?

A To the best of my recollection.

Q All right. And then, in addition, you met with Diana McCoy--

A Yes, sir.

Q --several times or I think you said

twice?
A Twice.
Q And then there was some phone conversations. Do you remember how long or how many phone conversations you had with her?
A No, sir, I do not remember.
Q And that was all before the trial?
A Yes.
Q Did they ever discuss the possibility of you testifying at that time, either Diana McCoy, Mr. Talman, or Julie Rice?
A I think so, but I'm not--I was in a fog--
Q Yeah.
A --at that--at that point.
Q So is it quite possible that they discussed that you may be called as a witness?
A Yes, sir.
Q And what was your understanding of Diana McCoy, Dr. McCoy, her role in this case?
A She was--I think her title is forensic psychologist, and she was analyzing the case to help defend Christa.
Q Okay. You understood she was part of the defense team then?
A Yes, sir.

Q And you understood that the information, when you were providing her information--first of all you understood that you needed to tell the truth to her?
A Yes, sir.
Q That it was very important to this case?
A Yes, sir.
Q And you did tell her the truth?
A Yes, sir.
Q And you understood that the information you provided her might very well be used in your daughter's defense; is that correct?
A Yes, sir.
Q Now, you indicated that ultimately it was determined they would--they were going to call you at trial--
A Yes, sir.
Q --and during the--and you did, in fact testify?
A Yes.
Q And that their strategy when discussing with you, meaning Mr. Talman and Julie Rice, is that they needed you to be--to portray Miss Pike--Christa Pike's childhood as very tragic or that the home life was very difficult for her; is that

correct?
A Yes, sir.
Q And the idea being that--to paint you as a bad mother so that the jury would hate you and not Miss Pike--
A Yes, sir.
Q --or not your daughter; is that correct?
A Yes, sir.
Q And is that what you attempted to do when you testified?
A Yes, sir. I told the truth, but it was exaggerated.
Q Exaggerated or emphasized--certain things were emphasized over others maybe?
A Yes, sir.
Q Now, is it your feeling today that Christa Pike's childhood was not that traumatic or not that difficult?
A She did have a traumatic childhood, and she did have a difficult childhood, yes, sir.
Q And was that in part because of your actions as her mother--
A Yes, sir.
Q --or neglect as her mother?
A Yes, sir.

Q So you would--would you agree with Dr. Pincus's statement in his report that Christa Pike is the product of an almost unbearably abusive background? Do you think that's fair?

A (Pause) I don't know.

Q He also goes on to say that Miss Pike was --"Christa Pike was shunted back and forth between her parents has had the effect of making her feel unwanted by both."

A Yes, sir.

Q Did you make Miss Pike feel unwanted?

A I didn't think I did at the time, but yes, sir.

Q The report also indicates that--you know, there's been some discussion that your daughter was sexually abused when she was growing up either by strangers or perhaps by boyfriends in the home. Are you aware--did you witness or are you--do you have any knowledge of any of these--this sexual abuse?

A I do not.

Q Do you have--was there an incident where she alleged she was sexually abused and you actually saw the blood on your daughter?

A No, sir.

C. Hansen - Cross

Q If Miss Pike--if your daughter had indicated that to Dr. Pincus, would she be telling the truth--
A No, sir.
Q --that you saw the blood?
A No, sir.
Q (Pause) Now, let me talk about your father, I believe, that--what's your father's name?
A Chris Fotos.
Q And was he the butcher?
A Yes, sir.
Q When I say "the butcher" I mean--
THE COURT: I'm sorry. Could you spell that last name please, ma'am?
A F-O-T-O-S.
Q That was actually his occupation?
A He owned a meat packing plant, yes.
Q And would your daughter go and visit him or did he take care of her there where the meat processing was going on?
A Yes, sir; we all did. I grew up there; Christa did too.
Q Now, was your daughter forced to watch this meat processing and animals being slaughtered and that kind of thing?

A No, she was not forced to; no, sir.
Q Did she, in fact, watch it?
A Yes, sir.
Q Can you describe what her attitude was about that? Was she horrified at all at this process?
A No, sir.
Q Did she like going and seeing that?
A I think she just liked being with her pawpaw.
Q Did you have--did you--were you uncomfortable with her being around animals that were being slaughtered?
A No, I didn't think about that.
Q Was your--did your father sacrifice these animals in some sort of ritualistic way or anything like that?
A No, sir.
Q It's just part of the job that he had in the meat processing plant?
A Yes, sir.
Q (Pause) Let me ask you about another sexual assault case that you mentioned. I think you said his name was Claude.
A Claude Davis.

Q Claude Davis. Could it be Clyde Davis as well? Is that the same individual we're talking about?
A It may be Clyde Davis, yes, sir.
Q Claude or Clyde Davis?
A Yes.
Q Do you remember actually him calling- Mr. Davis calling your home and talking to you?
A (Pause) You're thinking about the other person, Kenny Clyde.
Q Kenny Clyde. I see.
A Kenny Clyde.
Q I'm mixing those up.
A Yes, sir; he did call my home--
Q Okay.
A --and talk to me. And he actually told me he was going to rape me.
Q Okay. What happened with that?
A Well, first my husband went looking for him, and he didn't find him. Then Christa and a friend of her's found him in McDonald's parking lot in Hillsborough, and they beat him up with a stick.
Q In fact, they beat him up pretty severely; didn't they?
A Yes, sir.

Q And nobody else was around, just Miss Pike, your daughter, and her friends or her friend?
A Yes, sir, as far as I know.
Q (Pause) Now, it's fair to characterize your daughter when she was growing up, the older she got that she was consistently, always in some sort of trouble?
A Yes, sir.
Q In fact, you characterized her as being very rebellious?
A Yes, sir.
Q Was it fair to say that you tried to--you were more lax in your discipline and indulgent toward her; whereas, her natural father was more severe in his discipline?
A Yes, sir.
Q And both angles were attempted, both theories of childhood raising if you will--
A Yes.
Q --child rearing? In fact, her behavior and her rebellious nature scared off a number of your boyfriends?
A Yes, sir.
Q You've also characterized her, your daughter, as always having had a bad temper; is

that true?

A Did I say that?

Q Well, let me look at my notes. (Pause) Do you remember telling Dr. McCoy that your daughter always--has always had a bad temper, but she never actually hit you?

A I probably did.

Q Do you also remember telling Dr. McCoy that your house was a continuous battle zone?

A Yes, sir.

Q And you stand by that characterization today, right?

A Yes, sir.

Q You've also said that your daughter was a liar?

A Yes, sir.

Q And that she was notorious for lying from day one?

A Yes, sir.

Q And, in fact, on at least one occasion when she alleged she was raped, you didn't believe her?

A Not at first, I did not.

Q Let me talk about some of these situations. We had--you had mentioned Steve Keyall?

A Kyaw, yes, sir.
Q Kyaw. He was a boyfriend of your's that lived in the home with you--
A Yes, sir.
Q --and your daughter, Miss Pike? Now, do you remember an incident where your daughter, Christa Pike, actually chased Steve Kyaw around with a butcher knife?
A It was a butter knife.
Q A butter knife?
A Yes, sir.
Q (Pause) So you--do you recall telling Dr. McCoy that during this incident, Christa, your daughter, chased Steve around with a butcher knife?
A No, sir; I said butter knife.
Q So you're saying Dr. McCoy, if that's included in her report, that's actually an error? Is that what you're saying now?
A I don't remember telling her that, not about the butcher knife.
Q As you recall it now--
A Unless I'm--unless there was another incident that I don't remember.
Q Could there have been another incident like that?

C. Hansen - Cross

A I don't remember.
Q Now, there was a time when there was a friend of your daughter--of Christa Pike's, a Breanna?
A Yes, sir.
Q What's her last name? Do you recall?
A I don't remember. I'm sorry.
Q I didn't write that down. Now, this Breanna was a friend of Christa Pike's?
A Yes, sir.
Q And she came from an abusive home and so she moved in with you?
A Yes, sir.
Q Now, what was your daughter's reaction to her moving in?
A It was my daughter's idea.
Q Did everything turn out okay on that?
A She and Christa had an argument about something. I don't remember what. But their friendship ended so Breanna left and--
Q But you remember telling Dr. McCoy that your daughter beat Breanna up and pushed her down the stairs?
A Yes, sir.
Q And, in fact, ran her off--ran Breanna

off?

A Yes, sir.

Q You also talked about her going into the Job Corp and, in fact, that this was an idea of your daughter's, to go in the Job Corp, turn her life around, and maybe become a nurse--

A Yes, sir.

Q --with that goal in mind? But the actual triggering event that led her to going into the Job Corp involved Beth Brown; didn't it?

A Oh.

Q Isn't that what ultimately led her to join the Job Corp?

A I don't remember. I--I just--

Q Do you remember--

A --vaguely remember Beth Brown.

Q --do you remember Beth Brown?

A Very, very vaguely. I couldn't tell you what she looks like even.

Q Well, do you remember telling Dr. McCoy that after Beth Brown and your daughter had a falling out, that Christa Pike actually assaulted Beth Brown, that she and her friends broke into her home?

A I don't remember.

Q You don't remember telling her that?

A No, sir, I really do not.

Q And that this was the event, because they--her--she and her friends were charged, that your daughter chose to go into the Job Corp to avoid prosecution in that case?

A (To self) Did I know about the-- (Out loud) Maybe. I did not know that Christa was in any trouble until after she was at Job Corp and the Sheriff's Department came to our house with a warrant. But she had already been arrested here.

Q When they came--

A But that was before the trial, yes. It was after she was arrested here.

Q So people from North Carolina law enforcement from North Carolina came to your home?

A Yes, sir.

Q And did it involve an incident with Beth Brown?

A I don't know if it involved Beth Brown, but apparently Christa and some of her friends had shoplifted at one of the stores. So they had a warrant for her for that.

Q Now, she went into the Job Corp in the fall of 1994 or--yeah, 1994; is that correct?

A I think so.
Q And she came home over the Christmas break--
A Yes, sir.
Q --from Knoxville?
A Yes, sir.
Q And you've indicated to Dr. McCoy that she had these crystals with her? Can you explain that?
A Yes, sir; they were crystals that Tadarryl had given her.
Q What was the significance of the crystals?
A I do not know, but she just told me that Tadarryl had given them to her. And I can't remember if she explained them to me or not.
Q Do you recall her saying that they had any sort of powers, magical powers, or--
A I think they--I think they were supposed to have.
Q Anything about creating clouds over certain people?
A Yes, Tadarryl said. Christa said that Tadarryl could make the clouds move and make the sky open up.

Q Okay. And did Miss Pike, your daughter, claim to have that power as well with these crystals?

A No, sir.

Q Why was she carrying them with her?

A Because Tadarryl gave them to her.

Q Did she indicate that she was in a--any kind of gang or anything like that?

A No, sir.

Q Did she mention anything about being in WICA?

A No, sir.

Q You're not aware of anything, her being in a WICA--

A No, sir.

Q --gang?

A She asked me for money to buy shoes or clothes or something to wear to church. And that's all I was aware of.

Q You don't you recall telling Dr. McCoy that, "She had all these crystals with her. She told me she was in a group called WICA, which is in touch with the Earth, moon, flowers, and so forth"? Do you recall making that statement?

A I might have.

Q You're aware also that your daughter had a devil's tatoo on her chest?

A Yes, sir.

Q Did she have that in the fall of 1994?

A The tatoo?

Q Before the murder?

A I think so, but it wasn't a devil devil. It was a cute little cartoon. It wasn't a wicked devil, it was just a little cartoon.

Q A cartoon devil?

A Yes, sir.

Q But she had that in the fall of 1994, in other words?

A I think so. I--you're asking me things from 12 years ago.

Q I understand. It's difficult.

A I'm sorry.

Q Yes. Now, did you encourage her to go back to the Job Corp after the break?

A No.

Q You wanted her to stay?

A We wanted her to stay home.

Q But she indicated she felt like she needed to do this?

A Yes.

Q That she finally had an opportunity to turn her life around and to become a nurse?

A Yes, sir.

Q And you all, in fact, encouraged her. You gave her some sort of--was it a badge or something that indicated--that said, we--we've got the home support for you or--

A I think so.

Q --something like that?

A Yes, sir.

Q To show that you and your husband, her step-father at that point, were supporting her and were trying to encourage her?

A Yes, sir.

Q That she had this opportunity before her, she needed to take advantage of it?

A Yes, sir.

Q Do you remember telling Dr. McCoy that your daughter, Christa Pike, had had many second chances in her life and that she had blown them all?

A I may have said that.

Q Is that a fair characterization?

A Yes.

MR. PRICE: (Pause) No further