**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 5**

**DOCUMENT 2**

---

004596

VII E2009-00016-CCA-R3-PD

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGDoyal

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Volume 2

January 29-31, 2007 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Ms. S. Jo Helm
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Ms. Catherine Brockenborough
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS


| Volume 2 | Page |
| --- | --- |
| PETITIONER'S PROOF: | |
| CARISSA HANSEN: (continued) | |
| Redirect Examination by Ms. Brockenborough | 101 |
| GERARD HANSEN: | |
| Direct Examination by Mr. Brockenborough | 112 |
| Cross-examination by Mr. Price | 128 |
| Redirect Examination by Ms. Brockenborough | 139 |
| CARRIE ROSS: | |
| Direct Examination by Mr. Dawson | 144 |
| Cross-examination by Mr. Price | 194 |

questions.

THE COURT: Any other questions you have of Ms. Hansen?

MS. BROCKENBOROUGH: Yes, your Honor. One moment please.

THE COURT: Okay.

(Whereupon, Ms. Brockenborough and Mr. Dawson conferred.)

REDIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Ms. Hansen, Mr. Price asked you about Kenny Clyde?

A Yes, ma'am.

Q And you had indicated that Mr. Clyde had called the house and had threatened to rape you?

A Yes, ma'am.

Q Was that the first time that Mr. Clyde had called your home?

A No, I think he called on several occasions.

Q And at the time that he made that threat to you, were you aware of his activities regarding your daughter, Miss Pike?

A I knew that--I don't remember exactly what they were, but I knew that she was having

problems with him too.

Q Did you know that he had been stalking her?

A Yes.

Q And do you know what happened after the incident in which he was beaten up?

A Yes. We went to court over the incident, and when we got in the court the judge said that the case would be dismissed because Kenny Clyde was already serving time for molesting two toddlers.

Q And so charges were initially brought against your daughter because of the incident?

A Yes. The charges were dropped.

Q And they were dropped as--because he had been convicted in a case of sexual molestation?

A Yes, ma'am.

Q Are you aware of the extent of Mr. Clyde's stalking activities as it related to your daughter?

A Only what Christa told me, but this was long time ago. But she did tell me that he was stalking, and she and one of her friends told me that he was a child--that he was a child molester.

Q Do--

A And that he had threatened them.

Q And had he--do you know whether he had called the house on prior occasions?
A Yes, he had.
Q Mr. Price asked if you had--asked if you had stated that your daughter Christa's behavior scared off your boyfriends?
A Yes.
Q And you agreed with that statement?
A Yes.
Q Can you explain what you mean by that?
A She was just always running away and skipping school, like I said before, and I was having to look for her, searching all the time, had the police involved. It was just those things.
Q Okay. And so the--are you saying that the fact that you were spending time trying to go after Christa, that that was what scared off boyfriends?
A I think so. My life was just always a drama then.
Q You also agreed that at one point you had stated that Christa was notorious for lying from day one?
A Yes, ma'am.
Q And when exactly would day one be?

A Probably from the time she learned to talk.
Q Do you know whether your daughter Christa has ever said anything to you that was true?
A I'm sure--yes, ma'am, she has.
Q Do you know what led up to the incident where Christa was chasing Steve Kyaw around with a knife?
A I was at work when it happened, but--let's see if I can remember. He--are we talking about the butter knife incident, because I can't remember the other one? (Laughter)
Q If--I don't know that there were--
A I didn't--
Q --how many incidents there were.
A --know of two either. But the butter knife incident, she--was it a butter knife? I hate to answer wrong, so I'm not going to answer.
Q Okay. So you don't recall what led up to it?
A I do not.
Q Do you remember that this incident--whether this incident led to the family being involved with the court system at all?
A Yes.

Q And what do you recall about that?
A Steve had--Steve hit Christa.
Q What do you remember about--
A And that--and all I know is what the two of them told me.
Q Okay.
A But I believed Christa.
Q So this was--Mr. Kyaw hitting your daughter, was that something that preceded her chasing him with the knife?
A Yes.
Q And to your recollection those were connected?
A Yes.
Q Do you remember that Mr. Kyaw hit her across the face with a belt buckle?
A Yes, I think so.
Q And what was the result of that case?
A We broke up.
Q And was that a requirement of the court action--
A No.
Q --that was taken in this case?
A Well--(Pause) I think we had already broke up before we went to court for the case.

Q And it's your recollection that when Christa told you that Mr. Kyaw had hit her across the face with a belt buckle, that you believed her?

A Yes.

Q And do you recall how old Christa was at that time?

A (Pause) Hum, 12 or 13.

Q And how old was Mr. Kyaw?

A (Pause) Thirties.

Q And you indicated that Christa's friend, Breanna, had come to stay with you and that was at Christa's request--

A Yes, ma'am.

Q --is that correct? And Christa knew that Breanna had been abused?

A Yes, her mother had pushed her through a plate glass window.

Q And she had also asked if her friend, Brian Wilson, could stay with you?

A Yes.

Q And I believe you indicated that was because he had no other place to stay?

A Yes.

Q Is that right? Is it possible that you and Mr. Kyaw didn't break up until after the court

action?
A Hum, it could be possible.
Q And do you remember that Christa got her tatoo, that Mr. Price asked about, for her 16th birthday?
A I think she did.
Q Was it something that she had said that she wanted to do when she was 16? Do you remember her saying that?
A I don't remember.
Q And do you remember her going with her friend, Mandy, to get the tatoo?
A I knew about it after-the-fact.
MS. BROCKENBOROUGH: One moment please.
(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Miss Pike.)
MS. BROCKENBOROUGH: I don't have any other questions, although we would like to reserve --let me just make sure.
(Whereupon, Ms. Brockenborough conferred further.)
MS. BROCKENBOROUGH: We would like to reserve Ms. Hansen as a rebuttal witness, however.
THE COURT: And Ms. Hansen needs to

remain outside the courtroom?

MS. BROCKENBOROUGH: Yes, please, unless there's-

THE COURT: Okay. Do you have any other questions you want to ask her at this time?

MR. PRICE: No, your Honor.

THE COURT: Okay. Ms. Hansen, you do need to remain outside the courtroom. You're still under the rule, which means that you have to not discuss the matter with anybody, and we'll call you as quickly as we can, if you are to be called again. Does that mean Ms. Hansen is a rebuttal witness for later on too, whenever we come back?

MS. BROCKENBOROUGH: No, your Honor, it would just be during this.

THE COURT: You would determine? Okay. All right. That's fine. It's a little awkward since we're going to have to go out a ways. I understand that. Okay.

(WITNESS EXCUSED)

* * * *

THE COURT: Before we call the next witness, I want to be sure that the issue regarding communication between members of the audience and Miss Pike has been dealt with.

MS. BROCKENBOROUGH: It has been and all parties are very clear on what your Honor--

THE COURT: They need to be because this isn't child's games. This is real serious, and I need to listen instead of watching them talk to each other and communicate their fondness and admiration.

MS. BROCKENBOROUGH: I understand. Can-- is it possible for Miss Pike to get some Excedrin now?

THE COURT: Yes.

MS. BROCKENBOROUGH: Thank you.

THE COURT: And let me get her--would you get her a glass of water please? I don't have any. Surely, go ahead.

Who will your next witness be, if you could tell them?

MS. BROCKENBOROUGH: Gerard Hansen.

THE COURT: Gerard Hansen.

COURT OFFICER COFFEY: I'm sorry, your Honor; I didn't get that.

MS. BROCKENBOROUGH: Gerard Hansen.

THE COURT: Gerard Hansen. And I believe Mr. Hansen was sworn previously?

MS. BROCKENBOROUGH: Yes. (Pause) Your

Honor, I know you had indicated that you would prefer that we keep custody of--

THE COURT: That.

MS. BROCKENBOROUGH: --the Excedrin.

THE COURT: Uh-huh (Affirmatively).

MS. BROCKENBOROUGH: But I was wondering if we could leave it in the custody of the officers or--

THE COURT: I think--

MS. BROCKENBOROUGH: --someone else just-

THE COURT: --is that all right, Carl?

COURT OFFICER JENKINS: That'll be fine.

THE COURT: Okay. Let me--why don't you turn it over to--well, why don't we just leave it here in case we need it. And you know what we can do with it--Carl, could you lock it up maybe?

COURT OFFICER JENKINS: We can.

THE COURT: Yeah, why don't you just do that.

MS. BROCKENBOROUGH: Okay.

THE COURT: And that way we know it's locked and nobody's been in it.

MS. BROCKENBOROUGH: All right. Great. We can do that at the end of the day. Thank you.

THE COURT: We have a secure facility in the courtroom.

(Whereupon, the witness came into open court.)

THE COURT: Mr. Hansen, yes.

Are you ready, General, or-

MR. PRICE: Yes, your Honor.

THE COURT: Mr. Hansen was previously sworn. Before you start, did we make those exhibits yet? Have we marked those?

THE COURT REPORTER: Are you talking about the pictures that were-

THE COURT: No.

MS. BROCKENBOROUGH: Oh, we've not marked that.

THE COURT: Do you want to mark those so we don't forget, since they're Exhibit 1?

MS. BROCKENBOROUGH: Is that ready to be put in?

MR. DAWSON: Oh, yes, this is ready.

THE COURT: Okay.

MR. DAWSON: Your Honor, this is--we now have this ready to be marked as Number 1. It's in the order, with the exception we still don't have--

THE COURT: Right.

MR. DAWSON: --the table of contents.

THE COURT: Right, and we're going to get that together. So if you want to, if you all want to go ahead and let the court reporter have that, that would help.

And whenever you're ready to begin on Mr. Hansen's testimony.

(Collective Exhibit No. 1, Dr. McCoy's 5-volume report, was marked and filed.

GERARD HANSEN, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Sir, can you give us your name please?

A Gerard Hansen.

Q And, Mr. Hansen, where do you live right now?

A In Lubbock, Texas.

Q And how do you--do you know Ms. Christa Pike?

A Yes, I do.

Q And how do you know her?

A I'm married to her mother.

Q When did you marry your wife Carissa?

A 1992.

Q And how long had you known--how long had you known each other prior to being married?

A I met Carissa the first time in 1986 when I moved to North Carolina where she was living at the time. And then between those times I was still married to my ex-wife, back and forth, mostly work related items though. You know, I have to work--cookouts.

Q And at that point did your relationship with Carissa, your wife, turn from friendship to romance?

A She was the maid of honor at one of her friend's weddings, one of her best friends, and I helped cater and did some repairs on her house prior to.

Q And at some point before you were married, did you and your now wife move in together?

A Excuse me?

Q Did you and your now wife move in together?

A We moved in together, I believe, in 1991.

Q At the time that you moved in, was Christa Pike living with you?

A No.
Q And do you know where she was at that time?
A If I'm not mistaken, she was in Swannanoa at the time.
Q When she was released from Swannanoa did she come and live with you and Carissa?
A Yes.
Q And how long was she living with you until she was--went away again?
A I really could not tell you. If I had to guesstimate, it would be maybe a year, a year and a half.
Q And where did she go the next time?
A She went to Job Corp.
Q And do you recall how long she was at Swannanoa?
A About 15 or 16 months total.
Q When--now, do you--and do you remember when it was that she was released from Swannanoa?
A No, I do not.
Q Could it have been in early 1993?
A It was--it was after we got married, so that's certainly a possibility. We got married late in '92.

Q Do you remember--do you you remember an individual by the name of Kenny Clyde?
A Kenny Clyde, yes, ma'am.
Q And what do you recall about Mr. Clyde?
A That he was not a very nice person.
Q Okay. And why do you say that?
A Well, he had an attitude about him that was just-it stood out that he was most of the time looking for trouble.
Q And did he have any interaction with you or any other members of the family?
A Not directly he did not, no.
Q Do you have any memories of him ever calling the house?
A He's called--he called the house, and I know he asked to talk to Carissa, and he talked to Carissa.
Q And do you know what the nature of these conversations he had with Christa Pike--
A No, I do not.
Q Do you know the nature of--now, how many conversations do you know of that he had with your wife?
A I could not give you a number.
Q And do you--were you aware that Mr. Clyde

had been stalking Christa Pike?
A Yes.
Q Do you know whether your wife was aware that he had been stalking her?
A Uh-huh. (Affirmatively)
Q Did--and for the record was that a yes?
A Yes, I'm sorry.
Q Okay. Do you know--did your wife or you ever take any action to try and put an end to the stalking?
A I went looking for him but never found him.
Q And did either of you report this to the authorities?
A No, we did not.
Q Okay. How do you--how did Christa end up going to Job Corp? What are your recollections of--
A The recollection is that it was something she had read about, and it was for her an opportunity to make something for herself. And it was a nursing--it had a nursing program, which is what she was interested in.
Q Do you recall whether--whether her going to Job Corp was part of the aftercare for her

release from Swannanoa?
A No, I don't.
Q And do you recall whether there had been any direction that you or your wife facilitate Miss Pike going into Job Corp?
A No, I do not.
Q So your recollection is that the idea of Job Corp came from Christa--
A Right--
Q --herself?
A ---it did.
Q Did you have--did you ever visit with Miss Pike while she was at the Job Corp?
A Yes.
Q Can you describe that visit?
A Actually, for me to visit was outside. I was not allowed in the building.
Q And was--what building was this?
A It was--
Q Was it a residential building, a classroom per say?
A It was actually--I think it looks like--it looked like a hotel. I know it had a name, but I don't remember.
Q All right. And was it your understanding

that that's where--where Christa was living at the time?

A Yes.

Q And do you know why you were not allowed to go inside?

A I know it was--I think it had to do with the fact that it was a mixed; it was women's and men's. And because she was living in the women's dorm, I was not allowed in it.

Q And so your wife went into visit--

A Yes.

Q --with Christa? And do you remember how long she was there, while you were waiting outside?

A An hour and a half, two hours maybe.

Q Do you remember Christa's visit over Christmas--

A Vaguely.

Q --in 1984? And what do you remember about that?

A Well, I remember that we went--that I went to pick--and picked her up so she could--she could come home for Christmas.

Q And was she--how would you describe her mood or her attitude as it connect--you know, in regards to Job Corp?

A In regards to Job Corp, I'm not really sure if I got the right feelings about her not liking it there. But her attitude itself was like it's always been, as far as I know.

Q Okay. Well, let me try and clarify that a little bit. As far as Job Corp, are you saying that it was your impression that she didn't want to go back or that she did want to go back--

A She didn't want to go back.

Q --or she was enjoying it? Was that--

A Yes.

Q --is that fair to say, that that was your impression?

A Yes.

Q And when you say that her attitude as far as other things was the same as always, what do you mean by that?

A That's--that she was just herself. That's how--how I got to like Christa.

Q And how do you--how would you describe Christa?

A Well, with me she's always been open and friendly, and we get along great. And that is the same feeling I got all the time.

Q Has she ever been violent toward you?

G. Hansen - Direct

A No, never.

Q Have you ever been violent towards her?

A No, never.

Q Can you tell the Court what you remember about learning that Christa had been arrested in this case and what happened following that?

A I was at work when Carissa called me, and the only two things I heard when she called me--and I know probably Carissa said a lot more than that--was shooting and Christa.

Q When did you become aware that she had actually been charged with murder?

A I think it was a couple of days later when one of the detectives called Carissa, because when Carissa had called here to the Police Department they--they wouldn't let her talk to anybody.

Q Did you attend any of the proceedings involved in this case?

A Only the trial.

Q And were--did you ever go to Knoxville before the trial, between when Christa was arrested and the beginning of the trial?

A While she was in jail, we came down several times to visit.

Q All right. And do you recall how often you were able to come?
A I think we--no, I can't recall the exact number.
Q And do you remember, is it possible that you may have attended the preliminary hearing in the case?
A (Pause) Well, I wasn't there during jury selection, and that almost took a whole week. And I came that following Monday.
Q Okay. And--but prior to that, do you--well, let me ask you this. Do you remember whether you ever met Christa's attorney, William Brown?
A In North Carolina. The first time in North Carolina.
Q And are we talking about William Brown or William Talman?
A Oh, William Brown? Yeah, actually I did meet him. I did meet him.
Q Okay. The are a lot of Williams involved in this case.
A Yeah, I met him here at the courthouse.
Q And do you remember the circumstances of that meeting?
A No, I do not.

Q Did you talk with him at all about the case?

A Not about the case. He just said he was --he was the attorney that was going to handle it.

Q Now, let's go back to Mr. Talman. You indicated that you met him in Raleigh?

A Yes.

Q And was that the first time that you had met him?

A Yes.

Q And can you tell us the circumstances of that meeting please?

A Well, they wanted some more background information--

Q And what--

A --or additional information and wanted us to meet them at the hotel.

Q And when you say "they" and "them," who are you referring to?

A It was Mr. Talman and Ms. Brown, and me and Carissa was supposed to meet with them.

Q Mr. Talman and Ms. Brown?

A Is it?

Q Could it possibly be Julie Martin or Julie Rice?

A I thought--yeah. I thought her name was Brown, but yeah, Julie.

Q Are you referring to the second attorney that represented Christa at trial, just to make sure we're talking about the same person?

A I might have my names mixed up, yes.

Q Okay. And so they indicated that they wanted to talk with you and get some more information about Christa and her life; was that your understanding?

A Yes.

Q And did you--were you able to meet with them?

A After they finished dinner, we met with them in a room for about maybe an hour, an hour and ten minutes.

Q And you say that you met--I think you indicated you met them in Raleigh?

A At a hotel in Raleigh.

Q All right. And can you tell us a little bit more details about how those arrangements were set up and what happened when you got there?

A Well, when we got there, they had already ordered dinner. They were waiting for their dinner to come to their table. So they asked us to sit in

the lobby and wait till they were done.

Q And do you recall how long you waited?

A Oh, probably a good 45 minutes.

Q And after they were finished with the meal, you remember that you met with them?

A Up in the room.

Q In a room.

A In one of their rooms.

Q Okay. And were they asking you--did they, in fact, ask you questions about Christa's background?

A They did ask questions.

Q And do you remember when this was, how far before the trial?

A No, ma'am, I could not tell you that.

Q And I believe you said a little bit earlier that you were not here for the jury selection in the trial--

A Right.

Q --but you were able to make it the Monday of the second week--

A Right.

Q --is that right? And did you meet with any of the attorneys or anyone else from the trial team during that week?

A During that week we pretty much met at the courthouse.

Q And were you having substantive conversations or was it simply just sort of meeting and--

A Just sort of meeting, getting a little bit of update of what they were planning on doing.

Q What--is it fair then that the attorneys were aware that you were here in town, in Knoxville at the time?

A Yes.

Q And had you been subpoenaed to come?

A No, I had--I did not.

Q You did not receive a subpoena either from--

A No, ma'am.

Q --from Miss Pike's attorney or from the State?

A No.

Q When you arrived, when you first got here did you know whether you or your wife would be testifying at the trial?

A From the beginning, no, we did not know if we were going to be testifying. During the course, we were told that we would not.

Q So during the course of the preparation

before--

A Of that week.

Q During the course of that week--

A Right.

Q --you were told that you would not--

A Right.

Q --be testifying? Did that change at some point?

A Did that change?

Q Yes.

A No.

Q You did--you never testified at the penalty phase--

A No, I didn't ever.

Q --is that right? Now, did your wife-your wife ended up testifying; is that right? She did testify at the penalty phase?

A She testified at the sentencing hearing.

Q And was she aware that she was going to be testifying at sentencing-

A Huh-

Q --during that week?

A I can't speak for her, but I believe so, yes.

Q And were you present for any preparation

for her testifying?

A The only one that I can recall is when we went to Mr. Talman's office, and it was for the sentencing hearing.

Q And that--this was preparation for the sentencing hearing?

A Yes.

Q And do you remember when that meeting occurred?

A It happened on a Friday night, if I'm not mistaken, because the sentencing hearing was the following Saturday-

Q Okay.

A --that Saturday.

Q That Saturday. Could it have happened that Saturday morning?

A (Pause) Yes, it could have.

Q Do you remember meeting with Dr. Diana McCoy at all?

A I remember meeting her. I don't remember what we talked about. I think most of the talking was done between her and Carissa.

Q And where--where was this meeting?

A At her office.

Q Do you remember whether you ever met

Dr. McCoy at your house or whether she ever visited your house in North Carolina?

A I believe she came to North Carolina--(Pause)--one time.

Q And that was before the trial?

A Yes, it was before the trial.

Q And did you meet with her at that time or was it again mostly between Dr. McCoy and your wife?

A It was mostly between Dr. McCoy and Carissa.

MS. BROCKENBOROUGH: One moment please.

THE COURT: Uh-huh (Affirmatively).

(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Miss Pike.)

MS. BROCKENBOROUGH: I don't have any other questions for you at this time. Thank you.

THE COURT: All right. General, whenever you're ready.

CROSS-EXAMINATION

BY MR. PRICE:

Q When did Christa Pike come to live in your home?

A After she got released from Swannanoa.

G. Hansen - Cross

Q All right. Do you know--can you give us a year or anything like that?
A We moved into that house in North Carolina in '91. So it had to be somewhere in the spring of '91.
Q And what was Swannanoa? Do you--do you have any knowledge of that?
A Swannanoa was a--was, I think, a state-funded program that they would send peo-kids that were in trouble with the law. It was like a--I wouldn't call it a military school, but it's--that's kind of the impression that I had.
Q It was residential; in other words, the kids lived there?
A Yes, they lived there 24-7.
Q All right. And are you aware of how long she was there? You said 15 or 16 months?
A I think it was about 15 or 16 months. It was about a--it was less than a year and a half.
Q An intensive program where they're living--these children or these juveniles are living there and an attempt is made to get them to reform their behavior and get on with their life--
A Right.
Q --is that fair?

A That's fair.
Q Did you know--well, you didn't know her before. But when she came to live with you in your home, how was her behavior?
A Her behavior was fine.
Q You never had any problems with her?
A I never had any problems with Christa, no.
Q Were there any problems with her running away?
A Yeah, but not at that time, not after she came back. That--
Q When did--when did you have problems with her running away?
A When I first started seeing--started seeing her mother when they lived in Hillsborough.
Q Okay. Now, there was a time--there was an incident where you've indicated you'll remember for the rest of your life. It's when you lived in Flint Ridge Apartments; do you remember that?
A Uh-huh (Affirmatively).
Q And do you remember that incident I'm talking about, where the police--where she had to actually climb out the window? Can you tell us what happened?

G. Hansen - Cross

A Well, she had--she had run away and the police officer was bringing her--bringing her back. And while Carissa and the police officer were talking in the dining room, which is right by the front door, she was sitting in the chair in the living room and I guess instinctively, when she got up, I put my arms under her arms and lifted her off the ground because I had a feeling that she was going to run again.

Q She didn't try to run away then; you just grabbed her?

A I just hold her. She did eventually, when we put her--when she went upstairs and then climbed back out the window.

Q Okay. So eventually she--well, I thought that was--isn't it true that she climbed out the window before the police brought her back home?

A Yeah, that's probably how she got out.

Q Okay. So isn't it true that the way that incident unfolded is that Miss Pike, Christa Pike, had been out with her friends, she came in, and her mother told her she couldn't go back out again?

A Right.

Q Does that sound right?

A That sounds right.

Q She was sent upstairs to her room; is that true?
A Yes.
Q And she disobeyed her mother by getting some sheets together and climbed out the window?
A Right, she did.
Q And eventually she was found and returned by the police and brought back home?
A Yes.
Q And you yourself had to restrain her from running off again?
A Well, I'm not sure whether she was going to run again. It was just that she was sitting down in the chair and just suddenly got up, and I just did it instinctively.
Q You felt like that was a possibility? That was the reason you grabbed her; isn't that right?
A Well, that was--yes.
Q You were reduced to grabbing her to keep her from fleeing the home?
A I did not grab her. I was just putting--lifting her off the ground basically.
Q Okay. All right. Haven't you characterized her behavior--didn't you characterize it to

G. Hansen - Cross

Dr. McCoy as her--as Christa Pike being out of control?

A No, sir, not that I can recall.

Q You don't remember making that statement?

A No, sir.

Q You don't remember saying that you had a lot--you and Carissa had a lot of problems with Christa who was completely out of control, trying to see how far she could push everyone?

A I do not remember making that statement.

Q Do you remember the incident with Christa Pike pushing her friend Breanna down the stairs?

A No, sir.

Q You don't remember telling Dr. McCoy that you did recall this incident of Christa pushing Breanna down the steps?

A No, sir.

Q Do you remember telling Dr. McCoy that Christa very much likes the attention that she gets from her behavior?

A Yeah, I do remember saying that.

Q Is that true?

A Well, all--if Christa gots attention, then she was always the one that was smiling. So I guess I have to say yes, that's true.

Q She's certainly got a lot of attention now?

A Probably not the way she wanted it.

Q Do you remember getting a call from her the night of the murder, the night Coleen Slimmer was murdered at about 11:00 p.m.?

A If the call came in, I did not talk to her. Her mother probably most likely did.

Q You don't remember telling Dr. McCoy that Christa had called you at 11:00 p.m. the night of the incident, that she was very upset. She would not tell you what was happening, but eventually said that word was going around the Job Corp that someone had been killed. Do you remember making that statement?

A Vaguely. I'm not--I have heard the statement before. I cannot tell you for 100% if I said it or not.

Q Do you remember telling Dr. McCoy that she actually--Christa Pike actually wanted you to come and get her that very night?

A She did tell me that.

Q Do you remember that now, that conver-sation?

A I remember that part.

G. Hansen - Cross

Q This incident with Kenny Clyde--you indicated that Kenny Clyde was a child molester that was stalking Christa Pike?
A We found out from the police that he was a child molester.
Q Okay. But anyway--
A From one of the officers that we knew from the times that Christa had walked away--had run away.
Q Do you remember how old--how old Christa Pike was when this was going on?
A (Pause) About 14 or 15 maybe. I mean I met her when she was about 10. That was the first time I was--
Q And you, in fact, had tried to take matters into your own hand. You had tried to go and find Kenny Clyde?
A I went to look for him to see if there was--just to talk to him. I didn't--I mean I don't know what would have happened. I'm not a violent person. But when my wife had told me that he had done, I went in my truck and went lookin' for him.
Q But you were unsuccessful?
A I was unsuccessful.
Q Christa Pike actually was successful in

finding Kenny Clyde; wasn't she?
A At one time, yes.
Q Are you aware of how she was able to meet him?
A She had--her and her friend told him they were going to go out and have some fun.
Q She was able to lure him somewhere and then beat him up; wasn't she?
A But that's not what she told me. I mean that's not what I know at that time.
Q What do you know about it?
A That they were going to meet him. I didn't know they were going to beat him up.
Q No, I understand. But anyway, now as you sit here today, you know that what Christa Pike did, when she was threatened by this man, was she called him, told him under false pretenses, "Meet me so we can have some fun." And, in fact, she planned to assault him; isn't that what happened?
A That is what happened, yes.
Q And she beat him very severely?
A Yes.
Q How severely?
A I think he ended up going to the hospital and getting stitches.

MR. PRICE: (Pause) If I may have a moment.

THE COURT: Uh-huh (Affirmatively).

Q Was this--this Kenny Clyde incident, was that--that wasn't--you said she was about 14 or 15; is that right?

A I think that's right.

Q How close in time was it to when she went into the Job Corp Program?

A It was prior to her going to Job Corp.

Q By many--several months or years or--

A I really couldn't give you a time frame on that. I'm sorry.

Q But anyway your memory is that she was 14 or 15?

A Yes.

MR. PRICE: Pass the witness.

THE COURT: Any other questions?

MS. BROCKENBOROUGH: I do have a couple of questions, your Honor. One moment, please.

(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Miss Pike.)

THE COURT: Could I ask a question to clarify something here?

MS. BROCKENBOROUGH: Please.

THE COURT: Was that prior to her going to Swannanoa?

A No, it was after.

THE COURT: After Swannanoa, but prior to Job Corp. (Pause)

MS. BROCKENBOROUGH: I'm sorry. I wasn't paying a whole lot of attention but--

THE COURT: Did you hear what I asked him?

MS. BROCKENBOROUGH: No. (Laughter) If you could repeat that, please.

THE COURT: I asked him whether that was prior to her going to Swannanoa or after, and he said it was after Swannanoa but prior to Job Corp.

MS. BROCKENBOROUGH: The incident involving Mr. Clyde?

THE COURT: The incident involving Mr. Clyde.

MS. BROCKENBOROUGH: And--

THE COURT: And that was the only question I asked.

MS. BROCKENBOROUGH: Okay. Okay. Thank you.

(Whereupon, Ms. Brockenborough

conferred further.)

REDIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q And when--on your direct I believe you had said that you think Miss Pike was released from Swannanoa after you were married to her mother, and--but when Mr. Price was asking questions, you said it may have been the spring of 1991 when she came--

A Well, that's when we moved in the house in Cedar Grove--

Q All right.

A --where we were living at the time.

Q You moved into the house in Cedar Grove in 19--

A In 1991.

Q --the spring of 1991?

A Right, and we got married in October of '92.

Q And when you moved into the house in 1991, do you recall whether Christa was living with you then?

A After she left Swannanoa, she was living with us. She was living in--she was in Job Corp when we got married. So it had to be in 1991.

Q And you were married in 1992?
A Yes.
Q Okay. If the record reflects that she-- that Miss Pike did not start Job Corp until the fall of 1994, would that change sort of your recollection of the order of things?
A Where she was living?
Q Yes, and when--
A No, she was living in our--with us. She's never--I never lived at their house--I stayed there--when they lived in Flint Ridge. And then when we decided to move in together, we found this place in Cedar Grove.
Q And when you decided to move in together, was Christa still in Swannanoa or had she already been released?
A She was in Swannanoa.
Q All right. And that was in 1991 when you moved in?
A That's correct.
Q And do you recall when it was that she came out of Swannanoa?
A (Pause) I believe--I'm not positive, but it might have been in '92 because I--(Pause)
Q Was she at your wedding?

A No. That's what I'm trying to figure out because she was not.

Q And do you know why she wasn't there?

A Well, that's what I'm trying to figure out. She was either in Swannanoa or--I don't think she was in Job Corp yet. So she had to be in Swannanoa at that time.

Q And regarding this incident with Breanna falling down the stairs, do you--do you recall--what about that do you remember?

A I don't remember that at all. I remember Breanna living with us for awhile.

Q And do you remember taking Breanna to live someplace else when she left your house?

A I believe we took her back to her mother's.

Q And you remember--were you one of the people or were you the person who took her?

A I think me and Carissa took her at the time, yes.

Q And do you remember whether it was that day that she had fallen down the stairs?

A No, I do not. I don't remember her falling down the stairs, period.

Q Okay. You don't have any recollection of

Christa's friend Brandy fighting with her boyfriend at the time and being there and Breanna falling down the stairs?

A No, ma'am, I do not.

Q And so you don't know whether, in fact, Christa was even there when Breanna fell down the stairs; is that correct?

A Because I don't remember that is cer--I mean I don't know. I guess yes or no.

Q Okay. She could have been or she could not have been--

A She could have been or could not have been.

Q --as far as you know?

A During that time I worked 12 hour night shifts. So I might not have even been at the house at all. I don't--do not remember.

Q And has your wife always worked as well?

A Yes.

Q Full time?

A Yes.

MS. BROCKENBOROUGH: One moment please.

(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Miss Pike.)

MS. BROCKENBOROUGH: I don't have any other questions. Thank you.

THE COURT: Any other questions?

MR. PRICE: (Nodding negatively)

THE COURT: Thank you very much, Mr. Hansen.

May he be excused to remain in the courtroom?

MS. BROCKENBOROUGH: He may be excused, but we'd like to reserve him as a rebuttal witness as well.

THE COURT: Okay. Mr. Hansen, you need to remain outside and please don't discuss your testimony with anyone, and we'll call you if we need you to come back as a witness.

A Yes, ma'am.

THE COURT: Thank you, sir.

(WITNESS EXCUSED)

* * * *

MR. DAWSON: (Standing)

THE COURT: Mr. Dawson.

MR. DAWSON: Our next witness is Carrie Ross.

THE COURT: Do you want to call Carrie Ross--Carrie Ross, please. (Pause)

Do you feel better now, Miss Pike?

THE PETITIONER: I'm working on it. Thank you.

(Whereupon, the witness came into open court.)

THE COURT: Ms. Ross was also sworn this morning?

MR. DAWSON: Your Honor?

THE COURT: Ms. Ross was also sworn this morning, I believe?

MR. DAWSON: Yes, your Honor.

THE COURT: Okay. Come on up please, Ms. Ross.

(Whereupon, the witness took the witness stand.)

THE COURT: Okay. Mr. Dawson, whenever you're ready.

CARRIE ROSS, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q Ms. Ross, would you please state your name for the record please?

A Carrie Ross.

Q And will you spell your first and last

name for the court reporter please?
A C-A-R-R-I-E R-O-S-S.
Q And, Ms. Ross, where do you currently live?
A I live in Beckley, West Virginia.
Q Okay. And what is your relationship with Christa Pike?
A I'm her aunt.
Q Now, Ms. Ross, you did testify, did you not, in Miss Pike's trial in this matter in 1996?
A I did.
MR. DAWSON: And, your Honor, I'm going to try not to repeat anything that's in her testimony from '96, but I would like the Court to take judicial notice of what's in the record from that testimony.
THE COURT: That means I've got to go back and read it, but I'll be glad to if that's what you want to do, sure.
MR. DAWSON: Thank your Honor. I think the Court of Appeals doesn't like us putting record into this record so-
THE COURT: Speaking of the record, we're going to have to obtain the trial transcripts; aren't we? You all have them?

MR. DAWSON: We have them.

THE COURT: But I don't have them. So we either need to make them a part of the record or--

MR. DAWSON: Your Honor, I think what-

THE COURT: I don't think I do. Now--

MR. DAWSON: No.

THE COURT: I have some transcripts but they're--I also have my own notes. I'll have to look. I don't think I do though.

MR. DAWSON: You know, my understanding is the way the appellate courts like us to handle that is simply to observe that that's a prior part of this proceeding; and, therefore, the trial transcripts are part of what the Court would be looking at but not to actually put them in the record. They don't like to have--

THE COURT: That's fine with me. I just would like--you need to get it available to us. So we'll get that.

MR. DAWSON: Okay. Thank your Honor.

THE COURT: I don't want to go back through that, no.

MR. DAWSON: Right, okay.

THE COURT: Okay. Go ahead.

Q Ms. Ross, what is your profession?
A I'm a registered nurse and I teach nursing.
Q Okay. And in the time of the trial of this case in 1995 and '96, what was your profession at that point?
A I was an intensive care unit nurse.
Q And how long were you in that position?
A Eighteen years total, ten years at the time of her trial.
Q Okay. And is that part of what you teach now?
A Yes.
Q And as a result, you have studied the --I guess all things about newborns that are premature?
A Yes, I am currently certified in neonatal intensive care. So that's a national exam; the boards are.
Q Now, were you present or in the vicinity, I guess, when Christa Pike was born?
A Yes, I was.
Q And what was your job at that time?
A At that time I worked in the Pathology Department as a histology tech. I had not gone to

nursing school yet.
Q Okay. And what is your educational level?
A I have a Bachelor's of Science in nursing.
Q And where and when did you obtain that degree?
A Nineteen--in 1980 I had an Associate. In 1990 I completed by Bachelor's.
Q And where was that completed?
A At Bluefield State College.
THE COURT: I'm sorry, Bluefield?
A Yes.
THE COURT: Okay.
Q Bluefield, is that West Virginia or Virginia?
A It is; it's West Virginia.
Q West Virginia. Okay. I get confused about that corner of the world.
A I'm sorry.
Q The--and when--are you aware what had happened with Christa at the time of her birth?
A I am.
Q And were you--I mean how did you become aware of what was going on with your--with your

then--your new niece?

A My sister was--had had a caesarean section, and the physician was talking to me about the baby having problems, meaning Christa. He told me at that time that Christa had had a respiratory arrest, and that they were going to have to send her to Charleston, which is the medical center.

Q And are you aware of the type of facility then that she would have been placed in in Charleston?

A Yes. She went to an intensive care--a neonatal intensive care unit there.

Q And have you had a chance to review the birth records?

A I have.

Q And from the birth records or from your own knowledge, do you know what happened to her after she left the hospital in West Virginia?

A She was--well, she was transported by ambulance to Charleston, and in the ambulance we were told by the medics that she had had another respiratory arrest on the way. And once she got there, she was placed on the ventilator.

Q And how long was it then before she was

able to come home?

A I'm thinking--and I'm not certain--that it was about a week.

Q Okay. And I think in the testimony of the trial--and I'll be corrected if this is incorrect--but I believe you said at that point--let me get the actual question and answer. You were asked at that point on direct examination--

MR. DAWSON: And we're at page 2,486. This, your Honor, for the record is on page 2,486 of the transcript of the trial and--

THE COURT: Okay.

MR. DAWSON: --I'm not sure what line that's on, your Honor.

THE COURT: A long one.

Q And the--you indicated that--you were asked, "Were you present the first time that Miss Pike's mother was able to see her?" And to which you answered, "Yes". And then--you were then asked, "And when was that and how much time passed?" And you indicated. "Four days". Could you explain what had happened after four days versus what you've now said was approximately a week when she came home?

A She--she was on the ventilator for three

to four days. So I'm think--I'm thinking that that's probably what I was talking about--
Q Okay.
A --that she had known.
Q And then once she was off the ventilator, what would they do with someone in the neonatal intensive care unit?
A Well, then they start feedings and try to get the baby to gain weight, and then they let them go home.
Q Now, by feeding, would this be breast feeding or other kind of feeding?
A It would be--it would depend on the infant. I would think that if she were breast feeding, it would have been breast feeding.
Q But you don't know whether she was or not?
A But I don't know.
Q And let me go back a little bit now. Prior to the trial in this case in '96, did you have occasion to meet with Bill Talman?
A I did.
Q And approximately when and where was the first time you met Bill Talman?
A The first time I met with him was at

work, when I was in the intensive care unit there. And he came to my work, and we met in one of the rooms there. And then he came to my home later.

Q Okay. Now, was that within like the same visit?

A Yes.

Q --so it was later the next day--

A Yes.

Q --or later that day? Okay. And at that point, what did you and he discuss, not in detail but just in general?

A He just wanted to get some history on Christa basically.

Q Okay. And you talked also about your sister Carissa, correct?

A I did, yes.

Q And just for the record, Carissa Hansen now is your sister?

A That is correct.

Q And did you have occasion to meet with Bill Talman any other time?

A I did.

Q And when would that have been?

A Once he and Ms. Martin came to Beckley to meet with me. I don't even--I don't remember

how long it had been. And then we met again right before the trial I guess.

Q Okay. And in the--between then, between the time that Mr. Talman first met you and the time that Ms. Martin--then Ms. Martin, now Ms. Rice-

MR. DAWSON: Your Honor, for the record we're going to be talking to her about her with both names--

THE COURT: Correct.

MR. DAWSON: --because they knew her as Julie Martin.

Q Did you have occasion to meet with any other members of the defense team?

A I met with Diana McCoy.

Q Okay. And you recognized Dr. McCoy as being here today in the courtroom, correct?

A Yes.

Q Okay. And when you met with Dr. McCoy was this a similar meeting in terms of the information given to the time you met with Mr. Talman?

A No, it was kinda different, I guess.

Q Okay. Do you remember in what way?

A Well, it was right before the trial, and

we were basically going over what would--we would be doing in the trial and who would be doing what, and that kind of thing.

Q Okay. Now, I'm getting confused myself here. Did not Ms.--Dr. McCoy meet with you a couple of months before the trial?

A Yes, she did.

Q Okay.

A I'm sorry.

Q Yeah. That's--

A I didn't know that's the time you were talking about.

Q Okay. This was approximately December of '95, correct?

A Correct.

Q Okay. And did she meet with you in Beckley?

A (Pause) Yes.

Q Okay. So on that occasion was it a similar type of interview that Mr. Talman had done?

A Yes.

Q Okay. So now we're talking about the next time then that you saw both the--you saw Dr. McCoy. Let me ask you. Were you subpoenaed

to come down as a witness in the trial?
A No.
Q Were you told to be here?
A (Pause) That I had to be--that I definitely had to be here?
Q Well, no, just were you told--were you asked--I mean how did you happen to be here? Let me put it that way.
A I just sort of understood that I was--that I--that they wanted me to be here. I cannot say for sure that anyone said, "You have to be there."
Q Okay. And who asked you to come? I mean why did you come to the trial?
A Mr. Talman and Ms. Martin suggested sort of that I be here.
Q Okay. And do you remember when they made that suggestion?
A That was when they came together and to Beckley to talk with me--
Q Okay.
A --about--they just wanted some history. And I'm not--I can't really remember specifics. It's been awhile back.
Q Do you remember how long just

approximately before the trial that was?
A (Pause) I really can't because I don't remember when the trial was.
Q Okay. The--that's fair enough. I think the record would show the trial was in March of 1996.
A March. It would have been before that, several months before that.
Q And once you were here, when were--was--when did they tell you that you were definitely going to testify at the trial?
A (Pause) It was--I had came--I came down for the trial and I think they met--we met here in Knoxville when they discussed that, yes, you know, they wanted me to testify.
Q And then you were then telling about another meeting that you were at that Dr. McCoy and Mr. Talman and Ms. Martin were at. When was that?
A That was the one that I was referring to earlier where it was right before we came over for the trial.
A Okay. Now, this was--when you say you came over, this was when you--right before you came over to testify, correct?

A Right.

Q So to put it into perspective, this would have been the morning after the jury verdict finding Christa guilty, correct?

A I think so, yes.

Q Okay. And who was there at that meeting at that time?

A It was Mr. Talman; Ms. Martin; myself; my sister Carissa; Gerard, her husband; Glenn Pike; Diana McCoy. Those are the people that I'm certain were there, and I don't know about anyone else.

Q Now, were you all in one group?

A Yes, we were all in Ms. Martin's office.

Q Did they ever divide you up into other groups so you could talk individually about what you'd be asked when you testified?

A No.

Q Did they go over the type of questions that they would be asking you?

A (Pause) The type of questions, yes, I think so.

Q Okay. I think we're running--let me ask you this, because of your answer. I gather that we're having a question about definition here. So

can you describe what they described to you in terms of--what were they telling you at that time?
A Well, it was--they would tell me things like, "Well, we're going to ask you about your--I mean Christa's early childhood, your sister's behavior." They were pretty much general things but--
Q Okay. Kind of themes they were going to ask you about--
A Yes.
Q --as opposed to specifics?
A Yes.
Q Okay. And how long did this meeting take?
A I really don't remember. I can't--I couldn't tell you.
Q The--and who was--which of the attorneys, if you recall, was doing most of the talking?
A I think it was Mr. Talman.
Q And then you were actually examined by Ms. Martin, correct?
A Correct.
Q Ms. Ross, let me ask a little bit about your family. You grew up in the area of Beckley,

West Virginia, correct?
A Correct.
Q And just for the record, your father was Chris Fotos?
A Yes.
Q And your mother was Zola Fotos, correct?
A Yes.
Q And in terms of your family background, you had an Aunt Nora Privett, correct?
A Norma.
Q Norma Privett. I'm sorry.
A Norma Privett.
Q It says Norma. I just can't read it. The-and Privett is your maternal family's name, correct?
A Correct.
Q Okay And did she ever babysit for you and your sister when you were little?
A She did.
Q And what kind of a babysitter was she?
A She was abusive. She was always very nice to us when my mother was around. But as soon as she was left to babysit us, she would do things that--well, she would--I can specifically recall that she would pull me around by the hair of the--

literally, drag me through the house by my hair, and very abusive personality, yes.

Q And do you know whether or not--and that was to your sister as well, to Carissa?

A I don't know about my sister. She was older though. So she may have been in school when my aunt babysat.

Q And she is how much older than you are?

A She is four years older than I am.

Q Did your Aunt Norma ever babysit for your children?

A Maybe my son, but I can't say that for certain.

Q And--

A It wouldn't have been my choice.

Q --the--what about, do you know if she babysat for Alicia and Christa?

A She did.

Q Do you know if this was ever stopped at any particular time?

A It was.

Q Do you know why?

A Because Norma was very abusive and she would--I can't remember the specifics. I do remember telling my sister though at that--at some

point about the incidents when I was a child, and my aunt would drag me around by the hair and do things like that to me. I told her then--I said, "You know, you probably don't want her to watch the girls because this is the way I was treated."

Q Did it stop immediately after you told her that or was there some time passed before she actually then stopped using Norma?

A I think that it stopped--

Q Okay.

A --when--maybe the girls were complain-ing. I'm not--I can't really remember it's been so far back.

Q Okay. And let me ask a little about your father, Chris Fotos. I think we brought out from your sister--or maybe I think Mr. Price brought out from your sister, that he was a butcher by trade?

A He was.

Q And the--he at least had a butcher shop and a slaughtering house that was right on your property, correct?

A Correct.

Q And as children did you end up spending time with him in the slaughtering part of that?

A We did.

Q And that was not thought to be anything particular to your family, correct?

A Correct.

Q That was his business and that's what he did?

A That's what he did.

Q Now, your father--I think you testified about this as well in the trial as I recall. Your father was for a long period of time addicted to Talin (sic)?

A Yes.

Q And do you recall that?

A I do.

Q And what was your father like when he was on Taling (sic)?

A He was--(Pause) I'm trying to think of the word. He really had no concept of who he was, where he was. He was just out of touch with reality.

Q Did he always know who he was or who you were when he was on Taling (sic)?

A No, there were several times he didn't know who I was when he was on Talwin.

Q Did he ever threaten you when he was on

Taling?

A He pulled a gun on me once.

Q And how long did this addiction to Taling (sic) last?

A He got on Talwin in the early 60's. I don't exactly know the year--

THE COURT: It's Talwin; isn't it?

A Yes.

MR. DAWSON: It's--I may be--

THE COURT: T-A-L-W-I-N?

MR. DAWSON: Yes.

A That's correct.

THE COURT: Talman is Mr. Talman's name.

MR. DAWSON: Did I say Talman? I'm sorry. (Laughter)

(Whereupon, several parties laughed.)

THE COURT: I don't know what you said, but I just want to be sure we've got it correct.

MR. DAWSON: I'm sorry, your Honor.

THE COURT: Okay. I remember vaguely hearing about this back then but--

A He finally got off of it after my mother died in '85.

Q So all the time Alicia--or part of the

time when Christa Pike was there, he was still addicted?

A Yes.

Q And what kind of an attitude did your father have toward--when someone crossed him or if someone seemed to be giving him a difficult time?

A Well, he would sort of bluster and threaten to kill them.

Q Okay. And this he would do in front of anybody, correct?

A Anyone.

Q And it wouldn't matter if Miss Pike was there or not as a child?

A No.

Q And was there a time when the family--well, when your father, I guess, in particular was being investigated by the IRS?

A Yes.

Q How long did that last?

A That went on for years. I'm not sure how long, but it was years.

Q Okay. And did an incident happen in the courtroom regarding that?

A Yes.

Q Do you remember what it was?

A He took a gun into the federal court.
Q And did he say anything about that or--
A Well, they noticed that he had the weapon and asked him about the weapon, and apparently he paid a fine because he had the weapon.
Q Okay. Did he tell any stories about why he had the weapon to you perhaps, that might not have been what he told to the court?
A Well, **I** was just told that it was no big deal.
Q Did he ever say anything--did he make any statements of what he told the judge about why he had the gun?
A He told the judge that it was to unseat him.
Q And this was just basically your grandfather's character?
A My father's character?
Q I mean your father's character, right.
A Yes.
Q Okay. And what about your sister, Carissa, did she ever threaten to harm people?
A All the time.
Q And how would she do that?

A Well, she'd just say she was going to whip their--butt. (Laughter)

Q That would be somebody that she just felt angry at at the moment, correct?

A Correct.

Q Okay. And so were there any particular incidents that you're aware of where Carissa exhibited this behavior when she was with Christa Pike?

A A specific incidence. (Pause) Oh, I'm sure there were. Everyone--that's just a cultural thing there. Everyone solves everything with violence so--

Q So the general attitude in the community then was if somebody does something to you, you get even in some violent manner?

A Well, yes, you learned early on that you didn't--you don't run your mouth because if you do somebody will shut it for you. And that's cultural throughout the state pretty much. The Hatfields and McCoys.

Q Okay. And let me ask you a little bit about you and your--when you and your sister were growing up and, I guess, became young women, how did you socialize?

A How did we socialize?

Q You know, with your friends and, you know, when you were out.

A Well, let's see. We would go sneak into bars; we would do whatever--you know, whatever we could get into basically. And what age group--like in our teens, late teens, early teens?

Q Right, well late and early--late teens.

A Late teens. All we did--we would go and smoke pot, just skip school, go hang out at the lake all day and do whatever we could find to do, drugs, alcohol, whatever.

Q And what were--what became then your sister's drinking habits as she was approaching young womanhood?

A Well, she drank a lot, drank often.

Q Would you describe her as being an alcoholic?

A At that time?

Q Well, at any time.

A I would now.

Q You would now? And has this been coming on for a long time?

A Yes.

Q And back when she was a teenager, did

she appear then to be drinking more than she should?

A At that time, no more than anyone else.

Q Okay.

A But we were all drinking way too much.

Q Okay. Then there became a time when--well, how long--let me say, how long--how old were you when you ceased drinking too much? Let me put it that way.

A Probably in my early 20's.

Q Okay. And now what about your sister? Was there a period where she stopped drinking too much or did she just keep on drinking?

A She just sort of kept on drinking.

Q Okay. And even today she has trouble controlling that, correct?

A Correct.

Q The--and--(Pause) In terms of your sister's maturity, how would you describe her?

A I would say that she's emotionally immature.

Q And are there some examples or some things that make you feel that way about her?

A Well, she--one example is that she was--if she wanted to go on a trip, if she doesn't have

the money to make the car payment, she will go on the trip and let them repossess the car. I mean that's not a--it's like I want to go have fun. So it doesn't matter that I don't pay my bills. To me that's being very immature and irresponsible. She--with her children, I mean just--if she has the money to come and visit here, she will spend that money to go scuba diving and then complain to me that she didn't have the money to come visit because--I mean she still has the same immature behaviors that she's always had.

Q And at some point--tell me about her daughter, Alicia. At some point she was raised by you, correct, and your mother?

A Correct.

Q How did you come to have her in your household?

A She was married to Danny Thompson at that time, and Danny wrote her a letter that said, "I don't like children."

THE COURT: Well, let's get the "she" right because you're-

MR. DAWSON: Okay.

A Oh, I'm sorry.

THE COURT: You're talking about your

sister was married to Danny Thompson?

A I am talking about my sister.

THE COURT: Okay. The record isn't going to make sense if it all says "she".

MR. DAWSON: Yes, I understand, your Honor.

THE COURT: There's too many "shes" involved. Go ahead.

Q And so that was at the time she was married to Danny Thompson?

A Yes.

Q Okay. And do you remember approximately what years that was or the middle of what decade? (Laughter)

A I--I really can't tell you years. They just sort of all run in a blur.

Q Do you remember how old Alicia was at the time?

A Alicia was 12 or 13.

Q And so Christa at the time would have been seven or eight?

A Yes.

Q So go ahead then-so go ahead. I know we've interrupted you. So she came to live with you?

A She did.

Q And how long did--and it was you and your mother basically, or was it you, I mean?

A She was living with my husband and I. Well, after Danny wrote Carissa the letter and said he didn't want the children, Carissa gave the children up and then lived with him. My mother had watched Alicia a lot over the years, but she wasn't well.

Q Yeah.

A She was physically ill. So I took Alicia to live with me.

Q Okay. Now, when you say that your mother was physically ill, what disease did your mother die from?

A My mother was an alcoholic.

Q Okay.

A And she died from complications of--for alcoholism.

Q Okay. Basically cirrhosis of the liver?

A Yes. Well, no, she didn't have cirrhosis.

Q She didn't have cirrhosis?

A She had hepatitis--

Q Okay.

A --alcoholic hepatitis.

Q But she--and she had been an alcoholic for a long time?

A Many years.

Q And so Christa Pike, when she was in West Virginia, she would have seen your mother drinking?

A Oh, yes.

Q Getting back then to your sister and to Alicia, so Alicia came to live with you?

A Yes.

Q Had she, at periods of time before that, been with you and your mother?

A Pretty much all of her life she was back and forth and stayed mostly with my mother until my mother became ill.

Q Now, was Alicia's father ever involved in this life after she was born?

A Not really.

Q And he was about the same age that your sister was when he was born?

A Yes.

Q And they were married for a short period of time, correct?

A Yes.

Q And then at that time your sister worked when Alicia was first born?

A She did.

Q And do you remember how many jobs she worked at that point?

A When Alicia or Christa--

Q Alicia.

A Alicia. Carissa was in nursing school and--right after Alicia was born. So that--that's a pretty much full-time job right there. And then after she graduated from nursing school, I think she had--she had one job when she was married to James.

Q Okay. And then--but still she would rely then on your mother--

A Yes.

Q --or you to be the babysitter? And you were still living in the home at that point?

A I was.

Q You were how old?

A I was 15 when Alicia was born.

Q And then--periodically then she was with you and then she came to live with you on more of a permanent basis--

A Yes.

Q --when she was around 12, I think you said?

A That was when she was about 12 or 13.

Q Right. Okay. And what kind of support did your sister Carissa give to Alicia at that point?

A There wasn't any. There was no support for--from either parent.

Q And at this point where was Christa Pike?

A Christa was either with her father or her mother.

Q Okay. So Christa stayed with Carissa or with her father, Glenn?

A Yes.

Q Okay. And was there a reason that Christa didn't come and live with you?

A Quite frankly, I had four children of my own and once I took Alicia, I just couldn't afford to take Christa.

Q And I guess it was your--I mean what was--you had a former relationship with Alicia that was stronger than that with Christa?

A I did.

Q Okay. And would you ask your sister to

help provide support for Alicia?
A No, I never asked her for it.
Q And she never offered it?
A No.
Q She was working at the time?
A She was.
Q Where did she seem to be putting her priorities between her children and other things?
A Her children were never her first priority.
Q Okay. Where did they fall in her priorities?
A Her men usually, her husbands or--that was her main goal, was to keep them happy.
Q What about things like clothes and stuff, where did that fall?
A She liked--Carissa always like nice clothes. She always wanted to make her husbands and her men happy. And then if all of those things were taken care of, then her children would get what was left.
Q Was there ever anything left?
A Rarely.
Q In terms of the--(Pause) What about Alicia's father, did he ever provide child support

to you to help you support Alicia?

A No.

Q How many times has your sister been married?

A Five times.

Q And in addition to that, how many other men has she lived with to your knowledge?

A I have no idea.

Q Have there been a number?

A Yes.

Q And has your sister continued to--well, do you have any idea how she attracted all these men to come live with her or--was she out partying a lot or--

A She did party a lot.

Q And was this something that was important to her?

A It was.

Q (Pause) Was there anything--well, let me ask you and finish with Alicia first. When did Alicia end up leaving your home?

A She left when she was 14, I guess.

Q And why was that?

A She was pregnant, and she wanted to be with the father of the baby, which I at that point

disapproved of. And so she chose to go and live at my parents' home again because we disagreed about her baby's father, her relationship.

Q So she then went to live with your--was your mother still alive at that point?

A Yes.

Q Okay. She lived with your mother and your father then?

A Yes.

Q And did her then, I guess, boyfriend, soon to become husband, was he living with her at your parents?

A He wasn't. They then--she then moved to North Carolina after the baby was born, and that was when they moved together and got married.

Q And did you have children at that point?

A Yes.

Q And did you see a problem with having a pregnant niece who was 14 and unmarried in your home with the children?

A I didn't see it as a problem because my children were simply told that that was not an okay thing to do.

Q Okay.

A And they were old enough to understand

that at that time.

Q How old were they then?

A Well, Chris is probably four or five years younger than Alicia.

Q Chris is pretty close to--

A And he is the oldest.

Q --and he's pretty close to Christa in age?

A Yes, he is.

Q And they were close as cousins?

A Yes.

Q (Pause) What--what are your first recollections of Christa when she was just a little toddler?

A I recall that Christa was never--there was always a problem with Christa, because Christa just didn't seem to understand when you would tell her things. If you take a--with my own children, if I said, you know, "Don't play with that." I could remove them from the mic and they would leave it alone. But with her she never could understand that when you said, "Don't play with that," that meant don't play with that. She would go right back to it. So she was a very difficult child to watch. I mean you had to stay on her

constantly.

Q Were there any particular things you remember or sort of stories that you remember that indicate that trait in Christa?

A Well, one day she was downstairs and we had some billiard balls, and there was a glass door down there. And she was throwing those billiard balls, and she was less than three years old. She was throwing these balls at the glass door. So I would take the balls away, put them over there on the shelf and say, you know, "We're going to go do this." And she would go--she--you couldn't distract her from that activity. You couldn't remove her from it. She would go straight back to the billiard balls and throw--launch them at the door again. So after numerous times of removing the child, I had to finally just take her upstairs and close the door so she couldn't get back to them because she was just so determined that she was going to throw those billiard balls.

Q As a parent, you've raised--you have two children, three children?

A I have four.

Q Four children. Okay. So you've raised

your own children?

A Yes.

Q You've pretty much raised Alicia, and you've been with Christa. Is there a way that you would describe Christa, as compared to your own children or any other children you've been around, with regards to willfully doing things that are--that you've told her to stop doing?

A She--Christa never could understand what the word `no' meant. With my youngest daughter--my youngest daughter is very willful. And she--if you would say, "Courtney, don't do that," well, no, you know. She would say, "Do this," no. And she was very willful. She deliberately made that choice. She was not going to do what you told her to or she was going to do it anyway. But with Christa, it's like she never understood what you were trying to tell her to do or not to do. She didn't get that, what no means.

Q Okay.

A And she always had this--like she would stare at you like she didn't even know what you were talking about. She didn't understand you. With my daughter Courtney it was a definite, "I'm doing it because I want to." With Christa I never

had the feeling that she understood what I was trying to get her to understand, that this is not okay to do.

Q So what--

A Am I making sense to you?

Q --so it wasn't like, "I'm doing it to spite you. It's that I just don't know what I'm doing wrong."

A Right.

Q So she keeps doing it?

A Right.

Q Is that more or less--

A That's exactly how she was.

Q Okay. And you had described her appearance, I think, a little--not her appearance so much as her expressions, I guess, when she was two or three years old. How did you describe that?

A She had a very flat affect.

Q And what do you mean by that?

A That she showed little or no emotion. She just would stand there and stare. And even when--and my mother would get upset with her and yell at her and stuff, and she would just stand there and stare as if none of this was being

processed.

Q Let me ask you a little bit about your mother and her interactions with Christa, as well as Alicia. Did your mother seem to treat Christa differently than she treated Alicia?

A She did.

Q And could you describe how that was, I mean in what ways?

A My mother was very loving toward Alicia. She was very loving and nurturing and always showing her attention, and Christa-she was not. She was just there. Christa was just one of the crowd.

Q Did your mother resent having Christa at the house?

A She did.

Q And did your mother resent having Alicia?

A No.

Q Alicia was the oldest of the grand-children?

A She was.

Q So she was there for the first, obviously, grandchild. And was there a change in your mother between the time Alicia was born and

the time Christa was born that made her feel differently about the two of them?

A My mother was--for one thing my mother was getting older. For another thing my mother was getting--she was becoming--(Pause) Her alcoholism was getting worse and she was drinking more and more often. And I'm sure that Christa took away some of that alcohol time because she still felt half responsible to watch the child. And when you have to watch a child, you can't lay drunk.

Q Was--what were your mother's--your mother had different feelings about Carissa between having Alicia and having Christa?

A Yes, because she had already discussed with Carissa that she was tired of babysitting Alicia all the time and always having Alicia. And then when she found out Carissa was pregnant with Christa, she was very angry with her. She said she was not going to raise another child for her and that Carissa needed to make plans to raise the child herself. And my mother really resented my sister, but I think that that resentment toward my sister carried over to Christa.

Q And was that one of the reasons that

Christa seemed to spend more time--well, actually, let me put it this way. Did Christa spend more time with her other grandmother, with Grandmother Pike?

A She did.

Q And was this part of the reason?

A Yes.

Q Now, did you often see Christa after she had spending time with Grandmother Pike?

A I did.

Q And did Grandmother Pike have someone else living with her?

A She did. She had a male friend.

Q Okay. And what was his name; do you recall?

A Well, I don't know that he was living with her. I do know that he spent a lot of time at her house.

Q And spending time included overnight, right?

A Yes.

Q And do you know how--where Christa would sleep when she was at the house on nights when both Ernest and your grandmother were there?

A She told me--Mrs. Pike told me that

Christa would sleep between the two of them.

Q Did you see that as appropriate?

A No.

Q Did you--was there anything about Christa's actions when she returned from visiting with Grandmother Pike on these occasions that you noticed?

A Once--one time she came back, she had spent the weekend there. They had gone to Florida--or it was more than a weekend. They had gone on a vacation to Florida or something. And when Christa got back she was lying on Miss Pike's chest sort of--just sort of leaning up against her. She started stroking her breast, and it wasn't--

Q Now, when you say stroking her breast, Christa started stroking--

A Christa-Mrs. Pike's breast--

Q --Grandma Pike's. Okay.

A --and this was--she was a tiny--like two, two and a half years old. She was just a baby still, a toddler. And it was very inappropriate. It was more of a sexual touch. I mean you can--you can distinguish somebody grabbing like this or a baby patting from the kind of a

sensual touch. And I told my sister about that, and I said, "You know, I feel like that's very inappropriate behavior for a baby her age. She would not know to do that. That's something she has seen or observed quite often for her to remember to do it in that specific way."

Q And with all your experience now both as a mother and as a nurse who's--through most of your career has dealt with babies, correct?

A That's correct.

Q You would still see that as being inappropriate?

A I would on anyone's child.

Q And were there family, I guess, suspicions or thoughts about whether there might be some abuse happening to Christa at that time?

A I had my suspicions, and I mentioned it to my sister. And my sister also said, "Well, there could be something to that." And I'm not--I don't recall whether she did anything about it at that time or not.

Q Okay. And that was mainly--it was this type of inappropriate behavior for a small child that you saw that suggested to you that there was something else happening?

A Yes.
Q (Pause) What kind of attitude--I asked you a little bit before about Alicia and her marriage. And what kind of attitude did Carissa have toward her daughter at 14 being pregnant and getting married?
A She thought that the best thing for Alicia would be to marry Brian, the father of the baby, and live happily ever after.
Q And did you think this was a good idea?
A No, I did not.
Q Now, at the time, of course, Alicia hadn't finished high school, correct?
A No.
Q Had the father finished high school?
A No.
Q And had you talked to Alicia about that and about what your feelings were?
A I did. I basically told Alicia that I felt like a baby is no reason to commit to a marriage, and they were both too young and immature. She was still a child; she was 14 years old.
Q And now what about later when Christa became pregnant? Was that treated differently by

your sister to your knowledge?
A I--yes, I think it was.
Q Do you think that was as a result of going through it once with her older daughter or--
A I'm thinking that it was because of Christa's behavior at the time.
Q Okay. And what about--did--are you familiar with an incident that happened with Christa when she was in the first grade of drawing a picture of a penis?
A I am familiar with that.
Q Can you tell us what you know about that?
A I didn't ever see the pictures, but I did speak with the teacher. The teacher said that she had been drawing pornographic pictures in class, and so they were going to send her home with a recommendation that she--that her mother take her for counseling.
Q Do you know if that was done?
A It was.
Q And do you know what exposure she had had to any pornographic material at that time?
A I don't know about that.
Q Okay. Let me ask you a little bit more.

As she was approaching or as she was in Job Corp, I mean you were aware, I assume, that--of her time in Shaffer House?

A I was aware that she was there, but I don't really know any of the details about it.

Q And what about when she was sent to Swannanoa?

A I don't know any of the details about that either.

Q Okay. Now, were you--when did you learn that she was going to be going to Job Corp?

A It was right before she went in because I remember my sister saying that Christa was going to go to Job Corp and get her life straightened out.

Q Okay. And did that sound like a good idea?

A Well, it sounded like a good idea to all of us.

Q Okay. And did you see Christa while she was at Job Corp?

A I did.

Q And what were the circumstances of that?

A She had come home for the holidays to my house. When I say "home," I mean my house. And

we were all having dinner and celebrating the holidays.

Q Was there an incident that occurred on that particular time when your sister, Carissa, and I guess Gerard, her husband, and Christa all came together? Is that--

A That was the Christmas before--of--let's see. It would have been '94, I guess.

Q Right. And was there an--was there anything that happened between you and Christa when--shortly after her--they arrived at your home?

A She--we were watching TV that night. Everyone else had gone to bed. And she was talking to me about her mother, and she said, "You know, Aunt Carrie, Mom really worked hard on those pies that she brought." And I said, "She worked hard on them." And she said, "Yeah, Mom really wanted them to be perfect." And I'm like, why on Earth would she do that? And she said, "Because Mom wants everything to be perfect for you because she doesn't--she'll never feel like she's as good as you." And I said, "Well, you know, Christa, that's silly. She's--why would she think that?" And Christa said, "And I'm just like she is." So

I kind of got that feeling that Christa--that the pie--the pies had to be perfect for both of them so they could be good enough.

Q Okay. And was there--after Christa was arrested--well, let me ask you before we get there. When Christa was leaving at that point, did she leave from your home to go back to Job Corp?

A I'm--well, she left from my home. I don't know if she stopped off at her home or not.

Q Okay.

A But she didn't want to go.

Q Okay. Do you know why she didn't want to go?

A She was afraid. She told me--and this was that same night we were talking about the pies. She said that she was afraid to go back to Job Corp. And I said, "Well, Christa, you know you have to do something with your life. You're going to have to be able to earn a living." And she said, "Well, I want everybody to be proud of me, but people get hurt there." So she was afraid to go back.

Q Okay. And what--that you were aware of, what happened in terms of making a decision to go

back? What influence did she have? Why was the decision made?

A Well, her mother said that it was like a last ditch effort for her to get an education and to be able to get a skill or something so that she could support herself. So the feeling was that she had to go back whether she was afraid or not.

Q And did you have any idea at that point of anything about what Job Corp was like?

A No, I thought it was a--you know, that there was--a government facility. What could she possibly be afraid of?

Q Okay. So you thought it was more sort of like a college campus?

A I did.

Q And she didn't go into any more detail about what she was afraid of?

A (No oral response)

Q Did she call you after she was arrested?

A She did.

Q And what did she tell you at that time?

A She was really upset. She was crying and telling me that she just didn't know what had happened and-

Q Did you ask her--you learned then about

Tadarryl, correct?

A Correct.

Q And you knew that she had a boyfriend before, but didn't know who it was; is that--

A Yes.

Q Okay. And once you learned about Tadarryl, did you ask Christa, you know, why she had gotten involved and why this had happened? I mean why the crime had happened.

A I did. I was talking to her about him and I remember saying--you know, because I said, "I don't know why you're interested in this guy. You know none of the family are going to approve of him." And she said, "Because Aunt Carrie, he bought me flowers, and nobody's ever done that for me before."

Q Now--(Pause)--and the reason that they wouldn't approve of him is because he was African-American?

A For the most part, yes.

Q And your family is racially biased?

A Pretty much.

Q Okay.

MR. DAWSON: No further questions, your Honor.

THE COURT: General.

CROSS-EXAMINATION

BY MR. PRICE:

Q Are you doing okay? Do you need a break or--

A I'm fine.

Q Okay. Let me go back to the beginning of your testimony when Mr. Dawson was asking you about your contact with Bill Talman prior to the trial.

A Yes.

Q And you had indicated that one time Mr. Talman came to your work place, in this intensive care unit there in North Carolina?

A That was in West Virginia.

Q West Virginia. I'm sorry.

A Yes.

Q Excuse me. And then on that same visit, he also came and visited you in your home--

A Yes.

Q --to talk about the trial? You also mentioned that you had met with Julie Rice or then Julie Martin before the trial?

A Yes.

Q There were also some phone calls that

Mr. Talman made to you or that Julie Rice or Julie Martin made to you prior to trial as well--

A Yes.

Q --do you recall those?

A Yes, I do.

Q Do you recall how many phone calls they made to you?

A No, I have no idea.

Q Several?

A Several.

Q Is it fair to say?

A (No oral response)

Q And you met on more than one occasion with Dr. McCoy?

A Yes.

Q Okay. Do you remember how many times you met with her? I know we may have already discussed that but I--

A Twice that I can recall.

Q Twice. Do you remember talking to Dr. McCoy and providing her some information?

A I do.

Q Do you remember discussing Christa Pike and talking about her propensity to lie?

A Yes.

Q Do you remember telling her that she was a pathological liar?

A Yes.

Q And that's your--I mean that's your belief now as you sit here, that at the time we're dealing with here leading up to that trial, she could be characterized as a pathological liar?

A That's my opinion.

Q You also indicated that you did not trust Christa Pike?

A True.

Q In fact, you indicated not necessarily to Dr. McCoy, but later on that one of your sister's boyfriends, Steve--I may not pronounce it right--

A Kyaw.

Q --Kyaw--that Christa Pike had actually made up all the allegations she made against him. Do you remember saying that?

A I remember--yes, that's what I believe.

Q You believe that?

A Yes.

Q Are you aware of one incident where, in fact, Christa Pike chased Mr. Keyall (sic) around with a knife of some sort?

A I am.

Q You also told Dr. McCoy that one of the reasons you didn't want Christa Pike to come live with you, when that opportunity presented itself, is because you didn't want--you didn't trust Christa Pike to be around your children?

A It was because I did not--well, I did not want her to be around my children if she could not go by my rules, and there's a difference there.

Q And you were worried about what kind of influence she would be?

A If she didn't go by my rules, yes.

Q And you didn't trust her to go by your rules; did you?

A At that time, no.

Q (Pause) Now, you're aware of a--of Christa Pike's nephew whose name is Keith?

A Yes.

Q That's Alicia--Alicia's son?

A Yes.

Q Is that right? And you've indicated that you're aware that Keith had alleged that Christa Pike had actually sexually abused him?

A I'm not aware of that. Did I say that?

Q Did you--you don't--

A It's been many years.

Q Let me put that in context. Do you remember being interviewed by Dana Cook--

A I do.

Q --in April of '99, 1999? And do you remember indicating to her that Christa used to watch Keith, and that you recalled something about him saying she had touched him, doesn't recall anything coming out of it?

A I remember something along those lines, but that specifically I cannot say that I remember that.

Q Didn't that, in fact, play a factor in whether you wanted her to be around your children as well?

A I can't say that it did because I don't remember the incident. So I don't remember what my feelings were about it. (Pause) Then my son was very close to Christa, and I had no problem with that.

MR. PRICE: May I have a moment? (Pause) Oh, yeah.

Q You indicated that when Christa Pike became pregnant, you felt like your sister treated

her differently than she had treated Alicia?

A Yes.

Q And you indicated that was because of Christa Pike's behavior?

A Yes.

Q And what was that behavior you're talking about?

A Christa was doing drugs.

Q What kind of drugs?

A I don't know specifically which drugs. I do know that as a NICU nurse my advice would be --if you are doing a lot of drugs, there's always a very high risk that the infant could have an illness.

Q So, in fact, you would agree that if that was your sister's concern at the time that Christa Pike became pregnant--

A Yes.

Q --that she had a right to be concerned?

A Yes. I was concerned.

Q Now, you, in fact--when the news came out that Christa Pike had been arrested and charged with the murder of Colleen Slimmer, you were not surprised that she had gotten herself in trouble over here in Knoxville at the Job Corp; is

that fair to say?
A Well, you made it a very little specific. You said, "over here at Job Corp in Knoxville".
Q Well--
A Now, that would have surprised me because I really thought she was going to get her life straightened out at this point.
Q You didn't--well, let me just direct you to the statement I'm talking about. That you had indicated to Dr. McCoy that you thought Christa Pike, in fact, would be the one dead, considering the people she ran around with?
A That's correct.
Q And you stand by that statement today?
A Yes.
Q She ran around with a very rough crowd?
A Yes, she did.
Q All her life really?
A Not all of her life. A lot of her life.
Q A lot of her life. Certainly, when she got to an age where she could get out and run with a crowd?
A That's true and certainly when she got to Job Corp where the rest of them were.