# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 5

## DOCUMENT 3

---

004699

E2009-00016-CCA-R3-PD

VIII

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGooyal

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Volume 3

January 29-31, 2007 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Ms. S. Jo Helm
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Ms. Catherine Brockenborough
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

# TABLE OF CONTENTS


Volume 3 — Page

PETITIONER'S PROOF:

CARRIE ROSS:

Cross-examination by Mr. Price (continued) 201

Redirect Examination by Mr. Dawson 202

JONATHAN HENRY PINCUS:

Direct Examination by Ms. Brockenborough 207

Cross-examination by Mr. Price 280

Q Now, you had testified on direct about being called--that Christa Pike called you after she was arrested--

A Yes.

Q --very upset? And did she indicate to you whether--what had happened or that she was involved in the murder or anything like that?

A She was just upset and crying, and said she didn't know what happened, and she was pretty much hysterical when she called me.

Q How close--do you remember how close in time was that from the time she was arrested?

A I'm thinking it was probably the Sunday after. I know it was a Sunday.

Q So if the records indicated she was arrested on a Saturday, formally placed under arrest on a Saturday, your memory is that she called you the next day?

A It was--well--or it could have been a week later, but I remember it being a Sunday. That's all I can tell you.

MR. PRICE: No further questions.

MR. DAWSON: Your Honor, I have a couple of others on redirect.

THE COURT: All right, sir.

REDIRECT EXAMINATION

BY MR. DAWSON:

Q Mr. Price had asked you about the visits from Mr. Talman and your contact with him prior to trial. Did Mr. Talman talk with you in those--any of those times about the possibility of writing a book with him?

A He did.

Q What were the details of that?

A He said that he wanted to present--actually, the first book that he mentioned to me was that he was wanting to do a book about all the different death penalty cases that he had been on. And then he said that he felt like a book would help Christa because it would show the public who she really is, instead of the monster she's been made out to be by the press.

Q Did he ask you to help him with that book?

A Yes, he did.

Q And was this before trial that he first started talking to you about this?

A Yes.

Q And did he then, after trial, contact you again about it?

A I think he did once.

Q Also, one other thing. When Christa was little, did you ever learn about her watching violent movies?

A Yes.

Q And could you tell the details of that, if you remember?

A She always watched those violent movies, those "Friday the 13th" kind of movies. Do you know the ones I'm talking about, those really gory movies? And there were--there was no filter there. She could watch whatever she wanted.

Q How old was she when you first learned that she was watching those?

A She was small. I'm not good with numbers. I'm sorry. I just--

Q Approximately, was it preschool, early grammar school, any idea?

A At least--at least in grammar school.

Q Okay. And this was a time when you thought it was age inappropriate?

A Yes.

Q And not--these were not films you would allow your own children to watch?

A No, I wouldn't.

Q Okay.

(Whereupon, Mr. Dawson conferred with Ms. Brockenborough.)

Q And did you have any awareness of the allegations that were brought against Christa concerning her half-sister Lindsey?

THE COURT: I'm sorry, who?

MR. DAWSON: Her half-sister Lindsey.

THE COURT: Lindsey.

Q The alleged sexual misconduct.

A I don't know anything--I remember hearing something about that, but I really don't know anything about it.

Q Did you ever watch Christa when she was babysitting or anything, where she would be playing with a small child?

A Yes.

Q And how would she play with the child?

A Well, she--when she played with my children, which was when I was able to observe, she played at whatever level they were at. I mean she would play Barbies; she would play like a little kid herself.

Q Okay. So she was--when she was fairly old, she was still playing with dolls?

A Yes.
Q And this would have been when she was 16, 17?
A Yes.
Q Just as though she was one of the kids?
A Absolutely.
Q Not as you would see an older teenager playing with someone she was babysitting, but a co-child?
A Yes.
Q And you did allow Christa to play with your children alone when she was just--when she wasn't being supervised, she was with your children a lot?
A Yes.

MR. DAWSON: No further questions, your Honor.

THE COURT: Anything else, General?

MR. PRICE: (Nodding negatively)

THE COURT: May Ms. Hansen be excused or do you want her as a recall witness? Ms. Hansen, I'm sorry. I know better than that.

MR. DAWSON: She can be excused. She can be excused, your Honor.

THE COURT: I'm sorry. Okay. So she

can remain in the courtroom if she wishes to do so?

MR. DAWSON: Yes, your Honor, if she chooses.

THE COURT: Okay. Thank you very much, ma'am.

A Thank you.

(WITNESS EXCUSED)

* * * *

MR. DAWSON: Your Honor, could we have a very short recess?

THE COURT: I was about to take a ten minute recess. And it's already 3:00 o'clock. I know time flies when you're having fun but-

MR. DAWSON: I know, your Honor. We're going to try to move--we will talk during the break as to where we want to go next.

THE COURT: Yeah, figure that out and let's--and let me know. Court's in recess for ten minutes.

(Whereupon, a recess was taken; afterwards the following proceedings were had, to-wit:)

JONATHAN HENRY PINCUS, being called and

duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Doctor, can you please state your name for the record?

A Jonathan Henry Pincus, P-I-N-C-U-S.

Q And, Dr. Pincus, how are you employed?

A I am Chief of Neurology at Veterans Hos --Administration Hospital in Washington, D.C., and I am a Professor of Neurology at Georgetown University.

Q And is that--that's the School of Medicine at Georgetown?

A Right.

Q Can you summarize your educational and professional histories?

A Right. I graduated from Amhurst College in Amhurst, Massachusetts in 1956; from the Columbia University College of Physicians and Surgeons in 1960, where I got my M.D. degree. I did a year of medical internship at Kings County Hospital in Brooklyn, and then I did three years of neurology residency at Yale. I stayed on at Yale, was on the faculty starting as an instructor

in 1964. And in 1974 I was made a full professor at Yale, and I stayed at Yale as a full professor until 19--January 1987 when I accepted the Chairmanship of Neurology at Georgetown University. So I moved to Washington to be professor and Chairman of Neurology there. And I stayed there until 1995 when I resigned as Chairman, stayed on as professor. But in January 2001 I went to the Veterans Hospital as Chief. And that's where I am now.

Q And are you--do you have--hold any board certifications?

A Yes, I have boards in the American Board of Psychiatry and Neurology that has certified me in neurology and in child neurology. I'm not certified in psychiatry by the board. It's a one board for all those three things.

Q Can you--

THE COURT: I'm sorry. You are **not** certified in psychiatry?

A Right.

THE COURT: I realize that's one board but--

A In neurology and child neurology.

THE COURT: --you are in both of those?

A Right.

THE COURT: Okay.

Q And can you tell us generally what is neurology?

A Neurology is one of two medical specialties that deals with disorders of the brain and the spinal cord and muscles. But the brain is shared with psychiatry. Neurology is--the brain is the only organ of the body that is distinguished by having two medical specialties that are devoted to it. And it's a--it's kind of an acronym. That's the case. Neurology is supposed to be concerned with real disease, that is to say disease that correlates with some abnormal test or pathology slides; whereas, psychiatry is supposed to be disorders of the mind.

But, of course, modern research indicates that the mind is in the brain, and there really isn't any difference between neurology and psychiatry, except for the actual diseases that psychiatrists deal with like bipolar disorder, mood disorder, and schizophrenia; whereas, neurologists deal with movement disorders, epilepsy, migraine. Those have no particular correlation with test abnormalities either at

times. But whatever. That--we use the same medications very often and have the same--they're --if a neurologist didn't know about psychiatric things and if psychiatrists didn't know about neurological things, they wouldn't be very good at what they were supposed to be doing. They are--they're different in the sense that they're different diseases that they're specialists in, but truly it is the same organ.

Q Have you published or written any articles--

A Yes.

Q --in your field?

A I've written more than 140 articles and chapters, most of which have been published in peer review journals, that is to say journals that where--in order to be published, I have to be accepted by two or three of my peers who have read the articles and feel that the data is reasonable.

I've also written two books. One is a textbook. It's called *Behavioral Neurology*, and it deals with that aspect of neurology that is the borderline between neurology and psychiatry.

Q And are you the sole author of that book?

A No, I have a co-author. It's Pincus and Tucker. Gary Tucker was the other author. He's a--was a psychiatrist.

Q And briefly--

A And it's in its fourth edition; it was published in 19--in 2003. The first edition was 1972, Oxford University Press. The other book is a trade book, that is to say it's for laymen and it's called *Base Instincts: What Makes Killers Kill*? And it was published in 2001 by Norton Press.

Q Are you a member of any professional organizations?

A Yes. I am a member of the American Academy of Neurology. That is the general organization that represents all neurologists in the country. It has about 20,000 members and a yearly meeting. I was vice president of that organization, and I was also on its scientific issues committee for six years. What we did was to plan the meetings, what papers would be given at the yearly meetings that are given by that organization.

The other one is the American Neurological Association which--to which I was

elected in the 1960's. It's a group of academic neurologists. It's an elite group. It's the older organization. It goes back for more than 100 years, and it's--generally, to be a member of it you have to be equivalent of a tenured professor at a medical school. We used to have to write a thesis to be a member of it, and you have to be proposed for membership and seconded by two different people and then elected by the membership. So it's kind of an honorary organization. And I was on their council as well.

Q You indicated that you hold board certification in neurology and child neurology?

A Yes.

Q Have you also--have you been involved in the board--

A Yes.

Q --exams in any way?

A I am an--there are two parts to the examination. There's a written part and an oral part. For some six years I helped to make up the examination of the written part, and I've been an examiner of the oral part for many years including up to the present time.

Q Have you ever testified or been

recognized as an expert in neurology in any courts?

A Yes, in most of the states in the United States, almost all, in fact.

Q And have these been state courts and federal courts?

A Yes.

MS. BROCKENBOROUGH: Your Honor, I would like to tender Dr. Pincus as an expert in neurology at this time.

THE COURT: General, I know you're a Harvard man.

(Whereupon, the parties laughed.)

MR. PRICE: No objection, your Honor.

MS. BROCKENBOROUGH: Thank you.

THE COURT: The Court is compelled to recognize Dr. Pincus as an expert in the field of neurology and behavioral neurology. And when I asked a certain neurologist if he had ever heard of Dr. Pincus, he said, "Wow, you have Dr. Pincus in your court." So he's an expert.

MS. BROCKENBOROUGH: Thank you, your Honor.

THE COURT: They understand.

MS. BROCKENBOROUGH: If I may approach the witness for a moment. Actually, before I do that, I have provided Mr. Price with a copy of three of four pictures, and Dr. Pincus just today provided me--

THE COURT: Are those different ones?

MS. BROCKENBOROUGH: --with another one.

THE COURT: Ahh. Okay. Those kind of pictures.

MS. BROCKENBOROUGH: So I have one copy of those at this time, and I would ask if I could take it back and make copies--

THE COURT: Sure.

MS. BROCKENBOROUGH: --and give it to you tomorrow.

THE COURT: Do you want to make it a late-filed exhibit?

MS. BROCKENBOROUGH: Yes, please, after-

THE COURT: I believe that would be Late-Filed 3?

THE COURT REPORTER: Yes, ma'am.

(Collective Exhibit No. 3A through No. 3C, three photos of lobes of the brain, were

marked and filed. Exhibit 3D was to be marked and filed later.)

MS. BROCKENBOROUGH: And I do have an additional copy for the Court of at least the first three, and I'll provide others. (Giving the aforementioned photographs to the Court and the witness)

Q Dr. Pincus, can you tell what I've just handed you please?

A Yeah, these are pictures of the brain and they're color coded. It's the part of the brain that I am most interested, the part that has to do with thinking. The red is the frontal lobes, and the intense red is the part that controls motor movement. The blue is the parietal lobe. The green is the occipital of the back. You'll see yellow in a minute; that's the temporal lobe.

But at any rate, the frontal lobe, which from the top of the brain you can see takes up almost half of the substance of the brain, is the part of the brain that's very difficult to test for. You can only test for the back of it easily; that's the motor part. But this front part has to

do with judgment, insight, the ability to--let's call it social pragmatics. That's not a term of art but just describes when people interact with each other. Reading another person's feelings, identifying the kind of effect that you're having and caring about that, prioritizing and trying to --and the ability to change plans, to be flexible in order to achieve a goal or to avoid an unfortunate result.

That's a very hard part of the brain to test for. The frontal lobe is divided into three anatomic physiological sections. One is the dorsal lateral, which is what you're seeing here. The other is our two medial portions of it. And the one that's just over the eyes in the midline are the super orbital frontal cortexes. Very difficult to test, and it does not correlate with abnormalities much on the neurologic exam or neuropsychological testing. And yet it has a tremendous effect upon the personality of the individual and his behavior.

Most kinds of standard tests that neurologists do cover the motor strip, the parietal lobe, temporal lobe, and occipital lobe. They don't do--most of the ordinary, routine tests

that are done don't cover the big part of the brain, which is really 35 to 40 percent of the total mass of the brain, which is the frontal lobe. This is the picture, this first one, the brain from the top.

Looking at it from the side, you can see again the dorsal lateral cortex, dorsal lateral meaning the top and the side. You can see how big it is in relation to the rest. This is the temporal lobe here, the yellow. And that's the part that has to do with memory. Reading, writing, arithmetic are the parietal lobe. Vision is the occipital, and memory and speech are the temporal lobe, left temporal lobe.

When you look at the third picture of the brain, from the midline--f you cut the brain down the middle and looked at the side, you can see again the red is the frontal lobe. The intense red is the motor strip on the back here. But there's a part underneath and then the medial part. That's the super orbital cortex. That's the part that I was talking about before.

And there's another part called the singular gyrus, which is orange here. And it runs mostly in the frontal lobe. Most of it is in the

frontal lobe. It has to do with drive, motivation, initiative.

The orbital cortex is--there was a very famous case that involved the orbital cortex. It was the case of a man named Phineas Gage. And almost everybody has heard of Phineas Gage. He's the only man from around 1840 that people know by name. He was a very reliable, moral, ethical man who ran a--a foreman of a construction company that was putting in railroads in Northern New England. And a premature blast went off and they were blasting with gunpowder in those days. And a tamping iron went--blew out his eye, went into one orbit. And it was the size of a man's thumb and about two feet long. And it went into the orbit on the left side and came out the top of his head on the opposite side. And it was thought it was going to be a fatal injury, if not immediately then by infection later on. But that didn't happen.

He had to walk several miles to get back to assistance, and he did that. And assistance, of course, was putting him to bed, dressing the wound superficially, and giving him some whiskey.

There wasn't even a germ theory of

disease in those days. But people did know that infections occurred. But it didn't occur in his case. I guess that tamping iron must have been very hot when it went through and cauterized vessels and sterilized. But at any rate, he recovered completely. He was able to get up, walk, talk, think, remember, calculate, write, read.

There was only one difference, and that was he was a completely different person. He had become immoral, unethical, unemployable, unreli-able, a tramp. And he died a ruined man, a drinker, roustabout, a carouser a few years later. And the case was so interesting that they tracked down his skull and it exists now today in the medical museum at Harvard, along with the tamping iron that went through his head.

And it was actually studied not long ago and another article was written about him in science about--they reconstructed what his brain must have looked like using a computer and the inner markings of the skull and identified what part of the brain would be affected, and it was this orbital cortex that was mainly affected.

And that's a good example of what might

happen to someone who lost that part of the brain because that's the part of the brain that's responsible for ethics and morals. And it was very shocking at that time, in 1840, and still is to this day, that you could take that out of the brain that exists in the brain. And you can take them out without affecting anything else and change a person completely. That isn't what was supposed to happen. I mean the morals and ethics are supposed to be the provence of the law and religion, and this is medical science and biology. Those two fields or several fields are supposed to be parallel, but they intersected. And that was what was so shocking.

Now, when I have examined people who have been violent and murders--I've seen between 100 and 150 over the course of my career--what I've found mostly is that there are diseases of the frontal lobe. That the frontal lobe isn't working properly. That seems to be a relatively constant feature of killers. Another is the experience of having been horrendously abused in childhood, physically, sexually, or both. And the third is that there has been mental illness in the background, several different mental illnesses.

One of the more frequent ones being bipolar disorder, but also obsessive compulsive disorder, schizophrenia. There are others that can affect people's behavior and do. And there's been quite a bit of research that I've done, published, but it's--the thing that's so hard to understand is that most people who are brain damaged in this area, and most people who are mentally ill, and most people have been abused are not violent. And these factors, as we conceive them, don't just add up, but they interact with each other. Each one multiplies the effect of the next and, as a consequence, when you have all three together, you have a very live wire indeed, a very dangerous situation indeed. And that's my view of the cause of violence. Those factors interact. Now, not every case is exactly the same, obviously.

Maybe I'll--I'll just stop there. I don't want to give a lecture. I'll just answer questions. Go ahead.

Q Well, have you had occasion to examine Christa Pike?

A Yes.

Q And what were the circumstances of that examination?

A Well, I was first asked to do so in March 19--in 2001, and I came down and examined her then. I went over the history with her and the data that I was given to that date, some investigator's records, and some other records. The records weren't complete. I did my examination. I suggested that a number of tests be done, and they were done after some delay or--and then I wrote a final report. And I was able to examine her again on Sunday--not examine her, but just speak with her again on Sunday. And then I had an opportunity to also speak with other members of her family that had assembled for this hearing. And I have done that.
Q Okay. And Sunday would be yesterday--
A Yes.
Q --is that right? And you've also been in the courtroom for the testimony of the three family members who have testified so far; is that--
A That's correct.
Q --is that right? Before I--we get into the findings of your examination and evaluation of Miss Pike, can you tell us what are the components of a complete assessment?

A Yes. There is the--the most important is the history. The second is a physical neurological examination, neuropsychological testing which assesses the same things but using different tests, and the test of brain functions such as an EEG, a brain wave test, or PET scan--I'm getting fancy--and then the tests of the brain's structure, an MRI scan, a CT scan. But an MRI is more sensitive. And generally speaking, to do a complete evaluation you need all of those things because each tests something different.

The brain is a very complicated place, and there are lots and lots of different ways in which it can go wrong and be abnormal, more than you can have with blood tests. So I mean you think that there's an awful lot of tests that the doctor orders and he orders blood tests, but they're really many more things that can be done to try to assess the brain--that must be done to assess the brain because sometimes the neurologic examination is abnormal and all the other tests are normal. Parkinson's Disease is an example of that. Sometimes the neuropsychological tests are abnormal. Mental retardation.

And all the other tests but the psycho-

logical test can be abnormal. And the brain tumor, everything except the MRI can be abnormal. The point is--in an epilepsy it may be the EEG and nothing else. MRI normal, exam normal, the history wouldn't be, but okay. The EEG allows you to make a definite diagnosis on only the EEG.

The point is that an abnormality on one of those tests is the definitive abnormality. There is no combination of normal findings that could invalidate the one abnormality that we find.

Q What did your, I guess--well, and you indicated that you wrote a final report after you concluded your assessment--

A Yeah.

Q --on Miss Pike. I'd like to--let me show you this. (Showing witness document)

A Yeah, that's what--that's it.

Q Is that your final report that you submitted?

A That's right.

MS. BROCKENBOROUGH: I'd like--

THE COURT: Do you want to mark that as an exhibit?

MS. BROCKENBOROUGH: --I've provided a copy--yes, I've provided a copy to-

THE COURT: What would that be, Debbie, 4?

THE COURT REPORTER: Yes, ma'am.

THE COURT: Okay.

(Exhibit No. 4 was marked and filed.)

A Actually, that wasn't the final report--

THE COURT: Wait a minute.

A --I hadn't--

THE COURT: That wasn't--that's not right.

A I hadn't gotten the MRI yet with the EEG.

MS. BROCKENBOROUGH: I am sorry. Thank you.

A Okay.

MS. BROCKENBOROUGH: That was the one that I showed you, but that's not the one I should be admitting. No, no, this is it. This is the one that we--okay.

(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Mr. Price about Exhibit No. 4 and with the court reporter about Exhibit No. 3D.)

THE COURT: Would you like a drink of water, Doctor, while we're waiting?
A That would be great.
THE COURT: Could we get the doctor some cold water please?
COURT OFFICER CAMERON: Yeah.
THE COURT: Thank you. (Pause)
A I'm not sure I did a final report.
Q Well, I believe you have not. You have not submitted any written findings subsequent to reviewing the MRI.
A Okay.
Q Although-
THE COURT: So that's a preliminary report basically that we have?
A Yes.
MS. BROCKENBOROUGH: Yes.
A I don't think I did a final report.
Q Well, that-
A Stephanie left and that was my end of the contact with this case until you got in touch with me.
MS. BROCKENBOROUGH: Let me clarify that. Have we informed the State about the heterotopia?

MR. DAWSON: It's in Kenner's report.

MS. BROCKENBOROUGH: That's right.

A I didn't realize that until just now. (Laughing)

MS. BROCKENBOROUGH: The findings of the MRI and the EEG are in Kenner's disclosure from December.

(Whereupon, Ms. Brockenborough conferred with Mr. Dawson.)

THE COURT: Well, while they're doing that, I've got to stand up. I'm getting older than I was when we first tried Miss Pike.

A It feels good to stretch.

THE COURT: Sure.

(Whereupon, Ms. Brockenborough conferred with Mr. Price about different reports.)

THE COURT: Well, if there isn't anything further than the preliminary report, then we can just ask how anything he did subsequently changed his opinion.

A Yeah.

MS. BROCKENBOROUGH: Yeah, I just--I wanted to make sure that the State was aware-

THE COURT: Yeah.

MS. BROCKENBOROUGH: --of the findings and of the imaging and that part.

THE COURT: So we don't have a report from our ex--a full report from our expert?

MS. BROCKENBOROUGH: Not a full report on the findings, although they are referenced in Dr. Kenner's addendum report in December. So the State has been made aware of those findings.

THE COURT: Run that by me again.

MS. BROCKENBOROUGH: Dr. Kenner submitted an addendum--

THE COURT: It's chocolate time, isn't it? Yeah.

MS. BROCKENBOROUGH: --Dr. Kenner--

THE COURT: Kenner submitted an addendum to **his** report.

MS. BROCKENBOROUGH: Yes, which we provided to the State on December 15th, and in that it references the findings-

THE COURT: Of Dr. Pincus.

MS. BROCKENBOROUGH: --of Dr. Pincus and the--based on the imaging, the MRI that was done that's referenced.

THE COURT: But it's not in Dr. Pincus' unless he's adopting Dr. Kenner's findings?

MS. BROCKENBOROUGH: Correct, and I need to clarify that.

THE COURT: Yeah. Do you need a break to do that, ma'am?

MS. BROCKENBOROUGH: I--

MR. PRICE: I need to check my computer.

MS. BROCKENBOROUGH: I believe so.

THE COURT: Okey dokey. We'll take a brief recess.

A Okay. (Laughing)

THE COURT: And let me know as soon as you have an answer to that one.

MS. BROCKENBOROUGH: Thank you.

THE COURT: Take a recess.

(Whereupon, a recess was taken; afterwards the following proceedings were had, to-wit:)

THE COURT: Are you checking your computer, General?

MS. BROCKENBOROUGH: No. We've provided him with a hard copy that he is perusing.

MR. PRICE: Apparently, they had a copy.

(Pause)

(Whereupon, Court Officer York conferred with the Court.)

THE COURT: Folks, I'm just informed that--was it Captain Voyles?

COURT OFFICER YORK: Well, he was an investigator with-

THE COURT: He was--yeah. Dick Voyles passed away, and these folks would love to go to the funeral tonight.

MS. BROCKENBOROUGH: What time is it?

THE COURT: He was an investigator with them at the Police Department.

MS. BROCKENBOROUGH: Yeah. What time?

THE COURT: About 6:30 is the receiving?

COURT OFFICER COFFEY: 6:00 o'clock, your Honor.

THE COURT: 6:00 o'clock.

MS. BROCKENBOROUGH: We can--we can end with Dr. Pincus, which actually brings us to another--another issue. Some of our Asheville, North Carolina witnesses are stuck because of snow.

MR. DAWSON: And ice apparently.

MS. BROCKENBOROUGH: And ice.

(Laughing)

THE COURT: Last time I had this problem I sent the Sheriff's helicopters, but I don't

know. Is the Sheriff still the sheriff today?

COURT OFFICER COFFEY: Today.

THE COURT: What about tomorrow?

COURT OFFICER COFFEY: Not Wednesday.

THE COURT: Not Wednesday. We're having a little activity here in East Tennessee.

(Whereupon, the sheriff and charter situation, and the Judge's dog were discussed.)

THE COURT: Betty, do you want to make a copy of that report right there, please?

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH: (Continued)

Q While we're waiting for the copy, I won't actually talk about the contents of the report. But I just want to clarify, Dr. Pincus, that what's been entered as Exhibit 4 is a report that you sent to the former attorney, Stephanie McArdle, in March of 2001; is that correct?

A (No oral response)

Q And as indicated--does it indicate that you had yet to view the imaging--the imaging test results.

THE COURT: Let's be specific which

imaging tests.

Q That would be the PET, the--

THE COURT: The MRI and--

Q --MRI, and the EEG; is that correct?

A That's correct.

THE COURT: Okay.

A The EE--yes. The EEG had been done. That had been done in May of 1977, and the MRI that was done as a result of my request the next month after I wrote that preliminary report.

Q Okay.

A It was done at Vanderbilt.

Q So to clarify, as a result of this report we requested testing--the imaging to be done at Vanderbilt?

A Correct.

Q After that imaging was done, you had a chance to review the findings or review the results of the imaging?

A Right.

Q And was that additional information--have you incorporated that into your opinion--

A Yes.

Q --that you will be offering today?

A Yes.

Q And have you consulted with Dr. William Kenner as to your findings--
A I have.
Q --based on the images? Okay.
A Dr. Kenner also, subsequent to my having seen her, and I spoke with him recently after he had completed his diagnostic evaluation.
Q All right. And he--and is it your understanding that he was aware of the results of the MRI--
A Yes.
Q --as well? Okay.
THE COURT: (To Court Officer Betty Beiber) Give me a copy and give the original back to--
(Whereupon, Court Officer Beiber distributed the copies of said report she made for the parties.)
Q And, Dr. Pincus, you--as part of your assessment of Miss Pike, you conducted a physical examination; is that correct?
A I did, yes.
Q And what did that physical examination reveal?
A In general, it was normal, but there

were certain abnormalities that I think can only be characterized as minor. They--there was generalized hyperreflexia, that is to say her deep tendon reflexes were too active. But there were no abnormal reflexes that were elicited along with that that would endow that with great significance.

There was spooning of her outstretched hands. In other words, when I asked her to put her hands out in front of her, her fingers extended at the metacarpal phalangeal joint in that manner. I can't do it unless I press my fingers this way. (Demonstrating) And that's a sign that there is something not quite right about the basal ganglia, B-A-S-A-L, ganglia, G-A-N-G-L-I-A, which are gray matter masses at the center of the brain that influence movement and to some degree thinking.

There were Choreiform movements--

Q Before--I'm sorry. Dr. Pincus, before you move on, we were able to observe your demonstration of your hands. But for the purposes of the record, can you explain--

A Yes. There was extension of the metacarpal phalangeal joint. (Demonstrating)

Q Okay. And--
A M-E-T-A-C-A-R-P-A-L. Phalangeal is P-H-A-N-G-E-A-L.
Q And you are showing that when Miss Pike was asked to stick her hands straight out with her palms facing down--
A Right.
Q --the top--
A These fingers extended--
Q --her fingers sort of curved--
A --too much.
Q --upwards?
A Exactly.
Q Okay.
A Extended--the joint extended beyond normal.
Q Okay.
A And they were Choreiform movements, C-H-O-R-E-I-F-O-R-M, which meant that she couldn't hold her fingers still. When I asked her to hold her hands still, there were little jerking movements of her fingers and of her arms with her hands outstretched. And she wasn't able to stay absolutely still. That indicates again the basal ganglia not working properly.

And there was a positive nuchocephalic reflex, N-U-C-O-P-H -- N-U-C-O-C-E-P-H-A-L-I-C. And what that means is I asked her to close her eyes, and I put my hands on her shoulders. And I would move her shoulders to the left or again to the right. And what's supposed to happen normally is, after a slight delay of maybe a second or half a second, the head follows the shoulders. That's normal. But that's not what she did.

What she did was to have her head looking forward and, although I moved her shoulders to the side, her head didn't move. It stayed directly forward. And that means that there is an interruption of fibers that are coming from the motor area--supplementary motor areas to the brain stem, possibly at the level of the basal ganglia, possibly just under the cortex. I concluded--

Q And also--I'm sorry. Dr. Pincus, again for the record, you were moving--when you were moving Miss Pike's shoulders, you were actually somewhat rotating her joints of--

A I rotated her shoulders to the left and then to the right.

Q Okay. And you--

A And her head did not follow that. Her head just maintained itself as though she were looking, although her eyes were closed, at the wall directly opposite her.
Q Okay. And again that was an abnormal finding?
A Yes.
Q You also--you had started out by saying that you had found general hyperreflexia, which--
A You know, when you do a knee jerk--
Q --concerned her--
A --the neurologist hits your knee with a hammer and your leg moves, that's a deep tendon reflex. Her's were too active.
Q Fine. Thank you. And you were about to say that based on those observations, you would--
A I said that on the basis of the neurologic examination, that there was subcortical dysfunction involving the basal ganglia and possibly the thalamus.
Now, I have this other picture here which shows a cross-section of the brain and--as if the brain is a tomato and it was been cut kind of down the middle. And there are natural cavities inside the brain called ventricles where

--which contain spinal fluid. It looks like water. In here, of course, it's just a photograph and it's empty. But just to either side of that watery space are the basal ganglia, and it's right in the middle of the head. This is the caudate nucleus. This is the one that I thought was not functioning properly.

And it was interesting because the MRI showed an abnormality that was just lateral to the ventricle in the frontal lobe. It was right here. Right in that spot. (Demonstrating)

Q Dr, Pincus, I'd ask you to mark a couple of things. Could you please indicate, I guess with the initials BG, the area where the basal ganglia are found by actually writing it on that copy? That's the only copy that we have, and we'll make copies--

A Well, I'm not sure what you want me to indicate. Do you want me to indicate where--

THE COURT: Why don't you approach the bench and show the Doctor--

A Yeah.

MS. BROCKENBOROUGH: Okay.

THE COURT: --what you're talking about.

Q We're seeing you in the courtroom

pointing it out--

A Uh-huh (Affirmatively).

Q --but for purposes of people who look at it later, can you actually write or circle these numbers if they have been marked?

A Well, see, this is marked with number 2 here, and that says "head of caudate nucleus".

Q Okay.

A I don't want to ruin the picture, so I'll just--2 is the--

Q Just--can you circle number 2--

A Okay.

Q --just to clarify that?

A All right. (Circling)

Q Thank you.

A And this--this is generally--this is the area where--let's see, this is the left side. This is the right side. That is where the heterotopia is. It's there. (Indicating)

Q All right.

A And the EEG abnormality was right there. (Indicating)

Q Okay. All right. And--

A So it--

Q Okay.

A The point I'm trying to make is that the EEG showed an abnormality there. It had been done when--in 1977 because she was having epileptic seizures. And--

Q And how old was she about that time?

A Fourteen months.

Q It said high voltage sharp spikes and sharp waves coming mostly from the right fronto-temporal site and focal. And I've indicated on here with an arrow where that is. That's here. (Indicating)

Q And you've also indicated an "X" on that diagram?

A On the--yeah.

Q And that indicates?

A The MRI shows where there was an abnormality. Yeah, the abnor-the MRI said a small heterotopia, H-E-T-E-R-O-T-O-P-I-A, is present just lateral to the frontal horn of the right lateral ventricle. This is the frontal horn of the right lateral ventricle, and that would be just to the right of it. (Indicating) So in other words, my physical examination with its minor abnormalities, the MRI, and the EEG are all pointing to the same place. And there is a

consistency there that doesn't always appear. (Laughing) But at any rate, it was sort of aesthetically pleasing to me, hum, but--

Q What is a heterotopia?

A What is a heterotopia? Well, the brain is formed during fetal development. It comes from just a few cells. As you know, just--everything starts with just two cells. But as the nervous system develops, there's a clump of cells that's going to become these--the brain. And the cells within that little clump grow out.

Well, you can imagine a globe, and something in the center of the globe and little bits and pieces of neurons, nerve cells, grow out to the surface. Actually, there's so many that grow out to the surface, that the surface can't accommodate them all and it therefore becomes convoluted and there are sulci and gyrates to people that accommodate all of the cells that have to go to where they're going.

But this migration of cells to the surface, and to make the gray matter mantel of the brain, is something that occurs during pregnancy. And when the cells don't get to where they're going or they get stuck in a place that they don't

belong, in this case in the white matter, it's because of some maternal factor. The mother was exposed to radiation or she was ill. But actually, the most common cause of that is drinking, maternal exposure to alcohol. That's a well known cause, very common cause of the heterotopias.

And what does a heterotopia mean? So what if there's some gray matter where it doesn't belong? And it's true. So what? It doesn't-- sometimes it doesn't matter. But sometimes it does. And the thing that's associated with it is epilepsy and retardation. And the epilepsy comes from poor organization of the cortex. Epilepsy is certainly abnormal. Nobody fully understands the physiological reasons that the cells become epileptic, but everyone recognizes that when there are congenital abnormalities of the brain, especially this particular one, there's a likelihood of seizures.

Mental retardation isn't the only abnormality of thought and behavior that can arise from a congenital abnormality of the brain. It's the most severe, the most easy to recognize perhaps. But there are minor ones, less

impressive perhaps, less easy to identify. And, of course, this is in the frontal lobes which is a hard area to test for.

Reading, writing, arithmetic, memory, and speech are pretty important, but those are from the posterior two-thirds of the brain. In other words, a person could have an IQ of 120 or 130, in the genius range, and be a social imbecile because of frontal lobe disease. And that's the important thing.

Her frontal lobes aren't put together properly. One of the more important features of the frontal lobes is moral and ethical standards, the ability to say, "No, don't say that; no, don't do that" to yourself. And the two--there are several components in that.

One is what you learn from your parents. I mean you're not--human beings are not born with an ethical and moral sense. You're born with a capacity to develop one, but they must be exposed to the right influences in order for that to happen, A. B, you have to have a place for that to record, for that to encode so that they can influence behavior later on. And her's is damaged from the beginning, from the get go.

Q And when you're saying "her's," you are referring to Miss Pike?
A I'm talking about Christa Pike, yeah.
Q Okay.
A And then, of course, there's mental illness. And if there's mental illness as well, and that has its influence, particularly, bipolar disorder. During a manic period, a person has a lot of difficulty in controlling behavior because the mania itself manifests itself by making the person feel that they are invulnerable and can do anything and don't have to confine their behavior to the limits of what is allowed by society.
Q Now, before we go into a little bit more detail of those three areas, is there a significance in the fact that a heterotopia was visible, that showed up on the MRI?
A Yes. That's a very good point. Most of the heterotopias that you see are invisible on MRI. They are microscopic. The pathologists will say, "Oh, here is some heterotopic material. Here gray--here's gray matter where it doesn't belong." And most of--if you see a heterotopia on MRI, you can be absolutely certain that there's plenty more heterotopic areas and nests that exist that you

can't see on MRI. You could only see with a microscope.

Q And when you reference a pathologist finding heterotopic areas, this would be on slide tissue or slides of brain tissue--

A Those would be on slides done through autopsy, yes.

Q And after death, obviously?

A Right.

Q You indicated that Miss Pike was admitted to the hospital for suspected epilepsy or some sort of seizure--

A Yes--

Q --incident--

A --she had epilepsy, apparently.

Q Now, you say she **had** epilepsy--

A Well, they made that diagnosis.

Q --does she still--

A I didn't.

Q Does she still have epilepsy?

A No, but she had the con--people outgrow epilepsy. What does that mean? The brain develops. The brain weighs 400 grams at birth, and at full growth, at adulthood, it weighs 1200. And that doesn't--you don't achieve that until

you're in the early 20's, 20 **years** of age.

And what's happening is the brain is developing. There are no more cells in the brain at age 20 than they are at birth. In fact, there are fewer. But what happens is myelin, M-Y-E-L-I-N. It's a fatty substance that insulates nerves, gets deposited. The brain is almost completely unmyelinated at birth. Only the very back of it is myelinated. The last part of the brain to become myelinated is the frontal lobe, and that doesn't happen fully until the 20's, the early 20's.

Now, the nerves that have myelin don't work without myelin. They just don't work. They're not part of the electrical grid that operates the brain. But gradually with maturity that happens.

Now, as that happens, inhibitory systems develop that were not there at first, and epilepsy, which is a result of an abnormal group of cells, can become controlled. But the abnormal group of cells is still there and the **behavioral** effects of the abnormality in the brain may not go away. It may change and not be quite the same. An abnormal two year old isn't the same as an

abnormal 20 year old. But the fact of abnormality persists.

Q And so the--I guess it sounds like this process of myelination turns on or activates more and more areas of the brain as a person progresses through childhood--

A Yes.

Q --and into the teen years or into their early 20's?

A Also, the connections between nerve cells are very sensitive to the environment and develop as well. A part of the development of the brain and the greater weight of the brain into adulthood is the result of that. The development of contacts between cells. Each cell has about 10,000 connections with other cells. In other words, it doesn't look like a little string of pearls; it looks like a tree, each cell, each cell with each leaf of the tree, a point of synoptic contact.

Q Now, based on--so you had indicated that an assessment includes the physical examination, at times imaging, which we have in this case, both the MRI done recently and EEG that was--well, I guess that's not really imaging--but the EEG test

that was done when she was 12 to 14 months old and--

A Right. The MRI was done on the 2nd of April, 2001, and the EEG was done when she had epilepsy when she was 14 months old in 1977.

Q So based on that, on your assessment, are you telling us that Christa Pike has a damaged brain?

A Yes.

Q Are you familiar with the report that was done by Dr. Eric Engum on behalf of the defense at Miss Pike's trial? He's a neuro-psychologist.

A I read it, but I don't recall it in detail. I'm sorry.

Q Are you familiar with his finding or his conclusion that there was no brain damage?

A Right.

Q And have we discussed that finding and how it relates to yours?

A No, the test--all it means is the test that he did did not show brain damage, and that's fine. And they don't always.

Q And you had--you indicated that the frontal lobe and this particular area in which--I

guess it's the orbital cortex--

A Yes.

Q --in particular where Miss Pike's heterotopia is located, those are notoriously difficult to test--

A Yes, yes.

Q --as far as their functioning?

A Also, you've got to realize that the orbital cortex, like the rest of the brain, does not just sit in splendid isolation, like the--say the left kidney and the left flank, where everyday, 24 hours a day, seven days a week it's making urine. Doing the same thing, and it knows it's connected to the rest of the body with an artery, a vein, and a tube and that the one on the other side can do exactly the same thing, maybe even better.

The brain isn't like that. The brain is all connected, and there are many, many fiber tracks that lead from the frontal lobe elsewhere. And one of the more important ones goes from the frontal gray matter, to the white matter, to the basal ganglia, to the thalamus, to the hypo-thalamus, in the midline behind here. (Indicat-ing) This is a picture below it showing the same

thing.

Q Okay. And for purposes of the record, you're looking at--

A I'll make a little--

Q --would be the fourth page of Collective Exhibit 3.

A Right.

Q And the gray matter--

A Number 17 there.

Q --is the outer layer--

A I'll put that and circle that as well. That's the thalamus. (Circling) Well, anyway, that's the fiber track, from the frontal lobe to the thalamus, and back again, dorsa media nucleus of a thalamus, yes. So anywhere along that line, the track can be interrupted and the behavioral result will be exactly the same as if it were in the frontal lobe.

And you're right; it's very difficult to test for, characteristically difficult to test for. There is no psychological test that reflects the abnormality of the super orbital cortex in the midline.

Q And, hence, the importance of having a neurological examination and imaging as well--

A Sure.

Q --to explore--

A Yes--

Q --the possibility of damage in that area?

A --exactly right. It's a great demonstration of that because here, I would say, there's been a dramatic change in behavior and that was induced by this. And in part--in large part and psychological tests show nothing. The MRI shows us.

Q You indicated that a common--the--a commonality that you have found in your examination of convicted murderers is the--sort of the--I guess the big triumvirate of brain damage, history of abuse, and presence of mental illness?

A Yes.

Q And did you find evidence of a history of abuse with Miss Pike?

A Oh, yes.

Q Initially, did you find any evidence of abuse when you conducted your physical examination?

A Well, you see--yes. The history--of course, I got the history from her. And when you

get the history from a patient only in the situation like this, you can't rely upon it. You need to have it confirmed. But there were certain things. There were, hum--

Q Now, before we go to the corroboration of some of the reports, when you actually examined Miss Pike physically, did you observe any-- anything that might indicate a history of physical abuse?

A Yeah, there's scars.

Q And can you describe the scars?

A Well, her back has just got lots and lots of scars that run horizontally mostly, some of them vert--most of them horizontally, more of them on the left side than on the right. And it looked like if a person was right handed would have been capable of causing them. Some of them were an inch or two long. They looked as if they had been produced by a belt or a switch and--but one that was not given nicely. She's got scars on her face. She has scars on her--under her chin and her eyebrows, and she could give me the stories that went with them.

There are other scars on her face that come from an automobile accident which she went

through a window of the car in which she was riding. And she's had to have some plastic surgery as a result of that. But there are others.

The ones on her back, of course, she couldn't give me a history for because she couldn't see them. She's not aware. Some of the things--she has a little tatoo type of things, self-induced or done in prison. At any rate, yes, they are there. And when you see that kind of thing and you have the history, I consider that confirmatory.

Q And although Miss Pike was unable to give you particular details of a specific incident as it related to the scars on her back, did she give you any information about people in her life who may have been the cause of those scars?

A Yes; yes, her father. And I had an opportunity, speaking of him, yesterday as well. She said that the way he beat her--and he confirmed this--was to have her pull down her pants--this was when she was a little girl--bend forward, touch her toes, and then he would wail away at her buttocks and legs with a belt. And he denied beat--abusing her but did confirm the

beating. That was the way it was done, and he said, "Well, I can understand why she might have thought that it was abusive, because she doesn't know what abuse really is." "Who does?" "I do", meaning he knew.

How did he know? Because his father beat him once a month with a belt. But that was nothing compared to what his mother did to him, which was to beat him with a switch every day of his life. It was ten times more painful than the belt he said. And he was beaten for anything, for everything. And he believes that that was the right thing for her to do at that--he criticized her for having used the switch because it was **so** painful. But that's what she knew how to do, so that's what she did. And he accepts that as a good teaching and helped to make him into the man he is.

On one occasion, he said--I asked him if he ever beat Christa more than once in a day and he said, "Yes". There was one day when he beat her five or six times because of her homework. He said, "Do your homework," and she wouldn't do it. So he would beat her, then come back some--a little bit later, "Did you do your homework?"

"No, not yet." Beat her again. And he did it six times. And I asked him whether the beating that he delivered to her helped to actually accomplish what, and he said, "No, actually it never did accomplish anything." But he felt that it was the right thing to do and that it was not abusive.

Q Are you aware of any other physical abuse?

A Yes, her--she was--she's--I think her sister is four years older than she, and she was very often left sort of in charge of her sister by her mother, who the sister described as being really very much involved in herself.

The mother was dating; she was going out; she would get all dressed up. She would have to put on make-up, and she'd put on a toga to go to a toga party without too much in the way underneath.

And the sister tried to become involved in that, women's things kind of thing, with her mother. But the mother was out of the house. There was no food in the house. Much of the time, Christa and her sister were hungry. There was beer in the refrigerator but no food, while the mother was out carousing.

Now, this is something that Christa had told me, something that the sister told me, and something the mother denied. I believe Christa and the sister.

But the sister would do things that were cruel. Now, lots of children who are being abused are very cruel to animals. They're also cruel to younger children. And Christa has a burn from a curling iron on her forehead, eyebrows, underneath her chin. And the sister agreed that, yes, she had done that to her, but hadn't meant to. They were just playing. Maybe they were playing. I think you could believe that they were playing and that Christa believed that it was done on purpose.

The point isn't so much the burn; it's what the effect was on Christa. And her idea about what that was, was that she didn't count for anything in anybody's estimation. Her mother didn't care for her, didn't like her, didn't love her, and didn't--wasn't committed to her good health, happiness, welfare, and life. Her life was threatened and her corporeal integrity was threatened in her own home as a little girl. That's what it meant to her.

So--and it was consistent with other

things, many other things that happened, many other terrible, terrible things that happened.

Of all of the things that I know of in this case, the one that absolutely gave me goose pimples was this episode where she was raped by a monstrous character in the--who lived in the neighborhood, who was a known pervert and pedophile, etcetera, where she had walked to--they were living in a trailer park. This is the one with Claude Davis, and she was 11.

She was living in a trailer park and her job was to go and get the mail. So she went to the mailboxes. There were a lot of tall weeds around, and there was a little ditch too. And Claude was out there and he grabbed her and--when she went to the mailbox and raped her. She--he scared her; he inserted sticks into her vagina; had his dog lick her genitals. And she then went back to tell her sister and--who is at home. And her sister didn't believe it and thought it was funny and told the mother. They told--she told the mother when the mother came home, who also didn't believe her.

Christa's behavior had changed so much at school over the course of the next day or two,

that the teacher in school asked--the two teacher's aids asked Christa about what had happened. And Christa reluctantly, because she didn't want to get another put down of this kind, said what had happened. And in order to get anything done about it, the teacher had the mother go to the school and call the police from the school so that the teacher could see that the mother was doing it because, otherwise, she wouldn't have done it.

I pointed that out to the mother, and the mother was very vague about that. Well, yeah --no, I mean I didn't believe it, no. Well, I called the--I called the police. I tried--I did call". She was calling the police. "Where did you call the police from," I said, "Did you call them from your home or from school?" "Well, I don't remember which it was." But I knew from the records that it was the school. So I believed Christa on that one too.

Q Now, were you given--did you see any documentary evidence that confirmed that incident?

A Yes, there was a--let's see. That wasn't the Hillsborough one. That was--

Q Can I show you this document--

A Yeah, refresh my mind.
Q --to refresh your recollection?
A Thank you. Thank you. (Examining document) Yeah, here 1987. I thought she was younger than that at the time. All right. This is a State of North Carolina, in the General Court of Justice. This monster, where there was--whether it was take and attempt to take immoral, improper, and indecent liberties with Christa G. Pike who was under the age of 16 at the time for the purpose of arousing and gratifying sexual desire. At the time, the defendant was over 16 years of age and at least five years older than the child.
Q And you have reviewed those records--
A Yeah.
Q --before today; is that correct?
A Right. And he--talked about did assault her by touching her inside and outside her pants near her private parts. So, you know, like I heard somebody say that she lied. But there's one situation where she didn't lie, and the people who said that she was lying were lying. Anyway, even that doesn't--what's--what's the-
MS. BROCKENBOROUGH: One moment, please,

Doctor. I'd ask that these--this record from the North Carolina courts be admitted as the next exhibit, and the copy has been provided to the State.

THE COURT: Exhibit 5?

THE COURT REPORTER: Yes, ma'am.

(Collective Exhibit No. 5 was marked and filed.)

Q Dr. Pincus, before you move on to that, the summary and the indictment and that report does not indicate penetration with sticks or the presence of the dog. Do you know why that is?

A No.

Q And go ahead. I'm sorry to interrupt your--

A It doesn't mean--so what?

Q --your next--

A Let's say there weren't any sticks. Let's say there wasn't a dog. The point is that she thought that there were. And she goes and she tells her mother about it. She's a kid. This guy's not a kid. And her mother didn't do a thing about it! Wasn't going to do anything about it, and it was just to be mocked. Can you imagine? Is there anything more debasing and crushing,

degrading than to have your mother go along with this mortification and humiliation and deprecation. It was--it's unthinkable, horrible! How could anybody ever recover from something like that?

Q Did you find that that was a singular occurrence in Miss Pike's life growing up?

A No, it was not. It was a pattern. There were men that was traipsing in and out. She was married five times, and she was living with people beyond that. And there were people in and out of there all the time, and she's going out to parties, and she was drinking. She's an alcoholic. Let's call a spade a spade. She was an alcoholic then, she's an alcoholic now.

Last night when we came to speak with her, she told of having three rum and Cokes just before that. And I had seen her earlier in the cafeteria having wine. So and she was very tired around 9:00 o'clock, and it was--it was clear. I mean I'm a physician.

She said too--the mother said that she had not been drinking at all during her pregnancy. "Oh, no, I'm a nurse. I know what that would do. Oh, no." An alcoholic tells me that he's not been

drinking; I don't believe it, because her husband said that she was. He would only see her on the weekends because he was in the Army in North Carolina. But he'd come back to West Virginia on the weekends where they were living, and they would go out and they would drink, sure.

Q And in your practice, now in your position as Chief of Neurology at the VA--

A Veterans.

Q --Medical Center--

A Yeah.

Q --do you--do you have regular occasion to deal with Veterans who, in addition to neurological complaints, also experience--or are alcoholics?

A Sure. There's plenty of alcoholics at the VA.

Q And what other examples of abuse did you--

A Well, there was this other beauty here. Wait a minute. I get their names confused because they're almost the same name. One's--

Q Are you referring to--

A --Kenny Clyde--

Q --Kenny Clyde?

A --and the other one is--
Q Clyde Davis.
A --Clive (sic) something. Wait a minute. I'll find it. Claude Davis. (Pause) I've forgotten which is which but--
Q I believe we just entered the documents relating to Claude Davis.
A Claude Davis. And the other one is the other one. Okay. That was Kenny Clyde.
Q Yeah, and actually before we discuss the Kenny Clyde incident, are you aware of any other sexual assault that--
A Yeah, there was--
Q --Miss Pike was the victim of?
A --there was Steve, who was the mother's boyfriend.
Q And can you describe--
A And there was--
Q --what occurred there?
A --and there was a guy who raped her another time. Okay. The Steve thing. Do you want me to talk about that?
Q Yes, please.
A He--what he would do would be to somewhat engage her into a kind of a wrestling

match where he would come in and he would muss her hair or something like that. That's what she told me. And they would then get into a wrestling match. Well, a 13 or 14 year old girl, or teenage girl gets involved in a wrestling match with somebody who's dating her mother--is old enough to be doing that--why is he wrestling with her? It's something--wrestling going on in front of the mother too? The mother denied it, but I have reason to disbelieve the mother now.

And there were boxes, said Christa, of pornography, sadistic pornography that were--and that were part--and sexual pornography--that were part of his--the inheritance that he brought with him to their life. And her mother was like, "Oh, no, not boxes of pornography, just videotapes, just a few videotapes." I said, "Videotapes he had of pornography?" "All men have those." "Well, here's one that doesn't. And there are a lot of other men that don't." And I said, "Well, where did he keep them?" "Not in a box." I said, "Well, where did he keep them?" "Well, in a drawer." Well, okay. It seems that we're--I'm getting confirmation of the story that I heard from Christa.

And then on one particular night, he started twisting her nipples painfully. And she responded by twisting his scrotum painfully, in which he called--or responded to her by calling her a whore and a slut, and got into a fight.

Her mother wouldn't believe this was happening, or didn't support her, or took his side. And who knew about these things? These things are occurring inside of their--the dwelling.

Well, on one occasion he slugged her in the full view of her neighbor. He hit her in the face with a punch. And **she** brought charges against him. And those charges led to a mediation in which a deal was made that he was going to get out of the house and she was going to drop the charges.

Now, that happened. And Christa went on to say and her mother said, "Well, then you go find yourself some other place to live because we're out of here, because if he leaves we can't afford to stay here," which means that Christa was being prostituted by her mother to Steve in order to give them a place to stay.

That's--that is what Christa didn't tell

me. That's not what the mother told me. That's my conclusion of these facts.

Q And Christa was 13 at the time that that happened?

A Yes.

Q And you have reviewed records from Kyser Promenta (Phonetically)--

A I saw--

Q --about the mediation?

A --I think a mention on January 26, 1991 mediation and Kyser--mediation was mentioned in the chart there.

Q And--

A That she was hit several times by the mother's fiancé.

MS. BROCKENBOROUGH: For the record, those Kyser Promenta records are at tab two of Dr. McCoy's social history which has been admitted into evidence as Exhibit 1.

Q You indicated another rape when Miss Pike was 17.

A Right.

Q What do you--what do you know about that?

A Hum, let's see. She met this guy and--

this Kenny Clyde, I think it was, in some--what she described as a redneck bar when she was--

Q Actually--

A --only a teenager. She was about 16 or something like that.

Q Do you know whether Kenny Clyde actually sexually assaulted physically Miss Pike?

A Hum, no. She didn't give him the--what he did was he made lewd and inappropriate remarks to her. And then he got kind of fascinated by her, and he started stalking her. And he would--

Q Okay. I want to return to that in just a moment. But do you--if I could show you these documents, perhaps they'll refresh your memory.

THE COURT: While he's looking at that, it's already 4:45. And if we're going to get finished with Dr. Pincus, I have to give some time for cross. (Laughing)

A All right. Okay. Yeah. All right, so she was sexually assaulted by him. Oh, he's the black guy. I see. I didn't--I thought there was a second--another one. All right.

Q Do you remember that--this incident?

A Yes, I do.

MS. BROCKENBOROUGH: And for purposes of

time--

A Yeah.

MS. BROCKENBOROUGH: --I've provided a copy of these documents to the State. I'd ask that these be entered as the next numbered exhibit.

THE COURT: Exhibit 6.

(Collective Exhibit No. 6 was marked and filed.)

Q These--again, for time purposes, these summarize all of Miss Pike's visits to--they're records from the University of North Carolina Hospitals. And the particular visit is towards the end, and it reflects that on--I believe it's April 14th, 1994--I'm sorry, January 14th, 1994, Miss Pike came to the emergency room, reported a sexual assault by a stranger in which penetration did occur and gave consent to have a rape kit done. To your knowledge was anyone ever identified or prosecuted from that?

A Not--I don't know. No, I didn't see anything of that sort.

Q Okay. Now, returning to Kenny Clyde.

A Uh-huh (Affirmatively).

Q What was your understanding of who

Mr. Clyde was and what happened--

A He was--

Q --with him?

A --he was a neighborhood pervert who was calling her in the evening. When she--her father would answer the phone, he would hang up. And he would just speak with her and say all kinds of-- how he wanted to rape her and how he wanted her to be wearing a--red thong underwear. And he want-- he saw her buying--he could tell her what she did that day because he had been following her and knew what she was doing. And he wanted to rape her. And then her mother answered the phone one time, and he said some lewd stuff to the mother. And the mother said that, both here and with me last night, that that happened, yes. And so that made her angry and she wanted to fight with this guy. She wanted to beat this guy up.

Q And when you say "her" are you referring to Miss Pike?

A Christa. Christa said to her mother, "I'm going to go out and set this guy up with my friend Mandy." And her mother's advice to her, according to Christa, was, "Be careful." The mother says, "Oh, I didn't know that she was going

to do anything. What did she suppose that she was going to do?" I think she knew very well that Christa was going to do that, and that's what I believe.

Anyway, Christa wanted to give him a lesson that he wouldn't forget. And she hit him two or three times with a stick that she found at the site. And she cut the back of his head, and head wounds bleed a lot. And--but Christa said that something happened to her at that moment that surprised her. That she wanted to kill this guy. And she, if he had not escaped from there, would have. She--he hit her several times with a stick. She didn't even feel it. She was absolutely focused on destroying the guy. And she couldn't stop herself.

He got away. He was in bad shape or--some how or other a passing motorist took him to the hospital and what not. And he brought charges against Christa, which were thrown out basically. He didn't show up in court. Why didn't he show up in court? Because he was in a mental hospital for having molested his little niece and nephew in Buckner or someplace like that in North Carolina, or some other place in North Carolina.

And the judge made some comment, in dismissing that case, that she did society a favor by getting rid of this guy. At any rate, she didn't really do society a favor. That was a--that was something that should have been picked up on. She couldn't control herself. It surprised her. And it was a--it was a red flag. Intervene here; stop this. But there was no intervention. The mother didn't notice, didn't care, wasn't involved enough to care. At any rate, that's where we were.

Q And that finding, I guess, was the sense of not being able to stop herself of a sort of focused impassioned action, is that consistent with any of your physical findings?

A Well, yeah, I mean that--and that's also the bipolar illness too. See, I didn't make that diagnosis. That's Doctor--the psychiatrist who saw her, Doctor--

Q Dr. Kenner's diagnosis.

A --Kenner's. Yeah, yeah, yeah. William Kenner. And--but under the influence of all of those factors together, a brain that isn't working properly, the brakes aren't working. That's what the frontal lobe does. It's like the brakes. The

impulse is coming from a different part of the brain. That's the lymphatic system. But it's supposed to be inhibited by the frontal lobe, which isn't able to do it. And then she's got this mania going at the same time and lost control of herself in this because of the--and her back-ground of violence. The violence actually had been given a kind of parental sanction by the mother. "Be careful." My--really.

Q Now, you are familiar with Dr. Kenner's diagnosis of bipolar disorder. In your review of the social history, did you find evidence that confirmed or that supports that diagnosis?

A Absolutely. Yes, there's spending. She was working at one point two full-time jobs and a part-time job, and what did she spend money on? Candles, trinkets, shoes. She didn't have food! She would go days without eating. She would see other people eating. Sometimes the mother's boyfriend would come in with food and eat it with the mother and not give it to her. But it wasn't --it was okay with her. She had no appetite. That's what happens during periods of mania.

She would go for two or three or four days without sleeping or sleeping 90 minutes here

and 90 minutes there, sleeping on the ground, sleeping on the street. And it didn't bother her. Didn't wash, etcetera, and she used drugs; she used alcohol. Those are signs of bipolar. She had periods of lots of sexual activity, and then long periods when she would be depressed of none, where she couldn't get out of bed for 14 to 18 hours a day and just would sit there.

She lost a lot of school time because of depression. She lost--there was one period of 30 days where she didn't go 25 of them because of depression. Her weight fluctuated. She's been from 92 to 170. It was 92 before she got locked up. It was 103 in 1995, and May '06 was 170. That kind of weight fluctuation occurs in people with bipolar disorder.

Q To what extent can the weight gain be attributed to the fact that she is in prison and is locked up 23 hours a day?

A Well, the food is there; that's true. And it wasn't necessarily there on the outside. But she has the appetite for it here and she didn't have the appetite for it there.

Q And that lack of appetite is something that's consistent with bipolar--

A That goes with mania.
Q --with mania?
A Yeah.
Q What other evidence did you find that was consistent with Miss Pike having bipolar disorder?
A Well, she was very irritable when she would get manic, and the spending, the weight changes, sleeping, use of drugs, alcohol, mood change, the feeling tremendously energetic, the sexual activity. I mean if you look in a textbook of the section devoted to manic-depressive illness, which is what bipolar used to be called, that's it. That's mania.

And she has periods when she can't get out of bed, and she can't move, and she's 14 to 18 hours a day in bed. And she's feeling crying, and she wants--is suicidal, two suicide attempts by over dosage. And a family history which is absolutely, I mean this is a--it is a hereditary disease, bipolar illness.

Oh, my God, that family history on the mother's side is spectacular! Maternal grand-father--grandfather was addicted to Talwin by injection. He walked around with a gun in the

courtroom. He threatened the judge in the courtroom, pulled the gun on his daughter.

The mother there was in the--his wife was no great shakes either. She was an alcoholic who grew marijuana, died of cirrhosis of the liver.

And there's a maternal great aunt, Norma, who attempted murder. She was going to murder her butcher husband, that was what it is. And there was a great aunt, Geraldine, who God spoke to. Maternal great aunt--great great aunt, Nola, who went to a mental hospital.

We've got a--we have a family history here that's consistent with bipolar illness. I think we do.

Q Now, how is all--before I actually ask that question, what about Alicia? Alicia is--also shares the same maternal history.

A Yeah.

Q Grew up in similarly unstable surroundings like Miss Pike.

A Yeah, but that's a--that's a good point. Here's Alicia, and Alicia is a pretty together person. She's attractive, nicely dressed, well put together. She had a baby when she was 15, and

so I mean that did happen. But she's not brain damaged, and she probably didn't get the gene for manic-depressive illness. So she had the abuse. See, abuse isn't enough.

Eighty percent of people who are abused don't even abuse their own kids, let alone anybody else's. They are--they're not criminals; they're not violent.

Most people who are brain damaged, even brain damaged and mentally ill, the worst--they go live under a bridge someplace. They won't be the great contributors to society, but they're not dangerous.

It's if you put those things together though, the abuse and the brain damage and the mental illness, that's what we have here. And this is the result of it.

Q And how did these factors come together on the night of January 12th, 1995?

A Well, we had about three days. She said that she hadn't been sleeping good for about three days before that. And she was in the midst of a very excited period, when she was very irritable and angry. This girl had been repeatedly calling her and saying that she was a whore and a slut,

which are code words for her to get her excited. And the fact of the matter is that those are exactly the terms that she would have used to characterize her own actions. And it was intolerable to her to hear this from this other girl--don't understand.

Q And is--is that what you mean by code words--

A Yes.

Q --that they are triggers that are connected to Miss Pike's perception of herself?

A Yeah, and it's also what Steve called her. You know, that's what I'm saying. So those words had a history with her. People respond to that kind of thing and get very, very angry. And her purpose in beating up this girl was not to kill her, but what happened was exactly the same thing that happened with the other guy. Only this time she had an effective accomplice--accomplices.

But the other time she had her friend, Mandy, who just sort of held back, and she tried to get Mandy--we're now talking about Kenny Clyde. She wanted to run him over with the car and tried to get her foot onto the gas pedal. Mandy was running her mother's car. And to try to get him

and kill him with the car, but Mandy wouldn't allow it.

Well, there was no Mandy there when this poor girl who was killed was killed. In fact, there were accomplices who for their--God knows what their reasons were--but they were helping to overcome. In fact, I think the first blow was struck by the male accomplice. I've forgotten his name. But he hit her with a rock. It broke into three pieces after he--come on.

At any rate, I don't think--she didn't start off by wanting to kill her, I think. And she lost control of herself and she did want to kill her and did do it.

Q And so to a reasonable degree of medical certainty do you have--have you come to any opinion--

A Yes.

Q --with regards to Miss Pike? And what would that be?

A I would say that she was in the--in the --under the influence of a mental disease and defect that prevented her from being able to consider what she was doing, and to prevent herself from giving in to this impulse of killing.

Q And is it correct to say that the origin of that mental disease and defect was in utero?

A Yes. The--the bipolar is hereditary. The damage to her frontal lobe is because of material factors in utero, and the abuse was certainly nothing that she could control. In fact, she was a magnet for abuse because--**because** of the manic episodes. Here's--what are they saying about this little kid? She's running around all over the place; you can't talk to her. She doesn't--things don't register in her mind. She doesn't respond the way other kids do. She's excited all the time. She's running out of the house. She's not going anywhere in particular; she just can't sit still. And she's running out of the house and doing kinds--that's what children do who are manic!

It's--children's behavior is so multi-factorial. It's pretty hard to make that diagnosis in a child. But, you know, looking back on it now, we've got this other history of adult behavior. Pretty clearly, that's what it was. Kids who are six years old aren't going to be carousing, running around with women, gambling and spending money. What they do is they don't sleep

and they get very hyperactive. She was hyperactive when she was at the school. Then she had periods of depression too.

Q And was the evidence of these three factors present and available in 1994 and 1995, 1996--

A This was all--

Q --in the pretrial period?

A --this was all there.

MS. BROCKENBOROUGH: Thank you, Dr. Pincus. I don't have any other questions.

THE COURT: All right. General.

MR. PRICE: Do you want me to go ahead?

THE COURT: If you're ready.

CROSS-EXAMINATION

BY MR. PRICE:

Q Talking about what was available to defense counsel during the original trial back in 1995, and they had retained the services of Eric Engum. Eric Engum, I think you had reviewed his report?

A Yes.

Q All right. And you mentioned that you felt like problems with the frontal lobe and the diagnosis that you're making or the opinion you're

rendering here--they're difficult to test; is that fair to say?

A Yes.

Q And, in fact, Dr. Engum did not find the things that you are finding; is that fair?

A Correct, using the tests he used.

Q All right. And, in fact, he testified at trial, I believe, that there was no brain damage to Christa Pike?

A I'm aware of that.

Q Okay. You--have you reviewed his trial testimony?

A I don't think so, but I agree with that, yeah.

Q And so when the defense counsel retained his services and put on his testimony, they were going with what they had and what they had presented when they retained Dr. Engum; isn't that fair to say?

A I think that is fair to say.

Q Okay. Was Dr. Engum incompetent? What did he do wrong?

A He made a diagnosis that was wrong. He said that there was nothing wrong with her brain, but he didn't have an MRI. He didn't have a

neurologic examination. He did neuropsychological testing, but he didn't do--

Q So was he incompetent then? Was he acting incompetently when he rendered this opinion?

A I think that he made a mistake. I don't know if I would say that he was incompetent, but I think that he was wrong.

Q Well, to render a neuropsychological evaluation without doing an MRI, you're saying gives you the wrong conclusion?

A Well, it's just one test. I mean it's like saying, no, this guy doesn't have kidney disease. I did a thorough examination of his liver. It--if you want to--if you're an internist, you've got to do all the tests.

If you're a person who just does one single little test, maybe you just--if all you do is the blood sugar, and then you say, "Well, no, this person does not have anything wrong with them. Their sugar was normal." That's not enough. That's in--that is just making a mistake. That is over-interpreting your data.

He has one thing. He didn't have an E--didn't do an EEG, didn't do a neurologic exam,

didn't do an MRI. He did neuropsychological testing and he found no abnormality. And that would be--that would be the limit of what he could say. "I found no abnormality," not that the brain is normal. He couldn't say that. How could he say that from that data?

Q Well, he did testify. He got on the stand right in the very seat you're sitting on--

A (Laughing)

Q --and testified and told this jury there was no brain damage. And my question to you is--

A He was wrong.

Q --was he completely incompetent in rendering that opinion?

A He was wrong.

Q Should the defense counsel have been aware of that and been able to find you?

A Well, I think that the defense counsel might have been incompetent, but I don't think the neuropsychologist was. I just think he was wrong.

Q Well, how can you say the defense counsel was incompetent, but Dr. Engum wasn't? Doesn't that go--don't they go hand in hand? Didn't they both present incompetent testimony?

A No. The defense is responsible for

assembling a credible defense. And if they didn't know what they should do, they might have consulted some other person who knows what you need in a death penalty case. I don't know. I'm not--I'm not all the way here, and I can't really determine whether they are competent or incompetent. That's not my job or that's outside my area of competence.

Q You're not going--

A But--(Laughter)

Q Well, my question--you're not willing to say that Dr. Engum here was--should never have been retained and rendered an incompetent opinion?

A No. I have no--no problem with his findings. It was his over-interpretation of their significance is where he made a mistake. A neuropsychologist can't render an opinion about what the brain looks like and what even the brain does. All he can do is talk about his tests. That--and he found nothing. Okay. That's fair enough.

There could be something really wrong with the brain in some aspect of it that he didn't test. In fact, that is the case. The findings we got on the MRI scan have been there ever since she

was born. I mean if they had done an MRI scan, you would have seen the same things that we saw in--recently or in 19--2001.

As far as the EEG is concerned, the EEG report has been there since the 1970's. But he's --that's not his area. He doesn't know anything about neurology and epilepsy and stuff. He's a neuropsychologist.

Q Well, now these tests that he administered, are you familiar with those and do you rely on those, in fact, in making your--

A If you could just--

Q Sure. I'll show you.

A --refresh my memory.

Q (Showing documentation to the witness)

A Tests administered. Okay. He did a Wechsler; that's an IQ test. He did the Halstead Reitan Battery. That--that's good. And he did a Stroup (Phonetically). He did a Wisconsin Card Sorting Test. He did the right tests for the frontal lobe. But the part of the frontal lobe that is involved is not one that shows up on those tests. And he did it--

Q Do you see any--do you disagree with any of his conclusions just based on the limited tests

that he did?
A Hum--
Q Have you have reached any different conclusions?
A I don't--I don't think so, but if you'll just give me a moment.
Q Sure. (Pause)
A (Reviewing documentation) Well, see, I don't--I can't disagree with anything, any of his findings. And I don't even disagree with his interpretation of the findings. He did find paranoia, psycho--paranoia, borderline drug dependence, etcetera. He found things in there that he believed didn't really come from her brain, I guess, and he thought that her brain was normal.

But we know that her brain was not normal. And we also know that the reason for saying it is on the basis of things that were done, that had they been done then at that time would have been just as abnormal as they are now.

And I think that he, just to say it again, over-interpreted his findings. He didn't find any abnormalities; so he said that there's no abnormality there. The first part was right, and

the second part was wrong.

Q (Pause) Now, this--you mentioned that the orbital cortex is the one responsible for, in the human brain, for making ethical decisions or telling yourself to stop when doing something that's wrong?

A Su-super orbital, yes.

Q Super orbital. And that this was--and then your conclusion is that, in fact, Christa Pike does have damage to that area of her brain?

A Yes.

Q Is part of that--I mean in what ways does this manifest itself? Are we talking about an inability to control one's anger? Would that be--

A I think that--that's one that's--yes.

Q Would it be being a pathological liar?

A No, I don't--in what way is she a pathological liar? I mean I can understand why her mother might say something like that because her mother is very protective of her own presentation and her own reputation. But I found situation--evidence that the mother is a pathological liar, not Christa. Chris--she was **dead wrong** about things that she said about Christa,

and in a way that was sort of self-exculpating.

Q Well, we've heard from more than one witness today that's indicated that she lies and--

A Yeah, well--

Q --she has lied from day one and she's been a pathological liar.

A I don't know. You know--

Q This is not just her mother talking.

A They're--

Q And then when we put on more witnesses, they're going to say the same thing.

A Yeap, yeap, yeap.

Q Wouldn't you say that would be consistent with the damage to her brain if that's part of this manifestation of her poor ethical--or inability to control herself?

A I would need more data to know what you --specifically what we were talking about because here we have a little kid who's overactive, who's got a vivid imagination, and has a psychiatric illness. I know that the sister told me that when they smoked marijuana together--now here's the sister smoking marijuana with her sister, Christa, same material--Christa had visual and auditory hallucinations and was saying all kinds of weird

things that lasted for about half an hour. Scared the hell out of the sister, and didn't ever want to do that again with her because of it. Now, the effect of marijuana in Christa's brain, the very same material, was different for the sister. Now, are we going to say that Christa was lying or is it just that she is a--

Q Well, let me direct you just, Dr. Pincus--

A Yeah.

Q --where does the ability to be an honest person and to tell the truth and decide to tell the truth or to lie, is that somewhere in the brain?

A Sure.

Q Is that controlled? Where is that?

A Well, that's in the frontal lobe.

Q Exactly where Miss Pike has brain damage?

A Correct.

Q So being a pathological liar would be consistent with the find--physical findings you found in her brain?

A Yeah, maybe, maybe. I don't--I mean how was she a pathological liar? What did she lie

about?

Q All I'm asking you, Dr. Pincus, is that would--that would be consistent with your physical findings; would it not?

A I am not--

Q If she was. I'm not saying she was or you're saying she was.

A Well, everybody is--

Q I'm just saying if she was that would be consistent with her findings--with your findings?

A I would like to agree with you. I can understand what you're--what you're getting at, but the fact is the data that we have for making a diagnosis of pathological liar rests upon the opinion of her mother and her mother's reports as one source of them. And I believe that the mother is--was wrong about that. In fact, I have documentation that the mother is wrong about it. That's not just Christa's opinion that I'm talking about.

Q Who was the doctor--

A I've got records.

Q --what documentation are you talking about that proves that Miss Pike's mother--Christa Pike's mother is a pathological liar?

A Well, that--that Steve hit her, punched her. She said that he never did that.
Q You know we've had a witness--
A Now, I got--I got a--I got a--
Q --we've had a witness separate from her mother testify today--I believe you were in the courtroom--that said she didn't believe Christa, anything she said about Steve and all the accusations she made.
A Uh-huh (Affirmatively).
Q That wasn't her mother talking. That was another witness.
A Okay. But I know from my--because I went into it, that there is documentation to that.
Q What documentation?
A Well, we've got a scar on her lip where she was hit with a belt--where she said she was hit with a belt. And we've got a--
Q Now, why are you--why--
A --we've got a media-we've got a mediation--
Q Let's talk about the scar 'cause-
MS. BROCKENBOROUGH: Your Honor, I think--
THE COURT: Let him finish; let him

finish his sentence.

MS. BROCKENBOROUGH: Thank you.

MR. PRICE: The scar, let's talk about--well, he's--your Honor--

THE COURT: I understand, but let's--

MR. PRICE: --he's getting far afield. I'd like for him to just-

THE COURT: I understand. But let's start with the scar please.

Q The scar you're talking about, where's the scar?

A On her lip.

Q On her lip. Now, you're saying that this was inflicted by Steve?

A He said--she said it was inflicted by Steve.

Q And that's based on what **she's** telling you--

A Sure.

Q --isn't that right?

A Sure. But there's a scar there.

Q Now, how does that confirm or deny whether that is actually the origin of that injury?

A Okay. I accept that. The--there's a

statement in Kyser's records that makes reference to a deal that was worked out--or am I getting that wrong? Wait a second. They talked about a compromise that was worked out where Steve was going to be leaving. Yes, the Kyser report. It--was hit by her fiance--mother's fiancé several times. And there's mention of the mediation in that.

Q It was mentioned by Christa Pike; isn't that right? When they go into the mediation and that's what she's alleging. That's not a finding by any independent body, by a judge, or anybody else, or any confirmation from any other witness.

A Well--

Q It was supposedly witnessed by the whole neighborhood.

A I guess. Yes, we'd need to have the--to get a complete thing on that, we'd need the mediation report itself. I don't have that, but it's the same story that she's giving in January--

Q That's her story repeated in that form.

A --January 1991 that she was giving in 2007.

Q You're basing your conclusion about the origin of that scar simply on what Christa Pike

has told you and nothing else?

A And the scar, and the report, and consistency of it, yes.

Q The--

A Now--

Q --presence of the scar. I'm talking about where it came from.

A Are we--am I going to be a doctor or am I going to be an FBI agent? I'm a doctor and I--

Q On your direct testimony you appeared to be trying to do all those roles, Dr. Pincus.

A No, I'm not at all. I'm not at all. I've been asked to put this together, that with the abuse in the case--

Q You told us where your opinion was--

MS. BROCKENBOROUGH: Your Honor, I would ask that--

Q --based on the origin of that doctor's-

MS. BROCKENBOROUGH: --I would ask that counsel for the State allow him to at least finish the sentence.

MR. PRICE: I though he had.

THE COURT: Why don't we start--why don't we start the next question and then let him finish his answer if you would. We'll allow the

doctor to explain.

Q (Pause) At least a third or a substantial part of your conclusion, the opinion you're rendering, is based on a history of abuse; is that fair to say?

A Fair to say.

Q So it's fair to question you about how you came up with this history, how you determined it?

A All right.

Q Where--is the data accurate?

A Correct.

Q And if the data is inaccurate, that should affect your opinion; isn't that right?

A Yes.

Q And so this data we're talking about is substantially based on what Christa Pike has told you?

A Well, let's see. January 4th, 1994 in the Hillsborough Hospital, a 17 year old, sexual assault. The man who assaulted her pulled out the tampon and entered her vagina two or three times. They noted that there were bruises on her sternum, bruises on her right inner thigh, bruises on her left anterior tibia, bruises on the right medial

trapezius, and blood in the vault of her vagina. Now, would--am I getting medical confirmation of the fact that there was a sexual assault on 1-4-94? I think I am. And I'll accept that. And if you don't agree with me, I'll disagree with you.

Q Okay. On that finding?

A Yes.

Q Do you know what happened with that case?

A What happened? No.

Q Do you know?

A What? I don't know.

Q You talked about--I mean you talked about a number of histories, including the fact that you're saying her father beat her--

A Uh-huh (Affirmatively).

Q --abused her?

A Uh-huh (Affirmatively).

Q And you talked about how horrific it was?

A Yes.

Q And yet when you questioned the father, he denied that there was any physical abuse other than spanking?

A With a belt up to six times a day.

Q And in your opinion that constitutes horrific physical abuse of a child, a difficult child?
A It absolutely does. Horrific physical abuse of the child. And the father said the reason it didn't was because she doesn't--and why she would think that it was horrific was because she didn't have the full experience of abuse that only he knew because of his mother--
Q Well, when questioned--
A --who used to beat him daily.
Q I understand that. But when you questioned him about the details--
A Uh-huh (Affirmatively).
Q --of the abuse--
A Uh-huh (Affirmatively).
Q --compared to what--how Christa Pike had described it, he did not confirm what Christa Pike had told you about those spankings?
A He didn't? In what way?
Q You're basing your conclusion that those were--that Christa Pike was horrifically beaten by her father, such that this contributed to her traumatic history, based only on what Christa Pike has told you?

A Well--

Q Nobody else has confirmed it.

A That was true in--

Q Isn't that true?

A That was true when I wrote this report, but it's not true today because I spoke to the father and he confirmed it.

Q He confirmed spankings. He did not confirm--and you've already testified that he did not confirm the details and the extent of the abuse that Christa Pike is telling you?

A She told-

MS. BROCKENBOROUGH: Your Honor, I'm-- I'm objecting this. He's already testified, both on direct and three questions ago, that the testimony was not spanking. It was using a belt. And I believe he used the word whipping.

THE COURT: Well, I think--

MS. BROCKENBOROUGH: And that seems to be a confirmation.

MR. PRICE: Spanking--

THE COURT: Actually, what Dr. Pincus is testifying about is hearsay at this point, but anyway--

MS. BROCKENBOROUGH: Hearsay is--

THE COURT: --it's--he's answered it already, General. I think I understand the point.

MR. PRICE: Well, your Honor, I don't believe he has. I mean my point is that he's concluding that she was abused by her father, and my point is--and my question to him is--

THE COURT: He's based on that--

MR. PRICE: --that's not been--

THE COURT: --he's based on that primarily on what Miss Pike has said and--

MR. PRICE: Only what she has said.

THE COURT: --and upon marks that he says he's seen on her.

MR. PRICE: Dr. Pincus hasn't seen those.

A And what the father said.

THE COURT: And what the father said. He testified about that.

MR. PRICE: He testified he saw marks. Now, the origin of that--

THE COURT: We don't know.

MR. PRICE: --we don't know. That's important, your Honor.

THE COURT: I understand. I do understand that point.

MR. PRICE: The point is he's making all his history, this horrible history--

THE COURT: I understand.

MR. PRICE: --of Christa Pike based on what she has said.

THE COURT: I understand.

Q And she has brain damage to the point that she's not able to control whether she's able to tell a lie or tell the truth? And yet you're relying on that pathological liar to render your opinion; isn't that true, Dr. Pincus?

A No, that's not true. When she was with her father, she was subjected to frequent beatings with a belt that had a ritual aspect. She had to pull down her pants, stand and bend forward to touch her feet, so that her father could have access to her buttocks and back. The beatings would go on sometimes for as many as ten or 15 blows. She was not allowed to cry because if she did she would have more beating. The beatings were severe enough to leave welts, bruises, and cuts. I asked the father whether she was made to lean forward when he beat her. He said, "yes."

Q Now--

A She had to pull down her pants?