**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 5**

**DOCUMENT 4**

---

IX E 2009-00016-CCA-R3-PD

004802

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGooual

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Volume 4

January 29-31, 2007 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Ms. S. Jo Helm
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Ms. Catherine Brockenborough
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS

| Volume 4 | Page |
|---|---|
| PETITIONER'S PROOF: (continued) | |
| JONATHAN HENRY PINCUS: | |
| Cross-examination by Mr. Price (cont.) | 301 |
| Redirect by Ms. Brockenborough | 328 |
| Examination by the Court | 346 |
| Redirect by Ms. Brockenborough (cont.) | 348 |
| Reports to be Filed Discussed | 354 |
| ALICIA WILLIS: | |
| Direct Examination by Ms. Brockenborough | 362 |
| Cross-examination by Mr. Price | 397 |

Q --now before you--

A He said, "Yes."

Q Before you go, Dr. Pincus, that part about what you're talking about, is that coming from Christa Pike or is that coming from her father?

A The quote is from my report that I wrote in--March 25th, 2001.

Q And that's coming from Christa Pike; isn't that true?

A That is. But every detail of it--

Q I'm trying to get at what--

MR. DAWSON: Well, your Honor, if he could-

MS. BROCKENBOROUGH: Your Honor, if he could answer the question.

MR. DAWSON: --finish the question.

THE COURT: Okay. Okay. General, first of all--

MS. BROCKENBOROUGH: I--

THE COURT: --ask the question. He--it came from Christa Pike. But--and he doesn't need to read it if that--because we've gone through that. I think the point is: what other sources, if any, does he have to verify that? And that's

the question.

MS. BROCKENBOROUGH: His last two questions and answers--statements, your Honor, was that he went--he was beginning to go through each element of those quotes. He said, "Did I ask--that he asked the father--

THE COURT: Well, I understand all that.

MS. BROCKENBOROUGH: --and he said, "Yes". And I don't what's happening to Mr. Price's hearing.

THE COURT: I understand all that. And he has testified now that he has talked to the father, and what the father told him which in his mind confirms or doesn't confirm what Miss Pike's story is.

MR. PRICE: What he's doing, your Honor, is he's not separating that out. He's putting that all in there as fact-

THE COURT: I understand.

MR. PRICE: --and it's all coming from Christa Pike. And I'm trying to get him to separate it out, but he won't.

MR. DAWSON: Your Honor, he's trying to strip it out, but he's not allowing him to.

THE COURT: Well, you need to let him,

General.

MR. DAWSON: If he would allow the Doctor to answer the question--

THE COURT: I think he needs to be able to explain his answer if he's got further explanation of where he reaches his conclusions. And I grant you that he can read out of his report what Miss Pike said to him. The question is not what she said at this point. It's whether or not he can confirm it.

MR. PRICE: And his report doesn't distinguish--

THE COURT: I understand.

MR. PRICE: --is my point.

THE COURT: I've read his report.

MS. BROCKENBOROUGH: He's trying to distinguish it now in his testimony but-

THE COURT: Well, I understand that also. That's what I'm trying to let him do.

A According to my notes here, it says the father was beaten daily on his legs with a switch by his mother ten times more painful than a belt. He feels that he did not abuse Christa but understands that she might think that because she doesn't know what real abuse is. Daily beating

with a switch, and monthly with a belt. He beat Christa up to six times in one day for delaying her homework, and the way he did it was just as Christa described it, just as she described it. That's what he said. It sounds to me as if you basically agree with me, if that's true.

THE COURT: So--so--so I guess the conclusion is, that's the doctor's conclusion based upon--that's his verification of his conclusion.

A Right.

THE COURT: So let's go forward from there if we could.

Q I noticed in your report, talking about the Claude Davis warrant--I think that's been entered into evidence. I don't know if you have that in front of you, Dr. Pincus.

A Yeah, yeah.

Q And in your report you indicate--I want to find it--

A I think it was the third paragraph.

Q What page was that?

A It was the first page of my report, I think the third paragraph.

Q (Pause) Oh, yeah.

A Third sentence.

Q The second page of your report.

A Oh, second page of my report? Okay.

Q Second full paragraph, third paragraph down.

A Okay. It says "with another babysitter". That's the--

Q It started with age five or six.

A Oh, I gotta--

Q It may be out of order.

A Okay, sir. Second page.

MR. PRICE: If I may approach?

A Second page.

Q Yeah.

A Oh, at age five or six.

Q Yeah.

A Okay.

Q Now, this--

A Oh, oh, oh, yeah, that's it.

Q Yeah, the Claude Davis--

THE COURT: Okay. Now, where are--where are you now?

A This--it's this report here. (Showing)

THE COURT: Page what? Yeah.

A Second page.

THE COURT: Okay.

A The second full paragraph.

THE COURT: Okay. I've got it.

Q This Claude Davis formed an important part of your conclusion about her history; is that fair to say?

A Yeah, the first sentence to this is not concerning Claude Davis, but someone named Ernest. At age five or six she was sexually abused by the boyfriend of her paternal grandmother. That's--

Q At age nine, right?

A Yeah.

Q In the next sentence.

A Right.

Q At age nine she was molested by a man who threw her into a ditch, penetrated her with sticks, and caused his dog to lick her genitals?

A Right.

Q And you've testified that her parents-- her mother and her sister didn't believe her about that?

A That's right.

Q But, in fact, there were charges brought out; there was an arrest in that case--

A Uh-huh, yes.

Q --so that there is confirmation of the incident?

A Correct.

Q So you're saying that because there was an arrest warrant taken out, that that's absolute confirmation about Christa being thrown into a ditch--Miss Pike being thrown into a ditch and penetrated with a stick?

A Yes.

Q The simple fact of the arrest?

A Yes.

Q You're aware, are you not, that any child can come forward and allege things and cause a warrant to be taken out, but there has to be some finding to conclude that it actually happened? Would you agree with that?

A I don't think rapes are treated that way anymore, and I think that--I think that that's fantasy on your part. No, I don't agree with that.

Q Well, Dr. Pincus, I mean I prosecute child sex abuse cases, and I have gone forward on them with just the victim alone, but just because you have a victim saying that it happened does not end the matter. Would you agree with that?

J. Pincus - Cross

A It doesn't end the matter because we are not here at a the trial of this guy. We're here on the trial of her, to find out what her background is. I think it's enough for that. I don't think it's enough to convict somebody--
Q Just simply--
A --and send away for ten years.
Q --the fact that there was an arrest warrant taken out is enough for you to conclude that it happened?
A Yes, that's confirmatory evidence. That means it really happened.
Q No doubt in your mind that it happened?
A No doubt in my mind that it happened, and it happened--
Q Because--
A --as she described it.
Q --there's an arrest warrant?
A On the basis of what she said and the arrest warrant, yes.
Q Which was based on what she said?
A Oh, please.
Q Isn't that true?
A (Disgusted utterance)
Q Are you aware of any other physical

evidence that corroborated the story?

A I'm--I will stick with what she said and what--and that arrest. That is confirmation of what happened to her. It's not enough evidence to send him to prison, but it is enough evidence to verify--

Q In fact--

A --her claim.

Q --that's--you know, let's talk about the prison. I mean what she says happened would be a completely--would be a terrible crime and would--I mean--

A I'm glad you agree with that.

Q Oh, I certainly--

A I agree. I think it would be--

Q Taken into--

A --a terrible crime.

Q It absolutely would, taking the facts as they would. And, in fact, somebody who committed such an act and was found to have done that, proved to have done that, would be looking at 20 years in the State of Tennessee--

A He certainly should.

Q --in the penitentiary. Is that what happened to him in this case?

A I don't really know what happened to him.

Q Well, let's take a look at that.

A What happened to Claude Davis?

Q Would it disturb you to know that he never spent a day in prison over this crime?

A Was he found guilty and given a suspended sentence that lasted for two years?

Q He received a suspended sentence, exactly.

A Oh! He was found guilty!

Q No, he was--

A A suspended sentence is a sentence.

Q --he was actually allowed--he was found guilty of sexual assault. He was not found guilty of the sexual penetration--

A He was--

Q --that you say conclusively happened, Dr. Pincus.

A --he was found guilty of a sexual assault and give two years suspended sentence, and you won't agree--you don't agree that that happened? What kind of a fantasy world are you living in?

Q I'm agreeing that he was found guilty of

a sexual assault, but that's not what Christa Pike said happened. She said she was raped.

A She said she was--she described something--I don't--I'm not a sophisticated lawyer and I don't know the difference between rape, sexual assault, and whatever else it is.

Q Let me tell you, Dr. Pincus, there's a huge difference.

A But if somebody--

THE COURT: Wait; wait; wait; let--

A --but if somebody is found guilty of sexual assault and given a suspended sentence of two years on the basis of what this child said happened, then it happened. And for her mother to have mocked her for claiming this in the--at that time--

THE COURT: Okay.

A --was an outrage!

THE COURT: I'm going to stop this because frankly I'm the finder of fact. So neither Dr. Pincus nor anyone else can come to that conclusion. I can only listen to the testimony of the expert as to his opinions based upon his findings. And in this particular hearing, I'm going to have to weigh the various

statements of others. So what I'd like to do is either move on into his--anything else you want to ask, General, or-

MR. PRICE: Your Honor, I think I've got a ways to go. I mean are we--are you up to continuing to go?

THE COURT: Then we're going to--then I think we ought to continue.

MR. PRICE: I just don't want to be cut short.

THE COURT: I'm not going to have you cut short. All I'm trying to say is I don't want to, you know--you all don't need to engage in semantics about whether or not, you know, for what reasons we ought to find this one or that one telling the truth, because ultimately that's the decision for the Court to make.

Q (Pause) What independent evidence or corroborating evidence do you have of--well, I think we've actually covered that. I'll skip that part. (Pause) Do--you said you've written a book about why killers kill.

A Yeah.

Q Does that focus on this--does that coincide with the opinion you've rendered here

about the three areas?

A Yes.

Q And is your opinion in that book--unfortunately, I haven't read it; I should have in preparation for this--

A (Laughing)

Q Maybe I will afterwards. --that killers, or maybe at least premeditated murderers have all shared that three--those three backgrounds?

A As it turns out, yeah, they do. They're--the main criticism of the--I think most cogent ones is that there--that the epidemiological studies show that men, much more than women, are--kill strangers. How could that be? And that there are differences in the North and South, America and Europe, and all that kind of thing--blacks and whites--needs to be explained. Can you use the theory to do that? And it turns out actually you can.

Men are much more frequently brain damaged than women. I mean attention deficit, hyperactivity disorder, autism, learning disorders, even traumatic brain injury much more common in males. And so if these things, these three factors multiply each other, it would be

that brain damage is six, seven times more frequent in men. That's what you're going to get, and it's going to be in men.

So I think actually that the theory, it does--it can stand up to that kind of criticism. The book presents it and presents it in a pretty thorough way up to the point of discussing epidemiological things. I haven't--I'm writing another book for that. But--(Laughing)

Q I'll be sure to get it. (Laughing) Well, I guess my point then is your theory and what you have found in your studies is that these killers all share those three factors?

A Yes.

Q And, in fact, your testimony is that Miss Pike shares that factor as well?

A Yes.

Q Such that that created--when those all combined and the situation she was in created an irresistible impulse to commit the act that she did?

A Yes.

Q And is that true for all these killers you're talking about?

A Well, certainly the ones I've seen--not

all the ones I've seen though, I must admit. There was some that I didn't have--I can't say that. And one was a very famous one and I'm missing his name. It was in Florida, a serial killer of women.

MS. BROCKENBOROUGH: Bundy.

A Bundy. Yeah. His neurological exam was absolutely normal and so were his psychological testing. And I--I must admit I don't know what motivated him. But so there are--have been a few that I can't say that of. But another thing is that it's probably not fair for me to just quote my own experience with them because, after all, it's not been unbiased. The lawyers have asked me to see people who they probably think has something wrong with their brains. It was only in the very beginning that I did it in an unbiased way.

The first cases were not murders. They were kids in--who weren't violent and nonviolent in a reform school. And then there were a group of everybody who tried to see everybody who was on death row for a crime committed before the age of 18. So that was unselected in a sense too. And then the others, there was one, 15 murderers who

were on the verge of being executed that we were--I evaluated them. And it was very much true. There was one it didn't work for in that group of 14 plus 15 is 29. There was one that had not been abused. But the others--the others had. It worked pretty well.

Q So I guess still along that same line--veins that you brought it up, I mean you've never --have you ever appeared as a witness for the State?

A (Laughter) Only once and that was in my very first case, before I got involved in all this. It was a man in Orange, Connecticut who had made an attempt to rob a bank there. He had stolen a car, driven it to Orange, came in, wrote a little note out saying, "Give me your money." And they gave him the money and he walked out. And the only policeman--(Laughing)--in Orange, Connecticut was parked right outside the bank at that moment. And so he got arrested. And then he had had epilepsy. And he--he was saying that the whole thing had occurred in an epileptic seizure. And I said that, no, he hadn't. So I--I would--

Q Did you get into the fact on that case of whether he fit this irresultable (sic)--

irresistible impulse?

A (Laughing) I hadn't--I hadn't elaborated the theory yet--

Q Oh, okay.

A --but I did testify for the prosecutor.

Q Since then you--

A I haven't been asked though. (Laughing)

Q Well, what is your opinion about what is to be done with these killers that have the irresistible impulse?

A They've got to be separated from society, and separate--society must be protected. And they--they must be imprisoned.

Q Is it fair to even hold them morally accountable for what they do?

A Hum, it's a tough question. It's not an easy question to answer. I think that we--we're obliged to act as though they were--the answer to that question is yes, if it's--no matter if it's yes or no.

I'm a religious person as well as a scientist, and I believe in free will. And I--but it's a belief. It's not a finding. I believe in it, and I--but I do believe that its scope is narrowed in people who have brain damage, have

been abused, and who are mentally ill. And therefore, I think that the ultimate penalty is inappropriate in such a person, although I'm not going to say that the person should be freed, that they're not guilty on the basis of insanity-

Q Well, if it's an--

A --not at all.

Q --if it's an uncontrollable impulse--

A Well--

Q --irresistible impulse in these sit-- killers' situations--

A It could happen--

Q --how is it fair to even lock them up?

A --it could happen again. And I wouldn't--I would--the issue is almost never freedom versus punishment. It's death versus life imprisonment. I'm all in favor of life imprison- ment but--

Q You're--

A --I just know what you're saying, and I'm trying to be honest in answering it. I--I--I- -I--I do believe in free will.

Q You think in a situation --what you have found in Miss Pike's case, that that--those three factors leading to that irresistible impulse, that

in fact, if even the opportunity, she would kill again?

A She might very well if she got angry, yes.

Q Okay. Are you aware of her subsequent trial for attempted murder in Nashville based on actions in the women's prison there?

A Yes.

Q Is that consistent with what you found?

A Yes, yes. You know, it isn't--and she wasn't--the diagnosis of bipolar wasn't made yet. And they put her on Lithium and had a dramatic change in her behavior.

The fact that she's off Lithium now and her behavior hasn't deteriorated is good luck. Bipolar illness comes in episodes of mania and depression that are separated by periods of relatively normal reactions, and we're in such a thing now I think. But I would want her to be on Lithium.

Q Is it your conclusion also that, consistent with your opinion there, that when she goes into these rages, she has--she's not able to perform any premeditated intent to kill?

A It depends on your definition of

premeditated. In some states it's if you just want to kill the person for one second before you do, that's premeditation. If we're talking about real deliberation, real planning, I think that that's not what she would be doing. I think that if we're talking about one second, I think that is what we're--

Q She--so you're saying she wouldn't be capable of say planning this thing a few days ahead?

A She wouldn't do that. I don't think that that's what she would. She would want to give some--a lesson that they won't forget and not--and then lose control of herself while she was doing that. That's what happened twice.

Q Well, if the proof at trial in this case showed that she actually had told a friend that she was going to kill Colleen Slimmer, the victim--

A Uh-huh (Affirmatively).

Q --at least a day--I don't know exactly the time--but at least a day before this actually happened--

A Are we talking about--

Q --would that be inconsistent with what

you're--you're saying?

A --are we talking about the thing in Nashville?

Q No, no. I'm sorry. Going back to--

THE COURT: This case.

Q --what happened here in Knoxville, the original trial.

A Oh, this--the original trial?

MS. BROCKENBOROUGH: What was the question? I'm sorry. I missed the question.

Q Yeah. I'm--

A Perhaps we could repeat it.

Q Yeah. Dr. Pincus, you had indicated that her condition--Christa Pike's condition is such that she would not be able to form a plan days ahead of time to kill somebody, that her killing comes in the form of irresistible impulses given a situation; is that a fair characterization?

A Yeah, I--I--I don't think that she's not capable of planning to kill somebody. She's capable of it, but I don't think that she would do that. I think, in fact, what did happen was that she lost control of herself.

Q Well, then the fact that if proof came

out that she actually told a friend she was going to kill Colleen Slimmer, well before hand--

A (Sighing)

Q --this murder happened, would that be inconsistent with what you're saying?

A That would be inconsistent with what I'm saying, and I think it really--well, I have a lot of friends who say that if--"If the guy had said one more word to me, I would have killed him." But, you know, they don't really mean that.

Q And it doesn't really happen; does it?

A Exactly.

Q But in this case it did.

A It did. I know; I know; I know; You're right. I--I can't deny that.

Q Let me pose a hypothetical question to you. Would it be--or let me just ask it this way. Would it be inconsistent with your understanding of Christa Pike's condition if, when calling her mother after the incident in Nashville and describing the incident to her mother on the phone, she told her mother, "See, now I know the difference between premeditated murder and what happened with Colleen because, see ,I premeditated the hell out of this. I sure did. If I had had

30 more seconds, we'd have a chalk line out there in our rec pen and that bitch would be gone somewhere."

A She's talking about the women in prison, right?

Q That's the attack in the prison.

A Yeah.

Q She's saying she premeditated that. You're saying she's not capable of that?

A No, I think she is capable of it, but I don't think that the thing that we're dealing with here, that was the killing of that girl, was premeditated. And actually, what she said in that conversation would tend to bear that out, in that that wasn't premeditated and this one that occurred in the prison was. But, again, she was in a manic episode. Her judgment was--

Q But you're saying she couldn't--

A --her judgment was impaired, and she wasn't on Lithium at the time. And I feel very uncomfortable that she's not on Lithium now.

Q Well, you--but part of your testimony--with your answer just then was she is capable--

A Yes.

Q --of forming a plan to kill somebody?

A Yes, yes.

Q And capable--and very capable of following through with that?

A Yes, certainly capable.

Q So it's possible, although not your opinion, but it's possible that, in fact, in this case, she very well could have planned and formed a plan to kill Colleen Slimmer, follow through with it, and killed her?

A It's possible, yes.

Q And not be the result of some irresistible impulse?

A It's possible. That's why we're here is to try to determine.

Q Absolutely.

MR. PRICE: (Pause) I'm almost done, your Honor. (Pause)

Q Would you say fantasies about violence or obsession with violence, or just say focus on violence, would that be consistent with this brain disorder you're talking about?

A I don't think it would come from the brain disorder, the heterotopia, I mean no. I don't think it would come from that. I think that would come from the--her life experience of abuse

and the movies, the pornographic and sadistic stuff that she's had around.

Q And so these fantasies she has, she's--I guess she's related to you about having dreams about cutting open--

A Cutting open some guy's abdomen and taking out his intestines and strangling him with them, yeah. I mean that--that's--she recog-- that's a sick idea. She recognizes it as a sick idea, and it's not something she would do. It's the kind of thing that people with OCD, obsessive compulsive disorder, have. That's the kind of-- it's really kind of a terrible condition. Almost all--all of them realize that that is something that they wouldn't do, and that they don't want to do, and that they don't want to have that thought.

Q And if they realize they've done it, they would experience regret--

A Very much so.

Q --because they didn't really mean to do that?

A Very much so.

Q You would expect somebody who had succumbed to an irresistible impulse in--in a situation, that once she realized what had

happened and was confronted with it she would be remorseful?

A You would think so, but remorse and empathy and sympathy are not genetic endowments of human beings. They have to be taught. And anybody who was taught the way she was with the most dreadful kinds of dehumanizing experiences, were mocked, that is not the way you teach someone to be sympathetic and an empathetic human being.

Q But--

A I think that she doesn't feel that--

Q Didn't you say--

A --the thing that you're--

Q --that she was upset because of these dreams she was having? She was capable of--

A Those dreams, yes. I mean that would be something else. I mean we're not talking about the same thing.

Q When confronted with that violence in her own mind she, you said--indicated she felt bad about that.

A She did feel--she does feel bad about having those fantasies. She doesn't like those fantasies, and those fantasies are not what we're discussing.

Q So she's quite--what I'm getting at is she's quite--she's capable of feeling remorse over the violence in her mind?

A Well--(Slight laughter)--I don't think so. No, I don't--I don't--first of all, feeling remorse about a fantasy or having--or being upset by a fantasy is not the same as feeling remorse about something you've done. It's a--and, hum, I don't think that she, hum, has within her capacity to feel empathy and--and--and the kind of remorse that we--she should but--

Q Is that from the--is that from the brain damage or is that from her history?

A Both, both, both, because the part of the brain where that registers is--is not there, is not working properly, and because of her history because she wasn't taught that.

MR. PRICE: I think I'm done, your Honor. No further questions.

THE COURT: Any other questions you have, Ms. Brockenborough?

MS. BROCKENBOROUGH: Yes, your Honor.

THE COURT: Because I have a few when you get done. Go ahead.

REDIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Okay. Would you agree with the premise that--that committing murder is not normative behavior?

A Correct.

Q And in light of the facts of this case, does that--does that give you a sense of particularly abnor-abnormal behavior, given the nature of the--the--of how Miss Slimmer was killed?

A The--the--are you saying that just because she killed the girl, that means that she must be abnormal?

Q Well--

A I don't think that. You have to look at the facts around each case. There have been cases that I've seen and been asked to see where I wasn't able to find anything, very few, but there have been some. And you have to look into the individual circumstances of each case. And when we do that here, I'm finding we've got a trifecta. In other words, all three of the factors that I think are important, vulnerabilities to violence, are present here. And I think that they--there was a confluence of them along with that period of

mania--

Q I guess--

A --and anger, and that's what led to it.

Q Let--I guess I wasn't necessarily clear when I was asking if you agreed with the--the--I lost the word--but the assertion that committing murder is not normative behavior. I wasn't necessarily--I didn't intend it necessarily as a term of art so much as murdering is an exception--

A Well, yeah, most people are not murderers. And if you took the number of instances of murder and divided it by the number of opportunities for feeling it--for doing it, it would be a very, very tiny number that you would come up because all of us get angry with other people. Most of us, the last time we remember hitting somebody with the intention of hurting them is probably from the third grade or something like that or maybe kindergarten. Most people can't even remember that.

Q So does the fact that a murder was committed suggest a need or suggest the possibility that there is a mystery to solve as far as what led to that?

A Absolutely. I think everybody who

commits murder ought to be assessed carefully the way I have done it, because it's the most extreme kind of behavior you can imagine--imaginable.

Q And when--

A And if--yes, absolutely right.

Q And in a case where a person is facing death as a possible sentence, does that suggest an additional need to--

A It gives an urgency to it--

Q --an urgency to it.

A --yes. So we were asked to see this group of people in Florida because they were about to be executed. That was the only criterion.

Q And so in this case, when the defense team got the services of Dr. Engum and he returned with his neuropsychological evaluation indicating no brain damage, does that suggest a need to explore further?

A Absolutely. It--it almost demands it, because here you would have a very unusual occurrence, something that happened, no explanation for it. And so what's the explanation?

Q And you had indicated at the beginning of your testimony that a complete assessment involves examination and testing, both psycho-

logical testing and a physical testing, and imaging--
A Yes.
Q --in this case--
A Yes.
Q --when--
A Yes.
Q --when you're looking at behavior. And it also includes doing a social history or getting a social history of the person being evaluated?
A Absolutely.
Q Now, if Dr. Engum had not been provided a social history when he was doing the work on Miss Pike's case, would that have affected his ability to interpret his findings?
A Yes, it would have crippled him.
Q And did you, in working in this case, have the benefit of expertise of other experts?
A Oh, yes, I had a whole investigative report.
Q And had--you--you also indicated that you consulted with Dr. Kenner as well--
A Right--
Q -as well?
A --a psychiatrist had seen her. I had

the neuro-radiological study, the MRI, and also the actual M--EEG finding.

Q And if Dr. Engum did not have the ability to consult with other experts that may have been involved in the case, particularly psychiatrists, how would that affect if at all his ability to complete his evaluation of Miss Pike?

A He couldn't give a complete evaluation. All he could do would be his tests. He did his tests. His tests didn't show anything, and he over-interpreted it. He said that there is no brain damage, instead of just simply saying, "I find no explanation for what she did." What you need to do is get a psychiatrist, get a radiologist, get an EEG, etcetera, etcetera.

Q And when--

A Neurologist.

Q --and so is it--is it your opinion that --given the facts of this case or the facts of murder in general, if the first set of tests don't reveal anything, is it your opinion that you need to--sorry--I guess widen the scope of--of material?

A Absolutely.

Q And--

A I mean that's the way I would feel. If somebody said, "There's nothing neurologically wrong to this girl. Her neuropsychological testing was normal." I would laugh. I mean that--that--that's ridiculous. There isn't a neurologist in the world who wouldn't laugh at that. (Laughing)

Q And so turning to--turning to the Mr. Price's, I guess, dealing with--

A His report

Q No, I'm sorry. --with--if I could finish my thought then I could--

A I'm sorry.

Q --finish my question. No, no. Mr. Price asked you whether Miss--the damage--Miss Pike's brain damage can manifest itself as pathological lying given the location of the heterotopia and its connection to that--the fact that the heterotopia is located in the same area of the brain that affects one's ability to sort of tell the truth, I believe was sort of his theory. And he suggests--suggested that that may be a cause of her pathological lying, and that that is somehow a manifestation of the brain disorder. When asking those questions, Mr. Price was focusing on one

issue in a time, and I believe you had said in your--in performing an evaluation that it's important to look at the--that the--at the big picture. Is that a fair statement?

A It's important to look at the big picture, but it's also important to know what actually you're talking about when you say pathological lying. I don't know what the people were meaning when they said that. What was the behavior that led to that--them to say that about her? And we can talk about each of those things. Otherwise, it's a rather vague thing. She lied a lot, I guess. But some of the things that she lied about I--I'm--I don't think she did lie about. And so I'm not saying she didn't lie; maybe she did.

Not everybody with frontal lobe disease lies a lot. But people do say fantastic things that aren't true who have frontal lobe disease sometimes. That's true. Not everybody. They think that the--the man--the behavior is not just a manifestation of where the lesion is, it's also what the person brings to that lesion, the past experience.

Just to give a common example, let's say

that you and I went to a cocktail party, and we--a Christmas party and we drank some of the punch and we--our blood alcohol level was 100. Yours was 100 and mine was 100. Our behavior would be different from our usual behavior suddenly, but your behavior and my behavior wouldn't be the same, even though our blood alcohol level was the same and even though the change in our behavior had been caused by alcohol, because we bring something to the alcohol, a whole so--history of socialization. And it's the same thing here.

Q And in the course of your neurological evaluations, you had relied on other social histories and the work of other investigators?

A I always do.

Q You always do. And during--

A I can't do it myself.

Q --and during the course of--of prior evaluations, have you discovered any problems or difficulties in verification of abuse?

A You mean have--have there been times when I couldn't verify the abuse?

Q Well, are there--

A There has been one case. It's an interesting thing, an interesting subject. But

there--but there's one case where there was a--a guy claimed abuse, claimed he had been abused, where I could get absolutely no confirmation of that from the family or friends or anything. And I assume that he was making it up. He told it. It was a fantastic story, I mean just a horrible, horrible story. And I have--I was sure it was right, but it was wrong. That was one.

People who are facing the death penalty, you would think that they would fabricate stories about their abuse in order to win sympathy and get some sort of a mitigated sentence. That's not what happens. They do the exact opposite. They try to say that it didn't happen. "I'm not--haven't been abused." And they only give you--tell you about a fraction of what--the things that happened to them.

I don't know why that is. I guess some people would be rather dead than be considered abnormal, I think, but--or they're ashamed. They're so ashamed of what has happened to them, and it was so dehumanizing that they just don't want to talk about it. I don't know what it is, but at any rate that's the case. There's lying, but it goes the other way.

And in this case I don't think there was lying about that. I think she told pretty much the story as it happened.
Q Okay. And--
A And the scars fit in with it and all that.
Q --and going to those scars, Mr. Price suggested that Miss Pike was lying as to the source of the scars. Now, is there any doubt in your mind that the scars exist?
A No, I saw the scars.
Q And are they in a location where they would have been easily self-inflicted?
A No, no, the back.
Q Are they consistent with someone having been struck?
A They are. The ones on her face conceivably could have been caused by the accident that she had, the automobile accident.
Q But even if that was the case, that there was some fabrication involved with the source of scars on her face, there are scars on her body that you have observed which are consistent with abuse?
A Right.

Q And in situations where a child is abused by an adult without witnesses, do you find it--who is--who is available to either confirm or disprove such incident?

A What I do then--what I then--do then is to ask other siblings, siblings who were raised in the same environment what happened to them. And I speak to the people who were the abusers, if I have them available, and I asked them, "What did you do when the child behaved--your child behaved badly? How did you respond to that? And did you ever find it necessary to spank them or whip them, and what did you do, and how many times did you do it, and etcetera?"

Q Hum--

A And so then if I get confirmation in that way, I feel that there--I'm the one who makes the diagnosis of abuse. When dealing with a patient, that's my job.

Q Do you know whether Miss Pike gave a statement in this case?

A About?

Q About--after she was arrested for Miss Slimmer's murder, do you know whether she gave a statement to the police?

A I'm sure she--she--I know she did.

Q And--

A I don't remember the details of it though.

Q And if she were a pathological liar, would the reliability of that statement be in question?

A (Laughter) Yes, I guess, depending on what he meant by pathological liar.

Q You indicated that you haven't testified for the prosecution certainly since the development of your theory as to the causes of violence. Has it been your experience that the State or the prosecution are interested in the explanations leading to murder?

A Well, the--the individuals are interested, I'd have to say, but I have never been asked by the prosecution to evaluate a--a murder ever.

Q Are you familiar with the role and--

A If I were asked, I would do it.

Q Okay. Let--let everybody know that. If--are you familiar with the role of mitigation or the purpose of mitigation evidence in capital sentencing?

A I guess it's to avoid a capital sentence.

Q Okay. Are you familiar with the notion of morale culpability?

A I--I--in a lay sense I do--

Q Okay.

A --understand what that means but--

Q You were asked about whether you knew about the attempted murder conviction resulting from--from an incident in prison. Are you--let's see. And you indicated that you were aware of that and that the event preceded Miss Pike's diagnosis of bipolar and treatment?

A That's what I thought.

Q Okay. And are you aware that the incident was precipitated by Miss Pike's wanting to protect a friend?

A I didn't know that.

Q Would that be consistent with your sense of her pattern of behavior?

A I--I--I don't understand what you're asking me.

Q Well, I guess there was some discussion about--about premeditation and whether--I guess--well, let me--let me back up. The circumstances

surrounding the events that we know of in which Miss Pike was involved with violence, do you find those to be important as far as the incident involving Mr. Clyde and Miss Slimmer?

A Yeah.

Q So--

A Sure, yes, yes, yes. That goes all--into it. That's part of her social background. That's part of her history. That's part of her recollection and memory and her--the things that resonate and help to determine what her behavior is. But on the other hand, it's a little grandiose. That doesn't seem to be able to be the one--who empowered her to be the one who's protecting her friend? I mean that's a little grandiose, and that's a little--if she's bipolar--that would be consistent, I think, more with a bipolar diagnosis. We're moving into psychiatry there. You--you want to hear about that from Dr.--what do you call it--Ken?

Q Dr. Kenner.

A Yeah.

Q And Mr. Price quoted to you a portion of a telephone conversation, a statement that Miss Pike made to her mother the day after the

incident.

A And the incident that occurred in prison?

Q I'm sorry. In prison.

A Yes.

Q Yes, sir. And if--if Miss Pike had been in a manic state at the time she attacked the fellow inmate, would--and if she were still in a manic state the following day when she was talking with her mother--

A It sounds pretty much as if she was. That--that's true.

Q --those statements would be consistent with someone who was in a manic--

A Yes--

Q --state at the time?

A --very grandiose and--yes. The devil may care. Who cares if they're listening on the phone, blah, blah, blah, that kind of thing, yes.

Q You were also asked if there would be any relevance to evidence that Miss Pike, in this case, had stated prior to the murder that she wanted to kill Miss Slimmer. Is the fact that she stated it evidence that she meant it at the time?

A No. On the other hand, it--it's--it's

hard to argue that she didn't mean it because it happened.

Q You also made reference to sadistic videos that Miss Pike had been exposed to as a child. Do you know anything more--

A I missed a noun there.

Q Sadistic--

A Sadistic, yes.

Q --videos. Do you--do you know any--any details about those videos?

A I think I saw four of them. I mean the --they're not the--just in the package. There were three that were R-rated and one was not rated.

Q And were these sort of horror movies--

A They were horror-types of things.

Q --horror slasher movies? All right.

A There was some sexual content, but it was more the horror part of it that was the main point of it.

Q You also indicated that Miss Pike, in talking with you and relating to you her--her fantasies, that she recognized that the--that they were sick and that she expressed that she was upset about--about the fact she was having them;

was--is that correct?

A Uh-huh, yes.

Q And was she obligated to share with you those fantasies?

A No, of course not.

Q And when she--during the course of--of relating them to you and your evaluation, did you have any sense of a desire on Miss Pike's part to understand what the source of those were?

A Yes. That--we were--we were having quite an intense meeting. We spent three or four hours together, and she was very much anxious to know what my ideas were about why she has these kinds of thoughts. And you know what it's like to have a little fragment of a tune going on in your head again and again and again and it reverberates around, some trivial little tune. I can't get it out. And then finally it goes away after an hour or two.

But people with OCD have thoughts of the violent kind that she has, and they keep coming again and again. And it's hard to do--think of anything else when that is happening. And that was happening to her. She does have OCD but somehow or other mixed in with these other things.

And that's what happened. It--it--it--it isn't the thing--people don't do those things. People with OCD generally don't do those things and are bothered by the thought and, of course, interested to know why they have them.

Q And that--

A Most people don't.

Q --and that was something that you--you observed in Miss Pike?

A Yes.

Q Do you--are there any known causes of OCD or obsessive compulsive behavior--

A Yes.

Q --or disorder rather?

A It's--there's no neuropathology of it, but with PET scanning you can see and FMR, functional MR, can see that there's hyperactivity of parts of the frontal lobe that are adjacent to the singular gyrus in the right--next to the area where her problem is. Now, it's conceivable--when people have lesions in that part of the brain, they get OCD as part of it. They may get it after a streptococcal infections as well. And the idea there is that there is some damage to the ordinary, normal inhibiting mechanisms that act in

that area. And when that happens you get these weird thoughts. Part of the evidence that favors that is that when high doses of SSRI's, anti-depressants are used to suppress the OCD, you--when successful, the activity in those adjacent areas on the FMR and the PET scan goes down. That's--that comes as close as psychiatry gets to having a test that can be done for one of their conditions, and that's to say test of FMR or a PET scan in OCD.

MS. BROCKENBOROUGH: I don't have any other questions. Thank you, Dr. Pincus.

THE COURT: General.

MR. PRICE: No more.

THE COURT: Do you mind if I ask one or two?

MS. BROCKENBOROUGH: No, not at all, your Honor.

MR. PRICE: Please do.

A Go for it. (Laughing)

THE COURT: Your--for want of better words, your theory about this trifecta you've described, did you publish that in *Base Instincts*?

A It's in *Base Instincts*, yes.

THE COURT: I know. But when did you

first publish the theory?

A Oh, that was in the medical literature going back into the 80's. Nineteen seventy-nine was the very first art--big article that came out. Dr. Lewis, Dorothy (Indiscernible word) Lewis, L-E-W-I-S.

THE COURT: And the--and the testing that you did since--the other testing that was done was done on all these different people who you've evaluated before or after that?

A After that.

THE COURT: Okay.

A MRI wasn't really introduced in the mid 80's.

MS. BROCKENBOROUGH: I'm sorry. Before or after what, your Honor?

A Seventy-nine.

MS. BROCKENBOROUGH: Okay.

THE COURT: Before 1979 when the first article was published about it.

MS. BROCKENBOROUGH: Okay. All right.

THE COURT: Then other tests came along, I guess. So--so when did MRI start?

A The mid 1980's it became available.

THE COURT: Okay. Anything else?

Dr. Pincus needs to leave Knoxville, I imagine.

MS. BROCKENBOROUGH: Yes, your Honor. I just have one quick follow up to that.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MS. BROCKENBOROUGH: (continued)

Q Although you published studies specifically dealing with your observations of these three factors, had there been evidence in the literature suggesting behavioral links with these elements independently?

A No, in fact just the other way. There was a book that was written by the Head of the Department of Psychiatry in Saint Louie, Guze, G-U-Z-E, Samuel Guze, that said there was nothing whatever wrong with violent criminals neuro-logically or psychiatrically. (Laughter)

In fact, I--I used that against my colleague, Dorothy Lewis, when she wanted to get me involved in the very first study that we did. I said, "They already know there is nothing. There's nothing to this." (Laughing) I was wrong. Okay.

THE COURT: Okay. Thank you. Anything else you want to take up tonight? How many

witnesses do we truly have available tomorrow?

Doctor, please feel free to step down.

A Okay. (Laughing) Thanks.

THE COURT: And if any of those are exhibits, I need those.

A No, this isn't--that--here you want-

(WITNESS EXCUSED)

* * *

MS. BROCKENBOROUGH: How many witnesses do we truly have available for tomorrow; is that your Honor's question?

THE COURT: Yeah, I guess, because you said there were some problems with some people coming over the mountain or--

MR. DAWSON: Just one second, your Honor, and we'll have that.

THE COURT: --are we getting the word from the rear or-

MS. BROCKENBOROUGH: Yes.

MR. DAWSON: Your Honor, also before--before Dr. Pincus leaves, Miss Pike was wondering if she might have a chance to speak with him very briefly here in the courtroom? She wanted to thank him for--and--because she probably won't see him again so--

THE COURT: Why don't I give her that opportunity here in a few minutes.

MR. DAWSON: That's fine, your Honor. Thank you.

THE PETITIONER: Thank you.

THE COURT: Let me--let me- figure this out.

MR. DAWSON: That's fine, your Honor. I just wanted to bring that up before we lost Dr. Pincus.

THE COURT: That's fine. That's fine if he has time.

DR. PINCUS: Oh, I'm pleased to.

THE COURT: Okay.

MR. DAWSON: Your Honor, Miss Kennedy indicates we have ten that we know will be here tomorrow.

THE COURT: More lengthy, less lengthy? We just did four.

MR. DAWSON: Less lengthy than today for sure.

THE COURT: Okay.

MS. BROCKENBOROUGH: Per witness is-

THE COURT: I think that it would be fair to say that I won't be ready to start before

9:15 to 9:30 because I'm going to whip through whatever--there's four things left I think. So if we could do that, that's fine and get started.

And then you all have to realize that your original estimate of one week was way out of line because I haven't heard anything about his witnesses yet, and I don't doubt that the General is going to come up with some witnesses that I don't know about.

MR. DAWSON: Your Honor, Ms. Brockenborough and I, we've decided we--that neither of us has any ability to judge time. When we were working on the time for our witnesses, we figured we were--we are uniquely impaired in that ability.

THE COURT: Well, that's why I keep pushing you to find out because it makes a fundamental difference to the operation of a court with 1,000 cases. So anyway--okay.

MR. DAWSON: Your Honor, I can't tell you how much money I've lost over the years by misgauging time.

THE COURT: If you all would allow Miss Pike to just sit back over here and talk to Dr. Pincus for a few minutes, I'll be glad to do

that. I'm going to adjourn court. Let's make sure we have all our exhibits, folks.

(Whereupon, court adjourned.
Court reconvened at 9 a.m. on
the 30th day of January, 2007,
when the following proceed-
ings were had, to-wit:)

THE COURT: Ms. Jones has been printing all morning off of your e-mail, so we've got our copy now; don't we?

MS. JONES: Yes, we do.

THE COURT: Okay. (Laughing) Are there witnesses that were not sworn yesterday that need to be sworn today?

MR. DAWSON: Yes, your Honor.

THE COURT: Do you want to do them individually or--

MS. BROCKENBOROUGH: It's up--it's up to the Court.

THE COURT: Are you going to call any witnesses from yesterday?

MS. BROCKENBOROUGH: Yes, your Honor--

THE COURT: --first?

MR. BROCKENBOROUGH: The first--the first two witnesses have already been sworn in.

THE COURT: Okay. Why don't you--

THE CLERK: I'm going to finish up and then switch with (Inaudible word) and let her have my place.

THE COURT: No, no, no. What I'm saying is there are witnesses. We can either bring them in and swear them now-do you want to do that?

THE CLERK: I think it would be easier.

THE COURT: Yeah. Okay.

Do you want to bring in whatever witnesses have not been sworn that you intend to call today? (Pause) Can I--have you got whoever you need?

MS. BROCKENBOROUGH: We--yeah, our other witnesses are going to be staggered throughout the morning, your Honor. I do not have all-

THE COURT: All right. Then I'll swear them individually. Ladies, if you would please raise your right hands to be sworn.

(Whereupon, the witnesses were sworn to tell the truth by the clerk and responded affirmatively.)

THE COURT: All right. Ladies you're going to need to remain outside the courtroom

until we're ready to call you. We still have a few more witnesses from yesterday that we're going to do first. So if you'll stay where the officers can locate you. Please don't discuss this matter with anybody. Okay.

(Whereupon, the witnesses retired from open court being placed under the rule.)

THE COURT: Can I make an inquiry just for my own information?

MS. BROCKENBOROUGH: I'm sorry?

THE COURT: I have a whole lot of medical reports, some of which you have now introduced with Dr. Pincus. This is Dr. McCoy's; am I correct?

MS. BROCKENBOROUGH: Yes.

THE COURT: And are there other reports that you all are intending to introduce? Obviously, this is Dr. McCoy's and Dr. Pincus'. In the past we've had reports of Dr. Kenner. Dr. Auble had a report, I think.

MS. BROCKENBOROUGH: No, Dr. Auble didn't make a report. She just provided data to Dr. Kenner. Or if she provided a report, she provided it only to the Court and not to us.

THE COURT: That's true. I think that is true because I haven't located it yet. It's somewhere. I think there is one. I was going to look for it last night but wore out, so I didn't.

MS. BROCKENBOROUGH: We-

THE COURT: I just want to know what reports you all are going to want me to be considering for these purposes. For instance, Dr. Kenner's report from 2002 had some--

MS. BROCKENBOROUGH: That is his the-- his main report-

THE COURT: --information--right.

MS. BROCKENBOROUGH: --and then he--

THE COURT: Has there been a supplement now?

MS. BROCKENBOROUGH: It was a supple- mental.

THE COURT: Which I don't have.

MS. BROCKENBOROUGH: It's a two-page disclosure.

THE COURT: Okay.

MS. BROCKENBOROUGH: Would you like to be provided with that before Dr. Kenner testifies or just--

THE COURT: No, not necessarily.

MR. BROCKENBOROUGH: Okay.

THE COURT: I'm just trying to put together which--because, obviously, a lot of this rests on these doctors' reports, and I'm going to have to read these reports. And sine we've going to have time in between, I like to do as much preparation for hearing as I possibly can. And now we have this, and whether or not Dr. McCoy testifies at this point, this week.

MS. BROCKENBOROUGH: She will be, your Honor, she'll be our final witness.

THE COURT: Then I'll be able to--then I'll be able to go forward with it. But if I can jump ahead a little bit, I will prepare because I --I try to be up front on that.

MS. BROCKENBOROUGH: We--I don't know that we have a copy of--another copy of Dr. Kenner's report with us.

THE COURT: And, of course, I never saw Dr. Pincus' report till yesterday which I've read sitting here. But I'd like to have a little time to digest what he had to say.

MS. BROCKENBOROUGH: But the additional disclosure is rather brief. It's two pages and it's not--

THE COURT: Do you want me to--if I have Dr. Auble's report for the sake of disclosure of everything for this purpose, I will be glad to share that, I think.

MS. BROCKENBOROUGH: I think that would be--

MR. DAWSON: That would be nice.

MS. BROCKENBOROUGH: --that would be great.

THE COURT: Yeah? Okay. I will hunt for it during lunch or something. Okay.

MS. BROCKENBOROUGH: Okay. And speaking of records, I--your Honor, I forgot to ask that the birth records of Miss Pike be entered into evidence, and Mr.--Mr. Price has indicated he has no objection to doing so at this time.

THE COURT: That would become Exhibit--

THE COURT REPORTER: Seven.

THE COURT: --Exhibit 7.

(Exhibit No. 7 was marked and filed.)

MR. DAWSON: Your Honor, while we're also on the reports, there were two--there was at least one report, I think, that Dr. Kenner had appended to something at one point, and that was

Dr. Grassian's (Phonetically) report.
THE COURT: Doctor who?
MR. DAWSON: Grassian (Phonetically). He had used--
COURT CLERK JONES: He's the one that dealt with solitary confinement and--
THE COURT: Do we have that?
COURT CLERK JONES: Yes, it's in that Notice of Documents.
THE COURT: It's in your Notice of Documents.
COURT CLERK JONES: From back when there was a withdraw issue.
THE COURT: Yeah.
MR. DAWSON: It wasn't something that we were anticipating using. I think it--
MS. BROCKENBOROUGH: No.
MR. DAWSON: --it had to--really had to do with the issues of confinement.
THE COURT: With the withdrawal issue?
MR. DAWSON: Yeah.
THE COURT: Right. Well, now some of these come from that--
MR. DAWSON: Right.
THE COURT: --but we have certain

reports that are in her records. So what I guess I'm asking you to do, A, you were going to give me a list of witnesses yesterday--

MS. BROCKENBOROUGH: Yes.

THE COURT: --which you forgot.

MS. BROCKENBOROUGH: Which I have--

THE COURT: And (B) I guess--if we could get a list of the reports which are in your view--or you intend to enter as a part of this particular issue here.

MR. DAWSON: We will, your Honor

THE COURT: And there was another report of Dr.--

COURT CLERK JONES: Woods.

MR. DAWSON: Right. And I don't know where--you know, I know we got Dr. Woods' report to Dr. Kenner.

THE COURT: We have--I have a copy of Dr. Woods' report.

MR. DAWSON: Okay. And I know we filed it ex parte. I'm not sure where else it was because I noticed--

THE COURT: It was in the block of documents; wasn't it? The notice of filing? There was a great big notice of filing of

documents, and that was--

COURT CLERK JONES: It was attached.

MS. BROCKENBOROUGH: We filed a Notice of Documents?

THE COURT: We can look through the file to see if you like.

MR. DAWSON: I mean I don't think any of them are--I mean I think they're all worthwhile. I'm not sure--

THE COURT: Well, that's what I'm saying, and I don't know which ones you want to-- and perhaps all of those should be considered in light of the fact that the issue involves mental health and psychiatric issues.

MR. DAWSON: Right.

THE COURT: Psychological issues.

MR. DAWSON: Your Honor, let us work that out and we'll--

THE COURT: You all--well, that's why I'm asking now--

MR. DAWSON: --advise the Court.

THE COURT: --because I realize that there is an awful lot of paper and it came from many different sources, and I don't know whose it belongs to at this point. I'm sure the file, if

we were to look at the original court file, has it in its proper order, but I don't necessarily.

MS. BROCKENBOROUGH: In addition to the birth records, I am providing to the court reporter the copy of the last of what needs to be marked Collective Exhibit 3--

THE COURT REPORTER: 3.

MS. BROCKENBOROUGH: --3.

THE COURT REPORTER: Thank you.

THE COURT: Okay.

MS. BROCKENBOROUGH: Okay. So I'm providing copies of the birth records as well as to the Court--(Handing documents to the Court)

THE COURT: Thank you.

MS. BROCKENBOROUGH: --and then here is, I think, our witness list of today and tomorrow. (Handing documents to the Court)

THE COURT: Well, we have a long way to go if this is correct so-- (Pause)

Is Dr. Engum's report made an exhibit?

MS. BROCKENBOROUGH: No, your Honor, not yet.

THE COURT: Not yet, okay.

MS. BROCKENBOROUGH: Not--not--to the trial but--

THE COURT: I have a copy of that. Right. I have the copy of that from the trial so--I'm just trying to stay organized. I have at least seven files. Whenever you're ready, if you want to call your first witness, if Miss Pike is ready.

MS. BROCKENBOROUGH: Alicia Wills.

THE COURT: Ms. Wills. Call Ms. Wills please, Alicia Wills. Was Ms. Wills sworn yesterday?

MS. BROCKENBOROUGH: Yes, she was.

THE COURT: Okay. Are there anybody-- well, okay.

(Whereupon, the Court briefly addressed her clerk.)

THE COURT: Ms. Wills, you were previously sworn yesterday; is that correct?

MS. WILLS: Yes, ma'am.

THE COURT: If you'll come up, ma'am, and have a seat.

ALICIA WILLS, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Ms. Wills, can you please state your

name?
A Alicia Dawn Wills.
Q And where are you living right now?
A Lubbock, Texas.
Q And are you married?
A Yes.
Q And do you have any children?
A I have three children.
Q What is your relationship with Miss Pike?
A She's my half-sister.
Q And are you older or younger than she is?
A I'm old--I'm older.
Q You indicated that you are her half-sister. Do you share--you share the same mother; is that correct?
A Yes.
Q Okay. And who is your father?
A James Ferguson.
Q Can you tell us a little bit about your relationship with your father?
A I have a great relationship with my father now, and I had a great relationship with my father when I was young. But there was an

incident that happened when I was--I think I was probably about eight years old, seven or eight years old, and he was remarried and his wife didn't like me very much. And she just didn't like me very much and told my dad lies about me. And then, of course, my dad didn't believe her, and they had a huge fight. And she took me back to my mom's and told him a bunch of things, like she was really worried that my dad was going to sexually abuse me. And that my mother needed to do whatever she could to keep me away. And so I didn't see my dad until I was 17. And you know, when I was 13 I knew where he was, but I just chose not to call. And I didn't see him until I was about 17. But now we're--we have a very good relationship.

Q During the time, I guess nine or ten years that you did not see him, what was--well, let me back up. Did your mother believe what your step-mother had told her?

A I don't know if she believed it or not. I just--I don't know if she believed it or not.

Q Did she facilitate keeping you away from him?

A Yes.

A. Wills - Direct

Q And--
A But I think it was more my grandmother than it was my mother because my grandmother just was very controlling and wanted to have control of me. She loved me, but she didn't want me to go to my dad's. And I would go to my dad's and I would come home really happy and--you know, my dad has different religious than my--(Pause)--they were just different.
Q Your father and your grandmother?
A Yeah. And, you know, I would come home a lot of times after spending weekends with my dad and I'd be--I guess you could say full of the Lord and come home and talk about, you know, things like that. And I guess it made them feel uncomfortable because I could see that they were living a life that was not appropriate, and my dad was very righteous. I mean he was--he wasn't perfect. He made lots of errors in his youth too, but, you know, he walks the walk.
Q And so that was something that came between you and your mother's family?
A Uh-huh (Affirmatively).
Q During the time that you were away from your dad, did you live with your mother?

A I stayed with my mother. I don't really remember living with my mom. Mostly, I was--I lived with my grandmother. I, you know--when I was--we lived in a house--and how old was I? Maybe when Chris--when my mom married Glenn--I don't even know what year that was but--

Q And Glenn is Glenn Pike?

A Glenn is Christa's dad.

Q Uh-huh (Affirmatively) Well, do you remember how old you were when your--your parents divorced?

A Maybe three or four.

Q And you are how old--how much older than Christa?

A Four and a half years.

Q And when--when your mother married Glenn Pike, did you live with them?

A I think that I did. I think that I did, and then, you know, when my mom went into labor, I probably then moved to my grandma's. And I loved to stay up there at my mommaw and poppaw's, and so it was--and they loved having me there. So it was--I think, you know, Christa was, you know, in and out of the hospital when she was first born. So I think probably about that time is when I

really kind of just started staying up there a lot more. But, you know, I did--there were mornings when we got up--I remember school mornings standing in front of the oven getting warm. And--

Q And that was when you were in the same household as--

A That's when we were in the same house, and I was probably six or seven.

Q Who do you consider raised you?

A My grandmother.

Q And this would be your maternal grandmother?

A My mom's mother, yes.

Q Zola Fotos?

A Uh-huh (Affirmatively).

Q Is that correct? And how would you describe your relationship with her?

A I was just--I was a very happy kid, and I felt loved by my grandmother. My grandmother was just constantly either working in the garden or cooking. I remember her cooking or cleaning. She was just constantly busy all day. So we didn't really have a whole lot of interactions in the day. I'd--I knew she loved me.

Q And how was--so you--did you have

occasion--was Christa ever over at the house with your grandmother?

A Yes, she was.

Q Okay. And--

A Not as much as me, and I really don't remember her being with me and my grandmother that much.

Q Did you have occasions to observe how your grandmother treated Christa?

A Yes.

Q And what were those observations?

A I know sometimes she would get really frustrated with Christa, and I remember one time--I don't remember her spanking Christa. I know she probably did, but I remember one time her shaking Christa. And I don't know what that was over or what it was about.

Q And what--what kinds of things made--made her frustrated with--with Christa?

A Hum, well, she would ask Christa to do things, and Christa would just kind of be like--(Demonstrating)--like she didn't even hear her or--

Q Okay. And for the record because the record can't see you're blank--

A Oh, I'm sorry. Yeah, she had a blank stare. She would just sort of blank out or like she didn't understand what she was saying or-- Christa was just always so quiet.

Q And this is something that you remember. How old was Christa at the time?

A She was little. She was probably--let's see. If I was--(Pause)--I'd say three.

Q Did your--

A --or no, I'd say probably two, not three, two.

Q Do you know whether your grandmother drank?

A Oh, yes.

Q And can you tell us about that?

A Yeah. She drank every day. She started in the morning, and it was whiskey. And I never knew that she was drunk because, you know, she was constantly moving all day long. And I never really even noticed--I mean she never slurred in her speech or she never got strange until late at night when she would be down in her red rocking chair. And then sometimes, you know, she was really wasted by the end of the day. But by that time it was 9:00 and 10:00 o'clock.

Q And--

A And I remember as a child pouring out her liquor bottles, and our other family thinking she was drinking a lot more than she was. But I was pouring it down the drain. (Laughter) But she drank a lot.

Q And was that something that continued until her death?

A Just up--I think she quit drinking, and then as--when she quit drinking, she got sick.

Q What do you remember about when your grandmother died?

A I just--I was hurt inside. Honestly, I didn't--when she got really sick and she was back in the bedroom, I remember her--just her belly being so swollen and her looking like a skeleton almost, death warmed over. And I was--I became extremely mad--(Crying)--because I felt like she was mom, and I felt like she--if she loved me, she wouldn't have drank herself to death. And I felt like she just abandoned me. Thanks. (To court officer for tissue)

And I was a--like I said, I was always a really happy kid, even though I missed my dad and didn't get to see him. I still was happy because

that's just the way I was. But once she died, I just sort of developed an attitude that I didn't care about anybody else because nobody cared about me. And that's when my life started to take a turn for the worse, and I started to get in trouble and fights and drugs. And I wasn't really a drinker because I witnesses both my mother and my grandmother drinking a lot. And so I thought, "Well, I'm going to be smart. I'll never do that." So I smoked pot instead. (Laughter) But I'm not a drinker, so that's good. I don't smoke pot anymore either. (Laughing) But--

MS. BROCKENBOROUGH: I'd just ask that the record reflect that Ms. Wills was tearful during her recollection of her grandmother and her death.

Q Where was your mother during all of this?

A North Carolina. One--one summer she came home, and this was before my grandmother died. My grandmother was kind of sick. But one summer she came--well, she was living in West Virginia. She just come in--came in the house and announced that she was going to Busch Gardens. And she was all excited, and so Christa and I got

excited because we thought we were going to Busch Gardens. And we were informed that, no, she was going to Busch Gardens with a guy and they were getting married. And we didn't even know who he was. And she was all excited because we had popsicles that he stole out of--he was a truck driver and he had popsicles to give to us. And so she was very excited. So we got popsicles and they got to go to Busch Gardens. (Laughter) And then they came home from that trip--my grandmother was still very sick--and packed us up and moved us to North Carolina.

Q And you indicated that your mother was living in West Virginia at this time, and you were also in West Virginia; is that right?

A I was in West Virginia, but I was living with my grandmother.

Q And were you and your mother in the same town?

A Yes, my grandfather owned a piece of property where there were a lot of trailers. There was his house and then he had a trailer court behind it and then a house that he built for my mom. And my mom lived down in that house. And I'm sure that I would spend some nights down

there, but I don't really remember staying down there day after day after day.

Q And you indicated that your mother came home and announced that she was marrying this man and the whole family was moving to North Carolina?

A Uh-huh (Affirmatively).

Q And you stated that you'd not--you had not met him before?

A Right, I had not met him, didn't know who he was.

Q And had you lived with--with Christa before that?

A Yes.

Q And that was the time when she--when your mother was married to Christa's father?

A Yes.

Q But there had been a period of time where you were not living with Christa before that?

A Right. You know, when my mom divorced--when my mom and Glenn got divorced, I really don't remember living with her. I remember being with my grandmother. And Chris--I mean I guess if Christa was over there, then I probably was down there. But Christa also spent the majority of her

time with her Grandmother Pike, who was Glenn's mother.

Q What do you know about Christa's relationship with Grandmother Pike?

A I know that Miss Pike doted over her like I felt like my grandmother loved me. And I would go over and spend weekends with them. Not-- I mean maybe I was there a dozen times. That's probably it. But it just was always fun. I remember chasing chickens around, and Christa seemed really happy out there. And Miss Pike was really--she just always seemed really caring to Chris--towards Christa.

Q And how old were you when your Grandmother Fotos died?

A I was 13--12 or 13; I think 12.

Q And do you know how old Christa was when her grandmother died?

A She was in jail; so she didn't go see her funeral.

Q Are you sure about that?

A No, I'm not.

Q Okay. You characterized your observa-- or your sense of Christa's relationship with her Grandmother Pike as being similar to the one that

you had with your Grandmother Fotos?

A I'm sure that Christa probably felt like Ms. Pike was her only security in her world, where I felt like my grandmother was my only security. (Crying)

Q And after your grandmother died, you stated that everything changed for you. What--what happened after you moved to--now, before--you moved to North Carolina--

A Well--

Q --while your grandmother was still alive?

A Right.

Q And how long--

A So really when my grandmother got sick, that's when things started to change for me. And then after I moved to North Carolina, that's when life fell apart, because here I was living with this guy who was going to tell us, you know, he was going to step in and be instant dad. And you know, he was mean to us. I mean he never spanked me but, you know, he would--we had no money. And he would bring fast food in and sit and eat it in front of us and, you know, not even offer us a french fry. And I just--I was becoming very

angry. One night I was so mad at my mother for allowing this guy to just move in and, you know, shack up with her, and we were just sort of pushed to the side. And I was--I was supposed to start seventh grade that year, and I went from West Virginia where the style was really big hair and --it was just completely different.

And then I went to North Carolina and everybody's wearing Birkenstock sandals and have long straight hair. And I did not fit in at all. And I became completely depressed and extremely angry, and I know that I just--he had two daughters that he would bring over. And I would start fighting with those girls just because I didn't want to be there. I wanted to move back to West Virginia. And even though I knew my grandmother was sick and dying, I figured that I could take care of myself.

Q What was the name of your mother's husband, this husband?

A Which one? There's been a lot.

(Laughter)

Q The one that she--

A Danny Thompson. (Laughing and crying)

Q Danny Thompson. And was your mother--

did your--what was your mother's response to your change in attitude, your being unhappy and being depressed?

A Well, it's just all my fault. You know, she's just always kind of--I feel like my mom has a good heart, but she just--she'll put everybody else before us or herself or--or herself. She put her pleasures and her happiness before her children. And we're all guilty of doing that because I have children and I know. But--I don't --her happiness was more important than we were, and, you know, at that time in my life it was--it was just important that I had some friends and--

Q Was her happiness more important to her only during that period when she married Danny Thompson?

A No. I think that her happiness was more important to her all her life because it started when she was married to my dad. And, you know, I know that my dad had a temper and there were fights, and he hit her on a couple of times. And I know he probably really hurt her. But I know that she was running around having affairs with men while she was supposed to be at church and, you know--I just remember man, after man, after

man. And I was never--it just never seemed like I was ever even in her forethought. I don't even--I don't--I never remember sitting on her lap. I never remember getting a hug by my mom. (Crying) I don't ever remember her being maternal towards me.

Q How did she treat Christa?

A It was probably the same. I think that she and Christa seemed to be a little more close, but it was more of a friendship. It's always been that way. And I always felt like I was the mother, and at times when we were living in North Carolina after--I'm probably getting too far ahead. But whenever I--I became pregnant at 15 years old, and then I had a child. And then after I was 16, I moved back to North Carolina to move in with my mom and Christa. And Danny was still in the picture, but I quickly ran him off. And we were--it was more like friends. And I felt like I was the mother.

Q Did you ever see your mother hugging or showing affection, physical affection to Christa?

A No.

Q And you also, I believe, mentioned earlier that you didn't drink because your

grandmother drank and your mother drank. What do you know about your mother's drinking?
A Well, she still drinks a lot. She's definitely an alcoholic. She won't admit that, but she drinks every day.
Q Do you know whether she was doing that when you and Christa were children?
A (Nodding affirmatively)
Q You're nodding your head yes; is that right?
A Yes. I'm sorry.
Q And how--did you--did you see her drinking?
A I did. And parties were a big part of our life. I mean it was 70's. And I remember one time when I was in the second grade--now, my mom didn't really let me drink beer, but she would let me--I would take sips of her beer. And I remember wanting to feel big in school. So I packed my lunch for school and packed myself a beer. And I took it to school in the second grade, and I told everybody, "I'm having a beer today." Of course, I just wanted to appear big in front of my friends. (Laughing) And they quickly took it away and gave me a milk. (Laughing)

Q You--so beer was something--sort of a constant in the house when you were growing up?
A Uh-huh (Affirmatively).
Q You mentioned the incident where your mother's husband was eating food in front of you. Who else was there?
A It was--at that time it was just me, and Christa, and my mom.
Q And were you--
A Oh, I'm sorry. Me, Christa, my mom, and my baby.
Q Okay. So this was after your return to North Carolina--
A Yes.
Q --after you had--you had given birth to your child--
A Uh-huh (Affirmatively).
Q --and I believe he's a son named--
A Well, and he did that before then. And he used to bring candy into the house. We lived in--oh, what was the name of that place? It was near Graham, near Graham, North Carolina.
Q That's all right.
A I can't remember what the name of the town was. But he would bring candy into the

house, and he would not let us have any of it. But he would sit and eat it in front of us.

Q And was your mother also included in being able to eat?

A Probably if she wanted to, but she didn't eat candy.

Q Okay. And what about the fast food incident?

A No, she wasn't. He just brought it home and ate right in front of us.

Q And were you hungry at the time?

A We were hungry.

Q And was being hungry--was that the only time that you ever felt hungry?

A Well, we ate brown beans a lot, pretty much everyday.

Q Was--was there--were there times when there was no food in the house, but there was alcohol when you were growing up?

A I don't really remember. There was probably maybe cereal, but there was always alcohol and cigarettes.

Q And this was--and you're describing the households you were living in with your mother--

A With my mother, that's correct.

Q --is that what you're saying? There are a couple of things that you have told us about--told me about when we've spoken, and I just wanted to sort of direct your attention to a few incidents. What--now, did you--do you have any memories of observations of Christa with her father, Mr. Pike?

A Not really, mostly with Ms. Pike. The only memory that I have of Glenn is of him sitting in a Lazy Boy rocker watching TV, and Christa would sometimes be on his lap. But that's really it.

Q And do you have any memories or any recollections of any attempts at discipline or parenting from--on Glenn's part?

A I never saw Glenn spank Christa, but one time we--it was at Christmas time and we both got Christmas presents, and one of us got a doll that was a bubble gum doll. And I don't remember if that was my doll or if that was Christa's doll. But it may have been my doll and maybe Christa wanted it and--

Q Now, what was--what was this bubble--bubble gum doll?

A It was a doll that you--if you twisted

its arm, a bubble would blow out of its mouth. And then if you twisted its arm back, it would suck the bubble back in, hence bubble gum doll. And Christa broke my toy. And then her dad for punishment grabbed one of her toys. And it may have been that--that may have been her doll--and broke it. And that was the only time I ever saw him discipline Christa.

MS. BROCKENBOROUGH: One moment please.

(Whereupon, Mr. Dawson briefly conferred with Ms. Brockenborough.)

Q Now, do you remember--was the doll sort of a hard--

A Yes, it was a hard--

Q --plastic?

A --doll, uh-huh (Affirmatively).

Q I mean was it made out of plastic or like--

A It was a hard plastic doll.

Q And, hum--

A And it was probably about like a doll about this size (Indicating).

Q You're showing--

A About--what is that, 12 inches?

Q Okay. And your memory is that at the

end of the--you know, at the end of the day, I--essentially there were two toys that were broken?

A Well, mine was--I remember that mine was able to be fixed, or maybe it was--the bubble gum doll was able to be fixed. And I don't know if it was mine or if it was Christa's.

Q Okay. Do you remember an incident where you and your sister spent some money at the mall?

A I do. I remember--I don't remember how old we were. We were young. And it was probably before I was in the fifth--it was before I was in the fifth grade, that I was walking to the mall at that age. And I took Christa down there with us, and Glenn had given her some child support money to give to my mom. (Laughing) And we just thought it was for us, and we took it out and we went and bought CD's and--forget what else we bought. But we went to the mall and had a shopping spree with it. (Laughing)

Q And did anything else happen during that visit to the mall?

A It did. (Laughing) Even though we had money, I came back and I was in my bedroom and I said, "Christa, look." And I had stolen some earrings. And then Christa said, "Well, look!"

And she had stolen like 20 pairs of earrings or necklaces or--(Laughing)

Q And do you know whether Christa continued with that, with shoplifting? Was that something that you knew her to do later?

A I don't know if she did. She probably did because after--about--I don't remember us going to the mall together anymore after that. (Laughter) And I don't know if she did or not.

Q And you said this was before you were in the fifth grade. So you were before the age of--

A Probably 11.

Q Okay.

A Uh-huh (Affirmatively).

Q And so Christa was--

A So she was like six.

Q Do you know whether your sister ever sat around watching horror films or reading horror books?

A I recall Christa reading horror stories --horror books.

Q What kind of books do you remember her reading?

A Like Steven King. I mean as a young child she would read books that were thick novels.

And that's really all I remember her reading.
Q And about how old was she when she was reading these books?
A (Pause) This was after--well, maybe she wasn't that young. She was old--after, you know, I had my son at 15, she was reading them at that time. And it was around that time and--it was--it was around that time.
Q Okay. And did you--
A But--
Q --did you know her to read them before that period?
A I don't--I don't recall.
Q What is--do you remember telling me that you don't remember feeling happy after the third grade?
A Me or Christa?
Q You.
A After I stopped seeing my dad, I--I still always felt happy because I felt free as a child. I, you know, had a bike and I would ride it all over the trailer park, and I really felt like I knew--I was hurting inside because I missed my dad and I wanted to be with my dad. (Crying) But I remember times just laying in the grass and

looking up at the clouds and thanking God, and wondering why things happen the way they do. But overall I think I was a happy child. When I became angry was when I realized that my grandmother was dying. (Crying) And I didn't think I had anybody else to care for me, and I didn't really want to call my dad because already, at that point, I was witnessing the lifestyle of my mother, and it was party all the time. And it looked--it appealed to me. You know, women would come over to the house, and it was put on make up and get ready to go out. And it just looked like so much fun. And I was sort of looking forward to getting into that lifestyle.

Q And you indicated that for a period of time, you did. That you--

A I did.

Q --started using drugs. And can you tell us about that time? How old--how old were you?

A Twelve.

Q And-

A I was 12 years old when I smoked pot for the first time. I was 12 years old when I got drunk for the first time, and those are the only drugs that I did until--I didn't really drink a

lot, and I smoked pot until I became pregnant and --at 15. And then I never did really start drinking again. And I would smoke pot after that. When I was about 17 I started smoking it again.

Q And were you getting into trouble at school during this time?

A I was getting into a lot of trouble at school--

Q What kind of--

A --because I was angry inside and after-- when I moved--when my mom took me to North Carolina to live with Danny Thompson and I--I had lots of friends at my elementary school, and we were all excited about going to Beckley Junior High. I had made the cheerleading team, and I just was very excited about going into junior high. And when she moved me to North Carolina she took that away from me, and then I get back and my best friend, you know, thought that I was gone. And she got on the phone and pretended that she was me. And so she made a whole lot of people mad at me, when it was really her. And when I got back to Beckley Junior High, my very first day of school, I have all these people that are looking at me with anger in their eyes. And I'm not

understanding any of it. And they're telling me, well, why did I do all these things, and why was I calling April Athon (Phonetically) on the telephone and saying terrible things about her. And so I had no friends at this junior high school. (Crying)

And then there's this girl who they decided that she needed to beat me up over all these things that I said on the telephone. And her name was Brenda Bradley. And it was the first fight that I ever got into. And she was really big, and she just came up to me right in the middle of the classroom and smacked me in the face. (Crying) And so I ran out of the classroom, and I knew that she was going to come after me. And so I went and got my lock off my locker, and I put it in her face. And I was expelled from school that day.

Q And--

A And I was little, maybe 80 pounds. But she was big. That's why I got the lock.

Q And as a result of that, you had to change schools?

A And I had to change schools.

Q And is that when you went to live with--

A And I did. I had to go to a school across town, and I moved in with my aunt, Carrie Ross, and my uncle, Mike Ross.

Q How would you describe your sister?

A My sister has a big heart. She loves people. I've always felt that she's been warm towards people. It was her dream to become a nurse. She's always loved elderly people, and she was always very helpful. She was definitely--I mean I definitely remember as a child that I didn't understand her. She used to make me furious because she would just not do simple things like throw your gum in the trash. (Laughter) And I didn't understand that because I became a perfectionist, and she was very messy. And I didn't understand Christa, and sometimes she just had a blank look, like she just didn't know what you were talking about. But for the majority of the time, Christa was very loving. And I thought that we were close, and I--I love my sister. (Crying)

But I can definitely look back and see that there were things that were not normal about her. Sometimes when we would fight--I'm four and a half years older than her--and Christa--you

know, sisters just fight over washing dishes. (Laughter) You know, she could definitely hold her own with me. And you know, sometimes I would see her just completely change--(Snapping her fingers)--in an instant and go into rage mode.

Q When was it--how--when was the first time--how old was Christa the first time that you recognized that?

A The first time that I witnessed that was after I had moved. It--really that was when I had had my son and moved back in with my mother. That was the first time I really witnessed the rage that--you know, I felt like I was mom in that house. And, of course, I was cleaning it and one day Christa came in the house. I just cleaned it! And she just threw her candy wrappers in the floor. And that didn't settle very well with me, and that's when I started seeing the rage side of Christa. Because I would fight with her, and I would try to physically make her pick up her trash and try to physically make her do the dishes.

Q Did she--how--did she have a relationship--did she spend time with your baby, with you--

A She loves Keith, uh-huh (Affirmatively).

Q And how could you tell that?

A Well, she was just--she was Keith's mom. And, you know, if I--if we were there and Christa was there, then Christa just wanted to do everything for Keith. She wanted to feed him; she wanted to dress him; she wanted to bathe him. She wanted to just love him.

Q And do you know whether--did Keith ever make any allegations or did you ever become aware of any incident in which Christa may have abused him in any way?

A Keith has never made allegations in that way. I was always concerned because Christa always wanted to give him a bath. And it wasn't that I believed that Christa ever would hurt Keith because I knew that she loved him very much. But I just was extremely protective over Keith, and I just didn't feel comfortable with that.

Q Was one of the reasons that you didn't feel comfortable--did you have concerns that--that Christa may have been sexually abused or--

A Well, I didn't know if she was or not, but I knew that she was drawing dirty pictures at school at a very young age. And I just--(Pause) --there was an incident where Christa says that a

man raped her. And I really did not believe her because I thought that she was making it up to get attention.

Q And those--

A And just things on the sexual side. So I just didn't feel very comfortable, and I just wanted to protect my child. But I--I--I do not believe that Christa ever molested my son.

Q (Pause) You made the statement earlier that there were men in and out of your mother's home--

A Uh-huh (Affirmatively).

Q --and I guess between the two of you, you and your sister, who spent the most time in your mother's house?

A Christa did.

Q And--(Pause)

A My memories of Christa living with my mom--it seemed to me like she would be with my mom for about six weeks, and then she would go to her dad's about six weeks and then right back to my mom's. And it was always like, "Well, I can't get her to do anything." And that--that goes back to that kind of blank look that she would give us. And I--I thought she was playing stupid or just

being stubborn, just angry.

Q And this going back and forth between her mother's and her father's, did this continue after her mother moved to--your mother moved to North Carolina?

A I don't--I don't remember. I think Christa may have moved back with her dad for a period of time, but I really don't remember--

Q Okay.

A --because after that point, I was already consumed with myself and I wasn't thinking about her.

Q Do you recall an incident where--where Christa was burned by a curling iron?

A Yes. (Laughter) Hum, it's--it's a terrible memory for my sister, but I loved playing beauty shop. Christa had the most beautiful hair. She still does. And I was probably--Christa was probably about three or four, and we were playing beauty shop. And I curling her hair and I burnt her with the curling iron.

Q And do you remember where you burned her?

A On the chin.

Q What happened after that?

A. Wills - Direct

A Well, I believe she thought I did it on purpose, and I really didn't do it on purpose. (Laughing) But she still thinks I did.

Q Do you have any idea why she would think that?

A Well, probably because it hurt her. And I feel like probably at that time she already felt like nobody loved her because she was not receiving any affection from anybody but Ms. Pike. And I don't know if that was enough.

Q Now, you--at some point I take it you stopped getting in trouble at school? You indicated--

A Well, I--I got pregnant, and I didn't want to repeat the same--I didn't want the same thing happening to my child that happened in my life. (Crying)

Q And how would you describe your life today?

A I have a great life. I have a great life. I'm self-employed. I own my own business. I'm married. I have been married now for 12 years, and I have peace inside. And I'm not that angry person that I once was in my teens and early 20's. But I'm very happy.

A. Wills - Direct

Q Have you--do-

THE COURT: I'm sorry about the noise-

MS. BROCKENBOROUGH: Yeah, I'm sorry.

THE COURT: --but we have a leak and they're trying to get up the water I think. Can you handle it or do you want me to have them stop?

MS. BROCKENBOROUGH: I'm easily--no, no, I'm easily--I'm just easily distracted.

THE COURT: I can stop them if you want me to.

MS. BROCKENBOROUGH: That's okay. I'm almost done so-

THE COURT: Go ahead.

MS. BROCKENBOROUGH: Thank you. (Pause) I think I actually may be done. One moment please.

THE COURT: Sure.

(Whereupon, Ms. Brockenborough conferred with Mr. Dawson and Miss Pike.)

Q Thank you very much, Ms. Wills.

A Thank you.

THE COURT: Have you received--wait; whoa; you can't get off yet.

Have you received Jencks material, any

Jencks material?

MR. PRICE: I believe I have. I have an interview from June '06, from March of 2000, and then Dr. McCoy's report.

THE COURT: Okay.

MR. PRICE: So I have three statements.

THE COURT: Are you ready, General, or--

MR. PRICE: Yes, your Honor.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. PRICE:

Q Let me just begin with that last point about your situation now is that you have what you would consider stable home life?

A I do.

Q You've managed to raise Keith and take care of him and have a happy marriage?

A It's not been easy, but I know that I was married to Keith's father for a brief period of time and I was--I divorced him. And I saw the pain and the suffering that it caused, and it just brought back all the memories of my mother having guy and after guy. And I hated her for that. And I just did not want to repeat it. And my husband and I, it took us a long time to really grow

together, but now we're together.

Q All right. And you have steady employment?

A I'm self-employed, yes.

Q Self-employed.

A Uh-huh (Affirmatively).

Q Okay. You certainly haven't been charged with any violent crimes?

A No.

Q And I doubt--

A I'm fortunate because in my teenage years I fought a lot. I would go out looking for fights because I was mad and angry.

Q Did they ever lead to anybody being hospitalized?

A No.

Q And, obviously, you share the same mother with Christa?

A Uh-huh (Affirmatively).

Q You experienced much of the same treatment from your mother that Christa did?

A Uh-huh (Affirmatively). Or not treatment just we were ignored.

Q Same--yeah, same circumstances--

A Uh-huh (Affirmatively).

Q --in the home. Neglect--
A Yes.
Q --would be a fair--you, in fact, were--from what you indicated, it's not the same--don't share the same father, obviously. But your father, in essence, abandoned you to your mother; that's fair?
A That's true.
Q And Christa, your sister, Christa Pike also had kinda that same experience of being shoved back and forth between parents?
A Uh-huh (Affirmatively).
Q Is that fair?
A That's true.
Q And your response to that situation and that childhood share so many parallels to your sister. Your response was the determination to make yourself better?
A I think it's just a personality. I was --I felt my whole world was falling down, and I became extremely aware of everything. I could clean my house, my room. And if somebody came in and just moved a tissue box, I would know that it was gone. So I sort of went to a different extreme.

Q Uh-huh (Affirmatively). Well, you would agree your life and your sister's life have gone--

A Completely opposite.

Q --extremely different? I doubt you've probably looked at the report prepared by Dr. Pincus--

A No.

Q --have you? Let me ask you about some things. I think you mentioned, talking about the burning of the--of Christa-Christa Pike.

A Uh-huh (Affirmatively).

Q Was that on the chin or where was that when you burned her?

A Well, I believe she has a scar on her chin from the burn.

Q And that--and you're saying that was an accident?

A It was an accident. I was probably eight, and an eight year old with a curling iron.

Q Would you say that you were--I guess, given your home situation, you were responsible and babysat for your sister quite a bit?

A No, I didn't really babysit Christa until we were in North Carolina. But I didn't consider that babysitting because when I was in