# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 5

## DOCUMENT 5

---

E2009-00016-CCA-R3-PD

004905

IN THE CRIMINAL COURT FOR KNOX COUNTY

DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

FILED APR 07 2009 Clerk of the Courts Rec'd by

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| PETITIONER | ) | |
| VS. | | CASE NO. 68280 |
| STATE OF TENNESSEE, | ) | |
| RESPONDENT | ) | |

FILED FEB 27 2009 By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Volume 5

January 29-31, 2007 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Ms. S. Jo Helm
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Ms. Catherine Brockenborough
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS

Volume 5 | Page

PETITIONER'S PROOF: (continued)

ALICIA WILLIS:

Cross-examination by Mr. Price (cont.) 401

Redirect by Ms. Brockenborough 413

EMIL GLENN PIKE:

Direct Examination by Mr. Dawson 424

Cross-examination by Mr. Price 463

Redirect by Mr. Dawson 470

Examination by the Court 475

Redirect by Mr. Dawson (continued) 476

Scheduling Discussed by the Parties 479

The Date of a Previous Hearing Discussed where Attorney Ken Irvine Testified 482

FAYE JOHNSON GUY:

Direct Examination by Mr. Dawson 487

North Carolina, I wasn't watching her. We were watching each other.

Q Okay. So if Dr. Pincus in his report indicates, referring to you, being her older sister took care of her much of the time as a babysitter, you would disagree--

A We were left--

Q --with that?

A --we were left at home a lot, but I don't feel like I took care of Christa.

Q All right. Well, you--okay. You were with her though?

A Yes.

Q Would you agree with the characterization that you were very abusive toward her?

A No.

Q Would you agree with the statement that you burned Christa Pike on the eyebrow with a curling iron on purpose?

A No. On the eyebrow or the chin?

Q Well, this statement I'm reading says eyebrow.

A Okay. See I don't even remember. I thought it was the chin. But, no, I didn't do it on purpose.

Q And you would disagree with that, that the scar on her eyebrow was from you burning her with the curling iron?

A Well, I won't disagree because I thought it was the chin. But if it was on the eyebrow then it's the eyebrow. But it was a long time ago and we really have not discussed this.

Q No, I understand.

A Uh-huh (Affirmatively).

Q You would agree that--

A I did burn her with the curling iron.

Q And it left a scar?

A And it left a scar.

Q But you're saying that was an accident?

A It was an accident, but I mean we--I've talked about this with her attorneys and this--I mean it hurt her more--I mean she thought I did it on purpose, but I didn't.

Q Did you explain to her after it happened that it wasn't on purpose? I mean what was the situation there?

A Well, I said I was sorry, "Let me do your hair some more."

Q Was she in a lot of pain?

A Have you ever had a curling iron burn?

Q I've had burns.
A Probably not.
Q I'd say they are painful.
A She--it was painful.
Q Right. Did you try to help her with the pain?
A I probably did, but I was eight. I don't remember.
Q Well, my--what's--my question to you is: if you think--if you say it was an accident and to this day Christa Pike thinks that you intentionally burned her with the curling iron, what was the situation there that she came away with that impression?
A No, I can't understand why she felt that way, other than she was probably only three or four and didn't understand that it was an accident. She probably thought I did it to her on purpose.
Q What about a time when you tricked her into putting her hand into a door jamb and you intentionally slammed the door on her fingers?
A Hum, I don't recall ever doing that. When was that?
Q There's no reference to a date here.

There's been indication that she has a scar on her finger from that to this day.

A Does she? I really don't recall doing it.

Q Do you recall holding down Christa Pike with her feet uncovered and scraping and poking the bottoms of her feet with an electric plug in order to torture her?

A No, I don't. I don't recall doing that ever.

Q And that this was an especially terrible form of torture.

A Well, that wasn't me who did it, so that's an untrue statement. Who made that statement?

Q Well, I'd like to know myself.

A Uh-huh (Affirmatively). Electrical wires from what?

Q I think the indication is that these were cords, electrical plugs.

A And how would I hold her down **and** rub wires on her feet? That's an untrue statement.

Q Okay. (Pause) Did you ever go to this --Christa Pike's maternal grandfather--I guess you would share that grandfather with her on that.

Was that was Mr. Fotos?
A Is that--yes.
Q The butcher?
A Yes.
Q Okay. How would you--how would you describe him?
A Well, he was fun. He was the one who gave us all the candy. He was Papaw; he spoiled us. He bought us whatever we--he bought us toys and stuff. It just seemed like--my grandmother and grandfather didn't share the same room, and my grandfather watched cartoons when he was home all day. Well, not all day because he was only home a couple of hours a day. And so he was--I loved my Grandpa Fotos.
Q Were you ever aware of any abuse--
A No.
Q --or mistreatment of Christa--
A No.
Q --Pike? Do you--were you exposed to the processing of animals there that he had when he was a butcher?
A Well, my grandfather owned a slaughter house, and we always wanted to be around our grandpa. And so we were always down there. And I

eat meat still. (Laughter)

Q Sure. Was Christa Pike forced to go down there to witness--

A She was never forced to go down there, no. We went down there because we played down there.

Q And you were exposed to this animal processing?

A Uh-huh (Affirmatively).

Q Do you feel like you carry any scars, emotional scars from seeing that process?

A I feel like I don't. I remember him shooting a cow right in the head, hangin' 'em up, letting the blood drain, slicing 'em open, and peeling the skin off, and then cutting up the meat, and that's just what he did.

Q All right.

A It didn't--

Q It's part of life.

A --it didn't seem unnormal to me.

Q Right.

A They weren't cruel.

Q Now, let's talk a little bit about your sister being around your son Keith, and if you had--you never were aware of any specific abuse?

A No.

Q You just had concerns about it?

A I just had concerns because I was protective over my child and just wanted to be a good mom. And I just was concerned over the--she just wanted to give him a bath, always wanted to give him a bath. And as a mother that just set off something inside me that said, "no." But Christa loved Keith and she wanted to do everything for him. She wanted him to be her's.

Q Did you feel like you could trust your sister?

A I didn't, but that's just because I didn't really trust anybody. And that was my child.

Q Do you recall making a statement to Dr. McCoy that you never trusted Christa Pike to be alone with Keith?

A I made that statement, yes; but I also know that Dr. McCoy made a statement that I said Christa sexually molested Keith, and that was not an untrue--that's an untrue statement that I never made.

Q You never made that statement--

A I never--

Q --to Dr. McCoy?
A --I never made that statement to Dr. McCoy, and Dr. McCoy had a conversation with me on the telephone.
Q This is before the trial?
A Before the trial.
Q What about the statement that you always thought your sister, Christa Pike, was capable of sexually abusing Keith?
A Well, I did because I just felt uneasy about her always wanting to take him in the bathroom. And me myself not with really the Fotos side of the family or my mom's side, but me and my cousin from my dad's side, as little kids, you know we were probably four and five, you know, "I'll show you mine and you'll show me your's." And I knew--I just knew that kids did stuff like that. And I just didn't want that to be introduced to my son's life, and I was just trying to protect him, in case, just in case.
Q (Pause) Do you recall any incidences where you and Christa Pike got into an argument or fight and she used a knife?
A Yes, there was one time when I--it was her turn to do the dishes, and I was looking

around. I noticed that there were no dishes in the sink, and so she must have done them. But there were no dishes in the cabinet. And so I started looking around, and then I found dirty dishes underneath the kitchen sink that she had--it took more effort to hide those dishes and stick them underneath the sink than it would have for her to just wash them. And I physically took her hands and I made her--I retched (sic) in there and I grabbed the dishes and I put them in the sink, and I kept doing it with her hands. And I was forcing her to wash the dishes. And then she grabbed the knife, and we played chase around the kitchen with it.

Q When you say "played chase," I mean it wasn't real playing?

A Well, it wasn't play, but I didn't--I didn't feel threatened, but she was **very** angry.

THE COURT: Could I put that into context as to how you all were?

A Yes. I was 15 so--

THE COURT: She was 11.

A --she was 11. And then we had another fight about a year later. And I--I'm not even sure what that was over, but we got into a fight

out--after we got off the school bus. And we were fighting out in the middle of the street, and she ripped the buttons off my shirt. And then I moved out. (Pause) And that was--I was probably 16 at that age.

MR. PRICE: If I may have a moment, your Honor.

THE COURT: Uh-huh (Affirmatively).

(Whereupon, Mr. Price and Ms. Helm conferred.)

Q Now, you've indicated or at least in these statements that I have that at the time of the trial you were prepared to come and testify?

A Correct.

Q Would your testimony have been concerning her punishment? If you were to be called at the penalty phase of the trial--

A Uh-huh (Affirmatively).

Q --after the finding of the guilty verdict on the murder then--you're probably aware of this procedure. But anyway, then we have a penalty phase where a lot of witnesses such as yourself that knew her would be called. And if you had been called and asked the question about what you think should be done with your sister,

what would your answer have been?
A My answer would have been that she should have been given life in prison without parole, and it's--one, I was really mad at her, but I didn't feel like she deserved to die because I understood that, you know, you are who you associate with. And I feel like that situation played upon itself, and I feel like she took--I feel like she lied and said she did it all when she was definitely there and she was involved. And--but I would have not given her the death penalty. I would given her life in prison without parole.

And the reason is--is just because at that time Christa, before she went to the Job Corp, where my life got better, her's spiraled out of control. And she was, you know, living on the streets with her friends, doing drugs, inhalants, and I just figured she could not control herself in society. And she made a statement to me that she didn't care if she lived or died, that she was going to be dead before she was 22 years old. And this was before she even went to Job Corp.
Q Would you agree with Dr. Pincus if Dr. Pincus' assessment was, based on his

examination and conclusion about Christa Pike, that under the right circumstances and given the opportunity, she would kill again? Do you agree with that based on your experience with her?

A Based on my experience, I never would have thought Christa would ever kill anybody really, because she has always shown love towards people. I mean she's always been extremely loyal to her friends. And, you know, Christa really needed help from a long time back. She just always had problems. And I feel like if she would have had the proper treatment early on, then she never would have killed that girl. She never would have been in Job Corp.

Q And the fact that she has been--your sister has been convicted of trying to attempt--the attempted murder of another individual while in the women's penitentiary-

A Uh-huh (Affirmatively).

Q --does that change your opinion at all?

A No, it doesn't at all because I know that they were experimenting with the drugs that they were giving her. And I say experimenting. That's my own opinion because they would put her on a drug and give it to her for a few days and

then take her off and give her something else. And then put her on drugs and if she was doing good, they would take her off that drug and give her something else. And that day that that happened, they took her off her--whatever it was that she was taking. And then they put her in the cell. I feel like that's the State's fault that that happened.

MR. PRICE: No other questions.

MS. BROCKENBOROUGH: (Standing)

THE COURT: Go ahead, Ms. Brockenborough.

REDIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Ms. Wills, I have just a couple of things. Is it possible that--could there--I mean could there have been things that you did to Christa that you don't recall because at the time they didn't seem significant to you, but for whatever reason--

A Very well--

Q --they took on significance?

A --could have. I don't recall slamming her fingers in the door, but if she has a scar--I don't recall doing that.

Q And were there--do you remember an

incident where--is the--your son Keith's father, his name is Bryan; is that right?

A Uh-huh (Affirmatively).

Q And do you remember a time when you wanted--you left--you left Keith under Christa's care so that you and Bryan could sneak out of the house and go to a Def Leopard concert?

A I know we went to the Def Leopard concert, but we didn't sneak out of the house. And I--I'm pretty sure that my mom was there too.

Q Did you trust Keith with you mom?

A I did. My mom was not abusive; she was just neglectful and that's abusive.

Q You indicated that you had spoken with Dr. McCoy by phone?

A Uh-huh (Affirmatively).

Q Was that the only contact that you had with her or did you--did you ever meet with her in person?

A I visited with somebody up at Mike and Carrie Ross' house, and I don't recall if it was her attorney or if it was Diana McCoy. But I just met Diana McCoy out in the hallway, and I don't recall her face. So I don't believe that we met in person. And I do remember having a

conversation on the telephone. But I know that I did not make that statement that Christa abused--that I know that Christa sexually molested my son.

Q You--so--I'm sorry. (Sighing) You remember meeting with--with someone at your Aunt Carrie and Uncle Mike's home in West Virginia, and this was someone from Miss Pike's trial team?

A Yes.

Q And it was a woman, I'm assuming?

A It was a woman.

THE COURT: I'm sorry. At her--at her aunt's home?

MS. BROCKENBOROUGH: At her aunt's home, yes.

Q And do you remember how long before the trial that was?

A I do not know. I think a long time before the trial.

Q Do you remember whether--what you all discussed at that time?

A I don't.

Q Did you meet with--with this person alone or were you with--

A No--

Q --your aunt and uncle?

A We were in the family room, and I may have been alone with this person. (Pause) I just--I don't even recall the--the conversation.

Q Were you ever subpoenaed to the trial?

A I was not.

Q Okay. Not by the State or nor by the--the defense?

A No.

Q And had you anticipated that you would be a witness?

A I did.

Q And why was that?

A Well, I'm her sister and, you know, I felt like--I felt like Christa never had a fair share from the day she was born. And I thought that it would be important to--just to wit--testify that I saw her being passed back and forth and nobody really cared about Christa.

Q And where were you living at the time of your sister's trial?

A At the time of my sister's trial I was in Dallas, Texas.

Q And when did you move to Dallas?

A In 1993.

Q The incident where you were trying to

get your sister to do the dishes and then ended up she was chasing you around the--around the kitchen with a knife, do you remember whether you were also chasing her around with a broom?

A I don't know if I had a broom. I just knew I was going to knock the knife out of her and then probably we were going to have at it.

(Laughter)

Q And then is that what happened ultimately?

A I don't--maybe that's how we ended up out in the street. No, it wasn't. I don't think so. I think that--I think Christa then--I--you know, Christa went into her bedroom that day and sat there on her bed, and she sulked and she didn't say a word. And my mom came home and she was all upset. Of course, I was upset that Christa just sat on her bed. And then I got mad at my mom because she never would make Christa do anything. But I was mad at my mom really.

Q Was--was your mother working at the time?

A She was. She always worked.

Q And when--when were her work hours?

A She--at that time she was working for

Blue Cross/Blue Shield. So it was probably--she left about either 7:30 in the morning. And so we, you know, got ourself ready for school, got on the bus, and then we got home before she did. And she'd get home--she was a supervisor at that time and so she worked longer hours. Sometimes she would--5:00, 6:00 or--usually not later than 7:00 but--

Q Were there periods when she worked nights when you were living with her?

A When we were really young. That's when we were living down in the house on my grandfather's property.

Q And you don't remember her working any night shifts after you were back in North Carolina?

A I don't. (Pause) That was Bahama, North Carolina where we lived.

Q Bahama?

A Yeah.

Q Do you know how to spell that?

A No.

Q You stated that you thought that your sister lied in her statement after her arrest and took all the blame for things that she didn't do.

Why do you think that?
A Because I know Christa was extremely loyal to her friends. I felt Christa was loyal to me. I felt Christa just wanted to take care of them, and she didn't care about her life. And she didn't care if she died. And I know that she loved that boy Tadarryl, and I know that she felt like he had a future and she didn't.
Q Mr. Price made mention of the many parallels that exist or existed in your lives when you were growing up. Do you--you have three children?
A I do.
Q And, obviously, Keith, you know, he has a different father?
A Uh-huh (Affirmatively).
Q How old are your other two children?
A Nine and four.
Q And how similar are the three of them?
A They're not at all similar.
Q Okay.
A Keith is--he's a peaceful--(Indiscernible word), very easygoing. He's never in trouble. He's a little bit lazy, but he's a good kid, never ever did drugs, never drank. We would

have parties at our house and people, you know--I mean he would have parties, and he would run off his friends if they brought alcohol. He's a good kid.

Q How about your nine year old?

A And my nine year old talks incessively (sic), and he's extremely intelligent. And he's going to--I mean he's got a Type A personality, and he is already very good at sales. (Laughing)

Q And your youngest is a girl, I believe?

A And my youngest is a girl, and she's just really sweet, and she--she thinks she's a pony. She doesn't even really walk. I mean she can walk, and she's very athletic. My son is a junior black belt in Tai Quan Do, and my daughter just started taking it also. And they're happy.

Q And they're very different individuals?

A They are different.

Q Do you know--do you have any reason to believe or suspect that you might be suffering from mental illness?

A Well, it's possible, but I don't think so.

Q Have you ever been diagnosed with--

A No.

Q What about any brain damage--
A No.
Q --are you aware of any abnormalities in your brain?
A No, other than--you know, as a child I never--I never read a book until after I graduated high school. And then that's when I got my education, was after high school so--but no.
Q Were you ever diagnosed with any kind of learning disability or anything like that?
A No.
Q And are you aware of whether your sister has been diagnosed with any mental illness?
A I am not aware.
Q Okay. Or whether--
A I think--I know that since she's been in prison she's been receiving treatment, and they're trying to determine what really is wrong. But I don't know anything that's been determined.
Q Why do you believe that your sister didn't have a chance from birth, pretty much when she arrived in this world? I think that's what you had said.
A I just feel like Christa just always seemed sad, and I knew my dad loved me. I always

had that hope. I felt loved by my grandmother. And my grandmother didn't really want to have Christa there because she didn't understand Christa. And so I know Christa probably felt rejected by her. I know she probably felt rejected by her mom. And I know she felt rejected by her dad. And I know she felt like nobody ever cared because, you know, she was making up stories, and taking cigarettes to school, and trying her best to get in trouble, and still nobody cared.

MS. BROCKENBOROUGH: Thank you, Ms. Wills, I don't have any other questions.

THE COURT: Do you have any other questions, General?

MR. PRICE: No.

THE COURT: Okay. Thank you, Ms. Wills. May she be excused?

MS. BROCKENBOROUGH: Yes.

THE COURT: Okay.

(WITNESS EXCUSED)

* * *

THE COURT: It's 11:20. I'd really like to get another--I don't know if we can get another witness on--

MS. BROCKENBOROUGH: Yes, yes.

THE COURT: --in a short period of time. Do you have a short witness?

MS. BROCKENBOROUGH: Yes, Glenn.

THE COURT: Do you need a break?

MR. DAWSON: Your Honor, we could--well, our next witness was going to be Glenn Pike. I don't think he'll be real long, and we may break between his direct and cross or something. But I think we can get him on real quick.

THE COURT: I'm not--you can call your witnesses in whatever order. We'll stop for 45 minutes to an hour for lunch. But if we're going to get through the number of witnesses you have on your list, we'll never make it if we don't keep going.

MR. DAWSON: Your Honor, our next witness will be Glenn Pike.

THE COURT: Okay. Call Mr. Pike please, Glenn Pike.

COURT OFFICER COFFEY: I'm sorry, your Honor. I didn't hear you.

THE COURT: Glenn Pike.

COURT OFFICER COFFEY: Thank you.

(Whereupon, the witness came

into open court.)

THE COURT: Mr. Pike was sworn yesterday I'm pretty sure, right, sir?

MR. PIKE: Yes, ma'am.

THE COURT: If you'll come up and have a seat please, sir.

GLENN PIKE, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q Sir, would you please state your name for the record?

A Emil Glenn Pike.

Q And could you spell that for the court reporter please?

A E-M-I-L G-L-E-double N P-I-K-E.

Q And, Mr. Pike, what is your relationship with the petitioner in this case, Christa Pike?

A I'm her father.

Q And you testified at the trial in this case in 1996, correct?

A Yes, sir.

Q In the sentencing phase?

A Yes, sir.

Q Prior to the trial you were interviewed

by Mr. Talman once, correct?
A Yes, sir.
Q And he came up for--maybe more than once, but he came to Beckley, West Virginia where you lived, correct?
A Yes, sir.
Q And in addition did anyone else interview you from the trial team, other than Mr. Talman?
A I don't remember who it was, sir.
Q Okay. But somebody else did?
A Yes, sir.
Q Okay. And do you remember whether or not you were interviewed by Diana McCoy?
A I think so.
Q And she was a psychologist, correct, that was working with the defense team?
A Yes, sir.
Q Okay. Were you ever--were you subpoenaed to come to the trial?
A No, sir.
Q Were you asked to come to the trial?
A Yes, sir.
Q And do you remember when you were asked to come to the trial?

A Just like a day before I testified.
Q Okay. And do you remember who asked you?
A No.
Q Had you been expecting to be called to testify at the trial?
A I guess so. I really don't know.
Q Okay. And did you have any meetings with the attorneys to discuss your testimony before they put you on the witness stand?
A Yes, sir.
Q And when was that?
A I'm thinking it was either the morning of or the day before that I testified.
Q And where did that meeting take place?
A I think it was in the hotel room of Mr. Talman.
Q Okay. Could it have been a law office?
A Or his law office.
Q Okay. And the--and who was present at that time?
A I'm sorry; I don't remember. That's--
Q Let me ask you this, was it done one on one where just you and--either you or Ms. Martin or Mr. Talman?

A No, I think there was two people that--two or more people that was there--

Q Okay. And was--

A --with me. But I don't--I don't remember who it was.

Q Okay. So there were--others were there present?

A Yes.

Q Do you remember whether there were other family members present or--

A No, I don't think so.

Q The--and, Mr. Pike, let me just ask you a little bit about your own background. Where were you born?

A In Beckley, West Virginia.

Q And you lived with your mother and your father?

A Yes.

Q Was an intact family, correct? I mean your family was intact? Your--

A Yes, sir.

Q And what--what was your father's profession?

A He was a coal miner and a plumber. Before he died he was plumber.

Q Okay. And what about your mother?
A She was just a homemaker.
Q Okay. What was the--what type of discipline did you receive as a child?
A From my mother, she would use a switch on me. And from my father it was a belt.
Q And how often did this occur?
A More often from my mother than my father, but on a--from my mother, probably a daily basis.
Q Okay. And when you say a switch, could you describe how that was done and how big the switch was?
A Just however big I pulled it off of a tree.
Q Okay. So she would have you get the switch?
A Yes, that was part of the punishment.
Q And what happened--how often would your father then discipline you?
A Maybe once a month if I was--did something really bad.
Q Okay. And he would discipline you with a belt?
A Yes.

Q And how would he hit you with the belt?
A I just doubled over and--and hit me on my rear.
Q And what was the reason for doubling it over?
A Well, the way I understand it, it makes a sound that's psychological or whatever, plus it hurts a little bit. But it makes a sound worse than what it really is.
Q Okay. But it hurts a little bit more than a single belt?
A Yes.
Q And as a result of that, did you make any determination as to how you might treat your children?
A I swore to never switch--put a switch to my children.
Q And what was the reason for that?
A It just--it possibly could leave scars or I just thought that was just a little bit too much.
Q So you found the switch to be a lot more painful than you did the belt?
A Yes.
Q And in--at some point--let me ask you

this. How--at some point did your father die when you were a child?

A In 1961.

Q And how old were you at that point?

A I think I was 13.

Q What changes did that make in your family?

A Well, my father was the bread winner in the family, so income circumstances, and then not a male role model in the family.

Q And did you ultimately--let me ask you this. Did that require--did that end up requiring your family to move?

A In '64 we moved whenever I was 16 and could quit school. Yes, we moved to--to Indiana so that we could get work to pay for the farm.

Q Okay. So you still had the farm in West Virginia, but you could no longer live on the farm; was that--

A Well, we could live there, but we couldn't find enough work to really pay for it. We had to pay payments on it, and at that time I couldn't get a job. And my mother was having a hard time getting a job. So we--we moved to the city where both of us could work.

Q Now, did you have any siblings?
A Yes, I had one sister.
Q And how--where is she in relationship to you in terms of age?
A She's nine years older than I am.
Q So then by the time your father died, she was already out of the house?
A Yes, she had--she had children and was out of the house.
Q The--let me ask you. After you were in Indiana were you ultimately drafted?
A Yes.
Q And when was that?
A That was in 1966.
Q And as a result of being drafted, where did you end up being sent?
A I was sent to Vietnam, overseas.
Q And how long were you in Vietnam?
A I was in Vietnam for nine months and 24 days.
Q And was there a reason that you were in for that period of time?
A Yes, I got hepatitis and was sent to the hospital.
Q Were you also wounded as a result of

being in Vietnam?
A Yes.
Q Where in Vietnam did you serve?
A In the Central Islands of An Ke'.
Q And what was your role with the Army?
A I was with--in the infantry, a grunt soldier.
Q And as a result were you often on parole--on patrol? (Laughing)
A Yes.
Q And was this a regular condition of your work--of your time in Vietnam?
A Yes.
Q And those patrols, were you ever subject to an ambush?
A Yes.
Q Did that happen more than once?
A Yes.
Q Was that a fairly common experience?
A Yes.
Q And I assume you lost members of your patrol?
A Yes.
Q The--what happened then after you left Vietnam? Where did your Army career go?

A No, I got out and I stayed out for a few years, and in 1973 I went back in the service.
Q And what was the reason for that?
A I had moved back to West Virginia at the time, and there--again there was no job market. So I went back in the service for income.
Q And as a result of your time in the service--well, let me ask you this. Did you--you re-enlisted; and how long did you stay in that time?
A Three years.
Q And during that three years were you married?
A Yes.
Q And could you tell us who--who you first married and when?
A In I think it was '74 I married Joanne Lily. And then I divorced and I married Carissa.
Q And you were still in the Army when you married Carissa?
A Yes.
Q Where were you stationed at that point?
A Fort Bragg, North Carolina.
Q And where was Carissa living at that point?

A She was living on--at a trailer next to her mother and father's, on their property.
Q How often did you all see each other?
A Generally on the weekends.
Q And let me ask you. As a result of your --then subsequently you were--you were discharged from the Army, correct?
A Yes, sir.
Q And what kind of a discharge?
A Honorable discharge.
Q And what kind of discharge did you get the first time?
A Honorable discharge.
Q Okay. And as a result of your service in the Army, are you receiving any Veterans' benefits?
A Yes, I am.
Q And what's the reason for those?
A I'm receiving compensation for PS--PTSD and for high blood pressure.
Q Okay. And that was--the high blood pressure is thought to be service connected; is that correct?
A Yes.
Q And were you subjected to anything else

while you were in the Army that the Veterans Administration has cautioned you about, from any of your service in Vietnam?

A I had hepatitis while I was in there and--

Q What about any of the defoliants that were--

A The agent--agent orange.

Q Okay.

A I was informed that I was in an area that was subject to agent orange.

Q And did they discuss with you or give you any literature about what problems that might cause?

A There was literature that I was given. The only thing for children was spina--spina bifida, I think, was something that the VA recognized was one of the only things.

Q And perhaps some other birth defects, correct?

A Yes.

Q The--now, when you and Carissa were first--well, let me ask you this. How did you meet Carissa?

A I met her at a bar.

Q Okay. And you were both there drinking?

A Yes, sir.

Q This was--and where was this?

A This was in Beckley.

Q Okay. And this was a general way that you socialized; is that--

A Yes.

Q And after you were married--do you remember what year you were married?

A I assume it was '75. I don't really remember.

Q Okay. Do you remember how--when you were married in relationship to the birth of your daughter, Christa Pike?

A Well, it was close to a year. Nine months or a year before she was born.

Q So then Carissa became pregnant fairly quickly after you were married?

A Yes.

Q And the--during the time when you were in--still in the Army--and you said you came home on weekends?

A Yes.

Q What kind of socializing did you and Carissa do together when you were home on the

weekends?

A We had friends over and played cards, and we went to clubs.

Q Okay. And when you went to clubs, did you drink at the clubs?

A Yes.

Q And is it--did you have somewhat of a--well, did you drink fairly heavily at that point? Let me ask you that.

A Yeah, I guess you could say that.

Q Okay. Like for instance, when you went to the clubs, how much did you have to drink?

A I'd have five, six, up to ten drinks maybe.

Q Okay. And these were both hard liquor and beer or what were you drinking?

A No, generally just hard liquor.

Q Just hard liquor. And the--and what about when you first met Carissa, what was her alcohol intake like when you were at the clubs?

A Probably pretty close to what I would drink.

Q Okay. So she kept up--could keep up with you then?

A Yes.

Q And what about when--when you all were having friends over playing cards or whatever, did--was there alcohol involved on those occasions as well?
A Occasionally, not all the time, yes, occasionally.
Q And would that be the same sort of drinks that you all would have at the house?
A Yes.
Q And on the occasions when you did drink, how much would you drink then?
A Two, three, four drinks maybe, not as much as at a club probably.
Q And the--in terms of the--have you ever been counseled by the Veterans Administration or any other medical people about your drinking or--
A Well, the VA has always said that you shouldn't drink alcohol, and I've been counseled that way. But that's all.
Q I mean they've suggested that you slow down your own drinking?
A Yes.
Q And in terms of the period of time then between the time that you first married Carissa and the time you got out of the Army, this was a

fairly routine custom, that you all would--you'd come home on the weekend and you'd either go to clubs or you'd have friends over and alcohol would be involved? Is that fair to say?
A Yes.
Q And do you remember a time when Carissa ever stopped drinking some during those periods?
A I'm sure she didn't drink as much, but I don't know that she stopped completely.
Q But you remember she would go and at least have a drink or two when you were--when you were doing those things?
A Yes.
Q And you're just not sure how much she might have drank?
A No.
Q And, of course, you don't know whether she was drinking or not when you weren't there?
A No.
Q And then when did you finally get discharged from the Army in relation to when Christa was born? Was it before or after?
A Before.
Q Okay. So then you were back home and trying to establish your life there, correct--

A Yes.
Q --in Beckley? And what type of work were you doing at that point?
A I was trying to get a motocross race track started.
Q And where was that? Was that--
A It was on the family--the farm at Table Rock, right outside of Beckley.
Q And was that bringing in income for the family?
A Well, it was bringing in some, not as--not as much as it should have.
Q Okay. And was Carissa then still working as--when she was pregnant?
A Yes, she was.
Q And do you remember where she was working?
A She worked two or three different places. I don't remember exactly which one.
Q What do you remember about the day your daughter was born?
A When she was born, she was taken by c-section. She had hyaline membrane, and they told her that we was going to Charleston to a better hospital that could take care of her. And

we followed her to Charleston in an ambulance.
Q Okay. And so you went on--now when you said "we," was Carissa with you then?
A No, no, it was Carrie.
Q Carrie. Okay. And Carrie was working at the same hospital where she was born, correct?
A I think so, yes.
Q And what were your observations of the way that your daughter was--was being cared for when--when she arrived at the hospital in Charleston?
A Well, she was in a--a closed box. I don't know what you call it, but you couldn't--you couldn't really get to her that well or anything.
Q You couldn't hold her or you couldn't be with her?
A No. You could--well, I mean you could be in the same room, you know, but it's--they--she was in kind of a box.
Q Okay. And how--do you remember how long that lasted?
A No.
Q Okay. The--when Carissa and--did Carissa and Christa both get out of the hospital

at the same time, or did Carissa come home first or--

A I don't--I assume that Carissa came home first.

Q Okay. And once she came home, how long was it before she went back to work?

A I--I don't remember.

Q But was it fairly quickly?

A I think so.

Q And then how was your marriage at that point? I mean what--how long were you all married that first time?

A Just a couple of years I think.

Q Okay.

A I'm not really sure.

Q And do you remember the reason that you divorced?

A Carissa liked to go out after work, and I was--I was working away from home and we didn't spend that much time together.

Q Okay. So that's--and now what kind of work were you doing away from home?

A Construction work.

Q Okay. And this was on highway--roadway type construction?

A Yes.
Q And so you were basically gone during the week and then--
A Yes, gone--at times gone all week and then come in on the weekends for a day or two.
Q When you say she was going out with friends, male friends, female friends?
A Both.
Q Okay. And was this bothering you?
A Yes.
Q And so then you divorced. How long did you remain separated after you divorced?
A I don't remember.
Q Do you remember what it was--you did get back together, correct?
A Yes.
Q Do you remember what it was that caused you to come back together?
A Yes, Carissa called me at one time. She had took a bunch of pills and she asked me to come over. And when I came over, she had taken enough pills that we thought she should go to the hospital.
Q Now, when you say "we thought," you and Carissa together thought or you just thought--you

thought that--

A Well, me and Carissa, and if I'm not badly mistaken, Carrie was there too.

Q Okay. And did this appear to you to be a suicide attempt?

A Possibility, yes.

THE COURT: When you say "she," you mean Carissa took pills?

A Yes.

THE COURT: Okay.

Q And after that took--after that happened, what happened to your and Carissa's relationship?

A We just--I guess we stayed close together and we remarried.

Q Okay. And what happened during this next period of marriage then?

A The same thing. Just grew apart. She --she liked to party more than I did, and I worked out of town.

Q So then most of the time she was spending the day working or--and then the evenings partying. Was that her general schedule or--

A Well, I can't say for whenever I wasn't there, but I assume that's what happened.

Q Okay. And do you know who was taking care of your daughter Christa at that time?
A My mother and her mother generally.
Q Okay. Now, where did you live in relationship to--now, when--during the first period of marriage to Carissa, where--after you were out of the Army, where did you live in relationship to your mother or Carissa's mother?
A We lived in a trailer that was on her parents' property, a 150 yards, 200 yards from their house, approximately seven miles from my mother's house.
Q Okay. And your mother was--was mobile at the time and could travel?
A Yes.
Q So she would come to your trailer to sit--babysit or--
A Yes. Well, both ways. They would--she'd come and she'd take Christa home or she'd stay at the trailer.
Q And then you said the second time the marriage was the same. Where did you live the second time? Was it still the same place?
A The same place.
Q Okay. And after your divorce from

Carissa the first time for that whatever period of time is was between the marriages, where did Christa live?

A She--she lived with her--well, was in custody of her mother. But she stayed at--with my mother quite a bit.

Q Okay. So she was basically still living in the trailer then at the--on the Fotos' property?

A Yes.

Q Okay. The--after the second divorce, about how long were you married before you were divorced again?

A Just a couple of years.

Q Okay. At that point what was your relationship with Christa Pike? How often did you see her and that sort of thing?

A Well, I got to see her on weekends whenever she'd get to come over or--that's when I wasn't working.

Q And did you have any concern about the way she was being treated or anything at that time?

A Well, yes. My mother-in-law, Carissa's mom, didn't seem to like me or Christa very well.

So that presented a little bit of a problem.
Q Okay. And do you have any idea why she didn't like you or Christa?
A No, not really. She just seemed--I think she seemed to think that they had money and that I was maybe in a lower class.
Q And that was related to your father's, I guess, line of work and yours?
A Possibly, I really don't know.
Q Okay. But you did believe--it felt like she was looking down on your; is that--
A Yes.
Q And then after--did there come a time when Carissa moved away from West Virginia?
A Yes.
Q And at that point, where did Christa go?
A She went with her mother.
Q And do you remember what the reasons was for the move?
A She got married.
Q Okay. And was that to Danny Thompson?
A I think so.
Q Okay. And the--at that point--and she moved to North Carolina, correct?
A Yes.

Q Once she was in North Carolina, how often did you see your daughter Christa?

A I don't know if it was once a month or what. Just every so often we would meet halfway, and she would come and stay with me or, you know, as often as I could.

Q And then she would also at that point then spend a lot of time with your mother?

A Yes.

Q Where were you living at that point?

A Well, I was living at home.

Q Okay. So you were living with your mother then?

A Yes.

Q And so that was--now, was it just you and Christa and your mother that were in the household then?

A Yes.

Q Okay. And what was the relationship between your mother and Christa that you observed?

A Well, they had a real good relationship. I mean my mom loved Christa to death, and Christa loved her. I mean they was-- (Pause)

Q And I assume that your mother did not use the switch on Christa?

A No.
Q Did she discipline Christa?
A Not very often. She left that more up to me.
Q Okay. And what--what kind of things did you have to discipline Christa for?
A (Sighing) Well, just back talking, not minding, not doing what she was told, and then whenever she went to school, doing her schoolwork and so forth.
Q And how old was Christa at the time that you would be having--when we're talking about when you would have had to start disciplining her?
A (Sighing) I really don't--don't know. I mean at different times all her life as far as that goes.
Q Okay. And how did you discipline her?
A A lot of times I used my hand, and a lot of times I used a belt.
Q And what was the reason for using a belt?
A Well, psychological to make a noise that she was scared of and enough pain to make it, you know, so she would mind.
Q And how did you use the belt?

A I doubled it over and spanked her on her bottom.

Q So basically the same way your father did to you?

A Yes.

Q The--did you find that--well, I guess this--that Christa responded to being spanked or being hit with the belt?

A Not that well, no.

Q Okay. And did you find this frustrating?

A Oh, yes.

Q Did you find you ever had to hit her with the belt on more than one occasion on the same day?

A Yes.

Q Did that happen very often?

A On occasion.

Q And what were some of the occasions when it happened that she had to be hit with the belt on more than one time--I mean more than one occasion on the same day?

A Trying to get her to do her homework, and I'd give her an amount of time to start doing her homework. And she wouldn't do it. And then I

would try to reinforce that she had to do her homework, and then she wouldn't do it again. And it just--

Q Now, when you say you had to reinforce the need for her to do her homework, that would be when you would--when you would swat her first?

A Yes.

Q Now, each time would you hit her once, more than once?

A Sometimes once, sometimes more than once. I don't really remember exactly how many times.

Q Okay. And tell me, how was it--how did you--how did you perform or what did you have her do why you were going to hit her with the belt?

A Just bend over and--

Q And so she had to bend over and hold her toes or put her hands on the ground or what--how did she bend over?

A Well, just--just--she just had to bend over.

Q And did you have her pull down her pants or anything like that--

A No.

Q --to hit her?

G. Pike - Direct

A No.
Q So it was always with clothing between her and the belt?
A Yes.
Q Or did--sometimes because she was wearing a skirt or something, the clothing wasn't necessarily that thick?
A Yeah, possibly.
Q Okay. And now, on these occasions when she would get--when you would use--the belt would come out, you would use the belt, she would not respond, how much time would you give her before you might use it again?
A Oh, an hour or an hour and a half. Whatever--whatever time it was that gave her enough time to do, you know, what I had asked her to do.
Q And do you remember--have any idea what the most times in a single day that you had to actually punish her this way to try to get her to do her work?
A No, I don't remember.
Q Do you remember if it was, you know, more than three or four?
A Probably more than three or four, yes.

Q Okay. So it could have been as many as five or six?

A Yes, it could have.

Q And each time would it be fair to suggest that you were getting more and more frustrated with Christa for not responding?

A Yes.

Q And do you--would that cause you to hit her harder or to try to reinforce in some way that you really meant it this time?

A It possibly could.

Q (Pause) And when Christa was--when Carissa was married to Danny Thompson, did there come a time when--when Christa came to live with you?

A Yes.

Q Do you remember the circumstances of why she came to live with you at that point?

A I think Carissa was having disciplinary problems with her and asked me to try to take care of her.

Q Were you ever aware of whether Carissa was given the choice, either to send the kids away or Danny Thompson was going to leave her?

A I don't.

Q You're not aware of that?
A I'm not aware of that.
Q But there were several times when Carissa would be having disciplinary problems or just problems with Christa and she would send her to live with you, correct?
A Yes.
Q And then what would generally happen when she was living with you?
A Well, she'd get along good for awhile and then she'd act up and find it necessary to switch back.
Q So you'd then send her back to Carissa?
A Yes.
Q And the--do you have any idea how many times this happened? I mean how--
A No, I don't.
Q What about how frequently? I mean how many months would go by before you'd send her back or--
A Oh, it'd be quite--quite a bit of time in between. I don't--I don't remember how--how long but--
Q Okay. But I mean quite a bit of time, six months, a year, shorter, longer?

A Probably over six months--
Q Okay.
A --and that, you know.
Q And then she would go back and live with the other parent, and then it would be the same amount of time before she'd come back?
A Yeah, because she didn't--she didn't--she didn't have to switch schools and so forth like that so--
Q Did she go to school some time in West Virginia?
A Yes.
Q And she went to school some time in North Carolina?
A Yes.
Q (Pause) At some point you remarried, correct?
A Yes.
Q And who did you marry?
A Kathleen Almond.
Q And then you've had two children with Kathleen; is that correct?
A Yes.
Q And that--and who are they?
A Max and Lindsey.

Q And Max is here with you today?
A Yes.
Q And Max is how old now?
A Seventeen.
Q And how old is Lindsey?
A Eighteen.
Q Okay. So then Lindsey is, you know, roughly 12 years younger than Christa; is that--
A Yes, I guess.
Q And the--was there an allegation made that Christa had sexually abused Lindsey?
A Yes.
Q Could you tell us how that allegation came about?
A My wife at that time was going to a therapist and she told the therapist that, uh, Lindsey had said that Christa licked her. And then she pointed towards her belly or towards her genitals and said, "There?" And Lindsey said, "Yes," as--from what I understand. And the therapist at that time told my wife that she didn't want Christa around Lindsey anymore, and if she came and was around her, that she would have her arrested and whatever.
Q And did you ever discuss that with

Christa?

A Yes, I did.

Q And what was Christa's position?

A Well, Christa denied it but- (Pause)

Q Now, have you ever--had you ever--prior to that, did you ever see Christa playing with Lindsey?

A Oh, yes.

Q And how would she play with her?

A Well, there's been many times that she would, you know, like you do a baby, you blow on their bellies, give them raspberries or whatever, and--and played around with them.

Q And so you'd seen Christa doing that?

A Yes.

Q That was just normal play with a baby?

A Yes.

Q And did you ever see anything that you thought was inappropriate that Christa did with Lindsey?

A No.

Q And did you have any reason to believe whether or not this allegation was true?

A No.

Q And the result of this allegation was

that Christa was never able to return to your home, correct?

A Yes.

Q And you always then would just see her when or where?

A Whenever she would come in to see her grandparents or relatives or something, she'd give me a call before she came in, told me when she was going to be in town, and I would go over and see her.

Q And by this time the only grandparents still living were Carissa's parents, correct?

A Yes.

Q Your mother had died?

A Well, other than my mother, yeah.

Q What--do you recall Christa at your mother's funeral?

A No.

Q Okay. And do you recall what affect that your mother's death had on Christa?

A It was devastating to her. She--I mean that was her best buddy, I mean.

Q And were you aware that Christa was-- spent some time in a juvenile facility in North Carolina?

A Yes.
Q Did you ever visit her when she was there?
A No.
Q Did you ever talk to the--to any of the North Carolina social workers or counselors that were working with Christa?
A I think I talked to them and asked them how she was doing, yes. That's about it.
Q And that was by phone you talked to them?
A Yes.
Q And do you remember when--you said that your wife, Kathleen, was apparently seeing a therapist at the time that the allegations were made about Lindsey?
A Yes.
Q Do you remember why she was seeing a therapist?
A No, I don't.
Q Would you recall it might have been something that had happened to her of a sexual nature when she was a teenager?
A There's a possibility, yes.
Q And your marriage to Kathleen ended in

divorce, correct?

A Yes.

Q How long ago was that?

A '95, '96.

Q And you are, I guess--are you working now? Do you have any employment?

A Not permanent employment, no.

Q Okay. And this is as a result of you had an injury or a--that--on--that keeps you from doing construction work; is that--

A Yes.

Q That was a back injury?

A Yes.

Q And when did that occur?

A (Sighing) That was, I think, either '95 or '96.

Q Were you aware of your daughter's decision to go to Job Corp?

A Not until she was already in Job Corp, no.

Q Okay. So the first that you were aware of it was during that Christmas time that she was in Job Corp and she came--

A Yes.

Q --to the house? And let me go back one

step here first, back to the questions regarding Lindsey. Do you--do you believe that Christa molested Lindsey?

A No, I don't.

Q And that's based upon what?

A Well, that's based on a lot of thought, and then I've talked to Lindsey. And Lindsey doesn't believe it happened. She doesn't remember it.

Q And what was Christa's general--from your observations what was her general, I guess, attitude or feelings towards little children?

A She--she always got along good with little kids. She loved them and I mean that was--

Q She--

A --she loved to play home. She loved to play with kids, yes.

Q Okay. And the--now back to the Job Corp, she visited West Virginia during the Christmas of '94, right, which would have been the Christmas right before the incidents that--for which she got in--into jail; is that--is that right?

A Uh, yes.

Q Is that--is that when you first talked

with her or learned much about Job Corp?
A I--I think so, yes.
Q And do you remember what her--whether she wanted to go back?
A Yes, she did. She wanted--she wanted to finish up. She wanted--wanted to do good and finish up.
Q And why was that?
A Well, she just hadn't finished a whole bunch of stuff, and she wanted to--
Q So this was kind of her time to finally do something right?
A Right.

MR. DAWSON: If I could have one minute, your Honor.

(Whereupon, Mr. Dawson conferred with Ms. Brockenborough and Miss Pike.)

MR. DAWSON: Your Honor, I have no further questions.

THE COURT: Counsel, do you all want to take a lunch break at this point and then--or do you think you're going to have a long cross?

MR. PRICE: I don't believe it will be too long, your Honor. I don't think it will be

more than 15 minutes.

THE COURT: Why don't you go ahead and finish Mr. Pike then so he doesn't have to anticipate it over the--the time. And we'll take a lunch break right after we finish Mr. Pike's testimony.

CROSS-EXAMINATION

BY MR. PRICE:

Q Now, Mr. Pike, you had indicated that after you and Carissa had divorced for the second time, I think, she moved down to North Carolina; is that right?

A Yes, sir.

Q And there were occasions where your daughter, Christa Pike, would--was sent back and forth?

A Yes, sir.

Q You're saying she never had to switch schools. Do you mean--

A No, she did have to at one time. Whenever she was in junior high she had to switch schools. The one time is all I know of that she had to switch schools.

Q What was the reason for the switching back and forth?

A Just she didn't want to mind, you know.
Q So you were trying to figure out a way to get her to obey--
A Yes.
Q --and mind, right?
A To a certain extent, yes.
Q Was it--did you not want her there living with you? Did you not want her around?
A No, I wanted her there, but I also wanted her--the main problem I had with her was she didn't want to do her school work. And I couldn't--I couldn't make her do her school work. And she had to have an education. She had to do something where she could get an education, and I couldn't get her to do her school work. So I tried sending her to her mother's to get that.
Q You tried--you also tried spanking her as well?
A Yes, I did.
Q Did you love your daughter?
A Yes. I still do.
Q Ultimately, I guess finally what led her not to ever come back was this incident involving or allegation involving Lindsey; is that fair to say?

A Yes.

Q She never came back to live with you after that?

A No.

Q Now, you described how that allegation came out. It's true that Lindsey actually met-- came and told you and Kathleen, your wife--well, not came, but in your presence Lindsey made that allegation? Do you recall that?

A The allegation that Lindsey made was that "Christa licked me". Yes, that's--that's all she said.

Q Did Lindsey--

A That's the only thing in my presence that she said.

Q Okay. So you--

A Now, in my00in my ex-wife's presence what she said was that she pointed to her genital areas. Now, I never did see that or anything. The only thing I knew of is Lindsey said that "she licked me"--

Q And she said that in front of you?

A --which could have been her giving her a raspberry or whatever.

Q Sure. Sure, I understand that. But I

guess my question is, Lindsey said that about licking in your presence?

A Yes.

Q Now, if the strategy at trial--the original trial, at least in the penalty phase, when--of Christa Pike's childhood being discussed was to show that she was shunted back and forth and not really loved by either parent, do you agree with that assessment?

A No.

Q You didn't then either; did you?

A No.

Q And talking about the spankings with the belt and with the hand, let me ask you if you agree with this characterization of that, talking about your daughter. (Reading) "When she was with her father, she was subjected to frequent beatings with a belt that had a ritual aspect. She had to pull down her pants, stand and bend forward and touch her feet, so that her father could have access to her buttocks and back." Is that true?

A No. She never had to pull her pants down or anything for me to spank her or to use a belt on her. I did use a belt on her, and I did ask her to bend over. And--and I spanked her on

her butt, yes, I did.
Q Would you spank her on her bank?
A No. I spanked her on her butt. Now, there's a possibility that sometime if she moved or something like that, that something--
Q You might have--
Q --kind of--
Q --missed her bottom somewhat?
A Yes, but that--that--I tried for that not to happen. But there is always the possibility of that, yes.
Q You don't remember intentionally targeting her back?
A No, never.
Q What about the characterization that these beatings that we're talking about, where she's bending over with her pants down around her ankles, and bending over, that you would beat her continuing for as many as ten or 15 blows?
A Well, first of all you're telling me that I beat her with her pants down, and I just got through telling you that I did not.
Q Okay.
A So, no.
Q You don't agree that it went on for ten

or 15 blows?

A I don't agree with the way that you phrased it, and I don't agree that it went on for ten or 15 times, no.

Q Well, let me just tell you, Mr. Pike, I don't agree with that statement either--

A Well--

Q --but I'm just--I'm asking you. To your memory do you remember that those beatings that we're talking about or these spankings that went on for ten or 15 blows. Is that true--

A No.

Q --or not?

A I do not think they are, no.

Q Let me just make one other question about that. And I'm not--I'm not trying to accuse you. I'm just asking you if you agree or disagree with this statement, the truth of it. Okay. Can you tell me whether you agree or disagree with the truth of this--the following statement: "That during these beatings Christa Pike was not allowed to cry because if she did, she would have more beatings." Is that true?

A That's true to a certain extent. To a certain extent is--is I--I did whip her and tell

her not to cry because she knew all she had to do was do her homework or whatever, and she wouldn't get a spanking. So I told her not to cry because it was her fault. You know, if she would just do her homework or whatever, that none of this would happen at all. So, yes, to a certain extent that statement is true.

Q What about this statement? "The beatings were severe enough to leave welts, bruises, and cuts and occurred up to several times a week"?

A No.

Q Now, if there's been testimony that Miss Pike, your daughter, has scars up and down her back and these are from the beatings that you administered to her; is that true?

A No.

MR. PRICE: I'm almost done, your Honor.

THE COURT: Uh-huh (Affirmatively).

Q Do you agree with the--have you--do you recall characterizing your daughter as a manipulator?

A I don't recall saying that.

Q You don't recall making that statement to Dr. McCoy? "Christa was a manipulator who knew

how to push her parents so far such that they would ship her off to the other parent."

A I--I know that Christa knew how to push my buttons to get me to do probably just about anything she wanted, yes.

Q Do you recall making the statement that she lied a lot?

A Uh, she did lie some, yes.

Q In fact, there was--there was occasion where on this issue of getting her to do her work, that she actually forged her teacher's signature to say that she had done it?

A Yes.

MR. PRICE: I don't think I have anything else, your Honor.

MR. DAWSON: Your Honor, I have a couple more.

THE COURT: Go ahead, sir.

REDIRECT EXAMINATION

BY MR. DAWSON:

Q Mr. Pike, let me return just for a minute to the incident with the allegations about the abuse of Lindsey. Did your wife, Kathleen or Kathy, did she ever indicate that you would like Christa not at your house because it was

interfering with your all's relationship?
A Yes.
Q And that she would just as soon have--made it clear she would just as soon have Christa somewhere else?
A Yes.
Q The--getting back then to--you indicated that--obviously, that you do love Christa--
A Yes.
Q --and have always loved Christa. Isn't it possible that a child sees that differently than the adult may see it?
A I--I assume so, yes.
Q And do you think it's somewhat likely that Christa would see your not defending her with the issue with Kathy as a sign that you didn't love her?
A Possibly, yes--
Q And--
A --very possibly.
Q --and that your sending her back to her mother on a regular basis when you were having trouble with her was another sign that you didn't love her?
A It could have been, yes.

Q And isn't it also reasonable to say that your--your involvement with Christa for probably most of her life was more of absence than presence?

A Yes.

Q And, again, isn't that something that a child might take as being a sign that someone doesn't love her?

A Yes.

Q And so the same would apply to her mother and sending her to you?

A I--I'd assume so, yes.

Q That that would be taken by, again, the child as a sign that the mother doesn't love her?

A Yes.

Q And are you aware that the only person that Christa believes unconditionally loved her was your mother?

A Yes.

Q And that was pretty obvious from their relationship; wasn't it?

A Oh, yes.

Q And then that was part of why Christa was so devastated when your mother died?

A Yes.

Q And so you were aware that she felt she was left without anybody that cared about her at that point?
A Yes.
Q With regard to the issue of--of the--of the spankings, again, your intent and how Christa's taking it may be two different things, correct?
A Yes.
Q And also in terms of any welts or damages, scars, you don't know whether that might have been from some other person that was involved in her life?
A It--it wasn't from me.
Q Okay.
A I don't know who it would be from.
Q Well, you don't know whether it might have been from Danny Thompson or somebody else?
A No, I do not.
Q The--and, again, when we're talking about those--the number of times that you may have struck her, your counting and her counting might have been different?
A Possibly.
Q And I’m sure that--I'm not sure, but I

would assume that your mother would not think that she had treated you that badly by hitting you with a switch?

A Yes.

Q And she thought she was doing it for your own good?

A Right.

Q But you felt that it was pretty abusive; didn't you?

A Yes, I felt that was something that left marks and--and I wouldn't do to my child.

Q And finally on that--(Pause)--only my mind goes blank. The--(Pause) Oh! Isn't--didn't Christa, within the last few years, write you a letter concerning the--the spanking incidents?

A Yes, she did.

Q And what did she--what basically was she asking you not to do in that letter?

A She asked me not to spank her brother and sister, Max and Lindsey, not use a belt on them, because she felt it was psychological hurt them and physically she just--she just didn't want me to use a belt on the kids.

Q And--and you used the belt because you thought it was kinder than the switch?

A Yes.
Q But Christa never experienced a switch, correct?
A No.
Q And so she thought that the belt was pretty abusive?
A Yes.
Q So much that she was concerned for her half-sister and half-brother?
A Yes.
MR. DAWSON: No further questions, your Honor.
THE COURT: Any other questions, General?
MR. PRICE No.
THE COURT: I'd like to ask Mr. Pike a couple of questions and it's going to the report we heard about yesterday.

EXAMINATION
BY THE COURT:

Q Mr. Pike, did you ever hear of any allegation that your daughter was abused by a boyfriend of your mother's?
A I heard that, but I can't--I don't know anything about it.

Q At that time?
A No, not at the time that it happened, no.
Q Okay. Had you ever heard that from Miss Pike until recently?
A Uh, no.
Q Okay. And had you ever heard of any situation where she--where a boyfriend locked her into a chicken coop or some such?
A No.
Q And nobody had ever complained to you, not Miss Pike or anyone else, about that?
A No.
Q Okay. I don't know that it's true. I'm just asking you whether you ever heard of such a thing.
A No, ma'am.

THE COURT: Okay. (Pause) All right. May Mr. Pike be excused?

MR. DAWSON: Your Honor, I have one follow-up question.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. DAWSON: (Continued)

Q Mr. Pike, in terms of the allegations of

--of your--pertaining to the possibility that your mother's friend may have molested Christa, that was a friend named Ernest; was that right?

A Yes.

Q And did you hear anything about that suggestion coming from perhaps the Fotos family? Was there--was her aunt, or her mother, or anybody concerned about that?

A I don't--I don't remember who it would--came from.

Q (Pause) And so you don't know whether this might have happened when she was left alone with Ernest?

A No, I don't.

Q And your mother did leave her alone with Ernest from time to time; are you aware of that?

A On--on rare occasions, yes.

Q So your mother could go to the store and things of that nature?

A Yes.

MR. DAWSON: No further questions, your Honor.

THE COURT: Okay. Thank you, sir. You're free to go.

MR. DAWSON: Your Honor, he may be

excused.

THE COURT: Okay. You can stay in the courtroom if you wish for the rest of the hearing, or stay out, or leave if you need to leave, Mr. Pike.

Q Thank you.

(WITNESS EXCUSED)

* * *

THE COURT: All right. I'd like to take about an hour's lunch break. Will that be--

MR. DAWSON: Your Honor, I assume the Court is going to want to stop today around 5:00.

THE COURT: I would like to.

MR. DAWSON: And this time, 5:00 Eastern Time, not 5:00 Central Time, your Honor.

(Whereupon, the parties laughed.)

THE COURT: I was thinking about Pacific Time, actually. But I-- my concern has to do with several things because we could keep going this week if you want to. I'm a little concerned about weather. I'm concerned about getting the witnesses underway, and I've been trying with Ms. Jones' help to mark a few weeks that we could possibly continue this. But I don't know about your all's schedule so we do need to talk about

that.

MR. DAWSON: Your Honor, I just wanted to try to get some idea of how many witnesses we should make sure we have this after--this afternoon.

COURT CLERK JONES: We don't know how long the witnesses are.

THE COURT: I'll keep going as--yeah, how long are they going to be? Some of these people probably have spots of knowledge but not as lengthy as some of the others.

MR. DAWSON: Right. I think they're going to be, of course, much more on the level of Mr. Pike or less than on the level of the other witnesses that we called so-

THE COURT: Okay. Well, I can--I'm sure you prefer we stopped about 5:00 o'clock.

MR. DAWSON: That will be fine, your Honor.

THE COURT: And it's very difficult for Miss Pike, frankly, because she has to get up early to get here and has to get back to the facility and, you know, have something to eat and such as that. It makes it harder because it's a long distance.

MR. DAWSON: That's fine, your Honor. I just wanted--we just wanted to get some idea.

THE COURT: I would rather quit about 5:00 o'clock if that's at all possible.

MR. DAWSON: That's fine, your Honor.

THE COURT: Is that all right with you, General?

MR. PRICE: Yeah, that's fine.

THE COURT: Do you want to keep going this week?

MR. PRICE: (Slight laughter)

THE COURT: Well, I mean, you know, I assumed we weren't and so I have cases docketed, but--

MR. PRICE: I don't want to go past Wednesday.

THE COURT: You do not or you--

MR. PRICE: I'd rather not, your Honor.

THE COURT: Well, you have other obligations and so does General Helm.

MS. HELM: Yes, I do.

MR. PRICE: I'd planned on-

THE COURT: Okay. You all give some thought to that. If you'll visit me in my office, lawyers, before we get started this afternoon,

maybe we can come up with some dates, and I'll just carry this stuff in and see where we are and how far we can go.

MR. DAWSON: Thank your Honor.

THE COURT: Okay. The Court is in recess until about--oh, I'd say about 12:30. If you all would come back about 12:20 and visit with me.

(Whereupon, a recess was taken; afterwards the following proceedings were had, to-wit:)

THE COURT: I've had the--I've had the sealed documents looked at and the list of--of unsealed exhibits in this, and I can't find it. And I'll go back through everything. Maybe we're just mistaken, and it's a different case altogether. I just--for some reason I have this recollection of it, but I don't know. (Pause)

MR. DAWSON: Are we ready, your Honor?

THE COURT: Do we need Ms. Brockenborough?

MR. DAWSON: Oh, she's--your Honor, she's going to be preparing a witness while I examine the next witness.

THE COURT: Oh, okay. All right.

That's fine. Whenever you're ready, sir.

MR. DAWSON: Your Honor, our next witness will be Ms. Faye Guy.

THE COURT: Faye Guy. Okay. Call Faye Guy please. Oh, Debbie.

THE COURT REPORTER: Yes, ma'am.

THE COURT: While Ms. Guy is coming here in, come here a minute.

(Whereupon, the Court had a discussion with the court reporter at the bench about a hearing the Court wanted typed.)

THE COURT: Mr. Dawson, do you have a recollection of when we had the hearing and had Mr. Irvine testify?

MR. DAWSON: The, hum--

THE COURT: --about--do you know--would your calendar reflect that date?

MR. DAWSON: It was--I don't have my calendar.

THE COURT: I want to have that testimony typed for the purpose of doing that ruling, and I--we'll just try and remember to do that.

(Whereupon, the witness came
into open court.)

THE COURT: Ms. Guy, were you--you were sworn this morning?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Bear with us a minute. It's-

THE COURT REPORTER: September 21 maybe?

MR. DAWSON: Your Honor, I don't have my last year's calendar with me, but it was--it was November; wasn't it?

THE COURT: I think so. I'll figure it out.

MR. DAWSON: I want to--

MS. JONES: The Suttles case was October 31st.

THE COURT: October 31st?

MR. PRICE: October 31st, yeah. Is that it?

THE COURT: It was right--right in there, yeah, October 31st.

MR. DAWSON: That may be right.

THE COURT: That's right.

THE COURT REPORTER: October 31st was Suttles.

THE COURT: Yeah, the Suttles--

MR. DAWSON: Suttles.

THE COURT: The testimony we took about Suttles was just real recent.

MR. DAWSON: Was it--the testimony on--in Pike was be--was after Suttles because they came to--they had to--Suttles was set. They came over; that's when we realized that--

THE COURT: They both had the problem.

MR. DAWSON: --that one of our former members had changed sides and gone to the dark side. And we then--and that case was then continued with the problem, and then we filed a motion in Christa's case. And we had the hearing I want to think late November or even early December. There's December 6th. Is that--for some reason December 6th stands out in my mind.

THE COURT: Could be. I thought Suttles came after because I had it. I think maybe December 6; that's--that's possible.

COURT OFFICER JONES: That week would have opened up for him because he had a post-conviction hearing that was set for that week. It got postponed so Mr. Dawson would have been available that week. (Laughing)

THE COURT: She knows your calendar a lot better than you.

MR. DAWSON: What happened on December 6? -Oh, we had that.

THE COURT: Okay. Well I'll double check. Okay.

MR. DAWSON: That's right. That may be why December 6 rings a bell. It may have been that case.

THE COURT: Actually, it should be written on the trial jackets--on the last trial jacket. The last of the files, whatever file, seven or how ever many there are so far of this.

COURT OFFICER JONES: I think there's five including this one just for dates.

THE COURT: Yeah. I couldn't hear you. (Pause) Motion to Recuse. (Pause) Never mind. I take it back. I already put down that order, January 16th.

MR. DAWSON: That's correct in--in--

THE COURT: Do you have it?

MR. DAWSON: In this case?

THE COURT: I thought--I thought I put down something and it was this case.

MR. DAWSON: Oh, you did, yeah. This

order--the order was entered here. We--we

THE COURT: So we don't have to deal with it here.

MR. DAWSON: Oh, I thought you were looking for it for the Suttles case. But, yeah, now that order--

THE COURT: No, no, no.

MR. DAWSON: Okay.

THE COURT: I thought we had to enter an order--

MR. DAWSON: Oh, no. I'm sorry.

THE COURT: --because we talked about that earlier.

MR. DAWSON: I'm sorry.

THE COURT: Okay.

MR. DAWSON: No, the order was already entered in this case.

MR. PRICE: Yeah.

MR. DAWSON: That's correct, your Honor.

THE COURT: Okay. Never mind. Let's take Ms. Guy's testimony before she gets more confused about what--why she's up there.

MR. DAWSON: Or worse yet, your Honor, I get more confused why I'm standing here.

FAYE JOHNSON GUY, being called and duly

sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q Ma'am, will you please state your name for the record?

A Yes, Faye Johnson Guy.

Q And could you spell your name for the court rec--for the court reporter please?

A The entire name?

Q Yes, please.

A F-A-Y-E J-O-H-N-S-O-N G-U-Y.

Q And, Ms. Guy, where do you presently live?

A Carboro (Phonetically), North Carolina.

Q And that is over in near--near the tri-cities area?

A Yes, it's right adjacent to Chapel Hill.

Q I guess that's called the Research Triangle--

A Uh-huh (Affirmatively).

Q --I guess, not the tri-cities over there? The tri-cities are over here.

A RTP, yes.

Q Okay. The--and do you know the petitioner in this case, Christa Pike?

A Yes, I do.
Q And how do you know Miss Pike?
A I used to work with her mother and we were neighbors for about three years.
Q Okay. And--and that was in North Carolina?
A Yes.
Q And then you also--did you then know her mother before you knew her?
A Yes, I did; I met her at work.
Q And what kind of work do you do?
A I am a nurse in internal medicine at UNC now. At the time I was working as a Medical Review Claims Adjuster at Blue Cross Blue Shield.
Q And was that also then where Miss Pike's mother was working?
A Yes.
Q And that's--just for the record, that's Carissa, whatever her last name was then, correct?
A Yes.
Q Okay. And did anybody talk to you about this matter prior to Miss Pike's trial in 1996?
A No.
Q What was your relationship with Carissa, who is now Hansen? And you realize that her name

is now Hansen, correct?

A Yes, I do.

Q What was your relationship when you first met her and when you first knew her? When was it that you first were working together?

A I don't remember the year. I could guess around 1986.

Q And so when you first met--how long had you known Carissa before you met Christa?

A Probably just a few weeks or maybe a month because soon after we started working in the same department, we would get together and do picnics or do things on the weekends together or cook outs.

Q And how old was Christa at that point to the best that you can remember?

A I think she was around nine or ten.

Q Okay. And then that would put your recollection fairly good since she was born in 1976 so--

A I think so.

Q The--and when you socialized--what type of activities did you do when you socialized with Carissa Hansen or now--

A There were other people in our

department and most of us were married. And we would--most of us had children and we'd get together sometimes and go to the lake, have a picnic. We did go to the beach together one weekend, all of us. Cook outs, things like that.

Q Was there alcohol involved in these gatherings?

A Almost always.

Q And did you make any observations about Christa's mother, Carissa, with regard to alcohol?

A I'm not sure I realized it at first, but later on I seemed to believe that she probably abused alcohol.

Q Were there times when you gathered that you felt that at least using very much alcohol was inappropriate?

A Yes.

Q And what times would those be?

A Every time pretty much.

Q I mean that was when the children were there?

A Yes.

Q I mean in other words, you didn't think that you--the adults should be drinking at all because--

A Yes.
Q Okay. And that was whenever there were children present?
A Yes.
Q Did Carissa share that concern?
A I don't think so.
Q So--
A She never expressed to me that she did.
Q Okay. And did she ever stop drinking when the children were present?
A Oh, no.
Q The--and do you recall who it was that she was either married to or living with at the time you first met her?
A When I first met her, before we became friends, we--I just knew her on the job--she was either married to or living with somebody whose last name was Thompson.
Q Okay. Could it have been Danny Thompson?
A Danny, yes, that's correct.
Q And what did you think of Mr. Thompson?
A I think I only met him once or twice briefly, but he was drunk when I did and he seemed violent.

Q Okay. Did-did he--what was his--how did he appear or what did you observe in terms of his relationship with Carissa?

A The two times, like I said, was brief. I think I took her to her house to pick up something or it was brief and--but he was--he was angry and cursing at her and making threats. He didn't touch her physically while I was there, but he made threats.

Q And then was there a time--did a time come when--when Carissa left Danny?

A Yes--

Q And what--

A --that's when we became neighbors.

Q Okay. So--so she left and then she moved near you?

A Yes, about three miles apart at the--when I first met her, we lived about 40 minutes apart.

Q And in terms of--did she then--was she immediately dating again or did she--was there a period of time when she wasn't?

A I think pretty soon after she moved near me, yes.

Q And do you have a recollection of who

she dated at that time?

A There was a gentleman. He was married and lived with his wife, and so I don't know if you would appropriately call it dating. But I know they got together and spent time together a few times. That was--that was the first that I recall.

Q Now, when you say "get--got together," do you mean in a--in a sexual way or--

A Well, I didn't go with them, but they did--she did report that to me, that that's what occurred, and I know they left work a couple of times and went to a motel.

Q And did you believe that that was a problem?

A It's not a choice I would make.

Q Okay. And why is that?

A It made me uncomfortable.

Q Okay. And that's because he was--

A Married and lived with his wife.

Q Okay. And also because he was a supervisor?

A Yes, he was.

Q And did you--did you ever know an individual named Steve?

A Yes, Steve Kyaw or Kyak or something like that.
Q Right, it was K-Y-A-W or something?
A Something like that, yes.
Q Okay. And what did--what was the relationship between Steve and Carissa?
A Well, they were dating. She would bring him as a date to my house; maybe once or twice she did. And then he moved in with her pretty soon after that.
Q Okay. And then do you know whether they married or not?
A I don't think so.
Q Okay. Was--where was Christa at that point?
A At home.
Q Okay. At home meaning living with Carissa?
A Yes.
Q And also then Steve?
A Yes.
Q And did Carissa talk with you about the relationship with Steve?
A Some, yes.
Q And in terms of the particulars of her

physical relationship with Steve?

A Only if she was drinking, which was most of the time that I saw her, unless we were at work. If I saw her on the weekend or in the evenings, usually she had been drinking and, yes, she would talk about that.

Q And did you find that embarrassing?

A I--yes, I did.

Q Okay. The--were you aware of any--let me ask you this. At that time how much were you seeing of Christa Pike?

A Hum, I saw her every week and sometimes more than once a week and just about every weekend.

Q Okay. Now, would Christa spend time at your home?

A Yes, she did.

Q And can you tell us about when she would be there, what--what--under what circumstances?

A Well, certainly I would invite her if we were going to do some--I had a son--or have a son who's a few years younger than Christa. If we were going to do something with my son that I thought she would enjoy, we would invite her. Other times, I would just invite her because she

--she didn't have anything to do. She was just home alone. And then sometimes if Carissa was at the house and I knew she was drinking, I would have her leave Christa with me rather than drive with her in the car.

Q Now, you said that Christa was home alone, and obviously you were home at these times?

A Yes.

Q Did you and Carissa have different work schedules or--

A No, I don't know where she was.

Q Okay. So as far as you know, she wasn't working a second job or anything?

A Oh, no, no.

Q She just wasn't home--

A No.

Q --with Christa?

A No, we just worked daytime hours, like 9:00 to 5:00.

Q Okay. And the--did you ever have any problems with Christa being around your son?

A No.

Q And tell us about how they would play together. What would they do together?

A They played well together, and I even

had Christa babysit for me while I'd run to the store or something a few times. Like I said, they're not--he--at this time I'd say Christa was about 10 or 11 and my son would have been about seven. And they--so they were close enough in age to play together, but she was also old enough to watch him while I went to the store so I wouldn't make him go.

Q When they played together, do you have any observation of whether they played as seven years olds would play or as a 10 or 11 years olds would play or something in between?

A I'd say something in between.

Q Okay. The--you--do you have any knowledge as to whether Christa was exposed to any pornography in the home at that time?

A Yes, I believe she told me that once, that she had access to movies that belonged to either her mother or Steve. I'm not sure. But she did have free access to those. They were not locked away or anything.

Q Did you ever bring that up with Carissa as it might not be appropriate?

A (Pause) No, I don't think so.

Q And what about horror movies, any

knowledge or any observations she had access to those?

A Yes, I did bring that up to her. That was soon after we met and probably the first time I was invited to her home. And she and Christa would watch these horrible, horrible bloody gory movies, which I personally don't care for. But I did say something to her that I thought maybe Christa was too young for that, you know, that I didn't think it was appropriate.

Q This was when Christa was nine and 10 years of old--of age?

A This was when we first met, so probably around nine.

Q And then your concern was that they were simply age inappropriate?

A Exactly.

Q And they weren't the type of thing you'd want your child exposed to?

A No, no, no.

Q What was Carissa's response when you brought it to her attention and suggested that maybe she shouldn't be allowing Christa to watch these movies?

A Well, at first she thought it was funny

that I would bring--bring it up, I guess, or--and then, you know, she just kind of laughed it off and she said, "Well, she loves them. She's been watching those movies since she was two or three years old. She loves them. She enjoys them. They don't bother her."

Q And do you remember any of the titles of these movies by any chance or--

A Something to do with Freddy Krooger (Phonetically). I don't know the title. And then something to do with a man that chopped people up with a chain saw. I don't remember the title.

Q And these movies had vivid portrayal of people being chopped up with chain saws, etcetera?

A Yes, it sounded very vivid.

Q And something that would be over--well, we'll go into that later. What about did you--(Pause)--did you get married during the time that --of this period of time when you knew Carissa?

A Yes, about a year after I met Carissa.

Q And were Christa or Carissa at the wedding?

A Yes, they were in the wedding, both.

Q They were in the wedding. Okay. What --what roles did they have?

A It--it was a small informal wedding at my church, and so there weren't a lot of--there weren't attendants and things like that. But Carissa was like my attendant or best woman or whatever and--

Q Maid of honor or whatever?

A Yes, and Christa took care of the flowers.

Q Okay. And did they--was there a rehearsal dinner?

A Yes.

Q Was there anything that occurred at the her--rehearsal dinner that drew your attention?

A Just before--my husband's family was mostly from out--well, all were from out of town but one. And before we left for the rehearsal dinner, there was an incident of concern and then later that night after the rehearsal dinner when we were all back at the house.

Q Now, how would you describe the incident of concern?

A Well, my brother-in-law to be at the time and Carissa was having sex in the bathroom, and I kind of--I walked in on that. And then much later, like 2:00 or 3:00 o'clock in the morning,