# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 5**

**DOCUMENT 6**

---

E2009-00016-CCA-R3-PD

XI

005008

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGoodwal

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Volume 6

January 29-31, 2007 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Ms. S. Jo Helm
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Ms. Catherine Brockenborough
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS

Volume 6 Page

PETITIONER'S PROOF: (continued)

FAYE JOHNSON GUY:

Direct Examination by Mr. Dawson (cont.) 501

Cross-examination by Mr. Price 509

ORLANDO POWELL:

Direct Examination by Ms. Brockenborough 511

Cross-examination by Mr. Price 522

Redirect by Ms. Brockenborough 530

CAROL GOEHRING:

Direct Examination by Mr. Dawson 533

(No Cross-examination)

JAMIE CHRISTINE ROBINSON:

Direct Examination by Ms. Brockenborough 548

Cross-examination by Mr. Price 563

KERRY CLEMENT SHERRILL:

Direct Examination by Mr. Dawson 567

Cross-examination by Mr. Price 582

Redirect by Mr. Dawson 586

PEGGY HAMLETT:

Direct Examination by Mr. Dawson 589

after we were all back from the rehearsal dinner, they did the same. But they were in the spare bedroom, and I--and my husband walked in on that.

Q And was your--was your brother-in-law to be--was--was he married at the time?

A Yes.

Q And do you think that was something that Carissa knew?

A Yes.

Q And in addition to the one supervisor that we discussed earlier that was--Carissa was involved with, were there any other men in the office that she was involved with?

A (Pause) Not that I remember.

Q Okay. (Pause) Did you ever observe any mood swings or mood changes of Christa?

A Yes.

Q Can you describe what those were?

A There were times--like if she was spending the weekend with me, there were times that she would be really happy and cheerful and kind of up and excited and just cheerful. And quickly she may change to being tearful and sad and depressed, and she didn't want to talk, for no good reason, no certain incident that I--nothing had occurred that

I knew of.
Q Did you find--did you see those as any kind of a problem at that point?
A At first, I didn't. I thought, well, maybe it's hormones or maybe it's different because I have a boy and it's different with a girl. And maybe she's just more emotional. But as time went on, I observed that the mood swings were fast and erratic, not--not like I could be unhappy this morning and certainly be sad this afternoon. It was a faster change of mood, and it started to concern me then that I got kind of aware of it.
Q Now, in your practice as a nurse have you been--ever been involved with any or exposed to any patients or anyone that had been diagnosed with any kind of mental disorders?
A Well, I work in internal medicine, so certainly I see a little of everything. I've never worked in psy--psychiatry. So I have been around patients that were bipolar or depressed. I have seen patients, yes.
Q So since the--since the time that you were observing Christa, have you learned more about kind of mood disorders?
A I think I'm somewhat a professional

sadly. My mother was bipolar and I lived with it all my life.

Q And did some of the mood swings that you saw with Christa re--remind you of the ones you saw with your mother?

A It did, and I think that's why at one point it started to concern me more than just thinking it was hormones.

Q (Pause) Did you also know Christa's half-sister Alicia?

A I did.

Q And did you make--did you spend any time around both Christa and Alicia?

A I did, not a lot of time around both of them. I think when I first met the family, her sister was married and was living with her husband. And then for a period of time they moved out of their apartment and lived with Carissa, and--and I saw her more then, but not a lot of--I didn't spend a lot of time with her.

Q So this was after she had her child then?

A Yes. I think he was about two.

Q What--did you have any impressions about, you know, the way Alicia interacted with Christa?

A Yes, I think I mentioned that to her

mother once. I felt like, for lack of a better word, like she sometimes was picking on Christa and would bring out and point out things like, "Christa was supposed to be wash the dishes today and didn't. Aren't you going to do something about it?", and would seem to kind of point out to her mother negative things about Christa. I didn't think she was warm and loving towards her.

Q So kind of the older sister wanting to correct the younger sister or--

A No. It was a strange thing, like--like she wanted to be in between the relationship with Carissa and Christa, and like I'm the good guy and she's the bad guy kind of thing. That was my impression.

Q Did you ever meet Carissa's father?

A I did.

Q And that would be Chris Fotos, correct?

A Yes.

Q And tell us, how did--how did you have an occasion to meet him?

A He lived in West Virginia and I went home to visit him one weekend with Carissa, and then I think, hum, I went back one more time to visit. And then my husband, me, and a group of friends

went up to go white water rafting which was near his home, and so we took our tents and camped out at his house the night before we went rafting.

Q And what were your observations of him?

A Hum, he scared me a little bit. He made --I was uncomfortable in that, one, he was very prejudice against African-Americans, and he talked about that a lot which bothered me because my son is biracial. And he--he talked in like hatred type terms. And then he talked about violence a lot, like he'd say, well, something about a person at the grocery store and he didn't like the way they acted or a car pulled out in front of him, and they didn't know it but he could take their hatchet and just cut their head off or he'd shoot them in a minute, things like that. And there was a lot of talk of violence. I didn't see any violence, but there was a lot of talk of violence on many subjects.

Q So the talk was that if you have a problem with somebody, there's a violent solution?

A You'd chop their--I heard him say he had a hatchet that he kept sharp just for that reason, that he could cut their neck off.

Q And were you--you know, during the

friendship with Carissa, did she begin her relationship with her now-husband Gerard?

A Yes.

Q And can you tell us how that happened?

A Within the group of us nurses that worked together and became friends and started to get together on weekends and do some things, there was a couple, Gerard Hansen and Ann Marie Hansen, who were married, didn't have children, and they were part of our group because Ann Marie worked in Medical Review with Carissa and I. So they always got together with the rest of us. And somebody would have a Christmas party; we all went to the same house, and things like that, cook-outs, picnics, stuff like that. And then I believe Carissa and Gerard--well, I know Carissa and Gerard slept together, and then Gerard left Ann Marie and moved in with Carissa.

Q And what were your feelings about that?

A I was friends with all of them, and I had been knowing for some time and spending less and less time with Carissa and just not including her in things, and not spending time with her because the longer I knew her, I started to realize we didn't have as much in common. Our--our values

were not the same. And when that happened, I was just broken hearted because I was friends with Ann Marie and--and Gerard, and it was very painful for --for Ann Marie. And so I just didn't keep in touch with Carissa much after that. I didn't return her calls or anything.

Q Did you have occasion to observe the relationship between Christa and her mother?

A Yes.

Q And how would you categorize that relationship?

A Well, that's a big answer, but if I could sum it up, I think the thing that stuck me the most was that Christa always--no, I'm sorry, Carissa always acted more like Christa was her friend or her buddy or her sister or like one or us that--one of the girls that she hung out with. It wasn't like a--I won't say it wasn't like a mother-daughter relationship, but it wasn't like a mother-child relationship. It was more like anything goes and we're buddies. And she would share things with Christa that I don't think you should share with your child.

Q Like what?

A Because they're, well, not age

appropriate things. And also she would cry and tell her about a break up she had with somebody or a relationship with her boyfriend, or either she would actually talk about sex. And I think that's something you might do with one of your girl-friends, but not your child.

Q And, in fact, some of it when she was talking to you as one of the girlfriends, you found that to be inappropriate as well, correct?

A Absolutely.

Q The--and did--did you get any impression of how Christa felt about all this, from the time you spent with Christa?

A I--I think it had been that way her whole life because it seemed like that was the normal relationship for her with her mother, is to be her buddy or her friend or like one of her girlfriends.

Q Did Christa ever talk to you about wanting to spend time with her mother, do things with her mother?

A No, I don't think so.

Q And did Christa seem to like to come over to your house some though and spend--

A Yes.

Q --time with you and your family?

A Yes, she did.

MR. DAWSON: If I could have one minute, your Honor.

THE COURT: Uh-huh (Affirmatively).

(Whereupon, Mr. Dawson briefly conferred with Ms. Brockenborough and Miss Pike.)

MR. DAWSON: Nothing further, your Honor.

THE COURT: Thank you. General, do you have any questions?

CROSS EXAMINATION

BY MR. PRICE:

Q The last time you saw Christa Pike was in 1990? Does that sound about right?

A I think she was about 12. Is that right?

Q Okay. So if she was born in '76-

THE COURT: 1988.

Q 1988?

A Yeah, I think she was about 12, maybe 13, the last time I saw her.

Q And I don't know if you said this on the record, but at least in your statement, you--the Christa Pike that you knew was sweet and not violent at all?

A Never in my presence.

Q Never saw any violence?

A Never in my presence, no.

Q Is this Chris Fotos you're talking about, is that the one's that the butcher, had the meat processing?

A Yes. Now, he was retired when I met him. I don't think he was actively being a butcher. But that's what kind of business he had, yes. I heard him say that.

MR. PRICE: That's all, your Honor.

THE COURT: Thank you, ma'am.

May she--may Ms. Guy be excused to go?

MR. DAWSON: No redirect, your Honor. She may be excused.

THE COURT: Thank you so much.

WITNESS GUY: Do I need to stay?

THE COURT: You can stay in the courtroom, or go home, or whatever you'd like to do.

WITNESS GUY: All right!

(WITNESS EXCUSED)

* * *

THE COURT: Are you ready to call your next witness, folks?

MS. BROCKENBOROUGH: Orlando Powell.

THE COURT: Mr. Powell? Call Orlando Powell. (Pause) I'm sorry. I thought you said something. Were you all talking to each other?

(Whereupon, the witness came into open court.)

THE COURT: Mr. Powell, if you'll come forward please, sir.

COURT OFFICER COFFEY: He's not been sworn, your Honor.

THE COURT: Mr. Powell, would you please raise your right hand, sir, to be sworn.

(Whereupon, the witness was sworn to tell the truth by the Court and responded affirmatively.)

THE COURT: Please come forward and have a seat. Whenever you're ready.

ORLANDO POWELL, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Good afternoon. Sir, could you please give your name for the Court?

A Orlando Powell.

Q And, Mr. Powell, where do you--are you

living?

A In Durham, North Carolina.

THE COURT: In Durham?

A Yes, ma'am.

Q And how are you employed?

A I'm a supervisor at Chatham Steel.

Q At Chatham Steel?

A Yes, ma'am.

Q Do you know Christa Pike?

A Yes, ma'am.

Q How do you know her?

A Well, it's been really long. Christa--I used to be a manager at Pizza Hut, and at that particular time this--that was the place where everybody was there. I mean just Christa just came along with one of her friends and--that I had already known, and Christa just grew on me. And, you know, she grew towards me and the more she grew towards me, I just grew towards her.

Q And where was this that you met her?

A This was the Pizza Hut in Durham.

Q In North Carolina?

A It was right next to a place called Corner Pocket. We used to shoot pool and play video games, and throw darts, and stuff like that.

Q Do you remember when it was that you first met Miss Pike?

A Well, I would estimate--now, this has been awhile ago. I would estimate around '92, '93.

Q And at some point did you all grow from being friends to having a romantic relationship?

A Yes, we did.

Q And did you--were you spending a lot of time together?

A At first we didn't spend--well, we would see each other, but then it kind of grew into--you know, I mean she actually grew on me like really, really hard.

Q And--

A And it really hurts to see this, but you know, hey, I'm here.

Q And about how old was--was Miss Pike when you met her?

A (Sighing) I would say--she was like a year, two years, maybe three years younger than I am.

Q And about how old were you at the time you met?

A Are you going to make me do math? (Laughing) I would say I was approximately, what?,

21, 22, somewhere around in there.
Q Okay. What kinds of things did you all do together?
A Oh, well, we just hung out. You know, in the evening when I was working, I worked full time. I would go to work at 5:00 o'clock in the morning and get off at 2:00 o'clock in the morning. But Christa nine times out of ten was somewhere around. You know, it's a restaurant, Pizza Hut. I'm pretty sure there's some here, and you know, she would get a corner booth. And, you know, and that's the way it was. And then, you know, after that, yeah, we'd go shoot pool. We might go to a party here and there but, you know, just pretty much just hanging out. And then we just got to the point where we just were never separated, you know. She actually stayed with me most--nine times out of ten she was staying with me. And, you know, she was comfortable with it. I was comfortable with it, and we just went from there.
Q Did you have occasion to meet any of her family members?
A Her mom. I did meet her mother.
Q And what were the circumstances that you met her?

A Well, Christa--from my best memory, Christa asked me to carry her home to get clothes, because like I said she was staying with me and she gave out of clothes. So she went home. And the first time I met her mom, she actually introduced me to her mom and this was after the--me and Christa had been talking for awhile. We had got involved and everything, and then I finally was able to meet her mom. And I was a little on the nervous side that--about meeting her mom. I mean, you know, the meeting the family, you know--it's--she's white; I'm black. And you know, I'm nervous in that type of thing. And when I met her, it's--you know, it's like, "Hey, nice to meet you." And that was pretty much all I could get out of my mouth at that time.

Q What was your--your observations or your sense of Christa's relationship with her mother?

A With her mother I didn't see any type of relationship. I saw it was like Christa didn't want to go home. You know, Christa--I mean, you know, because we would sit up sometimes just talking. And we would sit up, me and Christa, we could just talk about anything. I was comfortable about letting myself go around her. She was

comfortable about letting herself go around me. And we would just talk about anything. And, you know, it was awhile ago, but vague memory that, you know, she wasn't happy. She wasn't happy. And you know, she had grew on me. And you know, I actually loved this lady, and it was my job to let her beauty come out, you know. I mean, you know, because she's a beautiful person inside, you know. I put it on myself to get her out, you know.

Q How did Christa act when she was around other people--

A (Sighing) Well--

Q --when it wasn't just the two of you together.

A --it's--I'm going to say--I mean I'm going to be honest. I called her a little fire ball some of the times. I mean, you know, she was --you know, go zero to 60 might be something you would say, but I would say zero to 100--(Snapping his fingers)--just like that and--you know. And--huh, but it all depends on who she was around. If she was around me, with me, or knew I was somewhere close by, I would never see it. I mean, you know, I could see it coming, and then I would have to stop it, you know, and that's just--

Q And when you're talking about "it" and zero to 100, what--what are you--what are you meaning?

A She has a temper, but it's just, you know--it's--it's--don't even take a second for the temper to come out. If somebody says something wrong, somebody did something wrong, it would just show up. And, you know, it would show up. And me thinking, you know, wanting to save the world, wantin' want to save Christa because jail is not a place for her at this time. She's young. She's got a lot of life to live and, you know, "let's do the right thing, Christa; calm down. Come on and go with me." And, you know, just like that, there she was right there with me, you know, and problem solved at that moment.

Q How--how would you describe her energy level?

A Her energy level. If I had just a quarter of it, I would--I would be like so super awesome. I mean, you know, she always kept spunk with her. She was always--I would say wired, for lack of better words.

Q Did you, hum--did you know Christa to do drugs?

A Yes.

Q And what--what kind of drugs did she use?

A Christa would--she would smoke marijuana and she would drink.

Q Did you know her to use cocaine?

A I never knew her to use it. I never knew her to use it and, you know, it never even crossed my mind that she was using anything what I would consider hard drugs.

Q And did you smoke marijuana and/or drink together?

A Oh, yeah, yeah.

Q You did both--

A Yeah.

Q --of those together?

A Yeah.

Q And how long were you all together?

A Good guess. To say physically together, maybe a year, a year and a half. But, you know, it's been 11, 12 years.

Q Right.

A She's with me every day. She's with me every day.

Q The energy level that you saw in Christa, did you associate that with any substance abuse on

her part?

A (Sighing and crying) No, no, no, I can't--no, because she was--she was there all the time. I mean it was just--she's just a ball of fire. That's what I called her. And then I blamed that on her hair. I mean she's--she was just a ball of fire, and that's what I called her all the time. And usually, if she was--(Sighing)--smoking marijuana, she was kind of like the energy level won't--it's to its peak, but it was still there. (Sniffing)

Q Were you--were the two of you dating when Christa made the decision to go to Job Corp?

A At the particular time that we were, let's say, seeing each other--I won't say it's dating. I mean I still loved Christa to death; Christa still loved me to death. And she went to Job Corp because she said she was going to better herself. And I was not going to hold her back from doing that because I would be defeating the purpose of what I was trying to do. You know, I was trying to just let her know that somebody is here. And she left; and she went. And I was looking so forward to when she came back for Christmas. And she showed up on Christmas.

Q And you were able to see her during the Christmas break?

A I was able to see her. I was actually at work and that was the last time I actually talked with her face to face at work. And at that particular time I tried to make her stay. I did. I told her I didn't want her to go. I mean because she--there was a void in my life at that particular time. And, you know, the situation that she's in right now, I deal with that every day. I beat myself up because I feel there could have been something I could have done to convince her to stay that particular day.

Q And is today the first day that you've seen her since that day she left?

A Today is the first day.

Q And is it fair to say that you are rather emotional?

A (Sighing) It's not that obvious, is it? (Laughing)

Q I think the tears sort of give it away but- Did anyone from Miss Pike's trial team contact you? Did you ever have any contact from her lawyers or anyone else that was working for her--

A Ms. Kennedy--
Q --before her trial?
A --is the only--
Q Okay. And you're referring to Tammy Kennedy?
A Tammy Kennedy. Yes, she's the only person I've ever talked to.
Q And you spoke with Ms. Kennedy. Do you remember when was the first time that you spoke with Ms. Kennedy?
A (Sighing) Let's just rattle off. I want to say it's approximately 2000.
Q And it was definitely after Miss Pike had already been convicted and sentenced to death?
A Yes, yes, yes.
Q How did you find out about the arrest?
A Well, you know, Durham and where I worked at, you know, people talk, and somebody came in and told me that, you know, that Christa was locked up. Hey, you and me, granted, you know, I didn't believe it. I mean because while she was in Job Corp, I did talk to her. I was just waiting for her visits. And then Ms. Kennedy made it like really, really known that it was for real.
Q And so you--your response really was that

you didn't--you didn't believe--

A No, I didn't believe it--

Q --what you heard, what you were told?

A --because that--that's not Christa. That's not the Christa Pike that was in Durham, North Carolina when I was there.

MS. BROCKENBOROUGH: (Pause) If I could have one moment please.

THE COURT: Uh-huh (Affirmatively).

(Whereupon, Ms. Brockenborough briefly conferred with Miss Pike and Mr. Dawson.)

MS. BROCKENBOROUGH: Thank you. I don't have any other questions, but the D.A. may have some for you.

THE COURT: General.

<u>CROSS-EXAMINATION</u>

<u>BY MR. PRICE</u>:

Q Mr. Powell, you said you remember being interviewed by Tammy Kennedy from the--Miss Pike's I guess you'd call them defense team or the lawyers that are representing her now, presently in this hearing, and Tammy Kennedy is one--is their investigator or one of their investigators?

A Uh-huh (Affirmatively).

Q Do you remember? You talked--I think you've talked to her at least on--from the statements I have, at least three--on three occasions?

A I want to say--yeah, three occasions.

Q And the first time you remember was in--you said 2000. Does July 11, 2000, does that sound about right?

A Somewhere in there. I--only thing I know is I was living in Parkview at that particular time.

Q Okay.

A And I do recall her living with me there.

Q And you realize that was for the purpose of preparing--she had already been convicted at that point--

A Uh-huh (Affirmatively).

Q --and sentenced and that they--you were being approached to--for information or interviewed about providing information that might help her in her appeals or at this post-conviction trial?

A Uh-huh (Affirmatively).

Q Did you realize that when you talked to Ms. Kennedy?

A Well, when Ms. Kennedy came to talk to

me, she was talking to me and, you know, it's like she needed to find out who Christa is, who Christa was, what she's like, and--and I just told her what I knew.

Q I mean you certainly wanted to help Christa Pike out?

A Of course, of course. I mean because that young lady, she's still in my heart; I mean, you know, and--

Q And to this day I mean you're very emotional about it--

A (Sighing)

Q --clearly?

A Yeah.

Q And you told Ms. Kennedy on that--on that day or at least in 2000, that first interview with Ms. Kennedy, that Christa Pike, the one that you knew, was not violent. You described her as mellow?

A Around me.

Q Okay.

A Around me. She was--she was always mellow around me.

Q You said that she had never been violent with you?

A No, I've--I can't recall a time that Christa was ever violent towards me.

Q And you actually had said you had never seen her become violent at all?

A No, not with me.

Q Have you ever seen her become violent around other people?

A Yes, I have. I mean there's been plenty of times that I've had to just like stop confrontations with her. I mean because, you know, she's --was not the biggest person in the world, but you know, she had a nice bark, you know, and you know, it's--trouble, you don't need it.

Q Would you say you had to stop her from becoming violent or from doing something?

A Well, yeah--yeah, she totally--I don't know. She changes, I mean when she gets upset. I mean like I said, she can go from zero to 100--(Snapping)--in a se--in a blink of a eye. And, you know, if she has issues or prob--problems with a particular person, I mean you can tell. Everything totally changes with Christa. And there's been plenty of times that I've had to stop confrontations with her and other people.

Q Did you tell--did you explain this quick

turn around, this quick temper of her's, to Ms. Kennedy when she interviewed there in 2000? Did you explain that to her?
A I just told her what, you know, I knew. I mean--
Q You never mentioned anything about her quick temper then; did you?
A Well, yeah, I mean I--I've always called her a fire ball to Ms. Kennedy. I've **always** said that.
Q You told her that in 2000?
A (Sighing) We're--we're talking seven years ago. And for me to sit here and tell you that I told her that in 2000, it could be a lie; it could not be a lie. And I'm not here to lie on anything. But, you know, it's like I do remember talking with Ms. Kennedy and letting her know that she is a fireball. She has a quick temper. Now, I can't say it was 2000.
Q Well, would it surprise you to know that there's nothing in that first interview about that at all, that that was not recorded by Ms. Kennedy?
A And, hum, that right there, I--like I said, I mean 2000, that's seven years ago, but I do realize that I have told Ms. Kennedy that she do

have a temper.

Q Well, I--I want to get to that; I understand that. But I'm talking about in this first interview that wasn't mentioned. But I mean--

A Okay.

Q --later on you did tell that to Ms. Kennedy--

A Okay.

Q --is that fair?

A That's fair; that's extremely fair.

Q I mean when you come back--I think the next one that I have is in 2005--

A Okay.

Q --so five--some five years later, maybe a little over five years later, you again talked to Ms. Kennedy. Do you recall that?

A I'm thinking that was when I was in Hillsborough, Pleasant Green.

Q Pleasant Green Road?

A Right.

Q You were living on Pleasant Green Road. Okay.

A Which is a Durham address, but it is actually Hillsborough.

Q And then in that instance, were you told during that interview that she was bipolar?
A Oh. I don't know. I may have; I may not have. I'm not sure, but I do recall hearing at one time that she had been diagnosed as being bipolar. I don't know if it was that interview or the interview that she did with me like in '06--'06.
Q Okay. And that's when you find--you found out from Investigator Kennedy, this Tammy Kennedy, that Christa Pike had been diagnosed as bipolar?
A Now, I did hear that but, you know, to pin--
Q Was that from her?
A --to pinpoint when--
Q I'm not asking you when.
A Okay.
Q I'm asking you from whom did you hear it?
A I'm not sure because I talked to Ms. Kennedy, and I--it was some other guy I talked to. I can't even recall his name.
Q Somebody else from the defense team?
A This--this is in '06, I think, because I was at Shassberry (Phonetically) at that particular time, I think.

Q Do you remember after discovering or being told about this bipolar disorder that you told Investigator Kennedy and, in fact, Christa could become violent?

A Yeah, and then the particular--the one thing about this--that situation is that, you know, I didn't see any of that stuff at that particular time back when we were younger. I didn't see it. And then you sit and you think about it as you're getting older--older and--you know what I'm sayin'? --and you look at the characteristics that she had, what she would do, and how she would do it. And then, you know, yeah, maybe she had this problem back then too and you, as being young, you just didn't put it all together.

Q Right. So--so I mean--but you're saying basically in 2000, when you're first interviewed, you didn't see that. You didn't mention anything about her temper. But then in 2005 or 6 when someone from the investigating team comes and tells you she's been diagnosed as bipolar, you say, "Ah hah, she did have a temper." Isn't that kind of the way it played out?

A I--I can't--I can't sit here and agree with that one because in 2000, which was seven

years ago, I can't recall exactly what I said. But you have the paper to be able to get the highlights of the interview that we had. And I can remember the 2006 interview a lot better than the 2000 interview.

Q You also told Investigator Kennedy that you were willing to testify and do anything else in your power to help Christa Pike?

A Yeah, and that's exactly--Christa Pike means a lot to me.

Q And, in fact, if she ever got out, that you had a room--a place for her to stay?

A Christa Pike would be welcome to my home.

MR. PRICE: No further questions.

THE COURT: Anything else you want to ask?

MS. BROCKENBOROUGH: Briefly.

REDIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q When Ms. Kennedy first met you in 2000, did you indicate at that time that you were--would be willing and were willing to help out Miss Pike?

A I--I can-I can sit here and say that I am almost positive that I would because that is what I'm here for. I mean, you know, Christa is part of

my life no matter what, and that's what--she's always welcome.

Q And back in 1995 and 1996, if anyone from Miss Pike's original trial team had talked with you, would you have been willing to help them?

A Yes, I would have.

Q Now, you say that you were willing to help Miss Pike. Are you willing to help to the point that you would lie?

A No, no, no.

Q Would you fabricate any information?

A No, no. That's one thing about me that's--you know, I would not lie to you. I mean I would just tell you the truth.

Q And if, hum--if--if certain questions had been asked or had not been asked at the first interview, would it have occurred to you to have sort of given every observation that you had of--of Miss Pike?

A I answer what's being asked and, you know--and, you know, me--some of the times I talk and I talk really long. And, you know, because Ms. Kennedy has picked up some of the things that she wouldn't ask and I would talk. And just the talk, I mean just basically I call it sitting back

and reminiscing of the good times that I had.

Q And you stated that when--when Miss Pike was with you, she was not violent--

A When she was around me.

Q --is that right? When she was around you?

A When she was around me, she was not violent towards me at all.

Q And on those occasions when you saw that she might be on the verge of losing her temper, you were successful--

A I was successful--

Q --at stopping it?

A --at steppin' in. I would just step in and cut it off.

MS. BROCKENBOROUGH: Thank you, Mr. Powell. I don't have any other questions.

THE COURT: Anything else, General?

MS. PRICE: No, your Honor.

THE COURT: May Mr. Powell be excused to go about his business?

MS. BROCKENBOROUGH: Yes, he's free to leave or stay as he wishes.

THE COURT: Thank you very much, sir.

A Okay.

(WITNESS EXCUSED)

* * * *

THE COURT: Who do you want to call next?

MS. BROCKENBOROUGH: I think our next witness is going to be Carol Goehring.

THE COURT: Carol Goehring. (Pause)

(Whereupon, the witness came into open court.)

THE COURT: Ms. Goehring, were you sworn previously?

WITNESS GOEHRING: Yes.

THE COURT: If you'll come--come up please, ma'am.

CAROL GOEHRING, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q Ma'am, could you please state your name for the record?

A Carol Goehring.

Q And, Ms. Goehring, could you spell your first and last name for the court reporter please?

A C-A-R-O-L G-O-E-H-R-I-N-G.

Q And, Ms. Goehring, where do you--where do you live?

A Creedmore, North Carolina.

Q And--

THE COURT: I'm sorry, where?

THE WITNESS: Creedmore, North Carolina.

THE COURT: Creedmore?

A (Nodding)

Q Speak up a little bit to make sure that the court reporter gets it. What--where is Creedmore--

A Hum--

Q --just generally in North Carolina, just gen--

A It's in Granville County.

Q Okay. And that's someplace around--

A Just outside of Raleigh.

Q --just outside of Raleigh.

A (Laughing)

Q At least not--certain of us here, including me, are not that familiar with the counties in North Carolina. And are you married?

A Yes.

Q And do you have any children?

A Yes.

Q And are you--do you work outside the home at present?

A No.
Q And what profession is your husband in?
A He's an electrician.
Q Okay. Do you know the petitioner in this case, Christa Pike?
A Yes.
Q And how do you know Miss Pike?
A We met in school. We were friends at children.
Q Okay. And how--about what age were you at the time that you met Miss Pike?
A Eleven or 12.
Q Okay. And you were in--do you remember what grade you were in?
A The sixth grade.
Q The sixth grade.
A No, seventh grade.
Q Seventh grade.
A Sorry.
Q And you were a little bit younger than Miss Pike, correct?
A Yes.
Q And that was because she had repeated the second grade--the seventh grade rather?
A (Nodded)

Q And how long did your relationship then last in terms of your--your--your friendship and being close, I guess?

A Hum, well, we knew each other. Well, we were talking for about two years, but we were really close for more--more--one--one year.

Q And during that time that you were close, did you spend any time at Miss Pike's hou--home?

A Yes.

Q And do you recall who was residing in that house with Miss Pike at the time?

A Her mother and Steve.

Q Okay. And do you know--do you remember Steve's last name at all?

A I don't.

Q The--and how--how often were you able to visit in--in Miss Pike's home?

A Maybe twice a week.

Q And how long did that last?

A A couple of months.

Q Okay. And what--what happened to change your ability to visit Miss Pike in her home?

A Well, I wasn't allowed to go there anymore.

Q What--what happened that caused it to--

why weren't you allowed to go there?
A Well, I was there when Steve attacked Christa.
Q Okay. Can you tell us what you observed about that attack?
A Well, it's--we--we were just hanging out in her room and he came home and--
Q So you were in Christa's room, right?
A Yes.
Q Okay.
A And he came home and looked in and went to the back, and he came back and started yelling and telling her she was going to come out there. And he walked away and--he was still yelling, but he walked away, and she went up and shut and locked the door. And he came back and was trying to get in. And he was determined he was getting in. He was yelling and he was screaming. And he went out the front, but I don't know where he was going. And I know she had--it was obvious that she didn't want me to know what was about to happen. So she told me to go out the back, but I didn't know anybody around there so I didn't have anywhere to go. So I just stood there.
Q Stood there in the room or stood there

after going out the back?

A No, I went out. When I went out back, I just kind of stood at the door for a minute, and then I just saw him nudge her to the room. And I, you know, I didn't know what to think of that. So I just kind of went around the side of the house and squatted and waited. And she came running out a couple of minutes later. You know, I heard bumping and yelling, and then she came running. And she had a knife in her hand and her face was all red, and she was trying to adjust her pants. And she was very panicked. And I don't know where Steve went at that time. We walked around to the front. I went in and got my back that had my change and stuff in it, and we went and got my mom to come and get us.

Q Okay. So you went to the store and used the phone; is that--

A Yes, I had to walk to the pay phone.

Q And had anything like that, even remotely like that, ever happened in your life before?

A No.

Q And your family, tell me a little bit about your family growing up. You have--

A Well, I have my mom and my dad--

Q Okay.

A --and two sisters, and we're very close, a very loving family.

Q And there wasn't any violence in your household?

A No.

Q So this was really--I mean how does an 11 or 12 year old feel when this happens?

A Oh, it was--it was very traumatic. I mean when, you know, he's in the home, he's an adult. I've been taught that adults are there to help you, not, you know--but I had never seen someone in a position of authority act that way.

Q From Christa's reaction, did it seem like this was unusual for her?

A Well, once my mom got there to get us, we didn't speak of it again. We went to my house, and we didn't talk about it. We just went on with the day, and she didn't mention it.

Q Okay. And then what happened--how did--how did you end up parting that particular day or time, you and Christa?

A Christa had called her mom to come and pick her up from my house.

Q Okay. And did anything happen when her

mother came to get her?

A Well, when her mom pulled up, my mom sent us to play and she--my mom spoke with Carissa. And then my mom called us when she was--it was time for her to go.

Q And you--you did relate to your mom what happened?

A Well, I mean my mom didn't really question me. I--you know, she--when she got there, she wanted to know, you know, what happened and I just told her, you know, he attacked here. That I don't know why. I don't know how it started. I don't know how it stopped. And she spent the rest of the time explaining to me how stuff like that could happen.

Q So your mother's attitude at that point was to find some way to protect you; is that basically what it was?

A Yes.

Q And then what happened at that point to your and Christa's relationship?

A Well, I--I didn't know what to say, and I think she may have been embarrassed. So we weren't as close as we had been for--for a little bit.

Q So something kind of artificial in your

relationship at that point because this--this thing was between you sort of?

A Yeah. I--I think we were afraid that if we actually talked that it would come up.

Q Okay. And she was embarrassed, you felt, to talk about it; you were embarrassed for her to even know that it happened. Is that--

A Yes.

Q Did you then--ultimately then renew a closer relationship?

A Well, after about a month or so had passed where we were just--kind of just skimming the surface and--then we just started talking again. We just kind of let it go and when we did, she--I found out that she had moved and that her mom took the advice to get away from Steve and--

Q And then did Christa ever tell you anything additionally about Steve and the way that he had treated her?

A It just--just was bad. I mean I never heard that she felt like his daughter or that he treated her with kindness. I never understood that in any way.

Q Did you ever see any evidence of any of the videotapes or anything that were around the

house?

A No.

Q And what were your observations of Christa's mother?

A There really aren't many observations. Even though I was in her home, I seen her maybe a couple of times in passing. She wasn't--she wasn't there.

Q And did you--did you have any observations about Christa's reaction or anything when--when her mother came to take her back home after that incident when--with Steve?

A Well, that wasn't actually the strange part. When her mother got there is what I consider strange.

Q Okay. Tell me about that.

A When--if something like that would have happened to me and my mom would have pulled in the driveway, that's my safety right there. And she didn't--she didn't want to go I don't think.

Q Okay. So she didn't see Mom coming as--as her safety net to protect her when she went back home?

A No, I don't think so.

Q How was Christa with her close friends?

In terms of--I mean what was the--I mean how did Christa look at friendship?

A She--she held friendship in a high regard.

Q Okay. And--and what are some examples of how she held it in that high regard?

A Well, I know that, you know, she was--when we were in school she would talk to the cheerleaders or talk to the other folks, but she made a point that, you know, there was--with the popular crowd there was so much back stabbing going on that she found safety in those she knew wouldn't stab her in the back.

Q And what--what about--did any incidents--how was she in terms of being loyal to her friends?

A She was very loyal.

Q And are there any examples of that that you can describe?

A Well, I know there was a time that one of our friends had run away from home and, you know, Christa didn't have to go, but she did so the girl wouldn't be alone.

Q Okay.

A She was trying to, you know, just--well, the girl didn't actually run away. She was put out

of her home. And she had nowhere to go, but she couldn't stay there so Christa went with her.

Q And this was a friend that was about the same age of young Christa?

A Yes.

Q And would that be Brandy, was her friend?

A Yes, she had just moved to town and didn't really know anyone.

Q And Christa befriended her because she just moved to town, correct?

A Yes.

Q And--and is that sort of what Christa did if there was somebody who seemed to be--

A An outcast.

Q --outcast? She would find them and try to welcome them?

A Yes.

Q What was Christa like when she was around you? When you were together what were her activity levels, that sort of thing?

A She was very happy. She was very energetic. She was always on the go, wanting to do something.

Q And was it--compared to your other friends and other kids your age at that time, what

did her energy levels appear to be?
A Kind of like a--you know, like a--like a attention deficit child, you know. Just something exciting is happening here, you know, that's good for a minute, but something--something over there. Let's go check that out too.
Q So just really jumping from subject to subject and a lot of--a lot of energy, a lot of movement?
A Yes.
MR. DAWSON: No further questions, your Honor.
THE COURT: Do you have any questions, General?
MR. PRICE: (Pause) No, your Honor, I don't have any questions.
THE COURT: All right. Ms. Goehring you're excused, hearing no objection. Yes, she can be excused?
MR. DAWSON: None--none, your Honor.
THE COURT: No, no, no what?
MR. DAWSON: Pardon me?
MS. BROCKENBOROUGH: No objections.
THE COURT: No objections.
MR. DAWSON: No objections. I'm sorry.

THE COURT: Oh, okay. Thank you, ma'am.
A Thank you.
THE COURT: You're free to go.
(WITNESS EXCUSED)
* * *
MS. BROCKENBOROUGH: Our next witness is Jamie Robinson.
THE COURT: How many more witnesses do you all have to be called tonight?
MS. BROCKENBOROUGH: After Ms. Robinson--
THE COURT: After Ms. Robinson.
MS. BROCKENBOROUGH: --five--four? One, two, three-
THE COURT: I'm just trying to time things here.
MR. DAWSON: We've got at least--we've got five from North Carolina.
MS. BROCKENBOROUGH: One, two, three, four, five. Five. That's it. Five. Six. And Andrew--we've got six more witnesses after Ms. Robinson.
THE COURT: Taking as long as all the others?
MS. BROCKENBOROUGH: Hum-
THE COURT: Hang on.

MS. BROCKENBOROUGH: I think a couple of them will be.

MR. DAWSON: Many are going to be more like this last one.

MS. BROCKENBOROUGH: But--yeah.

THE COURT: Okay.

MS. BROCKENBOROUGH: How long--how long are the-

THE COURT: Hang on a minute. (Pause)

(Whereupon, the witness came into open court.)

THE COURT: Are you ready? Ms. Robinson, come on up.

COURT OFFICER: She has not been sworn, your Honor.

THE COURT: Thank you, sir.

Ms. Robinson, if you'll come on forward please, ma'am. Just relax. Just step right up here and raise your right hand to be sworn.

(Whereupon, the witness was sworn to tell the truth by the Court and responded affirmatively.)

THE COURT: Sit, please, ma'am.

JAMIE ROBINSON, being called and duly

sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROCKENBOROUGH:

Q Good afternoon. Can you state your name for the record please?

A Jamie Christine Robinson.

Q And you're going to have to speak up-just move up a little closer--both for us and for the court reporter. Thank you. Ms. Robinson, are you married?

A I am.

Q And do you have any children?

THE COURT: I'm sorry. Ms. Robinson needs to speak up just a little bit.

MS. BROCKENBOROUGH: Okay.

THE COURT: Okay? It doesn't help you with your voice to--the mics record, but they don't help us to hear. Okay.

Q Are you married?

A I am.

Q And do you have any children?

A I do.

Q How many children do you have?

A Two.

Q Now, Ms. Robinson, do you know Christa

Pike?

A I do.

Q And at the time that you knew her, were you--were you married?

A No.

Q And what was your maiden name?

A Lawrence.

Q And how is it that you know Miss Pike?

A Her ex-boyfriend was best friends with my ex-boyfriend.

Q And where were you living at the time that you knew Miss Pike?

A Durham--

Q In North Carolina?

A --North Carolina.

Q And her boyfriend at that time, what was his name?

A Brian Wilson.

Q And what was your boyfriend's name?

A Jeffrey Crank.

Q Jeffrey Crank?

THE COURT: I'm sorry?

A Jeffrey Crank.

THE COURT: Okay.

Q And do you remember about when it was

that you met Miss Pike?

A I'm--I don't remember.

Q Do you know about how old you were? Were you junior high, high school age?

A Uh, almost 18, I would say.

Q Almost 18. All right. And do you know where Christa was living at--at that time?

A Hillsborough.

Q And that was also in North Carolina?

A Yes.

Q Okay. And how--at some point--now, when you first met her, was she living at home?

A She was.

Q All right. And at some point did that change?

A Yes.

Q Can you tell us a little bit more about that?

A I don't remember how it happened. I just know that we were all four on the streets for awhile.

Q And when you're referring to "all four," are you referring to yourself, and Miss Pike, and your two boyfriends at the time?

A Right.

Q And how is it that you were not living at home?

A Because my parents didn't approve of Jeff.

Q And did they give you an--an ultimatum?

A Right. If I was going to see him, I couldn't live there.

Q And at the time--you mention your parents--were--they were married and together?

A Yes.

Q And did you have any siblings?

A I have a brother.

Q All right. And what kind of--how would you describe your family?

A Hum, I--I don't know. Just the typical, normal family.

Q What kind of work did your father do?

A He was in the Air Force.

Q All right. And was he in the--the Air Force your whole growing up years?

A Yes.

Q And so rather than leave your boyfriend at the time, you decided to leave home?

A Right.

Q Right. Can you describe that time period

when the four of you were--were living out--out on the streets you describe? What exactly do you mean by that?

A Hum, well, I remember sleeping in the hospitals and hotels, and running the streets a lot of nights just walking.

Q Did you all have any money?

A No.

Q How did you make ends meet? How did you --how did you--how were you surviving?

A We didn't--we didn't make ends meet. Jeff and Brian would donate plasma sometimes to get money for a hotel.

Q Were there times that you slept literally out on the streets?

A Yes.

Q And were there times when you all didn't have anything to eat?

A Yes.

Q And do you remember taking some--or having some unusual meals as a result of that?

A Taking ketchup and hot sauce from the chicken place. I don't even remember where it was. It was on the strip in Durham. We took ketchup packs and hot sauce packs.

Q And that--so the condiments that are like out on the counters in the fast food restaurants?

A Yes.

Q Did you have occasion to meet Christa's mother?

A I did.

Q All right. And was this before, after, or during the time that you were on the streets?

A I can't--I don't remember that for sure.

Q What--did you ever spend any time at--at Christa's house before you were living out on the streets?

A I spent the night at her house. My mom took me there.

Q And was that on, hum, more than one occasion or just--just one--that one time?

A I--it--I think it was more than once.

Q Okay. And what were your observations, hum, of the household and of Christa's relationship with her mother?

A I didn't really see her mother and her speak. I briefly remember her step-dad, I believe, being there. They didn't--at the time, I know they didn't get along. I don't remember any conversation with her mother.

Q Was this because the mother wasn't around or was the mother--her mother around and there just wasn't any communication between them?

A I think her mom was there for a brief amount of time while I was there, and I don't remember them speaking. But then, you know, the other--the other time that I was there her mom wasn't home.

Q Was--was Brian living at--at the house at the time?

A Not at that time.

Q Okay. And do you remember anything--was there anything unusual about--about the house or, hum, about--something different from what you were accustomed to?

A There was no food. I didn't--there wasn't much food in the--in the kitchen. And I--if I remember correctly, I don't think that Christa had full bedding, like sheets, on her bed.

Q Were there occasions when it seemed as if you were in the house and Christa's mother and step-father weren't aware of that or didn't know that you were there?

A Uh, I remember a night that I spent the night with her. We had snuck Jeff in and he spent

the night with us as well, and they didn't even know.

Q (Pause) Do you recall an incident involving shoplifting?

A Yes.

Q Can you tell us about that please?

A Christa and I went into a store and shoplifted, I believe shirts that weren't even for us. They were for Jeff and Brian. And the security guard stopped us at the front, and I remember Christa screamed at me to run and she took off running.

Q And what happened then? Did you--did you start running?

A No.

Q You stayed there?

A Yeah.

Q And were you arrested?

A No, I wasn't.

Q Do you know what happened to Christa?

A Yes, they caught her and put her in the back of the car.

Q And what was--what were your--what were your impressions or any observations of that?

A I was allowed to--I didn't have to be put

in handcuffs or any--I don't believe taken back where Christa was. I--I was allowed to wait in the lobby, and my dad came to pick me up. And I believe they took Christa. I don't--I don't really remember what they did with her.

Q And, hum, so the--are you talking about the lobby of--of the police station or--

A Yes.

Q --of this store? So at some point you were picked up by the authorities?

A I rode--I--I rode with them, I do believe, and I stayed in the lobby. My dad was called from South Carolina and he came to pick me up.

Q Were you charged with anything?

A No.

Q Do you know whether Christa was?

A I don't remember.

Q Did you observe Christa talking with the police at all?

A Hum, I remember her laughing.

Q And what other observations do you have of--of Christa's behavior during the time you knew her?

A Even when--it seemed like if I had that

life, the parents that she had, I would be depressed and upset. And she never seemed to be depressed, or upset, or sad. She never, never portrayed that to me. I don't think I ever saw her cry.

Q And you say if--if she--if you had the life that she had and the parents that she had, what--what particularly are you referring to?

A I remember one time at the mall we got stopped by the security officers because we had been there a very long time, and they had called all of our parents. And Christa--

Q And "we" is referring to who?

A Brian, Christa, Jeff and myself. And they were on the phone with my mother for a really long time. My mom wanted to know if I looked like I had had a shower, and if I had been eating, and you know, she wanted to speak with me. And I don't believe the conversation with Christa's mom lasted two seconds, and it didn't seem to bother her. And just--if--if I didn't think that my parents cared, it would have bothered me a lot more than it did her or it seemed to.

Q So it was your impression that--that Christa's mother didn't care about her?

A That's--that was my impression.

Q What are--what are some of the--the moments or memories that stand out in your mind from the time that you knew Miss Pike?

A Just how she always seemed to be so okay with the way things were for her, and, you know, she never--it was never "I've been dealt such a bad hand". It was never "poor, pitiful me". I don't know. I just would have--I don't think I could have dealt with it the way that she did.

Q Do you remember, hum, an occasion where you observed a more sort of closer to a depressed or a quiet or solemn Christa Pike than the one that you had--were--were used to seeing?

A One time we--I don't remember where we were. We were walking; it was late; and Christa got quiet and--

Q Again, can you tell us who the "we" is?

A Jeff, Brian, and Christa, and myself.

Q Okay.

A She got quiet as we passed by someplace. I don't--it's been so long that I don't remember where we were. But Brian later told me that it was a place where she had been raped.

Q And did he give you any, hum, any other

details about--about that rape?

A Told me that the gentleman was black.

Q And anything else that you recall about it?

A Not that I can think of.

Q Was there--did they find any evidence at the site or anything?

A Yes. Brian said that there--she was--it was the time--that time of the month for her and there was a tam--her tampon was there.

Q Do--at some point I think you--you told me that you felt that Miss Pike had built some kind of outer wall around herself. Can you explain that a little bit?

A Just how she never showed any emotion. I mean we were walking one day and it was raining, and we were holding a polka dotted umbrella, and she's just skipping, singing, and humming along like we're not even walking in the rain with no place to go and no food, you know. Just that she was so--it's like she had a wall to protect herself from everything bad that was going on.

Q You indicated that at this point--at this time she was walking, humming, and acting as if she--sort of she was in different circumstances

than she actually was. Do you know--recall any other occasions when you saw her hum or sort of sing a song?

A Any time that she was mad, when she was angry. And I don't--I can't really recall times that I could say that she was upset because she never showed that to me. But if she was ticked, like when her and Brian would fight, or she was just angry, yeah, she would hum.

Q And--and did she and Brian fight a lot?

A Yes.

Q Would the arguments be physical?

A Yes.

THE COURT: Could I ask if you could put this in a year context or an age context?

MS. BROCKENBOROUGH: Sorry. I clarified --

Q Ms. Robinson, you indicated that you were--

A I'm going to say 18.

Q Okay.

A I believe I was 18, yes, ma'am.

Q Around 18. And what--and how old are you in regards to Miss Pike? How old was Miss Pike around the time?

A I believe that we're the same age.
Q Okay. And so this--this would have been when she was about 17 or 18--
A Right.
Q --at the time? And do you know how--how --do you know when it was that Miss Pike went--came to Knoxville to--to go to the Job Corp Program?
A I was not in contact with her then.
Q Okay. So it was some time before that--that period? You did--you didn't see her after she came to Job Corp?
A No.
Q And when did you learn that--that Miss Pike had been arrested for--for murder?
A Hum, it was after I had my first child in '96.
Q And what was your response?
A I was in shock.
Q In what way?
A I couldn't believe that she would do something like that.
Q Did you know--did you know--aside from her arguments with--with Brian, did you know Miss Pike to be--to be violent?
A No.

Q Okay. You'd never seen her sort of lose it or--

A I mean I knew that she could get angry. We all can get angry. But I didn't know her as the type of person that they were making her out to be when I saw it on the news.

Q And where were you living between January 1995 and December--I'm sorry--March of 1996?

A Nags Head, North Carolina.

Q Did anyone from Miss Pike's trial defense team contact you?

A No.

Q Okay. If they had contacted you at that time, would you have been willing to talk with them--

A Yes.

Q --and share your recollections of Miss Pike?

A (Nodding)

MS. BROCKENBOROUGH: I don't have any other questions for you, Ms. Robinson, but the D.A. may.

A Okay.

THE COURT: General.

<u>CROSS-EXAMINATION</u>

BY MR. PRICE:

Q Now, you mentioned you never saw Miss Pike become violent, but she could get angry; is that the way you put it?

A Uh-huh (Affirmatively).

Q Were you--did you witness an incident where she and some--maybe one other individual or individuals ganged up on Brian, her boyfriend?

A I do. Yes, I remember that.

Q Can you tell us what happened then?

A Hum, her boyfriend at the time beat Brian up pretty badly, and I remember Christa throwing a beer bottle at him.

Q Do you recall that she also kicked him in the face?

A Yes.

Q And was this kind of behavior abnormal for Christa Pike? I mean did--was that something that--

A At that time I wasn't around Christa anymore.

Q I see.

A Her and Brian had broken up. I was still with Jeff, and she had a new boyfriend at the time which jumped Brian. Christa and I weren't living

together at that time or even hanging around each other.

Q Do you know who the boyfriend was?

A I don't remember his name.

Q And how old--let's see--about how old were you when that happened?

A Eight--I was still 18, maybe fixin' to be 19.

Q Were you--were you born in 1976?

A I was.

Q All right.

MR. PRICE: Hang on just a second, your Honor. (Pause)

THE COURT: Huh-uh (Affirmatively).

MR. PRICE: No further questions.

MS. BROCKENBOROUGH: I have no redirect, your Honor.

THE COURT: Okay. Thank you, ma'am. You're free to go.

A Thank you.

(WITNESS EXCUSED)

* * *

THE COURT: Do you need a break, folks?

MR. DAWSON: A brief one would be nice.

THE COURT: Yeah, let's take a ten minute

break.

(Whereupon, a recess was taken; afterwards the following proceedings were had, to-wit:)

THE COURT: Are you all prepared to call your next witness?

MR. DAWSON: We are, your Honor.

THE COURT: How many more witnesses do you want to try to call tonight?

MR. DAWSON: We want to try to get six, your Honor.

THE COURT: Let's go.

MR. DAWSON: It'll be Kerry--Kerry Clement Sherrill, your Honor.

THE COURT: Kerry Sherrill?

MR. DAWSON: Kerry Sherrill, yes, your Honor.

THE COURT: Call Kerry Sherrill. That's one of the reasons I wanted your list because it helps.

(Whereupon, the next witness came into open court.)

THE COURT: Please come up, ma'am.

COURT OFFICER COFFEY: She has not been sworn, your Honor.

THE COURT: Thank you, sir.

Ms. Sherrill, if you'll just step right up there and face me, ma'am, and raise your right hand to be sworn.

(Whereupon, the witness was sworn by the Court to tell the truth and responded affirmatively.)

THE COURT: Have a seat please, ma'am.

MR. DAWSON: Your Honor, before we get started it might make it faster if we could give her Exhibit 1.

THE COURT: Can we give her Exhibit 1?

MR. DAWSON: Then she'll have it up there.

THE COURT: Do we even remember what is Exhibit 1?

MR. DAWSON: It's all those five volumes, your Honor.

THE COURT: Oh, that. Okay.

THE PETITIONER: (Sneezing)

THE COURT: Are you okay?

THE PETITIONER: I think so. I'm--yeah.

THE COURT: It's not an easy process. That's okay.

THE PETITIONER: (Sneezing) (Pause)

MR. DAWSON: Are we ready to start, your Honor?

THE COURT: Oh, yes, sir.

MR. DAWSON: Okay.

KERRY CLEMENT SHERRILL, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q Ma'am, would you please state your name for the record?

A Kerry Clement Sherrill.

Q And can you, just for the court reporter --your first name begins with K, right?

A Yes, sir.

Q K-E-R-R-Y?

A Yes, sir.

Q And if you could spell Sherrill please for the record.

A S-H-E-R-R-I-L-L

Q And, Ms. Sherrill, where do you presently live?

A Moncure (Phonetically), North Carolina.

Q And where in North Carolina is that approximately?

A It's about halfway between Raleigh and Chapel Hill.

Q Okay. And what--what's your profession?

A I'm a social worker.

Q And do you know the petitioner in this case, Christa Pike?

A Yes, I do.

Q And how did you come to know Miss Pike?

A I was a treatment worker for the Child Protective Services Unit of Orange County.

Q And in that capacity you came in contact with Miss Pike?

A Yes, she was one of my cases.

Q When you had Miss Pike under your--under your care, I guess, how--approximately how old was she?

A That I honestly don't remember. She was in middle school.

Q Middle school. Okay. And what were your first impressions of Miss Pike?

A Just quickly I was involved in the case. It was a child abuse and neglect allegation, and so I came out to meet with the family. And Christa was a bright and warm young woman, easy to get along with, enjoyed the attention of adults.

Q Okay. And was her case similar to all the other cases that you had under your--in your caseload at that point or was there some difference--or was it a little different?

A Well, my caseload spanned. I had children that I had custody of and were either living in their homes or were placed in group homes or treatment facilities, and then I had a few cases that were child abuse and neglect. And Christa fell in that smaller range.

Q Okay. And the--when she first came to you--and let me--what basically became the--the program or the plan for Christa?

A Well, she came to us--the allegation was actually against the mother's boyfriend at the time, Steve. And so the plan was to keep Christa safe when she was in the home and if Steve were going to be present in the home. So there was a service plan made up that included not being alone with Steve, as well as parenting for Carissa and more time between Carissa and Christa.

Q Okay. And do you recall what--what was going on between Christa and Steve that brought her to the court's attention?

A I don't. My--my recollection, obviously

to the best of memory--it was awhile ago--was that it was abuse and neglect for inappropriate discipline.

Q And as a result of--of Christa coming into your caseload, was she eventually given a placement outside the home?

A She was.

Q And where was that?

A At Shaffer House.

Q And if you could look at what's--those volumes that are in front of you, I'm interested in the volume that has tab 10 in it.

A (Pause) Okay.

Q And what--do you recognize tab 10, the documents within tab 10?

A It looks like a packet for the Shaffer House program, starting out with an application agreement.

Q Now-

THE COURT: Can you tell us in some context where that might be in our material?

MR. DAWSON: Oh, you--we haven't gotten you one of these yet?

THE COURT: We don't have tabs.

MR. DAWSON: Oh, okay.

MR. PRICE: I think it's got--it's got a Bate stamp.

MR. DAWSON: It's at--it's at Bate stamp 112.

THE COURT: It's at what?

COURT CLERK JONES: I've got it.

THE COURT: She's good. That's why I have her. Okay. Go ahead. We'll find it.

MR. DAWSON: Okay. Thank you, your Honor.

Q And--so the first item in there that starts--there was a cover sheet and then--and then there's--I guess starting on page 113 is what you're referring to as the Shaffer House--

A Basically it's an application form.

Q Okay. And then when I talked--and the next thing starting on 115 is the admission agreement?

A Uh-huh (Affirmatively).

Q And were you one of the people that--that participated in that agreement?

A (Pause) I--I would assume so. That would be typical for the social worker to--to be a part of that. It's actually up to the parent to--because Carissa Fotos had custody, it would have

been her role though to approve the--

Q Okay. And in this case, of course, she did approve it?

A Right.

Q And if you would then turn to--in that same set of documents, there is--on page 156.

A Yes.

Q There is a--well, I guess it's--it's entitled "Bimonthly Review of Plan of Care"?

A Uh-huh (Affirmatively).

Q And is that something that you also would have been involved in?

A Absolutely. We met every other week at the Shaffer House to go over how Christa was doing.

Q And in terms of that particular plan, there's a reference where it says "Status of Short Term Goals". The first one begins with Bonnie Farrell, and it talks about meet with mother. Who is Bonnie Farrell?

A Bonnie Farrell is the parenting specialist for Orange County Department of Social Services. She is sort of our resident expert in parenting.

Q And so she was put on your more difficult cases with parents?

A Absolutely.

Q And so what does that tell you about this particular matter then?

A What--what that would tell me is that Carissa was not doing what she needed to meet Christa's needs.

Q Okay. And then, uh--and that--does that then refresh your recollection kind of as to some of the stuff that was going on and the severity of what was going on in that--

A Yes.

Q --particular case? (Pause) There has--in terms of this--well--if you could turn to page 139. And this, of course, was not a record that--that you , correct?

A Correct. This is a record from Lutheran Family Services.

Q And so you--you don't have any knowledge of how this particular document got in--in these documents?

A No.

Q Do you know who Brandy is, the person that they--is--

A Brandy was a good friend of Christa's during that time in her life.

Q Okay. And this is a letter addressed to Brandy from Christa?

A Uh-huh (Affirmatively).

Q And this would have been while she was at Shaffer House?

A Right.

Q What--what kind--what does this letter appear to be telling us?

A I think at that point--the short version would be that she was very unhappy with her life and had made a plan to commit suicide and was listing to Brandy the reasons why she wanted to do that.

Q Okay. And that list basically is set out on page 142; is that correct?

A Yes.

Q And on page 142 she mentions--she mentions several things that she feels are just never going to work out in her life and some of the problems, correct?

A Right.

Q And she indicates in there that--what's circled as number 5 about two-thirds of the way down to the page, she says, "Me being--

A It--it appears to me to say, "me being

raped by Claude Davis."

Q Okay. Raped by Claude Davis. And that, of course, was the allegation that was made when she was tem or 11 years old, something of that nature, correct? Do you recall that at all?

A No, that was not something I was aware of.

Q Okay. But with this--when a child is--is writing a letter like this to a friend, would this be something that she would tend to be expected to exaggerate or lie in it about what's going on in her life or would this be, from your experience as a social worker with children, would this be something more akin to her baring her soul to her friend?

A I think for most kids, and particularly in Christa's case as well, many adults hadn't listened to her or trusted her. And so often children will turn to their friends, and especially a friend who is as loyal as Brandy was, to share their deepest secrets and to have someone that they could give some of their burdens to share with.

Q Okay. So if there was a question about the truthfulness of the allegation regarding Claude Davis, this would be something that you as a social

worker would--would take seriously as something that had happened to her; is that--

A Right. I mean often in a case with a relationship like Brandy and Christa had, a child is not going to create things to add to a story like that. I mean she was--more of a baring your soul type letter it reads.

Q It appears she had enough that was--not to add anything, especially when she's--appears to be talking about taking her own life?

A Correct.

Q Would--did a plan in terms of Christa's family, did it include them--what did it include for Carissa? I mean in terms of what would--as you were working out the placement plans and things, what--what would it--what kind of--how would Carissa--or involvement with Carissa fall into the plan that--that you were working with?

A And, again, this is sort of to the best of my knowledge, the plan with Carissa was--was one, was that Christa and Steve were not to be in the home alone together. That Carissa was going to be looking at some job changes in order to enable her to be home more, and that Carissa was going to be doing some parenting classes and some family

therapy work.

Q Do you know if any of that took place, I mean in terms of the change of jobs or the--

A The change of jobs did not. Eventually, Steve was no longer in the home, eventually. And I can't--I can't answer successfully if she attended the parenting classes with Bonnie Farrell or not. I just don't remember.

Q And if you would turn again to 156 where it has the comment about Bonnie Farrell, that goes on to say that Bonnie Farrell needs to meet with mother on teen parenting skills. Mom is unreal--has unrealistic idea--ideas regarding home placement, correct?

A Uh-huh (Affirmatively).

Q So what does that indicate--what would that indicate was going on with mom?

A My feeling was that, especially given the dates of the short term goals and the date of that plan, was that with her return home to be very shortly that--that mom probably hadn't put the things in place she needed to for the home placement to be successful.

Q What was your overall view of--of Christa when you had her in your care?

A Of Christa?

Q Christa.

A Again, she was--she was a very bright young lady. She was very loyal to her friends. I think--at the time I felt like her behavior was very much attention getting. And so she would do things to either get her mother's attention or to make sure she kept her friends' attention.

Q And was that--is that typically because someone doesn't have a whole lot of--doesn't think a lot of themselves so they're trying to find ways to impress other people?

A It can be.

Q Okay. But you don't have any idea with Christa whether that was true or not?

A No.

Q Now, you kept a picture of Christa, correct?

A Yes.

Q And was there--was that something that you did with most of your--

A No, it was not.

Q --children?

A I, um--I was at DSS for two and a half years and ran a case load of 28 children while I

was there that--that fluxed. It wasn't always the same children. Sometimes it was who were in long term care and sometimes it was not. So I tended to keep a picture of the children that touched me the most.

MR. DAWSON: And, your Honor, if I may approach the witness?

THE COURT: Uh-huh (Affirmatively).

Q And let me hand you this.

A Thank you.

Q Is this the picture that you kept--or a blown up picture?

A Yes; yes, that's a much larger size but yes. (Laughing)

MR. DAWSON: Your Honor, I would ask that that be made the next Exhibit.

THE COURT: Debbie, I'm lost.

THE COURT REPORTER: Exhibit 8.

THE COURT: Exhibit 8.

THE COURT REPORTER: Yes, ma'am.

MR. DAWSON: Your Honor, we'll give a copy to the Court.

A Thank you.

(Exhibit No. 8 was marked and filed.)

Q And so is this the way that you kind of remember Crista, with this--this photo?
A It is.
Q And you've kept this all these years?
A Yes, I have.
Q Now, did you work with Christa in terms of when she was returned home after Shaffer House?
A I don't have my--my memory is not that sharp at this point as to those years. I don't know if it was before she left or--or--before she went to Shaffer House or after that I spent most of my time with her.
Q Okay. But there was a time that--that you would help her mother try to find her when she ran away--
A Yes.
Q --from home?
A Yes.
Q And this was fairly frequent?
A Yes, it was.
Q Did you have any feeling about--I mean how--how successful were you and her mother at finding her?
A Not very.
Q Okay.

A We would take pictures of Christa to the neighborhood. Usually, Carissa would call all the friends she knew and try to find her, and we would go--one place was the McDonald's which was one of her popular places to go or to other places we thought she might be and look for her.

Q And she was on--then placed on probation; is that correct?

A That was after I had closed the case.

Q Oh, that was after you had closed the case?

A Yes, sir.

Q So then you were not--you--you were still involved with her, were you not though, when she--when she was adjudicated delinquent--

A And that I don't--

Q --as her social worker?

A --remember. We--by the time they had actually moved to Flint Ridge, which I was still involved with them, we were looking to close the case because Steve no longer lived in the home and that's who the allegation was against.

Q Were you involved in any way when she went to JEC--

A No.

Q --at Swannanoa?
A No.
THE COURT: Did you say, "no?"
A No-
MR. DAWSON: Your Honor--
A --not--not that I remember at least. I don't-
MR. DAWSON: Your Honor, I have no further questions for this witness.

CROSS-EXAMINATION

BY MR. PRICE:

Q Now, you said you became involved initially because there was an allegation of inappropriate discipline by Steve--
A Uh-huh (Affirmatively).
Q --in the home? And based on your initial response to that, I guess the initial investigation--
A Well, just to clarify I was actually a treatment worker.
Q Okay.
A So an investigator would have actually confirmed that.
Q I see. And then--
A So I--

Q --it came to you?

A Right.

Q All right. And as a result of the involvement of Child Protective Services anyway, Steve was not removed from the home or--and Christa was not removed from the home?

A No, sadly inappropriate discipline is a fairly common issue.

Q Okay. Certainly, if it had been something more serious such as a sexual abuse allegation, they would not--there would not have been any way to leave those two in the same home together?

A If the sexual abuse allegation had been proven. There were actually questions about that, but there was no--the investigation did not prove conclusive.

Q Okay. And was her referral to--was Christa Pike's referral to Shaffer House as a result of continuing inappropriate discipline by Steve?

A No, at that point it was more for things like truancy and running away.

Q Okay.

A There was concern that--that Christa

couldn't keep herself safe, and Mom couldn't keep her safe.

Q Were you involved in making that decision with Carissa?

A Yes.

Q To refer her to Shaffer House?

A Yes.

Q Did you feel like Carissa--I guess--what was her last name at that point? I--

A Fotos.

Q Fotos. Okay. Carissa Fotos, was she trying to work with you on that?

A It was about 50-50. There were days that she worked very hard with me, and about 50 percent of the time she did not.

Q So it was hit and miss; is it fair to say?

A Right.

Q At least there were times when she would contact you and say, "I can't find my daughter--

A Yes, there were.

Q --come help us?"

A Yes.

Q "Come help me find her." (Pause) Did you-in your experience with Christa Pike did you

have any evidence of violent behavior or extremely violent outbursts or anything like that?

A Not that I'm aware of.

Q How was she--how long was she at Shaffer House?

A That I don't remember. It's usually a short term placement though. So--so residents were usually there a maximum of three months.

Q And in general how would you characterize her progress there at Shaffer House?

A I don't remember.

Q Is it--is it a program that's sort of designed--a sort of place to refer children while the home environment gets situated, gets improved or is it--or is it more--or it is also a program that's focused on trying to reform the--the juvenile?

A Those two and many more. It was a--it was--it could be an interim placement for children who were going on to out-of-home long term placement. It was an emergency 90 day shelter.

MR. PRICE: No more questions, your Honor.

THE COURT: Okay. Thank you. May the witness be excused?

MR. DAWSON: Your Honor, if I have--I just have a couple of other--others.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. DAWSON:

Q Do you have any recollection of how Christa did at Shaffer House?

A I--I don't.

Q Okay. And do you recall whether she--did you have any trouble with Christa in terms of when dealing with her and your meetings with her?

A I didn't. She was always very respectful. She occasionally stood me up though. I would be supposed to, for example, pick her up from school, and she would be truant that day and so she wouldn't be there. But when I was with her she was always very respectful and--

Q And the--you said that the maximum time for--at Shaffer House was three months?

A That's my memory.

Q And do you recall how long Christa was actually there?

A I don't.

Q Let me ask you to look again at tab 10, and--which, again, these are the Shaffer House

files. And if you'd turn to page 151 there is a--a document called the Plan of Care, correct?

A Uh-huh (Affirmatively).

Q And those shows the admission date as 4-21-91, in the upper left-hand part?

A Yes.

Q Okay. And then there is another--if you look at I guess it's the 156 that we had, and that shows again a Plan of Care once again. And you were one of the people that was involved in the team that did that review, correct?

A Right.

Q And that one shows a date--today's date of 7-9-91?

A Right.

Q So--so she was still in custody almost three days--three months later, correct?

A Right. So it looks like she--

Q So is it likely that she served--that she was there the entire three months she could be there?

A Absolutely, that's what it looks like.

MR. DAWSON: No further questions, your Honor.

THE COURT: Okay. Thank you. May the

witness be excused?

MR. DAWSON: She may, your Honor.

THE COURT: Thank you, ma'am. You're free to go. If you'll just leave those there. Do we want other witnesses to have access to these reports?

MR. DAWSON: Yes, your Honor--

THE COURT: Okay. That's what I thought.

MR. DAWSON: --the next witness at least, the next couple.

THE COURT: Okay.

(WITNESS EXCUSED)

* * *

MR. DAWSON: Your Honor, our next witness would be Peggy Hamlett. Peggy Hamlett.

THE COURT: I'm sorry. Ms. Hamlett?

MR. DAWSON: Hamlett, yes, your Honor.

THE COURT: Okay.

MR. DAWSON: And I do not believe she has been sworn either, your Honor.

THE COURT: That's fine. I'll take care of it.

COURT OFFICER: She has not been sworn, your Honor.

(Whereupon, the witness came

into open court.)

COURT OFFICER COFFEY: She has not been sworn, your Honor.

THE COURT: All right. Ms. Hamlett, would you please raise your right hand?

(Whereupon, the witness was sworn to tell the truth by the Court and responded affirmatively.)

THE COURT: Have a seat please, ma'am. Whenever you're ready, sir.

PEGGY HAMLETT, being called and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q Ma'am, will you please state your full name for the record?

A Peggy Hamlett with the Department of Juvenile Justice.

Q And you're--

THE COURT: Of North Carolina.

MR. DAWSON: North, yeah, North Carolina, correct.

THE COURT: Okay. We're in Tennessee. So I need to be clear about that.

Q And, Ms. Hamlett, you spell your--your first name ending in Y, correct?
A Yes, sir.
Q And Hamlett is H-A-M-L-E-T-T?
A Yes, sir.
Q And--and what is your position now?
A I'm Chief Court Counselor.
Q And that's for--for where?
A For Orange and Chatham Counties in North Carolina.
Q Okay. And for those of us that are oblivious to North Carolina Counties, where are those?
A Orange and Chatham?
Q Yes.
A It's central. It's about a 40--
THE COURT: Tell us a city that we'd know.
A Chapel Hill.
THE COURT: Okay.
A It's about 45 miles north of Raleigh.
Q Okay. And did you at some point become involved in the case of Christa Pike?
A Yes, I did.
Q And do you recognize Christa here today

in the courtroom?
A I do.
Q Do you recall what placed her under your su-well, let me ask you what was your position at that time?
A I was a Court Counselor supervising children on probation.
Q Okay. And do you recall what--what--why it was that she came under your supervision?
A Yes, sir. She was initially charged, is my recollection, with a felony break and enter and larceny of a community center and stole some candy. But as a result of that, it was reduced to a misdemeanor.
Q And so she was then adjudicated to be delinquent; is that right?
A Yes, sir.
Q And if you would look at those volumes that are on the table there, there at tab 45.
MR. DAWSON: And, your--and your Honor, for the Court's information, that will begin on Bates stamp number 00670, so basically 670.
THE COURT: I've got it.
Q And, Ms. Hamlett, these are the records of--well, do you--do you recognize these records?

A Hum, well, I mean they're not necessarily some that were created by me, but I reviewed some of them last night.

Q Okay. And these are records of--of what?

A They are--they originated from the Juvenile Evaluation Center or the training school.

Q And some of the records in here would be records that were originated from the court system in Orange County, correct?

A That's correct.

Q Based--and the--and at this point, in terms of Orange County, you wouldn't actually have records existing; is that correct?

A No; no, sir.

Q And when would the records have been destroyed?

A When juveniles turn 18 they are destroyed.

Q Okay. Do you recall whether, prior to trial, you were contacted by anybody regarding Miss Pike's case? The trial was in March of '96.

A Prior to Christa being placed on probation?

Q No, prior to trial in this case.

A Oh, oh, yes.

Q Prior to trial in this case.
A I'm sorry. Yes, uh-huh (Affirmatively).
Q You were contacted?
A Yes.
Q And do you remember who contacted you or--
A Oh, prior. Hum, well, I'm sorry. I don't know the dates. Hum, I know that I--an attorney interviewed me. It was a man.
Q Okay.
A And then a Ms. McCoy interviewed me--
Q Okay.
A --in '96.
Q Okay.
A And I'm not sure when her trial was.
Q So both probably Mr. Talman and then Diana McCoy--
A That--
Q --who was the person that was doing a sort of history for--
A That sounds right.
Q Okay. And at that point you shared with them what you had. Were the records gone by that time or were they still--
A It should have been.

Q Okay. Because Christa at that point was over 18?

A Yes, sir.

Q The--and were you asked at all to come to Tennessee for the trial of Christa Pike back in '96?

A I wasn't asked to come. I was asked during the interviews if I would come.

Q Okay. Did you ever hear back from them to ask you to come?

A No, I was never asked to come.

Q Okay. And when you were asked, would--did you say you would come?

A I said I would.

Q And especially if they gave you a subpoena you'd come, right?

A Yes, sir.

Q The--but--but you wouldn't really had to been compelled; you would have gone to get there?

A Yes.

Q The--if you would look then on these records that's at tab 45, starting on--this probably doesn't have a number on it, but the page that's between 675--well, 673 and--well, it's out of place, apparently. It's between 673 and 674 in

my original.
A Okay.
Q And this--this document is--is--this comes from the court system, correct?
A Yes, sir.
Q And this is the--and what is this?
A This was her Commitment Order.
Q Okay. And she was--was--she first was placed on probation, correct?
A Yes, sir.
Q Okay. And then what happened to her probation?
A She was placed on probation. I'm not sure when. Hum, let's see. And after being on probation she was running away and not in compliance with her probation.
Q And as a result a decision was made to revoke probation and send her to a juvenile center, correct?
A Yes, sir.
Q What--and these would be the records--the records that are at the beginning of this are the records--the court records that actually sent her to a placement?
A This is the Commitment Order, uh-huh

(Affirmatively).
Q And were you involved in the decision as to where to send her?
A No, I don't think so. Usually, Raleigh made that decision.
Q Okay. But in terms of--I guess not the place to send her, but you were--you were involved in the decision to actually revoke her and send her to placement?
A With supervision, yes--
Q Right.
A --from my Chief Court Counselor.
Q And--(Pause) And when she was--she was sent to--do you remember where she was sent?
A Swannanoa.
Q Okay. And at that point it was called JEC?
A Yes, sir.
Q Which was Juvenile--
A Evaluation Center.
Q --Evaluation Center. But this was a residential treatment facility for juveniles?
A It was a training school.
Q Training school. And how do you define a training school? What--what--

A A locked facility, compel--
Q Oh, it was a locked facility?
A Yes, sir.
Q And how long would--would it--would it have been estimated that Miss Pike would spend at the training school once she arrived there? In the beginning what would have been the expectation?
A Well, I think it would have been my hope that she would have been in and out maybe in six month.
Q Okay. And did that happen?
A Not that I'm aware of. I think she stayed longer.
Q She stayed over a year, correct? Does that sound right? Does--
A I think that's right.
Q Okay. And do you know why she stayed that long?
A Because she did not adjust well in training school. She kept receiving infractions and had to stay longer.
Q Did there seem to be a pattern of her sabotaging her release or are you aware of any of that?
A It seemed that whenever she was close to,

you know, getting out or going to maybe Camp Woodson, that she would earn infractions and then she would not be allowed to--to leave or to go to Camp Woodson.

Q Okay.

A So she seemed like she sabotaged.

Q Now, what was Camp Woodson?

A Camp Woodson is a--a wilderness camp program that's run out of--it's kind of a part of the Juvenile Eval--Evaluation Center, and kids often go there to transition back into the community.

Q So the idea would have been she would have been at JEC awhile, gone to Camp Woodson--

A Uh-huh (Affirmatively).

Q --and then back to the--back to the community?

A Yes, that's usually the way it works.

Q And--and all that would take place in about six months or a little more maybe?

A Maybe, yes.

Q Okay. And are you aware that there were actually efforts made by her then-attorney to--to get her to Camp Woodson?

A Yes, you showed me a letter last night.

Q Okay. And--and did that ever take place? Did she ever get there?
A No.
Q And do you know the reason for that?
A Because she--going to Camp Woodson, you have to earn that privilege to go. You have to be at a certain level to go to Camp Woodson because they want kids who are ready to come home. And she was never at that point.
Q Okay. So she just never could kind of get it together enough--
A No.
Q --to do it?
A No.
Q And there was a point system--well, you may not--are you aware there was a point system at JEC, that they had to have a certain number of points to do things?
A It was a point or level system.
Q Okay. Were you involved with her at all when she went to Shaffer House?
A I don't remember.
Q That was probably prior to your involvement since--
A I think it was prior but I'm not sure.

Q So you wouldn't typically be involved with them until they're already adjudicated delinquent?

A Say that again. I'm sorry.

Q You wouldn't be involved with them until they're adjudicated delinquent?

A Not necessarily. I mean we do consultative work with families and children, and we did place children at Shaffer that were not necessarily adjudicated delinquent but--

Q When you first had Christa, how did you view her potential to succeed?

A Christa is a smart girl. She had a lot of potential. I mean school--she missed a lot of school, but that was--I got a lot of feedback from teachers saying that, you know, she had a lot of potential. She missed so much that her grades didn't reflect that, but she was smart.

Q What--what was her behavior? I mean what seemed to be fueling her behavior or what--was there any kind of pattern to her behavior?

A We really had a hard time getting a hold of why Christa was behaving that way. I mean she was really out of control.

Q And when being out of control, I mean did