**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

# ADDENDUM 5

# DOCUMENT 21

XXVI

006445

E2009-00016-CCA-R3-PD

IN THE CRIMINAL COURT FOR KNOX COUNTY

DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGDoyal

CHRISTA GAIL PIKE, )

PETITIONER )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

VS. ) CASE NO. 68280

STATE OF TENNESSEE, )

RESPONDENT )

TRANSCRIPT OF THE EVIDENCE

Petition for Post-Conviction Relief Proceedings

April 7th through April 11th, 2008

Volume 9

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Assistant District Attorney
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Post-Conviction Defender
Mr. James Crowson
Assistant Post-Conviction Defender
Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS


| Volume 9 | Page |
| --- | --- |
| PETITIONER'S PROOF: | |
| DIANA MCCOY: | |
| Direct Examination (continued) | 801 |
| Cross-examination | 819 |
| Redirect | 888 |

15 now; she's in the eighth grade. She sees Peter Kramer. Peter Kramer is someone that I spoke to, and he remembered Christa even though he had very little contact with her. Actually, the total number of sessions at this point is one.

He actually recommends that Ms. Hansen get insurance to cover in-patient treatment of Christa and that--and he actually thought that Ms. Hansen needed therapy herself. So he sees her once.

And then it's after--shortly after that, about a month after that, that Christa's behavior is really falling apart. Peter Kramer sees her again in conjunction with Peggy Hamlett, the Juvenile Court worker. And Peter Kramer again recommends in-patient treatment. Peggy Hamlett recommends that, quote, "If hospitalization becomes available that she be admitted to the hospital from training school. If hospitalization is not a possibility, I would request that a placement such as Eckerd Wilderness Camp Program be investigated and ordered for Christa to go directly from training school to camp."

And then that's when Rose Mary Wilson does the psychological evaluation on Christa on

November 18th of '91. And she recommends Wilderness Camp also. She said that this would stimulate further growth and responsibility and would also lead to intensified releases of feeling which with support from nurturing adults she may be able to work through, achieving greater acceptance and understanding of them. Christa would also benefit after a placement in Wilderness Camp from mental health treatment services to address these emotional issues. (Pause)

Q And--

A And then after that she goes to Swananoa on November 22nd of '91, and she's there until March 9th of '93. And she really was only supposed to go for three months, but she is displaying this characteristically self-destructive behavior of messing up every time she gets close to being discharged or to being released and she stays longer than she's supposed to. Hum, she--

Q Dr. McCoy, if I can, as I recall from some of the Swananoa staff that testified at this post-conviction hearing, there was some thought that Christa was intentionally sabotaging her release because she didn't want--want to leave?

A Yes. And actually Christa told me about

doing that, that she--she didn't really like it at Swananoa but it was very structured and she knew it was good for her and, in fact, did want to stay there.

Q So in some ways her conduct in--at Swananoa was another cry for help?

A Yes.

Q Then what happened with regard to additional treatment when she left Swananoa?

A Well, let's--maybe we ought to talk a minute about what happened at Swananoa--

Q Okay.

A --regarding treatment because there was a treatment planning conference on her behalf January 9th of '92 and there's a list of things that they were going to do for her: refer her to a chaplain for grief counseling. I don't know if that was done.

They wanted her to go to Blue Ridge Mental Health to get substance abuse/sexual offender counseling. The--she was actually evaluated for the sexual offender program, and the counselor thought that she was not appropriate for it because there wasn't any substantiation of the abuse and Christa was denying it. And they thought

that it would not really be profitable to explore it at that time. They gave her birth control counseling.

Q So then when there was an opportunity really to evaluate Christa with regard to the tendencies to sexually offend, the experts said, "We don't see anything here that suggests that she would." Is that--

A Yes, that seems to be the case from what I can read from the records.

The other thing that's in the records is from January 28th of '92 when Matthew Martin, the Judge who testified here, wrote a letter to the Honorable Stanley Peale urging him to commit Christa to Camp Woodson, rather than being at Swananoa.

She did--I saw one psychiatric consult in the file from February 5th of '92, and it was a page that listed many children and didn't have much to say about her other than the fact that she wasn't on medication.

And then apparently, the way Swananoa works is that--or the way getting into these wilderness camps works is your behavior has to be at a certain level and you have to be at a certain

age. And she--her behavior was not good enough to get her into this treatment camp, which I think is a little strange (Laughter), but her behavior wasn't enough. I think she had to be sixteen at the time. So she never did get the wilderness training.

Q And, Dr. McCoy, I think you testified yesterday that there was also stuff in the record that when she was first sentencing to a training school that the recommendation of the counselors that were working with her at that time was that they thought she would benefit from a wilderness camp?

A Yes, that was from Rose Mary Wilson and from Peggy Hamlett.

Q So sort of the recommendations that were being made were either--for whatever reason, weren't followed?

A Yes. And then there's--shortly before she's released on February 5th of '93, there's a progress report that says that she continues receiving counseling in the areas of substance abuse. So apparently she was getting something for that.

That she's actively participating in

girl's treatment group, and I--there were no notes about that. So I have no idea what that was about.

That she was seeing a staff psychiatrist named John Pavone (Phonetically) on a regular basis which was every other week, and I didn't see any records about that.

And it said that Brad Owen of Blue Ridge Center had reviewed her case and said he didn't need to serve her and that she had completed her GED.

But whatever kind of counseling there was, whether it was girls treatment groups, substance abuse, John Pavone, there were no records available about any of that.

THE COURT: Mr. Dawson, it's 11:30 so I need to know how much longer you're going to be.

MR. DAWSON: Your Honor, I would--I would hope that we could probably finish the direct in half an hour.

THE COURT: You told me you were going to have a few more questions yesterday afternoon at 5 o'clock too, but that's okay. You go right ahead then.

MR. DAWSON: Thank you, your Honor. I just have a few more of this one, your Honor.

Q Dr. McCoy--(Pause while petitioner's team conferred) Okay. Dr. McCoy, involving the number four, among Christa's psychological problems, you've listed those. And if you could just kind of briefly go over what--what is it that underlies that opinion of these psychological problems? And I think some of it is stuff we've already talked about so--

A Well, number four, where I say that she has psychological problems, the first one I said was attachment issues. That this contributed to her dysfunctional relationship with male peers. That she felt that no one cared about her after her grandmother died in '88. That she had sex with men just to feel someone cared about her. And I had quite a bit of confirmation of her promiscuity.

Q And this was what even her friends that she was sort of hanging out with on the street in North Carolina felt was beyond what was acceptable?

A Yes. Brandi told me that any man that Christa cared about could talk her into doing anything. Mandy said, "A guy could convince of Christa of just about anything." Brandi said that Christa got attached to boys too quickly and was used by them quite a bit. Mandy said the only way

Christa felt she could get close to a guy was by having sex with him.

Q And these were friends that weren't living the girl scout life either, correct? I mean they were--they were a little bit out of control themselves?

A Yes, they were.

Q But they saw Christa as even more out of control?

A Evidently, yes.

Q And these are sort of what--when you're talking about the psychological problems that developed, these are--these are things that we're talking about, all of this stuff we've mentioned already were leading to and developing the borderline personality disorder?

A Right. Her attachment issues (sic) is an example of one of the symptoms of the borderline personality disorder.

Q And then next, I guess, is inability--

A The next issue was inability to maintain emotional control, particularly during times of stress with reliance on others to help her maintain boundaries. So she has the characteristic of showing affective instability and having inappro-

priate expression of feelings.

Q And that also is one of the items on the borderline personality disorder, correct?

A Right--

Q And that's--

A --a marked reactivity of mood.

Q --and these are all from the DSM--

A Correct.

Q --that we talked about yesterday?

A Right. Transient stress related paranoid ideation, severe dissociative symptoms, irritability or anxiety. Peter Kramer, one of the counselors I mentioned, described her to me as a damaged child in need of help to learn how to develop controls.

Christa told me about being so angry when she was hitting Kenny Clyde that she couldn't even feel him hitting her back. She says she has no memory of what happened when Steve Kyaw hit her in the face with a belt because she was so angry.

She talked to me after she went to Jail here at Knox County Jail about screaming and carrying on and being walked to the be-sweet chair. And when she was on her way back, she said she had two handfuls of hair in her hand and didn't have

any memory of how she--she had done that.

Mandy told me that Christa has an explosive temper and loses control.

When the Kenny Clyde incident that--Mandy participated in that with her. She said the next day Christa couldn't recall everything that had happened.

Brandi said that once Christa's buttons are pushed it's all over. She said she's been there in the past to calm her down before Christa totally exploded.

Her--Christa's friend Willie Davis said that one Christa goes off she loses it.

Rose Mary Wilson, the psychologist, talked about the internal stress related to depression and angry over unmet needs for nurturing. That under the press of emotional reactivity she's not able to maintain effective control and organization in her thinking processes.

And then the next psychological problem I mentioned is a constant need for attention. That's part of the identity disturbance or--and also the chronic feelings of emptiness where--having people talk to her all the time gives her the attention she needs to give her a sense of self.

Peggy Hamlett talked about Christa being starved for attention because of her mother's neglect of her. Step-father Gerard commented on how much Christa loves attention. Brandi confirmed Christa loves attention, that she tries to be someone she isn't. That she has to look big is how she put it.

I told you the incident yesterday of Christa's practice of disguising her voice when she's talking to her friends on the phone so that they can believe she's not alone. And Carissa Hansen said Christa has been seeking attention her whole life. (Coughing) The other--

Q Dr. McCoy, just talking about the attention again, the attention seeking, I mean a lot of people want attention. That's why people become actors and actresses, I guess, and perhaps ministers and lawyers. How do you distinguish Christa from just normal people that like attention?

A Well, Christa goes to extremes to get the attention. For example, getting involved in confrontations with people when she's out in public.

Orlando Powell I think I talked about

yesterday being able to egg her on. The story Brandi told me was Orlando daring her, Christa, to go say something to that guy over there. Because she wanted Orlando's attention and his--and for him to admire her, she would take on grown men in a confrontational way to have Orlando's approval. So she's willing--the attention is related to the need for attachment and approval.

Q So then at some point is there--is there a line that's drawn, you know, as--you as a professional in psychology between what would be normal attention getting and some kind of psycho pathology in terms of attention getting?

A Well, I don't know about a line that we draw, but she--she clearly is in excess of what would be normal, to the point where she will put herself at risk in order to get that attention, to have the bad girl that fits with the tough girl image, to be the one who is respected because she, as Brandi said, acts big.

Q And that's probably a good way to turn to the next one, which is the tough girl image.

A Tough girl image, hum, to compensate for poor self-esteem and a lack of self-respect. Peggy Hamlett understood this about Christa very well.

Brandi did as well. Christa's friend, Willie Davis, talked about this as well. These are all interrelated. There's not really a clear line between any of them. He says a need to please others and a willingness to be influenced by others no matter what the cost to herself. This fits in with mom, Brandi, Mandy saying that Christa would always take the blame for others.

Again, these are attachment issues. She wants these people to love her, and she doesn't want to be abandoned by them. So one person might do it by giving people gifts, even going without lunch themselves to give money to people. Whereas, Christa's way of doing it is to take the blame for other people. And Brandi could describe that. Alicia could describe that, and Mandy could as--as well.

Q And is this also a sign for Christa's, you know, kind of overreaction to attachment? She wants to have--when she thinks somebody likes her then she wants them--I mean that--that relationship has to go beyond normal? It has to be a permanent bond sort of thing?

A Yeah, the one for borderline relationships is intense. It's an intense relationship

where she's willing to do anything. And particularly with kids whose family life is not so good, their friends mean everything to them.

And then the last opinion I had that--was that Christa is experiencing considerable stress at the time of the homicide which contributed to her participation. Well, we've talked before, I think, about Aunt Carrie saying that Christa called her from jail after her arrest and crying that "I was so stressed; I was so stressed."

And Brandi talked about Christa over Christmas telling about a girl at the Job Corps that had been messing with her and put a knife to her throat. And mom talked with me about that. That Christa had told over Christmas break about that as well.

Brandi said that Christa--Christa acted stressed out as though she was tired of the Job Corps and did not want to be there and would be glad when her training program was over.

But I think the main stress was what we talked about earlier today, about the relationship with Tadaryl being threatened and she hadn't had that sense of closeness, that sense of having a strong identity since grandma in '88.

Q Dr. McCoy, then when we take your opinions and all you've discussed now and we bring it to--to the time of the crime, do we have an ability of Christa Pike to maintain the normal controls over behavior that other--that most of us have?

A No, we don't. Christa, obviously, has severe problems. She has severe borderline personality disorder, and she does not have the controls that a normal person would have. That was--that's clear to me from talking to the people who--who know her and have been with her in situations.

Q And are these things that when Christa--that Christa can actually--I mean is she in control of her lack of control, if that makes any sense? I mean--I mean can she do anything as this is approaching to stop it?

A Well, I--you know, I think we're getting into issues of criminal responsibility with this, and I'm not really comfortable talking--saying that this girl has no control whatsoever. She has lesson control. She does not have the kind of control that a normal person would have. I mean the fact that she has no control whatsoever--I'm

not willing to go quite that far with it.
Q Okay.
A I do think that she has much less control than other people, yes.
Q I guess in terms of free will perhaps--I mean at some place along this line is she really unable to exercise control because--because of her mental illness?
A Yeah, she definitely has difficulty controlling herself based on what other people have told me, based on what she has told me where she doesn't remember afterwards what happens and just loses it completely.
Q And so that's--I guess what I'm--this is different than somebody without borderline personality, somebody without a background of abuse and neglect and all that we've discussed, commit- ting the same crime?
A This is different from a normal person committing it?
Q Correct.
A Is that what you're asking me?
Q Right.
A I'm not--still not really sure a normal person who committed this crime would do this

because--

Q I mean you can't figure out why they would commit it.

THE COURT: I don't know--I don't know if-- (Pause)

MR. DAWSON: I'll withdraw the question, I think, your Honor.

THE COURT: Yeah, it's--there's a--

MR. DAWSON: I think we're going to places that--

THE COURT: I think we're going to places we shouldn't go.

MR. DAWSON: We're probably beyond her expertise at this point.

A Well, we're beyond what I was asked to do definitely.

Q Right.

THE COURT: That--I think that's a fair way of putting it. Thank you.

Q And--and, Dr. McCoy, again, the opinions that you gave this morning, these are not things that you were asked to prepare for trial?

A That's correct.

Q In fact, you were specifically told not to?

A That's correct also.

MR. DAWSON: (Pause while petitioner's team conferred) Your Honor, I have no further questions.

THE COURT: Do you want to begin, General, or do you want to stop for lunch?

MR. PRICE: Whatever you want to do, your Honor. I could start.

THE COURT: I don't know how long you're going to take, and I hate to cut you off.

MR. PRICE: Well, I would--it's not--it's going to be more than 15 minutes.

THE COURT: Well, I understand that.

MR. PRICE: (Laughing) So it probably would be easier just to break for lunch now.

THE COURT: Stop now. Okay. All right. Let's take a lunch recess. And does Miss Pike have her medicine with her?

PETITIONER: Yeah.

THE COURT: Okay.

MR. CROWSON: Can I buy her a Coke?

THE COURT: Is it okay with you guys (security officers) if Miss Pike gets a Coke to drink--

MR. CROWSON: I'll buy it in a bottle.

THE COURT: --a bottle of Coke? It's totally against the rules of this court to let anybody do it, but all of you have been doing it anyway so-- It's been a tough time.

A Your Honor, what time are we coming back?

THE COURT: Oh, I'm sorry. Maybe about-- I'd like to try to start about 12:45, another hour, assuming nothing else happens.

MR. CROWSON: When are you going to want us in chambers, your Honor?

THE COURT: I'm sorry?

MR. CROWSON: When do you think you'll want us in chambers, after McCoy is finished?

THE COURT: I don't know.

I want to go--walk out, Melvie. Oh, yes. Thank you.

(Whereupon, the luncheon recess was taken; afterwards, the following proceedings were had, to-wit:)

THE COURT: Whenever you're ready, General, I guess. (Laughter)

CROSS-EXAMINATION

BY MR. PRICE:

Q Dr. McCoy, let me clarify something I'm a

little confused about. When you were retained on the case, your testimony is you were retained as a mitigation expert?

A Yes.

Q What was your understanding of that role?

A As I said yesterday, is that I would help prepare the case for sentencing and I would collect--help collect records and interview people and put together a theory of--that the defense would use for the sentencing hearing, and testify perhaps as well; although, I don't always testify.

Q Well, that was a question I was going to ask you. I think you mentioned you had some capital case experience before you came on Miss Pike's case?

A Yes.

Q Have you testified in those cases?

A I don't think so. I have to tell you I have--it's not clear in my mind in the 31 years I've been doing this which cases came at what point in my career. I don't think I testified in a case before this, in a capital mitigation case.

Q Okay. Since then have you testified?

A You know, I'm not really sure when Abulee (Phonetically) was. That was a--

THE COURT: I'm sorry. Which one?

A Abulee (Phonetically). I'm not sure when that case was. I don't know if that was before '96. I testified in that case at the federal level.

Q At the--would that be the habeas corpus proceeding?

A Yes.

Q As far as the jury penalty phase of a capital case--

A Before '96 I don't think so.

Q And since '96?

A Richard Thompson, Ricky Thompson.

Q Okay. Ricky Thompson, that's the only one?

A That I've actually testified at, I think so, yes.

Q So you felt like you were gathering the information, the background social history information on Miss Pike. That was your role, to prepare for this mitigation presentation to the jury?

A Well, that was part of it, to gather information. Of course, I was counting on the attorney and the investigator to gather that

information--

Q Sure.

A --in terms of records, but to meet with people and try to get a picture of his young lady and her life and what contributed to her being--becoming who she was, and her participation in this, and very importantly to identify potential witnesses that could testify at the sentencing phase, and to identify themes that--that these people could help present to the jury.

Q All right. For that kind of role, why wouldn't you use an investigator? Why would you want a psychologist?

A Because I don't think most investigators have the training that they would understand about borderline personality disorder and how the records and how the witnesses would play into that. I mean it's--it's not common knowledge what borderline personality disorder is. It's specialized knowledge.

Q Were you of the opinion that she had borderline personality disorder?

A Well, it wasn't really up to me to diagnose that, and I was comfortable with Eric Engum's diagnosis. If he had said something

totally off the wall like schizophrenia that I couldn't see that that was relevant at all, then I would have said something to Mr. Talman. But she looked like borderline personality disorder to me, and certainly the records that I reviewed and the people I talked to and what she told me were consistent with that. So I didn't have a problem with that. But I didn't see it as--and it wasn't my job to (a) diagnosis her, (b) do psychological testing, (c) assess her for criminal responsibility or any of that sort of thing.

Q Was it your understanding as you were going to trial and you were working with Mr. Talman in the months preceding the trial that when you testified, if you did, indeed, testify--well, let me--let me start from that premise. Did you understand you were going to testify as you all were preparing for the trial?

A Well, as we were--you know, there was a long preliminary stage; and, of course, that's always an option. And that wasn't really something that we--we firmed up until the Sunday of the 24th when he told me that I was going to be the only witness. But the possibility that I might testify is always an option.

Q Well, I mean you described you were blowing up exhibits and things like that. I mean was that your understanding that this was going to help you during your testimony?
A Yes.
Q So at least you were preparing for the test--to testify?
A Yes, I was.
Q And was it your understanding that in that testimony you would support Dr. Engum's conclusion of borderline personality disorder?
A Yes. The sentencing phase was basically built around that diagnosis.
Q Did you feel like because you hadn't been asked to give an opinion or run any other tests on Miss Pike that you could not say that on the stand?
A I just wasn't comfortable not having expert opinions. That's how I always testify. I had never testified as--I guess it's called a fact witness. I'm totally unfamiliar with that, and I felt like a fish out of water, I guess.
Q So were you thinking of yourself as an expert witness in this particular case, that you were going to testify as an expert witness?
A Yes, I was thinking I was going to

testify as an expert witness, and I--I wasn't quite clear how I was going to do that without having given the prosecution in advance what my opinions were.

Q Was it--did Mr. Talman ask you not to prepare an opinion or not to prepare a report?

A Oh, no, he wanted a report. He asked me --when I said to him, "I need to prepare some opinions if I'm going to testify as an expert witness"--he said no to that. He was okay--he wanted the report.

Q What do you consider your report in this case?

A I consider the report to be the--the narrative. I think it's about sixty pages.

Q The first sixty pages of your social history?

A Yes.

Q Did you--from your previous criminal practice did you understand--and I think from your concern about not preparing a report--did you understand that as an expert your report would be turned over--would need to be turned over to the State?

A Yes.

Q So when you're preparing this your understanding was this sixty--at least this sixty-page summary--narrative was going to be turned over to the State?

A Correct.

Q Did you have any questions or concerns about why am I preparing three copies of the whole volume?

A Did I--as I--no. If I'm asked to prepare--if I'm asked to prepare that for people or the attorney, that's what I do.

Q You didn't say, "Well, that--why are we preparing the three--the whole three volumes for the State? They're not entitled to that."

A He's the captain of the ship. He's the one who makes the decisions.

Q So you were just doing what he said?

A Correct.

Q You didn't ever raise that as an issue?

A I didn't raise that as an issue, no. And, you know, I don't mind them having the records. Of course, they're entitled to the records and they're actually, I think, entitled to my interview notes as well. So I don't--I don't really have a problem. And oftentimes in cases the

prosecution will ask for those records. So it's not anything new for me to hand those records over.

Q (Pause) So just to make sure I've got my bases covered on that--that area, when you--your intention at least going into trial before that March 24th meeting with Mr. Talman was that you were going to take the stand and at least concur with that Miss Pike had borderline personality disorder?

A Yes. I was going to do more than concur though. My--really my presentation was based on the borderline personality diagnosis.

Q (Pause) Do you ever recall a time when, after the verdict came back in the guilt phase--guilt/innocence phase--I think that came back on a Friday-

A Uh-huh (Affirmatively).

Q --that the defense team, at least the part that was there, huddled either here in the courtroom or outside somewhere close by and discussed what was going to come up next?

A I was not here at all during the guilt phase. I was home. And I got the call from Bill Talman when I was home Friday afternoon. So I was not a part of any of that.

Q Were you there any of that--you said you met on that Sunday, the 24th, March 24th. Were you there at the court house during the trial any of that week?

A Not at all. Mr. Talman called me just about every evening, except, I think, one evening he didn't call.

Q Do you ever remember a time during the trial that you all did huddle like that in the courtroom?

A We never huddled. (Laughing)

Q Never huddled?

(Whereupon, some of the parties laughed.)

A We never huddled. I didn't see Mr. Talman from Sunday, the 24th, until Friday evening.

Q (Pause) And your testimony is the issue at that March 24th meeting--it was at your house, I think?

A Yes, it was.

Q The issue then was--I guess the disagreement you and Mr. Talman had at that point was his decision just to call you?

A Well, we didn't disagree about it. He

told me this was his decision, and--and I said I didn't really think that was a good idea. We needed to have mitigation witnesses. For one thing when you have a case like this where it's--it's a difficult case, as I said yesterday; it was a hard case--and you have a very traumatic murder, and you have a very damaging statement, you need to have a lot of witnesses to be a buffer between all of that gory business and to present in great infinite detail this person's life. So one person droning on and on and on for hours or days is simply not sufficient.

Q Okay. Was that--in that--at that March 24th meeting that is when Mr. Talman actually got a full copy of the three-volume set?

A Yes, that evening. He could have had it sooner, but he said that he would pick it up from me then that Sunday night.

Q That's the first time he got it from your hands?

A Yes.

Q Hum, let's talk a little bit about borderline personality disorder, if we can. I know we've gone over it quite a bit. Were there--refresh my memory from your direct testimony. Did

you say that there were some psychotic elements to her borderline personality disorder?

A Yes. Borderline personality disorder is characterized by what's transient, brief, fleeting psychotic--can be, not always. They're not lengthy enough to warrant a separate psychotic disorder diagnosis.

Q Okay.

A They may--they're--they're momentary.

Q Just because they're so brief?

A Correct. And dissociative aspects also exist.

Q What in Miss Pike's social history led you to conclude that she had those psychotic elements?

A Well, the fact that she has these little blank out episodes when she doesn't really remember is possibly a psychotic episode. And, hum, I think I heard her mention a couple of things that suggested the dissociative element also. I know during the statement she talks about being detached from herself and watching herself.

Q So at least one characteristic you're saying of a psychotic episode, at least in Miss Pike's case, was blanking out?

A Yeah, losing control, getting so angry that she just simply doesn't remember what's going on?

Q I mean afterwards does she remember?

A No. According to Mandy she had to remind her after the Kenny Clyde incident of what had happened or elements of what had happened.

Q Did you ever discuss the specifics of the Colleen Slemmer murder, the details of it, with Miss Pike?

A I talked with her generally about it, but I--I just didn't see that as what I had been asked to do. That wasn't my area. That was for Dr. Engum to do.

Q So then you're not saying that it's your opinion that she had a psychotic episode during the murder of Colleen Slemmer?

A I'm not saying that, no.

Q Okay. (Pause) I'm just looking at the DSM here because I--(Laughing)--know very little about borderline personality disorder, but--

THE COURT: Which volume are you referring to--

MR. PRICE: Yeah.

THE COURT: --because there was some

discussion earlier?

MR. PRICE: I've got the 2000 edition.

THE COURT: DSM-IV-TR. Okay.

Q Is that what that is, Dr. McCoy--

A Correct.

Q --the 2000 edition of the DSM-IV?

A Yes.

Q Looking at page 709--(Pause)--there at the top it says course.

A I see it.

Q And I guess--is that just a description of how this disease typically--this disorder typically plays out?

A Yes.

Q And is it suggesting here that borderline personality disorder is often a lifelong condition?

A Yes. And it says that during the thirties and forties the majority of individuals with this disorder attain greater stability in their relationships and vocational functioning, which is actually true of a fair number of personality disorders. As you get older you just kind of settle down.

Q But anyway would that suggest there is at least some--I mean is Miss Pike ever going to be

free from borderline personality disorder?

A I don't think she'll ever be completely free of it. As it suggests in DSM, she will probably calm down some compared to how she was in her late teens--mid teens and early twenties.

Q But at least she'll--you said she'll calm down. At least she'll have some elements of relationship problems--

A Yes, I think so.

Q --and problems of impulse control?

A Probably.

Q Do you know anything or are you aware of anything about the--the August 2001 incident at the Tennessee Prison for Women?

A Yes.

MR. DAWSON: I'm going to object at this time to--to that incident. Obviously, Dr. McCoy's testimony has been largely about what she could have and would have testified at trial in 1996 had she been called, and this is a later incident that she would not have had any knowledge of or would not have occurred at the time of her testimony in 1996.

THE COURT: General.

MR. PRICE: Well, he's asked her to

prepare this summary of opinions that we've gone into in depth, and I'm just asking to see how that affects her opinion.

THE COURT: Up to--up to--currently--up to date, correct? I mean you were asking her up till now what her opinion was.

MR. DAWSON: Your Honor, I asked her that and she indicated that these--as I recall, her answer was that these opinions were based on the information she had previously.

A That's true.

MR. PRICE: But isn't it--I mean wouldn't it be fair to ask if this incident supports her opinion now or undermines her opinion?

THE COURT: If she know--if she would know.

MR. PRICE: Well, she indicated that she was aware of the circumstances of that crime.

THE COURT: I think you can ask her if it supports her opinion as we're sitting her today.

MR. DAWSON: Thank you, your Honor.

THE COURT: I'm not sure it makes a lot of difference in the long run about what happened twelve years ago, but it's a fair question, because she's testifying that things change with time as

well.

MR. DAWSON: Thank you, your Honor.

Q So at least knowing the limited knowledge you have about the circumstances of that crime there in 2001, do you feel like that was a part of her borderline personality disorder?

A It could have been. I--I'm going to have to tell you I haven't really talked with her about that in any depth, and I--I haven't really investigated it like I looked into the 1996 situation. I know about it. It could very well be a reflection of mental illness. I couldn't tell you definitely that I have an opinion about it though.

Q (Pause) Do you think that given the--this disorder that Miss Pike has that it's possible under the right stressful situation or circumstances that she would be prone to commit another act of violence?

A Yes, I think it's a possibility.

Q (Pause) What about post-trau-

MR. DAWSON: Your Honor, I'm going to object to that was well. I think that's getting into an impermissible aggravating factor. Future dangerousness is not an aggravating factor in Tennessee, and I don't think there should be

questions allowed about it. And there shouldn't have been if it was before the jury.

THE COURT: Where are you going with that, General?

MR. PRICE: Huh? (Questioning)

THE COURT: Where are you trying to go with that?

MR. PRICE: Well, I think it's important for--(Pause)--I'll just withdraw it, your Honor.

THE COURT: Okay.

MR. DAWSON: Thank your Honor.

Q What about post-traumatic stress disorder? Do you have an opinion as to whether Miss Pike suffers from that condition?

A I just really didn't evaluate her from that point of view. I wasn't the psychologist asked to assess her mental state. I simply dealt with mitigation.

THE COURT: Can I stop you a second? Were you asked to evaluate Miss Pike for the purposes of this hearing?

A No.

THE COURT: Okay.

Q Have you reviewed Dr. Kenner's report?

A I looked at it. I glanced at it.

Q I mean do you support his conclusions?

A I just did not get into evaluating this lady from the point of view of what is her mental state. I was the mitigation expert, and so I took the diagnosis that I was given by the guilt-phase expert and built my case around that.

Q Well, as a psychologist--I mean you're obviously very knowledgeable now about Miss Pike's life. Do you see elements there that support a conclusion that she has post-traumatic stress disorder?

A I didn't evaluate her from the point of view of--for example, if I was going to be asking her about post-traumatic stress disorder, I would be asking her about: does she think about the rapes, does she think about what happened with Steve Kyaw, how often does she think about it, what triggers thoughts about it, is your sleep disrupted by dreams about it, is her concentration impaired? I didn't go into any of those kinds of diagnostic issues with her.

Q You didn't think those were important questions to ask when you were doing this social history?

A No. I did not think that that was my

bailiwick. For one thing I really wouldn't want to be coming up with a different diagnosis. That really was Dr. Engum's bailiwick. That was not for me to get involved with. And believe me, with having only six months, I absolutely had my hands full to do what I had to do.

Q So you're--essentially you were just looking for things that would support Dr. Engum's conclusion?

A Basically. I agreed with his conclusion that it was borderline personality disorder. I didn't have any reason not to and--

Q Well, you weren't looking for reasons not to apparently; isn't that fair?

A That was not my job to be doing that. If I had seen something that I thought was grossly incorrect, then I would have said, "Mr. Talman, this is wrong."

Q But you weren't even asking the questions that might lead you to that conclusion?

A No. I didn't have--I didn't have a reason to. I did not consider that to be my job, to disagree with Dr. Engum.

Q (Pause) Did you ever at any point suggest to anybody on the defense team, Mr. Talman,

Mrs. Rice-Miss Martin at the time, any other person involved, that we need to bring in another mental health medical professional on this case?

A I suggested Dr. Bernet. Now, I don't remember if Mr. Talman brought that up to me or if I initiated that with him or it just came out of our talks together that there needed to be a psychiatrist who had some kind of specialization in the area of so-called Satanism, and I--I recommended Bill Bernet. And that was another reason I really didn't need to get into the issue of mental state at the time of the murder because then there were two professionals that dealt with that.

Q And that was the only one?

A Pardon me?

Q And that was the only one that you helped--

THE COURT: The only person she recommended?

MR. PRICE: Yeah.

Q That was the only other professional medical mental health professional that you recommended to--

A Yes. I--Dr. Engum is a neuropsychologist

and I assumed that if a neurologist was needed that he would be the gateway to a neurologist.

Q So you never saw the need for that?

A I never saw the need to question that or to consider any other possibility because there were two competent mental health experts dealing with the guilt phase.

Q Well, in the penalty phase--yeah, in the penalty phase as well, did you see the need for another mental health professional or medical professional?

A Well, I felt pretty good about the North Carolina people who are social workers and could bring expertise. Rose Mary Wilson is a psycholo-gist. I really felt that with all those people that the issue of more mental health coverage would be taken care of.

Q Now, I know you indicated that six months --you did what you could in the six months. Did you think you had a thorough social history?

A Well, I used the word adequate yesterday. I thought I had an adequate social history. I felt like I had a good case. I used the word compelling yesterday. I really--I feel that we had strong information to present to the jury. I would have

loved to have had more time. I think it would have been great to have the Swananoa people. I would have liked someone to have helped me find the Job Corps people. I think--I really think in her case the more people you can have testify the better off you are.

Q Were you furnished any of the interviews that Barry Rice had of the Job Corps people?

A This is the very first moment I knew that Barry Rice interviewed Job Corps people. In my letter I asked for that. I never got that.

Q Hum, did you ask--did you ever ask Mr. Talman for addition time to--to ask for a continuance for the trial so that you could do additional investigation?

A I don't remember if that was ever an issue.

Q So to your memory now, no, you never did?

A To my memory I don't remember asking, no.

Q (Pause) Now, I think you've testified on direct that you felt it was important to have a complete picture of the good and the bad of Miss Pike's social history, for lack of a better word, good and bad. Is that a fair characterization of your direct testimony?

A Yes. I think it's--I think that when you're presenting something to a jury, I think jurors are very sensitive to the truth. And I think nothing succeeds like the truth. And so that's what I wanted to present.

Q And you would agree that absent putting it in the right context there are things in your report that could be very damaging to Miss Pike?

A If they were presented like they were back in 1996, absolutely.

Q And even now do you think that if this is presented--if this **was** presented to a jury, your social history, do you think the subtleties of borderline personality disorder could be lost on a jury?

A No. I think that I could get the point across, sir. I think that I would pre--do my presentation ahead of time, be the first one. That all of these people would testify and I would testify at the end, and I would have a frame work around it. It would be lengthy mitigation testimony and it would be very detailed, much as it has been with this post-conviction.

Q And the way you've testified now, this past day and a half, that would have been

essentially the way you would have testified to the jury if you had been called in Miss Pike's case?

A Yes. Although I--if I'm testifying at the end--and I don't know if I would be allowed to sit in and listen to the lay witnesses or not--but I would incorporate their testimony into my final conclusions.

Q What if Mr. Talman had approached you and said, "You know, this--this particular witness or this particular portion of this interview I deem it to be highly prejudicial. I don't want it in your report"? If he had come to you with that kind of request, what would have been your response?

A If he had said, "I don't want to give the prosecutor your work; I just want to give them the report"--

Q No, that wasn't my question.

A Oh, leave out the interviews?

Q Leave out an interview entirely or a portion of the interview.

A I just--I really don't like to do that. I include everything. That's just how I do it.

Q You feel like that's important to--to support your opinion or to support your social histories to have a complete picture?

A Yes, I do. I think that--I mean nobody is all good; nobody is a perfect person. And a whole person needs to be presented, good, bad, blemishes, warts, every bit of it. I think that it--it is helpful for jurors to see this person in their entirety, how they got to be this way with these warts. I mean we all have that, and jurors know that too.

Q So--

A And I think it comes across as untruthful to say this is Little Red Riding Hood. I think it's ineffective.

Q That type of request then would have been refused?

A Well, I don't know that I would absolutely refuse it. We'd certainly talk about it, just as we did the Satanism issue. We would talk about it. But I can't see me cutting portions of my interviews out, leaving them out.

Q Just as an expert in psychology and mitigation, do you think it's ethical to do that?

A To cut things out?

Q Uh-huh (Affirmatively).

A I wouldn't think so. I don't do that. I wouldn't like to do that.

Q Well, the social history is in evidence, but I would like to discuss just a few things. Do you have that?

A I do.

Q (Pause) Look--just going through the time line there at the very beginning.

A I have my time line at the end. I wonder if there's a page--

Q Oh, I put--yeah.

THE COURT: Mine is at the beginning.

A Okay.

Q I put it at the beginning of mine.

A All right.

Q Now, I may have just moved it around.

A I've got it.

Q The first time you see a mental health person being consulted on Miss Pike's case, at least that I see in the time line, is this Dr. Yeargan?

A Yes.

Q And that was a referral. Do you know how that referral came about?

A I believe that was because Christa was drawing penises. And also, what I forgot to mention this morning, she had brought a

pornographic picture to class with some kind of piercing through it, a penis, and that raised some eyebrows.

Q And that's how she got referred?

A That is what I understand.

Q The next one then is Dr. Straw?

A Yes.

Q And that would have been about--okay. That was at age eight. So this would have made it about age 13?

A I think--wasn't Straw about age eight or nine?

Q I may--my math may be off.

A She was born in '76.

Q I'm looking at--it says '89 to '90.

A '89 is when she saw Dr. Straw. Now, wait a minute now. That wasn't Straw. (Pause) The next person she saw was at age nine was FMRS Mental Health Counsel. That was 4-12-85.

Q Oh, I missed that. Is that in the time line?

A That may not be in the time line.

Q Okay. So--okay. So that was when?

A Actually, as I recall, mom couldn't remember if Yeargan was first grade or third grade.

So I put Dr. Yeargan for third grade. And I don't see that I put the FMRS Mental Health Counsel records on the time line. I don't have everything on the time line.

Q I understand. It's not meant to be a detailed report.

A No.

Q But--so--but when would that have been? That would have been between Dr. Yeargan and Dr. Straw?

A Straw, correct.

Q And then Dr. Straw came about--

A He was in '89 after the suicide gesture or attempt.

Q And then I think there's another one, a reference to in '91 to a--

A Hum, '90 was after that. That was Orange-Person-Chatham Mental Health Center on 5-31-90. She didn't actually--Christa wasn't actually seen. The mother went in once.

Q So that wasn't for Christa then--Miss Pike?

A I think that it was meant to be for Christa. I don't know who referred Carissa, but Carissa went in once and didn't come back. She

went in--Carissa went in complaining about Chris--Christa.

Q Uh-huh (Affirmatively). And then the next one is the, I guess that I see on the time line, Kaiser Permanente?

A Correct.

Q What--what is that?

A It sounds like a hospital.

THE COURT: Permanente is a--it's an HMO; isn't it?

A Some kind of Mental Health Center.

THE COURT: It's a health maintenance organization.

A She saw somebody named Chuck Helton there.

Q Okay.

A And she was seen once there.

Q So that was just a one time incident, a one time consultation?

A Yes, after the suicide attempt.

Q Well, wasn't it after--according to this time line, wasn't it after--

A Oh, that was the Steve Kyaw thing.

Q --Steve--Steve Kyaw--

A Right.

Q --and Christa Pike?
A Yes.
Q Apparently, she had pulled a knife on him--
A Yes.
Q --after he had been beating her?
A Although she also made--I'm sorry. She also made a suicide gesture in seventh grade. I'm not sure if it was before or after Kaiser.
Q And the complaint there, I guess, other than the incident about the knife and Kyaw, is that she would not do chores, was argumentative, having problems with behavior--
A Yes.
Q --I guess it's fair to say?
A Right.
Q And then I see a shake--
A Of course--I'm sorry.
Q I'm sorry.
A It also does list her depressive symptoms--
Q Right.
A --to be complete. Yes, it does list Shaeffer House after that a few months later.
Q Then--okay, yeah. The symptoms are:

depression, insomnia, irritability, decreased appetite?

A Yes.

Q Right. Then the next one is Shaeffer House?

A Uh-huh (Affirmatively).

Q And what's your understanding of the--was there any kind of counseling or anything involved with Shaeffer House?

A Yes, there was a social worker, the gal who testified here. Kerry Clements saw her twice a month, and she was there for about three months.

Q What's the next one--the next place?

A After that she goes back to Orange-Person-Chatham Mental Health Center, and this time she sees Peter Kramer who is a social worker. And he's the man that I interviewed over at--in North Carolina, and she's seen once by him. And this is when Mr. Kramer first recommends in-patient treatment for her--

Q All right.

A --her being Christa.

Q Hum, is there something there then after that, between that and Swananoa?

A Yes. Then--well, it's not really

counseling per se. In the Juvenile Court records we see another note from Peter Kramer, and we see Peggy Hamlett's recommendation for the hospitalization after Swananoa. So Peter Kramer is probably the last out-patient, and then it's Juvenile Court people.

Q So at least by my count I'm seeing there's seven or eight mental health counselors or professionals that Miss Pike would have seen growing up?

A Well, one of them--the first one she saw a few times. The second one she saw twice. The third one I have one record from. The fourth one she didn't really see. The fifth one she saw once. Shaeffer House she saw five to six times. The next one--am I on seven?--she saw once.

Q Seven, uh-huh (Affirmatively).

A That is not really overwhelming mental health treatment. That's pretty skimpy. That's--

Q Were there any--in the seven were there--

A --that's called--that's what I call window dressing.

Q Well, my question is--I guess by my count that's seven.

A Seven stabs at window dressing.

Q Seven mental health professionals that she saw?
A Well, remember I said one she didn't see at all.
Q Well, I thought we were--I thought if you just counted--well, six or seven.
A No, the--no, mom went in.
Q I know. But I thought--even if you discount that I thought we had seven.
A Well--
Q But six or seven.
A --we can recount them.
Q Sure.
A One, two, three, four--actually, it's five. The first one was Yeargan; the second is FMRS; third is UNC; fourth is Kaiser; fifth is Shaeffer; and then sixth is Orange-Person. So it's six.
Q Six, not counting the one she didn't see?
A Correct.
Q Okay. (Pause) Let me ask you about the --your social history then, moving on to page 10. Now, you indicated there was some suspicion that Miss Pike had sexually abused some other child in the family?

A Yes. I think the allegation was made about Lindsay, the father's little daughter, Christa's half-sister, and Keith, Alicia's four-year-old son.

Q And you--I think you also indicated that Lindsay actually disclosed at least some indication of inappropriate behavior? It wasn't very clear because of her age?

A It wasn't very clear because I--I've heard different stories about what she said.

Q Okay. Did you receive any reports? Was it ever referred to the--(Pause)

A I don't believe--

Q --state--

A --not that I know of.

Q --whatever state agency?

A Not that I know about.

Q So these reports you're getting from family members telling you this?

A Right.

Q And--but you discount that?

A Well, I--I don't discount it. I--I'm hesitant to label somebody sexual offender. I mean that's true of Ernest too who's also being accused of sexually abusing Christa, I suppose, which would

be helpful to her mitigation. But, you know, I haven't talked to these people, and I don't--these are just glimmers of possibly something. It's--it's noteworthy; it's of interest. If I'd been around back then, I would have looked into it more. I--I just don't know. I don't want to draw firm conclusions about--

Q So you don't want to say one way or the other?

A It's a possibility, but I can't say definitely.

Q And at least when you're talking with Miss Pike about her own sexual abuse at the time you were preparing this--let's see. On page 10 she says she has no recollection of Ernest abusing her-

A Correct.

Q --or anyone else?

A Right. You know, and she could have made a big deal out of it. And she said, (Slurring) "I don't remember it."

Q Right. So based on that it's your--do you have a conclusion that she was, in fact, sexually abused or do you just--

A I wouldn't conclude that she--from that

incident with Ernest I don't know. Yes, it's of interest that she's drawing penises and taking porno!--a first grader taking porno to school, especially weird porno like that. It's of interest that she's stroking women's breasts inappropriately, but I--I don't know that it's because of Ernest.

Q Or anyone else sexually abusing her?

A Or anyone. Well, that's right because her mother, apparently, is pretty promiscuous. There's lots of men around. If she's got a porno magazine that she's bringing to school, where's she getting that from? And I think that I know where she's getting some of this from. I don't know.

Q You're not--so you're not prepared to say--at least you weren't then anyway, that she was the victim of sexual--Miss Pike was the victim of sexual abuse--

A Well, I--

Q --aside from the rapes? I understand.

A That'd be right, correct, at that age. I'm not saying she is; I'm just saying I don't know. I'm not saying she is or isn't.

Q Right. And that doesn't form a basis then of your conclusion of borderline personality

disorder?

A Well, yeah, it's a part of it. It's a possibility, but I--there's certainly more evidence for what happened at eleven--there's a police report--and age 17 when there are medical records of her being bruised and upset and crying. So that's--that's--

Q Those are--

A --becomes more-

Q --you're talking about the rapes, right? Isn't that what you're discussing then?

A Yeah. I'm saying that those came more recently in time, and there's actual documentation as opposed to that which happened years ago which there's--seems to be a lot of family gossip and rumors.

Q Uh-huh (Affirmatively). And you're--so really your borderline personality disorder, the sexual abuse or violence that you're really resting on there are these rapes as opposed to the rumors and gossip of the family about--

A I'm not basing it on Ernest. I'm saying it's a possibility. And Steve Kyaw forms a part of this sexual abuse. Twisting this teenagers nipples is not appropriate whether she pinched him on his

penis or not.

Q Do you consider that sexual abuse then?

A Oh, I do, yes, her pinching his penis or him pinching her on the nipples.

Q Who--let's move on then to page 14. (Pause) I think--looking at that top paragraph, I mean you concluded that Christa was shuffled back--Miss Pike was shuffled back and forth from her mother and her father while she was growing up a lot of times?

A Yes.

Q Isn't it fair to say, based on what you have in the social history, that part of the problem, not the only problem, but a part of the problem is that they were both having trouble controlling her?

A That that's why they passed her back and forth because she was--

Q In part.

A Oh, I think that is the reason they gave for passing her back and forth. That's one of the reasons they gave, yes.

Q (Pause) And then moving down there to that third paragraph, and this--I think this is the Steve Kyaw incident with the jacket.

A Uh-huh, yes, I see it.

Q And the fight, I guess, is the best way to describe it anyway. You indicate there, there in the middle of the paragraph, that at one point Steve Kyaw told Miss Pike's mom you--she has to go; Christa Pike has to go.

A (Pause) I see that, uh-huh (Affirmatively).

Q Yeah. And Miss--her mom's response was if she--if Christa had to go then so would she, words to that effect?

A She said that. I don't believe her. (Laughing) But she did tell me that.

Q Well, they stayed together; didn't they? I mean they went to counseling instead of kicking Christa out at that point?

A Well, mother reported to counseling that she didn't believe Christa, that that had happened.

Q I understand but that wasn't my question.

A And I--

Q My question was: at that point did they kick Christa out of their home?

A Well, I don't remember if she--I think she did go to her father's house for three weeks. For three weeks she went to her father's house.

Q And came back?

A And came back because it had been mediated that Kyaw would leave and she would drop--Christa would drop the charges.

Q So in essence after the three weeks were over and they'd gone through mediation, the result of that was Christa stayed and Steve Kyaw left?

A That was the result.

Q (Pause) Would you stay that's a time that Ms. Pike stood up for her daughter at least once?

A No. I don't think it happened the way Ms. Hansen described it, that she bravely stood up and said, "If Christa goes, so do I." I think that the mediation said that--

Q Well, this is--I'm reading from your report. (Pause)

A I do not believe Carissa Hansen said to Steve Kyaw, "If Christa goes, so do I." I think that that was forced by the mediation.

Q Where do you get this statement? "Carissa bailed him out, and when he returned home he said Christa had to go. But **Carissa** said that if Christa went so did she."

A Yes. And I'm telling you I don't believe

that's how it happened. I think mom shipped Christa off for three weeks and then the--

Q Well, if you don't believe it, why is it in your report?

MR. DAWSON: Your Honor, I would object and ask that he allow Dr. McCoy to finish her sentence.

THE COURT: Yeah, let her explain that and then I'm going to let you follow through-- follow up.

A Well, first of all in this report I'm not saying, as I write each sentence here, this is the truth. You'll note that I've got--at the end of each paragraph I'm ascribing who was the one who gave me this information. This is simply information that people gave me. I haven't put a judgment on it and said this is right or this is wrong. But I'm telling you now what my opinion is. I don't--I don't believe Carissa, not just because of my interactions with her but because of what all the people I have met, including all of these Juvenile Court people, have told me. And what they've told me confirms my feelings about Carissa.

Q I'm not asking you if Carissa Hansen was protective of Christa Pike all the time. I'm

asking you on this one occasion doesn't this statement and the fact that three weeks later Steve Kyaw was--left the home and Christa Pike was there indicate that on this at least one occasion Carissa Hansen stood up for her daughter?

A No, it does not.

Q So you're not vouching then for any of these statements in here. You're saying that you don't--you're just putting them in there; you're not vouching for their truth or accuracy?

A Correct.

Q (Pause) Page 16, there in that--the second full paragraph, this was the sum--I think you're addressing the summer before she went to Job Corps, which would have been 1994, the summer of 1994?

A (Pause) Okay.

Q And does that indicate that Miss Pike was growing marijuana--

A It does.

Q --that summer? (Pause)

THE COURT: I'm sorry. What page are you on?

MR. PRICE: That was--well, I lost it.

A Sixteen.

MR. PRICE: Thank you.

THE COURT: Sixteen.

Q (Pause) Moving on to 8--page 18, the bottom of page 18, and I think you've already hit on this. But I mean you wouldn't--would you agree from Mr. Pike, Glen Pike, to Carissa Hansen there were sort of two different philosophies of discipline, if you will--

A Seems like it, yes.

Q --with Mr. Pike being--

A Spare the rod, spoil the child.

Q Exactly. A lot of spanking or paddling or whipping, I guess, depending on how you looked at it and the mother trying to be buddy/buddy with Miss Pike?

A Yes, trying to be friends.

Q And neither one of them seem to have any --have worked with Miss Pike?

A That's true.

Q (Pause) And speaking of that issue about --I'm moving on to page 20, but it's the same issue about the--Mr. Pike, Glen Pike, spanking. You don't see and you never knew of any indication where Mr. Pike made Christa Pike drop her pants before he spanked every time or-

A No. And she told me it was through her panties.

Q Or through her clothing, I guess, is what I see here?

A Yeah.

Q (Pause) Page 21. The Swananoa-I'm looking at the second paragraph there or first full paragraph on that page. I mean one of the reasons there--you indicated she was sabotaging herself there keeping her there longer. But I mean that--what was happening there is she was being kept well beyond the normal time line because of her behavior?

A Yes, well beyond, probably--maybe even a year beyond.

Q (Pause) And you indicated--I mean you cite this one, at least, example, though this was at home, of behavior where Gerard Hanson, I guess, is now in the home?

A Yes.

Q And that's her present--that's Miss Pike's present step-dad by her mother?

A Yes.

Q (Pause) And that situation--(Pause)--well, let me read it myself, gather my thoughts.

(Pause) I think Miss Pike wanted to go out for the evening and her mother was trying to keep her in. And so they ran upstairs and climbed out the window with bed sheets?

A I think it was just Christa who did that.

Q Oh, they ran upstairs. Okay. Right. Christa was by herself?

A Right.

Q And then when they got her back with the police there, Gerard Hanson had to physically hold onto Christa to keep her from running away?

A Yes.

Q And running away was a frequent problem?

A Yes.

Q In fact, I think Peggy Hamlett had a problem of trying to deal with Christa-Miss Pike because of the frequent running away?

A Yes.

Q And she would run away to the beach-

A Yes.

Q --sometimes? (Pause) At the bottom of that page you mentioned also that Mr. Hansen at least suspects that she was running drugs for someone?

A Yes.

Q I guess, in fact, Miss Pike confirmed she was running drugs?
A Yes.
Q (Pause) At least on page 22 then of the last paragraph, one reason--when this--when her, Miss Pike's--Carrie Ross took in Miss Pike's sister but didn't take in Christa Pike, one reason she offered you anyway in this report, is she didn't want that influence in her home?
A Correct.
Q (Pause) Page 24, at the first--top of the page there you've mentioned a hyaline membrane?
A Yes.
Q Do you know--what is that? I--
A I don't know. I wish you had asked Carrie Ross; she would know.
(Whereupon, the parties laughed.)
Q I didn't know what it was. You don't know whether that actually turned out to be true or not or--
A I know she was hospitalized for a week after birth, but I don't know anything about what that is.
Q Okay.
A Of course, I'm not a medical doctor.

Q (Pause) Page 27, the--we've watched the video. I don't know that you were in there for that, the video of the slaughter house. How does that play into her borderline personality disorder, this being at the slaughter house?

A I don't know that it--it plays so much into that. I said I think it has desensitized her, the slaughter house and those horror movies that she watched from a young age that her mother thought was just fine to watch. I think that when you watch grizzly, gory stuff--I mean there's lots of research about children watching violence and how that affects people, if you have a steady diet of that kind of stuff.

Q And you say that desensitized her?

A Yeah, I think it desensitizes a person to blood and gore and bones and all that.

Q All right. Would you say Miss Pike, for whatever reason, was drawn to the slaughter house and to these horror movies?

A Yes, she was.

Q Now, is that the re--because of her borderline personality disorder or is that something else?

A I don't relate it to that, and I don't

know why she was drawn to that. I don't know if the slaughter house thing started because that was where she got to see her Papaw and then one thing led to another, and that watching the horror movies was her only way of spending time with her mother. I don't know. I just know that she liked those grizzly movies and she enjoyed going to the slaughter house.

Q At the bottom of the page there on 27 you also mentioned that essentially Christa Pike growing up was a kleptomaniac, never leaving the door without taking something?

A Yes.

Q At least that's how her sister described it and--

A And she agreed.

Q And she agreed.

A Christa agreed that that was true.

Q And now on the next page--

A Can I add something--

Q Sure.

A --since you've been asking me how does that relate to borderline? That is an impulse control issue.

Q And that's an example of being--not being

able to control your impulse?

A Yeah, that can be an impulse control thing.

Q Is kleptomaniac another disorder in here?

A Yeah, it can be another disorder.

Q You didn't diagnose her technically on that?

A No.

Q This--on page 28, the idea about throwing the puppy up and letting it hit the ground--

A Yes.

Q --time and again--

A Right.

Q --is that part of the impulse control issue?

A I can't relate that to that. I don't see it as that.

Q What is that from?

A I really--I just don't know.

Q The description there is, of course, that she had this puppy George and was throwing him up in the air when she was nine or ten and allowing him to hit the ground, pick him up again and love on him and then throw him up in the air again.

A Right.

Q (Pause while looking through social history) I covered that. (Pause) You did find evidence--now moving on to page 32--of I think you described it on your direct of while at Swananoa there was some at least dabbling in Satanism?

A Yes.

Q And what was the--what did you base that on?

A I didn't hear the first part of your question.

Q What did you base that on?

A Base what on?

Q This dabbling in Satanism.

A Oh, that was--

Q I mean how did you come to that conclusion that that was going on in Swananoa?

A Hum, I think I read in the records and also there was a witness here who talked about--something about that. But I read in the records that one of the staff came upon the girls in one of the cottages in a room late at night with a candle burning and a pentagram drawn on the floor.

Q You would agree a pentagram is commonly associated with satanic elements?

A Oh, I think it's commonly associated with

adolescent girl nonsense.
Q Well, then why not contribute that, what was going on there, to adolescent--adolescent girl nonsense? Why do we call that dabbling in Satanism?
A I don't really think she was dabbling in Satanism. I don't think Christa Pike has a clue as to what Satanism is. I think that she was doing it with Tadaryl because that was Tadaryl's thing. What I said yesterday was if he had been dabbling in Bonsai pruning, she would have been doing that as well.
Q But you're recording this here at Swananoa before she even knew Tadaryl Shipp; is that fair?
A Right. It says, "Dabbling in satanic ideas." That's not my phrase; that's their phrase that the records make note of. And when--
Q Then you--but you also reference the testimony that we prior (sic) had in this hearing as well of them being in a room and chanting around the pentagram?
A I don't take it seriously. That's my opinion. It wasn't--it's not a big issue.
Q But you included that in this dabbling in

satanic ideas?

A I put a quote from the records in the interest of accuracy--

Q And also referenced the statement earlier in the hearing, did you not? I didn't prompt that.

A I'm trying to be complete--

Q I understand.

A --and fully forthcoming.

Q And right. And so in essence of being complete and forthcoming you put those together and it indicated and supported dabbling in Satanism?

A Not to me.

Q (Pause) In essence you just think that was adolescent girl nonsense?

A I do.

Q What about cutting a pentagram on a young woman? Is that adolescent girl nonsense?

A I believe that was done by Tadaryl, as I understood it.

Q Is that what Miss Pike indicated to you?

A I think that's what I read in the statement.

Q In her statement?

A I think Tadaryl said that in his statement, as I recall.

Q Did you review her statement?

A I did read her statement. I don't remember what she said. But I know she was leaving Tadaryl and Shadolla out of her statement.

Q (Pause) At any rate whoever did it, that's not adolescent girl nonsense; is it?

A No, it's not.

Q (Pause) Now, I'm going to move on to page 35. I think this is dealing with the incident that actually led her to being referred to the Job Corps--

A Yes.

Q --the incident with--

A Well, she had been referred to Job Corps from Swananoa. She was supposed to go to Job Corps right from Swananoa, and that held up for, I think, about a year. But this is--this was one of the last incidents before she went to Job Corps.

Q Preceding that. And in this instance what you have recorded here anyway is that Miss Pike was taken in by a woman, Beth Brown?

A Well, I don't know that she was taken in; she lived for two weeks with her. I--I don't know who had--who took her in.

Q Well, it was her home; was it not?

A I don't know.

Q With the idea being Miss Pike was going to live in the home and babysit Ms. Brown's son?

A The arrangement was that Beth Brown was going to take a class. Christa was going to babysit the two-year-old son.

Q And things apparently went from bad to worse, and you indicate that Miss Pike beat on Beth, Ms. Brown, until her son woke up?

A Right. Actually, preceding that Christa and Beth got into an argument about how mean Beth was to her son, and then they had an argument and had a fight. Christa said she beat on Beth until her son woke up.

Q All right. And then later on there was another incident where they went back to the house and Miss Pike busted in the door and again assaulted Ms. Brown or hit her a few times, I think is the way you described it?

A Yeah. Can we describe what led up to that--

Q Sure. Read all you want.

A --in the interest of fairness?

Q Yeah.

A Okay. It does say, "Christa beat up Beth

after Beth told everything Christa had stolen from her. Beth reportedly bragged to everyone that she had a bullet with Christa's name on it. And Christa said she got tried of hearing this. And then Christa went to the house with some of her friends, and there was another altercation when Christa kicked in the door and hit Beth. And, apparently, Beth had a can of Mace and Maced them.

Q So I guess then to be fair on that, what's going on there is that Beth Brown is out there insinuating--or threatening Miss Pike?

A Yes.

Q And Miss Pike decides to take it into her own hands and confront Beth Brown?

A With her friends.

Q With her friends?

A Yes.

Q And that was--I don't know if we have a time on that. Was that shortly before--that would have had to have been shortly before she went to--

A Yes. It was definitely after Swananoa and before she went to Job Corps.

Q Possibly right before, I guess. But do you think that would have been 1994 then?

A Yes, I think probably so.

Q (Pause) There was another incident with that kind of issue where there was a, I guess, maybe a Mr. Clyde--

A Kenny Clyde.

Q --who was harassing or threatening Miss Pike and her friend?

A Mother. Well, I think it started--it included Carissa as well. Carissa--

Q It did. Okay.

A --testified she was getting phone calls.

Q And how did Miss Pike handle that situation?

A He was--Kenny Clyde was calling her up and she finally said something to him along the lines, "Well, if you want it that bad, meet me at a certain place." And I--Mandy Staley was with her. And they started beating on him, and he was beating on them back because she said she--she was so angry she couldn't feel him beating on her. But I think that the two girls got the upper hand, and Kenny Clyde made a police report. And instead--the charges, I guess, were dismissed against Christa, and basically she got a pat on the head from a number of people in the community--

Q Okay.

A --because he was a known--
Q For taking care of this guy?
A Yeah, because he was a know sexually offender.
Q So in essence she planned that out of, "If you're going to keep harassing me or threatening me, I'm going to draw you out here and take care of it"?
A Yes, I think that's how it happened.
Q And ultimately he actually had to go to the emergency room with a concussion, I think the report indicated?
A I don't remember.
Q I can't find the page.
A I don't remember.
Q We've entered this. What did you say on page 44, that you--(Pause) Well, let me ask it this way. This would have been, I think, the first time you recorded Miss Pike was sexually assaulted or raped?
A Are we talking about the first paragraph, Clyde Davis?
Q No. I'm moving down to the second paragraph. I mean I guess it follows.
A I'm sorry. The first one?

Q No.

A Clyde Davis?

Q This--I'm looking at the second paragraph is what I want to focus on.

A Okay. That's--that's Clyde Davis.

Q Is that still Clyde Davis?

A Yeah. I said age nine. I didn't have the records till the post-conviction people got involved. I think it actually happened when she was a little older, maybe eleven years old.

Q Are we on page 44?

A Yeah. Sexual history?

Q Right.

A This is Clyde Davis.

Q The one--the paragraph starting "Christa picked the man out of a photo lineup"?

A Right. That was the man at the trailer park that--where mom and sister said they didn't believe it.

Q And that's Clyde Davis?

A What you're--you're confused about this because Christa said she picked the man out of a photo lineup, but mom said she didn't. And that's why she didn't believe her.

Q Well, what I'm confused about is that

last line. It says, "Although Christa's two best friends are aware of the many details of Christa's life, including the second rape, neither had heard about this first alleged rape."

A That's what they said.

Q Well, wasn't one of those two--I forget which one--involved in assaulting him?

A No. That was Kenny. It's confusing.

Q I'm getting confused. (Laughter)

A Clyde Davis--I get them confused. Clyde Davis was the first one. Kenny--now I forgot his last name.

MR. CROWSON: Clyde.

A Kenny what?

Q Kenny Clyde and Clyde Davis. Is that the issue?

A Kenny Clyde and Clyde Davis.

Q Okay. I'm sorry. I know it's--I know everybody is tired. (Pause) Did you--you found that interesting anyway that she hadn't disclosed that or at least they reported they hadn't heard that from Miss Pike?

A Well, that's what they told me.

Q Did you say one of the issues with Miss Pike anyway is that almost from a very early age

she was drawn and ran with the wrong kind of people?
A Yeah, but I--I think you see that with people who change schools a lot. When you change schools you're not usually right in the in group. You usually start out at the fringes with the other, well, rejects, and then you work you way in if you're there long enough. But she changed schools so much I don't think she ever had the opportunity for that.
Q And the result of that was she--she continued to be running with the wrong crowd?
A Yeah, I think she did run with the wrong crowd.
Q (Pause) Miss Pike indicated to you on page 53 that she felt that the Job Corps place was a very violent and dangerous place? I think that's the way that she described it to you.
A Yes.
Q And as a result she herself carried a box cutter?
A Yes.
Q I don't know where this--(Turning pages) Didn't she indicate to you in her--when you were talking with her about Tadaryl Shipp that--when she

started having conflict with Colleen Slemmer, that she wanted--Miss Pike wanted to beat the shit out of Colleen Slemmer? Isn't that what she told you?

A I actually can't remember it. Can you reference it.

Q Yeah. It's in this statement. I don't know whether it's in your--it might be in the social history, but I--

A Well, I'll look too.

Q What's that?

A I'll look also.

Q Well, I know it's on appendix 12.(Pause) I'm looking at the second page of that which would be 262 Bates stamped.

A Okay.

Q The top of the paragraph.

A Yes, I see it. "Christa told her she needed to leave him alone and if she kept messing with him she was going to beat the shit out of her."

Q And, in fact, what's the next sentence say?

A "Tadaryl pulled her away and said, 'Stop Christa.'"

Q At least in that instance Miss--Mr. Shipp

is trying to restrain Christa Pike on being violent--

A Yes.

Q --to Colleen Slemmer?

A Yes.

Q (Pause) How serious do you think they were, while we're on that page, off--

A I'm sorry. What page was it? I closed it up.

Q I'm sorry. 266.

A Okay.

Q I know we've talked about dabbling in Satanism and not being that serious. But how--when you're talking about Tadaryl Shipp and Miss Pike together, how serious were they about this Satanism/witchcraft kind of thing?

A I think Tadaryl was probably very serious. I think that Christa thought it was fun. She told me it was fun. That the other kids at the Job Corps were terribly impressed that they could concentrate on clouds and make clouds disappear or move around or turn lights on and off by thought control.

Q One thing I was a little unclear about that is is that Miss Pike--you felt like she was

saying that was like a parlor trick kind of thing or did she actually believe Tadaryl and maybe even herself had that ability?

A The way she told me she actually believed that they could do that. She--actually, she talked about when she was in jail that she woke up and was really sick and couldn't move, and she thought that Tadaryl with his incredible powers somewhere in another jail cell was able to do that to her. Apparently, Tadaryl was pretty persuasive in that regard.

Q And at least in this case they're talking about where he showed her her demon?

A Yes.

Q And she could describe it to you?

A Yes.

MR. PRICE: (Pause) I'm almost done, your Honor.

THE COURT: Take your time.

Q She did have a couple of tattoos as well?

A Are we still on that section 12?

Q Yeah--well, I'm done with that. It might be in there. But I'm--can we go back to the social history, page 55?

A Yeah, she did. She had one that I think

she got before the Job Corps that said "Little Devil", and then she had one that was self applied that said "No. 1 bitch". She got that when she was twelve.

Q The devil tatoo she had before she went to--

A The No. 1 bitch one she did, but I--I kind of thought she'd gotten the little devil one before that also. Have I said--

Q And--

A --have I said otherwise?

Q I don't know. I just didn't remember it being--when it was.

A Yeah, I thought--I think it might have preceded Tadaryl.

Q Okay. Your memory is at least that that --that devil tatoo preceded her ever meeting Tadaryl Shipp?

A I really can't remember that. I'm sorry. I know that she had the No. 1 bitch one when she was very young. It might be in here if we looked at it.

Q And do you recall a name that Tadaryl Shipp had for her, a nickname I should say?

A Lil' Devil.

Q And that's the way Miss Pike, in fact, would sign her letters back to Tadaryl Shipp?
A Yes.
Q (Pause) My last area--this section on Colleen Slemmer, page 58--
A Okay.
Q How did she describe Colleen Slemmer coming into the Job Corps?
A She said that once a month some little whore would come to the Job Corps and get a name for herself, becoming so disliked by both males and females alike that she would end up having to go home. And this is how she categorized Colleen.
Q And they--I think they might have at some point--I can't tell--may have been friends during that Fall or whenever she came in?
A That Colleen and Christa were friends?
Q Yeah.
A Well, Christa talks about not always having problems with Colleen. She talked about seeing Colleen crying at one point and going up to her and trying to console her. But evidently it was not a good relationship between these two girls.
Q And when they came back from Christmas,

which would put us into January of 1995, Colleen Slemmer was causing Miss Pike a lot of problems?

A Yes. Actually, I think it's probably important to mention that before that Christa talked about waking up at night and seeing Colleen in her room rummaging through her stuff. And then I've also heard that she held a box cutter to her throat. I didn't hear that from Christa. I heard that from other people that Christa related that to. But, yeah, when she got back from Christmas Colleen was causing her a lot of problems.

Q And she felt--and Miss Pike--I don't know if it's because of what was going on with Mr. Shipp or Colleen or both--she felt her status slipping--

A Yeah, I think it--

Q --at the Job Corps?

A I'm sorry. I think it was a number of things there that was contributing to that, I think. Tadaryl had had sexual relationships with another little girl named Eshsha (Phonetically). And Christa knew she was perilously close to being kicked out of that place in which case she wouldn't be around Tadaryl anymore. And Tadaryl had lost interest in her and was not as protective and caring of her as he had been.

Q And Colleen Slemmer herself was publicly ridiculing her, I think you mentioned?
A Yes.
MR. PRICE: (Pause) That's it, your Honor.
MR. DAWSON: Your Honor, could we take a break, a short recess, before I--
THE COURT: I was about to do that.
MR. DAWSON: Thank you.
THE COURT: Let's take a brief ten or fifteen minute recess.
MR. DAWSON: Thank you, your Honor.
THE COURT: Do you have any other questions you want to ask Dr. McCoy? May she be excused or--
MR. DAWSON: Your Honor, I'm going to have just a very brief number of questions for Dr. McCoy.
THE COURT: Okay. Okay.
A I've got to be out of here--
THE COURT: Well, tell him.
A I am going to tell him.
THE COURT: What time do you have to--
A I have scheduled all my clients for late in the evening so--

THE COURT: What time?

A Starting at 4:00.

THE COURT: Dr. McCoy has clients beginning at 4 o'clock so--

MR. DAWSON: I know, your Honor. I think we'll be--we'll be fine, your Honor. If we could take about--if I could just have a five minute recess, I can--

THE COURT: About five minutes and then we'll--we'll get you done, Dr. McCoy.

Thank you, Don. It was much appreciated.

COURT OFFICER CAMERON: Yes, your Honor.

(Whereupon, a recess was taken; afterwards, the following proceedings were had, to-wit:)

THE COURT: One more question.

MR. PRICE: One more question.

THE COURT: **One**!

MR. PRICE: (Laughing)

Q Did you at anytime discuss Miss Pike's case, the details of it, with Mr. Crabtree?

A No.

MR. PRICE: That's all I have.

REDIRECT EXAMINATION

BY MR. DAWSON:

Q Dr. McCoy, just a couple of questions at this point. (Pause) Mr. Price had asked about, you know, why would you need a psychologist in--to do mitigation work and to interview these witnesses? Are there times when the people that you're actually trying to interview have also suffered from some mental illness or traumatic experiences that require somebody with some professional experience to actually get the facts out of them?

A Yes.

Q And is that something that you can do as a psychologist?

A Yes.

Q That a--an investigator, for example, doesn't never--doesn't necessarily have the experience or the training to deal with that?

A Yes.

Q Dr. McCoy, you were--you were asked about--(Pause)--whether you expected the State to be able to get your interview notes and the materials that you collected. I think you said that you did expect that they would. Did you expect the State to get the information that was in your report that you had collected without having

an opportunity to have some expert witness or somebody explain what the negative information in there meant and how it fit into the diagnosis?

A Absolutely not.

Q And you were asked a little bit about--at one point you were talking about--you were being asked about the issue of psy--psychotic episodes with somebody who has borderline personality disorder, and you had mentioned it having dissociative aspects. Could you explain what that is?

A Dissociative aspects are when a--a person detaches from a situation and distances themselves. For example, they might see themselves hovering above a situation or they're not really part of the scene going on. And a lot of times dissociation--the reason why you have it in borderline is because it comes from abuse situations. When a person is being abused, a defense of dealing with the pain of that is to separate themselves. "I'm not actually being sexually abused here; I'm off in that picture on the wall." So dissociation stems from abuse situations, and you teach yourself as a defense to shield yourself from the emotional trauma of the event.

Q And would that be true both in--if it's

sexual or physical abuse?

A Yes.

Q And are you aware of any indication in this particular case as to whether, during the crime itself, Miss Pike experienced any dissociative element?

A As I--I remember reading in a statement that she described herself to Randy York as not--that she was looking at herself performing these acts. That she didn't really feel herself actually doing it at the time.

Q And you were asked about, briefly I guess, you were asked about the 2001 incident at TPW. Were you aware of what kind of conditions Miss Pike was in at TPW at that time?

A No.

Q Okay. And are you aware that at some point Miss Pike was placed on medication for a psychiatric condition at TPW?

A Yes. I believe in 2002.

Q Okay. And that was for a diagnosis of bipolar illness, correct?

A That's what I understand.

Q Okay. And have you had a chance at all to look at the records of TPW since she was placed

on that medication?

A Yes. I've reviewed the records of TPW.

Q And is there a dramatic change in her behavior and her conduct issues that occurred before being placed on the medication and afterwards?

A Yes. I remember that there was a number of write-ups for infractions prior to the medication, and then I think maybe just one or two since she was placed on the medication.

Q Let me ask you. You also were asked about the issue of whether or not you saw any PTSD or made any diagnosis of PTSD and you said that you hadn't. Are there things in the report that you did and in the--and in the information that you learned through this case that would be consistent with somebody that would develop a post-traumatic stress disorder ailment?

A The rapes and the physical abuse would be consistent with someone. Whether she had the symptoms or not, I don't know. I didn't explore that with her, but she certainly had enough things happen to her that she could develop PTSD.

Q And you were asked if you were just looking at things that agreed with Dr. Engum. Were

you just trying to do a general social history and gather as much information as you could about Christa Pike or were you actually looking for things that agree with Dr. Engum and leaving out the rest?

A No. I was actually--I was doing, I guess, both in a way. I was doing a social history, large scale social history, and I understood he had diagnosed her borderline personality disorder. I didn't have a problem with that. And I was going to put my material within the framework for borderline personality disorder, essentially in agreement with this diagnosis in the guilty phase.

Q Would it be accurate to say that after you had collected everything and after you had analyzed it and written a report that it just happened that the information was consistent and, therefore, you could emphasize the borderline?

A It didn't really just happen that way. I mean I didn't go out of my way to pick material that was borderline, but it was a nice meshing. It was really perfect that he had done that diagnosis and the material that I uncovered was absolutely consistent with that. There was--it was fairly seamless.

Q So it wasn't cherry picking information; it was just that that's what was there?
A No, I don't think anybody could accuse me of cherry picking with this. I've got everything that I found in this report.
Q (Pause) And let me--you were asked at one point by Mr. Price whether you thought that the jury would somehow get lost in the subtleties of the borderline diagnosis. Is this record that you had and you could present--is this subtleties?
A I don't consider it subtleties. I think it's--I think it's a fairly powerful record I've collected. I wish I had this kind of mitigation evidence in all the cases that I do. It's--it's a fairly dramatic profile of--I mean I considered just posing the educational disruptions over the marital. And it was so complicated and so chaotic, I couldn't make one unified chart because there's just so many things in her life that would contribute to borderline. So I--I didn't see it as subtle. I saw it as dramatic.
Q And I think that this is sort of the poster child for borderline in looking at her social history?
A Well, that's--that's my phrase. Yes,

she's a poster child for borderline. (Laughter)

Q (Pause) When Mr. Price was going through the social history, he was pointing out that one of the items was that Miss Pike had brought pornographic pictures to class in an early--one of the early grades. Is this further evidence of the likelihood of what kind of--either sexual abuse or at least inappropriate sexual observations or activity in the home?

A Well, I mean, obviously, if she's had access to a pornographic magazine there's something inappropriate going on that she's--that she has access to it and is bringing it in.

Q And Mr. Price had asked you about--kind of to go through the psychological treatment, and I'm going to hand you--

MR. DAWSON: Could I ask that this be marked as the next exhibit, your Honor.

THE COURT: What number is that, Debbie?

THE COURT REPORTER: 33.

(Exhibit No. 33 was marked for identification only.)

MR. DAWSON: And I do have a copy for the Court, your Honor.

THE COURT: Thank you.

Q And, Dr. McCoy, do you recognize that document?
A Yes. This is a document that I prepared.
Q And this is a document that summarizes the psychological treatment that Miss Pike had received, right?
A It does.
Q And since you've gone over it, I won't ask you to go over it again.
MR. DAWSON: Your Honor, I would ask, however, that that be entered as the next exhibit.
(Exhibit No. 33 was marked and filed.)
Q And, again, when you were looking--when you were looking at this with Mr. Price or looking at the various treatments, he had--you know, he went on with the idea that there were--I think he came up--he came up with five or six actual treatments that she was involved in or treatment--treating agencies, I guess. When we're looking at somebody's treatment, are we looking for consistency of the treatment or as many different people that see her as possible? I mean what--
A Oh, obviously, we want consistency. It doesn't count as treatment if you go one place for

one session, another place for two. We obviously--

Q And that kind of consistency never occurred in Miss Pike's case, correct?

A Not that I saw.

Q And the older she got the more--the more treatment that would be required; is that a fair assessment?

A The older she got the more treatment that would be needed?

Q I mean in other words as long--the longer it went untreated the more serious it would be getting and then the more in depth treatment that would be required? Does that make sense?

A I--I would agree with that. The only thing--I do want to clarify. The only thing we don't know with Dr. Straw is how long she was actually seen by him. I only have one note. Carissa says more than that. I just don't know.

Q And, Dr. McCoy, you were also asked about the--the allegations that were in there that--that Miss Pike had sexually abused her, I guess, half-sister and her cousin. Were--

A Nephew.

Q Pardon?

A Nephew.

Q Nephew. Thank you. And the, uh--on these things--these things came in anyway, correct? These things--I mean these things were brought out in the trial anyway through the witnesses?

A Oh, yes, I believe so.

Q So essentially it was brought out without any protection for Miss Pike?

A Yes.

Q And if you testified you could have provided more infor--more information about that and brought it into perspective?

A Yes. I could have provided more information about a lot of things.

Q And let me ask you. Was there any evidence or any information that you came across that indicated that the incident with Keith--with Steve Kyaw and him eventually leaving that house, in fact, that was pursuant to a court order that he leave the house?

A Yes, that was my under--maybe not a court order, but a mediation agreement that they all reached. And whether that was in the form of a court order, I don't know.

Q Okay. But it wasn't a decision reached by Carissa Hansen, "I think I'm going to have Steve

Kyaw leave." It was somebody else telling her, "Steve is going to leave"?

A Right, or otherwise he gets criminal charges against him.

Q (Pause) And with the Beth Brown incident, do you recall, was Miss Pike babysitting for her--her child?

A Yes.

Q And she was kind of a live-in babysitter and that's how she had exposure to the way Ms. Brown was treating her child?

A Yes.

Q And that's what the disagreement began about with Beth Brown?

A That's my understanding.

Q And so was Christa Pike trying to protect the child?

A That was my understanding.

Q Perhaps not in the best way but--

A Right.

Q --in Christa Pike's way?

A Correct.

Q I think we said earlier that Miss Pike's issues involving even the Satanism both at Swananoa and at Job Corps later with Tadaryl, this is part

of the struggle that you were talking about for her religious identity?

A Yes. Well, part of it was. Part of it with Tadaryl was simply because that's what Tadaryl was into.

Q So it's kind of a combination of what we talked about earlier, all this pressure to have somebody love and care about her. This is what he's interested in. She's struggling for identity anyway. And so these things all come together in this--this fashion?

A Yes. And a certain amount of that goes along with adolescence anyway, but in particular with a borderline that is emphasized, the identity issue. I saw more of her religious seeking in her interest in the Wiccans, for example, as opposed to Satanism. Wiccans, as I understand it, is the worship of nature as opposed to something diabolical or evil.

Q And, Dr. McCoy, you were also asked, I think a couple of times--made the point that you weren't vouching for the truthfulness of the statements in the material but just writing in what people had said?

A Yes.

Q And how do you then--using all of the materials that you had, how do you arrive at what you believe to be the relative truth about what was happening in Miss Pike's life?
A I arrived at my opinions based on my interviews with people, and interviews with Christa, the documents, and trying to sift through all that and see what I can objectively prove or--prove to myself via the documents.
Q And that's where you find either a consistency between multiple people's statements or you find consistency between records and statements or just the general consistency with Christa Pike with what you're hearing; is that--
A Yes. You know, some of these opinions are so--so clear. The highly dysfunctional family, it's really hard to get around that. The number of traumatic events in her childhood, there's a lot of those and all of those issues, psychological issues--maybe it's because I'm a psychologist, but to me they're just so very obvious.
Q And in your opinion again as a psychologist and as an expert witness, can you actually convincingly show that she's a bipolar disorder without all the things in the social