**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ADDENDUM 5**

**DOCUMENT 22**

XXVII E2009-00016-CCA-R3-PD
006548

IN THE CRIMINAL COURT FOR KNOX COUNTY

DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGoad

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Petition for Post-Conviction Relief Proceedings

April 7th through April 11th, 2008

Volume 10

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Assistant District Attorney
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Post-Conviction Defender
Mr. James Crowson
Assistant Post-Conviction Defender
Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS


| Volume 10 | Page |
|---|---|
| PETITIONER'S PROOF: | |
| DIANA MCCOY: | |
| Redirect (continued) | 901 |
| Judge's Statement about Taking Everything into Consideration for the Past Twelve Years | 904 |
| STATE'S PROOF: | |
| RANDY YORK: | |
| Direct Examination | 916 |
| Cross-examination | 930 |
| Redirect | 976 |
| Recross | 977 |
| PETITIONER'S PROOF: (continued) | |
| HERBERT SANFORD MONCIER: | |
| Direct Examination | 982 |

history that you have brought out today and yesterday to the Court?

THE COURT: That she's bipolar disorder?

MR. DAWSON: I'm sorry. Borderline.

THE COURT: That she was borderline personality disorder at the time?

MR. DAWSON: That's what I'm trying to say, your Honor.

THE COURT: Yeah, okay.

MR. DAWSON: Thank you.

THE COURT: Can you answer that one? I'm still listening but, you know, yesterday at this time you promised one more question. I'm just wanting to remind you.

MR. DAWSON: This is my last question, your Honor.

THE COURT: Uh-huh (Affirmatively).

A I'm sorry; I'm going to ask you to restate it.

Q Okay. Let me rephrase it because I've been--

MR. DAWSON: I thank you, your Honor--

THE COURT: You're very welcome.

MR. DAWSON: --for correcting--as to my confusion.

Q Can you--do you think as an expert witness and if you were actually testifying as a psychologist that you could convincingly make the point that Christa Pike has a sever or extreme borderline personality disorder without talking about all of these things that you've talked about, all the--both negative and positive things in Christa's background and life?

THE COURT: Or had it at the time of the offense?

MR. DAWSON: Right.

A Could I make a convincing argument to a jury about borderline personality disorder without my materials, without talking about all of the incidents?

Q Right.

A No.

Q I think that all of these things are very important illustrated; otherwise, it's just me talking about symptoms from the DSM. I don't think that that would be persuasive without many anecdotes and documents and witnesses to also illustrate it.

Q Thank you, Dr. McCoy.

MR. DAWSON: No further questions.

THE COURT: General Price.

MR. PRICE: No questions.

THE COURT: May Dr. McCoy go back to her office now? (Laughing)

MR. DAWSON: She may, your Honor, and, in fact, we will help her get her things.

A And I'll be very quick.

THE COURT: If you would, go ahead and help Dr. McCoy for just a minute.

While Dr. McCoy is gathering that, can I ask whether Exhibit 14, the manuals that Ms. Rice was supposed to return back to the Court, have ever been delivered?

THE COURT REPORTER: No, ma'am.

MS. JONES: The manuals?

THE COURT: The three manuals regarding capital--the capital case--Capital Resource Center's manuals.

MR. DAWSON: I don't think we've ever seen them, no, your Honor.

THE COURT: No, I don't think we have. (Pause) Also, I think I want to say on the record, when everybody is listening because half of them aren't--they're going to have to hear it; so I'll wait.

(Whereupon, Mr. Dawson con-
tinued to help Dr. McCoy
get her things together.)

THE COURT: What happened to Exhibit 33?

MS. JONES: Dr. McCoy's still got it, I guess.

MR. DAWSON: It is--what is it, your Honor?

MR. CROWSON: The board.

THE COURT: The last exhibit, 33, the psychiatric schedule list.

Also, I need to say for the record--and I want to say this now so I don't forget to put it on the record when we're really tired as opposed to now--that in consideration of--when I take into consideration everything, I'm going to take judicial notice of the entire record, trial to the completion of this hearing, which will include all of the evidence, transcripts. We're going to review all of it, all of the psychological evaluations that were done at various times during the course of these proceedings, and everything is going to be taken into consideration. So I wanted to let you know. And I am going to take judicial notice of the last twelve years, at least my

history with Miss Pike.

MS. JONES: They don't have to make the transcript an exhibit.

THE COURT: Yeah, the transcript doesn't need to be made an exhibit if you don't--

MR. DAWSON: I understand, Your Honor.

THE COURT: Yeah.

MR. CROWSON: Actually, if we hadn't already asked for that, we were going to ask that the Court do that. So thank you very much.

THE COURT: Well, I thought about it Monday, but I'm afraid if I don't say it now I'll forget it in the--in the haste to go home so--

MR. DAWSON: Your Honor, we might have reminded the Court anyway because we very definitely want the Court to take judicial notice of the record.

THE COURT: Well, there's a lot to take --there have been psychological evaluations all the way through this proceeding so--

MR. DAWSON: Right.

THE COURT: Then I've got the 2002 reports, everything, and it's going to take us quite a long time to put together organizing--work this through as soon as we get Suttles finished.

MR. DAWSON: Yes, your Honor.

THE COURT: Anything else, Doctor?

DR. MCCOY: They're looking for Exhibit 33. I don't have one that's marked. What I have is that.

MR. DAWSON: Did I put it back?

THE COURT: You gave me a copy.

DR. MCCOY: I gave it to you. No, that's my stuff.

THE COURT: You gave me a copy. Do you want me to give you back mine?

DR. MCCOY: Oh, here it is.

THE COURT: Okay.

DR. MCCOY: Sorry.

THE COURT REPORTER: I knew I--

THE COURT: Thank you, Doctor. (Sighing)

Counsel, will you all approach the bench when you have a minute.

(WITNESS EXCUSED)

* * * *

(Whereupon, a bench conference was held as follows:)

THE COURT: I was going to give a gold star because you didn't ask how it was to be with Bill Crabtree.

(Whereupon the parties laughed.)

THE COURT: Where are we going from here? We need to call York. He's going to take a little while.

MR. CROWSON: I think Herb Moncier will be pretty quick.

THE COURT: Okay. Herb's been waiting. I'm willing to keep--I'm willing to go today until we can get these short witnesses done, if everybody else can. If you think--how long do you think it will take?

MR. CROWSON: The only problem with that is the shortest of the short witnesses, Isaacs, will be coming tomorrow morning first thing. Each of the--

THE COURT: You're going to add three more witnesses, and Christa is right. You lie. She's been telling me that all day.

MR. CROWSON: She's what?

THE COURT: She's been telling--we've been having discussions all day.

MR. CROWSON: Your Honor, I was trying to tell you--(Inaudible phrase)--court officers.

MR. DAWSON: Lying is a difficult word. What I say if I think it's true, it's not a lie.

THE COURT: Okay. So do you want to start with Randy York-

MR. DAWSON: That would be fine, your Honor.

THE COURT: --and let him--because that might take even longer than Herbert. Once you get Herb on the witness stand he'll never get off.

MR. DAWSON: Yeah, I think--why don't we --why don't we do--

THE COURT: So we're going to do him and Herb.

MR. DAWSON: That's right.

THE COURT: And we're not going to start Dr. Kenner until tomorrow?

MR. CROWSON: Right.

MR. DAWSON: Are you sure?

MR. CROWSON: He should--he should be ten minutes. I mean he's got one thing to say.

MR. DAWSON: Yeah, he got--he really does. He's about--

THE COURT: You obviously don't know Greg.

MR. CROWSON: Don't know him.

MR. PRICE: We have a video but I don't know if we have to play it.

THE COURT: What the hell is it?

MR. PRICE: It's the video where she-- where the audio didn't work.

MR. CROWSON: Where she's reacting (sic) the crime.

THE COURT: Oh, where she's reenacting the crime. Is that the only other video or is there another one with Dr. Kenner?

MR. CROWSON: There's one with Kenner, just comment upon--and it's about five to seven minutes--

(Whereupon, counsel briefly spoke simultaneously thus indiscernibly.)

MR. CROWSON: --of a ghastly horrible record, stuff from horror movies that Christa watched with her mother as a child.

MR. DAWSON: Dr. Kenner is going to talk about the effect that would have on a child.

THE COURT: Okay.

MR. PRICE: This video--I can't get it to play up here. I'd just as soon-

MS. JONES: I have a commitment; I'm going to have to leave pretty soon.

THE COURT: I'm going to go as far as I

can go. See if Greg can come even late, even after 5:00.

MR. DAWSON: Go ahead and make it just the section-

THE COURT: If you want to.

MR. CROWSON: Yeah, we've got to put-

THE COURT: Is he out of town or--

MR. CROWSON: He's in another (Phonetically) county unfortunately, yes. He's not in Knox County. Even the court house says--(Indiscernible phrase due to background noise).

THE COURT: It got buried somehow. So probably another hour of court. (Referring to tomorrow's docket) It won't take that long. It's not like today where it was lots of different problems. The only problem is I can't see--if this was a trial, I would work through lunch.

(Whereupon, several parties were speaking simultaneously and indiscernibly. Mr. Dawson is speaking to Mr. Price at the bench while Mr. Crowson is speaking with the Judge.)

MS. JONES: So you're saying that you're not going to do it?

MR. CROWSON: (Sighing) If that's what I'm faced with sitting here at 5:30 with (Inaudible word) just not doing well.

THE COURT: You know, I don't care if you all have to do it in writing.

MR. CROWSON: We are going to--

THE COURT: Well, I know, but it helps me if it's in writing because at 5:30 I'm going to be going (Indiscernible word).

MR. CROWSON: I think it will be-- (Inaudible phrase)

THE COURT: Unless you want to work--

MR. CROWSON: --through the whole thing because--(Inaudible phrase)

THE COURT: Unless you all want to do this on Monday.

MR. CROWSON: On Monday? Of what-- Monday?

MS. JONES: (Laughing)

THE COURT: We could do it at the house on Saturday.

MR. CROWSON: The Board complains about-- (Inaudible phrase).

MR. PRICE: If you want to ask him about it--(Inaudible phrase).

MR. CROWSON: --clean underwear.

MS. JONES: Did you use a dry cleaners?

MR. CROWSON: I--yes.

MR. DAWSON: I'd rather avoid the whole thing.

THE COURT: Do I have to make sure there's no errors by washing the lawyers' underwear? Do I have to fold it too.

MS. JONES: Have you found somewhere to take your stuff?

MR. CROWSON: (Laughing)

THE COURT: (Out loud) Miss Pike, do you need a break?

PETITIONER PIKE: I'm fine.

THE COURT: Oh-oh, where's Miles (Photographer)? (Laughing) It just occurred to me. Miles always gets me at my best moments. Okay.

(Whereupon, the bench conference continued as follows:)

MR. CROWSON: You're very kind to offer--(Inaudible phrase).

MR. DAWSON: I don't want to be any part of this conversation. I have enough to deal with with my staff. I'm not responsible for some parts of their mind.

THE COURT: I have to make the (Inaudible phrase) for Passover. Are you kidding?

MR. CROWSON: When is Passover?

THE COURT: A week from this weekend. My sister has to do all of the cooking.

MR. CROWSON: (Inaudible phrase)

THE COURT: I come from kosher butchers. It really wasn't as gross as you were trying to make it out. Okay. Shall we?

MR. CROWSON: Very comforting.

THE COURT: What?

MR. CROWSON: The video.

THE COURT: I don't like horror movies either. I don't watch lawyer shows either. I don't like them either.

MR. CROWSON: (Laughing)

(Whereupon, Ms. Jones gave Mr. Crowson directions to a dry cleaners.)

THE COURT: (Out loud) Well, I'm in big trouble now. Is he one of your witnesses too?

MR. CROWSON: I don't know, Judge.

THE COURT: Do you know who that is?

MR. DAWSON: No.

THE COURT: That's Jerry Becker.

MR. DAWSON: Oh.

(Whereupon, said bench conference concluded, and the Court addressed Attorney Jerry Becker.)

THE COURT: Okay. Let's get Randy in here and let's get on--do you want me to place of record that Randy worked in my court for a period of time. He no longer does.

MR. DAWSON: And we also had him on (Indiscernible word) hearing while he was working.

THE COURT: Oh, that's correct. He was also excluded.

MS. JONES: Yeah.

THE COURT: Okay. Let's get him in here. Could you call Randy York, please?

COURT OFFICER COFFEY: Yes, ma'am; he's outside.

THE COURT: I'll bet. He's been waiting all these years.

Do you all want to ask him any questions while he's under oath while we have Mr. York here? (To the court officers)

We're deteriorating, folks, and the decorum of the court is going down.

MR. DAWSON: Your Honor, if I could

check--we did move the admission of Exhibit 33, correct?

THE COURT: Which one was that?

MR. DAWSON: The one that was lost, the last one we gave to--

THE COURT: Yes.

MR. DAWSON: Okay. Fine.

THE COURT: We moved it--you didn't, but I just wrote it down as if you did. What you did not ever admit was the big poster chart.

MR. DAWSON: That's correct, your Honor.

THE COURT: And you didn't intend to.

(Whereupon, the next witness came into open court.)

THE COURT: Mr. York, would you please step up, sir. Raise your right hand to be sworn.

(Whereupon, the witness was sworn to tell the truth by the Court and responded affirmatively.)

THE COURT: The Court will--now he's got me tickled. Stop that. The Court will note that following the Pike trial when Mr. York retired from the Knoxville Police Department, he became a bailiff in this court. Throughout all of these proceedings as long as Mr. York worked in this

court, every time Miss Pike's case came up, we excluded Mr. York from the courtroom because he was a listed witness, although he **really** wanted to be in here anyway. But he has been excluded.

He now is a process server with the Sheriff's Department, having left the court services division and gone to that division. Is that right?

MR. YORK: That's correct, your Honor.

THE COURT: So that--I wanted to put that in the record so that forever they know what Mr. York's association with this Court was.

General, we're calling this witness out of order on your behalf so that Mr. York can attend a funeral; am I right.

MR. PRICE: Thank you. I appreciate the Court's indulgence on that.

THE COURT: Okay.

STATE'S PROOF

RANDY YORK, being duly called and sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PRICE:

Q Could you please tell us your name?

A Randy York.

Q And, Mr. York, back in January of 1995 where were you employed?
A With the Knoxville Police Department, Major Crimes Division.
Q And you were the lead investigator on the investigation of Colleen Slemmer?
A Yes, I was.
Q And as part of that investigation did you have an occasion to interview Christa on January 14th, 1995?
A I did.
Q Okay. Can you tell us--where did you first see her on January the 14th, 1995?
A The first occasion I met her was at the Job Corps Center.
Q And where at the Job Corps Center?
A It would have been in her room.
Q And what time of morning--or what time of day was this?
A At that time I believe it was between 6:30 and 7:30, somewhere between there.
Q And, uh, did you say it was in her room? Is that what you indicated?
A That's correct.
Q How did you see her in the room?

A We were taken there by the--at our request by the security force at Job Corps Center.

Q When you went to her room, what did you observe?

A I believe she was--at the time we first knocked I think she was asleep, and then we got her up. I went in and spoke with her for a moment, and I told her I needed--

THE COURT: Was this in the morning?

A In the morning, yes, ma'am, early morning.

Q You said between--sometime after 6:30?

A That's correct.

Q And, uh, when you first saw her in the room, I mean what did--did you observe anything about her demeanor?

A Hum, the best I recall she had on like some--you know, something you sleep in, bed clothes. I don't remember any street clothes or anything like that being on. It looks like she had something on to just sleep through the night.

Q Did you observe any signs of her being under the influence of anything?

A No, not at all.

Q Did you observe any other unusual aspect

about her, whether she was under distress or anything of that nature?

A No. I didn't detect any kind of--she was actually very jovial, very cooperative.

Q I guess that's fair. How would you--how **would** you describe the demeanor?

A Uh, it--when I first arrived at the room I wasn't there but just a short period of time, when I had her taken on to the--the Safety Building, and then I caught up with them at the Safety Building approximately around 8:00 or 8:30 where I took a statement from her.

Q So you, uh--you just briefly talked to her and then you talked to her more down at the Knoxville Police Department?

A That's correct.

Q And where did you interview her?

A In the--it's an interview room inside the Criminal Investigation Division, an office there on the third floor.

Q And in that room you had an occasion to talk to her then?

A I did.

Q And again, how would you describe her demeanor then?

A It was about the same. She was very--I would say jovial, cooperative. She was not at all combative or anything of that sort.

Q And did you ever detect any odor of alcohol or anything else?

A No, I did not.

Q At the beginning of the interview did you discuss the purpose of the interview and go over her rights?

A I did.

MR. PRICE: If I may approach.

(Exhibits No. 34, 35 and 36 were marked for identification only.)

Q Let me show you what's been marked Exhibit No. 34 and ask if you recognize that?

A Yeah, this appears to be the rights waiver.

Q Did you have her--did you go over that with her?

A Yes, I did.

Q Then did you have her sign it?

A I did. She signed it here that she had been read the statement of her rights and she understood what the rights were and she signed it.

Q Okay. And what's the date and the time on that?

A Uh, this is January 14, 1995 at 7:55 a.m.

MR. PRICE: I would offer that as Exhibit No.--

THE COURT: 34.

MR. PRICE: --34 into evidence, your Honor, please.

THE COURT: Okay.

(Exhibit No. 34 was marked and filed.)

Q And then Exhibit No. 35, do you recognize what that is?

A Yes, this is a con--consent to search waiver.

Q Did you have her sign that during this interview?

A I did.

Q Did you have her sign it at the end or how close in time was it to the previous rights wavier?

A Hum--

Q Do you recall?

A No, I don't recall. I think it was sometime after the--the statement was taken from

her because we didn't--I don't--I think we went after we took the statement over to--with the consent to search her room because she told us about some items that were there.

Q Was that the consent?

A It's what we call the consent form.

Q And that's a consent to search where?

A That's--it would be her room at 622 Dell (Phonetically) Avenue, Room 452.

Q And, again, you think you obtained that towards the end of the interview or later?

A Yes.

MR. PRICE: We'd offer that as Exhibit No. 35.

THE COURT: All right, sir.

(Exhibit No. 35 was marked and filed.)

Q And let me ask--show you Exhibit No. 36 there.

A Okay. This would be a transcribed copy of a tape-recorded statement that I took from Christa.

Q Have you seen that before?

A Yes, I have.

Q That was actually the transcript used

during the original trial?

A It is.

Q It may be an exhibit. I don't know.

THE COURT: It is.

MR. PRICE: But for purposes of this, I'd offer it as Exhibit No. 36.

THE COURT: That will be fine.

MR. DAWSON: Is it 36?

THE COURT REPORTER: 36.

THE COURT: 36.

MR. PRICE: Yeah, 36.

A No. 36 is on here.

(Exhibit No. 36 was marked and filed.)

MR. DAWSON: What was 34?

THE COURT: No. 34 was the rights waiver; 35 the consent to search waiver, and then 36 the transcript of the original statement.

MR. DAWSON: So the right waiver is 34.

THE COURT: Yes.

MR. DAWSON: No. 35 is the consent to search?

THE COURT: Correct.

MR. DAWSON: Thank your Honor.

MR. PRICE: I don't have the tape, your

Honor, for the purposes--but I know it's been entered as a technical--

THE COURT: The tape of the statement?

MR. PRICE: The tape of the statement. --because--

MS. JONES: Yeah.

THE COURT: It's a part of the original trial record which is probably at the Court of Criminal Appeals at this point. Isn't it? I have a copy of the transcript that I had when we played it at the original trial so--

MR. DAWSON: Your Honor, I don't think it's necessary. I think we've covered it enough.

Q Just--as far as her speech is concerned, did you notice--did you check anything about her speech that indicated that she was under the influence?

A I detected nothing about her speech-

THE COURT: One second. Thank you, Miss Brockenborough.

A --that would give me the indication she was intoxicated or on anything.

Q Now, obviously, you're not a psycholo-gist, but could you tell if--did she appear to be under any distress of any nature?

A Well, no, not--not of any--any stress other than, you know, we were doing the interview, but she was very cooperative, very jovial, and sometimes we laughed. I think maybe one time she kind of whimpered a time or two during the statement itself about some things, but it was noting significant.

THE COURT: I'm not sure that both--

MS. JONES: (Inaudible statement to the Court)

THE COURT: Right. This is--I think this is probably the original. I don't know what this tape is. This may have been somebody else. Those are the original--there's the original right there.

MR. PRICE: I don't know if I can withdraw that and make a copy of it because I can't find any in my file.

THE COURT: I guess we have to ask the Court of Criminal Appeals.

MS. JONES: Well, he's already withdrawn the record--(Inaudible phrase).

MR. DAWSON: But I can't let it out of the--I can't let somebody else have it without-

THE COURT: Would you mind calling over there and seeing if they have an objection to us

making a copy of that tape here in the court house-

MS. JONES: Okay.

THE COURT: --if we can even make a copy of it, if it hadn't been popped?

But do you have the equipment to do that quickly?

MR. PRICE: Yes.

THE COURT: Okay. That would be a good idea to have the extra copy.

Q Now, at any point during the interview did you take a pause and ask her to make--to give her opportunity to decide whether she wanted to continue?

A Yes, at one point I did; I stopped the tape. I think probably in eight or nine minutes I asked her if she wanted to think about it, and she indicated later she did. And then we got back on the record and I started again.

Q And did you--after you completed the interview, did you take Miss Pike out to the scene of the crime--

A Yes.

Q --to where Miss Slemmer's body was found?

A Yes, we did.

Q And what--and did you videotape that?
A Criminalistics videotaped it; I didn't.
Q And were you there when they were holding the camera?
A Right, I was.
Q And I think you're actually--have you reviewed that video?
A I saw a portion of it, a small portion.
Q And you're actually on the video, I believe?
A That's correct. I'm with her and she's directing me through some--
Q When she's--when you're there with her, did you notice anything about her ability to walk or anything like that that would indicate she was under the influence?
A No, I didn't see anything out of the normal in the way she walked. I didn't detect any problems with walking.
Q And you've indicated you reviewed the videotape--
A I think a portion of it.
Q --the video?
A I don't know if I saw the whole thing or not, but I did see a portion of it.

Q And did that appear to be the video of you at the scene that day with Miss Pike?

A Yes, she and I were at the scene; that's correct.

THE COURT: Exhibit 37.

THE COURT REPORTER: Yes, ma'am.

(Exhibit No. 37 was marked and filed.)

THE COURT: Before you play that, General, I--are you going to play it or--

MR. PRICE: Your Honor, I--for one, I can't get this to work again. (Laughing) And I don't think it's necessary. Just--I would offer it for the Court's consideration if you have to--if you need to refer to it.

THE COURT: Okay.

MR. PRICE: We'd offer that into evidence.

MR. DAWSON: Your Honor, the only objection we have to this particular video being put in the record is that this has other parts of what--the events that day as well. And I think we have an agreement to substitute this particular video with one that only has on it what in this is scene three, and that is the part with Miss Pike at

the scene.

THE COURT: But we haven't done that yet?

MR. DAWSON: No, your Honor. But I--

THE COURT: Okay. So you're going to substitute the proper Exhibit 37--

MR. PRICE: Yeah. I'm going to take out the other scenes.

THE COURT: --before the end of the week. Okay.

MR. DAWSON: We have to find somebody that that's within their scope of ability.

MR. PRICE: (Laughing)

THE COURT: Can Mr. Harper do it?

MR. PRICE: I can do it.

THE COURT: Oh, okay. You mean it's not challenged in that regard?

MR. DAWSON: No, apparently not.

MR. PRICE: Hum, and we'd like to add that tape once we get it copied as the next exhibit, and we'd pass the witness.

THE COURT REPORTER: Tape of what?

THE COURT: The tape that we've talked about. The original tape of this statement given from the Court of Criminal Appeals.

(Exhibit No. 38, the original

tape of Miss Pike's statement, was to be marked and filed at a later time; however, on Page 964 the parties decided to file a CD of the statement instead of the original tape.)

MR. DAWSON: I'm sorry, your Honor.

THE COURT: Do you have any questions?

MR. DAWSON: Oh, yes, your Honor, I do have some questions.

THE COURT: Your turn.

MR. DAWSON: He's done?

THE COURT: Don't say that.

MR. DAWSON: But if he's done, I have some questions.

THE COURT: Your question is: is he really done? He might come up with some questions if you give him time.

CROSS-EXAMINATION

BY MR. DAWSON:

Q Do you go by Detective York still or Mr. York or--

A Randy will do.

Q Randy. Okay. Well, are you still riding your bicycle? That's what I want to know?

A Yes, I am.

Q Good. The, uh, uh--you had indicated that when you first, I guess, arrived to arrest Miss Pike that--did she have on--I mean did it appear that she had just simply taken her blue jeans off and gotten in bed? She had her panties, a long like a T-shirt she may have been wearing?

A It's possible it was a T-shirt or pajamas; I'm not sure. I didn't note that particularly, but it wasn't like street clothes or anything like--

Q Okay.

A --she just flopped in there. We didn't--

Q Well, she had at least taken off her jeans to get in bed?

A Yes. There was a--there was a pair of jeans, I think, laying on a counter there.

Q Uh-huh (Affirmatively). And are there some alcoholic beverages that someone could drink that aren't going to really be on their breath?

A I suppose that's true. I--

Q Okay.

A --I'm not a drinker so I don't--

Q And if--and, of course, if she had been smoking pot that also wouldn't be something that

you would be able to tell at that point by breath or anything?

A Uh, I mean pot has an odor. I didn't smell that either.

Q Right. But that's only when you're actually smoking it it has an odor, not--not two or three hours later?

A Well, it--it settles on your clothes just like tobacco smoke.

Q Okay.

A I mean you can smell it for a while.

Q And now you said that she didn't appear to have any stress when you were actually taking her statement?

A No. I didn't detect anything that was--she wasn't hysterical. She wasn't anything like that. She was just very cooperative, kind of laid back actually. Jovial is the best way I can explain it.

Q And the--you said that she--would you describe her as having mood swings during the taking of the statement?

A I--I wouldn't call it mood swings, but I mean her--I guess her mood changed some, but not up and down and drastic, if that's what you're asking.

I didn't notice any drastic changes.

Q Now, you said there were--

A I'd say some emotional times, I guess, would be the best way to describe it.

Q And there were some times when you said she whimpered once or twice. That that was it?

A Yeah, that was about the--about the extent that I can remember any kind of--anything other than just a pleasant attitude.

MR. DAWSON: If I could have one minute to confer with my co-counsel?

THE COURT: Uh-huh (Affirmatively).

(Whereupon, there was a pause in the proceedings while the petitioner's team conferred.)

MR. DAWSON: Your Honor, we would ask that the--and I'm not sure how we're going to do it at this point, frankly, because we didn't come prepared to do it. But I would ask that the tape be played at this time in court--

THE COURT: Which tape?

MR. DAWSON: --so that Officer York can hear it, and perhaps that will refresh his recollection on what the tape seems to--

THE COURT: The tape of the statement?

MR. DAWSON: Yes, your Honor.

THE COURT: Did Susan just take it away with her? We can play it.

MR. DAWSON: Well, I'm not sure we have anything to play it on.

THE COURT: We do.

MR. DAWSON: Oh, okay.

THE COURT: It's a regular audio tape; isn't it?

MR. DAWSON: Yes, your Honor.

MR. CROWSON: Yes.

THE COURT: Play it on our--we can play it on our system.

MR. DAWSON: Oh, okay, your Honor.

THE COURT: (To Ms. Jones) We're going to play it.

MS. JONES: (To the Court) The main problem is that nothing from the record is to be introduced as an exhibit. It would have to be taken out of the record and made a part of this record.

THE COURT: (To Ms. Jones) Right. So that's why we want to make a copy. But they're going to play the tape.

(To Mr. Dawson) We can do that if you

want to do that.

MR. DAWSON: Yes, your Honor. We're trying to discuss if there's a way that we can fast forward to some particular poignant areas of the tape. But the problem is we didn't mark the tape to know where it would be so--

THE COURT: And I'm not sure I can allow you to mark the tape so-

MR. DAWSON: I know that, your Honor. I mean we didn't play it where we could tell where it would be. So we're--we're, uh--I think we're just going to have to play it.

THE COURT: Does anybody have an extra copy of the transcript they can provide me at this point?

MR. PRICE: Yes, I'm sorry. I do have one, your Honor.

THE COURT: And I have one somewhere in the valleys of the--

MR. PRICE: (Handing a document to the Court)

THE COURT: Thank you.

MS. JONES: I don't think there's going to be any problem with making a copy. They just--the clerks don't want to say yes without checking

with somebody above them first.

THE COURT: That's fine. Are they doing it? Are they checking? That's fine.

MS. JONES: And I gave them Melvie's name and number.

THE COURT: They're going to play it, yeah. Okay.

MR. DAWSON: Your Honor, do we have the tape still?

THE COURT: Do you have it? It's in the box. It's the one marked R York, I believe. It's the older looking tape. I don't know what that other tape is. I have no idea, unless there's more than one tape. Just hang onto that one and maybe we'll figure out what it is here after awhile.

MR. DAWSON: (Inaudible comment)

THE COURT: I don't know why it would be in there with that.

MR. CROWSON: It's got a Supreme Court number on it so--(Inaudible phrase).

THE COURT: Have you got a copy of it?

A The tapes, no.

THE COURT: No, the statement.

A Yes, I do.

THE COURT: Oh, okay.

A Yeah, yes, I got the one that--(Inaudible phrase).

(Whereupon, a tape was started.)

MR. DAWSON: That's not it.

THE COURT: So try the other tape, I guess.

PETITIONER PIKE: Who was that?

THE COURT: Don't ask questions like that. We don't know. (Laughter)

(Whereupon, the parties worked with setting up the taped statement. Then another tape was started.)

MR. DAWSON: No. Your Honor, what we have is--we do have the statement on CD. I don't know if we could play that.

THE COURT: Well, I mean it's going to reflect this if it's the correct statement so--

MR. DAWSON: Right, no matter how we--

THE COURT: Can you play it on the CD?

MR. DAWSON: Does that have speakers?

MR. CROWSON: It might not be loud enough for everyone to hear.

MR. DAWSON: Right.

MR. PRICE: It wouldn't be really loud,

but it will--might be loud enough.

(Whereupon, the CD of the statement was set up to play.)

PETITIONER PIKE: (To Mr. Crowson) Put the microphone up to it. Let's just put the microphone up to it.

MR. CROWSON: The petitioner has an idea.

THE COURT: It isn't working.

(Whereupon, the parties continued to try to set up the CD to play.)

MR. PENNELL: Mike that with this or perhaps with her speakers.

MR. DAWSON: Do you want to move--is there a way we can get it near the mics where the mic will pick up the-

MR. PENNELL: I can do it right here with mine.

THE COURT: Folks, I--I--(Sighing) It's a CD as opposed to a DVD?

MR. DAWSON: It's a CD, your Honor, and it plays with an audio program. We got confused about it the other night, because we thought it was the video that we'd been given. And instead, it was the one we brought. We eventually figured out what we had done. We read the label.

THE COURT: Well, it's getting late in the court house for anybody to be around, but I bet we could get somebody that gives us--we have some other equipment like that somewhere.(Pause) Just hang on.

(Whereupon, the parties continued to work on setting up the CD.)

THE COURT: Is that the left table or the right table?

COURT OFFICER: Excuse me?

(Whereupon, Mr. Pennell began tapping on microphones.)

THE COURT REPORTER: That goes into my ears right there. You're tapping on my head.

MR. PENNELL: Oh, oh, I'm sorry.

(Whereupon, the parties laughed.)

THE COURT: Okay. Try tapping the other one now.

COURT OFFICER: I didn't mean to tape on her head.

MR. PENNELL: I don't want her tapping on my head; I'll tell you that.

MR. CROWSON: Testing, testing.

MR. PRICE: It's on; it's playing. It's

just really soft.

THE COURT REPORTER: We don't have a PA system in here; do we, Judge?

THE COURT: Yes! Sure we do. I don't know if they--have they--

(Whereupon, the parties continued to try to set up the CD.)

THE COURT: Can I ask you something? Were you going to ask Mr. York questions about it or do you just want it played?

MR. DAWSON: Your Honor, I wanted to play it, and then after it's played I want to ask him if he-

THE COURT: Right.

MR. DAWSON: --if he recalls and--

THE COURT: If you all are real smart, you'll play it on the Apple. Turn it up.

MR. DAWSON: We were trying to figure out how we were going to get it to be stirred (Phonetically).

THE COURT: That's what I'm trying to say.

MR. DAWSON: Okay. You think what now?

THE COURT: Your Apple will probably do a

better job than that.

MR. DAWSON: Okay. We're going to try it.

THE COURT: We'll see. Let's try this first.

MR. DAWSON: Do you want to try the Apple?

MR. CROWSON: You want to try the Apple? That's going to-

THE COURT: Yeah. Doesn't that have a pretty good speaker, your Apple?

MR. DAWSON: It doesn't, your Honor.

THE COURT: Mmm, okay.

MS. JONES: You might try putting in a mike that amplifies over to the laptop.

THE COURT: Well, Miss Brockenborough, is that supposed to be the exhibit that has Miss Pike's tape? Where did you get 27?

MS. BROCKENBOROUGH: From the Exhibit List to the trial transcript.

MS. JONES: It is.

THE COURT: Why--

(Whereupon, the Court and Ms. Jones spoke simulate-pusly thus indiscernibly.)

THE COURT: Oh, yeah, I guess so. Could of had more than one interview on a given tape?

MR. YORK: Yes, absolutely.

THE COURT: So it's there somewhere.

MR. DAWSON: It should be there somewhere.

THE COURT: Yeah, we just don't know where.

MS. JONES: Do you want me to take it to your office and see if I can listen to it up to a point to where it begins or Melvie can?

MR. DAWSON: So we should try to forward it till we get to--we could tell when Christa--

THE COURT: We'd be better off trying to forward it, yeah.

MR. DAWSON: Yeah, I think that's right. We can try to get it. It may be on that tape. Let's--

THE COURT: Well, but **that** tape would have been also the interviews of people at the Job Corps Center, I guess.

MR. PENNELL: Anybody in the court house that has a CD player or a boom box--if anybody has one in their desk, that would work too.

THE COURT: So this would be pretty far

along.

MR. PENNELL: I've got one in the hotel room.

MR. DAWSON: We'll see if we can fast forward it, your Honor.

THE COURT: I think I'll stand up now. Do you want to stand up too, Miss Pike-

PETITIONER PIKE: Can I?

THE COURT: --get a little stretch?

PETITIONER PIKE: (Laughing and standing)

THE COURT: We're going to take a five minute break and let them find it, but it will take longer than five minutes.

MR. YORK: Could I get a drink of water by an chance?

THE COURT: Sure.

MR. YORK: Can I just step out and get it at the fountain?

THE COURT: Mr. York, is going to go get a drink of water while we're--while we're doing that.

Go ahead, sir.

(Whereupon, Mr. York stepped out to get a drink of water and the parties continued to

try to set up the tape/CD of
the petitioner's statement.
A tape was started.)

THE COURT: Okay. That's the first one.

COURT OFFICER JENKINS: I'm going to fast forward it, **I hope**.

MR. DAWSON: There seems to be a lot of people-

THE COURT: At the Job Corps.

MR. DAWSON: Some of them knew Christa.

THE COURT: But this interview was at the Police Department so it should be--

COURT OFFICER JENKINS: We can try it now.

(Whereupon, the tape was started.)

THE COURT: No. It might even be on the other side. I don't know.

MS. JONES: He said he probably did.

(Whereupon, many conversations
were going on among the parties.)

THE COURT: We can't get the video to play. So they're going to bring in a different--so tomorrow morning they're going to do that.

(Whereupon, a tape was started
in the wrong spot.)

THE COURT: (To Ms. Jones) Just tell her to docket it.

MR. DAWSON: I think we may have it.

THE COURT: Okay. Shut that one off and let's see if we can get--

(Whereupon, a tape was playing.)

MR. DAWSON: We're in good shape, your Honor. I think we can use--(Inaudible phrase)

THE COURT: Okay. Let's resume our former positions.

(Whereupon, Mr. York retook the witness stand.)

PETITIONER PIKE: This is while we're in my trial.

MR. CROWSON: Yes.

THE COURT: You're older.

PETITIONER PIKE: Oh. (Laughing)

MR. PRICE: Are you ready, your Honor?

THE COURT: Whenever you are.

(Whereupon, the tape of the petitioner's statement was started.)

MR. DAWSON: Your Honor, I've asked that that be stopped for a moment. And I just wanted to ask Mr. York, is that--

CROSS-EXAMINATION

BY MR. DAWSON:

Q Does she sound like she's jovial at this point to you?

A No, not at this point. I--she's not combative; she's not hysterical or anything. She had emotional motions.

Q Sounds a little depressed and sounds like she's about to cry, doesn't it?

A I don't detect that at this point.

(Whereupon, the tape was continued.)

Q Detective York, you don't--you don't see a little edge on her voice at this point when she's answering these questions?

A I--I don't know what you mean by edge. I don't--she's not hysterical; she's not--doesn't seem to be any--under any kind of pressure.

Q Okay. Go ahead.

(Whereupon, the tape was continued.)

MR. DAWSON: Stop it.

Q Do you hear any distress or anything in her voice yet?

A I--I detect her getting a little

emotional, yes.

Q Okay.

(Whereupon, the tape was continued with Mr. York's question: "So how did you get her to go up there?")

MR. DAWSON: If you could stop it.

Q Sir, at this point you had to remind her that another day had passed, correct?

A Well, yes, I did.

Q Okay. And isn't her voice becoming more and more distressed at this point?

A There were times she was emotional; I've said that.

Q So--

A I'm not sure of the term stressed or distressed. That's your--I don't know what level that would be.

Q So--so where--but we haven't heard any of the jovial part yet, correct?

A Uh, I don't know if any of it is even in the statement. I hadn't heard all of the statement. But there was times, yes, we--there was jovial times.

Q So if she was like this at times and

other times jovial, aren't those mood swings?
A Uh, I wouldn't call them mood swings.
Q Okay. And let me ask you. You're not--you're not trained in psychology or psychiatry?
A No, I'm not. That's a special training, no.
Q But somebody that is could listen to this and have a whole different impression than you have, correct?
A That's possible, yes.
Q And that person might think that perhaps there's something going on psychological with Miss Pike during this statement that would suggest that she is not able to--of her own free will give a consent to her statement at this point?
A I'm not sure what you just asked.
Q Well, I mean--I mean that--somebody that was a professional in psychology or psychiatry--
A Okay.
Q --could hear this statement and come up to a different conclusion than you did about her mental ability during this statement?
A I'd say that's possible.
Q (Pause while petitioner's team conferred) And at other points in this statement she was

actually actively sobbing; was she not?
A I believe at one point, yes, she was. I was--I said whimpering, but you might find it as sobbing.
Q And you think it was only one point?
A There may have been more than one point. I don't recall her ever being hysterical or combative or anything like that most--
Q But at times she was kind of more lively than others?
A That's correct.
Q At times she was sobbing?
A That's correct.
Q At times she--her voice sounded like it did on the tape that we've heard just now?
A That's correct.
Q And she was going through different phases of that throughout this statement; was she not?
A There was times of emotion, yes.
Q (Pause while petitioner's team conferred)
MR. DAWSON: Your Honor, unless the State has a reason that they want to hear the rest of the statement or Detective York does, I think we're satisfied with that amount and then--

THE COURT: We're going to make that an exhibit anyhow. General, do you have any questions or would you like to play any further?

MR. PRICE: I think--at this point I think we need to hear it.

THE COURT: Well, let's play the whole thing, and then if there's questions, we'll be glad to do that.

MR. DAWSON: That's fine, your Honor.

(Whereupon, the tape was started again and played for a few minutes to where Mr. York asked Christa about having a piece of the skull.)

Q And at this point are you hearing that there's a little like sniffling going on here as though she's, you know, dealing with some other problems and issues, like she's, you know, somebody that would be about to be sobbing or might be sobbing?

A Hum, there's a possibility of sniffling. I don't know what she was thinking, but she sounded emotional.

Q Okay.

(Whereupon, the tape was started again and played to Mr. York's

question: "You're emotionally stable and able to talk to me?")

MR. DAWSON: Okay. We can stop.

Q Okay. Detective York, again, at this point we're, you know--there was a time when the tape was off about nine minutes. What was happening then?

A Uh, I'm not sure what occurred during that--exactly during that nine minutes. I'm sure I probably got up and used the bathroom. A lot--sometimes I got her a Coke and water and would get her stuff. So what particular time that was--I don't know what exactly went down in that nine minutes.

Q Doesn't it sound like now when you're coming back on you're asking her if she's okay, and she seems to be getting more emotional at this time; does she not?

A I--well, yes, I did ask her if she was emotionally stable and able to talk.

Q Right. And then she's--then she comes back on and she's sounding less emotionally stable than she was when you stopped the tape back earlier; doesn't she?

A Uh, yes, at that particular point.

Q Right.
A Is that what you're saying?
Q Right, right. Okay.
A I agree with you.
MR. DAWSON: You can continue.
(Whereupon, the tape was started again and was played to "...and I pushed her down on the ground.")
MR. DAWSON: If we could stop it again, please.
(Whereupon, the tape was stopped.)
Q So, Mr. York, now at this point you're even asking her if she's okay. She's kind of broken down; she's sobbing. Is that how you would describe it?
A Uh, yes, yes.
Q Okay.
A I'll agree with that.
Q And you--you actually got concerned enough to ask her if she was okay?
A That's correct.
Q And prior to this she seemed to be sobbing kind of throughout; didn't she? She was sniffling; she was, um, sometimes having difficulty

with speech?

A Uh, I don't know about difficulty with speech. I did detect some sniffling, yes. She has a soft, low voice.

Q And all the kind of nasal sounds that I'm hearing, I mean that--did you think she just had a cold?

A No, I said she was sniffling. I don't think she had a cold. I don't detect her having a cold.

Q (Pause while petitioner's team conferred) Would you describe it as being emotional?

A That's correct. Yeah, she had emotional times.

(Whereupon, the tape was started again and played to the completion of side one and turned over to side two and played almost to completion.)

THE COURT: I'm just going to stand up and stretch up a little bit.

(Whereupon, the tape was continued to where the parties were talking about what Miss

Pike covered the victim's mouth with until the tape accidently was stopped.)

THE COURT: Whoops.

(Whereupon, the tape was continued to the completion of side two.)

THE COURT: Do you mind if I just stand here for a while?

MR. DAWSON: That's fine, your Honor.

THE COURT: Thank you. Go ahead.

Q Mr. York, so where during this statement was the jovial part?

A Well, we talked candidly before the--you know, during the time we transported her and talked to her she was jovial. Even afterwards we talked going out to the scene. She was--had kind of a happy attitude about her.

Q And this was, of course, then when it wasn't being either audio or video taped she was jovial?

A Uh, part of it was videotaped, yes.

Q And--but the rest of it when she was brought from the--from her room and when she was in the interrogation room, none of that's videotaped

right?

A No.

Q Certainly the Knoxville Police Department has a video camera?

A Well, we had one that we'd taken out to a scene--

Q Okay.

A --to video with.

Q And it works just as well in the Police Department as it does at scenes, right?

A Well, that's Criminalistics; that's theirs. We don't have one set up in our--

Q Okay. So in 1996 they'd cost, what, about seven hundred dollars ($700) for a videotape (sic)?

A I'm not sure.

Q And if you'd had one you could have shown this jovialness, right?

A I suppose so if I had one.

Q But without it all we have is a woman who seems to be struggling to maintain her composure?

A Uh, no, I don't agree with you on that.

Q You don't see it that way?

A She--she's pretty even through this. Now, I'm used to--when taking statements from

murder suspects or even victims and murderers, we have ups and downs where some will cry. They'll get emotional. You'll have to stop the tape, let them get it together. You'll have some that will be combative. I don't detect any of this in here, and I don't think you did either because she was--she had moments of--a little bit of emotion through parts of it. But she didn't--she didn't loose her composure at any part in time that I had to stop the tape.

Q You had to stop once and offer her--see if she--even said, "Are you okay?", right?

A I didn't stop the tape. I just asked her if she was okay.

Q Okay. Well, I would hope that you don't stop the tape when the person goes through a moment like that because, otherwise, are you getting a true statement?

A I agree with you.

Q And let me ask you. When you did stop the tape, you indicated that you might have gotten --and gone to the restroom and gotten her a Coke, gotten yourself a Coke. Do you recall that actually there was a woman in your department that went and got the Cokes and brought them back to

you?

A There may have been. I don't know.

Q And that you stayed there and maybe put your gun on the table and said, "The truth has to come out, and you've got to tell us the truth"?

A Now, wait a minute. I'm sorry? Are you saying I put my gun on the table?

Q Did you or--I mean did you? I'm just asking?

A No! I did not do that. (Laughter)

Q Did you try to tell her that the truth had to come out and that it was going to come out at some point and she just needed to be straight on this tape?

A No, I didn't. I told--I asked her--I said, "I know there's more that went on. Do you want to think about it?" She said, yes, she did.

Q Okay. And then that was on the tape. But what about when the tape was off? What happened then?

A Uh, I don't know. I may have got up and walked around for a minute or two or something. I don't know.

THE COURT: Can I stop you a second, Mr. Dawson? I've seen Mr. Moncier out there, and

he must be wondering. Could one of you go out and speak with him and let him know he's next?

MR. CROWSON: I did a moment ago, your Honor.

THE COURT: All right.

Q And--but again, that part wasn't videotaped so we don't really know what happened?

A No, it was videotaped.

Q And let's talk a little bit about going out to the scene. The audio broke, right, and there was no audio on the videotape that was done?

A That's what I was told. I hadn't ever seen the video until just--the portion of it that I saw, just a short portion. So I've never seen the video all the way through that I recall.

Q Okay. And you were told there was no audio?

A I was told that the audio was bad or there wasn't any audio. I'm not sure which.

Q And you were told that during the time you were out there, correct?

A Now, I don't recall that. It was sometime later. I don't know. Maybe during--even during the trial. It was some time. I don't recall ever hearing at the scene that the video

wasn't--the audio wasn't working. Don't know if we had even known that because I was away from the person that was video recording. I was out and she was showing me around.

Q And you weren't instructing her what to do because there was no--there was no audio so you couldn't here what you were talking about?

A I didn't instruct her to do anything. She was telling me.

Q You weren't asking her any questions?

A I asked her questions. I didn't instruct her **to do** anything. (Pause) That's my job to ask questions.

Q You never gave her instructions as to what to look at or what to point to or anything of that nature?

A **No**. She would have told me what to--where to look and what to do. And she kind of went through in detail what occurred.

Q And you weren't aware that the audio wasn't working at some point during that?

A Not that I recall. I was never told till later. I don't--I don't recall ever hearing it or seeing that tape till--I was just told later, and it may have been during a hearing or something that

the audio didn't work. I don't think it was even used in court the first time.

Q (Pause while petitioner's team conferred) You don't remember anything about that camera being broken in any way?

A No, I don't recall it being broken in any way. I didn't have control of the camera.

Q There was no time you stopped and then maybe part of it--it started recording and then stopped, the audio recording?

A Well, if we were moving to a location, a different location, it might have, but I didn't have anything to do with it. I didn't have--I was away from the camera.

Q (Pause while petitioner's team conferred) So do you recall--let's see. (Pause while petitioner's team conferred further) You don't recall the video having been transcribed at some point--

A Uh--

Q --and it stopping at some point and the--would the video accidently--the tape was turned off?

THE COURT: When are you talking about?

MR. DAWSON: Out at the--when they're out

on--

THE COURT: Out at the scene?

MR. DAWSON: --with Christa out at the-- out at the scene, your Honor.

THE COURT: Do you remember?

A I don't know how it would even be transcribed. I'm not sure what you're saying.

Q Well, do you recall at some point--

(Pause while petitioner's team conferred)

MR. DAWSON: One second, your Honor.

(Pause while petitioner's team conferred further)

MR. DAWSON: Your Honor, I'm going to need a moment to get something from the DA file because we think that this is something--we have something here from the DA file that indicates that the--this tape was inadvertently turned off--or accidently turned off.

THE COURT: (Sighing) Are you trying to cool it off?

MR. PRICE: Just trying to cover that.

THE COURT: Don't cover it; the bulb has to cool. You just need to shut it down a little bit. If you cover it, you'll melt it.

MR. PRICE: Well, I think I've got it going, and I'd like to show just a little part of

that.

THE COURT: Oh! You want to show a part of that tape?

MR. PRICE: Now, that I've got it working.

THE COURT: Okay. All right. That's fine. Just leave it.

MS. JONES: If he's just wanting to mess with it on his machine, he can just lay a piece of paper or something over it so it doesn't go through it.

MR. PRICE: Yeah, that's what I'll do.

THE COURT: As long as it doesn't burn though, the bulb, and he gets in trouble with the DA's Office, like Kevin Allen did.

Are you planning to make the CD of the vid--of the audio tape part of the record?

MR. DAWSON: Yes, your Honor.

THE COURT: That's yours; isn't it, General?

MR. PRICE: No, it's actually theirs but--

THE COURT: Okay. Well, can I make that the next exhibit then while we're at it?

MR. DAWSON: Yes, your Honor. I guess

the question that I would have then is whether the Court would want us to take it overnight and make copies. We only have one copy. We can do it either way.

THE COURT: It's the exhibit. So you can make copies but--and then file it tomorrow, if that's what you want to do.

MR. DAWSON: Yes, your Honor, if we could do that.

THE COURT: Okay.

MR. DAWSON: --and make it a late filed. And we'll prepare copies for--

THE COURT: Okay. That would be Exhibit No. 37.

THE COURT REPORTER: 39.

THE COURT: 39?! You're right.

MR. PRICE: Was 38 the tape?

THE COURT: 38, 38.

THE COURT REPORTER: No. 38 is the tape that's coming and 39 would be the CD that's coming.

MS. JONES: What was 37?

THE COURT: No. The tape is the CD.

MR. PRICE: That's what I was going to suggest is instead of having--

THE COURT: The tape is the CD. It's not

the tape.

MR. DAWSON: Right. It's a copy of the tape is what it is.

THE COURT: Well, it's a CD of the tape.

MR. DAWSON: Right.

THE COURT: But we don't need a copy of the tape and a copy of the CD.

MR. DAWSON: No, right, right.

MR. PENNELL: Right. So 38 would be the CD.

THE COURT: We just need Exhibit 38.

(Exhibit No. 38, a CD of Miss Pike's statement, is to be marked and filed tomorrow, April 11th, 2008. Whereupon, the court reporter and Mr. Price conferred.)

MS. JONES: Okay. What's 37?

THE COURT: 37 is the--is supposed to be the video of you going around the scene which we have not yet seen.

MS. JONES: Okay. What's 38?

THE COURT: 38 is what we just heard, the CD of the tape--of the tape of the confession.

MS. JONES: CD of statement.

THE COURT: Right, that's it.

THE COURT REPORTER: So we're not going to file the tape and the CD. We're just going to file this.

THE COURT: The CD late so they can copy it.

MS. JONES: So we've only got 38 exhibits in.

(Whereupon, there was a pause in the proceedings while the petitioner's team conferred, and the Court conferred with Ms. Jones about the records Ms. Rice is to furnish.)

THE COURT: We'll bring it up tomorrow. (Sighing) Are you okay?

(Whereupon, Ms. Jones conferred further with the Court about the records Ms. Rice is to furnish.)

THE COURT: Mr. Cameron, would you give Mr. York some water. You need to move around anyway. (Sighing)

(Whereupon, Ms. Jones conferred further with the Court about the records Ms. Rice is to furnish.)

THE COURT: (Sighing)

Q Now, Mr. York, let me ask you this. You have no recollection if a transcript that was found in the District Attorney's file says--(Pause)-- Well, if I could do this--

THE COURT: Does somebody need to help him run it?

MR. DAWSON: I want to go up to where it was just pushed. (Pause)

Q If you have--after you've--after you've been--there's an early part on this tape where you're describing it looks like what--(Pause)--it looks like--(Tapping)--it looks like you're--it's --you're--you're going back down to--(Pause while Mr. Dawson conferred with Mr. Pennell)

MR. DAWSON: All right. Somehow we-- (Pause)

Q All right. So after--after you apparently videoed some stuff already and then you're--you're back at the--we got--we start out-- it says--with you speaking. And you say, "Today's date is January 14th, 1995. It's now 11:20 a.m., and we're processing and video recording the area where the incident took place at the direction of a young lady. Would you please state your name?"

Then she says Christa Pike. And I'm assuming R Y here is Randy York?
A That's--that would be correct, yes, sir.
Q Okay. And then it's Christa Pike, and she's going over kind of what occurred. Okay. And this is actually some days--is this--(Pause)--this is the day of the--the afternoon after the statement was made in the morning, right?
A Well, are you talking about the videotape?
Q Yeah--that's a different line--yeah. We're talking about the video now?
A Yeah, it would have been--yes, after the statement, yes.
Q Right. And so, what, probably a couple of hours later?
A I--maybe longer than that because I still had two more statements that I took--
Q Okay.
A --that I spent quite a bit of time with so--
Q I think the time was on there but it disappeared so-- (Laughing)
A That's okay. I--I could--I would say two to four hours--

Q Okay.
A --more like four probably because I still--
Q Okay. This--I think it said 14:00 something so I think it's like 2:00 in the afternoon is what we--
A Yeah, that would be.
Q Don't hold me to that.
A Okay.
Q But I think that's what it said.
A Yeah, because I'm not sure either.
Q And that would be about right? That would--
A Yeah, that would be about correct, yeah.
Q Okay. And then--where are we at? Let's see we ought to be down there. And L. J. is the other initials on this. That would be the person that was actually running the camcorder or the--
A L. J. Would be Lenny Janeway, and he was the Criminalistic's man and he would have been the camera operator.
Q Okay. And so then--then at some point Christa says, "We came from that way," and she pointed apparently to where she came from and then --and it was raining that day, correct?

A I remember it raining, yes.

Q And the video depicts that it's raining and that Christa's got the umbrella that you--

A I did see that portion, yes.

Q And at some point you say, "Do you want to hold this umbrella? Okay. Go ahead." And then--then she's saying we came down from that way, down there."

A Now you're getting ahead of me. I have-- I haven't ever seen that part of the tape or heard any of that conversation.

Q Okay.

A I thought the audio was totally--

THE COURT: Do you want to show it to him instead of reading it to him?

MR. DAWSON: Yeah, we could do that, your Honor, if I could figure how long--

MALE VOICE: Actually, he--we--Leland has it right here.

MR. PRICE: Here's a hard copy.

MR. DAWSON: Oh, we've got a hard copy of it, your Honor. Okay. We're in good shape then.

MR. PRICE: I didn't realize that one was--(Inaudible word).

THE COURT: Mr. Dawson, when is your

appointment in Nashville?

MR. DAWSON: Pardon, your Honor?

THE COURT: When is your appointment in Nashville?

MR. DAWSON: (Indiscernible phrase) Hum, hum--

MR. CROWSON: (To Mr. Dawson) Next Wednesday.

THE COURT: You don't know. I thought it was next week.

MR. DAWSON: Oh, it is next week; that's true.

THE COURT: When?

MR. DAWSON: Wednesday, your Honor.

THE COURT: Oh.

PETITIONER PIKE: (Laughing)

THE COURT: Shucks. (Laughing)

MR. DAWSON: Your Honor, actually, we had changed our hotel reservations till Tuesday so--

(Pause while petitioner's team conferred)

THE COURT: You're right, Miss Pike, about Mr. Dawson.

PETITIONER PIKE: I know. (Laughing)

MR. DAWSON: There it is. Oh, we found it. Yeah, we got it. Your Honor, if I could show

this to Detective York.

Q This appears to be the same page we have. Starting with you indicating that it's--that's the wrong--it's 11:20. The 14th was the date.

A Okay. (Laughter)

Q So that--if you want to just read through that and--

A Is this from the videotape?

Q Yeah, this is a transcript of the videotape.

A Okay. Now, I--as far as I know, I don't recall ever seeing the videotape, and I was told that the audio didn't work on it.

Q Okay.

A And they weren't--weren't going to use it. That's all I know.

Q And it's cut off here. It goes a little bit and then cuts off. Is that--

A Well, that's what this is, yes.

Q Okay. And it doesn't pick up again until after you're finished with the walk and going back to the dorm it looks like?

A Yeah. Now, would this be me narrating it to the camera? Is that what you're saying? That's what it looks like to me.

Q Right.

A That--that's--that's my terminology. I would imagine that would be correct--

Q Okay.

A --if that's what you're asking.

Q That's what I'm asking.

A Okay.

Q Okay. And so you don't recall from that day that it--that somehow it got turned off?

A No, I don't.

Q You never learned that in the future?

A No.

Q Okay.

Q No. I always heard that the audio didn't work on it, and that's--that's all I've ever heard about it.

MR. DAWSON: And, your Honor, if we can--(To Mr. Price)--can we make this an exhibit to the record, just these few pages.

MR. PRICE: Yeah.

MR. DAWSON: I guess we wouldn't need the--unless you want more than these two pages.

MR. PRICE: That's fine, if that's the way you want to do it.

(Whereupon, Ms. Jones was

conferring with the Court.)

MR. DAWSON: Your Honor, we'd like to ask that the two pages that I have here of what Detective York just looked at be made the next exhibit.

THE COURT: I'm sorry?

MR. DAWSON: Your Honor, we ask that the two pages that were transcribed of the audio--

THE COURT: Be made an Exhibit 39.

MR. DAWSON: Your Honor, then at some point we may have to get this copied though so we can--

THE COURT: Sure. We can take care of that in the morning, I would imagine, if that's all right. (Pause) Mr. Moncier will take forever.

MR. DAWSON: We will try to make it not quite forever, your Honor.

THE COURT: Uh-huh (Affirmatively). You wait. He's fresh, see, and we're not so--

(Whereupon, there was a
pause in the proceedings
while the petitioner's
team conferred.)

Q Again, Mr. York, you would concede that somebody else--a mental health specialist might

listen to this tape and come up with an entirely different idea of what her mind-set was at the time she was giving it?

A I--I would say it would be--could be anyone's interpretation. They're more educated in that than I am so I would agree with that.

MR. DAWSON: No further questions, your Honor.

THE COURT: Thank you, sir. Any--anything you'd like to ask?

MR. PRICE: I'd just like to play it now that we've got this--

THE COURT: Play that portion of the video.

MR. PRICE: It's about two minutes, one or--

THE COURT: Oh, you take your time. I think you're the one that has had the least time today.

(Whereupon, the parties laughed.)

MR. CROWSON: Well, we would have stopped the audio.

MR. PRICE: Yeah, the--this has no audio on it. I believe it picks up where the audio may have been accidently turned off.

THE COURT: All right.

COURT OFFICER COFFEY: Can we get the lights, your Honor?

THE COURT: Yeah, that would help. I'll get them. It's okay.

(Whereupon, the lights were turned down and the CD/video at the scene was started.)

THE COURT: Was this played at the original trial?

MR. PRICE: No, your Honor. I think it was excluded--

THE COURT: I didn't think so.

MR. PRICE: --on motion of the defense.

THE COURT: Mr. York was young then.

A I noted that earlier, your Honor.

PETITIONER PIKE: (Laughing)

THE COURT: Uh-huh (Affirmatively).

A But I'm older and drier now.

(Whereupon, the CD/video was continuing to play for a few minutes, and Ms. Jones conferred with the Court.)

MR. PRICE: Your Honor, for my purposes of it, I'm done.

MR. DAWSON: Well, your Honor, I think that probably we should also see the rest of this since it's started.

MR. PRICE: No problem.

THE COURT: I'm sorry?

MR. PRICE: I was offering to stop it, but I think he wants to watch all of it.

THE COURT: You want to see the rest of this part?

MR. PRICE: Yes.

MR. DAWSON: Your Honor, we can stop at this point if we want to.

MR. CROWSON: Yeah, that's fine. We've seen it for this purpose. We're fine with it.

(Whereupon, Ms. Jones conferred with the Court.)

THE COURT: All right. You can turn it off. (Pause) General, do you have any--

MR. PRICE: One--one question I would have on that is--

<u>REDIRECT EXAMINATION</u>

<u>BY MR. PRICE</u>:

Q This last exhibit we had where they were able to retrieve some of the audio indicates that that section that we just watched with you and Miss

Pike out in the rain at the scene would have taken place between 11:20 and 11:36 a.m. Does that sound about right?

A I--that's possible, yes.

Q Late morning?

A I'm not sure of the time.

Q Okay. (Pause)

THE COURT: Any other--

MR. DAWSON: Your Honor, if I may--

THE COURT: Are there any other questions you've got, General? (Pause) Anything else?

MR. PRICE: No, your Honor.

THE COURT: Go ahead then.

<u>RECROSS-EXAMINATION</u>

<u>BY MR. DAWSON</u>:

Q Detective York, just a couple of questions about the video we just saw. Obviously, Miss Pike was still wearing a hair band at that point. She had a white hair band on, correct?

A That's correct.

Q And did you let her put that on while she was in a room or was that something that she had on at the time she was arrested?

A I don't recall.

Q Well, okay. What about the shirt she was

wearing? It was kind of a long shirt. Was that what she was wearing at the time that she was awakened that morning?

A I--it may have been; I'm not sure.

Q And the shoes she was wearing, those black shoes, are those the ones she got from one of the police--female police officers? Did--did--

A (Pause) I don't recall that. I know if they don't have them we'll furnish them some clothes. So I don't--I couldn't say for sure if that's some we furnished her or--or--

Q But she was taken from a room without shoes on; was she not?

A Actually, I don't recall if I was even in the room when she was brought out--

Q Okay.

A --because I just directed the--all the parties to be taken to the CID.

Q And that obviously showed that you were--she was telling you what was happening and you were pointing and sort of showing what she was telling you?

A That's correct.

Q And she was handcuffed the entire time out there, correct?

A Yes.

MR. DAWSON: No further questions, your Honor.

THE COURT: May Mr. York be excused?

MR. DAWSON: Excused, your Honor.

THE COURT: Thank you, sir.

A Thank you.

(WITNESS EXCUSED)

* * * *

THE COURT: Do you all need a break or are you ready to call your next witness?

MR. DAWSON: Your Honor, I'll need a couple of minutes before I call the next witness, and then we'll be ready to go.

THE COURT: I think that would probably be a good idea since it's Mr. Moncier. We'll take a couple of minutes. (Pause)

I need to know how long you think Mr. Moncier's proof is going to take, folks, and I really do need to know.

MR. MONCIER: Why don't we target 6 o'clock?

(Whereupon, the parties continued talking.)

THE COURT: Well, I guess I need an

estimate. Mr. Dawson, how long is this part going to take? And I'm serious. Some of these folks have obligations elsewhere so--

MS. JONES: She wants a legitimate estimate.

THE COURT: And Mr. Moncier is going to confine his answers to two words each.

(Whereupon, several of the parties laughed.)

MR. DAWSON: Hum--

THE COURT: Don't; don't start. (Laughing) Okay.

MR. DAWSON: Well, your Honor, he told us that he could get both of us with one or two bullets while we were standing here if we went too long. (Laughing)

MS. JONES: (Laughing)

THE COURT: You don't have to worry about him. He's not the one with the bullets. I know who has the--is the one with the bullets, and I'll take care of it so--

(Whereupon, the parties laughed.)

THE COURT: And I'm serious. So how long is it going to take? (Laughing)

MR. DAWSON: Hum--

MS. JONES: Just so people know.

MR. DAWSON: I know; I'm trying to--I'm thinking.

THE COURT: I'm going to take everybody home for supper and just do this on the porch or something.

MR. DAWSON: Hum-

MR. PENNELL: We're out of clothes, your Honor. We're completely out of clothes.

THE COURT: I've got a washer.

MR. DAWSON: Your Honor, I think we can--we can do the direct in forty minutes-

THE COURT: Forty minutes?

MR. DAWSON: --or less.

THE COURT: 7:00 o'clock.

COURT OFFICER COFFEY: Thank your Honor.

(Whereupon, a recess was taken; afterwards, the following proceedings were had, to-wit:)

THE COURT: Is there a reason why Mr. Moncier is seated at counsel table?

MR. MONCIER: I think it was a place he could find to perch his-

THE COURT: He just perches there automatically. Is he the next witness?

MR. DAWSON: Yes, he is, your Honor.

THE COURT: Mr. Moncier, please raise your right hand to be sworn, sir.

(Whereupon, the witness was sworn to tell the truth by the Court and responded affirmatively.)

THE COURT: Come on up and have a seat where I've always wanted to put you.

PETITIONER PIKE: (Laughing)

THE COURT: The record will reflect that the--the witness's full name is Herbert Sanford Moncier and let's go from there so we don't waste any time.

PETITIONER'S PROOF

HERBERT SANFORD MONCIER was called and, being duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAWSON:

Q And, Mr. Moncier, what is your profession?

A I'm an attorney.

Q And where do you practice that profession?

A Uh, in the southeastern United States.

Q And where is your office located?

A Knoxville.

Q And, Mr. Moncier, have you been active in local Criminal Defense Bar Association?

A I have.

Q And that's the local Knoxville Association?

A I've been active with the Knoxville Lawyers Defense--Knox area Defense Lawyers Association, yes.

Q And have you also been active with the Tennessee-- (Pause)

A Association?

Q --Association of Criminal Defense Lawyers?

A Since 1970--

THE COURT: Also known as TACDL.

MR. DAWSON: That's correct, your Honor.

A Since 1976.

Q And, Mr. Moncier, have you held offices in TACDL?

A Yes.

Q And have you been president of TACDL?
A Yes, I've been president of TACDL.
Q And that was some time ago?
A Uh, hum, I want to say it was 1983/1984.
Q And, Mr. Moncier, have you also been active in the National Association of Criminal Defense Lawyers?
A I have.
Q And through this activity have you had occasion to attend seminars on criminal defense?
A I have.
Q And have you attended those since--whatever the year you said--1974?
A I started the seminars early on with TACDL, and TACDL became one of the movements of the Tennessee Supreme Court for continuing legal education in 1990--81. My duty with TACDL at that time was to take a position for the association on continuing legal education and to implement that, and that's what I did. The Association strongly, strongly supported mandatory continuing legal education.
Q And have you also been a presenter or a teacher at the Association's seminars?
A Numerous times.

Q And does that include the seminars concerning the defense of a capital case?

A It does.

Q And let me ask you. Mr. Moncier, have you also taught nationally on criminal defense issues?

A I have. I've spoken nationally at several National Association for Criminal Defense Lawyers' seminars and annual meetings and to other state associations.

Q And in the course of your--both your attending and your teaching at seminars both in Tennessee and nationwide, have you had an occasion then to see and to understand the various standards of criminal defense that are being taught around the country?

A Yes, sir, I have.

Q And in Tennessee?

A Yes, sir.

Q And oftentimes at the TACDL seminars have there been national speakers on issues of the death penalty?

A I believe--

THE COURT: May I interrupt?

A Yeah.

THE COURT: Are you qualifying him as an expert in death penalty cases?

MR. DAWSON: Yes, your Honor.

THE COURT: Is that what you're after?

MR. DAWSON: Yes, your Honor.

THE COURT: Is that necessary?

MR. DAWSON: For some of the questions it may be, your Honor. (Pause) They're going to be brief. We're not going to go through the whole case, your Honor.

THE COURT: Well, I guess the General has to voir dire on that subject at the appropriate time, but go ahead and ask him the questions.

Q And--(Pause)

THE COURT: Sorry. I didn't mean to blow your-

MR. DAWSON: That's all right. And I've lost my chain of thought, your Honor.

Q And--

THE COURT: Something about the standards of capital defense cases.

MR. DAWSON: Right.

Q And so during the course of this, have you--have you gotten to understand both the statewide and national standards of defense of

capital cases?

A Yes, and I started in the early 1970s while I was in the military when the military was examining its capital uniform code of military justice and the use of capital punishment. When I became a prosecutor, we were still operating before Furman vs. Georgia (Phonetically), and I prosecuted several capital cases in Knox County. And upon the decision in Furman vs. Georgia, I participated in the legislation in Tennessee concerning the revision of the Tennessee statute with the Tennessee Legislature concerning capital case prosecutions in Tennessee.

I also helped write the first capital case manual that I believe was published in 1985. And, thereafter, my motions in what I call the capital case trial--some people call it the guilt/innocent phase; I don't use that term--and the sentencing capital trial--some people call that the sentencing phase; I don't use the word phase. That's something you're just passing through. But in those two different trials my motions in State vs. Huskey for both the capital case trial and for the sentencing trial became the standard published by the Tennessee Public Defender's Association and

TACDL and became incorporated into a later edition of the capital case manual.

In addition to that in 2004 in the case of <u>State vs. Stacey Sutteruth</u> (Phonetically), I re-did the motions for the capital case trial as well as the capital case sentencing trial, and those have now been published as well.

Q And you also had the opportunity to meet with and talk about capital case defense with various attorneys that are noted for their work in death penalty cases in the southeast?

A Absolutely. I--my mentor, if I could share just a little bit of a personal momento, is Millard Farmer out of Atlanta. He has been an inspiration to me in the work that I've done in capital case legislation writing and teaching and the two capital cases that I have tried.

Q And Mr. Farmer at one point was, I guess, the organizer and the main force behind a group called Team Defense?

A He is.

Q And that was a group that went around the southeast representing individuals in capital trials?

A Yes. And team defense became the

standard along with the Colorado plan for capital case defense. That was generally taught in the late eighties and early nineties.

Q And again, Mr. Farmer was one of the regular teachers at the National College of Criminal Defense; was he not?

A Every time I could ever go hear him speak, I did; and yes, your answer--the answer is yes.

Q And he has also spoken at TACDL seminars?

A He has.

Q Mr. Moncier, have you ever prepared to present a death penalty defense?

A Yes.

Q And have you prepared both the guilt/innocence trial as well as the sentencing trial?

A I called it the capital case trial. I don't like the word innocence either.

Q Okay.

A I called it the capital case trial. Yes, I have.

Q Okay.

A And I have prepared the capital case sentencing trial.

Q And have you ever presented a capital case sentencing trial?

A No.

Q Uh--

A Not--not after Furman vs. Georgia.

Q And what would be the difference of before and after?

A Furman vs. Georgia?

Q Right.

A Well, Furman vs. Georgia was the case that brought about the, uh, uh, bifurcated--well, not bifurcated--brought about the two-trial system in capital cases. That brought about legislation that brought about the two trial system.

MR. DAWSON: Your Honor, I would at this point ask that Mr. Moncier be qualified as an expert in the area of both criminal defense and the capital defense.

THE COURT: Do you have any questions, General?

MR. PRICE: Well, I just have an objection in that I--he's being called as an expert. Has he prepared a report or an opinion or anything like that--

MR. DAWSON: No.

MR. PRICE: --that I haven't been furnished? If he's here as an expert rendering opinions, I think I ought to be furnished that **or** in the alternative then to see what he has reviewed and relied on that's not been furnished to me either.

MR. DAWSON: Your Honor, I think what he's relied on--

THE COURT: Well, let me--let me say this. Mr. Moncier is certainly a man of enormous expertise and respect in the area of criminal defense and is always welcome in this court. But you're asking him to render an opinion on effective assistance of counsel or ineffective assistance of counsel, which is ultimately the prerogative of the Court.

MR. DAWSON: Your Honor, I'm not really asking him to render that. I was calling him today to talk about what the standards are, not whether this--not necessarily that this case meets--

THE COURT: Well, he--but he hasn't prepared--what did you say, before Furman you had not prepared a--

A No, after Furman vs. Georgia I have not actually gone through a sentencing trial in a

capital case. I've prepared them.

THE COURT: You've prepared them but you haven't actually gone through the entire--

A Didn't get to them because of the verdict of the jury on the initial case.

THE COURT: Well, some people might say it's because of you, Mr. Moncier, but I don't know.

A (Laughing)

PETITIONER PIKE: Because he's great.

THE COURT: So--so I don't know if he can render such an opinion at this point on the--and we've been talking for these days about the mitigation aspects.

MR. DAWSON: Your Honor, I was going to ask him, among other things, a series of questions dealing with the requirements in presenting a sentencing trial in a capital case, what--

THE COURT: Can he render an opinion about that or does he know that from his knowledge as a teacher of capital case defense?

MR. DAWSON: Yes, your Honor. That would be--

(Whereupon, the court reporter's cell phone went off.)

THE COURT REPORTER: Oh, I'm sorry; I'm

sorry; I'm sorry.

THE COURT: **Debbie**.

PETITIONER PIKE: (Laughing)

THE COURT REPORTER: I'm sorry.

THE COURT: I'd put you in jail, but I can't do without my court reporter today.

(Whereupon, the parties laughed.)

THE COURT REPORTER: I'm sorry. You can put me in jail if you want to.

THE COURT: That's how bad it is.

(Whereupon, the parties laughed.)

MR. DAWSON: That's something like don't throw me in that briar patch.

THE COURT: I'd have to go with her.

I think Mr. Moncier can answer those questions about what he views the standards to be. But whether he is an expert in presenting mitigation and--I don't know that I can qualify him as an expert at this point.

MR. DAWSON: Well, your Honor, as long as he can give--

THE COURT: I'm going to let him--

MR. DAWSON: That's fine. Okay.

THE COURT: --give his--his, I guess, list of what he believes mitiga-I mean, you know,

I'm going to listen to it because, as I've just said, he is a widely respected attorney and is always welcome in Division III of Criminal Court for Knox County.

MR. PRICE: But, your Honor, I mean is he coming to say these are the standards by--by who, by Herb Moncier? Is that the standard? This is the Herb Moncier standards?

THE COURT: Well, I guess he'd have to tell us--well, I don't know. He has to tell us where he got it, number one. Number two, he'd have to tell us what the standard was in 1996.

MR. PRICE: And also is he--is he opining to you that you should find that counsel in this case ineffective--

THE COURT: I don't think he's able to make--

MR. PRICE: --because they haven't met these standards? And isn't that your decision to make?

THE COURT: I don't think I'm going to let him ask that question. I don't think he can make that--I don't think he can answer that question. That is the ultimate question for the Court.

MR. DAWSON: I did not intend to ask him that question.

THE COURT: Why don't you ask him whatever it is you're going to ask him at this point and let the General listen and see if he wants to voice objection to those questions.

MR. DAWSON: Thank your Honor.

Q Mr. Moncier, let me just diverge, I guess, from that for a moment then and ask you about some issues in--in this case and that is: do you recall having any conversations with Dr. Diana McCoy regarding her relationship-- regarding this case and her dating relationship with Bill Crabtree?

A I did.

Q And what do you recall?

A Dr. McCoy in 1996 was one of a number of experts that I was working with in the State vs. Thomas D. Huskey case, both for the criminal trial as well as for the capital sentencing trial, if that were to occur. I had known Diana McCoy since approximately 1989 when she was an expert witness in the Pigeon River litigation case. So I was very aware of Dr. McCoy.

THE COURT: Which was a civil matter.

A Which was a civil case.

THE COURT: All right. Okay.

A She had evaluated in the sense of damages of the people that were exposed to dioxin (Phonetically) and gave various opinion with regard to those persons.

I had formed a great deal of respect for Dr. McCoy and the thoroughness of her work to the point that she was one of the primary persons who were (sic) working with regard to the insanity defense in the capital murder case of Huskey, as well as the sentencing defense if we faced that in opposition to capital punishment. So I was working very closely with her during that period of time.

I became aware, as I think everyone in Knoxville did, that Dr. McCoy who was very intelligent, a very knowledgeable person, had began to date another very intelligent, knowledgeable person, a friend of mine, Bill Crabtree. They were both single. What she saw in Mr. Crabtree was a little bit hard for me to understand, but other than that Mr. Crabtree is a very, very engaging person and a very good friend of mine. And I was very happy that they were able to--two profes- sionals were able to enjoy their company as they

did. There was no secrets about it. I think everybody in Knoxville knew it. And Bill Crabtree had gone through a very difficult divorce, and I was very pleased that two of my friends were enjoying their social company as single adults. There was nothing untoward about it. There was nothing secret about it. It was two people dating.

I happen to be single. Dr. McCoy never asked me out or to be with her. (Laughter) And so I was very pleased that Mr. Crabtree was enjoying her company.

But because of the fact that I was working very closely with her when she was contacted to--by Mr.--by someone to work on Mr.--or to the--Miss Pike's case, she came to me and she asked whether because she had not--was no longer dating Bill at that time and they both had started dating someone else; they remained very good friends. She asked me if--if there was anything improper or wrong with that. I told her of course not; there's not. But certainly I would let Mr. Talman know that and let him make a decision as to what to do on it. And she told me that she did, and she told me that, as I thought, that doesn't have **anything** to do whatsoever with her work,

number one. In my opinion that is not Rule 401 relevant evidence, the fact that she might have dated somebody in the District Attorney's Office or a prosecutor. I've even dated a prosecutor before. But that's not relevant evidence.

But, number two, even if it had some marginal relevance that's the type of thing that you don't go into under Rule 403. And it just didn't have anything to do with it.

So that's the way it was. She asked me if there was anything. And I also said, "Look. Hey, if you become an expert in the case, that's Mr. Crabtree's problem. If he thinks that creates a conflict for him, let him get out of the case," you know.

Q And did you later hear from Dr. McCoy again as to the issue--well, actually, did you later learn that Dr. McCoy was ultimately not called as a witness in the Christa Pike case?

A Well, it--I--my memory--of course, during that period of time I was focused on other things. I was focused on the Crystal (sic) Pike case; however, as it came on for trial, because my secretary, Carol Holbert, as we were working on the Huskey case upstairs, the Pike case was going on in

this courtroom. And my secretary got summons for the jury and actually got into the jury box and was questioned as to whether or not she could serve as a juror.

And it **so happened** during that period of time that she was sitting back in the jury room that all of the jurors in Miss Pike's case were talking about the Thomas Huskey case, thinking that that's what they were doing, and making some rather helpful statements to me that I later used to get Mr. Huskey's case transferred out of Knox County because of the undue excitement concerning Mr. Huskey's case. So Miss Holbert provided a very nice affidavit as to what the jurors were saying about Thomas Huskey, and he wasn't even the person on trial.

Q And this was some time after you had first talked to Dr. McCoy about the issue?

A Oh. I talked to Dr. McCoy **before** Mr. Talman. She brought that to my attention, that it was an issue as to whether or not she should accept Mr. Talman's or whoever--I'm not even sure--I'm not sure who it was that invited her, but I certainly told her to tell Mr. Talman because I knew that Mr. Talman was in the case at that time.

And it was long after that.

Q And so then after the trial did--did she contact you to ask you a question about her not being called as a witness?

A Several days after the trial she called me and she was very upset, very upset. She told me that she had been asked by Mr. Talman to say something that was not true. I was very careful with Dr. McCoy during the period of time I was working with her in the Huskey case, not to talk about other cases, for two reasons. Number one, I knew that that should not occur; and, number two, I wanted to emphasize to her the importance that she not talk about the Huskey case to other people because these were very high profile cases. So I had not talked to Dr. McCoy about the Crystal (sic) Pike case or the--her involvement in it intentionally during the high profile nature of the case as it went on before Judge Leibowitz.

She was very upset when she called me. She first said that she had been--

MR. PRICE: Your Honor, I object to hearsay.

THE COURT: That is hearsay.

MR. PRICE: This isn't something that