# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 5

## DOCUMENT 23

---

XXVIII E2009-00016-CCA-R3-PD

IN THE CRIMINAL COURT FOR KNOX COUNTY

DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGooyal

CHRISTA GAIL PIKE, )

PETITIONER )

VS. ) CASE NO. 68280

STATE OF TENNESSEE, )

RESPONDENT )

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

Petition for Post-Conviction Relief Proceedings

April 7th through April 11th, 2008

Volume 11

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Assistant District Attorney
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Post-Conviction Defender
Mr. James Crowson
Assistant Post-Conviction Defender
Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, Tennessee 37243

## TABLE OF CONTENTS


| Volume 11 | Page |
| --- | --- |
| PETITIONER'S PROOF: | |
| HERBERT SANFORD MONCIER: | |
| Direct Examination (continued) | 1001 |
| Examination by the Court | 1032 |
| Direct Examination (continued) | 1038 |
| Court Reporter's Certificate | 1050 |

they're suggesting should have been admitted in the sentencing phase capital trial. This is just blatant hearsay. We've already had Dr. McCoy on the stand--

THE COURT: It is hearsay.

MR. PRICE: --for two days.

MR. DAWSON: Well, your Honor, if--if--

THE COURT: She--it supports the fact that she's told us that she called him, but that's--I mean it is hearsay. There's no question about that.

MR. DAWSON: I think it's also sort of res gestae. It's something immediately after the facts, I mean that she's concerned about what to do and she's contacting someone who she thinks may be able to help and help her decide what--what action to take.

THE COURT: Well, I don't see anything wrong with him testifying that he was contacted, but I think whatever she said to him is hearsay.

Q Mr. Moncier, you were contacted by--by Dr. McCoy. And--and did you give her advice on the questions that she was asking you?

A I did.

Q And what advice did you give her?

A I advised her that although she was being asked to tell Judge Leibowitz something that was not true that that was at that time within the attorney/client and the attorney/work product and that she should not go independently to Judge Leibowitz at that time and tell Judge Leibowitz that something that was being told to Judge Leibowitz by Mr. Talman was not true.
Q Now, Mr. Moncier, let me ask you another question.
A And--and because it had already occurred at the time I learned about it and it was not something that was going to happen in the future, I did not believe that the crime/fraud exception applied.
Q And if there was--(Pause while petitioner's team conferred)
A I believed--let me also--I also told her that if there came a time that Miss Pike--or I think I said the name correctly--the defendant, the person that she was working for--
Q Right.
A --were to release her of the privilege she would be able to explain that. And I did mention Miss Pike had been convicted at that

point in time. And I did mention that there would be a direct appeal and that there would be a post-conviction proceeding if the direct appeal was unsuccessful, and at that point in time she could disclose it, with Miss Pike's permission.

Q And, Mr. Moncier, let me ask you just some--some--a question about when you were working--through your experience with TACDL, did you get a knowledge of the quality of the Criminal Defense Bar across the state of Tennessee?

A Well, I think so. You know, you can't work as closely as myself as well as other people who worked with the Criminal Defense Bar and the Public Defenders' Conference without having views of the levels of abilities of various attorneys.

Q And did you get an impression of how the Criminal Defense Bar in Knoxville sort of sized up to the--to the rest of the state?

A Oh, I think so.

Q And what was the Knox--what was the--what the view--

A Well--

Q --of actually other criminal defense lawyers about the Knoxville Criminal Defense Bar?

A Well, of course, I had another mentor, Robert Ritchie, that so many criminal defense attorneys in Knoxville had the privilege of knowing and developing their skills under his tutelage, and I attribute Mr. Ritchie to developing some **excellent** criminal defense attorneys in the Knoxville area.

There was--another reason though is that there was a District Attorney back in the seventies of which I grew up under, worked for for a period of time and others, by the name of Ron Webster. And Mr. Webster was a--you know, he just tried everything. (Laughing) You know, he was one of those guys--those District Attorneys that put people to trial. And **as a result** of that the criminal defense attorneys in Knoxville and in the Knox County area got **a lot** of experience trying cases and became excellent criminal defense attorneys. So I attribute those two factors to east Tennessee having--and then the Knoxville area having some of the best criminal defense attorneys in the state of Tennessee.

Q And did those lawyers that were learning at that time and learning from

Mr. Ritchie and--did they share their experiences and share their knowledge with the other members of the Bar?

A That's what we were taught through the team process that you said, and Mr. Ritchie, of course, was our mentor that taught us to share and to--to work with out fellow criminal defense attorneys and to share our information.

And, of course, TACDL was on the cutting edge of that, and being one of the sponsors of continuing legal education--and TACDL also being an organization that didn't represent the self-interest of the attorneys. I mean there was--we weren't trying to keep personal practice or any of those type things. We truly were seeking to have a fair system of justice for the people of Tennessee. That was what we were about. And so, consequently, we didn't get much money in doing that.

And CLE or Continuing Legal Education was **literally** the gateway toward TACDL providing what I considered to be the best continuing legal education in the United States. We had--we were right smack on the cutting edge of it, and we pumped it and we promoted it, and we--that's our

financial backbone today.

Q And the attorneys within the Knoxville area Bar, if you had a--a difficulty in a particular case or needed some assistance or just somebody to talk to, were there plenty--were there plenty of attorneys in Knoxville--in the Knoxville area that you could call and say, "I've got a problem in a case. Can I bend your ear?"

A Hum, the answer is yes. I don't think Robert Ritchie ever didn't answer a telephone call from a young attorney in Knoxville. He taught me the same--the same mentor of me.

I remember one of the most difficult cases in Knox County was when Ron Smith right out of law school got appointed by Judge Jenkins to represent Eva Jean Brown in a very, very high profile Knox County case. And he came to my office and looked at me and said, "Herb, I need help." And for the next four years I was embroiled in a high profile trial that ultimately she--charges were dismissed against Miss Brown for beating to death her four year old child.

And that's--I use that case in the late eighties as an example of, I think, what a number of attorneys that I can mention their names step

up and do what's asked of them when they are--when they're asked.

Q So in--in--and in a profile case--well, I guess we--I think we all agree that Christa Pike's case was a high profile capital case?

A It was.

Q And it was--and there were numerous challenges to say the least for the defense team representing Miss Pike?

A Certainly the publicity in Miss Pike's case created, uh, very intense issues to deal with.

Q And were there a number of lawyers in the Knoxville area that, **if asked**, would have participated in--in that defense?

A Certainly.

Q Either--

A I think I--I mean I can rattle--Bob Ritchie, Tom Dillard--Wade Davies was coming on very strong at that point in time--those are three--Charles Fels the ultimate mentor of us all who has now become a priest. I mean those people just did not re--decline to answer a telephone call. Ralph Harwell who just, you know, is a wealth of knowledge and experience. Jim Bell

that if you can st--be around him that long will give--

THE COURT: You mean James A. H.?

A I do mean James A. H. Bell, who is a wealth of knowledge. All of us--all of us developed this comradery, this degree of reaching out to teach, help, because it was our philosophy--and when I say our philosophy I think I was taught it by Bob Ritchie--that the better the representation by the Criminal Defense Bar the better the body of law that is developed for the state of Tennessee and ultimately the better system of justice we have.

Q And of course you all--I mean certainly Mr. Ritchie was active in--in several national organizations--

A Of course.

Q --in criminal defense as were Charles Fels and Tom Dillard and other people in Knoxville, correct?

A Yes.

Q And they easily could have connected a young lawyer with national experts to help them in a case such as this?

A Well, not only would they have but we

actually had referred--Kidler (Phonetically) wasn't in effect at that time, I don't think. Let's see, 1996. I'm not sure. **But** TACDL actually had hot lines. We had attorneys assigned from around the state. When somebody had a question they simply called this attorney and that attorney would refer them to somebody else that knew what they were doing.

And the answer is yes; there was actually a formulized-formulated, uh-formalized process for doing it. And certainly within the Knoxville legal community no one could practice criminal defense law under the umbrella that Mr. Ritchie gave us without understanding that those who did this for a profession were available at the moment of a telephone call to help.

Q Let me ask you as well. If--during that period of 1995, early '96, what was the reputation in terms of the local Bar of Mr. Talman?

A It's awfully difficult to--to--to try to project back at that time. Uh, Mr. Talman--when you asked me my opinion of that--first of all I'm not going to say that Mr. Talman wasn't

competent to practice law. I'm not going to do that. But because of his name, Mr. Talman, and he was very short in stature--
Q (Laughing)
A --that sort of stood out somewhat. He was an attorney that was accepting court-appointed cases. I cannot identify any, uh, cases of any significance that he had handled, nor is there any adjectives that I could use in a good na--in a good manner to describe his practice. The best I can do is say that he was an attorney that was accepting court-appointed cases.
Q Do you recall seeing him at any of the TACDL seminars?
A Yes. I--Bill--Bill came to some of the seminars that I had taught at, and I do recall him being at some seminars, not a frequent--I don't recall him being a regular attendee. Sometimes you can look out in the audience at every seminar (Laughing) and you think, you know, it's deja `vu. (Laughing) This is the same crowd we did last time. I don't have any new jokes. But Mr. Talman did attend some, yes.
Q And when--in terms of his practice and

what you observed of his practice in terms of a high profile capital case, such as this one, would you see him as an attorney that could have handled that kind of a case?

MR. PRICE: Your Honor, I object to that.

THE COURT: I think that goes to the ultimate question. I sustain the objection.

Q Let me ask the question I asked earlier then about Ms. Rice. When she became involved in 1996, what do you recall about Ms. Rice in terms of the way she was viewed by the Knoxville Bar?

A I had met Ms. Rice primarily actually at seminars that she had attended and in speaking to her to attend seminars. I knew that she had accepted court-appointed cases, but she was a young attorney at that time. I don't recall how long she had been practicing, but I viewed her as a young attorney. And, uh, I'm trying to remember whether--Rule 13 wasn't in place at that point in time. I don remember, however, being surprised that she was in the Pike case because of the--the--the nature of the case.

Q And was this the type of case that--let me ask you. I'm not saying this--was there any

capital case where there's--where the State is asking for the death penalty, is that really the place where an inexperienced lawyer who's never been involved in--in the type of litigation that's required--well, let me ask you this first. What type of litigation is required in a capital case?

A Going back to what I said was the adopted standard in the early nineties of team defense, it is my opinion that the defense--

MR. PRICE: Your Honor, this is what I object to. I mean he's rendering his opinion on a standard--first of all, he hasn't furnished a report. I don't have any discovery on this. I don't think this is relevant to this hearing.

THE COURT: Well, this is Mr. Moncier's opinion based upon his own created standard, and I understand where you're doing. But I think that's--I still sustain the objection. I think--I think at this point this is not based upon a specialized expertise in creating defense teams. He hasn't done it in mitigation, and that's what you've been talking about.

MR. DAWSON: Your Honor, he's prepared mitigation.

THE COURT: He's prepared--well, he--he may--he can say what he's done, but I'm, you know--it's not a standard.

MR. DAWSON: Well, your Honor--

THE COURT: There's no requirement in the law that you make a team defense or a single person defense or anything else.

MR. DAWSON: Your Honor, I think that he is capable though of--and because of his experience in--in the various organizations and the seminars he's--he's able to talk about what the developing national standard was at that time in terms of--of what was being taught to criminal defense lawyers, what the--was being adopted by criminal defense lawyers as the proper way to handle a capital case. I mean these are things that are not in the case law, frankly. These are the things that are in the training manuals and in the seminars that--that are--that expose criminal defense lawyers to the requirements of--for preparing for and handling a capital case.

MR. PRICE: I have the same objection.

THE COURT: He wants to testify at the time how he prepared a defense and gathered a team, he can testify to that. But I think that

he cannot render a standard.

MR. DAWSON: That's fine, your Honor.

THE COURT: I mean I--I'm not sure that it was a standard that--that is--is something that he can give an expert opinion on. I don't think there was a standard that he could give an expert opinion on at that time. There are standards.

MR. DAWSON: Well, your Honor, there were standards so that--there were the--

THE COURT: But not ones that are required by law in the courtroom. The Bar developed certain practices and encouraged each lawyer to do them--I think that's what you're getting at-

MR. DAWSON: That's correct, your Honor.

THE COURT: --and taught these practices and still teaches these practices at TACDL seminars, at what was the Capital Case Resource Center, which has been testified about and some other things. But I think that Mr. Moncier-and I think where we're going is that--that he was going to render in his opinion what a proper team defense is. And I think still

that's ultimately the--the province of the Court.

MR. DAWSON: Your Honor, I would suggest that the--that the Court should have the advantage of knowing--I mean the standards for capital defense or any kind of criminal defense are going to be those that are created by what is the standard within the Criminal Defense Bar because essentially it's the Criminal Defense Bar that's putting on the cases and doing the work.

THE COURT: But that's not the standard upon which I decided whether there was ineffective assistance of counsel.

MR. DAWSON: I think that it's a standard upon which one has to determine how far the--the defense in this case has deviated from what was--what was being taught or what was being advised. It's--I mean if the--in the--Baxter vs. Rose, you know, the Tennessee Supreme Court said that when determining whether someone is effect--has rendered ineffective assistance of counsel that the Court should be, hum--I've forgotten the line--but it's sort of in--that's not the right language--but it's instructed and guided by. And the actual word is escaping me right now.

(Whereupon, there was a

pause in the proceedings
while the petitioner's
team conferred and the
Court and Ms. Jones con-
ferred.)

THE COURT: A capital case attorney points out that Mr. Morrow--I hate to bring out Mr. Morrow--in the Suttles matter has laid out all of the standards, the applicable standards of the ABA, the--the Criminal Defense Bar and has set forth those standards in his brief. And we can do it that way too.

I think to ask Mr. Moncier to lay them out is--I mean with all due respect to Mr. Moncier, who I also consider a friend, I think that would be the more proper standard to use; would it not?

MR. DAWSON: Your Honor, there are also --many of them are in the document that we gave the Court--

THE COURT: Certainly.

MR. DAWSON: --in July of 19--of 2007.

THE COURT: Absolutely. So I mean I think we have it as it were.

MR. DAWSON: Yes, your Honor. (Pause)

Let me ask some of the practical questions, your Honor.

THE COURT: I wish you would because then I'm going to get them, if I--if I don't get them because I need to know the answers.

Q Mr. Moncier, let me ask you a little bit about--I'm just going to ask really one area at this point. And that is from your experience as a lawyer in trying criminal cases and civil cases and any other kind of cases, do you have--can you talk about the--the necessity in proving your case, and especially in a mental health case, of--of what has to be done when you're trying to convince a jury of someone's mental illness?

A Well, I think it's a three-part process.

(Whereupon, a cell phone went off.)

THE COURT: It's the ice cream man.

PETITIONER PIKE: (Laughing)

FEMALE VOICE: I'm so sorry, your Honor. I--

THE COURT: That's all right. Do you want to carry it outside.

THE COURT REPORTER: How come you're

not going to put her in jail?

THE COURT: I didn't say that.

A Where you have an issue to where a person's mental state of mind is at issue on the criminal trial as contrasted to the sentencing trial, the preparation and approach are completely different, night and day. For example, if you are at a criminal trial to where the issue is either insanity or the lack of mental capacity for an element of the offense--some people call it diminished responsibility, but we've been taught not to use that term. Then what you are doing is you are starting with the commission of the offense and unfortunately you're almost required to admit the commission of the offense in order to establish the question of whether or not the elements of an insanity defense are present or the elements of a lesser, uh, intent are present.

And to do that you have got to start at--well, really you've got to start before birth because all of the literature that attorneys have available to them tell us that during the gestation period of a child some of the mental functionings are being either developed or

impaired by alcohol, by hereditary conditions, by chemical conditions, by Xs and Os and the electrons as they develop in the brain. And so that gestation period is a **very** critical period to start with. And it's also, of course, the first part of the person's life and you build from there.

You--you examine the first part of the person's life, and what you do is you try--we call them vignettes in our business. You--and a vignette are examples of a person's development along the way that then an expert can take along with all of the testing devices that are available today with our science and can take those sociological, developmental, educational, family, uh, uh, substance abuse, all of those factors that cause a person to act in a particular manner.

Once you get those **facts** put together then you find an expert to tell you how those facts play into whatever mental disorder or derangement that that person may be found to have by all of the specialized things that are available to us as criminal defense attorneys.

Q Now, when you're then presenting that

to the jury, can you simply put on the expert or simply put on the lay witnesses?

A (Laughter)

MR. PRICE: Your Honor, I object to that too. (Pause) I mean there are--

THE COURT: Has he--has Mr. Moncier read the transcripts of **this** case?

MR. DAWSON: We can ask him, your Honor.

Q Mr. Mon--

THE COURT: I just did ask him. Have you, sir?

A I have read--

THE COURT: Have you reviewed this case?

A --I have--I have read parts of the transcripts of this case and--with specific reference to the transcript of Dr. Engum. I read Dr. Engum's testimony thoroughly, and I have read some of the other parts. I've scanned it. I wouldn't say I've studied it.

THE COURT: General, would you like to tell me the basis of your objection?

MR. PRICE: The basis of the objection is, the way I understood that question--I mean it

assumes there's one way to try any case. I mean there are an infinite number of situations and circumstances going through each case. And the way that I--the objection that I had to that question is he's suggesting that Mr. Moncier give his opinion as to how it should be tried in every case. And **again**, we're getting into the issue, your Honor, of something that you're going to have to decide. What he's really trying to do here--and I had no idea this was the purpose of calling Mr. Moncier. But he's trying to get Mr. Moncier to **tell you how you should rule in this case and that's improper**. He's not qualified to do that. They haven't followed the proper procedure in this case, and I think at this point I object to that question and continuing question in this manner, in this line.

MR. DAWSON: Your Honor, we'd be glad to turn over all of the materials that I've given to Mr. Moncier for his testimony today to--

THE COURT: It doesn't sound like a lot.

MR. DAWSON: I can tell him what it was. It was the transcript of Eric Engum's testimony, the transcript of the penalty phase

witnesses, hum, and a small amount of legal research that Mr. Moncier asked me to do so that he could remember some of the standards because he was rusty on Strickland and Baxter, just the exact language, not the general principles. And so I gave them--those to him. And that was it.

MR. PRICE: Now, how could he after reviewing that--and I don't think he's reviewed--it doesn't sound like he's reviewed all of those materials. But how could he render a judgment and present to your Honor how Mr. Talman and Ms. Rice were ineffective in this case with that **limited knowledge**--

MR. DAWSON: Your Honor, I think what we were getting into was--

MR. PRICE: --even if that was proper for him to do? Par--pardon me.

MR. DAWSON: We were getting into some general--I was trying to ask him some general principles that apply to really litigation and proving your issues and things that we've talked with Dr. McCoy about, the issues that Dr. McCoy would not be as--

THE COURT: He hasn't done it since before Furman vs. Georgia, even though he's

taught it.

MR. DAWSON: Your Honor, but he--he's prepared it. And the problem is that if you only use attorneys that have lost--

THE COURT: But--but--but the fact of the matter is an ineffective assistance of counsel claim deals with what happens in the courtroom on--in the heat of the battle and in the moment, and--and it's a little bit difficult if he has not reviewed **all** of the record. Dr. McCoy's record, he hasn't reviewed that. He hasn't reviewed her mitigation reports. How can he render an opinion about it or how can he even testify about it?

MR. DAWSON: Your Honor, actually, now that I think about it I did give him Dr. McCoy's report, but I don't think he had time to look at it. (Laughing) He-

A Oh, I--I--I--while I was waiting to be called upstairs, I think I looked at it. I did not study it in depth, but I looked at all of the pages.

THE COURT: Well, how it would have been presented goes to a lot of other issues too that I'm not sure he even has been made aware

of-

MR. DAWSON: Your Honor-

THE COURT: --for instance, the time frame upon which the attorneys had that report, the time frames of the trial, such as those things.

MR. DAWSON: Well, your Honor, we can ask him some questions like whether it makes since to have your expert complete the social history after the trial begins. I mean that--I mean there are some basic issues that Mr. Moncier because of his experience and because of his--his talking to various people around the nation would be able to say that's--whether that is or isn't the way it's normally done.

(Whereupon, there was a pause in the proceedings while the Court and Ms. Jones briefly con- ferred.)

THE COURT: Well, let's take just a couple of minute break and let me think about that.

(Whereupon, a recess was taken; afterwards, the

following proceedings
were had, to-wit:)

THE COURT: Please be seated. (Pause)

The ruling of the Court is as follows: Mr. Moncier and you seem to be attempting to offer standards which are put together by the lo--the defense Bar of the area, the state, and I understand that because those are the standards that are taught. So if you would like to provide those standards with the State and give them an opportunity--in writing, the written standards, and give him an opportunity to review them so that he can effectively cross-examine Mr. Moncier, then we could proceed with that. But I don't think that's what we're doing.

I think what we're doing right now is having Mr. Moncier tell me the standards, and I--I can't--it's unfair to the prosecution in this case. It's unfair to the Court, unless you want to lay out those standards in writing.

MR. DAWSON: Your Honor, I think that one of the problems is is really what I'm asking about is generalized standards of--of litigation that are taught in numerous seminars. And I don't think that we're--

THE COURT: But that--that's really not the question, what the generalized standards that are taught in seminars is.

MR. DAWSON: Well, I think they are though, your Honor. I think that--I think that when you have, you know--I think that what happens is, your Honor, you have standards, and especially in capital defense what's happened is you have standards that have developed by--back when the resource centers were available in most of the states that had the death penalty, each state was developing their--their death penalty defense manual. I know California had one. Tennessee, of course, had one. Kentucky had one. And we have a whole shelf in our office of various state standards that were collected by the Resource Center.

THE COURT: But you have manuals for all of those standards; do you not--

MR. DAWSON: Yes, we do.

THE COURT: --all the seminars, all the standards?

MR. DAWSON: Right.

THE COURT: Feel free to share them with the State, Mr. Dawson, and with the Court.

If you don't want to do that, then I think--then I think that where we're going is a lot of theory because he can't cross-examine him on it.

MR. DAWSON: Well--well, but, your Honor, I think what happened though--I think what happened is we have these standards developing and then we have the 1989 abandonment guidelines that were developed. And those were a--you know, kind of taken from the other standards. And then we have the 2003 guidelines. And, of course, the United States Supreme Court has said in several cases, starting with Wiggins vs. Smith, that the abandonment guidelines **are** the standard for criminal defense. And when they did that they--because Wiggins--they applied the '89 guidelines. Wiggins was tried in '88. So--and then there have been cases that were tried in the nineties where now they've applied the 2003 guidelines indicating these were developing standards--

THE COURT: All of capital case law **develops**. It constantly moves.

MR. DAWSON: Well, but these were standards that should have been known by the defense counsel that were trying these cases. They should have been following them. And I

think what basically they're saying is these were the developing standards that were being taught in national seminars and statewide seminars. That's how the standards developed. And so that what I'd be asking Mr. Moncier is: what was being discussed? What was being talked about in 1995?

THE COURT: Are there manuals that back all that up?

MR. DAWSON: There are not, your Honor. There are--you know--

THE COURT: Oooohhhh.

MR. DAWSON: --each TACDL seminar had a book with it that had each speaker's presentation, whatever they would give, like any other seminar. And then, you know, it's an amalgam of that that we're talking about. We're not talking about one particular--we're not talking about a manual that says, "This is the way you do it." We're talking about a growing understanding among members of the Criminal Defense Bar as to how the cases should be done. And that's what Mr. Moncier was not only--not only listening to but helping to create, and I think that's why he's an expert in this area.

THE COURT: But aren't those the same materials that Ms.--Ms. Rice and Mr. Talman testified about? Ms. Rice is suppose to present us with her copy of her material.

MR. DAWSON: Right, which she is--

THE COURT: I mean aren't we talking about those materials? They came out of the Capital Case Resource Center for Tennessee. That pretty was the standard in Tennessee at the time; was it not?

MR. DAWSON: And that's true that the--the--the 1992 Capital Case Resource--well, actually it was TACDL that printed it but--

THE COURT: Right.

MR. DAWSON: --frankly, the Resource Center was involved in the writing, of course, as well as some other lawyers around the state that weren't actually Resource Center members but that--but, yes, those were developed and those were the--were the kind of the guiding standards for Tennessee at that time.

THE COURT: And they are closely guarded by the Criminal Defense Bar--

MR. DAWSON: Not necessarily, your Honor. I mean--

THE COURT: --ordinarily.

MR. DAWSON: --we're willing to share. We--we're--

THE COURT: Well, feel free! (Laughing)

MR. DAWSON: And-

THE COURT: You know, if--if it--if--as this case has developed standards have changed also.

And even when we were preparing our Judges' seminar last year for capital cases, Justice White, in presenting history for us, talked about, "Well, this is the devel-she's--don't tell anybody now that she said this to us because I'm sure it's a Defense Bar secret. "These are the developing things that will be coming in the next year or two; watch for them."

And so I don't know. You know, again, I have great respect for what Mr. Moncier's expertise is. And it's just that these standards keep going.

And so if you want to come up with or present or proffer this, that's fine. But I don't think that I can--that I can--I think that the State's objection is valid since he has been

given **none** of this upon which this witness has come to testify. He has been given no notice of expert witness testimony to where he could do his own development. And I sustain the General's objection, basically.

MR. DAWSON: But, your Honor, from what I hear Mr. Morrell has given what we're going to do in the brief in Suttles that's been filed, and Mr. Price has--

THE COURT: Well, why can't we just use Mr. Morrell's brief-

MR. DAWSON: You know--

THE COURT: --instead of having Mr. Moncier up here? (Laughing)

MR. DAWSON: --I would venture a guess, your Honor, that you may see some of Mr. Morrell's brief once again.

THE COURT: Okay. I mean I have no objection to that. But--but what we're doing here is, you know--(Pause) I'm not sure that I can accept what Mr. Moncier's tactics were in Mr. Huskey's case as whether or not it's the standard in this case. That's what I'm trying to say. It's not--I think that there were some standards no doubt that the Criminal Defense Bar

used. But the standards used for effective assistance of counsel are set out in the abandonment guidelines and in the law, in the Supreme Court cases of the time, and we have those.

MR. DAWSON: Thank you, your Honor. I have no further questions of Mr. Moncier.

THE COURT: Do you have any other questions you would like to ask, General?

MR. PRICE: No, your Honor.

THE COURT: Can I ask a few?

MR. DAWSON: Yes, your Honor, as long as they're related to this case, your Honor. I need to protect the witness.

THE COURT: Oh, indeed they are related to this case.

A (Laughing)

(Whereupon, several parties laughed.)

<u>EXAMINATION</u>

<u>BY THE COURT</u>:

THE COURT: Mr. Moncier, do you ever use Dr. Eric Engum as an expert witness?

A I have.

THE COURT: And how--how many

occasions?

A That he actually testified? I believe that as far as--I've used him to do, uh, analysis and to give me opinions I would say maybe in ten cases.

THE COURT: Okay. And how about--

A He--he has only testified to my recollection in one case.

THE COURT: But you've used him in several cases?

A But I have used him in, I would suggest, maybe ten cases or so. And either his opinion did not--was not helpful--his opinion was not helpful or for whatever reason I didn't use it. He has provided affidavits for me in a number of cases, and I believe he did in Huskey.

THE COURT: Okay. Have you ever used the services of Dr. William Bernet of Nashville?

A I have heard of Dr. Bernet. I have not used his services.

THE COURT: Did you ever use the services of Dr. Charles Bebber?

A I have used Dr. Bebber in the nineties. The last time I used--on numerous occasions, and the last time that I used Dr. Bebber was in the

Huskey trial in Chattanooga. So the answer is yes.

THE COURT: And you have as you said a little bit earlier used the services of Doctor--my phone is going off--the services of Dr. Diana McCoy?

A Dr. McCoy has worked with me on a number of occasions. She has testified in cases I've had maybe on five occasions.

THE COURT: Did she serve you as a mitigation expert?

A Yes.

THE COURT: Did she provide you a full report?

A In some case she did and in some cases she did not. It depended upon--there were some cases that--that I called her to provide, uh, testimony that did not have a full report because it was as to testimony of the criteria contained within the Diagnostic Statistical Manual. I think maybe the first time she testified it was IV, and I think it's up now to V or so.

There were some occasions to where she did not provide me a report because she wasn't giving a special opinion as to that case but was

giving a broader opinion for the jury as to the criteria. And then what I did was offer factual evidence that met that criteria for the jury to take the broad opinion that she had of the mental illness and apply the facts to it. Very effective by the way.

THE COURT: In the state courts of Tennessee have your--has your work ever been reviewed for ineffective assistance of counsel?

A For ineffective assistance of counsel?

THE COURT: Yes, sir.

A No. It's been reviewed for over effective assistance of counsel.

(Whereupon, several parties laughed.)

THE COURT: No, I said in the state courts of Tennessee. Got that?

A (Pause) I--I don't think so. I don't think I've ever--I don't think so.

THE COURT: Have you ever represented a client in a post-conviction case?

A Yes.

THE COURT: Death penalty?

A No. Ooo! I have--I have participated in post-conviction death penalty work; however, I

have not been the lead counsel in a post-conviction death penalty case. I have participated. I-

THE COURT: Do you recall when that was?

A I worked on the House case, uh, in the post-conviction in the House case. But I was not--never a counsel of record in the House case. Hummm-- I worked on--I'm trying to think of the name of a case. Ann Short was the lead attorney on it, but I was counsel in Johnson City. And I cannot remember the name of the case which was the--

THE COURT: That would have been some years ago, yes?

A I believe 1996/7--

THE COURT: Okay.

A --out of Johnson City which was a death case which Ms. Short should have the credit but which I worked on with her of having a death penalty set aside in a post-conviction relief for ineffective assistance of counsel at the sentencing trial. I believe the name of the defendant was Campbell. He had been convicted of a very heinous crime of chopping a person's

finger off and theft and sentenced to death. It was affirmed through the Supreme Court.

Ms. Short and I were hired on the post-conviction and we were successful. Ms. Short was successful, although I did participate in that as trial attorney.

THE COURT: Okay.

A I think it was Campbell. Was it Campbell?

MS. JONES: Campbell?

THE COURT: Are you asking the expert?

A Why, sure, sure.

MS. JONES: I think it might be Kenneth Campbell.

A Kenneth Campbell, that's right, Kenneth Campbell.

THE COURT: You're welcome.

A Kenneth Campbell.

THE COURT: Any questions that you now have, counsel?

MR. DAWSON: Yes, your Honor--

THE COURT: I was afraid of that.

MR. DAWSON: --if I can follow up on that--

(Whereupon, several of the

parties laughed.)

A I also--I don't think that there-

THE COURT: He'll follow himself up. It's okay. (Laughing)

A Well, I was gonna--I was going through my mind. I didn't expect that question. I don't think that there has been a serious post-conviction relief on a capital case--a post-conviction relief in Knox County that my office has not consulted with the attorneys on, including Mark Ste--

THE COURT: Including this one.

A --Mark Stevens. Well, actually, I sort of got into this only because Dr. McCoy, you know, to begin with, and that's sort of how I came into this to express--and, you know--

THE COURT: At this point I'm going to shut my judicial mouth. Go ahead.

(Whereupon, some of the Parties laughed.)

DIRECT EXAMINATION

BY MR. DAWSON: (continued)

Q Mr. Moncier, let me ask you a little bit about Dr. Bebber that the Court brought out that you've used as a witness. Unfortunately for

us Dr. Bebber is now deceased. And--
A Is he?! I did not know that.
Q --we had him under subpoena, and he slipped out from under us. The--
A Are you--are you--is--
Q I'm serious. He is deceased.
A Charlie Bebber died?!
Q As well as we--when we tried to find him--
A I am so--
Q --after we subpoenaed him, he was gone. And he died sometime, I think, in the--it was within the last year or so.
A Humph.
THE COURT: But anyway--
Q But anyway--
A Go ahead.
Q --he was--
THE COURT: It's almost 7 o'clock at night.
Q --was his method of assisting in voir dire--do you remember how he--what he did for jury selection?
A Dr. Bebber had a very unique theory of finding punitive jurors. He rated people

concerning to how he viewed them as punitive or non-punitive. That was his little hook.

I got to know Dr. Bebber through my close friend and protégé, John T. Melton Rogers (Phonetically). He introduced me to Dr. Bebber. He was certainly a very, very unique individual. But he viewed jurors--he professed to be able to look at their handwriting and listen to them as to whether they were a punitive person or a non-punitive person. And that's sort of the criteria that he used.

Q And much of what he did was done prior to trial. He was looking at documents or looking at jury forms and--

A He--he professed to be able to tell an awful lot from a person's handwriting.

Q And these were the juror forms that are done by the venire, not--not long capital case juror questionnaires? But these were just the ones that they generally send in?

A Well, no, not--not necessarily. He--he certainly did use the court form that is a very short form when that was all that was available. But now in Huskey, for example, we were fortunate enough to have a questionnaire, or in several of

the Huskey cases we were fortunate enough. And--and he also looked at the handwriting on those.

Q Okay. But that would be only if those existed in the case that you were working on?

A Oh, certainly, yes, if there was a questionnaire.

Q And if there wasn't he would use the court--

A Yeah. And--and Dr. Bebber-the thing about him is that--you know, his system was that he would identify this punitive/non-punitive characteristic before trial. And, you know, during trial it didn't really matter too much what they said. And we debated that at great length. And quite often I did what I thought was different from what he thought.

Q All right. So he wasn't informing you by what he heard in the courtroom; he was informing you what he knew beforehand?

A He had a list made up before I went to trial based upon his rating methods based upon handwriting.

Q And then you were asked by the Judge about your work with Dr. McCoy and having a, I guess, a report completed. And you've had--have

you had her do a social history report?

A Say that again.

Q Have you had Dr. McCoy prepare a social history in any of the cases that you had?

A Yes.

Q And is that something that--what was the purpose of preparing that?

A (Pause) Well, when we started the objection a bit ago, I was telling you how important it is to now, even with the technology or the technology from--that we had back in 1996, we knew at that time that there was significant neurological information that was available to be able to predict a person's criminal activity--violent criminal activity.

And this primarily came out of Sweden, of the--the--the early examinations were out of the Sweden prisons with violent offenders that began to teach the neuropsychology and psychiatry that then led to more advanced studies of the electrons and the neutrons and the things that can be done now with--with chemical testing of the brain that is all developed during--before birth that dictates or can dictate a person's characteristics as they later become in life.

And so the answer to your question is that, yes, I have had Dr. McCoy go back to birth with clients of mine and to examine every document and every incident or vignette as we call them that can be verified, that can be verified, to where ultimately that, those facts, can be compared with expert opinions, which juries don't give too much credibility to, quite frankly--the studies are. Jurors listen to experts because--the studies show us that any party can get an expert to say whatever they want at any point in time. This isn't something that we lawyers chose to do. It's something that the courts imposed upon us.

And so what we do is the State goes out and gets their experts that have predispositions. The defense tries to find an expert that meets their expectations. And you keep shopping around until somebody finds somebody to tell what they want to tell. And the juries get the drift of that after awhile when they see, you know, very well suited experts sit on the stand, and one of them tells them one thing and one of them tells another thing and it depends on which side is paying.

Well, jurors tend to discount that because they are taught to rely on facts. So it is **critical**--(Pause)--I'm making a good point--

(Whereupon, some of the parties laughed.)

A --it is critical that you have the **facts** such as I've had Dr. McCoy do and I've had mitigation experts do. You be prepared and you have the **facts** that will substantiate that expert's opinion. You put the expert on. You get the opinion out of the expert. And then you go back and you show that jury **facts** that support that opinion, and that gives it credibility.

Q What if--what if the facts are negative to the--to the person that you're representing? I mean there are facts showing past criminal behavior, past drug use, past bad behavior.

A It depends on what kind of case you're trying. It depends--that tactic is completely different in a criminal trial from a criminal sentencing trial, night and day. First of all, in a criminal trial the tactic is to limit the jury's knowledge about--

MR. PRICE: Your Honor, can we get back to what he had Dr. McCoy do and--

THE COURT: Yeah, I think we're way beyond what the question was actually.

A I can answer with Dr. McCoy. I had Doctor--

THE COURT: Well, I think **you did** actually.

A Well, I've had Dr. McCoy prepared to testify both ways. If she's testifying as to insanity, I have had her prepared and I want to limit information that reflects badly on my client in the guilt trial or the--the first trial, phase one as they say.

On the other hand when it comes to the sentencing trial, it flip flops; it's exact opposite. And I've had her prepared to testify to all of the symptoms by all of the things that she's found over the years that are indicative of the underlying psychiatric disorder as to why this person shouldn't be put to death.

And the argument goes certainly this person has had all of these bad instances in their life, but it wasn't their fault. They were born with a brain disorder or they were born with a personality disorder, ladies and gentlemen of the jury. And all of these bad things that have

happened to their life are simply confirmation of the underlying mental disorder or mental disease and you don't put them to death.

So it depends. Yes, I don't as a tactic want bad things of my client to come into evidence when we're determining whether my client was guilty or not of committing this offense.

Q And if these--

A If found guilty of committing the offense though, by gosh, I endorse them and I embrace them in the sentencing trial. Of course, the client has done these bad things. The State wants you to kill the person because they've done these bad things, but these bad things are the symptom of the mental disease/mental disorder or mental disarraignment (sic) that your expert says.

Q And is this social history something that you want to give to all of your experts?

THE COURT: Let's start wrapping this up. Go ahead.

Q Is that something that you would want all of your experts to see so that they can sort of cross-pollinate?

A Oh, absolutely.

THE COURT: Oh, let's don't; don't go there, please. Let's don't go there please. (Laughing)

A Well, certainly, I would want my experts to be on--on--dealing with the same facts of my client's history, certainly.

Q And different experts are going to look at it from a different perspective as to what they might need; is that accurate?

A If people think that lawyers are subjective in their abilities and their opinions and different lawyers have different opinions and different views of things, the field of psychiatry is--and psychology is filed with different opinions, ways of looking at each other. And that's why you've got State experts, and that's why you've got defense experts is because--because you can find an expert in this country to tell you anything that you've got the money to buy.

Q But there's--also different medical experts will look at a different--at a problem from different angles and they might--

A Oh, no question about it. There are--there are doctors in this community who are on

the cutting edge--on the cutting edge of under-standing the human anatomy and its responses to stimuli. We have some of the finest doctors--

THE COURT: Let's don't go there. I appreciate it, Mr. Moncier, but let's don't go there. (Laughing)

A Well, there's no question about the fact that the Court's husband is--

THE COURT: I think that's pretty obvious.

A But we--

MR. PRICE: I am going to object to all of this for relevance.

THE COURT: It--I think it's not really relevant to this question today, and I love listening to Mr. Moncier but it's suppertime.

MR. DAWSON: I have no further questions. Thank you.

THE COURT: Any questions you'd like to ask, Mr. Moncier?

MR. PRICE: No.

THE COURT: May Mr. Moncier be excused?

MR. DAWSON: Yes, your Honor.

A Thank you, Judge.

THE COURT: You're very welcome,

Mr. Moncier.

(WITNESS EXCUSED)

* * * *

THE COURT: You'll thank me in the morning; believe me. Anything else you'd like to--did we get a hold of Mr. Isaacs?

MR. CROWSON: Yes, ma'am.

THE COURT: Can he be here at 8:30 in the morning?

MR. CROWSON: Yes, ma'am.

THE COURT: Court is adjourned until 8:30 in the morning. We'll take Mr. Isaacs and then we'll stop, take some docket, and then we'll pick this back up, which confines you to the thirty minutes you promised.

Oh, he isn't going to be gone very far.

I'll take it.

Have a good night, Miss Pike.

PETITIONER PIKE: You too.

(Whereupon, court adjourned.
Court reporter Lisa Kilbourne
took the April 11th, 2008
proceedings.)

*************************************************

CERTIFICATE

I, the undersigned, Deborah L. Hayes, Official Court Reporter for the Sixth Judicial District of the State of Tennessee, do hereby certify that the foregoing is a true, accurate and complete transcript of all the proceedings had and evidence introduced in the Petition for Post-conviction Relief proceedings of the captioned cause, relative to appeal, in the Criminal Court for Knox County, Tennessee, on the 7th, 8th, 9th and 10th days of April, 2008

I do further certify that I am neither of kin, counsel nor interest to any party hereto.

January 6th, 2008

Deborah L. Hayes
Official Court Reporter
State of Tennessee