# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

## ADDENDUM 5

## DOCUMENT 24

006704

E2009-00016-CCA-R3-PD

XXIX

IN THE CRIMINAL COURT FOR KNOX COUNTY, DIVISION III

AT KNOXVILLE, TENNESSEE

CHRISTA GAIL PIKE :
Petitioner :
VS. : CASE NO. 68280
STATE OF TENNESSEE :
Respondent :

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGDoyal

TRANSCRIPT OF PROCEEDINGS

Hearing held on 4-11-08

Volume 1 of 3 Volumes

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

APPEARANCES:

FOR THE STATE:

Mr. Leland Price
Assistant District Attorney General
Office of the District Attorney General
City-County Building
P.O. Box 1468
Knoxville, Tennessee 37901

FOR THE DEFENDANT:

Mr. Don Dawson
Mr. James Crowson
Post Conviction Defender's Office
530 Church Street
Suite 600
Nashville, Tennessee 37243-0505

# TABLE OF CONTENTS

## Volume 1


| | PAGE |
|---|---|
| April 11, 2008: | |
| Post Conviction Relief Hearing: | |
| GREGORY P. ISAACS | |
| Direct Examination by Mr. Crowson | 2 |
| Cross Examination by Mr. Price | 8 |
| Redirect Examination by Mr. Crowson | 8 |
| WILLIAM D. KENNER | |
| Direct Examination by Mr. Crowson | 20 |
| Cross Examination by Mr. Price | 184 |
| Redirect Examination by Mr. Crowson | 208 |
| Discussion Regarding Skull | 202 |
| Discussion Regarding Proffer of Testimony | 212 |
| Exhibit Pages | 217 |
| Court Reporter's Certificate | 223 |
| Certificate of the Court | 224 |

# E X H I B I T S


| NO. | ITEM | PAGE |
|---|---|---|
| 40 | Medical Records for Zola Fotos | |
| | Marked for Identification Only | 12 |
| | Filed into Evidence | 29 |
| 41 | Medical Records for Chris Fotos | |
| | Marked for Identification Only | 12 |
| | Filed into Evidence | 29 |
| 42 | PowerPoint Presentation Disk by Dr. Kenner | |
| | Late-Filed | 17 |
| 43 | Family Gene Gram | |
| | Filed into Evidence | 166 |
| 44 | Polaroid Photograph | |
| | Marked for Identification Only | 212 |
| 45 | Movie Clips on Disk | |
| | Late-Filed | 216 |

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE

DIVISION III

AT KNOXVILLE, TENNESSEE

| | | |
|---|---|---|
| CHRISTA GAIL PIKE | : | |
| Petitioner | : | |
| VS. | : | CASE NO. 68280 |
| STATE OF TENNESSEE | : | |
| Respondent | : | |

This case came on to be heard for Post Conviction Relief Hearing and was heard on the 11th day of April, 2008, before the Honorable Mary Beth Leibowitz, Judge, holding the Criminal Court for Knox County, Division III, at Knoxville, Tennessee, when the following proceedings were had:

THE COURT: Are we ready to swear Mr. Isaacs and proceed?

MR. CROWSON: Yes, your Honor.

THE COURT: Mr. Isaacs, please raise your right hand to be sworn.

(Whereupon, the witness was sworn.)

THE COURT: Please come up and have a seat, sir. And thank you for very much for your patience

yesterday.

When you're ready, sir.

MR. CROWSON: Thank you.

The first witness, GREGORY P. ISAACS, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CROWSON:

Q Good morning, Mr. Isaacs.

A Morning.

Q Would you please state your name for the record?

A Gregory P. Isaacs.

Q Mr. Isaacs, how are you employed?

A I'm the managing partner of the Isaacs, Ramsey Law Firm. I'm a licensed attorney here in the State of Tennessee.

Q And what is your primary area of practice?

A The primary area of practice would be criminal defense in both state and federal courts throughout the state.

Q And how long have you been engaged in the practice of criminal defense law?

A Approximately 20 years.

Q And are you a member of any local bar associations?

A I'm a member of the Knoxville Bar Association, the Tennessee Bar Association, the Tennessee Association of Criminal Defense Lawyers, the National Association of Criminal Defense Lawyers. I'm a member of the Board of Directors of the Knoxville Episcopal School. I am a member of the Tennessee Higher Education Committee appointed by Governor Bredeson. I serve on the Knoxville Zoological Board, and other non profits.

Q And particularly paying attention to the professional organizations to which you belong, do you have an opportunity to converse and discuss with local defense attorneys capital defense trial techniques and --

A Yes. I've tried two capital cases and a number of homicide cases, and I've been to a number of seminars and participated as both a speaker and a member of the audience.

Q Do you know Dr. Diana McCoy?

A I do.

Q And could you describe for us how you know Dr. McCoy?

A I know Dr. McCoy as a forensic psychologist. I have retained Dr. McCoy on a variety of cases throughout the years as a forensic psychologist.

Q And what is your opinion of Dr. McCoy as a forensic psychologist?

A My opinion of Dr. McCoy as a forensic psychologist is that she is very competent, very capable. She testified in the case of State versus Thomas D. Huskey and did a very excellent job. She also testified in the first case ever televised in the State of Tennessee, State versus Michael Frazier. We had a very favorable verdict, and I think that was due in large part to Dr. McCoy. And I've used her in a variety of other significant cases.

Q Have you ever had an opportunity to discuss Dr. McCoy with other members of the defense bar here in Knox County?

A Yes.

Q What is her general reputation amongst the defense bar?

A She is very thorough. She is a good witness. She is very driven, sometimes works so hard she can be hard to work with. And I mean that in a professional positive manner. But a very competent respected forensic psychologist.

Q What about ethically?

THE COURT: I'm sorry, what was the question?

Q Ethically.

THE COURT: Oh.

A I have never had an occasion to -- in working with Dr. McCoy to encounter anything that would be below what I think the ethical standard of care as it would relate to functioning as a forensic psychologist retained by a lawyer.

Q How about personally?

A I really don't have that type of interaction with Dr. McCoy.

Q Have you ever dealt with Dr. McCoy in a representative capacity?

A I have.

Q Tell us about that. Without violating attorney/client privilege.

A A few years ago Dr. McCoy was concerned she had been retained as a forensic psychologist in the State of -- the case of State versus Christa Pike.

Q Of course, that's the case that we're all here for today, correct?

A Correct. And she had been concerned earlier because she had done -- or informed me that she had done a tremendous amount of work and was not called as a witness. That to her was, she thought problematic. Subsequently, she received a letter from Bill Talman --

Q Did you have an opportunity to review that letter?

A I have. And the tone and tenor of the letter was such that she consulted me to determine the appropriate response. The letter had directly and indirectly cast some aspersions regarding Dr. McCoy's ethics, made a number of statements that Dr. McCoy felt were unfounded and untrue. And in that regard, I helped Dr. McCoy formulate a response.

Q And did you offer any advice to Dr. McCoy?

A I did. I said I think it was very important first of all, you know, if you felt you did something wrong to notify your Board. She did not. I felt that since it was a death penalty case, that she needed to respond in writing to clarify what happened. There was also -- she had some significant concerns that Mr. Talman wanted her to tell the prosecution something that wasn't true regarding the timing of when she had provided her report. Dr. McCoy felt that issue created a rift between her and Mr. Talman. And I told her that she needed to be very factual, and put in writing exactly what her concerns were.

Q Okay.

MR. CROWSON: May I approach the witness, your Honor?

THE COURT: Uh-huh. (Affirmative)

Q Mr. Isaacs, I'm handing you what's been marked as Exhibit 8. Would you take a look at that, please?

A (Witness complies with request.) Very well.

Q And what is it that you're looking at there?

A I'm looking at a letter dated March 5th, 1997, to William Talman from Dr. McCoy.

Q Had you ever seen that letter before?

A Yes.

Q When was that?

A I think I helped Diana draft this letter.

Q And I'll direct your attention to the fourth paragraph and the second sentence. There it reads, "You asked if I would testify under oath that this was not the truth." Is that your recollection of the content of --

A Well, I think it says, "You asked if I would testify under oath that this was the truth."

Q Oh, I'm sorry. You're absolutely right. And, of course, there she's talking about a suggestion from Mr. Talman that she testify under oath that she had given him the report -- her report earlier

than -- later than she, in fact, did, correct?

MR. PRICE: Your Honor, objection on that grounds. I think it's hearsay. It's actually double hearsay, if I'm not mistaken. And it's already been discussed, I think, with Mr. Talman and Dr. McCoy as well. So it's hearsay and I don't see the need for this witness to address that anyway.

THE COURT: It is hearsay.

MR. CROWSON: That's all I have of this witness, your Honor.

THE COURT: Do you have any questions, Mr. Price?

CROSS EXAMINATION

BY MR. PRICE:

Q Did you ever have any consultation with Dr. McCoy about the relationship with her and Mr. Crabtree?

A Yes.

Q Okay. Do you know when that was? Do you recall when she first consulted you on that?

A My recollection is it would have been at the time when she was retained by Mr. Talman.

MR. PRICE: All right. No further questions.

MR. CROWSON: Just briefly, your Honor.

REDIRECT EXAMINATION

BY MR. CROWSON:

Q Mr. Isaacs, since we're talking about the relationship between Dr. McCoy and Mr. Crabtree, did you ever have an opportunity to talk with Mr. Talman about that relationship, and in particular about its impact upon his decision making at the trial of Christa Pike?

A I did.

Q Can you tell us about that?

A I recall it was after these letters. Mr. Talman and Dr. McCoy had exchanged letters. I had encountered Mr. Talman at the City County Building, and we had what I would deem a casual conversation about what was going on. And I think he volunteered that he knew about the relationship. The relationship, basically, that Dr. McCoy and Mr. Crabtree had dated and, you know, it was kind of a non issue.

And then we kind of talked about other general things. And I kind of felt since Mr. Talman appeared to be concerned about the issue of Dr. McCoy and her testifying or not testifying, and he seemed a little nervous because he knew I represented Dr. McCoy. And that was the extent of it, but he kind of acknowledged he knew about the dating relationship, kind of shrugged it off that it was, in his opinion at the time, not significant.

MR. CROWSON: Thank you.

MR. PRICE: No further questions.

THE COURT: All right. Anything else?

MR. CROWSON: No, your Honor.

THE COURT: Thank you, sir. You're free to go.

MR. ISAACS: Thank you, your Honor.

THE COURT: Anything else you all want to take up before I stop and start my regular docket?

MR. CROWSON: Not at this time, your Honor.

THE COURT: Okay. There is a couple of things I do need to talk about. I'm going to hold my docket for an hour, stop, wherever that is, and pick up with -- I take it there's one more witness.

MR. CROWSON: Yes, your Honor.

THE COURT: And that is Dr. Kenner who will be a lengthy witness.

MR. DAWSON: Yes, your Honor.

MR. CROWSON: Yes, ma'am.

THE COURT: The ruling of the Court is, from that point in time when we begin we need to be finished by five o'clock, which includes an opportunity to cross or we go over until Monday.

MR. CROWSON: Okay.

THE COURT: That's just where we are. I mean, you're going to get the opportunity to present the whole thing, but I need to get -- and I'm going to give a little

leeway there, but all of us have obligations. It's my Sabbath if not somebody else's. So then yours. And so I would appreciate it if we could just stop at five, and if we can get finished by five, 5:15, 5:30, I'm okay with that. And Ms. Pike will have a transport order on the way back. If not, we just wait until Monday. I have a docket Monday, I think I can pick it up at a reasonable time and finish it.

MR. CROWSON: I think that's a fine solution, your Honor.

MR. DAWSON: Your Honor, while we're on the record though, and it'll save us a few minutes when we begin again since it's not quite nine o'clock, we do have two documents that we wanted to put into evidence. I think that they fall within the stipulation as to authenticity. And I think that Dr. Kenner's testimony will make them relevant. So I think that -- they're not his records, so I think it's probably best to put them in for identification only at this time.

THE COURT: Okay. Can you tell me how to describe them. That would be exhibit --

THE COURT REPORTER: Forty.

THE COURT: Forty.

MR. DAWSON: These, your Honor, we have previously sent to Mr. Price, and these are records -- the

first item, your Honor, is records from the University of Virginia Alkisah Center, and these are the medical records of Zola Fotos, which would be the maternal grandmother of Christa Pike. And I'd ask that they be made the next exhibit.

THE COURT: That will be 40 for I.D

MR. DAWSON: Yes, your Honor.

THE COURT: Okay.

MR. DAWSON: And, your Honor, I do have a copy for the Court.

THE COURT: Thank you.

(Exhibit No. 40 - marked for identification)

THE COURT: And you have another one?

MR. DAWSON: Yes, your Honor. And I'll give the Court a copy of the other one.

THE COURT: And this will be Exhibit 41.

MR. DAWSON: Yes, your Honor. And, your Honor, Exhibit 41 is the -- are the records from Appalachian Regional Hospital in Beckley West Virginia for Chris Fotos, who is the maternal grandfather of Christa Pike.

THE COURT: All right. Thank you, sir. We'll make both of those for I.D. until we get there.

(Exhibit No. 41 - marked for Identification)

THE COURT: Now, so far we have never received the records -- or the books that Ms. Rice --

MR. DAWSON: That's correct, your Honor.

THE COURT: -- indicated she would late file.

MR. DAWSON: That's correct, your Honor.

MS. SUSAN JONES: I'll place a call.

THE COURT: If you would place a call and tell her I want them here today, I'd appreciate that. And was there another late-filed -- we were going to copy the disk.

MR. CROWSON: That's correct, your Honor.

THE COURT: I don't know if you've had an opportunity to do that, but I thought that we -- I thought it went off with Mr. Price in his computer.

MR. CROWSON: It turned out it did, your Honor, we have it and --

THE COURT: Okay. Okay. That's fine. So we're ready to substitute that at this point?

MR. CROWSON: Yes, your Honor.

THE COURT: Okay. Okay. Go ahead. Do we have any more people out there waiting to come in for court? I need to go get my paperwork for regular docket. So if you all will kind of clear a space for the other lawyers and let me take a quick recess, I'll go do that, and I'll be ready to start by nine o'clock.

(Whereupon, a recess was taken.)

(Whereupon, other matters on the docket were

taken up.)

THE COURT: Court's still in session, folks. I haven't adjourned. So if we need to set up the PowerPoint, please feel free to come on up. Does the doctor need to assist you with that?

While we're waiting on the setup, I wondered if the lawyers could meet with me about the lunch hour. We can do this in open court, if you like. We have, as I understand it, a rather long day with Dr. Kenner, in an -- where's Mr. Dawson?

MR. CROWSON: That's who I was looking for, your Honor.

THE COURT: Why don't we find Mr. Dawson before I say this.

Counsel, in light of the fact that I know Dr. Kenner has a rather lengthy presentation, and I've already said I'll continue into Monday, in an effort to finish this case today how about I bring lunch in to the courthouse at my expense. There is no budget, but I'll do it. I'm glad to do it. I'm fully capable of affording it. And just get some trays from a place and bring it in and maybe take a little while for lunch. Give Dr. Kenner at least a half an hour anyway. And keep going in an effort to finish today. I still need to finish at a reasonable hour, but --

MR. CROWSON: I'm sure we can all contribute to lunch.

THE COURT: Well, I'm not sure I'd do that because -- and I'm -- and just do it. Is there anybody that feels that would be a conflict?

MR. CROWSON: We do have an issue about --

THE COURT: Do we? That's why -- I mean, I don't want to go to Monday. I've got more than plenty that got backed up this week. And Ms. Pike doesn't want to go to Monday. And she -- and you need to do an Order to transport her back. She's going back as soon as we're done, and as I understand it, what you want.

DEFENDANT PIKE: Yes, please, God.

THE COURT: I'm trying to push it, but on the other hand, Ms. Pike, you want me to hear everything that they want me to hear. So --

DEFENDANT PIKE: Right now.

THE COURT: I know.

DEFENDANT PIKE: Please get me out of here.

THE COURT: I know. I know. Ms. Pike and I have understood each other for 12 years. You guys don't have to stop her, I understand her. Thirteen years actually.

DEFENDANT PIKE: Yes, ma'am.

THE COURT: Now, so, if I can do it, I'm going

to start the process right now. It's already ten o'clock.

MR. CROWSON: Your Honor.

THE COURT: Yes.

MR. CROWSON: Dr. Kenner is supposed to testify in Nashville on Monday. So in the unlikely event that we're held over, your Honor --

THE COURT: Well, I want to -- you know, I heard how many slides Dr. Kenner has, I don't know if he can do them in four minutes each. But I can read a -- I can move a PowerPoint pretty fast too. So, it's fine. Let's just try anyway for Dr. Kenner's sake. Whose court has he got to be in?

MR. CROWSON: Judge Solomon's.

THE COURT: Oh, we can take care of that. That's not a problem. Well, let's get started as quickly as that PowerPoint's up and ready. Is it ready? You're still working on it, that's okay. So if you all will work on that in the next few minutes while Dr. Kenner visits with Ms. Pike. Let me know if it's even possible. Or maybe we can get a whole bunch of box lunches brought over or something.

Do you want to talk to Ms. Pike back in the docket for a while?

DR. KENNER: No, we've finished.

THE COURT: Okay. Can you see the screen

clearly, Doctor? Do you want me to lower this also?

DR. KENNER: No, that's fine. I can see. I may stand up at times to view --

THE COURT: That's perfectly all right, sir.

We now have all exhibits that were to be late-filed here; am I correct?

MR. DAWSON: There's one more late-filed exhibit, your Honor. For the record, Dr. Kenner will be testifying along with the aid of a PowerPoint presentation, and we'd like the --

THE COURT: Oh, I very much want the disk of that, if that's possible to get one.

MR. CROWSON: I've already spoken with Mr. Price about that, and we'll provide that as late-filed Exhibit No. 42, with the Court's permission.

(Exhibit No. 42 - late-filed into evidence)

THE COURT: What I'd like to do right now while I'm waiting on Susan is try cutting the lights a little so that everybody can see if without killing their eyes, but not -- and see if -- what else you got? That's good right there, I can see perfectly well. I can't read, but I can see. I can too. I'll get used to it.

MR. DAWSON: Your Honor?

THE COURT: Sir?

MR. DAWSON: While we're waiting, we have one

just minor, I think, just housekeeping chore here dealing with the TACDL Manual.

THE COURT: Uh-huh. (Affirmative)

MR. DAWSON: The issue came up about copying it. I did check with TACDL Office, it is copyrighted. And it may be possible to get a release to copy it, but they also have copies available. And so what I was going to suggest is that --

THE COURT: We substitute it.

MR. DAWSON: -- when I get back to Nashville I will obtain a copy from the TACDL Office and I will send it to Mr. Price and then he can deliver it to the Court.

THE COURT: That's fine. I really don't want to go through the proceedings of having somebody stand and copy those books if we can avoid it.

MR. DAWSON: That's fine, your Honor.

THE COURT: And the expense of it. But, obviously, if that's an expenditure that we have to go to, it is, to get it.

MR. DAWSON: I think that my office can probably fund that --

THE COURT: I would think so. Okay.

MR. CROWSON: Your Honor, do we have an exhibit number for that already as a late-filed exhibit, I guess?

THE COURT: The book?

MR. CROWSON: Yes.
THE COURT: Oh, yeah.
MR. CROWSON: Okay.
THE COURT: The TACDL Manual. Let me --
THE COURT: Fourteen. That's right.
MR. CROWSON: Thank you, your Honor.
THE COURT: I'll have to put him under oath too, so hang on. Does this count in the 120 PowerPoint slides?
MR. CROWSON: Yes.
THE COURT: For the record, Dr. Kenner had been my expert at one point, selected by the Court. So I don't know whether you all want to qualify him or not. But since I'd already qualified him by appointing him as my expert previously, is there any problem with recognizing Dr. Kenner? Or do you want to ask questions?
MR. CROWSON: Well, I think it might be illustrative to have some of his qualifications on the record in the event that this --
THE COURT: I'm sure they're there somewhere, but you feel free to do that. Dr. Kenner, would you please stand up, sir, and raise your right hand to be sworn?
(Whereupon, the witness was sworn.)
THE COURT: Have a seat, please, sir. Folks,

I'm going to put eye drops in my eyes along the way during the day, just don't pay any attention to me. I really need them. Otherwise, I'll follow asleep, and you'd prefer I didn't do that.

MS. SUSAN JONES: McCallister's is going to bring it to us.

THE COURT: Good girl. We've sworn Dr. Kenner and we're ready to begin. Go for it there, Mr. Crowson.

MR. CROWSON: Are we ready, your Honor?

THE COURT: Yes, sir.

MR. CROWSON: Okay. Well, being mindful of the Court's suggestion, we will introduce a C.D. of Dr. Kenner and just briefly go over his qualifications.

THE COURT: Sure. That's fine.

The next witness, WILLIAM D. KENNER, M.D., having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CROWSON:

Q Please state your name for the record.

A Sure. My name is William D. Kenner, M.D.

Q Dr. Kenner, how are you employed?

A I'm a physician with specialty

training in psychiatry, child psychiatry and psychoanalysis.

Q And where is your offices?

A 113 Thirtieth Avenue North, Nashville, Tennessee.

Q Could you give us a brief summary of your education?

A Certainly. I went to University of Tennessee to medical school, graduated in 1969. Clinical clerkship in psychiatry at Mayo Clinic, 1969. Rotating medical internship at Baptist Memorial Hospital in Memphis, Tennessee, 1970. In 1970 to '73 I was at the Psychiatric Institute, University of Maryland Hospital for residency in adult psychiatry. And one year of fellowship in child psychiatry. In '73 I came to Vanderbilt on the faculty in adult psychiatry and was there for two years. And I went back and finished the last year of child fellowship in '75.

Q Do you have any certifications?

A I am Board Eligible in adult and child psychiatry.

Q Okay.

THE COURT: I'm sorry, you're Board Eligible?

THE WITNESS: Yes. I also went to St. Louis Psychoanalytic Institute for psychoanalytic training from

'78 to '83. And let's see, from '73 to '75 I was assistant professor of psychiatry at Vanderbilt. I was Director of the Vanderbilt Admissions Unit at Central State Hospital. And then an attending psychiatrist at Vanderbilt Medical School Department of Psychiatry. I've been in private practice --

THE COURT: You are now?

THE WITNESS: Yes.

THE COURT: Okay.

A Well, I am currently an Associate Clinical Professor of Psychiatry at Vanderbilt. And I'm an instructor at the St. Louis Psychoanalytic Institute. I've been in private practice since '77.

I've taught the following courses: Trauma and Association, Child Development for the -- and Group Supervision for the Advanced Psychodynamic and Psychotherapy Program in Nashville. Weekly conferences for Fellows in Child Psychiatry at Vanderbilt. A Demonstration of Psychodynamic Short Term Psychotherapy at Vanderbilt. And also taught at the Vanderbilt Law School for the Supreme Court of Tennessee Judicial Conference. The -- let's see, various other places.

Papers I've given at National Conferences: Competency to Weigh Post Conviction Appeals at the American Academy of Law and Psychiatry, '05. Competency

to be Executed at the American Academy of Law and Psychiatry, in '04. The Reid Technique of Interrogation at the American Psychoanalytic Association in '07. The Good, the Bad, the Ugly of Forensic Psychiatry, that was at the American Academy of Law and Psychiatry in '06, also at a Forensic Interest Meeting. Competency to Make a Will. Murder During Sleep. Normal Adolescent Development. Psychological Trauma in a Case of Torture. Normal and Perverse Adolescent Sexual Development. Death of a Parent, Divorce, and Other Traumas of Adolescents.

I have lectured on a number of topics, Object Loss and Hysterical Contagion in a Nursery School Outbreak of Mass Psychogenic Illness by Proxy. Question: Child Sex Abuse, the Witch Hunt of the '80s for -- at the Memphis State University Law School. Expert Witness in Court. Lecture for the Ends of Court in Nashville.

And then I've been on a number of discussion groups with the American Psychoanalytic Association about learning disabilities, adults who have been sexually abused as children, a vulnerable child, dissociative disorders, psychoanalysis in the law, evening the score, psychoanalysis and the death penalty.

I've been a consultant for the U.S. Air Force JAG Office at the Air Force Academy, Federal Public Defender for the Middle District of Tennessee, U.S.

Attorney for the Middle District of Tennessee, the Attorney General for the State of Tennessee, the Board of Professional Responsibilities, the Supreme Court of Tennessee, the District Attorney for Davidson County, Tennessee, Helen Ross McNabb Community Mental Health Center, Forensic Team here in Knoxville, D.D. Wallace Community Mental Health Center, Forensic Team, the Division of the Health Related Boards of the State of Tennessee, and others.

Q Okay. Let me ask you, have you ever contributed to a capital defense trial team in the State of Tennessee?

A Yes, I have had -- worked on roughly, oh, probably 15 or so capital cases both at the -- total, at the guilt innocence and then post conviction parts of the process.

Q I mean, would you consider yourself in those cases a member of the defense trial team?

A In some of those I was a member of the defense trial team and some of those I was court appointed to answer specific questions. And in others I was part of the prosecution's team.

Q And --

A I'm a switch hitter.

Q -- in those cases where you were part

of the defense trial team did you have an opportunity to see how the attorneys structured the use of expert witnesses and the communications between expert witnesses and the capital defense team?

A Yes, I did.

Q Okay. Turning your attention -- I guess I should tender the witness at this point, your Honor, as an expert witness in psychiatry.

THE COURT: Do you want to ask any questions, General?

MR. PRICE: No objection. No, your Honor.

THE COURT: Dr. Kenner is recognized by the Court as an expert in forensic psychiatry.

Q Turning your attention now, Dr. Kenner, to the Petitioner in this case, Christa Pike. How did you get involved in this case?

A November the 7th of 2001, this Court ordered a competency evaluation to determine if she were competent to waive her post conviction appeals. They asked the three questions -- the Court asked the three questions that are on this slide.

Q Uh-huh. (Affirmative) And for the record, could you read those for us?

A Sure. Whether she suffered from a mental illness, disorder or defect? Whether the mental

disease, disorder or defect prevents the Petitioner from understanding the legal options and positions available? And whether the mental disease, disorder or defect prevents the Petitioner from making a rational choice among the options?

Q Tell us about that evaluation.

A Well, I undertook an evaluation of Ms. Pike. I saw her on the following dates, December the 20th, 27th, 28th of '01, March 13th and May 23rd of '02. I've seen her subsequently on -- after that evaluation on May the 19th, '04, and November the 15th of '07.

Q Those are the interviews that -- upon which you based your opinion rendered to the Court?

A Yes.

Q Did you review any documents before you formed an opinion?

A Yes.

Q What were those?

A I reviewed the documents that are displayed on this slide. They are Dr. Auble's psychological evaluation of her. Letter by Dr. Pincus. And forensic psychological evaluation by Dr. Elliott. And neuropsychological evaluation by Dr. Engum. An affidavit by Dr. Grassian. Let's see, Diana McCoy's mitigation volumes, which originally came, I think it was three

volumes, and by the time I got them they were four or five volumes. An Order regarding competency evaluations. Daily process notes from April the 22nd to -- '91 to --

Q May I interrupt you one moment, Dr. Kenner?

A Sure.

Q There was a statement made that Diana McCoy's notes were three volumes and then turned into five volumes. Did you get two extra volumes that are not available to the Court?

A No. They were simply divided differently. I'm sorry.

THE COURT: Okay. We're still talking about the same three volume work --

A Yes.

MR. CROWSON: Yes, that was turned over to Mr. Crabtree.

THE COURT: -- that she did originally? There isn't anything else that we have not turned over.

MR. CROWSON: There is nothing that Dr. Kenner -- that we have --

THE COURT: All right.

MR. CROWSON: -- that was not turned over to Mr. Crabtree.

THE COURT: Okay. Please go ahead, sir.

Q I'm sorry, Doctor, go ahead.

A Let's see, there was a timeline, North Carolina Division of Mental Health Records, a second Order Determining Competency, and then her entire prison records for Ms. Pike, and I eventually reviewed those from Patricia Jones as well.

Q Not pictured here, did you have an opportunity to review some of the family medical records?

A Yes, I have. I have reviewed the records for her maternal grandfather, and let's see, I think it was maternal grandmother who died of cirrhosis.

MR. CROWSON: May I approach the witness, your Honor?

THE COURT: Yes, sir. Those would be the exhibits that were previously placed as I.D.?

MR. CROWSON: Yes, ma'am, I believe 40 and 41.

THE COURT: That's right.

Q I'm handing you a couple of documents, Dr. Kenner, if you could take a look at those and identify them for the Court?

A Yes. The first one is Zola Fotos, her medical records. The second ones are for Chris Fotos and his medical records. And I have reviewed those.

Q Did you review those in an effort to form an opinion regarding the Petitioner, Christa Pike?

A Yes.

MR. CROWSON: Your Honor, at this point we would move to enter those into evidence.

A And I've also reviewed an Affidavit by her charge partner, Tadaryl Shipp.

Q Okay. And that's not here?

A No, it's not.

MR. CROWSON: Any objections?

MR. PRICE: No, your Honor.

(Exhibit Nos. 40 & 41 - entered into evidence)

Q Any other documents that you reviewed?

A I think that pretty well covers it.

Q Now, have you had an opportunity to speak with Ms. Pike and to review the trial transcripts from her --

A Yes, I have.

Q -- capital trial? Have you had an opportunity to learn about the structure of the defense team?

A Yes.

Q If you would, give us your thoughts about that.

A I think it -- the structure of the team was quite odd in terms of the way forensic

psychiatrists and psychologists and mitigation experts work on cases.

Q In what way?

A This slide illustrates that the lines of communication all went to the defense attorney, Mr. Talman, and that there was little or no cross talk here. Particularly isolated was the forensic psychiatrist, Dr. Bernet. He gave what was simply a collective aggression theory without having seen Ms. Pike.

Q Do you know if he had an opportunity to review her social history before he testified?

A According to the records he did not.

Q Okay. Do you know if Dr. Engum had an opportunity to review Christa Pike's social history before he testified?

A Based on his records, it didn't look like he incorporated that into his report, so one can only assume that he did not.

Q Now, were -- as you read through the transcripts, did you find any particular problems that were caused by this structure and by this failure to share information among the parties, and by the failure of Dr. Bernet to be allowed access to Ms. Pike?

A Yes.

Q Do you have a specific example of

that?

A Right. It was particularly limiting on Dr. Bernet's ability to testify and the extent and depth of his knowledge, his -- the certainty with which he testified in this case. And I think this is an example that -- from the court record the Court stated that, "He didn't evaluate Christa Pike, and I'm not going to let him answer questions about whether or not Christa Pike went off. And he can answer the questions as an expert in forensic psychiatry as to ritual abuse, but I'm not going to let him go any further." Going a bit further in the court records, the Court said, "What you asked him was what his opinion was with regard to this killing. He can't give an opinion with regard to this killing."

Q And again, for the transcript this was trial transcript page 2288, line 22, correct?

A Yes. And then on page 2308, line 14, the Court pointed out that Dr. Bernet bases his opinion not on any examination of the victim, or of an evaluation of -- and statements of other participants and upon Dr. Engum's opinions and findings. So that Dr. Bernet was providing what was in essence a -- sort of Lord of the Flies theory of the case. But --

Q What are your thoughts about -- are you familiar with the collective aggression school of

thought --

A Yes.

Q -- or theory?

A Yes. And --

Q What are your thoughts about that?

A It's an interesting theory, and there is some beginning neuroscience to back it up in terms of development -- the development of adolescent brain. However, to come in and simply give a theory, that would carry very little weight in my experience.

Q Very little weight with the jury unless you could relate it to the specific crime that's before the jury?

A Yes. And the details of the crime.

Q And in your opinion would it have been proper for Dr. Bernet to testify about how collective aggression may or may not have been a part in this specific crime based upon the information that he was able to review before trial?

A Well, I think it's almost like it's better than nothing, but, you know, typically in death penalty cases the psychiatrist has a chance to evaluate the defendant, to review all the records, to talk with the other experts involved in the case, and that's been my experience in cases.

It's also been my experience that the psychiatrist will frequently ask the mitigation expert to look for specific information that might be out there. And to pose questions to the psychologist and neuropsychologist and the -- those experts would also have similar interaction with the psychiatrist.

Q And without being armed with that information, it would be difficult for a psychiatrist to make a determination about whether collective aggression is involved in a --

A One could speculate about it, but I think this slide illustrates the problem in that Dr. Bernet was not able to give an opinion with that degree of medical certainty that's usually required to sustain an opinion in a case.

Q So what we see here is that Mr. Talman attempted to get a medical opinion from Dr. Bernet for the jury about whether Christa had the ability on the evening on the attack to form intent, premeditation, or deliberation?

A Yes.

Q And what do you think about his response?

A Well, I think his response was certainly honest and straight forward that he said, I

don't have an opinion with that degree of certainty, which is a reasonable degree of medical certainty.

Q And in your opinion would a jury, after hearing that testimony, believe that collective aggression was part of what happened that night with Christa Pike and Colleen Slemmer?

A Did the jury believe it?

Q Would they believe it?

A I don't think they would, (a) understand it, or (b) it would make much difference, is my impression of how they took it.

Q Now, what we see here is page 2338, line 9, and it appears that Dr. Bernet is being questioned again about what he based his opinion upon.

A That's correct. And that it -- again, he had very limited amount of material or data to support his opinion, and that was pointed out and it was quite limiting for him.

Q And I think at one point he was asked if he never had a conversation -- was it true that he never had a conversation with Christa Pike?

A That's true.

Q And this is General Crabtree's cross examination?

A Yes. It says, line 2340 -- page

2340, line 20, "Every bit of your testimony that you give here concerning this has been presumptions on your part based upon the information you were provided by someone else?" Dr. Bernet: "That's correct." "So this collective aggression concept of your knowledge, you don't know whether that is what occurred or not, do you?" "Uh, not from my own direct knowledge, that's correct."

Q So what the jury hear -- heard here was that the expert on the stand really didn't know whether collective aggression was --

A Not from his direct knowledge.

Q What sort of data was available to a psychiatrist back in 1986 -- 1996 with regard to examination and social history?

A There was significant data to suggest early onset Bipolar Disorder. There was also data to help the jury understand the impact of early layered trauma on Ms. Pike's personality development. And finally, there was data to understand Ms. Pike's congenital brain abnormality.

Q And this would have been data available to a competent psychiatrist, Dr. Bernet, if there had been an examination, and if a social history had been provided, correct?

A Yes. And it's important to recognize

that in the social history were Ms. Pike's medical records going back to her birth, and there was important data there that would certainly have brought up many questions that one would want to explore.

Q And what would that data have reasonably suggested to a psychiatrist after having reviewed it?

A Well, if you -- if one were to interview the mother in a collateral interview as I did, in which one usually would do in a death penalty case like this, she described that from age 12 to 13 that Christa would stay up all night. She would miss sleep because she wouldn't want to miss doing things with friends. She was on the go night and day. So she had a lot of energy. Sometimes she would chatter on, or she would look at you with an empty stare like the lights were on, but no one was home. And that would be suggestive of dissociative symptoms. "She'd take my car at night and she would party all night, and then put my car back in the garage."

Q Well, does the fact that a teenage girl likes to stay up late always indicate early onset of Bipolar Disorder?

A That in and of itself does not. Teenagers are famous for developing vampire hours in which they're perfectly happy to stay up all night and sleep all

day. The difference was that Ms. Pike did not sleep all day. She was up day and night. So that she had a pattern of sleeplessness in which she had a great deal of extra energy and she would go on to do many of the normal teenage things, but she would do them 24 hours a day quite often.

Q If we could back for a moment, there's a mention of dissociative symptoms, could you just -- I know we're going to get into that later, but if you could briefly tell us what that means?

A Sure. Dissociative symptoms simply refers to defects in an individual's memory system. And it's helpful to think of memory as if it were, oh, laying down a recording. Normally, there's just one recording. In cases of severe chronic trauma, particularly when it begins in early childhood, individuals will develop the capacity to make recordings on different tracks so that they may or may not be aware of what was recorded on one track. And this can lead to periods in which they don't remember what happened. They will frequently be called as a result of that liars, because they have no idea what they might have done when they -- during the period that they can't remember.

Q And there was data that was suggestive of dissociative symptoms that was available to

a psychiatrist back in 1995 and 1996?

A Yes.

Q With regard to Christa Pike?

A Yes.

Q The same thing for the symptoms suggestive of Bipolar Disorder, those were also available --

A Yes.

Q -- if anyone examined her back in 1996?

A Yes.

Q Are there any clinical observations from Christa's history that are also indicative of Bipolar Disorder?

A Yes. She was in treatment center in North Carolina and there were quite a number of entries. And these are just a sampling of those. And this is when she was roughly 15, bundle of energy, she talked all during quiet hour. Very talkative. Christa went through the rest of the day hyper, talked more than the rest during quiet hour. She was very talkative to staff. Total change of attitude over dinner. And had a great evening, played hard. Started to help with dinner but was too restless to stay at one task for too long.

"Christa came home looking okay, but feeling

terrible. She was rushed to the doctor and diagnosed with strep. Christa has an amazing amount of energy even when sick. She has -- she had a short nap and was up with peers as much as possible. Special accomplishments: succumbed to a short nap."

I mean, these entries --

Q It sounds like she has a lot of energy?

A She does. You know, she's kind of like the Energizer Bunny. But, again, this is what -- one of the clues, if you will, that a teenager may have clearly an onset of Bipolar Disorder. And what we see is that she's got this in addition to the problem sleeping. And that raises one's index of suspicion significantly.

Q What are some other symptoms of Bipolar Disorder?

A Individuals with Bipolar Disorder will have racing thoughts, they will be impulsive, they will be -- and this is on the manic side, and she is of Bipolar Type II, so she's hypomanic. Her -- in essence her cruise control is set on about 95 to 120 most of the time if she were running on the interstate. And so that any time the going gets rough, she's going to have problems with decision making. She'll make poor decisions. She'll be driven. She'll have a sense of

omnipotence and grandiosity and feel herself invulnerable to any kind of damage or risk.

Q Would you expect someone with Bipolar Disorder to have some down periods as well?

A They will frequently have down periods. With Bipolar II it's -- they're often more consistently hypomanic, but the hypomania, particularly with early onset Bipolar Disorder, will manifest itself more often with irritability than with euphoria.

Q There's been testimony, I know it's in her social history, that Christa had a suicide attempt in the sixth grade, would that be illustrative regarding the Bipolar diagnosis?

A Well, for Bipolar Type II Disorder you have to have at least an initial period of depression. She's had several suicide attempts. I think there was one in -- at one point I believe was the third grade, and then she's had a couple of -- a total of about three in childhood.

Q What about the performance of an early onset of a Bipolar child in school, what would you expect their scholastic achievement to be?

A Well, it depends. If she's got -- if she had excellent work habits, came from a very well structured family and so forth, and developed Bipolar Type

II Disorder in which she could get by on two or three hours of sleep a night, she could be an academic superstar, because she would be able to study and work an extra eight hours, where the rest of us mortals would be sleeping.

Q Did you review Christa's scholastic achievement?

A Yes. And in her case she had significant difficulty with sleep and with paying attention in school. She had problems with her memory. That's consistent with the brain abnormality that she has. She -- so that her school performance, once she got to be around 12, 13, got worse except in highly structured situations like summer school. And she was able to pull it out and do very well in summer school.

Q How did her scholastic achievement match up with her tested intelligence?

A She tests very well, so that she's quite a smart young woman, and should have done much better had her family situation been better, and had she gotten appropriate treatment.

Q Thank you, Dr. Kenner. I know we kind of got away from the PowerPoint, but I wanted to ask you those questions.

You mentioned also briefly as a symptom of

Bipolar II Disorder grandiosity. Do you have any specific examples that might have pointed a psychiatrist back in 1986 towards the diagnosis of Bipolar II based upon Christa's grandiosity?

A Yes. There were several incidences in the record that would speak to that. One was one that Christa described in which she was shot in the leg with a .22. She got in a fight with a girl defending a friend of hers. To begin with, the other girl was about twice Christa's size, and not only that but she was armed with a pistol. And Christa essentially took her on, discounted the fact that she had a pistol, described it as a little pissy gun. And the woman shot her in the leg and she said it was like somebody putting a cigarette out on her leg. She grabbed her head and put it through a car door window. And, you know, it was -- this is a remarkable way for a woman who at the time weighed a hundred to a hundred and ten pounds to deal with someone twice her size who was armed. Most folks, including myself, would have run quickly in the other direction. Christa didn't do that.

Q What does that show you?

A That certainly suggest that she had more than the usual adolescent sense of omnipotence and that no one can hurt me.

Q And, again, that points the needle

toward Bipolar II?

A That's suggestive that she has hypomanic, manic symptoms.

Q Do you --

A There's another incident in which a woman that she had babysat for, I think Beth Brown --

Q Yeah, we had testimony about that yesterday.

A Okay. Had said that there was a bullet with Christa's name on it, so Christa goes over and breaks the door down and beats her up. And, again, this is not what one would expect from the average or normal teenage girl.

Q Any other examples?

A Yes. There was a man who had -- let's see, Kenny Clyde I believe was his name, that had been harassing Christa and her mother. And Christa calls him up, lures him to a secluded location and proceeds to take a stick of some kind or two by four and beat him. And she -- Dr. Pincus described that during the beating she lost control of herself and might have killed him if he had not been able to get away.

You know, apparently the Court that -- he filed charges against her for assault, the Court was aware of his own propensity to violate women sexually, and I think

he actually praised her for doing this.

Q Do you have an opinion about what sort of effect the acceptance and praise of a judicial officer to this -- or for this behavior, of this behavior by Christa might have on a young lady with Christa's makeup?

A Well, what you -- if one were treating someone like Christa, what you would choose to do would be to help her as much as possible put on the brakes of her out of control behavior. And praising her for attempted extermination without a license would hardly be something that you would want to do, because you would want her to head in the other direction.

Q And so those are the -- some of the examples of the data that was available that pointed toward Bipolar II. What's the importance of explaining the Bipolar Disorder to a jury? And in particular with regard to its connection to the crime in this case?

A There is a critical connection here. And that is that Ms. Pike experienced two to four day cycles of sleep deprivation with increasing irritability.

THE COURT: Can you give me a timeframe for that?

MR. CROWSON: We're talking about the timeframe immediately proceeding --

THE COURT: That's why I'm asking the doctor --

MR. CROWSON: I'm sorry.

THE COURT: -- what timeframe he is talking about.

A I'm sorry, this is at the time of the crime, and it extended until she was on mood stabilizing drugs. And it had gone on probably for years before the crime.

Q And you're talking about the cycles themselves?

A Yes.

Q Okay. Now, what about the time surrounding the crime?

A Well, she would become more and more irritable, and she participated in Ms. Slimmer's murder at the end of one of her cycles when she was -- her irritability was peaking.

Q And what's the significance of the fact that she was in one of these hypomania cycles?

A Well, the significance of it is that she became just intensely irritable. And we'll see that in her interactions with me here in a few minutes. But the Judge Drowota writing in the Tennessee Supreme Court Decision pointed out that she had -- she said to another student at the Job Corps Center that Kim IloIlo that she

had just felt mean that day.

Well, in fact, that was part of her illness that she had days when she did feel mean. She did feel intensely irritable.

Q And she would feel irritable without any real stimulus or without a stimulus that you or I might --

A The stimulus for her was that she was sleep deprived. And it would be just like any of the rest of us, if we were three or four days without sleep, you know, you could -- you become quite irritable.

I remember my days as an intern when I was on all weekend and, you know, I just told folks not to talk to me on Monday.

Q And we'll return to this later, but if you could, give us an overview of Christa's life history, trauma history, and also if you can relate some of that history to her culpability for this crime.

A Sure. That Ms. Pike had experienced significant and repeated traumas in childhood and adolescence that effected her ability to control her behavior during the crime. And this -- the issue of control was both in terms of her ability to put on the brakes and in terms of how she saw the victim in this case.

Since she was a toddler she had been raised in slaughter house. That's where she would go to visit her grandfather. Her grandfather had babysitting duties quite often. And she would literally watch him slaughter animals.

Q Well, and let's stop there because we did see a film of a slaughter house. Have you had an opportunity to review the exhibit that we put on here through Carey Ross?

A Yes.

Q Okay. And that depicted, I guess, a slaughter house?

A It did.

Q What are your thoughts about how that would affect a toddler, and particularly a toddler with Christa's predispositions?

A Well, the problem with that kind of an experience for a toddler is that it's massively over stimulating. And it has a number of effects, which we can get into a bit later, but it answers for her one of the questions of what's the world really like. And those neuro circuits are still there for her in terms of this is what happens to animals. And it's not that great a leap between animals and humans.

Q Were there other traumas?

A Yes. She was exposed to other traumas that had cumulative effects on her.

Q Shifting gears for a moment. Is there anything in the medical history that you reviewed that was available back in 1996 that made you as a physician concerned about Christa's brain, whether there was any organic damage?

A Yes.

Q Okay.

A There was history of a seizure disorder at around 14 months. At that point she had an abnormal EEG. And she had a history of a head injury as an adolescent. I would point out that the seizure disorder was not febrile seizures, which are relatively benign in children in that they -- they'll have a seizure when they run a fever, but not otherwise. And most of those kids you don't have to worry about them.

Christa's seizure did not occur as part of a febrile illness. There was a specific EEG abnormality in the right frontotemporal area of her brain. And then she -- her head went through the windshield when she was in the 12, 13, 14 age range. All of those things in a death penalty case, the standard of care for a psychiatrist would require one to get the most sophisticated scans

available, which at that time was an MRI and a PET scan.

Q And, of course, for a psychiatrist to be held to that standard of care they would have to have examined the individual and provided a history, otherwise there would be no context for ordering these scans?

A Correct.

Q If a psychiatrist did adhere to that standard of care, would the condition have shown up if scans had been taken prior to Christa's trial? I'm talking PET scans and MRI scans?

A I'm sorry, I'm had trouble hearing you. What would have happened -- I'll ask it a different way. What would have happened had the psychiatrist ordered MRIs and PET scans back in 1996 after examining Christa --

THE COURT: I think your question was what would have shown up?

MR. CROWSON: Yeah.

THE COURT: What should have shown up?

MR. CROWSON: What would have shown up?

A What would have shown up was that she had an abnormality in the right frontotemporal area and super orbital heterotopia that Dr. Pincus described. And that this would -- there's a high correlation in the literature between that kind of an abnormality and

teenagers who develop Bipolar Disorder

Q And would that ha significance when taken together with seizure disorder?

A Well, it would ce fact that her brain was not wired corr abnormality occurred in an area of her brain that is -- provides executive functioning. It is the CEO for the brain, if you will. And when that part of the brain h problems, then you get behavioral discontrol and abnormality. Abnormal behavior.

You see that most clearly in frontotemporal dementia on the right side. This is the location of h heterotopia. This is a quote from the 2001 Neurology Journal, and they're pointing out that right side frontotemporal degeneration is associated with sociall undesirable behavior.

The early presence of socially undesirable behavior in frontotemporal dementia differentiates rig sided from left sided degeneration. And it highlights importance of the right hemisphere, especially the frontotemporal region in the mediation of social beha

So in this case we're able to show that Chr Pike has an abnormality in that part of her brain. An that that's significantly correlated with an inability

MR. PRICE: I think that's the same objection.

MR. CROWSON: I don't think so.

THE COURT: Go ahead.

MR. PRICE: He had rephrased the question and I had an objection to it, your Honor. The same objection, actually. I don't know if you heard the rephrased question.

THE COURT: I didn't hear the rephrased question.

MR. CROWSON: I can rephrase it again.

Q Would a psychiatrist be competent to determine what kind of mental health evaluation a death penalty defendant would need?

A Yes.

THE COURT: Okay. I'll take that one.

Q And if a psychiatrist ordered the proper scans and diagnostic tests, and had found the heterotopia you spoke of, what would have happened at that point? What would be the standard care at that point?

A Well, at that point one would ask for a neurological consultation. And a neurologist would review the scans, do a neurological evaluation on the patient. And --

Q Was there ever such an evaluation done?

A Yes, Dr. Pincus did, and he came up with a number of basal ganglion signs and symptoms that Christa Pike had that would suggest that she has an abnormality in that part of her brain, which does affect the way she functions in the world.

Q Real briefly, if you could talk, you said basal ganglion --

A Yes.

Q Could you, for the record, talk about what that --

A That's down in the limbic system, and it refers to -- that's the area of the brain and is where the brain regulates emotions. And I have some slides on that.

Q Briefly on this line, though, there are some, I guess, symptoms that were noted by Dr. Pincus and are included in your PowerPoint that indicated that there were problems with the basal ganglia, correct?

A Yes.

Q And those were hyperreflexia, spooning of her hands and --

A Yes. Choreiform movements of her outstretched hands. And she also had a nucleo cephalic test in which she would -- was asked to, with her eyes closed, turn her body from one side to the other and her

head did not turn with her body, which is suggestive of problems in that area of the brain.

Q And these are -- would these be considered objective tests?

A Yes.

Q And these tests are supportive of what was found in the MRI scan --

A Well, it illustrates that the MRI is not just something that you see on the scan and has no effect upon her in any other way.

Q And we were talking about the basal ganglion and what it does. What would you expect from someone who has an abnormality such as Christa in the basal ganglion?

A Well, what we're looking at in the -- she's got the basal ganglion findings, but the critical areas in terms of executive functioning --

Q Uh-huh. (Affirmative)

A -- and this is a list from a text on traumatic brain injury, because these are quite frequently seen in patients with traumatic brain injuries. And you have deficits in those. And these are the things that essentially a child learns in preschool and kindergarten. They include setting goals, planning, and anticipation of consequences, initiation and sequencing, inhibition of

behavioral response and degeneration of multiple responses, response alternatives, consensual and inferential reasoning, problem solving, mental flexibility, transcending immediate salient aspects of the situation, and contrast to being stimulus bound behavior. Executive attentional processing, self monitoring, self regulation, social adaptive functioning, sensitivity to others, using social feedback, engaging in detecturally appropriate social behavior. So these are the things that you need to know, to be able to do, to get along in life. And it's the -- in the prefrontal cortex that we have -- that's the part of the brain that gives us these executive function abilities.

Q Now, how is it that we know that this area of the brain that you talked about actually controls the executive function?

A Well, it blasted its way into the medical literature in 1848 in the Boston Medical and Surgical Journal. Dr. Harlow wrote of Phineas Gage, a fellow who was working doing road construction, he was a foreman. He had an inch and a quarter tamping rod, which happened to be sharp on one end and blunt on the other, and the sharp end he was -- as he was tamping down a hole that had been charged, the powder went off, it blew up through his cheek and out through the top of his head

doing damage to his frontal lopes, but he was up, and without losing consciousness, spoke within a few minutes he was able to walk or be helped to a cart.

He spoke quite reasonably, at first at least, and said, "Doctor, here is business enough for you." There were questions about -- people didn't believe that it actually had gone through his head, and he insisted that it had, but there was a manifest change in his personality. And this is a quote from that journal article, "The equilibrium, or balance so to speak, between his intellectual faculties and his animal propensities seems to have been destroyed. His fitful, irrebellent, indulging at times, and the grossiest profanity, which was not previously his custom, manifesting but little deference for his fellows, in patient of restraint or advice when it conflicts with his desires. At times pertinaciously obstinate, yet capricious and vacillating, devising many plans of future operation which no sooner arranged than they are abandoned in turn for others appearing more feasible. A child in his intellectual capacity and manifestations is the animal passions of a strong man. Previous to his injury, although untrained in the schools, he possessed a well balanced mind, very energetic and persistent with executing all of his plans of operation. In this regard his mind was radically

changed. So decidedly that his friends and acquaintances said he was no longer Gage." And so this is how we discovered the importance of the -- that part of the brain in controlling specific aspects of human behavior, because before this it was a silent area and was very -- had essentially been unstudied.

Some friends of mine have joked with me and claimed that that's how -- that Mr. Gage suddenly changed from a Republican into a Democrat, but I --

THE COURT: I don't think we better go there. It's really a Republican. Go ahead.

Q All of these changes were related to an insult or injury to a particular area of Mr. Gage's brain?

A Yes. It was to the left frontal lobe. But what happens is that in an injury like that the tracks that supply -- that also go to the right frontal lobe are damaged.

Q And how does that correspond to the lesion that was imaged in the heterotopia?

A That would be in roughly the same area. But hers -- that area was not completely knocked out, it was simply impaired in her case. So she didn't get the full Phineas Gage effect.

Q Well, let's shift gears for a moment

and talk with you about when you first began meeting with Christa Pike, and some of your observations as a result of those examinations and meetings. The first time you saw her was December 27th, 2001?

A Yes.

Q And what did you observe?

A At that point she seemed to be in a steady state for her pretreatment condition. She was not sleep deprived or particularly irritated at anyone. She joked with the prison staff as they removed restraints from her hands. Ms. Pike spoke at a faster than normal rate, but without marked pressure of speech. Her affect was hypomanic, and she was mildly irritated with the prison staff. She often referred to other inmates and staff in highly judgmental terms as stupid and idiotic. And this is something that you frequently see in patients who are manic in that they think of themselves as being extraordinarily bright. Ms. Pike is brighter than normal, but even folks who are not that bright and if they're manic will think highly of their ability to use reasoning and to come up with various ideas.

Q But based upon this first meeting with Ms. Pike, you weren't able to make a diagnosis about whether she was Bipolar or not?

A No. There were some suggestions

there, but certainly it wasn't -- it didn't sort of knock me over that she was Bipolar.

Q Is it fair to say that you have to observe an individual over a period of time before you can make a reasonable diagnosis about Bipolar?

A That's particularly true with someone who is Bipolar, because they will cycle. And in her case she goes through the -- you know, sort of a periodicity in which she'll become sleep deprived and irritability will go way up, and then it'll come back down and -- after she gets some sleep. And we saw that over the course of my interviews with her.

Q And you saw her a week later?

A Yes. At that time she hadn't slept for between 48 and 72 hours. She had had a conflict with the prison officials who had awakened her an hour after she'd finally gotten to sleep. She came near the peak of her mental activity as well as anger at those who had impinged on her. That's how she came to see me at that point.

There was no joking with the prison staff. She complained about the restraints with an angry tone in her voice. The correctional officials were -- officers were more distant and careful with her. And once seated in the interview room with the door closed, she apologized and

explained her current distress. She said, "Forgive me, I am having a bad day. They, the prison staff, are messing with me and I'm not sleeping. I feel like my brain is swollen and my eyes are going to pop out. So forgive me if I seem scattered." She said this quickly and in quite a loud voice.

Q Now, if we could go back quickly. Yeah. I see that you've emboldened part of this, is there any particular significance to the fact that she said her brain felt like it was swollen, her eyes were going to pop out?

A This is how people feel when they're severely sleep deprived.

Q Irritable?

A Irritable. Yes.

Q Scattered? Is the scattered feeling any indication that there may be a further deterioration during a hypomanic phase of the executive functioning, just so you feel scattered?

A Well, I think what she's describing there, is she simply can't get her thoughts together very coherently.

Q And, again, would that be an indication of problems with the executive functioning?

A Well, what happens when someone is

sleep deprived is that they have -- their thinking gets to be very inefficient. They -- it slows down. They have difficulty paying attention, so that the problems she has with executive functioning is going to get much worse when she's sleep deprived.

Q And I note that you noted that she was speaking quickly and in a loud voice?

A Yes.

Q Any significance to that?

A Well, that's something that one frequently sees with patients who are Bipolar, and in a manic side of things that she would speak more loudly and with a great deal more emphasis in her voice than usual.

Q And did you make any other observations during that visit with Christa?

A Yes. I inquired further about how are they messing with you. She said I've been to -- "I haven't been to sleep in two or three days, I finally went to sleep at seven p.m., they woke me at ten to eight, they put me in restraints, and I had to wait two hours as they went through my stuff. They are still ignorant, and it just makes me want to rip all my goddamn hair out. I don't want to go off like this. I just want to be left alone, but this is far too much to ask for."

So, again, I think what we see is how irritable

she is.

Q And as a result of that interview, I believe you said that you noticed that she had pressured speech?

A Yes.

Q And spoke loudly. Any other observations?

A Well, what was so striking was her irritability. I mean, when she -- my own subjective response to her was that the hair on the back of my neck stood up at that point because I felt like she was a bit like a powder keg and could go off at any second. I mean, she was just a raw nerve.

Q On the next slide, you say that her thoughts raced, tell us what you mean by that.

A Yes. That her thoughts were going by so quickly that she -- she couldn't put them all into words, that they -- many more thoughts than she could get out.

Q And did you place any significance upon that?

A Yes. That's frequently seen in individuals who have -- who are Bipolar and who are manic. She was able to slow down eventually during the interview, and she became a bit more logical and coherent at that

time.

Q And you say that the object of her irritability for the most part was the staff.

A Yes.

Q Is that right?

A Yes. That they had awakened her in the middle of the night, or after an hour of sleep, rather. She, later in the interview on the 27th, her anger toward the staff resurfaced with considerable intensity, she'd said, "I'd like to take half the people here and throw them off a cliff, it would be a better place."

Q And do you think when someone is in a hypomanic phase, when Christa is in a hypomanic phase, when she's irritated, do you think it matters really who it is that's around, or is she just going to be irritated with whoever's there?

A She's going to be irritated with anybody in the environment, it doesn't matter who it is.

Q I think you went back to see Christa the next day as well; is that correct?

A Yes, I did. And she came rested, must less irritable, less intense, and she remained hypomanic, but not as intensely so as on the day before. She looked calmer, less angry or agitated, almost happy. She said, "I'm feeling better today. I got to sleep about

three a.m. They told me that if I didn't clean it up --" meaning her room -- "I'd get wrote up. I visited with Mark this morning." I asked, "Could you tell me more?" And she went on to talk about a visit with a Methodist Minister from Vanderbilt who visited her. But the important thing was, she said, "I saw him and I went back to sleep, and then I woke up and then I came down here." I was seeing her later in the afternoon. I said, "Do you have a busy day ahead?" And she said, "Yeah. As long as I sleep it's okay. I didn't get up for lunch today, I wanted to sleep so bad."

So I think what we can see is how in -- how much these patterns of sleep deprivation effect her.

Q And when you visited her on that day she was markedly different?

A Yes. She said, "I don't like being messed with. I can't stand the threat of anyone I love being hurt physically or emotionally. More so --" meaning if someone threatens a loved one -- "then over myself getting hurt. People constantly talking and saying -- nothing irritates me. I go through manic periods of talking real fast, but I can't talk as fast as I'm thinking."

Q Once again, you've got some items underlined. What's -- what significance do you place upon

the fact that Christa says that people are constantly talking -- "people constantly talking and saying nothing irritates me"?

A Well, you know, that's mildly irritating to most people, it just doesn't, on our Richter Scale reach the point where we're ready to scream or do something more drastic about it.

Q Where --

A So that for her it just has a quality of someone pulling their fingernails down a chalkboard.

Q And where it ends up on her Richter Scale, to a large extent, depends upon what stage of hypomania she's in?

A How much sleep she's had. Yes. And she went on to say, "When I'm up a few days toward the end of the first day and the beginning of the second day I'm like that. I stay like that for about twelve hours, and it drives me nuts." And so, what we're looking at here is the effect of, again, her sleep deprivation. It's -- she is markedly uncomfortable with that.

Q Uh-huh. (Affirmative)

A She said, "I become less inhibited after two or three days. When I'm in a different environment --" meaning outside of prison -- "I do stupid things." She referred to one time when she was surfing on

top of a car, and it wasn't going very fast, but had she fallen off she said, "I would have been screwed." And she's right. I mean, she would have had probably a fatal head injury from that. A lot of kids have been killed that way.

But that was one of the things that came up for her was that outside of a structured environment she would go out and party and mostly smoke marijuana at the times when she was sleep deprived and irritable, and that would take some of the edge off.

Q What about engaging in this sort of self destructive behavior? Did you place any significance on that?

A Well, I think that there are a couple of things going on there. One is that -- and most importantly, is that folks when they are hypomanic they get -- use extremely poor judgment. It's like if you're driving down the road at 120 miles an hour, the chances to look at your environment to figure out what's on, to make good decisions, is markedly decreased. So that you can get into a whole lot of trouble when your brain is going that fast.

Q When was the next time that you had a chance to visit with Christa?

A The next time I saw her was in March

of '02. And she was on a mood stabilizer at that point, Depakote or valproic acid, and unfortunately she was getting some place between two and three times the dose, which had been ordered by the prison psychiatrist. It -- the -- whoever was giving her the drugs had gotten confused and had -- instead of giving her two a day were giving her six, three times a day. And so she was toxic at that point. She had visual hallucinations. And that -- those are the hallmarks of an adverse drug reaction.

Q And I guess at that point you weren't able to make a lot more progress regarding your diagnosis because of the toxicity?

A Right.

Q And so --

A I think I called the prison psychiatrist and said, "I think we've got a problem here."

Q Okay.

A And --

Q What did you observe on that day?

A Just that she was -- had the visual hallucinations. She thought she had bugs under her skin, various things like that. So that -- that really didn't mean much.

Q Okay. What about when she had

stopped?

A Well, by the 23rd of May, 2000, she had -- they had taken her off the Depakote, she was on Lithium. Her mental status had changed dramatically for the better. She had a markedly different affect. Her hypomania had settled down to euthymia or normal level of mental and physical activity. She was, in other words, on an even keel.

She complained of some lethargy on Lithium, which is not uncommon. Again, folks who are used to going 90 to 120, when they slow down to the speed limit feel like they're in slow motion. Her impulsivity had diminished considerably. And most importantly, she had a new capacity to reflect on her thoughts and feelings.

Her moods had begun to make sense to her for the first time that she could recall.

Q So, in a nut shell, how would you describe Christa's reaction to being placed on Lithium?

A Well, she had become euthymic and her Bipolar symptoms had abated so that she was on an even keel. And, I mean, one of the problems that she has faced is that throughout her adolescence, an important time in which we figure out our feelings and how other people feel, and what they're doing and why and so forth, all of this had been askew for her. And so for the first time

she was able to understand how she felt, how she related to other people and what she thought about these things. And that was an interesting and exciting time for her.

Q What about Christa's sleep problems while she was taking Lithium, did they improve or worsen?

A I asked, "Tell me about your sleeping." And she says, "Well, not very well. I sleep but I don't get into a deep sleep. I do sleep every night. I take the Lithium because I think it's doing good for me. I'm dealing with things a lot more better. I'm docile, but I'm not tired now as I was on the Depakote. But I have a little help controlling what I used to do."

And she actually referred to Lithium as her happy pills. She said, "Before I'd get depressed for no reason. But now if I'm sad or upset there's a reason." I observed, "It sounds like you feel that you are in a much -- you're in much better control of your own mind?" She said, "I do." I noted, "That must be a great relief." And she says, "It is."

Lithium is simply a salt, it's lithium carbonate, and it was actually used as a substitute for table salt. And so for someone to refer to it as a happy pill is -- tells you something about how irritable they -- and uncomfortable they were before that.

Q Did you do any testing that might

illustrate Christa's improvement after beginning the Lithium?

A Yes. Dr. Auble tested her before and after, and found that she was much less distressed after she was on Lithium. And I've got the years --

Q It looks like the dates should be May 17, 2002?

A Yeah, it should be.

Q Okay.

A Sorry. The scale measuring anxiety was significantly elevated on the MMPI II in January. And it was within normal limits in May. Measuring depression, it decreased significantly from significantly elevated to normal on the PAI. On the incomplete sentences, Ms. Pike reported that her future looked intolerable in January and too long in May. In January she said that her mind races beyond control sometimes. In May she said that her mind is defective.

There was also a drop in the scale on the MMPI and the PAI that measured manic symptoms.

Q If you could just briefly talk about those tests, and explain for the record what they are.

A Well, these are self report tests that -- they are, I forget exactly, 500 and something questions on an MMPI and a smaller number on the PAI. And

they ask people how they respond in particular situations. And I think what's important here is the difference in her responses on medication versus off.

Q All right. And Christa, of course, would have completed these tests, and what we're comparing is the tests pre Lithium -- the results of the tests that Christa took pre Lithium, and the results of the tests that Christa took after she started the Lithium regime?

A Yes.

Q Regimen. Excuse me.

A And she is -- this is also from Dr. Auble, "She's less reactive, increased ability to reflect on herself and others. She still has a tendency to fly off the handle, but is not nearly as pronounced." She's more capable of seeing the complexity of situations in May on Lithium versus before that. In January she wanted to be a leopard, if she could be some kind of an animal. And by May she wanted to be a puppy.

She said that she could -- if she could change herself, "I'd calm my temper, fix my teeth", and on and on in January. But by May she reported, "I'd fix the way my mind works."

In January she described herself as aggravated, frustrated, learning something new every day, ready to be released from this hell. And in May her responses were

more mild in that she said that she was a good hearted person, misunderstood, losing patience with everything, ready to fly away from here.

Q And again, these tests were undertaken with an eye toward whether Christa was -- your determination was to instruct the Court or enlighten the Court about Christa's capacity to withdraw her appeals at that time --

A Yes.

Q -- right? And she had, at that time, expressed a desire to withdraw her appeals?

A Yes.

Q Okay. I'm sorry, go ahead.

A Well, I think diagnosis in December of '01 was that she had a Bipolar Type II Disorder, hypomanic recurrent, Axis II, was borderline personality disorder, antisocial personality disorder. Axis III, she had the von Willebrand's disease. Axis IV is problems with primary support group, GAF 15.

By March --

Q If I could -- if I could go back just a moment before we get too far away from this. Regarding the Lithium, would you describe Christa's reaction and improvement under Lithium as marked?

A It was dramatic.

Q Dramatic?
A Yes.
Q Okay. And does that have any significance to your decision about whether to diagnose her as Bipolar?
A Well, yes. If she were not Bipolar, then one would not expect much of a response to Lithium.
Q Is Lithium used to treat other mental illnesses?
A It's reasonably specific for Bipolar Disorder. It can be used to augment the treatment resistant depression. And it has some mild calming effects on people who have personality disorders. But it's nothing like the kind -- the caliber of response that you see with Christa.
Q So would it be fair to say that when someone reacts as strongly as Christa did to the administration of Lithium that it's a good indicator that they're Bipolar?
A Yes. You know, one of the issues in diagnosing Bipolar II Disorder is someone like the police officer or the highway patrolman who stands on the side of the road and says, "I think that car is speeding." A psychiatrist is in a bit of that same position of saying, "I think that person is talking too fast. They're

talking -- they're thoughts are racing faster than they can speak, and so forth." And one can always question, as a good defense attorney would, "Well, Officer, how's your judgment in terms of calibrating speed out there on the road?" So it's very nice to have results like these in which you have someone with a before and after picture of their response to a mood stabilizing drug. And you've got psychological testing to back up that.

Q Okay. We were talking about your diagnosis now. After observing Christa and reviewing her social history, did you arrive at, to a reasonable degree of medical certainty, a set of diagnoses regarding Christa Pike?

A Yes.

Q And let's talk about the diagnoses. I guess you'd started already with December of 2001. Bipolar --

A Yes.

Q -- borderline, antisocial, and then some other things. Let's talk about the Axis, the Axis I, II, III and IV, what do those --

A Okay. Axis I is essentially what brings the patient into your office or hospital, or the reason for which you're seeing the patient. Axis II refers to personality disorders. Axis III is medical

conditions. And Axis IV is problems with the -- or the stressors. Axis V is a global assessment of functioning scale.

Q Okay.

THE COURT: Could I stop you? Could you tell me what von Willebrand Disease is?

A Yes. It's a clotting disorder.

THE COURT: Okay.

A In which it's not as severe as a hemophiliac, but they do have excessive bleeding like with nose bleeds, periods, things like that.

Q And it's Axis III because it's pretty much chronic?

THE COURT: A medical condition.

A Yes.

Q It's something she's going to live with?

A Right.

Q And Axis I, you said, I guess, are more emergent conditions, things that might put someone in treatment or in the hospital?

A Well, it's referred to as their chief complaint.

Q Okay.

A Not necessarily emergent, but just

that that's what brings them in.

Q Was there any change in your diagnosis in May of 2002? March?

A Well, March you had the medical condition that produced hallucinations, and that she was psychotic as a result of the adverse reaction to the overdose of Depakote. And then that had cleared up, of course, by May. And at that time, I diagnosed her as Bipolar Type II Disorder, partial remission, medication. And then the rest of it was essentially the same. She was functioning better. I gave her a GAF of 45.

Q And subsequent to the Lithium, did Christa Pike change her mind about her appeals?

A Yes, she did. She decided to reinstitute her appeals.

THE COURT: In May?

A Not in May --

THE COURT: Okay. Let's confine our time to May --

A Okay.

THE COURT: -- and then we'll get to that.

A No, she had decided --

THE COURT: She didn't in May?

A Yeah. To stick with them in May.

THE COURT: Yeah. Right.

Q Now, when you read the DSM it appears there are --

THE COURT: Could I stop a second?

Q Yes.

THE COURT: What is the scale on Axis V, the GAF scale? You went from 15 to 11 to 45, but what's the scale that you use?

A It's zero to 100.

THE COURT: Zero to 100. Okay. Thank you.

A If you're above 80, you're doing real well.

Q Is that primarily a subjective scale that the physician -- a number that the physician assigns based upon what he observes?

A Actually, it's in the DSM-IV-TR, and it's been in DSM since DSM-III in 1980. There are various behavioral criteria that determine where you are on that scale.

Q You just mentioned the DSM, could you tell us what that is?

A Sure. Diagnostic and Statistical Manual, it's now in its fourth edition, text revised.

Q And reading the DSM, it does appear that there are many different permetations or types of Bipolar Disorder; is that correct?

A Yes. And there are two in -- that are mentioned in DSM. But -- and that came in the literature in 1977. But there are many types that have been proliferating since then in -- in the research literature. And this is just one person's, oh, scheme for how to classify Bipolar Disorders.

And there are several competing schemes, but the point is that they -- this is the way people in the profession are beginning to think about this in more complex fashion than just Bipolar I and Bipolar II.

Q And what is Bipolar Spectrum Disorder?

A Okay. One of the ways that the thought in the field is going is that there is a sort of soft Bipolar spectrum. And what this means is that a number that -- is that we're looking at an illness that doesn't have terribly clear borders. So that many of the things that we used to think of as personality disorders, and are described in DSM-IV in that way, actually reflect part of the -- a Bipolar Spectrum.

And Arnold Lieber at Miami described patients showing excessive dependency, passive aggressiveness, histrionic traits, paranoid features, narcissistic or extreme self centeredness, hypochondriasis, and manipulative antisocial traits. And as he points out,

usually when they are effectively treated for their Bipolar conditions these character logic features become insignificant or may disappear entirely. And --

Q So that there are a number of personality disorders that are sometimes mistaken or confused --

A Yes.

Q -- with Bipolar?

A Right. And one of those is borderline personality disorder. It has become apparent that a high percentage -- and this is quoting from his work -- "a high percentage of these patients have co-morbid Bipolar Spectrum Disorders. This is proved to be a very important development for these patients. The prognosis for patients who are accepting of this treatment approach, meaning mood stabilizers, antidepressants, and atypical antipsychotic medications, is much better. They're often able to get better and to lead normal lives."

Q Now, one of the diagnoses that you had for Christa we saw a few minutes ago was borderline personality disorder.

A Yes.

Q Do you believe that diagnosis, looking back on it, is correct?

A Well, when I saw her back in '02, I thought that she was borderline and antisocial. What's been remarkable about her after treatment has been how much she's changed. And the change has been reflected in her behavior. And her prison records have reflected that as well. She went from someone who had quite frequent problems with the prison staff, was often written up for violations, to someone -- I think she's had maybe one violation since she's been on a mood stabilizer. Her personality has gradually changed over the years that -- as I have seen her. And you have to keep in mind that she is someone who has been on lockdown 23 hours a day.

Her interactions with other people are extremely limited. And it is in those times to interact with others that she would have a chance to develop and improve her personality. So the fact that she's been able to do that under those rather austere -- in that austere setting, with limited other human interactions, means that on a mood stabilizer she is -- she's not borderline and she's not antisocial.

Q And, again, her response to the Lithium you said was marked?

A Yes.

Q And would you expect someone who had borderline personality disorder to experience a

significant change upon being placed on Lithium?

A Not unless they are in the Bipolar Spectrum category. And there's -- there is actually a fight in the research community between Hogpus Akiskel, who used to be at the University of Tennessee in Memphis, who says that Bipolar Disorder is really misdiagnosed, and that they're all -- I'm sorry, that borderline personality disorder is misdiagnosed, they're all really part of the Bipolar Spectrum, and a group in Boston headed by Gunderson who says that they -- there's really a Bipolar Personality Disorder that's there, and we should recognize it.

How that's going to play out, and who's going to win by 2010 when DSM-V comes out is up in the air. But they're still lobbing articles at one another about that in the literature. So that this is a hot area.

I think in Ms. Pike's case what had been diagnosed as a borderline personality disorder was in fact something that was part of a Bipolar Spectrum Disorder.

Q And also, I think you mentioned that there was a diagnosis of antisocial personality disorder when you saw Ms. Pike back in 2001, 2002?

A Yes.

Q Is there any historical data to argue against that diagnosis?

A Yes. That in the records by Amy Powell, antisocial personality disorder, these in terms of neuroscience, these people lack the mirror neurons that allow children to develop a sense of empathy, a sense of recognizing pain in other people. And so the antisocial personality disorder is highly manipulative, doesn't care if other people hurt, and so forth. And for -- what we find in the records was that Christa has mothering instinct that leads her to soothe -- to try to soothe her friends all the time.

Q And Ms. Powell also, I think, noticed -- noted in some of her records that Christa also was upset when people mocked her?

A Uh-huh. (Affirmative)

Q Explain to us a little bit about what happened there.

A Well, at this point, they were -- other kids were mocking her and she was worried about whether she was pregnant and had lost a baby or not. And yet, she was -- with all of this -- with all of this being a problem she had still managed to get along with her peers and staff.

THE COURT: This would have been when she was 14 years old; is that correct?

A I think she was 15 at the time

probably.

THE COURT: Okay.

A So somebody who is an antisocial is not going to be able to get along in a stressful situation like that. They'll manipulate, yes, but they won't be able to respond to others.

And, let's see, you know, she -- Ms. Powell observed, "She finds a lot of enjoyment in life and freedom. She played in the graveyard with the birds and climbed a tree and observed art at UNC today. She's still angry at one of the residents, but her venom has died down some." So, she has an ability to engage other people in significant ways. And in a structured treatment setting, that's where you would expect an antisocial to run into problems.

Q Conversely, are there some medications from that same history, that general time, that suggest Bipolar?

A Yes. There's an article that was in the literature by 1995, Kovacs and Pollack found that 69 percent of Conduct Disorder Abuse had mania. So that this was something that -- to certainly look for in conduct -- in folks who had a Conduct Disorder diagnosis in childhood and adolescence.

THE COURT: Mr. Crowson, lunch is served, so

when you all get to a stopping point with this line, that would be fine. We can give everybody something to eat and keep going after that. You may want to finish --

MR. CROWSON: Well, you know, we're just about --

THE COURT: -- opportunities line of discussion.

MR. CROWSON: -- just started something -- something new here. So this might be as good a place as we're going to have for a while.

THE COURT: May I inquire what number slide we're on, Doctor?

MR. CROWSON: Actually, doing pretty well, your Honor, this is 65.

THE COURT: Really?

MR. CROWSON: So I think this -- as I say, I think this is as good a stopping point as we're going to have for a while.

THE COURT: I have enough food for 25 people. And there's about 25 people here. So -- and Ms. Pike is welcome to eat of our food as well. You can eat in here, if you wish. The food is in my jury room, so if someone would bring Ms. Pike a plate, I'd appreciate it. Or whatever it is.

DEFENDANT PIKE: Thank you.

THE COURT: And we've just got sandwiches and chips and such as that, and I have enough for everybody so that we can just move along and keep going. Do you want to get the lights, please?

Let's all take a break and have a bite to eat and such as that.

(Whereupon, a recess was taken.)

THE COURT: Thank you. Please be seated. I know I'm violating the rules, but I'm going to keep my tea up here.

Are we ready to -- let's see, this is where we stopped; am I right? And this is where you want to pick back up? Mr. Crowson? And you said we were on slide number 65?

MR. CROWSON: I did, your Honor.

THE COURT: Boy, I wasn't keeping track very well, but I'll try.

THE WITNESS: Thank you for lunch, your Honor.

THE COURT: You're very welcome, sir. And everybody --

DEFENDANT PIKE: Thank you again.

THE COURT: Anything to get through it, Ms. Pike. Oh, I have Ms. Pike's Transport Order in my office, so as soon as we know when we're doing it, we'll put it into effect.

MR. CROWSON: Thank you, your Honor.

DEFENDANT PIKE: Thank you for that too.

DIRECT EXAMINATION

BY MR. CROWSON: (Continued)

Q When we left off, Dr. Kenner, we were on this slide, and I'd asked you what are some indications from Christa's history that suggest Bipolar Disorder?

A Yes. Well, this slide covers irritability in use with mania. And then there's a '95 article wrote by Willenson that there's a high rate of irritability and a low rate of euphoria in Bipolar Disorders in adolescence.

And down here at the bottom, the delayed diagnosis and treatment in an article in Hospital and Community Psychiatry in '93, a survey published by the -- it's a group for folks who have Bipolar and Manic Depression Disorder or Manic Personality Disorder, found that there was a significant delay in the diagnosis of children, adolescence, with Bipolar Disorder. A delay in subsequent articles have been found to be on average of seven years from the onset of initial symptoms.

Q And why is that that children and adolescence often experience a delay in proper diagnosis?

A Well, it's because it's a moving -- with children and adolescence you have a moving target and

it's much more difficult, therefore, to diagnose them as being manic or hypomanic. They're more often diagnosed with depression, that's easier to pick out. But, you know, teenagers and kids will often, particularly with Conduct Disorder diagnosis simply be termed as a bad seed, bad kids, and in fact, they're Bipolar.

Q And we had testimony yesterday from Dr. McCoy that there were a number of healthcare professionals that saw Christa Pike as a young teen and adolescent. However, I don't believe that any of them had seen her more than once or twice. Would that likely give rise to a successful diagnosis for Bipolar Disorder?

A Well, it's more difficult because you need to evaluate someone for Bipolar Disorder not just as one shot, because, again, what you have is with Bipolar you will have somebody who will, like with Christa Pike, she'll look relatively normal and then she'll begin to over a three or four day cycle become increasingly irritable. She'll get some sleep, she'll go back to looking kind of normal. And then she'll repeat that cycle. So it just depends on where you see them in this cyclic pattern if you evaluate them one time. And so --

Q I'm not sure how to get that in the record.

THE COURT: I think what the doctor is saying

is he has to be able to observe a cyclical pattern --
Q I was talking about the --
THE COURT: -- which he's drawn with his laser pointer on the screen, over a period of time; is that what you're trying to say?
A Yes. So -- and it's a real problem because -- with medication, because if you see somebody and they're at a relatively normal spot, and you give -- let me back up. If you have somebody that's Bipolar and they're bouncing along like that. And let the record reflect I have a -- I'm using my laser pointer to describe sort of a bouncing ball effect. If you give them medication here, and you evaluate them here, you can say to yourself, "Oh, I've found the right medication." But you just happen to have seen them at a time when they are relatively normal because they'll go on with their disorder. So it's quite a complicated process of understanding and diagnosing and treating these individuals.
Q But specific to Christa Pike, were there any indications contained in her medical or social history that pointed toward Bipolar Disorder?
A Yes. There were quite a few in her -- you mean dissociative symptoms or --
Q Yeah, exactly. Would dissociative

symptoms typically be the part and parcel of Bipolar Disorder?

A No. Dissociative symptoms come up in response to trauma. And they refer to, again, if you use the analogy of a memory tape, the capacity of an individual to segment that tape so that they do not have to experience, or can dampen down some of the more disturbing things that have happened to them. And Ms. Pike gave a history of dissociative symptoms at age 12 following Grandmother Fotos' death. She was closest to Grandmother Fotos who had essentially raised her. She -- during the crime she also described dissociative symptoms.

THE COURT: Excuse me. I don't think that's quite correct, is it?

MR. PRICE: No, it's not.

MR. CROWSON: Pardon, your Honor.

THE COURT: It was Grandmother Pike that she was closest to and had been raised by; was it not?

A I'm sorry, you're right.

MR. CROWSON: Your Honor's correct. And the record should reflect that Grandmother Pike had died when Christa was 12.

THE COURT: Right. I think the record is replete with it.

MR. CROWSON: Right.

THE COURT: That this is the lady who she was close to. And that this was the lady who she spent most of her time with.

MR. CROWSON: This is where she related the dissociative -- thank you, your Honor.

THE COURT: Okay.

MR. CROWSON: You're absolutely correct.

A And the literature in terms of human behavior in high stressed situations is reasonably solid. Most of that comes from officer involved shootings. They -- and in those -- in that literature it demonstrates a breakdown of higher order cognitive functioning in high stress situations. So that officers are literally taught to respond with muscle memory rather than any kind of higher cognitive functioning.

Also, dissociative symptoms are quite common in officers' post shooting. It's in -- in one study it's in the 90 percent range. So that that's something that was in the record and could have been explored in more detail to help explain what happened at the time of the crime.

Q And when one experiences a dissociative episode, is there typically an effect upon memory?

A There's an effect upon memory. There can also be an effect upon control of behavior. It's

commonly seen in officers who -- and it has a street name, which is known as glock. If an officer means to shoot a suspect twice, but empties his high capacity magazine in the shooting, it's known as glocking someone. And it's quite common that an officer will after a shooting be asked, "How many times did you fire?" And he says, "Well, two or three." When, in fact, he emptied his entire magazine. That's -- you can read about this in a highly readable fashion in a book called Blink by Galloway. He goes into the Amadou Diallo shooting in New York, and describes that in some detail. And it makes for interesting reading, it's called, Blink, Thinking Without Thinking.

Q And there was testimony yesterday, Christa after the episode with Kenny Clyde where she -- where she beat him and attacked him after he had threatened her and her mother, her friend said that she could not recall the details of that assault. Is that an example of what we're talking about here?

A Yes. That's certainly consistent with having dissociative symptoms. And, again, people with dissociative problems will typically simply been seen as liars, that they're not telling the truth. And what they're telling you is what they remember, which is not the whole truth.

Q And often times these dissociative episodes are caused during, you say, stressful times, traumatic times. Are there other traumas in Christa Pike's life that are significant?

A Yes. She had early attachment abandonment trauma. She had physical abuse by father, stepfather. She had chronic and horrific over stimulation. She had repeated sexual traumas as a child and adolescent.

And this gets into what's known as Developmental Trauma Disorder. And I borrowed this and some subsequent slides from Patty van Eys, who works with children who have been in state custody, and this is a diagnosis which will be in DSM-V in 2010. Exactly how it's going to be described in terms of the official label is a bit up in the air, but it may be either Complex PTSD or Developmental Trauma Disorder.

Q And Developmental Trauma Disorder, its name implies that we're talking something that happens early in life; is that correct?

A That's correct. And the reason that's important is if one looks at the growth of the human brain, this is new born to six years, and you can see just the growth in the volume of the brain. But here is the truly important part, these -- this slide shows the

increase in the connections between new born and six years.

THE COURT: Is that referred to as neuronets?

A Yes, neuro networks.

THE COURT: Neuro networks.

A And so all of these networks are developing in that first six years. And there is actually a pruning of neurons, so that the neurons that are used together and that fire together, they stick together as a neuro network.

And this is a series of PET scans which show metabolic activity from birth to one year of age. And this is a little bit like the weather, the bright colors indicate increased metabolic activity. And you see it's fairly sparse here.

Q And we're looking at the picture on the far left --

A Yes.

Q -- and it indicates a lot of blue and --

A Right. And blue is relatively quiet, not much activity going on in terms of metabolism.

Q And this is a PET scan?

A Yes.

Q The one to the left, is that a new

born?

A That's a new born, and this is every three months.

Q And what -- again, for the record, what we're looking at is metabolic activity. The more metabolic activity the brighter the color?

A Yes.

Q Okay. Go ahead, I'm sorry.

A All right. And so what we see is how much of the brain begins to work in that first year of life. And there is a great deal more metabolic activity than you start off with. And these, again, are neurons that begin to fire together.

Q Now, these are roughly at four month intervals?

A I think it's three months.

Q Three months. And through one year. And then -- so this is indicative, I take it, of the sort of development of the brain that you see very early in life?

A Yes. It's quite impressive. And this is the growth of the human brain from birth to 20 years. But the important part is that in terms of weight it gets up to a maximum -- close to maximum weight by seven years. So after seven years your brain doesn't grow

that much. And by the time you're as old as I am it declines slightly.
Q And certainly, though, after seven years we learn a lot of things?
A Yes.
Q What is it that we're learning primarily in those first seven years?
A Well, those -- the first seven years is a time when you're laying down very basic, what's called, procedural memories of how the world works, how -- the way that you should think and interact with people. Again, I can't remember the fellow's name who wrote the book, Everything I Needed To Know In Life I Learned In Kindergarten. But that's what you -- basically, the important lessons that you learn in the first seven years along with language, of course.
Q So how to get along in society?
A Yes.
Q Basic ideas and morality, things along those lines?
A Right. And experience alters brain development. Childhood is a time for learning language, music, motor skills are most easily acquired then. If you want to be Tiger Woods you need to take up golf very early.

Q Why is that? I mean, just because when this is when the development --

THE COURT: Because you're required to use your motor skill memory and not think too much, that's why.

MR. CROWSON: Is that the problem with my game, your Honor?

THE COURT: Uh-huh. (Affirmative) That's exactly right. It's the problem with mine too because I took it up much later in life.

MR. CROWSON: So basically I'm out of luck.

A So the number of connections, the synapses increases dramatically after birth. And the environmentally stipulated neuronal activity is critical for the elaboration of territories and proper connections.

And one of the nice things about animal studies is that you can -- you can take kittens, mice, barn owls, you can expose them to particular kinds of stimuli and then you can dissect their brains, and count or in other ways examine the effects of that kind of stimulation. And in kittens visual input is important for proper segregation of fibers and visual functioning. In mice, enriched environments increase brain size and an ability to learn new tasks.

In barn owls, enriched environment increases auditory, visual, neuronal adaptation to altered visual

input so that you can actually get in there and count these things in a way that you can't do with humans, of course.

And Hebb's Axiom is that neurons that fire together wire together.

Q What's meant by that?

A Well, what we're talking about here, is that the parts of the brain that get used are those that get hard wired together. And if what gets wired up -- I don't -- it will be on down here a ways -- if the emergency system in the brain, and we're speaking primarily of the amygdala in the limbic system, if that is what is -- becomes hypertrophied, if most of the firing that goes on, or a disproportionate share of it, takes place within the emergency system in the brain, then that's going -- that part of the brain is going to have much more control over the way that that brain works, then someone who has had a more normal early experience.

Q And is that similar to working a muscle and it becomes stronger?

A Sure, it's the same thing.

Q Okay.

A And this slide speaks of the attachment and affect regulation in newborns and in neonates. In that the attachment relationship, the actual

relationship with the mother or mother surrogate is what allows the child to begin to develop the self regulatory mechanisms. As work comes out of Peter Fornagay and Mary Target's project in London, and it has -- it speaks primarily to a right brain, to the right brain activation pattern through attunement, synchronicity and interactive repair. The caregiver plays a critical role in helping the child develop the part of the brain that's going to be essential for them throughout the rest of their lives.

Q And this would include being able to recognize gestures and cues from facial expressions?

A Sure.

Q And when does this begin?

A At birth.

Q Okay.

A That attachment is critical. And the normal attachment behavior goes through a cycle in which the child is crying and reaching out, calling, the needs are met, the relationship is predicable. There's a lowered arousal that bolsters the child's affect regulation. They have a normal stress response. They develop a sense of trust that there will be somebody there to help me get through the bad spots in my early childhood. And they develop an internal working model that anticipates future responsiveness, so that they can

say to themselves, this is a pretty good world. They get their needs met and they're well on their way.
Q So what this -- and this is, I think, slide number 78, is that what you have on yours?
A My numbers don't appear, I just see --
Q Okay. Seventy-eight. This is, I guess, a feedback loop.
A Yes.
Q Is that what you'd call it? And what we learn here is that the child, the infant learns that he can control, or she control her environment somewhat by --
A Yes. And it's described in the literature as a period of omnipotence where the child thinks, oh, I can control mother or dad. You know, all I have to do is cry and they come to take care of me, and it's just a wonderful world.
Q And it gives you -- it gives the child, I guess, a feeling of worth --
A Yes.
Q -- that they can make things happen?
A Uh-huh. (Affirmative)
Q And the things that happen will be predictable and safe?
A Uh-huh. (Affirmative) Correct.

Q Is that fair to say?
A Yes.
Q Okay.
A And Urie Bronfenbrenner --
THE COURT: Urie Bronfenbrenner.
A Bronfenbrenner.
THE COURT: I think so.
A Okay. My dyslexia acts up when I testify.
THE COURT: Okay.
A He essentially borrowed Alan Greenspan's notion that it takes irrational exuberance on the part of a parent.
THE COURT: I'm afraid there's no irrational exuberance today, the market's down 200 points. But --
A On the part of a parent, you just have to be crazy about your child, as this parent obviously is. And that's what's needed. On this --
Q And this is a disturbing slide here --
A Yes.
Q -- number 80. What are we looking at here, Doctor?
A This is work by Rene Spitz that came out in -- this article was published in 1946. It refers