# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 5**

**DOCUMENT 25**

---

E2009-00016-CCA-R3-PD

XXX

IN THE CRIMINAL COURT FOR KNOX COUNTY, DIVISION III

AT KNOXVILLE, TENNESSEE

CHRISTA GAIL PIKE :
Petitioner :
VS. : CASE NO. 68280
STATE OF TENNESSEE :
Respondent :

FILED
FEB 27 2009
By Joy R. McCroskey, Clerk

FILED
APR 07 2009
Clerk of the Courts
Rec'd by RGDoyal

TRANSCRIPT OF PROCEEDINGS

Hearing held on 4-11-08

Volume 2 of 3 Volumes

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

APPEARANCES:

FOR THE STATE:

Mr. Leland Price
Assistant District Attorney General
Office of the District Attorney General
City-County Building
P.O. Box 1468
Knoxville, Tennessee 37901

FOR THE DEFENDANT:

Mr. Don Dawson
Mr. James Crowson
Post Conviction Defender's Office
530 Church Street
Suite 600
Nashville, Tennessee 37243-0505

# TABLE OF CONTENTS

## Volume 1


| | PAGE |
|---|---|
| April 11, 2008: | |
| Post Conviction Relief Hearing: | |
| GREGORY P. ISAACS | |
| Direct Examination by Mr. Crowson | 2 |
| Cross Examination by Mr. Price | 8 |
| Redirect Examination by Mr. Crowson | 8 |
| WILLIAM D. KENNER | |
| Direct Examination by Mr. Crowson | 20 |
| Cross Examination by Mr. Price | 184 |
| Redirect Examination by Mr. Crowson | 208 |
| Discussion Regarding Skull | 202 |
| Discussion Regarding Proffer of Testimony | 212 |
| Exhibit Pages | 217 |
| Court Reporter's Certificate | 223 |
| Certificate of the Court | 224 |

# E X H I B I T S



| NO. | ITEM | PAGE |
|---|---|---|
| 40 | Medical Records for Zola Fotos | |
| | Marked for Identification Only | 12 |
| | Filed into Evidence | 29 |
| 41 | Medical Records for Chris Fotos | |
| | Marked for Identification Only | 12 |
| | Filed into Evidence | 29 |
| 42 | PowerPoint Presentation Disk by Dr. Kenner | |
| | Late-Filed | 17 |
| 43 | Family Gene Gram | |
| | Filed into Evidence | 166 |
| 44 | Polaroid Photograph | |
| | Marked for Identification Only | 212 |
| 45 | Movie Clips on Disk | |
| | Late-Filed | 216 |

to work he did in a prison nursery in South America, in which the babies born to inmates were removed from their mothers. They were put into a quite sanitary, good nursery environment, but they had a one to twelve nurse to baby ratio. And what they found was that about half of the babies died of what he described as Merasmus. And this is a picture of an infant with Merasmus.

And they would -- this is from -- a quote from that work. These babies would stop eating. They would develop what he called anaclitic depression. And they would succumb in a brief period of about three months to a new clinical picture. They would have motor retardation. They would become completely passive. They would lay supine in their cots. They did not achieve the motor control necessary to turn in the prone position. They would just stare vacantly, expressionless. And, again, half of them would die.

Q Now, are we talking about the children of malnourished?

A No. These children were fed, they were watered, they had their diapers changed. They had everything they needed except about one-tenth of the tender loving care from a parent.

The ones who survived actually were those who were able to sort of eeck out a special relationship with

the caregivers. And so the caregiver with whom a child had a special relationship would come on duty and the child would kind of light up for that eight hour shift.

Q And so without a human touch, without kindness, these children would fail to thrive; is that fair to say?

A They did worse than that. This is essentially showing much the same thing in more modern terms. And this is going back to the brain scan. On your left is a normal child, a normal brain scan. On your right is a Romanian orphan. And what you see is that there is a lack of metabolic activity, guess where? In the prefrontal cortex, which --

Q And, again, what is that area of the brain responsible for?

A That area of the brain is responsible for executive functioning.

Q And so this -- what we're seeing here is that a failure to stimulate through human contact and attention -- failure to stimulate a child would result in a lower activity level in the area of brain that controls executive functioning?

A Yes. And this also -- this area also houses the all important mirror neurons, which are what really make -- allow us to be human to one another.

Q Mirror neurons?

A Yes.

Q Would you explain that term?

A Sure. There are neurons that allow us to experience what other folks are experiencing without literally walking in their shoes. So that if you -- if a child is watching someone else eat a candy bar, some of the same circuits are going to light up in their brain as happens with the kid who's eating the candy bar. So you can sit there and sort of anticipate or think of how good it tastes and so forth.

Q And so in many ways it's our understanding of the world?

A Yeah. It's a way of understanding that if you hurt someone else what it's going to feel like for them. And the antisocials are the folks who don't have those mirror neurons, and who go through life without that kind of moral compass.

Q Are they the only people who would have a deficit mirror neurons, antisocials?

A Well, you know, autistic folks have a hard time connecting their feelings and their thoughts, and so they may well have deficits in that area as well.

So healthy attachment gives you affect regulation.

Q Explain what you mean by affect regulation, please.

A It gives the child, and beginning as a newborn and as a neonate and then toddler, a way of regulating their feelings. And if you -- I'm sure we've all seen the very painful situations that -- in Wal-Mart or somewhere where a child is just completely out of control, a toddler screaming and so forth, well, that's the ability to calm down, to regulate those intense feelings is something that comes about as a result of healthy attachment.

Q So being able to control yourself, I guess, is a result of a healthy attachment; is that fair to say?

A Yes. With a caregiver who's just crazy about you.

Q Okay. And is the converse true, if you don't have a healthy attachment, you might have trouble controlling yourself or learning how to control yourself?

A Absolutely.

Q Okay.

A Learning how to relate to other people comes about through healthy attachments. Knowing that the person that you depend on to care for you is

going to be kind to you rather than hurt you or abandon you is critical.

Sense of self worth and ethicacy comes out of that as well.

Q And when you say a sense of self worth, I'm assuming that's a healthy sense of self worth --

A Yes.

Q -- as related to a healthy attachment. And, again, the converse of that, someone who doesn't have a healthy attachment early on with a caregiver who's crazy about them might end up with lower self esteem, lower self worth?

A Yes.

Q Or would end up with it?

A Yes.

Q Is that fair to say?

A Right.

Q What about Christa, what about her attachment history?

A Well, her mom worked two jobs virtually from the time that she was born. She often drank and became infatuated with various men in her life.

Christa had a series of caregivers including maternal grandfather, maternal grandmother. She had

multiple losses as her mother moved from West Virginia to North Carolina and back, as the men in her life came and went.

Q So these attachments, with her mother it was problem because her mother was busy. Her mother drank.

A Uh-huh. (Affirmative)

Q What about from birth? In the social history that was prepared by Diana McCoy, Christa was kept for the first week of her life in neonatal intensive care, would that have an effect?

A Well, it certainly puts an added stress on the relationship between mother and child, because there is a critical period for bonding at that time. And if that's disrupted then it's a bit more difficult for the mother and child to bond in the same way.

Q And would it be disruptive for a child to have multiple caregivers?

A Well, as long as there's reasonable stability. You don't want a revolving door. So that if you've got grandmother, granddad, helping to take care of a child, as long as it's a fairly stable system, then things can work well. If you get a new babysitter every month or so, something like that, that's not a good

pattern.

Q And what if you're put in a home where -- what if a child's put in a home where she's not necessarily wanted?

A Well, that doesn't help either.

Q Is there anything in Christa's social history that indicates what her Grandmother Fotos thought about keeping Christa?

A Grandmother Fotos was a lady with a number of problems. From what I've read, that she was just almost an end stage alcoholic by the time Christa came along.

Q And she was already keeping Christa's mother Carissa, her first daughter, Alicia, correct?

A Yes.

Q Do you know what her -- based upon the social history, what her thoughts were about now being tabbed to take care of another newborn?

A She wasn't excited about it. She didn't particularly want a new -- another baby to care for, so that was -- she didn't have a sense of enthusiasm and all starry eyed welcoming for Christa.

Q And under the best of circumstances, given her alcohol history, would she be an appropriate person to care for a newborn child?

A No. Children of alcoholics usually experience their parents as, oh, sort of checking out, being unavailable when they get too drunk. If they're mean when they're drunk, then they will feel as if though they have two parents, one who is sober and who might be kind of nice to them, and the other who is -- who was drunk and who would beat them or yell at them, or whatever.

Q And I see here on your PowerPoint slide that Christa's mother drank as well?

A Yes.

Q Do you have an opinion about how Christa's mother's relationship with various men impacted her relationship with Christa?

A Well, Christa had many men coming in and out of her life. But I think the critical issue was that mother would move -- move in with these men. She moved to North Carolina and then back to West Virginia, and repeated that trip several times.

Q And when she would move, it would take Christa out of a situation necessarily that she had become accustomed to, whether it was ideal or not, correct?

A Yes.

Q And, again, we're talking about

Christa's attachment history, and that would impact that negatively?

A Absolutely.

Q Getting back to the neonatal intensive care unit. Do you know whether back in the '70s there was any human interaction with children who were in neonatal care for the first few weeks or months of their lives?

A Not -- that really didn't come in until, oh, roughly the '80s.

Q Why did things change in the '80s?

A Well, because child psychiatrists started beating the doors down and saying, hey, folks, you've got to get these -- get parents in there to start bonding with their kids.

There was an obstetrician in Cincinnati, whose name I can't recall right now, who did, oh, movies of the bonding that takes place between a mother and her newborn infant. And he evangelized around the country to demonstrate to folks that there's very important interaction that takes place there. And that you need to respect that and allow parents to bond with their children.

Q Because as you said earlier, it starts at birth?

A Yes.
Q And this is the most important time for the development of these executive functions?
A Yes.
Q What about some other things that we've heard about about Christa's social history, and how they tend to indicate her attachment with her mother was formed? We did hear testimony that Christa's mother when told that she had a seizure at 14 months old, she wanted to stay out drinking, didn't want to go to the hospital. She said Christa would be fine. Does that tell you anything?
A Well, her mother's an LPN and, you know, it's a bit shocking that a mother with at least some medical training, experience, would respond in that way.
Q And does that give you any indication about how, as I say, the attachment and bonding was going between Christa and her mother back when she was 14 months old?
A It didn't sound like mother was exactly preoccupied with her daughter.
Q Now, does physical abuse, is it a component in the development of a child?
A It can be a problem.
Q What about in Christa's case?

A According to Christa her father was an ill tempered alcoholic -- I'm sorry, according to Christa's mother, Christa's father was an ill tempered alcoholic Vietnam Combat Veteran who had been exposed to Agent Orange. Christa Pike described beatings from him. "These were serious. I have a blood clotting disorder and bruise real easily. I would have bruises, and welts, and cuts on me. I don't care about all of the old fashion values. It's still beating your child. It don't do any good, look at where I am."

And Dr. Pincus found scars consistent with beatings.

Ms. Pike's mother described that her third husband, Christa's first stepfather, became abusive once he had the family living in a trailer in rural North Carolina.

Q And this is, again, after Christa had been uprooted from the life that she knew and taken --

A Yes.

Q -- along with the mother to chase yet another man?

A Yes.

Q And his name? Was that Danny Thompson?

A Yes. I think that was him.

Q Carissa's third husband?

A Yeah. And Christa described that he had made a leather strap thing with a wooden handle, "and he hung it on the wall and said it was for me if I screwed up. He had fun with it. He spanked me with it all the time. He hung it up on the wall in the bedroom. He would tell me to sit there and look at it. He would tell me not to get off the bed for any reason."

"One time I had a nose bleed and I went into the bathroom, and he slung me up against the bed. I ended up with bruises up and down my side. I began to despise him."

Q And what sort of effect would this physical abuse have on a child?

A Well, it has an effect in terms of how she begins to experience people who are supposed to take care of her. It has an effect in terms of a layering of traumatic experiences. Children who are physically and sexually abused, and who've experienced abandonment in early attachments are much more likely to have -- develop dissociative symptoms.

Q And we know also that Christa's Grandmother Fotos drank a lot and that she was -- physically would discipline Christa as well?

A Yes, she would.

Q Do you know about the Steve Kyaw incident? I'll remind you. We've hear testimony that Christa brought charges against Steve Kyaw for --

A Yes.

Q -- punching her in the face when they were living in North Carolina.

A And he would supposedly wrestle with her. And it's not clear from the record whether she grabbed him by the genitals, and he pinched her breasts, or whether he pinched her breasts, and she grabbed him by the genitals. But one of those interactions occurred and she -- he eventually hit her and charges were -- came as a result of that.

Q And I guess that's a little later in life? It was not necessarily in the early developmental years?

A No.

Q But would that have an impact upon a child?

A Well, what you have here, I think, is sort of an additive effect of the same bad things kept happening to her.

Q What about regarding a young child, a toddler, an adolescent, being exposed to horrific violence, rather than being abused herself, seeing

violence, what sort of effect would that have?

A That gets into what's called overstimulation. I think it occurred at the slaughter house in which animals were slaughtered in front of her. She was there off and on when grandfather babysat for her until she was seven. And then until his death she would come back and stay there at other times as well.

Q And, again, what sort of effect might you have if you're exposed to that sort of thing as a young child, as a toddler?

A That leads to -- overstimulation is simply overloading the child's nervous system. It's one of the reasons that even mild forms of sexual abuse can be traumatic for a child. Things that are not physically unpleasant. Children -- it's kind of like being tickled with a feather, you know, it -- you know, it might be fun for a few seconds, but after a while it's going to become quite painful.

And one of the things that we see is that children are quite vulnerable to having too much input. Adults can get this same experience, you know, if your meetings in New York and your wife says, "Before we leave I've got to see the Exhibition at the Met", and so you run over there and run through this exhibition at breakneck speed, and you come out just sort of dazed feeling. Well,

that's a mild version of overstimulation.

Q And I know there was some testimony when this was a time when -- really the only time when Christa was allowed to bond with her grandfather in situations where he was slaughtering cows or in --

A Yes.

Q -- the slaughter house. Any significance to that?

A Well, he was the only man in her life who was reasonably kind to her, and who stayed around over a significant period of time.

Q And would that possibly change a person's -- a young person's attitude towards violence?

A Well, overstimulation makes children more prone to violence. Her family had a family ethos and there were legends about family violence, that I'm sure made violence much more acceptable for her than would have been the case for other kids.

Q And these were things that -- the ethos, I guess you said, these legends she would have heard or did hear as a very young child?

A Yes. They included her maternal great grandfather who supposedly cut the cables and sent 20 men to their deaths in a coal miners' strike. I believe it was her grandfather, somebody was reaching for

something at the slaughter house that he shouldn't have, or at the meat market, and granddad just took -- grabbed one of his knives and stabbed the guy's hand and stuck it to the block.

Grandma Fotos would walk around toting a pistol, and if something bothered her she would shoot it. And even though she was inebriated much of the time apparently she was, by legend, a pretty good shot. So --

Q And this is -- these are the sorts of stories that are going around and Christa's hearing? They're helping --

A Yes. She's getting this, literally, with her mother's milk almost, that, you know, this family has got to stick up for itself and you don't -- let's see, you don't start fights but you end them. Or there was some saying like that. I don't remember exactly what it was, but something to that effect.

Q What about horror movies, any indication that Christa had early exposure to horror movies?

A Yes. According to Christa and her mother, that they had watched together a couple of horror movies and sort of laughed about them. And I think you've got those on your computer --

Q I have some of the highlights, yes.

A If I could turn on --
Q Do you remember what age range we're talking about when she was watching these movies?
A I think she was in grade school, as I recall. I don't remember exactly. Let me turn on that other projector.
MR. CROWSON: Your Honor, may we have a moment to set up for this?
THE COURT: Certainly. Do you need some light?
MR. CROWSON: No. It will be up here.
THE COURT: What slide are we at? I know you're about to go to a movie, but where are we here?
MR. CROWSON: We're doing well.
THE COURT: Well, that's relative.
MR. CROWSON: We're at 88.
(Whereupon, a portion of the movie was played.)
THE COURT: Is the sound part of it? I guess it is.
A What's important about this is that this fellow ends up very much like the cattle.
Q In what way?
A He --
THE COURT: Could you all identify what I'm looking at? I realize it's a horror film of some sort.

But is this -- was this called the Mutilator? Was this the name of the movie?

MR. CROWSON: Yes, ma'am.

Q All right. That's the one. And you said that was significant because of the use of a saw?

A Yes. And this is very much like what happens in a slaughter house to animals.

Q All right. And this is another scene. And, again, these are movies that would have been watched on the couch by Christa Pike and her mother, Carissa.

(Whereupon, a portion of the movie was played.)

Q These are movies watched by Christa with her mother, also watched by herself, correct, as just sort of a babysitter?

A Yes.

Q Now, is this sort of content appropriate --

A No.

Q -- for a nine year-old child?

A No.

Q Why not?

A Well, one, it's over stimulating. Two, children have a hard time figuring out the difference between what happens in a movie and what's part of life,

what's real, et cetera, so that a kid would have a hard time figuring out what this movie meant about life and about them and about how safe they were.

But in Christa's case it would have a special meaning because, you know, here are these people getting slaughtered literally like the cattle that Fluffy came through, and, you know, she put a dandelion in her ear and then 20 minutes later there was Fluffy's head with the flower still stuck in her ear.

Q You're talking about an incident that happened at her grandfather's slaughter house?

A Yes. And I mean, the night watchman seen there was certainly reminiscent of that.

Q Well -- and before we move on, we might have hit an important point there, just -- could you relate the whole story rather than just an excerpt of it? The story with Fluffy at the slaughter house as you remember Ms. Pike relating it.

A Sure. Right. She described a particular cow that was coming through that she named Fluffy. And that she played with Fluffy, kind of liked her. And she had -- the cow had a hole in her ear from the tag and she put a flower in her ear. And went off to play somewhere else, came back in a few minutes and there was Fluffy's head lying in the floor with the flower still

stuck in its ear.

Q Can you give us a timeframe age?

A She was in roughly the four to six, seven age range.

Q Okay. The same movie, the Mutilator.

(Whereupon, a portion of the movie was played.)

Q I'll ask you to comment. Again, is that age appropriate for an eight or nine year-old child to be watching either with their mother or on their own?

A No, it's not. And this -- this woman who is lying helplessly on the table while a man takes a giant fishhook and places it up through her perineum and out her abdomen has particular meaning for Ms. Pike because in -- a few years later she is sexually assaulted by a man who throws her down into a ditch and uses a stick and puts it into her vagina and then has his dog lick her genitals.

So when -- you know, that's getting mighty close to what she'd already seen in the movie. And probably caused the sexual abuse to have much more impact on her.

Q This is a different movie, the Re-Animator. Is this one of the ones that you recall Christa --

A Yes.

Q -- saying, she watched when she was eight or nine years old, in that age range?

A Yes.

(Whereupon, a portion of the movie was played.)

Q Again, for the record, what we just saw depicted in the movie the Re-Animator was a gentleman separating another man's head from his body with a flat shovel. Is that age appropriate for an eight or nine year-old child?

A No, it's not.

Q What sort of effect do you think that all of these movies would have? Again, I know you've answered the question. Just what's going on with an eight or nine year-old child who's watching this sort of thing?

A Well, for any eight or nine year-old child it would be over stimulating. For Christa Pike, it's reaffirming the lessons from Grandpa Fotos' slaughter house.

MR. CROWSON: Your Honor, could we approach?

THE COURT: Uh-huh. (Affirmative)

MR. CROWSON: Do you mind?

(Whereupon, a bench conference was held.)

MR. CROWSON: I just wanted to let the Court know, and get some thoughts from everybody, this next one has pretty graphic nudity. I don't know if you want to

see it.

THE COURT: The general can charge you with --

MR. CROWSON: I'm being ultra cautious. I just --

THE COURT: It's part of your presentation.

MR. CROWSON: It is. And I think the fact that I'm reticent to show it to a bunch of adults in a setting like this, I think, drives home the point even more that it's just absolutely not appropriate for a nine year-old child. But I didn't want to just launch into it without --

THE COURT: I'm not going to tell you how to present your case.

MR. CROWSON: Okay. This is the last one, by the way.

THE COURT: Last one, what, movie?

MR. CROWSON: Yes, ma'am.

THE COURT: Okay. Do these count as a slide also?

MR. CROWSON: These are not a part of it.

THE COURT: -- (inaudible) --

MR. CROWSON: Not a part of the slides.

THE COURT: We're doing fine. But while I have you up here, we still have to resolve the issue of this -- (inaudible) -- and I need to show you what I have at some

point this afternoon. It doesn't have to be resolved this afternoon, but we need to agree how we're going to do it.

MR. CROWSON: Do you want to wait until we finish this slide?

THE COURT: Oh, after we finish the whole thing, before you leave Knoxville. It's separate and --

MR. CROWSON: Okay.

THE COURT: If you want to show it fine, if you don't, fine. It's up to you. It's up to you whether you want to show it or just pass it and say it's a part of the exhibit. I don't care. I've seen pornography many times.

MR. CROWSON: Well, it's not all that. It's just evidence as to what she was exposed to as a child.

THE COURT: I understand that. But you're uncomfortable showing it to us as adults.

MR. CROWSON: Right.

THE COURT: What I'm trying to tell you is, I have to look at pornography in order to make rulings, so it's okay with me. Whatever you want to do.

MR. CROWSON: Okay.

MR. DAWSON: Thank you, your Honor.

(Whereupon, the bench conference was concluded.)

(Whereupon, a short recess was taken.)

DIRECT EXAMINATION

BY MR. CROWSON: (continued)

Q Okay, Dr. Kenner, I'm going to show you the, mercifully, the last of these slides.

THE COURT: From the Re-Animator.

MR. CROWSON: From the Re-Animator, yes, ma'am.

(Whereupon, a portion of the movie was played.)

THE COURT: This isn't what you were just referring to at the bench, was it?

MR. CROWSON: Yes, ma'am.

THE COURT: This is it?

MR. CROWSON: Yes, ma'am.

THE COURT: Oh, okay.

MR. DAWSON: It's going to get worse, your Honor.

THE COURT: It ain't going to get that much worse.

MR. CROWSON: No, it's not going to get that much worse.

Q Okay. Again, now that we've finished that. Age appropriate for a nine year-old girl?

A No. Certainly not.

MR. CROWSON: For the record --

THE COURT: It's not age appropriate for a nine year-old boy either, is it?

A No. A nine year-old boy might get

more eye strain though.

MR. CROWSON: I'm not sure it's age appropriate for me, your Honor.

Q For the record, what we've just viewed here is a fellow who in the previous scene we watched was decapitated by the shovel, has now been reanimated and is using his disembodied head to sexually assault a young girl who's strapped on what looks like an autopsy --

THE COURT: A kitchen sink.

Q -- gurney maybe? Or kitchen sink?

A An autopsy table.

THE COURT: Autopsy table.

Q What are your thoughts about this clip?

A Well, to an adult there's a certain kind of over the top campy quality to it. If I might turn the other one projector off --

THE COURT: Yes.

A -- and the other on to speed things up a bit. To a child --

THE COURT: Okay.

Q And as we were discussing at the bench, that last clip was a little pornographic. What about pornography in Christa's developmental years; were

there any incidents involving pornography?

A Yes. Most pronounced was Steve Kyaw's pornography. And Christa's mother described that she would come home from work and he would be watching porno movies. Ms. Pike recalled that "Steve was a boyfriend of her mother's and an idiot too. He was moron, an idiot, and a pervert. We lived with him in Hillsboro. When we moved in he had stacks of porno flicks. I would watch them when they were not home. I was twelve or thirteen years old."

"And then Dad had --" her dad had a deck of pornographic playing cards that she would -- she got a hold of. He also had -- I think it was his little eight millimeter sort of pocket viewer that had a pornographic picture on it. She took some of those to school to show off when she was fairly young, I think, kindergarten, first grade, something like that.

Q Are these indicative of poor supervision?

A Yes.

Q And what do you expect from someone who's exposed to porn? How it might affect someone who's exposed to pornography at such an early age?

A Well, if you're an adult, pornography is not a problem. Adults know how to deal with sexual

stimulation. For children and very early adolescents, they can't manage that caliber of stimulation. So it's damaging for them.

Q And, again, overstimulation is what we're talking about?

A Yes. Massive overstimulation.

Q I think we covered the horror films. A little bit out of order perhaps. What about sexual abuse?

A If -- at some point earlier in life, and it's not clear exactly when it happened, but her paternal grandmother's boyfriend was thought to be having some kind of sexual relationship with her. And it's mentioned in the record as, she was exposed to him from birth until five or six, something like that.

Q Uh-huh. (Affirmative)

A And there were strong suspicions that he had done something inappropriate with her. And then at age nine she --

Q Does -- I'm sorry, Doctor. Does Christa have any memory of this sexual abuse at the hands of her grandmother's boyfriend?

A No, but it is talked about in her mental health records as history that came at least through mother, and it may have been primarily something

that mother remembered.

Q So it was strongly suspected and mentioned --

A Yes.

Q -- in Christa's history?

A Right.

Q Okay.

A And at age nine there was an incident of the fellow -- she was molested by a man who threw her in a ditch and penetrated her with sticks and caused his dog to lick her genitals. This incident is confirmed by a later arrest of the man.

At age 17 she was again physically and sexually assaulted by a stranger.

Q And this sort of sexual abuse, these sort of sexual attacks, what sort of effect would you expect for those to have on a young adolescent or early teen?

A Well, along with the pornographic movies, et cetera, it would sexualize her. In other words, she would see -- she would be much more interested in sex than usual. She would be -- see sexual innuendo when there -- most people would not. She would be fearful of being vulnerable sexually. And she could either develop a sort of doe in the headlights response to that,

or develop a very aggressive response in which, by God, you ain't gonna do that to me, kind of response. So she could go either way.

You look at her sexual history and she describes having between the ages of 13, 14 and the time she was in incarcerated, having had sex with between 40 and 60 men. And that's --

DEFENDANT PIKE: I never said that, somebody else said that.

A -- a large number. The other thing you have to remember is that individuals who are bipolar and manic or hypomanic are hyper sexual as well, so that they will be much more sexually active than most folks.

Q And someone that's hypomanic may be even more sexually active than someone who suffers this kind of abuse that isn't hypo; is that fair to say?

A I'm sorry?

Q Well, what I'm --

A I guess the --

Q You said that Bipolar II people are more prone to being sexually overactive?

A Yes.

Q For lack of a better term. What about when you combine Bipolar II with a history -- a serious history of sexual abuse and assault?

A Well, it's kind of like one plus one is 11. And you get the possibility of a much greater rate of sexual acting out.

Q Does that impact on self esteem? You said that she had been with -- or reported at least having been with 40 to 60 men early in life, is there an impact on self esteem to someone who reports this sort of behavior?

A Well, it's the inverse of boys versus girls. Males, you know, with 60 notches on their gun would say, you know, I'm really -- I'm really something. Look at all these women I've seduced.

For a woman, it would have a different meaning. And it would undercut her self esteem.

Q And you testified earlier that Christa's self esteem was probably damaged from early in life. What effect would this further deterioration of her self esteem have?

A Well, it would make her vulnerable particularly at times when -- if someone chose to call her a slut, a whore, something like that.

Q Let's shift gears for a moment here and talk about how the brain is structured, and how it is that this structure effects how we make decisions.

A This is from an article from the

Harvard Business Review. Gardiner Morse looked at what we know about neuro networks and how decisions are made, and the way the brain is structured, and how sometimes it will lead business executives to make just wonderful decisions. And other times they will sail their companies upon the shoals for what seems like stupid reasons that don't make much sense. And I think what this tells us is that this -- what used to be rather arcane neuroscience is now getting into many spheres and is being recognized.

And this slide refers to the way the brain is organized, that there is a reptilian brain, a mammalian brain, and then in the prefrontal cortex we have the brain's CEO, or the most human, part of the brain.

This is a slide that illustrates the part of the brain, the limbic system, that is in charge of emotions. And Morse used the analogy that this is our doggie brain, and that we -- emotional decisions regardless of almost what they are, are made at this level. And most of our thinking goes on at this level. The cortex is where higher level thinking, reasoning, various other high level functionings occur there. It's language based.

It's as if we have -- our brains were a dual computer -- dual processor computer. We have the limbic system here is very --

Q The pink area of the brain?
A Yes, the pink area.
Q As depicted on this chart.
A It's very fast. The cortex is a rather slow but elegant computer. And it operates with a great deal of precision. It brings us things like law and medicine and so forth.

But this cartoon, I think, illustrates the problem of the two systems in that the one on the left -- we've got one, it makes twice the mistakes in half the time. And this is the older limbic system. And it's what we have inherited from lower animals.

On the right is our newer language based system. And it's very elegant, but you can see by the memories on these tapes up here, it is very slow. If a lion were to burst through the door, it would be this part of our brains that would -- right here, the limbic system, that would tell us, you know, it's time to do something in an emergency, particularly if the lion looked hungry.

And you get this, for example, in military and law enforcement training because they seek to train the limbic system. You want to think without thinking when it comes to whether or not to use deadly force, how to respond to emergencies.

If you have to use your cortex up here, you

could very well be dead before the thought process reaches a reasonable conclusion. But you'll have legally the right one if you use this up here. There's a disadvantage to thinking things through that slowly in high stress emergency situations.

Q With the limbic system that you're describing in here with the lion, it sounds like just a reflex system, a fight --

A It is blazenly fast.

Q A moment ago you described it as an emotional --

A Yes.

Q -- system as well. Explain, I mean, because I understand the fight or flight. I understand the reflex. But also our emotions are involved. Can you tell us how that is?

A Well, we can think with emotions extremely fast. You know, we can walk into a room and look at a group of people and get a first impression, okay, I like this person, I don't like that one. I better be very careful about this other person over here because I get a weird feeling about that person.

Q And you're talking about a gut feeling or --

A Yeah, yeah. And that's what comes

from the limbic system. You know, you've got to remember that long before we had language as preverbal primates, we had to figure out a way of telling friend from foe. Who was going to hit us in the head and steal our food, and whatever else we held precious, versus those that we could meet with, have something in common with, share with, et cetera, and it was this system that would have to save our bacon. So this is extremely well developed.

As a matter of fact, I'll digress for a second here. There's -- Gift of Fear is a great book written by Gavin de Becker about how the signal from our limbic system can be life saving. He grew up with a schizophrenic mother who was an alcoholic. He learned at a very early age when to tell -- how to tell when mother was simply blowing off steam versus when she was really a danger. She shot one of his stepfathers, almost killed him.

He went on to develop a threat assessment system that's currently used by the Secret Service, by the Supreme Court, folks who protect them, and other people, major law enforcement systems throughout the country, that rely on his -- the methods of threat assessment that he developed.

The key to it, in his book the Gift of Fear, is that you've got to pay attention when you hear this alarm

system going off, you know, you've got to act first and sort of think about it later in most situations. Don't -- a lot of times people will forget the message coming from their limbic system because it's just not polite to get on an elevator with somebody who looks creepy just because they look creepy. It's not politically correct. De Becker would say you've got to pay attention to that.

Q But is there a danger in acting before you think?

A Yes. And this is -- this cartoon illustrates the danger. "Wait guys, it was all a computer error." And what it refers to is the fact that the emotional computer in the limbic system, while it's extremely fast, it's a bit dirty in the way it works. It ain't precise. It's not as clear cut as our language based system.

And a lot of business in this courtroom probably has to do with computer errors, where people will see other folks as threatening, as dangerous to them and will respond in that way. When in the cold light of day, well, did you see a gun, no, but I knew he had one. Did you see a knife, no, but he sure looked like he had one. What they're talking about is that their limbic system said, watch out, this guy might have a gun or a knife.

Q Well, is there some sort of failsafe

to control the limbic system that most of us use every day?

A Well, yeah, most of us have brakes. We're able to think about things. And our limbic system and the amygdala here is the sort of alarm system in the whole process so that --

Q Is the amygdala part of the limbic system?

A Yes.

THE COURT: I don't see George Bush in the Department of Homeland Security.

A I'm going to get myself in trouble with political --

THE COURT: Okay. Don't go there, Doctor. Just go right ahead.

A Okay. This slide shows incoming signals. They come in the thalamus and they get divided. And this is what we see, hear, smell, taste, et cetera. And part of it goes to the limbic -- to the amygdala and then it goes -- and it also goes on up to the cortex so that we can begin to think about what we're thinking and experiencing and hearing and so forth. But if there's something particularly dangerous there the alarm's going to go off. For example, if you're walking down a trail in the woods and you know that this area is noted for snakes,

and you see a limb across the trail, you're likely to jump before you sit there and debate, does it have scales or is that bark? Is it moving or am I just scared?

And folks who have been traumatized early in childhood, they're amygdala is going to be much larger. They're going to see danger where others of us wouldn't see danger.

Q And, specifically, what about Christa Pike?

A Well, you know, she's had enough experiences so that her amygdala is going to be working overtime.

Q And she might see dangers or threats that others didn't see?

A Yes.

Q Or wouldn't see, I should say?

A Yes.

Q Now, we saw earlier a feedback loop that dealt with positive reinforcement for a child developing and interacting with a caregiver. What happens when that doesn't happen? What happens when the result of the child's complaining is negative?

A In -- this is the negative feedback where the child begins to cry or reach out, talking, crawling, the caregiver is unresponsive, abusive, or

negligent. The child feels out of control. There's affect dysregulation, chronic stress, and the relationships are unsafe, traumatic. They begin to anticipate future harm, become hyper vigilant, or shut down. And so their internal working model of the world is one in which there's frustration, danger, stress.

Q And what -- rather than something that's building and growing, I'm talking about self esteem, when we talk the other -- you're sort of looking at a -- what would have to be a downward spiral here, I guess --

A Yes.

Q -- because the arrows go around again to the child's needs. The child's needs change after their unresponsive relationships, after their -- feel like they're in unsafe situations. And, of course, they're going to express themselves differently.

A Yes.

Q Particularly with low self esteem might begin to act out and express themselves in a way to try to get attention; is that what we're talking about here?

A Yes. Children can have -- this can lead to all kinds of negative consequences. Children can begin to identify with the aggressor, so that they become

more aggressive. They can -- their chronic stress is going to actually damage parts of their brain that they need to make executive decisions that are needed for higher level cortical functioning.

Q And so rather than, again, building and growing and changing in that way you might find -- or describe a child that's in this negative loop as deteriorating?

A Yes. And the response to it can be -- to the chronic stress can either be fight or flight or freeze, depending on whether it's sympathetic response or parasympathetic response. And these are different parts of the nervous system.

The sympathetic response you get the hyper vigilance, reactive, alarmed, uncontrolled impulsiveness and aggressiveness. Parasympathetic is the doe in the headlights, freeze, disengage, camouflage, and you can have mixed responses that sometimes they'll have part of one and part of the other. It's not either or.

Q Does Christa fit on -- Christa Pike fit anywhere on this chart?

A Well, most of the time she has a sympathetic response. In the past, she was ready to fight. There are dissociative symptoms in the picture as well.

Q A moment ago you said that stress could actually be toxic or poisonous?

A Yes.

Q Tell us what you meant by that?

A Well, neuro -- the stress hormones that are released in emergency situations do a very good job of shutting down everything that we don't need in order to deal with immediate stress.

Robert Sapolsky in his book Why Zebras Don't Get Ulcers, described that for a zebra stress lasts about a minute to two minutes. And it's all about whether that lion catches you and eats you for breakfast or not.

Humans, on the other hand, have the capacity to continue a stress response even after the stress is over. And the problem with that is that the stress response shunts the body's resources away from digestion, away from immune response, and everything is involved in saving your bacon in a short period of time. But when it's prolonged over months, or years, or a lifetime, then that is toxic. And there are specific -- specific parts of the brain that are subject to these problems.

Q Talking about that, you said that zebras don't have ulcers and that it's a very good thing for them to react without thinking if there's a lion chasing them.

A Yes.

Q But it would be, I guess, then a bad thing for them to sit around and worry about lions all day?

A Only humans do that.

Q Right. And so if they did they would have these --

THE COURT: I saw a show about zebras just this morning where they were afraid to get near the water for fear of their enemies.

Q They're afraid --

THE COURT: That's what it said. I don't know about that.

A They know where the enemies hang out.

THE COURT: They know where the enemy hangs out. That's right.

A But once they're away from the water they can forget about the enemies. Humans would continue to worry about that.

Q And these neuro hormones that you're talking about in this worried zebra would be toxic to part of his physiology; is that it?

A Yes.

Q You say what these things do, they shut down non necessary -- unnecessary functions.

A Yes.
Q Digestion?
A Yes. Everything goes to the -- to muscles, to activating glycogen from storage, and the hypothalamic pituitary axis gets shut down or gets altered in that direction.
THE COURT: Is that a weight reduction --
A I -- it's not effective for weight reduction, because it would get you into Type II Diabetes.
THE COURT: Oh, okay.
Q What about --
A And it actually changes the architecture of the brain.
Q What about executive functioning and learning, are those necessary functions --
A Yes.
Q -- according to the limbic system, and according to these neuro hormones? Would they suffer in a situation where there's a lot of stress and a lot of neuro hormones present?
A Well, the -- there's impairment specifically in the hippocampus. The hippocampus is the part of the brain in which emotions and memories are connected. And it's the part of the brain that starts going early in Alzheimer's disease. Corticotropic, the

releasing factor or CRH is the particular hormone that looks like it's neuro toxic. This comes out of work at Emory in Atlanta.

Q Neuro toxic, that's a term I would like you to explain, if you could.

A Well, it literally kills brain cells. And it leads to impairment in learning, memory, stress regulation.

Q And this is a hormone that's present in everyone?

A Yes. It's a normal hormone. The level just goes way up in folks who have PTSD. It's -- Nimroff's group in Atlanta has done a great deal of work on that.

And the lower part of that slide simply refers to the fact that it can have an effect on prenatal development that can be offset to some extent by later development in animals that have been studied.

Q Dr. Kenner, at the bottom of these slides some of this -- some of these slides indicated that they are from after 1996 and 2000, these ideas and this research, is this something that's new?

A No. This has certainly been around before '95, it's just I've actually gathered these slides from various sources, made some of them myself. And it's

much easier because of the way medical databases are structured to kind of get the latest. But these ideas have certainly been around for -- back in the mid '90s.

Q Okay. Tell us, how does stress effect the developing brain for a neonatal or a toddler? And we talked about before all of that development that's going on in the first six or seven years. What does stress do?

A Okay. There's a throw and catch synchrony in human stress response. Our stress hormones, epinephrine, norepinephrine, more commonly known as adrenaline, when they're released there's also a common hormone or cortisol, that's released at the same time so that if someone almost hits you on the way to work you can be quite upset, but hopefully within a short time you can calm down and go ahead and work productively that day. If that happens, you can thank your cortisol production for allowing you to do that.

With things that are psychologically traumatic, the emergency hormones overpower and overrun the cortisol that's available to calm you down, so that the emergency hormones continue to -- at a high level. It's a little bit like getting a power surge on your computer. It burns in some new -- new things into your motherboard that don't particularly help you. Cortisol production at that point

goes up as does CHF levels, and that impairs brain development.

If you put a kid in a safe environment after they've been abused, they'll go down some, but they'll still remain high, the cortisol level.

Q In the previous slide, I believe you said, that young children who are neglected or maltreated have abnormal patterns of cortisol production as you were discussing. What about Christa Pike, does she fit that profile? Would you -- in your talks with Christa, and your examination of Christa, and looking at her social history, would she fit the pattern of someone who was neglected and maltreated enough to have abnormal patterns of cortisol production?

A Yes.

Q And the reason for that is the sexual, physical, verbal traumas that we've talked about here today?

A Right. With her, you have the layering of traumas.

Q And here we have a slide, the next slide, childhood maltreatment, this deals with the actual changes in the volume of the brain --

A Yes.

Q -- of children. Explain for us

what's going on here?

A Okay. In this slide there are various areas of the brain that show up on scans as smaller in volume in mistreated children, adolescents, with PTSD versus normal. And this just gives you -- and I won't run over everything here, it does happen to have a greater effect in boys than girls. But it hits many critical areas of the brain, particularly the prefrontal cortex, prefrontal white matter, corpus callosum, all of these are important in terms of behavior regulation.

There's a decrease -- a volume decrease in the corpus callosum that correlates with intrusive thoughts, avoidance, hyper arousal, and association. And most of this work probably did post date '95, but we certainly have known for a long time that it didn't help your brain to be exposed to trauma. It's simply quantified in this slide.

Q And lower volumes, would that typically correspond to lower activity, lower development?

A Well, lower volumes would mean that those areas wouldn't develop to the same extent as normal.

Q Now, real briefly, this says that you might see effects in the right temporal lobe, and things like that, what -- this portion would have nothing to do with whether a child has other organic damage in the --

A No. This is just from childhood maltreatment problems.

Q Well, what about when we do see a heterotopia such as the one that Dr. Pincus described with Christa, and layer on top of that some of these developmental problems, what might you see?

A Well, you're going to, again, see that the heterotopia is on top of the alterations and brain development that occur as a result of trauma. And then on top of that, you've got the Bipolar II Disorder so that quite a few things are layering up here.

Q And do those things tend to add or do they tend multiply and you have multiple problems with the --

A They generally add up and sometimes it's in a logarithmic fashion. And this slide simply shows the areas of the brain that are impacted by trauma. And most of these have to do with emotional regulation. So -- and the -- actually, the amygdalas get bigger, as one would guess. Prefrontal --

Q And the amygdala, again, is part of the --

A The alarm system. Yes.

Q The alarm system. Okay.

A And the higher areas, orbital

prefrontal cortex, ventral prefrontal cortex, dorsa lateral cortex, those are negatively impacted.

Q Those are -- I mean, that's your executive functioning that's --

A Yes.

Q I believe Dr. Pincus described that area of the brain as the brakes, that it would slow down the limbic system when the limbic system might be making a mistake.

A Yes. Well, the limbic system, you can describe it as the engine. It's where we get our power, but it's got to be mediated.

Q What is Disorder of Extreme Stress not otherwise specified?

A Okay. Judy Herman in Boston is a psychiatrist and psychoanalyst there, and she was the first to sit back and say, wait a minute, you know, most of the work on Post Traumatic Stress Disorder came out of Vietnam Veterans. And it was done in the VA system. It primarily had to do with men in their, by that time, in their 30s and older. And so, let's go back and look at what happens to children who have traumatic experiences. And let's look at people who've been through other kinds of traumatic experiences such as being exposed to torture, or in concentration camps, things that went on for a long

time, occurred to many people when they were very young and so forth. And so, she came up with the acronym of DESNOS.

And there was another group also working at Harvard in Boston and that was Bessel Van der Kolk, and he has come up with the notion of Complex PTSD. And that with Complex PTSD there is -- you see the complex disruption of affect regulation. You see disturbed attachment patterns, rapid behavioral regression/shifts in emotional states, aggressive behaviors against self and others, failures to achieve developmental competencies, chronic sense of ineffectiveness, loss of body regulations in areas of sleep, foods, self care, somatic problems, altered schemas of the world.

Q So, if we could go back to that there. I'm sorry. What about Christa Pike? Let's talk about each of these factors as it relates to her.

A Yes.

Q Complex disruption of affect regulation. I assume that means just being able to stay on an even keel --

A Yes.

Q -- not fly off the handle?

A And one of the things that both Van der Kolk's group and Judy Herman had pointed out is that

there are a large number of individuals who have Bipolar Type II Disorder who have histories of complex trauma. And there seems to be some connection there that complex traumas in folks who are predisposed to bipolar illness can lead to Bipolar Type II presentation.

Q What about the second attachment patterns, disturbed attachment patterns, do you see those --

A Yes.

Q -- any indications of those -- of that symptom in Christa Pike?

A Well, that's something that she -- she has very intense attachments to people. And I think that's what -- you can see it with this because these folks have intense needs. They've missed out on early parenting experiences so they will attach to folks very quickly, quite intensely.

Q It looks like rapid behavioral regression shifts emotional states. Christa Pike?

A Yes. She's certainly been known to go off very quickly, particularly before she got on mood stabilizers.

Q Aggressive behaviors against self and others?

A Yes. She certainly had that.

Q We talked earlier about her problems in school. The next one is failure to achieve developmental competencies and the chronic sense of ineffectiveness.

A Yes.

Q What do your thoughts about Christa Pike as it relates to that symptom?

A Well, she certainly has had much greater potential than she was able to fulfill in school. I think that now that she's on a mood stabilizer and much calmer, she's able to be more creative and to think much more deeply about things.

Q And the chronic sense of ineffectiveness, we listened to a statement here yesterday, and I know that you've had a chance to hear it as well, in it Christa said that she was not going to say anything about Tadaryl Shipp because he had so much potential, and she had messed up everything in her life. Is that a pretty clear indication of chronic sense, or at least in that state -- in that stage a sense of ineffectiveness?

A It would certainly suggest that.

Q Have you found in her history other indications that she had a sense of low self esteem ineffectiveness?

A Well, I think what you see with her is that she counts herself a failure before she begins, or has done that in the past. So that whatever she starts, she starts with a handicap almost.

Q Loss of bodily regulations in areas of sleep, food, self care. Anything in Christa's history that seems to fit into that category?

A She certainly had the sleep disorder. There's no history of an eating disorder. In terms of self care, she -- it was hard for her to value her body and to take good care of it.

Q Somatic problems?

A We saw on psychological testing that she had a test response particularly on the Rorschach that suggests she had concerns about her body.

Q Altered schemas of the world. What do mean by that?

A That's, again, looking at just how the world works so that individuals who are severely traumatized will assume that's just how the world works. That she will -- sees the world based on the bad things that have happened to her.

Q And Christa Pike?

A Yes.

Q Based upon your opportunity to talk

with Christa, and her social history, and everything that you've reviewed, have you been able to come to a conclusion regarding a diagnosis of Complex Post Traumatic Stress Disorder to a reasonable degree of medical certainty, as it relates to Christa Pike?

A Yes. If this were 2010, and the new DSM were out, I think we could -- she would meet that diagnosis. Again, you have to keep in mind that the DSM, it's not a law book, it is instead a political document in which warring camps have gotten together and they've decided, all right, for the sake of research and nomenclatures so that we can be talking about the same thing, we will agree that, you know, that this is what things, diagnoses and criteria for that are for now.

The problem is that it's a changing field. We're learning new things by leaps and bounds, thanks in no small part to neuroscience. So it's a great area to look at what's coming.

Q And there was work in this area done, as you said, back in the '90s and even before that?

A Yeah.

Q The post Vietnam era?

A Yeah. Judy Herman's was the first article on -- or book actually, on Complex PTSD or DESNOS as she described it.

Q Earlier when we were talking, you said that early trauma might cause an individual to misrecognize fear, or to misassign fear.

A Yes.

Q Tell us what you meant by that.

A Okay. This is -- this slide is one that you -- these pictures are used to study how people identify the emotions in this woman's face. And for normal people, this is seen as anger by 90 percent. And this is seen as fear by only 10 percent of normal folks. But in physically abused children, it's just the reverse, so that there amygdalas cause them to misidentify fear as if it were anger, and anger as if it were fear. So that you get into a situation where Colleen Slemmer is -- was probably looking quite fearful. Well, the problem with Christa Pike was that she more than likely would not identify the emotion in the victim accurately, except she would identify it as the inverse, that Slemmer was getting more and more angry, when, in fact, Slemmer was scared to death and getting -- feeling more and more helpless and vulnerable. Because for some reason folks whose amygdalas are hypertrophied from their own abuse will confuse that.

Q When you say hypertrophied, what do you mean by that word?

A Overused. That they literally get

bigger. You can see it in the scans.

Q So they've developed them, and as you said before, these neurons that fire together wire together.

A Yes.

Q They have a lower trigger point and they fire for longer and they're often misinterpreted -- or there are often misinterpretations when you're dealing with people who are physically abused as a child?

A Yes.

Q Is that fair?

A Yes.

Q Now, you said that -- is Developmental Trauma Disorder the same as Complex Post Traumatic Stress Disorder?

A Well, we haven't agreed on a name for it yet, but there's now recognized an entity out there, and whether you're going to call it DESNOS, Complex PTSD, Developmental Trauma Disorder, is as of right now uncertain. But this fellow right here, Bessel van der Kolk in Boston is the one heading up the study group that's developing DSM-V. So there's a good chance that his idea of Developmental Trauma Disorder may make it in. This is what it referred to, that you have exposure to layers of trauma, that there are triggered patterns of

repeated dysregulation and response to the trauma, the trauma cues, persistently altered attributions and expectancies, functional impairment. And this is basically going over the same things, the subjective response in that is a sense of rage, betrayal, fear, resignation, defeat.

And, again, this -- the triggered patterns of repeated dysregulation and response to trauma cues. Talking about an effective response, somatic, behavioral, they'll get into reenacting, self cutting. Ms. Pike had some of that. Cognitive, thinking that it's happening again, confusion, dissociation, depersonalization, this goes much beyond the old idea of PTSD is fairly incapsulated. Relational, clinging, oppositional, distressful, compliant, self attribution, and so forth.

They'll blame themselves.

Q Now, here we see persistently altered attributions and expectancies.

A Yes. What they expect from others is negative. What they see themselves as providing or -- is also negative. They'll be distressful with caretakers. Even if they've got good caretakers now. They have no expectancy of protection by others. Loss of trust in social agencies to protect them. Lack of recourse of social justice. Retribution. Inevitability of future

victimization.

Q Discuss these as they, again, relate to Christa Pike.

A Okay. Well, what he's talking about here in this article is that kids who have been traumatized in a layered way will have -- will expect to be victimized in the future. And they'll be -- they have no idea that DCS is out there to protect them or anyone else. You know, I think Christa, because of her Bipolar Disorder took it upon herself to protect herself and others in ways that were grandiose and flamboyant and dangerous.

Q And in at least one instance we know that she did press charges against Steve Kyaw, but --

A Yes.

Q -- for the most part, where it says lack of recourse of social justice, her recourse instead was she relied upon herself?

A Yes. And also lack of social justice in terms of the fellow who -- that had been charged with sexually assaulting her, he was apparently disheveled, had a beard, and was poorly dressed. By the time he got to court he was all cleaned up, and shaved, and she didn't recognize him.

Q And, again, in saying that she relied

upon herself for these things, that would be keeping with her upbringing with the culture in the family in which she --

A That's the West Virginia Fotos way apparently.

Q Okay. Functional impairment. Did Christa Pike experience any of these functional impairments?

A Yes. She was --

Q Explain --

A -- impaired educationally, because she had a good brain, she just couldn't slow it down long enough to use it. It impaired the relationship with her -- what was available from her mother. Her mother finally got into a good marriage and settled down. But Christa wasn't able to again develop a relationship with her.

She hears, you know, kids who are bipolar are pains for other kids, they waste their time, they're dangerous, so they end up running around with other bottom feeders, and get into all kinds of trouble because of that.

Q Could that also be a function of moving from school to school?

A Sure.

Q It's hard to get into the in-crowd if you're being --

A Christa, because of her impulsivity, and she couldn't keep her mouth shut, sometimes couldn't remember what she'd said, she would not make it with the in-crowd in any school, but particularly if she had to go from school to school. She would not make it as an army brat.

Q Uh-huh. (Affirmative)

A Legal trouble. That's why we're here. Vocationally, you know, she was trying to do something with the -- with nursing training at Job Corps, but she would never have made it in that without adequate medication.

THE COURT: What number are you on?

MR. CROWSON: What number are you on, Dr. Kenner?

THE COURT: He doesn't have a number. He'd have to shut it down to find the number.

Wasn't that one of the early ones?

A This should be one of the last ones.

Q I'm having a hard time finding that. Obviously, we're going to be discussing the impact of the early trauma that I assume was in Christa's life.

A Well, yes, but let's --

Q Hang on a second. Any similar examples --

A Yes.

Q -- of impact of early trauma that the jury might have been able to relate to or understand?

A Right. One that certainly comes to mind is that of Edgar Allen Poe, age three to four he was locked in a tenement, a Richmond tenement room, with his mother and younger sister. She was dying of consumption, coughing up copious amounts of bright red frothy blood, she couldn't take care of him, and so she would just lock the kids in the room with her. He went on to write eloquently but obsessively about blood. So -- and there's an article in the literature about William Nedemyer about how his early experiences are echoed throughout his writings.

With Christa Gail Pike, Grandpa Fotos cared for her in the slaughter house. She had a bleeding disorder and often had nose bleeds and excessive bleeding at other times. She was obsessed with blood. She played with animals and then examined their body parts after they're slaughtered with Grandpa Fotos. And so I think one could develop this much more in a trial than we're doing here, but it would certainly allow a jury a way of understanding how various themes could play out in an individual's life.

There are other examples. Magritte the surrealistic painter had similar experiences as a child. They got played out in his artwork.

Q I'd like to talk to you about a couple of other things and go off your presentation for just a few minutes, if we can.

A Okay.

Q And we'll return to it, I know that we're almost done.

MR. CROWSON: May I approach the witness, your Honor?

THE COURT: Certainly. Do you want the lights on?

MR. CROWSON: Yeah, I think so. I've already shown this to counsel. This will be marked as 43?

THE COURT: Oh, heck, I don't know. 42? Are you sure? No, 42 was a ---

MR. CROWSON: Dr. Kenner's PowerPoint presentation.

THE COURT: Hang on a minute. Hold on. Let me just make sure we're all singing off the same number here. So the PowerPoint is going to be 42?

MR. CROWSON: It will be late-filed, your Honor.

THE COURT: Okay. And this, therefore, will be

43. I don't know how to tell you this, but I'm going to have to get a lot closer to see that.

A It's the colors that are important.

Q Yeah.

MR. CROWSON: Your Honor, I think we'll be very brief with this, but it is illustrative.

THE COURT: Okay. Wait a minute. All right. Go ahead. These will help.

MR. CROWSON: Do you need --

THE COURT: No. My new contact lenses are waiting for me, but I haven't had time to get them. I can see it -- Okay. It's kind of a timeline of life, is it?

A It's a family gene gram. And then this refers to things that have happened in Christa's life.

Q And in the red -- there's a key here, but the red deals primarily with medical problems that Christa has had. You can see she was two months premature. She was admitted to Appalachian Regional Hospital --

THE COURT: Have you seen this, General?

MR. PRICE: Yes.

THE COURT: You've seen it?

MR. PRICE: I have.

THE COURT: Okay.

Q She was kept in neonatal intensive care. This pattern and the heterotopia, is that indicative of alcohol abuse by the mother?

A You can certainly see that in fetal alcohol syndrome.

Q All right. And at age 14 months, it looks like she had a seizure, we talked about, briefly, before. In your opinion, what was the cause of that?

A That was more than likely as a result of the heterotopia.

Q Okay. And I believe that's what Dr. Pincus testified to earlier as well?

A Yes.

Q We see a number of people in Christa's background, family, that had drug and alcohol problems as well.

A Yes.

Q Tell us how that might effect a young lady?

A Drug and alcohol problems are much more common in the family histories of patients who have Bipolar Disorder.

Q And we also see, is this illustrative of the different husbands and partners that Christa's mother had during the course of her youth?

A Yes.
Q Would you describe that as chaotic home life?
A It was. And there were others who didn't make it on the chart, because they weren't around that long.
Q Okay. And what kind of effect does that have on -- we talked about making attachments, but when you have a situation where the home life is changing so often, how does that help or hinder the child to make attachments as we discussed earlier?
A It makes it more difficult. It's one of the problems of single parents and dating, that it adds a level of uncertainty. You never know how long the new boyfriend/girlfriend is going to be around.

In Christa's case, her mother would not only go after these men, but often move in with them, become dependent on them, things like that, so that she failed to provide a real stable operating base, if you will, from which Christa could maintain her attachments.
Q Do you know whether there was a time when Carissa, now Hanson, Christa's mother, actually chose one of these gentlemen over her children?
A In terms of moving off with him or --
Q In terms of choosing to live with --

I'm talking about Danny Thompson here.

A Oh, they moved to North Carolina to a trailer in the woods.

Q Exactly. And was there a time when Christa and Alicia were asked to leave because Danny didn't want children around?

A Yes.

Q What kind of effect would that have --

A That doesn't --.

Q -- developmentally?

A Well, most kids would be angry about that. They would have -- it would affect their self esteem. It would -- you know, if you can't count on your mom to hang on to you through thick and thin, who can you count on. That sort of thing.

Q And her father, likewise, at one point, banned her from his home?

A Yes.

Q Similar effect on self esteem?

A Yes. Apparently there was a stepmother there, they were allegations that Christa had done something sexual to very young children. But children of three or four are quite easily induced to give false statements because -- from a worried parent or angry

parent asking what bad things did Christa do.

Q Now -- and I believe one of your publications dealt with the issue of false reports of child abuse --

A Yes.

Q -- The Witch Hunt of the '80s?

A Yes.

Q In your opinion, is it likely that Christa Pike abused her half sister or half brother?

A Well, we don't have evidence that she did. And, again, all it takes would be a few leading questions to create false allegations.

Q Okay.

MR. CROWSON: We'd move to enter this into evidence. I do think it's illustrative of the --

THE COURT: It will be Exhibit 43.

MR. CROWSON: -- chaotic nature of Ms. Pike's life.

THE COURT: 42 is going to be the PowerPoint presentation.

MR. CROWSON: Yes, ma'am. It will be late-filed.

(Exhibit No. 43 - entered into evidence)

THE COURT: And what slide are you on now?

MR. CROWSON: It's exciting. I think we're on

117.

THE COURT: Okay.

MR. CROWSON: But I did want to squeak up a couple of other things.

THE COURT: That's fine.

MR. CROWSON: Actually, your Honor, may I have a moment?

THE COURT: Yeah. You all want to take about a ten minute break?

MR. CROWSON: I think it's a good time. I think we're doing okay.

THE COURT: Okay.

(Whereupon, a recess was taken.)

THE COURT: Thank you, ladies and gentlemen. Please be seated.

And if you all don't mind, I'm going to stand up awhile. So go ahead, Mr. Crowson, whenever you're ready. What slide did you say we were on?

MR. CROWSON: Well, we're off track right now, your Honor.

THE COURT: Oh, thank you.

MR. CROWSON: We're returning back to the track here in a moment and we'll be on slide number 118 when we do.

THE COURT: Okay.

DIRECT EXAMINATION

BY MR. CROWSON: (continued)

Q Dr. Kenner, one thing we've not talked about today is the relationship that Christa Pike was engaged in at the time of this crime with Tadaryl Shipp. Have you had an opportunity review some of the social history and talk with Christa about that relationship?

A Yes, I have.

Q How would you characterize that relationship?

A I think she was infatuated with him, idealized him, found him -- thought he was her soul mate.

Q How did she feel about the fact that he was -- that she was Tadaryl's girlfriend? Was she proud of that fact?

A That was all important to her at that time.

Q And that was her identity at that time?

A Yes. It had a Romeo and Juliet quality about it.

Q Have you read enough about Tadaryl to form any opinions about him?

A Well, I've read some about him, and

my opinions about him are not exactly sterling.

Q They're not? In what way?

A I think he had significant gang related issues. That he also had come from the Louisiana/Creole culture, Caribbean culture, and had -- was flirting with voodoo, and black magic, devil worship, things like that.

Q And was he a violent person?

A Yes. He had, apparently, had a violent career as a gang member prior to coming to the Job Corps.

Q And do you know what the status of Christa's relationship was with -- with Tadaryl was around the time of the death of Colleen Slemmer? Were they doing well, had he --

A Yeah. He had had several dalliances apparently, including with Colleen Slemmer.

Q And how would those sorts of, again using the word dalliances, effect Christa's self esteem? How would she feel if she felt Tadaryl slipping away from her?

A I think it would have a very powerful impact on her in terms of threats to her attachment to him. What you see with people who have had early losses, as she's had, is that they will develop dependent

relationships in which they -- everything is tied up in that relationship so that -- you see it with women who've particularly been abused, they will have a hard time leaving their abuser, because to leave him means that they have to re-experience the early losses in their grief. So that they'll stick around and get beat up again, and again, and again.

Q And would losing Tadaryl back in January of 1995 been tantamount to losing her identity?

A Well, it would bring back the earlier losses that she'd had, particularly the loss of her grandmother, the loss of her -- other people that she had been close to, loss of her father, even though, you know, she had her differences with him, it was still difficult to lose him.

Q Shifting gears again. You said that you had been a part of a capital defense team on several occasions.

A Yes.

Q When it comes to explaining to the lay people on a jury about someone with a mental illness, what sort of things do you want to tell the jury about, what sort of incidents do you want to tell them about?

A Well, the important thing is not to tell incidences, but to put some kind of a coherent story

together. So that an individual's psychopathology, the problems that they're having on all levels, in terms of their -- how their brain is working, their past, their patterns of interaction, their style of thinking and acting. All of these come together in some kind of a coherent story that explains how a particular crime occurred at this time in the person's life.

Q But sometimes describing the life history of someone who's on trial for their life, will include some negative experiences, some negative things about that defendant; is that fair to say?

A Certainly.

Q I'm going to go over a few things that were discussed -- and, again, you've read the transcript of the penalty phase of Christa's capital trial?

A Yes.

Q I'm going to ask you to comment about a few of the things that came out during that penalty phase. When her aunt, Carrie Ross, was testifying, she was asked by Mr. Crabtree whether it -- that it was true that she was afraid to have Christa around her children, and she admitted that she was. Is there a way to explain or put into context that comment? Well, visa vie, Christa's experience and behavior.

A Yes. You know, Christa, if you look at her records from North Carolina, she was an out of control teenager, is the main thing that comes through from those records. And I think most prudent parents would not want an out of control teenager around their young children. Not because she's vicious and mean, but rather because, you know, she's a teenager who has no brakes. And I think one could explain that to the jury in terms of her Bipolar II Disorder and how that's affected her.

Q What about the statement, again, in Carrie Ross's cross examination, "Christa is a pathological liar."

A Well, people lie for many reasons. And you can have folks who are lying and don't know that they're lying because they've dissociated.

The other thing that happens is that folks who are bipolar and who are grandiose and -- will create and inflate their story so that you start off with a fish story, the fish is this long, and I'm referring to about eight inches, and it gets bigger, and it's bigger, and if you're really -- get pretty manic, I mean, it's a whole -- both arms held out wide. So that -- is that lying, yes. But it's a lie that occurs as part of a mental illness.

And, again, the folks who are traveling down

the highway of life at 120 miles an hour, they're not dotting their I's and crossing their T's and being terribly careful about what's going on.

Q Those were found on page 2506, by the way, of the transcript. Another comment again --

THE COURT: 2506?

MR. CROWSON: Yes, ma'am.

THE COURT: Okay.

Q -- by Mr. Crabtree on page 2506, "Christa was totally out of control?" And, again, that was agreed to by Carrie Ross. Is that what you -- how would you explain the fact that Christa is completely out of control?

A I would say, you know, most teenagers who have a Bipolar II Disorder are completely out of control unless they happen to be lucky enough to live in highly functional families, who have grown up with good socialization and brakes, and so forth, before they hit -- before their bipolar illness hits. You know, those people can do great things in life.

Q And is that how you would describe Christa's family?

A No. Her family was highly dysfunctional.

Q On to page 2507, Mr. Crabtree

questioning Carrie, "Isn't it true that Christa didn't go to school?"

A Yes.

Q What do you -- well, is there a reason that someone like Christa Pike or Christa Pike would not attend school regularly like someone who's not under the influence of mental illness?

A Yes. Most untreated Bipolar II adolescents don't do well in school. They can't sit still. It's boring. They know more than the teacher. A lot more than the average teenager thinks they know more than the teacher.

Q What about, again, page 2507, Mr. Crabtree says to Carrie Ross, "Her mother couldn't control her." And we've talked about control already, but is it surprising that her mother had a problem controlling her?

A That's a frequent complaint with parents with children who have Bipolar Disorder.

Q What about parents like Carissa Hanson?

A Well, she's going to -- because of earlier experiences that Christa had had with her mother, she's going to have less influence on her child than most. She hasn't done much to give her child good brakes or suspension through life. So there's not much that's going

to help Christa with this out of control limbic system engine that she's got running at hyper drive.

Q Again, page 2507, again, Mr. Crabtree suggesting to Carrie Ross that Christa steals. Carrie Ross agrees. Can you put that into context of knowing Christa's mental state?

A Yes. Folks with Bipolar Disorder are terribly impulsive. They'll get in all kinds of trouble for shoplifting, for stealing --

Q Is that self destructive behavior?

A Well, the issue is not self destruction in terms of a neurotic need to punish themselves, it's self destructive in that they don't have good brakes. And so you have the bipolar physician who, if he isn't well regulated, will get caught shoplifting at Target and end up in a very embarrassing situation.

Q Moving on, after Carrie Ross was called to the stand, the second witness for the defense in the penalty phase was Glenn Pike, Christa's father. Again, on cross examination, page 2517, Mr. Crabtree suggests to Glenn Pike, who agrees, that Christa lied to you. Again, we've covered that?

A Yes.

Q She was manipulative?

A Yes. One of the hallmarks of Bipolar

Disorder when they're manic is that -- or hypomanic, is that they are extremely manipulative. That -- Janowski had an article back in the '70s called the Manic Game, in which he dissected the kind of games that manic patients would play on inpatient -- in inpatient hospitals, psychiatric hospitals. Because if you reach critical mass, meaning more than about two bipolar manic patients in a -- on a psychiatric hospital ward, they would just create havoc among the staff. So they are master manipulators.

Q Moving to page 2520, the same cross examination, it's revealed to the jury that Mr. Pike -- rather there was an allegation of sexual abuse of Mr. Pike's daughter. Now, we've discussed that before, do you think that abuse occurred?

A You know, under those circumstances I would not be able to diagnose sexual abuse. And with that kind of evidence it's a little shaky.

Q Moving on, the third and final witness called by the defense during the penalty phase at Christa's trial was her mother, Carissa Hanson. Page -- again, cross examination, taken from the social history provided by Dr. McCoy, Mr. Crabtree asks Carissa about the time that Christa threatened Steve Kyaw with a butcher knife. Do you remember that incident?

A According to Christa Pike that came just after he had grabbed and twisted her breasts. And she grabbed him by the genitals and then grabbed the butcher knife.

Q Okay. And the fact that she threatened him with a butcher knife, can that be explained or better understood when one considers Christa's diagnoses?

A You'd have to look at both her diagnosis in that, you know, somebody is bipolar and manic or hypomanic, that you don't want to mess with them. They can be quite irritable and fly off the handle. Also, her background which, you know, she grew up literally from the time she was a toddler watching Grandpa Fotos with a butcher knife. And so that would certainly be in character with her family tradition.

Q On the next page, 2535 -- I'm reminded of something actually. Is it -- I know that you've reviewed a lot of things in preparation for this hearing, would it refresh your memory to suggest to you that Christa was actually struck in the face by Steve Kyaw before --

A Okay. That may have been what precipitated it. I don't recall.

Q But that doesn't really change your

answer?

A No.

Q Okay.

A She's somebody you don't want to mess with.

Q The next page, 2535, General Crabtree asks Carissa about the time that she found Christa butcher knife in her purse. Again, I'm going to assume the same set of circumstances that we talked about a moment ago. Do you find anything surprising about that, or is there an explanation for that?

A You know, I think it goes back to how Christa sees the world, that she sees the world as reasonably threatening. And that it would be prudent for her to go through life able to protect herself.

Q And the way she sees the world is more threatening than the rest of us. Is that a product of mental illness?

A Well, it's a combination of mental illness and the early trauma that she suffered.

Q Same page, Mr. Crabtree suggests to Carissa Hanson that Christa has been causing trouble since age 10. Given the diagnoses that we've talked about today, is that surprising?

A No. It's -- she had early onset of

her Bipolar Disorder, and it may have started at 10, it may have started at 12, I don't know, but it started sometime back then.

Q In her early home life --

A Yes.

Q -- things of that nature, not surprising. He asked her about a live-in boyfriend that Christa had at age 14. Is that a problem of Christa's or is that a problem of Carissa's?

A It sounds like it's more of a problem of mother's that she needs to have exercised better control with her daughter. But she didn't set a very good example herself.

Q Okay. Moving on to page 2540, Mr. Crabtree questions Carissa about the Beth Brown incident. We've discussed that.

A Yes.

Q And this is where she was perceived a threat and went over there and purportedly beat her up.

A Kicked the door in.

Q Kicked the door in. Does that -- is that explained by mental illness?

A Well, yes, that it's -- was extremely dangerous behavior, it demonstrated her -- Christa's sense of omnipetance that she's able to go over and confront a

woman who's supposedly ready to shoot her, and she does it barehanded and in grand style.

Q Page 2541, Mr. Crabtree suggests to Carissa Hanson that Christa "ran away numerous times". Is that surprising?

A That's something that you commonly see with kids who are bipolar. They'll end up living on the street as Christa did. They will travel across the country, get themselves into all kinds of trouble. A lot of kids who disappear probably have a Bipolar Disorder.

Q Finally, in this line of questioning, page 2542, Mr. Crabtree talks with Carissa about her statement to Dr. McCoy that Christa had had many second chances and blew them all.

A Yes.

Q Can you comment about that?

A Well, she's going to blow everything until she gets on a mood stabilizer. And I think we can see that once she's -- has mood stability and she's reasonably euthymic that she does much better.

Q Do you think it would be important for a health professional to testify to a jury to explain the things that Christa has done wrong in her life, or things that we just talked about --

A Sure.

Q -- in order for them to understand and put into context her behavior?

A Absolutely. Because otherwise she's simply a bad girl rather than that she's severely mentally ill.

Q Would it surprise you to know that nowhere in that penalty phase, opening, closing, or the evidence, is the term mental illness or any discussion of any mental illness uttered by anybody on the defense side?

A It's shocking to me it wasn't.

Q Do you think you could describe Christa Pike without discussing mental illness?

A No. I mean, you can, but it has --

Q I can -- let me rephrase the question.

A -- little bearing to --

Q Could you accurately describe Christa Pike --

A No.

Q -- without using the term mental illness --

A No.

Q -- or describing some mental illness? Well, let's look at the PowerPoint one more time. We're on the Edgar Allen Poe slide. We had talked earlier about

the structure of the trial team in Christa Pike's case; do you recall that?

A Yes.

Q And that's on your next slide here. And we talked about the problems that you saw with that.

A Yes.

Q Could you tell us what would have been a more productive structure, and what you believe that productive structure would have yielded?

A Yes. I think -- and it was my inability to get these boxes to work right, the psychiatrist should be down here with everybody else, not in any way elevated. Sorry. The -- I think what needed to happen was --

THE COURT: Dr. Kenner can't stay in the lines.

A It's been since early grade school. My knuckles got rapped for that, actually.

Anyway, the neuropsychologist, the psychiatrist, mitigation expert, they all needed to be talking to one another, sharing information, expanding each other's view of the case. And I think that would have -- and the psychiatrist should have done a full and complete psychiatric evaluation, looked at collateral -- done collateral interviews, reviewed all of the medical records, the past diagnoses, and formed a current

diagnosis, asked for consultations, asked for up to date scans, and all of this would have occurred reasonably if the structure had been different in the way that people communicated in this case.

Q Why is that?

A Well, because the psychiatrist would have actually seen the patient, would have reviewed the records, would have talked to these folks. You could have avoided Dr. Engum going out on a limb and saying there's no brain abnormalities, because one of the things that the forensic psychiatrist would have told him is, wait a minute now, with frontotemperal dementia you can't diagnose that with neuropsychological testing. It does a very poor job. It often misses the cases. And what you need for that is an MRI. And so that would have gotten him back -- throttled him back a little bit so he would have -- would not have gone out on that limb. And then --

Q What would be --

A -- I think with the mitigation a forensic psychiatrist would have asked for more specific material having to do with history and so forth, and had a real interplay there.

Q And had we had this cross talk, this discussion, what would have been the result? What should have been the result?

A Well, I think I just finished.
Q We can bring it up.
THE COURT: You can just tell us. We're going to have a copy of it anyway.
A All right. I think that had things gone their normal way that there would have been -- all of this would have come out, the heterotopia would have come up, the Bipolar Disorder would have been diagnosed, that there would be an entirely different picture that emerged of her. The early trauma, the impact of early trauma on individuals, all of that could have come out.
Q So --
MR. CROWSON: That's all I have, your Honor.
THE COURT: General Price, barring all previously mentioned deadlines, you have all the time you want.

CROSS EXAMINATION

BY MR. PRICE:

Q Dr. Kenner, can you go back to that slide that had your diagnoses on it?
A Yes. I am looking for that as we speak here.
THE COURT: Is that the last one? It had the axes on it?
A Yes.

THE COURT: Okay. Keep going. That was in 2001.

A Right.

THE COURT: Do you want the lights cut a little bit more, General, so we can see that more clearly?

MR. PRICE: I can see it.

THE COURT: Okay. That's fine.

Q So this would have been your first diagnosis? The first one you had?

A Yes.

THE COURT: This was his diagnosis in 2001.

Q I think it's modified some.

A 2001. December 2001.

Q But there are -- well, let's just talk about this one right now. I mean, it has changed --

A Yes.

Q -- since then? So on this one here, there's no mention of the -- now, I've forgot the name of it, but the Modified Post Traumatic Stress Disorder?

A No.

Q And why was that not included on that diagnosis?

A Well, if you're using the current DSM-IV -- and in '96, it would have been probably IV, I don't remember exactly what month IV-TR came out -- Post

Traumatic Stress Disorder would not be something you could diagnose her with using the standard criteria at that time. So that you wouldn't put complex PTSD or DESNOS into a diagnostic scheme like this, but it's certainly something that one could explain at trial.

Q Well, that's -- the next question is then, during the trial in 1996, this complex PTSD, would that have been an available diagnosis to the defense team?

A Well, it would be -- it would not be a diagnosis that was in DSM IV or IV TR, but it would be available to the defense team since the concepts were in the literature. It is a diagnosis that was recognized by the World Health Organization. And so it's out there. It's robust enough to survive reasonable cross examination.

Perry Mason might have been able to shoot holes in it, but --

Q Well, I'm no Perry Mason.

A Or Paul Marrow. But --

THE COURT: Thank you, Dr. Kenner.

A -- you know, it's something that I would be reasonably comfortable getting up here and -- at that time and saying, look, folks, you know, when kids go through this kind of stuff, it has a powerful effect upon their development. It has consequences. There's a

layering effect. Repeating all of what Judy Herman had to say, it distorts personality development. That their arguments in the literature about Borderline Personality Disorder, whether that is, in fact, a -- reflects sort of a Complex PTSD diagnosis or not.

Q Do you now -- I mean, do you now disagree that this Borderline Personality Disorder would be appropriate to include in her diagnosis?

A I don't think she has it. I think that -- if you remember the slide on the Soft Bipolar Spectrum Disorder, I think that most of the features of borderline personality that were problematic for her has been significantly emilierated with the mood stabilizing drugs.

Q Because of that you don't think she ever had Borderline Personality Disorder? It's really better explained by a diagnosis of Bipolar Disorder?

A Well, it's kind -- let me explain it like this. It's like somebody comes into your office and they present with coughing and fever, and you're not sure whether they have a cold, pneumonia, or the flu, and if you give them penicillin or some other antibiotic, they'll be over pneumonia in a day or two. If it's a cold, it's going to take two weeks. You know, a week or two before they're over it. And the flu a similar time course. So

what we have done here is actually like and experiment, in which we have given her a drug that has produced very significant changes that have -- that has changed her clinical presentation. Because she was in such an austere setting, it didn't take place as quickly as it would have had she been in a therapeutic center setting or in a more normal family environment, but it has nevertheless occurred.

So this isn't the same Christa Pike that we saw -- or that I assume you saw back in 2002. Or '96

Q So --

THE COURT: Does the same apply to Antisocial Personality Disorder?

A Yes.

THE COURT: You don't think she has it?

A No.

THE COURT: Okay.

A Because most of the symptoms for -- that would qualify her for Antisocial Personality Disorder are better explained by the Bipolar Disorder. And in looking at the issue of the differential -- and this is from the Synopsis of Psychiatry by Kaplan and Saddock, Eighth Edition, which is back in that era. The diagnosis of Antisocial Personality Disorder is not warranted when mental retardation, schizophrenia, or mania can explain

the symptoms.

Q So if you watched this experiment unfold you would come to the conclusion then that that Borderline Personality Disorder and the Antisocial Personality Disorder is not correct?

A Yes.

Q Do you think the social history as Dr. McCoy collected it, cries out for a diagnosis of Borderline Personality Disorder?

A Well, it is -- there is a kind of attachment trauma that can often lead to it. It doesn't always lead to it, and you never make a diagnosis based on a social history. You make a diagnosis based on current signs and symptoms.

Q So you think it would be inappropriate for a psychologist, let's say, to take the stand and say, I can concur -- I concur in the conclusion of Borderline Personality Disorder based on Ms. Pike's social history?

A Well, if you're basing it just on the social history, yes. I think it would be --

Q What about a social history that Dr. Engum -- I'm sorry to interrupt you?

A I think given the information they had back then, I think it was a reasonable diagnosis back

then.

Q This collective aggression theory to explain the murder of Colleen Slemmer, you -- it didn't sound like -- it sounded like you were skeptical of that as a factor?

A Well, no. I think it was definitely a factor. What I'm skeptical of, is what a jury in Knox County, Tennessee is -- would buy as something to mitigate in a death penalty case.

Q Well, putting aside what a jury would be skeptical of, I mean, is it your opinion that that played a part, collective aggression?

A Yeah, I think it did play a part.

Q What about -- do you think that getting on and looking at the murder of Colleen Slemmer, do think that Ms. Pike was going through a hypomanic episode during the murder of Colleen Slemmer?

A I think she was hypomanic. I think she was going through -- as I explained earlier, part -- she was at the end of one of her two to four day cycles of sleep deprivation in which she was sleep deprived and highly irritable.

Q Was that, I mean, is that part of a hypomanic cycle then?

A Well, hypomania in Bipolar II

Disorder, they don't cycle and have periods of mania and periods of depression like the classic Bipolar I, in which they will go for weeks or months of being one or the other. She has these periods of sleep deprivation that go -- reach a peek at about three days and then she can finally get sleep for eight or ten hours, and then she feels much more human, and then it starts over again. So -- I'm sorry if I'm confusing you.

Q It's confusing me. It's just me though.

A It's really a confusing picture, it's not just you.

Q What I'm trying to get at, is this hypomanic episode going on then during the murder of Colleen Slemmer?

A She's got the hypomania. And then on top of that she's got -- that goes with that is the sleep deprivation. And so she's getting at the peak of her sleep deprivation at about the same time the murder occurs. And that, in my opinion, would inflate her role. Because I saw her at -- in that same condition on December 21st, '01, and at that point she was a very prickly explosive character.

Q Is that typical of a hypomanic episode that has this violent side to it?

A People get into -- can present in any number of ways. There are some folks who are, you know, nice, you know, housewives who go to church three times a week, and they'll get hypomanic and they'll go off and start picking up men off the street for sex. Other folks will get in fights. They'll go in and, you know -- a physician in one case went into -- would go into bars and get into fights with anybody who was there. And he had been a former football player, so he could hold up his end of the fight. But he'd clean out the bar. And --

Q So then you would say that is at least common --

A It is common.

Q -- violent part -- component to it?

A Yes, when irritability is a major factor.

Q Even to the point of homicide, would you say; is that common?

A Well, homicide certainly does occur with people who have Bipolar Disorder. And you've got to be very careful with folks who are bipolar, particularly if they come from an environment in which violence was something they grew up with. I mean, had she grown up in a highly intellectual, well educated family, you know, in New York, upper West side or something, and had gone to

only the best schools, had a good academic background, her parents were solidly behind her, she wouldn't have -- she wouldn't have been violent. But she grew up, you know, in the hills of West Virginia, you know, in the butcher shop, in the slaughter house, violence was a part of her family history, by God, and they were proud of it. I mean, she could have come from Hawkins County for the way she --

THE COURT: Like you did.

A Like I did, yes.

Q So would you say she's a violent person?

A I think she was back then. I mean, she -- there are a lot of folks in Hawkins County you don't want to mess with too.

Q Now, you mentioned that also the -- I guess this really is apart from the hypomania, I think you had referenced that you noted she had 40 to 60 sexual partners, at least when you were seeing her. Do you recall what you based that on?

A What she told me.

Q That was in your own personal interview with her?

A Yes. And that would be consistent with both the hypomania and the sexualization.

Q I think also you indicated given Ms.

Pike's background and condition that she would perceive threats where other people would not see threats?

A Yes.

Q Is that fair to say?

A Yes.

Q Do you think she perceived Colleen Slemmer as a threat?

A Oh, yes. And she and Colleen Slemmer had something going in which they were threatening each other.

Q Did you review -- I mean, you -- you've reviewed her statement --

A Yes.

Q -- that she gave? And the way she described how that assault and murder unfolded. Do you think that at the end when Ms. Slemmer's head is bashed in with a chunk of asphalt that she saw Colleen Slemmer as a threat?

A Probably not by that time. But, you know, people get a head of steam up in a high stress situation, and it's hard to stop. I mean, it's like prize fighters. You know, the other fighter can be -- have both of his hands down to his side and be kind of wobbling around, and his opponent is still right there trying to hit him while the referee separates them.

Q But this is far from a prize fight, isn't it? I mean, isn't this situation -- at that point Colleen Slemmer is down on the ground bleeding, having been cut and beat up, and she's begging for her life, saying all she wants to do is walk home to Florida, I mean, that's not a prize fight.

A Oh, no. But it's the same -- it's the same kind of high stress situation in which people have started on something, and if you have somebody there who's got poor brakes, it makes it very difficult for her to stop.

Q And I think in her statement she talks about -- at that point, I don't think it's actually that point of the assault, but anyway, she hears a voice telling her, reasoning with her about what to do; do you recall that?

A Yes.

Q Does that -- would you categorize that as a -- some type of auditory hallucination or --

A It was probably more a hallucinosis.

Q I don't know what that is, can you explain?

A Sure. A hallucination is that the voice is coming from outside of you. It's speaking with some sort of authority usually. It may have some command

and control quality. You know, someone who's been -- had her kind of traumatic experiences will begin to fragment aspects of her personality. So that she will -- could experience a voice telling her something as if it were another person, but it is, in fact, part of herself. I don't know if that makes it any clearer.

Q Kind of reasoning with herself?

A Well, it -- that would be a popular way of thinking about it. But it's more like her personality begins to split apart. And so instead of being a cohesive self, it's like there are these other selves that can talk to her and tell her things.

Q Did you say that this idea about her being a manipulator and a pathological liar, I mean, that's -- is that part of her mental disorders?

A Yes. There are no better manipulators in the world than folks who are manic or hypomanic.

Q And the last area here. Actually, a couple -- two things. I think you had mentioned also that you said Colleen Slemmer had a dalliance with Tadaryl Shipp?

A Yes.

Q Did you mean that she had had a sexual relationship with him; is that what you meant?

A That's what he said, yeah.
Q You're basing that on what Tadaryl Shipp said?
A Yes.
Q Did Ms. Shipp ever -- or Ms. Pike ever indicate that to you?
A She wasn't certain. There had been some rumors but she was going to trust him. She didn't trust Ms. Slemmer though.
Q And Tadaryl Shipp said that in his statement to the police?
A No. He said that in an Affidavit.
Q An Affidavit, do you know where that Affidavit is? Or -- it was supplied to you by the defense team?
A Yes.
Q And then I think you were asked, at least on a couple of occasions, that you weren't prepared to conclude that Ms. Pike had ever sexually abused her nephew or her half sister, Lindsey; is that fair?
A Yes. Because I think there's -- the ages was like two and four, or two and three, or in that age range.
And I don't know if you remember the cases back in the late '80s, early '90s, of the child -- of the

daycare where you had 20 kids all of that age saying that they were sexually abused. And, I mean, in some cases half a dozen people would be arrested and so forth. And there was nothing ever found. And it makes it -- with that age child, you have to be extremely careful what you ask them because if you say, did she ever touch your bottom? Well, yes, but, you know, was she patting you on the bottom, or was she picking you up and had her arm under her bottom? Or how did it occur?

And anxious parents, particularly somebody if she's got a bit of a grudge against Christa, wants her out of her house, is not going to ask that in necessarily an unleading -- or non leading fashion.

Q And were you furnished by the defense team Ms. Pike's -- a statement by Glenn Pike where he indicated that Lindsey had said that Christa licked her at the same time as touching her private parts? Or actually, I'm sorry, to be fair, Glenn said that his wife came to him and said that Lindsey told her that Christa had licked her and at the same time was touching her private parts?

A Yes.

Q And that doesn't change your opinion, I guess, because kids can sometimes lie about that?

A Well, it's not that they lie about it, it's that, you know, an anxious parent is going to

ask, okay, what else did she do? What else did she do? What else? What else? What else?

And, you know, I have had the chance to listen to tape recordings of when parents have tape recorded interviews like that, and what you often see is that the closer the child gets to the genitals, the higher the parent's voice is going to get. And then what did she do? Or that they'll ask, well, did she touch you down there? Yes. Did she put her finger in your bottom hole? Yes. So everything is -- comes from suggestions made in the questioning. And that's the danger of interviewing a child of that age.

Q Did -- were you prepared to conclude that Ms. Pike was sexually -- that she herself was sexually abused, apart from -- I know there's record of rapes by strangers or people out in the community. I'm talking about sexual abuse in the home. Do you have an opinion as to -- or are you prepared to conclude that she was, in fact, the victim of sexual abuse within the home?

A I don't know about that. I think it's possible, but --

Q But you're not -- again, you're not -- you're kind of in the same position, you're not prepared to conclude that?

A Yes.

DEFENDANT PIKE: Does doing this (indicating) --

MR. CROWSON: Okay. Okay.

DEFENDANT PIKE: -- on somebody's stomach constitute child molesting?

MR. CROWSON: Christa.

THE COURT: No. But he's saying you didn't do it, he doesn't think.

DEFENDANT PIKE: Is this (indicating) molesting a child? (indicating)

MR. CROWSON: Christa.

THE COURT: Okay.

DEFENDANT PIKE: -- on somebody's stomach constitute child --

MR. CROWSON: Could we take --

DEFENDANT PIKE: -- molesting?

MR. CROWSON: Could we take a brief break, your Honor?

DEFENDANT PIKE: Does it? Does --

THE COURT: Ms. Pike --

DEFENDANT PIKE: -- anybody think that ever? Because I'm sick of this being brought up every time --

THE COURT: Ms. Pike --

DEFENDANT PIKE: -- trying to make me look like a fucking child molester.

THE COURT: Ms. Pike, nobody's accused you of it.

DEFENDANT PIKE: Yes, they are. Every time we're in this, and I'm sick of this.

THE COURT: Why don't you --

DEFENDANT PIKE: I've done a lot of bad things --

THE COURT: -- why don't you -- let's take a real break.

DEFENDANT PIKE: -- in my life.

MR. CROWSON: Thank you.

THE COURT: Let's take a little break. Let's take a little break.

DEFENDANT PIKE: I've done enough bad things in my life that everybody's trying to make me look worse than I am.

THE COURT: Okay. Just take a break because --

DEFENDANT PIKE: I'm sick of this of --

THE COURT: -- that's not that important.

DEFENDANT PIKE: -- my whole life --

MR. PRICE: Your Honor --

DEFENDANT PIKE: -- and I'm so tired of this shit.

MR. PRICE: -- I'm finished.

DEFENDANT PIKE: I'm over it.

THE COURT: Wait.

DEFENDANT PIKE: Damn it. I'm so sick of this shit. I can't --

(Whereupon, the defendant was escorted from the courtroom.)

THE COURT: Just give her a minute. Just relax. Let's do a few other things here. Do you mind, Doctor, if we kind of go --

THE WITNESS: No.

THE COURT: -- to a couple of other issues that I don't need Ms. Pike for?

We would like to have a hard copy of the PowerPoint, if you all could print it off for us as well as making the disk, because it will be easier for us to work with.

MR. DAWSON: Your Honor, could we put that as part of the record, make it like with the PowerPoint as part A and part B of that exhibit?

THE COURT: Sure. Yeah. And we'd like a copy of that.

MR. DAWSON: That's fine.

THE COURT: General, have you given any thought further, and I know we've been very busy campers this week, but to the issue of the skull?

MR. PRICE: Well, I have given some thought to

that and had some discussion in our office, and --

THE COURT: Do you need some time?

MR. PRICE: -- the only thing I can tell you is, that our position remains unchanged.

THE COURT: Your position remains unchanged. Okay.

MR. PRICE: As long as they're seeking a new trial, we feel like that is a key piece of evidence.

THE COURT: Okay.

MR. DAWSON: Your Honor, I would suggest to the Court, that I think the Court asked them if they would explore other possibilities on how to preserve it and how to present it, and I don't even know if they've made that exploration.

MR. PRICE: I have --

THE COURT: Well, what I would like to do is perhaps give us a little time and maybe get back together either on the phone or whatever, but give us a little bit of time to see what could be done about the possibility of doing some imaging and whether or not that would be a satisfactory solution. If it would not --

MR. PRICE: Can I just say I have explored that, I have not had any success. Maybe your Honor would have more success.

THE COURT: Well, I can order what I want, but

maybe I should explore that. Maybe that should be my burden. I don't know.

MR. PRICE: They might listen more to a judge.

THE COURT: Well, that's true. There's several options. One might be a way to better preserve it. One might be a way to image it and return it. But whatever we do, obviously, it's going to be in -- you know, if we do anything, it is deteriorating significantly in my view. And it's been twelve years and it could be a lot longer, so, I don't know. Okay. Let me carry that burden around a little bit.

And you carry around the following. How about we try to get our transcripts done in about 60 days. I believe that Debbie and Lisa can probably get that accomplished from their prospective.

MR. DAWSON: Your Honor, I would say that Debbie requested that we try to get as much time as we could for her.

THE COURT: I know. And you know, she requested six to eight weeks. And that's what six to eight weeks is, 60 days. And it's just these hearings of this week, so maybe then -- that would be June 10th, and then maybe go to -- I don't know, get some Briefs in by July 15th, if that's possible, and you would have until August 19th, which would give you 35 days. And that would

give us a little bit of time to begin our work on it before the Eric McLean case. Another fun case.

MR. DAWSON: As it stands now, I have another hearing on July 23rd. And we would -- which would mean that I probably couldn't start spending any time on it until after July 30th -- June 30th. And --

THE COURT: And I'm afraid I have a few more questions that I would like to ask of Dr. Kenner before we stop.

Well, can we just make those our targets?

MR. CROWSON: We can.

THE COURT: Mr. Marrow will tell you that a good lawyer can always get a continuance from me if he knows how.

MR. DAWSON: I can always ask Mr. Marrow how to do that, Judge.

MR. PRICE: What was my date?

THE COURT: And I was going to -- yours is going to be however many days beyond what he's just used. And I'm hopeful for 35 days.

MR. PRICE: Thirty-five days.

THE COURT: After him.

MR. CROWSON: And ours was due on what date, your Honor?

THE COURT: July 15th.

MR. CROWSON: July 15th.

THE COURT: Let me talk to my attorney here. Don't go too far, Dr. Kenner.

Will you all have some redirect?

MR. CROWSON: We will have, briefly.

THE COURT: Maybe I won't have any questions.

Okay. I think that rather -- I think that the only other issues we're going to have then is redirect whenever they're ready, if there is any redirect of Dr. Kenner.

My question to you is, do any of you have any objection to my personally, on the issue of the skull, contacting either Mr. Marks, the medical examiner, Dr. Mileusnic, or the head of pathology at U.T. to determine what could be done, if anything?

MR. CROWSON: Of course not.

MR. DAWSON: No, your Honor.

THE COURT: Okay. Well, let me ask him, because I'll do it personally.

(Whereupon, a short break was taken.)

THE COURT: Is it okay if Ms. Pike comes out?

COURT OFFICER: It's up to you, Judge.

THE COURT: Let her come out and sit down.

(Whereupon, the defendant was brought back into the courtroom.)

THE COURT: Are you ready, Ms. Pike, to sit down and relax a little bit? I've got to wait for Mr. Price and then we'll wrap this up.

General Price, in your absence there's only one question I've asked, and I'm going to ask you, and Ms. Pike was not out here when I did that, so I just as soon she heard this. With respect to the issue of the skull, do you have, or your office, have any objection to my personally contacting the medical examiner or the forensic anthropologist, Dr. Marks, or anyone else to determine what we could do, what the options would be?

MR. PRICE: I would actually request it myself.

THE COURT: I thought you might. So if -- with all person's permission I am going to address that issue. I'm going to kind of do my own research. I'm going to be like a French judge and do my own research.

Ms. Pike, all the issues in this case, the questions of fact are up to the finder of fact, and I'm afraid that's the fat lady and she's got to sing about them. And I will. You'll get a -- you're going to get a ruling that talks about what I think is right and wrong about all this.

Now, it might not tell the story of your life, but you understand that I'm going to go into all this. And I do have an opinion as to those facts that you were

so concerned about. And I appreciate your concern about them and understand it. Okay? So we're going to get into that -- and it's going to be in writing what I think about that. And if anybody knows how it all fell out, I probably do. So, I appreciate your just bearing with me on that.

And it's going to take some months before we get a ruling in this case. So I want you to understand that too. It's going to take quite a while because we've got to get the transcripts typed, they have to have time to send up Briefs. We have to have time to write an Opinion, and it will be quite lengthy. And so just bear with me. Okay? Fair enough?

DEFENDANT PIKE: Yeah.

THE COURT: Okay. All right. Are you now done with your questions?

MR. PRICE: Yes.

THE COURT: Redirect.

MR. CROWSON: Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. CROWSON:

Q Dr. Kenner, during cross examination there was discussion about whether Borderline Personality Disorder was a reasonable diagnosis back in, well, 2001 and 1996. Can you explain further why that was a

reasonable diagnosis at that time?

A Well, you know, the -- what you have had as I explained, is that an experiment, if you will, that has occurred in which Ms. Pike has gotten much better on the mood stabilizers.

I mean, she still has, as we seen today, some triggers that can -- that are very painful for her, and that can bring out a great deal of feelings. But, in general, she has handled herself, particularly in the prison system, much better. I think it's laid to rest the issue of Antisocial Personality Disorder, because on mood stabilizers she's a model prisoner. She's helpful to other people. The guards deal with her in a vastly different way now than they did back before she was on mood stabilizers. So that -- I think that what we've seen is a major change in her as a result of medication.

Q And that medication and that change helped lead you to the diagnosis of Bipolar II Disorder?

A Yes.

Q When weighing the two, Bipolar Disorder versus Borderline Personality Disorder, which is more significant? Which one would be a more significant diagnosis particularly as it relates to this crime?

A Well, I think Bipolar Type II Disorder has a great deal more explanatory power. And I

think it -- but you have to combine that with the issues of the early trauma and the layering effects that that had and so forth. So it's --

Q And back then the team thought that these traumas and some of the behaviors were a result of Borderline Personality Disorder. And now the diagnosis is complex PTSD; is that fair to say?

A Yes. But even back then, you know, Borderline Personality Disorder is not like somebody has a broken leg that's sort of healed wrong. There -- it was certainly recognized that there are many people who carried that diagnosis who had early trauma histories that were quite extensive.

Q And the label that you have fixed to these early traumas, and the result of these early traumas, and these behaviors, is that as important as the fact that Christa was mentally ill?

A No. And it's not as important as the fact that she experienced some truly horrific things in her young life.

Q During cross examination you rendered an opinion that it was likely that collective aggression had something to do with this crime. Did you form that opinion by reading a text book?

A No --

Q Or did you form that opinion by talking with Christa Pike and comparing what you knew about collective aggression?

A Oh, it was much more important to talk with her and to get her opinion on that. And to read what Tadaryl Shipp had to say.

Q How could a neuropsychologist miss a diagnosis of Bipolar Disorder?

A Well, you know, a little bit of it, I think, is a division of labor within the mental health professions. And psychologists are more likely to see folks on an outpatient basis, and the really -- the folks you solidly diagnose with a Bipolar Disorder are those who are generally inpatients. So -- and the testing is not as good for making the diagnosis in the case of a Bipolar II as in other diagnoses.

Q And I think you said on direct, the involvement of a psychiatrist would have likely remedied that problem?

A Yes. That we all bring different talents, abilities, backgrounds to the table, and I think that's why you want to have all three groups represented in a capital case defense team.

MR. CROWSON: One moment, your Honor.

THE COURT: Sure.

MR. CROWSON: That's all I have. Thank you, Dr. Kenner.

THE COURT: Anything else, General? Anybody want to add anything else? We've already set our timeframes.

MR. DAWSON: Your Honor, we have something. The exhibit that we discussed a moment ago, the one from the police records, the Polaroid with the hole in it.

THE COURT: The Polaroid with the hole. Yeah.

MR. DAWSON: After discussing that with Mr. Price, I think what we'd like to do is put that in for I.D. only -- it was -- as a piece of evidence. It was seized by the police during the search of Ms. Pike's room. And we were unable to have a witness to -- to put -- to make it relevant. So we would just make it I.D. only.

THE COURT: Okay. What number would that make it? Forty-five?

COURT REPORTER: Forty-four.

THE COURT: Okay.

(Exhibit No. 44 - Marked for Identification)

MR. DAWSON: I have two other things that I just -- I hate to bring up at this time.

THE COURT: That's quite all right. You take your time.

MR. DAWSON: I need to protect the record.

THE COURT: By all means.

MR. DAWSON: And, your Honor, it has to do with Mr. Moncier's testimony yesterday. And there were two things that I should have done that I didn't do.

THE COURT: Uh-huh. (Affirmative)

MR. DAWSON: Because it was getting to be 7:00.

THE COURT: At least.

MR. DAWSON: And I'm getting older than I used to be. But we -- just, your Honor, just as the issue -- one of the issues --

THE COURT: May Dr. Kenner step down?

MR. DAWSON: Yes, your Honor.

THE COURT: I mean, he doesn't have to sit on the hot seat anymore.

MR. DAWSON: He may, your Honor.

THE COURT: Thank you so much, Doctor, I appreciate your time.

THE WITNESS: Thank you.

MR. DAWSON: Your Honor, one of the issues was that the Court had sustained a hearsay objection by the State on when Mr. Moncier attempted to tell what Dr. McCoy had told him a couple of days after the trial ended. And, your Honor, I would like to suggest to the Court that that was admissible.

THE COURT: Would you like to make a proffer of

it?

MR. DAWSON: Yes, your Honor.

THE COURT: Go ahead.

MR. DAWSON: And, your Honor, I think that what he would have said, obviously, is that Dr. McCoy called him and told him --

MR. PRICE: Well, I object to that. He had an opportunity to make a proffer then. He can't make the proffer, he's got to have the witness to make the proffer.

MR. DAWSON: Well, your Honor, I think we can do it by Affidavit. I think the Court said --

THE COURT: Why don't you do it by Affidavit then.

MR. DAWSON: Thank you.

THE COURT: Why don't you offer it by Affidavit as late-filed.

MR. DAWSON: We can do that, your Honor. And then, you know, the other thing, your Honor, was that when Mr. Moncier was testifying about what the Court ended up suggesting he could not testify about, saying that it was standard, I would suggest that it was actually an alternative approach of how the evidence could have put on that could have been done by another attorney, and that the Court would give -- that would give the Court something else to consider when reviewing whether this

approach was a competent one, or was within the standard for criminal defense by having an alternative approach that could have been applied.

THE COURT: Why don't you proffer all that, please, sir?

MR. DAWSON: I will.

THE COURT: And then by Affidavit. That's fine.

MR. DAWSON: Thank you, your Honor.

THE COURT: Is there anything else, folks? General?

MR. PRICE: No, your Honor.

THE COURT: Ms. Pike, the transport order is already certified --

DEFENDANT PIKE: Thank you.

THE COURT: -- and it will be on its way. And I don't know when I'll see you again. So have a safe trip. And the Order will be forthcoming as soon as we can possibly put everything together. I do want you to understand I need the time to go back through all this.

DEFENDANT PIKE: Take all the time you need.

THE COURT: I probably will. Are you okay now? You ready to go?

DEFENDANT PIKE: Yeah.

THE COURT: Court's adjourned until 9:00 Monday

morning. Thank you all.

MR. CROWSON: Your Honor, I apologize --

THE COURT: For what?

MR. CROWSON: I made an error. And we'll need to go back on the record.

THE COURT: Is this an April fool or not?

MR. CROWSON: No ma'am.

THE COURT: Back on the record.

MR. CROWSON: Your Honor, I did not, when I was examining Dr. Kenner, make the horror movie clips an exhibit.

THE COURT: Oh. Let's make them an exhibit. Absolutely. Okay.

MR. CROWSON: That will be a late-filed exhibit.

THE COURT: That will be a separate disk from -- I don't want a written outline of that one.

MR. CROWSON: Okay.

(Exhibit No. 45 - late-filed into evidence)

THE COURT: Court's adjourned again.

****************************************************

(END OF REQUESTED TRANSCRIPT OF EVIDENCE)

# C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF KNOX:

I, Lisa A. Kilbourne, Official Court Reporter for the Sixth Judicial District of the State of Tennessee and Notary Public at Large, do hereby certify that I transcribed the above proceedings and that the foregoing pages constitute a true and accurate record, to the best of my knowledge and ability, of the proceedings had and evidence introduced in the captioned cause in the Criminal Court for Knox County, Tennessee, Division III, on the 11th day of April, 2008.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Witness my hand and seal this 10th day of April, 2008.

Lisa A. Kilbourne
Official Court Reporter
State of Tennessee

CERTIFICATE OF THE COURT

THIS WAS ALL THE EVIDENCE INTRODUCED AND PROCEEDINGS RELEVANT TO THE HEARING OF THIS CAUSE WHICH IS SIGNED, APPROVED, AND ORDERED TO BE MADE A PART OF THE RECORD BY THE COURT.

June 23, 2008.

Mary Beth Lesbourd

JUDGE