UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 5**

**DOCUMENT 26**

---

ORIGINAL

006931

E2009-00016-CCA-R3-PD

Supplement

XXXI

IN THE CRIMINAL COURT FOR KNOX COUNTY

DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

FILED JUL 17 2009 Clerk of the Courts Rec'd by RGDoyal

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

FILED JUL 15 2009 By Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

February 27th, 2006 Motions Hearing

Volume I of II Volumes

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price and Ms. S. Jo Helm
Assistant District Attorneys
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson & Ms. Catherine Brockenborough
Post-Conviction Defenders
Officer of the Post-Conviction Defenders
530 Church Street, Suite 600
Nashville, Tennessee 37243

TABLE OF CONTENTS


| Volume I | Page |
|---|---|
| February 27th, 2006 Motions Hearing: | 1 |
| Anatomy Exhibits Discussed | 3 |
| Motion to Quash Subpoenas for Judge Jenkins and Judge Baumgartner by Mr. Price | 13 |
| Argument about Mr. Talman's Over Billing Situation | 15 |
| Motion to Disqualify the Court Addressed | 27 |
| Ruling of the Court | 28 |
| Motion to Quash Moot and Subpoenas Withdrawn | 29 |
| Petitioner's Subpoenas Discussed | 32 |
| Motion to Not House Petitioner at the Knox County Penal Farm Addressed | 34 |
| Motion for Continuance Due to Election Year | 35 |
| Ruling of the Court | 37 |
| Motion for the Court to Recuse Herself from Serving as Judge and Fact Finder | 38 |
| The Previous Transcript Discussed | 39 |
| Motion for the Court to Recuse Herself (Continued) | 39 |
| Argument by Mr. Price | 72 |
| Argument by Mr. Dawson (continued) | 76 |
| Ruling of the Court | 94 |

TABLE OF CONTENTS


| Volume II | Page |
|---|---|
| Rulings of the Court (continued) | 101 |
| Motion for a Rule 9 Interlocutory Appeal | 108 |
| Motion to Have Another Court Hear the Motion to Recuse the Court | 132 |
| Argument about a Rule 9 Appeal by Mr. Price | 137 |
| Rule 9 Appeal Discussed Further by the Parties | 139 |
| Ruling of the Court on the Rule 9 Appeal | 144 |
| Scheduling Discussed and Dates Set | 147 |
| Service of Expert Witness Reports Addressed | 168 |
| Motion to Disqualify the District Attorney's Office Withdrawn | 175 |
| Stipulations to be Submitted to the Court | 176 |
| Court Reporter's Certificate | 183 |
| Certificate of the Court | 184 |

IN THE CRIMINAL COURT FOR KNOX COUNTY, DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

This case came on to be heard and was heard on the 27th day of February, 2006, before the Honorable Mary Beth Leibowitz, Judge, holding the Criminal Court for Knox County, Division III, at Knoxville, Tennessee, when the following proceedings were had, to-wit:

THE COURT: I believe all that I have left right now if Miss Pike's matter. Let me take a quick recess to get that stuff filed and get it back; is that all right? And then we'll address--we'll get Ms. Pike out here and we'll start addressing some of these issues.

(Whereupon, a recess was taken;
afterwards, the following pro-
ceedings were had, to-wit:)

THE COURT: Ms. Martinez, would you be able to hear better if you were further up?

MS. MARTINEZ: No.

THE COURT: Okay. If you can't, feel free to move.

All right. Mr. Cameron, let's bring out Miss Pike, please.

(Whereupon, the petitioner came into open court.)

THE COURT: Good morning, Miss Pike.

PETITIONER: Good morning. How are you?

THE COURT: Very well. Thank you. And you?

PETITIONER: I'm good.

THE COURT: We have a number of preliminary issues, I believe, to take up. We have--is this the-- Nancy, are these the ones that you just filed?

THE CLERK: What?

THE COURT: Are these the ones you just filed?

THE CLERK: The originals.

THE COURT: Okay. There's an issue I would like to take up before I take up the ones that I know you all are aware of. And we've had a number of pleadings filed today that I guess we need to kind of put in order. And part of what I intend to do today is a little bit of the housekeeping obligations that we have and to keep everything in order.

And, hopefully, at the end of the day, if we're still working on our post-conviction, I would like

to lay out the issues of post-conviction for the purposes of going forward with hearing, obviously, on those issues, not today but at a future time, as we've discussed previously.

The first issue I would like to take up relates to the exhibit which is the skull of Miss Slimmer. And previously we had discussed this. Ms. Martinez had moved to have it released to her, and all of us, even I think Miss Pike, agreed that she would like to have that done. I think the State had some objection based upon it's nature as an exhibit, which is proper, and because the law says that I'm not to release that exhibit until such time as the case is over. And, obviously, we have a very long way to go before this case is over.

I'm going to ask the State at this time with the modern, I guess, imagery that can be done, if they can come up with a way that we can preserve that evidence by the use of three-dimensional video or something, some other way of dealing with this in order that that go back to Ms. Martinez. And I do not have any--I don't have a solution right now. I'm asking you all to see if you can find a solution or if you're willing to find a solution, General Price. I think--and I'm not trying to pin that on you. That's kind of a

rotten thing to do. But if there is a way to deal with that in such a way that would be proper, I would like to be able to do that. And that's right off the bat. That's something that I think we've addressed in the past.

We are now at ten years, Miss Pike, next months from trial and twelve years from the date of all this and from Miss Slimmer's death. So I think it would be a good thing to at least look at that issue.

My other concern is that particular item is very fragile, and I--obviously, we have--it's hard for us to preserve it anyway. So I would like you all to look at that and perhaps in the next little bit talk to us about it here, not necessarily today, but if you can address it fine.

MR. PRICE: We'll be glad to look into that, your Honor.

THE COURT: There may be some ways that the Sheriff's Department or the Police Department can find to preserve. And I know you all probably want to talk to General Crabtree and General Nichols about that before you take any action. But perhaps there's a way to deal with that issue. I'd like to try, okay?

MR. DAWSON: Your Honor, if I may, while we're on that issue, if I remember what's been done in this

case, but I think that there was--about six months ago at Miss Pike's request we sent a letter, I believe, to the Court--I know to the Attorney General--although, Mr. Price didn't get it; he was away. And I'm not sure exactly who it was addressed to, but I've talked to Mr. Crabtree about it.

And while Miss Pike is here if the Court needs to have her put anything on the record about her willingness to waive what--I think what we said in the letter, based on our discussions with Miss Pike, was that Miss Pike was willing to waive any particular evidentiary issues that might be present in substituting something for that exhibit, and that whatever the State would come up with as long as it was reasonable that she would be willing to waive any objection she might otherwise have. And I don't know if there are any, frankly, but--

THE COURT: Well, actually there are two exhibits. There's the piece and then there's the skull. And we may not be able to release the piece, but surely we may be able to do that.

I--I will--I will address that with--with Miss Pike. But I believe, if I recall correctly, that letter did say that you all felt you were willing to do that, if that would be appropriate.

MR. DAWSON: That's correct, your Honor. We--we didn't know--I think that was written before the case was released from the Supreme Court, and we didn't know who had jurisdiction at that motion.

Your Honor, also if we could approach the bench on other matter dealing with exhibits that we think might not be appropriate--(Indiscernible phrase). We're not sure it's even there.

THE COURT: Okay.

MR. DAWSON: Catherine.

THE COURT: Do we have the--I mean I haven't asked for any exhibits today. I didn't think I needed to.

(Whereupon, a bench conference as follows:)

MR. DAWSON: Your Honor, when we were going through the records we were reminded that there was some allegation originally that--I don't think they were ever exhibits. Actually, I think it was just the Medical Examiner's Office. That there were other portions of the victim's anatomy that were preserved by the medical examiner. And we were wondering if--if they still are being preserved should they be-

THE COURT: That was a list, but I'm not sure that they ever-

MS. HELM: It was--(Inaudible comment)

THE COURT: I think something happened with those.

MS. HELM: At the time that the autopsy was done she was checked for the possibility of evidence of rape. And I believe that because of the stage her body was in that they removed her uterus to--

THE COURT: That's what I understood.

MS. HELM: But there was no evidence of rape. So I don't know what became of it.

THE COURT: The medical examiner would know.

MR. DAWSON: Because we would just--I mean--

THE COURT: I don't think--I think we had that discussion.

MS. HELM: We did.

THE COURT: Now, let me tell you all something else. There's a lot of issues that you've raised, and in order to--and I haven't told this to my court reporter yet. But in order that we cover everything, among the other things that I'm going to be doing today is I'm going to order every hearing from the beginning of arraignment that has not yet been typed to be typed.

MR. PRICE: Okay.

THE COURT: And if it hasn't been--I don't know. I don't know if there's anything missing-

MR. DAWSON: Yes.

THE COURT: --but I suspect there are a few.

MR. DAWSON: Your Honor, we discovered last week much to our dismay that the only record that was ever sent to the--at least to the appellate court starts with the first day of trial.

MR. PRICE: That's all we have.

MR. DAWSON: And Mr. Price and I have talked about that.

THE COURT: Jury selection not there?

MS. BROCKENBOROUGH: Uh-huh. (Affirmatively) No, no, no. Voir dire was there.

MR. DAWSON: Before the voir dire. There's some motions that were had.

MS. BROCKENBOROUGH: No motions.

THE COURT: There are no--

MR. DAWSON: Yes.

THE COURT: --there are no records of them up --see I think that some of the issues that you've got are actually in these records.

MR. DAWSON: And that's what we don't know.

THE COURT: I think--I just have the feeling, and I can't tell you. It's been ten years.

MR. DAWSON: No, that's fine.

THE COURT: I just have a feeling.

MR. DAWSON: Yes. Mr. Price and I talked about that on Thursday or Friday.

MR. PRICE: Right.

MR. DAWSON: And he was going to try--when we talked about trying to find and get those records produced so--so there wasn't time when we--

MR. PRICE: We tried to order them. They were at Sears, and they're coming in today.

MR. DAWSON: We were going to contact the Court--the Court of Appeals to see if we had all of the records. And then we realized from the--

MS. BROCKENBOROUGH: (Inaudible word)--of the record.

MR. DAWSON: --that we did have everything.

THE COURT: And I think--(Indiscernible phrase)

MR. DAWSON: So that was one of the problems that we had, your Honor.

THE COURT: Okay.

MR. DAWSON: We just want you--we didn't want to talk about the other thing in--

THE COURT: That's fine. I really think that that has been addressed and dealt with, but I--have the hearings of post-conviction that we've taken up before, including the hearing about Ms. Martinez and the skull--

(Indiscernible phrase)--filed her motions. Has any of that been typed?

MR. DAWSON: Some of it has.

MS. BROCKENBOROUGH: Not all of them.

THE COURT: Not all of them?

MR. DAWSON: Some of them have.

MS. BROCKENBOROUGH: And they all kind of blur together so I can't remember exactly which ones have.

THE COURT: Well, I remember a whole lot, but I can't say for sure what anybody said at one time. I remember.

MR. DAWSON: That one came up, hum--that one may have been--at least parts of that hearing may have been transcribed--

THE COURT: Yes.

MR. DAWSON: --or maybe not that part is--may be the problem.

THE COURT: Okay. Nancy, are these the originals or are these copies? These are copies? Okay.

(Whereupon, said bench conference
was concluded.)

THE COURT: All right. These two little brown files here are my personal files of Miss Pike's trial, and all of these are of the post-conviction matters. I purpose that we deal with your motions regarding

recusal, quashing--and I'm standing up for a good reason, and that is I'm getting stiff because I'm getting old.

All those motions right now that we set--we've set deadlines before that obviously have been overrun, quite frankly. And that we set hearing dates if it's at all possible if that's what we're going to do. And we've got to deal with the motions, obviously, to quash the motions--the other motions today.

I have allotted pretty much this week to do these matters. I don't think it's going to take all week because I think we're going to be dealing with these motions, and then we're resetting. Is that fair to say?

MR. DAWSON: Right, that's correct, your Honor.

THE COURT: Okay. General, are there any motions you wish to take up at this point?

MR. PRICE: Your Honor, we do have a Motion to Quash the Subpoenas for Judge Jenkins and Baumgartner and to quash the subpoenas for the four attorneys in our office.

THE COURT: There has not been a motion filed for me to be--have my subpoena quashed. I too have been subpoenaed in this case. So I'm going to be dealing

with that motion all by myself. If you all won't object, I'll represent myself in that matter.

MR. PRICE: I think it would be appropriate at this point to address the Motion to Quash the Subpoenas in Judge Jenkins and Baumgartner.

THE COURT: I would appreciate it. They are standing by, as I understand it, and will not leave the court house until I have had the opportunity to deal with that.

MR. PRICE: And, your Honor, we have filed--

THE COURT: And, if I may, General, let me find--I mean I have so many pieces of paper here.

MR. PRICE: It's one of those we filed this morning, your Honor.

THE COURT: I know. (Looking through documents)

MS. BROCKENBOROUGH: Is that the motion that you faxed us last week, right?

MR. DAWSON: Yeah--

MR. PRICE: No.

MR. DAWSON: --this morning.

MR. PRICE: The one I faxed was our--our subpoenas on our office.

MR. DAWSON: I think you did this one over the weekend.

MR. PRICE: Oh, you got that one?

MR. DAWSON: Yeah.

MR. PRICE: I changed it a little bit. I think I dropped the parts about the--Rule 17--

MR. DAWSON: Okay.

MR. PRICE: --and anything that fits in Rule 17 you can disregard.

MR. DAWSON: Okay.

THE COURT: I also received a letter from Ms. Rice indicating that she would not be free today until 1 o'clock so I--but she would be available after that. Okay. One more thing, General.

Tell Melvie I don't have any pads of paper but one in the courtroom. She's going to have to get me some. Thank you.

Okay. Go ahead, sir.

MR. PRICE: Your Honor, we filed a Motion to Quash the Subpoenas of Judge Baumgarter and Judge Jenkins. They were subpoenaed, I believe, last week is when they were actually served. And we think there are several grounds that are valid for quashing those subpoenas that we offered.

The first being that there's a specific statute that covers subpoenaing officers of the state, including the judges of the Criminal Courts of Knox

County, that being TCA 24-9-101 which exempts such officers from being subpoenaed to trial. And there's--a good reason for that is that these officers of the state need to be about their business, their constitutionally and statutory imposed business, particularly with the judges, of holding court.

And so they are to be--if they're going to be subpoenaed, if their testimony is actually needed, which we go on to say that it's not, but if their testimony is really needed, they're to be subpoenaed to deposition, which was not done in this case. Both of these judges have dockets scheduled this morning. They are under a duty to hear their dockets and proceed with their responsibilities.

So, in essence, these subpoenas put them in an untenable position of they can either abide by the subpoenas of a court, in which case they'll be neglecting their own duties, or they can appear--or they can go about their constitutionally imposed duties in court, and they'll be subject to punishment for failing to abide by the subpoenas. So, your Honor, that's a dilemma that this statute sought to avoid which has been created by the issuing of these subpoenas; and, therefore, they should be quashed.

We also say that if the intent is to bring the

Court--bring the judges in here to question their actions in their official capacity as judges, we submit that that is not the proper way to challenge a judges' actions. Their actions speak for themselves and can be challenged legally, and there is no need for their testimony about that.

And then, finally, your Honor, we submit that their testimony is immaterial to the issues in this case. Of course, any subpoena, any testimony that is sought by either party, has to be material and has to go to advance a cause, to advance a ground and establish a ground advanced by either part.

And we submit, based on what we know, that the testimony of these judges wouldn't--would not do that, would not advance or establish clear and convincing evidence a ground for relief for the petitioner.

One thing I would note too is the--and one thing I'm confused about, speaking with Mr. Dawson there was indication that maybe Judge Jenkins was involved in appointing Mr. Talman on this. And he can speak more to that as well. But I've looked at the record, and I don't see that, your Honor. I don't see any record of that--of any-of Judge Jenkins or Judge Baumgartner being--having any fingerprints on this case at all. So I'm a little confused about that.

THE COURT: I don't think that was the case. I think that this case started in General Sessions Court, and it was assigned to this court immediately after it was indicted. So anything that happened--unless it was done by interchange for some reason.

MR. PRICE: And so for those matters we think that--

THE COURT: I don't recall that. Anyway go ahead.

MR. PRICE: So based on what we know about that and what we've been able to determine, we think that any testimony would be immaterial. And so, therefore, your Honor, we'd ask that the subpoenas be quashed.

THE COURT: Mr. Dawson.

MR. DAWSON: Your Honor, I think in--in many ways hearing the Motion to Quash before the Motion to--to Recuse or to Disqualify this Court are somewhat premature. The ground--the reasons that we--that we subpoenaed the two other judges, quite frankly, as I explained to the District Attorney General last week, is that we're trying to make sure that if this case goes up on appeal either now or later on this issue of the Court's disqualification, the question may raise--be raised as to a fundamental issue in this motion, and

that is: what did the Court know and when did the Court know it, about Mr. Talman's situation?

The--it is our understanding, your Honor, from an interview with Mr. Talman that the--he was appointed initially. He was called over to the Court and appointed to Miss Pike's case by Judge Jenkins be--while it was still in the Grand Jury. And we've tried to--

THE COURT: That--maybe that's possible.

MR. DAWSON: Right.

THE COURT: I--I don't know.

MR. DAWSON: I understand, your Honor. And we were--

THE COURT: I don't know why that would have happened necessarily.

MR. DAWSON: We were trying to figure that out too, your Honor. We've talked to several of the attorneys to see if they were in the--in the---in the district to see if they had any understanding of why that would happen or how it would happen. And it's not in the record, your Honor, that we can find anywhere. Mr. Talman indicated that that appointed, whether it was official or unofficial that his--Mr. Talman related the attorney--

THE COURT: It seems to me that I--I mean I-- and just for the record-

MR. DAWSON: Right.

THE COURT: And, again, we're talking about remembering things that have happened twelve years ago now. It seems to me that Mr. Talman was already involved when--when Miss Pike actually came to this court the first time, but I don't remember whether or not I actually did the appointment order or not. But we can pull the file.

MR. DAWSON: You did, your Honor. The file reflects that you did the--you did an appointment order.

THE COURT: He may--he may have--as presiding judge upon the indictment, he may have felt this was a case that needed some--(Pause)

MR. DAWSON: Your Honor, what we believe the record would show is that William Brown was appointed to represented Miss Pike in the General Sessions Court. I think that's clear in the record. He represented her in the preliminary hearing. The case was then bound over to the Grand Jury.

What we have heard from Mr. Talman is that while it was before the Grand Jury, Mr. Brown began to have some question about his involvement in the case because he had no experience in capital cases, really no experience in murder cases, according to at least what we heard from Mr. Talman. The--and, therefore, he went

to Judge Jenkins and indicated he needed some assistance.

THE COURT: Okay.

MR. DAWSON: At that point Mr. Talman was appointed by Judge Jenkins, but that appointment was later revoked when the District Attorney General's Office complained that there shouldn't be two attorneys on the case because it hadn't yet been announced as a capital case. How the Attorney General's Office would know that two were even involved at that point is another mystery in the case. But the--in any case, then the case came to this court. And the next thing on the record, of course, is that this Court appointed Mr. Talman on May 23rd of 1995, which was right after arraignment.

THE COURT: But the reality is your issue has to do with Mr. Talman and his troubles with the State in his billing practices and whether or not that inappropriately impacted Miss Pike's case and, if so, whether or not that created an ineffective assistance of counsel.

MR. DAWSON: That's one issue, your Honor. The secondary or the subsidiary part of that--and the reason that we determined that it was necessary to ask this Court to disqualify itself was because it is our

impression from reading the file at the Board of Professional Responsibility and reading the file--or not the file--but reading the Comptroller's report--and actually, your Honor, we did for some time in--now and years past, we have talked to Chase Tapland (Phonetically) who was the auditor that was assigned to the case and was the chief auditor in that report.

We, to our dismay, learned last--two weeks ago, I guess, when we tried to start re--putting this back together, we learned that he's now in Vietnam doing church missionary work and has been for about a year and half and no longer with the state government and is slightly out of the reach of the subpoena of this Court at this moment so--and is not expected to return for at least six months.

So we're--and we also learned from the Comptroller's Office they also destroyed the file. So the remaining part of that file at this point is the report, which we do have. And we believe that what is a majority of the materials in the Board of Professional Responsibility are, in fact, more than likely the materials that were reviewed by the Comptroller's office. However, that's kind of where we are on that.

But--but in the--the--the subsidiary question we think that's important to this decision of this Court

is that it appears clear from what we viewed in the records that this Court was well aware, at the time that it appointed Mr. Talman, of the problems that he was having with the over billing. The record reflects in the Comptroller's report that in--and also in the Board of Professional Responsibility report from--from a response filed by Mr. Talman that in April of 1995 he repaid to the State an amount of 67--well, $62,000.00 (sixty-two thousand dollars) through a check that was given to the State through the District Attorney General's Office of Knox County, and that the remaining 4,000 some dollars of the 67,000 something total was paid by his agreeing to forego collecting fees that were then pending before the Administrative Office of the Courts.

THE COURT: And that was in April of 1995?

MR. DAWSON: Yes, your Honor.

THE COURT: Okay.

MR. DAWSON: And then this Court appointed Mr. Talman. And also in April of '95, I believe, is what the Board of Professional Responsibility report shows is when Mr. Talman self-reported to the Board--or maybe '94.

MS. BROCKENBOROUGH: March of '94.

MR. DAWSON: I'm sorry. It was March of '94

that he self-reported to the Board which was fairly quickly after there were initial reports of over billing by attorneys.

Mr. Talman also reports in statements that he's made to our Office that he--and I think it's in--actually, I think it's in--I'm not--I'm sorry--it's in the--it's in the Board of Professional Responsibility report. He reports that he voluntarily stopped accepting appointments for a period of time because of that, and we would assume--and he says from all courts, General Sessions and Criminal Courts in Knox County, which I would assume, therefore, would include this court.

THE COURT: After March of 1994?

MR. DAWSON: Yes, your Honor. And that it was right around the time of the appointment to Miss Pike's case that he began accepting cases again. But it's also clear that it wasn't resolved at that point.

The final resolution came at one of two places. Either in 1998 when the Supreme Court entered an order revoking Mr. Talman's license--suspending his license rather and--for eleven months and twenty-nine days, and then suspending the suspension for that period of time, and assigned another lawyer to review his fee requests during that eleven months and twenty-nine days.

THE COURT: That was in 1998.

MR. DAWSON: 1998, yes, your Honor.

And--so the time the problems for Mr. Talman would have ended then would either have been that date or else one year from that when that suspension ended.

The--we also--(Pause) So the question here, your Honor, really is kind of--it deals with what appears on the record to be this Court's knowledge that at the time this Court appointed Mr. Talman to represent Miss Pike he had some serious problems that would interfere with zealous representation. He had what could be called sort of a Damocles over his head.

THE COURT: Which you allege interfered with zealous representation. I mean I don't know that you can--you can't testify they did. You can't testify about it. It's an issue of post-conviction relief

MR. DAWSON: And that's true, your Honor.

THE COURT: Right.

MR. DAWSON: The problem that--for the Court, quite frankly, is the Court can't rule on it either until they hear all of the evidence--

THE COURT: Absolutely.

MR. DAWSON: --and--

THE COURT: I think it--I think it's a valid issue with respect to whether or not Miss Pike was

impacted with respect to--to his representation. I think that's a very valid issue.

MR. DAWSON: But, your Honor, our concern is that--wait a minute. I'm not sure where we are right now because I think we're still arguing the--

THE COURT: We're still talking about the Motion to Quash but the--

MR. DAWSON: --the Motion to Quash. Right. So-

THE COURT: --in regard to the other judges, I hope.

MR. DAWSON: And I'm trying to--I'm trying to remember where we are. And so--

THE COURT: We're going to take our time today, Mr. Dawson--

MR. DAWSON: Thank your Honor.

THE COURT: --so if we have to review a part that's okay.

MR. DAWSON: The--the issue with the other judges is--only deals with whether they knew of Mr. Talman's problem with the Bar during that part of 1995.

THE COURT: I think everybody knew.

MR. DAWSON: And I think--and I'm--and, your Honor, quite frankly, you know, it all rested on what

this Court were to say. If the Court would say, "Yeah, I was well aware of it," then, frankly, the subpoenas for these two judges are moot because the only reason that we subpoenaed them was out of an abundance of caution.

If this Court said, "Well, I didn't find out until, you know, later," then--then we would have to bring in information to find out what they--because what we don't know is exactly what discussions were held between the Court and the--and the Comptroller's Office in the discussions that are reported in the Comptroller's report that occurred in either--the report indicates that there were discussions with the Criminal Courts in Knox County--with two of the Criminal Courts in July or August of 1994.

THE COURT: And I was one of those Criminal Courts--

MR. DAWSON: And then the third one--

THE COURT: --am I correct?

MR. DAWSON: --in January of '95.

THE COURT: Am I correct?

MR. DAWSON: I'm assuming that's correct, your Honor. Except basically that it gets--the third one is then interviewed in January of '95. So by appointment in the case all three were--were interviewed.

THE COURT: Oh, I don't think there was any question but that we all knew that there was some difficulty that Mr. Talman had with this-this issue. He had self-reported to the Board, and I think it was public record. I think there was a public record of it. And I'm not sure that there isn't some record of it within those early parts of the records in this case. I do not know.

MR. DAWSON: And that, your Honor, I will apologize to the Court for because it just--it sort of--

THE COURT: We're going to unfortunately ask--and I don't even have the same court reporter. So we're going to have to get a bunch of things typed up here from here out.

MR. DAWSON: And that's fine, your Honor. That is--

THE COURT: Let me--let me stop you right here, and let's talk about what our record in our file reflects because you could look at all of the Comptroller's records you want, but the question is: what does this file reflect as to who did what when?

The indictment in this case was returned on April 12th, 1995. At that time Mr. Brown was attorney of record. May the 23rd, which I think is when the notice was filed--

MR. DAWSON: That's correct, your Honor.

THE COURT: --Mr. Talman was appointed, according to our record, as Mr. Brown's co-counsel because Mr. Brown was not qualified. Mr. Talman was qualified at that time, one of those few who could death penalty cases.

MR. DAWSON: And that was May 23rd, your Honor?

THE COURT: May 23rd, 1995. On January 19th, 1996, Mr. Brown was relieved for whatever reason, and I don't remember the reason and Ms. Rice came in. Maybe Mr. Brown was not qualified to act as second chair; I'm not sure. So Ms. Rice came into the case.

Now, in addition to that, from what you've just told me, his self-reporting occurred a year and two months before he was appointed and a year before he repaid his obligation. So it was already in the newspapers--not a year before--a month before he repaid that 62,000 (sixty-two thousand) dollar obligation. So it was already in the papers, and I think it was generally known in Knox County that Mr. Talman, among other lawyers, had had a little problem with the billing --a big problem--

PETITIONER: (Slight laughter)

THE COURT: --perhaps with the billing.

MR. DAWSON: Your Honor, additionally-

THE COURT: Now, wait.

MR. DAWSON: Right.

THE COURT: Now let me back up; just--just hang on a second. In addition to that, during that time period Mr. Talman had other death penalty cases in Knox County, including one in Judge Jenkins court apparently. So they--he was handling several death penalty cases during that period of time. And as I said, he was one of those lawyers at that time that was qualified to--to represent defendants.

MR. DAWSON: Your Honor, according to his report that's in the Board of Professional Responsibility materials, he advised the Board that he had withdraw from two death penalty cases during that period of time because he saw it as a potential problem.

THE COURT: When?

MR. DAWSON: Between, hum--it was--it was before the appointment in this case, your Honor.

THE COURT: Okay.

MR. DAWSON: It was--it was during that period between--

THE COURT: But at that point he took appointment in this case.

MR. DAWSON: That's correct.

THE COURT: He didn't--he didn't deny appointments.

MR. DAWSON: That's correct.

THE COURT: And that is an issue that I think is maybe--I don't know whether it's a valid issue or not until we've raised that issue and talked about what Mr. Talman did during that period of time and whether or not that had an impact on this case. Is that fair to say? (Pause) That's part of your issue of ineffective assistance of counsel.

MR. DAWSON: That's correct, your Honor. And --and--and the reason I was hesitating is--is that that is true in terms of the overall review of the post-conviction petition and the review of that issue. Our concern is--and the reason for the Motion to Disqualify is that this Court's--it's our position that this Court is not in a proper position to--

THE COURT: Make that decision--

MR. DAWSON: --make that determination--

THE COURT: --because--

MR. DAWSON: --because of the Court's own involvement in appointing him knowing that he had essentially a sort of damocles over his head at the time of the appointment and that--and that it would be difficult for an attorney to provide zealous

representation who at the time was potentially facing criminal prosecution--although, that never came to pass --and was also potentially facing the lose of his license, which at least was suspended for a period of time.

THE COURT: Okay. But let me back up just a minute. With respect to the subpoenas of Judges Baumgartner and Jenkins--

MR. DAWSON: Right.

THE COURT: --does what I've just recited as the set of circumstances satisfy your concerns about subpoenaing them?

MR. DAWSON: It does, your Honor, as long as the record reflects that, in fact, this Court knew that date of the appointment, then that--that satisfies that, and we don't need those two judges to say what they knew.

THE COURT: Well, I'm not testifying what I knew and what I didn't know unless I went back and reviewed all this. But I am fairly certain that by the time Mr. Talman was appointed in this case and by the time that he repaid funds that there had already been news media reports about this; am I correct?

MR. DAWSON: Your Honor, we're not sure what--

THE COURT: You had some news media reports that you attached to your motion.

MR. DAWSON: There were. There was one that was on--what we know is that in April of--March or April of '94 there was a news report that--that said that there was a problem, and that's when Mr. Talman apparently retained counsel.

THE COURT: Then--if that was when the first report was, then this Court--and it was common knowledge in the media in Knoxville and--therefore, I take it that your Motion to Quash their subpoenas is--your motion to --your subpoena and their motion is basically moot.

MR. DAWSON: That's correct, your Honor.

THE COURT: Okay. So let's--

MR. DAWSON: We were only going to call them if there was any dispute on that--on that issue, and there appears not to be.

THE COURT: Would you, Miss Odeneal (Phonetically), would you please tell the Judges that their motions--that the Motions to Quash are moot and subpoenas are basically, in effect withdrawn. Okay.

You know what? Hang on.

MR. PRICE: Is that, in fact, what the petitioners--

THE COURT: Other than myself the Motions to Quash--the motion--your motion is basically--

MR. PRICE: I mean I--are they withdrawing

those subpoenas? I wasn't clear on that.

MR. DAWSON: Yeah, yeah, as long as there's--

THE COURT: Yes.

MR. DAWSON: --I mean we may have--I mean should there develop any issue on that later, which I don't think--doesn't appear will at this point, it might cause us to reissue those subpoenas. But at this point we have no intention of draw--calling either Judge.

MR. PRICE: So those particular subpoenas are withdrawn.

THE COURT: They're withdrawn.

MR. DAWSON: That's correct.

MR. PRICE: And if they need to be reissued--

THE COURT: Okay. Now, I have a--are there any subpoenas that you all took as blanks that have not been returned?

MR. DAWSON: There may be, your Honor. Let me tell you what we have.

THE COURT: Yes, please, because--

MR. DAWSON: Because we had Mr. Myers (Phonetically)--we did--we have--I'm not sure what was returned and what wasn't is where I am sitting now. But we did subpoena Herb Moncier, and we have the return on that subpoena, your Honor. And he has advised us that he is not available today but is available tomorrow.

THE COURT: You subpoenaed Mr. Moncier on what issue?

MR. DAWSON: On the issue dealing with the conflict on the--Dr. McCoy's testimony.

THE COURT: Okay. Okay. I'm just trying to keep it all straight.

(Whereupon, the clerk briefly conferred with the Court.)

MR. DAWSON: What is it now? I'm sorry.

THE COURT: Did you issue a subpoena duces tecum or--

MS. BROCKENBOROUGH: No, your Honor.

MR. DAWSON: No.

MS. BROCKENBOROUGH: It was just a testimonial subpoena.

THE COURT: Okay. It was just a subpoena. It all has that on there.

MS. BROCKENBOROUGH: We--we may have used the wrong form but--

THE COURT: It just--it's just blank. That's all right.

MS. BROCKENBOROUGH: --it's just for him.

THE COURT: Okay.

MR. DAWSON: And then, your Honor, the other ones I'm assuming were returned by--

THE COURT: We can tell you if we can look at the list while you tell me who they are.

MR. DAWSON: We have subpoenaed Mr. Talman-

THE COURT: Right.

MR. DAWSON: --Diana McCoy--

THE COURT: Right.

MR. DAWSON: --hum--

THE COURT: Ms. Rice.

MR. DAWSON: --Ms. Rice and--

THE COURT: Members of the DA's Office, obviously, I know about.

MR. DAWSON: And then we have subpoenas to the two Judges and to the District Attorney General's Office for, I believe, General Nichols, General Helm--

THE COURT: Is there anybody else?

MR. DAWSON: --General Jenkins--not Jenkins--

THE COURT: Judge Jenkins.

MR. DAWSON: --Gen--wait a minute.

MS. BROCKENBOROUGH: General Blevins and General Crabtree.

THE COURT: General Blevins, General-

MR. DAWSON: Blevins and Crabtree.

THE COURT: Okay. You didn't subpoena Price and--

MR. DAWSON: No, your Honor; no, your Honor.

THE COURT: Okay.

MR. DAWSON: You know, the subpoenas all had to do with--

THE COURT: Right. I--

MR. DAWSON: --actions before Mr. Price went on the case.

THE COURT: --I understand. Do you have any more returns to file?

MR. DAWSON: I don't believe so, your Honor. I think that's all we have. I think those--

THE COURT: I think all of the rest of them must have been returned because they are already on my list. Okay. Now, that's straight.

Are there any other motions you wish to take up at this point, General, other than to let me let Mr. Dawson go through his motions that we were going to address at this point?

MR. PRICE: Well, I think it would be appropriate at this point--we were kind of getting into it already--is their Motion to Recuse the Court.

THE COURT: I think that's the next motion--well, there's two Motions to Recuse, and we'll take up both of those. There's also a Motion Not to House Miss Pike at the Knox County Penal Farm I think I better address right quickly, and that is that I really don't

have a lot of choice. But I have a car that will be standing by as soon as Miss Pike is done. So I'm not going to keep her any longer than is necessary to keep her here.

MR. DAWSON: Thank your Honor.

THE COURT: And I have--and I have, as we discussed when we had our joint phone call, communicated with the Sheriff himself as well as several of his lieutenants that it's necessary to keep a close eye on the situation basically.

MR. DAWSON: Your Honor, and we can report that they have done that so far. But Miss Pike was very concerned about after the hearing ends, and so if she is-

THE COURT: I hope that--I hope that if this hearing ends today or tomorrow we're going to have a car ready to go.

Melvie, is that right?

THE SECRETARY: I'm sorry?

THE COURT: Captain Hayes is going to take Miss Pike back as soon as possible.

THE SECRETARY: We're to notify him when she's through.

THE COURT: Okay.

MR. DAWSON: Thank your Honor.

THE COURT: Okay. Now, some of the things we've already talked about we'll be getting into a little bit further, I know, so I realize you're going to raise some of these points. Maybe we can get through them. Let's begin with you--let me see. Let's get over with the Motion to Recuse because I'm running for election. How about that? I think I have that somewhere.

MR. PRICE: I think that was a Motion to Continue because of that.

MS. BROCKENBOROUGH: I thought it was a Motion to Continue.

MR. DAWSON: A Motion to Continue, yes.

THE COURT: Oh, to continue because we're running for election.

MR. DAWSON: That's right. Your Honor, if we did it because you had to run for election, we'd recuse the entire Tennessee Bench. And although we thought about that, we didn't think it would be very effective. (Pause)

THE COURT: Well, luckily or unluckily for you, I have never had opposition. I do not presently have opposition. The filing deadline has passed. And except for as you pointed out, Mr. Dawson, if someone runs as a--as a write-in candidate--and I invite them to

do so--I don't think you have to worry. And also, as it happens, this evidentiary hearing will be set but it may not be set until after the--it may be set before the judicial elections happen which is August. But we're not going to be able to complete the evidentiary hearing today. But if there is any evidence today--and there well may be--you know, do you want to stand on that motion?

MR. DAWSON: Your Honor, we probably--I guess --I guess what I'm hearing the Court say is that--

THE COURT: You're stuck with me.

MR. DAWSON: --the Court--the Court is not disputing the idea that there are crocodiles in the bath tub in--

THE COURT: Absolutely not.

MR. DAWSON: --the language of the judge from California.

THE COURT: Absolutely.

MR. DAWSON: But the Court doesn't have--

THE COURT: And I don't intend to climb in the bath tub--

MR. DAWSON: Right.

THE COURT: --with the crocodiles. I'm going to stay out of the bath tub-

MR. DAWSON: Right.

THE COURT: --and take a shower instead.

MR. DAWSON: The Court doesn't have to swim for at least another eight years if someone runs against the Court at that point.

THE COURT: At least, if not longer. The question of the day is: will Miss Pike still be in Division III or will her case have gone somewhere else by then? And I think that's the next question, I guess, we need to deal with.

MR. DAWSON: That is, your Honor.

THE COURT: I'm going to deny your Motion for Continuance of Evidentiary Hearing until after the elections. Though I'm sure as time passes you will be filing other motions.

I could have taken that as an offense because that would wipe out everything I've ever done for seventeen years by saying that perhaps I couldn't be fair. And--and I hope that humor and fairness can get all the way through these--this day and the days to come.

MR. DAWSON: Your Honor, it was---it was in light of the fact that the election was coming up that that was filed and--

THE COURT: Yes. Well, I guess you probably insulted every judge that handles death penalty cases in

Tennessee; don't you think?

MR. DAWSON: Your Honor, no more than the American Bar Association has and others that have criticized the election of judges.

THE COURT: Well, you know, and for the record, we are required to run for election by--by partisan election. And we have no choice in that matter.

MR. DAWSON: I believe it's constitutional.

THE COURT: But that's something that--you know, it's kind of like something that is God's problem and is outside our hands. I really don't care. It's inappropriate for us to even deal with it. So let's just set that one aside.

MR. DAWSON: That's fine, your Honor.

THE COURT: Okay. That motion is denied. I'm trying to write down what I do as we get here so-- (Pause) Now comes the Motion for the Court to Recuse Itself from Servicing as Judge and Fact Finder. That's what it says. I think that's a typo, I would imagine.

MR. DAWSON: I think that is, your Honor. I think it was serving.

THE COURT: This particular motion--the State has filed a rather extensive response, and I have not had a chance to look at it. So if you would give me

just a minute to take a look at that, I would appreciate it.

MR. DAWSON: That's fine, your Honor.

(Whereupon, there was a pause in the proceedings while the Court reviewed the aforementioned document. She then addressed the court reporter at the bench about researching everything that has not yet been transcribed in Miss Pike's murder case.)

THE COURT: Okay. One of the problems I have, of course, is that I'm acting without a transcript, and I'm not sure that all of the transcripts of every hearing that's ever been typed, as we've talked about at the bench a few minutes ago, have been prepared. I'm presently having the Clerk's Office and I'm going to have Ms. Hayes tell me what was and wasn't typed so that we can determine exacting where--where we might be missing some of the answers to some of the questions just right out of the bat.

Okay. Let's--let's talk about your Motion to Recuse the Court from Serving as Judge in this Post-conviction Petition. And I guess there are several

issues that--that are the basis of your motion, Mr. Dawson.

MR. DAWSON: That's correct.

THE COURT: And so let's lay those issues out in a list first, and then we can get into the points.

MR. DAWSON: Your Honor, what we have set out in terms of the general issues is that there are really two--two parts to the motion, and the first part of the motion, I think, is the more important. The second is perhaps less important; although, I think--

THE COURT: Well, they both have to be addressed, I guess, so--

MR. DAWSON: Pardon?

THE COURT: I guess we both--both of them need to be addressed.

MR. DAWSON: Yes, your Honor, definitely they do. The first one, your Honor, we think actually is an issue that was not addressed in the District Attorney's response because the first one--and this--this, your Honor, actually--and I will advise the Court actually that I sort of clarified this better in my mind over the weekend on it as I preparing a motion for a Rule 9 if the Court happened to deny this motion.

But what--what it clarified for me is that the first part of our motion that deals with the appointment

of Mr. Talman being the reason for disqualification really deals with not the discretion of the Court type of disqualification or--or recusal but with the mandatory disqualification that comes from the Tennessee Constitution, Article 6, Section 11, and the Tennessee statute, that being Tennessee Code Annotated 17-2-101, that describes that activities that disqualify a judge from hearing a case. Whether those apply--

THE COURT: Why don't you run through what those are so we--

MR. DAWSON: Okay, your Honor.

THE COURT: I mean I want to do this a little at a time so we get everything in.

MR. DAWSON: The--(Pause)--I guess I'm going to have to paraphrase, your Honor, because I don't have it in front of me.

THE COURT: That's fine.

MR. DAWSON: But the--

THE COURT: We can put it in front of you if you want.

MR. DAWSON: The rule--what basically both the constitutional provision and the statutory provision do and as it relates to this case is they indicate that a judge that has an interest in the matter is disqualified from hearing it. And--so the question here, I think,

for this Court and for other courts that may review this issue, is the question of: what is the definition of interest?-because it's clear that subsumed within interest is a financial interest. And that's not here in this case. So that--that is--that for all reasons we don't allege and we don't pretend is here.

The interest in--in this case we think--and the reason it raises--arises to a constitutional problem as opposed to just a discretionary problem as related in the State's response deals with the nature of the decision to appoint Mr. Talman. Unlike other decisions that the Court may make that are simply decisions on legal motions, etcetera, I would agree wholeheartedly with Mr. Price's response that they are not--they don't justify recusal of the Court. Court's make decisions all the tame; they're asked to review those decisions all the time. And that's not what we're looking at here.

We're looking at a decision to appoint an attorney who, as I've said before, essentially had the sort of Damocles over his head in a high profile capital case who is essentially trying the case handcuffed because clearly he can't--and unfortunately my ability with words has failed me, and I can't think of anything better than he can't act up in court because he is--on

behalf of Miss Pike because-

THE COURT: Well, neither can you because I'll put you in jail.

MR. DAWSON: Well, I know, your Honor, but I'm not likely to lose my law license or I'm not likely to go to jail for some long period of time because I owe the state sixty-seven thousand dollars ($67,000.00).

THE COURT: It depends on what you do, I guess.

MR. DAWSON: Well, I understand, your Honor, but I think there's a limit, perhaps ten days, but--(Laughing)

THE COURT: Okay.

MR. DAWSON: But in any case, your Honor--

THE COURT: I was referring to your law license.

MR. DAWSON: Oh, I see, your Honor. Well, it depends on what I do; that's true.

THE COURT: Depends on what you do.

MR. DAWSON: (Laughing) But I don't think there is anything that I would do within--

THE COURT: That--go ahead.

MR. DAWSON: --zealous representation--

THE COURT: I'm trying to learn to keep my mouth shut.

MR. DAWSON: --that would risk any of those things.

THE COURT: Go ahead.

MR. DAWSON: The--but I think that--and because it--because the requirement, as we've argued in the motion for conflict-free counsel, especially--well in all cases, but especially in a high profile capital case--is so basic to our system of justice, to our entire system, you know, criminal justice system in the way it operates that to ignore that issue is fundamental to the fairness of this entire process. Because of the fundamental nature of that appointment, it's our position, your Honor, that this Court in deciding any future issues in this case, as the Court indicated, you know, whether Mr. Talman did or did not perform in an adequate fashion, is an issue still to be determined. But the fact that this conflict was there we think prohibits this Court from being that decision maker because the interest of this Court will be to try--I mean, again, I'm not--this is not personal, your Honor.

THE COURT: I understand.

MR. DAWSON: The human nature of the thing, which I think is what we're looking at--

THE COURT: Yes, I understand.

MR. DAWSON: --the objective standard is that

--that it would at least be in the back of the Court's mind even in a perhaps subliminal way to protect the Court's decision to appoint Mr. Talman and in doing that to find that he was not hampered by the pending issues in his personal life as he represented Miss Pike.

We think that because of that, the nature of this claim or the nature of the facts in this case, the appointment of Mr. Talman, again, in a high profile capital case at that particular time really raises to that level where it's--where that's the interest in the Court. The interest of the Court is to protect the Court's own integrity in making the appointment in the first place, and because of that we think the Court is disqualified from representing--I mean not representing but from presiding over this case in any further decisions.

Your Honor, and in terms of the high profile nature, your Honor, we would, of course, observe that even today in this now--

THE COURT: This is obviously one of the most high profile cases that has hit the state of Tennessee ever.

MR. DAWSON: Thank your Honor.

THE COURT: So--

MR. DAWSON: Your Honor, I would like--

THE COURT: --I'll take judicial notice of that fact; how's that?

MR. DAWSON: Thank your Honor. I would like to offer into evidence on this motion--we have--we've got an agreement with the District Attorney General that basically, I think, two things--1, three things, I think. But one is the special report from the Department of the Treasury.

THE COURT: I believe--did you--did you attach that, by the way?

MR. DAWSON: We have attached it, your Honor, but I think probably it needs to be an exhibit.

THE COURT: Oh, I think you should make it an exhibit.

MR. DAWSON: Yes, we did attach it, your Honor.

THE COURT: But I have it. Okay.

MR. DAWSON: And we do have an affidavit of authenticity, this copy of the report, from the Comptroller's Office.

THE COURT: Is this the original? Did you sign some of the copies of your motion?

MR. DAWSON: Pardon?

THE COURT: Is this the original motion?

MR. DAWSON: Is it not signed, your Honor?

THE COURT: Petitioner's Motion to Recuse--I--(To clerk)--are these the original motions?

THE CLERK: It looks like it.

MR. DAWSON: Unless we sent them from--

THE COURT: That it does. It needs to have been.

MR. DAWSON: We--I think, your Honor, I had--

THE COURT: Actually, I had one that was stamped today.

MR. DAWSON: --I had sent some copies of that to the Court directly--

THE COURT: That you might have hand signed?

MR. DAWSON: --because of the timing and that may have been--

THE COURT: Is that an original?

MR. DAWSON: It was--

THE COURT: --because you had one--I have one here that was stamped file January 27th.

MR. DAWSON: Right. We sent them to the Clerk.

THE COURT: That's yours.

MR. DAWSON: I hope something was signed, your signed, your Honor.

THE COURT: Oh, it was filed.

MR. DAWSON: I'm--

THE COURT: It's filed; it's just kind of-

MR. DAWSON: I don't guarantee anything that I--

THE COURT: I have a copy.

MR. DAWSON: --think I've done nowadays but--

THE COURT: I have a copy--

MS. BROCKENBOROUGH: Are they--

THE COURT: --extra.

MS. BROCKENBOROUGH: --signed?

THE COURT: Oh, it's probably a--it's probably a--you probably sent me a courtesy copy that has your original signatures.

MR. DAWSON: Okay. That's maybe what we did, your Honor.

THE COURT: Does that--that's what I'm asking.

MS. BROCKENBOROUGH: Oh. Okay. So they're signed but it looks like an original.

MR. DAWSON: Oh.

MS. BROCKENBOROUGH: I understand.

THE COURT: It is--yes, it looks like an original, but I have a stamped copy that was filed with the Clerk's Office on January 27th.

MR. DAWSON: Okay.

MS. BROCKENBOROUGH: Okay.

MR. DAWSON: Does that have an or--

THE COURT: So we have some stuff we could probably shred. We have plenty of extras. Okay.

MR. DAWSON: Your Honor, it was because of the timing of it that we sent the Court a courtesy copy.

THE COURT: Oh, yes, sir, I understand.

MR. DAWSON: All right.

THE COURT: In fact, I have--

MR. DAWSON: Your Honor, the Comptroller's report then would be Exhibit No. 1 to this hearing?

MR. PRICE: We don't have objection to that, your Honor.

THE COURT: All right. Exhibit 1 will be the Comptroller's report.

(Exhibit No. 1 was marked and filed.)

MR. DAWSON: And the next one, your Honor, is the--is the Board of Responsibility report--or not report but record. And this I think it would be best to include in two parts, part A being what is essentially pages--actually, they're not numbered regrettably--but it's the first 79 pages as I recall, of the file before the Board of Responsibility. And then the--

THE COURT: Now, what is that--I'm sorry--again?

MR. DAWSON: That's the--that's the file

that's in the Board of Professional Responsibility concerning Mr. Talman.

THE COURT: Okay. Now that I do not have a copy of, I don't think.

MR. DAWSON: You do now, your Honor.

THE COURT: And you wanted to make that Exhibit No. 2--

MR. DAWSON: Yes, your Honor, probably--

THE COURT: --the BPR file?

MR. DAWSON: --and probably a 2A and a 2B. The other--because the B then would be a compact disc that contains the entire file from the Board of Professional Responsibility, your Honor. And I want to put on the record--and the reason I want to do it is because we've sent a copy of this to--to the State, but Mr. Price has been unable to open it yet. We don't know why. There's something wrong with either the copy we sent him or something. But the--

THE COURT: Are these records which should be sealed or not?

MR. DAWSON: Your Honor, because--I think because it was a--there was a--

THE COURT: Finding?

MS. BROCKENBOROUGH: Public. (To Mr. Dawson)

MR. DAWSON: --a public finding--

THE COURT: Okay.

MR. DAWSON: --I think they're not.

THE COURT: Okay.

MR. DAWSON: And the Board didn't tell us that so--

THE COURT: That's fine; that's fine.

MR. DAWSON: Your Honor, and what's on this disc is the pages that we're providing the Court in what I'm calling now 2A. And then 2B would be the remainder of the materials. These are to the best of my knowledge--and Ms. Brockenborough and I went through these in the--in the Office of the Board, and then Ms. Brockenborough has gone through some of them since then. But it's eleven hundred (1,100) pages total, and that's why we didn't print it all out. Most of it is the fee requests filed by Mr. Talman that they were reviewing, and it includes requests that were signed by this Court, by Judge Jenkins.

THE COURT: By Judge--

MR. DAWSON: We think there's one by Judge Baumgartner. There's several by General Sessions Courts and then several by David Poss, the attorney, and by Thomas Slaughter, an attorney.

THE COURT: All three of whom were under investigation at that time.

MR. DAWSON: That's correct, your Honor. And so that--and that's just for completeness of the file.

THE COURT: That's fine, sir. And that--so we're making those Exhibits 2 A and B?

MR. DAWSON: Yes, I think, your Honor--

THE COURT: Okay.

MR. DAWSON: --just because they're both the Board of Responsibility reports.

MR. PRICE: We have no objection to those as long as--you know, I haven't been able to read that CD. But taking that that's what it is, in fact, and there's nothing else in there, we have no objection to that.

MR. DAWSON: And the reason I wanted to say in detail what we believe it was is because if there is something else it certainly is not within the stipulation from the State.

THE COURT: General, I--I have no problem with letting you, so to speak, check that out for the purposes of reviewing it if that--they have no objection to that so that you can see what it says at some point.

MR. PRICE: I may withdraw it, yes, if I could at some point.

(Collective Exhibits No. 2A and No. 2B were marked and filed.)

THE COURT: Okay.

MS. BROCKENBOROUGH: And, certainly, your Honor, if during the course of my finishing--

THE COURT: Do you have a copy that functions or-

MS. BROCKENBOROUGH: Yes.

THE COURT: --or is that the only one that functions?

MR. DAWSON: We--we--well--

MS. BROCKENBOROUGH: Actually, you know, I haven't looked at the disc. We have it--we have it in our files--

THE COURT: But you may not be able to open it either.

MS. BROCKENBOROUGH: --or downloaded. Exactly.

MR. DAWSON: Yes.

MS. BROCKENBOROUGH: So--and unfortunately, this--this lap top is having some problems.

MR. PRICE: The problem, I think, is not actually on the CD that we got. It was the fact that our software in our office is old. (Laughing)

THE COURT: Okay.

MR. DAWSON: We were able to open it, your Honor, with our, hum--whatever we have in the office.

MS. BROCKENBOROUGH: Oh, the open line, yes.

MR. DAWSON: We did download it to our--our--what we call our I-drive on our server in the office, and then from that is what we made the disc so--the copy. So we, at least, were able to open it and we could use it on our computers at the office, but whether it will on this one or not we don't know. We don't know whether the disc--but at least the original did.

THE COURT: Okay.

MR. DAWSON: The--your Honor, basically, the--we have other evidence that we, hum--(Pause)

THE COURT: Well, you said that there was two parts to this.

MR. DAWSON: Right. That's the first part, your Honor.

THE COURT: Yes.

MR. DAWSON: The second part of the motion--thank you for getting me back on track.

THE COURT: I'm trying.

MR. DAWSON: I got lost.

THE COURT: That's my function.

MR. DAWSON: Your Honor, the second part of the motion deals with what would come under, I think, the discretionary recusal by the Court under--as cited by Mr. Price, the--the--Code of Professional Conduct

for--Judicial Conduct rather, the section--Cannons 2 and 3 that talk about when a Court should recuse itself because there may be an appearance of impropriety. And while we think that that--and that's really--

THE COURT: And I--and let's get into what appearance of impropriety you think there is with respect to that issue-

MR. DAWSON: Okay, your Honor. So I think--

THE COURT: --even if it's a repeat--repetition of something we've talked about.

MR. DAWSON: Right.

THE COURT: I want to be--

MR. DAWSON: And that really comes into both issues in--so there's kind of three issues. But the first issue we have is that the--the Court is required to recuse itself under the constitution or the statute because of the interest. Then there's the--if the Court denies that, then I think the Court still should recuse itself because there is certainly the appearance of an impropriety for this Court to go on and decide the issues that we've already talked about regarding Mr. Talman and the over billing. The third reason was--dealt with--

THE COURT: Well, wait a minute; slow down. You think it's--I should--if I'm not compelled then I

should make a discretionary recusal for those reasons that you've already cited.

MR. DAWSON: That's correct, your Honor.

THE COURT: Okay. Now, the third reason.

MR. DAWSON: The third reason, your Honor, deals with our second allegation of conflict with Mr. Talman and that being the failure to present the mitigation testimony and mitigation materials that have been prepared by Dr. Diana McCoy.

This, as we understand the issue, your Honor, is that Mr. Talman made a representation in chambers to the Court and to the District Attorney General, to General Helm and General Crabtree, that he had given--he had been given the three volumes of mitigation materials that Dr. McCoy had prepared only a short time before that Friday afternoon when the Court had the in-chambers meeting after the return of the verdict and before the beginning of the penalty phase. And that that was the reason he hadn't turned it over earlier to--to the State. Most of this evidence, you know, we have through Dr. McCoy.

To the extent that the Court is a--is a witness at that hearing that was not recorded, in our understanding, then the Court's--

THE COURT: No, I don't know that.

MR. DAWSON: Yes. I mean I just-

THE COURT: There might have been something that was recorded. We may have done that--General Helm is the only other one that was there that is in the courtroom. There were some things that we did, and I don't remember if it was in Miss Pike's case or somebody else's that we actually had the court reporter present for. And it may--we're going to have to check on that.

MR. DAWSON: And if that's present, then that, of course, resolves the entire issue, your Honor.

THE COURT: I don't know.

MR. DAWSON: The other thing is--I mean, frankly, it wouldn't surprise me if the Court didn't remember what was said at that meeting--(Laughing)--twelve years ago or ten years ago, whatever it's been now.

THE COURT: Believe it or not, Mr. Dawson, I have racked my brain to remember what happened in that meeting. I remember the meeting vividly. I remember the report. I think I even looked at the report for some reason. I do not remember--and I did not take notes of that meeting. I do not remember what was said in that meeting, frankly.

MR. DAWSON: And I think to some ex--

THE COURT: I've tried. I wish I did.

MR. DAWSON: You know, that--and that, of course--I mean the only question--

THE COURT: That's one of the reasons I very much--and I haven't read these transcripts for years so I very much would like to reread that part of the transcript as well.

MR. DAWSON: And what happens in the transcript, your Honor--I mean the Court--the Court should reread it for the Court's benefit. But what happens in the transcript is the verdict is returned. There is some discussion about what needs to be done, housekeeping, to go forward. There's then a recess, obviously a meeting in chambers; after which, they return to the Court and then there's some question about how long does it take to get ready. And Mr. Crabtree is mentioning that he has just received these three volumes and he needs to--some time to go through them. And Mr. Talman then represents that he, as he stated--he said earlier this week I received them.

There is some question then about exactly what he said in chambers because Dr. McCoy's recollection is --and she is prepared to testify on this--is that he was in an absolute panic at that point and had asked her to say that she had just given it to him, I think, the day before when she, in fact, had not. She had given it to

him some time prior to that. And that it was for that reason she wasn't called.

So that's the issue is that the conflict that's created there--

THE COURT: Was that report even discoverable prior to the time that the verdict was returned?

MR. DAWSON: Your Honor--

(Whereupon, Ms. Brockenborough spoke to Mr. Dawson.)

THE COURT: I think that was part of the issue. I mean, you know, it's kind of coming back, and I don't know what Miss Pike recalls of all those moments. But I think that kind of was one of the discussions, whether or not he had to turn that over at that point until then.

MR. DAWSON: Your Honor, there had been a Motion, of course, for Discovery under Rule 16 filed by Mr. Talman. There had been a Motion for Reciprocal Discovery--

THE COURT: Filed by the State.

MR. DAWSON: --filed by the State.

THE COURT: But until the verdict came in we didn't know if we were going to get to the mitigation testimony.

MR. DAWSON: And that issue, your Honor, of

course, wasn't really resolved in--(Pause)

THE COURT: It was resolved eventually by the Courts.

MR. DAWSON: By Reed vs. State, your Honor.

THE COURT: Yes. I have a helper.

MR. DAWSON: And--and I suspect that the resolution was--although, it was little--it was toward doctors' reports which is--and what you told the doctor, which is a little different perhaps. But--but it was resolved at that point that that stuff could be turned over to the State but not given to the prosecutors--

THE COURT: Until--

MR. DAWSON: --until that time.

THE COURT: Right.

MR. DAWSON: So the State's experts would have been entitled to these reports but not--and then this other issue, your Honor, the issue that had been resolved before that that was resolved in the case of Nichols v. State was that if you don't do a report then they get everything under Rule 16. So that had been resolved and then it was--it was--

THE COURT: But there--but if I'm not mistaken, there was a report; was there not?

MR. DAWSON: Pardon?

THE COURT: Dr. McCoy did a report?

MR. DAWSON: No, your Honor.

THE COURT: No? She never did?

MR. DAWSON: No, your Honor.

THE COURT: So it was a report of her materials.

MS. HELM: She did a report; she didn't testify.

MR. DAWSON: Well, she did--she did--

MS. BROCKENBOROUGH: She did a social history with documentation attached--

THE COURT: Yes.

MS. BROCKENBOROUGH: --and the entirety comprised three volumes.

THE COURT: You see, the problem is I remember what's in that. That's one of the problems. I remember some history of Miss Pike that was not ever in the record. That--that's--I remember some of what they said--what that social history involved.

MS. BROCKENBOROUGH: I believe the transcript indicates--we have--(Pause)

THE COURT: Yes, and some of that will come out in these hearings, her social history.

MS. BROCKENBOROUGH: Yes, absolutely, your Honor. For your Honor's--

THE COURT: But they--it says whatever it

says.

MS. BROCKENBOROUGH: For your Honor's reference, it's Volume XXV of the transcript, pages 2463 to 2465, which we believe--it looks like--

THE COURT: I don't have the transcript so--

MS. BROCKENBOROUGH: Oh, okay.

THE COURT: I do not--I have never possessed a transcript. I have read the transcript several times. In fact, there was a whole portion that I realized was missing when the transcript was prepared that I had--

MS. BROCKENBOROUGH: We, hum--

MR. PRICE: I have a--not a--(Indiscernible word)--

THE COURT: Do you have a copy of that part?

MR. PRICE: --but I have an extra copy of that portion.

MS. BROCKENBOROUGH: We're used to the District Attorney in Shelby County always having the record at the PC hearings and so--

THE COURT: Usually they do--

MS. BROCKENBOROUGH: --we didn't make an effort to do that.

THE COURT: --but--and they may, but it has not been entered into evidence because we haven't ever gotten to a PC hearing.

MS. BROCKENBOROUGH: Right.

THE COURT: We're still doing preliminary matters.

MS. BROCKENBOROUGH: I understand.

MR. PRICE: May I approach?

MS. BROCKENBOROUGH: And I guess I just assumed we'd have it here.

THE COURT: Do you have any objection to my taking a look at it at this point?

MR. DAWSON: No, your Honor. And actually I was going to offer--we have the entire transcript if the Court wants to look at that. But we're--it's fine if the--if the Court wants to read that, that's great.

MR. PRICE: That begins there as the jury is leaving.

THE COURT: This was Friday night; wasn't it?

MR. DAWSON: It was, your Honor.

MS. BROCKENBOROUGH: Friday afternoon about 2:42, yes; yes, your Honor.

THE COURT: Oh, yeah, I remember. (Pause while reading) Now, this was after the chamber's conference?

MR. DAWSON: Yes, your Honor, when he--well, I think they've got--may--I don't know where this starts. Where does--

MR. PRICE: I start on 2464.

MR. DAWSON: Which starts saying what?

MS. BROCKENBOROUGH: I think 2463--

MR. DAWSON: Well, let me just get--

THE COURT: But it was when we came back in court.

MR. PRICE: Yes, you had just come back from that chambers conference.

MR. DAWSON: That's right, your Honor.

MS. BROCKENBOROUGH: Yes.

THE COURT: The jury let Court and then--

(Whereupon, there was a pause in the proceedings while the Court read the aforementioned transcript pages.)

MR. DAWSON: Your Honor, we also have the page before that if the Court needs that just to put in perspective--what happened on page 2463 is only the jury's--returns the verdict.

THE COURT: Mr. Crabtree wanted to see the report, if I recall correctly, and it was turned over to him. And he had a little bit of time to look at it, very little.

MR. DAWSON: Right.

THE COURT: Am I correct?

MR. DAWSON: Well, he had overnight.

THE COURT: Well, this is before that.

MR. DAWSON: Right, right, at that point, right.

THE COURT: And so he wanted additional time to take a look at it and review it. And so he had overnight. And the next morning we came in and Dr. McCoy was not put on the witness stand by Mr. Talman--

MR. DAWSON: That's correct.

THE COURT: --correct?

MR. DAWSON: That's correct.

THE COURT: For whatever reason Mr. Talman decided he didn't do that.

MR. DAWSON: That is correct, your Honor. And--

THE COURT: Is there any transcript of that discussion the next morning, having--if there was a discussion with regard to whether or not Dr. McCoy would testify?

MR. DAWSON: I don't believe so, your Honor. We don't--that's not ringing a bell so-- The--

THE COURT: Debbie.

THE COURT REPORTER: Yes, ma'am.

THE COURT: Would there be a record, a tape--

if there was an in-chambers hearing? Would you still have that tape?

THE COURT REPORTER: Possibly.

THE COURT: We need to see if there were any at anytime in-chambers hearings that go right along with all that.

THE COURT REPORTER: I'll be glad to look.

THE COURT: Okay.

MR. DAWSON: There's--there's a record of that, your Honor. Everybody we've talked to indicated there was no record taken, but that doesn't mean that the recollection is correct.

THE COURT: You know, but--but--but--(Sighing) You know, I've been doing this for seventeen and a half years, Mr. Dawson. And in some of the high profile cases on a rare--very rare occasion where it was deemed necessary, the court reporter came in and we--and we made a record in an in-chambers hearing. And it may well be that that happened, and I'm going to check every corner, nook and cranny at this point--

MR. DAWSON: That's fine, your Honor.

THE COURT: --because whatever it is is what it is; it speaks for itself.

MR. DAWSON: Because that obviously would be the best proof of what happened--

THE COURT: Absolutely.

MR. DAWSON: --if that was recorded.

THE COURT: Absolutely. Okay. I remember this now.

MR. DAWSON: And, your Honor--and so the--really that second is only to the--to the extent that the Court is a witness to that event and--

THE COURT: Well, so your issue is that I was present in that meeting that was held in my chambers at my request, probably--

MR. DAWSON: Right.

THE COURT: --at their request, to make a decision about what would happen to those materials and what we would do next basically.

MR. DAWSON: An issue though is--really on our issue in terms of the conflict for Mr. Talman, it really turns on what Mr. Talman represented--

THE COURT: To the Court--

MR. DAWSON: --to the Court.

THE COURT: --at that time?

MR. DAWSON: And I guess--

THE COURT: About?

MR. DAWSON: About when he received the report from Dr. McCoy.

THE COURT: Why does that matter, other than

the fact that you're alleging he was not telling the truth?

MR. DAWSON: Dr. McCoy is going to testify that that's the reason she wasn't called as a witness, that she refused to get on the witness stand and say that she had given it to him the day before, because she had given it to him, in fact, the Sunday before, and that he had been reviewing it for the entire month of March.

THE COURT: Because he made a representation in chambers--

MR. DAWSON: That's correct, your Honor.

THE COURT: --that you're saying was not the truth?

MR. DAWSON: What Dr. McCoy tells us happened is that he called her after that meeting--after court recessed he called her in a panic, that he was extremely worried. I think she refers to it as scared. Asked her if she could testify, if asked, that she gave it to him the day before.

The reason actually, your Honor, we were calling Mr. Moncier as a witness is that she then contacted Mr. Moncier and said, "What are my duties here? What should I do?" and was told, "You have to tell the truth on the witness stand." (Pause) And we

think that is a--

THE COURT: I can't recall what Mr. Talman said about that. All that I can recall is that I gave --the Attorney General was upset because he just got it. So we gave the Generals over night.

I recall some--I mean it was--it was a whole lot of material.

MR. DAWSON: That's correct, your Honor.

THE COURT: And I recall looking through it. Maybe I was given a--I don't--a copy of something.

MR. DAWSON: And the way it ended up being used, your Honor--it ended up being used by Mr. Crabtree in cross-examining Miss Pike's witnesses and destroying those witnesses on the witness stand because nothing was in context and--

THE COURT: Okay. But if I don't recall any conversation about when it came except for the--what he said on the record--

MR. DAWSON: That's fine, your Honor.

THE COURT: --I don't recall.

MR. DAWSON: We're satisfied to do. And we thought--

THE COURT: And I--I'm--I'm trying to honestly--no, I don't want to be a witness in this case. I have no desire to be a witness in this case; however,

the issue--the issues of post-conviction need to be presented to the Court. Obviously Mr. Talman's representations can--can--if they were made can come out or not come out through the other witnesses that were there who have been subpoenaed, such as Mr. Crabtree.

And by the way you haven't General Helm.

MR. DAWSON: Pardon, your Honor? I'm sorry.

THE COURT: You haven't subpoenaed General Helm; have you?

MR. DAWSON: We did, your Honor.

THE COURT: Oh, okay.

MR. DAWSON: But, your Honor, my understanding on that issue--and I mean that--and we don't feel real strong about the subpoena for General Helm or Mr. Crabtree for that reason. We have other reasons for Mr. Crabtree for being--

THE COURT: Well, I understand.

MR. DAWSON: But I have talked with Mr. Crabtree, and he has indicated to me that he doesn't remember. (Laughing)

THE COURT: Well, General Helm might not either. I don't know. I'm sure she's going to have to--

MR. DAWSON: He indicated he had talked to General Helm, but she didn't remember either.

THE COURT: That's why I'm so curious to know whether or not we have preserved any of that.

MR. DAWSON: They were only subpoenaed to, if necessary, put on the record that they didn't remember because, you know, we--we find that in post-conviction work, your Honor, oftentimes the courts--the appellate courts will say that we lose because we failed to disprove something.

THE COURT: Uh-huh. (Affirmatively)

MR. DAWSON: And so we just were subpoenaing them to make sure the record is perfectly clear that we tried to get this information and people's memories from ten years ago just isn't that sound.

THE COURT: Okay. Okay. With respect to this motion, let's go back on tract.

MR. DAWSON: Okay, your Honor.

THE COURT: Any other points you want to bring up?

MR. DAWSON: You know, those really are the two--the three points.

THE COURT: The three salient points. Okay.

MR. DAWSON: And--and--and the main--the main two really are--are the first two and that being that we believe that because of the nature of the appointment and what that does to an overall case and the idea of

appointing an attorney who--who is conflicted to a case violated Miss Pike's fundamental right to an attorney in this case. And that by doing that that this Court is not in a position now to review that issue, and that the Court would have an interest in that determination.

THE COURT: Well, let me ask you a question. What makes that different from any other post-conviction case of any kind--(Pause)

MR. DAWSON: Your Honor, I think that--my--first of all--

THE COURT: --I mean because you've got the same problem.

MR. DAWSON: First of all I'd say that is the hard question. And--however, I think that the disguising factor is--is the very core nature of--of--of the attorney/client relationship, of the attorney's duties in a--in any case, but in a capital case in particular, and in a high profile case even more so. To represent the client is so, again, just fundamental to the process that when that prong fails and when it fails ab initio because the Court appoints a lawyer with a title appointment has a serious conflict that is known to the Court that that is--that is fundamentally different than a ruling on a motion for ev-evidentiary motion or moveal (sic)--even moving--or a decision on a

Motion to Suppress or any other issue that may come before the post-conviction court.

This is reviewing the Court's actions at a very fundamental level that any Court, I think, would--would have some great misgivings about making that appointment, and that because of that that develops an interest in that decision that's beyond the normal interest that a Court has in its prior decisions. And for that reason this raises the constitutional level.

If the Court disagrees with that then at least it creates such a--at least a view of impropriety that the Court is not really--it would be difficult for the public, for Miss Pike, for the State of Tennessee, I think, to feel that justice was done however the Court rules on that issue in the future given that this cloud was on that appointment from the beginning. And that's kind of where we are. We just think that this is a--a fundamental decision.

THE COURT: Well, why is it any different than any other issue that Miss Pike might raise in her post-conviction petition that the Court may have ruled erroneously on in the past?

MR. DAWSON: Your Honor--and I think--I understand--

THE COURT: It's an issue of post-conviction.

I conceded that when we started today. Obviously, all of the things that had to do with Mr. Talman's representation of Miss Pike go to whether or not she was prejudiced by her representation or whether or not she had ineffective assistance of counsel.

MR. DAWSON: Your Honor, if--(Pause) Again, I think that the--the--the appointment of the attorney in the case--in a capital case, is the--is the first fundamental thing that a Court does to attempt to ensure that justice takes place in the--in the case. And in this case there was an attorney appointed who essentially hobbled in what he was going to do. I mean we had an attorney that--and--

THE COURT: Well, you're alleging that he was hobbled. That's certainly an issue of post-conviction.

MR. DAWSON: Well, no, your Honor, I think that--I think that--

THE COURT: I don't think you can--I think that's a finding of fact; isn't it?

MR. DAWSON: Your Honor, I think that it's a fact, though, that arises not from what the Court is going to hear in post-conviction but what's in the report from the Comptroller and what's in the materials from the Board of Professional Responsibility, that being that what we know about this case. I think that's

what's important, your Honor.

The bullet--the things that we know about this case that we believe are proved through the Comptroller's report and through the Board of Responsibility report. The--on--and then, you know, in talking to the--these facts go to the impropriety, frankly, and they go to the conflict. But what we know is that on March 15th--and the Court's related some of these already--but on March 15th the Comptroller was informed that there was a possibility of private attorneys paid by the State to represent any criminal defendants submitted improper billing to the Administrative Office of the Courts. That's contained in the Comptroller's report on page 1.

THE COURT: I guess I want to ask you something and I want to make it of record.

MR. DAWSON: Okay.

THE COURT: There was not an allegation of improper billing in this case; was there?

MR. DAWSON: Hum, your Honor, there was a cut in fee--

THE COURT: That's different.

MR. DAWSON: --in this case.

THE COURT: That's different.

MR. DAWSON: And it was cut in fee--

THE COURT: If there was, I'm not aware of it because somebody else did it.

MR. DAWSON: It was by the Court of Appeals, your Honor.

THE COURT: Yes.

MR. DAWSON: And the Court of Appeals said that they felt that--(Conferring with co-counsel)

THE COURT: That's a different issue.

MR. DAWSON: Yeah, we have that order. We'll pull that order because it's--

THE COURT: Well, they cut fees all the time but--

MR. DAWSON: Pardon, your Honor?

THE COURT: They cut fees all the time.

MR. DAWSON: I know.

THE COURT: But there was not an allegation of impropriety; was there?

MR. DAWSON: There--I was going to look up the exact wording, your Honor--

THE COURT: That would probably be helpful.

MR. DAWSON: Hum, because I didn't want to misstate it and I didn't want to mislabel it. The, hum --(Pause while conferring with Ms. Brockenborough) Your Honor, I think there was an order that was entered in the Court of Criminal Appeals that indicates--this was

an order entered by the Court of Criminal Appeals on, hum, July 11th, 1998. And, uh, it states that on March 9th, '98, William C. Talman submitted a request for an attorney fee in connection with the services rendered on behalf of defendant Christa Pike in this court. This would be in the Court of Criminal Appeals. Requested services total over 178.6 hours for an amount of nine thousand eight hundred fifty-five dollars and twenty-five cents ($9,855.25).

THE COURT: That was Mr. Talman's or Ms. Martin's?

MR. DAWSON: Mr. Talman's.

THE COURT: Okay.

MR. DAWSON: And six hundred and thirty-six point three eight--thirty-eight ($636.38) for necessary expenses. And then they go on to say that they note that Mr. Talman had been compensated by the trial court in excess of thirty-six thousand dollars ($36,000). And then after a careful examination of the claim submitted in this court, it is the court's opinion the amount of time expended by Mr. Talman in this appeal is dispro-portionate to the complexity and the number of issues involved in the appeal of this case. Further, an inordinate amount of time was spent in conversation and meetings with co-counsel and in representation following

oral argument, not withstanding the preparation of the petitioner to rehear.

THE COURT: They did that in many cases; didn't they?

MR. DAWSON: So--so they--

MS. BROCKENBOROUGH: Your Honor, actually, I mean the final--I think the final paragraph of the order really summarizes the issue. It's, "The Court wishes to emphasize that the disallowance of a substantial portion of the requested fees in this case is not to be interpreted as a determination that an attorney's fee in excess of ten thousand dollars ($10,000.00) would not be reasonable for appointed counsel in a capital case."

What we conclude in this order is the amount of time spent on this appeal is questionable and does not merit the fee requests. And there's an earlier reference where in--

THE COURT: I think you ought to make that exhibit to this hearing.

MR. DAWSON: I think that'd be--

MS. BROCKENBOROUGH: We'll be happy to do that. Actually, we have--

THE COURT: --or a copy of that. The copy of it--if you need to get one we'll--

MR. DAWSON: Yeah. We could--we could--

MS. BROCKENBOROUGH: Yeah.

MR. DAWSON: What we have is--let's just use that.

MS. BROCKENBOROUGH: Okay.

THE COURT: My able counsel to my left says Mr. Moncier got cut in the Huskey case too.

MR. DAWSON: Your Honor, there's no question that the court does question fees. We don't have a--

THE COURT: Oh, yes. Especially those courts question the fees. The attorneys fees in the trial courts are not as often questioned.

MR. DAWSON: But I didn't want to say that this wasn't suggesting that the fee was--

THE COURT: I understand. Let's make that an exhibit. I--that's fine. So that would be Exhibit--what now, Deb?--

THE COURT REPORTER: 3.

THE COURT: --3.

(Exhibit No. 3 was marked and filed.)

MR. DAWSON: Your Honor, and I'll--let me ask the Attorney General what he wants to do.

(Whereupon, Mr. Dawson briefly conferred with General Price off the record.)

THE COURT: I'm just talking about the order. I mean I think that's what we're talking about.

MR. DAWSON: Okay. It was just a question of what we had and where we got it, your Honor, was the--(Laughing)--was the issue.

THE COURT: Okay. Are we ready to let the State address the Motion to Recuse or are there some other points you want to--

MR. DAWSON: Your Honor, this--let me just pass this forward and advise the Court what it is on the record. This, I guess, will be Exhibit No. 3 to this hearing. And this is the two-page order signed by Judge Barker on June 11th, 1998.

THE COURT: Now the Chief Justice of the Supreme Court.

MR. DAWSON: Yes, your Honor.

THE COURT: Uh-huh. (Affirmatively)

MR. DAWSON: And it was attached. I mean we--we got it attached to the Claim for Attorney's Fee filed by Mr. Talman. We received it from the Administrative Office of the Courts. So that's where--where it came from. (Mr. Dawson to Ms. Brockenborough)

Your Honor, we then had--if we need to--one of the reasons that we subpoenaed, of course, some of the witnesses was to deal with the issues. And it sounds

like we may not need to at this point. But with the issues of when things were done and what the Attorney General's role was in collecting funds for Mr. Talman. Of course, when we get to the eventual issue there-- those issues--

THE COURT: That's a different issue.

MR. DAWSON: Yeah. That's really beyond the Court's--

THE COURT: That's a different matter, yes.

MR. DAWSON: --the Court's decision in this case at this point.

THE COURT: I'm trying to separate out-- separate out your motions from the issues of the Post-conviction Petition to deal with.

MR. DAWSON: Okay.

THE COURT: General. I was going to make a suggestion. It's 11:30. I'd like to hear the General's response, and then we'll take a brief lunch break, an hour or so. And in the meantime we're going to try to figure out what we have recorded and what we don't.

MR. DAWSON: That's fine. Your Honor, if--if --after Mr. Price finishes--I don't know if the Court wanted to look at stuff during the lunch break. But if so, even though I haven't found it yet, I would be glad to give the Court a copy of our Rule 9 that we prepared.

And the only--it does, I think, clarify the issues a little better as--I'm one of those people that's a slow thinker, and as I do different things it--I get it clearer in my mind. So if that would help the Court I will; if not, I'll wait until it becomes appropriate in this area.

THE COURT: Actually, you're doing fine. Let me think about that a minute while we're--

MR. DAWSON: Thank your Honor.

THE COURT: --we're hearing what he has to say.

MR. PRICE: Your Honor, in response we--we did file a memorandum, brief memorandum, about whether your Honor should be recused. And we began--

THE COURT: Yes, sir, and I do have it.

MR. PRICE: Okay. And we began with the very same line of thinking that--that you have mentioned in questioning Mr. Dawson about in that: how is this different than any other situation where an attorney comes in and says to your Honor, "Look, your Honor, you made a--you were in error; this previous ruling in this case or in a post-conviction proceeding that--the ruling you made originally was wrong"?

Simply because you're asked to go back and look at your own decision and you have an interest in

upholding your own decision doesn't mean you should be recused. And I submit-- I don't know that I would--I would even hesitate to say you have an interest in upholding your own decision. You--your Honor is presumed to be fair and impartial. And, in fact, I know on several occasions you have reversed your--

THE COURT: Heck of a presumption. (Laughing) I have.

MR. PRICE: --that you've gone back and reserved--reversed yourself, and we can all be wrong. And so--

THE COURT: As General Allen would like to point out sometimes I'm wrong and he's right.

MR. PRICE: (Laughing)

THE COURT: And if I don't reverse myself, I get reversed if I'm wrong. So--

MR. PRICE: Right, right.

THE COURT: --that's part of the--that's part of the nature of the business, I'm afraid.

MR. PRICE: And some--and many times, particularly in a Motion for New Trial, there's going to be--they are all very important, critical, fundamental issues. If you were called on to go back and review your denial of a Motion to Suppress that would have caused a case to be dismissed--I mean those are all

critical to the case, all very important decisions, that your Honor is called upon to rule upon in a Motion for New Trial or in a Petition for Post-conviction.

And the Rules of Criminal Procedure and the ways the post-conviction proced-statute is set up doesn't require your recusal simply because you're going back and looking at your own decisions. And that's simply what's going to happen in this case on this issue about whether Talman had a--Bill--Mr. Talman had a conflict of interest, had an actual conflict of interest that affected his performance.

By appointing him you, in essence, felt like he was capable of representing Miss Pike and was not--did not have a conflict. And now you're going to be called upon to review that decision, decide if it was erroneous. But you certainly are capable of doing that, and you have no vested interest in the outcome of that and--

So, your Honor, I don't think that's a proper basis for recusal. If it is I would say that the Supreme Court of this state is also going to have to recuse itself because it appointed Mr. Talman to represent a pro se defendant in a case before it at the same time you were appointing Mr. Talman to represent Miss Pike.

THE COURT: Can you tell me what case that might have been?

MR. PRICE: Yes.

THE COURT: I guess that's another issue for Mr. Dawson, but I'll probably be more gentle with him about it than they will.

MR. PRICE: I don't think--

THE COURT: Actually, Judge Barker. Go ahead.

MR. PRICE: And maybe the Petitioner's position is that they should also be recused as well. But the case was--he was appointed in March of '95. Of course, he was appointed to represent Miss Pike in May of '95. So two months before he was appointed in this case, Mr. Talman was appointed in the case of State vs. Irick, I-R-I-C-K.

THE COURT: Out of Knox County.

MR. PRICE: It may have been.

THE COURT: I think--it was, the Irick case. Was it a death case originally?

MR. DAWSON: Yes, your Honor. But it may not have been that. That was a pro se. I don't know what that was.

THE COURT: I don't either but there--okay.

MR. PRICE: And it was--

THE COURT: But it was a murder case none the

less.

MR. DAWSON: Initially, yes, your Honor.

THE COURT: And it was initially a death--

MR. PRICE: I mean I just--

THE COURT: It was a what?

(Whereupon, Ms. Vanessa Johnson spoke to the Court.)

THE COURT: I think that goes on to later issues, but I'm just making that point.

THE COURT: I think you're absolutely right. I think that he was. (To Ms. Johnson)

MR. PRICE: They're going to be called on to look at that as well, whether they made an error in appointing him to that case.

But, again, your Honor, your Honor is capable of looking at its own decisions and reevaluating them in light of a post-conviction petition. And that doesn't mean you should be recused.

On the second issue about you being a witness --(To Ms. Helm) Where is that transcript? Oh, yeah.

If you'll look, your Honor, I would submit-- and your Honor has already indicated she doesn't remember in this--in this part of it. So I think you being called as a witness now is probably moot. But even if you had some recollection of it, what was said

in chambers was repeated when they came back out on the record, at least the essential thrust of it, and that being Mr. Dawson is saying that Mr. Talman repre-- misrepresented when he received those materials. So what was the statement he made in chambers? He comes back out and repeats it.

On page 2568 line 21 he says, "Your Honor, as I explained in chambers, I have just received this documentation earlier this week myself." Now, whether that was a lie or misrepresentation--I'm sorry--it's not something your Honor's going to be having personal knowledge of. That's going to come from other witnesses.

THE COURT: I might point out that we were in trial day and night sometimes in that case from--from the Monday preceding until that day continuously, except for Sunday when I couldn't--was not allowed by law to hold court. So, you know, there was very little time for anybody to prepare anything to be honest with you.

MR. PRICE: Well, be that as it may, your Honor, I think the evidence--the record is clear. There's no need for your testimony on that issue. It's on the record what Mr. Talman said. If that was incorrect, what he had not said in chambers, I'm sure Mr. Crabtree and your Honor would have corrected him.

But he goes on and says in-on the record what he had said in chambers. So--and that's going to go also to the subpoenas to Mr. Crabtree and Ms. Helm about that issue too. That's why I bring that up.

So, your Honor, for those reasons we think your Honor should not recuse itself. That it can be fair and impartial to Miss Pike in reviewing it's own decisions, and we ask that you stay on the case.

THE COURT: That was succinct.

MR. DAWSON: Your Honor, if I may just briefly reply.

THE COURT: Please.

MR. DAWSON: Your Honor, I think--as to what was said in open court, we don't know whether that was what was said in chambers or not, and that's one of our problems. Obviously, the day before was also earlier this week, and it could have been that Mr. Talman had realized by that point that he had gotten himself in a bind and he was going to be a little more general. So we don't know what that--whether that reflects accurately what he said in chambers.

You know, again, what our proof is going to show is that he had some very severe concerns later that day when he spoke to Dr. McCoy when he made a decision not to use her as a witness.

And the--and, again, given the Court's indication of lack of memory of that, which doesn't surprise anybody--again, it was ten years ago--

THE COURT: Well, I--what would ordinarily happen--and I don't know if it happened in this case--is that I would tell attorneys that we need to go out and put it of record, what--why we're doing whatever we're doing that was in the chamber's conference. And I suppose that's what we were doing here is why we were continuing till tomorrow because.

MR. DAWSON: So all we know--I mean--I mean--but, frankly, that--I mean that issue again was not as important, and we still stand by our position that the appointment of counsel is such a fundamental act.

THE COURT: Would you like to know before I make a ruling on this whether or not there is anything of record that we could--

MR. DAWSON: Yes, your Honor, we would like to know that.

MR. PRICE: I'd like to know, your Honor.

THE COURT: Before I make a ruling on this motion?

MR. DAWSON: Well, I think--

MR. PRICE: Well--

MR. DAWSON: --and that's--now--

THE COURT: I--

MR. DAWSON: --you're talking about now anything on the record that would say that--whether you had advised Miss Pike of the--

THE COURT: No.

MR. DAWSON: --or the other--

THE COURT: No--well, I guess--

MR. DAWSON: --or both?

MR. PRICE: (Laughing)

THE COURT: Whether or not I had advised Miss Pike what?

MR. DAWSON: Well, I think when we--when we discussed--when we talked on--

THE COURT: On the phone the other day.

MR. DAWSON: --on the phone, we had talked about the question of whether at some point--

THE COURT: Whether or not Miss Pike was ever advised regarding Mr. Talman--

MR. DAWSON: Right.

THE COURT: --or whether or not there was ever anything--I'm not talking about that.

MR. DAWSON: Okay.

THE COURT: What I'm talking about is what happened that day that you're concerned about that's--

MR. DAWSON: I think it's important for the--

THE COURT: --(Inaudible word)--before.

MR. DAWSON: --eventual post-conviction to know.

THE COURT: But now--eventually I think we need--that's why I want everything. I want to know exactly what happened in the record.

MR. DAWSON: I don't think that we need to know that before the Court rules on this motion, your Honor.

MR. PRICE: That's--yeah, I agree, your Honor.

MR. DAWSON: Because I think--

THE COURT: I may not--

MR. DAWSON: Let me talk with my co-counsel for a minute.

THE COURT: --the problem is I may not know what was said. I just want to know what we have recorded because we would have to have it transcribed.

MS. BROCKENBOROUGH: Just to clarify your question is: if we would like to know whether there is in existence a record of what happened in chambers--

THE COURT: Yes.

MS. BROCKENBOROUGH: --not necessarily what--

THE COURT: That's my question.

MS. BROCKENBOROUGH: Okay.

MR. DAWSON: Okay. I just wanted to make

sure.

(Whereupon, Ms. Brockenborough
and Mr. Dawson conferred.)

THE COURT: While your counseling I'm going to counsel over here.

(Whereupon, the Judge conferred
with Ms. Johnson.)

MR. DAWSON: Your Honor, we--we--I guess that --and, obviously if there is a record of that meeting, then that part of the motion is moot, frankly.

THE COURT: Uh-huh. (Affirmatively)

MR. DAWSON: And so for that reason I guess it would be valuable to at least know if there is a record--

THE COURT: Okay.

MR. DAWSON: --of an in-chambers meeting. The other thing that we think is important though before the Court rules on the overall motion deals with whether there is records of the Court ever having advised Miss Pike--

THE COURT: About whether Mr. Talman--

MR. DAWSON: --of their knowing--

THE COURT: Well, that's one of the issues that I've wrestled with and realized that week that we'd need to deal with getting things typed up.

MR. DAWSON: You know, and we're not--you know, we're not conceding that if the Court did advise Miss Pike that--

THE COURT: I understand that.

MR. DAWSON: Right.

THE COURT: The question did I--was she aware may be an issue all the way around.

MR. DAWSON: Right.

THE COURT: And if not, why not? You know, I think those are valid questions to raise at post-conviction hearing.

MR. DAWSON: That's correct.

THE COURT: I'm not sure they're valid questions to raise over whether or not I should recuse myself for these reasons that you've set out. Certainly, we need to know what Miss Pike knew and when she knew it, I would think, based upon some of these issues.

MR. DAWSON: Your Honor, one thing that we've alleged in our latest file--amendments to the petition, which I don't know if the Court's accepted or not at this point, but what we've raised is that--

THE COURT: Your new grounds? Your new allegations, you mean?

MR. DAWSON: The new allegations dealt--really

dealt with--with one new allegation. Most of what it is--it withdrew some old allegations.

THE COURT: Yes, I realize that.

MR. DAWSON: But it raised one new allegation, your Honor, and that was that--again, as we were preparing for the hearing in general in this case; it, again, dawned on my dim brain for the first time that if we were alleging that Mr. Talman was under a conflict and if we are asking the Court to recuse itself because of that conflict, then that also questions whether the appointment of Mr. Talman, in the first place, violated Miss Pike's rights and so we raised that issue.

And we raised within that issue the question of the--whether the Court had ever advised Miss Pike of the conflict and whether it had ever been waived. And that's the question that we haven't been able to answer because we don't--haven't seen the entire transcript. We were hoping we could resolve that from transcripts and then discovered we didn't have transcripts of--of the hearings before the start of the trial.

So I think it's important to know, I guess, to some extent because the issue also then goes to the Court's conduct in either--if the Court did not advise Miss Pike of--of the Court's conduct of not advising Miss Pike.

THE COURT: If I have an obligation to advise Miss Pike.

MR. DAWSON: Your Honor, I think it's clear the Court did. I think it's clear that--that--

THE COURT: I think that's not--I don't know if that's a point they'd concede, but I'm not sure that that is because Mr. Talman had a law license and was licensed to practice law. He was licensed in all the courts of Tennessee. He had co-counsel. He had--he had certain obligations with respect to Miss Pike.

MR. DAWSON: Your Honor, we--we--

THE COURT: What I knew--whether or not--whether or not he was conflicted and perhaps failed to advise Miss Pike appropriately is an issue I think but--(Pause)

MR. DAWSON: Your Honor, we had at least posited as our--as a theory that the Court, the DA and Mr. Talman had a duty involved in this because Mr. Talman certainly knew he was under question. We now know that the Court also--

THE COURT: Well, he had already made his agreement to deal with everything by then. By the time I appointed him in this case it was a month after he had paid back sixty-two thousand dollars ($62,000.00); is that not correct?

MR. DAWSON: It was, your Honor. But the question was--

THE COURT: So he--

MR. DAWSON: --at that point our understanding is that they--I mean according to the records at least. The report to the--but the report indicates on May 31st when it was distributed to the various players that--the Comptroller's report--that it was distributed to the District Attorney General in Davidson County who was--who then referred it to the Tennessee Bureau of Investigation. So it would have seemed that at that point there was still ongoing question about what might be done, and that it wasn't resolved.

THE COURT: But he was--but he--

MR. DAWSON: An attempt had been made to resolve it, but there wasn't a settlement to our knowledge which is one reason--

THE COURT: I understand. But his law license was not in question at that point. He had his law license.

MR. DAWSON: He had his license, but he had a cloud over it, your Honor, is what our position is. There's no question--

THE COURT: I realize that; I realize that.

MR. DAWSON: --that he was a licensed

attorney.

THE COURT: I realize that's what your allegation is.

MR. DAWSON: Right.

THE COURT: Okay. All right. Do you all want to take a lunch recess and let's see what we can come up with here to help clarify things? And then I think I will be pretty much prepared to rule on this Motion to Recuse, and then we can step over to some of the other motions, if I haven't recused myself.

MR. DAWSON: Your Honor, what we would ask, I guess, so we can be prepared this afternoon, should we--we were supposed to contact our witnesses at this point to let them know--

THE COURT: Oh.

MR. DAWSON: --whether to be here or not.

THE COURT: Well, the next motion, if we're going to proceed, would be having to do with the Motion to Disqualify the State Attorney General's Office.

MR. DAWSON: Yes, your Honor.

THE COURT: And for that do you intend to call witnesses?

MR. DAWSON: I don't think so, your Honor. No, your Honor, but--

THE COURT: So what else is there that we

would need to hear with regard to amendments?

MR. DAWSON: If the Court were going to go forward, I think--I'm not sure what we--the witnesses that we have for--that we had prepared to come--

THE COURT: Have subpoenas.

MR. DAWSON: --would deal with the issue going on. I didn't know how far the Court wanted to go. We've subpoenaed, for instance, Dr. McCoy for the purpose of testifying as to the conversation she had with Mr. Talman.

THE COURT: With Mr. Talman.

MR. DAWSON: We have--so that goes to the issue of that conflict. We have subpoenaed Mr. Moncier only to--as to what he had, you know, talked with Ms. McCoy about.

THE COURT: With Ms. McCoy about. And that may go to the evidentiary hearing and it may not.

MR. DAWSON: Right.

THE COURT: Okay.

MR. DAWSON: And then we had--you know, the subpoenas that we had actually for--for District Attorney General Nichols and for Mr. Crabtree and Mr. Blevins had to do with their involvement in the collection of that sixty-two thousand dollars ($62,000.00) and what transpired and if they have a