# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 5

## DOCUMENT 27

---

ORIGINAL

007035

E2009-00016-CCA-R3-PD

Supplement

XXXII

IN THE CRIMINAL COURT FOR KNOX COUNTY

DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

FILED JUL 17 2009 Clerk of the Courts Rec'd by RGDoyal

CHRISTA GAIL PIKE, )

PETITIONER )

VS. CASE NO. 68280

STATE OF TENNESSEE,

RESPONDENT.

FILED JUL 15 2009 Joy R. McCroskey, Clerk

TRANSCRIPT OF THE EVIDENCE

February 27th, 2006 Motions Hearing

Volume II of II Volumes

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price and Ms. S. Jo Helm
Assistant District Attorneys
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson & Ms. Catherine Brockenborough
Post-Conviction Defenders
Officer of the Post-Conviction Defenders
530 Church Street, Suite 600
Nashville, Tennessee 37243

## TABLE OF CONTENTS

### Volume II


| | Page |
|---|---|
| Rulings of the Court (continued) | 101 |
| Motion for a Rule 9 Interlocutory Appeal | 108 |
| Motion to Have Another Court Hear the Motion to Recuse the Court | 132 |
| Argument about a Rule 9 Appeal by Mr. Price | 137 |
| Rule 9 Appeal Discussed Further by the Parties | 139 |
| Ruling of the Court on the Rule 9 Appeal | 144 |
| Scheduling Discussed and Dates Set | 147 |
| Service of Expert Witness Reports Addressed | 168 |
| Motion to Disqualify the District Attorney's Office Withdrawn | 175 |
| Stipulations to be Submitted to the Court | 176 |
| Court Reporter's Certificate | 183 |
| Certificate of the Court | 184 |

record as to what was--what, if anything, was told to Mr. Talman--

THE COURT: I'd like to hold off--

MR. DAWSON: --with regard to the payment of it.

THE COURT: --your witnesses just yet and we're going to--let me deal with this motion, obviously, first.

MR. DAWSON: That's fine, your Honor.

THE COURT: Then if we--if we're at that point, then I think we need to step to the--to do the argument on the Motion to Disqualify. And then if you--and he's--and, I take it, you're moving to quash the--well, we haven't even talked about the Motions to Subpoena. I guess we've got to do that first and then deal with the Motion to Disqualify.

MR. PRICE: They kind of go hand in hand.

THE COURT: So we've got a little bit of ways to go.

THE COURT: I'm sorry?

MR. PRICE: They kind of go hand in hand.

THE COURT: They go hand in hand obviously, but if, in fact, we're going to go to the Motion to Disqualify and put on proof, I don't know if that--let me get to that point first.

MR. DAWSON: Okay.

THE COURT: Let's just hold the witnesses off. Don't make them come in until it's necessary. We could always take a break and get anyone. Within an hour anybody can get across Knox County.

MR. DAWSON: Okay. Thank your Honor.

THE COURT: Okay. Court is in recess for about an hour so about 12:45, folks; is that okay?

(Whereupon, no oral response was given by any counsel.)

MR. DAWSON: Your Honor, we have one question, I think, nothing related to the hearing. It's related to Miss Pike.

MS. BROCKENBOROUGH: As you may recall from one of the hearings as to whether--I guess at the hearing as to whether Miss Pike could withdraw her post-conviction, she suffers from headaches often. And we had--the last time I think that Mr. Dawson had said that he had some medication. The Sheriff's Department wanted to give them theirselves.

THE COURT: He can't--

MS. BROCKENBOROUGH: But--

THE COURT: Yes.

MS. BROCKENBOROUGH: --so I was wondering, we have them--

(Whereupon, Miss Pike made a
comment to Ms. Brockenborough.)

MS. BROCKENBOROUGH: Yes, the problem is at the--the Sheriff's Department only has Tylenol which does nothing for her headaches.

THE COURT: I have that problem.

MS. BROCKENBOROUGH: And so I was wondering if--

PETITIONER: I have migraines.

MS. BROCKENBOROUGH: --I could give this to the Sheriff's Office. It's unopened, but this is something that helps with her headache.

THE COURT: They won't give it to her, I don't think.

MS. BROCKENBOROUGH: So I didn't know.

THE COURT: I don't think that's going to help. Is that a sealed package?

MS. BROCKENBOROUGH: It is a sealed package. I just got it from the drug store on Saturday.

THE COURT: (Pause)

(Whereupon, the Court conferred
briefly at the bench with Court
Officer Cameron about letting
her take two Excedrin right here
in open court.)

THE COURT: Do you have some water?
MS. BROCKENBOROUGH: Yes.
THE COURT: Unseal it, Ms. Brockenborough, and let her take a couple of Excedrin. I can understand that.
MS. BROCKENBOROUGH: Thank you, ma'am.
THE COURT: And then I--what I'm going to ask you to do Ms. Brockenborough is lodge that with me--
MS. BROCKENBOROUGH: Absolutely.
THE COURT: --so nobody else gets near it.
MS. BROCKENBOROUGH: Absolutely.
THE COURT: And then--as long as you don't say that makes me a witness.
MS. BROCKENBOROUGH: (Laughing)
MR. DAWSON: I only do--(Indiscernible phrase)--your Honor, otherwise I might.
THE COURT: Actually, I recall that Miss Pike has migraines, and she's told me before that she suffered from headaches.
THE COURT REPORTER: Do you want me to lock it in my desk, Judge?
THE COURT: Yes. Would you please lock it up, ma'am.
We'll lock it up and if we're--if you're in need of it later on.

Is that--you can--we're going to lock the courtroom, I guess, so if you want to leave that here. I'll be accessing the courtroom for the next hour, but that's okay. It's up to you.

Do you have something you need to give me? Come on up. (To an unrelated party)

Court is in recess if you all haven't already gotten that.

(Whereupon, the luncheon recess was taken; afterwards, the following proceedings were had, to-wit:)

THE COURT: I have here, which I'm not even sure we really need, unless you all need it--

MR. DAWSON: Do we need Miss Pike first, your Honor, or--

THE COURT: Yes, we do need Miss Pike. Bring her out.

I have Mr. Shipp's transcripts, which I don't think we really need. Can those go elsewhere? Do you need Mr. Shipp's transcripts for anything at this point?

MR. PRICE: I don't think so.

MS. BROCKENBOROUGH: Not to our knowledge.

(Whereupon, the petitioner was brought into open court.)

THE COURT: These are Miss Pike's, and this

has something to do with the transcripts of the Supreme Court. I don't know what--who's is this? (Referring to a manilla folder of documents with the Pike transcripts)

THE COURT REPORTER: It was just sitting on it.

THE COURT: Okay.

THE COURT REPORTER: So it needs to go back to them.

MR. PRICE: I think that has to do with change of venues.

THE COURT: I think that's exactly what it has to do with.

We have over the lunch break taken a look and Miss Debbie tells me that as far as we can tell there were never any recorded chambers' conferences, which doesn't surprise me, but it sure was worth checking into.

And we have a number of other dates that we've looked at on the original--well, I pulled the original files to check all of the dates. There are several dates such as arraignment date, various motion dates. Things may or may not have happened. I don't know whether things got bumped or what. But we have all the tapes now?

THE COURT REPORTER: They're pulling them for

me.

THE COURT: Uh-huh. (Affirmatively) How many hours did you say you were going to have to listen?

THE COURT REPORTER: Approximately 250 to 300.

MS. HELM: Pretrial?

THE COURT: To find the pretrial--

MS. BROCKENBOROUGH: To find it.

THE COURT: No, no, no.

MS. HELM: Oh.

THE COURT: She has to go through the tapes to find the--

MR. DAWSON: Okay. That's--

THE COURT REPORTER: The other dockets.

THE COURT: They were all regular motion dockets.

MR. DAWSON: Right.

THE COURT: And in those days we did hundreds of cases a day, but we'll do it. We'll have to find it. We'll figure out a way; don't worry. But--but that's for another day. I mean I think that information is for other issues. Okay.

So now that I know what all of these pretty brightly colored things are, let's go back to the issue of--I guess I can deal with the issue of my subpoena as well as a Motion to Recuse; is that fair to say?

MR. DAWSON: Yes.
THE COURT: It all ties in.
MR. DAWSON: Yes, your Honor.
THE COURT: Okay.
MR. DAWSON: I think, your Honor, actually, probably, we--from what we've discussed this morning, I think, as with the other judges, the motion for your subpoena is probably moot as well. Other than, I guess, we do have to get on the record somehow what the Court remembers from the knowledge of Mr. Talman's--I mean essentially we discussed it, but it isn't on the record.
THE COURT: Well, everything is on the record that we said today.
MR. DAWSON: I--yeah, I know, but I guess--well--
THE COURT: Okay.
MR. DAWSON: I don't know if there's a distinction, frankly.
THE COURT: Okay.
MR. DAWSON: And if the Court wants to declare that that's what the Court remembered--
THE COURT: Let me--
MR. DAWSON: --then I don't have any problem with that.
THE COURT: Let me cover what I think needs to

be covered.

MR. DAWSON: Okay.

THE COURT: And I'm sure you'll add whatever you think needs to be added; how's that?

We're here on a post-conviction, and the post-conviction statute specifically says that the trial judge shall hear the post-conviction. Now, you all--you all--the defense has moved that the Court recuse itself for a number of reasons. And I want to go over each one of those reasons.

I guess I better begin with the first that you've named which is that--that I should be mandatorily disqualified because not of--because I have an "interest"--and I put that in quotes for the record--in my decisions being correct and the rulings and my decisions being upheld.

MR. DAWSON: Your Honor, that's not exactly what the interest is.

THE COURT: Well, I--okay.

MR. DAWSON: Because--and let me also before--just so we're not starting with the wrong premise--

THE COURT: That I knew that he was--that he had--that I knew or should have known that he had a conflict at that time.

MR. DAWSON: Right.

THE COURT: And that, therefore, I should recuse myself. Is that fair enough? You said that my interest is protecting my integrity, in effect.

MR. DAWSON: Right. But it's more than--let me go back one step.

THE COURT: Yes.

MR. DAWSON: The Court said earlier--at--first of all said was that the statute requires--at least satutely (sic) requires that the trial judge shall hear the post-conviction. I think that's changed in 1995. That used to be the rule. Now, I believe the statute is no longer mandatory that the original trial judge--it used to be that the judge that heard--that the attorney appeared in front of had to hear the case if, in fact, it was--

THE COURT: It presumes that the trial judge should hear the case, in effect.

MR. DAWSON: Because in some--in some jurisdictions, your Honor, the trial judge does not. In Memphis, for example, they--they take care to make sure that it's a different judge that hears the post-conviction. So different--different--I think in Chattanooga they may as well. So in different--in different judicial districts they handle that differently. It used to be required. It's no longer

after '95.

But then the second question is I think that what we're saying is the interest is--I mean it's--it's the--the interest is in this Court's decision to appoint Mr. Talman. But we believe that that goes as a stronger interest than just an ordinary decision of the Court and--

THE COURT: Because it's a death penalty case.

MR. DAWSON: Well, because it's a death penalty case and because it's the initial appointment of counsel. It's who to appoint to represent somebody in a high--in a high profile death case, meaning that it goes to the--again, it goes to a fundamental right to--Miss Pike to have a conflict-free counsel that she has a constitutional right too. And that that was violated in the very beginning, and it's that decision that we think raises it above just an ordinary motion decision or other things that a Court might decide in the course of any trial. So we think this is--this is different in kind.

THE COURT: But you're asking me to--you're telling me that you believe it is a mandatory obligation to disqualify myself based on that?

MR. DAWSON: That's correct, your Honor.

THE COURT: Let me go backwards then. A judge

should according to--it's discretionary, I guess, with the statute. But a judge should hear their own petitions for post-conviction release. And I think my statements will tell you a little bit about why. The reason why is because the judge knows better what happened in these cases than anybody else probably and can understand the issues better without having to go backwards and learn them. I had to do that when I came on the bench with another case that someone else had tried, and there's good reason why they--why they do that.

When one receives a Motion to Recuse, sometimes they can consider it to be personal. And I've given an awful lot of thought to your motion. When you start thinking, however, about your obligation as a judge, you have to think about, you know: what are you doing here? Why are you doing what you're doing?

It's an interesting thing, and directions to judges come through millennia. Judging has existed through millennia beginning with the first sitting criminal judge, Moses. And one of the things Moses wrote was, "You shall not pervert justice." And that's what a judge does. A judge sees to it that justice is not perverted. A judge is to see to it that there is justice for everyone involved, justice for Miss Pike,

that she had as fair and full a trial as she should have, justice for everybody, justice for Ms. Martinez, justice for the people of the state.

In this case I think it's pretty obvious that everyone in Knox County knew that Mr. Talman had problems with his billing. He also had been appointed, I guess, by Judge Jenkins. If you tell me that--I haven't looked to see who signed the original order of appointment originally. And he was a death-qualified attorney with an active law license without restrictions. He too was presumed innocent until proven guilty. As it turned out he was never prosecuted in this case, I do not--in that case, I do not believe. And he kept his law license all the way through until you said there had been a suspension at some time later. But he did have a problem, and I think that it was generally known in the courts in Knox County.

Evidently, it was also generally known in the Supreme Court of Tennessee--and as Mr. Price has point out rightfully--the Supreme Court appointed him to represent Mr. Irick in what was a death case. And he represented Miss Pike. And as we sat over lunch and I went through the files, two of those files are the pre--are the pleadings of--the pretrial pleadings in these cases.

Now, whether or not Mr. Talman had a cloud over him that so inhibited his ability to practice law that it affected Miss Pike's representation is an issue for post-conviction. There's no question about that. And, obviously, I think that it's appropriate for you all to be able to put of record through Mr. Talman and other appropriate witnesses his problems with that regard and whether or not that had a material effect on Miss Pike's representation. Was everything done that he should have done? This was a death case. And you're right; there's a higher standard.

But I don't--and I've searched my soul about it. I don't think that I had had or have now any interest in protecting my rulings, protecting myself that was placed above **any** interest to do justice in this case. So with respect to a mandatory disqualification, I don't think I'm obliged to be disqualified because I knew or--and I knew; we all knew that Mr. Talman had his own problems.

For all we know Ms. Martin had a problem too. For all we know the Attorney General was in lawsuit. I don't know. But certainly we all live lives, and we have problems, and joys and excitement, and negative things happen to us. And I don't think that there's any reason that I should recuse myself as a mandatory

obligation based upon the Tennessee Constitution.

In fact, on numerous occasions--and I might point out that a judge's rulings speak for them. So my ruling to appoint Mr. Talman speaks for itself, my order to appoint him. My order to agree with Miss Pike when she decided she wanted to withdraw her petition spoke for itself. We can't look underneath that when it comes to rulings of the Court. And that's pretty clear in case law.

I believe even it was cited in the--Crabtree's response. But Pernell vs. State says the judge--"A trial judge should recuse him or herself whenever the judge has any doubt as to his or her ability to preside impartially in a criminal case or whenever his or her impartiality can be reasonably questioned."

Having a lot of knowledge about this case doesn't make me less than impartial. And when I say me this isn't a personal ruling as we've discussed. This is a judicial ruling.

Now, as to whether or not there's an appearance of impropriety and, therefore, based upon the cannons I should recuse myself, I think the statute says--(Turning pages) Let me go back through the statute here. (Pause) "It must appear that the trial court's decision"--well, there's a case. There's some

cases out of the Supreme Court in which it says that, "It must appear that the trial courts will not be reversed for abuse of discretion in a discretionary judgment unless the trial court's decision was against logic, reason or caused an injustice to the party complaining."

Miss Pike, again, raises the issue of the appointment of Mr. Talman as discretionary issue. And, frankly, I--(Pause)--I understand why the issue was raised. I'm not--it's not a personal issue. However, if Miss Pike's counsel had violated the rules and she's entitled to post-conviction relief in the long run, then that's an issue of post-conviction relief.

If I have opinions or knowledge and, obviously, as is obvious other than Miss Pike and perhaps General Helm in this room I have more--and Ms. Martinez, I have more knowledge of this case than anyone else in this room is not a ground to recuse myself. Unless Mr. Talman's problems can be shown to be prejudicial to Miss Pike, as would be appropriate in a post-conviction petition--and if they're not shown to be prejudicial to Miss Pike--unless they're prejudicial then it's not a ground for post-conviction relief. But as a discretionary matter, we haven't gotten to those things.

Now, Mr. Dawson you said on several occasions this morning "he did such and such" or "he has done such and such". To me those have to be presumptions until they're shown in court.

MR. DAWSON: I'll agree with that.

THE COURT: And, therefore--and, therefore, whether I appointed him or didn't appoint him is irrelevant until it's determined what happened and, if so, if it was prejudicial to Miss Pike. So I don't think I have any interest in the outcome other than to get this post-conviction petition on the road, which is --which is something that we've tried to do for many times now. And, of course, it's been delayed for a variety of valid reasons over the years.

Let me look at your motion here for just a minute. (Pause)

I've been sitting here for seventeen years. I've been reversed. I've gone back and started again. In fact, I was reversed in TaDarryl Shipp's case as to sentencing. It doesn't oblige--that doesn't give me any reason not to do my job in this case. I have thought very hard the last couple of weeks--it was last week, I guess--since I got your motion, whether or not my involvement in this case has taken me to the level that I should recuse. I don't find that to be the case.

Now, whether or not Mr. Talman told--let me make sure I'm on the right thing that we've discussed here. (Pause) Whether or not Mr. Talman misrepresented something to the Court or to Dr. McCoy or otherwise is also a question that fairly relates to whether or not Miss Pike was properly given counsel.

I have no independent memory other than that there was three volumes. I remember that there were volumes--and I'm not trying to testify; I'm just trying to--trying to make a ruling here--of mitigation materials. Those were turned over to the State as required after the verdict.

The State had no--not enough time. And then--and I can't imagine why--why there would even be an issue about when Mr. Talman received those materials because they didn't go to the State anyway at that point. And maybe the State was arguing that they were entitled and I ordered them turned over. But now post-Pike we know under Reed that was the appropriate thing.

But, nevertheless, the reason why he didn't call her must be another reason we haven't heard and is also appropriate for post-conviction. What his decision was at that point and why, having turned those materials over, are, obviously, issues for post-conviction and how that impacted Miss Pike. But, again, I don't think

that, having told you that and that this Court was as aware as anyone else, that you have any issue to raise with the Court itself other than through the post-conviction petition.

And that's what a post-conviction petition is. It asks the Court to go back and review everything and make sure that it was done properly, and if it wasn't it is the **duty** of the Court to review and to overturn a conviction. It's my obligation; that's my job. And I don't see a reason why--and if I don't do that job properly, somebody else is going to reverse it. So I don't see a reason to recuse myself for that reason either.

I think that what we're basically doing is narrowing down--these are the--the things that we have major concerns about. And I think that's part of what you're--what you're addressing with respect to the--with respect to Mr. Talman's representation.

Again, for the purposes of your Motion for a Subpoena, a judge speaks through their rulings. So you can take those rulings and say, "Okay. These are the grounds for post-conviction petition." But you can't subpoena me to ask me what I thought or what I think or what I remember. I've told you as much as I can in order to make this case go forward.

I remember that evening. I remember that verdict coming in. I remember us having a discussion, and I remember us discussing whether--when the State got its materials. And everything is spoken for through the transcript, I think. And if there isn't--and if there's anything else we're going to get it out of those transcripts that we have.

Now, if I have to, Deb, I'll help you listen to the tapes because if it's 250 hours we might all have to help.

But I don't think you've given me a ground to recuse myself at this point for post-conviction petition.

MR. DAWSON: I guess what I'm saying--

THE COURT: I guess what I'm saying is I'm quashing my own subpoena and I'm going to deny the Motion to Recuse.

MR. DAWSON: Your Honor, on the subpoena issue, of course, just for clarification that dealt only with the issue of what happened at that hearing that wasn't on the record.

THE COURT: I understand that.

MR. DAWSON: And we--

THE COURT: And I probably made it moot.

MR. DAWSON: Right. I think you did.

THE COURT: But because you subpoenaed me and nobody is here to represent me like the State represented the other judges, I think I need to make a ruling about it--

MR. DAWSON: That's fine, your Honor.

THE COURT: --at least for that purpose.

MR. DAWSON: I just--I just--when you--I just wanted to make it clear that we weren't--

THE COURT: It's not offensive; it's okay. (Laughing)

MR. DAWSON: --we weren't intending to call you for any reason outside of that--

THE COURT: I understand.

MR. DAWSON: --what happened at that hearing.

THE COURT: So as a result you're not intending to--except for that hearing--why can't I hear the rest of it? And I think I can.

MR. DAWSON: Your Honor, Miss--I think Ms. Brockenborough had a question about clarification.

THE COURT: Sure. I probably wasn't real clear so go ahead.

MS. BROCKENBOROUGH: Well, I just--and I'm not sure that we were very clear as to what we were arguing as far as the appearance of impropriety was concerned. So I just wanted to verify that in denying the Motion to

Recuse the Court is finding that there is not an appearance of impropriety for the Court to--

THE COURT: With respect to appointment of Mr. Talman?

MS. BROCKENBOROUGH: Right. For the--for the Court to hear--

THE COURT: Okay. Let me--let me clarify. Is that what you're talking about?

MS. BROCKENBOROUGH: Yes; yes, ma'am.

THE COURT: Okay. Let me see if I can clarify that just a little bit, Ms. Brockenborough, because this is a lot of complex issues.

With respect to Mr. Talman and his representation at that time because Mr. Talman was a licensed attorney with death qualifications, because Mr. Talman was--apparently accepted appointment to assist Mr. Brown, apparently, at some point--I don't even remember that part that Judge Jenkins did anything, but he might have. And it might have been presented to me as a fait accompli, quite frankly.

Because Mr. Talman had dealt with some of the issues anyway, had--he may have had a cloud over his law license, but he had his law license. I don't find that my appointment of Mr. Talman was such that I should recuse. Is that what you're trying to say?

MS. BROCKENBOROUGH: Not exactly, your Honor. I guess--our argument is at the appearance of impropriety as in the Court hearing the post-conviction issue or--well, the post--

THE COURT: Because?

MS. BROCKENBOROUGH: --actually the whole post-conviction petition on a case in which the Court appointed at trial to represent an 18-year-old in a high profile capital case a lawyer that the Court knew to be under investigation for having--

THE COURT: Well, you all--

MS. BROCKENBOROUGH: --essentially over billed sixty-seven thousand dollars ($67,000.00)

THE COURT: Okay. You all have presented today the Board of Professional Responsibility file as well as the Comptroller's file. We had no knowledge of those things. We knew he was being investigated. But those were not things that were ever given to me.

MS. BROCKENBOROUGH: I--I--I can understand that the Court didn't necessarily know the amount.

THE COURT: And assuming that Mr. Talman did what he was supposed to do to represent Miss Pike, obviously, both my--myself and the Supreme Court of Tennessee saw fit to appoint him in things. And we appointed him in other cases too. He was representing

several high profile defendant's around those times, and he had no problem apparently with that.

So the answer is: if, in fact, those things now come out and you've shown me--and you show me evidence that he has not properly represented Miss Pike, because of these things he did not consider certain things, perhaps there should have been some sort of disclose. I don't know whether or not those things are appropriate or not. But say there's a requirement of disclosure, then clearly those issues are post-conviction issues. And so there is no appearance of impropriety for me to--in light of his problem because that is a post-conviction issue to rule on when I get to that point. That's--I think that's what I'm trying to say.

MS. BROCKENBOROUGH: Okay.

THE COURT: Does that make sense?

MS. BROCKENBOROUGH: That does, your Honor. Thank you.

THE COURT: And if at that point there is an appearance of impropriety, you're going to tell me again.

MS. BROCKENBOROUGH: I probably will, your Honor.

THE COURT: I--I just don't--I don't see it.

I think that's just an--anytime there's a post-conviction petition the attorney who I appointed is being attacked. Now, this is a death penalty case. But I have the same very high standard for everyone who sits in jeopardy of their life or sits in jeopardy of their limbs or their time. Everybody has the same standard with respect to that. And I appoint them.

And sometimes they are people who got sued by their wives yesterday. Sometimes there have been appointments and somebody gets arrested the next day for drunk driving. It may not equate to a death penalty case, but it is certainly very similar. And those are the obligations of the Court. And that's part of what we do.

Let me go on to--so the point is your Motion to Recuse and Quash, obviously, we've dealt with. So let's go on to--

MR. DAWSON: Your Honor, at this point then it may be appropriate for us to actually file the Rule 9 motion that we had prepared and ask the Court to consider that.

THE COURT: Has the State gotten a copy of that yet?

MR. DAWSON: They have not yet, your Honor. We--

THE COURT: So they're going to have to have some time to respond to that because--(Pause) Well--(Pause) Hummm. (Pause)

MR. DAWSON: Your Honor, what we have that we'd like to file at this point then is a--a Motion for a Rule 9 Interlocutory Appeal.

THE COURT: Well, now if we had a Rule 9--if your motion was granted, would that mean that we would have to stop all proceedings while that Rule 9 was being taken up?

MR. DAWSON: You know, actually, your Honor--I mean, your Honor--but also I have in the file at this point a proposed order on the Rule 9. Your Honor, I guess the--I think the fact of the matter is the way this case is--is moving along at this point any way, obviously, we're going to have to--for the full hearing we're going to have to wait anyway.

THE COURT: Well, but I--but--but I'd like to direct it toward a hearing by getting things done that we could get done.

MR. DAWSON: I understand. Right, your Honor. And I was about to address that.

THE COURT: Yes.

MR. DAWSON: You know, I think that--I think that in terms of--of--

THE COURT: Do we need--she's welcome to stay. but does Mrs. Rice need to remain if she has other things to do?

MR. PRICE: Well, your Honor, she was here because of--

THE COURT: She was subpoenaed.

MR. PRICE: Well--(Laughing)--right.

THE COURT: She was obeying her court order.

MR. PRICE: That's--and I informed her over lunch that you might be rescheduling or indicating how we were going to proceed.

THE COURT: Well, yes, but I'm not sure when I'm getting to that, but maybe we are getting to that now so that's fine. Go ahead.

MR. DAWSON: Yes, we had talked about it before lunch, and Mr. Price nicely said he would call her and let her know that we weren't going to get to that thing. But--

THE COURT: That's fine.

MR. DAWSON: --your Honor, what I was going to say--and I think that--I mean if the Court did grant the Rule 9, I think that probably by the time we actually go --get to the full hearing anyway--

THE COURT: The Rule 9 would be done.

MR. DAWSON: --that the Court of Appeals would

have decided either--denied or whatever.

THE COURT: That's what I'm trying to say.

MR. DAWSON: And I don't see any reason why we can't do some things in preparation.

THE COURT: That's what I'm trying to say.

MR. DAWSON: That's what--right.

THE COURT: It makes me feel a little bit better that things are being done as opposed to the--I mean this has taken ten years.

MR. DAWSON: I think that I was--

THE COURT: And-

MR. DAWSON: --we were agreeing which is one of those rare circumstances, your Honor.

THE COURT: No--yes. Okay. So if that's the case--and I guess the State would like to review this just for a little bit. Do you need a few minutes to go over it and talk about it or--I haven't--

MR. PRICE: Yes, I would like--

THE COURT: It'd be nice if we looked at it too.

MR. PRICE: --a little time, your Honor.

THE COURT: Okay. (Pause) I'm trying to keep things that we've already dealt with out of the way.

(Whereupon, the Court organized her desk while Mr. Price reviewed

the aforementioned document.)

THE COURT: Feeling better, Miss Pike, than you were?

PETITIONER: Yeah. (Laughing)

THE COURT: Is your headache better?

PETITIONER: Yeah. Thank you.

THE COURT: Okay. (Pause while Mr. Price was reviewing the aforementioned document) When you're ready let me know because I have a question. Take your time. (Pause)

MR. PRICE: Judge, whenever you're ready.

THE COURT: Do you need a little more time?

MR. PRICE: I think I'm ready to present what argument I have.

THE COURT: Based upon what I've just said, would counsel--would--in your order--have you got a copy of the proposed order? Wouldn't number 1 and 2 of the proposed order be appropriate amendments, if they haven't already been alleged? Who knows what the post-conviction petition says on that?

MR. PRICE: When they--I'm sorry?

THE COURT: If they haven't already been alleged in the post-conviction petition, wouldn't they be proper amendments to the post-conviction petition based upon the ruling I've already made?

MR. DAWSON: Your Honor, I think that that's what's in that amendment that was filed--

THE COURT: Yes.

MR. DAWSON: --this year.

THE COURT: Yes.

MR. DAWSON: I think those are the amendments.

THE COURT: Those two are the amendments.

MR. DAWSON: Yes, your Honor.

THE COURT: The other three may be more appropriate for the Rule 9 is what I'm trying to say.

Let me see yours. (To Ms. Johnson)

The first two regard, "Does the appointment make"--

MR. DAWSON: Right.

MR. PRICE: It does go to the old conviction in the PCR grounds.

THE COURT: Those are PCR grounds potentially so--

MR. DAWSON: I guess, your Honor, those are there--as I was going through my mind, as for the order of decision making--

THE COURT: Sure. I understand.

MR. DAWSON: --that those were there. But I-- I think I understand what the Court's saying is that those are more appropriate a part of--they're really

outside of the question. They're kind of the threshold questions.

THE COURT: At this point, yes, I think so.

MR. DAWSON: Yeah, they're the threshold issues to the question.

THE COURT: Yes, that's right. They are the basic issues.

MR. DAWSON: Right.

(Whereupon, Ms. Johnson made a comment to the Court.)

THE COURT: But they may consider on 3, 4 and 5.

MR. DAWSON: Right. I think I understand what the Court is saying. Okay.

THE COURT: Okay. Rule 9 is discretionary. And if we can accomplish things while they're deciding (a) if they'll take a Rule 9 and (b) what they want to do with it if they will take it, that would make me feel a little bit better. But I guess I need to hear--do you want to argue about that first or--

MR. DAWSON: Well, your Honor, I think that our position would be--let me gather this--I mean it's one I think that--I think--I mean we still fell very strongly about the initial issue, about the recusal. And--and as I hope the Court knows, that's nothing

personal with the Court. It's--it's a legal issue that is--

THE COURT: Well, I--

MR. DAWSON: --refuses to go away and--

THE COURT: That--it's fine because then you've decided an issue when you get up there so somebody will decide it maybe.

MR. DAWSON: And--and so it seems I think we have one motion that I think we filed--(Laughing)--that we passed over and partly because I think it was properly passed over. And that was the issue of whether the Court should have another Court decide the issue to recuse which was one of the group of motions that we filed. And although that's the procedure in other states, as far as I can tell--

THE COURT: It's not here; although--

MR. DAWSON: --it's not here.

THE COURT: --although, there have been occasions where that does happen.

MR. DAWSON: And so I think that this would be an opportunity for at least another set of judicial eyes to look at this and see how they feel about it.

THE COURT: Okay.

MR. DAWSON: And I think that certainly that we can proceed again with getting this case prepared for

the final hearing while this is at least--while the court is deciding whether they're going to take it. You know, whether it would be provident to go forward, if they do grant the Rule 9, and while we're still arguing it, I'm not sure that the Court should go forward with the final hearing. But--

THE COURT: Can we back up a minute?

MR. DAWSON: Sure, your Honor.

THE COURT: I still have the motions to deal with their recusal.

MR. DAWSON: Right.

THE COURT: Are you wanting those issues also discussed today?

MR. DAWSON: Your Honor, I think what those issues--and I'm not sure exactly where we are on--on some of those because Mr. Price had discussed informally--and maybe we should discuss more, you know, what the State might be willing to stipulate to regarding that--that testimony because, hum, what the issue, for example, of--like I said earlier this morning with Ms. Helm and Mr. Crabtree of what was said at that in-chambers hearing. That's obviously going to be moot if we--well, I guess we can do that. But there is no transcript. But that's--I think that the answer to that is the same as the Court's, "Don't remember."

THE COURT: Well, if--if they--

MR. DAWSON: And if that's stipulated--

THE COURT: --it's their duty to determine whether they remember anything of it or not, if they have notes of any of it. I don't know.

MR. DAWSON: And--and--and my feeling is that as far as that particular issue is concerned if the State is willing to stipulate that their testimony would be that they don't remember I think that's all we need in the record.

THE COURT: And we've dealt with all of the Motions to Quash and recusal of them from representing the State in this.

MR. DAWSON: And I think that the issues--of course, the other issue we had with regard to Attorney General Nichols, Mr. Crabtree and Mr. Blevins dealt with information that they knew--

THE COURT: At the time.

MR. DAWSON: --at the time. And that goes to, I guess, the question as to whether or not that--I'm not even sure this is raised in the petition--the DA's responsibility to advise the Court or--or Miss Pike for that matter that the attorney may have had a conflict.

THE COURT: That too might be a post-conviction issue as opposed to a disqualification

issue.

MR. DAWSON: Correct. I agree with that, your Honor. I think--I think, if anything, that that goes to a post-conviction issue and so for the purpose of these hearings--I'm just trying to think through it. I think that we--we no longer need, hum--hold on just a minute; let me talk to my co-counsel. She's about to straighten me out.

THE COURT: Yes.

MS. BROCKENBOROUGH: Well, actually, your Honor, what I--what I was suggesting, based on our initial conversations with Mr. Price, my sense is that we may be able to render moot the motion or rather the Motion to Disqualify the--the District Attorney General's Office--

THE COURT: Well, my concern is--

MS. BROCKENBOROUGH: --if we could have--

THE COURT: --if you take a Rule 9 and then we come back here and then we have to deal with the issue of recusal of the Attorney General's Office then we take another Rule 9--

MS. BROCKENBOROUGH: No.

THE COURT: --you know, I'm just trying to make it a whole package, whatever the issue is.

MR. DAWSON: I agree; I understand.

MS. BROCKENBOROUGH: I understand. And as I said, I believe we may be able to render the Motion to Disqualify their office moot if we could discuss about agreed stipulations because if the State is willing to stipulate to what it is that we would be wanting to get on the record through those witnesses we wouldn't need to call them as witnesses.

THE COURT: Are you all in a position to talk about that at this point or--you're not? Do you need some time to deal with that?

MR. PRICE: Well, I'm not prepared to stipulate to just anything yet. I don't know what they're--what facts they're talking about.

In my response I tried to lay out what--what I thought was not in dispute, and that could give them some guidance about what we're willing to stipulate to.

But just going to the Rule 9, your Honor, I mean we want to make sure the State's position is known. We would oppose this Rule 9. We don't think that--

THE COURT: I realize that; I realize you don't feel it's appropriate that--

MR. PRICE: I don't think it fits the criteria. In researching the Motion to Recuse your Honor, you know, we came across this case after case where these motions were made, frequently by

Mr. Dawson's Office. These were all heard after, you know--

THE COURT: There's some precedent.

MR. PRICE: --on direct appeal from the--

THE COURT: Uh-huh. (Affirmatively)

MR. PRICE: --denial of the post-conviction. And so--and I know in at least one case. In the Reed case, if I'm not mistaken, Judge Blackburn--there was an appeal taken after she refused to recuse herself, and that appeal--interlocutory appeal--whether it was a Rule 10 or Rule 9 I don't know--that was denied.

I think it's an issue about--when your Honor decides to recuse itself it's an issue that can be looked at when all of this is done, and it would go up and all of the issues can be looked at by the Court of Appeals. And they would also have the benefit of the testimony that we're going to hear--hear concerning the conflict and, you know--the alleged conflict of Mr. Talman and how deep it goes and how it--whether it affected his performance of not, and whether, in fact, Miss Pike's right to conflict-free counsel was violated.

So I think this is something that should wait till the end and be wrapped up with all of the other issues. I don't think we're dealing with an irreparable injury, your Honor.

MR. DAWSON: Your Honor, I don't think it will apply. I think the only thing that we--if--obviously, if this Court were found to be incorrect on this ruling on a direct appeal, that would require them to set aside the entire proceeding, I would think, and start over again. And that just doesn't seem like a proper use of judicial resources. And here we can--we could be--make it a denial of the Rule 9 fairly immediately.

THE COURT: But we'd start all over again with the post-conviction. Let's don't.

MR. DAWSON: Right. That's what I thought you'd say.

THE COURT: (Laughing)

MR. DAWSON: That's what I meant to say.

THE COURT: Yes. I'm real conscious of the record, although I don't always make it very well. (Pause) Well, I've just gotten your motion. I, obviously, haven't had a chance to look at it.

Whether or not it or part of it would be granted as a Rule 9, the Court of Criminal Appeals doesn't have to take it. And if--I guess it would have to be some judicial economy, and you're right. If we start--if they said that I should have recused myself, then you'd start over with a post-conviction petition somewhere with somebody else and they might not grant

it.

MR. DAWSON: They may not.

THE COURT: But I'd like to re--it's discretionary; I'd like to read your motion in a little bit more detail, I think, before I would do that.

MR. DAWSON: That's fine, your Honor.

THE COURT: And I may want you to amend the order if I decide you should do that.

MR. DAWSON: I've got to find that.

THE COURT: But I would not grant a stay at that point. I'd like to--to proceed with anything else that can be done.

MR. DAWSON: I think that's fine, your Honor. I think it would--I think this at least gets us started. And if the Court grants the Rule 9, it gives us a chance for an appellate court to begin looking at it while we can--

THE COURT: It also gives him a chance more than I--we've just had to look at it and--but I understand where the General is coming from with it.

MS. BROCKENBOROUGH: A suggestion, your Honor.

THE COURT: Yes.

MS. BROCKENBOROUGH: Would it be possible for us to maybe recess for half an hour to give your Honor an opportunity to look at that and then we could confer

with--

THE COURT: You could confer about that other issue.

MS. BROCKENBOROUGH: Yes.

THE COURT: Sure.

MS. BROCKENBOROUGH: --to see if we can come to an agreement.

THE COURT: That might make a little sense. And we've allotted the day. I don't have any problem with that. That would be fine. Let's take about a half an hour recess.

(Whereupon, a recess was taken; afterwards, the following proceedings were had, to-wit:)

THE COURT: Okay. Now, where are we?

MR. DAWSON: Your Honor, we were doing--we were working on that--on the issue of the, hum, the Motion to Quash the Subpoenas, I think, of the--

THE COURT: Right. And perhaps the stipulation.

MR. DAWSON: And we've worked that out, I think, and this is how we've worked it out. We do have stipulations between the parties that I can either--we have to put them in English still, but we agree in content.

THE COURT: Uh-huh. (Affirmatively)

MR. DAWSON: And the--that will take care of the stipulation of Assistant District Attorney General Helm--I mean take care of the subpoena for her. We will withdraw that subpoena.

As to the subpoena of Mr. Crabtree with regard to his testimony regarding the in-chambers conference at the end of the--when the verdict was returned, with regard to that, we also withdraw any--any opportunity--or any needs to question Mr. Crabtree as to that.

THE COURT: As to that issue.

MR. DAWSON: That's correct, your Honor, The other issues--with the issues regarding what the District Attorney did or didn't do during the--the investigation of Mr. Talman and the payment by Mr. Talman, at this point we're going to withdraw those subpoenas as well. And we will advise the Court that that may come up again. We do not have a stipulation on that. That's not an issue depending on--no matter how the Court were to rule on any subpoenas or--or Motion to Quash if it returns. It's not an issue that we would take a Rule 9 on. That would be an issue that would just be left for the direct appeal.

THE COURT: Okay.

MR. DAWSON: And then there is one other

matter where Mr. Crabtree's testimony may become essential in rebuttal. We can't--we don't know that at this point and, obviously, we haven't worked out a stipulation as to that part. But that would be the same. It's not something that there would be a Rule 9 taken from.

THE COURT: Anything else you want to say about this Rule 9 before I decide on it?

MR. PRICE: Well, I don't know. Does your Honor--

THE COURT: I propose some amendments to the order.

MR. PRICE: Okay. Let me hear what you're proposing.

THE COURT: I thought you'd say that. I think the first two parts to Rule 9--to the Rule 9 order basically are post-conviction issues and they come out. That's my proposal.

I would amend number 3 to read as follows, "Does the allegation of the Court's complicity"--because I don't want to admit court complicity in an order sending this up there--"in denying the defendant conflict-free counsel create an interest for the Court in its post-conviction ruling on the issue of whether counsel's alleged conflict of interest denied the

petitioner her right to effective assistance of counsel?"

MR. DAWSON: That's fine, your Honor.

THE COURT: The rest of it I think is perfectly applicable. I mean that's fine the way it is, 4 and 5, unless you all have some issue.

MR. DAWSON: Your Honor, depending on how the Court wanted to handle it, I have in my pocket--

THE COURT: I--I just think when we're talking about an allegation of com--

MR. DAWSON: I have the order.

THE COURT: --you have what?

MR. DAWSON: I have the order in here. (Laughing) And if someone--

THE COURT: So we can pop it into one of the computers and--

MR. DAWSON: So we could easily make that change is all I'm saying, yes.

THE COURT: We can--well, I don't know. I'm not sure I want an in-chambers with you people, but we can take it into my computer if you need to.

(Whereupon, the parties laughed.)

MR. DAWSON: Well, we could--if we could get our computer to work, we could put it in it. But we have another one back at the hotel we can do. So it

will be easy to get it done is all I'm saying, your Honor.

THE COURT: Okay. Are you all staying here tonight anyway?

MR. DAWSON: Yes, your Honor.

THE COURT: Are you all staying tonight anyway--

MR. DAWSON: Yes, your Honor. We have--

THE COURT: --even if we're not done--even if we're done?

MR. DAWSON: Yes, your Honor. We're going to review some materials tomorrow so--

THE COURT: Well, then perhaps tomorrow we could let you all assemble and go over everything and we can take care of it--and let you all print it tonight if you want to.

MR. DAWSON: That would be fine, your Honor.

THE COURT: So with--with respect to that amendment, General, any--here's my feeling about this Rule 9 appeal. Letting you take the Rule 9 appeal as to this issue without a stay allows us to keep working, number one. Number two, it resolves that issue about conflict of interest of the Court, not necessarily conflict of interest or behavior of Mr. Talman, but about--

MR. DAWSON: Right.

THE COURT: --any Court issue or withdrawal issue immediately. And, therefore, if I have to withdraw because they say I'm wrong, which they've been known to do, or they take this and they want to stay, they can do that.

MR. DAWSON: That's correct, your Honor.

THE COURT: But if not and they say, "Sorry, you'll get to the end," as they have in a number of other cases, then we're still on track.

MR. DAWSON: That's fine, your Honor.

MS. BROCKENBOROUGH: Uh-huh. (Affirmatively)

MR. DAWSON: I think that's a wise way to proceed.

MR. PRICE: We respectfully disagree, your Honor. We--as I mentioned, we think this should be--your Court's ruling on recusing itself I think should be an issue along with all of the other issues once we get done with this post-conviction and it goes up on appeal. If they're going to reverse it--

THE COURT: Well, it very well may be that they say "no", and then that's exactly right.

MR. PRICE: Okay.

THE COURT: I--you know, I--I--

MR. PRICE: I don't think we've met the

standard in Rule 9 of irreparable harm, but I--

THE COURT: Well, let's call it judicial economy because if I'm not to be the judge in this case then we need to--we need to give somebody a running start. And if I am to be the judge in this case, then we know it.

MR. DAWSON: That's correct, your Honor.

THE COURT: And we're done with that issue till we get to the next issue, I guess.

MR. PRICE: One question I would have, your Honor. If we are--if there is--if we are finding that there is going to be irreparable harm if we continue--so we're granting the Rule 9 but then we're not going to grant the stay?

THE COURT: I'm granting it on the basis of judicial economy not irreparable harm. I do not find irreparable harm because Miss Pike can always get another post-conviction hearing if they make that finding, if that happens further down the road.

If you're right, post-conviction is just that. And so, therefore, how could she have irreparable harm? It's just to prevent--

MR. PRICE: I don't think there is. I think it's required.

THE COURT: I don't--I think I can--I can do

this on the basis of judicial economy. Now, they may not agree with me, and I suspect they won't agree. But just out of an abundance of caution and fairness, General, I think that that part of it ought to be dealt with so that--so that at least I know that this is not an issue that has to do with whether or not I ought to be here or not.

(Whereupon, the Court spoke with Ms. Johnson very briefly.)

THE COURT: Why don't we just kind of--I don't know--well, there are some other things we need to do right now. I would like to set--and I know I've already set other things, but I'll move them.

Oh, yes, and the order has to site the basis that it is on--you know what you're doing, Ms. Brockenborough. You come up with an amendment for me.

MR. DAWSON: Your Honor, if after we finish tonight if we could meet with your clerk, we could discuss and make sure we get the language right--

THE COURT: Uh-huh. (Affirmatively)

MR. DAWSON: --and we'll get it--we'll get it handled.

THE COURT: I suspect that you may have 30 witnesses, but it might mean that you don't call--

(Whereupon, deputy clerk James Deford brought a box of cassette tapes into the courtroom.)

THE COURT: What was that?

THE COURT REPORTER: My tapes.

THE COURT: Oh. I was teasing him about bringing all of the evidence up, but he didn't do it. I suspect that maybe it will go a little bit faster than we think if we start hearing proof promptly that day.

One of the things I would like to do whether it's today or tomorrow--and I'd love to do it today--is for us to lay out what is presently the post-conviction issues, give you all a filing deadline for any last amendments and responses.

I looked to see if there had previously been a filing deadline for amendments, and we kind of got strayed off the mark back in 2000 and whatever it was so--several times.

MR. DAWSON: That's correct, your Honor.

THE COURT: So I think it would be fair for everybody to take one last look, decide if there are some other things they want to say, lay out our issues just right down the block.

One time Mr. Dillard did a death penalty post-conviction, and we just took it right down. And it

would be a real helpful thing to everybody.

MR. DAWSON: So what--as I understand what the Court is suggesting is that we replace all of the present documents with one post-conviction petition--

THE COURT: Not necessarily--

MR. DAWSON: --that will have them all in it.

THE COURT: --but at least have the issues in order so we all know we won't--we're going to talk about this issue and this issue. Then you put on your proof any way you want. And then when we argue the issues, we can deal with them in an order that everybody can follow.

MR. DAWSON: That's fine.

THE COURT: We've got--who knows? That order is to specifically say that I do not stay further proceedings on the--

MS. BROCKENBOROUGH: Yes, ma'am.

THE COURT: --post-conviction petition, please, ma'am.

MS. BROCKENBOROUGH: Yes.

THE COURT: So if that's okay let's try to set this for a hear--a real hearing on post-conviction. I really need to try to make it, so to speak, fairly well engraved because we're--it's really hard. A whole week is now for us 18 trials and 100 to 150 motions and

informations and stuff that we have to kick over.

MS. BROCKENBOROUGH: Miss Pike reminded me that in addition Ms. Martinez's having kids during the summer, a number of the witnesses that we'll be calling from out of state will also be facing that situation.

THE COURT: So which would be a better time.

MS. BROCKENBOROUGH: So I'm thinking that maybe after school starts might be better for everybody. Although, I know that September and October is a--sort of a--

THE COURT: It's not bad. I've been doing real well with the docket.

Would it be easier for you to? (To her clerk)

All right. Let's march up here into September and let's look and see what we've got. (Pause) On September 11th--and I hate to do that--but on September 11th I've set Mr. Cates' post-conviction, Cumecus Cates. I am certain that Mr. Gulley and General Nassios or General Allen or whoever has that--is that yours? Actually, it is; isn't it?

MR. PRICE: It might be.

THE COURT: Why don't you look and see?

MR. PRICE: (Laughing)

THE COURT: It's a much newer post-conviction, although it is a 79 number.

Do you want Ms. Brad--Ms. Johnson to draft this?

MR. DAWSON: Either way, your Honor. We can. We do have everything down so either way or we could talk with her and we can get it figured out. We can do it ourselves or--

THE COURT: You'll work it out; that's fine.

MR. DAWSON: Whatever.

THE COURT: We may--(Pause)

MR. PRICE: It's General Nassios's.

THE COURT: I really would like to talk about issues this week if we can, I mean since we have this time that we've laid out. I don't know that you have all of the issues but you're pretty close.

MR. DAWSON: We're pretty close, your Honor. I think we--I think we can probably have all of them someplace in the milieu of the four or five--I guess four petitions that are filed now. And some, of course, have been withdrawn.

THE COURT: What does your calendar say on September 11th?

MS. BROCKENBOROUGH: We're free, your Honor.

THE COURT: Ms. Martinez, September 11, would that work?

MS. MARTINEZ: Yes.

THE COURT: Now, can we finish this in a week, folks?

MR. DAWSON: Your Honor, if we--what happens in terms of what we've been told in post-conviction hearings is the limiting factor really becomes the court reporter. We've been told because we're not--we're not basically stopping for conferences and we're not sending a jury in and out that in the post-conviction hearings we end up with about twice the transcript pages per day as in a trial.

THE COURT: Uh-huh. (Affirmatively)

MR. DAWSON: And if we--

THE COURT: I've got the best court reporter in the state. Don't I, Debbie?

THE COURT REPORTER: Oh! Thank you. (Laughing) I don't know about that.

MR. DAWSON: And we have--and I--unfortunately, our experience has been that a lot of judges when they say they've cleared their docket it means that they're still calling their docket and they're still calling all their motions and they're breaking--

THE COURT: Other than Mr. Cates, which I'll move--

MR. DAWSON: --which is--which is only the--

THE COURT: --it be blank.

MR. DAWSON: I understand, your Honor. Which is only to say that we don't have a whole lot of experience when we move right through one of these cases. But--but--

THE COURT: You will be with me, I'm afraid.

MR. DAWSON: --if that's going to happen, I don't see any reasons why this can't be done in a week--

MS. BROCKENBOROUGH: Yes.

THE COURT: Okay.

MR. DAWSON: --is what I'm trying to get to.

THE COURT: Okay. Here's--because we are a large county we have more than one court reporter. We have a floater. So we can get help if we need to--can't we?--

THE COURT REPORTER: Uh-huh. (Affirmatively)

THE COURT: --number one. Number two, that gives her time to find all this stuff and get it typed up for everybody to see. Number three, if I know we're going to start this post-conviction petition and we need to get it done in a week, then I can probably do little --I'll probably have to do some little dockets in the mornings. But I'll just avoid setting cases. I don't need a fourth vacation. I don't have--I mean it's nice, but I don't want one right now.

MS. HELM: (Standing)

THE COURT: What General? Here it goes. But wait; there's more.

MS. HELM: I'm sitting here thinking about these people that he's bringing in from out of state and when he's bringing them in.

THE COURT: Ohhh, football time in Tennessee.

MS. BROCKENBOROUGH: Oh, Lord.

MS. HELM: Yes. There's a game September the 9th and a game September the 16th.

(Whereupon, the parties laughed.)

THE COURT: The 16th is Florida. Is it here or there?

MS. HELM: Here.

MS. BROCKENBOROUGH: Ohhh.

MR. DAWSON: (Laughing)

PETITIONER: (Laughing)

MS. HELM: September the 9th is here as well.

MS. BROCKENBOROUGH: God bless the Volunteers. (Laughing)

THE COURT: All right. We've waited ten years. Let's see what we can do for--okay. Do you have a schedule in front of you?

MS. HELM: Yes.

MR. PRICE: Yes, your Honor.

(Whereupon, the parties laughed.)

MS. HELM: But that could be an issue.

MS. BROCKENBOROUGH: Yes. Thank you very much for bringing that up. It's serious here.

THE COURT: What about--what about--(Pause)

MS. HELM: September 30th or October the 7th are both away games.

MR. DAWSON: You know, we don't have this problem in Nashville with the Vanderbilt team.

THE COURT: So if we started on September 25th--

MS. JOHNSON: I'm gone then.

THE COURT: Your gone where?

MS. JOHNSON: I have a three week serial killer trial in--(Inaudible word)

THE COURT: A three week serial killer trial. Never mind. The problem on the week of September 18th is I don't want to do this the day after my birthday, though I will, but I have to finish by Thursday night and I can't do that. And then October 3rd--October 2nd I'm going to be off.

MS. BROCKENBOROUGH: What are the three weeks of the trial? Although I guess you don't want to go from a three week serial killer trial to a week post-conviction.

MS. JOHNSON: Oh, that'd be fine.

MS. BROCKENBOROUGH: I mean are you free the first week in October?

MS. JOHNSON: No. It's--

THE COURT: Well, now you've got to understand you have to work around my Jewish holiday.

MS. BROCKENBOROUGH: Oh, I--well, that's actually what I meant when I was referring to September and October was--

THE COURT: Yes. Well, September--between September 20--if we can get it done between September 25th and October--September 29th--

MS. BROCKENBOROUGH: But, you know, Ms. Johnson is going to be gone.

THE COURT: --that's not a problem.

But you're going to be gone.

MS. JOHNSON: I'll be gone between the--the three weeks--(Inaudible phrase)

THE COURT: Beginning the 25th?

MS. BROCKENBOROUGH: What's the football schedule in October?

THE COURT: No, I don't want to go that far out. Let's see if we can go backwards a little bit.

MS. HELM: If--if he doesn't want to bring them in until Monday or Tuesday, then the timing shouldn't be a problem provided they leave by Friday.

THE COURT: That's true.

MR. DAWSON: Your Honor, we could--we could probably do something where we could try to make sure we get all those witnesses done on like--

THE COURT: During the week.

MR. DAWSON: --Tuesday, Wednesday and Thursday or something.

THE COURT: Well, I think that Friday has got to be for some argument. I mean we're going to have to do--you've got to give me a little argument so that I understand the issues clearly.

MR. DAWSON: Right.

THE COURT: And you'd want to argue--you'd want to do oral argument; wouldn't you?

MR. DAWSON: Yeah, we--generally we do.

THE COURT: And, obviously, I'm going to take it under advisement and write you something but--

(Whereupon, the parties laughed.)

THE COURT: So maybe we ought to back up and try September 11th again. That makes the most since to me, if that's okay with everybody. Speak now or forever hold your peace.

MR. PRICE: That's fine, your Honor.

MR. DAWSON: Your Honor, I was pointing out to them that in Nashville at Vanderbilt we don't have the

same problem on football weekends. It's just--I don't know why.

(Whereupon, the parties laughed.)

THE COURT: We're beginning to have that problem for basketball season.

Okay. Nancy, set the PC hearing for September 11th.

Now, Debbie.

THE COURT REPORTER: Yes, ma'am.

THE COURT: The next question goes to you.

THE COURT REPORTER: That's plenty of time.

THE COURT: No, no, no, no, no.

THE COURT REPORTER: (Laughing)

THE COURT: I want them to have that so I can set some deadlines on them.

THE COURT REPORTER: Oh, okay.

THE COURT: I take it you'd like to see what's in those.

MR. DAWSON: Oh, very definitely, your Honor.

THE COURT: Oh, very definitely

MR. DAWSON: And, you know, it fairly may actually withdraw some of that, the issues, depending what's there.

THE COURT: That may narrow issues as opposed to expand issues.

MR. DAWSON: That's correct.

THE COURT: The end of June? (To court reporter)

THE COURT REPORTER: Oh, that's plenty of time.

THE COURT: To find what you've got to find? Some of it may be very short typing, but it all has to be typed up.

THE COURT REPORTER: Yes.

THE COURT: What about the end of May, being it's almost March 1st, two months?

THE COURT REPORTER: I think that will be enough time.

THE COURT: Well, if you need more time, we'll just enlarge our time.

Let's see if Debbie can find it all and get it typed up by the end of May. We've--we tried 30 cases last year, and we've already tried seven this year. And so, you know, they've got plenty to do here. So maybe 5-31 hopefully we can get the transcripts in hand.

THE COURT REPORTER: Okay.

THE COURT: And, Nancy, I'd like the Clerk's Office to prepare--now, the transcript you pulled down, that one is whose transcript?

MS. JOHNSON: TaDarryl Shipp.

THE COURT: No. The other--Miss Pike's transcript.

THE COURT REPORTER: The one in the box?

THE COURT: Yes.

THE COURT REPORTER: Twenty-five volumes of--

THE COURT: It's the Clerk's transcript?

THE COURT REPORTER: Yes, ma'am.

THE COURT: I can just check that out. It will behoOve me to re-read the trial as well. I might as well--we might as well have it in a situation where I've already re-read the trial, re-read all of the transcripts, and that will save all of us--

And you can do that too. And that will save--you have plenty of time. (To Ms. Johnson)

And that will save all-

(Whereupon, Ms. Johnson made
a comment to the Court.)

THE COURT: Well, I have too, twice--three times actually. (To Ms. Johnson)

That will save us all a little bit of time too.

MR. DAWSON: Your Honor, she may have time but no sleep is going to be her situation, I'm afraid.

THE COURT: Wait till you hear what I'm going to do to her for Suttles. May proposition was that we

have the transcripts typed up of the post-conviction hearing, and she will be back by the time we've got it set. And then she could spend her time at home writing Suttles opinion. It's not a good idea.

So if we were to do that, and get that by May 31st, can you get your amendments filed by the end of June, a deadline for the last filing of amendments?

MR. DAWSON: I don't see any problem with that at all, your Honor.

THE COURT: June the 30th.

MR. DAWSON: Your Honor, would it be possible to go to July 7th, only because we have a hearing that's going to be set the last week of May--

MS. BROCKENBOROUGH: In June.

MR. DAWSON: --in June rather?

THE COURT: July 7th.

MR. DAWSON: Yes, your Honor.

THE COURT: As the deadline for filing any--

MR. DAWSON: Yes, your Honor.

THE COURT: General, how long do you want to respond, August 7th or whatever it is?

MR. PRICE: A month will be fine.

THE COURT: August 4th. I'm writing it down for once.

MS. BROCKENBOROUGH: Will your Honor be

reducing this to an order, a scheduling order?

THE COURT: And then that will give us a month. Yes, we'll do a scheduling order. I think that's a good idea too.

Okay. Next--do you think there will be any other hearings we'll need to deal with other than the post-conviction hearing for any reason, unless there's--unless you issue subpoenas and we have motions to quash?

MS. BROCKENBOROUGH: (Laughing)

MR. DAWSON: Your Honor, Mr. Price had nicely given us a--

THE COURT: On either side, I've had them come on both sides actually in the past.

MR. DAWSON: Mr. Price had given us a list of motions pending--

THE COURT: Yes, he did.

MR. DAWSON: --that looked pretty accurate.

THE COURT: And you may thank me for that because I saw them in his little paws and said, "Oh, I could use that." So I--we wound up having to send them to both.

MR. DAWSON: I hadn't thought--

THE COURT: I don't know if it's correct or not, and he said he wasn't sure if it was entirely right.

MR. DAWSON: It looked pretty close to us. We--we weren't 100% certain either, but did look pretty close.

THE COURT: And that will get you way past the 2006 election.

MR. DAWSON: That's correct, your Honor. Well, I guess my motion is moot.

THE COURT: It will be.

MR. DAWSON: No matter how much fun I had writing it, your Honor, it's now moot.

THE COURT: I just hope nobody puts you in jail over it, Mr. Dawson because, you know, the fact of the matter is that in a post-conviction petition, a defendant does not have a right to competent counsel, as you know.

MR. DAWSON: We've been counting on that since my office was born, your Honor.

THE COURT: And if you get put in jail and/or Ms. Brockenborough more importantly gets put in jail, Miss Pike might be pro se.

MR. DAWSON: (Laughing) She has a statutory right, your Honor, to counsel. (Laughing)

THE COURT: Well, I understand. All right. Now, can we--yes. What did you say? Thank you. If you didn't hear her she said, "Not all of the judges were as

nice as me." That's true. I just want to do my job and go home.

MR. DAWSON: We have--

THE COURT: Can we--

MR. DAWSON: As I'm looking at this, your Honor--and I think that--(Ms. Brockenborough to Mr. Dawson)

THE COURT: Do you want to craft a whole new amended petition that sets out everything in all of the--

MR. DAWSON: It probably would be wise in this case, your Honor. This one has wandered so long and--

MR. PRICE: That sure would be helpful to me, your Honor.

THE COURT: That way--yes, it would help me too, to be honest with you. So maybe by that filing deadline we're going to have a new--

MR. DAWSON: Yes, your Honor--

THE COURT: --PC.

MR. DAWSON: --we'll go ahead and do that.

(Whereupon, Ms. Brockenborough briefly conferred with Mr. Dawson.)

MS. BROCKENBOROUGH: Your Honor, I know that you wanted to look at--sort of map out issues--

THE COURT: If we can.

MS. BROCKENBOROUGH: --this week, if possible. What I'm thinking is that between the information that we've--we have downloaded on disc and the fact that there's an hour difference with Nashville, we can have things emailed. We can actually do a draft of a consolidated petition--

THE COURT: And then can amend from that?

MS. BROCKENBOROUGH: --and then come in tomorrow--

THE COURT: That's fine.

MS. BROCKENBOROUGH: --and go over it if--if that works.

THE COURT: That would be fine.

MS. BROCKENBOROUGH: If we end up doing that though, would it be possible for Miss Pike to waive her presence and go ahead and be brought back?

THE COURT: I have a transport order laying right here that I haven't signed yet.

MS. BROCKENBOROUGH: Okay.

THE COURT: If all we're talking about is what the--well, wait; hang on, Miss Pike. If all we're talking about is, "What are the post-conviction issues?", that you're going to make Miss Pike a copy of anyway, I presume--

MS. BROCKENBOROUGH: We've actually already

provided her with--I mean this would just be a consolidation of what we've already filed.

THE COURT: What you've already filed, right.

MS. BROCKENBOROUGH: And if we file any additional things we'll get those to her.

THE COURT: And if she wants to waive her appearance, General, would you object to that and let me send her back tonight?

(Whereupon, General Price and General Helm conferred.)

THE COURT: Is that all--the only other issue we need to take up?

MR. PRICE: Your Honor, as far as her presence, if she'll waive her presence, you know, individually, I don't have a problem with that. I'm just afraid that that might become an issue later on. (Laughing) We all--

THE COURT: Oh, no, no, no. I'm going to--I'm going to swear her in.

MR. PRICE: Okay.

THE COURT: I'm not lettering her just say, "Thank you."

MR. PRICE: Okay.

THE COURT: Stand up, Miss Pike.

(Whereupon, the petitioner was

sworn to tell the truth by the
Court and responded affirmatively.)

THE COURT: Okay. Do you want to go back?

PETITIONER: Very much so.

THE COURT: Okay. And you understand that we may raise issues that you won't be here to hear about?

PETITIONER: I do.

THE COURT: Okay. In fact, Miss Pike had asked for this before. If there's a crucial hearing, Miss Pike, you're going to be here. That's just--that's the way it is. That's the way it's always been and you know that. But for this purpose, just to draft the issues and make sure that we all have the same list and know what we're working on, I'm going to go ahead and send Miss Pike back.

PETITIONER: Thank you.

THE COURT: (Pause while the Judge spoke to her secretary) Nancy, if you'll--can we call somebody down or--because we're almost done today; aren't we?

MR. DAWSON: Your Honor, we have two things that I was--two issues that I wanted to bring to the Court's attention just for consideration.

THE COURT: Okay.

MR. DAWSON: One is I know from the--I know from a list of motions that are still sort of floating

out here that one of them was several motions for extensions of time to--

THE COURT: File.

MR. DAWSON: --serve the expert reports. To my knowledge--

THE COURT: Did that ever happen?

MR. DAWSON: Many of them have been, your Honor. And to tell you the truth I'm not sure what has and hasn't at this point. So--

THE COURT: Did they ever take Dr. Pinkus's (Phonetically) deposition?

MR. DAWSON: We have not. And that was one of the questions--that was the other question. My two questions are: do we want to set another deadline for any new expert reports, because I assume the Court does? And then the second question was: we have not yet resolved the issue of taking the deposition of Dr. Pinkus.

THE COURT: We need to do any ex parte requests, my clerk reminds me, because of the AOC's strictures.

MR. DAWSON: That's correct, your Honor.

THE COURT: Yes, I guess we better do that. I'm trying to remember how--what our distances were.

MR. DAWSON: It may that Dr. Pinkus isn't

available that week anyway.

MS. BROCKENBOROUGH: Exactly.

MR. DAWSON: We--I think what happened is we filed that because he wasn't available when we were scheduled--

THE COURT: If you'd provide tickets to the ball game, you'd probably be able to--

(Whereupon, the parties laughed.)

THE COURT: That is the Florida game coming up that weekend.

MS. BROCKENBOROUGH: I have no idea what Dr. Pinkus's football affiliations are. (Laughing)

MR. DAWSON: I think he lives in Maryland.

MS. BROCKENBOROUGH: Is there--but he--he's also Orthodox Jewish as well and so--

THE COURT: Well, you won't have any problem.

MS. BROCKENBOROUGH: Okay. There's--

THE COURT: Not on the 11th--

MS. BROCKENBOROUGH: --no holidays that--

THE COURT: --of September.

MS. BROCKENBOROUGH: Okay, great. Thank you.

THE COURT: Your only problem is in traveling on a Saturday in that--

MS. BROCKENBOROUGH: Right.

THE COURT: --in that week.

MS. BROCKENBOROUGH: And then he'd have to drive to the stadium which--

THE COURT: Well, we'll take care of it.

MR. DAWSON: (Laughing)

MR. PRICE: (Laughing)

THE COURT: And if he needs appropriate meals, we can arrange them. We almost had that problem when we picked Ms. Pike's jury too. That was an issue. See you all just don't know half the battles that we had.

So I guess I could ask--let's start with the service of reports of expert witnesses. Do you have your reports already or are you still arranging to get reports?

MR. DAWSON: Your Honor, I--we have to, obviously, you know, sort of feel our way, but I think that they have all of our reports. We might have to get together with them and see what they have and what we have.

THE COURT: It's a good evening to be reviewing while you're sitting at the hotel.

MS. BROCKENBOROUGH: (Laughing)

MR. DAWSON: But--but I think that the fact of the matter is they have everything, hum, and--

THE COURT: Except for potentially the testimony of Dr. Pinkus. So when would you want--I

mean--

THE COURT: They have his report, however, your Honor.

THE COURT: Okay.

MR. DAWSON: They do have that.

THE COURT: So end of May to be sure we have everything?

MR. DAWSON: That's fine.

THE COURT: Is that okay, General? Well, let me--because he has a right to see if he can get counteracting experts, but he's got to arrange that.

MR. DAWSON: That's fine.

MR. PRICE: The end of May would work if--

THE COURT: Is that going to work? Okay. So like--what was that day in May that we talked about?

MS. HELM: May 31st.

MS. BROCKENBOROUGH: May 31st.

MR. PRICE: May 31st.

THE COURT: May 31st. That goes into the scheduling order, all these deadlines. Okay. Now, I guess you need to check on Dr. Pinkus and find out whether or not you've got to do a deposition and--

MR. DAWSON: That's correct, your Honor.

THE COURT: It's probably easier to bring them here than to send them there--send you all there. Okay.

What about ex parte requests, if there are any?

MR. DAWSON: Your Honor, we have--of course, all of the basic ones have already been done. I think we have to look and see what we--

THE COURT: Have.

MR. DAWSON: --they need to get the witnesses here. And then we also have the one for Dr. Kenner that we need to file.

And then we have kind of an odd one with Dr. McCoy because her--it's not clear what we're asking for with her. And what we were going--we're going to be using her both as--in her expert capacity to really present the case that she didn't present before. But her work is basically done. I mean it's not a question of--it's a question of time to review her--her files and be prepared to testify. And the--and then some of her testimony is going to be strictly as a fact witness as to what happened and didn't happen back then. So at some point we wanted to address that with the Court and just see what the Court's view was on that and what the AOC's view is obviously, depending on what the Court feels, because she would be testifying basically on what she did in preparation for the trial back in 1996. But she would be testifying in her expert capacity. So we

we're going to prepare the motion and get that to the Court. We need that and Dr. Kenner.

THE COURT: I'm just--we'll--we're worried about the AOC's time frame. So the sooner we can get whatever you've got to get together--

(Whereupon, Mr. Dawson conferred with Ms. Brockenborough.)

THE COURT: General, approximately how many witnesses do you expect to have, if you know at this point?

MR. PRICE: (Laughing) I think--at this point I think probably about four or five.

THE COURT: Okay.

MR. PRICE: I don't think--that I have in my mind.

THE COURT: I'm not holding anybody to a fine line. I'm just trying to--April 28th would be sixty days from now.

MR. DAWSON: That's what--we were looking at that. It looks like that'd be fine, your Honor.

THE COURT: Okay.

MS. HELM: What's that a deadline for?

THE COURT: His ex parte requests. (Pause) And if I might suggest, if you expect subpoenas to be issuing for a variety of people you already have for

September--

MR. DAWSON: Yes, your Honor.

THE COURT: --do it sooner than not.

MR. DAWSON: Yes, your Honor. We will try to put those in, I think, with the--what I would propose is that we make the 28th of April the deadline request. We will try to get together those requests, the expert requests, and get--and contact the Court and get a date to come over here and--

THE COURT: Okay.

MR. DAWSON: --deal with the Court.

THE COURT: That would--that would work.

MS. BROCKENBOROUGH: Does your Honor work--

THE COURT: You'll be doing it as needed?

MS. JOHNSON: I'll be on leave then.

THE COURT: Yes, but then you'd come back in June and do it as needed?

MS. JOHNSON: I'll be back then, yes.

THE COURT: Okay. That's fine.

MS. BROCKENBOROUGH: Do you take off the entire period of Passover or just--

THE COURT: Oh, no.

MS. BROCKENBOROUGH: Okay. So we--

THE COURT: But I will be off on the 20th of April.

MS. BROCKENBOROUGH: Okay.

THE COURT: And I will--and that's all.

MR. DAWSON: Thank your Honor.

THE COURT: I don't have time. When I retire I can take off for holidays. And it's not necessary; it's not like that. It's just the 20th of April that I want.

Anything else you all want to take up, gentlemen?

MR. DAWSON: We have one matter that we would like to approach the bench on if we could.

THE COURT: Okay.

MR. PRICE: Before that, your Honor, I just want to make it clear on this--our Motion to Quash the subpoenas, that's rendered moot because they're withdrawing those subpoenas on--concerning our individuals, the four attorneys. I mean we've agreed they may have to reissue them. But right now they're withdrawing their subpoenas.

THE COURT: Yes.

MR. PRICE: And then on the Motion to Disqualify the DA's Office, they're withdrawing--they are withdrawing that motion.

MR. DAWSON: That's correct, your Honor.

THE COURT: Thank you, General. I had not

written that one down.

MR. DAWSON: Your Honor, I'm assuming--as soon as the stipulations are worked out, we get them in writing--and we'll get an agreement--and we'll submit them to the Court.

THE COURT: Well, again, I'd like to try to do everything we can while I've got you here the next day or so, and then you all can--

MS. BROCKENBOROUGH: Okay.

MR. DAWSON: I will type them up tonight, your Honor. We'll have them in the morning and then we can probably get them done.

MS. BROCKENBOROUGH: Should we come back at 9:00 then tomorrow or 9:30.

THE COURT: 9:30. We've got a little bit of a docket. I didn't set a lot because I knew about this.

They didn't bring Mr. Slapnicker. I've only got four cases and they're not much so that will be fine.

MR. DAWSON: Your Honor, I assume that based on where we are that there's no question that we will finish everything tomorrow--

THE COURT: I'm sure.

MR. DAWSON: --because I have to be in front of the House, Ways and Means Committee on Wednesday, and

my Officer Manager is panicking. (Laughing)

THE COURT: Lots of luck. No. I--I think we can finish tomorrow morning, actually. This is just a matter of making sure we know what we're dealing with. And we're going to have somebody transport Miss Pike, I hope, tonight.

MR. DAWSON: Good.

THE COURT: I'm not for sure that we've got somebody but--I think.

MR. DAWSON: Thank your Honor. If we could approach the bench just very briefly, your Honor.

THE COURT: Sure. (To Debbie) You can have your exhibit back too.

THE COURT REPORTER: Oh, okay, thank you.

(Whereupon, a bench conference was held as follows:)

MS. BROCKENBOROUGH: What did Ms. Martinez say?

MS. HELM: No, absolutely not, she said no.

MS. BROCKENBOROUGH: Oh, okay. So it's not even an issue. We were--no--it's not even an issue. I should have asked before. I did have one question. When Miss Pike was brought here, whatever the processing was to be brought in the building, three letters that were addressed to mail but weren't stamped were taken

from here. And so she's wondering whether there's anyway to get those back, and I don't know to who I need to speak.

THE COURT: If they don't give them back to her on her way back, you need to let me know.

MS. BROCKENBOROUGH: Okay. Okay.

MR. DAWSON: Great. Thank you.

THE COURT: I don't know where they are.

MS. BROCKENBOROUGH: Okay. Thank you.

(Whereupon, said bench conference was concluded.)

THE COURT: Anything else? (Pause) Okay. Court is adjourned till 9 o'clock tomorrow morning.

- -(END OF THE REQUESTED TRANSCRIPT OF THE EVIDENCE)- -

Comptroller's Report

Exhibit No. 1

Introduced by: Mr. Don Dawson

Identified and made a part of the record this ________ day of March, 2006.

______________________________

JUDGE

Board of Professional Responsibility Report

Exhibit No. __2A__

Introduced by: Mr. Don Dawson

Identified and made a part of the record this ________ day of March, 2006.

________________________________________

JUDGE

Disc of Board of Professional Responsibility Report

Exhibit No. 2B

Introduced by: Mr. Don Dawson

Identified and made a part of the record this ________ day of March, 2006.

______________________________

JUDGE

Order About Mr. Talman's Fees

Exhibit No. 3

Introduced by: Mr. Don Dawson

Identified and made a part of the record this ________ day of March, 2006.

______________________________

JUDGE