# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 6**

**DOCUMENT 2**

---

IN THE CRIMINAL COURT FOR KNOX COUNTY
DIVISION III
KNOXVILLE, TENNESSEE
SIXTH JUDICIAL DISTRICT

Exhibits

CHRISTA GAIL PIKE, )
PETITIONER )
VS. ) CASE NO. 68280
STATE OF TENNESSEE, )
RESPONDENT )

TRANSCRIPT OF THE EVIDENCE

Exhibits

April 7-11, 2008 Petition for Post-Conviction Relief

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. Leland Price
Assistant District Attorneys General
Office of the District Attorney General
City-County Building
400 Main Avenue
Knoxville, Tennessee 37902

FOR THE PETITIONER:

Mr. Don Dawson
Mr. James Crowson
Post-Conviction Defender's Office
530 Church Street, Suite 600
Nashville, Tennessee 37243

## LIST OF EXHIBITS

(In April 7th - 11th, 2008 PCR Proceedings)

| NUMBER | ITEM | VOL. | PAGE |
|---|---|---|---|
| 1 | Report about Over-billing | I | 16 |
| 2A | Petition for Discipline | I | 19 |
| 2B | Motion to Dismiss | I | 19 |
| 3 | Original Trial Transcript, Volumes I and II, Motions | I | 28 |
| 4 | Billing Record of Julie Rice | I | 55 |
| 5 | Suggested Mitigation Witnesses | | |
| | (For Identification Only) | I | 66 |
| | (As Exhibit) | VII | 631 |
| 6 | Suggested Mitigation Themes | | |
| | (For Identification Only) | I | 91 |
| | (As Exhibit) | VII | 649 |
| 7 | Notes of Julie Rice | | |
| | (For Identification Only) | I | 99 |
| 8 | Letter to Mr. Talman from Dr. McCoy | | |
| | (For Identification Only) | II | 114 |
| | (As Exhibit) | II | 115 |
| 9 | Motion filed by Ms. Rice | II | 119 |
| 10 | Email from Ms. Rice to Mr. Talman | II | 149 |
| 11 | Affidavit of Julie Rice | II | 151 |
| 12 | Witness Statements | II | 153 |
| 13 | Release | II | 160 |

LIST OF EXHIBITS

(In April 7th - 11th, 2008 PCR Proceedings)

| NUMBER | ITEM | VOL. | PAGE |
|---|---|---|---|
| 14A,B &C | Training Manuals about Death Penalty, 3 Volumes | II | 194 |
| 15 | Statement of Brandi Rogers | III | 204 |
| 16 | Statement of Shandra Harris | III | 204 |
| 17 | Dr. Eric Engum's Report | | |
| | (For Identification Only) | III | 279 |
| | (As Exhibit) | III | 279 |
| 18 | Mr. Talman's Billing Record | III | 291 |
| 19 | Ex Parte Motions Filed Under Seal Regarding Dr. Bernet | III | 305 |
| 20 | Letter to Dr. Bernet | | |
| | (For Identification Only) | IV | 312 |
| | (As Exhibit) | IV | 314 |
| 21 | One Page of Notes | IV | 314 |
| 22 | Ex Parte Motion about Funding | IV | 337 |
| 23A | Letter to Talman from Dr. McCoy | IV | 362 |
| 23B | Letter to Dr. McCoy from Talman | IV | 362 |
| 24 | Letter to Mr. Talman and Ms. Rice from Dr. McCoy | V | 446 |
| 25 | Letter to Board of Professional Responsibility | V | 463 |

LIST OF EXHIBITS

(April 7th - 11th, 2008 PCR Proceedings)


| NUMBER | ITEM | VOL. | PAGE |
|---|---|---|---|
| 26 | Letter from Mr. Talman to Sandy Garrett | V | 463 |
| 27 | CD/Photos of Fotos Slaughter House | VI | 582 |
| 28 | CD/Video of Slaughtering Animals | VI | 591 |
| 29 | Article Written by Dr. McCoy | | |
| | (For Identification Only) | VII | 618 |
| | (As Exhibit) | VII | 619 |
| 30 | Final Statement of Dr. McCoy | | |
| | (For Identification Only) | VII | 624 |
| | (As Exhibit) | VII | 625 |
| 31 | Calendar of March 1996 | VII | 634 |
| 32 | Dr. McCoy's Charts | VII | 681 |
| 33 | Psychological Treatment Received by Miss Pike | | |
| | (For Identification Only) | XI | 894 |
| | (As Exhibit) | XI | 895 |
| 34 | Waiver of Rights | | |
| | (For Identification Only) | X | 920 |
| | (As Exhibit) | X | 921 |

LIST OF EXHIBITS

(In April 7th - 11th, 2008 PCR Proceedings)


| NUMBER | ITEM | VOL. | PAGE |
|---|---|---|---|
| 35 | Consent to Search Waiver | | |
| | (For Identification Only) | X | 920 |
| | (As Exhibit) | X | 922 |
| 36 | Transcript of Miss Pike's Statement | | |
| | (For Identification Only) | X | 920 |
| | (As Exhibit) | X | 923 |
| 37 | CD/Video of Mr. York and Miss Pike at Crime Scene | X | 928 |
| 38 | CD/Tape of Miss Pike's Statement Played in Court | X | 964 |
| 39 | Portion of Transcript of York and Pike at Crime Scene | X | 963 |

(Admitted on 4-11-08, Lisa Kilbourne Reporter)

| NUMBER | ITEM | VOL. | PAGE |
|---|---|---|---|
| 40 | Medical Records of Zola Fotos | | |
| 41 | Medical Records of Chris Fotos | | |
| 42 | CD of Dr. Kenner's Power Point Presentation | | |
| 43 | Time Line of Life | | |
| 44 | Polaroid Photograph | | |
| 45 | CD of Horror Movies Viewed | | |

# OFFICE OF THE DISTRICT ATTORNEY GENERAL

VICTOR S. JOHNSON III
*District Attorney General*

August 28, 2006

RECEIVED

AUG 30 2006

OFFICE OF POST-CONVICTION DEFENDER

Donald E. Dawson, Esq.
Post Conviction Defender's Office
530 Church Street, Suite 600
Cornerstone Building
Nashville, TN 37243

RE: William Talman

Dear Don:

Enclosed please find the copies you requested from our file on William Talman. There will be no charge for these copies.

Yours truly,

Victor S. (Torry) Johnson III
District Attorney General

FILED (27)
APR 07 2009
Clerk of the Courts
Rec'd by

VSJ/ja
Enclosure

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 608280 EXHIBIT NO. 1
DATE 4-7-08 ID ____ Evd ✓

# OFFICE OF THE DISTRICT ATTORNEY GENERAL

VICTOR S. JOHNSON III
District Attorney General

December 8, 1994

The Honorable Randy Nichols
District Attorney General
P. O. Box 1468
Knoxville, TN 37901-1468

RE: Indigent Criminal Defense Fund Investigation/William Talman and David Poss

Dear Randy:

Following our conversation of the other day, I spoke with Special Agent Bob Schlafly of the TBI and advised him to arrange to bring to your office the investigative file in the above styled matter. He will also arrange for Chas Taplin with the Office of the Comptroller of the Treasury to come with him so that they can meet with you and your staff to discuss their findings. As I explained, our office requested the initial TBI investigation and has worked closely with it and the Office of the Comptroller through this stage of the investigation. It now seems that we are to the point where a decision to prosecute criminally must be made. General Burson and his staff have been involved in the process, and could also be of assistance to you. It appears that William Talman and David Poss are the only two whose billing practices were so extreme as to warrant evaluation for prosecution. It does not appear that any real abuses of the system occurred elsewhere in the state. It is my understanding that you will review the file to determine whether your office can handle the case or whether a special prosecutor needs to be appointed.

Also, I am enclosing a copy of an ABA formal ethics opinion 93-379 dated December 6, 1993 that discusses the ethical concerns regarding billing practices such as those employed by Talman and Poss. I am not certain whether their practices have been reported to the Board of Professional Responsibility, but it would seem that they certainly ought to be in light of the ABA opinion.

Should you have any questions or if I can be of any assistance, please do not hesitate to contact me.

Yours truly,

Victor S. Johnson III
District Attorney General

VSJ/ja
Enclosure
cc: The Honorable Charles W. Burson
The Honorable Charles E. Ferrell
The Honorable Pat McCutchen

ABA Formal Ethics Opinion 93-379, Dec. 6, 1993.

"Consistent with the Model Rules of Professional Conduct, a lawyer must disclose to a client the basis on which the client is to be billed for both professional time and any other charges. Absent a contrary understanding, any invoice for professional services should fairly reflect the basis on which the client's charges have been determined. In matters where the client has agreed to have the fee determined with reference to the time expended by the lawyer, a lawyer may not bill more time that she actually spends on a matter, except to the extent that she rounds up to minimum time periods (such as one-quarter or one-tenth of an hour). A lawyer may not charge a client for overhead expenses generally associated with properly maintaining, staffing and equipping an office; however, the lawyer may recoup expenses reasonably incurred in connection with the client's matter for services performed in-house, such as photocopying, long distance telephone calls, computer research, special deliveries, secretarial overtime, and other similar services, so long as the charge reasonably reflects the lawyer's actual cost for the services rendered. A lawyer may not charge a client more than her disbursements for services provided by third parties like court reporters, travel agents or expert witnesses, except to the extent that the lawyer incurs costs additional to the direct cost of the third-party services."

"The first set of practices involves billing more than one client for the same hours spent. In one illustrative situation, a lawyer finds it possible to schedule court appearances for three clients on the same day. He spends a total of four hours at the courthouse, the amount of time he would have spent on behalf of each client had it not been for the fortuitous circumstance that all three cases were scheduled on the same day. May he bill each of the three clients, who otherwise understand that they will be billed on the basis of time spent, for the four hours he spent on them collectively? In another scenario, a lawyer is flying cross-country to attend a deposition on behalf of one client, expending travel time she would ordinarily bill to that client. If she decides not to watch the movie or read her novel, but to work instead on drafting a motion for another client, may she charge both clients, each of whom agreed to hourly billing, for the time during which she was traveling on behalf of one and drafting a document on behalf of the other? A third situation involves research on a particular topic for one client that later turns out to be relevant to an inquiry from a second client. May the firm bill the second client, who agreed to be charged on the basis of time spent on his case, the same amount for the recycled work product that it charged the first client?

"The questions presented to the Committee require us to determine what constitute reasonable billing procedures; that is, what are the services and costs for which a lawyer may legitimately charge, both generally and with regard to the specific scenarios? This inquiry requires an elucidation of the Rule of Professional Conduct 1.5, and the Model Code of Professional Responsibility DR 2-106."

"A lawyer who spends four hours of time on behalf of three clients has not earned twelve billable hours. A lawyer who flies for six hours for one client, while working for five hours on behalf of another, has not earned eleven billable hours. A lawyer who is able to reuse old work product has not re-earned the hours previously billed and compensated when the work product was first generated. Rather than looking to profit from the fortuity of coincidental scheduling, the desire to get work done rather than watch a movie, or the luck of being asked the identical question twice, the lawyer who has agreed to bill solely on the basis of time spent is obliged to pass the benefits of these economies on to the client. The practice of billing several clients for the same time or work product, since it results in the earning of an unreasonable fee, therefore is contrary to the mandate of the Model Rules."

B. Reverse Contingent

**ABA Formal Ethics Opinion 93-373**, Apr. 16, 1993.

"The Model Rules do not prohibit 'reverse' contingent fee agreements for representation of defendants in civil cases where the contingency rests on the amount of money, if any, saved the client, provided the amount saved is reasonably determinable, the fee is reasonable in amount under the circumstances, and the client's agreement to the fee arrangement is fully informed."

"Model Rule 1.5(a) sets out several factors by which the reasonableness of a fee may be determined, one of which is 'whether the fee is fixed or contingent.' These factors are substantially identical to those listed in DR 2-106(B) of the predecessor Model Code of Professional Responsibility."

C. Pro Bono

**ABA Formal Ethics Opinion 93-374**, June 7, 1993.

"[N]one of the policy considerations underlying the prohibition of [DR 3-102(A) or DR 2-103(B)] would be served by precluding a lawyer who undertakes a pro bono representation either on referral from a sponsoring pro bono organization or as an employee of such an organization, and whose services are the basis of court-awarded attorney's fees, from contributing those fees to the sponsoring organization. We also conclude that it is ethically permissible for a cooperating lawyer or a staff lawyer to agree in advance to remit all such fees to the organization as long as this arrangement is disclosed to the client."

V. Restricting Practice

OFFICE OF THE DISTRICT ATTORNEY GENERAL

VICTOR S. JOHNSON III
District Attorney General

December 19, 1994

Special Agent Robert K. Schlafly
Tennessee Bureau of Investigation
1148 Foster Avenue
Nashville, TN 37210-4406

RE: Indigent Criminal Defense Fund Investigation

Dear Bob:

Attached is a copy of my letter to Randy Nichols for your information.

Yours truly,

Victor S. Johnson III
District Attorney General

VSJ/ja
Enclosure

# OFFICE OF THE DISTRICT ATTORNEY GENERAL

VICTOR S. JOHNSON III
District Attorney General

December 8, 1994

The Honorable Charles W. Burson
State Attorney General and Reporter
114 John Sevier Building
500 Charlotte Avenue
Nashville, TN 37243-0497

RE: Indigent Criminal Defense Fund Investigation/William Talman and David Poss

Dear General Burson:

Enclosed please find a copy of my letter to The Honorable Randy Nichols regarding the above styled case. I spoke personally with Randy and he wanted to review the file before deciding whether his office could or could not be involved with the prosecution. If he determines that his office should be excluded, he will request a special prosecutor to review the file. I have passed along to him the suggestion that Bill Pope or Richard Fisher could be ideal candidates to serve if his office must recuse itself.

Yours truly,

Tony Johnson

Victor S. Johnson III
District Attorney General

VSJ/ja
Enclosure

OFFICE OF THE DISTRICT ATTORNEY GENERAL

VICTOR S. JOHNSON III
*District Attorney General*

# MEMORANDUM

TO: Charles E. Ferrell
Arthur M. Hayes, Jr.
David M. Himmelreich
Pat McCutchen
Robert K. Schlafly

FROM: Torry Johnson TJ

DATE: September 8, 1994

RE: Investigation of Overbilling by Appointed Defense Counsel

Based upon the responses, we will meet in my office on Tuesday, September 20, 1994 at 10:00 a.m. to discuss the status of the criminal investigation in the above styled matter.

I look forward to seeing you on that date.

VSJ/ja
cc: Charles Taplin

CHARLES E. FERRELL
DIRECTOR
THE ADMINISTRATIVE OFFICE OF THE COURTS
NASHVILLE CITY CENTER STE 1000
511 UNION STREET
NASHVILLE, TN 37243-0607

ARTHUR M. HAYES, JR.
DEPARTMENT OF AUDIT
JAMES K POLK OFFICE BLDG STE 1500
NASHVILLE, TN 37243-0264

DAVID M. HIMMELREICH
ASSISTANT STATE ATTORNEY GENERAL
450 JAMES ROBERSON PARKWAY
NASHVILLE, TN 37243-0485

PAT MCCUTCHEN
TN DISTRICT ATTORNEYS GENERAL CONFERENCE
800 CAPITOL BOULEVARD BLDG
226 CAPITOL BOULEVARD
NASHVILLE, TN 37243-0890

ROBERT K. SCHLAFLY
TENNESSEE BUREAU OF INVESTIGATION
1148 FOSTER AVENUE
NASHVILLE, TN 37210-4406

CHAS TAPLIN
DEPARTMENT OF AUDIT
JAMES K POLK OFFICE BLDG STE 1500
NASHVILLE, TN 37243-0264

Dale
File

LAW OFFICES OF
RITCHIE, FELS & DILLARD, P.C.
SUITE 800, MAIN PLACE
606 W. MAIN STREET
P. O. BOX 1126
KNOXVILLE, TENNESSEE 37901-1126

ROBERT W. RITCHIE
CHARLES W. B. FELS
W. THOMAS DILLARD
DAVID M. ELDRIDGE

WAYNE A. RITCHIE II
KENNETH F. IRVINE, JR.
WADE V. DAVIES

KNOXVILLE
615 637-0661
FACSIMILE
615 524-4623

WASHINGTON, D.C.
801 PENNSYLVANIA AVENUE
SUITE 810
WASHINGTON, D.C. 20004
202 508-3495

October 17, 1994

Mr. Victor S. Johnson, III
District Attorney General
20th Judicial District
Room 102 Metro Courthouse
Nashville, Tennessee 37201

**RE: William Talman, Esq.**

Dear Torry:

With your permission, I would like to call you later in the week to determine whether you have resolved the jurisdictional question which we discussed in August. If you have decided to accept jurisdiction, perhaps you will be kind enough to permit me to spend some additional time with you on the matter. As you may recall, Rule 13(2)(A) recites in pertinent part:

Time <u>may</u> be prorated . . .

As you know, the word "may" instead of the word "must" would appear to weaken considerably the possibility of any viable criminal charge.

Thank you for permitting me to talk with you about a matter which causes grave concern to a fine young practitioner here in Knoxville.

With best wishes,

Sincerely yours,

RITCHIE, FELS & DILLARD, P.C.

Charlie

CHARLES W. B. FELS

CWBF:djr

LAW OFFICES OF
RITCHIE, FELS & DILLARD, P.C.
SUITE 300, MAIN PLACE
606 W. MAIN STREET
P. O. BOX 1126
KNOXVILLE, TENNESSEE 37901-1126

ROBERT W. RITCHIE
CHARLES W. B. FELS
W. THOMAS DILLARD
DAVID M. ELDRIDGE

WAYNE A. RITCHIE II
KENNETH F. IRVINE, JR.
WADE V. DAVIES

KNOXVILLE
615 637-0661
FACSIMILE
615 524-4623

WASHINGTON, D.C.
801 PENNSYLVANIA AVENUE
SUITE 810
WASHINGTON, D.C. 20004
202 508-8400

December 1, 1994

Mr. Victor S. Johnson, III
District Attorney General
20th Judicial District
Room 102 Metro Courthouse
Nashville, Tennessee 37201

RE: William Talman, Esq.

Dear Torry:

With your permission, I would like to call you in the next day or two to catch up on our matter.

With best wishes,

Sincerely yours,

RITCHIE, FELS & DILLARD, P.C.

CHARLES W. B. FELS

CWBF:djr

COMPTROLLER OF THE TREASURY
DIVISION OF STATE AUDIT
SUITE 1500, JAMES K. POLK STATE OFFICE BUILDING
505 DEADERICK STREET
NASHVILLE, TENNESSEE 37243-0264
(615) 741-[redacted] 1623 FAX (615) 532-2765

SEND TO: Tom Thurman FAX# 862-5599

FROM: CHAS TAPLIN

DATE: 5/2/94

TIME: 1:00pm

WE ARE SENDING 3 PAGES TO YOU INCLUDING THIS COVER SHEET. IF ALL THE PAGES ARE NOT RECEIVED, PLEASE CALL US AT THE NUMBER SHOWN ABOVE.

COMMENTS: FYI

STATE OF TENNESSEE

**CHAS TAPLIN, CPA**
LEGISLATIVE AUDIT INVESTIGATOR

OFFICE OF THE COMPTROLLER OF THE TREASURY
DIVISION OF STATE AUDIT
SUITE 1500, JAMES K. POLK BUILDING
NASHVILLE, TENNESSEE 37243-0264 TELEPHONE 615-741-1623

**IT FIGURES:** Swimsuit adds and subtracts to flatter the body/E1, E3

# The Knoxville News-Sentinel

East Tennessee Edition • 2.00

SUNDAY MORNING, MAY 1, 1994

# TBI joins probe of lawyers' bills

## Excessive indigent-case fees studied

First of a series

By John North
News-Sentinel staff writer

NASHVILLE — The Tennessee Bureau of Investigation has joined a criminal inquiry into allegations lawyers in Knox County and elsewhere in Tennessee overbilled the state thousands of dollars last year while representing court-appointed clients, The Knoxville News-Sentinel has learned.

A Davidson County prosecutor is coordinating the investigation while agents and auditors gather evidence. No decision has been made about where cases would be prosecuted if charges are filed, said Davidson County Deputy District Attorney General Tom Thurman.

Knox County prosecutors, called in previously to help examine local cases, have been excused. The move was made to avoid a conflict should anyone from the district attorney general's office be called to testify against a defense lawyer, said District Attorney General Randy Nichols.

"A number of people on my staff could be potential witnesses were a case to proceed," Nichols said.

About two dozen lawyers — none of whom has been named — are under investigation. Of particular interest are two who charged Tennessee more than $100,000 last year for court-appointed work.

One lawyer is said to have billed the state at least 70 hours for work he said he did in a single day, court authorities have said.

Authorities are looking at claims filed by lawyers from Knox, Davidson, Shelby and Madison counties, among others.

Tennessee uses a public defender system to represent most poor clients, but private lawyers sometimes are called in if the defender's office has a conflict representing a defendant.

Lawyers are reimbursed from

Please see FEES, page A12



# Fees

Continued from page A1

a $5 million fund overseen by the state Supreme Court's administrative office, said Charles E. Ferrell, the office's director. All bills are supposed to be reviewed and signed by General Sessions and District Court judges before being sent to Nashville for payment.

The criminal investigation ups the stakes of what began in mid-March as an internal review of lawyers' bills by the Supreme Court's administrative office.

It also has cast a chill on Tennessee's legal community, where lawyers, as officers of the court, are expected to maintain high ethical standards.

District Public Defender Mark Stephens, who formerly took appointed cases while in private practice, said most lawyers do appointed work not for the money, which is far less than they make for retained cases, but because they enjoy the job.

The public shouldn't blame all defense lawyers for allegations being made against a few, he said.

"I feel sorry for those folks (the lawyers), and I was one of them for a long time," Stephens said. "I hate to see this kind of thing come down on them, and I hate it because it's another excuse to cast aspersions on the criminal defense bar."

Ferrell agreed the investigation is not a reflection of fee claims from all defense lawyers. Only a small number of bills submitted last year are being reviewed, he said.

Many lawyers reacted with disbelief when Ferrell announced the suspected abuse March 17. Reimbursement fees are low, and lawyers are limited in how much they can make on almost all criminal cases.

State Supreme Court rules dictate that a lawyer receive no more than $20 an hour for out-of-court work and $30 an hour for in-court work. Tennessee pays no more than $100 for each misdemeanor case, no more than $500 for each felony case in sessions courts and no more than $1,000 for each felony in criminal court, the rules state.

At that rate, a lawyer would have to take scores of court-appointed clients in General Sessions Court to make $100,000. Most Knox County defense lawyers accept or are assigned a fraction of that amount.

Longtime defense lawyer Randall E. Reagan, who often has taken court-appointed work in Knox County, called the rates "ridiculous." The rates date to the early 1960s, he said.

Reagan is among a group of lawyers statewide who approached the Supreme Court last year, before the investigation began, and asked for increased compensation. Justices are expected this summer to review the request, endorsed by several law associations in Tennessee.

"If this situation continues, there are not going to be competent attorneys who are available to perform this kind of service for the community and the judicial system, and the judicial system is going to have to shut down," Reagan said. "You can't prosecute indigent clients if you can't provide counsel for them."

The Supreme Court's administrative office began looking at fee petitions after Ferrell noticed numerous claims filed by the same lawyer for cases he said he worked on the same day.

Authorities found numerous instances in which lawyers submitted multiple claims for one client without prorating their time, as court rules require.

For example, a lawyer might represent a client facing three felony drug charges from one crime. If the lawyer had to be in court four hours one day for his client, he claimed four hours on each petition rather than prorate the time among the three cases.

Some lawyers were billing the state for 20, 30, 40 and more hours for one day's work.

Although officials have an idea of the kinds of abuse that allegedly occurred, they are a long way from completing their review.

Thurman said he asked for the TBI's help to facilitate the investigation. Auditors are going through boxes of fee petitions at the Nashville City Center, where the administrative offices of the courts are based.

Art Hayes, director of the Division of State Audit, confirmed Friday his auditors are conducting an independent review. Authorities are looking at 1993 records, but the investigation could go back to the early 1990s.

Ferrell has said lawyers who filed bogus bills could face professional disciplinary action as well as criminal charges.

Thurman said he has yet to meet with the auditors. Decisions also must be made about where charges would be filed and prosecuted.

"We haven't sat down and looked at this stuff yet," he said. "We don't really know what or how it transpired yet."

The state has frozen payments to some lawyers whose fee petitions are under scrutiny. Most court-appointed lawyers, however, are getting their money, Ferrell said.

"We're paying them," he said. "Of course, we're scrutinizing them a lot closer."

TENN.DEPT.OF.AUDIT

FEATS: Kentucky Derby, Expo

The Knoxville News-Sentinel

Edition •

SUNDAY MORNING, MAY 8, 1994

# State's probe of 24 lawyers includes two here who had 6-figure years

One in a series

By John North
News-Sentinel staff writer




Friday, July 23, was a busy day for Knoxville criminal defense lawyer David Poss.

Working on behalf of more than 15 court-appointed clients, the 41-year-old Poss appeared in two divisions of Knox County Criminal Court, met with prosecutors, spoke with police officers, interviewed clients and then spent the afternoon tending to defendants in General Sessions Court, his bills indicate.

He also found time to hear cases while sitting on the bench as a specially appointed Sessions Court judge.

All told, Poss charged the state for more than 70 hours of work that day on behalf of poor Tennessee clients, The Knoxville News-Sentinel has learned. The paper independently has verified billings for 68.75 of those hours.

He received more than $1,600 for his efforts. Last year, he made more than $121,000 on court-appointed work, often logging days of more than 25 hours, according to a review by The News-Sentinel.

State officials are conducting a criminal investigation into whether some 24 lawyers, including Poss and Knoxville lawyer Bill Talman, overcharged Tennessee thousands of dollars while representing court-appointed clients last year.

Although the scope is statewide, Knox County appears to be the center of the state's attention.

Court officials say they suspect some defense lawyers submitted bogus bills in which they charged for handling multiple cases on clients without prorating their time. Some lawyers regularly billed daily hours greater than the day is long, according to Charles E. Ferrell, director of the Administrative Office of Tennessee's courts.

Don Bosch, Poss' lawyer, on Friday said his client knows he

Please see LEGAL, page A8

007235

TENN.DEPT.OF.AUDIT TEL:615 532 2765





# Legal

Continued from page A1

couldn't possibly have worked all the hours he charged on some claims. He said Poss' billing method has been accepted practice for years in Knox County because the reimbursement rate is so low.

"Our position is, if we have done something that is incorrect and that has not been what we have always believed to have been the approved and common practice, we are willing to discuss that with the state," Bosch said.

Talman said he was surprised to hear the state had problems with the way he prepares his bills. He said he and other lawyers have done it the same way for years without any objections from state authorities.

To Talman, who was paid about $106,000 for court-appointed work last year, it seems unfair for the state suddenly to announce an investigation. He said he has consulted a lawyer.

"If I'm doing anything that's incorrect, I'm willing to straighten it out," he said.

Authorities expect it will take several weeks or months to review the thousands of fee petitions submitted by lawyers last year.

No one has been charged.

Traditionally, lawyers look at court-appointed work as a good way to help the public, even though the pay is low in comparison with other legal work. For others, it also can provide a comfortable living.

From 1992 to early March, Tennessee paid Poss more than $230,000 on court-appointed cases, state records show. In that same period, Talman received about $180,000, according to state records.

And they made it, according to a newspaper review, taking cases that usually paid no more than $100, $500 or $1,000.

Ask most criminal defense lawyers in Knox County to estimate how much they make in a year on court-appointed work, and they'll probably tell you it's no more than $25,000 or $30,000. The cases usually represent no more than 20 to 30 percent of a lawyer's total practice.

For Poss, the ratio was greater.

He agreed to take more than 180 court-appointed misdemeanors and more than 150 felonies. Poss, licensed to practice law in Tennessee since 1980, is in good standing and has received no disciplinary action, according to the state Board of Professional Responsibility, which supervises lawyers.

Almost all the work was assigned to him, with his consent, by Knox County judges in the City Sessions or County Sessions courts, where cases first are heard after a warrant is taken against a defendant.

Although Knox County and the rest of the state pay public defenders to represent most indigent clients, courts sometimes appoint private lawyers. The move typically is made because the public defender's office has a conflict representing a particular client.

As compensation, the state pays defense lawyers $20 an hour for out-of-court work and $30 an hour for in-court work, according to rules set forth by the Tennessee Supreme Court. The rates, which date to the 1980s, are far below what criminal lawyers typically charge for their services.

Lawyers also are limited in the total amount they can charge. For example, the state will pay them no more than $100 for a misdemeanor, no more than $500 for a felony case heard in General Sessions Court and no more than $1,000 for most felonies in Criminal Court.

Young lawyers sometimes seek court-appointed work when they need to establish their reputations.

For Poss, indigent defense cases brought him to court on an almost daily basis, according to fee petitions on file in Knox County and Nashville.

Judges also approved his fee claims on a routine basis.

Of the $121,433 Poss was paid by the state last year, more than $105,000 came from work he did while in Knox County General Sessions Court, according to state figures kept by the Administrative Office.

He often appeared to submit multiple claims for the same client without prorating the time he had spent on the case.

Here are examples taken from a review of Poss' fee petitions.

■ The week of March 29-April 2, 1993: Poss billed the state for more than 250 hours during this time, an average of more than 50 hours each day, his fee petitions show. Assuming all of that time was spent out of court — and it wasn't — that meant the state paid him more than $5,000 for the week.

## One-day fees

Documents filed with state and county courts show that lawyer David J. Poss billed the state of Tennessee for at least 68.75 hours of service July 23, 1993. Here is a partial client list and hours charged during that one day.

| | |
|---|---|
| Susan Lawson | 2.5 |
| Jerry Thomas | 2 |
| Billy Hobbs | 6 |
| James Payne | 2 |
| Charlie Thomas | 1 |
| Anthony Hamilton | 6.5 |
| Charles Richards | 1.5 |
| Steve Acuna | 11 |
| David Jones | 12 |
| Troy Tuttle | 3 |
| Christine Waymon | 2.5 |
| Brian Holder | 5 |
| Richard L. Groome | 6 |
| Robert Fielthouse | 2 |
| Pamela Donahue | 6.75 |
| Total | 68.75 |

Lawyer Bill Talman billed the state for 34.3 hours of service rendered on July 7, 1993.

| | |
|---|---|
| Donald C. Lee | 13.7 |
| Johnny Fortberry | 2.7 |
| Gary L. Bertrand | 1.4 |
| William E. Jones | 2.4 |
| Michael E. Duff | 0.5 |
| Clinton C. Williams | 3.5 |
| Total | 24.2 |

Source: Fee petitions on file in Knox County Sessions Court Clerk's Office and Administrative Office of Tennessee Supreme Court.

Ray Pineda/News-Sentinel staff

Tuesday, March 30, was the week's busiest day with at least 65 hours billed, many of those coming from petitions for six robbery warrants filed against Jacky D. Longmire.

Director Ferrell, in announcing the statewide investigation March 17, indicated some lawyers were billing the state on multiple-warrant cases without prorating their time, as required by the rules.

For example, if a lawyer appears in court for an hour one day representing a client who has four drug charges, Ferrell interprets the rules to read that the lawyer should charge 15 minutes on each fee petition.

The standard petition forms include this statement, under which the lawyer signs his name: "I certify that the foregoing represents an accurate and complete statement of time and expense in connection with the above action or proceeding . . . ."

In charging more than 35 hours to work on Longmire's cases March 30, Poss appeared to violate court rules.

Longmire's cases were bound over April 5 and 6 to the grand jury. Poss then filed the claims through the clerk's office of the Sessions Court, and they were sent to Nashville for payment.

The state ultimately paid Poss $3,000 to represent Longmire over a seven-day period for the six felony petitions.

■ May 21: Knox County Criminal Court occupied much of Poss' day, his bills indicate. He charged the state a total of 22.5 hours for time he said he spent in Judge Ray L. Jenkins' courtroom. Twenty of those hours were for client Douglas Mynatt, who faced four criminal drug charges.

Jenkins approved the bills July 19, records show. For his work on Mynatt's four cases, Poss received $4,000.

Poss also had business in General Sessions Court: he billed the state for five hours spent on behalf of four clients. Claims show he also charged the state for six hours of work talking with police and the district attorney for a client facing two felony charges and a misdemeanor.

In addition, he heard traffic citation cases on the bench while sitting as a special judge for Sessions Court Judge Geoff Emery.

■ July 23: Here's a summary of Poss' 68-plus-hour day.

It included 9.5 hours of court time in two of Knox County's criminal courts. He also billed the state for more than 17 hours of time spent in General Sessions Court.

In addition, he charged the state for more than 20 hours to visit with clients, interview police officers, investigate a case and speak with clerks. Tennessee paid him for a total of 12 hours he claimed to visit one client in jail and review his criminal history.

In all, he billed the state on this day for more than 70 hours of work, the paper has learned.

But he also found time to help Judge Bob McGee by hearing traffic citations on the Sessions Court docket.

State court administrators compile lawyers' claims based on the dates they are received.

For example, one batch of bills in December consisted of claims from 15 lawyers in Tennessee as well as Shelby County's Probate Court. The total amounted to $20,739, with several lawyers submitting claims of between $500 and $2,500, records show.

Among the bills are claims from Poss for $10,285. The total represents almost half of all the lawyer bills received that day.

After checking the math on Poss' bills, state authorities authorized payment to the Knoxville lawyer.

They would see other sizable batches of bills from Poss throughout 1993, including sets

*"Our position is, if we have done something that is incorrect and that has not been what we have always believed to have been the approved and common practice, we are willing to discuss that with the state."*

Don Bosch
Attorney for lawyer David Poss

*"Up until this point in time, up until the state decided they were going to change the rules, you didn't have to work as hard on some cases, but on other cases you had to work your rear-end off. I've always thought it kind of balanced out."*

Lawyer Bill Talman

TENN.DEPT.OF.AUDIT TEL:615-532-2765

—EY

totaling $8,[illegible] on Feb. 24, $11,[illegible] on July 21 and $8,[illegible] on Oct. 14. All were approved.

Bench said his client never had any criminal intent to defraud or deceive the public.

He said citizens should not assume his client or any other lawyer has grown rich taking court-appointed work. Poss' net income last year was about $40,000, he said.

Bench said Poss and Talman have performed a service for the state for which they should not be condemned. Bench said Poss did what he understood to be the common billing practice throughout Tennessee.

A review by The News-Sentinel showed, however, multiple billing without prorating time was not prevalent in the majority of lawyers' fee petitions.

"Without practitioners like David Poss and Bill Talman the ...

Please see LEGAL, page A7

A MATTER OF JUSTICE

# Legal

Continued from page A1

indigent defense system is going to fail because nobody is going to take thee cases and it will shut down the court system," Bench said.

Farrell, the state court's administrative director, declined to discuss specific lawyers who may have overcharged the state. State auditors are reviewing boxes of fee petitions from last year, and the Tennessee Bureau of Investigation has been called in to help in the investigation.

But it was Farrell who first raised questions after he became curious about the way a lawyer had computed his bills. He asked his staff to pull more fee petitions.

They found the hours rapidly piling up.

"I said, 'Well, there's not that many hours in a day,'" Farrell recalled.

He called Chief Justice Lyle Reid of the state Supreme Court, who directed that auditors be called in. The investigation was on.

For defense lawyer Bill Talman, 1993 also was a six-figure year, including expenses, in the Knox County courts.

The 34-year-old lawyer's court-appointed caseload consisted of about 60 cases in the criminal courts and more than 115 felonies and misdemeanors in the general sessions courts, according to a computer log kept by the courts' administrative office.

Talman had worked several years on some cases that were disposed of last year, records show.

Among Talman's most publicized clients last year was Michael E. Duff, the accused "Blue Light Rapist." A jury convicted Duff last summer, and his appeal is pending before Criminal Court Judge Mary Beth Leibowitz.

Talman has been licensed to practice law in Tennessee since 1986. He is in good standing and has faced no disciplinary actions, according to the Board of Professional Responsibility.

According to a review by the newspaper, Talman sometimes billed the state for more than 20 hours of work in a day. He recorded his time in tenths of an hour, as directed by state court rules, but he sometimes submitted multiple bills on the same client for the same day's work.

Here are examples taken from a review of Talman's fee petitions on file in Nashville and the Knox County Criminal Court clerk's office.

> *"Without practitioners like David Poss and Bill Talman the indigent defense system is going to fail because nobody is going to take thee cases and it will shut down the court system."*
>
> Don Bench
> Attorney for Poss

- July 7: Talman, according to fee petitions, billed the state for more than 16 hours spent in City Sessions Court that day. He appeared on behalf of two clients, Donald C. Lee and Johnny Portbarry, petitions indicate.

To represent Lee, who had seven warrants pending against him, Talman billed the state for 12.7 hours, or more than $380. Lee's cases were continued to July 28, warrants show.

As he often did last year, Talman turned to special judges to sign his fee petitions after Lee's sessions cases concluded. By law, special judges can approve fee petitions, although some General Sessions Court judges said they didn't know any were signing lawyers' claims.

Although Sessions Court Judges Geoff Emery and Brenda Waggoner heard Lee's cases in their courts, Talman had lawyers Ken Partan and Tom Slaughter, as special judges, sign the claims.

During the day, Talman also worked on several cases pending in Knox County Criminal Court, his petitions show. For example, he prepared court motions for one client, met with another, and took phone calls from defendant Duff and his mother.

For these cases, Talman charged the state 7.5 hours, records show.

- Sept. 2: Petitions show Talman charged at least 20 hours on this day, including more than 12 hours spent in Sessions Court. He charged the state 4.3 hours to represent one man in court on three warrants, and the case was

The Knoxville News-Sentinel, Sunday, May 8, 1994 • A7

— A MATTER OF MONEY

continued to Sept. 6.

Talman put in for another nine hours of work outside of court.

Slaughter and David Poss, as special lawyers, signed Talman's sessions petitions in the weeks after the cases were concluded, records show.

Talman said he had not reviewed his billings for July 7 and Sept. 2 and could not comment about them specifically.

He said, however, that his reported income last year was misleading because his wife, Martha Worms, also a lawyer, often handled Sessions Court cases while he worked in Criminal Court.

Talman said he and his wife always made certain their clients were properly represented.

Through the years, Talman said, some court-appointed cases have required more work than he possibly could have recovered in fee claims.

Other cases have taken less time, and on those the scale has tipped back the other way, he said.

For example, Talman said he has invested far more than the $1,000 the state probably will pay him to represent Duff. The bill for that case has not been submitted, and the petition included in the July 7 example was for another charge against Duff that was dismissed.

Talman said he assumed court administrators in Nashville have been looking at his fee petitions as long as he has been taking court-appointed work. In all that time, he said, no one ever told him he was doing anything wrong.

"Up until this point in time, up until the state decided they were going to change the rules, you didn't have to work as hard on some cases, but on other cases you had to work your rear-end off. I've always thought it kind of balanced out," he said. "I think there's a problem in them approving everything and then coming back and saying, 'Now, wait a second.'"

**MORE ON FEE ISSUE:** Judges, lawyers and state court officials all find fault with the indigent-case fee system/A8



007237



A8 • The Knoxville News-Sentinel, Sunday, May 8, 1994

A MATTER OF JUSTICE — A MATTER OF MONEY

# Fee system bothers judges, lawyers, state officials

By John North
News-Sentinel staff writer

Judges complain state rules are vague. Lawyers protest the pay rate is ancient. State court officials accuse lawyers of abusing the system.

As a statewide investigation into indigent fees continues in Tennessee, everyone is attacking the way the state pays private defense lawyers to represent poor clients. The issue embarrasses and exasperates the state's legal community.

"I'm not ducking any blame," said General Sessions Court Judge Brenda J. Waggoner, one of Knox County's four sessions judges. "I feel some kind of moral obligation like I haven't done my job. I think probably we're all to blame. . . . I think things need to be changed. I think we need to coordinate procedures and so forth."

Indigent defense is a multimillion-dollar issue with a hundred different headaches, a review by The Knoxville News-Sentinel has found.

Knoxville lawyer Bill Talman, whose bills are being reviewed by the state, thinks court officials need to look at their own indigent defense system if they're going to screen lawyers.

"Every one of those cases that I billed was done the way I was told to bill by the (court Administrative Office) office back when I first started practicing law and the way I was told to bill by the judges," he said.

Not every lawyer, however, made $100,000 last year as Talman did on court-appointed cases. In fact, Talman and fellow Knoxville lawyer David Pous appear to be the only lawyers in Tennessee who made six figures handling such work.

For its review, the newspaper looked at scores of bills, or fee petitions, from lawyers in Knox County and elsewhere in Tennessee. The newspaper found numerous examples of lax supervision, poor management and violations of state court procedure.

Records show questionable billings by lawyers throughout Tennessee, but Knox County appears to be the center of the controversy:

■ Judges often paid scant attention to the claims they signed.

They say that's because they

istrative Office was doing the job.

Records show Tennessee reimbursed Pous more than $100,000 just for sessions court cases, none of which paid more than $500 per claim.

Waggoner, while declining to discuss specific lawyers, said sessions assignments were concentrated among a handful of lawyers because they were the only ones willing to do the work.

On many bills, Pous charged the same hours over and over for clients who had multiple cases. He appeared to use a photocopied form — listing the same time increments and description of services — on dozens of bills for misdemeanor cases, the review showed.

and indictments but do not mention Sessions Courts.

The judges said their reading of the rules indicates court officials in Nashville should be the ones questioning billings.

The rules say a lawyer should submit his claim to the local judge who had jurisdiction of his case "for consideration in determining the compensation to be awarded."

The Administrative Office of the courts then "shall examine and audit all claims for attorneys' fees and expenses to insure compliance with these rules and other statutory requirements."

McGee said it's his job to verify that the lawyer submitting the bill was appointed to the case and the state's job to audit.

> "I'm not ducking any blame. . . . I think probably we're all to blame."
>
> General Sessions Court Judge Brenda J. Waggoner

State officials say those are the kinds of petitions to which they object. Sessions Court judges and at least one Criminal Court judge apparently saw nothing questionable about the method.

For example, on June 20, 21 and 23, Sessions Court Judge Gail Jarvis approved more than 30 petitions for Pous, including five misdemeanors with identical billing times and one felony for one woman, records show.

The other sessions judges signed similar volumes of petitions from Pous.

In September, Pous submitted a bill for $500 on a woman whose aggravated assault case was bound over to the grand jury. Waggoner signed it.

Two months later, the lawyer submitted another petition with the same docket number, this time with some differing times. Waggoner signed it, too. Nashville, however, caught the duplication and rejected the claim.

In November, Sessions Court Judge Bob McGee signed a felony petition for Pous without indicating what he was due. When Nashville authorities got the claim, they figured it and paid Pous $500, records indicate.

Waggoner and McGee said the rules about appointing lawyers are so poorly written it's not clear they even apply to Sessions

Charles E. Ferrell, Administrative Office director, said the employees who screen petitions are not trained lawyers and do not have the professional background needed to spot problems with a lawyer's bill.

The office, however, has begun questioning bills more closely, according to several Knoxville lawyers.

Ferrell said his office plans to conduct seminars to instruct judges on how fee claims should be handled. Rather than blame judges, however, Ferrell said the responsibility for accurate and honest bills lies with the lawyer.

Waggoner said judges often are too busy handling a daily docket to spend much time combing bills. Waggoner said she has to trust that a lawyer, as an officer of the court, is being honest.

Besides lacking time, Waggoner said, she has no practical way of checking whether a lawyer might, for example, file the same claim twice. Knox County keeps copies of petitions when a lawyer files them through the clerk's office, but it is not required that every lawyer submit a claim through the local office.

McGee said it is foolish to think Sessions Court judges can keep track of every lawyer who comes in their courtrooms.

If the system needs to be re-

view lawyers' claims is the wrong answer, McGee said.

"I think it would be better and more efficient if the state would set a flat rate and say, 'If a defendant is charged with X crime, the lawyer will be paid with X dollars.' Any attempt to monitor precise numbers of minutes and hours in court and out of court is ludicrous," he said.

The newspaper found other problems.

■ Record keeping and filing procedures are casual and inconsistent.

As stated, lawyers have the option of submitting their forms through the local clerk's office or mailing them to Nashville on their own. Judges, and the public, cannot check local records if they want to see all a lawyer's bills.

Also, petitions often had to be sent back from Nashville because the lawyer submitted them without securing a judge's signature, as state rules require.

■ Casual control over filing deadlines. Court rules say lawyers are supposed to submit claims 90 days after a case's disposition. In February, a lawyer submitted two claims for a client whose cases were disposed of in July 1991. Other lawyers missed the deadline by several months last year.

Court officials plan to start requiring lawyers to submit affidavits explaining why their petitions are late.

■ Sessions Court special judges — typically lawyers working under temporary appointments — signed fee claims for their peers, sometimes without the judges' knowledge.

By law, special judges can perform the same tasks as a regular judge. Waggoner, however, disapproves of them signing claims.

Waggoner, after a recent meeting with fellow judges, agreed to prepare an order that requires lawyers to get a regular judge to sign their fee petitions.

Lawyers say it's time the state overhauled its indigent defense system.

Tom Dillard, a partner with Ritchie Fels & Dillard, one of Knoxville's most respected law firms, said court rules need to be clarified for judges as well as lawyers. Tennessee also needs to raise its reimbursement rates, he said.

A lawyer actually loses money

cases, which pay $20 an hour for out-of-court work and $30 an hour for in-court work, said Dillard, president of the Knoxville Defense Lawyers Association. The group is composed of criminal defense lawyers.

A consultant's report about two years ago showed it cost a Tennessee lawyer on average more than $33 an hour to run his business, he said.

Tennessee has one of the lowest reimbursement rates in the United States, dating back to the 1960s, he said.

"It's a very confusing situation for these attorneys who unfortunately on top of losing money every time they go into court on these cases now are faced with these audits," Dillard said.

Dillard declined to comment about the state's investigation of Pous and Talman.

Defense lawyer Randy Reagan was among a group of lawyers who petitioned the state Supreme Court last summer, before the investigation, seeking a revamping of the indigent system. The court is scheduled to consider the request in June.

Reagan said he fears the public will assume lawyers are merely greedy. To him, the issue is not about cash but ensuring a defendant receives fair representation under the U.S. and state constitutions.

"It is the state's duty to provide these constitutional protections to people who cannot afford them," he said. "The current system, with the pay structure the way it is, with the lack of funding for expert assistance, it just is not getting the job done."

A8 The Knoxville News-Sentinel, Sunday, May 8, 1994



# Fee system bothers judges, lawy

By John North
News-Sentinel staff writer

Judges complain state rules are vague. Lawyers protest the pay rate is ancient. State court officials accuse lawyers of abusing the system.

As a statewide investigation into indigent fees continues in Tennessee, everyone is attacking the way the state pays private defense lawyers to represent poor clients. The issue embarrasses and exasperates the state's legal community.

"I'm not ducking any blame," said General Sessions Court Judge Brenda J. Waggoner, one of Knox County's four sessions judges. "I feel some kind of moral obligation like I haven't done my job. I think probably we're all to blame. ... I think things need to be changed. I think we need to coordinate procedures and so forth."

Indigent defense is a multimillion-dollar issue with a hundred different headaches, a review by The Knoxville News-Sentinel has found.

Knoxville lawyer Bill Talman, whose bills are being reviewed by the state, thinks court officials need to look at their own indigent defense system if they're going to screen lawyers.

"Every one of these cases that I billed was done the way I was told to bill by the (court Administrative Office) office back when I first started practicing law and the way I was told to bill by the judges," he said.

Not every lawyer, however, made $100,000 last year as Talman did on court-appointed cases. In fact, Talman and fellow Knoxville lawyer David Poss appear to be the only lawyers in Tennessee who made six figures handling such work.

For its review, the newspaper looked at scores of bills, or fee petitions, from lawyers in Knox County and elsewhere in Tennessee. The newspaper found numerous examples of lax supervision, poor management and violations of state court procedure.

Records show questionable billings by lawyers throughout Tennessee, but Knox County appears to be the center of the controversy:

■ Judges often paid scant attention to the claims they signed.

They say that's because they thought the state court's Administrative Office was doing the job.

Records show Tennessee reimbursed Poss more than $100,000 just for sessions court cases, none of which paid more than $300 per claim.

Waggoner, while declining to discuss specific lawyers, said sessions assignments were concentrated among a handful of lawyers because they were the only ones willing to do the work.

On many bills, Poss charged the same hours over and over for clients who had multiple cases. He appeared to use a photocopied form — listing the same time increments and description of services — on dozens of bills for misdemeanor cases, the review showed.

*"I'm not ducking any blame. ... I think probably we're all to blame."*

General Sessions Court Judge Brenda J. Waggoner

State officials say those are the kinds of petitions to which they object. Sessions Court judges and at least one Criminal Court judge apparently saw nothing questionable about the method.

For example, on June 20, 21 and 23, Sessions Court Judge Gail Jarvis approved more than 30 petitions for Poss, including five misdemeanors with identical billing times and one felony for one woman, records show.

The other sessions judges signed similar volumes of petitions from Poss.

In September, Poss submitted a bill for $500 on a woman whose aggravated assault case was bound over to the grand jury. Waggoner signed it.

Two months later, the lawyer submitted another petition with the same docket number, this time with some differing times. Waggoner signed it, too. Nashville, however, caught the duplication and rejected the claim.

In November, Sessions Court Judge Bob McGee signed a felony petition for Poss without indicating what he was due. When Nashville authorities got the claim, they figured it and paid Poss $500, records indicate.

Waggoner and McGee said the rules about appointing lawyers are so poorly written it's not clear they even apply to Sessions Courts. The rules refer to trials and indictments but do not mention Sessions Courts.

The judges said their reading of the rules indicates court officials in Nashville should be the ones questioning billings.

The rules say a lawyer should submit his claim to the local judge who had jurisdiction of his case "for consideration in determining the compensation to be awarded."

The Administrative Office of the courts then "shall examine and audit all claims for attorneys' fees and expenses to insure compliance with these rules and other statutory requirements."

McGee said it's his job to verify that the lawyer submitting the bill was appointed to the case and the state's job to audit.

Charles E. Ferrell, Administrative Office director, said the employees who screen petitions are not trained lawyers and do not have the professional background needed to spot problems with a lawyer's bill.

The office, however, has begun questioning bills more closely, according to several Knoxville lawyers.

Ferrell said his office plans to conduct seminars to instruct judges on how fee claims should be handled. Rather than blame judges, however, Ferrell said the responsibility for accurate and honest bills lies with the lawyer.

Waggoner said judges often are too busy handling a daily docket to spend much time combing bills. Waggoner said she has to trust that a lawyer, as an officer of the court, is being honest.

Besides lacking time, Waggoner said, she has no practical way of checking whether a lawyer might, for example, file the same claim twice. Knox County keeps copies of petitions when a lawyer files them through the clerk's office, but it is not required that every lawyer submit a claim through the local office.

McGee said it is foolish to think Sessions Court judges can keep track of every lawyer who comes in their courtrooms.

If the system needs to be reformed, adding more people to review lawyers' claims is the w[...] answer, McGee said.

"I think it would be better [...] more efficient if the state w[...] set a flat rate and say, 'If a d[...] dant is charged with X crime [...] lawyer will be paid with X [...] lars.' Any attempt to mo[...] precise numbers of minutes [...] hours in court and out of cou[...] ludicrous," he said.

The newspaper found [...] problems.

■ Record keeping and [...] procedures are casual and in[...] sistent.

As stated, lawyers have [...] option of submitting their f[...] through the local clerk's offic[...] mailing them to Nashville on [...] own. Judges, and the public, [...] not check local records if [...] want to see all a lawyer's bill[...]

Also, petitions often had t[...] sent back from Nashville bec[...] the lawyer submitted them w[...] out securing a judge's signat[...] as state rules require.

■ Casual control over fi[...] deadlines. Court rules say l[...] yers are supposed to sub[...] claims 90 days after a case's [...] position. In February, a law[...] submitted two claims for a cl[...] whose cases were disposed o[...] July 1991. Other lawyers mis[...] the deadline by several mo[...] last year.

Court officials plan to start [...] quiring lawyers to submit affi[...] vits explaining why their p[...] tions are late.

■ Sessions Court spe[...] judges — typically lawyers wo[...] ing under temporary appoi[...] ments — signed fee claims [...] their peers, sometimes with [...] the judges' knowledge.

By law, special judges can p[...] form the same tasks as a regu[...] judge. Waggoner, however, dis[...] proves of them signing claims.

Waggoner, after a rec[...] meeting with fellow judg[...] agreed to prepare an order t[...] requires lawyers to get a regu[...] judge to sign their fee petitions.

Lawyers say it's time the st[...] overhauled its indigent defe[...] system.

Tom Dillard, a partner w[...] Ritchie, Fels & Dillard, one [...] Knoxville's most respected l[...] firms, said court rules need to [...] clarified for judges as well as la[...] yers. Tennessee also needs [...] raise its reimbursement rates, [...] said.

A lawyer actually loses mon[...] when he takes court-appoint[...]

# ...ers judges, lawyers, state officials

and indictments but do not mention Sessions Courts.

The judges said their reading of the rules indicates court officials in Nashville should be the ones questioning billings.

The rules say a lawyer should submit his claim to the local judge who had jurisdiction of his case "for consideration in determining the compensation to be awarded."

The Administrative Office of the courts then "shall examine and audit all claims for attorneys' fees and expenses to insure compliance with these rules and other statutory requirements."

McGee said it's his job to verify that the lawyer submitting the bill was appointed to the case and the state's job to audit.

*...lame. . . . I think ...ne.* ❞

...urt Judge Brenda J. Waggoner

Charles E. Ferrell, Administrative Office director, said the employees who screen petitions are not trained lawyers and do not have the professional background needed to spot problems with a lawyer's bill.

The office, however, has begun questioning bills more closely, according to several Knoxville lawyers.

Ferrell said his office plans to conduct seminars to instruct judges on how fee claims should be handled. Rather than blame judges, however, Ferrell said the responsibility for accurate and honest bills lies with the lawyer.

Waggoner said judges often are too busy handling a daily docket to spend much time combing bills. Waggoner said she has to trust that a lawyer, as an officer of the court, is being honest.

Besides lacking time, Waggoner said, she has no practical way of checking whether a lawyer might, for example, file the same claim twice. Knox County keeps copies of petitions when a lawyer files them through the clerk's office, but it is not required that every lawyer submit a claim through the local office.

McGee said it is foolish to think Sessions Court judges can keep track of every lawyer who comes in their courtrooms.

If the system needs to be reformed, adding more people to review lawyers' claims is the wrong answer, McGee said.

"I think it would be better and more efficient if the state would set a flat rate and say, 'If a defendant is charged with X crime, the lawyer will be paid with X dollars.' Any attempt to monitor precise numbers of minutes and hours in court and out of court is ludicrous," he said.

The newspaper found other problems.

■ Record keeping and filing procedures are casual and inconsistent.

As stated, lawyers have the option of submitting their forms through the local clerk's office or mailing them to Nashville on their own. Judges, and the public, cannot check local records if they want to see all a lawyer's bills.

Also, petitions often had to be sent back from Nashville because the lawyer submitted them without securing a judge's signature, as state rules require.

■ Casual control over filing deadlines. Court rules say lawyers are supposed to submit claims 90 days after a case's disposition. In February, a lawyer submitted two claims for a client whose cases were disposed of in July 1991. Other lawyers missed the deadline by several months last year.

Court officials plan to start requiring lawyers to submit affidavits explaining why their petitions are late.

■ Sessions Court special judges — typically lawyers working under temporary appointments — signed fee claims for their peers, sometimes without the judges' knowledge.

By law, special judges can perform the same tasks as a regular judge. Waggoner, however, disapproves of them signing claims.

Waggoner, after a recent meeting with fellow judges, agreed to prepare an order that requires lawyers to get a regular judge to sign their fee petitions.

Lawyers say it's time the state overhauled its indigent defense system.

Tom Dillard, a partner with Ritchie Fels & Dillard, one of Knoxville's most respected law firms, said court rules need to be clarified for judges as well as lawyers. Tennessee also needs to raise its reimbursement rates, he said.

A lawyer actually loses money when he takes court-appointed cases, which pay $20 an hour for out-of-court work and $30 an hour for in-court work, said Dillard, president of the Knoxville Defense Lawyers Association. The group is composed of criminal defense lawyers.

A consultant's report about two years ago showed it cost a Tennessee lawyer on average more than $35 an hour to run his business, he said.

Tennessee has one of the lowest reimbursement rates in the United States, dating back to the 1960s, he said.

"It's a very confusing situation for these attorneys who unfortunately on top of losing money every time they go into court on these cases now are faced with these audits," Dillard said.

Dillard declined to comment about the state's investigation of Poss and Talman.

Defense lawyer Randy Reagan was among a group of lawyers who petitioned the state Supreme Court last summer, before the investigation, seeking a revamping of the indigent system. The court is scheduled to consider the request in June.

Reagan said he fears the public will assume lawyers are merely greedy. To him, the issue is not about cash but ensuring a defendant receives fair representation under the U.S. and state constitutions.

"It is the state's duty to provide those constitutional protections to people who cannot afford them," he said. "The current system, with the pay structure the way it is, with the lack of funding for expert assistance, it just is not getting the job done."


BAPTIST HEALTH REPORT

FEATURING LISA STEARNS



THIS WEEKS TOPIC:

CHRONIC HEARTBURN

Dr. George Webber tells us about a new less invasive surgery which can correct this problem in severe cases.

ON WBIR-TV, CHANNEL 10

TUESDAY, 6:59 P.M. (Before Wheel of Fortune)

WEDNESDAY, 7:15 A.M. (During The Today Show)

FINAL WEEK OF OUR BIG

GOING OUT OF BUSINESS SALE

ONE SUPER WEEK OF VALUES!



March 23, 1994

Honorable John Pierotti
District Attorney General
30th Judicial District
201 Poplar--Suite 301
Memphis, TN 38103

Honorable Mike McCown
District Attorney General
17th Judicial District
P.O. Box 904
Fayetteville, TN 37334

Honorable Torry Johnson
District Attorney General
20th Judicial District
222 Washington Square, Suite 500
Nashville, TN 37201

Hon. Jerry Woodall
District Attorney General
26th Judicial District
P. O. Box 2825
Jackson, TN 38302

Honorable Randall Nichols
District Attorney General
Sixth Judicial District
Suite 168-First Floor
Knoxville, TN 37902

Hon. Al C. Schmutzer
District Attorney General
Suite 301, Sevier County Courthouse
Sevierville, TN 37862

Honorable Gary Gerbitz
District Attorney General
11th Judicial District
600 Market Street, Suite 310
Hamilton County Chattanooga

RE: Indigent Counsel Pay Request Irregularities

Dear Generals:

I was informed yesterday of an investigation being performed by the Comptroller's Office of the above referenced fund and was asked by the administrator of the courts to inform you of the investigation and was requested to bring the TBI into the investigation.

I have notified assistant district attorney Tom Thurman of the Comptroller's investigation. I have requested that the auditor from the Comptroller's Office (Chris Freeze) give Tom Thurman sufficient details of the investigation and have asked Tom after having been advised and if feeling there is a necessity to request TBI assistance, that he do so.

This is simply to notify you of the situation in the event TBI agents should show up in your district unannounced to pursue this matter. If there are questions in this regard, please call me.

Sincerely,

Patrick H. McCutchen

phm/as

cc: Charles Ferrell
Larry Wallace
Tom Thurman
Chris Freeze

Report about Over-billing

EXHIBIT NO. 1

Identified and made a part of the record

this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

FILED
December 20, 2006
BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE
SUPREME COURT OF TENNESSEE
Carolyn Johnson
Deputy Executive Secretary

FILED (28)
APR 07 2009
Clerk of the Courts
Rec'd by

**IN DISCIPLINARY DISTRICT V**
**OF THE**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**OF THE**
**SUPREME COURT OF TENNESSEE**

**IN RE: DONALD E. DAWSON,**
**BPR #10723, Respondent,**
**An Attorney Licensed to**
**Practice Law in Tennessee**
**(Davidson County)**

**DOCKET NO.** 2006-1648-5-LC

# PETITION FOR DISCIPLINE

Comes now the Petitioner, the Board of Professional Responsibility of the Supreme Court of Tennessee, by and through Disciplinary Counsel, and pursuant to Rule 9, Rules of the Supreme Court of Tennessee, files this Petition for Discipline against the Respondent, Donald E. Dawson, and would respectfully show:

1. The Respondent is an attorney admitted by the Supreme Court of Tennessee to practice law in the State of Tennessee, with his last known office at 530 Church Street, Suite 600, Nashville, Tennessee 37243, located in Davidson County, and Disciplinary District V, Board of Professional Responsibility No. 10723.

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 2A
DATE 4-7-08 ID ___ Evd ✓

2A

2. Pursuant to Section 1 of Tennessee Supreme Court Rule 9, any attorney admitted to practice law in Tennessee is subject to the disciplinary jurisdiction of the Supreme Court, the Board, the Hearing Committee, hereinafter established, and the Circuit and Chancery Courts.

3. Pursuant to Section 3 of Rule 9, the license to practice law in this State is a privilege and it is the duty of every recipient of that privilege to conduct himself at all times in conformity with the standards imposed upon members of the Bar as conditions for the privilege to practice law. Acts or omissions by an attorney which violate the Code of Professional Responsibility of the State of Tennessee or the Tennessee Rules of Professional Conduct, shall constitute misconduct and be grounds for discipline.

4. Donald E. Dawson has failed to conduct himself in conformity with said standards and is guilty of acts and omissions in violation of the authorities cited and the Board authorized the filing of formal charges on December 8, 2006.

5. The following complaint against the Respondent was filed and designated as File No. 29350-5-LC. Pursuant to Rule 9, Rules of the Supreme Court, Respondent was notified of the complaint and afforded an opportunity to respond. Copies of the notice and summary of the complaint are attached to this Petition for Discipline as Collective Exhibit A.

## FILE NO. 29350-5-LC – COMPLAINT OF JULIE A. RICE

6. On July 17,2006, a complaint was received from Julie A. Rice, which was designated as File No. 29350-5-LC. Copies of the notice of complaint and summary of complaint are attached to this Petition for Discipline as Collective Exhibit A.

7. By letter dated July 28, 2006, Respondent submitted his response, a copy of which is attached to this Petition for Discipline as Exhibit B.

8. Complainant complains that Respondent was deceitful in his dealings with her by falsely claiming he had no choice but to contact her at home although her address for professional and business purposes is easily obtained. Complainant states she had warned Respondent not to use her home address when he had used it on a subpoena to subpoena her in February of 2006. Complainant complains that by generating a letter which will be copied to criminal defendant and placed in the criminal defendant's file, he violated Rule 4.4(a) of the Tennessee Rules of Professional Conduct and caused Complainant great distress which she believes was his intention. This case arises out of a death penalty case involving criminal defendant Christa Pike. Complainant had previously represented the criminal defendant. The criminal defendant filed a post conviction action against Complainant.

Complainant states that she satisfied her ethical duties to her prior client by speaking with three people from Respondent's office, and by turning over her file to him.

9. On September 21, 2006, Chief Disciplinary Counsel of the Board of Professional Responsibility, with concurrence of a Hearing Committee Member in Respondent's Disciplinary District found his actions warranted an Informal Admonition for violation of Rule 4.4(a) of the Tennessee Rules of Professional Conduct. See Exhibit C.

10. Thereafter on October 10, 2006, Respondent requested a formal proceeding. See Exhibit D.

11. Respondent's conduct evidences violations of Rules 4.4(a) and 8.4(a)(d) of Tennessee Rules of Professional Conduct.

## AGGRAVATING CIRCUMSTANCES

12. After misconduct has been established, aggravating circumstances may be considered in deciding what sanctions to impose.

13. Respondent has substantial experience in the practice of law, having practiced approximately twenty two (22) years, having been licensed in 1984.

14. Respondent refuses to acknowledge his wrongful conduct.

## ALLEGED VIOLATIONS

15. It is alleged that Respondent violated, as heretofore set forth, the following authorities, set out in detail, to-wit:

### Rule 4.4
### RESPECT FOR THE RIGHTS OF THIRD PERSONS

In representing a client, a lawyer shall not:

(a) use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person; or

### Rule 8.4
### MISCONDUCT

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) ...
(c) ...
(d) engage in conduct that is prejudicial to the administration of justice;

**WHEREFORE**, premises considered, the Petitioner prays:

1. That this Petition for Discipline be served upon the Respondent and that he be required to answer.

2. That a Hearing Panel be appointed to hear testimony and receive evidence in this cause and to make such findings of fact and order such disciplinary action as it may deem appropriate.

Respectfully submitted,

Laura L. Chastain, BPR #12018
Deputy Chief Disciplinary Counsel
1101 Kermit Drive, Suite 730
Nashville, TN 37217
615-361-7500

## NOTICE TO PLEAD

TO: Donald E. Dawson, Esquire
530 Church Street, Suite 600
Nashville, TN 37243

You are hereby notified that you are required to file your answer with Mary Woodroof, Executive Secretary, Board of Professional Responsibility, 1101 Kermit Drive, Suite 730, Nashville, Tennessee 37217 and serve a copy of your answer upon Disciplinary Counsel within twenty (20) days after service of this Petition. If you fail to file an answer the matters shall be deemed admitted.

## CERTIFICATE OF SERVICE

I certify I have served a copy of this Petition for Discipline upon Respondent, Donald E. Dawson, by regular mail and certified mail, return receipt number 7003 1010 0002 0813 0813, at 530 Church Street, Suite 600, Nashville, Tennessee 37243, the 20th day of December, 2006.

Laura L. Chastain

DawsonPetition-LC

# MEMORANDUM OF COMPLAINT

'our Name: Julie A. Rice, Attorney

'our Home Address: 1180 Winding Way, Knoxville (City) TN (State) 34923 (Zip)

'our Home Phone: (865) 560-6357 Your Work Phone: (865) 405-8291

'our Employer: Self

'our Work Address: P.O. Box 30074, Knoxville (City), TN (State) 34930 (Zip)

Name of Lawyer: Donald E. Dawson

Address of Lawyer: 530 Church St, Ste 600, Nashville (City) TN (State) 37243 (Zip)

State exactly what the lawyer has done, or failed to do, which you believe is unethical. **DESCRIBE YOUR COMPLAINT IN DETAIL.** Use the back of this page or attach other pages for more space.

Viol. of R. 8.4(c) by being dishonest & deceitful in his dealings with me by falsely claiming he had no choice but to contact me at home although my address for professional & business purposes is easily obtained. Moreover, he'd already been warned not to use my home address when he used it to subpoena me in February. By once more using my home address & generating a letter which will be copied to a criminal defendant & placed in her files, he violated fo

**NOTE:** You may have limited time (statute of limitations) to file a legal malpractice lawsuit. Filing a complaint with the Board will not preserve your legal rights and remedies. You should pursue independent legal action and seek independent advice and counsel concerning your legal matters. If you are not satisfied with the disposition of your complaint, you may appeal in writing to the Board within thirty (30) days of notice of the disposition. The Board may approve, modify or disapprove the disposition, or direct further investigation.

The information given in this complaint is true to the best of my knowledge and belief. I am aware that the lawyer may be notified of my complaint.

YOUR SIGNATURE: [signature] (BPR#015546) DATE 7/17/07

**MAIL TO:** Board of Professional Responsibility
1101 Kermit Drive, Suite 730
Nashville, TN 37217

EXHIBIT
COLLECTIVE
A

Rule 4.4(a) of the Code and caused me great distress which I believe was his intention. Please see ① the attached letter to me from Mr. Dawson, ② my response letter, and ③ a copy of an order from the Hon. Mary Beth Leibowitz in a similar death penalty case where Mr. Dawson's tactics and those of his office are made more clear. He apparently believes he can do anything to violate the Rules simply because he is handling death penalty cases. I submitted to the subpoena in February (?) but told them not to my home address anymore,

FAXED
7-17-06


## JULIE A. RICE

*Attorney at Law*
*Post Office Box 30074*
*Knoxville, TN 37930-0074*
*Phone: (865) 405-8291*
*julierice@knology.net*


TO: Board of Prof'l Responsibility
Phone: 800-486-5714 Fax: 615-367-2480
FROM: Julie A. Rice
DATE: 7-17-06
RE: Complaint
PAGES: 14 (including cover)

---

This fax is privileged material and intended solely for the above-named recipient. If you've received this fax in error, please telephone the sender immediately to report the error and return the original faxed documents to the sender by mail. Any unauthorized distribution of the information contained in this fax will be actionable and prosecuted to the fullest extent of the law.

*Attyfaxcover*

STATE OF TENNESSEE
**OFFICE OF THE POST-CONVICTION DEFENDER**
530 CHURCH STREET, SUITE 600
NASHVILLE, TENNESSEE 37243

Donald E. Dawson
Post-Conviction Defender
e-mail: don.dawson@state.tn.us

Phone: (615) 741-9331
Direct: (615) 741-9385
Fax: (615) 741-9430

July 11, 2006

Julie Martin Rice, Esq.
1180 Winding Way
Knoxville, TN 37923

RE: Christa Pike

Dear Ms. Rice:

First, let me apologize for sending this to your home address. However, I do not have your P.O. Box number, the Board of Professional Responsibility does not list an address for you, and you are not listed in the Tennessee Attorney's Directory. Therefore, I had little choice than to use the address we obtained for the subpoena we issued in February. I know that you did not appreciate our using this address for the subpoena, but since you have not provided another address to us, and you are not listed in the usual places, I was left with little choice. I assume that you to receive mail at your residence.

I was disappointed that you were unwilling to speak with me yesterday when I called to set an appointment with you to discuss Ms. Pike's case. As you know, her post-conviction hearing is set to begin on September 11, 2006. Of more immediate importance, our final amended petition is due on July 21. According to our records, you met with three people from my office in July 1999, Stefanie McArdle, an attorney who left our office in 2000, Dana Cook, an investigator who left our office around the same time, and Sam Sweeney, who was a summer clerk. Therefore, Catherine Brockenborough and I need to speak with you to ensure that we are making appropriate allegations in the petition and to prepare for the hearing itself. When I spoke with you in February, you indicated that you would meet with us to discuss Ms. Pike's case. Based upon your conduct on the phone with me yesterday and with Catherine last week, I am assuming you are now refusing to meet with us. Frankly, I found it both odd and unprofessional for you to respond to my request to speak to Julie Rice by staying "she is unavailable."

Both our obligation to interview prior counsel and your duty to cooperate in that regard are clear from various court rules and representation standards. Tenn. Sup. Ct. R. 28 § 6(C)(2) requires post-conviction counsel to "interview relevant witnesses, including petitioner and prior counsel." Tenn. Sup. Ct. R. 8, RPC 1.16(d) requires an attorney, upon termination of representation to "take steps to the extent reasonably practicable to protect a client's interests...." Guideline 10.13, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,

February 2003, is titled "The Duty to Facilitate the Work of Successor Counsel" and states:

> In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client and should cooperate fully with successor counsel. This duty includes, but is not limited to:
>
> A. maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation;
>
> B. providing the client's files, as well as information regarding all aspects of the representation, to successor counsel;
>
> C. sharing potential further areas of legal and factual research with successor counsel; and
>
> D. cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

The Commentary to this guideline emphasizes that the duty to "continue to safeguard the interests of the client" by cooperating with the professionally appropriate strategies of successor counsel" "is true even when (as is commonly the case) successor counsel are investigating or asserting a claim that prior counsel was ineffective." The admonition that trail counsel should continue to act in the client's interest is noted again in Guideline 10.14 which sets out the duties of trial counsel after conviction. The commentary to this section states, "Once successor counsel are in place, trial counsel continue to be under the obligation, imposed by Guideline 10.13, to recognize a continuing duty to safeguard the interests of the client and to cooperate fully with successor counsel."

With regard to our duty as post-conviction counsel, Guideline 10.7(B)(1) requires that we "conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel."

To provide further guidance on the requirement on predecessor counsel to assist in post-conviction, I have enclosed too thoughtful law review articles that I hope you will review. After you have had an opportunity to read this letter and the enclosed articles, I hope that you will reconsider your position and agree to work with us in preparing for Christa's post-conviction hearing. I can be reached at either of the numbers on my letterhead. I hope to hear from you soon as we plan to be in Knoxville next week and would appreciate an opportunity to sit down with you and discuss Christa's case.

With kindest regards,

Yours very truly,

Donald E. Dawson

Enclosures

# *JULIE A. RICE*

*Attorney at Law*
*Post Office Box 30074*
*Knoxville, TN 37930-0074*
*Phone: (865) 405-8291*


TO: Donald E. Dawson
Phone: 615-741-9331 Fax: 615-741-9430
FROM: Above
DATE: 7/17/06
RE: Your letter & unethical behavior
PAGES: 4 (including cover)

---

This fax is privileged material and intended solely for the above-named recipient. If you've received this fax in error, please telephone the sender immediately to report the error and return the original faxed documents to the sender by mail. Any unauthorized distribution of the information contained in this fax will be actionable and prosecuted to the fullest extent of the law.

*dawsonfaxcover*

Please return my file immediately to the above-referenced address. Your office has had plenty of time to copy it.

J. Rice

***JULIE A. RICE***
*Attorney at Law*
*Post Office Box 30074*
*Knoxville, TN 37930-0074*
*(865) 405-8291*

July 17, 2006
<u>Via Facsimile</u>

Mr. Donald E. Dawson, Atty.
Office of Post-Conv. Def.
530 Church St., Ste. 600
Nashville, TN 37243

Re: Your letter of July 11, 2006 and
Ms. Christa Pike's post-conviction relief action

Mr. Dawson:

You are in serious violation of the rules and spirit of our Code of Professional Responsibility. Generally speaking, your incivility as a matter of course toward any prior counsel of a death row inmate is unethical, unwarranted, and unnecessary. Specifically, your arrogant belief that I am unaware of my ethical duties and am otherwise failing to comply with the ethical requirements of death-penalty counsel is not only ludicrous, but also completely unfounded.

You, sir, are in violation of Rule 8.4 (c) of our ethics code for being dishonest and deceitful in your dealings with me during the course of this matter. Your claim to have "little choice" but to contact me at home because I am not listed in the "usual places" is a bald-faced lie as my professional mailing address is readily-ascertained by <u>all</u> the following, easy-to-use methods: (1) calling the Board, (2) calling TACDL, (3) contacting me by email through the TACDL Yahoo group, (4) contacting me through the Tennessee Bar Association by searching either their internet site or by phone, (5) calling Judge Leibowitz' secretary, (6) calling Kenny Myers, the private investigator you used to subpoena me, (7) typing my name into the Lexis SmartLynx person search system available in your office, or (8) ***simply calling my office phone number to request I provide my mailing address***. Moreover, I'm aware of your slanderous telephone call to Mr. Robert Vogel, Esq., who also knows how to contact me by mail and otherwise.

Mr. Dawson, you are also flagrantly in violation of Rule 4.4(a) of our Code by failing to respect my rights and current standing as a witness by using a means of contacting me you knew would cause problems and embarrassment. Choosing to use my home address after being explicitly told not to do so and thereby once again inserting that address into Ms. Pike's legal files is an intrusion into my personal life and a violation of my privacy rights. I am hereby once again demanding that you cease and desist using my home address in any attempts to contact me.

Mr. Donald E. Dawson
July 17, 2006
Via Facsimile
Page Two

Further, I am hereby demanding that you black out or otherwise obliterate any reference to my home address contained in the private files or client files your office has generated for Ms. Pike's representation regardless of the source or author of that reference. As I maintain the appropriate professional contact information with the Board of Professional Responsibility as I am required, there is absolutely no cause for anyone to contact me at home.

Please be advised I have satisfied my ethical duties to Ms. Pike by speaking with three people from your office, as your letter acknowledges, and by turning over my file to you. I don't have an ethical obligation to interrupt my schedule and my life to meet with you *ad nauseum* whenever you decide you need to speak with me especially when Ms. Pike and I are essentially in opposition as a result of the post-conviction action against me although I don't take her PCR filing personally Moreover, if you don't know by now whether or not you are making appropriate allegations on her behalf, you are violating other ethical obligations you undertook when you swore your oath before the Tennessee Supreme Court. I don't agree with the legal strategies of doing anything and everything to discredit prior counsel in order to win a retrial in death penalty cases. Finally, since I was unaware of your deceitful nature and unprofessional objections in February when I tentatively agreed to meet with you, I certainly have no obligation to subject myself to any unwarranted attacks prior to the hearing.

Mr. Dawson, you seem to have forgotten that I, not you, was the person who first came to know and care for Ms. Pike during a grueling time when I was offering my best efforts to represent her. I, not you, was shocked to the core when I discovered the mitigation specialist was hiding a big secret from Ms. Pike's attorneys. I, not you, had hopes and prayers crushed by the jury I argued before so urgently on Ms. Pike's behalf. I, not you, was the person standing next to Ms. Pike when the death sentence was imposed. And now you have the audacity to accuse me of acting in an unethical manner? Shame on you Mr. Dawson and everyone in your office who believes that prior counsel in death penalty cases are fair game for attacks during the post-conviction proceedings simply because we couldn't overcome overwhelming proof despite our legitimate efforts.

As for my responses when you called my business phone number, nothing I did was either odd or unprofessional for a sole practitioner in my position. Since I was busy working on another matter, I was not available to speak with anyone at length. Since I don't have a secretary to screen my calls when I'm not unavailable, I try to take a message for a later return call. Identifying myself as the speaker, especially for numbers like yours which I don't recognize, when I'm otherwise engaged working on some other matter causes the very problem I seek to avoid by taking a message for myself. However, I answered honestly when you inquired if I was the one speaking, and I told you I was busy and couldn't continue talking with you. I stand by my telephone procedures.

Mr. Don Dawson
July 17, 2006
Via Facsimile
Page Three

Due to your behavior, your attitude and what I believe are the inappropriate legal strategies you seek to employ in this matter, I do not wish to speak with you, or anyone from your office, further by any means until such time as I'm required to do so under oath before Judge Leibowitz. Be advised that I will consider any future attempts to contact me by phone or mail to be harassment and will take the necessary steps to protect myself from same.

It is unfortunate that your unethical and unprofessional behavior has forced me to this position. Like the late Bob Ritchie, I too long for more civilized relations among the bar especially among those who are practicing in the criminal defense arena. You should take a few lessons from his example as the consummate gentleman both in and out of court.

Sincerely,

Julie A. Rice

/jar
cc: Judge Mary Beth Leibowitz
Mr. William C. Talman
Mr. Leland Price

*dawsonlt1*

FILED
BY MARTHA PHILLIPS, CLERK

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

2006 JUL 13 PM 12: 13

KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

| | |
|---|---|
| STATE OF TENNESSEE | ) DOCKET NO. 47245 |
| | ) |
| vs. | ) POST CONVICTION PETITION |
| | ) |
| DENNIS WAYNE SUTTLES | ) |

**OPINION AND RULING**
**REGARDING PETITIONERS'S MOTION**
**TO COMPEL PRIOR COUNSELTO BE INTERVIEWED**

In this case the following four issues have been reviewed by the court and briefed by counsel for petitioner Suttles and the State of Tennessee.

The first issue, to which all parties agree is that Mr. Davis, who was previous counsel to Mr. Suttles at trial, is not an adverse party in these proceedings, is not represented by the Knox County District Attorney's Office. He is a witness whom the State intents to call for the hearing of the petition. It is further conceded that as to point two of this motion the petitioner's counsel, that is the Capital Case Post-Conviction Defenders Office, are successor counsel to Mr. Davis in accordance with the ABA Guideline 10.13.

As to the third issues whether or not Mr. Davis is required to cooperate with professionally appropriate legal strategies it is clear to all parties that ABA Guidelines 10.13 makes it clear that original trial counsel should cooperate with successor counsel even when successor counsel is asserting the claim that original trial counsel ineffective. However, original trial counsel is only obligated to cooperate with "professionally appropriate legal strategies of successor counsel." Counsel for Mr. Suttles has cited several cases in which it is obvious that Mr. Davis has obligation to cooperate up to a certain level. To that end Mr. Davis has turned over his files and complied with other things the court has compelled him to do to cooperate with

successor counsel to Mr. Suttles in his post-conviction petition. Successor counsel to Mr. Suttles argues that there is a heightened standard of due process and successor counsel, because Mr. Davis is more than a just a witness and owes duty to his client and justice in light of the heightened standards of due process for death penalty cases. They point out that co-counsel Leslie Jeffress, who assisted Mr. Davis in representing Mr. Suttles in his original trial, has cooperated to the extent requested by the Capital Case Post Conviction Defender's Office. Because this is a quasi civil and quasi criminal proceeding in which only Rules 16 and 28 apply, and the amended petition requires successor counsel to obtain information in order to find appropriate issues, they argue that Mr. Davis has a duty to cooperate with them as requested and to be personally interviewed.

The District Attorney's Office argues that although Mr. Davis is a key witness in his case, he is free to cooperate or not to cooperate with the Capital Case Post-Conviction Defender's Office if he determines that the avenues taken by the Capital Case Post-Conviction Defender's Office are not appropriate legal strategy. Nowhere is there an obligation in any of these rules that requires a witness to talk to successor counsel. Further, Mr. Davis argues that he is attacked in the post-conviction petition for various claims of ineffective assistance of counsel and to that end he has address a letter to the Board of Professional Responsibility, and has received a letter which is attached hereto and incorporated here and by reference from Mr. Lance Bracy.

As the attacked party, Mr. Davis is clearly not obligated to protect his former client above himself, where he has cooperated otherwise with counsel for Mr. Suttles. Because he has spoken with the District Attorney General's Office does not obligate him to speak with successor counsel. Fourth and last the Tennessee Rules of Criminal Procedure do not possess a mechanism to force prospective witnesses to discuss their testimony before trial. State v. Singleton, 853 S.W.2d 490,

492 (Tenn. 1993).

In this case, although Mr. Davis as an attorney has certain ethical obligations as an officer of the court, it is not for the court to require that he talk to either counsel under these rules. Therefore the motion of the petitioner to compel Mr. Davis to meet with and have a personal interview with petitioner's counsel is hereby respectfully denied.

The Clerk will forward a copy of this order to counsel for the defendant, to Brandt Davis, and to the office of the Knox County District Attorney General.

ENTER this the 12th day of July 2006.

MARY BETH LEIBOWITZ, JUDGE
CRIMINAL COURT DIVISION III
SIXTH JUDICIAL DISTRICT

# BOARD OF PROFESSIONAL RESPONSIBILITY
## OF THE
## SUPREME COURT OF TENNESSEE

LANCE B. BRACY
CHIEF DISCIPLINARY COUNSEL

LAURA L. CHASTAIN
DEPUTY CHIEF DISCIPLINARY COUNSEL

BEVERLY P. SHARPE
CONSUMER COUNSEL/DIRECTOR

1101 KERMIT DRIVE, SUITE 730
NASHVILLE, TENNESSEE 37217
TELEPHONE: (615) 361-7500
(800) 486-5714
FAX: (615) 367-2480
E-MAIL: ethics@tbpr.org

WILLIAM W. HUNT, III
CHARLES A. HIGH
SANDY GARRETT
JESSE D. JOSEPH
JAMES A. VICK
THERESA M. COSTONIS
DISCIPLINARY COUNSEL

March 23, 2006

Brandt Davis, Esquire
1707 Cove Creek Lane
Knoxville, TN 37919

Dear Mr. Davis:

Thanks for your recent inquiry relating to a post-conviction proceeding by your former client which resulted in a death penalty verdict while you were trial counsel.

A claim of ineffective assistance of counsel appears to be at issue. Therefore, your former client is now an opposing party. Consequently, RPC 3.4 appears to be the rule applicable to your inquiry.

Sincerely,

Lance B. Bracy
Chief Disciplinary Counsel

LBB:cj

STATE OF TENNESSEE
**OFFICE OF THE POST-CONVICTION DEFENDER**
530 CHURCH STREET, SUITE 600
NASHVILLE, TENNESSEE 37243

Donald E. Dawson
Post-Conviction Defender
e-mail: don.dawson@state.tn.us

Phone: (615) 741-9331
Direct: (615) 741-9385
Fax: (615) 741-9430

July 28, 2006

Sandy Garrett
Disciplinary Counsel
1101 Kermit Drive, Suite 730
Nashville, TN 37217

RECEIVED
JUL 31 2006
BOARD OF PROFESSIONAL RESPONSIBILITY
SUPREME COURT OF TENNESSEE

RE: File No. 29350-5-SG

Dear Ms. Garrett:

As a precautionary note, the matters underlying Ms. Rice's complaint involve the Knox County case of Christa Pile. Ms. Rice was the second chair counsel in that case and lead counsel was William Tallman. An issue in Ms. Pike's post-conviction involves Mr. Talman's conflict of interest in representing Ms. Pike in this very high profile death penalty case while at the same time having pending a complaint before the board involving his over billing the indigent defense fund by $67,000. According to the file that we obtained from your office, you were the disciplinary counsel assigned to Mr. Talman's case. That makes you potentially a witness at Ms. Pike's post-conviction hearing, either for Ms. Pike or perhaps for the State. I simply am informing you of this circumstance without any assumption as to whether it is or is not inappropriate for you to continue as disciplinary counsel in this matter.

In light of the fact that my office is overwhelmed at present and I have been struggling with the statutory duties of my office with the primary duty to represent death sentenced inmates in state post-conviction proceedings, Tenn. Code Ann. § 40-30-206(a), versus the duty to ensure that the attorneys in my office, including me, do not have workloads that prevent providing competent and diligent representation to all clients, *see* Formal Opinion 06-441, ABA Standing Committee on Ethics and Professional Responsibility, May 13, 2006, I am having difficulty justifying any time for responding to what I see as a totally frivolous complaint. However, since I am compelled to do so, I will take time to respond at the cost of failing to work on an Application for Permission to Appeal that is due on August 4.

To begin, I am at a loss to understand the alleged violation. The only rules I note that have been allegedly violated are R. 8.4(c) and 4.4(a). These allegations are both in Ms. Rice's letter to me and in her handwritten complaint to the board. While she refers to them as violation of the Code of Professional Responsibility in the letter to me (she refers only to the section numbers in her complaint to the board), I am proceeding on the assumption that she is referring to the Rules of

EXHIBIT
tabbies
B

Professional Conduct contained in Tenn. Sup. Ct. R. 8. Therefore, as I understand her complaint it is that by mailing a letter to her home address I have somehow failed to respect the rights of third persons by using "means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use[d] methods of obtaining evidence that violate the legal rights of such a person", R. 4.4(a), or in the alternative, I have "engage[d] in conduct involving dishonesty, fraud, deceit, or misrepresentation," R. 8.4(c).

Apparent Issue Part A:

Allegation: "Viol. of 8.4(c) by being dishonest & deceitful in his dealings with me by falsely claiming he had no choice but to contact me at home."

Response: The allegation is denied.

Explanation: When I correspond with a Tennessee lawyer, I first turn to the current edition of the M. Lee Smith Tennessee Attorneys Directory. In this instance it was the 2006 edition. Ms. Rice is not listed under either Rice or her maiden name Martin in either the alphabetical listing or the Knox County listing. As a second choice I check the Board of Responsibility website. Ms. Rice's current information is attached. I had hoped that we had put Ms. Rice's post office box address in our computer folders regarding Ms. Pike's case but I did not find it there either. At that point I did not believe that I was compelled to look further as I had her home address in our files on the copy of the subpoena we had served on her in February. At that time we used her home address because we did not know any other place at which to subpoena her and because Tenn. R. Crim. P. 17(d) states "A subpoena may be served by any person authorized to serve process, or the witness may acknowledge service in writing on the subpoena. Service of the subpoena **shall** be made **by delivering or offering to deliver a copy thereof to the person to whom it is directed or by leaving a copy thereof with an adult occupant of the person's usual place of residence."** (Emphasis added.) In this instance, we had an investigative trip planned to Knoxville the following week and an amended petition for post-conviction relief due on July 21. Given the need for as much information as possible before filing the amended petition and our need to prepare for the September 11, 2006 evidentiary hearing, I hoped to persuade Ms. Rice to speak with us at that time. Frankly, in my need to contact her quickly I totally misjudged her level of paranoia concerning her address.

In her July 17 letter to me, Ms. Rice sets out several means by which I might have learned her post office box address. One of these methods was to call her office phone. As you will recall from the copy of my letter that Ms. Rice included with her complaint, she had just told me on the phone that she was unavailable. Having been told that she was unavailable, it never occurred to me to try to call her about her address. I now wonder if I had called her again to ascertain her address, would her complaint simply have read that I was harassing her by calling her after she had said she was unavailable.

I see nothing dishonest or deceitful in anything that I wrote to Ms. Rice nor in any of my dealings with her. Perhaps my statement that "I had no choice but to use her home address" was somewhat of an overstatement. I should perhaps have said "I find it extremely strange that you do not list your professional address in either the Tennessee Attorney's Directory or with the Board of Professional Responsibility. However, since you make it hard to find your professional address and I am in a hurry to get this letter and the enclosed law review articles to you in the hope that you will change your mind and agree to meet with us, I trust you will forgive my using your home address." However, in all candor, I think we all know that "I had no choice but to" is a reasonable shorthand for many a long explanation. After all, apparently in Ms. Rice's view of the world one could never say, "I had not choice but to" because with infinite time and resources there are other solutions for every problem.

Apparent Issue Part B:

Allegation: "he violated (unreadable on my copy) Rule 4.4(a) of the Code and caused great distress which I believe was his intention."

Response: The allegation is denied

Explanation: In fact, as stated above, my intention was to persuade her to meet with us. In 28 years of practicing law I have never known a lawyer who did not list a business address and who was so paranoid about having a client discover her home address. Since she is still licensed, and I presume still practices, I also had no reason to assume that Ms. Rice had any particular impairments that might cause Ms. Rice to have "great distress" by my using her home address. My intent was simply to communicate with her.

Since I do not see any other actual allegations in Ms. Rice's two page hand printed complaint, this completes my formal response to Ms. Rice's complaint. However, I find it necessary to comment on the remaining content starting with the first full sentence of the second page of her complaint. Specifically, her attachment of an order by Judge Leibowitz in the Dennis Suttles case and her extremely reckless allegation "where Mr. Dawson's tactics and those of this office are made more clear. He apparently believes he can do anything to violate the Rules simply because he is handling death penalty cases." I find this statement to be reckless, bereft of logic, defamatory and insulting on several levels. I have practiced law for 28 years and have attempted to conduct my practice ethically and honorably. I have been the Post-Conviction Defender for Tennessee for 10 years and have attempted to maintain an office that aggressively fights for our clients but always attempts to do so in an ethical manner. Finally, I find nothing in Judge Leibowitz's order that suggests otherwise.

As I read the order attached to Ms. Rice's complaint, it states that "all parties agree that Mr.

Davis, who was previous counsel to Mr. Suttles at trial, **is not a adverse party in these proceedings, is not represented by the Knox County District Attorney's Office."** (Emphasis added.) This is consistent with my letter to Ms. Rice and the enclosures to that letter - Siegel, *My Reputation Or Your Liberty (Or Your Life): The Ethical Obligations of Criminal Defense Counsel in Postconviction Proceedings*, 23 J. Legal Prof. 85 (1999) and Fox, *Making the Last Chance Meaningful: Predecessor Counsel's Ethical Duty to the Capital Defendant*, 31 Hofstra L. Rev. 1181 (2003). (Both articles are attached.) Coincidentally, Judge Leibowitz's order clearly rejected the informal opinion of Mr. Bracey which Ms. Rice also attached. Mr. Bracey's opinion letter appears ill conceived and is contrary to every scholarly article and court decision of which I am aware. (*see*, *Hiatt v. Clark*, __S.W.3d __, 2006 WL 1886254 (Ky. 2006)(trial counsel in postconviction involving claim of ineffective assistance of counsel is not the client of the prosecutor and "defense counsel maintains a continuing obligation to the client beyond the trial's conclusion, which includes providing reasonable assistance where permitted and refraining form acting in a manner inconsistent with the client's right to effective assistance of counsel on appeal. Implicit in both the right to appeal and counsel's duty of loyalty is the understanding that trial counsel will not interfere with appellate defense counsel's representation, and to the extent necessary and possible, will assist appellate defense counsel in preparing the appeal.") (Opinion Attached.)

*Hiatt* and the above referenced law review articles are consistent with the ABA Guidelines that I referenced in my July 11 letter to Ms. Rice. Again, Judge Leibowitz's order appropriately cites the ABA Guidelines as authority for the duty of trial counsel "to cooperate with successor counsel even when successor counsel is asserting the claim that original counsel [were] ineffective." The order also clearly finds that post-conviction counsel are successor counsel. Judge Leibowitz concludes that trial counsel has "certain ethical obligations" but that the court cannot require counsel to talk with post-conviction counsel. There is nothing in this order that suggests that the tactics of the attorneys in my office (for the record I was not directly involved in the Suttles case) involve violating any rules.

In summary, my intent was to convince Ms. Rice to speak with us to help us clarify the claims being made and to insure that we fully covered any issues that Ms. Pike might have in post-conviction. I will stand by the materials that I sent to her as being appropriate statements of the ethical duties of trial counsel in post-conviction. I have not lied nor misrepresented anything to Ms. Rice. I respectfully request that her complaint against me be summarily dismissed.

Yours very truly,

Donald E. Dawson

Enclosure

# BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE
SUPREME COURT OF TENNESSEE

LANCE B. BRACY
CHIEF DISCIPLINARY COUNSEL

LAURA L. CHASTAIN
DEPUTY CHIEF DISCIPLINARY COUNSEL

BEVERLY P. SHARPE
CONSUMER COUNSEL/DIRECTOR

1101 KERMIT DRIVE, SUITE 730
NASHVILLE, TENNESSEE 37217
TELEPHONE: (615) 361-7500
(800) 486-5714
FAX: (615) 367-2480
E-MAIL:ethics@tbpr.org

WILLIAM W. HUNT, III
CHARLES A. HIGH
SANDY GARRETT
JESSE D. JOSEPH
JAMES A. VICK
THERESA M. COSTONIS
DISCIPLINARY COUNSEL

September 21, 2006

CONFIDENTIAL

Donald E. Dawson, Esquire
530 Church Street, Suite 600
Nashville, TN 37243

Re: File No. 29350-5-LC
Complainant: Julie A. Rice
**INFORMAL ADMONITION**

Dear Mr. Dawson:

In your representation of a criminal defendant in a post conviction matter you subpoenaed prior counsel for the defendant at her home address and after being specifically asked by prior counsel not to contact her using her home address again, you did so even though you had other sources to determine her office address. Your actions violated her right of privacy in violation of Rule 4.4(a) of the Tennessee Rules of Professional Conduct.

Tennessee Supreme Court Rule 8 is mandatory and prescribes a minimum level of conduct. Any violation adversely reflects upon the professional reputation of all members of the Bar.

Rule 9, Section 4, of the Tennessee Supreme Court Rules on Disciplinary Enforcement sets out the type of discipline to be administered when misconduct has been determined. The Board of Professional Responsibility of the Supreme Court of Tennessee, with concurrence of a Hearing Committee member in your Disciplinary District, has found that your actions warrant an Informal Admonition, and with it your file will be closed.

Please note that Rule 9, Section 8.1, permits you twenty (20) days to request a formal hearing on this matter. Rule 9, Section 8.4, also provides that private informal admonition and private reprimand are not available types of discipline following a formal proceeding. In a formal proceeding the hearing panel would either impose public discipline or dismiss the complaint.

Pursuant to Rule 9 (8.1) a complainant may within thirty (30) days appeal to the Board which may approve, modify or disapprove the disposition, or direct that the matter be investigated further.

Sincerely,

Lance B. Bracy
Chief Disciplinary Counsel

LBB:cd
Enclosures
29350-LC

EXHIBIT
C

RECEIVED
OCT 11 2006
BOARD OF PROFESSIONAL RESPONSIBILITY
SUPREME COURT OF TENNESSEE

STATE OF TENNESSEE
**OFFICE OF THE POST-CONVICTION DEFENDER**
530 CHURCH STREET, SUITE 600
NASHVILLE, TENNESSEE 37243

Donald E. Dawson
Post-Conviction Defender
e-mail: don.dawson@state.tn.us

Phone: (615) 741-9331
Direct: (615) 741-9385
Fax: (615) 741-9430

October 10, 2006

Lance B. Bracey
Chief Disciplinary Counsel
1101 Kermit Drive, Suite 730
Nashville, TN 37217

RE: File No. 29350-5-LC
Complainant: Julie A. Rice

Dear Mr. Bracey:

Pursuant to Tenn. Sup. Ct. R. 9, § 8.1, I hereby request a formal hearing in this matter.

In your September 21, 2006, letter advising me that "The Board of Professional Responsibility of the Supreme Court of Tennessee, with concurrence of a Hearing Committee member in [my] Disciplinary District, has found that my actions warrant an Informal Admonition," you state that my actions violate Rule 4.4(a). Specifically, your letter states that my actions violated Ms. Rice's right of privacy. You note that Ms. Rice's complaint was that after we subpoenaed her at her home Ms. Rice asked that we not use her home address again and that I then sent a follow-up letter to her home address.

The factual premise of the Board's conclusion appears correct; i.e., we did use Ms. Rice's home address, as required by Tenn. R. Crim. P. 17(d), when serving the subpoena to attend the post-conviction evidentiary hearing challenging her former client's first degree murder conviction and death sentence, she did ask us to use her post office box for future correspondence and I later sent her a letter again using the home address. However, it does not follow that this was a violation of RPC 4.4(a). The letter was sent in the hope that she would change her position of refusing to meet with us to prepare for the hearing. My co-counsel, investigator and I were planning a trip to Knoxville to prepare witnesses and otherwise prepare for the death penalty post-conviction hearing and I hoped to persuade Ms. Rice to meet with us. Approximately a week earlier she had refused the request of my co-counsel. I hoped to convince her that she had an ethical obligation under the ABA Guidelines, a law review article and a recent Kentucky Supreme Court decision to assist post-conviction counsel. I was in a hurry to get the letter in the mail and had misplaced her post-office box number. Ms. Rice does not have a law office, her address is not on the Board of Professional Responsibility web site, and she is not listed in the M. Lee Smith <u>Tennessee Attorneys Directory</u>.

EXHIBIT
D

I am requesting a formal hearing because my actions do not violate RPC 4.4(a). The first clause of Rule 4.4(a) requires that there be "no substantial purpose other than to embarrass, delay, or burden a third person." Ms. Rice, as my client's former counsel, is a third person to this death penalty post-conviction proceeding. She is not a party as the parties are my client and the State of Tennessee. On the other hand she is a very particular third person in that as my client's trial counsel she continues to have a fiduciary duty to my client. My letter to Ms. Rice clearly had the legitimate purpose of attempting to persuade her to meet with me and my co-counsel prior to the then imminent evidentiary hearing in the client's post-conviction case. Thus, while using her home address was an error in judgment on my part, since its effect was to harden her position of not meeting with us to prepare for the hearing, it certainly had a "substantial purpose other than to embarrass, delay, or burden" Ms. Rice. Therefore, my actions were not in violation of the first clause of Rule 4.4(a).

The second clause of Rule 4.4(a) requires that the lawyer "knowingly use methods of obtaining evidence that violate the legal rights of such a person." In describing the meaning of this clause, the comment to the rule states that the rights protected "include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship." The comment then mentions as examples illegal wiretapping and secret recording of a third person's activities. In this case my method of obtaining evidence was a sincere effort to obtain Ms. Rice's cooperation, cooperation that I firmly believe she is ethically required to provide, by writing her a letter asking her to meet with us. Therefore, the method, sending a letter requesting a meeting, was certainly neither in violation of her rights nor in violation of RPC 4.4(a).

The conclusion of the disciplinary counsel and a member of the hearing committee that I violated RPC 4.4(a) relies on a finding that my using her home address violated Ms. Rice's right to privacy. This conclusion ignores the requirement that it must be the method of obtaining evidence that violates the third person's legal rights and assumes that sending a letter to a person's home address violates her right to privacy. Neither position is supportable. In this case the method was a straight forward written request that trial counsel meet with post-conviction counsel to discuss trial counsel's testimony at an upcoming post-conviction evidentiary hearing. Since I already knew Ms. Rice's home address, which was available from any number of people finder web based computer services, using the address did not violate any right to privacy.

A cursory search on WestLaw revealed that many but not all courts have recognized that a person does have a privacy interest in her home address. I did not find any Tennessee appellate court cases that hold that there is such a right other than to protect the safety of undercover law enforcement officers. But, as one court recognized, this right is acknowledged by the fact that people can have unlisted phone numbers. However, this right generally comes into play only when someone in possession of the address disseminates it to others without the approval of the address holder. Even in those cases which recognize the right, it is not the use or even the dissemination of the

address that is actionable but only definable harm resulting from the dissemination. An example would be a bank selling the addresses of its customers to a junk mail service. The selling of the addresses was not actionable and the suits were dismissed because the plaintiffs were unable to show anything other than speculative harm. Ms. Rice's claim of a privacy interest is further diminished by the fact that her home address is readily accessible from numerous sources, such as the people finder programs from Accurint and WestLaw. Nothing suggests that sending a letter to a known home address is the type of legal right that is protected by Rule 4.4(a), even if it were permissible to divorce the violation of a legal right from the methods to obtain evidence.

Respectfully, under these circumstances I cannot accept this proposed Informal Admonition and request a formal hearing.

Yours very truly,

Donald E. Dawson

Petition for Discipline

EXHIBIT NO. 2-A

Identified and made a part of the record this 2nd day of February, 2009.

[signature]

JUDGE

FILED
September 19, 2007
BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE
SUPREME COURT OF TENNESSEE
Executive Secretary

**IN DISCIPLINARY DISTRICT V
OF THE
BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE SUPREME COURT OF TENNESSEE**

RECEIVED
SEP 28 2007
OFFICE OF POST-CONVICTION DEFENDER

IN RE: **DONALD E. DAWSON,**
BPR #10723, Respondent,
An Attorney Licensed to Practice Law
In Tennessee (Davidson County)

DOCKET NO: 2006-1648-5-LC

## MEMORANDUM AND ORDER GRANTING RESPONDENT'S MOTION TO DISMISS

This Memorandum and Order is a supplement to the Memorandum and Order filed with the Board on August 1, 2007, which is incorporated herein by reference. Following the entry of that Memorandum and Order, both disciplinary counsel and counsel for the respondent have filed supplemental briefs addressing the issues raised by the Panel and requested that the matter be submitted to the Panel on these briefs and the record without the necessity of oral argument as invited by the Panel in its August 1, 2007 Memorandum and Order. After reviewing the entire record, including the supplemental briefs filed by the parties, it is the unanimous conclusion of the Panel that the respondent's motion to dismiss should be granted in that there is no material question of fact presented by the record of any disciplinary violation committed by the respondent. Specifically, the Panel finds that there can be no disciplinary violation committed by the mere act of sending a personal letter between members of the bar.

The only disciplinary rule at issue is Rule 4.4(a) as determined by the Panel in its August 1, 2007 Memorandum and Order. In that order the Panel framed two issues to be addressed by the parties as follows:

FILED (29)
APR 07 2009
Clerk
Rec'd by

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 2B
DATE 4-7-08 ID ____ Evd ✓

> 1) Whether the Respondent had no substantial purpose other than to "embarrass, delay or burden" Ms. Rice by sending a personal letter to her home rather than her post office box;
>
> 2) Whether the Respondent knowingly in an effort to obtain evidence sent this letter to her personal address in violation of her legal right of privacy.

As to the first issue, the Panel concludes as a matter of law that the letter written by the Respondent to the complainant's home address could not have been designed to "embarrass, delay or burden" the complainant. There has been no argument advanced by disciplinary counsel as to how a personal letter between members of the bar to a home address could have this effect.[1]

As to the second issue, the Panel concludes as a matter of law that a letter to ones personal address that is not made public cannot violate the someone's right of privacy. No authority has been cited by disciplinary counsel indicating that a violation of a person's right of privacy in their home address can occur without some element of public dissemination. There is no fact or inference of any public dissemination by virtue of this letter being delivered to the complainant's home address.[2]

For the foregoing reasons, the Respondent's Motion to Dismiss is granted.

---

[1] The Panel would note that the contents of the letter itself were professional and courteous.

[2] Indeed, the complainant's letter of February 23, 2006 to the respondent and the district attorney only requested that subpoenas, that could result in public dissemination, not be sent to her home address.

Entered this 17th day of September, 2007.

C. Bennett Harrison, Jr. (5702)
Hearing Panel Chair
Suite 1500, Nashville City Center
511 Union Street
Nashville, Tennessee 37219
(615) 244-1440

Julian Ward Blackshear, Jr., Esq. (4607) by CBH w/ permission
4228 Home Haven Drive
Nashville, TN 37218-1414

Spruell Driver, Jr., Esq. (14829) by CBH w/ permission
511 Union Street, Suite 2700
Nashville, TN 37219-8966

Motion to Dismiss

EXHIBIT NO. 2-B

Identified and made a part of the record this 2nd day of February, 2009.

JUDGE

IN THE CRIMINAL COURT FOR KNOX COUNTY, DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

STATE OF TENNESSEE )

VS. ) CASE NO. 58183

CHRISTA GAIL PIKE )

TRANSCRIPT OF THE EVIDENCE

Pretrial Motion Hearings

Volume I of II Volumes

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. William H. Crabtree
Ms. S. Jo Helm
Assistant District Attorneys General
District Attorney General's Office
400 Main Avenue
City-County Building
Knoxville, Tennessee 37902

FILED 30
APR 07 2009
Clerk of the Courts
Rec'd by

FOR THE DEFENDANT:

Mr. William Talman
Ms. Julie Martin
Mr. William Brown
Attorneys at Law
Knoxville, Tennessee 38902

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 3
DATE 4-7-08 ID Evd ✓

counsel table, but he needs to--

MS. HELM: I guess he got demoted.

THE COURT: I reckon.

(Whereupon, this case came on to be heard further on the 19th day of January, 2006, when the following proceedings were had, to-wit:)

THE COURT: For the purposes of the media, Mr. Patrick, I'm going to take up another matter before I take up the Job Corp cases. I'm going to instruct you that until I either say you can take pictures or I say you can't--can't take any because I intend to bring the defendant's out so they can hear the proceeding on whether or not there should be photography done in the courtroom. So if you'll bear with me, I'll let you know.

MR. PATRICK: Okay.

(Whereupon, the Court disposed of other unrelated cases on its docket before discussing Shadolla Peterson's case with Mr. Chris Coffey and proceeding in this case as follows:)

THE COURT: Let's bring out the

guess I need to remind everybody about.
MR. TALMAN: Pardon me, Judge.
THE COURT: There's a--
MR. BROWN: A shoplifting.
THE COURT: --theft charges, yes. I don't think that we need to do anything with it. I just wanted to remind you it was there.
MS. HELM: Judge, just move it to the 18th.
THE COURT: When?
MR. BROWN: March 18.
THE COURT: March 18th. Okay. And I'm going to continue that matter to March 18th. Mr. Brown.
MR. BROWN: Yes, your Honor. I'm in a position this morning to--or this afternoon to--
THE COURT: It's afternoon already.
MR. BROWN: Right. --to ask to withdraw from Ms. Pike's case. Over the last couple of months Ms. Pike and I have had some communication problems and for whatever reason I think that--I've spoken with Ms. Pike and she and I are both in agreement that it would be in everyone's best interest to have me withdraw from the case and have new counsel appointed to represent her.

THE COURT: Ms. Pike is obviously charged with the most serious offense that she could face and the most serious penalty she could face.

Ms. Pike, you have talked to Mr. Talman and Mr. Brown. And for your information they have talked to both myself and the Attorney General about this matter.

General, did you want to respond to that?

MR. CRABTREE: Yes, your Honor. I just want to--I think the Court is aware of it, but I just want to remind the Court that an individual--I understand counsel is appointed in this case. An individual doesn't have the right to select their own appointed counsel--

THE COURT: I understand that.

MR. CRABTREE: --and--

THE COURT: I was about to address Ms. Pike about--

MR. CRABTREE: I apologize, your Honor--

THE COURT: --issues and reasons.

MR. CRABTREE: --if I didn't--

THE COURT: Okay.

MR. CRABTREE: I didn't mean--but I just didn't want the Court to get by me without me saying something.

THE COURT: I think that in some since this is Mr. Brown's motion as well as Ms. Pike's; is that fair to say?

MR. CRABTREE: Well, be that as it may, the State's concern is the fact that we have a date set.

THE COURT: Yes, you do.

MR. CRABTREE: And we would like to maintain that date if at all possible.

THE COURT: And if the change of counsel is going to affect that date, then we would be in opposition to counsel. I think the Court needs to keep in mind this is not a situation where this is the **only** counsel involved. Apparently, from what I understand there--no difficulty exists as far as Mr. Talman is concerned.

THE COURT: Well, from what I understand preparation for--for this trial is going forward as smoothly as both sides can--can get it to go.

Ms. Pike, let me ask you whether or not--as I said, you've talked to Mr. Brown about this and Mr. Talman?

DEFENDANT PIKE: Yes, ma'am.

THE COURT: And is what Mr. Brown has said a fair representation of how you feel about this

matter?

DEFENDANT PIKE: Yes, ma'am.

THE COURT: And do you understand that Mr. Brown has been appointed along with Mr. Talman to represent you in this case, and that it's really my choice as to who your attorney is? Some people tend to want to pick and choose by coming up and complaining or whatever. You have not directly asked me for this relief at any point. Are you asking me to appoint other counsel other than Mr. Brown at this time?

DEFENDANT PIKE: Yes, ma'am, I am.

THE COURT: It is not my intention to continue this case for this purpose, and I will have to obtain new counsel to work with Mr. Talman. I am going to let Mr. Brown withdraw. I know Mr. Brown has a number of major felony cases that are involved, and it is my intention--I have a couple of names in mind of people who I will try to discuss this with and with General Helm and Mr. Talman and General Crabtree in an effort to maintain that date.

MR. CRABTREE: Your Honor, if I might--

THE COURT: And I understand Mr. Talman is actively preparing so it shouldn't slow anything

down other than to get somebody up to speed at this point.

MR. CRABTREE: If I may make a suggestion, I think counsel--the Count indicated it was allowing Mr. Brown to withdraw. Could the Court withhold ruling on that particular issue until the Court finds whether or not someone can be found who can replace him without effecting the trial date?

THE COURT: I can do that, General, if you'd like me to.

MR. CRABTREE: I think that would--and we can set--pick a day next week and come--

THE COURT: That's fine. I'll do this Monday or Tuesday if you like.

MR. CRABTREE: Tuesday?

THE COURT: I don't want to delay it very far because every day that goes by makes it harder for new counsel. Would that be okay?

MR. CRABTREE: Tuesday?

MS. HELM: Tuesday--

MR. TALMAN: Tuesday would be a good day.

THE COURT: Mr. Talman, would you accept--Mr. Brown is listed as the representative on this other charge. Would you have objection to my just substituting you as counsel on that case?

MR. TALMAN: No. I think that's--probably the least of Ms. Pike's concerns is that case.

THE COURT: It is. I wonder if after we're finished today counsel would discuss this, including Mr. Brown, discuss this with me and let me come up with a couple of names I'm going to throw at you and see if you think that that would be okay.

MR. TALMAN: Yes, your Honor. Also, I would like to address General Crabtree. I have to respond to him a little bit. I like to argue with him every once in a while.

As to the being ready for trial on the March the 18th, I do not anticipate a change in second chair should affect being ready for March the 18th. And I have no problems making that representation. But I do want to make clear that I'm not agreeing to the point of if there's a problem that develops in discovery--and thus far we've not had one--but if we do have a problem, I don't want to waive an argument or a motion later.

MR. CRABTREE: If something--(Indiscernible phrase).

THE COURT: I will never let you all waive an argument or a motion in a death penalty case

where it affects this client's right to have-- affect you client's right to have everything on the table and have an opportunity. And I think you're safe.

MR. TALMAN: Well, I understand that. And it will be our intention to be ready to go to trial in March unless something unforeseen develops.

THE COURT: Well, to that end is there anything else we can take up as to motions at this point?

MR. CRABTREE: I think we probably need to get these other motions--just move those over until two--not to be heard until she gets a new counsel so they can all be done with the same people.

MR. TALMAN: Your Honor, could we go ahead and look tentatively at your--at your calendar sometime for--

THE COURT: I'm looking at it.

MR. TALMAN: --mid February for a motion day or--

THE COURT: Well, see if I really didn't like the media, which I do actually, I'd put it on Monday because they wouldn't have time to give me two business days. I'm not going to do that to them. (Pause) Thursday is a bad day simply

and that they let her use a phone?

THE COURT: Yes, that I can do.

MR. TALMAN: Okay.

THE COURT: I can arrange that.

MR. TALMAN: All right.

THE COURT: Mr. Bates, please tell them that when Ms. Pike gets downstairs she needs to make a phone call and she needs to be able to contact her family on my order.

Anything else?

MS. HELM: Do you still want us?

THE COURT: Yes, but I might as well adjourn so the officers can go home. They've been here all day. Court's adjourned until 9 o'clock Monday morning.

(Whereupon, this case came on to be heard further on the 23rd day of January, 1996, when the following proceedings were had, to-wit:)

THE COURT: All right. Have we carried on a conversation and are we ready to go forward on Ms. Pike's matter?

MR. TALMAN: Yes, your Honor.

THE COURT: Is she up?

MR. TALMAN: She is.
MR. GARRETT: Ms. Helm is--
THE COURT: Okay. Yes, I guess I need General Helm.
MR. TALMAN: We--also we want to address the issue of the photographer in the courtroom.
THE COURT: I understand that.
MR. TALMAN: Okay. Prior to taking any photographs.
THE COURT: I understand that too.
MR. TALMAN: Thank you, Judge.
(Whereupon, the Court took up other unrelated cases on its docket before proceeding in this case as follows:)
THE COURT: Ms. Martin, I presume you know why you've been asked to join us this morning.
MS. MARTIN: Yes, your Honor.
THE COURT: Are you willing to go forward in this matter? Are you willing to take appointment in this case?
MS. MARTIN: Yes, I am.
THE COURT: Okay.
MS. MARTIN: I talked to Mr. Talman about

the offense of Ms. Pike and I am willing.

THE COURT: Okay. Let me get everybody in one place and we'll do it officially then.

MS. MARTIN: Okay.

(Whereupon, the Court took up other unrelated cases on its docket before proceeding in this case as follows:)

THE COURT: Do we need Mr. Brown back?

MR. TALMAN: If your Honor needs him. He had somewhere to go.

THE COURT: Well, I'd kind of like him to be present so that he knows that it's taken care of.

(To court officer) Would you just step down the hall--I think he was a couple of doors down--and see if he's available to come back over here for a minute?

(Whereupon, the Court disposed of other unrelated cases on its docket before proceeding in this case as follows:)

THE COURT: Are to ready to bring Ms. Pike out? What happened to my camera man? That's all

MR. TALMAN: It's obvious--

THE COURT: Mr. Bates, would you please move over to the chair behind General Helm, and I have no problem with one officer sitting behind Ms. Pike.

MR. TALMAN: Which just happens to be a uniformed officer.

THE COURT: We have done this before. Well, we have done this before in other proceedings and for the jury's benefit, but officers belong in courtrooms. There's no--Ms. Pike is not shackled.

MR. TALMAN: We've--we've noted our objection, your Honor.

THE COURT: Ms. Pike is not handcuffed. There is no reason for there to be a problem.

MR. TALMAN: That's fine.

THE COURT: All right.

MR. TALMAN: Your Honor, I'm not trying to be argumentative. I'm just trying to make sure we preserve the record.

THE COURT: Mr. Talman, I'd be doing the same thing you're doing if I was over there, like I said earlier.

Now, we need to deal first with the issue of substitution of counsel. Ms. Martin--(Pause)

MR. TALMAN: Your Honor--

THE COURT: Wait a minute, Mr. Talman.

Ms. Martin, you have discussed this matter with Mr. Talman and with Mr. Brown and I take it with Ms. Pike; is that correct?

MS. MARTIN: Yes, I have, your Honor.

THE COURT: And are you willing to take appointment in substitution for Mr. Brown, based upon his Motion to Withdraw and the Court's previous ruling?

MS. MARTIN: Yes, I am, your Honor.

THE COURT: I'm going to appoint Ms. Martin.

MS. HELM: Your Honor, there's one other issue that you said you wanted answered before you relieve Mr. Brown.

THE COURT: Right.

MS. HELM: And I don't believe we've heard an answer to that question yet.

THE COURT: Ms. Martin, are you going to be available on March the 19th; is it?

MR. TALMAN: 18th.

MS. HELM: 18th.

THE COURT: 18th?

MS. MARTIN: The 18th I believe I have--

THE COURT: Free and clear.

MS. MARTIN: I only have one trial in March and it's not on that date.

THE COURT: Okay. That was something we're concerned about since this is, as you know, a very serious felony and Ms. Pike has been in custody so--

MR. TALMAN: Your Honor, I would also note while the State has a concern about being ready for trial by the 18th, if the State will comply with discovery by the 18th, we will be ready for trial by the 18th.

MS. HELM: No problem.

THE COURT: Okay.

MR. TALMAN: Is that for the record, General?

MS. HELM: Everything I said is on the record, Mr. Talman.

THE COURT: Yes, it is.

MR. TALMAN: Thank you.

THE COURT: All right. Now, are there any other issues you'd like to raise? Do you want another motion date?

MS. HELM: Yes, please, your Honor.

THE COURT: This is one that we, I take

Original Trial Transcript, Volumes I and II, Motions

EXHIBIT NO. 3

Identified and made a part of the record this 2nd day of February, 2009.

[signature]

JUDGE

SUPREME COURT FORM I-75

# CLAIM FOR ATTORNEYS FEES - INTERIM CLAIM

007292

INSTRUCTIONS: (See Supreme Court Rule 13). If this form is not completed correctly it will be returned to you. Attach order of appointment. Type and submit in duplicate. Deliver copies to clerk of court signed by attorney and judge. Clerk shall retain one copy for files and forward original to Executive Secretary, 1400 Nashville City Center, Nashville, Tennessee 37234-0607.

State of Tennessee
County of Knox Docket No. 58183-A
Christa Gail Pike in the Criminal court
Name of Indigent Defendant

1. X Felony
___ Misdemeanor
___ Petition for Early Release
___ Guardian Ad Litem
___ Post Conviction
___ Probation Revocation
___ Termination of Parental Rights / Dependent Neglect
___ Juvenile
___ Contempt

First Degree Murder - Death Penalty
Original Offense

39-13-202
In Violation of TCA Section

2. Disposition of Case:
___ Plea of Guilty ___ Nolle Prosequi
X Plea of Not Guilty and Trial by Jury ___ Plea of Not Guilty and Trial by Judge

COPY

X Other: (Explain) Interim Fee Petition in Capital Case

3. Sentence or Penalty, if any, the Defendant Received Jury returned verdict and death sentence on 03/30/96

4. Date of Disposition: Motion for New Trial Pending Date of Last Activity in relation to the case Case still pending

| Date | ACTIVITY (See S C Rule 13) Legal services rendered. Attach order of appointment stating reason therefor. Itemize out-of-pocket expense. Itemize other approved expense and attach certified copy of court's prior approval to this claim. | (A) In Court Hours in Tenths | (B) Out of Court Hours In Tenths | (C) Itemize Expense See S/C Rule 13 |
|---|---|---|---|---|
| 01/23/96 | Meet w/Bill Talman (X's 2); Meet w/Jo Helm; TC w/Bill Talman (X's 2) | | 1.6 | |
| 01/23/96 | Court Appearance; TC to Quindry | 1.0 | 0.1 | |
| 01/24/96 | TC w/Bill Talman; TCs to Quindry, Court Clerk, and Warren | | 0.8 | |
| 01/25/96 | TC w/Bill Talman; Review file | | 4.3 | |
| 01/26/96 | Research in death penalty manual; ltr to client | | 5.0 | $ 0.32 |
| 01/29/96 | Take package of documents to B. Talman | | 0.3 | |
| | TOTALS FROM ATTACHED SHEET (PLEASE SEE ATTACHED SHEETS) | 93.9 | 250.6 | $259.19 |
| ATTACH ADDITIONAL SHEETS IF NEEDED | TOTALS | 94.9 | 262.7 | $259.51 |

I certify that the foregoing represents an accurate and complete statement of time and expense in connection with the above action or proceeding and these services were rendered pursuant to appointment under TCA 40-14-201 et. seq. or TCA 37-1-150 (e) (f).

Julie A. Martin
PLEASE PRINT FULL NAME AND ADDRESS OF ATTORNEY

P.O. Box 426

Knoxville

Original Signature of Attorney

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
Social Security Number (not Firm I.D.)

(423) 523-7733 TN 37901-0426
Telephone #

ATTORNEY NOTE: If you are sued as a result of this court-appointment, please contact the office of the Executive Secretary.

## TO BE COMPLETED BY JUDGE

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 4
DATE 4-7-08 ID ___ Evd ✓

$ AMO

(A) ___ Total Approved In Court Hours @ $50.00 per Hour ........................ ___
(B) ___ Total Approved Out of Court Hours @ $40.00 per Hour .................... ___
Hours Only
SUB-TOTAL ___
(C) ___ Total All Approved Expenses (telephone, copying, mileage @ $ .22 per mile) ___
(D) ___ Expert Witness Fee per TCA 40-14-207(b) ................................ ___
(E) ___ SUBTRACT Amount Reimbursed per TCA 40-14-202(e),(g) .................... --
GRAND TOTAL PAYMENT AUTHORIZED ___

__ I hereby certify that I appointed the above named attorney to represent the herein listed indigent in compliance with TCA 40-14-201 et. seq. or TCA 37-1-150 (e) (f).

This the ___ day of ___, 1996. ___
Original Signature of Judge (Not Stamped)

APPROVED
___
EXECUTIVE SECRETARY

JUDGE PLEASE NOTE: FILL OUT REVERSE SIDE IF ORIGINAL OFFENSE IS MURDER 1.

4

| Date | ACTIVITY (See S C Rule 13) Legal services rendered. Attach order of appointment stating reason therefor. Itemize out-of-pocket expense. Itemize other approved expense and attach certified copy of court's prior approval to this claim. | (A) In Court Hours in Tenths | (B) Out of Court Hours In Tenths | (C) Itemize Expense See S/C Rule 13 |
|---|---|---|---|---|
| 01/30/96 | TC w/Bill Talman; review file documents from BT | | 5.2 | |
| 01/31/96 | TC w/Bill Talman; review file documents from BT | | 5.1 | |
| 02/01/96 | Review file documents from BT | | 3.7 | |
| 02/06/96 | Review file documents | | 4.0 | |
| 02/07/96 | Research in death penalty manual; review file documents | | 4.0 | |
| 02/08/96 | Review file documents; TC to jail | | 6.8 | |
| 02/09/96 | Research in death penalty manual; review file documents; jail conf. w/client | | 4.7 | |
| 02/12/96 | Review B. Brown's file | | 3.8 | |
| 02/13/96 | Review file; TC w/Clerk re: media; Meet w/Bill Talman | | 6.5 | |
| 02/14/96 | TC w/Bill Talman (X's 2);meet w/client; prep. for court | | 2.9 | |
| 02/15/96 | Motions Hearing; Meet w/Bill Talman; Meet w/client | 2.8 | 0.5 | |
| 02/19/96 | Review previously-filed pleadings; | | 4.0 | |
| 02/20/96 | Review documents from Talman's file; | | 3.7 | |
| 02/21/96 | TC w/Bill Talman; review research; review Brown's file | | 3.5 | |
| 02/22/96 | TC w/Bill Talman; review research | | 2.6 | |
| 02/23/96 | Review and prep. for court | | 0.4 | |
| 02/25/96 | TC w/Bill Talman; research in death penalty manual re: motions | | 4.3 | |
| 02/26/96 | TC w/Bill Talman (X's 2); research | | 3.9 | |
| 02/27/96 | Meet w/Bill Talman (X's 2); draft motions | | 5.6 | |
| 02/28/96 | Gather docs. and prep. for mtg.; review & redraft motions; meet w/Talman | | 4.6 | |
| 02/29/96 | Review docs. for ct.; in Court re: motions; Meet w/Talman; TCs re: lip 0.5 reader (X3) | | 1.8 | |
| 03/01/96 | Travel to Dr. McCoy's office; meet w/Dr. McCoy, review mitigation docs.; review docs from Talman | | 7.0 | |
| 03/02/96 | Review docs from Talman | | 2.7 | |
| 03/04/96 | TC w/Bill Talman (X's 2); TC w/McCoy; Meet w/Bill Talman and client; review McCoy's docs and prep for trip; TC w/K. O'Hara; TCs to witnesses (Ragland & Wayland) | | 6.6 | |
| 03/05/96 | Trip to Nashville and Bolivar w/BT re: Barnet & O'Hara | | 15.8 | |
| 03/06/96 | TC w/Bill Talman; review notebooks w/docs. | | 7.6 | |
| 03/07/96 | Research for motions; redraft motions | | 3.7 | |
| 03/08/96 | Prep file for trip; jail conf. w/client; travel to Shelby NC; Meet w/Jennifer McClary in Hendersonville, NC; review notes | | 7.5 | $ 41.37 (Motel) |
| 03/09/96 | Left Hendersonville to find Kim Ilollo in Shelby, NC; Left for Gastonia, NC to find Stephanie Wilson; Meet with Stephanie Wilson and her mother; Travel to Stanley, NC to find Mary Cogdill; Trip to Raleigh, NC to meet w/Christa's mother and step-father; Meet with Gerard and Carissa Hansen in Raleigh, NC review notes | | 12.3 | $127.14 (Motel & research)<br>$ 7.34 (Meals) |
| 03/10/96 | Ltrs to witnesses; Attempt to contact Teresa Williams; Attempt to contact Jeanette Marquez; Prepare for meeting w/Atty. Matthew Martin and TC; Listen to interview of Defendant w/counsel; Meet with Matthew Martin; In route to Beckley, WV to meet w/Carrie Ross; Prepare for meeting w/Carrie Ross; Meet w/Carrie Ross in Beckley, WV; review notes | | 12.6 | $ 0.96<br>$ 72.87 (Motel)<br>$ 4.89 (Meals) |
| 03/11/96 | Review file re: progress and work to be done; meet w/Bill Talman; Return trip to Knoxville; | | 8.0 | $ 4.62 (Meals) |
| 03/12/96 | TC w/Bill Talman; organize file from trip; TC w/B. Rice | | 2.3 | |
| | PAGE 2 TOTALS | 2.8 | 167.7 | $259.19 |

| Date | ACTIVITY (See S C Rule 13) Legal services rendered. Attach order of appointment stating reason therefor. Itemize out-of-pocket expense. Itemize other approved expense and attach certified copy of court's prior approval to this claim. | (A) In Court Hours in Tenths | (B) Out of Court Hours In Tenths | (C) Itemize Expense See S/C Rule 13 |
|---|---|---|---|---|
| 03/13/96 | TC w/Bill Talman; research re: death-qualified jury; draft motions; TC to M. Cogdill; meet w/Janeway and Keever at KPD; TC w/Jo Helm; review records received from KPD visit; | | 4.5 | |
| 03/14/96 | Prep for Court; In Court; Trip to KPD to view evidence in storage lockup; TC w/Bill Talman; review file to prep for meeting; meet w/Eric Engum, Bill Talman & Barry Rice | 1.3 | 7.3 | |
| 03/15/96 | Review BT's file on case; Meet w/Dr. McCoy and Bill Talman; | | 6.8 | |
| 03/16/96 | Prep for jury selection; meet w/client | | 6.0 | |
| 03/17/96 | Meet w/Bill Talman re: trial prep and motions; redraft motions; TC to B. Rice | | 7.8 | |
| 03/18/96 | Prep for Court; in Court; Meet w/Bill Talman & Charles Bebber during lunch re jury selection; Meet w/BT; review juror info. | 8.0 | 2.8 | |
| 03/19/96 | Prep for Court; in Court; Meet w/Job Corp Students and potential witnesses w/Bill Talman & Charles Bebber during lunch; Meet w/Crabtree re TBI Lab evidence; Meet w/Bill Talman; review juror info. | 6.8 | 4.5 | |
| 03/20/96 | Prep for Court; in Court; Meet w/Carissa Hansen, Dr. Bebber & Bill Talman during lunch; review juror info. | 8.8 | 3.3 | |
| 03/21/96 | Prep for Court; in Court; Meet w/Bill Talman & Dr. Bebber during lunch; review juror info. | 10.5 | 2.5 | |
| 03/22/96 | Prep for Court; in Court; Meet w/Bill Talman, Carissa & Dr. Bebber during lunch; prep opening statement | 7.8 | 2.6 | |
| 03/23/96 | Prep for Court; in Court; Meet w/Bill Talman; Meet w/client; Meet w/Bill Talman & Carissa Hansen; Meet w/Bill Talman; Review docs. re: cop witnesses | 3.3 | 5.0 | |
| 03/24/96 | TC w/Bill Talman; prep for Court | | 4.0 | |
| 03/25/96 | Prep for Court; in Court; Meet w/Bill Talman during lunch; review Jincks stmts. | 8.0 | 4.5 | |
| 03/26/96 | Prep for Court; in Court; Meet w/Bill Talman during lunch to prepare for p.m. court; TC w/Bill Talman; review notes from day's testimony & Engum's report | 7.8 | 4.3 | |
| 03/27/96 | Court prep for Engum's testimony; in Court; Meet w/Bill Talman & Dr. Engum during lunch re: testimony | 7.8 | 4.0 | |
| 03/28/96 | Meet Talman & Bernet downtown (a.m.); in Court; Meet w/Dr. Bernet & Bill Talman during lunch; meet w/Hansens, Ross & Talman | 7.5 | 4.3 | |
| 03/29/96 | Court prep; In Court; meet w/Carrie Ross re: penalty phase; prep questions for penalty phase; | 8.0 | 4.5 | |
| 03/30/96 | Meet w/Bill Talman, Glen Pike, Gerard Hansen, Carissa, Dr. McCoy & Carrie Ross; In Court; Meet w/Gerard, Glen Pike, Carissa, Carrie, Dr. McCoy & Bill Talman during lunch; Meet w/Bill Talman; Meet w/Bill Talman, Carissa, Gerard, Glen Pike, & Carrie Ross; TC to jail re: client's mental state | 5.5 | 4.2 | |
| | PAGE 3 TOTALS | ~~82.9~~ 91.1 | ~~91.1~~ 82.9 | -0- |

# TRAVEL EXPENSES

RE: Christa Gail Pike
Knox Criminal Docket No. 58183-A

**Lodging:**

| | | |
|---|---|---|
| 03/08/96 | Days Inn, Hendersonville, NC | $ 41.37 |
| 03/09/96 | Holiday Inn, Research Triangle Park, NC | $127.14 |
| 03/10/96 | Holiday Inn, Beckley, WV | $ 72.87 |
| | Subtotal: | $241.38 |

**Meals:**

| | | |
|---|---|---|
| 03/09/96 | Western Sizzlin | $ 7.34 |
| 03/10/96 | McDonald's | $ 2.18 |
| 03/10/96 | McDonald's | $ 2.71 |
| 03/11/96 | Arby's | $ 4.62 |
| | Subtotal: | $ 16.85 |

**TOTAL TRAVEL EXPENSES:** $258.23

007296

DAYS INN

22989 CHECKIN

DAYS INN
102 MITCHELL DRIVE
HENDERSONVILLE, N.C. 28792
86-69214-0007

FRI MAR 08 1996 09:15 PM

ACCT: 5342010003-834012 EXP: 10/97
CARD: MC

REC #: 0014 ROOM #: 000215

TOTAL 41.37

X
BARRY RICE

| DATE | AUTH | AMOUNT |
|---|---|---|
| 03/08/96 | 42 | 41.37 |

THANK YOU FOR STAYING AT
DAYS INN HENDERSONVILLE !!!

| FOLIO NO. | ROOM NO. | RATE NO. | NO. IN PARTY | SOC NO. |
|---|---|---|---|---|
| 22989 | 215 | | 1 | D1 |

NAME (LAST) (FIRST) (INITIAL) DATE DESCRIPTION AMOUNT BALANCE

PLEASE PRINT
ADDRESS (STREET) IN OUT

LLR #43

3/10/96 lunch on road in W. Va.

McDONALD'S
THANK YOU

WESTERN SIZZLIN
1545 RANKIN LAKE RD
GASTONIA NC 28052
(704)864-7300
HAVE A GREAT DAY!

SAT, MAR 09, 1996 01:55 PM
MC 5342010003834012 9710
SALE TERM# 0001 REF# 005
AP 068477 $7.34

I AGREE TO COMPLY WITH THE CARDHOLDER AGREEMENT
SIGNATURE/THANK YOU

ARBY'S STORE #
ACCURACY IS OUR
POLICY! 800-ARBYS64

| | | |
|---|---|---|
| PRESTON | 3 | 3127 |
| 1 | BEEF&CHEDD | 2.29 |
| 1 | 3POTATO CK | .99 |
| 1 | JAMOCHA | .99 |
| | SUBTOTAL | 4.27 |
| | SALES | 4.27 |
| | TAX | .35 |
| | TOTAL | |
| | CASH SALES | |

DRIVE THR

Mon Mar 11 15:45:18 1996

THANK YOU!!!
...ENJOY YOUR DAY!.

Mtg w/Matthew Martin 3/10/96 in NC.

McDonald's Hillsborough
Thank you for eating at McDonald's

THANK YOU
HILLSBOROUGH TEL# 9197329898
47 KS# 02 Mar.10'96(Sun)11:42

LG OJ 01 0.99 L Water 01 0.30
L COFF 01 0.75

| | |
|---|---|
| SUB TOTAL | 2.04 |
| EAT IN TAX | 0.14 |
| | 2.18 |
| CASH TEND | 2.25 |
| CHANGE | 0.07 |

007297

P.O. Box 13816
I-40 and New Page Road (Exit 282)
Research Triangle Park, NC
27709-3816
(919)941-6000 FAX (919)941-6030

Holiday Inn
RALEIGH-DURHAM AIRPORT
(I-40 at Research Triangle Park)

Delightfully Different Carolina Comfort™

**Name & Address**

JULIE MARTIN
PO 426

KNOXVILLE TN 37901

| | |
|---|---|
| Room | 471-11 |
| Arrive Date | 03/09/96 |
| Dept. Date | 03/10/96 |
| Folio # | 0 |
| Room Rate | 75.00 |
| Account | 2-CBANK |
| Mkt/Seg | 5-BEST |

Page 1

OPERATED BY AN INDEPENDENT OWNER
UNDER FRANCHISE FROM HOLIDAY INNS, INC.

The management is not responsible for any valuables not secured in safety deposit boxes provided at the front office. The guest understands and agrees to be personally liable for all charges incurred at the hotel.

SIGNATURE

I authorize you to bill the full balance of my account to my credit card which was presented upon registration.

SIGNATURE

SEE REVERSE SIDE FOR EXPRESS CHECK-OUT PROCEDURE

| DATE | CODE | REFERENCE | I.D. | DESCRIPTION | CHARGE | PAYMENT | BALANCE |
|---|---|---|---|---|---|---|---|
| 0309 | 291 | 390 | ZZ1 | REMINGTONS | 37.59 | .00 | 37.59 |
| 0309 | 115 | 0309000 | WBX | PACKAGE ROOM | 75.00 | .00 | 112.59 |
| 0309 | 211 | 0309001 | WBX | ROOM TAX | 8.25 | .00 | 120.84 |
| 0310 | 292 | 5114 | ZZ1 | THE CAFE | 6.30 | .00 | 127.14 |
| 0310 | 913 | 0310000 | JBC | VISA/MASTERCARD | .00 | -127.14 | .00 |
| | | | | ***TOTAL*** | | | $ .00 |

| | |
|---|---|
| ACCT. NO. | MC 5342010003834012 1097 |
| CARD MEMBER NAME | RICE/BARRY |
| ESTABLISHMENT NO. & LOCATION (ESTABLISHMENT AGREES TO TRANSMIT TO CARD ISSUER FOR PAYMENT) | Holiday Inn<br>Raleigh-Durham Airport<br>Page Road & Exit 282<br>Raleigh, NC 27709-3816 |
| CARD MEMBER'S SIGNATURE | X |

MERCHANDISE AND/OR SERVICES PURCHASED ON THIS CARD SHALL NOT BE RESOLD OR RETURNED FOR A CASH REFUND

| | | |
|---|---|---|
| DATE OF CHARGE | FOLIO NO./CHECK NO. | |
| 03/10/96 | HI- 87983-0/ | |
| AUTHORIZATION | | I.D. |
| 084618 | 132.00 | JBC |
| | .00 | |
| | .00 | |
| PURCHASES & SERVICES | 127.14 | |
| TOTAL AMOUNT | $ 127.14 | |

007298

## Guest Account

Holiday Inn

| Room | Rate | Arrival | Depart | Folio No. | Account | Affiliation | PF | ID | Page |
|---|---|---|---|---|---|---|---|---|---|
| 205 | 55.00 | 03/10/96 | 03/11/96 | 43832 | 2-CBANK | 7 WAS | 11 | JAF | 1 |

JULIE MARTIN
BOX 426

KNOXVILLE TN 37901

| Date | Code | Reference | ID | Description | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|
| 0310 | 215 | 1886 | ZZ1 | GARDEN RM CHGS | 8.43 | .00 | 8.43 |
| 0310 | 117 | 0310000 | SAW | SAVED ROOM | 55.00 | .00 | 63.43 |
| 0310 | 811 | 0310001 | SAW | SALES TAX | 3.30 | .00 | 66.73 |
| 0310 | 815 | 0310002 | SAW | OCCUPANCY TAX | 1.65 | .00 | 68.38 |
| 0311 | 215 | 1905 | ZZ1 | GARDEN RM CHGS | 4.49 | .00 | 72.87 |
| 0311 | 914 | 0311000 | JAF | VISA/MASTERCAR | .00 | -72.87 | .00 |
| **TOTAL** | | | | | | | $ .00 |

I AGREE THAT MY LIABILITY FOR THIS BILL IS ... HELD PERSONALLY LIABLE IN THE EVENT ... COMPANY OR ASSOCIATION FAILS TO PAY ... CHARGES.

GUEST SIGNATURE

...ECKLEY
...Harper Road
...est Virginia 25801
...e 304/255-1511

SUNDAY, MARCH 10, 1996 04:48 PM
HOLIDAY INN-BECKLEY WV
1924 HARPER ROAD
BECKLEY, WV 25801
(304)255-1511
MERCHANT #: 5900560086 AUTH ONLY

PREAUTH #: 11 00100
M\C # : 5342010003834012 EXP: 10/97
AUTH CODE: 041730
FOLIO # : 834012
ROOM # : 205

PURCHASES 72.87

X [signature]
BARRY RICE
I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT

RETAIN THIS COPY FOR YOUR RECORDS

Billing Record of Julie Rice

EXHIBIT NO. 4

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth [signature]

JUDGE

CONFIDENTIAL ATTORNEY WORK PRODUCT

Suggested Mitigation Witnesses

Alicia Wills, Christa's sister

Alicia is a good representative because she is a doctor's wife and someone respectable. She is able to freely talk about her promiscuity, being pregnant by the age of fourteen and married at fifteen, as well as her drug use, getting off drugs only four years ago. She is also able to talk about the fact that both she and Christa have had hard lives, with their respective grandmothers raising them and virtually having to raise themselves after these grandmothers died. Alicia could talk about how her mother meant well but did not set limits and did not follow through and how angry Alicia would get with her mother because of this. Carrie was Alicia's role model and she can acknowledge that she sent Carrie Mother's Day cards and that she is closer to Carrie's children than she is to Christa. She can also talk about the fact that she never wanted to be like her own mother and that when she was fifteen and married in living in North Carolina with Carissa that she did more of the caretaking of Carissa than vice versa because she had it more together than Carissa. Alicia has a clear sense that "There but for the grace of God go I" in that it was Carrie who made the difference to her. She sees Christa as "crazy" and as someone who thinks nothing of herself but who instead covers for her friends. She does think that Christa is dangerous and that she needs to be in a secure facility in view of how crazy she is.

Peggy Hamlett, Juvenile Court Counselor

Peggy is professional and objective. She does not seem to have an ax to grind. She is not defensive that this child fell through the cracks, as it were, nor does she seem intent on hanging her. She really saw the light when Christa entered Swannanoa because it was then that she became aware that Carissa was putting on a good front and did not follow through on anything. Peggy seemed a little rueful that she encouraged the Job Corps, saying that Christa seemed truly sincere about the Job Corps and saw this as her one hope because she could not count on her mother. Peggy has no use for Kenny Clyde, who exposed himself to her, and then is willing to say that he was scum and that Christa did the community a favor. She can also say that Christa was starved for attention because of her mother's neglect. The only possible drawback is that she recalls something about Satanism when Christa first entered the training school.

Rose Wilson, Juvenile Court Psychologist

FILED (32)
APR 07 2009
Clerk of the Courts
Rec'd by

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 5 ID Only
DATE 4-7-08 ID ✓ Evd ✓

Rose seems to have a soft spot for Christa and has a good understanding of Christa's personality dynamics. She is of the opinion that Christa never had role models to help her control her negative feelings and that she had few attachments to family members. She saw Christa as a scared little girl who adapted a tough role to prove how tough she was. She seemed afraid of what might happen to her and told Rose that she would end up dead or in jail. Rose also comments that Christa had no control over impulses.

Kerry Clement

Kerry made a favorable impression on me, likewise because of her professionalism. Now a school social worker, when she knew Christa she was a Child Protective Service treatment worker who became involved after the Steve Kyaw incident. She is very familiar with Carissa's poor discipline, not setting limits, or following through. She knows that friendship was always of the utmost importance to Christa, who was always involved with misdeeds with someone else. These misdeeds were something Christa seemed to be proud of, contributing to the tough girl image. Christa seemed eager to get her mother's attention any way she could. Kerry believes that Carissa herself did not want to grow up, much less parent a child. Carissa was not someone who could follow through. Kerry did not ever see Christa as particularly violent.

Matthew Martin, Esq., Christa's attorney

He seems to be enamored of Christa, crying when she was sentenced to training school, according to Kerry Clement, and traveling the three or four hours to the Asheville area to see her at some point. He has good professional credentials and certainly comes across as sincere in his viewpoint of Christa. He is invested in helping Christa. The only danger would be in how naive he might appear and easily taken in. Nonetheless, he is a clean cut professional who would help detract from the image of Christa as white trash in view of her drugs, promiscuity, and frankly anti-social behavior via stealing her mother's car, ATM card, kleptomaniac habits, etc.

Carrie Ross, Christa's aunt

A registered nurse, Carrie also creates a nice, middle-class image. She may be helpful in view of her long-standing competition of and resentment of her sister, Carissa, who she sees as the one who was babied over the years by her parents. Interestingly, Carissa sees this the reverse, saying that her mother had numerous surgeries over the years and she always had to baby-sit for her younger sister, Carrie. In any event, there is a strong rivalry between these two women and Carrie is certainly willing to demean Carissa as an irresponsible slut who was a

terrible parent to Christa, preferring to spend money on a party dress rather than on buying necessities for her children and always selecting any available man over her daughters. She would be more than willing to lay the blame for Christa's poor upbringing at Carissa's feet.

I do not think Carissa is a particularly good witness because her initial presentation is reasonably convincing and she, not surprisingly, does not own up to her very poor parenting of this girl. I encountered many, many inconsistencies in what she told me compared to that which was told me by others, but I think a jury would miss the subtleties and instead see some poor mother who went through hell with a rebellious teenager.

SP

Suggested Mitigation Witnesses

EXHIBIT NO. 5

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Liebowitz

JUDGE

STATE OF TENNESSEE VS. Christa Pike
007304
CASE NO. 68280 EXHIBIT NO. 67
DATE 4-7-08 ID ✓ Evd ✓

CONFIDENTIAL

ATTORNEY WORK PRODUCT

FILED (33)
APR 07 2009
Clerk of the Courts
Rec'd by

## Mitigating Themes

1. Borderline Personality - Christa presents as a borderline personality. This is associated with a periodic loss of control of psychotic proportions. Those who know Christa best are aware that she needs someone with her when enraged to keep her from going too far. Christa describes several incidents of "going off" and having no memory of this later. She talked most recently of several episodes of this happening in the jail, finding herself walking to the "Be sweet chair" but not having much memory of what had transpired earlier. This happened earlier in the jail as well. When she went off on Kenny Clyde a few years earlier her friend, Mandy, said she did not seem to have a clear memory of all aspects of the event and asked Mandy about it the next day. Sister Alicia described an incident of Christa chasing her with a knife such that she had to physically restrain her. She considers Christa to be "crazy" and in need of custodial care. Christa seems to have had no real role models of how to appropriately manage negative affect, according to Rose Wilson's juvenile court psychological evaluation. If anything, the maternal side of the family is replete with family members displaying poor anger management, including Chris Fotos, who beat up a teacher and was expelled, beat up his father and left home, and beat up his wife whenever his daughters weren't clean enough to suit him. Alicia was suspended for beating up a male student in the ninth grade. Carissa kicked in the door of home owned by a woman with whom Glenn was having an affair and often, according to Carrie, threatens to "whup your ass" whenever she is angry with someone. Christa's father, stepfather, Danny Thompson, and mother's boyfriend, Steve Kyaw, were all physically abusive of her.

2. Tough Girl Image - Christa is a young lady who has chronically suffered from poor self-esteem, not surprising in view of being passed back and forth between her parents and feeling that no one other than Grandmother Pike really cared for her. She has no self-respect and feels herself to be powerless. The Hillsborough Juvenile Court psychologist, Rose Wilson, viewed Christa as a scared youngster who wants to look "bad" in order to compensate for this fear. Christa's close friends and family as well as social workers who know her are all aware of Christa's need to project a tough image. Christa historically "goes off" on people she believes to be treating her disrespectfully. She viewed Tadaryl as "strong" and basked in his possessiveness of her and in the respect others at the

Job Corps gave her because of her association with him and her ability to perform occult "parlor tricks."

3. Need for Attention - Related to poor self respect is Christa's sexual promiscuity, reflecting her neediness and unmet dependency needs. This is probably at least partially due to getting so little love, affection, and attention from her father. She is especially vulnerable to the directives of men, such as Orlando Powell, who would dare her to do things at parties, and Tadaryl. Tadaryl has an especially strong influence over her because he projects genuine caring and concern for her well-being, akin to the unconditional love she experienced from her Grandmother Pike. Brandie, Mandy, Gerard Hansen, and social worker Kerry Clement all talk of Christa loving the limelight and doing anything for attention. Alicia believes the first rape allegations, made when Christa was nine or ten, were made in response to Baby Keith getting all the attention and replacing her as the baby in the family. Christa historically likes to have an audience when she engages in misbehavior, seldom doing anything alone.

   Negative attention seems one way to get her mother's attention in view of how wrapped up Mom has been in her own life and her own problems as regards men.

4. Self Destructive - Christa told her sister, Alicia, she hoped she would be dead by age 25. Christa's sense of fatalism and worthlessness are such that she told two important authority figures, Rose Wilson and Matthew Martin, that she would probably end up in prison. Christa told me that as far back as she can remember she has been sick of life. She made two outright suicide attempts in middle school and showed contempt for her life after this by using all manner of drugs, including inhaling the fumes from aerosol cans. Most people who know her assumed Christa was the one who would end up dead at an early age.

5. Job Corps Stress - Christa was under a good deal of stress at the time of the killing. She had been written up twice, once for being in Tadaryl's room, naked, and another time found on the roof outside his room. She was in conflict because she really wanted to complete the program, yet thought this unlikely. She felt she had to please Tadaryl as well, who always wanted her with him and thus placed her at risk for future write ups.. Previously always having been used by

men, Tadaryl was the first relationship she thought was actually working out and she was determined to keep Tadaryl happy at all costs so she could continue reaping the benefits of this relationship, such as a newfound sense of personal power and the respect of her peers.

A week or so prior to Colleen's death Christa's relationship with Tadaryl was on shaky grounds when she returned from Christmas break and found he had been involved with Isha. In addition, she had been moved from a 2 person to 6 person room as a disciplinary measure and was very unhappy about this as well. Colleen was outrightly contemptuous of her in public. Christa was experiencing a serious slip in her social standing at the Job Corps in addition to feeling her expulsion was eminent, at which time she did not know what she would do. A week or so prior to Colleen's death, Christa found herself frustrated and irritable, sleeping much more than usual as is her habit when she is depressed or under stress.

6. <u>Religious Confusion</u> - Christa was very confused about religious/spiritual issues. On her own when she was eleven or twelve she went to a Pentecostal church with friends. She obviously was experiencing a good deal of confusion at the Job Corps about where she stood on religious issues and continues to do so, trying to remain objective and saying she believes in God but does not know whether she is yet ready to worship him. She seems somewhat confused in her mind with such concepts as why God, if He is good, would allow bad things to happen to her, such as taking her grandmother. Her understanding of the occult/Satanism/witchcraft/devil worship is very simplistic and primitive, with Christa mostly going along with this to please Tadaryl and because other students at the Job Corps were so impressed. Christa has no clue as to any in-depth understanding of the Wiccans, crystals ("it has to do with your chi or aura or something like that"), and so forth. The so-called "Satanic overtones" of the killing are superficial. This did not at all approach a sacrifice, Satanic ritual, etc.

7. <u>Poor Parental Role Modeling</u> - Carissa has been a very poor role model for Christa in terms of teaching her an appropriate female role. Alicia pointed out the development of her own promiscuity and early (age fourteen) pregnancy because of her mother's glamorizing of sex. Carissa has contributed to Christa's poor self-esteem by setting her own needs ahead of Christa, i.e., sending her home to West Virginia when Danny Thompson made it clear he did not want

her girls with them. Carissa clearly has a good deal of leftover resentment about the problems Christa caused in her relationship with men, such as with Danny Thompson and Steve Kyaw.

Carissa has been very promiscuous, with most of her emotional investment being in the men in her life rather than in Christa. From birth on Carissa never had any time for Christa, for example, having only twelve days off Christa's first year of life and repeatedly dumping Christa and Alicia on their grandmothers, until both died and, as Alicia described it, both she and Christa were on their own at that point. Carissa said she visited Christa monthly at Swannanoa, but neither Peggy Hamlett nor Christa remember anything close to this number of visits.

Christa has been aware from an early age of her mother using marijuana and alcohol, with Christa logically interpreting this as meaning it was okay for her to use these substances as well. Her mother and maternal grandmother did not always consistently tell the truth and Christa has likewise developed this problem.

Carissa seems very out of touch, saying that she took Christa to church "for years" when this was actually until the age of two and even then it was probably Christa's grandmother who took her and not Carissa in view of her work schedule. She allowed Christa to live in her home with Brian and the only regret she expressed is how “terrible” she felt when she finally kicked Brian out. She talked about Christa not living with her father very much when she was growing up but this is belied by school records, with Christa spending quite a bit of time in West Virginia schools. Carissa talks of Christa doing better after she married Gerard but Gerard talks about Christa's behavior soon getting back to what it was prior to entering training school and with the police coming to their home every month. This was when Christa lived on the street, got pregnant, was gone for days at a time, lived with carnival men in a motel, was believed to be running drugs for someone in Durham, and so forth. It seems that Carissa is pretty much in a fantasy world where Christa is concerned.

Carissa does not believe a previous boyfriend, Steve, physically abused Christa despite the fact that Christa talked to several friends as well as Rose Wilson at juvenile court about this. Carissa was aware that Steve pinched her daughter on the breast after Christa pinched him on the penis when they wrestled but did not seem to see anything wrong with this. She allowed her "crazy" Aunt Norma to baby-sit for Christa despite having been physically abused herself by

Norma as a child. Carissa allowed her fourth husband, Danny Thompson, to beat Christa with a belt, saying she immediately left Danny when her daughters told her of this despite numerous episodes of his abuse reported by both Christa and Alicia and in spite of saying she separated from him ten times before divorcing him. She can't remember an ambulance being called for her daughter at the skating rink, but the stepfather "kind of" remembers it. She never knew her daughter was taking her car and money at night while she was sleeping, probably because she was passed out and was in a deep, alcoholic slumber.

Carissa was inconsistent in limit setting. She would ground Christa but seldom, if ever, follow through. As Kerry Clement described it, Carissa did not seem grown up herself much less able to parent a child. Alicia pointed out her mother's efforts to be Christa's friend rather than her mother and Gerard likewise described their relationship as more sisterly than mother-daughter. However, he himself sought to be Christa's friend rather than a father figure, for example, never telling Carissa that Christa, who did not have a driver's license, was taking her car at night. In essence, Christa had no parent figure to teach her right from wrong.

Carissa exhibits anti-social tendencies by virtue of the men with whom she associated, i.e., someone she later believed to be a Mafia hit man and Danny Thompson, charged with a crime that Carissa apparently knew was going to be committed and was charged with herself. She had her license revoked in West Virginia but continues to drive there anyway. She makes the decision after Christa is charged with murder to stop drinking and to start going to church. A longtime pot smoker, she smoked marijuana with both daughters and years ago tried to get her father to smoke pot as well. The Fotos family in general displays contempt for the rules of society, with Grandmother Fotos growing marijuana in her greenhouse and giving the plants to her friends and Grandfather Fotos three times being indicted for income tax evasion and carrying a gun into a courtroom.

8. A Loser - Christa shows a clear pattern of failing everything she attempts, such as not getting her driver's license and being fired from jobs. The only credit card she has ever had, from J.C. Penneys, she charged to the max and then skipped town without paying it off. At Swannanoa she was only supposed to be here for three months but was here for a year and three months because every time she got close to discharge she acted up, saying she did so deliberately

because she was afraid she would get into serious trouble if she came home and being able to identify the routine and structure of the training school as beneficial to her.

9. Pleasing Others - Also related to poor self-esteem is her willingness to "take the rap" for others. She believes that Tadaryl, a little younger than she, has a lot more on the ball than does she, who is never going to amount to anything anyway. Shadolla she considered a more or less innocent bystander despite the fact that Shadolla participated in the killing. Bereft of any real attachment to family as per Dr. Rose Wilson's evaluation, and Alicia, who said both she and her sister virtually raised themselves after their grandmother died and that she herself is closer to Carrie's children than she is to Christa, Christa's friends were and are of paramount importance to her. They are all she has, especially since she thinks so little of herself.

Christa is described by her friends as having terrible luck with men, only being attracted to losers who use her, such as Brian Wilson, a severely ill psychiatric patient, according to Dr. Wilson.

10. Sincere Desire to be a Nurse - Apparently, the possibility of actually making something of herself by entering the Job Corps was a strong determining factor in Christa returning after Christmas break despite her uneasiness about having been in trouble several times and fear she would be expelled.

Peggy Hamlett pointed out that Christa's desire to become a nurse seemed genuine, perhaps because she realized her mother had little to offer and the Job Corps was her only chance. Ginny Satterfield, previously the director of Sheaffer House, pointed out that Christa initiated arrangements to do volunteer work at nursing homes and seemed to genuinely enjoy this, perhaps because it evoked memories of Grandmother Pike. Christa told her friends, father, mother, stepfather, and Aunt Carrie that she was returning to the Job Corps after Christmas because she wanted them to be proud of her.

Perhaps because of Tadaryl's attention showing her she was worth something, Christa's self-esteem increased to the point that she actually wanted to make something of herself and for the first time in her life experienced the sense of pride that comes from achievement. This is a girl who had no discipline and no study skills frantically trying for once to do something respectable and noteworthy by completing a nurse's training

program in the Job Corps. Her need to keep Tadaryl happy and please him, however, put her in conflict with meeting academic/occupational goals, with the former winning out because of the intensity of her dependency and need for attention.

11. <u>No consistent treatment</u> - Although Carissa went through the motions of getting Christa counseling, in fact, she mostly just dabbled with it. Several of the social workers involved with this family, notably Peggy Hamlett and Kerry Clement, became aware that Carissa put on a good front but did not follow through. Counseling records reflect usually just a few sessions, with cancellations and no shows. Carissa did not abide by the mother/daughter contracts Ms. Clement attempted with her. She did not follow through on getting inpatient insurance for Christa as several recommended to her. She did not follow through on outpatient counseling for herself as Peter Kramer recommended.

Suggested Mitigation Themes

EXHIBIT NO. 6

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

007312

3/9 1-2P lunch

to Stanley, NC

3/9 @ 2 PM left Gastonia

- get off of 321 @ Lincolnton exit
- Hwy 27 West ≈ 10 miles

---

T/C 3/9 @ 2:09P (on cellular) to 704/827-2003
- spoke w/ Celeme Beals → MEC's mom
- not there @ time
- Mary Eliz. Codgell lives there (@ 7613 Roxboro Ln. (Stanley NC) but not there @ time
- MEC cld be @ Ms. Beals' sister's house (704/536-1403)

FILED (34)
APR 07 2009
Clerk of the Courts
Rec'd by

T/C 3/9 @ 2:13P (on cellular) 704/536-1403
no answer

T/C 3/9 @ 3:02P (from phone booth 704/827-2003 @ Lincolnton)
- told Ms. Beals I cldn't reach MEC @ 536-1403
- she said they've probbly gone out
- I said we'd call her back tonight to speak w/ Mary Eliz. ⟷ & if we cldn't catch her on the phone, I requested Mary Eliz. to call either me or Bill & I gave her our #s

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 17
DATE 4-7-08 ID ✓ Evd ____

CP:MARTIN:ATTY
112067

T/C by Bill 3/9 ≈ 6:15P 007313
to M. Martin in Hillsborough
→ out rt. then but wld
return ≈ 1 hr.

travelled on to Raleigh
listening to C. Pike
interview w/ WCT 7/24-25/95

3/9/96
7:30 PM arrived Raleigh

Relax Dinner until 10 PM then met Hansens

1.2 Mtg. w/ Carissa & Gerard Hansen
re: status, W interviews, trial
procedures, possibility of
testifying until 11:10 PM

Ask Eric E:
1) lack of emotion re: events
caused by disassociation?
2) lack of remembrance of
specifics caused by
disassociation?

doesn't remember specifics of this pt. after — wasn't hrg. anything
(memory prob) re: P/4
rock & throwing it
over & over

→ later, Tadaryl & Shadollah
told her what she did

→ has had flashbacks in jail (PTSD?)

3) piece of skull → "cldn't let go of it"
↳ to convince her of reality

CP:MARTIN:ATTY
112068

Notes of Julie Rice

EXHIBIT NO. 7

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leboeuf

JUDGE

*Diana McCoy, Ph.D.*
Clinical and Forensic Psychology

FILED (35)
APR 07 2009
Clerk of the Courts
Rec'd by

March 5, 1997

STATE OF TENNESSEE VS Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 8
DATE 4-7-08 ID ✓ Evd ✓

William C. Talman, Esq.
P.O. Box 506
Knoxville, TN 37901

**RE: Christa Pike**

Dear Bill,

The purpose of this letter is to relate the circumstances surrounding Christa's sentencing hearing and the role I played in it.

As you recall, I worked for 173 hours and received a fee of $20,000 after producing a 3 volume work on Christa describing her social history and development. During the interim that I was preparing this work, you repeatedly indicated that I would testify at her sentencing hearing. However, on the day before the sentencing hearing, March 29, 1996, you telephoned me in the afternoon, very distressed.

There were two major points which emerged during this discussion, as I recall. The first issue you introduced into our phone conversation was that the prosecutor was objecting to my report on the grounds that it was hearsay and the judge agreed with him such that the jury would not get my report. Accordingly, you felt my effectiveness as an expert witness would be limited, the first reason you gave me for not calling me to testify. I offered to call several attorneys with whom I had previously worked to get their opinions on this, and you encouraged me to do so.

Secondly, you had just that afternoon told both the Court and the prosecutor, the latter of whom was quite upset that he had not days earlier been provided such a voluminous piece of work for his perusal, that I had only given my extensive report to you the day before. You asked if I would testify, under oath, that this was the truth. I told you I would not be able to do that. In fact, I had given you my report on Sunday, March 24, and had told you the previous week, when I picked it up

8



620 Market Street, Suite 450 • Knoxville, Tennessee 37902

from Kinko's on March 21, that the report was ready at that time. I have documentation to substantiate this.

The ultimate outcome is that I did not testify at Christa's sentencing hearing but instead met with three of her family members at 7:30 a.m. that morning, Saturday, March 30, and over the next hour hastily attempted to prepare them for testimony. I do not feel that such short term notice adequately prepared these witnesses for the magnitude of the project in which they were to be involved that very morning.

I have always enjoyed working with you on a professional basis and I take serious issue with your previous accusations concerning any apparent breach of my ethical obligations and/or duties as regards Christa. If my recitation of these facts is inconsistent or different with your recollection, please contact me immediately. I would encourage you to make inquiry concerning whether this incident constitutes a breach of any duty to your client and her representation and/or any professional ethical violation. I do not want my letter to be misconstrued as accusatory or critical regarding your handling of the sentencing hearing.

It is my opinion that I performed my duties as an expert as diligently and thoroughly as they could be discharged. To describe this case as anything other than extremely complex and detail oriented would be an understatement. I remain surprised that the jury did not have the benefit of reviewing my work, either the report or through my testimony.

Sincerely,

Diana McCoy, Ph.D.
Clinical Psychologist

cc: Julie Martin, Esq.
file copy

Letter to Mr. Talman from Dr. McCoy

EXHIBIT NO. 8

Identified and made a part of the record this 2nd day of February, 2009.

JUDGE

Denial of alternative

007318

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 9
DATE 4-7-08 ID ____ Evd ✓

FILED MAR 18 1996

FILED (36) APR 07 2009 Clerk of the Courts

| | | |
|---|---|---|
| STATE OF TENNESSEE | ) | |
| | : | |
| v. | ) | No. 58183A |
| | : | |
| CHRISTA GAIL PIKE | ) | |

DIVISION III

MOTION CHALLENGING "DEATH QUALIFICATION" VOIR DIRE QUESTIONS AND PROPOUNDING ALTERNATIVE TO SAME

Comes Christa Gail Pike, by and through counsel, and challenges as unconstitutional any voir dire by the District Attorney General or the Court concerning prospective jurors' views on the issue of capital punishment. In support of her challenge, defendant states:

(1) She is charged with a capital offense and will be tried by a jury.

(2) In the course of voir dire, the District Attorney or the Court is expected to ask prospective jurors: "Are you conscientiously opposed to capital punishment?"

(3) The District Attorney or the Court is further expected to question and the challenge for cause any potential juror who responds in the affirmative to said question and, in addition, would not vote for death regardless of the evidence.

(4) The use of "death qualification" voir dire questions violates the defendant's right to an impartial jury drawn from a cross section of the community under the Sixth and Fourteenth Amendments to the United States Constitution and under the due process provisions of the Tennessee Constitution, and it excludes from the jury an identifiable segment of the community opposed to the death penalty.

(5) The use of "death qualification" voir dire questions results in a jury which is biased in favor of the prosecution and therefore violates defendant's right to an impartial trial under the Sixth and Fourteenth Amendments to the United States Constitution.

(6) Use of "death qualification" voir dire questions violates defendant's rights to equal protection under the law,



CP: MARTIN: ATTY
111415

since it arbitrarily singes out capital cases as cases in which the State is permitted to exclude potential jurors because of their views on punishment.

(7) If the Court restricts voir dire by the defense on the issues of punishment or questions of law but allows use by the State of "death qualification" voir dire, thereby affording the State an advantage in jury selection, defendant will be deprived of her right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitutions.

(8) Because a bifurcated trial is required in capital cases under Tenn. Code Ann. § 39-13-204, application of "death qualification" voir dire questions to potential jurors before the guilt or innocence phase of the trial allows a grave possibility of prejudice which cannot be justified by any State interest, and for which there is an easily accessible alternative.

Such an alternative would be the "don't ask; don't tell" procedure wherein after having been told the three options for punishment, the potential jurors are asked whether or not there is anything which would prevent or substantially impair their abilities to determine the facts, apply the law to the facts and follow the law without any specific reference to their abilities to impose the death penalty. It is logical to assume that any juror who is so strongly and diametrically opposed to the death penalty without regard to the facts of the case so as to be unable to impose a sentence of death would announce that particular belief if asked whether they could do their job as a juror. As this court is aware, people who hold an opinion on capital punishment, pro or con, are rarely silent on their views.

Such an approach finds support in Lockhart v. McCree, 476 U.S. 162 (1986) which dealt with jurors whose bias was so strong as to prevent or substantially impair their abilities to apply the law to the facts. In Lockart, the Court stated that

> "Prospective jurors come from many different backgrounds, and have many different attitudes and predispositions. The Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly

> carry out their sworn duty to apply the law to the facts of the particular case."

Lockhart v. McCree, 476 U.S. 162, 183-84 (1986). By focusing on the abilities of the potential jurors to follow the law and not necessarily what viewpoints such jurors hold, the Supreme Court has implied that it is not the viewpoint which is to be challenged, but rather the ability to follow the law in the face of a juror's particular views on capital punishment. Thus, an alternative method employing a "don't ask; don't tell" procedure is appropriate.

WHEREFORE, defendant prays that the use of "death qualification" voir dire be declared unconstitutional, and that it not be permitted in the course of this State's voir dire of potential jurors for her trial. In the alternative, defendant prays that the Court permit inquiry solely into the prospective jurors abilities to follow the law without specific reference to the death penalty as punishment (the "don't ask; don't tell" method).

Respectfully submitted,

CHRISTA GAIL PIKE

BY: ____________________

JULIE A. MARTIN
Attorney for Defendant
P.O. Box 426
Knoxville, TN 37901
423-523-7733

CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded to the office of the District Attorney General for Knox County, Tennessee, City/County Building, Suite 168, 400 Main Avenue, Knoxville, Tennessee, 37902.

This the 18th day of March, 1996.

____________________

qualchal.mot

Motion filed by Ms. Rice

EXHIBIT NO. 9

Identified and made a part of the record this 2nd day of February, 2009.

[signature]

JUDGE

**Subject:** **Christa Pike Brief Due Now**
**Date:** Sun, 1 Mar 1998 09:40:19 EST
**From:** WCTPC <WCTPC@aol.com>
**To:** legaljam@bellsouth.net

Hi Julie:

Where have you been? We have a brief due by no later than tomorrow. I thought that you were going to make changes, corrections or additions to the portions of the CCA brief that you had written and then e-mail or fax those changes to me. I have not heard from you. Apparently we had some mis-communication or mis-understanding. Also, I have tried a couple of times to call you, but did not get any answer or voice mail. Give me a call at your convenience. Don't worry or get upset the very worst that could happen is that they will kill our client and hold us in contempt of court (nothing like a little pressure, huh?). Seriously, don't get too excited. Just give me a call.

Bill

STATE OF TENNESSEE VS. Christa Gail Pike
CASE NO. 68280 EXHIBIT NO. 10
DATE 4-7-08 ID ____ Evd ✓

FILED (37)
APR 07 2009
Clerk of the Courts
Rec'd by

CP:MARTIN:ATTY
110868

Email from Ms. Rice to Mr. Talman

EXHIBIT NO. 10

Identified and made a part of the record this 2nd day of February, 2009.

Mary Bell Leuburg

JUDGE

Clerk of the Courts
Rec'd by

007324

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 6828 EXHIBIT NO. 11
DATE 4-7-08 ID ___ Evd ✓

**AFFIDAVIT**

FILED (38)
APR 07 2009
Clerk of the Courts
Rec'd by

STATE OF TENNESSEE
COUNTY OF KNOX

Comes now Affiant, Julie A. Martin, having been duly sworn, and states as follows:

1. I am co-counsel, along with Mr. William C. Talman, for Appellant Christa Gail Pike. Not only am I a solo practitioner, but I am also a single parent with sole responsibility for a two-year-old. Moreover, I am eight months pregnant.

2. I filed the second request for extension in this cause asking for thirty additional days because I knew of my hectic pending trial schedule. This court granted an extension for half that amount of time.

3. During the last two weeks, I have attempted to complete the work on Ms. Pike's brief in between the other scheduled matters for which I was legally and ethically obligated to prepare. I have attached a copy of pages from my calendar showing what was scheduled during that time. In addition to the scheduled matters, I have been obligated to put out a number of "fires," e.g. dealing with a defendant who walked away from court-ordered drug treatment in another city and finding a defendant who was mistakenly transported to prison prior to his trial. These matters were in addition to the personal matters to which I had to give my attention and time, e.g. doctors' appointments.

4. In addition to the trial which was heard on April 15, 1997, I have another felony trial scheduled for April 22, 1997. Although Ms. Pike's case is serious, these two clients also deserve prepared and competent counsel who can zealously and effectively represent them. As a result, I had to spend some of my time in the last two weeks preparing for Mr. Whitehead's trial, along with Mr. Owens' trial for which I am still preparing.

11

CP: MARTIN: ATTY
110332

5. I have tried to work both early in the morning and late at night on Ms. Pike's brief to such an extent that I feel I have risked the health of my unborn child. I have also worked on the weekends to the extent that was possible.

6. During this next work week once Mr. Owens' trial is heard, I anticipate being able to work on completing Ms. Pike's brief for the majority of three weekdays, plus I should have time on Saturday and Sunday for the finalization of the brief. I have attached a copy of my calendar for next week hereto.

7. I have no desire to cause undue delay or prejudice to the State in writing its brief nor this Court in hearing argument and rendering its decision in Ms. Pike's case. I am merely trying to ethically represent my client, Christa Pike, in a legally effective manner by giving this most serious of matters the time and attention which it deserves so that justice may be done.

Further, Affiant saith not.

JULIE A. MARTIN

Sworn to and subscribed before me, this 20th day of April, 1997.

Martha L. Keeney
Notary Public

My Commission Expires: 10 - 31 - 2000

*exten-3.aff*

Affidavit of Julie Rice

EXHIBIT NO. 11

Identified and made a part of the record this 2nd day of February, 2009.

JUDGE

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 6810 EXHIBIT NO. 12
DATE 4-7-08 ID____ Evd ✓

FILED
APR 07 2009
Clerk of the Courts
Rec'd by

39

WITNESS STATEMENTS

INTERVIEW AT JOB CORPS BARRY RICE, WILLIAM BROWN, 1/23/95

On 1/23/95 Mr. William Brown and I went to the Job Corps Building on Dale Avenue and interviewed several witnesses.

Captain Hudson was very co-operative with our investigation, however when we asked to interview the roommates of Christa Pike or anyone who might be helpful to our investigation, he brought all the witnesses into one big room at the same time.

I have identified each one of the people individually as I could and for those statements which I could absolutely attribute to an exact person I have done so with their own statement sheet.

The persons interviewed all at the same time as listed in my notes taken at the time were:

Cheryl Hodges
Candice Kahman
Pamela Fillers
Kim IloIlo
Shenika McQuinn

What they all said (at once) each chiming in with their story or nodding in agreement was:

(1) Tadaryl was always talking about he would kill somebody.
(2) Tadaryl had control over Christa.
(3) Tadaryl always told Christa how to act and what to do.
(4) Tadaryl had once beat Christa up and left her on the ground.
(5) Christa had fought/beat up other students for/over Tadaryl.
(6) Teresa Williams & Colleen were fighting over Sonny.
(7) Christa and Colleen were fighting/arguing.

There were conflicting statements whether Colleen dated black guys or not from the group.

Cheryl Hodges said she found the box cutter on Monday between 2:00-2:30pm.

Candice Kahman said she saw Tadaryl and Christa Thursday night at the Baskin Robins 31.

Shenika McQuinn refuted Christa's claim that Colleen had been in their room standing over Christa's bed at night with a box cutter. She said Colleen had never been in their room.



CP:MARTIN:ATTY
112073

Witness Statements

EXHIBIT NO. 12

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

# RELEASE

I, CHRISTA GAIL PIKE, by signature below, hereby give my full permission for my attorneys, William C. Talman and Julie A. Martin, to speak with any parties who are interested in the retelling of the trial of my case. I understand that Mr. Talman and Ms. Martin are still bound by the attorney-client privilege, and I understand that any information which they may tell about my case is limited to information which is public information, e.g. evidence at trial and in my court file, and their own personal experiences while working on my behalf. I further understand that Mr. Talman and Ms. Martin may eventually gain a pecuniary benefit from the retelling of my story, and I have no objection to this. Mr. Talman and Ms. Martin have my permission to do with the public aspects of my case as they see fit even if they profit from it financially.

I am signing below of my own free will and with the full understanding of what this Release means.

DATE: 5-1-96

Christa Gail Pike
CHRISTA GAIL PIKE

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. B
DATE 4-7-08 ID ____ Evd ✓

FILED (40)
APR 07 2009
Clerk of the Courts
Rec'd by

CO: MARTIN:ATTY
111134

Release

EXHIBIT NO. 13

Identified and made a part of the record

this 2nd day of February, 2009.

JUDGE

Training Manual about Death Penalty, Volume 1 of 3

Due to the size of this exhibit, it will be filed under separate cover and sent to the Criminal Court of Appeals.

EXHIBIT NO. 14-A

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Liebeaux

JUDGE

Training Manual about Death Penalty, Volume 2 of 3

Due to the size of this exhibit, it shall be filed under separate cover and sent to the Criminal Court of Appeals.

EXHIBIT NO. 14-B

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

Training Manual about Death Penalty, Volume 3 of 3

Due to the size of this exhibit, it shall be filed under separate cover and sent to the Criminal Court of Appeals.

EXHIBIT NO. 14-C

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

# WITNESS STATEMENTS

Brandy Leigh Rogers

Brandy said that Christa confessed to her that she had killed Colleen Slemmer and had carved a "devil symbol" on Colleen.

She said that Christa was "bragging " about what she had done.

Brandy did not believe her and Christa said she could prove she did it by taking Brandy to the place where she did it.

Brandy did not believe Christa had done anything to Colleen at that time but now thinks she killed Colleen.

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 15
DATE 4-7-08 ID____ Evd ✓

FILED (41)
APR 07 2009
Clerk of the Courts
Rec'd by

15

Statement of Brandi Rogers

EXHIBIT NO. 15

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leiberman

JUDGE

WITNESS STATEMENTS

Shandra Channel Harris

Ms Harris stated that Christa had borrowed a small meat cleaver/ hatchet from her sometime before the weekend of the killing.

She stated that Christa wanted "something sharp" but did not tell her what she planed to do with the cleaver.

Ms Harris is very hard to understand, and she also has a hard time relating to the time that events took place. For instance, in the same interview she indicated that she gave Christa the cleaver the prior weekend before the killing and Christa gave it back to her the Tuesday before the killing.

Then she said she didn't remember when Christa borrowed the cleaver but it was given back to her the Tuesday AFTER the killing. Christa was in custody on that Tuesday.

She does remember that she got the cleaver back and she put it away.

Next she said that Shedola had found the cleaver in its hiding place and took it away. She does not know how Shedola came to have her cleaver.

Ms Harris evidently has a lot to say but her sentences are disjointed and she constantly contradicts herself. The only thing she is really sure of is that the little meat cleaver/hatchet was hers and she at one time gave it to Christa.

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 16
DATE 4-7-08 ID____ Evd ✓

FILED (42)
APR 07 2009
Clerk of the Courts
Rec'd by________

Statement of Shandra Harris

EXHIBIT NO. 16

Identified and made a part of the record this 2nd day of February, 2009.

JUDGE

Eric S. Engum, Ph.D., J.D.
Cross Park Plaza • Suite D266
9111 Cross Park Drive
Knoxville, Tennessee 37923
~
(615) 531-2846 Fax
(615) 531-0560

Clinical Neuropsychology
Forensic Psychology

FILED
APR 07 2009
Clerk of the Courts
Rec'd by

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 17
DATE 4-8-08 ID ____ Evd ____

FILED 43
APR 07 2009
Clerk of the Courts
Rec'd by

# NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| NAME: | PIKE, CHRISTA GAIL |
| DOB: | 03-10-76 |
| CASE NUMBER: | 1995-029 |
| REFERRED BY: | William Talman, Attorney-at-Law |
| INITIAL CONTACT: | 05-24-95 |
| SUBSEQUENT CONTACTS: | 06-14-95, 06-30-95 and 08-29-95 |
| DICTATED: | 09-18-95 |
| TRANSCRIBED: | 09-22-95 |

Christa Gail Pike, a 19-year-old, white, single female, was evaluated upon her arrest and indictment on a charge of first-degree murder (12 January 1995). Miss Pike is charged in conjunction with the death of a fellow student, Colleen Schlemmer, with her two co-defendants, Tadaryl Shipp and Shadolla Peterson, all while students at the Knoxville Devision of Job Corp.

Miss Pike was referred for a comprehensive psychological and neuropsychological examination for the purpose of: 1) determining her competency to stand trial; 2) determining whether she suffered from a mental disease or defect which might exclude her from responsibility for the crime charged; 3) determining whether she suffered from a mental disease or defect which might relate to her diminished culpability for the charged offense; and, 4) the identification of potential mitigation factors should Miss Pike be convicted of the charged offenses.

**TESTS ADMINISTERED:**
Comprehensive psychological and neuropsychological evaluation were undertaken through initial clinical interview and Extended Mental Status Examination (24 May 1995 - 3.00 hours; 29 August 1995 - 1.00 hours) supplemented by administration of the Wechsler Adult Intelligence Scale-Revised (WAIS-R), the Halstead-Reitan Neuropsychological Battery (HRNB), the Benton Visual Retention Test (BVRT), the Hooper Visual Organization Test (HVOT), the Slosson Drawing Coordination Test (SDCT), the Stroop Color Word Test (SCW), the Grooved Pegboard (GP), the Selective Reminder Test (SRT), the Boston Naming Test (BNT), the Wechsler Memory Scale-Revised (WMS-R), the Test of Nonverbal Intelligence (TONI), the Wisconsin Card Sorting Test (WCST), the Visual Verbal Test (VVT), the California Verbal Learning Test (CVLT) and the Peabody Individual Achievement Test-Revised (PIAT-R).

In addition, personality, emotional and behavioral status were further evaluated through the administration of the Carlson

Psychological Survey (CPS), the Minnesota Multiphasic Personality Inventory with the Structural Summary (MMPI-2 and MMPI-2 SS), the Personality Assessment Inventory (PAI), the Motivation Analysis Test (MAT) and the Millon Clinical Multiaxial Inventory (MCMI-2).

**INITIAL CLINICAL INTERVIEW AND EXTENDED MENTAL STATUS EXAM:** On initial interview, Miss Pike presented as alert, oriented, open, accessible, responsive and cooperative. She demonstrated the ability to steadily maintain her attention span and her concentration was judged adequate for comprehending instructions and sufficient for carrying out tasks. There were no obvious signs of preoccupation, perplexity, preseveration or impotence in understanding. She demonstrated appropriate maintenance of task/goal orientation and persistence in work tolerance. Objectively, she demonstrated appropriate resistance to cognitive interference as reflected on the SCW (Word = 127; Color = 90; Color Word = 55).

Cognitively, Miss Pike was oriented to person, place, time and situation. Her speech and language skills appeared fluent and coherent with no signs of terseness, verbosity, misuse of language, pressure-of-speech or misuse of language. Her receptive language skills appeared intact in that she was able to follow complex three-step instructions. She was also able to detect the illogicalities in various absurd sentences (12/12 correct). Her expressive language skills also appeared within normal limits in that she was able to engage appropriately in antonym and synonym production. She also performed appropriately on the reversed words task. Her underlying thought processes appeared clear, logical and sequential with no signs of circumstantiality, tangentiality, disorganization, fragmentation, confusion or gross retardation of thought processes. She performed extremely well on sentence building tasks (7/7 correct), demonstrating appropriate cognitive organization abilities. She also demonstrated appropriate abstract reasoning in that she was able to interpret simple proverbs (6/8 correct) and fables (4/4 correct).

With respect to memory and information processing, Miss Pike performed extremely well both on the Two-Card Alternate Memory Task (44/52 correct) and on the Five-Card Sorting Task (8/10 correct). She also performed appropriately on the BVRT, a test of visual short term memory, reproducing all 10 of the designs correctly without producing any errors (expect 8 correct with 2 errors). There were no signs of, nor did Miss Pike report, any hypermnesia, paramnesia, retrograde or anterograde amnesia, confabulation, or fragmented and disordered recall. In fact, Miss Pike performed in the superior range on the Selective Reminder Test (128/144), a test of verbal learning ability. Miss Pike was able to master all 12 words after only 7 presentations. She also appeared intact with respect to basic spatial and perceptual skills as reflected on the HVOT (29/30 correct).

Basic problem solving skills also appeared intact in that Miss Pike obtained a TONI IQ of 124 (95th Percentile) which placed her in the

superior range of functioning. The TONI is a language-free measure of cognitive ability in which the client must examine differences and similarities among figures in a set and in the response alternatives, identify a rule that is operating among the figures, and, on the basis of that rule, select the correct response.

Accordingly, based upon the results of Extended Mental Status Examination, Miss Pike appeared to be performing within the average-to-high average range of intellectual functioning. This estimate is clearly superior to that which might normally be based upon both her educational and vocational background. By way of reference, Miss Pike does report that she formerly completed eighth grade and partially completed ninth grade while in training school. She ultimately obtained a GED High School Equivalency Diploma at age sixteen, obtaining a score of 263. After obtaining her GED, she reports no formal academic instruction but for her experience at Job Corp. Vocationally, she has worked at Mama Mia's Pizzeria in Durham, North Carolina, taking orders. In approximately October, 1994, she did commence at the Knoxville Job Corp Center to take nursing classes in order to become a Certified Nursing Assistant.

With regard to her overall physical status, Miss Pike does report a prior head injury with a brief loss of consciousness incurred in a motor vehicle accident (1991). Miss Pike reports that she did strike her head in the frontal area but has suffered no residual cognitive deficits, personality changes, or behavioral anormalities. She denies any history of seizures, comatose conditions, confusion/disorientation, losses of continuity, fugue/dissociative states, or hallucinatory/delusional occurrences. She states that she has had a past history of brief temper tantrums with general loss of awareness of her surroundings. She also reports some paranoid ideation and possible hallucinations when she first arrived in jail. She denies any visual, auditory, olfactory, gustatory, sensory or motor deficits. Motorically, she performed extremely well on the Grooved Pegboard bilaterally (Right = 56 seconds; Left = 55 seconds). She also performed flawlessly on the SDCT (100%, 0 errors), a test of visual-motor coordination and fine motor control.

With regard to a history of substance abuse, Miss Pike does report a history of severe marijuana dependence. She states that she originally started smoking cigarettes at age nine. Soon thereafter, she began experimenting with marijuana with increasing usage to three-to-four times per week by age twelve. By age fourteen, she states that she was smoking marijuana virtually everyday during the afternoon and evenings. She states that she has experimented with cocaine three times, LSD three-to-four times, amphetamines three-to-four times, opium two times, valium two times and percocets. She also reports a very troubling history of huffing air freshner, whiteout, rubber cement and rush commencing at approximately age thirteen. Upon her incarceration, she was prescribed Pamelor but has now recently been switched to Doxepin 50 mg QHS.

Affectively, Miss Pike was appropriate and an effective working rapport was readily established with this examiner. Throughout the multiple-clinical contacts, her continuum of mood ranged from mild dysphoria-to-happiness dependent upon the topic under conversation. She did demonstrate some limited tearfulness particularly when discussing the events and circumstances leading up to and including the alleged offense. She did not, however, demonstrate any signs of agitation, emotional lability, reduced frustration tolerance or irritability. She does report at least mild levels of anxiety, nervousness and tension based on the uncertainty of her situation. She also reports mild-to-moderate levels of clinical depression with some suicidal ideation. However, she has not and does not appear to be a risk of acting-out on her suicidal thoughts. She does state that her depression is exacerbated by feelings of helplessness, hopelessness and worthlessness. She does appear to possess fairly strong guilt feelings and significant remorse regarding her involvement with the alleged offense.

At present, Miss Pike reports that she suffers fairly significant insomnia due to her mind racing. She suffers early awakening as well as excessive daytime sleepiness. Her dream activity, though normal quantitatively, is qualitatively personified with themes of caged snakes, Malthus with sharp teeth and other fear-provoking phenomenon. She does report average-and-appropriate energy levels and normal appetite (height = 5'3"; weight = 130 pounds). Libido remains intact.

**NEUROPSYCHOLOGICAL TEST RESULTS:**
On the WAIS-R, Miss obtained a Full Scale IQ of 111 (77th Percentile) which placed her in the bright normal range of intellectual functioning. Miss Pike obtained a Verbal IQ of 112 (79th Percentile and a Performance IQ of 106 (66th Percentile).

Perusal of the Verbal subtest scores revealed a wide degree of scatter across cognitive capacities. Consistent with her educational background, her poorest performance was noted in Long Term Memory and General Fund of Information (5). At the other extreme, she performed in the very superior range with respect to abstract reasoning and verbal concept formation (16) demonstrating that despite her limited knowledge, she was able to make choices among semantic relationships based on similarity and consistency of meaning and to see potential changes of interpretations of objects and situations. She also performed grossly within normal limits on Vocabulary Development (9) suggesting her ability to remember meaningful connections between items of verbal information, the ability to produce words or ideas that conform to specific relationship requirements, and the ability to comprehend the meanings of words and ideas. She performed within normal limits in Social Comprehension and Judgment, demonstrating appropriate grasp of social conventionality by applying facts in a pertinent, meaningful and emotionally relevant manner. With regard to basic attention and concentration, Miss Pike performed extremely well on Digit Span (14). She also demonstrated the ability to maintain,

remanipulate, and reorganize memory traces as reflected on the Arithmetic subtest (10).

The Performance IQ of 106 revealed intact visual, spatial, perceptual and visual-motor skills. Visual scanning, visual alertness and attention to detail (12) were all in the above average range. She also performed in the above average range with regard to visual spatialization and perceptual organization as reflected on the Block Design (12) and Object Assembly (11) subtests. On Digit Symbol (9), she was grossly within normal limits with regard to visual-motor coordination, fine motor speed and speed of mental operation. She also performed grossly within normal limits on Picture Arrangement (9) which taps one's capacity to anticipate, judge and understand the various antecedents and consequences of events within a social milieu.

Further neuropsychological assessment was undertaken through the administration of the HRNB and a variety of ancillary assessment techniques. Overall, Miss Pike obtained a Russell-Neuringer Average Impairment Rating of 0.38 which placed her in the high normal range. In fact, considering the four most sensitive indicators of brain dysfunction in terms of level of performance; namely, the Impairment Index (0.00), the Category Test (13 errors), Part B of the Trail Making Test (54 seconds), and the Localization Component of the Tactual Performance Test (7/10 correct), Miss Pike's performances were in the high normal range in each instance. In fact, her extraordinarily high performances with regard to memory (WMS-R), learning (CVLT, SRT), conceptual skills (VVT), problem solving skills (WCST, TONI), and academic achievement (PIAT-R) strongly belie the presence of any underlying organic pathology. Stated alternatively, Miss Pike's excellent performance in neuropsychological assessment reveals the integrity of basic brain behavior relationships and belies the presence of any underlying brain damage. Below, in greater detail, are the results of neuropsychological assessment.

The most effective method of presenting neuropsychological test findings is through an analysis of each of the four basic functional units involved in all complex mental activity. The **first functional unit** includes those brain areas and processes involved with arousal, alertness and responsivity; i.e., attention, concentration and resistance to cognitive interference. On the Seashore Rhythm Test (30/30 correct), Miss Pike demonstrated the ability to attend to and discriminate rapidly presented auditory nonverbal stimuli. On the WAIS-R Digit Span (14), she performed within the superior range, recalling up to 9 digits forward and 7 digits reversed. Miss Pike also obtained a WMS-R Attention/Concentration Quotient of 115 (84th Percentile) which placed her in the bright normal range. She performed in the above average-to-superior range on Digit Span Forward (84th Percentile) and Reversed (97th Percentile) and in the above average range on Visual Memory Span Forward (55th Percentile) and Reversed (79th Percentile). As noted above, she also performed in the superior

range with regard to basic resistance to cognitive interference as reflected on the SCW (Color Word = 55).

The **second functional unit** includes those brain areas and processes involved in the sensation and initial processing of sensory information. Simple motor output is also included within this functional unit. On the Reitan-Klove Sensory Perceptual Examination, Miss Pike was intact with regard to basic visual, auditory and sensory input. She also performed appropriately bilaterally on Tactile Finger Recognition (Right = 0 errors; Left = 0 errors), Fingertip Number Writing (Right = 0 errors; Left = 0 errors), and Tactile Form Recogntion (Right = 8 seconds; Left = 8 seconds). Miss Pike also performed appropriately with regard to motor output as reflected on the Grooved Pegboard (Right = 56 seconds; Left = 55 seconds), Fingertapping (Right = 51 taps; Left = 50 taps), and Strength-of-Grip (Right = 26.5 kg; Left = 22.5 kg).

The third **functional unit** includes those brain areas and processes involved in the integration of sensory information, higher level perceptual skills, speech and language skills, sequencing, conceptual skills and memory. With regard to the integration of sensory information and higher level perceptual skills, Miss Pike performed extremely well on the Tactual Performance Test (TPT). The TPT utilizes a Modified Sequin-Goddard Form Board, a board with cutouts into which wooden shapes must be placed. To make this a tactile task, the individual is blindfolded and required to use somatosensory rather than visual cues to place the blocks. With the dominant right hand alone, Miss Pike placed all 10 blocks in 3 minutes, 0 seconds (expect less than 8 minutes, 18 seconds). With the nondominant left hand, she placed all 10 blocks in 3 minutes, 6 seconds (expect less than 4 minutes, 36 seconds). With both hands, she placed all 10 blocks in 1 minute, 58 seconds (expect less than 2 minutes, 48 seconds). She also performed appropriately both on Incidental Memory (9/10) and Localization (7/10) Components.

In terms of speech and language skills, Miss Pike performed appropriately on the Aphasia Screening Test, producing only 1 mild error of dyscalculia. She also performed appropriately on the Boston Naming Test (75/85 correct) reflecting appropriate word retrieval and expressive language skills. On the Speech Sounds Perception Test (57/60 correct), Miss Pike was able to match visual and auditory information. Miss Pike also performed extremely well on the PIAT-R, despite her very limited educational background. Overall, she obtained a PIAT-R Standard Score of 113 (81st Percentile) which translates to an above grade 12.9 equivalent. In fact, with the exception of spelling ability, all of Miss Pike's performances were at or above her stated level of academic achievement. By way of reference, her scores are summarized in the table below. It should be recognized that Standard Scores and Percentile Ranks are based upon the last grade completed, namely ninth grade.

| SUBTEST | GRADE EQUIVALENT | STANDARD SCORE | PERCENTILE RANK |
|---|---|---|---|
| General Information | >12.9 | 111 | 77 |
| Reading Recognition | >12.9 | 116 | 86 |
| Reading Comprehension | >12.9 | 124 | 95 |
| Total Reading | >12.9 | 123 | 94 |
| Mathematics | 11.5 | 105 | 63 |
| Spelling | 8.6 | 95 | 37 |
| Written Language | >12.9 | 111 | 77 |
| Total Test | >12.9 | 113 | 81 |

Miss Pike also performed within normal limits both on simple sequencing (Trails A = 34 seconds) and complex alternate sequencing (Trails B = 54 seconds). In addition, on the VVT (6 errors), a concept formation task, she demonstrated the ability to formulate two different concepts for a given set of stimuli. Essentially, she demonstrated the ability to sort stimulus objects into different classes based upon such properties as color, form, size, structural similarities, position and naming objects.

Miss Pike also performed in the very superior range with regard to basic memory skills as reflected on the WMS-R. In fact, Miss Pike obtained a WMS-R General Memory Quotient of 135+ (99th+ Percentile) with a Verbal Memory Quotient of 129 (97th Percentile) and a Visual Memory Quotient of 129 (97th Percentile). Verbally, Miss Pike was able to recall 42 of 50 facts from two short narrative passages (98th Percentile) and master all 8 Verbal Paired Associates after only two presentations. On the Short Term Visual Reproduction Task, she obtained a score of 39 out of 41 (93rd Percentile) and mastered all 6 Visual Paired Associates after only one presentation. Her Delayed Recall Memory Quotient of 138+ (99th+ Percentile) placed her again in the very superior range reflecting retention of previously mastered information. In fact, she recalled 39 of the 52 facts from the two short narrative passages (96th Percentile) and all 8 of the Verbal Paired Associates after a 30-minute delay. Similarly, she obtained a score of 40 out of 41 on the Visual Reproduction Task (99th Percentile) and retained all 6 Visual Paired Associates after a 30-minute delay.

The **fourth functional unit** includes those brain areas and processes involved in response planning, general cognitive organization, higher level problem solving skills and learning ability. On the Category Test (13 errors), Miss Pike performed in the superior range in terms of her ability to organize diverse stimulus material, to draw conclusions on the basis of her observations, to test her conclusions with respect to reality considerations, and to develop new hypotheses when her original inferences were not validated. As noted above, she also obtained a TONI Quotient of 124 (95th Percentile) which placed her in the superior range in terms of attending to and organizing multiple stimulus characteristics such as shape, position, direction or rotation,

contiguity, shading, size or length, movement, and pattern within the figures.

Miss Pike also performed in the superior range on the WCST, a test of problem solving, flexibility and responsivity to feedback. She completed all 6 of the sorting categories (expect 5.4) in but 82 trials while producing only 18 errors (expect 24.9). Her percentage of preseverative errors (11%) and her percentage of conceptual level responses (76%) were at or superior to expectation.

Finally, Miss Pike performed in the average-to-above average range with regard to basic learning ability. As noted above, she performed extremely well on the SRT (128/144 correct), mastering all 12 items after only 7 presentations. Also as noted above, she obtained rapid mastery on both the WMS-R Visual Paired Associates (1 trial) and Verbal Paired Associates (2 trials). Finally, on the CVLT, Miss Pike mastered 9, 12, 13, 12 and 15 of the 16 items in the Acquisition List. On the Interference List, she mastered 12 of the 16 items, a truly extraordinary performance. For both Short Delay Free Recall (13/16) and Cued Recall (15/16) and for Long Delay Free Recall (14/16) and Cued Recall (14/16), Miss Pike performed within normal limits. She also performed appropriately on the Long Delayed Recognition Task (16/16). Her recall style was personified by some excessive preseverations (15). However, there were no deleterious effects of retroactive or proactive interference. In addition, she produced a relatively normal serial position learning curve, engaged in appropriate semantic clustering, demonstrated a reasonable increment in words recalled per trial, and demonstrated appropriate percent recall consistency across acquisition trials.

**PERSONALITY ASSESSMENT:**
Assessment of personality, emotional and behavioral status were undertaken through the administration of the Carlson Psychological Survey (CPS), the Minnesota Multiphasic Personality Inventory (MMPI-2) with Structural Summary (MMPI-2-SS), the Personality Assessment Inventory (PAI), the Millon Clinical Multiaxial Inventory (MCMI-2) and the Motivations Analysis Test (MAT).

The CPS was designed primarily for those individuals falling under the aegis of the Criminal Justice System; i.e., intended primarily for individuals accused of or convicted of crimes or otherwise referred for socially deviant behavior. The CPS was designed to assess four basic content areas including Chemical Abuse (68th Percentile), Thought Disturbance (77th Percentile), Anti-Social Tendencies (76th Percentile) and Self-Depreciation (70th Percentile).

Individuals obtaining similar profiles typically have experienced poor social adjustment, particularly in relating to others. The results suggest that this client feels alienated, isolated, estranged, with the belief that others do not understand her or her situation. The results suggest that she may feel lonely, unhappy

and unloved. As a consequence, supportive and intimate relationships with others are typically seldom established or maintained. On the surface, these individuals may appear as cooperative and charming, however, underneath there may be some signs of anger, impulsivity, and feelings of anomie. Depression may also be apparent with feelings of inferiority and inappropriate affect. It is not uncommon for similar individuals to entertain suicidal thoughts.

On the MMPI-2, Ms. Pike produced a valid profile (L = 38T; F = 65T; K = 50T) though her response set did suggest some degree of moodiness, changeability, dissatisfaction, restlessness and opinionation. While the Ego-Strength Scale (45T) fell grossly within normal limits, there were indications of alienation from group norms (Re = 26T). There were also indications of emotional maladjustment manifest in anxiety, ineffectualness and pessimism in interpersonal relationships (Mt = 68T). Finally, there was clearly a lack of dominance in interpersonal relationships (Do = 25T) suggesting that this client is inefficient, feels inadequate to handle problems, and may be stereotyped in her approaches to solving problems. In addition, these individuals see themselves and are seen by others as submissive, weaker in face-to-face contacts, unassertive, unable to stand up for their own rights and opinions, and easily influenced by other people.

Overwhelmingly, individuals with low dominance, high maladjustment, and low social responsibility are far less likely to be in positions of responsibility and/or leadership since they have great difficulty in asserting themselves in even the most rudimentary situations. These individuals are typically highly ineffective in handling the problems and stresses of their life situations.

The obtained clinical profile is highly complex in that there may be more than one way to stress the relative waitings of the various scale elevations. In this examiner's opinion, the primary elevations are noted on the Psychopathic Deviate (92T), Paranoia (85T) and Schizophrenia (72T) Scales which reflect very severe characterological or personality impairments. The second aspect of the clinical profile is represented in elevations on the Depression (70T), Psychasthenia (72T) and Schizophrenia (72T) Scales, reflecting the psychic distress that this client is presently experiencing.

Returning to the primary feature or configuration of the clinical profile as represented in elevations on the Psychopathic Deviate, Paranoia and Schizophrenia Scales, it is clear that this pattern reflects chronic emotional disturbances which may have their genesis in early childhood experiences. Patients with such profile types are often described as being evasive and defensive about admitting to psychological conflicts and as being generally hostile, irritable and suspicious in their relationships with other people. They typically handle anxieties and conflicts by refusing to recognize their presence. These individuals are easily hurt by criticism and tend to suffer from ideas of reference. They are

often described as hostile, irritable, demanding, argumentative, resentful, suspicious, immature, narcissistic, ego-centric and self-indulgent. Rationalization and projection are noted defense mechanisms. Other symptoms may include ideas of reference, delusions, emotional lability, tension and anxiety. However, their typically extrapunitive ways of dealing with frustration do not prevent them from being quite tense, nervous and anxious. These individuals can be very demanding in a narcissistic and ego-centric way for attention, affection and sympathy with others. Inner conflicts about sexuality are often present and are likely to be responsible, among others, for characteristically poor interpersonal adjustment.

The second feature of the clinical profile is subsumed in the elevations of the Depression, Psychasthenia and Schizophrenia Scales. These elevations reveal a chronic symptom picture that includes the distress syndrome of depression, anxiety and nervousness combined with strong obsessional characteristics. The depression appears to be expressed primarily by feelings of helplessness, hopelessness and feelings of worthlessness. Patients with such profile types tend to be self-analytical and ruminatively introspective. They are typically intellectualizers who are overideational in their approaches to solving emotional problems. They complain of concentration and thinking difficulties and are apt to suffer from excessive indecision, doubts and vacillation. These clients are typically described as being fearful worriers who lack self-esteem and are proned to engage in suicidal rumination. They may also frequently exhibit the neurasthenic syndrome of weakness, fatigue and loss of interest in initiative. Not surprisingly, their socialization pattern is somewhat schizoid with a tendency to withdraw, be socially introversive and distant.

On the PAI, Ms. Pike did produce a valid profile though there was some mild inconsistency in her response to similar items (ICN = 64T) with some ideosyncratic responses to grossly pathological items (INF = 63T). There was also a notable and significant tendency to endorse items so as to present herself in a more negative (NIM = 66T) than positive (PIM = 38T) manner than may, in fact, be represented in the clinical profile. However, despite these mild tendencies, there appears little doubt that the overall clinical profile and resultant interpretative statements are essentially valid.

The clinical profile revealed primary elevations on Borderline (78T), Paranoia (70T) and Drug Dependence (76T) Scales. The configurations suggest a client with a history of substance abuse problems who is impulsive and affectively labile. Her drug use may be part of a more general pattern of self-destructive behavior. Her interpersonal relationships are likely to be volatile and characterized by marked conflict and even those relationships that have been maintained will have suffered some strain from her impulsive and hostile style of interaction. These relationships will likely to have deteriorated even further as a consequence of her drug abuse. She is likely to be particularly disinhibited

under the influence of drugs and may display particularly poor judgment and demonstrate other acting-out behaviors while she is intoxicated.

The elevation on the Borderline Scale suggest a client who is likely to be quite emotionally labile, manifesting fairly rapid and extreme mood swings and, in particular, probably experiencing episodes of poorly controlled anger. She appears uncertain about major life issues and has little sense of direction or purpose in her life as it currently stands. She is also quite impulsive and proned to behaviors likely to be self-harmful or self-destructive such as in sex, spending and/or substance abuse. She may also be at an increased risk for self-mutiliation and/or suicidal behavior (SUI = 78T). The profile also suggests significant suspiciousness and hostility in her relationships with others. She is proned to distrust the motives of those around her. Others probably see her as overly sensitive and she is likely to harbor feelings of resentment as a result of perceived slights and insults. She is quicker than most people to feel that she is being treated inequitably and often holds grudges against others, even if the perceived affront was unintentional.

Not surprisingly, her self-concept appears to involve a generally harsh, negative self-evaluation. She is proned to be self-critical and pessimistic, dwelling on past failures and lost opportunities with considerable uncertainty and indecision about her plans and goals for the future. Given this self-doubt, she tends to blame herself for setbacks and sees any prospects for future success as dependent upon the actions of others.

With regard to long term prognosis, the profile suggests interest in and motivation for a change (RXR = 31T). Her pattern of responses suggests an acknowledgment of important problems and the perception of a need for help in dealing with these problems. She does report a positive attitude towards the possibility of personal change, the value of therapy and the importance of personal responsibility. However, it should be noted that she is simultaneously experiencing recurrent suicidal thoughts which, in this examiner's opinion, emanate from her present evaluation of her life circumstances and immediate future. While it is true that only a small percentage of individuals who entertain suicidal thoughts actually act upon them, the elevation on this Scale (SUI = 78T) indicates that she should be monitored for any potential warning signs of self-destructiveness.

The results of both the MCMI-2 and the MAT add further support for the interpretations of the MMPI-2 and MMPI-2-SS and PAI. On the MCMI-2, Ms. Pike again produced a valid profile evidencing an appropriate amount of self-disclosure (X = 56BR), with no tendency to present herself in a more negative (Z = 59BR) or favorable (Y = 57BR) than the clinical profile might warrant.

Again, consistent with the results of the MMPI-2, the clinical syndrome scales revealed elevations on the Dysthymic Disorder (76T)

and Drug Dependence (73T) Scales. Again, consistent with the results of the MMPI-2 and PAI, there were no major signs of Thought Disorder (60BR), Major Depression (61BR) or Delusional Disorder (55BR).

On the other hand, there is a very significant elevation on the Borderline (87BR) Scale, a finding highly consistent with that noted on the PAI (see above). Patients obtaining similar elevations have conflicting and ambivalent feelings, intensely resenting those upon whom they depend but yet preoccupied with maintaining their emotional support. They show persistent attachment disorders with patterns of intense but unstable relationships. They tend to experience intense but labile emotions and frequent mood swings with recurrent periods of depression, anxiety or anger followed by dejection and apathy. They often will present with intense affect and with a history of impulsive behaviors. Manifestations of cheerfulness are often temporary coverups that mask deep fears of insecurity and fears of abandonment. They have very strong dependency needs and are preoccupied with seeking attention and emotional support and require considerable reassurance.

Often, these individuals seek attention and emotional support within romantic relationships (MAT Sweetheart/Spouse = 9). Often, these patients are particularly vulnerable to the separation from those who emotionally support them. Feelings of idealization are usually followed by feelings of devaluation and there is considerable interpersonal ambivalence extending even to within family relationships (MAT Home Parental = 3). These patients typically have unsatisfied basic needs for comfort (MAT Narcissism Comfort = 9) strongly suggesting not only emotional but also in basic creature comfort needs. These individuals lack a clear sense of their own identity and this uncertainty leads them to constantly seek approval, attention and reaffirmation. Splitting and projective identification are major defenses. These clients often have a punishing conscious and are prone to acts of self-mutilation and suicidal gestures (see PAI). They are also prone toward brief psychotic episodes and severe substance abuse.

**DX. IMP.:**

| | | |
|---|---|---|
| AXIS I: | 311.00 | Depressive Disorder Not Otherwise Specified |
| | 304.30 | Cannibus Dependence without Physiological Dependence, in Controlled Environment |
| | 305.90 | Inhalant Abuse by History |
| AXIS II: | 301.83 | Borderline Personality Disorder |
| AXIS III: | | No active medical illnesses or injuries |
| AXIS IV: | | Psychosocial Stressors: Present incarceration on charge of first-degree murder, pending trial, history of severe psychosocial and interpersonal difficulties, poor vocational and educational |

achievement, history of primary support group impairments, history of homelessness

AXIS V: Global Assessment of Functioning Scale: 55 (Moderate)

**SUMMARY:**
The results of intellectual and neuropsychological assessment reveal an extraordinarily intelligent young woman who performs within the superior range with regard to abstract reasoning, conceptual thinking, problem solving, flexibility and learning. Despite her history of educational and vocational difficulties, she is performing at least within the bright normal range of intellectual functioning (WAIS-R FSIQ = 111) with academic skills that far exceed her stated level of educational achievement (PIAT-R Grade 12.9). In addition, there are no signs of impairment in basic brain behavior relationships as reflected on the HRNB and a variety of ancillary assessment techniques. In fact, Ms. Pike is clearly intact within each of the four basic functional units including: 1) attention, concentration and resistance to cognitive interference; 2) sensory input and motor output; 3) higher level perceptual skills, conceptual skills, speech and language skills, memory and sequencing; and, 4) executive skills including problem solving and learning ability.

The results of personality assessment do not reveal any sign of psychosis but do, in fact, reflect very strong borderline personality characteristics (see PAI, MCMI-2). Essentially, the borderline personality characteristics reflect a pervasive and longstanding pattern of instability and interpersonal relationships, self-image, and affect combined with impulsivity in areas that are likely to be potentially self-damaging. It should be noted that individuals suffering from borderline personality disorder suffer from marked reactivity of mood resulting in intense episodic dysphoria, irritability and affective instability, often flowing from inappropriate and intense underlying anger. Because these individuals have experienced rejection in early life experience, they have had great difficulty in later establishing appropriate interpersonal or social relationships. Meaningful individuals in their lives seem to be defined in terms of extremes; that is, between marked overidealization and devaluation, hate, and disgust. In fact, often the same individual will, at differing times, be attributed both extreme negative and positive attributes.

As early dependency needs were not met within the family relationship, borderline patients often have very strong affectional needs which can hardly ever be fully satisfied. They have strong dependency needs which seem to emanate from frantic efforts to avoid real or imagined abandonment by supportive figures. Because they do not possess much ego-strength or dominance within interpersonal relationships, they are largely dependent upon others for their identity. When they do not receive validation from others, they tend to fragment both emotionally and behaviorally. In fact, at extreme levels, their chronic feelings

of emptiness may even lead to self-destructive behaviors and suicidal ideation. Aggressive impulses may also be unleashed which are both self-directed and other-directed. Because such individuals have very poor self-identities, they often lose their individuality to the norm of their reference group, no matter how deviant that norm might be.

Thank you very much for this most interesting and challenging matter. If you have any questions or require any further information regarding this most troubled young woman, please feel free to contact me at 615-531-0560.

Eric S. Engum, Ph.D., J.D.

Eric S. Engum, Ph.D., J.D.
Clinical Neuropsychologist

Dr. Eric Engum's Report

EXHIBIT NO. 17

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

Mr. Talman's Billing Record

Due to the size of this exhibit, it shall be filed under separate cover and sent to the Criminal Court of Appeals.

EXHIBIT NO. 18

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 16820 EXHIBIT NO. 17
DATE 4-08 ID ___ Evd ✓

# IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
## DIVISION III

STATE OF TENNESSEE, ]
Plaintiff, ]
]
vs. ] No.: 58183-A
]
CHRISTA GAIL PIKE, ]
Defendant. ]

FILED BY MARTHA PHILLIPS CLERK MAR 8 1996 KNOX COUNTY CRIMINAL COURT

FILED (44) APR 07 2009 Clerk of the Courts Rec'd by

## EX PARTE MOTION UNDER SEAL FOR APPOINTMENT AND PAYMENT OF EXPERT IN THE OCCULT, SATANIC WORSHIP AND RITUAL ABUSE TO ASSIST DEFENSE

Comes the Defendant, Christa Gail Pike, by and through Counsel who respectfully moves this Honorable Court, pursuant to Tennessee Code Annotated § 40-14-207(b) and Supreme Court Rule 13(2)(B)(10), to appoint William Bernet, M.D., as an expert to assist the Defense in trial in this capital case and to authorize payment for services rendered in connection with the preparation of this case for trial as well as any trial testimony. As grounds and in support thereof, the Defendant would show unto the Court as follows:

1. The Defendant has been indicted by the Knox Grand Jury with he offenses of First Degree Murder and Conspiracy to Commit First Degree Murder. The State has filed formal written notice of it's intention to seek the death penalty against the Defendant, Christa Gail Pike, and statute authorizes this Court to appoint experts to assist in the preparation of capital cases.

2. That the facts of this case involve a very brutal and gruesome killing of the victim in this case and it may well become necessary to argue during the penalty phase of this case about the punishment to be imposed against this defendant, i.e., infliction of the death penalty.

3. Counsel reasonably believes that testimony regarding satanic worship, the occult and ritual abuse will undoubtedly become a factor during the trial of this case and the Defendant needs to have an expert available to testify in this area.

4. That Counsel has searched extensively for an expert in these fields and has located Dr. Bernet, who is employed by the Psychiatric Hospital at Vanderbilt University Medical Center, Nashville, Tennessee. Dr. Bernet has provided Counsel with a fee schedule, which is attached hereto, setting forth his hourly rate of $250.00. Counsel would submit that this fee is

reasonable given the difficulty of finding a qualified expert in these fields. A copy of Dr. Bernet's *curriculum vitae* is attached hereto for the court's consideration.

5. After meeting with Dr. Bernet and discussing the issues in this case, Counsel reasonably believes that the total fee, including trial testimony, if any, should not exceed Ten Thousand Dollars ($10,000.00).

6. That this motion and any related ex parte order of the Court be filed by the Clerk under seal pursuant to the previous order of the Court, entered in this cause on or about the 1st day of June, 1995.

7. Counsel specifically reserves the right to seek authorization for additional funding for for these services if the need should arise.

This the 8th day of March, 1996.

CHRISTA GAIL PIKE

BY: [signature]

William C. Talman
Supreme Court BPR# 012262
Attorney for Defendant, Christa Gail Pike
P.O. Box 506
Knoxville, Tennessee 37901

Telephone: (423) 579-9060
Facsimile: (423) 573-2032

# VANDERBILT FORENSIC PSYCHIATRY

1601 Twenty-Third Avenue South
Nashville, Tennessee 37212-8645

Expert Witnesses in Civil and Criminal Actions
Involving Adults, Children, and Families

| | Telephone | Fax |
|---|---|---|
| William Bernet, M.D. | (615) 327-7130 | (615) 327-7114 |
| Barry Nurcombe, M.D. | (615) 327-7019 | (615) 327-7136 |
| | | |
| Lawrence Gaines, Ph.D. | (615) 327-7099 | (615) 327-7136 |
| Joseph LaBarbera, Ph.D. | (615) 327-7009 | (615) 327-7136 |
| Michael Tramontana, Ph.D. | (615) 327-7144 | (615) 327-7136 |

## Fee Schedule

The hourly fee for forensic services provided by psychiatrists and psychologists is $250. The billable activities include the time spent with clients and family members in conducting the evaluation; meetings with other personnel involved in the case; telephone conferences; reviewing records; writing reports; library research, if required; depositions; court appearances; and travel time. Expenses will be included for out-of-town trips, for transportation, food, accomodations.

The minimum time allotted for a deposition is two hours, or $500.

The minimum time allotted for a court appearance is four hours, or $1000.

There will be a charge for appointments, depositions, and court appearances which are canceled without proper notice. That is, it is necessary to cancel the event by 12:00 noon of the preceding day. If the event is canceled before that time, there will be no charge. If the event is canceled after that time, there will be a charge for the actual time allotted or for two hours, whichever is less.

If a private individual is requesting the evaluation, payment is required either through a retainer paid in advance or at the time services are rendered. An itemized receipt will be provided.

If an attorney is requesting the evaluation, the attorney should write a letter to Vanderbilt Forensic Psychiatry indicating that he or she understands the fee schedule and agrees to it. In complex or lengthy evaluations, a retainer may be required in advance.

# CURRICULUM VITAE OF WILLIAM BERNET, M.D.

**Office Address.**
The Psychiatric Hospital at Vanderbilt
1601 Twenty-Third Avenue South
Nashville, TN 37212

(615) 327-7130 FAX (615) 327-7114

**Background.**

Born November 25, 1941, in Omaha, Nebraska. Lived in Oklahoma, California, Massachusetts, Washington, D.C., Virginia, and Tennessee. Also three years in Japan.

**Education.**

Secondary School: attended Tokyo American High School - Narimasu; graduated from St. John's Preparatory School, Worcester, Mass., in 1959.

College: A.B. Summa Cum Laude from Holy Cross College, Worcester, Mass., in 1963.

Medical School: M.D. from Harvard Medical School, Boston, Mass., in 1967.

**Professional Training.**

Internship in medicine-neurology-pediatrics at the Bronx Municipal Hospital Center, Bronx, N.Y., 1967-68.

Residency in adult psychiatry at Massachusetts Mental Health Center, Boston, Mass., 1968-70.

Fellowship in child psychiatry at Massachusetts Mental Health Center, Boston, Mass., 1970-72.

**Previous Hospital Appointments and Clinical Experience.**

Staff psychiatrist at South Shore Mental Health Center, Quincy, Mass., 1970-72.

Assistant in Medicine (Psychiatry) at Peter Bent Brigham Hospital, Boston, Mass., 1971-72.

Staff psychiatrist at Area D Community Mental Health Center, St. Elizabeths Hospital, Washington, D.C., 1972-76. Consultant in psychiatry to the same program, 1976-79.

Staff psychiatrist, Director of Children's Unit, Director of Adolescent Unit, Psychiatric Institute, Washington, D.C. 1974-83.

Associate Director, Child and Adolescent Services, Psychiatric Institute, Washington, D.C., 1980-83.

Member of Metropolitan Psychiatric Group, 1974-88, and a member of its board of directors, 1983-86.

Director of Family Counseling Centers, various locations in Virginia, 1978-88.

Medical Director, The MidSouth Hospital, Memphis, Tennessee, 1988-90.

Director of Community Services, Charter Lakeside Hospital, Memphis, Tennessee, 1990-92.

**Current Professional Activities.**

Medical Director, The Psychiatric Hospital at Vanderbilt, Nashville, Tennessee, 1992 to the present.

Private practice of general psychiatry, child psychiatry, and forensic psychiatry, 1970 to present.

**Experience in Forensic Psychiatry.**

Employed part-time as psychiatrist at Massachusetts Correctional Institute, Concord, Mass., 1969-70.

Employed part-time as consultant to the Boston Municipal Court, 1972.

Member of Department of Forensic Psychiatry, Metropolitan Psychiatric Group, Washington, D.C., 1979-88.

Member of Forensic Psychiatry Program, Georgetown University Medical Center, Washington, D.C., 1983-88.

Consulting psychiatrist to Forensic Services Program, MidTown Mental Health Center, Memphis, Tennessee, 1988-92.

Director of Vanderbilt Forensic Psychiatry, 1992 to the present.

Testified as expert witness in District of Columbia, Alabama, Arkansas, Iowa, Kentucky, Maryland, Mississippi, Tennessee, and Virginia.

**Faculty Appointments.**

Clinical Instructor in the Department of Psychiatry, Georgetown University School of Medicine, 1972-75.

Clinical Assistant Professor in the Department of Psychiatry, Georgetown University School of Medicine, 1975-88.

Clinical Assistant Professor in the Department of Psychiatry, UT-Memphis, 1988-92.

Associate Clinical Professor in the Department of Psychiatry, Vanderbilt University, 1992 to the present.

**Board Certification.**

Certified by American Board of Psychiatry and Neurology in Psychiatry, 1974.

Certified by American Board of Psychiatry and Neurology in Child Psychiatry, 1975.

Certified by American Board of Forensic Psychiatry, 1987.

Certified by Tennessee Department of Mental Health and Mental Retardation to perform forensic evaluations, 1988 and 1993.

**Licenses.**
Currently licensed to practice medicine in Tennessee.

**Professional Societies.**
Fellow of American Psychiatric Association.
Fellow of American Academy of Child and Adolescent Psychiatry.
American Society of Adolescent Psychiatry.
American Association of Psychiatry and the Law.
American Group Psychotherapy Association.
American Academy of Forensic Sciences.
Tennessee Association for Child and Adolescent Psychiatry, President, 1990-91.
Tennessee Association for Adolescent Psychiatry, President, 1993-95.

**Military Service.**
Military obligation satisfied by serving in U.S. Public Health Service, 1972-74.

**Community Activities.**
Board member of CASA (Court Appointed Special Advocate), Memphis and Shelby County Juvenile Court, 1989-92.

Board member of CASA, Davidson County Juvenile Court, 1992-present. President-elect of the board, 1993-94.

Character Education Committee, Metropolitan Public Schools, Nashville, 1994.

**Publications.**

Bernet W. (1979). The Early Adolescent in the Day Hospital. Focus. Fall, 1979, pp 2-5.

Bernet W. (1982). The Technique of Verbal Games in Group Therapy with Early Adolescents. Journal of Child Psychiatry 21:496-501.

Bernet W. (1983). The Therapist's Role in Child Custody Disputes. Journal of Child Psychiatry 22:180-183.

Bernet W. (1989). Psychiatric Custody and Visitation Evaluations. Tennessee Family

Law Letter 3 TFLL 2, p. 9.

Meeks J., and Bernet W. (1990). The Fragile Alliance: An Orientation to the Psychiatric Treatment of the Adolescent (4th edition). Malabar, Florida: Kreiger Publishing Company.

Bernet W. (1991). Capitalization of Diagnoses in DSM-IV. Letter to Editor. American Journal of Psychiatry 148:1610.

Bernet W. (1992). 1992: The 300th anniversary of the Salem witch trials. Memphis Health Care News. June 1992.

Bernet W. (1993). False Statements and the Differential Diagnosis of Abuse Allegations. Journal of Child and Adolescent Psychiatry 32:903-910.

Bernet W. (1993). Humor in Evaluating and Treating Children and Adolescents. The Journal of Psychotherapy Practice and Research 2:307-317.

Bernet W. (1993). The Noncustodial Parent and Medical Treatment. Bulletin of the American Academy of Psychiatry and the Law 21:357-364. Reprinted in Tennessee Family Law Letter 8 TFLL 4, pp 15-19, 1994.

Licamele W., Bernet W. (1995). Group Therapy of Children and Adolescents. In Comprehensive Textbook of Psychiatry, 6th edition, edited by Kaplan H., Saddock B. Baltimore: Williams & Wilkins.

Bernet W. (1995). Running Scared: Therapists' Excessive Concerns About Following Rules. Bulletin of American Academy of Psychiatry and the Law 23:367-374.

Bernet W. (1995). Children of Divorce: A Practical Guide for Parents, Attorneys, and Therapists. New York: Vantage Press, Inc.

Bernet W. (in press). The Child and Adolescent Psychiatrist and the Law, chapters for next edition of Basic Handbook of Child Psychiatry.

Bernet W. (in press). Designing Visitation for Children of Divorce. The Custody Newsletter. Furlong, PA: Village Publishing.

**Submitted for Publication.**

The Differential Diagnosis of Ritual Abuse Allegations

The Importance of Humor in the Psychotherapy of Children and Adolescents

Child Maltreatment, for Current Diagnosis and Treatment in Psychiatry

Interviewing Adolescents, for Current Diagnosis and Treatment in Psychiatry

**Book Reviews.**

Psychiatric Examination of Children, Third Edition, by James Simmons, M.D., for Journal of Child Psychiatry, 1983.

Child Custody Mediation, by Florence Bienenfeld, Ph.D., for the Journal of Child Psychiatry, 1984.

Psychopathology in Childhood, by Juliana Lachenmeyer, Ph.D., and Margaret Gibbs, Ph.D., for Journal of Child Psychiatry, 1984.

Grown-up Abused Children, by James Leehan and Laura Wilson, for International Journal of Group Psychotherapy, 1986.

Basic Adolescent Psychiatry, by Derek Steinberg, reviewed for Journal of Clinical Psychiatry, 1989.

Sexual Trauma in Children and Adolescents: Dynamics and Treatment, by Diane Everstine, Ph.D., and Louis Everstine, Ph.D., reviewed for Journal of Clinical Psychiatry, 1990.

Instinctual Stimulation of Children: From Common Practice to Child Abuse, by John Weil, M.D., reviewed for Journal of Clinical Psychiatry, 1990.

The Uses of Writing in Psychotherapy, by Patricia Kelley, Ph.D., reviewed for International Journal of Group Psychotherapy, 1990.

Psychiatric Malpractice, by Robert Simon, M.D., and Robert Sadoff, M.D., reviewed for Journal of Clinical Psychiatry, 1992.

Protecting Children from Abuse and Neglect: Foundations for a New National Strategy, by Gary B. Melton, Ph.D., and Frank D. Barry, M.S., for the Bulletin of Psychiatry and the Law, 1995.

10-95\OFFICE\CV.001

Ex Parte Motions Filed under Seal Regarding Dr. Benet

EXHIBIT NO. 19

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Liebowitz

JUDGE

Letter to Dr. Benet

LAW OFFICES OF
WILLIAM C. TALMAN, P.C.
*Attorney at Law*
*P.O. Box 506*
*Knoxville, Tennessee 37901-0506*

*Telephone:* *(423) 579-9060*
*Facsimile:* *(423) 573-2032*

*International Internet*
WCTPC@LLR.COM

March 8, 1996

FILED (45)
APR 0 7 2009
Clerk of the Courts
Rec'd by ________

William Bernet, M.D.
The Psychiatric Hospital at Vanderbilt
1601 Twenty-Third Avenue South
Nashville, Tennessee 37212

**VIA FACSIMILE TRANSMISSION TO: (615) 327-7114**

RE: State v. Pike
Knox County Criminal Court No.: 58183-A

Dear Dr. Bernet:

With reference to our meeting earlier this week, I have obtained authorization from the Criminal Court to retain you in this case as an expert to testify regarding satanic worship, the occult and ritual abuse. A copy of the Court's order is also being faxed herewith. You are authorized to contact either of the psychologists already involved in this case regarding data gathered by them and any findings or opinions that they may have in this case. Dr. Eric Engum, whose telephone number is (423) 531-0560, has performed tests relevant to Ms. Pike's psychological profile and Dr. Diana McCoy, whose telephone number is (423) 688-1303, has prepared the mitigation data and a profile fro that perspective of the case.

By copy of this letter, I am authorizing and requesting Dr. Engum and Dr. McCoy to cooperate with you and to provide whatever information that you may reasonably need in order to testify as an expert. I look forward to speaking with you again early next week and to working with you in this case. If you should have any questions or comments concerning this matter, please feel free to contact my office.

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 20
DATE 4-9-08 ID ___ Evd ✓

Very truly yours,

[signature]

William C. Talman

cc: by facsimile to Dr. Engum & Dr. McCoy

20

007364

EXHIBIT NO. 20

Identified and made a part of the record this 2nd day of February, 2009.

JUDGE

One Page of Notes

arrived 6:40 P → work on jury mots

3/14 @ 7:10 P Mtg w/ BT, BR, EE, JM on Δ

EE talked w/ Dr. Bernet
he feels he'll be talking re: satanic aspects viz-a-viz premeditation

1) Bernet wants EE's rpt.
2) Stmts of all Δ's
3) very specific details of crime
4) narratives anyone's got
5) any part of social hist'y on Δ from McCoy
→ prob. w/ disclosure
6) autopsy rpt.
7) any docs. re: observations of satanism in JC overall
→ Senate rpt. → eg. prevalence
8) historical recds re: Δ's substance abuse
→ ques: why Δ & Tadaryl didn't smoke dope that day (before or after)

A) she's out of mj
B) she knew she was going to kill & wanted clear head
C) didn't have time w/ school
D) wanted clear head to kick her ass
(mj wld slow her reflexes)

Pat Pollack - orientation dude, "buddy" to all students
C. Bebber = good friends w/ Pollack; Pollack int'd in weird stuff
~~[illegible]~~ Slemmer came to Pollack & said was seeing T. Wms. boyfriend (Sonny Reeves) - Wms. came back & her & her friends (incl'g Δ) were giving Slemmer a hard time

000539

T. Wms - Δ hinted she was going to fight Slemmer - saw Slemmer & Δ leaving - next day "Δ acting like cat that [illegible]

[redacted]

EXHIBIT NO. 21

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

007368

IN THE CRIMINAL COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 108280 EXHIBIT NO. 22
DATE 4-8-08 ID ____ Evd ✓

STATE OF TENNESSEE, ]
Plaintiff, ]
vs. ]
CHRISTA GAIL PIKE, ]
Defendant. ]

FILED BY MARTHA PHILLIPS CLERK
FEB 29 1996
KNOX COUNTY CRIMINAL COURT KNOXVILLE

No.: 58183-A

## EX PARTE MOTION UNDER SEAL FOR ADDITIONAL FUNDING FOR PAYMENT OF MITIGATION SPECIALIST TO ASSIST DEFENSE

Comes the Defendant, Christa Gail Pike, by and through Counsel who respectfully moves this Honorable Court, pursuant to Tennessee Code Annotated § 40-14-207(b) and Supreme Court Rule 13(2)(B)(10), to authorize additional funding for payment of Diana McCoy, Ph.D., as a mitigation specialist for the Defendant in this capital case for services rendered in connection with the preparation of this case for trial as well as any trial testimony. As grounds and in support thereof, the Defendant would show unto the Court as follows:

1. This Court has previously appointed Dr. McCoy as a mitigation specialist to assist Counsel in the preparation of this case for trial and to testify as an expert witness during the trial of this capital case.

2. That Dr. McCoy, in preparation for trial, which is presently scheduled to begin on March 18, 1996, has exhausted the funds previously authorized by the Court since the preparation of this case has required Dr. McCoy to travel outside of the Knoxville, Tennessee area to gather data and interview informants necessary to the preparation of mitigation materials relevant to her expected testimony during the trial of this case.

3. That the facts of this case involve a very brutal and gruesome killing of the victim in this case and it may well become necessary to argue during the penalty phase of this case about the punishment to be imposed against this defendant, i.e., infliction of the death penalty.

4. That this motion and any related ex parte order of the Court be filed by the Clerk under seal pursuant to the previous order of the Court, entered in this cause on or about the 1st day of June, 1995.

5. In the original order seeking appointment of a mitigation specialist, Counsel informed

FILED (41)
APR 07 2009
Clerk of the Courts
Rec'd by____________

the court and specifically reserved the right to seek authorization for additional funding for mitigation support services should the need arise.

This the 29th day of February, 1996.

CHRISTA GAIL PIKE

BY: ______________________

William C. Talman
Supreme Court BPR# 012262
Attorney for Defendant, Christa Gail Pike
P.O. Box 506
Knoxville, Tennessee 37901

Telephone: (423) 579-9060
Facsimile: (423) 573-2032

Ex Parte Motion about Funding

EXHIBIT NO. 22

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

*Diana McCoy, Ph.D.*
Clinical and Forensic Psychology
200 Midlake Drive, Suite C • Knoxville, TN 37918 • (615) 688-1303

April 19, 1996

Bill Talman, Esq.
P.O. Box 506
Knoxville, TN 37901

RE: Christa Gail Pike - expenses

Dear Bill:

Enclosed please find a statement and copies of receipts for expenses incurred during the last week of preparing for the trial. These expenses exceeded that amount approved, and any help you can give in defraying these costs would be greatly appreciated.

With kindest regards,

Diana

Diana McCoy, Ph.D.
Clinical Psychologist

FILED (48)
APR 07 2009
Clerk of the Courts
Rec'd by

23A

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 23
DATE 4-11-08 ID ___ Evd ✓

23A

*Diana McCoy, Ph.D.*
Clinical and Forensic Psychology
200 Midlake Drive, Suite C • Knoxville, TN 37918 • (615) 688-1303

April 19, 1996

**STATEMENT**

Bill Talman, Esq.
P.O. Box 506
Knoxville, TN 37901

**RE: CHRISTA GAIL PIKE - EXPENSES**

| DATE | EXPENSE | COST |
|---|---|---|
| 3/19/96 | Federal Express bill for Swannanoa records | $ 24.25 |
| 3/20/96 | Copying and binding of report & file at Kinko's | $ 238.85 |
| 3/21/96 | Rebinding - Kinko's | $ 4.29 |
| 3/26/96 | Enlargements/Christa's history charts at Kinko's | $ 83.89 |
| **4/19/96** | **TOTAL** | **$ 351.28** |

FedEx.

## REMITTANCE ADVICE

Payment Due in 15 Days of Invoice Date

| ACCOUNT NUMBER | INVOICE NUMBER | DATE |
|---|---|---|
| 1132-3233-1 | 5-759-32788 | 03/19/96 |

BILLING INQUIRIES?
FAX: 800-548-3020
PHONE: 800-622-1147

24.25
AMOUNT DUE IN U.S. $

1 AIRBILLS

113232335759327884900024257 4

00306****************** 3-DIGIT 379

APPLIED PSYCHOLOGICAL SERVICES
200 MIDLAKE SR STE C
KNOXVILLE, TN 37918

To ensure proper credit, please return this document with your remittance.

Mail Payment to:

FEDEX
P.O. Box 1140
Memphis, TN 38101-1140
PLEASE DO NOT STAPLE OR PAPER CLIP
T.I.N.: 71-0427007

QUESTIONS? CALL OUR CUSTOMER ACCOUNT SERVICES, 800 622 1147, 7AM 6PM (CST) MONDAY FRIDAY (IN MEMPHIS, TN, CALL 901-397-2000)
TO ENSURE PROPER CREDIT PLEASE RETURN THE REMITTANCE ADVICE (1ST PAGE OF THIS INVOICE) WITH YOUR PAYMENT
MAIL TO FEDERAL EXPRESS CORP., P.O. BOX 1140 DEPT A MEMPHIS, TN 38101 1140

FedEx M-0145 6/95

FedEx.

BILL TO: APPLIED PSYCHOLOGICAL SERVICES
200 MIDLAKE SR STE C
KNOXVILLE, TN 37918

## RECIPIENT ACTIVITY SUMMARY

PAGE 1 OF 1
DATE 03/19/96
INVOICE NO. 5-759-32788 ACCOUNT NO. 1132-3233-1

| TRACKING NOS REFERENCE | SENDER'S NAME AND ADDRESS | RECIPIENT INFORMATION AND PROOF OF DELIVERY | PACKAGES & WEIGHT | SERVICES | CHARGES | NET CHARGES |
|---|---|---|---|---|---|---|
| 5061181436<br>05216165 1 | PAT HALL<br>DIV OF YOUTH, THE<br>705 PALMER DR<br>RALEIGH, NC 27603<br>SHIPPED 02/20/96 | DR DIANA MCCOY<br>CLINICAL & FORENSIC PSYCHOLOG<br>200 MIDLAKE DR STE C<br>KNOXVILLE, TN 37918 AA<br>DELIVERED:02/21/96 09:52<br>SIGNED: B.KINNANE | 1/ 2 | PRIORITY PAK | 24.25 | 24.25 |
| | | | | | | |
| | | | | | | |
| | | RECIPIENT SUBTOTAL | 24.25 | PAY THIS AMOUNT | | 24.25 |

QUESTIONS? CALL OUR CUSTOMER ACCOUNT SERVICES, 800 622 1147, 7AM 6PM (CST) MONDAY FRIDAY (IN MEMPHIS, TN, CALL 901 397 2000)
TO ENSURE PROPER CREDIT PLEASE RETURN THE REMITTANCE ADVICE (1ST PAGE OF THIS INVOICE) WITH YOUR PAYMENT
MAIL TO FEDERAL EXPRESS CORP., P.O. BOX 1140, DEPT A, MEMPHIS, TN 38101 - 1140

FedEx M 0145 6/95

007373

007374

1st 2nd BIN #

ko's the Copy Center (423) 281-9678
Broadway
e 140
ville, TN 37918

| TITY | UNIT PRICE | DISC. | AMOUNT |
|---|---|---|---|
| 192 | 0.15 | 0.00 | 28.80 |
| S/S F1 Prc Resume Papers | | | |
| 592 | 0.07 | 0.00 | 181.44 |
| S/S F1 Prc White, Ltr, Legal, 3H | | | |
| 6 | 0.25 | 0.00 | 1.50 |
| S/S F1 Prc Resume Cardstock | | | |
| 6 | 0.99 | 0.00 | 5.94 |
| D SPIRAL BIND NO COVER , | | | |
| 3 | 0.99 | 0.00 | 2.97 |
| D SPIRAL BIND NO COVER . | | | |

SUB-TOTAL
TAX
TOTAL
CHECK SALE
CHANGE
CUSTOMER ID

COOY

eipt Number : 189271 Register 14
te : 03/20/96
me :
-Worker :
inko's Thanks You For Your Patronage

te 3/20 Time 9AM Acct. #
McCoy First P.O. #
Work # 688-1303
Job Name Home # 689-9071

3 copies @ 100% size % on Wt E-3 paper type

t by pads of Laminate

TABS PC PCR Front BC-11 Back BC-11

Pricing:

ERT TABS
7 SECTIONS -
HERE. COPY
ON RES. PAPER WHERE ORIGINALS
ARE.

Thank you for bringing your project to Kinko's. Your work has been examined and meets the specifications you requested. Should you have any questions, please contact the manager or shift supervisor.

KNOXVILLE V
5034 N. Broadway
Knoxville, TN 37918
Phone: (423) 281-9678
Fax: (423) 281-9876

OPEN 24 HOURS

kinko's®
Your branch office

Kinko's
the copy center

| | 1st | 2nd | BIN # |
|---|---|---|---|

ate In 3/25/96 Due Date 3/26/96 Time 8:00 am Acct. #

ust./Acct. Name McCOY DIANA P.O. #

Last First

ddress Work #

ontact Job Name Home #

B&W Color Accent Color Over size

1:1 1:2 2:2 2:1

8.5 x 11 8.5 x 14 11 x 17

1 copies @ size % on paper type

In Out

S FB VB HB Spine Color TABS

PC PCR Front

Comments/Instructions

Kinko's the Copy Center (423) 281-9678
5034 Broadway
Suite 140
Knoxville, TN 37918

| QUANTITY | UNIT PRICE | DISC. | AMOUNT |
|---|---|---|---|
| 37 | 0.50 | 0.00 | 18.50 |
| OVERSIZE FULL SERVE BOND PER SQ FOOT | | | |
| 20 | 2.95 | 0.00 | 59.00 |
| AUX MOUNTING BASIC PER SQ FT | | | |

| | |
|---|---|
| SUB-TOTAL | 77.50 |
| TAX | 6.39 |
| TOTAL | 83.89 |
| CHECK SALE | 83.89 |
| CHANGE | 0.00 |
| CUSTOMER ID | MCCOY |

DIANAWER.

Receipt Number : 190401 Register 3
Date : 03/26/96
Time : 8:27 AM
Co-Worker : 23
Kinko's Thanks You For Your Patronage

Thank you for bringing your project to Kinko's. Your work has been examined and meets the specifications you requested. Should you have any questions, please contact the manager or shift supervisor.

KNOXVILLE V
5034 N. Broadway
Knoxville, TN 37918
Phone: (423) 281-9678
Fax: (423) 281-9876
*Manager: Chris Mitchell*

kinko's®
Your branch office

000175

Counter: Key On: Finishing: Quality Checked:

CGP

Kinko's the Copy Center (423) 281-[illegible]
5034 Broadway
Suite 140
Knoxville, TN 37918

| QUANTITY | UNIT PRICE | DISC. | AMOUNT |
| --- | --- | --- | --- |
| 4 | 0.99 | 0.00 | [illegible] |

BIND SPIRAL REBIND

| | |
| --- | --- |
| SUB-TOTAL | [illegible] |
| TAX | [illegible] |
| TOTAL | [illegible] |
| CASH SALE | [illegible] |
| CHANGE | [illegible] |

Receipt Number : 189512 Register [illegible]
Date : 03/21/96
Time : 2:09 PM
Co-Worker : 11
Kinko's Thanks You For Your Patronage

Letter to Mr. Talman from Dr. McCoy

EXHIBIT NO. 23-A

Identified and made a part of the record this 2nd day of February, 2009.

JUDGE

LAW OFFICES OF
**WILLIAM C. TALMAN, P.C.**
*Attorney at Law*
P.O. Box 506
Knoxville, Tennessee 37901-0506

*Telephone: (423) 579-9060*
*Facsimile: (423) 573-2032*

*International Internet*
*WCTPC@COUNSEL.COM*

January 30, 1997

Diana McCoy, Ph.D.
Clinical & Forensic Psychology
Centre Square One
620 Market Street, Suite 450
Knoxville, Tennessee 37902

RE: **State v. Pike**

Dear Dr. McCoy:

I received payment this week from the Administrative Office of the Courts for the reimbursement of the expenses that you incurred as a result of copying, enlargements, etc., which you had prepared at my request during our trial preparations for this case. Therefore, enclosed herewith please find a check in the amount of $327.03, which represents the full amount of the receipts for expenses that you tendered to my office. If you should have any questions or comments concerning this matter, please feel free to contact my office.

Very truly yours,

William C. Talman

cc: file copy

Enclosure

legal.wp/clients/pike/mccoy.exp

FILED (49)
APR 07 2009
Clerk of the Courts
Rec'd by

STATE OF TENNESSEE VS. Pike
CASE NO. 68280 EXHIBIT NO. 23B
DATE 4-8-08 ID____ Evd ✓

23B

23B

Letter to Dr. McCoy from Mr. Talman

EXHIBIT NO. 23-B

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

*Diana McCoy, Ph.D.*
Clinical and Forensic Psychology
200 Midlake Drive, Suite C • Knoxville, TN 37918 • (615) 688-1303

February 29, 1996

Bill and Julie:

I'm thinking of combining these marriage charts on Carissa and Glenn and blowing them up into one large exhibit for court to show the large number of people in and out of Christa's life contributing to attachment difficulties, and hence her intense bonding to Tadaryl.

Another exhibit, showing her many, many school changes, would help substantiate the attachment issue.

I also think an exhibit of the family showing their addictive problems (Grandmother and Grandfather Fotos, Great Grandfather Privett, Mom and Dad, Sister, Ex-bother-in-law) would be illustrative of Christa having learned that taking drugs and alcohol as per family role modeling is <u>the</u> way of dealing with the negative feelings and the problems of life, not to mention the possible inherited tendencies toward addictive behavior. This would leave Christa vulnerable to being overtaken by her emotions and subject to rages, a condition exacerbated by the borderline personality condition resulting from her unstable life and failure to bond. I need to explore Glenn's family tree a little more with respect to the addiction problem.

I still need to get birth records from Appalachian Regional Hospital in Beckley and Charleston Area Health Center. I am going to try to get records from Bluefield Community Hospital as well, where Christa had a tonsillectomy and hemorrhaged at age 5. I need to find out the hospital where Christa was taken after overdosing in the sixth grade and get those records. I want to talk to Dr. Gregory Straw in Durham, although Carissa tells me Dr. Straw has lost these records. I want to talk to Brian Hammond for his perspective. I would like her arrest record from Orange County, if you will please subpoena this.

Lastly, I am very interested in how other Job Corps students and teachers viewed the Christa-Tadaryl-Colleen-Satanism thing and am very much in need of Barry Rice's assistance in locating these individuals.

Diana

FILED (50)
APR 07 2009
Clerk of the Courts
Rec'd by________

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 24
DATE 4-8-08 ID____ Evd ✓

24

## 301.83 Borderline Personality Disorder

### *Diagnostic Features*

The essential feature of Borderline Personality Disorder is a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins by early adulthood and is present in a variety of contexts.

Individuals with Borderline Personality Disorder make frantic efforts to avoid real or imagined abandonment (Criterion 1). The perception of impending separation or rejection, or the loss of external structure, can lead to profound changes in self-image, affect, cognition, and behavior. These individuals are very sensitive to environmental circumstances. They experience intense abandonment fears and inappropriate anger even when faced with a realistic time-limited separation or when there are unavoidable changes in plans (e.g., sudden despair in reaction to a clinician's announcing the end of the hour; panic or fury when someone important to them is just a few minutes late or must cancel an appointment). They may believe that this "abandonment" implies they are "bad." These abandonment fears are related to an intolerance of being alone and a need to have other people with them. Their frantic efforts to avoid abandonment may include impulsive actions such as self-mutilating or suicidal behaviors, which are described separately in Criterion 5.

Individuals with Borderline Personality Disorder have a pattern of unstable and intense relationships (Criterion 2). They may idealize potential caregivers or lovers at the first or second meeting, demand to spend a lot of time together, and share the most

007382



intimate details early in a relationship. However, they may switch quickly from idealizing other people to devaluing them, feeling that the other person does not care enough, does not give enough, is not "there" enough. These individuals can empathize with and nurture other people, but only with the expectation that the other person will "be there" in return to meet their own needs on demand. These individuals are prone to sudden and dramatic shifts in their view of others, who may alternately be seen as beneficent supports or as cruelly punitive. Such shifts often reflect disillusionment with a caregiver whose nurturing qualities had been idealized or whose rejection or abandonment is expected.

There may be an identity disturbance characterized by markedly and persistently unstable self-image or sense of self (Criterion 3). There are sudden and dramatic shifts in self-image, characterized by shifting goals, values, and vocational aspirations. There may be sudden changes in opinions and plans about career, sexual identity, values, and types of friends. These individuals may suddenly change from the role of a needy supplicant for help to a righteous avenger of past mistreatment. Although they usually have a self-image that is based on being bad or evil, individuals with this disorder may at times have feelings that they do not exist at all. Such experiences usually occur in situations in which the individual feels a lack of a meaningful relationship, nurturing, and support. These individuals may show worse performance in unstructured work or school situations.

Individuals with this disorder display impulsivity in at least two areas that are potentially self-damaging (Criterion 4). They may gamble, spend money irresponsibly, binge eat, abuse substances, engage in unsafe sex, or drive recklessly. Individuals with Borderline Personality Disorder display recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior (Criterion 5). Completed suicide occurs in 8%–10% of such individuals, and self-mutilative acts (e.g., cutting or burning) and suicide threats and attempts are very common. Recurrent suicidality is often the reason that these individuals present for help. These self-destructive acts are usually precipitated by threats of separation or rejection or by expectations that they assume increased responsibility. Self-mutilation may occur during dissociative experiences and often brings relief by reaffirming the ability to feel or by expiating the individual's sense of being evil.

Individuals with Borderline Personality Disorder may display affective instability that is due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days) (Criterion 6). The basic dysphoric mood of those with Borderline Personality Disorder is often disrupted by periods of anger, panic, or despair and is rarely relieved by periods of well-being or satisfaction. These episodes may reflect the individual's extreme reactivity to interpersonal stresses. Individuals with Borderline Personality Disorder may be troubled by chronic feelings of emptiness (Criterion 7). Easily bored, they may constantly seek something to do. Individuals with Borderline Personality Disorder frequently express inappropriate, intense anger or have difficulty controlling their anger (Criterion 8). They may display extreme sarcasm, enduring bitterness, or verbal outbursts. The anger is often elicited when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. Such expressions of anger are often followed by shame and guilt and contribute to the feeling they have of being evil. During periods of extreme stress, transient paranoid ideation or dissociative symptoms (e.g., depersonalization) may occur (Criterion 9), but these are generally of insufficient severity or duration to warrant an additional diagnosis. These episodes occur most frequently in response to a real or imagined abandonment. Symptoms tend to be transient, lasting minutes or hours.

The real or perceived return of the caregiver's nurturance may result in a remission of symptoms.

### *Associated Features and Disorders*

Individuals with Borderline Personality Disorder may have a pattern of undermining themselves at the moment a goal is about to be realized (e.g., dropping out of school just before graduation; regressing severely after a discussion of how well therapy is going; destroying a good relationship just when it is clear that the relationship could last). Some individuals develop psychotic-like symptoms (e.g., hallucinations, body-image distortions, ideas of reference, and hypnagogic phenomena) during times of stress. Individuals with this disorder may feel more secure with transitional objects (i.e., a pet or inanimate possession) than in interpersonal relationships. Premature death from suicide may occur in individuals with this disorder, especially in those with co-occurring Mood Disorders or Substance-Related Disorders. Physical handicaps may result from self-inflicted abuse behaviors or failed suicide attempts. Recurrent job losses, interrupted education, and broken marriages are common. Physical and sexual abuse, neglect, hostile conflict, and early parental loss or separation are more common in the childhood histories of those with Borderline Personality Disorder. Common co-occurring Axis I disorders include Mood Disorders, Substance-Related Disorders, Eating Disorders (notably Bulimia), Posttraumatic Stress Disorder, and Attention-Deficit/Hyperactivity Disorder. Borderline Personality Disorder also frequently co-occurs with the other Personality Disorders.

### *Specific Culture, Age, and Gender Features*

The pattern of behavior seen in Borderline Personality Disorder has been identified in many settings around the world. Adolescents and young adults with identity problems (especially when accompanied by substance use) may transiently display behaviors that misleadingly give the impression of Borderline Personality Disorder. Such situations are characterized by emotional instability, "existential" dilemmas, uncertainty, anxiety-provoking choices, conflicts about sexual orientation, and competing social pressures to decide on careers. Borderline Personality Disorder is diagnosed predominantly (about 75%) in females.

### *Prevalence*

The prevalence of Borderline Personality Disorder is estimated to be about 2% of the general population, about 10% among individuals seen in outpatient mental health clinics, and about 20% among psychiatric inpatients. It ranges from 30% to 60% among clinical populations with Personality Disorders.

### *Course*

There is considerable variability in the course of Borderline Personality Disorder. The most common pattern is one of chronic instability in early adulthood, with episodes of serious affective and impulsive dyscontrol and high levels of use of health and mental health resources. The impairment from the disorder and the risk of suicide are greatest

in the young-adult years and gradually wane with advancing age. During their 30s and 40s, the majority of individuals with this disorder attain greater stability in their relationships and vocational functioning.

### *Familial Pattern*

Borderline Personality Disorder is about five times more common among first-degree biological relatives of those with the disorder than in the general population. There is also an increased familial risk for Substance-Related Disorders, Antisocial Personality Disorder, and Mood Disorders.

### *Differential Diagnosis*

Borderline Personality Disorder often co-occurs with **Mood Disorders**, and when criteria for both are met, both may be diagnosed. Because the cross-sectional presentation of Borderline Personality Disorder can be mimicked by an episode of Mood Disorder, the clinician should avoid giving an additional diagnosis of Borderline Personality Disorder based only on cross-sectional presentation without having documented that the pattern of behavior has an early onset and a long-standing course.

Other Personality Disorders may be confused with Borderline Personality Disorder because they have certain features in common. It is, therefore, important to distinguish among these disorders based on differences in their characteristic features. However, if an individual has personality features that meet criteria for one or more Personality Disorders in addition to Borderline Personality Disorder, all can be diagnosed. Although **Histrionic Personality Disorder** can also be characterized by attention seeking, manipulative behavior, and rapidly shifting emotions, Borderline Personality Disorder is distinguished by self-destructiveness, angry disruptions in close relationships, and chronic feelings of deep emptiness and loneliness. Paranoid ideas or illusions may be present in both Borderline Personality Disorder and **Schizotypal Personality Disorder**, but these symptoms are more transient, interpersonally reactive, and responsive to external structuring in Borderline Personality Disorder. Although **Paranoid Personality Disorder** and **Narcissistic Personality Disorder** may also be characterized by an angry reaction to minor stimuli, the relative stability of self-image as well as the relative lack of self-destructiveness, impulsivity, and abandonment concerns distinguish these disorders from Borderline Personality Disorder. Although **Antisocial Personality Disorder** and Borderline Personality Disorder are both characterized by manipulative behavior, individuals with Antisocial Personality Disorder are manipulative to gain profit, power, or some other material gratification, whereas the goal in Borderline Personality Disorder is directed more toward gaining the concern of caretakers. Both **Dependent Personality Disorder** and Borderline Personality Disorder are characterized by fear of abandonment; however, the individual with Borderline Personality Disorder reacts to abandonment with feelings of emotional emptiness, rage, and demands, whereas the individual with Dependent Personality Disorder reacts with increasing appeasement and submissiveness and urgently seeks a replacement relationship to provide caregiving and support. Borderline Personality Disorder can further be distinguished from Dependent Personality Disorder by the typical pattern of unstable and intense relationships.

Borderline Personality Disorder must be distinguished from **Personality Change Due to a General Medical Condition**, in which the traits emerge due to the direct

effects of a general medical condition on the central nervous system. It must also be distinguished from **symptoms that may develop in association with chronic substance use** (e.g., Cocaine-Related Disorder Not Otherwise Specified).

Borderline Personality Disorder should be distinguished from **Identity Problem** (see p. 685), which is reserved for identity concerns related to a developmental phase (e.g., adolescence) and does not qualify as a mental disorder.

## ■ Diagnostic criteria for 301.83 Borderline Personality Disorder

A pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

(1) frantic efforts to avoid real or imagined abandonment. **Note:** Do not include suicidal or self-mutilating behavior covered in Criterion 5.

(2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation

(3) identity disturbance: markedly and persistently unstable self-image or sense of self

(4) impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating). **Note:** Do not include suicidal or self-mutilating behavior covered in Criterion 5.

(5) recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior

(6) affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days)

(7) chronic feelings of emptiness

(8) inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights)

(9) transient, stress-related paranoid ideation or severe dissociative symptoms

Letter to Mr. Talman and Ms. Rice from Dr. McCoy

EXHIBIT NO. 24

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

*WILLIAM C. TALMAN, P.C.*
*Attorney at Law*
*P.O. Box 506*
*Knoxville, Tennessee 37901-0506*

*Telephone: (615) 579-9060*
*Facsimile: (615) 573-2032*

September 15, 1994

Mr. Lance B. Bracy
Chief Disciplinary Counsel
Board of Professional Responsibility
of the Tennessee Supreme Court
1101 Kermit Drive, Suite 730
Nashville, Tennessee 37217

Dear Mr. Bracy:

In my last correspondence to your office, dated July 28, 1994, I stated that I was going to consult with more experienced counsel prior to making a report to the Board regarding our internal review of fee claims submitted to the State in connection with court appointed indigent cases. In consulting with said counsel, I was reminded that, according to the Knoxville News Sentinel, the State was or is conducting a criminal investigation into these fee claim matters and that some two dozen lawyers were under investigation. Considering what my advice would generally be to anyone facing or involved in a criminal investigation, I have decided that the more prudent course of action for me to take would be to wait to make any report to the Board regarding this matter until the issue of criminal liability is resolved. I would like to make it clear that I would like very much to cooperate with the Board and to resolve this matter as expeditiously as possible, but that common sense and better legal judgment dictate otherwise at this juncture.

As soon as the issue regarding criminal liability or further investigation is resolved or when this matter is determined to be a civil disagreement only, I will provide a report to the Board of the results of my internal review of said fee claims. Your understanding and continued cooperation in this matter would be very greatly appreciated.

Very truly yours,

William C. Talman

cc: file copy

FILED (51)
APR 07 2009
Clerk of the Courts
Rec'd by

STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 25
DATE 4-8-08 ID____ Evd ✓

Letter to Board of Professional Responsibility

EXHIBIT NO. 25

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

007389

AUG 30 1995


*WILLIAM C. TALMAN, P.C.*
*Attorney at Law*
*P.O. Box 506*
*Knoxville, Tennessee 37901-0506*

*Telephone: (615) 579-9060*
*Facsimile: (615) 573-2032*


August 28, 1995

Honorable Sandy Garrett
Disciplinary Counsel
Board of Professional Responsibility
of the Supreme Court of Tennessee
1101 Kermit Drive, Suite 730
Nashville, Tennessee 37217

**CERTIFIED MAIL -- RETURN RECEIPT REQUESTED NO.: P 091 954 964**

RE: Your File No. 13624-2(K)-SG

Dear Ms. Garrett:

Enclosed herewith please find my response to the summary of complaint received from your office. I appreciate the courtesy that you demonstrated during our previous telephone conversation wherein I had requested additional time within which to respond to this complaint.

If you should have any questions or comments concerning this matter, or if you should require any additional information, please feel free to contact my office at your convenience.

Very truly yours,

William C. Talman

cc: file copy

Enclosures

FILED (52)
APR 07 2009
Clerk of the Courts
Rec'd by

STATE OF TENNESSEE VS. Christa Pike
CASE NO 68280 EXHIBIT NO. 26
DATE 4-8-08 ID ____ Evd ✓

Letter from Mr. Talman to Sandy Garrett

EXHIBIT NO. 26

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Lanbow

JUDGE

CD/Photos of Fotos' Slaughter House

Filed under separate cover.

EXHIBIT NO. 27

Identified and made a part of the record

this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

CD/Video of Slaughtering Animals

Filed under separate cover.

EXHIBIT NO. 28

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

# THE DEATH PENALTY AND MITIGATION

By: Diana McCoy, Ph.D.

*[Editor's Note: Dr. McCoy is a Knoxville forensic psychologist who specializes in death penalty litigation and has served as mitigation expert in many cases. She has testified in the guilt phase of homicide cases numerous times as well. Dr. McCoy wishes to express her appreciation to **Bill Redick** for his helpful comments in preparing this article.]*

All too often the fact that every death penalty case is really two trials, a guilt/innocence trial and a sentencing trial, is ignored. This posture is aided and abetted by the fact that many times the defendant wants to focus exclusively on the fact that he did not do the crime of which he is charged and is in denial about the very real possibility that he may be convicted. Defendants can often foil even those attorneys who appreciate the importance of carefully preparing for the sentencing phase by "stonewalling" about important background information in an effort to stress their normalcy and the extreme unlikelihood that they would ever engage in such culpable behavior. This can make it very difficult to proceed with mitigation.

Because the awesome responsibility of the attorney who has assumed a death penalty case is so overwhelming, it is sometimes tempting to share the defendant's head in the sand mentality and go into denial along with him. This is especially tempting since typically the defense attorney is focusing the lion's share of his/her efforts on the guilt phase. To wait until the day before or the morning of the sentencing trial based on a misplaced sense of complacency, i.e., that jurors will not sentence a woman or a nineteen year old to death, and to then make a last ditch effort to save your client's life is bound to be viewed as a half-hearted measure at best, illustrating to the jury that even you do not think your client's life is worth the effort to adequately prepare for trial. The jury assumes that you, as the defendant's supposed confidante, know "the real truth." Thus, skimping on preparation conveys an important corroborating message regarding the defendant's guilt and your sense of his worth that they will not fail to appreciate. The guilt and sentencing phase are complexly intertwined, and strategy for both phases should be carefully thought out well in advance of the trial beginning to ensure that the guilt phase plants the seeds so essential for a successful penalty phase.

### Develop a Mitigation Team

Because of the intense, time consuming work necessary to uncover evidence helpful in mitigation, it is recommended that you hire a mitigation expert/investigator team to help orchestrate the sentencing phase of the trial. A capital murder case is not the time to feel possessive. Peoples and Thomson (1998), in the *California Death Penalty Defense Manual,* stress the importance of a team approach emphasizing an interdisciplinary perspective to provide the "myriad of skills" attorneys are neither trained nor educated to perform.

With a number of personalities all working toward the same common goal, at least one is likely to connect with the defendant and not only access heretofore crucial data he/she has kept secret out of shame and embarrassment but may also be able to provide the defendant the emotional sustenance necessary to negotiate the stress and outright terror of a capital trial. Often defendants suffer from serious personality disorders and counsel must use care in preventing the team members from being played against each other, a highly destructive process for all concerned.

Funds for mitigation experts, investigators, and trial consultants are available in capital cases. In the event that the trial judge is loathe to approve funds for services, this is an appealable issue. The Tennessee Supreme Court and Sixth Circuit Court of Appeals have ruled on the importance of all available mitigation material being put before the jury in sentencing. State v. Odom (1996) held that at a sentencing hearing it was not harmless error that the mental health expert was not permitted to testify about the defendant's background, but constituted reversible error. Goad v. State (1996) held that ". . . defense counsel was ineffective in failing to present the available expert mitigating evidence of mental illness which would have substantially strengthened the mitigation case of the defense." In Austin v. Bell (1997) the Sixth Circuit held that trial counsel's performance during the sentencing phase was deficient and prejudiced his defense because he presented no evidence. Similarly, a federal judge ruled in the post-conviction case of Abu-Ali Abdur' Rahman v. Bell (1998), in which this author served as mitigation expert, that the defense at the original trial had not presented existing evidence that might have proven helpful in the penalty phase of his trial, granting him a new sentencing trial.

The mitigation expert, with the help of the investigator, collects all data pertinent to the defendant's background, including, but not limited to, educational, medical, employment, legal, and military records as well as those pertaining to marriage and divorce actions, social service agencies, etc. Records often take a long time to obtain and thus you should start early. A paper trail should not be considered a luxury item to pursue in whatever time is left over, nor should it be considered a necessary evil or nuisance. This is often the only objective evidence you may have from what will be viewed as a disinterested party to support your expert witness' testimony. In one capital case in which this author was involved, a review of educational records indicated two grade failures, which could be explained by the defendant repeatedly moving back and forth, inter-state, between two divorced, feuding parents during those two years. This had implications for the defendant's subsequent personality development, helpful in explaining and making understandable her behavior at the time of the homicide.

Records are also an important source for locating potential witnesses. For exam-

*(continued on page 4)*



30

# MITIGATION ARTICLE

*(continued from page 3)*

ple, in the post-conviction case of the aforementioned Abu-Ali Abdur' Rahman v. Bell, a previous homicide which took place in prison twenty years earlier was being used as an aggravating factor in a second homicide, the subject of the current litigation. Scrutinizing prison records resulted in finding the names of several correctional officers, since retired, who were willing to provide information on the circumstances of the case. Their version was much different from the misinformation provided by the district attorney to the mental health agency examining the defendant relevant to the second homicide, misinformation which not surprisingly had negatively impacted their findings. This issue had been overlooked by defense counsel in the defendant's original trial.

In short, any scrap of paper that may be out there could potentially shed light on the defendant's character and situation, offer factual information, as well as suggest additional leads and must thus be doggedly pursued. For example, the military records of Abu-Ali Abdur' Rahman's father, which could only be obtained via court order, made reference to a marriage prior to that with the defendant's mother, a marriage of which none of the offspring were aware. This small detail, seemingly inconsequential, contributed to the overall picture of a highly secretive family, which the judge ultimately described as not just dysfunctional but bizarre. This, in turn, helped develop the image of an emotionally and behaviorally disturbed man who was not in total control of his faculties at the time of the homicide. Unsealing the adoption records of the defendant's siblings in another post conviction case involving this writer proved helpful in illustrating the extensiveness of mental illness, addictive problems, and other emotional disorders in the extended family, contributing to the overall picture of the defendant's considerable mental problems.

A mitigation expert may prepare a written report, incorporating the records relied upon. This may or may not include professional opinions, and the mitigation expert may or may not testify, depending upon the credentials of your expert and the needs of the particular case. In the event the mitigation expert does testify, a carefully researched, factual social/psychological history lends an air of thoroughness and credibility to the defense presentation in the penalty phase and at the very least is a good visual exhibit when complete with all available records. More importantly, a well-presented social/psychological history will artfully develop an integrated, cohesive picture of your client. A mitigation analysis written just for counsel, which the jury never sees, succinctly provides an overview of the mitigation case by collecting, interpreting, and summarizing the data and including a timeline highlighting key events in the social/psychological, as opposed to legal, history of the defendant.

**The Importance of Themes**

The mitigation expert develops "themes" pertinent to the overall mitigation strategy. These themes vary widely, depending upon the defendant. For example, a primary theme may be that the defendant has had a terrible background, with all his siblings likewise having had difficulty in life and with no one emerging from such a family having much of a chance of success. If the siblings all did fine with the exception of the defendant, an explanation must be found to make this understandable, such as the presence of supportive adults in the lives of the others to whom the defendant did not have access, the defendant being singled out for abuse because of the father's suspicions that biologically he was not his child, and so forth. Another theme may be that of a passive personality stemming from childhood sexual abuse who is easily led and who would otherwise not have found herself in such a predicament had she not been under the domination of a stronger personality.

Themes of this nature are best asserted through testimony supported by police reports, third parties, medical records, and the like as opposed to only expert testimony which relies on the defendant's word and psychological test results. Numerous and often repeated interviews with family, friends, co-workers, neighbors, and so forth are essential in obtaining sufficient detail and multiple perspectives to persuasively weave this theme throughout the sentencing hearing in a believable manner.

As the mitigation expert in the recent trial in Memphis of State v. Groseclose, where the defendant received life instead of death, this author researched a number of themes to be considered for presentation during the sentencing trial. Chief among them was the defendant's exemplary behavior during his twenty-one years on death row prior to being granted a new trial. Accordingly, a good deal of time was spent on death row interviewing prospective witnesses and ferreting out those most likely to appeal to jurors by virtue of contributing something fresh to the proceedings. Among the many potential witnesses screened were correctional officers, work supervisors, fellow inmates, and prison administrators who had occasion to come into contact with Mr. Groseclose and were aware of his capabilities. In addition, individuals who had written to or visited the defendant over the course of many years were assessed for any contribution they could conceivably make. One endearing young lady carried with her to the witness stand a small, pink box decorated with a pig and filled with letters from Mr. Groseclose, who had served as a kind of Dutch uncle during her formative years, offering her advice on everything from college roommates to boyfriend problems.

Skillfully weaving together several themes is a means of capturing and maintaining the interest of your jurors. For example, several of the intertwining themes developed in the State v. Groseclose mitigation case pertained to the defendant's good behavior in prison, the importance of the defendant in the life of the young woman mentioned above as well as others, his considerable contribution to running the GED program on death row and assisting numerous inmates in earning their GED's, functioning as a kind of liaison between the previous war-

*(continued on page 5)*

(continued from page 4)

den and inmates transitioning from the old to the new prison, etc.

It is important to tailor the mitigation case to the unique properties of your particular defendant's situation. Simply because a mitigation strategy has worked in one capital case is no reason to assume it will do so again. One of the most challenging aspects of the sentencing phase is to avoid presenting the trite and the expected, which generally has the result of putting jurors to sleep, and to instead risk the novel and creative.

Nothing is as believable as truth. Oftentimes attorneys are at first blush scared off by an initial impression of their client stemming from what amounts to a cursory examination of the defendant's life. An in-depth analysis of that individual's background, explaining and making understandable the basis for her behavior at the time of the crime, may be much more poignant, compelling, and realistic than a legalistic sleight-of-hand designed to somehow minimize or distort data in a manner which counsel considers less damaging. Similarly, attempts to bully your expert witness into "pumping up" a diagnosis into something more dramatic than is. actually the case or to draw unwarranted conclusions in the interest of promoting a particular defense are not only ultimately embarrassing to all concerned but also, in the end, may be deadly.

## Sensitive Interviewing of Witnesses is Mandatory

Because of the often very sensitive nature of the themes being developed, careful questioning by a knowledgeable professional trained not just in interviewing techniques but also in the critical topics being explored, such as sexual abuse, the Battered Wife Syndrome, addiction, and so on is crucial. For example, when questioning family and friends in exploration of the battered wife defense, one must be cognizant of the likely defensiveness of these individuals, who may have known of the battering but nonetheless encouraged the woman to return to her husband. Their defensiveness may be reflected in their tendency to downplay the extent of the abuse and the defendant's fear in the face of the abuse. Reducing this defensiveness in order to elicit data as well as develop potential witnesses is often called for on the part of the interviewer. An understanding of the dynamics involved in such abusive situations, involving, for example, isolation of the family and deprivation of power by the withholding of keys, money and the opportunity to earn money, credit cards, etc. is likewise important in gathering data from informants.

It is essential that informants be interviewed individually rather than *en masse* or even in pairs since some things are easier to say one-on-one and if not held accountable for your words by the presence of others.

The mitigation expert should provide counsel a "cast of characters" to take the stage during mitigation, with an analysis of their strengths and weaknesses as well as suggestions for examination during trial. Parading a number of witnesses to the stand during sentencing, even if they are only on the witness stand for a few minutes, not only shows that you went to some trouble to identify and interview witnesses but also indicates that there are a number of other people, in addition to you, who think the defendant's life has sufficient value to miss work, risk the embarrassment of cross-examination, be away from loved ones if having to travel any distance, and so forth in order to come to trial. Each of these witnesses should present a slightly different perspective to hold the jury's attention while still developing a relevant theme or themes.

The more witnesses talk about your client, the more the jury is helped to see different aspects of your client and the more human he becomes in their minds. It is a well known truism that it is much more difficult to sentence someone you have come to know to death than it is a stranger, even with death-qualified jurors. The other benefit to having more rather than fewer witnesses is that one or the other of your witnesses is bound to appeal to some member of the jury, whether this is an authority figure, a representative of middle-management, someone from the working class, and so forth.

It is critical to have a family member testify, which is sometimes easier said than done in view of the often extremely dysfunctional families from which defendants emerge. The absence of family is a pointed message to a jury that no one close to the defendant cares whether she lives or dies.

Consider obtaining the affidavits, or even videotaping the testimony, of any witness you consider absolutely critical to your case, especially since appeals may go on for many years. Witnesses sometimes have the unnerving tendency of dying just when you need them the most. For example, in one case the affidavit from the only reasonably coherent sibling able to attest to the extreme brutality of the defendant's father toward the defendant was helpful, but not as helpful as his live testimony or even videotaped deposition would have been had he not chosen to commit suicide.

## The Impact of Expert Witnesses

Judges, as well as jurors, vary greatly in their attitudes toward expert witnesses, with some being more receptive and less threatened than others by experts. In addition, the jury may not find the expert credible, for one reason or another, especially in the case of a mental health expert who has previously testified in the guilt phase of the trial and is now "tainted." It may be advantageous, if psychological opinions are to be rendered in the sentencing phase of the trial, to have another mental health expert address pertinent issues in the guilt phase.

A mental health expert may help with an overview or a summation in the sentencing phase, with lay witnesses developing key issues relevant to this. The expert can also help interpret or give meaning to evidence presented by fact witnesses, offering expert opinions as to the significance of this data. These opinions and observations will appear to be more credible and substantial if a foundation is laid by the facts presented by the lay witnesses.

(continued on page 6)

# MITIGATION ARTICLE

(continued from page 5)

Mental health testimony can be a two-edged sword cutting both ways if it is not skillfully utilized to avoid dehumanizing your defendant and suggesting future dangerousness. Presenting evidence, for example, of a defendant's seriously disturbed mental state may be very convincing, so much so that the jury votes to give him death in the absence of any information to counterbalance this by suggesting the individual can be successfully treated.

Although much of the focus tends to be on psychologists and psychiatrists as expert witnesses, often other specialists are necessary as well and you should not expect your mental health expert to wear all hats. Depending upon the unique features of your particular case, you may require the services of an addictionologist to explain what life circumstances prompted the defendant to turn to alcohol and drugs, such as self-medicating to deal with chronic stress or a family history of substance abuse resulting in genetic predisposition. An expert on mental retardation or learning disabilities can explain how these impairments contributed to the defendant's behavior, making these problems something about which jurors may then understand and empathize.

If the prosecution intends to call an expert to testify regarding the future dangerousness of the defendant and you do not feel you have strong evidence to prove otherwise, the mitigation expert can utilize well-documented research to attest to the inability of mental health experts to accurately predict future dangerousness, or, if his training has not prepared him for this, can locate a qualified expert to do so. When expert witnesses are prevented from discussing future dangerousness, defense attorneys can still defuse the dangerousness issue through the testimony of relatives and friends of the defendant, who can describe numerous instances of the defendant solving problems non-violently. They may also discuss their personal relationship with the defendant in terms of how they do not fear him or feel threatened by him (White, 1987).

**Social Science Research May be Helpful**

Your mitigation expert should be conversant with law and case law as well as social science research. Much may be learned from reading current literature and applying this to mitigation work. For example, White (1987) studied the factors believed to influence jurors' penalty decisions in capital trials, the nature of the crime committed, and the defense's portrayal of the convicted offender's character. He determined that certain defenses were most or least effective, depending upon the specific nature of the homicide. White further suggests that it might be possible after the defense strategy has been ascertained for both the guilt and mitigation part of the trial, to decide which jurors might be more receptive to what particular kind of defense. That is, if the mitigation is to be based on the defendant's problematic upbringing and subsequent development of psychological problems, male jurors may be preferable to female jurors. However, female jurors may be preferred if the defense has decided to present an argument against the propriety of the death penalty. In his research suggestions he also discusses the possibility that jurors who vote for life and death may differ from each other in terms of personality variables in that jurors who vote for death may possess characteristics of the "authoritarian personality," such as being conventional in their values, more likely to identify with power figures, and more likely to punish people who violate society's rules. It may be helpful to utilize the services of a jury consultant in targeting these jurors for elimination.

Hans (1988) talks about the importance of setting the stage for the penalty phase and developing the mitigation case by illustrating positive features of the defendant throughout the guilt phase, since jurors often make up their minds prior to the penalty phase even beginning. She discusses models of jury decision making, saying that it is less a matter of weighing and summing aggravating versus mitigating factors and more a matter of comparing the defendant to a prototype of someone they believe definitely should get the death penalty, such as Richard Speck or Charles Manson.

Logan (1982; 1986) recommends against closing arguments by defense counsel which stress that the death penalty itself is equivalent to murder and that vengeance is a base motive since this directly attacks the values of these death-qualified jurors. Instead, making the defendant's behavior understandable as well as stressing the severity of life in prison without parole may be a more viable option because this takes into account the values and perspectives of the jurors, who can punish the defendant and protect society at the same time without imposing the death penalty.

Sontag (1986) found that college students do not have a clear understanding of the decision criteria for penalty instructions, nor do they fully understand the meaning of the most critical terminology used in these instructions, aggravating and mitigating. The importance of this is that if jurors do not fully comprehend these instructions they may be relying on their own decision criteria rather than those specified in the instructions. It is thus essential that counsel clarify this terminology to avoid confusion.

Barnett (1985) analyzed jury verdicts and found that the more certain jurors are that the killing was intentional, the more willing they are to render a death sentence.

Geimer and Amsterdam (1988) cited the most frequent reason for death verdicts as being the gruesome or cruel nature of the murder. Life verdicts were returned most often when there was lingering doubt about the defendant's guilt. It is imperative, therefore, to explore lingering doubt in the penalty phase.

State v. Odom, 928 S.W. 2d 18 (Tenn.1996).

Goad v. State, 938 S.W. 2d 363 (Tenn.1996).

Austin v. Bell, 126 S.W. 2d 363 (Tenn.1996).

Abu-Ali Abdur" Rahman v. Bell, M.D. Tenn.

(continued on page 7)

# ANNOUNCEMENTS

*(continued from page 6)*

No. 3: 96-0380, decided April 3, 1998.

Barnett, A. (1985). Some distribution patterns for the Georgia death sentence. *U.C. Davis Law Review*, 18, 1327-1374.

Geimer, W. and Amsterdam, J. (1988). Why jurors vote for life or death: Operative factors in ten Florida death penalty cases. *American Journal of Criminal Law*, 15, 1-54.

Hans, Valerie P. (1988). Death by jury. In K. D. Haas and J.A. Inciardi (Eds.), *Challenging Capital Punishment: Legal and Social Science Approaches*, Newbury Park: Sage, 149-175.

Logan, Deanna (1982). *Why you should not kill this man.* Paper presented at the British Psychological Society's International Conference on Psychology and Law, Swansea, Wales.

Logan, Deanna (1986). Pleading for life: an analysis of penalty phase final arguments. In M.G. Millman (ed.) *California Death Penalty Defense Manual.* Los Angeles, California: California Attorneys for Criminal Justice and California Public Defenders Association.

Peoples, Wendy C. and Thomson, James S. (1998). Penalty phase mitigation. *California Death Penalty Defense Manual.* Los Angeles, California: California Attorneys for Criminal Justice and California Public Defenders Association.

Sontag, L. (1986). *Comprehension of capital jury instructions.* Paper presented at the Western Psychological Association, San Jose, California.

White, Laurence T. (1987). Juror decision making in the capital penalty trial. *Law and Human Behavior*, 11, 113-131.



## Journey of Hope Comes to Tennessee

The *Journey of Hope....From Violence to Healing* is an educational and awareness tour that travels across the country spreading the message of forgiveness. The *Journey* is led by murder victims' family members who share their stories of the process of healing through reconciliation. Calling for alternatives to the death penalty, they are joined by death row survivors, families of death row prisoners, and friends and activists from around the world.

The *1999 Journey* will travel through the state of Tennessee, making stops in Nashville, Knoxville, Chattanooga, and Memphis. Journey participants will give presentations to high school and college classes, church groups and the media throughout the state. Together these presentations will offer a more complete picture of the cycle of violence and the way in which the death penalty prevents healing, prolongs suffering, and creates more victims.

Please support the *Journey* by inviting a speaker to address your church, school, or community organization. You may also wish to volunteer during the *Journey* as a support person. Of particular need is help in transporting Journey members between speaking engagements. Please call us at the Tennessee Coalition to Abolish State Killing at (615) 329-0048 to find out more about how you can get involved.

The itinerary for the Journey is as follows: April 11-13 Nashville, April 13-15 Memphis, April 16-18, Knoxville, April 19-21, Chattanooga, and April 22-25 Nashville.

### The Journey Concert

A concert benefiting the *1999 Journey* will take place on April 12 at the historic Ryman Auditorium in Nashville. The concert will feature Jackson Browne, Steve Earle, Emmy Lou Harris, The Indigo Girls and Sister Helen Prejean. Tickets go on sale March 1 through Ticket Master.

## 1999 TACDL CLE Schedule

Please note that the April Trial College scheduled for Memphis has been postponed until this Fall or next Spring.

**Tuesday, April 20th**
*Criminal Defense Attorney's Introduction to Davidson County Juvenile Court*
Juvenile Justice Center, Nashville,
1-4:15PM

**Friday, May 14th**
*Search and Seizure*
UT Conference Center, 4th Floor
Knoxville, 8AM-4:30PM

**Friday, June 18th**
*Criminal Law and Legislative Review*
BellSouth Auditorium
Nashville, 8AM-4:30PM

**Saturday, August 28th,**
*26th Annual Meeting and Trial Tactics Seminar*
Crowne Plaza, Nashville, 8AM-4:30PM

**Friday, October 15th**
*Mental Health Issues in Criminal Defense*
BellSouth Auditorium
Nashville, 8AM-4:30PM

**Tuesday, October 19th**
*TN District Public Defenders Annual Training Seminar*
Holiday Inn, Gatlinburg
8AM-4:30PM

**Tuesday, November 17th**
*Ethics and Professionalism in Criminal Defense Litigation*
(with Nashville Bar Association)
BellSouth Auditorium, Nashville
1-4:30PM

**Tuesday, December 7th**
*Ethics and Professionalism in Criminal Defense Litigation*
(with Knoxville Defense Lawyers Assoc.)
Calhouns on the River
10:30AM-2:30PM

Article Written by Dr. McCoy

EXHIBIT NO. 29

Identified and made a part of the record this 2nd day of February, 2009.

[signature]

JUDGE

*Diana McCoy, Ph.D.*
Clinical and Forensic Psychology
200 Midlake Drive, Suite C • Knoxville, TN 37918 • (615) 688-1303

FILED (54)
APR 07 2009
Clerk of the Courts
Rec'd by

April 19, 1996

State vs. Christa Pike
Case No. 68280
4-9-08 Exhibit No. 30

**FINAL STATEMENT**

Ms. Janice O'Cain
Executive Secretary's Office
Nashville City Center
511 Union Street, Suite 1400
Nashville, TN 37243-0607

**RE: CHRISTA GAIL PIKE**
**No.: 58183-A**

| DATE | SERVICES RENDERED | HOURS | CHARGE | PAID |
|---|---|---|---|---|
| 09/01/95 | Consultation with attorney | 1 | $ 125.00 | |
| 09/08/95 | Consultation with attorney | 1 | $ 125.00 | |
| | Clinical Interview | 3 | $ 375.00 | |
| 09/12/95 | Telephone call with attorney | .5 | $ 62.50 | |
| | Clinical Interview | 2 | $ 250.00 | |
| 09/22/95 | Telephone call with attorney | .25 | $ 31.25 | |
| | Clinical Interview | 2 | $ 250.00 | |
| 09/27/95 | Clinical interview | 2 | $ 250.00 | |
| | Dictating memos | .5 | $ 62.50 | |
| 10/05/95 | Clinical Interview | 2 | $ 250.00 | |
| 10/12/95 | Dictating report | 1 | $ 125.00 | |
| 10/14/95 | Reviewing materials | 1 | $ 125.00 | |
| | Dictating report | 1 | $ 125.00 | |
| 10/18/95 | Editing report | 1 | $ 125.00 | |
| 10/20/95 | Consultation with attorney | 1 | $ 125.00 | |
| | Clinical Interview | 3 | $ 375.00 | |
| 10/23/95 | Statement | | | |
| 11/07/95 | Review of records/timeline<br>- FMRS Mental Health<br>- NC Division of Mental Health | 4 | $ 500.00 | |

(30)

| | | | | |
|---|---|---|---|---|
| | - Kaiser Permanente MHC | | | |
| | - Records of Rosemary Wilson | | | |
| | - Records of J. Matthew Martin | | | |
| 11/08/95 | Review of records | 2 | $ 250.00 | |
| | - Preliminary Hearing transcript | | | |
| | - Attorney memos | | | |
| | - Letters | | | |
| | - Taped confession | | | |
| 11/10/95 | Consultation w/attorney | 3.5 | $ 437.50 | |
| | Travel time @ 62.50 | 1 | $ 62.50 | |
| 11/14/95 | Review of records | 2 | $ 250.00 | |
| | - Witness interviews | | | |
| | - Job Corps hearings | | | |
| 11/29/95 | Consultation w/attorney | 1 | $ 125.00 | |
| | Clinical Interview | 1 | $ 125.00 | |
| | Editing report | 1 | $ 125.00 | |
| 12/04/95 | **Received payment** | | | **$2906.25** |
| | Interview w/Carissa Hansen, Christa's mother | 3 | $ 375.00 | |
| 12/10/95-12/11/95 | Total travel time to and from West Virginia @ $ 62.50 | 13.25 | $ 828.13 | |
| | - Travel to Beckley, WV 5.5 hrs | | | |
| | - Travel to Glen Pike's 3/4 hr | | | |
| | - Travel to hotel 1 hr | | | |
| | - 12/11 travel in Beckley 1/2 hr | | | |
| | - Travel to Knoxville 5.5 hrs | | | |
| 12/10/95 | Interview w/Carrie Ross, Christa's Aunt | 2.25 | $ 281.25 | |
| | Interview w/Glen Pike, Christa's Father | 1.75 | $ 218.75 | |
| 12/11/95 | Interview w/Chris Fotos, Christa's Grandfather | 1.5 | $ 187.50 | |
| | Phone calls to Brian, Brian's father, Carrie, Chris | .5 | $ 62.50 | |
| 12/10/95-12/11/95 | Expenses for WV trip (Copy of receipts attached) | | $ 55.36 | |
| | - 12/10/95 Lunch $ 3.61 | | | |
| | - 12/10/95 Dinner $ 3.80 | | | |
| | - 12/11/95 Lunch $ 2.95 | | | |
| | - 12/10/95-12/11/95 Hotel $45.00 | | | |
| 12/12/95 | Review of notes, Timeline | 2 | $ 250.00 | |
| 12/12/95 | **Statement** | | | |
| 12/21/95 | Interview w/Carissa Hansen, Christa's mother | 6 | $ 750.00 | |
| 12/29/95 | Clinical Interview | 2.5 | $ 312.50 | |

| | | | | |
|---|---|---|---|---|
| 01/02/96 | Consultation w/attorney | .25 | $ 31.25 | |
| 01/08/96 | Reviewing records | 1.5 | $ 187.50 | |
| | Dictating social history | 6 | $ 750.00 | |
| 01/24/96 | **Received Payment** | | | **$4007.86** |
| 02/06/96 | Family tree/review of family history | 4 | $ 500.00 | |
| 02/10/96 | Travel to Durham, NC @ $ 62.50 per hour | 6 | $ 375.00 | |
| 02/11/96 | Travel in Hillsborough @ $ 62.50 per hour | .5 | $ 31.25 | |
| | Interview w/Carissa Hansen, mother | 1.5 | $ 187.50 | |
| | Interview w/Gerard Hansen, stepfather | 1 | $ 125.00 | |
| | Interview w/Brandie Parker, friend | 1.75 | $ 218.75 | |
| | Interview w/Willie Davis, friend | .25 | $ 31.25 | |
| | Interview w/Mandy Staley, friend | .25 | $ 62.50 | |
| | Travel in Hillsborough @ $ 62.50 per hour | .5 | $ 31.25 | |
| 02/12/96 | Interview w/Rose Wilson, Ph.D., Ginny Satterfield, and Peggy Hamlett, Juvenile Court workers | 1.25 | $ 156.25 | |
| | Interview w/John Martin, Esq., Christa's attorney | .5 | $ 62.50 | |
| | Travel to interview @ $ 62.50 per hour | .25 | $ 16.00 | |
| | Interview w/Matthew Martin, Esq., Christa's attorney | .5 | $ 62.50 | |
| | Travel to interview @ $ 62.50 per hour | .25 | $ 16.00 | |
| | Interview w/Det. Benjamin Frederick | .25 | $ 31.25 | |
| | Travel to interview @ $62.50 per hour | .25 | $ 16.00 | |
| | Interview w/Peter Kramer | .5 | $ 62.50 | |
| | Travel to interview @ $ 62.50 per hour | .5 | $ 31.25 | |
| | Interview w/Kerry Clement, Child Protective Services | .5 | $ 62.50 | |
| | Travel to interview @ $ 62.50 per hour | .5 | $ 31.25 | |

| | | | | |
|---|---|---|---|---|
| | Interview w/Det. Gerald Castle | .5 | $ 62.50 | |
| | Travel to Knoxville<br>@ $ 62.50 per hour | 6 | $ 375.00 | |
| 02/10/96-<br>02/12/96 | Durham trip expenses<br>copies of receipts included | | | |
| | - Inn at Tear Drops, 02/10-02/12 | | $ 139.10 | |
| | - Dinner, 02/10 | | $ 9.85 | |
| | - Dinner, 02/11 | | $ 11.84 | |
| | - Lunch, 02/12 | | $ 10.00 | |
| | - Dinner, 02/12 | | $ 4.82 | |
| | - Avis Car Rental, 02/10 - 02/12 | | $ 47.76 | |
| | - Plane tickets, 02/10 - 02/12 | | $ 311.00 | |
| | - Airline service charge (flight change due to weather) | | $ 50.00 | |
| | - Knoxville Airport parking 02/10 - 02/12 | | $ 18.00 | |
| 02/23/96 | Dictating report | 6 | $ 750.00 | |
| 02/24/96 | Dictating and editing report | 2 | $ 250.00 | |
| 02/25/96 | Dictating and editing report | 8 | $1000.00 | |
| 02/26/96 | Editing report, dictating memos | 5 | $ 625.00 | |
| | Editing report | 2 | $ 250.00 | |
| 02/27/96 | Editing report | 7 | $ 875.00 | |
| 02/28/96 | Clinical Interview | 1.5 | $ 187.50 | |
| | Dictating and editing report | 2 | $ 300.00 | |
| 02/29/96 | Dictating and editing report | 6 | $ 750.00 | |
| 03/01/96 | Consultation with attorney | 1 | $ 125.00 | |
| | Editing report | 3 | $ 375.00 | |
| **03/11/96** | **Received Payment** | | | **$2031.25** |
| | **Statement** | | | |
| | Consultation with attorney | .5 | $ 62.50 | |
| 03/12/96 | Genogram, relationship histories, school history, organizing index, finalizing report | 5 | $ 625.00 | |
| 03/13/96 | Reading Tadaryl's statement | .5 | $ 62.50 | |
| 03/14/96 | Reading Swannanoa records | .5 | $ 62.50 | |
| | Telephone w/Dr. William Bernet | .5 | $ 62.50 | |
| | Memos re: Carissa Hansen and Carrie Ross | 1 | $ 125.00 | |
| 03/15/96 | Editing report | 1 | $ 125.00 | |
| | Compiling report, index, charts | 1 | $ 125.00 | |
| | Consultation w/attorney | 2 | $ 250.00 | |
| 03/20/96 | Consultation w/attorney | .5 | $ 62.50 | |
| 03/21/96 | Consultation w/attorney | 1 | $ 125.00 | |
| 03/22/96 | Consultation w/attorney | .5 | $ 62.50 | |
| | Preparation for trial | 1 | $ 125.00 | |

| | | | | |
|---|---|---|---|---|
| 03/24/96 | Consultation w/attorney | 2.5 | $ 312.50 | |
| 03/26/95 | Consultation w/attorney | .5 | $ 62.50 | |
| **04/19/96** | **Received Payment** | | | **$5163.25** |
| | **Statement** | | | |
| **04/19/96** | **BALANCE DUE** | **173** | **$ 5914.25** | |

Final Statement of Dr. McCoy

EXHIBIT NO. 30

Identified and made a part of the record this 2nd day of February, 2009.

[signature]

JUDGE

# March 1996

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

State vs Christa Pike
Cause No. 68280
4-9-08 Exhibit 31

FILED (55)
APR 07 2009
Clerk of the Courts
Rec'd by

Calendar of March 1996

EXHIBIT NO. 31

Identified and made a part of the record this 2nd day of February, 2009.

[signature]

JUDGE

FILED (56)
APR 0 7 2009
Clerk of the Courts

# Christa Pike's

## Family




Key:

b. = born
m. = married
d. = died
D. = divorced
——— = married/children of couple
- - - - = child of unmarried couple
—/— = divorced
X = deceased
● = substance abuse
□ = male
○ = female

i

State vs Christa Pike
Case No 68280
4-9-08 Exhibit No. 32

(32)

007407

001515

001514

# MOTHER

## Carissa Fotos Ferguson Pike Thompson Hansen's

## Marriages and Relationships




007408

m. = married
D. = divorced
——— = married
- - - - - - = dating relationship/unmarried
* = cohabited
/ = separation

# FATHER

## Glenn Pike's

## Marriages and Relationships




m. = married
D. = divorced
———— = married
- - - - - - - - = dating relationship/unmarried
* = cohabited
/ = separation



001513

007409

# Educational History






007410

001512

Dr. McCoy's Charts

Due to the size and/or nature of this exhibit, it shall be sent under separate cover to the Criminal Court of Appeals.

EXHIBIT NO. 32

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

# PIKE PSYCHOLOGICAL TREATMENT

**ca.1982-83** Age 6, 1st grade, Dr. Yeargan, Beckley, W. Va.

Carissa Hansen: first weekly, then monthly 6 months; no improvement; behavioral (Bates 000295)

"very brief" (Bates 000021)

"several times; he said Christa was lazy" (Bates 000307)

Christa Pike: "a few times" (Bates 000218)

FILED 57
APR 07 2009
Clerk of the Courts
Rec'd by

**04/12/85** age 9, 3rd grade **FMRS MENTAL HEALTH COUNCIL, INC.**, Mark Sundstrom, W. Va.

Currently in Cranberry-Prosperity in Cranberry, intake questionnaire notes problems since kindergarten

Christa describes stepfather as "mean" but will not elaborate.

Termination Summary:

Reason for admission: inattentive at school, refuses to do classwork at school or homework; consistently scores in the top 10% nationwide in scholastic achievement testing.

2 sessions (02/21/85, 03/07/85) following intake (02/14/85), 1 school visit 02/25/85), NS 03/22/85; teacher indicated she had transferred to new school, moved to father's house.

Mother's marital relationships unstable; Christa is a highly capable student who realizes the consequences of her school behavior and yet seems unconcerned at this time.

Progress notes 03/07/85 (000005) Mother forgets to bring in daily reports, pleased with progress, as is teacher; father wants her to live with him; Christa has no preference; Mother says daughter avoids talking about feelings.

***Mother is married to Danny Thompson at this time; CGP and Alicia are sent away at his insistence.***

State vs Christa Pike
Case No. 68280
4-10-08 Exhibit No. 33

***Fails 3rd grade.***

**TOTAL NUMBER OF SESSIONS WITH CHRISTA: 2**

**05/30/89** 12 ½ year old, 6th grade, Grey-Culbreth Middle, **UNIVERSITY OF NORTH CAROLINA**, psychiatrist (?) Dr. Straw

"Depressed adolescent, 6th grade…brought by mother for academic failure and suicidal ideas and gesture; not actively suicidal but very difficulty to make contact with; not psychotic but seems angry; substance abused denied; suspect major depression, prob. adjustment reaction; weekly treatment, consider medication."

Physical exam notes history of hyperventilation, earlier rape allegation.

***Carissa is living with Steve Kyaw, paternal gm has died.***

Earlier medical records, attached, indicate that on 07/25/88 she hyperventilated, was taken by ambulance to hospital, resuscitated.

Carissa Hansen: "several times he talked about hospitalizing Christa" (Bates 000307)

saw her 8 months (Bates 000307)

**TOTAL NUMBER OF SESSIONS WITH CHRISTA: 1**

**05/31/90** Age 14, Stanford Jr. High, 7th **ORANGE-PERSON-CHATHAM MENTAL HEALTH CENTER**, Andy Mulcahy

Referral Information: Failing in school, defiance to school personnel; saw Dr. Straw 05/89-01/90 at NCMH; poor communication with mother and mother's fiancé.

Screening Questionnaire: Christa continues to fail classes, skips school, does not participate in class. She does not do chores at home either; began in 1st grade; I've tried everything – taking away for misbehavior, rewards for good behavior, spanking, yelling, you name it; discipline is mostly grounding and rewarding.

Only mother is seen, as per Peter Kramer, for one interview.

***Fails 7th.***

**TOTAL NUMBER OF SESSIONS WITH CHRISTA: 0**

**01/15/91** Age 14, 7th grade, Stanford, **<u>KAISER PERMANENTE</u>,** Chuck Helton

"She's been causing trouble for last 10 years; has been in therapy in past but financially had to discontinue – attempt suicide in past; last week she pulled knife on mother's fiancé; she called SS; alleging sexual abuse from mother's fiancé; mother does not believe her – states she (daughter) starts wrestling with him until mother sends her to her room to make her stop; SS recommended more counseling for her; mother found butcher knife in daughter's purse a few nights ago; ran away…has threatened fiancé; 1 ½ y 1 y ago, no improvement."

01/15/91 Intake Form

Depressive symptoms are wakes all through night (2 months), more irritable, decreased appetite, decreased concentration, decreased energy level, anhedonia, hopeless and blue

Father sent her home after 6 weeks in W. VA. because he couldn't handle her lying, bad influence on younger children.

01/26/91 Form: Christa was hit by fiancé while mother at work? Hx of several similar accusations; mother questions veracity of accusations; Christa now at ½ sister's house; hx of sexual abuse of younger children.

02/05/91 Meeting with Christa; upcoming court regarding assault on female

02/26/91 Mother reports father says psychologist believes Christa was sexually abusing 2 yr. old; Mother reports 4 year old Keith wets bed, said Christa said something about his penis, has enuresis. Given perpetrator history, Mother now believes Christa's abuse victimization, friend of paternal gm who had access from birth.

**TOTAL NUMBER OF SESSIONS WITH CHRISTA: 1**

**04/21/91-07/19/91** Age 15, 7th grade, **<u>SHEAFFER HOUSE</u>**, Kerry Clemens

**TOTAL NUMBER OF SESSIONS WITH CHRISTA: 5 – 6**

No counseling notes from Kerry Clements are in file.

**10/07/91** Age 15, 8th grade, Stanford, **ORANGE-PERSON-CHATHAM MENTAL HEALTH CENTER**, Peter Kramer

Referral Information: Running away from home, decreased school attendance, arrested for B & E on supervised probation for 12 months, stealing things from home, abusing pot and alcohol, past victim of sexual abuse, has molested younger relatives (per Ms. Hamlett).

10/09/91 Screening Questionnaire: Christa is not going to school, is drinking, ? doing drugs, has been seen snorting room deodorizer. Running away, will not stay home. Hanging out with 18-21 yr olds. Has a history, that she doesn't know I'm aware of, of child molestation. She lies chronically & steals. She is on one yrs. probation at this time for B & E, peti (sic) theft. Different behavior problems have been developing since 1st grade that I can remember. Spanking at first, grounding, psychiatric therapy, rewarding good behavior, ignoring bad or grounding...Nothing has helped. If I limit activity she just runs away.

Christa and Carissa meet with Peter Kramer for 1 visit and then just Carissa for the second visit; he ***recommends (Bates stamp 000544) that she get insurance to cover inpatient treatment of Christa and that she herself enter therapy but this was never done.***

**TOTAL NUMBER OF SESSIONS WITH CHRISTA: 1**

**11/14/91** Peter Kramer recommends ***inpatient treatment*** (Bates 000051); Peggy Hamlett ***recommends that "...if hospitalization becomes available that she be admitted to the hospital from training school. If hospitalization is not a possibility, I would request that a placement, such as Eckerd Wilderness Camp Program, be investigated in order for Christa to go directly from training school to camp" (Bates 000052)***

**11/18/91-** Psychological Evaluation, Rosemary Wilson, Ph.D.
Full Scale IQ 108
"End up dead or in prison or something" (000695)
"The losses and disruptions that have been constant in her social environment have not supported the development of adequate impulse control. Christa seeks release for painful feelings in hostile and aggressive acting out, even though she

fears the retaliation of further rejection. Under the press of emotional re-activity, she is not able to maintain effective control and organization in her thinking processes. The inevitable problems in adaptive functioning lead to consequences that confirm her feelings of inadequacy and unworthiness, and fuel her anger and depression. She has, though, preserved positive feelings in attachments to a friend and to a caring adult (her social worker) suggesting that her dependency needs are still accessible to corrective emotional experiences.

"Christa's primary need is for a stable placement, providing a structured environment, where firm, predictable limits can be placed on her behavior. ***External controls of the kind that might be found in Wilderness Camp, would stimulate further growth in responsibility, and would also lead to intensified releases of feeling, which, with support from nurturing adults, she may be able to work through, achieving greater acceptance and understanding of them. Christa would also benefit, after a placement in Wilderness Camp, from mental health treatment services, to address these emotional issues. At that time, the need for interventions focused on her suspected sexual offenses and her drug use may be assessed."***

**11/22/91-**
**03/09/93** <u>SWANNANOA</u>

**01/09/92** Swannanoa: Treatment Planning Conference (000687)
Refer to chaplain (grief)
Referral to Blue Ridge Mental Health (substance abuse; sexual offender program)
Birth control counseling
Counsel about sexual activity
Referral to psychologist and psychiatrist
GED

**01/28/92** Letter from J. Matthew Martin to The Honorable Stanley Peele urging him to ***commit CGP to Camp Woodson***

**02/05/92** Swannanoa: "Psychiatric Consults" (000690)
No meds

**04/13/92** ***Swannanoa: No camp due to moderates; depressed.***

**02/05/93** Swannanoa: "Progress Report" (000697)
Continues to receive counseling in the areas of Substance Abuse, actively participating in girls' treatment group; sees John Pavone, staff psychologist, on a regular basis, every other week; Brad Owen of Blue Ridge Center reviewed her case and said since nothing was substantiated and she denies it that he sees no need to serve her; completed GED.

No notes in file from John Pavone, girls treatment group, or substance abuse counseling.

Psychological Treatment Received by Miss Pike

EXHIBIT NO. 33

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

# WAIVER OF RIGHTS

SUSPECT'S/PERPETRATOR'S NAME Christa Gail Pike DATE 01-14-95

LOCATION WHERE WAIVER SIGNED CID Conference Room

CASE # ______ WARRANT # ______

After each instruction or component of the following warning, the officer must make every effort to determine whether the suspect understands, the waiver. If the suspect refuses to sign, the officer must write refused on the signature line.

## YOUR RIGHTS

1. YOU HAVE A RIGHT TO REMAIN SILENT. YOU DO NOT HAVE TO TALK TO ME UNLESS YOU WANT TO DO SO.

2. IF YOU DO WANT TO TALK TO ME, I MUST ADVISE YOU THAT WHATEVER YOU SAY CAN AND WILL BE USED AS EVIDENCE AGAINST YOU IN A COURT.

3. YOU HAVE A RIGHT TO CONSULT WITH A LAWYER AND TO HAVE A LAWYER PRESENT WITH YOU WHILE YOU ARE BEING QUESTIONED.

4. IF YOU WANT A LAWYER BUT ARE UNABLE TO PAY FOR ONE, A LAWYER WILL BE APPOINTED TO REPRESENT YOU FREE OF ANY COST TO YOU.

5. IF YOU DECIDE TO TALK TO ME WITHOUT A LAWYER PRESENT, YOU MAY STOP TALKING TO ME AT ANYTIME AND YOU MAY ALSO DEMAND A LAWYER AT ANY TIME.

I HAVE READ THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE.

Signed: X Christa Pike

Date: 01-14-95 Time: 7:55 Am

## WAIVER OF RIGHTS

HAVING BEEN FULLY ADVISED OF THE ABOVE RIGHTS, I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS WITHOUT A LAWYER PRESENT. I UNDERSTAND AND KNOW WHAT I AM DOING, WITH NO PROMISES OR THREATS HAVING BEEN MADE TO ME AND NO PRESSURE OR COERCION OF ANY KIND BEING USED AGAINST ME.

Signed: X

Date: 01-14-95 Time 7:55 Am

Officer: Randy York
(waiver advised by)

Witness: State vs Christa Pike — Case No. 68280 — 4-10-08 Exhibit No. 34 —

FILED (58)
APR 07 2009
Clerk of the Courts
Rec'd by ______

34

KP-PT-OPR(2/92)-036-RO

Waiver of Rights

EXHIBIT NO. 34

Identified and made a part of the record

this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

I, Christa Pike, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Randy York, Mark Waggoner, and Arthur Bohanan, Officers of the Knoxville, Tennessee Police Department, to conduct a complete search of my premises located at Knoxville Job Corps Center 621 Dale Ave Room # 452

These Officers are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.

This written permission is being given by me to the above named Officers voluntarily and without threats or promises of any kind.

Christa Pike
Signature

2-4-26

WITNESSES:
Randy York

Date: 01-12-94

FILED (59)
APR 07 2009
Clerk of the Courts
Rec'd by

KP-CI-GEN(1/92)-005-RO

State vs. Christa Pike
Case No. 68280
4-10-08 Exhibit No. 35

Consent to Search Waiver

EXHIBIT NO. 35

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

Transcript of Miss Pike's Statement

*Filed under separate cover.*

EXHIBIT NO. 36

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Seibourg

JUDGE

CD/Video of Mr. York and Miss Pike at Crime Scene

Filed under separate cover.

EXHIBIT NO. 37

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

CD/Tape of Miss Pike's Statement Played in Court

Filed under separate cover.

EXHIBIT NO. 38

Identified and made a part of the record this 2nd day of February, 2009.

Mary Bell Lubow

JUDGE

Okay, I had to change tapes in the recorder. The time is now 10:58 A.M. I'm going to be shutting the recorder off for just a few minutes.

Disregard the previous directions as the route that the suspects and the victim came from the Job Corp Center. We are going back over to the Job Corp Center now. The time is 11:00 A.M. Okay, we're starting out the directions that they took: We're on 17th, heading South toward Cumberland. The time is 11:02 A.M. Okay, we're turning right in the alley just north of Highland, between it and the car wash, headed west. This is the route that the female suspect is directing us that they took the morning the murder was committed. We are now turning left, back south, onto 18th Street from the alley. We are continuing South on 18th, crossing Highland Avenue. The female suspect advises they stopped right here and talked with someone at the 18th Street, IGA; they did not go in. Then proceeded on South on 18th Street, across from Laurel Avenue and turned right or west onto Clinch Avenue from 18th Street. They then cut left from the parking lot at the corner of Clinch and 19th Street, being southeast of the intersection. Then they come back out onto the street about the intersection of 19th Street and (unclear) Avenue. Continued South to Cumberland Avenue and then turned West on Cumberland Avenue. Okay, were turning right off of Kingston Pike into Tyson Park. Once they got into the park, they walked through the grass down to the left. They walked onto the bridge here across the creek in Tyson Park and then back under Kingston Pike heading toward Robertshaw Control Company.

When they were walking under Kingston Pike, they were actually on the bike trail down along the creek. They followed the bike trail onto UT Campus. We had to drive back on Kingston Pike, turned South out of Tyson Park, then turned west on Kingston Pike. Then we turned south or left onto Neyland Drive. We then turned off at UT Veterinary section of the campus. We're going back to the area of the murder scene on Jacub Drive. We are now at the murder scene, she is talking with the detectives in the car up front. She appears to be showing them where they murdered the victim at. She appears to be looking over her right shoulder to the place where the body was laying.

RY: Today's date is January 14, 1995, it is now 11:20 A.M. We are processing and video recording the area where the incident took place at the direction of the uh, young lady. Would you state your name, please.

CP: Christa Pike.

RY: Christa Pike, and she's going to go over kind of what occurred, okay.

LJ: We're recording now. Walk me through it in detail and I'll video it.

RY: Christa, if you would, tell us how you came up through here? Uh, about where you wind up at and what took place, as best as you can?

LJ: If you would, make it on this side over here.

FILED (60)
APR 07 2009
Clerk of the Courts
Rec'd by

State vs. Christa Pike
Case No 68280
4-10-08 Exhibit No. 39

CP: We came from that way.

RY: You want to hold this umbrella, okay. Go ahead.

CP: We came from that way, down there.

LJ: Okay, tell me, when your saying that way, tell me (unclear) the gravel road to the left?

CP: No, the one to the right.

LJ: The one with the UT Barricade across it.

CP: Yes.

LJ: That's the way you came into the scene?

CP: Yeah.

LJ: All right, continue on.

CP: And we came up here and we told her that we had some marijuana hidden in this thing and we had the key to that lock.

LJ: Okay, you were talking about the door on the bottom of the smoke stack?

CP: Yeah.

LJ: Okay.

CP: And....

LJ: The door on the bottom of the smoke stack is where you told her you had marijuana hidden, okay.

CP: And cause...she said that she wanted....

(Accidently the tape was turned off)

We're leaving the murder scene, the time is now 11:36 A.M. We're in route to the Job Corp Center to where the female suspect room.

Okay the time is 11:47 A.M., we arrived at the Job Corp Center. Getting the log sheet copies from the guard that was on duty as to arrival and leaving of suspects. Okay, the time is 11:51 A.M., we are entering room 452 of the Job Corp Center. Randy Wampler, Supervisor of Residential, 544-5600. Willie M. Hudson, Chief of Security, 544-5600, home: 966-1658.

Portion of Transcript of Mr. York and Miss Pike
at Crime Scene

EXHIBIT NO. 39

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

Medical Records of Zola Fotos

Due to the size and/or nature of this exhibit, it shall be sent under separate cover to the Criminal Court of Appeals.

EXHIBIT NO. 40

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

Medical Records of Chris Fotos

Due to the size and/or nature of this exhibit, it shall be sent under separate cover to the Criminal Court of Appeals.

EXHIBIT NO. 41

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

CD of Dr. Kenner's Power Point Presentation

To be filed separately.

EXHIBIT NO. 42

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leboeuf

JUDGE

EX. 43
4/11/08

007432




Christa Gail PIKE,
Petitioner
vs.
State of Tennessee
Case No. 68280
Exhibit No. 43
4-1-08

Time Line of Life

Due to the size and/or nature of this exhibit, it shall be sent under separate cover to the Criminal Court of Appeals.

EXHIBIT NO. 43

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz

JUDGE

Polaroid Photograph



STATE OF TENNESSEE VS. Christa Pike
CASE NO. 68280 EXHIBIT NO. 44
DATE 4-11-08 ID ✓ Evd ____

FILED 62
APR 07 2009

EXHIBIT NO. 44

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Leibowitz
JUDGE

CD of Horror Movies Viewed

To be filed separately.

EXHIBIT NO. 45

Identified and made a part of the record this 2nd day of February, 2009.

Mary Beth Lelbourg

JUDGE

CERTIFICATE

I, the undersigned, Deborah L. Hayes, Official Court Reporter for the Sixth Judicial District of the State of Tennessee, do hereby certify that the foregoing is a true, accurate, and complete Transcript of the Evidence of all the proceedings had and evidence introduced in the Petition of Post-Conviction Relief hearings of the captioned cause, relative to appeal, in the Criminal Court for Knox County, Division III, Knoxville, Tennessee, on the 7th through the 11th days of April, 2008.

I do further certify that I am neither kin, counsel, nor interest to any party hereto

January 31st 2009

Deborah L. Hayes

COURT REPORTER

CERTIFICATE OF THE COURT

THIS WAS ALL THE EVIDENCE INTRODUCED AND PROCEEDINGS HAD RELEVANT TO QUESTIONS RAISED ON THIS APPEAL ON THE PETITION FOR POST-CONVICTION RELIEF HEARINGS OF THIS CAUSE, WHICH IS SIGNED, APPROVED AND ORDERED TO BE MADE A PART OF THE RECORD BY THE COURT.

February 2, 2009

Mary Beth [signature]

JUDGE