# CHRISTA PIKE

## A Social History

STATE OF TENNESSEE VS CHRISTA PIKE
CASE NO. 68280 EXHIBIT NO 1-A
DATE 1-29-07 ID ✓ Evd ____

FILED
APR 07 2009 (1)
Clerk of the Courts
Rec'd by

Diana McCoy, Ph.D.
200 Midlake Drive, Suite C
Knoxville, TN 37918
(615) 688-1303

## EXTENDED FAMILY

The maternal side of Christa's family can trace their roots to a vineyard owner in Fogia, Greece named either Paleologos or Constantine Fotos, who was born in 1820. The original family name was Fokas. Paleologos/Constantine fathered five sons, with information known about four of them in that one was a merchant, the second a stone mason, the third owned a coffee house, and the fourth, Anthanasius, Christa's great, great grandfather, a vineyard owner (# 25, Fotos Family Generations).

Christa's maternal great grandfather, Gust Fotos, first son of Anthanasius Paleologos and Mary Fotos, stowed away on a ship from Tenedos, Greece at age seventeen, arriving in New York on New Year's Day in 1907, so family lore goes, although this would have actually made him twenty two if his birthdate of April 17, 1885, is correct. He traveled from here to Wheeling, West Virginia, where he worked on the state road crew as a water boy. He then worked in restaurants and coal mines in LeeVale, Whitesville, and Marsh Fork, West Virginia, and went into business for himself in Beckley, West Virginia first peddling meats and then entering the grocery and meat market business. Although Tressie Cook, a daughter, indicates he retired in 1977, his son, Chris, said his father worked for him in his meat packing business from 1960 until the day he died in 1988 at age 103. It is said Gust saved his money and sent to Greece for his two brothers, Pete and Mike, and Carrie, his sister (# 25, Fotos Family Generations and # 23, Chris Fotos).

A Greek Orthodox, Gust married Bertha Stover, a member of the Pentecostal faith, who died in 1990 at ninety one. Bertha's parents reportedly were farmers. She herself was a housewife. Gust and Bertha had two living sons. A third son died in infancy due to blood dyscrasia, an inherited family condition. John, the older, is married, has children, and is 65 years old. He is retired and lives in Beckley, West Virginia. He was in business for awhile with Chris Fotos, Christa's maternal grandfather, before owning a gas station and then becoming involved in real estate.

Chris Fotos has several sisters, Donnie, Tressie, Mary, and Martha. Donnie is reportedly illegitimate, with Bertha being pregnant with her when she married Gust, who never accepted Donnie. Donnie was described as an outcast and the only sibling who took up for her was Chris (# 25, Fotos Family Generations and # 23, Chris Fotos).

Chris Fotos was born on June 10, 1921 in LeeVale, West Virginia, with the family eventually moving to Beckley, West Virginia. At age nine, he said, he started

butchering one or two animals a week with his father. He was reportedly expelled from school in the eleventh grade after he and his brother beat up a teacher. At age sixteen, he said, he "knocked the hell out of my dad" and left for the Norfolk shipyards in Virginia, where he worked as a welder before moving on to Baltimore, working here as a welder as well and living in both places over a four year period. In 1943 he joined the army for four years, being stationed on the Aleutian Islands and earning an honorable discharge. He returned to Beckley and found a job at age twenty-five at Peerless Packing, working here for seventeen years until starting his own meat packing business in 1960. He owned this business until he retired shortly before his wife died in 1985 (# 23, Chris Fotos).

Chris Fotos married Zola Loretta Privett when she was fifteen and he was twenty-six. She had a sixth grade education. Her father, Henry Andrew Privett, was an alcoholic who reportedly physically abused all eight of his children, four boys and four girls, but especially the girls. The girls are all said to bear scars from his abuse. The Ku Klux Klan reportedly tarred and feathered Privett because of his abusive behavior, leaving him for dead. His sons found him and took him home, reviving him. This experience resulted in Privett becoming a minister, but he was reportedly just as strict and rigid as a minister as he was prior to his conversion, beating the children, for example, if they talked in church (# 19, Carissa Hansen).

Several of Privett's children are described as having resulting emotional problems of one sort or another. Zola, Christa's grandmother, was described by her daughter, Carrie, as sexually preoccupied and a chronic liar. Dorothy, now deceased, was reportedly mentally retarded because of having a high fever and polio when she was young. She was partially crippled. She married a man, Bill Howell, who reportedly served time for raping a little girl, and he was physically abusive of Dorothy. Two of Dorothy's brothers, Willis and Ralph, reportedly went to Baltimore and beat up Bill for beating up Dorothy and putting her in the hospital (# 19, Carissa Hansen and # 21, Carrie Ross).

Norma, another of Zola's sisters, also had polio as a young child and was in a body cast for over a year. Norma is described as one of the most disturbed of all the children. For example, she complained that her husband, Calvin Johnson, beat her when she was pregnant with triplets such that she miscarried, burying the children in the backyard. There is doubt within the family that she was actually pregnant as well as that her husband was abusive. Carrie Ross, Christa's maternal aunt, described Norma dragging her around by the hair while baby-sitting her, and Carissa, Christa's mother, mentioned Norma's abusive treatment of her as a child. Christa likewise spoke of Norma being abusive in the form of making her sister and herself drink Alka Seltzer when they told her they were thirsty and having to

sit in the bathtub for three hours at a time. Christa stated that when she and Alicia complained to her mother about Aunt Norma's treatment of them, Carissa did not believe them. Carissa said she only resorted to Norma as a sitter when she was in a pinch and could find no one else but discontinued using her as a sitter upon hearing from Christa that Norma was abusive (# 21, Carrie Ross and # 41, Carissa Hansen).

Geraldine, another of Zola's sisters, reportedly believes that God talks to her regularly, such as directing her to go to the mall when there are sales. Zola's maternal aunt, Nola Weikle, was committed to a mental hospital. This is commonly believed in the family to have been part of a plot devised by her husband, nicknamed Buffalo Bill, the county sheriff, to get her out of the way when he could not get a divorce from her. All four of Zola's brothers, Rudolph, Austin, Ralph, and Willis, are reportedly still living. They are described as even-tempered and as having no significant emotional/mental problems (# 21, Carrie Ross).

After the hard life Zola had with her family of origin, things looked up considerably when she married Chris Fotos. She was a housewife who helped her husband in his meat packing plant. They were initially fairly well off, having a beautiful home and a swimming pool. Their life was described as stable. However, in 1966 or 1967 Chris Fotos became seriously ill when his colon ruptured and he needed emergency surgery. After this he became addicted to injectable pain killers, especially Talwin. He said it numbed him from the waist down and each shot would last him four hours such that he took two injections a day to get through an eight hour work day, although for quite some time he took it much more frequently than this, according to his daughter, Carissa. He said he was addicted to it for fifteen years, discontinuing it when he retired (# 23, Chris Fotos and # 27, Carissa Hansen).

According to Carissa, her father's Talwin addiction changed everything at home in that he became physically and mentally abusive of her mother. He kept the family awake at all hours, demanding his shots, which his wife and Carissa gave him. Zola started drinking to cope, becoming an alcoholic and dying in 1985 at age 55 of cirrhosis of the liver. According to Chris Fotos, he and his wife got along extremely well and the only time they ever fought was over their girls. Said Chris, "They had to be spotless or she would be picking herself up off the floor" (# 20, Carissa Hansen and # 23, Chris Fotos).

On several occasions the IRS audited Chris Fotos and charged him with income tax evasion. When he went into the courtroom the judge became aware that he was concealing a gun, which Chris stated he had with him because he was carrying a large sum of money with which to pay the bond on the income tax

evasion charge. Chris stated that the gun was discovered in his shoulder holster when the judge asked him where he was going as he headed across the courtroom to talk to his attorneys. Chris said he responded, "You son of a bitch, I'm here to unseat you," whereupon four or five U.S. Marshalls jumped out of their seats and detained him. He had to pay a $2,000 fine and was put on four years probation for carrying a concealed weapon. He said his attorneys told him to say very little to the IRS agents other than "hello" and "good-bye." He embellished this by saying, "Hello, you sons of bitches," "Good-bye, you sons of bitches," and the like. The period of time that they were being audited by the IRS was reportedly quite hard on the family, with agents living with them for several weeks to inventory the entire household such that Zola had to account for every dress, every bobbypin, and every pair of shoes (# 23, Chris Fotos and # 20, Carissa Hansen).

Chris continued to operate his own meat packing business until he retired. Now age seventy-four, he owns a trailer park next door to his daughter, Carrie Ross, who moved into the family home. He lives with Carrie's sixteen year old son, Chris, who was born out of wedlock (# 23, Chris Fotos).

Chris had little to say about the situation with his granddaughter, Christa, stating that all he ever did during her childhood was work and that he did not have much time to play with his grandchildren. He commented, "Any woman who screws around with a Goddamned nigger deserves to die," adding that it would not hurt him a bit were she to be executed and that "I would probably throw the switch." His opinion of Christa is that she is a beautiful girl who could have had her choice of any man she wanted (# 23, Chris Fotos).

As noted above, Zola, Christa's maternal grandmother, died of cirrhosis of the liver in 1985 at age fifty five. Christa has not had a lot of involvement with this grandmother. When Zola was drunk she reportedly would tell Christa, "You're a little liar and you're going to go to hell." Zola was much more involved with Alicia, Christa's older sister, with Alicia having lived with her for long periods of time after Carissa divorced Alicia's father, James Ferguson, when Alicia was three. Carrie noted that Christa and Alicia often witnessed physical confrontations among Zola, Carrie, and Carissa, usually when Zola was intoxicated (# 19, Carissa Hansen and # 21, Carrie Ross).

Not as much is known about the extended family of Christa's father, Glenn Pike, who is more close-mouthed about his family history. He stated that his father, Emil Leonard Pike, was a coal miner and then a self-employed plumber. His mother, Delfa Clark, was a homemaker. He described his background as being lower middle-class. His father died of a heart attack when Glenn was thirteen.

He has a sister, Pearl Poling, who reportedly had some involvement with Christa until the Job Corps incident (# 20, Carissa Hansen and # 22, Glenn Pike).

## IMMEDIATE FAMILY

MOTHER - Carissa Ferguson Pike Thompson Hansen

According to Carrie Ross, Christa's maternal aunt, both she and Christa's mother, Carissa, had blood dyscrasia when they were small children but Carissa, four years older than Carrie, had it worse and was hospitalized several times during childhood for blood transfusions. Carissa failed the first grade because she was hospitalized so often. Carissa was pampered and petted, Carrie said, and never had to go by the rules. Carrie and Carissa were allowed to wear pants to school whereas the other girls could not, the idea being that the frequent nose bleeds characteristic of this illness were caused by changing from hot to cold and that pants kept them warmer than skirts. Interestingly, Carissa views herself as having had the harder life, saying because her mother so frequently had surgery that she provided much of the care of Carrie, four years younger than she (# 21, Carrie Ross and # 42, Carissa Hansen).

Carissa graduated from high school in 1970. She was generally not a disciplinary problem in school, being suspended one time in her senior year when she was truant with her best friend. Carissa later completed LPN training in 1975 after her divorce from James Ferguson (# 10, Carissa Hansen).

Carissa married James Ferguson, Alicia's father, in 1969 after dating him for five years. She was seventeen at the time. According to Carrie, he was very physically abusive of her sister, shooting at Carissa at one point when she was fleeing from him while carrying Alicia. They were divorced in 1974 (# 21, Carrie Ross and # 20, Carissa Hansen).

Carissa married Emil Glenn Pike on 7/2/75. Glenn was described by Carrie as "A nice guy. He's lazy. He doesn't have to go by the rules, he thinks. He's a mama's boy whose dad died early. His mama thought that anything that happened couldn't possibly be his fault." She said her sister worked two jobs because Glenn would not work. For example, he did not show up at his post office job because he had to get up too early and was fired via the mail rather than in person. His mother moved in with them because she did not want her son to have to take care of the baby. She provided childcare as well as cooked for them. Glenn did not want Alicia, who was sent to live with her maternal grandparents and Carrie (# 21, Carrie Ross).

Carissa stated that the marriage ended in divorce when she caught Glenn in bed with another woman in his mother's home. At the time he owned a motorcycle dirt track called Motocross Track. He knew that she would be there that day because he had called to tell her to bring something by. When she walked in she

saw her husband and a woman both naked in bed, with Glenn insisting that nothing had happened, that they had both just gotten drunk and had then fallen asleep in the same bed. His business subsequently failed after the divorce when he gambled away all his money, she said. Carissa and Glenn were divorced for two years before remarrying in 1979 (# 20, Carissa Hansen).

As noted above, Mrs. Pike, the paternal grandmother, had moved in with Carissa and her son soon after they first married. Carissa said Mrs. Pike spoiled her by cooking for her, cleaning, taking care of Christa, and in general making up for Glenn's deficits. Mrs. Pike lived with them for a year after Carissa divorced Glenn, until 1978, when Mrs. Pike moved in with her boyfriend, Ernest, who before this stayed with Carissa, Christa, and Mrs. Pike for weeks and even months at a time. Carissa said that sometimes she and her mother-in-law had disagreements, with Mrs. Pike, for example, not speaking to Carissa for a week after she cut Christa's hair. She would cry when Carissa disciplined Christa (# 20, Carissa Hansen).

It has been suggested that Ernest, an alcoholic, may have sexually abused Christa because sometimes she slept between Mrs. Pike and Ernest, both at Carissa's as well as at Mrs. Pike's home. Sometimes Christa was left alone with Ernest when Mrs. Pike would go to the store to buy him alcohol. According to Carrie, Christa would come home from her grandmother's house and touch her in unacceptable places, such as stroking her breast. Speculation within the family arose several years ago as to the possibility of this when it was suspected that Christa sexually molested her half sister(# 21, Carrie Ross and # 22, Glenn Pike).

Glenn has heard rumors of Ernest Johnson, his mother's boyfriend, sexually molesting Christa but doubts very much that this could have happened or that his mother knew anything about it, or, Glenn said, "That would be one dead man." Christa, he said, was everything to his mother, who died of cancer in 1988. Christa herself has no recollection of Ernest or of anyone else sexually abusing her. All she remembers about Ernest is that he ate raw eggs as well as killed, skinned, and ate "possums." She remembers visiting him in Florida with her grandmother (# 22, Glenn Pike).

During the two year interval between her marriages to Glenn Pike, Carissa dated numerous men. For example, she reportedly lived with Ronnie Rutherford for a few weeks. Carissa said that she dated a man named Clifford Gillenwater, who was reportedly involved with the Mafia. He traveled quite a bit, and they did not date a lot, with Carissa spending nights with him in his motel room when he was in town. She came to suspect that he was a hit man for the Mafia. She then saw a man named Haynes Smith, who she dated for six months, until he told her he

was getting married to someone else. (# 20, Carissa Hansen and # 21, Carrie Ross).

Carissa was dating Mike Smith when she overdosed in a suicide attempt. She was working two jobs at the time but had just left her day time job, as nurse at a doctor's office, because her employer was "touchy feely" and often made sexual remarks to her. Mrs. Pike was keeping Christa at night and bringing her home to Carissa during the daytime. Carissa was working nights at a nursing home as well. She would get up and fix Christa breakfast and go back to bed while Christa played on Carissa's bed with her dolls until Carissa got up at 10:30 A.M. (# 20, Carissa Hansen).

When Carissa opened her eyes at the hospital after overdosing, Glenn, her former husband, was sitting next to her. She decided that he must really care after all. This, the fact that he had a job in construction, and was engaged to another woman, who had taunted Carissa about their engagement, made her decide to remarry Glenn in 1979. However, soon after their marriage Glenn quit his job (# 20, Carissa Hansen)

In 1982 Carissa learned Glenn was seeing another woman and they began arguing constantly at this point. She described a dramatic altercation involving Glenn coming into the house one night and announcing to her and her guests that his girlfriend was going to give him a son. He told them that he was going to go out drinking and Carissa decided that she would, too, taking her daughters to her mother's house and going to a club. A man at the club told Carissa that her husband and the man's wife were together and told her where they could be found. Carissa and a friend found Glenn's truck at the trailer park the man had described. Carissa's dog had disappeared a few weeks earlier and both she and her daughters were heartbroken about this. When she approached the trailer she could hear their dog barking inside. When no one came to the door she kicked a hole through the door. The woman who finally came to the door said that Glenn was not there, but Carissa did not believe this, threatening to beat the woman up. Glenn finally came out, telling her to leave his girlfriend alone and to do whatever she had to do. He never returned home after this, and the next day Carissa filed for divorce. Carrie pointed out that throughout Christa's life all she has ever heard her mother say was, "I'll whup your ass" whenever someone crossed her (# 21, Carrie Ross and # 20, Carissa Hansen).

In 1982, following Carissa's divorce from Glenn, she and Christa, age six, moved in with her parents, Alicia, and Carrie. At the time she was working at Beckley Hospital, the nursing home not allowing her to come back after her overdose. Carissa was unsuccessful in organizing a union at Beckley Hospital and thus decided she should move on. She went to work at Princeton Community Hospital

for seven months. After her second divorce from Glenn, Carissa dated Tom Farrell in Beckley for a year. Tom told her from the beginning he did not like children and she knew there was no future with him. Before dating Tom Farrell she saw a man who she could only recall as Howard, who owned a night club, seeing him for a few months (# 20, Carissa Hansen).

Carissa had a CB radio at the time, meeting Danny Thompson, a trucker, via her CB. They began dating around September 1982, living together in his mobile home in Snow Camp, North Carolina in April 1983 and marrying in July 1984 (# 20, Carissa Hansen).

When Carissa moved to North Carolina in April 1983 to live with Thompson, Christa moved with her. Sometime in 1984 Carissa and her husband moved back to West Virginia because Carissa's mother was very ill with cirrhosis and also because Carissa was homesick. Although Christa lived with her mother and stepfather for awhile in November 1984, Christa then moved in with Mrs. Pike because Carissa was staying at the hospital so much with her sick mother. According to Carrie, Thompson had made it clear to Carissa that she had to choose between him and her daughters and she chose him (# 20, Carissa Hansen and # 21, Carrie Ross).

Although Mrs. Fotos died in 1985, Christa continued to live with Mrs. Pike until January 1986, at which point she again moved to North Carolina. Carissa was working at Hill Haven Nursing Home in Graham while living in Snow Camp. In February 1987 she went to work for Blue Cross-Blue Shield as a medical review examiner and in September was promoted to supervisor, working here until September 1989 (# 20, Carissa Hansen).

At one point Thompson reportedly stole a farm tractor and a riding lawn mower in Beckley, with both himself and Carissa being indicted for this. He was in North Carolina when Carissa was arrested during a visit to West Virginia. She telephoned Danny, asking him to come and help her deal with this, but he refused to do so, saying that the authorities would put him in jail if he showed up. The charges were subsequently dropped when Danny got rid of the tractor and riding lawn mower. Carissa, however, knew that he had stolen these items from a dealership, adding that she had told him not to do it (# 20, Carissa Hansen).

Danny had been married twice before and had two daughters, Tracie and Donna. After the move to North Carolina his daughters, then ages thirteen and eight, briefly came to live with them. Danny would tape their phone conversations and listen to the tapes later. The girls did not stay long after he learned that they had called their mother and complained about how strict Carissa was. He made the

girls pack up immediately and left them at their mother's door. The girls never visited again, nor did his two sons, Bubba and Joshua (# 20, Carissa Hansen).

Soon after this Christa's grade card was particularly bad, and Danny told Carissa to call Glenn to come get Christa because he was not putting up with Christa anymore. After he left the next day Carissa packed up and drove to Chapel Hill, renting a small, three bedroom trailer "with huge rats as big as possums." She and Christa stayed there with Alicia, age fifteen, who by this point had married Brian Hammond, with Carissa's permission and over Carrie's objections, after getting pregnant out of wedlock at age fourteen. Brian and Alicia slept on the floor in the living room and Keith, their infant, had his own room. Christa had her own room as well but slept with her mother. Carissa described Alicia reaching under the sink to get a pot, thinking she had it by its handle, but instead finding she was holding a black snake. Christa herself does not recall the rats and snake (# 20, Carissa Hansen and # 21, Carrie Ross).

Carissa moved across the street into a three bedroom double-wide trailer in Chapel Hill, where they lived for less than a year. The trailer was damp, cold, and mildewy. Christa complained that the landlord looked into the windows at her when her mother was not there. Danny moved in with Carissa for the last time, until she kicked him out and divorced him in May 1989. The precipitating event occurred one day when Christa and her mother had nothing to eat but a can of corn, which they split. Danny reportedly came home with a big bag of food from Burger King. Carissa and Christa were happy to have some food to eat, but Danny said it was all for him. Carissa had separated from Danny approximately ten times during this four to five year interval until finally divorcing him in May 1989. She said the separations were usually over both of the girls but mostly because of Christa, with Danny often angry because Christa would not do her homework or clean her room. He was reportedly physically abusive of both girls, described further below (# 20, Carissa Hansen).

At about this time Carissa started dating Steve Kyaw, doing so before her divorce from Danny was finalized. She moved to Hillsborough, North Carolina in August 1989 and lived with Kyaw because she thought it less expensive than living apart since they saw each other daily anyway. She was still working at Blue Cross-Blue Shield at the time (# 20, Carissa Hansen).

To this day Christa has strong feelings about Steve, describing him as "Nasty ... he was a pervert." She said he had a stack of X-rated video tapes higher than she was tall. Christa is of the opinion that her mother chose Steve over her, with her mother typically taking Steve's side in their many altercations. Steve, said Christa, would call her a whore and a slut while grabbing his genitals and shaking them at her.

One time Christa was attempting to leave because she did not want to stay at home with Steve and he hit her in the face. Christa complained to a policeman but ended up dropping the charges. Christa by this point was skipping school and associating with other children who often got into trouble, one of whom broke out two of their windows after Steve made him leave. Christa went to live with her father in West Virginia but after a few weeks he drove her home to her mother because of her behavior, depositing her and her suitcases at her mother's doorstep while Carissa was at work (# 20, Carissa Hansen).

Christa said that on occasion Steve would come in at 2:00 or 3:00 in the morning and start hitting her while she was sound asleep. Once he did this when her mother was there but usually Carissa was not at home when this occurred. Agency records make note of Steve pinching Christa on the breast during wrestling matches in retaliation for Christa pinching his penis as well as Christa complaining of him "feeling me up" when wrestling with him (# 2, Kaiser Permanente).

Another incident with Steve occurred when Carissa was at work and Steve told Christa not to leave the house until she had cleaned her room as he had told her to do. Instead, Christa reportedly went outside and when he went out after her she said, "Fuck you." He grabbed her jacket and the zipper left a mark on her face, said Carissa, although Christa claimed he hit her with a belt in front of the neighborhood. When he chased her inside with the belt, she reportedly grabbed a butcher knife from the kitchen and started chasing him. Christa had Steve arrested. Carissa bailed him out, and when he returned home he said that Christa had to go but Carissa said that if Christa went, so did she. Apparently, this prompted counseling as well as court ordered mediation, with the upshot being that Steve and Carissa separated. Carissa is adamant that Steve did not physically abuse Christa, although Christa told several of her friends, as well as a juvenile court psychologist, that he did (# 20, Carissa Hansen, # 29, Brandie Parker, # 31, Mandy Staley and # 32, Rose Wilson, Ph.D.).

In March 1991 Christa and her mother moved into Flint Ridge Apartments, renting a two story condominium. A month or so later Carissa and her current husband, Gerard Hansen, started dating. Around this time Christa was remanded to Swannanoa, a training school in North Carolina, and Carissa moved in with Gerard in his one bedroom rental home, living here until March 1992. At this point Christa came home from the training school and they rented a four bedroom house in Cedar Grove, right outside of Hillsborough, where they currently reside. Carissa married Gerard some months later, in October 1992. He is her fifth husband.

Additional information about Carissa, Christa's mother, is that as well as being arrested on theft charges, Carissa received a DUI in 1988 the night her grandfather, Gust Fotos, died. Her driving privileges were suspended in West Virginia by the Department of Motor Vehicles, and criminal charges in conjunction with the DUI were dropped. She has never asked for her driving privileges back but continues driving in West Virginia nonetheless (# 20, Carissa Hansen).

Christa worries about her mother dying of alcohol related problems because her maternal grandmother, Zola, died of cirrhosis. As soon as her mother comes home from work, Christa said, she starts drinking beer, drinking one after the other until she goes to bed. Christa especially noticed this after she turned nine. It troubles her that her mother will not acknowledge that she has problems with alcohol.

Carissa stated she used to drink quite a bit, drinking a six pack of beer a night after moving to Flint Ridge because she was alone so much of the time. When she moved in with Gerard she did not drink as much at first but then they started sharing a twelve pack of beer a night. They stopped drinking, for the most part, after murder charges were filed against Christa as well as started going to church. They now limit their alcohol consumption to a glass of wine with dinner each night, she said, although her daughter, Alicia, said they still drink some on weekends (# 20, Carissa Hansen and # 40, Alicia Wills).

Carissa said she smoked marijuana beginning in 1973 or 1974 when her younger sister, Carrie, introduced her to it. She said she smoked occasionally but has not smoked at all since the summer of 1994, after the homicide, because she wants to set a better example for Christa. She said she never smoked marijuana in the home in the presence of the children. She smoked marijuana with Christa once when Christa was seventeen and they were vacationing at Cape Hatteras. Carissa said she thought it would bring them closer together, as friends. Carissa tried LSD once, in the 1970s, after Christa was born but did not take this again because "it really messed me up" (# 20, Carissa Hansen).

Christa remembers the marijuana smoking incident with her mother in 1993 when they were vacationing at the Outer Banks. She said her mother never smoked marijuana in front of her as a child, but she was aware of her mother smoking with her boyfriend, Steve Kyaw, because she saw them smoking together when she accompanied them to a friend's house. They thought she was sleeping at the time. She was eleven or twelve and already smoking marijuana herself by this time, having begun to do so at age nine. Her sister, Alicia, and ex-brother-in-law, Brian, smoked in front of Christa when she was twelve or thirteen and Alicia was seventeen or eighteen, which Alicia confirmed. She said she only smoked pot

with Christa on two occasions because it frightened her to see Christa become so "wild" from its effects (# 40, Alicia Wills).

Christa stated that at least once when she came home she could smell marijuana in the house and Alicia later told her that she and her mother had been smoking pot together. Christa said she thought it was "cool" that her mother smoked pot, being of the opinion that her mother could not tell her not to smoke marijuana when she did so herself. Alicia also confirmed that she and her mother smoked marijuana together beginning when Alicia was about nineteen (# 40, Alicia Wills).

Christa claimed that Alicia grew marijuana at home as a teenager in her maternal grandmother's greenhouse and that she herself grew marijuana the summer before entering the Job Corps. Although Carissa has no knowledge of Alicia growing marijuana, she does recall destroying several marijuana plants of Christa's at about this time after being told of them by Alicia, with Christa becoming very angry about this. In turn, said Alicia, Christa destroyed her mother's tulips. Zola, Christa's maternal grandmother, grew marijuana in her greenhouse, said Carissa, although Zola herself did not smoke marijuana. Zola gave the marijuana plants to her friends as gifts. Carissa said she attempted to get her father to smoke marijuana as a substitute for the Talwin to which he was addicted, but to no avail (# 27, Carissa Hansen and # 40, Alicia Wills).

Carissa was never in counseling or psychotherapy, despite it having been recommended to her, until after this homicide involving Christa. She then saw Eva Farrell, a psychologist, who reportedly specializes in spiritual psychotherapy. That is, Carissa said, she heals by talking to you about the Bible. Carissa saw her two weeks after Christa's arrest and then had ten "phone sessions." Carissa has been attending a Bible study class weekly as well, with this also having started after murder charges were placed against Christa (# 20, Carissa Hansen).

Christa said her mother is much like she is herself. She is always with a man and, like Christa, is dependent on men but not necessarily for physical needs, Christa said. Christa stated she likes to take care of someone and have someone care about her, which she thinks she got from her mother. She thinks this is an "awful" way to be, saying that she has gone through mental hell because of boyfriends. She believes that she is like her mother as well in that she throws too much of herself into relationships, pointing out that when she was seventeen she voluntarily lived on the streets with an eighteen or nineteen year old man, Brian, for three months who was "A bum, ignorant, and an asshole." This is described further below.

Carrie Ross, Carissa's sister, said that although her sister has a "heart of gold" that she did not want her sister to get pregnant by her second husband, Glenn,

because she was so irresponsible with her first child, Alicia. Married initially at age seventeen, she had Alicia at age nineteen and mostly Carrie, four years younger than Carissa, and her mother took care of Alicia. Carissa, said Carrie, is emotionally immature. She will go with any man who pats her on the head. Christa, she said, is just like her mother. One of the main things she recollects about the relationship between Tadaryl and Christa is that Tadaryl was the first male to ever buy her flowers, which made a huge impression on Christa (# 21, Carrie Ross).

FATHER - Glenn Pike

Glenn was born in Raleigh, West Virginia and raised in nearby Table Rock after the age of ten. He and his family lived in a trailer on a farm (# 22, Glenn Pike).

Emil Leonard Pike, Glenn's father, died of a heart attack when Glenn was about thirteen. Glenn quit school in the eleventh grade. His mother could not get work so he and his mother moved to Indianapolis in 1964 when Glenn was sixteen and both worked in order to continue making payments on their farm. He was here for two years, until he was drafted into the army in 1966. His mother continued to live in Indianapolis (# 22, Glenn Pike).

Glenn served in Vietnam, where he said he contracted hepatitis as well as was shot in the neck. He was discharged in 1968 and went back to Indianapolis. His mother moved home to West Virginia in 1969 and Glenn followed in 1970. He said he did "odds and ends" in the form of bartending, construction work, and cutting timber until about 1970, at which point he re-entered the service and was stationed at Fort Bragg, North Carolina. He received an honorable discharge in 1976 and returned to the family farm. He had earlier married in 1975 to Jo Anne Lilly, only staying married to her for a few months (# 22, Glenn Pike).

In the same year as his divorce, 1975, Glenn married Carissa for the first time, being divorced from her in 1977 soon after his motorcycle racetrack failed. He remarried her in 1979 but was divorced from her again in 1982. He did construction work off and on until 1989, saying that sometimes he was off work because he could not find anything (# 22, Glenn Pike).

Glenn married Kathleen Allman, a Canadian citizen, in June 1986. This is his fourth marriage. They have two children, a daughter, Lindsey, age seven, and Max, age six. In 1991 Glenn started working for the National Park Service on a seasonal basis doing maintenance work, until he was laid-off in October 1994. He has not been able to find work since then and with his divorce pending from Kathleen, who returned to Canada with their two children, has found it hard to

hold a job. He has had to go to Canada twice this year to deal with the pending divorce. He has decided not to seek custody because the children have indicated to him that they are happy with their mother in Canada (# 22, Glenn Pike).

Inasmuch as he is a Vietnam veteran, Glenn believes he may have been exposed to Agent Orange and that this may have somehow adversely affected Christa. However, he stated that "You couldn't have asked for a better kid" up until Christa was about eight or nine. He attributed much of her behavior problems to her having lived mostly with her mother, who he said loves her and has done the best with her but was not firm enough with her. He also believes that Carissa's lifestyle "was probably the worst thing she could have done. She gallivanted around." He stated that his ex-wife likes to drink and was not at home much with Christa (# 22, Glenn Pike).

At the same time, Glenn acknowledged that he himself has little personal knowledge of Christa. He indicated that Christa stayed with his mother most of her earlier years, perhaps half the time. After their second divorce when Christa was five or six, she moved back and forth between her mother and Mrs. Pike, until Carissa moved to North Carolina, taking Christa with her when she was seven or eight. He is not aware of Christa having wet the bed up until about first grade, as her mother related. He does not recall Christa smoking in the third grade, taking pornography to school, and so forth, all of which is common knowledge on the maternal side of the family (# 22, Glenn Pike).

Mrs. Pike was everything to Christa, Carissa stated. When Grandmother Pike died from cancer in 1988, Christa, age twelve at the time, cried for days and could not be comforted. Several counselors related Christa's problems to the death of her Grandmother Pike but Christa herself scoffs at this, saying she had problems even before this. At the same time, however, she states that her grandmother was the only person who ever really loved her, with the exception of Tadaryl (# 20, Carissa Hansen).

Glenn did acknowledge that during the brief interval when Christa lived with him following the incident with Steve Kyaw that his wife thought that Christa molested their daughter, Lindsey, age two or three at the time. He indicated that Kathleen refused to allow Christa to return to their home after this. Glenn stated that he would have lunch with Christa every time she came to West Virginia, but he did not go to North Carolina to see her. He indicated that he is now older, more mature, and settled and is more invested in his current children than he ever was in Christa (# 22, Glenn Pike).

Glenn also acknowledged that neither he nor Carissa was really there for Christa as well as stated that Christa went from one extreme to the other as regards

discipline, with her mother being lax and he himself being strict. He said he used a belt on Christa but "not much," swatting her whenever she was bad and doubling the belt when she was particularly bad, such as when she lied, because the belt would then make a loud, smacking sound. If he just tapped her, he said, his mother as well as Christa would cry but then Christa would stop crying two minutes after he had finished punishing her. She mostly was punished for lying about not going to class and not doing her homework. She would forge teachers' signatures showing that she had handed in her homework when she had not. Whenever he could not handle her he would send her back to her mother, he said. He is of the opinion that Christa ran with the wrong crowd and that this made her rebellious (# 22, Glenn Pike).

Carissa stated that Glenn, an alcoholic for as long as she has known him, never paid child support and she never took him to court for this, being of the opinion that if Glenn did not love Christa, her daughter would learn it sooner or later. He seldom involved himself in Christa's life except to send clothing he bought at flea markets or unless Carissa insisted he buy Christa something, such as a winter coat (# 19 and # 20, Carissa Hansen).

Christa remembers going back and forth, two or three times a year, between her parents, with each threatening to send her back to the other because of her behavior, which she said she never considered much of a threat. Carissa stated that Christa actually only lived with her father for the three weeks in sixth or seventh grade following the Steve Kyaw incident and that she would only visit him after that for brief periods of time, usually in the summers. However, school records from West Virginia and North Carolina indicate a good deal of movement back and forth (# 22, Glenn Pike, # 27, Carissa Hansen, # 7, School Records, # 9, School Records and # 11, School Records).

Christa said all she really remembers about her birth father are the bad times. Her main memory of her father is of him "just sitting on his butt all the time." She thinks maybe he did some construction work. She said she does not like him very much because he seems to her to be lazy, but she loves him because he is her father and she "guesses" that she is supposed to. She has always had quite a bit of animosity toward him because of her mother. Her mother "busted her ass working," Christa said, whereas her father only paid child support two or three times. Christa is aware that her mother divorced her father after he cheated on her. During her parents' second marriage she recollects her father breaking her Bubble Yum doll after she colored on her sister's doll's face. Alicia told on her, and her father told Christa to go get her favorite doll, whereupon he broke it all to pieces. Even Alicia cried trying to help her put it together, said Christa, an event Alicia recollected as well (# 40, Alicia Wills).

Her father, Christa said, "Used to beat my ass with a belt so many times I lost count." He would make her touch her toes and then beat her through her clothing. Sometimes he would make her pick a switch. She thought she was really bad because of his constant beating of her. She would not do her homework, she stated, and she would get it for that. He would be in a bad mood, she would do something to get on his nerves, and he would take it out on her, in her opinion. She confirmed that her father would especially punish her for lying. She said he left bruises but she thought that was normal. Her grandmother used to cry whenever her father beat Christa, and he would tell her to shut up.

Shortly before Christa turned eighteen Gerard, her stepfather, made an effort to adopt Christa. He had adoption papers drawn up and sent to Glenn. However, by the time Glenn signed these papers and had them notarized, relinquishing his parental rights, Christa had already turned eighteen and the Hansens were told it was too late. Christa was very angry about this, Gerard said. At some point she went to her father's home in Beckley and took the rings her grandmother had left her as well as a piece of antique furniture, in effect telling her birth father that she wanted nothing more to do with him. Since her incarceration, however, she has telephoned him. He has not visited her at all, in contrast to her mother, who has visited Christa numerous times (# 28, Gerard Hansen).

STEPFATHER - Gerard Hansen

Gerard Hansen, age 39, is Christa's stepfather, Carissa's fifth husband. He has known Christa since 1991. Born and raised in Holland, he immigrated to America in 1981 after being an exchange student here in 1977 while in college. He is not yet an American citizen although he considers the United States his home. His parents still reside in Holland, and if something happens to them he wants to be able to go back to Holland quickly, which he could not do as easily were he an American citizen, he stated. He said he has the equivalent of a four year college degree from a technical school in Holland. He has worked the last seven years as a senior test operator at Mitsubishi Semi-conductor in Durham, where they make computer chips. He has been married before, for eight and a half years, and has no children. He has never had criminal charges placed against him (# 28, Gerard Hansen).

Gerard said he has always had a good relationship with Christa, who seems to see him as someone who is on her level. She has never viewed him as someone who tried to break up her family as he believes she has considered to be the case with previous stepfathers, and he and Christa have never had any really serious problems, he stated. According to Carissa, he tried to be Christa's friend rather than a parent figure, for example, never telling Carissa until just recently that

Christa, who has no driver's license, would take her car at night while Carissa was asleep. At the same time that he was being Christa's friend, Gerard described Carissa's relationship with Christa as being more sisterly than mother/daughter. They would constantly verbally battle over trivial things and he often had to intervene (# 28, Gerard Hansen and # 43, Carissa Hansen).

Gerard acknowledged that he and Carissa have had a good deal of trouble with Christa, who has been out of control for as long as he has known her, trying to see how far she could push everyone, in his opinion. She was better at first upon returning from training school at age seventeen after being sent here at age fifteen, until she started associating with her old friends and again began staying out late or not coming home at all for days at a time. He commented, as has Christa herself, that she could have left Swannanoa after three months but instead was here for over a year because of her poor attitude and behavior (# 28, Gerard Hansen).

Gerard was most taken by an incident that happened when a friend was visiting him from Holland before he and Carissa starting living together. He and the friend were visiting Christa and her mother at their apartment in Flint Ridge when Christa, who had been out all day, around four in the afternoon started nagging her mother to allow her to go out again for the evening. Her mother refused because, she said, they had company. Christa went to her room and soon thereafter they heard a thud. They ran upstairs to find that Christa had put a dresser in front of her door to prevent their entry and had tied her sheets together and dropped out her window. She was long gone, he said, by the time they got downstairs. Carissa called the police, who brought Christa back after about two and a half hours, along with her friend, Brandie. While the policeman was in the house, Brandie bolted out the front door, and Christa attempted to follow her, whereupon Gerard physically restrained Christa by wrapping his arms around her, lifting her off the floor as she screamed and struggled before finally sitting down. This was his only "run in" with her, he said (# 28, Gerard Hansen).

At one point Gerard and Carissa allowed Christa, age seventeen at the time, to live with a young man named Brian Wilson in their home, with the two teenagers sleeping together in Christa's bedroom. Gerard said he and Carissa reasoned that if she was going to try something like this, they would at least like it to be under their supervision. However, they grew to disapprove of Brian because of his laziness, finally telling him to leave, and Christa went with him. The two lived on the streets for a period of time. This is described further below (# 28, Gerard Hansen).

Gerard suspects after Christa's return from the training school that Christa was running drugs for someone in Durham. The police came by at least once a month

looking for Christa, until she left for the Job Corps in the fall 1994. The police never told the Hansens why they wanted Christa. Christa confirmed she was running drugs for a period of time, but said this was between her stints at Sheaffer house and Swannanoa (# 28, Gerard Hansen).

Gerard related another incident of Christa leaving home without permission and going with a black boyfriend, Orlando Powell, to the beach in South Carolina. Orlando returned without Christa and after a few days he called to tell them that Christa was living in a motel with several carnival people, mostly men. Gerard does not recall how or when Christa returned home. Christa stated she was in a motel room with two of her girlfriends, one of whom she thinks had a sexual relationship with one of the men, although insisted that she herself did not (# 28, Gerard Hansen).

According to Gerard, Christa very much likes attention. If she knows she has your attention, he said, she talks and talks and talks (# 28, Gerard Hansen).

SISTER - Alicia Wills

Carissa said she has always been close to Alicia, although Carissa's sister, Carrie, is of the opinion that it was she and Zola, Alicia's maternal grandmother, who actually raised her and Alicia confirmed this as well, saying that after Zola died in 1985 that she more or less was on her own. Alicia described Christa as being in a similar situation when her paternal grandmother died in 1988 (# 27, Carissa Hansen, # 21, Carrie Ross and # 40, Alicia Wills).

When Carissa moved to North Carolina with Danny Thompson, Alicia did not want to move with her but did so for part of the sixth grade. Danny and Carissa split up and Danny reportedly wrote Carissa a letter in March 1985 telling her that it was the children or him. Carissa chose Danny and Alicia went to live with Carrie while Christa was sent to her father. Carrie and her husband debated about taking in Christa as well but realized that Christa might be a bad influence on their own children. Christa's version of this is that her aunt considered having her live with them but thought this might make her mother feel bad since they already had Alicia. Carrie said all her money went to pay for necessities for Alicia because it was more important for Carissa to have a new party dress than to support her own child. It is Carrie's position that Alicia is actually closer to her children, regarding them as her siblings, than she is to her natural sister, Christa, which Alicia confirmed. For years, said Carrie, Alicia sent her Mother's Day cards (# 21, Carrie Ross and # 41, Alicia Wills).

In contrast to Carissa's account of Alicia having few difficulties, Carrie affirmed that Alicia, as well as Christa, had problems. Alicia herself, although now married to a medical doctor completing his residency in Irving, Texas, openly describes her promiscuity and drug use in her early years. She believes that in large part what saved her from ending up like Christa is living with her Aunt Carrie, an RN, who is an individual Alicia always admired and sought to emulate, in contrast to Alicia's mother (# 40, Alicia Wills and # 21, Carrie Ross).

When Alicia became pregnant at age fourteen Carrie was not in favor of Alicia marrying so young, but about this time Danny and Carissa moved back to Beckley, ostensibly to take care of Zola, who was dying of cirrhosis. Instead, Carrie said, Thompson ended up stealing things from Zola prior to her death. Carissa's attitude, Carrie said, was that it was fine for Alicia to marry at age fourteen, and Carissa thus gave her permission for her daughter to do so (# 21, Carrie Ross).

Alicia gave birth to Keith on January 14, 1987 when she was fifteen. She married the child's father, Brian Hammond, the month before, in December 1987, with the two moving to North Carolina to live with Carissa and Christa shortly before their marriage. By this time Carissa and Danny Thompson, her fourth husband, had separated (# 20, Carissa Hansen).

For a time, Carissa said, Alicia and Christa got along after Keith's birth. Prior to this, Alicia, who excelled in school, would taunt Christa about the fact that she, Alicia, made straight A's, in contrast to Christa's poor school performance. Alicia reportedly experienced school disciplinary problems only once, when she was suspended in the ninth grade for beating up a black football player who pinched her on the buttocks (# 20 and # 27, Carissa Hansen).

While living in North Carolina, Alicia and Brian acted as caretakers of both Carissa and Christa, with Alicia often loaning Carissa money and Brian fixing things for her. Alicia stated that her mother never seemed very together and relied heavily on her. Brian was reportedly selling drugs and going out on Alicia, who eventually divorced him. He moved back to West Virginia, taking Keith with him, with Alicia relinquishing her child as her own mother did her years earlier. Alicia met Matt Wills before her divorce and moved to Texas with him two years ago, living with him until last December, when they married. Alicia recently gained custody of her son and took Keith with her to Texas (# 21, Carrie Ross and # 40, Alicia Wills).

**INFANCY** (Birth through age one)

Christa was born in Appalachian Regional Hospital in Beckley, West Virginia but was immediately transferred to Charleston Area Health Center. She was on a respirator for a week due to being born with a hyaline membrane and respiratory failure. She was jaundiced at two weeks but not bad enough to be re-hospitalized. She had hip dysplasia at birth, i.e., no hip sockets. In her first year of life she had to wear three diapers at a time to hold her legs apart in such a manner that the large part of the bone wore in to her hip bone and grooved out a socket (# 20, Carissa Hansen).

Carissa stated that Christa was two months pre-mature, presumably the result of Carissa entering premature labor after a female patient in the psychiatric ward at Appalachian Regional Hospital, where Carissa worked at the time, assaulted her. Carissa immediately started spotting blood following this incident, was ordered to bed for a week by her physician, but nonetheless started labor at the end of the week. Christa was born via C-section when Carissa failed to dilate (# 27, Carissa Hansen).

Christa weighed five pounds, seven ounces at birth and was seventeen and three fourth inches long. Her eyes were blue and her hair was described as auburn. This information was derived from Christa's baby book, kept by her mother, with only five pages of this volume having any writing at all (# 24, Baby Book).

Christa reportedly turned over early and sat up on time, at about three months of age. She is described as having walked at about one year of age, also within normal limits. Although it was initially thought that Christa may have inherited the blood disease that runs in the family, this has been ruled out (# 20, Carissa Hansen).

Carissa said that she did not smoke marijuana, drink alcohol, or smoke cigarettes when she was pregnant with Christa. Glenn, however, thinks that she smoked marijuana about twice a month and drank alcohol about once a week while she was pregnant. He said she smoked cigarettes throughout her pregnancy (# 20, Carissa Hansen and # 22, Glenn Pike).

Carissa returned to work three weeks after Christa was born, at the time working as an LPN for a general surgeon from 9:00 A.M. to 5:00 P.M. Monday through Friday, working from 5:00 P.M. until midnight Monday through Friday at a nursing home, and working an additional twelve hours at the nursing home on weekends. Carissa stated that throughout the entire first year of Christa's life she had only twelve days off. Glenn, her husband at the time, was not working at all.

Carissa would come home to find him drinking beer and all the ashtrays overflowing (# 20, Carissa Hansen).

Christa stayed in a baby bed in her parents' bedroom for the first six months of life and then moved into a crib in her own room. Grandmother Pike would check on Christa at night even when she slept in her parents' room. At eight to twelve months of age Christa started crawling out of her crib and started sleeping with her grandmother, sleeping with her up until the grandmother died when Christa was twelve (# 20, Carissa Hansen).

**PRESCHOOL** (Ages two through four)

Christa lived with Grandmother Pike most of the time until the age of three unless Carissa had a day off, which was very seldom. Sometimes Mrs. Pike would bring Christa to Carissa's house on her infrequent days off so that she could have time with her daughter. Carissa acknowledged that Mrs. Pike was more of a mother to Christa than she. Typically as soon as Christa would get up in the morning Grandmother Pike would start playing with her, having tea parties, playing dolls, and the like (# 20, Carissa Hansen).

During Carissa's second marriage to Glenn between 1979 and 1982 Mrs. Pike was not quite as big a part of Christa's life as she had been earlier because Mrs. Pike was often traveling with Ernest, who had a home in Kentucky as well as West Virginia. He moved to Florida for a period of time, with Mrs. Pike going with him. Christa lived with them for three months in Florida. Upon Christa's return to her mother in Beckley, West Virginia, Zola baby-sat Christa for a period of time because Glenn refused to do so. When Zola's drinking got particularly bad Carissa put Christa in daycare for awhile in Beckley. Christa was here six months before she started kindergarten (# 20, Carissa Hansen).

## EARLY CHILDHOOD (ages five through eight)

At about age five Carissa enrolled Christa in ballet and tap classes as well as baton, with her Grandmother Pike taking her to these activities.

Christa recalls her sister, her cousin, Chris, and herself going to the slaughterhouse to watch their maternal grandfather, Chris Fotos, slaughter the animals from an early age. "We just loved it," said Christa. He would shoot the animals between the eyes and then hang them up by their feet. After cutting their throats he allowed the blood to drain, cutting out their "guts," said Christa. She described her grandfather wearing a big glove on one hand with which he would reach in and pull out the innards of the slaughtered animals. She said that the children would then play in the guts with sticks. They would get their grandfather to open up the stomachs of the animals so they could see what they had eaten. Whenever she came back to visit from North Carolina she would watch this slaughtering of the animals any chance she got. Sometimes she would name the animals before they were killed and her family thus refused to allow her to play with the animals for this reason. Christa mused that instead they should have refused to allow her to watch the butchering of the animals rather than not allowing her to befriend them.

Christa recalls in the third grade watching a movie called "The Mutilator." She will never forget this but said she does not know why it had such an impact on her. She said the "star" of the movie was killing everyone with an ax and she remembers in particular a scene where he tied down a girl and ran a meat hook up under her, with the hook emerging from her stomach. Both her mother and father allowed her to rent horror movies at an early age. She would typically ask video store clerks for the goriest movies they had, watching these movies over and over.

Christa remembers having horses at her father's home, saying that she rode them whenever she could and was never mean to them. She cried when her father sold the horses.

Christa wet the bed until she was in the first grade on a nightly basis, said Carissa (# 20, Carissa Hansen).

Christa recollects that she first shoplifted at age five, pocketing fifty dollars given her by her father to give her mother as a child support payment. She and Alicia split the money, went to the mall, and, after spending their respective $25.00, each shoplifted additional merchandise. Alicia said Christa is a kleptomaniac, virtually never leaving a store without shoplifting something, and Christa basically agreed that this is true (# 40, Alicia Wills).

**MIDDLE CHILDHOOD** (ages nine through twelve)

Christa recalls throwing her puppy, George, up in the air when she was nine or ten and allowing him to hit the ground. She would pick him up and love on him, then throw him up in the air again. She did this on three separate occasions.

While in the sixth grade at Grey-Culbreth School in North Carolina Christa remembers taking a picture to school of a naked man with his penis pierced. She said she got it from a friend of hers named Alice, adding, "I thought it was the craziest thing." Alicia recalls Christa reading pornographic magazines at various times but does not know how or where Christa obtained this material (# 40, Alicia Wills).

Christa said one of the hardest things she ever had to deal with at this age level was losing her Grandmother Pike to cancer. This is the only person who ever cared about her, she said, or cared whether or not she was in pain. It was hard for her to see her grandmother lose her hair, lose weight, etc. She was her grandmother's whole world. Together they would make cookies, baby-doll clothes, and the like. Her grandmother took the most pictures of her of anyone, said Christa. After her grandmother died she felt that no one cared for her and that the only reason why her mother and father had anything to do with her at all was because they had to and not because they wanted to.

Christa said that Danny Thompson, her mother's fourth husband, had a leather strap with a wooden handle "made just to wear my ass out." She recalls him pushing her against the bed and leaving bruises on her left hip and leg after he told her not to move and she instead went to the bathroom when her nose started bleeding. He hit her with this leather strap a few times on the legs and buttocks, leaving bruises. Once Christa recalls Danny telling her to stay up until she finished cleaning her room. Instead, she fell asleep under the bed with her legs sticking out and he came in and started hitting her legs. Her mother, she said, did nothing about this, although Carissa takes the position that immediately upon learning of his abusive treatment of her daughters that she left him (# 20 and # 43, Carissa Hansen).

Christa did not like Sheaffer House at first, where she was sent at age twelve, but cried when she left. She said she did fairly well there except for when she got caught smoking. She loved it, saying they would take her to the mall, to the YMCA, to swim and work out, or to do whatever the residents wanted. It was here that she started making friends with blacks, previously being strongly prejudiced against them. She liked their style, she stated, their music, and the way they dressed.

At some point after leaving Sheaffer House Christa recollects her mother and stepfather going to West Virginia and herself not wanting to go. She stayed behind, telling her mother she was going to spend the weekend with a friend. Instead, she and another friend decided to have a party and filled coolers full of liquor and beer. Christa was able to obtain money for this by selling her five-hundred dollar mountain bike for one hundred and forty dollars. Christa said she did not know that neighbors were watching them, who called Brian and Alicia. Brian showed up and slammed her head against the wall, bloodying her nose and ending the party.

**EARLY TEENS** (ages thirteen through fourteen)

Christa is aware that her stepmother, Kathleen, thought she had sexually abused Christa's niece, Lindsey about four or five years ago when Lindsey was two or three. Kathleen, she said, suddenly stopped talking to her and later indicated she thought Christa had molested Lindsey. Said Christa, "I may have done some sick things in my life but I would never do anything to hurt a child." Apparently, Kathleen was telling the psychologist she herself was seeing that Lindsey was talking about her private parts. The psychologist suggested the possibility of sexual abuse and Christa seemed a likely candidate because she sometimes baby-sat for Lindsey. Her father, stated Christa, said he did not know what to think but in any event Kathleen no longer wanted Christa in their home. Christa said she was very hurt by this and tried and tried to tell both her stepmother and father that she had not done this but Kathleen would not listen, her father would not take her part, and she never again was allowed in her father's home.

Sister Alicia never allowed Christa to be alone with her son, Keith, because she feared that between Christa's drug use, reading of pornography, and promiscuity that sexual abuse was a possibility. Although agency records suggest Christa sexually molested Keith, Alicia said she never suggested such a thing and does not believe this ever occurred (# 3, North Carolina Div. Mental Health Record and # 40, Alicia Wills).

It was about this time, said Alicia, that Christa started to grow particularly wild despite the efforts of Brian, her former spouse, and herself, to help Carissa with Christa. Carissa, said Alicia, was much too lenient with Christa, who by then was using drugs and displaying promiscuity. Alicia described an incident involving trying to get Christa to wash the dishes, with Christa "going crazy" and chasing Alicia with a knife. Alicia was able to restrain Christa until her mother returned home. Alicia is convinced that Christa is "crazy." Christa described a somewhat milder version of the incident, saying Alicia chased her with a broom and that both of them had a free-for-all (# 40, Alicia Wills).

Although Christa remembers her mother spanking her when she was very young, in her later years her mother seldom spanked her. Once, she said, her mother "went wild" when she and a friend were on "a runaway kick," for example, running away three times in one day. She recalls her mother grabbing her by the hair and pulling her down some steps into the living room.

Christa said she tried to kill herself in the sixth grade by overdosing. She told a friend she wanted to kill herself and the friend, whose mother was a doctor, obligingly brought pills to school for Christa. Christa said she took the pills at school one day when everybody else was doing "fun stuff" and Christa had to sit

in the hall for disciplinary reasons. Christa said she did this just because it was something to do. She started vomiting and her ex-brother-in-law, Brian Hammond, was called and took Christa to the hospital. She told him she was trying to get high and was not really suicidal because she did not want to be put in a mental hospital.

In the seventh grade, Christa and her best friend, Brandie Parker, made a decision to die together. Christa this time found pills at home. She said she wanted to kill herself because "just everything." Although the pills made her friend, Brandie, sick enough to have to go to the emergency room and subsequently be hospitalized in a psychiatric hospital for a month, Christa said the drugs had little effect on her other than making her "high." As she recalls her reason for doing this, it had to do with the circumstances of being in the seventh grade for the second time, she and her mother fighting daily, fighting with her nineteen year old boyfriend, and so forth.

Christa stated that she and Brandie would get high on Renuzit and Glade Air Freshener when they were in the seventh grade. They would go to the store and buy every can of air freshener on the shelf. She said that one could get high five or six times off of each can but that the high would only last a few minutes. She had nose bleeds constantly from this and said she had had these as a child as well. She would take a towel and fold it so that it was four layers thick and then breathe through the towel so that she would inhale gas and not liquid. She learned of this technique from a girl visiting the apartment complex from Michigan.

**MIDDLE TEENS** (ages fifteen through sixteen)

Christa said that the year and a half that she spent at Swannanoa, a training school, were "awful." She was always in trouble and had to be inside all the time sitting on a chair, reading, rather than being allowed to lie in bed when on restriction. She was housed in a special wing because she was always in trouble. She would not listen to anyone, often cussed staff, and constantly argued. No one ever effectively controlled her. After awhile she realized she would never get out until she buckled down.

Later, Christa acknowledged that Swannanoa was a stable, routine environment that was completely different from what she experienced at home. Christa said, "I think I was scared to go home because I was afraid I'd screw up real bad." She said that although she did not like Swannanoa she knew the routine was good for her, and every time she came close to discharge she deliberately sabotaged herself so she could stay longer.

Peggy Hamlett with Hillsborough Juvenile Court stated that their original plan was for Christa to be in some sort of residential psychiatric treatment before or after training school, the reason behind the psychological evaluation of Rose Wilson being performed. Instead, Christa constantly stayed in trouble such that every time she got close to earning enough points to enter a wilderness program or to be discharged, she ended up having to stay longer. Although Christa was to be here only three months, in fact she ended up having to stay for a year and three months. Consideration was given to moving her to Dillon, a facility for more severe problem children. It was when Christa first entered Swannanoa, Mrs. Hamlett said, that she heard vague rumors of Christa being involved in Satanism, and records here make note of Christa "dabbling in Satanic ideas." Christa stated that a boyfriend used to write her while she was here and put the number "6" on his letters, a symbol associated with the occult (# 32 Peggy Hamlett and # 45, Swannanoa records).

It was also at this time that she first became aware of what a poor role model Carissa was for Christa and how, despite a good initial presentation, she failed to follow through on treatment recommendations for Christa. She does not believe Carissa made much of an effort to visit Christa at Swannanoa. Carissa said she visited Christa once a month, but Christa herself said her mother only came four or five times. Rose Wilson commented that her mother's limited investment in her was a sore spot for Christa, who verbalized this to her as well as discussed her poor attachment with other family members (# 32, Peggy Hamlett and Rose Wilson, Ph.D. and # 43, Carissa Hansen).

This view of Carissa as setting few limits and not following through in a consistent manner was also voiced by Kerry Clement, a social services worker involved with this family following the Steve Kyaw incident. Ms. Clement viewed Carissa as a woman who had not yet fully grown up herself, much less was able to parent a daughter. Christa, she said, misbehaved in an effort to get her mother's attention since Carissa was so preoccupied with her love life. Ms. Clement speculated that perhaps because of limited maternal involvement, friendships took on a special importance for Christa. A Swannanoa staff person notes that Carissa's abusive relationships with men had affected Christa's relationships with males (# 37, Kerry Clement and # 45, Swannanoa records).

**LATE TEENS** (ages seventeen through nineteen)

After leaving the training school Christa lived with her mother and stepfather in Cedar Grove, an area outside of Hillsborough in North Carolina. Her mother had married Gerard Hansen while Christa was in training school and is still married to him. Christa loves him more than her real father because she said he does not "bitch" at or nag her. He is understanding and tries to help her. She can talk to him easier than she can her own mother because he does not look down on her or call her stupid or ignorant, she said.

Upon leaving the training school Christa said she would typically sleep until noon or 1:00 P.M. and then she would go out with her friend, Mandy, who had quit school. They would usually get drunk or "high" on drugs and arrive home at 2:00 or 3:00 A.M. Her parents griped at first about this and then stopped saying anything. Sometimes they would give her gas money.

Christa did not look for work at first. Brian Wilson, a chronically, severely disturbed psychiatric patient, according to Dr. Rose Wilson, moved in with them around the summer of 1993 after Christa told her mother he had nowhere to go. She cannot understand now why her mother allowed this, since Christa and Brian shared Christa's bedroom. At some point, she said, they lived on the streets because her parents did not approve of Brian living with them without working. During the time period that Brian did live with them two or three times a week Christa would leave him at home and go out with Mandy (# 32, Rose Wilson, Ph.D.)

Once Brian and Christa got into a fight about something and he hit her. She picked up a fire extinguisher and tried to strike him with it but he picked her up and dropped her such that she lost her breath. She knew that Brian had some sort of warrant out on him and called the police. He left but came back because it was so cold outside. He hid in Christa's closet, where the police found him. He went to jail for two or three months and it was after this that Christa went out into the streets with him. She recollects Brian breaking one of their windows but she does not know why or when this happened.

When she and Brian lived on the streets they would just walk and walk, said Christa, just to be going somewhere, such as walking from Chapel Hill to Durham. Christa said she would cry and people would give her money because they felt sorry for her. A friend of Brian's, Jeff, and his girlfriend, Christine, rented a trailer with Christa and Brian. Christa got disgusted because she was working three jobs by this point and Brian was barely working one job. After he quit his job Christa moved in with her boss, Randy, from the Great Steak and Fry, and his wife, Leah, as well as with his brother, Howard. Christa and Leah

worked together at the Orange Julius. Christa lived with them for a month or two and finally moved home the summer before she entered the Job Corps.

Christa believes she was home by her eighteenth birthday, returning when her parents allowed Breana, an old friend of Christa's whose mother had been abusive of her, to live there, with Christa not feeling comfortable with Breana having access to her possessions. Prior to returning home Christa lived with various friends after leaving Brian. Christa eventually ran Breana off.

Also during this interval Christa lived for two weeks with Beth Brown, a woman a few years older than Christa. Beth was supposed to be taking a class and Christa was to baby-sit for Beth's two year old son while she was in school. Christa said she and Beth got into an argument about how mean Beth was to her son. She said she could not put up with Beth anymore, especially because Beth was seeing "some nasty, straggly, drunk man" who was there all the time and Christa did not want to be around him. When Christa left Beth reportedly tried to keep all Christa's clothes. Christa said she and Mandy went back to get her things but Beth said she could not have them. Christa found her clothes in the bottom of Beth's washing machine, with cat excrement having ruined her clothing. Christa said she beat on Beth until her son woke up.

The second time Christa beat up Beth was after Beth told everybody that Christa had stolen from her. Beth reportedly bragged to everyone that she had a bullet with Christa's name on it, and Christa said she got tired of hearing this. One night Christa was out with Mandy, Orlando Powell, Jimmy, and another girl and they were all drunk. They drove by Beth's house and Beth reportedly called for Christa to go away. Christa said she kicked in Beth's door and hit Beth a few times. Jimmy attempted to pull Christa off of her. Beth sprayed them with a can of mace. Orlando picked up a car seat that was on her front porch and threw it at Beth. Mandy helped Christa get into the car. They drove to a Texaco station and tried to wash the mace out of their eyes, where they were arrested. Christa called her mother to get her out of jail. The others paid for Beth Brown's door being kicked in and the charges were dropped, with Christa avoiding all this by entering the Job Corps. Christa obtained a J.C. Penney's charge card and charged three or four hundred dollars worth of merchandise for which she never paid before leaving North Carolina to enter the Knoxville Job Corps.

Christa vigorously denied that she has ever been involved in prostitution but said Beth Brown tried to get her to do this. Beth reportedly told her a man who owned the Starlight Drive-In would give Christa fifty dollars "if I would let him eat me out for about twenty minutes."

While living on the streets Christa shoplifted from Roses Department Store, saying that she took things for her mother for Mother's Day although Carissa herself has no clear recollection of this. Christa never showed up for court. Carissa said that Christa would steal her ATM card at night while she was asleep and withdraw $100.00 at a time, causing her to bounce checks before she became aware of what Christa was doing. Christa denied stealing Carissa's ATM card but said she would steal money from her mother's purse (# 43, Carissa Hansen).

## EDUCATIONAL DATA

Christa said that if she spent the school year with her father, she would spend part of the summer with her mother, and vice versa. She initially went to Cranberry Elementary School in Beckley, West Virginia when living with her mother. Her kindergarten teacher was Ms. Bradley and a friend that she remembers was Stacy Fitzwater. She also went to Cranberry Elementary School for first grade when living with her mother but could not recall the names of any of her teachers. She thinks she went to live with her father for part of the second grade, going to Beaver Elementary. Glenn shipped Christa back to her mother in Snow Camp, North Carolina, she thinks, and she went to Alexander Wilson Elementary School for the rest of the second grade, where her teacher was a Ms. Roshelli. She thinks she may have gone back to Beaver Elementary in Beaver, West Virginia to live with her father and entered the third grade here. It was at this point that Carissa was seeing Danny Thompson, who she eventually married and who gave her the ultimatum of him or her daughters. Christa said it was at this point that she started getting "bad." She recollects taking a cigarette lighter and cigarettes to school and getting caught. She got into her first fight, with a girl named Amanda Emory, beating up Amanda who was saying things about Christa's grandmother, who was dying of cancer.

Christa ended up repeating the third grade and started third grade again at Beaver Elementary but believes she may have finished at Snow Camp, North Carolina. She thinks she went for fourth grade to Alexander Wilson Elementary School, again in Snow Camp. She cannot remember the name of her fourth grade teacher or much about this year. She believes she may have gone back to her father in Beaver, West Virginia for fifth grade, attending Shady Spring Elementary School, although school records reflect this was actually Beaver. Her mother believes she then went to Carrboro Elementary. Carissa moved to Chapel Hill, North Carolina and Christa lived with her mother during the sixth grade while attending Grey-Culbreth Middle School before transferring to Stanford after her mother moved to Hillsborough to live with Steve Kyaw in 1989. Christa went to summer school at Stanford in order to avoid repeating the sixth grade.

Christa was getting into quite a bit of trouble by this point, she said, often getting "high" and drunk and smoking cigarettes a lot. She said she never did her homework and often "cussed out" her teachers. She started being truant in about the sixth grade. She was suspended two or three times but cannot recall why. It is at this point that Christa made her first suicide attempt.

In the seventh grade Christa lived with her mother and Steve Kyaw in Hillsborough, North Carolina while attending Stanford Middle School. Halfway through the school year she moved to her father's home in Beaver, West Virginia

following the first incident with Steve Kyaw. She thinks that she did two months of the seventh grade at Shady Spring Junior High School before going back to her mother in Hillsborough and attending Stanford Middle School again. She failed this year, not surprisingly, having changed schools so many times that year. Both of her parents at this point were saying they could not handle her. She was not doing her schoolwork and had started sneaking out of her mother's house at night. This was when she met her friend, Mandy, and she, Mandy, and Mandy's brother would often go out together and get intoxicated as well as high on marijuana.

Christa repeated the seventh grade at Stanford Middle School in Hillsborough between 1990 and 1991 and was passed to the eighth grade. She started the eighth grade at Stanford but was sent off to Swannanoa, finishing the eight and ninth grades here and subsequently earning her GED.

Early school records indicate that Christa did very well on standardized tests, scoring in the top 10% nationwide in academic achievement testing although her actual grades did not reflect her potential (# 1, FMRS Health Council, Inc.).

## MEDICAL DATA

Records from the training school indicate that Christa experienced seizures during infancy. This was confirmed by her maternal aunt, Carrie Ross, who said that once when she, Carissa, and several ofther women were out drinking that Christa's sitter called Carissa to say that Christa had a very high fever and was seizuring. Carissa reportedly told the sitter that Christa would be fine, to rub her down with cold water. Carrie, however, insisted they leave the bar and check on Christa despite Carissa's reluctance to do so. Carissa's recollection is that she immediately left when she heard that Christa had seizured and took her to the hospital where the baby was admitted. This is reportedly the only seizure Christa had (# 21, Carrie Ross, # 45, Swannanoa records and # 20, Carissa Hansen).

It was first believed that Christa had inherited the family medical disease, blood dyscrasia, but this was ruled out. However, when she had a tonsillectomy at age seven or eight she almost hemorrhaged to death and required blood transfusions. She was hospitalized for three days at Bluefield Community Hospital (# 20, Carissa Hansen).

Upon entering Swannanoa it was learned Christa had chlamydia. Christa said she was not "screwing everyone" but would have sex just to feel someone cared about her. Usually she would not use any form of protection, saying she is allergic to condoms, which make her vagina swell. She started using birth control pills at first with Tadaryl but then decided she wanted to get pregnant and discontinued their use (# 45, Swannanoa records).

Christa said she used to hyperventilate when she was younger, whenever she became upset. She recalls doing this two or three times, once at age eight or nine while in Snow Camp. Another time she was at a skating rink in Hillsborough when she was twelve and a girl "jumped" on her. Christa screamed and could not breathe. An ambulance came and administered oxygen, which she said she found embarrassing. Another time she was at a friend's house in Snow Camp and started hyperventilating for no reason, with someone attempting to perform CPR. She does not know if an ambulance was called or not. Carissa has no recollection of Christa ever hyperventilating but said Gerard could vaguely remember something about this. Christa would stare off into space for hours at a time as a young child, Carissa said, whenever she tried to get her to do anything, such as clean her room or do her homework. Christa said she still retreats deeply into herself and broods on things such that nothing short of a very loud noise can distract her (# 43, Carissa Hansen).

In February 1990 Christa was in a car wreck, receiving a deep gash in her forehead when she went through the windshield and requiring minor plastic

surgery. It is not believed she suffered a loss of consciousness. She had just started modeling school but refused to go after this because of the head bandages (# 20, Carissa Hansen).

Christa talked about an incident that happened at the Job Corps, at which time she did not know exactly what happened to her. She was with Tadaryl on the second floor and suddenly became short of breath and started choking. She fell against the wall because she could not breathe and put her hand on the back of her neck, yanking off her necklace. Someone came up and was grabbing her and she started pushing everyone away. They took her to security and started making her drink water. Someone told her this experience was the result of not eating.

At age seventeen Christa underwent an abortion due to unwanted pregnancy.

While at the Job Corps Christa thought she was pregnant. Tadaryl took her to security at the Job Corps, and they took her to Baptist Hospital. It was learned she had an ovarian cyst that ruptured and Christa was treated for this in the emergency room. Both she and Tadaryl were in tears because she was not pregnant, said Christa.

## RELIGIOUS DATA

Christa recalls going to church with her paternal grandmother to Beaver First Baptist Church every Sunday until the age of five. When she moved to Hillsborough she and a neighbor, Breana, went to a Pentecostal church located next door to her home, being eleven or twelve at the time. When she was in Sheaffer House she went to church but does not know which church it was other than that it was a black church and they went there with a black staff person. She hated going. They would visit the staff person's black friends after church and she hated that as well because she felt so out of place.

## PSYCHOLOGICAL TREATMENT

In kindergarten Christa remembers going to FMRS for counseling in Beckley, West Virginia. She does not know why she was in therapy other than that she did not do her school work. She does recall trying to do her work but getting a sad face sticker on her paper from her teacher. The teacher said she deserved it and this hurt Christa's feelings. According to agency records, she actually went for counseling in the third grade rather than kindergarten (# 1, FMRS Mental Health Council, Inc.).

Dr. Charles Yeargan is another therapist Christa saw in Beckley about the same time. Dr. Yeargan was contacted but said he does not keep records this long and cannot remember Christa. Carissa remembers Dr. Yeargan telling her that Christa's only problem was that her daughter is lazy. Christa said she saw other counselors whose names she cannot remember (# 20, Carissa Hansen).

Carissa added that Christa saw a Dr. Gregory Straw in Chapel Hill at North Carolina Memorial Hospital for about eight months following her second overdose in the seventh grade. Dr. Straw reportedly told her that Christa was depressed. She saw him for about eight months, until spring 1989. Several times he reportedly talked about hospitalizing Christa but never did, said Carissa. Carissa said her daughter got school counseling through Orange County Mental Health, until she moved in with her father. Examination of the records and an interview with the counselor, Peter Kramer, suggest that he saw Christa only two or three times, with the mother not following through on the recommended counseling for herself after Christa moved back to her father following the Steve Kyaw incident. It was reportedly at this time that the incident involving Christa sexually molesting her half sister, Lindsey, age two or three at the time, occurred (# 20, Carissa Hansen and # 36, Peter Kramer).

It was not until the second incident involving Steve Kyaw, when Carissa called her ex-husband to see if he would take Christa again, that Carissa learned about the alleged sexual abuse. Glenn reportedly told her that his wife, Kathleen, would not allow Christa back in the home. Following this second incident is when Christa went to see Chuck Helton at Kaiser Permanente a few times. Christa's runaway behavior intensified, with Christa getting on the bus to go to school but then not coming home for several days. After a period of time she ended up in first Sheaffer House, a group home, and then Swannanoa.

## EMPLOYMENT HISTORY

Christa said she baby-sat at an early age, age nine or ten, for two girls in a trailer park, ages six and seven. She also baby-sat for the children of her father.

Upon leaving the training school Christa said she did private duty nursing jobs that her mother got for her for one to two week periods of time. Earlier, at Sheaffer House, she did volunteer work in a nursing home, Carolwoods. She said she would help out in the recreation department, setting up games. She would also help feed the patients. She did this off and on beginning about the age of fourteen or fifteen.

When living on the streets of Durham Christa worked at Gypsy's Candyland for two months as a clerk, Great Steak and Fry Company for two months, and Orange Julius for two months, working all three of these jobs simultaneously. It is her opinion that she was always dependable, was on time for work, and was clean.

After she returned home her boyfriend at the time, Orlando Powell, found Christa a job in Durham at Mama Mia's Pizzeria and she worked here for about two months with her friends, Mandy and Brandie, taking orders. In addition to paying them she said their bosses kept them high on marijuana, giving a bag of marijuana to whoever sold the most pizza, which Mandy and Brandie likewise confirmed (# 31, Mandy Staley and # 29, Brandie Parker).

Christa said she worked at the Waffle House in Hillsborough for a short period of time. She commented, "I felt like scum there. It was just awful. I worked third shift, when all the drunks and cops came in." She believes this was after living on the streets with Brian but she is not sure. She said she was fired because she was at the Waffle House one weekend as a customer and her boss hollered at her to take her feet off the booth. She told him she was there as a customer and he told her that if she would not move her feet he would fire her. She said "go ahead" and he fired her.

## SEXUAL HISTORY

At age nine Christa said she was molested by a man named Clyde Davis. He was in his forties and lived in the same trailer park as they. She got off the bus one day after school, walked to their trailer, then went to the mailbox to get the mail. Her mother was at work and her older sister, who was usually there waiting on her, had not yet gotten home. The man reportedly grabbed Christa and threw her in the weeds. He stuck sticks and fingers in her vagina and had his dog lick her vagina as well while he held her down, she stated. She said she was scared and just laid there after it started. She tried to scream but no one was within hearing distance. The next day she told a friend in school, Sarah, and a teacher's aid about this. School authorities told Christa's mother.

Christa picked the man out of a photo lineup, but he was only actually kept in jail for two weeks. After that her sister started meeting her at the bus stop. Alicia is of the opinion that Christa was lying, since she was sitting on the sofa when Alicia arrived home, acting as though nothing was wrong. Carissa also has doubts as to whether this event actually transpired. Alicia speculates Christa was jealous of the attention her new baby, Keith, was getting from everyone, with Christa having previously been the baby of the family. Interestingly, although Christa's two best friends, Brandie and Mandy, are aware of many details of Christa's life including the second rape, neither had heard about this first alleged rape (# 43, Carissa Hansen, # 40, Alicia Wills, # 29, Brandie Parker and # 31, Mandy Staley).

When she was seventeen Christa was visiting her friend, Brandie, and said she went out walking late one night to get diapers for Brandie's son, although Brandie said Christa was out looking for a telephone to call her boyfriend, Brian, with whom she had had a disagreement. A black man in his late twenties walked toward Christa and she crossed the road to avoid him. He reportedly said, "What's wrong? Because I'm a nigger you think I'm going to hurt you?" She said "No" and turned around to walk back home because she was frightened. She could not run because she was wearing slick boots. He ran behind her and pulled her down the side of the road such that she hit her head on a rock. He pulled her up a hill by her hair and her shirt. She was screaming and there were houses around her but no one came to her aid even though the next day when the police investigated, these neighbors indicated they had heard screams that night, she said. The man pulled down her pants and entered her but did not ejaculate. He had her by the hair and kept hitting her head on a rock on the ground while saying, "Be still, bitch." She was screaming and he put his hand over her face, which was suffocating her. When a car approached and slowed down, with its headlights on them, the man took off. She ran back to her friend's house and the police were called. She said she tries not to think about it but does so whenever

she hears anything about rape, usually every few months. On occasion she dreams about this as well as thinks about it if someone puts his or her hand over her face. Once while in Durham she said she saw the man walking down a street (# 29, Brandie Parker).

Christa said her first consensual sexual experience was when she was fourteen with a boyfriend, Bryan Dickinson. They had sex two or three times. When she was fourteen or fifteen she had sexual relations with her boyfriend at the time, Kenny Andrews, who she described as an on again, off again boyfriend. She had another boyfriend, age nineteen, when she was fifteen named Leroy Carroll. She was very enamored of him and they had sexual relations many times. She said they were always together and were best friends. She only came home to shower and eat. Her mother could not do anything with her, including getting her to go to school, because Christa would be out all hours of the night with Leroy, drinking and smoking pot. She said she was obsessed with him and the summer before she entered the Job Corps she tried to get back with him even though she was going with someone else at the time. When she finally did get him back she did not want him again and broke up with him.

Phil Riddle was another boyfriend, "I guess," at about the same time and she had consensual sex with him about three times. At age seventeen her boyfriend was Brian Wilson, with whom she lived on the streets for several months. She had sex many times with him. Once, when she and Brian were living on the streets, a black man offered them his home for the night and offered her five hundred dollars in exchange for sex. Although she said she refused, when he later pressed the issue she did not resist but was not given any money.

When she was seventeen Christa went to the beach for three days with Mandy and two boys. After getting drunk she had sex with a man she could only identify as Rick S. She became pregnant by him and subsequently had an abortion, her mother talking her into this on the advice of Carissa's physician employer, who was aware of Christa's extensive drug use, involving crack. Christa, however, said she used crack only three or four times and never when she was pregnant, with her mother greatly exaggerating this (# 27, Carissa Hansen).

At age eighteen Christa had a black boyfriend named Orlando Powell. Her parents did not know until after Colleen's death that Christa dated black men, Christa said. Her mother would have been disgusted with her as well as would her extended family, she said, were they to know. She had sexual relations with Orlando many times. She was "the other woman" since she was aware he had a regular girlfriend. She dated Adam Lyntz at the same time that she was seeing Orlando and had sex with him many times as well.

Upon coming to the Job Corps at age eighteen she started seeing Tadaryl, having sex with him about two weeks after coming to Knoxville and virtually daily thereafter and two to three times a day on weekends. Sex with him was better than with anyone else, she stated. Sometimes sex with him was rough and other times it was romantic. He made her feel important, sexy, pretty, and that nothing else in the world mattered other than that she be satisfied sexually. He cared more for her sexual enjoyment than his own, she said, and it was the first time she really felt she was truly making love with a man rather than just having sex.

Christa believes she must have really low self-esteem to put up with what she has from men. For example, many times she has been "the other woman" when the man has actually had another girlfriend who was his regular girlfriend.

On further reflection, Christa believes she has probably had about twenty sexual partners. Other people interviewed commented on Christa's promiscuity. Her two closest friends, Brandie and Mandy, view Christa's promiscuity as directed toward trying to feel someone cared for her and finally realizing that if she had to have sex to get a man's attention, he probably was not worth it. At this point she began focusing on one relationship at a time. Both young women also believe a man could convince Christa to do anything because of her need for his attention and approval (# 40, Alicia Wills, # 37, Kerry Clement, # 32, Peggy Hansen, # 36, Peter Kramer, # 31, Mandy Staley, # 29, Brandie Parker and # 30, Willie Davis).

## LEGAL HISTORY

The earliest Christa remembers running away was at age twelve, the same age she began slipping out of her mother's home at night. She estimates she has run away about twenty times. The longest she was gone was the three months she lived on the streets with Brian. Otherwise, she might be gone for a few days or a few weeks. Often she would go from friend to friend, with social worker Kerry Clement noting that Christa seemed to have quite a good support system in that the two times she assisted Carissa in trying to find Christa by showing her picture around the community that they were singularly unsuccessful. Sometimes Christa would go to the beach. Usually she left when she was sick of arguing with her mother or just wanted something exciting to do. Her mother would just let her go, she said, and Christa reasoned that probably her mother knew she would be coming back. Typically her mother would not take out a warrant. Christa is of the opinion that her parents probably got used to her leaving at will. She thinks she may have been grounded for running away but said her parents never stuck to it (# 37, Kerry Clement).

Christa said sometimes she left home because one of her friends would want to and Christa did not want her friend to go by herself. She said her friends would do this in return for her as well. She ran off with Brian, for example, at age seventeen, because she was worried about him although now acknowledges that it was "stupid" for her to sleep in parks and laundry rooms. Even when living on the streets with Brian she said she kept in contact with her mother, who had told her that as long as she had anything to do with Brian she did not want her at home. Brandie likewise had no use for Brian, allowing Christa to come to her home to shower, taking Christa clothing, shoes, etc., to designated meeting places, and so forth, but making it clear she wanted noting to do with Brian (# 29, Brandie Parker).

Earlier, at the age of fourteen, Christa and Brandie ran off together and lived in the woods. The two of them broke into a concession stand, stealing candy and hot dogs. Apparently they were apprehended when they set a fire in the woods to keep warm. A warrant was taken out on them for breaking and entering and larceny and both were placed on supervised probation for a year. Donny Simpson and then Peggy Hamlett were her probation officers for a year. Christa said she hated them because she was so busy being a "wild child" she did not want to have to go to the required meetings. Ms. Hamlett said she had a difficult time keeping up with Christa, who did not come to appointments and who would be gone whenever she went to meet with her (# 32, Peggy Hamlett).

Christa ran away several times more and this time her mother had her sent to a training school, at age fifteen, Swannanoa Juvenile Evaluation Center, described

above. She was here for a year and three months, returning the day before her seventeenth birthday.

Christa recalls other charges being placed against her. The first was by Kenny Clyde, who charged her with assault after Christa and her friend, Mandy, beat him up because of his repeated threats to rape and murder them, burying them where no one would ever find them. The judge reportedly thanked her for doing the community a favor and a number of people who have personal knowledge of this individual share this sentiment (# 32, Peggy Hamlett, # 33, John Martin, Esq. and # 35, Detective Benjamin Frederick).

In addition Christa was charged in the above-described breaking and entering. She has also been charged with shoplifting. In North Carolina when living on the streets with Brian she shoplifted from a Walmart. She said she did not show up for court. She was also charged with shoplifting from Roses and again did not show up for court. She was charged with assault over the incident involving Beth Brown, described above. In December 1994 she was charged with shoplifting from Watson's in Knoxville and was supposed to be booked on January 7 or 8, 1995, but this was precluded by the killing of Colleen Slemmer.

Christa herself has also pressed charges against others. At age eight or nine she alleged she had been raped, as described above, and her mother complained to the police department about this even though Carissa is not sure this actually occurred. Christa twice pressed charges against her mother's boyfriend, Steve Kyaw. This first happened when Steve allegedly hit her when she was twelve or thirteen. She dropped the charges. The second time she pressed charges she was thirteen when she said he hit her in the face with a belt. They ended up in Dispute Settlement Court, with Christa agreeing to drop the charges if Steve moved out, which he did. Carissa does not believe these incidents occurred as Christa says they did. The third time Christa made a complaint to the police was when she was raped at age seventeen. The alleged assailant was never found and Carissa likewise doubts this rape occurred. Christa also filed a complaint against Brian Wilson when he struck her, having him arrested (# 20 and # 43, Carissa Hansen).

Once at the Job Corps when Christa was walking to the store someone allegedly jumped her and tried to rape her. She filled out an incident report at the Job Corps but this was not in her Job Corps file (# 26, Job Corps Records).

Christa acknowledged she has always been an impulsive individual, stating, "Something will pop up in my head. I never stop and think about anything." She said she knows she has a short attention span and quickly gets sick of things. When she gets angry, said Christa, she does not think about anything. She

compared this to having tunnel vision, saying it has happened two or three times in her life prior to and including the incident involving Colleen. She remembers being extremely angry to the point of not remembering things clearly the next day in the incident involving Kenny Clyde as well as with the incident which occurred earlier with her mother's boyfriend, Steve Kyaw. Mandy commented that the day after the Kenny Clyde incident, Christa asked her details about what had transpired, seemingly not being able to remember (# 31, Mandy Staley).

Christa said that she has been involved in more physical fights with males than females. She had numerous physical confrontations with Brian, the man she lived with on the streets. Christa stated that in school she always associated with the children of whom everyone else was afraid. Said Christa, "Everyone was scared of us but I don't know why. We'd always be high or drunk. I'd spend half the day drunk, then come back and get on the bus and go home."

## DRUG AND ALCOHOL HISTORY

Christa said she started smoking marijuana at age nine, obtaining it from older friends. She smoked every two weeks when she was younger but on a daily basis beginning at age eleven, describing this as a gradual process. In the Job Corps she only smoked marijuana a few times because Tadaryl disliked her using drugs or drinking alcohol.

Christa said she has tried about everything in the way of drugs including pills, LSD three or four times, cocaine about three times with no effect whatsoever, and crack four times. She said she never used anything intravenously. The pills she took were Dilaudids, Somas, Valium, and "uppers." She and her friends used caffeine pills frequently, she said, as well as an over-the-counter preparation for asthma, Mini-Thins. Three of the Mini-Thins, she said, will make one "hyper." As noted above, she and her friend, Brandie, also inhaled Renuzit and Glade Air Freshener.

Christa started drinking at age eleven or twelve, drinking with her friend, Mandy, who lived across the street from her. She said she was never really a regular drinker but only drank some on weekends.

Christa said she does drugs just to be doing them because they keep her from being bored with life. She said that she has been sick of life for as far back as she can remember.

## JOB CORPS

When Christa was in the training school she was supposed to go to the Job Corps immediately upon her release but this did not work out. When she got home she kept trying to get into the Job Corps and her stepfather tried to help her with this also but she did not actually get in until September 13, 1994 despite leaving Swannanoa on March 9, 1993, a year and a half earlier. Leaving home to come to Knoxville was "no big deal" to her because she had moved back and forth between her parents so many times as well as had lived on the streets with Brian and then in a group home for three months as well as a training school for fifteen months.

At the Job Corps she was enrolled in a six month program to become a Certified Nursing Assistant (CNA). Upon successful completion of this, said Christa, the Job Corps would pay for one and a half years of training enabling her to become an LPN and, if successful at this, her mother would help her obtain training to be an RN. Said Peggy Hamlett, this was Christa's one chance, since she probably realized her mother did not have much to offer her. Earlier Christa had told Dr. Rose Wilson at juvenile court and later her attorney, Matt Martin, that she would probably end up in jail. She told Alicia she hoped she would be dead by age twenty-five. Ginny Satterfield, another social worker, pointed out that for all her bad qualities Christa genuinely seemed to like nursing, initiating volunteer work at a nursing home when she lived at Sheaffer House, for example. Alicia likewise commented that when Christa would accompany her mother to nursing homes that all the patients loved her (# 32, Peggy Hamlett, Rose Wilson, and Ginny Satterfield, # 40, Alicia Wills and # 34, Matthew Martin, Esq.).

Christa said she always wanted to be a nurse but deep down inside never really thought she could ever do this. She found the training program at the Job Corps to be tedious in that "it just dragged on" and was in actuality longer than six months. She did not know how to study, never having learned this earlier, she said.

Christa was close-mouthed on the issue of gang involvement, saying she is not allowed to talk about this and steadfastly refusing to do so other than to say that six pointed stars, the number six, and drawings of pitch forks are gang symbols, not Satanic. Although Tadaryl had meetings with his gang, Folk, she said that she did not attend other than having some involvement with female gang members. However, she apparently spoke of this to both Brandie and Mandy, telephoning them about a week after arriving in Knoxville to tell them she either had to join a gang or the next day she would be beaten up. Her choice of initiation into the gang was either a sleep-in, where she had to sleep with all the gang members, or a jump-in, also known as a "360," wherein three men on one

side of her and three men on the other side would beat her for a full minute. Christa chose the latter because she said this would earn her more respect. She called her friends a week or so later to say she had completed the jump-in and was a little bruised but basically was all right. When asked about this, Christa said in actuality she did neither a sleep-in nor a jump-in. Instead, Tadaryl initiated her via a three hour stint of "rough sex" which purpose was "...to get me in. To make me his queen" (# 29, Brandie Parker and # 31, Mandy Staley).

Carissa said Christa was very ambivalent about returning to the Job Corps following Christmas break, telling her mother about Colleen entering her room with a box cutter and in general talking about how stressed she was feeling. Carissa and Gerard had earlier visited the Knoxville Job Corps and had been appalled by seeing the blood on the carpets and walls. Carrie stated that when she asked Christa why she continued to stay in the Job Corps if she felt so stressed, Christa responded, "I couldn't leave because just for once in my life I had to do this right. I wanted to make you proud of me." She told her father, Glenn Pike, over Christmas that she was going to finish something for once and that she was going to make something of herself. Glenn said, "She seemed really proud of herself." Carissa told Christa she need not return, that they would enroll her in a local community college. Alicia, who was visiting her mother, was appalled by what she viewed as her mother again giving into Christa, and insisted Christa return to Knoxville and complete the program. Carissa and Gerard had a badge made for Christa which read, "Home is where the heart is. Home health care." On the back they wrote, "We're proud of you" (# 21, Carrie Ross, # 22, Glenn Pike, # 40, Alicia Willis and # 27, Carissa Hansen).

## TADARYL

Tadaryl is from Memphis. He has never talked much to Christa about his family. She knows his parents are divorced. He has told her that he and his father sold drugs together as well as used drugs together but Christa does not know what kind of drugs these were. She knows that he stayed with an aunt when he went home over Thanksgiving. She believes that he belongs to the upper middle-class because whenever he needed anything his mother always sent him money and he did not seem to want for anything.

Christa thought it was "cool" that everyone was "scared shitless" of Tadaryl. He would beat up other males on Christa's behalf, with Christa relating an anecdote about Tadaryl once throwing a white male against the wall who had accidentally bumped into Christa. Tadaryl told this person that if he ever even looked at Christa funny that he would cut him, showing him a razor blade he carried in his mouth. Tadaryl was very protective of Christa and wanted everyone to know it.

All the men carried razor blades in their mouths, Christa said. She herself carried a box cutter at times because she said the Job Corps was a very violent and dangerous place, which a U.S. Senate hearing also seems to suggest. She almost used it one time when a friend of her roommate came in and was "clicking on" Christa for something. Christa thought she was going to be hurt and held the box cutter in back of her, preparing herself to use it, until the girl left the room. Christa said Tadaryl did not usually carry a weapon other than occasionally carrying a razor blade in his mouth. Some of the females, she said, carried weapons with them all the time. For example, Colleen had a box cutter the night she was in Christa's room and Kim Iloilo, another student, often carried a box cutter (# 42, Job Corps Oversight: Hearings Before the Committee on Labor and Human Resources, United States Senate).

Christa said that in the past when she was involved with relationships she would throw herself into them but they never worked out. This one with Tadaryl, however, was working. He always wanted her beside him, and this was something she really liked. Even after school when she wanted to lie down he would want her to lie down in his room with him. If she went to take a shower and was not back in an hour he would come looking for her. He took care of her, giving her anything she needed. Right before Christmas she thought she was pregnant and he was happy about this, crying when it turned out she was not. Whenever she was sick he babied her and sat beside her. No one besides her mother or grandmother ever did this for her.

The young men and women of the Job Corps were not supposed to be on each other's floor but Christa always sat in the hallway on the boys' floor, describing herself as a permanent fixture. On weekends she would be in Tadaryl's room and a few times she spent the night with him, twice being written up for this when she was caught.

Christa went home for Christmas vacation and returned January 3 or 4, 1995. She found that Tadaryl had been "messing" with a black girl named Isha. He had not had sex with her, according to the girl, who said she had just kissed him. Christa told Isha that she was not mad at her because she considered it Tadaryl's fault and not hers. However, Christa was very hurt. She told Tadaryl if that was what he wanted, to be with Isha, then that is what he should do but Tadaryl said he wanted Christa instead. Although she kept throwing this up in his face, she was still with him quite a bit after this. She did not trust him, however, and wanted him to keep reassuring her, which he continued to do.

Adding to her discomfort was that right before she left for Christmas Christa was moved to a six person room following her second write-up for being in Tadaryl's

room. Christa said she thought the six person room was just "awful" because she was with the "nerds" of the Job Corps and she had no privacy. She never even unpacked her things because she did not feel comfortable. She did not have any space, this being the same amount of space as a two person room. There was one bathroom for six girls to get ready in the morning.

Christa said she was worried about getting kicked out of the Job Corps but she was even more worried about making Tadaryl happy and keeping him. All she ever thought about, she said, was "If I do this, how will he feel, what will he think?" He stopped her from doing things she used to do every day until she arrived at the Job Corps, such as smoking marijuana. She only did this two or three times behind his back compared to smoking pot every day before this. Previously, being high was her normal state of mind, she said.

Christa said that Tadaryl is younger than she but "a hell of a lot bigger and smarter and more mature than your average seventeen year old." She is of the opinion that he has more of a chance in life than she and it is for this reason that she should take the blame for everything. Christa stated that she does not know why she cares about others more than herself. She is aware that this has gotten her into trouble and put her in situations she does not need to be in.

## SHADOLLA PETERSON

Shadolla Peterson, said Christa, is from Cleveland, Tennessee. Christa is of the opinion that Shadolla wants everyone to think she is better than she is. She likes to get with one person and just stay with her, totally, talking to that person about everyone else. At the time of the incident everyone was picking on Shadolla and she did not have anyone to run around with. She and Christa were not really good friends, in Christa's estimation. However, Shadolla greatly admired Christa's occult powers, in Christa's opinion, and enjoyed associating with her for this reason, as did many of the other Job Corps students.

**SATANISM**

Christa said she had crystals when she went home for Christmas break but did not speak very knowledgeably about them, describing them as "just like energy crystals, something about your chi or aura, I don't know." She was wearing a wizard necklace that Tadaryl had given her when she was arrested. It has a pentagram on it that Tadaryl gave her as well. She thinks she was also wearing a black cord with a pink crystal on it and a black herringbone necklace. At age eighteen she had a devil tattoo put on her breast when she was in North Carolina. At first she was going to get a large dwarf on her leg but then decided to get a little tattoo. She put a tattoo first on her left wrist at age twelve saying, "#1 Bitch." Christa said, "I thought I was bad then."

Christa said she was never before involved with any kind of cult until she started seeing Tadaryl. He would go outside of a building whenever he was angry and make monsters out of the clouds. This happened two or three times. She said she was fascinated by it and thought it was "cool." This made her feel Tadaryl was a strong person, she said.

Everyone knew Tadaryl was involved with witchcraft and talked about being afraid of him, said Christa. If anyone said anything "smart" all Tadaryl would have to do was stand up, she said, and everybody would try to calm him down. Once he had her look into a mirror in a darkened room. He told her she had a demon inside of her and was able to adjust the light in such a way that Christa thought she could see this. His roommate used to see Tadaryl do things with crystals, such as having black clouds hover over others. A friend of hers, Tyrone Comfort, had a crush on Christa and woke up one morning to find a black cloud hovering over him and was unable to move a muscle for a minute or two, ascribing this to Tadaryl. Brian, one of the students at the Job Corps, would sleep with the covers over his head because he was so afraid of these clouds.

Christa said that she and Tadaryl did not try to hide any of this because they thought it was fun but never actually called it witchcraft. The other Job Corps students were interested and were constantly asking them to show them what they could do. Christa said she felt she could do something no one else could. She enjoyed playing with this, as she put it. Christa wanted to do things with the clouds, such as make them move around, just to say she could do it. She wanted to make the lights go off and on by the pool. All the other students would watch them. She would make the lights come on and Tadaryl would make them go off. The other students would ask how they could do it and they would never tell them.

Christa said she got into this with Tadaryl because she found it fascinating. He called her "The devil's daughter." It was kind of like, she said, "We can do this and everyone thought we were so close," and this had a lot to do with her interest in Satanism. He told her he used to sacrifice rabbits in Memphis but that he had gotten out of this for a few years. Tadaryl, she said, is the kind of person who likes to put on a show for everyone, needing a lot of attention.

Tadaryl saw the movie "Natural Born Killers" three times. He told Christa it was a good movie and that she needed to see it because it reminded him of her and himself. Christa said she did not understand what he meant because she did not see herself as evil although he seemed to see both himself and her in this manner. Tadaryl was into this quite a bit more than she, she said. Christa said she had a sense that if she were not into Satanism she would not have Tadaryl.

Tadaryl was not like this when she first met him and it was only after they had been seeing each other for a month that she became aware of this interest of his. He told other Job Corps students, June Bug and Boo, that he could make their eyes turn blue. She said that they would wear sunglasses and she knew what they were doing because the devil has blue eyes. She said it is sign of how much power you have in you, something no one else can do.

Christa said that Donna Marsh, a Job Corps trainee who died in an automobile accident in August 1995, was a friend who tried to get her to go to church. Christa did not have anything to wear so she did not go. However, she talked to Tadaryl about going by saying, "Come on, let's just go listen to the other side." He did not believe in God, asking her why God would let people starve if he could turn rock into bread, why walk a straight line and not do anything fun if you're a Christian, if God is so merciful and loving, why will he send you to Hell if you do not do everything he says, etc.

Christa began to speculate that it was akin to a game between Satan and God, with each wanting to see who could get the most people. Christa said she did not really side with God or Satan. She said that this was when she was trying to figure everything out. She still does not understand why God stuck you on earth, just to be mean and let people starve. If he loves you so much, she said, why does he let you screw up and then send you to Hell? She said, "If Satan is trying to tempt you so much then why are there not more Satanic churches? Why does everyone preach that God loves you when he takes away people I love?" She said she does not think about this now as much as she used to but that Tadaryl talked to her about this almost every day and had pretty well convinced her. She recalled talking to her cousin, Chris, during Christmas vacation about things Tadaryl did with clouds but did not recollect talking to him about the devil doing more for her than God, as he reported (# 39, Chris Fotos).

Christa said she went to three meetings involving the Wiccans. She said they believe in crystals and the moon goddess. Christa thought it was "neat." The Wiccans, she said, talked about wind, earth, and water and worshipped the full moon. She said a woman ran around flinging water on everyone and saying, "You're moon blessed." They wore long skirts, pretty daggers, were barefoot, and ran around singing such that Christa found it "pretty," "fun," and "different." She does not know how it compares to Satanism.

Christa said she needs to stay on Tadaryl's good side because although he probably would not kill her that he could make her really sick and cause her a good deal of pain. Christa said once she became very ill while in jail and thought that Tadaryl was responsible for it. She woke up out of a dead sleep and started vomiting. Her stomach was tied up in knots and she felt as though someone was squeezing her. She said she knows that he can do something like this to her if he wants to.

## COLLEEN SLEMMER

Colleen arrived at the Job Corps around November or December 1994 whereas Christa had been there since September. Christa first met Colleen when she came upon her talking to Mike Brock at the back stairwell. They were all over each other, said Christa, who later learned that that same day they had sex together out in back of the volleyball field.

Once a month, said Christa, "some little whore" would come to the Job Corps and get a name for herself, becoming so disliked by both males and females alike that she would end up having to go home, and this is how she categorized Colleen. While on the second floor, the boys' floor, Christa observed Colleen in one boy's bedroom with eight males. Colleen was reportedly in the bathroom and two of the males came out and said she was giving "blow jobs." In the bedroom Little Joe, a virgin, was being coaxed by several of the men into having sex with Colleen. Later Christa learned that she had, in fact, had sex with Little Joe. Christa learned that they were "running a train" on Colleen, one entering her from the vagina and the other anally.

After this, Colleen called the girls who dated black guys "nigger loving whores." Christa thinks this was Colleen's effort to be liked by playing up to the more "redneck" element of the Job Corps but more people heard this than they were supposed to and Colleen started making enemies.

One day, in the rec room, Tadaryl was shooting pool and soon thereafter when Christa got there she overheard Colleen say to Tadaryl, "I'd fuck the shit out of you." Christa said she could not believe that Colleen had said that. She heard Tadaryl respond, "I think I'll pass on that." Colleen then said, "Why don't you come with me behind the culinary trailer and I'll suck your dick and I'll bet you'll want it then."

Christa went over to Colleen and said something to the effect that how could she call her, Christa, a nigger loving whore when she was running around with everybody at the Job Corps, that Tadaryl was hers and to find her own. She told Colleen that if she did not leave Tadaryl alone she would "beat the shit" out of her.

One night before Christmas vacation Christa's roommate, Shaniqua McQuinn (Nicky) from Chattanooga was out for the night and Christa awoke to find Colleen in her room, going through her possessions. Colleen had a box cutter with her. When Christa confronted her Colleen said she was looking for

something of Nicky's. Colleen said "just forget it" and left when Christa attempted to question her about this.

Colleen was a "smart ass" to her wherever she went, said Christa. She saw Colleen daily because they all ate together. Colleen would roll her eyes whenever she saw Christa, look her over from head to toe, "accidentally" bump into her, and so forth. Christa did not know what Colleen was trying to do. She did not really worry much about Colleen because she had been with everyone and she did not think Tadaryl would get involved with her in view of this.

Although earlier she had enjoyed the status of being Tadaryl's girlfriend, following Christmas break Christa felt her status slipping in the eyes of her fellow Job Corps students. She had been put in a six person room with "nerds," a room the same size as a two person room, having been moved there for disciplinary reasons. Tadaryl had showed himself to be less than fully devoted to her by his actions with Isha over Christmas break. Colleen was publicly ridiculing her. Christa began to sleep more than usual, her typical reaction to stress. She found herself going to bed at 8:00 or 9:00 PM rather than her usual midnight or 1:00 AM, sleeping longer on weekends, and napping almost daily after lunch. She was irritable. Tadaryl thought she was pregnant. She did not know what would happen to her relationship with Tadaryl should she be expelled from the Job Corps for academic failure or disciplinary reasons and was trying not to think about this. As long as she was with Tadaryl she felt fine, but when alone she experienced a disquieting sense of panic.

## JAIL ADJUSTMENT

Since being in jail Christa has been on Doxepin for depression as per Rick Sawyer with Helen Ross McNabb Mental Health Center. The medication is not working as well as it did and Christa has sought to have this increased. For a period of time she was put on suicide watch.

Christa said she goes to church on Thursdays. She said she is "not all holy" and does not read the Bible but she does listen to the service. She said she does not really worship any deity at this point. She is still confused but said she does not believe as she did regarding Satan. She is not an atheist, she said, believing in God, but she has not yet decided whether or not to worship him. Christa said she does not know if she is still mad at God or not because "I haven't figured it all out yet."

Over Christmas 1995 Christa said she ended up in the "Be sweet chair" because she was screaming and carrying on. She does not really know what she was screaming but recalls that when she came back to reality that she was handcuffed and was walking toward the chair, where she was restrained for fifteen minutes. She recalls this happening one other time, a few months after she was incarcerated. Everyone was getting loud and argumentative and she started screaming and pulling her hair. When she came to she had two handfuls of her hair in her hands. She has no idea how long this episode lasted.

In December 1995 Christa said she got into a fight with someone at jail, Tara Pfeiffer. This involved an incident over the telephone. Christa was put in lock-down because of this, the third time she was in lock-down since entering the Knox County Jail. In January 1996 she was ordered to lock-down for thirty five days after she and five other female inmates took pills from a med cart, with all of them being transported to the hospital to have their stomachs pumped and blood drawn.

# Christa Pike's

## Educational History




007496

# Christa Pike's

## Family




i

007497

# MOTHER

## Carissa Fotos Ferguson Pike Thompson Hansen's

## Marriages and Relationships




m. = married
D. = divorced
——— = married
- - - - - = dating relationship/unmarried
* = cohabited
/ = separation

# FATHER

## Glenn Pike's

## Marriages and Relationships




007499

m. = married
D. = divorced
———— = married
- - - - - - - - = dating relationship/unmarried
* = cohabited
/ = separation

# TIMELINE

| | |
|---|---|
| 06/29/69 | Carissa Fotos marries James Ferguson |
| 06/27/71 | Alicia Ferguson, CGP's half sister, is born |
| 12/13/74 | Carissa and James Ferguson divorce |
| 1975 | Emil Glenn Pike marries Jo Anne Lilly; marriage lasts a few months |
| 07/02/75 | Carissa marries Emil Glenn Pike |
| 03/10/76 (#1, #3) | CGP is born: 2 months premature via C-section; hyaline membrane, respiratory failure |
| 1977 | Carissa and Glenn Pike divorce |
| 09/77 (#1, #3) | Fever, convulsions and CGP is hospitalized at Appalachian Regional Hospital; lumbar puncture and EEG inconclusive |
| 1976-79 (#3) | Primary caretakers are mom and paternal grandmother |
| 1977-1979 | Between marriages to Glenn Pike, Carissa has relationships with the following men:<br>Ronnie Rutherford (with whom she lived)<br>Clifford Gillenwater<br>Haynes Smith<br>Mike Smith |
| 1979 (#20) | Carissa - suicide attempt |
| 1979 | Following suicide attempt, Carissa remarries Glenn Pike |
| 1982 | Carissa and Glenn Pike divorce |
| 1982-1983 | After second divorce from Glenn Pike, Carissa has relationships with the following men:<br>Howard ?; Carissa cannot recall his last name<br>Tom Farrell |

| | |
|---|---|
| 09/83 | Carissa marries Danny Thompson, with whom she lived before marrying |
| 1984 (#3) | Tonsillectomy; hemorrhages and needs blood transfusions |
| 1984-85 (#1, #3) | Cranberry-Prosperity Elementary - 3rd grade; transferred schools when moved to Dad's after Thompson told Carissa he did not want her girls; failed 3rd grade |
| 02/14/85-03/22/85 (#1) | CGP living with mother; counseling with Dr. Charles Yeargan because CGP, age 8, is inattentive in school and refuses to do class work or homework; was reportedly scoring in top 10% nationwide in scholastic achievement testing |
| 03/85 (#1) | CGP Living with Father |
| 06/86 | Glenn Pike marries Kathleen Allman; they have two children |
| 10/13/88 (#3) | Paternal grandmother, primary caretaker, dies of cancer |
| 1988-89 | 6th grade - Standardized tests show CGP as above average in everything except math; in summer school, described as "an excellent student; she did well in all areas." |
| 1989 (#3) | CGP - Suicide attempt |
| 05/08/89 | Carissa and Danny Thompson divorce; Carissa already seeing Steve Kyaw before divorce is final |
| 1989-90 (#3) | Failed 7th grade after going back and forth from Mother to Father and back to Mother again because of Crista's difficulties with Kyaw |
| 05/89-01/19/90 (#2,#3) | Seen by Dr. Gregory Straw at UNC (NCMH) due to "poor communication" with mother and mother's fiancé, Steve Kyaw |
| 02/90 (#20) | CGP is involved in car accident, going through windshield and getting gash on forehead; minor plastic surgery |
| 1990-91 | Stanford Junior High School (9/14/90) for 7th grade, the |

| | |
|---|---|
| (#2) | second time; described by teachers as "super," "very good," and "good student" in non-academic subjects; Mom contacted Kaiser Permanente on 2/11/91 when CGP pulled a knife on Kyaw; CGP alleges Steve Kyaw sexually abused her and hit her, according to Chuck Helton, her counselor; Kyaw, who lived with them for 21 months, would pinch CGP's breast while they wrestled because she would pinch his penis; CGP says he would feel her up when they wrestled; Mom says child would not do chores, is argumentative, truant; symptoms of depression (insomnia, irritable, decreased appetite, concentration and energy level, anhedonia, blue feeling); long-term treatment predicted because of suspected early history of sexual abuse, dissociation from awareness of affect |
| | Stephen Kyaw agrees to move out; CGP drops charges through Dispute Mediation |
| | Mom reports Father's 3 year old daughter from his fourth marriage may have been sexually abused by CGP, according to a psychologist |
| 04/21/91-07/19/91 (#4) | Placed at Sheaffer House for truancy, running away, authority problems, drug usage (marijuana); reportedly adjusted well but made no real effort to change her rebellious behavior; upon return home, continued to come and go at will, often staying away for days |
| 09/17/91 (#5) | Suspended two days for truancy; brought back to school by Sheriff's Department |
| 09/26/91 (#4) | CGP adjudicated delinquent on Misdemeanor Breaking, Entering or Larceny charges after they were reduced from a felony; placed on one year probation and ordered to cooperate with court counselor's recommendations; however, continues to be aggressive toward peers, verbally abusive of teachers, repeatedly runs away from home; sexually active; history of drug and alcohol abuse; at Stanford Middle, failed every subject and missed 25 out of 33 days since last court appearance |
| 09/27/91 (#5) | Mother visiting in W. VA and CGP had friends over; Mom called because of the noise, who calls Alicia in Chapel Hill; Alicia discovers alcohol in home, apartment in shambles |

| | |
|---|---|
| 09/30/91 (#5) | CGP runs away and returns the next day; Mother files missing persons report |
| | CGP is diagnosed at age 15, by her NC Div. of Mental Health therapist, Andy Mulcahy, as conduct disorder, pot and inhalant abuse, R/O PTSD; she is described as having poor impulse control and reality testing, omnipotent; the counselor notes poor parental limit setting; problem behaviors at this time include running away, truancy, breaking and entering, stealing from her home, abusing pot and alcohol, inhaling from deodorizers, sexual abuse victim, and being very popular with other problem children |
| 10/09/91 (#5) | CGP too sick to keep appointment with Peggy Hamlett, court counselor, because of her use of alcohol the previous evening |
| 10/09/91 (#5) | Inpatient treatment considered by Peggy Hamlett and Peter Kramer, counselor with Div. of Mental Health |
| 10/13/91 (#5) | Runs away and returns next day |
| 10/14/91 (#5) | Runs away to beach and returns 10/24 |
| 10/28/91 | Leaves campus without permission; one day suspension; Motion for Review alleging violation filed |
| 10/28/91 | Adjudicated to be a delinquent juvenile and placed on probation for running away from home on several occasions (9/30/91 - 10/01/91; 10/13/91 - 10/14/91; 10/14/91 - 10/24/91); present only 4 days at school since the year started; not keeping appointments with court counselor; not cooperating with counseling through Mental Health with Peter Kramer; abusing alcohol on 10/09/91 such that she is unable to keep appointment with court counselor |
| 10/29/91 (#5) | Mother reports to Peggy Hamlett that CGP and her friends were creating a disturbance by being loud; she found empty Renuzit air freshener containers |
| 10/30/91 | Aggressive behavior toward students; conference with parents |

| | |
|---|---|
| 11/08/91 (#5) | Mother files missing person's report with Hillsborough Police Department; CGP was to go to West VA with her mother but ran away and did not return until 11/11/91 |
| 11/08/91 (#5) | Suspended 4 days for rudeness and disrespectful behavior |
| 11/14/91 (#4, #5) | Peggy Hamlett's report indicates CGP failed every subject due to high absenteeism; Rose Wilson, Juvenile Court psychologist, describes CGP as absent most days but seen as bright, verbal, and capable by teachers (CAT 1989: 71st percentile reading, 93rd percentile language, 40th percentile math); however, all grades below average; teachers say inattentive and unproductive because she missed too much instruction to understand; memories of family: Sister victimizing her by tricking her into putting hand on door frame before slamming door on it; Father breaking her doll; Mother and CGP's relationship described as distant, with lack of warmth between them<br><br>WISC-R: Verbal IQ 102, Performance IQ 114, Full Scale IQ 108; "Personality assessment suggests that she experiences considerable internal stress related to depression and anger over unmet needs for nurturing...The losses and disruptions that have been constant in her social environment have not supported the development of adequate impulse control. CGP seeks release for painful feelings in hostile and aggressive acting out, even though she fears the retaliation of further rejection. Under the press of emotional re-activity, she is not able to maintain effective control and organization in her thinking processes."<br><br>Remanded to training school, Swannanoa |
| 10/23/92 | Carissa marries Gerard Hansen; they live together before marrying |
| 03/09/93 | CGP Released from training school; has earned GED |
| 09/07/93 (#6) | CGP charged with assault with a deadly weapon after she and a friend, Mandy Staley, beat a man who was allegedly harassing them; charges were subsequently dropped |
| July 1993 | D&C due to pregnancy |

| | |
|---|---|
| 1993 | CGP falls back into her old habits of coming and going at whim; parents allow CGP to share bedroom with a seriously disturbed teenage boy, Brian Wilson; when they kick him out, CGP leaves also, and together the pair live on the streets until CGP, working three jobs, becomes disgusted with his refusal to work |
| 1994 | CGP moves back home. She is charged several times with shop-lifting, runs up a credit card, fails to follow through on getting her driver's license, is fired from several jobs, and is charged with assault (Beth Brown) before coming to the Knoxville Job Corps in September 1994; she shoplifts in Knoxville and is written up twice at the Job Corps; she is moved from a two person to a six person room; she is experimenting with witchcraft/Satanism, the Wiccans, and Christianity |
| January 1995 | CGP charged with murder of Colleen Slemmer |

# INDEX


| | | | |
|---|---|---|---|
| 1985 | # 1 | FMRS Mental Health Council, Inc.<br>Beckley, West Virginia | 000001 - 000014 |
| 1991 | # 2 | Kaiser Permanente Records<br>North Carolina | 000015 - 000023 |
| 1991 | # 3 | North Carolina Div. of Mental Health Records<br>Durham, North Carolina | 000024 - 000035 |
| 1991 | # 4 | Rosemary Wilson, Ph.D. (Evaluation)<br>Juvenile Court Psychologist<br>Hillsborough, North Carolina | 000036 - 000040 |
| 1991-1992 | # 5 | Juvenile Court Records<br>Hillsborough, North Carolina | 000041 - 000058 |
| 1991-1993 | # 6 | Matthew Martin, Esq. (Attorney records)<br>Hillsborough, North Carolina | 000059 - 000072 |
| 1991 | # 7 | C.W. Stanford Middle School, North Carolina (Includes Cranberry-Prosperity, West Virginia records) | 000073 - 000078 |
| 1993-1994 | # 8 | Jerry L. Danford, M.D. (Physician records)<br>Durham Clinic, Durham, North Carolina | 000079 - 000088 |
| 1987-1990 | # 9 | Shady Springs Junior High School, Beaver, West Virginia (Includes C.W. Stanford Middle School, North Carolina; Orange Co. Schools, North Carolina; Cranberry-Prosperity, West Virginia; Chapel Hill Schools, North Carolina; and Grey Culbreth, North Carolina) | 000089 - 000111 |
| 1991 | #10 | Sheaffer House Records<br>Chapel Hill, North Carolina | 000112 - 000254 |
| 1988-1989 | #11 | Chapel Hill-Carrboro City Schools<br>Chapel Hill, North Carolina | 000255 - 000264 |

| | | | |
|---|---|---|---|
| 09/08/95 | #12 | Interview with Christa Gail Pike (3 Hrs) | 000265 - 000268 |
| 09/22/95 | #13 | Interview with Christa Gail Pike (2 Hrs) | 000269 - 000274 |
| 09/27/95 | #14 | Interview with Christa Gail Pike (2 Hrs) | 000275 - 000279 |
| 10/05/95 | #15 | Interview with Christa Gail Pike (2 Hrs) | 000280 - 000283 |
| 10/20/95 - | #16 | Interview with Christa Gail Pike (3 Hrs) | 000284 - 000285 |
| 11/21/95 | #17 | Interview with Christa Gail Pike (1.5 Hrs) | 000286 - 000289 |
| 12/29/95 | #18 | Interview with Christa Gail Pike (2.5 Hrs) | 000290 - 000294 |
| 12/04/95 | #19 | Interview with Carissa Hansen, mother | 000295 - 000300 |
| 12/21/95 | #20 | Interview with Carissa Hansen, mother | 000301 - 000310 |
| 12/10/95 | #21 | Interview with Carrie Ross, maternal aunt | 000311 - 000314 |
| 12/10/95 | #22 | Interview with Glenn Pike, father | 000315 - 000317 |
| 12/11/95 | #23 | Interview with Chris Fotos, maternal grandfather | 000318 - 000319 |
| 1976 - | #24 | Baby book of Christa Gail Pike, kept by Mother | 000320 - 000371 |
| | #25 | Fotos Family Generations (Family tree of maternal side of family) | 000372 - 000376 |
| 09/14/94- 01/95 | #26 | Job Corps Records | 000377 - 000522 |
| 02/11/96 | #27 | Interview with Carissa Hansen, mother | 000523 - 000526 |
| 02/11/96 | #28 | Interview with Gerard Hansen, stepfather | 000527 - 000529 |
| 02/11/96 | #29 | Interview with Brandie Parker, friend | 000530 - 000534 |
| 02/11/96 | #30 | Interview with Willie Davis, friend | 000535 |
| 02/11/96 | #31 | Interview with Mandy Staley, friend | 000536 - 000537 |

| | | | |
|---|---|---|---|
| 02/12/96 | #32 | Interview with Ginny Satterfield, court counselor, Peggy Hamlett, juvenile court counselor, and Rose Wilson, Ph.D., Juvenile Court Psychologist | 000538 - 000540 |
| 02/12/96 | #33 | Interview with John Martin, Esq., Christa's attorney | 000541 |
| 02/12/96 | #34 | Interview with Matthew Martin, Esq., Christa's attorney | 000542 |
| 02/12/96 | #35 | Interview with Detective Benjamin Frederick, Hillsborough Police Department | 000543 |
| 02/12/96 | #36 | Interview with Peter Kramer, MSW, social worker with North Carolina Div. of Mental Health | 000544 |
| 02/12/96 | #37 | Interview with Kerry Clement, family specialist | 000545 - 000546 |
| 02/12/96 | #38 | Interview with Detective Gerald Castle, Orange County Sheriff's Department, North Carolina | 000547 |
| 12/10/95 | #39 | Interview with Chris Fotos, cousin | 000548 |
| 02/26/96 | #40 | Interview with Alicia Wills, sister | 000549 - 000552 |
| 02/26/96 | #41 | Interview with Carissa Hansen, mother | 000553 |
| 01/18/95-01/19/95 | #42 | Job Corps Oversight: Hearings Before the Committee on Labor and Human Resources, United States Senate | 000554 - 000664 |
| 02/27/96 | #43 | Interview with Carissa Hansen | 000665 |
| 02/28/96 | #44 | Interview with Christa Gail Pike (1.5 Hrs) | 000666 - 000669 |
| 11/22/91-03/19/94 | #45 | North Carolina Department of Human Resources, Division of Youth Services Records (Swannanoa) | 000670 - 000834 |

Case #: [illegible]

Date: [illegible]

ASSESSMENT RESULTS: List results of any completed assessments.

| Assessments and Evaluations | Results |
| --- | --- |
| [illegible] | [illegible] |

Please see Assessment Checklist for consideration of evaluation needs.

A. Level of Stress: Mild Code No. 3

B. Level of Functioning: Fair Code No. 4

| INTERVENTION: Problem/Need | Goal/Objectives | EAD / DC | Specific Method and/or Program, Service or Activity | Responsible Person |
| --- | --- | --- | --- | --- |
| [illegible] | Increased academic achievement [illegible] | 4-85 | School consultation; School/Home Checklist | [illegible] |
| [illegible] school | Increased compliance at school as reported by teacher. Client accept consequences for noncompliance at school | 4-85 | School consultation; School/Home checklist | [illegible] |
| | | | | |

FMRS MENTAL HEALTH COUNCIL, INC.
FINAL TREATMENT PLAN
Page 2

III. **STATEMENT OF INFORMED CONSENT:**

I hereby authorize FMRS Mental Health Council to provide the listed services to the above-named client and agree to cooperate with the staff in accomplishing the objectives stated above.

Cousin Thompson
Client Signature

FMRS Staff Signature

Parent or Guardian Signature

IV. **PARTICIPANTS:** Note - Signatures above indicate person is participant on IDT.

| | Signature | Relationship/Agency |
|---|---|---|
| A. | Sheila Hunt | SUPERVISOR |
| B. | | |
| C. | | |
| D. | | |
| E. | | |
| F. | | |
| G. | | |

V. **REVIEW DATES:**

| | | | |
|---|---|---|---|
| A. First Review: | Scheduled week of: 4/5/85 | Date Conducted: | |
| B. Second Review: | Scheduled week of: | Date Conducted: | |
| C. Third Review: | Scheduled week of: | Date Conducted: | |
| D. Fourth Review: | Scheduled week of: | Date Conducted: | |
| E. Fifth Review: | Scheduled week of: | Date Conducted: | |
| F. Sixth Review: | Scheduled week of: | Date Conducted: | |

# FMRS MENTAL HEALTH COUNCIL, INC.

## TERMINATION SUMMARY

CASE NO.: 11252 CLIENT NAME: Christa Pike CASE MANAGER: Mark Sundstrom DATE: 4/12/85

REFERRAL SOURCE: Family

Level of Stress Mild Code No. 3

Level of Functioning Fair Code No. 4

REASON FOR ADMISSION: Client's mother said that Christa is inattentive at school and refuses to do classwork at school or homework. She consistently scores in the top 10% nationwide in scholastic achievement testing.

SUMMARY OF ASSESSMENTS: Two sessions following intake, as well as one school visit. Assessment shows Christa to be a highly capable student who realizes the consequences of her school behavior and yet seems unconcerned at this time. Mother's marital relationships have been unstable. However, support seems to be available from recent ex-husband on these school matters.

COURSE OF TREATMENT: Sessions consisted of building rapport with client who chose to not respond to many inquiries about her behavior and establishment of school/home checklist. Improvement noted by mother in second session, yet teacher was impatient with progress.

FINAL OUTCOME: Client no showed for 3/22/85 session. Teacher indicated that client had transferred to new school and moved to her father's house. No effort was made by family to contact me for further sessions.

000003

FMRS Staff Signature Mark Sundstrom
Child Outpatient Therapist

MS/ks

007513

F.M.R.S. MENTAL HEALTH COUNCIL, INC.

# PROGRESS NOTES

NAME, CASE NUMBER, SEX

Christa P. Ke
F
11252

handouts on feelings & About Myself to talk about next time.
Mrs. Thompson believes Christa has an avoidance of talking about
her feelings. Daily report will continue & Mrs. Thompson [illegible]
another Family Circle [illegible] Response [illegible]

[signature]

3-22-85 Phone contact with Mrs. Shumake. She stated that she didn't believe
the checklist was effective because Christa still had problems in the classroom. She
did say that Christa's ☺ had increased but still felt generally that the checklist
wasn't worth the time involved for her. Furthermore she said that Mrs. Thompson
has agreed to have Christa move to her father's house & transfer to [illegible]
School.

[signature]

3-22-85 No show

[signature]

000004

PROGRESS NOTES

F.M.R.S. MENTAL HEALTH COUNCIL, INC.

# PROGRESS NOTES

NAME, CASE NUMBER, SEX

Christa Pike
F.
11252

2-14-85 Intake Assessment.

2-21-85 Phone conversation with Mrs. Shumate re: Christa. She described Christa as "lovable" and "intelligent". However she is distracted, disinterested and inattentive at school. Refusal to do class work is common. She is willing to cooperate with school/home checklist & I will make visit there in next few days to firm up program.

[signature]

2-21-85 Christa & her mother were here for scheduled session. Talking, Feeling & Doing Game was played. Each seemed to enjoy this activity. Both were informed of my conversation with Mrs. Shumate & the likelihood of intervention of school/home checklist for next week to begin.

[signature]

2-25-85 School visit with Mrs. Shumate at Cranberry Elementary. Daily Progress Report was discussed with completion of classwork & ... to be scored with ☺ or ☹. It will beginning 2-27-85.

[signature]

Problem 1 & 2

3-7-85 Christa & her mother were here for session today. Although Mrs. Thompson forgot to bring in daily reports, she stated that Christa had 2 days with no ☹ 2 days with all ☺ and one day with half ☺ & half ☹. She is pleased with improvement as is her ... Her father is requesting that Christa move to his house because he believes Mrs. Thompson isn't able to attend to her school needs because she works nights. Christa has not or will not state her preferences about moving. This is common for Christa yet still frustrates her, Mrs. Thompson said. Christa was given (over)

FMRS MENTAL HEALTH COUNCIL, INC.

CHILD OUTPATIENT AND ASSESSMENT PROGRAM

Summary of Intake Interview

**Date:** 2/14/85

**Client:** Christa Pike

**Age:** 8

**Case #:** 11252

1. PRESENTING PROBLEM(S): State reason(s) for referral or visit (define presenting problem(s).

Christa Pike is an 8 year old white female referred by her mother for the intake. Her mother said that Christa is inattentive at school and refuses to do classwork at school or her home. Nevertheless, she consistently scores in the top 10% nationwide in scholastic achievement testing. Christa was accompanied by her natural mother, Carissa Thompson.

2. BACKGROUND: Social and General History Related to Presenting Problem: Note how long it has been a problem, frequency of problem occurrence, antecedents, consequences, settings in which problem occurs (physical and social) as applicable. If possible include concrete example(s) of presenting problem(s). Include any relevant information regarding background or developmental history.

Mrs. Thompson has been married four times. She was married prior to Christa's birth to the father of her oldest daughter, Alica. Later she married Christa's father and was married for four years. After divorcing Mr. Pike, she later married him again and their second marriage lasted two years. Her fourth marriage, to Mr. Thompson, is currently in its second year. Despite her marriage partners and family instability, Christa has been seemingly unaffected, Mrs. Thompson reported. She remains close to her natural father and sees him practically every weekend. Christa said she was pleased with her mother's decision to marry Mr. Thompson but now has few positive feelings toward him.

Christa has been disinterested and unmotivated toward her school work since beginning kindergarten. She is no special discipline problem at home. Christa is a third grade student at Cranberry-Prosperity Elementary School.

3. SIGNIFICANT OTHERS: Family members, friends, teachers, social service agents, etc. Relationship of each to problem if applicable.

Carissa Thompson: mother, age 33. Currently Mrs. Thompson works evenings at a local restaurant.

Danny Thompson: stepfather, age 39. Christa described her stepfather as "mean" but would not elaborate as to what she meant.

Christa's natural father is supportive of her mother's efforts to motivate Christa's interest in school work and is willing to cooperate, Mrs. Thompson explained.

4. CLIENT'S DAILY ACTIVITIES: Summarize a "normal" day for the client. (Schedule format if possible).

After school, Christa enjoys watching TV or visiting with friends in the neighborhood. After dinner she may again watch TV until bedtime at 9:00 p.m.

5. What does the client like to do? What does s/he do well? (List possible reinforcers).

Watch TV, color or draw or visit friends.

6. Describe the reward and punishment systems which are operating in this family and whether they are effective or ineffective.

Common forms of punishment include talking, restriction of TV and occasional spankings. Promises of edible treats, etc., for good grades has been attempted for rewards. All these attempts have proven futile, Mrs. Thompson said.

7. BACKGROUND - MEDICAL HISTORY: Information relevant to treatment.

n/a

8. If there is a problem in any of the following areas, check and explain below:

a) ____ Sleep
b) ____ Eating
c) ____ Appetite
d) ____ Energy
e) ____ Fatigue
f) ____ Sex
g) ____ Anxiety

n/a

9. If any of the following are suspected or present, check and explain below:

a) ____ Unusual psychomotor activity (tics, tremors, etc.)
b) ____ Speech problems (rate, production, coherency)
c) ____ Memory problems (immediate, recent, remote)
d) ____ Suicidal ideation or behavior
e) ____ Violent, homicidal, or aggressive behavior
f) ____ Obsessions, compulsions, hallucinations, delusions
g) ____ Child abuse
h) ____ Alcohol or drug abuse

n/a

10. What does client and/or the client's parent(s) expect from professional help? What is child and parent's priority for change?

Mrs. Thompson would like her child to begin to take a greater interest in school and work to her capabilities. Christa would not state her expectations for treatment.

11. INTERVIEW INFORMATION: Summary and Subjective Impressions of Situation.

Christa appeared to be a bright, confident and independent young girl. She said very little throughout the intake and would respond with only brief statements or a shrug of her shoulders. However, she was polite and well mannered and seemed to be totally relaxed and content coloring or drawing during the session. She realizes the consequences of her school behavior and yet seems unconcerned at this time. Mrs. Thompson's marital relationships have been unstable and certainly difficult for both she and her family. She seems to have a genuine interest in her daughter's failure to achieve. However, she will need additional support from her ex-husband in intervening due to the positive relationship which exists between Christa and her father.

12. RECOMMENDATIONS: Is further evaluation or assessment necessary? Include recommendations for treatment programs and what function each recommended program would serve.

1. School-consultation.
2. Design and implement school/home checklist.
3. Review with the parent child management techniques, ie., S.T.E.P. material.
4. Assess client and family adjustment to multiple marriages and parental figures.

13. Diagnostic classification (include DSM-III code) V62.30 Academic Problem

Clinician: Mark Sundstrom (signature)
Mark Sundstrom
Child Outpatient Therapist
Position

MS/ks

**[illegible]RS MENTAL HEALTH COUNCIL, INC.**
**CHILD OUTPATIENT AND ASSESSMENT PROGRAM**
**INTAKE QUESTIONNAIRE**

Please furnish the following information about your child and your family as completely as possible. The information which you furnish will be used, in part, to determine the type of treatment which will be most beneficial to your child. All information given will be held in strict confidence unless a release of information form is signed by you.

GENERAL INFORMATION

DATE TODAY: 2-14-85

PLEASE PRINT

CHILD'S NAME: Christa Gail Pike PHONE: 255-2651

S. S. NO.: ______

DATE OF BIRTH: 3-10-76 AGE: 8 WEIGHT: 50-55 lbs

SEX: ___ M ✓ F. CHILD'S HEIGHT: ______

CHILD'S ADDRESS: Rt. 1 Box 62 (Number and Street)

Beckley (City) Raleigh (County) WV (State) 25801 (Zip)

CHILD LIVES WITH: (Check those appropriate)

✓ Mother ___ Step-Mother

___ Father ✓ Step-Father

___ Other (Specify): ______

Legal custody retained by: Mother

CHILD'S BEHAVIORAL INFORMATION

PLEASE DESCRIBE CURRENT PROBLEM AND ITS HISTORY: Does not pay attention in class. Teacher expresses concern because she disturbs the class. Is failing 3rd grade but has had problems since Kindergarten. Makes A's on tests but will not do homework or participate in classroom activities. Scored very high on CAT last year in top 4% in nation's 2nd graders.

000010

Child Outpatient and Assessment Program
Intake Questionnaire
Page 2

NAME OF THE PERSON WHO SUGGESTED YOU BRING YOUR CHILD TO THE MENTAL HEALTH CENTER (IF OTHER THAN YOURSELF): ____________

RELATIONSHIP TO CHILD: ______ Physician ______ Teacher ______ Other

SCHOOL CHILD ATTENDS: Cranberry-Prosperity GRADE: 3

LOCATION OF SCHOOL: Cranberry (City) Raleigh (County)

NAME OF SCHOOL COUNSELOR: Ms. Shutmate Free 100-1:30 Periods 10:10-10:32

NAME OF PRINCIPAL: Mr. Pettry

IS CHILD NOW IN: ✓ Regular Classes ______ Special Education
______ Vocational/Technical
______ Other (Specify): ____________

HAS YOUR CHILD EVER SKIPPED A GRADE? ______ Yes ✓ No

HAS YOUR CHILD EVER BEEN HELD BACK A GRADE? ______ Yes ✓ No

IS YOUR CHILD NOW UNDER LEGAL CHARGES? ______ Yes ✓ No

HAS YOUR CHILD EVER BEEN IN A JUVENILE DETENTION HOME? ______ Yes ✓ No

IF SO, PLEASE LIST THE CHARGES AND WHEN THE CHILD WAS ARRESTED, ETC.:

1. ____________

2. ____________

CHILD'S MEDICAL HISTORY

WHAT IS THE NAME OF YOUR CHILD'S PHYSICIAN? Conception

WHEN WAS THE LAST TIME YOUR CHILD VISITED HIS PHYSICIAN? ______ (Month) 1984 (Year)

IS YOUR CHILD NOW TAKING PRESCRIBED MEDICATION? ______ Yes ✓ No

IF SO, WHAT KIND (Name of medication, dosage)? For what? Prescribed by whom?

1. ____________

2. ____________

3. ____________

000011

Child Outpatient and Assessment Program
Intake Questionnaire
Page 3

DOES YOUR CHILD USE ANY NON-PRESCRIPTION DRUGS SUCH AS MARIJUANA, ALCOHOL, TOBACCO, ASPIRIN, COUGH MEDICINE, ETC.? ______ Yes __✓__ No ______ Don't Know

Please List:

1. ______________________ 3. ______________________

2. ______________________ 4. ______________________

HAS YOUR CHILD HAD ANY SERIOUS INJURIES OR ILLNESSES (High Fever, Head Injuries, etc.)? __✓__ Yes ______ No

IF YES, WHAT KIND?

| Name of Illness or Nature of Injury | Age When Occurred |
|---|---|
| 1. Hyaline membrane - Resp. failure | birth |
| 2. ↑ fever convulsions - | age 18 mos? |

HAS YOUR CHILD OR A FAMILY MEMBER (Parents, Aunts, Grandparents, etc.) EVER BEEN SEEN BY A PSYCHOLOGIST, PSYCHIATRIST, OR MENTAL HEALTH CENTER BEFORE?

______ Yes __✓__ No

IF YES, PLEASE LIST:

| Person Treated | Name of Agency or Professional | Location | Date Treated |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

FAMILY INFORMATION

NAME OF MOTHER (Step-Mother, etc.): Carissa Fotos Thompson AGE: 33

HIGHEST GRADE COMPLETED BY MOTHER: 1½ yrs. College OCCUPATION: LPN - Bartender

SALARY/MONTH: 500.00

MOTHER'S PLACE OF EMPLOYMENT: Filipos PHONE: 255-6305

ADDRESS OF MOTHER'S EMPLOYMENT: Skelton W.V.

Child Outpatient and Assessment Program
Intake Questionnaire
Page 4

NAME OF FATHER (Step-Father, etc.): Danny Thompson

HIGHEST GRADE COMPLETED BY FATHER 12 OCCUPATION: heavy [illegible]

SALARY/MONTH: [illegible]

FATHER'S PLACE OF EMPLOYMENT: unemployed PHONE:

ADDRESS OF FATHER'S EMPLOYMENT:

NAMES OF OTHER CHILDREN IN FAMILY (Include Foster Children, etc.):

| Name | Sex M or F | Age | Live at Home? Yes or No | Highest Grade Completed |
|---|---|---|---|---|
| 1. Alicia Ferguson | F | 13 | yes | 8 |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

Date: 2-5-85 Worker: Calpin

Referral Source: Corissa (?) Thompson

Title:

Relationship/Agency:

Address:

578

Phone Number: 255-2651

Client's Name: Christa Pike Age: 9

Address: Rt 1 Box 62 Beckley

Phone: (Home) 255-2651 /(Work)

Nature of Problem/Services Desired: In 3rd grade. Has trouble in school - straight A on tests, Doesn't do any work in school. Scored in top 10 people in nation on California Achievement Test. Doesn't pay attention in school. Well behaved at home, generally.

Appointment Date and Time: Thurs Feb 14 at 9am

Clinician: Sundstrom

Ref. Source Letter Needed ____ Clinician Informed ____ Entered in Log ____

Client Showed 1st Appt. ____ OR Letter Sent ____

Client Terminated ____ OR Rescheduled for ____

Client Showed 2nd Appt. ____ OR Letter Sent ____

Client Terminated ____ OR Rescheduled for ____

Client Showed 3rd Appt. ____ OR Client Terminated ____

Case Opened? ____ Date ____

000014

007524

007525

KAISER PERMANENTE

# PROGRESS NOTES

CONFIDENTIAL

Carmsa Fotos
w/f - Stephen
Kyaw
(KÁ YAH)

collateral - Christa Pike

| DATE | PROB. # | |
|---|---|---|
| 2/26/91 | | Orange County Social Services worker Cary Clement seeks placement for Christa in group homes. |
| | | At Dispute Mediation, Christa dropped charges ~~Father~~ since Stephen is moving out in March |
| | | Ms Fotos reports Christa's F reports psychologist's belief that Christa was sexually abusing F's 2-y-o daughter. Ms Fotos also reports her 4-y-o grandson Kei wetting bed & commenting Christa "said things re his pains", ultimately daytime enuresis as well, all following a week of Christa providing him unsupervised daytime babysitting. |
| | | Given perpetration hx, (M) now believes Christa's abuse victimization. Believes most likely perpetrator was friend of g-(M) who had access from birth - 4 yo, mostly ~2 y.o. |

000015

Moore® 3

FORM # 400065

Christa's accusations of sexual abuse began when she was 6-y-o and continues to present accusing Stephen of sexual abuse - "feeling her up" when they wrestled. Stephen acknowledges he responded to her pinching his penis by pinching her breast "to show her you don't do that to a person."

(M) still believes Christa's later elaborations are not true - that "there wasn't enough time for him to go through his whole toolbox & do the things she claimed."

Ms Fotos & Mr Kyah plan to "date when we can" despite gruelling & conflicting work schedules. Ms Fotos does not believe they can live together again "until Christa is better." 21 months of living together, only last 6 months of rapid deterioration. "I think she's just depressed 'cause I'm always on her for doing things." Mr Kyah acknowledges using corporal punishment at least twice (using belt or spanking) for not cleaning room on time.

Th discusses reasoning for avoiding corporal punishment in general & specifically c̄ adolescents & further c̄ adolescents c̄ hx of sexual abuse. Discusses foundation of parenting "⊕ relin based

007527

NSER PERMANENTE

PROGRESS NOTES

**CONFIDENTIAL**

Carrie Foster ✓

| DATE | PROB. # | |
|---|---|---|
| | | collateral - Christa Pike |
| 2-26-91 | | on mutual respect." Defines "belonging to family & learning cooperation & responsibility" as goals, NOT compliance c̄ orders of parents. Discuss simple techniques for beginning to move in that direction. Predicts LT tx indicated for Christa if (1) hx of sexual abuse as early as [illegible] twenty and/or (2) dissociation from awareness of affect is profound as the thinks. ✓ |
| | | Plan - (1) ind eval : Christa |
| | | (2) family eval. |
| | | [signature] |
| | | Chart copied & sent to OPC MH 10/18/91 per consent stmt & request of current therapist. |
| | | [signature] |

Moore® 303

FORM # 400065

007528

KAISER PERMANENTE

PROGRESS NOTES

CONFIDENTIAL

Christa Pike

| DATE | PROB. # | |
|---|---|---|
| 2-5-91 | | Christa school goal — |
| | | /5 / 6-7 / 6 |
| | | some ideas of how to ↑ to 6; |
| | | pay more att'n in class, do work. |
| | | She predicts no worsening, maybe |
| | | the same or a little improvement. |
| | | Family will be in court re step-F's |
| | | "assault on female" case vs. Christa |
| | | (she claims he hit her, he claims he |
| | | grabbed her jacket when she refused |
| | | to come inside.) |
| | | Th directs (MO) & Christa in direct |
| | | comm'n — (MO) able to directly |
| | | express her love & concern for |
| | | Christa, who in spite of clearly |
| | | displaying a variety of affect |
| | | (tearing, setting jaw c̄ apparent |
| | | anger or resolve, grinning, laughing) |
| | | reports not thinking or feeling anything. |

FORM # 400065

303

DATE PROB. #

007529

I again requested a separate individual appt ē Christa and a couple interview ē (SM) & step [illegible].

[signature]

KAISER PERMANENTE

007530

PROGRESS NOTES

**CONFIDENTIAL**

Pike, Christa
# 019 2014

| DATE | PROB. # | |
|---|---|---|
| | | |

KAISER PERMANENTE

126905

TELEPHONE MESSAGE
MEDICAL RECORD REQUEST

7:55 1/26/91

| | | |
|---|---|---|
| LAST NAME Pike | FIRST NAME Christa | M M# 0192014 |
| TELEPHONE HOME 7326463 | WORK EXT | DOB/AGE 14 |
| CALLER'S NAME Mother Carisa Photo MD | OFFICE | |
| REASON FOR CALL/CHIEF CONCERN | | |
| SYMPTOMS AND DURATION Christa was hit by fiancé while mother at work? - Hx of several similar accusations - Mother questions veracity of accusations - Christa now at 1/2 sister's house. Hx of sexual abuse of younger children | | |
| CURRENT MEDICATIONS/TREATMENTS | | |
| RELATED MEDICAL HISTORY | | |
| KNOWN ALLERGIES | PREGNANT ☐ YES ☐ NO | |
| PLAN/Rx Call Chuck Holton and DSS on Monday. Keep daughter & fiancé apart. Keep daughter away from younger children | | |
| NURSE'S SIGNATURE | M.D. SIGNATURE [signature] | |
| APPT. DATE | APPT. TIME | PROVIDER |

| | |
|---|---|
| PHARMACY NAME: | |
| PHARMACY LOCATION: | |
| PHARMACY PHONE NUMBER: | |
| Rx CALLED INTO PHARMACY BY: | |
| DATE/TIME: | |
| Rx ☐ NEW ☐ REFILL | |
| REFERRAL: | |
| CONSULTANT: | |
| E.R. | |
| HOSP. | |
| ADD VISITS ___ # | AUTH. |
| ☐ AUTHORIZED | ☐ NOT AUTHORIZED |

KFHP-NC-K100-B

1 - CHART COPY / 2 - (REFERRAL/CLINIC/MD) / 3 - ORIGINATOR / 4 - OUT GUIDE

**PRESS FIRMLY - PRINT CLEARLY - ALL COPIES ARE IMPORTANT**

2-1-91 Phone call to Cathleen Goodhand DSS, NA, left message. Phone call to Christa Pike; reports "we've got it all worked out & we're getting along good." [signature]

400065

000020

007531

KAISER PERMANENTE

Carolina Permanente
Medical Group, P.A.

**MENTAL HEALTH**
**INTAKE FORM**

DATE 1-15-91

**PRESENTING COMPLAINT/HISTORY** Christa c/o "not getting along c Steve" - even when I'm less rude & obedient he nitpicks & finds something wrong.

(M) c/o Christa's disobedience (clean room, fold clothes) (doesn't bring report cards to mom)

(M) worn out worrying about constant crises: C's rel c stepdad, c skipping school, argumentative

**SYMPTOM LIST**

Depressive Sx wakes all thru night (~2 months), more irritable ⊖ appetite ⊖ concentration ⊖ energy level

Manic Sx ⊖ anhedonia ⊕ hopeless, blue

Psychotic Sx

Anxiety/Phobic Sx

Organic Sx

Sexual Disorder Sx

Adjustment Disorder Sx

Somatic Sx

Other

**PSYCHIATRIC HISTORY** 1 1/2 y c Dr Staw at UNC 1 year ago, ? depression Dr Yeargan in W Va when pt in 3rd grade very brief

**FAMILY PSYCHIATRIC HISTORY**

(see genogram)

**FAMILY HISTORY** (members of immediate family) Christa attends Stanford ? Sch ? 15 yo ? failing scores "a concern - but I'm not gonna die if I don't make straight A's" Willing to work on school performance but "I don't care"

[F] sent her home after 6 weeks in W. Va. He "couldn't handle her lying, bad influence on younger children"

400013 (3/89)

000021

KAISER PERMANENTE

PROGRESS NOTES 007532

Christa Pike

**CONFIDENTIAL**

DATE | PROB. #




genogram

1/15/91

[illegible] MSW

KAISER PERMANENTE

007533

# PROGRESS NOTES

F# 0192013

**CONFIDENTIAL**

| DATE | PROB. # | |
|---|---|---|
| | | |

KAISER PERMANENTE

Chuck
Tx Dr Straus UNC

Ex-H left ō
she accused
him of rape
4-y-ago / accused
neighbor
of molesting
her 2 y-ago

126997

TELEPHONE MESSAGE
MEDICAL RECORD REQUEST

LAST NAME Price FIRST NAME Christa M M# 0192014

TELEPHONE HOME 732-6463 WORK 478-7337 EXT

DOB/AGE

CALLER'S NAME Carissa Fotos MD OFFICE

REASON FOR CALL/CHIEF CONCERN "She's been causing trouble for last 10 yrs"

SYMPTOMS AND DURATION Has been in therapy in the past but financially had to discontinue – attempted suicide in past, last week she pulled knife on mother's fiancé.

CURRENT MEDICATIONS/TREATMENTS She called S.S. alledging sexual abuse from mother's fiancé

RELATED MEDICAL HISTORY Mother does not believe her - states she (daughter)

KNOWN ALLERGIES starts wrestling w/him until mother sends her to her room PREGNANT ☐ YES ☐ NO

PLAN/Rx to make her stop. SS recommended more counseling for her. – Mother found butcher knife in daughter's purse a few nights ago (1½ y ago ran away & 1250 AM has (no improvement) threatened fiancée ē knife

NURSE'S SIGNATURE

M.D. SIGNATURE CHafol MD

APPT. DATE 1-15-91

APPT. TIME 8 AM

PROVIDER Hed

PHARMACY NAME:

PHARMACY LOCATION:

PHARMACY PHONE NUMBER:

Rx CALLED INTO PHARMACY BY:

DATE/TIME:

Rx ☐ NEW ☐ REFILL

REFERRAL:

CONSULTANT:

E.R.

HOSP.

ADD AUTH.

VISITS ____ # ______

☐ AUTHORIZED ☐ NOT AUTHORIZED

1 - CHART COPY / 2 - (REFERRAL/CLINIC/MD) / 3 - ORIGINATOR / 4 - OUT GUIDE

KFHP-NC-K100-B

PRESS FIRMLY - PRINT CLEARLY - ALL COPIES ARE IMPORTANT

Cannot come in today – will get Monday off

Medical/Legal
Department
Bert Radford
(919) 878-5895

3

**Peter Kramer, MSW**

Substance Abuse Services
Adolescent Program

Family Counseling Center
300 W. Tryon Street • Hillsborough, NC 27278
(919) 732-8181, ext. 2375

**ORANGE-PERSON-CHATHAM MENTAL HEALTH CENTER**

**NORTH CAROLINA DIVISION OF MENTAL HEALTH, MENTAL RETARDATION AND SUBSTANCE ABUSE SERVICES**

| | |
|---|---|
| CLIENT:<br>RECORD NUMBER: | 1. Complete at screening.<br>2. Part A and B must be completed.<br>3. Sign, date, and authenticate all entries. |

**PART A — SCREENING INFORMATION** TYPE OF INSURANCE, if any ____

Date of Call: 10-7-91 Date Scheduled: Oct. 11

Name: Pike, Christa Time: 8:30 Therapist: Mulcahy

Address: 600 S. Churton St Home Phone: 732-8769

flint Rd. Apts. #28 4'Boro

Parent's Name, if a minor ____

Work Address: Carissa Fotos Work Phone: 470-7337

— Dur. Hospital, Regional

Seen at OPC Before: Y Same Name: ____ Therapist: ____

Date of Birth 3/10/76 Age ____ Race ____ Referred by Peggy Hamlett

Time Consideration for Appointment: ____

Referral Information: Running away from home, ↓ school attendance, arrested for B & E on supervised probation for 12 mo. Stealing things from home. Abusing Pot + Alcohol, past victim of sexual abuse, has molested younger relatives (Per Ms Hamlett)

**PART B — SCREENING EVALUATION**

____ Yes—The client was evaluated and meets criteria for admission. The disposition is to admit the client. See admission assessment for complaint or presenting problem(s).

✓ No—The client was evaluated and did not meet criteria for admission. Part C will be completed. (Back)

Comments:

10/16- No show for ~~screening~~ P.K. intake - mother was called & said Christa went to the beach w/ 2 friends. RTC 10/23/91 for intake - Kramer

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

____ Sign, Date and Authenticate

000025

Form No. AP 1-04-87 Part A and B EMERGENCY/SCREENING/ADMISSION ASSESSMENT

ORANGE-PERSON-CHATHAM MENTAL HEALTH CENTER
Children and Youth Services
SCREENING QUESIONNAIRE

Date 10-9-91

Your Name Carissa Fotos Age 39 Marital Status Div.

Address Flint Ridge Apts. #28 600 S. Churton St. Hillsborough NC 27278

Home Phone 732-8769 Work Phone 470-7337

Referred by Peggy Hamlet

3. Please complete for all persons living in your household:

| Name | Age | Relationship to You | Occupation | Highest Grade Comple |
|---|---|---|---|---|
| Christa Pike | 15 | Daughter | School | 7th |
| (Aleshia) | 20 | | | |

Presenting Problems: Please describe the major problems, worries and concerns that you have. Christa is not going to school, is drinking, & doing drugs, has been seen snorting room deoderizer. Running away, will not stay home. Hanging out with 18-21 yr olds. Has a history, that she doesn't know Im aware of, of child molestation. She lies chronically + steals. She is on one yrs. probation at this time for B+E, peti theft

When did these problems begin? Different behavior problems have been developing since 1st grade that I can remember.

How have you handled these problems? Spanking at first, grounding, psychiatric therapy, rewarding good behavior, ignoring bad or grounding.

What kind of discipline is used in your family? None at present, nothing has helped. If I limit activity she just runs away

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

8. Have you or any member of your immediate family had any previous evaluation, counseling or psychotherapy? Yes ✓ No ____ If yes, please complete:

| Who | When | Where | Therapist/Counselor |
|---|---|---|---|
| Christa | Off + on since 3rd grade | W.V. + N.C. | Dr. Straw NC Chuck Holten-Kayser |
| myself | 1989 | Alan Konell in Chapel Hill | |

9. Have you or any of your family ever been hospitalized for emotional or psychiatric problems? Yes ____ No ✓ If yes, please complete:

| Who | When | Where | Therapist/Counselor |
|---|---|---|---|
| | | | |

10. Do you or any member of your family smoke, drink or use drugs? ____
If yes, please state which of the following you use and how much/how often you use them.

| | Who | How Much/How Often |
|---|---|---|
| a. Tobacco Products | myself | 1pk/day |
| b. Alcohol | myself<br>Christa | 6 Beers/week<br>? freq. lately |
| c. Drugs | Christa | ? |

11. If you drink alcohol, have you or any member of your family ever experience any of the following problems?

| | Yes | No | Who |
|---|---|---|---|
| Memory lapses/blackouts | | ✓ | |
| Shakes/tremors | | ✓ | |
| Drinking upon waking up | | ✓ | |
| Miss meals due to drinking | | ✓ | |
| Miss work or daily activities | | ✓ | |
| Drink on job or daily activites | | ✓ | |
| Illness due to drinking | | ✓ | |
| DUI or alcohol related arrests | | ✓ | |
| Drinking related accidents | | ✓ | |
| Fight or quarrel with others | | ✓ | |

12. Have you ever attended any of the following? No

____ AA ____ Alanon ____ Alateen ____________ Other
Name

**— SENSITIVE INFORMATION —**
**WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.**

3. Have you or any of your family experienced any of the following:

| | Yes | No | Who |
|---|---|---|---|
| Nervousness | | ✓ | |
| Nervous breakdown | | ✓ | |
| Crying spells | | ✓ | |
| Depression | | ✓ | |
| Suicide attempt/Suicide | ✓ | | myself 1977 or 78 – Christa 1989? |
| Frequent mood changes | ✓ | | Christa |
| Court/Legal problems | ✓ | | Christa |
| Temper tantrums | | ✓ | |
| Fighting | | | |
| Lying | ✓ | | Christa |
| Stealing | ✓ | | Christa |
| Running away from home | ✓ | | Christa |
| Problem drinking | ? | | Christa – my mother was Alcoholic |
| Problem drug use | ? | | Christa |
| Eating problems | | ✓ | |
| Sleep problems | | ✓ | |
| Nightmares | ? | | Christa |
| Bed wetting | | ✓ | |
| Clinging to others | | ✓ | |
| Shy/Stays to self | | ✓ | |
| Accidents/Accident prone | | ✓ | |
| Frequent minor illnesses | ✓ | | Christa |
| Convulsions or epilepsy | | ✓ | |
| Ulcers | ✓ | | myself several yrs ago ? now |
| High or low blood pressure | ✓ | | myself in past ↑BP – normal now |
| Cancer | | ✓ | |
| Diabetes | ✓ | | my Grandmothers – Pat. + Mat. |
| Sickle cell anemia | | ✓ | |
| Venereal disease | | ✓ | |
| Other serious illnesses | | ✓ | |
| Allergies | | ✓ | |
| Currently on medication | | ✓ | |

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

✓

# CHILD INFORMATION FORM

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

Child's Name Christa Date of Birth 03-10-76

## I. Developmental History

1. Was pregnancy planned? Yes ✓ No ___
2. Any complications during pregnancy? Yes ✓ No ___ If yes, please explain: Premature C-section - Hyaline membrane syn.
   a. Which of the following were used during pregnancy?
   Medications ___ Drugs ___ Alcohol ___ Cigarettes ___ NONE
3. Any complications during delivery? Yes ✓ No ___ If yes, please explain:
   Breech birth - C-Section performed
4. Feeding: Did child eat well? Yes ✓ No ___ Colicky: Yes ___ No ✓
   Age when weaned? one yr.
5. Temperament: What kind of baby was s/he? very good - quiet
6. Walking: At about what age did child walk? 1 yr.
7. Talking: At about what age did child talk? normal
8. Toilet training: At what age did toilet training begin? 1 yr - 18 mos
   At what age was it completed? Bedwetting till 1st grade
9. Who took primary care of child during first 3 years? Myself + grandmother
10. Anything unusual about child's development? She was always quiet though seemed happy - Never asked for anything which is unusual
11. Has child reached puberty? Yes ✓ No ___ If yes, at what age? 14
12. Do you have any concerns about child's sexual development or behavior? Yes ✓ No ___
    If yes, please explain: see front page
13. Date of child's last physical exam: March or April 91
14. Major illnesses or hospitalizations; Tonsilectomy - 1984 I think

## II. School History

1. Current school and grade: Stanford Jr. High 8th grade
2. Any grades repeated? Yes ✓ No ___ If yes, which one(s)? 3rd - 7th
3. Any special services or classes? Yes ✓ No ___ If yes, please describe:
   summer school after 6th grade
4. Overall school performance: Grades Failing Behavior Disruptive
   Never does homework - skips frequently

## III. Social Development

1. How does child get along with other children? Very popular with other problem children
2. How does child get along with adults? Good with other parents of friends Poor with me
3. Does child have any close friends his/her own age? yes
4. What does child do for play and recreation? Drinks now - used to Enjoy Rollerskating + Dancing, swimming
5. How does child spend time alone? Watches TV or Listens to Radio - Very difficult to get her to do anything else

## IV. Other Concerns

Is there anything else about child you think we should know? Yes ✓ No ___
If yes, please explain: Can talk more in detail later -
I think Christa is in so Deep that she cant get out.
I dont know how to communicate with her!

007541

ORANGE-PERSON-CHATHAM
MENTAL HEALTH CENTER

NORTH CAROLINA DIVISION OF
MENTAL HEALTH, MENTAL RETARDATION
AND SUBSTANCE ABUSE SERVICES

CLIENT:
RECORD NUMBER: File

1. Complete at screening.
2. Part A and B must be completed.
3. Sign, date, and authenticate all entries.

**PART A — SCREENING INFORMATION**

TYPE OF INSURANCE, if any Pacific Mutual 50%

Date of Call: 5/22/90 Date Scheduled: 5/31/90

Name: Christa Pike Time: 4 PM Therapist: Mulcahy

Address: 107 West Hill ave Home Phone: 732-6463
Hillsborough NC 27278

Parent's Name, if a minor Carissa Fotos

Work Address: Carol Woods Work Phone: 968-4511

Seen at OPC Before: NO Same Name: Therapist:

Date of Birth 3/10/76 Age 14 Race W Referred by mother

Time Consideration for Appointment:

Referral Information: Failing in school, defiance to school personnel, saw Dr Straw 5/89 - 1/90 at NCMH. poor communication with mother and mother's fiance.

**PART B — SCREENING EVALUATION**

____ Yes—The client was evaluated and meets criteria for admission. The disposition is to admit the client. See admission assessment for complaint or presenting problem(s).

____ No—The client was evaluated and did not meet criteria for admission. Part C will be completed. (Back)

Comments:

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

000031

Sign, Date and Authenticate

No. AP 1-04-87 Part A and B

EMERGENCY/SCREENING/ADMISSION ASSESSMENT

ORANGE-PERSON-CHATHAM MENTAL HEALTH CENTER

Children and Youth Services

SCREENING QUESIONNAIRE

Date 5/31/90

Your Name Carissa J. Fotos Age 32 Marital Status Divorced

Address 107 W. Hill Ave, Hillsborough NC 27278

Home Phone 732-6463 Work Phone 968-4511

Referred by

Please complete for all persons living in your household:

| Name | Age | Relationship to You | Occupation | Highest Grade Completed |
|---|---|---|---|---|
| Christa Gail Pike | 14 | daughter | school | 7th |
| Steve Kyaw | 37 | Friend | grocery stocker | 1? |

Presenting Problems: Please describe the major problems, worries and concerns that you have.

Christa continues to fail classes, skips school, does not participate in class. She does not do chores at home either.

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

When did these problems begin? 1st grade

How have you handled these problems? I've tried everything - Taking away for misbehavior, rewards for good behavior, spanking, yelling, you name it!

What kind of discipline is used in your family? Mostly grounding + rewarding

. Have you or any member of your immediate family had any previous evaluation, counseling or psychotherapy? Yes ✓ No ____ If yes, please complete:

| Who | When | Where | Therapist/Counselor |
|---|---|---|---|
| Christa | 1989-90 | NCMH | Gregory Straw MD |

9. Have you or any of your family ever been hospitalized for emotional or psychiatric problems? Yes ____ No ✓ If yes, please complete:

| Who | When | Where | Therapist/Counselor |
|---|---|---|---|
| | | | |

Do you or any member of your family smoke, drink or use drugs? yes
If yes, please state which of the following you use and how much/how often you use them.

| | Who | How Much/How Often |
|---|---|---|
| a. Tobacco Products | self | 1pk/day |
| b. Alcohol | self + Steve | occ. |
| c. Drugs | NO | |

If you drink alcohol, have you or any member of your family ever experience any of the following problems?

| | Yes | No | Who |
|---|---|---|---|
| Memory lapses/blackouts | | ✓ | |
| Shakes/tremors | | ✓ | |
| Drinking upon waking up | | ✓ | |
| Miss meals due to drinking | | ✓ | |
| Miss work or daily activities | | ✓ | |
| Drink on job or daily activites | | ✓ | |
| Illness due to drinking | | ✓ | |
| DUI or alcohol related arrests | | ✓ | |
| Drinking related accidents | | ✓ | |
| Fight or quarrel with others | | ✓ | |

. Have you ever attended any of the following?

____ AA ____ Alanon ____ Alateen ____________ Other
Name

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

Have you or any of your family experienced any of the following:

| | Yes | No | Who |
|---|---|---|---|
| Nervousness | | ✓ | |
| Nervous breakdown | | ✓ | |
| Crying spells | | ✓ | |
| Depression | ✓ | | Christa |
| Suicide attempt/Suicide | ✓ | | Christa 89 OD |
| Frequent mood changes | ✓ | | all of us |
| Court/Legal problems | | ✓ | |
| Temper tantrums | | ✓ | |
| Fighting | | ✓ | |
| Lying | ✓ | | Christa homework [illegible] |
| Stealing | | ✓ | |
| Running away from home | | ✓ | |
| Problem drinking | | ✓ | |
| Problem drug use | | ✓ | |
| Eating problems | | ✓ | |
| Sleep problems | | ✓ | |
| Nightmares | | ✓ | |
| Bed wetting | | ✓ | |
| Clinging to others | | ✓ | |
| Shy/Stays to self | | ✓ | |
| Accidents/Accident prone | | ✓ | |
| Frequent minor illnesses | | ✓ | |
| Convulsions or epilepsy | | ✓ | |
| Ulcers | | ✓ | |
| High or low blood pressure | ✓ | | Carissa - occasional ↑ BP |
| Cancer | | ✓ | |
| Diabetes | | ✓ | |
| Sickle cell anemia | | ✓ | |
| Venereal disease | | ✓ | |
| Other serious illnesses | | ✓ | |
| Allergies | ✓ | | Christa - Desipramine Trial 7/89 |
| Currently on medication | | ✓ | |

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

# CHILD INFORMATION FORM

Child's Name Christa Pike Date of Birth 03-10-76

## I. Developmental History

1. Was pregnancy planned? Yes ✓ No ___
2. Any complications during pregnancy? Yes ✓ No ___ If yes, please explain: pre-term 7mos.
   a. Which of the following were used during pregnancy?
   Medications ___ Drugs ___ Alcohol ___ Cigarettes ___ NONE
3. Any complications during delivery? Yes ✓ No ___ If yes, please explain:
   failed to dialate - C-section
4. Feeding: Did child eat well? Yes ✓ No ___ Colicky: Yes ___ No ✓
   Age when weaned? 1 year
5. Temperament: What kind of baby was s/he? quiet.
6. Walking: At about what age did child walk? 1 yr.
7. Talking: At about what age did child talk? ___
8. Toilet training: At what age did toilet training begin? 1 yr.
   At what age was it completed? 3 yrs.
9. Who took primary care of child during first 3 years? myself + paternal grandmother
10. Anything unusual about child's development? ___

11. Has child reached puberty? Yes ___ No ___ If yes, at what age? ___
12. Do you have any concerns about child's sexual development or behavior? Yes ___ No ___
    If yes, please explain: ?

13. Date of child's last physical exam: 1988
14. Major illnesses or hospitalizations; [illegible] - Blood dyscrasia
    Summer 84 lack of clotting factors

## II. School History

1. Current school and grade: Stanford Jr. High 7th grade
2. Any grades repeated? Yes ✓ No ___ If yes, which one(s)? 3rd + possibly 7th
3. Any special services or classes? Yes ___ No ✓ If yes, please describe:

4. Overall school performance: Grades Failing every yr. Behavior poor - does not participate in class, do homework [illegible]. Disruptive in class

## III. Social Development

—SENSITIVE INFORMATION—
WHEN REQUESTED BY CONSUMER, MUST BE SHOWN AND/OR INTERPRETED BY A COMPETENT CLINICIAN. REDISCLOSURE PROHIBITED BY LAW WITHOUT CLIENT CONSENT.

1. How does child get along with other children? well
2. How does child get along with adults? well
3. Does child have any close friends his/her own age? yes
4. What does child do for play and recreation? roller skate, Bicycle, dancing, modelling school
5. How does child spend time alone? asleep or listening to music + watching TV

## IV. Other Concerns

Is there anything else about child you think we should know? Yes ___ No ___
If yes, please explain:

4

# PSYCHOLOGICAL EVALUATION

## CONFIDENTIAL

Name: Christa Gail Pike
Date of Birth: 03-10-76
Dates of Evaluation: 11-18-91; 11-19-91

Referral and Background

Christa, aged 15, was referred for psychological evaluation by her Court Counselor, Ms. Peggy Hamlett. Christa was adjudicated delinquent on 9-26-91 on Misdemeanor Breaking, Entering or Larceny charges after they were reduced from a felony. She was placed on one year probation, and was ordered to cooperate with her Court Counselor's recommendations. However, since the court hearing, Christa has persisted in a number of problematic behaviors: she is aggressive toward peers and verbally abusive toward staff in school, and she repeatedly runs away from home. Christa is sexually active and has a history of drug and alcohol use. Psychological evaluation was requested in order to help with intervention planning.

Christa lives with her divorced mother, Carrisa Fotos. Her father, Glenn Pike, is remarried and lives in West Virginia. Her older sister is now married and living out of the home. Christa describes a fairly unsettled life since her mother brought the two girls from West Virginia to North Carolina, where she married again, and divorced, and subsequently has had two live-in boyfriends. About 4 years ago, Christa was sexually molested by her grandmother's boyfriend, and has recently alleged that a boyfriend then living with her mother was physically abusive to her in her mother's absence. Christa's runaway and truant behavior developed around this time and since her mother's second shift job limited the supervision she could provide, Christa was sent to live with her father and his family. She was returned to her mother's home, though, after allegedly sexually abusing her young half brother. In April, 1991, DSS placed Christa at Sheaffer House, where she adjusted fairly well, but reportedly made no real efforts to change her rebellious attitude. She returned home in July, 1991, and continued to come and go at will, often staying away for days at a time.

Christa is an 8th grade student at Stanford Middle School. She has been absent for most days of school this year. She is seen by most teachers as bright, verbal and capable. Achievement scores in 1989 placed her between the 71st and 93rd percentiles for reading and language and at the 40th percentile in math. However, since then, her scores have all been well below average. Her teachers report that she is generally inattentive and unproductive in class, probably because she has missed too much instruction to understand the material.

Procedures

Wechsler Intelligence Scale for Children - Revised (WISC-R)
Draw-A-Person
Kinetic Family Drawing
Adolescent/Adult Sentence Completion
Thematic Apperception Test - (TAT)
Rorschach

Behavioral Observations and Clinical Interview

The evaluation took place at the detention center where Christa was awaiting transportation to training school. Although she was suffering from Sinusitis, she seemed very willing to participate in the evaluation, which she saw as preferable to the alternative of school. Christa is a slightly-built, attractive, auburn-haired girl with delicate features. She has a crude tattoo on her left wrist: #1 Bitch. She was attentive and cooperative throughout the evaluation, and seemed genuinely concerned about her performance. She was particularly thoughtful over projective stimuli, often pausing before she responded. At the end of the evaluation, she asked, "How did I do? Am I crazy?". She commented that she had "lots of imagination" but had never been able to do well in school, because the work was so boring.

Christa talked spontaneously about her circumstances and her past. She was nervously preoccupied with the prospect of going to training school, wishing she could make the transition soon, and "get it over". Past experiences she described were almost all negative ones, but Christa spoke about them with very little emotion. She talked about her physical abuse by her mother's past boyfriend, about

frequent moves, which had led to her never staying in one school for more than 2 years, and about being victimized as a young child by her older sister. She told how her sister had once tricked her into putting her hand on a door frame, so as to slam the door on her fingers. Christa's sister now tells her to just leave; no one wants her. She had only one memory of the time her parents were together; her father had punished her by taking her favorite doll and breaking off all its limbs. Describing a distance or lack of warmth between her mother and herself, Christa explained "we don't have the relationship most people do". She was unable, at first, to draw herself and her mother doing something together, because, she said, they hardly saw each other. She responded finally to the suggestion that she might draw them involved in an activity she would like to share with her mother.

Test Results
On the WISC-R, Christa obtained a Verbal IQ of 102 ± 6, in the Average range, a Performance IQ of 114 ± 8 in the High Average range and a Full Scale IQ of 108 ± 5, also in the Average range. Among verbal tasks, Christa demonstrated strengths in logical, abstract reasoning and in social comprehension (84th %ile). She performed relatively less well, though still at the average level, on measures of general knowledge, arithmetic, and vocabulary, which are more closely related to educational experiences. Christa's perceptual motor skills were evenly developed at the average level, with the exception of a significant strength in understanding part-whole relationships (99th %ile). Her score on this one subtest mainly accounted for the 12 point difference between Christa's Verbal and Performance IQ scores.

The projective figure drawing Christa produced was a simple, child-like picture of a smiling girl in jeans. The drawing, and the comments Christa made about it, suggested that she feels quite insecure and unsupported, that she prefers to hide feelings of vulnerability or sadness from others. There were also indications of concerns about her physical well being. A picture of herself and her mother playing cards, showed Christa, as she pointed out, as the larger of the two figures. She did not seem to view her mother as having a parental role of control and responsibility.

In the sentence completion task, Christa's responses reflected her preoccupation with her immediate circumstances: her dislike of the detention center, her fears about going to training school, and anxieties about what might happen to her if she couldn't control her behavior ("End up dead or in prison or something"). She acknowledged feeling angry with herself most of the time. She spoke several times, with frustration, about continuing to get in so much trouble. Even at the time, she knew it was bad but, she said, it was "just so tempting". Christa added to the sentence stem: Nobody knows that I ... "I can't help being in so much trouble. I don't know why". Though Christa's self-statements revealed a fairly pessimistic outlook, she did think that she was able to get along well with peers, particularly with a best friend, who was important to her.

Christa's TAT stories were all quite brief. Characters were mainly seen as upset, sad, or depressed, although Christa occasionally made an effort to "undo" a grim story with a second humorous version. The source of distress for her characters was generally a loss, separation, or disappointment in a relationship: a mother learning that her child is dead; a woman being left by an angry boyfriend; a child worried, because no one came to take her home from a babysitter's house.

Christa produced an average number of Rorschach responses for a girl her age, and an average number of "popular" precepts, showing an ability to make appropriate and conventional interpretations of stimuli. She also recognized formations commonly seen as people, suggesting adequately developed social relatedness and a wish for satisfying relationships, including heterosexual relationships. However, there were also indications of distancing and inhibition, a reserve, which may serve as a defense against anger over unmet needs for nurturing. There was in the protocol a prominent theme of oral aggression and hostility. Negative feelings, aroused particularly by the colored stimulus cards, prompted disturbing images: On Card II - "a mouth with a busted lip", on Card X - "a big sea creature sucking all the little ones in". Bodily concerns, which are sometimes associated with repressed hostility,

were also evident. There were an unusually large number of percepts of internal organs. Christa drew upon her intelligence and creativity to produce a high proportion of percepts using the whole inkblot, but as she reacted to strong negative feelings, her defenses failed her, and her percepts became, in a few instances, quite confused and disorganized.

Summary and Recommendations

Christa is a 15-year-old girl, whose measured intelligence is in the average range of intellectual functioning. Personality assessment suggests that she experiences considerable internal stress related to depression and anger over unmet needs for nurturing. The losses and disruptions that have been constant in her social environment have not supported the development of adequate impulse control. Christa seeks release for painful feelings in hostile and aggressive acting out, even though she fears the retaliation of further rejection. Under the press of emotional re-activity, she is not able to maintain effective control and organization in her thinking processes. The inevitable problems in adaptive functioning lead to consequences that confirm her feelings of inadequacy and unworthiness, and fuel her anger and depression. She has, though, preserved positive feelings in attachments to a friend and to a caring adult (her social worker) suggesting that her dependency needs are still accessible to corrective emotional experiences.

Christa's primary need is for a stable placement, providing a structured environment, where firm, predictable limits can be placed on her behavior. External controls of the kind that might be found in Wilderness Camp, would stimulate further growth in responsibility, and would also lead to intensified releases of feeling, which, with support from nurturing adults, she may be able to work through, achieving greater acceptance and understanding of them. Christa would also benefit, after a placement in Wilderness Camp, from mental health treatment services, to address these emotional issues. At that time, the need for interventions focussed on her suspected sexual offenses and her drug use may be assessed.

Rosemary Wilson, Ph.D.

Rosemary Wilson, Ph.D.
Licensed Practicing Psychologist
Juvenile Services Division



RW/am

5

JUVENILE SERVICES DIVISION
THOMAS A. DANEK, PH.D.
ADMINISTRATOR

DONALD L. HARGROVE
CHIEF COURT COUNSELOR
P. O. BOX 60
HILLSBOROUGH, N. C. 27278

# ADMINISTRATIVE OFFICE OF THE COURTS

RALEIGH, NORTH CAROLINA

FRANKLIN FREEMAN
DIRECTOR

PATRICIA S. HUNT
CHIEF DISTRICT COURT JUDGE
DISTRICT COURT DISTRICT 15B

To: Hon. Kella Hatcher, Assistant D. A.

From: Donnie Phillips, Intake Counselor DP(rr)

Date: September 13, 1991

Re: Brandy Michelle Parker DOB: 11-03-71
Christie Gail Pike DOB: 03-01-76

Complaint(s): BEL (1 count each)

A decision has been made to approve petitions for filing concerning the above-named juveniles (copies attached). The Adjudicatory Hearings are scheduled for a session of Juvenile Court to be held on September 26, 1991 in Hillsborough.

Please feel free to contact me if you have any further questions regarding these approvals. I can be reached by calling the following numbers: 732-8181 (Hillsborough); 688-7331 (Durham); 227-2031 (Mebane); 967-9251 (Chapel Hill); Please ask for extension 2215 when calling.

DP/am

cc: Juvenile Clerk
Victim(s)
Law Enforcement
Intake File

007554

File No. 91201

**STATE OF NORTH CAROLINA**

Orange County

In the General Court of Justice
District Court Division

In the Matter of:

Name of Juvenile: Christa Gail Pike

# JUVENILE PETITION

G.S. 7A-533:-560

Name of Petitioner: Ned Thorpe, Investigator OCSD

Juvenile's Date of Birth: 03-01-76 | Age: 15.5

Juvenile's Address: 600 S. Churton Street

City, State Zip: Hillsborough, N. C. 27278

Offense or Condition

- [X] Delinquent
- [ ] Abused
- [ ] Undisciplined
- [ ] Neglected
- [ ] Dependent

I have sufficient knowledge or information to believe that a case has arisen which invokes the juvenile jurisdiction of the court, and therefore allege that:

1. The above named juvenile is within the age of jurisdiction, or was at the time of the offense or condition, and resides in the district at the address shown above, or was found in the district as alleged herein.

2. The names and addresses of the juvenile's parents or guardian or custodian or caretaker are as follows:

| NAME | RELATIONSHIP OR TITLE | ADDRESS |
|---|---|---|
| Carissa Fotos | mother | same as juvenile |
| | | |
| | | |

3. The following offense(s) or condition(s) is/are alleged:

That the juvenile is a delinquent juvenile as defined by GS 7A-517(12) in that at and in the county named above and on or about the 3rd day of September, 1991, the juvenile did unlawfully, willfully and feloniously break or enter a building which was the property of White Cross Recreation Association, located on White Cross Road, Chapel Hill, N. C., with the intent to commit a felony therein, to wit: Larceny, in violation of GS 14-54(a).

And on or about the date of offense shown and in the county named above, the juvenile did unlawfully, willfully and feloniously steal, take and carry away assorted food items, the personal property of White Cross Recreation Association, having a value of $5.00, pursuant to the commission of felonious breaking and entering described in the charge above, in violation of GS 14-72(b)(2).

000042

(Attach additional pages as needed for allegations)

I request the court to hear the case to determine whether the allegations are true and whether the juvenile is in need of the care, protection, or supervision of the State.

## VERIFICATION

Being first duly sworn, I say that I have read this petition and that the same is true to my own knowledge, except as to those matters alleged upon information and belief, and as to those, I believe it to be true.

| SWORN AND SUBSCRIBED TO BEFORE ME | |
|---|---|
| Date: September 6, 1991 | Petitioner's Signature: Neal Thayer |
| Signature of Official Authorized to Administer Oaths: [signature] | Address: 144 E. Margaret Lane |
| Juvenile Court Clerk | City, State, Zip: Hillsborough, NC |
| | Agency (if applicable): DCSO |
| | Title (if applicable): Investigator |
| | Telephone: 7322431 |

**Witnesses**

| Name | Address | Telephone |
|---|---|---|
| Mr. B. Braxton | 1223 Crawford Dairy Rd., Chapel Hill? | 942-1603 |

**Decision of Intake Counselor Regarding the Filing of the Petition for an Offense**

| | |
|---|---|
| ☒ Approved for Filing | Date and time of telephone approval received from intake counselor to file the petition. Date: Time: ☐ A.M. ☐ P.M. |
| ☐ Not Approved | |
| R- 9/11/91 | Date: September 13, 1991<br>Signature of Intake Counselor: Donald R. Rhodes |

007556

STATE OF NORTH CAROLINA

Orange County

File No. 91 J 104

In The General Court of Justice
District Court Division

In the Matter of

Name of Juvenile: Christa Gail Pike

Date of Birth: 3/1/76

Age: 15

Address: 600 S. Churton Street

City, State, Zip: Hillsborough, NC 27278

Date of Hearing: 9/26/91

# JUVENILE ADJUDICATION ORDER

G.S. 7A-637

This case was heard at a session for juvenile hearings on a Petition alleging the above named juvenile or juveniles to be as follows:

Allegation
G.S. 14-54(a); G.S. 14-72(b)(2)

The following persons were present at the hearing: juvenile, mother, Carrie Clement-Social Worker, Kella Hatcher-District Attorney, Donnie Phillips-Intake Counselor, Inv. Ned Thorpe(OCSD)-petitioner

In the adjudication part of the hearing, the Court finds as indicated below:

☒ 1. That the juvenile or juveniles were represented by an attorney at law:

Name of Attorney(s): Matthew Martin

OR:

☐ 2. That the proceeding did not involve alleged delinquency and the parties were advised of their right to counsel and waived their right to such counsel.

3. That the parties received adequate notice of the facts alleged in the petition so that they knew the nature of the proceeding and had an opportunity to prepare for the hearing; and
4. That the parties had their right to confront and cross-examine witnesses explained to them; and
5. That the parties were informed of their privilege against self-incrimination.

Based on the evidence presented, the Court finds that the following facts have been proved

☒ beyond a reasonable doubt (for delinquent matters), or
☐ by clear and convincing evidence:

that on or about the 3rd day of September, 1991, the juvenile did unlawfully, wilfully and feloniously break or enter a building which was the property of White Cross Recreation Assoc., and did unlawfully, wilfully and feloniously steal, take and carry away assorted food items, the personal property of White Cross Recreation Association, having a value of $5, pursuant to the commission of felonious breaking and entering.

**CONCLUSIONS OF LAW**

As a matter of law, the Court concludes said juvenile(s) ☒ to be ☐ not to be within its juvenile jurisdiction as

☒ Delinquent ☐ Undisciplined ☐ Abused ☐ Neglected ☐ Dependent.

It is therefore ORDERED that the juvenile be placed on probation under the supervision of the Court Counselor's Office for a period of time not to exceed one year. Terms of probation are as follows:

1-She is not to violate the law.
2-She is to go to school regularly, not skip classes and obey school rules.
3-She is to stay at home and not leave unless she has her mother's expressed permission.
4-She is to cooperate with the Court Counselor's Office.
5-She is to cooperate in regard to any assessment that may be recommended for her.
6-She is to cooperate with Howard Lee.

*...hat the Court proceed to the disposition part of the hearing, or that the case be continued for disposition after ...evaluation, or that the petition be dismissed because the conditions alleged do not exist or because the juvenile is ...not in need of the care, protection, or supervision of the State, etc.)*

000045

| ...e Order Entered | Date Signed |
|---|---|
| 9/26/91 | 10/9/91 |
| AOC-J-500, Side Two | Signature of Presiding Judge |

Date: 11/28/91

TO: Connie Clements, Juvenile Court Clerk

FROM: Peggy Hamlett, Juvenile Court Counselor

IN RE: Request for Hearing

Motion for Review Termination, Compliance

Title of Action: Christa Gail Pike

File Number: 91 J 104

Previous Attorney: Matthew Martin

Please put on docket for Nov. 14, 1991

Also, the witnesses I wish for the District Attorney to subpoena are listed below.

Thanks,

Peggy Hamlett

Peggy Hamlett
Court Counselor

007559

File No. 91 J 104

**STATE OF NORTH CAROLINA**

Orange County

FILED In the General Court of Justice
District Court Division

1991 OCT 28 PM 12:45

ORANGE COUNTY, C.S.C.

BY____

# MOTION FOR REVIEW

G.S. 7A-664

In the Matter of

Name of Juvenile: Christa Gail Pike

Date of Birth: 03-01-76 | Age: 15

Address: 600 South Churton Street

City, State, Zip: Hillsborough, N. C. 27278

Name of Movant: Peggy Hamlett

I request the Court to hear and further consider the case of the juvenile named above, as to whom the Court is exercising continuing jurisdiction, and as ground for such motion, show the Court:

Facts and Circumstances Indicating Need for Review

That the above-named juvenile was adjudicated by the Court on September 26, 1991 to be a delinquent juvenile as defined by GS 7A-517(12). That as a result of said adjudication, the juvenile was placed on probation subject to conditions imposed by the Court. That in the county named and on or about the 26th day of September 1991, the juvenile violated the conditions imposed by the Court by (1) Running away from home on several occasions, the first being on September 30, 1991, with her returning the next day; the second runaway occurring on October 13, returning October 14; the third time she left October 14th and returned October 24th. (2) Not attending school - has been present only 4 days since school started. (3) Has not kept any appointments with her court counselor. (4) Has not cooperated with counseling through Mental Health with Peter Kramer, due to Christa being a runaway for long periods of time. (5) That on October 9, 1991, Ms. Fotos reported that Christa had abused alcohol the previous night and was sick and unable to keep her appointment with me.

The described conduct violates the conditions of the judgment imposed by the Juvenile District Court on the 26thday of September, 1991, which are as follows:

(1) She is not to violate the law.
(2) She is to go to school regularly, not skip classes and obey school rules.
(3) She is to stay at home and not leave unless she has her mother's expressed permission.

(Use reverse side for additional Facts and Circumstances) CONTINUED ON BACK

Being first duly sworn, I say that I have read the foregoing motion and know the content thereof and that the same is true of my own knowledge, except as to those matters alleged upon information and belief, and as to these matters, I believe the same to be true.

SWORN AND SUBSCRIBED TO BEFORE ME

Date: 10/28/91

Signature of Official Authorized to Administer Oaths: Connie L. Clements

Title: Juvenile Court Clerk

Signature of Movant: Peggy Hamlett

Title (if applicable): Court Counselor

Address: P. O. Box 60

City, State, Zip: Hillsborough, N. C. 27278

000047

Agency (if applicable): Juvenile Services

AOC-J-101

NORTH CAROLINA
ORANGE COUNTY
HILLSBOROUGH

IN THE GENERAL COURT OF JUSTICE
JUVENILE COURT DIVISION
JUDGE STANLEY PEELE, PRESIDING

NOVEMBER 14, 1991

| TIME | FILE NO. | ATTY | TITLE OF ACTION | TYPE | REASON FOR HEARING | PETITIONER |
|---|---|---|---|---|---|---|
| 8:30 | 91 J 115 | Ennis | William Tripp | Dep. | Cont. From 11/7/91 | Court-Peele |
| 9:00 | 91 J 85 | Baker | Robert "PeeWee" Sharpe | Del. | Cont. From 10/24/91 | Court-Peele |
| | 91 J 59 | Morris | Jason B. Daye | Del. | Disp. Cont. From 10/24/91 | Court-Peele |
| | 91 J 84 | Malone | Robert McCrimmon | Del. | Def. Pros. From 8/8/91 | Court-Hunt |
| | 91 J 120 | Holmes | James F. Stephenson, Jr. | Del. | Petition | Castle-OCSD |
| | 91 J 113 C-E | Freedman | Shelton D. Freeman | Del. | Petitions | Dickinson-PC & Castle |
| | 91 J 121 A-C | Baker | Brian Keith Dickinson | Del. | Petitions | Dickinson-PC & Castle |
| | 91 J 43 | Freedman | Joseph Brodie | Del. | Petition | Frederick-HPD |
| | 91 J 102 | Mills | Stevie M. Riley, JR. | Del. | Petition | Frederick-HPD |
| | 91 J 104 | Martin | Christa Pike | Del. | Motion For Review | Hamlett-CC |

TERMINATIONS

Curtis D. Johnson 91 J 62 (Del) Hargrove

007560

Christa Pike

000048

Matthew Martin

COURT REPORT
November 14, 1991

Juvenile's Name: Christa Gail Pike
Date of Birth; 3-1-76
Parent: Carissa Fotos
Address: 600 South Churton Street
Hillsborough, N. C. 27278
School: Stanford Middle School
Grade 8

Legal Status:
Christa was adjudicated delinquent on 9-26-91 for Misdemeanor Breaking, Entering and Larceny and was placed on probation for a period of time not to exceed one year with the following conditions:
(1) She is not to violate the law.
(2) She is to go to school regularly, not skip classes and obey school rules.
(3) She is to stay at home and not leave unless she has her mother's expressed permission.
(4) She is to cooperate with the Court Counselor's Office.
(5) She is to cooperate in regard to any assessment that may be recommended for her.
(6) She is to cooperate with Howard Lee.

A Motion For Review alleging violation was filed on 10-28-91 by this court counselor.

School Situation:
Please review grades for first nine weeks and note that due to her high absenteeism she has failed every subject. Christa has missed 25 out of 33 days since her last court appearance.

Please review Discipline Tracing Profile for detailed description of actions taken and the dates.

Home Situation:
Christa's behavior since her September 26, 1991 court hearing has been consistently poor.

During the weekend of September 27-29 while Mrs. Fotos was in West Virginia visiting her father, Christa had friends at the apartment and the neighbors were disturbed over the noise to the point that they called Mrs. Fotos in West Virginia who in turn called her daughter and son-in-law in Chapel Hill to see if they could find out what was going on. When the son-in-law arrived at the apartment, there was a great deal of alcohol in the home and the apartment was in shambles.

Christa left home on 9-30-91 and made an appearance at school the next day. A missing persons report was filed by Ms. Fotos on 9-30-91.

Christa was scheduled to come in for an office visit on 10-9-91. However, due to Christa's alcohol use the previous night, Ms. Fotos reports she was too sick to keep her appointment.

Christa left home again on 10-13-91 and reportedly went to the beach with friends. She came back to Durham and stayed with a male friend, Allen Payne, and his parents. Mr. Payne returned Christa to her home on 10-24-91.

Ms. Fotos reports to me that on 10-29-91 Christa and her friends were creating a disturbance for the neighbors again by cursing very loudly, thus upsetting their young child. When Ms. Fotos returned home she found an empty Renuzit air freshner container and she feels Christa was sniffing again to get high. Christa has admitted to sniffing the air freshner previously.

Ms. Fotos is in the process of changing insurance companies and she has been informed that the new coverage will not occur until January. Ms. Fotos is in the process of acquiring information as to whether there is any way possible to work around the delayed coverage.

Ms. Fotos again filed a missing person's report with the Hillsborough Police Department on 11-8-91. Christa was to go to West Virginia with her mother on this date, however, she ran away again and did not return until 11-11-91.

Mental Health:
I requested that Peter Kramer, counselor with Mental Health, do a screening on Christa to determine what services are appropriate for her at this time. Peter Kramer specializes in substance abuse and he met with Ms. Fotos and Christa during the second week of October and another meeting was scheduled, however, Christa was missing and didn't keep the next appointment. Ms. Fotos has met with Mr. Kramer to discuss options for Christa and due to Christa's prior involvement with inpatient at the Child Behavior Clinic with Dr. Straw and due to her involvement with Kaiser Permanente and to her increased substance abuse, Mr. Kramer feels an inpatient admission rather than outpatient treatment would be of more benefit to Christa at this time. The issue of Christa being sexually abused as a child and her allegedly sexually abusing her nephew and half brother are also issues that need to be addressed.

Recommendations:
Christa and Ms. Fotos have utilized various resources in the community. Christa was seen by Dr. Straw at the Behavior Clinic and following that was seen by a counselor at Kaiser Permanente. Ms. Fotos agreed to The Voluntary Family Adjustment Service Agreement with DSS and as a result Christa was placed at Sheaffer House on 4-12-91 in an attempt to stabilize her behavior. Christa's social worker, Kerry Clemens, also offered counseling sessions twice a month. While at Sheaffer House, Christa's attendance improved, however, she did very little to work on her problems. Mrs. DeLong, Sheaffer House Director, felt that if there were any improvements made they weren't significant and she left the program having the attitude that she came in with, i.e., rebellion.

Counseling has been offered through mental health but due to Christa's absences away from the home she has not taken advantage of the services offered.

Due to Christa's unwillingness to cooperate with services offered and because she continues to disobey her mother regarding running away, I feel it is in Christa's best

interest that she be committed to the Division of Youth Services with the provision in the order that when and if hospitalization becomes available that she be admitted to the hospital from training school. If hospitalization is not a possibility, I would request that a placement, such as Eckerd Wilderness Camp Program, be investigated in order for Christa to go directly from training school to camp.

Respectfully submitted,

Peggy Hamlett

Peggy Hamlett
Court Counselor
District Court District 15-B

PH/am

STATE OF NORTH CAROLINA

A TRUE COPY
007565
CLERK OF SUPERIOR COURT
By C. Clements
Asst. Deputy Clerk Superior Court

91 J 104

Orange County

In The General Court of Justice
District Court Division

In the Matter of

| | |
|---|---|
| Name of Juvenile<br>_rista Gail Pike | |
| Date of Birth<br>_/1/76 | Age<br>15 |
| Address<br>600 South Churton Street | |
| City, State, Zip<br>_illsborough, NC 27278 | |
| Date of Hearing<br>_ovember 14, 1991 | |

# JUVENILE DISPOSITION AND COMMITMENT ORDER

G.S. 7A-652

This case came on for disposition, the above juvenile having been found within the juvenile jurisdiction of the Court as delinquent.

The following persons were present for the hearing: juvenile, mother, Carrie Clemons-Social Worker, Kella Hatcher-District Attorney, Peggy Hamlett-Court Counselor

Name of Attorney at Law Who Represented the Juvenile
Matthew Martin

After considering the evidence, the Court finds: The Court adopts the November 14, 1991, Court Report as findings _n this matter. The Court also finds that since her last court date she has violated all but the first and last term of _er probation. On Sept. 30, 1991, she ran away and returned on Sept. 31st. She ran away a 2nd time on Oct. 13, 1991, and returned on Oct. 14th. She ran away again on October 14th and did not return until the 24th of October. She has not attended school but 4 days since school started. She has not cooperated with the school rules and she has been very _de and insulting to the school administration. She has not kept her appointments with her Court Counselor nor _as she cooperated with Peter Kramer. On October 8th she had a party at her home when her parents left. There was alcohol present at this party, which she abused. The juvenile is out of control. She has not cooperated at home, _t school or with her Court Counselor. The juvenile has proved that she can not be helped through the probation mode.

The juvenile was placed on probation on 9/26/91 for being in violation of G.S. 14-72(b)(2).

The Court further finds that the juvenile meets each of the following criteria for commitment to the Division of Youth Services, Department of Human Resources, specifically that:

x (1) The juvenile is delinquent and is ten years of age or older;

x (2) The juvenile has not or would not adjust in his own home on probation or while other services are being provided;

x (3) Community residential care has already been utilized or would not be successful or is not available;

x (4) The juvenile's behavior constitutes some threat to persons or property in the community;

x (5) The alternatives to commitment as contained in G.S. 7A-649 have been attempted unsuccessfully or are inappropriate.

AOC-J-503
Rev. 7/82.

OVER

... the best interest of the juvenile to be placed in Training School.

007566

It is therefore ORDERED that the juvenile be committed to the North Carolina Department of Human Resources, Division of Youth Services for an indefinite period of time.

| Date Order Entered | Date Signed |
|---|---|
| November 14, 1991 | 11/20/91 |
| | Signature of Presiding Judge [signature] |

Matthew Martin

R403-3 D I S C I P L I N E T R A C K I N G P R O F I L E Page 1
PIKE CHRISTA 08 F 95441 CW STANFORD 680-316
FLINT RIDGE #2028 NOV 12 1991
HILLSBOROUGH NC 27278 RESIDES WITH:

HOMEROOM: 171 ROOM 171 EVANS ADVISOR:
HOME PHONE: 919 732-8769 BIRTHDATE: MAR 10 1976
MOTHER: CARISSA FOTOS PHONE: 919 470-7337 (WORK)
FATHER: E. GLENN PIKE

NOVEMBER 8, 1991 - SUSPENDED BECAUSE OF RUDENESS AND DISREPECTIVE BEHAVIOR TO ME. CHRISTA & CHRISTY LEFT OFFICE WITH A BARAGE OF PROFANITIES. WIGGINS

| DATE | I/A | CODE | DESCRIPTION | DATE | CODE |
|---|---|---|---|---|---|
| SEP 17 1991 | I | PEGG | PEGG | SEP 17 1991 | OS02 |
| | I | TRS | TRUANT FROM SCHOOL | SEP 17 1991 | OS02 |
| | | | BROUGHT BACK TO SCHOOL BY SHERIFF DEPT | | |
| | A | OS02 | OUT OF SCHOOL SUSPENSION 2 DAYS | | |
| OCT 28 1991 | I | UDP | LEFT CAMPUS WITHOUT PERMISSION | OCT 28 1991 | OS01 |
| | | | LEFT CAMPUS W/O PERMISSION/BRANDI PARKER | | |
| | I | WIGG | WIGGINS | OCT 28 1991 | OS01 |
| | A | OS01 | OUT OF SCHOOL SUSPENSION 1 DAY | | |
| OCT 30 1991 | I | ABS | AGRESS BEHAVIOR TOWARD STUDENTS | OCT 30 1991 | CONF |
| | | | SLAPPED DAVID STRUM | | |
| | I | EVAN | EVANS | OCT 30 1991 | CONF |
| | I | PEGG | PEGG | OCT 30 1991 | CONF |
| | A | CONF | CONFERENCE WITH PARENT | | |
| NOV 08 1991 | I | RVC | DISRUPT,DISRESPECTFUL CLASSROOM | NOV 08 1991 | OS04 |
| | | | SEE NOTES FOR NOVEMBER 8, 1991 | | |
| | I | RVP | USE OF PROFANITY | NOV 08 1991 | OS04 |
| | | | SEE NOTES FOR NOVEMBER 8, 1991 | | |
| | I | UDP | LEFT CAMPUS WITHOUT PERMISSION | NOV 08 1991 | OS04 |
| | I | WIGG | WIGGINS | NOV 08 1991 | OS04 |
| | A | OS04 | OUT OF SCHOOL SUSPENSION 4 DAYS | | |
| | | | OSS 11/12-15/91 | | |

SUMMARY

INCIDENTS

| CODE | OCCURRENCES | ACTED UPON |
|---|---|---|
| ABS | 1 | 1 |
| EVAN | 1 | 1 |
| PEGG | 2 | 2 |
| RVC | 1 | 1 |
| RVP | 1 | 1 |
| TRS | 1 | 1 |
| UDP | 2 | 2 |
| WIGG | 2 | 2 |

ACTIONS

| CODE | OCCURRENCES |
|---|---|
| CONF | 1 |
| OS01 | 1 |
| OS02 | 1 |
| OS04 | 1 |

*** End of Profile **

```
DAILY ATTENDANCE          CW STANFORD 680-316                  NOV 12 1991
          D A I L Y   A T T E N D A N C E   P R O F I L E

SEP 03 1991  Tuesday      2  TO  NOV 12 1991  Tuesday      2
     Student Number  95441        PIKE CHRISTA
Enter Selection      1 Next  2 Prev  3 Summary
DATE            A/T RSN    DATE               A/T RSN    DATE               A/T RSN
                                            PM A     E                     PM A  2  U
NOV 06 1990 T CATGY MST1
JUN 12 1991 W WDREW W5     SEP 24 1991 T AM A     E     OCT 09 1991 W AM A  2  U

                                            PM A     E                     PM A  2  U
SEP 03 1991 T ENTER E1
              CATGY MST1   SEP 26 1991 R AM A     E     OCT 14 1991 M AM A  2  U

SEP 17 1991 T AM A  2  U                    PM A     E                     PM A  2  U

                                                        OCT 15 1991 T AM A  2  U
              PM A  2  U   SEP 27 1991 F AM T     E                   PM A  2  U
SEP 18 1991 W AM A  3  E   OCT 02 1991 W AM A  2  U
              PM A  3  E                 PM A  2  U     OCT 16 1991 W AM A  2  U
               ACTN OSS    OCT 03 1991 R AM A  2  U                   PM A  2  U
SEP 19 1991 R AM A  3  E                 PM A  2  U     OCT 17 1991 R AM A  2  U
              PM A  3  E   OCT 04 1991 F AM A  2  U                   PM A  2  U
               ACTN OSS                  PM A  2  U     OCT 18 1991 F AM A  2  U
SEP 20 1991 F AM A     E   OCT 07 1991 M AM A  2  U                   PM A  2  U

              PM A     E                 PM A  2  U     OCT 21 1991 M AM A  2  U
SEP 23 1991 M AM A     E   OCT 08 1991 T AM A  2  U                   PM A  2  U
En'ries Continued

F1  PROCESS                                            F9  CANCEL
```

```
DAILY ATTENDANCE          CW STANFORD 680-316                  NOV 12 1991
          D A I L Y   A T T E N D A N C E   P R O F I L E

SEP 03 1991  Tuesday      2  TO  NOV 12 1991  Tuesday      2
     Student Number  95441        PIKE CHRISTA
Enter Selection      1 Next  2 Prev  3 Summary
DATE            A/T RSN    DATE               A/T RSN    DATE               A/T RSN
OCT 22 1991 T AM A  2  U                 PM A     E

              PM A  2  U   NOV 05 1991 T AM A     E

OCT 23 1991 W AM A  2  U                 PM A     E

              PM A  2  U   NOV 08 1991 F AM A     E
OCT 24 1991 R AM A  2  U                 PM A     E
              PM A  2  U

OCT 25 1991 F AM A  2  U
              PM A  2  U
OCT 28 1991 M AM A  2  U

              PM A  2  U

OCT 29 1991 T AM A  3  E

              PM A  3  E
               ACTN OSS

OCT 31 1991 R AM T  2  U
NOV 04 1991 M AM A     E
End of Entries

F1  PROCESS                                            F9  CANCEL
```

007569

PAGE 171

ONLY 134 SCHOOL DAYS LEFT! **REPORT CARD**

| NAME | NUMBER | GRADE | SCHOOL NAME |
|---|---|---|---|
| RISTA | 55441 | 08 | C. W. STANFORD 680-316 |

DIVISION 171
ROOM 171
EVANS

| | AVERAGE | DAYS ABSENT | TIMES TARDY |
|---|---|---|---|
| PERIOD 1 | 64.5 | 25.0 | 2 |
| ENT YEAR | 64.5 | 25.0 | 2 |

| SEC DESCRIPTION / TEACHER | | OCT 91 MARK ABS | MARK ABS | MARK ABS | MARK ABS | CREDIT VALUE / CREDIT EARNED / CLASS AVG. / COURSE AVG. |
|---|---|---|---|---|---|---|
| 8 EVANS<br>PLETE--NEEDS TO MAKE-UP WORK<br>ABSENTEEISM | QUARTER | INC | | | | CLASS AVG. 81.0<br>COURSE AVG. 87.2 |
| 07 GEN MATH 8 WILLS<br>ABSENTEEISM | QUARTER | INC | | | | CLASS AVG. 85.1<br>COURSE AVG. 83.0 |
| 03 SCIENCE 8 KUNTZLEMAN<br>MPLETE--NEEDS TO MAKE-UP WORK<br>ABSENTEEISM | QUARTER | INC | | | | CLASS AVG. 84.9<br>COURSE AVG. 87.5 |
| 06 NC HISTORY 8 FAULKNER<br>ABSENTEEISM | QUARTER | 60 | | | | CLASS AVG. 80.6<br>COURSE AVG. 84.6 |
| 01 ART 8 NEMET | QUARTER | 69 | | | | CLASS AVG. 84.3<br>COURSE AVG. 84.4 |
| 11 PE/HEALTH 8 ROBERTS | QUARTER | INC | | | | CLASS AVG. 86.1<br>COURSE AVG. 88.6 |

GRADING SCALE:
A 93-100
B 85-92
C 77-84
D 70-76
E 69-BELOW

TO THE PARENTS/GUARDIAN OF:
CHRISTA PIKE
FLINT RIDGE #2028
HILLSBOROUGH NC 27278

PARENT CONFERENCES WILL BE HELD AT
C. W. STANFORD MIDDLE SCHOOL
MONDAY, NOVEMBER 11, 1991 12:00-8:00 PM
PLEASE CALL THE SCHOOL OFFICE
732-6121 TO MAKE AN APPOINTMENT

000057

ACADEMIC PROGRESS CW STANFORD 680-316 NOV 12 1991

# A C A D E M I C P R O G R E S S P R O F I L E

Student Number 95441 PIKE CHRISTA Semester 1

Enter Selection 1 Next 2 Previous

| COURSE NUMBER | SEC | TITLE | RPT PER | TCHR | QUARTER | CM1 | CM2 |
|---|---|---|---|---|---|---|---|
| 1020 | 15 | COMM SK 8 | 1 | EVAN | INC | 3 | 9 |
| 2002 | 7 | GEN MATH 8 | 1 | W | INC | 9 | |
| 3002 | 3 | SCIENCE 8 | 1 | KUNT | INC | 3 | 9 |
| 4020 | 6 | NC HISTORY 8 | 1 | FAUL | 60 | 9 | |
| 5032 | 1 | ART 8 | 1 | NEME | 69 | | |
| 9002 | 11 | PE/HEALTH 8 | 1 | ROBE | INC | | |

End of Courses

F1 PROCESS F9 CANCEL

6

# ATTORNEY NEW MATTER MEMO

## Client Data

Client: Christa G. Pike

Date: 9/28/93

Address: 7828 Tom Pope Loop

Cedar Grove TX 77231

File No: ________

Telephone: (home) 644-7305

(work) ________

Comment: ________

************************************************************

## File Data

File title: Christa Pike

Matter/Issues: Assault w/Deadly weapon

Statute of limitations issue? ___Yes _X_ No

Deadlines involved? _X_ Yes ___No

Conflicts of interest? ___Yes _X_ No

Estimated amount of money involved, $________

Adverse party ________ Adverse Attorney ________

Address: ________ Address: ________

Telephone #: ________ Telephone #: ________

************************************************************

## Fee Basis

_X_ Flat _X_ Fixed $150.00 ___Range $________ to $________

___Hourly $________ per hour, ___plus ______% of amount recovered

___Contingent _____% of amount recovered

___Work done based on all relevant factors:

___Retainer $________ per ________ covering ______ hours, additional hours at $________ per hour

___Estimated fee $________

___Other ________

************************************************************

## Billing Arrangement

Fee: ________ ___Monthly ___Quarterly ___On completion

___Other ________

___Retainer $________ received __/__/__, $________ to fee, $________ to disbursements

___Advance $________ received __/__/__

Comment ______________________

**********************************************************************

NOTES

Kenny Gegan calling collect from jail writing sexually explicit letters. (During late June) probably 5 or 6 times. After he got out of jail he called despite Christa's request that he not. What if he came to house + raped her? She would like it. At that point she had never laid eyes on him. Then about August apologized to Christa. After that called 1x2/week. Christa had seen him at Burger King. On 8/31/93 called Christa for a ride — gave him a ride from Lloyd's Quickie Mart to Rural Fest party. "Have you ever had sex in woods? Are you a virgin?" Grabbed Christa forcefully she hit him w/a stick. Only once. Called her afterwards. Has called repeatedly since then.

**********************************************************************

Administrative

✓ Files/indexes completed by [initials] on 9/28/93
___Deadline control system initiated by ______ on __/__/__
✓ Conflicts of interest checked by [initials] on 9/28/93
Initiating attorney [initials]
Assigned attorneys [initials]
Referred by ______
Copy sent to client by: ______ on __/__/__

Witnesses
Nancy Staley 644-6478
Marissa Hanson (mother)
Heidi Chapman Elliott Hensley
Melissa Young Nick Hensley
(Bill Young father)

93 CR 9210

**CRIMINAL SUMMONS**
**MISDEMEANOR ASSAULT**

- [ ] I. Simple
- [ ] II. Serious Injury
- [x] III. Deadly Weapon
- [ ] IV. On Female
- [ ] V. Pointing Gun
- [ ] VI. On Gov't Off./Emp

THE STATE OF NORTH CAROLINA VS.

Name, Address And Telephone No. Of Defendant
Chrystal Pike
Joppa Oaks
Hillsborough

| Race | Sex | Date Of Birth | Age |
|---|---|---|---|
| W | F | 3-10-76 | 17 |

Social Security No.: Redhair 503"
Driver's License No.:
Name Of Defendant's Employer:

Offense Code
I. 1368 IV. 1330
II. 1326 V. 1322
III. (1327) VI. 1355

Offense In Violation Of G.S.: 14-33(b)(1)
Date Of Offense: 8-31-93

Complainant (Name, Address Or Department, Phone No.)
Kenny Clyde
511 N. Churton St.
Hillsborough
732-9500 W

Witnesses (Names, Addresses, Phone Numbers)

Date Issued: 9-7-93
Date Of Service:

AOC-CR-145
Rew 10/91

# STATE OF NORTH CAROLINA

ORANGE County

In The General Court Of Justice
District Court Division

To the defendant:

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above you unlawfully and willfully did assault *(charge only one offense)*

- [ ] [SIMPLE ASSAULT (G.S. 14-33(a)] and strike ______ by ______
- [ ] [ASSAULT INFLICTING SERIOUS INJURY (G.S. 14-33(b)(1)] and strike ______ by ______ thereby inflicting serious injury *(describe injury)* ______
- [x] [ASSAULT WITH A DEADLY WEAPON (G.S. 14-33(b)(1)] Kenny Clyde with a deadly weapon, a stick by hitting him repeatedly with it
- [ ] [ASSAULT ON A FEMALE BY A MALE OVER 18 (G.S. 14-33(b)(2)] and strike ______ a female person, by ______

The defendant is a male person and was at least 18 years of age when the offense occurred.

- [ ] [ASSAULT BY POINTING A GUN (G.S. 14-34)] ______ by intentionally pointing a gun, ______, at such person without legal justification.
- [ ] [ASSAULT ON GOVERNMENT OFFICER/EMPLOYEE (G.S. 14-33(b)(8)] and strike ______, a government (officer) (employee) by ______

At the time of the offense the (officer) (employee) was attempting to discharge the following duty of his (office) (employment): ______

This act was in violation of the law referred to in this Criminal Summons. This Summons is issued upon information furnished under oath by the complainant listed. You are ORDERED to appear before the Court at the location, date and time indicated below to answer to the charge(s). If you fail to appear, an order for your arrest may be issued and you may be held in CONTEMPT OF COURT and imprisoned for up to thirty (30) days or fined up to $500.00 or both. This penalty for failure to appear is in addition to any sentence which may be imposed for the crime(s) charged.

Signature: [signature]
- [x] Magistrate
- [ ] Assistant CSC
- [ ] Deputy CSC
- [ ] Clerk Of Superior Court

Location Of Court: Hillsborough
Court Date: 10-6-93
Court Time: 9:00 [ ] AM [ ] PM

93 SEP 8 ... 23

007574

Release Cited dist R

000061

007575

If this Criminal Summons is not served within ninety (90) days, it must be returned to the Clerk of Court in the county in which it was issued with the reason for the failure of service noted thereon. The officer must state all steps taken by his department in attempting to serve the summons and any information obtained about the whereabouts of the defendant.

**RETURN OF SERVICE**

I certify that this Criminal Summons was received and served as follows:

| Date Received | Date Served | Date Returned |
|---|---|---|
| | 9/16/93 | |

☒ By personally serving this Criminal Summons on the defendant.

☐ This Criminal Summons WAS NOT served for the following reason:

Signature Of Officer Making Return: [signature]

Department Or Agency Of Officer: OCSO

**RETURN FOLLOWING REDELIVERY**

I certify that this Criminal Summons was received and served as follows:

| Date Received | Date Served | Date Returned |
|---|---|---|
| | | |

☐ By personally serving this Criminal Summons on the defendant.

☐ This Criminal Summons WAS NOT served for the following reason:

Signature Of Officer Making Return

Department Or Agency Of Officer

000082

Name Of Attorney For Defendant At Time Of Trial Or Plea ☐ Waived Attorney

PLEA: ☐ guilty ____ ☐ not guilty ____ ☐ no contest ____ VERDICT: ☐ guilty ____ ☐ not guilty ____

☐ It is ORDERED that this case be consolidated for judgment with case number ____.

JUDGMENT: The defendant appeared in open court and freely, voluntarily and understandingly entered the above plea; on the above verdict it is ORDERED that he: ☐ pay a fine of $____ and costs. ☐ be imprisoned for a term of ____ in the custody of the ☐ Sheriff. ☐ N. C. DOC. ☐ With defendant's consent, execution of the sentence is suspended and he is placed on unsupervised probation for ____ years, subject to the following conditions:

1. commit no criminal offense in any jurisdiction. 2. possess no firearm, explosive or other deadly weapon listed in G.S. 14-269. 3. remain gainfully and suitably employed or faithfully pursue a course of study or of vocational training that will equip him for suitable employment. 4. satisfy child support and family obligations, as required by the Court.
5. pay to the Clerk of Superior Court the costs of court and any additional sums shown below.

| Fine | Restitution* | Attorney's Fee | Community Service Fee | Other |
|---|---|---|---|---|
| $ | $ | $ | $ | |

*The name(s) and address(es) and amount(s) due the person(s) to receive this restitution are:

☐ 6. complete ____ hours of community service during the first ____ days of probation, as directed by the community service coordinator, and pay the fee prescribed by G.S. 143B-475.1(b).

☐ 7. not be found in or on the premises of ____ located at ____

☐ 8. not assault, communicate with or be in the presence of ____.

☐ 9. this sentence is to run at the expiration of the sentence in case number ____.

☐ 10. Other: ____

☐ The defendant, in open court, gives notice of appeal to the Superior Court.

| Date | Signature Of District Court Judge |
|---|---|
| | |

AOC-CR-145, Side Two

**NOTE:** *If defendant is placed on supervised probation, judge should NOT execute judgment on this form, but on AOC-CR-302. Clerk may use this form for courtroom notes.*

4-4-92
Sunday!

Dear M. Maitin,
Hey! How are you? Fine I hope. I'm doing great here! So, what's up? Lots my way, as you know! I leave for "Camp Woodsen" next Monday, the 13th! I just wanted to write you and say THANK YOU for sticking by me & believing in me enough to persist in trying to get me out of here!

Ms. Howell (Social worker for JEC girls) informed me that the reason she even considered me for camp ~~session~~ #116 was because of all the time and concern you put into my case.

I get to go home May 21st because you believed in me!

You should have seen

Peggy's face when Ms. Howell told her that! HA!
I couldn't help it, I busted out laughing! 

I had my Re-release conferance last week. Thats when all that happened.
Anyway, I will be on a C.R. (conditional release).
My C.R. is as fallows:

* Curfew - 9:00 pm. Weekdays.
12:00 pm weekends.

Cooperate with:
Peter Kramer and have frequant drug tests.

Peggy Hamlett

Education: Go to Durham tech. program or complete high school at Orange High.*
Also, there was a little add on - 'Anything Peggy or my mother think of can be added on'.

That part sucks royaly but I guess I'll have to live with it huh?

Time has gone by fast since I've been in here, and I've learned ALOT! It was a good experience for me but yes I AM ready to go home now!

I just thought I'd write and say "Thank You" and I really appreciate everything you have done for me.

Thanks Again,
Christa Pike

Camp session #16,
Here I come!



**MARTIN & MARTIN**
A Professional Association
Attorneys and Counsellors at Law

*Harry C. Martin*
*J. Matthew Martin*

102 North Churton Street
Hillsborough, North Carolina 27278

*(919) 732-6112*
*Chapel Hill: (919) 933-2135*
*Facsimile: (919) 732-6392*

February 24, 1992

Miss Christa Pike
Juvenile Evaluation Center
741 Old U.S. Highway 70
Swananowa, North Carolina 28778

ATTORNEY/CLIENT CORRESPONDENCE
CONFIDENTIAL & PROPRIETARY

Dear Christa:

Thanks for writing. I am trying to get you moved to Camp Woodson. I have written Judge Peele and spoken with Peggy and the psychologist, who evaluated you. The psychologist has indicated that Camp would be good for you, but Peggy thinks imprisonment is appropriate to teach you that your actions have consequences. I may be able to talk Judge Peele in writing a letter of recommendation for Camp which would help cut through some of the red tape. However, it is critical that you do something to earn some points to move yourself along in that direction. Please let me know how it goes. I plan to be in Asheville around March 26th and 27th and I will be sure to see you then.

Sincerely,

J. Matthew Martin

JMM/ma

**MARTIN & MARTIN**
A Professional Association
Attorneys and Counsellors at Law

*J. Matthew Martin*

102 North Churton Street
Hillsborough, North Carolina 27278

*(919) 732-6112*
*Chapel Hill: (919) 933-2135*
*Facsimile: (919) 732-6392*

December 6, 1991

Miss Christa Gail Pike
741 O U.S. 70
Swannanoa, North Carolina 28778

ATTORNEY/CLIENT CORRESPONDENCE
CONFIDENTIAL & PROPRIETARY

Dear Christa:

I just wanted to let you know that I haven't forgotten about you and that if people haven't forgotten about you then you are not alone. I will try to come see you on December 15, 1991, and we will discuss you situation on your case further at that time. I look forward to seeing you.

With every good wish, I am

Sincerely,

J. Matthew Martin

JMM/ma

**MARTIN & MARTIN**
A Professional Association
Attorneys and Counsellors at Law

*J. Matthew Martin*

102 North Churton Street
Hillsborough, North Carolina 27278

*(919) 732-6112*
*Chapel Hill: (919) 933-2135*
*Facsimile: (919) 732-6392*

January 28, 1992

The Honorable Stanley Peele
District Court Judge
15-B Judicial District
Orange County Courthouse
106 East Margaret Lane
Hillsborough, North Carolina 27278

HAND DELIVERED

Re: Christa Gail Pike
91 J 104

Dear Judge Peele:

You may recall that we spoke briefly regarding Ms. Pike when we bumped into each other at lunch the other day. At that time, I mentioned to you that I had discovered a program which I thought would be very beneficial to her and which I believed would be an alternative to commitment as described in N.C. Gen. Stat. § 7A-649. It is called Camp Woodson, and is a direct outgrowth of the Juvenile Evaluation Center (JEC) in Swannanoa, where Christa Pike is being warehoused. After visiting with Christa in Swannanoa on December 14, 1991, I have come to the conclusion that this placement for her would be appropriate.

Officials of Camp Woodson have indicated to me that they believe that Christa would be a good candidate for camp. It is too late to get her in camp for the January session, but I believe that we could get her there for the next appropriate session.

I have discussed the matter with Peggy Hamlett and she has advised me that she would oppose such a placement at this time, commenting that Christa is receiving counseling which she feels is appropriately carried out in the confinement setting. I cannot help but to disagree, note that N.C. Gen. Stat. § 7A-649(6) gives the Court the authority to order the juvenile to a community based program of academic or vocational education or to a professional or residential or nonresidential treatment program which shall not exceed twelve (12) months. I believe that my discovery of Camp Woodson, to which a juvenile can only be admitted by virtue of

attendance at JEC would meet statutory standards set out above and that accordingly it is an alternative to commitment which would be appropriate pursuant to N.C. Gen. Stat. § 7A-651(e). I note that the Court continues to retain jurisdiction despite the commitment to the Division of Youth Services and pursuant to N.C. Gen. Stat. § 7A-652(g) and pursuant to N.C. Gen. Stat. § 7A-664 Court may modify the order that it has entered.

I respectfully request that you look into this matter and if in your determination you believe that we need to have a formal hearing on it as a petition to modify the Court's order, I would very much like to go forward with that. If the matter can be resolved informally, that would be fine too. By copy of this letter I am notifying all interested parties as to this communication.

With every good wish, I am

Respectfully,

J. Matthew Martin

JMM/ma
cc: Kella W. Hatcher, Esq.
Ms. Peggy Hamlett
Miss. Christa Gail Pike

007584

12-20-91

Dear M. Martin,

Hey! How are you? I'm OK I guess but I'm still here at J.E.C.! I just wanted to thank you for all you have done, and are doing!! It seems like you are the only person that really understands my point of view. You have really been there for me and I wanted you to know I really appriciate that! Oh! By the way, You told me to write Peggy about the pictures Brand Parker sent me and send you a copy with "C-mm" or

000071

Something on it. Before I write her I want to get that strait with you. If you can find the time PLEASE write me back and explain that to me. And give me the update on camp.

I'm looking forward to seeing you. And I'll be waiting (since that's all I can do) to hear from you.

Sincerely,

Christa Pike

007586

NAME Pike Christa G. 007587

(Last) (First) (Middle) (Nickname) (Date of Birth)

## V. IMMUNIZATIONS

Stanford Middle School

RECORD OF IMMUNIZATIONS (Enter date of EACH dose — Mo/Day/Year)

| VACCINE | #1 | #2 | #3 | #4 | #5 |
|---|---|---|---|---|---|
| DTP | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-87 |
| OPV | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-87 |
| MMR | 9-22-77 | | | | |
| MEASLES | | | | | |
| MUMPS | | | | | |
| RUBELLA | | | | | |

*STATE LAW REQUIRES FOLLOWING MINIMUM DOSES:*

5 DTP SHOTS (If 4th dose is after 4th birthday, 5th dose is not required.)
4 ORAL POLIO VACCINE DOSES (If 3rd dose is after 4th birthday, 4th dose is not required.)
1 MEASLES SHOT (On or after 1st birthday)
1 RUBELLA SHOT
1 MUMPS SHOT

☐ I CERTIFY THIS CHILD HAS RECEIVED THE IMMUNIZATIONS NOTED IN PART V.

Signature Judy Butler RN Title School Nurse

Check One: ☐ Medical Personnel ☑ School Personnel

## VI. KINDERGARTEN HEALTH ASSESSMENT

*To Be Completed By Health Care Provider:*

A. 1. Hemoglobin/Hematocrit ☐ NORMAL ☐ ABNORMAL ☐ NOT INDICATED

2. TB Skin Test TYPE TEST ______ RESULTS ______ ☐ NOT INDICATED

B. SCREENINGS:

1. VISION
☐ Within normal limits ☐ Within normal limits w/ corrective lenses ☐ Needs follow-up
Test Used: ______

2. HEARING
☐ Within normal range ☐ Outside normal range ☐ Needs follow-up
Test Used: ______

3. DEVELOPMENT (*Optional*)
☐ Within normal range ☐ Outside normal range ☐ Borderline ☐ Needs follow-up
Test(s) Used: ______

C. Does this child take medication on a regular basis? ☐ YES ☐ NO

If yes, list medication, frequency of administration, and possible side effects: ______

Does medication need to be given at school ☐ YES ☐ NO

D. List any significant medical or dental condition, disability, or allergy: Blood Clotting Problems cB
Mild Sting Allergy cB
Nosebleeds cB

E. To what extent might these conditions affect the child's school performance? ______

List any special health considerations needed for this child while in school: ______

*Signature of Health Care Provider* *Date* *Address*



000073

Cranberry

# PERMANENT HEALTH RECORD

________ County Schools

0004 74

Pupil Name: Last-First-Middle: Pike, Christa Gail

Date of Birth: Mo. 3 Day 10 Yr. 76 | Sex: F | Race: A

Address: Rt. 1 Box 62 Beckley, WV 25801

School: Cranberry-Prosperity

Pupil resides with: Name-Relationship: Pike, Carissa J. (Mother)

Telephone: Home-Business: 253-5415

Father/Guardian Name: Last-First-Middle Initial: Pike, Emil G.

Occupation: Const. Worker

Mother/Guardian Name: Last-First-Middle Initial: Pike, Carissa

Occupation: LPN

Emergency Telephone Name-Relationship: Chris Fotos (Grandparents) 253-5415

Physician | Telephone

Dentist | Telephone

Hospital | Telephone

## VISION SCREENING

W - With Glasses
WO - Without Glasses
____ Color Blind

| Date | R. | L. | Both | Remarks-Type of Test-Examiner's Name |
|---|---|---|---|---|
| 12-14-81 | ✓ | ✓ | ✓ | Passed - Nina Runion |

007588

## HEARING SCREENING

✓ Satisfactory x Unsatisfactory

| Date | R. | L. | Remarks-Type of Test-Examiner's Name |
|---|---|---|---|
| 2-22-81 | ✓ | ✓ | Passed - Rhonda Lester |

## OTHER SCREENING

| Date | Type | Results | Remarks-Examiner's Name |
|---|---|---|---|
| 1-16-81 | Dist | Passed | Robin McCallister |

## EMERGENCY TREATMENT PLAN

## IMMUNIZATIONS

Enter date of each dose by month, day, and year

| VACCINE | DATES | | | | | |
|---|---|---|---|---|---|---|
| DTP/Td | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-81 | ok |
| TOPV/IPV | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-81 | |
| Rubeola (Measles) | 9-22-77 | | | | | |
| Rubella (Three-day measles) | 9-22-77 | | | | | |
| Mumps | 9-22-77 | | | | | |

DTP - Diphtheria, tetanus, pertussis
Td - Tetanus-diphtheria
TOPV - Trivalent oral polio
IPV - Inactivated polio

Recorded by:

## TUBERCULIN TESTS

N: Negative P: Positive

| Date | Type | Result | Date | Type | Result | Date | Type | Result |
|---|---|---|---|---|---|---|---|---|
| 9-17-81 | Tine | N | | | | | | |

## DENTAL SCREENING

✓ Satisfactory xx Moderate Defect
x Slight Defect xxx Marked Defect

| Date | Dental Inspection | Brush-In Program | Rinsing Program | Remarks-Examiner's Name |
|---|---|---|---|---|

JUN 05 1991

# REPORT CARD

| NAME | NUMBER | GRADE | SCHOOL NAME | |
|---|---|---|---|---|
| CHRISTA | 95441 | 07 | C.W. STANFORD | 680-316 |

DIVISION 141
ROOM 141
TUCK, T.

| | AVERAGE | DAYS ABSENT | TIMES TARDY |
|---|---|---|---|
| ERIOD 4 | 69.625 | 7.0 | 1 |
| JRRENT YEAR | 69.563 | 20.0 | 16 |

| SEC | DESCRIPTION | TEACHER | | OCT 90 MARK ABS | JAN 91 MARK ABS | MAR 91 MARK ABS | JUN 91 MARK ABS | |
|---|---|---|---|---|---|---|---|---|
| 02 | ART 7 | NEMET | QUARTER | 90 | 90 | | | CREDIT VALUE |
| | | | SEMESTER | | 90 | | | CREDIT EARNED |
| | | | YEAR | | | | | CLASS AVG. / COURSE AVG. |
| 10 | EXP TECH 7 | TOLLIVER | QUARTER | 100 | 80 | | | CREDIT VALUE |
| | | | SEMESTER | | 90 | | | CREDIT EARNED |
| | | | YEAR | | | | | CLASS AVG. / COURSE AVG. |
| 03 | LANG ARTS 7 | WILLIAMS, M | QUARTER | 62 | 75 | 65 | 60 | CREDIT VALUE |
| | | | SEMESTER | | 68 | | 63 | CREDIT EARNED |
| | | | YEAR | | | | 66 | CLASS AVG. 76.7 / COURSE AVG. 79.2 |
| 01 | MATH 7 | MAYO | QUARTER | 60 | 60 | 60 | 60 | CREDIT VALUE |
| | | | SEMESTER | | 60 | | 60 | CREDIT EARNED |
| | | | YEAR | | | | 60 | CLASS AVG. 70.9 / COURSE AVG. 78.2 |
| 06 | PE/HEALTH 7 | PRICE | QUARTER | 60 | 60 | 60 | 82 | CREDIT VALUE |
| | | | SEMESTER | | 60 | | 71 | CREDIT EARNED |
| | | | YEAR | | | | 66 | CLASS AVG. 87.7 / COURSE AVG. 89.4 |
| 05 | READING 7 | TUCK, L. | QUARTER | 69 | 69 | 60 | 60 | CREDIT VALUE |
| | OPERATIVE | | SEMESTER | | 69 | | 60 | CREDIT EARNED |
| | | | YEAR | | | | 65 | CLASS AVG. 75.4 / COURSE AVG. 79.9 |
| 05 | SCIENCE 7 | LEWIS, A | QUARTER | 60 | 60 | 63 | 65 | CREDIT VALUE |
| | NOT ATTEMPT CLASS WORK | | SEMESTER | | 60 | | 64 | CREDIT EARNED |
| | | | YEAR | | | | 62 | CLASS AVG. 75.1 / COURSE AVG. 79.9 |
| 01 | SOC ST 7 | BELFIELD | QUARTER | 71 | 77 | 60 | 60 | CREDIT VALUE |
| | | | SEMESTER | | 74 | | 60 | CREDIT EARNED |
| | | | YEAR | | | | 67 | CLASS AVG. 84.2 / COURSE AVG. 83.5 |

SUMMER SCHOOL: JULY 8 – AUGUST 2
8:20 AM TO 1:20 PM

PARENT MEETING: JULY 1-7:00 PM
C.W. STANFORD MEDIA CTR.

GRADE SCALE: A=93-100 B=85-92 C=77-84 D=70-76 E=BELOW 70

TO PARENT/GUARDIAN OF:
CHRISTA PIKE
FLINT RIDGE #2028
HILLSBOROUGH NC 27278

...continued

PPS-3 (continued) 007590 Stanford Middle

| Student ID Number | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

School ~~Orange~~ Stanford School System Orange County Date 6/8/90

NAME Pike, Christa Gail (Last) (First) (Middle) (Nickname) BIRTHDATE 3-10-76 Mo Day Year

SEX: (M or F) RACE: American Indian ☐ Asian ☐ Black ☐ Hispanic ☐ White ☐ Other ________

# NORTH CAROLINA PUBLIC SCHOOLS

# SECONDARY STANDARDIZED TEST RECORD FORM

This form must follow pupil when transferred.

Enter secondary test results in date order sequence. Enter elementary test results on reverse of form. If entry typed or handwritten, scores should be labeled according to the following code: Percentile - %, Stanine - S, Grade Equivalent - G.E., Intelligence Quotient - I.Q. Any other type of test results should be explained: name of test, date given, and actual grade placement at time of testing should also be included.

If exceptional, note type of exceptionality:

[illegible]E CHRI T G
DB: 03/10/76

| TEST/LEVEL | DATE | | | SEQUENCES | ANALOGIES | MEMORY | VERB REAS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| CS - 4 | 04/90 | NPA ▶ | | 71 | 61 | 41 | 66 | 71 |
| CSI ▶ 109 | CA ▶ 14- 1 | SS ▶ | | 693 | 712 | 596 | 723 | 632 |

| SEQUENCES | ANALOGIES | MEMORY | VERB REAS | TOTAL |
|---|---|---|---|---|
| ▶ | | | | |
| ▶ | | | | |

[illegible]E
PIKE CHRI T G
DOB: 03/10/76
SP CODES: ..........
[illegible]R MTH: 26 TRAD

32224 R95706C001-03-041

| CAT | SCORES | READING VOC | READING COMP | READING TOTL | LANGUAGE MECH | LANGUAGE EXPR | LANGUAGE TOTL | MATHEMATICS COMP | MATHEMATICS C&A | MATHEMATICS TOTL | TOTAL BATTERY | SPEL | SOCL STDY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FRM/LEVEL | NP ▶ | 39 | 19 | 29 | 32 | 5 | 10 | 6 | 34 | 14 | 15 | 55 | 27 |
| E/17 | AANP ▶ | [illegible] | 53 | [illegible] | 59 | 59 | 61 | 54 | [illegible] | 53 | 63 | 51 | 55 |
| GRADE | GE ▶ | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 2.7 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 07.7 | AAGE ▶ | 8.7 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 7.9 | [illegible] |
| | SS ▶ | 736 | 716 | 727 | 696 | [illegible] | [illegible] | [illegible] | 724 | [illegible] | [illegible] | 750 | 673 |
| 04/90 | DIFF ▶ | | – | | | – | – | – | | – | – | | – |

| TEST/LEVEL | DATE | | | SEQUENCES | ANALOGIES | MEMORY | VERB REAS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| CS - 4 | 03/91 | NPA ▶ | | 87 | 83 | 72 | 77 | 81 |
| SI ▶ 114 | CA ▶ 15- 0 | SS ▶ | | 706 | 740 | 689 | 728 | 732 |

| SEQUENCES | ANALOGIES | MEMORY | VERB REAS | TOTAL |
|---|---|---|---|---|
| ▶ | | | | |
| ▶ | | | | |

| CAT | SCORES | READING VOC | READING COMP | READING TOTL | LANGUAGE MECH | LANGUAGE EXPR | LANGUAGE TOTL | MATHEMATICS COMP | MATHEMATICS C&A | MATHEMATICS TOTL | TOTAL BATTERY | SPEL | SOCL STDY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FRM/LEVEL | NP ▶ | 32 | 12 | 21 | 21 | 32 | 27 | 4 | 60 | 17 | 20 | 31 | 32 |
| E/17 | AANP ▶ | 60 | 62 | 65 | 67 | 66 | 69 | 62 | 74 | 71 | 69 | 49 | 67 |
| GRADE | GE ▶ | 6.3 | 5.0 | 5.6 | 4.3 | 4.7 | 4.4 | 3.6 | 6.4 | 5.3 | 5.2 | 6.3 | 5.6 |
| 07.6 | AAGE ▶ | 8.7 | 8.6 | 8.9 | 9.9 | 9.1 | 9.5 | 8.5 | 9.5 | 9.2 | 9.3 | 7.7 | 9.1 |
| | SS ▶ | 729 | 703 | 716 | 682 | 695 | 689 | 696 | 750 | 723 | 709 | 727 | 666 |
| 03/91 | DIFF ▶ | | – | – | – | | – | – | | – | – | | – |

2 2
3 3
2 2

SAT

NC Competency Test
(when passed)

000076

Publis 85

NAME: PIKE CHRIST G
TEACHER: TUCK T W
SCHOOL: CW STANFORD
SYSTEM: ORANGE CO SS

# TEACHER REPORT

GRADE: SEVENTH
BATCH/GROUP: 8651-001/019
RUN DATE: 04/10/91
TEST DATE: SPRING 91

348 539
348 539

## SUMMARY OF STUDENT'S SCORES

IS STUDENT'S ACHIEVEMENT IN SIC SKILLS IS BEST MMARIZED BY HER TOTAL TTERY SCORE. HER TOTAL TTERY SCORE IS BETTER THAN PROXIMATELY 20 PERCENT OF E NATION'S 7TH GRADERS AND R OVERALL ACHIEVEMENT IS LL BELOW AVERAGE FOR HER ADE LEVEL.

| TEST | SCORES (PERCENTAGE WHO SCORED BELOW THIS STUDENT) |
|---|---|
| READING VOCABULARY | 32 |
| READING COMPREHENSION | 12 |
| TOTAL READING | 21 |
| LANGUAGE MECHANICS | 21 |
| LANGUAGE EXPRESSION | 32 |
| TOTAL LANGUAGE | 27 |
| MATHEMATICS COMPUTATION | 4 |
| MATHEMATICS CONCEPTS & APPLICATIONS | 60 |
| TOTAL MATHEMATICS | 17 |
| TOTAL BATTERY | 20 |
| SPELLING | 31 |

PROFILE OF STUDENT'S SCORES




## READING SKILLS

HIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
9 RECOGNIZING, INTERPRETING WRITING TECHNIQUES
6 INFERRING THE CENTRAL THOUGHT IN PASSAGES
5 ANALYZING CHARACTERS IN PASSAGES
8 DIFFERENTIATING BETWEEN FORMS OF WRITING
5 UNDERSTANDING THE OPPOSITE MEANING OF WORDS
7 INTERPRETING EVENTS IN PASSAGES

## LANGUAGE SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED TO:
49 USING PERSONAL OR RELATIVE PRONOUNS
50 USING VERB FORMS
51 USING ADJECTIVE OR ADVERB FORMS
THIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
57 IDENTIFYING OR DEVELOPING TOPIC SENTENCES
58 ORDERING SENTENCES IN PARAGRAPHS
46 PUNCTUATING WITH INTERRUPTERS AND QUOTE MARKS

## MATHEMATICS SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED TO:
73 UNDERSTANDING NUMERATION
76 UNDERSTANDING PROBLEM SOLVING
78 UNDERSTANDING GEOMETRY
THIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
70 DIVIDING FRACTIONS
71 USING INTEGERS AND PER CENTS
64 SUBTRACTING FRACTIONS

007591

**ASONING/THINKING SKILLS SCORE:** The CAT Test contains items that require drawing inferences evaluating information (reasoning/thinking). These items were rescored to provide a general pression of how this student performed on reasoning/thinking skills items. The number of items student answered correctly, along with examples of the reasoning/thinking type items, follow:

| NUMBER CORRECT | EXAMPLES |
|---|---|
| 28 OF 60 | READING: Based on the story, what will probably happen when Jack climbs the fence?<br>MATHEMATICS: If there are 4 pens in a box and 12 boxes in a case, how many pens are there in 3 cases? |

ESTIMATED OBJECTIVE SCORES

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| OCABULARY | | | |
| 24 SYNONYMS | 60 | - 8 | R |
| 25 ANTONYMS | 38 | -20 | - |
| 26 HOMONYMS | 49 | -11 | - |
| 27 AFFIXES | 52 | -14 | R |
| 28 WORDS IN CONTEXT | 63 | - 6 | R |
| OMPREHENSION | | | |
| 32 PASSAGE DETAILS | 42 | -33 | - |
| 35 CHARACTER ANALYSIS | 32 | -42 | - |
| 36 CENTRAL THOUGHT | 31 | -39 | - |
| 37 INTERPRETING EVENTS | 40 | -37 | - |
| 38 FORMS OF WRITING | 33 | -40 | - |
| 39 WRITING TECHNIQUES | 29 | -34 | - |
| ANGUAGE MECHANICS | | | |
| 43 PRONOUN I,NOUN,ADJECT | 68 | -10 | R |
| 44 BEGINNING WORD, TITLE | 47 | -17 | - |
| 45 PERIOD,QUEST.,EXCLAM. | 43 | -18 | - |
| 46 COMMA,COLON,SEMI,QUOT | 41 | -20 | - |

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| 47 PROOFREADING | 41 | -16 | - |
| LANGUAGE EXPRESSION | | | |
| 49 PRONOUNS | 99 | + 7 | + |
| 50 VERBS | 99 | +22 | + |
| 51 ADJECTIVES, ADVERBS | 99 | +19 | + |
| 53 SENTENCE PATTERNS | 63 | - 4 | R |
| 54 SENTENCE RECOGNITION | 99 | +20 | + |
| 56 SENTENCE COMBINING | 67 | - 4 | R |
| 57 TOPIC SENTENCE | 0 | -64 | - |
| 58 SENTENCE SEQUENCE | 33 | -34 | - |
| COMPUTATIONS | | | |
| 64 SUBTRACT FRACTIONS | 21 | -41 | - |
| 65 MULTIPLY WHOLE NUMBERS | 27 | -54 | - |
| 66 MULTIPLY DECIMALS | 27 | -46 | - |
| 67 MULTIPLY FRACTIONS | 22 | -31 | - |
| 68 DIVIDE WHOLE NUMBERS | 24 | -53 | - |
| 69 DIVIDE DECIMALS | 21 | -52 | - |
| 70 DIVIDE FRACTIONS | 17 | -25 | - |

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| 71 INTEGERS,PER CENTS | 19 | -17 | - |
| CONCEPTS & APPLICATIONS | | | |
| 73 NUMERATION | 84 | +11 | + |
| 74 NUMBER SENTENCES | 66 | + 5 | R |
| 75 NUMBER THEORY | 69 | + 5 | R |
| 76 PROBLEM SOLVING | 81 | + 8 | + |
| 77 MEASUREMENT | 61 | + 7 | R |
| 78 GEOMETRY | 81 | + 9 | + |
| SPELLING | | | |
| 40 VOWEL SOUNDS | 61 | - 9 | R |
| 41 CONSONANT SOUNDS | 73 | - 5 | R |
| 42 STRUCTURAL UNITS | 59 | - 7 | R |

AN EXPLANATION OF THE OBJECTIVES TESTED MAY BE FOUND ON THE BACK OF THIS REPORT

= TEST SECTION OMITTED

QTR MTH: 28 TRAD

ESTIMATED OBJECTIVE SCORE LEGEND
PER--Estimated Percentage: CTB estimate of the percentage correct this student would obtain if he/she took a large number of items measuring the objective (based on number of correct items for each objective and subtest score).
DIF---Percentage Difference: The difference between the CTB estimated percentage for this student and the estimated percentage for a typical student in the national norm group.
AI---Achievement Indicator: + = Objective Achieved (75-99%); R = Objective Partially Achieved (50-74%); — = Objective Not Achieved (0-49%); Blank = Items measuring objective were omitted

8

received

193866

*Diana L. McCoy, Ph.D.  Applied Psychological Services*

200 Midlake Drive, Suite C • Knoxville, TN 37918 • (615) 688-1303

## RELEASE OF INFORMATION

Information to be released from: Dr. Jerry Danford
c/o Durham Clinic PA
3901 Roxboro Rd.
Durham, NC 27704

Information to be released to: Diana McCoy Ph.D.

Patient: Christa Gail Pike

Birthdate: 3-10-76

I hereby authorize release of any information concerning my self to the agency and/or professional named above (relationship:daughter, son, husband, wife, mother, father, family, other).

Date: 11-21-95

Signature: [signature]

Witness: [signature]

**DURHAM CLINIC, P.A.**

007594

| **CHART #** | **PATIENT NAME** | **DATE** |
|---|---|---|
| 193866 | PIKE, CHRISTA G. | December 15, 1994 |

**ATTENDING PHYSICIAN** **REQUESTING PHYSICIAN**

Jerry L. Danford, M.D.

****************************************************************************

Clinic Note

Eighteen year old white female. Earlier this afternoon this patient had the sudden onset of sharp pain in the lower abdomen. A short time later she began to have light vaginal bleeding. She has continued to have sharp pains to the present time.

She had a normal menstrual period the last week in November, and she has been having regular menstrual periods. For the past two months the menstrual periods have been heavier, and she has had more cramps. No fever. No GI or urinary symptoms.

EXAMINATION: ABDOMEN: Soft and flat. Mild tenderness to palpation in both lower quadrants. No rebound tenderness, no mass. PELVIC: External genitalia, BSU normal. Vagina clean and rugated. There is a very scant amount of dark blood in the vagina. Cervix pink, clean, firm. Uterus anterior, small, firm, mobile, and nontender. There is slight tenderness to manipulation of the uterus. In the right adnexa there is a soft cystic mass measuring 2 to 3 cm in diameter. This is tender to palpation. Left adnexa clear. Rectal not done.

IMPRESSION: 1) Leaking right ovarian cyst.

DISPOSITION: 1) The physical findings were discussed with her and her mother. She is to stay at bed rest as much as possible over the next two or three days. Hot Sitz baths bid to tid. Prescription for Percocet (twenty). I have discussed the possibility of starting back on birth control pills with the patient and her mother. Return prn. JLD/pt

| ACCOUNT # | PATIENT NAME | DATE |
|---|---|---|
| 193866-1 | Pike, Christa | September 28, 1993 |

007595

| ATTENDING PHYSICIAN | REFERRING PHYSICIAN | GENERATOR ID |
|---|---|---|
| 10 | | PTT |

*************************************************************************

Four days ago this patient had sexual intercourse using a condom and spermicide. Following intercourse there was some irritation and swelling around the vagina. The swelling went down in two days, but since then there has been some itching around the vagina. Yesterday she used Mycolog cream, but the Mycolog cream seemed to make the itching and irritation worse. She has not seen any discharge.

EXAMINATION: There is slight reddening of the external genitalia. A small tear measuring approximately 8 millimeters in length is present on the perineum. There is no induration around this area. The vaginal mucosa is pink and clean. There is a very slight discharge. A hanging drop shows no evidence of infection.

IMPRESSION: 1) Probable allergic reaction.

DISPOSITION: 1) Discontinue Mycolog cream. 2) Prescription for Lidex cream 0.05%. 3) Return prn. JLD/pt

| ACCOUNT # | PATIENT NAME | DATE |
|---|---|---|
| 193866-1 | Pike, Christe 007596 | September 3, 1993 |

| ATTENDING PHYSICIAN | REFERRING PHYSICIAN | GENERATOR ID |
|---|---|---|
| 10 | | PTR |

*******************************************************************

Early this morning this patient got up to go to the bathroom, and she noticed some irritation on the left side of the vagina. Also, she had some difficulty in walking, because she was swollen on the outside of the vagina. She says that there was no irritation what so ever yesterday. She had seen no unusual discharge.

She had a suction D&C in July and is currently taking loestrin 1.5/30. She has had some breakthrough bleeding with the first 2 cycles, but the breakthrough bleeding has become less. She has not been skipping pills. She denies any sexual contact since the suction procedure.

EXAMINATION: The left labia minus is very edematous and tender to palpation. There is no involvement what so ever on the right side. Close examination reveals no evidence of trauma, lacerations, abrasions, or infection. There is no induration in the vulva. No palpable nodes in the groin. Hanging drop shows no evidence of infection.

IMPRESSION: Edema of the left labium minus. Possible allergic reaction.

DISPOSITION: Medrol Dosepak 4 mg. Hot sitz baths bid to tid over the next 2 or 3 days. Avoid tight clothing. Mycolog cream to be applied to the labia following sitz baths. She will call back if the swelling has not disappeared over the next 2 or 3 days. JLD/pt

| ACCOUNT # | PATIENT NAME | DATE |
|---|---|---|
| 193866-1 | Pike, Christa | June 11, 1993 |
| ATTENDING PHYSICIAN | REFERRING PHYSICIAN | GENERATOR ID |
| 10 | | ptd |

007597

**********************************************************************

17 year old white single female para 0. On 6-7-93 this patient noted the gradual onset of sharp pains in the right lower abdomen. Over the next 2 hours these pains became progressively severe, and she eventually went to the emergency room at Durham Regional Hospital. In the emergency room a quantitative HCG was 9 97. Pelvic ultrasound revealed no gestational sack in the uterus. Both adnexa were clear. Over the next 5 to 6 hours the patients pain subsided completely, so she was discharged with ectopic precautions.

She states that she had regular and normal menstrual periods through April of this year. Her last normal menstrual period was on 4-23-93. There has been no bleeding since that time. No abnormal discharge. No GI or urinary symptoms. She has had breast tenderness for about 2 weeks.

EXAMINATION: Weight: 115 Blood Pressure: 102/50 LMP: 4-23-93 Birth Control: condoms Abdomen: Soft and flat. No tenderness to palpation. No palpable mass. Pelvic: External genitalia, BSU normal. Vagina clean and rugated. Cervix slightly everted, firm, clean. Uterus anterior, small, firm. Good mobility, no tenderness. Adnexa clear and non tender bilaterally.

IMPRESSION: Probable early uterine pregnancy.

DISPOSITION: She is to return in 2 weeks for a repeat pregnancy test. If the pregnancy test is still positive at that time, she will need to have a repeat ultrasound. JLD/pt

007598

==================== PHYSICIAN COPY FOR : DANFORD,JERRY LEE ====================

NAME: PIKE,CHRISTA G
H# : 234197244 LOC: PU ROOM: AGE: 17Y SEX: F
ACCT: 0615475 DR: DANFORD,JERRY LEE CODE: 94

************************************ CHEMISTRY: MISCELLANEOUS ************************************

| | | |
|---|---|---|
| TEST: | | HCG QUAN |
| UNITS: | | MIU/ML |
| LO-HI: | | |
| 06/25/93 | | |
| * | 1430 | 97740 |
| | | HCG2 |
| | | HCG3 |
| | | HCG4 |

---FOOTNOTES---
HCG2 2 WEEKS 50 - 1,000 MIU/ML
HCG3 3 WEEKS 100 - 5,000 MIU/ML
G4 4 WEEKS 600 - 10,000 MIU/ML

000084

X-RAY CONSULTATION
DURHAM RADIOLOGY ASSOCIATES, INC.
SUITE 303 CENTRAL MEDICAL PARK 2609 N. DUKE ST.
DURHAM, NORTH CAROLINA 27704
PHONE 220-5109
FEDERAL TAX # 56-0945618

007599

12:59

CPHP' 193846-1

| | |
|---|---|
| EXAMINATIONS REQUESTED: | 1:00 PELVIC ULTRASOUND |
| CLINICAL DATA | EARLY PREGNANCY |
| SEND FILMS TO HOSPITAL | XX NO ☐ YES |

| | | | |
|---|---|---|---|
| DATE: 12 JULY 93 | | DOCTOR: DANFORD | |
| PATIENTS LAST NAME: PIKE, | FIRST: CHRISTA | MIDDLE: G. | |
| ADDRESS: 7828 TOM POPE LOOP | | | |
| CITY: CEDAR GROVE, | STATE: NC | ZIP: 27231 | TELEPHONE: 644-7305 |
| SEX: F | DATE OF BIRTH: 10 MARCH 76 | SOC. SEC. NUMBER: 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 | |
| PREVIOUS X-RAYS | ☐ NO | XX YES | U/S DRA |

X-RAY REPORT

Pike, Christa G.

12 July 93: OB ULTRASOUND: Study reveals a single intrauterine gestation with cardiac activity and fetal motion. Crown-rump measurements are indicative of a 9.0 ± 1 weeks pregnancy.

Ovaries are identified and appear to be of normal size and configuration. There is no evidence of cul-de-sac fluid.

IMPRESSION: (1) Single intrauterine gestation with cardiac activity and estimated gestational age of 9.0 ± 1 weeks.
(2) No evidence of abnormal adnexal masses or cul-de-sac fluid.

Hal D. Safrit, M.D.

mjh
7-12-2

007600

# CYTOPATHOLOGY REPORT
DEPARTMENT OF PATHOLOGY
DURHAM COUNTY HOSPITAL CORPORATION
DURHAM, N.C.

Cyto Accession #: C93-13902

Patient Name: PIKE,CHRISTA H#: DJ-234197244
Sex/Age: 17Y F Location: DR JERRY DANFORD/AP
DOB: 03/10/1976 Attending Physician: DANFORD,JERRY LEE
Collect Date: 06/11/93 Received Date: 06/11/93
Specimen Source: CERVICAL ENDOCERVICAL
Clinical Impression: ROUTINE PAP

| | | | |
|---|---|---|---|
| Abnormal Bleeding: | NO | Menopause (Date): | NO |
| Douched/24 hours: | NO | Previous Cyto Exam: | YES |
| Hormones (type): | NO | Pregnant: | YES |
| IUD: | NO | Prior Therapy: | NO |
| LMP (date): | 042393 | (Specify) | |

================================================================================

GROSS DESCRIPTION: 2 SLIDES

SPECIMEN QUALITY: SATISFACTORY.

CYTOLOGIC FINDINGS: BACTERIAL CYTOLYSIS AND RARE CANDIDA PRESENT.

CYTOPATHOLOGY REPORT: CERVICAL CYTOLOGIC MATERIAL.
NO EVIDENCE OF CANCER IN THIS SPECIMEN

JUN 23 1993
CARD SENT

Date Reported: 06/16/93
PDE/EI

------------------
Reported/Reviewed By

==================== PHYSICIAN COPY FOR : DANFORD,JERRY LEE ====================

NAME: PIKE,CHRISTA G
H# : 234197244 LOC: ER ROOM: AGE: 17Y SEX: F
ACCT: 6048915 DR: DANFORD,JERRY LEE CODE: 94

****************************** MICROBIOLOGY: UROGENITAL CULTURES ******************************

06/07/93 CULTURE,GC ONLY
* 0328 ACC. NO.: M11494 TRANSPORT TIME: 0.1 HRS *** FINAL 06/11/93 **
SPECIMEN DESCRIPTION: CERVIX

CULTURE:
ORG #1 NO NEISSERIA SPECIES ISOLATED

000087

007602

==================== PHYSICIAN COPY FOR : DANFORD,JERRY LEE ====================

NAME: PIKE,CHRISTA G
H# : 234197244 LOC: ER ROOM: AGE: 17Y SEX: F
ACCT: 6048915 DR: DANFORD,JERRY LEE CODE: 94

************************************* SEROLOGY: DNA PROBES *************************************

06/07/93
* 0328 CHLAMYDIA DNA PROBE NEGATIVE FOR CHLAMYDIA TRACHOMATIS BY DNA PROBE. A NEGATIVE RESULT INDICATES C. TRACHOMATIS NUCLEIC ACID WAS NOT DETECTED IN THE SPECIMEN TESTED. A NEG TEST DOES NOT EXCLUDE THE POSSIBILITY OF INFECTION. IF CLINICAL INDICATIONS STRONGLY SUGGEST CHLAMYDIA INFECTION, ADDITIONAL SPECIMEN SHOULD BE COLLECTED. THIS TEST IS FDA APPROVED FOR UROGENITAL AND CONJUNCTIVAL SPECIMENS ONLY.

****************************** MICROBIOLOGY: UROGENITAL CULTURES ******************************

06/07/93 CULTURE,GC ONLY
* 0328 ACC. NO.: M11494 TRANSPORT TIME: 0.1 HRS *** PRELIMINARY **
SPECIMEN DESCRIPTION: CERVIX

CULTURE:
ORG #1 NO NEISSERIA SPECIES ISOLATED

000088

S.T.A.R.S. STUDENT DATA X8320

OPERATOR: NANCY TASK: (ADD/CHG/DEL/INQ/END)? CHG

SCHOOL: 0061 SHADY SPRING JR. HIGH SCHOOL LAST UPDATE: 09/18/90

STUDENT: 0234197244 PIKE, CHRISTA GAIL HRM: 303 GRD LVL: 07 CONFLICT: R

SCHEDULE TASK(ADD/CHG/DEL/INQ/CLR/END/P/R): ___ CLASS: SECT:

| CLASS/SEC | | NAME | PD | SEM | MEETS | ROOM | TEACHER |
|---|---|---|---|---|---|---|---|
| 3110 | 05 | 7A MATH | 01 | 3 | MTWRF | 303 | TIM MEADOR |
| 1110 | 01 | 7A WORLD REGIONS | 02 | 3 | MTWRF | 306 | DONNA O'FIELD |
| 6001 | 03 | BASE | 03 | 3 | MTWRF | 402 | SUSAN LEWIS |
| 9234 | 04 | STUDY HALL | 04 | 1 | MTWRF | 303 | TIM MEADOR |
| 9100 | 02 | 7 ART/MUSIC/HLTH/PE | 05 | 3 | MTWRF | 103 | DEBBIE REDDEN |
| 2110 | 05 | 7A BIOLOGICAL SCI | 06 | 3 | MTWRF | 500 | TERESA LESTER |
| 0110 | 10 | 7A ENGLISH | 07 | 3 | MTWRF | 310 | MARTHA RECTOR |

007605 165-4412

# CLEARANCE FOR WITHDRAWAL

SHADY SPRING JUNIOR HIGH SCHOOL
P.O. BOX 248
BEAVER, W.VA. 25813

When withdrawing from school, each student is required to turn in books, lock, pay all fines, and check with each teacher before leaving. This completed form is to be returned to the Guidance Office by the student before leaving.

Name: Pike, Christa

Grade: 7

Date of Withdrawal: 10/29/90

Homeroom:

Date of Birth: 03/25/76

| Class | Teacher | Absences | Grade | Books Lock Fines | Signature |
|---|---|---|---|---|---|
| Math | Meador | 1 | 16% Sixteen pct | ✓ | L S Meador |
| World Regions | O'Field | 0 | 40% | ✓ | O'Field |
| Home Ec - Base | S. Lewis | 1 | 50% | ✓ | [illegible] |
| St. Hall | Meador | 1 | X | / | LSM |
| Art | Redden | 0 | 81% | ✓ | DR |
| Biol Science | Lester | 0 | 93% | ✓ | [illegible] |
| English | Rector | | | | |
| Library | Wills | — | — | ✓ | EW |

000090

007606

# C. W. STANFORD JUNIOR HIGH SCHOOL
Route 4, Box 222
Hillsborough, North Carolina 27278
(919) 732-6121

## PUPIL TRANSFER & WITHDRAWAL RECORD

Student is to:

1. Have transfer record filled out in duplicate.
2. Show transfer record to each of his teachers and librarian before leaving school.
3. Return to office at end of the day for the principal's signature.
4. Take transfer record to new school.

Homeroom teacher is to: Fill in attendance figures and withdrawal code. Attach duplicate copy of register sheet to this form.

Teacher is to:

1. Record grades for present nine weeks period.
2. Indicate student's book status in Book Column.
   a. has or has not returned books
   b. amount of fine if book lost, damaged, not returned
   c. amount of fine still owed

Name of Student Christa Pike Date of Transfer 9-14-90

Transferring to: Shady Springs Junior High

Age 14 Birthdate 3-10-76 Grade 7 # yrs. attending Stanford 2

Days present this term ______ Days absent ______

Reason for transfer moving Withdrawal Code ______

| Subject | Comments | Books Ret. Yes | No | Present 9 Wks. Grade | Teacher's Signature |
|---|---|---|---|---|---|
| AA | Super Student | none | | — | [illegible] |
| Exploring Tech | Very Good Student | none | | A | [illegible] |
| Physical Ed. | Good Student | | | A- | [illegible] |
| Art | Good student | | | A | Ms. Nemetz |
| Lang. Arts | | yes | — | none | M. Williams |
| Math | | yes | | 68. | Mayo |
| Social Studies | | yes | — | 72 | Belfield |
| Lunchroom Read | ok | yes | — | [illegible] | [illegible] |
| Media Center Science | Ok | Yes | — | — | A. Lewis |

000091

Christa Pike

Stanford Middle School
301 Orange HS Rd.
Hillsboro, North Carolina 27278

(919) 732-6121

Called 9/28/90 9/28/90

11-17-87

TO: Stanford Middle School
301 Orange H.S. Rd.
Hillsboro, NC 27278

Attention: Guidance Office

According to the Final Regulations-Family Educational Rights and Privacy Act (Buckley Amendment) dated June 17, 1976, it is no longer necessary to obtain written consent to release records between schools. It states that school officials, including teachers within the educational institution and officials of other schools in school systems in which the student may intend to enroll, may receive a students records without a written consent for such release.

Please send records including courses, grades, credits, test scores and health records on the following student.

Name: Pike, Christa

Birthdate: ____________________

Grade: 7

Thank you for your cooperation. Susan Belcher, LPC 9/28/90

Shady Spring Junior High School
P.O. Box 248
Beaver, West Virginia 25813

007609

**RALEIGH COUNTY SCHOO**
105 Adair Street, Beckley, W. Va. 25801

MID-NINE WEEKS REPORT

SCHOOL Shady Spring Jr

STUDENT'S NAME Christa Pekl DATE 10-4

SUBJECT Home Ec TEACHER Lewis

NOTICE TO PARENTS

✓ This student is presently in academic difficulty in this subject, and consequently there is the danger of failure.

___ This student's grade is falling below his usual achievement.

CAUSES FOR DEFICIENCY:

___ Poor attendance/tardiness
___ Inadequate preparation for class
✓ Lack of serious approach to studies
✓ Poor test scores
✓ Does not complete homework assignments
___ Lack of attention
___ Lack of participation/cooperation

RECOMMENDATIONS:

___ Better record of attendance/promptness
___ Needs to bring book, pencil, paper to class
___ More serious approach to studies
___ Better results on tests
___ Needs to give more attention to homework
___ More attention to material covered in class
___ More participation and cooperation in class

ADDITIONAL COMMENTS: 60%

WHITE - HOME
YELLOW - TEACHER
PINK - OFFICE

N. Lewis
Teacher's Signature

We need your attention and help in this matter; by working together, we can insure your child's educational progress.

000094

R101-53
"N 04 1990

INDIVIDUAL PUPIL RECORD
C.W. STANFORD 680-316
AS OF JUN 04 1990



NAME : CHRISTA
SURNAME : PIKE
ADDRESS : 107 W HILL AVE
HILLSBOROUGH NC 27278

STUDENT NUMBER : 95441
STUDENT ID :
DIVISION CODE : 137
GRADE CODE : 07
SEX CODE : F
ETHNIC CODE : WHTE

RESIDES :

PHONE : 919 732-6463

| SCH MON | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | MEM | PRS | ABS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | E1 | | | | | | 1 | 1 | | | | | | | | | 1 | | | 19 | 16 | 3 |
| 2 | | 1 | 1 | | | | 1 | | | | | | | | 1 | | | | | | 20 | 16 | 4 |
| 3 | | | | | | 1 | | | | | | | | | 1 | | 1 | | 1 | | 20 | 16 | 4 |
| 4 | | 1 | 1 | | | | | 1 | | 1 | 1 | | 1 | 1 | | 1 | | | | | 20 | 12 | 8 |
| 5 | 1 | 1 | | 1 | 1 | 1 | | | | | | | | 1 | | | | | | | 20 | 14 | 6 |
| 6 | | | | | | | | | | | | | | | | | 1 | | | 1 | 20 | 18 | 2 |
| 7 | | | 1 | | 1 | | | | | | | | 1 | | | | 1 | | | | 20 | 16 | 4 |
| 8 | | | | | | | 1 | | | | 1 | 1 | | | | | 3 | 3 | | | 20 | 15 | 5 |
| 9 | | | | | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | XX | XX | XX | XX | 16 | 9 | 7 |
| 10 | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | XX | 0 | 0 | 0 |
| | | | | | | | | | | | | | | | | | | TOTALS | | | 175 | 132 | 43 |

Dropped from Summer School

PROMOTED (CHECK ONE) : YES_____ NO ✓ Summer School TO GRADE 7

SCHOOL TRANSFERRED TO : ____________________

ADDRESS : ____________________

DATE RECORDS FORWARDED: ____________

TEACHER/PRINCIPAL SIGNATURE : [signature] [signature]

JUN 08 1990

007611

# REPORT CARD



| ...NT NAME | NUMBER | GRADE | SCHOOL NAME |
|---|---|---|---|
| ...E CHRISTA | 95441 | 07 | C.W. STANFORD 680-316 |

| ...SE | SEC | DESCRIPTION | TEACHER | | OCT 89 MARK ABS | JAN 90 MARK ABS | MAR 90 MARK ABS | JUN 90 MARK ABS | |
|---|---|---|---|---|---|---|---|---|---|
| 507 | 03 | SOC ST 7 | YELLIN | QUARTER | 69 | 68 | 65 | 65 | CREDIT VALUE |
| DOES NOT PAY ATTENTION IN CLASS | | | | SEMESTER | | 68 | | 65 | CREDIT EARNED |
| | | | | YEAR | | | | 65 | |
| I...CONSISTENT EFFORT | | | | | | | | | CLASS AVG. 80. |
| | | | | | | | | | COURSE AVG. 81. |
| ...7 | 04 | COMPUTER 7 | KENION, S | | | | | | CREDIT VALUE |
| | | | | QUARTER | | | 72 | | |
| | | | | SEMESTER | | | | | CREDIT EARNED |
| | | | | YEAR | | | | | |
| | | | | | | | | | CLASS AVG. |
| | | | | | | | | | COURSE AVG. |
| ...807 | 04 | DRAMA 7 | DETER | | | | | | CREDIT VALUE |
| | | | | QUARTER | | | | 98 | |
| | | | | SEMESTER | | | | | CREDIT EARNED |
| | | | | YEAR | | | | | |
| | | | | | | | | | CLASS AVG. 82. |
| | | | | | | | | | COURSE AVG. 85. |

CREDIT VALUE
CREDIT EARNED
CLASS AVG.
COURSE AVG.
CREDIT VALUE
CREDIT EARNED
CLASS AVG.
COURSE AVG.
CREDIT VALUE
CREDIT EARNED
CLASS AVG.
COURSE AVG.
CREDIT VALUE
CREDIT EARNED
CLASS AVG.
COURSE AVG.
CREDIT VALUE
CREDIT EARNED
CLASS AVG.
COURSE AVG.

JUN 06 1990

# REPORT CARD

007012

PAGE

| STUDENT NAME | NUMBER | GRADE | SCHOOL NAME |
|---|---|---|---|
| [illegible]KE CHRISTA | 95441 | 07 | C.W. STANFORD 680-316 |

| | G.P.A | AVERAGE | DAYS ABSENT | TIMES TARDY |
|---|---|---|---|---|
| REPORT PERIOD 4 | | 67.875 | 14.0 | 2 |
| SEMESTER 2 | 0.0 | 68.25 | 21.0 | 7 |
| CURRENT YEAR | 0.0 | 69.844 | 43.0 | 8 |

DIVISION 137
ROOM 137
WILLIAMS, M

| COURSE | SEC | DESCRIPTION | TEACHER | | OCT 89 MARK ABS | JAN 90 MARK ABS | MAR 90 MARK ABS | JUN 90 MARK ABS | |
|---|---|---|---|---|---|---|---|---|---|
| [illegible]07 | 01 | ART 7 | DELL-JONES | QUARTER | | 99 | | | CREDIT VALUE |
| HARD WORKER | | | | SEMESTER | | | | | CREDIT EARNED |
| | | | | YEAR | | | | | CLASS AVG. / COURSE AVG. |
| 1U07 | 01 | MUSIC 7 | KREGE | QUARTER | 86 | | | | CREDIT VALUE |
| | | | | SEMESTER | | | | | CREDIT EARNED |
| | | | | YEAR | | | | | CLASS AVG. / COURSE AVG. |
| [illegible]07 | 03 | FRENCH 1A 7 | HOLZHAUSER | QUARTER | 60 | 60 | 60 | 70 | CREDIT VALUE |
| | | | | SEMESTER | | 60 | | 65 | CREDIT EARNED |
| | | | | YEAR | | | | 63 | CLASS AVG. 82 / COURSE AVG. 81 |
| [illegible]07 | 03 | LANG ARTS 7 | MCLEOD | QUARTER | [illegible] | [illegible] | [illegible] | 60 | CREDIT VALUE |
| [illegible] | | | | SEMESTER | | [illegible] | | [illegible] | CREDIT EARNED |
| DOES NOT ATTEMPT CLASS WORK | | | | YEAR | | | | | CLASS AVG. [illegible] / COURSE AVG. 75? |
| 1A07 | 03 | MATH 7 | THOMPSON | QUARTER | 60 | 60 | 60 | 60 | CREDIT VALUE |
| | | | | SEMESTER | | 60 | | 60 | CREDIT EARNED |
| | | | | YEAR | | | | 60 | CLASS AVG. 72 / COURSE AVG. 74 |
| [illegible]07 | 11 | PE/HEALTH 7 | ROBERTS | QUARTER | 85 | 87 | 78? | 80 | CREDIT VALUE |
| | | | | SEMESTER | | 85? | | 89? | CREDIT EARNED |
| | | | | YEAR | | | | 87 | CLASS AVG. 89? / COURSE AVG. 83 |
| [illegible]207 | 03 | READING 7 | WILLIAMS, M | QUARTER | 70 | 67 | 66 | 60 | CREDIT VALUE |
| DOES NOT COME TO CLASS PREPARED | | | | SEMESTER | | 69 | | 63 | CREDIT EARNED |
| | | | | YEAR | | | | 66 | CLASS AVG. 72 / COURSE AVG. 74 |
| [illegible]07 | 03 | SCIENCE 7 | JOHNSON | QUARTER | 60 | 60 | 61 | 60 | CREDIT VALUE |
| | | | | SEMESTER | | 60 | | 61 | CREDIT EARNED |
| | | | | YEAR | | | | 61 | CLASS AVG. 75 / COURSE AVG. 77 |

SUMMER SCHOOL: JULY 9 - AUGUST 3, 1990

GRADING SCALE:
100-93 = A SUPERIOR 92-85 = B ABOVE A[illegible]
84-77 = C AVERAGE 76-70 = D BELOW A[illegible]
69-60 = E UNSATISFACTORY

NO GRADE CHANGES SHOULD APPEAR ON REPO[illegible]

!!!!! HAVE A GREAT SUMMER VACATION !!!

TO THE PARENTS/GUARDIAN OF:
CHRISTA PIKE
107 W HILL AVE
HILLSBOROUGH NC 27278

000097

NAME Pike Christa 007613 G.
(Last) (First) (Middle) (Nickname) (Date of Birth)

## V. IMMUNIZATIONS

RECORD OF IMMUNIZATIONS (Enter date of EACH dose — Mo/Day/Year)

| VACCINE | #1 | #2 | #3 | #4 | #5 |
|---|---|---|---|---|---|
| DTP | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-87 |
| OPV | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-87 |
| MMR | 9-22-77 | | | | |
| MEASLES | | | | | |
| MUMPS | | | | | |
| RUBELLA | | | | | |

*STATE LAW REQUIRES FOLLOWING MINIMUM DOSES:*

5 DTP SHOTS (If 4th dose is after 4th birthday, 5th dose is not required.)
4 ORAL POLIO VACCINE DOSES (If 3rd dose is after 4th birthday, 4th dose is not required.)
1 MEASLES SHOT (On or after 1st birthday)
1 RUBELLA SHOT
1 MUMPS SHOT

☐ I CERTIFY THIS CHILD HAS RECEIVED THE IMMUNIZATIONS NOTED IN PART V.
Signature Judy Butler RN Title School Nurse
Check One: ☐ Medical Personnel ☑ School Personnel

## VI. KINDERGARTEN HEALTH ASSESSMENT

*To Be Completed By Health Care Provider:*

A. 1. Hemoglobin/Hematocrit ☐ NORMAL ☐ ABNORMAL ☐ NOT INDICATED
2. TB Skin Test TYPE TEST ______ RESULTS ______ ☐ NOT INDICATED

B. SCREENINGS:

1. VISION
☐ Within normal limits ☐ Within normal limits w/ corrective lenses ☐ Needs follow-up
Test Used: ______

2. HEARING
☐ Within normal range ☐ Outside normal range ☐ Needs follow-up
Test Used: ______

3. DEVELOPMENT (*Optional*)
☐ Within normal range ☐ Outside normal range ☐ Borderline ☐ Needs follow-up
Test(s) Used: ______

C. Does this child take medication on a regular basis? ☐ YES ☐ NO
If yes, list medication, frequency of administration, and possible side effects: ______

Does medication need to be given at school ☐ YES ☐ NO

D. List any significant medical or dental condition, disability, or allergy: Blood Clotting Problems ф
Mild Sting Allergy ф
Nosebleeds ф

E. To what extent might these conditions affect the child's school performance? ______

List any special health considerations needed for this child while in school: ______

*Signature of Health Care Provider* *Date* *Address* *Phone No.*

000098

PPS-3 (continued) 007614

| School Stanford | School System Orange County | Date 6/8/90 | Student ID Number |
|---|---|---|---|

NAME Pike, Christa Gail (Last) (First) (Middle) (Nickname) BIRTHDATE 3-10-76 Mo Day Year

SEX: (M or F) RACE: American Indian ☐ Asian ☐ Black ☐ Hispanic ☐ White ☐ Other

NORTH CAROLINA PUBLIC SCHOOLS

# SECONDARY STANDARDIZED TEST RECORD FORM

This form must follow pupil when transferred.

Enter secondary test results in date order sequence. Enter elementary test results on reverse of form. If entry typed or handwritten, scores should be labeled according to the following code: Percentile - %, Stanine - S, Grade Equivalent - G.E., Intelligence Quotient - I.Q. Any other type of test results should be explained: name of test, date given, and actual grade placement at time of testing should also be included.

If exceptional, note type of exceptionality:

NAME
PIKE CHRI T G
DOB: 03/10/76

TEST/LEVEL: TCS - 4 CSI 109
DATE: 04/90 CA 14- 1

| | SEQUENCES | ANALOGIES | MEMORY | VERB REAS | TOTAL |
|---|---|---|---|---|---|
| NPA | 71 | 81 | 41 | 86 | 71 |
| SS | 693 | 712 | 596 | 728 | 682 |

| | SEQUENCES | ANALOGIES | MEMORY | VERB REAS | TOTAL |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

NAME
PIKE CHRI T G
DOB: 03/10/76
SP CODES: .........
QTR MTH: 28 TRAD

82224 R957030001-03-041

CAT E&F

FORM/LEVEL E/17
GRADE 07.7
DATE 04/90

| SCORES | READING VOC | READING COMP | READING TOTL | LANGUAGE MECH | LANGUAGE EXPR | LANGUAGE TOTL | MATHEMATICS COMP | MATHEMATICS C&A | MATHEMATICS TOTL | TOTAL BATTERY | SPEL | SOCL STDY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NP | 39 | 19 | 29 | 32 | 5 | 10 | 6 | 34 | 14 | 15 | 65 | 27 |
| AANP | 60 | 58 | 61 | 59 | 59 | 61 | 54 | 66 | 63 | 63 | 51 | 65 |
| GE | 6.9 | 5.6 | 6.2 | 5.3 | 2.1 | 2.7 | 4.3 | 6.5 | 5.1 | 4.6 | 9.0 | 5.4 |
| AAGE | 8.7 | 8.3 | 8.6 | 8.5 | 8.4 | 8.6 | 7.9 | 8.8 | 8.5 | 8.7 | 7.9 | 8.9 |
| SS | 738 | 716 | 727 | 696 | 607 | 652 | 710 | 724 | 717 | 699 | 750 | 678 |
| DIFF | | - | | | - | - | - | | - | - | | - |

| | |
|---|---|
| | PSAT |
| | SAT |
| | NC Competency Test (when passed) |

000099

| | |
|---|---|
| NAME: PIKE CHRI T G<br>TEACHER: WILLIAMS M F<br>SCHOOL: STANFORD<br>SYSTEM: ORANGE CO | GRADE: SEVENTH<br>BATCH/GROUP: 4391-001/005<br>RUN DATE: 04/26/90<br>TEST DATE: SPRING 90 |

# TEAC R REPORT

## SUMMARY OF STUDENT'S SCORES

HIS STUDENT'S ACHIEVEMENT IN ASIC SKILLS IS BEST UMMARIZED BY HER TOTAL ATTERY SCORE. HER TOTAL ATTERY SCORE IS BETTER THAN PPROXIMATELY 15 PERCENT OF HE NATION'S 7TH GRADERS AND ER OVERALL ACHIEVEMENT IS ELL BELOW AVERAGE FOR HER RADE LEVEL.

| TEST | SCORES: PERCENTAGE WHO SCORED BELOW THIS STUDENT |
|---|---|
| READING VOCABULARY | 39 |
| READING COMPREHENSION | 19 |
| TOTAL READING | 29 |
| LANGUAGE MECHANICS | 32 |
| LANGUAGE EXPRESSION | 5 |
| TOTAL LANGUAGE | 10 |
| MATHEMATICS COMPUTATION | 6 |
| MATHEMATICS CONCEPTS & APPLICATIONS | 34 |
| TOTAL MATHEMATICS | 14 |
| **TOTAL BATTERY** | 15 |
| SPELLING | 65 |




## READING SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED TO:
26 IDENTIFYING MULTIMEANING WORDS
27 IDENTIFYING THE MEANING OF AFFIXES
24 UNDERSTANDING THE MEANING OF WORDS IN PHRASES
THIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
25 UNDERSTANDING THE OPPOSITE MEANING OF WORDS
37 INTERPRETING EVENTS IN PASSAGES
36 INFERRING THE CENTRAL THOUGHT IN PASSAGES

## LANGUAGE SKILLS

THIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
56 COMBINING RELATED THOUGHTS IN SENTENCES
50 USING VERB FORMS
51 USING ADJECTIVE OR ADVERB FORMS
58 ORDERING SENTENCES IN PARAGRAPHS
53 IDENTIFYING GRAMMATICAL PATTERNS OF SENTENCES
49 USING PERSONAL OR RELATIVE PRONOUNS

## MATHEMATICS SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED T
73 UNDERSTANDING NUMERATION
THIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
66 MULTIPLYING DECIMAL NUMBERS
67 MULTIPLYING FRACTIONS
68 DIVIDING WHOLE NUMBERS
74 UNDERSTANDING NUMBER SENTENCES
70 DIVIDING FRACTIONS

007615

REASONING/THINKING SKILLS SCORE: The CAT Test contains items that require drawing inferences or evaluating information (reasoning/thinking). These items were rescored to provide a general impression of how this student performed on reasoning/thinking skills items. The number of items this student answered correctly, along with examples of the reasoning/thinking type items, follow:

| NUMBER CORRECT | EXAMPLES |
|---|---|
| 25 OF 60 | READING: Based on the story, what will probably happen when Jack climbs the fence?<br>MATHEMATICS: If there are 4 pens in a box and 12 boxes in a case, how many pens are there in 3 cases? |

## ESTIMATED OBJECTIVE SCORES

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| VOCABULARY | | | |
| 24 SYNONYMS | 85 | +17 | + |
| 25 ANTONYMS | 10 | -48 | - |
| 26 HOMONYMS | 99 | +39 | + |
| 27 AFFIXES | 99 | +33 | + |
| 28 WORDS IN CONTEXT | 33 | -36 | - |
| COMPREHENSION | | | |
| 32 PASSAGE DETAILS | 33 | -42 | - |
| 35 CHARACTER ANALYSIS | 80 | + 6 | + |
| 36 CENTRAL THOUGHT | 25 | -45 | - |
| 37 INTERPRETING EVENTS | 22 | -55 | - |
| 38 FORMS OF WRITING | 50 | -23 | R |
| 39 WRITING TECHNIQUES | 63 | 0 | R |
| LANGUAGE MECHANICS | | | |
| 43 PRONOUN I, NOUN, ADJECT | 73 | - 5 | R |
| 44 BEGINNING WORD, TITLE | 60 | - 4 | R |
| 45 PERIOD, QUEST., EXCLAM. | 53 | - 8 | R |
| 46 COMMA, COLON, SEMI, QUOT | 51 | -10 | R |

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| 47 PROOFREADING | 45 | -12 | - |
| LANGUAGE EXPRESSION | | | |
| 49 PRONOUNS | 40 | -52 | - |
| 50 VERBS | 14 | -63 | - |
| 51 ADJECTIVES, ADVERBS | 17 | -63 | - |
| 53 SENTENCE PATTERNS | 38 | -29 | - |
| 54 SENTENCE RECOGNITION | 60 | -19 | R |
| 56 SENTENCE COMBINING | 0 | -71 | - |
| 57 TOPIC SENTENCE | 56 | - 8 | R |
| 58 SENTENCE SEQUENCE | 33 | -34 | - |
| COMPUTATIONS | | | |
| 64 SUBTRACT FRACTIONS | 60 | - 2 | R |
| 65 MULTIPLY WHOLE NUMBERS | 60 | -21 | R |
| 66 MULTIPLY DECIMALS | 0 | -73 | - |
| 67 MULTIPLY FRACTIONS | 0 | -53 | - |
| 68 DIVIDE WHOLE NUMBERS | 0 | -77 | - |
| 69 DIVIDE DECIMALS | 60 | -13 | R |
| 70 DIVIDE FRACTIONS | 20 | -22 | - |

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| 71 INTEGERS, PER CENTS | 20 | -16 | [illegible] |
| CONCEPTS & APPLICATIONS | | | |
| 73 NUMERATION | 92 | +19 | [illegible] |
| 74 NUMBER SENTENCES | 17 | -4 | [illegible] |
| 75 NUMBER THEORY | 67 | +3 | [illegible] |
| 76 PROBLEM SOLVING | 50 | -23 | [illegible] |
| 77 MEASUREMENT | 67 | +13 | [illegible] |
| 78 GEOMETRY | 67 | -5 | [illegible] |
| SPELLING | | | |
| 40 VOWEL SOUNDS | 80 | +10 | [illegible] |
| 41 CONSONANT SOUNDS | 91 | +13 | [illegible] |
| 42 STRUCTURAL UNITS | 74 | +8 | [illegible] |

AN EXPLANATION OF THE OBJECTIVES TESTED MAY BE FOUND ON THE BACK OF THIS REPORT

* = TEST SECTION OMITTED

QTR MTH: 28 TRAD

ESTIMATED OBJECTIVE SCORE LEGEND:
PER=Estimated Percentage: CTB estimate of the percentage correct this student would obtain if he/she took a large number of items measuring the objective (based on number of correct items for each objective and subtest score)
DIF=Percentage Difference: The difference between the CTB estimated percentage for this student and the estimated percentage for a typical student in the national norm group.
AI=Achievement Indicator: + = Objective Achieved (75-99%); R = Objective Partially Achieved (50-74%); — = Objective Not Achieved (0-49%); Blank = Items measuring objective were omitted.

000100

VI. Signatures of Persons Involved in the Development of the Personal Education Plan

A. Home School Teacher ____ Date ____ Home School Principal ____ Date ____

B. [signature] (Summer School Teacher) Date 8-89 [signature] (Summer School Principal) Date 8/8/89

(Summer School Lead Teacher)

Parent Guardian Surrogate ____ Parent Guardian Surrogate ____

VII. Summer School Progress/Recommendations/PEP Update

Christa was an excellent student.
She did well in all areas.

Teacher's Signature [signature] Date 8-89

VIII. Personal Education Plan Review

Date & Initial

8-89 SI A. The student was not retained after attending summer school and PEP has been reviewed and/or revised to assure continued progress.

____ B. The student was retained after attending summer school. The PEP has been reviewed and/or revised. Comprehensive Educational Assessment will also be completed.

____ C. The student did not attend summer school and was retained. The PEP will be completed and implemented. A Comprehensive Educational Assessment will also be completed.

IX. Follow-Up

The school-based committee met for the purpose of update/review of the PEP and concluded the following:

Date & Initial

____ A. Grading Period One - ____

____ B. Grading Period Two - ____

____ C. Grading Period Three - ____

____ D. Grading Period Four - ____

____ E. Grading Period Five - ____

____ F. Grading Period Six - ____

Summer '89

L.A - 92 of 100
Read - 95 of 100
Math - 28 of 100
} 71.7%

93%



III. Instructional Plan and Evaluation

Instructional Plan

| Goals | Objectives | Materials | Methods | Person Responsible | Date | Evaluation Techniques | Results |
|---|---|---|---|---|---|---|---|
| 1) Improve math skills | 1) Simply put, she has to grasp the work and skills in all areas including all operations, fractions, decimals, measurements and geometry. | 1) NC Curriculum guide 2) Boardwork 3) Worksheets 4) Games | 1) One-to-one individualized help 2) Group work 3) Practice Practice Practice | Tripp | 6-89 | Test Classwork MDST | Pass |

Additional Resources and/or Support (as needed):

IV. Parents' Role and Activities

V. Student's Role and Activities

VI.

ORANGE COUNTY SCHOOLS
Basic Education Program
Personal Education Plan

I. General Data

Student Christa Pike Date of Birth ____

Student ID No. ____ Grade ____ Race ____

Student's Address 107 West Hill Ave Hillsborough, NC 27278
Street/P.O. Box/Route City State Zip

Students resides with ☑ parent ☐ guardian ☐ surrogate

HEALTH ALERT (conditions of which staff should be aware, e.g., allergy to bee stings):

Home School Culbreth Principal ____
Teacher(s) ____
Summer School Stanford Principal Hicks
Teacher(s) Tripp
Subjects L.A., Math, Read
Date PEP Developed ____ Home School 6-8 Summer School

II. Present Level of Performance - Attach samples of student's work

A. Test Data

1. Formal Test Results

| | | Date |
|---|---|---|
| CAT | | |
| NCMSDT | | |
| Other | | |
| | | |

2. Informal Tests (example reading/language arts/mathematics inventories)

type ____ results ____ date ____

| Home School | Date | Comments | Summer School | Date | Comments |
|---|---|---|---|---|---|
| | | | | | |

B. Academic Strengths and Needs (summarized statements)

Strengths: ____

Needs: ____

PPS-2 Rev. 88 [redacted]

| Student ID Number | [redacted] |
|---|---|

| School [redacted] | School System [redacted] | Date |
|---|---|---|

NAME Pike [redacted] (Last) [redacted] (Middle) (Nickname) BIRTHDATE 3 10 76 (Mo Day Year)

SEX: (M or F) RACE: [redacted] Asian ☐ Black ☐ Hispanic ☐ White ☐ Other ______

# PUPIL PHYSICAL [redacted] AND PERMANENT HEALTH RECORD

(APPROVED BY [redacted] EDUCATION AND DEPARTMENT OF HUMAN RESOURCES)

[redacted] the pupil when transferred.

I. [redacted] TEACHER UPDATES YEARLY

[redacted]

II. RECORD OF IMMUNIZATIONS (Enter date of EACH dose)

| VACCINE | #1 | #2 | #3 | #4 | #5 |
|---|---|---|---|---|---|
| DTP | 5/27/76 | 9/1/76 | 6/23/[redacted] | 9/19/78 | 9/17/81 |
| Polio | [redacted] | | | | |
| MMR | 9/2[redacted] | | | | |

[redacted]

Physician's Certification: [redacted] CHILD HAS RECEIVED THE IMMUNIZATIONS NOTED IN PART II.
[redacted] THIS CHILD HAS BEEN EXAMINED AND IS PHYSICALLY FIT TO ATTEND SCHOOL (EXCEPTIONS NOTED IN PART III).

PHYSICIAN'S SIGNATURE/DATE:

IV. PUPIL'S SCREENING RECORD

| VISION | | HEARING | | DENTAL | | SCOLIOSIS | |
|---|---|---|---|---|---|---|---|
| Date | Comments | Date | Comments | Date | Comments | Date | Comments |
| 5/9/89 | (L) 20/25 (R) 20/25 | 5/9/89 | Passed | 10/3/88 | No obiv. prob | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

000104

(Observations and Referrals on Opposite Side)

# PERMANENT HEALTH RECORD

______ County Schools

000105

| | | | |
|---|---|---|---|
| Pupil Name: Last-First-Middle<br>Pike, Christa Gail | Date of Birth<br>Mo. 3 Day 10 Yr. '76 | Sex<br>F | Race<br>A |
| Address<br>Rt. 1 Box 62 Beckley, WV 25801 | School<br>Cranberry-Prosperity | | |
| Pupil resides with: Name-Relationship<br>Pike, Carissa J. (Mother) | Telephones: Home-Business<br>253-5415 | | |
| Father/Guardian Name: Last-First-Middle Initial<br>Pike Emil G. | Occupation<br>Const. Worker | | |
| Mother/Guardian Name: Last-First-Middle Initial<br>Pike, Carissa | Occupation<br>LPN | | |

| | |
|---|---|
| Emergency Telephone Name-Relationship | Chris Fotos (Grandparents) 253-5415 |
| Physician | Telephone |
| Dentist | Telephone |
| Hospital | Telephone |

## VISION SCREENING

W - With Glasses
WO - Without Glasses
____ Color Blind

| Date | R. | L. | Both | Remarks-Type of Test-Examiner's Name |
|---|---|---|---|---|
| 12-14-81 | ✓ | ✓ | ✓ | Passed - Nina Runion |

## HEARING SCREENING

✓ Satisfactory x Unsatisfactory

| Date | R. | L. | Remarks-Type of Test-Examiner's Name |
|---|---|---|---|
| 2-22-81 | ✓ | ✓ | Passed - Rhonda Lester |

## OTHER SCREENING

| Date | Type | Results | Remarks-Examiner's Name |
|---|---|---|---|
| 1-14-81 | [illegible] | Passed | Robin McCallister |

## EMERGENCY TREATMENT PLAN

## IMMUNIZATIONS

Enter date of each dose by month, day, and year

| VACCINE | DATES | | | | | |
|---|---|---|---|---|---|---|
| DTP/Td | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-81 | ok |
| TOPV/IPV | 5-27-76 | 9-1-76 | 6-23-77 | 9-19-78 | 9-17-81 | |
| Rubeola (Measles) | 9-22-77 | | | | | |
| Rubella (Three-day measles) | 9-22-77 | | | | | |
| Mumps | 9-22-77 | | | | | |

DTP - Diphtheria, tetanus, pertussis
Td - Tetanus-diphtheria
TOPV - Trivalent oral polio
IPV - Inactivated polio

Recorded by:

## TUBERCULIN TESTS

N: Negative P: Positive

| Date | Type | Result | Date | Type | Result | Date | Type | Result |
|---|---|---|---|---|---|---|---|---|
| 9-17-81 | Tine | N | | | | | | |

## DENTAL SCREENING

✓ Satisfactory xx Moderate Defect
x Slight Defect xxx Marked Defect

| Date | Dental Inspection | Brush-In Program | Rinsing Program | Remarks-Examiner's Name |
|---|---|---|---|---|

007620

NORTH CAROLINA ANNUAL TESTING PROGRAM BASIC SKILLS

Name: PIKE, CHRIST G
Teacher: LEARNER J
School: GREY CULBRETH
School System: CHAPEL HILL CITY

Student ID: 111935
Grade: 8
Test Date: NOV 1, 1988
Packet ID: 81218

Writing, Grades 6 and 8

000106

Learning to write is an important educational goal for all North Carolina students. Measuring the skills involved takes time and thoughtful judgment. Students were given approximately 50 minutes to write about a given topic. Each paper was scored by two carefully trained, experienced readers. The scores reported below represent their combined judgment of this sample of the student's writing. Space is provided for this student's teacher to give additional information about other writing skills observed during the year.

The composition score shows how well this student expressed an idea without penalty for spelling or grammar. The second score is for English conventions and does represent a measure of this student's ability to use standard English.

| WRITING SKILLS MEASURED | SCORE | EXPLANATION |
| --- | --- | --- |
| Composing Skills (Communicating an Idea)* <br>• Having a main idea <br>• Providing supporting detail <br>• Showing organization <br>• Using coherence techniques | 2.5 | Some of the descriptive writing skills that are being measured are present in this paper. The writer does not exhibit control of the descriptive mode of discourse. Even though the subject is identified and a general idea of the subject is conveyed, there are insufficient specific details and/or the organization is weak. The two readers differed in their judgment of the level of skills present. |
| Conventions (Using Correct English)* <br>• Using complete sentences <br>• Using appropriate forms of words <br>• Using standard mechanics (punctuation, spelling) | ++ | The paper has a reasonable, acceptable level of proficiency in sentence formation, usage and mechanics. |

007621

*A FURTHER EXPLANATION OF THE TESTING AND SCORING MAY BE FOUND ON THE BACK OF THIS REPORT.

TEACHER COMMENTS:

I have reviewed this report and have made additional comments where necessary. Please, do not hesitate to contact me for a more detailed explanation of the scores or further assistance in this matter.

SIGNED

201000

PPS-3 (continued)

007622

| Student ID Number |
|---|

| School | School System | Date |
|---|---|---|

NAME ______ (Last) (First) (Middle) (Nickname) BIRTHDATE ______ Mo Day Year

SEX: (M or F) RACE: American Indian ☐ Asian ☐ Black ☐ Hispanic ☐ White ☐ Other ______

NORTH CAROLINA PUBLIC SCHOOLS

# SECONDARY STANDARDIZED TEST RECORD FORM

This form must follow pupil when transferred.

Enter secondary test results in date order sequence. Enter elementary test results on reverse of form. If entry typed or handwritten, scores should be labeled according to the following code: Percentile - %, Stanine - S, Grade Equivalent - G.E., Intelligence Quotient - I.Q. Any other type of test results should be explained: name of test, date given, and actual grade placement at time of testing should also be included.

If exceptional, note type of exceptionality:

GRADE 6.7
SPRING 1989

GREY CULBRETH
PIKE CHRIST G

| CAT E&F LEVEL 16 | TOTAL READING | TOTAL LANGUAGE | TOTAL MATHEMATICS | TOTAL BATTERY | | SPELLING |
|---|---|---|---|---|---|---|
| SCALE SCORE ▸ | 788 | 735 | 735 | 752 | | 708 |
| GRADE EQUIVALENT ▸ | 12.9 | 9.4 | 5.9 | 8.5 | | 5.2 |
| NATIONAL PERCENTILE ▸ | 93 | 71 | 40 | 73 | | 21 |
| NORMAL CURVE EQUIV. ▸ | 81 | 62 | 45 | 63 | | 33 |

681-5 8106-322 30114085 05/01 82505

| | |
|---|---|
| | PSAT |
| | SAT |
| | NC Competency Test (when passed) |

000107

NORTH CAROLINA ANNUAL TESTING PROGRAM BASIC SKILLS

NAME: PIKE CHRIST G
TEACHER: LEARNER J
SCHOOL: GREY CULBRETH
SYSTEM: CHAPEL HILL

# TEACHER REPORT

TEST LEVEL/FORM: 16/E
CTB STUDENT ID: 30114085
SOCIAL SECURITY:

LEA/REGION: 681-5
BATCH GROUP: B106-322/006
RUN DATE: 05/01/89
TEST DATE: SPRING 89

GRADE 6

342|535
342|535

## SUMMARY OF STUDENT'S SCORES

THIS STUDENT'S ACHIEVEMENT IN BASIC SKILLS IS BEST SUMMARIZED BY HER TOTAL BATTERY SCORE. HER TOTAL BATTERY SCORE IS BETTER THAN APPROXIMATELY 73 PERCENT OF THE NATION'S 6TH GRADERS AND HER OVERALL ACHIEVEMENT IS MOST SIMILAR TO THE AVERAGE ACHIEVEMENT OF THE NATION'S STUDENTS AT THE MIDDLE OF THE 6TH GRADE.

| TEST | SCORES (PERCENTAGE OF NATION'S 6th GRADERS WHO SCORED BELOW THIS STUDENT) |
|---|---|
| READING VOCABULARY | 88 |
| READING COMPREHENSION | 97 |
| TOTAL READING | 93 |
| LANGUAGE MECHANICS | 59 |
| LANGUAGE EXPRESSION | 78 |
| TOTAL LANGUAGE | 71 |
| MATHEMATICS COMPUTATION | 36 |
| MATHEMATICS CONCEPTS & APPLICATIONS | 45 |
| TOTAL MATHEMATICS | 40 |
| **TOTAL BATTERY** | 73 |
| SPELLING | 21 |

PROFILE OF STUDENT'S SCORES




### READING SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED TO:
32 IDENTIFYING DETAILS GIVEN IN PASSAGES
35 ANALYZING CHARACTERS IN PASSAGES
37 INTERPRETING EVENTS IN PASSAGES
38 DIFFERENTIATING BETWEEN FORMS OF WRITING
28 IDENTIFYING MISSING WORDS BY THEIR CONTEXT
27 IDENTIFYING THE MEANING OF AFFIXES

### LANGUAGE SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED TO:
54 IDENTIFYING COMPLETE SENTENCES
50 USING VERB FORMS
53 IDENTIFYING GRAMMATICAL PATTERNS OF SENTENCES
49 USING PERSONAL OR RELATIVE PRONOUNS
56 COMBINING RELATED THOUGHTS IN SENTENCES
51 USING ADJECTIVE OR ADVERB FORMS

### MATHEMATICS SKILLS

THIS STUDENT IS STRONGEST IN SKILLS RELATED TO:
74 UNDERSTANDING NUMBER SENTENCES
65 MULTIPLYING WHOLE NUMBERS
73 UNDERSTANDING NUMERATION
THIS STUDENT IS WEAKEST IN SKILLS RELATED TO:
70 DIVIDING FRACTIONS
67 MULTIPLYING FRACTIONS
69 DIVIDING DECIMAL NUMBERS

007623

**REASONING/THINKING SKILLS SCORE:** The CAT Test contains items that require drawing inferences or evaluating information (reasoning/thinking). These items were rescored to provide a general impression of how this student performed on reasoning/thinking skills items. The number of items this student answered correctly, along with examples of the reasoning/thinking type items, follow:

| NUMBER CORRECT | EXAMPLES |
|---|---|
| 41 OF 57 | READING: Based on the story, what will probably happen when Jack climbs the fence?<br>MATHEMATICS: If there are 4 pens in a box and 12 boxes in a case, how many pens are there in 3 cases? |

ESTIMATED OBJECTIVE SCORES

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| VOCABULARY | | | |
| 24 SYNONYMS | 85 | +24 | + |
| 25 ANTONYMS | 85 | +29 | + |
| 26 HOMONYMS | 95 | +23 | + |
| 27 AFFIXES | 97 | +19 | + |
| 28 WORDS IN CONTEXT | 98 | +23 | + |
| COMPREHENSION | | | |
| 32 PASSAGE DETAILS | 99 | +29 | + |
| 35 CHARACTER ANALYSIS | 99 | +20 | + |
| 36 CENTRAL THOUGHT | 97 | +26 | + |
| 37 INTERPRETING EVENTS | 99 | +24 | + |
| 38 FORMS OF WRITING | 99 | +31 | + |
| 39 WRITING TECHNIQUES | 96 | +33 | + |
| LANGUAGE MECHANICS | | | |
| PRONOUN I, NOUN, ADJECT | 81 | + 7 | + |
| BEGINNING WORD, TITLE | 73 | + 4 | R |
| PERIOD, QUEST., EXCLAM. | 71 | + 8 | R |
| 46 COMMA, COLON, SEMI, QUOT | 75 | + 6 | + |

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| 47 PROOFREADING | 73 | +11 | R |
| LANGUAGE EXPRESSION | | | |
| 48 NOUNS | 84 | +15 | + |
| 49 PRONOUNS | 92 | + 8 | + |
| 50 VERBS | 93 | +11 | + |
| 51 ADJECTIVES, ADVERBS | 87 | +13 | + |
| 53 SENTENCE PATTERNS | 93 | +26 | + |
| 54 SENTENCE RECOGNITION | 98 | +21 | + |
| 56 SENTENCE COMBINING | 92 | +16 | + |
| 57 TOPIC SENTENCE | 75 | +14 | + |
| 58 SENTENCE SEQUENCE | 87 | +18 | + |
| COMPUTATIONS | | | |
| 61 ADD. FRACTIONS | 50 | -13 | R |
| 64 SUBTRACT FRACTIONS | 58 | - 9 | R |
| 65 MULTIPLY WHOLE NUMBERS | 79 | 0 | + |
| 66 MULTIPLY DECIMALS | 52 | - 9 | R |
| 67 MULTIPLY FRACTIONS | 44 | - 9 | - |
| 68 DIVIDE WHOLE NUMBERS | 54 | -12 | R |

| OBJECTIVES | PER | DIF | AI |
|---|---|---|---|
| 69 DIVIDE DECIMALS | 49 | -11 | - |
| 70 DIVIDE FRACTIONS | 16 | -22 | - |
| CONCEPTS & APPLICATIONS | | | |
| 73 NUMERATION | 75 | + 3 | + |
| 74 NUMBER SENTENCES | 89 | + 5 | + |
| 75 NUMBER THEORY | 53 | - 6 | R |
| 76 PROBLEM SOLVING | 65 | - 2 | R |
| 77 MEASUREMENT | 53 | - 2 | R |
| 78 GEOMETRY | 74 | + 3 | R |
| SPELLING | | | |
| 40 VOWEL SOUNDS | 52 | -19 | R |
| 41 CONSONANT SOUNDS | 58 | -15 | R |
| 42 STRUCTURAL UNITS | 60 | -12 | R |

AN EXPLANATION OF THE OBJECTIVES TESTED MAY BE FOUND ON THE BACK OF THIS REPORT

○ TEST SECTION OMITTED

QTR MTH: 28 TRAD

82500

ESTIMATED OBJECTIVE SCORE LEGEND

PER—Estimated Percentage: CTB estimate of the percentage of items the student would answer correctly if the student took a large number of items measuring the objective (based on number of correct items for each objective and subtest score).
DIF—Percentage Difference: The difference between the CTB estimated percentage for this student and the estimated percentage for a typical student in the national norm group.
AI —Achievement Indicator: + = Objective Achieved (75-99%); R = Objective Partially Achieved (50-74%); — = Objective Not Achieved (0-49%); Blank = Items measuring objective were omitted.

NORTH CAROLINA SOCIAL STUDIES TEST

NAME: [illegible]IKE CHRIS[illegible] G
TEACHER: LEARNER J
SCHOOL: GREY CULBRETH
SYSTEM: CHAPEL HILL

GRADE: 06.7
FORM: A
CTB STUDENT ID: 30114085
SOCIAL SECURITY:

LEA/REGION: 681-5
BATCH/GROUP: B106-322/006
RUN DATE: 05/02/89
TEST DATE: SPRING 89

BASIC SKILLS

GRADE 6

## SUMMARY OF STUDENT'S SCORES

HE NORTH CAROLINA SCIENCE AND SOCIAL STUDIES TESTS ARE EACH COMPOSED OF 60 ITEMS WHICH SAMPLE A STUDENT'S CUMULATIVE SCIENCE AND SOCIAL STUDIES KNOWLEDGE TUDENT'S ACHIEVEMENT ON THESE BASIC SKILLS TESTS IS BEST SUMMARIZED BY HIS OR HER TOTAL TEST SCORES. THIS STUDENT CORRECTLY ANSWERED 49 OF THE SCIENCE IT 1 OF THE SOCIAL STUDIES ITEMS. HER SCIENCE TOTAL SCORE IS BETTER THAN APPROXIMATELY 88 PERCENT OF THE STATE'S SIXTH GRADERS AND HER SOCIAL STUDIES TOTAL S BETTER THAN APPROXIMATELY 24 PERCENT OF THE STATE'S SIXTH GRADERS. THEREFORE, HER OVERALL ACHIEVEMENT IS WELL ABOVE AVERAGE IN SCIENCE AND SLIGHTLY BEL VERAGE IN SOCIAL STUDIES AS COMPARED TO OTHER NORTH CAROLINA SIXTH-GRADE STUDENTS.

| TEST | SCORES: NUMBER CORRECT | SCORES: PERCENTAGE OF STATE 6TH GRADERS WHO SCORED BELOW THIS STUDENT |
|---|---|---|
| TOTAL SCIENCE | 49 | 88 |
| TOTAL SOCIAL STUDIES | 31 | 24 |

PROFILE OF STUDENT'S SCORES




The profile below shows scores on the broad areas of science and social studies. While these scores might be more valid on a longer test, the items that are included do give a g impression of how this student did in each area. The type of information covered in the test is best explained through examples shown on the reverse side of this form.

| AREA | NUMBER CORRECT |
|---|---|
| SCIENCE | 49 OF 60 |
| LIFE SCIENCE | 9 OF 12 |
| PHYSICAL SCIENCE | 11 OF 12 |
| EARTH SCIENCE | 10 OF 12 |
| NATURE OF SCIENCE | 9 OF 12 |
| PROCESS SKILLS | 10 OF 12 |
| SOCIAL STUDIES | 31 OF 60 |
| HISTORY | 8 OF 12 |
| GEOGRAPHY | 8 OF 12 |
| ECONOMICS | 5 OF 12 |
| GOVERNMENT | 2 OF 12 |
| ANTHROPOLOGY-SOCIOLOGY | 8 OF 12 |

PERCENTAGE CORRECT




* = TEST AND/OR TEST SECTION OMITTED

TEACHER COMMENTS: ____________________

I have reviewed this report and have made additiona ments where necessary. Please, do not hesitate to c me for a more detailed explanation of the scores or assistance in this matter.

SIGNED: ____________________
teacher/guidance counselor/prin

000109

11-17-87

TO: Stanford Middle School
301 Orange H.S. Rd.
Hillsboro NC 27278

Attention: Guidance Office

According to the Final Regulations-Family Educational Rights and Privacy Act (Buckley Amendment) dated June 17, 1976, it is no longer necessary to obtain written consent to release records between schools. It states that school officials, including teachers within the educational institution and officials of other schools in school systems in which the student may intend to enroll, may receive a students records without a written consent for such release.

Please send records including courses, grades, credits, test scores and health records on the following student.

Name: Pike, Christa

Birthdate: ____________________

Grade: 9

Thank you for your cooperation. Susan Belcher, LPC 9/28/90

Shady Spring Junior High School
P.O. Box 248
Beaver, West Virginia 25813

SHADY SPRING JUNIOR HIGH SCHOOL
OFFICE OF THE PRINCIPAL
BOX 248
BEAVER, WEST VIRGINIA 25813

BEAVER, WV
PM
OCT 1
1990
25813

Stanford Middle School
301 Orange High School Road
Hillsboro
North Carolina