# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 6**

**DOCUMENT 6**

---

FILED (4)
APR 07 2009
Clerk of the Courts
Rec'd by____

STATE OF TENNESSEE VS CHRISTA PIKE
CASE NO. 68280 EXHIBIT NO. 1-D
DATE 1-29-07 ID ✓ Evd ___

Interview with Mandy Staley, friend
Date: 2/11/96

Mandy said she could not believe the homicide happened. She never thought Christa's temper would get that far out of hand. Mandy's position is that Christa must have somehow been brainwashed into this.

Mandy talked about the Christmas break, when Christa was in North Carolina. Tadaryl called on the phone and Mandy talked with him while Christa was in the shower. They had a pleasant chat before Tadaryl told Mandy that he had something in his hand with which he could kill her in a hundred different ways. Mandy was a little taken aback by this. She gave the phone to Christa. Christa told Mandy that she and Tadaryl would sit up late at night in their respective dormitory rooms turning lights off and on with mind control.

Christa talked with Mandy about being "beaten" into a gang. This was called a "360." This involved walking down the middle of six guys who beat her for sixty seconds.

Christa told Mandy that Tadaryl was into devil worship. She began relating this to Mandy in her letters and phone calls. She told Mandy that Tadaryl gave her crystals which had lots of power. Mandy said Christa always had a strong imagination but does not believe she could ever get as wild as she was the night of the homicide without some help. Tadaryl gave Christa a book about devil worship which, by the time you got to the last chapter, there was reportedly no going back. Mandy said she told Christa she was crazy. However, Christa liked Tadaryl quite a bit and it is Mandy's opinion that Christa wanted to have something in common with Tadaryl, hence, her accepting of the devil worship thing. A guy could convince her of just about anything, said Mandy. For example, when they would go out with Orlando Powell to parties Orlando would say such things to Christa as, "I don't think you would dare spit in that guy's face over there and call him a punk," which Christa would immediately do. Another guy dared her to hit a guy in the face and challenge him to step outside, which she likewise did.

Mandy said she has known Christa since Christa was eleven or twelve. Christa could fight and was not afraid of anyone or anything.

Beth Brown called Christa and Mandy "nigger loving crack heads." Mandy and Christa went to Beth's house with Orlando, Jimmy, and a female driver. Christa knocked down her door and kicked her around some. Beth maced them and they left. Christa never does anything by herself, said Mandy. Mandy's position about this is that Christa probably wants to have someone there to verify the fact that she actually did it.

Mandy said that Christa's life has been "The worse. She's not had it easy." She talked about Christa being raped, Steve Kyaw beating on her, her father not being around, and so forth. She believes that Christa and her mother had a fairly good relationship despite having the usual mother/daughter disagreements.

Mandy talked about Kenny Clyde calling both herself and Christa to say he was going to come out and rape them, murder them, and bury them such that nobody would ever find them because Christa lived so far out in the country. After hearing this at length they told Clyde that they wanted to pick him up and talk with him. They took him to a dead-end road in the middle of nowhere. Mandy started talking to him angrily in hopes of making him angry so that she and Christa would be able to follow through with what they had planned. They picked up sticks and started beating him. Christa, she said, has an explosive temper and really lost control, with Mandy having to restrain her. The next day Christa did not remember all that had happened.

Christa was really over-impressed with Tadaryl, said Mandy. She thought Tadaryl loved her. Now she only mentions him now and then. Christa is the kind of person who would cover for someone to keep them from getting into trouble and Mandy said she would do the same for Christa. Sometimes Christa has gotten so angry that she cannot remember the next day what happened, such as details of the Kenny Clyde incident. When no one is around who really knows Christa it is impossible to calm her down, said Mandy. In fact, said Mandy, you cannot even touch Christa when she is angry if she doesn't know you.

Mandy is of the opinion that Christa has never before been in a situation where someone egged Christa on rather than calming her down. Christa has talked about Tadaryl wearing a cast on the night of the killing but having it off the next day, apparently something Christa had told her. Christa has told her that this is because the cast had Colleen's blood on it and he was trying to get rid of it.

Mandy said Christa used to be very loose sexually and related this to her poor self-esteem. She thought the only way to get close to a guy was by having sex with him at about age seventeen she realized that if this is what it took that he wasn't worth it and started going with just one guy at a time.

Mandy was working at a drycleaners until her boss called her stupid, she went off, got in his face, and cussed him. She was kicked out of school in the ninth grade because of "doing so many bad things." She failed the second grade. Last year at the age of eighteen she was charged with possession of marijuana. She lives at home and is not dating anyone regularly. Her parents split up before she was born. Her stepfather entered her life seven or eight years ago. Although she had a rough time with him at first she loves him now and said he is the closest to a father she has ever had. She started using drugs at about age twelve, getting them from her older brother, Chris. She first smoked marijuana at age thirteen.

# 32

Interview with Peggy Hamlett, Juvenile Court Counselor, Ginny Satterfield, Court Counselor, and Rose Wilson, Juvenile Court Psychologist
Date: 2/12/96

Peggy Hamlett said the files at Juvenile Court are destroyed when the children turn eighteen. She stated that she has never known Christa to be as violent as this homicide would reflect. Christa was always involved with someone else whenever she was in any kind of trouble. Peggy had a hard time getting her hands on Christa because whenever she would go to meet with her, Christa would usually be gone.

Peggy said that although Carissa came across as wanting help that she became aware after Christa entered Swannanoa that her mother was really a very bad role model. Christa did not seem to be a priority for Carissa. She would say she wanted to be in parenting classes and wanted help for Christa but would never follow through. This was a real issue for Christa, who would often talk about this. Her mother did not hardly visit her at all when she was in training school.

Swannanoa considered transferring Christa to Dillon, a facility that had higher security. Christa apparently was in quite a bit of trouble, stopping up the commodes with toilet paper, for example. She seemed to do well until she was close to discharge, then she would act up again. This happened several times.

Peggy was aware that Christa was involved in several fights when she was in middle school. Christa was never disrespectful to Peggy's face. She said it was because Carissa did not follow through on Christa's appointments with the Department of Mental Health that Christa became more of a juvenile court issue.

Peggy was aware that Christa always wanted to be a nurse. She seemed truly sincere about the Job Corps, her one hope. Peggy believes Christa was aware that she could not count on her mother too much.

Peggy said that Christa's promiscuity was a problem. Carissa complained constantly about Christa bringing boys to her house when she was not there. Peggy is aware that once when Christa ran away with Brandie that she was with boys.

Peggy terminated her supervision of Christa after she entered the training school. Regarding the Kenny Clyde incident, she stated that, "Kenny Clyde was scum." He was well known to the community as a peeping tom, voyeur, and child molester. Apparently, Clyde exposed himself to Peggy and she has no use for him. She is not aware of Christa ever being involved in any kind of lesbian activity.

Peggy said that they saw Christa at juvenile court as bright, capable, and as going downhill fast.

Christa would never hide her misbehavior but Peggy does not know if she would actually take the blame for others. Christa was starved for attention because of her mother's neglect of her but Peggy is not aware of whether she specifically wanted male attention.

Ginny described Christa as sneaky and manipulative. Christa was at Sheaffer House, where Ginny was director at the time, for ninety days. Christa was smart enough to play the system, said Ginny, sitting back and instigating much of the time. She did volunteer work at a nursing home, Carrolwoods, going daily to this and initiating it on her own. There was a part of Christa, said Ginny, that enjoyed doing this kind of work.

Ginny described Christa as living in the moment, being easily bored, and desiring immediate gratification. She told a story of Christa and two others sneaking out and with Christa probably being the instigator. Ginny has a bad feeling about Christa, describing her as a back stabber. She would say one thing to you, be friendly, and then turn around and say something different. She was never actually violent at Sheaffer House. She would take responsibility when she was caught for her misdeeds. Ginny does not know whether or not she would ever take the blame for others.

Rose did psychological testing on Christa. Rose is of the opinion that Christa led Brandie on and was the instigator of their misdeeds. Brandie was always amazingly close to Christa.

Rose knew of Brian Wilson, the young man with whom Christa lived on the streets. Brian, she said, has had very severe psychiatric problems, being in and out of mental institutions since the age of ten. Bright and articulate, Brian has a sensitive side to him and she could see that Christa would be drawn to him like a moth to flame.

Rose said the point of her psychological with Christa was to try to get her into some kind of treatment program, such as a wilderness program. Apparently, the original plan was to do something therapeutic with Christa before and after the training school experience, such as a wilderness camp. Unfortunately, Christa would have had to apply before her sixteenth birthday but Christa's behavior was so abysmal at the training school that she exceeded her sixteenth birthday before application could be made.

When Rose saw her in detention Christa was anxious and contrite. She said that Christa described no attachment to anyone, such as to her mother, for whom Christa seemed to be just too much trouble. Her father was hard on her and her sister, Alicia, was reportedly cruel to her. Rose is of the opinion that Christa

never had much in the way of role models to help her learn to control negative feelings. She believes that Christa must have been pretty scared and that in response she took a tough role, tattooing on her hand "Number One Bitch" to prove how tough she was and that she could take on the world. She was scared about what was going to happen to her and the path she was on. She predicted to Rose that she would end up dead or in jail. Rose said she comments in her report about Christa believing she has no control over her impulses. Christa was Rose's first client at juvenile court.

# 33

Interview with John Martin, Attorney
Date: 2/12/96

Mr. Martin said he represented Christa in the incident regarding Kenny Clyde. He found her to be "a very nice child." He believes that she is easily led by her friends and subject to peer pressure. Mr. Martin does not believe Christa "hatched the plan" involving the killing of Colleen Sleemer, in view of what he knows about Christa. He had a good deal to say about Kenny Clyde, who is now in Dorothea Dix, apparently a mental hospital in Raleigh. Clyde, he said, was in court every week or so on sexual charges and is now locked up for good.

At the time of the Kenny Clyde incident, the judge reportedly dismissed the charges of assault against Christa and thanked Mr. Martin for defending Christa. The judge reportedly commented that it looked like he had scared off Clyde since he did not show up for court. Later Clyde showed up at the district attorney's office and asked why Christa had not been put in jail. The district attorney reportedly told Clyde that he was a bad witness who consistently violated probation by making harassing phone calls to victims or intended victims.

Mr. Martin said Christa's family was always supportive of her and seemed to take a genuine interest in her.

Interview with Matthew Martin, Attorney
Date: 2/12/96

Mr. Martin represented Christa, who was his first client to be remanded to a training school. He was very upset about this, thinking the judge had made a mistake with Christa, who he saw as a sweet, bright, and inquisitive girl. She was appropriately dressed and kept appointments. He was so upset by her going to a training school that he went to Asheville to visit her. He thought she was doing fairly well there. She would write him and even came to see him after she left the training school.

Mr. Martin said that he never thought her behavior would escalate to murder but thought that she might someday be arrested in view of the statement she wrote to him about probably being in prison later in life.

Mr. Martin said that Christa's mother did not seem to be "together." There was quite a bit of friction between Christa and her mother. He thought her stepfather seemed to be a pretty nice guy. Mr. Martin said he has seen Christa get angry but never "go off." He would never have predicted this.

Mr. Martin knows nothing about Christa and the likelihood of satanic involvement. He knew that Christa ran with other girls and that when they were on the run they would break into empty apartments and possibly engaged in what he described as "teenage orgies."

He wanted her at Camp Woodson but every time she got close to going, she would mess up.

Interview with Detective Benjamin Frederick with the Hillsborough Police Department
Date: 2/12/96

Contrary to what Carissa said, Detective Frederick has no recollection of ever mentioning to Carissa that Christa was involved in prostitution. He said that in 1991 he is aware that she ran away from home perhaps seven or eight times. Her name came up now and then but she was not one of their major problems and they mainly dealt with her as a runaway. Once he worked a case involving a wallet disappearing and Christa's name was one of the names that came up but she was not charged. He said that they consider someone a major problem when they are committing crimes, not running away. He assumed there must be some kind of problem at home between Christa and her mother.

Detective Frederick is aware of Christa and another girl assaulting a guy. He does not think she intended to kill that person. He is aware that this person got a good beating but knew this individual to be pestering Christa and some of her friends. Said Detective Frederick, "I couldn't swear that individual didn't need it." He said that once the police department arrested an adult for assaulting Christa, Steve Kyaw.

Interview with Peter Kramer, MSW
Date: 2/12/96

Mr. Kramer stated that his contact with Christa was limited. Chuck Helton at Kaiser Permanente saw her first in 1991, then Mr. Kramer, and then juvenile court took over. He said he first met Christa in the eighth grade when she was in a peer support group at Stanford Middle School. She only actually attended once or twice because she stopped coming to school.

On 5/31/90 Carissa and Christa met with a co-worker, Andy Mulcahy, for the purpose of a screening. In 1991 she came with her mother and met with Mr. Kramer and then for the third visit just Carissa came and met with Mr. Kramer. He thought Carissa to be "pretty appropriate." He made a recommendation to Carissa on 10/9/91 that she get insurance to cover inpatient treatment of Christa and that she herself enter therapy but this was never done.

His clinical impression of Christa was that she was a child with fairly serious issues in the realm of sexuality based on a report that a social worker from the Department of Social Services, Howard Lee, made that Christa may have been sexually abused by someone and that she in turn may have sexually abused her father's children. Christa's presenting problems, he said, was that she was missing school and running away from home. She had already been arrested for breaking and entering and put on probation for twelve months by the time he saw her. He speculates she was referred to him by Peggy Hamlett at Juvenile Court. Peggy told him that Christa was using marijuana and alcohol and also gave him the information regarding the sexual abuse. He said that he never actually brought up the sexual abuse issue with Christa and that Carissa told him she had never discussed this with Christa either. His agency diagnosed Christa as having a conduct disorder and drug abuse problem, ruling out post traumatic stress disorder. He thought she showed poor impulse control and that Carissa was unable to provide limits. His treatment of Christa stopped when she was remanded to training school and also because on 10/23/91, at which point the extended screening was over and she was to become a client, Christa ran away.

Mr. Kramer clarified that although he thought hospitalization of Christa might help contain her and help her deal with the sexual abuse and drug issues that he was also coming around to the point of view that any kind of containment might help, such as training school. He had heard rumors that Christa was in over her head regarding sex and drugs and that she was associating with much older individuals. He said he stands by his recommendation regarding her need for treatment, believing her to be a damaged child who needed help in learning to develop controls.

008093

# 37

Interview with Kerry Clement
Date: 2/12/96

Kerry is now a family specialist worker, in effect a school social worker. At the time she knew Christa she was a child protective services treatment worker. She became involved with this family after Steve Kyaw left marks on Christa. Carissa, she said, was very frustrated because Christa was not following the rules at home. Steve was being relied upon by Carissa for childcare and Steve and Christa were often involved in power struggles. Carissa had taken the child to Dr. Straw for counseling. Carissa's discipline at home was poor. She would set limits and not follow through. She was invested in different men and did not seem to have the time for Christa.

At least twice Kerry recollects she and Carissa going around the neighborhood with photos of Christa, who had run away. Christa seemed to have a fairly good network of friends and was never found via this method. Christa seemed to be into thrill seeking behavior and just could not seem to stand being at home. She was heavily into huffing Renuzit Air Freshener at the time.

After Christa was sent to Swannanoa Kerry said she lost contact with Christa. She believes Carissa moved to Durham for a few months after this before coming back to the Hillsborough area. Kerry is aware that Christa did not see her father a lot although does know that she briefly stayed with her father following the Steve Kyaw incident. She does not believe that Christa had much contact with her old sister, Alicia. She does recollect something about Alicia thinking Christa had molested her child.

Friendship, said Kerry, has always been very important to Christa. Everything she ever heard about Christa seemed to involve some sort of "team effort." She was always involved with her misdeeds with someone else. In a way, she seemed to Kerry to be kind of proud of the incidents, as though these contributed to her tough girl image. Generally she had no consequences for her misbehavior until she was sent to Swannanoa. Her misbehavior certainly got her mother's attention and perhaps was the reason for Christa's behavior. Kerry said she does not think that Carissa herself wanted to be grown up and yet she had this daughter she was compelled to parent. The few times Kerry ever saw Carissa and Christa together they seemed to be fairly happy. She drew up contracts between mother and daughter but there were always excuses from Carissa as to why she could not follow through.

Kerry had never heard anything about Christa being involved in Satanism.

Kerry said that Christa probably only went to Kaiser Permanente with Chuck Helton two or three or times because the policy of this assistance program is to just see people a few times.

Kerry said they were concerned about Christa being so sexually active. Although she denied it to them, considering the situations in which Christa was so frequently involved it was likely she was promiscuous.

Kerry is surprised about Christa being involved in this incident. She herself is of the belief that Christa would have ended up somehow killing herself with drugs. When she worked with Christa

there was always a good deal of anger directed toward society in general but no real violence toward anyone. She never worried about her safety when she was with Christa.

008096

Interview with Detective Gerald Castle, Orange County Sheriff's Office
2/12/96

Det. Castle said he has no recollection of Christa. He said he knows her name but cannot picture what she looks like. He searched the missing person files and found two missing person reports on her from 1993 and 1994 when Christa was a juvenile. In North Carolina, missing juveniles are not picked up after the age of 16. Det. Castle said Christa may have been charged with other things, but if so, he cannot tell.

008098

Interview with Chris Fotos, cousin
12/11/95

Chris said that Christa said she believed in God and that she wanted to go to heaven. She said something about the Devil being more than God is right now, or someone was giving her more than God.

# 40

Interview with Alicia Wills, sister
Date: 2/26/96

Alicia said that Carrie understood how her mother was when she lived in West Virginia but did not know how things were in Flint Ridge Apartments, when Christa really started getting into trouble. Alicia said her mother tried to do what she could but Christa would steal her car at night when she was about fifteen and leave the house. Christa and her friends were inhaling aerosols and using crack. She thinks that Christa had a lot of problems. Alicia knew that Christa was smoking cigarettes from the third grade on.

Alicia thinks the second time Christa claimed to be raped was true but does not believe it was true when she was nine or ten. Alicia had just had a baby and had come to North Carolina to be with her mother. Keith was getting most of the attention and she thinks this was hard on Christa, who was used to being the baby.

Christa's father never cared for her and never gave her any attention. Both grandmothers raised the girls. Alicia feels as though she was her own parent. Zola was an alcoholic and she was only with Carrie for about two years. Her mother tried to take control of Alicia when she was thirteen but by then it was too late.

Alicia denied ever telling Carrie she wanted to get pregnant. She said she really got pregnant by mistake. She did confirm that she thinks of Carrie as her mother figure and has sent her Mother's Day cards.

When Grandmother Pike died it was to Christa as though her mother had died and she was on her own, as Alicia was. Alicia believes what hurt Christa the most was going back and forth from one parent to the other. Alicia and her mother argued an awful lot over Christa because Christa had such incredible misbehavior but then her mother would do nothing about it. Carissa was very lax in setting limits and never following through on anything. She kept trying to be Christa's friend. She tried to do things with Christa, such as go shopping with her, in an effort to be her friend. Christa was always too interested in boys.

Alicia said she was promiscuous at a young age because sex was so glamorized. Her mother was with so many men that Alicia thought this was the thing to do.

Alicia said, "I definitely feel that there but for the grace of God go I." Christa never cared about anything, but Alicia said she herself always had a sense of responsibility. Christa and Alicia were never close. Alicia feels Christa was jealous of her because she felt that Alicia had it so much better. Alicia acknowledged that living with Carrie made things better for her. She said she would look at Carrie and think, "This is the kind of person I want to be." At the

same time she would look at her mother and think, "I don't want to grow up to be like her."

Christa told Alicia, when Alicia was scolding her one time about her behavior, that she hoped she is dead by twenty-five.

It bothered Alicia that Christa consistently would earn points at Swannanoa and get close to being discharged and then would mess up. When she left the training school her mother laid ground rules for her but Christa did not stick to them.

Carissa and Gerard still drink on weekends. They used to drink nightly.

Christa probably felt her mother loved herself more than she did Christa.

Alicia said that she used drugs, too, when she was a teenager and has been drug free for four years. She has never used heavy drugs. She avoided alcohol because of the example of her mother and grandmother.

Christa grew pot and not that long ago, probably right before she entered the Job Corps. She planted them in the woods and one day Alicia saw her sunning them. Alicia told her mother because she was afraid her mother might lose her LPN license, and Carissa destroyed them. In retaliation, Christa destroyed her mother's tulips.

Lots of time, said Alicia, she would get so angry at Christa that she wanted to kill her. She tried letting Christa stay at her house but it did not work out because she could simply not trust Christa. She believes Christa to be a back stabber, being nice to your face but stabbing you in the back once you turn your back on her. Alicia never trusted Christa to be alone with Keith although does not think she actually sexually abused him. However, she always thought Christa was capable of this. Christa sometimes looked at pornographic magazines and was promiscuous. She thinks that Christa said something once to Keith about his penis being a pickle. Christa often bathed Keith, and Alicia does not know whether she ever did anything to Keith or not but never really suspected this.

Alicia acknowledged that she herself grew pot plants when she was fourteen. Regarding her grandfather, Chris Fotos, Alicia said he would get up at 4:00 A.M. and be at work by 5:00 or 6:00 A.M. He spoiled them, constantly buying them things, but never played with the grandchildren.

Alicia said she smoked marijuana with her mother when she was nineteen although her mother never smoked pot very much. Her mother stressed to her not to tell Christa. Alicia smoked pot with Christa when Alicia was about fifteen.

Alicia described her Aunt Norma as "just crazy." She never did anything to Alicia except yell at her and sometimes shake her. Alicia would make fun of her.

Christa was a kleptomaniac who would steal every time she went to the store. She has been like this since grade school. She lies because she wants everyone to like her. She used to visit nursing homes with her mother and everybody loved her.

Brian and Alicia were parents to Christa and Carissa after they moved to North Carolina. Alicia believes she herself had it together a lot more than her mother did.

Zola had lots of surgeries, cataracts and ear surgery, and Carissa had to care for Carrie all the time and this is when she learned to cook.

Alicia remembered the Bubble Yum doll incident. She felt real bad for Christa then. Alicia and Christa got into a fight and in retaliation Christa colored all over Alicia's doll. Alicia told Glenn and he broke the arms and legs of this doll. They tried to put it back together again.

Christa loved animals but after she started abusing drugs she became real mean to the cats at home, swinging them around by the tail.

Christa and Alicia only got high twice because Christa "totally flipped out." She went from one mood to the other, about five or six moods. Alicia has never seen anyone like this before.

Alicia has seen Christa go into a rage. Once when she was home with Christa, Christa refused to do the dishes and Alicia took her hands and made her do the dishes. Christa, fourteen at the time, flipped out, grabbed a knife, and started chasing Alicia with it. Alicia grabbed the knife and threw it down but Christa ripped all the buttons off of Alicia's shirt. Alicia is convinced that Christa did not know what she was doing. Alicia said she has always been stronger than Christa, and she carried her into her room and held the door so she could not get out.

Christa was always dirty and did not like to bathe until she met Brandie and Mandy, when her hygiene improved. She never cared for her hair until she got older. Her room was always a mess, with Christa sticking dirty underpants back in drawers, for example.

Christa always watched horror movies and Carissa and Kathy would watch these movies with her.

Christa often took up for others if she was in trouble. She does not really seem to care very much for herself and probably does not really think it matters. Alicia has known Christa to take up for a guy when the two of them have gotten into trouble together. For example, she told a story about Christa and some boy stealing something and Christa saying it was all her idea.

Christa and Alicia were home together over Christmas before the killing. Christa was in a lot of conflict about going back. Alicia said that Christa has a legitimate interest in taking care of people and being a nurse. Carissa told Christa she did not have to go back and Carissa and Alicia got into a big argument because Alicia took the position that Christa never finishes anything and should be made to go back.

Alicia said she has a very short temper but it is not as bad as it used to be.

Danny Thompson was verbally abusive of their mother and physically abusive to both Alicia and Christa, which Carissa and Danny argued about.

Alicia was married to Brian Hammond on December 28, 1988 and divorced in October 1993. James Ferguson is forty-five and he was born August 25. Alicia married Matthew Wills August 25, 1994.

Alicia finished by saying, "Christa is crazy. I don't think she intended to kill that girl but she needs to be where she is. I've always felt sorry for her."

# 41

Interview with Carissa Hansen
Date: 2/26/96

Carissa said she knows nothing about an ambulance coming to the skating rink to take care of Christa because she hyperventilated, but Gerard vaguely remembers something about this. She did confirm that Christa had lots of nose bleeds as a child. She herself did not see Christa having increased nose bleeds when she was inhaling aerosols but a friend of Christa's told her because she was so concerned about the nose bleeds.

Carissa had Aunt Norma take care of the girls when she was desperate for a baby-sitter. Christa complained about Norma hitting her and after Carissa heard this she never allowed Norma to baby-sit again. When Carissa was little Norma pulled her hair.

Carissa talked about the party Christa threw when she was fourteen or fifteen. Carissa was going to West Virginia for the weekend and Christa planned on spending the weekend with a friend she had met at Sheaffer House. Carissa talked to the friend's mother, who said that she wanted Christa for the weekend. However, this mother called Carissa in West Virginia to say she went to pick up Christa, and Christa said she was going to go to West Virginia instead. The mother was suspicious of this because she could see children entering the house and suspected Christa was going to have a party. Carissa called Brian and asked him to check because she thought Christa was going to have a party.

Over Christmas Christa talked to Carissa about Tadow, apparently Tadaryl. She told her mother she had a boyfriend but did not say it was Tadow and did not mention he was black.

Danny Thompson may have whipped Christa one time and that was probably when Carissa left him, she thinks. She does not know if Danny has a criminal record. Carissa believes she visited Christa at Swannanoa once a month.

Carissa confirmed that she had to care for Carrie quite a bit during childhood because of Zola's surgeries.

000554

S. Hrg. 104-12

# JOB CORPS OVERSIGHT

## HEARINGS

BEFORE THE

## COMMITTEE ON LABOR AND HUMAN RESOURCES UNITED STATES SENATE

ONE HUNDRED FOURTH CONGRESS

FIRST SESSION

ON

EXAMINING PERFORMANCE, ACCOUNTABILITY, AND THE INCIDENCE OF VIOLENCE AT JOB CORPS SITES

JANUARY 18 AND 19, 1995

Printed for the use of the Committee on Labor and Human Resources

008108

U.S. GOVERNMENT PRINTING OFFICE
87-272 CC WASHINGTON : 1995

## COMMITTEE ON LABOR AND HUMAN RESOURCES

NANCY LANDON KASSEBAUM, Kansas, *Chairman*

| | |
|---|---|
| JAMES M. JEFFORDS, Vermont | EDWARD M. KENNEDY, Massachusetts |
| DAN COATS, Indiana | CLAIBORNE PELL, Rhode Island |
| JUDD GREGG, New Hampshire | CHRISTOPHER J. DODD, Connecticut |
| BILL FRIST, Tennessee | PAUL SIMON, Illinois |
| MIKE DeWINE, Ohio | TOM HARKIN, Iowa |
| JOHN ASHCROFT, Missouri | BARBARA A. MIKULSKI, Maryland |
| SPENCER ABRAHAM, Michigan | PAUL D. WELLSTONE, Minnesota |
| SLADE GORTON, Washington | |

SUSAN K. HATTAN, *Staff Director*

NICK LITTLEFIELD, *Minority Staff Director and Chief Counsel*



000555

# CONTENTS

## STATEMENTS

JANUARY 18, 1995


| | Page |
|---|---|
| Kassebaum, Hon. Nancy Landon, a U.S. Senator from the State of Kansas | 1 |
| Pell, Hon. Claiborne, a U.S. Senator from the State of Rhode Island | 2 |
| Kennedy, Hon. Edward M., a U.S. Senator from the State of Massachusetts | 3 |
| Harkin, Hon. Tom, a U.S. Senator from the State of Iowa | 4 |
| Wheeler, Rhonda, Ventura, CA, and Fred Freeman, Jr., Carlisle, PA | 5 |
| Peterson, Gerald W., former assistant inspector general, U.S. Department of Labor, Washington, DC; Randall Godinet, Oceanside, CA; Shirley D. Sakos, Piscataway, NJ; and Ron Stallworth, Department of Public Safety, Salt Lake City, UT | 19 |
| Anderson, Karen, St. Paul, MN, and Luis Melendez, New York, NY | 41 |


## APPENDIX


| | |
|---|---|
| Statements, articles, publications, letters, etc.: | |
| Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah | 53 |
| Gerald W. Peterson | 55 |
| Ron Stallworth | 58 |
| Luis Melendez | 70 |
| Letters to Senator Kassebaum from: | |
| George E. Foreman | 54 |
| Rev. Wayne Hoehns | 55 |
| Gov. Michael O. Leavitt | 74 |
| Senator Sarbanes | 75 |
| Senator Reid | 76 |
| Senator Daschle | 77 |
| Senator Levin | 77 |
| Senator Johnston | 78 |
| Senator Inouye | 79 |
| Senator Murray | 80 |
| Senator Conrad | 80 |
| Senator Boxer | 81 |
| Gov. Terry E. Branstad | 87 |
| Letters to Senator Simon from: | |
| A.L. "Mike" Monroe | 86 |
| Carolyn Parker | 87 |
| Article—Dallas News—"Trouble at the Corps" | 64 |
| Letters to Senator Harkin from: | |
| Jean Espinosa | 88 |
| Teresa A. Drummond | 89 |
| Marietta L. Kibbie | 91 |
| Mandy Weber | 91 |
| Jean Ann Rogers | 92 |
| Kendra Mallek | 93 |
| Dody Barnes | 93 |
| Derrick Sanders | 94 |
| Annette A. Odvody | 95 |
| Ed Wisdom | 95 |
| Robert Huisinga | 96 |
| Amanda Owen | 96 |
| Tammy Ribbink | 97 |




008109

Page

Letters to Senator Harkin from—Continued
- Amy Douthit ..... 98
- Shannon Sorey ..... 98
- James Henderson ..... 99
- Courtney Davis ..... 100
- Todd Alan Dumdei ..... 100
- Amanda M. Wagoner ..... 102
- Stacie Hall ..... 103
- Marco Hogue ..... 104
- William Thompson ..... 105
- Kim Wingate ..... 107
- Kathie J. Donahue ..... 107
- Beverly Elizabeth Herron ..... 108
- Amanda Jurgens ..... 108
- Tonya Morgan ..... 109
- Karrie Weaver ..... 109
- Andrea Adney ..... 110
- Karlene Jansa ..... 111

## STATEMENTS

JANUARY 19, 1995

Page

Kassebaum, Hon. Nancy Landon, a U.S. Senator from the State of Kansas ..... 113

Kennedy, Hon. Edward M., a U.S. Senator from the State of Massachusetts ..... 115

Deering, John P., admissions counselor, Job Corps, region 5; Larry King, Forest Service Council, CCC center director, Pine Knot, KY; Dr. Robert Belfon, Piscataway, NJ; and John C. McKay, TX ..... 115

Ross, Doug, Assistant Secretary for Employment and Training, U.S. Department of Labor, Washington DC; and Peter Rell, Director, Job Corps, U.S. Department of Labor, Washington DC ..... 134

Coleman, Hon. Ronald, a Representative in Congress from the State of Texas ..... 152

Gadsden, Curtis, director of worldwide marketing for high-end storage devices, IBM Corp., Mahwah, NJ; Mary S. Young, director, Carrasco Job Corps Center, El Paso, TX; and Jamison Gorby, Red Rock Job Corps Center, Lopez, PA ..... 154

## APPENDIX

Statements, articles, publications, letters, etc.:
- John Deering ..... 163
- Robert Belfon ..... 163
- John C. McKay ..... 165
- Curtis Gadsden ..... 167
- Suzanne Smith ..... 169
- Larry King ..... 175
- Doug Ross ..... 176
- Jamison Gorby ..... 191

Letters to Senator Kassebaum from:
- Scott Marquardt ..... 168
- Michael D. Empey ..... 169
- Michael T. (Mickey) Pablo ..... 171
- John McKay ..... 174
- Senator Leahy ..... 175
- Harvey L. Arrowood ..... 194
- Doug Ross ..... 197

Letter to Senator Bennett from Doyle E. Talbot ..... 169

Letters to Senator Baucus from:
- Crisco Stahl ..... 172
- Ayleen and Thomas Bain ..... 173
- Mary L. Tevebaugh ..... 173

Letters to Senator Simon from:
- Wilma P. Mankiller ..... 187
- International Brotherhood of Painters and Allied Trades ..... 188
- John O. Crosby ..... 188
- W. Lamar Houston ..... 189





Page

Letters to Senator Simon from—Continued
- Luis R. Mier ..... 189
- Mary A. Yanez and Armida Navarrete ..... 190
- Jose L. Aguilar ..... 191

Letter to Representative Obey from Harvey L. Arrowood ..... 195

Affidavit of Christie Miller ..... 204

008110

# JOB CORPS OVERSIGHT

**WEDNESDAY, JANUARY 18, 1995**

U.S. SENATE,
COMMITTEE ON LABOR AND HUMAN RESOURCES,
*Washington, DC.*

The committee met, pursuant to notice, at 9:55 a.m., in room SD–430, Dirksen Senate Office Building, Senator Kassebaum (chairman of the committee) presiding.

Present: Senators Kassebaum, Jeffords, Coats, Frist, DeWine, Ashcroft, Gorton, Pell, Dodd, Simon, Harkin, and Wellstone.

## OPENING STATEMENT OF SENATOR KASSEBAUM

The CHAIRMAN. It is a few minutes early, but since everyone is in place, I think we will go ahead and call to order the hearing this morning, which is the Job Corps oversight hearing.

I would just like to say a couple of words first about this hearing, which will be one of two on the Job Corps program. This follows up on the oversight hearing that was held last October, which I think is an important responsibility of this committee on all of the areas over which we have oversight. We must be able to look at it in an objective and thoughtful way and analyze both the strengths and weaknesses of whatever initiative we are undertaking.

At the outset, I would like to thank the ranking member, Senator Kennedy, for agreeing to call that hearing last fall when he was chairman of this committee, and it is my regret that he has to be away today. I know he shares my interest in seeing that the Job Corps as well as any of the other Federal job training programs meet high standards and perform in a cost-effective manner.

Job Corps is the oldest and most expensive Federal training program designed to help economically disadvantaged youth. It is also considered to be the best program of its kind. Labor Secretary Reich has described it as "the jewel in the crown of the Federal job training programs."

Certainly there are many centers throughout the country that are performing effectively. These centers are offering skills training and education that are making a difference in the lives of many young people. Tomorrow, in fact, we will hear from the director of one of these centers.

The goal of these hearings is to take a balanced, in-depth look at the realities of the Job Corps, the good and the bad. My own goal is neither to tear down the successes nor gloss over the failures. It is to determine what works and what does not, so that Job Corps performs as intended, not merely as we hope it might.

A central issue is whether we want Job Corps to be a quasi-corrections program or a training program. It has become a bit of each. The goal has become blurred and the mission, I would suggest, is ambiguous.

There is growing evidence, however, that the rave reviews given Job Corps as a whole are based more on faith than on fact. Prior to the October hearing, the committee had not taken a close look at the Job Corps program in over 10 years. During that time, the program has enjoyed the strong support of Republicans and Democrats alike, despite a steady stream of negative reports issued by the Department of Labor's Inspector General, going back into the late 1980's. Both parties share the responsibility for turning a blind eye toward the disturbing picture drawn by these reports.

Last fall's hearing offered a sobering account of low performance and poor accountability in the Job Corps, underscoring problems identified and documented by the inspector general. We learned, for example, that with an annual budget of $1.1 billion, Job Corps costs $23,000 per student per year; yet it only places 12 percent of those students in the jobs for which they are trained.

We also found that 50 percent of Job Corps students drop out of the program after the first 6 months.

We can no longer focus only on the success stories while sweeping the failures under the carpet. To do so is a disservice to the American taxpayer and, more importantly, to the young people who see Job Corps as a beacon of hope for their futures and who are committed to making their dreams a reality.

Unfortunately, in far too many cases, these hopes are being dashed. The dreams of training and a good job are being replaced by the nightmare of an environment which tolerates unacceptable behavior in the interest of keeping up the numbers.

Following last October's hearing, individuals from throughout the country began calling my office to offer disturbing accounts of activities within many Job Corps centers. I realize one has to be very cautious about calls of that nature, because some have vendettas that they wish to exercise. But I think the most troubling is the pattern of uncontrolled violence which has been a common thread among so many of these accounts.

Just this past weekend, a Job Corps student was brutally murdered, and three other Job Corps students are being held for the murder in Knoxville, TN. Sadly, this is not an isolated case.

Several of the witnesses who will appear today will tell their own stories about the violent actions which drove them away from the opportunity they thought they had found in Job Corps. I believe their testimony will offer a vivid portrait of the realities which lie behind the disappointing statistics of overall Job Corps performance.

Thank you. I turn now to Senator Pell, standing in for Senator Kennedy today. We welcome your opening comments, Senator Pell.

## Opening Statement of Senator Pell

Senator PELL. I thank you, Madam Chair, and I thank you for holding these hearings.

There has been a lot of discussion about the Job Corps, and I think it is a good idea to clear the air. At an earlier time, when the subject of Job Corps was being discussed by the Senate, I spoke about solutions to the important problems and challenges facing our young people—the need for originality and new ideas, the need for knowledge to combat ignorance, and above all, the need for broadening horizons for youth—so that each young man and young woman in the United States can develop the best of his or her talents in a climate of maximum opportunity.



To be precise, those remarks were made in March of 1964, 30 years ago, during the debate on President Johnson's poverty program which, among others, created Job Corps. Those comments are just as relevant today as they were then and they continue to emphasize the importance of the Job Corps.

Thirty years later, the challenges that faced the youth in 1964 are the challenges of young people today, as evidenced by the current appeal of boot camps, teaching marketable skills to poverty youth still remains a novel idea.

It is just as important today to replace ignorance with knowledge, and most importantly, to broaden the horizons of all of our young people, regardless of economic status. The Job Corps program is a vital cornerstone in our efforts to see that our young people can develop their talents to the best of their ability.

It is my understanding that we will see and hear some pretty spectacular testimony during the next couple of days. As one of only two members of the committee to vote for the original creation of Job Corps, I have always been a strong supporter of it and believe, as I said before, that Job Corps will probably show itself to be the most successful overall domestic program.

I recognize that there are some warts, some flaws, but in general, I believe they have a pretty good record. That does not mean I am opposed to a responsible review, with the goal of making the program work better. It would be my hope that we might be able to make this program better able to expand the horizons of yet another generation.

I might add my own personal hope that someday, we will get a Job Corps center in my own State.

Thank you, Madam Chairman.

The CHAIRMAN. Thank you, Senator Pell.

[The prepared statement of Senator Kennedy follows:]

## Prepared Statement of Senator Kennedy

I commend Senator Kassebaum for convening this hearing to follow-up on the hearing we held last October to review one of our most important and successful education and training programs—the Job Corps.

The Corps has been a success story for 30 years. It now serves more than 60,000 new students a year. Since its creation in 1964, it has helped prepare 1.5 million youth for jobs and careers. Seven out of every 10 Job Corps graduates get jobs, enter the military, or pursue further education after leaving the program.

Its success is even more remarkable, since it targets "at-risk" youth. The average Job Corps student is 18 years old, reads at a seventh grade level, has never held a full-time job, and comes from an economically disadvantaged family. Seventy percent are minori-

008112

000558

ties, 80 percent are high school dropouts, and 40 percent of their families receive public assistance.

Job Corps participants receive good support, including residential supervision, counseling, food, clothing, education, job training, medical services, transportation, student allowances, and job placement.

For every dollar invested in the program, $1.46 is returned to economy through taxes paid by graduates, reductions in welfare and lower costs for crime and prison.

Because of this record, Job Corps has enjoyed bipartisan support in Congress and by Republican and Democratic administrations.

Last week the Labor Committee held 3 days of hearings on reforming and streamlining Federal job training programs. I share Senator Kassebaum's concern for ensuring that all job training programs are accountable and cost-effective. In the wake of recent violent incidents at Job Corps centers, it is particularly important to do all we can to ensure the safety of participants in the program.

I look forward to hearing from our distinguished witnesses, and to working with Members on both sides of the aisle in Congress and with the Clinton administration to make our job training programs as effective as possible.

## Prepared Statement of Senator Harkin

This hearing will examine Job Corps, an education and training program for disadvantaged youth. We will hear from some participants and staff about their experiences with the program. I am aware of some of the problems with the Job Corps program and direction on how to resolve those problems.

A 1982 longitudinal study of the Job corps program by Mathmetica Policy Research estimated that each dollar spent on this training program returned $1.46 on the investment. The study is being updated, but the new data is expected to yield the same or similar results.

Job Corps is working in Iowa. In 1993, the Denison Center served 480 students and placed 80% in jobs or advanced training programs. I have visited the center on several occasions with my most recent visit occurring last fall to dedicate a new child care facility. The center will now recruit and train mothers with their children. I would note that most of these families could most likely be on welfare without this addition to the Denison Center. On every visit I have been impressed by the program.

I would like to include a letter from Iowa's Governor, Terry Branstad affirming his support for Job Corps and a packet of letters I received from students at the Denison Job Corps Center made a part of the hearing record.

Madam Chairwoman, I know there are some problems. I am very concerned about the experiences of violence at certain Job Corps Centers that will be outlined by some of our witnesses. Even on act of violence at Job Corps Center is unacceptable and I want to find a way to make sure that the zero tolerance policy is reality for every participant.

I want to find constructive solutions to these problems to build a more effective, residential job training program for disadvantaged youth. I look forward to the testimony at this hearing and look forward to working with you and my other colleagues on this committee on the major issues affecting the training and retooling of the American work force.



[Letters from Governor Branstad and the Denison Job Corps Center may be found in the appendix.]

The Chairman. First, we will see excerpts from a series of television reports by a station in Dallas, TX concerning the State of conditions at the McKinney Job Corps center in Dallas.

Following the airing of these reports, the Department of Labor closed down the center prior to the scheduled Christmas break and has since, as I understand it, terminated the contract with the center operator.

[Videotape shown.]

The Chairman. I would like to welcome the first panel by saying how much I appreciate your willingness to come here and tell us about your experiences at the Job Corps. Your testimony is very important to us as we try to sort out what needs to be done to improve this program, and we look forward to hearing from you. I know it is not easy, and for that reason, I think we are all very appreciative.

First, I would like to welcome Rhonda Wheeler, who lives in Ventura, CA. She was a student the Job Corps center in McKinney, TX and was shown on the tape that was just previewed.

Fred Freeman is from Carlisle, PA. He was a student at the Woodstock Job Corps Center outside Baltimore, MD.

I would very much like to welcome both of you. Rhonda, we will begin with your testimony.

## STATEMENTS OF RHONDA WHEELER, VENTURA, CA, AND FRED FREEMAN, JR., CARLISLE, PA

Ms. Wheeler. My name is Rhonda Wheeler. Last year, I was a recently separated single mother of a 4-month-old son. I moved to Dallas, TX to move with my mother until I got on my feet. I had dropped out of high school in my second year, and I was faced with the fact that without an education, I would never earn enough money to support myself, let alone my son.

While staying with my mother, I searched the want ads of the newspapers every day, finding nothing that I was qualified for. I had no driver's license, so that made it even harder to find work. That, plus the cost of day care, made my situation overwhelming. That is when I saw the ad for the Job Corps in McKinney.

That ad stated: "Training, room and board, transportation, child care and clothing allotment provided and a biweekly salary." It sounded wonderful. It sounded too good to be true—and as it turned out, it was.

During orientation the first day, we were given a briefing by security, which was very strange. They told us the names and addresses of drug dealers in McKinney, and they told us not to go there. They warned the women in my orientation group about places we should avoid on center because of the recent rapes that had occurred. They also told us the best hiding places on center where kids go to have sex, which included under the buildings and in the bushes.

008113

000559

During the 10 days I was at McKinney, I saw kids having sex all the time, and often right out in the open. When I mentioned one incident to one of my counselors during my second or third day on center, I was told, "Welcome to Job Corps. You might as well get used to it."

From my second day on, whenever I walked anywhere alone on center, or passed a large group of females, they would start shouting, "Bitch" or other obscenities. When I mentioned this to one of the security people, he said, "We have got bigger problems than name-calling to worry about," and that I should get over it.

On my third day there, I was harassed by a student to the point that she had to be held back from assaulting me. The student then threatened to "get me when I was asleep." I went to security and filed a complaint against her. The counselor talked to me and said the student said she had not meant anything by what she said, that it was just a misunderstanding and that I should put it behind me.

As for the violence on center, I saw 12 fights in the 10 days I was there. During orientation, we were able to tour our various classes on center. I went to the clerical class because that was one of my choices. Five minutes after I got there, two students started punching each other. Both were bleeding, and one student picked up a typewriter and threw it at the other. The teacher acted like this happened quite frequently. He sent both students to security. I never found out if they were punished, but both students were back in class the next day.

Illegal drugs were rampant at McKinney. I was approached frequently and asked if I wanted to buy anything from marijuana to acid, and nobody tried to hide it. It was another one of those things at the Job Corps that was part of the atmosphere of the place.

For example, everyone knew the drug dealers would come to the east side of the campus and sell it openly to students through the fence.

And security rarely did anything about it, probably because they were scared of the students. On one occasion after dark, I saw a security vehicle patrolling the bushes near the center administration building. I was sitting on the steps. I saw about 10 students coming out of the bushes, yelling, "Get that spotlight off my woman," and shouting all kinds of four-letter words at the security patrol. The students surrounded the vehicle in a threatening way, and I thought they were going to beat up the two security guards in the vehicle, but one student recognized one of the guards and said, "OK, he's cool," and the security just drove away.

By my 10th day at McKinney, I could not wait to go home. It was a madhouse. I wanted out. I called my mother and asked her to come and get me. Some of the managers from the Job Corps center called me at my mother's house, trying to get me to reconsider. They came over first thing in the morning. But there was no way that I was going back there.

I would like to say one last thing in closing. I am aware that Wackenhut, the center operator of McKinney, has sent information regarding me to members of this committee. I have read the information that was sent, and I would like all of the members of this





committee to know that the information sent by Wackenhut is absolutely untrue and is a malicious attack on my character.

The other information regarding my health history is distorted and untrue, but even if it were true, it is a clear violation of my right to privacy that I was promised when I joined the Job Corps.

I want the committee to know that I am contacting an attorney to discuss taking legal action against Wackenhut for sending this information to the committee.

Thank you, and I will be happy to answer any questions.

The CHAIRMAN. Thank you, Ms. Wheeler.

Mr. Freeman?

Mr. FREEMAN. Good morning, Madam Chairman.

Chairman Kassebaum and members of the committee, my name is Fred Freeman, Jr. I am 19 years old, and I am from Carlisle, PA. I attended Woodstock Job Corps Center outside Baltimore, MD in March of 1992. I lasted for about 23 days before I became convinced that the program was not for me. I left voluntarily; I was not terminated.

The reason why I left was simple: I was tired of getting beat up and being threatened by other students and having the center ignore what was happening.

The Job Corps program that the recruiter told me about was very different from the one I experienced at the Woodstock Center. The reason I went there was to learn a skill that would help me get a good job and to get my GED. I was a high school dropout. My Job Corps recruiter, Bob Settle, said so many nice things about the program. He showed me a listing and beautiful color pictures of various Job Corps centers. Judging from the pictures, they all looked like expensive summer camps and resorts.

But when I arrived at Woodstock in early March of 1992, the difference between what Mr. Settle had said the program would be like and the reality was shocking.

The condition of the buildings and the residential living areas was rundown. Many of the dormitory rooms had cracks in the ceilings, and there was no way to secure your possessions. But the biggest downer of all was the violations and the threats of violence from other students that occurred on a daily basis.

The first night I got there, one of the other new students got into a fight with another student who had been there for a while. The new guy got beat up and knocked down, but no one told the residential advisor. I was told that this was part of the landscape, and I should get used to it.

The second night, I got my "blanket party." This was standard treatment for all new guys. A blanket party, for those not familiar with the term, is when you are sleeping in your bunk, somebody suddenly throws a blanket over you, and eight to ten guys take turns punching you and kicking you. The blanket is so that you cannot identify who is doing the punching and kicking. After it happened, I told the residential advisor. He said he would make a report on it, but nothing ever happened. That was part for the course at Woodstock.

There were fights regularly, after-hours in the dorm area, but no one was ever put on report for it. Many of the students carried knives and other homemade weapons that they made in the metal

008114

shop. I even saw two students who had pistols in their rooms. It was pretty scary. As for drug use people were always smoking dope. The residential advisors knew about it, but nobody did anything about it.

One might, a guy came up to me in the hall of my dormitory and asked me if I wanted to buy some cigarettes. I said sure. He told me to come into his room, which I did. Once inside the room, he closed the door and forced me up against a wall, holding a fork to my throat. He told me to give him all the money I had or else. I had $10 in my pocket, and I gave it to him.

I mentioned to my roommate what happened, and he said, "Go ahead and report it, but you had better be ready for that guy to come after you." I never did report it, for fear that the guy would come after me.

There was a lot of gang activity in the center, too. Gangs wore their colors, gave their gang signs and travelled in packs. If you messed with one of them, you had every other guy in his gang coming after you.

Theft was another problem. When I went to Woodstock, I took two big suitcases of clothing, including a pair of Air Jordans. Within the first 2 weeks, most of my clothes were stolen right out of my room. A few days before I left, a guy came into my room with a few others. I looked at his feet, and I realized he was wearing my stolen Air Jordans.

I said, "Hey, you got my Air Jordans; I want them back." He did not deny it, but he told me if I wanted them, I would have to fight him for them. I said, "All right, let's go."

Suddenly, someone turned out the lights in the room, and I was kicked and punched by him and his buddies. About 20 guys jumped me, and I got kicked from head to toe. After they left, my roommate took me down to the duty officer, and they took me to Baltimore County Hospital. I had two cracked ribs, and my right temple was swollen up like a balloon.

I never got my Air Jordans back, and to my knowledge, no one was disciplined for the incident—no center review board, no nothing.

I left the center 2 days later to go home on emergency leave because my sister was sick. When my parents saw the bruises on me and my swollen face, plus my cracked ribs, they did not want me to go back. I did not want to go back, either. I wanted to get my GED and learn a trade, but not under those conditions.

A couple days later, my father drove me back to Woodstock to get my stuff, and I voluntarily left the program. When I got there to pick up my stuff, my dormitory had been torched. Luckily, my room did not get burned. There were a couple of other kids from Carlisle who were also quitting at the same time. One of them had cigarette burns up and down his arms as a result of an incident in the dormitory. He said he had had it with all the abuse.

When I left, I signed a form stating that I had had clothing, shoes and personal items stolen from me worth between $400 to $500. They said they would reimburse me. That was 2½ years ago. I have made several calls to the regional office in Philadelphia about it, but nothing was ever done about it. They still owe me for the stolen items.



In closing, I would like to say that Job Corps seemed like a good idea when I first heard about it. It was supposed to be a program that helped you get your high school diploma and gave you training in a trade that would help you get a good job.

The reality is that Job Corps is more like a reform school or a place that the court sends you instead of jail, where the strong dominate the weak. I think it is a waste of taxpayers' money. If I were a parent, I would not allow my kids to go there.

Thank you.

The CHAIRMAN. Thank you, Mr. Freeman.

I have just a couple of questions. First, Rhonda, I would just like to say that I share your concern about the memo that was sent out by the Wackenhut Educational Services. It is an invasion of privacy—it was sent to every member of the committee—not only regarding yourself, but others who were in the television series about McKinney.

I know that in the past, this has been something that, when we have asked for records, there is always the question of wanting to protect privacy, and no records have been available. So I think that this is unfortunate. We have had situations regarding these hearings which create an atmosphere of intimidation which I really think is uncalled for.

We have tried very hard to not make this in any way a sensational atmosphere regarding these hearings. There would have been far more that we could use that would have been very sensational if indeed that were the intent. But the intent is to try to figure out what we can do to make Job Corps a stronger and better program.

Both of you have really shown a great deal of courage to come here, because I know it has been difficult. I would just like to ask you, Rhonda, while you were at the center, it is obvious that the violence there had a great effect on you and I assume on many others there. Did you find that for the brief time that you were there that there was an effort to have a strong training program?

Ms. WHEELER. No. The first 10 days is orientation, and the only training that I saw there—I toured the clerical class, and the only thing I saw was them throwing typewriters at each other. But during the 10 days that I was there, we were really just briefed by security. We played video games a lot is what we did.

The CHAIRMAN. From your experience in talking to the other students who were there, did you get a feel for whether students were there with an intent to try to learn some skill? Was the focus on job training skills, or were there students there who were referrals from the courts?

Ms. WHEELER. Yes. A lot of the kids just did not have any other place to go, and that is the truth. A lot of them had warrants, but most of them just did not have anyplace to go.

I had a real close friend who wanted to leave Job Corps because in 10 days, 10 of his friends had gotten beaten up real, real bad, and he knew he was next. So I went and picked him up from Job Corps; he left, and we took him to his parents' and his parents told him that he would have to live out on the street—he was 19—that he would have to live out on the street before he would come home from Job Corps, and they made him go back. Three days later, he

008115

000561

was viciously attacked, viciously attacked. And he had to stay; he is still there. He just had no place to go.

The idea of studying—it is not an atmosphere that you can really study in. And I am sure that at first, a lot of kids have the intention of coming to get the training they need, but then all the distractions that come in are so overwhelming that you lose that intent.

The CHAIRMAN. Fred, when you were at Woodstock, did anyone mention to you—and perhaps this would be true at McKinney as well—that there is a zero tolerance requirement for violence at the center, that this is the policy of the Job Corps program, trying to reinforce zero tolerance of violence?

Mr. FREEMAN. Some members of the security guard and some residential advisors did, but they did not go by what they said. What they said to me was one thing, and then when some violence happened, they did another thing; basically, they ignored it.

The CHAIRMAN. Did you find a similar situation at Woodstock as you heard Rhonda Wheeler describe at McKinney?

Mr. FREEMAN. Yes.

The CHAIRMAN. And as you have talked to friends since you have been out, did you feel that you gained anything while you were there that has been of use to you since?

Mr. FREEMAN. No, nothing that I can remember right now that I can use.

The CHAIRMAN. If either one of you had to give some suggestions for what should be done first to improve the program, do either of you have a suggestion you would make? Rhonda?

Ms. WHEELER. I would say you would have to first decide whether you want Job Corps to be like a prison camp or you want it to be a school. If you want a place like Job Corps to be a school, you would have to weed out all the people with warrants, all the gangs; you would have to weed out the drugs. You would have to do that. You would have to decide whether you wanted it to be a prison camp, because if you are going to keep the same kids there, you are going to have to run it like that; you would have to run it like a prison camp in order for them to learn anything, because it is just that violent.

The CHAIRMAN. Thank you.

My time is up. Senator Pell?

Senator PELL. Obviously, these incidents that you have spoken about, your experiences, are pretty dreadful. How widespread do you think those incidents are, from the gossip amongst the kids who were in your camp, in other camps around the country? Maybe yours were rogue camps. What are your thoughts?

Mr. FREEMAN. Well, I just recently spoke to a girl who went to the Utah Job Corps. While she was there, she had her nose broken, she was stabbed with a pencil. A lot of people at the Job Corps in Utah were sent to I guess different psychiatric hospitals, from what she told me, because it is just so violent. I believe that it is widespread.

Senator PELL. Do you have any thoughts, Mr. Freeman?

Mr. FREEMAN. I recently spoke to one of my friends who attended the same Job Corps I did, but she attended the year before. While she was there, she was severely beaten. She got stabbed; she has

000562



scars on her body from a bunch of gangs and stuff like that down there.

To me, from what I went through, when I was in Woodstock, MD, everyone who was there who had been to other Job Corps, like in Pittsburgh and stuff like that, said that it is basically the same thing with all the other Job Corps.

Senator PELL. Thank you both very much and for your courage in coming forward this way.

I have no further questions, Madam Chairman.

The CHAIRMAN. Senator DeWine?

Senator DEWINE. Thank you, Madam Chairman.

Let me first thank both of you for testifying this morning. You describe in your separate testimonies about the separate facilities, Ms. Wheeler, a case where you saw open sex, open use of drugs, fights; and Mr. Freeman, you were personally assaulted, personally robbed, and you saw drugs. You have both described a situation that, to put it charitably, is certainly not conducive to any kind of learning or study.

Let me ask both of you who really was in charge in your separate facilities. Who ran the place, really?

Ms. WHEELER. The kids; the students ran my Job Corps. I do not know legally who ran it besides Wackenhut, but the students ran the Job Corps, the gangs.

Senator DEWINE. And there were gangs there?

Ms. WHEELER. Oh, yes, definitely, definitely.

Senator DEWINE. Mr. Freeman?

Mr. FREEMAN. Basically, the students, the gangs ran it. I am sure there was somebody who was supposed to be running it and taking care of weeding out all of the violence and problems like that, but basically, the kids ruled the school.

Senator DEWINE. You described it as an environment where the strong dominated the weak, basically.

Mr. FREEMAN. Yes.

Senator DEWINE. So it was basically the subculture inside the operation that was controlling it.

Mr. FREEMAN. Right.

Senator DEWINE. You both described the situation, and both of you left after a short period of time, one of you after 10 days, and Mr. Freeman, I believe, after 23 days. If that was your reaction, what was the reaction of some of the other students? You have said that some of them had no place else to go, but certainly there were some there who could have been other places. I mean, did anybody else complain to you? Did you find anybody else who had a common——

Ms. WHEELER. Oh, yes—everybody, everybody. I was always told, "If you fight one, you fight them all." Mainly during the day, the kids who did not want to have anything to do with the drugs and the gangs would go in their rooms and sit after school. They did not walk outside, they did not go to dinner unless it was a school day and they had to. They would sit in there rooms. There would always be somebody after you, always.

I literally slept with one eye open. I was literally told not even to leave a pair of panties out because they would get it. So yes, ev-

008116

eryone there had some sort of problem or another—I mean everyone.

Senator DEWINE. So there clearly were people there, though, who were like you, who did want to learn, who went there for a specific purpose?

Ms. WHEELER. Oh, yes, yes.

Senator DEWINE. What learning did you observe? I know you were there for a relatively short period of time, and Mr. Freeman, you were there for 3 weeks or so, but in each of your cases, was there learning going on, was there teaching going on, was there training going on that you observed?

Mr. FREEMAN. Well, I went there wanting to get my GED and further my education, and second, I wanted to take culinary arts. In the period of time that I was there, they bounced me back and forth, so that basically I did not get a chance to learn the trade I wanted to. I learned a little bit of it, but they bounced me back and forth between landscaping, brick masonry, welding, culinary arts, and their other training.

And for the schooling, the stuff they taught I already knew. When I would tell the person who was teaching the class, "I already went through this, I already know about this; can I take a test and go on and advance to another level?" she would say, "No. You are going to stay right here at this level with the whole class."

Senator DEWINE. For some students, though, Mr. Freeman, would you say that the teaching was appropriate? What I am trying to get at is—you have described the culture of violence here which is not conducive to learning—but we are trying to get a full picture as well. For some of the students, was the teaching appropriate, that you could see?

Mr. FREEMAN. Yes.

Senator DEWINE. So there was some learning going on there.

Mr. FREEMAN. Yes.

Senator DEWINE. Ms. Wheeler?

Ms. WHEELER. Well, I was there for 10 days, and that was orientation, and I just never observed any teaching going on. When I toured the classes, I toured about five classes, but I never actually saw anyone teaching anyone anything. I mean, the printing class that I toured, there were no students in the class, and the teacher was just sitting there, doing nothing. And the clerical class that I went into, they were throwing typewriters and fighting.

Senator DEWINE. Literally, throwing typewriters?

Ms. WHEELER. Literally, throwing typewriters. That was the class I was going to choose as my clerical class, and I walked in there, and there were people bleeding—it was bad.

And then I toured the electricians' class, and that was insane; I mean literally, it was insane. The teacher went back into the office and took the three kids, myself and two others who were touring the electrical class, took us back there and locked the door. They were beating on the door, pounding, just pounding, and they were not doing anything—they were not doing anything, nothing. It was insane.

Senator DEWINE. Thank you very much.

Thank you, Madam Chairman.

Senator Kassebaum. Thank you, Senator DeWine.

000563



Senator Dodd?

Senator DODD. First I would like to thank you, Madam Chairman, for holding these hearings, and let me also thank our witnesses for coming today.

As someone who has chaired a lot of hearings over the years where young people are asked to come and testify, I know it is always a difficult thing to do, and we certainly appreciate your presence here today.

Madam Chairman, I really do not have any questions for our witnesses, but I would like to make a couple of comments if I could. First of all, I would like to introduce in the record a letter we received from George Foreman who is, as you know, a graduate of a Job Corps center and feels very, very strongly about the Job Corps experience and what it meant in his life.

To quote from his letter, he says, "I want to be known as in Job Corps' corner as it was once in mine. Since 1968, when I went to the Parks Job Corps Center in California to Mexico City, where I won the Olympic Gold Medal, I have gone on record before all kinds of audiences and in one congressional hearing about what a youthful direction-changer it was for me. It was more than a skill training experience. It showed me there were well-intentioned and caring people, from the biggest American corporations to dedicated individuals who were helpful, if there was a matching effort and response from us youthful disadvantaged in quest of opportunities. They provided first steps from the swamp we were in, and that there was a way out and up in lives for which no hope was apparent before."

"Job Corps has known both praise and criticism, winners and losers. As one who was in it, knew it from the inside and the hopelessness of those to whom it reached out, I have always felt it attacked a problem likely to be with us always, and until something comes up that is a better way, it should be retained. To me, it was indeed a friend in need. It is a sad moment in one's life when he denies his roots or where he comes from, but I acknowledge that whatever I have been and am today, the Job Corps was my starting point. Treat it kindly."

Signed, George Foreman.

I will put that in the record.

[Letter from George Foreman may be found in the appendix.]

Senator DODD. Madam Chairman, I just want to make a couple of points. As I understand it, there are roughly about 100 of these centers around the country, and I do not know how many people are presently in the program. We have had testimony now from our two lead-off witnesses totalling about 20 or 30 days of an experience there—and a dreadful and tragic one.

I would hope as we go through this process—and you stated so in your opening comments—there are, obviously, the dreadful anecdotal stories that can doom a program, and the only thing people may know about this will be the testimony of a few witnesses who have had a terrible experience. As I understand it, the McKinney Center is now closed. It was shut down. You made that point earlier, and I think that is worth noting. I do not know all the reasons why it was shut down, but I suspect in part it was because of the experiences that Ms. Wheeler has had, perhaps among others.

But I think it is important to note, as we look at the kinds of people we are trying to deal with in our Job Corps programs after 3 decades, and some tremendous successes, that these are the toughest, toughest situations that these young people are living in in our country, age 16 to 24. They come from our roughest neighborhoods and communities, under the most difficult circumstances. All Job Corps students are economically disadvantaged. That is a criterion for getting in. Approximately 40 percent are 16- to 17-year-olds; 70 percent are members of minority groups; 50 percent black, 14 percent Hispanic, 6 percent other minorities; 40 percent are women; 80 percent are high school dropouts; 70 percent have never held full-time jobs; 43 percent are from families on public assistance. More than 4 out of 10 entering students read below the 4th grade level. That is 16- to 24-year olds.

I would point out that of those who complete the program—one-third drop out in the first 90 days for a lot of reasons—but of those who complete the program, 60 percent end up going on to higher education and jobs and completing their high school equivalency. So that as we look at this—and clearly, things need to be done to improve security and performance—I hope we do not, as I am fearful will happen here, destroy something that has meant a great deal to an awful lot of people and can work better and work well. And I did not hear either one of our witnesses say that if they were sitting on this side of the table, they would vote to eliminate Job Corps altogether across the country. They had bad experiences and got out of the program.

Madam Chairman, I served in the Peace Corps in the 1960's when the Job Corps and a lot of these programs came up. Peace Corps volunteers came from by and large suburban, upper-income, middle-class communities, and we went to work in Third World countries. In a sense, Job Corps is just the reverse of that. What we are looking at is a lot of children coming from neighborhoods and communities that mirror the Third World countries that many of us went to work in.

So I sincerely hope as we go through these 2 days of hearings on this issue that we will not lose sight of the important value this program has and will have.

We have all been victimized and seen in the past these programs of an investigative report, and the eye of a little camera moving around—it was hard to see in that program, and it was kind of a sensational approach to it—and it can end up destroying something that is just terribly important.

It costs somewhere between $30,000 and $40,000 a year to keep a person in jail in Connecticut. It costs about $60,000 a year to keep a young person in a residential treatment program. This is an expensive program, and I hope we can reduce the cost, but we have to start to work with these young people who are the toughest to place.

And again, maybe there are better alternatives. As George Foreman said, maybe someone will come up with a better idea, and if they do, then let us consider it. But in the meantime, let us try to make this program work. Let us get it on track. Let us come up with some good ideas and suggestions on how to improve it.

000564



So I am sure that of the thousands of people who have gone through these programs and have completed the programs, some have had tough experiences in them. It sounds in some ways not unlike an urban high school in my State when I hear what is going on from our two witnesses here, or college campuses in some ways. Now, that is not an excuse, but nonetheless this is an endemic problem we are facing today in our society. It is not, unfortunately, focused just on Job Corps centers. Today, you can go into what once were nice, polite, safe neighborhoods, and there is violence everywhere. That is an endemic problem we have got to try to do something about, and I think this is a reflection of what is happening in some of these places.

So again I thank our witnesses for being here this morning and look forward to the testimony of the coming panels. And again, I sincerely hope we will really focus on how we can make this work better.

Thank you, Madam Chair.

The CHAIRMAN. I thank you, Senator Dodd. I would just say, as I said at the beginning and have said before, that the intent is to make the program work better. When George Foreman was in the program in 1969, it was a relatively new program with high ideals. I think it is a real disservice to the young people who are in the program today to not make sure that those same ideals and criteria are maintained.

The inspector general at the Department of Labor since 1987 has been raising concerns about the program that we here in Congress have passed over and others have passed over, and that is why I feel that sometimes it takes witnesses who bring the worst to light in order to get our attention. Nobody was paying any attention to the inspector general's report at the Department of Labor, and I think in order to make sure that we are doing what we should do, we have to view it in the context of trying to find some answers to make it work better.

008118

I value what you said, but I also want you to know that that is the intent of these hearings.

Senator DODD. I appreciate that. And you are right, when George Foreman was in the program in 1968, the United States was a lot different then as a country, too.

The CHAIRMAN. Senator Harkin?

Senator HARKIN. Thank you, Madam Chair.

Again, I appreciate the witnesses coming this morning, and I want to echo what the chairman of the committee said when she said we want to make the Job Corps centers work better and find out if there is anything we can do to help make them work better and more effectively, more efficiently. I am all for that. So I appreciate your coming this morning to tell your stories.

As I understand, there are 111 centers in the United States. Ms. Wheeler, you spent 10 days at McKinney. Have you ever been to another Job Corps center?

Ms. WHEELER. No, I have not.

Senator HARKIN. And Mr. Freeman, you spent 23 days at Woodstock. Have you ever been to another Job Corps center?

Mr. FREEMAN. No.

Senator HARKIN. Well, I guess I would just echo what Senator Dodd was saying. We have 111 centers, and they serve really some of the toughest populations in the United States. These are some pretty tough kids. And quite frankly, I am surprised there are not more stories like this when you think of the population that is being served and some of the environments that some of these young people come out of. I am surprised there are not more.

But I think, quite frankly, that the vast majority of Job Corps centers are doing an outstanding job in the United States.

We have one in Iowa, the Denison Job Corps Center. I have visited there many times, and I have never heard stories like this. I am not saying that it has not happened; I would not have first-hand knowledge of it. But the private businesses in the community of Denison think it is probably one of the best things that ever happened to Denison, IA. And these are the Main Street business people there. It has support from that community.

At first, when it moved in there, people were a little leery of it. And Denison is a small community of maybe a few thousand people, but I am telling you that the members of the private sector there are the biggest supporters of the Job Corps center. And these are kids who come from all over the State, out of State. Again, these are some pretty tough kids who come in there.

We just added a facility onto that Job Corps center where mothers like you, Rhonda, who have young children—now, you probably were not able to take your child to the Job Corps center, were you——

Ms. WHEELER. No.

Senator HARKIN. At the Denison Job Corps Center in Iowa, a young woman like you with a young child can be there with her young child. There is a day care center there, there is a Head Start center there, so that you can go to classes, and your child has great day care, preschool, nutrition programs. They are all right there in the Job Corps center.

There are not many like that in the United States. This was one of the first centers that got such a system. But it tends to make it a more family-oriented type of experience, rather than just single people running around there; it makes it more family-oriented. And with the Head Start center there, I thought, gee, we ought to have more of those around the country, where we combine the young people with their children, and a Head Start center right in the Job Corps center itself. I think it tends to take some of the hard edge off of people.

So there are innovative things that we can do, I think, to change the Job Corps centers to be able to reach out to people like you and to make your experiences there a little bit more pleasant. And I think if you could have had your child at a center like this, your story here today would have been completely different, if you could have been at Denison.

Ms. WHEELER. No, I do not think it would have. I am sorry.

Senator HARKIN. If you had been at Denison and could have taken your child to the Denison Job Corps Center in Iowa and gotten training, you say your story would not have been any different today?





Ms. WHEELER. No, no, that is not what I am saying. I am saying that if I would have had my child with me——

Senator HARKIN. No. I said if you could have had an experience at the Denison Job Corps Center in Denison, IA, where you could have taken your child and lived with your child, and your child could have got10 day care training, and you could have gone to classes and so on, and where there was no violence, I think your story would have been different today.

Ms. WHEELER. It might be, it may have been, yes.

Senator HARKIN. That is what I am saying. So I guess this Job Corps center has been shut down. I am not going to defend every Job Corps center and every manager that runs one, but you cannot paint all the Job Corps centers with a broad brush.

You have probably never been on a college campus, either, have you?

Ms. WHEELER. No.

Senator HARKIN. Have you ever been on a college campus, Mr. Freeman?

Mr. FREEMAN. No.

Senator HARKIN. Well, I am telling you, there is a lot of sex and a lot of drugs going on on college campuses, whether it is Ohio State or the University of Kansas or Connecticut or Iowa.

Senator DODD. Be careful, now. We are number one in basketball. [Laughter.]

Senator HARKIN. But I am saying you cannot paint all of these things with a broad brush stroke.

Madam Chair, I would like to submit for the record a letter from the Reverend Wayne Hoehns, Des Moines, IA, in support of the Job Corps center. He is a volunteer who works with Job Corps people when they complete Job Corps and go on to get jobs.

He says, "I am proud to be one of the thousands of volunteers all across America who are able to help many Job Corps completers make successful transitions into our Nation's work force."

"I have observed that the finest training programs at Job Corps centers are those which are in partnership with free enterprise corporations. My conclusion is that we need to encourage more of this kind of cooperative opportunity."

[Letter from Reverend Hoehns may be found in the appendix.]

Senator HARKIN. Last summer was the 30th anniversary of Job Corps. I was honored to be at one and to be honored for my support for Job Corps at that time. I was not the only one—Senator Simon, Congressman Williams, Congressman Hoyer, and Senator Dole from Kansas were also honored.

I would like to include in the record a letter from Senator Robert Dole, the now Majority Leader of the Senate, and I will just read a couple paragraphs.

He says, "Well, first let me thank Rick Littinberger for an earlier presentation of the award. I am very honored to receive the award. We have a great Job Corps center in Manhattan, KA—Flint Hills Job Corps Center. I was there for the dedication. I was there trying to get it built. We had a lot of help from Republicans, Democrats, and people in the area."

"It has been a great success story, as other Job Corps centers have been across the country. It gives young people opportunities

they never dreamed of and makes them successful workers. They get back in the work force, do good things and are on the tax rolls and payrolls all across America. And I think this is one program, Mr. Secretary, we ought to take a look at when we talk about expansion."

"I used to know the Secretary of Labor pretty well; I think her name was Elizabeth Dole. And I talked about the Job Corps program to her, and she was a very strong supporter of the Job Corps program."

"I am sorry I cannot be here for the main program, but I thank you very much for this outstanding award. It will be displayed proudly in my office."

"Thank you." Signed, Senator Robert Dole.

Senator HARKIN. So again, I do not doubt what you say at all. I do not doubt that these incidents happened. To the extent that they do, we need to tighten down on them, and any suggestions and advice that we can get on how we perhaps restructure, how we take care of these kinds of things, I am all for. We cannot let one or two bad apples spoil the barrel.

Quite frankly, I think the vast majority of Job Corps centers in the United States are doing a great job. So I think your testimony here this morning will encourage us to take a look at how we might revise, how we might streamline, how we might make them more effective and able to do a better job.

And as I said, rather than holding up McKinney or Woodstock as prime examples of Job Corps, Madam Chair, I would like to hold up the Denison, IA Job Corps Center as the prime example of what Job Corps can do.

Thank you.

The CHAIRMAN. Thank you, Senator Harkin.

I would just like to point out, though, that McKinney is not an isolated incident. The Department of Labor itself has identified 25 centers as being ones with potential problems relating to the conditions at the centers.

As I said earlier, we tried hard not to have a whole array of witnesses here wanting to tell stories, because it is difficult not to regard everybody tarred with the same brush, and that is not the intent. But I would suggest to you that just because someone is economically disadvantaged, we should not tolerate the levels of violence that are being tolerated. That is very unfair to those who are wanting to seek job training and assistance at these centers. And that was the purpose of this hearing.

Senator HARKIN. Madam Chair, I could not agree more with you on that. You are right on point on that.

The CHAIRMAN. Thank you.

I thank Ms. Wheeler and Mr. Freeman very much. We appreciate your testimony today.

It is a pleasure to welcome our second panel. I would like to introduce Gerald Peterson, the former assistant inspector general for audit at the Department of Labor. Randall Godinet is a former residential advisor at the Flint Hills Job Corps Center in Manhattan, KA. He now works with the Boys and Girls Clubs of America in San Diego, CA. Shirley Sakos was a licensed practical nurse at the Edison Job Corps Center in Edison, NJ from 1992 to 1994. Sergeant Ron Stallworth has been a law enforcement officer for 20 years. He is a gang intelligence coordinator with the State of Utah Department of Public Safety, Division of Investigation.





008120

It is a great pleasure to welcome you. Let me first say that your full statements will be made a part of the record, and if you could hold your statements to around 5 minutes, it would be appreciated. Thank you.

Mr. Peterson, we will begin with you.

**STATEMENTS OF GERALD W. PETERSON, FORMER ASSISTANT INSPECTOR GENERAL, U.S. DEPARTMENT OF LABOR, WASHINGTON, DC; RANDALL GODINET, OCEANSIDE, CA; SHIRLEY D. SAKOS, PISCATAWAY, NJ; AND RON STALLWORTH, DEPARTMENT OF PUBLIC SAFETY, SALT LAKE CITY, UT**

Mr. PETERSON. Thank you, Senator Kassebaum and members of the committee.

As you have already mentioned, Job Corps is a very expensive program. It costs taxpayers over $1 billion per year, and this translates to about $23,000 per year per participant.

Let me say at the outset that I am one of those people who believes very much that the Government needs to support a program similar to Job Corps. I also very much believe that the program should be improved and can be improved and made more effective in helping participants to become more employable, responsible and productive citizens.

In our reports, we have reported that over $100 million is wasted annually; that is to say, there is no measurable gain for 15 percent of total Job Corps funds. Only about 12 or 13 percent of the participants obtain jobs for which they were trained. That is the job match category. Most of the information I am revealing today, Senator, is for program year ending 1990, which was the last year that the inspector general audited the statistics for the Department of Labor.

A full one-fourth of total Job Corps participants are lost in the system, and I think this is very disturbing. Job Corps simply does not know what happened to them. What we have said is that knowing what happens to students after leaving Job Corps is essential before any evaluation of program effectiveness is possible.

One out of five of total Job Corps participants are not placed in any jobs or returned to school or enter the armed forces.

Only 17 percent of total Job Corps funds actually go toward the educational/vocational training piece. As you know, the residential part of the program is a very expensive part of the program.

Classroom absenteeism averages 33 percent in some centers and as high as 50 percent in other centers. I believe the inspector general, later on in the year, will have a more detailed report on this, but before I retired, we had developed a pilot which suggested a very high rate of absenteeism at the centers that we visited.

The poor-performing centers consistently rank at the bottom, yet they continue to be fully funded despite the fact that they show little or no improvement.

Also disturbing, I think, is that by Job Corps' own count, there are approximately $400 million in unfunded renovations necessary

to make the current Job Corps centers a more desirable environment, more conducive to learning and intensive training.

I think what is really troublesome about that is that at the time when Job Corps had $400 million of unfunded renovations on their books, they were trying to at the same time expand the program considerably.

I believe that the program operations and performance need to be carefully evaluated and corrective actions taken if the American taxpayers are going to continue to support a program like Job Corps.

I think more important than the statistics is ensuring that you have a management that is intent on doing something about these statistics. Most troublesome to me was that shortly after we briefed you, Senator Kassebaum, the Secretary of Labor characterized the data that we used in that briefing as isolated facts and misinterpretations of isolated facts. I think that is not the way to go about evaluating this program and getting it fixed.

More troublesome than that, the current Job Corps director told me that I was wasting his time when we conducted an exit conference using this data and refused to even appear at future exist conferences because he felt that this data was, I guess, not necessary for his management of the Job Corps centers. I think that type of approach to management of Job Corps assures you are going to get into problems, have serious problems, and that you are not going to solve them.

Thank you.

The CHAIRMAN. Thank you, Mr. Peterson.

[The prepared statement of Mr. Peterson may be found in the appendix.]

The CHAIRMAN. Mr. Godinet?

Mr. GODINET. Good morning, Chairman Kassebaum and members of the committee.

My name is Randall Godinet. I reside in Oceanside, CA, where I work as the executive director for the Oceanside Boys and Girls Club. I have been involved in Boys and Girls Clubs since the early 1970's.

In January of 1992, I left my job with the Boys and Girls Club to take a position as a residential advisor at the newly opened Flint Hills Job Corps Center in Manhattan, KA. I was later promoted to senior residential advisor. It was a position I occupied for the next 2 years, in which I received and completed a certified reviewer's training, phase one, in Reno, NV.

I along with other staff was involved in the start-up of this Job Corps center in Manhattan, managed by the Management Training Corporation. I came to this position with high hopes that I would be able to use my experience and education to improve the future prospects of at-risk youth who look up to Job Corps as a real alternative to the dead ends to which their untrained lives are leading.

But my experience with this MTC facility showed me a cynical reality far-removed from my lofty aspirations, one where little attention was paid to the needs of these young kids and where selections and retentions were based upon the things which would best contributed to the luster of MTC's image.

000567



I left feeling that much of the funding designated for this vital need was wasted through malfeasance and incompetence. With a heavy and disillusioned heart, I returned to California and resumed my previous career as executive director.

Prior to opening Flint Hills Job Corps Center, the center director stated at a meeting that we would be serving 250 students; a population which would include men, women, and single-parent mothers and their children. From the onset, the director stated that we, staff, needed to be primarily concerned with the students' average length of stay, or ALOS, the completion rate of vocational trade, and/or GED, and the termination rate. He also stated that he would not tolerate any violence on this campus, nor would he tolerate the students damaging the facilities. He also stated that he would not hesitate to load all the students onto a bus if this was called for by violations of the PRH, which is the policy regulation handbook.

From the beginning, we had problems retaining students, and it became more apparent that our student retention rate was deteriorating. To offset this, management staff became more creative in manipulating the numbers. We increased our medical terminations for students who were experiencing homesickness at the direction of management, and instead of reporting how many students were absent without leave, or AWOL, the center would report that they were on unpaid administrative leave.

As time went on, the staff became concerned with the amount of violence on the campus. Reports included a disproportionate number of students of color, although the same act of violence was ignored when committed by a nonethnic counterpart. When the students would report "blanket parties," beating up a kid at night in his room by throwing a blanket over his head and physically abusing him, the center standards officer, or CSO, would disregard this since it meant that a sizable number of students could be terminated for their participation, at a time which would impact financially on the center's income.

When students would go out during the evening and on weekend trips, they would often come back under the influence of alcohol and/or drugs; also, with these substances on their person or in their belongings, we were not allowed to search their rooms or their person. However, we were allowed to search their suitcases or bags. If a substance was found, very rarely did we involve our local law enforcement, although a close relationship had already been established with the chief of police and the county attorney, both of whom served on the center's board.

When a student would report that he or she had been victimized by a gang in the center, the victim's safety was not a priority. Often, the solution to this problem would be that the victim would be medically terminated or transferred to another center, leaving the gang element intact. If a student did not complete his or her vocational and/or GED, the center would still take credit for the student as if he or she was able to find employment, even at a fast food restaurant or local McDonald's, where he could have found work without the Job Corps program.

Another concern at this center was an increasing amount of sexual activity, both student/student and student/staff. If a student or

008121

staff was held in high regard, nothing was done. If it involved student-to-staff, depending on the member of staff and their position at the center, the complaint might be disregarded, or the staff was terminated, and the student was transferred to another center.

I realize that these allegations are serious, and some may question why they were not presented to the Department of Labor in a timely manner. My explanation is that from the beginning, the regional office of the Department of Labor collaborated with the director of the Flint Hills Job Corps Center, and they would intercede on behalf of MTC because of their strong personal ties, both with MTC management. Therefore, it would be difficult to ask the Department of Labor to investigate the allegations. My expectation of the outcome would have been that the investigation would have been conducted with little honesty and, at best, would have been futile.

It is reasonable to believe that MTC has deliberately misrepresented Job Corps and has failed to provide an environment that is conducive to young adults in achieving a vocational degree so that they might become productive members of society.

I do have a recommendation. I would suggest that a neutral party join the group that oversees the semiannual review that is done twice a year, one by the Department of Labor and the other by the corporate office. This will obviate the tendency of Department of Labor personnel to act in collusion with MTC staff to turn away from problem areas requiring immediate attention. It is of primary importance that Job Corps staff, like all members of the organizations that were designed to offer service to youth, remember that their primary function is to serve the best interests of the youth who look to them for support.

Thank you very much.

The CHAIRMAN. Thank you, Mr. Godinet.

Ms. Sakos?

Ms. SAKOS. Chairman Kassebaum, members of the committee, my name is Shirley Sakos, and I reside in Piscataway, NJ. I would also like to say that I live half a block away from a Job Corps center.

I was employed as a staff licensed practical nurse by ITT Federal Services at Edison Job Corps Center in Edison, NJ from March 1992 to September 1994. I was acting health services manager from March 1993 to May 1993.

From the onset of my employment, I became aware of the importance of maintaining the OBS, or onboard strength, of the students. And at our center, which was the first Job Corps center to be contracted in 1965, our center OBS is about 524 students.

There were many times when students were on an unauthorized leave of absence from center, otherwise referred to as AWOL status. When the students returned, some would claim that they had been ill. I was requested by the center director to write a LETT form, which is a leave extension, termination or transfer form, which would then void out their AWOL status. This was not a policy approved by the policy requirement handbook or the TAG, technical assistance guidelines, but one rather developed by the administration to prevent terminations of students and thus maintain the onboard strength.

000568



I would liken this to if I had a job, and I was away from work for a week; I did not call in, I did not bring back a doctor's note, but I showed up and said, "I was ill, so cover me."

There would be daily meetings in the center director's office to review problem students. There was one recommendation among many I recall when a student had been continually disruptive in classes, exhibiting violent behavior and general noncompliance with the program, including failure to participate in the drug program. He was recommended for termination by the staff and also the mental health consultant, who was a Ph.D. We were overruled by the center director, who thought the student should not be terminated due to the already low OBS. And I refer to this as "managing by the numbers."

Because disruptive students were kept in the program who should have otherwise been terminated, violence in the center was allowed to proliferate. I observed personally on a daily basis that not only were injuries sustained from fights on center, but often self-inflicted wounds from emotionally disturbed students. Many of these incidents involved drug or alcohol abuse.

When anybody would come with an injury, we would do drug tests, because sometimes they were referred to us as suspicious.

Students were often very disruptive while in the dispensary. Loud, foul, abusive language and disrespect toward the staff were common occurrences, with often threatening remarks or gestures. When students thought they were waiting too long for care, they would often throw chairs about the waiting room to get attention. Having to take time out to call security officers and write these students up denied time that should have been spent caring for the other students who truly needed medical attention.

Not only did the violence affect the staff, but also students who were at Job Corps to take advantage of the program. One evening I was called to the center for an emergency. When I arrived at the center, I was informed by security that there had been a fight at the center between two gangs. The police had come to center, and everything was now calm, but there was a female student in the dorm who was hysterical.

When I arrived at the dorm, the female student was in a State of hysteria, afraid she may get hurt. After reassurance and emotional support was given, she felt secure enough to leave the dorm to go to the dispensary for further treatment. I suggested that the counselor speak to her and the other members of the dorm, since everyone appeared to be frightened by the incident.

There was also the issue of sexual assaults at the center. As a member of the sexual assault response team, I was called to the center one night when a student claimed that she had been raped and wished to press charges. I instructed security to call the police. The following day, the group life manager called me to express that I had mishandled the incident by calling the police. There was an atmosphere that whenever possible, incidents should be handled internally and not involve the local police department.

Students come to Job Corps to leave drug abuse and violence in their communities only to find the same conditions exist at the Job Corps centers. I believe there has to be a more viable alternative than to allow the drug abuse and violence to continue at Job Corps

008122

centers. Students who are serious about job training should have that opportunity to do so, in a drug-free and safe environment.

I would like to thank the committee for the opportunity to share my experience at Job Corps, and also for allowing me to take part in the process of government.

Since writing my statement, I became aware that the last utilization report reflects that approximately one-third of our students at the Edison Job Corps Center are taking some kind of drugs, mostly marijuana. When you asked about alternatives and how we can correct this problem, sometimes I think that when students come in, a boot camp type atmosphere for students who are positive and could be separated from the rest of the students and be active in a very good drug treatment program, so that those issues could be addressed before they start in the educational setting.

I was shocked to hear about the murder; I did not know about that until I came here today.

I would like to share two incidents that happened. Back in 1987, a lady was murdered across the street from the Job Corps center by a Job Corps students, and he was responsible for no less than 13 burglaries in my neighborhood.

Also, several years ago, some students stole a car; they happened to be cut off in front of my house, drove over my front lawn, took down my mailbox and a telephone pole. So I can attest first-hand that there is violence, and my concern is that it is starting to proliferate. When the Job Corps were first started, I do not think these problems existed, and I appreciate the committee having oversight hearings so we can deal with these issues.

Thank you.

The CHAIRMAN. Thank you very much, Ms. Sakos.

Sergeant Stallworth?

Sergeant STALLWORTH. Madam Chairman, distinguished members of the committee, I want to thank you for the opportunity to testify at this hearing on Job Corps.

I want to say at the outset that I am a supporter of the program. Such endeavors are vital to ensuring that some of the have-nots in society are presented with the means to elevate themselves into the realm of the haves, and in the process become productive contributors to the betterment of the Nation.

Before proceeding any further, you should first know a little about me. I am Sergeant Ron Stallworth, a 20-year veteran of law enforcement and currently the gang intelligence coordinator for the Utah Division of Investigation. It was my concepts for addressing the emergence of the gang culture in Utah which ultimately led to the creation of the federally-funded Salt Lake Area Gang Project.

I was among the first law enforcement officers to explore the correlation between gangster rap music and gang culture and have lectured nationally on this subject since 1992. Last year I presented testimony on that subject to the Senate Judiciary Subcommittee on Juvenile Justice.

In 1989, the Utah law enforcement community began responding to the rise in criminal street gang activity. We quickly determined that a major reason for this was due to the influence of imported gang members by the privately managed Management and Training Corporation and Job Corps Center in Clearfield, UT. We sought

000569



information from Job Corps officials there as to the gang presence on the center which bled over into our communities. Our request was met with a brick wall of defiant excuses contrary to the truth.

We questioned whether or not Job Corps officials had an obligation to the communities negatively impacted by their program. We questioned whether they had a moral and ethical obligation to do everything within their means to alleviate the impact of the burden placed on Utah taxpayers by some of their student gang members. To us, the answer was clearly yes.

Clearfield officials have always assumed a defensive posture whenever the negative aspects of their program are raised by law enforcement. They promote a polished image to sell themselves to the community. I have learned over the years that when this image is challenged, when any negatives of the program are brought under microscopic scrutiny, Job Corps officials adopt what I call a siege-like, "us versus them" mentality, and they circle their wagons to try to defuse and redirect the focus of attention from the issue in question.

Their most egregious effort to protect that image involves coercive threats and intimidation. I have twice been on the receiving end of such tactics by Clearfield officials. Their compromising of public safety efforts to me and to some of my colleagues in Utah law enforcement is at the height of defiant arrogance. Such an attitude to us is, at the very least, irritating and, at the very worst, contemptuous of all proper and appropriate ethical behavior.

Ladies and gentlemen, I am not the enemy of the Clearfield Job Corps program, as some of those officials have asserted over the years. I whole-heartedly endorse the intent of the Job Corps program. I do, however, think that under the private management system, the private contractor system, as experienced in my State, it has become a Frankenstein monster which is rampant and out of control. To me, it needs to be brought back into focus and made accountable to the needs and concerns of the citizens whose tax dollars support its existence and whose lives are negatively impacted by the imported criminal element.

Toward this end, I would suggest that the following questions be deliberated on during this nearing. First, is the private contractor system the best resources to administer the Federal funds in pursuit of the Job Corps mission?

No. 2, should a comprehensive investigation into the administration of Job Corps' funding be initiated by an appropriate Federal law enforcement agency?

No. 3, is the money used to maintain the program receiving adequate return on its investment? Is the program having a positive effect on the vast number of its participants, or are the statistics reflecting a financial boondoggle that could be better used in a different format?

No. 4, is there some Federal guideline that prohibits private contractors from cooperating with law enforcement officials? If so, should that guideline be reevaluated?

No. 5, if a social disease such as gangs is imported into unsuspecting communities as a result of a benevolent social improvement program by the Federal Government, should the Government then have an obligation to assist those communities in

008123

funding to address the backlash of having to respond to the negative impact of that program?

In closing, I Feel that we must look at the current State of America and the impact of its youth on the affairs which threaten to tear apart our society. We must ask what effect will today's youth, governed by the ethics of gang culture, have on the structure of tomorrow's society if left unchecked, without a Job Corps or similar type of program to address certain needs. To me, the outlook is frightening.

As a Nation, we are held hostage by the grip of gang culture on the hearts and minds of our young. In the Salt Lake City metropolitan area, that grip, ladies and gentleman, has seized the hearts and minds of children as young as 6 years of age. We must stop the death grip of gangs. Quarantining such a social bacteria by keeping it confined to the inner cities from which it has traditionally nestled will forever be doomed to failure. We must seek to control this problem in part through the positive benefits of programs such as Job Corps.

To me, ladies and gentlemen, the youth of America represent our future. We must seize control now to ensure that the future for them is a bountiful one. Well-managed social programs can go a long way toward ensuring that that future shines brightly for generations to come.

I would like to thank you, and I would also like to offer as part of my testimony a partial list of crimes involving Job Corps students at the Clearfield facility that have warranted police response over the years, and also a copy of a report I prepared in 1993 for the Governor of Utah's Summit on Gang Violence, in which the first 15 pages are devoted to elements of the Job Corps problems we have experienced in the State of Utah.

Thank you.

The CHAIRMAN. Thank you very much.

[The prepared statement of Mr. Stallworth may be found in the appendix.]

The CHAIRMAN. Thank you all very much. This has been a very impressive panel. I will tell you why I am so impressed, and that is because all four of you are dedicated and caring people who want to see a program such as Job Corps succeed. You believe there is a need for a program like this, and yet your testimony indicates that there are some enormous problems that are keeping it from succeeding in one way or another.

I go back again to how often questions have been raised, either through the inspectors general reports over the years and/or yourselves, as you have reported to the management and have just met with a blank wall in being able to carry through suggestions or even acknowledgement of problems that exist. And Sergeant Stallworth, from your experience, you are certainly well-positioned to understand the difficulties that are there.

I just think all four of you have given us some very, very important testimony. I guess I would like to ask all of you a question in general, because you have all mentioned that corrective action is necessary.

Sergeant Stallworth, you mentioned a different format perhaps would be necessary as one of your points, if I am correct. Have you



given thought—and some ideas have come forward already—to whether it is a training purpose, or is it a correctional purpose or a boot camp-type environment? What format do you, with your experience, think we should be looking at?

Sergeant STALLWORTH. Really, that is an interesting question. We have two Job Corps programs in the State of Utah. One is managed by the Management and Training Corporation out of Ogden, UT, which is the Clearfield Center, and then we have one that is managed by the Department of Labor, the Weber Basin Job Corps.

We have virtually no problems at the Weber Basin Job Corps. All of our problems, from a criminal and especially a gang standpoint, reside and exist on the Clearfield facility.

My biggest complaint with this program is that I have always been a supporter of it, and all I have ever asked from the standpoint of doing my job and doing it effectively for my bosses is cooperation when the need arises.

For example, if my public safety commissioner or the Governor of Utah asked me the nature of the gang problem in the State of Utah, I could only give them estimates, because I do not know what exists on the Clearfield facility, because they will not give me the information. If you look at the report that I will submit, my "Gangs in Utah" report, I did an informal survey to try to get that information when the Job Corps in Clearfield would not give it to me, and my survey was basically every time we contacted the Clearfield Job Corps kids, which was every night, I would ask them what gangs exist on that facility, what are the numbers, give me some estimates. And over a period of time in 1989, all of these numbers were the same—about 300 gang members at that time, Crips and Bloods, about 29 Crip gangs, 21 Blood gangs, 7 Hispanic gangs out of Los Angeles, and the two major gang factions in the Midwest, from Senator Simon's State, the Vice Lords and the Black Gangster Disciples.

Now, that is in an informal survey. I have tried to get firm statistics from them, and they refuse to give me anything. All I ask is for numbers so that I can do my job. When we contact these kids on the street, and they tell us about their gang involvement, I call back to the center or have called back and ask for follow-up on some of this information, and the response I always got was, "We don't have gang members out here. We have wannabes." I addressed that issue in my "Gangs in Utah" report also.

So clearly, I think the program is needed. I think that this private contractor system needs to be seriously reevaluated; why do I have these problems at the Clearfield facility, but not at the Weber Basin facility? Is there a management issue here? I do not know, but I think something needs to be done to rectify these problems because it impacts what people such as myself have to do in terms of public safety efforts.

The CHAIRMAN. Mr. Peterson, from your standpoint of audits through the years, do you think there is a problem with private contracting? Is that it, or is it something much different?

Mr. PETERSON. I am not sure if there is a problem with private contracting. I think maybe there is more of a problem with large versus small. My memory of Clearfield and Weber Basin is that Weber Basin is a very, very small center as opposed to Clearfield,

008124

with a very large population much of which was imported from New York City and major metropolitan areas.

Sergeant STALLWORTH. The population at Clearfield is primarily from south-central Los Angeles, East Los Angeles, St. Louis, Kansas City.

Mr. PETERSON. Yes. So there are very different types of people at the two centers and very different in terms of the size of those two centers.

I do have some thoughts on what Job Corps should be doing and what they should not be doing. Certainly, Madam Chairman, there should be no thought of expanding and opening new centers while Job Corps has $400 million of unfinanced, unfunded maintenance building up. Many of these centers are in very bad shape, and we certainly should take a look at what we have—maybe close some of those centers because they may not be economical to run anymore—but certainly we should not be opening new centers while we are carrying these older centers with a heavy unfunded maintenance problem.

I think the next thing is that management needs to look and get back to the roots of this program. If you look at why we had a residential training program, it was because many of these young people were coming from very disruptive environments, and this residential program was about changing the environment.

Well, what you have heard today is young people sitting here saying that the change is from a decent environment to a disruptive environment. Certainly if we are going to justify a residential program, priority one has to be that you change the environment, that the environment is a safe environment, that the environment is conducive to learning. That is essentially what the program was all about, but I am afraid we got away from that. I think we got management that was too much interested in building the size of their program. Down at the Department of the Labor, you oftentimes heard the thrust of getting it to the billion dollar level, instead of the concentration on the kids and on a safe place for young folks to be trained and educated.

So I think if we did those two things, if we went back and picked up that unfunded maintenance and got it cleaned up—either closed or cleaned up—and we had a greater concentration on making sure that the young people coming into this program came into a place where the environment could in fact be adjusted, could be made safe, then I think Job Corps may be on the right course to satisfy this potential. But until those things are done, I think there is very little hope.

The CHAIRMAN. I have some further questions that I would like to ask Ms. Sakos and Mr. Godinet, but my time is up for right now. Senator Simon?

Senator SIMON. Thank you very much.

Let me say that I start with some prejudice—I think the Job Corps program is a great program. I also agree with what you say in that it needs improvement. And I think, Sergeant Stallworth, your opening statement was just precisely right. It is a good program, but it does need improvement.

And I would add—and I have visited a couple of Job Corps centers—that we have to remember we are not dealing with the Sunday school class of the First Presbyterian Church in Topeka or the First Baptist Church of Cleveland or Our Savior Lutheran Church in Carbondale, IL. The average student is an 18-year-old dropout, reading at a 7th-grade level, is from a disruptive home life, and has never held a full-time job.



You mentioned, Mr. Peterson, the $23,000 cost, and that is a high figure, but we also have to look at what it costs to put somebody in prison, and you are talking about a very similar annual cost and not doing, frankly, the constructive things that need to be done.

Mr. Peterson, in your written remarks, you say "the last Senate oversight hearing on Job Corps took place in February 1984." Just for your information, we had one in October of last year. And I commend the chair of this committee for holding this hearing today.

Charles Masten, the inspector general for the Department of Labor, had these comments in testimony in October: "In its 30-year history, the program has enjoyed a great deal of success. However, as is always the case for programs of this size and magnitude, there is room for improvement." And then he adds, "In most cases, management has addressed our recommendations for changes and taken necessary corrective action."

My impression, Mr. Peterson, is that you hit right on part of the problem in small versus large. When we try to deal with too many people in a Job Corps center, I think then we have problems. I think that is one of the things that we should learn in the process of all of this.

The second thing, you mentioned, Sergeant Stallworth, and that is the private contracting system. I am not opposed to it, but I think we have to be very careful, and when people do not perform, they do not get any more contracts, period.

One of the problems—and I have helped to create it, and I hate to say it, my colleagues may have even helped to create it—is that we try to keep down the number of Federal employees, so the Department of Labor and every other department try to figure out how can we get the job done and not have so many Federal employees—so we contract out, when sometimes that is not the wise thing to do, as you have pointed out.

I would like to enter into the record a letter from Mike Monroe, the international president of the painters' union, which is very supportive of this program, as are, I would add, the homebuilders.

[Letter from Mr. Monroe may be found in the appendix.]

Senator SIMON. Ms. Sakos, you mentioned the drug problem, and I guess all of our problems are interrelated, but our failure to provide drug treatment for people when they need it is just a tragedy in our society.

The Chicago Sun Times had a story the other day stating that 90 percent of the people who come in and say, "I want drug treatment" cannot get it; they are told to get on a waiting list.

I visited the Cook County jail. There are 9,000 people in the jail, and in this kind of dormitory, minimum security area, there were about 45 people. And in going around visiting, one of the prisoners told me, "I would like to get into drug treatment." I turned to the

008125

000571

assistant warden and asked, "Why can't he get into drug treatment?" He said, "Well, we have 120 places for 9,000 prisoners."

I turned to the other people there and I asked, "How many of you would like to get into drug treatment?" and probably 25 raised their hands.

Your point that we have to move on this I think is very important, and the gang problem. I know I am digressing from the subject here, but because you have so much experience in this gang issue, Sergeant, if all of a sudden, you were a member of the U.S. Senate, and you could do anything you wanted to do to deal with the gang problem, what would you be doing?

Sergeant STALLWORTH. That is a dangerous question to ask me, Senator. For one thing, I do not believe in giving up on these kids. I believe very strongly in this generation. The vast majority of these kids who are involved in gangs and causing the problems which are epidemic in this country are really good kids. They are confused kids. They are at a stage in their lives where they are revolting against something, and in many cases, they do not know what they are revolting against.

I liken it to the time when I was growing up in the 1970's, and we had the Vietnam War, we had all the protests that were going on and so on. But we had something we could attach ourselves to, and when we went through that rebellious stage, we latched onto it, and whether we were right or wrong was not the issue; it was an issue for us, and we latched onto it. Kids today do not have that, and a lot of these kids, especially in my State, are looking for something to revolt against, there is nothing, and this gang issue is the big thing. They latch onto it, and they do not know what they are getting themselves into, and if we do not act quickly, we will lose them; they literally get lost.

When we talk about the problem out there, we are looking at probably 3 percent of this generation that is involved in this, that is causing the problem, and in my State, commit about 50 percent of the crimes.

So I do not believe any of us should give up on these kids. They are good kids. They need a lot of help. Programs such as Job Corps can help in that respect if they are managed properly. I think we need to look at some other things, such as alternative programs, alternative education programs, for a lot of these kids. A lot of this generation is not cut out for college, so we should not try to force them in that direction when they probably want to get involved in a good, well-paying job, raise a family, and move on with their lives. There is a lot of variety. If you ask 10 different people who have worked on gangs, you will get 10 different answers on how to respond to this issue.

Senator SIMON. I thank you.

Madam Chairman, I would just note in the back of the room, Sarge Shriver, who played a leading role in not only Job Corps, but a lot of other good causes. We are pleased and honored to have Sarge Shriver here in the audience today.

The CHAIRMAN. Come on up and take a seat. It is a pleasure to welcome Mr. Shriver. He has been a long-time supporter and activist and initiator of many of these efforts that have been so important.



Senator SIMON. Absolutely.

The CHAIRMAN. Welcome.

Mr. SHRIVER. Thank you.

The CHAIRMAN. Senator DeWine?

Senator DEWINE. Madam Chairman, thank you.

Let me thank the members of the panel for their testimony this morning.

Mr. Peterson, let me start with you. I want to follow up on a line of questioning that Senator Simon was exploring a moment ago. My questions to you are just so I can better understand where you are coming from and what your philosophy is and really, what your testimony is.

I do not think there is any doubt that any time you have a residential facility, it is going to be, by most people's standards, shockingly high.

For example, in the prison system in the State of Ohio, we think we do it cheaper than just about any State in the Union, and it still costs us on average $11,500 per inmate per year. That is a lot of money. Residential facilities for young children, troubled children, teenage children, run anywhere between $30,000 to $60,000 or even $70,000 a year in my experience. So I think you would agree that residential by definition is going to be expensive.

I would ask you what your opinion is in regard to one of the basic premises of Job Corps, which is that it should be residential, that it is moving people from one environment into another environment. Is that as correct a premise today as we thought it was in this country 30 years ago?

Mr. PETERSON. I suspect that the premise is still correct. Unfortunately, many of the centers, or a number of the centers, do not do a very good job of adjusting to that environment. So that while some of the centers are doing an excellent job of providing a safe environment, an environment which is conducive to learning, a number of other centers—I can think of 20 or 30 of them—do not do a good job and are below the average in virtually every category of measurable benefits.

Senator DEWINE. And I think that is pretty clear from your testimony and some other information that we have received. But just to summarize, you would not change the basic concept—you do not like how many of them are working out, but you do not have any problem with the basic concept. It is going to be expensive; we are targeting a very difficult group in the sense that they have been deprived that most of us have had during our lifetimes, and so going into it, we know it is going to be expensive.

Mr. PETERSON. I think, Senator, that we should expect it to be expensive, but we should also expect it to be a safe environment and one in which they can learn.

Senator DEWINE. I appreciate that and certainly agree with that.

Let me look at one of the figure that has been quoted and that you spoke about this morning. I believe you said that 13 percent of the people in Job Corps found jobs that matched their vocational skills. What is the significance of that statistic—and let me just explore that with you a moment, and then I would like you to respond to that.

008126

000572

That assumes that there is a higher level that found other jobs that did not fall within the category of matching their vocational skills. And is the basic premise that these individuals who found these other jobs who do not fall within that could have found the jobs anyway, even though they were not involved in Job Corps?

Mr. PETERSON. Well, we know that a certain percentage of young folks are going to get jobs with or without intervention on the part of Job Corps. What Job Corps seems to be is an established environment in which a young person can get vocational training or educational training and then qualify for a specific job. That is not the only rating factor, certainly for Job Corps, but if you rate Job Corps just based on how effective they are at getting young folks jobs in the vocation being trained, they are not terribly effective—only about 12 percent.

Senator DEWINE. Let me explore that further with you, then. Is it possible that Job Corps is also teaching work habits and is also teaching other things that might not directly show up? In other words, let us take another example. Let us take a child of mine who might have an English degree from college. That child may not go on to teach English. That child may use that English degree to get something else. Maybe some of the discipline that was learned in college somehow translates into getting a job that is, ostensibly at least, totally unrelated to what the specific degree is.

What I am trying to explore with you is what are the correct criteria that we should use to judge the success rate of Job Corps—and I understand what you are saying about the 13 percent, but what I am trying to understand is do we give them credit for anything beyond that.

Mr. PETERSON. Oh, absolutely, absolutely. And certainly, as you point out, there is much to learn in some of these centers that stays with a kid perhaps his or her whole life and may be more important than the vocational training. But we do think that the matched employment should be part of the criteria, that if in fact we are going to afford this vocational training, then we ought to be measuring how effective that training is. And unfortunately, it is not as effective as one might think, particularly given the discussions that go on about the need for developing skill training. You know, we keep hearing that there are lots of jobs out there if the young folks just had the skills. Well, Job Corps seems to shoot that in the foot because it does not appear that we are able to get that training across in that environment in such a way as to make that person employable.

Senator DEWINE. My time is up. I do have some additional questions, and I hope we have a second round, Madam Chairman.

If I could, though, let me just finalize this by saying that I think one of the things this committee has to look at is what are the criteria that we should use for a program that costs over $1 billion a year, that is targeted at young people who are going to have a very, very difficult time, where the success rate percentage-wise may not be as high as we would expect if the criteria for entering Job Corps were different, and how in fact do we judge this in the future. I think one of the things that we should insist on from the Department is that the longitudinal studies be in place and that we truly measure not just the process, but also the results. And



with you, Mr. Peterson, I was trying to explore what those results should be and how we should actually measure them.

Mr. PETERSON. I think if you looked at all the statistics, probably the one that correlates most closely with a person being successful, both in terms of getting the job and the wages received, is probably length of stay—in other words, how long a person stays at the center. If we could keep that person in the center for a full year, for instance, the opportunity and the chance that that person is going to get a job in the field trained goes up significantly, and the wages that that young person is going to get upon graduation goes up significantly. But we have got to get back to finding out how to keep them there. You certainly cannot keep them in the center, listening to the first panel today, when the kids do not consider themselves safe and so on.

So I think we need to concentrate on the environment and then get some decent standards. For instance, there is no standard on classroom attendance. In a program like this, you would guess that there would be some kind of a standard that says you need to go to class. There is no standard. So that when we went out and took a look at the centers, we were finding an absentee rate of 33 percent and up. The kids just are not there.

So I agree with you that we need to agree upon some meaningful criteria and then hold Job Corps management responsible for reporting on a timely basis, and I think active oversight on the part of this committee will do a great deal.

Senator DEWINE. Thank you.

Thank you, Madam Chairman.

The CHAIRMAN. Senator Wellstone?

Senator WELLSTONE. Thank you, Madam Chair.

Since I was not able to hear the testimony, and I know you have one more panel, I have just one very brief question—and I thank each of you for being here.

Regarding the statistic about 12 percent placed in trades, my understanding is that the Department of Labor, looking at the first 6 months of program year 1994, found that 25.7 percent of all participants had been placed in jobs in which they were trained, and of all the students placed into jobs, 41 percent are job training matches.

I do not want this to become just a battle of statistics, but I just wonder whether the panelists might want to respond to that, just so we can know which data we are working with.

Mr. PETERSON. Well, if that figure is correct, it is an enormous step in the right direction. I must say that I come from a background that would question that a bit, and I would wait until you get an audited figure before you conclude that the statistic is correct as presented.

Senator WELLSTONE. I think that is fair enough, Mr. Peterson. I just want to point out that some of the information is from the 1990 report, and that was 1990——

Mr. PETERSON. Yes, that is correct.

Senator WELLSTONE [continuing]. And there is some other data that I think is important, and we can all look at it and see whether we think it is rigorous. But I just wanted to get that out as part of the record.

008127

000573

Mr. PETERSON. The reason why I was using 1990 data is because that was the last audited data.

Senator WELLSTONE. I understand.

Madam Chair, first of all, I would like to thank you for this hearing. I am really looking forward to the next panel—Karen Anderson is here from Minnesota—so I will just wait.

I do want to make the point that I know others have made as well, and that I think Karen Anderson can speak about with more eloquence and more personal experience than I ever could, which is that for whatever problems there are—and one of the things I appreciate about what you are trying to do is the rigor of your approach—for whatever problems there are that we have to deal with, for whatever accountability—more accountability has to be built into the system—this program also has some startling success stories, has an extremely important mission, and sends a very important message to some young people in this country who live amidst some pretty brutal and pretty awful conditions. And I would like to focus, of course, on the success of it, so that we can really build on that and make sure that we do not move away from what I think is a terribly important mission to Job Corps.

I just wanted to get that on the record, and I think that is the spirit in which we will work together.

Thank you.

The CHAIRMAN. Thank you.

I would like ask another question, because I did not get a chance to hear either Ms. Sakos or Mr. Godinet respond. What corrective action do you think would be important? I think, building on what Senator DeWine and others were asking, it again goes to the purpose of the Job Corps program and what should it be for us in the next decade. And all four of you are supportive and feel a need there, but what do we need to do to answer that need? Both of you have worked in Job Corps centers, are dedicated to seeing it achieve what we want it to achieve, so I would like to hear both of you suggest some corrective action that you think would be useful.

Ms. Sakos?

Ms. SAKOS. While I was at the Job Corps center, I was also a volunteer in women and community service, which is a program funded by the Department of Labor for the women at the Job Corps center. I think these programs are very good for the young women who come into the programs, but the main thing that I see is the drug problem on the center, and I think this leads to some of the violence.

Before we expand the program, I think we need to look at alternative methods. This week in the news was very interesting. We had the Bill Moyers report; I saw another program on teenage pregnancy. And one of the problems I saw at our Job Corps was lack of adequate staffing. When I would go into one of the dormitory, there would be maybe 100 girls in the dormitory and only two residential advisors for the primary shift, 4 p.m. to 12 p.m., and maybe only one at night. This is totally inadequate.

And I think there should be better educated staff to deal with these problems. When you have one psychologist, one center mental

000574



health consultant for 524 students, I think that is inadequate as well.

So I think before we go ahead and expand the program, we should look at the staffing, the training of the staff, and whether we should have a separate drug treatment program before the education program starts for those students who come in and are positive for drugs.

The CHAIRMAN. Let me just ask you—I thought there was a drug treatment program in place for students.

Ms. SAKOS. We have one drug treatment counselor and one certified alcohol counselor for the whole center, and then we have a part-time, subcontracted drug counselor, 20 hours a week. To me, that is inadequate, especially when you have the CAC, who has to test all these urines. You are testing maybe 500 urines a month doing drug screening. There should be somebody separate just to do that. The staffing is just totally inadequate to deal with the program.

The CHAIRMAN. And then, too, there is no real enforcement for students who continue to use drugs, so you have got an unbalanced sort of approach there, it seems.

Ms. SAKOS. And also, I found when I was the health service manager, and I went into the managers' meeting in New York for Region 2, they were just totally unaware of the reality of the situation. The regional director got up, and the first thing he said to me was, "My main priority this year is to stop smoking on centers." I just could not believe that this was his main priority when we had all of these other drug problems, teenage pregnancies. In the master plan at the Edison Job Corps Center, they talk about opening a day care center, bringing women who have children to live on center. Before we even address that, we should address the drug problems. Are we going to bring children into this setting in a center where one-third of the students are on drugs? Is this going to be a safe environment for opening a day care center, or bringing women and children onto the center?

I think we just need to deal with the problems at hand first, which are the drugs and the violence, and I think part of the cause of the violence is the drugs.

I am also a police matron in my town, and again, with most of the young women who come in, it is drug-related violence. I think all the health issues are connected to this, and if the committee will only look at the cost of not taking care of these problems now, later on the problems are going to be much worse—the drugs are going to lead to health problems, the cost of the health problems, the cost of incarcerating students who get arrested for the drugs.

This is a great opportunity to do something in the community for students who have problems. Years ago, I remember the word "latchkey" was the prominent phrase of the 1980's. Now, unfortunately, these latchkey children are known in my community as "throwaways." And that disturbs me greatly, that we would even think of using a term like that for young adults in our society. We are a great society, and I just think that having the Job Corps centers right now is a good perspective for students who have problems to come, if only we will do something more as far as staffing and education; I think it will help.

008128

The CHAIRMAN. I am sorry, I am using more than my time, but I feel this is a very informative panel.

Mr. Godinet, could you give us a few thoughts about what corrective actions you think should be taken?

Mr. GODINET. As you heard some of the testimony from students who were there, even though they said they were only there for 3 weeks or so, the bottom line is that Job Corps has to realize that they have a problem, and they need to get out of the denial stage about the gang element.

When I first took the job at Flint Hills Job Corps Center, I had a lot of experience with gangs. I listened to Sergeant Stallworth speak, and one of the first things I identified in my first week of training at the Denison Job Corps and with the first influx of students who came to the Flint Hills Job Corps Center was an increasing number of gang members.

A lot of people say if you have no idea what a gang member is, and the director of your center is saying that these kids are "wannabe" gang members, those kids are just as bad as gang members. They are very intimidating to some of the students, the quote-unquote "good students" that you have on center; and you lose a lot of those students through termination because of the intimidation that some of these gang members are bringing into the center.

One of the biggest things that we had on our center was this "hands-off," attitude; nobody can touch the Flint Hills Job Corps. We were the first brand-new start-up center, and we had this persona about ourselves that nobody from an outside agency could come in there and ask any questions about us. We had a closed door policy, and nobody could come in there. And the staff were intimidated from saying anything because they thought they were going to lose their jobs. And Flint Hills Job Corps had probably the most educated out of all 108 Job Corps at the time that I was there, as far as percentage of graduates. Probably 25 percent of the residential advisors were taking jobs at $7.40 an hour, with degrees, at the Flint Hills Job Corps.

I visited four Job Corps centers—it is not just one Job Corps center that I visited—and I think the biggest issue is that we have lost focus of what Job Corps is all about. When I first heard about Job Corps, and I thought about the process of Job Corps and what it could do for at-risk youth, somewhere along the line, the importance shifted to how much salaries the management was going to make, increasing the dollar amount, and the lack of experience that the managers had in working with the kids. You hire the line staff who know how to work—and they often refer to residential advisors as "line staff"—they hire these people to make them look good, and then, when they thought they were burning out and they were questioning management, they got rid of them. These were the people who understood the kids.

So when you go in and look at a Job Corps center, a lot of people who have no affiliation and do not understand the students at the center, ask the questions of the wrong people, because these people are only going to give you an image of what Job Corps is all about; they are not going to give you the truth about what Job Corps is all about. The only way you can find that out is to know where to ask the questions and to get down there with the students and to

000575



get out of the denial stage and allow outside agencies to come in and evaluate your program to improve some of the positive things that can come out of Job Corps for the students.

The CHAIRMAN. Thank you very much.

Just one further question, Sergeant Stallworth, about your response to Senator Simon about the gang problem. How prevalent is the gang problem in Job Corps nationwide? Do you have any statistics at all that would give us some indication? Is this prevalent nationwide? I think most of us have a hard time even understanding this.

Sergeant STALLWORTH. No, there are no statistics nationwide to the best of my knowledge, and I will be honest—I would be very surprised if any one of you in the positions you have could find that information out, because Job Corps refuses to acknowledge that the problem exists. They try to downplay it or to just flat deny that there is any such thing as a gang problem.

As I mentioned in my testimony and in my written statement, in 1989 we started addressing the issue, and we immediately identified that the bulk of our influence was coming from the Clearfield Job Corps. So we tried to address the issue at that time, and we did not get any response.

The CHAIRMAN. And partly, too, I suppose it is a reflection of disadvantaged youth in our society today; there are more gang initiatives in and among disadvantaged young people today which did not exist that much in the mid-1960's.

Sergeant STALLWORTH. Yes.

The CHAIRMAN. So I suppose it is reflecting that, but to ignore it as a problem is to then jeopardize the whole program, I think, and that is what we have got to address.

Sergeant STALLWORTH. One of the things that happened in my State was that we had officials at the Clearfield facility tell us they tried to downplay the gang past of a lot of their incoming students. All we asked for was to identify that problem and let us know that you have this particular gang member, from this particular gang, in our midst, so that we can be prepared to address such issues.

All we wanted essentially was numbers—how many gang members are out there, what gangs do they represent—and then when we contact them over the course of doing our job, we will deal with the issue at that time. We could not get the basic numbers from them.

The CHAIRMAN. I think Senator DeWine had another question, but first, Senator Simon.

Senator SIMON. If I could just ask Mr. Godinet and Ms. Sakes a question that both Mr. Peterson and Sergeant Stallworth addressed. The idea of having smaller Job Corps centers, smaller numbers, they have both indicated that that makes sense. Does that make sense to you, too?

Mr. GODINET. Absolutely. I believe that a smaller Job Corps center with smaller numbers—instead of opening up new centers, have a waiting line of students wanting to come in, and show the successes of the students who are already there. It makes no sense to open up a new Job Corps center and bring a lot of other students into the same type of environment without improving the existing

008129

environment that you have in Job Corps. So I do believe that that is a very important issue.

I also think that Job Corps cannot be used as a substitute for jail. A lot of students that I met with indicated that their probation officer told them, "Either you go to Job Corps, or you go to jail." That perception in the community is what went out in Manhattan, KA and in the Midwest during that time, and that was the wrong perception of the community about Job Corps.

Senator SIMON. Ms. Sakos?

Ms. SAKOS. I agree that smaller Job Corps would be better. At our Job Corps, we have two programs. I the Prep program, a number of inmates come from the youth detention center in Jamesburg, and they are housed, and they intermingle with the regular students. I think that there should be a separate program for inmates.

And the PAY program was a program where students were sent to Job Corps in lieu of going to jail, or that was their sentence, was to go to Job Corps. Again, I think there should be a separate program for these students.

I think when they screen for these students, they need to screen them better. One of the problems I found as a health services manager was that some students were being sent to Job Corps with suicidal histories, severe emotional problems—they needed to be tested prior to coming to Job Corps. Some of them were at borderline mental retardation and were not even appropriate for the program.

So I think these students need to be looked at separately. When you have a student who is incapable of understanding that he has tested positive for exposure to tuberculosis, and he needs to take this medication on a daily basis, and he cannot even comprehend that, and we have to have the residential advisor give it to him on a daily basis, I do not think these students are appropriate for Job Corps.

So I think smaller Job Corps, smaller programs, and keep it specific. Focus on what it was originally meant for.

Senator SIMON. Thank you.

The CHAIRMAN. Thank you.

Senator DeWine?

Senator DEWINE. Ms. Sakos, let me start if I could with you. Your testimony earlier, and actually, the testimony of all the panel members, would indicate that build into the system today is sort of an economic incentive for the contract agency to be in denial, to deny the violence, to keep as many students on the rolls as they can, which ultimately leads to, Sergeant Stallworth, what happens when you try to investigate and find out and get some information, no one wants to give you any information, frankly because there is an economic incentive for them not to tell you what is going on. Is that a fair summary—or, I guess I would ask if anyone on the panel disagrees with that.

Ms. SAKOS. I agree with that. When I started getting more involved in the management side of Job Corps, everything was focused on the numbers. We cannot terminate anybody from health services for medical this week, for example, because we have had too many already. And these statistics—from what I understand today, there has not been an oversight hearing in many years—so we need to re-look at the statistics.



I am told in the policy requirement handbook that I should only see in a Job Corps as big as ours something like only 10 percent of the students for nonphysician visits.

Well, I would like to know when those statistics were written. Was it 10 years ago? Health issues on our young adults have really changed. So—especially when something is for profit—but that was more or less the atmosphere throughout the Job Corps, was the focus on the numbers, to keep the students there no matter what.

Senator DEWINE. Ms. Sakos, you have alluded to the fact that some of the individuals who are in Job Corps perhaps should be in a different type of program. And you talked about the alternative of you either go to prison, or you go to Job Corps. And I do not know whether any of the members of this panel can comment on it, but I think it is an appropriate question for the committee, and for the committee to ask not only this panel, but additional panels, and that is to try to put the situation in a little historical perspective as to whether or not the group of individuals who are supposedly being served by Job Corps today is a different kind of population than it was 10 or 20 or 30 years ago.

I do not know the answer, because I do not have the institutional memory, I do not have the history of this. But if any of you have a comment on that—Mr. Peterson or anybody else—I would just be curious to know whether, as we are trying to judge how Job Corps is doing today, we are comparing apples and oranges versus how it was doing in 1970 or 1980.

Mr. PETERSON. Well, there is a very strong desire to keep the beds full as the program speaks to it. And I think perhaps that drive does ensure that you are getting somewhat of a different mix of students today than you did sometime back.

You speak of some of the criteria. Maybe the criteria we ought to apply to this program should include what kind of a waiting list of young folks do we have to take this $23,000 scholarship that we are offering.

Unfortunately, at many of the centers, there is not only not a waiting list, but there is active resistance to going there. So that while there are some centers that have been identified by that targeted population as being good and people want to get into them, particularly on the West Coast, there are many centers that people are trying their very best to avoid.

Senator DEWINE. Well, also, is there not a recruitment process?

Mr. PETERSON. Yes.

Senator DEWINE. There is obviously an economic incentive to keep it filled, so there is a recruitment process which goes with that—which may not all be bad, but that is the fact of life.

Mr. PETERSON. That is a fact of life, yes.

Mr. GODINET. The screeners who screen students into Job Corps receive bonuses for the length of time that a student goes to Job Corps. So it is almost more important that they get any kid in there, and they realize that a Job Corps center will try to keep the student as long as possible, whether the student is fit to succeed in Job Corps or not. So maybe you ought to take the incentive away from the screeners that they will receive a bonus for sending a student, which will protect the Job Corps center from allowing some-

I was only going to stay at Job Corps until something better came along, because the school part did not appeal to me at all. But Job Corps saw me coming, attitude and all. The messages I got from them were: No conning, no lying, and no destructive behavior whatsoever—although I did give them a run for their money, until 1 day, my BAM instructor called me into his office, and he asked, "Karen, did you ever consider going into sales for a living?"

I replied, "No."

Then he said, "Well, you should. You are the biggest con artist I have ever met in my life. Now get out of my office."

Wow, these people really knew me pretty well. That was the day I started my new life. Job Corps really did change my life. It gave me the opportunity to learn job skills, do some self-healing, learn communication skills and new and better life skills. Job Corps gave me a vision. Job Corps taught me to take responsibility for my actions and credit for my accomplishments.

At times, I struggled through the program, but Job Corps did not give up on me. Job Corps taught me that I was really important and that I should not give up on myself. So I did not. I completed the Job Corps program, and it was the proudest moment of my life.

Like many other 17- and 18-year-olds in the Job Corps, when I left, I did not find a job in my trade, but I did not give up. Job Corps taught me that if you do not find a job in your trade, just find a job.

I found a job working at a 7-Eleven for about a year. It was the first time in my life I could ever pay rent. I then moved to California, where I got a job working in a copy center. Eventually, we got a computer in the store, and I started messing with it after work. I decided that this was it; this was what I came here for.

I taught myself how to use the computer and how to do design work. Ironically, after leaving California and returning to Minnesota, I found myself unable to find a job because I was overqualified.

With my new skills and the commitment to succeed which I discovered at Job Corps, I got an entry-level position working at a new sign company in St. Paul. I proved to be an asset to the company and presented the owner with a business plan to incorporate graphic design into our sign business.

With trust in me, she made an investment for the company's future and made me a 50 percent partner. We have been open for 5 years now, and the business is very successful. We are an active business in the community, we pay taxes, and we do a lot of community work. We also act as a work experience site for other Job Corps students.

So you can say I may not have gotten a job in my trade, but at least I got a job. In fact, I have never been unemployed since I left Job Corps. Now I am a business owner, giving back to the community more than I ever would have if I had stayed in my trade.

And for those who say that the program is not serving enough and is not worth the investment, I would say that in taxes alone, I more than paid back the Government for my stay at Job Corps.

I am not alone. Each year, the Hubert H. Humphrey Job Corps Center serves and helps 500 students. Seventy-five percent of them get jobs, join the military, or pursue further education. That is just

000577



the tip of the iceberg when you consider there are 88,000 poor kids in the State.

That is why about a year and a half ago, I became a part of the Job Corps system again as an advocate. In the spring of 1994, the Hubert H. Humphrey Job Corps Center, the Midway Chamber of Commerce and my company planned and participated in a graffiti removal project. It was a one-day event, and teams of volunteers were sent out into the streets of our community to clean up vandalism off of our buildings.

The following Monday, I got a call from a local bank executive who helped in the cleanup. He said he was amazed at how sincere, caring and hardworking the students from the Job Corps center were and that he felt guilty about his opinion of Job Corps before that day. On a greater scale here today, I wish to hear the same reaction.

I also got a call from a local business owner who said that in the 20 years that he had been in business, no one had ever done anything this good for the community. What a proud moment for Job Corps. Those students finally got the respect they deserved.

That event was just one of many proud moments for those students. I truly believe it is not always the big college grad who makes and gets opportunities. Job Corps gives young, disadvantaged adults their spirits back.

I met a young woman named Samantha 2 weeks ago. She had graduated from Job Corps and was just starting out on her own and had nothing to furnish her apartment with. So I went to Samantha's to bring her some items for her apartment. What we found was a rundown efficiency with not one ounce of furniture, not even a lamp. But she could have cared less. She had a job, and she was proud of herself and her accomplishments. She told me she was going to get some furnishings eventually, but she was happy just the way things were. Furniture was not even relevant. And I remember myself, when I left Job Corps—it did not matter to me, either. I am sure Samantha will not be unemployed again if she has anything to do with it, thanks to Job Corps.

Newt Gingrich once said, "If you are on welfare, you are not free." That is true, because I have been there.

So I would like to close my testimony with a question. If you were 18 years old, unemployed, homeless, and without resources, would you a) enter the Job Corps program, where you have a chance at a better future, or b) enter the system of the not free?

I made my choice, and I am very proud of it.

Thank you.

The CHAIRMAN. Thank you very much.

Officer Melendez?

Mr. MELENDEZ. Good afternoon, Madam Chairman and distinguished Senators. My name is Luis Melendez. I have been a New York City police officer for 8 years, assigned to the 46th precinct as a youth officer.

I am here to officer testimony based upon my personal experiences with the South Bronx Job Corps Center.

As a youth officer, my primary function is to act as a liaison with the community in dealing with all area youth in the Bronx. Throughout my tenure as a youth officer, one of my most positive

008131

experiences has been the special relationship the precinct has shared with the South Bronx Job Corps Center.

As a youth officer, I have had the opportunity to visit a number of schools within the precinct area, as well as to be in a position to be acutely aware of negative incidents that occur daily in the New York City public school system. In contrast to what is happening in both the schools and in the streets, the South Bronx Job Corps Center offers a safe sanctuary for those kids who believe that an education is still their ticket out of an uncertain future. It not only offers them an opportunity to complete their education, but for many, the residential setting has helped countless youth escape homelessness, hunger, abuse, and other conditions associated with their home environments.

The majority of the South Bronx Job Corps Center student population is from the immediate Bronx area, where most of the youth of the same age category are high school dropouts. Yet I am aware that many of the South Bronx Job Corps students are now attending college-accredited courses throughout the City University of New York system.

Many kids from the Bronx are borderline in that a little push either way makes a difference. These kids by and large do not have the sense that anyone cares, but they do when they become students at the South Bronx Job Corps.

The foundation for the success for the South Bronx Job Corps Center is "tough love," with a strong focus on old-fashioned values. "Doing the right thing is the only thing" is a way of thinking and a way of life. Often, this may be the first time these young people have been made to understand what is acceptable and unacceptable behavior and that every action has a consequence in a manner which is supportive and nurturing instead of hostile and threatening.

The staff work hard to impress that living by these values will be necessary for the young adult to get and keep a job somewhere down the line.

Over time, reverse peer pressure is a natural progression. So many of these kids come to truly believe that Job Corps is their salvation, that it is a wonderful privilege, and they themselves exert pressure over their peers to behave and get the most out of their experience while at the center. This generates a tremendous amount of positive motivation among the student population and, coupled with a consistent discipline system that sanctions inappropriate behavior and extensive counseling support, makes for a winning formula.

The premise of practicing good values is constantly being reinforced with a reward system in place for positive behavior and results, be it in the student's educational and vocational progress, or learning to live and become self-sufficient among 250 peers of several different nationalities.

Over the year, there have been very few calls to the 46th Precinct from the center on violence-related activity, and whenever I have visited the center, the halls and grounds are free of graffiti and trash. It is my impression that the South Bronx Job Corps is doing a terrific job with these kids, and I understand it is rated one of the best in the country.



Every day and in every way, the message at the South Bronx Job Corps Center is to strive for excellence. Over the years, the students and the staff of the center have become the best neighbors to the 46th Precinct and its community members. They have opened up the facility to host a number of events, including joint community relations meetings held monthly. They have hosted and catered a number of meetings for community-based organizations that do not have the room or the resources to do so on their own.

Every year, the 46th Precinct is host at the center for the police clergy conference, the police business conference, and the police fellowship breakfast.

When our community members need assistance cleaning up a park or renovating a church, these kids are there. They have organized and participated in anti-drug and anti-violence rallies, worked in soup kitchens, delivered meals to their peers in the adolescent AIDS ward of Montifiore Hospital, collected and wrapped boxes of toys for the 46th Precinct's "Toys for Tots" campaign every year—and the list goes on.

Every year, our precinct sponsors a talent show for the community though, and South Bronx Job Corps Center students with both students and police officers participating alike. The center has participated in the "Cop of the Month " program, which recognizes heroic behavior from my fellow police officers. Job Corps students are part of the monthly ceremony, presenting the awards with our commanding officer.

Clearly, for a lot of these kids, this positive interaction is the first such interaction they have had, and likewise, both cops and kids share the experience as partners, breaking down the barriers and historical way students have viewed law enforcement in the past. 008132

Students from the South Bronx Job Corps Center lead by example, and as a police officer, I must say that one way or another, we will deal with most of the youth in the community. Watching the students at the South Bronx Job Corps Center growing into caring and responsible adults, and channeling their energies into positive things is very rewarding personally, versus meeting up with them in a public safety arena.

Our precinct is very grassroots-oriented, and after 7 years of working with the South Bronx Job Corps Center, I can without hesitation say that they are one of our best neighbors. If schools in New York City and throughout the Nation could replicate what goes on at the South Bronx Job Corps Center, my job would be easier.

Many articles have appeared in the New York City newspapers about the severe adolescent high school dropout rate. Job Corps fills a much-needed niche that, if not available, would surely result in an even bleaker picture.

In closing, I know what the South Bronx Job Corps Center means to the kids from the Bronx. It means breaking free of generations of poverty and getting much more than piece of paper when they leave. It means receiving love and support that they may never have experienced. It means learning to be a productive member of our community and giving something back unconditionally. It means everything to some of these kids, especially those

waiting to get in and those we know are still out there who need the services.

From my experience as a member of the New York City Police Department, 46th Precinct, Job Corps works.

Thank you.

[The prepared statement of Mr. Melendez may be found in the appendix.]

The CHAIRMAN. Thank you very much. I appreciate the testimony from both of you ,and I will reserve my time for questions and yield to Senator DeWine, since Senator Wellstone is not back yet.

Senator DeWine?

Senator DEWINE. Madam Chairman, I really have no questions. I would just say we appreciate your testimony very much. Your testimony clearly indicates that Job Corps can work and that it certainly is very, very cost-effective in some cases. I do not think this hearing today is about whether it is worth it to spend $20,000, or $22,000 or $24,000 to save a human being and turn their life around. I think it clearly is. I think the question is whether or not Job Corps as it is currently constituted is the best use of those funds, and your testimony, Ms. Anderson and Officer Melendez, has been very, very helpful to me.

Thank you.

The CHAIRMAN. Senator Wellstone?

Senator WELLSTONE. Thank you, and I apologize to both panelists for missing their testimony, which I'll read later with interest. Every once in a while—and I know my colleagues know exactly what I am going to say—every once in a while, a phone call comes at exactly the time you want to be in committee. So my apologies.

First of all, let me thank both of you. Mr. Melendez, and Karen, whose draft testimony I did get a chance to read before coming. I would like to ask a couple of questions.

Karen, you have been willing to kind of lay bare your own personal life because you feel so strongly about the importance of Job Corps. And of course, it is great because in Minnesota, it is named after a great Senator, the Hubert H. Humphrey Job Corps Center.

But what would have happened to you if you had not found Job Corps? I know it is sort of hard to look back, but I think we need to understand what this all means in personal terms.

Ms. ANDERSON. Well, I cannot say that I would have stayed on welfare, but I am sure I would have been on welfare for quite a while. I would say that I had a lot of problems personally—alcohol, myself—and I just do not think I was old enough or intelligent to make major decisions in my life. I probably would have just stayed where I was. I did not really have the smarts to interview for a job even at minimum wage, like McDonald's or something like that, or the clothes or anything. I felt like I was at a point in my life where I just did not have a thing, any means to really pursue a life.

So I probably would have been on welfare, public housing, and getting foodstamps for quite a while if I had not entered the Job Corps system.

Senator WELLSTONE. I have a couple of other specific questions. I know that this letter from George Foreman has already been referred to, but I want to just read the last paragraph again because

000579



of the way in which I think it reinforces your testimony, Karen, or your testimony reinforces this letter.

The last paragraph of this letter from George Foreman to the chairman of our committee reads: "Job Corps has known both praise and criticism, winners and losers. As one who was in it, knew it from the inside and the hopelessness of those to whom it reached out, I have always felt it attacked a problem likely to be with us always, and until something comes up that is a better way, it should be retained. To me, it was indeed a friend in need. It is a sad moment in one's life when he denies his roots or where he comes from, but I acknowledge that whatever I have been and am today, the Job Corps was my starting point. Treat it kindly. Job Corps took me from the mean streets and out of a nightmare lifestyle into a mode where the most incredible of dreams came true."

My point, before I just ask a couple of more specific policy questions, is that at this hearing, it should be emphasized that however we talk about improving this program, however we talk about making this program accountable, however we talk about streamlining this program, let that be only with the purpose of providing constructive criticism. Let it not be for the purpose of weakening this program or abandoning our commitment to the mission of this program, because there are many problems with many different policies in this country—I cannot think of one program that does not have its problems and its imperfections—but that cannot detract from what Mr. Foreman is saying here today. It cannot detract from the testimony of the two of you, because if you think about it, it is the same old story—either you make the investment in young people in the skills and the health and the intellect and the character of young people, and you have hope for them and what they can do for our country, or you pay the price later on. And when I think of the cost of this, and then I compare the modest cost of your training, Karen, versus who you have become and what you do with your business and what you contribute to the community, it seems to me that this is a very worthwhile investment. And I believe that that is what Mr. Foreman is trying to say; I believe that this is what you are trying to say.

I would say to the chair that I hope that whatever we do is only in the direction of building on this program and improving it, not in the direction of moving away, financially or in any other way, from what I think is a very, very important commitment and a very successful program.

Mr. Melendez, since I missed what you had to say—and I apologize for that—given what I've just said, what is your sense of Job Corps' mission? Should we build on what is there, should we try to make it stronger and more positive and expand it, or do you think there is a need to begin to scale back this program?

Mr. MELENDEZ. I can only answer that as to how it applies to my job as a police officer in the Bronx. The Job Corps that I work with is a vital resource for a lot of the kids that I deal with. You have to understand that working with today's youth is hard enough; you have to have things at your disposal, tangible things, that they can get into and that can give them some kind of hope, can give them a way out.

008133

Lots of times, they feel that people are too caught up with other issues and do not have time for them. The sergeant was speaking about gangs before, and I think it is a sense of family and a sense of support that they are lacking, and with the Job Corps that I deal with, that is the sense I get. We deal with a lot of different organizations in my precinct, and we do develop a sense of family, where we deal with each other on a professional level, of course, but we have helped each other so much that it is more of a family type of atmosphere, and the kids see that, the kids that I deal with.

I do not have to State enough how hard it is for a police officer nowadays to deal with youth.

Senator WELLSTONE. Thank you.

And the final question for the two of you—and Madam Chair, I have visited the Hubert Humphrey Center in St. Paul and had a chance to meet with a lot of the students and staff and to talk to them about their lives, and also have had a chance to talk with the graduates and have seen what they have been able to do in their lives—what would each of you say about Job Corps' mission? The most important thing is that this hearing begins to lay the basis for that analysis.

What would each of you say is the single most important key factor for success, based upon your own experience, so that we can make sure that that is a part of all of the Job Corps programs—because that is key if we are going to maintain this program, and build on what we've done in the last 30 years. We had better not move away from our commitment to the program. Are there ways of improving the Job Corps to make it more effective.

Ms. ANDERSON. It is obvious to me that from what I have heard today, it is who is running the Job Corps center. It is good management. I know that the Hubert H. Humphrey Job Corps Center is run by the Vanel Corporation, who obviously must do a tremendous job running that center, because I see nothing but positive. And when there is negative in any situation there, it seems to get taken care of pretty quickly.

I was shocked to hear some of the stories today. I would say management. You know, it starts from up top; it is your staff. I think it is important that maybe those Job Corps centers in those real hard areas need more security.

You know, when I went to Job Corps, I did not just get out of Yale. I was living on the streets; I was a mean kid; I caused a lot of trouble. But I learned to accept that troubled side of myself as a positive in how I brought it into my future.

So I think management has a lot to do with how those Job Corps centers are being dealt with.

Senator WELLSTONE. Thank you.

Officer Melendez?

Mr. MELENDEZ. I would pretty much piggyback on what Ms. Anderson said. I think you have to accentuate the positive and the good things that are being done. Just like in any major corporation, any department, you can look at any facet of life, and there are problems with certain aspects, but you have to look at the good that is being done. And the things that are not working out so well, you just have to take a better look at them.

000580



Just looking at it from my standpoint, in New York we have 76 precincts, and what may work in one precinct may not work in another precinct. I think you may have to do the same thing with some of the Job Corps centers—look at what is working in some of them and maybe take some of those programs or projects or initiatives or ideas and see if they will work somewhere else.

Senator WELLSTONE. Thank you very much, and I apologize for my impoliteness of stepping out while you were testifying.

Thank you, Madam Chairman.

The CHAIRMAN. Officer Melendez, you mentioned that what works in one precinct might not work in another. As I understand it, the South Bronx Center has as their students only those from the South Bronx area; is that correct?

Mr. MELENDEZ. I think it is a little wider than that. I am not sure, but I do not think they are just from the South Bronx. I think they probably bring kids from all over.

The CHAIRMAN. From the New York area, though.

Mr. MELENDEZ. Right.

The CHAIRMAN. In some of the centers, they come from other States; there is an active recruitment to bring them in. I was just wondering if, when you said it was sort of like family, they were basically there from the same area, so they did feel a certain closeness, and if that is an advantage.

Mr. MELENDEZ. I understand what you are saying as far as coming from different States and areas, but I am a firm believer that kids are kids, and most kids are willing to embrace certain concepts. I think that is one of the reasons why we have gangs; they are following——

The CHAIRMAN. And how do you deal with that problem in the South Bronx center?

Mr. MELENDEZ. Well, I am not saying it is an easy problem, and you are not going to cure it overnight, but there has to be some sensitivity at the site. I have met people at Job Corps who used to go to Job Corps and are now working there. I think that is helpful, because the kids see that you can come into the center and go out and prosper and come back, and give back something to the kids who are in there. So that is something that you may want to look into, something like a mentoring program where the kids can see people who have made it. A lot of kids who are out on the street just see drug dealers making it, or people who rob and burglarize making it, and that becomes, unfortunately, a mentor to them. So that is something you may want to look at.

The CHAIRMAN. Ms. Anderson, I was impressed that you are involved with a work experience program, that you initiated a work experience site, I guess you call it. I have the feeling that you actually would have done quite well, even without the Job Corps program. I think you have a lot of abilities and a keen understanding of some of the needs that exist. You have put into place, I think, not only dealing with your own problems successfully, but you have translated that into some very positive work.

Follow-through is one of the things that has troubled me. There is not good data on where young people have gone and one helping them. Maybe their first job only lasted a month, if that long. Is

008134

there a place to go—tell me what you do at this work experience site. Do you help graduates of the Job Corps center?

Ms. ANDERSON. They are actually students who are still in Job Corps. They call it a work experience site. After a person completes his or her program and has not yet left Job Corps, they would come to my business for 6 weeks, from 8 o'clock in the morning until 2 o'clock in the afternoon, and treat it as their employment.

I feel like my work experience site is kind of special in the sense that we do not necessarily cater to the office occupation student, the BAM student, the TCU, culinary arts, or whatever; but we bring students into my business so that they can see first-hand what it is like to operate a small business, whether they are in culinary arts or any other trade that they took, so they can see what happens in accounting, what happens up front with the customers, how do we run production through.

So every Job Corps student that I have had in my store has just been a tremendous help. They have all worked hard, they have really tried hard to prove themselves. And that is kind of the sad part where I feel bad about those students, because they have to work twice as hard as the next guy. They really have to try to prove themselves, and it is very important for those kids in Job Corps to see a business operating and how things work and all that. So I feel that it is really an important part of Job Corps.

The CHAIRMAN. I agree with you, and I am really pleased to hear what you are doing in that regard and how that is working.

I would gather that both of you feel that if there were a drug or violence problem at the centers with which you have been involved, that it was not great; is that correct?

Ms. ANDERSON. The Hubert H. Humphrey Job Corps Center really does have zero tolerance policy. Did I see drugs while I was in Job Corps? Absolutely, I did. On a large scale? No. But at the same time, if I were to look back on it, that exactly the kind of kids who go to Job Corps, people who are going to turn it around. But those people did not last long at Hubert H.

The CHAIRMAN. They were either dismissed or helped; is that right?

Ms. ANDERSON. We did not have zero tolerance while I was in Job Corps, but I will tell you they did get a lot of chances. But I think it does not matter how old you are, 17 or 47, if you are not going to take to having somebody help you, then you need to leave, obviously.

I think people get to the point where they say this is not working for this person, and they are not helping us in any way, and so they do not last in the program; but that is going to happen.

The CHAIRMAN. And that is management, too.

Ms. ANDERSON. Management, too, absolutely.

The CHAIRMAN. Thank you both very much.

Senator Pell?

Senator PELL. I have one question, and that is how do you account for the difference between the testimony of the earlier witnesses and your own experience? You said, Ms. Anderson, that it was a question of management? Is that what your thought would be—leadership?





Ms. ANDERSON. I would think that if a Job Corps were run properly—I know that the Job Corps center in St. Paul may possibly be a model Job Corps center—but I grew up on the streets, so I would imagine that any Job Corps that you go to is going to be a real tough environment, although in areas where the populations are either way too large, or their are mismanaged, I think that is a problem.

I think the basic point for Job Corps is that it is going to take young adults who have absolutely zero other options and get them into the work force, and I think that is the main objective.

I would say my opinion, just having an opinion about it, is it would be a management issue. If a Job Corps does not have the proper security, that could be a problem. My story is very different from their stories. I would have never spent 21 days in a Job Corps center. I would have spent maybe a couple of months, to adjust to the environment. So I spent a year at Job Corps, and it was a positive experience for me. That is kind of how I feel about it.

Senator PELL. Thank you.

Officer Melendez?

Mr. MELENDEZ. Actually, I was kind of surprised at some of the testimony and a lot of the negative things that I heard, compared to the Job Corps that I am associated with and that I work with. I kind of thought that all the Job Corps centers were like the one in the South Bronx, and that they were all doing an outstanding job. Everybody has problems, and you are going to have isolated incidents, but I was shocked at what I heard today. I thought everybody was going to come in here and just rave about the Job Corps, and so to hear some of the things that are going on is surprising.

Senator PELL. Thank you.

Thank you very much, Madam Chair.

The CHAIRMAN. Senator Simon?

Senator SIMON. Just an observation. My impression— and I have to say my experience is extremely limited—but from just visiting two Job Corps centers is very positive. When you mention management, I think that really is a key, and I think the most important point on management is not in itself enough, but management really has to care about young people and not just the bottom line and how many bucks you can make on a situation.

Officer Melendez, in your excellent testimony you talked about the Job Corps participants being "borderline." I think that is a pretty good description. And if you will forgive me, Karen Anderson, you were borderline——

Ms. ANDERSON. I was probably a little bit less than borderline.

Senator SIMON [continuing]. But you have turned into a great asset to your community, and I think your testimony was terrific. George Foreman was borderline, and Job Corps lifted him.

I think what we have to do is say that yes, we have to improve the situation; we have some situations that are not as good as they should be—but we should keep your testimony in mind.

I thank you very much.

Thank you, Madam Chairman.

The CHAIRMAN. Thank you, and I agree. We should keep your testimony in mind. It is important to hear the success stories that do exist. I think also, because we do care about wanting to reach

008135

those who are troubled and who go to the Job Corps program seeking help, we owe them the very best Job Corps program we can provide.

And where there are problems, and where violence may exist, it is not fair to those who wish to succeed in that program not to look at it with a critical eye. That does not mean that it is not very important, and I think that is what this committee is trying to do.

So we value your testimony; I think it helps give us a side of the picture that we need to keep in mind. Thank you very much for coming today.

[The appendix follows.]

000582



# APPENDIX

## PREPARED STATEMENT OF SENATOR HATCH

Madam Chairman, I want to thank you for initiating these hearings to review the Job Corps program.

As you know, the Job Corps has recently celebrated its 30th anniversary. it is one of the few programs that came out of the Great society era that I actually agree with and believe has done a lot of good.

I am proud that Utah has two Job Corps Centers—Clearfield and Weber Basin—which have posted records of achievement.

I believe, Madam Chairman, that there is a place in an integrated job training system for a residential program. While I agree that Job Corps is an expensive program to operate, there are some young people who simply must get away from the poor and unhealthy environments that have contributed to their unemployability, substance abuse, juvenile delinquency, or other difficulties.

At the same time, I agree with your concerns about maintaining the Job Corps as a job training program, not a quasi-correctional program. And, I am most disturbed, as I am sure all Job Corps supporters are, about gang involvement in Job Corps centers. It should be obvious to everyone that steps must be taken to protect the integrity of the program.

Additionally, the type of intensive residential remediation and training offered by Job Corps is not for everyone, however. Perhaps we also need to make more effective determinations about those young people who can succeed in Job Corps and those who are likely to drop out or who may have a harmful effect on other participants or on the community.

I agree with the chairman that the taxpayers do not have money to waste on the ineffective placement of youth in Job Corps as opposed to a job training program that may be better suited to them.

As much as I support the Job Corps, I do not believe that it is perfect. I held an oversight hearing on the Job Corps during my tenure as chairman of the Labor Committee. During that hearing, we exposed several Job Corps Centers that had been allowed to deteriorate.

I believe oversight is essential to ensure program integrity and effectiveness. In my opinion, Congress does too little of it. Almost any Federal program can be improved, and I support the oversight of job training programs initiated by Senator Kassebaum. This particular hearing has identified important specific areas for improvement in the Job Corps, which, if we act on them, will help Job Corps meet our expectations for performance as well as its own goals for assisting young people in our country.

008136

January 16, 1995

Chairman Nancy Landon Kassebaum,
Senate Labor Committee
Senate Office Building
Washington, DC

Dear Chairman Nancy L. Kassebaum:

My mail and my telephone since November 5th, last year have been full of appeals that I be heard from on many subjects. One is the great honor of an invitation to appear before your congressional hearings regarding the Job Corps. My schedule is so jammed, including impending departure to Europe, a personal appearance is impossible. But I want to be known as in Job Corps' corner as it was once in mine. Since 1968 when I went from the Parks Job Corps Center in California to Mexico City where I won my Olympic Gold Medal, I have gone on record before all kinds of audiences and in one Congressional hearing about what a youthful direction-changer it was for me. It was more than a skill training experience. It showed me there were well-intentioned & caring people from the biggest American corporations to dedicated individuals who were helpful if there was matching effort and response from us youthful disadvantaged in quest of opportunities they provided first steps from the swamp we were in and that there was a way out and up in lives for which no hope was apparent before.

Job Corps has known both praise and criticism, winners and losers. As one who was in it, knew it from the inside and the hopelessness of those to whom it reached out, I have always felt it attacked a problem likely to be with us always and until something comes up that is a better way, it should be retained. To me it was indeed a friend in need. It is a sad moment in one's life when he denies his roots or where he comes from but I acknowledge that whatever I've been and am today. The Job Corps was my starting point. Treat it kindly.

Job Corp took me from the mean streets and out of a nightmare lifestyle into a mode where the most incredible of dreams came true!

George E. Foreman,
Twice and Current Heavyweight Boxing
Champion of the World

000583



The Honorable Nancy Kassebaum
Chair, Committee on Labor and Human Resurces
302 Russell Office Building
Washington, D.C. 20510

Dear Senator Kassebaum:

I am writing to share with you my firm support of the Job Corps program.

I am a volunteer who contacts Job Corps completers when they return to Polk County, Iowa. I have assisted them with finding jobs, going on to college, locating housing, and securing medical care.

In addition, I have visited six Corps centers during the past year to improve my follow-up skills with these young men who are usually beginning their first job in the "real world".

I've observed that the finest training programs at Job Corps centers are those which are in partnership with free enterprise corporations. My conclusion is that we need to encourage more of this kind of cooperative opportunity for at risk young men who are being equipped for lifetimes of tax-generating and income producing employment.

I am proud to be one of thousands of volunteers all across America who are able to help many Job Corps completers make successful transitions into our nation's workforce.

If there are any ways I may work with you to improve Job Corps training for at risk youth please feel free to solicit my support.

Thank you for your leadership.

Rev. Wayne Hoehns
1422 Cutler Ave.
Des Moines, Iowa 50315

008137

## PREPARED STATEMENT OF GERALD W. PETERSON

Madam Chairwoman and Members of the Committee:

I am pleased to appear before you today to testify on the Job Corps Program. Specifically, I will attempt to convey some of my concerns that result in unsatisfactory performance outcomes by students.

Concern #1 - Lack of Congressional Oversight. The last Senate oversight hearing on Job Corps took place in February 1984. For a program costing more than a billion dollars a year, you should do better.

Concern #2 - **Lack of Management Commitment**. My initial briefing of you and your staff pertaining to much of the data I will discuss today was dismissed as "erroneous . . . or misinterpretations of isolated facts" by Secretary Reich. The current Director of Job Corps told me I was wasting his time when we briefed him on this data and in fact refused subsequent briefings offered on our "Analysis of Costs Invested in Human Capital in the Job Corps Program."

Concern #3 - **Policy and Program Problems**.

-- $100 million spent with no measurable benefits - 15% of the resources invested in the Job Corps program had no measurable return. Participant did not get a job within six-months of leaving the program, did not demonstrate any educational achievements, and did not complete a vocational program. There were 13,112 students who fell into this category in PYE 1990. This represented 20.6% of total output.

-- Students are not being placed in jobs for which they are trained - Only 13% found jobs that match the vocational skills they gained in the program for PYE 1990.

-- In PYE 1990 24.1% of the total Job Corps participants were lost in the system - Job Corps simply does not know what happened to them. Knowing what happened to students after leaving Job Corps is essential, before any evaluation of program effectiveness is possible.

-- Approximately 1 out of 5 of the total Job Corps participants are not placed in any job, returned to school, or entered armed forces.

-- Only about 17% of the total Job Corps funds actually went towards educational/vocational



training in PYE 6-90. Costs were incurred in the following categories:

+ Administration - 26%
+ Residential living - 24%
+ Educational and vocational training - 17%
+ Facilities, equipment, and depreciation - 14%
+ Allowances - 10%
+ Medical and Dental - 4%
+ Outreach, screening, placement-3%
+ Travel and transportation - 2%

-- Consistently poor performing centers are not closed. These poor performing centers place fewer students upon termination, assist fewer students in obtaining their GED or in achieving learning gains, have fewer students who complete their vocational training, and have a higher turnover of students. At some point, Job Corps must decide whether it is wise to continue to invest in a center which is performing poorly and not meeting program objectives, or whether these funds are better invested elsewhere.

-- There is $400 million in unfunded renovations necessary to make the current Job Corps centers a more desirable environment and conducive to learning and intensive training. This may help to explain why in PYE 1990 39% dropped out within the first 90 days. Job Corps management says the drop out rate results from its strict discipline which they see as a sign of the program's success. In actuality only 13% drop out for disciplinary reasons.

Job Corps is a very expensive program, costing tax payers over $1 billion a year. This translates to about $23,000 per year, per participant. I believe that program operations and performance need to be carefully evaluated and corrective action taken if we are to continue investing in this program.

008138

000584

## PREPARED STATEMENT OF RON STALLWORTH

Madam Chairwoman, distinguished members of the committee, ladies and gentlemen; I want to thank you for allowing me this opportunity to present testimony on a matter I feel is crucial in addressing the needs of a particular segment of American youth. Before proceeding any further I would first like to introduce myself.

I am Sergeant Ron Stallworth, of the Utah Department of Public Safety's Division of Investigations. I have been a law enforcement officer for approximately 20 years. I am the senior gang investigator in the State of Utah and currently serve as its Gang Intelligence Coordinator. I have been involved in the Utah law enforcement response effort against gangs since its inception in April, 1989. It was my concepts for addressing this issue that later resulted in the creation of the federally funded Salt Lake Area Gang Project (a multi-jurisdictional gang suppression and diversion unit). In addition I was a pioneer in the study of gang behavior and mentality as expressed in the lyrics of "gangster" rap music. I have authored two self published books on the subject and have conducted training throughout the country at seminars sponsored by federal law enforcement agencies, including the offices of the Drug Enforcement Administration, Bureau of Alcohol, Tobacco & Firearms, U.S. Marshall's Service, Department of Agriculture/U.S. Forestry Service, and U.S. Attorney. In February, 1994 I presented testimony on the subject of "gangster" rap music to the U.S. Senate Judiciary Subcommittee on Juvenile Justice. In November, 1994 at the invitation of the National Drug Intelligence Center, under the auspices of the Department of Justice, I was invited to participate in a Street Gang Symposium. I along with fifteen (15) other "recognized street gang experts from state and local law enforcement agencies across the country," were brought together to examine the street gang problem from a national perspective.

Let me state at the onset that I am first and foremost a believer in and supporter of the mission of social programs, such as that of the Job Corps. Programs such as this, which are designed to help disadvantaged youth achieve a basic measure of education and vocational training, when effectively and responsibly managed, are noble efforts on the part of the American consciousness and very, very necessary. When such endeavors are successful they embolden the impacted individual to bolster self-esteem and in the process encourages the continued pursuit of achievement towards becoming a productive member of society.

The America of the 90's, ladies and gentlemen, has become a hostile land of inane aggression and violent acts of defiance by the "have nots" of society towards the "haves." Nowhere is this attitude and behavior more evident than among the youth, especially those whose lives unfold amidst the dismal, sordid squalor in the "concrete jungles" of the inner cities.

Fuel for this cycle of violent aggression frequently lies in the sense of disfranchisment and despair brought on by the social isolation of inner city living. In such circumstances the despair I speak of often lies in the failure of inner city inhabitants to feel a "connection," a sense of community, with the mainstream of American society. Too often the feeling of social isolation results in a destructive mind-set among the youth of inner city America. In their misguided effort to express a sense of self-worth and achievement, these young people all too often find themselves on the path of destruction--towards themselves, their peers (who are often innocent bystanders), and the community-at-large.

It therefore becomes imperative that those in positions of power and authority do everything within their means to address such issues. If we as a society are to have any hope of reducing and/or eliminating this feeling of despair and social isolation, it is essential that we arrest the development of the "violence as a normal response" attitude which finds favor among the youth of America, especially those in the inner cities.

Having expressed my support for the Job Corps mission, I must now express some concerns that I have regarding the program. The reservations I have are based on my personal knowledge and experience of having worked on the gang issue in the State of Utah during the past six (6) years and of involvement in this issue from a national perspective over the course of my role as a national lecturer during the past three (3) years. The issues I discuss have been experienced, personally, by me over the course of my years as a Gang Investigator in my state. To aid in the understanding of the subject of Job Corps, gangs and their impact on Utah society





I attach a copy of my report titled, "Gangs In Utah: A Panoramic Perspective On The Culture" (pages 2-15 specifically discuss the connection with Job Corps). This report was prepared in conjunction with the Utah Department of Public Safety's 1993 Summit on Gang Violence. Out of fairness to the current leadership of the Job Corps program in Clearfield, Utah I must state that there has been a significant change of direction, for the better, where concerns for Job Corps student/gang members and their negative impact on the surrounding communities has arisen. This change, though not as encompassing as I and other gang investigators in the state would like to see, is nonetheless in marked contrast to the previous administration of the Clearfield program.

As I stated earlier, programs such as Job Corps are a very necessary ingredient in the recipe for addressing the plight of disadvantaged youth in this country. However when it is time to add this ingredient into the mix some important considerations must first be examined. Among them are:

1. The effectiveness of the program to positively impact the targeted youth.

2. The locale of the program in relation to the environmental background of the targeted youth. For example, rural vs urban/big city (i.e., Los Angeles) vs small city (i.e., Salt Lake City). Cultural issues should also be subject to review.

3. The impact on the community in the placement of certain groups of targeted youth.

When all of these factors are considered and the end result is a negative, then you will find that the community (or some vestige of the community) will explode in an uproar of negative verbiage against such programs. It is under such conditions that Job Corps has come under close scrutiny and severe criticism from the citizens whose taxes support its existence. An addendum to this would also lie with the failure of Job Corps officials to adequately assuage the concerns of the community regarding certain aspects of their program. The issue of gang involvement on the part of Job Corps student/gang members is, perhaps, the best example of the latter.

In the latter part of the 1980's this country was impacted by a major social epidemic: the migration of inner city gang members across the heartland of America. This migration, primarily from metropolitan Los Angeles, set in motion a social phenomenon of violence, anti-authority defiance, and revolutionary anarchism among the youth which drastically altered the landscape of communities across the nation and, in the process, destroyed lives. The migration revolved around several issues. As stated in the 1994 National Drug Intelligence Center's "Street Gang Symposium Report," among the reasons why street gang members migrate from larger cities to smaller cities and communities are:

1. Relocation of families.

2. Avoid apprehension and prosecution.

3. Avoid retribution from rival street gang members.

4. In connection with private and public training and rehabilitation programs.

5. New criminal markets and higher illegal profits.

6. Less street gang rivalry and competition.

7. Easier to intimidate and manipulate the community.

8. Limited law enforcement resources and lack of street gang recognition/awareness.

This migration across the expanse of contiguous American states spread a cultural dynamic and anti-authority/anti-mainstream value system which, as a byproduct of the criminal association of gang involvement, has torn at the fabric of our society. This cultural dynamic has empowered our youth, most notably those in the so-called "at-risk/troubled" category, to heights of influence and power previously unheard of in the communities from which they originated.

Over time and under such circumstances as listed above, many youth came under the wing of the Job Corps program (In particular see category #4 above). In perhaps the vast majority of cases these individuals sought out Job Corps as a legitimate and bonafide means of social betterment. Unfortunately, though, some of these youth became products of the program as a result of court ordered mandate referral; i.e., "join Job Corps or go to jail." It should be noted that in my encounters with Job Corps students over the years, many have told me that they were in the program as a result of having committed a criminal offense in their city of origin and were given such an option by the court.

As evidenced by my report on the history of the Utah gang environment, "Gangs In Utah...," since at least 1978 the role of some Job Corps student/gang members has been a negative one in terms of their impact on Utah society, especially among its youth.

In part that negativity has been based on a form of "culture shock" experienced by the transplanted student/gang members. This culture shock relates to my statement on the previous page regarding locale being given prime consideration when determining the placement of some Job Corps students.

For some of the inner city gang members placed at the Clearfield, Utah Job Corps facility the relatively pristine and sedate Utah lifestyle (in relation to the lifestyle and cultural environment of the neighborhoods from which they came) is an alien experience. In such instances it is only natural to search for and/or cling to that which provides familiarity to a more comfortable zone of experience. This, in part, accounts for the propensity of Job Corps student/gang members to respond to the foreigness of the Utah environment by clinging to the lifestyle of the gang culture which nurtured them. Their efforts to adapt brought them in close contact with Utah youth who admired the defiant, anti-authority/anti-establishment stance of that particular culture's value system. This, in turn, led to the adoption of the counter-cultural lifestyle of gangs on the part of Utah's young. The end result of this "cross-breeding" of cultures has spawned a new generation of hardened Utah youth—gang members—which, in turn, led to a level of violence previously unseen on the streets of Utah communities.

For Utahns the inability of the Job Corps student gang member to acculturate to a different social climate reflects a negative stain on the pristine setting I spoke of earlier. That stain binds us to the social phenomenon caused by the gang migration.

As I previously mentioned, criticism of the Job Corps program, especially among law enforcement officers throughout the country who have had the misfortune to come into conflict with its negative aspects, lies in the failure of its administrative officials to respond to legitimately expressed concerns from the community. The issue of gang involvement among its students is an excellent example.

The Utah law enforcement community began to proactively address the issue of criminal street gang activity in April, 1989. It was quickly determined that some Job Corps student/gang members from the Clearfield facility were, to a great extent, prime reasons for the increasing metamorphosis of Utah youth into acceptance of the gang cultural value system as their preferred mode of behavioral expression. To aid us in identifying the extent of the gang presence in the Salt Lake City metropolitan area, we in the Salt Lake Area Gang Project sought the assistance of officials with the privately run (Management and Training Corporation—MTC) Job Corps facility in Clearfield, Utah. The student/gang members we were routinely encountering on city streets were from this particular facility (there is a second Job Corps program operating in the Ogden-Salt Lake City metropolitan area which is managed by the Department of Labor). The nature of the assistance we requested was as follows:

1. Name of gangs represented on the Clearfield facility.

2. Names of identified Job Corps gang members (or verification of information independently obtained by gang investigators).

3. Monikers used by identified Job Corps gang members.

4. Dates of birth.



5. Social Security Numbers.

6. Home address of the city of origin of identified Job Corps gang members (many times if an individual's gang affiliation is not readily known it can be determined by virtue of a home address in the city of origin).

Regretfully our simple request for assistance went unanswered. In fact, the response chosen by Job Corps officials was to not cooperate with our efforts to address public safety issues involving a small percentage of their students. They resorted to a semantical game of denying they had "true" gang members at the Clearfield facility, but rather if they had anything it was nothing more than "wannabe" gang members. To understand the use of this term by Job Corps officials in an effort to deny or downplay the existence of gang members in their program, please refer to page #12 of my "Gangs In Utah..." report.

From the very beginning of our contact with Job Corps officials regarding the negative impact some of their student/gang members were having on the community, we asked a few simple questions: Does Job Corps have an obligation to the communities negatively impacted by the effect of its program? Do Job Corps officials, in their zealousness to maintain student capacity, have an obligation to assure Utah citizens that the social environmental impact of their somewhat dysfunctional human imports will not be a stain on the Utah lifestyle? Is there a moral, ethical, and professional obligation on the part of Job Corps officials to do everything within their means to rectify (or lessen) the impact of the burden placed on Utah taxpayers and its criminal justice system by a group of its out-of-control charges whose basic foundation is rooted in placing a high regard on aggression and violent expression against authority, and whose cultural ethic is diametrically opposed to that of the mainstream? To us the answer was a clear and resounding.....YES!

The Clearfield Job Corps program is federally subsidized with tax dollars which are administered through the private Management and Training Corporation in Ogden, Utah. The corporation and its employees are rooted in Utah society and, like all citizens in the state, have a vested interest in issues of public welfare and safety. A conflict seemingly occurs when the interest of a private enterprise's effort to ensure a profit requires that they promote a false image to the community by suppressing viable information which could aid in securing the safety of the general public and which, in fact, undermines all legitimate efforts to that end.

Privately managed Job Corps programs maintain a "polished" public face in order to sell itself to the community. I have learned over the years that when this image comes under fire, when any aspect of the program with the slightest hint of negativity attached to it is brought to the focus of public scrutiny, Job Corps officials adopt a siege-like "Us versus Them" mentality. In essence they circle their wagons to try and diffuse or redirect the focus of attention from the particular issue in question.

The most egregious act on the part of these officials to protect their image in the wake of law enforcement efforts involving their student/gang members has been the subtle use of threats and intimidation. I have twice been on the receiving end of such tactics by MTC/Job Corps officials.

There have been other efforts on the part of these officials to protect their program and its public image whenever conflicts or potential conflicts occur with law enforcement. Such arrogant defiance is, at the very least, irritating and, at the very worst, contemptuous of all proper perception of appropriate ethical behavior.

As I stated at the start of my testimony, I am a believer in and supporter of the basic mission of the Job Corps program. I cannot, however, support such efforts when responsible officials act irresponsibly to the needs and concerns of the public interest when it regards issues of public safety.

My remarks throughout this testimony have centered on the program and actions of officials of the Job Corps program in Clearfield, Utah. The second program I spoke of earlier, Weber-Basin Job Corps, has had virtually little contact with law enforcement officials in comparison with their Clearfield counterpart. In my years of addressing this issue I can only recount,

008140

000586

perhaps five incidents involving students of the Weber-Basin program. Is this a reflection of management styles? One can only surmise that perhaps management influences may be an important factor.

From a law enforcement perspective there has been nothing but complete and total cooperation from Weber-Basin officials on those few occasions when they have had to be contacted regarding problem students. Perhaps this positive attitude accounts for the Weber-Basin program, based on a five year (1988-92) study, being listed as among the best Job Corps centers in the country with a #3 rating (as opposed to the Clearfield facility which was rated significantly lower). The contribution of the Weber-Basin program to Utah's increasing gang presence has been non-existent compared to that of the Clearfield program.

Is the Job Corps program in Utah the only one of its kind contributing to the spread of gang culture throughout the United States? In July, 1993 I testified in a capital homicide trial in Austin, Texas which ended in the conviction of a 19 year old Houston gang member accused of murdering a Texas State Trooper. Testimony from family and friends of the accused indicated he began exhibiting gang behavior and expressing a propensity towards violent acts of aggression towards law enforcement officials only after spending time in a Job Corps program.

I have had conversations with law enforcement colleagues in the midwest and along the eastern seaboard who have had similar encounters with Job Corps students and officials as those I have described in my testimony. The only difference in their experiences and mine has been the locale. Everything else remains the same in an almost clone-like fashion. I have also had discussions with Idaho officials of the U.S. Department of Agriculture who have had negative encounters with Job Corps student/gang members.

As I expressed earlier much of my reservations regarding the Clearfield Job Corps occurred under a previous administration than that which currently oversees the program for the Management and Training Corporation. It should be noted by this committee, however, that some holdover of the actions of Job Corps officials causing those reservations remain today under the current leadership. In point of fact the most egregious acts by those officials in response to law enforcement efforts have strictly come under the auspices of the current administration.

Ladies and gentlemen of the committee, I am not "the enemy" of Job Corps, as some officials with the Clearfield program have asserted over the years. I whole-heartedly endorse the basic intent of the program. I do however think that under the management of certain private enterprises it has become a "Frankenstein" monster rampaging out of control. It needs to be brought back into focus and made accountable to the needs and concerns of the citizens whose tax dollars support its existence. Towards this end I would suggest the following questions be asked and deliberated on during the course of these hearings:

1. Is the private contractor system the best resource to administer the federal funds in pursuit of the mission of the Job Corps program. Should this system be abolished and reaffirmed under the Department of Labor as it was originally intended?

2. Should a comprehensive investigation into the administration of the federal funds supporting the Job Corps program be initiated by an appropriate federal law enforcement agency?

3. Is the money used to maintain the Job Corps program receiving adequate return on its investment? Is the program having a positive effect on the vast number of its participants or are the statistics reflecting a financial boondoggle that could, perhaps, be better used in a different format?

4. Is there some federal guideline that prohibits private contractors from cooperating with law enforcement officials in maintaining public safety by providing select information on "problem" students? If so should it be reevaluated with provisions attached that would allow for exceptions in select circumstances?



5. If a veritable "social disease," such as gangs, is going to be imported into unsuspecting communities as a result of a "benevolent social improvement program" administered by the federal government; should the government then have an obligation to assist those communities in funding to address the backlash of having to respond to the negative impact of their "benevolent migration?"

In closing, I feel we must take an introspective look at the current state of America and the impact of its youth on the affairs which threaten to tear apart our society. We must then turn our sights towards the future and ask what effect will the youth of today, governed by the ethics of gang behavioral attributes and the social isolationism caused by being products of America's "concrete jungles," have on the structure of tomorrow's society, if left unchecked without a Job Corps or similar type program to address certain needs?

To me, ladies and gentlemen, the outlook is a frightening one. Much of this country is held hostage by the grip of gang culture and its behavioral attitude on the hearts and minds of our young. In the Salt Lake City metropolitan area that grip has seized children as young as 6 years of age. We must stop the death grip of gangs! We must actively seek to control the ingredients which make the socially excluded inner city communities fertile environments for the fermentation of gang culture. Quarantining such a social bacteria, keeping it confined to the inner cities from which it has traditionally nestled, will forever be doomed to failure. We must seek to control this problem at its source, in part, through the positive benefits of a Job Corps and other such programs. If such endeavors prove successful, then as a society of concerned citizens, perhaps, we can limit its spread.

The youth of America, ladies and gentlemen, represent our future. We must seize control now to insure that the future for them is a bountiful one. Well managed social programs whose model is one of a cooperative and vested interest in community concerns (as opposed to assuming an adversarial stance due to the facade of maintaining a "polished" public image) can go a long way towards insuring that future shines brightly for generations to come.

Thank you very much.

008141

000587

## DALLAS NEWS SERIES—"TROUBLE AT THE CORPS"

| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| "Students call it SCARY<br>Employers call it CRAZY<br>the Inspector General calls it a WASTE<br><br>A Becky Oliver exclusive..." | The three-part investigative report aired during November ratings period on KDFW Channel 4 News in Dallas. Many of the statements are untrue. Many of the images are staged and distorted. What follows are the facts about the McKinney Job Corps center and national facts about Job Corps. |
| "The campus is a haven for sex, violence, gangs and drugs." | ***FACT:*** *These claims are, simply put, lies. Many scenes show normal events technically dramatized to give a sinister effect.* |
| Visual: Blurry, Gritty black and white images with ominous background music. | This footage was taken by a hidden camera in a security guard flashlight. Upon close scrutiny, you will see that these images show students in their dorms, in the recreation center, the cafeteria and other common areas on center. |
| Anchorwoman: "Investigation shows rampant abuses..."<br><br>Becky Oliver's introduction to the segment. "...complaints were unbelievable..." | ***FACT:*** Since 1989, the Inspector General has issued 202 reports on Job Corps. None of these reports uncovered "rampant abuses" of a fiscal or program nature of any kind. |



| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| Job Corps Employee ID of man saying "its a madhouse, the students run the campus." | ***FACT:*** This man is an investigative reporter for channel 4.<br><br>According to students, this man encouraged, solicited, and orchestrated unacceptable behavior among McKinney students so he could film it instead of performing his hired duties of providing for the safety and security of students, staff and property as stated in his job description.<br><br>***FACT:*** There is a strict disciplinary and behavior code that all Job Corps students are to follow. In addition, regulations require between 12-15:1 teacher-to-student ratio in academic and vocational classes. |
| "Weapons are not allowed on campus but weapons are common knowledge on center..." | ***FACT:*** This is a false statement. Weapons are not common knowledge on Job Corps centers and by regulation are prohibited on all centers.<br><br>***FACT:*** To ensure safety on all Job Corps centers, center staff periodically check dorms and lockers for weapons, drugs and alcohol or other unauthorized items. If a weapon is found, it is confiscated, destroyed or turned over to local authorities. The owner must then appear before a center review board which recommends termination or other sanctions. |
| Hidden Camera: "Here a student brags about making weapons in carpentry class." | ***FACT:*** This statement is out of context. This student voluntarily signed a statement saying that the incident he mentioned <u>happened several years ago at another educational institution</u>.<br><br>The student is enrolled in plastering -- not carpentry at McKinney. |
| "Security guards are shown discussing government checks issued to students and how they use the funds for drugs. | ***FACT:*** Job Corps students earn a maximum of $36.82 every 2 weeks. Research shows that most Job Corps students use this modest stipend for personal hygiene products, travel home, and clothing.<br>Job Corps maintains and enforces a Zero Tolerance Policy towards drugs, alcohol, violence and harassment at all centers. |

008142

000588

008143



| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| "Teachers report that students come to class stoned and drunk, making it impossible to teach...Lighting up before class. This student even offers to sell drugs..." | **FACT:** Nationally about 30% of incoming Job Corps students test positive for drugs. Once detected, they are immediately enrolled in drug and alcohol counseling. Any student who shows no improvement is terminated from the program or referred to a community-based treatment center for intensive counseling. |
| Segment shows openly lewd behavior on a picnic table..." | **FACT:** The female student featured in this scene informed the center director the day of the taping that it would appear in the news story that night. She also assisted Channel 4 with locating disgruntled students for the segment. The footage was filmed with a telephoto lens from a van outside the center. |
| "Even though there have been confirmed cases of HIV on center, students are crawling under the building for sex...pillows have been found in this crawlspace..." | **FACT:** All incoming students are tested for HIV and AIDS upon entry. The McKinney Job Corps Center has not had an HIV individual on center for over a year. |
| | **FACT:** There are no reports of these items having been found in the crawlspace. If the scene videotaped by the channel 4 investigator working as a security guard had actually been discovered, it should have been reported. Nevertheless, the Center has sealed all 70 such crawlspaces beneath the older buildings on Center. |
| Rhonda Wheeler, a single mom, lasted only two weeks. "If there's a word for it, it is HELL. There are used condoms all over the place." | There are 600 students enrolled at McKinney. Other students offer a different point of view. Ms Wheeler remained on center 9 days. |
| Becky Oliver concludes with stack of documents with incident reports. | **FACT:** A total of 87 Significant Incident Reports were filed for a 2-year period at McKinney. During that time, almost 2,000 students were on the center. These incident reports range from modest disciplinary action to drug possession. |
| "Why the troublemakers get to stay..." | **FACT:** By regulation "troublemakers" do not remain in Job Corps once due process procedures by staff and students have been followed. |



| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| "They could care less about those kids, all they care about are the numbers." | **FACT:** By statute and regulation, Congress and the Dept. of Labor require centers to keep detailed records on each student in their care and to be accountable to taxpayers for funds expended.<br><br>The vast majority of staff work on Job Corps centers because they are committed to helping disadvantaged youth; certainly not because of the pay. |
| Becky Oliver. "We found administrators play more of a number game than running a program that adds up to success." | **FACT:** Job Corps' success is well documented anecdotally and statistically. Nationally, 7 out of 10 Job Corps students start jobs, enter the military or pursue higher education.<br><br>**FACT:** Job Corps is the most thoroughly evaluated program in the history of federal job training programs. |
| Tapes of two students: one reports that a student is in the hospital right now because he was hit with rocks in a sock; | **FACT:** There are no documented reports to support this statement. |
| Louis King says his roommate's bed was set on fire as he slept. | **FACT:** The roommate was the unfortunate victim of an ill-conceived practical joke called "hot foot." The student who committed the prank was discharged the same day it occurred. The injured student was treated at the clinic for burns to his left foot and ankle. |
| Segment shows teacher in profile. Says there are kids with 187 absences in his class. When asked, "Are they terminating and following the rules? He responds, "Not at all." | **FACT:** Over the past year, the McKinney Job Corps center terminated 1,030 students -- an average of 20 students per week.<br><br>**FACT:** Regulations do not allow students to be retained who have been absent for 10 or more consecutive days, or more than 22 days per year.<br><br>Job Corps operators use a software system that tracks student absences, and this system does not allow students who exceed these limits to be retained in the system. Students who are AWOL from the center are not paid for the days they are absent.<br><br>In a system as large as Job Corps, there are some staff that do not measure up. |

000589

| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| After Jose's comment. "I'll act on it so quickly it will make your head turn." | FACT: Job Corps' prime concern is the safety and well being of its students. Immediate action was taken. |
| Gerald Peterson: "You're getting ripped off." | FACT: During the seven years, Mr. Peterson led investigations of the Job Corps annual Inspector General audits of over $1 billion of Job Corps expenditures found that 99.7% of those expenditures withstood intense scrutiny. And that only three-tenths of 1% of Job Corps expenditures were disallowed |
| Second Peterson segment...Congress has known all along that Job Corps is wasting $100 million and yet the funding keeps on coming... | FACT: This statistic is a gross distortion of the IG report, which stated: 85% of the investment resulted in participants receiving measurable results." The 15%, or $100 million, with "no measurable results" were attributed to "students who dropped out early from the program." |
| Peterson continues..."The talk about expanding the program is insane." | FACT: Since 1990 Republicans and Democrats have strongly endorsed the Job Corps 50-50 Plan, which proposes to gradually add 50 Job Corps centers to serve 50% more disadvantaged youths by the end of the century.<br><br>There are an estimated 6 million imprisioned young people in America. Job Corps' comprehensive services could greatly benefit many of these hardest to serve and most needy youth.<br><br>Drop in Senator Dole's remarks (CG over the footage: Senator Robert Dole (R-KS), May 4, 1994. "Should be considered for expansion..." |
| Report shows a graphic with two points: 1 out of 3 dropout: 1 in 8 get jobs they were trained for... | FACT: The national average illustrates that 30% of Job Corps students do not adapt to center rules and regulations and experience severe homesickness, causing them to leave the program. In addition, Job Corps is required by law to provide placement assistance to all students -- even those who drop out before completing the full program<br><br>FACT: Job Corps mission, according to Public Law 97-300 is to assist young individuals who need and can benefit from an unusually intensive program, operated in a group setting, to become more responsible, employable and productive citizens." |

000590



| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| | FACT: Job Corps' success is measured in several areas: GED attainment, reading gains, math gains, length of stay and vocational completion and placement.<br><br>FACT: Nationally Job Corps places 70% of its students into jobs, military or further education -- 28% enter jobs for which they were specifically trained. 31% into other jobs and 11% enroll in full-time school.<br><br>41% of Job Corps students are 16 or 17 years old or under, limiting the full range of jobs available to them.<br><br>FACT: A long-term follow-up study shows that Job Corps returns $1.46 for every dollar invested. Indicators from subsequent years have shown an equally high return on taxpayers' dollars. |
| Senator Kassebaum remarks ... "No accountable...it isn't working as it should. The perpetuation is fraud." | FACT: There has been no record of fraud in Job corps in over 200 IG audits Of the more than $4.4 billion reviewed in total, the IG found 0.3% as disallowable costs -- attesting to Job Corps fiscal integrity.<br><br>FACT: Expansion of Job Corps is warranted because of the alarming numbers of poor youth needing residential education and job training services. Members of Congress and officials from the Bush and Clinton Administrations have endorsed a phased-in expansion and enrichment of Job Corps over this decade. |
| Becky Oliver statement. "First hearing in 12 years. ." | FACT: This statement is false. There have been hearings on Job Corps by virtually every Congress since the late 1960s.<br><br>FACT: The Dept. of Labor testifies about Job Corps before the House and Senate Appropriations Committee every year. |

008144

| McKinney Tape Excerpt | Suggested Text Insert |
|---|---|
| Oliver statement to Jose: "Shouldn't DOL follow these kids longer, shouldn't we..." | FACT: By law, Job Corps is not mandated to follow students for extended periods of time. Resources for extended follow-up for each student are not provided by Congress<br><br>FACT: A pilot program following Job Corps students for 13 weeks is underway to evaluate and estimate the costs and staff resources requires to follow 62,000 young people annually. |

## PREPARED STATEMENT OF LUIS MELENDEZ

Hello, my name is Luis Melendez. I have been a New York City Police Officer for __________ years, assigned as the 46th precinct's Youth Officer.

As Youth Officer, my primary function is to act as a liasion with the community in dealing with all area youth in the Bronx. Throughout my tenure as Youth Officer, my most positive experience has been the special relationship the precinct has shared with the South Bronx Job Corps Center.

As Youth Officer I have had the opportunity to visit a number of schools within the precinct area as well as in a position to be acutely aware of negative incidences that occur daily in the New York City public school system.

Several years ago, the New York Daily News ran a front page article entitled "Murder Streets". The article was speaking about the area in which the South Bronx Job Corp Center is located. It was one of the highest crime areas in New York City, with the area immediately surrounding the center plagued with devastation. In stark contrast to what was happening in both the schools and the streets, the South Bronx Job Corps Center offered a safe sanctuary for those kids who believed that an education was still their ticket out of an uncertain future. It not only offered them an opportunity to complete their education, but for many, the residential setting has helped countless youth

000591



escape homelessness, hunger, abuse and other conditions associated with their home environments.

The South Bronx Job Corps Center has become the one constant that was a positive thing in the lives of these young adults and it continues to be. A brief review of any New York City paper bears out some of the parental atrocities which occur daily in the Bronx. And then there is the South Bronx Job Corps Center, a shining light in an otherwise very dim existence.

Ninety percent of the South Bronx Job Corps Center student population is from the Bronx, where conservatively, over 80% are high school dropouts. And yet, almost 20% of these students are now taking college accredited courses through the City University of New York system while enrolled at the South Bronx Job Corps Center.

The majority of the kids from the Bronx are borderline, in that a little push one way or another makes the difference. These kids by and large don't have the sense that anyone cares. But they do when they are students at the South Bronx Job Corps Center.

The foundation for the success of the South Bronx Job Corps Center is "tough love", with a strong focus on old fashioned values. "Doing the right thing is the only thing" is a way of thinking and a way of life. Often, this may be the first time these young people have been made to understand what is acceptable and unacceptable behavior and that every action has a consequence in a manner which is supportive and nurturing instead of hostile and threatening. The staff work hard to impress that living by these values will be necessary for the young adults to get and keep a job somewhere down the line.

Over time "reverse peer pressure" is a natural progression. So many of these kids come to truly believe that Job Corps is their salvation, that it is a wonderful privilege, and they themselves exert pressure over their peers to behave and get the most of their experience while at the center. This generates a

008145

tremendous amount of positive motivation among the student population, and coupled with a consistent discipline system that sanctions inappropriate behavior and extensive counseling support makes for a winning formula.

The premise of practicing good values is constantly being reinforced, with a reward system in place for positive behavior and results, be it in the student's educational and vocational progress or learning to live and become self sufficient among 250 peers from several different nationalities. There are no calls to the 46th precinct from the center on violent related activity. The center's only "family" is the South Bronx Job Corps Center "family" and the halls and grounds are free of graffiti and trash.

The South Bronx Job Corps Center is ranked in the top 25 percentile in the country with well over 100% achievement in Reading (110%) and Math (104%) gains, GED attainment (157%), Placement (102%), Quality Placement, including Job Training Match, college and/or military (121%) and length of stay (118%). They have been the Regional Academic Olympic champions every year for the last four years, yet never won a basketball championship.

Every day, in every way, the message at the South Bronx Job Corps Center is to strive for excellence. Over the years, the students and staff at the center have been the best of neighbors to the 46th Precinct and its community members.

They have opened up their facility to host a number of events including joint Community Relations meetings held monthly. They have hosted and catered a number of meetings for community based organizations who don't have the room or the resources to do so on their own. Every year, the 46th Precinct is hosted at the center for the Police Clergy Conference, Police Business Conference and Police Fellowship breakfast.

When our community members need assistance cleaning up a park or renovating a church, those kids are there. They have organized and participated in Anti-Drugs and Anti Violence





rallies, worked in soup kitchens, delivered meals to their peers in the Adolescent Aids ward of Montifiore Hospital, collected and wrapped boxes of toys for the 46th's "Toys for Tots" campaign every year and the list goes on and on.

Every year, our precinct sponsors a talent show for the community youthy and South Bronx Job Corps Center students with both students and police officers alike participating. Last year's winner appeared in a Spike Lee movie. The center has participated in the "Cop of the Month" program which recognizes heroic behavior for my fellow officers. Job Corps students are part of the monthly ceremony, presenting the awards with our commanding officer. Clearly, for alot of these kids, this positive interaction is the first such interaction they have had and likewise, both cops and kids share the experience as "partners", breaking down the barriers and historical way students have viewed law enforcement in the past.

008146

Students from the South Bronx Job Corps Center lead by example, and as a police officer, I must say that one way or another we will deal with most of the youth in the community. Watching the students at the South Bronx Job Corps Center growing into caring and responsible adults and channeling their energies into positive things is very rewarding personally versus meeting up with them in a public safety arena. Our precinct is very "grass roots" oriented and after seven years of working with the South Bronx Job Corps Center, I can without hesitation say that they are one of our best neighbors. If schools in New York City and throughout the nation could replicate what goes on at the South Bronx Job Corp Center, then our world would be much better. Did you know that it costs over $38,000 a year to keep a young person in jail in New York City? $24,000 a year for public school, over $19,000 for foster care? According to Board of Education officials, the Bronx public school system cannot boast more than a 44% graduation rate which is based on attending five years of high school versus the traditional four. Compare that to the

South Bronx Job Corps Center's 157% achievement in GED attainment and over 109% overall achievement in the criteria established to be considered a graduate during an average length of stay of 280 days. The cost of Job Corps is not only less than jail or public school, it's proven success is significantly higher than the public schools in New York.

In closing, I know what the South Bronx Job Corps Center means to the kids from the Bronx. It means breaking free of generations of poverty and getting much more than a piece of paper when they leave. It means receiving love and support that they may never have experienced. It means learning to be a productive member of our community - to give something back unconditionally. It means everything to some of these kids, especially those waiting to get in and those we know are still out there who need the services. From my experience as a member of the New York City Police Department, 46th Precinct, Job Corps works!!

January 26, 1995

The Honorable Nancy Landon Kassebaum
Chair, Senate Committee on Labor and Human Resources
SD-428 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Madame Chairman:

I am writing in support of the Job Corps program which has provided a valuable service in my state. It is one federal program that has had continued success in Utah and has provided needed assistance for our at risk youth.

Job Corps makes a big difference in the economic and social well-being of Utah. Two centers presently operate here: the Clearfield Job Corps Center and the Weber Basin Civilian Conservation Center. They provide a safe environment and effective job skills training to more than 1,500 of our nation's at-risk youth each year. A zero-tolerance policy initiated at Clearfield and Weber Basin four years ago ensures a proper atmosphere at both centers and keeps violent incidents to a minimum. More than 70 percent of the students from both Utah centers are placed into jobs, higher education, or the military. More that 220 Utah businesses participate in the work experience program that each student goes through.

000593



Job Corps provides other important benefits. The program helps prevent crime, provides role models for young people outside Job Corps, and produces workers with valuable social skills. Clearly, Job Corps is worth the investment of federal funding it takes to turn these students into tax-paying wage earners and responsible citizens.

This success is especially gratifying when you consider the Clearfield center is operated by a private contractor under a highly accountable system of standard and measurements. The Clearfied center, and dozens of others like it across the nation, are prime examples of how private business can apply innovations and cost savings to produce excellent results from a government program.

I applaud your efforts to limit federal spending and mandates. As you do so, I hope you will continue supporting programs like Job Corps that contribute so successfully to our nation's future.

Sincerely,

Michael O. Leavitt
Governor

January 10, 1995

The Honorable Nancy Kassebaum
Chairman
Committee on Labor and Human Resources
428 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Madame Chairman:

I am writing to express my strong support of the Job Corps program. The Job Corps program has a proven record in giving disadvantaged youth the skills, training and confidence to lead productive and independent lives.

The Job Corps programs in Maryland have helped thousands of at-risk youth gain the necessary training and life skills to help them succeed in today's job market. The statistics on outcomes are impressive. In program year 1993, 70% of all the individuals who successfully completed their Job Corps program got jobs, joined the military or went on to further their education.

Job Corps has also proven to be a sound economic investment. An independent study by Mathmatica Policy Research, Inc., determined that for every dollar invested, an estimated $1.46 is returned to the economy through reductions in income maintenance payments, costs of crime and incarceration and through increased taxes paid by graduates of the program.

While I am aware of and support the need to streamline and consolidate the multitude of often duplicative and inefficient federal job training programs, I hope that the success of the Job Corps program is not overlooked. Job Corps is an effective, low cost approach to servicing the job and life skills training needs of disadvantaged youth. Therefore, as you move forward with relevant Committee hearings on federal job training programs, I encourage you to look closely at the success of the Job Corps program.

008147

As you and our colleagues on the Labor and Human Resources Committee continue to examine federal government's approach to job training and reemployment issues, I appreciate your keeping my comments in mind.

Sincerely,

Paul S. Sarbanes
United States Senator

January 17, 1995

Honorable Nancy Kassebaum
Chairman
Senate Committee on Labor and Human Resources
835 Hart Senate Office Building
United States Senate
Washington, D.C. 20510

Dear Chairman Kassebaum:

I am writing to express my support for the Job Corps program. In my state of Nevada, Job Corps has reached out to many young people, providing them the skills, knowledge and self-esteem they need to turn their lives around.

In these times of scarce federal resources, we must invest in programs that work. Almost seventy percent of Job Corps graduates go on to higher education or find meaningful employment. Additionally, a longitudinal study conducted by Mathematica Policy Research demonstrated that the public investment in Job Corps yields an even more substantial return to the government and to American taxpayers. The study found that for every dollar invested in Job Corps, a $1.46 is returned to the public through increased taxes and reduced costs in crime, incarceration, and public assistance.

Job Corps has proven its commitment to our nation's disadvantaged youth and will continue make a difference in their lives and in the future success of our nation. I encourage you to consider all of its merits while examining the program's future.

If I can be of any assistance, please do not hesitate to contact me.

With all best wishes,

Sincerely,

HARRY REID
United States Senator

000594



January 13, 1995

The Honorable Nancy Kassebaum
Chairman
Committee on Labor and Human Resources
428 Dirksen Senate Office Building
Washington, DC 20510

Dear Madam Chairman:

I understand that you will be holding oversight hearings on the Job Corps program next week. At a time when the entire federal bureaucracy is undergoing an examination designed to make government work better and cost less, a review of Job Corps is certainly in order. I am writing today to make you aware of my strong support for this valuable program.

South Dakota has more than 17,000 rural youth living in poverty. The Box Elder Job Corps Civilian Conservation Center in Nemo, South Dakota is able to serve 200 of these at-risk youth each year.

In your Committee's review of the statistical and anecdotal information relating to Job Corps, please keep in mind the unique population this program serves -- severely disadvantaged youth who are trying to break the cycle of poverty and welfare. Considering the group that it serves, it is important to note that over 70% of the young men and women who complete their Job Corps training either go on to find paid employment, join the military, or attend further schooling -- immediately contributing to the economic growth of our country.

I have heard recent reports critical of certain Job Corps centers. It is my understanding that these concerns are being addressed. In the final analysis, if there are problems with Job Corps, let's fix them. However, let us not dismantle a program that returns $1.46 for every dollar invested in it.

While I am aware of and support the concept of streamlining the assortment of federal job training programs to make them more cost-effective, the successes of Job Corps should not be forgotten. This program has provided a viable alternative for our at-risk youth who may otherwise end up utilizing more costly options, such as welfare and incarceration.

I look forward to working with you in an effort to make Job Corps an even more effective training program for our country's young people.

With best wishes, I am

Sincerely,

Tom Daschle
United States Senate

008148

January 17, 1994

The Honorable Nancy Kassebaum
302 Russell Senate Office Building
Washington, D.C. 20510

Dear Nancy,

I am writing to you to express my strong support of the Job Corps program. Job Corps is a unique and vital program in our country. The comprehensive group of services it presents to at-risk youth are the only chance that many of them may have to develop a skill or find gainful employment.

Over its thirty-year history, Job Corps has served 1.6 million individuals. Seven out of every ten graduates get jobs, enter the military or pursue further education. This is a truly outstanding achievement when one considers that the average student is a high-school dropout, with low reading skills, who has never held a full-time job.

The state of Michigan currently operates two Job Corps Centers, with a third slated to be opened in Flint, Michigan in 1996. As an indication of the community's commitment to this program, over thirty local organizations have raised two million dollars in resources to help support the program. Michigan, like many other states, has depressed communities struggling to produce and employ competent workers. Job Corps is one of the programs that many of these communities rely upon to meet that challenge.

I appreciate your effort to conduct oversight hearings on this effective program. It is important that we in Congress supervise programs like Job Corps to ensure that they are organized and operated as efficiently as possible. I believe a fair and impartial look at the evidence will end up strengthening and supporting the Job Corps program.

Thank you for your consideration.

Sincerely,

Carl Levin

Carl Levin

January 10, 1995

The Honorable Nancy Landon Kassebaum
Chairman
Senate Committee on Labor and Human Resources
428 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Madam Chairman

It has come to my attention that you will be holding oversight hearings on the Job Corps program later this month. I wanted to express my strong support for this program as a cost-effective investment in today's economically disadvantaged youth

The State of Louisiana has more than 156,000 poverty youth. The Shreveport and New Orleans Job Corps centers have played an integral role in helping reduce the number of poverty youth in the state In addition, the cities of New Orleans and Shreveport have benefited from the renovation, beautification and repair projects performed by the Job Corps students.

As you review the statistical data available about Job Corps, take care not to lose sight of part of the program's original intent -- to contribute to both immediate and long-term economic growth. For those young men and women in the State of Louisiana who complete the program, and immediately go into paid employment positions the return is self-evident. But, please consider that the focus of the Job Corps program is as much about developing responsible, dependable, motivated and employable youth for tomorrow as it is about employing every youth it graduates today. I continue to believe such a mission is both insightful and forward thinking.

000595



Senator Kassebaum, I am pleased of your interest in the Job Corps program and am confident that upon review, you will share, as I do, the hope for its continued contributions and success for our society and our country.

Sincerely,

J. Bennett Johnston
United States Senator

January 10, 1995

The Honorable Nancy Kassebaum
Chair
Committee on Labor and Human Resources
United States Senate
Washington, D.C. 20510

Dear Madam Chairman: Nancy

I am writing to express my strong support of the Job Corps program, which has brought hope, opportunity and empowerment to more than a million young people looking for a chance to prove themselves. I have always viewed Job Corps as one of the federal government's most effective programs. It is amazing to note that, considering the population that it serves, 70% of all Job Corps participants get jobs, join the military or go on to further education.

I am especially proud of the Job Corps in Hawaii, which has helped hundreds of at-risk youth gain necessary employment and life skills to help them succeed in the job market. The Hawaii Job Corps program is ranked second in the nation, and currently holds a rating at 132.7% of the standard. 75.7% of students in the Hawaii program were verified as placed into jobs or full time further education upon completion of the program. If it were not for the Job Corps, many of these young people would have ended up dropping out of school, in detention homes, jail or even worse. Instead, they will become productive members of our community, contributing tax dollars to our economy.

I appreciate your efforts to conduct oversight hearings on this program, and I know that you will take a fair and impartial look at all of the evidence presented before you. I also know that you will find that Job Corps works.

I look forward to working with you to improve the best program for at-risk youth our nation has to offer, the Job Corps.

Aloha,

DANIEL K. INOUYE
United States Senator

008149

January 12, 1995

The Honorable Nancy Kassebaum
Chair, Committee on Labor and Human Resources
302 Russell Senate Office Building
Washington, DC 20510

Dear Madam Chairwoman,

I am writing to express my support of the Job Corps program I believe in the Job Corps because it has helped bring hope, opportunity and empowerment to more than a million young people looking for a chance to prove themselves

The Job Corps program of Washington State has helped at-risk youth gain the necessary employment and life skills to help them succeed in the job market If it were not for the Job Corps, many of these young people would have dropped out of school or ended up in detention homes or prison Four centers in my state serve over 1,400 students each year, and offer a variety of occupational training. One of those facilities, the Cascade Job Corps Center, volunteered over 3,000 hours of community service to the County last year

I have always viewed the Job Corps as an effective program 70% of all Job Corps participants find employment, join the military or further their education Additionally, modest investment in the Job Corps results in a return far more valuable than the dollars we put in the program--confident young people poised to support themselves and their families and to contribute to the overall productivity of our nation

Madam Chairwoman, I appreciate your efforts to conduct oversight hearings on this effective program, and look forward to working with you to improve a great concept for our nation's at-risk youth Thank you for your consideration

Sincerely,

PATTY MURRAY
U.S. Senator

January 11, 1995

The Honorable Nancy Landon Kassebaum
Committee on Labor and Human Resources
Dirksen 428
Washington, D.C. 20510-6300

Dear Madam Chairman:

I am writing to share with you my strong support for the Job Corps program. I have always viewed Job Corps as one of the federal government's most effective programs, and I am pleased to know you will be conducting oversight hearings on the program in the near future.



Last September, a ribbon-cutting ceremony was held for the new Quentin Burdick Job Corps Center in Minot, North Dakota. There is no question that this facility, like its fellow centers nationwide, will help a large number of at-risk youths gain the training and employment skills necessary to help them succeed in an increasingly competitive job market. Without the program, many of these young people could end up dropping out of school, being placed in detention centers or jail -- or worse.

I have witnessed first-hand how effective Job Corps is for North Dakotans, and I think the statistics are clear about its impact nationwide. As you are probably aware, approximately 70 percent of all Job Corps participants get jobs, join the military or go on to further their education. The average learning gains among Job Corps participants include a jump of 1.2 grade levels in reading and 2.2 grade levels in math. Job Corps students perform an estimated $22 million worth of community project work annually as part of their training. And these numbers don't even begin to reflect the intangible benefits that Job Corps provides, such as instilling in participants a sense of self-respect, work ethic, responsibility and self-sufficiency.

The modest investment we make in Job Corps results in a return that is far more valuable then the dollars initially put in the program. The role of Job Corps is particularly important as Congress begins to consider welfare reforms. According to the Child Welfare League, some 500,000 youth are in the child-welfare system, and at least 2 million families have become long-term users of AFDC benefits. Job Corps exemplifies the kind of education, training and support that is needed to help break the cycle of poverty -- the same cycle of poverty we must confront as we debate how best to reform our welfare system. As such, I again applaud you for scheduling the forthcoming hearings. I am confident that any balanced analysis will further emphasize the effectiveness of the Job Corps program.

I look forward to working with you to improve the best program for at-risk youth that our country has to offer.

Sincerely,

KENT CONRAD
United States Senator

January 20, 1995

The Honorable Nancy Landon Kassebaum
Chairwoman, Committee on Labor and Human Resources
United States Senate

Dear Madam Chairwoman:

I am writing to express my strong support for the Job Corps program. I believe in Job Corps because it has helped bring hope, opportunity and empowerment to more than a million young people seeking a chance to improve themselves.

I appreciate your decision to hold oversight hearings in an attempt to address some recent problems experienced by the Job Corps. Like you, I have been disturbed by reports of violence at Job Corps Centers. Violence cannot be tolerated at any level and this must be a clear mandate of the Job Corps.

008150

000506

I am proud to say that the Job Corps has been a success in California. Four of the five California Centers rank in the top 21 of the 110 Centers in the nation for overall performance. Last year, 2,547 students participated in the Job Corps in California and more than 75% of them were placed in jobs, joined the military, or pursued further education, a rate higher than the national average.

If it were not for the Job Corps, many of these young people would end up dropping out of school, in detention homes, jail or even worse. Additionally, the modest investment in Job Corps results in a return that is far more valuable than the dollars we put in the program- confident young people poised to support themselves and their families and contribute to the overall productivity of our nation.

I look forward to working with you to improve one of the best programs for at-risk youth our nation has to offer. Thank you for your consideration.

Sincerely,

Barbara Boxer
U.S. Senator

## JOB CORPS PERFORMANCE SUMMARY 1989-1994

| | PY 90 7/90-6/91 | PY 91 7/91-6/92 | PY 92 7/92-6/93 | PY 93 7/93-6/94 | PY 94 (first half) 7/94-12/94 | |
|---|---|---|---|---|---|---|
| **PLACEMENTS:** | | | | | | |
| Entered employment | 27,149 | 29,979 | 29,465 | 34,547 | 21,050 | |
| Enrolled in school | 7,297 | 8,091 | 5,846 | 5,989 | 3,250 | |
| TOTAL PLACEMENTS *NOTE: Job Corps is responsible for providing job placement assistance to all students – including early dropouts* | 34,446 | 38,070 | 35,311 | 40,536 | 24,300 | |
| % of students placed, including early dropouts | 69.3% | 68.6% | 64.9% | 69.8% | 76.9% | |
| *NOTE: See reverse side for how placement rate is calculated.* | | | | | | |
| **JOB TRAINING MATCH PLACEMENTS:** | | | | | | |
| Number | *Began tracking as a performance standard in PY 92* | | 11,022 | 12,289 | 8,663 | |
| % of job placements | | | 37.4% | 35.6% | 41.2% | |
| % of all terminees | | | 17.9% | 19.3% | 25.7% | |
| **AVERAGE WAGES:** | | | | | | |
| All placements | $4.88 | $5.08 | $5.33 | $5.33 | $5.56 | *Percent higher than minimum wage* 30% |
| Training match jobs | $5.72 | $5.77 | $5.93 | $5.93 | $6.43 | 51% |
| **# OF YOUTH SERVED: *** | 60,586 | 61,888 | 61,577 | 63,117 | 31,319 | |
| **EARLY DROPOUTS (90 days):** | 37.6% | 36.7% | 30.8% | 31.4% | 32.2% | |
| **AVG. STAY (in months):** | 7.6 | 7.6 | 7.8 | 7.5 | 7.6 | |



| | | | | | |
|---|---|---|---|---|---|
| **LEARNING GAINS (grade levels):** | | | | | |
| Reading | 1.3 | 1.4 | 1.2 | 1.2 | 1.8 |
| Math | 1.8 | 1.9 | 1.8 | 2.2 | 3.0 |
| **GEDs:** | | | | | |
| # eligible for GED | 25,090 | 24,796 | 21,596 | 23,816 | 13,145 |
| # passed GED | 10,101 | 10,802 | 10,931 | 12,289 | 6,109 |
| % of eligible that passed GED | 40% | 44% | 51% | 52% | 46% |
| **VOCATIONAL COMPLETION:** | *Began tracking in PY 91.* | | | | |
| % of all students | | 35% | 32% | 34% | 39% |

* Includes early dropouts

SOURCE: U.S. Department of Labor

## THE MISSION OF JOB CORPS

According to Public Law 97-300, **Job Corps' mission is: "to assist young individuals...to become more responsible, employable, and productive citizens...by providing the training and opportunity to succeed."** Job Corps serves disadvantaged young men and women ages 16 through 24 by providing them with the educational, vocational, and social skills needed to become productive, taxpaying citizens.

## FACTS ABOUT JOB CORPS PERFORMANCE

**WHAT DOES THE U.S. DEPARTMENT OF LABOR (DOL) MEAN BY JOB CORPS "TERMINEE?"**
The U.S. Department of Labor (DOL) defines "terminee" as any student who enrolls in Job Corps, whether or not he/she graduates. **A center termination** does not mean that a student has been dismissed from a center; it simply means that the student has left the center, either by completing the program and graduating, or by leaving prior to completion.

**HOW DOES DOL CALCULATE JOB CORPS' PLACEMENT RATE?**
DOL counts as placements all students who are placed in jobs, further education, or the military. The placement rate is calculated by counting all students whose placement is verified by DOL through personal contact or paperwork, plus an estimated percentage of those students who could not be tracked. DOL conservatively estimates that the percentage of non-trackable students that are placed is the same as the percentage of students documented as placing themselves into jobs, further education, or the military. Employment may include temporary jobs, and education includes colleges, universities, trade schools, and other advanced training programs. (Note: 41% of Job Corps students are 16-17 years old, which limits the full range of jobs available to them.)

**WHAT IS A JOB TRAINING MATCH?**
A job training match means that a Job Corps student has been placed in a job that exactly matches his or her vocational training.

**WHAT IS AN EARLY DROPOUT?**
DOL defines an early dropout as a student who leaves Job Corps in less than 90 days.

**ARE JOB CORPS STUDENTS ELIGIBLE FOR THEIR GED?**
More than one-third of all Job Corps students are eligible for their GED. When students enroll in Job Corps they participate in standardized testing – the same exams used by most public schools – to determine if they are eligible for GED attainment. Students may not be eligible for GED attainment if they arrive at Job Corps with a high school diploma, if they experience significant language barriers, or if they have other serious learning obstacles.

**HOW IS A JOB CORPS STUDENT RATED A VOCATIONAL COMPLETER?**
Job Corps students who have achieved all skills listed in the Job Corps' curriculum for their trade are considered vocational completers.

008151

00050

## A COST COMPARISON OF AMERICA'S RESIDENTIAL YOUTH PROGRAMS

| | Performance Indicators | Population served | Services offered | Average Stay Cost | Youths served |
|---|---|---|---|---|---|
| **Job Corps** (U.S. Dept. Labor, 100% federally funded) | • Reading gains<br>• Math gains<br>• GED attainment<br>• Vocational completion rate<br>• Vocational job trade match rate | Youths from economically disadvantaged backgrounds, 16-24 years old | • High school equivalency<br>• Vocational training<br>• Job placement assistance<br>• Social skills training<br>• Counseling<br>• Medical and dental services<br>• Some follow-up tracking<br>• Community college course linkages<br>• Some sole-parent dorms: limited child care<br>• Driver's education | $14,052 (average stay 7.5 months)<br>$61 per day | (63,000 per year) |
| **Boy's Town** (100% private funds) | • Improved personal characteristics (i.e. punctuality, hygiene)<br>• Academic achievement based on individual potential | Children with behavioral or serious family problems that require them to be removed from their home community, 10-17 years old | • Mental health services<br>• Education<br>• Vocational training<br>• Job placement assistance<br>• Some after care | $73,918 (average stay 18 months)<br>$137 per day | (558 per year) |
| **Challenge Program** (U.S. Dept. of Defense, 100% federally funded) | • GED attainment during or after the program<br>• Completion of program and its requirement to enter college or obtain employment. | Youths from all economic backgrounds, 16-18 years old | • Residential education<br>• College preparation<br>• High school equivalency<br>• Vocational training<br>• Job placement assistance<br>• Counseling available<br>• Military drill training | $13,500 (average stay 5.5 months)<br>$82 per day | (325 in first year of operation) |
| **Milton Hershey School** (100% private funds) | • Preparing children for life | Economically and socially disadvantaged children and youths, 4-18 years old | • Mental health and some counseling<br>• Originally vocational training only for white orphan boys<br>• Basic education added<br>• College prep curriculum, scholarships available<br>• Minimal job placement assistance<br>• No follow-up tracking | $45,279 (annual cost) (up to age 18)<br>$124 per day | (1,100 per year) |

SOURCES: U.S. Department of Labor
GAO Report to the Chairman, Subcommittee on Oversight of Government Management; Committee on Governmental Affairs, U.S. Senate, January 1994
Milton Hershey literature
International Center for Residential Education

(one figure) = 500 youths served



## WHAT'S THE ALTERNATIVE?

Absent Job Corps' comprehensive services (including 24-hour residential living, basic education, job training, basic medical care, social skills training, counseling, and leadership opportunities for students), the estimated 600,000 underemployed, undereducated and severely economically disadvantaged youths eligible for Job Corps and living in the U.S. may flood other available — yet limited — services.

| JOB CORPS | HOMELESS SHELTER | FOSTER CARE | GROUP HOMES | INCARCERATION |
|---|---|---|---|---|
| Average cost per 24-hour day: **$61** | Average cost per bed/8-hour night: **$50** | Average cost per 24-hour day: **$100** | Average cost per 24-hour day: **$85** | Average cost per 24-hour day: **$104** |
| Cost per average stay (7.6 months) of student: **$14,052** | Cost per average stay (15 months) of person: **$27,450**<br>Cost to implement a national comprehensive program to aid the homeless: **$6 billion** | Cost per average child varies widely, since children may remain in Foster Care from birth to age 18. At age 18, children "age out" of Foster Care, and may flood other available services. | Cost per average child varies widely, since children may remain in Group Homes from birth to age 18. | Cost per average stay varies widely, depending on the nature of the offense. |
| Cost per yearly training slot (roughly equivalent to 1.5 youths served): **$22,371** | Cost per person per year: **$18,250**<br>Money spent by New York City in 1988 to care for 30,000 homeless persons: **$758 million** | Cost per person per year (average stay varies greatly): **$36,500** | Cost per person per year: **$31,000**<br>Cost per person per year of The Villages, Topeka, KS: **$26,000**<br>Cost per person per year of the Bruckner Baptist Children's Home, Texas: **$36,000** | Cost per person per year: **$38,000** |
| SOURCE: U.S. DEPARTMENT OF LABOR | SOURCE: PROCEEDINGS, BUILDERS: BEHIND THE MANY FACES OF HOMELESSNESS, LAYING A FOUNDATION FOR ACTION, 1989 and THE PARADOX OF HOMELESSNESS, GEORGE WASHINGTON UNIVERSITY, 1991 | SOURCE: "WHEN PARENTS ARE NOT IN THE BEST INTEREST OF THE CHILD," MARY-LOU WEISMAN, THE ATLANTIC MONTHLY, JULY 1994, P. 51 | SOURCE: "THE ORPHANAGE," NEWSWEEK, DEC 12, 1994, P. 32 | SOURCE: U.S. DEPARTMENT OF JUSTICE |

January 13, 1995

The Honorable Paul Simon
Senate Labor and Human Resources Committee
462 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Senator Simon:

I am writing to express my strong support for the Job Corps Program. The International Brotherhood of Painters and Allied Trades, has been involved in Job Corps for more then 25 years. During that time, thousands of young men and women, *Youth at Risk*, have gone through our Job Corps Painting, Glazing, Floor Covering and Sign Industry Programs. Through the training and opportunities provided by Job Corps, these graduates have entered our apprenticeship programs to further hone their skills. There are numerous success stories of Job Corps graduates who have become journeymen in their trades, shop foreman, job superintendents, contractors and union officers.

Each year, Job Corps helps tens of thousands of young people to break the cycle of poverty and welfare dependance by providing the vocational training and job placement that young people need to become tax paying citizens.

This week, the Senate Labor and Human Resources Committee will be holding oversight hearings on Job Corps. I hope, as a member of that committee, you will take an objective look at all of the data, not just concentrate on anecdotal presentations. After studying all of the facts, I am sure you will find that this modest investment in our nation's youth results in a return that is far more valuable than the dollars spent on the program. The bottom line is, *Job Corps Works* and Job Corps graduates are poised to support themselves and their families, and to contribute to the overall productivity of this nation.

If you need any additional information, please feel free to contact my office at 202/637-0720.

Sincerely,
A. L. "Mike" Monroe

A. L. "MIKE" MONROE
General President

000599



To the Honorable Paul Simon:

It has been Tri-State Beauty School's pleasure to work with the El Paso Job Corps to train 10 students at a times since June 1991. When a student graduated, the student was replaced so we usually had 10 students enrolled. All the students were high risk students. Many had no discipline, parental guidance, or place to live. From the day they entered school, we saw the difference in our usual high risk student. Job Corps students were more highly motivated, generally easier to work with, and their attendance was excellent. They were constantly monitored by Job Corps counselors, and if there was a problem with the student, we were immediately assisted in solving it.

Tri-State Beauty Schools in El Paso, Texas have been training students as cosmetologists since 1931. Most of our students receive Pell Grants, but Tri-State Beauty Schools give institutional grants, or loans, to the students instead of relying on Federal loans. We were once one of the institutions with high default. However, we have reduced the default to 0 % with one servicer, and to 20% with another servicer for the past year.

Every single student who graduated from Tri-State Beauty School and who was an El Paso Job Corp resident, has a job in the cosmetology industry.

Heather Gilmore is the proprietor of a salon, which was installed by her grandmother. Ana Vargas, Angie Mendoza and Norma Borunda, all Job Corps graduates, have a jointly owned shop.

Sonia Lopez had been consistently told by her mother she would never achieve anything. The day she received her diploma, she ran to take it to her mother, proving she was able to achieve! She has a job in cosmetology.

All these cosmetologists are paying their way in society, and we believe that their stories would have been different if they had not been enrolled in El Paso Jobs Corps and then sent to Tri-State for job training.

We have worked with many state and federal agencies for many years. I have never worked with an agency, either state or federal, which has had a more consistent manner of handling clients or a better achievement record.

El Paso Job Corps fills a vital need in this community, which is one of the cities in the United States most depressed economically. We will appreciate your consideration of this agency.

Sincerely,
Carolyn Parker
Carolyn Parker
President

January 17, 1995

The Honorable Nancy Kassebaum, Chair
Senate Labor and Human Resources Committee
302 Russell State Office Building
Washington, D.C. 20500

Dear Senator Kassebaum:

As Governor of Iowa, I am writing you to encourage the continued support for the Job Corp 50/50 Plan.

I have visited the Denison Job Corp Center on many occasions and we are pleased and proud of the positive results produced by this center. The very capable staff is offering training for at-risk youth throughout the Midwest. They have an outstanding program for single parents, which provides on site living facilities and day care while the students are receiving an education and job training.

008153

If we are going to break the cycle of poverty, crime, and unemployment, how better can we do it than by providing training and educational opportunities for these hard to place young people. Not only do they learn job skills, they are also learning the value of community service (putting something back into society). They are involved in many community service projects in the Denison area which give them worthwhile experience in a wide variety of fields, plus a sense of belonging to the community.

The Denison Job Corp Center serves an average of 500 students per year. And, this site is the number One center in the nation for placement of its students.

I strongly encourage you to continue this valuable program.

Sincerely,

Terry E. Branstad
Governor

January 13, 1995

Senator Tom Harkin
531 Hart Senate Office Building
Washington, DC 20510

Dear Senator Harkin,

The students at the Denison Job Corps were very concerned about the upcoming hearings and want their voices heard!

I am sending you a packet of letters and essays from them for your review

Please take the time to read them and when you do, I'm sure they will speak for themselves. All of these were written voluntarily and are in their original form.

Thank you on behalf of the Denison Job Corps Center.

Sincerely,

Joann Espinosa
Center Director





January 10, 1995

U S Senator Tom Harkin
316 Hart Senate OfficeBuilding
Washington D.C 20510

Dear Senator Harkin,

My name is Teresa Drummond, and I am a student at the Denison Job Corp Center I want to tell you the story of my life, how I came to be a student here, and what it has done for me

I was born to a low-income single parent home, which put me at a disadvantage to other children I had the potential to succeed, but was never given the opportunity to show my talents and abilities Never the less, there was a problem side to me as well My mother had difficulties raising me, and when I was in my early teens I was placed in a group care facility To say the least, I was far from being an angel

When I was sixteen years old, I decided that I wanted to do something in life I wanted to be somebody I went into the Independent Living Program, scoring the highest in Iowa on the evaluation Every month, I received a check from the state which enabled me to stay in school I was an honor student who was enthused with learning Everything was going as well as could be expected I was working and making more than minimum wage, which is not bad for a high school student

When I was a senior in high school, I turned 18 years old This meant that I would no longer receive checks for being a child of the state Paying bills on time became difficult, and I had to start working extra hours This caused me to miss a great deal of school In the midst of everything, I was dropped from school a month and a half before graduation I really couldn't afford it, but I took the day off from work to go to the graduation ceremony for the class of "1994" I sat up in the bleachers, watching my friends go up for their diplomas I was fine until they came to where I would have been standing, had I completed I burst into tears There was nothing I could do to stop the hurt and the disappointment I was feeling All the nights I had stayed up studying, the events I had missed, and the fun I could have had, if only there weren't a test the next day These things seemed as if they were for nothing They no longer had any meaning

I lost hope in everything I had ever believed in I thought that I could never be successful at anything, and no one tried to change my mind or tell me different I pawned off everything I owned just to make my rent payment Things just seemed to be getting worse and worse Then they didn't just seem that way, they were Within a month, I was living on the streets Sleeping where ever I ended up at night I registered at the local Human Services for food stamps and Title XIV My friends were having troubles with money as well, so I could not ask them for help I didn't talk to my family much any more, and I wasn't so sure that they would help me anyway Towards the end I resorted to staying in an abandoned van behind my friends apartment

When I was in group care, I had heard of a place called Job Corp After hearing about it, I never thought anything more about it A concerned friend of mine informed me about a crisis center in my home town Come to find out later, I had lived there as a child with my mother I had been living there nearly a week when I came across a pamphlet on Job Corp I dialed the number for the hotline on the back, and they put me in contact with a screener Her name was Cindy Swan, and she was happy to help me out

My time had run out at the crisis center and I had no where to go A week later I met with Cindy and she helped me get funding from the Human Resources office to stay in a hotel until I could get into an orientation group Within a couple of days I received a call from Cindy She had gotten me bumped up on the waiting list, and they had an opening for me I would be leaving within a few days or so

That next Tuesday I boarded a Greyhound bus that would take me to start the beginning of my new life. I arrived in Denison, Iowa at 8:45 p.m. on June 21, 1994 with nearly twenty others who had no idea what lay ahead of them. As we drove up the long curvy drive way, fear rose in me. I had no idea what to expect. The bus stopped at the top of the hill and let everyone out. There were several students there to meet us. We entered the orientation room, and we were greeted by the instructor who did her best to show us that we were welcome. The first couple of weeks were tough, but we managed to make it through.

If I had only known what this place could do for a person, I would have been here long before now. I am trying to make a life for myself. The skills that I learn here will always be with me. That's something that can never be taken away from me. I have been here for nearly seven months now. It has not been easy. There have been several times that I have wanted to leave, but I knew that if I stayed, things would get better. Leaving would simply have been the wrong solution to a simple problem.

In the time that I have been a Job Corp student, I have succeeded in doing many things. In September of 1994, I received my G.E.D., my High School Diploma, and my Certified Nurses Aide. Recently, in December of 1994, I earned my Home Health Aide certification. A am currently a Business & Clerical student and a part-time college student. I am enrolled in the Arts & Sciences program at Western Iowa Tech with hopes of starting the Licensed Practical Nursing program in August. Even after I venture away from Job Corp, I plan on furthering my education in the field of pediatrics.

I owe my success to the staff and students at Job Corp. Without them I would never have been able to put on that cap and gown that I worked so hard for in high school. With their help I've nearly touched the stars. All of my dreams for the future are slowly becoming reality. I now know that I can be successful and that I can do anything that I set my mind to. Job Corp has made me a better person. It is shaping the person that I will be in the future. Not only am I well educated, but that I can be successful and that I can do anything that I set my mind to. Job Corp has made me a better person. It is shaping the person that I will be in the future. Not only am I well educated, but I have the social skills to make it in life. I hope that others can come to find what I have found in this program. It's not something that is just given to you, you have to set your sights and go after it. Now, not only do I have the potential to succeed, I've been given the opportunity to succeed, and I have.

I truly believe, that if I had not come to Job Corp, that eventually I would have been living off of welfare with a dead end job, perhaps I would have been living back on the streets. That very well could have been my fate. It just goes to show that you can change your destiny. I will never lose hope again, because I now know that everything that lies in my future, is up to me. I have the power to be anything that I want to be.

I want to thank you for your time, and giving me the chance to tell you what Job Corp has done for my life.

Sincerely,

Teresa A. Drummond

000601



# How Job Corps Changed My life?

By Marietta L. Kibbie

Before I came to Job Corps, I had problems with my family and I was stealing from my parents. Then I was sexually melested by my uncle, so my parents and I decided to find a solution to the problems. That's when I heard about Job Corps.

We contacted the screener in my area of central Iowa, and we had an interview with him. He asked me some questions like "How did I hear about Job Corps?" I said my high school counselor had told me about the high school diploma class here so I said "Let's go for it." So I entered the Job Corps program on July 5, 1994.

Then I talked with Mrs. Phyllis Harms, the high school diploma instructor, about getting in to High School Diploma Class. They had to order my transcripts, then wait to get my transcripts back before I could get in. Now I am in High School Diploma clss and I am doing very well in there, even passing the tests in my classes. I have seven more credits left then I will get high school diploma.

I want to complet my training here in Denison Job Corps then go on to Excelsior Springs Job Corps in Missouri for more extensive traning in business.

The teachers here are very nice to me, especially one of the teachers, Mrs. Judy Jepson, who kind of adopted me as her daughter. I even have a step Grandpa out here ao Job Corps. His name if Mr. Ike Johnson; he is very cool. Even the RA's are nice to me, espcially Sheila Reitan, Linda Blum, Diane Littleton, and Linda Brink. They are like moms also to me. Even the C-2 dorm ladies, especially Karrie Weaver, Stacie Hall, and Kathie Donahue are good friends and sisters.

My other responsibilities and duties are Bigs Sister and Brother, Linen Monitor and Rec Aide.

I am glad that we get free medical, dental, food, and housing provided. We even get paid like in the real world.

The center is a perfect place for people who are having problems in the family and school. Even if you have to leave brothers and sisters behind that goes crazy then they are around you.

Job Corps is a good place to go and improve yourself. The teachers here help you figure out your problems and even the RA's help me with my homework when I need it. The old saying "You can learn a lot when you put your mind to it" is true. Job Corps helps me get on with my life instead of depending on my parents. Job Corps will help me get an education and job were I can support myself in the future without depending on my parents or society for sudstance.

008155

## How Job Corps Changed My Life

by Mandy Weber

Before I came to Job Corps I was living at my frierds house. I slept on the couch. I was on food stamps and not getting along with my parents very well.

My Mother told me about Job Corps and the benefits it provides. She told me that they pay for your health and dental care, and they pay you every two weeks. They also give you clothing allowances, so you can buy clothes you need.

I've been here for a year and I couldn't have made a better choice. I've made lots of friends and I've had more responsibility than I ever did at home. I'm on the BIGS and I enjoy that because I help people get to know the place better. I've been on Dorm Government, but I resigned to focus on my high school diploma and my trade.

I'm in the Security trade and I love what I do. I basically do security skills books and we do cross walk duty at the elementary school in Denison. The Security students do campus patrol, fire drills and fire marshall reports. As future Security guards, we do physical training , watch videotapes on what to look for on the job sight where you would work.

When I get out I want to go into the United States Coast Guards. There i want to be trained in Maritime law enforcement. After boot camp, I would like to be sent to Corpus Christi, Texas. When I finish my tour of duty in the Coast Guards, I would like to be a guard in the prison system.

If I say anything to anyone who can't afford college or is having trouble getting through high school and who meets the age qualifications of sixteen to twenty-four years; I would suggest Job Corps. I think it's a good program with lots of benefits to it. It is worth being here for as long as it takes you to complete. Also life is too short to come to waste. If you have a chance to come to Job Corps, take it. It may be the biggest step in your life and one of the smartest ones too.

## How Job Corps Changed My Life

by Jean Ann Rogers

I have been in Job Corps for three months. Job Corps has changed my life around all the way. Job Corps gave me a secure place to stay. When I was back home I was in and out of foster homes for about two and a half years. I lived in several foster homes, never living in any of them for more than six months. Just before I came to Job Corps I was living with a friend in an apartment because I was kicked out of my mother's for hanging out with the "wrong crowd."

Job Corps is giving me some training skills as my trade is Health Occupations. In Health Occupations we study the body parts, how to make occupied beds and how to bathe the patients. In order to become a Certified Nurses Aid you must be able to pass the states board test. When you are halfway through the training you will learn how to take care of patients. With all the training I have, I hope I will be able to become a Registered Nurse sometime.

Job Corps has also taught me how to learn responsibility. Back home I never had any responsibilities. But when I came to Job Corps I had to do chores as part of the dorm living arrangement. Every morning we have to get up and clean our rooms and do the dorm duties so the whole dorm will be clean. Everyday we get graded on the areas and rooms and if any rooms or areas fail the people in the room or the people on the crew have to do the scrub club for one hour.

Job Corps has also taught me how to handle money. When I was back home I thought I should have money everyday. But since I have been up here I learned money doesn't grow on trees. Job Corps pays us $22.00 dollars every two weeks. So basically when you are out of money you have to wait until the next payday. Also up here we have a bank in case you want to deposit money. But you do need to tell the bank the night before if you want more than $25.00 dollars out.



Job Corps is also helping me get a high school diploma because I quit school my junior year. I had a lot of problems. I didn't think I could handle on my own. Then one afternoon, Job Services called and asked me if I was interested in going back to school. I said yes, because while I was at home, I just sat around and thought to myself that I would like to complete my education.

Job Corps gave me a lot to look at because in Marshall everything was negative. I thought there was no life out there for me but since I came to Job Corps, they showed me that I would like to do something with my life.

So if I know anyone who quits school I will suggest Job Corps to them because it is a great place!

## How Job Corp Changed My Life

by Kendra Mallek

Job Corps has changed my life in many ways. I would say that the biggest change Job Corps has made has been in my attitude. Without a positive attitude you will not make it far in life.

Before I came to Job Corps, I didn't have any plans for the future and I didn't care. I am only sixteen years old and already have my life planned out. Since I've been at Job Corps I have completed Security.

I am working on my high school diploma and hope to have it by the end of April. I didn't do so well in high school when I was at home, so I came to Job Corps with very few credits. But I believe if I put my mind to it I can accomplish anything.

I am very thankful to certain staff members for being so supportive and for helping me get past my problems and getting on with more important things in life.

The best thing Job Corps is giving me is the training and education I will need to support my child that is on the way.

I have so many things to be thankful for and the most important thing is Job Corps. It has changed my life for the better in my way.

I believe you get what you want out of life. If you come to a Job Corps with a bad attitude and start causing trouble, don't think that your education is just going to be handed to you. On the other hand, if you come to Job Corps with a positive attitude and the strength to overcome obstacles, you can and will get what you came for.

Everyone doesn't like the rules, but Job Corps is just preparing you for the real world.

## How Job Corp Changed My Life

by Cody Barnes

When I was fifteen I got into a lot of trouble with the police. I was into stealing and thought it was cool that I got things for free when everybody else had to pay for it and I didn't. Well, I got caught all right and got six months probation. I got shipped to my Aunt Judy's house in Olin, IA in the country so I couldn't get into trouble. I spent about one year there and straightened up a little but I met alcohol and drugs; they helped me forget my problems for the mean while.

When I got off of probation I moved back in with my parents. I was sixteen, now a teenager and ready to party, but my mom made a curfew. I never listened to my mom anyway. Then I started hanging out with a bad crowd and they dropped out of school and I skipped a lot also to go have fun with them. After about six months I dropped out too and my parents were very unhappy with me.

I got a job at McDonald's as a prep cook and I worked there for three months or so until I quit. I went home and told my parents and they kicked me out. I had no place to go, my parents said if my friends were so important, go live with them. I ended up going to Foundation Two, a home for kids who have no place to go, but you can only stay there for three weeks. My mom let me come home again.

I kept getting into trouble and she said, "If you don't straighten up I will send you to Job Corp." Like it was a threat. I started reading about it and it seemed like a good idea. So I had my mom take me down to the screener, her name is Pat Jackson. She told me interesting things about Job Corps. I wanted to get into diesel mechanics, but they did not offer it in this Job Corp so I went with Welding. I stuck with Welding for three months but it wasn't for me. I got a trade change into Carpentry. I got a lot of friends and I am having a lot of fun. I am learning a lot about carpentry. When I first got up here I could hardly read and write, now look at me! It is getting to be more fun up here and I finally got on Phase 1 and I am proud of myself!

How Job Corps Changed My Life

by Derrick Sanders

Before I came to Job Corps I used to live in Naples, Florida. My life was normal. I held a fair paying job. I didn't run the streets. My life changed for the worst when my girlfriend and my child that she was carrying died when a drunk driver hit her car. After I was told she had passed on, everything I worked so hard for meant nothing to me. I quit my job. I had violent temper flare ups. After a while my mother called me from Des Moines and I decided to move to Iowa. But nothing seemed to change much. I got into trouble with the law and I could only get low paying jobs. After a while I decided to go to Job Corps to change my life.

At Job Corps they taught me to control my temper and to think things through. They have different trades that they offer at the center. I'm in the Welding trade. The Welding instructor taught me forms of welding and he also taught me how to read and write blueprints. He is teaching us to be successful in life no matter what we do.

When I complete the Welding program, I hope to be a well respected individual. Most importantly, I hope to be an example for my little brother Norris, who is in and out of trouble. In ten years I plan to own my own welding shop.

So that's why I came to Job Corps. That's why Job Corp is so important to young people like me.



January 12, 1995

How Job Corp Changed My Life!

Job Corps has changed my life since I've been here. I've been a whole eight months and I'm working on more and education. I'm going to be a cop. Security is the trade I am planning on doing. I've always wanted to become a cop.

This is really a good place to be. The teachers, trade instructors and students are really nice. They treat us with respect, but you have to give respect back too.

You also need responsibility, because that's very important. You have to be up by 6:30 a.m.. You have to be in either class or trade by 8:00 a.m. and no one has to keep pestering you and telling you to do this and that. You need to do it by yourself.

There a lot of people who have found a companion and wait months to finish their education. Then they get married and graduate for Job Corps.

In conclusion, this is a good place to be! I would suggest Job Corp for every student who wants an education and training for your trade.

Sincerely,
Annette Odvody
Annette A. Odvody
Student at D.J.C.C.

January 12, 1995

To whom it concerns.

Before I came to Job Corps, I was working at Pizza Hut Then I went to Job Corps I came up to get a good schooling because they good teachers and nice staff that are really polite to us kids. they have lots of clubs like the D.J. Club, Bigs, Clown Club, Weight Club, and Chess Club

We goto classes from 8 to 3:30 p.m. They have no classes and they have Dresscodes and they have 8 different trades on the center I think the center keeps some kids out of trouble and personally myself I like Job Corps. You have alot of responsibility to take care of at Job Corps to compleat at Job Corps. I really like Job Corps.

I really Have changed my life by coming to Job Corps I found a nice girlfriend at Job Corps We will leave together, with our trades and educations.

Your Truly,
Ed Wisdom
Ed Wisdom
Student at D.J.C.C.

008157

000603

How did Job Corps Change my life?

by Robert Huisinga

On May 24, 1993 I had a problem with money and I didn't pay for my bills. I was living with my freind's grandparents. They got to the point that they couldn't afford me staying there. I had to pack and move on but to were I didn't know. I ended up walking around for two day's then I ended up staying with my other good friend named Tony. That fell throw the roof I ended up at the park for a week. That was the worst week I had in my life.

On May 29, 1993 I found a job I was working in a body shop. That work out good. I found a house to live in on June 3, 1991. I told my self that bills come first. That work for a year. One weekin Tidd came home for a weekin and he told me about Job Corps I thought about it for a day or to. Then I decided to talk to a guy about it his name was Rich Powe he was an Old elder but he was nice kind of funny to. He told me it will take about two to three weeks or longer. Three weeks past I got a phone call and it was Job Corps to tell me that they will pick me up in a week. at that time I wonted to go. Two weeks past I got nervous and scared and I decided not to go. I stayed at that house for a year. In that year got to the point that everything was going wrong I was dependent on drugs I was using it every day until I got sick and tired of the way I was living. I lost my friends because I chose my drug our my friends.

On June of 1994 I lost my house. I stopped and told my self I couldn't live this way anymore. I moved to my sisters house in Carrol, IA. She tried to get me under control and change my attitude problem she help a little but it all fell through the roof. I decided to call Job Corps to see if they can give me a nether chance at it and I did.

It was July 30, 1994 we were on the way to Job Corps when I got there I was nervous I smoked about three cigarettes less than 30 min. though I walked up to the building I filled out papers. My sister had to go back home right a way I didn't know any one except two people Todd Dunche and Ben. After I got all those papers done they took me to my room al my roommates were there to meet me I was still nervous. My big had to go in town so my roommate should me around his name was Jason he was alright. We went to eat then Jason had to live for a hour or two I stayed in my room unpacking.

Two mouths past I didn't have a attitude anymore and found out the easy way to save money. I made more friends here in Job Corps than what I had in my home town. I decided to take Culinary Arts because I love to cook. My instructor showed me how to cook interesting thing. When I came in to Job Corps I didn't know alot but I start my classes and I had the best teacher her name is Ms. Beeck she is easy to talk to and she understands people, also she is very sweet.

Another month went by so I have been here for three mouths and I found a girl how is meant to be mine forever this girl changed my life see made me look at life a different way. Now I'm trying to make my self to think positive not negative things.

Job Corps is a nice place to stay and learn, meet friends, to fix your problems, and to make your life better and easier to live.

## Why Job Corp Changed My Life!

*January 12, 1995*

My name is Amanda Owen and I am writing this essay portaining, Why Job Corp has changed my life, for the reason being it has. Back in 1992 of August I entered the program. In the seven months I was here alot happened. I graduated receiving my GED. Yes that was it. Because of my attitude and low temper I was constantly in trouble. In March of 1993 I resigned. Going back with my uncle for two months. Working at a recycling company I saved enough money to get an



apartment of my own. Things were going fine but I found myself always wondering what if I would of stayed at Job Corp. As time went on and months passed reality was starting to frighten me. It was hard trying to keep up with bills and buying grories too. Than in April of 94 I found out I was pregnant. Trying to work double shifts of 18 hours an day plus finding time for myself was impossible. On top of things my car broke down and I had no transportation to work. In July of 1994 I quit job and struggled day by day. At the end of July I had a miscarriage. That's when I decided I wanted to go back to Job Corp. August 23, 1994 I arrived here on center. Since we been back we received no NIP's, I'm almost completed in my CNA and I'm running for Secretary of Excutive Council. I've been on dorm Government on my dorm. And also I'm trying to become a Big Sister. Job Corp is a good opportunity and I'm glad I had a chance to be a part of it. I fell more responsible and mature than before. All I can say is if you want to make something of yourself you have to put some effort into it and coming to Job Corp has helped me do so.

How Job Corp Changed My Life

by Tammy Ribbink

I came to Job Corps on March 8th 1994. When I heard about Job Corps I was really not interested in it. But I made My mind up and called this counseler about Job Corps she sat down with me and talked to me about the different trades that Job Corps had. I said I'll let you know if I decide to go. And I did go to Job Corps not by myself but with my husband.

When we got here at Job Corps I was very nervous didn't think I like it but as the weeks went on it got easier. I had to go to some classes they are Reading, Writing and Thinking Skills, Math. Cultural Awareness. These classes are helping me in these areas because I needed the extra help. The teacher's really help me when I have a problem. My trade is Culinary Arts which I want to be a cook. I plan on completing my trade before I leave Job Corps.

When I was at home I always had my parents get me up in the morning but since I came to Job Corps I get up by myself because I know I have to go to school or my trade. Job Corps has changed my life because I know now I have a trade or a job for me when I'm finished. When my husband and I leave Job Corps we hope to have jobs waiting for us because we want to spend the rest of our lives together forever. if we didn't come to Job Corps we wouldn't have a good life to look forward to.

008158

000604

## How Job Corp Changed My Life
by Amy Douthit

Job Corps changed my life so much. I came up here to get a better education even though I already have my diploma. The teacher's are so nice to me and patient to me. I Wanted to get a better job in the near future Job Corps is a neat place to go. It's a place ware kids can came to get more education.

Job Corps pays you for going to school and it pays for your room and board. Job Corps is a place where kids can come to if their family has no money to send to a college that does cost money. If the kids want to go to college.

Job Corps offers transportation to go home on the holidays and to go into town if you wanted to go. Job corps has councilor's that can help you when you need it.

We even have a bank that is very understanding. Job Corps has rooms where we can sleep at night. Job Corps respects other people problems and doesn't tell anyone else. They have a great attitude toward other people.

Job Corps will lead me to a job that I really want and willing to work hard in. It gave me a chance that I can improve that I can do something with my life and for myself. It makes me feel good I will be a completer.

## How Job Corp Changed My Life
by Shannon Sorey

Job Corps is the biggest improvement in my life. Job Corps, gave me a second chance to prove to myself that I can make it on my own someday. Job Corps, brings me self-esteem I've never had so much of. Job Corps has brought me responsiablity, hope, and most important honesty to me and all the people around me.

Job Corps helps you to have respect for other people knowing they have problems too and that I'm not the only one.

I do better here at Job Corps, better than I ever did in school. Job Corps gives me opportunities that I'd never have any where else.

I came from a poor family and never thought I'd have a chance for much. I'm fulfilling my dreams now. Some kids don't have home's to go to or money to get things they need. Job Corps, buys us things to survive then the money we do get gets spent on things like shampoo, soap, and so-on. Which some kids (young adults) have never had before the money or a home.

Job Corps, helps us to survive in the future because we are the future. Job Corps helps us all to stay in line to do our very best.

Job Corps, teaches how to live good life's and gives us help and time out's (breaks) so our minds don't over load.



Job Corps, has teachers that take time out to help you understand your work. Job Corps offers us a doctor, dentist, and councilor's. Job Corps teaches us the meaning of respect for everyone's feelings, we all treat each other equally and always have friends to lean on.

Job Corps, lets us work at our own pace so we aren't being pushed or pressured which helps to the greatest for me because I'm a slow learner and Job Corps, helped me to realize that its okay as long as we hang-in and keep trying.

Job Corps, gives us transportation home on holidays and take's us to town to get things we need.

Job Corps, helped me to find myself and never let go again. To hang-in even when times are tough. Job Corps taught me to be social and never give up because everything is worth a try.

Job Corps, also may help you to meet the guy or girl that was meant to be for you and the good thing about it is you'll be able to support each other or yourself. Job corps also gives you love!

Dear Sir,

I'm writing to response to the proposed downsizing of Job Corps. I'm a 19 year old male who attends the Denison Job Corps in Denison Iowa. Job Corps has and continues to provide young adults with an education. Job Corp does have its share of problems but the positive outweigh the negative. I have attended Job Corps for the last 3 months and study CNA. Before I came to Job Corps my life was out of control. I had no discipline and I ran the streets. I was in a gang and had been shot once and stabbed twice. When I got to Job Corps the staff took a genuine concern for my well fair they welcome me and got me wright in my trade. I have met many people at Job Corps and have changed considerably since I first enter Job Corps. Job Corps had also inabiling me to persuaded my high school diploma and I hope to graduate in 2 or 3 months. There is also another advantage of Job Corps I have been able to keep up on my child support for my two kids. There is a place where single parent's can come and also get their kids around them. Job Corps is a very good program that shouldn't be downsized. A lot of your adults rely on Job Corps for a second chance. I know a lot of people who would be in jail if they where not at Job Corps.

It cost a lot more to send a kid to Job Corps than to send a person to jail for a year. Job Corps has help a lot of people better there self over the years. I hope that you will see the positive benefits that Job Corps has to offer. I would like to hear back from you to see how you feel on the issue.

Sincerely,

James Henderson

James Henderson
Student, of D.J.C.C.

## My Life Without Job Corps!
by Courtney Davis

I am a Denison Job Corps student, and I am writing to let you know the facts as I see them, and how the facts as I see them, and how they are written, and how Job Corps has changed my life. If the budget had been cut a long time ago I would not have had the opportunity to come to Job Corps, and more than likely, I would have ended up in jail or murdered!

Job Corps is the largest federally funded residential, education, and job training program for youths who would not have been able to further their education. Job Corps students range between the ages of 16 and 24. Some of us have children. There are 111 Job Corps Center nationwide, and they are the only program that offers us jobs training, education, andhich I am prepresentlyul. To eliminate the Job Corps programs would be detrimental to the future of our country, and to our young children yet to be born. I have been taughtevery student who becomes a completer at Job Corps is making a contribution to our country.

Our success rate at the Job Corps Centers is rather impressive. Seven out of every ten graduates get jobs, enter the military, or pursue further further education. Small businesses nationwide turn to Job Corps for well trained and educated workers. At the Job Corps Centers it costs $58 a day or $21,000 per training slot for each Job Corps student. In other programs such as Boys Town it cost $40,000 to $48,000 annually per student. Research has shown that some correctional facilities expendetures for the incarcerated for the incarcerated is as high as $56,00 annually to house each prisoner.

I don't know if any of this means anything to you, but it means a lot to someone like me. I am sixteen years old and I have been in and out of school since I was 12 years old. I was running with gangs and drinking alot, and smoking weed. I carried a gun to keep myself safe, and most of the time I didn'tknow what my situation would be from one hour to the next. I aspire to become more educated, because I have always been smart I just never used my intelligence in the outside world before. I never had much of a chance to use my ability in my world. I was on a one way street headed for destruction and no one could help me.

One day after I had been on the streets for two week, and no one knew where I was and frankly neither did I. I was found by my father and he brought me home. My friend called me and she and her friend were talking about coming to Job Corps. I thought about it because I was desperate to get out of this unpredictable life style, so I descided to come to Denison Job Corps Center. I didn't know what to exspect, and when I first pulled up I thought I was going to jail, but I didn't see any bars. After a while of being here the rules no longer bothered me, for this is the first that I have ever had possitive structure in my life.

Today, I have plans for my future, something I never had before. Job Corps has given my life hope, and not only hope but my life has meaning now. I like what I am doing, and I like the way I feel. I feel like I am finally succeeding at something in my life, and I am somebody.

With out this program I would have became another statistic, possibly living on the streets. I would have either ended up in jail, dead, or with too many babies, no future, and no education. Thanks to Job Corps for providing me the opportunity to be educated, job trained, and self reliant with out any need or help from welfare.

## How Job Corp Changed My Life
by Todd Alan Dumdei

On October 5, 1993, a struggling young man drove to Ida Grove to talk to an older gentleman about changing his life and goals. This older man, whom I will call Alex, told the younger man about making a wounderous new life and a better future for himself. Alex told me about Job Corps and the chance it gives almost everyone. I asked alot of questions about Job Corps because I had heard all





kinds of stories about the place. Alex did not pull any punches. He was straight forward and confirmed a few of the stories. Most of them were wrong. I was still unsure about Job Corps, but still decided to go and try to accomplish something other than working deadend jobs.

Alex called me on October 13th and told me that the date was set and the staff would be waiting for me on the 19th. I got nervous and asked if he could start me at a later time. Alex told me that he could give me a week longer. But, in order for me to be able to change my life I would need to stop stalling. I called Job Corps and told them I would be ready on the 19th. The next day I was fired from my job and a week later my car was reposessed by my bank. My life was getting more messed up by the minute. The only thing I had to look forward to now was Job Corps.

A van pulled up outside my house and a strange man walked up the sidewalk. I knew he was the driver, somehow. I loaded my bag in the backseat, climed in front, put my seat belt on and soon fell asleep. While we were driving up the hill to the Denison Job Corps I read the signs. They offered me some comfort. Here's what they said:

You Have Now Entered,
Where Dreams Become True.
For At This Center,
Life Begins Anew.
The Skills You Gain,
Will Always Remain,
No Matter Where Your Domain.

WELCOME DENISON JOB CORPS CENTER

When we reached the Orientation building my "Big Brother" was there waiting for me. He introduced himself as Jeremy. He helped me carry my bags to the Orientation room and on to dorm as soon as all the necessary paperwork was done. Jeremy showed me around the campus for a while then we went to the cafeteria. I was really scared being around all of these new people and didn't eat much. Later on that night, I was able to meet all of the people on dorm. I was starting to relax a little and after roll call I went to my room and went to sleep. My week in Orientation was fun and very informative. I was starting to feel a lot more welcome.

As I finished Orientation and starting OEP, I was making more friends than I ever had in my home town. OEP, which stands for Occupational Exploration Program, helped me decide which carrer I wanted. I was also shown how to set goals and meet them. After just two weeks at Job Corps, I was starting to feel good about myself and my future. As I started my trade and academic classes, I felt myself gaining self-esteem and pride. I was accomplishing something for a change instead of just giving up and running away from my problems.

After a few months, I started getting a little stressed out and fell back to what I used to be. I stole a pool stick and I got caught. The staff that delt with me were fair in my punishment. I asked if I could see the center Mental Health doctor. I was put on medication for my stress and learned from a friend about a relaxation technique. After about four more months, I was doing better so I was put on two different types of medication. I think I was allergic to one of the medications because that next day I went into extreme depression and I ran from the center to try to kill myself. I was found walking and taken to the town hospital where I requested mental treatment. I was taken to Cherokee Mental Hospital where I received the treatment I needed.

008160

After I was released, I was put on medical leave for a month. When I came back I was greeted by all of my friends. I was very happy I was allowed to come back and I thanked all of my friends for being there when I needed them. I also apologized to them for putting them through the pain and sorrow when I left. I still feel bad for not being able to say good-bye to some of my friends who left before I got back. However, I feel we will all meet some day in the future.

Now, a year and three months after my first day, I have completed my trade and am starting pre-employment training. I now have the future I didn't have before. I am proud to be a Job Corps student and I will encourage other people who are needing guidance in their lives to go to Job Corps and get the training they need for a brighter tomorrow.

I am finally able to say I finished something that will make me a better person.

HOW JOB CORPS CHANGED MY LIFE!

BY AMANDA H. WAGONER

January 11, 1995

When I entered Job Corps on June 21, 1994, I had only been out of college for a month and a half and I still was having a difficult time finding a job to support myself. I was living on my own for three years and only fifteen miles away from my parents for whom were still supporting me before coming here.

As I was coming up the drive in a very cramped, packed bus of bags and about 30 some kids, including myself, I saw about 7 to 8 signs spread a part from each other and each one read a different phrase:

YOU HAVE NOW ENTERED
WHERE DREAMS BECOME TRUE.
FOR AT THIS CENTER
LIFE BEGINS ANEW.
THE SKILLS YOU GAIN
WILL ALWAYS REMAIN
NO MATTER WHERE YOUR DOMAIN.
WELCOME DENISON JOB CORPS CENTER.

At first when I read that I thought "Yeah right. I may have entered, I'm not going to stay because my dreams have never become true." After reading all of those signs, I had yet another thought.

My other thought was after getting to Job Corps is that if three years of college and two credits short of getting a college diploma didn't work for me, Job Corps certainly wouldn't work for me either. As you can now see, I didn't quit no matter how much I wanted too and I am still here.

In my own opinion before Job Corps, I just wasn't getting anywhere with my life. I really thought my future was bleak because of the way I was treated by other kids from my younger years of elementary, junior high, and high school grades.

With me having a learning disability, I thought I would never graduate from high school. Eventually, I thought I would have gotten a lousy job that I would be stuck with for the rest of my life that I may not like nor would want for the rest of my life.





Now that I'm in Job Corps, I'm getting even closer to being a step off completer in my trade. I guess you can say, I made a good choice in staying. Once I have completed that step off level, I will have a better chance of getting a good job that I would like rather than getting a job that only requires you to have a high school diploma for which I already required on June 1, 1991.

I would like to say I've had some help from some fellow students, teachers, residential advisors, and all other staff members, past and present, to get where I am at now. I know I did the work myself but I've had their help on understanding what I'm working on now and what I have worked on in the past since I've entered Job Corps. Without their help, I don't know where I would be now.

By doing what I'm doing now in Job Corps, I have changed in many ways that I can't think of or could have imagined on changing if I was still going to college back home right now instead of being here. Since being here, I have become a part of the Big Brother/Big Sister Program, a Dorm Aide at one time, a Dorm Government Officer position of Chief Justice, and a Recreation Aide.

After I am completed with Job Corps, I'm thinking of going back to college at home to complete the two credits I need for the college diploma in Office Technology. Maybe this time, I'll have a better time at adjusting to going to college.

All in all, I think Job Corps is a good place to go to for a very good education and the training you will need for the future. Job Corps can change a person's attitude on life. Please give it a try.

Have a HEART and the S.P.I.R.I.T. to go for it in Job Corps anywhere here in the United States.

HOW JOB CORPS CHANGED MY LIFE
By Stacie Hall

I dropped out of high school to be with my older friends that had already graduated. If I went to school I missed out on all the fun with them. Drugs and alcohol became a big part of my life. In fact it pretty much took over. At that time I left home, thinking I would do just fine on my own.

I moved around from here to there living with friends; eating their food and using what little money my family gave me for drugs and alcohol. I never asked them for much because I had my pride and didn't want to admit I was wrong. I still did not have a job.

I finally got a job in my hometown and stared working. Drugs and alcohol were still a big part of my life, and because of that I lost my job and my apartment; which meant once again I was letting my family down.

I went through two more jobs, still living with friends, before I found a job that I really liked. I got my own apartment and found a roommate. I had all the training I needed for the job, but because it was a small business, the pay was very low. I barley made enough money to live, even with a roommate to split the bills with. My drug addiction was taking up all the money I had.

Then one day I was watching television and I saw a commercial about Job Corps. It was then I decided I was sick of living the way I was; dodging my family because I was embarrassed to how my face because I was a loser. I wanted to get job training, get a job, and live like normal people. I wanted off welfare. I wanted to make something of myself. I wanted to amke my family proud of me. I wanted to make my mom and dad so proud of me that they would say, she's finally getting it together.

Job Corps was my last chance. If it weren't for this program I'd still be in my apartment getting high and drunk, hopin I would work the next day do I would have enough money to get food.

If you were to close down the Job Corps Centers, think about all of the people that are just like me. The ones that wouldn't get a chance to make their life better. Some people want to straighten their life out but can't because of money or other things. Job Corps is the answer to their prayers.

I've been here 7 months now. Its changed my life. I haven't done any drugs since I walked on center and I haven't drank for four months. Since I've gotten here I've earned my High School Diploma. I plan on going to college once I complete my trade and get as much education as I can. There have been rough times, and I've wanted to leave but thanks to the support of my friends and the staff I've made it through. I want to be somebody, not a nobody. Thanks to Job Corps I well be somebody someday.

How Job Corp Changed My Life

by Marco Hogue

Before I entered Job Corps I was seventeen years old living in East St. Louis as a young teenager out on the streets parting, in a gang and sellling crack doing all the bad things a teenager would do.

One day in a shoot out my cousin got shot standing next to me, and died. Right then and there I realized that could have been me. I told my dad and he worked with me and said, "Son, you need to leave this town and make something out of yourself besides this surrounding here."

Three days passed, he suggested Job Corps, that's when I got signed up at Mingo Job Corps. That's where I had a chance to get a fresh new start with my life, and a change.

The first day I met new people, and a friend. It took me five months to get adjusted to the place and straighten up, also a chance to leave my thug life behind. There were rules for me to follow, I learned a lot about discipline. I also learned about people and how to deal with them on center and off.

000609



Thanks to the training of social skills, when it was first put out to be a learning subject for the Job Corps system. This was a part of my life that I took serious, this is when I matured, by eighteen I felt like I was twenty-three.

Thanks again for the Job Corps system for the good things they have to offer for the young and older students. As well for the training to a forest fighter on the side, beside your trade of choice to make extra money.

I also learned C.P.R., and I was trained to be a Cormen leader, which I thought was great. This charged my point of view about life, that I can be somebody. I also completed and recieved a certificate in Culinary Arts, this is when I ran for Vice President of the center and won.

The best part is that I had the chance to travel, and visit other Job Corps Centers, as well as meeting new people. I'm only human, I had some bad times and some good times at Job Corps. Most importantly the people at Job Corps that care about the students here, that helps a lot, with any problem.

Peer Counseling was an important part of my life on center is helping out the students with their problems and concerns that make me feel good.

Me, myself, and I can be devoted to the Job Corps system. That's one of the reasons why I came to back to Job Corps to Denison to get my G.E.D. and meet more people and give lots of ideas to make this center a better place to work and live.

008162

Needless to say I had to leave Mingo to take care of my sick Grandmother, but now I'm back and going all the way to the top of my goals, instead of one step away.

Then I want to help Denison out as much as possible by giving them more and more of the ideas to make and improve this center so everyone could be happy.

That is the reason why I'm running for President for Executive Council. Hopefully in my future I will be a part of the Job Corps Center, by starting out as a Center Standard Officer.

HOW JOB CORPS CHANGED MY LIFE

by William Thompson

Before I came to Job Corps, my life was shattered I started going down hill at the age of nine. It got worse through the years.

My parents fought with me every day to go to school I never liked school from the third grade on, but it was in the sixth grade when I ruined it for myself I started doing drugs and alcohol

One morning my mom told me to get up for school and I swore and threw an ashtray at her. She picked up a belt and was going to spank me, and I grabbed a knife and told her if she came near me I would kill her. My dad came hoe that morning and made me go to school. I got kicked out of school the same day for fighting with a student.

Later that day mo took me to see a psychiatrist. That very day I was admitted into the psychiatric care unit at Marian Health. I was in different lock-ups during the next five years

My teenage years were in nut wards and I had only myself to thank for it All I did was fight and lose control When one place would get sick of my behavior they would ship me to another Even in the placements when they tried to get me to do school work I would throw it at them and tell them to do it themselves I got treated fair in some placements and unfair in others.

Finally at the age of sixteen I got to go home. I found out how precious life and freedom was to me But my attitude never changed. My parents and I fought even worse I got more and more into drugs and alcohol I would go to school for a month or two and quit That was my pattern until I was eighteen lucky for me I worked good enough to pass.

As soon as I turned eighteen my attitude changed a little. The fighting slowed down a little between my parents and I. They didn't like me doing drugs, but they knew they couldn't stop me I was never at home that year Instead i was out partying and getting into illegal activities

There was one person that would not give up on me, my English teacher from East High School he came out to the house quite often trying to get me to sign up for Job Corps Every time he left I threw the papers away and said I didn't need Job Corps Then one day he came over, discussed Job Corps with me, and said if I fail to sign up this time he would never ask me again He told me I was ruining my life by not working or finishing my education Well, for a year and a half after that I still thought he didn't know me or what he was talking about

Then it happened, mom told me that because I had no job or intention of going back to school I had to move out So I moved onto a farm with a friend of my dads

That is when I realized how bad my situation really was I kept thinking how I had let my parents and myself down I knew at that moment I wasn't going anywhere in life I couldn't get any of it out of my mind. So I went back to my parents and asked if they would take me sign up for Job Corps They thought I was joking or trying to pull one over on them But my dad took me to a Job Corps screener before I changed my mind I thank God he did because once I signed up I wondered if I had made the right choice

It was awhile before I got my invitation letter But in between time, I kept thinking maybe I did something that I was going to regret after I got there I thought I would be there a week and would quit My parents and relatives "gave me two weeks" and said I would quit

I've been here almost seven months and I am very proud of myself I am more proud of myself than I have ever been in my life. I have earned my G.E.D. so far and hopefully my high school diploma in time I have done some of the most unbelievable things here I am proud to be president of the chess club and wing leader of my dorm I push myself in sports to do the best I can and to get trophies or awards I have already won three and I'm going for them all I am proud of my certificates of completion in the classes I've completed I've never felt so good about myself as the way this place makes me feel

Maybe I've never been off drugs long enough to know what it feels like I have shocked my parents and relatives Now when I go home, they always tell me good things that I haven't heard since I was a kid I try to be more responsible than I was I look back at my past and thin why did that have to be me

Since I have been at Job Corps, I have seen a different future for myself. one that really is there if I want it bad enough There's no way I could throw my last chance of making something of myself away I plan to get my diploma and finish a trade or two, or three. I'll do anything I can to change my life and build my relationship with my family again before I lose them I almost blew up and got terminated, but I handled it better than I have ever done in my life I know it's because I've never been this far, and I'm never going back Job Corps has changed my life in ways I've never imagined And I know if I can do it anyone can They just need to wake up the way I did, hopefully sooner.

000610



To whom it may concern,

This letter is to inform you of the concern existing about the need of Job Corps Centers nation wide.

As you know, since its beginning, Job Corps has been helping kids by offering vocational training such as Health Occupations and Business Clerical, techinical training such as building trades or welding with the option of Union benefits, or college courses and advanced training for completers. Plus, Job Corps offers a high school diploma and/or GED program for those students who have come into the program without finishing high school.

The after-school activities are just as numerous as the vocational choices with a recreational hall, art room, and a gym. The rec hall also funds trips to rec and fitness centers, movies, concerts, and sporting events.

In a perfect world, Job Corps would not be necessary, teenagers would stay out of trouble, and the government would make all the right choices.

Unfortunately, as we all know, this is not a perfect world. Job Corps is necessary not only for troubled teenagers but those without a last chance, like me.

If you vote against Job Corps in February you will take away that last chance that many of the 40,000 students currently enrolled in the Job Corps program have, not to mention the countless others awaiting enrollment into this vital program.

I am Kim Wingate and have been in Job Corps since June 15, 1993. The program has given me a chance for a future. I now have plans for a job, a place to live, and enough readjustment to get off to a good start once I've completed my trade.

Please take another look at Job Corps and consider what may happen to our society if it doesn't continue to exist before you make your final decision.

Thank you for your time,

Sincerly,

Kim Wingate

Kim Wingate
Denison Job Corps
Center

How Job Corps changed my life

As a student of Job Corps I think that I can truthfully speak for how much Job corps can really help people that need it. Before I came, I had made so many plans for my future, but none of them fell through for me. Maybe because I didn't have my G.E.D, Driver's license, or any money at all for college.

But if people would just stop and think about what this place offers, they would realize that it truely benefits them. But most people come here thinking more of a social life than anything, and don't even take into consideration all the opportunities that Job Corps has to offer.
I'm not saying I never got fed up with having rules that made you feel as if you never passed out of 7th grade, but I do realize that almost every rule they enforce here serves a purpose to you later in life.

008163

I am a student in the Painting trade here on center and when I complete and land a good paying job I can't exactly be tired when I come to work, nor late for that matter. So that's why there are cerfews, to help you get used to what it's like in the real world. And my employer won't tolerate a person strung out on drugs or abuses alcohol. And that is why drinking and drugs are prohibited. The lists can go cn and on. But what everyone finds to be unfair, is really helping you for your future.

I don't actually expect that everyone is going to come to the great realization that I did, but everyone still needs the opportunity to try and understand. I've seen Job Corps turn people that would seem hopless to the rest of the world, and turn them into people that live and work in your community.

Written By:
Kathie .J. Donahue
student of DJCC
Kathie Donahue

My name is Beverly E. Herron and I am twenty years old. I am the oldest of four and come from a single parent home, where mom works nights, collects child support and welfare.

Job Corps is helping me to keep from getting on welfare and getting behind on payments. This is my home now. If you take this opportunity away from me and others then some of us will be living on the streets or in prison.

This is our second chance to straighten up and become good citizens. I'm learning how to keep my temper, a clean house and community. In Denison Job Corps Center we are also learning to respect others and ourselves.

Job Corps is also home to a lot of single parents with small children, whose futures depend on their parents education and jobs. Congress says that they want people off welfare and not to be totally dependent on it. Yet Congress wants to cut back on our education and ticket to a better future.

Please don't take the bettering of our future and others future away from us and them.

Beverly Elizabeth Herron
Denison Job Corps Center
Denison, Iowa

Hello,

01-12-95

My name is Amanda Jurgens I am in the Business & Clerical program in the Denison Job Corps Center I am nineteen years old, and I don't want to know where I would be at in this point in my life if it weren't for Job Corps

I have been in Job Corps for about eight months I have come along way So far, I have received my High School Diploma, my drivers license and I am close to finishing my trade

Because of Job Corps, my future is a much brighter one It has not only taught me the skills that are vital for getting a job and keeping one, it has made me open my eyes Open my eyes to life I now realize that college IS A MUST! Because of Job Corps, I am looking forward to being on my own, supporting myself

Before I came to Job Corps, my life was basically a dead end. No car, (no transportation) no job, (I was living off of SSI), and I was doing drugs, and getting pretty much involvedroad to loserville





Now, in the time-span of under a year, my life has REALLY CHANGED! ! A am not saying it has been easy either The living environment of Job Corps can sometimes be a little nerve wracking, but I guess anything worth having is worth working for isn't it" I am not also trying to say that Job Corps is wonderful, and its flawless, because it is not

What I do know, though is that I'm going to have a job, car, place, college, career, and sense of pride when I get out of Job Corps I am almost there It has really been worth it

Thank You for your time
Amanda Jurgens

How Job Corps Changed My Life
by Tonya Morgan

Job corps has improve my life in so many ways it is hard to list all of them.

I guess the biggest change for me is the fact that I finally started going to school regularly. At Job corps there's no where else to go, but at home there were to many other places. Job corps is a good program because you can go to high school and learn a trade at the same time.

The way you have to be so independent is good for me, because it was rally time to realize mom wouldn't slways take care of me. I am learning to budget my money, and that making money the right way is the best way. While you are in this program you learn to do everything for yourself that mom did for you.

Job corp has taught me one lesson that I will need for the rest of my life, and that's how to get along with others, and to deal with others, even if I don't like them. It used to be that I would be ready to fight if someone lookes at me the wrong way. This program teaches me the work place you just can't beat up your boss because of a disagreement, or you'll either end up fired and/or in jail.

So, If you think this program doesn't teach anything you're wrong; it improved my life almost 100%. Because I finally realized that without an education you can't make it. This society is hard these day's and an education is the best way to get anything you want.

HOW JOB CORPS CHANGED MY LIFE
BY KARRIE WEAVER

Job Corps has changed my life in so many ways. When I came in to Job Corps I had nothing. I had no job skills, and I was fighting with my family. I was only 16, I didn't know how to handle responsibility or know how to live without my family and friends.

Job Corps has given me job training. I am currently in the Health Occupations class. In Health Occupations, we study how to take temperatures, pulses, respirations and blood pressure. We also learn to care for people. All of this studying will help me to become a certified nurses assistant. If it wouldn't of been for my instructor, Mrs Lisa Hartman, I doubt if I would be able to take state boards. Mrs. Hartman has helped me so much with my classes and my personal life.

The counselors here at Job Corps helped me to deal with my family problems. They encouraged me to talk things out with my family. Now,because of the Counselors help, my family and I are getting along better. The counselors take time out of their nusy schedules to talk with us.

My RA, Sheila Reitan, helped me learn responsibility by encouraging me to run for Dorm Government. As the Treasurer of C-2 dorm has taught me how to be more responsible because I have to help a dorm full of ladies clean. I also listen to become a better member in a group living atmosphere.

Another area in Job Corps, besides my Vocation and dorm that has helped me are the extra activities I am in, such as Bigs, Jr.Wics, and peer helpers.

If I hadn't heard of Job Corps, I might be living on the streets. If I could give some advice, to anyone without job skills, it would be to go to Job Corp. It has helped me out alot. I would also tell then that it maybe hard, but it will be worth it when they complete!

To Whom It May Concern:

This is in regards to the current situation in Congress concerning the Job Corps Program. I will be perfectly honest in that I do not tend to stay abreast of political situations. However, I am aware of the fact that our new Republican majority have shown the utmost interest in down-sizing the federal government.

I have just recently become aware that this down-sizing that is taking affect will include the Job Corps Program. If you have ever visited a Job Corps Center, no doubt, you found a lot of teenagers in both educational and technical training. If by chance you remained on that center to find these students in their leisure time activities, I'm positive you would find a great deal of activity in the recreation room, art room, and in the gym.

I would not begin to say that all Job Corps Centers are perfect or run as smoothly as a freshly paved highway, but the students find a place that they can call home, not worry about where meals might come from, or if they'll be able to scrape together the funds to pay for school fees or clothes.

My name is Andrea Adney and I am twenty-two years old. I have resided on the Denison Job Corps Center since August 9, 1994. For myself as well as many other students here, Job Corps was a last chance to make something of our lives.

When I came to Job Corps last fall I was leaving behind a part time job at a fast food restaurant that paid minimum wage, in hopes of having the opportunity to gain enough knowledge and experience so I wouldn't have to live as I had in the past. So I wouldn't have to go through trying to fit three adults into a two room living space, or live out of a car; not knowing where the next meal would come from or when.

For me Job Corps has become a place where I can pick up the pieces of my life and put them together. I've been doing that and I've had help. For the first time in my life I have a couple of freinds that I trust farther than I can throw them. With them as well as members of the staff I've found pieces of my life that I didn't know were missing, and I found where they fit.

Job Corps gives so many young adults the opportunity to get the training that will be needed to make it in the world today. Many of us who are here are here due solely to financial reasons, as I've already explained that I am. Being unable to affort to attend a regular "institution of higher learning", we turn to programs such as Job Corps to build ourselves a tomorrow that we can all live with.

000612



I hope Congress will help us to have a today that will allow us to build a better tomorrow than we had to look forward to yesterday. Please do not cut Job Corps from the Federal Budget, if you do in the long run all you will be doing is making the deficit rise a little for each of the approximate 40,000 students currently in this vital program, not to mention the countless others who are waiting to come here.

Thank you very much for your time, and hopefully your support.

Andrea Adney
Denison Job Corps
Corpsmember

U S Senator Tom Harkin
316 Hart Senate Office Building
Washington D C 20510

Dear Senator Harkin,

When I was a child I went through many things with my family With my brothers in and out of the home and my dad running from the cops I never went to school on a regular basis I was always a smart child, but never given the chance to really work hard

By the time I was in high school I had a stable home and things were better There was a few problems and I didn't want to live at home anymore I fell in love and moved in with my boyfriend at the age of sixteen I didn't want to quit school, but by the time I got permission to change school districts it was too late I would have had to of taken the whole junior year over I didn't want to do that So I went and I received my GED

I basically gave my education up for my boyfriend and his children We went through some hard times and split up after being together for 3 years I wanted to start on getting my education after that My best friend told me about Job Corp I was definitely interested So after 3 months of deciding what I wanted I decided to go for it

I arrived August 23, 1994 I had no idea what to expect or how to react It was quite a change for me Within the first week I knew this was for me I made alot of friends and I felt real comfortable After taking orientation and learning about all the trades I felt that this place had alot to offer me and anyone who is willing to take advantage of the opportunity

If I wasn't here in Job Corp I would be in the streets or in a dead end job I feel real proud of myself and I think that anyone who wants to achieve their goals will do it here

This place has changed my life forever With all the education I receive and all the people I know it's well worth every little sacrifice I make

Sincerely,

Karlene Jansa

008165

The CHAIRMAN. That concludes today's hearing.

[Whereupon, at 12:52 p.m., the committee was adjourned.]

008166

# JOB CORPS OVERSIGHT

## THURSDAY, JANUARY 19, 1995

U.S. SENATE,
COMMITTEE ON LABOR AND HUMAN RESOURCES,
*Washington, DC.*

The committee met, pursuant to notice, at 10:09 a.m., in room SD–430, Dirksen Senate Office Building, Senator Kassebaum (chairman of the committee) presiding.

Present: Senators Kassebaum, Jeffords, Frist, DeWine, Ashcroft, Abraham, Gorton, Kennedy, and Simon.

### OPENING STATEMENT OF SENATOR KASSEBAUM

The CHAIRMAN. The hearing will please come to order. My apologies for starting late. Senator Kennedy and I were making a presentation before the Rules Committee on our reduction of 25 percent to the Labor Committee funding. Senator Kennedy is on his way, and I think I will go ahead with my opening statement, because he will be here any minute.

Yesterday the committee heard disturbing testimony about the problem of violence at Job Corps centers. That testimony by young people who have gone to Job Corps seeking help, and from former staff members at Job Corps centers, was I thought powerful evidence that violence is not an isolated or incidental problem.

In fact, the evidence suggests that Job Corps has failed a central part of its mission—to provide a safe, secure environment for disadvantaged young people who desperately want to break out of the cycle of poverty.

Today we will hear from Job Corps management, staff, and administration witnesses on the problem of violence and other issues that this committee must address if Job Corps is to meet its real potential. I believe a key issue facing this committee is the fundamental question about how Job Corps is being managed and how we can change a system that I think clearly has gone off course.

The witnesses in these 2 days of hearings demonstrate that Job Corps has a great pool of dedicated and talented workers who deserve to be backed up and supported by this committee in seeing that serious problems are addressed, not ignored. Denying the seriousness of these problems is not an option, and I want to make clear that I as chairman intend to follow through and see that real change occurs.

The concerns raised about Job Corps and the severe budget limits facing Congress have brought Job Corps to a crossroads. This committee will have to decide what direction we want this program



000613

to take—whether we want this program to focus on training and education or to operate correctional facilities.

We must explore the role of private contractors and whether they are being held fully accountable when they play numbers games that place their Federal contracts above the needs of young people.

Finally, we need to ask whether local communities should play a far greater role in how Job Corps centers are operated.

I believe Job Corps serves an important and necessary role, but I also believe Job Corps must change, and change for the better, or it will die. I for one want to send a clear message that Job Corps must produce real results, not just glowing press releases. Now is the time to deal with these issues.

We heard yesterday about what a success Job Corps had been in George Foreman's letter about what Job Corps had meant to him. That was 1968. We are in a different time. We have not held oversight for about 10 years in a thorough way to really analyze what has taken place, not only in the population being served, but the needs of that population that need to be met.

So I think it is a great opportunity, but it is one that we have to take seriously, and I think we can only succeed by being very realistic and serious about the responsibilities that each and every one of us holds.

Senator Gorton, we are waiting for Senator Kennedy, because I know he does have an opening statement.

Senator GORTON. Madam Chairman, I have only one request. We received an unsolicited phone call yesterday from a woman in the State of Washington who had serious problems and was subject to an assault in one of the Job Corps sites. I have asked her to put this in writing, and I would simply ask that the record be kept open so that her letter, assuming that it comes, could be made a part of the record.

The CHAIRMAN. Yes, I will be happy to do so, and as I stated yesterday, the hearing record will be kept open until the end of the week and perhaps even until the first of next week. A number of people have asked if they could submit statements for the record, and I think it is important that the record be kept open so that everyone can have their statements be a part of the hearing testimony.

I will go ahead and introduce the first panel, and when Senator Kennedy arrives, we will go ahead, and I know he will want to make his comments at that time.

It is a pleasure to welcome the first panel this morning. John Deering lives in Augusta, WI, where he is an admissions counselor for Job Corps Region 5, which includes 11 Job Corps centers in six States.

Larry King is president of the Forest Service Council and director of the Pine Knot Civilian Conservation Center in Kentucky.

Dr. Robert Belfon is a pediatric dental specialist, with practices in Piscataway and Plainfield, NJ. He worked at the Edison Job Corps Center in Edison, NJ between April 1991 and June 1993.

John McKay began working for Job Corps in 1965. He has worked as director of a civilian conservation center and project manager at the Job Corps regional office in Dallas. He retired last year and lives in Irving, TX.

000014



It is a pleasure to welcome all of you.

It is a pleasure to welcome the ranking member, Senator Kennedy. I explained that we were both testifying at the Rules Committee prior to coming here. Do you have any opening comments you wish to make?

## OPENING STATEMENT OF SENATOR KENNEDY

Senator KENNEDY. Well, we are here to hear the witnesses. I thank the chair, and I want to say how much all of us appreciate the chairman's leadership on this issue and the reviewing that we are giving the Job Corps program and training programs generally.

The purpose of this series of hearings is to find out how we can coordinate, consolidate and make more effective the resources that are being expended at the Federal level and also matched in the States and the private sector.

The Job Corps program has been in existence for a considerable period of time and is a lifeline to many young people who have dropped out of school or who have had difficulties in their own academic training, to give them a second opportunity and a chance to move into the future in terms of employment, or possibly the military service. We know that some 60,000 young people have graduated from the Job Corps programs, and close to 65 to 75 percent have actually been placed.

We heard enormously distressing and disturbing reports yesterday of incidences of violence at Job Corps centers. A single incident of violence is too much, and I think all of us have to try, in any program, to see what can be done to make the program itself more efficient, more effective, and more directed; and hopefully, as a result of these hearings today, we will get constructive suggestions and ideas as to how to deal with the complex problems which we are facing in our society, and how we can address some of the real challenges that are facing these young people with extraordinary difficulties and complex life experiences.

It is not an easy problem; if it were an easy issue, it would have been solved a long time ago. But we can certainly learn from these hearings, and I am looking forward to working with the chair and other members of the committee to try to make this a more effective program.

Thank you, Madam Chairman.

The CHAIRMAN. Thank you, Senator Kennedy.

Mr. Deering, we will start with you.

## STATEMENTS OF JOHN P. DEERING, ADMISSIONS COUNSELOR, JOB CORPS, REGION FIVE; LARRY KING, PRESIDENT, FOREST SERVICE COUNCIL, CCC CENTER DIRECTOR, PINE KNOT, KY; DR. ROBERT BELFON, PISCATAWAY, NJ; AND JOHN C. McKAY, IRVING, TX

Mr. DEERING. Chairman Kassebaum, Senator Kennedy, members of the committee, my name is John Deering. I am from Wisconsin, and I am employed as an admissions counselor for Region 5, which covers 11 Job Corps centers.

As an admissions counselor, I am the first, and most of the time the only person, that young men and women see before they enter

008167

the Job Corps campus. I see the anticipation and desire in their eyes for a change in their lifestyle.

As an admissions counselor, I am also employed as a placement specialist. When a young person graduates from the Job Corps campus, it is my duty to help that person find a job.

I believe the Job Corps program is a great program. I think it helps young people, and I think the rural youth of Wisconsin need this program. But I do believe there are problems—not only the problems that were mentioned before this committee yesterday, but other problems.

I toured the largest campus in Region 5 in November. The instruction that I was given before I even got off the bus was: Do not go anywhere alone; always go with another person.

I do believe that there is violence and gang activity on these campuses, and frankly, I choose not to send the young people from my area to those campuses. Of the 11 campuses in my region, I will send my youth to only two—two small, rural facilities that I believe are safe. I have sent youth to some of these other campuses; they come home scared, they come home frustrated.

I believe that it is time for the Job Corps program to be looked at, to be streamlined, and to take a serious look at the violence and gang activity that happens on our campuses.

I think part of the problem with the Job Corps program is the Job Corps centers. They are run on a contractual basis, and again, the problem here is money. Each young student graduated means a dollar amount to that contractor. There is no incentive for that contractor to send home a student who is causing problems, when that student may mean $400, $500, $600 to that contractor. And for a contractor who is already in trouble financially, it does not make financial sense.

The same goes for admissions counselors such as myself. My job is to recruit young people. I need to recruit a specific number of young people each month or my job is in jeopardy. I know there are admissions counselors all over the country, particularly in my area, who will recruit anybody they can possibly get—violent gang member, drug abuser—it makes no difference. My job depends on numbers.

That is incomprehensible, and the Job Corps program cannot be run that way.

Third, I believe that the Department of Labor regional offices have too much control over students and too much control over the Job Corps campuses. I believe that if the Department of Labor had less control and were streamlined, the Job Corps campuses would be much better.

I will make a side comment that the Civilian Conservation Corps campuses in my area—there are two of them—are the two campuses I send my youth to. They are run by the Department of Agriculture, they have a different mission than the other campuses, and I am proud to send my students there.

In my statement before this committee, I have three recommendations—streamline the Department of Labor; make the admissions counselors and the Job Corps campuses one entity—they are now two and sometimes three entities—that would bring accountability to Job Corps admissions counselors and the Job Corps

000615



campuses if they worked hand-in-hand. Finally, make the Department of Labor responsible for oversight of the functions and not a controller. I believe there is too much control in our Department of Labor regional offices, and that control should be sent to the Job Corps campuses.

Chairman Kassebaum, Senator Kennedy, thank you.

The CHAIRMAN. Thank you very much, Mr. Deering.

[The prepared statement of Mr. Deering may be found in the appendix.]

The CHAIRMAN. Mr. King?

Mr. KING. Good morning. I would like to take this opportunity to thank Chairman Kassebaum, Senator Kennedy, and the other distinguished members of this committee for the opportunity to testify before you today.

My name is Larry King, and I am a 12-year employee at the USDA Forest Service, at the Pine Knot Civilian Conservation Center in Pine Knot, KY. I also serves as president of the National Federation of Federal Employees' Forest Service Council that represents 18 Civilian Conservation Centers and approximately 650 Federal employees.

First and foremost, I would like to say that the Job Corps program is a much needed program. We serve the kids whom everyone else has given up on. We provide opportunity to those who have no opportunity. We are truly a program of last resort.

I would also like to go on record and say that our Forest Service CCCs are the best-managed and most productive centers in the program. However, for the past 5 years, I have lobbied for changes in our program; I have raised concerns regarding the way the program has been managed by the Department of Labor. As protection from the many attempts to cut the program in the past, the Department of Labor has developed elaborate systems of statistics to justify the program's existence. While we felt sure that this was a necessary evil at the time, this has become part of the problem with our program. Center directors are currently engaged in obtaining successful statistics at any cost. They are forced to do this; if not, they risk the chance of DOL closing them due to low statistics.

The single most disruptive factor is called ALOS, or average length of stay. This single factor weighs heavily on how a center is ranked by the Department. More often than not, center directors keep students who are disruptive, violent and who fail to make progress, solely for the purpose of obtaining a high ALOS. While ALOS tends to be the key standard in rating a center, other factors such as education, social adjustment, skills and vocation are treated as side issues.

We now have a program which has been developed to produce numbers, not to train highly-motivated young men and women who are socially well-adjusted and competitive in today's work force.

In recent years, the program has come under attack due to numerous negative incidents that have occurred both on Federal and contract centers, and the costs associated with the program. Most of the Job Corps population is obtained from inner cities throughout the Nation.

008168

008169



The program accepts those youth who are not functioning in our society for any one of a number of reasons. Therefore, it is understandable that our centers are experiencing the same problems that have been occurring in the inner cities. While most students can be turned around, it must be recognized that not every youth who comes into the program will be successful. Some students do not benefit from the program and continue to exhibit violent behavior. Because of the ALOS requirement, these students are commonly retained long after it has been determined that they should be removed.

While our student population has become more aggressive and violent, the Job Corps program itself still functions under a 1960's mentality. We function under what is conceived by the rank and file as the "poor baby" concept. Centers are now allowed to enforce discipline or maintain a productive atmosphere in which social development can occur. DOL policy in regard to discipline reflects standards under which students do not have to be responsible for their actions. Instead, centers operate under the concept that the student's background is justification for whatever actions the student takes. In other words, our students are not responsible for their poor behavior—society is.

We currently have a DOL administration which highly favors the use of contract centers. It should be noted that when contract centers were established, they were run by major corporations to train prospective employees. This is not the case today. Currently, anyone can establish a contract center. A contractor's primary objective is to make money, not to train students. Contractors provide the minimum training environment needs for the students, with profit dictating their choices.

In comparison, Federal centers are set up to provide quality training, not to make profit. The cost difference, however, between the two kinds of centers is not that great. The quality of training, education and social environments found in the two kinds of centers is strikingly different. Federally-operated centers have by far the best managed and most productive training environments.

The additional cost of the Federal centers is offset by the value of the projects that students produce during training. Specifically, students at contract centers are taught by building mock-ups or simulated construction projects. Federal centers teach students skills by actual construction of public facilities, such as ranger stations, visitor centers, and Job Corps centers themselves. Many communities around Federal centers have greatly benefited from projects completed by Job Corps students.

We believe that the current DOL Job Corps administration must change before any real progress can take place. In fact, we suggest a complete flush of the current DOL Job Corps administration, from the Washington level through the regional offices.

If the current administration and the philosophy are not changed, the program will never become a vehicle to effectively serve those who need it most—the students and the taxpayers of this country.

The committee should know that this program is a good program, a needed program, a program that serves kids whom no one else wants to deal with, a program that changes many potential dependents of the Government into taxpaying citizens. We do make a difference in the lives of these kids. The public does benefit from our program.



However, we recognize that we can and we should improve. Recently, the Forest Service reorganized our national and regional Job Corps structure to cut overhead costs and streamline the organization. We, the employees, and the NFFE Forest Service Council stand ready and willing to work with anyone, at any time, to improve the program so that it will be truly the best in the Nation.

If eliminating the Job Corps program is on the committee's mind, I ask that you reconsider and help us put one of the best programs in the Nation back on track. The kids need it, and the taxpayers deserve it. Eliminating the program is not the cure; fixing it is. We need a program based on accountability, not accounting.

The CHAIRMAN. Thank you, Mr. King.

[The prepared statement of Mr. King may be found in the appendix.]

The CHAIRMAN. Dr. Belfon?

Dr. BELFON. Chairman Kassebaum, Senator Kennedy, members of the committee, I wish to thank you for inviting me to testify.

My name is Robert Belfon, and I am a pediatric dental specialist with practices in Piscataway and Plainfield, NJ. I was a contracted medical services provider at the Edison Job Corps facility from the period of April 1991 through June 1993 in Edison, NJ, which was administered for the DOL by ITT.

In early February 1991, I was contacted by the medical staff of Edison Job Corps, which requested that I see a few of the resident Corps members in my office for the purpose of providing dental treatment. The arrangement suited us, and I agreed.

Subsequently, Mrs. Jacqueline Tchir, the then health services manager, inquired if I might be interested in joining them as a contracted dental services provider. She went on to explain to me the philosophy of Job Corps and how it served the underprivileged and possibly misdirected youth, many of them from inner cities and many of them from minority groups. She also explained to me the many training programs that were set up for young people, and how for many of them, it was their first time out of the ghetto and a drug-ridden environment.

Well, I must admit that I found the proposition challenging. As a 46-year-old African American male who was raised in the Southwest Bronx in a housing project, and a former gang member, I know that I could never have survived my teenage years in the turbulent 1960's without many of the guardian angels who helped me and shaped me into what I am today. Indeed, many, if not most, of the young men who were my contemporaries in that housing project never made it to their 25th birthday, let alone out of the ghetto.

So needless to say, I jumped at the chance to give something back and maybe make a difference in some kid's life. I guess I even saw myself as a role model, as I assumed the other staff members and administrators undoubtedly were.

Well, I was certainly wrong in my assumptions. I soon found out that what we had in Edison was the Edison Job Corps Center ghetto dumping ground. By this statement, I mean that these young

people were taken out of a negative environment of many inner cities in the tri-State area only to be placed in another negative environment in Edison, NJ, to be victims of another system that had no concern for the human being, but just for the slot that he or she occupied. If all the slots were filled, then all was right with the world and Job Corps. It was nothing but a numbers game.

The center director's mandate was to preserve the census so that the Government checks kept coming in. To keep the census up, HIV tests were misdated, positive drug screening tests were ignored, and medical problems not noted in charts. Many things were done to keep the residents in and to facilitate and keep the numbers.

There were in fact several times that as per the Job Corps handbook, I was obligated to terminate certain residents for medical reasons and/or noncompliance of medical treatment. However, when I discussed this with the medical director and the center director, I was advised by the center director that her interpretation of my instructions, which were in fact in the Job Corps handbook, was different. She refused to allow the terminations to go through, and after I discussed this matter with the regional director of dentistry, he advised me that the center director should not have overridden my medical recommendations.

Other measures that were taken to keep the residents happy and compliant included allowing them to conduct their social activities, including sexual, any place they saw fit—under our windows, in the bushes, behind the buildings. In the spring and summer, there was an unusually high number of cases of poison ivy that came through our medical department. Students were allowed not to go to class, to hang out in the stairwells, hallways, and even in the infirmary.

The residents who were assigned to the medical department to help clean up were allowed, after they felt they were finished, to sleep side-by-side with residents who were housed in the infirmary for various illnesses. This was standard procedure throughout the entire time that I was there.

The Job Corps members were the only losers. They were not being prepared for a job, or for a life outside the center; nor were they being taught the basic skills needed to find, keep, and function in a job.

As a matter of fact, a common complaint among the residents was that many of the training programs that they were advised they could participate in before they joined were either no longer offered or had never been offered at that center.

Drug use and trafficking of the same were also overlooked. It was common knowledge around the center that certain residents sold drugs in and out of Job Corps. In one particular case, there was a resident who drove a $30,000 customized BMW and would periodically be AWOL for weeks at a time, only to return to the center and continue his business deals. Yet nothing was ever done by the center director about this.

Violent behavior was allowed. The dental department reported numerous incidences of negative and violent attitudes and behaviors, such as threats of a physical nature. These incident reports were never acknowledged. It was common knowledge among staff

00061



members that incident reports were not worth the ink they were written with. Many violent residents went on to injure other staff members and/or residents.

This type of behavior was disruptive and detrimental to the residents who wanted to make proper use of the program and opportunities. Instead of establishing deterrents for this negative behavior by enforcing the rules, they were allowed to continually disrupt others and exhibit antisocial behavior, without any fear of consequences.

These young people were falling victims to the same negativity that presumably, they had come to Job Corps to avoid or overcome.

I must tell you that as a taxpayer, I condemn this misuse and abuse of moneys, and as an African American male, I resent the for-profit ghetto created by DOL and ITT, which only benefited the people who were running the programs.

Throughout my stewardship of the dental department, I wrote and forwarded many letters and other correspondence to both DOL and ITT in reference to these incidents and irregularities, but they were all ignored.

I wish to thank you very much for this opportunity to testify.

The CHAIRMAN. Thank you, Dr. Belfon.

[The prepared statement of Dr. Belfon may be found in the appendix.]

The CHAIRMAN. Mr. McKay?

Mr. MCKAY. Chairman Kassebaum, members of the committee, my voice is a little rough as a result of the Dallas game last Sunday.

I entered the Job Corps program in 1965, shortly after its inception. I came from the public school systems in Texas and Oklahoma. I first served as deputy director of a conservation center for the Bureau of Indian Affairs and then later as acting center director of that center. Later, I transferred to the Office of Economic Opportunity as their national training director, and then was assigned at the national level as a project manager.

In 1971, when regionalization came about, and the Department of Labor took over administration of the program, I transferred to the Dallas office as a project manager.

In the interest of time, I will just briefly State my opinion of the problems, as I see them, in Job Corps.

I see these problems as essentially the result of a policy that seems to reward contractors, but places the welfare and achievement of students far down the ladder of objectives. Speaking as someone who has seen the program from the inside, I can honestly say that I do not believe it is worth the $1 billion a year that we are spending on it now.

One of the reasons is violence on centers.

The CHAIRMAN. Mr. McKay, could you pull the mike just a little closer? Thank you. The Cowboys did not win, either, did they?

Mr. MCKAY. They did not win; it was that 21 points to begin with that got me. I am an old coach, Senator. [Laughter.]

In August 1992, I got a telephone call from Senator Bumpers' office in Arkansas, asking me about conditions at the center at Little Rock. I was very cautious, as I had no program responsibilities at Little Rock, and I told them that. The young lady I spoke with,

008170

Rose Collins, said, "Mr. McKay, your name has been given to us as one who will be honest with us."

I looked into the serious incidents in Little Rock, and I called Ms. Collins back and told her that everything she asked about had been verified.

Later, on review of two centers in our region, I was looking at discipline, and I learned that at the first center, two security officers had been beaten so badly by Corps members that they had to be hospitalized. At the second center, a vocational instructor was beaten so badly that he was off the job for 3 months. This instructor asked me not to include this in the review, because he feared repercussions from his center.

I took both of these problems to the regional director and asked him to include them in the annual center review, and he refused to do so.

The assistant district attorney of Chavez County, NM threatened to arrest center administration at the Roswell Center because they had knowledge of an alleged rape. They did not notify the police, and they allowed the 20-year-old person who allegedly committed the rape to resign from the center and leave the State.

Serious incident reports as I reviewed them in the past year, 1992-1993, proved to me that incidents of gang-related and dope-related problems had increased.

I was asked to say something about the performance measurement system, a system designed to judge the effectiveness of the centers. I worked on records of PMS every time I monitored a center I was assigned to, or on the eight or nine annual reviews that I made. I never reviewed records that were completely accurate.

In discussing this problem with staff members, some of them told me that if they did not come up with positive results, it would mean their jobs. I am speaking of the categories of vocational completers, reading and math gains, and length of stay.

Job Corps did develop a good policy handbook. However, their biggest problem, in my opinion, was when the administration decided to admit students with serious criminal backgrounds and drug-related problems. You may recall that in the original OEO program, students with such backgrounds were precluded from entering Job Corps.

Policies were frequently ignored. The best example I can give you is that we have mandatory termination for discipline problems, and if necessary, centers would ignore this.

I would like to make some brief comments on program mismanagement. I witnessed the following problems of mismanagement, ethics, and possibly illegal activities in my tenure in the Job Corps over the past decade. I would be pleased to provide the committee with further information regarding these many problems.

High-level Job Corps officials have had improper relations and interactions with contractors, including providing confidential information regarding bids on Job Corps centers to incumbent or favored contractors.

There has been collusion among contractors regarding not to bid against each other on certain center contracts. I have seen many contracts awarded in violation of Federal Acquisition Regulations. There have been many high-cost settlements made to protect corporate and possibly high-level Federal staff paid for with appropriated funds and then sealed to protect the facts. There has been little if any congressional oversight in the past 10 years.



I would like to offer some recommendations, but in the interest of time, I will not, but would ask that they be included in the record.

Thank you, Senator.

The CHAIRMAN. They will be fully included in the record. Thank you, Mr. McKay.

[The prepared statement of Mr. McKay may be found in the appendix.]

The CHAIRMAN. I will save my questions and yield my time right now to Senator Jeffords.

Senator JEFFORDS. I thank the chair. I have to go off to another adventure, similarly related.

I have been following Job Corps for some 20 years now, 14 in the House and 6 in the Senate, so I have been through the ups and downs of the Corps over the years. I think we have to keep in mind what the Corps was designed for, and I will just quote some statistics to emphasize that we cannot just end up changing our philosophy and "creaming," just picking out the great kids who need some help.

The cost, as you know, is around $20,000 per student. That is two to four times what other options cost. On the other hand, the failure in both human and financial terms—when you recognize that it costs some $60,000 to incarcerate someone, and you recognize that up to 80 percent of those incarcerated are school dropouts, you can see that there can be a tremendous advantage to having success in the Job Corps if we do pick out those who are at risk but do have potential and are able to give them a good education.

Where I do become concerned, though, is as to whether we have any measure of outcomes or longitudinal studies that you are aware of that indicate to us that we have had success in these programs and that we have reduced the number that will end up incarcerated. If anybody has that, I would appreciate that information, and second, how do we try to balance those who are there so that we do not end up with gangs, and at the same time, we do not end up with, as I said earlier, just picking the best out there so that our statistics look good. I would appreciate your comments on that.

Mr. King?

Mr. KING. I have no real knowledge on the job placement. At one time, I understood that basically, if the kid went on the job for 1 day, he was counted successful. That may have changed since the last time I knew anything about that.

This program is a great program, and nobody even questions that. We do question the administration of the program and how it is being administered. In bringing the kids in, yes, I think we should be open; we should try to take in as many kids as we can possibly work with. But we have got to recognize that we are working with some kids who have been very unsuccessful throughout their young lives, and we cannot get every kid who comes into the program turned around; we cannot be 100 percent, 100 percent of

008171

the time. That is unrealistic, and it puts you in a skewed environment.

Senator JEFFORDS. Mr. Deering?

Mr. DEERING. Senator, I believe there are several answers to your question, from my standpoint as an admissions counselor. One of the problems that I have in the State of Wisconsin is checking backgrounds on youth. For any young person under the age of 18 who is a juvenile, those records are sealed, so I can get no knowledge of a criminal background, and it is very tough for me to distinguish any youth who has a criminal background. And I think it is very difficult for an admissions counselor, whose job is on the line, to distinguish between wanting to keep his job and sending in youth who are appropriate, and keeping the numbers up so he does not lose his job. I think that is a vital problem that the Job Corps program has, and I see it.

On the other end of that, I think the administration of the program at the Job Corps center level is also mishandled. There are many youth on the Job Corps centers who see violence, who are involved in violent activities, who are not sent home. Again, I deal with many young people who are at their rope's end. I get calls from schools and human service agencies every day, saying, "This is this kid's last chance," and judges, saying, "Take this young person away, or he will be incarcerated." These are the kinds of young people that Job Corps is dealing with.

Many of these young people do well in the Job Corps program. Many of them do not. As an admissions counselor, I have no way of telling which youth will work in the Job Corps center and which youth will not. That has to be up to the Job Corps center staff. My opinion is that the Job Corps center staff are not doing that job productively, and we are keeping too many students on center who are inappropriate.

How we determine who is appropriate on center and who is not, I cannot answer that.

Senator JEFFORDS. Thank you.

Mr. McKay?

Mr. MCKAY. I agree with you. I think we need to serve these students as long as we can.

Senator JEFFORDS. Thank you.

Thank you, Madam Chairman.

The CHAIRMAN. Thank you very much, Senator Jeffords.

Senator Kennedy?

Senator KENNEDY. Thank you very much.

I thank the members of the panel. I think the last comments are enormously important to consider as we are looking at Job Corps. The growth of violence among young people in this country in the period of recent years has just exploded. Every superintendent of every school can tell you about it. A lot of them are doing very creative and imaginative things—I know they are in my State, and I am sure in many other States as well—to try to deal with it.

We are dealing with the problem of school dropouts, we are dealing with the phenomenon of the growth of youth gangs, we are dealing with the explosion of youth violence, particularly among younger people. In my State, any young person who is incarcerated costs $75,000 within Route 128, and about $45,000 outside Route



128. So we see judges making decisions about what they are going to do with these young people and where they are going to go. This is a very tough crowd.

But that does not excuse the kinds of situations that you have outlined here, and the extraordinary abuses that Mr. McKay has outlined here. I know you were outraged by it and complained about it, and why you did not get more action, maybe there is a good explanation for it that you want to comment on, but certainly, with that kind of record, I think there is some responsibility to take it not just to the immediate superior but to others as well.

One of the points that seems to run through here, though, is the incentives for recruiting. We hear a great deal about privatization, and I am all for it where we can have it. But just listening to this panel talk about how this is put out in a contract, and you get a contractor who is going to get the lowest cost in order to be able to compete and meet Federal regulations; then, there is the issue of how we are going to be able to get profit, how we are going to keep those young people in the slots; and then, why we ought to keep them. So you have all of the incentives, as you mention here, going the wrong way.

I am not here to say that a Federal bureaucrat can manage this thing any better, although I was interested in the Conservation Corps—that is run by the Department of Agriculture, is that right?

Me. King. That is correct, Senator.

Senator KENNEDY. And from what Mr. Deering has said, that appears to be a better program; am I right on that? Mr. Deering, you mentioned that the two schools that you do send people to are the Conservation Corps Centers?

Mr. DEERING. Yes, Senator Kennedy. In Region 5, those are what I perceive as the two best centers, simply because they are small, and they are in rural communities.

Senator KENNEDY. That, I am sure, has something to do with it. There are many factors, I am sure, but I think one of the things that we will have to deal with which is pretty fundamental is the recruitment and the establishment of these programs, and the contracting and the maintenance, and the fact that it is a bottom-line item that these contractors are going to profit more by keeping the gang member who is committing violence, selling drugs, or doing some other inappropriate behavior, in order to make a buck. That undermines the program, it is unfair to the other kids, it is outrageous in terms of the other young people, it is denying them an opportunity, and we have got to try to deal with this.

I do not know whether you have any recommendations, and I am sure that that in and of itself is not the problem. In my State, we have some Job Corps programs, and I wish they were better, but there are some good programs. In other places, we have seen how the Job Corps centers are tied into the communities in a more effective way, are tied into the local law enforcement, are tied into the education system, and are tied into the private sector in terms of the training programs, and have been much more localized.

You can ask yourself, should you take a kid from the Job Corps in Boston and send him to South Carolina; does that make any sense, if he can go to a better program where he can get more focus and attention and coordination—whether it is law enforcement,

and he can come back and say, "This guy is a bad person. He is causing these problems, and you are better off getting rid of him," or "This one ought to get a second chance."

Do you have any suggestions on how to establish the program so that those incentives are not going the wrong way, as you have outlined; and second, do you have any suggestions in terms of the structure of the program, and how you might see involvement of local law enforcement, local education, and local private sectors, so they could work more effectively and get away from the Department? I know the time is moving along, but could you please address those questions?

Mr. KING. Yes, Senator Kennedy. I think first, you and Senator Kassebaum need to know that we feel the CCCs are the best program. We feel that we are being held constantly hostage by the Department of Labor, under threats of contracting us out. We hear that every day: If you guys do not hop through this hoop, then by God, we will just contract the rest of the CCCs out. We live under that threat day to day.

Second, you talked about centers and locations. If you look at the Glen Mills approach and some of the other programs out there that are doing very, very well——

Senator KENNEDY. Well, explain to us about contracting out and what that means. What are they trying to say to you?

Mr. KING. What they are trying to say is that if we do not conform to the statistical means and methods they have, such as ALOS, then they will contract the CCCs out; they will close out centers, lay off our Federal employees, and turn those centers over to the private contractors who are already running the contract centers. We live with that throughout every day.

Senator KENNEDY. I see. The point I am trying to get at is the best way to get it done. You say that that is not a good way to do it—and we do not want to get caught up in these generalities, and we do not want to say that there are not superb programs that have not been run through contracting—but how do you suggest that we address the issue of the incentives that are built into the system, that I understand are going the wrong way in terms of the contracting out—the fact that you will get more people in there, and keep the bad apples, the ones you should not have in there.

Mr. KING. I started to mention a program called Glen Mills, which is in Pennsylvania. They deal with the same population of young people that we deal with, and their strategy and their philosophy is just 180 degrees different from what we are doing. We are doing accounting. They are doing a socialization program. They are moving these kids out of the culture that they are in—you are talking about Boston, an inner city environment, you move those kids out of that environment, and you put them in a culture where success is the norm—they call it "normative culture"—it is the normal thing to be. Instead of being a gang member, you get your GED, and you are around other kids who do that, you are around other people who are successful.

So changing the environment and changing the culture is absolutely fundamental. If you leave the kids in the same environment, doing the same things that they do every day, that is what you are going to get. True organizational insanity is doing the same things



the same way and expecting different results. You are not going to succeed unless you move the kids out of that environment.

Senator KENNEDY. Mr. Deering?

Mr. DEERING. Senator Kennedy, from my perspective as an admissions counselor, I work for a contracting agency. The Job Corps centers are different contracting agencies. My belief is that if we made the admissions counselors and the Job Corps centers the same contracting agency, there would be continuity between myself and the center directors. I believe center directors should be ultimately responsible for the recruitment of youth in their areas. That puts the responsibility for the youth who are eligible not on me as an admissions counselor, but on that center director. That makes the center director ultimately responsible for a) the youth who come to that Job Corps center, and b) the youth who leave that center. To me, that is the answer to the problem.

Senator KENNEDY. Could I just get other panel members' reaction to that suggestion?

Mr. KING. That is not a bad idea at all.

Senator KENNEDY. Mr. McKay?

Mr. MCKAY. I think it is great—local input, local employment.

Senator KENNEDY. Dr. Belfon?

Dr. BELFON. As a medical provider, it really would not be appropriate for me to comment.

Senator KENNEDY. I understand. Thank you.

I thank you for the suggestions. If you have others, I hope you will express those. Thank you very much.

Mr. MCKAY. Senator Kennedy, you cited a comment I made. I did try to go through other avenues. I wrote a letter to Pete Rell in the national office, and also a letter to this committee through my union activities; I was a local steward in the union. So I tried.

Senator KENNEDY. I see. Thank you.

Mr. KING. I would like to add to that, Senator Kennedy, this is just part of one file that I have put together. I have written, and I have been on the Hill and tried everything I could do to change the program.

Senator KENNEDY. Thank you.

The CHAIRMAN. Senator Frist?

Senator FRIST. I also would like to thank each of you for your testimony today.

Dr. Belfon, your testimony is most disturbing to me in that very little positive at all came out. Was there anything positive that you saw in the particular center that you participated in?

Dr. BELFON. Oh, yes, sir, there were many things that I felt were positive in the center. I felt that there were many Corps members who wanted to complete the program and get through, and I did in fact see many get through and go on to be successful.

The great problem I had with the program was that there were other kids who were quite disruptive, and that just made it very hard for the kids who wanted to be successful and who wanted to use the program for what it was intended.

Senator FRIST. And to change that, what would you recommend—at that particular center, what would you recommend?

Dr. BELFON. At that particular center, first of all, when there are youth who are disruptive, maybe they should not be sent home;

008173

maybe there should be some kind of alternative for them, maybe something like a boot camp type program that they might participate in, that is a little bit stricter, so that they would know they had to do what was necessary, and then they could eventually be integrated into the general program.

Senator FRIST. And how much of that is driven by the statistical—keeping people in a program so that you can report statistics—and this may be for you, Mr. King, or Mr. Deering. How much of what Dr. Belfon just said is driven by the statistical recordkeeping and accounting?

Mr. KING. You have hit the problem. That is absolutely the problem. You cannot correct any of this as long as you are hopping through these statistical hoops. If you have to be 100 percent, 100 percent of the time, and you live and die by that number, then you are going to do anything you can do to get the number, and then the program, whether you are training or whatever, that is a side issue.

Senator FRIST. And do you eliminate the statistical hoops by bringing it down to more regional control, or local control, or back to this local standard-setting.

Mr. KING. I want to echo what Dr. Belfon said. One of the recommendations that I made to NPR was to establish orientation centers before the kids could come to the main Job Corps centers, with basically a boot camp atmosphere, to get their attention, to get them focused. If you have kids who are drug-dependent, if you have kids with mental problems, you can address those problems right there, before we make that big investment of $20,000 that you are talking about. There, we can do that. We cannot try to train, educate, socialize and try to deal with kids with these problems at the centers, all at the same time. It is a really bad system.

Senator FRIST. So everybody would go through that orientation process?

Mr. KING. Yes.

Senator FRIST. And would that help with what you were talking about, Mr. Deering, as to predicting—this lack of predictability is a fundamental problem; it clearly cannot be done—if you had an orientation program like that, would that allow you to further sift through and predict? And clearly, we do not want to take just the people who are going to do well, but those whom you can potentially help.

Mr. DEERING. Yes, Senator, I believe that it would.

The State of Minnesota does quite a good job. There is a Job Corps center in Minneapolis, and there is a local governmental body on the board of that program; the Governor is involved. The State of Minnesota Job Corps, which is in Region 5, is an institution that works totally on its own in the State, and I think because they work on that small local network, they do some of those things. I think that is a good program, and I would urge the committee to take a look at the Job Corps center in the State of Minnesota. There need to be some changes, and I think an orientation program would be a great idea.

Senator FRIST. This goes to Mr. King and also to Mr. McKay, because one of your recommendations was to abolish the existing 30-year procedure for awarding contracts, and it goes again to what

000621



Mr. King said. Could you shed a little more light on if you abolished it, what would you replace it with?

Mr. KING. It has been my belief that instead of expanding the program—I am on a CCC, so contracting, I am limited on—but instead of expanding the program, I think we should strengthen what we have in place. We are taking resources away from a program that we already have in place which could strengthen our program, such as orientation centers.

Somebody else has to speak on the contracting. I am not familiar with that.

Mr. MCKAY. I do not see anything wrong with the contractors. I think it should be more localized. I think the recruits should come from the immediate area, and you should work with the employers in that area. I think the contracting situation, whether through local, State, Federal, will still work.

Senator FRIST. Thank you.

The CHAIRMAN. Thank you.

Senator DeWine?

Senator DEWINE. Thank you.

I thank the four witnesses. Your testimony has been very helpful to us. We are now in our second day of testimony, and several things, at least to my mind, are becoming apparent. One is that we have created a system that puts a premium on a numbers game, that puts a premium, as Senator Kennedy was referring to, whether we privatize, contract out, whatever we do. But we have created that system in the Government. We have created a system where we tell the contractor we are going to reward him for the number of people he has in, for the number of people who physically get through the program and accumulate this time.

We are not, to my knowledge, at least, rewarding or penalizing the contractor based on the only result that I think really matters, and that is where is this person 6 months from now after he leaves the program; where is he a year from now; does he have a job? And whether it be the same job he got immediately or whether it is a job he was trained for, I am not sure is that relevant. It may have some relevance. But it seems to me the question is where is he in his life.

I would like any of you who would like to to comment on my comment. Am I wrong in this regard, or not? Is that the situation that we have created?

Mr. KING. Well, Senator, you have heard several good suggestions and ideas, and once again, as you know, we submitted to NPR; and you are going to hear them all day long. The problem is you cannot get them into the Department of Labor. They are not going to listen to you. They are not going to listen to people who do the job every day, who point out these problems and say, "Gee, maybe we should change our accounting," as you suggested. You cannot get that through to the Department. They are not going to listen to you. They are not going to listen to us.

Senator DEWINE. Mr. Deering?

Mr. DEERING. Senator, we do keep track of statistics of where youth are 6 months after the Job Corps program, whether they are vocational completers or they go AWOL. We keep track of statistics on minimum wage and how much that person is making, the type

008174

of job he has, it is congruent with the job he trained for. Those statistics, again, are skewed, maybe not by the Department of Labor, but by the way we go about them.

It would seem to me that we should lengthen that period of follow-through to more than 6 months, to maybe a year, to find out where those students are further down the road.

Senator DEWINE. And how are the statistics skewed?

Mr. DEERING. Well, one of the statistics we have is the average wage the Job Corps student makes. I think it is approximately $5.69 an hour. That takes into consideration all the young people who go into Job Corps, come home without completing their vocation and go to work at McDonald's. That will automatically bring that wage down. It is not what I would consider an accurate description of those young people who are going out and making wages at $15, $16, and $17 an hour. That is how I believe the statistic is skewed.

Senator DEWINE. I took the opportunity yesterday to have several of my staff members back in Ohio visit Job Corps centers, one in Dayton and one in Cincinnati, and I was surprised to find what at least they explained to me—and I would like for you to comment on it in regard to your own experience—the disconnect between the placement for a job and that job center.

I was told, if I understood the conversation correctly that I had this morning with my staff member, that in one of the Ohio offices, for example, the people who are involved in job placement are not in Ohio. Is that possible?

Mr. DEERING. Yes, sir, it is definitely possible. We have contractors doing placement in the State of Wisconsin whose main offices are in Chicago.

Senator DEWINE. How can that work?

Mr. DEERING. It does not, sir. That is part of the problem. As the admissions counselor, I do dual duty as admissions and placement. There are other organizations that contract just to do placement.

It is not reasonable for an organization having an office in Chicago or Dayton to place a student in Eau Claire, WI. IT is impossible. I do not know how it happens. I have a hard time doing it, and I am 40 and 50 miles away from the students I work with.

Senator DEWINE. Mr. King?

Mr. KING. I am in Kentucky, and our placement office is in Atlanta, to give you an idea. But I would like to say that the AFL-CIO trades on our CCCs do work very much hand-in-hand with the kids, placing them through their locals.

Senator DEWINE. And that was another thing that we found out from the Cincinnati office, the close connect between labor and the actual placement, which I think is a very, very positive thing, very, very positive. I was very happy to hear about that.

It seems that there is a real disconnect not only from the placement, but in the actual recruitment; that in some cases, the recruitment is—and I think that goes back, Mr. Deering, to what you were saying—and it seems to me what several members of the panel are saying is that you have to really get the recruitment not only for the job after the fact, but the recruitment for who goes into the program much more tied to the individuals who are ultimately

000629



going to be held accountable, which is the people who run that particular program. Is that my understanding?

Mr. DEERING. Yes, it is, sir. I speak weekly with the center director from the Job Corps center in the State of Wisconsin. I have a very good working relationship with that center. I have never spoken with some of the center directors from the other centers. Unless I have a student going there, I do not even know what programs are being offered in those centers. The information that I receive from some of those centers is very old.

I make a point of contacting the center director, the orientation specialist, whoever it is on a center that I work with closely. The Blackwell Center, I have a great relationship with. That is why my recommendation to this committee is take those two organizations, the centers and the admissions people, and put them together; then there has to be communication between the two, where right how, there is not.

Senator DEWINE. Well, there has to be accountability, too.

Mr. DEERING. Absolutely.

Senator DEWINE. I mean, ultimately, someone is going to have to be accountable. If I am going to be judged on my performance, it seems to me I would want to have input both ways, both incoming as well as the actual placement in the job, and then hold me accountable.

Mr. DEERING. There is no continuity. The centers keep track of all the students that I send. If I continually send students that are inappropriate, the center has no recourse to me, because my main office is in Chicago, and my director is saying, "You keep your numbers up. We do not care about what is going in."

Senator DEWINE. Thank you. I see my time is up. Thank you very much.

The CHAIRMAN. Thank you.

Senator Abraham?

Senator ABRAHAM. Thank you.

I just have a couple of questions. Mr. Deering, Region 5 I think includes Michigan.

Mr. DEERING. Yes, it does, sir.

Senator ABRAHAM. I think we have two sites in our State. We heard testimony yesterday about problems at various sites. Can you shed any light for me on what might be going on at these sites, from your perspective, and how do you think they are operating?

Mr. DEERING. I cannot comment on the Job Corps center in Detroit. It is one of those centers that recruits only from the city of Detroit. The Grand Rapids center is a center that I have not been on. I can only tell you what I hear from admissions counselors in the State of Michigan. I would not send any of my youth to that center. The admissions counselor in the State of Michigan has told me that he is fearful when he travels to that center. So unless a student has relatives or family in that area, I would not send a student there. And for what reason, I do not know. I do believe they are making some good changes. I have heard some positive things about that center. As of yet, I would not send anyone there.

Senator ABRAHAM. This whole panel has outlined problems. This is a problem in the Job Corps per se that is about 30 years old, I guess. The concept of CCC camps goes back a lot further. In fact,

008175

my own father was in a CCC camp in northern Michigan many years ago.

The problems you are describing have evolved, though, and I would like to get a sense of when you think the deterioration and the problems with respect to the standards began to occur. It has certainly not just happened over the last 12 months. Give me what your sense is.

Mr. King?

Mr. KING. I would say we started declining about 10 years ago; in the last 5 years, it has been pretty rapid. Once again, that is with the more elaborate statistical and accounting programs to go the rough than ever before; contractors have expanded. That is my view of things from being in the program for 12 years.

Senator ABRAHAM. Mr. McKay?

Mr. MCKAY. I would agree, in the 5-year time frame.

Senator ABRAHAM. Dr. Belfon?

Dr. BELFON. The problems that I observed, sir, were basically consistent throughout the time I was there.

Senator ABRAHAM. Mr. Deering?

Mr. DEERING. I cannot comment on that, sir. I have not been with the Job Corps program for that long. But I can tell you that this program has been around for 30 years, and there are communities in Wisconsin that have never heard of it. So for the northern part of the State of Wisconsin, it has been a 30-year problem.

Mr. KING. We do have employees who have worked for their entire lives on the centers, and from my discussions with those folks, I would say 5 to 10 years. They shake their heads and say, "Gee, you should have been here when the program was this."

Senator ABRAHAM. My reason for asking is that I think sometimes in Washington, we tend to look at things in the political context too often. The program problems you are describing are not ones that are just 2 years old; they did not start with this administration, and they were not just part of the last administration. They have sort of developed over a lot of different administrations and political contexts.

So as we approach trying to solve these problems, I would like to make sure we look at it not in the political sense, but in terms of that it is not just one person's fault or one administration's fault, and that it is something that hopefully we can approach without a lot of accusations and finger-pointing at specific political figures, but rather at a problem that we can all work together to address.

Mr. MCKAY. Senator, I would like to comment, and I hope my comments are not taken as finger-pointing. I think the real serious problems on the Job Corps centers started when we dropped the requirements of input. That is to say, a student with a murder conviction, which I have experienced, could come into the Job Corps program. I think this probably started the real downfall of the Job Corps program.

Senator ABRAHAM. Thank you.

The CHAIRMAN. Thank you, Senator Abraham.

Senator Kennedy has a follow-up comment.

Senator KENNEDY. Part of the dilemma is that we are all looking for accountability. The purpose of these hearings on the jobs program is to try to find out, with the expenditure of billions of dol-



lars, is how good is the training program; does the young person or older person being trained really get skills; does the employer know about those skills so they can make a judgment; are those skills portable, so they can go to different places and find work; does the taxpayer know whether the programs are really good. We really do not do that very well, and the American people are not going to support it; if they do not know what they are getting, they are not going to support it, and they should not.

Now we have a situation where, in the Job Corps, we require them to compile statistics on job placement, on further education, on GED attainment, on average reading and math gains, on job training match, on average wage upon entering employment, vocational completion rate, number of terminees per week, number of absences per day per student, number of significant incidences on the center, along with general financial information. We have required all of these things to get it, and we are really not getting it. That is what you are telling us here. I think there is an honest desire to try to get it, to support those that are working, and to hold accountable or de-fund those that are not working.

This is part of what we are trying to do, and after the hearing today, if you can think a little more, now that you have a better idea—and I am sure you had a good idea before the hearing—but if you have a better idea after listening to some of the questions, and if you could give us some additional information, working with our staffs, we would be very, very grateful.

I want to thank all of you for your testimony.

Thank you, Madam Chairman.

The CHAIRMAN. I think it was just superb testimony. All four of you have added a great deal to our understanding of the issues. As Senator Abraham said, and as I said at the beginning of this hearing yesterday, this is not a political issue. It is something which we are engaged in and a responsibility that I think Congress has in oversight, to try to solve some problems as things change, and as we need to be able to change with it to make things more accountable and more effective. All four of you have approached this with that interest, and I just want to assure you that I do think you have the attention of the Department of Labor, as well as the Congress, and out of that, I think we will find some answers.

I appreciate very much your coming and thank you for being willing to share your thoughts with us this morning.

I think we will go ahead and start with the second panel, even though there will be a vote at around 11:30.

It is a pleasure to welcome the second panel, and I am sure you are pleased to be able to have a chance to offer your testimony this morning.

Peter Rell is the director of the Job Corps Program at the Department of Labor, and Doug Ross is assistant secretary for employment and training at the Department of Labor.

Would you like to go first, Assistant Secretary?

008176

000623

**STATEMENTS OF DOUG ROSS, ASSISTANT SECRETARY FOR EMPLOYMENT AND TRAINING, U.S. DEPARTMENT OF LABOR, WASHINGTON, DC; AND PETER RELL, DIRECTOR, JOB CORPS, U.S. DEPARTMENT OF LABOR, WASHINGTON, DC**

Mr. ROSS. Thank you, Madam Chairman, Senator Kennedy, members of the committee, and my old Michigan colleague, Senator Abraham.

I am indeed delighted to have this chance. You have raised important questions, and I am eager to respond. I will briefly summarize my testimony and submit the full written statement for the record.

The CHAIRMAN. Thank you.

Mr. ROSS. Job Corps has really been a long-term bipartisan test, I think, of two critical propositions. The first is can a structured residential environment that focuses on individual responsibility and preparation for a job actually empower large numbers of our most disadvantaged young people to be able to turn their lives around and get off on a productive track. And the second, which has come up very much today, is a heavy reliance on the private sector rather than public bureaucracies, an effective way to deliver these relatively complex service to this at-risk group of young Americans.

We think, looking at both the research and the stories of at this point hundreds of thousands of young people, that the answer to both of those is an emphatic yes. At the same time, Madam Chairman, Secretary Reich and I agree with you that this is also a program that would benefit from some significant reform, and this is a topic I want to talk about with you today.

First, we have sought to define a very clear and straightforward mission for Job Corps in the 1990's—I know that is an issue that you have raised—and that is to provide a disciplined environment where disadvantaged young people, whose lives are either going nowhere or going the wrong way, can step up, have the chance to take responsibility for turning their lives around, and leave with a clear path to adulthood either in the form of a job or full-time post-secondary education that we think will lead to a job.

So the goals are likewise very clear: Jobs, further education, better incomes. That is how we want to measure all of this and determine what success is.

Now, by those standards, the first question is how are we doing. Well, of the 1.7 million young people whose lives have been touched by Job Corps over the last 30 years, 1.1 million, or 65 percent, have gone on to jobs or further education following their Job Corps experience. The inspector general of the Department of Labor, who in fact has been a source of a lot of good suggestions for improving the Corps, testified I believe before this committee last week that Job Corps is in fact an important tool in helping disadvantaged young men and women turn their lives around and increase their economic earning power.

In the first 6 months of this program year, Madam Chairman, nearly 75 percent of all students leaving the Corps for whatever reason, went into jobs or further full-time education. And of those getting jobs, 41 percent got jobs in areas directly related to their



vocational training and averaged more than $6.50 an hour in starting wage.

Now, as for the question of return on investment—in other words, what is the real impact; do the benefits outweigh the costs—we believe that the current returns on the program are at least as great today as the $1.46 in benefits to society for every dollar invested that the Mathematic study documented in 1982. The reason we believe that is the performance measures that were used in that Mathematica study have in every case either remained steady or gotten better. The real costs of the program have remained constant since the late seventies, no real costs at all. And finally, what has happened to kids not going to Job Corps—high school dropouts in this country—in terms of their employment rate and their earnings, things have gotten markedly worse. So we believe the new Mathematics study which, as you know, is out there will show that we are doing as well, if not better.

At the same time, some important questions have been raised about Job Corps that I believe are serious and deserve answers, and therefore, before closing I would like to just address three of them very briefly.

One of the points that I think you have made very effectively, Madam Chairman, and Secretary Reich strongly agrees, is that we have to know what we are getting for these programs—not how many are enrolled in training, or how many are enrolled in this or that—the outcomes. How many are getting jobs? What are they earning? What are the wages, and what is the education?

The measures we use to determine whether a Job Corps contractor keeps a contract or not are primarily job placement, education gains, and wages. This length of stay is one of nine measures. We have kept it, with the inspector general's support, because it is a good predictor. IF people think it gets in the way, we can get rid of it. You do not make more or less money, basically, around holding people in; you make it finally in terms of what happens to kids. That is whether you keep a contract or not.

The second issue, very quickly, is does Job Corps have a problem with violence at its centers. Now, again, in Job Corps, we start with the belief that any violence is unacceptable, that any level of violence above zero just is not acceptable.

Job Corps does provide a level of safety that is substantially greater than the places disadvantaged kids come from or go back to—meaning the streets of our cities, our public schools, and our prisons.

A couple quick facts. During the last full program year, there were no homicides committed on a Job Corps center in the Nation, and nine Job Corps residents were killed while off center, either while on leave or during a vacation break. So the homicide rate on Corps centers was zero. The rate for all Job Corps students—we include those who went home and then met with death—was less than half the homicide rate for similar young people not in Job Corps. In fact, if you do it by 100,000 the way things are measured, it was about 28 per 100,000. In the city of Washington for kids that age, it is over 200 per 100,000. So Job Corps kids are substantially safer in their centers than living in their own neighborhoods. And when matched with public schools, you see the same thing. Two

008177

008178



percent of high school kids experience violence each year. On Job Corps centers, it is somewhat less than one percent.

But, having said that, it is too much. One percent is one percent too much, which is the reason for this zero tolerance for violence policy initiated in June, which I hope we can talk about.

The final question, I think, is: Has Job Corps responded quickly and thoroughly to the suggestions for improving the program raised by the OIG and enforced very effectively by yourself, Madam Chairman.

I just want to announce that Job Corps has now taken strong action in virtually all of the areas for improvement identified by the IG, including concerns over low-performing centers, stronger performance measures, better match placement, and more extensive followup of students when they leave.

In addition—and I will close now—working with the IG, we are proposing a set of bold reforms that I think will deal with many of the issues we have been talking about, including raising the age of Job Corps entrants, requiring students to be drug-free when they enter, establishing a 30-day probationary period during which time the student has to step up and make a very explicit commitment about his preparedness to do this and to give the center an opportunity to get rid of the young person if they are not ready for it, with no effect at all on their performance, and also, legislative authority to be able to also deal with public centers, Government-run centers, that are not performing at an appropriate level so we can, in that case, bid those out.

So we believe, bottom line, that Job Corps works to give kids a chance at personal responsibility—it is not perfect, but we propose to make it better, and working together, we think we can.

Thank you so much.

Senator Kassebaum. Thank you, Mr. Ross.

[The prepared statement of Mr. Ross may be found in the appendix.]

The CHAIRMAN. Mr. Rell, I understand you do not have an opening statement, is that correct, and that you will just respond to questions?

Mr. RELL. Yes, Madam Chair.

The CHAIRMAN. Thank you very much.

Let me make a few comments. You have heard a lot, but I think there is a disturbing sort of trend that I want to question you about.

Mr. Ross, perhaps it is important to State for those who do not know what the placement criteria are for Job Corps.

Mr. ROSS. The placement criterion is one of two things. Unsubsidized employment in the private sector—at this point, it has to be at least 20 hours a week, although we are raising the number to 32 hours shortly—or placement in further education ... attendance. So you either have to be in an ...

000625



in October, we are now in the process of implementing a 13-week follow-up to see whether the person is still there, much the way we do in JTPA, and to make sure that counseling services continue to be available for up to 6 months.

We are asking further for easier access to wage placement data and Social Security data, so we can do the kind of one-year or further follow-ups that Senator DeWine mentioned, which I think are very sensible.

The CHAIRMAN. Yes. I am pleased that you are moving in that direction, because 1 week of placement does not, I think, make an outcomes-based record very useful or helpful to the young person if you are really trying to get data about what is happening.

Mr. ROSS. Right. Now, the Mathematica study, those longitudinal studies, followed young people for up to 4 years, so that when we talk about $1.46 back on $1, it is after people have been followed—but we need to do it for each kid on an ongoing basis; I could not agree more.

The CHAIRMAN. What has really troubled me a great deal is the violence that we keep hearing about. You spoke of a disciplined environment, and it seems to me that what we are hearing more and more is that it is not a disciplined environment, that we have situations now where it is not a correctional environment, either, and yet more and more young people unfortunately are coming as court referrals. Should they be handled in a different way—and I think that was a comment made by the first panel—in sort of a separate, boot camp environment, first, before training, and there has to be something there, in a very disciplined, structured environment.

You say that zero tolerance is in place, but we have heard in testimony that indeed this really is not working very well. So I would like to explore with you a little bit about that.

The inspector general has reported the high dropout rates, 50 percent in the first 6 months. There are some who would attribute this to an atmosphere that exists there, and that they do not wish to remain in that atmosphere. To what would you attribute the dropout rate?

Mr. ROSS. To begin with your question about whether it should be run as a correctional place, or as a place where you can get training and other learning opportunities to move forward—I think in our minds, that is clear. It is the latter; its purpose is not correctional. Students who have serious criminal backgrounds should not be admitted, and we in fact are proposing that as evidence of a real commitment to step up and take personal responsibility, if you are not drug-free, you should be referred to a place where you can get drug-free and be allowed admission only when you are drug-free.

The reason, I think, for the dropout rate is this. Job Corps, if you do not have a serious criminal record, has open admissions. It says if you think you are ready to step up and take responsibility for turning your life around, you are welcome in, and here are the terms. If you live by them, you can succeed; if you do not, you will

who sign up for 2-year programs, associates degrees, more than 60 percent drop out before getting to the second year. In 4-year universities, more than 45 percent drop out before getting their B.A.s. This is fairly thought. You have got to be ready to do it. We think that by eliminating younger entrants, 16-year-olds, and beginning to reduce the number of 17-year-olds, we will also have a larger population that is ready to step up and take the responsibility and make something of this opportunity.

The CHAIRMAN. But by increasing that age limit, aren't you also missing an ever younger level of population that is dropping out?

Mr. ROSS. We think that between JTPA, school-to-work, and the Title II-B and II-C programs, there is in fact an effort to keep those young people closer to home and get them connected up with local learning, because as you have said, one of our goals is job placement, and even if you give a 16-year-old pretty decent vocational training, in many cases, they are not really ready yet, or legally cannot even go out and get good full-time jobs in the private sector.

The CHAIRMAN. And I can accept that. I think again, though, it speaks to this uncertain purpose that has evolved perhaps over the last 8 to 10 years. We are not quite sure what population we want to serve or how.

Going back to the fact that the high dropout rate reflects, you are saying, the strict discipline and requirements that exist there, as you know, that was one of the questions that was raised when Senator Kerrey of Nebraska and myself sent a letter to you, raising the concerns that we had, and one of them was the high dropout rate, and you reflected at the time that you believed it was because of strict discipline and behavioral codes. This response was sent to all of the Members of Congress at that time.

Does the Department of Labor still believe that that is the case and that violence as we have seen reported has nothing to do with it?

Mr. ROSS. I would never say that.

The CHAIRMAN. I mean, we have heard students say they have left because it is not an environment they want to be in.

Mr. ROSS. I would never say that violence is not an issue. Job Corps is still part of America. The kids come from America, and the Job Corps centers are located in America; and America at this point is sadly a country beset by an enormous amount of violence involving its young people.

Job Corps centers are safer places than the streets and schools our young people come from, but we are not there yet. And by the way, the zero tolerance policy, started in June, doesn't mean yet that there is zero violence. It means that there is a renewed commitment to face up to all situations where any act of violence occurs, to make sure it is dealt with, to encourage—as has been happening and was mentioned by previous panelists—the fact that when young people show by their behavior that they are not ready to live by the code, you have to ask them to leave.

The CHAIRMAN. Mr. Rell, let me just follow through a bit on this. It is my understanding that on June 10th of last year, you sent a memo on violence to all the Job Corps regional directors and the center directors. And in the memo, you state: "The evidence suggests that the greatest single factor causing students to leave our program early is violence."

000626



Mr. RELL. Yes, ma'am.

The CHAIRMAN. Do you believe that that is the case?

Mr. RELL. I think it is.

The CHAIRMAN. Do you and Mr. Ross agree on this?

Mr. RELL. We are not inconsistent, Senator, I do not believe. The strict requirements that we have on Job Corps centers include no violence. So that when young people cannot accommodate themselves to a disciplined environment and to the requirements that are established, part of their failure to accommodate themselves is committing acts of violence. So I do not believe the two things are at all inconsistent.

Over the past several years, Madam Chairman, the level of violence in our society has increased, the students we receive have been exposed to more violence, drugs have increased. Our population has indeed changed, and our problem has gotten tougher. That is why we have had to move and make changes in the program as we moved along.

We have added substance abuse counselors in an effort to address the substance abuse problem. We have become convinced at this point that the problem in that area is so great that we do not have the adequate resources to address it properly. As Mr. Ross mentioned, we have come to the conclusion that what we need to do is we need to require young people, as a sign of their commitment to changing their lives, to become drug-free prior to enrollment.

With regard to the violence aspect, we noticed an increase in violence not only in the general society, but unfortunately, in the Job Corps centers as well. That is why I sent that policy directive last June to implement a zero tolerance for violence policy and to make it clear to the centers that that was the policy and that that is what needed to be enforced. And that is part of the discipline environment, and that is part of the requirements that young people need to live by. If they do not choose to live by that, then they must leave.

Mr. ROSS. And contractors who are not able to establish that environment, we have simply moved to terminate those contracts. So we are holding both the contractors of centers, both public and private, and the young people themselves.

The CHAIRMAN. Following along that line, let me ask you—because as you may know, we started the hearing yesterday with a videotape of the McKinney Center in Dallas. My understanding is that the center operator there was terminated; is that correct?

Mr. ROSS. That is correct.

The CHAIRMAN. Could you just describe for us, given the fact that you say that this is something you are following through on, how that termination was handled, and was this a mutual agreement of the parties?

Mr. ROSS. It was done this way. Whenever we get any evidence in addition to our own monitoring and reports that behavior is not being maintained at appropriate standards, we immediately move in and attempt to determine what in fact is going on.

008179

There is a center run by the National Park Service in North Carolina, and some parents had given us some information that there was violence on that center. We checked it out—there was no media involved in that—and stopped sending young people there, because we cannot, unlike the gentleman here said, currently bid out a Government center that is not meeting standards. That is not allowed under the JTPA amendments.

The case of Wackenhut was, as you showed, a television report. So we went and checked it out. I have three tests, Madam Chairman, and then I will tell you exactly what we did. No. 1 is was the report on television—since I could not verify it one way or another, directly—was it part of a pattern of difficulty on that center? And the answer to that was yes; they had been struggling with poor performance reports for some period.

Second, when I confronted them with what they were going to do about that, they were not able to provide an answer that I think I could have come before you or anybody else and convincingly said, "Keep this contract in place."

And third, I have to ask the question, if there were an extended member of my family—much the way the gentleman talked about the people he was placing here—given what I had known—I read all the incident reports—would I be comfortable sending that member of my family to that center? The answer was no.

Wackenhut, the contractor, was given 10 days to show cause why we should not terminate their contract. We were not persuaded. They said, look, let us just do it voluntarily. We are willing to just work out an agreement with you so there is no litigation or anything; we will just terminate it, and you can turn it over to another contractor.

We agreed. Another contractor should be selected by early February, and the transition will occur at the end of March.

The CHAIRMAN. Was Wackenhut penalized or sanctioned in any way? Do they have other centers that they still operate?

Mr. ROSS. They have two other centers that they operate. The results of this and the performance here, if they choose to compete to continue any of those centers, will be part of the record. You are judged on your performance not only at the center you are bidding for, but other centers you have operated elsewhere.

The CHAIRMAN. My time is up, and I thank you.

Senator Kennedy?

Senator KENNEDY. Thank you very much, Mr. Ross. We appreciate your presence here.

At the outset, I will say that I am a strong believer in this whole effort to try to really give these young people a second chance. As you point out in your testimony, 80 percent are high school dropouts; 40 percent come from families on public assistance; 70 percent have never had a full-time job; most come from neighborhoods plagued by high rates of unemployment, crime, welfare and illiteracy. And it is very easy for us to sit up here and sharpshoot and flyspeck this program. And if you read that outline 20 years ago, it would be a different kind of kid who falls into this program. We are mindful of that.

Having said that, however, I think we have to really ask ourselves whether you are getting the full information about what is



really happening out there. I have been impressed with many things that Sarge Shriver did, but one of the things he did in the Peace Corps when they set it up was to have five investigative reporters go around in the Peace Corps and find out where the problems were before the press found out about them, so they were able to make some changes.

And I would just suggest to you that you develop within that program of yours the kind of tough-minded review of these kinds of issues that we have heard today, as well as others. You have heard it, and you can evaluate it. We listen to it, and some of this makes some sense, but you have to look at it against the total review. And you ought to be able to rely not just on the IG, and not just on the proclamations or issuing the recommendations, or asking for this kind of assessment or that kind of review, but really finding out what is going on out there, because I think you can get the feeling that this whole program is targeted now, and those who believe and understand that this is an important effort to try to reach out to these young people must be able to respond to these kinds of questions that have been raised.

One of the things that this committee is looking at is how you are going to tie together various kinds of training programs. You have very similar kinds of kids in JTPA II-C, very similar in terms of disadvantaged kids—a somewhat different profile, but not greatly different. In the School-to-Work program, some of those efforts that were passed last year were to reach out to the kids who have dropped out of school, maybe recently dropped out, both to get them into the School-to-Work program and to help them to be able to go on. You have Tech Prep, and other kinds of programs out there, and I think what we are really looking at now is how to find ways that we can have some coordination, working closely together and maximizing these local kinds of neighborhood initiatives, which I think are taking place; I know they are in many of the communities in my State, with Mayor Manino's strong emphasis on neighborhoods, where you are working with local businesses, with local educators, and with local law enforcement people to really do something.

So we need your recommendations. This program cannot live, I think, just in and of itself. It has to be linked in some kind of relationship with these others, and how that is going to work is really what we are looking for in this committee.

You talk about defunding some of these programs. How many have you defunded because of the violence element?

Mr. ROSS. First of all, since we established this policy in June, a North Carolina center run by the U.S. Park Service was not meeting standards, and we could not defund them, but we cut off students, and we said, "Until we are satisfied, you get no more students." Wackenhut, we cut off, because they were not able to maintain the environment. The Cleveland center—we went out and dropped in on 28 centers, not quite as deftly as Sargeant Shriver did it—and we had a meeting with him some time ago, and I know he really did it very well, and that is a good model, by the way, I happen to believe—we dropped in on 28 centers, and at Cleveland, we were not comfortable, and we terminated their contract. We told the Park Service—they are running four centers—that in

terms of behavior among our 20 worst ones, we asked them to show cause why we should not take those centers and give them over to some other part of the Government.

Senator KENNEDY. OK. We have got a vote, but I was trying to take the IG report and also your response to this. I would have liked to have seen it be more responsive to what the IG has talked about, and the changes that are being made and what is really happening out there.

We heard some criticism just in terms of the privatization, and the financial pressures of keeping kids on; you heard those today. I do not know how much weight to give that, and I would like to hear you talk about some of those kinds of difficulties.

I think what we really want to see is a tough hands-on policy. I know that that is your background, being very, very successful in the private sector and involved in public policy. And I also want to pay tribute to Mr. Rell, who has spent a lifetime in commitment to this.

So I think that now is really the time that people are going to be looking for this kind of accountability, and just having the lists and the statistics, we do not know, obviously, whether that in and of itself is responding to the kinds of things that are really happening out there, and we need your guidance, your help, your oversight, and your tough-mindedness in trying to make this the kind of program that will have support.

Mr. ROSS. I know you have to go vote. I just want to say that the last thing I want to do is come before you in any defensive fashion. I care desperately, as do the Secretary and the rest of us, that this really work. It is not a question of trying to put out statistics. We do think a lot of good results are being achieved. We are very open and are trying to be very bold and imaginative in terms of ways to take it a quantum leap forward. Nothing is sacred in this. We are willing to change what needs to be changed.

I think the key thing is, ultimately, the human beings; is this really a chance to turn your life around? That is what needs to drive it, and your comments are extremely well-taken.

Senator KENNEDY. Thank you.

Thank you, Madam Chair.

The CHAIRMAN. Senator Simon, do you want to try to ask something now, or shall we go and vote and come back?

Senator SIMON. I think maybe we ought to vote, and I hate to ask them to wait.

Mr. ROSS. We would be happy to wait. This is very important.

The CHAIRMAN. If you do not mind waiting, we will come back. The committee stands in recess for 15 minutes.

[Recess.]

The CHAIRMAN. The hearing will resume.

Senator Simon?

Senator SIMON. Thank you, and I thank the witnesses for staying. We have little control over when the votes are cast and that sort of thing.

Let me just summarize some impressions that I have from witnesses yesterday and today—and unfortunately, I was tied up the day before and was not able to be here. One is that generally speaking, the Government-run programs operate pretty well. Those that are contracted out, some do very well, as we heard from St. Paul, MN yesterday, and some do not do well. Generally, the smaller programs are more successful than the large programs, and where you can have a residential program that is in a different setting from where people live, that generally is better.

000628



I would add that I get a little concerned when I hear questions of you and responses from you geared only to job placement. When you have 41 percent job placement, it does not mean that the Job Corps is unsuccessful for the other 59 percent. You are giving a spark of hope to a lot of people who have just given up in our society, and we have too many people who have given up.

What I do not want to see happen is—we had the CETA program, and there were some deficiencies in that program; then we shifted to JTPA, and we were so anxious to provide measurable success stories that there was a "creaming"—where they had a choice of getting a high school graduate or a high school dropout, they took the high school graduate into the JTPA program because you could show better results at the end.

I think Senator Kassebaum's suggestion for follow-up is good, and I would like to see follow-up not just a month later or 6 months later; I would like to see it a year later, and on two elements. One is jobs or education, and the second is what is the rate of incarceration, because there will be some of these young people who will be in prison at that point. What kind of comparison is it for those who went into this program and a similar kind of group outside?

We are dealing with what one police officer yesterday called "borderline" young people—good kids, potentially, but who for a variety of reasons have had problems.

I was just talking with Karen Anderson, from St. Paul, who was a witness yesterday, a great witness. She says there are many more success stories than there are failures in Job Corps. I think that that is something to keep in mind as we focus, understandably, on how we can improve the program.

The one question that I am concerned about is when you have a private contractor who takes over a program in Kansas or Illinois or anywhere, we heard yesterday people saying, "We do not want to get rid of students, because there is a profit in keeping them there." Is that the case? Should it be restructured so that what we are interested in is not so many bodies, but really doing the job? Are we getting the right impression or the wrong impression here?

Mr. ROSS. That is a good question, Senator. The reality is there is no sort of "bodies for bucks" incentive or provision in any of this. I believe you have a center operator from one of the better centers on your next panel, and I believe she can explain that.

Senator SIMON. Can you explain how you contract? Let us say I am going to sign a contract with you. How am I paid?

Mr. ROSS. OK. Why don't you explain the payment process, and then let me explain why it does not create an incentive simply to hold onto people who ought to be gotten rid of, that there is no profit in that.

Mr. RELL. Senator, the contracts are cost reimbursement contracts where the contractor is reimbursed for the actual expenses of operating the center. There is also a profit. It is called a "fixed

008181

fee," and it is fixed. The amount of profit, Senator, does not vary depending on how many people are on-center or whether there are 400 or 380 or any of those things. "Bodies for bucks" is not the method of payment.

Mr. ROSS. So what it means is you get this contract. The number of people on site does not affect the profitability of the site. The key for a contractor is to be able, after 2 years of getting the contract, to get renewals for up to 3 additional years and then in bidding to keep it and to be able to win that competition. And that is determined primarily by output measures such as the percentage who get jobs, the percentage who go on to further education on a full-time basis, those who get a GED, those who realize reading and math gains.

So holding someone who is disrupting everybody else and keeping them from learning and advancing works against your ability. There is no financial incentive to keep around disruptive young people, period.

Mr. RELL. May I add one thing, Senator?

Senator SIMON. Yes.

Mr. RELL. There are nine performance standards for Job Corps centers. Mr. Ross enumerated about seven of them. There are two additional ones. One is the average length of stay, which has been the subject of some discussion, Senator. That is the only process measure in there, and the reason why it is there is because every piece of research that has ever been done says that there is a direct correlation between the achievements in academics, in placement, in the levels of jobs that you get and the wages that you earn, and how long you stay.

You have to stay in the center in order to learn. That is the one standard that is a process standard. If that is confusing or troublesome to someone, we can draft that standard, because if you ask any of the center directors—and I think you have one on the next panel—I am sure they will tell you that in order to achieve those learning gains, get that GED, complete the vocational training and obtain a job, kids have to stay there long enough to learn, and they know how to do that.

Senator SIMON. And when you say there are nine criteria, is average length of stay weighed more heavily than the other eight criteria?

Mr. RELL. No, sir. It is one of nine criteria.

Senator SIMON. All right. You also mentioned that you give 2-year contracts. Someone who has never done this before—does that person or corporation or whatever it is get a 2-year contract the first time, or do you give them a one-year contract the first time, just to see whether they can perform?

Mr. ROSS. The basic process is that you compete, and you compete with others, and if you win, you get a contract for a 2-year time. We are also now moving to put in place a provision which allows us to terminate even within that 2 years, if there is a reason—we have been doing that, but this will allow us to do it even more quickly—and then, after the 2 years, there are 3 option years at the discretion of Job Corps. If we do not think you have done a good enough job, or have done a mediocre job, we will then say

000629



no option years; let us put the operation of this center back out for bidding.

Senator SIMON. And in that first year—and I know my time is up, Madam Chairman—but in that first year, is there a particularly intensive look at the kind of job that someone is doing?

Mr. RELL. Yes, Senator. We conduct annual onsite reviews of the Job Corps centers with teams of experienced people—depending on the size of the center, anywhere from five to ten people—for a week at a time, including in the evening and on weekends and so on. Those reviews are carefully timed so that you can have the results of those reviews when it is time to make a decision about contracting.

On a 2-year contract, you have to make that decision about 14 months into it, because until somebody completely reinvents the procurement regulations, it takes about 8 months to conduct a competitive procurement.

Senator SIMON. Thank you, Madam Chairman, and I thank both of you.

The CHAIRMAN. Senator DeWine?

Senator DEWINE. Thank you, Madam Chairman.

I would like to get some basic facts on the record, but not just on the record, so I can understand. Is it my understanding, Mr. Ross, that the last longitudinal study was done in 1982?

Mr. ROSS. The last longitudinal study was completed in 1982; that is correct, sir.

Senator DEWINE. Is my understanding correct that there is a current study ongoing that you would say would be a longitudinal study—and by that, I mean simply that I know what percentage in 6 months or in 12 months actually have jobs and where they are.

Mr. ROSS. Actually, it follows young people for 4 years against a control group of similar young people who did not have a Job Corps experience.

Senator DEWINE. And when would we expect the completion of that, and when would we expect the preliminary report?

Mr. ROSS. The completion, I believe, will be around 1997 because of the tracking. That is my understanding.

Mr. RELL. I believe that is correct, Senator.

Senator DEWINE. Will we get interim numbers, though?

Mr. ROSS. I do not think so, not to my knowledge. What was interesting is——

Senator DEWINE. That is a long time to wait—and I understand it is good to have a long time; please do not misunderstand me.

Mr. ROSS. OK. Pete may correct me on that.

Senator DEWINE. My point is that I think it would be very helpful for a program that is costing over $1 billion a year to have these figures after a year, after a year and a half, 2 years.

Mr. ROSS. Why don't you answer that, Pete, and then let me explain other things that we are doing so that we do not have to wait until we have that fully.

Mr. RELL. Senator, the follow-up period—that the independent evaluation firm is conducting—the follow-up period is 12 months, 30 months, and 48 months. We will have some interim reports, obviously, from the contractor as they gather and analyze that data.

008182

008183



I would suggest, however, that the 12-month follow-up point does not tell you a whole lot, but it is better than nothing.

Senator DEWINE. Mr. Rell, it tells me a whole lot more than I have had for 12 years. This program has been operating now, and we have not had any longitudinal study since 1982, so in all fairness, it is going to tell us a whole lot more than we have right now.

Mr. RELL. There will be those interim reports at those follow-up points.

Senator DEWINE. And when would we expect that first one, then, because I do not know when the study started.

Mr. RELL. The study started in November of last year.

Senator DEWINE. November of 1994; is that right?

Mr. RELL. Yes, sir.

Senator DEWINE. So we could expect something toward the close of this year.

Mr. RELL. Early 1996, I would suspect.

The CHAIRMAN. Senator, would you yield?

Senator DEWINE. I will.

The CHAIRMAN. I believe I am correct that this study is $13 million?

Mr. RELL. I believe that is correct.

Mr. ROSS. That is the reason we do not do them more frequently. But what we are attempting to do now——

Senator DEWINE. Oh, I understand.

The CHAIRMAN. That was my point, Mr. Ross.

Mr. ROSS [continuing]. That does not require waiting, because the information you are asking for is critical.

Senator DEWINE. Yes, I understand. Also, Mr. Ross, it would seem to me there is some interim between $13 million and doing nothing for 12 years. One of the difficulties I have is when I talk to directors, they can tell me how many were placed at one point in time, they can tell me how many were placed in a job that is specific to their training, but if I ask, well, where are they in 6 weeks, or where are they in 6 months, or where are they in 12 months, I get nothing. And I do not think that that is their fault. I think it is the fault of how the program is being run, that no one is asking them to supply those statistics.

Mr. ROSS. We are asking them now.

Senator DEWINE. OK. Tell me how we are going to get that.

Mr. ROSS. In two ways. First, we have been piloting in New England, and will ultimately now spread to the full country, an automatic follow-up of 13 weeks, of checking where that individual is 13 weeks later, and continuing to make counseling available to them over a 6-month period after they have gotten their initial placement. Second, we are going to be asking the committee and Congress for legislative authority to get more direct access to wage record data and Social Security data, so as an ongoing matter, we can check after 1 year or after 2 years.

Now, that will only tell us what is happening to these young people, which is critically important. It still will not answer the question as to what is the impact relative to young people who have not been through the program. For that, you are left with the kind of random selection, Mathematica studies. But the other kind, we are

000630



going to be able to begin providing for you in the months immediately ahead.

Senator DEWINE. Let me turn to another question that has come out in the testimony, and that is what I would characterize as a disconnect between the recruitment for an individual, then the training, the education, then the job placement. It seems to me we are talking about three different components.

For example, in Dayton, OH, it is my understanding that when individuals are recruited, they are recruited by a national group, and there is no concerted effort in the Dayton community to target people from Dayton who might qualify; there is some, but there is not a concerted effort. There is a national group that runs that, a national contractor. Then, when the person comes out, or is getting ready to try to find a job, they are dealing again with the national group.

So I would like you to address that. It seems to me, as a person who is really just looking at this based on the testimony in the last few days and the information I have been able to obtain, that that is a disconnect, and it seems a strange way to run the operation.

Mr. ROSS. Senator, when I first saw it—because coming here less than 2 years ago, I was fairly new to Job Corps—it looked a bit strange to me. The way it works is this. Many States only have a single center. Some States have no center at all. So let us take Dayton. Dayton, in order to be used appropriately, requires the attracting of young people from all over, not just Dayton. Well, if the Dayton center has to hire people in Cleveland, in Columbus, in Cincinnati as well as Dayton, not to mention rural areas and other parts of the Midwest, there are no scale economies. For every, single center to have a major recruitment system of its own becomes prohibitively expensive.

It is the same with placement. Let us say I am from Cleveland, and I come to your Dayton center. I get a terrific opportunity, and I use it. I want to go back to Cleveland now; that is where I am from. I need someone connected to the Cleveland labor market who can hook me up.

But you are right—the question then is that the people doing the training and the people doing the placement do not seem to have a shared responsibility. So what we have now done and have put in place—it has been for some time now—is both the center operator in Dayton and the placement resource in Cleveland are both held accountable for the placement of that young person, so they both have a terrific incentive to work together and cooperate to make sure it is effective.

So we are talking about how you make a national system efficient, because kids come from all over. In many cases, maybe they will say, "The last place I want to go back to is Cleveland. I came from gangs, I have got family problems there. I need a new start. Dayton was a new start. Get me into a different place. Send me down South. Send me out West." With the current setup, we can do that.

Senator DEWINE. I see my time is up. Thank you.

The CHAIRMAN. Thank you.

Mr. Rell, you have been Job Corps director since 1984.

Mr. RELL. I believe it has been since 1983, Senator.

The CHAIRMAN. Excuse me—1983. So you have seen a lot of changes take place, and there are a couple of things I would like to ask about and then just a final comment.

One, in the contracting, placement and/or recruitment, isn't it true that Job Corps contracts separate for recruitment and placement? It is not the center contract that does that. You contract under another contract; is that correct?

Mr. RELL. That is correct, Senator. The contracts for operating the Job Corps centers are indeed different from the contracts for outreach screening and placement. The outreach screening and placement contracts are organized by geographic area, whereas the centers are not evenly spread in all of the States, so the match is not exact.

For example, there are six Job Corps centers in Kentucky. There is one placement contract for the entire State of Kentucky.

The CHAIRMAN. Pardon me. Why should there be six in Kentucky?

Mr. ROSS. You do not have to answer that question. I will protect him as a civil servant. [Laughter.] I think it could have been the political configuration of the Congress at some time in the past. Is that a fair statement?

Senator KENNEDY. It is called Carl Perkins.

Mr. ROSS. Yes. Thank you, Senator. [Laughter.]

Mr. RELL. I am sorry. I wandered into that one.

The CHAIRMAN. Sorry; I should have known before I asked.

Let me just ask you, then, doesn't that set up, however, some—it goes along with what Senator DeWine was asking, to a certain extent. We get a disconnect between recruitment and—we have been hearing that where you have smaller centers, where you have a community that is involved, those tend to be centers that are working better. Why have something where you have to go outside in order to get numbers to bring into the center? And I think there is a certain percentage paid in your contract to those who are contracting for recruitment as well as who receive a contract for placement. Is that not correct?

Mr. RELL. That is correct, Senator. The recruitment and placement contracts are currently fixed-unit price contracts. That is, you get paid one price per arrival. That is to cover all of the outreach and all of the screening for however many people you need to contact and screen in order to have that one arrival.

And you are right about the disconnect. We have taken steps to link the two organizations better. Because of the geography, it is not always possible to have the Job Corps center itself be its own recruiter and placer, because of geographic coverages.

But our challenge is to link the Job Corps centers more closely with the outreach screening and placement agencies. We have taken a number of steps in that direction. One of the primary ones is that the incentives and the standards need to be the same. Right now, the performance standards for placement agencies are identical to the performance standards for the Job Corps centers—the very same standards, the same kind, and the like.

Administrative arrangements to make a better connection, to work together and transfer information have also been put into place.





One of the criticisms that the inspector general levied—and it is a correct one, Senator—was that we lost track of 25 percent of the students who left the Job Corps centers in 1990. That was a disconnect between the centers and the placement contractors. That problem has been, if not fully solved, I believe, addressed. This year, 12 percent are missing. We have been unable to locate 12 percent after they left the center and went back to their home communities or wherever. I hope to get that percentage down into the single digits by the end of this program year.

The CHAIRMAN. Mr. Rell, one other thing that I find troubling is—we have talked about zero tolerance, and this is a policy that now, all of a sudden, you are initiating with some vengeance, evidently.

I worry—and I think we are going to have to work together, again, on exactly what it is we hope to do with Job Corps, because if we are trying to serve disadvantaged youth, disadvantaged youth today are coming with different problems than they came with when the program started 30 years ago. And I would really hate to see us get into "creaming."

I think to say that a student should come drug-free is one thing. I think they should take the responsibility to try to get there, but I also feel even more strongly that it is up to the management of the center to make sure drugs are not sold at the center.

Mr. RELL. Absolutely.

The CHAIRMAN. So if we somehow start to take youth and say they have to be drug-free, we are not living up to our responsibility, or those who are managing the centers, to make sure an atmosphere is being provided that allows them to begin to turn their lives around. And as we have heard more and more, why go from the street, where it has been unsafe, to a center that provides somewhat the same environment?

I really do not want to see just the figures show that somehow we have zero tolerance. That does not really matter to me. What matters to me is strong discipline that provides the kind of environment in which we can turn lives around.

Mr. RELL. I could not agree with you more, Senator. And the intent of the zero tolerance policy is to create and enforce that kind of environment. And it has not done so in terms of statistics. Statistics are not the issue. The zero tolerance policy is intended to ensure that all center staff address all acts of violence and deal with them appropriately.

The way to have a safe center is to make sure that both the staff and the students buy into that, that they understand that that is the expectation and that there are consequences for not abiding by that. The consequences for the students are that if they do not want to buy into it, they will lose their opportunity for being at that center, and the consequences for the center operator are that they will no longer be operating the center.

The CHAIRMAN. Was that in place at the McKinney center?

Mr. RELL. Our zero tolerance policy was announced in June. Our review at the McKinney center showed that it was not well-implemented. We have done follow-up and review of 28 centers, as Mr. Ross mentioned earlier, and we will be following up on the rest of them by March. Out of those 28 centers, we were dissatisfied with

eight, and two of those, very dissatisfied, as Mr. Ross mentioned, McKinney and one in Cleveland, where we changed center operators.

The CHAIRMAN. And the center operator who was at McKinney also operates the Guthrie center in Guthrie, OK, which has had a number of violations, and I assume that that one is under review as well?

Mr. RELL. It is, Senator. The Guthrie center has been reviewed, and it was not satisfactory; it was one of the eight that I mentioned that was not satisfactory, and there are specific steps that have been required and are being taken, and my staff are on-center on a regular basis, Senator, at Guthrie to ensure that they are followed through.

The CHAIRMAN. Well, I welcome—and I think the whole panel does—the opportunity to work together, because I feel that it is a responsibility we all have to make this successful. I appreciate your testimony this morning. I think we have a lot ahead of us to do——

Mr. ROSS. We do.

The CHAIRMAN [continuing]. And I look forward to working together. And I would just suggest not a State of denial that there are problems, but help us—help us in a realistic fashion; be honest about what is out there and what we can do.

Mr. ROSS. If I could—I am speaking here for Secretary Reich as well—we would very much like over the next 6 months, based both on the things that we have worked out in agreement with the IG, but also to sit down with your staffs and yourselves to get further ideas, to see if we cannot be very comfortable that by July 1, we have in fact dealt to our mutual satisfaction with areas that we think are very much in need of improvement. We would look forward to that very much, Madam Chair.

The CHAIRMAN. Well, I appreciate it, because we have tried, you know, and like some of the testimony we heard earlier, we have not always had as much success being heard as we would like; and perhaps this hearing will help clear the air for everyone.

Senator Kennedy?

Senator KENNEDY. If you would perhaps respond to some of the items that have been raised as part of the record; I think you ought to be given a chance to react. Some of those things might have been cleared up and steps taken. I think it would be valuable just to have a complete record.

Mr. ROSS. Yes.

Senator KENNEDY. And I think there were some suggestions made by other panelists, and we would like to have your reaction to those as well. I think the point is that we all want to try to have the opportunity of working together. I think that that is very clear across the line here, and your willingness and the administration's willingness to involve itself in an intense kind of way I think is very positive and very good news.

Thank you, Madam Chairman.

The CHAIRMAN. Senator DeWine had another question.

Senator DEWINE. Thank you.

Mr. Ross, let me follow up on the issue of the placement of the individuals as they come out of the program. How is that handled



as far as the money for the contractor? Is that per individual placed? Mr. Rell?

Mr. RELL. Yes, sir.

Senator DEWINE. And how much is that?

Mr. RELL. It varies. They are competitive contracts, Senator, so it would vary by individual contract competition.

Senator DEWINE. What would the range be?

Mr. RELL. It would average around $400.

Senator DEWINE. Around $400. And to get that $400 as the contracting agency, what do I have to do? What is the result that I have to show?

Mr. RELL. You have to verify that an individual has either enrolled full-time in school or has entered onto a job, and you need to check at least 1 week after he has actually been there.

Senator DEWINE. So my incentive is to help that person either continue his or her education or get a job—and that can be any job, is that right?

Mr. RELL. That is correct, Senator.

Senator DEWINE. OK. That can be any job that lasts at least a week. In other words, all I have to show is that it did in fact last a week.

Mr. RELL. Yes. This is entered employment; it is not follow-up at all. The only significance of the week is that you have to verify that it actually happened, that the individual actually entered onto the job, so that it is not prospective, that he tells you he has got a job.

Senator DEWINE. Has there ever been any thought given to creating possibly a dual system, where the contract agency gets so much if that person gets the job, which we all know is very important—getting them into the labor market—but then gets so much more as a bonus if they can verify that that person has a job in 3 months, or that the employment has continued?

I do not know how you would design that—and I can understand the incentive for getting in the door, having a job. It is very, very important. Statistics clearly show that if a person gets a job, then many times, he is on his way. It seems to me, though, it is also important to give that contract agency some incentive to get a job that possibly matches the training the person has and/or also a job that that person may be able to keep for a while or that that person will continue to work for a while.

It seems to me that our whole emphasis is on any job, and it seems to me maybe it should be a modified version of that.

Mr. ROSS. I think you are right, and I think particularly now that we are beginning to introduce follow-up over time, that contracts ought to reflect that, that there ought to be incentives for the type of job and the duration. I think that makes great sense, and that is something I think we ought to be working on.

Senator DEWINE. Thank you.

The CHAIRMAN. Senator Simon had a follow-up.

Senator SIMON. Yes. I would just like to enter into the record some letters in support of Job Corps from Wilma Mankiller, the chief of the Cherokee Nation, and some others, and then just one quick question.

[Letters referred to may be found in the appendix.]

008185

Senator SIMON. Senator Kassebaum mentioned the idea of recruiting people only from the community. My impression is that one of the pluses is if you can sometimes take young people away from their communities, there is a real plus; they sever the ties from a gang or from family problems and other things.

Would you like to comment on that?

Mr. ROSS. I would first of all say that whenever people can stay in a community and have those ties, and they are beneficial, that is wonderful; I agree with the chairman. In other cases, people are looking to get out of the environment, and in fact, success means going away.

I guess the best analogy is almost a major State university. It draws mainly from the State but really relies on high schools all over the State to help bring people to it and usually, in order to put it all together and keep itself interesting, has some out-of-State residents as well.

In a sense, the Job Corps works something like that. And for a lot of young people—some of my own kids; I am a father of three—getting away from home was in fact a major step in development and growing up; it was a good thing to do. Sometimes kids say, "I am not ready yet. I would like to stay closer to home." Hopefully, we have enough flexibility in this system to allow both.

Senator SIMON. Thank you.

Thank you, Madam Chairman.

The CHAIRMAN. Thank you.

Thank you, Mr. Rell, Assistant Secretary Ross. We appreciate your being here.

Mr. ROSS. Thank you, Madam Chairman. Thank you all.

Mr. RELL. Thank you.

The CHAIRMAN. It is a pleasure to welcome the third panel, and we appreciate very much your patience in waiting until after one o'clock.

I would like first to introduce Representative Ronald Coleman, from the 16th District of Texas. We appreciate very much your coming over, Congressman Coleman, to give a special introduction. It is a pleasure to welcome you here because you represent the district of El Paso and have been a lifelong resident there and know well, I think, the work of the center there, which has set a good record for Job Corps centers. So thank you for coming over.

**STATEMENT OF HON. RONALD COLEMAN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF TEXAS**

Mr. COLEMAN. Thank you, Senator.

I appreciate very much the opportunity to be here.

Senator DeWine, it is good to see you again. Welcome back to Washington.

Let me say to you that I am here, really, just to introduce Mary Young, the director of the David Carrasco Job Corps Center in El Paso. I am a strong supporter of the Job Corps centers. As I know Senator DeWine remembers, back in the mid-eighties, we went through a process that called for a good deal of slashing and cutting of programs. We know we are in a similar situation today, and I would just say to you that I can tell you that I am a supporter and continue to be because of the excellent results that we have





seen in El Paso as a result of having a quality, class act with a Job Corps center that is supported by my business community, small and large, and that is supported by the citizens of my district.

Under Ms. Young's leadership, this Job Corps center has made a difference in the lives of literally thousands of young people. To have them in our community and stay in our community is something we endeavor to do. It is not our intention for them to leave; we want them to stay and work within our community.

I would tell you that I think the Job Corps center in El Paso is a true model for excellence. I attend twice a year a regular meeting at which they ask me for a congressional rundown of what is going on in Washington, DC. I think it is an excellent part of their program, and I am always happy to oblige.

During its 24 years of operation, as you may know, the Job Corps center in El Paso has been honored with the highest commendations. I will not go through all of them; I have submitted my statement for the record. I will only tell you that I happen to know that Mary Young was especially proud of the 1990 Secretary of Labor, Elizabeth Dole's, recognition of the center for having maintained a number one ranking for 12 consecutive years.

Mary will present to you her viewpoint on how we think other Job Corps can learn from our experience. I represent the fifth-poorest district in the United States, so it is not as though I come to you with the understanding that this is a model with no problems. We certainly do have young people with great difficulties, and many minorities attend our Job Corps center.

I will just tell you that it is also my view that it would be imprudent for anyone to try to paint a picture of the Job Corps system itself in a negative light, because all centers certainly do not fall into any one mold.

Ms. Young has been associated with the El Paso center since 1970 and has been the center director since 1990. Really and truly, her continuing legacy to El Paso and our Nation is truly wonderful for us to see, because she has been extremely successful in creating a number of graduates from our center and their placement in jobs, which has made a true difference in my town.

Thank you, Senator, for permitting me to introduce her.

The CHAIRMAN. Thank you very much, Congressman Coleman. We appreciate your coming over.

The CHAIRMAN. May I now introduce the rest of the panel. Jamison Gorby is a student at the Red Rock Job Corps Center in Lopez, PA. Curtis Gadsden is director of worldwide marketing for High-End Storage Devices with IBM Corporation.

I would like to ask if it would be all right if Mr. Gadsden could go first with his testimony. He has a 2 o'clock flight to catch, which is going to push it a little close.

Does anybody else have a transportation problem?

Ms. YOUNG. No.

Mr. GORBY. No.

The CHAIRMAN. Well, thank you. Mr. Gadsden, would you please proceed? I would just like to say that Senator Jeffords is going to be taking over for me in a few moments. I have to be away from the committee for a time.

Thank you very much, all of you, for being here.
Mr. Gadsden?

**STATEMENTS OF CURTIS GADSDEN, DIRECTOR OF WORLDWIDE MARKETING FOR HIGH-END STORAGE DEVICES, IBM CORP., MAHWAH, NJ; MARY S. YOUNG, DIRECTOR, CARRASCO JOB CORPS CENTER, EL PASO, TX; AND JAMISON GORBY, RED ROCK JOB CORPS CENTER, LOPEZ, PA**

Mr. GADSDEN. Madam Chairman, thank you very much, Senator Kennedy and the other Senators, and also thanks to the panel for allowing me to go first. I will probably miss the flight, but I will give it my best shot.

My name is Curtis Gadsden. I am 47 years old. My wife and stepson and myself reside in Mahwah, NJ. I am currently, as Madam Chairman said, director for IBM of Worldwide Storage Marketing.

I graduated from Job Corps in December 1967. I was a very young lad, who had left rural America, in search of bettering my life. My brother and sisters and I attended segregated school in South Carolina. I left after graduating from high school and started working in a laundry in Union City, NJ. Then I read about the Job Corps center.

I enrolled in 1967. There was a screening process which, in my opinion, was a very good process. From there, they sent me to Clearfield, UT, where I studied accounting.

I would like to point out one of the benefits of community involvement. I heard Madam Chairman ask someone on the first panel should there be community involvement. In my personal opinion, I think that it is very beneficial, because having left Jersey City, going to Clearfield, UT, some 3,000 miles away from home, not knowing anyone, not knowing that environment, and never having been on an airplane—that was in 1967, the first time ever—not knowing the western part of the country, what they did at that center was they invited in people from the community, who met with us and embraced us. We established trust and confidence, and we established rapport with the residents in Clearfield, UT. From time to time, they would invite us on weekends and for Thanksgiving dinner.

So back to her question about should people in the community be involved in these programs, my answer would be yes, as well as the private sector.

We also toured Theikold Chemical Corp. which, in my opinion, gave us some insight into things that one can excel to become later on in life—engineering, science, etc. So I thought that that was very, very helpful.

However, at the Clearfield center, I really wanted to get involved in computers. They transferred me from the Clearfield center to the New Bedford center in Massachusetts, where I studied computers.

And although it is not in my statement, I might add that during that time, I recall a visit to the New Bedford center by Senator Kennedy and staff in 1967. And I have heard a lot of testimony this morning that is very disturbing to me, but I can tell you that at that center, there was a lot of pride. When we heard the Senator was coming, we competed to see what dorm would be the best, because there were awards. We had on a weekly basis the "dorm of the month." There were incentives at the centers to motivate and inspire young Americans.



Also, there was a "student of the month" club, which I am pleased to tell you that in 1967, in the month of July, I was named student of the month.

So there were many incentives to motivate young Americans during the 1967 time frame. I just wanted to share that with you.

Needless to say, I furthered my education, but Job Corps gave me the foundation to build upon, and I am pleased to tell this committee today that this foundation that I have established, through the help of the Federal Government, is as solid as the Twin Towers in New York City. Nothing can shake my foundation, because I am very comfortable with the time the Government spent investing in me, so that today, I can return thousands and thousands of tax dollars to the Federal Government. And in addition to that, my church record will show that I also donate a fair amount of money to my church, to help feed the hungry in Newark, NJ. Every year, I donate one paycheck out of my monthly salary to the United Way. So I am a self-sufficient American, with a wife and one son, and thanks to God, the Job Corps put me on that platform, and I never have to look back; I always look ahead, to a better future in America.

Thank you very much.

[The prepared statement of Mr. Gadsden may be found in the appendix.]

Senator JEFFORDS [presiding]. Thank you, Curtis, and I will deviate from the normal system of hearing from the entire panel before questions; I know how long it takes to race to the airport so I want to help you in that regard.

I will ask you, have you had occasion to visit other Job Corps centers since your time there? Have you had the opportunity to do that?

Mr. GADSDEN. Yes, sir. I visited the one in Jersey City. I do not know if it is still there. This one was located on Montgomery Avenue in Jersey City. I visited that one in the mid-1970's.

Senator JEFFORDS. And do you still follow up with some of your peers that you graduated with?

Mr. GADSDEN. A couple of them, yes. One gentleman was my roommate, Ray Espayanas out of Carlsbad, NM. I have chatted with him a few times, and I have also chatted with Theodore Hoehne, out of Vineland, NJ.

Senator JEFFORDS. Are they also paying their share in terms of taxes, the way you are?

Mr. GADSDEN. Yes, sir.

Senator, if I may, can I just leave a couple of recommendations with you?

Senator JEFFORDS. Of course. I want to give you that opportunity.

Mr. GADSDEN. Thank you, sir.

I believe that this committee should seriously take a look at community and private involvement. I believe that that is the key. I have heard testimony about how kids are reacting today, and that is unfortunately the society in which you and I live today.

008187

000634

When I went to Clearfield, UT, white Americans embraced a black American from Jersey City, and that was asking a lot on their part, and I really appreciated that. So I believe you really need to take a look at corporate and community support.

The second point is I think you should revisit the screening process. I heard about the kinds of students in the program. The program itself is great, but I really think you should take a look and say these are the students we are looking for—students from poor families, students who would like to excel, students who are looking for a second chance in life. I really suggest you take a look at that.

I am not an expert here; I can only tell you what we do in the private sector to motivate people. Maybe we need to try to get the contractors to place students so they will stay with the job; maybe you would want to take a look at an incentives program. Senator DeWine asked about an achievement bonus. Maybe you would want to take a look at the $400 and consider giving them $200 at placement and 9 or 12 months later down the road, give them another $500 or $600 or $700. That is a motivational type of incentive that will help the contractors as well as the employers to keep these people employed.

Also, I think there were some things that worked extremely well when I was there. Why not take a look at incenting these students? Do a "student of the month," do a "dormitory of the month." We have to change the way we do things today. We cannot stay the course that we used yesterday, because we are in a different world today.

Thank you.

Senator JEFFORDS. Thank you for very excellent testimony.

Senator DeWine?

Senator DEWINE. I am going to vote for you getting to the airport, Mr. Gadsden.

Mr. GADSDEN. I am fine. If I miss the flight, I can catch another one. This is important.

Senator DEWINE. Well, I appreciate your testimony, and I think your recommendations are very interesting, and your testimony was very compelling. I appreciate it.

Thank you, Mr. Chairman.

Senator JEFFORDS. Thank you very much, Curtis.

Senator JEFFORDS. Mary, would you proceed, please?

Ms. YOUNG. Distinguished members of the committee, my name is Mary S. Young. I am the director of the David L. Carrasco Job Corps Center in El Paso, TX.

The center in El Paso has been operated since its inception by the Texas Educational Foundation, Incorporated, which is a nonprofit foundation formed to improve the lives of young people through the operation of Job Corps centers.

The Texas Educational Foundation also has continuously operated the Gary Job Corps Center in San Marcos, TX since March 2, 1965. This 2,200-student center was the second Job Corps center to be opened in the Nation.

I am pleased to have the opportunity to share information with you about the Carrasco Center in El Paso which, as I tell new students each week in orientation, is truly a place filled with opportunity for them to change and improve their lives.

000635



Our center is named in honor of our founding director of 20 years, Davis L. Carrasco, who established the philosophy which continues to serve as the basis for our program operation, and I also believe as the basis for the success of our center and its graduates. This philosophy is based on the firm belief that young people with very bleak futures can be empowered to drastically change the direction of their lives through a transformation which occurs as they progress through the Job Corps education and training program.

Our center has been recognized as the flagship of Job Corps for many years. The Texas Educational Foundation's large center in San Marcos also has been recognized throughout its nearly 30 years of operation as a center with consistently sound performance.

We have an inherent advantage at the Carrasco Center in that all of our students are enrolled from the local community of El Paso. This enables us to involve parents and guardians strongly in the progress or lack of progress of their sons and daughters.

However, I believe that the most significant strength in our program lies in the dedication and commitment of our staff. We enjoy tremendous longevity in our staff group, a dedicated group of people who have made the Job Corps their lives' work. Their goal, in keeping with our basic philosophy, is one of quality and high performance.

Our standards are high and are emulated to our students by our staff, who are firmly conscious that they must be role models for those whose lives have been entrusted to us.

The dedication of our staff projects a positive and motivating image to our students. We set high standards for ourselves and for our students and expect these to be met by all individuals in both groups.

Our approach is preventive, educational, and if need be, corrective.

Another key concept in our philosophy and daily operations is one of firm discipline. I have heard a lot of talk today about zero tolerance for violence, and actually this is somewhat of a new term to us. But our 25-year philosophy has always been an absolute intolerance for violence of one person against another.

At the same time, our commitment is to serve the individual needs of each student at all costs until these needs bring or have the potential to bring harm to another individual or to the student and staff group as a whole.

Many of our students come to us with a history of gang affiliation. One of our innovative approaches in combating this influence has been to develop an ongoing working relationship with the El Paso police department. Officers come to the center on a regular basis, counsel with students, have lunch with them in the cafeteria, and develop individual relationships which help our students to sever their past gang affiliations and move toward and new and more productive way of life. The police officer becomes a real person to know and respect, rather than someone to fear.

Another innovative aspect of our program is an extension of support to students once they have graduated and entered the work

008188

world. Through the use of follow-up questionnaires to employers, we obtain information about the success of our graduates in their employment, or difficulties or problems that they are encountering. When the latter is reported, instructors and counselors continue to work with graduates in order to improve their job performance.

Our students and generations of their families before them have been on welfare. However, they do not want to continue to remain in this circumstance. A classic example of this fact is a graduate of our center who works as a switchboard operator. When she received her first paycheck, she presented it to me proudly and said, "Mrs. Young, because of this check, I no longer have to take welfare, and I am the first person in my family who has not had to live on welfare." She continues at her same job, 15 years later. She is not a Ph.D., although we have those, but she has supported her children as a single parent, and they have not lived on welfare.

Although I have spoken about our uniqueness and a number of our program innovations, I do not want it to appear that our center is so different that it is not a part of the Job Corps program. We are only an example of the very effective national Job Corps program which has provided the guidance and direction, monitoring and supervision, that has enabled us to develop innovative enhancements to the basic Job Corps program.

I strongly believe that it is imperative that the Job Corps remain structured as a national program so that the program quality that the David L. Carrasco Center has developed can continue to flourish.

I am here to testify today to the fact that our students complete the Job Corps program and go on to jobs, military service, and higher education, and off the welfare rolls. I firmly believe that the national Job Corps program is a viable one, a successful program that should not be dismantled or reconfigured, nor should its funding be cut, for to do so would severely harm our most vulnerable, and potentially our most valuable resource—our youth, who I know can be developed into trained, skilled workers to advance our economy rather than be a burden on it.

Thank you for giving me the opportunity to provide information to you today as you seek to evaluate the effectiveness of the Job Corps program.

Senator JEFFORDS. Thank you very much.

Senator JEFFORDS. Our next and last witness is Mr. Jamison Gorby, who is a student in Lopez, PA. I am sure this is the first time you have testified before a Senate committee. I remember my first time before a Senate committee. I was an attorney general at the time, and I was very nervous; I do not know about you.

First of all, let me ask you, where is Lopez?

Mr. GORBY. It is about 30 miles northeast of Harrisburg. It is a nice place. It is out in the country, kind of.

Senator JEFFORDS. Where is your home?

Mr. GORBY. My home is Cochranton, which is just south of Erie, PA.

Senator JEFFORDS. How far is that from Lopez?

Mr. GORBY. Well, it is a 6-hour drive.

Senator JEFFORDS. That is some distance; so you are not in your community.



Mr. GORBY. No.

Senator JEFFORDS. Well, go ahead with your statement, and take your time. Do not worry about the lights.

Mr. GORBY. I am a student at Red Rock Job Corps. I have been there for about 5 months. I will tell you a little bit about my background, where I am from and a couple of places I have been.

When I was 4, my parents got divorced. I grew up in Cochranton, and the year that I turned 12, my stepfather and my mother and myself moved to California. Growing up in a small town out in the country and then moving to a large city was pretty unique; it was a lot to handle. I wanted to be back in Pennsylvania, and I decided, after numerous arguments with both my mother and my stepdad, that I was going to do my own thing.

I went out on the streets, and for approximately 2 years, I lived on the streets in California, and I made my living out there on the streets by "signing." What that is—I am sure you have seen people standing on street corners, holding signs that say "Will work for food or wages."

Among the places I stayed were old, condemned houses. At that time, I was too young to hold a job, so there was not a lot for me to be able to do. I did a lot of odd jobs like mowing lawns and stuff like that, to keep myself alive.

From there, a gentleman picked me up 1 day, fed me, gave me a place to stay and offered me a job with him at his towing company. After about a year living with him, we got to be pretty good friends, and he contacted my mother, and she came to me with a plane ticket and told me I could either come back to live with her, or go back to Pennsylvania and stay with my dad. So I went back to Pennsylvania and moved in with my father.

We had our problems. Growing up, I never really got to know my real dad, and so we had our problems adjusting to each other, and things did not work out there. So I spent a lot of time in and out of group homes and foster homes.

My dad gave custody of me to my uncle, who lives in Erie, and I went up and stayed with him. In my time with him, I worked at different jobs, like the country fair and stuff like that.

What I wanted from life at that time was to make something of myself because I had been through a lot; I had been down at the bottom. Some friends of mine knew about Job Corps and had signed up for Job Corps, and I learned about the program from them. I thought there was a golden opportunity to make up what I had lost over the last several years.

So I went in and talked to my screener and signed up and went into Job Corps, and I am proud to say that that has been a big milestone in my life. It has been a great privilege to be able to be there and put forth effort to better myself so that I can help my community and other communities later in life.

While I was there, I got my GED, and I was named academic student of the month. Red Rock is more of a challenge. I get to deal with new people. You learn how to live with different types of people with different backgrounds, from different areas.

One thing about Job Corps that I can really appreciate is that it is structured, but it is not so structured that you cannot be who you are and achieve your goals.

008189

000636

Having been in and out of group homes, they are very, very structured; you do not have your own freedom.

Red Rock has given me an opportunity to succeed. I have total support from all the staff members there. They all make you feel really good. Having support from the staff members makes me want to push myself even more. I have been to enough places and been through enough that I know it is time to settle down; it is time to make something out of life.

I still keep in contact with all my family and all my friends. When I presented my GED to my father, he got a little tear in his eye, and he said, "See—we always knew you could do it. You just had to put forth the effort."

I thank God and Job Corps that I did it, because without them, I would never have had the chance.

[The prepared statement of Mr. Gorby may be found in the appendix.]

Senator JEFFORDS. Where are you now, Jamison, in your life's plan? You are still at the school.

Mr. GORBY. Yes, I am still at the school.

Senator JEFFORDS. But you have your GED.

Mr. GORBY. I have my GED.

Senator JEFFORDS. And what are you doing now? Are you in skill training?

Mr. GORBY. Yes; I am taking brick masonry as my skills training. I have got 11 more TARs to complete the shop and become a graduate. I plan to take the advanced course in brick and leave with my advanced degree.

Senator JEFFORDS. Let me ask both of you some questions. I think one of the areas that Senator Kassebaum and I are interested in is community. In your case, you are not near your community, and in some respects, because of your family life, it would appear that perhaps it was better to be away from the community that you were then living in—or would you have rather been near to where one of your parents was?

Mr. GORBY. Being where I am has helped because it has kept me far enough away from my old friends and so on so I do not have an urge to go back and do a lot of the things that I used to do, but I am close enough that I can still stay in contact with everybody back there. The community there, and the communities around Red Rock, are very, very supportive.

I would have to say that I feel I owe the community a lot because without them, we would not have the opportunity to go up there and succeed and make something out of our lives.

Senator JEFFORDS. Mary, I am sort of halfway in a dilemma. I know in our Job Corps, we were all community for a while in Vermont, or at least in northern New England. Now, the assignment method is first come, first served, so we are finding that our Vermonters are going down to urban centers, and young people from urban environments are coming to Vermont, and that has created some problems with the mixture of culture and style. So I am sort of in the middle—I can understand Jamison's situation and others, where it is best to get out of an environment, perhaps.



So at least it seems to me that the individual ought to have a choice rather than be assigned arbitrarily as they are now. I would appreciate your comments on that.

Ms. YOUNG. Well, the students do have a choice. When students approach recruiting offices, they do have a choice to request a center. Some students from El Paso do choose to go elsewhere. However, it is also a residential program, so that even in our setting there are some students who will not choose to go on the weekends; they will remain at the center all the time. But the support of the family members, whatever that family structure is, the support of it, unless there is none whatsoever, is beneficial to the success of the program, I believe.

Senator JEFFORDS. How do you measure educational success? We have a serious problem in this country, as you well know, to say nothing of Job Corps. Statistics show that about one-third of our young people who graduate from high school now are functionally illiterate and that half who graduate do not have what we would consider an acceptable education.

Are you required to, or have you yourselves established what must be accomplished toward an education in order to be considered to have successfully graduated?

Ms. YOUNG. Yes. The goal is to advance reading ability and math gains by 2 years, and our length of stay is approximately 1 year, so this is an auspicious goal to advance at least double the enrollment time, and it is measured by a nationally normed test, the test of adult basic education.

Senator JEFFORDS. Now, is it a requirement to have that test?

Ms. YOUNG. Yes. That is a national requirement to administer that test.

Senator JEFFORDS. Senator DeWine?

Senator DEWINE. I have no questions. I appreciate the testimony very much.

Senator JEFFORDS. Thank you both very much, and Jamison, we wish you well and look forward to watching your career. I have a lot of brick work that needs to be done at my house. [Laughter.]

I thank both witnesses, and I thank everyone out there in the audience for coming. This is an extremely interesting and critical and necessary subject of job training that we have been investigating, and Senator Kassebaum has done an extraordinarily excellent job in bringing witnesses and being involved, and hopefully, we can derive some policy changes here to better utilize the training resources that we have.

As I brought out before, we have an incredible need for training, and our resources are very, very limited. We only have enough money to take care of about 10 percent of the universe right now of those who need training, and each year we are graduating some 800,000 young people who are in need of training when they graduate. If we were to adequately train all of them, it would cost us about $8 billion a year, and these people are out there, looking for further training. So this is a very, very serious problem that Senator Kassebaum and I are looking at to see how we can better utilize those resources that we have and at the same time, how we can improve our basic education so that the need for remedial training, which is costing our businesses billions of dollars a year,

008190

000

can be eradicated and made unnecessary so that we can be competitive in a very competitive world, and so that all of us can have a higher standard of living and live better lives. And all of that, we have got to do with less resources. But hopefully, we will be able to find the resources by reordering our priorities.

[The appendix follows.]

000638



# APPENDIX

## PREPARED STATEMENT OF JOHN DEERING

Chairman Kassebaum, Senator Kennedy, members of the Committee. My name is John P. Deering. I'm from Wisconsin and I'm employed as a Job Corps Admissions Counselor for Region Five, which covers eleven job corps centers in six states.

As an admissions counselor for Job Corps, I strongly believe in the positive changes that take place in the young people we serve: the Job Corps graduates that return home and find meaningful employment.

But I also believe that Job Corps could be changed to increase graduation rates and improve service. In my opinion, there are three inherent problems with the way the program is currently managed.

First, the Job Corps Centers (JCC) are contracted agents of the Department of Labor (DOL) and are paid per head for each individual on center and each student that graduates. I believe this policy forces the Job Corps center operator into keeping students who exhibit inappropriate behavior, i.e., those with criminal records, drug dealers and gang members.

Several of the Job Corps campuses in the region I represent do not even appear safe for the young in and women that I recruit. I toured a large center in November and was told by several youth that they did not feel safe there. I was also told that gang activity was rampant on that center, which included riots and incidents of arson.

I have a hard time sending young men and women to centers that are unsafe or have a history of gang activity or violence. I have had young people return home prematurely because they did not feel safe. The stories of violence from these young people are enough to scare any ADULT.

To allow rural youth from Wisconsin to travel to large, dangerous centers is to invite failure for these young people and for Job Corps. It is very hard to overcome the persuasion of a disgruntled youth returning home and telling friends and family that Job Corps is unsafe.

Second, the screening agencies are also contracted agents. This poses the same problems as above. Admission counselors often recruit young people whose past behavior is inappropriate for the program, in order to keep their numbers up so they do not lose their jobs.

Third, the DOL regional office has too much control over when and if students arrive on center. All potential student files are screened through DOL which may take weeks or months to determine eligibility. There is very little continuity between the screeners, DOL and the various job corps centers.

I believe the above problems could be easily overcome with only a few changes:

1. Make the Job Corps Center operator responsible for recruitment in their region/state. This would make the screener accountable to the Job Corps center director and help to prevent the admission of ineligible students. It would then be the responsibility of the individual Job Corps center to ensure that the students on center were appropriate. This would offer clear responsibility for who is to blame when students with inappropriate behavior are admitted to the center (as in Minnesota) and create problems.

2. Allow the Job Corps Center to make the determination of eligibility of students instead of the Department of Labor. This would speed the process and open communication between the center and the screener. Again, this makes the center operator directly responsible for the safety of students.

3. Make the Department of Labor responsible for oversight of the functions described above and for providing technical advice to screeners and job corps centers.

Thank you.

## PREPARED STATEMENT OF ROBERT BELFON

Chairman Kassebaum, Senator Kennedy, Members of the Committee:

I wish to thank you for inviting me to testify. My name is Robert Belfon, I am a Pediatric Dental Specialist with practices in Piscataway and Plainfield, New Jersey.

I was a contracted medical services provider at The Edison Job Corps facility from the period of April 1991—June 1993, in Edison, New Jersey, which was administered for the Department of Labor by ITT.

In early February 1991, I was contacted by the medical staff of Edison Job Corps which requested that I see a few of the resident Corps members in my office for the purpose of providing dental treatment. The arrangement suited us and I agreed.

008191

Subsequently, Mrs. Jacqueline Tchir, the then Health Services Manager inquired if I might be interested in joining them as a contracted dental services provider. She went on to explain the philosophy of Job Corps, and how it serves underprivileged and possibly misdirected youths, many of them from the inner city, and many of them from minority groups. She also explained the many training programs that were set up for young people, and how for many of them, it was the first time out of the ghetto and a drug ridden environment.

Well, I must admit that I found the proposition challenging. As a 46 year old black male, who was raised in a South West Bronx Housing Project, and a former gang member, I know that I could have never survived my teenage years in the turbulent drug-crazed sixties without the many guardian angels that helped shape me to be what I am today. Indeed many, if not most of the young men who were my contemporaries in that housing project, never made it to their twenty-fifth birthday, let alone out of the ghetto. So, needless to say, I jumped at the chance to give something back, and maybe make a difference in some kid's life. I guess I even saw myself as a role model, as I assumed the other staff members and administrators undoubtedly were.

Well, I certainly was wrong in my assumptions. I soon found that what we had in Edison was the Edison Job Corps Center Ghetto Dumping Ground. By this statement, I mean that these young people were taken from a negative environment of many inner cities, the tri-state area, only to be placed in another negative environment in Edison, New Jersey, to be victims of another system that had no concern for the human being but just the slot that he or she occupied. If all the slots were filled, then all was right with the world and Job Corps. It was nothing more than a numbers game.

The Center Director's mandate was to preserve the census, so that the government checks kept coming in. To keep the census up, HIV tests were misdated, positive drug screening tests were ignored, medical problems not noted in charts, etc. Many things were done to keep the residents in, to facilitate and keep the numbers up. There were in fact several times that as per the Job Corps handbook I was obligated to terminate certain residents for medical reasons, and/or noncompliance of medical treatment. However, when I discussed this with the Medical Director and noted it in the charts I was advised by the Center Director that her interpretations of my instructions were different, and she refused to allow terminations to go through. Afterward I discussed this matter with the Regional Director who advised me that the Center Director should not have overridden my medical recommendations.

Some of the other measures that were taken to keep the residents happy and compliant were to allow them to conduct their social activities (including sexual) any place they saw fit, under our windows, in the bushes, behind buildings, etc. In the spring and summer the Medical Department had an unusual high incidence of poison ivy cases. To allow them not to go to class, and hang out in staircases, hallways, and even in the infirmary. Those residents that were assigned to the Medical Department to help out were allowed to sleep side-by-side in the beds next to the residents that were housed in the infirmary for various illnesses; this was standard procedure throughout the entire time that I was there. The Job Corps members were the only losers. They were not being prepared for a job or lives outside the Center, nor were they being taught basic skills need to find, keep, and function in a job. As a matter of fact, a common complaint among the residents was that many of the job training programs that they were advised they could participate in before they joined were either no longer offered or had never been offered.

Drug use and trafficking of the same were also "overlooked." It was common knowledge around the Center that certain residents sold drugs in and out of Job Corps. In one particular case, there was a resident who drove a thirty thousand dollar customized BMW, and would periodically be AWOL for weeks at a time, only to return and reenter the program to continue his business deals, yet nothing was ever done by the Center Director about it.

Violent behavior was allowed. The Dental Department reported incidents of negative and violent attitudes and behaviors, such as threats of a physical nature, etc. These incident reports were never even acknowledged. It was common knowledge among members of the staff that incident reports were not worth the ink they were written with. Alot of these violent residents went on to injure other staff members and/or residents.

This type of behavior was disruptive and detrimental to those residents who wanted to make proper use of the programs and opportunities. Instead of establishing deterrents for this negative behavior by enforcing the rules, they were allowed to continually disrupt others and exhibit antisocial behavior, without any fear of consequences.



These young people were falling victims to the same negativity that presumably they had come to Job Corps to avoid or overcome.

I must tell you that as a taxpayer, I condemn this misuse and abuse of moneys, and as a black man, I resented the For Profit Ghetto created by DOL and ITT, that only benefited the people who were running the programs.

Throughout my stewardship of the Dental Department, I wrote and forwarded many letters and other correspondence to both DOL and ITT in reference to these incidents and irregularities, but they were all ignored.

I hope my input serves to clarify some of the issues and concerns in these matters. I stand ready to assist you and your Committee with any help that you may need.

Once again, I thank you for this opportunity to appear before you and to allow me to voice my concerns about this very serious issue.

## PREPARED STATEMENT JOHN C. MCKAY

Chairman Kassebaum, Senator Kennedy, members of the committee, my name is John C. McKay. I am honored to be here today. I feel I may be able to assist in helping Job Corps, a program I believe is worth saving.

I entered the Job Corps program in 1965, shortly after its inception, as a deputy director and then a director of a civilian conservation center with the Bureau of Indian Affairs. I later served as a national training director with the Office of Economic Affairs and as a project manager with the old Office of Economic Opportunity. In 1971, I was assigned to the Dallas regional office of Job Corps as a project manager where I served until my retirement last year.

In the interest of time, I will briefly state my opinion of problems in the Job Corps. They are essentially the result of a policy that seems intended to reward center contractors, but places the welfare and achievement of students far down the ladder of objectives. There is mismanagement in the program from Washington down to the regional offices. Speaking as someone who has seen the program from the inside, I can honestly say that it is not worth the billion dollars that is being spent on it.

Some examples:

### VIOLENCE ON CENTERS

1. In August 1992, I reviewed a complaint from U.S. Senator Dale Bumpers regarding the Little Rock Job Corps Center. The complaint identified drug problems, physical abuse of students, disciplinary problems, and students with weapons on center. The complaints were substantiated with incident and monitoring reports.

2. As a member of the 1992 regional office review team of Guthrie (Oklahoma) Center, it was reported to me that students had beaten two security staff members so badly that they were hospitalized. The security director stated to me that he had resigned his position because the center administration would take no action against the students.

The review team leader and the regional director refused to include my request to make this a part of the review report. It is, however, a matter of record of the hospitalization.

3. A vocational staff member at the Quachita Civilian Conservation Center was beaten by a student and was hospitalized. As a result, he was off work for a period of three months. Here again, the center took no action to discipline the student. The regional director refused to include this act in the regional office annual review of the center.

4. The district attorney of Chavez County, New Mexico, considered criminal charges against the Roswell Center administration who failed to report a complaint of rape of a seventeen-year-old student by a twenty-year-old student. The center had allowed the twenty-year-old to terminate and leave the state.

5. Serious incident reports in the Dallas regional office clearly show that during 1992-1993, drug and gang-related incidents have increased discipline problems on the centers. Concerned staff have stated to me that these problems were out of hand and that if it were known that they had said this, they would lose their jobs.

### PERFORMANCE MEASUREMENT SYSTEM (PMS)

Job Corps's Performance Measurement System was established to measure the effectiveness of centers and the regional offices. While the intent was good, it simply is not an effective system to accurately measure effectiveness.

1. On the many center reviews in which I have participated, I have never found a center to accurately report all categories of Performance Measurement System.

008192

2. Vocational instructors do not have a total understanding of the requirements to certify students as a vocational completer. During reviews of centers and also during monitoring trips, I would review the individual student's training and achievement record. Instructors were not sure of the requirements for vocational completer certification.

3. Reading and math gains could not be supported with test results, as the test results were not maintained in accordance with Job Corps requirements.

4. Contractors have stated that not meeting Performance Measurement System would cause them to lose their contracts, and center staff felt they would lose their jobs if they did not go along with inaccurate reporting.

5. Recently, in a center directors' meeting, the regional director stated to the center directors that all centers could be "medium" or "high." He then said, "You know what I mean." They knew.

JOB CORPS POLICY

Job Corps developed a policy and procedures handbook which caused many problems for the basic Job Corps mission. The most serious problems I experienced in reviewing and monitoring centers were:

1. A serious policy change in the input of students. The statute which governs the eligibility of students for Job Corps precluded input of students with serious criminal or drug problems. In an effort to keep the centers full, the Job Corps administration changed this policy, and in effect, changed the Job Corps mission from basic education and vocational training to one of remediation, which is in direct conflict with the original Job Corps mission.

2. New programs, such as the Alcohol and Other Drug Abuse (AODA) program, created conflicts with established discipline policies.

3. Center and Job Corps administration frequently ignores policy.

PROGRAM MISMANAGEMENT

I have witnessed the following problems of mismanagement, ethics and possible illegal activities in my tenure with Job Corps over the past decade and more. I would be pleased to provide the committee with further information regarding many of these problems.

1. High level Job Corps officials have had improper relations/interactions with contractors, including providing confidential information regarding bids on Job Corps centers to incumbent or favored contractors. This is identified in the Federal Acquisitions Regulations as an illegal act.

2. There has been collusion by contractors when bidding on center contracts. It involves the practice of not bidding against each other.

3. Awarding Job Corps support contracts in excess of $2,500 without competitive bids. This is also a violation of F.A.R. (Federal Acquisition Regulations).

4. Contracts awarded to retiring, high level Job Corps officials upon their retirement by Job Corps national office to secure their silence and loyalty regarding their knowledge of illegal or improper activities by the National Office.

5. The use of contractors to pay federal vouchers in an attempt to circumvent federal procurement regulations.

6. Musical chairs used in awarding Job Corps center contracts, especially when both contractors have had serious operational problems resulting in the loss of other center contracts.

7. High cost settlements made to protect corporate and possible high level federal staff, paid for with appropriated funds, and then sealed to protect the facts of the complaints.

8. The lack of any oversight by congressional committees during the past ten years.

9. Job Corps policy is selectively enforced.

I would like to offer the committee some recommendations for improving this program, but in the interest of time, I will end my testimony here and ask that they be submitted for the record. I would be happy to respond to any questions the senators might have about any of the information I have mentioned.

Thank you.

RECOMMENDATIONS

1. Prior to funding the Job Corps program for year 1996, audit the general and administrative expenses of at least five contractors.

2. Abolish the existing thirty-year-old procedure of awarding contracts.



3. Consider federally-funded Job Corps Centers by states which would provide for local oversight, similar to local school boards. Provide training for local input and the opportunity for students to make weekend home visits.

4. Re-establish a mandatory discipline program to protect youth who want and need this program.

PREPARED STATEMENT OF CURTIS GADSDEN

My name is Curtis Gadsden. I am a 47-year-old married man with one step son. I live in Mahwah, New Jersey. I just completed my 27th year with IBM. I am currently Director of Worldwide Marketing for High End Storage Devices. In 1967, I was a 17-year-old black youth and I was trapped in a world of little opportunity. In 1968, I graduated from Job Corps. Job corps gave me not only job training and a basic education, but the motivation and courage to make more of my life.

I was just 18 years old in 1968 when I read about Job Corps in the newspaper and decided to enroll. I grew up in Stestephen, S.C., then a rural area with virtually no job prospects for young high school graduates. My father, a farmer and electrician, did the best he could to support our family. My seven brothers and sisters and I attended segregated schools.

We studied by the light of kerosene lamps until the family could afford electricity in the mid 1960s. My mother measured every meal prior to cooking it. There were never seconds. We didn't get indoor plumbing until my senior year in high school.

So you see I simply could not ask my parents for money to go to college or job training. My own lack of skills and racial discrimination completely obstructed my future.

After graduating from high school, I traveled to Jersey City, N.J. in search of opportunity. I lived with my older sister and worked at a minimum wage job in a laundry. That's when I decided to enroll in Job Corps.

Within a few months, I traveled to the Clearfield Job Corps Center in Utah. I saw immediately that Job Corps was a place that would help me understand the different nationalities of Americans. We all lived together on the center. I had a roommate from New Mexico, and I learned so much about his cultural background. In a way, Job Corps brought the whole country together.

At the Clearfield center, I trained in bookkeeping and accounting and I developed an interest in computers that would last a lifetime. I accepted the rules and the discipline of center life because I was grateful to enhance my lifestyle. We were all severely poor and we lacked education.

Then I switched to the Rodman center in Massachusetts to train in basic machine operations and wiring. At the time, the center was operated by IBM and offered the most up-to-date technological training.

I will always remember that Job Corps taught me a foundation of skills I could use in the marketplace. Job Corps staff helped increase my self-confidence by telling me I could succeed.

Not long after graduating from Job Corps, I started working for IBM pushing a mail cart in the stock room. But I new I wouldn't be there for long. Because Job Corps had given me a vision that I'd be doing more. Sure enough, IBM management saw my potential and promoted me to a computer operator trainee. Then I became a senior computer operator, a systems engineer, and finally a marketing manager. I earned a bachelor's degree in computer science from Rutgers University—all this because I have never lost the desire to succeed that Job Corps gave me.

We need Job Corps to breathe new life into our young people. At this point, we have a choice—we can either make America a prison or a globally competitive nation. If we invest in Job Corps, we're making the right choice.

When I think about Job Corps, I see it as a federal investment in myself—one that I've been returning for nearly a lifetime. I am living proof that Job Corps works. I'm doing very well. I'm self-sufficient. I certainly pay a lot of taxes, and I'm a very hard-working American. I give thousands of dollars each year to various charities and to my church. I can afford it today because this country invested in me through Job Corps. I give it back every day.

I hope that more young people who were like me find their way through Job Corps. I don't know where else will they go. There are more Americans out there who benefited from Job Corps than you can imagine. They might not talk about it, but they are working, supporting their families and living their lives free from poverty.

Let me close by saying to this committee: Thanks to God for giving us Job Corps because it helped me and it's still helping kids who need it. Investing in Job Corps will reap the benefits tomorrow.

008193

000547

MANAGEMENT & TRAINING CORP.,
OGDEN, UTAH 84409,
*January 19, 1995.*

Hon. NANCY L. KASSEBAUM,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR KASSEBAUM: I am submitting this letter for the record of the Labor Committee's oversite hearing on Job Corps. Management & Training Corp. is the largest operator of Job Corps centers and also the operator of the Flint Hills Job Corps Center. MTC appreciates your effort to make these hearings a success, and welcomes the positive changes which they are already bringing about.

Since this round of hearings began some months ago, we have seen a clarification of expectations for center operators; a rethinking of which students are most appropriate for Job Corps; and improved partnerships between the Department of Labor, center operators, and recruitment and placement contractors. We view the changes outlined in the Assistant Secretary's testimony as being beneficial to the program.

On the whole, the hearings presented an accurate picture of Job Corps, its successes and its weaknesses. We felt some of the testimony was not accurate and did not present a fair picture. The circumstances under which some of the witnesses (students and staff) left the program were not explained and may have provided the committee with some insight regarding motive. However, I believe most of what all the witnesses said contained some truth.

We are very interested in seeing improvements being made to the Job Corps program and can offer some suggestions ourselves. It was unfortunate that the committee was left with the conclusion that the simple answer to improving center performance was to get tough with the center operators. Turning over center operators is necessary in some cases. However, it is not a panacea and there are plenty of examples in which changing contractors did not improve the performance of a low-performing center.

The success of a Job Corps center depends on open and honest partnerships between all the players working for the benefit of the students: Congress, the center operator, the national office of Job Corps, the regional office of Job Corps, the organization with the recruitment contract, the organization with the placement contract, the contractors or unions with the contract to operate the vocations on center, and the organization with the architectural services contract. Businesses have found great success implementing concepts of Total Quality Management which stress teamwork and partnerships. Strict accountability, high standards, and consequences for poor performance are also part of TQM, but strict accountability alone will not provide the foundation that can dramatically improve the process and the outcomes.

We welcome your efforts to open this dialogue to mutually explore methods for substantial improvements in performance as well as greater efficiencies, and we want to be part of the debate.

Finally, I propose that you consider appointing a blue ribbon commission, outside the Department of Labor, to look into ways to strengthen the program. A former Secretary of Labor could chair the commission and a representative group of experts from within the Job Corps system and from without could explore new approaches. I know that if you open the door, you will find that there are all sorts of meaningful suggestions that people are eager to make.

I believe Bob Stokes' approach to covert investigations, in which disgruntled former employees and students are heavily relied on, will not lead to solutions as good as those that would result from an open dialogue in which all are represented.

You are already having a favorable impact on the program. You have the opportunity to make a historic improvement in Job Corps. We want to help.

Sincerely,

SCOTT MARQUARDT,
*President.*

000641



OGDEN CITY POLICE DEPT.,
OGDEN, UTAH 84401,
*January 20, 1995.*

Hon. NANCY KASSEBAUM,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR KASSEBAUM: Northern Utah is fortunate to be the home of Clearfield Job Corps. Over the past two decades, I have had the opportunity to witness the positive impact of this job training program. Students come away from the program with not only vocational skills but with the social skills necessary to become productive members of society.

While serving as a member of the community relations council for Clearfield Job Corps, I have been impressed with the quality of their training programs, social skills workshops and leadership opportunities. They train and provide job placement for a high percentage of the youth who enter the program.

As federal job training programs are scrutinized, I would like to ask your support of Job Corps. I have witnessed firsthand the contribution Job Corps makes to Northern Utah.

Sincerely,

MICHAEL D. EMPEY,
*Chief of Police.*

cc:
Senator Bennett
Senator Hatch

---

LAYTON CITY POLICE DEPT.,
LAYTON, UTAH 84041,
*January 18, 1995.*

Hon. ROBERT F. BENNETT,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR ROBERT F. BENNETT: Weber and Davis Counties have become increasingly grateful for the Clearfield Job Corps Center and all it does for our young people.

Seventy-seven percent of the students who left Clearfield Job Corps Center last year became employed within six months after leaving the program. They now can care for their families, pay taxes and contribute to our community both professionally and socially. I attend community relations council meetings at the Clearfield Job Corps Center, and I am continually impressed with the quality of Job Corps' curricula, training programs, social skills workshops, and leadership opportunities for students. There is no doubt that Job Corps is helping youth obtain employment and become viable members of our community.

As you and your colleagues scrutinize federal job training programs, I know you will find that Job Corps, with fiscal integrity, trains and places a high percentage of youth. In fact, why not enhance and expand Job Corps through the Job Corps 50-50 Plan, a plan to enrich existing centers and gradually build 50 new centers by the end of the decade? Since 95 percent of the plan supports existing centers, we can be assured of continued quality services for youth. With the remaining 5 percent, we can build new centers to help thousands more people become productive citizens.

Senator Bennett, Job Corps deserves your support. Weber and Davis Counties have seen time and time again how it gives back to all of us.

Sincerely,

DOYLE E. TALBOT,
*Chief of Police.*

---

PREPARED STATEMENT OF SUZANNE SMITH

I was in attendance at the hearings on January 18 and 19 when testimony was given by individuals concerning their experiences with the Job Corps program. In some cases, their recommendations for corrective action were sought.

Accompanying me at the hearings was the Executive Director of the Appalachian Council, Anthony Stellar, who has been involved with Job Corps since 1967. I have worked with Job Corps contracts for Appalachian Council since 1978.

008194

Appalachian Council has operated Job Corps contracts for recruitment and placement since 1967. The operations have included states in seven of the ten regions of the Department of Labor. The Council also operates a national contract for advanced placement for Job Corps students, the Industry Work Experience Program (IWEP), and the vocational training components of the Job Corps centers at Pittsburgh and at Batesville, Mississippi.

Our collective experience has allowed a comprehensive perspective of the various components and functions of the Job Corps program. We have seen its successes, experienced first hand its growth, dealt with the youth who confirm its essential rationale, and finally, we have watched with dismay as the quality of the program has been diminished by the statistical game-playing and cutthroat contracting methods which have taken place over the last eight or ten years.

Many of the things brought out in the hearings we know to be true, and we have railed against to no avail.

AFL-CIO Appalachian Council began recruiting for Job Corps in 1967 at the request of OEO to recruit and screen rural youth in Appalachia for training in Job Corps. The premise behind the policy of the residential requirement for most of Job Corps is a valid one for the most part. Many youth need to leave an impoverished or dangerous environment to break out of a destructive mode of behavior. Recruitment agencies serve a valuable purpose in reaching populations not in proximity to a Job Corps center in screening youth, not for just a particular center, but in focusing on the needs of the individual youth for the type of training desired and the location preference relative to particular circumstances.

Unlike some of the participants giving testimony, we believe there is definite benefit in keeping the functions of recruitment agencies and centers separate, though they are, and should be, distinct components of a team which should have a common goal—to train at-risk youth so that they may become full participants in a productive, fulfilling life which contributes to society in a meaningful way. Unfortunately, the Performance Measurement Standards in place for Job Corps contractors work against this team concept, and place centers and recruitment agencies at odds for survival.

Outreach, Screening, and Placement contracts are fixed unit price, indefinite quality contracts. They are competitively bid and are awarded for one year plus two option years. The contractor gets paid per arrival for recruitment and per placement for placement contracts. Some regions contract for recruitment and placement in one operation. Others have separate contractors conducting recruitment and placement operations in the contract area.

Center contracts are cost plus fixed fee type. They are let for two years plus three option years. They are also competitively bid, except, of course, for the conservation centers which are operated by the government.

Centers face the problems of meeting the statistical standards set by the National Office, regarding On Board Strength (OBS), Weekly Termination Rate (WTR), and other stats indicating educational accomplishments of students, etc. Youth who arrive on center and stay one day or ten days (as did Rhonda Wheeler who testified) are a liability to the statistical performance of the center. It is customary for the center then to blame the recruiting agency for screening "bad" kids.

Screening agencies must abide by the regulations set down in the Policy Requirements Handbook for determining eligibility. Youth who have health or behavior-related problems (mental/emotional or court jurisdiction) must have applications reviewed by the Department of Labor Regional Office. All relevant information from professionals dealing with the youth's case are gathered by the screening agent and submitted with the application to the Department of Labor. "Clean" applicants are those who meet eligibility criteria and are without other mitigating circumstances in the background. Much in the recruitment process is dependent upon qualified staff who are capable of exercising good judgment. Even when those characteristics are present some youth will get into the program who perhaps should not be there. Yet, the essence of the program is to deal with youth at-risk, those who come out of environments where they have already experienced failure and where the systems have failed them. None of these young people who apply for Job Corps appear as candidates for Princeton. Though many are talented and intelligent, their circumstances have certainly not fostered or rewarded efforts for pursuing excellence.

Thus, even when all eligibility criteria are met, many youth who go into the program need much in the area of guidance,counseling, supervision, psychological help, in addition to training and education. Are the Job Corps centers equipped to supply what this disadvantaged group needs? Are the salaries being offered staff sufficient to attract the highly qualified people necessary to work with this target group? Are the Performance Measurement Standards forcing contractors to address numbers over the needs of the "customer"—the disadvantaged youth?





Screening agencies are being pressured to screen for "suitability" in addition to eligibility. Is the youth dressed as though he were part of a gang? Is he/she committed to remaining in program? Screening contracts now are penalizing the fixed price contractor by deducting a percentage of the unit price from the payment for a youth who does not remain on center for at least 30 days.

Obviously youth who admit to or even flaunt gang membership are not "suitable." But those who wish to hide it, can. Should the screener then deem the young person ineligible based on the manner of dressing or any other appearance? Some youth who seem enthusiastic and committed drop out after a week. Others who appear to be lukewarm about the program stay for a year and learn welding or carpentry.

The Job Corps mission should be restated. That mission should determine policy, and policy should be the basis for procedures.

Numbers-driven performance measurement misses the boat when assessing quality. While Regional Directors are screaming for quality and suitability in recruited youth, they are awarding contracts to recruitment agencies who win contracts with a low bid, and then pay screeners "incentive" commission based on numbers of arrivals. Again, numbers get in the way of quality.

Procurement methods for contracting for Job Corps are a travesty, and in no way do they reflect the philosophy stated by Secretary Reich in his efforts to "reinvent" the Department of Labor. Fixed price contractors must bid on Job Corps services for which numbers to be recruited are inflated to assure the Region of the youth needed to fill the centers. Yet, the guarantee is for only 80% of the number in the solicitation, and the maximum provision is up to 200% of the number requested. To bid realistically and competitively while staying solvent is virtually impossible.

Appalachian Council pays competitive salaries and full benefits and so has minimal turnover in employees. Staff tenure averages over 12 years, some have 20 years experience in dealing with Job Corps youth. The Council, while performing at near 100% of goal, has lost four contracts this year which we held for 28 years. The winner underbid considerably, pays on commission basis, and offers minimal benefits to employees. Their current performance in two of the contract areas is much below quota.

Such contracting practice is a small example of evaluation procedures which, under the guise of cost saving have instead cost the government 100's of thousand of dollars, and have cost the real customer, the youth, the benefit of a quality managed program where outcomes are valued over output.

The mission of Job Corps is noble and essential. It is a dual one, in our view. There should be specialized centers to deal with the court referred youth, and to address the different needs of the under 18-year-old.

Training matched placement is not as relevant a measure of success as is the fact that the youth is now employable when he/she might have been in jail or worse. Many young people are saved because of Job Corps. I have personally spoken with a number of young people whose lives were changed dramatically.

Job Corps is expensive but less so than the cost of not addressing the issues that are its intrinsic mission. The Demming-style of quality management which is the basis for some of the reinvention policies of government tells us to go for quality not quotas, and the bottom line will show a plus. If Job Corps dollars are spent wisely, the program could save the government money and save the society the burden of dealing with the residual of damaged lives.

---

THE CONFEDERATED SALISH AND KOOTENAI TRIBES OF THE FLATHEAD NATION,
PABLO, MONTANA 59855,
*January 20, 1995.*

Hon. NANCY LANDON KASSEBAUM,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR KASSEBAUM: The Confederated Salish and Kootenai Tribes respectfully submit this letter for the Congressional Record as an expression of our support for Job Corps Programs. Since 1968, the Tribes have successfully operated the Kicking Horse Job Corps Center on the Flathead Indian Reservation. In 1972, we converted the Kicking Horse campus into an All-Indian Campus actively recruiting Indian students from throughout the United States. It is our position with 27 years of experience, that Job Corps is a proven viable alternative for addressing the needs of disadvantaged youth.

Nationally, Indian Reservations have the highest rates of poverty, unemployment, infant mortality, substance abuse, suicide and dropout rates to name a few of the

problems. As a result, Indian youth endure intensified social degradation while attempting to assimilate into a dominant culture without any means of support. With limited resources, Tribal governments cannot fully address the socioeconomic needs of their reservations however, Job Corps Programs aid Indian communities in addressing these problems. Since its inception, the Kicking Horse Job Corps Center has provided a safe environment for our students to excel academically and to acquire a competitive edge to compete in today's job market. We specifically provide quality services to the student population which contributes to raising the standard of living on most Indian Reservations by producing a better educated and trained workforce.

The Department of Labor reports that Kicking Horse excels in placements, academic standards with an above average GED attainment rate and the completion rate of the Vocational Program is consistently high. Most of our students could not have realized these successes without the residential campus and the support services we offer. Additionally, the Center has recently earned the distinction of receiving an Exemplary Status Certificate from the Montana State and Advisory Committee for the Northwest Association of Schools Colleges and the Northwest Accreditation Team. This certificate demonstrates that we have gone "above and beyond the standards of accreditation" by instituting new and exemplary programs.

Senator Kassebaum, we appreciate your efforts in conducting oversight hearings on the Job Corps Program. Please keep in mind that the Kicking Job Corps Program is truly a unique experience that provides employment opportunities and life skills for at risk youth. We urge you to review all of the evidence such as the IG audits, GAO reports and performance statistics to determine the true cost-effectiveness of educating disadvantaged youth in America.

The Confederated Salish and Kootenai Tribes firmly believe that the advancement of American society depends on Job Corps programs which provide essential services to disadvantaged youth. Job Corps brings hope, opportunity and empowerment to the millions of young people who are looking for a chance to prove themselves. Everyone benefits when at-risk youth are removed from unemployment and welfare rolls, kept off the streets and diverted from the lives of crime and violence. It behooves us all to support the 50/50 Plan for the continued expansion of Job Corps programs. Senator Kassebaum, Kicking Horse Job Corps students are living proof that Job Corps works.

We appreciate the opportunity to share our enthusiasm for the continued success of Job Corps and look forward to working with you on expanding programs for at-risk youth.

Sincerely,

MICHAEL T. (MICKEY) PABLO.
*Chairman of the Tribal Council.*

c: Chrono
The Honorable Pat Williams.
The Honorable Max Baucus.
The Honorable Conrad Burns.

---

CRISCO STAHL,
RONAN, MT 59864,
*January 7, 1995.*

Hon. MAX BAUCUS,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR BAUCUS: Please include this letter as testimony in the Job Corps hearing next week. As a Business Instructor at Kicking Horse Job Corps in Ronan, Montana, I believe that the educational, vocational, 'and residential living programs can benefit young disadvantaged youth all over the United States. I have observed students that have taken advantage of this opportunity to develop self-esteem and improve their educational backgrounds during the six years I have been teaching.

The video tapes of the CBS report appeared to be media sensationalism to me. The rebuttal by Director Boswell explains the behavior problems of the particular students taped. More importantly, if employees were doing the secret video taping; these employees set poor examples of what they were hired to do. In the Job Corps program, it is mandated that in appropriate behavior be addressed by all employees in order to provide a safe, secure environment for the students at any Job Corps Center. Concern should have been given to the behavior of the employees not confronting any inappropriate behavior they saw while observing students.

00064



As far as the examples used in the tape, these negative scenes could be construed on any private or public school ground. We do not shut down schools when inappropriate behavior is observed, the students are addressed regarding the behavior problem. It may be true that some students manage to enroll in Job Corps under false information provided during the application process. Certainly, it is difficult to document all activities of students particularly when they come from other states. Director Boswell has done a good job of reporting that some of these students were not contributing to a positive living environment and do not belong in the Job Corps program.

Job Corps enrolls students who do not succeed in the public sector. Job Corps has provided education programs to address social behavior as well as educational training, G.E.D.'s, and vocational training for industrial jobs. Documentation can be provided regarding the success rates of employment or further educational training of the students enrolled at Job corps. Of course, there are students who are not motivated to succeed and do not provide a positive environment for others. Where in the world is this not a true statement. It is easy to expound upon negative experiences, but please allow the many successful Centers, employees, and students to inform you about the positive results of the Job Corps program. I am proud to say that I work at such a place.

Please give Job Corps the opportunity to continue its motivational, positive program for the young people who need to continue their education and training. Job Corps is not a waste of taxpayer money and should be allowed to continue its work with disadvantaged youth.

Respectfully submitted,

CRISCO STAHL.

---

*January 9, 1995.*

Hon. MAX BAUCUS,
*U.S. Senate,*
*Washington, DC 20510*

DEAR SENATOR BAUCUS: Please include this letter as testimony in the upcoming Senate Hearings on the Job Corps Program.

The Job Corps program has a center in Ronan, Montana, near to my home. I have personal knowledge of this center and how it is administered. Many friends of mine are employed at the center and the public is often invited to the center for art exhibits, pow wows and business activities.

It is my understanding that Kicking Horse Job Corps Center has a zero tolerance policy with regards to drugs and alcohol as well as violence. Students are sent to review board and terminated from the program if they cannot comply with these policies.

The staff, faculty and administration at Kicking Horse Job Corps are caring professionals who do an excellent job educating and training disadvantaged youth who enroll. Many students have worked for businesses in the surrounding communities and have always exhibited good work habits and a good understanding of their trade.

Please consider carefully the overall achievements of the Job Corps Program. It is essential to have this program to train youth who have "fallen through the cracks" yet desire to better themselves by succeeding in the work force of this great country.

Sincerely,

AYLEEN BAIN.
THOMAS P. BAIN.

---

MARY L. TEVEBAUGH,
PABLO, MT 59855,
*January 6, 1995.*

Hon. MAX BAUCUS,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR BAUCUS: I am writing to ask that you have this letter included as testimony in the Job Corps Hearing.

As an instructor for Sash Kootenai College I teach afternoon classes at the Kicking Horse Job Corps Center. In this position I have had first hand experience at seeing the benefits of the program.

008196

I understand that the video tapes on the CBS report on the McKinney Job Corps Center will be part of the evidence used at the hearing. I would like to request that careful consideration to the rebuttal by Director Boswell be carefully considered.

Even if the newscast were not misleading, I would like the committee to consider that it is highly probable that similar evidence could be found at any high school with the same number of students. We do not consider closing the doors on a public school if there are drugs, teacher molesting children or inappropriate behavior. We take steps to correct the problems.

The Job Corps success rate is based on students that the public schools have failed to educate.

Before closing the doors on the Job Corps I would like the committee to consider giving true test. Perhaps do an unbiased study comparing an equal number of students in the public schools and in Job Corps over a set period of time. Including beginning and ending pictures, documentation of behavior changes and employability.

I feel confident that if the committee could see the changes in students that I have seen at Kicking Horse Job Corps they would not feel that it is a waste of tax payers dollars.

Sincerely,

MARY L. TEVEBAUGH.

---

JOHN MCKAY,
IRVING, TX 75061,
*January 26, 1995.*

Hon. NANCY LANDON KASSEBAUM,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR SENATOR KASSEBAUM: Thank you for the opportunity to participate in the Job Corps hearings by your committee on January 19, 1995. I believed my comments would assist in saving the Job Corps program. I left the hearing with serious concerns which I wish to call to your attention.

After the hearings concluded, a Job Corps contractor stated to me, "Well, Pete Rell stonewalled his way through another one." He then added, "It'll be business as usual next week." I further felt that Doug Ross simply was not aware of the serious problems that Job Corps was experiencing the past several years.

The statistics Rell refers to are, at best, inaccurate and possibly fraudulent. There is a Job Corps National Office Review that reported to Rell that fraudulent records were reported by a contractor. Maryetta Cunningham of the Dallas Regional Office participated in this review and is willing to give sworn testimony to this statement. Maryetta has since retired and lives in Denton, Texas.

During the hearing, Senator Kennedy offered a suggestion which referenced investigators from Sergeant Schriver's office as head of the Office of Economic Opportunity. Their mission was to investigate program problems and let him know of these immediately. If your committee, along with Doug Ross's office, selected a highly qualified, Job Corp-experienced, small group of consultants which would investigate all aspects of Job Corps problems prior to further funding, you would have creditable, updated information which your committee could use to make valuable and informed decisions. I do not believe that the 13 million dollar review of 30 centers is a reliable vehicle for your committee.

I have another suggestion if further hearings are held. Review all contracts made by the regional offices as well as by the National Office. Personnel actions taken by Rell should be reviewed, i.e., the action in Region 6 when Rell bypassed Levell Johnson, a black man with 28 years plus of successful Job Corps experience, for a person of no federal service and questionable performance at the center level. Many other personnel actions taken by Rell should be reviewed for Office of Personnel Management compliance.

Senator Kassebaum, I wish to restate my support of the mission and the intent of the original Job Corps program. I believe a new approach through a federal-state administration, local oversight and input, and placement designed to meet the real need of disadvantaged youth without serious drug and/or criminal backgrounds should be supported with federal funds.

Sincerely,

JOHN MCKAY.



U.S. SENATE,
WASHINGTON, DC 20510,
*January 23, 1995.*

Hon. NANCY KASSEBAUM,
*U.S. Senate,*
*Washington, DC 20510.*

DEAR NANCY: I am writing to inform you of the successes of the Northlands Job Corps Center in Vergennes, Vermont. I believe that you may find it useful when reviewing testimony from the Labor Committee's Job Corps hearing of January 19, 1995.

The Northlands Job Corps Center has been a success in Vermont and is committed to providing Vermont's disadvantaged youths with the educational, vocational and social skills necessary to contribute in the community. Last year, over 38 percent of the students eligible for the GED program receive their GED before leaving the program, and 82 percent of the students were placed in jobs or signed up for additional educational programs. Of those students participating in the vocational program, 70 percent found employment directly related to the training they received at the Job Cons Center.

The Northlands Job Corps Center has helped Vermont's disadvantaged youths. Whether it is a safe haven from a troubled home or as a place where a child can learn and gain self-confidence, the Northlands Job Corps Center enhances the lives of its students.

I appreciate you keeping these thoughts in mind when reviewing the Job Corps' value. Please feel free to contact me if you have additional questions about the Northlands Job Corps Center.

Sincerely,

PATRICK LEAHY,
*U.S. Senator.*

## PREPARED STATEMENT OF LARRY KING

I would like to take this opportunity to thank Chairperson Kassenbaum, Senator Kennedy and the other distinguished members of this committee for the opportunity to testify before you today. My name is Larry King, I'm a 12-year employee of the USDA - Forest Service at the Pine Knot Civilian Conservation Center, located in Pine Knot, Kentucky. I also serve as the President of the National Federation of Federal Employees, Forest Service Council that represents 18 Centers and approximately 650 federal employees from across the nation.

First and foremost, I would like to state that the Job Corps program is a much needed program. We serve kids whom everyone else has given up on. We provide opportunity to those who have no opportunity. We are truly a program of last resort. I would also like to go on record in saying that our Forest Service Civilian Conservation Centers are the best managed and most productive Centers in the program.

However, for the past five years, I have lobbied for change in our program. I have raised concerns regarding the way the program has been managed by the Department of Labor. As protection from the many attempts to cut the program in the past, the Department of Labor has developed elaborate systems of statistics to justify the program's existence. While we felt sure that this was a necessary evil at the time, this has become part of the problem with our program. Center Directors are currently engaged in obtaining successful statistics at any cost. They are forced to do this, if not, they risk the chance of their Center being closed by D.O.L. due to low statistics.

The single most disruptive factor is called A.L.O.S., or average length of stay. This single factor weighs heavily on how a Center is ranked by D.O.L. More often than not, Centers keep students who are disruptive, violent, and who are failing to progress, solely for the purpose of obtaining a high A.L.O.S. statistic. While A.L.O.S. tends to be the key standard in rating a Center, other factors such as education, social adjustment skills, and vocation are treated as side issues. We now have a program which has been developed to produce numbers, not to train highly motivated young men and women, who are socially well adjusted and competitive in today's work force. (It is our feeling that A.L.O.S. was created primarily to justify the Contract Centers existence.)

In recent years, the program has come under attack due to numerous negative incidents that have occurred on both Federal and Contract Centers, and the cost associated with the program. Most of the Job Corps population is obtained from inner cities throughout the nation. The program accepts those youth who are not functioning in our society for any one of a number of reasons. Therefore,

008197

it is understandable that the Centers are experiencing the same problems that have been occurring in our inner cities. The A.L.O.S. statistic is a detriment to controlling the violence. While most students can be "turned around", it must be recognized that every youth that comes into the program will not be successful. Some students do not benefit from the program and continue to exhibit violent behavior. Because of the A.L.O.S. requirements, these students are commonly retained long after it has been determined they should be removed.

While our student population has become more aggressive and violent, the Job Corps program itself still functions under a "60's" mentality. We function under what is conceived by the rank and file as the "poor baby" concept. Centers are not allowed to enforce discipline or maintain a productive atmosphere in which social development can occur. D.O.L. policy, in regard to discipline, reflect standards under which the students do not have to be responsible for their actions. Instead, centers operate under the concept that the student's background is justification for whatever actions the student takes. In other words, our students are not responsible for their poor behavior, society is.

Program Administration Charge:

We currently have a D.O.L. administration which highly favors the use of Contract Centers. It should be noted that when Contract Centers were established, they were run by major corporations to train prospective employees. This is not the case today. Currently, anyone can establish a Contract Center. A Contractor's primary objective is to make money, not train students. Contractor's provide the minimal training environment needs for students, with profit dictating choices. In comparison, Federal Centers are set up to provide quality training, not to make a profit. The cost differences between the two types of Centers is not that great. The quality of training, education, and social environments found at the two types of Centers, however, is strikingly different. Federally operated Centers have, by far, the best managed and most productive training environments. The additional cost of the Federal Centers is offset by the value of the projects the students produce during training. Specifically, students at Contract Centers are taught by building "mock ups" or simulated construction projects. Federal Centers teach students skills by actual construction of public facilities, such as Ranger Stations, Visitor Centers, and Job Corps Centers themselves. Many communities around Federal Centers have benefited greatly from projects completed by Job Corps students.

We believe that the current D.O.L. Job Corps administration must change before any real progress can take place. In fact, we suggest a complete flush of the current D.O.L. Job Corps administration, from the Washington level through the Regional offices. If the current administration and the philosophy is not changed, the program will never become a vehicle to effectively serve those who need it most, the students and taxpayers of the country.

This committee should know that this program is a good program -- a needed program. A program that serves kids whom no one else wants to deal with. A program that changes many potential dependents of the government into tax paying citizens. We do make a difference in the lives of these kids. The public does benefit from our program in many ways. However, we recognize that we can and should improve. Recently, the Forest Service reorganized our national and regional Job Corps structure to cut overhead costs and streamline the organization. We the employees, and the N.F.F.E. Forest Service Council stand ready and willing to work with anyone, at any time, to improve the program so that it will truly be the best in the Nation.

If eliminating Job Corps program in on the committee's mind today, I ask that you reconsider and help us put one of the best programs in the Nation back on track. The kids need it and the taxpayers deserve it. Eliminating the program is not the cure, fixing it is. We need a program based on accountability, not accounting.

000645

## Prepared Statement of Doug Ross

Chairman Kassebaum, Senator Kennedy and Members of the Committee, I am pleased to have the opportunity to testify before you on Job Corps -- a 30 year bipartisan initiative that is America's oldest, largest, and most comprehensive residential training and education program for unemployed and under-educated



youth. Designed for America's most severely disadvantaged young people, the program breaks the cycle of poverty and dependence-- often multi-generational-- by giving young men and women an opportunity to take responsibility for turning their lives around. It does so by providing a structured environment in which these youth can learn the self-discipline as well as the academic, vocational and social skills that are needed to become productive members of our society.

Last year, Madam Chairman, you declared that it was time to review the Job Corps and ensure that it was using federal resources efficiently and effectively. Secretary Reich and I agree with you. And I am delighted to be here today to review the program's performance and discuss how we can make a good program even better.

Job Corps has been a long-term bipartisan test of two critical propositions:

- Can a structured, disciplined residential environment that focuses on individual responsibility and preparation for a job empower large numbers of young people from poverty backgrounds to turn their lives around and become productive citizens?
- Does privatization work as an effective way to implement a comprehensive training program requiring carefully coordinated delivery of services to a severely disadvantaged group of young Americans?

Based on rigorous evidence as well as the stories of hundreds of thousands of young Americans, we believe the answer to both propositions is a resounding "yes".

**Performance Overview**

In terms of its mission to provide opportunities for severely disadvantaged young Americans to take responsibility for their lives, Job Corps works. At any one time, the Corps serves over 40,000 young men and women, ages 16-24, all of whom are economically disadvantaged. Minority group members represent 70% of Job Corps students; 80% are high school dropouts; over 40% come from families on public assistance; and more than 70% have

008198

never held a full-time job. Most come from neighborhoods plagued by high rates of unemployment, crime, welfare, illiteracy, illegitimacy and drug abuse.

Since 1966, Job Corps has served approximately 1.7 million young Americans. Over this period of time, Job Corps data indicates that 1.1 million or 65% have found a job or gone on to further education after their Job Corps experience. Last year, in PY 1993, 70% of all students leaving Job Corps were successfully placed, and data for the first half of PY 1994 suggests an even higher placement rate this year. We are proud of this record of success. But we know that Job Corps can and must continue to improve if it is to earn the maximum return for the American taxpayer. Indeed we believe that Job Corps will benefit from significant reform that I will spell out later in this testimony.

It has been the policy of Job Corps to enroll the most disadvantaged young people -- to deliberately take on the hard cases. These young women and men receive a wide variety of opportunities from the chance to attain a high school education to access to job skills in demand and a job. But the most important element of the students' experience is the Job Corps expectation that they can succeed and the demand that they exercise the discipline that will lead to success in life.

Fortunately, Job Corps has been extensively assessed. As a result, we have a clear understanding of the program's strengths and weaknesses, as well as its impact on participants and the benefits to society as a whole.

Office of the Inspector General Audits and Assessments

The Inspector General of the U.S. Department of Labor has regularly audited the Job Corps and assessed its effectiveness. The OIG's reports have consistently reflected the view that Job Corps, overall, is a positive program that works. At a hearing last week before the Subcommittee on Labor, HHS, Education, the Inspector General testified that "this program can be an important tool in helping disadvantaged young men and women to turn their lives around and increase their economic earning power."

000646



The OIG also has regularly offered recommendations for ways to improve Job Corps. As Secretary Reich mentioned in his appearance before this Committee last October, Job Corps has previously undertaken significant improvements in response to earlier OIG audit reports, and other improvements and changes are underway in response to more recent audit reports. These improvements, which started during the Bush Administration, include termination of specific center contracts when poor performance remained uncorrected, several revisions of performance standards, revision of eligibility documentation requirements, introduction of a comprehensive student accountability system, introduction of vocational competency testing, implementation of performance standards for placement contractors, and consolidation of student allowance payment and data systems.

We have recently developed a joint action plan with the OIG for continued program improvements. I will return to this later in my testimony.

Job Corps Impact Evaluations

While audits such as those of the Department's Inspector General are important for effective program management and maintaining the financial integrity of the program, they do not attempt to determine the return on investment or impact of the program. The Department wants to know -- as does this Committee and the American public -- if the total positive impacts resulting from the program outweigh the costs.

We have turned to impact studies for this information. To examine the effectiveness of the Corps, a longitudinal study of over 5,000 youth was completed in 1982. This study was conducted by Mathematica Policy Research, an independent consulting agency, and analyzed a random sample of participants. The earnings, educational achievement, criminal records, and welfare dependency of Job Corps enrollees were compared to the records of a demographically similar comparison group who had not enrolled in the Job Corps. These experiences were tracked for a period of four full years after graduation.

008199

The evaluation found that Job Corps participation significantly increased earnings and educational attainment, while reducing welfare dependency and the incidence of serious crime among graduates. The study determined that there was a return to society of $1.46 for every $1.00 spent, including increased economic output of Job Corps students and lower public expenditures from reductions in welfare dependency and involvement in serious criminal activity. This return on investment is among the highest in federal job training programs -- and for other domestic programs.

Referring to this study, Professor Richard Nathan of the State University of New York, a former high-ranking official during the Reagan administration, recently wrote:

> "Although this study (by Mathematica) was completed some time ago, we have solid evidence that Job Corps benefits are still overwhelmingly positive. The basic performance measures of the program-- job placement, educational improvement, etc. -- have all been stable or rising since the program was evaluated. Furthermore, program costs have not increased since the evaluation, indicating the program is still cost effective. Finally, the income and employment of disadvantaged youth who do not participate in Job Corps have been steadily declining over the past decade. Thus, the assistance of Job Corps is more needed than ever."

The Job Corps program has undergone changes and improvements since the original Mathematica study was completed in 1982. The curriculum and services provided have changed based on the additional decade of experience working with disadvantaged youth and employer involvement. We believe these changes have improved the program's effectiveness.

Last year, the Department of Labor launched a new multi-year scientific evaluation of Job Corps using random assignment. Although we cannot predict precisely the results of this evaluation, we believe that the result of the study will demonstrate public returns on investment at least as large as those found in the previous evaluation since Job Corps data on



student accomplishments and outcomes have been consistent or better since 1982.

**Bipartisan Support for Job Corps**

Because of its consistently solid performance, Job Corps has enjoyed strong bipartisan support throughout its history. The Clinton Administration has pursued a 50/50 strategy--an effort to expand the capacity of the Corps by 50% by increasing the number of Centers by 50 in a graduated manner over the next decade. At the Corps' 30th anniversary last year Majority Leader Robert Dole declared, "It (Job Corps) gives young people opportunities they never dreamed of and makes them successful workers. They get back in the workforce, they do good things, they are on the tax rolls, the payrolls all across America. And I think this is one program...we ought to take a look at when we talk about expansion."

During the last Congress, a bipartisan coalition recognized the history of Job Corps' success in designing the new federal program of boot camps. It drew on Job Corps as a model for the boot camp education and training component as a way to give youth who have committed crimes a last chance.

**Job Corps - A Privatized Program**

Privatization of Job Corps has turned out to be an effective way to ensure continuous improvement and to offer a means of dealing with low-performing sites. Currently, Job Corps has a network of 111 centers, with at least one center in all but four states. Thirty of these centers are operated by the Federal Departments of Interior and Agriculture. With only a few exceptions, the other 81 are operated by private for-profit and non-profit contractors selected on the basis of competitive bids.

These private center operators range from companies such as the Teledyne and Vinnell corporations, (which have large Defense operations), to Management Training Corporation, (which is Job Corps' largest contractor and whose primary business is Job Corps training) to the YWCA. Job Corps also depends on strong employer association and union involvement to run specialized vocational training programs. Indeed, Job Corps training is provided

008200

through long-standing and effective partnerships between the business community, the labor movement, the for-profit and nonprofit sector and governmental agencies at all levels.

Good contractor performance on key performance indicators is a condition for continuation of the competitive center contracts. Privatization has made it possible to get rid of ineffective center management. Indeed, over the past 2 years alone, 21 contracts have been terminated prior to the end of their maximum 5-year duration, primarily for reasons of poor performance.

Job Corps' history has been one of continuously expanding private contractors and reducing government-operated centers. In 1976 slightly more than 50% of all centers were privately operated. Today 72% of the system is privately operated and competitively bid. We believe the privatization of Job Corps should be continued and expanded.

Republican administrations have managed Job Corps for 20 of the program's 31 years and have led the program in a positive direction. The Clinton Administration is now seeking to build on that legacy and develop ways to further improve the program.

**Areas in Need of Reform**

Despite Job Corps' overall successes, the Chairman has eloquently and correctly pointed out that some areas of the program need to be improved. Last October, Madam Chairman, you reminded us that an oversight hearing on Job Corps was last held by the Senate Labor and Human Resource Committee more than 10 years ago and that there is a need for a thorough evaluation of the program. You also expressed concern that the Department of Labor's Inspector General had identified different aspects of the Job Corps program that warranted attention and corrective action. Secretary Reich and I agree.

Many of your concerns and those of other Committee members were triggered by audit reports from the Department's Inspector General. These audits were based on a review of Job Corps data to measure performance of various components of the program.

The Inspector General testified at the October 4 hearing on its audit of Program Year 1990 concerning Job Corps and reported

000647



a number of areas that needed to be reviewed and assessed by the Department. These included:

- Failure of some students to obtain measurable learning or job placement gains.
- Failure to determine the post-program placement status of all Job Corps terminees.
- A low percentage of training-related job placements by graduates and terminees -- even though nearly 70% of all students did obtain jobs or go on to further education.
- The fact that certain centers consistently performed below the national average and continued to operate with no significant improvement.

**Job Corps Corrective Action**

At the direction of the Secretary, plans have been completed and actions have been taken or are underway to deal with each of these deficiencies. Indeed, practical corrective measures on most of the OIG concerns have been underway for some months. These measures included revisions in the Job Corps performance measurement system for PY 1994 as well as issuance of our zero tolerance policy against violence at Job Corps centers in June 1994.

We think it is especially important to note that the Department has moved forcefully to address problems at Job Corps centers where poor performance has been especially severe or persistent. In September 1994, after following up on complaints received by parents of students, we suspended new student enrollment at the Oconaluftee (NC) Job Corps center until improvements are made in the center environment. In December 1994, after an in-depth review triggered by disturbing TV reports about the McKinney Job Corps Center in Texas, we took action to terminate the existing contractor and install a new one.

Also in December of 1994, we undertook a series of special onsite reviews to determine how effectively our zero tolerance

008201

policies were being implemented. The first wave of reviews was completed at 28 centers before the holidays, including all centers where the potential for violence related problems was thought to be highest. All remaining centers will be reviewed by no later than mid-March 1995.

This first wave of "zero tolerance" reviews resulted in: 1) formal notification to the current Cleveland (OH) Job Corps center contractor that, based on persistent performance problems and an assessment that the living and learning environment is not safe enough, the contract will be terminated and a new contractor installed; 2) transmittal of a letter to the National Park Service, citing chronically poor performance at all four of their Job Corps centers, asking them to "show cause" promptly why the interagency agreement for operation of these centers should not be terminated; and 3) temporary suspension of operations at the Joliet (IL) and Cassadaga (NY) Job Corps centers to implement corrective action before the students returned from the winter break.

We have also developed a joint OIG-ETA action plan to methodically address and remedy problems at our poorest performing centers. This plan will be implemented in the early months of 1995 and includes: 1) stronger emphasis on past performance when competitive contracting decisions are made; 2) conduct of an in-depth analysis of the poorest performing centers by OIG teams to identify common factors contributing to poor performance; 3) development of a technical assistance guide that will help center contractors and managers make more effective use of data reports to identify and remediate performance problems; 4) provision of special training to key management staff at 10 of the poorest performing centers; 5) intensive onsite technical assistance at least 3 of the poorest performing centers; 6) establishment of procedures that will allow for accelerated termination and replacement of poor performing center contractors; and 7) development of a legislative proposal to permit contracting out the management and operation of the 30 federally administered Civilian Conservation Centers to private

000648



contractors where the agency has failed to perform adequately. In assessing performance, success in program outcomes, the levels of violence, and cost-related factors, consistent with the recommendations of the National Performance Review, would be considered.

ETA also is ready to embark on a set of far-reaching policy and programmatic initiatives that will strengthen Job Corps student outcomes and improve the cost effectiveness of the program. These measures include:

1) Establishing an initial 30-day probationary or trial enrollment period for new enrollees during which a student would be expected to demonstrate a personal commitment to succeeding in Job Corps, and the labor market or leave the program. Corps participants would be expected to sign a written pledge to that effect. Job Corps provides students with an opportunity to change their lives. It is up to each student to take advantage of the opportunity Job Corps provides.

2) Adopting a new requirement that new students be drug-free as a condition for enrollment in Job Corps. This is based on the premise that a student's commitment to succeed at Job Corps is an empty promise unless the student is drug free upon arrival at the Job Corps center.

3) Restricting enrollment of younger students. In our discussions with the OIG, it was agreed that Job Corps should be viewed primarily as an avenue for disadvantaged young adults to move successfully into the labor market. It was further agreed that, with high school age youth (17 year olds and particularly 16 year olds), it was more difficult to obtain a realistic commitment for labor market entry upon completion of the program. **Therefore, ETA proposes to eliminate enrollment of 16 year olds altogether and to impose a 15% cap on the enrollment of 17 year olds.**

008202

4) Reallocating existing resources to strengthen job placement and follow-up services. Currently services terminate with a student's initial job placement (which is defined as employment obtained within 6 months after leaving the Job Corps). We plan to conduct follow up in the 13th week after the initial placement and to provide any additional placement services and support needed up to the maximum period of 6 months. We intend to make sure that the entrance into the labor market for Job Corps grads is permanent.

5) Seeking legislative authority to ease access to social security and unemployment insurance data to improve our ability to evaluate longer term results of program participation. This will aid our ability to measure the Job Corps return on taxpayer investment without relying exclusively on impact evaluations.

**Summary**

America has always defined itself as a country in which everyone must have the opportunity to take charge of their lives to pursue the American Dream -- especially the young. Job Corps is one of few ways we have created to make that opportunity real for the children of the poor.

Unlike too many social service programs, Job Corps rejects victimization and demands responsibility. It deplores dependence and offers independence and self-reliance. And for those willing to work hard, it opens the doors out of a world of poverty, crime, and substance abuse into the American mainstream of work, family and citizenship. Boot camps offer a responsible last chance to young convicted criminals. It would be ironic if similar opportunities were not available to those from the same barrios, ghettos, and areas of rural poverty who were law abiding.

The Job Corps mission of providing a "second chance" to high schools dropouts is more important than ever. The decline in the fortunes of Job Corps' target population over the period since the Mathematica study was completed is distressing. From the

0006



later 1970s to 1992, the employment rate among recent high school dropouts has plummeted from 50% to 36%. And those who are employed earn less. The real earnings of young high school dropouts who are employed full-time have dropped almost 25% since the late 1970s. And crime rates -- especially violent crime rates -- have increased among young people.

The bottom line, Madam Chairman, is that Job Corps works to provide at-risk young people with a chance to take personal responsibility for their lives. It is not perfect. It needs further significant improvement as we have outlined today. But it works.

In close collaboration with you and the other members of the Congress, the Administration is convinced we can make it even better.

Thank you.

008203

January 06, 1995

The Honorable Paul Simon
462 Dirksen
Senate Office Building
Washington D.C. 20510

Dear Senator Simon:

I restate the need for continuation of the Job Corps program as expressed in previous correspondence. Though the true viability of Job Corps is often overlooked, the need for this service is at an all time high not only to our country and state but also to Indian tribes.

As Congress begins to evaluate job training programs I wish to make known the significance of Job Corps to at-risk youth. I am certain you know of the staggering statistics facing young people today, however, national figures are increased and even doubled for Indian people. We consider Job Corps an effective solution to the problems of our area as we strive to become independent and to shape our youth into solvent adults.

We extend our appreciation to you and your colleagues for this review and express a desire that Job Corps continue for the benefit of the youth of our nation.

Thank you for your attention and support.

Sincerely,

Wilma P. Mankiller,
Principal Chief

INTERNATIONAL BROTHERHOOD *of*
**Painters and Allied Trades**

*Consisting of*

House, Sign, Pictorial, Scenic, Machinery and Transportation Painters; Paperhangers, Hard Wood Finishers, Grainers, Varnishers, Enamelers, and Gilders; All Workers in Glass Used for Architectural and Decorative Purposes; All Workers Engaged in Preparing, Manufacturing and Handling of Lead, Color, Oil, Lacquer, Varnish, and Paint; All Workers Engaged in Applying Linoleums and Carpet for Decorative or Acoustical Purposes, and Allied Workers.

*dress of Writer* 615 West Genesee Street

*on No.* 31 *of* Syracuse, New York 13204

The Honorable Paul Simon
Senate Labor and Human Resources Committee
462 Dirksen Senate Office Building
Washington, DC 20510

January 17, 1995

Dear Senator Simon:

I am writing this letter to express my strong support of the Job Corps Program. I believe in Job Corps because for the last 30 years it has helped 1.5 million formerly disadvantaged young people prepare and prove themselves in the working world.

The Job Corps program has helped thousands of at-risk youth to break the cycle of poverty and welfare dependence by providing the vocational training and job placement young people need to become tax-paying citizens.

In terms of employment and economic development, I consider Job Corps one of the Federal Government's most effective programs. Considering the population it serves, it is amazing to note that a majority of all Job Corps participants get jobs, join the military or go on to further education.

This modest investment in our nation's youth results in a return that is far more valuable than the dollars spent on the program. For 30 years, Job Corps has helped young people between the ages of 16 and 24 gain marketable skills, self confidence and good jobs. These young people are poised to support themselves and their families and to contribute to the overall productivity of our nation.

Senator, I request that you take an objective look at all of the data, not just concentrating on anecdotal presentations. After examining more than 200 IG Audits, countless GAO reports, and the performance statistics tracked by the Department of Labor, you will find that Job Corps works.

Sincerely,

[signature]

000650

January 11, 1995

The Honorable Paul Simon
United States Senate
462 Dirksen Senate Office Building
Washington, D. C. 20510

Dear Senator Simon:

On January 18 and 19, Senator Kassebaum will be holding hearings on the Job Corps. Before you make any considerations, I would ask you to tour a center to see for yourself why Job Corps is the best residential training program in the world



Yes, the costs are high - $21,000, but an orphanage is $36,000 a year, jail is $25,000 a year and in jail nothing is done to rehabilitate the person. Job Corps is a bargain for the taxpayers; and, if the states get a hold of it, Job Corps will just turn into another high school for the kids to drop out of.

I would urge you to consult with Senators Hatch and Bennett and let them tell you about the success stories of the Clearfield and Weber Basin Job Corps Centers in Utah. I believe you will be pleasantly surprised.

Best wishes to you and yours in 1995

Very truly yours,

[signature]

John O. Crosby

Dear Senator Simon,

I understand that you and your committee will be holding hearings on Federal Job Training Programs in the near future. I would appreciate your consideration in leaving the Job Corp Program as is because of the following.

1. A Job Corp Center is located in my neighborhood and they are **Great** neighbors to me and my subdivison. It would take much more than a few lines to express to you the countless, positive things they have accomplished.
2. The **Turner Job Corp Center, Albany, GA**, has 1030 students from all over the U.S. They teach these students Academic, and Vocational Training, along with how to become a Positive, Productive, Taxpaying Citizen!!! (we both know how important that is)
3. As a war veteran, taxpayer, neighbor and entrepreneur, allowing the Turner Job Corp Center Program to remain a productive, cost - effective government training program would be most beneficial to all concerned

*It is cheaper to **Educate** than to Incarcerate!!!
Incarceration price per year per person $ 28,000.00
Job Corp price per year per person $18,000.00
Thank You for Your time and Concern Please come to South Georgia (Albany) and see for yourself.

Best Personal Regards,
Sincerely,

[signature]

W Lamar Houston,
**Owner**

008204

Dear Senator Simon:

I am writing to share some insight with you concerning my support of the Job Corps program and my views as a police officer concerning the David L. Carrasco Job Corps Center in El Paso, Texas.

During the Kennedy-Johnson Administration, the Job Corps was created to provide a vehicle for under-privileged youth to find hope and success through education and training. This program was an alternative to the formal educational system in each

community and El Paso, Texas, was fortunate to be the recipient of a Job Corps Center. This program provided our youth a great opportunity away from the negative influences in their community, helping them avoid the potential of engaging in criminal behavior or possible incarceration. I've seen the results of falling into a pit of despair by dealing with the criminal element on a daily basis.

The Job Corps Center, in El Paso, is the vehicle envisioned by its creators. It provides the avenues for hope and success for the youth of our community. This vision was also shared by the late David L. Carrasco when he opened the center in 1970. The community did not relish the idea. During its inception, many problems arose between police and Job Corps students. However, these problems were minor compared to the opportunity this great program has brought our community. This community understands and supports the impact Job Corps has made on thousands of young people, their families, and this community.

Since 1971, I have been involved with our Job Corps Center being a police officer with the El Paso Police Department and more recently, as the Director of Public Safety for the El Paso Community College. Our community recognizes the need for this federally funded program. This enables the entire Center staff to energize its efforts towards student success rather than constantly seeking operational funds from local or state entities.

Therefore, I urge you to examine your options. If necessary, cut the non-productive centers; but, leave the doors open to the future of millions of youth across the United States. I am confident your hearings will find Job Corps programs can be as effective as the David L. Carrasco Job Corps Center with effective leadership and great community support. Let the vision live!

Respectfully,

Luis R. Mier
Director
Department of Public Safety
El Paso Community College
919 Hunter Dr.
El Paso, Tx. 79915

0006

Dear Senator Simon:

In view of your recent concern of the effectiveness of job training programs and knowing the great contribution that our David L. Carrasco Job Corps Center has made in our own El Paso community we write this letter.

Through personal experience we know the benefits that our Job Corps Center training programs have brought to thousands of young people who were on a collision course to failure. The program offered corps members a second chance to becoming productive and contributing adults. The center not only assisted them with attaining job skills but offered a nurturing and caring family of staff members to support them through it all. As employees of the El Paso Community College we are partners in this endeavor of service to students. By the way, one of the Job Corps strongest aspects is the extraordinary support they receive from the community through active participation in the Community Relations Council.



Through this Council participation Armida Navarrete our program secretary and I have personally interviewed hundreds of these corps members over the past 10 years, getting to know them before and after their Job Corps experience. The effectiveness of any program is evident in its product, and the evidence are the placements. You may already know the Job Corps program here in El Paso is tops in the nation.

We ask that you to please look at our track record and successful placement of graduates and plead that you continue supporting our disadvantaged youth the Authors of El Paso's and our Country's Future by maintaining federal funding for the David L. Carrasco Job Corps Center.

With kind regards, we thank you for any consideration you can give this request.

Respectfully,

Mary K. Yanez
Senior Adult Program, Coordinator

Armida Navarrete
Secretary

Dear Senator Simon

The New Year brings a big challenge to the 104th Congress for changes and reform I believe that reform is very much needed However, you have to be careful how the reform is going to take place

I am writing to you about the Job Corps I believe that the centers should be evaluated individually and find out whether they are producing or not Whather they are accomplishing their goals or not Weather they have the support of the community Whather the students learn and are place in jobs I don't believe all centers should be penalized because some do not produce or meet their goals

The David L Carrasco Job Corp Center in El Paso is one of the best in the nation The center has been recognized for a number of years I don't believe that this center should have its funding decrease or eliminated If they were not doing the job I would certainly favor cutting their funding

Check with the Labor Department and find out about the center in El Paso I hope that you consider this suggestions

Hoping to hear from you I remain

Sincerely,

José I Aguilar
3707 Cumberland
El Paso, Texas 79903

## Prepared Statement of Jamison Gorby

Hello, my name is Jamison Gorby. I am a student at the Red Rock Job Corps Center. I've been there for five months. Let me tell you about my background and how Job Corps has helped me.

008205

I guess my worst problems began when I was 11 years old. I grew up in a small town called Cochranton. It's just south of Erie, Pennsylvania. This was way out in the country. When I was 4, my parents divorced. I was living with my mother, and she remarried and moved to California when I was 12. I just could never adjust to my life out there because of the environment and because I couldn't really accept my parent's divorce.

I couldn't live at home. I couldn't take it. So I lived on the streets. For 2 years in California, I made my living by signing. In case you don't know what signing means, it's when you stand on the street corners and hold up a sign that says "will work for food or wages." I lived under bridges and inside of abandoned houses. I had no permanent address. I mowed lawns and painted fences. Because at the time I was too young to get a job. Today, I still think that many people have misperceptions about homeless people and think that they are out there because they don't try to better themselves and that they can't be trusted.

It wasn't as dangerous on the streets as you might think. I had friends at the time, other people on the street who would watch out for me. We all had nicknames. Mine was Indy or Taz. One day a man picked me up, fed me, and gave me a job working with him at a towing company. I stayed with him for approximately a year, and then he called my mother to come and get me. I was ready for a secure place to call home. She gave me a plane ticket to get to my father's house back in Cochranton, Pennsylvania. I was 15 years old.

I really didn't know my father or his wife. It was a hard adjustment, especially with my stepmother. One night we had a fight and I left to stay overnight at the neighbors. The next day, a foster care social worker got me. After my foster home experience, I was moved to a group home called Bethesda, in Meadville, Pennsylvania, a town near Cochranton. I was not used to such a structured environment and I still was unemployed. Then my dad gave sole custody to my uncle. I moved once again, and tried to live with my uncle in Erie, Pennsylvania. He was a former pastor and history teacher and we could never seem to relate well. I worked temporarily at the country fair, and then I was off to another group home. Most of the time, I just felt terribly angry, but gradually I realized that I wanted to do something



more with my life. A friend told me about Job Corps. I really wanted a new start. I wanted something to turn me around, and help me wipe the slate clean. I wanted to get educated and do something with my life -- and get it right for once!

Making the decision to enter Job Corps was a big step for me.

I've been at Job Corps for five months. In that time I've earned my GED and I've been chosen as Academic Student of the Month. When I compare Job Corps to the other places I've been, I see that it is more of a challenge. I get to deal with new people, and I have learned to live with different people. I don't find Job Corps too structured — unlike a group home where we didn't seem to have any freedom or rights at all. I can still be who I am at Job Corps. I have the opportunity to succeed because I have total support from everyone.

This kind of support makes me feel good. I've never had that in my life. It makes me want to push myself even more. I plan to complete brick masonry as a trade, and I want to get my advanced training in brick too. Then I'm going to get a job. I adjust better now. I've been to enough places and I know it's time to settle down. I plan to get a job in Pennsylvania. It's my home and it's in my blood.

I still keep in touch with my parents, my uncle and some of my friends. They are all so pleased with my progress. When I earned my GED, I handed it to my dad, and he had tears in his eyes. He said, "See, we knew you could do it, with a little help." And thanks to God and Job Corps, I did it.

Out of all the places I've been, Job Corps has been the only place to make such a difference in my life and give me direction I've never had. Even though I am young, I feel like I am speaking from years of experience because I have lived on the streets. I've lived in foster homes, with relatives, with friends. But Job Corps is the first place I've felt in control of my life. Without Job Corps, I would have to pick up my sign again. I hate to think of that.

December 30, 1994

Senator Nancy Landon Kassebaum
SR-302 Russell Senate Office Building
Washington, DC 20510-1602

Attn: Ted Verheggen
Chief Labor Counsel

Dear Senator Kassebaum:

My name is Harvey L. Arrowood. I have been involved with the Job Corps Program since 1979. I am currently the Regional Director for the AFL-CIO Appalachian Council Job Corps Project in Region V.

On May 23, 1994 I sent Congressman David Obey and Senators Herb Kohl and Russell Feingold a plan that I believe, if implemented, would redefine Job Corps' objectives and make Job Corps a model program for generations to come. I am enclosing a copy of that letter and plan for your assessment.

I would like to go on record as saying that I support the Job Corps program with every fiber of my body and believe it to be one of the finest programs of its kind ever developed by the U.S. government. I have dedicated the rest of my working life to helping Job Corps attain the goals set down for it at its inception. However, in recent years I have witnessed a steady decline in the effectiveness and end product of the program.

Job Corps is currently mired in a statistical chasm that will necessitate rudimental changes if we are to improve Job Corps' outcome. These changes must take place throughout the entire spectrum that governs the program.

I believe if left unchecked Job Corps will continue on its present path to self-destruction, having been placed, intentionally or unintentionally, in an environment in which no program, no matter how well conceived, could function.

I am most encouraged by the recent national attention focused on Job Corps and applaud your efforts in making Job Corps a more efficient and responsible program.

I would like to offer my assistance in this endeavor. I would appreciate an opportunity to testify at the upcoming sub-committee hearings regarding the Job Corps. I believe my 15 years experience and having worked in the program through four different administrations would provide invaluable testimony.

I will avail myself to your requests.

Thank you for your consideration.

Sincerely,

Harvey L. Arrowood

Harvey L. Arrowood
R 19901 Konkel Road
Hatley, WI 54440

000653



May 23, 1994

The Honorable David Obey
Congress of the United States
2462 Rayburn House
Washington, D.C. 20515-4907

Attn: Kathleen Sykes
Legislative Assistant

Dear Congressman Obey:

Please allow me a brief introduction:
My name is Harvey L. Arrowood. I am currently the Regional Director for the AFL-CIO Appalachian Council Job Corps Project. I began my career as a Field Staff Representative responsible for screening and placement in northern Wisconsin. I held that position for 9 years. I was then promoted to Field Staff Liaison. In this position I was responsible for all communications between staff, management, and the U.S. Department of Labor. I held that position for 4 years. I have held my current position for the last 2 years. I have a total of 15 years experience with the Job Corps program.

Over the last 15 years, I have witnessed many changes in the Job Corps program. I am most concerned with the direction in which Job Corps seems to be moving. I feel the Job Corps has evolved into a program of statistics rather than a program of job training. The current emphasis seems to be geared toward placement. I think the emphasis should be directed toward keeping the students at the center long enough to complete their trade and/or obtain a G.E.D. certificate. Far too many youth are leaving the centers without training and/or G.E.D. certificates. I believe if we are successful in keeping the students at the centers longer, the job placement after training will take care of itself. I feel the time is right for a re-inventing of the Job Corps.

I am submitting a plan that, if adopted, would move Job Corps successfully into the 21st Century. This plan is very cost efficient and can be implemented with a minimum disruption of services. My plan is as follows:

An orientation center would be established in each region. In regions where large populations are present, there may be a need for more than one orientation center. These orientation centers could be one of the proposed new centers, or they could be an existing center. All newly incoming students would arrive at this center where they would be tested; counseled; receive a physical exam, psychological exam (if needed), background check, suitability for the program, and possible G.E.D. testing. The student would remain at this center for 2 to 4 weeks. These orientation centers must be operated by an agency of the U.S. Government. I do not believe they could be successful if they were operated by a for profit company.

The orientation centers will be the key to the success of this plan. Incoming youth will have an opportunity to feel the Job Corps experience; and, Job Corps will have the opportunity to screen out any youth who would not benefit from the program before enrollment at a training center. After completion of orientation center requirements, students would be sent to one of the Job Corps training centers in the region. These training centers must be specialized.

I believe one of the most serious problems facing the Job Corps at present is the alarming number of students leaving the program each

008207

week, or the WTR (Weekly Termination Rate). The WTR seems to be at a much higher rate for younger students than it is for older students. Under the current structure, centers must try to meet the needs of all students. I believe this to be an improbable task. I feel the centers would be much more productive and obtain better results if they were able to specialize and be responsible for only a select group.

I am enclosing an outline showing the proposed orientation center, trades at centers, and center restrictions. This is merely a rough draft. It is intended to visually depict an idea.

If you feel these proposed changes warrant consideration, I would appreciate an opportunity to meet with you in person to further discuss this plan.

Thank you for taking the time to read this letter.

Sincerely,

Harvey L. Arrowood

Harvey L. Arrowood
R 19901 Konkel Road
Hatley, WI 54440




000654



**U.S. Department of Labor**

Assistant Secretary for
Employment and Training
Washington D.C. 20210

January 27, 1995

The Honorable Nancy L. Kassebaum
Chairman, Committee on Labor
and Human Resources
United States Senate
Washington, D.C. 20510

Dear Madam Chairman:

This is in response to your letter of January 24 requesting additional information to be submitted for the record of the Job Corps Oversight Hearings. Our responses to your questions are enclosed.

I spoke with Ted Verheggen of your staff and am eager to meet with you next week to set out next steps. We look forward to working with you to strengthen the Job Corps program.

Sincerely,

Doug Ross

008208

RESPONSE TO QUESTIONS ON JOB CORPS

1. Job Corps' Zero Tolerance Policy on Violence on Centers

   a. What is the precise definition of this policy?

      A copy of the policy which was issued in June 1994 is attached. Based on the results of the on-site assessments underway, the policy will be supplemented with additional requirements as well as technical assistance material to share best practices in implementation.

   b. Is it mandatory for all centers?

      Implementation of a zero tolerance for violence policy is mandatory for all centers.

   c. What type of behavior is considered grounds for disciplinary termination?

      A student is issued an immediate disciplinary termination when convicted of a serious crime (felony), is confined under sentence for more than 60 consecutive days; or under judicial sentence, is banished from the municipality, county or State where the individual's center is located.

      Each center operator is required to establish rules and ... for students and provide a role for student

related activities, violations of safety standards or rules, coercive or assaultive behavior, and other instances of misconduct as set forth in the center's rules. Students who test positive for drugs and are required to participate in the Alcohol and Other Drugs of Abuse (AODA) program may be terminated for failure to comply with their behavioral contract. Due process for students in such cases includes a Center Review Board, a formal decision by the Center Director for termination, and an opportunity to appeal an adverse action to the Regional Office.

d. What is the policy regarding termination for violating the Zero Tolerance Policy on violence? Is it "one strike and you're out" or a more gradual approach?

As noted above, it is currently the responsibility of each center operator to develop specific rules of conduct and sanctions for misconduct for that center. We are developing additional requirements designed to ensure that center disciplinary systems consistently address violent acts without imposing detailed procedural requirements from the Federal level.

e. If Job Corps' Zero Tolerance Policy was implemented in June 1994, why did the director wait until December 7, 1994, to order immediate on-site inspections of 28 problem centers?

The Zero Tolerance policy was announced in June. On-site reviews were initiated six months after the issuance of the policy to ensure that centers had full opportunity to operationalize the policy and to enable full assessment of center implementation of the policy. The on-site assessments for high risk centers (16) were scheduled to be conducted right before the holiday break so that any serious concerns with the ability of center management to ensure the safety and security of students could be addressed during the break, before students returned in January. Additional centers were assessed prior to the holiday break; assessments continue and will be completed for all 111 centers in March 1995.

2. <u>Job Corps Performance Measurement System</u>

Several witnesses testified that these statistics have been manipulated by individual centers directors to give them more favorable ratings in terms of average length of stay (ALOS), student terminations, GED, and vocational trade completion.

The Job Corps Student Pay, Allotment and Management Information System (SPAMIS) was designed to ensure that centers are accountable for data entered into the database. The Job Corps Policy and Requirements Handbook contains specific rules governing inputting, changing and deleting data, especially those elements that may impact PMS (performance measurement system) reporting. These rules and required audit trails make abuse difficult. Specific information is provided below.

000655



a. Is the system vulnerable to abuse?

The system is difficult to abuse because of the system design that requires auditability of database data back to source documents, enforced by reviews conducted by regional Job Corps staff and audits by OIG staff. Other specific controls are in place as described below.

b. Explain the Job Corps policies for ensuring that center statistics are protected from intentional manipulation or distortion.

The Job Corps Policy and Requirements Handbook (PRH) is very specific in defining procedures for areas and functions that may be vulnerable to compromise. In the functional area of student pay (enrollments, status changes, terminations, conducting pay, reporting non-pay statuses, etc), the PRH specifically mandates the separation of functions and duties, ensuring that staff that enter information that generates pay are prohibited from distributing that pay. As for data integrity, the Job Corps has identified specific data elements that, if manipulated, could have PMS reporting implications. The PRH mandates that changes made to these data elements be authorized and documented by supervisory staff and that the center director, or an alternate designated in writing, sign the transaction print-out identifying the change. This document is retained on center and is a review item on regional office conducted reviews.

c. What has Job Corps done in terms of oversight to improve the accuracy of these center statistics and to prevent would-be abuse.

The Job Corps conducts reviews of center operations which includes audits of database data back to source documents. The SPAMIS system prohibits the changing of data after a specified period of time after termination, and since PMS reports are cumulative, any temporary changes made to influence short term PMS results would be correctly reported in the cumulative reports. We have recently began designing and developing software modules that will scan data to identify possible violations of policy as regards status change and termination requirements in specific cases. <u>The results of our testing thus far do not indicate abuse in these areas</u>.

3. <u>Center Contractor Evaluation</u>

a. What are the most important criteria for judging a center contractor's performance?

Performance against standards for reading and math gains, GED attainment, vocational completion, placement of all terminees, placement of vocational completers in training related jobs, average wage rate, average length of stay, and quality (including a safe learning and living environment) and compliance rating are the major criteria. In Program Year 1995, a student survey will be used to initiate a measure for customer satisfaction.

008209

b. Do the criteria include A.L.O.S. and Weekly Termination Rate?

Average Length of Stay is one of nine formal performance standards. Weekly Termination Rate was eliminated as a performance standard for PY 1994 because it was being misinterpreted by some center directors in a way that was not in the best interest of students. Consideration will be given to eliminating the ALOS standard as well for PY 1995.

c. If a center operator permits the actual number of students to fall consistently below the contractual on-board strength (OBS) number, can the operator be disciplined? Can the operator's contract be canceled if the OBS is not met on a consistent basis?

Job Corps outreach/screening contractors, not center operators, are responsible for recruiting a sufficient number of students to keep centers at capacity. An operator's contract would not be canceled because the center was not at capacity. Center contracts are Cost Reimbursement Plus Fixed Fee (CPFF), which means that the amount of profit (fee) the contractor receives is not dependent on the number of students enrolled.

4. Center Operator Performance Impact

a. What role does a center operator's past performance play in the consideration of that operator's bid on a center?

Past performance is one of the criteria used in the evaluation of proposals for center operations; this criterion is worth 15 points out of 100.

Offerors submitting proposals for operation of a center must submit information on what their performance has been at other centers or, if not a current center operator, what their experience has been in related areas. Regional Directors solicit input from all other regions regarding an offeror's past performance and check references for offerors which have no previous Job Corps performance record. In looking at past performance, proposal reviewers evaluate this information as well as performance data of all centers operated by the offeror over the past 3 years, audit information, and center quality and compliance assessments.

b. If a center operator loses a contractor for poor performance, does Job Corps have a policy to conduct a review of all other centers operated by that contractor?

No. Each center, and each contract, is considered on its own merits. However, past performance is an important criteria in procurement evaluations. Poor performance in any of the other centers operated by that contractor would be identified in their annual review.

c. The Department of Labor announced in early January that the Vinnell Corporation was awarded the contract to run the McKinney Job Corps Center in Texas. Please explain the rationale for that decision. What was Vinnell's performance record when it ran the Gainesville JCC? Why were they replaced by a different operator? Has Vinnell ever lost any Job Corps center contracts due to poor performance? If so, which ones and when?



Vinnell was selected to operate the McKinney Job Corps Center because the corporation operates the top performing center in the Dallas region (the Laredo Job Corps Center); they are familiar with the student population, regional economy, etc.; and they have the staff capability and resources to move in and take over operation of the center on short notice. The Job Corps Regional Director has confidence that the application of the successful approaches used at the Laredo, Texas center will address the problems identified at McKinney.

Vinnell took over the operation of the Gainesville Job Corps Center in December 1989. The option year which would have become effective December 1993 was not awarded for performance reasons. The contract was extended for 120 days, until March 1, 1994, to allow time for a competitive procurement to be conducted. Vinnell lost the contract for operation of the center through this competitive procurement process which resulted in the selection of another operator.

5. Job Corps Admission Policy Change

To be enrolled in Job Corps, the statute requires that a student "...be free of medical or behavioral problems so serious that the individual could not adjust to the standards of conduct, discipline, work, and training which the Job Corps involves..."

a. Has Job Corps or the Department of Labor changed its policies so that students with behavioral and medical problems are admitted to the program?

There has been no policy change. The files of any applicants who have a history of behavioral problems must be reviewed by the Job Corps regional office for final eligibility determination. The files of applicants who have medical problems must be reviewed by the Job Corps regional office in consultation with regional health consultants for final eligibility determination. These reviews are required to determine whether or not an applicant's problems are "so serious that the individual could not adjust..."

b. If so, what was the date of the policy change?

As indicated, there was no policy change.

c. On whose authority was this made?

N/A

6. Sexual Discrimination Lawsuit Against Center Operator

One witness at the hearings testified that a sexual discrimination lawsuit was filed in 1992-1993 against the center operator of the Laredo JCC. The lawsuit was reportedly settled out of court, and the plaintiff received a cash settlement of $165,000.

a. Who was the center operator of the Laredo JCC at the time of the lawsuit?

Vinnell was the operator at the time of the lawsuit.

b. Who paid the cash settlement? The center operator or the Job Corps regional office in Dallas? Were public funds used to pay this lawsuit settlement?

008210

An out of court settlement was paid from funds in the Vinnell center operations contract. When we questioned the appropriateness of such charges to the contract, we discovered that direct charges to the contract for legal and settlement costs were approved by the cognizant audit agency for this contractor, the Defense Contract Audit Agency. We are conducting research to determine if it is legally possible to include special provisions in Job Corps contracts which would make such charges as direct costs to the contract unallowable.

c. Are center operators penalized for these kinds of discrimination lawsuits by Job Corps if the complaints are to be accurate?

A center operator's performance in all areas is evaluated during center reviews and is considered as part of past performance in procurements. Any pattern of inappropriate personnel practices would influence past performance evaluations negatively.

June 16, 1994

MEMORANDUM FOR: ALL JOB CORPS REGIONAL DIRECTORS
ALL JOB CORPS CENTER DIRECTORS
ALL JOB CORPS CENTER OPERATORS
ALL NATIONAL TRAINING AND SUPPORT CONTRACTORS
ALL OUTREACH, SCREENING AND PLACEMENT CONTRACTORS

000657

FROM: PETER E. RELL
National Director
Job Corps

SUBJECT: Job Corps' Zero Tolerance for Violence Policy

As I stated in my remarks to the Job Corps Policy Forum on March 9, the top priorities for the Job Corps for this year are; (1) Placement, and, (2) effectively dealing with violence on our centers.

I believe these two priorities are directly related. If students feel threatened or unsafe at any center, they "vote with their feet" and leave before gaining any real benefit from the program.

The evidence strongly suggests that the greatest single factor causing students to leave our program early is violence. Obviously, students who leave before completing their vocational training or, in some cases, their academic program, has a direct and very negative impact on our placement effort.

Most of our centers have done an excellent job controlling negative behavior and provide a safe and secure environment for their students.

However, given the rising tide of adolescent violence in many of the communities from which our students are recruited, we believe <u>now</u> is the time for our program to initiate a new Job Corps-wide effort to ensure that a safe and secure environment is the norm at all of our centers for all of our students.

During the past several months we have had a number of discussions with Regional Directors, center operators, center staff and others who are involved with our program on the subject of how best to address the issue of violent behavior (including the threat of violence) in the Job Corps. In the course of these



discussions, the term "Zero Tolerance for Violence" has emerged as the most accurate "label" for the environment that we wish to achieve and maintain at all of our centers.

While no one has objected to the <u>concept</u> of a "Zero Tolerance for Violence", there have been questions about how we define Zero Tolerance and what are the specific implications for changes in policies and procedures relating to center operations.

At this point, I propose that we attempt to "define" Zero Tolerance in broad terms so as to allow operators the freedom to decide for themselves exactly how to implement this policy at their centers. Again, at this point, I propose that we not attempt to mandate for each operator specific rules or guidelines for implementation of this policy on their centers.

However, to establish some parameters, I would suggest the following required procedures for all operators:

- All <u>acts</u> of violence or <u>threats</u> of violence will be aggressively and promptly addressed by center staff. No violent act or threat of violent act will be ignored or disregarded.
- The Social Skills Training (SST) curriculum will be fully and consistently implemented at every center.
- All applicants to Job Corps will be required to sign a pledge or statement at the application stage promising not to engage in violent behavior or threatening violent behavior while they are enrolled in our program.
- The Zero Tolerance for Violence policy will be addressed early during the center's Orientation program and reenforced throughout the students' tenure in the program.
- Regional Office Annual Reviews of centers will closely examine the actions the center has taken to address the violence question. This would include, but not be limited to, specific questions on: student surveys addressing their perceptions of violence or the threat of violence; the role of the center's security staff and how effective they appear to be in ensuring the safety and security of the students; and, in general, what procedures the center has implemented to comply with the Zero Tolerance Policy.

I recognize that some Regions, operators and centers have already implemented this policy and that interpretations of what the policy actually means ranges from "one strike and you're out" to intensive counseling for first-time violent offenders with a disciplinary discharge occurring only after the second or third offense.

For the present, I am willing to allow for this diversity in interpretation if the alternative is to formulate a comprehensive, all-inclusive, detailed set of rules for the implementation of this policy which may not meet the needs of each and every center or even be sensible for the individual situations at each center.

I look forward to working with you in the implementation of this Zero Tolerance for Violence Policy.

008211

TO: Madame Chairman, Nancy Kassebaum

SUBJECT: Curlew Job Corps, Wauconda, Washington

DATE: 01/26/95

**AFFIDAVIT OF CHRISTIE MILLER**

STATE OF WASHINGTON )
) ss.
County of Pierce )

THE UNDERSIGNED, being first duly sworn on oath, states:

This is my account of rape, attempted rapes, assaults, knife attacks, burglary, attempted burglary, drug dealing, drug abuse and theft at the Curlew Job Corps center at Wauconda, Washington.

INCIDENTS

Incidents that I either witnessed or had first hand knowledge of during and after my employment with the Job Corps Center. To the best of my knowledge no punitive action was ever taken by the responsible supervisors, Wayne Tapp and John Davis, regarding the incidents described below. In fact, the responsible supervisors have consistently attempted to cover up these heinous crimes, exposing both students and Job Corps staff to extreme acts of violence and danger.

After the responsible supervisors, Wayne Tapp and John Davis, failed to take action, I was personally the victim of an attempted gang rape, the target of a knife-throwing student, the victim of a severe beating, and the target of a burglar who was practically naked. In each case Wayne Tapp and John Davis refused to either investigate or punish the students thereby encouraging future acts of violence. I was told by Wayne Tapp and John Davis that as a

000658

RAPE

federal employee I did not have the same legal rights as a civilian employee. Furthermore, they intimidated me by threatening to terminate me and soil my employment record. I was single, and



solely responsible for the care of my infirm grandmother, who was wholly dependent upon my income for her survival.

As a result of the physical and emotional attacks upon me, I began to suffer excruciating bouts of anxiety, fear, and depression. Ultimately, the stress caused me to seek medical and psychological treatment.

My treating physicians have diagnosed my symptoms as acute clinical depression, bulimia, and post traumatic stress syndrome. Since my receipt of medical disability compensation, my former supervisors, Wayne Tapp, John Davis, Robert Lynn Scott and Ed Schultz, have waged a war of retaliation, attempting to discredit my testimony and veracity.

I am terribly afraid of further retaliation as a result of my testifying on the public record. However, I cannot allow what I have seen to go unrecorded. The Job Corps as it is managed now is neither a safe haven for needy youth nor a safe place for employees.

DATE OF INCIDENT: On or about 10/27/86

PLACE OF INCIDENT: Curlew Job Corps, Wauconda, Washington

CENTER DIRECTOR: Wayne Tapp

NAME OF VICTIM: Lawrence Clair Arial / Corpsmember

NAMES OF ALLEGED PERPETRATORS: Corpsmembers: Robert McNeeley, Charles Spiker, Jim Wayne Muldoon, Lonnie S. Young, Edward Rudat.

On 10/27/86 Lawrence C. Arial was sexually tortured, beaten and raped for over two (2) hours. The intercom security system which by Job Corps policy was supposed to be activated was not turned on. Furthermore, contrary to Job Corps policy, there were no Corps personnel in the vicinity. The attack included forced sex, masturbatory ejaculations on Arial's face and head, beatings, verbal harassments, ridicule, and future threats of violence to ensure that the attack would not be revealed.

The residual effects of the attack devastated Arial's life. Contrary to Job Corps policies, no medical attention was given to

008212

Arial. The Job Corps Center's physician was never called, although John Davis and Wayne Tapp were immediately notified of the incident. Arial was not taken to a hospital, nor did the Corps provide any services for recovery.

Lawrence C. Arial was left to fend for his own physical, mental and emotional well being. Despite the severity of the experience that Lawrence C. Arial had been subjected to, Wayne Tapp planned to put this young victim on a bus to Tacoma, Washington alone. Because Arial was one of my culinary arts students and I was his instructor, I personally drove him to his parents' home.

Contrary to Job Corps policy, Lawrence C. Arial was never given a CA-1 Injury Report to fill out. However, records of the attack should be part of the public record at the Ferry County Courthouse in Republic, Washington.

It is my understanding that Lawrence C. Arial retained counsel from the law firm of Rush, Hannula and Harkins in Tacoma, Washington, and that a lawsuit was settled in his favor for an undisclosed amount. It is my further understanding that Lawrence C. Arial is still suffering greatly from the sexual attack and torture he endured while a Corps member at the Curlew Job Corps Center directed by Wayne Tapp.

The leader of the attackers was Charles Spiker who had a long-known history of violence, and had previously nearly killed a corpsman with a hammer. As the oldest student, he was a primary instigator of physical and sexual attacks. Many employees had attempted to have Charles Spiker dismissed from the Job Corps. I believe that the only reason he was not dismissed was to keep the enrollment numbers high to insure future Job Corps funding. In fact, I discovered that the Curlew Job Corps was deliberately keeping Corps members on the books long after they had left the center, or were terminated or were AWOL. Others who were ready to leave the program were discouraged from doing so.

I questioned John Davis, Work Programs Officer, about this record keeping. Specifically, I wanted to know why those students



who had been terminated were still on the record. John Davis told me if tried to talk to anyone about this, he would "nail me to the wall."

## RAPE

In January, 1988 I was alone in my office in the dining hall. Five (5) student Corps members came into my office. There was only one exit. One of the students stood by the door as a look-out while the others held me down and attempted to have oral sex with me. There was a lot of noise upstairs and no one could hear me screaming. I was punched repeatedly in the face, neck and chest. They attempted to grab my ankles, and tore my shirt off. They tore my pants down and attempted to have intercourse with me. I fought the best I could for nearly twenty (20) minutes and eventually succeeded in freeing myself.

The memories of the incident have never left me. I immediately reported the incident to Wayne Tapp's wife, Nancy Tapp, who was a good friend of mine. Soon after, I reported the incident to one of the Corps counselors. The director, Wayne Tapp, was notified by both the counselor and his wife that I had been attacked and yet I was forced to continue to teach with the same students and I was provided with no further protection. Furthermore, no follow-up investigation was made nor were the students punished.

## KNIFE ATTACK

A student Corps member by the name of Shawn Matkin, who had a known history of drug abuse and violence, attacked me in the kitchen with a knife. This was witnessed by Jim Windsor, Job Corps staff member. According to Job Corps policy, I immediately filled out an incident report and according to procedure, filed it with my supervisor, Al Reddicks. To the best of my knowledge, no measures were ever taken. I was provided with no additional security. The

008213

student Corpmans was never punished and I was forced to continue to work in this dangerous environment.

ATTEMPTED RAPE/BURGLARY

Late one evening while I was alone in my trailer, a drunken student Corps member dressed only in his underwear attempted to break into three (3) different houses, trying to find me. He first broke into the cook's supervisor's house. He then attempted to break into Wayne Tapp's house and then Jerry and Alice Mitchell's house. Wayne Tapp's wife, Nancy, was terrified by this incident. When the Corpsman was caught a short time later by Wayne Tapp, he confessed that he was trying to find my home.

To the best of my knowledge, no criminal charges were ever brought against the Corps member. Furthermore, contrary to Job Corps policy, no Incident Reports were ever filed by either Wayne Tapp or John Davis.

000

BEATING

Another assault that I suffered in the dining hall was by student Corps member Dean Troyer. Dean Troyer had started a fight in the dining room, and as a supervisor it was my responsibility to defuse the altercation. I instructed the other student Corps members to break up the fight. Dean Troyer came into my office, grabbed my arm, punched me in the face and chest, grabbed my arm again and slammed me into the door. There were over seven (7) witnesses to this incident. According to the Job Corps policy, I filed an Incident Report with my supervisor, Al Reddicks. Al Reddicks was so angry with me that he demanded I produce the original Incident Report which I kept in my files. I implored my supervisor to remove Dean Troyer from the dining hall. His response was to become angry with me for reporting the incident. Not only was Dean Troyer not removed from the dining hall, but he was also never punished. Later, he attacked another employee named Jan Clark. In spite of the fact that Dean Troyer had a long history of violence at the Job Corps Center, he was retained.



SEXUAL DEVIANCY

As I was going down stairs to the kitchen in the Job Center's dining hall, a Corpsman named Wes Burchard started masturbating in front of me. I immediately filed an Incident Report with John Davis. Davis laughed and told me it was normal. To my knowledge, no action was taken at that time. Later, Wes Burchard was caught masturbating in front of another young student Corps member in the showers. It was only after this and other intimidating incidents that he was sent to a mental hospital for evaluation. I was informed shortly after that he had raped a patient at that hospital. It is my understanding that the Job Corps knew that Wes Burchard had a violent history and a criminal record. It is my belief that none of my Incident Reports of this individual was ever filed.

ARSON

Two (2) female cousins who were open members of the Tacoma Crips were allowed to enter the Job Corps. One of them was enrolled in the culinary arts program under my direction. There were many incidents to describe. However, the most dangerous involved one of the cousins setting fire to a mattress in her dormitory. To my knowledge, no formal charges were ever filed against this student Corpsman. As a result of this incident of arson and the failure of the director to take any criminal actions, I feared for my life.

DRUG DEALING

In the Fall of 1987, I was sent to northern California with approximately twelve (12) or more Job Corps members as part of a cooking crew to help fight the Seiad fire. We were stationed on the site for approximately six (6) weeks. As a supervisor of these Corps members, I discovered several individuals abusing and dealing marijuana, cocaine and alcohol. According to Job Corps policy, I filed Incident Reports on several individuals and called the Curlew

008214

Job Corps Center and notified them of the violations. All of the Corps members admitted to abusing the drugs and alcohol and signed their respective reports. However, when the Corps members returned to the Center, Wayne Tapp refused to file these Incident Reports, contrary to Job Corps policy.

When I returned to the Curlew Job Center from California, I was called into Wayne Tapp's office. At that time Wayne Tapp demanded to know whether I had ever drunk alcohol on the job. I denied the accusation and to my shock I was told to "forget about the drug bust."

Wayne Tapp's decision to ignore the drug bust had a serious impact on my safety and standing at the Center. This sent a tacit signal to the student Corp members that their behavior would go unpunished. This put me in grave danger and soon after was when I suffered the above-mentioned rape.

## HEALTH AND HYGIENE VIOLATIONS

In spite of the fact that I filed multiple Incident Reports, I was forced to work on shift with a student Corps member named Brian Yaeger, who wore his pants halfway down his buttocks. However, most offensive was Mr. Yaeger's hygiene. Often Mr. Yaeger had defecated in his pants and continued to wear them throughout his shift. Although I continued to file Incident Reports regarding these ongoing health, sanitary and hygiene violations, to my knowledge my supervisor never filed them. In another incident a student Corps member under my supervision complained of sickness. I sent him to the Job Corps Center's sickhall. The nurse denied treatment and directed the student Corpsman to return to work. We later discovered that the Corpsman suffered from hepatitis. As a result of this, over two hundred (200) people in the Job Corps had to receive hepatitis shots. To the best of my knowledge, the nurse directed Al Reddicks to have all students work whether they were sick or not.

00051



## MY SUFFERING

When I applied for the Job Corps Center's position of Cook Instructor, the job description stated that I would be working with "disadvantaged youths". However, the application interview failed to warn me that the disadvantaged youths with whom I would work alone and at night had long criminal histories of rape, assault and even murder. Furthermore, I was never warned that rape, beatings, burglary, theft, arson, drug use and abuse, alcohol use, drug dealing, sexual harassment and discrimination, and the fraudulent reporting of retention records and other documents would be a part of my Job Corps experience. These were daily realities of the Curlew Job Corps in Wauconda, Washington.

I was never warned that by accepting this position I would be put in harm's way. I have never encountered such terrifying and horrific realities within a workplace. The blatant ongoing disrespect for human dignity which I witnessed in the Job Corps infrastructure has scarred me.

Since the night of my first attack, I have suffered horrible nightmares, which continue to this day. The emotional and psychological damage I suffered as a result of the incidents at the Job Corps Center have disabled me. I have suffered from bulimia, nightmares, headaches, clinical depression, fear, and acute anxiety.

Eventually, I was unable to meet my duties at the Job Corps, and as I began to break-down psychologically, my treating physician prescribed one (1) month of sick leave. I requested advance sick leave from Wayne Tapp. I was told by John Davis before I left that I could not discuss any of the problems that I had experienced at the Job Corps Center with anyone, especially Dee Wedell who was at the time in charge of the Job Corps Department of Labor in Seattle. John Davis warned me that if I told anyone he would make sure that it would backfire on me. Wayne Tapp also told me that I could not talk to anyone in the Union.

008215

RETALIATION

Contrary to Job Corps policy, John Davis altered my timeslip on one pay period that I know of. I was determined to file a grievance and expressed my concerns to an employee of the Job Corps named Sandy Evans. Unbeknownst to me, Sandy Evans was having an affair with Wayne Tapp, to whom she is now married. Sandy Evans warned me that if I filed a grievance, that Wayne Tapp and John Davis would fabricate false information and do anything to hurt me.

When Wayne Tapp learned that I was filing for Worker's Compensation, he told me that if I applied for Worker's Compensation, it would "hurt my work record" and he "would not under any circumstances ever pay for someone not to work." During this last meeting with Wayne Tapp and John Davis, I was also told that I should, "quit my job and go on food stamps." Once again I was warned not to apply for Worker's Compensation. Contrary to Job Corps policy and federal law, Wayne Tapp refused to file my Worker's Compensation claim. It was not until William Howard of the Office of Worker's Compensation (OWCP) in Seattle warned Wayne Tapp at least twice of the legal ramifications for not filing a claim, was the claim filed, after two and one half months.

Almost immediately after I was gone on sick leave, Wayne Tapp and John Davis broke into my locked file cabinet and stole my personal files, and confidential records, including medical records. Furthermore, many copies of my Incident Reports were taken as well. When I confronted John Davis on the telephone about his breaking into my personal files, he told me, "I can break into anything I want at any time." They did not know that I had copies of my daily notes, including several of the Incident Reports and records which disappeared from my personal file. Those records have never been returned, despite reperted requests to John Davis and Wayne Tapp.

000662



CONCLUSION

The Job Corps knowingly and willingly receives gang members, criminals, sociopaths and sexual deviants within their program. However, the Job Corps fails to inform their employees that these individuals are anything other than "disadvantaged youths." The Job Corps knowingly and willingly continues to alter and inflate student roster lists. Students who have exhibited continued acts of violence remain undisciplined, uninvestigated and unrecorded so that the Job Corps may maintain their inflated rosters.

I continue to suffer as the result of the experiences at the Job Corps Center. At this time, I continue to be the subject of continued harassment and retaliation by members of the Job Corps Center and the U.S. Forest Service. It is my understanding that my confidential personnel files and medical records including the progress notes of my psychological therapy have been disseminated to these institutions without my permission or knowledge. After nearly seven (7) years from the date of these incidents I continue to suffer from the attacks and retaliation of Job Corps representatives who at this time have begun to wage a new war to deny me Worker's Compensation benefits. Their preposterous contention is that my testimony is a complete fabrication. Should this investigation request further information, I am prepared to provide complete documentation including names, addresses, social security numbers and dates of birth of perpetrators, and names of

008216

witnesses to all of the aforementioned incidents, including some copies of the Incident Reports which disappeared from the stolen files in my office.

Respectfully submitted this 27th day of January, 1995.

Christie Miller
CHRISTIE MILLER

SUBSCRIBED AND SWORN to before me this 27th day of January, 1995.

Jeanne L. Hoskinson
NOTARY PUBLIC in and for the State of Washington residing at Gig Harbor
My Commission Expires: 11-21-95

Senator JEFFORDS. So I thank everyone for coming, and with that, I will declare the hearing closed, leaving the record open for such additional material as may be appropriate.

[Whereupon, at 1:45 p.m., the committee was adjourned.]

O

000663

008217

witnesses to all of the aforementioned incidents, including some copies of the Incident Reports which disappeared from the stolen files in my office.

Respectfully submitted this 27th day of January, 1995.

Christie Miller
CHRISTIE MILLER

SUBSCRIBED AND SWORN to before me this 27th day of January, 1995.

Jeanne L. Hoskinson
NOTARY PUBLIC in and for the State of Washington residing at Gig Harbor

My Commission Expires: 11-21-95

Senator JEFFORDS. So I thank everyone for coming, and with that, I will declare the hearing closed, leaving the record open for such additional material as may be appropriate.

[Whereupon, at 1:45 p.m., the committee was adjourned.]

○