# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## ADDENDUM 7

## DOCUMENT 1

---

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# EASTERN DIVISION
# AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTA GAIL PIKE | ) | C.C.A. No.: E2009-00016-CCA-R3-PD |
| Appellant, | ) | |
| v. | ) | KNOX COUNTY<br>Case No. 68280 |
| STATE OF TENNESSEE, | ) | Post-Conviction |
| Appellee. | ) | (CAPITAL CASE) |

ON APPEAL AS OF RIGHT FROM THE JUDGMENT OF
DIVISION THREE OF CRIMINAL COURT FOR THE SIXTH JUDICIAL DISTRICT
AT KNOXVILLE, KNOX COUNTY, TENNESSEE

---

## BRIEF OF THE APPELLANT

---

Donald E. Dawson, BPR # 010723

Avram Frey[1]

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331

Counsel for Christa Gail Pike

**ORAL ARGUMENT REQUESTED**

[1] Tennessee Bar membership pending the results of the July 2009 bar exam.

## Table of Contents

Table of Authorities viii

Issues Presented for Review xv

Preliminary Statement xix

References Used in this Brief xxiii

Statement of the Case 1

Statement of the Facts 2

I. Lead Counsel William Mr. Talman stole $67,027 from the Indigent Defense Fund. 2

II. Ms. Pike's case presented an enormous challenge. 4

III. The Trial Court appointed conflicted, incompetent counsel. 4

IV. Defense Counsel constructively forfeited Ms. Pike's case in the sentencing phase. 7

A. Ms. Pike's Trial Counsel Presented Limited, Unpersuasive, Piecemeal Evidence during the Penalty Phase. 9

1. Ms. Pike's Aunt, Carrie Ross 9

2. Ms. Pike's Father, Glenn Pike 11

3. Ms. Pike's Mother, Carissa Hansen 12

B. Armed with Dr. McCoy's Three-Volume Mitigation Materials and Social history, the Prosecutor Exposed Damaging Evidence on Cross-Examination 13

C. Mr. Talman called no Medical or Mental Health Experts During the Sentencing Phase, but Instead Relied on the Jury's Recollection of Unpersuasive Expert Testimony from the Guilt/Innocence Phase. 15

D. Ms. Pike's Counsel Did Not Argue that Ms. Pike's Mental illness Rendered her Insufficiently Culpable for the Death Penalty in Sentencing Phase Opening and Closing Arguments 18

V. Ms. Pike's Counsel had Access to a Body of Penalty Phase Evidence that Would Likely Have Resulted in the Jury's Returning a Verdict of Life. 19

A. Ms. Pike Presented a powerful Mitigation Case on Post-Conviction. 19

1. Three Common Characteristics of Violent Killers. 20

2. Evidence of Brain Damage 21

a. Expert Testimony 22

b. Lay Witness Testimony 23

3. Evidence of Mental Disorder 24

a. Dr. Kenner's Testimony 24

b. Lay Witness Testimony 26

4. Evidence of Childhood Abuse and Neglect. 29

a. Early Trauma 29

b. Neglect 30

c. Physical Abuse 35

d. Sexual Abuse 37

e. Overstimulation 39

f. Glorification of Violence 42

g. PTSD 44

h. Circumstances Directly Preceding Ms. Slemmer's Killing 44

i. Religious Confusion 46

5. Evidence of Ms. Pike's Positive Traits. 47

B. Ms. Pike's Post-Conviction Mitigation Case was Readily Available for Presentation at the Time of Trial. 50

1. Availability of Expert Testimony Regarding Brain Damage. 50

2. Availability of Expert Testimony Regarding Mental Illness. 52

a. Bipolar Disorder was the Proper Diagnosis 52

b. Evidence of Borderline Personality Disorder Would Nonetheless Been Persuasive. 53

i. Dr. McCoy 54

ii. Dr. Engum 58

iii. Opening and Closing Arguments 58

C. Availability of Lay Witnesses. 58

VI. Trial Counsel Conducted no Meaningful Voir Dire. 62

VII. Ms. Pike's Trial Counsel Negotiated Media Rights to Ms. Pike's Story During their Representation of Her. 62

Argument

Introduction and Standard of Review 63

I. Ms. Pike was Deprived of the Right to Unconflicted Counsel in Violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution. 63

A. Mr. Talman was Conflicted after Stealing from the Indigent Defense Fund and Lying to the Court in the Course of Ms. Pike's Trial. 64

B. Strickland Prejudice is not Required, but is Nonetheless Present 73

C. Counsel were Conflicted as a Result of Procuring a Release of Media Rights from Ms. Pike 77

D. The Lower Court Erred in Finding Ms. Pike's Conflict Claims "Waived." 79

II. Ms. Pike was Denied the Right to the Effective Assistance of Counsel 80

A. Deficient Performance 81

1. Penalty Phase Deficiency Regarding Proof of Insufficient culpability 81

a. Failure to Present Mitigation Evidence in Counsel's Possession 82

b. Failure to Discover Relevant Mitigation Evidence 86

i. Brain Damage 86

ii. Mental Illness 88

ii. Testimony of Lay Witnesses 90

c. Disclosure of Protected Work Product to the Prosecutor 90

d. Failure to Present effective Penalty Phase Arguments 92

e. Failure to Conduct Meaningful *Voir Dire* 93

f. Failure to Object to the State's Suggestion of a Legally Inconsistent Aggravating Factor 97

2. Guilt/Innocence Phase Deficiency Regarding Lack of Intent 99

a. Failure to Present Evidence to Undermine the Elements of First Degree Murder 99

b. Failure to Make Effective Arguments 101

c. Failure to Make effective Use of *Voir Dire* 103

B. The Showing of Prejudice 103

1. Penalty Phase Prejudice 103

a. Ms. Pike Presented a Complete and Moving Case for Mitigation on Post-Conviction 103

i. Evidence Explaining Ms. Pike's Lesser Culpability 104

ii. Evidence Portraying Ms. Pike's Positive Attributes 107

b. The Mitigation Case Presented at Trial did not Come Close to Approximating Ms. Pike's Post-Conviction evidence in Mitigation 107

c. The Aggravating Evidence did not Overwhelm Ms. Pike's Post-Conviction Mitigating Evidence 108

2. Guilt/Innocence Phase Prejudice 109

III. Under the Constitutional Understand of the Requirements for a Categorical Bar to Execution Set out by the supreme Court in Atkins and Roper, Ms. Pike, an Immature, Mentally Ill, Brain Damaged Eighteen Year Old is not Eligible for the Death Penalty 110

A. The United States Supreme Court and the Supreme Court of Tennessee limit execution to "the worst of the worst" by examining the characteristics of particular groups under three factors. 111

B. Under the Above Three-Factor Test, Execution of Older Adolescents Must be Categorically Barred. 114

1. Objective Indicia of Contemporary Public Values Suggest Opposition to Execution of Older Adolescents 115

a. Proportionality Analysis Reveals that Older Adolescents are not Physiologically Capable of Full Culpability for Their Crimes. 116




Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 6 of 196 PageID #: 8877

b. The Diminished Culpability of Older Adolescents Cannot be Adequately Protected Through Presentation of Mitigating Evidence. 117

C. Under the Three-Factor Gregg Test, the Cognitively Impaired and Mentally Ill must be Spared Execution. 118

1. Public Values do not Support Execution of the Cognitively Impaired 118

2. Execution of the Cognitively Impaired is no Proportional Punishment Under the Tennessee and Federal Constitutions. 120

3. Execution of the Cognitively Impaired Serves no Useful Purpose, and Therefore Amounts to unnecessary Infliction of Pain 122

D. Due Process and equal Protection Require extension of Roper and Atkins to Older Adolescents and the Cognitively Impaired, respectively. 123

E. The Combination of Older adolescence, Mental Illness, and Brain damage Requires Categorical Exclusion from the Death Penalty 124

IV. Striking a Qualified Juror for Cause is a Structural Defect Requiring Reversal of Ms. Pike's Conviction and Sentence 124

V. The Court Below Erred by Failing to Recuse Itself in this Matter 126

A. The Post-Conviction Court was Disqualified from Deciding Petitioner's Post-Conviction Claim because Judge Leibowitz had Personal Knowledge of Material Facts in Dispute. 126

B. In Light of the Nature of Ms. Pike's Post-Conviction Claims, a Reasonable Person Would Have Considered the Post-Conviction Court Incapable of Impartial Adjudication of Ms. Pike's Post-Conviction Petition. 130

VI. The Appointment of Counsel with an Active Conflict Known to the Court Constitutes Structural Error Requiring that both Ms. Pike's Conviction and Sentence be set Aside. 131

VII. Ms. Pike was Denied her Due Process Right to Effective Representation on Appeal 132

A. The ABA Guidelines Establish the Standard of Practice. 133

B. The Appellant Counsel Rendered Deficient Performance by Failing to Raise the Following Issues. 133

1. The Appointment of Counsel with an Active Conflict Known to the Court Constitutes Structural Error Requiring that both Ms. Pike's Conviction and Sentence be Set Aside. 133

2. Striking a Qualified Juror for Cause is a Structural Defect Requiring Reversal of Ms. Pike's Conviction and Sentence. 134

3. Permitting the Jury to Consider the Avoiding Arrest Aggravating Factor, After Permitting a Conviction for Conspiracy to Commit Murder, Denied Ms. Pike her Rights Under the State and Federal Constitutions. 134

4. Failing to Challenge the Constitutionality of the Death Penalty by Failing to Argue the Issues set out in Section VIII, Below. 134

VIII. Ms. Pike's Death Sentence Should be set aside due to the Unconstitutionality of Tennessee's Death Penalty Scheme; Lethal Injection; Infringement of Ms. Pike's Fundamental Right to Life; and Lack of Grand Jury Indictment. 134

A. The Tennessee Death Penalty Scheme is Unconstitutional 134

B. Executing Ms. Pike by Means of Lethal Injection would Violate her Rights Under Art. 1§§ 8 and 16 Tenn. Constitution and Amendments 8 and 14, U.S. Constitution. 135

C. The Death Sentence is Unconstitutional because it Infringes upon Ms. Pike's Fundamental Right to Life, and Imposition of the Death Penalty is not Necessary to Promote any compelling Tennessee State Interest. 135

D. The Indictment Returned by the Grand Jury was Unconstitutional. 136

Conclusion 137

Certificate of Service 137



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 8 of 196 PageID #: 8879

## Table of Authorities

**Cases**:


Adams v. Texas, 448 U.S. 38 (1980) ........ 95

Amedeo v. State, 384 S.E.2d 181, 182 (Ga. 1989) ........ 87

Apprendi v. New Jersey, 530 U.S. 466 (2000) ........ 136

Atkins v. Virginia, 536 U.S. 304 (2002) ........ passim

Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975) ........ 80

Beaver v. State, 475 S.W.2d 557 (Tenn. Crim. App. 1971) ........ 125

Beets v. Scott, 65 F.3d 1258 (5th Cir. 1995) ........ 77

Billy-Eko v. United States, 8 F.3d 111 (2d. Cir. 1993) ........ 80

Bolen v. Young, 455 N.E. 2d 1316 (1982) ........ 128

Boykin v. Webb, 541 F.3d 638 (6th Cir. 2008) ........ 71, 78

Brent v. State, 929 So.2d 952 (Miss. Ct. App. 2005) ........ 130

Bush v. Gore, 531 U.S. 98 (2000) ........ 135

Campbell v. State, 904 S.W.2d 594 (Tenn. 1995) ........ 132

Ciak v. United States, 59 F.3d 296 (2d Cir. 1995) ........ 80

Coker v. Georgia, 433 U.S. 584 (1977) ........ 111

Coleman v. State, 2007 WL 1651882 (Tenn. Crim. App. June 7, 2007) ........ 80

Cooper v. State, 849 S.W.2d 744 (Tenn. 1993) ........ 132

Cottingham v. Cottingham, 193 S.W.3d 531 (Tenn. 2006) ........ 132

Cuyler v. Sullivan, 446 U.S. 335 (1980) ........ 71, 73

Davis v. State, 598 S.W.2d 582 (Mo. Ct. App. 1980) ........ 129

Disciplinary Counsel v. Holland, 835 N.E.2d 361 (Ohio 2005) ........ 70

Enmund v. Florida, 458 U.S. 782 (1982) ........ 111

Ex parte Adkins, 687 So.2d 155 (Ala. 1996) ........ 130

Evitts v. Lucey, 469 U.S. 387 (1985) ........ 132

Ford v. Wainwright, 477 U.S. 399 (1986) ........ 111, 118, 136

Furman v. Georgia, 408 U.S. 238 (1972) ........ passim

Goad v. State, 938 S.W.2d 363 (Tenn. 1996) ........ passim

Government of Virgin Islands v. Zepp, 748 F.3d 125 (3d Cir. 1984) ........ 70

Gray v. Mississippi, 481 U.S. 648 (1987) ........ 125

Gregg v. Georgia, 428 U.S. 153 (1976) ........ passim

Henyard v. State, 689 So.2d 239 (Fla. 1996) ........ 117

Holloway v. Arkansas, 435 U.S. 475 (1978) ........ 132

Jackson v. Commonwealth, 266 Va. 423 (Va. 2003) ........ 117

Johnson v. Zerbst, 304 U.S. 458 (1938) ........ 79

Jorbert v. Hopkins, 75 F.3d 1232 (8th Cir. 1996) *cert. denied* 518 U.S. 1029 (1996) ........ 132

Kansas v. Marsh, 548 U.S. 163(2006) ........ 110

McCullough v. State, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003) ........ 70

McFarland v. Yukins, 356 F.3d 688, 706 (6th Cir. 2004) ........ 71

Maitland v. Zanga, 14 Wash. 92 (1896) ........ 129

Medellin v. Dretke, 371 F.3d 270 (5th Cir. 2004) ........ 117

Mickens v. Taylor, 535 U.S. 162 (2002) ........ passim

Momon v. State, 18 S.W.3d 152 (Tenn. 1999) ........ 71, 72, 78

Morgan v. Illinois, 504 U.S. 719 (1992) ........ 95, 96

Netters v. State, 957 S.W.2d 844 (Tenn. Crim. App. 1997) ........ 71

Oesby v. United States, 398 A.2d 1 (D.C. App. 1979) ........ 93

Olim v. Wakinkona, 461 U.S. 238 (1983) ........ 135

Parker v. State, 3.So.3d 974 (Fla. 2009) .......... 82, 83

Penry v. Lynaugh, 492 U.S. 302 (1989) .......... 104, 112

People v. Alvarez, 926 P.2d 365 (Cal. 1996) .......... 129

Potka v. State, 2002 WL 65993 (Tenn. Crim. App. Jan. 18, 2002) .......... 80

Pylant v. State, 263 S.W.3d 854 (Tenn. 2008) .......... 7263, 80

Ring v. Arizona, 536 U.S. 584 (2002) .......... 136

Roper v. Simmons, 543 U.S. 551 (2005) .......... passim

Rugiero v. United States, 330 F. Supp. 2d 900, (E.D. Mich, 2004) .......... 70

San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1973) .......... 136

Satterwhite v. Texas, 486 U.S. 249 (1988) .......... 132

Smith v. Kemp, 715 F.2d 1429 (1983) .......... 133

Smith v. State, 1997 WL 658993 (Tenn. Crim. App. Oct 23 1997) .......... 80

Solina v. United States, 709 F.2d 160 (2d Cir. 1983) .......... 71

Stamford v. Kentucky, 492 U.S. 361 (1989) .......... 115

State v. Banks, 271 S.W.3d 90, (Tenn. 2008) .......... 102

State v. Berry, 141 S.W.2d 549 (Tenn. 2004) .......... 136

State v. Burns, 6 S.W.3d 453 (Tenn. 1999) .......... 63

State v. Coffelt, 2006 WL 2310597 (Tenn. Crim. App. Aug. 8, 2006) .......... 771

State v. Culbreath, 30 S.W.3d 309 (Tenn. 2000) .......... 70

State v. Davis, 141 S.W.3d 600 (Tenn.2004) .......... 110

State v. Garrard, 693 S.W.2d 921 (Tenn. Crim. App. 1985) .......... 130

State v. Harris, 989 S.W.2d 307 (Tenn. 1999) .......... 134

State v. Hartman, 42 S.W.3d 44 (Tenn. 2001) .......... 116

State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992) .......... 98

State v. Nichols, 877 S.W.2d 722 (Tenn. 1994) ........ 91, 92

State v. Oody, 823 S.W.2d 554 (Tenn. Crim. App. 1991) ........ 71

State v. Pike, 978 S.W.2d 904 (Tenn. 1998) ........ passim

State v. Pritchett, 621 S.W.2d 127 (Tenn. 1981) ........ 134

State v. Rodriguez, 254 S.W.3d 361 (Tenn. 2008). ........ 126

State v. Savage, 577 A.2d 455 (N.J. 1990) ........ 87

State v. Schiefelbein, 230 S.W.3d 88 (Tenn. Crim. App. 2007) ........ 91, 92

State v. Taylor, 968 S.W.2d 900, (Tenn. Crim. App. 1997) ........ 81

State v. White, 114 S.W.3d 469 (Tenn. 2003) ........ 71

Stein v. Professional Center, 666 So. 2d 264 (Fla. App. 1996) ........ 128

Strickland v. Washington, 466 U.S. 668 (1984) ........ passim

Swain v. Alabama, 380 U.S. 202 (1965) ........ 96

Terrell v. United States, 6 F.2d 498 (4 Cir. 1925) ........ 129

Thompkins v. Cohen, 965 F.2d 330 (7th Cir. 1992) ........ 71

Thompson v. Oklahoma, 487 U.S. 815 (1988) ........ 112, 115

Tyler v. Swenson, 427 F.2d 412, 415 (8th Cir. 1970) ........ 129

United States v. Cancilla, 725 F.2d 867 (2nd Cir. 1984) ........ 71

United States v. Greig, 967 F.2d 1018 (5th Cir. 1992) ........ 70, 72

United States v. Halley, 240 F.2d 418 (2 Cir. 1957) ........ 129

United States v. Hearst, 638 F.2d 1190 (9th Cir. 1980) ........ 77, 79

United States v. Levy, 25 F.3d 146 (2d Cir. 1994) ........ 71

United States v. Lowry, 971 F.2d 55 (7th Cir. 1992) ........ 70

United States v. Montana, 199 F.3d 947 (7th Cir. 1999) ........ 70

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) ........ 15

United States v. Ricks, 775 F.2d 455 (4th Cir. 1985) .......... 96

Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001) .......... passim

Wainwright v. Witt, 469 U.S. 412 (1985) .......... 93, 95, 125

Wiggins v. Smith, 539 U.S. 510 (2003) .......... passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) .......... 124,148

Woodson v. North Carolina, 428 U.S. 280 (1976) .......... 135

Zant v. Stephens, 462 U.S. 862 (1983) .......... 98, 134


**Statutes and Rules**:


United States Constitution, Fourth Amendment .......... 136

United States Constitution, Fifth Amendment .......... 134, 136

United States Constitution, Sixth Amendment .......... passim

United States Constitution, Eighth Amendment .......... passim

United States Constitution, Fourteenth Amendment .......... passim

Tennessee Constitution, art. I, § 6 .......... 136

Tennessee Constitution, art. I, § 7 .......... 136

Tennessee Constitution, art. I, § 8 .......... passim

Tennessee Constitution, art. I, § 9 .......... passim

Tennessee Constitution, art. I, § 16 .......... passim

Tennessee Constitution, art. I, § 17 .......... 134, 135

Tennessee Constitution, art. II, § 2 .......... 134, 135

Tennessee Constitution, art. XI, § 8 .......... 134

Model Penal Code § 4.01 (2008) .......... 119, 120

Model Rules of Prof'l Responsibility R. 1.8(d) .......... 77

Tenn. Code Ann. § 20-9-301 .......... 102

Tenn. Code Ann. § 39-2-203(j)(7) (1982 Repl) ........ 115

Tenn. Code Ann. § 37-1-134(a)(1)(1996 Repl) ........ 115

Tenn. Code Ann. § 39-13-203 ........ 111, 118

Tenn. Code Ann. § 39-13-204(i)(5) ........ 4

Tenn. Code Ann. § 39-13-204(i)(6) ........ 97, 98

Tenn. Code Ann. § 39-13-204(j)(7) ........ 96, 115

Tenn. Code Ann. § 40-23-114 ........ 135

Tenn. Code Ann. § 40-30-105(b) ........ 130

Tenn. R. Crim. P. 16(b) ........ 91

Tenn. R. Crim. P. 26.2 ........ 92

Tenn. R. Evid. 705 ........ 92

Tenn. Sup. Ct. R. 8, Canon 5 ........ 77

**Other Authority**:

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (2003) ........ 133

Ariana Levinson, Lawyering Skills, Principles and Methods Offer Insight As to Best Practices for Arbitration, 60 Baylor L. Rev. 1 (2008) ........ 101

David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 26.32 (1985) ........ 102

Freedman, *The Professional Obligation to Raise Frivolous Issues in Death Penalty Cases*, 31 HOFSTRA L. REV. 1167 (2003) ........ 133

Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299 (1983) ........ 81, 96

John Blume, et al., Probing "Life Qualification" Through Expanded Voir Dire, 29 Hofstra L. Rev. 1209 (2001) ........ 97

Laura Mansnerus, "Damaged Brains and the Death Penalty," New York Times, July 21, 2001 ........ 118

Kevin Drew, "Executed Mentally Ill Inmate Heard Voices Until End," CNN, January 7, 2003 .......... 118

Margaret Covington, Jury Selection: Innovative Approaches to Both Civil and Criminal Litigation, 16 St. Mary's L. J. 575 (1985) .......... 97

Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?, Colum. L. Rev 1538 (1988) .......... 116, 120

Tools for the Ultimate Trial: the Tennessee Death Penalty Manual, Vol. II (3rd ed. 1992) .......... 81

## ISSUES PRESENTED FOR REVIEW

I. Was Ms. Pike Deprived of the Right to Unconflicted Counsel?

A. Did Mr. Talman's having over billed the Indigent Defense Fund by at least $67,027 between 1990 and 1993 and the resultant Petition for Discipline by the Board of Professional Responsibility that was pending during the entirety of his representation of Ms. Pike create a conflict of interest?

B. Did Mr. Talman's lie to the Trial Court and Prosecutor about the date on which he had received materials from the mitigation specialist create a conflict of interest?

C. Did Mr. Talman further mislead the court by suggesting that it was the mitigation specialist's delay that made him unable to provide an answer to the State's query regarding the existence of a report or summary in the mitigation materials?

D. Is the existence of an actual conflict of interest proven by Mr. Talman's decision not to call his mitigation expert as a witness; thus forfeiting over 90% of his prepared sentencing phase proof?

E. Does the evidence preponderate against the finding of the Post-Conviction Court that the reasons Mr. Talman gave at post-conviction for not calling the mitigation specialist to testify were credible?

F. Did Ms. Pike's Trial Counsel create yet another conflict when they had Ms. Pike agree they could make a profit selling her life story?

II. Was Ms. Pike denied the effective assistance of counsel?

A. Did Trial Counsel's failure to present the mitigation evidence in their possession fall below the standards for performance required of defense counsel in a capital case?

1. Did Trial Counsel's plan of putting all of the mitigation evidence in through the mitigation specialist fall below the standards for performance required of defense counsel in a capital case?

2. Did deciding not to call the mitigation specialist or any other expert to explain Ms. Pike's past behavior as it related to her diagnosed mental illness fall below the standards for performance required of defense counsel in a capital case?

3. Did failure to present the vast majority of the information prepared by the mitigation specialist fall below the standards for performance required of defense counsel in a capital case?

B. Did Trial Counsel's failure to investigate various red flags showing brain damage fall below the standards for performance required of defense counsel in a capital case?

1. Did Trial Counsel's failure to investigate the cause of Ms. Pike's seizures as a young child or the abnormal EEG when she was fourteen months old constitute deficient performance?

2. Did failure to further investigate Ms. Pike's mother's alcohol ingestion during pregnancy with Ms. Pike constitute deficient performance?

3. Did failure to further investigate various indicia that something was wrong with Ms. Pike that came from other witnesses constitute deficient performance?

4. Did failure to further investigate for brain damage due to Ms. Pike's head going through the windshield in a car accident constitute deficient performance?

C. In light of the lack of explanation for Ms. Pike's behavior and for her seizures as a child, did Counsel fall below the standards for performance required of Defense Counsel in a capital case by failing to utilize the services of a medical doctor -particularly a neurologist – to examine Ms. Pike?

1. Was it reasonable for Trial Counsel to have accepted Dr. Engum's determination of no brain damage when they had not provided him with a thorough social history of Ms. Pike?

2. Should death penalty defense counsel have sufficient knowledge of mental health issues to know the limitations of a psychologist's expertise?

D. Was it deficient performance for Trial Counsel not to have learned that Ms. Pike suffered from PTSD and a Bipolar Disorder rather than Borderline Personality Disorder?

1. Since Bipolar Disorder requires a linear evaluation of an individual's conduct over time, was it deficient performance not to provide the psychologist with a complete social history?

2. Was it deficient performance not to secure the services of a medical doctor, either a neurologist or a psychiatrist to evaluate Ms. Pike?

3. Was it deficient performance not to have interviewed various staff members at the juvenile institutions in which Ms. Pike was housed and who had worked extensively with her?

E. Did Trial Counsel's opening and closing arguments in the penalty phase of Ms. Pike's capital trial fall below the standards for performance required of defense counsel in a capital case?

F. Was Trial Counsel's performance deficient in that they failed to conduct a meaningful voir dire?

1. Did Trial Counsel's performance fall below the standards for performance required of defense counsel in a capital case when they facilitated the court's decision to strike a *Witherspoon-Witt* qualified juror for cause?

2. Was it deficient performance not to ask questions that would life qualify the jury?

3. Was it deficient performance, in light of the facts of this case, not to voir dire on issues of attitudes about interracial dating, satanic worship, and mental illness?

4. Was it deficient performance not to ask questions that would have revealed whether the prospective jurors were aware of the over billing scandal or Mr. Talman's role as a major violator?

G. Did Trial Counsel's failure to object to the State's use of inconsistent theories by first seeking conviction for conspiracy to commit murder and premeditated murder and then utilizing the avoid arrest aggravating factor to obtain a death penalty fall below the standards for performance required of defense counsel in a capital case?

H. Was Trial Counsel's performance in the guilt phase deficient by failing to substantiate Ms. Pike's inability to form intent?

I. Did Trial Counsel fall below the standards for performance required of defense counsel in a capital case in their use of a psychiatrist who had never examined Ms. Pike to attempt to prove lack of intent – especially by utilizing the psychiatrist as a expert in Satanism and opening the door permitting the Prosecutor to present a vast amount of evidence related to Ms. Pike and Mr. Shipp's dabbling in the occult?

J. Did Trial Counsel's deficient performance prejudice the outcome of the guilt-innocence phase of Ms. Pike's capital trial?

K. Did Trial Counsel's deficient performance prejudice the outcome of the sentencing phase of Ms. Pike's capital trial?

III. Does the Constitutional understanding of the requirements for a categorical bar to execution set out by the Supreme Court in Atkins and Roper, require a categorical bar from the death penalty for Ms. Pike, an immature, mentally ill, brain damaged 18 year old?

A. Should older adolescents whose brains are still developing be included in the categorical bar?

B. Should seriously mentally ill defendants be included in the categorical bar?

C. Should older adolescents who are seriously mentally ill and who suffer brain damage affecting the frontal lobe functions be excluded from the death penalty?

IV. Did the striking of Mr. Rutherford, a *Witherspoon-Witt* qualified juror, for cause constitute a structural defect to Ms Pike's capital trial requiring the reversal of her conviction and sentence?

V. Was the Post-Conviction Court required to recuse itself from hearing Ms. Pike's Petition for Post-Conviction Relief because the Court below had introduced structural error into Ms. Pike's capital trial and because the court relied on its own un-cross-examined testimony on a critical issue?

VI. Did the appointment of an attorney with an active conflict known to the court at the time of appointment constitute a structural error that requires that Ms. Pike's conviction and sentence be vacated?

A. Did the appointment of an attorney with a pending petition for discipline for a highly publicized theft from the state indigent defense fund constructively deny Ms. Pike the right to counsel?

B. Does the appointment of Mr. Talman, under the known disabilities facing Mr. Talman "bear directly on the 'framework within which the trial proceeds,'" thereby rendering the entire trial a denial of due process?

VII. Was Ms. Pike denied her right to the effective assistance of counsel on appeal?

VIII. Should Ms. Pike's death sentence be set aside due to the unconstitutionality of Tennessee's death penalty scheme; lethal injection; infringement of Ms. Pike's fundamental right to life; and grand jury indictment?

# PRELIMINARY STATEMENT

Christa Pike never had a chance. She suffered a brain injury prior to birth. She was born into a childhood of abuse and neglect, Post-Traumatic Stress Disorder (PTSD), and early onset Bipolar Disorder. When her tragic beginning led to her involvement in killing Colleen Slemmer, the legal system let her down just as her family had all her life.

Ms. Pike's pre-birth brain damage, known as a heterotopia, was, in all probability, caused by her mother's drinking during pregnancy. The damage is in the frontal lobe and interferes with impulse control and moral reasoning. Ms. Pike was born into a family who taught violence as problem solving and she was subjected to abuse and neglect. She was seriously rejected by both parents. As a toddler she was left in the care of her grandfather and played in the gut bucket as he slaughtered animals in his slaughterhouse. As a young child she enjoyed quality time with her mother watching violent horror movies and was exposed to pornography by her mother's many live in boyfriends and husbands.

Before her eighteenth birthday Christa Pike had been raped twice – once when she was eleven years old and again when she was seventeen. Ms. Pike's mother never believed that Ms. Pike had been raped as an eleven year old girl. Ms. Pike was also physically and sexually abused by her mother's boyfriends and husbands. When one husband told her mother she had to choose between Christa and himself, Christa was sent to live with her father. As a result of the abuse, Ms. Pike developed PTSD, the effect of which was exacerbated by her Bipolar Disorder.

As Ms. Pike struggled to understand why the only person who had ever cared about her, her paternal grandmother, had died, and to find anyone who really cared about her, she decided to attend Job Corps and become a nurse – to amount to something after all. Yet Job Corps proved to be a dangerous place. One of the most dangerous students, Tadaryl Shipp, an active member of the Gangster Disciples, had shown a real interest in Ms. Pike. He appeared to be the person

who really cared about her for whom she had been searching. The victim in this case, Colleen Slemmer, began unknowingly pushing Ms. Pike's triggers. She entered Ms. Pike's room armed with a box cutter and stood menacingly over Christa. Ms. Slemmer burned a photograph of Ms. Pike's beloved grandmother. She was making a play for Mr. Shipp. All this Ms. Pike found threatening and, true to the well taught family value of using violence as problem solving, she planned to send a warning to Ms. Slemmer by beating her up.

Ms. Pike's hyper-vigilance was also symptomatic of her PTSD. For three or four nights prior to the Ms. Slemmer's death, Ms. Pike did not sleep. Her Bipolar illness was entering a very active period of hypomania. On the night of the planned assault, unlike on other occasions when Ms. Pike had lost control, the friends she had with her, Mr. Shipp and Ms. Peterson, did not put on the brakes to stop Ms. Pike. Instead they poured gasoline onto the fire to by cutting Ms. Slemmer.

Ms. Pike was then arrested and charged with murder and conspiracy. Unfortunately, as Ms. Pike now faced her greatest struggle, the trial of her life, the Court turned its back and treated Ms. Pike with the same neglect as had her family. The Court appointed as lead counsel, the attorney to be in charge of the trial for her life, an attorney who had stolen over $67,000 from the indigent defense fund from 1990 through 1993. This fact was published in the major Tennessee newspapers, including the Knoxville Sentinel at the very time he was being appointed to represent Ms. Pike. As a result of his dishonesty in billing the state, lead counsel's law license was in jeopardy from the time he was appointed to represent Ms. Pike through his final act of representation in the Tennessee appellate courts. Lead counsel had never handled a death penalty case.

After appointing an unqualified dishonest lead counsel, the Court below rushed Ms. Pike's case to trial. The Court substituted Ms. Pike's co-counsel less than eight weeks prior to trial on

condition that the time of appointment would not justify a continuance. Co-counsel had never handled the defense of any charge above a class-B felony. Despite difficulties in selecting a jury due to the heavy publicity in the case, the court accepted jurors with vast knowledge of the facts surrounding the death of Ms. Slemmer. The court also struck a juror who was *Witherspoon-Witt* qualified for cause, thereby easing the Prosecutor's burden of proof.

Not surprisingly, Ms. Pike's trial turned into a debacle. The guilt phase went poorly. Counsel presented a psychiatric expert who had never met, let alone examined, Ms. Pike. When asked if he had an opinion to a medical certainty concerning Ms. Pike's mental state at the time of the offense, he was forced to respond that he did not, having never examined Ms. Pike. The expert had been tendered as an expert in Satanism, an issue which had to that point been somewhat minor. However, this opened the door to the Prosecutor having a field day painting Ms. Pike and her co-defendant, Mr. Shipp, as Satan worshippers. Counsel presented a psychologist who proclaimed that Ms. Pike had no brain damage and who misdiagnosed her as having a Borderline Personality Disorder. Needless to say the guilt phase went badly and Ms. Pike was convicted of first degree murder and conspiracy to commit first degree murder.

Counsel, having no experience in the presentation of the penalty phase of a capital case, elected to present all of the mitigation through their mitigation specialist. This plan continued through the return of the verdict of guilt. Now facing the time for the presentation of the mitigation evidence counsel gave the entire collection of work conducted by the mitigation specialist to the Prosecutor. When confronted with questions about why he had not previously given the State a report, he had explained that he had just the night before received the materials from his mitigation specialist. When asked to confirm the lie, the mitigation specialist refused, and counsel decided not to call the mitigation specialist. Having not subpoenaed any witnesses, counsel had to rely on the three family members who happened to be present. Consequently, very little of Ms.


Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 22 of 196
PageID #: 8893

Pike's social history was presented. The jury never heard about the rapes, the sexual abuse, playing in the slaughterhouse while a toddler, being exposed to graphic horror movies, the PTSD, or the Bipolar Disorder. Because the mitigation specialist's entire work product was handed to the Prosecutors, the three witnesses called brought out many "negative" things about Ms. Pike, but no one was put on to explain the connection of these events to Borderline Personality Disorder, let alone the Bipolar Disorder and PTSD.

In this brief, Ms. Pike argues that her capital trial was undermined by Counsel's conflicts, their deficient performance, and structural error.



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 23 of 196 PageID #: 8894

## REFERENCES USED IN THIS BRIEF

References to the Record will be as follows:

The record to the capital trial will be referred to as T [Vol. No.]: [Page]

Exhibits from the capital trial will be referred to as Tr. Ex ____.

The post-conviction record will be referred to as PC [Vol. No.]: [Page].

Because the hearing occurred on three separate dates and the exhibits were not consecutively numbered: Post-conviction exhibits will be referred by the hearing date and exhibit number, i.e., [Month] [Year] Ex.__. The exhibit volume designated "Supplemental Exhibits" will be referred to as S. Ex. ___.

The Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit, is found in Supplement Exhibits, Exhibit 1 and will be referred to as 'Comptroller Report" and cited as CR: [Page].

The work of the mitigation specialist at trial, Dr. Diana McCoy, consisted of three volumes of materials. It has been divided into five volumes for this record and is located in PC Exhibits, January 2007, Ex. 1. In this Brief the 60 page social history will be referred to as "Social History." The records and memoranda of interviews will be referred to as "Mitigation Materials" and cited as M Mat Vol. ___ at ___.

Appellant will be referred to variously as Appellant, Petitioner, Ms. Pike, Christa Pike or Christa.

Appellee will be referred to as the State or prosecution.

## STATEMENT OF THE CASE

On April 12, 1995, Christa Pike, Shadola Peterson and Tadaryl Shipp were indicted for the premeditated murder and conspiracy to commit the premeditated murder of Colleen Slemmer. (T I: 3.) Ms. Pike was the first to be tried. Her trial was held March 18-30, 1996. (T III: 367-69, 377-92.) She was convicted of both charges and sentenced to death for the murder and to a consecutive 25 years for conspiracy. (Id. at 395, 409.)

Ms. Pike's convictions and sentences were affirmed on appeal. State v. Pike, 978 S.W.2d 904 (1998). The United States Supreme Court denied certiorari on June 1, 1999. Pike v. Tennessee, 526 U.S. 1147 (1999).

On June 3, 1999, Ms. Pike filed a pro se Petition for Relief from Conviction and Sentence. (PC I: 1.) In 2001, Ms. Pike requested that her post-conviction petition be dismissed and that the court set an execution date. Pike v. State, 164 S.W.3d 257, 260 (2005). Following a hearing on June 25, 2002, the Court below granted Ms. Pike's motion to withdraw her petition. On June 27, 2002, the court entered a written order and on June 28, 2002, an amended written order, granting Ms. Pike's motion to withdraw her petition. Id. Within 30 days, Ms. Pike's counsel filed notice of appeal and Ms. Pike filed a motion requesting to resume her post-conviction. Id. at 260-61. On May 12, 2005, the Tennessee Supreme Court entered its opinion permitting her to vacate the trial court's order and reinstate her post-conviction. Id. at 260, 267.

Evidentiary hearings were conducted in the Post-Conviction Court in January 2007, July 2007 and April 2008.[2] On September 22, 2008, Ms. Pike filed her closing brief. (PC IV: 451-551.) The State filed a responsive brief on November 14, 2008. (Id. at 554-90.) Ms. Pike filed a Brief in Reply on December 8, 2008. (Id. at 591-98.) On December 10, 2008, the Court below entered its Findings of Fact and Conclusions of Law denying Ms. Pike's petition for post-conviction relief. (Id. at 599 –V: 701.)

---

[2] The hearing was delayed in part because the Trial Counsel filed a complaint against the Post Conviction Defender which was not dismissed until September 17, 2007. (Apr 08 Ex 2A, 2B)

Ms. Pike filed her notice of appeal on January 2, 2009. (Id. V. at 702.) Ms. Pike now appeals to this Court.

## STATEMENT OF THE FACTS RELEVANT TO APPEAL

### I. Lead Counsel William Mr. Talman stole $67,027 from the Indigent Defense Fund.

In 1994, the Tennessee Comptroller of the Treasury began an investigation into the billing practices by defense counsel in indigent criminal cases. (S Ex. 1, Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit (hereinafter "Comptroller's Report").) The Comptroller's Report uncovered an overbilling scandal and named William Talman as the second most egregious offender.[3] Mr. Talman was required to repay the Indigent Defense Fund by a total of $67,027. (CR: 9.)

To put Mr. Talman's over billing in perspective, consider the findings of the Comptroller's Report:

> From our review of fee petitions submitted by the 24 individuals who had received payments exceeding $20,000 in 1993, we determined that the billing practices of seven attorneys included excessive hours which were paid by the Administrative Office of the Courts. The improper billings by two attorneys notably exceeded the billings of the other five. The two attorneys, Mr. David Poss. and Mr. William Talman, were each paid **in excess of $100,000 for representing indigent clients in 1993**. In our review of fee petitions submitted for 1993, we found 148 days of apparently excessive billings for Mr. Poss. and 81 days for Mr. Talman. Attorneys Poss. and Mr. Talman frequently billed the state for over 24 hours of service in a single day.

(CR at 5.) (emphasis added)

At the going rate for appointments in 1993, Mr. Talman's overbilling amounts to 3,333 hours (at 30 dollars per hour for in-court work) to 5,000 hours (at 20 dollars per hour for out-of-court work) billed for indigent defense in a single year. To achieve this number of billable hours would require

---

[3] The review by the Comptroller found that only 20 attorneys had received payments in excess of $20,000 in 1993, and seven of those 20 had billed excessive hours. (CR: 5.) At over $100,000, Talman's 1993 billing was five times that $20,000 mark.

working 64 to 96 hours for each of the 52 weeks of the year *before* taking care of any private clients or handling any of the many non-billable hours required to run a law office.

All of the cases handled by Mr. Talman had fee caps per case. Since Mr. Talman primarily handled general sessions cases, the fee cap for most of his work was $500, a total he regularly exceeded. (Id. at 3-4.) The Comptroller found that "[t]he hours Mr. Talman reported on multiple fee petitions differed only slightly, apparently to give the appearance of proration." (Id. at 9.) The report also noted that many of the fee applications were signed by special judges, including other attorneys whose fee applications were questioned. (Id.) In essence, the evidence suggests that Mr. Talman knowingly and willfully defrauded the State. During the course of the investigation into over billing, the State considered prosecuting Mr. Talman.[4]

In mid-April 1995, Mr. Talman returned $67,027 through the Knox County District Attorney General – the very office that was prosecuting Ms. Pike.[5] (CR: Audit Highlights 3.) Mr. Talman reached a civil settlement on repayment of the stolen funds and considered the matter closed. (PC XXI: 457.) However, Mr. Talman was never officially released of criminal liability and criminal prosecution for theft over $60,000, a Class B felony[6] with a minimum sentencing range of 8 to 12 years.[7]

On March 30, 1994, Mr. Talman self-reported to the Tennessee Board of Professional Responsibility ("the Board") at the advice of counsel. (S. Ex 2A, March 30, 1994 Letter from Mr. Talman to the Board.) Throughout Ms. Pike's trial and direct appeal, the Board's decision as to

---

[4] (Apr 08 Ex. 1 (December 8, 1994 letter from District Attorney General Torry Johnson to District Attorney General Randy Nichols noting "It appears that William Talman and David Poss are the only two whose billing practices were so extreme as to warrant evaluation for prosecution."; S Ex 2A, File of Board of Professional Responsibility, September 15, 1994 letter from Talman (citing need to remain silent until decision is made whether to prosecute.)))

[5] In fact, it was Mr. Talman's understanding that the lead Prosecutor in Ms. Pike's case, Bill Crabtree, had been involved in the matter of Mr. Talman's over billing. (PC XIX: 260.)

[6] T.C.A. § 39-14-105.

[7] T.C.A. § 40-35-112.

possible sanctions remained outstanding. The matter was not resolved until one day after the completion of Ms. Pike's direct appeal in the Tennessee Supreme Court, when Mr. Talman received an 11 month 29 day suspension of his law license. This sanction was suspended. (Compare (PC I: 71-72; S Ex, 2a [8], Board of Professional Responsibility File, 3rd - 4th pages, (Nov. 24, 1998 Order of Enforcement[9])); and (PC XIX: 264) with State v. Pike, 978 S.W.2d 904 (Tenn. 1998), rehearing denied November 23, 1998.)

## II. Ms. Pike's case presented an enormous challenge

Ms. Pike and co-defendants Tadaryl Shipp and Shadola Peterson killed Colleen Slemmer on January 12, 1995. State v. Pike, 978 S.W.2d 904, 908-909 (Tenn. 1998.) On January 14, 1995, Ms. Pike and Mr. Shipp were arrested, and Ms. Pike gave a detailed statement in which she recounted the killing and admitted her own involvement. (Id.) Immediately after the homicide, Ms. Pike acting bizarrely made statements to friends and classmates at Job Corps. (Id. at 908.) The case was highly publicized in the local media. (T I: 102, III: 319.) Even a brief overview of Ms. Pike's situation revealed that if she was convicted of first degree murder the State would be able to prove at least one aggravating factor – that the murder was heinous, atrocious, or cruel.[10] It was also clear that Ms. Pike suffered from a severe mental illness. Under these circumstances, her defense would require attorneys who were well qualified and whose ability to represent Ms. Pike was not hampered by a cloud over their ability to continue to practice.

## III. The Trial Court appointed conflicted, incompetent counsel.

The Trial Court was aware of the need for experienced, qualified counsel to represent Ms. Pike at trial. (Apr 07 Ex. 3 at 59) (Court acknowledges that Ms. Pike is charged with the "most serious offense … and

---

[8] Made part of the record of the evidentiary hearing at PC XVII: 13-14.

[9] The Order of Enforcement suspended Mr. Talman's license "for a probationary period of eleven months twenty nine days, with all time suspended, conditioned upon the absence of any finding by a court, the Board of Professional Responsibility or Hearing Panel during this eleven month, twenty nine day probation that the Respondent has violated the Code of Professional Responsibility."

[10] Tenn. Code Ann. §39–13–204 (i)(5).

the most serious penalty she could face."); (T XXXI: 47-48 (Trial Court acknowledges that "[this was] obviously one of the most high profile cases that has hit the state of Tennessee ever.").[11] Ms. Pike's defense required counsel with the commitment and ability to present complex theories in defense, including the inability to form the requisite intent and mitigation phase proof of mental illness. (PC XX: 322-25.)

Initially, the Knox County General Sessions Court appointed William Brown as sole counsel. Brown was admittedly unqualified to handle a capital case. While the case was before the grand jury, he requested that replacement counsel be appointed. (PC XIX: 261.) The Trial Court appointed William Talman as second counsel, but did not allow Mr. Brown to withdraw from the case until approximately eight weeks prior to trial. (Apr 07 Ex. 3 at 58.)[12]

The Trial Court appointed Mr. Talman lead counsel on May 23, 1995,[13] approximately *one month* after he had returned the $67,027 to the Indigent Defense Fund of the Administrative Office of the Courts. (T I: 8; CR at 9.) At the time of Mr. Talman's appointment as lead counsel, the Trial Court was well aware of his recent criminal conduct. All three criminal court judges in Knoxville were interviewed concerning the overbilling in either July or August 1994 or January 1995.[14] As the Trial Court admitted, "I knew; we all knew that Mr. Talman had his own problems." (PC XXXII: 114.)

---

[11] With regards to publicity, a large number of the prospective jurors reported that they remembered the media information on the case and that it was "gruesome." (See, e.g., (T IV: 90, 94) (Court notes only three out of the first 18 jurors had not heard something about the case and refers to case as having "been a publicized case and it is a obviously a very serious charge"); (T V: 122-28) (prospective juror remembers three people involved, a piece of the skull, pentagram carved on chest, Ms. Pike is the one who committed crime); (T XII: 881) (prospective juror remembers it was "brutal"); (T XVI: 1270) (prospective juror remembers hearing murder was brutal).)

[12] The transcript excerpt shows a date of January 19, 2006; however, this was corrected during the evidentiary hearing. (PC Ex. 3 at 40; PC XVII: 45-46.)

[13] Mr. Talman was first appointed by Judge Jenkins prior to Ms. Pike's arraignment. However, it was later determined that this appointment was not authorized as she was not yet entitled to two attorneys. Mr. Talman was subsequently appointed at arraignment by the trial judge in this matter. (PC XIX: 261-62.)

[14] (PC XXXII: 113); (CR: 15.) Moreover, the overbilling scandal, as well as Mr. Talman's involvement, had been publicized in major Tennessee newspapers, including the Knoxville News Sentinel. (PC XIX: 255-58; (Apr 08 Ex. 1) (Knoxville News-Sentinel, Sunday, May 1, 1994, Sunday May 8, 1994) (Talman specifically identified in two articles); (PC I: 67-69) (The Tennessean, June 7, 1995) (Talman specifically identified.)

At the time of his appointment, Mr. Talman had never handled a death penalty case. (PC XIX: 255.) He was generally considered a mediocre lawyer among the Knox County defense bar. He was reliant on court appointments for his income and had never worked on a significant case. (PC XXVIII: 1009-10.)

Mr. Talman's appointment was particularly perplexing in light of the renowned caliber of the Knoxville criminal defense bar. Experienced capital attorneys such as Robert Richie, Charles Fels, Wade Davies, Ralph Harwell, Jim Bell, and Herb Moncier were all qualified and available to represent Ms. Pike if so appointed. (Id. at 1003-08.)

On January 23, just 55 days before the trial started, the Trial Court appointed Julie (Martin) Rice[15] as second counsel in Ms. Pike's case. Ms. Rice was appointed upon her agreement not to seek a continuance for purposes of preparation.(Apr 07, Ex. 3: 93-94.) At the time of her appointment, Ms. Rice had at least one other trial scheduled prior to Ms. Pike's capital trial. (Id. at 94.)

Ms. Rice did not remember how she and Mr. Talman divided the work on Ms. Pike's case, but she recalled that she was responsible for the family witnesses. (Id. at 48.) Mr. Talman said he assigned the penalty phase to Ms. Rice. (PC XX: 321.) He thought that a female attorney would provide a "softer appearance to the jury and - - that's why we divided the functions ... and let her handle the mitigation." (Id.)

Nonetheless, at the time of Ms. Rice's appointment – and more significantly, at the time of her pledge to the Trial Court that she would not seek a continuance though trial was only eight weeks off – she had not reviewed Ms. Pike's Social History, spoken to the mitigation specialist on the case, or met with the defense team's psychologist. (PC XVII: 42, 44-45.) Ms. Rice did not speak to mitigation specialist Dr. McCoy until March 1, seventeen days before trial. (PC. XVII: 50-53.) The only time that Ms. Rice met with Dr. McCoy

---

[15] At the time of her appointment and the trial of this case Ms. Rice was known as Julie Martin. She subsequently married and adopted her husband's name, Ms. Rice. At the time she testified in post-conviction, her last name was Rice, and therefore she will be referred to as Ms. Rice throughout this Brief. (See PC 17: 21-22.)

prior to trial was on March 15, three days prior to the start of voir dire. (PC XXIV: 622, 633-35.) On that date, Mr. Talman and Ms. Rice reviewed Dr. McCoy's three-volumes of mitigation investigation notes ("Dr. McCoy's Mitigation Materials".) (Id. at 633.) Ms. Rice did not recall ever having a set of Dr. McCoy's Mitigation Materials. (PC XVII: 55-56.)

Ms. Rice had been licensed for approximately three and a half years at the time of Ms. Pike's trial. (PC XVII: 29-30.) She had never handled a murder case, or any prosecution more serious than a Class B felony. (Id. at 31-33.) She had little or no experience working with expert witnesses or investigators and no particular knowledge of psychological issues. (Id. at 33-36.) She had not attended any trial practice institutes. (Id. at 37.)

Mr. Talman testified that, as lead counsel, he wanted Ms. Rice to be his co-counsel and would have recommended her for appointment. (PC XX: 319.) However, he further testified that, had he known that Ms. Rice had never handled a murder case, he probably would not have asked her to be appointed. (Id. at 320.) Mr. Talman's ignorance of his co-counsel's qualifications was not unique to his work with Ms. Rice. He testified that he did not know, or at least could not recall, how long his former co-counsel on this case, Bill Brown, had practiced, or anything else about Mr. Brown's qualifications. (Id. at 318-19.)

**IV. Defense Counsel constructively forfeited Ms. Pike's case in the sentencing phase.**

Ms. Pike's trial defense was marked by error from the beginning, but the close of Ms. Pike's trial bore witness to a complete and catastrophic collapse. It was in the final two days of representing Ms. Pike that her Counsel manifested conflicted motives and incompetency most starkly, scrapping all prior preparations and putting before the jury only easy fodder for exploitation by the State on cross-examination.

Prior to and during the trial, forensic psychologist Dr. McCoy acted as mitigation specialist in Ms. Pike's case. Dr. McCoy conducted extensive investigation and numerous interviews in order to assemble a case in the event of a sentencing phase. The substance of Dr. McCoy's work was contained in three-volumes

consisting of a 60 page social history (herein after 'Social History"), numerous records she had collected and her memoranda of all of the interviews she had conducted with Ms. Pike, her family, friends, and a small number of juvenile court workers who had been assigned to Ms. Pike (herein after "Mitigation Materials".) From the beginning, Mr. Talman planned on presenting the mitigation case through Dr. McCoy alone. (See PC XX: 328-329; XXV: 715, 741.)

At the close of the guilt/innocence phase of Ms. Pike's trial, after the jury had returned a conviction of murder in the first degree, the Trial Court called an *in camera* meeting with both parties. Defense Counsel failed to request that this meeting be recorded, and because it took place out of the presence of the Court Reporter, it is not in the record. During the *in camera* meeting, Mr. Talman provided the Prosecutor with Dr. McCoy's three-volume Mitigation Materials and Social History. (T XXIX: 2465.) Immediately after the meeting, once again in court and on the record, the Prosecutor expressed agitation at having received voluminous materials pertinent to Dr. McCoy's testimony so near to her taking the stand. (Id. at 2465-69.) The Trial Court then continued the start of the penalty phase until the following morning to allow the Prosecutor time to review Dr. McCoy's Mitigation Materials and Social History. (Id. at 2465.)

After leaving court, Mr. Talman contacted Dr. McCoy in a panic. He informed her that he had been pressed by the State as to why he had not yet turned over any of Dr. McCoy's materials, and in response, had lied to the Trial Court and Prosecutor by saying he had only received the materials himself the prior evening, March 28, 1996. (PC XXV: 740.) He was also panicking because the Prosecutor had complained it was all hearsay. (Id.) In point of fact, Dr. McCoy had repeatedly asked Mr. Talman when she should complete her materials and provide them to him. In response, Mr. Talman had continually answered that there was no rush, because he planned to provide any discoverable materials to the State only at the last possible instant. (PC XXIV: 676-77.) Ultimately, Dr. McCoy gave her Mitigation Materials and Social History to Mr. Talman on Sunday, March 24, *five days earlier than Mr. Talman had represented to the Trial*

*Court and Prosecutor.*[16] (PC XXV: 740.) On the phone the previous evening, March 29, Mr. Talman asked Dr. McCoy to corroborate his version of events in the course of her testimony by stating that she had just given him the materials. (Id.) Dr. McCoy told Mr. Talman on the telephone that she could not lie on the witness stand. After agreeing to get advice from attorneys Herb Moncier and Greg Issacs concerning the hearsay issue Dr. McCoy called Mr. Talman back and informed him she was not able to reach either attorney. Mr. Talman told her that she would not be called to testify, and in fact, she was not. (PC XXV: 740-43.)

Knoxville attorney Herb Moncier confirmed that shortly after Ms. Pike's trial phase, Dr. McCoy phoned him very upset. (PC XXVII: 1000.) He recalled advising her that although she had been asked to testify to something that was not true, the conversation was protected by the attorney/client privilēge and attorney work product doctrines, and since the trial was over, she should not go immediately to Judge Leibowitz, but later, if Ms. Pike released the privilege, she could tell the Trial Court what happened. (PC XXVIII: 1002.)

### A. Ms. Pike's Trial Counsel Presented Limited, Unpersuasive, Piecemeal Evidence During the Penalty Phase.

Mr. Talman made the decision to scrap Ms. Pike's mitigation case on the eve of the penalty phase of her trial. With only 12 hours to concoct an alternative strategy, Mr. Talman ultimately called the three witnesses who had been present throughout the trial and were available on short notice: Ms. Pike's maternal aunt, father, and mother.

#### 1. Ms. Pike's Aunt, Carrie Ross

The first defense witness during the penalty phase was Ms. Pike's aunt, Carrie Ross. Ms. Ross testified that Ms. Pike was born prematurely and was immediately taken to a regional medical center an hour away. Her mother did not see her for four days. (T XXVIII: 2485-86.) Immediately after Ms. Pike came home from the neonatal care center, her mother went back to work, leaving Ms. Pike in the care of her paternal grandmother, Delpha Pike. (Id. at 2486.) Ms. Pike spent most of her time with Delpha Pike who

[16] Dr. McCoy presented receipts showing that she had picked up the photocopied and bound volumes of her Notes and Social

was "totally and absolutely devoted to [her.]" (T XXIX: 2502.) Ms. Pike and Grandmother Pike were inseparable. (Id. at 2503.) Delpha Pike died when Ms. Pike was about 12 years old; Ms. Pike was devastated and hysterical at her grandmother's funeral. (Id. at 2504.)

Ms. Ross testified that Ms. Pike's mother, Carissa Hansen, was rarely in Ms. Pike's life. Ms. Hansen worked two jobs and, when not working, was out drinking. (Id. at 2495.) Ms. Hansen never cleaned the house and did not clean up the dog stool on the floor. (Id. at 2496.) Ms. Hansen spent her money on clothing for herself, but never bought clothes for Ms. Pike or her sister. The children were often without food and Ms. Ross was frequently left to provide it for them. (Id. at 2496-97.)

Ms. Ross related an incident that took place when Ms. Pike was three or four. She and Ms. Hansen were out at a bar when Ms. Hansen got a call informing her that Ms. Pike was having a seizure. Ms. Hansen said that Ms. Pike would be okay and did not want to leave the bar. However, Ms. Ross insisted that they leave to check on Ms. Pike. When they arrived home, Ms. Pike was having a seizure and had to be taken to the hospital. (Id. at 2498-99.)

Ms. Ross further testified that Ms. Hansen had no rules and failed to discipline Ms. Pike. (Id. at 2499.) One of Ms. Hansen's husbands, Danny Thompson, gave Ms. Hansen an ultimatum: either send away the children, or he would leave. Ms. Hansen sent Ms. Pike to live with her father and Ms. Pike's sister to live with Ms. Ross. (Id. at 2500 – T. XXIX: 2501.)

Ms. Ross testified that Ms. Pike grew up in a number of different homes, staying sometimes with her mother, her father, and both sets of grandparents. According to Ross, Ms. Pike's maternal grandmother verbally and physically abused Ms. Pike, spanking her for everything and berating her constantly. (Id. at 2491.)

---

History from Kinko's on March 20. (PC XXIV: 672-73; Apr 07 Ex. 23A.)

Ms. Ross also testified to substance abuse in Ms. Pike's family. Ms. Pike's maternal grandfather was addicted to Talwin.[17] Ms. Pike's maternal grandmother was an alcoholic. (Id. at 2490.) At trial, Ms. Pike's second counsel, Ms. Rice, attempted to use Ross's testimony to demonstrate that substance abuse runs in the family and to explain the hereditary nature of addiction. The Prosecutor objected that Ms. Ross was not an expert in substance abuse, and the Trial Court sustained the objection.[18] Ms. Rice subsequently abandoned the line of questioning. (Id. at 2492-94.)

Ms. Ross stated that whenever Ms. Pike was at Ms. Ross's home, including shortly before the killing of Colleen Slemmer, Ms. Pike would behave like a little girl, playing with dolls with Ms. Ross's much younger child. (T XXIX: 2501.)

**2. Ms. Pike's Father, Glenn Pike**

Glenn Pike, Ms. Pike's father, testified to having married Ms. Pike's mother twice. During both marriages, he asserted, he had a good relationship with Ms. Pike but was not around much because he was working. (T XXIX: 2511-12.) His mother took care of Ms. Pike more than he did, although Ms. Pike stayed with him intermittently when she was young. (Id. at 2512.)

Mr. Pike described himself as a strict disciplinarian. When Ms. Pike did something wrong, he spanked her. (Id. at 2515.) At one point, when Ms. Pike was doing poorly in school and he could not get her to improve, he sent her back to her mother.

After Mr. Pike's second marriage to Ms. Hansen ended in divorce, he married Kathleen Allman. Ms. Pike would call about once a month, and whenever she was in town, she and Mr. Pike would spend time together. (Id. at 2512-13.)

---

[17] Talwin is a particular brand of pentazocine, "a potent opiod agonist/antagonist analgesic with some addiction liability but only rare withdrawal syndrome and tolerance. . . ." STEDMAN'S MEDICAL DICTIONARY 1322 (Marjory Spraycar ed., 26th ed. 1995.)

[18] Clearly the expert they could have used to make this connection was Dr. McCoy whom they decided not to use on the eve of the sentencing phase.

Mr. Pike testified that sometime around 1989, Ms. Allman made allegations against Ms. Pike.[19] (Id. at 2513-14.) At Ms. Allman's insistence, Mr. Pike then barred Ms. Pike from his home. Mr. Pike testified that he knew this upset Ms. Pike greatly. (Id. at 2514.)

Mr. Pike stated that his relationship with Ms. Pike deteriorated completely when she told him that she no longer wanted his name and wanted to be adopted. Mr. Pike signed the necessary papers and voluntarily extinguished all parental rights. (Id. at 2515-16.)

**3. Ms. Pike's Mother, Carissa Hansen**

Ms. Pike's mother, Carissa Hansen, was the third and final witness for Ms. Pike during the penalty phase. Ms. Hansen confirmed that she and Pike were married twice. (T XXIX: 2523.) She also confirmed that he was not around very much and that Ms. Pike was raised largely by her paternal grandmother, but that she also spent some time with her maternal grandmother. (Id. at 2523-24.) Ms. Hansen stated that Mr. Pike did not have a job while they were married, and that she worked two jobs to support them. (Id. at 2524.)

In 1983, Ms. Hansen married Danny Thompson. Mr. Thompson abused Ms. Pike physically. (Id. at 2525.) Mr. Thompson eventually threatened to leave Ms. Hansen if she did not send her children away. Ms. Hansen complied and sent Ms. Pike to her father. (Id.) In approximately 1984, another of Ms. Hansen's male companions, Steve Kyaw, also physically abused Ms. Pike. On one occasion, he whipped Ms. Pike with a belt. On another, following an argument, Mr. Kyaw was arrested. (Id. at 2532.)

When Grandmother Pike developed cancer, Ms. Pike was sent back to live with Ms. Hansen. (Id. at 2528.) Ms. Pike wanted to stay in West Virginia to care for her grandmother and believed that her grandmother died because she was not there to care for her. (Id.) Ms. Pike cried for days after the funeral, did not go to school, and not long afterward, attempted suicide. (Id.) After Grandmother Pike died, Ms. Pike

[19] On cross-examination, the Prosecutor uncovered the substance of these allegations: that Ms. Pike sexually abused the young daughter Ms. Allman and Mr. Pike. The Post-Conviction Court found these allegations baseless. (PC V: 625 n.7.)

spent about 95 percent of the time with Ms. Hansen and the remaining five percent or so with her father, but was frequently shuffled back and forth. (Id. at 2526.)

Ms. Hansen admitted that while Ms. Pike was being cared for by her grandmothers, Ms. Hansen drank heavily, smoked marijuana, and used other drugs. (Id. at 2527.) She admitted smoking marijuana with Ms. Pike in an attempt to be closer to her and her friend. (Id.) She also admitted never getting regular medical treatment for Ms. Pike. Ms. Hansen testified that she took Ms. Pike to see a psychiatrist the day of her suicide attempt and for a couple of outpatient visits. (Id. at 2530.)

Ms. Pike repeatedly ran away and lived on the streets for short periods. Ms. Hansen took no action to bring Ms. Pike home in such circumstances. Instead, Ms. Hansen testified, she usually responded by drinking and feeling sorry for herself. (Id. at 2532.)

Ms. Hansen testified that she visited Ms. Pike at Jobs Corps. Ms. Pike gave Ms. Hansen a tour of the facilities and Ms. Hansen was alarmed to see gang signs and blood all over the men's room door and trailing down the hall. (Id. at 2531.)

**B. Armed with Dr. McCoy's Three-Volume Mitigation Materials and Social History, the Prosecutor Exposed Damaging Evidence on Cross-Examination.**

The morning after Mr. Talman provided the Prosecutor with Dr. McCoy's Mitigation Materials, the three Prosecutors working on the case had looked through the material and marked the pages "with little yellow stickies." (PC V: 685; PC XIX: 238.) Dr. McCoy's Mitigation Materials contained the substance of extensive interviews with numerous acquaintances and family members of Ms. Pike, including the three individuals who testified at sentencing. Much of the information was damaging to Ms. Pike when taken out of context. As a result, the Mitigation Materials provided the Prosecutor with powerful ammunition in his cross-examination of Ms. Pike's sentencing phase witnesses.

On cross-examination of Ms. Pike's maternal aunt, Carrie Ross, the Prosecutor pointed out that Ms. Ross took in Ms. Pike's half-sister Alicia, but refused to do so with Ms. Pike because Ms. Ross was afraid to leave Ms. Pike alone with her children. (T XXIX: 2506; M Mat, Vol. 3 of 5, Appendix 21 (Interview with

Carrie Ross, 12/10/95, Bates Stamp 311).) The Prosecutor also got Ms. Ross to admit that she had called Ms. Pike a pathological liar. (T XXIX: 2506; M Mat, Vol. 3 of 5, Appendix 21 (Interview with Carrie Ross, 12/10/95, Bates Stamp 313).)

On cross-examination, again through the Prosecutor's use of Dr. McCoy's Mitigation Materials, Ms. Pike's father admitted that Ms. Pike lied to him and was manipulative. (T XXIX: 2517.) The State also brought out that the incident that caused Mr. Pike to ban Ms. Pike from his home with Ms. Allman was the alleged sexual abuse of his and Ms. Allman's young daughter.[20] (Id. at 2520; see M. Mat., Vol. 3 of 5, Appendix 22 (Interview with Glenn Pike, 12/10/95, Bates Stamp 315-317).)

The Prosecutor was also able to exploit Dr. McCoy's Mitigation Materials on cross-examination of Ms. Hansen, he brought out that when Ms. Pike was 12 years old she threatened Ms. Hansen's then-boyfriend, Mr. Kyaw, with a butcher knife. (Id. at 2534, 40; see M Mat., Vol. 1 of 5 at 14; Appendix 2 at Bates 23, Appendix 20 at 308.) The Prosecutor also asked whether Ms. Hansen reported finding a butcher knife in Ms. Pike's possession on another occasion. (T XXIX: 2535.) Hansen had indeed so reported to Dr. McCoy. (M. Mat., Vol. 1 of 5 Appendix 2 at Bates 23.)

The Prosecutor also brought out Ms. Hansen's statement to Dr. McCoy, duly recorded in Dr. McCoy's Mitigation Materials, that Ms. Hansen had not been able to control Ms. Pike since she was eight years old. (T XXIX: 2537.) Specifically, Dr. McCoy's Mitigation Materials related that Ms. Hansen told Dr. McCoy, "[t]here has always been trouble with Ms. Pike, from the first grade on." (See M Mat., Vol. 3 of 5 Appendix 19 at Bates 295.)

The Prosecutor then moved to other specific incidents that were contained in Dr. McCoy's summaries of interviews with Ms. Hansen. These facts included Ms. Pike having a live-in boyfriend when she was 14 and growing marijuana inside Ms. Hansen's house. (T XXIX: 2537; M Mat., Vol. 3 of 5, Appendix 19 at

[20] The Court below found these allegations to be completely unsubstantiated. (PC V: 625 n.7.)



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 38 of 196 PageID #: 8909

Bates 297; Appendix 27 at Bates 524.) The State also got Ms. Hansen to admit that Mr. Pike would not allow Ms. Pike around his young children. (See M Mat., Vol. 3 of 5 Appendix 20 at Bates 308.)

Finally, the State brought out Ms. Hansen's statement to Dr. McCoy that Ms. Pike was a liar who had many second chances and blew them all. (T XXIX: 2541-42.) This information, too, was contained in the Notes prepared by Dr. McCoy. (See M Mat., Vol. 3 Appendix 20 at Bates 302, Appendix 27 at Bates 523.)

### C. Mr. Talman called no Medical or Mental Health Experts During the Sentencing Phase, but Instead Relied on the Jury's Recollection of Unpersuasive Expert Testimony from the Guilt/Innocence Phase.

The only evidence presented regarding Ms. Pike's mental condition was presented through the testimony of Eric Engum, J.D., Ph.D, during the guilt/innocence phase of trial.[21] Dr. Engum testified that his Ph.D. was in clinical psychology and his private practice was primarily in neuropsychology and forensic psychology, although he was not board-certified in either specialty. (T XXV: 2166, 2172-73, 2175.) Defense Counsel asked Dr. Engum in preparation for trial to determine whether Ms. Pike suffered from any psychological conditions that might support diminished capacity or diminished culpability and to identify potential mitigating factors. (Id. at 2178.) In reaching his opinion, Dr. Engum limited the scope of his evaluation to psychological testing, a mental status examination, and interviews with Ms. Pike. (Id. at 2178-79.) Significantly, Dr. Engum's evaluation was limited to information he learned from Ms. Pike in four sessions of clinical consultation. His report was finished long before Dr. McCoy's work was completed, and Dr. Engum was thus without the benefit of Dr. McCoy's Social History and Mitigation Materials. (Compare Apr 08 Ex. 17 (Dr. Engum's report dated 09-22-95) with PC XXIV: 633 (On 03-15-96, Mr. Talman and Ms. Rice reviewed the three volume mitigation materials before it was copied and bound).)

Dr. Engum reported that he found "some degree of depression," a full IQ of 111, academic achievement in the eleventh to twelfth grade range, no brain damage, a history of marijuana dependence

---

21 The defense also presented the testimony of psychiatrist Dr. William Bernet during the guilt phase. However, Dr. Bernet had not examined Ms. Pike and was unable to testify regarding her psychiatric condition. (T XXVI: 2277, 287-89 (no evaluation was done in this case), 2295 (Dr. Bernet has never met or examined Ms. Pike).) His testimony was limited to opining that, from the

and inhalant abuse, and very severe Borderline Personality Disorder. (T XXV: 2180-83, 2185.) With respect to his diagnosis of borderline personality, Dr. Engum reported that Ms. Pike met eight of the nine characteristics for that disorder. The one characteristic Dr. Engum found missing was "recurrent suicidal behaviors." (T XXV: 2190.) Dr. McCoy's Social History, which Dr. Engum was without, showed evidence of at least three suicide attempts and serious bouts with depression. (M Mat, Tab 45, Bates 716.) There was also evidence of a fourth suicide attempt when Ms. Pike was in the third grade and she overdosed on Tylenol. (PC VI: 63.)

Of the eight characteristics of Borderline Personality Disorder that Dr. Engum found exhibited by Ms. Pike, he related three to the facts of Ms. Pike's conduct surrounding the killing of Ms. Slemmer. First, he discussed the characteristic of unstable identity, which he described as "the keynote of Borderline Personality Disorder." (T XXV: 2190.) Unstable identity, Dr. Engum explained, means that borderline individuals "draw their identity ... from those around them," "are highly dependent upon others," and "[have] little sense of self [because] they fear abandonment by those individuals who are important in their life." (Id.) Dr. Engum found this relevant to Ms. Pike's relationship with her codefendant, Tadaryl Shipp, noting that it explained why she fell deeply in love with him and found the fear of losing him so threatening as to push her to violence. (Id. at 2191-92.)

Dr. Engum next testified regarding a second characteristic of Borderline Personality Disorder and its manifestation in Ms. Pike - the absence of direction and inability to maintain vocational and other goals. Dr. Engum found that this characteristic was responsible for Ms. Pike's history of being "very impulsive, almost to the point of being self-destructive in terms of drug abuse, in terms of sexual promiscuity, in terms of risky activities." (Id. at 2193.)

Third, Dr. Engum discussed the characteristic of paranoia, which he found evidenced in Ms. Pike's "paranoid ideation" that any woman even having idle talk with Mr. Shipp was threatening to Ms. Pike and

---

evidence presented, the killing of Ms. Slemmer had the indicia of collective aggression and not a satanic cult killing. (T XXVI: 2280-2318.)

Mr. Shipp's relationship. Such ideations created "incredible levels of anger and hostility towards the person that [she] perceive[d] as potentially separating [her] from the lover, from Tadaryl Shipp." (Id. at 2194.)

Dr. Engum opined of the killing itself that Ms. Pike "did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, Borderline Personality Disorder, which meant that she basically went out of control." (Id. at 2197.) He reached this conclusion on the basis of his interviews with Ms. Pike and his examination of Ms. Pike's recorded statement to police. (Id. at 2197-98.) Dr. Engum explained Ms. Pike's post-killing giddiness and braggadocio in showing others a piece of Ms. Slemmer's skull as behaviors displaying an emotional release; according to Dr. Engum, Ms. Pike was excited because killing Ms. Slemmer was, for Ms. Pike, insurance against any threat to Ms. Pike's relationship with Mr. Shipp. (Id. at 2198-99.)

Dr. Engum offered no general discussion of Borderline Personality Disorder and its effects. Apart from the three particular characteristics that he linked to Ms. Pike, he did not explain the disorder's effects on an individual's brain and behavior.

Nor did Dr. Engum provide a detailed basis for his diagnosis of Ms. Pike. He stated that Ms. Pike displayed eight of the nine hallmark characteristics of Borderline Personality Disorder, but he discussed only three of those eight. More significantly, however, even with respect to those three, Dr. Engum did not substantiate his diagnosis with evidence of behaviors or particular incidents in Ms. Pike's history. For instance, because Dr. Engum never reviewed Dr. McCoy's materials, he did not know that on a number of prior occasions Ms. Pike had lost control and had to be restrained by her friends, or that she had previously attempted suicide. In addition, Ms. Pike's counsel made no attempt to incorporate information in Dr. McCoy's materials while Dr. Engum was on the stand, for instance, by asking if particular behaviors or occurrences were consistent with his diagnosis. As a result, Dr. Engum provided only a weak, conslusory discussion of Ms. Pike's mental health issues, but also failed to provide a context in which the potentially negative information in Dr. McCoy's Mitigation Materials – the information evoked by the Prosecutor on

cross-examination during the penalty phase – could be viewed by the jury as symptomatic of Ms. Pike's mental illness.

Dr. Engum's diagnosis was, moreover, undermined during cross-examination. First, Dr. Engum acknowledged that a personality disorder manifests without any outward physical signs, and thus is diagnosed through formal testing and review of an individual's behavioral history. (PC XXVI: 2216-17.) But since Dr. Engum did not have Dr. McCoy's Mitigation Materials and Social History, he could not go beyond his personality tests to help explain the diagnosis. Furthermore, because Dr. Engum based his diagnosis entirely on Ms. Pike's self-reporting, he was forced to admit on cross that if Ms. Pike was discovered to have lied to him, he might be compelled to change his opinion regarding her state of mind at the time of the offense. (Id. at 2218.)

### D. Ms. Pike's Counsel Did Not Argue that Ms. Pike's Mental illness Rendered her Insufficiently Culpable for the Death Penalty in Sentencing Phase Opening and Closing Arguments.

In his opening statement in the penalty phase of Ms. Pike's trial, Mr. Talman referred to Dr. Engum's testimony in saying "Ms. Pike has a personality that she derives and gains her self-esteem, her self-worth, from those around her." (T XXVIII: 2480-81.) This was the only reference to Ms. Pike's mental illness in Mr. Talman's opening statement. However, Mr. Talman did not utilize this fact to suggest that Ms. Pike was mentally ill, or that her illness was responsible for her conduct in killing Ms. Slemmer. Instead, Mr. Talman confusingly suggested that, since Ms. Pike had low self-esteem, the jury could best punish her by giving her a life sentence, because that would deprive her of the fame and notoriety on which she was then relying for her sense of self-worth. (Id. at 2481.) In her brief closing argument in the sentencing phase, Ms. Rice never attempted to connect any of Ms. Pike's conduct – at any time – to Ms. Pike's mental disorder as diagnosed by Dr. Engum. (T XXIX: 2560-65.)

As a result, neither attorney suggested the relevance of Ms. Pike's psychological disorder to the case for mitigation. Neither attorney told the jury that even though they did not find that Ms. Pike's mental health issues prevented her from forming intent, these issues did constitute mitigation under (1) Tennessee Code



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 42 of 196 PageID #: 8913

Annotated § 39-13-204(j)(2), that "[t]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance," and (2) that:

> The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment.

§ 39-13-204(j)(8).

## V. Ms. Pike's Counsel had Access to a Body of Penalty Phase Evidence that Would Likely Have Resulted in the Jury's Returning a Verdict of Life.

On post-conviction, Ms. Pike presented the case for mitigation that her trial jury was never given the chance to hear. This evidence completely explained Ms. Pike's participation in Ms. Slemmer's killing as the product of a complex interaction between Ms. Pike's brain damage, mental illness, and history of abuse and neglect. Because this evidence provided a thorough and convincing account of Ms. Pike's crime in a way that highlights Ms. Pike's diminished culpability for that act, the jury's fear and outrage over Ms. Pike's horrific crime would likely have been replaced with understanding, making a life verdict the most likely outcome.

Moreover, all of the evidence presented by Ms. Pike on post-conviction was immediately available to Ms. Pike's Trial Counsel. Much of the evidence was in Counsel's *immediate possession*, and was simply withheld for reasons stemming either from Mr. Talman's conflict or Counsel's general incompetence. Still other evidence would have been easily discovered if Defense Counsel had made even minimally diligent efforts to investigate potential issues and incorporate the opinions of experts into their trial strategy. In short, Defense Counsel had, but folded, the case that would have saved Ms. Pike's life.

### A. Ms. Pike Presented a powerful Mitigation Case on Post-Conviction.

Ms. Pike's post-conviction mitigation case explained Ms. Pike's participation in Ms. Slemmer's killing by revealing the unique confluence of disabilities that rendered Ms. Pike unable to choose an alternative path. Ms. Pike put on expert testimony to the effect that individuals exhibiting three characteristics in particular –

(1) brain damage, (2) mental illness, and (3) a history of abuse – are predisposed to commit acts of violence. Ms. Pike then made the case that she suffers from all three characteristics: she has (1) a heterotopia of the frontal lobe, (2) Bipolar disorder, and (3) Post-Traumatic Stress Disorder resulting from a history of physical and sexual abuse. Additionally, Ms. Pike demonstrated that she was raised in an environment that condoned, normalized, and even glorified extreme levels of violence and gore. Ms. Pike also demonstrated that, in the months leading up to the killing of Ms. Slemmer, she was under mounting stress and exposure to violence while a student at Job Corps, both because of the generalized level of danger and violence at the Job Corps facilities, and more specifically because of her relationship with co-defendant Tadaryl Shipp.

Upon review of this evidence in sum, the jury would have understood Ms. Pike's role in her crime as a function of her unfortunate condition and upbringing, and in turn, would likely have returned with a life verdict.

### 1. Three Common Characteristics of Violent Killers.

On post-conviction, Ms. Pike presented the testimony of Dr. Jonathan Pincus. Dr. Pincus is Chief of Neurology at the Veterans Administration Hospital in Washington, D.C. and a Professor of Neurology at Georgetown University, School of Medicine. (PC VIII: 207.) He is board-certified in Psychiatry and Neurology and has written over 140 articles and chapters, most of which have been published in peer reviewed journals. (Id. at 208, 210.)[22]

Dr. Pincus testified during post-conviction proceedings that he has developed a theory that helps explain the occurrence of violent murders based on 100 to 150 case studies. This theory is rooted in Dr. Pincus' finding of a common set of three characteristics in particularly violent killers: (1) frontal lobe damage, (2) mental illness, and (3) a history of abuse. (Id. at 220–21.) From this empirical finding, Dr.

---

22 In finding that Dr. Pincus was qualified as an expert in neurology, Judge Leibowitz, in obvious reference to her husband who is a neurologist in Knoxville, stated "And when I asked a certain neurologist if he had ever heard of Dr. Pincus, he said, 'wow, you have Dr. Pincus in your court.' So he's an expert." (PC VIII: 213.)

Pincus has extrapolated a theory of the way in which these characteristics causally interact to effect violent results.

Beginning with the characteristic of brain damage, or frontal lobe damage more specifically, Dr. Pincus explained that the frontal lobe is the region of the brain where moral teaching is encoded. In later life, this same region in turn functions to regulate conduct in accordance with learned ethical standards. (Id. at 243.) Damage to an individual's frontal lobe thus obstructs moral learning, and ultimately leaves the individual with an incomplete, confused, and ineffective moral compass. (Id.)

The second characteristic common to violent killers – mental illness – compounds this problem. Dr. Pincus discussed Ms. Pike's particular mental disease, Bipolar Disorder (as discussed below) by way of example. Dr. Pincus explained that the predominant feature of Bipolar Disorder is mania that may distort one's perception of reality for extended periods of time. (Id. at 244:5-13.) It is this reality-distorting feature of certain mental illnesses that exacerbates the effects of brain damage and makes the commission of violent crime dramatically more likely.

Finally, individuals with Dr. Pincus's third factor – a history of abuse – often internalize a sense that violence is an appropriate response to confusion or agitation, and that chaotic, irrational behavior is normal. As a result, when the three factors identified by Dr. Pincus are present in tandem, in the words of Dr. Pincus, "you have a very live wire indeed." (Id. 221:13-14.)

**2. Evidence of Brain Damage**

Ms. Pike presented evidence of brain damage on post-conviction in two ways. First, she presented the expert neurological testimony of Dr. Pincus and the expert psychiatric testimony of Dr. Kenner. Second, she presented lay witnesses who testified to their observations of Ms. Pike's behavior.

### a. Expert Testimony

Dr. Pincus testified to the condition of Ms. Pike's brain, specifically noting the presence of damage to Ms. Pike's basil ganglia. Basil ganglia, according to Dr. Pincus, are "gray matter masses at the center of the brain that influence movement and to some degree thinking. (Id. at 234.)

Abnormality in Ms. Pike's basil ganglia was clear to Dr. Pincus from consistent indications across a variety of tests. (Id. at 234-38.) Evidence of basal ganglia damage was evident in the physical examination he performed on Ms. Pike, in an electroencephalography ("EEG") that had been conducted in 1977 when Ms. Pike was 14 months old, and in a small heterotopia, visible to the naked eye, on a magnetic resonance imaging ("MRI") scan performed on Ms. Pike at Dr. Pincus' request. (Id. at 234-40.) Dr. Pincus defined a heterotopia as being "formed during fetal development" when cells migrating to form the brain are interrupted and gray matter cells end up in the wrong place- in the white matter." (Id. at 241-42.) Dr. Pincus explained that heterotopia is normally visible on an MRI only with the aid of a microscope, making Ms. Pike's heterotopia significant because when you can see it with the naked eye "you can be certain that there's plenty more heterotopic areas and nests that exist that you can't see on MRI." (Id. at 244-45.) According to Dr. Pincus, this heterotopia was consistent with Ms. Pike's childhood seizures, of which Dr. Pincus was aware from reviewing Dr. McCoy's Social History. (Id.)

Dr. Pincus testified that Ms. Pike's brain damage was likely highly detrimental to Ms. Pike's capacity for moral reasoning. This was because, he explained, the extent and location of Ms. Pike's heterotopia and basil ganglia damage are such as to interfere with her frontal lobe function. The frontal lobe, Dr. Pincus stated, controls the learning and regulation of ethical behavior. (Id. at 243.) Consequently, Dr. Pincus concluded, Ms. Pike was likely born with a faulty system for incorporating morality from the world around her, and was likewise unable to place effective moral constraints on her conduct.

William Kenner, M.D., a psychiatrist who had first been appointed as the court's expert to determine whether Ms. Pike was competent to dismiss her post-conviction petition, see Pike v. State, 164 S.W.3d

257, 260 (Tenn. 2005), confirmed the findings of Dr. Pincus. Dr. Kenner stated that Ms. Pike's EEG at fourteen months suggested that her brain was not wired properly and the location of the damage was in the area that controls executive functioning and behavior regulation. (PC XXIX: 50.) Dr. Kenner further specified that the frontal lobe is responsible for setting goals, planning, anticipating consequences, initiation and sequencing, inhibition of behavioral responses, self-monitoring, and self-regulation, in addition to still other functions. (Id. at 54-55.) Dr. Kenner agreed with Dr. Pincus that Ms. Pike's frontal lobe was significantly impaired. (Id.)

**b. Lay Witness Testimony**

Ms. Pike presented two witnesses, her aunt Carrie Ross and her sister Alicia Wills, to testify to observations of Ms. Pike with regard to the issue of brain damage. Both witnesses stated that Ms. Pike exhibited behavior from a very young age that suggested some neurological abnormality.

Ms. Ross testified that, from a very young age, Ms. Pike did not seem to understand instructions. Ms. Ross said that, for example, someone might tell Ms. Pike not to play with this or that, but Ms. Pike would go right back to it. (PC VII: 178.) To illustrate this point, Ms. Ross relayed an incident in which Ms. Pike, at three years old, was throwing billiard balls at a glass door in Ms. Ross's home. (Id. at 179.) Ms. Ross explained that, although Ms. Pike was told repeatedly that what she was doing was dangerous and likely to result in harm, Ms. Pike showed no sign of comprehension and simply stared blankly into space. (Id.) According to Ms. Ross, Ms. Pike was not being willful or disobedient, but was instead in a non-comprehending, trance-like state: she had a flat affect and just stood and stared. (Id. at 181.) Ms. Ross offered this recollection as merely demonstrative, stating that Ms. Pike frequently zoned out in this manner when confronted with instruction. (Id.)

Ms. Pike's sister, Alicia Wills, testified similarly. Ms. Wills told the Post-Conviction Court that Ms. Pike did not stay with Grandmother Fotos as often as she did with Grandmother Pike because Grandmother Fotos was "frustrated by Ms. Pike's failure to comprehend when she was being told what to do." (PC IX:

368-69.) In this manner, the testimony of both Ms. Ross and Ms. Wills mirrored the findings of Dr. Pincus. Dr. Pincus's scientific testimony explains the vacant stare observed by Ms. Ross and Ms. Wills – in essence, these family members were watching Ms. Pike's brain malfunction in the face of moral teaching that failed to register.

**3. Evidence of Mental Disorder**

Ms. Pike presented extensive evidence on post-conviction that she suffers from Bipolar Disorder. This evidence, like that in support of Ms. Pike's brain damage, was put on through both expert and lay witnesses.

**a. Dr. Kenner's Testimony**

Ms. Pike's proof regarding her Bipolar Disorder was presented largely through the post-conviction testimony of Dr. Kenner. Dr. Kenner testified that he had reached an expert opinion that Ms. Pike suffers from Bipolar Disorder. This opinion, he stated, was based on numerous sources of information, including reports from three psychologists, Drs. Auble, Elliott and Engum, the evaluation by Dr. Pincus, Dr. McCoy's three-volume Mitigation Materials and Social History, the North Carolina Division of Mental Health records, medical records related to Ms. Pike's maternal grandparents, and an affidavit by Tadaryl Shipp. (PC XXIX: 26-29.) In addition, Dr. Kenner interviewed Ms. Pike eight times and conducted a collateral interview with Ms. Pike's mother. (Id. at 26, 36.)

Dr. Kenner explained that individuals with Bipolar Type II Disorder, which was his diagnosis for Ms. Pike, will have racing thoughts and be highly impulsive. Because Ms. Pike is hypomanic, she is likely to be in a condition approaching mania most of the time. (Id. at 39.) Dr. Kenner described Ms. Pike's hypomania as akin to driving with the cruise control on and set between 95 and 120 miles per hour. As a result, when confronted with problems, hypomaniacs like Ms. Pike are certain to make rash, poor decisions. (Id.) Dr. Kenner further explained that Bipolar Disorder creates in Ms. Pike a sense of omnipotence and grandiosity, making her feel invulnerable to danger. (Id. at 39-40.) Often her hypomania will manifest as irritability

rather than euphoria. (Id. at 40.) A person with Bipolar II Disorder will also have periods of depression, which Dr. Kenner noted, explains Ms. Pike's suicide attempts. (Id.)

Dr. Kenner testified that he found strong evidence of Ms. Pike's Bipolar Disorder over the course of his clinical treatment of her. On his second visit with Ms. Pike, Dr. Kenner noted seeing Ms. Pike in a fully hypomanic state. (Id. at 59-60.) After several further meetings with Ms. Pike, Dr. Kenner was able to see the affects of Bipolar Disorder on her mental state and behavior more fully. (Id. at 58-66.)

Dr. Kenner's observation of bipolar symptoms was buttressed by Ms. Pike's response to Lithium, which he prescribed to stabilize her moods. Dr. Kenner found that Ms. Pike "changed dramatically for the better," noting in particular that her impulsivity diminished and that she was able to gain some perspective on her condition. (Id. at 68.) Dr. Kenner also noted that Ms. Pike's positive reaction to Lithium had been confirmed by Dr. Auble in her psychological evaluation of Ms. Pike. (Id. at 70.) Additionally, Ms. Pike reported that while on the medication she was no longer experiencing random bouts of depression. (Id. at 69.) Dr. Kenner stated that Ms. Pike's dramatic improvement on Lithium helped solidify the diagnosis of Bipolar Disorder. (Id. at 73.)

Dr. Kenner also found ample evidence of Bipolar Disorder in Ms. Pike's life history. For instance, Ms. Pike had long exhibited the extended periods of manic energy that are symptomatic of Bipolar Disorder. In this regard, Dr. Kenner found it telling that, as a pre-teen and teenager, Ms. Pike was constantly on the move, often not sleeping because she did not want to miss activities with friends. Dr. Kenner differentiated this behavior from that of a normal teenager by noting that while normal teens might occasionally stay up all night, they would sleep during the day when exhaustion set in. By contrast, Ms. Pike never needed to make up for lost sleep. (Id. at 36-37.)

Dr. Kenner also discussed incidents in which Ms. Pike's sense of grandiosity or invincibility suggested the onset of the Bipolar illness. In one incident, Ms. Pike got into a fight with a bigger girl who was carrying a gun. Ms. Pike was shot in the leg, but, seemingly unphased, she managed thereafter to grab the other

girl's head and put it through a car window. On this occasion, Ms. Pike referred to the other girl's firearm as "a little pissy gun." (Id. at 42.) To Dr. Kenner, this indicated "more than the usual adolescent sense of omnipotence" – it suggested a manic or hypomanic state. (Id. at 42-43.)

Dr. Kenner found another example of Ms. Pike's symptomatic sense of invincibility in an incident in which Ms. Pike nearly killed a man named Kenny Clyde. Mr. Clyde had sexually harassed Ms. Pike and threatened to rape her, and in response, Ms. Pike lured him to a secluded place and beat him up. (Id. at 43.)[23] But for the intervention of a friend, Ms. Pike would likely have killed Mr. Clyde that night. (Id.)

Dr. Kenner testified that another feature of Ms. Pike's Bipolar Disorder is periodic onset bouts of mounting irritability. This results from the fact that Ms. Pike has early onset Bipolar Disorder in which hypomania will often manifest itself as irritability rather than euphoria. (Id. at 40.) Dr. Kenner saw evidence of this symptomatic irritability in Ms. Pike's conduct in the course of killing Ms. Slemmer. He testified that prior to the killing, Ms. Pike was experiencing long cycles of sleep deprivation with increasing irritability. (Id.) These cycles had actually been the norm for Ms. Pike for a period of years before the crime.[24] At the time of Ms. Slemmer's killing, Dr. Kenner explained, Ms. Pike had been awake for four days and her irritability was at its apex. (Id. at 45.)

In light of the sum total of his interactions with Ms. Pike and his review of her Social History, Dr. Kenner testified that he was able to diagnose Ms. Pike with Bipolar Disorder to a reasonable degree of medical certainty. (Id. at 74.)

**b. Lay Witness Testimony**

Ms. Pike also presented evidence on post-conviction of lay witness observations of Ms. Pike's behavior that support her diagnosis of Bipolar Disorder.

---

[23] Dr. Kenner noted that when the authorities essentially thanked Ms. Pike for 'taking care of' Mr. Clyde, they sent the wrong message. An individual as out of control as Ms. Pike, Dr. Kenner opined, needed no encouragement for her violent outbursts. (Id. at 44.)

[24] This pattern abated only when Ms. Pike was placed on mood stabilizing drugs during the course of the post-conviction proceedings.

James Matthew Martin was a judge in the Tribal Court for the Eastern Band of Cherokee Indians at the time of his post-conviction testimony on Ms. Pike's behalf. (PC IV: 37, 44.) Judge Martin represented Ms. Pike in juvenile matters in North Carolina; he was permitted to testify on post-conviction as an expert in juvenile law and issues involving juvenile sentencing. (Id. at 42-44.) Judge Martin testified that it did not surprise him that Ms. Pike had been diagnosed as having a Bipolar illness.

Orlando Powell testified that he met Ms. Pike in 1992 or 1993. (PC XI: 513.) He spent a lot of time talking with Ms. Pike during that period and recalled that she was not happy. He also recalled that she had a temper and could go from "zero to 100" very quickly. However, whenever her tempered flared up, if he was around, he was able to get her to calm down and regain control. (Id. at 516-17.) Powell also recalled that Ms. Pike had a very high energy level; he stated that if he just had a quarter of her energy it would be "super awesome." (Id. at 517.)

Peggy Hamlett testified that she was employed by the North Carolina Department of Juvenile Justice as the Chief Court Counselor for Orange and Chatham Counties. (PC XI: 589-90.) In that capacity, she supervised Ms. Pike after Ms. Pike was placed on probation (Id. at 591.) Ms. Hamlett testified that Ms. Pike was, as a young teenager, "really out of control." (Id. at 600.) Ms. Pike was exhibiting very impulsive behavior by skipping school, running away from home, and not keeping appointments. She was "huffing" (breathing fumes from aerosol cans), and Ms. Hamlett suspected that Ms. Pike was also drinking and perhaps using other drugs. (Id. at 601.)

Debby Howell Burchfield testified that she was the Director of the Buncombe Juvenile Detention Center in Asheville, North Carolina. Ms. Burchfeld stated that she met Ms. Pike when Ms. Pike was placed at the Juvenile Evaluation Center in Swannanoa, North Carolina – at that time Ms. Burchfield was working at the center. (PC XII: 610.) Ms. Burchfield's records indicate that Ms. Pike was depressed and often cried in her room. (Id. at 627.) Ms. Pike was written up for self-mutilation, which Ms. Burchfield explained is typically perceived as indicative of deeper psychological issues requiring further evaluation. (Id. at 629.) Ms.

Burchfield also reported that Ms. Pike usually exhibited a higher energy level than most teenagers, but that Ms. Pike would very quickly go from happy to depressed.

Kristina Hargis testified that she was a social worker with the North Carolina Department of Juvenile Justice, and that she had worked at Swannanoa, where she met Ms. Pike. (PC XII: 646.) Ms. Hargis functioned as a combination house parent and counselor for Ms. Pike during that time, spending eight hours a day with the students in their housing, and one hour a week individually with Ms. Pike. (Id. at 647.)

Ms. Hargis said that when she knew Ms. Pike, Ms. Pike was depressed and struggling. (Id. at 650.) Ms. Pike was also frustrated, Ms. Hargis said, because she was constantly being written up for actions she couldn't control – Ms. Pike didn't understand why she misbehaved as she did, and couldn't seem to get a handle on her impulses. (Id. at 652.) Ms. Hargis reported that Ms. Pike exhibited drastic mood changes, alternating between being up, full of life, and mischievous on the one hand, and depressed, upset, and crying on the other. Ms. Hargis testified that in her professional experience, these mood swings were more severe than those of the average teenager. (Id. at 655-56.) Ms. Hargis stated that if Ms. Pike had been able to control her moods, regulate her conduct, and avoid write-ups, she probably would have been released from Swannanoa after only six months, as opposed to the two years she was ultimately kept there. (Id. at 653.)

Onas Perry testified that she worked at the Swannanoa Juvenile Evaluation Center as a cottage technician at the time Ms. Pike was there. Ms. Perry supervised sixteen girls in their residential housing, including Ms. Pike (PC XII: 720.) Ms. Perry testified that she held a Bachelor's degree in criminal justice with a minor in social work and also had training in counseling. (Id. at 722-23.)

Ms. Perry worked the 2:00 to 10:00 PM shift at Swannanoa and was with the students from after school until they went to sleep at night. (Id. at 721.) She explained that part of her job entailed checking on the girls every 15 minutes while they slept. She noted that Ms. Pike would be asleep and then "would wake up in her sleep like a nightmare." (Id. at 727.) Ms. Onas noted that Ms. Pike's moods were different than those

of the other girls: sometimes she was calm, others she was rambunctious, out of control, and overly energetic, and still others she was depressed and would stay in her room, crying. (Id. at 732.)

Carol Goehring, a friend of Ms. Pike's when the two were in their early teens, recalled Ms. Pike as "like an attention deficit child .... Just something exciting is happening here, you know, that's good for a minute, but something – something over there. Let's go check that out too." (Id. at 545.)

#### 4. Evidence of Childhood Abuse and Neglect.

On post-conviction, Ms. Pike told the story of her life up to the time of her crime. As presented through both lay witness recollections and expert analysis, the evidence made clear that Ms. Pike's history was defined by trauma, abuse, and neglect. Ms. Pike's expert testimony clarified the manner in which this history effected the development of her identity.

##### a. Early Trauma

Ms. Pike's heterotopia is most likely the result of her mother's drinking while pregnant with Ms. Pike. Dr. Pincus opined that the most common cause of heterotopia is the mother's ingestion of alcohol during pregnancy, (PC VIII: 242), and the record is replete with evidence that Ms. Pike's mother is alcoholic and drank throughout her pregnancy with Ms. Pike. Ms. Pike's father, Glenn Pike, testified that he did not remember Ms. Hansen slowing her drinking anytime during their marriage, a period which included her pregnancy with Ms. Pike. (PC X: 438.) He testified that Ms. Hansen was a heavy drinker, drinking as many as 10 drinks during a night while they were out, whether at nightclubs or playing cards with friends. (Id. at 437.)

Ms. Pike's half-sister – Ms. Hansen's oldest child, Alicia Wills – testified that her mother always drank a lot and that she often attended parties where there was drinking when her children were small. (PC IX: 375.) Ms. Wills went on to testify that, while food was sometimes scarce, Ms. Hansen always had alcohol in her home. (Id. at 380.)

Ms. Pike's life outside the womb also began traumatically. After her premature birth, she experienced a seizure and was rushed to the intense neonatal care unit of a hospital far away, in Charleston, West Virginia. She suffered respiratory failure after birth and again in the ambulance on the way to the hospital. Ms. Pike was afflicted with hyaline membrane disease, which occurs when immature lungs prevent an infant from holding sufficient oxygen. Upon arrival at the neonatal care unit, Ms. Pike was placed on a respirator. (PC VI: 51; VII: 149; X: 440-41; Jan 07 Ex. 7 at Bates 23.)

Dr. Kenner testified that this first experience constituted early attachment abandonment trauma. Because Ms. Pike was in the neonatal unit for the first week of her life, she had no bonding experience. (PC XXX: 106.) At that time there was no human interaction with babies in neonatal care units – it was not until the 1980s that child psychiatrists began to recognize the importance of mother-child bonding from the moment of birth and subsequently insisted on human interaction under circumstances like Ms. Pike's. (Id. at109.) Dr. Kenner opined that Ms. Pike's deficit could be overcome by reasonable stability after Ms. Pike was sent home, but that did not happen in Ms. Pike's case, resulting in lasting emotional and psychological damage. (Id. at 106.)

At 14 months, Ms. Pike experienced two seizures which required that she be admitted to the hospital. (Jan 07 Ex. 7 at Bates 6-7.) It was on this admission that the EEG relied upon by Dr. Pincus was conducted. The EEG results were abnormal, showing "frequent high voltage sharp spikes and biphasic sharp waves. . . mostly from the right frontal temporal site focal." (Id. at Bates 14.) This was the first sign of Ms. Pike's heterotopia.

**b. Neglect**

From birth, Ms. Pike's parents were disinterested in Ms. Pike's well-being and treated her care as an unwelcome nuisance. (PC VII: 175-76; VIII: 253-55; X: 442-44, 449-53.) When she was 14 months old, Ms. Pike suffered two seizures. Ms. Pike's mother was out drinking on the evening the seizures occurred and had to be chided into checking on Ms. Pike. As Dr. Kenner noted, wanting to stay out partying instead of

returning to aid Ms. Pike suggested that Ms. Hansen was "[not] exactly preoccupied with her daughter." (Id. at 110.)

Neither of Ms. Pike's parents played a significant or lasting role in raising Ms. Pike. While her parents were married, primary care of Ms. Pike was delegated to Mr. Pike's mother. When they were divorced, Ms. Pike was passed back and forth between them haphazardly, each reluctantly taking Ms. Pike in for a brief period before tiring of her and sending her to the other. (PC XXIX: 2502-03.) When Ms. Pike was 8 or 9 years old, Ms. Hansen sent her to live with her father because Ms. Hansen's then-husband, Danny Thompson, told her that he did not like children and that Ms. Pike and her sister had to go. (PC VII: 169-71.) Mr. Pike initially took Ms. Pike in, but he later forbid her from entering his home after his wife alleged that Ms. Pike sexually abused their infant daughter, Ms. Pike's half-sister Lindsey. (PC X: 456-57.) Incidentally, the Court below found that there was no credible evidence that Ms. Pike "was in any way abusive to any children in her family, or otherwise." (PC V: 625 n.7.) For his own part, Mr. Pike never credited his wife's allegations – instead, he believed that Ms. Pike simply played with Lindsey, and that his wife had manufactured the abuse to keep Ms. Pike from visiting. (Id. at Bates 316.) Nonetheless, Mr. Pike made no effort to confront his wife, and instead kicked Ms. Pike out with the understanding that she was not welcome back.

During the times that Ms. Pike spent in her mother's house, she was left to fend for herself. Ms. Pike's Aunt, Carrie Ross, testified that Ms. Hansen placed her appearance, clothing, drinking, and the whims of her various husbands and boyfriends before the interests of her children. (PC VII:175.) Ms. Pike's half-sister, Alicia Wills, recalled one boyfriend in particular who frequently brought fast food and candy into the house and ate it in front of the girls, offering them nothing, though there was no food in the house. (PC IX: 380-81.)

One feature of the disregard Ms. Pike was shown by her parents was their tendency to leave her with abusive caretakers. Among these was her maternal grandmother, Zola Fotos, an alcoholic who resented

having to care for yet another of Ms. Hansen's daughters. (PC VII: 171,182; IX: 369.) While Ms. Pike's Grandmother Fotos was loving and nurturing to Ms. Pike's older half-sister, Alicia, Ms. Pike was scorned, abused, and neglected. By the time Ms. Pike was born, Grandmother Fotos was getting older and her alcoholism was worsening with the result of her drinking more frequently; part of her resentment toward Ms. Pike was that she was forced to drink less when she had to care for Ms. Pike. (PC VII: 183.) Grandmother Fotos showed her resentment of Ms. Pike with verbal and physical abuse. (PC VII: 181; IX: 368.)

Ms. Pike was also left in the care of an abusive great aunt, Norma Privett. Aunt Norma had cared for Carrie Ross when Ms. Ross was a child. While caring for Ms. Ross, Aunt Norma was very abusive and would drag Ms. Ross around by the hair. Ms. Ross did not allow Aunt Norma to babysit any of her children. However, she did babysit Ms. Pike and her sister until Ms. Ross persuaded Ms. Hansen against it. (PC VII: 159-61.)

The one bright spot in Ms. Pike's life appeared to be her Grandmother Pike. As presented at trial, shortly after Ms. Pike's birth, Grandmother Pike became her primary caretaker and appeared to be the only person in the world who loved Ms. Pike. As Ms. Pike's half-sister noted at the post-conviction hearing, "I'm sure that Christa probably felt like [Grandmother] Pike was her only security in the world." (PC IX: 375.) Unfortunately, Grandmother Pike died when Ms. Pike was 12. Ms. Pike was feeling she no longer had anyone who cared about her after Grandmother Pike's passing, and was devastated by the loss. (T XXIX: 2502-2504; PC X: 458.)

After Grandmother Pike died, the absence of any consistent parenting in Ms. Pike's youth brought the involvement of Child Protective Services, and eventually juvenile detention. Kerry Clement Sherrill testified that she met Ms. Pike while employed as a social worker for the Child Protective Services Unit of Orange County, North Carolina. (PC XI: 568.) Ms. Pike was assigned to Ms. Sherrill as a case of child abuse and neglect. Ms. Pike was in junior high at the time and being abused by her mother's then-boyfriend, Steve. (Id. at 569.) Ms. Sherill devised a treatment plan that entailed Ms. Pike's not being left alone with Steve,

parental counseling for Ms. Pike's mother, and development of a better relationship between Ms. Pike and her mother, beginning with the two spending more time together. (Id.)

Ms. Sherrill was also involved with Ms. Pike when she was removed from her home and temporarily placed in the Scheaffer House boarding facility. (Id. at 570.) Ms. Sherrill noted that while Ms. Pike was at Scheaffer House, the Department of Social Services assigned their resident expert on parenting, Bonnie Farrell, to work with Ms. Pike's mother, Carissa Hansen. Ms. Sherril explained that this assignment was significant, since Ms. Farrell was placed on only the most difficult cases. (Id. at 572-73.)

Ms. Sherrill testified that she was unsure if her treatment plan was successful in Ms. Pike's case. Ms. Sherrill had recommended that Ms. Hansen find a job that would allow her to be home more, while simultaneously taking some parenting classes and doing family therapy work. Ms. Sherrill stated that Ms. Hansen did not change jobs, that she seemed to not have taken any of the other steps prescribed in the treatment plan, and that she seemed disinterested in assuring Ms. Pike's return home. (Id. at 576-77.) In the July 9, 1991 Bimonthly review of the plan of care, the notes indicate that "Bonnie Ferrell needs to meet w/ Mother on teen parenting skills, mom has unrealistic ideas re: home placement." (Jan 07 Ex. 1, Appendix 10, Bates 156.) The proposed date for return home was July 19. (Id.) The comment in the June 23, 1991 Bimonthly Review was "[r]eturn home/but this is looking less likely. Bonnie Ferrell to do direct work with mother on parenting." (Id. at Bates 155.)

Peggy Hamlett was employed by the North Carolina Department of Juvenile Justice as the Chief Court Counselor for Orange and Chatham Counties. (PC XI: 589-90.) In that capacity she supervised Ms. Pike on probation for juvenile offenses. (Id. at 591.) After being adjudicated a delinquent, Ms. Pike was initially placed on probation, but because she kept running away from home and violating the rules of her probation, she was sent to the Swannanoa Juvenile Evaluation Center, which was a "training school," or locked facility. (Id. at 595-97.) Ms. Hamlett anticipated that Ms. Pike would be at Swannanoa for about six

months, but it ended up being much longer. Ms. Hamlett recalled that every time Ms. Pike was nearing release, she seemed to sabotage that possibility to avoid having to return home. (Id. at 597-98.)

Debbie Howell Burchfield worked at Swannanoa while Ms. Pike was held there from November 1991 to March 1993. (PC XII: 610, 614.) Ms. Burchfield testified that Ms. Pike was at Swannanoa far longer than most of the young people housed there. (Id. at 614.) Young people were released based on a point system, and Ms. Pike was unable to earn sufficient points to be released. (Id.) Ms. Burchfield stated that this failure could be taken to mean either of two things: Ms. Pike was unable to follow the rules, or she was deliberately sabotaging her chances to avoid going home.

Ms. Burchfield recalled that Ms. Pike was uncertain about what she would do when left the training school. (Id. at 615.) Ms. Burchfield also recalled Ms. Pike saying that she never felt close to either of her parents: her mother in particular was unavailable to her, and various males with whom her mother had relationships had been abusive to Ms. Pike. (PC XII: 619.) Ms. Burchfield testified that, strikingly, Ms. Pike was unable to draw a picture of herself and her mother doing something together when asked to do so by Ms. Burchfield. As a result, she was instead asked to draw something that she would like to do with her mother. (PC XII: 631.) Ms. Pike was permitted a family visit approximately once per week while at Swannonoa. Since she was there approximately 15 months, she could have received approximately 60 family visits. Of those 60 possible visits, according to Ms. Burchfield's records, Ms. Pike received eight. (Id. at 616.) Her father never visited. (PC X: 458-59.)

Onas Perry, a "cottage technician" at Swannanoa at the time Ms. Pike was held there, testified that on many occasions, Ms. Pike sought Ms. Perry out late at night to talk one-on-one. On these occasions, Ms. Pike spoke about wanting a better relationship with her mother. Ms. Pike said that her mother was unavailable, and that she wished her mother loved and cared for her more. (PC XIII: 724-25.) Ms. Perry thought that Ms. Pike had a bad family situation, (Id. at 733); she believed that the reason Ms. Pike was at the Juvenile Evaluation Center for 15 or 16 months was that it was a safe haven for her. (Id. at 728.) Ms.

Perry noted that Ms. Pike would earn a lot of points toward being discharged, but that she would then do something to blow it, suggesting that Ms. Pike was intentionally sabotaging herself. (Id. at 735.)

Jamie Robinson testified that she knew Ms. Pike when they were both seventeen: Ms. Robinson and her boyfriend were living on the streets with Ms. Pike and her boyfriend, Brian Wilson. (PC XI: 549-50, 561.) She recalled that her boyfriend and Mr. Wilson would donate plasma in order to get money for a hotel and that at times they would eat only ketchup and hot sauce they had taken from a fast food restaurant. (Id. at 552.) Ms. Robinson recalled spending the night at Ms. Pike's house on one occasion and noted that there was not much communication between Ms. Pike and her mother. Nor was there was much food in the house. Ms. Robinson also commented that Ms. Pike seemed to be without "full bedding, like sheets, on her bed." (Id. at 554.)

Ms. Robinson recalled that even when she was living on the streets, her parents still showed they cared about her. She could not say the same for Ms. Pike. She recalled an incident in which she and Ms. Pike were stopped by security officers at a mall and the officers called their parents. She recalled that her mother spent a long time on the phone with them, asking about her condition and asking to speak with her. Ms. Pike's mother, in contrast spent "two seconds" on the phone. It was Ms. Robinson's impression that Ms. Pike's mother did not care about Ms. Pike at all. (Id. at 557-58.) Ms. Robinson is now married with two children. (Id. at 548.)

### c. Physical Abuse

Ms. Pike suffered repeated physical abuse as a child. Glenn Pike admitted during his post-conviction testimony that he whipped Ms. Pike with a belt when she disobeyed him. (PC X: 448.) He testified that he would beat her when she did not complete her homework. (Id. at 451.) On at least one occasion, he beat her five or six times on the same day because she did not complete her homework to his satisfaction. (Id. at 452.)

While Mr. Pike downplayed these beatings as routine discipline, the observations and testimony of Dr. Pincus clearly demonstrate that Mr. Pike grossly understated the violent nature of these whippings. Dr. Pincus testified about his observation of scars on Ms. Pike's back that were most likely caused by a belt or switch wielded by a right-handed assailant. (PC VIII: 252.)

Ms. Pike also suffered violent physical assaults by the other men in her surroundings. Her mother's boyfriend, Steve Kyaw, was charged with assaulting Ms. Pike when he punched her in the nose. (PC VI: 61.) Carol Goehring, a childhood friend of Ms. Pike's, testified to this abuse. (PC XI: 534-36.) Ms. Goehring stated that she and Ms. Pike first met in the seventh grade and were very close friends for about a year. (Id. at 535-36.) For a couple of months, she visited in Ms. Pike's home about twice a week. This lasted until she was no longer permitted to visit after she witnessed Steve Kyaw attack Ms. Pike. (Id. at 536-37.)

Ms. Goehring described the attack as follows: she and Ms. Pike were in Ms. Pike's room when Mr. Kyaw came home. He began yelling and telling Ms. Pike to come out. He initially walked away while yelling, and Ms. Pike locked the door, but he then returned, yelling and screaming and determined to get in. He then went out the front. Ms. Pike did not want Ms. Goehring to know what was about to happen so she told Ms. Goehring to go out the back. But since Ms. Goehring was not familiar with the neighborhood and did not know where to go, she stood at the door and watched Mr. Kyaw force his way into Ms. Pike's room. Ms. Goehring then squatted by the side of the house and waited. She heard bumping and yelling, and a couple minutes later Ms. Pike came out of the house very panicked. Ms. Pike had a knife in her hand, her face was red, and she was trying to adjust her pants. Ms. Pike and Ms. Goehring then walked to a pay phone and contacted Ms. Goehring's mother who came to get them. (Id. at 537-38.) Ms. Goehring found this very traumatic as she had never experienced anything like it before. (Id. at 539.) She noted being surprised that when Ms. Pike's mother arrived to pick her up later that day Ms. Pike did not appear to want to go with her. It was clear to Ms. Goehring that Ms. Pike did not see her mother as someone who would protect her. (Id. at 542.)

Another instance of physical abuse occurred when Ms. Pike's sister's boyfriend, Brian Hammond, gave Ms. Pike a bloody nose -- he had been dispatched to check on Ms. Pike while Ms. Hansen was out of town with a husband, and was angered to find that Ms. Pike was having a party at the house. (PC VI: 59-60.)

Dr. Kenner testified that the physical abuse by Ms. Pike's father, Grandmother Fotos, Danny Thompson, Steve Kyaw and others was highly damaging to Ms. Pike's developing psyche. (Id. at 111-13.) This abuse, he stated, increased the likelihood that Ms. Pike would develop dissociative symptoms, or breaks from reality. (Id. at 112.)

**d. Sexual Abuse**

Ms. Pike was the victim of repeated sexual abuse as a child. Although Ms. Pike's Grandmother Pike brought a uniquely positive dimension to Ms. Pike's childhood, even this relationship was not without its harmful side. Although the proof was not absolute, there were indications that Grandmother Pike's male companion, Ernest, sexually abused Ms. Pike. When Ernest spent the night, Ms. Pike would sleep between him and her Grandmother. When Ms. Pike was two or two and half years old, Carrie Ross noticed that Ms. Pike often stroked Grandmother Pike's breasts in an inappropriate, sexual manner. (PC VII: 185-86.) Furthermore, when Ms. Pike was in the first grade, her teacher reported that she had been drawing pornographic pictures in class, suggesting abusive exposure to sex. (Id. at 188.)

Ms. Pike was also sexually abused by some of the men with whom her mother lived. Evidence was presented that Ms. Hansen lived with Steve Kyaw when Ms. Pike was 12 or 13. (PC VI: 61.) Kyaw had boxes of pornographic pictures that Ms. Pike had access to, and Kyaw would wrestle with Ms. Pike and twist her nipples. (PC VIII: 263-265.)

A man named Claude Davis sexually assaulted Ms. Pike when she was 11 years old, violating her vaginally with sticks and allowing his dog to lick her genitalia. (PC VIII: 257; Jan 07 Ex. 5.) Criminal charges were later reduced when Mr. Davis shaved his beard and Ms. Pike's subsequent identification was deemed

"unreliable." (PC VI: 67.) Shockingly, both Ms. Hansen and Ms. Pike's sister, Alicia, expressed doubt that Ms. Pike was telling the truth when she first related this horrifying experience. (PC VIII: 257-59.)

However, that Ms. Pike was, in fact, sexually assaulted by Claude Davis can hardly be denied. Kerry Sherrill – a social worker for Child Protective Services assigned to Ms. Pike – testified that while Ms. Pike was at Scheaffer House, a residential facility for neglected and abused children, Ms. Pike wrote a letter to her friend Brandi telling her that nothing was working out in her life, that she was very unhappy, and that she had made a plan to commit suicide. (Id. at 574; Jan 07 Ex. 1, Appendix 10, Bates 139-143.) In the letter, Ms. Pike listed the things that had gone wrong in her life and lead her to decide on suicide. (Jan 07 Ex. 1, Appendix 10, Bates 142.) In that list, she included: "5. Me being raped by Claude Davis." (Id.) She also told Brandi that she was glad she had her as a friend and that she wanted Brandi to have the "two things that mean more to me than Anything in the world, (1) My Grandmother's rings and (2) My Bible." (Id. at Bates 141.) Ms. Sherrill noted that a child, when writing a letter bearing her soul to an obviously dear friend, was not likely to exaggerate or lie. On the contrary, since Ms. Pike had no adults who either listened to or trusted her, Ms. Pike was left to turn to a friend to share her deepest secrets. (PC XI: 575.)

Ms. Burchfield, who worked with Ms. Pike at Swannanoa, corroborated the account of Ms. Pike's having been raped at age 11. (Id. at 626-27; (Jan 07 Ex.1, Appendix 45, Bates 711).) In particular, Ms. Burchfield testified that the rape was included in the social history she obtained from Ms. Pike at Swannanoa; and that in Ms. Burchfield's experience the information obtained from students in this process had "pretty much been truthful." (PC XII: 626-27.) Ms. Burchfield's notes further indicate that Ms. Pike reported three separate suicide attempts, the first of which was in response to Ms. Pike's mother not believing that Ms. Pike was raped at age 11. (Jan 07 Ex.1, Appendix 45, Bates 716.)

When Ms. Pike was 16 or 17 years old, she was raped by a man who grabbed her when she was going to the store. (PC VI: 66-67.) Hospital records confirmed the rape. (Jan 07 Ex. 6.)

Ms. Pike's history of sexual abuse was corroborated by the testimony of Onas Perry, Ms. Pike's cottage technician at the Swannanoa Juvenile Evaluation. During their late night talks, Ms. Perry stated, Ms. Pike reported being verbally, physically and sexually abused. (Id.) Ms. Onas took such comments very seriously because she had been a foster parent for about 10 children and had seen child abuse and the damage it caused. Ms. Perry was also the victim of childhood abuse herself. Ms. Perry testified that Ms. Pike's reporting concerning abuse resonated as truthful. In addition, Ms. Perry noted that as a general matter, when a student had a problem that necessitated a conversation in the middle of the night, the student was unlikely to make up the substance of the conversation. (Id. at 726.)

**e. Overstimulation**

Overstimulation refers to childhood exposure to adult themes, as well as the resultant effects for cognitive development that may follow. Ms. Pike suffered overstimulation as a result of exposure to graphic horror movies and pornography, and the slaughter of animals.

Dr. Kenner testified that Ms. Pike was first exposed to pornography at a young age, when she played with her father's pornographic playing cards. She took these cards to school in either kindergarten or first grade to show her classmates. (PC XXX: 126.) Faye Guy testified that when Ms. Pike was nine or 10 she had access to pornographic movies that belonged either to Ms. Hansen or her then-boyfriend, Steve Kyaw. (PC X: 497.) Dr. Kenner testified that this access amounted to exposure: using the "stacks of porno flicks" that Mr. Kyaw watched until Ms. Pike's mother came home from work, Ms. Pike would occupy herself when left home alone. (PC XXX: 126.)

Dr. Kenner explained that this early and intense exposure to pornography was likely to have "sexualized" Ms. Pike, making her more interested in sex than normal and more likely to see sexual innuendo where others would not, and more fearful of being sexually vulnerable. (Id. at 128.) This, in turn, would have had a cumulative effect in combination with Ms. Pike's history of sexual abuse and Bipolar Disorder. As Dr. Kenner put it, "it's kind of like one plus one is 11." (Id. at 130.) Hyper-sexuality is already a

common symptom of Bipolar Disorder, Dr. Kenner explained, and the additional damage of sexual abuse and overstimulation would have greatly amplified the risk that Ms. Pike would act out sexually. (Id.) Ms. Pike was, in fact, far more sexually active than her peers. (M Mat: Appendix 30, 31.) Dr. Kenner explained that, for a female, sexual experiences with many males would result in subsequent loss of self-esteem, making Ms. Pike particularly sensitive to being called a "slut," "whore" or the like. (Id.)

Ms. Guy testified that Ms. Pike was also inappropriately exposed to graphic images of gore and violence when Ms. Pike and her mother watched horror movies together. (PC X: 497-98.) Ms. Guy described these particular movies as "horrible, horrible bloody gory movies" that were simply not age-appropriate for Ms. Pike at the time. (Id. at 498.) Ms. Guy testified that she once told Ms. Hansen that these movies were inappropriate for Ms. Pike, but that Ms. Hansen laughed it off, saying, "[w]ell, she loves them. She's been watching those movies since she was two or three years old." (Id. at 498-99.) Ms. Guy did not remember the titles to the movies but remembered that one was about Freddy Krueger and another had to do with a man that chopped people up with a chain saw. She recalled that the movies sounded very vivid. (Id. at 499.)

Ms. Pike's aunt, Carrie Ross, also testified to Ms. Pike's exposure to graphic violence in movies from a young age. Ms. Ross could not recall precisely how old Ms. Pike was at the time, or what movies in particular she was shown, but Ms. Ross was certain that Ms. Pike was at least as young as grammar school, and that the movies were horrendously inappropriate for children of that age. (PC VIII: 203.)

Some of the movies Ms. Pike was exposed to as a child included The Mutilator and The Re-Animator. (PC XXX: 120.) The Mutilator involves vivid depictions of killings by cutting up people while they are alive. There is one scene in particular in which a woman is shown "lying helplessly on the table while a man takes a giant fishhook and places it through her perineum and out her abdomen." (Apr 08 Ex. 45 (DVD with clips of both movies); PC XXX: 120.) In The Re-Animator, one scene portrays a man severing another man's head with a flat shovel. In the next scene, the severed head sits – still alive – in a pan next to a table on

which a naked woman is tied. The movie then shows the severed head moving in a sexually explicit manner first to the woman's breasts and then to her vaginal area. (Apr 08 Ex. 45; PC XXX: 121.) Counter-intuitively, these movies had pleasant connotations for Ms. Pike because watching them was virtually the only way she was able to spend time with her mother as a child.

The other primary source of overstimulation for Ms. Pike was her grandfather's slaughterhouse. From the time that Ms. Pike was a toddler, she frequently spent days with her Grandfather in his slaughterhouse. According to the testimony of Carrie Ross, Ms. Pike would first play with the cows in the holding pen. (PC XXIII: 584-85; XXIV: 608; Apr 08, Exhibit 27.) Then, Ms. Ross explained, Ms. Pike would go into the slaughter house and watch as her grandfather knocked a cow unconscious, hoisted it by its hind leg, cut its throat, drained its blood, removed the guts, preserving those that could be sold, and bisected the cow down the spine using a meat saw. (PC XXIII: 586-90) (Ms. Ross described the process used by Ms. Pike's Grandfather when slaughtering cows using the pictures in Exhibit 27; Apr 08, Ex. 28 (clip from a DVD depicting the slaughter of a cow); (PC XXIII: 591 - XXIV: 602) (Carrie Ross describing video concerning slaughter of a cow and commenting that this was the same process used by her father).) Ms. Ross testified from personal experience that this is what Ms. Pike would have seen when she spent time with her grandfather. (PC XXIII: 593-95, 598.)

Afterword, Ms. Pike, while still a toddler, would inspect the contents of the gut bucket – the container into which the animal's guts were dropped during the slaughtering process. (PC XXIII: 586-87.) As Dr. Kenner explained, this activity might have been appropriate and even educational for an older teenager or adult, but was highly inappropriate and damaging to the brain of a small child. (PC XXX: 114.)

Dr. Kenner explained the connection between Ms. Pike's repeated overstimulation as a child, neglect, and abuse, testifying Ms. Pike's fight or flight reaction became over developed. As a result where others may have seen fear in Ms. Slemmer's face during the attack, Ms. Pike would see anger. (Id. at 139,154.)

Dr. Kenner explained overstimulation removed from Ms. Pike the natural inhibition to escalating violence that is inherent in individuals not similarly exposed. (Id.)

### f. Glorification of Violence

Ms. Pike was raised in an environment that not only condoned but also revered violence as a means of problem-solving. This system of values inhered in the larger community in which Ms. Pike was raised. As Carrie Ross testified, where she and Ms. Hansen grew up "[e]veryone solves everything with violence .... you learned early on that you didn't – you don't run your mouth because if you do somebody will shut it for you. And that's cultural throughout the state [of West Virginia] pretty much." (PC VII: 166.)

Ms. Ross made clear that this value system was firmly entrenched in Ms. Pike's family. Ms. Pike's mother, Carissa Hansen, would commonly threaten physical violence whenever she was angry. (PC VII: 165.) Ms. Ross testified that the family was taught that the appropriate response to verbal or physical attack was physical violence. (PC VII: 164.) On one occasion, Ms. Ross was ridiculed by her mother, Zola Fotos, for walking away when another woman tried to pick a fight with her. Ms. Fotos challenged her daughter to go back and finish the altercation, asking "what are you going to kill her with?" and calling her a coward. (PC XXIII: 572.) In the words of the Post-Conviction Court below, "Ross testified that in the Fotos family you were taught that if someone starts something that you better finish it or you would get it when you came home." (PC V: 617.)

This same message was delivered to Ms. Pike. Her grandfather, Chris Fotos, repeatedly told the grandchildren that if someone started a fight with them and they did not finish it, then he would kick their butts when they got home. (PC XXIII: 577.) Ms. Pike's maternal Grandmother Fotos concurred in these teachings. (Id.)

Ms. Pike's great-grandfather Gust Fotos was a very violent man.(PC XXIII: 566.) Ms. Pike's grandfather, Chris Fotos, left home at a very young age to avoid beatings from Gust Fotos. (Id.) It was well

known in the family that Gust Fotos had a step-daughter that he kept locked in the basement and to whom he would deny food when he got angry with his wife, Ms. Pike's great-grandmother. (Id. at 567.)

Family gatherings were filled with stories about Gust Fotos. One frequent story involved his "heroic" efforts in one of the early battles between the coal mine operators and the Mine Workers Union. According to legend, while a car-load of non-union workers ("scabs") taking the jobs of striking union members was being lifted out of a mine by cable, Gust Fotos cut the cable, and a car-load of workers plunged to their deaths. (Id. at 568-70.) This account of mass-murder was passed down with pride and reverence. In another popular family story, a man in Chris Fotos' butcher shop reached for a piece of meat that Gust Fotos wanted – Gust Fotos impaled the man's hand on a butcher block. Both Chris and Gust Fotos considered the incident humorous. (Id. at 570-71.) Such stories were told with laughter at Ms. Pike's family gatherings. (Id. at 569-71.)

Ms. Pike's grandfather Chris Fotos was extremely violent in his own right. For instance, it was widely known in Ms. Pike's family that he would threaten to kill anyone who crossed him or otherwise gave him a hard time. (PC VII: 164.) He made such threats wantonly and in front of anyone, including Ms. Pike. (Id.) When the IRS brought a tax claim against Chris Fotos, he smuggled a gun into a federal courtroom to threaten the judge. (Id. at 164-65.) This was another favorite anecdote among Ms. Pike's family. When Grandfather Fotos told the story, the judge asked why he had the gun and Mr. Fotos told the judge – the punch line – that it was to "unseat" him. (Id. at 165.)

Ms. Pike's maternal grandmother, Zola Fotos, also instilled a code of violence in Ms. Pike. Grandmother Fotos, a severe alcoholic who frequently looked after Ms. Pike, was often seen in the afternoon shuffling around her unkempt home with a loaded pistol, drunk and mumbling threats to unseen trespassers. (PC XXIII: 574.)

Ms. Pike also received positive reinforcement for her own acts of violence. In a particularly telling example, Ms. Pike was praised by a state court judge for her assault on Kenny Clyde. Mr. Clyde, a local

pervert, began stalking Ms. Pike, even calling her home and making lurid suggestions to her mother. (PC VII: 101-02.) At one point, Ms. Pike's step-father, Gerard Hansen, went out looking for Mr. Clyde, but without success. (Id. at 116.) Subsequently, Ms. Pike and her friend Mandy, whom Mr. Clyde had also threatened to rape, lured Mr. Clyde to a remote spot and beat him up. (Jan 07, Ex. 1 at Appendix 31 Bates 537.) During this attack, Ms. Pike lost control completely and moved to run Mr. Clyde over with her car. (Id.) Mr. Clyde would likely have been killed that night had not Mandy reached over with her foot and jammed on the brakes, bringing the car to a stop before Mr. Clyde was hit. (PC VIII: 269-70, 277-78.) Ms. Pike was charged with assault, but the case was ultimately dismissed because Mr. Clyde was no longer available as a witness to testify; he was serving time for molesting two toddlers. (PC VII: 102.) In dismissing Ms. Pike's case, the Judge commented that Ms. Pike had done society a favor by attacking Mr. Clyde. (PC VIII: 271.) Ms. Pike's family ethos in violent self-help was thus reinforced.

**g. PTSD**

As noted above, Dr. Kenner discussed how the combination of neglect, abuse, overstimulation and glorification of violence affected the development of Ms. Pike's brain. (Id. at 137.) Dr. Kenner also explained how various stress hormones – produced in response to near-perpetual fear of something bad happening – lead to development of Post-Traumatic Stress Disorder ("PTSD"). (Id. at 147.) After reviewing the criteria for PTSD, Dr. Kenner indicated to a reasonable degree of medical certainty that Ms. Pike suffers from PTSD. (Id. at 149-53.)

Dr. Kenner opined that children such as Ms. Pike that have been traumatized will expect to be traumatized in the future and will distrust other people. Because Ms. Pike is also Bipolar, she "took it upon herself to protect herself and others in ways that were grandiose and flamboyant and dangerous." (Id. at 157.)

### h. Circumstances Directly Preceding Ms. Slemmer's Killing

In the months leading up to Ms. Pike's participation in Ms. Slemmer's Killing, Ms. Pike was surrounded by circumstances that greatly amplified her potential for violent behavior. These circumstances centered around her matriculation at Job Corps, and her relationship with codefendant Tadaryl Shipp.

William Joseph Mode was an instructor at Job Corps from 1992 through April 19, 1995. He testified that the Job Corps facility was dangerous for both students and faculty. (PC XIII: 760, 763-67.) He knew that Mr. Shipp was both an uncooperative student and dangerous. (Id. at 765-66.) He was aware the many students were armed with either knives or guns, and that Mr. Shipp in particular was widely known to be in possession of a firearm. (Id. at 767.) Mr. Mode explained that, while the most dangerous students were readily identifiable, a private company held the contract to run the Job Corps center in Knoxville, and the company was paid based upon the number of students at the facility. Consequently, Job Corps was very reluctant to remove a student from the program. (Id. at 769-71.)

Andrew Scott Drace attended Job Corps at the same time as Ms. Pike. (PC XII: 676.) He testified that Job Corps was a very violent place due to the presence of gangs and predatory students who picked on others. (Id. at 677.) He indicated that because he was Caucasian, the gang members would come into his room and put a towel or sheet over him and beat him up. (Id. at 679.) Tadaryl Shipp was one of these gang members. (Id.) Mr. Drace explained that of all the males in the dormitory, very few were Caucasians, perhaps as few as ten, and that these young men had a difficult time of it. (Id.) Mr. Drace said that he did not personally know Shadolla Peterson – Ms. Pike's second codefendant – but that he did know Mr. Shipp quite well "because [he] was in fear of him on a daily basis." (Id. at 681.) Mr. Shipp was the leader of his group and made it known that he was "a thug." (Id. at 682-83.)

Mr. Drace stated that on one occasion, Mr. Shipp tried to pick him up and throw him off of a bridge onto a railroad track some 200 feet below. (Id. at 683.) Mr. Drace managed to get away when several cars

crossing over the bridge stopped to investigate and Mr. Shipp was distracted, fearing witnesses to the attempted murder. (Id. at 684.)

Kimberly Rhodes testified that she had been a student at Job Corps and a friend of Ms. Pike's. (PC XIII: 790.) Ms. Rhodes testified for the State at Ms. Pike's 1996 trial under her maiden name "Iloilo."[25] (Id. at 790-91.) In her testimony, she indicated that Job Corps was scary at times, and that she was afraid for her personal safety. She elaborated that there was a lot of animosity between different groups, and that this sometimes led to violence. (Id. at 793-94.) She also testified that there was a lot of drug use. (Id. at 794.)

Dr. Kenner explained the psychological foundation of Ms. Pike's relationship with her co-defendant Tadaryl Shipp. Dr. Kenner stated that Ms. Pike was infatuated with Mr. Shipp. (PC XXX: 168.) The available information concerning Mr. Shipp was that he was violent, dangerous, had been involved in gang related violent activity before coming to Job Corps, and practiced Satanism. (Id. at 169.) His appreciation of violence and Satanic worship exerted a strong influence on Ms. Pike, who was willing to adopt his interests in effort to please him and thereby bolster her low self-esteem. Around the time of Ms. Slemmer's death, though Mr. Shipp was dating Ms. Pike, he was sexually involved with other women. Mr. Shipp had a history of both manipulating and abusing adolescent females. (See PC XV: 182-84; XVI: 217-25.) He also had a history of threatening the girls he dated if he did not get his way. (PC XV: 184; XVI: 222.)

Ms. Slemmer, the victim, was also involved with Tadaryl Shipp. The competition for Mr. Shipp's affections precipitated a feud between Ms. Slemmer and Ms. Pike. Ms. Slemmer provoked Ms. Pike by burning a photo of her grandmother and standing over her bed with a box cutter. This fueled Ms. Pike's insecurities and played into her sense of self-worth and relationship dependency. (Id. at 169-70.)

### i. Religious Confusion

Ms. Pike put on evidence at post-conviction to suggest that she had long struggled with religious themes and identification of her own beliefs. Ms. Hargis testified that Ms. Pike was searching for answers

[25] Ms. Rhode's maiden name is misspelled in the transcript as Ellow. (PC XII: 792.)

about religion and would often ask her questions about Ms. Hargis' own beliefs. (PC XII: 655.) Ms. Perry testified that she and other counselors at Swannanoa saw Ms. Pike as searching and experimenting to find out who she was, as well as what God and the devil were. (PC XIII: 730-31.) As discussed below, Dr. McCoy also noted religious confusion as a recurrent theme in Ms. Pike's young life. When coupled with evidence that Ms. Pike's interest in Satanism was sparked by Tadaryl Shipp, on whom she was completely doting and dependent, Ms. Pike's dabbling emerges as the product of youthful confusion and experimentation, as opposed to a deeply held, sinister belief system.

**5. Evidence of Ms. Pike's Positive Traits**

Ms. Pike also presented evidence on post-conviction of her positive personality traits. This evidence conveyed Ms. Pike's intelligence, good humor, and humanity in a manner that would have been essential to humanize Ms. Pike in contrast with the evidence of her crime.

Kerry Sherrill, the social worker for Child Protective Services assigned to Ms. Pike's case, recalled Ms. Pike as very bright and loyal to her friends. (PC XI: 578.) Ms. Sherrill thought that Ms. Pike sometimes acted out, but only for attention. (Id.) Ms. Sherrill kept a picture of Ms. Pike, and explained that she kept pictures of the children who touched her most. (Id. at 578-579, Jan 07 Ex. 8.) She recalled that Ms. Pike was always respectful when they met, but that sometimes, when Ms. Sherrill was supposed to pick Ms. Pike up at school, Ms. Pike would stand her up because she had skipped school. (PC XI: 586.)

Peggy Hamlet supervised Ms. Pike's probation when Ms. Pike was a young adolescent. Ms. Hamlet testified that Ms. Pike was clearly very bright and that her teachers reported that she had great potential. (PC XI: 600.)

Carol Goehring, a one-time close friend of Ms. Pike's, testified that Ms. Pike held friendship in very high regard and was very loyal. She recalled a time when a new girl in town named Brandy was put out of her home and had nowhere to go. Ms. Pike was concerned for Brandy's safety and stayed with her on the

streets. (PC XI: 543-44.) When Ms. Pike was around Ms. Goehring, she seemed happy and was very energetic, always wanting to do something fun. (Id. at 544.)

Debby Burchfield, who testified to working with Ms. Pike while Ms. Pike was housed at the Swannanoa juvenile detention facility, recalled that Ms. Pike planned to enroll in technical college to study nursing with a long term goal of becoming a physician's assistant. Ms. Burchfield saw Ms. Pike as bright and very personable; Ms. Burchfield testified that she considered Ms. Pike's goals attainable. (PC XII: 621.) Ms. Burchfield pointed out that, while at Swannanoa, Ms. Pike completed her GED and applied to Job Corps. The plan was for her to go directly from the training school to Job Corps, but Ms. Pike was placed on Job Corps wait list and was unable to matriculate immediately. (Id. at 623.)

Kristina Hargis, a social worker at Swannanoa, testified to recognizing Ms. Pike at the post-conviction proceeding despite the passage of 14 years. Ms. Hargis thought she and Ms. Pike had a good relationship and that Ms. Pike would open up to her and tell her what she was thinking. (Id. at 654.)

Marshall Muse testified that he was a teacher of Ms. Pike's at Swannanoa's training school. (PC XII: 663.) At first, he said, Ms. Pike was defiant in his class and he wrote her up for misbehavior numerous times. (Id. at 664.) But after Ms. Pike understood that Mr. Muse was in charge, he went on, she began to work in his class and he saw "flashes that there's something special, something different, something that set her apart from the other students." (Id. at 664-65.)

Mr. Muse then made Ms. Pike a teacher's aide. In that capacity, she performed tasks for Mr. Muse in the afternoon, and he could always count on her to do what she was assigned and nothing else. (Id. at 665.) She was trusted not only by Mr. Muse, but also by other faculty members. Consequently, she was given assignments by other faculty members and was given the run of the campus to perform various errands. Mr. Muse also indicated that he and Ms. Pike had a healthy respect for each other and that she had a delightful sense of humor. (Id. at 666.)

Mr. Muse recalled that in response to one particular Thanksgiving writing assignment, Ms. Pike included him in her story as the "mean Muse" pitted against a pumpkin, the story's protagonist. Mr. Muse noted that the story was in good humor and he published it for the whole campus to enjoy. (Id. at 667.)

On a different writing assignment, however, he recalled writing Ms. Pike up for not doing the assignment satisfactorily. He had asked the students to write about heroes and observed that Ms. Pike had waited until the last seven minutes of the period to write anything and then simply scrawled a "smart-alec" response. Ms. Pike, he went on, responded by writing a lengthy appeal of the write-up, explaining why she had been unable to answer the questions posed. (Id. at 668-669; (Jan 07, Ex.1, Appendix 45, Bates 669-771.) In her appeal, Ms. Pike commented that Mr. Muse had written her up three other times, and that she had not appealed any of those write-ups because she had been guilty. In contrast, she felt differently about this write-up. (Ex. 1, Appendix 45 at 771.) Mr. Muse stated that, in retrospect, he understood that Ms. Pike had difficulty identifying a hero and struggled with the assignment for that reason – ordinarily, she wrote more than was required. (PC XII: 668-69.)

Mr. Muse remarked that Ms. Pike loved to be challenged intellectually and rose to the occasion each time. (PC XII: 669.) He testified that Ms. Pike did well whether she was working with under-achieving students or doing menial chores, like cleaning up the classroom. She respected the other students, and Mr. Muse even had her substitute for him when he was absent. (Id. at 670-71.)

Onas Perry, Ms. Pike's cottage technician at Swannanoa, testified that Ms. Pike generally got along with the other girls in the cottage. She noted that on one occasion, Ms. Pike comforted another girl who was upset, telling her that everything was going to be okay. She also recalled that each time a new girl arrived, Ms. Pike would take the lead in trying to make the girl feel welcome. (PC XIII: 736.)

Ms. Perry discussed two other incidents involving Ms. Pike's interaction with other students. In the first, Ms. Pike was talking with another girl who liked the same boy as Ms. Pike, and Ms. Perry feared that a fight was imminent. To her surprise, however, Ms. Pike told the other girl that if she wanted the boy, she could

have him. On the second occasion, a girl took something from Ms. Pike and Ms. Pike confronted her, saying that if the girl needed the thing more than Ms. Pike did, she could have it. Ms. Pike merely told the girl she should have asked for it first. (Id. at 729-30.)

Reverend Jacqueline Olebe testified that she was a health instructor at the Job Corps center between 1994 and 1995. (PC XIII: 774.) Reverend Olebe had Ms. Pike as a student in her health and parenting classes. (Id. at 775.) When Ms. Pike was not sleeping in class, she was a "very sharp student;" however, usually she was either asleep or absent. (Id. at 776.) Reverend Olebe noted that Ms. Pike did complete her health and parenting modules, and that Ms. Pike was always respectful to her and others. (Id. at 776-77.) Reverend Olebe also encountered Ms. Pike coming before the Drug Abuse Panel seeking help for abuse of marijuana and alcohol. (Id. at 778-79.)

Kimberly Rhodes (Iloilo) met Ms. Pike on Ms. Rhodes' first day at Job Corps. After she finished orientation, Ms. Rhodes sat with Ms. Pike and they talked for four or five hours, immediately becoming close friends. (PC XIII: 795.) Ms. Pike and Ms. Rhodes had a "really good relationship" and shared with each other whatever they had. (Id.) Ms. Rhodes thought that she felt close to Ms. Pike because neither of them felt like they fit in with their family. (Id. at 795-96.) They confided in one another and Ms. Rhodes felt safe with Ms. Pike. (Id. at 796.)

**B. Ms. Pike's Post-Conviction Mitigation Case was Readily Available for Presentation at the Time of Trial.**

All of the elements of Ms. Pike's post-conviction proof of mitigation were available for presentation at trial, whether because already in Defense Counsel's possession, or because easily discoverable through minimally diligent investigation. Defense Counsel had access to an abundance of evidence of both brain damage and mental illness through expert testimony, as well as an overwhelming quantum of lay witness testimony regarding all aspects of Ms. Pike's mitigation case.



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 74 of 196 PageID #: 8945

**1. Availability of Expert Testimony Regarding Brain Damage.**

Defense Counsel put on no evidence of Ms. Pike's brain damage at trial. To the contrary, Counsel's expert psychologist Dr. Engum found that Ms. Pike possessed no brain damage at all. This was error.

As Dr. Kenner testified, at the time of Ms. Pike's trial in 1996, "there was data to understand Ms. Pike's congenital brain abnormality." (PC XXIX: 35.) He noted that the EEG, produced when Ms. Pike had seizures at the age of 14 months, indicated an abnormality in her right frontal lobe. Additionally, Dr. Kenner pointed to medical records that contained information that her head had gone through the windshield when she was in her early teens. He testified that these events indicated the possibility of brain damage and thus a reasonable standard of care required that sophisticated brain scans be conducted. (Id. at 48-49.) Dr. Kenner noted that had such scans been conducted, they would have shown an abnormality in the right frontal lobe as well as the super orbital heterotopia that Dr. Pincus described. (Id. at 49.)

Dr. Pincus confirmed that Ms. Pike's history of seizures and EEG results provided important information from which to conclude that she had brain damage. He explained that Dr. Engum missed these clues both because he had neither a complete social history nor the EEG. He stated that although the EEG results had been in existence since the 1970's, interpreting them was beyond the expertise of a psychologist such as Dr. Engum. (PC VIII: 285.) Dr. Pincus emphasized that you cannot rely on one set of testing for the reason that a test result showing abnormality on any one test is definitive of the existence of abnormality – thus a multitude of tests is necessary. (Id. at 223-24.)

Dr. Pincus also testified that the most important information for his examination was Dr. McCoy's Social History. (Id. at 223.) He pointed out that because Dr. Engum had relied on his own clinical interview and neuropsychological testing alone, he had overstated his expertise when he testified that Ms. Pike had no brain damage. Dr. Pincus noted that the best Dr. Engum could have said, in actuality, was that *his evaluation* did not show brain damage. (Id. at 248, 281-87.) In fact, Dr. Pincus explained, there are no

*psychological* tests that will show abnormality in the area of the brain affected by the damage that Ms. Pike possesses – distinct neurological testing is essential. (Id. at 250.)

Furthermore, even the most cursory of interviews with Ms. Pike's immediate family would have revealed that Ms. Pike's mother, Ms. Hansen, has been an alcoholic since well in advance of Ms. Pike's birth. Investigation would have shown that Ms. Hansen drank heavily while pregnant with Ms. Pike, and this discovery would have suggested that Ms. Pike might suffer from congenital birth defects.

**2. Availability of Expert Testimony Regarding Mental Illness**

At the time of trial, Defense Counsel were operating under the theory that Ms. Pike suffered from Borderline Personality Disorder, not Bipolar Disorder, as Ms. Pike established on post-conviction. In the first place, there was clear evidence at the time of trial to support the more proper diagnosis of Bipolar Disorder. But ultimately, a complete case based on a theory of Borderline Personality Disorder would nonetheless likely have been effective, had it been put before a jury. Trial Counsel did not, however, put on the case for mental illness that it had prepared.

**a. Bipolar Disorder was the Proper Diagnosis.**

As a threshold matter, Ms. Pike presented proof that her Trial Counsel should have arrived at a theory based on a diagnosis of Bipolar Disorder. Dr. Kenner testified that, "[t]here was significant data to suggest early onset Bipolar Disorder." (PC XXIX: 39.) Dr. Kenner identified specific entries from Ms. Pike's records – available at the time of trial – that would have suggested this diagnosis. For instance, there were many entries indicating that Ms. Pike had far more energy than others around her, and that she had problems sleeping. (Id.) Dr. Kenner found further evidence of the Bipolar Disorder through Ms. Pike's three suicide attempts, noting that in a Bipolar II Disorder there is an initial period of depression. (Id.) Moreover, Dr. Kenner suggested that Ms. Pike's EEG at 14 months would also suggest possible development of Bipolar Disorder, since there is a high correlation between Ms. Pike's brain damage and development of Bipolar Disorder as a teenager. (Id. at 49-50.)

Dr. Kenner explained that the Borderline Personality Disorder diagnosis by Dr. Engum and its support by Dr. McCoy, although incorrect, was not altogether out of the ball park. He noted that many people with early trauma histories, such as that of Ms. Pike, have been diagnosed as having Borderline Personality Disorder. (PC XXX: 209-10.) Moreover, he indicated that many things that used to be considered personality disorders are now seen as part of the bipolar spectrum. (PC XXIX: 78.) According to Dr. Kenner's testimony, Bipolar Disorders are often misdiagnosed as Borderline Personality Disorder – a fact that has been documented in numerous studies. (Id. at 79.) Dr. Kenner explained that since the experts at the time of the trial did not see Ms. Pike over a period of time, they could not have properly diagnosed Ms. Pike because a diagnosis of Bipolar Disorder requires significant clinical observation. (Id. at 87.) Dr. Kenner stated that the decisive factor in finding that Ms. Pike is bipolar, and not borderline, was Ms. Pike's positive response to mood stabilizing medication. (PC XXX: 208-09.) [26]

On post-conviction, Dr. McCoy was asked about the diagnoses made since the time of Ms. Pike's original trial. With regard to the diagnosis of Bipolar Disorder, Dr. McCoy noted from her review of the prison records that after Ms. Pike was placed on appropriate medication for a Bipolar illness, her behavior at the Tennessee Prison for Women changed dramatically and she had very few write-ups. (PC XXVI: 891.) Dr. McCoy also noted that, although she had not asked Ms. Pike about the symptoms of PTSD and, therefore, could not say whether or not she had the illness, the rapes and physical abuse that Ms. Pike experienced would be consistent with typical causes of PTSD. (Id.)

**b. Evidence of Borderline Personality Disorder Would Nonetheless Been Persuasive.**

While Ms. Pike's diagnosis of Borderline Personality Disorder at trial was neither as accurate nor as persuasive as the post-conviction consensus that Ms. Pike is bipolar, the evidence of mental illness available at trial was nonetheless fitting and substantial. Because the bulk of that evidence was not

[26] He also pointed out said that the change in behavior after being given proper medication meant that she did not have antisocial personality disorder. (PC XXX: 209.) He noted that a diagnosis of antisocial personality disorder also did not fit because Ms. Pike's Social History documents an established development of empathy for others. (PC XXIX: 82-83.)

introduced at Ms. Pike's trial, and because said evidence would have provided an infinitely stronger mitigation case than the one that was actually advanced by Defense Counsel, Ms. Pike also presented the evidence pertinent to a borderline personality diagnosis on post-conviction. Trial Counsel failed to make a case of mental illness during the penalty phase either through their planned chief witness, Dr. McCoy, their guilt/innocence phase expert, Dr. Engum, or their own arguments in opening and closing.

**i. Dr. McCoy**

Trial Counsel assumed from the outset that Ms. Pike's case would reach the penalty phase, and that the presentation of mitigating evidence was Counsel's most important function in Ms. Pike's defense. (PC. XX: 324.) The plan for preparing and presenting the mitigating evidence was to present the evidence which would support a sentence other than death primarily, if not exclusively, through Ms. Pike's mitigation specialist, Diana McCoy, Ph.D. (Id. at 328-329; PC XXV: 741.) Dr. McCoy was to use Ms. Pike's Social History as the basis of her testimony. (PC XX: 328.) In a nutshell, the "plan was to try and have Dr. McCoy bring all this stuff in ... about her background and tie it in with Dr. Engum's report."[27] (Id. at 329.) This remained the plan up until the penalty phase began. (Id. at 338.)

On Friday, March 15, 1996, three days before the beginning of the voir dire in Ms. Pike's death penalty trial, Dr. McCoy met with Defense Counsel to discuss her role in the trial. In order to make certain they were all in agreement, she provided a document containing what she understood to be the mitigation themes she and Mr. Talman had been discussing for the past six months. (PC XXIV: 649-50.) The first listed theme was Borderline Personality Disorder. (Id. at 650; Apr 08, Ex. 6.) During the post-conviction hearing, Dr. McCoy provided the information she had been prepared to provide at the trial in support of the mitigation themes, most notably the diagnosis of Ms. Pike as borderline.

Dr. McCoy indicated that had she testified she thought it would have been important to explain the criteria for a Borderline Personality Disorder diagnosis as set out in the DSM, the diagnostic and statistical

---

[27] Dr. Engum is a neuropsychologist who testified at the guilt phase that Ms. Pike suffered from Borderline Personality Disorder. (T XXV: 2166.)

manual commonly used by psychologists and psychiatrists. (Id. at 695.) She stated that Borderline Personality Disorder is defined as a "pervasive pattern of instability of interpersonal relationships, self-image and affect and marked by impulsivity." (Id.) She stated further that Borderline Personality Disorder is characterized by "frantic efforts to avoid real or imagined abandonment." (Id. at 696.) As a result, Dr. McCoy explained, people with Borderline Personality Disorder "often have very inappropriate anger that they express way out of proportion to the incident." (Id.)

Dr. McCoy reported she would have also informed the jury that impulsivity is a major characteristic of the disorder. Typically there are a number of recurrent suicide gestures or threats and self-mutilating behavior. (Id. at 697.) In addition, a borderline individual will have mood swings during which she may be really happy one minute, then irritable and, then anxious. (Id. at 698.) Borderline individuals also become bored easily and are always looking for something to do. The intense anger and stress can cause transient psychotic episodes. (Id.)

Dr. McCoy opined that "since Borderline Personality Disorder is basically a mental disorder characterized by extremes in relationships and instability in relationships" the kind of instability, abuse and neglect seen in Ms. Pike's life is "a good basis for borderline personality development." (PC XXIV: 688.) Among other issues, Dr. McCoy pointed out that coming from a dysfunctional family, moving back and forth between parents and other caretakers, and observing the instability of the mother's relationships are all classic factual predicates for cases of Borderline Personality Disorder, calling them "the cornerstones of Borderline Personality Disorder." (PC XXV: 770.) Such a background contributed to Ms. Pike's frantic efforts to avoid real or imagined abandonment, which is diagnostic criteria number one for borderlines. (Id. at 765.) Seeing close alcoholic relatives constantly fighting further contributed to the development of Ms. Pike's Borderline Personality Disorder. (Id. at 773.) According to the DSM manual, Dr. McCoy noted, the various traumatic events in Ms. Pike's childhood and adolescence, including two rapes and physical abuse



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 79 of 196 PageID #: 8950

by a number of caregivers, further contributed to the development of Borderline Personality Disorder. (Id. at 774, 793.)

Ms. Pike's continual childhood efforts to run away and behaviors such as using her mother's ATM card, losing emotional control, and exploding in angry outbursts were all manifestations of the Borderline Personality Disorder. (Id. at 795-96.) Furthermore, Dr. McCoy testified that the finding in her Social History of "[t]ransient stress related paranoid ideation, severe dissociative symptoms, irritability or anxiety" were all indicative of Borderline Personality Disorder. (PC XXVI: 809.) Dr. McCoy concluded that "Christa obviously has severe problems. She has severe Borderline Personality Disorder, and she does not have the controls that a normal person would have." (Id. at 815.) She testified that her theory of the defense for the sentencing phase was that Ms. Pike suffered from Borderline Personality Disorder and that all of Ms. Pike's negative behavior was symptomatic of that mental illness. (PC XXIV: 677-78.)

Dr. McCoy related her prepared "mitigation themes" to Borderline Personality Disorder, as she had prepared to do at trial. One such theme was "religious confusion." She explained that Ms. Pike was grappling with issues of religious themes and spirituality and trying to find her place. Ms. Pike was searching for answers to deep causal questions, most notably, why her grandmother was taken from her. Dr. McCoy explained that this spiritual searching was part of Ms. Pike trying to find an identity or stabilize her sense of self, which is a common behavioral theme among individuals with Borderline Personality Disorder. (PC XXIV: 665.) This testimony would have helped to explain Ms. Pike's dabbling in Satanism. (Id. at 666-67.)

Another of Dr. McCoy's themes was a "tough girl image," which she noted is related to the Borderline Personality Disorder because it pertains to Ms. Pike's chronic suffering from poor self-esteem. (Id. at 700.) Dr. McCoy viewed the tough girl image through the lens of Ms. Pike's friends, family, and professional service providers whom Dr. McCoy interviewed. Specifically, this group included friends Brandi Parker and Willie Davis, social worker Kerry Clement, psychologist Rosemary Wilson, Ms. Pike's half-sister, Alicia

Wills, and Ms. Pike's aunt, Carrie Ross. From these individuals she learned that Ms. Pike's tough girl image was a protective shell, designed to conceal a deep and pervasive fear. (PC XXV: 701-02.) Numerous individuals also spoke of how starved Ms. Pike was for attention. (Id. at 703.) To Dr. McCoy, this was all symptomatic of Ms. Pike's sense of abandonment, feelings of isolation, and identity disturbance – all themselves telltale signs of Borderline Personality Disorder.

Dr. McCoy also spoke of self-destructive behavior as a symptom of Borderline Personality Disorder. She explained that the record she developed showed that Ms. Pike was highly self-destructive, always sabotaging her chances for release from Swannanoa, attempting suicide three separate times, and failing to meet the requirements of probation. (Id. at 705.)

Dr. McCoy testified regarding the connection between Ms. Pike's Borderline Personality Disorder and her relationship with her co-defendant, Tadaryl Shipp. Ms. Pike's friends, Brandi and Mandy, both told Dr. McCoy that Ms. Pike was so hungry for attention that she would do anything to impress a boy. Dr. McCoy opined that this intense need for a romantic relationship was consistent with Borderline Personality Disorder. Dr. McCoy also related that when Ms. Pike's relationships would end, Ms. Pike would be devastated. As a result, when Ms. Pike arrived at Job Corps and Mr. Shipp showed interest in her, it played into her borderline issues of unstable identity and low self-esteem. Because Mr. Shipp was feared by other Job Corps students, Ms. Pike also saw him as her protector. (Id. at 722-23.)

Dr. McCoy noted that while she had not intentionally geared her social history interviews and records collection toward supporting Dr. Engum's diagnosis of Borderline Personality Disorder, the material she found did mesh nicely with his diagnosis. (PC XXVI: 892.) In fact, Dr. McCoy's opinion was that the information she compiled in her Social History represented "a fairly powerful record" to support a diagnosis of Borderline Personality Disorder. Dr. McCoy went so far as to say that Ms. Pike could have been accurately presented to a jury as the "poster child" for Borderline Personality Disorder. (Id. at 893-94.)

Finally, Dr. McCoy testified that, in order to convincingly show that Ms. Pike suffered from a serious Borderline Personality Disorder, it was necessary to present all the information in Dr. McCoy's prepared Social History, the good and the bad. Dr. McCoy stated that all of the things in her Social History were important and that without the anecdotes, documents, and witnesses, one could not make a convincing case. Without such information, Dr. McCoy remarked, "it's just me talking about symptoms from the DSM." (PC XXVII: 902.)

**ii. Dr. Engum**

As discussed above, Trial Counsel did not recall Dr. Engum during the penalty phase to discuss Borderline Personality Disorder and how it explained Ms. Pike's role in Ms. Slemmer's killing. The jury thus heard no expert information regarding the role that Ms. Pike's mental illness played in diminishing in her culpability for that crime.

**iii. Opening and Closing Arguments**

Also noted above, Ms. Pike's Defense Counsel made no mention of mental illness during their opening and closing statements in the penalty phase. (See T XXVIII: 2477-81 (Mr. Talman's opening); T XXIX: 2560-65 (Ms. Rice's closing).)

Moreover, the jury had little to draw upon for the influence of Ms. Pike's mental illness from Counsel's opening and closing statements during the guilt/innocence phase. During the guilt/innocence phase opening statement, Ms. Rice merely reviewed the elements of first degree murder and suggested that all elements would not be proven. No mention was made of a Borderline Personality Disorder or any other mental disease or defect that might prevent Ms. Pike from forming the requisite intent. (T XIX: 1565-67.) In his closing argument in the guilt/innocence phase, Mr. Talman never mentioned that Ms. Pike suffers from any mental disorder at all. (T XXVII: 2387-99.)

**C. Availability of Lay Witnesses**

As discussed above, Ms. Pike presented on post-conviction a significant volume of lay witness testimony touching all aspects of her mitigation case. Much of this evidence was in Defense Counsel's hands at the time of trial, but was never put forward. Some of this evidence was not discovered by Trial Counsel for simple lack of investigation. On post-conviction, Mr. Talman testified that the necessary mitigation evidence would have been best presented by people who had known and worked with Ms. Pike in the community including juvenile workers, friends, others; however, Mr. Talman conceded that he had not subpoenaed any such witnesses. (PC XX: 347.)

Prior to trial, Dr. McCoy recommended that certain witnesses be called, and she recommended against the use of Carissa Hansen, Ms. Pike's mother. (PC XXIV: 631; Apr 08, Ex. 5.) In a document titled "Suggested Mitigation Witnesses," Dr. McCoy recommended calling (1) Alicia Wills, Ms. Pike's sister, (2) Peggy Hamlett, a juvenile court counselor, (3) Rosemary Wilson, juvenile court psychologist, (4) Kerry Clement, a social worker who had assisted Ms. Pike, (5) Matthew Martin, Ms. Pike's juvenile court attorney, and (6) Carrie Ross, Ms. Pike's aunt. (Apr 08, Ex. 5.) Of this group, only Carrie Ross was called.

In addition to Dr. McCoy's explicit recommendations, there were numerous additional witnesses – many of whom Dr. McCoy interviewed – who would have been available if contacted by Defense Counsel. Dr. McCoy's three-volume Mitigation Materials contains interviews with the following potential witnesses: (1) Gerard Hansen, Ms. Pike's step-father (2) Brandi Parker, Ms. Pike's close friend (3) Mandy Staley, Ms. Pike's close friend;, (4) Willie Davis, Ms. Pike's friend, (5) Ginny Satterfield, Ms. Pike's court counselor, (6) John Martin, Ms. Pike's one-time attorney, and brother of Matthew Martin, (7) Chris Fotos, Ms. Pike's cousin. (JA 07, Ex. 1.) Ms. Pike's friend Carol Goehring also testified for Ms. Pike on post-conviction, and would have been available at trial.

On post-conviction, Ms. Pike put on a number of witnesses who knew Ms. Pike through Child Protective Services, Swannanoa, or Job Corps. Ms. Pike's Post-Conviction Counsel recognized that, because Ms. Pike's history was marked by neglect, it would be necessary to interview witnesses from institutional settings to find individuals who knew and had cared for Ms. Pike. This investigation yielded witnesses such as (1) Debby Burchfield, (2) Kristina Hargis, (3) Marshall Muse, and (4) Onas Perry. Ms. Burchfield testified that at the time of Ms. Pike's trial, Ms. Burchfield was contacted by a psychologist or psychiatrist requesting case files on Ms. Pike.[28] (PC XII: 610.) No other request was made, but Ms. Burchfield stated that she would have complied with any efforts to aid in Ms. Pike's case. (Id. at 611.) Mr. Muse testified that he was not contacted by anyone prior to trial. (Id. at 671-72.) Ms. Perry testified similarly. (PC XIII: 736.)

Trial Counsel's mitigation case consisted of three witnesses, two of which were used to particularly ill effect. As noted above, Dr. McCoy recommended that Ms. Pike's mother, Carissa Hansen not be used as a witness. Dr. McCoy warned that, while Ms. Hansen would initially appear reasonably convincing, she "does not own up to her very poor parenting," and the information Ms. Hansen gave was inconsistent with what Dr. McCoy learned from others. (AP 08, Ex. 5 p.3.) Dr. McCoy was concerned that rather than see Ms. Hansen as a devastating influence in Ms. Pike's life, the jury would view Ms. Hansen as a "poor mother who went through hell with a rebellious teenager." (Id.) In fact, significant evidence that Ms. Pike was a difficult child was put before the jury on cross-examination, and this evidence was never explained as symptomatic of Ms. Pike's brain damage and mental disorders.

Trial Counsel also put on Ms. Pike's father, Glenn Pike. Glenn Pike admitted to sporadic interest in Ms. Pike, but was not used effectively. Dr. McCoy's Mitigation Materials revealed the following information from

---

[28] According to the record, the request for records was made by Dr. McCoy. (Jan 07, Ex. 1, Appendix 45, Bates 670.)

her interview with Mr. Pike, all of which would have been significant to present as mitigation, but none of which ultimately was put before a jury:

(1) Ms. Hansen drank, smoked, and used drugs while pregnant with Ms. Pike;

(2) Mr. Pike was more mature at the time of trial than he was when Ms. Pike was younger and has kept greater contact with his children from his marriage with Ms. Allman than he had with Ms. Pike; (Id. at Bates 316);

(3) Ms. Pike was born with hyaline membrane disease;[29] (Id. at Bates 315);

(4) Ms. Pike was allowed to roam around her grandfather's slaughterhouse while he was slaughtering animals (Id.);

(5) Ms. Pike's paternal grandmother adored her. Grandmother Pike died of cancer in 1988 when Ms. Pike was 12 years old; (Id. at Bates 316);

(6) Mr. Pike and Ms. Hansen divorced when Ms. Pike was about two years old. They remarried when Ms. Pike was four or five and stayed together about one year; (Id.);

(7) Neither parent was there for Ms. Pike; (Id. at Bates 317).

On cross-examination, Mr. Pike became a harmful witness when he was used by the Prosecutor to expose allegations that Ms. Pike had sexually abused Mr. Pike's younger child. This information was contained in Dr. McCoy's Mitigation Materials Regrettably, Trial Counsel failed to use the same Mitigation Materials to rehabilitate Mr. Pike by bringing out that he was not convinced that Ms. Pike had sexually abused his daughter Lindsey. The Mitigation Materials suggested that Mr. Pike thought that Ms. Pike played innocently with his younger child.[30] (Id. at Bates 316.) The Mitigation Materials also revealed that

---

29 Hyaline membrane disease is also known as neonatal respiratory distress syndrome. It is related to immature lungs in premature babies and prevents the premature newborn from obtaining sufficient oxygen. http://emedicine.medscape.com/article/409409-overview.

30 The Post-Conviction Court noted that a "sex abuse counselor had thought that there was no credible evidence that the Ms. Pike had sexually abused her half sister." (PC V: 625.) The Court agreed that "There was no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise." (Id. at n.7.)

Mr. Pike thought his then-wife manufactured the allegations of sexual abuse to keep Ms. Pike out of the house. (Id.) This information, too, could have been but was not used to rehabilitate Mr. Pike.

It is also significant to note that all three of the witnesses put on by Trial Counsel during the penalty phase had rejected Ms. Pike and historically denied her love and affection. Trial Counsel thus presented no mitigation evidence from anyone who cared about Ms. Pike or held her in high esteem. The contrast to Ms. Pike's post-conviction case – replete with testimony from individuals who care deeply for Ms. Pike – was thus striking in its presentation of Ms. Pike, for the first time in her capital proceedings, as a human being whose life is worth saving.

**VI. Trial Counsel Conducted no Meaningful Voir Dire.**

When conducting the voir dire related to death qualification, the Prosecutor asked whether any juror would not be able to consider the death penalty ("consider all three punishments") in the case based upon Ms. Pike's youth. (PC X: 601-602; XV: 1121; XVIII: 1442.) Defense Counsel never objected to this misstatement of the law and never corrected it by informing the jury that they were permitted to find that any one mitigating factor could outweigh any and all aggravating factors. This error was brought home when one venire member, Mr. Rutherford, voiced concern about imposing the death penalty to someone as young as Ms. Pike. Rather than recognizing that Mr. Rutherford was merely reflecting on the mitigating value of youth, Defense Counsel permitted a strike for cause without objection. (T XIX: 1510-14.)

**VII. Ms. Pike's Trial Counsel Negotiated Media Rights to Ms. Pike's Story During their Representation of Her.**

After she was convicted and sentenced to death, but before Ms. Pike's motion for a new trial was heard, Mr. Talman and Ms. Rice had Ms. Pike sign a release permitting them "to speak with any parties who are interested in the retelling of the trial of [her] case." (T III: 394 (jury verdict dated 3-30-96); T XXXII: 2 (Motion for New Trial heard on July 25, 1996); Apr 08, Ex. 13 (Release).) The release specifically stated:

> I further understand that Mr. Talman and Ms. Martin may eventually gain a pecuniary benefit from the retelling of my story, and I have no objection to this. Mr. Talman and Ms. Martin have my permission to do with the public aspects of my case as they see fit even it they profit from it financially.

(Apr 08, Ex. 13.)

Ms. Pike's aunt, Carrie Ross, testified that on several occasions, Mr. Talman discussed writing a book with her about Ms. Pike's case. Although Ms. Ross could not remember when Mr. Talman last broached the topic, she did place the time as after the trial by noting that Mr. Talman told her that he had gotten a release signed by Ms. Pike giving him permission to write a book. (PC XXIV: 612.)

## ARGUMENT

## INTRODUCTION AND STANDARD OF REVIEW.

Ms. Pike's trial counsel conducted moderate investigation and employed three mental health experts in preparing for trial. Nonetheless, counsel assembled Ms. Pike's mitigation case on the spur of the moment, calling three members of Ms. Pike's family to give unrehearsed testimony. Counsel had planned to do more: the day before the penalty phase began, Mr. Talman planned to call Ms. Pike's mitigation specialist, Dr. Diana McCoy, to testify on the basis of her three volumes worth of mitigation materials. But in the hours preceding the penalty phase, not only was Dr. McCoy's prospective testimony withdrawn, her materials were given to the State for use on cross-examination. In pulling Dr. McCoy's testimony, counsel's performance was unjustifiable, but it is not inexplicable. To understand counsel's reasons requires only going back three years to the source of Mr. Talman's conflict of interest, when the State discovered that Mr. Talman stole over $67,000 from the Indigent Defense Fund.

On post-conviction, Ms. Pike proved that she suffers from brain damage, Bipolar Disorder, and PTSD, and that her childhood was marked by abuse, neglect, and early and continuous exposure to violence, blood, and gore. The difference between this evidence and that put forward at trial entitles Ms. Pike to vacation of her conviction and sentence. The Post-Conviction Court below disagreed, finding neither a conflict of interest nor ineffective assistance. With regard to that finding, this Court's review "is *de novo* with

no presumption of correctness." Pylant v. State, 263 S.W.3d 854, 867-868 (Tenn. 2008), accord State v. Burns, 6 S.W.3d 453, 461 (Tenn.1999); Tenn. R. App. P. 13(d). Findings of pure fact are presumed correct but are rebutted where the evidence preponderates to the contrary. Pylant, 263 S.W.3d at 876.

## I. Ms. Pike was Deprived of the Right to Unconflicted Counsel in Violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution.

Ms. Pike's trial was marked by two distinct conflicts of interest that rendered her representation by defense counsel constitutionally inadequate. No showing of prejudice is required with regard to these claims, but out of an abundance of caution, Ms. Pike discusses below the prejudice that resulted from counsel's conflict .

### A. Mr. Talman was Conflicted after Stealing from the Indigent Defense Fund and Lying to the Court in the Course of Ms. Pike's Trial.

Mr. Talman was appointed lead counsel in Ms. Pike's case on May 25, 1995. (PC XIX: 261.) He brought on Dr. Diana McCoy a few months thereafter. (Id. at 280.) Dr. McCoy was to serve as Ms. Pike's mitigation specialist, a function Mr. Talman deemed crucial:

> Well, I think early on we developed a strategy or an idea that [examining psychologist] Dr. Engum and I were going to concentrate on the guilt phase of the – of the trial and take the, if you will, take the beating in the guilt phase, and then have Dr. McCoy and [co-counsel] Ms. Rice come along and, if you will, save the day in the – in the mitigation phase as far as trying to avoid the death penalty.

(Id. at 280-81.) For the penalty phase, Mr. Talman recalled that, "our plan was to try and have Dr. McCoy bring all this stuff in, you know, about [Ms. Pike's] background and tie it in with Dr. Engum's report." (PC XX: 329.) Dr. McCoy spent six months interviewing Ms. Pike, her family, and friends, and assembling three volumes of notes (hereinafter, "Mitigation Materials") and a 60-page summation (hereinafter, "Social History"). (See Jan 07 Ex. 1.) That she alone would testify in mitigation – no other witnesses were slated – remained Defense Counsel's plan up through Friday March 29, the day the jury returned a sentence of guilt and the day the penalty phase was set to begin. (PC XX: 338, 347, 351.)

On that Friday afternoon, the trial court called a meeting *in camera* to discuss the parties' plans for the penalty phase. The *in camera* proceedings, which immediately followed the jury's verdict of guilt, were not transcribed, and on post-conviction, no party to the meeting could recall precisely what transpired there. (PC XXXII: 118-20.) The only fact generally agreed upon is that Mr. Talman walked into the Court's chambers with Dr. McCoy's Mitigation Materials and Social History, and the Prosecutor walked out with them. (Id.; T XXIX: 2465.) Immediately after the *in camera* meeting, the parties returned to the courtroom where, on the record, the Trial Court recessed the penalty phase until the following morning to allow the State time to review Dr. McCoy's materials. (PC XXXII: 120; T XXIX: 2465.)

The next morning, defense counsel presented its mitigation proof. Dr. McCoy was not called to testify. Instead, with no witnesses under subpoena for the sentencing phase, counsel called the members of Ms. Pike's family who happened to be present -- Ms. Pike's mother, father, and aunt. (T XXVIII: 2482-2500; T XXIX: 2501-43.) These witnesses were asked to testify moments before the proceedings began, and their testimony was unrehearsed. (PC VI: 39-40, 45-46; VII: 155-57; VIII:425-26; XXV: 742-43.) On cross-examination, the State made use of Dr. McCoy's Mitigation Materials to contradict these witnesses and sully Ms. Pike's image. In this manner, Ms. Pike's planned mitigation case unraveled: the information gathered by her mitigation specialist was presented only by the State, and in the worst possible light. The question Ms. Pike raises on post-conviction is, *why*? Why after months of preparing to use Dr. McCoy was her testimony retracted at the last possible instant?

Dr. McCoy testified at post-conviction that she received a phone call from Mr. Talman on Friday, March 29, 1996. (PC XXV: 739-40.) Mr. Talman had just left court and was in a panic. Speaking frantically, he told her that he was in trouble in the wake of an in camera meeting with the prosecutor and the trial court. (Id.) The prosecutor, Mr. Talman explained, had "gone ballistic" upon learning that the defense intended to introduce Dr. McCoy as an expert witness at sentencing without having provided the State with a copy of her report. (Id.) Mr. Talman explained that he then turned all of Dr. McCoy's written work-product over to

the State, and apologized for the delay, saying that he had only received Dr. McCoy's materials himself the previous evening. (Id.)

This was untrue. As Dr. McCoy testified, she provided her Social History and Mitigation Materials to Mr. Talman on Sunday, March 24 - five days before the date Mr. Talman represented in the *in camera* meeting. (PC XXIV: 676-77; XXV: 740.) Mr. Talman provided nothing to the State during those five days because it was Mr. Talman's plan all along to hold any discoverable materials until the last possible second. As Dr. McCoy testified:

> [i]t was kind of a joke that [Mr. Talman] was going to just give this to the prosecutor when Christa was found guilty and that would be really funny to see Bill Crabtree's reaction to having – to get this at the last minute and read it in time for a sentencing hearing.

(PC XXIV: 677.) But the joke had backfired, Mr. Talman explained, and under pressure, Mr. Talman had lied to the court and prosecutor concerning the date on which Dr. McCoy gave her work product to Defense Counsel. (PC XXV:740.) Dr. McCoy, Mr. Talman explained over the phone, would need to corroborate this lie on the stand during her penalty phase testimony the following day. (Id. at 740-43.) When Dr. McCoy refused to do so, Mr. Talman informed her that, in that case, she would not be called to testify. (Id.)

Dr. McCoy's post-conviction testimony was corroborated by Knoxville attorney Herbert Moncier. Mr. Moncier testified during post-conviction that he received a phone call from Dr. McCoy shortly after the trial ended. (PC XXVII: 1000.) Dr. McCoy was very upset and expressed continuing concern that Mr. Talman had asked her to lie on the stand. Mr. Moncier advised Dr. McCoy that, since the trial was over and the attorney-client and work–product privileges would be in effect throughout the direct appeal process, Dr. McCoy should wait until post-conviction to disclose her account of events. (PC XXVII: 1000 – XXVIII: 1002.) Knoxville attorney Greg Isaacs further corroborated Ms. Pike's account, testifying that he had spoken with Dr. McCoy about Mr. Talman's having asked her to lie on the stand. (PC XXIX: 6.)

Mr. Moncier and Issacs also testified to Dr. McCoy's credibility in general. Mr. Isaacs testified that Dr. McCoy has a reputation for being hard-working, competent, and professional. (PC XXIX: 4.) On the basis of

his experience working with Dr. McCoy, Mr. Isaacs opined that Dr. McCoy was highly ethical. (Id. at 4-5.) Mr. Moncier indicated similarly that he had "a great deal of respect for McCoy and the thoroughness of her work." (PC XXVII: 996.)

Dr. McCoy's version of events was also inherently plausible: during the *in camera* meeting on Friday, March 29, Mr. Talman had reason to lie to the Court and prosecutor. Between 1990 and 1993, Mr. Talman defrauded the indigent defense fund of at least $67,027 by overbilling in court-appointed cases. (CR: 9.) Although he was not the only lawyer investigated for over-billing, Mr. Talman and Knoxville attorney David Poss were far and away the two most egregious offenders.[31] (Id. at 5.) In total, Mr. Talman billed for several thousand illusory hours.[32] Judge Leibowitz, the trial judge for both Ms. Pike's trial and post-conviction hearings, had appointed Mr. Talman and had approved his fee claims during the period between 1990 and 1993. (S Ex. 2b.)

When the Comptroller's Report was first publicized in the Knoxville news media, Mr. Talman obtained a lawyer, self-reported to the Board of Professional Responsibility ("BPR") at the advice of counsel, and reached a civil settlement to repay over $67,000 in stolen funds. (PC XXI: 457; S. Ex. 2A, March 30, 1994 Letter from Mr. Talman to the Board.) Ultimately, the Tennessee Supreme Court suspended Mr. Talman's law license for eleven months and twenty-nine days. However, this sanction was not entered until Nov. 24, 1998, one day after the Court's final action in affirming Ms. Pike's conviction and sentence. (Compare, State v. Pike 978 S.W.2d 904(1998) (rehearing denied Nov. 23, 1998) with (S. Ex. 2A (order of enforcement, Nov. 24, 1998).)

---

[31] Seven attorneys were identified as overbilling a total of $228,601. Of that amount Mr. Talman and Mr. Poss were responsible for $178,152, or 78 percent of the total. (Id. at 5.) Talman's 1993 income from indigent defense exceeded $100,000. (CR: 5.) To make this income, he would have had to bill between 3,333 and 5,000 hours that year - depending on whether he was billing for in-court or out-of-court work. (See, Statement of Facts, supra, at 3.) Mr. Talman perpetrated this theft by two means. First, when working on defense cases involving multi-count indictments, for each hour worked Mr. Talman charged an hour for every count in the indictment (CR: 6.) Second, Mr. Talman inflated his billable hours, sometimes billing for more than 24 hours on a single day. (CR: 7.)

[32] Assuming Talman billed fraudulently for only in-court time at the approved rate of $30 per hour, he overbilled 2,234 hours. This figure marks the low end of Talman's total overbilled hours. Assuming Talman billed fraudulently only for out-of-court time at the approved rate of $20 per hour yields the upper boundary for Talman's fraudulent billing, 3,351 hours.

Mr. Talman was considered for prosecution, (Apr. 08 Ex. 1), but ultimately neither he nor any other attorney was ever prosecuted. At the time of Mr. Talman's appointment in Ms. Pike's case, however, the questions of criminal or professional sanctions for his overbilling were unresolved. Review by the BPR was still pending, and though the State had not initiated any prosecution, it had given no assurances that it would not prosecute in the future.

Against this factual backdrop, the reason for counsel's penalty phase collapse emerges. In the wake of a serious professional and criminal breach, Mr. Talman was in the shadow of sanctions that threatened his livelihood, and perhaps also his freedom. Facing heat from the prosecutor regarding the timing of disclosures, Mr. Talman provided protected materials to the prosecutor and then, to cover his tracks, explained the late production by saying he had only received the materials the prior evening. Dr. McCoy refused to perjure herself by corroborating this lie, at which point Mr. Talman – who could ill afford a second ethics violation – took Dr. McCoy out of the proceedings for fear his lie would be exposed.

Of course, this was not the story told by defense counsel during post-conviction. Mr. Talman offered the following explanation for the decision not to call Dr. McCoy:

> [I]t was just one of these little huddles outside during a break or something, you know – we're going to start this phase, going to put this witness on, going to start with this, going to put you on. To Dr. McCoy, "I'm going to have you corroborate Dr. Engum's report and go through things." And she said, "I can't do that; I didn't conduct an evaluation of Ms. Pike." And at that point is when I made the decision.

(PC XX: 352.) When pressed to explain what it meant that Dr. McCoy was unable to corroborate Dr. Engum's diagnosis, Mr. Talman was at a loss. (Id. at 359.) Indeed, he testified that Dr. McCoy's statement on the morning she was to testify caught him by surprise, saying "I-I-I had always believed [Drs. McCoy and Engum] were on the same page," (Id. at 358) and "I don't recall Dr. McCoy . . . saying anything about anything of disagreement on Dr. Engum's report or anything that we had talked about." (Id. at 359.)

In her post-conviction testimony, Dr. McCoy stated, "Christa is a disturbed young lady. She has borderline personality disorder. There was no – I mean I agreed with Eric Engum's diagnosis." (PC

XXIV:638.) Dr. McCoy testified that as Ms. Pike's mitigation specialist, she treated Dr. Engum's finding of Borderline Personality Disorder as an organizing principle around which she framed her findings.(PC XXIV: 647, 649-52.) This testimony was supported by a document Dr. McCoy had prepared for a meeting with Mr. Talman, in which she identified Borderline Personality Disorder as the most significant mitigation theme in Ms. Pike's case. (PC XXIV: 650; Apr 2008, Ex. 6.) It is thus difficult to understand in what sense Mr. Talman believed that Dr. McCoy was incapable of corroborating Dr. Engum's diagnosis.

Mr. Talman testified on post-conviction to other reasons for pulling Dr. McCoy's testimony. He explained that he was hesitant to put Dr. McCoy on the stand because "there were things in her report that I just didn't want to come in, frankly." (PC XX: 348). As the Court below found, however, Mr. Talman knew the facts in Dr. McCoy's Mitigation Materials as well as Dr. McCoy herself – the two were in regular correspondence throughout Dr. McCoy's investigation. (PC V: 683). In fact, on the basis of Mr. Talman's understanding of Dr. McCoy's findings, Defense Counsel planned to present the entire mitigation case through Dr. McCoy up until the day before the penalty phase began. Mr. Talman stated that he was pleased with Dr. McCoy's work, and he filed numerous motions to obtain additional funding for her investigation. (PC XX: 334, 353.) As Dr. McCoy testified on post-conviction, Mr. Talman never expressed any discomfort with the information she uncovered in her investigation, and he made no efforts to steer Dr. McCoy away from discovering or including certain types of information in her written work. (PC XXIV: 662-63.) In short, if Mr. Talman had reservations about Dr. McCoy's findings, he didn't show it.

Mr. Talman testified that another factor in his decision to pull Dr. McCoy's testimony was the fact that Dr. McCoy had dated William Crabtree, the State's lead prosecutor on the case. (PC XX: 352.) Yet, although Mr. Talman claimed to have discovered this information shortly before trial, he did not discuss it with either Mr. Crabtree or the Trial Court, and he did not seek a continuance for the purpose of replacing Dr. McCoy. (Id. at 355-56.) This was because, in Mr. Talman's words, "I never doubted Dr. McCoy's work. I never doubted Dr. McCoy's integrity. She assured me she had never talked to Mr. Crabtree about this

case. I have no reason to doubt Mr. Crabtree's integrity." (Id. at 355.) Again, if this factor troubled Mr. Talman, his words and actions suggested the contrary.

For her part, co-counsel Ms. Rice offered an additional reason for the decision not to allow Dr. McCoy to testify: on the morning that the penalty phase began, Ms. Rice and Mr. Talman saw Dr. McCoy's Social History and Mitigation Materials on the State's table covered in yellow "Post-It" notes. (PC V: 685.) According to Ms. Rice, defense counsel were concerned that, after giving the State Dr. McCoy's materials, the prosecutor had prepared an onslaught. (PC XIX: 238.) The Court below rejected this rationale for the reason that, "[b]oth Dr. McCoy and Talman stated that the decision [not to put on Dr. McCoy] was made the evening before the penalty phase and the stickers were seen on the materials the morning of the penalty phase." (Id. at 685 n.29.) Accordingly, this explanation should be given no weight.

This was the sum total of defense counsel's explanation for the decisions to turn over Dr. McCoy's work product and simultaneously pull Dr. McCoy's penalty phase testimony. Ultimately, given the above-noted problems with each of these explanations, defense counsel were able to provide little insight into what really happened, further strengthening the account provided by Dr. McCoy, Mr. Moncier, and Mr. Isaacs.

Given this understanding of the facts, Mr. Talman's penalty phase decisions must be considered as products of a conflict of interest. The basis for an attorney conflict may be any interest or loyalty on the part of defense counsel that drives a wedge between counsel and the defendant. McCullough v. State, 144 S.W.3d 382,385 (Tenn. Crim. App.2003) ("Where an attorney is placed in a position of divided loyalties – here, between himself and his client – an actual conflict is created."); State v. Culbreath, 30 S.W.3d 309,315(Tenn.2000) (citing State v. Tate, 925 S.W.2d 548,554 (Tenn. Crim. App. 1995). Among the class of potentially conflicting interests are the personal interests of defense counsel. McCullough, 144 S.W.3d at 385 (citing Tenn. Sup. Ct. R. 8, DR 5-101(A)(2002); Government of Virgin Islands v. Zepp, 748 F.3d 125,135 (3rd Cir.1984), which may include the desire to avoid agitating the trial court or prosecutor for fear


Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 94 of 196 PageID #: 8965

of losing one's law license. See U.S. v. Greig, 967 F.2d 1018, 1022 (5th Cir. 1992); Rugiero v.U.S., 330 F. Supp. 2d 900, 906 (E.D. Mich, 2004); see also, Disciplinary Counsel v. Holland, 835 N.E.2d 361 (Ohio 2005) (attorney suspended for nearly identical conduct to that of Mr. Talman). Another recognized conflicting interest is preoccupation with fear of instigating prosecution for one's own misdeeds. See, e.g., U.S. v. Montana, 199 F.3d 947,949 (7th Cir.1999) (fear of irritating prosecutor and provoking retaliation); U.S. v. Lowry, 971 F.2d 55, 61 (7th Cir.1992) (potential conflict where defense counsel under investigation by prosecution because counsel might "either refrain from aggressive cross-examination during the trial in order that he might gain the favor of his potential prosecutors, or that he would be unduly hostile toward them, losing objectivity, and thus harm [defendant's] rapport with the jury"); Thompkins v. Cohen, 965 F.2d 330, 332 (7th Cir.1992); U.S. v. Levy, 25 F.3d 146,156 (2d Cir. 1994); U.S. v. Cancilla, 725 F.2d 867, 870 (2nd Cir. 1984); Solina v. U.S.,709 F.2d 160, 164 (2d Cir. 1983) (fear of spurring trial court or prosecutor into investigating counsel's criminal history created conflict).

To prove a violation of the Sixth Amendment right to counsel, a defendant must demonstrate that an 'actual' conflict 'adversely affected' counsel's representation at trial. Cuyler v. Sullivan, 446 U.S. 355, 350 (1980); State v. White,114 S.W.3d 469,476 (Tenn.2003); Netters v. State, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997). "Adverse effect" entails a lesser burden of proof than prejudice under Strickland v. Washington, 466 U.S. 668 (1984). Sullivan, 446 U.S. at 350 (1980); Netters, 957 S.W.2d at 847-48; State v. Oody, 823 S.W.2d 554, 558 (1991). Whereas prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 694, adverse effect requires only that defense counsel "actively represent[ed] conflicting interests." Netters, 957 S.W.2d at 847. A defendant may prove adverse affect as follows:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the Petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. . . . [T]he petitioner must show that the alternative strategy was 'clearly suggested by the circumstances.' Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

Mickens v. Taylor, 240 F.3d 348,361(4th Cir. 2001), aff'd, 535 U.S. 162(2002); accord U.S. v. Novaton, 271 F.3d 968, 1011 (11th Cir. 2001); see generally State v. Coffelt, 2006 WL 2310597,at *15-18 (Tenn. Crim. App. Aug. 8, 2006); Netters, 957 S.W.2d at 848 ("The proper focus is solely upon whether counsel's conflict affected counsel's actions."). To establish the third prong – causation – a defendant need only show that the course of action pursued by defense counsel was consistent with a conflict and not otherwise explicable. See Boykin v. Webb, 541 F.3d 638,644(6th Cir. 2008); McFarland v. Yukins, 356 F.3d 688,706 (6th Cir. 2004); Mickens v. Taylor, 240 F.3d at 360 (4th Cir.2001) (*en banc*), aff'd, 535 U.S.162 (2002); Greig, 967 F.2d at 1025; U.S. v. McLain, 823 F.2d 1457, 1464 (11th Cir. 1987). Under the facts discussed above, Ms. Pike has made the necessary showing.

With regard to the first two prongs, it is clear that (a) not turning over all of Dr. McCoy's materials and (b) putting Dr. McCoy on the stand were objectively reasonable defense strategies.[33] Dr. McCoy's documents were privileged work product to which the State was not entitled. As Mr. Talman himself noted, Dr. McCoy's interview notes contained sensitive information which could be – as was proven during the penalty phase – exploited by the State. Likewise, putting Dr. McCoy on the stand would have been objectively reasonable. Dr. McCoy was prepared to corroborate Dr. Engum's finding of Borderline Personality Disorder, and had prepared to testify with regard to six months worth of mitigation investigation. Since no other witnesses were subpoenaed, much of this evidence could only have been introduced through Dr. McCoy. Moreover, since Mr. Talman had already armed the State with Dr. McCoy's Mitigation Materials, it was essential that Dr. McCoy testify because only she – as a licensed mental health professional and the mitigation specialist in Ms. Pike's case – was capable of marshalling potentially damaging evidence into the context of Ms. Pike's mental illness.

Ms. Pike has also established the third prong of adverse affect – that Mr. Talman's failure to pursue these objectively reasonable strategies may be explained only by his conflict. Ms. Pike has presented proof

that Mr. Talman lied to the trial court and the prosecutor about the timing of his receipt of materials from Dr. McCoy. Ms. Pike has further shown that Mr. Talman attempted to induce Dr. McCoy to commit perjury to cover up his lie, and that when she refused to do so, he made the immediate decision to pull her testimony. Support for the fact that Mr. Talman lied in the *in camera* meeting may also be found in other established instances of Mr. Talman's untruthfulness. Cohen, *et al.*, Tennessee Law of Evidence, Fifth Ed. 2005, at 6-66 (using specific instances of conduct, short of criminal convictions, to support untruthfulness has been referred to as "one of the most important rules in the Tennessee Rules of Evidence."). Mr. Talman demonstrated his untruthfulness by overbilling the indigent defense fund for over $67,000. In addition, the record in Ms. Pike's case suggests that Mr. Talman lied to the trial court on a second occasion, this time on the record. Immediately after the March 29 *in camera* meeting, the prosecutor asked Mr. Talman where in Dr. McCoy's Mitigation Materials the State might find a consolidated report. Mr. Talman responded that he was unsure, stating, "Your Honor, as I explained in chambers I had just received this documentation earlier this week myself." (T XXVIII: 2468.) However, the proof at post-conviction showed that on March 15, both Mr. Talman and Ms. Rice read through and approved Dr. McCoy's Social History and Mitigation Materials. (PC XXIV: 633.) Thus, Mr. Talman saw the Mitigation Materials in question not days ago, as he alleged to the Court, but nearly two weeks ago.

Furthermore, Ms. Pike has established that Defense Counsel's stated reasons for forfeiting Dr. McCoy's materials and refusing to put Dr. McCoy on the stand do not hold water. Mr. Talman knew, despite his claim to the contrary on post-conviction, that Dr. McCoy was prepared to corroborate the testimony of Dr. Engum, Likewise, Mr. Talman knew both (1) that Dr. McCoy's investigation uncovered so-called 'two-edged' information, and (2) that Dr. McCoy had dated the lead prosecutor; if these developments unsettled Mr. Talman, he took no corrective action. In contrast, Dr. McCoy's account provides a plausible explanation for Defense Counsel's conduct.

---

[33] Ms. Pike maintains that planning *only* to put Dr. McCoy on the stand was not objectively reasonable.

**B. Strickland Prejudice is not Required, but is Nonetheless Present.**

Conflict of interest claims require no showing of prejudice. Cuyler v. Sullivan, 446 U.S. 335 (1980). A presumption of prejudice attaches to conflict claims because (1) the effects of a conflict are often difficult to detect and quantify, and (2) a strict rule of presumed prejudice ex poste is proper given the duties of defense counsel and trial courts to investigate and root out potential conflicts ex ante. Strickland, 466 U.S. at 692.

Nonetheless, under the Strickland definition of prejudice -- a reasonable probability that, but for counsel's deficient performance, the outcome would have been different, 466 U.S. at 694 – Mr. Talman's conflict was clearly prejudicial to Ms. Pike's defense.

With regard to Defense Counsel's decision not to present the testimony of Dr. McCōy, Tennessee has developed a three factor test to determine the existence of prejudice for failure to present mitigating evidence. Goad v. State, 938 S.W.2d 363,369 (Tenn.1996). First, the reviewing court must examine the nature and extent of the mitigating evidence that was available but not presented. Id. Next, the court compares the mitigating evidence not presented with that actually presented to determine whether the original trial presentation was substantially incomplete. Id. Finally, the court considers whether the aggravating evidence was in any event so overwhelming as to render irrelevant the inadequacies of trial counsel's deficiency. Id.

Under the first Goad factor – the nature and extent of mitigating evidence not presented – the relevant evidence is the testimony Dr. McCoy was prepared to give at trial, which was in fact presented later on post-conviction. Dr. McCoy testified that her Social History corroborated Dr. Engum's finding of Borderline Personality to such an extent as to make Ms. Pike a "poster-child" for the disorder. (PC XXVI: 893-94.) Dr. McCoy explained that Borderline Personality is characterized by unstable identity, instability in interpersonal relationships, impulsivity, frantic efforts to protect against real or imagined abandonment,

instances of disproportional, inappropriate anger, and often suicide attempts. (PC XXIV: 695-97.) Intense anger and stress in borderlines, she elaborated, can cause transient psychotic episodes. (Id. at 698.)

Dr. McCoy testified that Ms. Pike's Social History showed both the classic elements for developing Borderline Personality Disorder, and the prototypical manifestations of the disorder in its most severe form: (1) Ms. Pike suffered neglect, abandonment, and physical and sexual abuse, which collectively function as triggers for the onset of Borderline Personality Disorder, and (2) Ms. Pike's behaviors in acting out, including violent incidents such as the crime underlying this case, were largely explicable in terms of Borderline Personality Symptoms. (Id. at 677-78; PC XXVI: 795-96, 809.)

Specifically, Dr. McCoy's Social History documented extensively the exceptionally trying circumstances under which Ms. Pike grew up, including the following facts:

- Ms. Pike's mother was an alcoholic who was disinterested in Ms. Pike and often failed to provide for Ms. Pike's basic needs, such as food and clothing;
- Ms. Pike's father, Glenn Pike, played little role in the parenting of Ms. Pike, was physically abusive when Ms. Pike stayed with him, and he ultimately forbade Ms. Pike from visiting his home based on unfounded accusations;
- Ms. Pike was passed between assorted caretakers, several of whom were openly disdainful of Ms. Pike;
- Ms. Pike's early life was marked by instability and chaos, not only in her shifting caretakers, but also in the number of different men living with her mother, and in constant school transfers;
- Ms. Pike was rejected by her aunt, Carrie Ross, who was willing to care for Ms. Pike's sister, Alicia Wills, but not Ms. Pike;
- Ms. Pike's paternal grandmother was the only caretaker who loved Ms. Pike, and Grandmother Pike died when Ms. Pike was 12; Ms. Pike's mother did not allow Ms. Pike to be with her grandmother when she died, and Ms. Pike blamed herself for her grandmother's death and attempted suicide shortly thereafter;
- Ms. Pike was likely sexually abused by her grandmother's companion;
- Ms. Pike was raped by a stranger at age 11 and again at 17;
- Ms. Pike was beaten by various adult men in her immediate surroundings, including her sister's boyfriend and her mother's husbands and boyfriends.

(See, Jan 07, EX. 1, Vol. 1 of 5,S Hist.)[34]

Under the second Goad factor – a comparison of the mitigation presented with what could have been presented – the mitigation presented at trial does not hold a candle to the evidence presented by Dr. McCoy on post-conviction. During the penalty phase, defense counsel offered the testimony of Ms. Pike's mother, father, and aunt. These witnesses testified that Ms. Pike's mother was an alcoholic, that Ms. Pike's parents were both uninvolved in her life, that Ms. Pike was physically abused by different men in her life, and that Ms. Pike occasionally lived on the streets. (T XXIX: 2496-502, 2511-16, 2523-32.) On cross-examination, armed with Dr. McCoy's materials, these witnesses collectively admitted that Ms. Pike had always been a difficult child (Id. at 2537), that she had been accused of sexual abuse (Id. at 2520), that she was not trusted with children, (Id. at 2506; M. Mat. Vol. 3 of 5 Appendix 20 at bates 308), that she was manipulative and a liar (T XXIX: 2517, 2541-42), and that she had threatened her mother's boyfriend with a butcher knife as a young adolescent (Id. at 2534, 2540).[35]

Defense counsel presented no expert testimony during the penalty phase. As a result, no defense witness explained to the jury that the negative evidence brought out on cross-examination was explicable and in fact symptomatic of Ms. Pike's mental illness. Dr. Engum, who testified during the guilt/innocence phase, had told the jury that Ms. Pike suffered from severe Borderline Personality Disorder. (PC XXV: 2180-85. 2190-94.) But Dr. Engum never explained the ways in which mental illness diminished Ms. Pike's moral culpability, nor did he discuss how potentially 'two-edged' information proved the severity of Ms. Pike's mental illness.

The case that could have been presented is thus distinguishable in two critical respects from the case that actually was. First, Dr. McCoy's Social History provides a significantly more detailed, better corroborated, and more persuasive account of Ms. Pike's life story than the testimony heard at trial. See

---

[34] The scope of the evidence that Dr. McCoy would have presented is severely truncated in this argument section due to page limitations. The testimony Dr. McCoy was prepared to give at trial is set forth in more detail in the Statement of the Facts, *supra*, at 54-57.

[35] For a more exhaustive account of the evidence presented in the sentencing phase *see* Statement of the Facts, *supra*, at 22-57.

Goad, Id. at 371 (holding quantum of evidence significant to strength of mitigation case, even if substance overlapping). Second, Dr. McCoy's testimony provides a link between Ms. Pike's negative behaviors, including her role in Ms. Slemmer's death, and her mental illness.

The third Goad factor calls for a reweighing of aggravating and mitigating evidence after incorporating newly presented mitigation. Under this factor, given the strength of Dr. McCoy's Social History and testimony, at least one juror would have been likely to find that the mitigating factors outweighed the aggravating factors in this case. Wiggins v. Smith, 539 U.S. 510, 537 (2003) (prejudice established if "at least one juror would have struck a different balance"). In Wiggins, the Court found highly probative evidence of childhood neglect, abuse, homelessness, absentee parents, and an alcoholic mother. Id., 539 US. at 535. This is precisely the sort of evidence presented in depth by Dr. McCoy, but which was absent during Ms. Pike's trial. For this reason, the effect of defense counsel's conflicted conduct during the sentencing phase was prejudicial to Ms. Pike's case.

**C. Counsel were Conflicted as a Result of Procuring a Release of Media Rights from Ms. Pike**

At the post-conviction hearing, Mr. Talman approached Ms. Pike's aunt, Carrie Ross, to discuss authoring a book with her concerning Ms. Pike's life and criminal prosecution. (PC XXIV: 612.) After sentencing, but prior to their representation of Ms. Pike on direct appeal, Mr. Talman and Ms. Rice had Ms. Pike sign a waiver releasing all media rights to her story. The waiver contained a clause specifically authorizing Defense Counsel to use or sell Ms. Pike's story for pecuniary gain. (Apr 07 Ex. 13.)

An attorney's attempt to profit from sale of a client's story during the course of representation of the client constitutes a conflict of interest.[36] Tenn. Sup. Ct. Rule 8, Canon 5, EC 5-4, DR 5-104[1996-1997]; Model Rules of Prof'l Responsibility R. 1.8(d) ("Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation."); Tenn. Rules of Prof'l Resp. R.

---

[36] In 2002, the Tennessee Supreme Court replaced the Rules of Professional responsibility with the Code of Professional Conduct. Releases such as the one Ms. Pike signed are now prohibited by Tenn. Sup. Ct. R. 8, RPC 1.8(d).

1.8(d) (same); Model Rules of Prof'l Responsibility R. 1.8(d) cmt. 3 ("measures suitable in representation of the client may detract from the publication value of an account of the representation"); Beets v. Scott, 65 F.3d 1258, 1274 (5th Cir.1995) ("serious potential conflict of interest" where attorney's son negotiated media rights contract with defendant); U. S. v. Hearst, 638 F.2d 1190, 1196 (9th Cir.1980) (finding ". . . potential conflict of interest . . . virtually admitted" where defense counsel conceded book deal). Mr. Talman's discussions with Ms. Ross make evident his interest in profiting from Ms. Pike's story from the earliest stages of his representation of Ms. Pike. Because counsel handled Ms. Pike's direct appeal, counsel's conduct in obtaining a waiver also occurred in the course of representing Ms. Pike, This conduct also casts a shadow backwards across Ms. Pike's trial, suggesting that defense counsel were motivated by monetary gain throughout.

As discussed above, proof of a conflict of interest entails a showing of adverse effect. This may be shown by proving (1) an alternative strategy (2) that was objectively reasonable (3) was pre-empted by counsel's conflict. Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001), aff'd, 535 U.S. 162 (2002). Ms. Pike is entitled to an inference of the causation required under (3) if she can show that Mr. Talman and Ms. Rice's conflict was consistent with their failure to pursue reasonably objective strategies. See Boykin v. Webb, 541 F.3d 638, 644 (6th Cir. 2008); McFarland v. Yukins, 356 F.3d 688, 706 (6th Cir. 2004).

In Ms. Pike's case, adverse effect is apparent in counsel's failure to seek a continuance. Effective representation of Ms. Pike mandated delay for two reasons. First, counsel had no experience in litigating in a complex and time-consuming field. Mr. Talman had never litigated a capital case prior to Ms. Pike's, and Ms. Rice had never represented a criminal defendant in anything greater than a B-felony. (PC XIX: 255; XVII: 31-33.) Mr. Talman was on the case for eight months, and Ms. Rice for less than two. (PC XIX: 261-62; Apr 08 Ex 3: 93, 94.) Even experienced capital defense attorneys require a great deal more than eight months to prepare for trial. The work of capital defense counsel, at a bare minimum, entails gaining a client's trust, identifying and investigating potential issues for two stages of trial, obtaining and utilizing the

necessary experts, preparing for effective voir dire, preparing and briefing pretrial motions, and preparing witnesses to testify at trial. This work simply cannot be done quickly. And supposing that novice capital defense counsel may be capable of effective assistance on the first try, such counsel require additional time to obtain a basic understanding of a field of law and literature that takes time to master.

Second, Ms. Rice was appointed as co-counsel less than two months prior to trial – after Mr. Brown withdrew. (Apr 08 Ex. 3.) Without more time to debrief her on his trial strategy, delegate responsibility, and bring her up to speed on the facts of the case, Mr. Talman was effectively trying the case alone. Under these circumstances, it would have been objectively reasonable for Mr. Talman and Ms. Rice to seek a continuance.

Counsel's failure to seek a continuance is consistent with counsel's pecuniary interest in selling Ms. Pike's story. In the wake of Ms. Pike's arrest and indictment, her story generated considerable publicity.[37] This media attention gave value to Ms. Pike's story, but with the passage of time, a new sensational story would have been likely to emerge and wash out interest in commercial accounts of Ms. Pike and her crime. As a result, Defense stood to gain by not seeking a continuance, because a rapid trial insured their ability to capitalize on Ms. Pike's story before it cooled. See Hearst, 638 F.2d at 1193,1194 (finding "not implausible" the allegation that defense counsel's book deal was responsible for counsel's failure to seek a continuance "so public interest would not cool and competing authors would not get the jump on him").

Ms. Pike avers, as discussed above, that she is not required to demonstrate prejudice on this claim. However, the evidence of prejudice is immediately apparent; failure to gain a continuance resulted in poor preparation that undermined Ms. Pike's defense in totality. Under these circumstances, Ms. Pike has established a second conflict of interest mandating reversal and invalidation of her conviction and sentence.

**D. The Lower Court Erred in Finding Ms. Pike's Conflict Claims "Waived."**

[37] See, e.g., Knoxville News-Sentinel, Sunday, May 1, 1994, Sunday May 8, 1994) (Talman specifically identified in two articles); (TR PC Vol. I at 67-69) (The Tennessean, June 7, 1995) (Talman specifically identified.)

In denying Ms. Pike's conflict claim, the Court below began its analysis,"[i]nitially, this Court finds that this issue is waived. Talman testified that he had informed the petitioner of the issue and that she actually liked him more because of it. No issue was raised either pretrial or at trial." (PC V: 646.) In finding the conflict issue "waived," the Court below might have meant (1) that Ms. Pike made an intelligent and knowing decision to proceed with Mr. Talman as her attorney in spite of his potential conflict, Johnson v. Zerbst, 304 U.S. 458, 464 (1938), or (2) that Ms. Pike defaulted on her claim by failing to raise it on direct appeal under Tennessee Code Annotated 40-30-106(g). The lower Court's discussion on this point – captured in its entirety in the above excerpt – offers no insight into which interpretation of "waived" was intended.

Regardless of this confusion, both interpretations represent erroneous legal findings. As to the first interpretation, waiver under Johnson v. Zerbst requires (1) that the trial court inform the defendant on the record of counsel's potential conflict and (2) defendant's right to new counsel, and (3) that the defendant then waive the right to new counsel on the record. Potka v. State, 2002 WL 65993, at *4 (Tenn. Crim. App. Jan. 18, 2002). None of these conditions were met in Ms. Pike's case. Furthermore, to the extent that the Court below found this issue waived on the basis of Mr. Talman's representations, this was also legal error. Smith v. State, 1997 WL 658993, at *5 (Tenn. Crim. App. Oct. 23, 1997) ("The statements of counsel are insufficient, as a matter of law, to constitute a waiver of a potential conflict of interest.")

As to the second interpretation, Ms. Pike did not waive her right to challenge Mr. Talman's conflict by failing to raise the claim at trial or on direct appeal. Tennessee law recognizes allows for review of a conflict of interest claim on post-conviction – even at the level of appeal before this Court – under the doctrine of plain error. Coleman v. State, 2007 WL 1651882, at *7 (Tenn. Crim. App. June 7, 2007)(recognizing that actual conflict is created where attorney is required to review his own performance); see also, Ciak v. U.S., 59 F.3d 296, 303 (2d Cir. 1995); Billy-Eko v. U.S., 8 F.3d 111 (2d Cir. 1993). As a result, under any possible interpretation of the lower Court's finding of "waiver," that finding was legal error.



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 104 of 196 PageID #: 8975

## II. Ms. Pike Was Denied the Right to the Effective Assistance of Counsel.

Pursuant to the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, § 9 of the Tennessee Constitution, Christa Pike was guaranteed the right to counsel. Pylant v. State, 263 S.W.3d 854 (Tenn. 2008). This right includes "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" Id. at 858 (quoting Strickland v. Washington, 466 U.S. at 687); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prove violation of this right, Ms. Pike must show that: (1) her counsel's performance was deficient, and (2) her counsel's deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984). In determining the existence of prejudice, this Court must consider the effect of counsel's deficiencies both on their own and cumulatively. See State v. Taylor, 968 S.W.2d 900, 912 (Tenn. Crim. App. 1997).

### A. Deficient Performance

In numerous respects, counsel's performance in this trial fell below the standards required of defense counsel in a capital case. A complete list of defense counsel's errors is found in Ms. Pike's post-conviction Petition. (PC II: 274, 278- III: 305.) For purposes of this Brief, Ms. Pike focuses only on those errors that directly prevented a jury from reaching an informed decision as to two paramount issues: (1) whether Ms. Pike possessed the requisite degree of culpability for imposition of the death penalty, and (2) whether Ms. Pike possessed the requisite intent for capital murder.

#### 1. Penalty Phase Deficiency Regarding Proof of Insufficient Culpability

In any capital case, defense counsel's obligation during the penalty phase is to tell a "story that simultaneously humanizes the defendant, explains his behavior, diminishes culpability for the crime, and assures the jury that a sentence of life in prison will both punish the defendant and protect society." Tools for the Ultimate Trial: the Tennessee Death Penalty Manual, 3rd Ed. 1992, Vol. II at 14.51 (Apr 08 Ex. 14B). Additionally, since the guilty verdict in a capital case often signifies that the prosecution has established a prima facie case for a death sentence, counsel should have "presumed that death w[ould] be the outcome

unless he present[ed] a vigorous affirmative case for life." Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 335 (1983). Indeed, counsel in this case was well aware of the importance of mitigation to Ms. Pike's survival: Mr. Talman recalled, "I don't think there was any question it was a penalty phase case." (PC XX:324.)

Yet defense counsel arrived at the penalty phase empty-handed. Having completely scrapped the planned sentencing evidence, see Argument I, supra, Mr. Talman met with Dr. McCoy the night before the start of the penalty phase and, having decided to present only the three family members present, met briefly with them immediately prior to court. (PC VI: 39-40, 45-46; VII: 155-57; VIII: 425-26; XXV: 742-43.) The resulting mitigation case was paper-thin and quickly torn to shreds on cross-examination. Unsurprisingly, the jury returned with a verdict of death.

It need not have been this way. The penalty phase verdict was less an appropriate response to the facts than an indictment of the performance of defense counsel. In particular, Ms. Pike's death sentence was the direct result of the following deficiencies of counsel: (a) counsel failed to present mitigation evidence in their actual possession; (b) counsel failed to discover relevant mitigation evidence; (c) counsel surrendered privileged information to the State; (d) counsel failed to make effective opening and closing arguments; (e) counsel failed to conduct effective *voir dire*; and (f) counsel failed to move to strike one of the State's aggravating factors.

**a. Failure to Present Mitigation Evidence in Counsel's Possession**

Six months before trial, Dr. McCoy was retained as Ms. Pike's mitigation specialist and instructed to prepare a social history to serve as the foundation of penalty phase proof. (See Jan 07 Ex. 1.) On Sunday, March 24, 1996, Dr. McCoy provided her extensive Social History including three volumes of Mitigation Materials to defense counsel, approximately one week after the trial began. (PC XXV: 740.) Ultimately, counsel made no use of either Dr. McCoy or her materials, except to provide the written work product to the State for use in cross-examining the three penalty phase defense witnesses.

As a threshold matter, it was error for defense counsel to plan to present all of Dr. McCoy's materials through Dr. McCoy alone: a social history is more properly presented through lay witnesses than a single expert. In Parker v. State, 3 So.3d 974, 983 (Fla. 2009), the Florida Supreme Court granted post-conviction penalty phase relief where counsel presented the mitigation case through five witnesses -- two investigators, the petitioner's mother, an accomplice, and one mental health expert. On direct appeal, the court had found the mitigation proof unsubstantiated because the evidence presented by the investigators was not "first hand" and the mental health expert had "relied almost entirely on Parker's self-reported history and did not corroborate this information by interviewing collateral sources." Id. at 984. In finding that counsel were ineffective on post-conviction, the court noted that Parker's collateral challenge "fleshed out the 'bare bones' presented at the penalty phase" through "testimony from numerous witnesses about his background and childhood." Id.

Defense counsel did not have to look far for the suggestion to use lay witnesses – Dr. McCoy encouraged this strategy, and provided a list of persons to subpoena. (Apr 08 Ex. 5). In fact, Mr. Talman conceded on post-conviction that he should have called the majority of those individuals interviewed by Dr. McCoy, as well as others, including juvenile detention workers, and friends of Ms. Pike from Job Corps. (PC XX: 347). Nonetheless, defense counsel subpoenaed no lay witnesses. (PC. XX: 347).

By default, Dr. McCoy prepared to present Ms. Pike's entire social history by herself. Her testimony was designed to provide a psychological context for the existing facts on the basis of Dr. McCoy's expertise. This would have included testimony that every facet of Ms. Pike's life, including what might otherwise be considered negative evidence, was either a factor contributing to the development of Ms. Pike's mental illness, or a symptomatic behavior of that same illness and Ms. Pike's background of abuse and neglect. (PC XXV: 765-73, 793-96; *see,* Statement of Facts, *supra*, at 54-57.)

However, as discussed above, defense counsel made the decision to pull Dr. McCoy's testimony on the eve of the sentencing phase with no alternative plan in place. Ms. Pike has already asserted that the

only explanation for this decision is that Mr. Talman was acting on the basis of a conflict of interest. Here, Ms. Pike argues in the alternative that, whether or not this Court finds an unconstitutional conflict, Defense Counsel's decision to pull Dr. McCoy's testimony constituted ineffective assistance of counsel. This conclusion follows because Defense Counsel's proffered reasons – to which this Court is limited in its review – amount to deficiency *per se*.

Ms. Pike has already detailed each of Defense Counsel's four reasons for pulling Dr. McCoy's testimony at the last minute: (1) Counsel's claim that Dr. McCoy could not corroborate Dr. Engum's finding of Borderline Personality Disorder; (2) Mr. Talman's belief that certain elements of Dr. McCoy's Social History were 'double-edged'; (3) Dr. McCoy's former romantic involvement with lead prosecutor Mr. Crabtree; and (4) Counsel's fear of ambush when the prosecutor arrived at the penalty phase carrying Dr. McCoy's Mitigation Materials "covered in little yellow stickies." Similarly, Ms. Pike has explained how each justification is implausible. In this section, Ms. Pike argues that, if credited, these explanations prove counsel's deficiency.

The first explanation – that Dr. McCoy could not corroborate Dr. Engum's diagnosis – is untrue. Dr. McCoy was prepared to testify that Ms. Pike was a "poster-child" for Borderline Personality Disorder, that the recurrent themes in Ms. Pike's social history were consistent with that disorder, and that Ms. Pike's misbehavior was entirely explained and understood in terms of Borderline Personality. (PC XXVI: 892-94.) Moreover, Defense counsel should have known this. Mr. Talman testified on post-conviction that he and Dr. McCoy had regular meetings and phone conversations discussing the progress of the case. (PC V: 653.) Dr. McCoy provided a document to both members of defense counsel containing what she understood to be the mitigation themes she and Mr. Talman had previously discussed, (PCXXIV: 649-50): the first theme on the list was Borderline Personality Disorder. (Id. at 650; Apr 08 Ex. 6.) As a result, if defense counsel honestly believed that Dr. McCoy would not corroborate Dr. Engum's findings on the stand, counsel was paying no attention to their mitigation specialist. If counsel did not listen to Dr. McCoy, then counsel's

decision not to put her on the stand could not have been based on Dr. McCoy's investigation. As a result, "counsel were not in a position to make a reasonable strategic choice." Wiggins v. Smith, 539 U.S. at 536.

Counsel's second explanation, that Dr. McCoy's materials contained 'double-edged' information, invites three challenges. First, as already noted, Mr. Talman claimed to be in regular communication with Dr. McCoy, and to be fully apprised of developments in the mitigation case. If Mr. Talman's alleged concerns are to be believed, then by his own admission, Mr. Talman sat on his hands until the eve of sentencing only to throw away his planned case with nothing in reserve.

Second, if counsel were concerned with negative facts in Dr. McCoy's materials, the reasonable approach would have been to present Dr. McCoy's testimony to provide a context in which to view such facts. Dr. McCoy was prepared to testify that Ms. Pike's character and conduct were symptomatic of Ms. Pike's mental illness and history of abuse and neglect. In this regard, the so-called negative information in fact strengthened the mitigation case.

Third, not only did counsel not use Dr. McCoy to defuse harmful facts, counsel provided those facts to the State, which in turn used them for effective cross-examination that met with no rebuttal. If counsel were concerned with 'double-edged' information, they selected the most damaging way to handle the problem.

Counsel's third explanation – that Dr. McCoy had once been romantically involved with Mr. Crabtree – meets with a similar problem. Mr. Talman knew of the relationship in question months in advance of the penalty phase. (PC XXV: 747-49.) If he was truly concerned, he did not show it. Nevertheless, defense counsel had no reasonable cause for concern. There is no reason to believe that Dr. McCoy's work on this case either was or would have been inhibited in any way by her former relationship with Mr. Crabtree. Indeed, Mr. Talman conceded as much, undermining his own justification by admitting the relationship was of no moment to Ms. Pike's defense. (PC XX: 355.)


Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 109 of 196 PageID #: 8980

With regard to the fourth explanation – the yellow "stickies" – there is no doubt, as the Court below found, (PC V: 685 n. 2a), that this explanation was a post-hoc rationalization. Counsel did not see the "stickies" until Saturday morning, and the decision not to put on Dr. McCoy was made Friday night. (Id.)

Because each of counsel's proffered explanations ultimately fall flat, there is no reasonable strategic basis on which counsel could have decided to pull Dr. McCoy's testimony from the penalty phase. As a result, this decision must be considered deficient performance.

**b. Failure to Discover Relevant Mitigation Evidence**

Defense counsel failed to discover critical mitigation evidence in this case, most notably, Ms. Pike's brain damage and Bipolar Disorder, and the testimony of numerous lay witnesses.

**i. Brain Damage**

Dr. Jonathan Pincus testified that the first and most significant indication of Ms. Pike's brain damage was her history of seizures dating almost from birth. Dr. Pincus also considered highly relevant Ms. Pike's EEG results from 1977, which showed abnormality when Ms. Pike was 14 months old. (Jan 07 Ex. 7 at Bates 6-7, 14.) Dr. Kenner testified that on the basis of the abnormal EEG result and Ms. Pike's history of seizures, ample evidence existed at the time of Ms. Pike's trial to suggest the need for a neurological examination. (PC XXIX: 35.) Dr. Kenner also noted that Ms. Pike had survived a traumatic accident when she was 14, during which her head went through a car windshield. (Id. at 48-59.) This incident, too, he noted, suggested a significant probability of brain damage.

Defense attorneys were in possession of other red flags in the form of information obtained from prospective lay witnesses. Carrie Ross, Ms. Pike's maternal aunt, told Dr. McCoy that Ms. Pike's mother, Carissa Hansen, was a life-long alcoholic. (PC VII: 166-67.) Glenn Pike, Ms. Pike's father, substantiated this information, and further said that he could not recall Ms. Hansen ever abstaining from alcohol during pregnancy. (PC X: 437-38.) This was sufficient information to suggest that Ms. Pike had been exposed to alcohol in-utero, and that she may have suffered some resulting neurological impairment. Ms. Rosas

testified at trial that Ms. Pike was born prematurely, (T XXVIII:2485-86), which would also suggest the possibility of neurological issues.

There was thus a body of evidence which readily suggested brain damage, yet the defense conducted no neurological investigation. Subsequently, counsel failed to discover Ms. Pike's neurological disabilities, namely, an abnormality in the brain that impairs Ms. Pike's impulse control. The only investigation that counsel conducted relative to Ms. Pike's particular brain was in the form of psychological evaluation by Dr. Engum. This was inadequate for two reasons.

First, and most fundamentally, Dr. Engum is a neuropsychologist. (PC XXV: 2166, 2172-73.) As Dr. Pincus testified, brain damage, particularly the heterotopia afflicting Ms. Pike, does not show up on neuropsychological testing. (PC VIII: 250.) This is because this damage is *physiological* in nature. (Id.) Dr. Pincus thus agreed that no brain damage was discovered through Dr. Engum's testing, but he offered an important qualifier: none *could have been discovered.* (Id. at 248, 281-87.) Because Dr. Engum was not an expert in neurology and could not perform the appropriate testing, he had no way of knowing for certain whether brain damage was present. At most, Dr. Pincus explained, Dr. Engum could have stated that he found no brain damage, but in going further to say none existed, he overstated his findings. (Id.)

Of course, Ms. Pike does not contend that defense counsel should be held to a standard of neurological knowledge on par with Dr. Pincus. What Ms. Pike argues, and what counsel should have known, is simply (1) that the available evidence suggested physiological damage, and (2) that Dr. Engum was not a medical doctor. See State v. Savage, 577 A.2d 455, 465 (N.J. 1990) (death penalty defense requires "an expertise regarding special considerations present in capital cases"); Amedeo v. State, 384 S.E.2d 181, 182 (Ga. 1989).

These two requirements of defense counsel represent the minimum level of knowledge for competency. Seizures, irregular EEGs, traumatic head injury, and prenatal alcohol ingestion – there can be no question that these things signal problems with the physical brain. As for the expertise of psychologists,

a reasonably competent defense attorney – particularly in a capital case, where issues of mental illness are abundant – is required to know the limitations of a psychologist, who is not a medical doctor. Competent counsel would have known that different areas of expertise are needed to conclude that there is no brain damage. As Dr. Pincus noted, you cannot rely on one set of testing to find brain damage, because any one test showing an abnormality is definitive that the abnormality exists. (PC VII:223-24.)

The second reason defense counsel were unreasonable in relying on Dr. Engum's opinion is that Dr. Engum provided no explanation for the myriad indications of brain damage. After Dr. Engum stated that he had found no brain damage, counsel were in the same position as before, with a variety of indications that something was wrong with Ms. Pike, but with no overarching theory to explain them. It was unreasonable for counsel to abandon the investigation at this stage and leave an obvious mystery unsolved. Minimal diligence required a second opinion from a medical professional with a different specialty.

**ii. Mental Illness**

Trial counsel arrived at a diagnosis of Borderline Personality Disorder. As Drs. Pincus and Kenner testified, this diagnosis was incorrect. The proper diagnosis was Bipolar Disorder, as confirmed by Ms. Pike's positive response to mood-stabilizing drugs. (PC VIII: 244; PC XXX: 209-10.) Dr. McCoy also noted that Ms. Pike's behavior changed dramatically once she was medicated for the Bipolar Disorder. (PC XXVI:890-91.) While Ms. Pike maintains that evidence of Borderline Personality Disorder would have been persuasive if the defense had presented it in the penalty phase, she contends that counsel's failure to obtain the proper diagnosis was ineffective assistance. Additionally, counsel failed to discover Ms. Pike's Post-Traumatic Stress Disorder ("PTSD").

Ms. Pike's Bipolar Disorder and PTSD were readily discoverable at the time of trial. Dr. Kenner noted several pieces of information from Ms. Pike's social history that immediately suggested Bipolar Disorder, including: (1) numerous reports from family and friends that Ms. Pike exhibited extremely high levels of

energy and had trouble sleeping; (2) Ms. Pike's three suicide attempts; (3) Ms. Pike's displays of belief in her own invincibility; and (4) Ms. Pike's EEG at 14 months, because there is a significant correlation between brain damage and the development of Bipolar Disorder. (PC XXIX: 26-29, 37-37, 40-45.) During post-conviction, Ms. Pike presented still other characteristics suggestive of Bipolar Disorder – including evidence of rapid and dramatic mood swings, or descriptions of Ms. Pike as "out of control" – all of which was discoverable at the time of trial. (PC XI: 516-17, 600.)

Dr. Kenner testified that there is a danger of misdiagnosing bipolar individuals as borderline. (PC XXX: 209-10.) To achieve the correct diagnosis, he stated, a clinician has to acquire longitudinal information about the client, preferably through repeated clinical interviews. (PC XXIX: 87.) Dr. Kenner opined that Dr. Engum reached the wrong diagnosis because he met with Ms. Pike only four times. (Id.)

Regarding his diagnosis of PTSD, Dr. Kenner based his opinion on Ms. Pike's history of abuse and neglect. (Id. at 149-53.) He also saw evidence of PTSD in her delusional paranoia, heightened fear of abandonment, and hyper-vigilance in the face of perceived threats. (Id. at 154-57.) Dr. Kenner obtained the information necessary for a PTSD diagnosis through repeated clinical interviews and review of Ms. Pike's social history. (Id. at 149-53.)

A clear pattern emerges with respect to Dr. Engum's failure to identify either Ms. Pike's Bipolar Disorder or her PTSD: Dr. Engum knew very little about Ms. Pike's life. This fault is directly attributable to trial counsel. As the leaders of the defense team, they were responsible for overseeing and directing the work of their experts. This entails (1) insuring significant face time between mental health practitioners and the client, and (2) facilitating communication between experts. Defense counsel in this case failed to do both – another example of deficient performance.

Trial counsel structured their experts in such a manner that each worked in isolation with respect to the others. Dr. Engum never met or otherwise communicated with Dr. McCoy, and he completed his evaluation of Ms. Pike before Dr. McCoy's work began let alone before her Social History was complete. (Compare

Apr. Ex. 17 with PC XXIV: 633; PC XXV: 2178-79.) Dr. Engum was thus without the benefit of Dr. McCoy's work. This was compounded by the fact that Dr. Engum interviewed Ms. Pike a relatively scant number of times, resulting in a clinical evaluation based on very little information about her life history. Counsel had a responsibility to prevent this result by organizing their team so that the mental health experts could pool their resources and benefit from one another's discoveries, insights, and opinions. Instead, counsel assigned discrete tasks that left each expert in a vacuum. Had Dr. Engum, at the very least, reviewed Dr. McCoy's Social History, he would have recognized numerous incidents – both causes and likely effects – suggesting Bipolar Disorder and PTSD. The failure to reach the correct diagnoses of Ms. Pike's mental illnesses therefore rests with Ms. Pike's counsel at trial.

**iii. Testimony of Lay Witnesses**

Defense Counsel failed to investigate Ms. Pike's life history as it pertained to her experiences in various institutional facilities, including Child Protective Services housing, juvenile detention, and Job Corps. This was a significant oversight, considering that Ms. Pike had spent the last eight years of her life prior to trial – from age 10 to 18 -- in various institutional settings. More pointedly, however, counsel was aware that Ms. Pike was rejected by her parents and maternal aunt. The evidence uncovered by Dr. McCoy revealed that the only family member who had cared for Ms. Pike, her paternal grandmother, was dead. (See PC IX: 375; PC X: 458; T XXIX: 2502-04.) As a result, it was incumbent upon counsel to seek lay witnesses who could testify to caring for Ms. Pike. Such proof would have both humanized Ms. Pike and shown a death sentence to increase rather than diminish net suffering.

**c. Disclosure of Protected Work Product to the Prosecutor**

Mr. Talman testified before the post-conviction court below that he turned all three volumes of Dr. McCoy's work product over to the Prosecutor because "the Court said we had to give them to him. But I could be mistaken as to whether it was actually a ruling." (Id. at 374-75.) Mr. Talman later cast doubt on the existence of an order for production, saying "in retrospect, I probably would not have given the entire thing

and made the Court [*sic*] specifically order me to do that." (Id. at 376-77.) There is no evidence in the record of any order requiring Mr. Talman to produce Dr. McCoy's work product.

In fact, Mr. Talman was not under any obligation to provide the prosecutor with Dr. McCoy's Mitigation Materials. Three regulatory provisions are controlling on this issue: (1) Tennessee Rule of Criminal Procedure 16(b); (2) Tennessee Rule of Criminal Procedure 26.2; and (3) Tennessee Rule of Evidence 705.

Rule of Criminal Procedure 16(b)(2) specifically states that defense counsel must disclose "reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents, or of statements made by the defendant, or by State or defense witnesses, or by prospective State or defense witnesses, to the defendant, his agents or attorneys." Tenn. R. Crim. Pro. R. 16(b(2)(1996).[38] "On the other hand, the rule precludes discovery of 'reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents . . . or of statements made by . . . defense witnesses . . . to the defendant, his agents, or attorneys.'" State v. Nichols, 877 S.W.2d 722, 729 (Tenn. 1994) (quoting Tenn. R. Crim. P. 16(b)(2).) Discoverability thus turns on whether the notes in question are the result of psychological testing and examination, or instead represent "statements" made to defense counsel or their agents. Id. Dr. McCoy testified at post-conviction that she "felt like a fish out of water" because, in Ms. Pike's case, she conducted no psychological evaluation and was instead limited to conducting mitigation interviews for the purpose of compiling a social history. (PC V: 684,) Because she never conducted any "physical or mental evaluations" of any prospective witness, Dr. McCoy's Mitigation Materials were protected under Rule 16(b)(1)(B). Cf. Nichols, 877 S.W.2d at 729-30.

Rule of Criminal Procedure 26.2(a) states:

> **Motion for Production.** After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the

[38] Ms. Pike cites to the regulations that would have been applicable at the time of this trial; so, for example, the year of publication for Rule 16(b) is 1996 as opposed to 2009.

> examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

For purposes of Rule 26.2, "a 'statement' of a witness means: (1) a written statement made by the witness that is signed or otherwise adopted or approved by him; or (2) a substantially verbatim recital of an oral statement made by the witness. . . ." Id. at Rule 26.2(g). Under this rule, Dr. McCoy's Mitigation Materials would not have been discoverable because they contained annotations of statements made by Dr. McCoy's interviewees, not the statements of Dr. McCoy herself. See, e.g., State v. Schiefelbein, 230 S.W.3d 88,148 (Tenn. Crim. App. 2007). Dr. McCoy's Social History, if considered a statement under Rule 26.2, would have been discoverable only upon motion by the State *after* Dr. McCoy testified. Tenn. R. Crim. P. R. 26.2(a).

Finally, Rule of Evidence 705 holds, "[t]he expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Tenn. R. Evid. 705. Under Rule 705, the raw data underlying an expert's opinion is thus discoverable only by order of the trial court. Id. Generally, trial courts make such determinations after viewing the raw data *in camera* and require disclosure only where the expert has not written a consolidated report. Schiefelbein, 230 S.W.3d at 148-49; Nichols, 877 S.W.2d at 729-30. There is no evidence in the record that the trial court ever reviewed Dr. McCoy's materials or made any decision that fairness required their disclosure.

In sum, then, neither Rules of Criminal Procedure 16(b) and 26.2, nor Rule of Evidence 705 would have required production of Dr. McCoy's Mitigation Materials and Social History to the State. Because Mr. Talman was thus not required to turn over Dr. McCoy's work product to the State, it was error to do so without objection regardless of any court order.

**d. Failure to Present Effective Penalty Phase Arguments**

Counsel's penalty phase arguments highlighted and compounded counsel's poor preparation. Mr. Talman's opening suggested that the defense would "help the jury understand how a bright, intelligent girl

can end up in a courtroom facing the death penalty." (T XVIII: 2478.) However, he offered no elaboration, neither mentioning what evidence was planned nor why it was mitigating. Mr. Talman did not tell the jury that Ms. Pike, at 18 years and ten months of age, was only narrowly eligible for execution at the time of her crime. Nor did he explain that youth was a statutory mitigating factor. Mr. Talman also neglected to discuss that Ms. Pike was not single-handedly responsible for Ms. Slemmer's death, but acted in concert with two violent gang-members who shared significant culpability for the crime. Perhaps most startling, however, was Mr. Talman's failure to discuss any of the evidence uncovered by Drs. Engum and McCoy. Mr. Talman made no mention of Ms. Pike's mental illness or history of abuse and neglect.

Ultimately, Mr. Talman presented the jury with only one reason not to sentence Ms. Pike to death: because she "derives and gains her self-esteem, her self-worth from those around her," he suggested, "a life sentence would be the harshest punishment because it would deprive her of the notoriety she craves." (Id. at 2480-81.) This excerpt captures Mr. Talman conceding to the jury that Ms. Pike was deserving of the worst punishment they could imagine. More fundamentally, however, it suggests that Mr. Talman did not understand the function of opening argument. In Oesby v. U.S., the D.C. Circuit noted that, "the purpose of an opening statement for the defense is to explain the defense theory of the case, to provide the jury an alternative interpretive matrix by which to evaluate the evidence, and to focus the jury's attention on the weaknesses of the government's case." 398 A.2d 1, 5 (D.C. App. 1979).[39] The Court's subsequent reprimand of counsel in Oesby applies equally to Mr. Talman: "Counsel's statement in this case was at best confusing and unilluminating. It did little to inform the jury of any weaknesses in the government's case, and supplied only a bare bones description of the defense theory." Id.

The penalty phase closing presented by Ms. Rice was equally fault-worthy. Ms. Rice, like Mr. Talman, never alluded to any of the mitigation themes of mental illness, lack of significant prior criminal activity, murder committed under extreme mental or emotional disturbance, or Ms. Pike's youth at the time of the

crime. (Compare T XXIX: 2560-65 with Id. at 2578-79.) Instead, Ms. Rice spoke in generalized platitudes, calling Ms. Pike "the poster child for the result of the breakdown of family values" and advising the jury, without providing any reason, to "choose life." (See T XXIX: 2565.)

#### e. Failure to Conduct Meaningful *Voir Dire*

After the completion of the Witherspoon-Witt and pretrial publicity qualification of the venire, prospective juror Mr. Rutherford, who had initially been determined to be death-qualified, told the Court that he was having difficulty with the idea of imposing the death penalty due to Ms. Pike's youth. (T XIX: 1510.) This exchange followed:

> **Court**: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I, I need you to tell me how you feel.
>
> **Mr. Rutherford**: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.

(T XIX: 1510-11.) Mr. Rutherford then explained to the Court that he worked with "a lot of kids" and understood that due to their immaturity, they do impulsive things. (Id. at 1511.) The prosecutor then stated:

> **Mr. Crabtree**: . . . And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> **Mr. Rutherford**: I have problems just because of the death penalty.
>
> **Mr. Crabtree**: That's what we are talking about. I'm not talking about anything else now. I'm talking about the death penalty. Are you saying because of this individual's age you could not return a death penalty?
>
> **Mr. Rutherford**: I, I don't think I could.
>
> **Mr. Crabtree**: . . . So, let's see if we can make it clear – as far as her, the sole factor of her age, that would be something that you could not do?
>
> **Mr. Rutherford**: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem --
>
> **Mr. Crabtree**: – I understand you are saying that because of her age that one factor would keep you from returning the death penalty, is that correct?

---

[39] While Oesby is a pre-Strickland case and follows a now rejected performance standard, its reasoning remains instructive. The standard used in Oesby was, "[r]epresentation is deemed ineffective where the accused demonstrates 'gross incompetence' which 'has in effect blotted out the essence of a substantial defense.'" 398 A.2d at 4.

**Mr. Rutherford**: I think so.

(Id. at 1512-14.) At this pint, Ms. Rice interjected:

**Ms. Martin [Rice]**: Just one little clarification. Mr. Crabtree talked about that there is a possibility that age will be a mitigating factor, that the Judge may instruct you on that. And I just want to be clear. Are you saying that, are you saying that if there are aggravating factors and just this age mitigating factor you could not return a sentence of death?

**Mr. Rutherford**: I don't think I could.

(Id. at 1514.) Thereafter, Mr. Talman conceded that Mr. Rutherford should be struck for cause, and the Trial Court excused Mr. Rutherford. (Id. at 1514-15.)

In Witherspoon v. Illinois, 391 U.S. 510, 522-523 (1968), the Court held that striking a juror who had conscientious scruples against the death penalty but who, nevertheless, could consider it, violated the defendant's right to an impartial jury under the Sixth and Fourteenth Amendments. In Wainwright v. Witt, 469 U.S. 412, 424 (1985), the Court clarified the Witherspoon standard, proclaiming the critical issue to be "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The Supreme Court offered another formulation of this standard in Morgan v. Illinois, 504 U.S. 719, 728 (1992). The Court summarizing Witherspoon, Witt, and Adams v. Texas, 448 U.S. 38 (1980), as holding "that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." (emphasis added.) According to Morgan, Witherspoon "was in reality a limitation of a State's making unlimited challenges for cause to exclude those jurors who 'might hesitate' to return a verdict imposing death." Morgan at 731 (citing Witherspoon, 391 U.S. at 512-13).

In their handling of prospective juror Mr. Rutherford, defense counsel ignored the teachings of Witherspoon, Witt, Adams, and Morgan. Mr. Rutherford made clear that he could consider the death penalty for a mature defendant, but that he had reservations in light of Ms. Pike's youth. Defense counsel could have kept Mr. Rutherford in the venire by showing that based on his answers, he would be willing to consider death if the State could prove that Ms. Pike was sufficiently mature to be fully culpable for her

crime. Moreover, counsel could have objected that Mr. Rutherford was entitled as a matter of law to consider youth a mitigating factor, and that on the basis of this factor alone, he could vote for life if he was not satisfied that the government's proof either overwhelmed or undermined it. Instead, counsel participated in Mr. Rutherford's removal for cause.

While counsel's handling of Mr. Rutherford is perhaps the most egregious example of deficient performance during *voir dire*, it did not stand alone. The prosecutor continually asked venire members whether they could impose the death penalty ("consider all three punishments") in spite of Ms. Pike's youth. (E.g. PC X: 601-02; XV: 1121; XVIII: 1442.) As discussed above, this was a misstatement of the law: a juror is entitled to find that any one mitigating factor outweighs all aggravating evidence, and thus a juror could not have been disqualified on the grounds that concerns over Ms. Pike's youth were likely to predominate. Defense counsel made no objection to the State's questioning, and they offered no corrections in their own discussions with jurors.

Unfortunately, this was part and parcel of a much larger oversight – trial counsel never told the jury that Ms. Pike's youth was a statutory mitigating factor. See Tenn. Code Ann. § 39-13-204(j)(7). Nor did counsel voir dire on any other prospective mitigation themes, as by asking questions related to juror views of mental illness, psychology, and mental health experts. Counsel thus foreclosed the possibility of striking for cause those jurors who could not consider certain mitigation evidence, see Swain v. Alabama, 380 U.S. 202, 218-21 (1965); Morgan, 504 U.S. at 728; see generally, Goodpaster, 58 N.Y.U. L. Rev. at 325-26, let alone using peremptory strikes to create a jury sympathetic to Ms. Pike's mitigation case.

Also missing from voir dire was any questioning as to juror beliefs that may have prejudiced Ms. Pike. For instance, counsel asked no questions about attitudes toward interracial dating, though Ms. Pike, a white woman, was dating her black co-defendant, Tadaryl Shipp. Counsel also failed to ascertain whether any juror was aware of the overbilling of the Indigent Defense Fund and Mr. Talman's involvement therein. And while Ms. Pike's victim in this case was found with a pentagram carved into her chest, counsel asked

no questions regarding juror fears or prejudices involving Satanism. In this manner, counsel effectively forfeited the opportunity to conduct informed jury selection. It is no exaggeration to suggest that this error may have cost Ms. Pike the trial, and her bid for life. See Swain v. Alabama, 380 U.S. 202, 218-221(1965); U.S. v. Ricks, 775 F.2d 455, 469 (4th Cir. 1985) (Wilkinson dissenting) ("[It is] the belief of many trial lawyers that cases can be won or lost on the basis of effective voir dire and peremptory challenge."); Margaret Covington, Jury Selection: Innovative Approaches to Both Civil and Criminal Litigation, 16 St. Mary's L.J. 575 (1985) ("Experienced trial lawyers agree that the jury selection process is the single most important aspect of the trial proceedings."); John Blume, *et al.*, Probing "Life Qualification" Through Expanded Voir Dire, 29 Hofstra L. Rev. 1209, 1210-11 (2001) ("[I]n many capital cases, jury selection is literally a matter of life and death.").

**f. Failure to Object to the State's Suggestion of a Legally Inconsistent Aggravating Factor**

On April 12, 1995, Ms. Pike, along with co-defendants, Shadolla Peterson and Tadaryl Shipp, was charged with premeditated first degree murder and conspiracy to kill Colleen Slemmer (T I: 3.) On May 23,1995, the State filed a Notice of Intent to Seek the Death Penalty indicating that it would rely on the aggravating circumstances set out in Tennessee Code Annotated § 39-13-204(i)(5), (6) and (7). (Id. at 9.)

At the conclusion of the guilt/innocence phase of trial, the jury was instructed on the elements of conspiracy to commit first degree murder, which include that the State must prove an agreement to commit a murder in the first degree. (T XXVIII: 2431.) After the State emphasized in closing that Ms. Pike had told others the night before that she would kill Ms. Slemmer and that she and her friends had lured Ms. Slemmer to Tyson Park, (T XXVII:2378-79; XXVIII:2403, 2405-06), the jury convicted Ms. Pike of both premeditated first degree murder and conspiring with others to commit the same murder. (T XXVIII: 2462.)

In the penalty phase, the jury was instructed that it could consider the (i)(5) aggravator (heinous, atrocious and cruel) and the (i)(6) aggravator (committed for the purpose of avoiding arrest). (T XXIX: 2577.) The jury found both aggravating factors. (Id. at 2587.)



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 121 of 196 PageID #: 8992

Under the facts of this case, Ms. Pike's simultaneous convictions of conspiracy and capital murder using the avoid arrest aggravator violated Ms. Pike's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Art. I, §§ 8, 9 and 16 of the Tennessee Constitution.[40] The State's proof of premeditation required for the first degree murder conviction included, *inter alia*: telling a friend one day before the killing that she was going to kill the victim, procuring weapons to accomplish the crime, arming herself beforehand, luring the victim to an isolated area to commit the crime, and attacking the unarmed victim with two deadly weapons. State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998). The evidence that the Tennessee Supreme Court found proved the conspiracy included: Ms. Pike and her co-defendants leaving the Job Corps facility together prior to the killing, Ms. Pike and another person accompanying the victim to an isolated place, and both Ms. Pike and Mr. Shipp wearing necklaces with pentagram shaped pendants. Id. at 916. Consequently, the finding of sufficient evidence to support both convictions is premised on events that occurred *prior to the beginning of the violent encounter.*

In contrast, the evidence used to support the (i)(6) avoiding arrest aggravator was an excerpt from Ms. Pike's statement that during the attack on Ms. Slemmer, in which she heard a voice telling her that she had to do something to keep Ms. Slemmer from going to the police. (Id. at 918.) This event – an alleged auditory hallucination – took place *after* the initiation of the attack on Ms. Slemmer, and therefore after the seminal facts used to support both premeditation and conspiracy. Consequently, barring proof that Ms. Pike changed her mind, and then re-resolved to kill Ms. Slemmer to avoid arrest – which proof was completely lacking at trial – the jury's simultaneous finding of both conspiracy to commit murder and the (i)(6) aggravator was logically inconsistent. In other words, according to the State's version of events, Ms. Pike either intended to kill Ms. Slemmer before the attack, or she resolved to do so during the attack, but not both. Use of the (i)(6) aggravator was thus unconstitutional and counsel was obligated to object at trial. See

[40] The Court below construed this argument as a challenge to the facial constitutionality of the (i)(6) aggravator and as an issue of the sufficiency of the evidence in this case. (PC V: 660.) In so doing, it failed to address the gravamen of the argument – under the state's theory the intent to kill was expressed by Ms. Pike the day before the crime and that an agreement to kill was made before inviting Ms. Slemmer to accompany the three co-conspirators to the park.

Zant v. Stephens, 462 U.S. 862, 877 (1983); see generally, State v. Middlebrooks, 840 S.W.2d 317, 341-347 (Tenn. 1992).

### 2. Guilt/Innocence Phase Deficiency Regarding Lack of Intent

At the close of the guilt/innocence phase, the trial court charged the jury that in order to find Ms. Pike guilty of first degree murder, they must have found each the following elements proven beyond a reasonable doubt: "(1) that the Defendant unlawfully killed the alleged victim; . . .(2) that the Defendant acted intentionally; . . . (3) that the killing was deliberate. . . and (4) that the killing was premeditated." (T XXVIII: 2420.) "A deliberate act," the trial court explained, "is one performed with a cool purpose." (Id.) "Premeditation means that the intent to kill must have been formed prior to the act itself." (Id.)

Ms. Pike's killing of Ms. Slemmer was neither deliberate nor premeditated. As Ms. Pike proved on post-conviction, and as detailed more fully in the discussion of prejudice, below, the facts establish that Ms. Pike participated in Ms. Slemmer's killing in the midst of a hypomanic, psychotic break.

#### a. Failure to Present Evidence to Undermine the Elements of First Degree Murder

Trial counsel failed to present an effective case to undermine the State's proof of deliberate and premeditated murder. This was the result of two of the same fundamental errors that plagued Ms. Pike's representation in the penalty phase - failure to make appropriate use of expert witnesses, and failure to discover relevant lay witness testimony.

First, defense counsel presented scant expert testimony with regard to Ms. Pike's mental state surrounding the killing of Ms. Slemmer. Dr. Engum was the only defense witness to testify to Ms. Pike's state of mind surrounding the offense. He testified:

> My opinion is, and it is particularly based on the test results and on a review of her statement, that she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, Borderline Personality Disorder, which meant that she basically went out of control.

(T XXV: 2197.) While this testimony was substantively on point, it was insufficiently substantiated. The State was able to exploit this fact on cross-examination by repeatedly pointing out that the factual basis for

Dr. Engum's opinion was limited to the statements made by Ms. Pike, an admittedly intelligent young woman with an obvious penal interest in presenting as 'out of her mind' at the time of the offense. (Id. at 2205-06, 2218.) Because Dr. Engum had no alternative basis for his information, the State was able to get him to admit that, if Ms. Pike had lied to him, he might be forced to change his opinion. (Id. 2218.)

The State also pursued a cross-examination strategy that played into the common distrust of jurors for expert witnesses. With a line of questioning concerning Dr. Engum's compensation on this case, during which he revealed that he worked only with criminal defense teams and relied on this work for 20% of his income, the State tried to paint him as an untrustworthy "hired gun." (Id. at 2207-09.) Later, the State launched an attack on Dr. Engum's entire field of expertise, implying that Ms. Pike suffers from a 'phantom' mental illness because the evidence of her disorder is psychological and thus not tangible, like the physical evidence of the crime. (Id. at 2216-17.)

In the end, the State's tactics were effective; in finding Ms. Pike guilty of first degree murder, the jury necessarily discredited Dr. Engum's testimony. This was avoidable. Dr. McCoy's Social History contained a wealth of information from potential lay witnesses that was highly correlated with Dr. Engum's diagnosis of Borderline Personality Disorder. Other lay witnesses, not interviewed by Dr. McCoy, could also have testified that Ms. Pike had lost complete control in the past, nearly killing a man in one instance before she was held back by a friend at the last minute. (PC XXIX: 43; VII: 116.) Lay witnesses could also have testified that Ms. Pike was incapable of calming down on her own, and needed to be physically restrained while in the midst of a manic rage. (PC XI: 516-17.) Had trial counsel (a) called these witnesses, (b) called Dr. McCoy, or (c) provided Dr. Engum with a copy of Dr. McCoy's Social History, the lone witness testifying to Ms. Pike's mental state would not have been forced to testify that his opinion was only as good as the defendant's word.

Counsel made another significant error in its use of Dr. William Bernet during the guilt/innocence phase. Dr. Bernet was called on to testify that Ms. Slemmer's killing was not a satanic ritual, but, rather, was

consistent with a phenomenon called "collective aggression." (T XXV: 2297, 2315-16.) The relevance of this testimony was never made clear. (Id. at 2306-14.) However, while Dr. Bernet's testimony offered no apparent benefit to Ms. Pike's defense, it was highly prejudicial and represented a wasted opportunity. Dr. Bernet's testimony was prejudicial because it opened the door to a lengthy discussion of Satanism and the various details of Ms. Slemmer's killing that bore satanic overtones, such as the carving of a pentagram in her chest. (Id. at 2335, 2337.) Dr. Bernet's testimony represented a wasted opportunity because he might have provided meaningful testimony regarding Ms. Pike's state of mind at the time of the offense. Dr. Bernet, however, never met or evaluated Ms. Pike. (Id. at 2295.) In defense counsel's direct examination of Dr. Bernet, Mr. Talman asked if Dr. Bernet could testify to a reasonable degree of medical certainty as to Ms. Pike's mental state. (Id. at 2318.) Dr. Bernet was forced to respond that he could not, "not having interviewed her, and with the limited information I have . . . ." (Id.) On cross-examination, the State added:

> **Mr. Crabtree**: So, every bit of your testimony that you give here concerning this has been presumptions on your part, based on information you were provided by someone else?
> **Dr. Bernet**: That's correct.

(Id. at 2340.)

**b. Failure to Make Effective Arguments**

Counsel's opening and closing arguments in the guilt/innocence phase failed to address the only significant issue concerning Ms. Pike's guilt for first degree murder: whether evidence of mental illness negated the State's assertion that the killing of Ms. Slemmer was deliberate and premeditated.

Ms. Rice's opening statement – which filled less than three transcript pages – began:

> The State may or may not be able to prove some of the essential elements of the offense charged, murder in the first degree.
>
> We believe that they will not be able to prove each and every one of the essential elements required that they prove. (sic)

(Id. at 1565.) Ms. Rice then concluded by setting out the elements for first degree murder. Absent from this argument was anything that might be considered persuasive. See Ariana Levinson, Lawyering Skills,

Principles and Methods Offer Insight As to Best Practices for Arbitration, 60 Baylor L. Rev. 1, 63 -64 (2008) ("A good story has the power of persuasion, and the primary purpose of the opening statement is to tell one."). By failing to present the defense's theory of the case, counsel abdicated an important duty of representation. See Tenn. Code Ann.§ 20-9-301 (opening statement is to allow the parties to set forth "their respective contentions, views of the facts and theories of the lawsuit . . . ."); David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 26.32, at 286 (1985) ("[T]he opening statement is the best and first opportunity to convey [the defense view of the lawsuit] to the jury.")

In his closing statement in the guilt/innocence phase, Mr. Talman stated that Ms. Pike had intended only to beat up Ms. Slemmer, but that the attack became frenzied and Ms. Slemmer was killed. (T XXVII: 2393-94.) Mr. Talman alluded to the testimony of his two experts, Drs. Engum and Bernet, for the limited purpose of reminding the jury that Ms. Pike's frenzied state would not have passed during the time that Ms. Pike heard a noise and stopped to investigate in the midst of the attack on Ms. Slemmer. (Id. at 2394.) While Mr. Talman's argument touched on the right themes, like Ms. Rice's opening, it included no discussion of evidence. In part, this error was cumulative, for, as discussed above, counsel neglected to discover and present relevant evidence concerning Ms. Pike's inability to form the requisite intent. But Mr. Talman also neglected to utilize the evidence he did have in support of the defense theory. Mr. Talman failed to either mention Ms. Pike's diagnosed illness, Borderline Personality Disorder, or to cite Dr. Engum's expert opinion that Ms. Pike was in the midst of a near dissociative state at the time of the crime. (T XXVII: 2313-18.) Mr. Talman thus fell short of the standard for closing argument recently analyzed in State v. Banks:

> Closing arguments have special importance in the adversarial process. Their purpose is to sharpen and to clarify the issues that must be resolved in a criminal case. They accomplish this purpose by enabling the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.

271 S.W.3d 90, 130-131 (Tenn. 2008) (internal citations and footnote omitted).

### c. Failure to Make Effective Use of *Voir Dire*

Ms. Pike has demonstrated above that defense counsel squandered voir dire as an opportunity to select a jury sensitive to issues of mental illness, and without prejudice against Ms. Pike or her counsel. These same deficiencies were equally detrimental to Ms. Pike's defense during the guilt/innocence phase.

## B. The Showing of Prejudice

A petitioner claiming ineffective assistance of counsel must prove both deficient performance and prejudice. Strickland, 466 U.S. at 693. Prejudice requires only a showing that, but for counsel's error, a single juror would likely have voted for life. Wiggins v. Smith, 539 U.S. 510, 537 (2003). Counsel's errors in both phases of trial were prejudicial under this standard.

### 1. Penalty Phase Prejudice

As explained above in Ms. Pike's discussion of prejudice resulting from counsel's conflict of interest, Goad v. State, sets out the law for determining the existence of prejudice arising out of failure to present mitigation evidence. 938 S.W.2d 363, 369 (Tenn. 1996). The Goad factors entail analysis of: (1) the mitigation case as presented on post-conviction; (2) the difference between the post-conviction case and the mitigation presented at trial; and (3) whether the aggravating evidence would nonetheless have outweighed the post-conviction mitigation.

#### a. Ms. Pike Presented a Complete and Moving Case for Mitigation on Post-Conviction.[41]

Mitigating evidence presented by Ms. Pike on post-conviction is most easily summarized when divided into two categories: (1) evidence explaining Ms. Pike's diminished culpability for her participation in the

[41] The evidence regarding mitigation in the case is spread out through thirty volumes of transcripts and numerous exhibits. It comprises the testimony of over twenty-five witnesses. Therefore, only the surface is touched in this argument section. The evidence is condensed in the Statement of the Facts segment of this Brief.

killing of Ms. Slemmer; and (2) evidence depicting Ms. Pike in a positive light as a person whose life is valuable.

### (i) Evidence Explaining Ms. Pike's Lesser Culpability

Ms. Pike's post-conviction case entails a comprehensive explanation of Ms. Pike's crime in terms of a variety of factors and influences beyond her control. Ms. Pike suffers from three disabilities which, in combination, correlate strongly with incidents of violence, suggesting a causal relationship that is supported by scientific theory. These disabilities, as attested by Dr. Pincus, are frontal lobe damage, mental illness, and a history of abuse and neglect. (PC VIII: 220-21, 240-44.) The U.S. Supreme Court has found such evidence highly relevant in mitigation, noting that,

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

Penry v. Lynaugh, 492 U.S. 302, 319 (1989), overruled on other grounds, (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

Ms. Pike's mitigation case established, first, that her brain damage consists of substantial heterotopia affecting the frontal lobe as well as damage to the basal ganglia which inhibits frontal lobe functioning. (PC VIII: 234-40.) This damage is organic and was likely caused by prenatal exposure to alcohol. (Id. at 242.) The consequence of Ms. Pike's brain damage is twofold: (1) Ms. Pike was unable to properly encode moral lessons during the foremost years of cognitive development, meaning she has a limited moral bank from which to draw; and (2) Ms. Pike is less capable than an average person of placing moral constraints upon her conduct. (Id. at 243.) These limitations are mutually compounding, producing an end result of drastically reduced ability to choose and avoid behaviors on the basis of right and wrong.

Second, Ms. Pike is severely mentally ill. She suffers from early onset Bipolar Disorder, which is distinguished by intense mood swings between hypomania and depression. (Id. at 244; PC XXIX: 26-29.) Ms. Pike's hypomania may last days and manifest as increasing irritability checkered with psychotic breaks from reality. (PC XXIX: 39.) Ms. Pike also exhibits delusions of grandeur and invincibility as characteristics of her hypomania. (Id. at 39-40.) On the other end of the bipolar pendulum, Ms. Pike falls into bouts of depression, low self-esteem, and identity confusion that give rise to relationship dependency. (Id. at 40.)

Ms. Pike also suffers from PTSD. (Id. at 149-53.) As a result, she is distrusting, paranoid, and constantly fears that rejection, abandonment, or violence are looming. Id. She is responsively hyper-vigilant in anticipating and protecting against perceived threats to her stability. (Id. at 157.)

Third, Ms. Pike endured extensive abuse and neglect from birth until the commission of the crime in this case. She was shuffled back and forth between alcoholic, disinterested, and abusive care-takers, most notably her parents, who admitted to having wanted nothing to do with Ms. Pike.[42] Her home environment was devoid of stability and entailed a rotating cast of her mother's boyfriends and husbands, several of whom abused Ms. Pike. Ms. Pike was sexually abused from a young age and raped on two separate occasions. She was beaten physically by a number of different adult men. As a child, she was shuttled back and forth between as many schools as caretakers. As a teenager, she was passed through Child Protective Services and then various juvenile detention facilities, where she acted out to avoid being sent home for good behavior. Ms. Pike lived intermittently on the street, and was largely left to rely on herself for food and other necessities from an early age.

As Dr. Pincus explained, these three characteristics reacted explosively. (PC VIII: 221.) Individuals exhibiting all three are significantly impaired in their powers of moral-reasoning and self-control, and are significantly more likely to commit serious acts of violence. (Id. at 220-21.) In essence, an individual like Ms.

[42] For citation to facts in this paragraph, *see generally* Statement of the Facts, *supra*, at 29-42.

Pike is a ticking time-bomb, capable of being ignited by conditions of stress, confusion, or agitation to which an unafflicted person will adapt and respond appropriately. (Id. at 220.)

Ms. Pike also presented evidence that the circumstances leading up to and including Ms. Slemmer's death were of exactly the sort to trigger her latent potential for violent outbursts. While a student at Job Corps, Ms. Pike was surrounded by violence, which was rampant among the student body. (PC XII: 677-84; XIII: 760, 763-67; 791-94.) Ms. Pike became fixated and completely dependent on Tadaryl Shipp, a manipulative and violent gang member who played into Ms. Pike's insecurities by cheating on her. (PC XII: 679-84; XIII: 767l; XXIX: 169-70.) Among Mr. Shipp's lovers was Ms. Slemmer, whom Ms. Pike considered a threat to her relationship with Mr. Shipp. (PC XXIX: 169-70.) Ms. Slemmer had been causing problems with Ms. Pike for a long time, coming into her room and standing over her with a box cutter, calling her names, and damaging photos of her Grandmother Pike, the one family member who had cared about Ms. Pike. (Apr 08 Ex. 36 at 3-4; Ex. 44; PC VIII: 276.)

Ms. Pike was raised to believe that the appropriate response to a threat was physical violence. (PC VII: 164-67; XXIII: 566-77.) This message inhered in her familial culture as a child,[43] and had been reinforced throughout her life. (Id. PC VIII: 271.)[44] As a result, Ms. Pike planned to beat up Ms. Slemmer to resolve their conflict. However, because of Ms. Pike's disabilities, the attack escalated tragically. Ms. Pike had been hypomanic for an extended period before the attack, had not slept for four days prior, and was at the peak of irritability. (PC XXIX: 45.) During the course of the attack, Ms. Pike lost control. Rather than restraining her as others had done in the past, Ms. Pike's co-defendants hurled fuel on the fire by cutting Ms. Slemmer and keeping her from fleeing. (PC V: 110-12.) Whereas an ordinary person would have recoiled at the physical damage wrought on Ms. Slemmer, Ms. Pike was normalized to the sight of blood

---

[43] For instance, Ms. Pike's family celebrated a story in which Ms. Pike's great-grandfather was alleged to have killed scores of strikebreakers by cutting the cable to a car pulling them out of a mine.

[44] When Ms. Pike nearly killed a local pervert, the judge who sentenced her thanked Ms. Pike for doing the community a favor.

and gore from her childhood experiences watching horror movies and playing in her grandfather's slaughterhouse. (PC X: 497-99; VIII: 203; XXIII: 586-90; XXX: 120-21.)

Furthermore, Ms. Pike was 18 at the time of Ms. Slemmer's killing. An ordinary 18 year old lacks the impulse control, accountability, and solidity of identity of an older adult.[45] For Ms. Pike, whose cognitive development was greatly slowed by brain damage and mental illness, the abilities to reign in her impulses, regain rationality, and resist peer influence were that much more underdeveloped.

**ii. Evidence Portraying Ms. Pike's Positive Attributes**

Ms. Pike presented numerous lay witnesses at post-conviction who attested to her positive attributes. Because she was rejected by her family, this evidence came from individuals whom Ms. Pike had met in institutional settings and from peers. These witnesses testified that she was intelligent, honest, loyal, and that she had a great sense of humor. (PC XI: 543-44; 578-79, 600; XII: 621, 654, 663.) Ms. Pike acted as a protector and confidante for friends, and responded positively to authority figures who took an interest in her and showed her respect. (PC XII: 663-71, 729-30.) She showed promise as a student and writer, and was pensive about her future. (Id. at 621, 663-71.) She expressed a desire to find her place in the world, find peace with religion, and to make something of herself with an education and career. (Id. at 621, 655, 730-31.)

This evidence showed Ms. Pike as a person whose life, while tragically marred by Ms. Slemmer's killing, consists of more than that crime. Ms. Pike presented evidence to remind the finder of fact of her humanity, and that her young life is worth saving.

**b. The Mitigation Case Presented at Trial Did Not Come Close to Approximating Ms. Pike's Post-Conviction Evidence in Mitigation.**

As Ms. Pike has noted above, counsel's mitigation case at trial consisted of three lay witnesses, no expert testimony, and no argument concerning Ms. Pike's age, mental illness, or any other factor that would speak to her diminished culpability. (*See* Argument I, above.)



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 131 of 196 PageID #: 9002

The trial presentation thus contrasts strikingly with the case presented on post-conviction, which completely explained Ms. Pike's role in her crime in terms of factors beyond her control, including brain damage, Bipolar Disorder, and severe abuse and neglect during childhood.

It is also important to note that the witnesses who testified for Ms. Pike during the sentencing phase of her capital trial had all rejected Ms. Pike throughout her life, refusing to parent or otherwise care for her as a child. Because these witnesses did not care for Ms. Pike, they failed to convey her humanity to the jury. Dr. McCoy had warned trial counsel that Ms. Pike's mother, Carissa Hansen, would not present well as a witness because she "does not own up to her very poor parenting" and the jury would see her as "a poor mother who went through hell with a rebellious teenager." (Apr 08 Ex. 5.)

In addition, the State was able to exploit Dr. McCoy's materials to get these witnesses to admit on cross-examination that Ms. Pike had always been a difficult child (Id. at 2537), that she had been accused of sexual abuse (Id. at 2520), that she was not trusted with children, (Id. at 2506; M. Mat. Vol. 3 of 5 Appendix 20 at bates 308), that she was manipulative and a liar (T XXIX: 2517, 2541-42), and that she had threatened a man with a butcher knife as a young adolescent (Id. at 2534, 2540).[46] The mitigation case at trial was thus reduced to the claim that Ms. Pike had suffered an unhappy, perhaps worse-than-average childhood, and the State was allowed to suggest that this was because Ms. Pike was a worse-than-average child.

**c. The Aggravating Evidence did not Overwhelm Ms. Pike's Post-Conviction Mitigating Evidence.**

The jury found two aggravating factors: (1) that the murder was performed to avoid arrest, and (2) that the murder was especially heinous, atrocious, and cruel. See State v. Pike, 978 S.W.2d 904, 907 (Tenn. 1998). With regard to the avoid arrest aggravator, Ms. Pike has argued that this was inconsistent with the State's theory that Ms. Pike conspired with her co-defendants to kill Ms. Slemmer. Moreover, the only proof

---

[45] *See* Argument III, *infra*, for discussion of influence of youth on brain development, both in isolation and as coupled with mental illness.

of this aggravator was Ms. Pike's statement that she heard a voice during the crime saying that she had better kill Ms. Slemmer or she would end up in prison. Pike, 978 S.W.2d at 918. Far from suggesting the rational calculation the avoid arrest aggravator envisions, this evidence suggests that Ms. Pike was suffering auditory hallucinations in the throws of a hypomanic psychotic break. Indeed, Ms. Pike's post-conviction mitigation suggests that she lost all control of her rational faculties during Ms. Slemmer's killing. As a result, rather than being overwhelmed by it, Ms. Pike's mitigation case *undermines* the first aggravating factor.

With regard to the second aggravating factor, that the murder was heinous, atrocious, and cruel, Ms. Pike's mitigation case effectively defuses the State's evidence. The State's proof of this factor was rooted in the facts of the crime: Ms. Slemmer suffered over an extended period and died a violent death. But Ms. Pike's post-conviction presentation reduced her moral culpability in two ways. First, it showed that Ms. Pike was only one of three assailants, the other two being violent gang members who were responsible for starting the cutting of Ms. Slemmer and carving a pentagram in her chest. (PC XII: 679, 681-83; XIV: 86; XV: 110-112.) Second, the post-conviction evidence on brain damage, mental illness, overstimulation, and the abuse and neglect she had suffered would have helped explain her total loss of control during the attack. For this reason, the State's aggravating evidence would not have outweighed Ms. Pike's mitigation, and accordingly, Ms. Pike has met her burden of establishing prejudice for failure to present said proof.

**2. Guilt/Innocence Phase Prejudice**

The failures of Defense Counsel likewise prevented the jury from reaching an informed decision as to whether Ms. Pike possessed the requisite *mens rea* for first degree murder. As based entirely on Ms. Pike's own reporting, Dr. Engum's guilt/innocence phase testimony was too thin to convince a jury that Ms. Pike participated in Ms. Slemmer's killing in the throes of a borderline, quasi-dissociative rage. Defense Counsel's incompetent voir dire and opening and closing arguments only compounded this problem.

---

[46] For a more exhaustive account of the evidence presented in the sentencing phase *see* Statement of the Facts, *supra*, at 19-50.

By contrast, the evidence of Ms. Pike's brain damage, Bipolar Disorder, and PTSD, as discussed above, would have provided substantial proof that Ms. Pike was in the midst of a hypomanic episode at the time of Ms. Slemmer's killing. This testimony could have been corroborated by lay witnesses to testify that Ms. Pike had nearly killed Kenny Clyde in just such a bipolar rage on a previous occasion. (PC XXIX: 43.) Other lay witnesses could further have supported the contention that Ms. Pike's moods could swing like a pendulum, and at the end of her rope, she was completely out of control. (PC XI: 516-17, 600.) An expert such as Dr. Kenner could have testified that Ms. Pike had been awake for four days at the time of the crime, and that in this extended hypo manic state, she was at the peak of her irritability. (PC XXIX: 45.) An expert could likewise have testified that Ms. Pike, suffering from PTSD, was likely to have perceived Ms. Slemmer as a threat, even as Ms. Slemmer was being attacked. (PC VII: 157.)

This evidence – from numerous sources, provided by experts and lay witnesses alike – would have demonstrated that Ms. Pike's attack on Ms. Slemmer was never a planned murder, carried out with cool deliberation, but rather a planned assault that escalated into a reckless homicide. As with Ms. Pike's penalty phase case, proper voir dire and opening and closing arguments would only have bolstered this proof, with the end result that a jury would likely have found Ms. Pike to lack the requisite elements for conviction of first degree murder.

## III. Under the Constitutional Understanding of the Requirements for a Categorical Bar to Execution Set Out by the Supreme Court in Atkins and Roper, Ms. Pike, an Immature, Mentally Ill, Brain Damaged Eighteen Year Old Is Not Eligible for the Death Penalty.

The rationale behind Roper v. Simmons, 543 U.S. 551, 570-73 (2005), and Atkins v. Virginia, 536 U.S. 304, 315-21 (2002), supports a categorical bar to execution of both older adolescents and individuals suffering from serious mental illness or brain defect. The same categorical bar is even more appropriate when, as in this case, a given individual falls into both categories.

The Eighth and Fourteenth Amendments to the U.S. Constitution and article I § 16 of the Tennessee Constitution hold that execution must be reserved for "the worst of the worst." Kansas v. Marsh, 548 U.S.

163, 206 (2006) (Souter, J., dissenting) (citing Roper v. Simmons, 543 U.S. 551, 568 (2005)); accord Furman v. Georgia, 408 U.S. 238, 294-95 (1972) (Brennan, J., concurring); State v. Davis, 141 S.W.3d 600, 617 (Tenn. 2004). Since 2003, the U.S. Supreme Court has defined the class of "the worst of the worst" in two important ways: (1) it has recognized that certain classes of offenders, by virtue of their common characteristics, are highly likely to lack the degree of culpability necessary for imposition of the death penalty; and (2) it has found that presentation of mitigation evidence during the penalty phase of a capital trial is insufficient protection for members of these classes, and therefore that a categorical bar to execution is required. Roper, 543 U.S. at 570-73; Atkins, 536 U.S. at 315-21. On this basis, the Supreme Court declared in Roper and Atkins, respectively, that individuals who commit capital crimes while either (a) under 18 or (b) mentally retarded may never be considered "the worst of the worst." [47]

**A. The United States Supreme Court and the Supreme Court of Tennessee Limit Execution to "the Worst of the Worst" by Examining the Characteristics of Particular Groups Under Three Factors.**

As this Court is well aware, the U.S. Supreme Court placed a moratorium on the use of the death penalty in Furman v. Georgia, 408 U.S. 238 (1972), because, under then-existing state statutes, executions were arbitrary. As Justice Potter Stewart famously noted, "[t]hese death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." Id. at 310. Four years later, the Supreme Court lifted the moratorium and established the framework for determining whether a statute provides for sufficient winnowing of the class of offenders. Gregg v. Georgia, 428 U.S. 153, 172-73 (1976). In Gregg, the Supreme Court held that a capital punishment statute would be held constitutional so long as it: (1) reflected contemporary public values, as evidenced by objective indicia; (2) satisfied the proportionality requirement that the punishment fit the crime; and (3) entailed no unnecessary inflection of pain. Id. at 173.

Use of this three-factor analysis has expanded since Gregg. Although initially developed to test the facial constitutionality of a given statute, the Gregg analysis has since been used to determine whether

---

[47] The State of Tennessee had earlier reached the same conclusions by statute, Tenn. Code Ann. § 39-13-203 (1990), and by Supreme Court decision, Van Tran v. State, 66 S.W.3d 790 (2001).

particular groups merit categorical exception from capital statutes as applied. This practice began with groups defined by their alleged crimes. Coker v. Georgia, 433 U.S. 584 (1977) (death penalty for rape of adult woman unconstitutional); Enmund v. Florida, 458 U.S. 782 (1982) (death penalty for felony murder unconstitutional where defendant did not kill, attempt to kill, or intend death or use of force). In Ford v. Wainwright, the Supreme Court proceeded to analyze groups defined by the characteristics of the members themselves, but only in relation to the effects of those characteristics after the fact of conviction. 477 U.S. 399 (1986) (death penalty for insane at time of execution unconstitutional). In the past 20 years, the Supreme Court has taken the next logical step, considering the propriety of execution for groups whose defining characteristics suggest a lesser degree of culpability for capital crimes. See Thompson v. Oklahoma, 487 U.S. 815 (1988), overruled by Roper, 543 U.S. 551; Penry v. Lynaugh, 492 U.S. 302 (1989), overruled by Atkins, 536 U.S. 304. The Tennessee Supreme Court mirrored this development in Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001), finding execution of the mentally retarded to be unconstitutional even before the Supreme Court so held in Atkins.

In tandem with the expanding use of the Gregg analysis, the Tennessee and U.S. Supreme Courts have arrived at a more precise understanding of each of the three Gregg factors. Under the first factor, which calls for an assessment of public values, the courts look to legislation, polls, juror surveys, jury verdicts, positions taken by professional and advocacy organizations, and any other objective data to determine whether public sentiment disfavors execution of the group in question. See Atkins, 536 U.S. at 313-17; Van Tran, 66 S.W. 3d at 801-04. The second factor – proportionality analysis – entails judicial scrutiny of prevailing scientific and social science literature with an eye towards evidence that the group in question may be physiologically incapable of full culpability. See Roper, 543 U.S. at 569-71. Third, and finally, in determining whether execution would result in the unnecessary infliction of pain or suffering, the courts ask whether execution of group members is likely to further either of the purposes of capital punishment in retribution and deterrence. See Id. at 571-72.



Case 1:12-cv-00035-HSM-SKL Document 13-1 Filed 08/01/12 Page 136 of 196
PageID #: 9007

In arriving at the decision that certain groups must be categorically barred from capital punishment, the Tennessee and U.S. Supreme Courts explicitly found insufficient the prospect of group members defending against execution on a case by case basis. This was for the reason that existing means of fighting a death sentence – an insanity defense, or presentation of sentencing phase mitigation – provided insufficient protection. In Van Tran, the Tennessee Supreme Court held:

> [T]he jury's consideration of mental retardation as a mitigating factor is by itself insufficient to address the concerns protected under the Eighth Amendment or article I, § 16. In such circumstances, evidence of mental retardation would only be weighed in conjunction with one or more aggravating circumstances, such as the heinousness of the crime or a defendant's prior record. In our opinion, the weighing process would not sufficiently isolate the consideration given to the issue of mental retardation and would not provide reasonable assurance that an individualized decision will be made as to whether the death penalty was appropriate punishment for a particular mentally retarded offender . . . In sum, the limitations and impairments associated with mental retardation warrant more consideration than simply allowing the evidence to be weighed in the mix of aggravating and mitigating circumstances.

Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001). The Van Tran opinion went on to find that the existence of an insanity defense was also an insufficient prophylactic, not only because it is rarely used and more rarely successful, but more fundamentally because it misses the point. Id. The question for purposes of the Eighth Amendment and article I, § 16 is not whether legal guilt exists, but whether culpability is present to the degree required for a sentence of death. Id.

In Roper, the Supreme Court elaborated on the shortcomings of mitigation evidence in the particular circumstances of adolescent defenders who commit violent crimes:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime could overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective maturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

Roper, 543 U.S. at 572-73.

From these decisions, a principle emerges: only categorical exception to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals. The

availability of an insanity defense is insufficient in light of its high burden of proof, and presentation of mitigation evidence suffers from a variety of shortcomings, including (a) the prospect that the mitigating evidence will 'get lost in the mix' or (b) be outweighed in the minds of jurors by a heinous crime; (c) the possibility that the characteristics of group members will lead to false confessions or (d) render them unable to assist counsel; (e) the possibility that the characteristics of group members will make them unsympathetic to jurors; and (f) the possibility that the very characteristics suggesting diminished culpability will function as aggravating evidence of future dangerousness.[48]

### B. Under the Above Three-Factor Test, Execution of Older Adolescents Must be Categorically Barred.

Adolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty. For this reason, individuals under the age of 18 are immune from capital prosecution under both Tennessee and federal law. Yet in terms of brain development, 18 is an arbitrary number. Cognitive development spans years as the brain grows from about 400 to 1200 grams, and as the nerves become myelinated or insulated. (PC VIII: 246.) The myelin is what permits the nerves to work in a functional electrical grid. (Id. at 246-47.) The frontal lobe is the last area to myelinate, and this process is not complete until the early twenties. (Id. at 245-46.) This is the area of the brain that controls both encoding moral and ethical standards and the behavior regulation. (Id. at 243.) As a result, healthy individual raised in stable environments may reach cognitive maturity in their early twenties. When the variables of mental illness or environmental abuse and neglect are factored in, cognitive development may take place even later. (Id. at 246.)

There is thus a significant population of individuals who lack the requisite brain development to be fully culpable for their crimes, and yet currently fall outside of the absolute bar to execution imposed by Tennessee and federal law. These older adolescents may have brains that are developmentally identical to

[48] The Court below, after recognizing that future dangerousness is not an aggravating factor, denied relief in part because it found the evidence of mental illness and brain damage to suggest future dangerousness. (PC. V: 689.)

or even less developed than individuals who are shielded because of a difference in birth date of a few years, months, or even days. Under the three-factor test recognized in Roper, Atkins, and Van Tran, this Court should find imposition of the death penalty unconstitutional as applied to older adolescents.[49]

### 1. Objective Indicia of Contemporary Public Values Suggest Opposition to Execution of Older Adolescents

In assessing the public disposition regarding execution of a particular class of persons, the Tennessee Supreme Court looks to any available objective data, including activity among state legislatures, poll returns, capital juror research data, capital sentencing and executions, and the positions taken by professional and advocacy organizations. Van Tran, 66 S.W.3d at 801-03. Because execution must comply with the standards of decency inherent to both the Tennessee and federal constitutions, the Van Tran Court held it proper to examine evidence of a public consensus both at the national level and in Tennessee standing alone.

Tennessee has long recognized the special status of young people with regard to the death penalty. Tennessee's post-Furman death penalty statute has always recognized youth as a statutory mitigating factor. Tenn. Code Ann. 39-2-203(j)(7)[1982 Repl.]; Tenn. Code Ann. 39-13-204(j)(7)[2006 Repl.]. Tennessee has long declared that offenders under the age of 18 could not be sentenced to death. See Tenn. Code Ann. 37-1-134(a)(1) [1996 Repl.]. In the modern era, Tennessee has not executed anyone younger than 23 at the time of the offense. See http://www.clarkprosecutor.org/html/death/usexecute.htm (Coe (age 23), Alley (29), Workman (28), Holton (36), Henley (31)). Of Tennessee's present death-sentenced inmates, approximately 7.7% were 19 or under at the time of the crime. See http://www.tennessee.gov/correction/deathrowlist.html.

On the national level, 29 of 37 states with the death penalty made youth a statutory mitigator by 1989. Stamford v. Kentucky, 492 U.S. 361, 375 (1989), overruled on other grounds, Roper, 543 U.S. 551. In

---

[49] In fact, this case contains the perfect example of the problem. A member of the original venire, Mr. Rutherford, demonstrated that he clearly understood that an eighteen year old might act impulsively because her brain was not yet fully developed. Instead of finding that Mr. Rutherford was qualified and therefore could be on the jury and judge Ms. Pike's youth as mitigating, the Court below erroneously struck him for cause. (T. XIX: 1510-15.)

1988, the Supreme Court concluded it would violate the Eighth Amendment to execute an offender who was younger than 16 years of age at the time of the crime. Thompson v. Oklahoma, 487 U.S. 815 (1988). In Roper, the Court shielded adolescents in the next two years of life for much the same reasons. 534 U.S. 551, 564-65. In addition, a national consensus against execution of young people is visible in the results of the Capital Juror Project's South Carolina jury study, which the Tennessee Supreme Court has now relied upon twice. See Van Tran, 66. S.W.3d at 802; State v. Hartman, 42 S.W.3d 44, 59 (Tenn. 2001). The findings of the Capital Jury Project suggest that jurors consider the youthfulness of a capital defendant to be "significantly mitigating." Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum. L. Rev. 1538, 1564 (1988).

**a. Proportionality Analysis Reveals that Older Adolescents are not Physiologically Capable of Full Culpability for Their Crimes.**

The Tennessee and U.S. Supreme Courts also look to prevailing scientific research and literature to determine whether the death penalty may be considered proportional to the crimes of a certain group of offenders. In Roper, the U.S. Supreme Court specifically found that the consensus among experts in the scientific community suggests three reasons why adolescents "cannot with reliability be classified among the worst offenders," 543 U.S. at 569: (1) adolescents tend to possess a lack of maturity and an underdeveloped sense of responsibility; id.; (2) adolescents are more vulnerable or susceptible to negative influences and peer pressure; id.; and (3) the character of adolescents is more transitory and less fully formed than that of adults; id. at 570. Critically, nothing in the Roper opinion limited these finding to adolescents under 18 years of age. On the contrary, the Roper Court noted that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Id. at 574.

More significantly, the science that informed the Supreme Court's Roper opinion suggests that individuals lack the brain capacity for full culpability until they are in their early 20's. The Roper amicus

brief[50] relied on scientific findings that suggest the brain's development is not complete for purposes of maturity, responsibility, impulse control, and character development until at least age 20, and often not for several years thereafter. See Amicus Brief of AMA, APA, et al. filed with the U.S. Supreme Court in Roper v. Simmons, No. 03-633 (internal citations omitted).

**b. The Diminished Culpability of Older Adolescents Cannot be Adequately Protected Through Presentation of Mitigating Evidence.**

Both the U.S. and Tennessee Supreme Courts have held that mitigation is insufficient protection for those who are insufficiently culpable against threat of execution. This is because mitigation evidence may be overwhelmed by highly emotional evidence such as that found in the case of a heinous crime, or because the very facts suggesting diminished culpability may suggest the aggravating fact of future dangerousness. Roper, 543 U.S. at 572-73; Atkins, 536 U.S. at 320-21; Van Tran, 66 S.W.3d 790.

The fear that capital juries will disregard the fact of youth in the face of a heinous crime is not merely hypothetical. Of the small number of older adolescents executed in recent years, a significant number committed crimes of shocking cruelty. See Jackson v. Commonwealth, 266 Va. 423, 428 (Va. 2003); Medellin v. Dretke, 371 F.3d 270, 274 (5th Cir. 2004); Henyard v. State, 689 So.2d 239, 242-44 (Fla. 1996).

Tragically, the reasons that full culpability is lacking are often the very same reasons that youthful offenders are capable of particularly offensive crimes: maturity, defenses to peer pressure, and impulse control are not fully formed. That phenomenon is prominently manifested in Ms. Pike's case, where her inability to regain self-control in the midst of a violent, group attack culminated in a tragic, torturous murder which must have overwhelmed juror considerations of Ms. Pike's youthfulness. Ms. Pike falls squarely within the class of older adolescent defendants who were wrongfully sentenced to death on the basis of the facts of the crime without regard to her incomplete culpability.

---

[50] The brief was filed by the American Medical Association, the American Psychiatric Association, the American Society for Adolescent Psychiatry, the American Academy of Child & Adolescent Psychiatry, the American Academy of Psychiatry and the Law, the National Association of Social Workers, the Missouri Chapter of the National Association of Social Workers, and the National Mental Health Association.

Presentation of youthfulness as a mitigating factor is insufficient protection for older adolescents because of the danger that such evidence will be computed as the aggravating factor of future dangerousness. Roper itself provides a striking example of the way in which evidence of youthfulness may be two-edged. At trial level, the Missouri State Prosecutor offered the following as sentencing phase rebuttal to the defendant's suggestion that his age was mitigating: "'Age, he says. Think about age. Seventeen years old. Isn't that scary? Doesn't that scare you? Mitigating? Quite the contrary I submit. Quite the contrary.'" Roper, 543 U.S. at 558.

**C. Under the Three-Factor Gregg Test, the Cognitively Impaired and Mentally Ill must be Spared Execution.**

The Tennessee and U.S. Supreme Court have recognized that the mentally impaired require special protections in the capital arena. Mental illness may be raised to claim incompetency to stand trial and as an affirmative defense to guilt. Under Ford v. Wainwright, an individual must be mentally competent at the time of execution. 477 U.S. 399 (1986). Additionally, the mentally retarded are systematically shielded from capital prosecution under Atkins, 536 U.S. 304, Van Tran, 66 S.W.3d 790 and by statute, Tenn. Code Ann. §39-13-203.

This patchwork provides incomplete protection for the cognitively impaired. In 2005, the American Civil Liberties Union reported that since 1983, over 60 people with mental illness or retardation had been executed, and that an estimated 5-10% of death row inmates suffered from serious mental illness. http://www.aclu.org/capital/mentalillness/10617pub20050131.html. In 2006, Amnesty International issued a report on the execution of the mentally ill replete with case studies of severely impaired individuals who were executed. See generally http://www.amnesty.org/en/library/asset/AMR51/003/2006/en/73c0b3fe-d46f-11dd-8743-d305bea2b2c7/amr510032006en.pdf (hereinafter "Amnesty International Report"). Media coverage has also shed light on the woeful mental condition of criminal defendants put to death. See, e.g., Laura Mansnerus, "Damaged Brains and the Death Penalty," New York Times, July 21, 2001; Kevin Drew, "Executed Mentally Ill Inmate Heard Voices Until End," CNN, January 7, 2003. There is thus little doubt

that the cognitively impaired are slipping through the cracks, and that more comprehensive protection is needed. The three-factor Gregg analysis requires that the cognitively-impaired be provided systematic exemption from the death penalty.

**1. Public Values do not Support Execution of the Cognitively Impaired.**

State legislatures and Congress have represented the public distaste for execution of the cognitively-impaired through enactment of numerous protections. In 2006, Amnesty International ("Amnesty Int'l") cited to the following enactments:

- 12 U.S. states are abolitionist, and a 13th, New York, has a *de facto* moratorium on the death penalty in place after its capital statute was found unconstitutional by the state's highest court and has not been reinstated. These states are not using the death penalty against anyone, let alone people with mental illness.
- 25 of the 37 death penalty states, as well as the federal government, have as statutory mitigating factors for consideration by capital juries at sentencing either (1) the defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform that conduct to the requirements of the law was impaired; or (2) the defendant was acting under extreme mental or emotional disturbance.
- In at least five states – Arizona, Florida, Mississippi, Ohio and Nevada – a number of inmates suffering from mental illness have been removed from death row under proportionality review.
- Of the death penalty states which allow defendants to plead "guilty but mentally ill" (GBMI), only four have passed death sentences in GBMI cases.(112) Only one such defendant is believed to remain on death row – James Wilson in South Carolina.

Amnesty International Report, at 46.

Two states have explicitly considered abolishing the death penalty for the severely mentally ill. This year, bills in Illinois and North Carolina were approved by legislative committees. However, neither bill has, as of this filing, been passed into law. http://www.deathpenaltyinfo.org/recent-legislative-activity#2009.

In 2008, Congress passed the Mentally Ill Offender Treatment and Crime Reduction Reauthorization and Improvement Act of 2008. Pub.L. 110-416, § 1(a), Oct. 14, 2008, 122 Stat. 4352. This statute authorizes grants for the identification and treatment of mentally ill offenders, the expanded use of mental health courts, and the training of law enforcement in special issues associated with mentally ill offenders, in

addition to other measures designed to provide better tailored assistance to the mentally ill in the criminal system. http://www.govtrack.us/congress/bill.xpd?bill=s110-2304&tab=summary.

The 2008 Model Penal Code further reflects a growing understanding of the diminished culpability of the cognitively-impaired. Section 4.01 states:

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

Model Penal Code § 4.01 (2008). This formulation of the insanity defense clearly extends beyond the classic M'Naghten formulation by exempting from criminal sanction those persons who are volitionally incapacitated by cognitive impairment.

In addition to legislative developments, the first factor of the Gregg test may be evidenced by juror surveys and the positions of professional organizations. See Atkins, 536 U.S. at 313-17; Van Tran, 66 S.W. 3d at 801-04. The Capital Juror Project, discussed above, found that, after mental retardation, a defendant's history of mental illness was the single most powerful type of evidence in mitigation. Garvey, 98 Colum. L. Rev. at 1559. Of the representative sample of capital jurors surveyed, nearly 50% reported that they would be less likely to vote for death in the case of a mentally ill defendant, and over a quarter stated that they would be significantly less likely to so vote. Id.

With regard to the stated positions of professional organizations, largely the same collection of organizations has publicly condemned the execution of the mentally ill as opposed execution of the mentally retarded prior to Atkins. The American Bar Association ("ABA") passed Resolution 122A roundly rejecting capital punishment for the severely mentally ill and those with similar symptoms resulting from serious brain injury. http://www.ndrn.org/issues/cj/ABA%20Resolution-%20feature%20article305.pdf. This resolution has since been endorsed by the American Psychiatric Association, the American Psychological Association, and the National Alliance for the Mentally Ill. http://www.deathpenaltyinfo.org/mental-illness-and-death-penalty. Also, Mental Health America has rejected execution of the mentally ill and the use of treatment or medication

to restore competency for the purpose of execution. http://www.mentalhealthamerica.net/go/position-statements/54.

### 2. Execution of the Cognitively Impaired is no Proportional Punishment Under the Tennessee and Federal Constitutions.

In Atkins, the Supreme Court cited modern scientific research and literature in finding that mentally retarded defendants were less culpable for their crimes because of their "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." 536 U.S. at 318. The scientific literature requires the same finding with respect to the cognitively impaired, whether because of organic or traumatic brain damage, or because of mental illness.

Resolution 122 adopted unanimously by the ABA House of Delegates summarizes contemporary literature and explains the reasons why the cognitively impaired lack the degree of culpability necessary for execution. The Resolution and attached Report specifically call for an exemption from the death penalty for the following individuals: (1) those with significant limitations at the time of the offense due to mental retardation, dementia, and traumatic brain injury; and (2) those with a severe mental disability that impaired their ability to (a) appreciate the nature or wrongfulness of their crimes, (b) exercise rational judgment in relation to their conduct, or (c) conform their conduct to the requirements of law. *See* Recommendation at §§ 1-2. The ABA defines "severe disability" as including Axis I diagnoses – Schizophrenia, Bipolar Disorder, Depressive Disorders, Post-Traumatic Stress Disorder ("PTSD") – and sometimes certain Personality Disorders, such as Borderline Personality Disorder, particularly when found in combination with intermittent psychosis. Report at 670 (citing American Psychiatric Association, Diagnostic And Statistical Manual 49 (text rev. 4th ed. 2000) (hereafter DSM-IV-TR) at 25-26.

That those individuals who suffer from these types of conditions are less culpable than those who are not cognitively impaired follows directly from even a basic understanding of these conditions. In Ms. Pike's case, Dr. Pincus testified during post-conviction proceedings that in the 100 to 150 cases of violent murder he had

researched, the most frequent explanation for the violence of the offender was a combination of three factors: (1) frontal lobe damage, (2) mental illness, and (3) a history of abuse. (PC VIII: 220–221). Frontal lobe damage, as already discussed, impedes an individual's ability both to absorb moral information in early life and to comport with moral standards later on. (Id.) Mental illness compounds this problem. Ms. Pike's Bipolar Disorder, for example, is marked by manic periods in which Ms. Pike has great difficulty controlling her behavior because of a distorted view of reality. (Id. 244). Of course, Bipolar Disorder is not unique in this regard – schizophrenia, PTSD, chronic depression, and even extreme cases of Borderline Personality Disorder may be marked by deep and persistent psychotic breaks, including visual and auditory hallucinations and paranoia. Finally, individuals with Dr. Pincus' third factor – a history of abuse – often lack any substantive moral modeling, and conversely learn that chaos and violence are appropriate outlets for confusion and agitation. When these three factors are present in combination, in the words of Dr. Pincus, "you have a very live wire indeed." (Id. 221).

What Pincus' research and testimony show is that individuals with significant cognitive impairments may be predisposed to violence and, more significantly, ultimately unable to avoid committing violent acts. This propensity undermines the core notion of culpability - that individuals are responsible for the harmful effects of their behavior where the effects were foreseeable and the individual might have done otherwise. Because individuals with serious cognitive impairments often could not have done otherwise, it is clear that they may lack full culpability.

### 3. Execution of the Cognitively Impaired Serves no Useful Purpose, and Therefore Amounts to unnecessary Infliction of Pain

Because of their defining characteristics, execution of the cognitively-impaired cannot achieve either of the twin purposes of execution generally. The first purpose – retribution – requires that the offender be fully culpable. The cerebral shortcomings of individuals with brain damage or severe mental illness may render them less than fully culpable. For this reason, no retribution is gained through execution of the cognitively-impaired.

Likewise, the second purpose of capital punishment – deterrence – cannot be furthered by execution of this group. Individuals who should be insulated from the death penalty because of cognitive impairments cannot bring their behavior in line with moral and legal standards. This failure of self-control is a fact irrespective of the punishment for particular crimes.

### D. Due Process and equal Protection Require extension of Roper and Atkins to Older Adolescents and the Cognitively Impaired, Respectively.

The clear import of the Supreme Court's Furman and Gregg decisions is that the Due Process Clause of the Fourteenth Amendment compels the States to winnow down the class of death-penalty eligible offenders to the "worst of the worst" by non-arbitrary processes and standards. The Fourteenth Amendment's Equal Protection Clause requires States to distinguish between classes of people on the basis of rational, non-arbitrary reasoning. Failure to extend Roper and Atkins to older adolescents and the cognitively impaired, respectively, violates both of these constitutional mandates. As discussed above, the scientific basis for the decisions in Roper and Atkins apply equally to these unprotected groups, and this disparate treatment is without independent justification.

To understand the extent of the arbitrariness manifested by failure to extend the protection of Roper and Atkins, consider two hypothetical examples. First, imagine twin siblings born seven minutes apart, who, 18 years after the birth of the elder, commit a capital murder together in the course of five minutes. As a technical matter, the older twin is 18 and eligible for the death penalty. Under Roper, the younger twin is protected.

Second, imagine two individuals are driving in a car together when another car on the road cuts them off. Infuriated, the two individuals conspire to commit and carry out a murder of the other driver, which, because particularly heinous, is a capital crime. The first offender suffers from Bipolar Disorder, and was in a manic state, not having slept for 40 hours, at the time of the crime. This offender has frontal lobe damage and a history of physical and sexual abuse, which, in tandem, give rise to an irresistible impulse to exact

revenge. The second individual is mentally retarded. Under Atkins, the second offender is protected against imposition of the death penalty, but the first is not.

What these examples make obvious is that the principles of Roper and Atkins exceed their present application, and that there is no apparent reason, other than ease of application, for the current limitations. The constitution, and the application of the death penalty, require more as a basis for distinguishing between death eligible offenders.

**E. The Combination of Older Adolescence, Mental Illness, and Brain Damage Requires Categorical Exclusion From the Death Penalty.**

If this Court is not sufficiently persuaded that older adolescence or mental illness individually should be categorically exempted from the death penalty, it must still consider whether there is any material way to differentiate in terms of culpability between a juvenile, a person who is mentally retarded and a person who, like Ms. Pike, is an older adolescent, mentally ill and brain damaged.

The evidence in this matter is that due to the existence of a heterotopia, Ms. Pike's frontal lobe has been damaged since she was in-utero. (PC VIII: 240-45.) In addition, due to the abuse she suffered as a young child, the development of her brain was arrested. (PC XXX: 149-53.) She also suffers from a sever Bipolar Disorder that is dominated by long periods of hypomania in which she becomes increasingly irritable with occasional psychotic breaks from reality. (PC VIII: 244; XXIX: 26-29, 39-40.) All of these elements match or surpass the reasons for exempting juveniles and the mentally retarded from the death penalty. Ms. Pike is unable to control her emotions and actions due to mental illness and brain damage. Her frontal lobe, as an 18 year old at the time of the offense, was not only not incompletely developed, but was also damaged. These limitations produced an offense that appears heinous, making mitigation evidence an uncertain tool for protection of Ms. Pike's life. The conditions surrounding Ms. Pike's case are thus indistinguishable from those of juveniles or the mentally retarded. Under these circumstances, Ms. Pike's death sentence violates the Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 8 and 16 of the Tennessee Constitution and her death penalty must be set aside.

## IV. Striking a Qualified Juror for Cause Is a Structural Defect Requiring Reversal of Ms. Pike's Conviction and Sentence.

As argued in section II, above, the trial court improperly struck prospective juror Mr. Rutherford for cause. Mr. Rutherford was initially qualified for service following questioning on publicity and death eligibility when he asked to approach the court to discuss concerns about giving the death penalty to a person as young as Ms. Pike. (T XIX: 1510.) The discussion that followed centered on whether Ms. Pike's age would prevent him from voting for the death penalty. (Id. at 1510-14.) Mr. Rutherford explained that he worked with "a lot of kids" and understood that due to immaturity, they do impulsive things. (Id. at 1511.) He said that he did not "think he could" give someone Ms. Pike's age the death penalty. (Id. at 1512.) He emphasized that he had no problem with giving the death penalty to "someone that was more mature." (Id. at 1513.) He focused entirely on age and maturity completing his thought, "I wouldn't have a problem with [the death penalty for someone more mature], but the immaturity is a problem." (Id.) Following this colloquy, the trial court struck Mr. Rutherford for cause. (Id. at 1515.)

This was error. In Beaver v. State, 475 S.W.2d 557, 558 (Tenn. Crim. App. 1971), this Court held that in order to be excused for cause, a juror must unequivocally make a statement that would be disqualifying under Witherspoon. In Gray v. Mississippi, the Supreme Court clarified its holding in Witherspoon and Wainwright v. Witt, calling the critical issue "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Gray v. Mississippi, 481 U.S. at 657-658 (citing Witt, 469 U.S. at 424). In this case, Mr. Rutherford unequivocally stated that if the State could show maturity, he had no problem with the death penalty. (PC XIX: 1513.)

Erroneously striking a qualified juror for cause is a structural error that requires reversal without any showing of prejudice. Gray v. Mississippi, 481 U.S. 648, 650-651 (1987) (citing Davis v. Georgia, 429 U.S. 122) ("when a trial court misapplies Witherspoon v. Illinois [citation omitted] and excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence imposed by the jury cannot stand.").

The Gray Court said that "[t]he nature of the jury selection process defies any attempt to establish that an erroneous Witherspoon-Witt exclusion of a juror is harmless." Id. at 664-65. Tennessee law is in accord. In State v. Harrington, 627 S.W.2d 345, 350 (Tenn. 1981), the Court reversed the defendant's sentence without any discussion of prejudice or harmless error because jurors were excluded for cause in violation of Witherspoon. The Tennessee Supreme Court has repeatedly found that "some errors defy harmless error analysis and require reversal." Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999). Such errors are "structural defects in the constitution of the trial mechanism" which "have an impact upon '[t]he entire conduct of the trial from beginning to end.'" Id. (quoting Arizona v. Fulminante, 499 U.S. 279, 310 (1991).); accord State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) ("Structural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur.").

## V. The Court Below Erred by Failing to Recuse Itself in This Matter.

Judge Leibowitz served a both trial and post-conviction court in Ms. Pike's case. On post-conviction, Ms. Pike moved for recusal, a motion Judge Leibowitz denied from the bench. For two reasons, the court's failure to recuse was error of constitutional dimensions.

### A. The Post-Conviction Court was Disqualified from Deciding Petitioner's Post-Conviction Claim because Judge Leibowitz had Personal Knowledge of Material Facts in Dispute.

Petitioner's foremost claim for post-conviction relief is that her trial counsel was ineffective in light of a conflict of interest. As discussed in detail elsewhere in this Brief, Mr. Talman stole $67,000 from the Indigent Defense Fund and disciplinary sanctions were pending at the time of his representation of Ms. Pike. (See Argument, Section I, above.) As a result, it was in Mr. Talman's pecuniary and penological interest to avoid agitation of either the prosecutor or the trial court in the course of the trial. At close of the guilt/innocence phase, moments before the penalty phase was to begin, the trial court held an in camera meeting with the parties. That meeting was off the record. At the close of the meeting, when the parties returned to the courtroom and resumed recorded proceedings, the prosecutor was in possession of Dr.

McCoy's three-volume Mitigation Materials. (T. XXIX: 2468.) Shortly thereafter, Mr. Talman decided to not call Dr. McCoy to testify at sentencing, effectively scrapping Ms. Pike's mitigation case. (PC XXV: 740-43.)

It is Ms. Pike's contention in post-conviction that the events of the unrecorded, in camera meeting substantiate a claim of conflict that mandates vacation of her conviction and sentence. This contention is rooted in the testimony of Dr. McCoy, whose version of events was confirmed by Knoxville attorneys Herbert Moncier and Gregory Isaacs. (PC XXVII: 1000 –XXVIII:1002; XXIX: 4-6.) It is also Ms. Pike's theory that Mr. Talman turned over the three-volume Mitigation Materials in an effort to placate the State.

For purposes of the present argument, what is critical is that the post-conviction court, Judge Leibowitz, was a party to the unrecorded in camera meeting. The substance of that meeting was very much in dispute, and Ms. Pike subpoenaed Judge Leibowitz as a necessary witness to testify to her recollection of Mr. Talman's behavior and representations during the meeting in question. In response, Judge Leibowitz quashed her own subpoena and denied the motion to recuse.[51] (PC XXXII: 120.)

In explaining her decision, Judge Leibowitz stated as follows:

> I have no independent memory [of the unrecorded in camera meeting] other than that there was three volumes. I remember that there were volumes – and I'm not trying to testify; I'm just trying to – trying to make a ruling here—of mitigation materials. Those were turned over to the State as required after the verdict.
>
> The State had no – not enough time. And then – and I can't imagine why – why there would even be an issue about when Mr. Talman received those materials because they didn't go to the State anyway at that point. And maybe the State was arguing that they were entitled and I ordered them turned over.
>
> . . . .
>
> Again, for the purposes of your Motion for a Subpoena, a judge speaks through their rulings. So you can take those rulings and say, "Okay. These are the grounds for post-conviction petition." But you can't subpoena me to ask me what I thought or what I think or what I remember. I've told you as much as I can in order to make this case go forward.
>
> I remember that evening. I remember that verdict coming in. I remember us having a discussion, and I remember us discussing whether – when the State got its materials. And everything is spoken for through the transcript, I think. And if there isn't – and if there's anything else we're going to get it out of those transcripts that we have.

(Id. at 118-120).

---

[51] The Post-Conviction Court granted permission to appeal to this Court pursuant to T.R.A.P. 9. (PC. II: 206.) This Court found the issue reviewable after final judgment and denied permission to appeal. (Id. at 208.)

It is important to note the myriad ways in which Judge Leibowitz thus admitted that her personal knowledge of the facts would inform her decision on the merits of Ms. Pike's conflict claim.

First, the Post-Conviction Court stated of Dr. McCoy's Mitigation Materials, "[t]hose were turned over to the State as *required* after the verdict." (Id. at 118) (emphasis added). Mr. Talman, as argued above, was not required by law to turn over the Materials. (See Argument, Section I at, *supra,* at 85-87.) The post-conviction court's statement thus suggests that either (1) the court held an erroneous, fixed opinion of the law, or (2) the court was referring to her recollection of ordering Mr. Talman to turn over the Materials. Either possibility presents clear evidence of impropriety. If the Court below held a fixed, erroneous opinion, then it could not decide Ms. Pike's claim impartially. On the other hand, if the post-conviction court was referencing her own order, then this was testimony as to a disputed fact – Ms. Pike maintains that no such order was given, and there is no proof of any such order, save the inadvertent testimony of the post-conviction court.

Second, the Court below noted as an aside "I can't imagine why – why there would even be an issue about when Mr. Talman received those materials." (PC XXXII: 118). This excerpt makes clear that Judge Leibowitz was ready to determine, without hearing the evidence, that the timing of when Mr. Talman had received the materials from Dr. McCoy was not relevant. However, before making this statement, the court had been informed that the date Mr. Talman received the materials was relevant because Dr. McCoy was prepared to testify that she was not called as a witness because she would not support Mr. Talman's lie. (See PC XXXI: 60-61.)

Third, Judge Leibowitz expressed fundamental misunderstanding of the manner in which the circumstances at trial made her a necessary witness on post-conviction. She stated, "a judge speaks through their rulings . . . .you can't subpoena me to ask me what I thought or what I think or what I remember. I've told you as much as I can in order to make this case go forward." (PC XXXII: 119). As a matter of law, these statements were in error. A judge *can* be subpoenaed, Stein v. Prof'l Center, 666 So.

2d 264, 266 (Fla. App. 1996) (Judge may be subpoenaed in post-conviction proceeding to testify to relevant facts not recorded); Bolen v. Young, 455 N.E. 2d 1316 (1982) (same), and it is under precisely such circumstances as a subpoena is appropriate that a judge must recuse herself.

Fourth, and finally, Judge Leibowitz stated "everything is spoken for through the transcript, I think. And if there isn't – and if there's anything else we're going to get it out of those transcripts that we have." (Id. 120) Since the in camera meeting was *unrecorded*, its contents are not included in the trial transcript. The post-conviction court thus flatly denied that it could consider any proof as to what occurred during that meeting that was not substantiated by the transcript. But Petitioner's proof is substantiated by the testimony of three credible witnesses, not the transcript. As a result, the above excerpt provides still further evidence that the Court below was incapable of reaching a decision based on the evidence presented.

Because Judge Leibowitz presided over Ms. Pike's post-conviction petition as post-conviction court, Judge Leibowitz served as witness, judge, and jury. This was unconstitutional in violation of due process and Ms. Pike's right to confront adverse witnesses. See Davis v. State, 598 S.W.2d 582, 585 (Mo. Ct. App. 1980); Tyler v. Swenson, 427 F.2d 412, 415 (8th Cir. 1970); U.S. v. Halley, 240 F.2d 418 (2 Cir. 1957); Terrell v. U.S., 6 F.2d 498 (4 Cir. 1925); Maitland v. Zanga, 14 Wash. 92 (1896). As the Eighth Circuit noted:

> [I]t runs against the grain of fairness to say that the same judge may consider his own crucial testimony and recollection rebutting petitioner's claim and simultaneously pass upon the credibility of all witnesses in weighing the evidence. A member of the judiciary has no peculiar competence in factual recollection of unrecorded events. In fact, the many cases a trial judge participates in may well cloud vivid recollection of detail in a specific case. A party should be permitted to test a judge's recollection, as a witness presenting factual material testimony, as he would any other witness upon cross-examination.

Swenson, 472 F.2d at 415. In the only case known to Ms. Pike in which a reviewing court has found a judge below did not have a duty to recuse in light of personal knowledge of a disputed issue, the decisive factor in the court's decision was that the judge below presumed all facts in dispute in favor of the defendant. People v. Alvarez, 926 P.2d 365, 416 (Cal. 1996). In the present case, the post-conviction court presumed no facts in favor of Ms. Pike. To the contrary, Judge Leibowitz admitted that her own

memory did not support Ms. Pike's theory, that her own memory complied with her understanding of the logic of the case, and that she would not be persuaded by Ms. Pike's proof. For these reasons, this Court must reverse the Court below and provide Ms. Pike with a new post-conviction trial proceeding before an impartial judge.

**B. In Light of the Nature of Ms. Pike's Post-Conviction Claims, a Reasonable Person Would Have Considered the Post-Conviction Court Incapable of Impartial Adjudication of Ms. Pike's Post-Conviction Petition.**

In the ordinary run of cases, adjudication of a post-conviction petition by the same court that presided over the petitioner's trial is both proper and expedient. State v. Garrard, 693 S.W.2d 921,922 (Tenn. Crim. App. 1985); Tenn. Code Ann. § 40-30-105(b). Additionally, recusal is not required anytime a judge is called upon to review her own order – for example, judges frequently decide motions to reconsider.

Ms. Pike's claim is that Court below knowingly appointed conflicted, incompetent counsel in violation of her rights to due process and effective assistance of counsel. Because Talman's conflict extended throughout the trial, his appointment to represent Ms. Pike constitutes a structural error which deprived her of basic protections, rendering her trial fundamentally unfair. Momon v. State, 18 .W.3d 152,165 (Tenn. 999). This type of error is different from ordinary errors in kind because it involves the court itself being instrumental in denying Ms. Pike a fair trial, as opposed to having counsel deficiently perform without the know-ledge of the court. In other words, it is the court's actions and not counsel's that denied the fundamental fairness. Under such circumstances, Ms. Pike's post-conviction petition falls outside the normal presumption of impartiality that attaches to post-conviction adjudication by the same court that presided at trial.

Simply, the Court was required to recuse itself. Brent v. State, 929 So.2d 952, 955 (Miss. Ct. App. 2005) (judge who had issued search warrant was required to recuse himself from later challenge to propriety of issuance of search warrant); Ex parte Adkins, 687 So.2d 155, 156 (Ala. 1996) (judge was required to recuse himself in action alleging his bias in prior proceeding). In finding that she had no

obligation to recuse herself in light of Ms. Pike's claims of unconstitutional appointment of Trial Counsel, the post-conviction court stated:

> In this case I think it's pretty obvious that everyone in Knox County knew that Mr. Talman had problems with his billing. He also had been appointed, I guess, by Judge Jenkins. If you tell me that – I haven't looked to see who signed the original order of appointment originally. And he was a death-qualified attorney with an active law license without restrictions. He too was presumed innocent until proven guilty. As it turned out he was never prosecuted in this case. . . .

(PC XXXII: 113). Far from assuaging concerns that she might have difficulty adjudicating Ms. Pike's case impartially, this excerpt underscores the validity of such concerns. In this quotation, the court first attempts to defer her own responsibility, and then defends her position by shielding Talman. (Id. at 114). In this manner, the court attempted to downplay both Talman's indiscretions and the importance of her knowledge of the same at the time of appointment.

It is plain that the Court below was unable to divorce itself from the challenge to its conduct in appointing conflicted counsel. Instead of making a decision about whether or not she could rule on the issues surrounding her appointment of Talman, *i.e.*, the issue in post-conviction, she immediately leapt to defense of the appointment itself. For these reasons, the post-conviction court impartiality is in question and it was required to recuse itself from Ms. Pike's post-conviction petition, and the failure to do so denied Ms. Pike a fair and impartial post-conviction proceeding. Due process therefore requires that the decision below be vacated, and that this cause be remanded for adjudication by a different court.

## VI. The Appointment of Counsel With an Active Conflict Known to the Court Constitutes Structural Error Requiring that Both Ms. Pike's Conviction and Sentence Be Set Aside.

The factual basis for this claim is fully set forth above, and therefore will not be repeated in full here. The necessary facts are that immediately prior to appointment as lead counsel for Ms. Pike's defense: (1) Mr. Talman returned over $67,000 to the indigent defense fund to repay monies stolen between 1990 and 1993; (2) Mr. Talman's malfeasance had recently been widely reported, including extensive articles in

Knoxville's principal newspaper; and (3) all this was known to the Court below at the time of the appointment. (Argument, Section I, *supra*, at 78-80.)

Ms. Pike here argues that the appointment of counsel who the court knew had a high risk of conflict constitutes a structural error requiring that her conviction and sentence now be set aside. See Holloway v. Arkansas, 435 U.S. 475, 489 (1979) (citing, Chapman v. California, 386 U.S. 18, 23 (1967) ("the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error."); Cottingham v. Cottingham, 193 S.W.3d 531, 537 (Tenn. 2006); Satterwhite v. Texas, 486 U.S. 249, 257 (1988) ("When a defendant is deprived of the presence and assistance of this attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic.").

## VII. Ms. Pike was Denied her Due Process Right to Effective Representation on Appeal

Under the due process clause of the Fourteenth Amendment, Ms. Pike has a right to the effective assistance of counsel on her direct appeal. Evitts v. Lucey, 469 U.S. 387 (1985); Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). The standard used to judge the effective assistance of counsel on appeal is the same as that in reviewing counsel's performance under the Sixth Amendment at trial. Cooper v. State, 849 S.W.2d 744, 746-747 (Tenn. 1993).

For the purpose of this argument Ms. Pike must concede that, as a general principle, counsel is not required to argue every issue on appeal. Id. at 747 (citing Jones v. Barnes, 463 U.S. 745 (1983). However, viewing this principle narrowly can be deadly for an inmate facing death at the hands of the State. In Jorbert v. Hopkins, 75 F.3d 1232, 1240 (8th Cir. 1996) *cert. denied* 518 U.S. 1029 (1996), the U.S. District Court granted relief finding that Nebraska's "exceptional depravity" aggravating factor was unconstitutionally vague. In granting relief, the district court found that Joubert had shown cause for his failure to raise the issue of vagueness in state court because, although the issue may have been settled in federal court, the Nebraska state courts had continued to find the Nebraska "exceptional depravity" aggravating factor valid.

Id. at 1242. The Eighth Circuit held that because this was not a novel issue, "[t]he mere fact that the Nebraska Supreme Court had not decided the issue, or even the likelihood that they would decide it against him if he raised it," did not provide valid reason for not raising the issue as early as Joubert's 1985 direct appeal. Id. at 1243.

There was a similar result in Smith v. Kemp, 715 F.2d 1429, 1476 (1983), where the court denied relief to Smith while it had granted relief to his co-defendant because the co-defendant had raised a not-yet established jury composition issue in state court and Smith's attorney had not raised the issue. Smith was executed; his co-defendant received a life sentence in a new trial. *See* Freedman, The Professional Obligation to Raise Frivolous Issues in Death Penalty Cases, 31 Hofstra L. Rev. 1167, 1178 (2003). Consequently, while the prejudice from failure to raise an issue may not be readily determined until after final federal review of the case, the prejudice is still very real.

**A. The ABA Guidelines Establish the Standard of Practice.**

Further, the standard of practice for death penalty defense requires that counsel representing a death sentenced client at any point after conviction should "litigate all issues, whether or not previously presented, that are arguably meritorious." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 1989, Guideline 11.9.2 (D) ("[a]ppellate counsel should seek, when perfecting the appeal, to present all arguably meritorious issues"); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, February 2003, Guideline 10.15.1, Reprinted at 31 Hofstra L. Rev. 913, 1079 (2003). The commentary to Guideline 10.15.1 further hones the problem inherent in winnowing issues in the direct appeal stating:

> "Winnowing" issues in a capital appeal can have fatal consequences. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client is killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.

31 Hofstra L. Rev. at 1083.

**B. Appellant Counsel Rendered Deficient Performance by Failing to Raise the Following Issues.**

1. **The Appointment of Counsel with an Active Conflict Known to the Court Constitutes Structural Error Requiring that both Ms. Pike's Conviction and Sentence be Set Aside.**

This issue was raised and argued in argument VI, above, and, in the interest of reducing page length, argument VI is incorporated herein by reference.

2. **Striking a Qualified Juror for Cause is a Structural Defect Requiring Reversal of Ms. Pike's Conviction and Sentence.**

This issue was raised and argued in argument IV, above, and, in the interest of reducing page length, argument IV is incorporated herein by reference.

3. **Permitting the Jury to Consider the Avoiding Arrest Aggravating Factor, After Permitting a Conviction for Conspiracy to Commit Murder, Denied Ms. Pike her Rights Under the State and Federal Constitutions.**

This issue was raised and argued in argument II (see Argument, Section II, *supra*, at 96-98), above, and in the interest of reducing page length, the pertinent pages of argument II is incorporated herein by reference.

4. **Failing to Challenge the Constitutionality of the Death Penalty by Failing to Argue the Issues set out in Section VIII, Below.**

The arguments supporting this claim are set out in argument VIII, below, and in the interest of reducing page length are incorporated herein by reference.

## VIII. Ms. Pike's Death Sentence Should Be Set Aside Due to the Unconstitutionality of Tennessee's Death Penalty Scheme; Lethal Injection; Infringement of Ms. Pike's Fundamental Right To Life; and Lack of Grand Jury Indictment.

### A. The Tennessee Death Penalty Scheme is Unconstitutional.

Tennessee's death penalty sentencing statute and the imposition of the sentence of death in this state violate Amendments 5, 6, 8, and 14 to the U. S. Constitution, as well as art. I, §§ 8, 9, 16, and 17,art. II, § 2, and art. XI, § 8 of the Tennessee Constitution. Tennessee's death penalty scheme fails to meaningfully narrow the class of death-eligible defendants. State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999); see also Zant v. Stephens, 462 U.S. 862 (1983); State v. Pritchett, 621 S.W.2d 127 (Tenn.1981); Furman v. Georgia, 408 U.S 238 (1972).

Tennessee's appellate review process in death penalty cases is constitutionally inadequate because it is not "meaningful" and because the statutorily-mandated proportionality review is conducted in violation of due process and the law of the land. The appellate review process is not meaningful because: (a) the Court cannot reweigh proof due to the absence of written findings concerning mitigating circumstances; (b) the information relied upon by the Court for comparative review is inadequate and incomplete; (c) and, the Court's methodology is flawed. By creating a statutory requirement that the appellate courts conduct proportionality review, there is constitutional right that the proportionality review be conducted consistent with the elements of due process. *See, e.g.,* Olim v. Wakinkona, 461 U.S. 238 (1983). Tennessee's proportionality review process is not conducted in a manner sufficient to satisfy the federal due process clause or the state constitutional "law of the land" clause, Tenn. Const., Art. I, § 8.

Allowing Tennessee's 31 elected District Attorneys to indiscriminately seek or forego the death penalty in any given case violates the principles set out in Bush v. Gore, 531 U.S. 98 (2000), and Furman v. Georgia, 408 U.S. 238 (1972). This practice also ignores the long-held understanding that death is different in kind from all other punishments. Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

In addition to violating Ms. Pike's rights to equal protection, this unfettered discretion of prosecutors to seek a death penalty results in a two-fold violation of art. II, § 2 of the Tennessee Constitution.: granting this discretion is an improper delegation of judicial power and exercising the discretion constitutes an impermissible assumption of legislative power by the prosecutor (who obligates the State to spend millions of dollars in litigation and other costs, thereby usurping the legislative function of revenue appropriation).

**B. Executing Ms. Pike by Means of Lethal Injection Would Violate Her Rights Under Art. I §§ 8 and 16, Tenn. Constitution and Amendments 8 and 14, U. S. Constitution.**[52]

---

[52] Ms. Pike's counsel on direct appeal did raise a challenge to electrocution. Subsequently, the authorized method of execution in Tennessee was changed to lethal injection. Tenn. Code Ann. § 40-23-114. As a result, this is Ms. Pike's first opportunity to challenge the constitutionality of the present method of execution.

Tennessee's protocol for lethal injection is unconstitutional, and creates a substantial risk of serious bodily harm, given the protocol's inclusion of pauncuronium bromide and the failure to sodium thiopental to induce anesthesia. Because this method involves the risk of unnecessary pain, it violates Eighth Amendment.

**C. The Death Sentence Is Unconstitutional Because It Infringes Upon Ms. Pike's Fundamental Right To Life, And Imposition Of The Death Penalty Is Not Necessary To Promote Any Compelling Tennessee State Interest.**

Pursuant to Amendments 4, 5, 6, 8, 9, and 14 to the U.S. Const. and Art. I §§ 6, 7, 8, 9, 16,17 of Tennessee Constitution, the death sentence must be set aside because it unconstitutionally impinges upon Ms. Pike's fundamental right to life. Convicted murderers retain a fundamental right to life under Amendments 8 and 14 to the U.S. Constitution. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33-34 (1973); Ford v. Wainwright, 477 U.S. 399, 409 (1986). U.S. Constitution explicitly recognizes the right to life as fundamental in both the due process clause of Amendment 5 and Due Process Clause of the 14th Amendment; Art. I § 8 of the Tennessee Constitution acknowledges life as a fundamental right, as does international law.

**D. The Indictment Returned By The Grand Jury Was Unconstitutional.**

Tennessee denied Ms. Pike her rights under Art. I, §§ 8, 14 and 16, Tenn. Const. and the 5th and 8th Amendments to the U.S. Const. because the aggravating factor making her eligible for a death sentence was neither in the indictment nor returned by the grand jury. See, Ring v. Arizona, 536 U.S. 584 (2002); Apprendi v. New Jersey, 530 U.S. 466 (2000); but see, State v. Berry, 141 S.W.2d 549 (Tenn. 2004). Therefore, this Court must set aside the sentence of death and return this matter to the trial court for resentencing.

## Conclusion

For all of the above reasons, Appellant Christa Pike respectfully requests this Court to reverse the decision of the Post-Conviction Court; to grant her Petition for Post-Conviction Relief; to set aside her convictions and sentences for first-degree murder and conspiracy to commit first degree murder; and to grant any other appropriate relief.

Respectfully submitted,

Donald E. Dawson, BPR No. 010723
Post-Conviction Defender

Avram D. Frey[53]

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331
(615) 741-9430 (Fax)

Counsel for Appellant, Christa Pike

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Brief of the Appellant was sent via U.S. Mail, first-class postage pre-paid, to Jennifer L. Smith, Associate Deputy Attorney General, Office of the Attorney General - Criminal Division, P.O. Box 20207, Nashville, TN 37202-0207 on this the 28th day of September 2009.

Donald E. Dawson

53 Tennessee Bar membership is pending the results of the July 2009 bar exam.

Not Reported in S.W.3d, 2007 WL 1651882 (Tenn.Crim.App.)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Jackson.
Howard Lee COLEMAN
v.
STATE of Tennessee.

No. W2006-02601-CCA-R3-PC.
Assigned on Briefs April 10, 2007.
June 7, 2007.

Appeal from the Criminal Court for Shelby County, No. P-24987; Chris Craft, Judge.
Juni S. Ganguli, Memphis, Tennessee, for the Appellant, Howard Coleman.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Alanda Dwyer and Katrina Earley, Assistant District Attorneys General, for the Appellee, State of Tennessee.

DAVID G. HAYES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

**OPINION**

DAVID G. HAYES, J.

***1** The Appellant, Howard Lee Coleman, appeals the judgment of the Shelby County Criminal Court denying post-conviction relief. Coleman was convicted of first degree murder and especially aggravated robbery and was sentenced by the jury to life imprisonment without the possibility of parole. He also received a concurrent sentence of twenty years for his especially aggravated robbery conviction. Coleman filed a *pro se* petition for post-conviction relief in 2001, alleging multiple deficiencies underlying his ineffective assistance of counsel claim, including the failure to perfect a direct appeal of his convictions. After the appointment of counsel, the post-conviction court heard evidence on all the allegations and granted a Rule 3 delayed appeal to this court. The remaining post-conviction issues were stayed pending the outcome of the appeal, which was subsequently denied. Following the denial of second tier review, Coleman, proceeding *pro se,* filed an amended post-conviction petition in 2005. The attorney appointed to represent Coleman in his post-conviction challenge was the same attorney appointed to him in the direct appeal of the case. The post-conviction court subsequently denied post-conviction relief. On appeal, Coleman argues that he was denied his Sixth Amendment right to the effective assistance of counsel, specifically arguing that trial counsel was ineffective by failing to properly investigate and prepare the case. Following review, the judgment of the post-conviction court is affirmed with regard to all allegations of ineffective assistance of counsel at trial. However, plain error review of the record reveals an actual conflict of interest in that counsel appointed to perfect the direct appeal was also appointed to represent the Appellant in the amended portion of the post-conviction proceeding. Because the record is silent with regard to the conflict of interest issue, we vacate the judgment and remand for a determination of whether the Appellant was informed of the conflict and, after full disclosure, consented to the representation of appointed post-conviction counsel for purposes of the amended proceedings. If waiver is found, the post-conviction court shall enter an order accordingly and reinstate the original judgment. However, if the court finds that no waiver occurred, the court shall appoint new post-conviction counsel for the limited purpose of allowing Coleman to amend his post-conviction petition to include any issues which resulted from the unsuccessful delayed appeal. *See* Tenn. Sup.Ct. R. 28 §

(9)(D)(b)(3)(a).

**Factual Background**

The facts underlying the Appellant's convictions, as established on direct appeal, are as follows:

> ... [according to] a statement ... taken from the [Appellant] two days after the killing ..., the [Appellant] admit[ted] to shooting and killing a black male on July 12, 1997, in the parking lot at 915 East McLemore. The [Appellant] alleged in his statement that a robbery of the victim was planned by himself and three co-defendants.... The [Appellant] claimed that [co-defendant] Parrish originated the plan after the victim "walked up and showed a lot of money." According to the [Appellant], Parrish left and returned with a silver .38 revolver with black grips and was handing it to [co-defendant] Love when the [Appellant] intervened. In the [Appellant's] words, "I grabbed it and then we attempt to rob the guy. I walked over to the guy, everybody was standing around and so I shot him. Then I looked around, wasn't nobody there so I went in his pocket and got the money[.]" The [Appellant] in his statement alleged he shot the victim five or six times, took $210 from him, and shared it with the co-defendants.

***2** *State v. Howard Coleman,* No. W2002-01485-CCA-R3-CD (Tenn.Crim.App. at Jackson, Jan. 12, 2004). Two co-defendants testified against the Appellant at trial, identifying him as the person who planned the robbery and shot the victim. *Id.* The co-defendants further stated that they received none of the robbery proceeds. *Id.* Additionally, a bystander "testified that the [Appellant] looked like the individual he saw shooting." *Id.* Following a jury trial, the Appellant was convicted of premeditated murder, first degree felony murder, and especially aggravated robbery. *Id .* The two murder convictions were merged, and the Appellant was sentenced to life imprisonment without the possibility of parole. *Id.* Additionally, the court sentenced the Appellant to twenty years for the robbery conviction, to be served concurrently with the murder sentence. *Id.*

In April 2001, the Appellant filed a *pro se* post-conviction petition alleging multiple instances of ineffective assistance of counsel, including the failure to perfect a direct appeal in the case. Following the appointment of post-conviction counsel, an amended petition was filed. A post-conviction hearing was held on December 19, 2001, at which trial counsel and the Appellant testified. Following a determination that the Appellant was denied his right of appeal, the post-conviction court granted a delayed appeal in the case, with post-conviction counsel being appointed to represent the Appellant. Pursuant to Tenn. Sup.Ct. R. 28(D), the court, after having heard proof on the remaining allegations of ineffective assistance of counsel at trial, held in abeyance any ruling with regard to these remaining allegations pending the outcome of the direct appeal. A direct appeal was filed with this court challenging only the sufficiency of the convicting evidence. A panel of this court subsequently denied the appeal on January 12, 2004. *Id.* Permission to appeal to the Tennessee Supreme Court was denied on May 24, 2004. *State v. Howard Coleman,* W2002-01485-SC-R11-CD (Tenn. May 24, 2004).

On March 15, 2005, the Appellant filed an amended *pro se* petition for post-conviction relief. Counsel, who had represented the Appellant on direct appeal, was again appointed as post-conviction counsel. A second post-conviction hearing was held on December 21, 2005, at which both trial counsel and the Appellant again testified. No issues resulting from appellate counsel's handling of the direct appeal were included in the amended petition.

At the 2001 post-conviction hearing, the Appellant testified that trial counsel was appointed, along with a second attorney, to represent him following his preliminary hearing. He acknowledged that his case was originally filed as a capital case and stated that he was aware he could receive the death penalty if convicted. He testified that trial counsel met with him approximately ten to fifteen times and that trial counsel "somewhat" explained the charges against him. The Appellant acknowledged that trial counsel conveyed the State's offer of life with parole, which he refused. He explained he wanted to proceed to trial, despite trial counsel's urging him to accept the plea offer based upon counsel's belief that it was a "losing" case.

***3** The Appellant testified that trial counsel reviewed the statement which the Appellant had given to police, but he stated that he informed trial counsel that he did not recall giving a detailed statement to the police. He acknowledged that trial counsel, nonetheless, filed a motion to suppress

the statement. The Appellant also acknowledged that he never provided trial counsel with possible defense witnesses, that he had no alibi defense, and that he was provided a copy of the co-defendants' statements prior to trial. When asked what he believed that trial counsel should have done differently, the Appellant responded that "trial counsel should have gone out on his own and done investigating."

Trial counsel testified that he met with the Appellant on more than ten occasions and that he discussed the details of the case with him. He stated that the State provided him with open-file discovery and that he filed thirty-five to forty motions in the case. Trial counsel acknowledged urging the Appellant to accept the plea agreement because he believed it was in the Appellant's best interest to do so based upon the evidence. Nonetheless, he was prepared for trial when the Appellant chose to proceed. Because the Appellant's confession was crucial evidence, trial counsel filed a motion to suppress the statement, which was subsequently denied.

Trial counsel verified that the Appellant had provided no possible defense witnesses, other than family members who had no specific knowledge of the facts of the case. However, trial counsel stated that he, on his own, visited the crime scene and canvassed the area, searching unsuccessfully for possible eyewitnesses to the shooting. Additionally, trial counsel met with an investigative service several times, which was retained through court-ordered funding. Trial counsel acknowledged that he neither received nor reviewed a copy of the preliminary hearing transcript, stating he felt it was unnecessary because the Appellant's confession to the crime was more than sufficient evidence to establish probable cause. According to trial counsel, he devoted fifty hours of time outside the courtroom, in addition to over sixty hours in court, to the Appellant's case.

At the second post-conviction hearing, the Appellant, while acknowledging that trial counsel did in fact file a motion to suppress the statement on other grounds, expressed concern that he was not advised of his rights prior to giving the statement. The Appellant, on cross-examination, acknowledged that the transcript reflected that his Fifth Amendment rights were provided to him as shown in the transcript of his statement, but he denied that he read his rights prior to signing the statement. Trial counsel testified that he considered raising the issue at the motion to suppress hearing, but he asserted that he was unable to do so because, at the time of the hearing, the Appellant claimed that he had no recollection of making the statement at all. Thus, he had no proof supporting that claim.

***4** On July 13, 2006, the post-conviction court, after reviewing the transcript of the 2001 and the 2005 evidentiary hearings, denied the Appellant's petition by written order. This timely appeal followed.

**Analysis**

**I. Ineffective Assistance of Counsel at Trial**

On appeal, the Appellant has raised the single issue of ineffective assistance of trial counsel. To succeed on a challenge of ineffective assistance of counsel, the Appellant bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984), the Appellant must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn.Crim.App .1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

State v. Burns, 6 S.W.3d 453, 463 (Tenn.1999) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id.* at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." Fields v. State, 40 S.W.3d 450, 458 (Tenn.2001) (citing Tenn. R.App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn.1997)). However, *conclusions of law,* are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

On appeal, the Appellant argues that trial counsel was ineffective based upon the cumulative effect of various deficiencies characterized as failure "to properly investigate and prepare the case." Specifically, he contends that trial counsel: (1) failed to expend an adequate amount of time preparing for the case, spending only fifty hours outside of court appearances; (2) failed to discuss trial strategy, instead discussing only plea options with the Appellant; (3) failed to review the tape of the preliminary hearing in order to learn what crucial witnesses might testify to; (4) failed to challenge a photospread identification; (5) failed to employ expert investigative services, instead conducting investigations for which he was not trained; and (6) failed to "ably challenge" the admission of the Appellant's statement given to police on grounds that the Appellant was under the influence of narcotics.

***5** Initially, we are constrained to note that the Appellant has waived consideration of trial counsel's failure to challenge a photospread identification because he raises the issue for the first time on appeal. No allegations regarding this contention were contained in the Appellant's petition or developed at the post-conviction hearing. Additionally, we are precluded from reviewing the Appellant's assertion that trial counsel failed to "ably challenge" his statement on grounds that he was under the influence of narcotics.[FN1] At the post-conviction hearing, the issue of the Appellant's statement to the police was raised but in the context of a challenge to its admission based upon the fact that the Appellant had not been provided his *Miranda* rights. No proof was presented with regard to whether the Appellant was under the influence of drugs. We have consistently held that an appellant cannot change theories from the lower court to the appellate court. State v. Alder, 71 S.W.3d 299, 303 (Tenn.Crim.App.2001). "[A] party cannot assert a new or different theory to support the objection ... in the appellate court." State v. Adkisson, 899 S.W.2d 626, 634 (Tenn.Crim.App.1994). To do so constitutes waiver of the issue. *Id.*

FN1. We would also note, as addressed *infra,* that the issue is improper as part of an amended post-conviction petition following a delayed appeal, as the alleged error did not result from appellate counsel's handling of the delayed appeal. *See* Tenn. Sup.Ct. R. 28, § 9(D)(3)(a).

In denying the Appellant's petition, the post-conviction court found as follows:

> As the proof presented at the hearing, the only suggestion made by [the Appellant] as to any additional work his attorney might have performed was that the attorney might have "went out on his own, did a little more investigation or something." ... [Trial counsel], on the other hand, testified that he had been a practicing attorney for 26 years at the time of the trial, had tried numerous cases, visited the crime scene, canvassed the neighborhood, got open file discovery from the State, including the statements of the co-defendants, and went over all of this with the [Appellant] extensively in jail visits, along with Kevin Reed, a second attorney appointed [the Appellant]. [The Appellant] has failed to offer anything additional his attorney might have done which might have changed the outcome of the trial.
>
> [The] Appellant did not offer the names of any witnesses that he suggests his attorney should have interviewed or subpoenaed. [Trial counsel] testified that no names were furnished him, and that his personal canvassing of the neighborhood of the crime scene turned up no potential

witnesses not called by the State at the [Appellant's] trial.

... [The Appellant] does not suggest any motions left unfiled which would have affected the outcome of his trial.... [Trial counsel] filed numerous motions and had a pre-trial evidentiary hearing on the motion to suppress the [Appellant's] confession, which was decided against [the Appellant].

....

[The Appellant] has suggested no viable defense which could have been presented. He confessed to shooting the victim after he and his co-defendants had planned to rob him. His co-defendants testified against him in the trial, as well as bystanders who witnessed the [Appellant] shoot this unarmed young man in the chest, and then saw him shoot the victim repeatedly in the back while he was on the ground, attempting to crawl away, stating "Drop it off, drop it off."

***6** Following review, we conclude that the record before us does not preponderate against the post-conviction court's findings that trial counsel properly investigated and prepared the case for trial. A bare allegation that trial counsel has failed to perform in some manner, as asserted here, does not equate to ineffective assistance of counsel. To prevail, the Appellant must establish that, as a result of the particular omission or failure, (1) a benefit was lost and (2) as a result of the lost benefit, there was a reasonable probability that the case would have concluded differently if counsel had performed as suggested. *See* Burns, 6 S.W.3d at 463. The Appellant has failed to establish either of these factors with regard to his claims. For example, the Appellant offers no explanation of how spending more time preparing for the case, in addition to the fifty hours expended, would have affected the outcome of the trial, and he offers no proof as to what trial counsel could have discovered had he further personally investigated the facts or had hired additional investigators. *See Black v. State,* 794 S.W.2d 752, 757 (Tenn.Crim.App.1990). Moreover, the Appellant has failed to show how trial counsel viewing the preliminary hearing tape would have aided in the Appellant's defense. Clearly, trial counsel testified he was given open-file discovery, which would have contained evidence intended to be offered by the State at trial. His blanket assertion that trial counsel was not qualified to investigate the case is misplaced. The record clearly indicates that, in addition to his own efforts, trial counsel consulted with investigative services. Accordingly, we conclude that the Appellant's allegations of inadequate preparation and investigation must fail. As found by the post-conviction court, trial counsel spent many hours preparing the case, filed several motions, met with the Appellant on multiple occasions, and personally investigated the circumstances of the case. As noted by the State, there was overwhelming proof against the Appellant, including his own confession and the testimony of two co-defendants and one uninterested eyewitness. The Appellant asserts that the cumulative effect of the trial court's errors warrants a finding of ineffective assistance of counsel. Having concluded that the record supports no single finding of deficient performance or prejudice, this issue is without merit.

**II. Post-Conviction Issues Resulting from the Delayed Appeal**

Although not raised as an issue by the Appellant, plain error dictates that we address the issue of a conflict of interest which is apparent from the record before us. Tennessee Supreme Court Rule 28, § 9(D) governs the procedure to be employed following the granting of a delayed appeal in the context of post-conviction proceedings. The rule, with which the post-conviction court in this case complied, provides that the "court shall enter an order granting the petitioner a delayed appeal, staying the post-conviction proceedings pending the final disposition of the delayed appeal." Tenn. Sup.Ct. R. 28, § 9(D)(1)(b). The rule contemplates that the post-conviction court will hear proof on all post-conviction issues raised by the petition, although the trial judge is required to hold in abeyance its rulings on all issues other than the delayed appeal. However, the rule further provides that following the disposition of the direct appeal, the petitioner may amend the original petition to challenge any "new issues cognizable in a post-conviction proceeding result[ing] from the handling of the delayed appeal." Tenn. Sup.Ct. R. 28, § 9(D)(3)(a); *see also* State v. Evans, 108 S.W.3d 231 (Tenn.2003). This rule has the practical effect of allowing a petitioner to challenge the effectiveness of appellate counsel on direct appeal.

***7** Here, appellate counsel and post-conviction counsel on the amended petition following direct

appeal, were one and the same. While petitioners for post-conviction relief are not constitutionally entitled to the effective assistance of counsel, they do have a statutory right to counsel. *McCullough v. State,* 144 S.W.3d 382, 385 (Tenn.Crim.App.2003) (citing *Leslie v. State,* 36 S.W.3d 34, 38 (Tenn.2000)). "[T]his statutory right includes the right to be represented by conflict-free counsel." *Id.* (citing *Kevin Burns v. State,* No. W2000-02871-CCA-R3-PD (Tenn.Crim.App. at Jackson, Aug. 9, 2001)). When an attorney is placed in a position of divided loyalties between himself and his client, an actual conflict is created. *Id.* In *McCullough,* this court specifically held that representing a defendant in a post-conviction proceeding after having represented the defendant on direct appeal created an actual conflict of interest. *Id.* Thus, an actual conflict existed in this case as appellate/post-conviction counsel would be forced to review his own performance on direct appeal. Having concluded that an actual conflict existed, plain error review permits us to consider the error "to do substantial justice" in this case. *See* Tenn. R.Crim. P. 52(b). Because the record is silent with regard to the conflict of interest issue, we vacate the judgment and remand for a determination of whether the Appellant was informed of the conflict and, after full disclosure, consented to the representation of appointed post-conviction counsel for purposes of the amended proceedings. If the court finds no such waiver occurred, the post-conviction court shall appoint post-conviction counsel for the limited purpose of reviewing the Appellant's post-conviction petition involving those issues which may have resulted from the unsuccessful delayed appeal. However, if the Appellant did waive the conflict, the original judgment of the court should be reinstated.

## CONCLUSION

Based upon the foregoing, the Shelby County Criminal Court's denial of the Appellant's post-conviction petition is affirmed with regard to all issues involving the Appellant's allegations of counsel's ineffective assistance at trial. However, because of an actual conflict, the post-conviction court's ruling with regard to the amended petition is vacated and the case is remanded for a determination of whether the conflict was waived. If no waiver occurred, the post-conviction court shall appoint counsel to allow the Appellant to amend his petition to challenge any issues cognizable in a post-conviction proceeding which resulted from appellate counsel's handling of the delayed appeal. If the court finds that an appropriate waiver was made, the court shall enter an order accordingly, and the original judgment of the court shall be reinstated.

Tenn.Crim.App.,2007.
Coleman v. State
Not Reported in S.W.3d, 2007 WL 1651882 (Tenn.Crim.App.)

END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2002 WL 65993 (Tenn.Crim.App.)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

**NOT FOR CITATION**

Court of Criminal Appeals of Tennessee,
at Nashville.
Bequir Ymerli POTKA, Fatmir Agolli, Stavri Popa & Epison Pulaha,
v.
STATE of Tennessee.

No. M2000-02305-CCA-R9-CO.
Jan. 18, 2002.
Application for Permission to Appeal
Denied by Supreme Court
July 15, 2002.

Appeal from the Criminal Court for Davidson County, No.2000-C-1348; Steve Dozier, Judge.
Mark C. Scruggs, Nashville, Tennessee, for the Appellants, Bequir Ymerli Potka, Fatmir Agolli, Stavri Popa, and Epison Pulaha.

Paul G. Summers, Attorney General & Reporter; Jennifer Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the Appellee, State of Tennessee.

OPINION

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

JAMES CURWOOD WITT, JR., J.

***1** We granted the defendants' application for interlocutory appeal, *see* Tenn. R.App. P. 9, to review the trial court's disqualification of defense counsel based upon conflicting interests in counsel's representation of all four defendants. Because we conclude that the lower court acted within its discretion in disqualifying counsel from multiple representation, we affirm.

Fatmir Agolli, Bequir Potka, Stavri Popa and Epison Pulaha are charged with a variety of crimes apparently related to a barroom brawl. All four defendants are represented by one attorney, Mark C. Scruggs. On motion of the state, the trial court found that due to conflicting interests, the defendants should be required to retain separate counsel, thereby disqualifying Mr. Scruggs. The defendants maintain, as they did in the lower court, that they understand the potential for conflicting interests but, nevertheless, wish to be represented jointly by Mr. Scruggs.

In order to understand the conflict question, an explanation of the nature of the charges is pertinent. In indictment number 2000A463, returned March 24, 2000, Agolli and Potka were charged with four counts of aggravated assault, all four defendants were charged with one count of vandalism, and Potka was charged with one count of driving under the influence. This indictment was before the court when it made its ruling disallowing joint representation. Subsequently, a superseding indictment was returned which charged each of the four defendants with four counts of aggravated assault and one count of vandalism and which charged Potka with one count of driving under the influence.

At the hearing on the motion to disqualify, defense counsel acknowledged that there was a "different plea offer for three of them as opposed to one." He further acknowledged that "the problem with it is ... three who are not United States citizens could very well be deported." He stated this was the "holdup as far as that's concerned." Defense counsel stated he only talked to the defendants as a group, not individually, and advised them they could get separate counsel who could negotiate with the district attorney. He said that "in all likelihood, I think that would probably involve some type of cooperation." Defense counsel stated all defendants wanted him to continue to represent them. As stated, the trial court granted the state's motion to disqualify defense counsel.

The defendants moved the court for reconsideration of its order requiring separate counsel for each defendant, and they moved in the alternative for permission to pursue an interlocutory appeal. *See* Tenn. R.App. P. 9 (appeal by permission of the trial and appellate courts). The lower court entered an order granting permission to pursue an interlocutory appeal. The defendants then filed an application for interlocutory appeal with this court, and the state did not oppose it. We granted the application. We have now received the briefs and oral arguments, and the case is before us for disposition.

***2** The sole issue presented is whether the lower court erred in requiring that each of the four defendants be represented by separate attorneys. The defendants claim that there is no evidence of an actual conflict in this case, and in any event, they claim that they have each knowingly and intelligently consented to joint representation after disclosure of potential conflicts. The state counters with the argument that the trial court had the discretion to require separate counsel for each defendant upon a showing of either an actual conflict or a serious potential for conflicting interests. Furthermore, in the state's assessment, the trial court acted within that discretion in ruling that the potential conflicts in this case warranted separate counsel for each defendant.

We begin, of course, with the constitutional right to counsel, grounded in the Sixth Amendment. *See* U.S. Const. Amend. VI; *see also* Tenn. Const. art. I, § 9. The right to choose and be represented by counsel of one's choosing is "comprehended" by the Sixth Amendment, although the Amendment is targeted toward securing effective counsel for an accused, not unconditionally guaranteeing counsel of one's preference. *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *see State v. Carruthers,* 35 S.W.3d 516, 546 (Tenn.2000). Thus, the Sixth Amendment's right to counsel of choice is a qualified one, also referred to as a "presumption in favor of counsel of choice." *Wheat,* 486 U.S. at 159-60, 108 S.Ct. at 1697-98. This qualified right may be limited by the court if good cause exists. *State v. Parrott,* 919 S.W.2d 60, 61 (Tenn.Crim.App.1995).

Moreover, the existence of *actual* conflicts of interests may be good cause to disqualify counsel which overcomes an accused's presumption favoring counsel of his choice. *Parrott,* 919 S.W.2d at 61. Cases in which one attorney represents multiple defendants charged relative to the same criminal episode present situations of special concern due to the possibility of such conflicting interests. *Wheat,* 486 U.S. at 159-60, 108 S.Ct. at 1697.

The more difficult question is whether the *potential* for conflicting interests may constitute good cause for disqualification of counsel in multiple representation situations. The law on this point is not entirely clear in Tennessee.

The United States Supreme Court has said that as a function of one of the "circumscribed" aspects of the Sixth Amendment, a trial court acts appropriately in inquiring into "possible" conflicting interests and determining whether separate counsel is warranted. *Wheat,* 486 U.S. at 159-160, 108 S.Ct. at 1697. The high court has recognized the inherent difficulties in making this determination, which necessarily must be made before trial and therefore without the benefit of hindsight. *Id.* at 163, 108 S.Ct. at 1699. Although the court recognized a presumption in favor of counsel of choice, it noted the presumption could be overcome not only by a showing of actual conflict but also by a showing of serious potential for conflict. *Id.* at 164, 108 S.Ct. at 1700. Tennessee decisions on point are more circumspect in authorizing a trial court to disqualify counsel based upon potential conflict. This court has held that "an actual conflict, rather than the mere possibility [of conflicting interests]" must be shown before disqualification is justified. *State v. Parrott,* 919 S.W.2d 60, 61 (Tenn.Crim.App.1995);

State v. Oody, 823 S.W.2d 554, 558 (Tenn.Crim.App.1991). Under this line of authority, a court errs in basing a disqualification decision on "what might happen." *See* Parrott, 919 S.W.2d at 61.

***3** When considering the rule of *Wheat* in contrast with that of *Parrott* and *Oody,* we believe that the soundness of the state court decisions is questionable in light of United States Supreme Court precedent allowing disqualification based upon serious potential for conflict. *See generally* Wheat, 486 U.S. at 159, 108 S.Ct. at 1697. *Oody* cites no authority for its proposition that only an actual conflict will support disqualification, and *Parrott* cites only *Oody.* There is no suggestion in either *Parrott* or *Oody* that the Tennessee Constitution provides a defendant more protection than the qualified right to counsel of choice contemplated by the Sixth Amendment to the United States Constitution.[FN1] *See generally* Parrott, 919 S.W.2d at 61-62; Oody, 823 S.W.2d at 558. On issues of federal constitutional law, we are bound to follow the rulings of the United States Supreme Court as the ultimate authority on federal constitutional questions.[FN2] *State v. Pendergrass,* 13 S.W.3d 389, 397 (Tenn.Crim.App.1999), *perm. app. denied* (Tenn.2000). Thus, we conclude that, consistent with *Wheat,* a trial court has wide-ranging authority to disqualify counsel from representing multiple defendants if there is an actual conflict of interests or a serious potential for conflict. *See* Wheat, 486 U.S. at 159, 164-108 S.Ct. at 1697, 1700. Its exercise of that authority is subject to our review for abuse of discretion. *Clinard v. Blackwood,* 46 S.W.3d 177, 182 (Tenn.2001).

FN1. The defendant in this case makes no such argument, either.

FN2. Interestingly, our Rules of Criminal Procedure appear to require disqualification if it appears likely that a conflict will arise. Rule 44(c) provides,Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. *Unless it appears that there is good cause to believe no conflict of interest is likely to arise,* the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

Tenn. R.Crim. P. 44(c) (emphasis added).At first blush, Rule 44(c) appears not to apply to this case at all. The text of that rule refers to cases joined pursuant to Rule 8(b), but not 8(c). Rule 8(b) discusses joinder of *offenses.* Rule 8(c) discusses joinder of *defendants.* Our Rule 44(c) was patterned after Federal Rule of Criminal Procedure 44(c). *See* Tenn. R.Crim. P. 44(c), Advisory Comm'n Cmts. (subsection 8(c) added "to conform the rule to the similar federal rule"). Federal Rule 44(c) refers to Federal Rule 8(b), the latter of which covers joinder of defendants. There is no Federal Rule 8(c). Clearly, Tennessee Rule 44(c) contemplates multiple representation problems which may arise due to joinder of *defendants. See* Tenn. R.Crim. P. 44(c) ( "Whenever two or more defendants have been jointly charged pursuant to Rule 8(b)...."). We believe it apparent that the reference in Tennessee Rule 44(c) to Tennessee Rule 8(b) is an oversight and was intended to be a reference to Tennessee Rule 8(c). Thus, we conclude that Tennessee Rule 44(c) applies to cases in which there is a joinder of *defendants,* as there is in the case before us.

We think it is clear in the case at bar that serious potential for conflicting interests existed. The defendants' attorney was in a situation in which he would be hard-pressed to pursue plea bargaining for the benefit of one or some of his clients given the detrimental impact on the remaining clients, particularly if such an agreement called for the pleading defendant to testify against his remaining co-defendants. In that it appears that three of the four defendants are not United States citizens and might face deportation if convicted, the situation in this regard is exacerbated. If the case goes to trial with one attorney representing all four defendants, one or more of the defendants may wish to testify to facts exculpatory to himself but placing the blame on one or more of the other defendants. Counsel would then be in the position of sponsoring testimony detrimental to the affected defendants,

whom he also represents.

Jointly represented defendants may waive the right to conflict-free counsel. *See* Wheat, 486 U.S. at 161-62, 108 S.Ct. at 1698. However, the court may decline to accept the waiver and require individual representation of each defendant. *Id.* at 162, 108 S.Ct. at 1698. Because a trial court must make a disqualification decision before the trial takes place and therefore without the benefit of hindsight, it is afforded "substantial latitude" to refuse to accept waivers of conflicts from the affected defendants.[FN3] *Id.* at 163, 108 S.Ct. at 1699. A panel of this court has prescribed the following procedure for determining whether a defendant waives his right to conflict-free counsel and whether the court should accept the waiver.

FN3. "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict.... A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants." *Wheat,* 486 U.S. at 163, 108 S.Ct. at 1699.

***4** The [defendant] must be present in open court. The parties and the trial court should explain to the [defendant] how an actual or potential conflict may affect him and that the [defendant] has a right to be represented by separate counsel. The [defendant] must be questioned under oath by the parties and the trial court to determine if the [defendant] understands the actual or potential conflict. The [defendant] must state under oath whether he desires to waive the actual or potential conflict. If the [defendant] states he is willing to waive any actual or potential conflict of interest, the trial court shall permit the [defendant] to be represented by private counsel absent a compelling reason to the contrary.

*Shannon L. Smith v. State,* No. 02C01-9508-CR-00241, slip op. at 7-8 (Tenn.Crim.App., Jackson, Oct. 23.1997); *see* Tenn. R.Crim. P. 44(c). That procedure was followed in this case.

At the conclusion of the inquiry in this case, the trial court was persuaded that the defendants "are not aware or do not have the ability to understand the impact that the potential conflict could have on their defenses." Although the defendants answered all questions favorably to understanding the nature of the potential conflict, the benefits of separate representation, and the desire to proceed with joint counsel, the court expressed "concerns that all defendants were able to understand all of the questions...." There was a palpable communication barrier in that all four defendants were of Albanian extraction, and three of the four were able to communicate only through an interpreter. The court cited the "language barrier" as significant in its concern that the defendants did not knowingly and voluntarily waive their rights. The court had the opportunity to observe the defendants during their responses to questioning and evaluate any non-verbal indications that they may not have fully understood the meaning of their responses. *See* *Long v. Tri-Con Indus.,* 996 S.W.2d 173, 178 (Tenn.1999) (considerable deference must be afforded by appellate court to trial court's findings relative to weight and credibility of witness's testimony, as trial court has opportunity to observe the witness's demeanor and hear the testimony). In addition, one of the defendants expressed on the record his fundamental lack of understanding of the American judicial process. In this situation, we are constrained to hold that the trial court did not abuse its discretion in declining to accept the waiver and requiring separate counsel.

In so ruling, we are not holding, nor suggesting that the state can secure disqualification of able defense counsel by simply making different plea offers for different defendants or otherwise manufacturing a conflict. As the high court noted in *Wheat,*

the Government may seek to "manufacture" a conflict in order to prevent a defendant from having a particularly able defense counsel at his side; but trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of decision.

***5** 486 U.S. at 163, 108 S.Ct. at 1699.

Therefore, we affirm the lower court's order requiring that each defendant retain separate counsel.

Tenn.Crim.App.,2002.
Potka v. State
Not Reported in S.W.3d, 2002 WL 65993 (Tenn.Crim.App.)

END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.2d, 1997 WL 658993 (Tenn.Crim.App.)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Jackson.
Shannon L. SMITH, Keith Versie, AND Michael L. Wofford, Appellants,
v.
STATE of Tennessee, Appellee.

No. 02C01-9508-CR-00241.
Oct. 23, 1997.

FOR THE APPELLANT: Richard B. Fields Attorney at Law 699 Jefferson Avenue Memphis, TN 38105 George Kendricks L. Song Richardson Attorneys at Law 99 Hudson Street, Suite 1601 Steven W. Hawkins Attorney at Law 918 F Street, N.W., Suite 601 Washington, DC 20004

FOR THE APPELLEE: John Knox Walkup Attorney General & Reporter 500 Charlotte Avenue Nashville, TN 37243-0497 Michael J. Fahey, II Assistant Attorney General 450 James Robertson Parkway Nashville, TN 37243-0493 New York, N.Y. 10013 William L. Gibbons District Attorney General 201 Poplar Avenue, Suite 3-01 Memphis, TN 38103 John W. Campbell Assistant District Attorney General 201 Poplar Avenue, Suite 3-01 Memphis, TN 38103

OPINION

JONES, Presiding Judge.

***1** The issue this Court must resolve in this extraordinary appeal is whether the trial court abused its discretion by disqualifying counsel in this post-conviction proceeding based upon a conflict of interest amongst the petitioners. After a thorough review of the record, the briefs of the parties, and the law governing the issue presented for review, it is the opinion of this Court the judgment of the trial court should be reversed and this action remanded to the trial court for further proceedings consistent with this opinion.

On the evening of June 24, 1991, at approximately 9:12 p.m., three African-American males approached Terry and Elizabeth Wilbanks and attempted to rob them. When the couple attempted to flee, Terry Wilbanks was shot. He died as a result of this gunshot wound. Elizabeth Wilbanks was shot in the hip. She survived the gunshot wound.

The petitioners were arrested at a fast food outlet approximately two blocks from the situs of the robbery. The petitioners entered the following guilty pleas pursuant to a plea bargain agreement:

1.) Shannon L. Smith: murder in the perpetration of a robbery, confinement for life in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction;

2.) Keith Versie: murder in the perpetration of a robbery, confinement for life in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction; and

3.) Michael A. Wofford: facilitation to commit murder in the perpetration of a robbery, confinement for twenty-five (25) years in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction.

The petitioners filed a joint petition for post-conviction relief on April 20, 1995, in the Criminal Court for the Thirtieth Judicial District. The petition alleged the ineffective assistance of counsel and the entrance of involuntary pleas of guilty. The state filed an answer on May 3, 1995.

On or about the 30th day of May, 1995, the state filed a pleading entitled "Motion to Remove Counsel Due to Conflict of Interest." The motion alleged that (a) Wofford will be subject to a life sentence if his convictions are set aside, (b) counsel will use Wofford to benefit Smith and Versie, and (c) Wofford should be advised of the consequences of his actions in seeking to set aside his convictions. Based upon these concepts, the state asserted there was a conflict of interest between Smith and Versie on the one hand and Wofford on the other hand. Both the state and the petitioners rely upon the Sixth Amendment to the United States Constitution, Article I, § 9 of the Tennessee Constitution, and the Code of Professional Conduct, Tenn.Sup.Ct. R. 8.

***2** On July 27, 1995, Alan E. Glenn, a former assistant district attorney and presently in the private practice of law, entered a limited appearance on behalf of Wofford. On this same date, Mr. Glenn, a person of sterling character, advised the trial court he had talked to Wofford and Wofford's mother regarding the proceedings pending before the trial court. He explained to Wofford the potential for a conflict of interest and what may occur if his convictions were set aside. Wofford advised Glenn he wished to waive any conflict of interest and proceed with the suit for post-conviction relief with his two former co-defendants.

The trial court subsequently entered an order disqualifying counsel of record from representing any of the petitioners. The order recites that Wofford had waived any conflict of interest. However, the trial court ruled this waiver was not binding upon the court. According to the trial court, whether to permit the waiver of a conflict of interest rests within the sound discretion of the trial court.

I.

Since the creation of the Post-Conviction Act, the appellate courts of this jurisdiction have been unable to determine whether suits brought pursuant to the Act are civil or criminal in nature. The courts have referred to such proceedings as "criminal," "quasicriminal," and a "hybrid affair."

In *State v. Scales,* 767 S.W.2d 157, 158 (Tenn.1989), the issue before the supreme court was whether the waiver of the notice of appeal provision contained in Rule (4)(a), Tenn.R.App.P., could be applied in a post-conviction relief proceeding. The supreme court, stating "post-conviction proceedings are criminal in nature," held the waiver provision was applicable in post-conviction suits.

In *State v. Ronnie C. Styles,* Cocke County No. 03-S-01-9108-CR-00067 (Tenn., Knoxville, January 25, 1993), Styles was indicted for committing perjury in a post-conviction proceeding brought by Ronald Cassity. The question arose regarding the difference in the statute of limitations between criminal and civil cases. The court said in ruling:

> Neither party, as defense counsel has pointed out in the defense brief, have been able to discover a case in this jurisdiction directly pointing out whether a post-conviction proceeding is a civil matter or a criminal matter.
>
> We agree there has been a blur in the definition between civil and criminal cases heard under the provisions of the Post-Conviction Procedure Act. In this jurisdiction such proceedings have variously been referred to as quasi civil or quasi criminal. In *Mitchell v. State,* 512 S.W.2d 661, 663 (Tenn.Crim.App.1974), the Court of Criminal Appeals held a petition for habeas corpus and a post-conviction petition to be *pari causa* when the relief and procedure authorized by the Post-Conviction Procedure Act appears adequate and appropriate. We find the comment of the United States Supreme Court in *Smith v. Bennett,* 365 U.S. 708, 81 S.Ct. 895, 897, 6 L.Ed.2d 39 (1961), to be relevant in this case. In *Smith* the court said: "We shall not quibble as to whether in this context it be called a civil or criminal act.... The availability of a procedure to regain liberty lost through criminal process cannot be made contingent upon a choice of labels."

* * * *

**3* A post-conviction proceeding is a hybrid affair, involving an appeal from a criminal prosecution which is considered under civil rules of procedure.

* * * *

The procedural characteristics of the post-conviction remedy should be appropriate to the purposes of the remedy. While the post-conviction proceeding is separate from the original prosecution proceeding, the post-conviction stage is an extension of the original proceeding and should be related to it insofar as feasible.

Post-conviction review has become an established part of the criminal process. In formulating a rule we recognize that the post-conviction proceeding is procedurally separate and apart from the original criminal prosecution.... It seeks not to convict, but to set aside a conviction which is void or voidable because of the abridgement of constitutional rights. The base root of the proceeding is criminal. The post-conviction stage of a criminal trial is an extension of the original proceeding. The procedure by which a criminal conviction may be set aside is civil in nature, therefore, it is tried under the Rules of Civil Procedure and less stringent evidentiary rules apply.

*Styles,* slip op. at 6-9. In *Watkins v. State,* 903 S.W.2d 302, 305 (Tenn.1995), the supreme court essentially adopted the holding in *Styles* without making reference to the case.

The Tennessee Rules of Post-Conviction Procedure, created by the supreme court, add another dimension to this dilemma. Section 3(B) states "[n]either the Tennessee Rules of Civil Procedure nor the Tennessee Rules of Criminal Procedure apply to post-conviction proceedings...."

While the supreme court has made an effort to clarify the nature of post-conviction proceedings, the distinction remains blurred. After stating in *Styles* and *Watkins* the proceedings are civil in nature and are governed by the Rules of Civil Procedure, the supreme court has formulated a rule which states that neither the civil or criminal rules apply in these proceedings unless specifically designated by a particular provision of the rules. Tenn.Sup.Ct.R. 28 § 3(B).

II.

It has long been established that the right to counsel provisions embodied in the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution extend through the first appeal as of right. *Pennsylvania v. Finley,* 481 U.S. 551, 554-55, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539, 545-46 (1987); *House v. State,* 911 S.W.2d 705, 712-13 (Tenn.1995), *cert. denied,* 517 U.S. 1193, 116 S.Ct. 1685, 134 L.Ed.2d 787 (1996). In other words, there is no constitutional right to the assistance of counsel in post-conviction proceedings. *Carruthers v. State,* 814 S.W.2d 64, 69 (Tenn.Crim.App.), *per. app. denied* (Tenn.1991). As the supreme court said in *House,* "the federal constitution does not require that states provide an attorney to an indigent postconviction petitioner...." 911 S.W.2d at 712.

**4* The petitioner in a post-conviction proceeding has a statutory right to the appointment of counsel when the petition alleges a colorable claim that has not been waived, previously determined, or barred by the statute of limitations. Tenn.Code Ann. § 40-30-207(b)(1) (formerly Tenn.Code Ann. § 40-30-107). The supreme court has also provided for the appointment of counsel in post-conviction cases. Tenn.Sup.Ct.R. 13 § 1.

The appellate courts of this state have zealously guarded a petitioner's right to counsel in post-conviction cases. *See, e.g., Allen v. State,* 854 S.W.2d 873, 876 (Tenn.1993); *Swanson v. State,* 749 S.W.2d 731, 734-35 (Tenn.1988); *Martucci v. State,* 872 S.W.2d 947, 948 (Tenn.Crim.App.1993); *State v. Clark,* 774 S.W.2d 634, 636 (Tenn.Crim.App.1989); *State v. Mullins,* 767 S.W.2d 668, 670 (Tenn.Crim.App.1988), *per. app. denied* (Tenn.1989); *Childress v. State,* 695 S.W.2d 541, 543 (Tenn.Crim.App.1985); *Mayes v. State,* 671 S.W.2d 857, 859 (Tenn.Crim.App.1984); *Haynes v. State,* 637 S.W.2d 467, 468 (Tenn.Crim.App.1982). The number of unreported cases which have reversed the trial court for the failure to appoint counsel are legion. In *State v. Butler,* 670 S.W.2d 241, 243 (Tenn.Crim.App.), *per. app. denied* (Tenn.1984), this Court said "the assistance of counsel is necessary to aid both the petitioner and the courts in bringing this matter to a proper conclusion."

III.

The precise question this Court must resolve is whether (a) the petitioner is entitled to be represented by private counsel of his or her choice, (b) there is a conflict of interest in this case, and, if so, whether (c) the petitioner has a right to waive a conflict of interest created by joint representation. The appellate courts of this state have not addressed these issues.

A petitioner in a post-conviction action has a qualified right to be represented by retained private counsel of his or her choice. For instance, retained private counsel must be licensed to practice law in Tennessee and be in good standing with the appropriate agencies. Counsel licensed in another state may represent the petitioner if counsel complies with the *pro hac vice* requirements contained in the Supreme Court Rules. Of course, there are numerous other factors that could affect this qualified right.

In this case, the facts do not create a conflict of interest. All three petitioners were convicted for engaging in the same criminal conduct after they entered their respective pleas of guilty. The grounds raised in the petition are common to all three petitioners. If each petitioner was granted a separate evidentiary hearing, or each granted a separate lawyer, the same evidence would be adduced at each hearing or by each lawyer. In short, whether or not there may be disparity in sentencing if the petitioners are granted a new trial and are convicted does not create a conflict of interest in this proceeding. However, separate counsel may be required to represent the petitioners if a new trial is granted.

***5** Assuming *arguendo* there is a conflict of interest based upon multiple representation in a post-conviction action, the parties should be given the opportunity to waive the conflict in order to be represented by the same lawyer. Here, the state alleged Michael Wofford presented a conflict of interest, and private counsel should be barred from representing any of the petitioners. Separate counsel conferred with Wofford and his mother and announced to the trial court Wofford understood the possibility of a conflict of interest. However, he was willing to waive the conflict to be represented by private counsel filing the petition on his behalf.

The statements of counsel are insufficient, as a matter of law, to constitute a waiver of a potential conflict of interest.[FN1] The petitioner must be present in open court. The parties and the trial court should explain to the petitioner how an actual or potential conflict may affect him and that the petitioner has a right to be represented by separate counsel. The petitioner must be questioned under oath by the parties and the trial court to determine if the petitioner understands the actual or potential conflict. The petitioner must state under oath whether he desires to waive the actual or potential conflict. If the petitioner states he is willing to waive any actual or potential conflict of interest, the trial court shall permit the petitioner to be represented by private counsel absent a compelling reason to the contrary. In short, a trial court should not overrule the informed decision of the petitioner who knowingly and intelligently waives either a potential or actual conflict of interest, decides to be represented by his retained counsel of choice, and agrees to accept the consequences of his decision. *See* State v. Parrott, 919 S.W.2d 60, 62 (Tenn.Crim.App.1995).

FN1. When a member of this panel asked the attorney arguing the merits of the petitioners' case if evidence had been presented regarding Wofford's desire to waive any potential or actual conflict of interest that might exist, counsel stated evidence had been presented at the hearing. The record, as previously noted, does not contain evidence of this fact. The statements of counsel do not constitute evidence. *See* *Delk v. State,* 590 S.W.2d 435, 440 (Tenn.1979); *State v. Dykes,* 803 S.W.2d 250, 255 (Tenn.Crim.App.), *per. app. denied* (Tenn.1990).

While Tenn.R.Crim.P. 44(c) is not applicable in post-conviction actions, the rule serves as a guideline as to how a trial court should proceed when a party asserts or it is readily recognized that an actual or potential conflict of interest may exist. Such a procedure will preserve the right to counsel in post-conviction actions prescribed by statute and rule.

This cause is remanded to the trial court for further proceedings consistent with this opinion.

WELLES and SMITH, JJ., concur.

Tenn.Crim.App.,1997.
Smith v. State
Not Reported in S.W.2d, 1997 WL 658993 (Tenn.Crim.App.)

END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2006 WL 2310597 (Tenn.Crim.App.)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Nashville.
STATE of Tennessee
v.
Billy Jackson COFFELT.

No. M2005-01723-CCA-DAC-CD.FN1

FN1. The petitioner's appeal of the denial of his petition for post-conviction relief under case number M2005-00097-CCA-R3-PC was consolidated with the delayed appeal of his convictions in case number M2005-01723-CCA-DAC-CD.

Assigned on Briefs Feb. 14, 2006.
Aug. 8, 2006.

Direct Appeal from the Criminal Court for Davidson County, No. D-1179; Cheryl Blackburn, Judge.
David M. Hopkins, Nashville, Tennessee, for the appellant, Billy Jackson Coffelt.

Paul G. Summers, Attorney General & Reporter; Leslie Price and Sophia Lee, Assistant Attorneys General; Victor S. Johnson, III, District Attorney General; and Brett Gunn and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

## OPINION

GARY R. WADE, P.J.

***1** The petitioner, Billy Jackson Coffelt, was convicted in 1983 of assault with intent to commit first degree murder and assault with intent to commit robbery with a deadly weapon. The trial court imposed a sentence of life for the conviction of assault with intent to commit first degree murder and a sentence of not less than ten and not more than twenty-one years for the conviction of assault with intent to commit robbery. There was no direct appeal. After seventeen years of protracted litigation, the post-conviction court granted the petitioner a delayed appeal of his convictions. At the same time, the post-conviction court denied the remaining claims in the petition for post-conviction relief. The petitioner filed separate notices of appeal in each case. The cases were later consolidated by this court upon motion of the petitioner. The single issue presented in the petitioner's delayed appeal is whether the evidence is sufficient to support the convictions. In his appeal of the denial of his post-conviction petition, the petitioner asserts that he was denied the effective assistance of counsel at trial. Because the evidence was sufficient to support the convictions, the judgments of conviction as to the delayed appeal are affirmed; however, because the petitioner was denied the effective assistance of counsel at trial, the judgment of the post-conviction court denying relief must be reversed, the convictions vacated, and the cause remanded for a new trial.

The petitioner and a co-defendant, Terry Campbell, were jointly tried for the shooting and attempted robbery of the victim on July 11, 1980. The petitioner was subsequently convicted of assault with intent to commit first degree murder and assault with intent to commit robbery. He did not perfect a direct appeal of the convictions. In 1987, the petitioner filed a petition for post-

conviction relief. The petition was dismissed without a hearing six months later. *See State v. Billy J. Coffelt,* No. M2001-03073-CCA-MR3-PC (Tenn.Crim.App., at Nashville, July 2, 2003) (Coffelt II); *State v. Billy J. Coffelt,* No. M1998-00337-CCA-R3-CD (Tenn.Crim.App., at Nashville, Feb. 1, 2001) (Coffelt I). Eleven years later, the petitioner, apparently unaware of the dismissal, filed a motion asking about the status of his petition and seeking to set an evidentiary hearing on his claims. The post-conviction court denied the motion on the basis of the earlier dismissal. The petitioner then filed an unsuccessful motion for delayed direct appeal. On appeal, this court remanded the case to the post-conviction court for an evidentiary hearing to determine "whether the [petitioner] received due notice of the denial of his post-conviction petition." *Coffelt I,* slip op. at 2. Upon remand, the post-conviction court concluded that the petitioner " 'was not aware, through his own knowledge or knowledge that could be attributed to him, of the final judgment denying his Post-Conviction Petition,' " *see Coffelt II,* slip op. at 2, but nevertheless denied the petition without a hearing. On appeal after remand, this court concluded that "it was error for the post-conviction court to summarily dismiss the petition without holding an evidentiary hearing" and remanded for a hearing on the claims raised in the post-conviction petition. *Coffelt II,* slip op. at 3.

***2** Upon remand, the post-conviction court appointed counsel. An amended petition was filed and an evidentiary hearing was held on August 2, 2004, some twenty-four years after the crimes. Ultimately, the post-conviction court ruled that the petitioner was entitled to a delayed appeal pursuant to Tennessee Code Annotated section 40-30-118 (1983) "[i]n the interest of justice." In the same order, however, the post-conviction court denied the remainder of the petitioner's claims for post-conviction relief. The petitioner subsequently filed a notice of appeal to this court based upon the grant of the delayed direct appeal of his convictions. He also filed a separate notice of appeal based upon the post-conviction court's denial of his remaining post-conviction claims.

In *Gibson v. State,* 7 S.W.3d 47, 50 (Tenn.Crim.App.1998), this court established procedural guidelines for a delayed appeal. This court ruled that when such an appeal was warranted, as in this instance, the remaining post-conviction allegations should be dismissed without prejudice while the direct appeal is in process. Under the procedural guidelines set forth in that case, the dismissal was to be without prejudice so that, at the conclusion of the direct appeal, a subsequent petition for post-conviction relief could be filed without any concern over procedural bars such as waiver or previous determination. *See* Tenn.Code Ann. § 40-30-106(g), (h) (2003); *cf.* Tenn.Code Ann. § 40-30-102(c) ("[I]f a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed."). Later, in 2002, our supreme court amended Rule 28 of the Rules of the Supreme Court relating to the grant of a delayed appeal. That rule now provides as follows:

> Upon determination by the trial court that the petitioner was deprived of the right to file an appeal pursuant to Rule 3, Tennessee Rules of Appellate Procedure, the trial court shall apply the procedures set out in Tennessee Code Annotated section 40-30-[1] 13.

Tenn. Sup.Ct. R. 28 § 9(d)(1)(a). In *State v. Ben Thomas Dowlen,* No. M2003-00508-CCA-R3-CD (Tenn.Crim.App., at Nashville, July 20, 2004), *perm. app. denied* (Tenn. Nov. 15, 2004), this court addressed the change in procedure mandated by the amendment, observing that "[a]lthough the supreme court provided for a stay of the post-conviction collateral-attack proceedings pending a Tennessee Rule of Appellate Procedure 11 delayed appeal and pending a Rule 3 delayed appeal granted by the *appellate* court, Rule 28 makes no stay provision when the *post-conviction* court grants a Rule 3 appeal." *Id.,* slip op. at 2. Describing the absence of such a provision as "conspicuous," this court concluded that the amendment authorized the trial court to simultaneously grant a delayed appeal and deny post-conviction relief. *Id.* Because our supreme court has, by rule, approved the procedure utilized in this case, this court is in the unusual position of considering a delayed direct appeal at the same time as an appeal of the denial of post-conviction relief.

I. Delayed Appeal

***3** The only issue presented in this delayed appeal is whether the evidence was sufficient to support the convictions. The petitioner contends that the evidence was insufficient because it consisted primarily of the questionable testimony of an accomplice, Cathy Campbell. The state submits that the evidence was sufficient.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R.App. P. 13(e); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Liakas v.. State*, 286 S.W.2d 856, 859 (1956). Because a verdict of guilty against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn.1992).

As to the conviction for assault with intent to commit first degree murder, the statute in effect at the time of the crime provided, in pertinent part, as follows:

> Whoever shall feloniously and with malice aforethought assault any person, with intent to commit murder in the first degree, or shall administer or attempt to give any poison for that purpose, though death shall not ensue, shall, on conviction, be imprisoned in the state penitentiary for not less than five (5) nor more than twenty-five (25) years.

Tenn.Code Ann. § 39-604(a) (1980) (repealed 1982). Assault with intent to commit robbery was defined as follows:

> Whoever shall assault another, with intent feloniously and willfully to commit a robbery, shall, on conviction, be imprisoned in the penitentiary not less than three (3) years nor more than fifteen (15) years. If the assault is committed by means of a deadly weapon, whether injury results to the person assaulted or not, the penalty on conviction shall be imprisonment in the penitentiary for not less then (sic) five (5) years nor more than twenty-one (21) years.

Tenn.Code Ann. § 39-607(a) (1980) (repealed 1982).

At trial, the victim, Bernard Tefteller, testified that shortly before midnight on July 10, 1980, he was drinking at the V.I.P. Lounge on Murfreesboro Road in Nashville when Cathy Campbell came into the club and initiated a conversation with him about the pinball machine. He recalled that after a short while, Ms. Campbell suggested that they "go someplace else that is a little bit more exciting and has better music." At that point, the two left in the victim's car and drove to a parking lot where the driver of a dark green vehicle pointed a gun at the victim and said, "Hold it! Vice Squad!" The victim testified that he was shot in the arm as he "jerked the car in gear," suffering a broken bone and a torn muscle. He described the weapon used as a .45 automatic. The victim stated that he was able to see both the driver and the passenger of the other vehicle clearly during the offense. According to the victim, he tried to drive away after the shooting but Ms. Campbell "kept jerking the gearshift" and said, "You are not going anywhere; we have got you."

***4** The victim testified that despite Ms. Campbell's interference, he was able to drive to a Ryder Truck Rental, where employees called for the police and an ambulance. The victim identified the petitioner as the shooter and the co-defendant, Terry Campbell, as the passenger in the dark green vehicle on the night of the offenses. According to the victim, approximately two weeks after police returned his vehicle to him, he and a coworker "got in the car and started tearing the car apart and found what was left of the bullet." The victim testified that he delivered the spent bullet to police.

Cathy Campbell, who was married to the co-defendant at the time of the offense and at trial, testified that she met the petitioner during the spring of 1980. According to Ms. Campbell, she was "riding around out in south Nashville" on the night of the offenses with the co-defendant and the petitioner, who suggested that she go into the V.I.P. Lounge alone "and bring a man out, any man,

and take him with me somewhere and get him to park the car" so that the petitioner could "rob him." Ms. Campbell stated that she agreed to take their victim to a designated place "off the main road." She testified that the plan included the use of a .45 caliber handgun that she had stolen from her father to complete the robbery.

Ms. Campbell testified that she went into the V.I.P. Lounge, initiated a conversation with the victim, and, after a short time, asked him "if he would like to leave ... and go smoke some marijuana." According to Ms. Campbell, she directed the victim to the designated location and, less than five minutes later, the petitioner "pulled up in the car" and pointed the .45 out the window and said, 'Vice squad.' She recalled that as the victim attempted to drive away, she heard a gunshot. At trial, she claimed that she did not see the co-defendant in the car at the time of the shooting. She also admitted that she had initially told police that a man named Herston Kelley FN2 had committed the offenses because she "didn't want [the petitioner] to get in any trouble."

FN2. In the transcript of the evidentiary hearing, this individual's name is spelled "Hurston Kelly."

During cross-examination, Ms. Campbell admitted that she had consumed Valium and alcohol on the night of the offenses. She acknowledged that the charges against her for her role in the offenses had been retired as the result of her agreement to become a witness for the state.

Officer Jerry Moore of the Metro Police Department, who participated in the investigation, testified that approximately six weeks after the offenses, the victim provided him with what he believed to be "a spent .45 caliber slug." Officer Moore stated that when he showed five photographs to the victim, the victim selected two of the photographs as being similar to the shooter. One of the two men was the petitioner.

Officer Preston Perkinson, who was also involved in the investigation, testified that the firearms ammunition records at LaBurt's Market in Nashville indicated that Ms. Campbell had purchased .45 caliber ammunition but the date of the purchase was unclear. Officer Perkinson stated that when he prepared a second photograhic lineup, the victim positively identified the petitioner as the shooter. Officer Perkinson claimed that he was unaware that Officer Moore had previously shown the victim a photographic lineup.

***5** Phillip Denning, a defense witness, testified that he and his wife held their annual cook-out on July 11, 1980, and that the petitioner attended the party. He stated that the party lasted "anywhere from 12:00 [noon] ... that day until it just die[d] off at 2:00 or 3:00 in the morning." According to Denning, guests were asked to make donations to cover the cost of the food and the band and that the petitioner was in charge of collections. Denning claimed that both the petitioner and the co-defendant stayed at the party throughout the evening until the early morning hours. He testified that the scene of the shooting was a thirty-five to forty-five minute drive from his residence. During cross-examination, Denning admitted that although he had no independent recollection of the date of the cookout, he had a calender from 1980 that indicated that the party occurred on July 11.

Robert Hutchison, also a defense witness, testified that he attended the Dennings' cook-out and that the petitioner and co-defendant were present throughout the entire evening. Hutchison conceded that he had no independent recollection of the date of the party but recalled that the annual event usually occurred in July. James Paul Estes also testified that the petitioner attended the Dennings' party and stayed throughout the late evening hours and into the early morning hours on the following day. Estes was unable to provide a date for the event.

From this testimony, the jury returned verdicts against the petitioner for assault with intent to commit first degree murder and assault with intent to commit robbery. The victim, who identified the petitioner as the shooter, testified that he was shot in the arm and that his injuries required several surgeries over the course of more than a year. Cathy Campbell testified that she planned the robbery along with the petitioner and the co-defendant and was with the victim when he was shot. Although

the petitioner claims that Ms. Campbell's testimony was not credible, questions of credibility are resolved by the jury and not by this court. *Liakas,* 286 S.W.2d at 859. As to the alibi defense, the state presented witnesses who testified that the shooting occurred during the early morning hours of July 11, 1980, while the Dennings' annual cookout did not begin until noon that day. Under these circumstances, it is our view that he evidence was sufficient to support the convictions.

II. Post-Conviction Petition

In his petition for post-conviction relief, the petitioner asserted that he was denied the effective assistance of counsel at trial. Specifically, he claimed that his trial counsel was ineffective by failing to preserve his right to a speedy trial, by failing to adequately investigate the facts of the case, by failing to file a motion to suppress the pretrial identification by the victim, by failing to object to the introduction into evidence of a bullet found in the victim's car, by failing to object to the introduction of a receipt for the purchase of ammunition, by failing to request a continuance, and by failing to file a Notice of Alibi. Finally, he contended that his trial counsel had an actual conflict of interest by also undertaking representation of the co-defendant.[FN3]

FN3. While the petitioner also claimed that his trial counsel was ineffective by failing to perfect a direct appeal, this claim was resolved by the post-conviction court's grant of a delayed appeal.

***6** At the evidentiary hearing, which was held some seventeen years after the petitioner filed his original petition for post-conviction relief, the petitioner's sister, Wilma Jo Poole, testified that at the time of the offenses, the petitioner and Ms. Campbell were involved in a romantic relationship. Ms. Poole claimed that the two had lived with her and had slept with each other in the same bed for approximately six months. She recalled that Ms. Campbell was married to the co-defendant during that time and that the petitioner and Ms. Campbell had "parted ways" by the time of the trial.

The petitioner testified that he agreed to pay trial counsel $15,000 to represent both him and the co-defendant, who was dating and living with the petitioner's sister at the time. According to the petitioner, the co-defendant had agreed to reimburse him for half of the fee but never did so. The petitioner recalled that payment was secured by a lien on his father's house, which the petitioner stood to inherit upon his father's death. He stated that trial counsel drew up a contract for payment on the criminal case which provided for payment of $15,000 plus ten percent in interest for each year that the bill remained unpaid. At the same time, trial counsel drew a will for the petitioner's father, which provided that the petitioner would inherit the residence. The petitioner testified that trial counsel had the property sold at auction in 1990, some ten years after the offense, receiving $24,000 from the transaction.

The petitioner testified that after the jury verdicts, his trial counsel failed to file a motion for new trial and that he "went on to prison and ... never saw [trial counsel] anymore after that." The petitioner claimed that after he was charged, he saw his trial counsel only once and did not see him at all between the time of his arraignment and the time of trial. He contended that trial counsel failed to preserve his right to a speedy trial by refusing to file a motion demanding trial or asking for dismissal. According to the petitioner, although the offense occurred in July of 1980, he was not indicted until September of 1982 and his trial was not until October of 1983. The petitioner explained that after his initial arrest in 1980, the case was dismissed by the General Sessions Court when the victim failed to prosecute the case. He claimed that he was surprised when he was informed of the indictment two years later.

The petitioner also contended that his trial counsel failed to adequately investigate the case. According to the petitioner, he informed his trial counsel that he could provide witnesses to verify his whereabouts on the day of the offense but that trial counsel failed to interview those witnesses prior to the trial and failed to secure their presence at trial. The petitioner recalled that when he realized that his alibi witnesses were not present, he sent his sister to bring them to court. The petitioner asserted that even after the witnesses arrived, trial counsel failed to argue an alibi defense. He also claimed that if trial counsel had adequately investigated the case, he would have realized that the

"true" offense date was July 10 rather than July 11. According to the petitioner, he went to work on the 10th, helped a friend install a stereo in his car until approximately 9 p.m., and then returned to his father's house, where he lived at the time. He testified that his father and the friend he had helped, both of whom had died since the trial, could have verified this information.

***7** The petitioner testified that trial counsel failed to adequately prepare, claiming "[h]e just basically got discovery three days before trial and went to trial ... without him doing any investigation or question[ing] any witnesses whatsoever." The petitioner claimed that he specifically asked trial counsel to determine prior to trial whether the gun allegedly used during the robbery had been stolen, as Cathy Campbell contended. He recalled that counsel failed to act on his suggestion and "never really" cross-examined Ms. Campbell about the gun at trial.

The petitioner also claimed that trial counsel should have filed a motion to suppress the pretrial identification by the victim. According to the petitioner, the victim initially failed to make a positive identification and identified him only when shown a second photographic array which contained the same picture as in the initial lineup. The petitioner also contended that trial counsel should have objected to a bullet the victim claimed to have found in his car after the offenses based upon the lack of a proper chain of custody.

The petitioner insisted that his trial counsel failed to adequately cross-examine Cathy Campbell at trial, arguing that she should have been impeached with the initial statement she gave to the police, wherein she claimed that she committed the crime with Hurston Kelly. The petitioner claimed that he had met Kelly while in prison and that Kelly had informed him that Ms. Campbell had attempted to blame him for the crime because she was upset that he had ended their romantic relationship. The petitioner contended that trial counsel should have asked Ms. Campbell about his romantic relationship with her for impeachment purposes:

> [H]e never brought any of that up.... [O]nce Cathy testified that she didn't see [the co-defendant] in the passenger's seat of the car that night, [trial counsel] sort of tore back. He didn't really tear into her. He didn't really get into her at all after that, you know, I don't know if he was trying to protect [the co-defendant], but he let her go [without adequate cross-examination]....

The petitioner also testified that his trial counsel failed to impeach Ms. Campbell with a prior statement wherein she had claimed that a "friend" had dropped her off at the V.I.P. Lounge, which was different than her testimony at trial:

> [O]nce Cathy ... didn't put Terry in the passenger's seat of that car, I believe at that point, [trial counsel] just pulled back on it. He asked her about some drug problems and stuff like that, but he didn't really ... impeach her the way you are supposed to when you know a witness is lying.... I don't know if he was trying to protect [the co-defendant], but he just let me go.... That is the way I feel about it.

During cross-examination by the state, the petitioner conceded that trial counsel had represented him on several matters, including jury trials in Sevier and Davidson Counties, during the time that this case was pending. He testified that he was aware of the facts of this case because Ms. Campbell telephoned him on July 11, 1980, while he was preparing to attend the Dennings' barbecue and told him that "she had gotten into some trouble." He claimed that Ms. Campbell "pleaded with" him to take her to the party and that, on the way, she informed him that she had been arrested on the previous evening but had not been charged. According to the petitioner, Ms. Campbell told him that she did not know the identity of either the victim or the shooter and had claimed that "she was up there smoking a joint with somebody and the guy had pulled up beside her." The petitioner conceded that he knew that "the incident that Ms. Campbell was involved in ... had occurred before" the evening of the Dennings' party. He also acknowledged that the only date contained in the indictment was July of 1980.

***8** Trial counsel, a witness for the state, testified that at the time of the petitioner's trial, "there was no general practice of filing a motion for discovery" and contended that the generally accepted practice was to "sit down with the District Attorney and whatever information you could glean from

the file, the General would normally give to you." As to the filing of other pretrial motions, trial counsel stated that he did not recall "that it was done then." He maintained that he could not remember anything specific with regard to the trial because of the passage of time until the evidentiary hearing. He could not even recall whether he had represented both the petitioner and the co-defendant, explaining that he did not "dispute the record" and observing that "the usual practice back then" permitted dual-representation. Trial counsel also contended that at the time of the petitioner's trial, attorneys were not required to file a motion to withdraw prior to resigning from the case after the filing of a motion for new trial.

At the conclusion of the hearing, the post-conviction court granted the petitioner a delayed appeal but denied relief with regard to his claims of ineffective assistance of counsel. The court concluded that trial counsel had adequately investigated the case and that, even if he had not done so, the petitioner had failed to prove that he had been prejudiced by any alleged deficiency in the investigation. The post-conviction court determined that trial counsel was not deficient by failing to file a Notice of Alibi and observed that the petitioner was "confused" about the offense date. The court ruled that the petitioner was not prejudiced by trial counsel's failure to challenge the pretrial identification by the victim or by trial counsel's failure to challenge the chain of custody of a bullet found in the victim's car. Finally, the post-conviction court, observing that it was bound by this court's opinion in the co-defendant's appeal, concluded that the petitioner was not prejudiced by trial counsel's dual representation.

In this appeal, the petitioner contends that he was denied the effective assistance of counsel at trial. He specifically asserts that his trial counsel was ineffective by failing to adequately investigate, by failing to request discovery, by failing to file a Notice of Alibi and subpoena alibi witnesses, by failing to preserve his right to a speedy trial, by failing to file a motion to suppress the pretrial identification by the victim, by failing to object to the admission into evidence of a bullet found in the victim's car and a receipt for the purchase of ammunition, and by having an actual conflict of interest. The state submits that trial counsel performed adequate pretrial investigation and that the record establishes that trial counsel received discovery from the state prior to trial. The state also submits that the petitioner was not denied a speedy trial, that the pretrial identification was not unduly suggestive, that the bullet was properly admitted into evidence, and that the ammunition receipt was not admitted into evidence. Finally, while the state concedes that there was a conflict of interest, it contends that the petitioner failed to establish that he was prejudiced by trial counsel's joint representation.

***9** Under our current statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. *See* Tenn.Code Ann. § 40-30-110(f) (2003). Under the version of the Post-Conviction Procedure Act in effect at the time of the filing of the petition in this case, however, the petitioner was only required to establish his claims by a preponderance of the evidence. *See* *Clenny v. State,* 576 S.W.2d 12, 14 (Tenn.Crim.App.1978). On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *Brooks v. State,* 756 S.W.2d 288, 289 (Tenn.Crim.App.1988). The burden is on the petitioner to show that the evidence preponderated against those findings. *Clenny,* 576 S.W.2d at 14.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington,* 466 U.S. 668, 693 (1984). The error must be so serious as to render an unreliable result. *Id.* at 687. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn.1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn.Crim.App.1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn.2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn.1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn.2001); *see also* State v. England, 19 S.W.3d 762, 766 (Tenn.2000).

A.

***10** The petitioner first asserts that his counsel was ineffective by failing to adequately investigate the facts of the case. He contends that if counsel had investigated properly prior to trial, he would have been aware that the offense was alleged to have occurred during the late evening hours of July 10 and early morning hours of July 11 rather than the late evening hours of July 11. The petitioner claims that he summoned witnesses to verify his whereabouts late on July 11 as a result of the inaccurate information. According to the petitioner, his father and a friend could have verified that he was at home on the evening of July 10. The petitioner testified that during the seventeen-year delay between the filing of his original post-conviction petition and the evidentiary hearing, both potential witnesses had died. The petitioner also asserts that trial counsel failed to investigate Cathy Campbell's claim that she had stolen from her father the weapon used during the robbery. In addition, the petitioner contends that trial counsel failed to locate, interview, or subpoena any potential witnesses and failed to request discovery. Trial counsel testified that he had no specific recollections about the facts of the petitioner's case but did note that the filing of discovery requests was not generally done at the time of the petitioner's trial.

The post-conviction court concluded that "trial counsel did in fact conduct investigation and even called witnesses on [the][p]etitioner's behalf as demonstrated by the trial transcript." The court also determined that although trial counsel may not have met with the petitioner specifically regarding this case, "the evidence at the evidentiary hearing showed that [trial counsel] had a longstanding relationship with [the][p]etitioner, representing him on several trials.... Given the representation on multiple cases in close proximity, discussions regarding [those cases] may have involved discussions regarding the other pending cases." Finally, the post-conviction court ruled that the petitioner had failed to establish that he was prejudiced by any alleged deficiency in trial counsel's investigation.

Initially, it is our view that the record does not support the post-conviction court's finding that trial counsel conducted an investigation prior to the petitioner's trial in this case. Trial counsel specifically testified that he could not recall any details about the petitioner's case and did not even claim that he had conducted an investigation. There is simply no evidence that that he interviewed any witnesses. Furthermore, the trial transcript establishes that the three defense witnesses were summoned to court by the petitioner's sister, Wilma Jo Poole. There is no indication that trial counsel interviewed them prior to their testimony. It was unrefuted that the petitioner had asked trial counsel to subpoena the witnesses. Ms. Poole had to leave the trial in order to secure their presence. Preparation by trial counsel might have led to the discovery that the witnesses would be testifying to alibi for a day after the crime.

***11** Nevertheless, the petitioner has failed to establish that he was prejudiced by any deficiency in trial counsel's pretrial investigation. At the evidentiary hearing, he expressed an awareness that the crimes occurred on the evening and early morning hours immediately prior to the Dennings' cookout. He stated that Ms. Campbell had, in fact, told him so. The victim reported that the offense occurred during the late evening hours of July 10 and early morning hours of July 11. The testimony provided at trial by the victim and Ms. Campbell confirmed that report. The indictment did not specify a date. It

is unclear from the record why the petitioner believed that the offense occurred during the late evening hours of July 11. His testimony at the evidentiary hearing suggests that he was simply confused about the timing of the offense. Because there was no discrepancy in the date or time of the offense, trial counsel could not have been deficient for failing to have discovered that which did not exist.

Further, the petitioner failed to establish that there was information regarding the theft of the weapon that would have been relevant and admissible at his trial. Finally, the petitioner conceded that the witnesses he wanted to testify on his behalf were, in fact, witnesses at the trial.

B.

The petitioner next contends that his trial counsel was ineffective by failing to file a Notice of Alibi, thereby depriving him of the right to present a defense. He also asserts that trial counsel should have requested a continuance when it became apparent that there was a discrepancy in the time frame of the offenses. The record establishes that the victim testified that he arrived at the V.I.P. Lounge at 10:00 p.m. on July 10, 1980, and left with Cathy Campbell at 11:45 p.m. The shooting occurred just after midnight. Thus, the offense date was July 11, 1980. Three witnesses testified on the petitioner's behalf that he attended a cookout during the evening hours of July 11, 1980. At the conclusion of the trial, trial counsel did not request an instruction on alibi as a defense and conceded that no Notice of Alibi had been provided prior to trial. The trial court did not provide an instruction on alibi. The defense witnesses, of course, did not testify to an alibi during the time frame of the offense. Thus, the filing of a notice would have made little difference.

The post-conviction court concluded that the petitioner was "confused about the date the offense is alleged to have occurred" and ruled that there was no basis for trial counsel to request a continuance because there was no discrepancy in the offense date. The court also observed that the petitioner was permitted to present alibi evidence at trial and that the jury could have considered this evidence despite the lack of an alibi instruction.

Again, the petitioner has been unable to establish that he was prejudiced by any deficiency in this regard. As indicated, the petitioner testified that on July 11, as he was preparing to attend the Dennings' barbecue, he spoke with Ms. Campbell, who informed him that she had been involved in the offense on the previous evening. Thus, the petitioner acknowledged his awareness prior to the trial that the offense did not occur at the same time as the cookout but on the previous evening. The petitioner conceded that there would have been no reason for trial counsel to present witnesses to verify his whereabouts at the time of the barbecue. He admitted that the three defense witnesses testified at his request and were not subpoenaed by trial counsel. Unfortunately for the petitioner, his father and another individual who he claims could have established an alibi had died prior to the evidentiary hearing. While their testimony might have been helpful, this court cannot speculate upon the nature of what they might have said. Furthermore, the petitioner acknowledged that he did not make trial counsel aware of either his father's potential testimony or that of the other individual prior to the trial. That he did not do so under the circumstances then existing casts doubt on the petitioner's claim. The burden, of course, is on the petitioner to establish prejudice. It is our view that he has failed to do so.

C.

***12** The petitioner also contends that his trial counsel was ineffective by failing to preserve his right to a speedy trial. The record establishes that the petitioner was indicted in September of 1982 and tried in October of 1983. The right to a speedy trial is, of course, constitutionally based. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In *State v. Bishop,* 493 S.W.2d 81 (Tenn.1973), our supreme court adopted a four-factor analysis first established in *Barker v. Wingo,* 407 U.S. 514 (1972), for determining whether one has been denied his entitlement to a speedy trial:

(1) the length of the delay;

(2) the reason for the delay;

(3) whether the defendant asserted a claim to his right; and

(4) whether the defendant was prejudiced by the delay.

Bishop, 493 S.W.2d at 84. The length of the delay is a triggering mechanism. Until there is some delay which is presumptively prejudicial, characterized in some federal and state cases as being from one to two years, there is no necessity for inquiry into the other factors. Barker, 407 U.S. at 530. The record establishes that there was a thirteen-month delay between the indictment and trial. That period of time was not sufficient to trigger consideration of the remaining factors. Moreover, none of the other factors favor the petitioner. In consequence, he has failed to establish that he was prejudiced by trial counsel's failure to file a motion for speedy trial.

D.

The petitioner next contends that his trial counsel was ineffective by failing to file a motion to suppress the pretrial identification by the victim, which he claims was unduly suggestive. The petitioner testified that shortly after the offenses, the victim was shown a photographic lineup that included his photograph but was unable to make a positive identification. He stated that several weeks later, the victim was shown another photographic lineup that contained the same photograph of him and made a positive identification. The post-conviction court concluded that the petitioner had "not demonstrated that he was prejudiced by trial counsel's alleged deficiency regarding the photograph identification ."

In *Neil v. Biggers,* the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. 409 U.S. 188, 198-99 (1972). First, trial courts must determine whether the procedure used to obtain the identification was unduly suggestive. *Id.* at 198. A violation of due process has occurred if the identification procedure is so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Id.* If a court finds that the identification procedure was unduly suggestive, the court must determine whether, under the totality of the circumstances, the identification is nevertheless reliable. *Id.* at 199; State v. Brown, 795 S.W.2d 689, 694 (Tenn.Crim.App.1990). This standard was adopted by our supreme court in Bennett v. State, 530 S.W.2d 511, 512-15 (Tenn.1975). A finding that the pretrial identification was unreliable will also require the exclusion of a subsequent in-court identification by the same witness. State v. Philpott, 882 S.W.2d 394, 400 (Tenn.Crim.App.1994). Factors to be considered are as follows:

***13** (1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention at the time of the crime;

(3) the accuracy of the witness' prior description of the criminal;

(4) the level of certainty demonstrated at the confrontation; and

(5) the time elapsed between the crime and the confrontation.

Neil, 409 U.S. at 199; *see also* Philpott, 882 S.W.2d at 400.

Here, the trial transcript establishes that the victim was, in fact, shown two photographic lineups several weeks apart, each of which contained a photograph of the petitioner. The officer who conducted the first lineup testified that the victim chose two photographs as being similar to the shooter. One of the two was a photograph of the petitioner. Several weeks later, another officer, who testified that he was unaware of the first lineup, showed the victim a second photographic array. This time the victim positively identified the petitioner as the shooter. Both officers were thoroughly cross-examined on the identification procedure. The second officer stated that he did not know whether the same photograph of the petitioner had been used in both lineups. He explained that the first array had not been preserved. The victim, who testified that he was only a few feet away and able to clearly see the face of the gunman, positively identified the petitioner at trial. He expressed a high degree of certainty. In our view, the *Neil* factors favor the admission of the identification. Thus, no prejudice resulted from trial counsel's failure to challenge identification prior to trial. In consequence, the petitioner is not entitled to relief.

E.

The petitioner also asserts that his trial counsel was ineffective by failing to object to the admission into evidence of a bullet the victim claimed to have found in his car and of a receipt for .45 caliber ammunition signed by Ms. Campbell. He specifically contends that trial counsel should have objected to the bullet because the state had failed to establish a proper chain of custody. With regard to the receipt, he contends that the receipt was inadmissible hearsay. The post-conviction court determined that the admission of the bullet into evidence was "not a chain of custody issue in that the police did not recover the bullet and were unable to account for its chain of custody within the department." The court concluded that the petitioner was not prejudiced by trial counsel's failure to object because "the issue that the bullet was recovered later was before the jury." As to the receipt, the post-conviction court ruled that the petitioner had failed to establish prejudice because the receipt was not actually admitted into evidence at trial.

The victim testified that after his vehicle was returned to him by the police, he and a co-worker dismantled the dash and discovered a spent .45 slug. He then took the slug to the police department, which maintained custody until trial. The victim was thoroughly cross-examined about his discovery of the bullet, conceding that police had previously searched his car for evidence prior to returning it to him. Under these circumstances, the evidence was properly admitted. It is our view, therefore, that the petitioner was not prejudiced by trial counsel's failure to object.

***14** Although Ms. Campbell and Officer Perkins were questioned about an ammunition receipt, it was not admitted into evidence. No prejudice could have resulted. Thus, the petitioner is not entitled to relief on this issue.

F.

Finally, the petitioner asserts that his trial counsel was ineffective by undertaking joint representation of both him and his co-defendant because there was an actual conflict of interest. He contends that when Ms. Campbell claimed that she did not see the co-defendant in the car at the time of the shooting, trial counsel failed to impeach her with her prior inconsistent statements to police and failed to cross-examine her regarding the status of their romantic relationship. The petitioner claimed that when trial counsel "backed off" of Ms. Campbell after she gave exculpatory testimony about the co-defendant, he sacrificed his advocacy for the petitioner.

The post-conviction court observed that this court had previously determined that trial counsel was ineffective by representing both the petitioner and the co-defendant and that the co-defendant was prejudiced by the dual representation. *See Terry Campbell v. State,* No. 86-280-III (Tenn.Crim.App., at Nashville, Apr. 7, 1987). This court ordered a new trial for the co-defendant. The post-conviction court also observed that in concluding that the co-defendant was entitled to a new trial, this court had indicated that there was "a conflict of interest that adversely affected the attorney's representation of [the co-defendant], but not [the petitioner]." *See id.* The post-conviction court ruled that "[t]his decision applies to [the petitioner's] case as a matter of law" and determined that the petitioner was not entitled to a new trial because he suffered no prejudice from the dual representation.

Initially, it is our view that the post-conviction court erred by concluding that this court's decision in *Campbell* was a binding conclusion of law in the case of the petitioner. In *Massengill v. Scott,* our supreme court summarized the related doctrines of res judicata and collateral estoppel:

> "The doctrine of collateral estoppel or estoppel by judgment is an extension of the principle of res judicata, and is generally held to be applicable only when it affirmatively appears that the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment....
>
> Res judicata bars a second suit between the same parties and their privies on the same cause of action as to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit. To support

a plea of res judicata, it must be shown that the judgment in the prior case was final and concluded the rights of the party against whom it is asserted. It is also necessary to show that both cases involved the same cause of action. To sustain a plea of collateral estoppel it must be shown, inter alia, that the issue sought to be concluded not only was litigated in the prior suit but was necessary to the judgment in that suit."

***15** 738 S.W.2d 629, 631-32 (Tenn.1987) (quoting 22 Tenn. Jur. pp. 111-12). "Privity within the meaning of the doctrine of res judicata is privity as it exists in relation to the subject matter of the litigation." *Harris v. St. Mary's Medical Center, Inc.*, 726 S.W.2d 902, 905 (Tenn.1987). "One defending on the basis of res judicata or collateral estoppel must demonstrate that 1) the judgment in the prior case was final and concluded the rights of the party against whom the defense is asserted, and 2) both cases involve the same parties, the same cause of action, or identical issues." *Richardson v. Board of Dentistry*, 913 S.W.2d 446, 459 (Tenn.1995) (citing *Scales v. Scales*, 564 S.W.2d 667, 670 (Tenn.Ct.App.1977)).

The principle of res judicata is not applicable in this case because the prior litigation involved neither the same parties nor the same cause of action. Similarly, the doctrine of collateral estoppel would not apply because the prior litigation did not include the petitioner as a party and because this court's reference to the petitioner was not necessary to the final judgment. Moreover, the state has not established that the petitioner qualifies as a privy of the co-defendant as defined by case law. Because the ruling does not qualify as a prior action involving the same defendant, the ruling in *Campbell* is not binding precedent in the petitioner's case. *See Kenneth B. White v. State*, No. W2004-02553-CCA-R3-PC (Tenn.Crim.App.2006) (quoting Tenn. R. Sup.Ct. 4(H)(1)) (" 'An unpublished opinion shall be considered controlling authority between the parties to the case when relevant under the doctrines of the law of the case, res judicata, collateral estoppel, or in a criminal, post-conviction, or habeas corpus action involving the same defendant.' ").

A claim of ineffective assistance of counsel based upon an attorney's conflict of interest is examined under a slightly different standard than a traditional ineffectiveness claim. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). In *Strickland,* the Court summarized it's holding in *Cuyler* as follows:

> In *Cuyler* ... [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Strickland*, 466 U.S. at 692. The Court did not rule, however, that multiple representation is per se prejudicial to defendants:

> Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."

***16** *Id.* (quoting *Cuyler*, 446 U.S. at 350). Our supreme court has observed that "an actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.' " *State v. White*, 114 S.W.3d 469, 476 (Tenn.2003) (citing *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn.2000); Tenn. R. Sup.Ct. 8, EC 5-1)). Our high court determined that "[i[n the context of multiple employment ... an actual conflict arises where an attorney's continuance of such employment 'would be likely to involve the lawyer in representing differing interests.' " *Id.* (citing Tenn. Sup.Ct. R. 8, DR 5-105(B)). This court has said that "[t]he proper focus is solely upon whether counsel's conflict affected counsel's actions." *Netters v. State*, 957 S.W.2d 844, 848 (Tenn.Crim.App.1997).

The right to counsel requires complete devotion to the interest of the defendant. *State v. Knight*,

770 S.W.2d 771, 775 (Tenn.Crim.App.1988). "[A] lawyer forced to represent co[-]defendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment." Cuyler, 446 U.S. at 345 (citing Holloway v. Arkansas, 435 U.S. 475, 481-482 (1978)). In *White,* our supreme court explained the role of defense counsel:

> "[T]he basic duty defense counsel owes to the administration of justice and as an officer of the court is to serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation." This duty requires defense counsel to exert every reasonable effort to protect the client's interests, both in the investigation and the trial of a case, by interviewing the client; apprising the client of his or her rights; conducting a thorough legal and factual investigation of the case; attempting to obtain information in the possession of the prosecution and law enforcement authorities; filing appropriate motions for the suppression of the evidence; raising all available claims, issues and defenses; conducting effective cross-examination of the State's witnesses; and attempting to mitigate punishment if the client is convicted. In sum, counsel must be constantly guided by the obligation to pursue the defendant's interests and to do so to the fullest extent allowed by the law and applicable standards of professional conduct.

*Id.* at 477-478 (citations omitted). When counsel is unable to provide a "zealous representation ... unfettered by conflicting interests," there has been a breach of the right to the effective assistance of counsel. *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989). Our Rules of Professional Responsibility provide that "[l]oyalty to a client is also impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client." Tenn. Sup.Ct. Rule 8, Canon 1.7. "Under *Cuyler,* loyalties divided between co-defendants necessarily will infect the very core of at least one's defense, and prejudice should be presumed." *See* *Caban v. United States,* 281 F.3d 778, 782 (8th Cir.2002).

***17** As indicated, the United States Supreme Court has held that because there is a breach of loyalty in cases involving an actual conflict of interest, prejudice is presumed. Cuyler, 446 U.S. at 350. When a defendant fails to object to the multiple representation at trial, however, he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance" and the mere possibility of prejudice will not warrant relief. *Id.* at 348. "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim...." *Id.* at 349-50 (citations omitted).

Here, the petitioner hired trial counsel to represent him and the co-defendant as a favor to the latter, who was dating the petitioner's sister. The record suggests that at the time of trial, counsel was aware of the petitioner's prior romantic relationship with Ms. Campbell and the fact that the petitioner had ended the relationship. The petitioner contended that after Ms. Campbell provided testimony that exculpated the co-defendant, trial counsel "sort of tore back ... He didn't really get into her at all after that ... I don't know if he was trying to protect [the co-defendant], but he let her go." He recalled that trial counsel failed to impeach Cathy Campbell with the prior inconsistent statements she had provided to the police and did not cross-examine her regarding her romantic relationship with him, explaining that "once ... she didn't put [the co-defendant] in the passenger's seat of that car ... [trial counsel] just pulled back.... He asked her about some drug problems and stuff like that, but he didn't ... impeach her the way you are supposed to when you know a witness is lying." The trial transcript substantiates his claims. It establishes that trial counsel did not question Ms. Campbell about her prior relationship with the petitioner or otherwise attempt to exploit their break-up as a possible motive for her to lie. Nor did he question her regarding her statement that she had stolen from her father the weapon used in the shooting. The record further establishes that the only questions asked of Ms. Campbell during cross-examination related to her previous drug use.

This court has observed that "there is a strong likelihood that an attorney who represents multiple co-defendants will encounter a conflict of interest as there will almost always be a disparity in their relative positions." *Howard Clifton Kirby v. State,* No. 03C01-9303-CR-00074, slip op. at 7 n. 3 (Tenn.Crim.App., at Knoxville, Sept. 28, 1994). There was a disparity in the positions of the petitioner

and his co-defendant. Ms. Campbell specifically implicated the petitioner in the offenses and provided the only proof of premeditation on the charge of assault with intent to commit first degree murder. Despite her previous statements to the contrary, Ms. Campbell attempted to exonerate the co-defendant, testifying at trial that there was no one in the passenger seat of the petitioner's vehicle. When Ms. Campbell, one of the state's primary witnesses failed to implicate the co-defendant as anticipated, an actual conflict of interest presented itself. Campbell and the petitioner had competing defenses. Trial counsel should have then made an attempt to withdraw from the dual representation. *See* Tenn. Sup.Ct. Rule 8, Code of Professional Responsibility, EC 5-14 (stating that such representation may constitute a violation of the Code of Professional Responsibility). In order to best serve the petitioner, counsel should have attacked the credibility of Ms. Campbell and pointed out the inconsistencies in her pretrial statements to the police and her testimony at trial. Because she had provided exculpatory testimony for the co-defendant, however, counsel was faced with an unavoidable dilemma. An attack on the credibility of the witness would have been detrimental to the defense of the co-defendant. In *Holloway,* the Supreme Court ruled that "[i]n a case of joint representation of conflicting interests the evil-it bears repeating-is in what the advocate finds himself compelled to refrain from doing." 435 U.S. at 490.

***18** The situation presented in this case is similar to the one presented in *Glasser v. United States,* 315 U.S. 60 (1942), where the Supreme Court held that an actual conflict of interest existed. In that case, Glasser and his co-defendant, Kretske, were represented by Stewart. At the trial, a government witness named Abosketes implicated Glasser as the central figure in a bribery scheme but a second witness, Brantman, implicated only Kretske and testified that he "did not know Glasser." *Id.* at 72. Stewart failed to cross-examine Brantman about Glasser's lack of involvement and indicated that he did so because he was afraid of the implications of such questioning on Kretske's case. Observing that "a thorough cross-examination was indicated to fully develop Brantman's lack of reference to, or knowledge of, Glasser," the Court concluded that "Stewart's failure to undertake such a cross-examination luminates the cross-purposes under which he was laboring" and granted a new trial.

Here, a thorough cross-examination of Ms. Campbell, including her prior inconsistent statements to police and her romantic relationship with the petitioner, was required to best serve the interests of the petitioner. That counsel failed to pursue such action after Ms. Campbell provided testimony that was exculpatory to the co-defendant demonstrates that counsel was laboring under an actual conflict of interest. Under law, prejudice must be presumed.

The degree to which counsel's failure to cross-examine Ms. Campbell affected the petitioner's case is difficult to ascertain and ultimately irrelevant. Although the victim identified the petitioner as the gunman, Ms. Campbell's testimony provided the only proof that the shooting had occurred during an attempt to rob the victim, a necessary element of the conviction for assault with intent to commit robbery. In addition, her testimony provided the only proof of premeditation, a requirement for a conviction for assault with intent to commit first degree murder. The jury obviously accredited those portions of her testimony. In the case of the co-defendant, this court reversed his conviction and ordered a new trial based upon the actual conflict of interest even though the victim identified him as the passenger at the time of the shooting. *Campbell,* slip op. at 7. That demonstrates the importance of the right to a conflict-free counsel.

In *White,* our supreme court observed that "it is notoriously difficult to prove a negative." 114 S.W.3d at 477-478. The Supreme Court has continuously cautioned that "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland,* 466 U.S. at 692; *Holloway,* 435 U.S. at 490. That is the basis for the rule that once an actual conflict of interest is established, prejudice is presumed. In this instance, the dual representation resulted in an actual conflict of interest that adversely affected the trial counsel's performance to the petitioner's detriment. Because this court must presume that the petitioner was prejudiced by the dual representation, the petitioner is entitled to a new trial.

***19** Accordingly, the judgment of the post-conviction court is reversed, the convictions are vacated, and the cause is remanded for a new trial.

Tenn.Crim.App.,2006.
State v. Coffelt
Not Reported in S.W.3d, 2006 WL 2310597 (Tenn.Crim.App.)

END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.