**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 7**

**DOCUMENT 2**

---

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | No. E2009-00016-CCA-R3-PD |
| v. | ) | KNOX COUNTY |
| | ) | |
| STATE OF TENNESSEE, | ) | Post-Conviction |
| | ) | (CAPITAL CASE) |
| Appellee. | ) | |

ON APPEAL AS OF RIGHT FROM THE JUDGMENT OF THE CRIMINAL COURT OF KNOX COUNTY

---

## BRIEF OF THE STATE OF TENNESSEE

---

ROBERT E. COOPER, JR.
Attorney General & Reporter

MICHAEL MOORE
Solicitor General

FRANK BORGER-GILLIGAN
Assistant Attorney General
Criminal Justice Division
425 5th Avenue North
P.O. Box 20207
Nashville, Tennessee 37202
(615)-741-2969

## TABLE OF CONTENTS


STATEMENT OF ISSUES PRESENTED FOR REVIEW .......... 1

STATEMENT OF THE CASE .......... 2

STATEMENT OF FACTS .......... 6

ARGUMENT .......... 52

I. APPELLANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF COUNSEL'S ALLEGED CONFLICTS OF INTEREST .......... 52

A. Appellant failed to demonstrate that counsel was conflicted as a result of the Comptroller's investigation into his prior billings to the indigent defense fund .......... 55

B. Appellant has failed to establish a conflict of interest regarding alleged false statements trial counsel made to the court. .......... 59

C. There was no conflict of interest as a result of the discussion of media rights to the appellant's story .......... 62

II. THE POST-CONVICTION COURT CORRECTLY DENIED RELIEF WHEN IT FOUND THAT THE APPELLANT FAILED TO PROVE THAT SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL. .......... 65

A. Counsel was not ineffective for allegedly failing to discover or present mitigating evidence. .......... 69

B. Counsel was not ineffective for disclosing allegedly protected work product to the state. .......... 74

C. Appellant's claim of ineffective assistance of counsel for failing to present effective arguments in both the guilt and penalty phase of trial is waived. .......... 77

D. Counsel did not fail to conduct a meaningful voir dire. .......... 78

E. Counsel was not ineffective for failing to object to "the State's Suggestion of a Legally Inconsistent Aggravating Factor. ........ 83

F. Counsel was not ineffective for allegedly failing to present evidence to undermine the elements of first-degree murder. ........ 85

III. APPELLANT IS ELIGIBLE FOR THE DEATH PENALTY UNDER ATKINS V. VIRGINIA AND ROPER V. SIMMONS. ........ 88

IV. APPELLANT'S ARGUMENT REGARDING THE TRIAL COURT'S STRIKING OF AN ALLEGEDLY QUALIFIED JUROR FOR CAUSE IS WAIVED. ........ 94

V. THE POST-CONVICTION COURT DID NOT ERR BY REFUSING TO RECUSE ITSELF IN THIS MATTER. ........ 95

VI. THE TRIAL COURT DID NOT COMMIT STRUCTURAL ERROR BY APPOINTING COUNSEL TO THIS CASE; THERE WAS NO CONFLICT OF INTEREST. ........ 99

VII. APPELLANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL. ........ 100

VIII. TENNESSEE'S DEATH PENALTY STATUTE IS NOT UNCONSTITUTIONAL; APPELLANT'S CHALLENGE TO THE LETHAL INJECTION PROTOCOL IS NOT A COGNIZABLE CLAIM ON POST-CONVICTION ........ 102

A. The Tennessee death penalty statute is constitutional. ........ 102

B. Appellant's challenge to Tennessee's lethal injection protocol is not a cognizable basis for relief under the Tennessee Post-Conviction Procedure Act. ........ 103

C. Appellant's argument regarding the constitutionality of the indictment is waived and otherwise without merit. ........ 105

CONCLUSION ........ 106

CERTIFICATE OF SERVICE ........ 107

# TABLE OF AUTHORITIES

## CASES


*Adams v. Texas*,
100 S.Ct. 2521 (1980) ........ 79

*Atkins v. Virginia*,
536 U.S. 304 (2002) ........ 88, 89, 91

*Baxter v. Rose*,
523 S.W.2d 930 (Tenn. 1975) ........ 67, 75

*Bell v. Cockrell*,
310 F.3d 330 (5th Cir. 2002) ........ 89

*Black v. Blount*,
938 S.W.2d 394 (Tenn. 1996) ........ 78

*Black v. State*,
794 S.W.2d 752 (Tenn. Crim. App. 1990) ........ 60

*Bolin v. State*,
405 S.W.2d 768 (1966) ........ 60

*Coleman v. State*,
2007 WL 1651882 (Tenn. Crim. App. June 7, 2007) ........ 57

*Cooper v. State*,
849 S.W.2d 744 (Tenn. 1993) ........ 68, 100, 101

*Cuyler v. Sullivan*,
446 U.S. 335 (1980) ........ 53, 54, 57, 59, 65

*Fields v. State*,
40 S.W.3d 450 (Tenn.2001) ........ 55, 66

*Ford v. Wainwright*,
477 U.S. 399 (1986) ........ 93

*Goad v. State*,
938 S.W.2d 363 (Tenn. 1996) ........ 67, 69, 71, 72, 86, 88

*Gray v. State,*
887 So.2d 158 (Miss. 2004) ..... 89

*Gregg v. Georgia,*
428 U.S. 153 (1976) ..... 93

*Hawkins v. State,*
586 S.W.2d 465 (Tenn. 1979) ..... 99

*Henley v. State,*
960 S.W.2d 572 (Tenn. 1997) ..... 52, 58, 59, 68

*Hicks v. State,*
983 S.W.2d 240 (Tenn. Crim. App. 1998) ..... 66

*Hill v. McDonough,*
547 U.S. 573 (2006) ..... 104

*Johnson v. State,*
102 S.W.3d 535 (Mo. 2003) ..... 89

*Jones v. Barnes,*
463 U.S. 745 (1983) ..... 100, 101

*Mickens v. Taylor,*
240 F.3d 348 (4th Cir. 2001) ..... 61, 62

*Mickens v. Taylor,*
525 U.S. 162 (2002) ..... 61, 63

*Nichols v. State,*
90 S.W.3d 576 (Tenn. 2002) ..... 67, 69

*People v. Burney,*
212 P.3d 639 (Cal. 2009) ..... 104

*Pike v. State,*
164 S.W.3d 257 (Tenn. 2005) ..... 3, 4

*Pike v. Tennessee,*
526 U.S. 1147 (1999) ..... 3

*Pruitt v. State,*
834 N.E.2d 90 (Ind. 2005) ..... 89

*Roper v. Simmons*,
543 U.S. 551 (2005) .................................................................... 88, 91, 92, 93

*Smith v. Robins*,
528 U.S. 259 (2000) .................................................................................. 100

*Smith v. State*,
1997 WL 658996 (Tenn. Crim. App. Oct. 23, 1997) ......................................... 56

*State v. Alley*,
776 S.W.2d 506 (Tenn. 1989) ........................................................................ 79

*State v. Berry*,
141 S.W.3d 549 (Tenn. 2004) ...................................................................... 105

*State v. Bland*,
958 S.W.2d 651 (Tenn. 1997) ...................................................................... 103

*State v. Burns*,
6 S.W.3d 453 (Tenn. 1999) ..................................................................... 67, 68

*State v. Bush*,
942 S.W.2d 489 (Tenn. 1997) ........................................................................ 84

*State v. Carter*,
714 S.W.2d 241 (Tenn. 1986) .................................................................. 84, 85

*State v. Cazes*,
875 S.W.2d 253 (Tenn. 1994) ...................................................................... 102

*State v. Holder*,
15 S.W.3d 905 (Tenn. Crim. App. 1999) ......................................................... 66

*State v. Keen*,
926 S.W.2d 727 (Tenn. 1994) ...................................................................... 102

*State v. Pike*,
978 S.W.2d 904 (Tenn. 1998) ............................................................ 3, 17, 71, 72

*State v. Paul Dennis Reid*,
213 S.W.3d 792 (Tenn. 2006) .................................................................. 98, 99

*State v. Smith*,
868 S.W.2d 561 (Tenn. 1993) ........................................ 84

*State v. Strode*,
232 S.W.3d 1 (Tenn. 2007) ........................................ 91

*State v. Vann*,
976 S.W.2d 93,117-18 (Tenn. 1998) ........................................ 102

*State v. Zimmerman*,
823 S.W.2d 220 (Tenn. Crim. App. 1991) ........................................ 68

*Steadman v. State*,
806 S.W.2d 780 (Tenn. Crim. App. 1990) ........................................ 96

*Stewart v. Martinez-Villareal*,
523 U.S. 637, 118 S. Ct. 1618, 140 L. Ed.2d 849 (1998) ........................................ 93

*Strickland v. Washington*,
466 U.S. 668 (1984) ........................................ 52, 53, 54, 65, 67, 68, 75, 86, 100

*Tidwell v. State*,
922 S.W.2d 497 (Tenn. 1996) ........................................ 58

*United States v. Cronic*,
466 U.S. 648 (1984) ........................................ 53, 54, 65

*Van Tran v. State*,
6 S.W.3d 257 (Tenn. 1999) ........................................ 93, 103

*Van Tran v. State*,
66 S.W.3d 790 (Tenn. 2001) ........................................ 90, 91

*Wainwright v. Witt*,
105 S.Ct. 844 (1985) ........................................ 80, 81, 82

*Wilcoxson v. State*,
22 S.W.3d 289 (Tenn. Crim. App. 1999) ........................................ 68

*Witherspoon v. Illinois*,
88 S.Ct. 1770 (1968) ........................................ 79, 80, 82

*Workman v. State*,
868 S.W.2d 705 (Tenn. Crim. App. 1993) ........................................ 78

## STATUTES

Tenn. Code Ann. § 39-13-203 ........ 90, 91

Tenn. Code Ann. § 39-13-204(i)(5)(1997 Repl.) ........ 71

Tenn. Code Ann. § 39-13-204(i)(6)(1997 Repl.) ........ 71

Tenn. Code Ann. § 40-30-103 ........ 66

Tenn. Code Ann. § 40-30-105(b)(1995) ........ 97

Tenn. Code Ann. § 40-30-106(f)-(h) ........ 95

Tenn. Code Ann. § 40-30-106(g) ........ 78, 102, 105

Tenn. Code Ann. § 40-30-110(f) ........ 66

## OTHER AUTHORITIES

RPC 1.8(a) ........ 63

Tenn. Sup. Ct. R. 8 ........ 63

Tenn. R. Crim. App. 10(b) ........ 104, 105

Tenn. R. Crim. P. 52(b) ........ 57

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I. Whether the appellant was deprived of the right to effective assistance of counsel as a result of alleged conflicts of interest of trial counsel.

II. Whether the post-conviction court correctly denied the appellant's multiple claims of ineffective assistance of counsel at trial.

A. Counsel was not ineffective at the penalty phase of trial for allegedly failing to discover or present mitigation evidence.

B. Counsel was not ineffective for disclosing allegedly protected work product to the state.

C. Appellant's claim of ineffective assistance as a result of failing to present effective arguments in both the guilt and penalty phase of trial is waived.

D. Counsel did not fail to conduct a meaningful voir dire.

E. Counsel was not ineffective for failing to object to "the State's suggestion of a legally inconsistent aggravating factor."

F. Counsel was not ineffective for allegedly failing to present evidence to undermine the elements of first-degree murder.

III. Whether the appellant is eligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002), and its progeny.

IV. Whether the appellant's argument regarding the trial court's striking of an allegedly qualified juror for cause is waived.

V. Whether the post-conviction court erred by failing to recuse itself in this matter.

VI. Whether the trial court committed constitutional error by appointing counsel with an alleged "active conflict known to the court."

VII. Whether the appellant received effective assistance of counsel on appeal.

VIII. Whether Tennessee's death penalty statute is constitutional.

## STATEMENT OF THE CASE

On April 12, 1995, Christa Gail Pike ("Pike" or "Appellant") was indicted for first-degree premeditated murder and conspiracy to commit the first-degree murder of Colleen Slemmer. Co-defendants Tadaryl Shipp and Shadola Peterson were also indicted for the same offenses. (TR I, 2-3).[1] On May 23, 1995, the District Attorney General indicated that he intended to seek the death penalty against the appellant under Tenn. Code Ann. § 39-13-204(i)(5), (6) and (7). (TR I, 9).

Jury selection began on March 20, 1996, and was completed on March 23, 1996. (TR III, 379-386). The guilt phase of the appellant's trial began on March 23, 1996, and concluded on March 29, 1996, with the jury finding her guilty of first-degree premeditated murder and conspiracy to commit first-degree premeditated murder. (TR III, 395). On March 30, 1996, the appellant was sentenced to death for first-degree murder and twenty-five years for conspiracy to commit first-degree murder, to be served consecutively. (TR III, 393-394, 409). In reaching its decision that the death sentence was the most appropriate punishment, the jury found two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, § 39-13-204(i)(5), and that the murder was committed for the purpose of

[1] The record on direct appeal consists of thirty-two volumes of records and transcripts and thirty-one exhibits. The record on direct appeal will be referred to by "TR" volume and page number. Ex. (TR III, 379).

avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another, § 39-13-204(I)(6). (TR III. 393-394).

Pike filed a motion for a new trial, which was overruled by the trial court in July of 1996. (TR III, 418-419). A notice of appeal was filed on August 20, 1996. (TR III, 409). On October 5, 1998, the Tennessee Supreme Court affirmed the convictions and sentences. *State v. Pike,* 978 S.W.2d 904 (Tenn. 1998). The United States Supreme Court denied certiorari on June 1, 1999. *Pike v. Tennessee,* 526 U.S. 1147 (1999).

On June 3, 1999, the appellant timely filed a *pro se* petition for post-conviction relief in the Criminal Court of Knox County. (PC I, 1-12).[2] The trial court appointed the Office of the Post-Conviction Defender to represent Ms. Pike. During a hearing on June 25, 2001, the appellant orally advised the trial court of her desire to withdraw her post-conviction petition and to schedule an execution date. *See Pike v. State,* 164 S.W.3d 257, 260 (Tenn. 2005). Approximately two months later, on September 4, 2001, the appellant submitted a letter to the trial court reiterating her desire to withdraw her petition and to schedule an execution date. *Id.* After questioning the appellant and confirming that her position had remained unchanged, the trial court concluded that she had the right to make such decision as long as she was competent enough to do so. *Id.* The trial court appointed Dr. William Kenner

[2] The record on post-conviction appeal consists of five volumes of technical records, twenty-five volumes of transcripts, and seventy-five exhibits (including six DVDs). The record on post-conviction appeal will be referred to by "PC" volume number and page number. Ex. (PC I, 1).

to conduct a psychiatric evaluation to determine the appellant's competency to make such a decision. *Id.*

On June 25, 2002, the trial court conducted an evidentiary hearing to determine the appellant's competence, and concluded that she had "freely and voluntarily" decided to withdraw her petition and to waive post-conviction review. *Id.* On June 27, 2002, the trial court entered a written judgment dismissing the petition and setting an execution date. *Id.* On July 8, 2002, Pike's attorneys filed a notice of appeal. On July 26, 2002, Pike's attorneys filed a second notice of appeal, and a motion seeking to vacate the order dismissing her petition, to reinstate her post-conviction petition, and to set a date for an evidentiary hearing on her post-conviction petition. *Id.* On August 1, 2002, this Court granted a stay of execution, and remanded the case to the trial court for a hearing on the appellant's motion to vacate the order dismissing her post-conviction petition. *Id.*

The trial court denied the appellant's motion to vacate the dismissal order and to reinstate her post-conviction petition. Appellant appealed, and this Court affirmed. The Tennessee Supreme Court granted the appellant's application for permission to appeal and concluded that the motion to vacate should be granted. The Court remanded the case to the trial court with instructions to reinstate Pike's post-conviction petition, to schedule an evidentiary hearing, and to resume post-conviction proceedings. *Id.*, at 267.

Evidentiary hearings were conducted in the post-conviction court in January 2007, July 2007, and April 2008. On September 22, 2008, the appellant filed her post-conviction closing arguments brief. (PC IV, 451-551). The state filed its responsive brief on November 14, 2008. (PC IV, 554-590). On December 10, 2008, the post-conviction court entered its Findings of Fact and Conclusions of Law denying Pike's petition for post-conviction relief. (PC V, 599-701). Appellant timely filed a notice of appeal on January 2, 2009. (PC V, 702).

## STATEMENT OF FACTS

Appellant contends that the trial court erred in denying post-conviction relief. Specifically, she asserts that she is entitled to post-conviction relief as a result of her trial counsel's alleged conflict of interest and because she was allegedly provided ineffective assistance of counsel at trial and on appeal. Among other claims, the appellant also maintains that the death sentence should be set aside due to the unconstitutionality of Tennessee's death penalty scheme. The following facts are relevant to the issues presently before this Court:

***Direct Appeal:***

In affirming the appellant's convictions and sentences on direct appeal, the Tennessee Supreme Court set out the following facts:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the defendant, Christa Gail Pike, a student at the Job Corps Center Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, Pike's boyfriend, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center. Slemmer was not with them.
>
> Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk. Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke

into smaller pieces, she had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that Pike was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw Pike at breakfast the next morning she asked Pike what she had done with the piece of the victim's skull. Pike replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of Slemmer's skull. Pike also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. Pike told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

Though neither Iloilo nor Wilson immediately reported Pike's statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered Slemmer's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal. Upon closer inspection, he saw the victim's clothes and her nude breast and realized it was the body of a human female. He immediately notified law enforcement officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated. Johnson removed all civilians from the area and secured the scene surrounding the body.

As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and

broken foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle, with trampled bushes, hand and knee prints in the mud, and drag marks. A large pool of blood was found about 30 feet from the victim's body.

The victim's body was actually lying face down on a pile of debris. When officers turned the body over, they discovered that the victim's throat had been slashed. A bloody rag was around her neck. Detective Donald R. Cook, of the U.T. Police Department, accompanied the body to the morgue. He observed the body after it had been cleaned and noticed that a five pointed star in a circle, commonly known as a pentagram, had been carved onto the victim's chest.

Randy York, a criminal investigator with the Knoxville Police Department, began investigating this case on January 13, the day the victim's body was discovered. York separately interviewed the defendant and Shipp at the Knoxville Police Department on January 14th. Investigator York advised defendant Pike of her Miranda rights, but she chose to waive them and make a statement. Pike explained in detail how the killing had occurred. Pike's statement was tape-recorded and transcribed in some forty-six pages. Copies of the transcription were given to the jury, and the jurors were allowed to listen to the tape through individual headphones.

In her statement, Pike said that she and Slemmer had been having problems for some time. Pike claimed to have awakened one night to find Slemmer standing over her with a box cutter. Pike told Investigator York that Slemmer had been "trying to get [her] boyfriend" and had been "running her mouth" everywhere. Pike said that Slemmer had deliberately provoked her because Slemmer realized that Pike would be terminated from the Job Corps program the next time she became involved in a fight or similar incident.

Pike claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. Pike said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to Pike, she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, Pike told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though Pike refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, Pike and Slemmer exchanged words. Pike then began hitting Slemmer and banging Slemmer's head on her knee. Pike threw Slemmer to the ground and kicked her repeatedly. According to Pike, as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report Pike so she would be terminated from the Job Corps program, Pike again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with Pike caught Slemmer and pushed her to the ground.

Pike and the other person, who Pike referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where Pike cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," Pike recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point Pike said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, Pike cut Slemmer's back, "the big long cut on her back." Pike said Slemmer repeatedly tried to get up and run. Pike recounted how Slemmer bargained for her life, begging Pike to talk to her and telling Pike that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. Pike told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." Pike said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked Pike what she was going to do to her, at which point Pike thought she heard a noise. Pike left the scene to check out the surrounding area to make sure no one was around. When she returned, Pike began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, Pike cut Slemmer's throat several other times. Pike said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that Pike and the other person would push her back on the ground.

Slemmer attempted to run away again, and Pike threw a rock which hit Slemmer in the back of the head. Pike stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, Pike continued to hit her. Eventually Pike said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but Pike "kept hitting her and hitting her and hitting her." Pike eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, Pike said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. Pike said the episode lasted "for about thirty minutes to an hour." Pike admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. Pike also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. Pike denied carving a pentagram in the victim's chest, but said that the other person had cut the victim on her chest.

After disposing of Slemmer's body, Pike and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and Pike returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. Pike never identified that individual. Pike told Investigator York that the blood-stained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. Pike also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. Pike gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there Pike retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that Pike eventually directed him to the exact location where the victim's body was found.

After Pike's statement was played for the jury, the State introduced pictures of Pike and Shipp taken at the Knoxville Police Department on the day the statement was given, January 14, 1995, two days after the murder. In the pictures, both Pike and Shipp were wearing pentagram necklaces.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had retrieved a pair of black gloves and two of Slemmer's I.D. cards from the Texaco station on Cumberland Avenue. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special Agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of Pike and Shipp. Those items that he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that she had been unable to perform a DNA analysis on the blood taken from the shoes of Pike and Shipp, but she had determined that the blood samples taken from the clothing of both Pike and Shipp matched the DNA profile of the victim.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer, a nineteen-year-old Job Corps student. Dr. Elkins described the victim's body as covered with dirt and twigs. Slemmer was nude from the waist up clothed only with jeans, socks, and shoes. After removing the victim's clothing and cleaning the body, Dr. Elkins had attempted to catalog the slash and stab wounds on the victim's torso by assigning a letter of the alphabet. There were so many wounds that eventually Dr. Elkins decided to catalog only the most serious and major wounds. Dr. Elkins explained that to catalog every wound she would have been required to go through the alphabet again, and stay in the morgue for "three days." Eventually, Dr. Elkins said she "basically threw up [her] hands and just said, enumerable [sic] more superficial slash wounds on the back, arms and chest." In addition, Dr. Elkins said the victim had purple contusions on her knees, indicating fresh bruising consistent with crawling, and defensive wounds on her right arm.

Dr. Elkins described the major slash and stab wounds she had cataloged on the victim's back, arms, abdomen, and chest. She found a six inch gaping wound across the middle of the victim's neck which had

penetrated the fat and muscles of the neck. In addition, Dr. Elkins had found ten other slash wounds on the victim's throat. Other slash wounds were on the victim's face, and Dr. Elkins observed what appeared to be a pentagram carved onto the victim's chest. Because the area around each wound was red in appearance, Dr. Elkins concluded that the victim's heart had been beating when the wounds were inflicted and she said the victim would not have been rendered unconscious by any of the stab or slash wounds.

Dr. Elkins determined that the victim's death was caused by blunt force injuries to the head. The victim had suffered multiple and extensive skull fractures. From the autopsy, Dr. Elkins determined that the victim had sustained a minimum of four blows to her head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the victim's skull had been fractured as had the bridge of her nose. However, the major wound, labeled as injury "W", involved most of the left side of the victim's head. Dr. Elkins said that this injury, caused by blunt force to the left side of the victim's head while the right side of the victim's head was against a firm surface, also had fractured the right side of the skull and imbedded a portion of the skull into the victim's brain. Dr. Elkins found small divots in the victim's skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows. Finally, Dr. Elkins testified that blood in the victim's sinus cavity indicated she had been alive and probably conscious when the injuries were inflicted.

During her testimony, Dr. Elkins utilized the victim's skull to describe the injuries. She testified that in order to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had removed the top of the victim's skull in order to remove the brain. Embedded inside the victim's brain as a result of the blunt force were portions of the victim's skull. Dr. Elkins removed those embedded pieces and forwarded them to Dr. Marks. Dr. Marks reconstructed the skull, fitting those loose portions into the left side area of the skull. However, those pieces had not completely filled one area on the left side of the victim's skull. Dr. Elkins then showed the jury a piece of skull that had been given to her shortly before the trial and demonstrated that it fit perfectly into the remaining area of the victim's skull. The piece of skull utilized by Dr. Elkins had been taken from the pocket of a jacket which witnesses identified as belonging to Pike.

Pike's jacket had been turned over to law enforcement officials by Job Corps employees. Robert A. Pollock, orientation specialist at Knoxville Job Corps, testified that he had spoken with Pike on January 13, 1995, concerning a misplaced I.D. card. After Pike left his office, Pollock noticed a black leather jacket hanging on the chair where she had sat. The jacket had been hanging on the chair when Pollock locked the room at approximately 4:00 p.m. on January 13th, and it was still there when he returned at 7:30 a.m. on January 17th. Because he had heard over the weekend that Pike was a suspect in this murder investigation, Pollock immediately turned the jacket over to the Job Corps' Safety and Security Captain, William Hudson. Hudson called the Knoxville Police Department and turned the jacket over to Officer Arthur Bohanan when he arrived a short time later.

Officer Bohanan identified the jacket, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the jacket and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which the victim's skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

Following the introduction into evidence of the victim's skull, numerous photographs, and items of the victim's clothing, the State rested its case-in-chief.

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the defendant. Dr. Engum described Pike as an "extremely bright young woman." Dr. Engum explained that Pike "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." Pike had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that Pike had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the defendant suffers from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the defendant is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in interpersonal



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 22 of 117 PageID #: 9089

relationships, in controlling her behavior, and in achieving vocational and academic goals.

During direct examination, Dr. Engum opined that the defendant had not acted with deliberation or premeditation in killing Slemmer. Instead Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the defendant's coat, Dr. Engum explained that the Defendant actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the defendant's way of getting recognition, "no matter how distorted" the recognition.

On cross-examination, Dr. Engum stated that there was no question that the defendant had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the defendant and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the defendant nor any of the other witnesses. Dr. Bernet admitted that he did not have enough information to offer an expert opinion as to whether Pike acted with intent or premeditation in killing the victim.

Based on this evidence offered during the guilt phase of the trial, the jury found Pike, guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, Pike's aunt as a witness. Ross testified that the defendant had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that Pike's family has a history of substance abuse and that Pike's maternal grandmother was an alcoholic who was verbally abusive to Pike. Following the death of Pike's paternal grandmother, Pike was shuffled between her mother and father. According to Ross, Pike's mother's home was very dirty. Pike's mother set no rules for her, and on the occasions that Pike had visited Ross, the defendant had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.

On cross-examination, Ross admitted that she had previously described Pike as a pathological liar and that she had been afraid to allow Pike to associate with her own children. Ross also admitted that Pike had been out of control since she was twelve years old.

Glenn Pike, the defendant's father, testified that he had kicked the defendant out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the defendant prior to her eighteenth birthday. On cross-examination, he admitted that he had forced Pike to leave his home in 1989 because there had been an allegation that the defendant had sexually abused his two-year-old daughter from his second marriage. According to her father, Pike had been disobedient, dishonest, and manipulative when she had lived with him.

The defendant's mother, Carissa Hansen, a licensed practical nurse, testified that Pike had lived with her 95 percent of the time since her paternal grandmother's death. Hansen admitted that she had smoked marijuana with the defendant in order to "establish a friendship." Hansen related that the defendant had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped Pike with a belt. Hansen had the boyfriend arrested.

On cross-examination, Hansen admitted that Pike's behavior had been problematic for years. The defendant had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, Pike had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that Pike had wielded a "butcher-knife" against the boyfriend, who had been arrested for whipping her. Hansen also said Pike had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that Pike had been out of control since she was eight years old. Following Hansen's testimony, the defense rested its case.

In rebuttal, the State presented the testimony of Harold James Underwood, Jr., a University of Tennessee police officer who was assigned to secure the crime scene on January 13, 1995. Underwood testified that the defendant came to the scene with three to five other females between four and five p.m. that day. Pike asked Underwood why the area had been marked off and questioned him concerning the identity of the victim and whether or not the police had any suspects. None of the other females spoke during the fifteen minutes the group was there. Underwood said Pike appeared amused and giggled and moved around. Underwood noticed that Pike was wearing an unusual necklace in the shape of a pentagram. After learning at roll call on January 14, 1995, that the victim of the murder had a pentagram carved on her chest, he reported Pike's strange behavior and unusual necklace to his superior officers.

Based on the proof submitted at the sentencing hearing, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) "the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(5) and (6) (1997 Repl.). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the Court of Criminal Appeals.

*State v. Pike,* 978 S.W.2d 904, 907-914 (Tenn. 1998).

***Post-Conviction Hearing:***

In her petition for post-conviction relief, Pike asserted multiple grounds for relief, including: claims of attorney conflicts of interest, ineffective assistance of counsel, and a challenge to the constitutionality of Tennessee's death penalty procedure. (PC IV, 451-551). In its Findings of Fact and Conclusions of Law, the post-conviction court found every allegation in the petition meritless. (PC V, 599-701). The court's decision was based upon the following evidence that was presented at the post-conviction hearing:

Pike's mother, Carissa (Fotos) Hansen, testified that prior to marrying the appellant's father, she had been married to James Ferguson, with whom she had a daughter, Alicia, Pike's older half-sister. (PC VI, 48-49). Ms. Hansen met the appellant's father, Glenn Pike, around 1975, and the two were married shortly thereafter. (PC X, 436). Mr. Pike was a veteran of the Vietnam War who was drafted into service in 1966. (PC X, 431). He was honorably discharged, but re-enlisted in 1973 and was then stationed at Fort Bragg, North Carolina. (PC X, 433). During this time, Mr. Pike would return to Beckley, West Virginia, on weekends. (PC X, 436). It was here that he met Carissa (Fotos) Hansen. (PC X, 435-436). Carissa became pregnant with the appellant shortly after she and Pike were married in 1975. (PC X, 436).

Mr. Pike was honorably discharged from service for a second time before the appellant was born on March 10, 1976. (PC X, 434). As a result of Mr. Pike's service in Vietnam, he received benefits for Post-Traumatic Stress Disorder ("PTSD") and for high blood pressure. (PC X, 434). Mr. Pike was also informed by the Veteran's Administration ("VA") that he had been in an area in Vietnam that had been subjected to Agent Orange, and he was warned of the potential for birth defects, such as spina bifida, in children. (PC X, 435).

Mr. Pike testified that he had first met Carissa (Fotos) Hansen at a bar in Beckley, West Virginia, while he was on weekend leave from Fort Bragg. (PC X, 436). Early in their relationship, their socialization consisted mainly of drinking in bars, playing cards, and going to clubs. (PC X, 437). The couple would often have "five, six, up to ten drinks" of hard liquor a night. (PC X, 437). However, Carissa Hansen testified that she never drank or used drugs during either of her children's pregnancies. (PC VI, 77).

At the time that Ms. Hansen was pregnant with the appellant, she had been working as a licensed practical nurse. (PC VI, 50). She testified that she had been working in a psychiatric unit in March of 1976 when she was injured by an alcoholic with delirium tremens. (PC VI, 50). As a result, Hansen started leaking amniotic fluid and went into labor shortly thereafter. (PC VI, 50). She was approximately seven months pregnant at the time. (PC VI, 50).

Because the appellant was in the breech position, she was delivered by caesarean section and taken to the nearest neonatal intensive care unit in Charleston, West Virginia. (PC VI, 50-51). It was discovered that the appellant had a condition known as hyaline membrane, where the lungs were not fully developed; she was in respiratory distress. She also had bilateral hip dysplasia, where her hip sockets were not fully formed. (PC VI, 51). Appellant was at the neonatal intensive care unit for two weeks. (PC VI, 51). Carissa was in the hospital for approximately one week following her surgery before she was finally able to visit the appellant in the neonatal unit. (PC VI, 51).

After Carissa returned home from the hospital, she went back to work "fairly quickly." (PC X, 442). Mr. Pike soon found construction work away from home and, consequently, did not spend much time with Carissa or the appellant. (PC X, 442). As a result of this separation, Mr. Pike and Carissa divorced in 1977. (PC X, 443). However, after Carissa allegedly attempted suicide by overdosing on pills, the couple became close again and remarried in 1979. (PC X, 444, Ex. 1A, Appendix ii).

After the appellant was born, she was cared for primarily by her paternal grandmother. After Carissa and Pike divorced for the second time, the appellant lived with her grandmother, with whom Mr. Pike lived as well. (PC X, 448). By all accounts, the appellant had a great relationship with her grandmother, and the two were very close. (PC X, 448-449). In 1978, the appellant's grandmother moved in with her boyfriend, Ernest, who was speculated to have sexually abused the appellant.



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 28 of 117 PageID #: 9095

(PC X, 476-477). However, neither Mr. Pike nor the appellant had any recollection of such sexual abuse. (PC X, 476).

Hansen testified that in 1982, after her divorce from Mr. Pike, she moved with the appellant and Alicia, Hansen's first daughter, to North Carolina to be with her new husband, Danny Thompson. (PC VI, 54). Appellant and Alicia, however, were unhappy in North Carolina and ended up returning to West Virginia and then back to North Carolina again. (PC VI, 54). Ms. Hansen testified that both the appellant and Alicia stayed with her most of the time, but the appellant also stayed with both of her paternal and maternal grandparents as well.

Ms. Hansen was separated from Danny Thompson shortly after they were married, and were divorced in 1989. (Ex. 1A, Add. ii). Around this time, Ms. Hansen began living with Steve Kyaw, who did not have a good relationship with the appellant. (*Id.*). Hansen testified that Kyaw hit the appellant once and ended up in court. (PC VI, 62). She stated that the appellant once chased Kyaw with a butter knife (not a butcher knife) after Kyaw had hit her in the face with a belt buckle. (PC VI, 93). Ms. Hansen testified that she recalled two suicide attempts by the appellant with the first being in the third grade. (PC VI, 63). She stated that the appellant, had seen therapists and psychologists over the years. (PC VI, 64).

Ms. Hansen testified that, in elementary school, the appellant informed school officials that she had been raped the previous day. (PC VI, 64). A man named Claude Davis was arrested but was not convicted, as the appellant was unable to

(PC X, 476-477). However, neither Mr. Pike nor the appellant had any recollection of such sexual abuse. (PC X, 476).

Hansen testified that in 1982, after her divorce from Mr. Pike, she moved with the appellant and Alicia, Hansen's first daughter, to North Carolina to be with her new husband, Danny Thompson. (PC VI, 54). Appellant and Alicia, however, were unhappy in North Carolina and ended up returning to West Virginia and then back to North Carolina again. (PC VI, 54). Ms. Hansen testified that both the appellant and Alicia stayed with her most of the time, but the appellant also stayed with both of her paternal and maternal grandparents as well.

Ms. Hansen was separated from Danny Thompson shortly after they were married, and were divorced in 1989. (Ex. 1A, Add. ii). Around this time, Ms. Hansen began living with Steve Kyaw, who did not have a good relationship with the appellant. (*Id.*). Hansen testified that Kyaw hit the appellant once and ended up in court. (PC VI, 62). She stated that the appellant once chased Kyaw with a butter knife (not a butcher knife) after Kyaw had hit her in the face with a belt buckle. (PC VI, 93). Ms. Hansen testified that she recalled two suicide attempts by the appellant with the first being in the third grade. (PC VI, 63). She stated that the appellant, had seen therapists and psychologists over the years. (PC VI, 64).

Ms. Hansen testified that, in elementary school, the appellant informed school officials that she had been raped the previous day. (PC VI, 64). A man named Claude Davis was arrested but was not convicted, as the appellant was unable to

positively identify him in court. (PC VI, 65). Hansen also testified that the appellant later told her that she had been sexually assaulted on the way to the store one night when she was about sixteen years old. (PC VI, 66).

Ms. Hansen stated that Alicia, who been living with her aunt, came to live with them after Alicia had gotten pregnant as a teenager. Alicia, her boyfriend, and new baby all lived with Hansen and the appellant for about two years. (PC VI, 55).

In 1991, Steve Kyaw moved out of Hansen's home (Ex. 1A, Add. ii). The appellant's mother married Gerard Hansen in October of 1992. (*Id.*). During this time, the appellant had admitted to Hansen that she had been using cocaine, although Hansen had no first-hand knowledge of this. (PC VI, 58). Appellant also became pregnant when she was about seventeen and was apparently worried about how the cocaine might affect the baby. (PC VI, 58). Hansen informed the appellant that if she chose to keep the baby, she would have to get a job. (PC VI, 58). Pike chose to have an abortion. (PC VI, 58-59).

Ms. Hansen testified that, overall, she lived in about five different places with the appellant in North Carolina. (PC VI, 67). Appellant had constantly skipped school and run away. (PC VI, 68). She was sent to live in a group home on two different occasions. (PC VI, 69). After the appellant had returned home, she indicated her desire to go the Job Corps, where she could complete her education and work toward a career as a nurse. (PC VI, 69-70).

In September of 1994, the appellant entered the Job Corps in Knoxville, Tennessee, where she enrolled in classes and lived in student housing. (PC VI, 71). Hansen testified that she had gone to visit the appellant at her dormitory in Knoxville and indicated that the facilities were dirty and there had been blood in the halls. (PC VI, 72). She stated that she had tried to convince the appellant to return home, but she refused. (PC VI, 72). Hansen testified that the appellant had informed her that a girl at Job Corps had been threatening her and had stood over her bed one night waving a knife. (PC VI, 72). However, according to the appellant, she was not afraid because she was friends with Tadaryl Shipp. (PC VI, 72).

Ms. Hansen testified that she recalled meeting with Attorney William Talman, lead counsel at trial, on at least two occasions, and recalled meeting with Dr. Diana McCoy, the appellant's mitigation specialist, on at least two occasions. (PC VI, 83-84). She stated that she had not known before the trial that she would be testifying, but admitted that she might have been told pre-trial that she might be a witness. (PC VI, 84). She further stated that Attorney Talman had informed her that he had planned to make the family look bad and exaggerate any bad things in an effort to help the appellant. (PC VI, 85-86).

Ms. Hansen disagreed with Dr. Pincus' assessment that the appellant was the product of an almost unbearably abusive background. (PC VI, 87). She testified that she had no personal knowledge of any sexual abuse of the appellant and had never seen blood on her as the result of any sexual attack. (PC VI, 87). She also stated

that the appellant had been rebellious and had a bad temper. (PC VI, 91-92). She recalled that Kenny Clyde had threatened to rape the appellant and, as a result, the appellant and a friend had beaten him up. (PC VI, 90). She further recalled that the appellant had beaten another girl and had thrown her down a flight of stairs. (PC VI, 94). She indicated that she was unaware of any trouble that the appellant had gotten into while at Job Corps and did not recall anything about her interest in Wicca or Satanism. (PC VI, 95-99). She further admitted that Pike was a notorious liar. (PC VII, 103).

Gerard Hansen, the appellant's step-father, testified that he had been married to the appellant's mother since 1992. (PC VII, 113). He stated that the appellant had always been very open and friendly and had never acted violently toward him. (PC VII, 119-120). He recalled having met with the trial attorneys both before trial and after the verdict prior to sentencing. (PC VII, 122-123). He did not recall telling Dr. McCoy that the appellant had been out of control. (PC VII, 133). He did state that he believes the appellant likes the attention that she has gotten from her behavior. (PC VII, 133). He further testified that the appellant had called him and asked him to come and get her late on the night of the murder. (PC VII, 134).

Carrie Ross, the appellant's maternal aunt, testified that she had met with both trial attorneys as well as Dr. McCoy prior to trial. (PC VII, 151-154). She stated that she had numerous phone calls with the attorneys prior to trial. (PC VII, 151-154). She stated that she had been told that she would be testifying sometime after



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 33 of 117 PageID #: 9100

the guilt phase of the trial. (PC VII, 156). She recalled that family members met with Dr. McCoy the morning before the penalty phase to go over the type of questions that would be asked on the witness stand. (PC VII, 157). She testified that Attorney Talman had told her that he did not think that the appellant would get the death penalty, and that he was purposely leaving holes in the case so that there would be plenty of room for appeal. She also recalled having discussions with Talman about a book of the appellant's story. (PC VIII, 202).

Ross testified that her father, the appellant's grandfather, Chris Fotos, had been a butcher with his own slaughterhouse. (PC VII, 161). Mr. Fotos had been addicted to pain medication for fifteen years and had been "out of touch with reality" when he was on it. (PC VII, 162-163). Ross described her father as having a violent nature and described how he had once pulled a gun on her and had taken a gun into federal court and threatened a judge over his tax problems. (PC VII, 164-165). She stated that the mentality in the household was that if someone did something to you, then you had better get even in a violent manner. (PC VII, 166).

Ross further testified that her father had liked having the grandchildren around while he was working in the slaughterhouse. Ross admitted that both she and her son grew up around the slaughterhouse and that she did not really think anything of it. (PC VII, 161-162). She further stated that the appellant had always wanted to be around her grandfather while he was working at the slaughterhouse and on the farm. (PC VII, 162). She stated that Mr. Fotos always used bad language and carried a

gun, often using it to threaten people. (PC VII, 164). She stated that in the Fotos family, you were taught that if someone starts something with you, you had better finish it or you would "get it" when you got home. (PC VII, 166).

Ross described her mother, Zola Fotos, as a violent alcoholic who had been ill with hepatitis when the appellant was young. (PC VII, 159, 171). She stated that Ms. Fotos had been angry with the appellant's mother when she became pregnant with the appellant, and that she never cared for the appellant all that much. (PC VII, 183). As a result, the appellant spent most of her time growing up with her paternal grandmother, with whom she had a great relationship. (PC VII, 183-184).

Ross testified that, as a teenager, she had smoked pot, skipped school, and drank with her sister, Carissa, the petitioner's mother. (PC VII, 167). She stated that Carissa drank a lot as an adult and had been emotionally immature. (PC VII, 167-168). She stated that she believed that children had never been Carissa's first priority. (PC VII, 168-169). Ross testified that Carissa had been married five times (including twice to the appellant's father) and had numerous live-in boyfriends. She recalled that Danny Thompson, Carissa's third husband, had told Carissa that he did not like the children. (PC VII, 171). Shortly thereafter, Alicia was sent to live with Ross, and the appellant was sent to live with her father and Grandmother Pike. (PC VII, 171).

Ross testified that the appellant had been afraid to return to the Job Corps, but that Carissa had convinced her that it was her best chance to get an education. (PC

VII, 191). She also admitted the she thought Pike was a pathological liar and could not be trusted. (PC VII, 196). She further admitted that she did not want Pike around her children and had thought that she would wind up dead. (PC VII, 197-200).

Alicia Willis, the appellant's half-sister, testified that she had no relationship with her father, James Ferguson, from the age of eight to seventeen. (PC IX, 364). She stated that she had lived with her mother, but was really raised by her Grandmother Fotos. (PC IX, 364-366). She admitted that Ms. Fotos drank every day, but she had always felt loved by her. (PC IX, 367-369). She also recalled that Ms. Fotos often got frustrated with the appellant and had shaken her on one occasion. (PC IX, 368). She stated that the appellant spent most of her time with Grandmother Pike, who was kind and loving toward her. (PC IX, 374). She described the appellant as having been happy when she was with her paternal grandmother. (PC IX, 374). She also recalled that both she and the appellant had often gone to the slaughterhouse because they had wanted to go, and she did not recall any abuse of the appellant by Mr. Fotos. (PC X, 405-406).

Willis testified that, while she and the appellant were in West Virginia, their mother had married Danny Thompson, a man that neither of them knew, and had thereafter taken them back to live with them in North Carolina. (PC IX, 372, 376). She recalled that Danny Thompson had been mean to her and the appellant and that she had been very unhappy and depressed. (PC IX, 377). She also recalled countless



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 36 of 117 PageID #: 9103

men in her mother's life and stated that there had been absolutely nothing maternal about her. (PC IX, 377-378).

Willis stated that she had felt hurt and abandoned when her Grandmother Fotos had died. (PC IX, 387). She stated that, after her death, she had not cared about anyone and felt that no one cared about her. (PC IX, 387). As a result, she stated, her life took a turn for the worse, and she began getting into trouble, drinking, and smoking marijuana. However, overall, she described herself as a happy kid. (PC IX, 387).

She described the appellant as having a big heart and having been overall good to other people. (PC IX, 390). However, she stated that she had never really understood the appellant and that the appellant had been very different. (PC IX, 390-391). She recalled that, around the age of ten or eleven, the appellant would often go into a rage in an instant. (PC IX, 391). She acknowledged that the appellant had always had problems, but she never thought that the appellant could ever kill anyone. (PC IX, 391).

Willis stated that the appellant had loved Willis' son Keith when he was a baby. (PC IX, 391-392). She stated that she had been very protective of her son around the appellant, but she did not believe that Pike had ever molested her son and had denied ever having said differently to Dr. McCoy. (PC IX, 392, 407).

Glenn Pike, the appellant's father, testified that he had met with both trial attorneys and Dr. McCoy prior to trial. (PC X, 425). He recalled that he had been



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 37 of 117 PageID #: 9104

called a day or so before to come to testify at trial, but it really had not been a surprise to him that he would be called to testify. (PC X, 426). He further stated that he had met with the trial attorneys on the morning he testified. (PC X, 426).

Mr. Pike testified that the appellant had primarily been raised by her grandparents. (PC X, 446). He also agreed with the other witnesses that Grandmother Fotos had not liked the appellant. (PC X, 446). Grandmother Pike, on the other hand, loved the appellant and cared for her kindly. (PC X, 448). He stated that the appellant was devastated when she died. (PC X, 458).

Mr. Pike admitted to having spanked the appellant with his hand and with a belt when he disciplined her. (PC X, 449-450). He did not agree, however, that the spankings had been severe enough to leave welts, bruises, or cuts. (PC X, 469). He further stated that whenever either he or the appellant's mother had trouble with the appellant, each would send her back to the other parent to live. (PC X, 455). He did not, however, agree that the appellant had not been loved by either parent. (PC X, 455).

Mr. Pike testified that his former wife, Kathleen Allman, had made accusations that the appellant had sexually abused their daughter, but that neither he nor his daughter had ever believed the accusations. (PC X, 457, 461). He stated that he was not aware of any abuse of the appellant by any of her mother's boyfriends or husbands. (PC X, 475-476).

Faye Johnson Guy testified that she had known the appellant's mother and the petitioner for years. (PC X, 488). She testified regarding Hansen's relationships with men and about the inappropriate things, such as pornographic movies, horror movies, and drinking, that had occurred around the appellant as a child. (PC X, 499-500). She stated that she had told Hansen that these things were inappropriate, but Hansen disagreed. (PC X, 498-499).

Several of the appellant's childhood friends testified that the petitioner never really had a relationship with her mother and that her conditions at home were not good. (PC XI, 515-516). They further testified that the appellant had a quick temper, used drugs, and was violent toward others, but not toward her friends. (PC XI, 517-520, 525).

Several people who had worked at Swannanoa and Sheaffer Houses, as well as one of the appellant's social workers, testified at the post-conviction hearing. Some testified that the appellant had been at Swannanoa longer than she should have been because she would sabotage herself so that she would not have to go home. (PC XI, 597-598). Appellant was described as very intelligent but prone to drastic mood swings. (PC XI, 600).

Several people who either worked with the appellant or were students at the Job Corps also testified at the post-conviction hearing. They testified generally to the violent atmosphere at the Job Corps and how the staff there had done nothing about it. (PC XII, 679). Colleen Slemmer, the victim, was described as being respectful,

sharp, and very skilled in her work. (PC XIII, 753-754). Appellant was also described in relatively positive terms. Tadaryl Shipp, who was not liked by many of the students, was rumored to have carried a weapon with him. (PC XIII, 767).

Tyrone Comfort, a former student at Job Corps, testified that he had been best friends with the appellant. (PC XV, 154). He stated that the appellant had a short temper and would sometimes snap. (PC XV, 154-155). He testified that the appellant and Shipp had often argued, and he recalled seeing bruises and marks on the appellant at times, although he admits that he never actually saw Shipp hit her. (PC XV, 157-161).

Jermaine Bishop, another former student, testified that he was currently serving time for especially aggravated kidnapping and especially aggravated robbery. (PC XVI, 248). He testified that he was aware of the appellant's involvement with Shipp and had described Shipp as being in control of the relationship. (PC XVI, 254). He also stated that Shipp and the appellant argued frequently. (PC XVI, 252).

Kim (Iloilo) Rhodes, another student and friend of the appellant, testified that she had been a state's witness at the trial. (PC XIII, 790-791). She described Job Corps as a scary place and acknowledged the excessive drug use that was prevalent. (PC XIII, 793-794). She stated that she had become close friends with the appellant, and the two shared secrets and generally felt safe with each other. (PC XIII, 795-796). She stated that she had never seen the appellant act violently toward anyone.



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 40 of 117 PageID #: 9107

(PC XIII, 796). She testified that, while at Job Corps, the appellant had become sick and had suffered a miscarriage. (PC XIII, 796).

Ms. Rhodes then testified about the statements that the appellant had made to her after the murder of Colleen Slemmer. (PC XIII, 800). She stated that Pike had told her that she had cut the victim's throat, had beaten her, and had thrown asphalt on her head. (PC XIII, 812). She stated that Pike told her that she kept cutting the victim because the victim was a witch and she would not stop talking. (PC XIII, 815).

Judge James Matthew Martin, who had been Pike's juvenile attorney in North Carolina, testified that he thought that sending the appellant to training school was a mistake. (PC XIV, 53). He felt that she would have benefited more from some other type of service. (PC XIV, 54). He had considered the appellant an abused child and was not surprised when she was later diagnosed with Bipolar Disorder. (PC XIV, 66).

Tadaryl Shipp, the appellant's co-defendant, testified that he and co-defendant Shadola Peterson had been members of the Gangster Disciples, but that the appellant had not been a member. (PC XIV, 85-86). He stated that the appellant had been his best friend and that they were romantically involved. (PC XIV, 89). He described the appellant as a caring but moody person who would occasionally hit him for no apparent reason. (PC XIV, 90-91). He described the appellant as two different people when she was either agitated or calm. (PC XIV, 93). He indicated that the

appellant had been particularly agitated prior to the murder, but he did not know why. (PC XIV, 94).

Shipp stated that he had been the one who carved the pentagram on the victim, but he could not explain why he had initially told detectives that the appellant had brought the weapons and helped carve the pentagram. (PC XV, 110-111). Likewise, he testified that he did not recall whose idea it was to bring the victim to the scene, even though he initially told detectives that it had been Pike's idea. (PC XV, 119). He further claimed that he would have testified at the appellant's trial if asked, even against the advice of his attorneys. (PC XV, 127).

Dr. Diana McCoy, the appellant's mitigation specialist at trial, testified at the post-conviction hearing as an expert in the field of clinical psychology as well as mitigation. (PC XXIV, 617). She stated that she had been hired as a mitigation specialist by Attorney Talman to help prepare for the appellant's trial. (PC XXIV, 620). She described her job as collecting information and records, interviewing family and friends, and analyzing the information in an attempt to develop themes of the appellant's defense. (PC XXIV, 621). She stated that she had been told specifically by the attorneys to prepare a report, but not an opinion. She stated that she had provided a final bound version of her report to the attorneys on March 24, 1996, but had gone over the materials with them much earlier. (PC XXIV, 623, 633, 672). She indicated that she and the attorneys were in regular contact and were constantly providing each other with documents and information. (PC XXIV, 623).



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 42 of 117 PageID #: 9109

She described Attorney Talman as being as familiar with the materials as she was. (PC XXIV, 621). She further stated that Attorney Talman never asked her to leave things out of her report.

Dr. McCoy testified that the vast majority of her contact in the case had been with Attorney Talman and acknowledged that they had worked a lot and well together. (PC XXIV, 622-623). Records established that she had met with Talman face to face at least fourteen times and talked with him at least forty times over the phone. (PC XXIV, 623). She stated that she had much more collaboration with Talman than she had experience on any other capital case that she had worked. (PC XXIV, 623).

Dr. McCoy stated that she had met with the appellant nine times prior to trial. (PC XXIV, 626). She stated that she had wanted to build a rapport with the appellant so that she would open up to her about everything. (PC XXIV, 627). She acknowledged that she had known of Dr. Engum's diagnosis regarding Borderline Personality Disorder ("BPD") and agreed with it. (PC XXIV, 639-640). She opined that family members alone would not be enough to fully explain who the appellant was and why she committed this crime. She stated that while there were a few things that she was not able to get prior to trial, she felt that she had done an adequate social history and there was compelling mitigation evidence to be presented on behalf of the appellant. (PC XXIV, 668).

Dr. McCoy explained in detail that her first theory was Borderline Personality Disorder ("BDP"). (PC XXIV, 677, 695). She explained some of the characteristics, such as: fear of abandonment, unstable relationships, mood swings, unstable self-image, and impulsivity. (PC XXIV, 678). Another theme that Dr. McCoy asserted in mitigation was what she called the "tough girl image." (PC XXIV, 700). She opined that this was an image that the appellant had cultivated in order to come across as fearless, when in fact she was a pretty scared kid. (PC XXV, 702). The next theme that she had asserted was that the appellant was self-destructive. (PC XXV, 704). She gave examples of the appellant's past history of sabotage and suicide attempts. (PC XXV, 705). She further described the appellant as promiscuous with an intense fear of rejection. (PC XXV, 706).

Dr. McCoy testified that she had never told the attorneys that she did not agree with Dr. Engum's diagnosis of BPD and that it had never come up. (PC XXV, 714). When asked why she had not testified at trial, she stated that she had not been given a reason. (PC XXV, 714). She recalled that Attorney Talman had called her after the guilty verdict and was very upset because the prosecutor had gone "ballistic" about receiving the mitigation report so late and felt that it was all hearsay. (PC XXV, 740). She stated that Talman had asked her to lie about when she had given the report to him, but she refused. (PC XXV, 740). She opined that this is when Talman decided not to call her as a witness. (PC XXV, 741). She further acknowledged that she had met with Talman for several hours that evening and that

Talman had decided to call the petitioner's parents and aunt as mitigation witnesses. (PC XXV, 743). She stated that she had met with these witnesses at Talman's office the following morning to prepare for sentencing. (PC XXV, 743).

Dr. McCoy testified that, while she had not prepared opinions for trial, she had prepared them for post-conviction hearings. She opined the following:

(1) Appellant is the product of a highly dysfunctional family with much of her subsequent developmental issues stemming from this;
(2) Appellant experienced a number of traumatic events during childhood and adolescence, including rapes as well as physical abuse at the hands of her father and step-father, and physical and sexual abuse by one of her mother's boyfriends that further contributed to the exacerbation of psychiatric problems;
(3) Appellant's parents failed to adequately address their daughter's emotional problems;
(4) Appellant's psychological problems include:
   (a) attachment issues, with this significantly contributing to her dysfunctional relationships, including Tadaryl Shipp;
   (b) inability to maintain emotional control, particularly during times of stress, with reliance on others to help her maintain boundaries;
   (c) a constant need for attention;
   (d) assumption of a tough-girl image to compensate for poor self-esteem and a lack of self-respect; and
   (e) a need to please others and a willingness to be influenced by others, no matter what the cost to herself; and
(5) Appellant was experiencing considerable stress at the time of the homicide, which contributed to her participation.

(PC XXV, 761-763). Dr. McCoy opined that at the time of the murder, the appellant had felt that her identity, which was centered around Tadaryl Shipp, had been slipping away. (PC XXV, 770). She further stated that the appellant's problems at the Job Corps and her problems with the victim had made her feel like

she was losing her own sense of self-esteem and identity. (PC XXV, 771). She stated that because of the appellant's BPD, she had felt frantic and had experienced irrational anger. (PC XXV, 772). She further discussed various events in the appellant's life where the appellant had not recalled details of what had happened when she became very angry. (PC XXVI, 810). She opined that, because of the appellant's BPD, she does not have the controls of a normal person. (PC XXVI, 810). She was not willing, however, to say that Pike has no control whatsoever as it relates to criminal responsibility. (PC XXVI, 815).

On cross-examination, Dr. McCoy acknowledged that, in her thirty-one years of doing this type of work, she has never testified in a single capital case. (PC XXVI, 820). She stated that she believed that a psychologist, rather than an investigator, was necessary for mitigation because of the training needed to understand issues related to BPD. (PC XXVI, 822). She admitted that it had not been part of her job to diagnose the appellant, nor to assess her criminal responsibility. (PC XXVI, 822-823). She further stated that, although her report and records were handed over to the state, she did not mind and it was not anything new to have done so. (PC XXVI, 825-826).

Dr. McCoy further explained on cross-examination that, while BPD is characterized by some psychotic elements, she was not of the opinion that the appellant had a psychotic episode during the murder. (PC XXVI, 831). She admitted that she had not discussed the details of the murder with the appellant

because she felt that was Dr. Engum's job. She did not consider it her job to do things that might lead to a different diagnosis than that of Dr. Engum. (PC XXVI, 838). Dr. McCoy stated that, because Dr. Engum was a neuropsychologist, she assumed that if a neurologist was needed, he would have been the person to suggest it. (PC XXVI, 839-840).

Dr. McCoy acknowledged that she did not think that the appellant's interest in the slaughterhouse or horror movies were related to her BPD, but rather were more related to her desire to spend more time with her grandfather and mother. (PC XXVI, 867). She further opined that the appellant is "the poster child" for BPD. (PC XXVI, 893-894).

Dr. Jonathan Henry Pincus, an expert in neurology, testified that he examined the appellant in March of 2001 and then again just prior to the post-conviction hearing. (PC VIII, 222). He stated that, in his research of murderers, he has found three factors generally exist: brain damage, history of abuse, and presence of mental illness. (PC VIII, 220-221). He opined that the appellant had all three factors and that this information was available prior to trial. He discussed the appellant's history of abuse and social history and supported Dr. Kenner's diagnosis of Bipolar Disorder. (PC VIII, 230).

Dr. Pincus stated that the appellant's physical exam was generally normal with only minor abnormalities. (PC VIII, 223-234). An MRI exam showed an abnormality just lateral to the ventricle in the frontal lobe, which he described as a

heterotopia. (PC VIII, 238). He stated that heterotopias are generally invisible to the eye on test results and often occur during fetal development. A common cause, he opined, is maternal exposure to alcohol during pregnancy. (PC VIII, 241-242). An EEG from 1977, taken when the appellant was fourteen months old, also showed an abnormality in that area of the brain. (PC VIII, 247-248). He opined that the physical examination of the appellant, the MRI, and the EEG all pointed to the same area of the brain. (PC VIII, 249).

Dr. Pincus opined that the appellant's frontal lobes were not put together properly. (PC VIII, 243). He stated that the frontal lobes are an important feature in a person's moral and ethical standards, which are developed through experience and encoded in the brain. (PC VIII, 243). He testified that the appellant's ability to do this was damaged "from the get go." (PC VIII, 243).

When asked about Dr. Engum's conclusions regarding the lack of brain damage, he stated that they only meant that the tests performed by Dr. Engum did not show brain damages, which he claimed was not unusual for this area of the brain. (PC VIII, 248). He stated that the area of abnormality is notoriously difficult to test as far as functioning and "there is no psychological test that reflects the abnormality of the super orbital cortex in the midline" as with the appellant. (PC VIII, 249-250). He stated that he did not have any issues with Dr. Engum's findings, but believed that Dr. Engum should have only said that he had *found* no abnormalities. (PC VIII, 283).

When describing the murder, Dr. Pincus stated that it was his understanding that the appellant had not slept well for the three days before the murder and was in the midst of a very excited, irritable period. (PC VIII, 276-277). He opined that the victim had done things to Pike to trigger her anger. (PC VIII, 277). Dr. Pincus professed that Pike probably would have killed Kenny Clyde, a man who had been stalking her and her mother, if she had not been stopped by a friend. (PC VIII, 270-271).

Dr. Pincus stated that he did not think the death penalty was appropriate, but thought that Pike should be in prison because she might very well kill again if she got angry. (PC IX, 318). He also admitted that he felt that Pike was capable of forming a plan to kill someone and following through with it, although he did not think that happened in this case. (PC IX, 321). He also admitted that Pike probably did mean it when she stated on the day before the murder that she was going to kill the victim. (PC IX, 324). He also admitted that he did not think that Pike was capable of remorse or empathy. (PC IX, 326-327).

Dr. William Kenner, an expert in forensic psychiatry, testified that he believed that there was data available at the time of trial that could have been discovered if a competent psychiatrist had conducted an examination of the appellant. (PC XXIX, 35-36). He stated that he had personally examined the appellant, reviewed her history and made the following diagnoses:

| | |
|---|---|
| Axis I (active diagnosis): | Bipolar II Disorder, hypomanic recurrent |
| Axis II (personality disorder): | Borderline Personality Disorder<br>Antisocial Personality Disorder |
| Axis III (active medical conditions): | von Willibrand Disease |
| Axis IV (psychosocial stressors): | Problems with primary support group, social environment, incarceration |
| Axis V (global assessment): | 15 |

(PC XXIX, 74-75). In reviewing her records and talking with the appellant and her mother, Dr. Pincus opined that there were signs of early onset bipolar disease. (PC XXIX, 35). He further explained that, in his opinion, this information was critical in order for the jury to make a connection between the appellant's condition and the offense that she committed. (PC XXIX, 44). Dr. Kenner professed that at the time of the murder the appellant had been experiencing a two- to four-day cycle of sleep deprivation with increasing irritability, which peaked at the time of her offense. (PC XXIX, 44-45).

Dr. Kenner further discussed the appellant's history of trauma and abuse as well as her history of seizure disorder occurring when she was fourteen months old. (PC XXIX, 48). He opined that, if these tests had been done prior to trial, it would have shown the abnormality discussed by Dr. Pincus. (PC XXIX, 49-50). He further stated that there is a high correlation between the abnormality described by Dr. Pincus and teenagers who developed Bipolar Disorder. (PC XXIX, 49-50).

Dr. Kenner stated that in early 2002, the appellant started taking Lithium and had described her reaction as dramatic. (PC XXIX, 68). In May 2002, Dr. Kenner evaluated the appellant again and diagnosed that her Bipolar II Disorder was in

partial remission as a result of the medication. (PC XXIX, 68, 76). Despite his new diagnoses, he testified that he now thinks that the appellant's personality disorder were part of her Bipolar Spectrum Disorder. (PC XXIX, 78, 81). He stated that Bipolar Disorder is an illness that "doesn't have terribly clear borders." (PC XXIX, 78). He further stated that "many of the things we used to think of as personality disorders, and are described in DSM IV in that way, actually reflect part of the – Bipolar Spectrum." (PC XXIX, 81). He opined that the appellant is not borderline and is not antisocial. (PC XXIX, 82). He also admitted that there is an ongoing debate in the mental health community as to whether BPD is misdiagnosed Bipolar Disorder or whether there is, in fact, BPD. (PC XXIX, 81, 86). Despite this, Dr. Kenner professed that he thinks, in the appellant's case, what had been diagnosed as BPD was actually part of a Bipolar Spectrum Disorder. (PC XXIX, 88). He also indicated that new diagnoses are constantly emerging in the mental health community. (PC XXIX, 81-88).

On cross-examination, Dr. Kenner admitted that, given the information that the defense team had, BPD was a reasonable diagnosis when the trial was held. (PC XXX, 190-191).

William Crabtree, lead prosecutor in the petitioner's trial, testified that he has been employed with the Office of the Knox County District Attorney General for over thirty years. (PC XIX, 232). He testified that Dr. Diana McCoy had been a psychologist in Knox County for a number of years and that the two had dated for a

period of time. (PC XIX, 232). He stated that they had dated prior to the appellant's trial and were not at all involved during the trial. (PC XIX, 233).

General Crabtree testified that he did not even know that Dr. McCoy was involved in the appellant's trial until her notebooks were turned over to him prior to the sentencing phase. (PC XIX, 237). He stated that he was not happy about receiving the three-volume report so late in the proceedings. (PC XIX, 238). However, he stated that he did not recall if there was any new information in the report or whether it was all information that they had already known. (PC XIX, 240).

William C. Talman, the appellant's counsel at trial, testified that he has been a practicing attorney in Knoxville since 1986. (PC XIX, 254). At the time of the appellant's trial, Mr. Talman's practice had been exclusively criminal defense. (PC XIX, 255). Prior to his appointment on this case, Talman had handled several murder trials, but had not previously handled a capital case. (PC XIX, 255).

Mr. Talman testified that in 1993 or 1994 he had learned that the Comptroller's Office was conducting an audit of the indigent defense system and that he was likely one of the attorneys involved in the audit. (PC XIX, 256). He stated that, as a result of a "self-audit," he discovered that he had occasionally billed for more than 24 hours a day and had self-reported this to the Board of Professional Responsibility. (PC XIX, 257). In his report to the Board, Talman stated, "I don't know whether I violated a rule or not, but in case I did I'm self-reporting." (PC XIX,

258). He acknowledged that in April of 1995, he paid back roughly $67,000 to the indigent defense fund. (PC XIX, 259). Mr. Talman was appointed to represent the appellant on May 25, 1995. (PC XIX, 261).

Talman testified that he was aware that his name had been in the newspaper in connection with the audit of the indigent defense fund, but he did not recall whether or not it was covered on the television news or radio. (PC XIX, 263). At the time he was appointed to this case, Talman stated, he "had been cleared to go forward as far as practicing law." (PC XIX, 263). At the time of his appointment, the only bar complaint against Mr. Talman was the one that he had made himself. (PC XIX, 263). He stated that this complaint was settled, that he never received an active suspension, and that his practice has never been interrupted. (PC XIX, 264). He indicated that he had no concern that any member of the jury might recognize his name in connection with the Comptroller's investigation. (PC XIX, 265).

Mr. Talman stated that his practice involved a lot of murder cases, as well as a lot of high-profile cases. (PC XIX, 266). He estimated that he had handled a dozen or more felony jury trials and did not recall whether he had used expert witnesses prior to the appellant's trial. (PC XIX, 266). However, he stated that he had always used investigators, pathologists, and psychologists. (PC XIX, 266-267). Mr. Talman recalled that he had been in contact with Bill Redick and John Oliva at the Capital Case Resource Center at some point prior to the trial. (PC XIX, 272).

Fairly early on in the trial preparation, Mr. Talman retained the services of Dr. Engum for the purposes of psychological testing. (PC XIX, 274-275). He stated that he had met with Dr. Engum several times to discuss the case and his findings. (PC XIX, 278). In late summer or early fall of 1995, Talman retained the services of Dr. Diana McCoy as a mitigation specialist. (PC XIX, 280). Mr. Talman testified that he met with Dr. McCoy quite frequently to discuss the case. (PC XIX, 283). Talman stated that Dr. Engum's responsibility was to conduct a neurological evaluation and that Dr. McCoy's responsibility was to gather background information and compile a social history. (PC XIX, 283). Talman's strategy was to use Dr. Engum in the guilt phase of the trial and then bring in Dr. McCoy during the sentencing phase. (PC XIX, 280-281).

Mr. Talman testified that Julie Ann Martin Rice had been appointed as co-counsel, but that he had not previously worked with her. (PC XX, 319). He testified that Ms. Rice had previously handled criminal trials while she was with the Public Defender's Office in Blount County. (PC XX, 319). Mr. Talman testified that he was aware that Ms. Rice had not previously handled a capital murder trial. (PC XX, 320). He stated that Ms. Rice was to handle the penalty phase of the trial because he felt they would "do better in a penalty phase with a female attorney." (PC XX, 321). He further stated that he was responsible for the whole case and that they tried to divide both phases of the trial between the two of them. (PC XX, 321). Talman

stated that, as lead counsel, he was responsible for working directly with Dr. McCoy. (PC XX, 322).

Talman testified that the appellant was a very cooperative, but very complicated, client. (PC XX, 323). He acknowledged that the appellant had cooperated with the state and this case was not a "who done it." (PC XX, 323). It was Talman's assumption that this case was going to go to the penalty phase of the trial. (PC XX, 324). He acknowledged that "between voir dire and sentencing [the petitioner was] either going to get the death penalty or not" and that "what took place in between those was of somewhat limited significance." (PC XX, 325).

Mr. Talman stated that he had planned to have Dr. McCoy testify at the sentencing phase regarding the appellant's background and have her "tie it in with Dr. Engum's report." (PC XX, 328). He acknowledged that, looking back at the trial, there are things that he wished he could have done differently. (PC XX, 329). Talman did not specifically recall discussing with Dr. McCoy potential witnesses that should be presented at the sentencing phase, but he assumes that he did. (PC XX, 331-332). He stated that he did not think that he was ever dissatisfied with the work that Dr. McCoy had done. (PC XX, 333).

Talman stated that, during the guilt phase, the defense tried to attack the elements of intent and premeditation. (PC XX, 336). He testified that they tried to "soften Christa as best we could, make her a person" and that they did the best they could under the circumstances. (PC XX, 336). He stated that he had spent a

considerable amount of time investigating the case, travelling to North Carolina, interviewing friends and family and numerous other witnesses. (PC XX, 340). Talman did not specifically recall interviewing anyone from either of the juvenile facilities where the appellant spent time. (PC XX, 343).

Talman testified that he had planned on using Dr. McCoy to give an overview of the appellant's life. (PC XX, 344). He acknowledged that he was hesitant about even using Dr. McCoy's report because it contained a lot of information that he did not want to come in. (PC XX, 345). He stated that the primary reason he did not call Dr. McCoy to the stand was because she could not corroborate Dr. Engum's testimony. (PC XX, 348). He said that the final decision was made not to call Dr. McCoy right before the sentencing phase began. (PC XX, 351). He did not recall whether or not he had discussed this decision with the appellant. (PC XX, 396). One of the factors in this decision was that Dr. McCoy informed him that she could not corroborate Dr. Engum's report because she did not conduct an evaluation on the appellant. (PC XX, 352). Mr. Talman stated that he did not know whether Dr. Engum had the chance to review Dr. McCoy's report prior to trial. (PC XX, 371). He also stated that he was uncomfortable with Dr. McCoy's relationship with General Crabtree. (PC XX, 353). However, Dr. McCoy assured him that she had not discussed the case with General Crabtree, and he never doubted Dr. McCoy's integrity. (PC XX, 355).

Mr. Talman stated that the final decision to call only the three witnesses who were presented at the sentencing phase was made sometime during the week of the trial itself. (PC XX, 372). He also admitted that he did not conduct any independent research into Borderline Personality Disorder ("BPD") and, in retrospect, he should have done so. (PC XX, 389).

Talman recalled that, during voir dire, the publicity of this case was quite extensive. (PC XX, 397). He stated that almost all of the prospective jurors had heard something about the case. (PC XX, 398). Talman did not recall whether or not he asked any questions during voir dire to "life-qualify" the jury. (PC XXI, 408).

Talman acknowledged that he may have discussed the possibility of writing a book with Carrie Ross, the petitioner's aunt, after the case was over, but that nothing had become of it. (PC XXI, 410). He did not recall ever discussing writing a book with Ms. Rice and stated that he never made any profit off the appellant's story. (PC XXI, 414). He further stated that he was devastated and depressed for a long time after the appellant was sentenced to death. (PC XXI, 412).

Talman testified that he received an offer for a settlement for life without parole, but the appellant indicated that "she did not want to grow old in jail[.]" (PC XXI, 426). Talman testified that she said that "if there was no chance of ever getting out, she didn't want to do the deal." (PC XXI, 427). Talman admitted that his biggest regret was "not hammering away at Christa to take a settlement." (PC XXI, 427).

On cross-examination, Talman acknowledged that the appellant did not receive prefect representation at trial. (PC XXI, 454). He further stated that, although he wishes he had done some things differently, he did not think, given the facts and circumstances, a jury would have come back differently. (PC XXI, 454).

Talman stated that he did not consider withdrawing from the case because of the over-billing issues and considered the matter closed before he was appointed. (PC XXI, 456). He testified that they had done an internal audit in his office and arrived at a figure that they felt was a fair settlement. The money was paid, and he considered the matter concluded. (PC XXI, 457). He said that, after they had paid this settlement, he had started to receive court appointments again. (PC XXI, 458). He had discussed these allegations with the appellant and she did not have any problem with the issue. (PC XXI, 469). He further stated that this issue did not affect his performance or zealousness in his representation of the appellant. (PC XXI, 472).

Talman stated that he had always believed that Tadaryl Shipp had done more in this case than the appellant had said he had done. (PC XXI, 479). He felt, however, that the jury was not going to let the appellant off because "Mr. Shipp had done this or Ms. Peterson done this or that." (PC XXI, 480). He felt that the big problem he had with the case was that the appellant was protecting Shipp. (PC XXI, 480).

Talman testified that he felt he had a good relationship with the appellant and that they had met frequently to go over the case. (PC XXI, 481). He stated that his workload during the appellant's trial was reasonable. In fact, he said, they may have neglected other clients in order to put further effort into the appellant's case. (PC XXI, 483).

Mr. Talman stated that in his experience, "juries aren't real impressed with experts." (PC XXII, 501). Unfortunately, he stated, juries look at the facts of the case. (PC XXII, 501). He further reiterated the numerous reasons that he had decided not to call Dr. McCoy as a witness. (PC XXII, 502).

Julie Ann Martin Rice, Mr. Talman's co-counsel at trial, testified that she has been licensed to practice law since 1992. (PC XVII, 22). She testified that she was appointed to represent the appellant on January 23, 1996. (PC XVII, 26). She stated that her practice at the time was primarily criminal defense. (PC XVII, 29). Prior to her appointment, Mr. Rice served as an Assistant Public Defender in Blount County where she handled felony and misdemeanor trials. (PC XVII, 31). She acknowledged that she had never handled a murder trial prior to her involvement in the appellant's case. (PC XVII, 33). She stated that her primary role on the defense team was research and motions-drafting. (PC XVII, 37). Ms. Rice was also responsible for preparing for voir dire, conducting some cross-examination in the guilt phase, and handling the family witnesses in the penalty phase. (PC XVII, 48).

Ms. Rice testified that she believed that the appellant was under the influence of Tadaryl Shipp. (PC XVII, 49). She stated that, in the penalty phase, they attempted to establish that the appellant came from a dysfunctional family with a history of alcohol and drug abuse. (PC XVII, 73). She acknowledged that only three witnesses were called to establish this and that Dr. McCoy was not one of them. (PC XVII, 77). She indicated that there were several problems with Dr. McCoy, such as her relationship with the prosecutor, which led to their decision not to call her as a witness. (PC XVII, 77). She stated that she did not trust Dr. McCoy as a witness after finding out that she had withheld her relationship with General Crabtree from them. (PC XVII, 87). She also stated that they had an issue with the fact that Dr. McCoy was not in agreement with some of Dr. Engum's report. (PC XVII, 79). Because of these problems, they could not use Dr. McCoy as a witness, but tried to get her report admitted nonetheless. (PC XVII, 80). Ms. Rice did not recall when the decision was made not to use Dr. McCoy. (PC XVIII, 113).

Ms. Rice acknowledged that they had to be careful about the type of mitigation evidence that they presented. (PC XVIII, 125). She admitted that they had "a horrible case with horrible facts and someone that confessed ad nauseam and kept confessing over and over and over in letters that she was passing out." (PC XVIII, 125). She stressed that presenting past incidents in the appellant's life was a "two-edged sword" that could hurt them as much as it helped. (PC XVIII, 125).

On cross-examination, Ms. Rice acknowledged that she was aware of Mr. Talman's overbilling issues when she was appointed on this case. (PC XVIII, 168). She did not think that these issues affected Mr. Talman's representation of the appellant. (PC XVIII, 168). She recalled that the publicity surrounding the appellant's case was concerning, but their strategy was to get the case to the jury before the publicity got even worse. (PC XVIII, 170).

Rice further stated that during the guilt phase, they were going for second degree murder by trying to knock out the element of premeditation. (PC XVIII, 172). Again, she indicated that she felt that Tadaryl Shipp dominated the appellant and urged her to commit the murder of Colleen Slemmer. (PC XVIII, 182). She stated that much of Dr. McCoy's report undermined the whole theory that the appellant did not premeditate or that Shipp dominated her. (PC XVIII, 185). Finally, in regards to Dr. McCoy's report, Ms. Rice stated that the prosecution was unable to use many of the damaging facts contained in the report as a result of their decision not to call Dr. McCoy as a witness. (PC XIX, 201).

# ARGUMENT

## I. APPELLANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF COUNSEL'S ALLEGED CONFLICTS OF INTEREST.

Appellant alleges that the post-conviction court erred in denying her claim of ineffective assistance at trial as a result of counsel's alleged conflicts of interest. Specifically, she claims that she is entitled to relief under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections Eight and Nine, of the Tennessee Constitution because: (1) trial counsel had been under investigation for overbilling the indigent defense fund, (2) trial counsel allegedly made a false statement to the court, and (3) trial counsel had discussed media rights with witnesses prior to trial and appeal. However, the appellant has failed to prove that counsel's performance was deficient or that she was prejudiced by any of the alleged deficiencies. She is not entitled to post-conviction relief on this claim.

In order to receive post-conviction relief based on a claim of ineffective assistance of counsel, a defendant must demonstrate the existence of two factors: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).



Case 1:12-cv-00035-HSM-SKL Document 13-2 Filed 08/01/12 Page 62 of 117 PageID #: 9129

Deficiency is established by a showing that counsel's performance was so serious that it fell below the range of competence demanded of an attorney in a criminal case. *Strickland*, 466 U.S. at 687. In order to establish prejudice, the petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* There are, however, a small number of cases in which actual prejudice need not be shown. *United States v. Cronic,* 466 U.S. 648 (1984). In *Cronic*, the United States Supreme Court stated that there are situations where counsel's performance is so deficient that it becomes presumptively prejudicial, *i.e.,* when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id* at 658-659.

A conflict of interest does not, in and of itself, constitute ineffective assistance of counsel. Unless the petitioner shows that counsel was burdened by an actual conflict, he must prove both that counsel's performance was deficient and that he was prejudiced by such deficiency. *Strickland,* 466 U.S. at 692. In *Cuyler v. Sullivan,* 446 U.S. 335, 350 (1980), the Supreme Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. However, prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Id.,* at 350. Until a defendant shows that his counsel actively

represented conflicting interests, he has not established the constitutional predicate for his claim. *Id.*

In *Cuyler,* a case heavily relied on by the appellant for his contention that prejudice is presumed, the defendant and his two co-defendants were indicted for first-degree murder. Two lawyers represented all three defendants throughout the trial without objection from the defendant to the multiple representation. Defendant was convicted, while his co-defendants were acquitted. The lower appellate court found that both lawyers had represented defendant and that reversal was required because there was a possibility of a conflict of interest in that representation. The Supreme Court, however, vacated, holding that where a defendant raises no objection at the trial to the sufficiency of the multiple representation, he is required to show that an actual conflict of interest adversely affected his lawyer's performance. The Supreme Court expressly held that "the possibility of a conflict is insufficient to impugn a criminal conviction." *Cuyler,* 446 U.S. at 350.

In the present case, trial counsel did not "actively represent conflicting interests" that adversely affected his performance, *Id.,* at 350, nor did the alleged deficiencies result in a complete failure to "subject the prosecution's case to meaningful adversarial testing," *Cronic,* 466 U.S. at 659. Accordingly, in order to demonstrate that she received ineffective assistance of counsel as a result of the alleged conflicts, the appellant must establish both deficiency and prejudice. *Strickland,* 466 U.S. at 692.

The standard of review which applies to this matter is set out in *Fields v. State*, 40 S.W.3d 450, 456 (Tenn.2001):

> The standard of appellate review applied to ineffective assistance claims has always been that a trial court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Under this standard, appellate courts do not reweigh or reevaluate the evidence or substitute their own inferences for those drawn by the trial court. *Henley*, 960 S.W.2d at 579. Furthermore, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. *Id.*

***A. Appellant failed to demonstrate that counsel was conflicted as a result of the Comptroller's investigation into his prior billings to the indigent defense fund.***

Appellant first alleges that she received ineffective assistance of counsel as a result of the Comptroller's investigation into counsel's prior billings to the indigent defense fund. Although the appellant's rationale for alleging a conflict of interest is unclear, she presumably maintains that counsel was conflicted between his representation of the appellant and an unsubstantiated fear of being prosecuted by the state. However, because the appellant fails to demonstrate that counsel was actually conflicted by the investigation or that she was prejudiced by any alleged deficiency or conflict, as is required under *Strickland,* she is not entitled to post-conviction relief.

First, in denying this claim, the post-conviction court correctly found that Pike had waived any conflicts of interest. "[Attorney] Talman testified that he had

informed [Pike] of the issue and that she actually liked him more because of it. No issue was raised either pretrial or at trial." (PC V, 646; PC XXI, 469). Appellant, however, is apparently confused about the court's interpretation of "waived" and argues that the legal findings were erroneous.[3]

Appellant first contends that under *Smith v. State,* 1997 WL 658996, *5 (Tenn. Crim. App. Oct. 23, 1997), "the statements of counsel are insufficient, as a matter of law, to constitute a waiver of a potential conflict of interest."[4] *Smith,* however, addresses the issue of whether a defendant can privately waive an actual or potential conflict of interest where his attorney is representing multiple defendants in the same matter with potentially conflicting interests. In such case, a defendant must state under oath whether he agrees to waive the potential conflict. *Id.* The facts in the appellant's case present no such situation requiring a waiver under oath of a potential conflict. Trial counsel did not represent any of the appellant's co-defendants, and there has been no showing that counsel represented any other interests that conflicted in any way with his representation of the appellant. The comptroller's investigation into the indigent defense fund matter had been concluded prior to trial and, regardless, there has been no showing of how this matter actively conflicted with counsel's representation of the appellant. Moreover, trial counsel voluntarily informed the appellant of this matter, and the appellant had no objection whatsoever. As such, the appellant's reliance on *Smith* is misplaced. There was no

[3] *See* Appellant's brief, p. 80.
[4] *See* Appellant's brief, p. 80.

conflict, and even if so, it was waived.

Likewise, the appellant's reliance on *Coleman v. State,* 2007 WL 1651882, *7 (Tenn. Crim. App. June 7, 2007), for his contention that an "actual conflict is created where an attorney is required to review his own performance"[5] is misplaced. In *Coleman,* this Court held that "representing a defendant in a post-conviction proceeding after having represented the defendant on direct appeal create[s] an actual conflict of interest." *Id.* As a result of such actual conflict of interest, plain-error review permits the appellate court to consider any errors, such as waiver of the conflict, in order "to do substantial justice." *Id.; see also* Tenn. R. Crim. P. 52(b). In the present case, trial counsel was never in such a position that required him to review his own performance. Counsel represented the appellant at trial and on appeal, not during any post-conviction proceeding. Counsel was not required, as in *Coleman,* to review claims against himself of ineffective assistance of counsel. As such, the appellant's reliance on *Coleman* is misplaced.

Regardless of the waiver, however, the post-conviction court addressed the appellant's substantive claim and found it to be without merit. "In order to establish a violation of the Sixth Amendment, a defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980)(holding that the mere possibility of a conflict of interest is not enough to establish ineffective assistance of

[5] *See* Appellant's brief, p. 80.

counsel where the defendant raised no objection to multiple representation at trial). Accordingly, the appellant was required to prove both deficiency and prejudice as is required under *Strickland*.

In denying this claim, the post-conviction court made the following findings of fact: Attorney Talman was under investigation by the Comptroller's Office and ordered to reimburse the state more than $60,000. (PC V, 646). Prior to the appointment of Talman, the court inquired into the status of the investigation and discovered that the reimbursement had been paid in full. *Id.* The actual investigation had concluded prior to Talman's appointment as the appellant's attorney. *Id.* Talman had been appointed by the Tennessee Supreme Court in another matter in March of 1995, two months prior to his appointment in this case. *Id.* Talman remained a licensed attorney, in good standing, throughout the entire investigation. *Id.* He consistently stated that he had considered this matter concluded prior to his appointment and had never spoken to anyone at the District Attorney's Office regarding the investigation. Additionally, he had informed the appellant of the investigation and she "seemed to like him more because of it." (PC V, 647).

The aforementioned findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court does not reweigh or reevaluate the evidence or substitute its own inferences for those drawn by the trial court. *Henley*, 960 S.W.2d at 579. Appellant

has failed to prove that the evidence on record preponderates against these findings of fact. Accordingly, he has neither established that counsel's representation was deficient nor that he was prejudiced by any alleged deficiency. As the post-conviction court correctly concluded, the appellant's allegations are merely speculative and nothing in the record demonstrates otherwise. The proof does not establish that "an actual conflict of interest adversely affected his lawyer's performance." *See Cuyler v. Sullivan,* 446 U.S. at 350. The post-conviction court's denial of this claim should be affirmed.

***B. Appellant has failed to establish a conflict of interest regarding alleged false statements trial counsel made to the court.***

Appellant next alleges that trial counsel lied to the court *in camera* about when he had received Dr. McCoy's mitigation reports, which supposedly created a conflict of interest. Appellant further contends that Attorney Talman asked Dr. McCoy to lie to the court about when she turned over the report to him, and when she refused, Talman decided not to call her as a witness. However, the post-conviction court correctly concluded that no such conflict existed. Appellant is not entitled to relief on this claim.

"[Q]uestions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Henley*, 960 S.W.2d at 579. The party seeking to overturn the findings of the trial judge bears the burden on appeal of demonstrating why the evidence contained in the record preponderates against the findings of the

trial judge. *Bolin v. State,* 405 S.W.2d 768, 771 (1966); *Black v. State,* 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

Appellant's allegation rests entirely on speculation and disputed testimony which does not preponderate against the post-conviction court's findings of fact. In denying this claim, the court found Attorney Talman to be credible when he testified that he had never asked Dr. McCoy or any other witness to lie under oath. (PC V, 657). The court also found that Dr. McCoy was clearly upset with Talman and implicitly found her testimony less credible than Talman. Additionally, Talman testified that there were multiple reasons why he chose not to call Dr. McCoy as a witness, including the primary reason that she could not corroborate the testimony of Dr. Engum (PC XX, 348), who testified at the guilt phase, and because of her past relationship with the prosecutor, William Crabtree (PC XX, 352).

Moreover, the court noted that the record does not support Dr. McCoy's testimony at the post-conviction hearing. Following the *in camera* meeting in which Talman turned over Dr. McCoy's report, Talman made the following statement on record:

> Your Honor, as I explained in chambers, I had just received this documentation earlier this week.

(PC V, 658). Neither the court nor the state objected to this statement or attempted to correct it for the record. As such, nothing in the record supports the appellant's current accusations.

Apparently acknowledging that the post-conviction court found Talman's version of events substantiated by the record and more credible than Dr. McCoy, appellant now insists that she is entitled to relief because "Dr. McCoy's version of events was also inherently plausible[.]"[6] However, the mere plausibility of an unsubstantiated accusation does not warrant post-conviction relief. Appellant's attempt to establish that the "mere plausibility" that Talman might not have called Dr. McCoy as a witness in order to protect himself created an actual conflict of interest erroneously relies on a *Mickens v. Taylor,* 240 F.3d 348, 361 (4th Cir. 2001) (three-prong standard for showing adverse affect in a conflict of interest claim). In *Mickens,* the Fourth Circuit held:

> [First,] the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. In the language of *Tatum,* the petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." *Tatum,* 943 F.2d at 376. Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Id.* Although the Fourth Circuit's decision in *Mickens* has not been adopted in any Tennessee decision, the *decision* itself was affirmed by the Supreme Court who added that, to void the conviction, it is necessary "for petitioner to establish that the conflict of interest adversely affected his counsel's performance." *Mickens v. Taylor,* 525 U.S. 162, 174 (2002).

---

[6] *See* Appellant's brief, p. 67.

Appellant contends that she is entitled to relief because she has satisfied all three prongs of the aforementioned test. Assuming *arguendo* that the *Mickens* test is the standard in this jurisdiction, and assuming *arguendo* that she has otherwise established the first two prongs of the standard, she has entirely failed to prove Talman's decision not to call Dr. McCoy as a witness was linked to an actual conflict or that the alleged conflict adversely affected counsel's performance. As discussed above, the post-conviction court found that Attorney Talman was more credible than Dr. McCoy in his testimony regarding when he received the mitigation report and why he decided not to call Dr. McCoy as a witness. Whereas Dr. McCoy's version of the events was "also inherently plausible," the evidence simply does not preponderate against the court's findings of fact that no conflict existed. Appellant's theory as to why counsel decided not to call Dr. McCoy is mere speculation and is unsubstantiated by any proof on the record. Accordingly, she is not entitled to post-conviction relief.

***C. There was no conflict of interest as a result of the discussion of media rights to the appellant's story.***

Finally, the appellant contends that the post-conviction court erred in denying relief when it found that there was no conflict of interest as a result of trial counsel's discussions with the appellant's aunt, Carrie Ross, about the rights to the appellant's story. Appellant, again, erroneously asserts that she is not required to show prejudice on such a claim. However, such a showing is, indeed, necessary, and she has entirely

failed to prove that she was prejudiced by any such alleged conflict. Appellant is not entitled to post-conviction relief.

Rule 1.8(a) of the Tennessee Rules of Professional Conduct, dictates that "[a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest *adverse to a client*" unless there is full disclosure, the client is given the opportunity to seek independent counsel, and the agreement is in writing and signed. (emphasis added). Tenn. Sup. Ct. R. 8, RPC 1.8(a). Generally, an agreement by which a lawyer acquires literary or media rights concerning the *conduct of the representation* creates a conflict of interest between the attorney and the client. (emphasis added) *See id.*, commentary [3]. If such conflict is proven, it is still necessary "for petitioner to establish that the conflict of interest adversely affected his counsel's performance." *See Mickens v. Taylor,* 525 U.S. at 174.

Contrary to the appellant's assertions, trial counsel did not enter into any such agreement with the appellant prior to or during trial. Talman did, however, acknowledge having a discussion with Carrie Ross, a person with no legal rights in the appellant's story, regarding potentially writing a book.[7] There is absolutely nothing in the record to suggest that either attorney entered into an agreement with the appellant herself, the only person able to legally give permission to use her story, prior to or during trial. Because there was no agreement regarding any literary or

[7] No such book has ever been written by either Attorney Talman or co-counsel Julie A. Martin-Rice.

media rights between the appellant and her attorneys prior to or during trial, there was no conflict of interest in that regard. Appellant's assertions that the alleged conflict "cast a shadow" on the trial because counsel were "motivated by monetary gains" is clearly erroneous.

On May 1, 1996, after the appellant was found guilty and sentenced to death but prior to direct appeal, she signed a release giving the attorneys permission to retell her story. *See* Exhibit 13, post-conviction hearing April 7, 2008. In pertinent part, the release is "limited to information which is public information, *e.g.* evidence at trial and in my court file, and their own personal experiences while working on [the appellant's] behalf." *Id.* The release further acknowledged that the attorneys may "eventually gain a pecuniary benefit from the retelling on [the appellant's] story." *Id.* Because this agreement was entered into after the conclusion of trial and sentencing, it is irrational to suggest that the appellant was adversely affected by the conduct of the attorneys during trial as a result of this post-trial agreement.

In regards to counsel's representation of the appellant on direct appeal, the appellant has failed to prove that she was prejudiced or adversely affected by the alleged conflict. Apparently acknowledging that she was neither prejudiced nor adversely affected during the appeal, the appellant insists that "she is not required to demonstrate prejudice on this claim."[8] Appellant is incorrect. This is not an example of counsel's performance that is so deficient that it becomes presumptively

[8] *See* Appellant's brief, p. 79.

prejudicial. *See United States v. Cronic,* 466 U.S. 648. Nor is it an example of a situation where counsel "actively represented conflicting interests" and such actual conflict "adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. at 350. Thus, a demonstration of prejudice is required. A conflict of interest does not, in and of itself, constitute ineffective assistance of counsel. Unless the petitioner shows that he was burdened by an actual conflict, such as representing multiple clients with conflicting interests, *see Cuyler v. Sullivan,* 446 U.S. 335, he must prove both that counsel's performance was deficient and that he was prejudiced by such deficiency. *See Strickland,* 466 U.S. at 692. In this case, the appellant has simply failed to demonstrate that she was prejudiced or adversely affected by this alleged conflict. She is not entitled to post-conviction relief.

## II. THE POST-CONVICTION COURT CORRECTLY DENIED RELIEF WHEN IT FOUND THAT THE APPELLANT FAILED TO PROVE THAT SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

Appellant challenges the post-conviction court's denial of relief on the grounds that trial counsel were ineffective in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. However, because the appellant failed to prove her allegations by clear and convincing evidence, the post-conviction court properly denied relief.

In order to obtain post-conviction relief, a petitioner must prove the allegations in his or her claim by clear and convincing evidence that his or her conviction or

sentence is void or voidable because of the abridgment of a right guaranteed by the United States Constitution or the Tennessee Constitution. Tenn. Code Ann. §§ 40-30-103 and 40-30-110(f). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)); *see also Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

On appeal, this Court reviews the post-conviction court's findings of fact *de novo* with a presumption that those findings are correct, unless the record preponderates against the factual findings. *State v. Fields*, 40 S.W.3d 450, 456-58 (Tenn. 2001). But the trial court's conclusions of law on the claim (i.e., that counsel rendered deficient performance or that counsel's deficient performance unconstitutionally prejudiced the petitioner) are reviewed under a purely de novo standard, with no presumption of correctness. *Id.,* at 458. This Court may not reweigh the evidence or substitute its own inferences for those drawn by the trial court, and questions concerning the credibility of the witnesses, the weight and value to be given their testimony and any factual issues raised by the evidence are all for the trial court's determination. *Id.* at 456 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)).

There is no dispute that a petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment of the United States

Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). To prove ineffective assistance of counsel, the petitioner must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases," *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), in other words, that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *see also Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). The petitioner must prove that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.

Any "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Counsel's performance must be viewed within the context of the case as a whole, taking into account all relevant circumstances and evaluating the attorney's allegedly deficient conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 690. In so doing, the reviewing post-conviction court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. "When assessing an attorney's performance it is not [a reviewing court's]

function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" *Henley*, 960 S.W.2d at 579 (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

Even if a petitioner sufficiently proves that trial counsel unconstitutionally rendered deficient performance, the petitioner must also prove that counsel's deficient performance somehow prejudiced the defense. *Strickland*, 466 U.S. at 687-88; *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993). In its review, this Court is not constrained to address deficient performance and prejudice in any particular order, and if the Court determines that the appellant has not proven one prong by clear and convincing evidence, the Court need not address the other prong in its analysis. *See Burns*, 6 S.W.3d at 461.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and in this regard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting *Strickland*, 466 U.S. at 694). The petitioner must prove a reasonable probability that but for counsel's deficient performance, the petitioner would have received an acquittal or a guilty verdict on a lesser-included offense or would have received a reduced sentence. *Wilcoxson v. State*, 22 S.W.3d 289, 304 (Tenn. Crim. App. 1999); *State v. Zimmerman*, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991). "In short, a petitioner must establish that the deficiency of

counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome." *Nichols*, 90 S.W.3d at 587 (citing *Burns*, 6 S.W.3d at 463).

In her current appeal, the appellant raises multiple claims of ineffective assistance. However, because the post-conviction court properly found each of these claims to be without merit, relief was properly denied.

### A. *Counsel was not ineffective for allegedly failing to discover or present mitigating evidence.*

Appellant argues that the post-conviction court erred in denying her claim of ineffective assistance as a result of counsel's failure to discover mitigating evidence and present it at the penalty phase of trial. The post-conviction court, however, carefully analyzed this argument under *Goad v. State,* 938 S.W.2d 363 (Tenn. 1996), discussed *infra,* and properly concluded that the claim is without merit. This decision should be affirmed.

When analyzing a claim of ineffective assistance as a result of failing to present mitigating evidence, the courts apply the three-pronged test set forth by our Supreme Court in *Goad v. State,* 938 S.W.2d 363, 371 (Tenn. 1996): (1) the reviewing court must first analyze the nature and extent of the mitigating evidence that was available and not presented; (2) the court must then determine whether substantially similar mitigating evidence was presented to the jury during either the guilt phase or the sentencing phase of the proceedings; and (3) the court must consider whether there

was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination. *Id.*, at 371.

In denying the appellant's claim, the post-conviction court first analyzed the mitigating evidence that was actually known to the defense at the time of trial, *i.e.*, the evidence contained in Dr. McCoy's mitigation report, and correctly concluded that the appellant had not met the *Goad* standard. In reaching its decision, the post-conviction court found that:

> Dr. McCoy testified concerning various themes of mitigation that she thought should have been presented to the jury during the course of the trial. While this court finds that there may have been mitigating evidence that was not presented to the jury, this court has previously discussed counsel's decision to limit some mitigation and the negative aspect of some of that evidence.

(PC V, 688). The court next concluded that the mitigating evidence that was in Dr. McCoy's report was "substantially similar" to the mitigation evidence that was presented during both the guilt and penalty phase of the trial. Specifically, the court found:

> much of the evidence presented by the petitioner here was presented to the jury in one of the phases of trial, but this court notes that it was not to the extent that the petitioner now asserts that she thinks it should have been. Some of the witnesses would have been redundant while others would have included some very negative information about the petitioner.

(PC V, 688-689). In her current appeal, the appellant now insists that the evidence that was contained in Dr. McCoy's report should have been presented

through the presentation of lay witnesses.[9] Regardless of trial counsel's tactical decision to present the evidence through Dr. McCoy rather than through lay witnesses, the appellant does not seem to dispute that much of this evidence was, in fact, presented to the jury at one of the phases of trial.

Finally, the post-conviction court determined that there was "such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination." *See Goad,* 938 S.W.2d at 371. (PC V, 689). In sentencing the appellant to death, the jury found that (1) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and that (2) "the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. §§ 39-13-204(1)(5) and (6) (1997 Repl.). On direct appeal, the Court of Criminal Appeals and the Tennessee Supreme Court affirmed that the evidence was sufficient to support these findings. *See State v. Pike,* 978 S.W.2d 904, 917-918 (Tenn. 1998). Specifically, the Supreme Court concluded that:

> In this case, the medical examiner testified that the wounds on the victim's body were too numerous to catalog. The victim's throat had been repeatedly slashed, defensive wounds were found on her right arm, bruises consistent with crawling were found on her knees, and she had sustained at least four heavy blows to her head. Her skull was fractured in several places. A pentagram had been carved onto her chest. According to the medical proof, and the defendant's own statements to the police and to other witnesses, the victim was alive and conscious

[9] *See* Appellant's brief, p. 83.

> when these injuries were inflicted upon her. In fact, according to the defendant's statements, some of the wounds were inflicted because the victim would not stop begging for her life. The defendant also admitted, and the crime scene revealed, that the victim repeatedly tried to run away and escape the attack. In fact, the victim was so terrified that she offered to walk to her home in Florida without returning to the Job Corps facility for her belongings in exchange for her life. The merciless assault upon the victim continued for a period of thirty minutes to an hour. Considering this record, we agree with the Court of Criminal Appeals that the evidence is overwhelmingly sufficient to support the jury's finding that "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code An.. § 39-13-204(i)(5) (1997 Repl.).
>
> We also reject the defendant's contention that the evidence is insufficient to support the jury's finding of the (i)(6) aggravating circumstance. This Court has previously held that to establish the applicability of this aggravating circumstance, the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing. *State v. Bush,* 942 S.W.2d 489, 504 (Tenn. 1997); *State v. Smith,* 868 S.W.2d 561, 581 (Tenn. 1993); *State v. Carter,* 714 S.W.2d 241, 250 (Tenn. 1986) (avoidance of arrest need not be sole motive for murder). In this case, Pike repeatedly told police that as she was assaulting the victim, she heard a voice telling her that she had to do something to keep the victim from reporting the assault and causing her to go to prison for attempted murder. When the victim begged for her life, Pike responded that she was not going to be "rotting in jail because of [the victim's] stupid ass." Based upon our consideration of the record, we agree with the Court of Criminal Appeals that the evidence was sufficient to support the jury's finding that "the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 Repl.).

*State v. Pike,* 978 S.W.2d at 917-918.

The post-conviction court reasonably concluded that there was "such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination." *See Goad,* 938 S.W.2d at 371. The evidence

in the record does not preponderate against the court's analysis of this claim and its conclusion.

Appellant further contends that counsel were ineffective for failing to discover relevant mitigating evidence. This issue was raised on post-conviction as a failure "to obtain and use experts in a manner consistent with effective representation" and a failure "to adequately investigate or present evidence of the petitioner's diminished capacity and state of mind at the time of the offense." (PC V, 662). This issue, likewise, was properly denied by the post-conviction court and the appellant has failed to demonstrate that the evidence preponderates against the court's denial of her claim.

Appellant argues that the testimonies of Drs. Pincus and Kenner, who both testified at the post-conviction hearing, conclusively established that she suffered from brain damage, and that trial counsel was ineffective for failing to investigate and discover such information.[10] She further contends Dr. Engum's diagnosis of Borderline Personality Disorder was incorrect and that the proper diagnosis was Bipolar Disorder and Post-Traumatic Stress Disorder. Finally, she argues that counsel was in possession of numerous "red flags in the form of information obtained from prospective lay witnesses"[11] that should have alerted counsel of the need to discover and present evidence of alleged brain damage. Thus, she concludes, counsel

[10] *See* Appellant's brief, p. 86.
[11] *Id.*

was ineffective for relying only on Dr. Engum's opinion and presenting no further evidence of alleged brain damage.

The post-conviction court addressed these claims and concluded that "no relief is warranted based on the fact that the opinions of Drs. Pincus and Kenner differed somewhat from that of Dr. Engum." (PC V, 670).

> The experts at all the proceedings opined that the petitioner acted without premeditation. Drs. Engum, Pincus and Kenner all testified that the petitioner lost control. Dr. Pincus specifically testified, as did Dr. Engum, to the petitioner's premeditation and deliberation in planning the beating, taking weapons, getting to the park, carving a pentagram, and delivering blows to the victim. They both opined that the petitioner had not, however, premeditatedly and deliberately murdered the victim. They opined, as did Dr. Kenner, that once the beating began, she lost control and could not stop. Drs. Pincus and Engum also agreed that while they did not think a cooling off period had occurred, there had been time for that to occur. Dr. Pincus also admitted that the fact that the petitioner had told someone the day before the murder that she was going to kill the victim and then did in fact kill the victim makes it appear premeditated. This court will not fault counsel because the specific diagnosis by different experts differed. Counsel appropriately relied upon the retained experts opinion.

(PC V, 671). Accordingly, the post-conviction court found that counsel's performance in this regard was neither deficient nor prejudicial. Appellant has simply not established that the evidence in the record preponderates against this decision. The post-conviction court's denial of this claim should be affirmed.

### *B. Counsel was not ineffective for disclosing allegedly protected work product to the state.*

Appellant next contends that trial counsel was ineffective for turning over all three volumes of Dr. McCoy's mitigation report to the state as he was so ordered by

the court. Appellant specifically contends that, under Rules 16(b) and 26.2 of the Tennessee Rules of Criminal Procedure, as well as Rule 705 of the Tennessee Rules of Evidence, trial counsel was under no obligation to provide the state with any of Dr. McCoy's mitigation materials. However, the appellant has failed to demonstrate that turning over the doctor's reports was either deficient or prejudicial to her defense. The post-conviction court properly denied relief.

Initially, the appellant has failed to meet her burden of proof in establishing that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *See Baxter v. Rose*, 523 S.W.2d at 936; *see also Strickland,* 466 U.S. at 688. Appellant has simply failed to prove that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Appellant's argument regarding deficiency rests entirely on whether or not the trial court ordered counsel to produce the mitigation materials.[12] Although the appellant admits that, under Tenn. R. Evid. 705, a testifying expert may be required to disclose the underlying facts and data used in forming an opinion upon order of the court, she insists that "there is no evidence in the record" to establish that the court evaluated the report and issued such an order.[13] However, the only testimony elicited on the issue at the post-conviction hearing established that the court did inform trial counsel *in camera* that

---

[12] There is nothing in the record to support the appellant's argument that the materials that were turned over to the state were protected as work product.

[13] *See* Appellant's brief, p. 92.

such material needed to be turned over. (PC XX, 374). Nothing in the testimony of General William Crabtree, the prosecuting attorney who was present at the *in camera* meeting, contradicts Attorney Talman's testimony that he was ordered to produce the materials. Regardless of the fact that the appellant has not sufficiently established that any of the materials were, in fact, protected, she has failed to demonstrate that counsel was deficient in turning the materials over to the state.

More importantly, the appellant has failed to prove that she was prejudiced by anything in the mitigation report that was turned over to the state. Indeed, she has not even argued that she was prejudiced by anything in Dr. McCoy's report. At the post-conviction hearing, General Crabtree was questioned regarding the contents of the report:

Q. And what kind of things did you find in that report?

A. Oh, I don't recall what I found in there. There was just a list of things, a list of people – or people – interviews, that sort of thing. Specifically, I can't recall.

Q. There were witness interviews included in those documents?

A. Yes, I believe there were some witness interviews included in the documents. I say I think there were. I don't recall really specifically what all was in there.

Q. And to your knowledge did you use information gleaned from those documents to cross-examine witnesses during the penalty phase of the trial?

A. I don't know the answer to that.

Q. Well, let me ask you –

A. Uh –

Q. I'm sorry.

A. I don't know whether I used information that was in there to cross-examine witnesses or I used information that was in there in the phrasing of questions or things of that nature. And I don't know – I don't recall if there was a lot of new information in there or this was things that we knew from some other source somewhere along the way.

(PC XIX, 239-240).

Appellant simply failed to prove by clear and convincing evidence that trial counsel was so deficient that it prejudiced her defense. Appellant has also failed to demonstrate that the evidence in the record preponderates against the post-conviction court's denial of this claim. She is not entitled to post-conviction relief.

***C. Appellant's claim of ineffective assistance of counsel for failing to present effective arguments in both the guilt and penalty phase of trial is waived.***

Appellant contends that trial counsel was ineffective for failing to present effective arguments in both the guilt and penalty phases of trial. Specifically, she contends that counsel's opening and closing arguments in the guilt phase of trial failed to address whether any evidence of mental illness negated the element of premeditation for first-degree murder.[14] She further contends that trial counsel's arguments during the penalty phase of trial failed to sufficiently address the

[14] *See* Appellant's brief, p. 101.

mitigating evidence and "highlighted and compounded counsel's poor performance."[15]

These claims, however, are being presented for the first time on post-conviction appeal. Neither argument was raised in either her petition for post-conviction relief, nor were they argued at the post-conviction hearing. Consequently, the claims are waived for the purposes of appellate review.[16] *See* Tenn. Code Ann. § 40-30-106(g) (a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"); *see also Black v. Blount,* 938 S.W.2d 394, 403 (Tenn. 1996); *Workman v. State,* 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993).

***D. Counsel did not fail to conduct a meaningful voir dire.***

Next, the appellant contends that trial counsel were ineffective in failing to conduct a meaningful *voir dire*. Specifically, she contends that counsel were ineffective for failing to object to the striking of a juror who indicated that he could not return a death sentence solely based on the appellant's age at the time of trial. She also insists that counsel were ineffective by failing to adequately *voir dire* prospective jurors regarding racial biases or "fears or prejudices involving Satanism."[17] These claims, however, were appropriately rejected by the post-conviction court.

---

[15] *See* Appellant's brief, p. 93.
[16] If this Court determines that this issue is not waived, the State respectfully requests permission to file a supplemental brief addressing the merits of this claim.
[17] *See* Appellant's brief, p. 97.

The United States Supreme Court has examined the issue of capital juror selection in great detail and has refined it through several opinions. Tennessee courts have followed the Supreme Court's analysis. *See State v. Alley*, 776 S.W.2d 506, 518 (Tenn. 1989), *cert. denied,* 110 S.Ct. 758 (1989). The issue was first discussed at length in *Witherspoon v. Illinois*, 88 S.Ct. 1770 (1968). At the time of trial in *Witherspoon*, Illinois juries had complete discretion as to when to impose the death penalty, and the jury assessed punishment at the same time it rendered its verdict as to guilt. *Adams v. Texas*, 100 S.Ct. 2521, 2525-2526 (1980). By statute, Illinois allowed unlimited challenges for cause by the State to any juror who stated that he had conscientious scruples against capital punishment or that he was opposed to capital punishment. *Witherspoon*, 88 S.Ct. at 1722. In the trial at issue in *Witherspoon*, 47 members of the venire were successfully challenged for cause under the statute. *Id.*, at 1773. The court held that the selection process violated the defendant's Sixth Amendment right to a fair and impartial jury because the jury eventually selected was not representative of the community. *Id.*, at 1775-1776. The Court found that much of the constitutional harm occurred because many of the jurors were excluded without knowing whether they could put their beliefs aside and still follow the law. *Id.* The Court held that by its statute providing for such challenges, Illinois had crossed the line of neutrality; the State could not entrust the determination of whether a man should live or die to a "tribunal organized to determine a verdict of death." *Id.*, at 1776.

Seventeen years later, the Court in *Wainwright v. Witt*, 105 S.Ct. 844 (1985), clarified some of the confusion that had arisen from *Witherspoon* and some of its other prior decisions on the matter. *Wainwright* involved a Florida capital case where one juror expressed personal opposition to the death penalty, and further stated that she felt her view would influence her decision on guilt or innocence. That juror had been dismissed for cause on the basis of *Witherspoon*. *Wainwright*, at 846. The Eleventh Circuit Court of Appeals had reversed the conviction, finding that the juror had been improperly excused under *Witherspoon*. The United States Supreme Court reversed the Eleventh Circuit, finding that the juror had been properly dismissed for cause. *Id.* In correcting some of the misapprehensions of the Eleventh Circuit, the Court lamented that despite *Witherspoon's* limited holding, courts had applied it too broadly. *Wainwright*, 105 S.Ct. at 849.

The court explained that *Witherspoon* had to be understood within the context of the issues presented. Much had changed in the field of capital litigation since the time of *Witherspoon*. Juries no longer had unlimited discretion in imposing capital punishment. Furthermore, *Witherspoon* dealt with circumstances under which jurors *could not* be excluded, but did not explain when jurors *could* properly be excluded. *Wainwright*, at 851. The Court explained that *Witherspoon* had to be understood in accordance with the traditional reasons for excluding jurors. As Justice Rehnquist noted, there is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Wainwright*, at 851. *Witherspoon* was not

grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment's right to a fair and impartial jury. *Id.* The key to the analysis is not what a juror believes about the death penalty, but whether, because of those beliefs, a potential juror lacks impartiality. *Id.*, at 851-852. Based on this understanding of its prior opinions, the Court announced that the standards for determining whether a juror could be properly excluded was whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Id.*, at 852.

The *Wainwright* standard does not require that a juror's bias be proven with "unmistakable clarity" because determinations of juror bias cannot be reduced to question and answer sessions that obtain results in the manner of a catechism. *Id.* Accordingly, the parties attempting to select the jury, as well the trial judge, must be intently attuned to the jurors' responses to determine potential bias. As the *Wainwright* court noted, even when the printed record may not be particularly clear, there will be situations where the trial judge is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law. *Id.*, at 853. For that reason, the Supreme Court demanded that deference be paid to the trial judge who sees and hears the potential jurors.

Applying these standards to the facts of this case, it is clear that the court was entirely within its discretion to remove the prospective juror, Mr. Rutherford, for cause. Rutherford clearly stated that he could not impose the death penalty under

any circumstances because of the appellant's age. (TR XIX, 1514). He was, therefore, appropriately struck for cause. Appellant contends that, because Mr. Rutherford stated that he could not return a death sentence solely on the basis of the appellant's age at the time if trial, it was not an unconditional bias, against capital punishment under *Witherspoon, supra.* However, as the Supreme Court articulated in *Wainwright,* the purpose of *voir dire* is to determine potential juror biases and the law does not require such bias be proven with "unmistakable clarity."

Appellant further argues that Mr. Rutherford was inappropriately stricken for cause because "a juror is entitled to find that any one mitigating factor outweighs all aggravating evidence, and thus a juror could not have been disqualified" on this ground.[18] This argument, however, fails to comport with the Supreme Court's rationale in *Wainwright* that the focus of *voir dire* is to determine potential bias. Moreover, because the appellant's age is a fact that is not debatable, Mr. Rutherford's opposition to imposing the death penalty on this ground was definitively an unconditional rejection of imposing the death penalty in this case. Mr. Rutherford was appropriately struck for cause. Appellant carries the burden of establishing by convincing evidence that the trial court's determination to dismiss this juror for cause was erroneous. Appellant has failed to meet that burden. Accordingly, the appellant has failed to establish that counsel were deficient in failing to object to Mr. Rutherford's dismissal.

---

[18] *See* Appellant's brief, p. 96.

Appellant also contends that trial counsel were ineffective because they had failed to inquire into prospective juror's attitudes regarding mental illness, psychology, Satanism, and interracial dating.[19] However, the appellant has failed to offer any evidence that any prospective juror was improperly excluded in this regard, or that any member of the jury harbored any bias or prejudice against any of the aforementioned issues. Consequently, she has failed to meet her burden of proving that counsel was deficient and that such deficiency prejudiced her trial as is required under *Strickland*. Appellant is not entitled to post-conviction relief.

***E. Counsel was not ineffective for failing to object to "the State's Suggestion of a Legally Inconsistent Aggravating Factor.***

Appellant currently argues that counsel were ineffective for failing "to object to the state's suggestion of a legally inconsistent aggravating factor."[20] Specifically, she contends that her "simultaneous convictions of conspiracy and capital murder using the avoid-the-arrest aggravator violated [her] rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Art. I, §§ 8, 9 and 16, of the Tennessee Constitution."[21] Appellant argues that because her convictions for premeditated first-degree murder and conspiracy to commit such is predicated on her forming intent prior to the acts, it is "legally inconsistent" to also find that she committed murder to avoid arrest. Appellant is mistaken.

To establish the applicability of the "avoiding arrest" aggravating circumstance,

---

[19] *Id.*
[20] *See* Appellant's brief, p. 97.
[21] *See* Appellant's brief, p. 98.

the State must prove that avoidance of prosecution or arrest was *one* of the purposes motivating the killing. *State v. Bush,* 942 S.W.2d 489, 504 (Tenn. 1997); *State v. Smith,* 868 S.W.2d 561, 581 (Tenn. 1993). Avoidance of arrest need not be the sole motive for the murder. *State v. Carter,* 714 S.W.2d 241, 250 (Tenn. 1986). In *Carter,* the Supreme Court addressed this very issue:

> Next defendant insists that the trial court should have instructed the jury that the second statutory aggravating circumstance, T.C.A. § 39-2-203(i)(6), would not apply unless they found that defendant's sole motive in committing the murder was to avoid arrest or prosecution. Defendant cites two cases in support of his contention, *Menendez v. State,* 368 So.2d 1278 (Fla. 1979), and *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979). Those cases do not support defendant's assertion that avoiding arrest or prosecution must be the sole motive before that aggravating circumstance may be invoked. *Goodman* expressly says, "that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime." 257 S.E.2d at 586.
>
> The evidence in this case clearly supports a finding that defendant's motive was to kill and dispose of [the victim's] body in Cherokee Lake to prolong discovery of his body and avoid detection and apprehension for the murder and the planned robbery to be accomplished in [the victim's] truck.
>
> Defendant contends that the two aggravating circumstances that the jury found defendant was guilty of are based upon the same set of facts and thus provides an arbitrary basis for imposition of the death penalty. There is simply no merit to the proposition that those two aggravating circumstances are identical. A defendant may commit murder during the commission of any or any combination of the listed felonies without any intent or motive on his part to kill to avoid arrest or prosecution. On the other hand, murders are often committed without the commission of a listed felony and as part of the same episode acts are performed indicating a motive to avoid detection and prosecution for that killing. The fact that the commission by defendant of larceny of [the victim's] pick-up truck, his kidnapping, murder and attempted disposal of his body in the lake coalesced into a short time frame does

> not support defendant's contention of duplication in the legislative promulgation of those two aggravating circumstances or render their application to the facts of this case arbitrary or in any manner unlawful or prejudicial.

*State v. Carter,* 714 S.W.2d at 250.

Appellant's underlying contention that counsel were ineffective for failing to object to an alleged "legally inconsistent aggravating factor" is, therefore, entirely without merit. There is nothing "inconsistent" about the finding of the "avoiding arrest" aggravator and her convictions for premeditated murder and conspiracy to commit premeditated murder. Because the Court found the underlying issues to be meritless, trial counsel cannot be ineffective for failing to object. Appellant is not entitled to relief on this claim.

***F. Counsel was not ineffective for allegedly failing to present evidence to undermine the elements of first-degree murder.***

Finally, the appellant argues that she is entitled to post-conviction relief because counsel "failed to present an effective case to undermine the State's proof of deliberate and premeditated murder." Appellant contends that counsel failed to make appropriate use of expert witnesses and failed to discover relevant lay witness testimony. Specifically, she claims that Dr. Engum's testimony regarding her mental state was "sufficiently on point" but was "insufficiently substantiated."[22] Had trial counsel presented lay witnesses, she argues, Dr. Engum "would not have been forced

[22] *See* Appellant's brief, p. 99.

to testify that his opinion was only as good as the defendant's word."[23] Appellant also argues that counsel was ineffective for presenting Dr. Bernet, whose testimony, she claims, was "highly prejudicial and represented a wasted opportunity."[24] The post-conviction court correctly denied relief on these claims.

Regarding the "insufficiently substantiated" testimony of Dr. Engum, the appellant has failed to demonstrate how any of the allegedly relevant lay witness testimony would have affected the determination of the jury. As with any ineffective assistance of counsel claim, the appellant bears the burden of proving that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland,* 466 U.S. at 687.

Where the alleged prejudice under *Strickland* involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, the court must consider three factors. First, the courts should analyze the nature and extent of the mitigating evidence that was available, but not presented. Second, the courts should consider whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the trial. And third, the courts should determine whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. *Goad v. State,* 938 S.W.2d 363, 371 (Tenn. 1996).

Applying the *Goad* standard to the facts of the present case, it is clear that the

---

[23] *See* Appellant's brief, p. 100.
[24] *See* Appellant's brief, p. 101.

mitigating evidence that was not presented to the jury was substantially similar to evidence that was presented and would have had no effect on the jury's determination. First, the nature of the mitigating evidence that was not presented would have been offered merely to bolster the testimony of Dr. Engum. Appellant acknowledges this in her brief: "While [Dr. Engum's] testimony was substantively on point, it was insufficiently substantiated."[25] However, the appellant fails to articulate exactly how any specific lay witnesses would have sufficiently substantiated Dr. Engum's testimony. Appellant does, however, contend that the testimonies of Drs. Kenner and Pincus, whom she refers to as "lay witnesses" in her brief,[26] could have testified that she "had lost complete control in the past, nearly killing a man in one instance before she was held back by a friend at the last minute." It is hard to understand how exactly this testimony would have helped her at trial, but regardless, it was evidence that was already presented through the testimony of Dr. Engum. Appellant also contends that "[l]ay witnesses could have testified that [the appellant] was incapable of calming down on her own, and needed to be physically restrained while in the midst of a manic rage."[27] The appellant cites the post-conviction testimony of Orlando Powell, her former boyfriend, for this contention.[28] However, Mr. Powell asserted no such statement. (PC XI, 516-517). Regardless, this testimony would have been substantially similar to that which was already presented

---

[25] *See* Appellant's brief, p. 99.
[26] *See* Appellant's brief, p. 100; *see also* Testimony of Dr. Kenner (discussing Dr. Pincus' testimony) (PC XXIX, 43).
[27] *See* Appellant's brief, p. 100.
[28] *See* Appellant's brief, p. 100, citing to the testimony of Orlando Powell at (PC XI, 516-517).

at trial and would have been unlikely to have affected the determination of the jury.

In denying this claim, the post-conviction court carefully analyzed the mitigating evidence offered at the hearing and concluded:

> [Attorney] Martin Rice testified that many witnesses presented two-edged swords. This court agrees that when reviewing the materials related to many of the lay witnesses, there is problematic information in many of the interviews done by Dr. McCoy. Some examples include the fact that the petitioner's sister had told Dr. McCoy that the petitioner was "crazy" and "dangerous" and that the petitioner had chased her once with a knife. People from the training school would have been questioned about her prior "dabbling" in Satanism before she ever met co-defendant Shipp. Dr. McCoy had stated that she had concerns about now Judge Martin because she thought he would come across as naïve and easily taken in by the petitioner. Some of the petitioner's friends told Dr. McCoy about the petitioner's statements to them that she had committed the murder and things about the weapons involved. With the potential for much of this plus other information to harm the petitioner's case in mitigation, counsel made a reasonable choice to limit what came before the jury and from whom.

(PC V, 686).

Appellant has failed to establish that the mitigating evidence that was presented at the post-conviction hearing meets the standard set forth in *Goad, supra.* Thus, the appellant has failed to meet her burden of proving that counsel was ineffective under *Strickland v. Washington.* Appellant is not entitled to post-conviction relief.

## III. APPELLANT IS ELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND *ROPER V. SIMMONS*.

Appellant contends that she is not eligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002), and *Roper v. Simmons,* 543 U.S. 551 (2005), because

she is an "immature, mentally ill, brain-damaged eighteen year old."[29] This issue was raised for the first time during post-conviction and was found to have been waived as a result of a failure to raise the issue on direct appeal. (PC V, 698-699). In her consolidated petition for post-conviction relief, the appellant admits that the issue was not raised on direct appeal but insists that it is not waived because "the law has developed since the direct appeal." (PC III, 316). However, the law in Tennessee has not changed in any significant way since the appellant's trial and direct appeal, and the appellant has not made any previous attempt to preserve the issue. The post-conviction court correctly held that the issue was waived.

Regardless of the waiver, the appellant's present arguments are without merit and her claim should be denied. In *Atkins,* the Supreme Court held that the execution of mentally retarded criminals is "cruel and unusual punishment" and is prohibited by the Eighth Amendment. *Atkins,* 536 U.S. 304. However, the Court explicitly left to the individual states "the task of developing appropriate ways to enforce the constitutional restrictions upon its execution of sentences." *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)). *See also Bell v. Cockrell,* 310 F.3d 330, 332 (5th Cir. 2002) (*Atkins* did not conclusively define mental retardation); *Pruitt v. State,* 834 N.E.2d 90, 107 (Ind. 2005) (same); *Gray v. State,* 887 So.2d 158, 168 (Miss. 2004) ("Determining who is mentally retarded for purposes of this prohibition has been left to the individual States."); *Johnson v. State,*

[29] *See* Appellant's brief, p. 110.

102 S.W.3d 535, 540 (Mo. 2003) ("*Atkins* did not define the perimeters of mental retardation, but left 'to the States the task of'" enforcing the restriction).

In 1991, prior to the Supreme Court's decision in *Atkins* and prior to the appellant's trial and direct appeal, the Tennessee General Assembly enacted Tenn. Code Ann. § 39-13-203, which provides in part as follows:

> (a) As used in this section, 'mental retardation' means:
>
> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
>
> (2) Deficits in adaptive behavior; and
>
> (3) The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.
>
> (b) Notwithstanding any provision of law to the contrary, no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death.

Tenn. Code Ann. § 39-13-203 (1991).

Ten years after the enactment of this statute, in *Van Tran v. State,* 66 S.W.3d 790 (Tenn. 2001), the Tennessee Supreme Court held that "execution of a mentally retarded individual violates the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution." *Van Tran*, 66 S.W.3d at 812. In reviewing Tennessee's mental retardation statute, the Court observed that "the statutory definition of mental retardation in Tennessee adopts the nationally accepted definition of mental retardation." *Id.* at 794 (citing *Penry v. Lynaugh*, 492 U.S. 302, 308 n.1 (1989)). The Court thus directed application of the statutory

definition of mental retardation set forth in Tenn. Code Ann. § 39-13-203 as the constitutional standard for Tennessee offenders. *See Van Tran*, 66 S.W.3d at 812 ("The applicable criteria [to determine petitioner's alleged mental retardation] are those presently set forth by statute").

In *Atkins,* the Supreme Court specifically refrained from imposing its own definition of the condition, although specifically noting that the various statutory definitions of mental retardation in effect at that time, including Tennessee's, while not identical, "generally conform to the clinical definitions," which require significantly subaverage intellectual functioning existing concurrently with related limitations in two or more adaptive skill areas and manifesting before age 18. *Atkins*, 536 U.S. at 309, n.3, 314 n.12, 317 n.22. Finally, Tennessee strictly adheres to a requirement that mental retardation be manifest by 18 years of age. *See State v. Strode,* 232 S.W.3d 1, (Tenn. 2007).

In the present case, the appellant has offered no evidence whatsoever that she meets either the *Atkins* standard or the definition of mental retardation as set forth in Tenn. Code Ann. § 39-13-203. She further attempts to extend the ruling in *Atkins* to "categorically bar" the "execution of both older adolescents and individuals suffering from serious mental illness or brain defect." However, neither *Atkins* nor *Roper v. Simmons,* 543 U.S. 551 (2005), support this contention.

Three years after *Atkins* was decided, in *Roper v. Simmons,* 543 U.S. 551 (2005), the Supreme Court extended its ruling in *Atkins* and held that the Eighth and

Fourteenth Amendments barred imposing the death penalty on anyone under the age of eighteen when the crime was committed. In reaching this decision, the Court cited to factors unique to adolescents as evidenced by psychological studies. *Id.,* at 569. First, the majority noted the lack of maturity and "underdeveloped sense of responsibility" in those under eighteen. They found that these qualities tended to result in ill-considered actions and decisions. Second, the majority found that those under eighteen are more prone to "negative influences and outside pressures, including peer pressure." Finally, the majority found that the personality traits of a juvenile are more transitory and less fixed. *Id.,* at 570. Moreover, the Court addressed the concern over drawing the line at the age of eighteen and concluded:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* [*v. Oklahoma,* 487 U.S. 815 (1988)] drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

*Roper,* 543 U.S. at 574.

Because the appellant was over the age of eighteen at the time she brutally murdered Colleen Slemmer, her death sentence was not constitutionally invalid under *Roper.* Regardless of the fact that this issue was not raised during direct appeal,

and is therefore waived, it is without legal merit.

Appellant further contends that, under *Gregg v. Georgia,* 428 U.S. 153 (1976), a case decided roughly twenty years prior to *Atkins* and *Roper,* the "execution of older adolescents must be categorically barred."[30] This argument, however, was implicitly rejected by the Court in *Roper* when it concluded that eighteen is "the age at which the line for death eligibility ought to rest." *Roper,* 543 U.S. at 574.

Additionally, the appellant argues that she is "cognitively impaired and mentally ill" and, therefore, incompetent to be executed under the auspices of *Ford v. Wainwright,* 477 U.S. 399 (1986).[31] To the extent that the appellant is claiming that she is incompetent to be executed, her argument is not ripe and should be dismissed without prejudice.

In *Ford v. Wainwright, supra,* the Supreme Court held that the execution of a prisoner who is insane is prohibited by the Eighth Amendment to the United States Constitution. In *Stewart v. Martinez-Villareal,* 523 U.S. 637, 118 S. Ct. 1618, 140 L. Ed.2d 849 (1998), the Court clarified that a claim of incompetency is not ripe, however, until execution is imminent. In *Van Tran v. State*, 6 S.W.3d 257, 267 (Tenn. 1999), the Tennessee Supreme Court held that execution is imminent in Tennessee only "when a prisoner sentenced to death has unsuccessfully pursued all state and federal remedies for testing the validity and correctness of the prisoner's conviction and sentence and this Court has set an execution date upon motion of the

---

[30] *See* Appellant's brief, p. 114.
[31] *See* Appellant's brief, p. 118.

State Attorney General." Appellant's claim in this regard is not ripe for appellate review. The post-conviction court's denial of this claim should be affirmed.

## IV. APPELLANT'S ARGUMENT REGARDING THE TRIAL COURT'S STRIKING OF AN ALLEGEDLY QUALIFIED JUROR FOR CAUSE IS WAIVED.

Appellant contends that the trial court erred when it improperly struck a prospective juror, who she claims was otherwise qualified, from the jury. This argument, however, is being presented for the first time in a post-conviction proceeding and is therefore waived.

The Post-Conviction Procedure Act provides in pertinent part:

> (f) Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.
>
> (g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.
>
> (h) A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the

opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Tenn. Code Ann. § 40-30-106(f)-(h).

Although this issue could have been presented upon direct appeal, it is being presented for the first time in this post-conviction proceeding. Appellant presents no claim based upon a constitutional right not previously recognized, nor does she allege that the failure to previously present the claim was the result of state action in violation of the constitution. This issue is therefore waived.[32] *See id.*

## V. THE POST-CONVICTION COURT DID NOT ERR BY REFUSING TO RECUSE ITSELF IN THIS MATTER.

Appellant contends that the Honorable Mary Beth Leibowitz, who presided over both trial and the post-conviction hearing, committed constitutional error by failing to recuse herself from the post-conviction proceedings. Specifically, the appellant claims that "the post-conviction court was disqualified from deciding the petitioner's post-conviction claim because Judge Leibowitz has personal knowledge of material facts in dispute."[33] Appellant further alleges that, in light of her post-conviction claims, "a reasonable person would have considered the post-conviction court incapable of impartial adjudication of [her] post-conviction petition."[34] However, the appellant has failed to prove that such recusal was justified, and that the failure to do so resulted in a violation of her constitutional right to due process.

[32] If this Court determines that this issue is not waived, the State respectfully requests permission to file a supplemental brief addressing the merits of this claim.
[33] *See* Appellant's brief, p. 126.
[34] *See* Appellant's brief, p. 130.

She is not entitled to post-conviction relief on this claim.

The issue of whether a judge who presided over the criminal trial is qualified to preside over the post-conviction hearing is governed by Tenn. Code Ann. § 40-30-105(b). This exact issue was addressed by this Court in *Steadman v. State,* 806 S.W.2d 780 (Tenn. Crim. App. 1990) and was again analyzed by this Court in *John A. Brown v. State of Tennessee,* 1991 Tenn. Crim. App. LEXIS 466 (Tenn. Crim. App. June 6, 1991):

> In a recent opinion by this Court, *Steadman v. State*, S.W.2d (Tenn. Crim. App. Knoxville, December 4, 1990), Judge Tipton gives us an interesting historical analysis of the Post-Conviction Procedure Act as it relates to the issue of appointment of the hearing judge. Judge Tipton's analysis applies to the case at bar.
>
> The Post-Conviction Procedure Act originally required the petition to be filed with the clerk of the convicting court, but it had no provision limiting the original trial judge's authority to preside. 1967 Tenn. Pub. Acts, Chapter 310, Section 2. In 1969, the legislature amended the law by requiring the Tennessee Supreme Court Chief Justice to designate a judge "to hear and determine such petition, except the judge who presided at the criminal trial in which the conviction occurred." 1969 Tenn. Pub. Acts, Chapter 242, Section 1. It is reasonable to assume that the legislature was assuring the appellant that the petition would be heard before an impartial judge.
>
> Apparently in 1971 the General Assembly deleted the original judge prohibition. However, in 1972, the legislature restored the prohibition, but with an exception relating to competency of counsel issues:
>
>> The chief justice of the Tennessee Supreme Court shall designate and assign any chancellor, judge of the criminal court, or circuit court judge to hear and determine such petition, except the judge who presided at the criminal trial in which the conviction occurred, provided however, the original trial judge, where available, shall be designated

> where an issue is raised as to the competency of counsel representing the petitioner in the original proceeding.

1972 Tenn. Pub. Acts, Chapter 792, Section 1; T.C.A § 40-30-103(b) (1982).

The legislature again amended T.C.A. § 40-30-103(b) in 1988. The first subdivision governs the procedures involved when the issue is competency of counsel. The second subdivision reads as follows:

> If such petition does not raise the issue of competency of counsel at the original trial or appellate proceeding, the chief justice shall designate and assign an appropriate judge to hear and determine such petition. Unless the provisions of subdivision (1) are applicable, *the designated judge shall not be the same judge who presided at the trial in which the conviction occurred*. (Emphasis added).

*Brown v. State*, 1991 Tenn. Crim. App. LEXIS 466, *5-6 (Tenn. Crim. App. June 6, 1991).

Currently, this provision of the Post-Conviction Procedure Act is codified at Tenn. Code Ann. § 40-30-105(b) (1995) as follows:

> At either the trial proceeding or an appellate proceeding reviewing the proceeding, the presiding judge of the appropriate court shall assign a judge to hear the petition. *The issue of competency of counsel may be heard by a judge other than the original judge.* If a presiding judge is unable to assign a judge, the chief justice of the supreme court shall designate an appropriate judge to hear the matter. (Emphasis added).

*Id.*

The current language regarding claims in ineffective assistance of counsel is notably less restrictive in regards to the ability of the trial judge to preside over the post-conviction hearing. The language in the 1988 provision strictly prohibited the trial judge from presiding over the post-conviction hearing unless the issue of

competency of counsel was raised. In 1995, this language was removed and replaced with the provision that "[t]he issue of competency of counsel *may* be heard by a judge other than the original judge." Thus, the language suggests that a trial judge *may* preside over post-conviction proceedings regardless of whether the issue of competency of counsel has been raised, provided of course there are no other issues that would disqualify the judge from presiding at the later hearing.

On its face, because the appellant has raised multiple claims of ineffective assistance of counsel, Judge Mary Beth Leibowitz was fully qualified to preside at post-conviction under Tenn. Code Ann. § 40-30-105(b) (1995) and was not required to recuse herself. Appellant, however, further contends that Judge Leibowitz should have been disqualified from the post-conviction proceedings because she "had personal knowledge of material facts in dispute."[35] However, prior knowledge of material facts is not alone cause for disqualification.

In *State v. Paul Dennis Reid*, 213 S.W.3d 792 (Tenn. 2006), the Supreme Court denied a similar claim when it held that a trial judge, who presided over Reid's previous trial for murder, did not err by failing to recuse himself at Reid's subsequent murder trial. Specifically, the Court found that,

> A trial judge is not disqualified because that judge has previously presided over legal proceedings involving the same defendant. *See State v. Hines,* 919 S.W.2d 573, 578 (Tenn. 1995) ("'A judge is in no way disqualified because he tried and made certain findings in previous litigation.'" (quoting *King v. State,* 216 Tenn. 215, 391 S.W.2d 637, 642 (1965)). Moreover, "[p]rior knowledge of facts about the case is not

---

[35] *See* Appellant's brief, p. 126.

> sufficient in and of itself to require disqualification." *Alley,* 882 S.W.2d at 822.

*Reid,* 213 S.W.3d at 815.

Likewise, in *Hawkins v. State,* 586 S.W.2d 465 (Tenn. 1979), the Court held that a trial judge, who had issued a search warrant, was not required to recuse himself from a hearing on the suppression of evidence obtained by the search warrant. The judge's interest in the warrant's issuance was not sufficient to require reclusion. *Id.*

Appellant's contention that Judge Leibowitz should have been disqualified solely on the ground that she was party to an *in camera* meeting between opposing counsel is entirely without legal merit. Appellant fails to explain how or why Judge Leibowitz's presence at this meeting affected her impartiality at post-conviction. Moreover, the appellant fails to explain why the "disputed" information that occurred in the *in camera* meeting was not elicited at post-conviction through the testimony of General Crabtree, who was a party to the meeting. Appellant's bald accusations of impartiality and implied impropriety do not come close to proving that Judge Leibowitz was disqualified from presiding at post-conviction and should have recused herself from the proceedings. This issue is entirely without merit.

## VI. THE TRIAL COURT DID NOT COMMIT STRUCTURAL ERROR BY APPOINTING COUNSEL TO THIS CASE; THERE WAS NO CONFLICT OF INTEREST.

Appellant next contends that the trial court committed reversible error by appointing counsel with an alleged "active conflict known to the court." However, the reasons set forth in Section I, pp. 54-67, *supra,* of this brief, the appellant has

failed to prove that trial counsel was conflicted in any way. Accordingly, the trial court committed no error in appointing a qualified and experienced attorney to represent the appellant at trial and on appeal. This issue is without merit.

## VII. APPELLANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.

Appellant next contends that she received ineffective assistance of counsel on appeal in violation of the Sixth and Fourteenth Amendments. Specifically, she claims that she is entitled to relief because counsel failed to raise four issues on appeal: (1) the appointment of counsel with an active conflict known to the court; (2) striking a qualified juror for cause; (3) permitting the jury to consider the avoiding arrest aggravator; and (4) failing to challenge the constitutionality of the death penalty.[36]

The standard used for determining ineffective assistance on appeal is the same standard that is used when reviewing a claim of ineffective assistance at trial. *Strickland*, 466 U.S. at 687-88; *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993).

> A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the defendant's appeal would have been successful before the state's highest court.

*Smith v. Robins,* 528 U.S. 259, 285 (2000). There is no constitutional requirement that an attorney argue every issue on appeal, and attorneys have the discretion to make tactical decisions regarding what issues to raise on appeal. *Jones v. Barnes,* 463

[36] *See* Appellant's brief, p. 134.

U.S. 745 (1983). Consequently, their decisions should not be second-guessed by the appellate courts. *Id.*, at 751; *Cooper,* 849 S.W.2d at 747.

Ironically, in regards to the appellant's first three claims, she argues that appellate counsel was ineffective for failing to raise on direct appeal the very substantive issues she presently raises on post-conviction appeal, which she claims are not waived. Because the underlying substantive claims, however, are either waived or entirely without merit as discussed *supra,* the appellant has failed to prove that counsel was ineffective in failing to raise them on direct appeal.

Regarding the appellant's fourth claim, that appellate counsel was ineffective for failing to challenge the constitutionality of the death penalty, this issue was properly denied by the court. Again, the appellant raises the same underlying substantive claim, discussed in Section VIII, *infra,* for which he claims appellate counsel was ineffective for failing to raise on appeal. For the reasons set forth in Section VIII, the appellant has failed to prove that such a claim, had it been properly raised on direct appeal, would have been successful before the state Supreme Court. Therefore, she has failed to prove that she was prejudiced by any potential deficiency on the part of appellate counsel. Counsel was not ineffective in this regard. Appellant has failed to demonstrate that she received ineffective assistance of appellate counsel. She is not entitled to post-conviction relief.

## VIII. TENNESSEE'S DEATH PENALTY STATUTE IS NOT UNCONSTITUTIONAL; APPELLANT'S CHALLENGE TO THE LETHAL INJECTION PROTOCOL IS NOT A COGNIZABLE CLAIM ON POST-CONVICTION

### *A. The Tennessee death penalty statute is constitutional.*

Appellant alleges that the Tennessee death penalty sentencing statute is unconstitutional and that her sentence should be set aside. Specifically, she argues that the statute is unconstitutional because it fails to meaningfully narrow the class of death-eligible defendants, the appellate review process in death penalty cases is inadequate, and because "the statutorily mandated proportionality review is conducted in violation of due process and the law of the land."[37] In the first place, this issue could have been presented at trial and on direct appeal. Therefore, the issue has been "waived" and is not cognizable in a post-conviction proceeding. *See* Tenn. Code Ann. § 40-30-106(g).

Furthermore, the appellant's argument that Tennessee's death penalty scheme fails to meaningfully narrow the class of death-eligible defendants has previously been rejected by the Tennessee Supreme Court. *See State v. Vann,* 976 S.W.2d 93,117-18 (Tenn. 1998); *State v. Keen,* 926 S.W.2d 727, 742 (Tenn. 1994). Likewise, the appellant's argument that the appellate review process in Tennessee is constitutionally inadequate has been rejected. *See Vann,* 976 S.W.2d at 118-19; *State v. Cazes,* 875 S.W.2d 253, 270-71 (Tenn. 1994). Moreover, our Supreme Court has held that, "[w]hile important as an additional safeguard against arbitrary or

[37] *See* petitioner's brief, p. 135.

capricious sentencing, comparative proportionality review is not constitutionally required." *State v. Bland,* 958 S.W.2d 651, 663 (Tenn. 1997). Accordingly, the appellant is not entitled to relief on this claim and the judgment of the post-conviction court should be affirmed.

***B. Appellant's challenge to Tennessee's lethal injection protocol is not a cognizable basis for relief under the Tennessee Post-Conviction Procedure Act.***

Appellant contends that the protocol for lethal injection currently used by the State of Tennessee is unconstitutional and creates "a substantial risk of serious bodily harm, given the protocol's inclusion of pancuronium bromide and the failure to [*sic*] sodium thiopental to induce anesthesia."[38] However, a challenge to the specific protocol employed by the Tennessee Department of Correction to carry out a death sentence is not cognizable under the Post-Conviction Procedure Act. Under Tenn. Code Ann. § 40-30-103, post-conviction relief shall only be granted "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." A challenge to the method of a future execution does not affect the validity of a criminal judgment and, thus, is not a basis for relief from the judgment on post-conviction. The fact that a specific protocol may be constitutionally infirm does not render the prisoner's conviction or sentence void or voidable; it simply prevents the State from carrying out the sentence until the defect is cured. *See, e.g., Van Tran v.*

[38] *See* petitioner's brief, p. 136.

*State*, 6 S.W.3d 257, 263-64 (Tenn. 1999) (recognizing this distinction in the analogous context of competency for execution - "A prisoner's competency to be executed is a question independent of the validity of trial and sentencing, and as such, not within the contemplation of the [Post-Conviction Procedure] Act."). *See also People v. Burney*, 212 P.3d 639 (Cal. 2009) (challenges to execution protocol do not impugn the validity of judgment). In *Hill v. McDonough*, 547 U.S. 573 (2006), the Supreme Court distinguished between a general challenge to a death penalty judgment and a limited challenge to the specific protocol employed by a state to carry out an execution. The former category is cognizable under the plain terms of Tenn. Code Ann. § 40-30-103; the latter is not.

Where an execution is not imminent, the method of execution currently in effect is not determinative of the way it will be administered at the time of execution. Under these circumstances, any complaints about Tennessee's present execution protocol are premature. Appellant's challenge to the protocol employed by the Tennessee Department of Correction to carry out death sentences does not lie in post-conviction proceedings.

Moreover, the appellant offers no argument or authority for his proposition beyond its bare assertion. Consequently, the issue is waived. *See* Tenn. R. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Appellant is not entitled to relief on this issue.

*C. Appellant's argument regarding the constitutionality of the indictment is waived and otherwise without merit.*

Appellant next complains that the indictment returned by the grand jury was unconstitutional "because the aggravating factor making him eligible for the death penalty was neither in the indictment nor returned by the grand jury."[39] Again, the appellant's claim is not supported by any argument or any meaningful citation to legal authority. Consequently, the issue is waived. *See* Tenn. R. Crim. App. 10(b).

Moreover, petitioner could have raised the issue at trial and on direct appeal. Thus, the issue is "waived" and is not cognizable in a post-conviction proceeding. *See* Tenn. Code Ann. § 40-30-106(g). In any event, the issue is without merit and should be dismissed. *State v. Berry,* 141 S.W.3d 549, 558-562 (Tenn. 2004).

---

[39] *See* petitioner's brief, p. 136.

## CONCLUSION

For the reasons stated, the judgment of the post-conviction court should be affirmed.

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

FRANK BORGER-GILLIGAN
Assistant Attorney General
Criminal Justice Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 532-7911
B.P.R. No. 27111

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been sent by United States mail, first class postage prepaid, to: Donald E. Dawson, Office of the Post-Conviction Public Defender, 530 Church Street, Nashville, TN 37243, on this the 22nd ~~th~~ day of December, 2009.

FRANK BORGER-GILLIGAN
Assistant Attorney General

cc: LELAND PRICE
Assistant District Attorney General
Office of the District Attorney General
City-County Building
P.O. Box 1468
Knoxville, Tennessee 37901