# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ADDENDUM 7**

**DOCUMENT 3**

**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**
**EASTERN DIVISION**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | **C.C.A. No.: E2009-00016-CCA-R3-PD** |
| **Appellant,** | ) | |
| | ) | **KNOX COUNTY** |
| **v.** | ) | **Case No. 68280** |
| | ) | |
| **STATE OF TENNESSEE,** | ) | **Post-Conviction** |
| | ) | |
| **Appellee.** | ) | **(CAPITAL CASE)** |

**ON APPEAL AS OF RIGHT FROM THE JUDGMENT OF DIVISION THREE OF CRIMINAL COURT FOR THE SIXTH JUDICIAL DISTRICT AT KNOXVILLE, KNOX COUNTY, TENNESSEE**

---

# REPLY BRIEF OF THE APPELLANT

---

**Donald E. Dawson, BPR # 010723**
**Post-Conviction Defender**

**Avram D. Frey, BPR # 028520**
**Assistant Post-Conviction Defender**

**Office of the Post-Conviction Defender**
**530 Church Street, Suite 600**
**Nashville, TN 37243**
**(615) 741-9331**

**Counsel for Christa Gail Pike**

**ORAL ARGUMENT REQUESTED**

## Table of Contents

Table of Authorities .......... iii

Preliminary Statement .......... v

Argument in Reply .......... 1

Introduction and Discussion of Critical Issue .......... 1

I. The State's Response Does Not Negate Mr. Talman's Conflict of Interest .......... 5

(1) Ms. Pike Did Not Waive Her Conflict of Interest Claim .......... 6

(2) The State's Argument that Mr. Talman Had No Reason to Lie is Contrary to the Evidence .......... 8

(3) The Post-Conviction Evidence Necessitates the Conclusion that Mr. Talman Lied to the Court in an *in camera* meeting .......... 10

II. Trial Counsel's Representation Was Deficient .......... 14

(1) Mr. Talman Failed to Provide Ms. Pike's Social History to Medical Experts .......... 14

(2) Whether or Not this Court Finds that Trial Counsel Suffered From a Conflict of Interest, Counsel's Penalty Phase Presentation Constituted Ineffective Assistance .......... 17

III. Ms. Pike's Claim That She is Ineligible for the Death Penalty Is Not Waived .......... 21

Conclusion .......... 23

Certificate of Service .......... 24

# Table of Authorities

**Cases**

*Atkins v. Virginia,* 536 U.S. 304 (2002) ....... 21

*Brown v. State,* 2007 WL 293011 (Tenn. Crim. App. Feb. 2, 2007) ....... 9

*Burford v. State,* 845 S.W.2d 204 (Tenn. 1992) ....... 22

*Coleman v. State,* 2007 WL 1651882 (Tenn. Crim. App. June 7, 2007) ....... 6,7

*Cooper v. State,* 847 S.W.2d 521 (Tenn. Crim. App. 1992) ....... 15,17

*Cuyler v. Sullivan,* 446 U.S. 335 (1980) ....... 7

*Harries v. Bell,* 417 F.3d 631 (6th Cir. 2005) ....... 21

*Henley v. State,* 960 S.W.2d 572 (Tenn. 1997) ....... 9,10

*Johnson v. Zerbst,* 304 U.S. 458 (1938) ....... 6

*McCullough v. State,* 144 S.W.3d 382 (Tenn. Crim. App. 2003) ....... 6

*Massaro v. United States,* 538 U.S. 500 (2003) ....... 7

*Momon v. State,* 18 S.W.3d 152 (Tenn. 1999) ....... 9

*Quinones v. Miller,* 2003 WL 21276429 (S.D.N.Y. June 3, 2003) ....... 7

*Rompilla v. Beard,* 545 U.S. 374 (2005) ....... 17

*Roper v. Simmons,* 543 U.S. 551 (2005) ....... 21

*Sawyer v. Whitley,* 505 U.S. 333 (1992) ....... 23

*Smith v. State,* 1997 WL 658993 (Tenn. Crim. App. Oct 23, 1997) ....... 6

*State v. Culbreath,* 30 S.W.3d 309 (Tenn. 2000) ....... 6

*State v. Pike,* 978 S.W.2d 904 (Tenn. 1998) ....... 21

*Stephens v. Kemp,* 847 F.2d 642 (11th Circ. 1988) ....... 15

*Strickland v. Washington,* 466 U.S. 668 (1984) ....... 15



Case 1:12-cv-00035-HSM-SKL Document 13-3 Filed 08/01/12 Page 4 of 124 PageID #: 9188

*Teague v. Lane,* 489 U.S. 288 (1989) .......... 23

*Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001) .......... 21, 22

*Wiggins v. Smith*, 539 U.S. 510 (2003) .......... 16

*William v. Taylor*, 529 U.S. 362 (2000) .......... 21

**Constitutions**

Eighth Amendment, United States Constitution .......... 22

Tennessee Constitution, Article I, § 16 .......... 22

## Preliminary Statement

After review of both the Brief of the State and the Brief of the Appellant, Ms. Pike will primarily rely on the arguments made in her opening Brief. She will use this Reply Brief to emphasize arguments previously made and facts previously presented relating to three points argued by the State. First she will present a summary of the factual information presented in her opening brief establishing that Mr. Talman suffered under a serious conflict of interest while representing Ms. Pike. Next, this Reply Brief will show that the arguments presented by the State to rebut Ms. Pike's claim of conflict lack merit. Ms. Pike then addresses two prongs of the State's argument that trial counsel's performance was not deficient. First, she will demonstrate defense counsel was obligated to conduct further investigation into Ms. Pike's mental health by – at a minimum – timely providing the mitigation materials and social history prepared by Dr. McCoy to Dr. Engum. Second, Ms. Pike will show that whether or not trial counsel was conflicted, failure to present his planned mitigation evidence constituted ineffective assistance. Finally, Ms. Pike argues in this Reply that her claim under the rationale of *Roper* and *Adkins*, (Pike's Br. at 110-124), was not waived and is properly before this court.

Ms. Pike has set forth the prejudice from counsel's conflicts and deficient performance in her opening brief and will not repeat it here.

In this Reply Brief, Ms. Pike will use the same convention for citing to the record as was used in her opening brief as follows:

The record to the capital trial will be referred to as T [Vol. No.]: [Page]

Exhibits from the capital trial will be referred to as Tr. Ex ____.

The post-conviction record will be referred to as PC [Vol. No.]: [Page].

Because the hearing occurred on three separate dates and the exhibits were not consecutively numbered: Post-conviction exhibits will be referred by the hearing date and exhibit number, i.e., [Month] [Year] Ex.__. The exhibit volume designated "Supplemental Exhibits" will be referred to as S. Ex. ___.

The Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit, is found in Supplement Exhibits, Exhibit 1 and will be referred to as 'Comptroller Report" and cited as CR: [Page].

The work of the mitigation specialist at trial, Dr. Diana McCoy, consisted of three volumes of materials. It has been divided into five volumes for this record and is located in PC Exhibits, January 2007, Ex. 1. In this Brief the 60 page social history will be referred to as "Social History." The records and memoranda of interviews will be referred to as "Mitigation Materials" and cited as M Mat Vol. ___ at ___.

Appellant will be referred to variously as Appellant, Petitioner, Ms. Pike, Christa Pike or Christa.

Appellee will be referred to as the State or prosecution.

In addition, the Brief of the Appellant will be cited as "Pike's Br." and the Brief of the State of Tennessee will be cited as "State's Br."



Case 1:12-cv-00035-HSM-SKL Document 13-3 Filed 08/01/12 Page 7 of 124 PageID #: 9191

# ARGUMENT IN REPLY

## INTRODUCTION AND DISCUSSION OF CRITICAL ISSUE

William Talman, Christa Pike's lead counsel at trial, testified on post-conviction that he was neither conflicted nor deficient in his representation of Ms. Pike. On the strength of that testimony, the State argues, this Court should find that Ms. Pike's trial counsel was both unconflicted and effective. There are two problems with this argument. First, Mr. Talman has an established penchant for dishonesty with courts. Second, the facts suggest that Mr. Talman lied in this particular case, both during trial and in his testimony before the post-conviction court.

That Mr. Talman has no reservations about lying to courts is substantiated by his theft of over $67,000 from the State Indigent Defense Fund by overbilling from 1991-1993. In 1993, Mr. Talman billed in excess of $100,000 for representing indigent clients. (S Ex. 1, Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit (hereinafter "Comptroller's Report") at 5). When the Tennessee Comptroller of the Treasury investigated the matter in 1994, it discovered that Mr. Talman had overbilled on 81 days of the previous year, frequently billing in excess of 24 hours for a given day. (Id.). At the going rate for appointments in 1993[1], Mr. Talman overbilled for between 3,333 and 5,000 hours, a range that translates to between roughly one-and-a-half to two-and-a-half years of 40-hour workweeks.

The Comptroller also found that Mr. Talman's reported hours "differed only slightly" across cases, "apparently to give the appearance of proration," and that many of his fee applications were signed by special judges who were themselves attorneys implicated in the

[1] From 1991-1993 the rate of payment for indigent defense was $30 per hour for in-court work and $20 per hour for out-of-court work.

Comptroller's Report. (Id. at 9). Both of these facts, the Comptroller noted, manifested Mr. Talman's intention to defraud the State courts. (Id.).

When the Comptroller's Report was published, Mr. Talman admitted his guilt. On the advice of counsel, he self-reported to the Tennessee Board of Professional Responsibility, (S. Ex 2A, March 30, 1994 Letter from Mr. Talman to the Board), and in mid-April of 1995, he paid the State the agreed upon sum of $67,027, (Comptroller's Report, Audit Highlights at 3). Mr. Talman's theft was punishable as a Class B felony, T.C.A. § 39-14-105, carrying a minimum sentence of between 8 and 12 years, T.C.A. § 40-35-112. Though Mr. Talman was not ultimately indicted, the District Attorney of both Davidson and Knox Counties contemplated his prosecution.[2]

From his admitted theft, three facts of Mr. Talman's character emerge: (1) if there is money involved, Mr. Talman is willing to lie, (2) even to a court; and (3) Mr. Talman places his own welfare over any allegiance to that of indigent defendants.

But, as noted above, the evidence of Mr. Talman's dishonesty is not merely historical. Mr. Talman also lied in this case. During an *in camera* meeting, he represented to the trial court that he had only just received the notes and social history of his mitigation specialist, Dr. Diana McCoy. (PC XXV: 740). In truth, he had received the materials several days earlier. (Id.; PC V: 657). When Dr. McCoy refused to corroborate Mr. Talman's story in the course of her penalty phase testimony, Mr. Talman made the abrupt decision not to call her. (PC XXV: 740-43).

[2] Apr 08 Ex. 1 (December 8, 1994 letter from District Attorney General Torry Johnson to District Attorney General Randy Nichols noting "It appears that William Talman and David Poss are the only two whose billing practices were so extreme as to warrant evaluation for prosecution."); S Ex 2A, File of Board of Professional Responsibility, (September 15, 1994 letter from Talman (citing need to remain silent until decision is made whether to prosecute)).

As Ms. Pike argued in her underlying Brief in this Court, the above understanding of Mr. Talman's conduct is the only one supported by the existing facts. (See Pike's Br. at 68-71). This is evident from the following considerations: (1) three credible witnesses testified that Mr. Talman lied to the trial court; (2) Mr. Talman's professed reasons for not calling Dr. McCoy make no sense; and (3) Mr. Talman's lie to the court – and subsequent dishonesty on post-conviction – make perfect sense in light of Mr. Talman's character and the relevant circumstances.

First, three credible witnesses testified in support of the fact that Mr. Talman lied to the trial court *in camera*. Dr. McCoy testified that Mr. Talman called her mere moments after the *in camera* meeting in a panic, explaining that he had lied to the court and would need Dr. McCoy to corroborate his story on the stand. (PC XXV: 740-43). When she refused, Dr. McCoy continued, Mr. Talman pulled her penalty phase testimony. (Id.). This account was supported by both Herb Moncier, (PC XXVII: 1000), and Greg Isaacs, (PC XXIX: 6). Mssrs. Moncier and Isaacs each testified to receiving a phone call from Dr. McCoy in which she recounted having spoken with Mr. Talman. (PC XXVII: 1000; PC XXIX: 6). In each phone call, according to Mssrs. Moncier and Isaacs, respectively, Dr. McCoy stated that Mr. Talman reported having lied to the trial court in a meeting *in camera*. (Id.). The post-conviction court made no findings adverse to the credibility of any of Dr. McCoy, Mr. Moncier, or Mr. Isaacs. In fact, the court below cited Dr. McCoy's testimony 11 separate times in support of its findings of fact.[3]

[3] The post-conviction court's citations to Dr. McCoy's testimony in support of its findings of fact are as follows:

(1) "Dr. McCoy also testified that because Dr. Engum was a neuropsychologist that she would have assumed he would have been the person to make the call if a neurologist was needed." (PC V: 670);
(2) "Dr. McCoy testified that she prepared her materials to support Dr. Engum's diagnosis and that she had not asked questions that she would have asked with a different diagnosis." (PC V: 671);
(3) "As Dr. McCoy testified, at the time of trial attorney Talman knew the mitigation materials as well as she did." (PC V: 683);

Second, as discussed extensively in Ms. Pike's opening Brief, Mr. Talman's asserted reasons for not calling Dr. McCoy are obvious post-hoc rationalizations. (Pike's Br. At 68-71). Mr. Talman claimed that he pulled Dr. McCoy's testimony for three reasons: (1) because Dr. McCoy could not corroborate the findings of Mr. Talman's guilt/innocence phase mental health expert, Dr. Engum; (2) because Mr. Talman believed that Dr. McCoy's testimony was "two-edged"; and (3) because Dr. McCoy had previously dated the prosecutor, William Crabtree. (PC XX: 348-52). Ms. Pike has shown that none of these reasons could have, in fact, motivated Mr. Talman's decision. Dr. McCoy's testimony was built around Dr. Engum's diagnosis, (PC XXIV: 638, 647, 649-52; Apr 2008, Ex. 6), and Mr. Talman knew this, (PC V: 683). Dr. McCoy and Mr. Talman had worked for months to shape Dr. McCoy's testimony, and Mr. Talman planned to present Dr. McCoy as his only mitigation witness. (PC XXIV: 649-50). The claim that Mr. Talman nonetheless decided that Dr. McCoy's testimony would be harmful and subsequently pulled it – *mere hours before the sentencing phase with nothing in reserve* – is thus absurd. Finally, even Mr. Talman ultimately conceded that Dr. McCoy's dating history was a non-issue in his decision-making. (PC XX: 355).

Third, Mr. Talman's lies at trial and on post-conviction are perfectly in keeping with his character and the relevant circumstances. As discussed above, Mr. Talman has a record of

---

(4) "Dr. McCoy stated that she had not prepared any opinions and that she had felt like a fish out of water as a result." (PC V: 684);
(5) "Talman and Dr. McCoy stated that they had discussed things 'ad nauseam' . . ." (Id.);
(6) "Dr. McCoy clearly states her opinion on matters as she should." (Id.);
(7) "Dr. McCoy stated that the investigator, Barry Rice, had spoken to people at the Job Corps but that she had never seen the information on this." (Id.);
(8) "Both Dr. McCoy and Talman stated that the decision was made the evening before the penalty phase and the stickers were seen on the materials the morning of the penalty phase." (PC V: 685 n.29);
(9) "Dr. McCoy had stated that she had concerns about now Judge Martin because she thought he would come across as naïve and easily taken in by the petitioner." (PC V: 686);
(10) "Dr. McCoy stated that she had no problem with the State having all her materials and that she regularly turned them over to the state." (PC V: 687);
(11) "Dr. McCoy testified concerning various themes of mitigation that she thought should have been presented in mitigation." (PC V: 688).

deceiving and defrauding the courts at the expense of indigent criminal defendants. But more significantly still, Mr. Talman's earlier theft from the Indigent Defense Fund was still very much at issue at the time of Ms. Pike's trial. Mr. Talman only returned the stolen sum of $67,027 in April of 1995, (Comptroller's Report, Audit Highlights at 3), approximately one month before he was appointed in Ms. Pike's case (PC XIX: 261-62). At that time, and throughout Ms. Pike's trial and direct appeal, review of Mr. Talman's overbilling was pending before the Board of Professional Responsibility, (PC I: 71-72; PC XVII: 13-14, Board of Professional Responsibility File at 3-4 (Nov. 24, 1998 Order of Enforcement)), and whether Mr. Talman would be prosecuted was not completely foreclosed. As a result, Mr. Talman had every reason to believe that both his freedom and his livelihood depended upon the opinions of the trial court and prosecutor in Ms. Pike's case. The circumstances thus suggest that when the prosecutor became angry with Mr. Talman for his delay in turning over Dr. McCoy's materials in the *in camera* meeting, Mr. Talman lied to escape culpability. Mr. Talman's testimony at the post-conviction hearing was simply a by-product of his earlier mistruths – an attempt to preserve his reputation in the Knoxville bar, where he has long relied on court appointments for income.

## I. The State's Response Does Not Negate Mr. Talman's Conflict of Interest.

The State presents several arguments in attempt to defeat Ms. Pike's claim that she was represented by conflicted counsel at trial. In substance, these arguments are: (1) that Ms. Pike waived any conflict of interest claim; (2) that Mr. Talman was not actually conflicted because he said so when the trial court inquired; and (3) that Mr. Talman did not lie to the trial court during an *in camera* meeting. None of these arguments has merit. Ms. Pike addresses each in turn, below.

**(1) Ms. Pike did not waive her conflict of interest claim.**

The post-conviction court found that Ms. Pike's conflict of interest claim was waived because, Mr. Talman said that Ms. Pike "actually liked him more because of [the overbilling], and because "[n]o issue was raised either pretrial or at trial." (PC V: 646). Ms. Pike argued in her Brief before this Court that the post-conviction court's ruling was in error because, under the law of Johnson v. Zerbst, 304 U.S. 458 (1938), and Smith v. State, 1997 WL 658993 (Tenn. Crim. App. Oct. 23, 1997), a criminal defendant cannot waive a known right or privilege via the representations of her attorney alone. (Pike's Br. at 80). Moreover, Ms. Pike argued, Tennessee law does not require a criminal defendant to raise a conflict of interest claim at trial or on direct appeal – such a claim will be reviewed for the first time on post-conviction following Coleman v. State, 2007 WL 1651882 (Tenn. Crim. App. June 7, 2007). (Pike Br. at 80).

In its Response, the State alleges that Ms. Pike may not rely on either Smith or Coleman. With regard to Smith, the State recognizes that the case holds "the statements of counsel . . . insufficient, as a matter of law, to constitute a waiver of a potential conflict of interest." (State's Br. at 56) (quoting Smith, 1997 WL 658996, at *5). The State denies, however, that Smith has any bearing here, because, in Smith, the attorney conflict was born of simultaneous representation of co-defendants. (Id.). This case, the State argues, entails a claim that defense counsel was conflicted by his own self-interest, not by simultaneous obligations to co-defendants. (Id.).

The State's alleged distinction is one without a difference. Tennessee law treats claims of attorney conflict identically. McCullough v. State, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003); State v. Culbreath, 30 S.W.3d 309, 315 (Tenn.2000). The State has provided no case law in support of the proposition that the type of conflict is relevant to the manner in which the right

to unconflicted counsel may be waived. Indeed, no such precedent exists, and furthermore, there is no logical reason to distinguish between types of conflict on the issue of waiver. Smith recognizes that a conflicted attorney's first loyalty cannot be certain to be to his client, and therefore, that the attorney cannot be trusted to represent his client in waiving the conflict. It makes no difference, under this reasoning, what the nature of the conflict is.

With regard to Coleman, the State agrees with Ms. Pike that, under that case, defense counsel cannot waive by failing to raise it if raising it could have meant "review[ing] his own performance." (State's Br. at 57). However, the State argues, Mr. Talman was never required to review his own performance, and therefore, Coleman is inapposite. (Id.).

The State's argument is factually incorrect. For Mr. Talman to raise a claim of conflict of interest on Ms. Pike's behalf would have entailed telling the court that, after reflection, he found his loyalties to be divided and considered that his performance had suffered. This amounts to review of his performance, and Coleman is thus applicable.

The State also fails to grasp the reasoning behind the court's opinion in Coleman, that it would make no sense to require a criminal defendant to assert a conflict of interest while presently represented by the same conflicted counsel. The Coleman rationale reflects two considerations. First, the very fact that trial counsel is conflicted renders counsel untrustworthy to advocate for the client, particularly on the subject of counsel's conflict. Consequently, a requirement that criminal defendants raise conflict claims at trial would be tantamount to a requirement that they proceed *pro se* on conflict claims, effectively denying them of the right to counsel. See Quinones v. Miller, 2003 WL 21276429, at *21 (S.D.N.Y. June 3, 2003) ("a litigant does not waive an actual conflict of interest claim . . . by failing himself to raise the issue

at trial, *pro* se, as such a rule would effectively require represented defendants to act as their own counsel.").

Second, as the United States Supreme Court found in Massaro v. United States, Sixth Amendment claims cannot be adjudicated without the development of facts that will not emerge from the record at trial or on direct appeal – accordingly, such claims are properly litigated in collateral proceedings, where a trial court may develop a record as to issues concerning defense counsel's performance. 538 U.S. 500, 505-07 (2003). Because conflict of interest claims are a species of ineffectiveness claims, they require factual development that is only properly achieved on collateral review. As a result, requiring criminal defendants to raise conflict claims at trial would deny courts the ability to review such claims on the basis of a properly developed record.

Finally, the Supreme Court implicitly recognized that a criminal defendant need not raise a claim of conflict at trial when it held in Cuyler v. Sullivan that, "[i]n order to establish a violation of the Sixth Amendment, *a defendant who raised no objection at trial* must demonstrate than an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. 335, 348-49 (1980) (emphasis added). By providing the means for prevailing on a conflict claim not raised at trial, the Cuyler Court unmistakably authorized the merits-based disposition of conflict claims raised for the first time in post-trial proceedings. For all these reasons, this Court should reject the State's argument and the findings below that Ms. Pike's conflict of interest claim is waived.

**(2) The State's argument that Mr. Talman had no reason to lie is contrary to the evidence.**

Addressing the merits of Ms. Pike's conflict claim, the State argues that Mr. Talman had no reason to lie to the trial court. The State bases this argument on the fact that, after the trial court asked Mr. Talman if his previous theft from the Indigent Defense Fund posed any problems

for his representation of Ms. Pike, Mr. Talman responded that the overbilling issue had been resolved. (State's Br. at 58 (citing PC V: 647)). Furthermore, the State notes, the post-conviction court credited Mr. Talman's testimony on this issue, both explicitly and by finding Mr. Talman generally credible on post-conviction. (Id.). Thus, the State concludes, the overbilling issue did not create an interest for Mr. Talman that detracted from his loyalty to Ms. Pike and ultimately motivated him to lie to the court. (Id.).

The State's argument in this regard is troubled. As a threshold matter, it is simply not the case that the overbilling issue had been resolved by the time of Ms. Pike's trial. Review of Mr. Talman's case by the Board of Professional Responsibility – and thus Mr. Talman's ability to practice law – was pending throughout Ms. Pike's trial and direct appeal. (PC I: 71-72; PC XVII: 13-14, Board of Professional Responsibility File at 3-4 (Nov. 24, 1998 Order of Enforcement)). Additionally, while Mr. Talman repaid $67,027 to the Attorney General approximately a month before being assigned to Ms. Pike's case, he was never given any verifiable assurances that he would not be prosecuted in exchange. Prosecution thus remained a possibility for the duration of the statute of limitations for Class B felonies.

More generally, though, the State's argument is flawed insofar as it relies on Mr. Talman's credibility. While the reasoned credibility determinations of a post-conviction court are not to be disturbed on review, Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999), a post-conviction court's particular findings of fact must be overturned where the evidence preponderates to the contrary. Brown v. State, 2007 WL 293011, at *11 (Tenn. Crim. App. Feb. 2, 2007); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). In the present case, the evidence is irrefutable that the matter of Mr. Talman's theft from the Indigent Defense Fund was not



Case 1:12-cv-00035-HSM-SKL Document 13-3 Filed 08/01/12 Page 16 of 124 PageID #: 9200

resolved at the time of Ms. Pike's trial, as without question his continued authority to practice law remained in the hands of the Board of Professional Responsibility.

**(3) The post-conviction evidence necessitates the conclusion that Mr. Talman lied to the Court in an *in camera* meeting.**

Next, the State argues that, whether or not Mr. Talman was conflicted in light of the unresolved circumstance of his theft of over $67,000, he nonetheless did not lie *in camera*. To support this claim, the State relies on three arguments: (a) the post-conviction credited the testimony of Mr. Talman; (b) the trial record supports Mr. Talman's version of events; and (c) the post-conviction court found Dr. McCoy, whose testimony contradicted Mr. Talman on this issue, to be not credible. Given the evidence and applicable law, none of these arguments is persuasive.

**(a) *The post-conviction court's credibility determination is not decisive as to the issue of whether or not Mr. Talman lied.***

The State argues that, because the post-conviction court credited Mr. Talman's post-conviction testimony, and because Mr. Talman testified that he did not lie to the trial court, this Court's review of the issue is foreclosed. (State's Br. at 60). As discussed above, that is not the law. The law holds that the post-conviction court's factual findings are to be upheld *unless the evidence preponderates to the contrary.*[4] Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). In this case, the evidence leads inevitably to the conclusion that Mr. Talman lied *in camera*, asked Dr. McCoy to corroborate that lie, and then pulled her testimony from the penalty phase when she refused. The strongest evidence of these facts is the testimony of Dr. McCoy. (PC XXIV: 740-43). This testimony was corroborated by Mssrs. Moncier and Isaacs. (PC XXVII: 1000; PC XXIX: 6). Furthermore, the post-conviction court made no finding as to Dr. McCoy's credibility

[4] Adopting the State's proposition that a finding of credibility by the trial court forecloses a determination that a factual finding is contrary to a preponderance of the evidence would give the trial judge, sitting alone, an authority not subject to review.

on this point, and it credited Dr. McCoy's testimony in reaching factual findings on 11 separate occasions. (See *supra* n.2).

The fact that Mr. Talman lied *in camera* is also evident from the shoddy and nonsensical nature of Mr. Talman's proffered reasons for not calling Dr. McCoy to testify. As outlined in the introduction to this Reply, Mr. Talman offered three reasons for pulling Dr. McCoy's testimony: (1) because it would not corroborate Dr. Engum's diagnose of borderline personality; (2) because it was "two-edged"; and (3) because Dr. McCoy had dated Mr. Crabtree. (PC XX: 348-52). But contrary to Mr. Talman's testimony, Dr. McCoy's testimony was formulated with the specific design of bolstering a borderline personality disorder. (PC XXIV: 638, 647, 649-52; Apr 2008, Ex. 6). Mr. Talman knew this because, as the post-conviction court found, he and Dr. McCoy engaged in regular, detailed communications. (PC V: 683). For this reason, it is also incomprehensible that Mr. Talman would have suddenly decided on the eve of the penalty phase that Dr. McCoy's testimony would influence the jury negatively. Mr. Talman was instrumental in shaping that testimony, and with literally *nothing* prepared – no subpoenas were issued – it defies belief that Mr. Talman considered Dr. McCoy's testimony to be more damaging to Ms. Pike than assembling a case for mitigation from scratch overnight. Finally, as noted above, with respect to Dr. McCoy's relationship with Mr. Crabtree, Mr. Talman himself admitted that this ultimately played no part in his decision-making. (See PC V: 658 n.20).

And furthermore, that Mr. Talman lied is consistent with his underlying conflict. At the time of the *in camera* meeting, Mr. Talman was in danger of angering the prosecutor and trial court for failure to disclose information about his mitigation expert. (PC V: 657-58; PC XXV: 740). Mr. Talman was facing disciplinary measures before the Board of Professional Responsibility, and felony prosecution remained a possibility. It thus makes perfect sense that

Mr. Talman would have felt compelled to distance himself from any potential wrongdoing. Alleging that he had only just received Dr. McCoy's materials allowed Mr. Talman to remove the specter of culpability.

For the foregoing reasons, the evidence preponderates against the post-conviction court's finding that Mr. Talman did not lie *in camera*. As a result, this Court should hold that Mr. Talman lied as a result of a personal conflict, scrapping six months of preparations to the detriment Ms. Pike's mitigation case.

**(b) *The trial record offers no reliable evidence as to whether or not Mr. Talman lied* in camera.**

The State argues that the following passage from the trial record, representing events that occurred only moments after the *in camera* meeting in question, supports Mr. Talman's account that he neither lied to the court, nor asked Dr. McCoy to lie on the stand:

> Your Honor, as I explained in chambers, I had just received this documentation earlier this week.

(State's Br. at 60 (citing PC V: 658)). In this excerpt, Mr. Talman stated that he received Dr. McCoy's materials earlier in the week, as opposed to the previous evening, as Ms. Pike claims Mr. Talman represented to the court *in camera*. Based on this incongruence, the State argues, this Court must conclude that what appears in the record represents the fact of the matter. (Id.).

The problem with the State's reasoning is that there is no basis to conclude that the statement of an attorney is a fact merely because it is spoken into the record. It can only be asserted that Mr. Talman's statement represents the truth if there is reason to believe that either the court or the prosecutor would have corrected it otherwise. There is, however, no reason to believe this. First, it is not reasonable to assume that either the court or prosecutor even caught the inconsistency between Mr. Talman's representations *in camera* and his statement on the

record. But second, even supposing they did, there is no reason to believe either would have deemed it critical to correct the incongruence. This is because, at the time, there was no way of knowing the significance that statement would have now, on post-conviction. At *that* time, Mr. Talman's statement for the record was trivial. Only Mr. Talman could have known the significance that statement might have, and as has been discussed in detail, Mr. Talman had reason to cover his tracks. As a result, nothing may reasonably be concluded from the record concerning Mr. Talman's representations *in camera*. Viewed in the proper context, the most probable scenario is that Mr. Talman deliberately placed that statement in the record to insulate his wrongdoing.

**(c)** ***The post-conviction court made no explicit finding as to Dr. McCoy's credibility, and implicitly found her credible.***

The State argues that the post-conviction court "found that Dr. McCoy was clearly upset with Talman and implicitly found her [Dr. McCoy's] testimony less credible than Talman [*sic*]." (State's Br. at 60). In this manner, the State suggests that the post-conviction court found Dr. McCoy not credible and interpreted her testimony as a dishonest exercise in bitterness. The State provides no citation to the post-conviction court's opinion for this alleged finding, and indeed, there is none. To the contrary, the post-conviction court never made a finding regarding Dr. McCoy's credibility on the issue of Mr. Talman's *in camera* misrepresentation, and furthermore, the court based its findings of fact on Dr. McCoy's testimony on 11 distinct occasions throughout its opinion. <u>See</u> n.2, supra. The post-conviction court went so far as to say that, "Dr. McCoy clearly states her opinion on matters as she should." (PC V: 684). The State's argument notwithstanding, it is therefore plain that the post-conviction court found Dr. McCoy credible.

With regard to the fact that Dr. McCoy was upset with Mr. Talman about not being called to testify at sentencing, the post-conviction court found evidence of this in Mr. Talman's

testimony and in a letter written from Dr. McCoy to Mr. Talman. (PC V: 658-59). But Ms. Pike does not contest the fact that Dr. McCoy was upset with Mr. Talman. That fact is consistent with Ms. Pike's version of events, because Dr. McCoy clearly had reason to be upset after being told that she would not be called to testify because she refused to lie on the stand. It was reasonable for Dr. McCoy to respond with anger to Mr. Talman's outrageous conduct. Dr. McCoy's concern about the harmful affect of Talman's decision on Ms. Pike is also clear from her phone call to Herb Moncier immediately after the trial. (PC XXVII:1000 – XXVIII:1002.) In this manner, Dr. McCoy's anger with Mr. Talman in fact supports the notion that Mr. Talman lied *in camera*. The States claim to the contrary, that Dr. McCoy's anger was the impetus for false testimony on post-conviction, is completely baseless, and more significantly, the post-conviction court made no such connection.

In light of the foregoing, none of the State's arguments is capable of reshaping the evidence to support the allegation that Mr. Talman was honest in his representations to the court and prosecutor *in camera*. Because each of the State's arguments ultimately falls flat, this Court should look to the sum of the evidence, which unquestionably supports a finding that Mr. Talman lied *in camera*, asked Dr. McCoy to lie subsequently, and then dismantled Ms. Pike's mitigation case when Dr. McCoy refused.

## II. Trial Counsel's Representation Was Deficient.

### (1) Mr. Talman failed to provide Ms. Pike's social history to medical experts.

The State relies on the findings of the court below to argue that counsel's failure to conduct additional investigation into Ms. Pike's mental illness was neither deficient performance nor prejudicial. This issue has been extensively covered in Ms. Pike's opening Brief , (Pike's Br.

at 86-90), and is mentioned herein only to provide additional support for this claim. The State's argument, as did the findings of the Post-Conviction Court, ignores the long noted requirement that because the death penalty differs from all other penalties, "there is a 'greater duty of inquiry into [a] client's mental health imposed for [the] penalty phase of [a] trial.'" Cooper v. State, 847 S.W.2d 521, 529 (Tenn. Crim. App. 1992) (quoting Bertolotti v. Dugger, 883 F.2d 1503, 1516 (11th Cir. 1989) (citing Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988))). The Cooper Court went on to further cite Stephens with approval. Cooper, 847 S.W.2d at 530.

Stephens is particularly relevant to the case at bar. In that case, defense counsel relied on a psychiatrist's finding of no evidence of severe mental illness. The court responded that such reliance was not deficient performance with regard to the guilt phase of trial, but that it was with respect to the penalty phase. The Eleventh Circuit specifically noted, "when a capital sentencing proceeding is contemplated by counsel aware of the facts of which appellant's trial counsel was aware, professionally reasonable representation requires more of an investigation into the possibility of introducing evidence of defendant's mental capacity in the sentencing phase than was conducted by trial counsel in the this case." Stephens at 653. The same is true in Ms. Pike's case.

In evaluating counsel's conduct in this case, it is necessary that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. 668, 688-689 (1984). It is therefore important to set out what Ms. Pike's trial counsel knew at the time they decided to rely on Dr. Engum's finding of no brain damage.

Counsel knew that they had not provided Dr. Engum with Dr. McCoy's social history of Ms. Pike.[5] Among other things, the social history would have made Dr. Engum aware of both Ms. Pike's history of seizures and her history of suicide attempts. (Social History 30-31, 39). In addition, Dr. Engum would have been aware that Ms. Pike had been in a car wreck in which her head went through the windshield, leaving a deep gash in her forehead. (Id. at 39-40). Dr. McCoy's social history also contains information that would support concern over Christa's mother's alcohol consumption during pregnancy. (Social History 24). Dr. McCoy's mitigation materials also contain a psychological evaluation by North Carolina Juvenile Services when Ms. Pike was 15. (Vol. I, Appendix Four). That report indicates that much of what Dr. Engum noted in terms of Ms. Pike's mood swings had long been present. This information would, at a minimum, have given additional information that Dr. Engum could have used to show the severity and long-term nature of Ms. Pike's mental health problems.

There can be no question that a thorough social history is a necessity in preparation for the sentencing phase of a death penalty trial. See, e.g., Wiggins v. Smith, 539 U.S. 510, 524-525 (2003). While the Court in Wiggins dealt with the failure to prepare a social history report, it is equally clear that failure to utilize the report results in the same detriment to the defendant as failing to prepare one in the first place. Consequently, Ms. Pike's trial counsel's performance was deficient for failing to have the social history prepared in time to provide it to Drs. Engum

---

[5] The court below made an erroneous finding that Dr. Engum was aware of the information that Dr. McCoy had put in her report. (PC V: 671). This finding is contrary to the preponderance of the evidence. The record is clear that Dr. Engum had not been provided any of the information obtained by Dr. McCoy. When asked at trial about his evaluation of Ms. Pike, Dr. Engum related that he conducted interviews and testing over four sessions. (T XXV: 2178). This included a clinical interview and mental status examination, an intellectual assessment, academic testing, a neuropsychological assessment, and a personality and emotional assessment. (Id. at 2178-79). He commented that his opinion was based on his test results, review of Ms. Pike's statement to the police, and review of Ms. Pike's statement to him during interviews. (T XXVI: 2201, 2205). Furthermore, Dr. Engum noted that if Ms. Pike had lied to him in the interview, then he would have been forced to change his opinion. (Id. at 2218). This indicates that he had nothing to rely on other than his own interviews and Ms. Pike's statement to the police. Finally, Dr. Engum completed his report on September 22, 1995, (April 2008 Ex. 17), while Dr. McCoy's report was not available until March 15, 1996, (PC V. XXIV at 633).

and Bernet to determine whether the information it would have provided suggested a different diagnosis or perhaps further investigation. Ultimately, trial counsel made use of Dr. McCoy's social history only by providing it to the State for use on cross-examination – the many compelling aspects of the social history were never presented as mitigating.

In Rompilla v. Beard, 545 U.S. 374 (2005), the Court found counsel's performance deficient even though counsel had utilized three mental health professionals to examine his mental state at the time of the crime and with respect to competency to stand trial. These mental health professionals claimed to have found "nothing useful." (Id. at 382). The Court responded that because counsel had failed to obtain the public record of a prior conviction that counsel knew would be used as an aggravating factor, and because that record contained "a range of mitigation leads," counsel was ineffective. (Id. at 390-391). In Ms. Pike's case, had counsel provided what they had to their expert, this would have put a cluster of mitigation leads directly under Dr. Engum's nose, suggesting a need for further mental health testing. In short, it would have lead to the findings made by Drs. Pincus and Kenner.

**(2) Whether or not this Court finds that trial counsel suffered from a conflict of interest, counsel's penalty phase presentation constituted ineffective assistance.**

Two considerations must guide any court reviewing the decisions of counsel when those decisions are alleged to have denied a defendant her right to the effective assistance of counsel. First, the reviewing court must give deference to *sound* trial strategy. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Second the court must make every effort "to eliminate the distorting effects of hindsight." Id. Under these standards, the evidence in this case demonstrates that trial counsel's decision not to present the evidence collected by Dr.



Case 1:12-cv-00035-HSM-SKL Document 13-3 Filed 08/01/12 Page 24 of 124 PageID #: 9208

McCoy at sentencing was neither a sound strategy nor a rational choice.[6] Again looking from the vantage point of counsel at the time the decision was made to not use Dr. McCoy as their mitigation witness, it is clear that counsel's decision is not supported by sound strategic or tactical reasons.[7] First and foremost, they knew that without calling Dr. McCoy as a witness, they would not have any mental health professional to explain how the evidence that appeared negative in Ms. Pike's social history was actually proof that Ms. Pike was mentally ill and had been severely damaged by a past of neglect, abuse and mental illness. In addition, trial counsel knew:

1. that they had not subpoenaed any witnesses for the penalty phase;

2. that they had handed the State all of the materials they had planned to use;

3. that they had only three potential witnesses, none of whom would be able to provide any explanation for what counsel had determined was negative behavior on Ms. Pike's part;

4. that the State would be aware of the negative information the witnesses had provided to Dr. McCoy, because counsel had just handed the State every memorandum related to the knowledge of the witnesses as prepared by Dr. McCoy;

5. that Dr. McCoy had recommended against calling Ms. Pike's mother, Carissa Hansen, as a witness because, as Dr. McCoy put it:

> I do not think Carissa is a particularly good witness because her initial presentation is reasonably convincing and she, not surprisingly, does not own up to her very poor parenting of this girl. I encountered many, many inconsistencies in what she told

---

[6] In the Brief of the Appellant at page 83, Ms. Pike argued that it was error to plan to present all of the mitigation evidence through the mitigation specialist rather than call the necessary lay witnesses to lay the foundation for the expert analysis. Ms. Pike maintains that argument; however, having made the decision to rely on Dr. McCoy alone, and having not subpoenaed the lay witnesses or health care and juvenile professionals who knew Ms. Pike, pulling the only remaining witness who could put the information about Ms. Pike before the jury constitutes an irrational and unsound decision that no rational attorney would have made under the circumstances.

[7] In fact, prior to deciding not to use Dr. McCoy as had long been planned, trial counsel provided the negative information they feared to the prosecutor and then presented the very witnesses that had provided much of the negative information.

> me compared to that which was told me by others, but I think a jury would miss the subtleties and instead see some poor mother who went through hell with a rebellious teenager.

(April 2008 Ex. 5 Suggested Mitigation Witnesses);

6. that Dr. McCoy was prepared to testify that "Christa presents as a borderline personality" and that the materials in her social history supported that diagnosis, (April 2008 Ex. 6, Mitigating Themes);

7. that Dr. McCoy was prepared to testify: (a) that Ms. Pike had "chronically suffered from poor self-esteem" because no one appeared to care for her, except her then-deceased paternal grandmother; (b) that Ms. Pike had no self-respect and felt powerless; (c) that Ms. Pike put forth a "tough girl image" to compensate for her fears; and (d) that this understanding of Ms. Pike was supported by the juvenile court psychologist who examined her in North Carolina, (Id.);

8. that Dr. McCoy was prepared to testify that Ms. Pike "historically 'goes off' on people she believes to the treating her disrespectfully," (Id.);

9. that Dr. McCoy was prepared to testify because of the neglect and abuse that Ms. Pike encountered at home, she had a desperate need for attention (Id.);

10. that Dr. McCoy was prepared to testify that Ms. Pike was self-destructive, did not expect to live to age 25, and had made two attempts at suicide (Id.);

11. that Dr. McCoy was prepared to testify that Ms. Pike was under a great deal of stress from her situation at job corps at the time of the offense (Id.);

12. that Dr. McCoy was prepared to testify that Ms. Pike was confused about religion, wanting to believe in God but struggling with the loss of her grandmother, the only person who cared about her (Id.);

13. that Dr. McCoy was prepared to testify that Ms. Pike suffered from poor parental role modeling, including her mother's promiscuity and abuse of alcohol and marijuana (Id.);

14. that Dr. McCoy was prepared to testify that the poor modeling included her maternal grandmother growing marijuana and her maternal grandfather bringing a gun into a federal courtroom after being indicted for tax evasion, (Id.);

15. that Dr. McCoy was prepared to testify that Ms. Pike continually sabotaged her chances for release from the juvenile training school in North Carolina

because she was afraid she would get into serious trouble if she were released and went home (Id.);

16. that Dr. McCoy was prepared to testify that Ms. Pike was anxious to please others due to her low self-esteem and that she commonly took the rap for others who she felt were more important than she her; including her co-defendant's in this case (Id.);

17. that Dr. McCoy was prepared to testify that Ms. Pike's desire to become a nurse was genuine and that while in Sheaffer House as a young juvenile she would volunteer to work at nursing homes and enjoyed it, (Id.);

18. that Dr. McCoy was prepared to testify that Ms. Pike received no consistent treatment as a juvenile because her mother would not follow through with the recommendations of health professionals and juvenile workers, (Id.); and

19. that from the interviews she conducted and the records she collected Dr. McCoy had many examples of Ms. Pike's caring and generosity for which counsel had not secured any other witness.

Counsel thus failed to use Dr. McCoy's extensive work product for any purpose other than to provide it to the State for it to cherry-pick any damaging evidence for use on cross. No rational attorney provides his or her opponent the information to destroy his or her case and then expects that the opponent will not use it. Providing this information and not calling Dr. McCoy cannot fall with the category of sound trial strategy. The material provided to the State included the following facts:

1. Ms. Pike's aunt took in Ms. Pike's half-sister to raise but refused to take in Ms. Pike because she was afraid to leave Ms. Pike alone with her children, (T XXIX: 2506; M Mat. Vol. 3 of 5, Appendix 21);

2. Ms. Pike's aunt had said that Ms. Pike was a pathological liar, (T XXIX: 2506; M Mat. Vol. 3 of 5, App. 21);

3. Ms. Pike's father admitted that Ms. Pike lied and was manipulative and had indicated that Ms. Pike was banned from his home due to alleged sexual abuse of his then wife's daughter,[8] (T XXIX: 2517, 2520; M. Mat., Vol. 3 of 5, Appendix 22);

---

[8] The post-conviction court found that there was "no proof in the record that Ms. Pike was in any way abusive to any children in her family, or otherwise." (PC V:625 n. 7).

4. Carissa Hansen reported that Ms. Pike had threatened one of Ms. Hansen's boyfriends with a butcher knife. found a butcher knife in Ms. Pike's possession, had not been able to control Ms. Pike since she was 8 years old, that Ms. Pike had a live-in boyfriend when she was 14 years old and had grown marijuana in Ms. Hansen's house, that Ms. Pike's father would not allow Ms. Pike around his young children, and that Ms. Pike was a liar who had many second chances and blew them all. (T XXIX: 2534-35, 2537, 2541-42; M. Mat. Vol. 1 of 5, at 14, Appendix 2 at Bates 23, Appendix 20 at 308; Vol. 3 of 5 Appendix 19; Appendix 27.) All of these matters could have been explained and were explained in post-conviction through appropriate experts, including Dr. McCoy.

In Harries v. Bell, 417 F.3d 631, 641 (6th Cir. 2005), the Court noted that in Williams v. Taylor, 529 U.S. 362, 396 (2000), while the state could have presented highly damaging evidence in response to the mitigating evidence, trial counsel was nonetheless deficient for not discovering and presenting mitigating evidence and that said deficiency was prejudicial. In the instant case, the error is even more egregious because one of trial counsel's stated reasons for not presenting Dr. McCoy was the negative information in her report, yet counsel provided this information to the State and then presented nothing to counterbalance or explain it..

## III. Ms. Pike's Claim That She Is Ineligible for the Death Penalty Is Not Waived.

Ms. Pike argued in her original Brief that she is not eligible for the death penalty under the reasoning of Roper v. Simmons, 543 U.S. 551 (2005), and Atkins v. Virginia, 536 U.S. 304 (2002). (Pike's Br. 110-24). Ms. Pike will not rehash that argument in this Reply. Here, Ms. Pike addresses the State's claim that the argument is waived.

Ms. Pike was tried in 1996. Her conviction was rendered final by the Tennessee Supreme Court in 1998. State v. Pike, 978 S.W.2d 904 (Tenn. 1998). Atkins and Roper, by contrast, were not decided until 2002 and 2005, respectively. And while Tennessee's decision in Van Tran v. State preceded Atkins, Van Tran was nonetheless decided in 2001, roughly three

years after Ms. Pike's conviction became final. See Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001). As a result, the constitutional basis for the claim Ms. Pike has asserted on post-conviction were not in existence at the time of Ms. Pike's trial or direct appeal. For this reason, Ms. Pike cannot be deemed to have waived the claim in question.

In the alternative, to the extent that this Court finds that Ms. Pike was nonetheless required to raise the present claim on direct appeal, Ms. Pike asserts that defense counsel was ineffective for not anticipating and raising the issue that Ms. Pike is ineligible for the death penalty in light of her mental illness and age at the time of the offense.

Should the court find that this issue has been otherwise waived, Ms. Pike submits that the court should nevertheless review the claim under Tennessee's broad view of the due process requirements of the Tennessee and federal constitutions. The Court recognized in Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992), that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." The Court's decision in Van Tran is illustrative on this point. In Van Tran, the question of whether the petitioner was mentally retarded and thus ineligible for the death penalty was raised for the first time on a motion to reopen post-conviction. 66 S.W.3d at 793-94. Consequently, there was a serious issue of whether the claim was waived. See, Id. at 799 n.10. The Tennessee Supreme Court nevertheless entertained the constitutional challenge to Mr. Van Tran's eligibility for the death penalty and found that the execution of the mentally retarded violated the Eighth Amendment to the United States Constitution and Art. I § 16 of the Tennessee Constitution. Id. at 810. The Court further found that the holding announced a new rule of law that was "in no way dictated by our existing precedent." Id. at 811. As a result, the

Court held that the decision was retroactive under Tennessee precedent that "a new state constitutional rule is to be retroactively applied to a claim for post-conviction relief if the new rule materially enhances the integrity and reliability of the fact finding process of the trial." Id. quoting Meadows v. State, 849 S.W.2d 748, 755 (Tenn. 1993). The Court also found its decision retroactive under Teague v. Lane, 489 U.S. 288 (1989).

The issue raised by Ms. Pike is particularly compelling because under the constitutional provisions advanced, she would be ineligible for the death penalty and therefore legally innocent of the death penalty under Sawyer v. Whitley, 505 U.S. 333 (1992). Hence, Ms. Pike is in the same position as Van Tran and Burford in that a favorable decision disqualifies her from the present sentence. For this reason alone, this Court should rule on this issue on the merits.

## Conclusion

For all of the above reasons and in her opening brief, Appellant Christa Pike respectfully requests this Court to reverse the decision of the Post-Conviction Court; to grant her Petition for Post-Conviction Relief; to set aside her convictions and sentences for first-degree murder and conspiracy to commit first degree murder; and to grant any other appropriate relief.

Respectfully submitted,

Donald E. Dawson, BPR No. 010723
Post-Conviction Defender

Avram D. Frey, PBR No. 028520
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331
(615) 741-9430 (Fax)

Counsel for Appellant, Christa Pike

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Brief of the Appellant was sent via U.S. Mail, first-class postage pre-paid, to Frank Borger-Gilligan, Assistant Attorney General, Office of the Attorney General -Criminal Division, P.O. Box 20207, Nashville, TN 37202-0207 on this the 15th day of January, 2010.

Donald E. Dawson

# APPENDIX

**Unpublished Cases:**

Smith v. State, No. 02C01-9508-CR-00241, 1997 WL 658993 (Tenn. Crim. App.)

Coleman v. State, No. W2006-02601-CCA-R3-PC, 2007 WL 1651882 (Tenn. Crim. App.)

Quinones v. Miller. No. 01Civ.10752(WHP)AJP), 2003 WL 21276429 (S.D.N.Y.)

Brown v. State, No. M2005-02439-CCA-R3-PC, 2007 WL 293011 (Tenn. Crim. App.)

Smith v. State, No. 02C01-9508-CR-00241, 1997 WL 658993 (Tenn. Crim. App.)

**H**Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Jackson.
Shannon L. SMITH, Keith Versie, AND Michael L. Wofford, Appellants,
v.
STATE of Tennessee, Appellee.
**No. 02C01-9508-CR-00241.**

Oct. 23, 1997.

FOR THE APPELLANT: Richard B. Fields Attorney at Law 699 Jefferson Avenue Memphis, TN 38105 George KendricksL. Song Richardson Attorneys at Law 99 Hudson Street, Suite 1601 Steven W. Hawkins Attorney at Law 918 F Street, N.W., Suite 601 Washington, DC 20004

FOR THE APPELLEE: John Knox Walkup Attorney General & Reporter 500 Charlotte Avenue Nashville, TN 37243-0497 Michael J. Fahey, II Assistant Attorney General 450 James Robertson Parkway Nashville, TN 37243-0493 New York, N.Y. 10013 William L. Gibbons District Attorney General 201 Poplar Avenue, Suite 3-01 Memphis, TN 38103 John W. Campbell Assistant District Attorney General 201 Poplar Avenue, Suite 3-01 Memphis, TN 38103

OPINION

JONES, Presiding Judge.

***1** The issue this Court must resolve in this extraordinary appeal is whether the trial court abused its discretion by disqualifying counsel in this post-conviction proceeding based upon a conflict of interest amongst the petitioners. After a thorough review of the record, the briefs of the parties, and the law governing the issue presented for review, it is the opinion of this Court the judgment of the trial court should be reversed and this action remanded to the trial court for further proceedings consistent with this opinion.

On the evening of June 24, 1991, at approximately 9:12 p.m., three African-American males approached Terry and Elizabeth Wilbanks and attempted to rob them. When the couple attempted to flee, Terry Wilbanks was shot. He died as a result of this gunshot wound. Elizabeth Wilbanks was shot in the hip. She survived the gunshot wound.

The petitioners were arrested at a fast food outlet approximately two blocks from the situs of the robbery. The petitioners entered the following guilty pleas pursuant to a plea bargain agreement:

1.) Shannon L. Smith: murder in the perpetration of a robbery, confinement for life in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction;

2.) Keith Versie: murder in the perpetration of a robbery, confinement for life in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction; and

3.) Michael A. Wofford: facilitation to commit murder in the perpetration of a robbery, confinement for twenty-five (25) years in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction.

The petitioners filed a joint petition for post-conviction relief on April 20, 1995, in the Criminal Court for the Thirtieth Judicial District. The petition alleged the ineffective assistance of counsel and the entrance of involuntary pleas of guilty. The state filed an answer on May 3, 1995.

On or about the 30th day of May, 1995, the state filed a pleading entitled "Motion to Remove Counsel Due

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to Conflict of Interest." The motion alleged that (a) Wofford will be subject to a life sentence if his convictions are set aside, (b) counsel will use Wofford to benefit Smith and Versie, and (c) Wofford should be advised of the consequences of his actions in seeking to set aside his convictions. Based upon these concepts, the state asserted there was a conflict of interest between Smith and Versie on the one hand and Wofford on the other hand. Both the state and the petitioners rely upon the Sixth Amendment to the United States Constitution, Article I, § 9 of the Tennessee Constitution, and the Code of Professional Conduct, Tenn.Sup.Ct. R. 8.

***2** On July 27, 1995, Alan E. Glenn, a former assistant district attorney and presently in the private practice of law, entered a limited appearance on behalf of Wofford. On this same date, Mr. Glenn, a person of sterling character, advised the trial court he had talked to Wofford and Wofford's mother regarding the proceedings pending before the trial court. He explained to Wofford the potential for a conflict of interest and what may occur if his convictions were set aside. Wofford advised Glenn he wished to waive any conflict of interest and proceed with the suit for post-conviction relief with his two former co-defendants.

The trial court subsequently entered an order disqualifying counsel of record from representing any of the petitioners. The order recites that Wofford had waived any conflict of interest. However, the trial court ruled this waiver was not binding upon the court. According to the trial court, whether to permit the waiver of a conflict of interest rests within the sound discretion of the trial court.

I.

Since the creation of the Post-Conviction Act, the appellate courts of this jurisdiction have been unable to determine whether suits brought pursuant to the Act are civil or criminal in nature. The courts have referred to such proceedings as "criminal," "quasi-criminal," and a "hybrid affair."

In *State v. Scales*, 767 S.W.2d 157, 158 (Tenn.1989), the issue before the supreme court was whether the waiver of the notice of appeal provision contained in Rule (4)(a), Tenn.R.App.P., could be applied in a post-conviction relief proceeding. The supreme court, stating "post-conviction proceedings are criminal in nature," held the waiver provision was applicable in post-conviction suits.

In *State v. Ronnie C. Styles,* Cocke County No. 03-S-01-9108-CR-00067 (Tenn., Knoxville, January 25, 1993), Styles was indicted for committing perjury in a post-conviction proceeding brought by Ronald Cassity. The question arose regarding the difference in the statute of limitations between criminal and civil cases. The court said in ruling:

Neither party, as defense counsel has pointed out in the defense brief, have been able to discover a case in this jurisdiction directly pointing out whether a post-conviction proceeding is a civil matter or a criminal matter.

We agree there has been a blur in the definition between civil and criminal cases heard under the provisions of the Post-Conviction Procedure Act. In this jurisdiction such proceedings have variously been referred to as quasi civil or quasi criminal. In *Mitchell v. State*, 512 S.W.2d 661, 663 (Tenn.Crim.App.1974), the Court of Criminal Appeals held a petition for habeas corpus and a post-conviction petition to be *pari causa* when the relief and procedure authorized by the Post-Conviction Procedure Act appears adequate and appropriate. We find the comment of the United States Supreme Court in *Smith v. Bennett*, 365 U.S. 708, 81 S.Ct. 895, 897, 6 L.Ed.2d 39 (1961), to be relevant in this case. In *Smith* the court said: "We shall not quibble as to whether in this context it be called a civil or criminal act.... The availability of a procedure to regain liberty lost through criminal process cannot be made contingent upon a choice of labels."

* * * *

***3** A post-conviction proceeding is a hybrid affair, involving an appeal from a criminal prosecution which is considered under civil rules of procedure.

* * * *

The procedural characteristics of the post-conviction remedy should be appropriate to the purposes of the remedy. While the post-conviction proceeding is separate from the original prosecution proceeding,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the post-conviction stage is an extension of the original proceeding and should be related to it insofar as feasible.

Post-conviction review has become an established part of the criminal process. In formulating a rule we recognize that the post-conviction proceeding is procedurally separate and apart from the original criminal prosecution.... It seeks not to convict, but to set aside a conviction which is void or voidable because of the abridgement of constitutional rights. The base root of the proceeding is criminal. The post-conviction stage of a criminal trial is an extension of the original proceeding. The procedure by which a criminal conviction may be set aside is civil in nature, therefore, it is tried under the Rules of Civil Procedure and less stringent evidentiary rules apply.

*Styles*, slip op. at 6-9. In *Watkins v. State*, 903 S.W.2d 302, 305 (Tenn.1995), the supreme court essentially adopted the holding in *Styles* without making reference to the case.

The Tennessee Rules of Post-Conviction Procedure, created by the supreme court, add another dimension to this dilemma. Section 3(B) states "[n]either the Tennessee Rules of Civil Procedure nor the Tennessee Rules of Criminal Procedure apply to post-conviction proceedings...."

While the supreme court has made an effort to clarify the nature of post-conviction proceedings, the distinction remains blurred. After stating in *Styles* and *Watkins* the proceedings are civil in nature and are governed by the Rules of Civil Procedure, the supreme court has formulated a rule which states that neither the civil or criminal rules apply in these proceedings unless specifically designated by a particular provision of the rules. Tenn.Sup.Ct.R. 28 § 3(B).

## II.

It has long been established that the right to counsel provisions embodied in the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution extend through the first appeal as of right. *Pennsylvania v. Finley*, 481 U.S. 551, 554-55, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539, 545-46 (1987); *House v. State*, 911 S.W.2d 705, 712-13 (Tenn.1995), *cert. denied*, 517 U.S. 1193, 116 S.Ct. 1685, 134 L.Ed.2d 787 (1996). In other words, there is no constitutional right to the assistance of counsel in post-conviction proceedings. *Carruthers v. State*, 814 S.W.2d 64, 69 (Tenn.Crim.App.), *per. app. denied* (Tenn.1991). As the supreme court said in *House*, "the federal constitution does not require that states provide an attorney to an indigent postconviction petitioner...." 911 S.W.2d at 712.

***4** The petitioner in a post-conviction proceeding has a statutory right to the appointment of counsel when the petition alleges a colorable claim that has not been waived, previously determined, or barred by the statute of limitations. Tenn.Code Ann. § 40-30-207(b)(1) (formerly Tenn.Code Ann. § 40-30-107). The supreme court has also provided for the appointment of counsel in post-conviction cases. Tenn.Sup.Ct.R. 13 § 1.

The appellate courts of this state have zealously guarded a petitioner's right to counsel in post-conviction cases. *See, e.g., Allen v. State*, 854 S.W.2d 873, 876 (Tenn.1993); *Swanson v. State*, 749 S.W.2d 731, 734-35 (Tenn.1988); *Martucci v. State*, 872 S.W.2d 947, 948 (Tenn.Crim.App.1993); *State v. Clark*, 774 S.W.2d 634, 636 (Tenn.Crim.App.1989); *State v. Mullins*, 767 S.W.2d 668, 670 (Tenn.Crim.App.1988), *per. app. denied* (Tenn.1989); *Childress v. State*, 695 S.W.2d 541, 543 (Tenn.Crim.App.1985); *Mayes v. State*, 671 S.W.2d 857, 859 (Tenn.Crim.App.1984); *Haynes v. State*, 637 S.W.2d 467, 468 (Tenn.Crim.App.1982). The number of unreported cases which have reversed the trial court for the failure to appoint counsel are legion. In *State v. Butler*, 670 S.W.2d 241, 243 (Tenn.Crim.App.), *per. app. denied* (Tenn.1984), this Court said "the assistance of counsel is necessary to aid both the petitioner and the courts in bringing this matter to a proper conclusion."

## III.

The precise question this Court must resolve is whether (a) the petitioner is entitled to be represented by private counsel of his or her choice, (b) there is a conflict of interest in this case, and, if so, whether (c) the petitioner has a right to waive a conflict of interest created by joint representation. The appellate courts of this state have not addressed these issues.

A petitioner in a post-conviction action has a qualified right to be represented by retained private coun-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

sel of his or her choice. For instance, retained private counsel must be licensed to practice law in Tennessee and be in good standing with the appropriate agencies. Counsel licensed in another state may represent the petitioner if counsel complies with the *pro hac vice* requirements contained in the Supreme Court Rules. Of course, there are numerous other factors that could affect this qualified right.

In this case, the facts do not create a conflict of interest. All three petitioners were convicted for engaging in the same criminal conduct after they entered their respective pleas of guilty. The grounds raised in the petition are common to all three petitioners. If each petitioner was granted a separate evidentiary hearing, or each granted a separate lawyer, the same evidence would be adduced at each hearing or by each lawyer. In short, whether or not there may be disparity in sentencing if the petitioners are granted a new trial and are convicted does not create a conflict of interest in this proceeding. However, separate counsel may be required to represent the petitioners if a new trial is granted.

***5** Assuming *arguendo* there is a conflict of interest based upon multiple representation in a post-conviction action, the parties should be given the opportunity to waive the conflict in order to be represented by the same lawyer. Here, the state alleged Michael Wofford presented a conflict of interest, and private counsel should be barred from representing any of the petitioners. Separate counsel conferred with Wofford and his mother and announced to the trial court Wofford understood the possibility of a conflict of interest. However, he was willing to waive the conflict to be represented by private counsel filing the petition on his behalf.

The statements of counsel are insufficient, as a matter of law, to constitute a waiver of a potential conflict of interest.[FN1] The petitioner must be present in open court. The parties and the trial court should explain to the petitioner how an actual or potential conflict may affect him and that the petitioner has a right to be represented by separate counsel. The petitioner must be questioned under oath by the parties and the trial court to determine if the petitioner understands the actual or potential conflict. The petitioner must state under oath whether he desires to waive the actual or potential conflict. If the petitioner states he is willing to waive any actual or potential conflict of interest, the trial court shall permit the petitioner to be represented by private counsel absent a compelling reason to the contrary. In short, a trial court should not overrule the informed decision of the petitioner who knowingly and intelligently waives either a potential or actual conflict of interest, decides to be represented by his retained counsel of choice, and agrees to accept the consequences of his decision. *See* State v. *Parrott,* 919 S.W.2d 60, 62 (Tenn.Crim.App.1995).

FN1. When a member of this panel asked the attorney arguing the merits of the petitioners' case if evidence had been presented regarding Wofford's desire to waive any potential or actual conflict of interest that might exist, counsel stated evidence had been presented at the hearing. The record, as previously noted, does not contain evidence of this fact. The statements of counsel do not constitute evidence. *See* *Delk v. State,* 590 S.W.2d 435, 440 (Tenn.1979); *State v. Dykes,* 803 S.W.2d 250, 255 (Tenn.Crim.App.), *per. app. denied* (Tenn.1990).

While Tenn.R.Crim.P. 44(c) is not applicable in post-conviction actions, the rule serves as a guideline as to how a trial court should proceed when a party asserts or it is readily recognized that an actual or potential conflict of interest may exist. Such a procedure will preserve the right to counsel in post-conviction actions prescribed by statute and rule.

This cause is remanded to the trial court for further proceedings consistent with this opinion.

WELLES and SMITH, JJ., concur.

Tenn.Crim.App.,1997.
Smith v. State
Not Reported in S.W.2d, 1997 WL 658993 (Tenn.Crim.App.)

END OF DOCUMENT

Coleman v. State, No. W2006-02601-CCA-R3-PC, 2007 WL 1651882 (Tenn. Crim. App.)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Jackson.
Howard Lee COLEMAN
v.
STATE of Tennessee.
**No. W2006-02601-CCA-R3-PC.**

Assigned on Briefs April 10, 2007.
June 7, 2007.

Appeal from the Criminal Court for Shelby County, No. P-24987; Chris Craft, Judge.
Juni S. Ganguli, Memphis, Tennessee, for the Appellant, Howard Coleman.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Alanda Dwyer and Katrina Earley, Assistant District Attorneys General, for the Appellee, State of Tennessee.

DAVID G. HAYES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

**OPINION**

DAVID G. HAYES, J.

***1** The Appellant, Howard Lee Coleman, appeals the judgment of the Shelby County Criminal Court denying post-conviction relief. Coleman was convicted of first degree murder and especially aggravated robbery and was sentenced by the jury to life imprisonment without the possibility of parole. He also received a concurrent sentence of twenty years for his especially aggravated robbery conviction. Coleman filed a *pro se* petition for post-conviction relief in 2001, alleging multiple deficiencies underlying his ineffective assistance of counsel claim, including the failure to perfect a direct appeal of his convictions. After the appointment of counsel, the post-conviction court heard evidence on all the allegations and granted a Rule 3 delayed appeal to this court. The remaining post-conviction issues were stayed pending the outcome of the appeal, which was subsequently denied. Following the denial of second tier review, Coleman, proceeding *pro se,* filed an amended post-conviction petition in 2005. The attorney appointed to represent Coleman in his post-conviction challenge was the same attorney appointed to him in the direct appeal of the case. The post-conviction court subsequently denied post-conviction relief. On appeal, Coleman argues that he was denied his Sixth Amendment right to the effective assistance of counsel, specifically arguing that trial counsel was ineffective by failing to properly investigate and prepare the case. Following review, the judgment of the post-conviction court is affirmed with regard to all allegations of ineffective assistance of counsel at trial. However, plain error review of the record reveals an actual conflict of interest in that counsel appointed to perfect the direct appeal was also appointed to represent the Appellant in the amended portion of the post-conviction proceeding. Because the record is silent with regard to the conflict of interest issue, we vacate the judgment and remand for a determination of whether the Appellant was informed of the conflict and, after full disclosure, consented to the representation of appointed post-conviction counsel for purposes of the amended proceedings. If waiver is found, the post-conviction court shall enter an order accordingly and reinstate the original judgment. However, if the court finds that no waiver occurred, the court shall appoint new post-conviction counsel for the limited purpose of allowing Coleman to amend his post-conviction petition to include any issues which resulted from the unsuccessful delayed appeal. *See* Tenn. Sup.Ct. R. 28 § (9)(D)(b)(3)(a).

**Factual Background**

The facts underlying the Appellant's convictions, as established on direct appeal, are as follows:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

... [according to] a statement ... taken from the [Appellant] two days after the killing ..., the [Appellant] admit[ted] to shooting and killing a black male on July 12, 1997, in the parking lot at 915 East McLemore. The [Appellant] alleged in his statement that a robbery of the victim was planned by himself and three co-defendants.... The [Appellant] claimed that [co-defendant] Parrish originated the plan after the victim "walked up and showed a lot of money." According to the [Appellant], Parrish left and returned with a silver .38 revolver with black grips and was handing it to [co-defendant] Love when the [Appellant] intervened. In the [Appellant's] words, "I grabbed it and then we attempt to rob the guy. I walked over to the guy, everybody was standing around and so I shot him. Then I looked around, wasn't nobody there so I went in his pocket and got the money[.]" The [Appellant] in his statement alleged he shot the victim five or six times, took $210 from him, and shared it with the co-defendants.

*2*State v. Howard Coleman,* No. W2002-01485-CCA-R3-CD (Tenn.Crim.App. at Jackson, Jan. 12, 2004). Two co-defendants testified against the Appellant at trial, identifying him as the person who planned the robbery and shot the victim. *Id.* The co-defendants further stated that they received none of the robbery proceeds. *Id.* Additionally, a bystander "testified that the [Appellant] looked like the individual he saw shooting." *Id.* Following a jury trial, the Appellant was convicted of premeditated murder, first degree felony murder, and especially aggravated robbery. *Id* . The two murder convictions were merged, and the Appellant was sentenced to life imprisonment without the possibility of parole. *Id.* Additionally, the court sentenced the Appellant to twenty years for the robbery conviction, to be served concurrently with the murder sentence. *Id.*

In April 2001, the Appellant filed a *pro se* post-conviction petition alleging multiple instances of ineffective assistance of counsel, including the failure to perfect a direct appeal in the case. Following the appointment of post-conviction counsel, an amended petition was filed. A post-conviction hearing was held on December 19, 2001, at which trial counsel and the Appellant testified. Following a determination that the Appellant was denied his right of appeal, the post-conviction court granted a delayed appeal in the case, with post-conviction counsel being appointed to represent the Appellant. Pursuant to Tenn. Sup.Ct. R. 28(D), the court, after having heard proof on the remaining allegations of ineffective assistance of counsel at trial, held in abeyance any ruling with regard to these remaining allegations pending the outcome of the direct appeal. A direct appeal was filed with this court challenging only the sufficiency of the convicting evidence. A panel of this court subsequently denied the appeal on January 12, 2004. *Id.* Permission to appeal to the Tennessee Supreme Court was denied on May 24, 2004. *State v. Howard Coleman,* W2002-01485-SC-R11-CD (Tenn. May 24, 2004).

On March 15, 2005, the Appellant filed an amended *pro se* petition for post-conviction relief. Counsel, who had represented the Appellant on direct appeal, was again appointed as post-conviction counsel. A second post-conviction hearing was held on December 21, 2005, at which both trial counsel and the Appellant again testified. No issues resulting from appellate counsel's handling of the direct appeal were included in the amended petition.

At the 2001 post-conviction hearing, the Appellant testified that trial counsel was appointed, along with a second attorney, to represent him following his preliminary hearing. He acknowledged that his case was originally filed as a capital case and stated that he was aware he could receive the death penalty if convicted. He testified that trial counsel met with him approximately ten to fifteen times and that trial counsel "somewhat" explained the charges against him. The Appellant acknowledged that trial counsel conveyed the State's offer of life with parole, which he refused. He explained he wanted to proceed to trial, despite trial counsel's urging him to accept the plea offer based upon counsel's belief that it was a "losing" case.

***3** The Appellant testified that trial counsel reviewed the statement which the Appellant had given to police, but he stated that he informed trial counsel that he did not recall giving a detailed statement to the police. He acknowledged that trial counsel, nonetheless, filed a motion to suppress the statement. The Appellant also acknowledged that he never provided trial counsel with possible defense witnesses, that he had no alibi defense, and that he was provided a copy of the co-defendants' statements prior to trial. When

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

asked what he believed that trial counsel should have done differently, the Appellant responded that "trial counsel should have gone out on his own and done investigating."

Trial counsel testified that he met with the Appellant on more than ten occasions and that he discussed the details of the case with him. He stated that the State provided him with open-file discovery and that he filed thirty-five to forty motions in the case. Trial counsel acknowledged urging the Appellant to accept the plea agreement because he believed it was in the Appellant's best interest to do so based upon the evidence. Nonetheless, he was prepared for trial when the Appellant chose to proceed. Because the Appellant's confession was crucial evidence, trial counsel filed a motion to suppress the statement, which was subsequently denied.

Trial counsel verified that the Appellant had provided no possible defense witnesses, other than family members who had no specific knowledge of the facts of the case. However, trial counsel stated that he, on his own, visited the crime scene and canvassed the area, searching unsuccessfully for possible eyewitnesses to the shooting. Additionally, trial counsel met with an investigative service several times, which was retained through court-ordered funding. Trial counsel acknowledged that he neither received nor reviewed a copy of the preliminary hearing transcript, stating he felt it was unnecessary because the Appellant's confession to the crime was more than sufficient evidence to establish probable cause. According to trial counsel, he devoted fifty hours of time outside the courtroom, in addition to over sixty hours in court, to the Appellant's case.

At the second post-conviction hearing, the Appellant, while acknowledging that trial counsel did in fact file a motion to suppress the statement on other grounds, expressed concern that he was not advised of his rights prior to giving the statement. The Appellant, on cross-examination, acknowledged that the transcript reflected that his Fifth Amendment rights were provided to him as shown in the transcript of his statement, but he denied that he read his rights prior to signing the statement. Trial counsel testified that he considered raising the issue at the motion to suppress hearing, but he asserted that he was unable to do so because, at the time of the hearing, the Appellant claimed that he had no recollection of making the statement at all. Thus, he had no proof supporting that claim.

***4** On July 13, 2006, the post-conviction court, after reviewing the transcript of the 2001 and the 2005 evidentiary hearings, denied the Appellant's petition by written order. This timely appeal followed.

**Analysis**

**I. Ineffective Assistance of Counsel at Trial**

On appeal, the Appellant has raised the single issue of ineffective assistance of trial counsel. To succeed on a challenge of ineffective assistance of counsel, the Appellant bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984), the Appellant must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn.Crim.App .1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn.1999) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of law and fact. *Id.* at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn.2001) (citing Tenn. R.App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn.1997)). However, *conclusions of law*, are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

On appeal, the Appellant argues that trial counsel was ineffective based upon the cumulative effect of various deficiencies characterized as failure "to properly investigate and prepare the case." Specifically, he contends that trial counsel: (1) failed to expend an adequate amount of time preparing for the case, spending only fifty hours outside of court appearances; (2) failed to discuss trial strategy, instead discussing only plea options with the Appellant; (3) failed to review the tape of the preliminary hearing in order to learn what crucial witnesses might testify to; (4) failed to challenge a photospread identification; (5) failed to employ expert investigative services, instead conducting investigations for which he was not trained; and (6) failed to "ably challenge" the admission of the Appellant's statement given to police on grounds that the Appellant was under the influence of narcotics.

***5** Initially, we are constrained to note that the Appellant has waived consideration of trial counsel's failure to challenge a photospread identification because he raises the issue for the first time on appeal. No allegations regarding this contention were contained in the Appellant's petition or developed at the post-conviction hearing. Additionally, we are precluded from reviewing the Appellant's assertion that trial counsel failed to "ably challenge" his statement on grounds that he was under the influence of narcotics.[FN1] At the post-conviction hearing, the issue of the Appellant's statement to the police was raised but in the context of a challenge to its admission based upon the fact that the Appellant had not been provided his *Miranda* rights. No proof was presented with regard to whether the Appellant was under the influence of drugs. We have consistently held that an appellant cannot change theories from the lower court to the appellate court. *State v. Alder*, 71 S.W.3d 299, 303 (Tenn.Crim.App.2001). "[A] party cannot assert a new or different theory to support the objection ... in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634 (Tenn.Crim.App.1994). To do so constitutes waiver of the issue. *Id.*

> FN1. We would also note, as addressed *infra*, that the issue is improper as part of an amended post-conviction petition following a delayed appeal, as the alleged error did not result from appellate counsel's handling of the delayed appeal. *See*Tenn. Sup.Ct. R. 28, § 9(D)(3)(a).

In denying the Appellant's petition, the post-conviction court found as follows:

> As the proof presented at the hearing, the only suggestion made by [the Appellant] as to any additional work his attorney might have performed was that the attorney might have "went out on his own, did a little more investigation or something." ... [Trial counsel], on the other hand, testified that he had been a practicing attorney for 26 years at the time of the trial, had tried numerous cases, visited the crime scene, canvassed the neighborhood, got open file discovery from the State, including the statements of the co-defendants, and went over all of this with the [Appellant] extensively in jail visits, along with Kevin Reed, a second attorney appointed [the Appellant]. [The Appellant] has failed to offer anything additional his attorney might have done which might have changed the outcome of the trial.
>
> [The] Appellant did not offer the names of any witnesses that he suggests his attorney should have interviewed or subpoenaed. [Trial counsel] testified that no names were furnished him, and that his personal canvassing of the neighborhood of the crime scene turned up no potential witnesses not called by the State at the [Appellant's] trial.
>
> ... [The Appellant] does not suggest any motions left unfiled which would have affected the outcome of his trial.... [Trial counsel] filed numerous motions and had a pre-trial evidentiary hearing on the motion to suppress the [Appellant's] confession, which was decided against [the Appellant].
>
> ....

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> [The Appellant] has suggested no viable defense which could have been presented. He confessed to shooting the victim after he and his co-defendants had planned to rob him. His co-defendants testified against him in the trial, as well as bystanders who witnessed the [Appellant] shoot this unarmed young man in the chest, and then saw him shoot the victim repeatedly in the back while he was on the ground, attempting to crawl away, stating "Drop it off, drop it off."

***6** Following review, we conclude that the record before us does not preponderate against the post-conviction court's findings that trial counsel properly investigated and prepared the case for trial. A bare allegation that trial counsel has failed to perform in some manner, as asserted here, does not equate to ineffective assistance of counsel. To prevail, the Appellant must establish that, as a result of the particular omission or failure, (1) a benefit was lost and (2) as a result of the lost benefit, there was a reasonable probability that the case would have concluded differently if counsel had performed as suggested. *See* Burns, 6 S.W.3d at 463. The Appellant has failed to establish either of these factors with regard to his claims. For example, the Appellant offers no explanation of how spending more time preparing for the case, in addition to the fifty hours expended, would have affected the outcome of the trial, and he offers no proof as to what trial counsel could have discovered had he further personally investigated the facts or had hired additional investigators. *See Black v. State,* 794 S.W.2d 752, 757 (Tenn.Crim.App.1990). Moreover, the Appellant has failed to show how trial counsel viewing the preliminary hearing tape would have aided in the Appellant's defense. Clearly, trial counsel testified he was given open-file discovery, which would have contained evidence intended to be offered by the State at trial. His blanket assertion that trial counsel was not qualified to investigate the case is misplaced. The record clearly indicates that, in addition to his own efforts, trial counsel consulted with investigative services. Accordingly, we conclude that the Appellant's allegations of inadequate preparation and investigation must fail. As found by the post-conviction court, trial counsel spent many hours preparing the case, filed several motions, met with the Appellant on multiple occasions, and personally investigated the circumstances of the case. As noted by the State, there was overwhelming proof against the Appellant, including his own confession and the testimony of two co-defendants and one uninterested eyewitness. The Appellant asserts that the cumulative effect of the trial court's errors warrants a finding of ineffective assistance of counsel. Having concluded that the record supports no single finding of deficient performance or prejudice, this issue is without merit.

**II. Post-Conviction Issues Resulting from the Delayed Appeal**

Although not raised as an issue by the Appellant, plain error dictates that we address the issue of a conflict of interest which is apparent from the record before us. Tennessee Supreme Court Rule 28, § 9(D) governs the procedure to be employed following the granting of a delayed appeal in the context of post-conviction proceedings. The rule, with which the post-conviction court in this case complied, provides that the "court shall enter an order granting the petitioner a delayed appeal, staying the post-conviction proceedings pending the final disposition of the delayed appeal." Tenn. Sup.Ct. R. 28, § 9(D)(1)(b). The rule contemplates that the post-conviction court will hear proof on all post-conviction issues raised by the petition, although the trial judge is required to hold in abeyance its rulings on all issues other than the delayed appeal. However, the rule further provides that following the disposition of the direct appeal, the petitioner may amend the original petition to challenge any "new issues cognizable in a post-conviction proceeding result[ing] from the handling of the delayed appeal." Tenn. Sup.Ct. R. 28, § 9(D)(3)(a); *see also State v. Evans,* 108 S.W.3d 231 (Tenn.2003). This rule has the practical effect of allowing a petitioner to challenge the effectiveness of appellate counsel on direct appeal.

***7** Here, appellate counsel and post-conviction counsel on the amended petition following direct appeal, were one and the same. While petitioners for post-conviction relief are not constitutionally entitled to the effective assistance of counsel, they do have a statutory right to counsel. *McCullough v. State,* 144 S.W.3d 382, 385 (Tenn.Crim.App.2003) (citing *Leslie v. State,* 36 S.W.3d 34, 38 (Tenn.2000)). "[T]his statutory right includes the right to be represented by conflict-free counsel." *Id.* (citing *Kevin Burns v. State,* No. W2000-02871-CCA-R3-PD (Tenn.Crim.App. at Jackson, Aug. 9, 2001)). When

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

an attorney is placed in a position of divided loyalties between himself and his client, an actual conflict is created. *Id.* In *McCullough,* this court specifically held that representing a defendant in a post-conviction proceeding after having represented the defendant on direct appeal created an actual conflict of interest. *Id.* Thus, an actual conflict existed in this case as appellate/post-conviction counsel would be forced to review his own performance on direct appeal. Having concluded that an actual conflict existed, plain error review permits us to consider the error "to do substantial justice" in this case. *See*Tenn. R.Crim. P. 52(b). Because the record is silent with regard to the conflict of interest issue, we vacate the judgment and remand for a determination of whether the Appellant was informed of the conflict and, after full disclosure, consented to the representation of appointed post-conviction counsel for purposes of the amended proceedings. If the court finds no such waiver occurred, the post-conviction court shall appoint post-conviction counsel for the limited purpose of reviewing the Appellant's post-conviction petition involving those issues which may have resulted from the unsuccessful delayed appeal. However, if the Appellant did waive the conflict, the original judgment of the court should be reinstated.

**CONCLUSION**

Based upon the foregoing, the Shelby County Criminal Court's denial of the Appellant's post-conviction petition is affirmed with regard to all issues involving the Appellant's allegations of counsel's ineffective assistance at trial. However, because of an actual conflict, the post-conviction court's ruling with regard to the amended petition is vacated and the case is remanded for a determination of whether the conflict was waived. If no waiver occurred, the post-conviction court shall appoint counsel to allow the Appellant to amend his petition to challenge any issues cognizable in a post-conviction proceeding which resulted from appellate counsel's handling of the delayed appeal. If the court finds that an appropriate waiver was made, the court shall enter an order accordingly, and the original judgment of the court shall be reinstated.

Tenn.Crim.App.,2007.
Coleman v. State
Not Reported in S.W.3d, 2007 WL 1651882 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Quinones v. Miller. No. 01Civ.10752(WHP)AJP), 2003 WL 21276429 (S.D.N.Y.)

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Edgar QUINONES, Petitioner,
v.
David L. MILLER, Superintendent, Eastern Correctional Facility, Respondent.
**No. 01Civ.10752(WHP)(AJP.**

June 3, 2003.

*REPORT AND RECOMMENDATION*

PECK, Magistrate J.

*1 Edgar Quinones, pro se, petitions for a writ of habeas corpus from his July 10, 1995 conviction in Supreme Court, New York County, of second degree murder and second and third degree criminal possession of a weapon, for which he was sentenced as a repeat offender to concurrent terms the longest of which was twenty years to life imprisonment. *See*People v. Quinones, 272 A.D.2d 228, 228, 708 N.Y.S.2d 616, 616 (1st Dep't 2000). Quinones' amended petition claims ineffective assistance of trial counsel on multiple grounds, including a conflict of interest. (Dkt. No. 1: Petition at 3; Dkt. No. 10: Amended Pet. ¶ 1.)

Quinones' conflict claim asserts that since his attorney, Alvin Morris, also represented Quinones' brother Dennis when Dennis was arrested for possession of a .380 caliber handgun, Dennis must be the real killer. Brother Dennis and attorney Morris are dead, so there is no way to test whether these assertions have any basis in reality. The Court's first reaction on reading Quinones' conflict claim was that, in light of attorney Morris' and Dennis' deaths, the claim was frivolous. On further review, however, while the Court is denying the claim, it has required a great deal of analysis.

Conversely, on reading Quinones' general claims of ineffective assistance, the Court initially was troubled by some of Morris' alleged deficiencies. In deciding the petition, the Court has carefully read the entire trial transcript, and concludes that while Morris' conduct of the trial was not stellar, it did not constitute ineffective assistance.

For the reasons discussed below, Quinones' petition should be DENIED.

*FACTS*

*Quinones' Pretrial Request for Change of Counsel*

On April 24, 1995, Quinones requested the trial court to replace his retained counsel, Alvin Morris, because, according to Quinones, Morris had neither interviewed witnesses nor filed motions. (Dkt. No. 20: State Am. Appendix: Quinones C.P.L. § 440 Motion Ex. P: 4/24/95 Transcript at 3.) The court noted that the latter was not true because "extensive motions were filed." (*Id.*) FN1 Further, Morris had negotiated a plea offer with the prosecution for a five- to ten-year sentence, which Quinones rejected, despite a warning from the judge that the deal "is ridiculously low" and if he turns it down and is convicted, "he faces twenty-five to life." (*Id.* at 2.) The court pointed out that Morris was *retained* counsel, and warned that any new retained lawyer would have to be prepared for trial in thirty days. (*Id.* at 4-5.) Ultimately, Quinones did not replace Morris.

FN1. This is confirmed by the contents of attorney Morris' file. (*See* Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. Ex. A, referring to counsel's "Omnibus Motion," the State's response to the motion and the court's decision on the motion.)

*Pretrial Suppression Hearing*

Lamont Carter was murdered on December 31, 1992, at approximately 7:20 p.m. on the corner of 132nd Street and Fifth Avenue in Manhattan. (6/1/95 *Wade* Hearing Transcript ["H"] 5-6, 29-30.) Quinones was arrested for the crime on August 20, 1993 (Milian: H.16), after two eyewitnesses-Carol Deans and Marion Scarlett-placed him at the scene (Milian: H. 9-11, 14, 16, 28, 30).

*2 On June 1 and June 2, 1995, the court conducted a pretrial *Wade* hearing to determine the propriety of three separate photo array identifications by Deans and Scarlett and a lineup identification by Deans. (H.46.) The court heard testimony from Detectives George Milian and Ronald Balzan, who obtained the identifications. (Milian: H. 7-9, 14, 16-17; Balzan: H.

41.)

Detective Milian testified that Carol Deans witnessed the shooting. (Milian: H. 7, 28.) On January 3, 1993, just three days after the shooting, Deans identified Quinones in a photo array by stating: " 'This looks a lot like the guy that did the shooting. If I had him in person, I could be absolutely sure." ' (Milian: H. 9-11; *see also* Milian: H. 29-30, 34.)

Detective Milian testified that he included Quinones' brother in the photo array shown to Deans on January 3, 1993. (Milian: H.14, 23-24.) Defense counsel did not follow up on this line of inquiry. (*See* Milian: H. 24-34.) The judge later remarked that the pictures of the two brothers "look very much alike." (H.54.)

Detective Milian testified that the brother's name was Jorge Vasquez. (Milian: H. 23-24.) Until recently, the parties assumed that the brother in the photo array was Dennis Quinones. (*E.g.*, Dkt. No. 20: State Am. Answer ¶ 29.) However, in his most recent submission to this Court, Quinones asserted that the brother in the photo array was *"David* Quinones," apparently *another* "one of Petitioner's brothers." (Dkt. No. 22: Quinones Traverse Br. at 12.) The State agrees that the lineup photo was *not* of Dennis. (Dkt. No. 25: A.D.A. Axelrod Aff. ¶¶ 3-4.)

On March 1, 1993, the police interviewed the victim's "wife," Marion Scarlett. (Milian: H. 11-12.) According to Detective Milian, Scarlett immediately identified Quinones in a photo array as "the guy that was involved in the [oral] fight with" her husband on the day he was killed. (Milian: H.13-14, 27, 34-35.) Quinones' "brother" was not included in the photo array shown to Scarlett. (Milian: H. 13-14, 23.)

Late on the night of August 20, 1993, Deans again identified Quinones from a photo array.FN2 Deans again identified Quinones' picture. (Balzan: H. 42.) At 4:30 a.m. on August 21, 1993, nearly eight months after the shooting, Quinones was placed in a lineup for viewing by Deans. (Milian: H. 16-17; H. 47.) When Deans viewed the lineup, she "started to shake" and identified Quinones by exclaiming, in a "trembl[ing] voice: " 'O[h], my God. He's there. He's there." ' (Milian: H.19-20, 30.)

FN2. There is conflicting testimony as to whether that array was the one shown to Scarlett in March 1993 (Balzan: H. 41-42; H. 35) or the original January 1993 photo array (*see* H. 36 ("the first photo array [Deans] viewed on January 3rd was re-shown to her on August 20th"); H. 50 (Deans was shown the same photo array twice); H. 55 (same).)

Quinones was in the same number-three position in the photo arrays and the lineup. (Milian: H. 11, 14, 20.) Quinones' counsel suggested at the hearing that Quinones had been moved to that specific position in the lineup. (H.26.)

On cross-examination, defense counsel attempted to elicit from Detective Milian that Quinones' appearance differed from the others in the lineup, in that Quinones' shirt had blood on it, his shirt was on backwards, and his shoes did not have laces. (Milian: H. 24-26.) Based on the photograph of the lineup, Detective Milian conceded that Quinones' shirt did have blood on it on the night of the lineup, but could not tell whether Quinones' shirt was on backwards or whether his shoes had laces. (Milian: H. 24-26.)

***3** Quinones' counsel Morris moved to suppress the identifications, but he presented no witnesses and presented no argument at the conclusion of the hearing other than asserting that the detectives' testimony was "entirely self-serving." (*See* H. 43-46.)

At the conclusion of the hearing, the court found Detective Milian's and Detective Balzan's testimony "to be credible" (H.47) and held that none of the four pretrial identifications was suggestive (H.54, 58-59). Although the ages and hairstyles of the men in the photos differed, the court termed this a "distinction without significance." (H.52-53.) All the men pictured "appear to be Hispanic," all had the same skin tone, and all but one had similarly shaped eyes and pencil-thin mustaches. (H.52-53.) The court concluded that there was nothing in either photo array that would automatically draw the eye to one photograph as opposed to the others. (H.54.) While the court was somewhat troubled that Deans was shown the same array on January 3, 1993 and again on August 20, 1993 just before she identified Quinones in the lineup, the court's concerns were alleviated by the intervening time period between the two photo arrays and Deans' pronounced reaction to the lineup. (H.55-56, 58-59.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

As to the lineup, the court noted that all of the participants were seated so height was not a variable, and while one (not Quinones) wore a white shirt which could have stood out, the lineup participants' skin tones and hair length did not vary markedly. (H.56-57.) While the defense had raised a question as to whether Quinones' shirt was blood-stained and whether his shoelaces were missing, the court saw no blood on Quinones' shirt in the lineup photograph, and was unable to tell if his shoes were laced up or not. (H.57-58.) The court concluded: "I cannot say that the line-up by its composition was suggestive. Nor is there any evidence that the conduct of the lineup, itself, was suggestive." (H.58.)

*The Defense's Opening Statement at Trial*

Defense counsel Alvin Morris told the jury in his opening that "the wrong man is being accused of this murder." (Trial Transcript ["Tr."] 395.) He also said that the victim was a drug dealer who was killed by other drug dealers who wanted his drug spot, and that the drug dealers chose to put the blame on Quinones. (Defense Opening: Tr. 395-96.) He asked the jury to use their "common sense" as they listened to the prosecution's evidence, and concluded by stressing the prosecution's burden of proving guilt beyond a reasonable doubt. (Defense Opening: Tr. 396-97.)

*The Prosecution Case at Trial*

*Carol Deans and Detective Milian*

Carol Deans, a "friend" of Carter's for over twenty-five years, testified that on December 31, 1992, at approximately 7:15 p.m., she was walking east on 132nd Street near Fifth Avenue when she saw Carter "talking" with "somebody"-a "young man" "standing next to him." (Deans: Tr. 421-23, 427-28, 433-35, 449.) From inside his jacket, "the young man took out a gun and started firing" ten shots at Carter. (Deans: Tr. 422, 427-29, 441.) The shooter was "young," "very fair-skinned," and "tall"-"5'6", 5'7"." (Deans: Tr. 427, 435-36.) Deans described the shooter's hairstyle as "cut bald" or "shaved off" like that of an "average Black man." (Deans: Tr. 451-52.) He was wearing a black jacket and "could have been" wearing a black baseball cap. (Deans: Tr. 436-37.) Deans described the gun as a "9 millimeter" based on its "square shape." (Deans: Tr. 428.)

*4 It was turning nightfall but not really dark, and there was good lighting, so Deans had no "problems" seeing the shooting. (Deans: Tr. 424-26.) She told the police that she saw the shooting from fifty feet away, although she was not "good" with distances. (Deans: Tr. 425, 437.) After the shots were fired, the shooter "stopped and he was uncertain which direction to turn." (Deans: Tr. 430.) When the shooter "turned," Deans "saw him" and then he "ran" "into the projects." (Deans: Tr. 429-30.) "Just as [Deans] walked up and got to the corner, it was over and done with, within seconds." (Deans: Tr. 453.) Deans was "[j]ust in shock" immediately after the shooting it "[t]ook [her] time to get [herself] together in order to move." (Deans: Tr. 455, 461-62.) She spoke to the police later on the night of the shooting and again on January 3, 1993. (Deans: Tr. 430-31, 453-55; Milian: Tr. 525.)

At trial, Deans was unable to identify Quinones as the shooter:

Q. The person that you saw talking to Lamont Carter eventually firing the weapon, do you see him in court today?

A. I don't know.

Q. You don't know?

A. No. I just had sort of a profile.

Q. Are you saying you are unable to identify him today in court?

A. Yeah.

(Deans: Tr. 429.)

Q.... When you came into this court today you indicated you couldn't say that this is the person that you saw on the 31st of December, 1992, correct?

A. That is true.

(Deans Tr. 433.) FN3 Prior to the shooting, Deans had never seen Quinones before. (Deans: Tr. 450-51.)

FN3. Quinones asserts that Deans testified that she saw the shooter "at an angle." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

32.) In fact, her testimony was far more ambiguous:

Q. That photograph that I've just shown you, that is People's 1 in evidence, to your knowledge, does that appear to be taken where you were standing when you viewed this?

A. Yeah, because-Yes. Yes. The corner is right here. I mean the curb is right there. So, it's like the angle, yes. (Indicating)

(Deans: Tr. 426-27.)

Deans testified, without objection, that at 4:30 a.m. on August 21, 1993, nearly eight months after the shooting, she viewed a police lineup of several "sitting" individuals and selected number three as the shooter. (Deans: Tr. 431; Milian: Tr. 528, 531-32.) In court, Deans viewed a photograph of the lineup and circled individual number three as the shooter, whom counsel stipulated was Quinones. (Deans: Tr. 431-32; Milian: Tr. 532-33.)

Detective Milian testified that upon viewing the August 21, 1993 lineup, Deans "immediately began to shake, and she said 'Oh, my God. Oh, my God. It's him." ' (Milian: Tr. 528, 531-32.) After some hesitation, Deans said " 'It's Number 3. He's the one that shot Lamont" Carter. (Milian: Tr. 531-33.) FN4

FN4. Defense counsel Morris elicited from Detective Milian that Quinones had small blood stains on the front of his shirt during the lineup, thus throwing into question the lineup's fairness. (Milian: Tr. 534-36, 551-53.) When asked whether Quinones had been "beaten" prior to the lineup, Detective Milian stated that "necessary force was utilized" when the "defendant resisted arrest," resulting in a bloody shirt. (Milian: Tr. 536-38.)

On cross-examination, Quinones' counsel, Morris, first had Deans repeat that she could not identify Quinones in court as the shooter. (Deans: Tr. 433, quoted at pages 7-8 above.) Morris then asked Deans if she was aware that Carter was a drug dealer, which Deans denied. (Deans: Tr. 434.) Morris next established that Deans and Ed Smith were "lovers," but Deans denied Morris' assertion that Smith and Carter were partners in the drug trade. (Deans: Tr. 434-35, 450.) According to Deans, she, Carter and Smith "were all friends together." (Deans: Tr. 435, 449.) Deans also denied that Smith was present at the time Carter was shot. (Deans: Tr. 435, 449-50.)

***5** While cross-examining Deans, Quinones' attorney Morris established that Deans' daughter (who was thirteen or fourteen years old at the time of the shooting) was standing with Deans when the shooting occurred. (Deans: Tr. 441-45, 460.) Deans' daughter ran into the beauty parlor to inform Scarlett that Carter had been shot. (Deans: Tr. 445.) Morris asked Deans, but the Court precluded Deans from answering: "Did you in any way stop your daughter from coming here to this court and testifying as a witness in this case." (Deans: Tr. 445, 448.) The judge also quashed, on hearsay grounds, the question: "Are you aware of the fact that your daughter said that this is not the person who was there at the time?" (Deans: Tr. 446-48.) Outside the jury's presence, Morris explained his question by stating "[h]er daughter spoke to me." (Deans: Tr. 447.) Morris thus implied to the court that Deans' daughter had told him that Quinones was not the shooter. (*See* Tr. 446-47.) Detective Milian testified that although Deans' daughter was present at the shooting, the police did not speak to her, apparently because Deans said that the daughter " 'didn't see what happened because she was behind me." ' (Milian: Tr. 540-41, 553.) On cross-examination, the court precluded Detective Milian from answering whether it was "a fact that the reason why you didn't interrogate [Deans'] daughter is because her daughter said a tall Black man did this shooting?" (Milian: Tr. 540.)

*Marion Scarlett*

The victim's "girlfriend," Marion Scarlett, identified Quinones at trial as the man her husband was speaking to before the shooting. (Scarlett: Tr. 470, 474-75.) Scarlett worked in a beauty salon across the street from where the shooting took place. (Scarlett: Tr. 471, 480.) On the night of the shooting, Scarlett saw Carter leave a pizza parlor and stop to "talk" to a man, whom she identified in court as Quinones. (Scarlett: Tr. 471-75.) She described Quinones' appearance that night as "a young man, light-skinned Spanish. He had on a black-and-white leather jacket,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

black pants...." (Scarlett: Tr. 474.) Although she described Quinones as "[t]aller than" her five feet, six inches, when Quinones stood up in court she said "[h]e seemed taller to me." (Scarlett: Tr. 490-91.)

As Quinones and Carter were talking, Scarlett approached Carter, "pull[ed] on his sleeve" and told him that she was ready to leave. (Scarlett: Tr. 475-76.) Quinones became "agitated" "[b]ecause [Carter] had turned his attention to [Scarlett] and he was answering back to" Scarlett. (Scarlett: Tr. 476-79.) Quinones "said like 'Yo, I'm talking to you, man." ' (Scarlett: Tr. 477.) Scarlett did not pay attention to what Quinones and Carter had been "discussing." (Scarlett: Tr. 477.)

Scarlett returned to her beauty salon, and observed Carter and Quinones crossing the street together. (Scarlett: Tr. 479-82, 502-03 .) Scarlett estimated that "five or ten" (or "ten or fifteen") minutes later she heard "lots" of gun shots, and a girl came running into the shop saying, " 'Your man is down. Your man is down." ' (Scarlett: Tr. 482-83, 497-99, 503.) Since Scarlett did not actually see the shooting, she could not state whether Quinones was the shooter. (Scarlett: Tr. 481-83,491,498.) Scarlett ran across the street to where Carter was lying on the ground. (Scarlett: Tr. 484.) She spoke to the police about what she had seen. (Scarlett: Tr. 486.)

***6** Quinones' counsel Morris brought out that Scarlett had never before seen the person who had the argument with Carter. (Scarlett: Tr. 488.) Scarlett testified on cross-examination that she only saw Carter and Quinones talking together, and did not "see anybody else there." (Scarlett: Tr. 494-95.) After her recollection was refreshed by reading Detective Milian's report, she remembered having told the police that, prior to the shooting, she saw Carter talking with "three other people" in addition to Quinones. (Scarlett: Tr. 495-97.) FN5

FN5. On cross-examination, Deans denied telling the police that she "observed several males talking with the deceased." (Deans: Tr. 440.) Rather, Deans testified that Carter and the shooter were talking together, while the other men were "two or three feet away"-they were not "all talking together." (Deans: Tr. 438-41.)

On cross-examination, Scarlet acknowledged that Carter sold drugs and "suppose [d]" that Ed Smith (Deans' boyfriend) was his partner. (Scarlett: Tr. 493.) Scarlett claimed not to know Deans at the time of the shooting (Scarlett: Tr. 491-92), though Deans had testified that she had been friends with Carter for over twenty-five years, Scarlett was friends with Deans' boyfriend, Ed Smith, and Deans' daughter knew to find Scarlett in the salon (Scarlett: Tr. 492-94). Defense counsel Morris elicited from Police Officer Ramos that Carter was found with a beeper and 43 crack vials. (Ramos: Tr. 587-88; *see also* Milian: Tr. 544-45.) Defense counsel also established on cross-examination of the medical examiner that Carter used cocaine-he had "cocaine breakdown product in the blood and in the brain," indicating that "he had taken cocaine recently" before his death. (Hayes: Tr. 520-21.)

Upon defense counsel's argument at a charging conference, the court agreed to charge the jury that they could consider that Carter was a drug dealer, but only for the purpose of determining Deans' credibility, given that she testified that she did not know he was a drug dealer despite being friends with him for over twenty-five years. (Tr. 642-46; *see also* Tr. 561-65, 723-24.)

*Additional Police Testimony*

Detective Mary Dugan of the Crime Scene Unit testified that although the murder weapon was not found at the crime scene at 132nd Street and Fifth Avenue on December 31, 1992 (Dugan: Tr. 399, 401-02, 414, 416), the discharged shell casings came from a .380 caliber semi-automatic handgun (Dugan: Tr. 405-07, 413, 415). There were no fingerprints on the shell casings (Dugan: Tr. 408), although "it's very unusual to find a fingerprint on bullets [*i.e,* shells] that have been fired" (Dugan: Tr. 417). The parties later stipulated that another ballistics detective would have testified that the six shell casings found at the scene and the six bullets removed from Carter's body came from a .380 caliber semi-automatic pistol. (Tr. 633-35.)

Quinones' counsel Morris did not object to Police Officer John Ramos' testimony that an unidentified woman at the crime scene yelled, " '[t]he Puerto Rican did it." ' (Ramos: Tr. 575-76.) On cross-examination, however, Morris established that this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

reference to the "Puerto Rican" was not in Officer Ramos' notes, nor did anyone at the scene go over to Officer Ramos and state that she was a witness. (Ramos: Tr. 579-81.)

***7** Before the arresting officers testified, Morris asked the court to instruct them not to say they were members of the "Career Criminal Apprehension Unit." (Tr. 592.) The court agreed, but also expressed surprise that there was no objection when Detective Milian earlier testified in passing (Milian: Tr. 527) about that unit. (Tr. 597-99.)

Detectives Sheridan and Kaplan testified that when plain clothes detectives approached Quinones to arrest him in August 1993, Quinones "pushed" the "small child" he was walking with, ran onto First Avenue, and resisted arrest. (Sheridan: Tr. 601-02, 613-14; Kaplan: Tr. 619-21, 629-30.) Defense counsel elicited that the detectives were all in plain clothes and did not produce badges before approaching and grabbing Quinones (Sheridan: Tr. 604-05), presumably explaining Quinones' flight and resistance. The judge later established that the plain clothes detectives had not identified themselves as such until they were actually subduing Quinones. (Kaplan: Tr. 622, 629.) Detectives Sheridan and Kaplan repeatedly denied that any of the arresting officers had struck Quinones, testifying that they "used necessary force to bring him to the ground." (Sheridan: Tr. 606-07, 610-11; Kaplan: Tr. 623-24, 626.)

*Defense Motion to Dismiss*

After the State rested, Quinones' counsel Morris moved to dismiss, arguing that no witness had identified Quinones in court as the shooter. (Tr. 636.) Defense counsel noted that "a careful perusal of the testimony of the lady who allegedly participated in the lineup testified that she identified a profile of a person seated in Seat Number 3. She said she did not identify the defendant as he sits in court as being in that particular seat." (Tr. 637.) The court denied the motion. (Tr. 638-39; *see also* Tr. 640-42.) The defense rested without calling any witnesses. (Tr. 639.)

*Colloquy Re Possible Defense Witnesses*

The defense called no witnesses at trial. (*See* Tr. 639.) Just days before trial was to begin, defense counsel had informed the court that he had "witnesses who allegedly were there at the time of the incident." (Tr. 3.) However, counsel hadn't "seen them yet because [he is] a very busy practitioner," but expected to see them before the trial began. (Tr. 3-4.) At the beginning of voir dire, on June 6, 1995, Quinones' counsel Morris notified the court that he had two possible witnesses: Aaron Bishop and Damon White. (Tr. 9, 22-23.) During voir dire, on June 7, 1995, at defense counsel's request, the trial judge issued subpoenas on behalf of the defense to "Damond White" and "Aaron Bishop, Jr." who defense counsel described as two witnesses that he might call, "maybe." (Tr. 267-68; Dkt. No.1: Pet. Ex. B: Quinones 3/29/00 1st Dep't Reply Br. Supp. Rec. at 6, 7.)

Carol Deans' daughter-who allegedly told Quinones' counsel Morris that Quinones was not the shooter (*see* pages 9-10 above)-was not called to testify by either party. As the State neared the end of its case, the court questioned the defense about its witness list: "My question to you is whether there is a Defense case ...," to which defense counsel Morris replied, "Your Honor, I'm going to flip a coin now. I have been looking for a witness or two witnesses for a while now, and unless a miracle happens this evening-my office tells me somebody has called, et cetera, et cetera-I do not have any witnesses." (Tr. 559-60). The next day, the court asked "Mr. Morris, just as a timing mechanism, did any miracles occur last evening?" (Tr. 595.) Morris responded: "No. Unfortunately, I guess I'm a bad guy." (Tr. 595-96.)

*Defense Summation*

***8** In his summation, defense counsel Morris emphasized that Deans was unable to identify Quinones as the shooter in court (although counsel also mischaracterized the testimony by asserting that Deans said " 'That is not the man" '). (Defense Summation: Tr. 653-55.) Morris highlighted Deans' testimony that she had only seen a "profile." (Defense Summation: Tr. 655.) Morris, however, seemed to confuse that testimony, asserting that Deans had testified that she only saw a profile at the *lineup* rather than at the shooting. (*Id.*)

Morris attacked Deans' credibility, noting that Deans had denied that Carter or her boyfriend Smith were drug dealers or that she knew Scarlett, when the evidence was to the contrary. (Defense Summation: Tr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

656-57.) Morris pointed out that Scarlett admitted that Carter and Smith were drug dealers. (Defense Summation: Tr. 656-57.) Morris noted certain other inconsistencies in the eyewitness' description of the shooter (and the shooter's gun), such as Deans' testimony that the shooter was "tall," whereas Quinones was not much taller than Deans' five foot six inches. (Defense Summation: Tr. 657-59, 664.) Morris also pointed out that Scarlett had described the shooter's hair as that of a "Black man," while Quinones was a "light-skinned Hispanic." (Defense Summation: Tr. 659.) Morris asserted that perhaps twenty minutes elapsed between the time Scarlett left Carter and the shooting-more than enough time for Quinones to leave and another person to commit the shooting. (Defense Summation: Tr. 667-68.)

Morris questioned why Deans had not contacted the police sooner, implying that her story was fabricated. (Defense Summation: Tr. 660-62.) Importantly, Morris asserted that Deans' daughter was "the person who really knew who the shooter was," but that the State had failed to call her. (Defense Summation: Tr. 662-64.)

Finally, Morris reminded the jury that Carter was a drug dealer, and died holding 43 vials of crack. (Defense Summation: Tr. 668-69.) "When a partner becomes deceased, generally the other partner takes all the business...." (Defense Summation: Tr. 669.) Morris thus implied that Quinones was framed, as the victim's partner was Ed Smith, and the only alleged eyewitness to the shooting was Smith's "paramour." (*Id.*)

*Prosecution Summation*

In its summation, the State ridiculed defense counsel Morris' failure to support his opening statement claim that Quinones was being framed by the drug dealers who actually killed Carter. (State Summation: Tr. 672-74.) The prosecutor theorized that when drug dealers kill their competitors, they just do it, without getting the police involved by trying to frame someone else. (State Summation: Tr. 673.)

The State asserted that if Deans' daughter had exculpatory testimony, the defense would have called her. (State Summation: Tr. 679.) The State further claimed that Deans had not approached the police earlier because of fear, and that Deans failed to mention her daughter to the police in order to protect her daughter. (State Summation: Tr. 676-79.)

***9** Defense counsel's only objection (overruled by the court) was to the prosecutor's statement that Deans had not identified Quinones in the courtroom because "just like at the lineup, she froze." (State Summation: Tr. 682.) The prosecutor elaborated on this theory, asserting that Deans had suppressed her recollection due to "trauma ." (State Summation: Tr. 683.) The prosecutor's trauma theory, however, had no basis in the record and seemed to contradict Deans' own testimony that she did not recognize the shooter in court because she "just had sort of a profile" (Deans: Tr. 429). (State Summation: Tr. 682-85.)

The prosecutor asserted that the jury should disregard Scarlet's time estimate that she saw Quinones and Carter talking five to fifteen minutes before the shooting, since her perception of time was probably distorted: "When things are not going so great, or something traumatic or terrible happens, it seems like time goes on forever. Two minutes can seem like fifteen minutes." (State Summation: Tr. 680, 690.)

Although the police did not identify themselves when they approached Quinones to arrest him, the prosecutor speculated that Quinones must have known they were the police: "I submit to you when this defendant saw those people approaching, he made them for police officers. You know, it's not too difficult to make plain clothes cops for who they are." (State Summation: Tr. 692.) He then asserted "[i]f [Quinones] wasn't the killer, if some other person out there did it, what's he running for?" (Tr. 693.)

*Jury Charge*

The court's jury charge echoed both counsels' mischaracterization of Scarlett's testimony by saying that Carter and Quinones were having a dispute: "within minutes of his being shot, the defendant was having some kind of a dispute or agitated discussion with the deceased, Lamont Carter." (Charge: Tr. 742; *see* Defense Summation: Tr. 658, 666-67, & State Summation: Tr. 686-87, 689, referring to a verbal "argument" between Carter and the shooter.) In discussing Deans' failure to identify Quinones in the courtroom, the court commented that Deans' memory was perhaps "fresher" at the lineup than at trial, since it was "shortly after" the crime. (Charge: Tr. 744-45.) FN6

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN6. Again, the lineup was conducted over seven months after the shooting, and the trial took place nearly two years after the lineup.

Defense counsel raised only one exception to the jury charge-asking the judge to clarify that Deans had not made an in-court identification (Charge: Tr. 751-52), which the court did (Charge: Tr. 752-53).

*Jury Deliberations*

The jury began deliberations at about 12:30 p.m. on June 14, 1995. (Tr. 754.) The jury asked for and received a read-back of Deans' testimony and a further explanation of "reasonable doubt." (Tr. 759-67.) At 5:40 p.m. that day, the jury sent out a note stating that they were "at an impasse." (Tr. 771.) The court responded with an *Allen* charge and sent the jury to dinner. (Tr. 771-72, 774-76.) The jury resumed deliberations at 7:30 p.m., and at 8:10 p.m. sent out a note reading: " 'We, the jury, are hung and we feel strongly that further deliberations will not change the convictions of the divided jury." ' (Tr. 777-78.) The Court responded with a second "somewhat stronger" *Allen* charge, without objection. (Tr. 779-86.) The jury resumed deliberations on June 15, 1995 at approximately 10 a.m. (Tr. 813), and reached a verdict at 11:45 a.m. (Tr. 814-15).

*Verdict and Sentence*

***10** On June 15, 1995, the jury found Quinones guilty of second degree murder and criminal possession of a weapon in the second and third degrees. (Verdict: Tr. 816-20.)

On July 10, 1995, the court sentenced Quinones, as a predicate felon, to concurrent terms of twenty years to life, 7-1/2 to 15 years, and 3-1/2 to 7 years, respectively. (Sentence: Tr. 5-8.)

*Direct Appeal*

Represented by different, assigned counsel, Quinones appealed to the First Department [FN7] on the grounds, *interalia,* that his trial counsel rendered ineffective assistance by: (1) failing to offer a coherent theory of the case (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 39-45); (2) failing to object to the admission of multiple items of evidence-especially hearsay and Deans' pretrial identification (*id.* at 45-46); (3) asserting various ineffective arguments (*id.* at 46-47); (4) making no attempt to obtain possibly favorable evidence from Deans' daughter (*id.* at 48); (5) failing to object to several improper statements and arguments in the prosecutor's summation (*id.* at 48-51); and (6) failing to object to improper jury instructions, particularly where testimony was mischaracterized (*id.* at 51-52). Further, Quinones alleged that trial counsel's aggregated errors constituted ineffective assistance in violation of the Sixth Amendment even if the individual errors did not. (*Id.* at 53-58.)

FN7. Quinones' opening brief to the First Department is dated September 29, 1999 (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 61), over four years after the July 10, 1995 sentencing. At least part of this delay was caused by Quinones' appellate lawyers' repeated requests for extensions in order to "review and gather information" and to move for funds to hire an investigator. (Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. Ex. E: Schmidt Aff. ¶ 3; *seealsoid.* Ex. C: Schmidt Letters; *id.* Ex. D: Motion for Investigator.)

On May 23, 2000, the First Department affirmed Quinones' conviction, denying his ineffective counsel claims:

> On the existing record, we conclude that defendant received meaningful representation. Counsel's alleged deficiencies did not deprive defendant of a fair trial.

*People v. Quinones,* 272 A.D.2d 228, 229, 708 N.Y.S.2d 616, 616 (1st Dep't 2000) (citations omitted).[FN8] The New York Court of Appeals denied leave to appeal on August 14, 2000, *People v. Quinones,* 95 N.Y.2d 870, 715 N.Y.S.2d 224 (2000), and denied Quinones' pro se motion for reconsideration on December 26, 2000, *People v. Quinones,* 95 N.Y2d 968, 722 N.Y.S.2d 485 (2000).

FN8. Although the First Department also denied most of Quinones' other claims (including for sufficiency of the evidence and various evidentiary rulings), it reversed the trial court's revocation of Quinones' proba-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion. *Id.* at 229, 708 N.Y.S.2d at 616.

*Quinones' Habeas Petition and Amendment*

Quinones' timely pro se habeas corpus petition, dated October 15, 2001 and received by the Court's pro se office on October 26, 2001, asserted the same ineffective assistance of counsel claims that Quinones had raised before the First Department. (Dkt. No.1: Pet. at 3, referencing Pet. Ex. A: Quinones 1st Dep't Br.)

Quinones wrote to this Court on May 10, 2002, stating that he had retained counsel, Anthony Ricco, Esq., to file a C.P.L. § 440.10 motion in state court (on unstated grounds), and that if such motion did not "prevail," he would move to amend his habeas petition. (Dkt. No. 8: Quinones 5/10/02 Letter.) The Court directed Quinones to amend his habeas petition and promptly file the C.P.L. § 440 motion. (Dkt. No. 8: 5/14/02 Memo Endorsed Order.) By letter to the Court dated May 23, 2002, Quinones' new counsel, Ricco, asserted that Quinones' trial counsel, Alvin Morris, had a conflict of interest because he simultaneously represented Quinones' deceased brother, Dennis Quinones, who was the actual murderer. (Dkt. No. 9: Ricco 5/23/02 Letter.) This was the first notice given by Quinones or his counsel to any court, state or federal, of such an alleged conflict. (*Seeid.* at 2: "Although the issue of ineffective assistance of counsel was raised below in the state court proceedings the specific claim of 'conflicted counsel' was never previously litigated.") Ricco noted that Quinones had retained a retired New York City detective as an investigator, and that the investigation would be completed "expeditiously so that an application for relief ... can be made on the basis of reliable investigatory work and not simply toothless allegations." (*Id.*)

***11** On May 29, 2002, Quinones moved, pro se, to amend his petition (Dkt. Nos. 10-11: Quinones Motion to Amend), and by order dated June 7, 2002 (Dkt. No. 11: 6/7/02 Memo Endorsed Order), this Court granted Quinones' motion, thereby adding two additional ineffective counsel claims:

(1) Whether petitioner was deprived of his Constitutional right to "conflict free" representation where attorney, Alvin C. Morris, Esq., simultaneously represented petitioner and his brother, Dennis Quinones, on unrelated charges, knowing full well that the .380 caliber handgun Dennis Quinones was indicted for in Bronx County may have been the same weapon used to murder Lamont Carter.

(2) Whether petitioner was deprived of his Constitutional right to "conflict free" representation where attorney, Alvin C. Morris, Esq., failed to call an eyewitness who would have exculpated petitioner, but would have identified Dennis Quinones, petitioner's brother, as the actual shooter.

(Dkt. No. 11: Quinones 5/29/02 Aff. ¶ 1.) This Court also ordered Quinones to exhaust these claims in state court by way of a C.P.L. § 440 motion. (Dkt. No. 11: 6/7/02 Memo Endorsed Order.)

*Quinones' C.P.L. § 440 Motion*

On June 26, 2002, Quinones filed a pro se C.P.L. § 440.10 petition in state court, asserting that because of a conflict of interest, his trial counsel rendered ineffective assistance. (Dkt. No. 20: State Am. Appendix: Quinones 6/26/02 C.P.L. § 440 Aff. & Quinones C.P.L. § 440 Br.) Quinones alleged that because his trial counsel, Alvin Morris, formerly represented his brother, Dennis Quinones, Morris refrained from asserting at trial that Dennis committed the Carter shooting, even though certain evidence suggested that Dennis-rather than Edgar Quinones-may have been the shooter.[FN9] (Quinones 6/26/02 C.P.L. § 440 Aff. ¶¶ 18, 22-23; Quinones C.P.L. § 440 Br. at 5-10.) Quinones' C.P.L. § 440 motion requested the state court to order a ballistics comparison of the .380 caliber gun found in Dennis' possession and the .380 shell casings from Carter's murder. (Quinones 6/26/02 § 440 Br. at 6, 16-17.)

FN9. For ease of reference, petitioner Edgar Quinones will be called "Quinones" and his brother Dennis Quinones will be called "Dennis ." No disrespect is intended.

The parties agreed on the key facts. On February 14, 1993, six weeks after Carter's murder, "Jose Medina-AKA Dennis Quinones" was arrested in the Bronx for criminal possession of a .380 caliber handgun. (State Am. Appendix: Quinones C.P.L. § 440 Motion Ex. I: 2/14/93 Criminal Complaint; *see also* Quinones C.P.L. § 440 Exs. K & L.) [FN10] On February 19, 1993, Morris filed a notice of appearance as Dennis' attorney of record on that arrest. (Quinones C

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

.P.L. § 440 Ex. K: 2/19/93 Notice of Appearance; Dkt. No. 13: A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 17.) On March 16, 1993, when Dennis failed to appear in court on the gun possession charge, a bench warrant was issued for his arrest. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 16.)

FN10. The State misstates the date of Dennis' arrest as February 19, 1993. (Dkt. No. 13: A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 16.)

Several months later, on August 20, 1993, petitioner *Edgar* Quinones was arrested for Carter's murder. (Milian: H.16.) On January 3, 1994, Morris filed a notice of appearance on Quinones' behalf in the criminal case underlying this habeas petition. (Quinones C.P.L. § 440 Ex. K at 2.) Quinones' trial for the Carter killing began June 1, 1995, and he was sentenced on July 10, 1995. (*See* pages 3, 18 above.) The police did not finally track down Dennis (who had been missing since March 1993) until September 5, 1996, over one year after Quinones' sentencing. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 16; Quinones C.P.L. § 440 Br. at 6 n. 18; *see* Quinones C.P.L. § 440 Ex. L: 12/5/96 Superseding Indictment of Dennis.) FN11

FN11. The State claims that "[d]uring the entire time [Quinones'] case was pending there was no active case against [Dennis]." (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 16.)

***12** Quinones asserted on "information and belief" that attorney Morris was dead by the time Dennis reappeared in September 1996. (Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. at 3 n. 2; *see also* Quinones C.P.L. § 440 Br. at 15; Pet. Ex. A: Quinones 1st Dep't Br. at 39 n. 32 ("Present and previously-appointed appellate counsel have been unable to locate the attorney, Alvin Morris, and it appears that he died within about a year of the trial.").) FN12 It is clear that Morris did not represent Dennis in 1996. (*See* A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶¶ 17-18 & Exs. A & B .) The parties agree that Dennis subsequently died; the record is silent as to the date of his death except that he died at some time before Quinones first raised the conflict claim in May 2002. (Dkt. No. 9: Quinones' Counsel Ricco 5/23/02 Letter at 1; A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶¶ 14, 21, 24.)

FN12. The only nearly admissible evidence of Morris' death is an affidavit by Quinones' then-appellate counsel stating, upon information and belief as of August 28, 1997, that Morris was dead. (Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. Ex. D: Barocas 8/28/97 Aff. ¶ 4; *seealso* Quinones C.P.L. § 440 Reply Br. Ex. E: Schmidt 9/25/97 Aff. ¶ 9.)

Quinones argued in his § 440 motion that at the time of trial, Morris must have known that Dennis was the "true killer." (Quinones 6/26/02 C.P.L. § 440 Aff. ¶ 23; Quinones C.P.L. § 440 Br. at 5.) Morris certainly knew-based on the complaint in Dennis' case and the police report in the Carter shooting-that the .380 caliber handgun for which Dennis was arrested in 1993 was the same caliber weapon used in the Carter murder. (Quinones C.P.L. § 440 Br. at 5-6, 9 & Ex. I: 2/14/93 Criminal Complaint & Ex. J: 12/31/92 Police Report.) Morris also knew that the prosecution's case against Quinones relied solely on the eyewitness testimony of individuals who did not know Quinones (*see* pages 7-8, 10-11 above), and that, in the words of the trial judge, the two brothers "look very much alike" (H.54). (Quinones C.P.L. § 440 Br. at 10-11.) Further, Morris knew that three months after the Carter shooting Dennis was arrested on the gun charge and then disappeared, and that Dennis previously had been convicted of attempted murder. (Quinones C.P.L. § 440 Reply Br. at 9; Quinones C.P.L. § 440 Ex. M.)

According to Quinones, Morris thus was absolutely conflicted, as Quinones' best defense was to shift the blame onto Morris' former client, Dennis. (Quinones C.P.L. § 440 Br. at 7-10.) According to Quinones, "An attorney not faced with divided loyalties would have pursued a defense demonstrating that [Dennis] Quinones was the actual shooter." (*Id.* at 10.) According to Quinones, at minimum, an unconflicted attorney would have determined whether a ballistics test had been performed on the gun in Dennis' possession, and if not, would have requested such a test. (*Id.* at 11.) Further, according to Quinones, an unconflicted attorney would have insisted that Dennis' mug shot be displayed to the eyewitnesses at trial when identifying the shooter. (*Id.* at 11; Quinones C.P.L. § 440 Reply Br. at 9 n. 6.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Morris failed to alert Quinones' trial judge that he also was counsel to Dennis. (Quinones C.P.L. § 440 Reply Br. at 7.) Morris' only reference to Quinones' family was: "Your Honor, I am retained on this case but I have known the family of my client for years, and I'm doing this particular matter with hardly any monies at all." (H.36.) FN13

FN13. Quinones asserted that he only learned recently from a private investigator (hired after the instant habeas petition was filed) "that the .380 caliber semiautomatic handgun found in Dennis Quinones' possession was, perhaps, the same weapon used in the Lamont Carter homicide." (Quinones 6/26/02 C.P.L. § 440 Aff. ¶ 22; *see alsoid.* ¶¶ 17, 19; *see also* Dkt. No. 22: Quinones Traverse at 11-12.) Quinones' affidavit does not clarify whether he was unaware that his brother had been arrested for handgun possession, or unaware that his brother had been arrested for possession of a *.380.* (*See* Quinones C.P.L. § 440 Br. at 6 n. 20 (Quinones was unaware until recently that "Dennis Quinones was arrested for possessing a .380 semiautomatic" handgun); Quinones C.P.L. § 440 Reply Br. at 10 ("The information concerning the .380 recovered from Dennis Quinones was discovered by [the] Private Investigator...."); Dkt. No. 16: Quinones § 460 1st Dep't Br. at 14.) It seems likely, however, that Quinones knew at the time of his trial that: (1) he and Dennis looked alike (if, indeed, they do look alike, which is now open to doubt); (2) Dennis had been arrested for gun possession; and (3) Morris had originally defended Dennis on the gun charges in 1993, as Dennis advised their family to retain Morris to defend Quinones. (Quinones 6/26/02 C.P.L. § 440 Aff. ¶ 18 n. 10.) Thus, it appears that Quinones was merely unaware until recently that Dennis' arrest involved a .380 handgun. Quinones, however, said for the first time in his appeal of the denial of his § 440 motion that he did not "realize" until 2002 "that Mr. Morris represented the Quinones brothers simultaneously." (Quinones § 460 1st Dep't Br. at 14.)

***13** Quinones also argued to the § 440 court that because of his divided loyalties, Morris failed to call a number of exculpatory witnesses at trial. (Quinones C.P.L. § 440 Br. at 10-15.) For example, according to Quinones, Malik Abdullah Akili, a friend of Carter's and an eyewitness to the crime, maintained that Quinones was not the shooter. (Quinones C.P.L. § 440 Br. at 12 & Ex. G: Akili 4/27/02 Aff.) Akili's description of the murderer's clothes was similar to that given by Deans and Scarlett (Quinones § 440 Br. at 12), but Akili said the Hispanic male was taller and wider than Quinones (Quinones C.P.L. § 440 Ex. G: Akili Aff. at 1.) Akili signed an affidavit on April 23, 1997 swearing that Quinones was not the shooter and that he was never approached by Quinones' attorney to testify to that effect. (Akili Aff. at 1-2.) Akili's name was written on Quinones' trial counsel Morris' notes of potential witnesses. (Quinones C.P.L. § 440 Ex. H.) FN14

FN14. Counsel's notes also contained the name of another uncalled witness, Nathaniel Battle, who, according to counsel's scribbled notes: "Saw crime-Person from Bklyn did it." (Quinones C.P.L. § 440 Ex. H.)

In addition, Quinones argued that Morris should have called Deans' daughter, as she witnessed the shooting and allegedly told Morris that Quinones was not the shooter. (Quinones C.P.L. § 440 Br. at 13; Tr. 446-47.)

Finally, based on the above evidence, Quinones moved the § 440 court to order a ballistics test to determine whether Dennis' gun was the murder weapon. (Quinones 6/26/02 C.P.L. § 440 Aff. ¶¶ 24-26; Quinones C.P.L. § 440 Br. at 16-17; Quinones C.P.L. § 440 Reply Br. at 8-11.)

*The State's Opposition to Quinones' § 440 Motion and His Reply*

In its opposition to the § 440 motion, the State raised several arguments. First, the State argued that although Morris represented Dennis when he was first arrested in February 1993, Morris did not represent Dennis when he reappeared in 1996. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶¶ 17-19.) FN15 Thus, according to the State, Morris only represented Dennis for a short period in 1993-months before Quinones was even arrested for the Carter shooting.

(*Id.*) In reply, Quinones pointed out that "[e]ven though a representation has ended, a lawyer has continuing professional obligations to a former client, including the duty to maintain that client's confidences and secrets." (Quinones C.P.L. § 440 Reply Br. at 3.) Thus, according to Quinones, even if Morris no longer represented Dennis at the time of Quinones' trial, Morris had a continuing duty to Dennis that caused a conflict of interest. (*Id.*)

FN15. The State asserts that when Dennis reappeared in court on September 5, 1996, he was represented by "Victor Dailey Rivera." (*Id.* at ¶ 17.) The documents submitted by the State, however, show Dennis represented on September 5, 1996 by assigned counsel Elliot Charles Shapiro. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. Ex. A.) Dennis was later represented by "Daly-Rivera" (which the State translated as "Victor Dailey Rivera") at his December 18, 1996 arraignment, September 19, 1997 plea, and October 9, 1997 sentencing. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶¶ 17-19 & Ex. B.)

Second, the State argued that at Quinones' sentencing, when the trial judge asked him if he had anything to say, he replied with a simple "no." (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 20.) According to the State, if Quinones knew that his counsel had failed to call exculpatory witnesses such as Akili and Deans' daughter, Quinones would have "shout[ed] from the rafters that his attorney had sold him out." (*Id.;see alsoid.* ¶ 24.) Nor were Quinones' conflicted counsel ineffective counsel claims raised on direct appeal. (*Id.* ¶ 21.) Quinones replied that prior to the trial he *had* complained to the judge about Morris' failure to investigate, to no avail. (Quinones C.P.L. § 440 Reply Br. at 6 citing Ex. P: 4/24/95 Conf. Transcript.) More importantly, Quinones correctly asserted that ineffective counsel claims involving matters outside the record must be brought by way of a C.P.L. § 440 motion-not at sentencing or on direct appeal. (Quinones C.P.L. § 440 Reply Br. at 6.)

***14** Third, the State asserted that although Quinones had raised a host of generic ineffective counsel claims on direct appeal (*see* Pet. Ex. A: Quinones 1st Dep't Br. at 39-58), he had intentionally delayed raising his conflict of interest claims until both Morris and Dennis were dead, so that the court would be unable to probe Morris for any "trial strategy" behind, for example, Morris' failure to call the various missing witnesses. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶¶ 21, 24.) According to the State, Quinones' appellate attorney could have filed a C.P.L. § 440 motion containing these allegations as a "supplement to his appeal." (*Id.* ¶ 24.)

Quinones replied that his appellate counsel made known as early as 1997 that they intended to file a C.P.L. § 440 motion alleging ineffective assistance of counsel. (Quinones C.P.L. § 440 Reply Br. at 7 & Exs. C, D, & E.) Further, although a prior appointed appellate attorney had petitioned the court in 1997 for funds to hire an investigator to help prepare the appeal (Quinones C.P.L. § 440 Reply Br. Ex. D),[FN16] Quinones claimed that he only learned in 2002 from a private investigator that Morris had represented him and his brother simultaneously, and that Dennis' 1993 arrest involved a .380 handgun (Quinones 6/26/02 C.P.L. § 440 Aff. ¶¶ 17, 19, 22; Quinones C.P.L. § 440 Br. at 6 n. 20; Quinones C.P.L. § 440 Reply Br. at 10; Dkt. No. 16: Quinones § 460 1st Dep't Br. at 14).

FN16. The attorney, Lawrence Barocas, retired due to illness within several months of taking on Quinones' case. (Quinones C.P.L. § 440 Reply Br. Ex. E.) The First Department refused to appoint Barocas' partner, Sam Schmidt, to continue the appeal. (*Id.*)

Finally, the State asserted that because Quinones fled the scene with the handgun, he could easily have given the gun to his brother Dennis prior to Dennis' arrest six weeks later. (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 22.) Thus, even if a ballistics test proved that the handgun Dennis was caught with matched the handgun that shot Carter, such a finding would not be "dispositive" (*id.*), especially since Quinones' conviction was based on the testimony of two eyewitnesses (*id.* ¶ 23). In reply, Quinones argued that even if Dennis' possession of the murder weapon did not conclusively prove that Dennis, and not Quinones, committed the murder, an unconflicted attorney would have argued the point to the jury in an effort to raise a reasonable doubt regarding Quinones' guilt. (Quinones C.P.L. § 440 Reply Br. at 10.)

*The State Court Decisions Denying Quinones' C.P.L.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*§ 440 Motion*

On September 18, 2002, the trial court denied Quinones' C.P.L. § 440 motion, adopting virtually wholesale the State's arguments (as well as the State's misspelling of Morris' name as "Morrison"):

> Although defendant had the opportunity to raise the specific issues contained in the motion on direct appeal, he unjustifiably failed to do so. Moreover, with respect to the defendant's ineffective assistance of counsel claim, the evidence submitted by the People shows that after defendant's brother absconded and was returned to court, he was represented by Victor Dailey Rivera Esq. and not Alvin Morrison [sic] Esq., and that during the sentencing hearing when asked by the Court whether he had anything to say, rather than alerting the court to a possible exculpatory witness and to advise the court of trial counsel's failure to call such a witness, defendant replied "No."
>
> ***15** Lastly, the possibility that the handgun which the defendant's brother was later arrested for illegally possessing, and which defendant contends is the real murder weapon-and his brother the real murderer-is of no consequence since a witness identified the defendant as the shooter, as the person seen speaking with the decedent moments before the murder, and as the person with whom one of the identifying witnesses had a verbal exchange at the crime scene before the murder.
>
> This Court has reviewed the defendant's remaining contentions and find[s] them to be without merit.

(Dkt. No.17: 9/18/02 State Court § 440 Decision, record citation omitted.)

On December 12, 2002, the First Department summarily denied leave to appeal, stating that "there is no question of law or fact presented which ought to be reviewed." (Dkt. No. 18: Quinones Mot. to Amend Pet., Ex. A: 1st Dep't 12/12/02 Order.)

*Additional Proceedings in This Court*

On January 15, 2003, this Court granted Quinones' request to amend his petition to include the following claim:

> Defendant Was Deprived Of His Constitutional Right to "Conflict Free" Representation When Attorney C. Morris, Esq., Simultaneously Represented Defendant And His Brother, Dennis Quinones, On Unrelated Charges, Knowing Full Well That The .380 Caliber Handgun Dennis Quinones Was Indicted For In Bronx County May Have Been The Same Weapon Used In The Lamont Carter Murder.

(Dkt. No. 18: 1/15/03 Memo Endorsed Order & Quinones 1/8/03 Aff. ¶ 1.) This claim is virtually identical to one of the claims added by way of the Court's June 7, 2002 Order. (*See* pages 20-21 above .)

In its response to Quinones' amended petition, the State repeated its earlier arguments, but assumed for habeas purposes that Dennis' gun was the murder weapon:

> Although no ballistics comparison was ever made, the People took the position in state court that it made no difference whether [Dennis'] gun was the murder weapon. Thus, this response assumes that a ballistics test would have revealed the gun to have been the one that petitioner used when he shot Carter.

(Dkt. No. 20: State Am. Answer ¶ 23 n. 1.)

In his most recent submission to this Court, Quinones claimed for the first time that the photo array depicted not Dennis, but rather *"David* Quinones," *another* "one of Petitioner's brothers." (Dkt. No. 22: Quinones Traverse Br. at 12.)

On May 20, 2003, this Court issued the following order:

> The State is to inform the Court ... whether ballistics testing still can be done on Dennis' .380 and the Carter-murder shells, and if so, should complete the tests and inform the Court of the results....
>
> The State is also to provide the Court ... with the photo array pictures of Quinones and his "brother" and any other evidence as to whether that brother whose picture was in the photo array was "Dennis" or "David."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Dkt. No. 23: 5/20/03 Order; *see also* Dkt. No. 24: 5/23/03 Order.)

***16** The State responded by affidavit that "the bullets and shell casings recovered in connection with Lamont Carter's murder had been fired from the gun that Dennis Quinones possessed." (Dkt. No. 25: A .D.A. Axelrod 5/28/03 Aff. ¶ 2.) Further, the State averred that the photo array in question depicted *neither* Dennis *nor* David Quinones:

> [A]t a pre-trial hearing, the detective who compiled the initial [photo] array testified that he had been informed by another detective that Jorge Vasquez, whose picture was # 4 in the array, was petitioner's brother. The detective also testified that petitioner had never confirmed that fact (Hearing Transcript at 23-24).
>
> I am informed by Assistant District Attorney Harvey Rosen, who investigated and prosecuted the case, that this belief that Vasquez was related to petitioner was incorrect and that no family member's photograph appeared in that array. Additionally, I obtained Vasquez's arrest record and compared it with the record for Dennis Quinones. These records ... reveal that the two men are not the same.
>
> Lastly, while petitioner has claimed that it was not Dennis Quinones' but David Quinones' photograph that appeared in the array, Vasquez's record reveals that he has never used the name Quinones.

(A.D.A. Axelrod 5/28/03 Aff. ¶¶ 3-5.)

*ANALYSIS*

I. *THE AEDPA REVIEW STANDARD*[FN17]

FN17. For additional decisions authored by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, *see* *Wilson v. Senkowski,* 02 Civ. 0231, 2003 WL 21031975 at *5-6 (S.D .N.Y. May 7, 2003) (Peck, M.J.); *Naranjo v. Filion,* 02 Civ. 5449, 2003 WL 1900867 at *5-7 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *8-10 (S.D.N .Y. Dec. 23, 2002) (Peck, M.J.); *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *6-8 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Figueroa v. Greiner,* 02 Civ. 2126, 2002 WL 31356512 at *5-6 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *6-8 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Velazquez v. Murray,* 02 Civ. 2564, 2002 WL 1788022 at *12-14 (S.D.N.Y. Aug. 2, 2002) (Peck, M.J.); *Soto v. Greiner,* 02 Civ. 2129, 2002 WL 1678641 at *6-7 (S.D.N.Y. July 24, 2002) (Peck, M.J.); *Green v. Herbert,* 01 Civ. 11881, 2002 WL 1587133 at *9-11 (S.D.N.Y. July 18, 2002) (Peck, M.J.); *Bueno v. Walsh,* 01 Civ. 8738, 2002 WL 1498004 at *10-11 (S.D.N.Y. July 12, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *8-9 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *12-13 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at 8-9 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.); *Thomas v. Breslin,* 01 Civ. 6657, 2002 WL 22015 at *4-5 (S.D.N.Y. Jan. 9, 2002) (Peck, M.J.); *Thomas v. Duncan,* 01 Civ. 6792, 2001 WL 1636974 at *7 (S.D.N.Y. Dec. 21, 2001) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *6 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Rodriguez v. Lord,* 00 Civ. 0402, 2001 WL 1223864 at *16 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at *11 (S.D.N.Y. June 8, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31426266 (S.D.N.Y. Oct. 25, 2002) (Berman, D.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *5 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2000) (McKenna, D.J.), *aff'd,*303 F.3d 411, 417 (2d Cir.2002), *cert. denied,*123 S.Ct. 1353 (2003); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,*No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,*123 S.Ct. 1787 (2003).

Before the Court can determine whether Quinones is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." *Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also,e.g.,Eze v. Senkowski,* 321 F.3d 110, 120 (2d Cir.2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.' ") (quoting *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001), *cert. denied,*535 U.S. 1019, 122 S.Ct. 1611 (2002)).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." *Williams v. Taylor,* 529 U.S. at 404-05, 120 S.Ct. at 1519.[FN18] Both, however, "restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523.[FN19] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d at 135; *accord,e.g.,DelValle v. Armstrong,* 306 F.3d at 1200.

FN18.*Accord,e.g.,Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000); *Lurie v. Wittner,* 228 F.3d 113, 125 (2d Cir.2000), *cert. denied,*532 U.S. 943, 121 S.Ct. 1404 (2001); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000), *cert. denied,*531 U.S. 1116, 121 S.Ct. 865 (2001).

FN19.*Accord,e.g.,DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002); *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,*123 S.Ct. 251 (2002); *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

***17** As to the "contrary to" clause:

A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

*Williams v. Taylor,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20.[FN20]

FN20.*Accord,e.g.,DelValle v. Armstrong,* 306 F.3d at 1200;*Yung v. Walker,* 296 F.3d at 135;*Kennaugh v. Miller,* 289 F.3d at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

42; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 127-28.

In *Williams,* the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. at 1523. However, "[t]he term 'unreasonable' is ... difficult to define." *Id.* at 410, 120 S.Ct. at 1522. The Supreme Court made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.*[FN21] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 539 U.S. at 409, 120 S.Ct. at 1521.[FN22] The Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Jones v. Stinson,* 229 F.3d at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).[FN23] Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d at 45; *accord Yung v. Walker,* 296 F.3d at 135. Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." *Yung v. Walker,* 296 F.3d at 134.

FN21. *See also, e.g., Eze v. Senkowski,* 321 F.3d at 124-25; *DelValle v. Armstrong,* 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

FN22. *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002); *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 128-29.

FN23. *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d at 245; *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

***18** *Sellan v. Kuhlman,* 261 F.3d at 312; *accord, e.g., Cotto v. Herbert,* No. 01-2694, 2003 WL 1989700 at *6 (2d Cir. May 1, 2003); *Eze v. Senkowski,* 321 F.3d at 121; *Ryan v. Miller,* 303 F.3d at 245; *Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,* 123 S.Ct. 694 (2002); *Jenkins v. Artuz,* 294 F.3d 284, 291 (2d Cir.2002) ("In *Sellan,* we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference."); *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002); *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001).[FN24] "By its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the merits,' not to a disposition 'on a procedural, or other, ground.' Where it is 'impossible to discern the Appellate Division's conclusion on [the relevant] issue,' a federal court should not give AEDPA deference to the state appellate court's ruling." *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003) (citations omitted).[FN25] Of course, "if there is no [state court] adjudication on the merits, then the pre-AEDPA de novo standard of review applies." *Cotto v. Herbert,* 2003 WL 1989700 at *7.

FN24. The Second Circuit "recognize[d] that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable appli-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

cation' or 'contrary to' tests." Sellan v. Kuhlman, 261 F.3d at 312. Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

> We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." Mercadel v. Cain, 179 F.3d 271, 274 (5th Cir.1999).
>
> Sellan v. Kuhlman, 261 F.3d at 314; *accord, e.g.,* Cotto v. Herbert, 2003 WL 1989700 at *6; Eze v. Senkowski, 321 F.3d at 121-22; Norde v. Keane, 294 F.3d at 410; Aparicio v. Artuz, 269 F.3d at 93.

FN25. The Second Circuit in *Miranda v. Bennett* continued: "Generally, when the Appellate Division opinion states that a group of contentions is either without merit 'or' procedurally barred, the decision does not disclose which claim in the group has been rejected on which ground. If the record makes it clear, however, that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." *Id.* at 178.

## II. *THE STRICKLAND V. WASHINGTON STANDARD ON INEFFECTIVE ASSISTANCE OF COUNSEL*[FN26]

FN26. For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel in language substantially similar to this section of this Report & Recommendation, *see* Hediam v. Miller, 02 Civ. 1419, 2002 WL 31867722 at *14-16 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); Rosario v. Bennett, 01 Civ.7142, 2002 WL 31852827 at *26-28 (S.D .N.Y. Dec. 20, 2002) (Peck, M.J.); Dickens v. Filion, 02 Civ. 3450, 2002 WL 31477701 at *13-14 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); Aramas v. Donnelly, 99 Civ. 11306, 2002 WL 31307929 at *9-11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); Larrea v. Bennett, 01 Civ. 5813, 2002 WL 1173564 at *16-19 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); Jamison v. Berbary, 01 Civ. 5547, 2002 WL 1000283 at *9-11 (S.D.N.Y. May 15, 2002) (Peck, M.J.); Cromwell v. Keane, 98 Civ. 0013, 2002 WL 929536 at *15-17 (S.D.N.Y. May 8, 2002) (Peck, M.J.); Rivera v. Duncan, 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J .); Ennis v. Walker, 00 Civ. 2875, 2001 WL 409530 at *15-16 (S.D.N.Y. Apr. 6, 2001) (Peck, M.J.); Fluellen v. Walker, 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003); Dukes v. McGinnis, 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); Cruz v. Greiner, 98 Civ. 7939, 1999 WL 1043961 at *16 (S.D.N.Y. Nov. 17, 1999) (Peck, M.J.); Lugo v. Kuhlmann, 68 F.Supp.2d 347, 370 (S.D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); Santos v. Greiner, 99 Civ. 1545, 1999 WL 756473 at *7 (S.D.N.Y. Sept. 24, 1999) (Peck, M.J.); Franza v. Stinson, 58 F.Supp.2d 124, 133-34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); Torres v. Irvin, 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); Boyd v. Hawk, 965 F.Supp. 443, 449 (S.D.N.Y.1997) (Batts, D.J. & Peck, M.J.).

In Strickland v. Washington, 466 U.S. 668, 104 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. This performance is to be judged by an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064;*accord,e.g.,Bell v. Cone,* 122 S.Ct. 1843, 1850 (2002).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).[FN27]

FN27.*Accord,e.g.,Bell v. Cone,* 122 S.Ct. at 1852;*Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001).

Second, the defendant must show prejudice from counsel's performance. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.[FN28]

FN28.*See also,e.g.,Bell v. Cone,* 122 S.Ct. at 1850;*Aparicio v. Artuz,* 269 F.3d at 95;*Sellan v. Kuhlman,* 261 F.3d at 315;*DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,*519 U.S. 824, 117 S.Ct. 83 (1996).

> "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." *Strickler v. Greene,* 527 U.S. 263, 289-91, 119 S.Ct. 1936, 1952-53 (1999); *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-66 (1995); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998 (1986) ( "a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*" ); *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." *Strickler v. Greene,* 527 U.S. at 291, 119 S.Ct. at 1953;*cf.id.* at 297-301, 119 S.Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

***19** The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland v. Washington,* 466 U.S. at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.' " *Lindstadt v. Keane,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland v. Washington,* 466 U.S. at 695-96, 104 S.Ct. at 2069);*accord,e.g.,Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991).

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069.[FN29]

FN29.*Accord,e.g.,Smith v. Robbins,* 528 U.S. 259, 286 n. 14, 120 S.Ct. 746, 764 n. 14 (2000).

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690-91, 104 S.Ct. at 2066.[FN30]

FN30.*See also,e.g.,Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1575 (1982) ("We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) ("In reviewing *Strickland* claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on ... counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), *cert. denied,*513 U.S. 820, 115 S.Ct. 81 (1994).

As the Second Circuit noted: "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d at 199.

For purposes of this Court's AEDPA analysis, "the *Strickland* standard ... is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Aparicio v. Artuz,* 269 F.3d at 95 & n. 8 (quoting 28 U.S.C. § 2254(d)(1)).[FN31] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" *Aparicio v. Artuz,* 269 F.3d at 95 n. 8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.... Rather, he must show that the [First Department] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone,* 122 S.Ct. at 1852.

FN31.*See also,e.g.,Bell v. Cone,* 122 S.Ct. at 1852;*Sellan v. Kuhlman,* 261 F.3d at 315.

III. *QUINONES' CONFLICT OF INTEREST CLAIM IS NOT PROCEDURALLY BARRED OR BARRED BY LACHES*

A. *State Procedural Bar*

***20** It is unclear whether the C.P.L. § 440 court held that Quinones' conflict of interest claims were procedurally barred, or merely that they were not credible, on two bases. First, the § 440 court noted that "during the sentencing hearing when asked by the Court whether he had anything to say, rather than alerting the court to a possible exculpatory witness and to advise the court of trial counsel's failure to call such a witness, defendant replied 'No.'" (Dkt. No.17: 9/19/02 State Court § 440 Decision at 2.) Second, the § 440 court held that "[a]lthough defendant had the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

opportunity to raise the [conflict of interest claims] on direct appeal, he unjustifiably failed to do so." (*Id.*)

The State has effectively waived any procedural bar by failing to argue in its opposition to Quinones' habeas petition (*see* Dkt. No. 20: State Am. Answer) that the § 440 decision rested on an adequate and independent state ground. *See,e.g.,*Collins v. Travis, 00 Civ. 3746, 2000 WL 1476664 at *10 n. 13 (S.D.N.Y. Oct. 5, 2000) (Peck, M.J.) ("The government's brief did not argue that the First Department's decision rested on an independent and adequate state ground, and this Court declines to raise the issue *suasponte.*" ). Even were this Court inclined to consider the matter *suasponte,* however, the two grounds asserted by the § 440 court are not adequate procedural bars.

The "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice." ' *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043 (1989) (citations omitted); *see also,e.g.,Roberts v. Batista,* 01 Civ. 5264, 2003 WL 1900866 at *7-8 & n. 8 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.) ( & cases cited therein). A state court's finding of procedural default constitutes an "adequate" ground only "if there is a 'fair and substantial' basis in state law for the state court's determination." *Garcia v.. Lewis,* 188 F.3d 71, 78 (2d Cir.1999). The procedural rule must be " 'strictly or regularly followed." ' *Wedra v. Lefevre,* 988 F .2d 334, 339 (2d Cir.1993) (quoting *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987 (1988)). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review" in federal court "of a federal constitutional claim." *Ford v. Georgia,* 498 U.S. 411, 423-24, 111 S.Ct. 850, 857 (1991) (quoting *James v. Kentucky,* 466 U.S. 341, 348-51, 104 S.Ct. 1830, 1835-37 (1984)); *seeHathorn v. Lovorn,* 457 U.S. 255, 263, 102 S.Ct. 2421, 2426 (1982) ( "State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims.").

***21** The two possibly procedural grounds proffered by the § 440 court fail to satisfy the adequacy standard. First, a litigant does not waive an actual conflict of interest claim (of which he was unaware) by failing himself to raise the issue at trial, *prose,* as such a rule would effectively require represented defendants to act as their own trial counsel. Although C.P.L. § 440.10(3)(a) provides that a court "may deny" a § 440 motion where "facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal," this provision expressly "does not apply to a motion based upon deprivation of the right to counsel at the trial or upon failure of the trial court to advise the defendant of such right." C.P.L. § 440.10(3)(a); *see*Bolling v. Stinson, No. 97-CV-6721, 1999 WL 287733 at *3 (E.D.N.Y. May 5, 1999) (State court held petitioner's ineffective counsel claim procedurally barred under C.P .L. § 440.10(3) because petitioner failed to raise the claim at trial. Habeas court held the procedural bar was not an adequate and independent state ground because, *inter alia,* (1) "[d]uring trial ... petitioner clearly could not object to his trial counsel's assistance," and (2) C.P.L. § 440.10(3)(a) "does not apply to a motion based upon deprivation of the right to counsel at the trial."). Moreover, the Supreme Court has held that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348-49, 100 S.Ct. 1708, 1718 (1980),[FN32] implying that conflicts need not be raised at trial.[FN33] Quinones thus did not waive his conflict claim by failing to raise it, *prose,* at trial or at sentencing.

FN32. *Accord,e.g.,Strouse v. Leonardo,* 928 F.2d 548, 552 (2d Cir.1991); *Martinez v. Senkowski,* No. 97 CV 0624, 2000 WL 33767628 at *4 (N.D.N.Y. Jan. 7, 2000); *Hunte v. Keane,* No. CV 97-1879, 1999 WL 754273 at *7 (E.D.N.Y. Aug. 24, 1999) (Raggi, D.J.).

FN33. As noted below, Quinones asserts that he did not even know at the time of trial or direct appeal that his trial counsel was conflicted. (*See* pages 24 n. 13, 27 above.)

Second, under New York law, ineffective counsel claims involving matters outside the record-including claims of conflict of interest-"must be pursued by way of a CPL 440.10 motion." *People v. Kazmirski,* 299 A.D.2d 826, 827, 749 N.Y.S.2d 194, 195 (4th Dep't 2002), *appeal denied,*99 N.Y.2d 583, 755 N.Y.S.2d 719 (2003); *People v. Mora,* 290 A.D.2d 373, 373-74, 737 N.Y.S.2d 71, 72 (1st Dep't) ("Defendant's claim that he was denied the effective assistance of counsel due to a purported conflict of interest is based on factual allegations dehors the record that would require a CPL 440.10 motion ...."), *appeal denied,*98 N.Y.2d 639, 744 N.Y.S.2d 768 (2002). FN34 Because the conflict of interest claim in this case is based on evidence outside the trial record, Quinones had no choice but to bring his conflict claim under C.P.L. § 440.10 rather than on direct appeal. His failure to raise the conflict claim on direct appeal therefore cannot be considered an "adequate" state ground barring this Court's review on the merits. *See,e.g.,Senor v. Senkowski,* No. 97-CV-4929, 1999 WL 689477 at *3-5 (E.D.N.Y. Aug. 31, 1999) (state procedural bar did not constitute adequate and independent state ground, where the § 440 court found ineffective counsel claims barred under § 440.10(2)(c) for failure to raise the claims on direct appeal; habeas court held that "petitioner properly concluded that he should reserve his ineffective assistance claim for a § 440 motion rather than pursue it on direct appeal").

FN34.*Accord,e.g.,People v. Englert,* 285 A.D.2d 987, 988, 727 N.Y.S.2d 680, 681 (4th Dep't) ("Defendant's contention that defense counsel had a conflict of interest 'is based on material dehors the record, and thus the appropriate procedural vehicle is a motion pursuant to CPL 440.10' ...."), *appeal denied,*97 N.Y.2d 655, 737 N.Y.S.2d 56 (2001); *People v. Joseph,* 266 A.D.2d 237, 238, 697 N.Y.S.2d 659, 659 (2d Dep't 1999) ("The defendant contends that he was denied the effective assistance of counsel because of certain alleged conflicts of interest and counsel's alleged failure to gather exculpatory evidence. However, these claims concern matters dehors the record and thus are not reviewable on appeal ...."), *appeal denied,*94 N.Y.2d 881, 705 N.Y.S.2d 13 (2000). *See,e.g.,People v. Brown,* 45 N.Y.2d 852, 853-54, 410 N.Y.S.2d 287, 287 (1978) ("Generally, the ineffectiveness of counsel is not demonstrable on the main record ... [and] in the typical case it would be better ... that an appellate attack on the effectiveness of counsel be ... brought under CPL 440.10."); *People v. Graham,* 298 A.D.2d 766, 766-67, 748 N.Y.S.2d 704, 704 (3d Dep't 2002) ("To the extent that [judge's conflict of interest] was brought to defense counsel's attention by defendant before County Court, it is a matter outside the present record and, therefore, defendant's proper recourse [for ineffective assistance claim] is a motion pursuant to CPL 440.10...."); *People v. Mendoza,* 298 A.D.2d 532, 533, 748 N.Y.S.2d 666, 666-67 (2d Dep't) (Because "defendant's [ineffective counsel] claim involves affidavits and other matters dehors the record which could not be reviewed on direct appeal ... defendant was not procedurally barred from moving pursuant to CPL 440.10 to vacate the judgment of conviction."), *appeal denied,*99 N.Y.2d 561, 754 N.Y.S.2d 213 (2002); *People v. Delgado,* 292 A.D.2d 212, 213, 741 N.Y.S.2d 2, 4 (1st Dep't) ("[D]efendant's claim that trial counsel's decision to waive ... two issues constituted ineffective assistance raises questions of strategy that would require a CPL 440.10 motion in order to expand the record."), *appeal denied,*98 N.Y.2d 696, 747 N.Y.S.2d 414 (2002); *People v. Taborn,* 292 A.D.2d 200, 201, 738 N.Y.S.2d 216, 216 (1st Dep't) ("Since defendant's ineffective assistance claim rests largely on allegations dehors the record concerning matters of strategy, preparation of witnesses and consultations between defendant and counsel, it would require a CPL 440.10 motion ...."), *appeal denied,*98 N.Y.2d 713, 749 N.Y.S.2d 11 (2002); *People v. Delarosa,* 287 A.D.2d 735, 736, 732 N.Y.S.2d 108, 110 (2d Dep't 2001) (claim that trial counsel was ineffective for failing to serve a timely alibi notice involves "matters dehors the record which could not be reviewed on direct appeal" and,

therefore, should not have been held procedurally barred under C.P.L. § 440.10(2)(b)); *People v. Brown,* 258 A.D.2d 354, 354-55, 685 N.Y.S.2d 665, 666 (1st Dep't) ("Since defendant failed to raise his ineffective assistance of counsel claims via a CPL 440.10 motion, his claims are not reviewable on direct appeal because they are based on facts dehors the record and counsel has had no opportunity to explain his trial tactics ...."), *appeal denied,*93 N.Y.2d 1001, 695 N.Y.S.2d 747 (1999); *People v. Hammock,* 255 A.D.2d 957, 958, 681 N.Y.S.2d 184, 185 (4th Dep't 1998) ("To the extent that defendant's contention concerning ineffective assistance of counsel arises from matters outside the record, the facts underlying that contention should be developed through a postjudgment motion under CPL article 440 ...."), *appeal denied,*93 N.Y.2d 899, 689 N.Y.S.2d 711 (1999). *See also,e.g.,Hernandez v. Lord,* 00 Civ. 2306, 2000 WL 1010975 at *3 & n. 2 (S.D.N.Y. July 21, 2000) (Peck, M.J.) (citing cases).

***22** A more difficult issue is whether Quinones waived the conflict of interest claim by not asserting it until both attorney Morris and his brother Dennis were dead. (*See* Dkt. No. 20: State Am. Answer ¶ 28.) The State's habeas opposition papers assert this "laches" defense under federal law (State Am. Answer ¶ 28, citing *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721 (1993)), and the Court therefore turns to that issue.

B. *The State Has Not Proved A Laches Defense, Especially Prejudice*

The Second Circuit has held that despite passage of the AEDPA one-year statute of limitations, 28 U.S.C. § 2244(d)(1), habeas petitions from state court convictions continue to be governed by the equitable doctrine of laches. *See**Ross v. Artuz,* 150 F.3d 97, 103 (2d Cir.1998) ("We note that nothing in this opinion retreats from our observation in *Peterson [v. Demskie ],* 107 F.3d [92], 93 [2d Cir.1997], that the fact that a petition is not time-barred by AEDPA does not, in appropriate factual circumstances, preclude a dismissal of the petition as unduly delayed pursuant to Habeas Rule 9(a)."). Thus, even claims found timely under the one-year AEDPA statute of limitations may be denied on laches grounds. *See,e.g.,Cotto v. Lord,* 99 Civ. 4874, 2001 WL 21246 at *5 (S.D.N.Y. Jan. 9, 2001), *aff'd,*No. 01-2056, 21 Fed. Appx. 89, 90, 2001 WL 1412350 at *1 (2d Cir. Nov. 8, 2001); *Dumas v. Kelly,* 105 F.Supp.2d 66, 69 (E.D.N.Y.2000); *Figueroa v. Portuondo,* 96 F.Supp.2d 256, 278 n. 18 (S.D.N.Y.1999).

Rule 9(a) of the Rules Governing § 2254 Proceedings in United States District Courts provides:

Delayed petitions. A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

28 U.S.C. foll. § 2254 (2003).

"Rule 9(a) has been narrowly construed," such that the State faces a " 'heavy burden" ' in proving its laches defense. *E.g.,Cotto v. Lord,* 2001 WL 21246 at *6;*see also,e.g.,Pacheco v. Artuz,* 97 Civ. 3171, 2001 WL 1134864 at *4 (S.D.N.Y. Sept. 18, 2001); *Dumas v. Kelly,* 105 F.Supp.2d at 69-70. The State "must: (1) make a particularized showing of prejudice; (2) show that the prejudice resulted from the petitioner's delay in filing a petition; and (3) show that the petitioner has not acted with reasonable diligence." *Pacheco v. Artuz,* 2001 WL 1134864 at *4;*accord,e.g.,Cotto v. Lord,* 2001 WL 21246 at *6;*Dumas v. Kelly,* 105 F.Supp.2d at 69-70;*Figueroa v. Portuondo,* 96 F.Supp.2d at 278.FN35 "If the respondent [State] fails to establish any one of these elements, its Rule 9(a) motion fails." *Dumas v. Kelly,* 105 F.Supp.2d at 70.

FN35.*See also,e.g.,Carmona v. Attorney General,* 96 Civ. 8045, 1997 WL 876737 at *5 (S.D.N.Y. Oct. 7, 1997), *report & rec. adopted,* 1998 WL 213781 at *3 (S.D.N.Y. Apr. 29, 1998); *Hughes v. Irvin,* 967 F.Supp. 775, 779 (E.D.N.Y.1997); *Hodge v. Walker,* 95 Civ. 2873, 1996 WL 363181 at *2 (S.D.N.Y. July 1, 1996), *report & rec. adopted,* 1996 WL 591247 (S.D.N.Y. Oct. 11, 1996); *Moseley v. Scully,* 908 F.Supp. 1120, 1130 (E.D.N.Y.1995), *aff'd,*104 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

356 (2d Cir.1996).

***23** The State must prove that prejudice was caused by petitioner's delay, and not "the 'mere passage of time alone." ' *Pacheco v. Artuz,* 2001 WL 1134864 at *4;*see,e.g.,Hodge v. Walker,* 1996 WL 363181 at *3 (dates when defense counsel died "are significant because they relate to whether the prejudice faced by respondent is attributable to petitioner's delay."). FN36 Moreover, " '[p]rejudice to the state may not merely be presumed ... from the absence of a transcript or of witnesses necessary to recount the details of [a] proceeding." ' *Cotto v. Lord,* 2001 WL 21246 at *6. Rather, the state " 'must actually be disadvantaged by the absence of such resources in responding to the particular allegations or theories asserted by [the] petitioner as grounds for habeas corpus." ' *Id.;accord,e.g.,Pacheco v. Artuz,* 2001 WL 1134864 at *4.FN37 Finally, the claim of prejudice applies only to the inability to defend the habeas corpus petition, not to the difficulty of retrying the petitioner. *SeeVasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 624 (1986) ("Congress has not seen fit ... to provide the State with an additional defense to habeas corpus petitions based on the difficulties that it will face if forced to retry the defendant."); *Figueroa v. Portuondo,* 96 F.Supp.2d at 279 ("The State, if it claims prejudice, must show prejudice in terms of experiencing difficulty in responding to the petition, and not to the potential of retrying the Petitioner.").FN38

FN36.*See also,e.g.,Cotto v. Lord,* 2001 WL 21246 at *6;*Figueroa v. Portuondo,* 96 F.Supp.2d at 278 ("Significantly, delay alone is not a bar to relief."); *Hughes v.. Irvin,* 967 F.Supp. at 774; *Moseley v. Scully,* 908 F.Supp. at 1130.

FN37. The grounds most often troublesome to the courts are ineffective counsel [and four other enumerated grounds.] ... When they are asserted after the passage of many years, both the attorney for the defendant and the state have difficulty in ascertaining what the facts are. It often develops that the defense attorney has little or no recollection as to what took place and that many of the participants in the trial are dead.... As a consequence, there is obvious difficulty in investigating petitioner's allegations.

Advisory Committee Notes to Habeas Rule 9(a).

FN38.*Accord,e.g.,Dumas v. Kelly,* 105 F.Supp.2d at 70;*Hodge v. Walker,* 1996 WL 363181 at *2;*Norwood v. Hanslmaier,* No. 93 CV 3748, 1998 WL 178857 at *2 (E.D.N.Y. Feb. 24, 1998).

As to the causation element: " 'At a minimum, [the causation element] requires the state to establish that if [petitioner] had filed his habeas petition at some earlier time the evidence the state says it has lost would have been available.' For instance, the state cannot base its prejudice claim on the death of a key witness if that death occurred the day after the petitioner's state court trial." *Dumas v. Kelly,* 105 F.Supp.2d at 70 (citation omitted, brackets in original).

Once the State has satisfied the elements of prejudice, causation, and unreasonable delay, the burden shifts to the petitioner to rebut the claims. *See,e.g.,Rideau v. Whitley,* 237 F.3d 472, 479 (5th Cir.2000), *cert. denied,*533 U.S. 924, 121 S.Ct. 2539 (2001); *Hughes v. Irvin,* 967 F.Supp. at 779.FN39

FN39. Certain decisions seem to hold that, rather than requiring the State to prove lack of diligence on the petitioner's part, the State need merely prove prejudice and causation, and the petitioner must then rebut the claim with evidence of reasonable diligence. *See,e.g.,Moseley v. Scully,* 908 F.Supp. at 1130 ("If the state does establish prejudice resulting from the petitioner's delay, the burden shifts to the petitioner to either successfully refute the state's assertion of prejudice or show that the delayed petition is 'based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred." '). Such a distinction is immaterial in this case.

The laches "doctrine is 'permissive rather than mandatory, allowing a district court to exercise discretion to entertain an application, even where the state has made the required showing of delay and prejudice." ' *Pacheco v. Artuz,* 2001 WL 1134864 at *4 (quoting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cotto v. Lord, 2001 WL 21246 at *5). As then District Judge Sotomayor explained, the defense should be applied "flexibly ... to prevent a petitioner from unfairly disadvantaging the state by delaying adjudication of his habeas claims until witnesses are unavailable, memories stale, and evidence difficult to produce. The ultimate concern of this rule is that adjudications under a habeas petition be fair and accurate." *Rodriguez v. Artuz*, 990 F.Supp. 275, 279-80 (S.D.N.Y.), *aff'd*, 161 F.3d 763 (2d Cir.1998). " '[L]apses of time that affect the state's ability, but that do not make it "virtually impossible" for the state to respond, [do not] require dismissal." ' *Rideau v. Whitley*, 237 F.3d at 478.

***24** The State asserts that Quinones unjustifiably delayed raising the conflict of interest claim until May 23, 2002-nearly seven years after his July 10, 1995 sentencing-thus prejudicing the State's habeas defense because of the deaths of attorney Morris and brother Dennis:

> Petitioner's task of satisfying his burden of proof is further complicated by his decision [not] to raise his conflict allegation until seven years after his conviction. Of course, this timing renders his claims suspect, since it appears that he waited until both [Dennis] and Morris had passed away to level his accusations. Neither man is available to testify as to whether [Dennis] told Morris about his alleged complicity in the Carter murder and thus neither man can refute petitioner's claims. Petitioner also knows that he may implicate his brother in the murder charge with impunity, since his brother can no longer suffer ramifications, such as a possible indictment for the murder charge, from petitioner's post-conviction strategy. Given the lengthy delay, this Court could fairly resolve the claim by rejecting it on grounds of laches, *see* *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721 (1993). At the very least, petitioner's claims must be viewed skeptically, with all factual inferences drawn in favor of the People.

(Dkt. No. 20: State Am. Answer ¶ 28.) FN40 *See* *Cotto v. Lord*, 2001 WL 21246 at *6 ("Where a petitioner asserts an ineffective assistance of counsel claim, the testimony of the attorney alleged to have rendered ineffective assistance is relevant and the death of that attorney may result in prejudice."); *Hodge v. Walker*, 95 Civ. 2873, 1996 WL 591247 at *2 (S.D.N.Y. Oct. 11, 1996) (habeas petition dismissed based on federal laches defense, where petitioner pleaded guilty in 1967, and later claimed ineffective counsel based on alleged out-of-court statements, but petitioner failed to show why he did not bring habeas petition by 1971, when one trial counsel died, 1987, when the other counsel died, or 1991, when the trial judge died).

> FN40. This Court would add that it is now impossible to determine from Morris whether, out of familial loyalty, Quinones told Morris not to accuse Dennis of the murder.

As to the reasonableness of Quinones' delay in raising the conflict claim, Quinones asserts that he did not learn until 2002, when he hired a private detective, that Dennis had been arrested for possession of a .380 caliber handgun. FN41 (*See* Dkt. No. 22: Quinones Traverse at 7-8, 11-12.) The State has not shown that Quinones knew this earlier, although it can be argued that Quinones should have known of Dennis' arrest and Morris' representation of Dennis, given that (1) Dennis and Quinones were brothers, and (2) according to Quinones, Dennis suggested to Quinones' family that they hire Morris to represent Quinones (*see* page 24 n. 13 above). In addition, in 1997, Quinones' then-appellate counsel sought leave from the First Department for funds to hire an investigator (Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. Exs. D-E; *see* page 27 above), presumably to make the same investigations that Quinones' investigator made in 2002. Indeed, by April 1997, Quinones had obtained an allegedly exculpatory affidavit from Mr. Akili, who Quinones knew had not been called as a defense witness at trial by Morris. (*See* Dkt. No. 20: State Am. Appendix: Quinones C.P.L. § 440 Motion Ex. G: Akili Aff.) Thus, "by the exercise of reasonable diligence," perhaps Quinones should have known all relevant information about his conflict claim at the time of his trial or at least by 1997 when he tried to investigate matters.

> FN41. As noted above (page 24 n. 13), it is unclear whether Quinones also asserts that he did not know (1) that Dennis had been arrested for possession of a handgun (as opposed to not knowing that Dennis had been arrested for possession of a *.380* handgun), or (2) that Morris had previously represented

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Dennis.

***25** Even were the Court to find Quinones' delay unreasonable (and it is not at all clear that the State carried its burden on this point), the State clearly has failed to prove that any delay prejudiced the State's response to Quinones' habeas petition. Morris is alleged to have died no later than September 5, 1996 (A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 17 & Ex. A)-*i.e.,* only fourteen months after Quinones' sentencing.[FN42] Any delay *after* Morris' death is, of course, irrelevant to the prejudice question. Thus, in order to prove prejudice, the State would have to show that Quinones unjustifiably delayed by failing to file his federal habeas petition *before* Morris' death in September 1996. The State has not done so given (1) the realities of New York State practice, since Quinones' direct appeal was not even filed at that time, (2) Quinones' inability to bring a federal habeas petition until he exhausted state remedies,[FN43] and (3) the heavy burden the State must bear to prove laches. *See,e.g.,*Walters v. Scott, 21 F.3d 683, 688 (5th Cir.1994) ("Assuming *arguendo* that the death of the court reporter and unavailability of records is construed as prejudicial to the state, the state bears the further burden of proving that [petitioner's] delay in filing his habeas petition caused those sources of evidence to be lost. At a minimum, this requires the state to establish that if [petitioner] had filed his habeas petition at some earlier time, the evidence the state says it has lost would have been available.... The court reporter may have died the day after [petitioner's] trial concluded, in which case the reporter's unavailability would certainly not be attributable to [petitioner's] delay in bringing his habeas petition ."); Hill v. Linahan, 697 F.2d 1032, 1036 (11th Cir.1983) ("[S]ince respondent does not disclose the date of [petitioner's counsel's] death, he has not demonstrated that [petitioner's] counsel would have been available if [petitioner] had brought his petition within a 'reasonable' period of time."); Cotto v. Lord, 2001 WL 21246 at *6 (laches defense denied: "when trial counsel was contacted about the petitioner's case in 1993, three years after the end of the petitioner's direct appeal, trial counsel did not remember much about the case and had already thrown out all his files ..., and it is not clear that his testimony would have been helpful to the respondent if this petition had been filed prior to his death"); Dunas v. Kelly, 105 F.Supp.2d at 70 (*Dictum:* "if the respondent fails to make the required showing of prejudice, it is irrelevant whether the petitioner was diligent or not in filing his habeas petition"; "For instance, the state cannot base its prejudice claim on the death of a key witness if that death occurred the day after the petitioner's state court trial ."); *Brewster v. Kirby,* 954 F.Supp. 1155, 1159 (N.D.W.Va.1997) (rejecting laches defense because, *interalia,* "the presiding trial judge ... died in the five-year interval between petitioner's June 1975 conviction and the September 1980 hearing on remand ...; therefore, any prejudice to the respondent as a result of [the judge's] death is not caused by any alleged delay in bringing the instant petition").

FN42. The State has offered no evidence, admissible or otherwise, establishing Morris' date of death. Because the State bears the burden of proof as to prejudice, and since the State does not dispute Quinones' allegations regarding Morris' date of death, the Court will assume that Morris died some time before September 1996. *Cf.*Dumas v. Kelly, 105 F.Supp.2d at 70 n. 3. Indeed, the Court notes that Quinones' Traverse puts Morris' death in 1995 (obviously, the second half of 1995). (*See* Dkt. No. 22: Quinones Traverse at 9.)

FN43. Even if delay in bringing state court proceedings could be a basis for a laches claim here, which the Court need not decide, the State's evidence at best leads to the conclusion that Quinones or his appointed state appellate counsel knew or suspected this issue in late 1997 when they sought funds to hire an investigator. (*See* page 27 above.) Morris, however, already was dead by that time. Thus, any post-1997 delay in bringing state (or federal) proceedings could not have prejudiced the State. *Cf.*Cotto v. Lord, 2001 WL 21246 at *7 (finding that petitioner was reasonably diligent under Rule 9(a) in filing state collateral proceedings and federal habeas petition several years after conclusion of direct appeal, given that, *interalia,* "[a]fter the conclusion of her direct appeal in 1990, the petitioner had no legal assistance and was acting pro se for a number of years").

***26** Nor can the State prove laches with respect to Dennis' testimony. The State correctly argues that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

after Dennis died, Quinones could "implicate his brother in the murder charge with impunity." (State Am. Answer ¶ 28.) "The defense that the crime was committed by someone else who is unfortunately dead has traditionally been met with skepticism." People v. Simon, 75 A.D.2d 516, 516, 426 N.Y.S.2d 753, 754 (1st Dep't 1980). However, the issue here is not whether Quinones' conflict claim should be viewed with skepticism based on its timing, but whether the State's ability to respond to the habeas petition was prejudiced by Quinones' delay. The only colorable argument is that Dennis is now unavailable to rebut Quinones' theory that Dennis told Morris that he killed Carter. The State, however, has offered no evidence establishing the date of Dennis' death.FN44

> FN44. The record reveals only that Dennis was sentenced on the gun charge on October 9, 1997, over two years after Quinones' July 10, 1995 sentencing. (Dkt. No. 13: A.D.A. Rosen 9/2/02 C.P.L. § 440 Opp. Aff. ¶ 18 & Ex. B.)

The State's federal laches defense therefore should be denied.

## IV. *QUINONES' CONFLICT OF INTEREST CLAIM SHOULD BE DENIED ON THE MERITS*

### A. *Applicable Legal Principles*

" 'A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." ' *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir.2002) (quoting *United States v. Blau*, 159 F.3d 68, 74 (2d Cir.1998)).FN45 "The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1181 (1978); *see also,e.g.,Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1241 (2002). As the Supreme Court has repeatedly noted:

> FN45.*Accord,e.g.,Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *United States v. Perez*, 325 F.3d 115, 125 (2d Cir.2003); *United States v. Blount*, 291 F.3d 201, 210 (2d Cir.2002), *cert. denied,*123 S.Ct. 938 (2003).

"Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.... [A] conflict may ... prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another."

*Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 1697 (1988) (quoting *Holloway v. Arkansas*, 435 U.S. at 489-90, 98 S.Ct. at 1181). The right to conflict-free counsel applies equally to appointed and, as here, retained counsel. *E.g.,Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716 (1980).

" '[A] defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." ' *United States v. Blau*, 159 F.3d at 74;*accord,e.g.,United States v. Perez*, 325 F.3d at 125;*United States v. Blount*, 291 F.3d at 210-11;*Lopez v. Scully*, 58 F.3d 38, 41 (2d Cir.1995).

***27** The standard governing an ineffective assistance of counsel claim based on an asserted conflict of interest was articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708 (1980), and differs from the more general ineffective assistance standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *See,e.g.,United States v. White*, 174 F.3d 290, 294-95 (2d Cir.1999). Indeed, both prongs of the standard-defective performance and prejudice-are substantially different under *Cuyler v. Sullivan*.

As to the defective performance prong, where, as here, a petitioner "raised no objection at trial" regarding the alleged conflict, *Cuyler v. Sullivan*, 446 U.S. at 348-49, 100 S.Ct. at 1718, his Sixth Amendment claim cannot prevail unless he demonstrates "that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected

his lawyer's performance," Burger v. Kemp, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120 (1987) (citations & internal quotations omitted); *accord,e.g.,*Mickens v. Taylor, 122 S.Ct. at 1242 ("absent objection, a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation" ') (quoting Cuyler v. Sullivan, 446 U.S. at 348-49, 100 S.Ct. at 1718). The Supreme Court recently clarified that "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Mickens v. Taylor, 122 S.Ct. at 1244 n. 5;*accord*id. at 1243 ("we think 'an actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance*-as opposed to a mere theoretical division of loyalties.").

"The burden of proof rest[s] on [Quinones] to show a conflict of interest by a preponderance of the evidence." Triana v. United States, 205 F.3d 36, 40 (2d Cir.) (§ 2255 proceeding), *cert. denied,*531 U.S. 956, 121 S.Ct. 378 (2000); *accord,e.g.,*Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir.2001) (*en banc* ) (petitioner must prove by preponderance of the evidence that actual conflict adversely affected attorney's performance), *aff'd,*535 U.S. 162, 122 S.Ct. 1237 (2002); *see also,e.g .,*Cuyler v. Sullivan, 446 U.S. at 348, 100 S.Ct. at 1718 ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). "[T]he burden of proof cannot be met by speculative assertions of bias or prejudice." Triana v. United States, 205 F.3d at 41.

As for the prejudice prong, because, among other things, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," Strickland v. Washington, 466 U.S. at 692, 104 S.Ct. at 2067, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," Cuyler v. Sullivan, 446 U.S. at 349-50, 100 S.Ct. at 1719;*accord,e.g.,*Mickens v. Taylor, 122 S.Ct. at 1244 ("prejudice will be presumed only if the conflict has significantly affected counsel's performance-thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown"); Burger v. Kemp, 483 U.S. at 783, 107 S.Ct. at 3120.[FN46]

FN46.*See also*e.g.,Cuyler v. Sullivan, 446 U.S. at 349-50, 100 S.Ct. at 1719 ("Once the Court concluded that [an attorney] had an actual conflict of interest, it refused 'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict. The conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel." ') (quoting Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467 (1942)); United States v. Schwarz, 283 F.3d at 91 ("While a defendant is generally required to demonstrate prejudice to prevail on a [*Strickland* ] claim of ineffective assistance of counsel, this is not so when counsel is burdened by an actual conflict of interest. Prejudice is presumed under such circumstances. Thus, a defendant claiming he was denied his right to conflict free counsel based on an actual conflict need not establish a reasonable probability that, but for the conflict or a deficiency in counsel's performance caused by the conflict, the outcome of the trial would have been different. Rather, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance.") (citations omitted); Lopez v. Scully, 58 F.3d at 43 ("Harmless error analysis is inappropriate in this context. Once a petitioner has shown that an actual conflict of interest adversely affected defense counsel's performance, prejudice to the petitioner is presumed and no further showing is necessary for reversal.... Because prejudice is presumed, the violation of [petitioner's] Sixth Amendment rights cannot be harmless.").

***28** To date, the Supreme Court only has applied this presumption of prejudice to cases involving attorneys who concurrently represented clients with conflicting interests-so-called "multiple concurrent representation." Mickens v. Taylor, 122 S.Ct. at 1245-46 ("In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.").[FN47]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN47. The Supreme Court further explained: "Both *Sullivan* itself, and *Holloway,* stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. Not all attorney conflicts present comparable difficulties." *Id.* at 1245 (citations omitted).

B. *Morris Was Not Subject to an Actual Conflict of Interest that Adversely Affected His Performance*

Prior to *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237 (2002), courts consistently split the *Sullivan* deficiency prong into two elements: (1) actual conflict, and (2) adverse effect on performance. Under this prior precedent, a defendant was required (1) first to prove an actual conflict, and (2) then to prove that the conflict adversely affected the attorney's performance, *i.e.,* that "a 'lapse in representation" ' resulted from the conflict. *See,e.g.,United States v. Schwarz,* 283 F.3d 76, 91-92 (2d Cir.2002). Although *Mickens* effectively conflated the two elements, *Mickens v. Taylor,* 122 S.Ct. at 1244 n. 5 ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."), this Court will analyze the two elements separately for conceptual clarity. *SeeWilliams v. United States,* No. 02-2198, 2003 WL 21182101 at *2-3 (2d Cir. May 20, 2003) (Post-*Mickens* decision: "To prevail on an 'actual conflict' claim, a defendant must first show that an actual conflict existed, then demonstrate that this conflict adversely affected defense counsel's performance." Applying *Strickland* standard because defendant failed to prove that a conflict of interest existed.).

1. *Morris Did Not Have an Actual Conflict of Interest*

a. *Morris' Representation of Quinones Was Successive To, Rather than Concurrent with, his Representation of Dennis*

A threshold issue is whether Morris' representation of Quinones was successive to or concurrent with his representation of Dennis, as a conflict will be more easily found where the representation was concurrent. *See,e.g.,Freund v. Butterworth,* 165 F.3d 839, 859 (11th Cir.) (*en banc* ) (" '[G]enerally, it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so." '), *cert. denied,*528 U.S. 817, 120 S.Ct. 57 (1999); *see also,e.g.,Moss v. United States,* 323 F.3d 445, 459 (6th Cir.2003); *Perillo v. Johnson,* 205 F.3d 775, 797 (5th Cir.2000) ("Several of our sister circuits have drawn such a distinction in Sixth Amendment conflict of interest cases, holding that an actual conflict may be more difficult to prove when it arises from the context of successive or serial representation rather than concurrent representation.") (citing cases); *Salam v. Lockhart,* 874 F.2d 525, 527 (8th Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 252 (1989); *Mannhalt v. Reed,* 847 F.2d 576, 580 (9th Cir.) ("Generally, it is more difficult to show an actual conflict resulting from successive rather than simultaneous representation."), *cert. denied,*488 U.S. 908, 109 S.Ct. 260 (1988).

***29** The state court's C.P.L. § 440 decision implicitly held that Morris' representation of Quinones was successive to Morris' representation of Dennis, as follows: "Moreover, with respect to the defendant's ineffective assistance of counsel claim, the evidence submitted by the People shows that after defendant's brother absconded and was returned to court, he was represented by Victor Dailey Rivera Esq. and not Alvin Morrison [sic] Esq ....." (Dkt. No.17:9/19/02 State Court § 440 Decision at 2.) The state court's rationale is misguided. It proves nothing that Morris did not still represent Dennis when Dennis returned to court in September 1996, given that Morris had *died* earlier. (See pages 22-23 above.) Rather, the question is whether Morris continued to represent Dennis at the time of Quinones' June 1995 trial and July 1995 sentencing. Nevertheless, while the state court's rationale may have been erroneous, this Court finds that the holding of successive representation is supportable on alternative grounds.[FN48]

FN48.*Cf.,e.g.,Eze v. Senkowski,* 321 F.3d 110, 125 (2d Cir.2003) (" 'when a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent" ') (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 311-12 (2d Cir.2001)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

"[O]nce established, a lawyer-client relationship does not terminate easily. Something inconsistent with the continuation of the relationship must transpire in order to end the relationship." SWS Fin. Fund A v. Salomon Bros. Inc., 790 F.Supp. 1392, 1398 (N.D.Ill.1992).FN49 In this case, Morris filed a notice of appearance on behalf of Dennis in February 1993, and Dennis disappeared one month later, reappearing in September 1996. (*See* page 22 above.) In the interim, Morris appeared on behalf of Quinones in January 1994 and defended him at trial and sentencing in June and July 1995. (*See* page 22 above.)

FN49. Courts have held that:

> the attorney-client relationship is terminated only by the occurrence of one of a small set of circumstances. First, ... the relationship can be terminated by the express statement of either the attorney or the client. Second, acts inconsistent with the continuation of the relationship (e.g., the client's filing a grievance with the local bar association against the attorney) are a second means.... Third[,] even without overt statements or acts by either party, the relationship may lapse over time.

SWS Fin. Fund A v. Salomon Bros. Inc., 790 F.Supp. at 1398-99.

Although Morris' representation of Dennis was brief, it is difficult to discern a clear termination to the relationship, as Morris never withdrew his notice of appearance and Dennis was still alive at the time of Quinones' trial. Courts generally hold that mere passage of time (here, from February 1993 to June 1995) does not end the attorney-client relationship.FN50 *See, e.g.,* Perillo v. Johnson, 205 F.3d 775, 798-99 (5th Cir.2000) ("Where the prior representation has not unambiguously been terminated, or is followed closely by the subsequent representation, there is more likely to be a conflict arising from defense counsel's representation of the first client.... Where, however, defense counsel's involvement in the prior representation was either transient or insubstantial, we have been less inclined to find an actual conflict."); United States v. Levy, 25 F.3d 146, 156 (2d Cir.1994) (questioning whether counsel's representation of co-defendant actually terminated when co-defendant fled to Israel, given that counsel "never formally withdrew as [co-defendant's] representative"); *cf.* Caban v. United States, 281 F.3d 778, 784 n. 4 (8th Cir.2002) (although attorney claimed his work for other client was not an "active case," this did not preclude finding of concurrent representation and conflict). However, the passage of time, combined with Dennis' disappearance (and the lack of any evidence of later contacts between Dennis and Morris) and, as far as the record shows, Morris' "transient or insubstantial" role in Dennis' criminal case, may provide firmer evidence that the relationship effectively was terminated before Quinones' trial.

FN50. In the different context of police questioning of a criminal defendant, New York courts have held that " '[o]nce a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer,"' even where the prior representation took place years earlier. People v. Singer, 44 N.Y.2d 241, 251, 405 N.Y.S.2d 17, 23 (1978). Thus, in People v. West, 81 N.Y.2d 370, 599 N.Y.S.2d 484 (1993), the Court of Appeals suppressed statements made to the police by a suspect who had been represented at a lineup over three years earlier, holding that the police had improperly failed to determine whether the attorney client relationship had terminated, and could not simply assume termination based on the passage of time. Id. at 372, 379-81, 599 N.Y.S.2d at 48. 490-91.

***30** In any event, the Supreme Court has repeatedly held that " '[b]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." ' Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 1246 (2002) (quoting Nix v. Whiteside, 475 U.S. 157, 165, 106 S.Ct. 988, 993 (1986)); *accord, e.g.,* United States v. Taylor, 139 F.3d 924, 930 (D.C.Cir.1998) ("An ethical lapse is not the same as a conflict of interest...."); United States v. Gallegos, 39 F.3d 276, 278 (10th Cir.1994) ("our inquiry is *not* whether a state disciplinary rule for lawyers has been violated ..., but whether, everything considered, Appellant's counsel 'actively' represented conflicting interests").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Moreover, the *Mickens* Court distinguished successive from concurrent representation on the ground that, in a concurrent situation " 'counsel *activelyrepresented* conflicting interests." ' Mickens v. Taylor, 122 S.Ct. at 1245. Whether or not the relationship between Morris and Dennis technically terminated, the situation here resembles a successive representation more than a concurrent one. The evidence shows that Morris represented Dennis very briefly, apparently only at Dennis' arraignment. Dennis promptly disappeared, never to contact Morris again (as far as the record reveals), and Morris represented Quinones at trial over two years later. All things considered, this Court cannot conclude that Morris continued to "actively represent" Dennis at the time of Quinones' trial.

The Supreme Court has never decided the precise contours of successive or concurrent representation or whether a situation like this should be deemed a concurrent representation. (*See* pages 55-56 above, and pages 78-79 below.) Accordingly, applying AEDPA's deferential standard, this Court cannot say that the state court's conclusion that Morris' representation of Quinones was successive constituted an objectively unreasonable application of Supreme Court precedent.

b. *Quinones Cannot Prove that Morris was Actually Conflicted, As there is no Evidence that Dennis Shared Relevant Confidences With Morris or That the Two Cases Were Substantially Related*

"A conflict may be rooted in the attorney's prior representation of a person whose interests are antagonistic to those of his present client." United States v. Blount, 291 F.3d 201, 211 (2d Cir.2002), *cert. denied,*123 S.Ct. 938 (2003); *see also,e.g.,*United States v. Malpiedi, 62 F.3d 465, 467-70 (2d Cir.1995); United States v. DiTommaso, 817 F.2d 201, 219-20 (2d Cir.1987); United States v. Gonzalez, 105 F.Supp.2d 220, 223-24 (S.D.N.Y.2000); *see*Church v. Sullivan, 942 F.2d 1501, 1510-11 (10th Cir.1991) ("in the context of successive representations, we find it difficult to envision circumstances more fraught with inherent conflict than where an appointed attorney representing a reluctant defendant must present a defense theory inculpating the attorney's former client, particularly where the former representation was factually intertwined with the criminal defendant's case"). [FN51] However, "[i]t is more difficult for a defendant to show that counsel actively represented conflicting interests in cases of successive rather than simultaneous representation." Moss v. United States, 323 F.3d at 459 (collecting cases); *accord,e.g.,*Enoch v. Gramley, 70 F.3d 1490, 1496 (7th Cir.1995), *cert. denied,*519 U.S. 829, 117 S.Ct. 95 (1996).

FN51. "The fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information.... Thus, the most common example of an actual conflict of interest arising from successive representation occurs where an attorney's former client serves as a government witness against the attorney's current client at trial." Moss v. United States, 323 F.3d 445, 460 (6th Cir.2003). One court explained the problems of successive representation in the government witness context as follows:

> Three major potential areas of conflict arise: the attorneys pecuniary interest in furthering his business relationship with the government witness may impair the attorney's ability to cross-examine the witness zealously; the attorney 'may misuse confidential information obtained from the [witness], or may fail to fully cross-examine for fear of misusing confidential information'; or the attorney may be required to testify about material aspects of the witness' testimony or otherwise place his own credibility at issue either in cross-examining the witness or in attacking the witness' testimony in summation.

Anwar v. United States, 648 F.Supp. 820, 826-27 (N.D.N.Y.1986) (citations omitted), *aff'd,*823 F.2d 544 (2d Cir.1987). The attorney is burdened by both the duties of confidentiality and loyalty to his former client. United States v. Gonzalez, 105 F.Supp.2d at 223-24.

***31** The appropriate standard for finding an actual conflict in the context of successive representation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

has been described as follows:

> An "actual conflict" of interest occurs when a lawyer has "inconsistent interests." In order to prove that an "actual conflict" hindered petitioner's lawyer's performance, petitioner "must make a factual showing of inconsistent interests" or point to "specific instances in the record" to suggest an actual impairment of his or her interests. "[G]enerally, it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so." At minimum, petitioner must "show that *either* (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of [petitioner], *or* (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to [petitioner's] later case." Even proof of *both* substantial relatedness and confidential information, however, may not necessarily be enough to demonstrate "inconsistent interests" in a successive representation case. The situation may call for "other proof of inconsistent interests." Overall, the "actual conflict" inquiry is fact-specific, consistent with the petitioner's ultimate burden "to prove that his conviction was unconstitutional."

*Freund v. Butterworth,* 165 F.3d 839, 859 (11th Cir.) (*en banc* ) (citations omitted), *cert. denied,*528 U.S. 817, 120 S.Ct. 57 (1999); *accord,e.g.,Moss v. United States,* 323 F.3d at 462;*Enoch v. Gramley,* 70 F.3d at 1496;*Mannhalt v. Reed,* 847 F.2d 576, 580 (9th Cir.) ("In successive representation, conflicts of interests may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties."), *cert. denied,*488 U.S. 908, 109 S.Ct. 260 (1988).

Accordingly, this Court must first determine whether an "actual conflict of interest" existed by looking to whether (1) the two cases were substantially related *or* (2) relevant confidences were shared. If either element is satisfied, then the attorney *may* have labored under "inconsistent interests." *See,e.g.,Smith v. White,* 815 F.2d 1401, 1405-06 (11th Cir.) (to determine whether the attorney labored under "inconsistent interests," look to whether cases were substantially related and whether confidences were shared), *cert. denied,*484 U.S. 863, 108 S.Ct. 181 (1987). The Court must then determine whether these inconsistent interests caused an adverse effect on representation.

Quinones has argued that at the time of trial, Morris must have known that Dennis was the "true killer," because Morris knew that: (1) the .380 caliber handgun for which Dennis was arrested in 1993 was the same type of weapon used in the Carter murder; (2) the prosecution's case relied solely on the eyewitness testimony of individuals who did not know Quinones; (3) in the words of the judge at the *Wade* hearing, Quinones and Dennis "look very much alike"; (4) Dennis was arrested in the nearby Bronx (the murder took place in upper Manhattan); (5) three months after the Carter shooting Dennis was arrested on the gun charge and then disappeared; and (6) in 1980 Dennis had been convicted of attempted murder. (*See* page 23 above.)

***32** These allegations prove neither that Dennis shared relevant confidences with Morris nor that Dennis' and Quiniones' cases were substantially related.

Quinones argues that during the short period in which Morris represented Dennis on the gun charge, Dennis *could* have confided in Morris that he killed Carter. Quinones' assertion is, however, purely speculative, and thus cannot ground his conflict of interest claim. *See,e.g.,Freund v. Butterworth,* 165 F.3d at 864 (it cannot be presumed that confidences were shared absent evidence of a substantial relationship between the two actions); *Enoch v. Gramley,* 70 F.3d at 1498-99 (hearing unnecessary in § 2254 habeas proceeding, where petitioner offered only speculative assertions that allegedly conflicted attorney obtained relevant confidences from conflicting client). Moreover, it seems unlikely that Dennis would have shared with Morris confidences relating to Carter's murder, given that Morris only represented Dennis for a very short time, and apparently only as to an arraignment.[FN52]*SeePerillo v. Johnson,* 205 F.3d 775, 799 (5th Cir.2000) ("Where ... defense counsel's involvement in the prior representation was either transient or insubstantial, [the Fifth Circuit has] been less inclined to find an actual conflict."); *Salam v. Lockhart,* 874 F.2d 525, 528 (8th Cir.) (in determining whether prior representation of another suspect in petitioner's case constituted an actual conflict, court considered "minimal" nature of prior representation, as suspect was only "represented for one day at a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

bond hearing"), *cert. denied,*493 U.S. 898, 110 S.Ct. 252 (1989); *Etna Prods. Co. v. Tactica Int'l, Inc.,* 234 F.Supp.2d 442, 444 (S.D.N.Y.2002) ("The nature of the prior representation-brief, episodic, and limited-does not suggest a strong likelihood that relevant confidential information passed from defendants to" counsel).FN53

FN52. Quinones has offered virtually no evidence regarding Morris' relationship with Dennis. Morris filed a notice of appearance five days after Dennis was arrested. (Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. at 9.) "Shortly thereafter, Dennis Quinones made bail, absconded, and was returned on a bench warrant six years later...." (*Id.*)

FN53. In other successive representation cases, the Court was actually able to determine that no confidences had been shared in the prior case-a determination impossible in this case because Morris is unavailable. *See* *United States v. Kliti,* 156 F.3d 150, 154-55 (2d Cir.1998) ("Although there may be situations where an attorney's representation of [a co-defendant and adverse witness] at a bond hearing or other preliminary hearing might create a potential or actual conflict of interest, this record does not present that situation," as attorney expressly advised co-defendant at bond hearing that attorney represented other defendant, "and that [co-defendant] should not provide [attorney] with any substantive information because of the possible conflict of interest that could result."); *Mannhalt v. Reed,* 847 F.2d at 580 (No conflict from defense counsel's prior representation of a government witness during a lineup and arraignment, as attorney did not "enter[ ] into an attorney-client relationship with [the witness]. They did not discuss the case with [the witness] or open a file and no further action was taken on [witness'] behalf after the lineup.").

Nor can Quinones show that Dennis' and Quinones' cases were "substantially related." "A nearly endless variety of approaches for determining whether a substantial relationship exists has surfaced over the years...." *ABA/BNA Lawyers' Manual on Professional Conduct* at 51:224 (2002); *see generally* *id.* at 51:221-31;1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering,* § 13.5 (3d ed.2002). The Second Circuit follows a stringent standard, requiring that the issues in the former representation be "identical" to or "essentially the same" as those in the current representation. *Government of India v. Cook Indus., Inc.,* 569 F.2d 737, 739-40 (2d Cir.1978) (granting disqualification in civil actions "only upon a showing that the relationship between issues in the prior and present cases is 'patently clear.' ").FN54

FN54. *Accord, e.g., Etna Prods. Co. v. Tactica Int'l, Inc.,* 234 F.Supp.2d at 444 (civil disqualification case: " 'if the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same, then there is a 'substantial relationship' between the representations" '); *Loomis v. Consolidated Stores Corp.,* 98 Civ. 8735, 2000 WL 1229262 at *3 (S.D.N.Y. Aug. 29, 2000); *Regal Mktg. Inc. v. Sonny & Son Produce Corp.,* 01 Civ.1911, 2002 WL 1788026 at *7 (S.D.N.Y. Aug. 1, 2002) ("A substantial relationship will be established between the two representations if facts pertinent to the problems for which the original legal services were sought are relevant to the subsequent litigation.") (civil disqualification case); *Mitchell v. Metropolitan Life Ins. Co.,* 01 Civ. 2112, 2002 WL 441194 at *4-5 (S.D.N.Y. Mar. 21, 2002) (Pauley, D.J.).

The substantial relationship rule provides that "once the former client [petitioner] proves that the subject matters of the present and prior representations are substantially related, the court will irrebutably presume that relevant confidential information was disclosed during the former period of representation.... The reason for this presumption is that it is not practical or fair to require a subsequent client ... to prove what specific facts the former client ... disclosed to the lawyer during the prior representation. Moreover, standards of professionalism often prevent the lawyer from disclosing such information without the former client's consent. To avoid these complications, upon a showing of substantial relatedness, we presume that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> former client ... divulged to the lawyer ... all of his or her confidences relevant to the subject of the representation." *Freund v. Butterworth,* 165 F.3d at 859-60 (citations, fn., & internal quotations omitted); *accord,e.g.,*Government of India v. Cook Indus.. Inc., 569 F.2d at 740 ("[W]e start with the well established principle that, in order to grant a disqualification motion, a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case. Such a requirement would put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether."); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268-69 (S.D.N.Y.1953) (Weinfeld, D.J.).

The keystone in Quinones' argument that the two cases were substantially related is that (1) Dennis' gun was the gun that was used to kill Carter, (2) the case against Quinones was based solely on eyewitness testimony, and (3) Quinones and Dennis resembled each other. Quinones' argument fails on the third point: the only support for the alleged physical resemblance between Dennis and Quinones consists of: (1) Quinones' post-trial assertion (*see* Dkt. No. 20: State Am. Appendix: Quinones C.P.L. § 440 Br. at 5-6, 11; *see also* Dkt. No. 20: State Am. Answer ¶ 29) that one of the pictures in a photo array shown to eyewitnesses depicted his brother Dennis; and (2) the trial judge's remark, after reviewing the same photo array at the *Wade* hearing, that Quinones and his "brother" resembled each other (H.54).FN55 In his most recent submission to this Court, however, Quinones claimed that the photo array depicted not Dennis, but rather *"DavidQuinones,"another* "one of Petitioner's brothers." (Dkt. No. 22: Quinones Traverse Br. at 12.) FN56 Further, the State has now submitted an affidavit averring, based on Dennis' arrest records, that the individual identified in the photo array as Quinones' brother was not, in fact, Dennis. (Dkt. No. 25: A.D.A. Axelrod 5/28/03 Aff. ¶¶ 3-5.) As a result, the record now contains no admissible evidence that Dennis resembled Quinones.

FN55. At the *Wade* hearing, Detective Milian simply identified the picture as that of Quinones' "brother" "Jorge Vasquez." (Milian: H. 23-24.)

FN56. Quinones made this concession while seeking to rebut the State's argument that Morris may have decided not to point the finger at Dennis, because the eyewitnesses had already proven able to distinguish between Quinones and Dennis in the photo array identification. Quinones responded: "With regard to the photo array which contained a photo of one of Petitioner's brothers. Respondent claims that it was a photo of 'Medina.' [*i.e.,* Dennis]. (Answer at ¶ 27). Actually, the photo array contained the photo of Petitioner's brother, David Quinones. So trial counsel could have, in fact, displayed a photo of 'Medina' to the jury." (Quinones Traverse Br. at 12.)

***33** Absent evidence of a close resemblance between Dennis and Quinones, Dennis was not a plausible suspect in the murder case, and thus Morris did not labor under a conflict of interest, as Morris was not torn between defending Quinones and shifting the blame towards Dennis. *See*Cuyler v. Sullivan, 446 U.S. at 350, 100 S.Ct. at 1719 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance ."); *Triana v. United States,* 205 F.3d 36, 42 (2d Cir.) (rejecting as "speculation" defendant's claim that his attorney was conflicted by third-party's payment of attorney's fees; defendant failed to prove predicate that attorney actively represented conflicting claims), *cert. denied,*531 U.S. 956, 121 S.Ct. 378 (2000); *Freund v. Butterworth,* 165 F.3d at 864 (where petitioner claimed conflict because attorney failed to shift blame to client formerly represented by attorney, court rejected argument that two crimes were "substantially related," because, *interalia,* "no evidence exists in the record that the gun [used by petitioner in murder] was the same one that [former client] used in the aggravated assault case").FN57 In any event, even if the identity of the gun would cause the cases to be considered substantially related, the Court concludes in the next section that Morris' prior representation of Dennis did not adversely affect his representation of Quinones.

FN57. In *Smith v. White,* 815 F.2d at 1406, petitioner, who was convicted of murder, claimed that his attorney was conflicted because he previously represented another possible murder suspect. Specifically, petitioner confessed that he obtained the rifle used in the murder when he and a "friend" burglarized a house together. *Id.* at 1404. At trial, the "friend," who was not a suspect in the murder, testified for the government against petitioner. *Id.* Petitioner claimed that his friend actually committed the murder, and that his attorney failed to accuse petitioner's friend of the crime because counsel previously represented the friend in an unrelated marijuana charge. *Id.* at 1405. The Eleventh Circuit rejected the conflict claim because petitioner came forward with no evidence that the murder and marijuana charges were related or that petitioner's counsel had obtained relevant confidences from the friend. *Id.* at 1406. As in this case, petitioner "presented evidence which raised, at very most, a speculative possibility of conflict." *Id.;accord*Enoch v. Gramley, 70 F.3d 1490, 1498-99 (7th Cir.1995) (petitioner claimed conflict because his attorney previously represented government witness whom petitioner claimed was the "only other suspect in the crime"; court rejected conflict because the prior representation was four years earlier in a completely unrelated case, and petitioner failed to prove relevant confidences were shared), *cert. denied,*519 U.S. 829, 117 S.Ct. 95 (1996).

2. *Morris' Prior Representation Of Dennis Did Not Adversely Affect His Representation of Quinones*

a. *The Adverse Effect Standard*

As noted above, Quinones must show by a preponderance of the evidence that " 'a conflict of interest actually affected the adequacy of his representation." ' *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1242-43 (2002) (petitioner must establish that the conflict *"affected counsel's performance*-as opposed to a mere theoretical division of loyalties"); *see also*Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719 (1980) ( "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). The Supreme Court has explained, in general terms, that the conflict must have an "adverse" and "significant[ ]" effect, *Mickens v. Taylor,* 122 S.Ct. at 1244 n. 5, 1245, but has not described the precise contours of the "lapse in representation," *Cuyler v. Sullivan,* 446 U.S. at 349, 100 S.Ct. at 1719;*see,e.g.,Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 3121 (1987) (rejecting claim of actual conflict of interest because, *interalia,* any conflict "did not harm [the allegedly conflicted] lawyer's advocacy").

To fill this gap, the Second Circuit adopted a test followed by both the First and Third Circuits:

[I]n order to prove adverse effect on the basis of what an attorney failed to do,

***34** "[a defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993) (quoting *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988) (quoting *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985)), *cert. denied,*492 U.S. 906, 109 S.Ct. 3215 (1989)), *cert. denied,*511 U.S. 1022, 114 S.Ct. 1407 (1994); *accord,e.g.,United States v. Schwarz,* 283 F.3d 76, 92 (2d Cir.2002); *Amiel v. United States,* 209 F.3d 195, 199 (2d Cir.2000); *Triana v. United States,* 205 F.3d 36, 40-41 (2d Cir.), *cert. denied,*531 U.S. 956, 121 S.Ct. 378 (2000). Based on this two-element test, the Second Circuit has held that once a petitioner demonstrates an actual conflict, he:

is not required to show that the lapse in representation affected the outcome of the trial or that, but for the conflict, counsel's conduct of the trial would have been different. [ *United States v.] Malpiedi,* 62 F.3d [465,] 469 [ (2d Cir.1995) ]. The forgone strategy or tactic is not even subject to a requirement of reasonableness. *Id.* As we have previously recognized,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> [t]he test is a strict one because a defendant has a right to an attorney who can make strategic and tactical choices free from any conflict of interest. An attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics is hardly an objective judge of whether that strategy or tactic is sound trial practice.

*United States v. Schwarz,* 283 F.3d at 92.[FN58]

> FN58. *Accord, e.g., Hess v. Mazurkiewicz,* 135 F.3d 905, 910 (3d Cir.1998) (Petitioner "must identify a plausible defense strategy that could have been pursued, and show that this alternative strategy inherently conflicted with, or was rejected due to, [counsel's] other loyalties or interests.... Significantly, [petitioner] need not show that the lapse in representation was so egregious as to violate objective standards for attorney performance. See [ *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988) ] (noting that accused may establish a lapse in representation merely by showing counsel rejected a defense that 'possessed sufficient substance to be a viable alternative')."). 

Other circuits have held, to the contrary, that in order to prove an adverse effect, petitioner must show that the foregone strategy was "objectively reasonable." *See Mickens v. Taylor,* 240 F .3d 348, 361 (4th Cir.2001) (*en banc* ), *aff'd,* 535 U.S. 162, 122 S.Ct. 1237 (2002); *Freund v. Butterworth,* 165 F.3d 839, 860 (11th Cir.) (*en banc* ), *cert. denied,* 528 U.S. 817, 120 S.Ct. 57 (1999). As the *en banc* Eleventh Circuit held:

> First, [petitioner] must point to "some plausible alternative defense strategy or tactic [that] might have been pursued." Second, *he must demonstrate that the alternative strategy or tactic was reasonable under the facts.* Because prejudice is presumed, the petitioner "need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used," rather he only need prove that the alternative "possessed sufficient substance to be a viable alternative." Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*35 *Freund v. Butterworth,* 165 F.3d at 860 (quoting *Freund v. Butterworth,* 117 F.3d 1543, 1579-80 (11th Cir.1997)) (emphasis added & citations omitted).[FN59]

> FN59. The Fourth Circuit, *enbanc,* offered a similar formulation:
>
> > First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, *the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts* of the case known to the attorney at the time of the attorney's tactical decision.... [T]he petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." ... Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.
>
> *Mickens v. Taylor,* 240 F.3d at 361 (emphasis added). A panel of the Eight Circuit followed a similar path, albeit not as well-defined. *See Caban v. United States,* 281 F.3d 778, 786 (8th Cir.2002) ("if a reasonable attorney would have adopted the same trial strategy absent a conflict, [petitioner] cannot show [his attorney's] performance was *adversely* affected by that conflict" under *Cuyler v. Sullivan* standard).
>
> Certain circuit court decisions seem to apply the *Strickland* standard of deferring to counsel's "trial strategy" rather than applying *Sullivan's* "adverse effect" standard. *See United States v. Mays,* 77 F.3d 906, 908-09 (6th Cir.1996) ("[D]efendant must show not only a conflict but also that the conflict caused the attorney to make bad choices for his client. In fact, the incidents referred to in defendant's brief of arguably unwise questions by defense counsel of prosecution witnesses appear to have been part of a losing strategy but

they were not the result of choices made where there were clearly better alternatives. Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) ('Judicial scrutiny of counsel's performance must be highly deferential')."); United States v. Kindle, 925 F.2d 272, 275-76 (8th Cir.1991) ("[T]he defendant must ... 'demonstrate an actual conflict of interest which adversely affected his attorney's performance' to obtain relief.... The limited record is simply inadequate for us to conclude that there was an actual conflict of interest and clear prejudice to appellant. The alleged omissions by defense counsel are not enough in the context of the record to constitute clear evidence of a conflict of interest and prejudice. Such decisions could have been defense strategy, and we give great deference to counsel's determinations within that realm."). Deference to "trial strategy" in the context of a conflict of interest review seems plainly contrary to Supreme Court precedent, as it would eviscerate the less deferential standard announced by the Supreme Court in *Cuyler v. Sullivan* and its progeny. The standard announced in *Sullivan* was meant to be different from *Strickland*. Deferring to trial strategy would render the first prong of *Sullivan* no different from *Strickland* (although *Sullivan'* s presumption of prejudice would still remain in the second prong).

Thus, there is no Supreme Court precedent, but a split in circuit authority, regarding the appropriate conflict of interest standard. Under AEDPA, however, the question is whether the state court's decision unreasonably applied *Supreme Court* precedent; "[a] petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 296 F.3d 129, 135 (2d Cir.2002). Given that the Supreme Court has not spoken on whether or not the plausible alternative strategy need be "reasonable," and the circuits are divided, this Court cannot say that the Second Circuit's holding that a petitioner need not prove that a foregone strategy was "reasonable" represents "clearly established" Supreme Court precedent under AEDPA. *See*James v. Herbert, No. 02-2389, 57 Fed. Appx. 894, 896, 2003 WL 328803 at *2 (2d Cir. Feb. 13, 2003) (where Supreme Court had not spoken on a particular counsel conflict issue, and at least one other circuit court disagreed with the Second Circuit's position on the issue, the Second Circuit could not say that the state court's contrary decision " 'unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to [a] situation[ ] which that principle should have, in reason, governed" '); Hines v. Miller, 318 F.3d 157, 164 (2d Cir.) ("Given the many divergent approaches and outcomes in federal courts that have applied clearly established Supreme Court precedent to the facts at issue and the absence of any Supreme Court decision concerning this type of [ineffective assistance] claim, we find no basis for concluding-as the dissent does-that the Appellate Division's decision here constituted an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States."), *cert. denied*, No. 02-9637, 2003 WL 1609428 (May 19, 2003); DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir.2002). This Court therefore concludes that, in the absence of Supreme Court precedent on point, the First Department's decision can be upheld under the Eleventh Circuit standard-*i.e.*, Quinones had the burden of proving by a preponderance of evidence that Morris did not pursue some "reasonable" strategy because of his alleged conflict.[FN60]

FN60. While the state court's C.P.L. § 440 decision failed to explain which conflict of interest standard it employed, this Court must nevertheless determine the appropriate conflict of interest standard against which the state court's decision should be judged. *See*Eze v. Senkowski, 321 F.3d 110, 125 (2d Cir.2003) (" 'when a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent" ') (quoting Sellan v. Kuhlman, 261 F.3d 303, 311-12 (2d Cir.2001)).

b. *There was no Adverse Effect on Morris' Representation Of Quinones, Because (a) Dennis was Not a Plausible Suspect, and (b) Pointing the Finger at Dennis Would Only Have Inculpated Quinones*

Quinones alleges that but for a conflict of interest, Morris would have: (1) requested that ballistics tests be performed on Dennis' gun; (2) accused Dennis at trial of committing the murder; and (3) called certain alibi witnesses to testify. These were not reasonable strategies.

***36** First, Morris' failure to call other witnesses, including Akili, cannot reasonably be ascribed to any conflict of interest.[FN61] Akili's affidavit merely exculpates Quinones; it does not in any way inculpate Dennis. (Dkt. No. 20: State Am. Appendix: Quinones C.P.L. § 440 Motion Ex. G: Akili Aff.) Quinones' assertion that Akili might have identified Dennis at trial as the killer lacks support in Akili's affidavit, which appears to have been prepared at Quinones' (or his current investigator's) request. (*Seeid.*) As for witnesses other than Akili, since Quinones fails to describe the nature of their testimony, the Court cannot conclude that they would have inculpated Dennis. Since calling Akili and the other witnesses would not have inculpated Dennis, Morris' failure to call them does not demonstrate a conflict of interest or a plausible alternative defense strategy that was foregone because of a conflict. At best, the alleged failure to offer these other witnesses merely demonstrates Morris' incompetence, an issue analyzed in Point V below. *See,e.g.,Moseley v. Scully,* 908 F.Supp. 1120, 1142 (E.D.N.Y.1995) ("Even assuming, *arguendo,* that these [foregone] motions were plausible and likely to succeed, there is simply no evidence that they were 'inherently in conflict with or not undertaken due to [attorney's purported] other loyalties or interests." '), *aff'd,*104 F.3d 356 (2d Cir.1996).

FN61. At most, Morris' conflict of interest would have caused him to (1) fail to ask for a ballistics test, and (2) fail to ask eyewitnesses at trial to compare Dennis' picture.

Second, as explained in Point IV.B.1.b above, absent evidence of a close physical resemblance between Dennis and Quinones, Morris would have had no reason to believe that Dennis was a reasonable suspect in the Carter murder. Indeed, although it is now undisputed that Dennis possessed the murder weapon, there is no evidence that *Morris* knew, or had reason to know, this "at the time of [his] tactical decision," *Mickens v. Taylor,* 240 F.3d 348, 361 (4th Cir.2001) (*en banc* ), *aff'd,*535 U.S. 162, 122 S.Ct. 1237 (2002). Because Morris had no plausible reason to suspect Dennis of the murder, accusing Dennis of the murder (or even requesting a ballistics test) was not a "reasonable," plausible defense strategy that an unconflicted attorney would have taken, and thus any "conflict" here had no adverse effect on Quinones' case. *See United States v. Blount,* 291 F.3d 201, 211-12 (2d Cir.2002) (no conflict found where a member of defendant's attorney's law firm had represented the government's witness in an unrelated matter, but, *inter alia,* defendant failed to show that the prior representation "had any effect" on defense counsel's performance), *cert. denied,*123 S.Ct. 938 (2003); *Freund v. Butterworth,* 165 F.3d 839, 866-68 (11th Cir.) (*en banc* ) ("wholesale shifting of the blame to [allegedly conflicted attorney's former client] was not a plausible defensive 'option *realistically* available to trial counsel[,]" ' even though all of the state's physical proof "either belonged to or was found on property of" the former client, who was a separately-tried, non-testifying co-defendant), *cert. denied,*528 U.S. 817, 120 S.Ct. 57 (1999); *Oliver v. Wainwright,* 782 F.2d 1521, 1525-26 (11th Cir.1986) (petitioner failed to prove actual conflict of interest based on attorney's failure to shift blame to jointly-represented co-defendant, as the facts did not support the blame-shifting theory; although the co-defendant "either held the deceased by her arm, or instigated the fight between [petitioner] and the deceased, or both ... [t]hese facts alone do not support the theory that [co-defendant] stabbed the deceased"), *cert. denied,*479 U.S. 914, 107 S.Ct. 313 (1986); *Bisaccia v. United States,* No. 97 CV 6683, 97 CV 3659, 2000 WL 703014 at *10 n. 6 (E.D.N.Y. Apr. 12, 2000) (rejecting as "speculation about possibilities untethered to facts" defendant's claim that counsel's conflict kept him from " 'put[ting] on truthful evidence that [counsel's prior client] had a key role in the ... murder ... and that [defendant] was not at all involved" '); *United States v. Felzenberg,* 97 Civ. 2800, 93 CR. 460, 1998 WL 152569 at *16 (S.D.N.Y. Apr. 2, 1998) (Sotomayor, D.J.) (rejecting as "baseless" defendant's "claim that, because of a conflict of interest, [defendant's attorney] rejected a defense that would point to [attorney's other client] as the real villain behind the fraud scheme," as this alternative defense strategy "lacked credibility").[FN62]

FN62.*Compare,e.g.,Sanders v. Ratelle,* 21 F.3d 1446, 1453-55 (9th Cir.1994) (Petitioner's attorneys at both his first trial (ending in a hung jury) and second trial were

found to be conflicted by loyalty to petitioner's brother, who had been previously represented by the (first-trial) attorney on the very same charges. Unlike here, however, petitioner and his brother were both "prime suspect[s]," and petitioner's counsel advised the brother to invoke the Fifth Amendment rather than testify even though he was "*the* key ... witness" and would have exculpated petitioner.).

***37** Third, requesting a ballistics test proving that Dennis possessed the murder weapon had the serious risk of *inculpating,* not exculpating, Quinones. Importantly, because no evidence linked Quinones with a murder weapon, Morris was able argue to the jury that the state's case consisted *solely* of two "eyewitnesses," one of whom did not see the shooting and the other of whom could not identify Quinones at trial. (*See* pages 14-15 above.) Had a ballistics test shown that Dennis' gun was the murder weapon, and had Morris then accused Dennis of the murder, the prosecution would have argued to the jury (as it has argued here) that Quinones undoubtedly gave the gun to his brother Dennis during the three months between the murder and Dennis' arrest. The prosecution could then point to both eyewitness testimony *and* a connection between Quinones and the murder weapon, via his brother Dennis. Testing Dennis' gun could have supplied a missing link in the prosecution's case-a link between Quinones and the murder weapon. That would hardly have been a "reasonable" trial strategy. *See*Triana v.. United States, 205 F.3d 36, 41 (2d Cir.) (attorney's advice that defendant not testify did not "support ... inference of divided loyalty," as such testimony would have been risky), *cert. denied,*531 U.S. 956, 121 S.Ct. 378 (2000); *United States v. Felzenberg,* 1998 WL 152569 at *16 (rejecting defendant's claim that counsel failed to pursue a "viable alternative defense strategy," as the proffered strategy would have undermined the reasonable strategy actually pursued).

Moreover, in the absence of a resemblance between Dennis and Quinones, the jury would have had little reason to think that the eyewitnesses identified the wrong brother. Accusing Dennis would only have linked Quinones to the murder weapon while undermining the defense theory that Quinones was framed by other drug dealers.[FN63] *See*Lombardo v. United States, 222 F.Supp.2d 1367, 1386-87 (S.D.Fla.2002) (attorney's failure to call his prior client as a witness did not prove divided loyalty, as it would have undermined defendant's only available defense theory); *cf.*Hess v. Mazurkiewicz, 135 F.3d 905, 910-11 (3d Cir.1998) (finding actual conflict where attorney failed to call witnesses who might have exculpated petitioner *and* inculpated attorney's former client).

FN63. This case thus resembles cases in which a defendant complained that his allegedly conflicted attorney failed to point the blame at defendant's co-conspirators, even though such blame would have inculpated defendant as well. *See,e.g.,*United States v. Stantini, 85 F.3d 9, 18-19 (2d Cir.), *cert. denied,*519 U.S. 1000, 117 S.Ct. 498 (1996).

Finally, the key issue in any conflict of interest claim is whether a reasonable attorney unburdened by the conflict might have acted differently at trial. Here, Quinones' conflict claim is dependent on his supposition that Dennis confessed to his attorney Morris at the time of his arraignment on weapons possession charges that he had shot Carter. Yet a reasonable, unconflicted attorney would not have been privy to that confession. Having no evidence that Dennis was the killer, an unconflicted attorney would have had no reason to point the finger at Dennis. This Court must therefore conclude that even if Dennis told Morris that he was the murderer, that confidence did not have an adverse effect on Morris' representation of Quinones, as Morris acted no differently than an unconflicted attorney would have acted. *See*United States v. Shwayder, 320 F.3d 889, 890 (9th Cir.2003) ("There was one fact not available from an independent source-that [prior client] had lied to [attorney] during his prior representation. It is impossible, however, to characterize [attorney's] failure to mention this fact as an adverse effect caused by his former representation of [prior client]. [Attorney's] communications with [prior client] were protected by the attorney-client privilege, so they could not have been elicited by any other lawyer either. [Attorney] did, nevertheless, emphasize in closing that [prior client] had lied to everyone else, specifically mentioning 'his [other] lawyer,' as well as [defendant-attorney's current client]."), *amending*312 F.3d 1109, 1119-20 (9th Cir.2002). Since Quinones has asserted (to avoid laches) that he did not know of Dennis' arrest for possessing a .380 gun, an unconflicted attorney similarly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

would not have known that fact, and would have no basis, or reason, to try to point the finger at Dennis. Thus, Morris' prior representation of Dennis would not have caused him to act any differently than a non-conflicted attorney.

***38** Ultimately, this Court cannot say that the state court's § 440 decision was an objectively unreasonable application of Supreme Court precedent, in that Quinones has failed to prove that Morris labored under a conflict of interest, much less that such conflict caused Morris to forego some objectively reasonable alternative defense trial strategy.

C. *It is Not Reasonably Probable that any Conflict Prejudiced Quinones' Case*

It is well-settled Supreme Court precedent that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Cuyler v. Sullivan, 446 U.S. 335, 349-50, 100 S.Ct. 1708, 1719 (1980); *accord,e.g.,*Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 1244 (2002) ("prejudice will be presumed only if the conflict has significantly affected counsel's performance-thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown"). In its most recent decision on the issue of conflicts, however, the Court emphasized that it had never applied this presumption of prejudice outside the context of "multiple concurrent representation." Mickens v. Taylor, 122 S.Ct. at 1245. Indeed, the Court cautioned that its decision should not be "misconstrued" as extending the *Sullivan* rule to conflicts involving successive representation:

> In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.

*Id.* at 1245-46. The Supreme Court seemed to distinguish successive representation cases on the ground that the *Sullivan* presumption of prejudice only applied where " 'a defendant shows that his counsel *activelyrepresented* conflicting interests." ' *Id.* at 1245 (quoting Cuyler v. Sullivan, 446 U .S. at 350, 100 S.Ct. at 1719) (emphasis added in *Mickens* ). The Sixth Circuit recently stated that "[i]n the wake of *Mickens,* no court has applied the *Sullivan* presumption to a case of successive representation." Moss v. United States, 323 F.3d 445, 460 (6th Cir.2003) (collecting cases).

In light of *Mickens,* "[t]here is ... no 'clearly established federal law, as determined by the Supreme Court of the United States' mandating reversal of a conviction on a mere showing of a conflict of interest involving successive representation that adversely affected the attorney's representation of his client." Montoya v. Lytle, No. 01-2318, 53 Fed. Appx. 496, 498, 2002 WL 31579759 at *2 (10th Cir. Nov. 20, 2002), *cert. denied,*No. 02-9835, 2003 WL 1825142 (May 19, 2003).[FN64] Accordingly, on habeas review, conflict claims involving successive, rather than concurrent, representation, must satisfy the *Strickland* standard for proving prejudice, *i.e.,* petitioner must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," ' Mickens v. Taylor, 122 S.Ct. at 1240 (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984)). *See*Montoya v. Lytle, 2002 WL 31579759 at *2 (on habeas review, applying *Strickland* prejudice standard to conflict claim involving successive representation).

> FN64.*See also*Smith v. Hofbauer, 312 F.3d 809, 816-18 (6th Cir.2002) (State court held that prejudice would not be presumed where attorney was being prosecuted in the same county as the criminal defendant he represented. On habeas review, in light of *Mickens,* Sixth Circuit held that "the Supreme Court has never applied Sullivan's lessened standard of proof to any conflict other than joint representation," and that the state court decision was thus not an objectively unreasonable interpretation of "clearly established" Supreme Court precedent.). *But see*United States v. Young, 315 F.3d 911, 914-15 n. 5 (8th Cir.) (*Sullivan* applies to cases of "multiple or serial" representation, while *Strickland* applies to all other conflicts), *cert. denied,*No. 02-9949, 2003 WL 1923315 (May 19, 2003).

***39** Applying *Strickland,* the Court agrees with the C.P.L. § 440 court's decision that there is no reason-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

able probability that any conflict of interest prejudiced the outcome of Quinones' case.[FN65] Prejudice is a close question here because a "reasonable probability" of prejudice is a relatively low standard (*see* page 37 n. 28 above). Given that the jury's deadlock required *twoAllen* charges (*see* page 18 above), even a small amount of exculpatory evidence could have tipped the balance in favor of acquittal. The Court nevertheless concludes that no prejudice was likely, for the same reasons the Court found no likelihood of an adverse effect on Morris' representation. (*See* pages 73-77 above .) Simply put, because there is no admissible evidence that Dennis resembled Quinones, there would be little reason to think that accusing Dennis of the crime would help Quinones' case, where two eyewitnesses identified Quinones as the shooter. Quite the contrary, as explained above, accusing Dennis-and thus connecting Quinones to the murder weapon-would almost certainly have damaged Quinones' case.

FN65. The state court held that:

> the possibility that the handgun which the defendant's brother was later arrested for illegally possessing, and which defendant contends is the real murder weapon-and his brother the real murderer-is of no consequence since a witness identified the defendant as the shooter, as the person seen speaking with the decedent moments before the murder, and as the person with whom one of the identifying witnesses had a verbal exchange at the crime scene before the murder.

> (Dkt. No. 17: 9/19/02 State Court § 440 Decision at 2.) Again, the Court agrees with the state court's holding of no prejudice but not its rationale.

While this Court might hold differently if presented with the question *denovo,* the Court cannot say that the state court's result was an objectively unreasonable application of Supreme Court precedent.

For all these reasons, Quinones' conflict of interest ineffective assistance claim should be denied.

V. *QUINONES' TRIAL ERROR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED*

Quinones alleges a host of trial attorney errors, divided into seven categories based on the subheadings in Quinones' First Department brief on direct appeal: (1) failing to offer a coherent theory of the case (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 39-45); (2) failing to object to the admission of multiple items of evidence-especially hearsay and Deans' pretrial identification (*id.* at 45-46); (3) asserting various ineffective arguments (*id.* at 46-47); (4) making no attempt to obtain possibly favorable evidence from Deans' daughter (*id.* at 48); (5) failing to object to several improper statements and arguments in the prosecutor's summation (*id.* at 48-51); (6) failing to object to improper jury instructions, particularly where testimony was mischaracterized (*id.* at 51-52); and (7) trial counsel's aggregated errors constitute ineffective assistance of counsel in violation of the Sixth Amendment even if the individual errors did not (*id.* at 53-58).

The Court begins with a short section on the proper procedure for analyzing ineffectiveness claims where the allegedly ineffective counsel is dead. There follows an analysis of each of Quinones' claims under *Strickland's* first prong-deficient performance. Specifically, taking each claim, *seriatim,* the Court analyzes whether Quinones has shown that Morris erred, and concludes with an analysis of whether any aggregated errors amount to deficient performance under *Strickland.*

A. *Analysis of Ineffective Assistance of Counsel Claims Where Counsel is Unavailable*

***40** Were Morris alive today, this Court could convene a hearing at which Morris could testify regarding his trial strategy and the motives behind his actions at trial (for example, his failure to object to seemingly inadmissible testimony). Since Morris is unavailable to testify, however, a hearing is unnecessary. *See,e.g.,*Henry v. Scully, 918 F.Supp. 693, 715 (S.D.N.Y.1995) ("Normally, before finding counsel inadequate, an evidentiary hearing would be held, at which questions of strategy would be addressed. In this case, petitioner's trial counsel is deceased, and that is not possible." On the trial record, habeas court finds aggregate errors rendered counsel ineffective where there were no rational strategic grounds for counsel's actions.), *aff'd,*78 F.3d 51 (2d Cir.1996).[FN66]

FN66.*See also,e.g.,*Fink v. Lockhart, 823 F.2d 204, 206 (8th Cir.1987) ("Because [petitioner's] trial counsel died before any of the post-conviction proceedings, we never will know whether his omissions were a part of a deliberate trial strategy." Court nevertheless affirms finding that attorney not ineffective.); *cf.*United States v. King, No. 00-7773, 11 Fed. Appx. 219, 220-21, 2001 WL 568022 at *2 (4th Cir. May 23, 2001) (remanding for factual findings on whether counsel advised petitioner "of the disposition of his criminal appeal in this court and of the opportunity to seek a writ of certiorari from the Supreme Court"; noting that although trial counsel could not testify, as he was dead, the government had not yet attempted to obtain the attorney's case file).

Although Quinones obtained a copy of Morris' case file (Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. Ex. A), the State has failed to offer any relevant evidence from the file.

Since Morris' death precludes determination of his reasons for his actions (or inactions), this Court has no choice but to decide the issue based on the available evidence. *See,e.g.,*United States v. Childress, 58 F.3d 693, 736 (D.C.Cir.1995) ("We recognize that the district court's inquiry will be complicated immeasurably by [requested trial counsel's] death. We ask only that the district court examine the available evidence" to determine whether defendant was denied the right to counsel of choice.), *cert. denied,*516 U.S. 1098, 116 S.Ct. 825 (1996); Bullock v. Whitley, 53 F.3d 697, 701 (5th Cir.1995) (Because trial counsel "is now deceased ... [his] reasons for failing to investigate [petitioner's] mental state more thoroughly are now forever indeterminable. However, trial counsel's testimony is not necessary to our determination that a particular decision might be considered sound trial strategy."); Flores v. Keane, 211 F.Supp.2d 426, 446 (S.D.N.Y.2001) (rejecting petitioner's argument that court could not decide issue without affidavit from trial counsel; "among other reasons, trial counsel, *Alvin Morris,* is deceased, and the Court must 'examine the available evidence,' " quoting *Childress* ).

Morris' death, of course, does not relieve Quinones of the burden of overcoming the presumption that Morris' representation was competent. *See,e.g.,*Slevin v. Unites States, 71 F.Supp.2d 348, 358 n. 9 (S.D.N.Y.1999) ( "[B]ecause the death of a petitioner's trial counsel is just as, if not more, likely to prejudice the respondent, it does not relieve the petitioner of his 'heavy burden' of proving ineffective assistance."), *aff'd,*234 F.3d 1263 (2d Cir.2000).

B. *Strickland's First Prong: Deficient Performance*

1. *Quinones' Claim that Morris' Theory of the Defense was "Incoherent"*

Quinones asserts that Morris failed to have a "coherent theory of the defense." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 39-45.)

The Second Circuit has consistently stated that the court will not " 'second-guess matters of trial strategy simply because the chosen strategy has failed." ' Lake v. Portuondo, No. 00-2150, 14 Fed. Appx. 126, 128, 2001 WL 830583 at *1 (2d Cir. July 25, 2001), *cert. denied,*535 U.S. 999, 122 S.Ct. 1565 (2002); *accord,e.g.,*Smith v. Keane, No. 95-2480, 101 F.3d 1392, 1996 WL 364539 at *3 (2d Cir. July 2, 1996), *cert. denied,*519 U.S. 969, 117 S.Ct. 396 (1996); United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir.1987). Rather, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and must presume that counsel "made all significant decisions in the exercise of reasonable professional judgment." Strickland v. Washington, 466 U.S. 668, 689-90, 104 S.Ct. 2052, 2065-66 (1984); *see*United States v. Luciano, 158 F.3d 655, 660 (2d Cir.1998) ("[A]n appellate court on a cold record should not second-guess [counsel's trial conduct] decisions unless there is no strategic or tactical justification for the course taken."), *cert. denied,*526 U.S. 1164, 119 S.Ct. 2059 (1999).

***41** This Court has carefully read the entire trial transcript in this case. Contrary to Quinones' assertion, the Court finds that Morris pursued a competent (albeit ultimately unsuccessful) trial strategy of blaming Carter's death on competitors in the drug trade who then framed Quinones. (*See,e.g.,* pages 9, 11-12, 15 above.) *Cf .*United States v. Thristino, No. 01-1155, 47 Fed. Appx. 7, 9, 2002 WL 31008776 at *1 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir. Sept. 9, 2002) ("it was reasonable for counsel to agree to admission of [drug-related] evidence in order to advance the theory that [defendant's] apartment mates, who were government witnesses and admitted drug users, were seeking to frame" defendant). Indeed, Quinones concedes that the strategy of showing that Carter was a drug dealer killed by other drug dealers was "reasonable," but that "the execution of the strategy ... was incompetent," since it "was never supported by evidence." (Dkt. No. 1: Pet. Ex. B: Quinones 1st Dep't Reply Br. at 7.)

While Morris' presentation was far from elegant, and sometimes bordered on the inarticulate, the Court cannot say that his shortcomings were of a constitutional magnitude. *Seee.g.,* United States v. Hon, 17 F.3d 21, 26-27 (2d Cir.1994) (counsel not ineffective, where counsel's "closing argument began with the following garbled statement: 'The awesome majesty that has become the American bald eagle, yet, you must render unto Caesar only what justly belongs to Caesar, and it was the intention of our founding father that you use this rendition and temper it with reasonable doubt." ' Counsel's "comment was merely inarticulate" and his "argument as a whole was an effective one."); *United States v. DiTommaso,* 817 F.2d at 216 ("We have reviewed at length transcripts of trial counsel's cross-examination and summation. To put it charitably, neither performance furnishes a full model for aspiring advocates. On the other hand, we have not discovered any error of constitutional dimension.") (fn.omitted).

Quinones complains that Morris' opening statement promised to present witnesses proving that Carter had been killed by his partner in the drug business and that Quinones had been framed. (Quinones 1st Dep't Br. at 39-41.) That is inaccurate, as Morris never promised to present defense witnesses, as opposed to "showing" certain things. (Defense Opening: Tr. 395-96.) The decision as to whether to make an opening statement, and its scope, is a matter of trial strategy. *See,e.g., United States v. Kortright,* No. 99-1225, 205 F.3d 1326 (table), 2000 WL 232291 at *1 (2d Cir. Jan. 25, 2000) (rejecting ineffective counsel claim based on, *interalia,* "the content of counsel's opening statement," "because displeasure with defense counsel's trial strategy is not sufficient to establish ineffectiveness under the stringent requirements of *Strickland,* ... and because [petitioner] has not shown that trial counsel's assistance was unreasonable under all the circumstances"); *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987) ("[T]he decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel."), *cert. denied,*484 U.S. 1061, 108 S.Ct. 1018 (1988); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *23 (S.D.N.Y. May 8, 2002) (Peck, M.J.) ("Counsel's decision not to make an opening statement may be attributed to counsel's trial tactics.") (citing cases). Moreover, consistent with his opening promise that "we will show you that the person who was killed was a drug dealer" (Tr. 395), Morris elicited evidence through cross-examination of the State's witnesses that Carter, in fact, was a drug dealer. (*See* pages 11-12 above.) Morris did not promise the jury that the defense would call witnesses, and the decision of what witnesses to call, or not call, is a strategic decision. *See,e.g., United States v. Best,* 219 F.3d 192, 201 (2d Cir.2000) ("counsel's decision as to 'whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation." '), *cert. denied,*532 U.S. 1007, 121 S.Ct. 1733 (2001); *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999) ("[C]ounsel's decision not to call witnesses to testify about [a particular question] cannot form the basis of a meritorious ineffective assistance claim. 'The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." '), *cert. denied,*531 U.S. 864, 121 S.Ct. 156 (2000); *United States v. Luciano,* 158 F .3d at 660 ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."); *Unites States v. Bruce,* No. 97-1198, 97-1372, 159 F.3d 1348 (table), 1998 WL 538146 at *4 (2d Cir. Mar. 13, 1998) (decision not to call any witnesses did not support ineffective counsel claim, where evidence was obtained through cross-examination of government witnesses); *United States v. Nersesian,* 824 F.2d at 1321 ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.").

***42** Quinones also argues that Morris' inept cross-examination of Detectives Sheridan and Kaplan merely resulted in damaging testimony regarding Quinones' efforts to flee when being arrested.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Quinones 1st Dep't Br. at 42.) On direct, however, the detectives already had described Quinones' attempt to flee. (Sheridan: Tr. 601-02; Kaplan: Tr. 620-21.) One can hardly blame Morris for attempting to shake the detectives' story, even if that attempt backfired. *See,e.g.,*Bilzerian v. United States, No. 96-2920, 125 F.3d 843 (table), 1997 WL 603470 at *2 (2d Cir. Sept. 30, 1997) ("Defense counsel's decisions were part of a reasonable trial strategy, that simply did not work. [On cross-examination, c]ounsel understandably tried to rebut damaging testimony, only to find their decision led to more harmful evidence. This decision does not fall below a level of reasonableness."), *cert. denied,*527 U.S. 1021, 119 S.Ct. 2365 (1999); *see also*Dunham v. Travis, 313 F.3d 724, 732 (2d Cir.2002) ( "Decisions about 'whether to engage in crossexamination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim."); United States v. Luciano, 158 F.3d at 660 ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."); United States v. Nersesian, 824 F.2d at 1321 ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature.").

Quinones also complains that Morris failed to assert certain lines of argument in his summation. For example, one problem with Morris' "frame-up" theory was that, if Deans intended to frame Quinones by falsely identifying him at the lineup, she likely would have identified him at trial as well. (Quinones 1st Dep't Br. at 44.) In Quinones' view, Morris should have explained that Deans may have been unwilling to commit perjury, as her trial testimony was under oath but her lineup identification was not. (*Id.*) According to Quinones, Morris also failed to argue in summation that Scarlett's and Deans' testimony that they did not know each other was not credible, as they admitted that one was the girlfriend and the other the long-time friend of the same man, and Deans' daughter somehow knew where to find Scarlett to tell her that Carter had been shot. (Quinones 1st Dep't Br. at 44-45.) Further, Quinones claims that Morris failed to argue that Quinones fled from the officers because they were in plain clothes and thus were not recognizable as police officers. (Quinones 1st Dep't Br. at 45, 47.)

Morris' decision to forego all of these arguments, however, falls under the rubric of trial strategy. As the Supreme Court explained: "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. The Court cannot say that Morris' failure to assert the alternative arguments proffered by Quinones render Morris' performance ineffective.[FN67]

FN67. Quinones also points out certain lines of cross-examination by Morris that did not bear fruit, and, indeed, seem entirely irrelevant. (Quinones 1st Dep't Br. at 41-44.) Since, however, this testimony did not affirmatively damage Quinones' case, and Morris otherwise made a relatively effective presentation, such irrelevant material cannot ground an ineffective counsel claim. Quinones also notes certain factual inaccuracies asserted by Morris, such as his claim that Deans had testified that Quinones was *not* the shooter (Defense Summation: Tr. 653-54), when in fact she had merely testified that she did not know whether the shooter was in the courtroom (Deans: Tr. 429). (Quinones 1st Dep't Br. at 43.) Morris' version of events, however, benefitted the defense.

***43** This Court is, however, somewhat troubled by Morris' confusing summation regarding Deans' identification testimony. (*See* Quinones 1st Dep't Br. at 43-44.) As noted above, Deans testified at trial that she was unable to identify the shooter in court, and seemed to explain her inability by stating that at the time of the murder she only saw a "profile" of the shooter. (Deans: Tr. 429 ("Q. You don't know? A. No. I just had sort of a profile.").) Morris could have argued to the jury not only that Deans could not identify Quinones as the shooter at trial, but that Deans' "profile" testimony also threw her lineup identification into doubt. By emphasizing the poor angle of her view of the shooting, Deans implied that she never got a good look at the shooter. If the *angle* of her view of the shooting-as opposed to the lapse of time-made it impossible for her to recognize the shooter in court, then her lineup identification may have had no basis.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Although Morris' summation emphasized Deans' inability to identify Quinones as the shooter in court (Defense Summation: Tr. 653-54), he seemed to state that Deans had testified that she had only seen a profile of Quinones in the *lineup:*

> *Now, the District Attorney showed [Deans] a photograph which is in evidence which is People's 9, a lineup photo.*
>
> And what does she say to that? Do you recall her saying this? And I could be wrong. It's your recollection that counts, not mine.
>
> You are the judges of the facts. And if there's any dispute, just ask this gentleman here to read it back to you, her testimony, Carol Deans. (Indicating)
>
> *She said she only looked at the profile. Remember that word. The profile of the person in this lineup seated in the third position. The profile.*
>
> A profile is not a face. It's part of a face, isn't it? Or, has it changed since overnight? Since overnight has it changed? I don't think so.
>
> That's what that lady said.
>
> *Has there been any identification of my client being the shooter in this case? By anyone? No. Absolutely not.*

(Defense Summation: Tr. 655, emphasis added.) FN68

FN68. In a colloquy with the court at the conclusion of the State's case, in support of defense's motion to dismiss, Morris repeated the same misconstrual of Deans' testimony: "Your Honor, a careful perusal of the testimony of the lady who allegedly participated in the lineup testified that she identified a profile of a person seated in Seat Number 3. She said she did not identify the defendant as he sits in court as being in that particular seat." (Tr. 637.)

By contrast, the State's summation stated that Deans testified that she only saw a profile at the time of the shooting:

> And she got a good look at him. If you'll remember, yeah, [Deans] said she got a side profile view; but just after the shooting when he didn't know which way to go, he looked at her direction, and she remembered that.

(State Summation: Tr. 684.) Notably, the trial court itself found Deans' "profile" testimony unclear: "[Deans] said she didn't know because she only saw a profile. She didn't say when she saw a profile." (Tr. 808.)

Morris' apparent interpretation of Deans' testimony makes no sense. To explain her inability to identify Quinones in court, Deans stated that she "just had sort of a profile." (Deans: Tr. 429.) Why would she have referenced the poor viewing conditions at the lineup (without actually mentioning the lineup) in response to a question of whether the person sitting in front of her in court was the same person she saw commit a shooting? Indeed, the subject of the lineup was not even *mentioned* until later in Deans' testimony. (Deans: Tr. 429, 431.)

Although this Court has not been provided with a clear copy of the lineup photograph, this Court may take judicial notice of the fact that lineups do not generally consist solely of profile views. The testimony reveals that the individuals were "seated throughout the entire lineup." (Milian: H. 21, 56; Deans: Tr. 431; Milian: Tr. 533.) Had this been a profile-only lineup, presumably one of the witnesses to the lineup would have mentioned that fact. The jury also would immediately have seen that Morris' alternate interpretation made no sense, as the jury had access to the lineup photograph admitted into evidence that (presumably) showed a full-face view of each individual.

***44** Although Deans' "profile" testimony was ambiguous, the most reasonable interpretation-and the one most helpful to the defense-was that she only had a profile of the shooter at the time of the shooting. By asserting that Deans only viewed Quinones' profile at the lineup, Morris missed a vital opportunity to question Deans' identification testimony. Because Morris' actions seems to have been based on a misinterpretation of testimony, this Court cannot simply excuse his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

actions as "trial strategy." FN69

FN69. *See, e.g., Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 2588 (1986) (decision based on ignorance of relevant facts and "mistaken beliefs" as to legal procedures was not based on "strategic considerations"); *Lindstadt v. Keane,* 239 F.3d 191, 201 (2d Cir.2001) ( "The prosecution emphasizes that defense counsel was not alone in failing to notice these errors, a point also made by the state appellate court and the district court. We do not think that the failure of others to notice establishes that the point is so subtle that an effective counsel would miss it. A trial judge has a full plate without undertaking an independent study of the facts on which the parties seem to agree. The prosecutor may (though should not) have other priorities."); *Pavel v. Hollins,* 261 F.3d 210, 218 & n. 11 (2d Cir.2001) (decisions made in ignorance of relevant facts or law cannot be characterized as strategic under *Strickland,* collecting cases); *Fogg v. Kernan,* No. C95-3581, 1998 WL 470470 at *8 (N.D.Cal. Aug. 7, 1998) ("[W]hile trial counsel's ... letter to [the petitioner] is not by itself probative, it certainly implies that trial counsel did not have a grasp on the details of the plea agreement.... This letter therefore strongly suggests that trial counsel's advice about the plea agreement was steeped more in uninformed confusion than in cunning strategy.").

While Morris could have more effectively used Deans' testimony, ultimately Morris did get his point across. He reminded the jury that Deans could not make an in-court identification (Defense Summation: Tr. 653-54), posited that the lineup had been contaminated (referencing the "profile" testimony), and concluded that Quinones had not been identified by "anyone" as the shooter (Defense Summation: Tr. 655). FN70 Morris' summation on this point could have been much better, but it was not objectively unreasonable.

FN70. Further, Morris repeatedly advised the jury to have the trial testimony read back to them (*e.g.* Defense Summation: Tr. 655), and one of the first actions the jury took after beginning deliberations was to ask to have Deans' testimony read back (Tr. 759-60), thus presumably curing any distortion caused by Morris' summation.

Quinones' claim that Morris' theory of the defense was "incoherent" is really a collection of specific challenges to Morris' conduct. Morris' defense theory was clear and coherent-Quinones was not the shooter, no one identified him as the shooter, and Carter was a drug dealer who was killed by fellow drug dealers. The overall defense theory was coherent, albeit unsuccessful. The Court cannot say that the First Department's denial of this ground of Quinones' ineffective assistance claim was an "unreasonable application" of the *Strickland* standard.

2. *Morris' Alleged Failure to Object to Admission of Evidence*

Quinones asserts that Morris failed to object to the admission of multiple items of evidence. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 31-38, 45-46.) On direct appeal, the First Department rejected all of Quinones' evidentiary claims as unpreserved: "[e]ach of defendant's contentions concerning the court's evidentiary rulings requires preservation (CPL 470.05 [2] ), and we decline to review any of these unpreserved claims in the interest of justice." *People v. Quinones,* 272 A.D.2d 228, 229, 708 N.Y.S.2d 616, 616 (1st Dep't 2000). The First Department also held that Morris' "alleged deficiencies did not deprive [Quinones] of a fair trial." *Id.* at 229, 708 N.Y.S.2d at 616.

a. *Morris' Failure to Object to Lineup Testimony Without Foundation*

Quinones claims that Morris erroneously failed to object to the admission at trial of testimony regarding Deans' pretrial identification, where no foundation had been laid under C.P.L. § 60.25 that Deans could not identify the defendant at trial because of the passage of time or the defendant's changed appearance. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 31-34, 45.) FN71

FN71. Quinones could prevail if he proved that counsel's performance was objectively unreasonable in failing to assert a meritorious objection under either New York State

law or federal constitutional law. *See*Sellan v. Kuhlman, 261 F.3d 303, 309-10 (2d Cir.2001) (petitioner may claim ineffective assistance of appellate counsel based on counsel's failure to raise state law claim on appeal); *Mayo v. Henderson,* 13 F.3d 528, 533-36 (2d Cir.1994) ("The claim whose omission forms the basis of an ineffective assistance claim may be either a federal-law or a state-law claim...."); *Claudio v. Scully,* 982 F.2d 798, 803-05 & n. 5 (2d Cir.1992) ("The federal constitutional right to effective assistance of counsel may be violated by an attorney's failure to raise a meritorious state law claim or defense."), *cert. denied,*508 U.S. 912, 113 S.Ct. 2347 (1993); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *19 n. 34 (S.D.N.Y. May 31, 2002) (Peck, M.J .) (Petitioner "could prevail if he proved that counsel's performance was objectively unreasonable in failing to preserve a meritorious federal *or* state claim."), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *12 (S.D.N.Y. May 25, 2000) (Peck, M.J.) (trial counsel was not ineffective for failing to object to Allen charge, because charge was correct under both federal and state law), *aff'd,*No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,*123 S.Ct. 1787 (2003).

The New York Court of Appeals has described the criteria for admitting testimony regarding a pre-trial identification pursuant to C.P.L. § 60.25, as follows:

> ***45** The authorization contained in CPL 60.25 is specific and limited. By its terms, CPL 60.25 does not allow third-party testimony confirming a pretrial identification by a nontestifying witness. Instead, the statute expressly delineates preconditions and the particular instances for the admission of previous identification evidence, in the absence of trial-present identification.
>
> The witness who made the pretrial identification must have testified to: (1) observing the defendant "either at the time and place of the commission of the offense or upon some other occasion relevant to the case;" (2) observing, under constitutionally permissible circumstances, "a person whom he recognized as the same person whom he had observed on the first or incriminating occasion;" and (3) being "unable at the proceeding to state, on the basis of present recollection, whether or not the defendant is the person in question"....

*People v. Patterson,* 93 N.Y.2d 80, 82, 688 N.Y.S.2d 101, 103 (1999) (quoting C.P.L. § 60.25); *accord,e.g.,People v. Quevas,* 81 N.Y.2d 41, 42-43, 595 N.Y.S.2d 721, 722 (1993).

"Central to the admissibility of third-party testimony under CPL 60.25 is the fact that the witness cannot state, 'on the basis of present recollection,' whether or not defendant is the person in question." *People v. Bayron,* 66 N.Y.2d 77, 81, 495 N.Y.S.2d 24, 26 (1985). Although the statute does not define "present recollection," the New York Court of Appeals has long held that the statute "applies to a situation where the witness, due to lapse of time or change in appearance of the Defendant, cannot make an in-court identification, but has on a previous occasion identified the defendant." *People v. Nival,* 33 N.Y.2d 391, 394-95, 353 N.Y .S.2d 409, 411-12,*cert. denied,*417 U.S. 903, 94 S.Ct. 2597 (1974); *accord,e.g.,People v. Bayron,* 66 N.Y.2d at 81, 495 N.Y.S.2d at 26 ("CPL 60.25 has been applied in instances where the eyewitness has been unable to recognize defendant due to lapse of time or change in appearance") (collecting cases).[FN72]

> FN72. Once the witness testifies that he
>
> cannot make an in-court identification, but has on a previous occasion identified the defendant ..., the fact that the defendant is the person whom the witness previously identified 'may be established by testimony of another person or persons to whom the witness promptly declared his recognition' at the time he made the prior identification.... The testimony of the witness and the other person, taken together, constitutes 'evidence in chief'.
>
> *People v. Nival,* 33 N.Y.2d at 394, 353 N.Y.S.2d at 412. Thus, if Deans' testimony satisfied C.P.L. § 60.25, it was proper for Detective Milian to testify about Deans' identification of Quinones at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the lineup. *See also,e.g.,*People v. Nival, 33 N.Y.2d at 393, 396, 353 N.Y.S.2d at 410, 413 (police testimony admissible as to eyewitness' pretrial identification, where defendant subsequently changed his appearance so that eyewitness could not identify him at trial); *People v. Walters,* 299 A.D.2d 377, 378, 749 N.Y.S.2d 156, 156 (2d Dep't 2002) (Police testimony as to pretrial identification held admissible where the "victim testified at the trial, which was held almost one year after the crime occurred, that '[i]t's been so long' that he could not recognize in the courtroom the person who robbed him. Further, the victim testified that he identified the perpetrator to the police immediately after the crime occurred, and that the person the police arrested was the person who robbed him."), *appeal denied,*99 N.Y.2d 621, 757 N.Y.S.2d 832 (2003).

Deans' trial testimony was not sufficiently specific so as to satisfy the State's burden, as her inability to identify Quinones as the shooter was not ascribed to either lapse of time or a change in Quinones' appearance:

Q. The person that you saw talking to Lamont Carter eventually firing the weapon, do you see him in court today?

A. I don't know.

Q. You don't know?

A. No. I just had sort of a profile.

Q. Are you saying you are unable to identify him today in court?

A. Yeah.

(Deans: Tr. 429.)

Q.... When you came into this court today you indicated you couldn't say that this is the person that you saw on the 31st of December, 1992, correct?

A. That is true.

(Deans Tr. 433.) Nor did the trial court make a finding that Deans' inability to identify Quinones resulted from a failure of recall due to lapse of time.

***46** In *People v. Quevas,* 81 N.Y.2d at 43-44, 595 N.Y.S.2d at 722, an eyewitness repeatedly answered "nope" in response to the question of whether his assailant was in the courtroom. The Court of Appeals held:

> The proper foundation was not laid for the admission of the police officer's testimony as to the complainant's out-of-court identification of the defendant. Although it was their burden to do so, the People did not establish the reason why the complainant could not make an in-court identification.
>
> In order to lay a proper foundation under CPL 60.25 there must be testimōny from the witness which establishes a lack of present recollection of the defendant as the perpetrator.... The evidence must establish a lack of present recollection as a basis for the lack of identification and not a fear of identifying the defendant.... Here, the identification testimony from the witness was ambiguous and there was no basis for the court to make a finding in accordance with CPL 60.25 that the witness could not identify the defendant on the basis of present recollection.
>
> Moreover, the court did not make a finding that the complainant had no present recollection of the defendant.... It is possible, for example, that the complainant could not identify defendant because (1) he was physically or mentally incapable of doing so; (2) he was too frightened to do so ...; or (3) defendant was not the perpetrator.

*Id.* at 45-46, 595 N.Y.S.2d at 723;*accord,e.g.,People v. Marte-Nuesi,* 248 A.D.2d 555, 555-56, 669 N.Y.S.2d 866-67 (2d Dep't) ("[T]rial court erred by permitting a third party to testify as to the complainant's prior identification of the defendant as the perpetrator. The identification testimony from the complainant at trial was ambiguous, and there was no basis for the court to make a finding in accordance with CPL 60.25 that the complainant could not identify the defendant on the basis of present recollection ...."), *appeal denied,*92 N.Y.2d 901, 680 N.Y.S.2d 65 (1998); *People v. Morton,* 189 A.D.2d 488, 495, 596 N.Y.S.2d 783, 788-89 (1st Dep't 1993) ("Upon being

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

asked if she saw, in the courtroom, the two men who entered her apartment and robbed her, the complainant stated, 'I don't see them'; 'I really don't see them' and, 'I'm sorry, your Honor, I don't see them'. At no time did she state that defendants were not the perpetrators. Nor is there any indication that she did not identify them for fear of reprisal.... As *Quevas* clearly holds, before a witness's testimony as to the complainant's out-of-court identification of the defendant may be admitted, a proper foundation, i.e., that the witness cannot identify the defendant on the basis of present recollection, must be laid. Our review of the record indicates that, while such a showing might well be made in this case, it was not on this record."); People v. Smith, 195 A.D.2d 265, 267, 599 N.Y.S.2d 582, 584 (1st Dep't 1993) (same; related case).FN73

FN73. *See also, e.g.,* People v. Marrero, 183 A.D.2d 728, 729, 583 N.Y.S.2d 468, 470 (2d Dep't) (where "the complainant was not 100% certain [at trial that] the defendant was the perpetrator, but he did not attribute his uncertainty to the lapse of time or a change in the defendant's appearance," "it was improper to admit the third-party testimony by the arresting police officer which had the effect of bolstering the testimony that [the complainant] was 100% certain when he made the prior identification"), *appeal denied,* 80 N.Y.2d 906, 588 N.Y.S.2d 831 (1992); *cf.* People v.. Bayron, 66 N.Y.2d at 82, 495 N.Y.S.2d at 26 (Third party testimony as to eyewitness' pretrial identification inadmissible, where, "[by] his repeated refusals to identify defendants because of fear of retribution, [the eyewitness] manifested not an inability to identify these defendants-a neutral fact-but the converse."); People v. Murphy, 235 A.D.2d 933, 934-35, 654 N.Y.S.2d 187, 190 (3d Dep't) ("In order to lay a proper foundation for such testimony, there must be evidence establishing a lack of present recollection of the defendant as the perpetrator.... This foundation was established here by evidence that defendant had significantly changed his appearance between [the time of the crime] and the trial .... ), *appeal denied,* 90 N.Y.2d 896, 662 N.Y.S.2d 439 (1997).

***47** Deans did, of course, testify at trial that she witnessed the shooting (*e.g.,* Deans: Tr. 421-22, 435), and also identified a photograph of the pretrial lineup, circling Quinones' picture as the individual she identified at the time of the lineup. (Deans: Tr. 431-32.) The State argues that Deans' trial testimony "acknowledg[ing]" her pretrial identification is the "plain equivalent of what Section 60.25 requires-a statement that the witness is 'unable' to state whether the defendant is the perpetrator." (Dkt. No. 6: State Appendix Ex. C: State 1st Dep't Br. at 14.) The State, however, offers no authority to support this proposition, which seems contrary to the New York Court of Appeals' *Quevas* decision.

Nevertheless, Morris may have decided for strategic reasons to leave Deans' ambiguous testimony as is, rather than to object and risk more damaging testimony. After all, Deans had no difficulty picking Quinones' face from the lineup photograph at trial, and acknowledged picking Quinones at the lineup. Had Morris objected on C.P.L. § 60.25 grounds to the admission of testimony regarding the lineup, the State almost certainly would have elicited from Deans that her inability to recognize Quinones at trial was due to lapse of time. (*See* Dkt. No. 6: State Appendix Ex. C: State 1st Dep't Br. at 14.) FN74 Further, had either the State or Morris inquired of Deans further, she might have cleaned up her ambiguous (but seemingly exculpatory) statement that she "just had sort of a profile." (Deans: Tr. 429.) Instead, Morris let Deans' testimony stand, and then emphasized on summation that: (1) Deans failed to identify Quinones at trial as the shooter, and (2) Deans' testimony that she only saw the shooter's "profile" threw her entire lineup identification into question.FN75 *Cf., e.g.,* United States v. Miguel, No. 97-1047, 122 F.3d 1058 (table), 1997 WL 557589 at *3 (2d Cir. Sept. 9, 1997) (attorney's failure to object to hearsay was a reasonable trial strategy given defendant's theory of the case); *United States v. Brant,* No. Civ. A. 91-5859 & 91-6673, Crim. 89-111-02 & 89-111-01, 1993 WL 313369 at *5 (E.D.Pa. July 30, 1993) (Attorney "was more reserved and subtle, preferring to leave that last, dangerous question unasked, so that the seed of doubt could be nurtured in summation."), *aff'd,* 27 F.3d 559 (3d Cir.), *cert. denied,* 513 U.S. 904, 115 S.Ct. 268 (1994).

FN74. Had this occurred, however, the State would not have been able to argue on clos-

ing that Deans failed to identify Quinones at trial due to fear. (*See* pages 16 above & 126-27 below.)

FN75. As noted in Point V.B.1 above, although Morris' summation on this point was less than articulate, he nonetheless conveyed the point that Deans had not identified Quinones and had not even sufficiently viewed the shooter.

Thus, the Court cannot say that Morris' decision not to object on C.P.L. § 60.25 grounds was not based on reasonable trial strategy. More importantly, the Court cannot say that the First Department's decision denying Quinones' ineffective assistance claim on this ground was an "unreasonable application" of the *Strickland* standard.

b. *Morris' Failure to Object to Police "Bolstering" Testimony*

Morris failed to object to Detective Milian's testimony that he looked for Quinones in order to place him in a lineup after speaking to Scarlett, Deans, and other detectives. (Milian: Tr. 525-26.) According to Quinones, "[t]he inevitable inference which the jury must have drawn from this testimony was that there was information from unspecified sources identifying the defendant as the man who had committed the shooting." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 34-36, 45.)

***48** The relevant testimony is as follows:

Q. Upon receiving the assignment regarding the Lamont Carter homicide investigation [on December 31, 1992], what did you do?

A. I responded to the location and I coordinated with detectives and officers that were at the location.

Q. Did you have occasion at some point later that day to speak to anybody?

A. Yes, I did.

Q. Who did you speak to?

A. Police Officer Ramos.

Q. Did you also have occasion-aside from Officer Ramos, did you speak to any other detectives?

A. Yes. Several.

Q. And, did you have occasion to speak to any civilians on that date as pertaining to that case?

A. Yes.

Q. Who was that?

A. I spoke to Marion Scarlett.

Q. Where was it you spoke to her?

A. We spoke to her in the 25 Precinct.

Q. And, did there come a time that you spoke to Carol Deans?

A. Yes, there was.

Q. When was that that you personally spoke to her?

A. It was approximately January 3rd of 1993.

Q. Now, with regard to Ms. Scarlett, did you have occasion to speak to her again?

A. Yes, I did.

Q. When was that?

A. I spoke to her March 1st of '93, also.

Q. Now, *after speaking to Ms. Scarlet, to Ms. Deans, and the other detectives, did there come a point in time in March of 1993 that you wanted to see the defendant in this case?*

A. Yes, there was.

Q. For what purpose did you want to see the defendant at that time?

A. I wanted to put him in a corporeal lineup.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q. What efforts did you make to find the defendant in order to put him in that corporeal lineup?

A. I canvassed the Lincoln Projects area where he was purportedly sighted and spoke to his wife.

Q. When did you speak to her?

A. April 1, 1993.

(Milian: Tr. 524-26, emphasis added.)

New York courts have long held that police witnesses may not "bolster" a witness' identification of a defendant by testifying that hearsay conversations between the police and the witness led to the defendant's arrest, even if, as here, the connection between the conversation and the arrest is only "implicit" or "inferential." *See*People v. Holt, 67 N.Y.2d 819, 820, 501 N.Y.S.2d 641, 642 (1986) ("It was also error to permit a police officer to testify, over objection, that he had arrested the defendant after conferring with the eyewitness. Although such implicit bolstering may not have warranted reversal in and of itself ..., the testimony should be excluded upon proper objection at the retrial."); People v. Martinez, 209 A.D.2d 641, 642, 619 N.Y.S.2d 134, 135 (2d Dep't 1994) ("it was error to permit the back-up officer to testify, over objection, that he had identified the defendant after conferring with the undercover detective who had observed the perpetrator, because such testimony constitutes improper bolstering"), *appeal denied,*85 N.Y.2d 911, 627 N.Y.S.2d 334 (1995); People v. Bryan, 179 A.D.2d 667, 668, 578 N.Y.S.2d 608, 609-10 (2d Dep't) ("The arresting officer testified that he charged the defendant with the robbery after the complainant gave certain responses to questions during the lineup. Although the arresting officer did not reveal any answers given by the complainant, this testimony was improperly admitted since it implicitly bolstered the complainant's testimony."), *appeal denied,*80 N.Y.2d 829, 587 N .Y.S.2d 913 (1992).[FN76]

FN76.*People v. Liberatore,* 167 A.D.2d 425, 426, 561 N.Y.S.2d 832, 834 (2d Dep't 1990) ("we agree that the trial court erred in permitting police officers to give bolstering hearsay testimony concerning conversations with witnesses and the fact that these conversations led to the defendant's arrest."), *appeal denied,*78 N.Y.2d 956, 573 N.Y.S.2d 651 (1991); *People v. Montes,* 149 A.D.2d 956, 956, 540 N.Y.S.2d 89, 89 (4th Dep't) ("The court erred by allowing two police officer witnesses to testify that, after speaking with eyewitnesses to a fatal shooting, they issued an order for defendant's arrest. This testimony indirectly bolstered the identification of defendant and was improper."), *appeal denied,*74 N.Y.2d 744, 545 N.Y.S.2d 118 (1989); *People v. Faison,* 126 A.D.2d 739, 739-40, 511 N.Y.S.2d 324, 326 (2d Dep't 1987) ("the testimony by a police officer that the complainant had identified the defendant to him as her robber, and that, after having a brief conversation with her, he arrested the defendant, improperly bolstered the complainant's identification testimony, both directly ... and inferentially.... Although the defendant did not preserve the issue for appellate review ..., we deem this an appropriate case for exercising our discretion to reach this issue in the interest of justice."); *People v. Vasquez,* 120 A.D.2d 757, 757-58, 502 N.Y.S.2d 282, 283 (2d Dep't 1986) ("It was also improper for the arresting officer to testify, over objection, that he arrested the defendant after conferring with the complaining witness and determining that the witness was certain of his identification. This testimony amounted to implicit bolstering and was error.... Where, as here, a conviction is based solely upon identification testimony by a single witness who made a brief observation of his assailant, any error which is apt to enhance the weight of such testimony may not be disregarded as being merely technical in nature."); *People v. Lee,* 110 A.D.2d 913, 915, 488 N.Y.S.2d 738, 741 (2d Dep't 1985) ("During his testimony, the investigating detective was permitted to testify, over objection, that the defendant became a suspect the day after the young victim had provided a description of his assailant. Such testimony, which raised the inference that the victim had identified the defendant, was inadmissible hearsay ..., which, in effect, was utilized to bolster the victim's identification testimony." This was error, though not reversible standing alone.); *People v. Cummings,* 109 A.D.2d 748, 749-

50, 485 N.Y.S.2d 847, 849 (2d Dep't 1985) ("testimony of an investigating detective that, after speaking to a codefendant, he obtained a warrant for defendant's arrest," constituted "impermissible hearsay").

***49** A small number of decisions have allowed such testimony on the ground that it merely supported the "narrative of events" leading up to the arrest. *See*People v. Vanier, 255 A.D.2d 610, 610, 680 N.Y.S.2d 877, 877-78 (2d Dep't 1998) ("The defendant was convicted of robbing the complainant of two chains. A detective testified that after he had a conversation with the complainant, the investigation focused on the defendant. Then, the detective later testified that the defendant was arrested. The defendant now contends that this testimony constitutes impermissible bolstering, requiring reversal. Because the defendant at no time objected to this testimony, his claim is unpreserved for appellate review.... In any event, this testimony 'merely served as a necessary narrative of events leading to [the] defendant's arrest.'..."), *appeal denied,*93 N.Y.2d 903, 689 N.Y.S.2d 715 (1999); *People v. Stansberry,* 205 A.D.2d 317, 317-18, 613 N.Y.S.2d 6, 7 (1st Dep't) (Rejecting bolstering claim. "During cross-examination of the victim defense counsel elicited testimony that defendant was arrested after the victim spoke to a police officer. The brief and restricted testimony by a police officer that he spoke to the victim, and that defendant was arrested afterward, merely served as a necessary narrative of events leading to defendant's arrest."), *appeal denied,*84 N.Y.2d 910, 621 N.Y.S.2d 528 (1994); *People v. McClain,* 176 A.D.2d 521, 522, 574 N.Y.S.2d 712, 712 (1st Dep't 1991) (Although "the arresting officer testified that he spoke with the victim before arresting defendant, ... the confrontation clause is not implicated in this case as no statement by the victim was introduced at trial. Rather, the arresting officer's testimony at trial was merely that he arrested defendant after interviewing two eyewitnesses and the victim, and conducting further investigation. Furthermore, the People presented the two eyewitnesses to the shooting, who were long-term acquaintances of defendant and unequivocally identified defendant as one of the shooters, as well as corresponding spent shells recovered from the scene. Thus, even on an 'implied bolstering' theory, there is no likelihood that the jury might have substituted the officer's brief testimony for that of the eyewitnesses, or that it in any way contributed to the verdict ...."), *appeal denied,*79 N.Y.2d 950, 583 N.Y.S.2d 204 (1992).

While the issue is a close one, the Court cannot find that Morris erred by failing to object. First, Detective Milian testified that he sought out Quinones "after speaking to Ms. Scarlet, to Ms. Deans, *and the other detectives."* (Milian: Tr. 526, emphasis added.) This reference to conversations with other detectives reduced the danger that the jury would connect the eyewitness conversations with the arrest. *See*People v. McClain, 176 A.D.2d at 522, 574 N.Y.S.2d at 712 (police "arrested defendant after interviewing two eyewitnesses and the victim, and conducting further investigation").FN77

FN77. Bolstering is generally not a cognizable federal claim. *See,e.g.,*Bailey v. People of State of New York, 01 Civ. 1179, 2001 WL 640803 at *8 (S.D.N.Y. June 8, 2001) (Peck, M.J.) (citing cases). Quinones cites (Quinones 1st Dep't Br. at 36) to *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994), where the Second Circuit held that "[a] defendant's right to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying co-defendant admitted in evidence against him," and found counsel ineffective for failing to object to such testimony. Although the testimony in *Mason* is strikingly similar to that found here, *Mason v. Scully,* 16 F.3d at 40, this case is distinguishable for two reasons. First, both Deans and Scarlett ultimately testified at trial, subject to cross-examination. This case thus lacks the Confrontation Clause concerns raised in *Mason,* which involved hearsay from a *non* testifying codefendant. Second, the *Mason* Court expressly relied on the fact that "there was no police work that turned up [defendant], and the only lead to him obviously came from [the detective's] conversation with [co-defendant]." *Id.* at 44. Here, by contrast, Detective Milian sought out Quinones "after speaking to Ms. Scarlet, to Ms. Deans, *and the other detectives."* (Milian: Tr. 526 (emphasis added).) *See*Quartararo v. Hanslmaier, 186 F.3d 91, 99 (2d Cir.1999) ("Unlike [*Mason* ] ..., this is not a case in which no police work turned up petitioner and the only lead to him came from [co-

defendant's] conversation with [a detective].”), *cert. denied,*528 U.S. 1170, 120 S.Ct. 1196 (2000).

***50** Second, Morris may have reasonably chosen not to object in order to avoid highlighting the testimony, which the jury likely failed to notice (as it consisted of only a single, fleeting, reference) and which was not later emphasized in the State's summation.FN78

FN78.*See,e.g.,United States v. Schake,* No. 02-1743, 57 Fed. Appx. 523, 526, 2003 WL 202439 at *2 (3d Cir. Jan. 29, 2003) (Affirming district court's finding “that counsel's failure to object to a single, brief question by the prosecutor ... was reasonable in light of counsel's fear that an objection would highlight the matter for the jury.”); *United States v. Alsop,* No. 99-3983, 12 Fed. Appx. 253, 258, 2001 WL 391967 at *3 (6th Cir. Apr. 12, 2001) (“the prejudicial testimony was not elicited by the Government, was limited to a single reference ..., and passed without objection or request for a curative instruction. A curative instruction would have emphasized and may have undermined defense counsel's strategy to ignore the remark.”), *cert. denied,*534 U.S. 916, 122 S.Ct. 262 (2001); *Anderson v. Sternes,* 243 F.3d 1049, 1057-58 (7th Cir.) (Petitioner's “attorney may have strategically decided that it was better not to ask for a limiting instruction ... because such an instruction would highlight the evidence to the jury. Such a strategy is reasonable, especially given that the evidence ... was a minor portion of the government's case.”), *cert. denied,*534 U.S. 930, 122 S.Ct. 294 (2001); *Buehl v. Vaughn,* 166 F.3d 163, 176 (3d Cir.) (Agreeing with state court's conclusion that “[b]ecause the [objectionable] statements were fleeting, ... ‘trial counsel may have wished to avoid emphasizing what might have gone relatively unnoticed by the jury.” ’), *cert. dismissed,*527 U.S. 1050, 119 S.Ct. 2418 (1999); *United States v. Grunberger,* 431 F.2d 1062, 1069 (2d Cir.1970) (“it is understandable that a defense counsel may wish to avoid underscoring a prejudicial remark in the minds of the jury by drawing attention to it” through an objection); *United States v. Corcoran,* 855 F.Supp. 1359, 1371 (E.D.N.Y.1994) (“reasonable tactical decision” not to object to damaging testimony, as it “would merely serve to highlight the testimony”), *aff'd,*100 F .3d 944 (2d Cir.), *cert. denied,*517 U.S. 1228, 116 S.Ct. 1864 (1996); *Gatto v. Hoke,* 809 F.Supp. 1030, 1039 (E.D.N.Y.) (“counsel's failure to object to the prosecutor's summation represents his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them”), *aff'd mem.,*986 F.2d 500 (2d Cir.1992). *But seeWashington v. Hofbauer,* 228 F.3d 689, 706 (6th Cir.2000) (“[Counsel's] explanation that he was worried the objection would render damage that an instruction could not cure is clearly not viable, for two reasons. First, accepting as a proper trial strategy a lawyer's doubts over the effectiveness of objections and curative instructions would preclude ineffectiveness claims in every case such as this, no matter how outrageous the prosecutorial misconduct might be. In other words, were we to accept the State's argument, no failure to object could ever comprise ineffective assistance of counsel, and no claim of prosecutorial misconduct, however egregious, could be raised on habeas review if not objected to. Second, we must presume that juries follow their instructions.”).

The Court cannot say that the First Department's decision denying Quinones' ineffective assistance claim on this ground was an “unreasonable application” of the *Strickland* standard.

c. *Morris' Failure to Object to Hearsay that the “Puerto Rican Did It”*

Quinones asserts that Morris erred by failing to object to Officer Ramos' testimony that he heard an unidentified woman at the crime scene yell “something like”: “ ‘The Puerto Rican did it. The Puerto Rican shot him.” ' (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 36-37, 45, citing Ramos: Tr. 575-81.)

The State does not even attempt to argue that this statement was admissible (Dkt. No. 6: State Appendix Ex. C: State 1st Dep't Br. at 18), as it consisted of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

hearsay from an unknown declarant with no indicia of reliability. *See,e.g.,*People v. Alexander, 173 A.D.2d 296, 298, 569 N.Y.S.2d 689, 691 (1st Dep't 1991) (Reversible error to permit police officer "to testify that the crowd outside the complainant's apartment building told [the officer] that they had seen defendant [in burglary case] climb out of the second floor window onto the fire escape." "Although the spontaneous declaration exception to the hearsay rule applies to statements made by bystanders as well as participants, where, as here, there is no proof of the identity of the declarants or of whether they had an 'adequate opportunity to observe' the event, it is error to permit such testimony.") (citations omitted); *People v.. Lopez,* 123 A.D.2d 399, 399-400, 506 N.Y.S.2d 600, 601 (2d Dep't 1986) ("error was committed by the trial court when it ... allowed a police officer to testify that certain individuals at the scene of the incident, who did not testify at the trial, identified the defendant as the perpetrator"), *aff'd,*69 N.Y.2d 975, 976, 516 N.Y.S.2d 660, 660 (1987).

Instead, the State maintains that Morris' "decision to refrain from objecting to this testimony most probably was a strategic one, to permit the jury to hear this possibly exculpatory material." (State 1st Dep't Br. at 18.) Scarlett testified that the man-whom she identified in court as Quinones-speaking to Carter prior to the shooting was "light-skinned Spanish." (Scarlett: Tr. 474.) Although Deans testified on direct examination that the shooter was "very fair-skinned" (Deans: Tr. 427), on cross examination she stated that the shooter's hair was "shaved off," like "an average Black man" (Deans Tr. 452). In the State's view, the hearsay that a "Puerto Rican" did the shooting served as further "[c]onflicting testimony as to the shooter's race." (State 1st Dep't Br. at 18.) The State therefore argues that it was reasonable for Morris to highlight this conflicting testimony, and, at minimum, admission of the statement did not harm Quinones' case. (State 1st Dep't Br. at 18.)

***51** The State's theory is patent nonsense. As the State notes elsewhere in its First Department brief (State 1st Dep't Br. at 27), Morris argued on summation that Deans' cross-examination testimony that the shooter was a "Black man" exculpated Quinones, who was apparently a "light-skinned Hispanic" [FN79] (Defense Summation: Tr. 659).[FN80] Further, Morris attempted to impeach Officer Ramos as to the "Puerto Rican" statement by eliciting that the "alleged[ ]" statement was not contained in Ramos' notes, questioning whether Ramos really could remember such an oral statement three years after the fact, and noting that the police had failed to detain the woman who "allegedly" made the statement. (Ramos: Tr. 578-83.) Clearly, Morris' strategy was not to embrace the veracity of Ramos' hearsay statement. Indeed, given Scarlett's testimony regarding a "light-skinned *Spanish"* man (Scarlett: Tr. 474), Deans' direct testimony regarding a "very fair-skinned" man (Deans: Tr. 427), and Quinones' *Hispanic* surname and evident appearance as a "light-skinned *Hispanic"* (Defense Summation: Tr. 659), it could hardly have benefitted Quinones' case to admit further eyewitness testimony through Officer Ramos that the shooter was *Hispanic,i.e.,* a "Puerto Rican" (Ramos: Tr. 575-76).

FN79. Morris' summation itself distorted Deans' testimony, as she merely stated that the shooter's hair was done in the style of "an average Black man," apparently meaning "shaved off," not that the shooter was a Black man.

FN80. If, as the State seems to assert, Quinones actually had the appearance of a "Black man" rather than an Hispanic, then Morris was egregiously inept for failing to highlight to the jury the would-be exculpatory testimony from Scarlett and Deans that the shooter was a "very fair-skinned" man and a "light-skinned Hispanic." Moreover, in its summation, the State emphasized Scarlett's testimony that the shooter was a "light-skinned Hispanic man" (State Summation: Tr. 686), which would not have helped the State's case if Quinones actually looked like a "Black man." Similarly, in finding that the two pretrial photo arrays shown to Deans and Scarlett had been proper, the trial court noted approvingly that "[e]ach of the photo arrays have men who appear to be Hispanic." (H.52.) Quite clearly, Quinones had an "Hispanic" appearance.

It is true that a reasonable attorney sometimes refrains from objecting to damaging testimony, where the statement itself is fleeting and might have escaped the jury's notice, and the objection and any ensuing curative instruction would only highlight the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

damaging testimony. (*See* cases cited at page 103 n. 78 above.) In this case, however, Officer Ramos' hearsay testimony was more than a fleeting reference that would have escaped the jury's notice. (Ramos: Tr. 575-76.) More importantly, on cross-examination, Morris went to great lengths to attack Ramos' memory of the statement (Ramos: Tr. 578-83), thus highlighting the damaging testimony to the jury (and, in the process, ensuring that the jury understood the testimony to be inculpatory). It appears that Morris had absolutely no strategic reason not to have objected to the statement's admission and ask for a curative instruction.FN81

FN81.*See,e.g.,Henry v. Scully,* 78 F.3d 51, 53 (2d Cir.1996) ( "[D]efense counsel's failure to object [at three separate junctures] could not have been part of any meaningful defense strategy of which we can conceive, notwithstanding the government's afterthefact claim to the contrary."); *DeLuca v. Lord,* 77 F.3d 578, 588 (2d Cir.1996) (Counsel's "abandonment of [a particular] defense was so hasty and based on so little, that in light of the obvious likely benefits that could be gained from the defense, his decision cannot be considered either a reasonable professional judgment or a reasoned strategic choice."), *cert. denied,*519 U.S. 824, 117 S.Ct. 83 (1996); *see alsoEze v. Senkowski,* 321 F.3d 110, 137 (2d Cir.2003) ("It does not appear that offering any of this evidence or advancing any of these arguments would have interfered with the defense's ability to make other arguments."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) (Granting habeas writ where counsel failed to assert "sure winner" on appeal. "We cannot conceive of how making such an argument could possibly have interfered with the making of any other arguments that were available" to petitioner.).

Nevertheless, the Court cannot say that this error (by itself) prejudiced Quinones. Scarlett identified Quinones at trial as the person having a discussion with Carter some five to ten minutes before the shooting, and Deans identified Quinones in a lineup (but not at trial) as the shooter. There really was no doubt as to the shooter's ethnicity-just whether or not the Hispanic shooter was Quinones. The hearsay that "the Puerto Rican shot" Carter added little or nothing to the case. This error (standing alone) was not prejudicial.

d. *Morris' Failure to Object to Testimony that Quinones was Arrested by Members of the Career Criminal Apprehension Unit*

Quinones claims that Morris erred by failing to object to Detective Milian's testimony that Quinones was arrested by the "Career Criminal Apprehension Unit." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 45, citing Milian: Tr. 527.) As the trial judge later noted, the name of the unit might suggest to the jury that defendant is a "career criminal." (Tr. 593.)

***52** Morris should have anticipated from identical statements at the *Wade* hearing that this testimony would arise at trial. (Milian: H. 31; Balzan: H. 41.) There is no doubt that an objection (or better, a pretrial motion in limine) would have been sustained, as the judge: (1) expressed "surprise" that Morris "didn't raise [the issue] earlier" (Tr. 592); and (2) once Morris raised the issue, ordered the State to avoid the "career criminal" testimony going forward (Tr. 592-94).

e. *Morris' Failure to Object to Scarlett's Testimony that the Shooter was "Upset"*

Quinones asserts that Morris erred by failing to object to Scarlett's "conclusory" testimony that the man talking to her boyfriend prior to the shooting was "upset." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 45, citing Scarlett: Tr. 476.) The Court disagrees, as this appears to be the sort of "lay opinion" that courts commonly deem admissible. *SeeBlake v. People,* 73 N.Y. 586 (1878); *People v. Roldan,* 211 A.D.2d 366, 369, 627 N .Y.S.2d 1014, 1016 (1st Dep't 1995) ("lay opinion is properly received in evidence. Familiar examples, given in Richardson, *Evidence* § 364 (Prince 10th ed), are whether a person is angry or jesting, vigorous or feeble, sober or intoxicated, the estimated age of another, the genuineness of handwriting, the identity of a briefly seen perpetrator or his telephone voice, etc."), *aff'd,*88 N.Y.2d 826, 643 N.Y.S.2d 960 (1996); 33 N.Y.Jur.2d *Criminal Law,* § 1987 (2002) ("A lay witness may testify as to his impressions of the emotional state of another person, including his observations as to whether such person seemed nervous, excited, angry, or feigning

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

anger."); *see also* 4 *Weinstein's Federal Evidence* § 701.02 at p. 701-6 (2d ed.2003) (same rule for lay opinion under Federal Rules of Evidence). Thus Morris did not err in failing to object, since the testimony was not objectionable.

f. *Morris' Failure to Object to Deans' Hearsay Statements at Lineup*

Quinones claims that Morris erred by failing to object when Detective Milian testified that when Deans saw the lineup, "she immediately began to shake, and she said 'Oh, my God. Oh, my God. It's him." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 45-46, citing Milian: Tr. 531.) As Quinones points out (Quinones 1st Dep't Br. at 46), Morris should reasonably have anticipated such trial testimony given that the detective testified to the same effect at the *Wade* hearing (Milian: H. 19-20). Thus, the State cannot reasonably argue that Morris decided not to object in order to avoid emphasizing the damaging testimony.

It is not clear, however, that such testimony was objectionable. In *People v. Grubbs,* 112 A.D.2d 104, 492 N.Y.S.2d 377 (1st Dep't), *appeal denied,*66 N.Y.2d 615, 494 N.Y.S.2d 1037 (1985), a detective testified at trial that the victim, upon recognizing her alleged attacker at a subway station several days after the attack, "became very, very nervous," "started breathing heavy, saying, 'oh my God," ' "appeared to have gone into shock," and "was standing very stiff, shaking. Her mouth was wide open. Her eyes were wide open." 112 A.D.2d at 104-05, 492 N.Y.S.2d at 378. The First Department reversed:

> ***53** The sole reason for eliciting [the detective's] observations of the complainant's physical reactions upon viewing the accused was to bolster her identification testimony. The admission of such testimony was error. ( *People v. Trowbridge,* 305 N.Y. 471, 113 N.E.2d 841.) It is of no consequence that the detective described only the physical reaction of the complainant and did not relate any oral statement or contemporaneous utterance made by her at the time of the arrest. ( *People v. Mobley,* 56 N.Y.2d 584, 450 N.Y.S.2d 302, 435 N.E.2d 672.). The witness' statements to the effect that the complainant became nervous and upset and appeared to go into shock were undoubtedly meant to convey complainant's fear and revulsion upon confronting the person who had sexually assaulted her. As such, his testimony tended to reinforce the trustworthiness of the complainant's in-court identification of defendant as the perpetrator, the sole testimony on that issue presented by the prosecution on its direct case.

*Id.* at 105, 492 N.Y.S.2d at 378-79.

The *Grubbs* holding, however, appears to be based on the inadmissibility of pre-trial identification testimony to bolster an identification at trial, as evidenced by the authorities cited. Similarly, in *People v. Echavarria,* 167 A.D.2d 138, 140, 561 N.Y .S.2d 226, 227 (1st Dep't 1990) (the only relevant decision cited by Quinones in this or the state proceeding), counsel was found ineffective because, along with a host of other errors, he failed to object "[w]hen the prosecutor asked the witness for her reaction upon seeing defendant's photograph, she stated that she started crying and 'got chills up and down my body." ' That holding, again, appears to have been based solely on the inadmissibility of bolstering pre-trial identification testimony.

Here, by contrast, pre-trial identification testimony was properly admissible, as noted at Point V.B.2.a above. Thus, this Court cannot conclude the Morris erred by failing to object. *See,e.g.,United States v. Arena,* 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance."), *cert. denied,*531 U.S. 811, 121 S.Ct. 33 (2000); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *14 & n. 25 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.) (same, collecting cases).

3. *Quinones' Claim That Morris Asserted Ineffective Arguments*

Quinones assigns a variety of errors to Morris' performance at the *Wade* hearing. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 46-47.) There is no need to catalog these alleged errors, however, as there is no reasonable probability that they affected the outcome; the evidence was overwhelming in favor of admitting Scarlett's and Deans' identification of Quinones. *SeeStrickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069 (1984) ( "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the [ineffective counsel] inquiry if the defendant makes an insufficient showing on one.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***54** Quinones also complains that although Morris asked both Scarlett and Deans to describe the shooter's height, he failed to actually put *Quinones'* height on the record. (Quinones 1st Dep't Br. at 47.) Quinones' complaint is without basis. When Scarlett described the shooter as "[t]aller than" herself (*i.e.,* over five feet, six inches), Morris asked Quinones to stand up. (Scarlett: Tr. 490-91.) Scarlett then stated "[h]e seemed taller to me" (Scarlett: Tr. 491), effectively distinguishing Quinones from the shooter. Deans, by contrast, described the shooter as "tall"-"5'6", 5'7"." (Deans: Tr. 427, 435-36.) Morris may have decided that since Quinones was, in fact, 5'6", it would not help his case to record Quinones' actual height on the record. Certainly, the jury was able to observe Quinones' actual height, even if his height is not recorded for purposes of the appellate (and habeas) record. There is no error here.

4. *Quinones' Claim that Morris Failed to Call Key Witnesses*

Quinones argues that Morris erred by failing to call Deans' daughter, who "*might* have testified that the shooter was not Quinones." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 48, emphasis added.) Specifically, Quinones asserts that Morris "informed the judge that [Deans'] daughter had told him that Quinones was not the person who did the shooting." (*Id.,* citing Tr. 448.) Despite this, the daughter's "name was not on the list of possible witnesses prior to voir dire." (Quinones 1st Dep't Br. at 48, citing Tr. 22.)

Quinones is mistaken as to both the facts and the law. As to the facts, it is far from clear that the daughter told Morris that Quinones was not the shooter. On hearsay grounds, the judge quashed Morris' question to Deans: "[a]re you aware of the fact that your daughter said that this is not the person who was there at the time?" (Deans: Tr. 446-48.) Subsequently, outside the jury's presence, Morris explained to the judge that "[h]er daughter spoke with me." (Deans: Tr. 447.) That is not a clear statement by Morris that the daughter gave an exculpatory statement. Indeed, Morris' questions to Deans could have been nothing but a crafty effort to put doubt in the jurors' minds where no real exculpatory evidence existed. On summation, Morris convincingly argued that Deans' daughter "really knew who the shooter was," thus implying that the prosecution was hiding the truth by failing to call her. (Defense Summation: Tr. 663-64.)

Moreover, Quinones has come forward with no other evidence-such as an affidavit from the daughter-proving that the daughter could exonerate Quinones or would have been willing to testify.[FN82] "A petitioner may not merely allege that certain ... witnesses 'might' have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such tetimony would have changed the result." Rosario v. Bennett, 01 Civ. 7142, 2002 WL 31852827 at *33 & n. 59 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) (citing cases); *see,e.g.,*Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir.1990) ("To affirmatively prove prejudice [from counsel's failure to investigate], a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial. Moreover, if potential trial witnesses are not called to testify at a postconviction review hearing, the petitioner ordinarily should explain their absence and 'demonstrate, with some precision, the content of the testimony they would have given at trial." ') (citations omitted); Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative." ') (citations omitted).[FN83]

FN82. In fact, Quinones has a copy of what appears to be Morris' notes of his interview of Deans' daughter (*see* Dkt. No. 13: Quinones C.P.L. § 440 Reply Br. at 6 & Ex. A ¶ 40), but that information has not been submitted to this Court.

FN83.*See also,e.g.,Polanco v. United States,* 99 Civ. 5739, 94 Cr. 453, 2000 WL 1072303 at *10 (S.D.N.Y. Aug. 3, 2000) (denying claim of failure to investigate, because petitioner "does not say precisely what counsel would have learned or how counsel would have learned it"); Muhammad v. Bennett, 96 Civ. 8430, 1998 WL 214884 at *1 (S.D.N.Y. Apr. 29, 1998) ("petitioner's speculative claim about the testimony of an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

uncalled witness" is insufficient to show ineffective assistance of trial counsel); Croney v. Scully, CV-86-4335, 1988 WL 69766 at *2 (E.D.N.Y. June 13, 1988) ("Petitioner's contention that assignment of an investigator would have been helpful to his defense is conclusory and speculative. Petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial."), *aff'd,*880 F.2d 1318 (2d Cir.1989).

***55** "[C]ounsel's decision as to 'whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation." ' *United States v. Best,* 219 F.3d 192, 201 (2d Cir.2000) (quoting *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.), *cert. denied,*522 U.S. 846, 118 S.Ct. 130 (1997)), *cert. denied,*532 U.S. 1007, 121 S.Ct. 1733 (2001); *accord,e.g.,United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999) (" 'The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." '), *cert. denied,*531 U.S. 864, 121 S.Ct. 156 (2000). Especially given the lack of proof that Deans' daughter would have provided exculpatory testimony, this Court cannot conclude that Morris' decision not to call her constituted ineffective assistance.FN84

FN84. In his C.P.L. § 440 motion regarding Morris' alleged conflict of interest, Quinones asserted that the conflict was demonstrated by, among other things, Morris' failure to call an exculpatory witness named Malik Abdullah Akili, who was listed in Morris' case notes as a potential witness. (Dkt. No. 20: State Am. Appendix: Quinones C.P.L. § 440 Br. at 12 & Ex. H.) In an April 23, 1997 affidavit, Akili stated that he was a friend of the victim and an eyewitness to the shooting, and that Quinones was not the shooter. (State Am. Appendix: Quinones C.P.L. § 440 Motion Ex. G: Akili Aff. at 1.)

Akili's affidavit is suspect, as he claims that he simply happened to overhear Quinones (whom he never met before) discussing his case in the "bullpens" of the court building while awaiting trial. (Akili Aff. at 1.) It would not be unreasonable for Morris to have decided not to call such a suspect witness. (*See* cases cited at page 114 above.) In any event, Quinones has *expressly* disclaimed any independent ineffectiveness claim based on Morris' failure to call Akili. In his Traverse, Quinones stated: "to satisfy the federal 'lapse in representation' requirement, Petitioner attached the Akili affidavit to his N.Y. C.P.L. 440 [conflict of interest] motion to demonstrate other options at Mr. Morris' disposal. [Quinones' counsel's] investigation into Petitioner's claim of innocence did not involve the Akili affidavit, neither was the Akili affidavit relied upon as an *independent* ground for relief." (Dkt. No. 22: Traverse ¶ 9; *see also* Dkt. No. 16: Quinones C.P.L. § 460 1st Dep't Br. at 6 & nn. 4-5.)

Quinones' C.P.L. § 440 papers mention other witnesses whom Morris allegedly failed to call, such as Nathaniel Battle. (Quinones C.P.L. § 440 Br. at 13-15 & Ex. H.) Quinones, however, offers no evidence that these witnesses could offer exculpatory testimony, other than the fact that their names were in Morris' case notes as potential witnesses. *See,e.g.,Rosario v. Bennett,* 2002 WL 31852827 at *33 & n. 59 ( & cases cited therein). Moreover, Quinones relies on Morris' failure to call these witnesses only in support of his conflicted counsel claim and not to show general ineffectiveness. (*See* Dkt. No. 16: Quinones C.P.L. § 460 1st Dep't Br. at 6 & n. 5.) Accordingly, because Quinones does not claim Akili or these other witnesses as "an *independent* ground for relief," and Quinones' First Department brief on direct appeal, upon which his habeas Petition relies, mentions only Deans' daughter as a missing witness in his general ineffective assistance claim, this Court will not consider Quinones to have asserted an independent habeas claim for ineffectiveness of counsel based on the failure to call witnesses other than Deans' daughter.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

5. *Quinones' Claim that Morris Failed to Object to the State's Improper Summation*

Quinones faults Morris for failing to object to a number of allegedly improper statements and arguments in the prosecutor's summation. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 48-51.)

a. *Morris' Failure to Object to the Prosecutor's Statement that Quinones Could Have Called Deans' Daughter as a Witness*

Quinones claims that Morris erred by failing to object to the prosecutor's improper statement implying that Quinones had the obligation to call Deans' daughter as a witness-effectively shifting the burden of proof:

> [Deans] didn't tell you about her daughter. She doesn't want her daughter involved in this.
>
> Well, if her daughter knew something differently, [Morris] certainly knew where to find her based on his cross examination. And if he wanted her here, he could subpoena her here.

(State Summation: Tr. 679, *cited in* Quinones 1st Dep't Br. at 50.)

The prosecutor's statement does not appear to violate the federal constitution. Although the government may not "suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever" Unites States v. Parker, 903 F.2d 91, 98 (2d Cir.1990), the

> prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, as well as his failure to support his own factual theories with witnesses. A constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury 'naturally and necessarily' would interpret the summation as a comment on the failure of the accused to testify.

United States v. Bubar, 567 F.2d 192, 199 (2d Cir.) (citations omitted), *cert. denied,*434 U.S. 872, 98 S.Ct. 217 (1977); *accord,e.g.,*United States v. Salameh, 152 F.3d 88, 136 (2d Cir.1998), *cert. denied,*525 U.S. 1112, 119 S.Ct. 885 (1999); United States v. Caccia, 122 F.3d 136, 140 (2d Cir.1997); United States v. Yuzary, 55 F.3d 47, 53 (2d Cir.1995); United States v. McDermott, 918 F.2d 319, 327 (2d Cir.1990), *cert. denied,*500 U.S. 904, 111 S.Ct. 1681 (1991). Thus, "there is no deprivation of a defendant's constitutional rights by permitting the jury to draw an adverse inference against him for his failure to call an available material witness," where the witness was available to both prosecution and defense. United States v. Caccia, 122 F.3d at 140;*accord,e.g.,*United States v. Munoz, No. 95-1070, 122 F.3d 1057 (table), 1995 WL 595088 at *2 (2d Cir. Sept. 14, 1995) ("[I]f both parties had access to the uncalled witness, 'the failure to produce is *open* to an inference *against both parties.'* ... The prosecutor's suggestion that the jury draw this inference against the defendant was not improper."); United States v. Nichols, 912 F.2d 598, 601-02 (2d Cir.1990); Marchese v. Senkowski, No. 97-CV-2055, 1999 WL 731011 at *10-11 (E.D.N.Y. Sept. 15, 1999).

***56** It is unclear whether New York has a similarly expansive rule. [FN85] Even if the prosecutor's statement would not ordinarily be permissible under New York law, however, Morris' statements "opened the door," rendering the prosecutors statement unobjectionable. Both in his cross-examination of Deans (Deans: Tr. 442-48) and Detective Milian (Milian: Tr. 540-41) and in his summation (Defense Summation: Tr. 662-64), Morris implied that the State was hiding Deans' daughter, "the person who really knew who the shooter was in this case" (Tr. 663). Under New York law, the prosecutor had the right to respond by pointing out that Morris had subpoena power as well. *See*People v. Youmans, 292 A.D.2d at 648, 738 N.Y.S.2d at 757 ("the prosecution may comment upon the failure to present a certain witness where it is a fair response to defense counsel's summation"), *appeal denied,*98 N.Y.2d 704, 747 N.Y.S.2d 423 (2002); People v. Guillebeaux, 229 A.D.2d 399, 399, 645 N.Y.S.2d 59, 60 (2d Dep't) ("The prosecutor's comments about the defendant's failure to present a certain alibi witness were a fair response to defense counsel's own summation and a fair comment within 'the four corners of the evidence'.... In addition, defense counsel made his own summation comments on the subject, and, in fact, spoke about the alibi witness's absence at greater length than did the prosecutor."), *appeal denied,*88 N.Y.2d 1021, 651 N.Y.S.2d 20 (1996); People v. Brown, 216 A.D.2d 670, 674,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

628 N.Y.S.2d 211, 215 (3d Dep't) ("The prosecution's reference to [witness'] failure to testify at trial was not unduly prejudicial given that such comments were made in response to defense counsel's similar comments during his summation."), *appeal denied,* 86 N.Y .2d 791, 632 N.Y.S.2d 504 (1995); *People v. Mackey,* 52 A.D.2d 662, 662, 381 N.Y.S.2d 1004, 1005 (3d Dep't 1976) ("Defendant first contends that the prosecutor made prejudicial statements in his summation in that he referred to the subpoena power of the defendant's attorney. These remarks to the jury must be evaluated in their relationship to the defense attorney's summation which had just been concluded.... Defense counsel implied that the People failed to call certain witnesses because their testimony would have been damaging to the People's case. In view of counsel's suggestions to the jury that the prosecutor had engaged in improper conduct, the prosecutor's statement regarding defendant's subpoena powers was not improper.").

FN85. State decisions have allowed prosecutors to comment on the defendant's failure to call witnesses, but only, it appears, where: (1) the defendant himself had come forward with evidence, and (2) the witnesses were available to the defendant. *See,e.g.,People v. Tankleff,* 84 N.Y.2d 992, 994-95, 622 N.Y.S.2d 503, 504-05 (1994) (prosecution's summation comments regarding defendant's failure to call several significant witnesses "did not constitute an impermissible effort to shift the burden of proof" where "the defense had elected to come forward with evidence" and all of the witnesses were available to defendant); *People v. Rodriguez,* 38 N.Y.2d 95, 98, 378 N.Y.S.2d 665, 668-69 (1975) ( "Ordinarily, a court may not comment upon a defendant's failure to testify or otherwise to come forward with evidence, but, once a defendant does so, his failure to call an available witness who is under defendant's control and has information material to the case may be brought to the jurors' attention for their consideration.... Though the rule ordinarily does not apply when a witness is equally accessible to both parties (Richardson, *Evidence* (10th ed.), s 92), it may come into play even then if it appears that such a witness is favorable to one party and hostile to the other."); *People v. Youmans,* 292 A.D.2d 647, 648, 738 N.Y.S.2d 756, 757 (3d Dep't), *appeal denied,* 98 N.Y.2d 704, 747 N.Y.S.2d 423 (2002); *People v. Negroni,* 280 A.D.2d 497, 497, 720 N.Y.S.2d 522, 522 (2d Dep't), *appeal denied,* 96 N.Y.2d 832, 729 N.Y.S.2d 453 (2001); *People v. Wood,* 271 A.D.2d 705, 705, 707 N.Y.S.2d 184, 185 (2d Dep't), *appeal denied,* 95 N.Y.2d 873, 715 N.Y.S.2d 228 (2000); *People v. Diaz,* 254 A.D.2d 94, 94, 682 N.Y.S.2d 123, 123 (1st Dep't 1998), *appeal denied,* 93 N.Y.2d 852, 688 N.Y.S.2d 499 (1999).

Because the prosecutor's statement was not improper, it was not error for Morris to refrain from objecting.

b. *Morris' Failure to Object to the Prosecutor's Assertion That Morris Failed to Support The Factual Theories He Espoused in his Opening Statement*

In a similar vein, Quinones argues that Morris should have objected to the prosecution's assertion "that the defense had failed to produce evidence to support the opening statement contention that Carter was a drug dealer killed by his partner." (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 50, citing Tr. 672-73.) While it is true that it would have been objectionable for the prosecutor to assert that Quinones failed to sustain some burden of producing evidence,FN86 a close reading of the state's summation reveals that the State never claimed that defendant bore the burden of proof, but merely pointed out that no evidence supported Morris' theories:

FN86. *See* *People v. Hopper,* 277 A.D.2d 171, 172, 717 N.Y.S.2d 123, 124 (1st Dep't 2000) ("While we are perturbed by the prosecutor's comment on defendant's failure to prove certain matters mentioned in defense counsel's opening statement, which had been stricken, the comment does not warrant reversal in light of the court's instructions on the burden of proof, which instructions the jury is presumed to have followed ...."), *appeal denied,* 96 N.Y .2d 830, 729 N.Y.S.2d 451 (2001); *People v. Brown,* 91 A.D.2d 639, 640, 456 N.Y.S.2d 821, 822 (2d Dep't 1982) (Reversing because, *inter alia,* prosecutor "continually commented upon defense counsel's failure to prove certain things he had mentioned in his opening

statement. We have held in the past that such conduct is improper inasmuch as the prosecutor is, in effect, suggesting to the jury that the defendant had the burden of proving his innocence."); *People v. Knatz,* 76 A.D.2d 889, 890, 428 N.Y.S.2d 709, 711 (2d Dep't 1980) (listing a variety of errors requiring reversal, including "the prosecutor's reference to defense counsel's failure to prove certain things which defense counsel mentioned in his opening statement").

***57** Now, I want to talk a little bit about what Mr. Morris has talked about. I submit to you he's raised a number of what I submit are nonissues.

First of all, with regard to Ed Smith-this is ... in his opening-he was going to demonstrate to you that this was a drug dealer who was killed by his partner and that his partner in essence had this defendant framed.

There isn't a bit of evidence of that whatsoever in this case. Pure speculation. Pure surmise.

Did you hear one bit of evidence that said that this deceased was killed by somebody else and that they brought in Carol Deans and Marion Scarlett to participate in this frame?

....

There isn't a bit of evidence whatsoever about that. He promised you the world. He delivered nothing.

(State Summation: Tr. 672-74.)

While the final statement about Morris "deliver[ing] nothing" may have skated along the thin line of propriety, it was not objectionable for the State to point out that the evidence did not support Morris' theories. *See,e.g.,United States v. Bautista,* 23 F.3d 726, 733 (2d Cir.) ("[T]he government may comment on a defendant's failure to call witnesses to support his factual theories. The government may not, however, go further and suggest that the defendant has the burden of producing evidence. The challenged [prosecutor's] statement, although inapt, when considered in context would not have been understood by a reasonable jury as anything more than an argument that the jury need not believe uncorroborated defense theories."), *cert. denied,*513 U.S. 862, 115 S.Ct. 174 (1994). Accordingly, Morris cannot be faulted for failing to object. *See,e.g.,Franza v. Stinson,* 58 F.Supp.2d 124, 148-49 (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.) (counsel not ineffective for failing to object to unobjectionable summation by prosecutor) (collecting cases); *see also,e.g.,Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *35 & n. 61 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) ("counsel cannot be faulted for failure to make a meritless objection" to an unobjectionable jury charge) (collecting cases). This is especially true in light of the trial court's clear instructions to the jury that the prosecution had the burden of proof and the "defendant is never required to prove anything." (Charge: Tr. 710-17.) *See,e.g.,Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 369-70 (S.D.N.Y.1999) (Peck, M.J.) (collecting cases).

c. *Morris' Failure to Object to the Prosecutor's Repeated Distortions of the Record on Summation*

Quinones asserts that Morris failed to object to the prosecutor's repeated distortions of the record on summation. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 48-51.) The New York Court of Appeals has described the standard for reviewing prosecutor summations:

[A]lthough counsel is to be afforded 'the widest latitude by way of comment, denunciation or appeal in advocating his cause' summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits.

***58** It is fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within 'the four corners of the evidence' and avoid irrelevant comments which have no bearing on any legitimate issue in the case. Thus the District Attorney may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferable from the evidence. Above all he should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*People v. Ashwal*, 39 N.Y.2d 105, 109-10, 383 N.Y.S.2d 204, 206-07 (1976) (citations omitted) (conviction reversed because "prosecutor's [summation] remark definitely conveys the impression that [informant] was killed by those he had informed upon, one of whom was this defendant"; prosecutor may not "try to convey to the jury, by insinuation, suggestion or speculation, the impression that the defendant is guilty of other crimes not in issue at the trial"); *see,e.g.,People v. Galloway*, 54 N.Y.2d 396, 399, 446 N.Y.S.2d 9, 11 (1981) ("the prosecutor's characterization, in summation, of the defense's contention that the witness ... possessed a gun as a 'smokescreen' or 'a red herring' and his aspersions on the credibility of the defendant's and [another witness'] testimony did not exceed the broad bounds of rhetorical comment permissible in closing argument").FN87

FN87.*See also,e.g.,People v. Harris*, 98 N.Y.2d 452, 492 n. 18, 749 N.Y.S.2d 766, 786 n. 18 (2002) ("Defendant argues that the prosecutor invited the jury to punish defendant for exercising his rights to a trial and not to testify, that the prosecutor misstated the record, referred to facts not in evidence, and misused evidence, and that the prosecutor denigrated defendant's defense and inflamed the jury." Although the issues were unpreserved, "[i]f we were to review them we would conclude that those statements do not 'exceed the broad bounds of rhetorical comment permissible in closing argument'...."); *People v. De Jesus*, 42 N.Y.2d 519, 526, 399 N.Y.S.2d 196, 200-01 (1977) ("When an attorney in summation enlarges upon facts not in evidence or presses upon the jury subjects which its members have no right to consider, the required and proper practice for opposing counsel is to interrupt the summation for the purpose of objecting to the improper statements."); *People v. Taylor*, 296 A.D.2d 512, 512, 745 N.Y.S.2d 477, 477 (2d Dep't 2002) ("[T]he challenged remarks made by the prosecution during summation constituted reversible error, as the remarks exceeded the 'broad bounds of rhetorical comment permissible in closing argument' ... to the extent that the prosecution distorted the facts in evidence and made comments which were either inflammatory, speculative, or concerned matters not in evidence."); *People v. Shaw*, 228 A.D.2d 291, 293, 644 N.Y.S.2d 208, 209 (1st Dep't 1996) ("the comment to which defendant now objects-that in the half-hour interval between the robbery and the appearance of defendant and his accomplice at a nearby hospital for a gunshot wound to defendant, they could have secreted the guns used and money stolen during the robbery-was inferable from the evidence and proper response to the defense summation commenting on the absence of such evidence as basis for reasonable doubt"), *appeal denied*,91 N.Y.2d 1012, 676 N.Y.S.2d 141 (1998); *People v. Turner*, 214 A.D.2d 594, 594, 625 N.Y.S.2d 233, 234 (2d Dep't) ("The challenged comments in the prosecutor's summation were either within the bounds of permissible rhetorical comment afforded counsel during summation, responsive to the defendant's summation, constituted fair comment on the evidence, or related to matters which were fairly inferable from the evidence ...."), *appeal denied*,86 N.Y.2d 742, 631 N.Y.S.2d 623 (1995).

The first statement that Quinones finds objectionable (Quinones 1st Dep't Br. at 48) could fairly be described as merely ambiguous: "that's what Carol Deans and Marion Scarlett did. They recognized the defendant in this courtroom and at the lineup." (State Summation: Tr. 676). Quinones argues that the prosecutor's statement is false because Deans actually failed to identify Quinones in court. (Deans: Tr.429.) However, the prosecutor's summation statement referred to both Deans *and* Scarlett, and Scarlett did identify Quinones at trial, while Deans identified him at the lineup. (*See* pages 8, 10 above.) More importantly, soon after making the above statement, the prosecutor sought to explain why Deans had *not* identified Quinones at trial (State Summation: Tr. 681-84), thus clearing up any ambiguity or misstatement.FN88

FN88. Moreover, immediately after the main the jury charge (after Morris took exception), and in a later supplemental charge, the court emphasized to the jury that Deans had been unable to identify Quinones in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

court. (Charge: Tr. 753, 810-11.)

Quinones also complains about the State's assertion that "[i]f a drug dealer wants to get rid of the opposition, they kill them. They don't get the law involved in terms of framing somebody else." (State Summation: Tr. 673; Quinones 1st Dep't Br. at 50.) While the State's assertion as to the normal practice of drug dealers was not based on evidence in the record, it was within the bounds of fair comment on the evidence and the defense's arguments.

Quinones also finds improper (Quinones 1st Dep't Br. at 50) the State's hypothesis that although Scarlett estimated that ten to fifteen minutes elapsed between the time she saw Quinones with Carter and the time of the shooting, the elapsed time was actually "a minute or two," because the "trauma" of "losing her boyfriend" made the "incident seem[ ] much longer [to Scarlett] than it really was." (State Summation: Tr. 690, 680.) The State's theory, while of dubious validity (given that the "trauma" to Scarlett took place after the lapse of time, not before it), was a fair comment on the evidence, as the State accurately described Scarlett's testimony, and merely hypothesized why Scarlett may have been mistaken.

***59** Finally, Quinones claims (Quinones 1st Dep't Br. at 51) that Morris should have objected to the following:

> But what most corroborates [the eyewitness identification testimony] is the defendant's action on August 20th of 1993 when Detective Sheridan and Detective Kaplan and their colleagues arrived at the scene.
>
> And I submit to you when this defendant saw those people approaching, he made them for police officers. You know, it's not too difficult to make plain clothes cops for who they are.
>
> He knew what they were there for. He recognized them. Those are cops. He knew what they were. And that's why he bolted.
>
> ....
>
> ... His running away was the confirmation of the identification by Carol Deans and Marion Scarlett.
>
> If he wasn't the killer, if some other person out there did it, what's he running for? He doesn't even know why the cops have arrived yet if he's innocent.

(State Summation: Tr. 692-93.)

Prior to the arrest, detectives had told Quinones' wife that they were seeking Quinones in order to place him in a lineup in connection with the shooting. (Milian: Tr. 526-27.) The prosecutor's statement was fair comment on the evidence: it was a fair inference from the evidence that Quinones, who knew the police were looking for him, recognized the plain clothes detectives as police; thus his flight could be considered an indication of guilt.

d. *Morris' Failure to Object to the Prosecutor's Statement That Because Of Her Fear, Deans Did Not Come Forward Sooner, Did Not Mention that her Daughter Saw the Shooting, and Was Unable to Identify Quinones as the Shooter*

Quinones asserts that the prosecutor had no evidentiary basis for claiming that Deans failed to talk to the police at the scene because she was afraid, and failed to testify on direct regarding her daughter being present because she was trying to protect her daughter. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 48-50, citing State Summation: Tr. 676-78.) In addition, Quinones asserts that the statements were improper because state courts have reversed convictions where the prosecution has even implied that the defendant had threatened witnesses.[FN89]

> FN89. *See People v. Facciolo,* 288 A.D.2d 392, 394, 734 N.Y.S .2d 179, 182 (2d Dep't 2001) ("[R]eversal is warranted because the prosecutor repeatedly argued during his summation that the four prosecution witnesses who were inside the produce store when the shooting occurred were reluctant to testify against the defendant, and implied that he had threatened them. These comments were not within the 'four corners of the evidence'...."); *People v. Rivera,* 160 A.D.2d 267, 272, 553 N.Y.S.2d 707, 711 (1st Dep't 1990) ("[T]he prosecutor's summation, which repeatedly alluded to [complainant's] fear and threats to his safety, ven-

> tured far beyond 'the four corners of the evidence,' and forayed well past what we consider to be an appropriate response to defense counsel's summation."); People v. Heppard, 121 A.D.2d 466, 468, 503 N.Y.S.2d 153, 155 (2d Dep't) ("We are disturbed, however, by the remarks made by the prosecutor during summation that strongly implied that the defendant had done something to put [eyewitness] in fear of testifying, when in fact no testimony had been adduced that [eyewitness] or anyone in her family had been threatened in any way. It is basic that on summation the prosecutor must stay within 'the four corners of the evidence' and not make reference to matters not in evidence ..., and we find the departure from that rule exhibited in this case to be highly improper."), *appeal denied,*68 N.Y.2d 813, 507 N.Y.S.2d 1030 (1986); People v. Lozada, 104 A.D.2d 663, 664-65, 480 N.Y.S.2d 117, 118-19 (2d Dep't 1984) ("[A] new trial is required because of certain improper comments made by the prosecutor in summation concerning threats made by the defendant against prospective witnesses. Although under certain circumstances evidence of threats against a witness may establish 'consciousness of guilt' and be admissible against an accused, here the prosecutor asked the defendant whether he had threatened the lives of witnesses and received a negative response. No evidence was adduced to controvert this answer. It is a basic proposition that the prosecutor, in summing up, must stay within 'the four corners of the evidence' and reference may not be made to matters not in evidence.") (citations omitted).

In this case, however, the prosecutor merely stated that Deans failed to mention her daughter because she was "being protective ... [s]he did not want her daughter involved in this." (State Summation: Tr. 677-79.) As for Deans herself not contacting the police earlier, the prosecutor explained that Deans

> was nervous and upset. She really did not want to be forced on that witness stand. Nobody wants to testify.
>
> Think of yourselves when you're being voir dired in this case. Many of you I'm sure were a little nervous when we were questioning you.
>
> ....
>
> That's different than being a witness, a witness who basically has to confront the person she saw do the shooting.
>
> ... She was traumatized by what happened. She was scared of what happened. And she certainly wasn't going to run forward in front of everybody in the street and say "I saw this," and take whatever risk that that entails.

***60** (State Summation: Tr. 678-79.) The statement that Deans was afraid of coming forward because of "whatever risk that that entails" appears to merely state the obvious-that witnesses to criminal acts commonly may be nervous about getting involved.

Quinones also faults Morris for failing to object when the prosecution claimed that Deans failed to identify Quinones in court because of "fear":

> So, there's no reason for [Deans] to lie. But certainly if she was going to lie, if she was hell bent on getting the defendant, the way you do it is come into this court and say "Yeah; that's the man I saw doing the shooting."
>
> Instead what happened, I submit to you, just like at the lineup, she froze. She was scared.

(State Summation: Tr. 681-82.)

The prosecutor's statement was patently improper, as the First Department explained in identical circumstances:

> It was blatantly improper for the prosecutrix to suggest that the victim's inability to make an in-court identification was due to fear, not an inability to recognize, especially since the People had been permitted, pursuant to CPL 60.25, to introduce third-party testimony about a prior out-of-court identification by the victim. Third-party testimony of a prior out-of-court identification may not be admitted where the eyewitness's failure to make an in-court identification is predicated on fear.... Thus,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> the People would have it both ways, utilizing the CPL 60.25 exception based on the victim's present inability to recognize the perpetrator and, at the same time, suggesting that the victim's failure to make an identification was due to fear.

*People v. Weeks,* 156 A.D.2d 133, 134, 548 N.Y.S.2d 179, 180 (1st Dep't 1989), *appeal denied,*75 N.Y.2d 819, 552 N.Y.S.2d 569 (1990).[FN90]

> FN90. The prosecutor's statement also contradicted the evidence, as Deans testified that she could not identify Quinones because she "just had sort of a profile" (Deans: Tr. 429), not because of fear.

Morris, however, did object to the prosecutor's assertion regarding Deans' failure to identify Quinones, and was promptly overruled. (State Summation: Tr. 682.) [FN91] The prosecutor then went on to develop, in some detail, his unsupported theory that Deans "suppressed" her memory of the shooting out of fear: "I submit to you in her trauma and her fear she suppressed her recollection of the defendant. She did not want to remember. And so, two years ago after that lineup she suppressed it. But it was fear and fright that made her unable to identify the defendant in this court." (State Summation: Tr. 682-84.) While these statements were certainly objectionable, Morris can hardly be faulted for failing to lodge yet another objection so soon after the trial court overruled his earlier objection to the same line of reasoning. *See,e.g.,Bennett v. Angelone,* 92 F.3d 1336, 1349 (4th Cir.) ("[R]efraining from objecting to avoid irritating the jury is a standard trial tactic."), *cert. denied,*519 U.S. 1002, 117 S.Ct. 503 (1996); *Bussard v. Lockhart,* 32 F.3d 322, 324 (8th Cir.1994) ("Counsel's decision to object during the prosecutor's summation must take into account the possibility that the court will overrule it and that the objection will either antagonize the jury or underscore the prosecutor's words in their minds. Thus, the question we have to ask is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection. In this case, defense counsel's decisions not to object to the comments were reasonable.").

> FN91. This was Morris' only objection during the State's summation.

6. *Quinones' Claim that Morris Failed to Object to the Trial Court's Erroneous Marshaling of the Evidence*

***61** Quinones faults Morris for failing to object to the trial judge's allegedly erroneous marshaling of the evidence during the jury charge. (Dkt. No. 1: Pet. Ex. A: Quinones 1st Dep't Br. at 51-52.)

In the main jury charge, the court stated that: "Ms. Scarlett testified that within minutes of his being shot, the defendant was having some kind of a dispute or agitated discussion with the deceased, Lamont Carter." (Charge: Tr. 742.) [FN92]

> FN92. The court substantially repeated this in a supplemental charge responding to a jury note requesting the identification charge (Tr. 796): Scarlett "testified that within minutes prior to his being shot, the defendant was having some kind of a dispute or agitated discussion with the deceased, Lamont Carter." (Tr. 801.)

Quinones' principal objection to this language has some limited substance. [FN93] Scarlett testified that after Carter exited a pizza parlor, "[h]e stopped to talk to someone" (Scarlett: Tr. 473-75), although Scarlett could not "hear what it was they were discussing at all" (*id.* 475). Scarlett approached Carter, "pulled on his sleeve and said that [she was] ready to go to the supermarket." (Scarlett: Tr. 475-76.) This caused Quinones to become "upset":

> FN93. Quinones also asserts that it was Ms. Scarlett's "estimate" that "[a]bout five or ten minutes" elapsed between the time she left Carter and the time of the shooting. (Scarlett: Tr. 482, *seeid.* at 497.) Quinones thus assigns error to the court's characterization of the time lapse as "within minutes." (Quinones 1st Dep't Br. at 52.) This Court disagrees. *Cf.,e.g.,Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *25 (S.D.N.Y. May 31, 2002) (Peck, M.J.) ("It is settled law that 'when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute' ineffective assistance of counsel under Strickland."), *report & rec. adopted,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D.J.).

A.... Because [Carter] had turned his attention to me and he was answering back to me, you know, about what I said.

Q. Who was answering back to you?

A. [Carter] was talking back to me, and the person he was talking to [Quinones] got agitated like.

Q. What did the defendant do?

A. He said like "Yo, I'm talking to you, man." And he said-and [Carter] answered him "Just cool, you know. I'm talking to my lady," and "Hold up."

....

Q. Now, you indicated the defendant got angry when [Carter] turned his attention to you, is that correct?

A. Yeah.

....

Q. What do you mean he got "agitated"? What did he do, the defendant?

A. He had his hands in his pockets. "I'm talking to you, man, you know; we're talking," and sort of like that.

(Scarlett: Tr. 476-79.)

Based on Scarlett's testimony, one could construe Quinones' annoyance as a normal response to being rudely interrupted-not the kind of exchange that would normally motivate a murder. As Quinones explained, "[t]he more hostile the tone of the conversation, the more credible the inference that Quinones bore ill will towards Carter and might have shot him." (Quinones 1st Dep't Br. at 52.) FN94 Nevertheless, the court's charge language-"some kind of a dispute or agitated discussion"-cannot be deemed erroneous. Scarlett did, after all, repeatedly describe Quinones as "agitated," and Quinones' verbal altercation could reasonably be described as a "dispute." By modifying the "dispute or agitated discussion" language with the phrase "some kind of," the court described a myriad of possibilities. Accordingly, while the charge may have failed to capture the flavor of Scarlett's testimony, the language was not truly erroneous, and thus Morris' failure to object cannot be deemed error.

FN94. The court's characterization of the Quinones-Carter discussion was understandable, given that Detective Milian testified at the *Wade* hearing that Scarlett identified Quinones in the photo array by stating " 'This is the guy that was involved in the fight with [Carter].' ' (Milian: H. 14; *see alsoid.* at 13 ("argument"); *id.* at 27 ("fight"); *id.* at 49 ("fight") .) Moreover, the State repeatedly emphasized in its opening statement that Quinones and Carter had "argued," even prior to Scarlett tugging on Carter's sleeve. (Tr. 391-92.) At trial, however, Scarlett never mentioned any "fight," and certainly did not testify that Quinones and Carter were arguing when she arrived. The court and both sides' counsel apparently conflated the *Wade* and trial testimony.

However, this Court is troubled by Morris' own repeated and gratuitous references to the Quinones-Carter discussion as an "argument," both in Morris' summation (Defense Summation: Tr. 658, 666-67) and cross-examination of Scarlett (Scarlett: Tr. 488, 490, 491, 495, 497). (*See* Quinones 1st Dep't Br. at 44.) Indeed, Morris highlighted the hostile nature of the "argument" by lamely noting to the jury that "[t]here was never any threats of violence." (Defense Summation: Tr. 667.) Instead of arguing that Quinones' alleged "agitation" was a normal display of annoyance in response to a rude interruption and hardly a motivation for murder, Morris put the worst possible spin on the situation, apparently based on Detective Milian's *Wade* hearing testimony (Milian: H. 13-14).FN95 Decisions made out of ignorance of the relevant testimony cannot be characterized as "strategic" under *Strickland.See,e.g.,Pavel v. Hollins,* 261 F.3d 210, 218 n. 11 (2d Cir.2001). Morris should have at least advocated an interpretation that helped, rather than undermined, his client's case.

FN95. Morris also failed to object to the prosecution's repeated reference to an "ar-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

gument." (State Summation: Tr. 688-89 ("As Lamont came out of the pizza parlor, that's when he's approached by the defendant, and the defendant and Lamont are having an argument. [Ms. Scarlett] doesn't know what the argument is about, and I'm not going to ask you to conjecture what the argument was about, or to speculate what the argument was about. But they were arguing."); *see alsoid.* at 686-87.)

***62** Quinones also claims that Morris erred by not objecting to the court's charge regarding the timing of Deans' pretrial identification. (Quinones 1st Dep't Br. at 52.) In its main jury charge, the court stated:

> The evidence is that the crimes charged were committed on December 31, 1992. This trial is now being held some 2-1/2 years later.
>
> It is, therefore, relevant to establish that *shortly after the commission of the crimes charged while the witness' memory was, perhaps, fresher than at present,* Carol Deans picked out and identified this defendant, Edgar Quinones, as the perpetrator of the crime at a lineup.

....

> The People contend that such [prior identification] evidence is reliable because of the *proximity of the identification to the event....*
>
> However, the defendant contends that the witness Carol Deans did not actually identify the defendant but made a mistake in the identification of the defendant by identifying merely a profile.

(Charge: 744-46, emphasis added.)

Immediately after delivering the main jury charge, and in response to a request by Morris that the court emphasize Deans' inability to make an in-court identification, the court delivered a supplemental charge providing, in relevant part:

> [W]hen I spoke of the identification by Ms. Deans, I'm referring to the identification that she made at the lineup of August 20th of 1993....
>
> As you are all aware, [Ms. Deans] made no in-court identification when she testified here two days ago, but she did indicate her identification which was made eight months after the event in August of 1993.

(Charge: Tr. 753.) FN96

FN96. During deliberations, in response to a note requesting "the identification charge" (Tr. 796), the court substantially repeated the above language:

> Now, you will recall that the witness Carol Deans testified that after the crime she saw and identified the defendant at a lineup on August 20, 1993, at the 25th Precinct.
>
> The evidence is that the crime charged was committed on December 31, 1992. This trial is now being held some 2-1/2 years later.
>
> It is, therefore, relevant to establish that shortly after the commission of the crimes charged while the witness' memory was, perhaps, fresher than at present, Carol Deans picked out and identified this defendant as the perpetrator of the crime at a lineup.
>
> ...
>
> The people contend that [the prior identification] evidence is reliable because of the proximity of the identification to the event, itself.
>
> That is, the proximity in time as well as to the nature and the spontaneity and the circumstances of the witness' identification at that time.
>
> The defendant, however, contends that the witness did not actually identify the defendant but that she made a mistake in the identification of the defendant by identifying only a profile.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Supp. Charge: Tr. 803-04.)

The court accurately described the lineup as taking place eight months after the shooting. However, the court's characterization of that lapse of time as "*shortly after* the commission of the crimes charged while the witness' memory was, perhaps, fresher than at present" was erroneous. (Charge: Tr. 745.) The Supreme Court has held that "a lapse of seven months between the [crime] and the confrontation ... would be a seriously negative factor in most cases ." *Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 383 (1972). By effectively characterizing the lapse of time as insignificant, the court precluded the jury from reasonably questioning the "freshness" of Deans' identification so long after the shooting. Morris' error in not objecting to this aspect of the charge was compounded by his failure to raise the timing issue in his summation . FN97

FN97. This Court's criticism of Morris' performance is nonetheless tempered by the fact that the court's charge was delivered orally, and was apparently not provided to counsel for advance inspection. *SeeBloomer v. United States,* 162 F.3d 187, 193 (2d Cir.1998) (recognizing greater difficulty of perceiving error in oral jury instruction at trial than written record on appeal); *United States v. Birbal,* 62 F.3d 456, 459 n. 1 (2d Cir.1995) (noting difficulty of discerning specific flaws in oral jury charges); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *27 (S.D.N.Y. May 31, 2002) (Peck, M.J.) (trial counsel's failure to object was not erroneous, especially where the trial counsel "had to make his decision without advance warning (or research help) during trial."), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D.J.).

*7. Morris' Aggregated Errors Did Not Amount to Deficient Performance Prejudicing Quinones*

As noted above (see page 38), any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury." ' *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland v. Washington,* 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2069 (1984)). Morris' errors included the following: (1) failing to object to Officer Ramos' testimony that he heard an unidentified woman at the crime scene yell: " 'The Puerto Rican did it" ' (Point V.B.2.c above); (2) failing to object to Detective Milian's testimony that Quinones was arrested by the "Career Criminal Apprehension Unit" (Point V.B.2.d above); (3) repeatedly describing the discussion between Quinones and Carter as an argument (Point V.B.6 above); and (4) failing to object to the jury charge characterizing Dean' lineup identification as taking place "shortly after" the shooting (Point V.B.6 above).

***63***Strickland,* of course, teaches that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." ' *Id* .

Even if Morris' actions resulted from error rather than strategy, trial counsel's performance must still be accorded a certain degree of deference, as the Sixth Amendment does not guarantee "error-free, perfect representation," *Morris v. Garvin,* No. 98-CV-4661, 2000 WL 1692845 at *3 (E.D.N.Y. Oct. 10, 2000), but merely a "wide range of professionally competent assistance," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Quinones must show that Morris "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064;*seeSmith v. Robbins,* 528 U.S. 259, 284, 120 S.Ct. 746, 763 (2000) (" 'We address not what is prudent or appropriate, but only what is constitutionally compelled." ') (quoting *United States v. Cronic,* 466 U.S. 648, 665, n. 38, 104 S.Ct. 2039, 2050 n. 38 (1984)); *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 3126 (1987) (same); *Castro-Poupart v. United States,* No. 91-1877, 976 F.2d 724 (table), 1992 WL 240655 at *2 (1st Cir. Sept. 30, 1992) ("Effective assistance is not necessarily error free assistance.); *Lancaster v. Newsome,* 880 F.2d 362, 375 (11th Cir.1989) ( "petitioner was not entitled to error-free representation, only representation that `fell within the range of competence demanded of attorneys in criminal cases"); *United States v. DiTom-*

*maso,* 817 F.2d 201, 216 (2d Cir.1987) (although, "[t]o put it charitably," trial counsel's performance did not "furnish[ ] a full model for aspiring advocates," it did not fall outside the "wide range of reasonable professional assistance"); *Wise v. Smith,* 735 F.2d 735, 739 (2d Cir.1984) (defendant "was not entitled to a perfect defense, and the cumulative effect of the errors and omissions that we might find do not amount to a denial of effective assistance of counsel"); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *26 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D. J.); *Solomon v. Commissioner of Correctional Servs.,* 786 F.Supp. 218, 226 (E.D.N.Y.1992) ("Although petitioner's counsel undoubtedly made certain errors, this record indicates that viewed in the context of the entire record, he did a reasonable job.").

In the related context of what constitute "cause" for a procedural complaint, the Supreme Court has pointed out that there is some level of attorney mistake that, though prejudicial to the defendant, does not amount to ineptitude of constitutional proportions:

***64** [T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. At least with respect to defaults that occur at trial, the Court of Appeals' holding that ignorant or inadvertent attorney error is cause for any resulting procedural default is plainly inconsistent with *Engle.* It is no less inconsistent with the purposes served by the cause and prejudice standard.

....

So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington,supra,* we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.

*Murray v. Carrier,* 477 U.S. 478, 486-88, 106 S.Ct. 2639, 2644-45 (1986). FN98

FN98. *See* *Engle v. Isaac,* 456 U.S. 107, 133-34, 102 S.Ct. 1558, 1575 (1982) ("Counsel might have overlooked or chosen to omit respondents' due process argument while pursuing other avenues of defense. We have long recognized, however, that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *accord,e.g.,* *Larrea v. Bennett,* 2002 WL 1173564 at *27.

The Court, as noted above, has read the entire trial transcript. Clearly, Morris was no Clarence Darrow or Arthur Liman. But judged in context and without the benefit of hindsight, Morris' aggregated errors did not constitute ineffective assistance in violation of Quinones' Sixth Amendment rights. Moreover, applying the AEDPA standard, this Court cannot say that the First Department's rejection of Quinones' ineffective counsel claims constituted an objectively unreasonable application of Supreme Court precedent. *See* *Jones v. Stinson,* 229 F.3d 112, 121 (2d Cir.2000) (although Second Circuit might have found error had question been presented on direct review, under deferential AEDPA standard the appellate division's ruling was held not objectively unreasonable).

## *CONCLUSION*

For the foregoing reasons, Quinones' habeas claims should be DENIED. However, because the questions of whether Morris' alleged conflict or trial performance constituted ineffective assistance of counsel are not altogether free of doubt, even when reviewed under the deferential AEDPA review standard, the Court should issue a certificate of appealability. *See,e.g.,* *Miller-El v. Cockrell,* 123 S.Ct. 1029, 1039 (Feb. 25, 2003) (" § 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right." ' The statute "does not require a showing that the appeal will succeed. Accordingly, a court ... should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief."); *Slack v. McDaniel,* 529 U.S. 473, 475, 120 S.Ct. 1595, 1599 (2000) (certificate of appealability should issue where "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further" '); *Lucidore v. New York State Div. of Parole,* 209 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

107, 112 (2d Cir.) (certificate of appealability should issue "if the issues involved in a petition are debatable among jurists of reason, could be resolved in a different manner, or are adequate to deserve encouragement to proceed further"), *cert. denied,*531 U.S. 873, 121 S.Ct. 175 (2000).

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

***65** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also*Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley III, 500 Pearl Street, Room 2210, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Pauley. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,*513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,*506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2003.
Quinones v. Miller
Not Reported in F.Supp.2d, 2003 WL 21276429 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Brown v. State, No. M2005-02439-CCA-R3-PC, 2007 WL 293011 (Tenn. Crim. App.)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Nashville.
Earnest F. BROWN
v.
STATE of Tennessee.
**No. M2005-02439-CCA-R3-PC.**

Assigned on Briefs Sept. 20, 2006.
Feb. 2, 2007.

Direct Appeal from the Criminal Court for Davidson County, Nos.2003-D-2461, 2004-A-77, 2004-B-1679, 2004-C-2030, and 2004-C-2039; Steve R. Dozier, Judge.
Dwight E. Scott, Nashville, Tennessee, for the appellant, Earnest F. Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; David E. Coenen, Assistant Attorney General, and Victor S. (Torry) Johnson III, District Attorney General; Pamela Anderson, Assistant District Attorney General; and Ami Eisenbeck, Assistant District Attorney General, for the appellee, the State of Tennessee.

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

**OPINION**

THOMAS T. WOODALL, J.

*1 In October 2004, Petitioner, Earnest F. Brown, pled guilty to two counts of theft of property over $1,000.00, one count of burglary, two counts of burglary of a motor vehicle, and one count of assault. In exchange for his plea, the trial court sentenced Petitioner to serve two years as a Range I offender for the first conviction of theft over $1,000.00, four years as a Range II offender for the second conviction of theft over $1,000.00, two years as a Range II offender for each burglary of a motor vehicle conviction, and eleven months, twenty-nine days for the assault conviction, for a total effective sentence of fourteen (14) years, eleven (11) months, twenty-nine (29) days. In June 2005, Petitioner filed a pro se petition for post-conviction relief. After appointing counsel and conducting a hearing, the post-conviction court denied Petitioner post-conviction relief. Petitioner now appeals that denial arguing that the trial court erred in denying his petition because (1) his guilty pleas were not knowingly and voluntarily entered, and (2) he did not receive effective assistance of counsel. After a thorough review of the record, we affirm the judgment of the trial court.

**I. Guilty Plea**

At the guilty plea proceeding, Petitioner stated that he was taking the prescribed medications Haldol, Lithium, and Thorazine, but indicated that he understood why he was in court and stated that his purpose for being in court was "taking a plea." The State outlined the offenses which Petitioner was pleading guilty to, and the trial court explained the range of punishment for each offense. Petitioner affirmed that he understood what he was being charged with and the range of punishment as well as the recommended sentence. He likewise affirmed that he had discussed the charges with his attorney and that he was satisfied with counsel's representation.

Petitioner said that he did not have any questions regarding his guilty pleas. He acknowledged that if at any time he did not understand some part of the proceedings he should tell his trial counsel and the court would clarify any confusing issue. He further acknowledged his right to a jury trial with respect to each offense and his understanding that by entering a guilty plea he was waiving his right to a jury trial. Petitioner indicated that it was his choice to enter a guilty plea and that he was doing so voluntarily after reviewing his plea agreement with counsel. He affirmed his understanding that these convictions could be used against him in the future. He reiterated that he understood what he was doing as well as the consequences of his pleas. The following stipulated facts were then read into evidence by the State:

Your Honor, on Case Two-thousand-four-B-sixteen-ninety-seven, as to the "D" felony theft, the State's proof would be that, on April ninth of two-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

thousand-four, at about six-twenty in the morning, Sergeant Lee Dupie observed a traffic violation by the driver of a red Chevrolet truck.

***2** He stopped this individual, determined the identity to be this Defendant, Mr. Earnest Brown, who did not have a driver's license on his person.

At that time Sergeant Dupie issued him a traffic citation for running a red light, a non-turn-signal and a seat-belt law.

Approximately a minute later, Kathy Fugate telephoned the Metro Police and stated that her nephew, the Defendant, Earnest Brown, had just left her place of employment and that she believed that he was driving a truck that was possibly stolen.

The police were dispatched the description; and the police were able to find that the Chevrolet pickup that the Defendant was driving was registered to Leonard-Lozano, who had not even been aware that his vehicle was missing or that it was stolen yet at that point.

All of this occurred here in Nashville, Davidson County; that the truck was valued over a thousand dollars, and the Defendant did not have the consent to have the vehicle (sic).

As to two-thousand-four-A-seven-seven, the State's proof would be that, on November twenty-eighth of two-thousand-and-three, a Metro Police officer observed a white Chevrolet Blazer, that had the name, "Jesus," on a license place on the front of it.

This vehicle was located at Holly Street and South Eleventh Street, here in Nashville, Davidson County.

Officer Proctor had previously read on his computer that a vehicle matching that description had been stolen from Sixteen-Ten Gartland Avenue.

He turned around to get behind the vehicle, confirmed that there was a pickup on the vehicle, and then initiated his emergency equipment. He stopped the vehicle, and the Defendant, Earnest Brown, along with the Co-defendant, Randall Bowman, were in the vehicle.

The-the vehicle was valued at approximately three-thousand dollars. The Defendant did not have the consent of the owner to be in possession of this vehicle.

And the Co-defendant in this case, Randall Bowman, who's previously pled, has given a proffer to the State and would've testified, had this gone to trial.

As to Two-thousand-four-C-twenty-thirty, the State's proof would be that, on May seventeenth of two-thousand-and-four, Mr. Kevin Perkins would testify that, when he came to his home, he was walking up the stairs to his apartment, when he encountered the Defendant, that he noticed that the Defendant was wearing his tennis shoes.

When the victim asked-Mr. Perkins asked for his shoes back, the Defendant then told him to try and take them if he wanted them. The Defendant then tried to hit Mr. Perkins with a beer bottle.

All of this occurred here in Nashville, Davidson County, on May seventeenth of two-thousand-four.

As to Two-thousand-four-C-twenty-thirty-nine, the State's proof would be that, on May twenty-sixth of two-thousand-and-four, Officer Womack was dispatched to Thirteen-O-One Boscobel Street, in regards to a theft.

This location is here in Nashville, Davidson County. Mr. Frank Pierce had advised the police that his vehicle had been broken into and that some of the property taken from the vehicle was left lying next to his vehicle.

***3** Mr. Pierce hid in the bushes, to watch and see if the person who did this was going to come back. The Defendant shortly thereafter walked back towards the vehicle; and hence (sic) he was beginning to grab the property, Mr. Pierce jumped out of the bushes, grabbed at him, chased the Defendant down the street, but he was able to get away.

Officer Womack went to the residence of the Defendant's grandparents and asked for consent to search the residence. This was after he had encountered Mr. Brown, read Mr. Brown his rights, and Mr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Brown denied knowing anything about this incident.

However, the saw that was stolen from Mr. Pierce's vehicle was inside the residence of his grandparents.

All of this occurred here in Nashville, Davidson County.

As to Two-thousand-three-D-twenty-four-sixty-one, the State's proof would be that, on April tenth of two-thousand-and-three, about nine-thirty that morning, an officer was dispatched to the victim's, Scott McEwen's, residence, at Twele-O-Two Boscobel Street, here in Nashville, Davidson County, East Nashville.

Mr. McEwen told the police that someone had broken into his garage. It was a garage that was not attached to the home. The garage had been forcibly broken into, as well as the vehicle which was inside the garage had been broken into (sic).

Several items were missing from the garage and car, including over a thousand dollars' worth of musical instruments, equipment, and electronic equipment.

No one observed the crime occur; however, the Metro Police Identification Section was able to lift latent prints from the driver's door frame of Mr. McEwen's vehicle, that was parked in the garage.

Those latent prints were developed and were found to match the left, middle fingerprint of the Defendant, or Mr. Brown, who happened to be a neighbor of Mr. McEwen.

He did not have Mr. McEwen's permission to have any of these items or be in his garage.

All of this occurred here in Nashville, Davidson County.

Following the recitation of the facts, the trial court questioned Petitioner as to whether he heard the facts and whether the statements about the burglaries, thefts, and assault were true. Petitioner affirmed that he heard the facts and that they were true. The court then asked for Petitioner's plea to which he responded he was pleading guilty on all charges, including two counts of theft over one thousand dollars, one count of assault, two counts of burglary of a motor vehicle, and burglary. The trial court accepted the pleas finding that they were knowingly and voluntarily entered.

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner's trial counsel, Tracey Robinson-Coffee, testified that she had been practicing law for approximately eight years and that seventy-five percent of her legal practice consisted of criminal defense. She stated that she represented Petitioner prior to the time he entered his guilty pleas. During the course of her representation, trial counsel spoke with Defendant "eight to ten times." During each of these discussions, trial counsel and Petitioner discussed the charges against him, the elements of each charge, the State's proof, and the potential range of punishment for each crime.

***4** Trial counsel said that she was initially retained to represent Petitioner in case number 2003-D-2461 when that case was pending in general sessions court. At that time, Petitioner had two other cases pending in circuit court. At the family's request, trial counsel took on the additional circuit court cases. Pending adjudication of these charges, Petitioner was arrested and charged with another crime. Trial counsel investigated each of the indictments independently because Petitioner's family did not have funds to hire a private investigator on his behalf.

Trial counsel recalled that Petitioner was charged with theft of property over one thousand dollars which involved an automobile owned by an individual named Mr. Lozano. Petitioner told trial counsel that he had permission to use the car because he had given the owner drugs in exchange for the use of the car. Trial counsel later determined that the individual with whom Petitioner made this exchange was not the true owner of the vehicle. Counsel attempted to contact this unknown individual using information provided by Petitioner. She was not able to contact this individual, nor was she able to contact Mr. Lozano despite making "several attempts."

Trial counsel recalled another case of theft over one thousand dollars which involved theft of a car from Ms. Heidi Taylor. She said that in this case, Petitioner was the passenger in the car and his co-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant was the driver. She could not recall the details of the car or its condition upon recovery. She likewise could not recall any attempt to negotiate a settlement on Petitioner's behalf lessening the theft charge to unauthorized use of a vehicle.

Although trial counsel had difficulty recalling the specifics of each of Petitioner's indictments, she stated that she did recall having problems negotiating with the State regarding a plea agreement on Petitioner's behalf. Specifically, she stated that the problem with negotiating a settlement was that "every single time that [Petitioner] would post a bond, he would pick up a new case. And basically what I understand of the law, when you are out on bond and you pick up a new case and you plead to these cases, the cases are going to be run consecutive and not concurrent. So, that was the problem I was having with trying to negotiate a plea with the State."

Trial counsel said that Petitioner did indicate at times that he wanted to go to trial rather than plead guilty to the charges. They discussed the possibility of going to trial because there were possible defenses to some of the charges, namely the theft charge wherein Petitioner was the passenger in the car and not the driver. She explained to Petitioner that although he might be found not guilty on some of the charges if he went to trial, he did not have a defense to all of the charges and would most likely be found guilty on some counts. Because Petitioner would likely be found guilty, and because he was a Range II offender at the outset, trial counsel advised him against trial because he would be risking a possible twenty-year jail sentence.

***5** Trial counsel said that she read and discussed Petitioner's plea agreement with him, including the charges he was pleading to and the range of punishment. She said that she was aware that Petitioner suffered from bipolar disorder and that past, personal experiences had caused him additional psychological damage. Trial counsel had Petitioner evaluated by a psychiatrist who found Petitioner competent to stand trial. Trial counsel was aware that Petitioner was prescribed psychotropic medication by a doctor, and that he was taking this medication on the day that he entered his guilty pleas. She said that nevertheless, Petitioner indicated that he understood what he was doing when he entered his guilty pleas.

Trial counsel said that Petitioner had been taking the psychotropic drugs prior to his incarceration. After his initial incarceration, Petitioner went without the drugs for a time period, but he began taking them again and had been taking the drugs for "a couple of months" before he entered his guilty pleas. Trial counsel met with Petitioner in jail while he was taking the drugs. According to counsel, during these meetings, Petitioner engaged in "competent conversation" and they were able to intelligently discuss his cases and the range of punishment involved with each case. She stated that "[i]n fact, ... the medications were somewhat calming to him. Because prior to him taking the medications when I would see him in jail, I remember one or two incidents that he was kind of agitated. So, I think that the medications helped him." She likewise discussed all of the available discovery with Petitioner. She reiterated that she and Petitioner repeatedly discussed the various aspects of his cases. On the day of his pleas, they discussed these things again as well as the plea agreement itself. Petitioner did not ask any questions regarding what he was pleading guilty to or the range of punishment involved. He appeared to trial counsel to understand all aspects of the discussion.

Petitioner testified that he did not know how many times he met with trial counsel prior to entering his guilty pleas. He said that trial counsel discussed each of his cases with him, but he did not know if she investigated the charges against him. Petitioner initially did not recall that the stipulated facts were read into the record at the guilty plea proceeding. However, after having his memory refreshed, Petitioner acknowledged that the facts recited at his guilty hearing were true with the exception that the truck was not stolen. With respect to the conviction wherein he was the passenger in the car, he denied his guilt and any knowledge that the car was stolen although he remembered pleading guilty to the crime. Petitioner said he did not know why he had agreed to the facts as true other than he was "messed up" on his medication at the time of his pleas.

Petitioner said that he was taking Haldol, Lithium, and Thorazine for bipolar disorder on the day he entered his guilty pleas. He said that he had been taking those kinds of medication "just about" all of his life. He did not recall the trial court asking him if he was taking any medication at the time of his guilty pleas, but stated that the drugs did affect his ability to un-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

derstand what he was doing when he pled guilty. He further stated that at the time of the post-conviction hearing, it had been "about eight months" since he had taken his medication and he "understand[s] a whole lot more now that [he] is off of them."

***6** Petitioner stated that he wanted to go to trial rather than plea. He denied any recollection that he waived his right to a jury trial during his guilty plea. He said that he did not inform the Court that he wanted a trial at the time of his plea because he "didn't know what [he] was doing at the time." Petitioner did not know if he told his attorney that he wanted a trial, and he could not recall what his attorney told him regarding whether he should go to trial. He stated, "[m]y attorney told me 14 years is the best I was going to get. So, I signed for it." Petitioner indicated that were he not taking his medication, he would not have agreed to enter his guilty pleas.

Petitioner initially stated that trial counsel did not go over the plea agreement document with him, nor did she discuss the elements of the crimes he was charged with or the State's evidence against him. Petitioner said that trial counsel failed to discuss possible defenses or to explain the State's burden of proof to him. However, on cross-examination, he admitted that trial counsel explained what he was being charged with and what each offense meant, and that because of this he was able to identify individuals trial counsel should speak with in conducting her investigations. He further admitted that trial counsel explained the range of punishment associated with each crime, and that in light of the evidence against him, she advised him to enter the plea agreement in exchange for a sentence of fourteen years, eleven months, twenty-nine days. Finding it in his best interest to plea, Petitioner acted on trial counsel's advice.

At the conclusion of the post-conviction hearing, the post-conviction court denied the petition for post-conviction relief. The court then issued an order denying the petition in which the court made the following findings of fact and conclusions of law:

> The petitioner's first claim is that trial counsel was ineffective in that trial counsel failed to counsel the petitioner thoroughly regarding the possible outcome of a trial should the case have proceeded to trial. The Court heard adequate proof, *that was not rebutted by the petitioner,* that trial counsel thoroughly investigated the facts and circumstances of the case. Ms. Robinson-Coffee testified that she met with the petitioner a total of "eight to ten times" and discussed the State's strength of the evidence thoroughly with the petitioner including the possible outcome should a jury convict the petitioner in each of the aforementioned indictments. The witness also stated that she recalled explaining the probability of a conviction and the chance, if any, of a successful defense should the cases had [sic] proceeded to respective trials. The defendant conceded that trial counsel met with him on various occasions and discussed "all the cases." Based on this admission, and the uncontroverted proof offered by the State, the petitioner has failed to show, by clear and convincing evidence, that counsel was "not functioning as the counsel guaranteed the defendant by the Sixth Amendment" in regards to his first issue. *Strickland* at 687; *See also*Tennessee Code Annotated § 40-30-210. Therefore, the petitioner's initial claim is respectfully without merit.

> ***7** The petitioner's second claim is that trial counsel failed to adequately [apprize] the petitioner of his possible defenses and what the State's evidence was against the petitioner. The Court must note, as suggested above, that trial counsel stated that she met with the petitioner "eight to ten times" regarding the various charges and that the petitioner conceded on cross-examination that trial counsel met and discussed all the cases with him. This, in the Court's opinion, is proof in and of itself that the petitioner has failed to carry his burden in accordance with *Strickland,* supra. However, the Court shall elaborate further. In 2004-A-77, Ms. Robinson-Coffee stated she was made aware of a possible defense by the petitioner in that the petitioner was a passenger of the car that was stolen from Heidi Taylor. However, trial counsel felt that a problem with this possible "defense" was that the petitioner was facing numerous charges and committed the acts while out on bond, thus facing the possibility of the convictions running consecutive by law. In 2004-B-1697 the petitioner alleged that he made trial counsel aware of a possible defense in that he received the stolen car from Leonard Lozano with permission. However, the Court must point out that at the entrance of the guilty plea, the petitioner, when asked by the Court if the facts stated by the State were true in that he stole the vehicle, the petitioner responded that they were. This is supported by a transcript of the guilty plea which was intro-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

duced as an exhibit (Exhibit 1). Therefore, the Court is of the opinion that the petitioner has failed to show by clear and convincing evidence that trial counsel's work was not "within the range of competence demanded of attorney's in criminal cases." *Baxter* at 936. Nor has the petitioner established that his case was prejudiced as a result of counsel's ineffectiveness. *Strickland* at 697. Therefore, in accordance with *Strickland,* supra, and its progeny, the petitioner, as to his second contention, has failed to show to this Court a deficiency with counsel['s] performance that offends his Sixth Amendment rights.

The petitioner's third and final issue is that trial counsel was ineffective in that trial counsel let the petitioner enter guilty pleas in the above-styled cases while under the influence of mind-altering drugs and, thus, it can not be said that the petitioner knowingly and intelligently waived his constitutional rights at the entrance of such pleas.

....

The petitioner claims his convictions are invalid in light of violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution as well as the Due Process provisions of the United States and Tennessee Constitution in that his plea of guilty was involuntary and was not knowingly and intelligently entered. *Boykin* at 338. The petitioner asserts that at the time of entering his guilty plea, he was under the effects of Haldol, Lithium, and Thorazine and that these "mind-altering" drugs had an effect on his ability to comprehend the nature and consequences of the rights to which he waived in entering the guilty pleas. Trial counsel testified that she had competent conversations with the petitioner regarding his cases with the assistance of the medications stated above. The petitioner avers that he was [sic] received such "mind-altering" drugs at the time of the plea and that such a chemical consumption had a direct effect at the entrance of the plea. The Court has reviewed the transcript and points out that the Court was made aware of the petitioner's medicine consumption at the time of the plea. The court must also point out that the Court asked the petitioner if he understood what he was in Court for and the petitioner responded "taking a plea." The court also instructed the petitioner that at if any time he does not understand what the inquiries are, he could ask trial counsel or the court. The petitioner responded that he understood. The Court is of the opinion that the petitioner has failed to show that his entrance of the plea was the result of "mind-altering" drugs and, therefore, his plea was not entered into *voluntarily, understandingly and intelligently. Boykin* at 338. Trial counsel stated she had numerous conversations with the petitioner while on the same medications and that the exchanges were competently conducted. Further, the Court went so far as to ask the petitioner if he understood why he was in court and he responded that he was present to enter a plea of guilty. The court must state that this averment fails to rise to meritorious claim under *Strickland,* supra, and its progeny. Therefore, the third issue is without merit.

***8** The Court has reviewed the record and recalls that trial counsel Tracey Robinson-Coffee represented the petitioner with vigor and zealousness. Under the standards set forth under *Strickland,* supra, the petitioner has not carried his burden by clear and convincing proof. Based on the forgoing analysis, the Court is of the opinion that the petitioner's petition as to any and all issues raised should be respectfully *denied.*

**III. Analysis**

**A. Post-Conviction Standard of Review**

To sustain a petition for post-conviction relief, a defendant must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. *See*T.C.A. § 40-30-110(f); *Momon v. State,* 18 S.W.3d 152, 156 (Tenn.1999). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns,* 6 S.W.3d 453, 461 (Tenn.1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the trial court's findings unless the evidence in the record preponderates against those findings. *See* Henley v. State, 960 S.W.2d 572, 578 (Tenn.1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn.Crim.App.1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See* State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn.2001). All questions concerning the credibility

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *See* Momon, 18 S.W.3d at 156; *Henley*, 960 S.W.2d at 578-79. However, the post-conviction court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *See* Fields v. State, 40 S.W.3d 450, 458 (Tenn.2001).

**B. Knowing and Voluntary Guilty Plea**

Petitioner contends that his guilty pleas were not knowingly and voluntarily entered because he received inadequate advice from counsel and because he was under the influence of "mind-altering" drugs at the time of his guilty pleas. Specifically, Petitioner asserts that his pleas were not knowingly entered because trial counsel failed to adequately inform him of the possible sentences he would receive should his case proceed to trial. He further contends that he was not adequately advised regarding the elements of the crimes charged, the evidence that the State had against him, the State's burden of proof, or possible defenses. He argues that although the guilty plea agreement was explained to him by trial counsel, "insufficient time was taken to ensure that Petitioner understood what he was doing." He asserts that because of his medication, he "did not fully comprehend what he was doing or the sentence he was going to receive." He argues that trial counsel was aware he suffered from psychological issues and was taking medication, but took no "special precautions" to ensure that he knowingly entered his guilty pleas. He further argues that the medication caused him to agree to a set of facts that were not true. He asserts that because his pleas were not knowingly given it was in violation of his Fourteenth Amendment rights.

***9** As noted by the trial court, a guilty plea must be voluntarily, understandingly, and knowingly entered to pass constitutional muster. Boykin v. Alabama, 395 U.S. 238, 242, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); State v. Neal, 810 S.W.2d 131, 135 (Tenn.1991), *overruled in part on other grounds by* Blankenship v. State, 858 S.W.2d 897 (Tenn.1993). In examining whether a guilty plea was knowingly and voluntarily entered, the standard is " 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " Jaco v. State, 120 S.W.3d 828, 831 (Tenn.2003) (quoting North Carolina v. Alford, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970)). As further noted by the trial court, a court may consider a number of factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: 1) the defendant's relative intelligence; 2) the defendant's familiarity with criminal proceedings; 3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; 4) the advice of counsel and the court about the charges and the penalty to be imposed; and 5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.*

Before accepting a guilty plea, the trial court must question the defendant on the record to ensure that the defendant is knowingly and voluntarily entering the plea. *See* Boykin, 395 U.S. at 243-44, 89 S.Ct. 1709. In *Boykin v. Alabama,* the United States Supreme Court held that the trial court must question the defendant to ensure the defendant understands that by entering the plea he is waiving the privilege against self-incrimination, the right to a jury trial, and the right to confront his accusers. 395 U.S. at 243-44, 89 S.Ct. 1709.

Applying these principals, we agree with the trial court and conclude that Petitioner's guilty plea was knowingly and voluntarily entered. The transcript from the guilty plea proceeding reveals that the trial court correctly informed Petitioner regarding his constitutional rights and specifically asked if he understood that he was relinquishing those rights by pleading guilty. According to the record, Petitioner repeatedly affirmed his understanding of the proceedings, the charges against him, and the consequences of his decision to plead guilty. Petitioner affirmed that he was satisfied with trial counsel's representation. Petitioner acknowledged that he was taking the prescribed medicines, Haldol, Lithium, and Thorazine, but assured the trial court that he understood what was happening and why he was in court. He stated that his purpose for being in court was "taking a plea." He affirmed that he was entering the plea voluntarily after informed discussions with counsel. Additionally, trial counsel testified that she had several discussions with Petitioner regarding the charges, the evidence against him, the State's burden of proof, the possible range of punishment for each crime, and the consequences of going to trial versus accepting a plea

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

agreement. Several of these discussions were conducted while Petitioner was taking his medication. As noted by the trial court, trial counsel testified that they were "competent" conversations wherein she and Petitioner intelligently discussed his cases. She also testified that she hired a psychiatrist to evaluate Petitioner, and the psychiatrist determined that Petitioner was competent to stand trial. Moreover, Petitioner testified on cross-examination that he did discuss pertinent issues with counsel, including possible sentences he might receive if he choose to go to trial. He admitted that after having these discussions with counsel, he made the decision to plead guilty because it was the best option. As such, we cannot conclude that Petitioner's guilty pleas were unknowingly and involuntarily entered in violation of his constitutional rights.

**C. Ineffective Assistance of Counsel**

***10** Petitioner next argues that trial counsel provided ineffective assistance of counsel because she failed to adequately investigate the charges against him, failed to discuss the elements of the crimes with which he was charged, failed to discuss the State's evidence against him, failed to discuss possible defenses, failed to explain the State's burden of proof, and failed to adequately advise him regarding his guilty plea.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that the services rendered by trial counsel were deficient and that the deficient performance was prejudicial. *See* Powers v. State, 942 S.W.2d 551, 558 (Tenn.Crim.App.1996). When a petitioner claims ineffective assistance of counsel in relation to a guilty plea, the petitioner must prove that counsel performed deficiently and, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley,* 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See* id. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact ... thus, [appellate] review of [these issues] is *de novo* " with no presumption of correctness. *State v. Burns,* 6 S.W.3d 453, 461 (Tenn.1999). Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn.Crim.App.1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State,* 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

Petitioner asserts that counsel did not adequately investigate the charges because she did not interview potential witnesses. He asserts that although counsel testified that she was unable to locate Mr. Lozano, Petitioner had identified Mr. Lozano and pointed him out to trial counsel in court. Petitioner asserts that had counsel interviewed Mr. Lozano, she would have discovered that Petitioner had permission to use Mr. Lozano's truck, which Petitioner was convicted of stealing, because he gave Mr. Lozano a "piece of dope" in exchange for use of the truck. Trial counsel testified that Petitioner initially told her he had exchanged drugs for permission to use the car. Trial counsel later discovered, however, that Petitioner had conducted this exchange with someone other than the car's true owner. Using information provided to her by Petitioner, trial counsel attempted to investigate Petitioner's allegations by contacting both the owner of the vehicle, Mr. Lozano, and the individual with whom Petitioner actually made the exchange. The contact information Petitioner gave to trial counsel was not accurate and consequently her attempts were unsuccessful. Mr. Lozano was not called to testify at the post-conviction hearing. *See Black v. State,* 794 S.W.2d 752, 755 (Tenn.Crim.App.1990) (imperative that witnesses testify to determine prejudice). Thus, Petitioner's argument is essentially a request that we

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

review the post conviction court's credibility determinations as between Petitioner and trial counsel. The post-conviction court chose to accredit the testimony of trial counsel over that of Petitioner. As previously stated, credibility determinations are entrusted to the post-conviction court. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn .1999). We see nothing in the record to preponderate against the post-conviction court's findings.

***11** Petitioner offers no specific factual support for his remaining claims that trial counsel was ineffective. He makes only bare allegations that counsel was ineffective because she failed to discuss the elements of the crimes with which he was charged, failed to discuss the State's evidence against him, failed to discuss possible defenses, failed to explain the State's burden of proof, and failed to adequately advise him regarding his guilty plea. Trial counsel testified that she met with Petitioner "eight to ten times." During each of these meetings, trial counsel and Petitioner discussed the charges against him, the range of punishment, the elements of the crimes charged, the State's proof, and possible defenses. At the post-conviction hearing, Petitioner admitted that these conversations had taken place and that trial counsel had discussed these various aspects of his cases with him. The post-conviction court found that "[b]ased on this admission, and the uncontroverted proof offered by the State, the petitioner has failed to show, by clear and convincing evidence, that counsel was 'not functioning as the counsel guaranteed the defendant by the Sixth Amendment.' ... Nor, has the petitioner established that his case was prejudiced as a result of counsel's ineffectiveness." We agree with the post-conviction court. Petitioner has failed to meet his burden of demonstrating that counsel's performance was deficient. Accordingly, he is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

Tenn.Crim.App.,2007.
Brown v. State
Not Reported in S.W.3d, 2007 WL 293011 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.