**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 7**

**DOCUMENT 4**

---

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# EASTERN DIVISION
# AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTA GAIL PIKE | ) | |
| | ) | C.C.A. No.: E2009-00016-CCA-R3-PD |
| Appellant, | ) | |
| | ) | KNOX COUNTY |
| v. | ) | Case No. 68280 |
| | ) | |
| STATE OF TENNESSEE, | ) | Post-Conviction |
| | ) | |
| Appellee. | ) | (CAPITAL CASE) |

ON APPEAL AS OF RIGHT FROM THE JUDGMENT OF
DIVISION THREE OF CRIMINAL COURT FOR THE SIXTH JUDICIAL DISTRICT
AT KNOXVILLE, KNOX COUNTY, TENNESSEE

---

## SUPPLEMENTAL BRIEF OF THE APPELLANT

---

Donald E. Dawson, BPR # 010723
Post-Conviction Defender

Avram Frey, BPR # 028520
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331

Counsel for Christa Gail Pike

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

I. PROCEDURAL HISTORY ..... 1

II. FACTUAL HISTORY ..... 1

III. ARGUMENT ..... 1

A. The Holding in Frazier ..... 2

1. *Frazier requires that trial courts remedy known attorney conflicts.* ..... 2

2. *Frazier delineates the minimum procedures for securing waiver.* ..... 3

3. *Failure to comply with Frazier constitutes structural error.* ..... 3

B. Frazier's Bearing on the Present Case ..... 4

1. *Ms. Pike's trial counsel was seriously conflicted.* ..... 4

2. *The trial court was aware of the conflict.* ..... 7

3. *The trial court failed to take the requisite corrective measures.* ..... 8

4. *This Court must vacate Petitioner's conviction and sentence.* ..... 9

IV. CONCLUSION ..... 10

CERTIFICATE OF SERVICE ..... 10

INDEX TO UNPUBLISHED CASES



Case 1:12-cv-00035-HSM-SKL Document 13-4 Filed 08/01/12 Page 3 of 88 PageID #: 9311

## TABLE OF AUTHORITIES

**Cases:**


Burns v. State, 2001 WL 912817 (Tenn. Crim. App. Aug. 9, 2001) .................................. 3, 4, 6, 7, 9

Cuyler v. Sullivan, 446 U.S. 335 (1980) .................................................................................. 4

Disciplinary Counsel v. Holland, 835 N.E. 2d 361 (Ohio 2005) ................................................ 7

Frazier v. State, 303 S.W.3d 674 (Tenn. 2010). ................................................................ *passim*

Glutch v. State, 1992 WL 24056 (Tenn. Crim. App. Feb. 12, 1992) .......................................... 3

Kirby v. State, 1994 WL 525086 (Tenn. Crim. App. Sept. 28, 1994) .......................................... 3

McCullough v. State, 144 S.W.3d 382 (Tenn. Crim. App. 2003) ......................................... 3, 5, 6

People v. Edebohls, 944 P.2d 552 (Colo. Ct. App. 1997) .......................................................... 5

Rugiero v. United States, 330 F. Supp.2d 900 (E.D. Mich. 2004) ........................................... 6, 7

Smith v. State, 1997 WL 658993 (Tenn. Crim. App. Oct. 23, 1997) ........................................... 9

Solina v. U.S.,709 F.2d 160 (2nd Cir. 1983) ............................................................................ 6

State v. Chubb, 2007 WL 258429 (Tenn. Crim. App. January 29, 2007) ..................................... 2

State v. Cottle, 946 A.2d 550 (N.J. 2008) ................................................................................ 5

State v. Culbreath, 30 S.W.3d 309 (Tenn. 2000) .................................................................. 5, 6

State v. Tate, 925 S.W.2d 548 (Tenn. Crim. App. 1995) ........................................................ 3, 5

State v. Troglin, 2006 WL 2633107 (Tenn. Crim. App. Sept. 14, 2006) ...................................... 2

Strickland v. Washington, 446 U.S. 668 (1984) ........................................................................ 4

Thompkins v. Cohen, 965 F.2d 330 (7th Cir. 1992) .................................................................. 6

United States v. Greig, 967 F.2d 1018 (5th Cir. 1992) .............................................................. 7

United States v. Levy, 25 F.3d 146 (2d. Cir. 1994) ............................................................... 5, 6

United States v. Lowry, 971 F.2d 55 (7th Cir. 1992) ................................................................ 5

**Statutes:**


T.C.A. § 39-14-105 .......... 5

T.C.A. § 40-2-101 .......... 5

T.C.A § 40-35-112 .......... 5

## I. PROCEDURAL HISTORY

Ms. Pike is before this Court on appeal from denial of her petition for post-conviction relief. On September 29, 2009, Ms. Pike timely filed a Brief in this Court urging reversal of the decision below and vacation of her conviction and sentence in light of her trial counsel's conflict of interest, among other grounds. The State submitted its Response Brief on December 28, 2009, and Ms. Pike filed a Reply Brief on January 15, 2010. On February 18, 2010, the Tennessee Supreme Court issued a decision in Frazier v. State, 303 S.W.3d 674 (Tenn. 2010). Because Ms. Pike's counsel deem the decision in Frazier to bear significantly on the conflict issue in her case, counsel filed a Letter of Supplemental Authority on March 1, 2010.

Oral argument in this matter was held on April 13, 2010. At argument, undersigned counsel requested the opportunity to file supplemental briefing on the impact of Frazier. This Court granted that request and afforded Ms. Pike two weeks and ten pages to brief the relevant issues. Ms. Pike submits this Supplemental Brief in compliance with that Order.

All other procedural history relevant to this Supplemental Brief may be found in Petitioner's original Brief, here incorporated by reference.

## II. FACTUAL HISTORY

Ms. Pike incorporates by reference all facts presented in her original Brief. Significant facts are cited by reference to the Brief of the Appellant in the Argument Section below.

## III. ARGUMENT

The Tennessee Supreme Court's recent opinion in Frazier v. State reinforces that a trial court must follow certain procedures if it is aware that defense counsel is operating under a conflict of interest. 303 S.W.3d 674 (Tenn. 2010). Failure to comply with these procedures amounts to structural error requiring that any subsequent conviction and sentence be vacated. In this case, Ms. Pike's lead trial counsel operated under an actual conflict of interest. The trial court was aware of this conflict but failed to remedy it in accordance with constitutional mandates. Accordingly, Ms. Pike's conviction and sentence must be set aside.

### A. The Holding in Frazier

Frazier stands for three propositions of law that are pertinent to the case at bar: (1) that trial courts must inquire into and remedy defense counsel conflicts of which they know or should know; (2) that a trial court must follow certain procedures to find a knowing and intelligent waiver of the right to conflict-free counsel; and (3) that a trial court's failure to remedy a known conflict warrants automatic reversal and vacation of any conviction and sentence.

1. ***Frazier requires that trial courts remedy known attorney conflicts.***

In Frazier, the Tennessee Supreme Court held that:

> [C]ourts have an independent duty to ensure that all proceedings are conducted within the ethical standards of the profession and are "fair to all who observe." Wheat v. United States, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed. 2d 140 (1988). When, therefore, the trial court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken. [Cuyler v. Sullivan, 446 U.S. 335, 346-47 (1980)]; see also [Wood v. Georgia, 450 U.S. 261. 272 (1981)]. Otherwise, prejudice will be presumed. Sullivan, 446 U.S. at 349-50, 100 S.Ct. 1708.

303 S.W.3d at 683.

Frazier thus requires a trial court with actual or constructive knowledge of a potential attorney conflict to first make an inquiry, and then, if a conflict is found, to take "appropriate measures." Id.[1] The trial court's duty is irrespective of the type of conflict at issue – a trial court is duty-bound to remedy "'any circumstance in which an attorney cannot exercise his independent professional judgment free of competing interests." Id. at 682 (quoting State v. Culbreath, 30 S.W.3d 309, 312 (Tenn. 2000)). Only two courses of action are "appropriate measures" for remedy of a known attorney conflict: (1) the court may disqualify the conflicted attorney, or (2) the court may oversee the defendant's knowing and voluntary waiver. Id., at 684-85.[2]

---

[1] Accord State v. Chubb, 2007 WL 258429, at *15 (Tenn. Crim. App. January 29, 2007) (quoting Cuyler v. Sullivan, 446 U.S. 335, 347 (1980) for the contrapositive proposition, "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry."); State v. Troglin, 2006 WL 2633107 at *24-27 (Tenn. Crim. App. Sept. 14, 2006) (upholding decision below where trial court made an inquiry and determined that no conflict existed).

[2] As Frazier held, "[d]isqualification of counsel is not required in every instance [in which an actual conflict is found by the trial court]. Counsel may continue representation, however, only when there has been a knowing and voluntary waiver of the conflict of interest that

### 2. *Frazier delineates the minimum procedures for securing waiver.*

Frazier defines the requisite procedures for knowing and voluntary waiver of the right to conflict-free counsel. Citing the safeguards compelled by this Court in Burns v. State, 2001 WL 912817 (Tenn. Crim. App. Aug. 9, 2001), Frazier requires that, at a minimum, the party waiving the right:

> (1) be brought into open court, (2) be given a full explanation on the record how this matter would affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the post-conviction court to determine his understanding of the matter and waiver; and (5) state under oath whether he desires to waive any appearance of impropriety.

Frazier, 303 S.W.3d at 684 (quoting Burns v. State, 2001 WL 912817, at *6 (Tenn. Crim. App. Aug. 9, 2001)); accord McCullough v. State, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003); Kirby v. State, 1994 WL 525086, at *6 (Tenn. Crim. App. Sept. 28, 1994). A trial court with actual or constructive knowledge of a defense attorney's conflict is thus limited to two curative measures: (1) disqualification or (2) waiver under the specific procedures set out in Burns.

### 3. *Failure to comply with Frazier constitutes structural error.*

Under Frazier, when a trial court fails to remedy a known conflict, reversal and vacation of any conviction and sentence is automatic. Noncompliance with Frazier is structural error – a litigant challenging his conviction and sentence need not show that any harm resulted from the fact of his attorney's conflict.

This rule is manifested by two means in Frazier. First, Frazier holds that, "[w]hen . . . the trial court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken. *Otherwise, prejudice will be presumed.*" Frazier, 303 S.W.3d at 683 (internal citations omitted) (emphasis added); accord Glutch v. State, 1992 WL 24056 (Tenn. Crim. App. Feb. 12, 1992). The plain import of this language is that a Frazier claimant need not prove that counsel's conflict affected his representation, i.e., that

---

is satisfactory to the trial court." 303 S.W.3d at 684-85; accord State v. Tate, 925 S.W.2d 548, 553 (Tenn. Crim. App. 1995) ("Once an actual conflict of interest is shown, disqualification is the appropriate remedy."); McCullough v. State, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003) (discussing procedure for knowing and intelligent waiver).

the court's error was prejudicial, but only that the trial court knew or should have known of the conflict and failed to take corrective action.

Second, that failure to follow Frazier is structural error is apparent from the remedy in Frazier itself. The Frazier Court remanded for determination of whether the petitioner had waived his rights in accordance with Burns. Id. at 685. If not, the Court ordered, new counsel was to be appointed, the petitioner given leave to amend his petition, and any grounds for relief considered, i.e. the decision below was to be vacated. Id. Significantly, the Court's decision entails no consideration of whether the attorney's conflict affected his representation in any way, or moreover, of the petitioner's ability to prove the same. Frazier, 303 S.W.3d at 685.

**B. Frazier's Bearing on the Present Case**

Ms. Pike was represented at trial by counsel with a serious conflict of interest. The trial court was aware of this conflict, but failed to either disqualify counsel or secure a waiver in accordance with Frazier. Significantly, both Frazier and Burns were both post-conviction cases in which the right to counsel was statutory. Frazier, 303 S.W.3d at 680; Burns at *4. Because Ms. Pike's claim revolves around the right to counsel at trial, her right arises under Article I, § 9 of the Tennessee Constitution and the Sixth Amendment to the United States Constitution. These rights being stronger than the statutory right to post-conviction counsel, Ms. Pike's right to the procedural safeguards outlined in Frazier and Burns is superior to both. As a result, Ms. Pike's conviction and sentence must be set aside.[3]

***1. Ms. Pike's trial counsel was seriously conflicted.***

As fully detailed in Appellant's original Brief, Ms. Pike's trial counsel, William Talman, overbilled the Indigent Defense Fund for over $67,000 between 1990 and 1993. (App.'s Br. at 2-3). In 1994, an investigation by the State Comptroller's Office determined that the overbilling was an intentional fraud. (Id.). This theft was

---

[3] It is Ms. Pike's argument in this Supplemental Brief that, under Frazier, she is not required to prove that her attorney's conflict impacted his performance in the course of her defense. However, as discussed at length in her original Brief, the facts as presented in post-conviction establish that trial counsel's conflict resulted in adverse effect under Cuyler v. Sullivan, 446 U.S. 335 (1980), as well as prejudice as defined by Strickland v. Washington, 446 U.S. 668 (1984). (See App.'s Br. at 64-77).

classifiable as a Class B felony carrying a minimum sentencing range of 8-12 years. T.C.A. § 39-14-105; T.C.A § 40-35-112. In a letter to Knoxville Attorney General Randy Nichols – whose office prosecuted Ms. Pike – District Attorney General Torry Johnson recommended that the State consider prosecution of Mr. Talman. (App's Br. at 3 n.4). Approximately one month before his appointment to Ms. Pike's case, Mr. Talman paid the State through William Crabtree – the same prosecutor that prosecuted Ms. Pike– a lump sum in the amount he was determined to have stolen. (Id. at 3). Critically, Mr. Talman received nothing in return for this repayment – he was given no assurance or documentation to the effect that he would not be prosecuted, and his prosecution remained a possibility for the length of the statute of limitations at issue – eight years. (Id.); T.C.A. § 40-2-101.

In March of 1994, Mr. Talman, at the advice of counsel, self-reported to the Tennessee Board of Professional Responsibility. (App.'s Br. at 3). This ethics complaint was not resolved until November 24, 1998, the day after the Tennessee Supreme Court denied rehearing on Ms. Pike's direct appeal. (Id. at 3-4).

Tennessee has long held that the basis for an attorney conflict may be any interest or loyalty on the part of defense counsel that drives a wedge between counsel and the defendant. McCullough v. State, 144 S.W.3d 382,385 (Tenn. Crim. App.2003); State v. Culbreath, 30 S.W.3d 309, 315 (Tenn.2000); State v. Tate, 925 S.W.2d 548, 554 (Tenn. Crim. App. 1995). Given this understanding, the circumstances surrounding Mr. Talman's representation of Ms. Pike must be classified as a conflict of interest for two basics reasons: (1) Mr. Talman was facing prosecution by the same office that was prosecuting Petitioner; and (2) Mr. Talman was facing disbarment.

Undersigned counsel is not aware of a case in Tennessee in which an attorney was facing prosecution by the same office that was prosecuting a client, but in the jurisdictions that have considered the issue, the law is clear: such an attorney is under a conflict of interest. State v. Cottle, 946 A.2d. 449, 564 (N.J. 2008) ("an attorney has a per se conflict of interest when both he and his client are simultaneously under indictment in the same county and being prosecuted by the same prosecutor's office"); People v. Edebohls, 944 P.2d 552, 556 (Colo. Ct. App. 1997); United States v. Levy, 25 F.3d 146, 156 (2d. Cir. 1994); United States v. Lowry, 971 F.2d 55, 61 (7th

Cir. 1992); Thompkins v. Cohen, 965 F.2d 330, 332 (7th Cir. 1992); Solina v. U.S.,709 F.2d 160, 163-64 (2d Cir. 1983); Rugiero v. United States, 330 F. Supp. 2d 900 (E.D. Mich. 2004)[4].

The reason for this rule is that "[a] situation of this sort . . . may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer." Thompkins, 965 F.2d at 332; accord Levy, 25 F.3d at 156 ("[Counsel] may have believed he had an interest in tempering his defense of [defendant] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [defendant] would prompt the Government to pursue the case against [counsel] with greater vigor."). As a result, Mr. Talman's representation of Petitioner at a time when he faced prosecution by the same office that was prosecuting his client created an actual conflict of interest.

Similarly, Mr. Talman was conflicted as a result of his potential disbarment for an ethics violation pending before the Board of Professional Responsibility. Under these circumstances, Mr. Talman's priority was to please and placate the trial court and prosecution in attempt to protect his law license – a motivation at odds with zealous representation of Ms. Pike. While Tennessee has not squarely confronted these circumstances, either, the Tennessee courts have consistently recognized the danger inherent in conflicts involving the personal interests of the attorney. See McCullough v. State, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003); State v. Culbreath, 30 S.W.3d 309 (Tenn. 2000). Indeed, Tennessee has recognized personal conflicts far more tenuous than those facing Mr. Talman in the present case. In the case discussed above, State v. Burns, this Court recognized a conflict of interest where a single member of the nine-member board that oversaw counsel's office was a distant

---

[4] In Rugiero, the District Court found that that:

> [Since counsel] was faced with an uncertain situation with respect to his own criminal liability, i.e., not knowing when, how, or if, the Government was going to prosecute him. . . .[counsel] went to trial with his freedom and livelihood in the balance. It is the existence of this undeniable uncertainty regarding [counsel's] own liberty and financial interests before and during Petitioner's trial and [counsel's] knowledge of this uncertainty that gives rise to the actual conflict in this case.

330 F. Supp. 2d at 907.

relative of the victim in counsel's case. 2001 WL 912817, at *2 (Tenn. Crim. App. Aug. 9, 2001).[5] Furthermore, jurisdictions outside Tennessee have broadly accepted that a threat to an attorney's law license creates a substantial conflict. See Disciplinary Counsel v. Holland, 835 N.E. 2d 361 (Ohio 2005); United States v. Greig, 967 F.2d 1018, 1022 (5th Cir. 1992); Rugiero v. United States, 330 F. Supp. 2d 900 (E.D. Mich. 2004).

***2. The trial court was aware of the conflict.***

The same court, Judge Leibowitz, heard both Ms. Pike's trial and post-conviction proceeding. On post-conviction, Judge Leibowitz reflected, "I think it's pretty obvious that everyone in Knox County knew that Mr. Talman had problems with his billing [at the time he was appointed to represent Ms. Pike]," (PC Tr. Vol. XXXII at 113), and that "I knew; we all knew Mr. Talman had his own problems" (Id. at 114). Indeed, Mr. Talman's overbilling had been reported in both the Knoxville News-Sentinel, Sunday, May 1, 1994, and Sunday, May 8, 1994, and in The Tennessean, June 7, 1995. (App's Br. at 5 n.14.)

In her Order denying Ms. Pike post-conviction relief, Judge Leibowitz recalled "having inquired of Talman the status of the issue [of his overbilling] prior to his appointment," clearly indicating that in her role as trial court, she considered the circumstances to pose a threat to Mr. Talman's ability to represent Petitioner. (PC Tr. V at 647.) In response to her inquiry, Judge Leibowitz recalled that, "Talman assured the court that the reimbursement had been paid in full." (Id. at 646). The court below also noted that Talman testified that "he had some recollection of having mentioned the over-billing to the petitioner and the fact that it had been resolved" and that "[t]he petitioner actually seemed to like him more because of it." (Id. at 647.)

Far from dissipating the notion that Mr. Talman was conflicted, Judge Leibowitz's pre-trial inquiry *confirmed* it. Judge Leibowitz already knew that Mr. Talman had stolen more than $67,000 from the Indigent

[5] It bears noting that in Burns, this Court found "[no] actual conflict or serious potential conflict." Burns 2001 WL 912817 at *5. Finding only an appearance of impropriety, this Court remanded to determine the existence of waiver using the above-outlined procedures. Id. at 7. Significantly, in reaching this decision, the Court found insufficient to waive the appearance of impropriety that (1) Mr. Burns' swore out an affidavit attesting that he understood the issue and wished the continued representation of the post-conviction defender; (2) the post-conviction defender's office had spent over 1500 hours working on Mr. Burns' case prior to learning of the conflict; and (3) Mr. Burns and his counsel had established a long term attorney-client relationship. Id. at *3, *6-7. On the facts, Mr. Talman faced a far graver conflict in his representation of Ms. Pike, and the basis for the trial court's determination of waiver was far flimsier.

Defense Fund. What she learned from her colloquy with Mr. Talman was that he had not been released from the threat of prosecution by the same office that was prosecuting Mr. Talman's client. Conspicuously absent from Mr. Talman's representation to the trial court, and likewise, from the court's post-conviction Order, was any proof that Mr. Talman would not be prosecuted for theft. At best, Mr. Talman might have represented that he had a gentleman's agreement with the Knoxville District Attorney, but this could only have made the conflict more acute, insofar as Mr. Talman's freedom from prosecution would have been contingent on his pleasing the prosecutor in Ms. Pike's case.

Moreover, as Judge Leibowitz recognized in her post-conviction Order, there remained the "unresolved issue at the time of his appointment . . . related to his having self-reported to the Board of Professional Responsibility." (PC Tr. Vol. V at 646). The trial court was thus aware that Mr. Talman's law license was in jeopardy throughout his representation of Ms. Pike.

The State does not dispute that the trial court was aware of Mr. Talman's conflict. (Br. of Appellee at 58.) To the contrary, the State endorses the following findings made by the court below: (1) Mr. Talman was under investigation and was ordered to reimburse the state more than $60,000; (2) Mr. Talman had never spoken to anyone in the District Attorney's Office (and consequently was never told he was not subject to prosecution); and (3) that Mr. Talman was concerned enough about a possible conflict to have informed Ms. Pike about the investigation. (Id.) The State concedes these points because it argues that, whatever Mr. Talman's conflicts, they were waived by Ms. Pike. As discussed below, this is incorrect as a matter of law.

### *3. The trial court failed to take the requisite corrective measures.*

While the trial court in Ms. Pike's case was aware of Mr. Talman's conflict of interest, the court failed to take the requisite curative action. Instead, Judge Leibowitz found that, based on Mr. Talman's representation that he had repaid the stolen funds, the conflict was dispelled. (PC Tr. Vol. V at 646.) According to Judge Leibowitz, "[Mr. Talman] too was presumed innocent until proven guilty. As it turned out he was never prosecuted . . . ." (PC Tr. Vol. XXXII at 113.) Furthermore, according to Judge Leibowitz's post-conviction Order, Mr. Talman's

representation that he had told Ms. Pike of the conflict and that she "liked him more because of it" qualified as a knowing and voluntary waiver of Ms. Pike's right to conflict-free counsel. (PC Tr. Vol. V at 646-47.)

The trial court's handling of Mr. Talman's conflict was legal error. Mr. Talman remained open to prosecution throughout his representation of Ms. Pike, and the trial court knew it. Whether or not Mr. Talman was entitled to a presumption of innocence is irrelevant – what matters is the possibility that the threat of prosecution interfered with his ability to provide Ms. Pike with zealous capital defense. Additionally, the trial court knew of a serious complaint pending in the Board of Professional Responsibility – a complaint filed by Mr. Talman at the suggestion of his counsel in which he admitted to serious ethical infractions. Under these circumstances, the trial court had a duty to either disqualify Mr. Talman or secure Ms. Pike's knowing and intelligent waiver.

There is no dispute that trial court did not disqualify Mr. Talman. This left Ms. Pike's knowing and intelligent waiver as the only remaining option. However, the trial court failed to comply with the requirements for knowing and intelligent waiver. Petitioner was never (1) brought into open court, (2) given a full explanation on the record of how the conflict would affect her; (3) advised of her right to appointment of other counsel; (4) questioned under oath by the parties and the court to determine her understanding of the matter and waiver; and (5) made to state under oath whether she desired to waive any appearance of impropriety. Instead, the trial court interred waiver from Mr. Talman's off-record representation that Petitioner had no objection to the conflict. PC Tr. Vol. V at 646. This was insufficient as a matter of law. See Smith v. State, 1997 WL 658993, at *5 (Tenn. Crim. App. Oct. 23, 1997).

### *4. This Court must vacate Petitioner's conviction and sentence.*

Because the trial court in this case failed to take the measures required under Frazier to remedy the serious conflict facing defense counsel, this Court must find that Ms. Pike's trial was marked by structural error. The appropriate remedy is vacation of Ms. Pike's conviction and sentence.

## IV. CONCLUSION

For reasons set forth in this Supplemental Brief and in her opening and reply briefs, Appellant, Christa Pike, respectfully requests that this Court reverse the decision of the Post-Conviction Court; grant her Petition for Post-Conviction Relief; set aside her convictions and sentences for first-degree murder and conspiracy to commit first degree murder; and grant any other appropriate relief.

Respectfully submitted,

Donald E. Dawson, BPR No. 010723
Post-Conviction Defender

Avram D. Frey, PBR No. 028520
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
Nashville, TN 37243
(615) 741-9331
(615) 741-9430 (Fax)

Counsel for Appellant, Christa Pike

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Supplemental Brief of the Appellant was sent via U.S. Mail, first-class postage pre-paid, to Frank Borger-Gilligan, Assistant Attorney General, Office of the Attorney General-Criminal Division, P.O. Box 20207, Nashville, TN 37202-0207 on this the 27th day of April 2010.

Donald E. Dawson

# INDEX TO UNPUBLISHED CASES

1. Burns v. State, 2001 WL 912817 (Tenn. Crim. App. Aug. 9, 2001)

2. Glutch v. State, 1992 WL 24056 (Tenn. Crim. App. Feb. 12, 1992)

3. Kirby v. State, 1994 WL 525086 (Tenn. Crim. App. Sept. 28, 1994)

4. Smith v. State, 1997 WL 658993 (Tenn. Crim. App. Oct. 23, 1997)

5. State v. Chubb, 2007 WL 258429 (Tenn. Crim. App. January 29, 2007)

6. State v. Troglin, 2006 WL 2633107 (Tenn. Crim. App. Sept. 14, 2006)

# Burns v. State

# 2001 WL 912817

# (Tenn. Crim. App. Aug. 9, 2001)

**H**Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Jackson.
Kevin BURNS,
v.
STATE of Tennessee.
**No. W2000-02871-CCA-R9-PD.**

Aug. 9, 2001.

Interlocutory Appeal from the Criminal Court for Shelby County, No. P-21820; James C. Beasley, Jr., Judge.

Donald E. Dawson, Post-Conviction Defender, and Marjorie A. Bristol, Assistant Post Conviction Defender, Nashville, TN, for appellant, Kevin Burns.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and John W. Campbell and Thomas D. Henderson, Assistant District Attorneys General, for appellee, State of Tennessee.

RILEY, J., delivered the opinion of the court, in which OGLE, J., and CLARK, Sp. J., joined.

OPINION

RILEY.

*1 The petitioner, currently represented by the Office of the Post Conviction Defender, was originally convicted of felony murder and sentenced to death. The petitioner's conviction and sentence were affirmed on direct appeal. *See State v. Burns,* 979 S.W.2d 276 (Tenn.1998). After the filing of a post-conviction relief petition, the post-conviction court granted the state's request to disqualify the Post Conviction Defender since a member of the Post Conviction Defender Commission was related to the victim of the crime. In this interlocutory appeal, the petitioner argues: (1) there is no conflict of interest; and (2) if a conflict exists, it can be waived. After a thorough review of the record, we conclude that (1) there is no actual conflict, and (2) any alleged impropriety may be waived by the petitioner after full disclosure. We reverse and remand for further proceedings.

The Office of the Post-Conviction Defender (hereinafter "PCD") was created to provide representation to indigent persons convicted and sentenced to death. Tenn.Code Ann. § 40-30-302. The PCD must operate "consistent with professional standards and shall not compromise independent professional judgment, or create a professional or institutional conflict of interest, [or] appearance of impropriety ... or other violation of the Tenn.Code of Professional Responsibility ..." *Id.*

The PCD's Office is controlled by a nine-member commission. *See* Tenn.Code Ann. § 40-30-303. The commission is responsible for appointing a qualified attorney as PCD, preparing an annual budget for the office of the PCD, administering the funds made available to the office, and overseeing the expenditure of the funds. Tenn.Code Ann. § 40-30-304(c), (d).

The PCD was appointed to represent petitioner, Kevin Burns, in his petition for post-conviction relief. Petitioner was originally convicted of first degree murder and sentenced to death. Approximately one year after the appointment, the state sought to disqualify the PCD alleging that one of the PCD Commission members was a cousin of the victim in this crime. The post-conviction court found the PCD had an actual conflict of interest, declared that the conflict was not waivable by petitioner, and disqualified the PCD. This interlocutory appeal followed.

BACKGROUND

The underlying facts and procedural history relevant to this issue are undisputed. On November 4, 1999, the PCD was appointed to represent the petitioner on his petition seeking post-conviction relief. The affi-

davits of the Post-Conviction Defender and the petitioner indicate that the PCD actually began its involvement in this case in November 1998, a year before its appointment in the post-conviction proceeding, immediately after the Tennessee Supreme Court denied relief in the direct appeal. The PCD's affidavit also indicates that the PCD assisted in the filing of a petition to rehear with the Tennessee Supreme Court and a petition for writ of certiorari in the United States Supreme Court. It further indicated that the PCD assisted in the preparation of the *pro se* petition for post-conviction relief along with motions to appoint counsel and stay execution.

***2** Carolyn Watkins, a member of the PCD Commission, was a second cousin once removed to the victim since the victim's grandmother was the first cousin of Watkins' grandfather. The victim's mother called Watkins on September 26, 2000, and inquired why witnesses were being subpoenaed. Watkins called the district attorney's office and was informed that the petitioner was seeking post-conviction relief. After Watkins' call, the state filed a motion to disqualify, which was subsequently granted by the trial court.

HEARING ON MOTION TO DISQUALIFY

A. Testimony

Carolyn Watkins testified at the disqualification hearing that she is currently employed with the Shelby County Office of Equal Opportunity Compliance; she is a member of the PCD's Commission; and at the time of the petitioner's trial, she was employed by the Shelby County Public Defender's Office as a member of the capital defense team. It was her recollection that the Shelby County Public Defender's Office was never involved in the representation of the petitioner since Watkins was the cousin of the victim. She explained her relationship with the victim and his family, prior to the victim's murder, as follows: she had never met the victim; she met the victim's mother in 1992; she had previously known the victim's grandmother; and she saw the victim's grandmother approximately once every two years. Watkins stated that she "just ran into [the victim's grandmother and mother] in the hall" of the courthouse during the petitioner's trial. She further stated that she could not recall if she first learned of the victim's death during that meeting. Watkins stated that she did not "sit through the [petitioner's] trial," but she would periodically check on her relatives and "explain what was going on in the proceedings."

On September 26, 2000, almost two years after the Tennessee Supreme Court affirmed petitioner's death sentence, Watkins was contacted by the victim's mother inquiring why a trial witness was again being subpoenaed. Watkins then contacted the district attorney's office, was referred to the prosecutor in this case, learned for the first time of the post-conviction proceedings, learned that the PCD represented the petitioner, and informed the prosecutor of her position on the PCD Commission.

During examination by the court, Watkins stated that she merely explained the legal process to the victim's family during the trial. Additionally, Watkins stated that she did not recall conferring with the victim's family concerning the facts of the murder, defense strategies, plea negotiations, or the penalty phase of the trial. She further explained that the victim's family was primarily concerned with why the case was continued numerous times.

Watkins summarized the PCD Commission's duties to include: hiring, proposal of the budget, oversight of the budget, and policy suggestions. She stated that the commission meets approximately once or twice per year, often by telephone or video conferencing. When asked if the PCD's Office's continued representation of petitioner would affect her work on the commission, she stated that she "can't foresee how it would." She further expressed her strong belief in the rights of criminal defendants.

***3** The petitioner also filed his own affidavit in which the details of the alleged conflict were fully disclosed; he stated he understood the details of the dispute involving the alleged conflict; he stated he had developed trust in the PCD; he expressed his desire that the PCD continue to represent him; and he waived any conflict. Time records documenting over 1500 hours of work performed by the PCD staff were also filed as part of the record. The affidavit of the PCD indicates that the distant familial relationship between Watkins and the victim would have no effect on the representation of petitioner.

B. Trial Court's Findings

At the hearing, the trial court indicated that Watkins'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

relationship to the victim's family created both an "appearance of a possible conflict" and an actual conflict. In its written order, the trial court found that the relationship created an actual conflict which required disqualification, and the trial court further implicitly found that the conflict could not be waived by the petitioner.

CONFLICT

A. Standard of Review

Pursuant to its inherent authority, our supreme court promulgated the disciplinary rules defining and regulating ethical requirements applicable to practicing attorneys. *See* Clinard v. Blackwood, 46 S.W.3d 177, ----, 2001 WL 530834, at *2 (Tenn. May 18, 2001); Tenn. Sup.Ct. R. 8. A trial court's ruling on the disqualification of counsel will be reversed only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the complaining party. State v. Shirley, 6 S.W.3d 243, 247 (Tenn.1999). Our supreme court stated:

As the above authorities suggest, this Court owes a special obligation to ensure proper application of our rules and administration of the legal profession. Our review of a lower court's interpretation of the ethical rules promulgated by this Court is plenary. *See In re:* Burson, 909 S.W.2d 768, 774 (Tenn.1995); Belmont v. Bd. of Law Examiners, 511 S.W.2d 461, 462 (Tenn.1974); *Anderson,* 676 S.W.2d at 333-34. Accordingly, we will closely scrutinize a trial court's disqualification of an attorney or that attorney's firm for an abuse of discretion arising from improper interpretation or application of our rules. *Accord* Cheves v. Williams, 993 P.2d 191, 205 (Utah 1999) ("The proper standard of review for decisions relating to disqualification is abuse of discretion. However, to the extent this court has a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited.").

Clinard, 46 S.W.3d at ----, 2001 WL 530834, at *2.

B. Applicable Ethical Requirements

The presented issue involves the application and interaction of two separate and distinct ethical requirements; namely, Tenn. Sup.Ct. R. 8, Canon 5, DR 5-101(A) (refusing employment when the interests of the lawyer may impair the lawyer's independent professional judgment), and Tenn. Sup.Ct. R. 8, Canon 9 (avoiding the appearance of impropriety). We will examine both requirements and whether a conflict is waivable.

(1) Conflict and Waiver

*4 Although one seeking post-conviction relief has no constitutional right to counsel or effective assistance of counsel, he or she does have a statutory right to counsel. *See* Tenn.Code Ann. § 40-30-207(b)(1); Leslie v. State, 36 S.W.3d 34, 38 (Tenn.2000). By implication, we believe this statutory right, even though not a Sixth Amendment right, includes the right to be represented by conflict-free counsel. *See* Wilcoxson v. State, 22 S.W.3d 289, 320 (Tenn.Crim.App.1999) (noting right to conflict-free counsel is inherent in cases which involve the Sixth Amendment right to counsel).

Generally, an attorney with an "actual conflict of interest" should withdraw or be subject to disqualification. Culbreath, 30 S.W.3d 309, 312-13 (Tenn.2000). An "actual conflict of interest" usually involves one attorney representing two or more persons with diverse interests. State v. Tate, 925 S.W.2d 548, 552 (Tenn.Crim.App.1995). In essence, it is where an attorney is placed in a position of divided loyalties. *Id.* at 553 (citations omitted).

Most conflicts can be waived by the client after full disclosure. *See id.* However, trial courts should have substantial latitude in refusing waivers of conflicts since the likelihood and dimensions of conflict are often difficult to predict. Wheat v. United States, 486 U.S. 153, 162-63, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The *Wheat* allowance of substantial latitude to the trial court in accepting or refusing waivers appears to be based, at least in part, upon the federal courts' independent interest in ensuring ethical compliance and the appearance of fairness. *Id* at 160. Since the State of Tennessee has the same independent interest, we see no reason to deviate from the *Wheat* rationale.

(2) DR 5-101: Independent Professional Judgment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Withdrawal or disqualification under DR 5-101 is required only when "professional judgment ... will be or reasonably may be affected by the lawyer's own financial ... or personal interests ." We further note that the rule expressly provides that the conflict may be waived "with the consent of the client after full disclosure." DR 5-101.

(3) Canon 9: Appearance of Impropriety

Withdrawal or disqualification may also be required where there is an "appearance of impropriety" as set forth in Canon 9.[FN1] *See* Clinard, 46 S.W.3d at ----, 2001 WL 530834, at *6; Culbreath, 30 S.W.3d at 313. The existence of an appearance of impropriety is determined from the perspective of a reasonable layperson. Clinard, 46 S.W.3d at ----, 2001 WL 530834, at *7 (citation omitted). The mere possibility of impropriety is insufficient to warrant dismissal. *Id.* at ____, 2001 WL 530834, at *6. Disqualification of counsel on this basis alone is a "drastic remedy" to be employed only in "rare case[s]." *Id.* at ____, 2001 WL 530834, at *7.

FN1. The Tennessee Supreme Court noted that the "appearance of impropriety" standard has been widely criticized and has been rejected by the American Bar Association's Model Rules of Professional Conduct. Clinard, 46 S.W.3d at ----, 2001 WL 530834, at *6. The court also noted that future revisions to our Code could yield a similar rejection. *Id.* at n. 7. Since the ultimate outcome of *Clinard* was based upon the "appearance of impropriety" provision, the *Clinard* holding may not be lasting precedent.

(4) Summary

In summary, a post-conviction petitioner is statutorily entitled to conflict-free counsel. A violation of DR 5-101 (impaired independent professional judgment) or Canon 9 (appearance of impropriety) creates a conflict. These conflicts may usually be waived after full disclosure, except the trial court is given substantial latitude in determining whether to accept a waiver. The appellate court reviews the trial court's determination on disqualification issues under an abuse of discretion standard; however, this court closely scrutinizes disqualification since it involves an interpretation of rules governing ethical behavior of attorneys.

C. Analysis: DR 5-101

*5 Watkins' testimony at the hearing revealed that she is distantly related to the victim (second cousin once removed); she never met the victim; she was unaware of the post-conviction proceedings until September 2000; she was unaware that the PCD's Office was appointed to represent petitioner until she called the district attorney general's office; she had limited contact with the victim's family; the petitioner's continued representation by the PCD's Office would not affect her work on the commission; she is one of nine commissioners on the PCD Commission; the commission meets one or two times per year mostly by telephone or video conference; and she has no real involvement as a commission member with the day-to-day operations of the PCD. The affidavit of the PCD states that Watkins' situation would not affect the representation of the petitioner.

The only argument that can realistically be made with regard to an actual conflict is that, as one of nine commission members, Watkins votes to hire the PCD and oversees the budget. We conclude that Watkins' distant familial relationship with the victim and his family and her *de minimus* authority over petitioner's counsel are not sufficient to establish an actual conflict or a serious potential for a conflict. We further conclude that there is no indication that the PCD's professional judgment will be or reasonably may be affected by these circumstances. Thus, there is no violation of DR 5-101.

D. Analysis-Appearance of Impropriety

However, our analysis does not end with our finding of no actual conflict, for "even '[i]f there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety.' " Clinard, 46 S.W.3d at ----, 2001 WL 530834, at *7 (citing Culbreath, 30 S.W.3d at 312-13).

In *Clinard,* our supreme court held that the mere appearance of impropriety justified the removal of counsel where a member of the counsel's law firm formerly represented the adversaries of the firm's current clients in the same litigation. *Id.* The court described the situation as follows:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Counsel's] firm now stands as adversary against the [former clients] in the very litigation in which [counsel] once represented them and gained their confidences. To analogize to baseball, [counsel] has not only switched teams, he has switched teams in the middle of the game after learning the signals. That [counsel] has been benched by his new team does little to ameliorate the public perception of an unfair game.

*Id.* The case at bar does not in any way involve confidences gained by the PCD that can be used against a former client. There has been no switching of teams.

Even though there has been no switching of teams in the case at bar, an appearance of impropriety is not limited to such a scenario. *See id.* at ____, 2001 WL 530834, at *6 (observing that ethical rules must be broad, and the appearance of impropriety standard is appropriate when more specific rules may be ineffective). Accordingly, "from the perspective of a reasonable lay person," we conclude that in this capital case representation by appointed counsel under these circumstances could create, to some degree, an appearance of impropriety. *See id.* at ____, 2001 WL 530834, at *7 (holding appearance of impropriety is determined "from perspective of a reasonable lay person"). To the extent that there is an appearance of impropriety, we must now determine whether petitioner should be able to waive it.

E. Analysis-Waiver

***6** The *Clinard* court qualified the standard for disqualification under Canon 9, stating "[w]e recognize that disqualification of one's counsel is a *drastic remedy* and is ordinarily unjustifiable based solely upon an appearance of impropriety. We remain convinced, however, that *in a rare case* ... the taint of the appearance of impropriety can be purged only by disqualification." *Id.* (emphasis added). We must now determine whether the case at bar is one of those "rare case[s]" in which the taint of the appearance of impropriety can be purged only by the drastic remedy of disqualification.

The state in its brief concedes that any conflict in this matter is waivable by the petitioner upon full disclosure; however, it insists the post-conviction court is not required to accept the waiver under the circumstances. *See Wheat,* 468 U.S. at 162-63.

In determining whether the trial court abused its discretion in disqualifying the PCD without the opportunity for waiver, we should consider all the facts and circumstances surrounding this case. We appreciate the concerns of the trial court. This is a death penalty case which will be closely scrutinized by the courts of this state and perhaps the federal courts as well. However, we also recognize that the statute contemplates representation by the PCD absent an ethical impropriety. Certainly, the PCD is not the only counsel who can provide competent representation of the indigent petitioner. Nevertheless, the PCD was specifically created to provide specialized knowledge and competent representation in death penalty cases. We also note that the request for disqualification came long after the PCD's original involvement with the petitioner and his case. This involvement apparently began in November 1998 immediately after the Tennessee Supreme Court denied relief on direct appeal, has continued, and has resulted in over 1500 hours of work performed on petitioner's behalf. According to petitioner's affidavit, he has developed trust in the PCD and desires their continued representation. Although the indigent petitioner is not entitled to counsel of his choice, his relationship with his appointed counsel is relevant to our evaluation as to whether disqualification is the only "drastic remedy" available to purge the taint of any appearance of impropriety. *See Clinard,* 46 S.W .3d at ----, 2001 WL 530834, at *7; *see also Morris v. Slappy,* 461 U.S. 1, 23, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (Brennan, J ., concurring) (suggesting that the relationship with appointed counsel should be considered in determining whether continued representation is possible).

F. Our Conclusion

After a careful review of the evidence, the ethical requirements, and the case law, we conclude that this is not one of the rare cases in which the drastic remedy of disqualification is necessary. A waiver, after full disclosure, is the appropriate option. This is especially true in light of petitioner's alleged relationship with the PCD and the extensive services already rendered on his behalf. To the extent that there may be a limited appearance of impropriety, we believe that continued representation after a proper waiver would not create an appearance of unfairness in fu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ture proceedings and would not undermine confidence in the judicial system.

G. Procedure To Be Followed Upon Remand

*7 The petitioner was not given an opportunity to waive any conflict or appearance of impropriety. The affidavit filed by petitioner is insufficient to constitute a proper waiver. We, like the trial court, are concerned with potential future issues arising in this capital case. Accordingly, we find it prudent in this capital case for the trial court upon remand to appoint independent counsel to advise the petitioner concerning his proposed waiver. Thereafter, petitioner should (1) be brought into open court, (2) be given a full explanation on the record how this matter would affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the post-conviction court to determine his understanding of this matter and waiver; and (5) state under oath whether he desires to waive any appearance of impropriety.[FN2] If petitioner understandingly waives any appearance of impropriety, the post-conviction court shall allow the PCD to continue to represent petitioner absent a compelling reason to the contrary. Absent a proper waiver, the post-conviction court shall appoint other counsel.

FN2. This procedure was utilized in *Shannon L. Smith, et al v. State*, C.C.A. No. 02C01-9508-CR-00241, 1997 WL 658993, at *5 (Tenn.Crim.App. filed October 23, 1997, at Jackson).

CONCLUSION

Based on our examination of the record, we conclude that the trial court erroneously disqualified petitioner's counsel without petitioner having the opportunity to waive any appearance of impropriety. We reverse the judgment of the trial court and remand this matter for appointment of independent counsel to advise petitioner on the issue of waiver and for further proceedings consistent with this opinion.

Tenn.Crim.App.,2001.
Burns v. State
Not Reported in S.W.3d, 2001 WL 912817 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Glutch v. State

# 1992 WL 24056

# (Tenn. Crim. App. Feb. 12, 1992)

**H**Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Knoxville.
Timothy K. GLUTCH, Appellant,
v.
STATE of Tennessee, Appellee.
**No. 33.**

Feb. 12, 1992.
Permission to Appeal Denied by Supreme Court March 1, 1993.

Claiborne County, Lee Asbury, Judge (Post-Conviction).
Leah J. Prewitt, Knoxville, for appellant.

Charles W. Burson, Attorney General & Reporter, Gordon W. Smith, Deputy Attorney, Nashville, William Paul Phillips, District Attorney General, Michael O. Ripley, Asst. Dist. Atty. General, Jacksboro, for appellee.

OPINION

PEAY, Judge.

*1 The petitioner was found guilty by a jury of armed robbery. For this offense he received a fifteen year sentence as a Range I standard offender. The State and the petitioner then appealed. While the petitioner's cause was unsuccessful, the State succeeded in having the case remanded for re-sentencing. *State v. Timothy K. Glutch,* No. 24, Claiborne County (Tenn.Crim.App. filed Aug. 12, 1987, at Knoxville). The petitioner's application for permission to appeal this decision was denied by the Tennessee Supreme Court on November 9, 1987, and upon remand he was sentenced to thirty-five years as a Range II offender.

On November 22, 1988, the petitioner filed a pro se post-conviction petition which was later amended by appointed counsel. In his amended petition he alleges that:

1. He was denied a fair trial based upon the State's failure to remedy the effects of Sharon Guillory's perjured testimony;

2. "Ineffective assistance of counsel must be presumed [when] the same attorney represents two defendants, one by appointment and one by contract," and neither the attorney nor the court attempts to disclose the possible conflicts of interest;

3. He received ineffective assistance of counsel as the attorney whom he had told that he would not testify against Guillory and who had told him not to make any statements was the same attorney who aided in negotiating the agreement concerning Guillory's guilty plea and subsequent testimony against him; and

4. His subsequent counsel was ineffective at trial, and because of the conflict of interest, was also ineffective on appeal.[FN1]

> FN1. When the issue of ineffective assistance of appellate counsel is raised, the applicable prior panel is to hear the case. If one of the judges is unavailable, a replacement is designated by the Chief Justice of the Tennessee Supreme Court. T.C.A. § 40-30-103(b)(1). However, in this case the petitioner, through counsel, asked that this procedure be waived, and the State raised no objection. Judges Dwyer and Jones along with now Justice O'Brien comprised the original panel, and Jones is also a member of this panel. In view of these facts and the record, we have agreed to accept the petitioner's waiver and determine the issues.

After reviewing the record, we find any error to have been harmless and, therefore, affirm the lower court's denial of post-conviction relief.

On January 7, 1985, a woman entered the Pizza Inn located in New Tazewell, Tennessee, and robbed this establishment at gun point. Approximately three hundred fifty dollars ($350) was taken. Shortly before the woman's entry, a man had come in and had ultimately requested a cup of coffee, but before doing so, he had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

acted rather suspiciously by going into the rest room and looking into a back room and the kitchen. Presumably because the restaurant was about to close, there were no other customers present.

At trial two witnesses identified the petitioner as being the man who had preceded Sharon Guillory, the "trigger woman", into the restaurant. Another witness claimed to have seen an extremely rusty, blue pickup truck near the Pizza Inn around the time of the robbery. Guillory was found to have owned a truck meeting this description.

In addition, Guillory testified, admitting her participation in the robbery and implicating the petitioner. She claimed that the petitioner had been in need of money to purchase drugs, that he had entered the restaurant in question, and that upon returning with a cup of coffee, he had announced, "that he had found a place to rob". She then explained that she had volunteered to enter the restaurant and take the money at gunpoint because she had feared that the petitioner would have killed someone had he re-entered to commit the robbery.

*2 The petitioner's first issue arises out of portions of Guillory's testimony which he claims amounted to perjury. He contends that the prosecutor failed to remedy the effects of this testimony. Although we agree that the State had an obligation to correct the misleading if not actually perjurious statements made by Guillory while on the witness stand, we do not believe such forms a grounds for reversal in this case.

According to the record, on August 16, 1985, Guillory made a statement concerning the robbery inculpating both the petitioner and herself. At the conclusion of this statement, the assistant district attorney is quoted as having said:

Now, as a part of our agreement, I'm going to fill a waiver out and make a recommendation and we'll enter a guilty plea this afternoon.... My recommendation now, understand, my recommendation as to the sentence is conditioned upon your testimony and *I'm not going to make a recommendation today as to sentence,* it's going to be a guilty plea. Sentencing will be reserved pending either the trial or the disposition of Tim Glutch, your co-defendant.... And at that time, should you testify differently, all bets are off. And we go back to square one. But if you testify concurrently [sic] with what you told me then I will abide by the agreement that I had made with you. (emphasis added)

The substance of this agreement may be found in Exhibit 4, which contains the following language:

I understand that the [a]ssistant [district] [a]ttorney general Jeff Blevins will recommend, upon my guilty plea to the offense of armed robbery as charged the following:

(1) A sentence to be served of 10 years, Range I Standard (30%).

(2) Nolle of the Aggravated Kidnapping Charge.

(3) An interview with me with my attorney, R. Jackson Rose, present wherein I will tell the truth.

I agree to testify truthfully at trial of this case, if called by the State.

Later in the day, on August 16, 1985, Guillory did indeed plead guilty, and the transcript of her guilty plea hearing is included in this hearing. At the conclusion of the hearing, the assistant district attorney stated:

As the Court may note, on the back of the plea agreement and waiver, the State *intends to recommend* a ten (10) year sentence to be served as a Range One thirty (30) percent offender, conditioned upon the happenings of certain events; that is, upon the trial of the co-defendant, Timothy Glutch, the State may call Sharon K. Guillory to testify on behalf of the State. We would expect she would testify in accordance to a statement she has given in the presence of her attorney, myself, and another witness this day, and should she either refuse to testify or testify falsely, the State would, and did place her on notice in writing in the statement, withdraw the recommendation concerning the sentence to be imposed. (emphasis added)

The court then reserved the imposition of sentence.

When called upon to testify at the petitioner's trial, the following exchange took place between Guillory and the petitioner's trial counsel:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***3** Q. And you gave a statement or agreed to plead guilty for a reduced sentence?

A. I gave a statement and agreed to plead guilty, not that I know to a reduced sentence. *My guilty plea was not based on any particular offer.* I decided to plead guilty last May.

Q. Has the State agreed to a number of years, recommended sentence that you're aware of?

A. I don't think any recommendation has really been made yet.

Q. so you don't know how many years you were pleading guilty to?

A. I was pleading guilty to the charge.

(emphasis added)

Guillory seems to have attempted to walk a very fine line relying on the prosecution's not having officially recommended her sentence to the trial court. However, in view of her signed agreement, it seems that she slipped by claiming that her plea was not based on any particular offer. Even if this portion of her testimony were not considered perjury, it is misleading. We find it hard to believe that one appropriately formulated question from one of the assistant district attorneys would not have put an end to any possible confusion. Unfortunately, the assistant district attorney who executed the written plea agreement with Guillory appears to have only added to the confusion by remarking during closing argument that Guillory was "convicted of the offense with which she was charged, armed robbery". He makes no mention of the kidnapping charge which was nollied.

Due process is violated when the prosecutor allows false evidence from a government witness to stand uncorrected. The fact that false testimony goes only to the credibility of the witness does not weaken this rule. United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir.1977). A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 766 (1972). *See* State v. Teague, 645 S.W.2d 392, 398 (Tenn.1983).

In reviewing the record in this case, we find that defense counsel argued that the witness had pled guilty in return for her testimony and that the number of years she received would depend upon her performance as a witness. Counsel also had been furnished with the witness' typed statement which made reference to a plea recommendation by the district attorney general. The record further reveals that the recommendation for Guillory's sentence was included on the "waiver" form executed at the time of her guilty plea. In light of these factors, we do not believe that there is a reasonable likelihood that the jury's judgment was affected; thus, this issue does not merit the ordering of a new trial.

In the petitioner's second issue he contends that this Court must presume that he was rendered ineffective assistance of counsel because he was appointed and represented by Jackson Rose, who was retained by his codefendant. In his third issue he contends that if such may not be presumed, the Court should find that he was rendered ineffective assistance of counsel since he had made it clear he would not testify against Guillory and counsel had advised him not to make any statements. We do not agree with the petitioner's contentions.

***4** Although Rose does not recall having been retained by Guillory, the preliminary hearing transcript reflects that he was. There is no dispute concerning the fact that he was appointed to represent the petitioner at the general sessions level. While James Estep, III, became the petitioner's appointed counsel from the time of his arraignment in criminal court, we find nothing in the record to indicate that any possible conflicts of interest between the petitioner and his codefendant were explained to the petitioner during the time that Rose represented both. Testimony from the post-conviction hearing reveals that Rose believed that the petitioner's and the codefendant's interests were consistent at the time of the preliminary hearing. In addition, Estep does not recall the petitioner's voicing any complaints concerning the quality of Rose's representation. Our review of the preliminary hearing transcript indicates that Rose argued far more strenuously for a reduction of the petitioner's bond than for reduction of the codefendant's.

However, because Rose helped negotiate Guillory's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

plea agreement while possessing the knowledge that the petitioner had said he would not testify against Guillory and after having advised the petitioner not to make any statements, the petitioner concludes that he received ineffective assistance of counsel. We note that Rose testified that he was aware of and recognized problems in attempting to represent codefendants and that he would not have given any advice to the petitioner after he was appointed to represent Guillory in criminal court. The record is unclear as to the exact date that new counsel was appointed for the petitioner in criminal court, the date that Rose began discussing a possible guilty plea with Guillory, or if Rose ever represented Guillory and the petitioner at the time of the negotiation of Guillory's guilty plea.

When a conflict of interest is the basis for a Sixth Amendment claim, prejudice may or may not be presumed. If the defendant or defense counsel gives the trial court notice of an alleged conflict, and the trial court fails to inquire into the conflict, a reviewing court will presume prejudice upon a showing of possible prejudice. *United States v. Ziegenhagen*, 890 F.2d 937, 940 (7th Cir.1989). If no objection is raised at trial, an actual conflict of interest adversely affecting his or her attorney's performance must be demonstrated by the defendant/petitioner. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

In this case the alleged conflict does not appear to have existed after the proceedings were initiated in criminal court. The petitioner and Guillory had separate counsel from their time of arraignment. The trial court was never made aware of any previous conflict and, therefore, prejudice is not presumed, nor do we find any showing of prejudice from the record.

We also note that the petitioner in post-conviction relief proceedings has the burden of proving the allegations in his or her petition by a preponderance of the evidence. *McBee v. State*, 655 S.W.2d 191, 195 (Tenn.Crim.App.1983). In addition, the factual findings of the trial court in postconviction hearings "are conclusive on appeal unless the evidence preponderates against the judgment". *State v. Buford*, 666 S.W.2d 473, 475 (Tenn.Crim.App.1983). The trial court did not find Rose's representation to be ineffective, and we do not believe that the evidence preponderates against this finding. The petitioner has not carried his burden on this issue.

***5** Finally, the defendant contends that Estep rendered ineffective assistance at trial and, because of a conflict of interest, on appeal. He bases his claim of ineffective assistance at trial on his counsel's failure to request a continuance to prove that Guillory had lied when she denied having authored a certain note, failure to remedy the allegedly unconstitutional conditions under which the petitioner was being held, and failure to become familiar with the facts of the case such as the terms of Guillory's plea agreement. In addition, he bases his claim of ineffective assistance of counsel on appeal on Estep's having been the attorney for Claiborne County while pursuing his appeal and knowing that the petitioner had filed a civil suit against the county which was pending during that time. This suit sought relief because of the jail conditions and ultimately resulted in a settlement of four thousand five hundred dollars ($4,500) according to the petitioner's testimony.

To some degree Estep responded to these allegations during the post-conviction hearing. He explained that the petitioner had been concerned about a note allegedly written by Guillory and "slid down the jail floor to [the petitioner]"; however, he went on to add that "it didn't make a bit of sense". Furthermore, he recalled no discussion during the trial concerning obtaining a handwriting expert although he did secure such an expert for the new trial hearing.

When asked about any efforts he may have made to improve the conditions under which the petitioner was being held, Estep claimed to have spoken with the sheriff about the matter on one or two occasions. Although he was unaware of the effect, if any, that this request had had, he remembered the sheriff's saying that the petitioner had been a problem and there was not much more which could be done for him but that "he would try".

Estep also claims to have been prepared for the case explaining such details as the number of conferences he had had with the petitioner prior to trial and his having interviewed Guillory "once or twice" prior to her plea and once afterward.

Finally, he acknowledged that he apparently had been the attorney for Claiborne County while pursuing the petitioner's appeal. He also admits to having been aware of the petitioner's suit which was pending

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

against Claiborne County at the same time; however, he explained that he had been unaware of the details as an insurance company had handled the defense. Furthermore, the petitioner testified that he had mentioned the suit to Estep and that Estep had suggested that he not continue telling him about it because he was the "city [county] attorney and there might be a conflict of interest there".

In reviewing the petitioner's Sixth Amendment claim of ineffective assistance of counsel with regard to Estep, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975). In order to prevail on a claim of ineffective counsel, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and that this performance prejudiced the defense. There must be a reasonable probability that but for counsel's error the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692, 694, 104 S.Ct. 2052, 2064, 2067-68, 80 L.Ed.2d 674 (1984); *Best v. State*, 708 S.W.2d 421, 422 (Tenn.Crim.App.1985).

***6** As stated earlier, a petitioner in post-conviction relief actions must prove his or her allegations by a preponderance of the evidence. *McBee*, 655 S.W.2d 191, 195, and the trial court's findings are conclusive "unless the evidence preponderates against the judgment." *Buford*, 666 S.W.2d 473, 475. The trial court in this case determined that the defendant had received effective assistance of counsel at trial. Specifically, the court found that the petitioner was adequately and effectively represented in both the general sessions court and the trial court, that he was represented by counsel without any conflicts of interest, and that the State did not offer perjured testimony nor did it fail to disclose exculpatory evidence. While we disagree with the trial court's finding concerning Guillory's testimony, we do not believe that such resulted in ineffective assistance of counsel. This portion of the petitioner's issue concerning Estep's alleged ineffectiveness at trial is without merit.

Also lacking merit is the petitioner's allegation of ineffective assistance on appeal because of a conflict of interest. To be successful on this type of claim, the petitioner must show prejudice. *Roy Langford v. State*, No. 88-105-III, Cheatham County (Tenn.Crim.App. filed December 29, 1988, at Nashville). The record reveals no prejudice to the petitioner as a result of an apparent conflict of interest on the part of appellate counsel.

From our review of the record in this cause, we do not find that the evidence preponderates against the judgment of the trial court; thus, the judgment is affirmed.

JONES and TIPTON, JJ., concur.

Tenn.Cr.App.,1992.
Glutch v. State
Not Reported in S.W.2d, 1992 WL 24056 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Kirby v. State

# 1994 WL 525086

# (Tenn. Crim. App. Sept. 28, 1994)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Knoxville.
Howard Clifton KIRBY, Appellant
v.
STATE of Tennessee, Appellee.
**No. 03C01-9303-CR-00074.**

Sept. 28, 1994.
Permission to Appeal Denied March 20, 1995.

David M. Eldridge, Knoxville, TN

Charles W. Burson, Kimbra R. Spann, Nashville, TN

Randall E. Nichols, Robert L. Jolley, Jr., Knoxville, TN

OPINION

WHITE.

***1** Appellant, Howard Clifton Kirby, appeals as of right from the Knox County Criminal Court's denial of post-conviction relief from his 1989 conviction as a habitual criminal.[FN1] Appellant contends that his 1976 guilty pleas in which he pled guilty to multiple counts of armed robbery, robbery, and burglary must be set aside due to a conflict of interest resulting from counsel's joint representation of appellant and two co-defendants.

FN1. At the time appellant was convicted under the habitual criminal statute, he also pled guilty to one count of third degree burglary. That plea is not at issue in this appeal.

In his petition for post-conviction relief, appellant claimed that the conflict of interest resulting from multiple representation denied him effective assistance of counsel. He alleges that he did not knowingly and intelligently waive his right to independent counsel because, although he knew that his attorney represented a co-defendant who would testify against him, he was never informed of the consequences of joint representation. After an evidentiary hearing, the trial court found that no actual conflict of interest existed in the joint representation, but that, if a conflict existed, appellant had waived any right to relief. We reverse.

I. *Standard of Review*

When reviewing the dismissal of a post-conviction petition, this court must affirm the judgment of the trial court unless the evidence in the record preponderates against the judgment. A trial court's findings of fact at an oral hearing have the weight of a jury verdict. *Breton v. State,* 477 S.W.2d 754, 756 (Tenn.Crim.App.1971). On appeal, those findings are conclusive unless the evidence preponderates against the judgment. *Butler v. State,* 789 S.W.2d 898, 900 (Tenn.1990). Therefore, this court must review the record to determine whether the evidence contained therein preponderates against the trial court's finding that there was no actual conflict of interest in this instance and that, if a conflict existed, the appellant waived that conflict.

The rules of appellate review are well-established. First, this court cannot reweigh or reevaluate the evidence; nor can it substitute its inferences for those drawn by the trial court. *Farmer v. State,* 574 S.W.2d 49, 51 (Tenn.Crim.App.1978); *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978). Second, questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are matters resolved by the trial court. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983). Third, appellant has the burden of establishing that the evidence in the record preponderates against the findings of the trial court. *Butler v. State,* 789 S.W.2d at 900.

In the 1976 cases, appellant and two co-defendants, Tony Sheppard and Steven Chapman were represented by attorney Ray E. Cate. Attorney William A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Davidson assisted Cate in handling this matter. Cate is now deceased.

Chapman was a co-defendant in five of the ten cases. In one of the cases, Chapman gave a statement to the police which implicated appellant in a robbery at the Heart of Knoxville Motel and exculpated himself. He indicated his willingness to testify against appellant and co-defendant Sheppard. We know Cate was aware of Chapman's statement because the statement was part of Cate's files, and because Cate spoke to appellant about it.

***2** Co-defendant Sheppard and appellant pled guilty. Appellant received an effective sentence of thirty years. Chapman maintained his claim of innocence and ultimately, the charges against him were dismissed upon motion of the state. The court file contains no explanation for the dismissal. At the post-conviction hearing, the prosecutor in the 1976 cases, Randy Nichols, testified that the cases against Chapman were dismissed because one of the witnesses refused to come back for trial and because the proof against Chapman was weak.

In 1989, appellant pled guilty to a single count of third-degree burglary and to a habitual criminal charge. Based on his prior convictions, he received a life sentence.FN2 He challenges the convictions used to support the finding of habitual criminality.

> FN2. In addition to the 1976 convictions, appellant pled guilty to third degree burglary in 1972. He was sentenced to serve three years.

At the post-conviction hearing, appellant, Davidson, and Nichols testified. Neither Davidson nor Nichols had any independent recollection of the 1976 guilty pleas. Davidson testified that he did not know whether he or Cate ever discussed the existence of a conflict of interest in the joint representation of Chapman and appellant. He testified only that it was Cate's practice to make a client aware of a conflict. Nichols testified that, after reviewing the files, he had no memory of any basis for removing Cate from the representation of the co-defendants.

At the evidentiary hearing, appellant stated that, in the beginning, he did not want to plead guilty. Later, however, he changed his mind. The appellant testified that:

A. He told me he was representing Mr. Chapman.

Q. Did he discuss the matter any further with you?

A. Just that the statement he wrote on, ah, against me.

...

Q. Did Mr. Cate tell you that Mr. Chapman was going to testify against you?

A. He said it was possible.

...

Q. And when Mr. Cate said it was possible that Mr. Chapman would testify against you, did he ask you whether he wanted you to, to continue, to continue to have him as a lawyer?

A. He said that, ah, that, ah, Steve could testify against me. He said, but we wouldn't worry about that right now, till we go in there and see what they were going to offer.

...

Q. And Mr. Cate talked to you about that statement, and the possibility of Mr. Chapman testifying?

A. Yes, sir.

Q. And you still wanted, at that time, Mr. Cate to represent you?

A. Yeah.

...

Q. Howard, when, ah, when Mr. Cate discussed Mr. Chapman's statement with you, did he ever use the words "conflict of interest?"

A. No, sir.

...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q. Did he ever ask you to waive any conflict?

A. Not that I remember.

...

Q. Anything else that you recall, that he said to you about that issue?

A. Not that it, just that he was going to stay Steve's attorney, and mine until, to see what was going to, the outcome of the cases.

Q. Give you a choice?

A. He didn't ask me.

II. *Ineffective Assistance of Counsel*

***3** In Tennessee, the accused has a constitutional right to the effective assistance of counsel at all critical stages of a criminal prosecution. Tenn. Const. art. I, § 9; *Powell v. Alabama,* 287 U.S. 45, (1932); *McKeldin v. State,* 516 S.W.2d 82, 86 (Tenn.1974). Under the standard established by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984), in order to establish ineffectiveness, a criminal defendant must show both that counsel's performance was deficient and that the deficiency is sufficient to undermine confidence in the outcome of the proceeding. 466 U.S. at 694.

The standard is adjusted, however, in the context of a guilty plea. To set aside a guilty plea because of ineffective assistance of counsel, the counsel's performance must be deficient as defined in *Strickland.* However, to satisfy the "prejudice" element, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985); *Thomas v. Foltz,* 818 F.2d 476, 480 (6th Cir.), *cert. denied,* 484 U.S. 870 (1987).

The right to counsel contemplates that the services rendered shall be completely devoted to the interests of the accused. *State v. Knight,* 770 S.W.2d 771, 775 (Tenn.Crim.App.1988); *Moran v. State,* 472 S.W.2d 238 (Tenn.1971). A defense attorney must be "free to use all ... skills to provide the best possible defense for [the] client." *Zuck v. Alabama,* 588 F.2d 436, 440 (5th Cir.), *cert. denied,* 444 U.S. 833 (1979). Courts have long recognized that where counsel is unable to provide "zealous representation ... unfettered by a conflicting interest," a defendant's Sixth Amendment right to effective assistance of counsel is violated. *State v. Thompson,* 768 S.W.2d 239, 245 (Tenn.1989). *See Holloway v. Arkansas,* 435 U.S. 475 (1978); *Glasser v. United States,* 315 U.S. 60 (1942).

A claim of ineffective assistance of counsel based on an attorney's conflict of interest is examined under a slightly different standard than a traditional ineffectiveness claim. *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980). In *Strickland,* the Court summarized it's holding in *Cuyler* as follows:

In *Cuyler* ... [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

***4** 466 U.S. at 692.

*Strickland* specifically does not find, however, that multiple representation is per se prejudicial to defendants.[FN3] The Court explained that:

> FN3. However, there is a strong likelihood that an attorney who represents multiple co-defendants will encounter a conflict of interest as there will almost always be a disparity in their relative positions. Such representation may constitute a violation of the Code of Professional Responsibility. *See* Tenn. Sup.Ct. Rule 8, Code of Professional Responsibility, EC 5-14. An attorney should decline to represent multiple defendants unless a thorough investigation reveals that no conflict is likely to develop, and the defendants consent to the representation after

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> full disclosure. *See* The A.B.A. Standards for Criminal Justice, The Defense Function, § 3.5(b)(1986).

Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Id.* (*quoting* Cuyler v. Sullivan, 446 U.S. at 350, 348).

The primary question in the context of a guilty plea is whether the plea was a "voluntary and intelligent choice" made by the defendant. *North Carolina v. Alford,* 400 U.S. 25, 31 (1970). Therefore, the standard must be modified slightly to determine whether a conflict of interest in the entry of a guilty plea has resulted in a Sixth Amendment violation:

[T]o successfully assert a claim of ineffective counsel based on a conflict of interest, a defendant who entered a guilty plea must establish: (1) that there was an actual conflict of interest; and (2) that the conflict adversely affected the voluntary nature of the guilty plea entered by the defendant.

*Thomas v. Foltz,* 818 F.2d at 480 (citation omitted).

Appellant is not required to prove that, but for the conflict of interest, he would not have entered a plea. Once an actual conflict is proven, a petitioner need only demonstrate that counsel's conflict had an adverse impact on his decision to enter a guilty plea. *Id.* at 483.

### III. *Actual Conflict of Interest*

Until a defendant has established that defense counsel "actively represented conflicting interests, the defendant has not established the constitutional predicate for his claim of ineffective assistance." *Glasser v. United States,* 315 U.S. at 65-67. To demonstrate that an actual conflict existed, appellant must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action [that were] helpful to one client but harmful to the other. *Thomas,* 818 F.2d at 481 (quoting *United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.), *cert. denied,* 464 U.S. 991 (1983)). On the other hand, courts are reminded that it is notoriously difficult to prove a negative. The Supreme Court cautions that "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland,* 466 U.S. at 692; *Holloway v. Arkansas,* 435 U.S. at 490.

Actual conflicts have been found in circumstances similar to the one in this case. The Eleventh Circuit found an actual conflict where one defendant initially wanted to go to trial but the other did not, because it was "obvious that the brothers' attorney was placed in a position of divided loyalties." *Ford v. Ford,* 749 F.2d 681, 682 (11th Cir.), *cert. denied,* 474 U.S. 909, 106 S.Ct. 278 (1985). The Supreme Court has recognized that multiple representation may prevent an attorney "from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution." *Holloway v. Arkansas,* 435 U.S. at 490. In *Baty v. Balkcom,* the Fifth Circuit found that an actual conflict existed because, absent any conflict of interest, the attorney might have negotiated a plea agreement in which the defendant agreed to testify against the co-defendant in exchange for more favorable terms. *Baty v. Balkcom,* 661 F.2d 391 (former 5th Cir.1981), *cert. denied,* 456 U.S. 1011 (1982).

***5** In a Tennessee case, counsel represented one defendant, the appellant, who pled not guilty and a co-defendant who pled guilty. The co-defendant was called in rebuttal at trial and testified against the defendant. *Moran v. State,* 472 S.W.2d 238, 239 (Tenn.Crim.App.), *cert. denied,* (Tenn.1971). Although in this instance appellant pled guilty and the co-defendant who made the incriminating statement maintained his innocence, the reasoning of the court seems equally applicable to this case:

We feel one counsel representing co-defendant and petitioner under these circumstances could not be effective. At the very outset a red flag was hoisted, ... when their pleas to the indictment were conflicting. We are constrained to say that this fact of divergent pleas of the defendants was of itself more than prima facie evidence to alert the learned trial judge....

*Id.* (citations omitted).

The *Moran* court concluded:

[Defense counsel] was cast in the unenviable position of trying to explain away an incriminating statement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of one of his clients made to the detriment of the other. To have successfully defended both under these circumstances would have strained the abilities of the greatest prestidigitator who ever lived.

*Id.*

Although there are factual differences between the instant case and those summarized above, it is clear that Cate's representation of the appellant and Steven Chapman was an actual conflict of interest. From the beginning, Cate as defense counsel for appellant, represented another client whose statements and whose prospective testimony could convict the appellant. By the same token, Cate was precluded from offering appellant's testimony against Chapman during plea negotiations. While we do not know what factors entered into the agreement that was reached, the record indicates that the prosecution was interested in obtaining appellant's testimony against Chapman,[FN4] that appellant never testified against his co-defendant, and that the charges against Chapman were dismissed because the evidence against him was too weak. *See* Thomas, 818 F.2d at 478. It can reasonably be inferred from the facts in the record that the absence of any agreement in which appellant would testify against Chapman was at least partially influenced by Cate's need to protect Chapman. *See* Glasser v. United States, 315 U.S. at 73 (desire to protect co-defendant inferred from colloquy on the record).

FN4. Nichols testified that the prosecution's file contained notations concerning the possibility of bringing appellant in to testify against Chapman.

> Rule 44(c) of the Rules of Criminal Procedure requires that the trial judge advise co-defendants who are jointly represented of their right to effective assistance of counsel and independent representation This rule had not yet been adopted in Tennessee in 1976. It is relevant, however, that at the submission hearing, the trial judge advised the appellant of his right to a jury trial, his right to confront and to cross-examine witnesses, and his right to testify or not testify at trial. The trial judge made no mention of the right to counsel or independent representation.

> According to appellant, Cate told him that "we wouldn't worry about that right now till we go in there and see what they were going to offer."

The record does not support the trial judge's finding that there was no actual conflict of interest in the joint representation of the appellant and his co-defendant. The words of Chief Justice Burger in *Holloway v. Arkansas* are particularly relevant to the circumstance of this case:

[I]n a case of joint representation of conflicting interests the evil-it bears repeating-is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.

***6** 435 U.S. at 490. Cate was unable to put every possible card on the negotiating table on appellant's behalf because he also represented co-defendant Chapman. An actual conflict of interest existed.

IV. *Waiver*

The trial court held that even if an actual conflict existed, that appellant "has waived his right to post-conviction relief by acknowledging his knowledge of the potential conflict, and his waiver of it, and by not raising these issues some thirteen (13) years following his petition." We respectfully disagree. The record does not support a conclusion that appellant made a voluntary, knowing, and intelligent waiver of his right to conflict-free representation.

Waiver requires not only comprehension but relinquishment. Before a trial court can find that a defendant has waived a constitutional right, the state must prove an "intentional relinquishment of a known right or privilege." *Brewer v. Williams,* 430 U.S. 387, 404 (1977). An accused must make his choices with his eyes wide open. *Patterson v. Illinois,* 487 U.S. 285, 292 (1988). A valid waiver may not be presumed from a silent record. *Boykin v. Alabama,* 395 U.S. 238 (1969). *See* *State v. Mackey,* 553 S.W.2d 337 (Tenn.1977).

In order to constitute a knowing and intelligent waiver of appellant's right to conflict-free representa-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion, the state must show that (1) the defendant was aware that a conflict existed; (2) the defendant realized the consequences to his defense that continuing with counsel under the burden of a conflict could have; and, (3) the defendant was aware of his right to obtain other counsel. Zuck v. Alabama, 588 F.2d at 440. *See also* United States v. Casiano, 929 F.2d 1046, 1052 (5th Cir.1991); United States v. Roth, 860 F.2d 1382, 1387-88 (7th Cir.1988).

Appellant was aware of the factual circumstances that created the conflict of interest. He testified that when Cate talked to him about Chapman's statement and possible testimony, he still wanted Cate to represent him. Nothing indicates, however, that appellant knew that the joint representation was a conflict that could jeopardize his interests. Nothing in the record demonstrates that appellant was made aware of the dangers of joint representation, the implications it held for his plea bargaining position, or the straight-jacket into which it thrust his attorney. Davidson, who had assisted Cate, was unable to state that appellant had been informed about the conflict of interest, and testified only that it was Cate's practice to inform clients of potential conflicts. The trial judge who accepted the guilty plea did not advise appellant of his right to counsel or make any inquiry regarding the joint representation of three defendants, two of whom were pleading guilty and one who was not.

Cate informed appellant that he also represented Chapman and that Chapman might testify against him. He did not make appellant aware of the consequences of joint representation on plea bargaining, and never asked appellant if he would like a different lawyer. In fact, appellant believed that a problem would arise only if plea bargaining did not succeed.

***7** Appellant did not realize or have an appreciation for the impact that the conflict would have upon his defense even in the plea bargaining stage. He was never informed of his right to independent counsel. He did not make any intelligent and knowing decision to continue Mr. Cate's representation. The record does not sustain a finding of a voluntary and intelligent waiver of a known right.

V. *Adverse affect on the guilty plea*

Having determined that in this case an actual conflict of interest existed and that there was no waiver of the conflict, we must now determine whether the record contains evidence showing that the conflict adversely affected appellant's guilty pleas. A strict showing of prejudice under the *Strickland* standard is not required. Prejudice is presumed if the defendant is able to demonstrate an adverse impact on the voluntariness of his plea. *Strickland*, 466 U.S. at 692; *Cuyler*, 446 U.S. at 349-50.

Appellant need not show that, but for the conflict, his attorney would not have urged him to plead guilty and he would not have entered a plea. *Thomas v. Fultz*, 818 F.2d at 483. Nor is it proper to consider whether another attorney, untainted by a conflict of interest, would also have recommended that appellant accept the plea bargain offered by the state. *Id.* Appellant has the lesser burden of proving that the conflict had some adverse impact on his plea.

The record leads us to conclude that the multiple representation adversely impacted appellant's pleas on the five cases in which Chapman was his co-defendant. The prosecutor testified that the state was interested in obtaining appellant's testimony against Chapman. A memo to the file evidenced that appellant was the necessary link to a successful prosecution of Chapman in the four armed robbery cases and in the single simple robbery case. In the four armed robbery cases, which arose out of one incident at a mobile home, Chapman maintained his innocence. Only one victim could identify Chapman at all, and his testimony was described in the state's memo as "lukewarm." The memo recited only one alternative to retiring the four cases against Chapman:

I have also asked that Mr. Kirby be brought back from the Penitentiary for [the simple robbery trial] and I hope that I might be able to discuss it with him and get him to testify against Mr. Chapman in the simple robbery and also, with his cooperation, we might be able to get him to testify against Mr. Chapman on the armed robberies and then again bring these matters to the active trial docket and try Mr. Chapman.... With the assistance of Mr. Kirby and the lukewarm testimony of Mr. Marcus, I think we have a possibility of convicting Mr. Chapman....

Undoubtedly appellant would have benefitted from the state's use of his testimony. Thus, counsel's inability to negotiate that arrangement because of multiple representation adversely impacted the five pleas

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in cases number 2430, 2433, 2484, 2681, and 2278.

***8** We are unable to determine on this record whether the conflict adversely impacted the other pleas. For example, we do not know whether the offer made to appellant was contingent upon his pleading guilty to all offenses or if he could have received the same offer on only these five. We, therefore, remand this case to the trial court for a consideration of whether the actual conflict of interest, which we have found to exist, had an adverse impact on any of appellant's pleas other than those in which Chapman was appellant's co-defendant.

Accordingly, we reverse the trial court's denial of appellant's petition for post-conviction relief and set aside the five 1976 guilty pleas in which Chapman was appellant's co-defendant. We remand this case for consideration of the impact, if any, that the multiple representation had on the other pleas. Following that determination, the court must determine the validity of the 1989 conviction for habitual criminality.

WADE and SUMMERS, JJ., concur.

Tenn.Crim.App.,1994.
Kirby v. State
Not Reported in S.W.2d, 1994 WL 525086 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Smith v. State

# 1997 WL 658993

# (Tenn. Crim. App. Oct. 23, 1997)

Not Reported in S.W.2d, 1997 WL 658993 (Tenn.Crim.App.)
**(Cite as: 1997 WL 658993 (Tenn.Crim.App.))**

**H**Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Jackson.
Shannon L. SMITH, Keith Versie, AND Michael L. Wofford, Appellants,
v.
STATE of Tennessee, Appellee.
**No. 02C01-9508-CR-00241.**

Oct. 23, 1997.

FOR THE APPELLANT: Richard B. Fields Attorney at Law 699 Jefferson Avenue Memphis, TN 38105 George KendricksL. Song Richardson Attorneys at Law 99 Hudson Street, Suite 1601 Steven W. Hawkins Attorney at Law 918 F Street, N.W., Suite 601 Washington, DC 20004

FOR THE APPELLEE: John Knox Walkup Attorney General & Reporter 500 Charlotte Avenue Nashville, TN 37243-0497 Michael J. Fahey, II Assistant Attorney General 450 James Robertson Parkway Nashville, TN 37243-0493 New York, N.Y. 10013 William L. Gibbons District Attorney General 201 Poplar Avenue, Suite 3-01 Memphis, TN 38103 John W. Campbell Assistant District Attorney General 201 Poplar Avenue, Suite 3-01 Memphis, TN 38103

OPINION

JONES, Presiding Judge.

*1 The issue this Court must resolve in this extraordinary appeal is whether the trial court abused its discretion by disqualifying counsel in this post-conviction proceeding based upon a conflict of interest amongst the petitioners. After a thorough review of the record, the briefs of the parties, and the law governing the issue presented for review, it is the opinion of this Court the judgment of the trial court should be reversed and this action remanded to the trial court for further proceedings consistent with this opinion.

On the evening of June 24, 1991, at approximately 9:12 p.m., three African-American males approached Terry and Elizabeth Wilbanks and attempted to rob them. When the couple attempted to flee, Terry Wilbanks was shot. He died as a result of this gunshot wound. Elizabeth Wilbanks was shot in the hip. She survived the gunshot wound.

The petitioners were arrested at a fast food outlet approximately two blocks from the situs of the robbery. The petitioners entered the following guilty pleas pursuant to a plea bargain agreement:

1.) Shannon L. Smith: murder in the perpetration of a robbery, confinement for life in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction;

2.) Keith Versie: murder in the perpetration of a robbery, confinement for life in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction; and

3.) Michael A. Wofford: facilitation to commit murder in the perpetration of a robbery, confinement for twenty-five (25) years in the Department of Correction; especially aggravated robbery, confinement for twenty-five (25) years in the Department of Correction; aggravated assault, confinement for six (6) years in the Department of Correction.

The petitioners filed a joint petition for post-conviction relief on April 20, 1995, in the Criminal Court for the Thirtieth Judicial District. The petition alleged the ineffective assistance of counsel and the entrance of involuntary pleas of guilty. The state filed an answer on May 3, 1995.

On or about the 30th day of May, 1995, the state filed a pleading entitled "Motion to Remove Counsel Due

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to Conflict of Interest." The motion alleged that (a) Wofford will be subject to a life sentence if his convictions are set aside, (b) counsel will use Wofford to benefit Smith and Versie, and (c) Wofford should be advised of the consequences of his actions in seeking to set aside his convictions. Based upon these concepts, the state asserted there was a conflict of interest between Smith and Versie on the one hand and Wofford on the other hand. Both the state and the petitioners rely upon the Sixth Amendment to the United States Constitution, Article I, § 9 of the Tennessee Constitution, and the Code of Professional Conduct, Tenn.Sup.Ct. R. 8.

***2** On July 27, 1995, Alan E. Glenn, a former assistant district attorney and presently in the private practice of law, entered a limited appearance on behalf of Wofford. On this same date, Mr. Glenn, a person of sterling character, advised the trial court he had talked to Wofford and Wofford's mother regarding the proceedings pending before the trial court. He explained to Wofford the potential for a conflict of interest and what may occur if his convictions were set aside. Wofford advised Glenn he wished to waive any conflict of interest and proceed with the suit for post-conviction relief with his two former co-defendants.

The trial court subsequently entered an order disqualifying counsel of record from representing any of the petitioners. The order recites that Wofford had waived any conflict of interest. However, the trial court ruled this waiver was not binding upon the court. According to the trial court, whether to permit the waiver of a conflict of interest rests within the sound discretion of the trial court.

I.

Since the creation of the Post-Conviction Act, the appellate courts of this jurisdiction have been unable to determine whether suits brought pursuant to the Act are civil or criminal in nature. The courts have referred to such proceedings as "criminal," "quasi-criminal," and a "hybrid affair."

In *State v. Scales,* 767 S.W.2d 157, 158 (Tenn.1989), the issue before the supreme court was whether the waiver of the notice of appeal provision contained in Rule (4)(a), Tenn.R.App.P., could be applied in a post-conviction relief proceeding. The supreme court, stating "post-conviction proceedings are criminal in nature," held the waiver provision was applicable in post-conviction suits.

In *State v. Ronnie C. Styles,* Cocke County No. 03-S-01-9108-CR-00067 (Tenn., Knoxville, January 25, 1993), Styles was indicted for committing perjury in a post-conviction proceeding brought by Ronald Cassity. The question arose regarding the difference in the statute of limitations between criminal and civil cases. The court said in ruling:

Neither party, as defense counsel has pointed out in the defense brief, have been able to discover a case in this jurisdiction directly pointing out whether a post-conviction proceeding is a civil matter or a criminal matter.

We agree there has been a blur in the definition between civil and criminal cases heard under the provisions of the Post-Conviction Procedure Act. In this jurisdiction such proceedings have variously been referred to as quasi civil or quasi criminal. In *Mitchell v. State,* 512 S.W.2d 661, 663 (Tenn.Crim.App.1974), the Court of Criminal Appeals held a petition for habeas corpus and a post-conviction petition to be *pari causa* when the relief and procedure authorized by the Post-Conviction Procedure Act appears adequate and appropriate. We find the comment of the United States Supreme Court in *Smith v. Bennett,* 365 U.S. 708, 81 S.Ct. 895, 897, 6 L.Ed.2d 39 (1961), to be relevant in this case. In *Smith* the court said: "We shall not quibble as to whether in this context it be called a civil or criminal act.... The availability of a procedure to regain liberty lost through criminal process cannot be made contingent upon a choice of labels."

* * * *

***3** A post-conviction proceeding is a hybrid affair, involving an appeal from a criminal prosecution which is considered under civil rules of procedure.

* * * *

The procedural characteristics of the post-conviction remedy should be appropriate to the purposes of the remedy. While the post-conviction proceeding is separate from the original prosecution proceeding,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the post-conviction stage is an extension of the original proceeding and should be related to it insofar as feasible.

Post-conviction review has become an established part of the criminal process. In formulating a rule we recognize that the post-conviction proceeding is procedurally separate and apart from the original criminal prosecution.... It seeks not to convict, but to set aside a conviction which is void or voidable because of the abridgement of constitutional rights. The base root of the proceeding is criminal. The post-conviction stage of a criminal trial is an extension of the original proceeding. The procedure by which a criminal conviction may be set aside is civil in nature, therefore, it is tried under the Rules of Civil Procedure and less stringent evidentiary rules apply.

*Styles,* slip op. at 6-9. In *Watkins v. State,* 903 S.W.2d 302, 305 (Tenn.1995), the supreme court essentially adopted the holding in *Styles* without making reference to the case.

The Tennessee Rules of Post-Conviction Procedure, created by the supreme court, add another dimension to this dilemma. Section 3(B) states "[n]either the Tennessee Rules of Civil Procedure nor the Tennessee Rules of Criminal Procedure apply to post-conviction proceedings...."

While the supreme court has made an effort to clarify the nature of post-conviction proceedings, the distinction remains blurred. After stating in *Styles* and *Watkins* the proceedings are civil in nature and are governed by the Rules of Civil Procedure, the supreme court has formulated a rule which states that neither the civil or criminal rules apply in these proceedings unless specifically designated by a particular provision of the rules. Tenn.Sup.Ct.R. 28 § 3(B).

II.

It has long been established that the right to counsel provisions embodied in the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution extend through the first appeal as of right. *Pennsylvania v. Finley,* 481 U.S. 551, 554-55, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539, 545-46 (1987); *House v. State,* 911 S.W.2d 705, 712-13 (Tenn.1995), *cert. denied,* 517 U.S. 1193, 116 S.Ct. 1685, 134 L.Ed.2d 787 (1996). In other words, there is no constitutional right to the assistance of counsel in post-conviction proceedings. *Carruthers v. State,* 814 S.W.2d 64, 69 (Tenn.Crim.App.), *per. app. denied* (Tenn.1991). As the supreme court said in *House,* "the federal constitution does not require that states provide an attorney to an indigent postconviction petitioner...." 911 S.W.2d at 712.

***4** The petitioner in a post-conviction proceeding has a statutory right to the appointment of counsel when the petition alleges a colorable claim that has not been waived, previously determined, or barred by the statute of limitations. Tenn.Code Ann. § 40-30-207(b)(1) (formerly Tenn.Code Ann. § 40-30-107). The supreme court has also provided for the appointment of counsel in post-conviction cases. Tenn.Sup.Ct.R. 13 § 1.

The appellate courts of this state have zealously guarded a petitioner's right to counsel in post-conviction cases. *See, e.g., Allen v. State,* 854 S.W.2d 873, 876 (Tenn.1993); *Swanson v. State,* 749 S.W.2d 731, 734-35 (Tenn.1988); *Martucci v. State,* 872 S.W.2d 947, 948 (Tenn.Crim.App.1993); *State v. Clark,* 774 S.W.2d 634, 636 (Tenn.Crim.App.1989); *State v. Mullins,* 767 S.W.2d 668, 670 (Tenn.Crim.App.1988), *per. app. denied* (Tenn.1989); *Childress v. State,* 695 S.W.2d 541, 543 (Tenn.Crim.App.1985); *Mayes v. State,* 671 S.W.2d 857, 859 (Tenn.Crim.App.1984); *Haynes v. State,* 637 S.W.2d 467, 468 (Tenn.Crim.App.1982). The number of unreported cases which have reversed the trial court for the failure to appoint counsel are legion. In *State v. Butler,* 670 S.W.2d 241, 243 (Tenn.Crim.App.), *per. app. denied* (Tenn.1984), this Court said "the assistance of counsel is necessary to aid both the petitioner and the courts in bringing this matter to a proper conclusion."

III.

The precise question this Court must resolve is whether (a) the petitioner is entitled to be represented by private counsel of his or her choice, (b) there is a conflict of interest in this case, and, if so, whether (c) the petitioner has a right to waive a conflict of interest created by joint representation. The appellate courts of this state have not addressed these issues.

A petitioner in a post-conviction action has a qualified right to be represented by retained private coun-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

sel of his or her choice. For instance, retained private counsel must be licensed to practice law in Tennessee and be in good standing with the appropriate agencies. Counsel licensed in another state may represent the petitioner if counsel complies with the *pro hac vice* requirements contained in the Supreme Court Rules. Of course, there are numerous other factors that could affect this qualified right.

In this case, the facts do not create a conflict of interest. All three petitioners were convicted for engaging in the same criminal conduct after they entered their respective pleas of guilty. The grounds raised in the petition are common to all three petitioners. If each petitioner was granted a separate evidentiary hearing, or each granted a separate lawyer, the same evidence would be adduced at each hearing or by each lawyer. In short, whether or not there may be disparity in sentencing if the petitioners are granted a new trial and are convicted does not create a conflict of interest in this proceeding. However, separate counsel may be required to represent the petitioners if a new trial is granted.

***5** Assuming *arguendo* there is a conflict of interest based upon multiple representation in a post-conviction action, the parties should be given the opportunity to waive the conflict in order to be represented by the same lawyer. Here, the state alleged Michael Wofford presented a conflict of interest, and private counsel should be barred from representing any of the petitioners. Separate counsel conferred with Wofford and his mother and announced to the trial court Wofford understood the possibility of a conflict of interest. However, he was willing to waive the conflict to be represented by private counsel filing the petition on his behalf.

The statements of counsel are insufficient, as a matter of law, to constitute a waiver of a potential conflict of interest.[FN1] The petitioner must be present in open court. The parties and the trial court should explain to the petitioner how an actual or potential conflict may affect him and that the petitioner has a right to be represented by separate counsel. The petitioner must be questioned under oath by the parties and the trial court to determine if the petitioner understands the actual or potential conflict. The petitioner must state under oath whether he desires to waive the actual or potential conflict. If the petitioner states he is willing to waive any actual or potential conflict of interest, the trial court shall permit the petitioner to be represented by private counsel absent a compelling reason to the contrary. In short, a trial court should not overrule the informed decision of the petitioner who knowingly and intelligently waives either a potential or actual conflict of interest, decides to be represented by his retained counsel of choice, and agrees to accept the consequences of his decision. *See* State v. Parrott, 919 S.W.2d 60, 62 (Tenn.Crim.App.1995).

> FN1. When a member of this panel asked the attorney arguing the merits of the petitioners' case if evidence had been presented regarding Wofford's desire to waive any potential or actual conflict of interest that might exist, counsel stated evidence had been presented at the hearing. The record, as previously noted, does not contain evidence of this fact. The statements of counsel do not constitute evidence. *See Delk v. State,* 590 S.W.2d 435, 440 (Tenn.1979); *State v. Dykes,* 803 S.W.2d 250, 255 (Tenn.Crim.App.), *per. app. denied* (Tenn.1990).

While Tenn.R.Crim.P. 44(c) is not applicable in post-conviction actions, the rule serves as a guideline as to how a trial court should proceed when a party asserts or it is readily recognized that an actual or potential conflict of interest may exist. Such a procedure will preserve the right to counsel in post-conviction actions prescribed by statute and rule.

This cause is remanded to the trial court for further proceedings consistent with this opinion.

WELLES and SMITH, JJ., concur.

Tenn.Crim.App.,1997.
Smith v. State
Not Reported in S.W.2d, 1997 WL 658993 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# State v. Chubb

# 2007 WL 258429

# (Tenn. Crim. App. January 29, 2007)

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Nashville.
STATE of Tennessee
v.
David Michael CHUBB.
**No. M2005-01214-CCA-R3-CD.**

June 20, 2006 Session.
Jan. 29, 2007.

Direct Appeal from the Criminal Court for Sumner County, No. 770-2002; Jane Wheatcraft, Judge.
Patrick T. McNally, Nashville, Tennessee (on appeal), and Michael W. Edwards, Hendersonville, Tennessee (at trial), for the appellant, David Michael Chubb.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sally Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

NORMA McGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. DAVID G. HAYES, J., filed a separate concurring opinion.

**OPINION**

NORMA McGEE OGLE, J.

*1 The appellant, David Michael Chubb, was convicted by a jury in the Sumner County Criminal Court of four counts of aggravated sexual battery, one count of attempted aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia. The trial court sentenced the petitioner to a total effective sentence of fourteen years incarceration in the Tennessee Department of Correction. On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred in failing to inquire into the conflict of interest when it was revealed at trial that the appellant's trial counsel had previously represented the mother of the minor victim; (2) whether the trial court erred in allowing the State to admit a videotape into evidence; (3) whether the trial court erred in denying the appellant's motion for a bill of particulars; (4) whether the trial court erred in charging a special jury instruction requested by the State; (5) whether, according to the dictates of *Blakely v. Washington,* the trial court erred in sentencing the appellant; and (6) whether the trial court erred in imposing consecutive sentences. Upon our review of the record and the parties' briefs, we reverse the convictions for aggravated sexual battery and attempted aggravated sexual battery based upon an improper instruction, affirm the drug related convictions, and remand for a new trial on the aggravated sexual battery and attempted aggravated sexual battery charges.

### *I. Factual Background*

The appellant was originally charged with one count of rape of a child, five counts of aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia. A trial was held on these charges.

At trial, Paula East, the mother of the victim, R.E.,[FN1] testified that she had two children. R.E. was born on June 8, 1988, and her brother, Shane, was born about a year later. East recalled that she had gone to school with the appellant and had "remet" him some years later at the Eleventh Frame, the bar section of a bowling alley. She and the appellant dated for a while before she and her children moved into his residence on Tyree Springs Road in Hendersonville in September 1992. She testified that her sex life with the appellant was "fine at first," but it began to dwindle. In May 1993, they moved into the Bluegrass Apartments. In December 1995, they moved to the Lake d'Ville Apartments. East stated that she and her children lived with the appellant for approximately nine years until her relationship with him ended in March 2001.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

At that time, East and her children moved in with her parents.

FN1. It is the policy of this court to refer to minor victims of sexual crimes by only their initials.

On April 10, 2002, East and R.E. were watching the news on channel 5 and saw a broadcast "regarding a sex abuse case." East stated that following the broadcast a list of questions was shown concerning possible signs that might indicate a child has been sexually abused. East maintained that after she saw the broadcast, it "[j]ust popped in my head that this fit my daughter for some reason or another." For example, East stated that R.E. experienced nightmares, could not sleep alone, clung to her, and displayed a lack of interest in school. Following the broadcast, East and R.E. had a conversation in which R.E. disclosed that the appellant had sexually abused her. The next morning, East reported the abuse to the Hendersonville Police Department.

*2 East noted that she had previously suspected that the appellant might be abusing R.E. East recalled that in late 1996 or early 1997, she took a painkiller before going to a neighbor's house. When East returned home, she saw R.E. lying on top of the appellant, and R.E. was trying to get his hand out of her panties. East told R.E. to follow her into the bathroom. East asked R.E. what was going on, and R.E. replied, "[N]othing." East asked R.E. if the appellant had touched her, and R.E. denied that any touching had occurred. East said that she had been dizzy and "woozy" because of the medication and did not want to believe what she had seen. Therefore, she convinced herself that she had been seeing things.

East stated that the appellant and R.E. were affectionate with each other. She maintained that the only time she was troubled by the appellant's touching of R.E. was the occasion when she saw them on the couch after she had taken painkillers. She did not confront the appellant about the incident. She did not think there was a need to talk with the appellant because she believed R.E.

East stated that near the end of her relationship with the appellant, he was unemployed and would watch the children while East was working. In 1999 and 2000, R.E. and Shane were in different schools; therefore, R.E. and Shane arrived home at different times.

East stated that sometimes she and the appellant used babysitters to watch the children. Regardless, East said that the appellant would occasionally watch the children while she ran errands.

East averred that she had not suspected that the appellant was continually abusing R.E. She believed that the appellant was merely acting like a father to her children because their biological father was not around.

East recalled that the appellant kept a boat and a Sea-Doo at the Creekwood Marina. East saw the boat twice during her relationship with the appellant, but the appellant spent many hours working on the boat. East did not believe that her children had ever been on the appellant's boat.

East conceded that she and the appellant were having problems in their relationship when she witnessed the couch incident. East denied knowing Lisa Gibbner, and she did not recall ever telling Gibbner that "payback was going to be hell" for the appellant. However, East acknowledged that she could have made the statement. East acknowledged that she could have said in anger that she would make the appellant pay; however, she did not recall ever making that statement. She said that at the time the sexual abuse report was made, she was no longer angry with the appellant nor was she "out to get" him.

The victim, R.E., testified that she was fifteen years old at the time of trial and her younger brother, Shane, was fourteen. She recalled that she, her mother, and her brother moved into the appellant's Tyree Springs residence when she was three or four years old. When she was five or six years old, they lived in the Bluegrass Apartments. When R.E. was approximately six years old and was attending first grade, the appellant began to make her "uncomfortable." She explained, "He would just touch me in inappropriate areas, in my breast area or my vaginal area." R.E. recalled that if her mother was away or not in the room and her brother was outside playing, the appellant would start to rub her back because she liked back rubs. Then, he would progress to intimate touching. R.E. stated that the appellant touched her inappropriately every day or every other day. R.E.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

said that initially she did not realize that the touching was wrong; she explained, "When I was little, I thought he's an adult; he can do this."

***3** When R.E. was six years old and living in Bluegrass apartments, she and the appellant were lying on the couch in the living room. Her mother and brother were not at home. R.E. testified, "The only thing I remember is he lifted me over his head and he licked me ." R.E. stated that she was not wearing panties, but she could not remember how her panties had been removed. The appellant licked her vaginal area.

Later, the appellant, East, R.E., and Shane moved to Lake d'Ville Apartments. When she was seven or eight years old, R.E. and the appellant were on the couch. The appellant had put his hand down R.E.'s panties and was touching her vaginal area. R.E. was standing and had begun pulling up her underwear when East walked in. East took R.E. out of the room because she thought she had seen something inappropriate. East questioned R.E., but R.E. asserted that nothing had happened. R.E. testified that she lied to East "[b]ecause I thought he had the right to do it. I didn't think there was anything wrong with it at that time.... [H]e was an adult, and I was told that adults can do what they want."

R.E. recalled that when she got a little older, she began resisting the appellant. Specifically, she recalled an incident that occurred when she was eight or nine years old and was living at the Lake d'Ville apartment. R.E. stated that

> [t]here was this one time when we were on the couch, and he started rubbing me. Somehow or another I got up, and I ended up on the floor. I don't remember if I tripped or what happened, but he ended up getting on top of me, and I tried to push him off. When I couldn't get him off, I slapped at him, and finally I got away and I ran.

R.E. recalled that both she and the appellant were fully clothed at the time. During the incident, the appellant touched her breasts and vaginal area. R.E. said, "As soon as I got away, I went back to the hallway, and I waited there. Whenever I came back in, he was seated on the couch, and I went to a chair across the room."

R.E. recalled another incident that occurred when she was seven or eight years old and living at Lake d'Ville. R.E. was sleeping in the bedroom with East, and R.E. awoke to find the appellant rubbing her back. She said, "We laid there a little bit, watching TV. And after a bit, he took my hand and made me grab him ... [o]n his private." R.E. had to hold the appellant's penis through his clothes for a while.

R.E. said that the appellant did not always talk during the incidents. She maintained, "He would just be really kind about it. Didn't say anything about what we were doing." However, if the appellant ever spoke during the abuse, his voice was "kind, soft" and not "harsh."

The week after July 4th, near the time that East, R.E., and Shane moved out of the appellant's residence, R.E. and the appellant went out on his Sea-Doo. They came to shore about sunset. The appellant's boat was docked, and R.E. and the appellant went onto the boat. R.E. said that they went down into a small sleeping compartment. The appellant turned on music, and they sat for a minute. R.E. was wearing a bathing suit consisting of shorts and a spaghetti strap shirt. The appellant touched R.E.'s breasts and later touched her vaginal area. R.E. was unable to leave because the appellant was positioned between her and the exit.

***4** Some time after R.E., East, and Shane moved out of the appellant's residence, R.E. and East were watching the news. They saw a program about a man and pornography. At the end of the program, five questions were shown as indicators that a child had been sexually abused. East told R.E. that she had three or four of the indicators. At that time, R.E. told her mother about the appellant's abuse because she felt like it was the right time, and she felt like she needed to "get it out." R.E. said that the appellant was no longer around, and she felt safe and protected.

After R.E. told East of the abuse, R.E. met with Detective Jim Vaughn. At Detective Vaughn's request, R.E. telephoned the appellant. Prior to the call, Detective Vaughn and R.E. discussed "scenarios" to talk about during the calls. R.E. stated that she lied to the appellant during the conversations to try to get him to confess to the abuse. R.E. told the appellant that she missed him and that she had a boyfriend named Eric. Neither of those things were true.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

R.E. stated that she would not have known if the appellant became aroused when he touched her. She said that she continued to feel the effects of the abuse. She explained that her friends could not approach her from behind and touch her shoulders because it would scare her or trigger flashbacks.

R.E. testified that the appellant was a father figure to her. She cared for him as a stepfather. She explained that she knew where certain incidents happened because she remembered "how everything was laid out. I remember that we had a small balcony. I remember small things." R.E. stated that the appellant and East did not have a happy relationship, and they had verbal arguments.

R.E. stated that she did not tell East about the abuse because she feared that East might not believe her or would get mad. After the incident in which she kicked the appellant, she wanted to tell East. However, she had previously lied to East about the abuse, and she thought that East would not believe her.

R.E. recalled that East was "pretty mad" when they moved out of the appellant's residence. The appellant had a girlfriend at the time. R.E. did not hear East say that she would get even with the appellant.

Detective Jim Vaughn with the Hendersonville Police Department testified that on April 11, 2002, after East reported R.E.'s sexual abuse, he became the lead investigator in the case. Detective Vaughn stated that delayed reporting was not unusual in a child sex abuse case because children try to forget the abuse as a coping mechanism. Detective Vaughn and Teresa Towery with the Department of Human Services interviewed R.E. at her school. After the interview, Detective Vaughn had R.E. telephone the appellant on April 16, 2002, in an attempt to gain incriminating information.

An audio recording of the April 16, 2002, conversation was played for the jury. The tape contained, in pertinent part, the following conversation:

> ***5** R.E.: Um, I was watching the news the other day and it said something about child abuse, and my mom ended up saying that, you know, I had some of the signs of it. But, you know, um, remember how you used to touch me and stuff?
>
> The appellant: Well, yeah.
>
> R.E.: Um. Well. Was that kind of sexual?
>
> The appellant: Well, no, I didn't think so. I mean, that was just, uh, [ (pause) ] you know [ (pause) ] just rubbing on you. I didn't think it was, I mean....
>
> ....

Did you?

> R.E.: Yeah, because I mean it was in my private areas.
>
> The appellant: Oh, well.
>
> R.E.: I don't know. But, I mean [ (pause) ]. Why did you though?
>
> The appellant: Well I didn't, I didn't think that, uh, I didn't think that it was, you know, [ (pause) ] that way.
>
> ....
>
> I thought you know, you were just, if it was, you know, if, I would believe that if it was like sexual that, you know, there it would have been, it would have been different. I don't know, but....
>
> ....
>
> Damn, darling. I'm sorry you feel that way.
>
> ....
>
> R.E.: Yeah. Do you think I should tell my mom about you touching me and stuff?
>
> The appellant: Well, I [ (pause) ] [ (sigh) ] [ (pause) ]. I, you know, I don't think so, you [ (pause) ] it wouldn't, you know, it would probably save me a whole lot of trouble [ (stammering) ] if you know, if you feel bad about it, then....
>
> R.E.: Trouble from what?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The appellant: Well, you know, that [ (pause) ] can start some, I imagine that could start trouble for me.

R.E.: What would happen to you?

....

... I mean like, do you think my mom would go to the police or something?

The appellant: Well, I'd hope not, but I, you know. Never can tell. She was always kind of, uh, [ (pause) ] nervous like that. I mean, I don't know how she is now, is she getting any better?

....

R.E.: Yeah. We just, I just want to know why, you know. Why you really did that.

The appellant: [ (pause) ] Well, uh, I, I don't know why. I mean, I guess, [ (pause) ] you, you know we were laying there and uh, [ (pause) ]. It felt like, you know, it looked like to me that you wanted me to do that and [ (pause) ] until you told me to stop and then I always stopped, you know.

R.E.: Hmm. Sometimes you didn't. Sometimes you kept on.

The appellant: [ (pause) ] Well, I, I [ (stammers) ], I don't, you know, I don't, I guess I don't really know how to explain it. But you know, I-I-I hope that it's not bothering you. Does it seem to ... does it bother you?

R.E.: [ (sigh) ]

The appellant: I mean, apparently it does. You called me up out of the blue to ask me about it.

R.E.: Well, yeah, it does kind of bother me. I mean it made me kind of-it made me feel like I had done something, you know.

....

And I just really need to talk to somebody. I don't know who to-who to talk to.

....

I can't go to my mom because she'd probably flip.

***6** The appellant: Yeah.

....

Well, would you like to talk to me about it? I mean....

....

Well, hopefully we can talk-we can talk the way through this, I, you know, like I said didn't think that it would be-I didn't really look at it as that way.

R.E.: I mean, I thought about talking to, just like a secret help-line, police line or something, and-I didn't know.

....

That would help.

The appellant: [ (sigh) ][ (pause) ] Well, that could help, I don't know. [ (stammering) ] Like I say, I'd hope that, uh, between the two of us we could take, we could, uh, talk it out or whatever or maybe you, you know, maybe you do need to find....

....

Someone else to help us. But, I didn't-I-like I say-I-didn't think of it as, as, as sexual, as that way.

....

R.E.: I mean in a way it kind of was.

The appellant: Well, I [ (pause) ]. I-like I say I-I just never thought of it that way, and I'm-I-I guess-I-you know I don't want to say that you got the wrong idea about it, but....

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

....

R.E.: It started when I was a little girl.

The appellant: Well, that's what I thought-I-you know-I thought that was just-that-something that you want-something-that, uh-you like for me to do and-I-like I said when, when I did, when you, you told me to stop I did. I didn't have any, you know....

R.E.: Yeah, well, I mean, there's just some times where I remember one time, you took me out of my room and stuff, and I was just kind, I got kind of ... you know-I've been kind of nervous, like am I a virgin? You never really done anything to me have you?

The appellant: Well, certainly, no. I have never. No.

....

... It wasn't anything like that sweetheart, that's why I say, I never thought of it as being like that. That's why I never thought of it being like, that way.

....

I mean, it was just sort of, you know, uh, rubbing your back, rubbing your shoulders, rubbing you-rubbing your tummy, you know, rubbing your legs.

R.E.: Well, in the inner parts of my legs, and between my legs. It was all over.

The appellant: Like I said, when-at that point when-when you told me to stop then, then I did.

....

No, it's nothing like that I.... Boy, no wonder it's bothering you like that. I'm-I'm sorry to hear that sweetheart. I really am.

....

R.E.: Okay. But, you don't think I should tell my mom?

The appellant: Well, I think your mom would probably pretty much freak out if you told her something like that, like you said. I don't, uh, like I say I'm-I'm-I'm sorry that you thought it was that way I-I-and-I-maybe-you know, unless it's really bothering you, may be more trouble than it's worth. Hopefully you and I can talk our way through this or-or maybe we-you and I can go get somebody to help us or whenever.

Detective Vaughn had R.E. place another call to the appellant on April 23, 2002. During this conversation, R.E. told the appellant that she had a boyfriend named Eric who had "been wanting to like touch me like you were and stuff.... Do you think I should let him?" The appellant responded, "Well, probably not, darlin'.... I'm sure that he's after something." R.E. told the appellant that East had asked R.E. about seeing her and the appellant on the couch once in a suspicious situation. The appellant said, "Really, I don't remember that.... You got a little bit better memory than I do."

***7** On September 12, 2002, Detective Vaughn and Detective Bob Fohrd went to the appellant's residence at Waterview Apartments to confront the appellant about the abuse of R.E. Detective Vaughn knocked on the door, and the appellant answered. Detective Vaughn asked the appellant if the detectives could come in to the apartment. The appellant stated that he needed to straighten up the apartment, and Detective Vaughn told the appellant that it was not necessary. The appellant then acceded to the detectives' request to enter.

As they were walking through the living room, Detective Vaughn saw two "one-hitters," wooden boxes which typically contain enough marijuana for a single use and an accompanying smoking apparatus. Detective Vaughn asked the appellant if anyone else was in the apartment. The appellant told him that his girlfriend, Audrey Wiater, was asleep upstairs.

The men proceeded to the kitchen, and Detective Vaughn told the appellant that he wanted to talk about the situation with R.E. The appellant said that he had told R.E. that she could discuss her problems with East or the police. Detective Vaughn informed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the appellant that R.E.'s calls had been recorded, and he was aware of what the appellant had said to R.E. Detective Vaughn said that he did not believe the appellant was truthful during the interview.

The appellant told the detectives that he had invited them in and could uninvite them. Detective Vaughn informed the appellant that the detectives could not leave because they had seen the "one-hitters" in the apartment. Detective Vaughn had several officers come to the apartment to watch the appellant while he went to apply for a search warrant. After obtaining the search warrant, Detective Vaughn returned to the appellant's apartment. The search of the apartment revealed two "one-hitters," marijuana seeds, a funnel, cigars, rolling papers, a marijuana pipe, and at least two bags containing a total of 5.3 grams of marijuana.

Keith Lovell, the chief videotape editor with WTVF in Nashville, testified at trial that on April 10, 2002, the station broadcast the program "Operation Candy Man." He stated that although the main portion of the broadcast was kept, the information immediately following the program was not kept. The main portion of the broadcast was then played for the jury.

The appellant testified on his own behalf. He stated that in 1991, he and East met at the Eleventh Frame nightclub in Hendersonville. Thereafter, they began living together with East's two children in a house he was renting on Tyree Springs Road in Hendersonville. When he and East first began living together, he spent six months working at Malone and Hyde. His hours were from 5:30 a.m. to 3:30 p.m., and he also worked as an auto mechanic on the side. The appellant said that at that time, he came home most evenings, and East was usually home with the children when he arrived.

The appellant then began working for Tom Bannen Chevrolet ("Tom Bannen"), and he stayed there for six years. His working hours were 7:30 a.m. to 6:30 or 7:00 p.m., and he worked quite a bit of overtime but no weekends. He stated that he was alone with the children occasionally when East ran errands. In 1999, the appellant left Tom Bannen and opened Chubb's Automotive. He worked from 7:30 a.m. to 7:30 p.m. and occasionally worked weekends. He said that at that time he was "very rarely" alone with the children. The appellant closed Chubb's Automotive in 2001 and went through a period of unemployment from the end of 2001 to the beginning of 2002. The appellant recalled that during a period of unemployment, R.E. arrived home from school an hour or two before Shane, and the appellant was at home when R.E. arrived.

***8** The appellant testified that East left him on two occasions, the first being for three months in 1997. Thereafter, East returned to try to resolve their problems. The appellant said, "We fought quite a bit and [there was] not much love left in the relationship." He stated that they had verbal altercations over Lisa Gibbner, another woman in the appellant's life. The appellant began an affair with Gibbner when they both worked at Tom Bannen. In 1996, East called Tom Bannen and tried to get Gibbner and the appellant fired. The appellant learned from Gibbner that East called her at work and told her, "Payback is a bitch. I'll get you both."

After the appellant and East separated the second time, he did not hear from her again. Then, on April 16, 2002, he received a call from R.E. He said that he was "quite surprised" to hear from her. When East and the appellant were together, he formed a "pretty good ... father-daughter-type relationship" with R.E. He said that he loved her "as a child, you know as my daughter, as a stepdaughter." During the call, when R.E. mentioned the appellant touching her, he thought she was talking about the times he rubbed her back as they were watching television. The appellant said that he was careful in how he responded to R.E.'s conversation. He did not want to call her a liar or say that she was crazy because he was trying to be careful of R.E.'s feelings. He explained, "I wanted to try to smooth out the situation versus trying to aggravate it." The appellant stated that he sometimes rubbed R.E.'s back, but "[w]hen she would get up and tell me to stop, I would stop. You know, I never-I didn't rub in her private areas."

At trial, the appellant denied that he ever touched R.E. in a sexual manner. He said that he and R.E. would "[p]lay, wrestle, things like that." He never gave R.E. a bath or saw her naked because "[h]er mother was kind of protective of that."

The appellant stated that R.E. has never been on his boat. He explained that during his relationship with East he did not want East to find out about the boat;

therefore, he hid it from her so she would not complain about it. The appellant admitted that R.E. had ridden on the Sea-Doo. In the summer of 1998 or 1999, he and R.E. went alone to ride the Sea-Doo. The appellant's boat was at the same dock as the Sea-Doo, but they never went on the boat.

The appellant said that on several nights during the relationship with East he did not come home. He did not recall ever being alone with the children when they lived at Bluegrass Apartments; however, he was occasionally alone with the children when they lived at Lake d'Ville Apartments.

The appellant said that R.E. had no reason to accuse him of these crimes. He never threatened R.E. or told her that it was okay for an adult to touch a child.

The appellant stated that when the detectives arrived at his apartment, he tried unsuccessfully to delay their entrance. After they were there for a while, the appellant asked the detectives to leave. They said that they could not go because they had seen marijuana paraphernalia in the apartment. The appellant admitted that the marijuana found in the apartment belonged to him.

***9** Lisa Gibbner testified that when she worked at Tom Bannen, she began a romantic relationship with the appellant. The relationship lasted until 1999. Almost every night the appellant came to her apartment after work. He either spent the night or left at 2:00 or 3:00 a.m. Gibbner knew the appellant was living with East, but she never met East. In summer 1995, East found out about the appellant's relationship with Gibbner. East called Gibbner and said, "Bitch, I will get you. [The appellant] will pay. Maybe not today, but he will pay." Gibbner took the statement as a threat, and she said that the statement bothered her.

Gibbner said that she trusted the appellant, and he was her best friend. She trusted him with her children, saying "If I were to die today, I would leave my children to him." Gibbner stated that she never saw the appellant exhibit any bizarre behavior.

Audrey Wiater, the appellant's girlfriend, stated that she was staying with the appellant at the time he was arrested. Her daughter had been around the appellant a few times. The appellant had never exhibited any bizarre behavior. Wiater said that the appellant was honest and truthful.

Based upon the foregoing evidence, the jury convicted the appellant of four counts of aggravated sexual battery, one count of attempted aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia. The trial court sentenced the petitioner to ten years for each aggravated sexual battery conviction; four years for the attempted aggravated sexual battery conviction; and eleven months and twenty-nine days for each of his convictions for the possession of marijuana and possession of drug paraphernalia. The trial court ordered the aggravated sexual battery sentences, the marijuana sentence, and the paraphernalia sentence to be served concurrently with each other. The court further ordered that the attempted aggravated sexual battery sentence be served consecutively to the aggravated sexual battery sentences for a total effective sentence of fourteen years.

On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred in failing to inquire into the conflict of interest when it was revealed at trial that the appellant's trial counsel had previously represented the mother of the minor victim; (2) whether the trial court erred in allowing the State to admit a videotape of a news broadcast into evidence; (3) whether the trial court erred in denying the appellant's motion for a bill of particulars; (4) whether the trial court erred in charging a special jury instruction requested by the State; (5) whether, according to the dictates of *Blakely v. Washington,* the trial court erred in sentencing the appellant; and (6) whether the trial court erred in imposing consecutive sentences. We will address these issues in a different order than that in which they were raised.

## *II. Analysis*

### A. Bill of Particulars

***10** First, we will address the appellant's complaint that the trial court erred in denying his motion for a bill of particulars. The State contends that the appellant waived this issue by failing to include a transcript of the hearing on the motion, or, in the alternative, that the trial court properly denied a bill of particulars based upon the State's open file discovery policy.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The record reflects that on count one the appellant was charged with "on or about the latter part of 1994 ... unlawfully, knowingly and feloniously sexually penetrat[ing] [R.E.], a child less than thirteen years of age, by performing cunnilingus on the victim." On count two, the appellant was charged with "on or about 1996 ... knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally touching the victim's vaginal area." On count three, the appellant was charged with "on or about 1997 ... knowingly and feloniously attempt[ing] to sexually penetrate [R.E.], a child less than thirteen years of age by attempting to have sexual intercourse with the victim." On count four, the appellant was charged with "on or about 1997 or 1998 ... knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally forcing R.E. to touch [the appellant's] penis over his clothing." On count five, the appellant was charged with "between on or about the Summer of 2000 and March 2001 ... knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally touching R.E.'s breasts." On count six, the appellant was charged with "between on or about the Summer of 2000 and March 2001 ... knowingly and feloniously hav [ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally touching R.E.'s vaginal area." Count seven charged the appellant with possession of marijuana, and on count eight the appellant was charged with possessing drug paraphernalia.

On August 22, 2003, the appellant filed a motion for a bill of particulars, asking that the State be required to reveal "[t]he exact times and dates of the offenses so that the defendant may know when the offenses occurred," "[t]he exact location of the offense," "[t]he nature of the injuries sustained by R.E. of the alleged rape," and "[t]he manner and nature of any package containing the drugs." On September 5, 2003, the trial court entered an order addressing the appellant's motion. The order states:

> The State stated that all discovery that was in ... their possession had been provided and that there were audio tapes and a video tape that was in the possession of Detective Jim Vaughn of the Hendersonville Police Department.
>
> IT IS THEREFORE, ORDERED that Detective Jim Vaughn of the Hendersonville Police Department provide the audio tapes to the Defense by Monday, September 1, 2003 and the video tape be made available to the Defense for reviewing on the same date.

*11 Initially, we will address the State's claim that the appellant has waived this issue. Generally, an appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the basis of appeal. Tenn. R.App. P. 24(b); *see also* Thompson v. State, 958 S.W.2d 156, 172 (Tenn.Crim.App.1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence ." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn.Crim.App.1991). In the instant case, it appears that the State is correct in maintaining that there was a proceeding relating to the motion for a bill of particulars and that a transcript of the proceeding was not placed in the appellate record for our review. Regardless, we conclude that the merits of the appellant's claim can be addressed based upon the record before us.

Tennessee Rule of Criminal Procedure 7(c) provides that, "[o]n defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." The decision whether to order a bill of particulars lies in the discretion of the trial court, and this court will not reverse the trial court's denial of a bill of particulars absent a showing that the trial court abused its discretion. *See State v. Stephenson*, 878 S.W.2d 530, 539 (Tenn.1994).

There are three purposes of a bill of particulars: (1) to provide the defendant with information about the details of the charge if this is necessary to the preparation of the defense; (2) to avoid prejudicial surprise at trial; and (3) to enable the defendant to preserve a claim of double jeopardy. *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn.1991). The Advisory Commission Comments to Rule 7(c) state that the purpose of the bill of particulars is to enable the defendant to know "precisely what he or she is charged with." It is not meant to be used for the purposes of broad discovery. *See* Tenn. R.Crim. P. 7(c), Advisory Commission Comments; *see also* Stephenson, 878 S.W.2d at 539.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

" 'The test in passing on a motion for a bill of particulars should be whether it is necessary that [the] defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided.' " *State v. Hicks,* 666 S .W.2d 54, 56 (Tenn.1984) (quoting 1 C. Wright, Federal Practice and Procedure, Criminal, § 129 (1982)). If the needed information is in the indictment or has been provided by the State in some other satisfactory form, no bill of particulars is required. *Id.* A bill of particulars is not intended to be a means of learning the State's evidence and theories, although to the extent the information sought is necessary, it will be required, even if to do so discloses the State's evidence or theories. *Id.*

On appeal, the appellant asserts that he was denied his right to a fair trial because the trial court refused to grant his motion for a bill of particulars. However, the appellant has not argued how any information from a bill of particulars would have changed his trial preparation or defense. The appellant has not alleged any specific information that was withheld by the State. The appellant also has not said how his defense was hampered by any such withheld information. In other words, the appellant has not stated how he was prejudiced by the lack of a bill of particulars. *See State v. Thomas Wayne Overbay,* No. E1999-00840-CCA-R3-CD, 2000 WL 1246617, at *6 (Tenn.Crim.App. at Knoxville, Sept. 5, 2000), *State v. Michael Thomason,* No. W1999-02000-CCA-R3-CD, 2000 WL 298695, at *8 (Tenn.Crim.App. at Jackson, Mar. 7, 2000). Specifically, we note that in the order responding to the motion for the bill of particulars, the trial court observed that the State engaged in open file discovery, enabling the appellant to discover the information known to the State. Further, when discussing election of offenses at trial, the appellant's counsel stated, "I know on the bill of particulars that [the State] gave me everything that she had." We conclude that the appellant is not entitled to relief on this issue.

B. Admission of Video

***12** The appellant argues that the trial court erred when it allowed the State to introduce into evidence a videotape of the news broadcast "Operation Candy Man," which broadcast prompted R.E. to disclose the sexual abuse to East. The appellant contends that the videotape was not relevant to any fact of consequence at trial.

As the State notes in its brief, at trial the appellant objected to the admission of the videotape, arguing that the tape was inadmissible hearsay. The appellant contended that

> [t]here were five instances that the tape stated that Ms. East had indicated [R.E.] was exhibiting. That would go to the truthfulness or to whether or not this newscast is saying these are signs of child abuse, and I think it would unduly prejudice my client.

On appeal, however, the appellant argues that the videotape should not have been admitted because it was not relevant to any issue of consequence at trial. "As a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." *State v. Leach,* 148 S.W.3d 42, 55 (Tenn.2004); *see also* Tenn. R.App. P. 3(e), 36(a). Initially, we note that the trial court did not abuse its discretion in determining that the videotape was not being offered for the truth of the matter asserted; instead, the State was offering the tape as proof of the "trigger" for R.E.'s disclosure of the sexual abuse. Because it was not raised at trial, we will not now address the relevancy of the videotape.

C. Conflict of Interest

The appellant's next issue concerns whether "[t]he trial court's failure to inquire into trial counsel's conflict of interest between successive representation deprived [the appellant] of the right to retain conflict-free counsel as guaranteed by Article I, Section 9 of the Tennessee Constitution and the Sixth and Fourteenth Amendments to the United States Constitution." FN2 The appellant's complaint arose when, at trial, his counsel began to cross-examine Paula East, the mother of R.E. The following colloquy then occurred:

> FN2. We note that the appellant did not raise this issue in the context of ineffective assistance of counsel.

> [Counsel:] Ms. East, I have to ask you this: Have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I ever been your lawyer?

[East:] Yes, you have.

[Counsel:] I thought I had. I just didn't remember. Do you remember what it was about?

[East:] A divorce.

[Counsel:] And it was in what year?

[East:] 1991.

[Counsel:] And you had these babies at that time?

[East:] Yes.

[Counsel:] I'm sorry, I didn't remember your name. But it is still the same isn't it?

[East:] Still the same.

[Counsel:] I just can't remember anymore.

Later, a similar exchange took place during counsel's cross-examination of R.E.:

[Counsel:] Hello.... I've never met you. I represent [the appellant]. You probably don't know it, but I got your mother's divorce.

[R.E.:] Yes, I know.

[Counsel:] Why didn't somebody tell me? I didn't remember. Did she just tell you?

[R.E.:] No. I knew about it whenever we found out that you were the attorney.

***13** [Counsel:] You were only one, I believe, weren't you?

[R.E.:] Yes.

Neither the appellant or his defense counsel raised an objection based upon conflict of interest to counsel's continuing representation of the appellant. At the motion for new trial proceeding, the appellant was represented by a new attorney. In the motion for new trial, the appellant argued that the trial court had a duty to inquire as to the nature of the conflict once it was disclosed during trial.

At the hearing on the motion, the appellant called his trial counsel to testify. Counsel stated that he had been licensed to practice since 1975. He began representing the appellant in late 2002 or early 2003, and a trial was held in September 2003. Counsel stated that on the first day of trial as he was coming into the courthouse, he saw R.E. and East. Counsel thought that East looked familiar. He said that he may have even asked the appellant who East was. He asserted that he did not recall that he had previously represented R.E.'s mother in a divorce case until East confirmed it on cross-examination. Counsel acknowledged that he did not have a conflicts system in his office.

Counsel stated that after the disclosure he did not discuss the matter with the appellant "because I didn't feel a conflict existed at that time because I remembered not one thing about Paula East." He also stated, "I don't remember anything about that case. Period ." Counsel asserted that after he learned of the prior representation, his representation of the appellant was not clouded in any way.

The appellant testified that he met East after her divorce was final, and he did not know that counsel had represented East in a divorce proceeding. The appellant said that when East approached the witness stand, counsel asked the appellant if he had ever represented her. The appellant said that he responded by "shrugg[ing] my shoulders kind of in disbelief." Counsel never discussed a possible conflict of interest with the appellant. The appellant stated, "I believe that the fact that he may have represented her and her daughter at one point in his career possibly threw him off when he was cross-examining her. Like, as stated in the record, I guess, earlier, that he seemed to be shaken when he saw her and then asked me about-if he knew her." The appellant said that he had reflected upon the potential conflict and would have sought other counsel had he known of the conflict.

In its order denying the motion for new trial, the trial court found that "[w]hile it is unfortunate that [counsel] was not aware of the potential conflict prior to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

trial, the Court did not find it necessary to stop the trial. The representation was many years before and the Court is satisfied that counsel's performance was not in any way affected by his prior representation."

On appeal, the appellant complains that the trial court knew or should have known counsel had a conflict in the instant case and should have inquired about the conflict. The appellant contends that the trial court's failure to make the inquiry is an error of constitutional dimensions requiring automatic reversal.

***14** Initially, we note that it is unquestioned that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." *State v. Thompson,* 768 S.W.2d 239, 245 (Tenn.1989). However, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718 (1980). This court has noted that "[a]n actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." *State v. Tate,* 925 S.W.2d 548, 552 (Tenn.Crim.App.1995); *see also Clinard v. Blackwood,* 46 S.W.3d 177 (Tenn.2001). In other words, an actual conflict of interests exists when counsel is placed in a position of divided loyalties. *McCullough v. State,* 144 S.W.3d 382, 385 (Tenn.Crim.App.2003).

There are several potential types of conflict of interest. For example, there is the potential for a conflict of interest during instances of multiple representation; i.e., when one attorney simultaneously represents clients with differing interests. *See State v. White,* 114 S.W.3d 469, 476 (Tenn.2003). Additionally, a conflict of interest can arise from successive representation, namely when an attorney who once represented a co-defendant or witness currently represents the accused.[FN3] *See State v. Coulter,* 67 S.W.3d 3, 29 (Tenn.Crim.App.2001); *see also United States v. Shepard,* 675 F.2d 977, 979 (8th Cir.1982). Demonstrating an actual conflict of interest is generally more difficult in a successive representation case than in a simultaneous representation case. *See Enoch v. Gramley,* 70 F.3d 1490, 1496 (7th Cir.1995); *Smith v. White,* 815 F.2d 1401, 1405 (11th Cir.1987).

> FN3. "Effective March 1, 2003, the Code of Professional Responsibility was replaced by the Tennessee Rules of Professional Conduct, likewise codified at Tennessee Supreme Court Rule 8." *State v. McCullough,* 144 S.W.3d 382, 385 n. 1 (Tenn.Crim.App.2003). New Rule 1.9(a) of the Rules of Professional Conduct provides:
>
> > A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents in writing after consultation.
>
> > Tenn. Sup.Ct. R. 8, RPC 1.9(a).

One of the chief concerns in successive representation cases "is the possibility that the attorney may use or divulge on behalf of the new client confidential or privileged information obtained from the former client." *Coulter,* 67 S.W.3d at 29. Successive representation may result in an actual conflict " 'if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.' A corollary danger is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." *Enoch,* 70 F.3d at 1496 (quoting *Mannhalt v. Reed,* 847 F.2d 576, 580 (9th Cir.1988)). Actual prejudice can be found if "(1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case." *Smith,* 815 F.2d at 1405. In the instant case, there is no evidence in the record that an actual conflict existed because of counsel's prior representation of East.

***15** Regarding the issue of the court's duty to inquire into potential conflicts, we note that Rule 44(c) of the Tennessee Rules of Criminal Procedure mandates that a trial court inquire as to potential conflicts of interest when an attorney appears in court representing co-defendants. Our rules do not explicitly address other instances in which a trial court has a duty to inquire into conflicts of interest. Although the instant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

case does not concern an issue of multiple representation, we find guidance as to the trial court's duty to inquire in *Cuyler v. Sullivan.* In *Sullivan,* the United States Supreme Court explained that "nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case." 446 U.S. at 346, 100 S.Ct. at 1717. In fact, "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Id.* at 347, 100 S.Ct. 1717.

From the record before us, it appears that while neither the appellant nor the appellant's counsel objected to counsel's continued representation on conflict grounds, the court was nonetheless made aware of a possible conflict of interest.

> [B]ringing a conflict home to a court does not ... oblige a trial judge to conduct an inquiry anytime the judge becomes aware of a potential conflict of interest. The Supreme Court never intended to require a trial court to initiate an inquiry every time it becomes aware of a possible conflict of interest.

*Beets v. Collins,* 986 F.2d 1478, 1484 (5th Cir.1993) (citing *Sullivan,* 446 U.S. at 346-47, 100 S.Ct. at 1717). While the better practice in this case would have been for the trial court to make further inquiry into the possible conflict caused by counsel's prior representation of a State witness, we can not conclude that the trial court violated a duty to inquire further. It was apparent by the questions asked by counsel that he had little recollection of his representation of East, and he felt no particular bias in favor of East. Moreover, we note that counsel adequately cross-examined both East and R.E. The appellant is not entitled to relief on this issue.

We also note that, as *Sullivan* suggests, "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." 446 U.S. at 346, 100 S.Ct. at 1717. In the instant case, even in the face of a potential conflict, counsel did not ask the court for a recess or a jury-out hearing in order to determine the extent of the conflict. Clearly, the preferable course of action would have entailed not bringing counsel's previous representation to the jury's attention. However, we cannot conclude that this is error meriting reversal.

D. Jury Instruction

The appellant's next issue relates to a special instruction given by the trial court at the State's request. Specifically, the appellant contends that the instruction given by the court lessened the State's burden of proof. Further, the appellant claims that the instruction "bolstered [R.E.'s] credibility to the jury and diminished the value of [the appellant's] testimonial denials."

***16** Prior to the jury charge, the State submitted in writing a request for a special jury instruction. The proposed jury instruction stated, "The Court instructs you that in a sexual abuse case you may convict the defendant on the basis of the victim's testimony alone. Corroboration of the victim's testimony is not necessary." Despite the appellant's objection, the trial court agreed to give the special instruction, finding that it was a correct statement of the law. On appeal, the appellant argues that the trial court erred by giving the instruction because the "special corroboration instruction 'corroborated' [R.E.'s] allegations."

A defendant has a "constitutional right to a correct and complete charge of the law." *State v. Teel,* 793 S.W.2d 236, 249 (Tenn.1990). Therefore, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." *State v. Phipps,* 883 S.W.2d 138, 150 n. 20 (Tenn.Crim.App.1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Forbes,* 918 S.W.2d 431, 447 (Tenn.Crim.App.1995).

Generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[ ]." *State v. McKnight,* 900 S.W.2d 36, 47 (Tenn.Crim.App.1994). "An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime." *Id.* This court has observed that "[a] child can be an accomplice in a sex-related case. When a child is deemed an accomplice, the testimony of the child, like an adult, must be corroborated." *State v. Griffis,* 964 S.W.2d 577, 588 (Tenn.Crim.App.1997) (footnote omitted). However,

such is not the case when the child victim is less than thirteen years old. Tennessee Code Annotated section 40-17-121 (2003) provides:

> If the alleged victim of a sexual penetration or sexual contact within the meaning of § 39-13-501 is less than thirteen (13) years of age, such victim shall, regardless of consent, not be considered to be an accomplice to such sexual penetration or sexual contact, and no corroboration of such alleged victim's testimony shall be required to secure a conviction if corroboration is necessary solely because the alleged victim consented.

*See also* State v. Ballinger, 93 S.W.3d 881, 887 (Tenn.Crim.App .2001).

We agree with the appellant that the instruction should not have been given. In the context of addressing whether the evidence is sufficient to support the conviction, the testimony of the victim alone could be sufficient. However, the use of the disputed language in the context of instructing the jury regarding the State's burden of proof runs a serious risk of misleading the jury. Moreover, in Tennessee judges are prohibited from commenting on the credibility of witnesses or on the sufficiency of the evidence. Tenn. Const. Art. VI, § 9; *State v. Suttles,* 767 S.W.2d 403, 406-07 (Tenn.1989). The proof in this case essentially presented to the jury a question of credibility between the victim and the appellant. The jury instruction effectively informed the jury that they need look no further than the victim's testimony to convict and thus implied that the jury need not consider all other proof. Accordingly, we conclude that the error merits reversal of the appellant's aggravated sexual battery and attempted aggravated sexual battery convictions. However, we conclude that the instruction had no impact on the appellant's drug related convictions.

E. Sentencing

***17** The appellant's final issues concern the sentences imposed by the trial court. Although we have reversed the appellant's convictions for aggravated sexual battery and attempted aggravated sexual battery, we will address his sentencing issues as to those convictions to facilitate further appellate review. At the outset, we note that appellate review of the length, range or manner of service of a sentence is de novo. *See* Tenn.Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. *See* Tenn.Code Ann. §§ 40-35-102, -103, -210 (2003); *see also State v. Ashby,* 823 S.W.2d 166, 168 (Tenn.1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). *See* Tenn.Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. *Id.* at (d); *Ashby,* 823 S.W.2d at 169.

1. *Blakely*

As his first sentencing issue, the appellant contends that the trial court erred in applying certain enhancement factors that were not admitted by the appellant or found by a jury in violation of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531 (2004). In *Blakely,* the Supreme Court explained that the " 'statutory maximum' for *Apprendi [v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348 (2000) ] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely,* 542 at 303, 124 S.Ct. at 2537. However, recently in *State v. Gomez,* 163 S.W.3d 632, 661 (Tenn.2005), a majority of our supreme court found that, unlike the sentencing scheme discussed in *Blakely,* "Tennessee's sentencing structure does not violate the Sixth Amendment." Therefore, we are compelled to conclude that the trial court did not err in failing to submit the enhancement factors to the jury for their determination. The appellant is not entitled to relief on this basis.

In our de novo review, we note that the trial court found the existence of two enhancement factors: (8) the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement, and (16) the appellant abused a position of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense. The record amply supports the application of enhancement factor (16), particularly in light of the testimony of both the appellant and R.E. that at the time of the offenses the appellant was a "father figure" to R.E. *See State v. Kissinger,* 922 S.W.2d 482, 489 (Tenn.1996). However, the record does not support the application of enhancement factor (8). Aggravated sexual battery requires that the defendant have "unlawful sexual contact with a victim." Tenn.Code Ann. § 39-13-504(a) (2003). Sexual contact is defined as an intentional touching of a victim's intimate parts or the clothing covering R.E.'s intimate parts, "if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn.Code Ann. § 39-13-501(6) (2003). Therefore, enhancement factor (8) may not be applied to a conviction for aggravated sexual battery or attempted aggravated sexual battery because it is also a necessary element of the offense. *State v. Hayes,* 899 S.W.2d 175, 185 (Tenn.Crim.App .1995).

***18** The trial court also found the existence of mitigating factors, namely that the appellant "does not have a seriously long criminal history" and that the appellant "has good family relationships." *See* Tenn.Code Ann. § 40-35-113(13) (2003). Considering the enhancement and mitigating factors, the trial court sentenced the petitioner to ten years for each aggravated sexual battery conviction; four years for the attempted aggravated sexual battery conviction; and eleven months and twenty-nine days for each of his convictions for the possession of marijuana and possession of drug paraphernalia. Regardless of the error in finding enhancement factor (8) applicable to the appellant, we conclude that the length of the sentence imposed by the trial court was supported by the record. *See State v. John Ramsey Duncan,* No. M2005-01431-CCA-RM-CD, 2005 WL 1768754, at *15 (Tenn.Crim.App. at Nashville, July 27, 2005), *perm. to appeal denied,* (Tenn.2005).

2. Consecutive Sentencing

The appellant's final issue concerns the imposition of consecutive sentencing. At the conclusion of the sentencing hearing, the trial court found that consecutive sentencing was proper because the appellant was "convicted of two or more statutory offenses involving sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim and the time span." Therefore, the trial court ordered the appellant to serve his four-year sentence for attempted aggravated sexual battery consecutively to his ten-year sentences for aggravated sexual battery, for an effective fourteen-year sentence. On appeal, the appellant contends that the trial court erred in imposing consecutive sentences.

Initially, we note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." *State v. Adams,* 973 S.W.2d 224, 230-31 (Tenn.Crim.App.1997). Tennessee Code Annotated section 40-35-115(b) (2003) contains the discretionary criteria for imposing consecutive sentencing. *See also State v. Wilkerson,* 905 S.W.2d 933, 936 (Tenn.1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the following criteria:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

***19** (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to R.E. or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn.Code Ann. § 40-35-115(b)(1)-(7) (2003).

The appellant contends that "[w]ithout minimizing the nature of the offense, this case involved only 'fondling,' at worst, and there was nothing especially horrifying, shocking or outrageous in the nature of these offenses such that consecutive sentences would be warranted." He also contends that the trial court's utilization of the relationship between the appellant and R.E. to both enhance his sentence and impose consecutive sentencing "amounts to impermissible double counting."

In the instant case, the appellant was convicted of multiple counts of the aggravated sexual battery and attempted aggravated sexual battery of a child. At the time of the offenses, the appellant was involved with R.E.'s mother, and he served as a "father figure" to R.E. The appellant sexually abused R.E. over a span of several years. R.E. was not comfortable reporting the abuse until after she and her mother no longer lived with the appellant. Moreover, R.E. had problems in school because of the abuse, although she was showing improvement at the time of the sentencing hearing. R.E. testified at the sentencing hearing that she had difficulty trusting people and that she could not tolerate people coming behind her and touching her because it reminded her of the abuse. R.E. said that she still had episodes of crying and shaking and had nightmares, but she was improving with the help of therapy. Given the foregoing facts, we are loath to describe this case as "only 'fondling,' at worst."

Additionally, the appellant's "double counting" argument is unavailing. The 1989 Sentencing Act does not prohibit using the same facts and circumstances to enhance sentences and to impose consecutive sentencing. *State v. Elam,* 7 S.W.3d 103, 108 (Tenn.Crim.App.1999); *State v. Meeks,* 867 S.W.2d 361, 377 (Tenn.Crim.App.1993). Therefore, we conclude that the trial court did not err in imposing consecutive sentences.

### *III. Conclusion*

We affirm the appellant's drug related convictions. However, based upon the trial court's improper special instruction, we reverse the convictions for aggravated sexual battery and attempted aggravated sexual battery and remand for a new trial on those charges.
HAYES, DAVID G., Judge, separate concurring.
I join with the majority in concluding that the State's special instruction submitted to the jury constituted reversible error. I write separately only to note the following additional reasons for finding the instruction was error. The special instruction, in its entirety, is as follows:

***20** The court instructs you that in a sexual abuse case you may convict the defendant on the basis of the victim's testimony alone. Corroboration of the victim's testimony is not necessary.

First, I know of no requirement that the jury be instructed on an issue which is *not* the law of the case. Thus, I find it unnecessary to instruct the jury that "corroboration of the victim's testimony [was] not necessary."

Second, and of greater concern, I find the trial court's instruction is a misstatement of the law. Tennessee Code Annotated section 40-17-121 (2003), which the State relies upon as authority for the special instruction, provides:

If the alleged victim of a sexual penetration or sexual contact within the meaning of § 39-13-501 is less than thirteen (13) years of age, such victim shall, regardless of consent, not be considered to be an accomplice to such sexual penetration or sexual contact, *and no corroboration of such alleged victim's testimony shall be required to secure a conviction if corroboration is necessary solely because the alleged victim consented.*

(emphasis added).

Contrary to the trial court's instruction, the statute does not state that "the defendant [may be convicted] on the basis of the victim's testimony alone." Rather, the statute provides only that no corroboration of the victim's testimony is required to secure a conviction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

where the victim becomes an accomplice by virtue of his or her consent to the sexual misconduct. The statute was intended only to negate the corroboration requirement for an accomplice's testimony, not to lessen the proof required to convict.

For these additional reasons, I find the special instruction constitutes reversible error.

Tenn.Crim.App.,2007.
State v. Chubb
Not Reported in S.W.3d, 2007 WL 258429 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# State v. Troglin

# 2006 WL 2633107

# (Tenn. Crim. App. Sept. 14, 2006)

**H**Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Knoxville.
STATE of Tennessee
v.
Nelson TROGLIN.
**No. E2005-02015-CCA-R3-CD.**

Assigned on Briefs May 16, 2006.
Sept. 14, 2006.
Application for Permission to Appeal Denied by Supreme Court Jan. 29, 2007.

Direct Appeal from the Circuit Court for Bledsoe County, No. 41-1999; Thomas W. Graham, Judge.
C. Douglas Fields, Crossville, Tennessee (on appeal) and Jeffrey Harmon, Jasper, Tennessee (at trial), for the appellant, Nelson Troglin.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; James Michael Taylor, District Attorney General; James W. Pope III, Assistant District Attorney General, for the appellee, State of Tennessee.

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA McGEE OGLE, JJ., joined.

## OPINION

ROBERT W. WEDEMEYER, J.

***1** The Defendant, Nelson Troglin, was convicted of attempted first degree murder, and the trial court sentenced him to twenty-four years in the Department of Correction. On appeal, the Defendant contends that the trial court erred when it: (1) refused to strike prospective jurors; (2) did not instruct jurors on the charge of aggravated assault as a lesser-included offense; (3) refused the Defendant's request for a mental evaluation; (4) denied the motions to replace Defendant's counsel, which caused the Defendant to receive ineffective assistance of counsel; and (5) improperly allowed references to the Defendant's indictment for the murder of Ralph Wilkey. Finding no reversible error, we affirm the judgment of the trial court.

### I. Facts

This case arises from the attempted murder of the victim, Mike Stafford. At the Defendant's trial, the State and the Defendant stipulated to the following:

> If Jamey Roberson, the Circuit Court Clerk, was called to testify, Your Honor, he would testify that his occupation, he is the Circuit Court Clerk; that its's his duty to file pleadings in court cases, such as indictments and so forth; that he would testify that [the Defendant] was indicted for the homicide of Ralph Wilkey on July 27, 1998, by the Bledsoe Grand Jury.
>
> He would also testify that that case on March 16, 1999, was set for trial for September 21, 1999. He would also testify that [the victim, Mike Stafford,] did testify at that trial against [the Defendant]. That will be the proof in that case-I mean, if Mr. Roberson was called to testify.

Howard Upchurch testified that he represented the Defendant for the charges brought against the Defendant for the homicide of Ralph Wilkey. He said that, at the end of April of 1999, he provided the Defendant with a list of witnesses that the State intended to call at the Wilkey trial and that Mike Stafford's name was on that list. Upchurch further testified that Stafford testified against the Defendant during the Defendant's trial for Wilkey's homicide. On cross-examination, Upchurch explained that as a criminal defense lawyer he routinely receives a list of State witnesses and that he shares such lists with his clients.

Joe Johnson testified that he has known both the De-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant and the victim, Stafford, all of his life. He said that, on the Thursday before the victim was shot, the Defendant told him that Stafford was on the Defendant's "list." Johnson explained that the Defendant often joked about different people, so he did not tell the victim or the police what the Defendant had said. On cross-examination, Johnson testified that Stafford is his first cousin. He acknowledged that he did not know exactly what the Defendant meant when he made the statement about the victim being on his "list."

Elizabeth Summers testified that she grew up with the Defendant, that she has known Stafford for years, and that she has known a man named Dennis Cagle throughout his entire life. She testified that, at 10:30 p.m. on May 2, 1999, she went to her job at Nyla's Place, a gas station and convenience store. During her shift, which lasted from 11:00 p.m. on May 2, 1999, until 7:00 a.m. on May 3, 1999, neither the Defendant nor Cagle came to her store. Stafford, however, entered the store alone at around 11:40 p.m. on May 2, 1999, and purchased a twelve-pack of beer and two packs of cigarettes. Willie Mae Pendergrass and Eddie Tollett were present when the victim entered the store. Summers testified that, about twenty minutes after Stafford came to Nyla's Place, she heard, via a police scanner, that Stafford had been shot. On cross-examination, Summers testified that Stafford's purchase of beer and cigarettes from Nyla's Place was not an unusual event, and, at the time of his purchase, he did not look afraid or upset.

***2** Willie Mae Pendergrass testified that her sister owns Nyla's Place, and Pendergrass was at the store from 7:00 or 7:30 p.m. on May 2, 1999, until 3:00 or 4:00 a.m. on May 3, 1999. She said that, during this time, she did not see the Defendant, whom she has known for fifteen years, but she did see Stafford at the store on May 2 at around 11:30 or 11:45 p.m. Pendergrass testified that, while she was still at Nyla's Place at around 12:00 a.m., she heard that Stafford had been shot. On cross-examination, Pendergrass testified that she had not seen Stafford in the store during late night hours before and that Stafford rushed in and out of the store.

Dennis R. Cagle testified that he has known the Defendant for most of his life and that the Defendant is his friend. He said that, in May of 1999, he lived with Victoria Dodson on Brockdale Mountain, and, on May 2, 1999, at around 9:30 or 10:00 p.m., the Defendant drove to his house and asked him to drive the Defendant to get something to eat. Cagle noted that the Defendant had been drinking alcohol, and Cagle agreed to drive the Defendant into town. He testified that they went to the McDonald's in town, which is a thirty to thirty-five minute drive, they drove around for a while, and then they went to Nyla's Place to get some beer. He could not recall exactly when they arrived at Nyla's Place and agreed that they may have arrived there after 11:00 p.m. He said that the Defendant got out of the vehicle, but he did not actually see the Defendant go into the store. When the Defendant returned to the vehicle, he said that the store would not sell him beer. Cagle testified that the Defendant told him that Stafford could purchase beer from the store.

The Defendant gave Cagle Stafford's address, and they drove to Stafford's house where the Defendant exited the vehicle and knocked on Stafford's front door. Cagle testified that a female, whom he did not recognize, came to the front door and spoke with the Defendant, and then a few minutes later Stafford came to the door. He said that Stafford and the Defendant appeared to be talking, and then they got into Cagle's truck, they all drove to Nyla's Place, and Stafford entered the store. He testified that he did not see the Defendant give Stafford any money for the beer, but Stafford came back from the store with some beer and got into the truck. He testified that they all drank and drove around.

Cagle testified that the three men went to the Veteran's Club ("VFW") because the Defendant had to use the restroom. They parked in a dimly lit area, and all three men exited the truck. Cagle said that he stood on the driver's side of the truck while the Defendant and Stafford stood on the passenger's side of the vehicle, talked for awhile, and then started walking towards the back of the VFW. He testified that he did not know whose idea it had been to go back to the VFW, and then he acknowledged that he had previously told David Emiren, a former Tennessee Bureau of Investigation ("TBI") agent, that the Defendant asked Stafford to go to the back of the VFW. Cagle said that he started to follow them, the Defendant told him to go back to the truck, and Cagle went back and sat down in the truck. He said that Stafford and the Defendant were gone behind the VFW for "a few minutes," and then he heard two shots. He then saw

Stafford run from behind the VFW towards Stafford's house, and he heard Stafford make "some kind of unintelligible statement," which he described as "more or less a moan or a groan." He explained that, as he watched Stafford run, the Defendant got back in the pickup truck.

***3** Cagle testified that he never saw a weapon and that he did not see anyone else at the VFW. Cagle asked the Defendant what had happened, and the Defendant replied that he "shook him up a little." Cagle testified that, when asked, the Defendant denied shooting Stafford. The Defendant said, "Let's go home," and they went back to Cagle's house, which took about thirty-five minutes, and the two did not speak as they drove. Cagle said that, when they returned to his house, Dodson was there, and Cagle took a shower while the Defendant sat on his couch and ate a hamburger. Cagle testified that he did not know if the Defendant went to the Defendant's vehicle before he entered Cagle's home.

Cagle said that, while he was in the shower, Dodson came to the bathroom door and told him that Ed Wooden was at their home and wanted to speak with him. Cagle went to the kitchen door and asked Wooden to come inside, and Wooden replied that he would wait on Cagle. Cagle thought that Wooden could not see the Defendant inside Cagle's house from where Wooden was standing, so he assumed that Wooden did not know that the Defendant was inside. Cagle left with Wooden and went to the jail to speak with the police.

Cagle testified that, the day after Stafford was shot, he provided Agent Emiren with a statement and denied saying anything untruthful. He explained that, on the night of the crime, both he and the Defendant drank a lot of alcohol and that he did not want to tell the agent anything more than necessary. Cagle testified that he owned a forty-five caliber pistol and that, on May 2nd or 3rd of 1999, the pistol was in Barney Nerrgaurd's pickup truck. He testified that, later, Agent Emiren returned and asked Cagle about this forty-five pistol, both he and Agent Emiren shot his gun, and the agent retrieved some hulls from the pistol. Cagle said that Agent Emiren returned to Cagle's house again and asked Cagle for his gun, and he told Agent Emiren that he had traded his gun for a rifle at a gun store. Cagle identified a weapon presented by the State and testified that it was the gun that he had owned when the crime had occurred. Cagle denied loaning the weapon to the Defendant at any time prior to the victim's shooting and denied ever seeing the Defendant in possession of this pistol.

On cross-examination, Cagle acknowledged that he had a dispute with Stafford in the past but testified that this dispute was not a "big deal." He testified that, on the night of the crime, he had consumed "a couple of six-packs" of beer prior to the Defendant's arrival at his house. When the Defendant arrived, he seemed like he was in a good mood and did not appear to be hiding a weapon. Cagle further testified that they did not discuss Stafford or the Defendant's upcoming trial for Ralph Wilkey's homicide. Cagle said that no one threatened Stafford before he got into Cagle's truck. He acknowledged that he was intoxicated the first time that he provided Agent Emiren with a statement. Cagle denied possessing a weapon on the night of the crime but acknowledged that he had a pruning saw in his truck. Cagle testified that the Defendant never expressed any intent to kill Stafford, and he never said that he tried to kill Stafford.

***4** On redirect examination, Cagle said that, at the time of the crime, he also owned a twelve gauge shotgun and a thirty-eight revolver, and the thirty-eight was kept inside Dodson's purse. He said that he never saw the Defendant with the thirty-eight revolver and that he did not think that the Defendant knew that Dodson had that gun. On recross-examination, Cagle testified that it was pretty dark at the VFW and that he turned the headlights off when the men were standing outside the truck.

Victoria Gossett Dodson testified that she has lived with and dated Cagle for six years. She said that on Sunday, May 2, 1999, the Defendant, a friend whom she has known all her life, came to their home at around 9:30 or 9:45 p.m. She said that the Defendant had been drinking alcohol, but he was not drunk, and he asked Cagle to take him to town to go to McDonald's and to get some more beer. She estimated that Cagle and the Defendant left the house no later than 10:00 p.m. and that she saw the men again about two or two and a half hours later. She said that the Defendant seemed more intoxicated when the men returned and, while Cagle had consumed a few beers before the men left her home, he did not appear drunk. She said that, after the men returned to her house, Cagle took a shower, the Defendant sat on her couch and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ate a hamburger, and no one engaged in any conversation about Stafford.

Dodson said that she heard someone pull into her driveway, so she looked outside and saw Wooden and some men at her back porch. Wooden asked her if Cagle was home, and she told him that Cagle was just getting out of the shower and invited Wooden and the men who accompanied him to come inside, but the men said that they would wait outside for him. Cagle then went outside to speak with the men. Dodson testified that Wooden and the men who accompanied him could not see the Defendant from where they stood, that she did not tell these men that the Defendant was in her home, but the men pulled in right behind the Defendant's car. She said that the Defendant remained in her home while Cagle left with Wooden to answer some questions.

Dodson said that she asked the Defendant, "What's going on?" and that he replied, "We shot [Stafford]." She asked the Defendant who shot Stafford, and he said that he shot Stafford once and that Cagle shot him twice. She said that the Defendant told her to call the hospital to see if Stafford was dead, which she did and learned that Stafford had been transferred to another hospital. The Defendant asked her to call that hospital to see if Stafford was dead, which she did and learned that Stafford was going to have surgery to repair the damage from his gunshot wounds. She told the Defendant what she had learned, and the Defendant told her, "He needs to die and go on. He needs to die and go on." Dodson testified that she asked the Defendant why this had happened, and the Defendant did not respond and appeared to pass out on the couch.

***5** Dodson testified that the police later called her on the telephone and said that they were coming back to her house to get the Defendant, which they did and arrested the Defendant. She thought that she showed Agent Emiren her thirty-eight pistol. Dodson testified that Cagle owns a forty-five pistol, but he did not have it with him on the night of the crime. She said that she spoke with Agent Emiren the day after the crime had occurred, but she was not completely truthful with him because she was scared that she might get Cagle into trouble. She said that she did not tell the agent that the Defendant had said that Stafford needed to die on the night of the crime because she was trying to protect Cagle and the Defendant. She said that, later, she told Agent Emiren what the Defendant had said.

On cross-examination, Dodson testified that she loved Cagle and that she would hate to see him go to the penitentiary. She said that she and Cagle rode on four-wheelers on the day of the crime and finished riding about ten minutes before the Defendant came over to their house. She acknowledged that two full years passed before she told Agent Emiren that, on the night of the crime, the Defendant had said that Stafford needed to die. She testified that she drank alcohol on the night of the crime, that she takes Xanax, and that she should not mix alcohol with her prescriptions. She said that the Defendant never threatened her or her family. She said that, after these events had occurred, she searched her entire home for a pistol but could not find one.

Virginia Wright Stafford testified that, at the time of trial, she was married to Stafford, the victim, and that she has lived with him for the past twelve years. She described her home's location in relation to Nyla's Place and the VFW. She explained that one can get to the VFW from her house by crossing through her neighbor's yard and then going through a hayfield. She testified that she has known the Defendant as an acquaintance since she first started dating Stafford. She said that the Defendant came to her home between 10:00 and 10:30 p.m. after she had gone to bed, Stafford answered the door, and she heard the Defendant ask Stafford to leave the house. She went to the door and saw the Defendant standing there, and Stafford left with the Defendant. She did not recall at what hour Stafford returned to their residence, but, when he returned, he told her to call 9-1-1 because the Defendant had shot him. She said that Stafford was bent over, holding his side, and told her that he was dying. She called 9-1-1 and Gary Johnson, a police officer with the Pikeville Police Department, arrived at her home and took Stafford to the Bledsoe County Hospital. She said that he stayed at this hospital for approximately two hours and that he was then transported to the UT Hospital in Knoxville where he stayed for approximately twenty days. On cross-examination, she denied knowing about any disagreements between Stafford and Cagle. She acknowledged that Stafford drank and that he was apparently able to buy beer on Sundays. She testified that, when she saw the Defendant at the door, no one acted suspiciously, and she did not see any weapons.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***6** Steven Michael ("Mike") Stafford, the victim, testified that he lives with and is married to Virginia Wright Stafford. He said that he has known the Defendant his entire life and that Ralph Wilkey was his brother-in-law. Stafford testified that, after Wilkey's death in 1998, he provided the police with some information regarding the Defendant and that he served as a witness for the State in a homicide case brought against the Defendant. Stafford said that, on Sunday, May 2, 1999, the Defendant came to his porch door and asked him to take the Defendant to get some beer. He agreed, the Defendant gave him twenty dollars, and he went to Nyla's Place with Cagle and the Defendant to buy the beer. Stafford saw Nyla's sister, Willie Mae Pendergrass, in the store, and he purchased the beer and went back to the truck. He said that the Defendant asked him to ride around and drink a beer and that he declined the invitation because he had to awake at 3:00 a.m. to take his wife to work. He said that the Defendant said, "Well, can't you ride with us and just drink one beer?" He agreed to this proposition, and they went to the VFW.

Stafford testified that he did not know why they went to the VFW and that the VFW was closed, so they stood outside talking. Stafford explained that the Defendant went behind the building to go to the bathroom and then hollered at him, asking him to come around the building. Stafford testified that he and Cagle started to go around the building, and the Defendant said, "Not you, Denny, just Mike." Stafford testified that Cagle stayed by the truck in front of the building, and Stafford walked around the building. He said that he stood about three feet from the Defendant, and the Defendant asked him, "[Y]ou think they'll do anything to me about Ralph?," and he replied, "I think they ...," and then the Defendant shot him three times. Stafford testified that he could not see the gun in the Defendant's hand because of how the Defendant was standing, but he could tell that the Defendant was aiming at him when the Defendant shot the gun. He testified that the first gunshot hit him just below his right nipple and exited below his left shoulder blade. Stafford described how he ran around the building, went across the parking lot, went into some bushes, and then he had to sit down. He said that he was in pain and felt like he had been shot more than once. He did not recall seeing Cagle when he ran, and he was scared that the Defendant and Cagle were working together.

Stafford said that he ran to his home and arrived at the first step of his residence, and then he picked up an item and threw it against the wall to get his wife's attention. Stafford thought that he told his wife that the Defendant had shot him and told her to call 9-1-1. He said that Officer Johnson arrived, that his wife put him in the officer's car, and the officer took him to a hospital. From there, he went to another hospital in Knoxville, had surgery, and he stayed there for about two weeks. Stafford acknowledged that he had previously received a ticket for presenting a false identification, and that, in 1995, he pled no contest to improper influence of a jury.

***7** On cross-examination, Stafford acknowledged that Cagle had accused him of raiding Cagle's marijuana patch. He said that, on the night of the crime, he was not surprised when Cagle arrived at his house because Cagle was with the Defendant. He said that the Defendant never threatened him over the course of the evening, and the Defendant did not seem to be hiding a weapon. Stafford testified that he did not see what kind of gun the Defendant used to shoot him. He said that, before the Defendant called him to walk around the building, the Defendant had not asked him about the Wilkey case. When asked if he told Officer Johnson that the Defendant and Cagle shot him, he testified that he could not recall because he was weak and "out of it."

Officer Gary Johnson testified that he was employed with the Pikeville Police Department on Sunday, May 2, 1999, and that the sheriff's department received a call about a shooting during the early morning hours of May 3, 1999. He said that he went to the victim's residence, and, when he arrived, he saw Stafford bent over on his steps. Stafford told Officer Johnson that he was going to die and that the Defendant had shot him, and the officer took Stafford to the hospital and could see blood coming from Stafford's back. On cross-examination, Officer Johnson testified that he never interviewed Cagle about the incident. He acknowledged that Stafford said that both the Defendant and Cagle shot him. He testified that he did not know if anyone ever performed a gunshot residue test on the Defendant or Cagle.

David Emiren, a former agent with the TBI, testified that he investigated the victim's shooting and that he went to the VFW on May 3rd, at around 5:30 a.m.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

where he took photographs of the area and found a forty-five caliber hull that had been expended from a weapon and landed behind the VFW. He testified that he was unable to find a weapon or the bullet that went through the victim. The agent testified that he went to Cagle's residence to find out about Cagle's guns and that Cagle said that he owned a forty-five pistol but that gun was located elsewhere. Agent Emiren explained that, later, he found the weapon in a store that Cagle had traded firearms with and that he took some test shots with this weapon. He testified that this weapon expended forty-five hulls and that he retrieved the hulls from this gun, and they were compared against the hull that was found at the crime scene. The agent testified that he was the officer that investigated Ralph Wilkey's death, that Stafford was a witness for the State, and that Stafford testified against the Defendant. He acknowledged that the Defendant's car was at Cagle's residence, that he searched the Defendant's car, and that he did not find a weapon inside.

On cross-examination, Agent Emiren acknowledged that Stafford was not the only individual on the State's witness list in the Wilkey case and that he and about a dozen other people were on the list. He testified that he did not perform a gunshot residue test on Cagle. The agent acknowledged that he knew that Cagle was at the crime scene when he conducted his investigation, and he explained that, according to his understanding, Cagle was not the alleged shooter. He acknowledged that almost two years had passed before he tested Cagle's forty-five to see if it produced a hull that matched the one discovered at the crime scene. He explained that, when he conducted his investigation, Cagle said that the weapon that ejected the forty-five hull was in Barney Neergaurd's truck. Agent Emiren testified that he searched the Defendant's vehicle and that he could not find a weapon inside. He did not recall if he found a witness list inside the Defendant's vehicle. On redirect examination, Agent Emiren testified that Stafford was an important witness for the State in the trial for the charges brought against the Defendant for Wilkey's murder.

***8** Dinnah Caluag, a TBI firearms examiner, testified that she examined a forty-five pistol that Agent Emiren had submitted to the lab. She explained that this weapon uses forty-five caliber cartridges, and she explained how the gun operates and that it ejects cartridge cases that are also referred to as hulls. She identified a cartridge case that was submitted to the lab and collected from the crime scene, and two other cartridge cases that Agent Emiren gave to her. She explained that a gun makes certain markings on a hull when it is fired and that she compared the hull taken from the crime scene with the other two hulls that Agent Emiren had given to her. She testified that the hull from the crime scene could have been fired from the forty-five pistol Agent Emiren submitted, but the other hulls did not have sufficient markings to determine from what weapon they had been fired.

Richie Dykes and Teresa Smith testified that, on the day the victim was shot, Cagle had fired a pistol, possibly a forty-five, two or three times over the top of Jeremy Davis's truck. Smith testified that the Defendant is her uncle and that she went to Dykes's residence to look for hulls because she thought that the Defendant had been set up. Smith acknowledged that she testified as a witness for the Defendant in the Wilkey trial.

The Defendant testified that he is friendly with both Cagle and the victim, but he had heard that Cagle and Stafford had problems with each other in the past. He testified that, on the day of the crime, he went to his brother Buck's house, drank some beer, and then went to Cagle's house. He testified that he had loaned Cagle one hundred dollars, and he went to Cagle's house to collect the money. He said that, when he arrived at Cagle's house, Cagle asked him to go with Cagle to Dunlap to get some hamburgers and beer, and the Defendant agreed. The Defendant testified that Cagle drove to the McDonald's, but it was closed, so they went to the Golden Gallon to get some beer. The Defendant testified that Cagle's girlfriend, Dodson, was in the kitchen when they returned to Cagle's house, and Cagle went into another room and said, "I'll be back" and was gone for about an hour and a half. The Defendant thought that Cagle was going to his father's house because Cagle's father was sick and lived next door. The Defendant said that he sat down on Cagle's living room chair, and when Cagle finally returned, Cagle had showered but, he did not appear to need a shower.

The Defendant denied seeing Stafford on the night of the crime and said that he did not leave Cagle's house until the police took him into custody. The Defendant testified that he had seen the gun that was entered

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

into evidence several times before at Cagle's residence. He testified that he did not own a gun like the one that had been entered into evidence, that he does not own a forty-five, and that he did not own a forty-five on the day of the crime. He denied going to his car when they returned to Cagle's house. He said that, when the deputies arrived at Cagle's residence, they said who they were, and they asked to speak with Cagle. He acknowledged that, once the deputies left with Cagle, he could have left Cagle's residence. The Defendant testified that he did not leave and that the police officers later took him into custody. He testified that he is right-handed and that he can shoot a pistol with his right hand.

***9** On cross-examination, the Defendant acknowledged that his thumb and his index finger are his only working right-hand fingers and that his pinkie finger and ring finger are his bad fingers. The Defendant explained that, if he had problems using his right hand, then he could not have worked at his job. The Defendant said that, on the day of the crime, he spoke with his brother and Dennis Johnson. He said that he saw these people during the day and that he went to Cagle's residence at around 9:00 or 9:30 p.m. He said that Cagle had owed him money for a couple of months, and he did not know why he chose to retrieve his money from Cagle on that particular day. The Defendant testified that he sat and watched television when Cagle left his home at around 11:30 p.m. after they returned from their trip to town.

The Defendant said that Cagle called the Sheriff when he returned, at around 12:30 a.m., and asked who had gotten shot in Bledsoe County. Cagle told him that Cagle heard about the shooting on a scanner, but he did not have a scanner. The Defendant acknowledged that he knows Wooden personally and that he did not go to talk to Wooden when the police officers arrived at Cagle's residence. The Defendant said that he figured that the police officers would come and speak with him if they wanted to talk to him. He testified that he had no reason to speak with the officers even though he had heard that somebody had been shot. The Defendant acknowledged that he stayed at Cagle's house after Cagle left with the police even though he did not know if Cagle would return. He denied telling Dodson that he shot Stafford and that Stafford needed to die. The Defendant said that Dodson did not use the phone while he was at Cagle's house.

The Defendant acknowledged that Upchurch represented him in the Ralph Wilkey case and that he received a list of State witnesses in the mail, and he went over the list with Upchurch. He acknowledged that he knew that Stafford was on this witness list, but he did not recall telling Joe Johnson that Stafford was on his "list." He further testified that he did not say that Stafford was on his list and that Johnson's statements are incorrect. The Defendant testified that Virginia Wright Stafford was mistaken when she said that she saw the Defendant knocking at her door. He also testified that the victim's testimony that the Defendant shot him is incorrect and that he did not tell Dodson that he shot the victim.

Based upon this evidence, the Defendant was convicted of attempted first degree murder, and the trial court sentenced him to twenty-four years in the Department of Correction.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) refused to strike prospective jurors; (2) did not instruct jurors on the charge of aggravated assault as a lesser-included offense; (3) refused the Defendant's request for a mental evaluation; (4) denied the motions to replace Defendant's counsel, which caused the Defendant to receive ineffective assistance of counsel; and (5) improperly allowed references to the Defendant's indictment for the murder of Ralph Wilkey. Finding no reversible error, we affirm the judgment of the trial court.

### A. Jury Selection

***10** The Defendant contends that the trial court erred when it refused to strike prospective juror Larry Hankins because he is related to the victim. Further, he alleges Hankins allegedly made improper comments to other jurors. Next, he contends that Ronald Nipper's inclusion was prejudicial because he is Danny Cagle's first cousin. Finally, he contends that juror Ralph Angel prejudicially withheld pertinent information during voir dire. The Defendant further argues that the inclusion of these jurors deprived him of his Constitutional right to a trial by an unbiased jury. The State counters that these issues are without merit and that the record lacks any evidence that any of the jurors were biased against the Defendant.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**1. Juror Larry Hankins**

The Defendant contends that the trial court erred when it refused to strike prospective juror, Larry Hankins, who is related to the victim. The State contends that the Defendant waived this issue because he did not object to the inclusion of Larry Hankins on the basis of his relation to the victim.

During the jury selection process, the trial court asked potential jurors if they knew the victim, Mike Stafford. The following dialogue ensued with the potential juror, Larry Hankins:

Juror: His wife is my first cousin.

The Court: His wife is your first cousin. Now that's a fairly close relation, anything about that that would give you any difficulty in this case today?

General Pope: Your Honor, she will be a witness.

The Court: What?

General Pope: The wife will be a witness.

The Court: Okay. The wife will actually be a witness and that will be your cousin. Anything about that, as a juror you've got to be, you've got to scrutinize the testimony of all witnesses. Witnesses are presumed to tell the truth, but once they say what they say the juror has to be able to make a judgment as to whether or not they think they have and that doesn't necessarily mean they would be lying, but maybe they didn't remember something correctly, or they weren't able to articulate, that is, relate it very clearly, and for several reasons you might not accept what a witness had to say. Can you judge her testimony the same as you would anybody else or is she going to get a benefit when she takes the stand?

Juror: Same as everybody else.

Harmon [Defense Counsel]: What's the name?

The Court: He said the same as everybody else. What's your name, sir?

Juror: Larry Hankins.

The Court: Okay. Mr Hankins, I'm not going to excuse you at this time unless you think in some way because of that you'd be leaning one way or another in the case. Do you have any reason to lean one way or another in this case? You do not, okay. Okay, Mr. Hankins, I would not excuse you.

The Defendant's trial counsel further questioned Hankins about his ability to serve as an impartial juror, and the following dialogue ensued:

[Defense Counsel]: All right. And I believe, Mr. Hankins, you said that you're actually related to [Virginia Stafford].

***11** Hankins: Yes.

[Defense Counsel]: To what degree?

Hankins: First cousins.

[Defense counsel]: First cousins. That's pretty darn close.

Hankins: Pretty close.

[Defense Counsel]: Well, you, obviously know your first cousin and y'all may have family reunions, you may just see each other down here at the Jiffy Mart or whatever, and you know, if you end up on this jury you're going to have to make a real tough decision. It's because, you know, there are charges in this case that somebody shot her husband for whatever reason. Do you feel like that that family relationship that you're going to be able to set that first cousinship aside and listen purely to what comes off the stand and make a decision? Can you remove your relation and make a decision?

Hankins: I hope so.

[Defense Counsel]: Well, I know you're hoping so, but what we've got to have and I'm not trying to put you on the spot, but you're the only one that got through the net from back there that was related to someone and what we've got to have is really an assurance from you that your relationship, cousin, first cousin, will not cause you in anyway to lean

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

against [the Defendant] and maybe put a little more weight in the State's case, because, you know, your first cousin will get right up here and testify, be looking at the jury and looking at the lawyers and, you know, she may be the most honest person in the world and she may not be, I really don't know her, but what it comes down to is you have to decide, you know, is the fact that she's my cousin going to make me lean towards the State's case a little more. Can you assure me that you will not?

Hankins: Yes.

[Defense Counsel]: Okay. I'm going to hold you to it.

The Defendant's trial counsel did not object to Hankins's inclusion on the jury.

The procedure relating to the selection of a fair and impartial jury is a matter entrusted to the sound discretion of the trial court. *State v. Plummer,* 658 S.W.2d 141, 143 (Tenn.Crim.App.1983); *See* Tenn. R.Crim. P. 24(a). Tennessee follows the common-law rule by which challenges of juror qualifications fall within two distinct classes. *State v. Akins,* 867 S.W.2d 350, 355 (Tenn.Crim.App.1993). Those challenges based on defects in qualifications such as alienage or statutory requirements are called propter defectum, which, literally translated means "on account of defect." *Id.* (citing BLACK'S LAW DICTIONARY 1098 (5th ed.1979)). The other class of challenges, propter affectum is based on bias or prejudice "actually shown to exist or presumed to exist from circumstances." *Id.* (citing *Durham v. State,* 182 Tenn. 577, 188 S.W.2d 555, 559 (Tenn.1945)(quoting 1 Bouvier's Law Dictionary 451 (Rawle's 3d rev. 8th ed. (1914)). Propter defectum challenges must be made prior to verdict, but propter affectum challenges may be made after verdict. *State v. Furlough,* 797 S.W.2d 631, 652 (Tenn.Crim.App.1990).

According to Tennessee Code Annotated section 22-1-105 (2003): "No person can act as a juror in any case in which the person is interested, or when either of the parties is connected with the person by affinity or consanguinity, within the sixth degree, computing by the civil law, except by consent of all the parties." An objection based on a disqualification under Tennessee Code Annotated section 22-1-105 is waived unless raised prior to the swearing of the jury. *See State v. Elrod,* 721 S.W.2d 820, 822 (Tenn.Crim.App.1986); *see also State v. Brock,* 940 S.W.2d 577, 579 (Tenn.Crim.App.1996) (holding that a defendant waived any objection to the inclusion of a juror who was related to one of the victims by failing to object when the juror disclosed the relationship).

***12** The trial court did not abuse its discretion when it did not strike Hankins as a juror. The record reflects that the Defendant's trial counsel had ample opportunity to fully question Hankins about his ability to serve as an impartial juror despite his relation to the victim, and his trial counsel did not object to the inclusion of Hankins on the jury based upon a violation of Tennessee Code Annotated section 22-1-105. Therefore, the Defendant waived any objection to the inclusion of Hankins on the jury on the basis of his relation to the victim.[FN1] Later during the voir dire process, the Defendant used a peremptory strike to remove Hankins from the jury pool because Hankins allegedly made improper comments to another juror. The Defendant is not entitled to relief on this issue.

FN1. The Defendant later objected to the inclusion of Hankins on the jury because Hankins allegedly made

improper statements during a break in the voir dire process, and we discuss this objection below.

The Defendant also contends that the trial court erred when it did not strike Larry Hankins from the jury after he was accused of making improper, prejudicial comments to other jurors during voir dire and when it did not disqualify the jurors who were allegedly tainted by Hankins's statements. The Defendant also argues that he was further prejudiced because a juror tainted by Hankins's alleged improper comments was included on the jury after the Defendant had exhausted his peremptory strikes, and the Defendant was thus precluded from using a peremptory strike against this juror. The State contends that this issue is without merit, and the trial court did not abuse its discretion when it impaneled the jury.

After a break during the jury selection process, someone told the Defendant's attorney that she overheard Hankins making a statement to other potential

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

jurors about the case. The following dialogue ensued:

[Defense Counsel]: Mrs. Driver just brought to my attention, a lady came up to her who is, I believe, a relative of [the Defendant's] who says during the break she heard Mr. Hankins, I think it's Larry Hankins who's a cousin to Virginia Stafford, make a comment to, perhaps another-

Mrs. Driver: Several jurors.

[Defense Counsel]: Several jurors, something about we ought to go just hang him now, something to that extent. I'd like to get that woman in here and see what she heard and who said it and who they said it to.

The Court: Do you want to ask that question of him first?

[Defense Counsel]: I'd rather get her in here. Find out exactly what she said she heard. Do you know her name? You go ahead and get her....

The Court: Ma'am, it's stated that you thought you'd overheard something.

General Pope: Do you want to swear her in your honor?

Audience Member: Yeah, I'll swear.

(Whereupon, the female audience member was sworn.)

The Court: What do you-

Audience Member: I was setting down there smoking by the ashtray on the bench and there was four of the jury members down there talking and the Hankins man, I know him just from where I see him, he said, "We might as well just tell Jimmy Pope he's guilty and hang him now and get it over with and have a party for the 4th." I thought, well, that's not fair.

***13** The Court: Yeah, I understand. People say stuff like that.

Audience Member: He said, "We'll just go to the park and we'll fish tonight and spend the night."

The Court: Did he say anything about, I mean, like if he's be doing it for a reason or that he wanted to get it over with?

Audience Member: Get it over with and get it out and just go ahead and charge him guilty and be done with it.

The Court: Okay, we can ask-

[Defense Counsel]: What's your name, ma'am?

Audience Member: Melissa Olinger-Nipper.

[Defense Counsel]: Melissa Olinger-Nipper.

Olinger-Nipper: It's hyphenated. Jimmy knows me. I went to school with him, Mr. Pope.

The Court: Okay.

Olinger-Nipper: I have no reason to lie.

The Court: Who was it?

Olinger-Nipper: It was Mr. Hankins, but there was somebody setting beside me that heard the same thing.

The Court: Okay. Well, we can deal with something like that.

Olinger-Nipper: Yeah, I just didn't know if I should tell it or not, Your Honor.

The Court: Yeah, you should tell it.

Olinger-Nipper: Right, that's what I'm saying, he may not have meant it.

The Court: We'll bring him in and we'll see, let him be asked a couple of questions on it, if he's that irresponsible to say something like that and see if it bothers anybody.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Defense Counsel]: Thank you, ma'am

The Court: Is Mr. Hankins on the original 12?

[Defense Counsel]: Right, Larry Hankins.

General Pope: Your Honor, he's the one that's a cousin to Mrs. Virginia Wright, the victim's wife.

The Court: Ask Mr. Hankins to step back here. He's on the front row of the jury box, the [farthest] away from us.

Mr. Hankins, you were overheard by someone making a comment, and it may be understandable as a joke or something, but did you make a comment let's go ahead and find him guilty so we can go out and party, did you say anything like that?

Hankins: No, sir, I did not.

The Court: Okay. We have a person that thought they overheard that. Were you there when somebody else might have said something like that? It's suppose to have been just during break standing around talking with some other jurors, just some comment to the effect that we ought to hang him and get this over with so we can party tonight or something like that.

Hankins: No.

The Court: Anything like that?

Mr. Hankins: No, when I left I went to my truck to make sure no one stole anything out of it and by the time I walked back up on the steps it was about time to come back in.

The Court: So you weren't involved with any conversations with anybody?

Hankins: No.

The Court: Must have been somebody else if that's the case. You wouldn't share any such sympathy as that, I mean, as far as just wanting to get something over with?

Hankins: Oh, no, sir.

The Court: We understand how important it is for everybody. Okay, you're done, unless someone wants to ask him.

***14** [Defense Counsel]: Did you overhear anyone out there make some sort of comment, you know, like to get this over with so we can go ahead and celebrate the 4th, or go fishing at the park, something like that?

Hankins: Now, I did make a comment to the Deboard boys, I said, "If we go to the park at least you can go fishing." Now, I did make that comment.

[Defense Counsel]: About meaning if you got put up in the motel there?

Hankins: Yeah.

[Defense Counsel]: Which Deboard boys are we talking about here? Jerry Deboard?

The Court: Nothing wrong with that. That would be a good idea. I hope you can go fishing if you're up there.

Hankins: Well, Jerry and Roy Deboard, Jr., was both standing there, you know. They's talking about they's getting ready to go fishing this morning. I said, you know, if you do get picked up at least you can go fishing, you know, which I didn't think anything was out of the ordinary. Just a couple of old country boys talking about fishing.

[Defense Counsel]: That's all I have.

The Court: All right. Just take your seat back and we'll be out in just a minute. We may want to call somebody else, I don't know. Do you want to call these other folks on something like that?

Mrs. Driver: She was sitting outside she said smoking when she heard it.

[Defendant]: Bring in Jerry Deboard just to make sure.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court: It's obvious that was the conversation that she was overhearing.

[Defense Counsel]: Probably so. If we could bring just one of the two in he mentioned. Jerry Deboard. He's on the back row, second one from you just to confirm what he says.

The Court: You're Mr. Deboard?

Deboard: Yes.

The Court: Mr. Deboard, there has been some discussion and that's why we want to ask before we get any further in here, that there was some comment made maybe that, at least one person that was standing outside while everybody was out taking their breaks and so forth, that there was an indication that was that statement, he didn't, in his position, he didn't restate it exactly as it was told to us, but it does appear that some kind of discussion occurred about fishing or maybe even getting the trial over so they could go fishing. Were you-

Deboard: I didn't hear nothing about fishing, he was just aggravating said, I didn't hear nothing about fishing. He was aggravating saying, you know, a man get thrown out by this and that, you know, you know how people will set around and say something like that, but no, there wasn't no comment that I recall of fishing, Of course, now, I was talking to my wife, because I hadn't been able to get a hold of her and told her that so far I'd been picked to stay on the jury. There's four or five of us standing there. They may have been discussing something on fishing.

The Court: Did anybody make any-

Deboard: Now, my cousin was talking about fishing. He said if he had his depth finder hooked up last night you'uns wouldn't have got a hold of him, because he'd done already been gone this morning. Now they was a comment-

***15** The Court: Is he on the jury, too?

Deboard: He's picked, but he's still setting out-

The Court: He's a replacement juror.

Deboard: He's still a replacement. His comment was fishing. Now, him and Larry may have been saying something about that during the time that I was talking to my wife.

The Court: Did you overhear anybody make any kind of statement that could be considered serious-

Deboard: Not nothing to me.

The Court:-That they would decide the case-

Mr. Deboard: Not nothing serious.

The Court: Just to get the heck out of Dodge.

Deboard: To me not nothing seriously, it was just, you know, people standing around talking. To me nothing seriously, no, I didn't think they was, nobody was being serious you know.

The Court: Did you hear anybody say, well, let's just go ahead and find him guilty so we can, you know, go party tonight or tomorrow night?

Deboard: Larry, he said something about, somebody else said, I think he's guilty, you know, like I said, just joking, but ... in my opinion I don't think anybody was being serious. It was just, you know, people joking.

The Court: Well, you understand that, obviously, this is vitally important to everybody here-

Deboard: Yes, sir.

The Court: And certainly to [the Defendant], and no decision ought to be made because of an impending party-

Deboard: Yes, sir.

The Court: And you wouldn't do that would you?

Deboard: No, sir. Me myself, I didn't make no kind of comment like that. I was just, I was standing there on the back step back there talking to my

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

wife, telling her to be around home close by because I may have to call her to have her bring some clothes.

The Court: Anybody else want to ask anything of this juror?

[Defense Counsel]: No.

The Court: You can go on.

(Juror Excused.)

The Court: What it sounds like to me is just good old boys talking-

[Defense Counsel]: It's good old boys mouthing off, but according to this witness, Mr. Hankins, maybe jokingly, stood up and said, We should go ahead and find him guilty so we can go fish or whatever?

The Court: I think what I should do is give them instruction just to impress upon them that, obviously, this case can't be decided based on anybody's idea, you know, including the case to meet some other schedule such as a party or something, and just kind of leave it at that.

[Defense Counsel]: I would like to go ahead for the record to make a motion to strike Mr. Hankins, though. I just feel like what he said shows prejudice on his part.

The Court: There may be some lack of maturity. I don't think it shows that he's going to do anything wrong to [the Defendant], so I'm not going to strike him....

(Whereupon, court resumed ... with all jurors present.)

Ladies and gentleman, I want to give you a little caution, all of you, and I don't think we're going to break up again until we actually have a jury selected, but I want to caution you one more time. You should not discuss this case in any way with each other during the breaks. You know, if something is said about the case it causes a person possibly to take some opinion or think you have an opinion about the case and it just might change people that are thinking, certainly, I know everybody wants to get along and it may be that someone would even say something that's kind of joking about the case, but it might be overheard by somebody who is extremely interested in the matter and it wouldn't be a joke if you were the one that was on trial or someone in their family and they heard a juror joking in some fashion about let's get it over with in a hurry or something to that effect. We had a little question about that and so I just want to tell you just generally be mindful that this is serious business and the less levity that you have about the matter the better. It doesn't mean you can't talk with each other about the time of day and so forth, but remember, especially if you were out around the courthouse, you just should not say anything about the case at all and I believe that should cover the grounds....

***16** The record reflects that Hankins was struck from the jury during the first round of challenges. The record reflects that both parties exhausted their peremptory challenges and that Roy Deboard was then placed on the jury.

The ultimate goal of voir dire is to ensure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire rests within the sound discretion of the trial court. *State v. Howell,* 868 S.W.2d 238, 247 (Tenn.1993). Rule 24(b) of the Tennessee Rules of Criminal Procedure governs challenges to potential jurors for cause and, in pertinent part, states, "Any party may challenge a prospective juror for cause if ... there exists any ground for challenge for cause provided by law; [or] the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." However, a trial court is granted wide discretion in ruling on the qualifications of the jurors, and a trial court's decision in this regard will not be overturned absent an abuse of discretion. *State v. Kilburn,* 782 S.W.2d 199, 203 (Tenn.Crim.App.1989). Unless there has been a clear abuse of discretion, the trial court's discretion is not subject to review. *See* *Lindsey v. State,* 189 Tenn. 355, 225 S.W.2d 533, 538 (Tenn.1949). A trial court's finding of impartiality may be overturned only for manifest error. *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *State v. Howell,* 868 S.W.2d at 247.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In the case under submission, the trial court did not abuse its discretion when it refused to excuse potential juror Hankins for cause and when it did not disqualify any jurors who allegedly heard Hankins' statements.[FN2] The Defendant argues that inconsistencies between Hankins's and Deboard's testimony reveal that improper comments were made during voir dire that were prejudicial to the Defendant. However, this Court is unable to conclude that the trial court abused its discretion when it found that the conversation at issue had no bearing on the ability of Hankins and the Deboards to serve as impartial jurors. First, we note that Olinger-Nipper acknowledged that Hankins may not have meant the statements that she allegedly heard him make, and Jerry Deboard testified that the conversation was not serious. The record reflects that the conversation between Hankins and the Deboards revolved around their planned recreational activities and not the merits of the case at issue. The trial court determined that the conversation perhaps suggested that Hankins is immature but does not suggest that Hankins would treat the Defendant unfairly. We note that, the trial court, rather than the appellate court, is clearly in the better position to observe the demeanor, attitude, and body language of a potential juror from which the court may conclude the potential juror's capability of impartiality. *See* State v. Lorenzo Malone, No. M2003-02770-CCA-R3-CD, 2005 WL 1521788, at *3 (Tenn.Crim.App., at Nashville, June 27, 2005), *no Tenn. R.App. P. 11 application filed.* The record does not reflect that the trial court abused its discretion or committed "manifest error" when it impaneled the jury, therefore the Defendant is not entitled to relief on this issue.

FN2. The State argues that the Defendant waived this issue because the Defendant failed to object to the

inclusion of Jerry Deboard and Roy Deboard on the jury. However, as previously discussed, a challenge that is based on actual prejudice may be made after the jury verdict. *See* Akins, 867 S.W.2d at 355.

***17** Furthermore, we note that the Defendant has failed to show how the alleged error prejudiced his case. "[I]rrespective of whether the trial judge should have excluded the ... challenged [juror] for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." Howell, 868 S.W.2d at 248 (citing State v. Thompson, 768 S.W.2d 239, 246 (Tenn.1989)). The "failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." Howell, 868 S.W.2d at 248. The Defendant in the instant case has stated that a tainted juror, Roy Deboard, was included on the jury after he exhausted all of his peremptory challenges. However, defense counsel only questioned Jerry Deboard about his exposure to Hankins's prejudicial comments. The record contains no evidence as to what Roy Deboard heard or thought about the allegedly improper comments, and we decline to speculate. Because the Defendant failed to show that an incompetent jury or impartial juror was forced upon him, we conclude that the Defendant is not entitled to relief on this issue.

### 2. Juror Ronald Nipper

The Defendant argues that the inclusion of Ronald Nipper on the jury violated the Defendant's right to an unbiased jury because Nipper is the second cousin of the State's witness, Dennis Cagle. He contends that the inclusion of potentially biased jurors hindered his ability to meaningfully participate in the jury selection process and violated principles of justice and fair play.

First we note that the record shows that the Defendant failed to object for cause to Nipper's inclusion on the jury. During the voir dire process, the following dialogue ensued:

General Pope: Anyone that knows Denny Cagle? Mr. Nipper, you know him?

Mr. Nipper: I'm related to him.

General Pope: You're related to him. What's your relationship?

Mr. Nipper: Second cousin.

General Pope: Second cousin, okay. Would it be fair to say, Mr. Nipper, that you already have an opinion about Mr. Cagle's credibility or lack of-don't tell me which-but an opinion about his credi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

bility or lack of credibility?

Mr. Nipper: No.

General Pope: Okay. You could [sit] here and listen to his testimony and judge his testimony the same as anybody else?

Mr. Nipper: (Nods head up and down.)

General Pope: Okay. And if you thought he was telling the truth, you'd so find and if you thought he was not telling the truth you'd so find that, too?

Mr. Nipper: (Nods head up and down.)

General Pope: And the fact that you're related to him and say, say he testified to one thing and you end up finding differently than what he testified to, is that going to cause you any problem later when you have to see him on the street or reunion or whatever else, is that going to be in the back of your mind when you're there in the jury room?

***18** Mr. Nipper: No.

General Pope: You can call it like you see it?

Mr. Nipper: Yeah.

After defense counsel became aware that Nipper and Cagle are second cousins, the following conversation ensued:

[Defense Counsel]:And these other people we talked about, Denny Cagle being cousins or friends of his, those people, can you assure me that that relationship, if he takes the stand you're going to treat him like any other witness? I know we're asking you to do some gymnastics here, but I'm going to hold you to the fact that you've said you can do that, all right?

The record reflects that the Nipper assured the trial court that his relations would not effect his ability to act as an impartial juror, and Defense counsel did not object to the inclusion of Nipper on the jury. Therefore, the Defendant is not entitled to relief on this issue.

### 3. Juror Ralph Angel

The Defendant contends that the trial court erred when it failed to exclude Ralph Angel as a juror because Angel willfully failed to inform the trial court that he knew about the Defendant's prior conviction for Ralph Wilkey's homicide. The Defendant also contends that, because the trial court asked prospective jurors on several different occasions if they knew anything about the Defendant, Angel's silence about his knowledge of the Defendant's prior homicide conviction reveals that he was not an impartial juror. The Defendant notes that all of the other potential jurors who indicated that they knew about the Defendant's prior homicide conviction were excused for cause after further questioning by the trial court. The State argues that the record lacks any evidence that juror Angel willfully concealed or failed to disclose information on voir dire that reflected his lack of impartiality. The State also argues that the Defendant was not prejudiced by the inclusion of Angel on the jury because a stipulation that the Defendant was indicted for the homicide of Ralph Wilkey was entered into evidence at the outset of the trial.

Juror Angel testified at the hearing on the Defendant's motion for new trial that he served as the jury foreman in this trial, that he knew the Defendant before the trial began, and that he knew of the Defendant's prior homicide conviction. He explained that he did not disclose his knowledge during voir dire because he thought that the trial court did not specifically ask him questions regarding this information. The following dialogue ensued:

General Pope: Do you remember the Judge asking some general questions at the beginning of all the jurors sitting out in the seats, did he do that?

Angel: Yes, he asked some questions.

General Pope: And the questions that he asked, if any applied to you, did you answer to those truthfully?

Angel: I didn't feel like any applied to me.

General Pope: None applied to you, okay. Then when you were picked up and put in the box were you asked more questions I assume?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Angel: Some.

***19** General Pope: Maybe not individually, but-

Angel: Right.

General Pope: And did you answer all questions truthfully in that scenario?

Angel: Yes.

General Pope: And that's never changed since the trial or anything, right?

Angel: No.

General Pope: Your Honor, without specific questions and know which ones-

The Court: (Interposing) In one of the questions that would have been asked, do you know of any reason why you can't be fair and impartial, that is usually ask[ed] two (2) or three (3) times?

Angel: Correct.

The Court: Did you know of any reason why you couldn't be fair and impartial?

Angel: No.

General Pope: Based on anything, I mean, this is another question that's some times asked, if you did know anything about [the Defendant], could you set that aside and decide the case solely on the facts presented to you in court.

Angel: Yes.

General Pope: And is that what you did?

Angel: Yes.

The trial court: Well, at this point there's no reason to believe that it was anything more than negligent. I mean, he said he didn't think the question was asked that required his response that may be a mistake on his part, but that's not the same, you know, as intentionally doing it and then he says that it [had] no effect that he judged this case based on the facts he heard, so it seems to me like the burden would be on you to go further than just the fact that he got on the jury, maybe knowing more than he should have as far as what was trying to be elicited from him. You really need to be able to show something that would have caused him, first of all, to be getting on that thing for the purpose of convicting or give the Court at least some reason to infer that from some fact. I don't have any fact in which to infer other than the threshold issue of he may not have responded correctly, so I guess-I can go ahead and rule on this one, I don't see any reason, I don't believe there's any basis upon which to grant a new trial based on what Angel has testified to and what has been established, unless you have other witnesses that somewhere are going to impeach Angel.

The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel. *Akins,* 867 S.W.2d at 355 (citing 47 Am.Jur.2d, Jury § 195 (1969)). Pursuant to Tennessee Code Annotated section 22-3-101 (2003), "Parties in civil and criminal cases or their attorneys shall have an absolute right to examine prospective jurors in such cases, notwithstanding any rule of procedure or practice of court to the contrary." Our courts, both civil and criminal, have long recognized the importance of the voir dire process and have zealously guarded its integrity. *Akins,* 867 S.W.2d at 355. Since full knowledge of the facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make "full and truthful answers ... neither falsely stating any fact nor concealing any material matter." *Id* . (citing 47 Am.Jur.2d, Jury § 208 (1969)).

***20** When a juror conceals or misrepresents information tending to indicate a lack of impartiality, a challenge may be made in a motion for new trial. After establishing that the challenge may be maintained, a defendant bears the burden of providing a prima facie case of bias or partiality. *See State v. Carruthers,* 145 S.W.3d 85, 95 (Tenn.Crim.App.2003). When a juror willfully conceals (or fails to disclose) information on voir dire that reflects on the juror's lack of impartial-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ity, a presumption of prejudice arises. *Akins,* 867 S.W.2d at 355. Failure to disclose information in the face of a material question reasonably calculated to produce the answer gives rise to a presumption of bias and impartiality. *Id.* The question must be material and one to which counsel would reasonably be expected to give substantial weight. Insignificant non-disclosures will not give rise to a presumption of prejudice. *Furlough,* 797 S.W.2d at 653. The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances. *Akins,* 867 S.W.2d at 356 n. 13. Findings of fact made by the trial court are given the weight of a jury verdict. *State v. Burgin,* 668 S.W.2d 668, 669 (Tenn.Crim.App.1984).

In the case under submission, we have discovered nothing in the record which casts doubt on the trial court's conclusion that this issue does not warrant a new trial. While Angel's knowledge of the Defendant's prior conviction should have been disclosed during the voir dire process, the evidence does not indicate that Angel intentionally withheld the information. The record reflects that Angel did not think that the general questions about knowing anything about the Defendant applied to him. The Defendant has failed to prove a prima facie case of bias or partiality because he failed to prove that Angel willfully concealed or failed to disclose information on voir dire "which reflects on the juror's lack of impartiality." *Akins,* 867 S.W.2d at 355. Furthermore, we do not think that bias has been shown. The State and the Defendant stipulated at the outset of trial that the Defendant had been indicted for the murder of Ralph Wilkey and that the victim, Mike Stafford, testified at the Defendant's trial for that murder. Accordingly, at the outset of trial, all the jurors knew information similar to what Angel knew about the Defendant. We find that the degree of Angel's information other than that presented at trial was minimal and agree with the trial court's finding that such exposure did not prejudice the Defendant's case.

The Defendant contends that this case is similar to *Akins,* in which our Supreme Court granted the Defendant a new trial because a juror did not respond to questions about potential biases that were directed to the pool of potential jurors. The case under submission is distinguishable from *Akins.* The *Akins* Court noted that the juror "realized the significance of her experience yet failed to disclose them and then used them to counsel jurors about extraneous matters." *Id.* at 357. Unlike the juror in *Akins,* Angel explained that he did not think that the questions posed during voir dire pertained to him, and all of the jurors learned most of the information that Angel knew at the beginning of the Defendant's trial. Because the Defendant failed to show that Angel intentionally withheld information or that Angel's inclusion on they jury prejudiced his case, he is not entitled to relief on this issue.

***21** The Defendant contends that the trial court, by allowing Juror Angel to testify at the hearing on the Defendant's motion for a new trial, violated Rule 606(b) of the Tennessee Rules of Evidence. That rule bars juror testimony regarding jury deliberations but permits testimony and affidavits pertaining to extraneous prejudicial information, outside influence, and agreed quotient verdicts. Tenn. R. Evid. 606(b). Additionally, Rule 606(b) bars testimony as to "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind." *Id.* The rule does not apply to testimony about voir dire and does not foreclose a challenge on the ground of proper affectum. Angel's statements pertained to his responses during the voir dire process. Therefore, the inquiries regarding his ability to serve as an impartial juror did not violate Tennessee Rule of Evidence 606(b), and the Defendant is not entitled to relief on this issue.

### B. Lesser-Included Offense

The Defendant contends that the trial court erred in failing to instruct the jury on aggravated assault as a lesser-included offense of attempted first degree murder. Specifically, the Defendant argues that a jury instruction on aggravated assault was warranted because the indictment and arrest warrant recite allegations that constitute both aggravated assault and attempted first degree murder. He further argues that the evidence established at trial supports the lesser-included offense of aggravated assault. The State contends that aggravated assault is not a lesser-included offense of attempted first degree murder, and, therefore, the trial court properly declined to instruct the jury on aggravated assault.

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. *State v. Smiley,* 38

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.W.3d 521, 524 (Tenn.2001). The standard of review for mixed questions of law and fact is de novo with no presumption of correctness. *Id.* The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Davenport,* 973 S.W.2d 283, 287 (Tenn.Crim.App.1998) (citing *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.1986)); *see also* Tenn. R.Crim. P. 30.

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." *State v. Allen,* 69 S.W.3d 181, 187 (Tenn.2002). In *State v. Burns,* 6 S.W.3d 453 (Tenn.1999), our Supreme Court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser-included offense: An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element elements establishing:

***22** (1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or (c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

*Id.* at 466-67.

Attempted first degree murder is the attempt to kill another when the defendant acts intentionally and with premeditation and deliberation. *See* Tenn.Code Ann. §§ 39-12-101; 39-13-202(a)(1) (2003). Assault requires bodily injury, fear of bodily injury, or offensive physical contact, none of which are essential to an attempt to murder. *See* Tenn.Code Ann. § 39-13-101(a) (2003). Aggravated assault is an assault accompanied by serious bodily injury or use of a deadly weapon. Tenn.Code Ann. § 39-13-102(a) (2003). Thus, aggravated assault and assault are not lesser-included offenses of attempted first degree murder under the *Burns* test because the statutory elements are different. [FN3] *Burns,* 6 S.W.3d at 466-67; *Wayford Demonbreun, Jr. v. Ricky Bell,* No. M2005-01741-CCA-R3-HC, 2006 WL 197106, at *5 (Tenn.Crim.App., at Nashville, Jan. 26, 2006), *no Tenn. R.App. P. 11 application filed; State v. Joshua Lee Williams,* No. W2000-01435-CCA-R3-CD, 2001 WL 721056, at *6 (Tenn.Crim.App., at Jackson, June 27, 2001), *perm. app. denied* (Tenn. Oct. 29, 2001); *State v. Christopher Todd Brown,* No. M1999-00691-CCA-R3-CD, 2000 WL 262936, at *2 (Tenn.Crim.App., at Nashville, Mar. 9, 2000), *perm. app. denied* (Tenn. Sept. 10, 2001). "If a lesser-included offense is not included in the offense charged, then an instruction should not be given, regardless of whether the evidence supports it." *Burns,* 6 S.W.3d at 466-67.

FN3. Defense Counsel acknowledges that several opinions from this Court have held that, pursuant to the *Burns* test, aggravated assault is not a lesser-included offense of attempted first degree murder but argues that "the application of *Burns* was intended to be broader or that the analysis remains flawed." However, besides noting that our Supreme Court declined to address whether aggravated assault is a lesser-included offense of attempted first degree murder in *State v. Yoreck, III,* 133 S.W.3d 606 (Tenn.2004), defense counsel fails to provide any legal support for his argument. Consequently, the Defendant is not entitled to relief on this issue. *See* Tenn. R.Crim.App. 10(b).

Because aggravated assault is not a lesser-included offense of attempted first degree murder, the Defendant was not entitled to such a jury instruction. Under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the *Burns* analytical framework, we cannot consider the Defendant's arguments that the evidence at trial supported an instruction of aggravated assault. *See Id.* Similarly, the law precludes us from addressing the Defendant's argument that his charging instrument and arrest warrant established allegations that constitute aggravated assault. Under *Burns,* the offense charged, not the actions described in the arrest warrant, determine what lesser-included offenses the trial court should give to the jury. *Id.*

The Defendant's indictment charged that:

> [The Defendant] did unlawfully, intentionally and with premeditation attempt to kill one Mike Stafford and in furtherance of the aforesaid attempt did shoot the said Mike Stafford with a firearm, to wit: a handgun, the aforesaid actions constituting a substantial step toward the commission of the offense of First Degree Murder....

***23** This indictment clearly charges the Defendant with attempted first degree murder and makes no allegations that the Defendant committed an aggravated assault. In this case, the jury was charged with attempted second degree murder and reckless endangerment. We conclude that the trial court did not err in failing to instruct the jury on aggravated assault, and the Defendant is not entitled to relief on this issue.

### C. Mental Evaluation

The Defendant contends that the trial court erred when it did not obtain a mental evaluation of the Defendant to determine his competency to stand trial. The Defendant further argues that the mental evaluation that he had previously received served as an improper basis for the trial court's denial of his request for a mental evaluation, prior to trial in this case. The State counters that the evidence presented at the hearing on the motion for a mental evaluation failed to show that the Defendant was incompetent to stand trial, especially in light of the fact that the Defendant had received a mental evaluation in December of 1999, just months before the trial in this case. The trial court denied the Defendant's motion for a mental evaluation.

In his motion for a mental evaluation, Defense counsel alleged that the Defendant had received treatment for mental illnesses in the past and was presently in need of such treatment. At the hearing on the Defendant's motion, defense counsel testified that the Defendant was irrational and that he needed a mental evaluation. Assistant District Attorney General Pope testified that the Defendant made a similar motion in his previous murder trial, which occurred about a year ago, and that the mental evaluation revealed that the Defendant was competent and sane. The trial court noted that the Defendant appeared to be competent and sane at his prior trial. The trial court denied the Defendant's motion to receive a mental evaluation.

"When the accused is believed to be incompetent to stand trial, the criminal, circuit or general sessions court judge may, upon his or her own motion or upon petition by the district attorney general or defense counsel and after a hearing, order the defendant to undergo a mental evaluation." *State v. Rockie Smith,* No. W1999-00814-CCA-R3-CD, 2000 WL 1664280 *5 (Tenn.Crim.App., at Jackson, Oct. 23, 2000), *no Tenn. R.App. P. 11 application filed;* Tenn.Code Ann. § 33-7-301(a)(1) (2003). The applicable test as to competency to stand trial is whether the accused has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him. *State v. Benton,* 759 S.W.2d 427 (Tenn.Crim.App.1988). Before the mental examination is ordered, there must be evidence sufficient to raise a question as to the accused's mental capacity. *State v. West,* 728 S.W.2d 32, 34 (Tenn.Crim.App.1986). The decision to grant an evaluation is within the power of the trial judge, and this Court will not reverse a denial of a mental evaluation absent a clear showing of abuse of discretion on the part of the trial judge. *State v. Rhoden,* 739 S.W.2d 6, 16 (Tenn.Crim.App.1987); *State v. Lane,* 689 S.W.2d 202, 204 (Tenn.Crim.App.1984).

***24** In the case under submission, the Defendant has not shown that the trial court abused its discretion when it denied his motion for a mental evaluation. First, we note that the record does not contain the prior mental evaluation, and we agree with the Defendant that the results of a mental evaluation conducted during a previous trial might not necessarily affect the outcome of his motion for a mental evaluation at a later date. Nonetheless, the evidence presented was not sufficient to raise a question as to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant's mental capacity. The only allegations that the Defendant was presently unfit to stand trial consisted of defense counsel's observations that the Defendant was paranoid and irrational. The record lacks any evidence to refute the notion that the Defendant had sufficient ability to understand the proceedings against him and to assist in his defense. The record transmitted to this Court does not reveal any evidence, outbursts, or any other type of conduct which would cause the trial court to believe that the appellant was incompetent at the time of his trial. *See* *State v. Rhoden,* 739 S.W.2d 6, 17 (Tenn.Crim.App.1987). Because the record does not reflect sufficient evidence to raise a question as to the Defendant's mental capacity, the trial court did not abuse its discretion when it denied the motion for a mental evaluation, and the Defendant is not entitled to relief on this issue.

### D. Motions to Replace Counsel

The Defendant contends that the trial court erred when it denied his motion to discharge appointed counsel and his trial counsel's motion to withdraw because his defense counsel had a conflict of interest and because an acrimonious relationship and a complete breakdown of communications had developed between the Defendant and his trial counsel. The Defendant further argues that, because the trial court denied these motions, he recieved ineffective of counsel. The State counters that the trial court did not err when it denied these motions and that the Defendant received effective assistance of counsel.

#### 1. Conflict of Interest

The Defendant contends that the trial court erred when it denied his trial counsel's motion to withdraw due to a conflict of interest based on his trial counsel's prior representation of State witnesses. Specifically, the Defendant argues that, among other things, his trial counsel's conflict of interest "chilled" his trial counsel's ability to cross-examine the victim. The State counters that the Defendant's trial counsel's past representation of State witnesses did not prevent defense counsel from preparing a vigorous defense for the Defendant and that defense counsel did not need to withdraw because he effectively and zealously represented his client.

In a motion to withdraw, the Defendant's trial counsel notified the trial court that he had previously represented Victoria Bradford Cagle, a State witness, and Christy Littrell, the victim's step-daughter and Virginia Stafford's daughter, who was also on the State's witness list.[FN4] Due to these perceived conflicts of interest, the Defendant also moved to discharge his counsel. The Defendant's trial counsel filed another motion to withdraw, contending that he had previously represented the victim, Mike Stafford, on a charge of manufacturing marijuana and in a case in which Stafford pled no contest to the charge of improper influence of a juror. In his motion, defense counsel argued that Stafford should be cross-examined regarding this conviction for the purpose of impeaching the victim's credibility and that his former representation of Stafford would impede his ability to effectively cross-examine the victim. Defense counsel noted that he contacted the Board of Professional Responsibility,[FN5] which agreed that the Defendant's trial counsel should not represent the Defendant due to a conflict of interest.

FN4. We note that the record reveals that Christy Littrell did not testify at trial.

FN5. The record does not contain any written opinion or statement from the Board of Professional Responsibility and does not describe in detail the opinion that the Board of Professional Responsibility provided.

***25** At the hearing on this motion the following evidence was presented: Defense counsel testified that he represented the victim, Mike Stafford, on a manufacturing marijuana charge. He also described how he represented Victoria Bradford Cagle, Dennis Cagle's wife, on a ten-count forgery charge. He noted that Bradford was at the residence when Dennis Cagle and the Defendant left Cagle's house together to go pick up the victim. He explained that Bradford would be the "counter alibi" witness in this case and that he could not effectively cross-examine her. Defense counsel further testified that he represented and continues to represent Christy Littrell, Mike Stafford's step-daughter and Virginia Stafford's daughter, but acknowledged that Christy Littrell would not serve as a witness against the Defendant. He explained that the Defendant felt like these three apparent conflicts of interest would prevent the Defendant from receiving neutral, vigorous, and zealous representation. Assistant District Attorney General Pope argued that,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

because all of the charges that the State witnesses faced when defense counsel had represented them are part of the public record, defense counsel's prior representation of State witnesses did not prejudice the Defendant. The trial court ruled that:

> All right, I think this is the kind of thing that on close inspection, the Public Defender's office would have a problem in representing almost anybody, because if you go to stepchildren and extended relatives in almost every criminal case you've got sort of a circle of regulars, the same ones we see here in court all the time, you're going to have some connection in some way, so I don't think there's anything that was mentioned, that was mentioned to me that would be, that would be the kind of conflict that would require removal, so I deny the motion on all grounds.

The day before trial, defense counsel again asserted that his prior representation of Stafford on a jury tampering charge could hinder his ability to effectively cross-examine Stafford and to zealously represent the Defendant. The trial court inquired as to what details about the victim's prior conviction for tampering with a jury defense counsel needed to give to the jury in order to effectively impeach the victim's credibility as a witness. Defense counsel said: "I'm not worried about the actual facts on that conviction coming in, to be quite honest with you. I think just the fact of the conviction is really about as far as I was planning to take it."

At trial, the State asked Stafford if he pled no contest to improper influence of a jury, and Stafford said that defense counsel served as his lawyer in that case. The following dialogue ensued:

> [Defense Counsel]: Your Honor, the exact thing that I feared would happen just happened, that he said I was his lawyer on that prior conviction of jury tampering. I'm requesting a mistrial at this time based on that information, and at the least, a curative instruction to the jury.
>
> ***26** The Court: I don't think they picked up on that. I didn't even think much about it when it came up.
>
> General Pope: Your Honor, I don't know how that would be prejudicial at all.
>
> The Court: There's nothing prejudicial.

During cross-examination, defense counsel asked Stafford about his conviction for tampering with a jury. Stafford replied that he pled no contest and testified that he received the conviction for tampering with a jury because defense counsel had represented him and did not "work hard enough" to get him acquitted. Defense counsel again asked for a mistrial, and the following dialogue occurred:

> [Defense Counsel]: This is why I filed the pre-trial motions. I'm again asking for a mistrial.
>
> Trial Court: I'm not going to give you a mistrial. You know this guy's limited ability to respond to questions of that nature, so he's just trying to say what he thought, and you were asking him why and he brought it out-
>
> [Defense Counsel]: No, I didn't ask him why. I asked him-
>
> The Court: But I don't see how that effects in any way your case. Okay, so motion denied.

Whether an accused is entitled to a substitution of counsel is a question which addresses itself to the sound discretion of the trial court. State v. Gilmore, 823 S.W.2d 566, 569 (Tenn.Crim.App.1991). It is unquestioned that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." State v. Thompson, 768 S.W.2d 239, 245 (Tenn.1989). An actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests and exists where an attorney is "placed in a position of divided loyalties." State v. Tate, 925 S.W.2d 548, 553 (Tenn.Crim.App.1995). A conflict "may exist anytime a lawyer cannot exercise his or her independent professional judgment free of 'compromising influences and loyalties.' " State v. Culbreath, 30 S.W.3d 309, 315 (Tenn.2000) (citing Tate, 925 S.W.2d at 554). Unless a defendant can establish that his counsel "actively represented conflicting interests," he has not established the constitutional predicate for his claim. *Id.* at 350. To establish a claim based upon conflict of interests, the conflict must be actual and significant, not irrelevant or "merely hypothetical." *Terrence B. Smith v. State*, No. M2004-02366-CCA-R3-PC, 2005 WL 2493475, *5

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Tenn.Crim.App., at Nashville, Oct. 7, 2005), *perm. app. denied* (Tenn. Mar. 27, 2006). Generally, prejudice will only be presumed when the conflict of interest arises in cases involving representation of serial or co-defendants. *Id.* However, once the existence of an actual conflict has been shown, prejudice to the accused is presumed. *Id*. at *3.

Courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States,* 486 U.S. 160, 160 (1988). However, our Supreme Court has recognized that the opinions from the Board of Professional Responsibility are not binding on this Court since they "do not have the force of law." *State v. Jones,* 726 S.W.2d 515, 519 (Tenn.1987). The disciplinary rules govern lawyer conduct within the profession, but they do not fully equate with the body of law governing courts, trials and the administration of the justice system. *Id.* However, the " 'Code often provides guidance in our determinations.' " *Tate,* 925 S.W.2d at 550 (quoting *State v. Willie Claybrook,* No. 3, 1992 WL 17546, *11(Tenn. Crim.App., at Jackson, Feb. 5, 1992), *perm. app. denied* (Tenn. May 4, 1995).

***27** In the case under submission, the trial court did not abuse its discretion when it denied the motions to remove counsel due to an alleged conflict of interest. The trial court determined that defense counsel did not actively represent conflicting interests, and there is nothing in the record to contradict the trial court's finding. Defense counsel conceded that the only information about Stafford that the Defendant wanted the jury to hear was that Stafford had been convicted of tampering with a jury. This evidence was heard by the jury, presumably for the jury to consider in assessing Stafford's credibility. Defense counsel acknowledged that he did not need to provide the jury with details about the victim's prior conviction. The Defendant has failed to establish that his counsel had a conflict of interest and that he was prejudiced due to any alleged conflicts of interest. The Defendant is not entitled to relief on this issue.

### 2. Acrimonious Relationship

The Defendant contends that the trial court erred when it denied his motion to discharge appointed counsel due the acrimonious relationship and the complete breakdown of communication that developed between them. The State contends that the trial court did not err when it denied this motion. The record reflects that, a few weeks before his trial began, the Defendant filed a motion asking the court to relieve counsel from further representation of the Defendant because irreconcilable differences and a complete breakdown of communications had arisen between the Defendant and his trial counsel. The day before the trial began, defense counsel informed the trial court that a personality conflict had developed between him and the Defendant but that this conflict would not affect defense counsel's ability to represent the Defendant.

Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial. *See* U.S. Const. amend VI; Tenn. Const. art. I § 9. However, the Sixth Amendment's protection includes no guarantee of the right to a meaningful relationship between an accused and his counsel, whether counsel be appointed or retained. *See State v. Carruthers,* 35 S.W.3d 516, 546 (Tenn.2000). Neither the Federal nor State constitutions requires that an indigent defendant receive counsel of his choice, or counsel with whom the defendant enjoys "special rapport, confidence, or even a meaningful relationship." *Id.* The baseline guarantee is one of effective counsel, not preferred counsel. *Id.*

With respect to motions to withdraw, the trial court may, upon good cause shown, permit the withdrawal of an attorney appointed to represent an indigent defendant. Tenn.Code Ann. § 40-14-205(a) (2003). When a defendant seeks to substitute counsel, he or she has the burden of establishing to the trial judge's satisfaction that "(a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them." *State v. Gilmore,* 823 S.W.2d 566, 568-69 (Tenn.Crim.App.1991). The trial court has wide discretion in matters regarding the appointment and relief of counsel, and its action will not be set aside on appeal unless a plain abuse of that discretion is shown. *State v. Rubio,* 746 S.W.2d 732, 737 (Tenn.Crim.App.1987). Further, the defendant must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

demonstrate that he was prejudiced by the trial court's denial of the motion to withdraw. *See* State v. Branam, 855 S.W.2d 563, 566 (Tenn.1993). This Court has previously held that the fact that a defendant chose not to cooperate with competent appointed counsel does not entitle him to the appointment of other counsel. *Rubio,* 746 S.W.2d at 736. It been was noted that the "willful refusal of a defendant to cooperate with his attorney is not imputable to either the State or defense counsel." *State v. McClennon,* 669 S.W.2d 705, 707 (Tenn.Crim.App.1984). The States's constitutional obligation has been fulfilled by the appointment of counsel, and there is no constitutional requirement that the court continue to appoint additional counsel "until one is appointed with whom the defendant might elect to cooperate." *Id.*

***28** In the case under submission, the trial court did not abuse its discretion when it denied the Defendant's motion for the appointment of substitute counsel. The Defendant contends that he was forced to go to trial with counsel that had asserted that the Defendant was paranoid and irrational. However, defense counsel made these assertions in order to assist the Defendant by advising the trial court that the Defendant needed a mental evaluation. The record reflects that counsel was willing to work with the Defendant to address any conflicts or communication problems that had developed between them. Defense counsel did not state that he could no longer represent the Defendant due to the Defendant's offensive personality. In fact, defense counsel told the trial court that he could represent the Defendant despite the conflicts that had arisen between them. Accordingly, in our view, the Defendant has failed to meet his burden of establishing that he had a complete breakdown in communications with appointed counsel or that he and his appointed counsel had become embroiled in an irreconcilable conflict. Furthermore, the Defendant failed to establish that he was prejudiced by the trial court's denial of the motion to withdraw. Therefore, the Defendant is not entitled to relief on this issue.

### 3. Ineffective Assistance of Counsel

The Defendant contends that his right to counsel and effective representation was abridged because the trial court denied his motion to withdraw. Specifically, he asserts that the alleged animosity and distrust that arose between the Defendant and his trial counsel violated his right to effective representation. The State counters that the Defendant failed to prove that his trial counsel was ineffective in any way and that the record demonstrates that Counsel's representation of the Defendant was well within the range of competence demanded of criminal defense attorneys.

This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State,* 13 S.W.3d 401, 405 (Tenn.Crim.App.1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson,* 958 S.W.2d 156, 161 (Tenn.Crim.App.1997). The defendant runs the risk of having the issue resolved " 'without an evidentiary hearing which, if held, might be the only way that harm could be shown-a prerequisite for relief in ineffective trial counsel claims.' " *Id.* (quoting *Jimmy Wayne Wilson v. State,* No. 909, 1991 WL 87245, at *6 (Tenn.Crim.App., at Knoxville (Tenn.Crim.App., at Knoxville, May 29, 1991) *no Tenn. R.App. 11 application filed* ).

Nonetheless, our Supreme Court has stated that claims of ineffective assistance of counsel may be presented on direct appeal and that the reviewing court must apply the same standard as utilized for such claims as in post-conviction proceedings. *See Burns,* 6 S.W.3d at 461 n. 5. When a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington,* 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Should the defendant fail to establish either factor, he is not entitled to relief. Our Supreme Court described the standard of review as follows:

> ***29** Because a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one com-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ponent.

Goad v. State, 938 S.W.2d 363, 370 (Tenn.1996).

On claims of ineffective assistance of counsel, the defendant is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn.Crim.App.1994). Such deference to tactical decisions of counsel applies only if the choices are made after adequate preparation for the case. *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *Brooks v. State,* 756 S.W.2d 288, 289 (Tenn.Crim.App.1988). The burden is on the Defendant to show that the evidence preponderates against those findings. *Clenny v. State,* 576 S.W.2d 12, 14 (Tenn.Crim.App.1978). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457-58 (Tenn.2001).

In the case under submission, the Defendant has failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. As previously stated, the record reveals that his defense counsel at trial felt that he could provide the Defendant with effective representation despite any previous conflicts that had arisen between himself and the Defendant. In his own brief, the Defendant acknowledges that his trial counsel was experienced and competent. The Defendant provides no specific examples of how the trial court abridged his right to effective assistance of counsel by denying his motion to withdraw. Furthermore, the Defendant has failed to show how any alleged ineffective assistance of counsel prejudiced his case. The Defendant is not entitled to relief on this issue.

### E. References to Prior Conviction

The Defendant contends that the trial court erred when it disclosed to the jury that the Defendant was previously indicted for the homicide of Ralph Wilkey. Specifically, the Defendant argues that the prejudicial effect of this evidence outweighed its probative value. He contends that the trial court screened people who already knew of the Defendant's prior conviction due to the prejudicial effect of such information. The State counters that the Defendant waived this issue because he failed to file a motion in limine to prevent any references to the Defendant's prior trial, failed to contemporaneously object at trial to such references, and actually agreed to stipulate that the Defendant was indicted for the murder of Ralph Wilkey and that Stafford testified as a witness for the State at that murder trial.

***30** Under Tennessee law, relevant evidence is generally admissible unless its probative value is substantially outweighed by its prejudicial effect. *See* Tenn. R. Evid. 402 and 403. Evidence is "relevant" if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 404(b) states that evidence of "other crimes, wrongs or acts is not admissible to prove the character of a person or to show action in conformity with the character trait" but that such evidence "may ... be admissible for other purposes." The rule includes the following procedures for determining the admissibility of 404(b) evidence:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2)The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs or acts. *State v. James,* 81 S.W.3d 751, 758 (Tenn.2002). Where the procedures "are substantially

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

followed, the trial court's decision will be given great deference and will be reversed only for an abuse of discretion." *Id.* at 759; *see also* State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997). However, the decision of the trial court is afforded no deference, and our review is de novo, if the procedural requirements are not substantially followed. *Id.*

Traditionally, courts have not permitted the State to establish through acts of prior misconduct any generalized propensity on the part of a defendant to commit crimes. *See, e.g.,* State v. Teague, 645 S.W.2d 392 (Tenn.1983). Most authorities suggest that trial courts take a "restrictive approach of 404(b) .... because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[8][e] (4th ed.2000). A jury cannot be allowed to convict a defendant for bad character or any particular disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. *State v. Rickman,* 876 S.W.2d 824, 828 (Tenn.1994) (citing *Anderson v. State,* 165 Tenn. 569, 56 S.W.2d 731 (Tenn.1933)). In those instances where the prior conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. *State v. Mallard,* 40 S.W.3d 473, 488 (Tenn.2001).

Generally, only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. *State v. McCary,* 922 S.W.2d 511, 513 (Tenn.1996). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the Defendant's character. *Id.* at 514. The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.* Nevertheless, evidence of a defendant's prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Such material issues include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn R. Evid. 404, Advisory Comm'n Comm.

***31** Unlike Federal Rule of Evidence 404(b), which generally bars evidence of other crimes, wrongs, or acts, the corresponding rule in Tennessee does not specifically enumerate the purposes for which such evidence may be offered. The issues to which evidence of other acts may be relevant were not listed by the Advisory Commission so that lawyers and judges would "use care in identifying the issues to be addressed by the Rule 404(b) evidence." Neil P. Cohen, et al ., *Tennessee Law of Evidence* § 404.6, at 169 n. 457 (4th ed.2000). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial judge should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered.

In the case under submission, the trial court did not hold a hearing outside the presence of the jury to determine if the stipulation and all evidence regarding the Wilkey case should be entered into evidence. However, the Defendant did not object to the introduction of such evidence. There is clear and convincing evidence in the record that the Defendant was indicted for the homicide of Ralph Wilkey. The Defendant stipulated that he was indicted for Ralph Wilkey's homicide and that Stafford was a State witness at the Defendant's trial for the Wilkey Homicide. The trial court presiding in this case also presided in the case in which Ralph Wilkey was a victim of homicide for which the Defendant was convicted.

Based on our review of the record, the trial court did not abuse its discretion when it allowed into evidence information about the trial for charges brought against the Defendant for the homicide of Ralph Wilkey. We conclude that the Defendant's indictment for the homicide of Ralph Wilkey was relevant to show the Defendant's motive for attempting to murder the victim. The explanation of the pending charge against the Defendant carried great probative value because it provided a motive for the Defendant to attempt to murder the victim. Therefore, the Defendant's indictment for the homicide of Ralph Wilkey had probative value that was not outweighed by its prejudicial effect. The Defendant contends that the State could have established its case without mentioning that the prior case was a homicide or murder case. However, a pending homicide charge, with the severe penalties for conviction, would logically provide a stronger motive to kill a State witness than most other types of pending criminal charges. Therefore, the trial court did not abuse its discretion when it allowed testimony about the Defendant's prior homicide indictment and testimony about the Wilkey trial into evidence for the purpose of proving a motive for the Defendant's attempt to murder Mike Staf-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ford. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

Tenn.Crim.App.,2006.
State v. Troglin
Not Reported in S.W.3d, 2006 WL 2633107 (Tenn.Crim.App.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATE OF TENNESSEE
**OFFICE OF THE POST-CONVICTION DEFENDER**
530 CHURCH STREET, SUITE 600
NASHVILLE, TENNESSEE 37243

Donald E. Dawson
Post-Conviction Defender
e-mail: dawsond@tnpcdo.net

Phone: (615) 741-9331
Direct: (615) 741-9385
Fax: (615) 741-9430

April 27, 2010

Joanne Newsome, Chief Deputy Clerk
Supreme Court Building
505 Main Street, Suite 200
Knoxville, TN 37902

VIA FEDEX

Re: *Christa Gail Pike v. State of Tennessee,* No. E2009-00016-CCA-R3-PD

Dear Ms. Newsome:

Enclosed for filing are the original and four copies of the Supplemental Brief of the Appellant in the above styled case. Supplemental briefing was requested during oral argument on April 13, and on April 14 the Court entered an order granting Appellant 14 days to file a brief not exceeding ten pages. This Supplemental brief is therefore due on April 28, 2010.

Thank you for your assistance in this matter.

Respectfully,

Donald E. Dawson
Post-Conviction Defender

cc: Assistant Attorney General Frank Borger-Gilligan, Criminal Justice Division, P.O. Box 20207, Nashville, Tennessee 37202-0207