UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ADDENDUM 7**

**DOCUMENT 6**

ORIGINAL

**IN THE SUPREME COURT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| **Appellant,** | ) | |
| **v.** | ) | **No.: E2009-00016-SC-R11-PD** |
| **STATE OF TENNESSEE,** | ) | **(Capital Case)** |
| **Appellee.** | ) | **Post-Conviction** |

---

**BRIEF OF *AMICI CURIAE*, THE ETHICS BUREAU AT YALE AND THE VANDERBILT LEGAL CLINIC**

---

11-1
FEDEX

KENT R. McKEEVER
WHITNEY C. BOSHERS
(specially admitted to practice
pursuant to Supreme Court Rule 7 § 10.03)

SUSAN L. KAY (6630)
VANDERBILT LEGAL CLINIC
VANDERBILT LAW SCHOOL
131 21ST AVE., SO
NASHVILLE, TN 37203
615.322.4964
Counsel for *Amici Curiae*

FILED
2011 NOV -2 AM 10:53

OF COUNSEL:

LAWRENCE J. FOX
George W. and Sadella D Crawford
Visiting Lecturer in Law,
Yale University Law School

Grant Bermann
Michael Drezner
Alexander Fenner
Adam Hockensmith
Ramya Kasturi
Lawrence Kornreich
Sarah Langberg
Alexander Ramey
Stephanie Turner
Carleen Zubrzycki

Students in the Ethics Bureau at Yale University Law School

## TABLE OF CONTENTS


**Table of Authorities** ........ *i*

**Interest of Amici** ........ *1*

**Statement of the Case** ........ *1*

**Summary of the Argument** ........ *5*

**Argument** ........ *7*

**I. MR. TALMAN FACED AN IMPOSSIBLE CONFLICT OF INTEREST AT THE TIME OF THE APPOINTMENT** ........ *7*

A. At the Time of His Appointment in This Case, Mr. Talman was Under Threat of Prosecution for Overbilling the State in Other Criminal Cases ........ *8*

1. The Duty of Loyalty Is the Most Fundamental Duty Owed By a Lawyer to His Client ........ *9*

2. Mr. Talman Was Conflicted Under Any Standard ........ *13*

B. This Court Should Adopt the ABA Guidelines As A Metric For Determining Whether Counsel Has Been Reasonably Competent ........ *14*

1. - Mr. Talman Lied to the Court ........ *16*

2. Mr. Talman Surborned Perjury ........ *17*

3. Mr. Talman Failed To Put the Key Witness on the Stand ........ *17*

**II. THE TRIAL COURT FAILED TO ABIDE BY THE DICTATES OF THIS COURT AND OF THE CODE OF JUDICIAL CONDUCT** ........ *19*

A. The Trial Court Failed in Its Duty To Ensure a Fair Trial Because It Appointed a Clearly Incompetent and Conflicted Lawyer ........ *20*

B. Judge Leibowitz Should Have Recused Herself To Avoid an Appearance of Impropriety ........ *21*

C. Judge Leibowitz Should Have Recused Herself Because She Was a Potential Material Witness in the Proceedings ........ *22*

**CONCLUSION** ........ *23*

**CERTIFICATE OF SERVICE** ........ *25*

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Eaton*,
293 P. 788 (Cal. 1930)....10

*Beard v. Board of Professional Responsibility*,
288 S.W.3d 838 (Tenn. 2009).... 16-17

*Blough v. Wellman*,
974 P.2d 70 (Idaho 1999)....10

*Board of Professional Responsibility v. Slavin*,
145 S.W.3d 538 (Tenn. 2004)....21

*Bobby v. Van Hook*,
130 S.Ct. 13 (Nov. 9, 2009)....15

*Caperton v. A.T. Massey Coal Co*,
129 S. Ct. 2252 (2009)....19, 21

*Chalmers v. State*,
W2006-00424-CCA-R3-PD, 2008 WL 2521224 (Tenn. Crim. App. June 25, 2008)....15

*Cuyler v. Sullivan*,
446 U.S. 335 (1980)....11

*Flatt v. Superior Court*,
9 Cal. 4 275....10

*Frazier v. State*,
303 S.W.3d 674 (Tenn. 2010)....11, 12, 20

*Hamblin v. Mitchell*,
354 F.3d 482 (6th Cir. 2003)....15

*Hicks v. State*,
191 Tenn. 214 (1950)....17

*Milligan v. Bd. of Prof'l Responsibility*,
166 S.W.3d 665 (Tenn. 2005)....8

*Rayburn v. Bd. of Prof'l Responsibility*,
300. S.W.3d 654 (Tenn. 2009)....8

*Republican Party of Minnesota v. White*,
536 U.S. 65 (2002)....................19

*Rugiero v. United States*,
330 F. Supp. 2d 900 ( E.D. Mich. 2004)....................13

*State v. Pike*,
978 S.W.2d 904 (Tenn. 1998), *rehearing denied*....................3

*State v. White*,
114 S.W.3d 469 (Tenn. 2003)....................21

*Strickland v. Washington*,
466 U.S. 668 (1984)....................9, 14

*Thompkins v. Cohen*,
965 F.2d 330 (7th Cir. 1992)....................13

*United States v. Levy*,
25 F.3d 146 (2d Cir. N.Y. 1994)....................13

*United States v. McLain*,
823 F.2d 1457 (11th Cir. 1987)....................13

*Wheat v. United States*,
486 U.S. 153 (1988)....................7

*Wiggins v. Smith*,
538 U.S. 510 (2003)....................15

*Williams v. Reed*,.
29 F. Cas. 1386 (D. Maine 1824)....................10-11

*Young v. United States*

481 U.S. 787 (1987)....................13

**STATUTES**

TENN. CODE ANN. § 39-14-105 (West 2011)....................8

TENN. CODE ANN. § 39-16-705 (West 2011)....................17

**OTHER AUTHORITIES**

31 HOFSTRA L. REV. 913, 928 (2003)....................15, 18, 19

ABA Formal Opinion 93-379 (1993)....................8

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* ....................14, 15, 16, 18, 19, 20

TENN. RULES OF PROF'L CONDUCT 1.1-1.3 ....................17

TENN. RULES OF PROF'L CONDUCT 1.5 ....................8

TENN. RULES OF PROF'L CONDUCT 1.7 .................... 10, 12, 13, 14

TENN. RULES OF PROF'L CONDUCT 3.2 ....................16

TENN. RULES OF PROF'L CONDUCT 3.4 ....................17

TENN. RULES OF PROF'L CONDUCT 4.1 ....................8

TENN. RULES OF PROF'L CONDUCT 7.1 ....................8

TENN. RULES OF PROF'L CONDUCT 8.4 ....................8

TENN. SUP. CT. R. 10....................19, 20, 21, 22

TENN. SUP. CT. R. 13....................15, 18

## INTEREST OF *AMICI*

The Criminal Practice Clinic, a part of the Vanderbilt Legal Clinic, provides representation to indigent defendants in the state criminal courts of Tennessee. Over the years, the clinic has taken on many issues of importance to the practice of criminal law.

The Ethics Bureau at Yale—a group of ten law school students supervised by an experienced practicing lawyer/lecturer—provides professional responsibility advice to not-for-profit legal services providers; drafts amicus briefs in cases concerning professional responsibility; assists defense counsel with ineffective assistance of counsel issues relating to professional responsibility matters; and offers ethics advice and counsel on a pro bono basis.

The Vanderbilt Legal Clinic and the Ethics Bureau at Yale respectfully submit this brief as *amici curiae* for two reasons. First, they do so because of their abiding interest in ensuring that the Tennessee Rules of Professional Conduct and the Sixth Amendment right to counsel preserve the right of every criminal defendant to receive competent and conflict-free representation. Second, they recognize that judges must act impartially and avoid both impropriety and the appearance of impropriety. When lawyers violate the law governing lawyers, and when judges appoint incompetent and conflicted counsel to represent criminal defendants and fail to recuse themselves when required, they not only damage the integrity of the trial at issue, but they undermine the broader legal system and the public's confidence in its integrity and fairness.

## STATEMENT OF THE CASE

On May 23, 1995, Christa Pike's capital case was placed in the hands of William Talman, a lawyer who was laboring under the threat of his own criminal prosecution. A lawyer in private practice, Talman earned a substantial portion of his income through indigent criminal

representation. In 1994, the Tennessee Comptroller revealed that Mr. Talman had been systematically defrauding the State's Indigent Defense Fund. (Supp Ex. 1, Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit (hereinafter "CR").) Specifically, the Comptroller found that Mr. Talman had fraudulently billed an inflated number of hours worked on behalf of indigent clients each year from 1990 to 1993. (Supp. Ex. 2-A (Petition for Discipline March 19, 1998).) For those years, he billed the state between 3,333 and 5,000 hours *each year*[1] for work with indigent clients. (*See* CR: 3.) Mr. Talman thus claimed to have worked between 64 and 96 hours every single week of the year—and often 24 hours in a single day—on state-paid matters. Moreover, the Comptroller concluded that Mr. Talman had attempted to cover up his theft. (CR: at 9.)

The Tennessee Bureau of Investigation conducted a further inquiry into his years-long theft, and Mr. Talman was considered for criminal prosecution. In December, 1994, the District Attorney for Davidson County, Tennessee, who, along with the District Attorney for Knox County, had jurisdiction over Mr. Talman's transgressions, stated that he found the scheme to be "so extreme as to warrant evaluation for prosecution." (Apr. 2008 Ex. 1, (December 8, 1994 letter from District Attorney General Torry Johnson to District Attorney General Randy Nichols).

Mr. Talman was well aware of the potential for his own criminal prosecution at this time. In fact, he declined to respond to the complaint from the Board of Professional Responsibility, noting his desire to remain silent so long as criminal prosecution against him remained a possibility. (Supp. Ex. 2A, (File of Board of Professional Responsibility, September 15, 1994,

[1] A year has 8,760 hours.

letter from Talman).) While law enforcement officials evaluated Mr. Talman's conduct, in April, 1995, the state Comptroller calculated the tens of thousands of dollars that Mr. Talman had stolen from the Indigent Defense Fund and ordered him to immediately repay $67,027. (CR: 9.) One month later, while Mr. Talman was still under the threat of prosecution, he was appointed to represent Christa Pike in her capital case. This was to be the first capital defense case in Mr. Talman's legal career; he had never before served in one on his own or as part of any other capital defense legal team. (T Vol. I at 8.).

The prosecution that Mr. Talman was facing ran parallel to that of his client: he was brought before the Board of Professional Responsibility at the same time that he was defending Ms. Pike. Mr. Talman was appointed to represent Ms. Pike on May 23, 1995, and his representation did not end until November 23, 1998. (T Vol. I at 8.); *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *rehearing denied* November 23, 1998. In his own case, Mr. Talman entered a conditional guilty plea before the Board of Professional Responsibility on October 29, 1998. (Supp. Ex. 2-A.) Just one day after Mr. Talman's advocacy on behalf of Ms. Pike ended, this Court accepted his conditional guilty plea and Mr. Talman's law license was ordered suspended for 11 months, 29 days (though this order was suspended after nearly a year of probation). (Supp. Ex. 2-A (Order of Enforcement Nov. 24, 1998.) In short, for the entire time he was representing Ms. Pike, Mr. Talman was himself laboring under the threat of both criminal and professional sanctions.

Despite the looming danger for Mr. Talman, and notwithstanding the fact that Judge Leibowitz was aware of the very complex and public nature of the case, she inexplicably appointed Mr. Talman to his first capital defense. As the judge herself stated, "[this was] obviously one of the most high profile cases that has hit the State of Tennessee ever." (T XXXI:

47-48.) Further, Judge Leibowitz was personally interviewed as to her knowledge of Mr. Talman's theft during the investigation into his actions. (PC XXXII: 113; CR: 15.) In fact, she stated that at the time of the trial, "I knew; we all knew that Mr. Talman had his own problems." (PC XXXII: 114.) However, Judge Leibowitz's inquiry into the matter consisted solely of her questioning Mr. Talman about the status of his case and accepting without further examination his statement that the situation had been resolved. This was a misrepresentation by Mr. Talman, since his case remained active before the Board of Professional Board of Responsibility, and, as far as he knew, at the District Attorney's office as well.

Given Mr. Talman's actions up to this point, it is sadly unsurprising that he committed further unethical conduct during his representation of Ms. Pike. Specifically, to cover the lies that he had told the trial court, Mr. Talman chose not to call his only planned sentencing phase witness, Dr. Diana McCoy. Dr. McCoy had investigated extensively during the pre-trial and trial period Ms. Pike's history of abuse and neglect, her early and continued exposure to extreme violence and gore, her untreated mental illness and numerous other mitigating aspects of Ms. Pike's social history. In fact, Mr. Talman had filed a motion requesting additional money for Dr. McCoy's services prior to the start of Ms. Pike's trial, noting that the work would be "relevant to [Dr. McCoy's] expected testimony." (PC Apr. 2008 Ex. 22) Furthermore, during the post-conviction hearing, Mr. Talman testified that, "We planned to put Dr. McCoy on, and have her go through Christa's background . . . that was the plan in a nutshell." (PC Vol. XX at 328.)

However, it was only at the very close of Ms. Pike's trial that Mr. Talman presented the prosecution with Dr. McCoy's three-volume Mitigation Materials and Social History (including vast amounts of protected work product and notes). (T XXIX: 2465.) The prosecutor was understandably incensed that he received this document so close in time to the mitigation phase,

during which Dr. McCoy was expected to testify. (T XXIX: 2465-69.) In response, Mr. Talman lied to the prosecutor and the court. He claimed that he had only received the mitigation materials the prior evening, March 28, 1996. (PC XXV: 740.) In fact, Dr. McCoy provided the materials to Mr. Talman on March 24, five days earlier than the date that Mr. Talman had represented as the day of receipt. (PC XXV: 740.)

Subsequently, on March 29, 1996, Mr. Talman telephoned Dr. McCoy and asked her to corroborate his lie about the date that she transferred the mitigation materials to him in her upcoming court testimony. *Id.* Dr. McCoy refused. She instead sought advice from other lawyers, and when she was unable to reach them, she contacted Mr. Talman again. He told Dr. McCoy that he would not call her to testify if she did not support his story, (PC XXV: 740-43.), and indeed, he did not call her as a witness. Although Mr. Talman offered post-hoc rationales for failing to call Dr. McCoy to the stand, none have any merit, let alone can overcome Dr. McCoy's description of her conversation with Mr. Talman. As a result, it is clear that the collapse of Ms. Pike's mitigation case was the result of Mr. Talman's unethical behavior.

## SUMMARY OF THE ARGUMENT

As the supervisor of the lower courts and as the final arbiter of the standards for the practice of law in Tennessee, the Court must address and remedy the numerous ethical and constitutional violations that pervade this case. The first of these violations was Mr. Talman's appointment to represent Ms. Pike as her capital defense lawyer, despite the fact that the trial court knew that he had committed theft and violated the Rules of Professional Conduct when he stole over $67,000 from the State's Indigent Defense Fund.

Second, Mr. Talman faced an unavoidable conflict of interest that should have independently precluded him from representing Ms. Pike. His ability to represent his client

faithfully was necessarily impaired from the moment the representation began because Mr. Talman knew that disciplinary proceedings and a criminal investigation were underway. Under these circumstances, Mr. Talman could not possibly have put his client's interests before his own, as every lawyer is required to do. Instead of recognizing this non-waivable conflict and dismissing Mr. Talman, the trial court ignored the conflict and allowed Mr. Talman to continue with the representation.

Third, Mr. Talman's actions at trial reflected the pre-existing conflict. Throughout the course of the trial, he violated the fundamental principles that guide the profession. Mr. Talman lied to the court and suborned perjury. In addition, in order to cover up his own misconduct, he failed to call Dr. McCoy, the key witness during the mitigation phase.

Finally, the Judge's conduct also provides the foundation for key assertions of error on this appeal. Judge Leibowitz appointed an incompetent and conflicted lawyer to represent Ms. Pike. She failed to recuse herself from the trial notwithstanding the fact that she was a key witness in the professional and criminal proceedings against Mr. Talman. She also failed to recuse herself from the post-conviction hearing despite the fact that she was a material witness to a disputed and material factual matter in the post-conviction hearing. These actions violated the Code of Judicial Ethics, and threaten to undermine public confidence in the judicial system.

## ARGUMENT

Public confidence in the American legal system rests on the assurance that trials are conducted fairly, that lawyers represent their clients competently and loyally, and that judges give every appearance of propriety and of impartiality in their decision-making. When these assurances go unfulfilled, the most immediate victims are the parties to the case, to whom procedural justice is denied. But the greatest victim is the integrity of and the public confidence in the legal system. Ethical violations eviscerate the guarantees upon which our legal system is based and undermine our confidence not only in the present case but in all future cases. As the United States Supreme Court has stated, all "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153 (1988). *Amici* believe that this Court must take this opportunity to ensure that courts and attorneys in this state honor their ethical obligations.

To condone the actions of counsel and of the trial court in this case would be antithetical to the longstanding ethical principles that this court has developed, promulgated and protected so conscientiously.

### I. MR. TALMAN FACED AN IMPOSSIBLE CONFLICT OF INTEREST AT THE TIME OF THE APPOINTMENT

Mr. Talman never should have been appointed to represent Ms. Pike. His criminal misconduct prior to the appointment demonstrated his incompetence to represent anyone, let alone a capital defendant. More importantly, his misconduct gave rise to an unavoidable conflict of interest: facing disciplinary charges and a criminal investigation at the time of his appointment, Mr. Talman could not possibly have put his client's interests before his own.

Making matters worse still, Judge Leibowitz appointed Mr. Talman with full knowledge of both his criminal record and his inability to act with unfettered loyalty.

### A. At the Time of His Appointment in This Case, Mr. Talman was Under Threat of Prosecution for Overbilling the State in Other Criminal Cases

Two years prior to his appointment in this case, Mr. Talman overbilled the State's Indigent Defense Fund by over $67,000, often billing more than 24 hours in a single day. In doing so, he committed felony theft. TENN. CODE ANN. § 39-14-105 (West 2011) (designating theft of more than $60,000 Class B felony). He also violated multiple rules of professional conduct. See, *e.g.*, TENN. RULES OF PROF'L CONDUCT R. 1.5(a) (2011) ("A lawyer shall not make an agreement for, charge, or collect . . . an unreasonable amount for expenses."); *id.* R. 4.1(a) ("In the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person.");*id.* R. 7.1 ("A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services."); *id.* R. 8.4(c) ("It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . ."); ABA Formal Opinion 93-379 (1993).

More importantly, at the time of his appointment, Mr. Talman knew that the disciplinary proceedings and criminal investigation pending against him could likely result in either suspension, TENN. SUP. CT. R. 9, § 4.2, 4.3; *see, e.g.*, *Milligan v. Bd. of Prof'l Responsibility*, 166 S.W.3d 665 (Tenn. 2005), or disbarment, TENN. SUP. CT. R. 9, § 4.1; *see, e.g.*, *Rayburn v. Bd. of Prof'l Responsibility*, 300. S.W.3d 654 (Tenn. 2009), as well as eight to twelve years in prison. *See* TENN. CODE ANN. § 39-14-105 § 40-35-112 (West 2011). These penalties all aim to remove incompetent lawyers, like Mr. Talman, from practice and to keep them from harming other clients. Indeed, this Court recognized as much when it suspended Mr. Talman from practice in

1998. Unfortunately, this action came years after Mr. Talman's appointment and representation of Ms. Pike.

The fact that Mr. Talman returned the stolen $67,000 to the Indigent Defense Fund as soon as his misconduct became public, and a month before his appointment, had no effect on his conflict of interest. His was still under threat of professional and criminal sanction. In December, 1994, just five months before Mr. Talman's appointment in this case, the District Attorney for Davidson County, Tennessee, who, along with the District Attorney for Knox Couny, had jurisdiction over this matter, indicated that he was considering prosecuting Mr. Talman. He stated that he found the scheme to be "so extreme as to warrant evaluation for prosecution." (Apr. 2008 Ex. 1, (December 8, 1994 letter from District Attorney General Torry Johnson to District Attorney General Randy Nichols)).

Notwithstanding her knowledge of the misconduct, Judge Leibowitz appointed Mr. Talman to represent Ms. Pike. Prior to the time of his appointment in this case, Mr. Talman had *never* represented a capital defendant in any capacity, let alone as first chair.

### *1. The Duty of Loyalty Is the Most Fundamental Duty Owed By a Lawyer to His Client*

As the U.S. Supreme Court has repeatedly recognized, the duty of loyalty is "the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984). This duty—which demands that a lawyer represent his client zealously, faithfully and diligently—has long occupied a privileged place in the American legal tradition. By 1824, then-Judge Story had already articulated this principle with clarity:

> When a client employs an attorney, he has a right to presume . . . that he has no engagements, which interfere, *in any degree*, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity.

*Williams v. Reed*, 29 F. Cas. 1386 (D. Maine 1824) (emphasis added). Since then, courts have often reiterated the importance of the duty of loyalty. *See, e.g.*, *Blough v. Wellman*, 974 P.2d 70, 72 (Idaho 1999) ("The relationship of client and attorney is one of trust, . . . obligating the attorney to discharge that trust with complete fairness, honor, honesty, loyalty, and fidelity."); *Flatt v. Superior Court*, 9 Cal. 4 275, 289 (1994) ("The most fundamental quality of the attorney-client relationship is the absolute and complete fidelity owed by the attorney to his or her client."); *Anderson v. Eaton*, 293 P. 788, 789-90 (Cal. 1930) ("One of the principal obligations which bind an attorney is that of fidelity . . . .").

This universally-recognized duty has been codified in the ABA Model Rules of Professional Conduct and in the ethical rules of every state, which forbid any lawyer from proceeding with a representation when that lawyer faces a conflict of interest. *See* NATIONAL REPORTER ON LEGAL ETHICS AND PROFESSIONAL RESPONSIBILITY, VOLS. I–IV. Tennessee is no exception. *See* TENN. RULES OF PROF'L CONDUCT R. 1.7(a)(2) ("A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer."). And while these rules allow clients to waive the right to conflict-free representation in a limited set of circumstances, *see id.* R. 1.7(b), many conflicts are simply non-waivable, because the lawyer-client relationship becomes so corrupted when loyalty from lawyer to client ceases to exist. This was the case with Mr. Talman's criminal and professional vulnerability.

When a lawyer violates the duty of loyalty—as he or she inevitably does when faced with a conflict of interest—counsel not only unfairly denies justice to the client; he or she undermines the legal profession and the entire system through which justice is administered. As a result the

United States Supreme Court treats conflicts of interest as particularly noteworthy among the universe of all ethical violations. *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

This Court, too, has been stalwart in its recognition of the importance of the duty of loyalty, just recently emphasizing the necessity of conflict-free representation. *Frazier v. State,* 303 S.W.3d 674 (Tenn. 2010). In *Frazier*, this Court held that "if a trial court knows or should know of conflicts of interest that might disqualify an attorney from participating in a post-conviction proceeding, the subject must be addressed." *Id.* at 679-80. In other words, the court has an independent duty to take action whenever counsel might be conflicted, for it "bears ultimate responsibility to regulate the practice of law in Tennessee." *Id.* This duty of independent inquiry ensures fair and ethical proceedings, and it serves to diminish the need to reverse proceedings on appeal because of counsel's conflicts of interest.

Furthermore, this Court made clear that when a trial court determines that counsel faces a conflict of interest, it must either disqualify counsel or ensure that the client has knowingly and voluntarily waived the conflict if possible. A conflict of interest exists under "*any* circumstances in which an attorney cannot exercise his independent professional judgment free" of competing interests. *Id.* at 682, (quoting *State v. Culbreath*, 30 S.W.3d 309, 312 (Tenn. 2000)) (emphasis added).

Thus, *Frazier* set forth a two-step process for trial courts: first, the trial court must inquire whether a conflict of interest for a lawyer's representation of a client exists, and second, if the court determines that a lawyer indeed faces a conflict of interest, it must disqualify counsel or require the client to waive the conflict. The court in Ms. Pike's case, however, failed to carry out the proactive and preventative approach that *Frazier* mandates, and it undermined the important duty of loyalty that this Court and all other courts have recognized as the most fundamental duty

owed from lawyer to client. Had the trial court addressed the implications of Mr. Talman's non-waivable conflict of interest, the court would have appointed other counsel for Ms. Pike and this Court would not need to address this problem thirteen years later.

### 2. *Mr. Talman Was Conflicted Under Any Standard*

When courts in Tennessee and elsewhere reiterate the importance of the duty of loyalty and conflict-free representation, they often speak variously of "potential" or "actual" conflicts of interest. *See, e.g.*, *Frazier*, 303 S.W.3d 674. But this distinction is not reflected in the Rules of Professional Conduct, which are concerned solely with whether a conflict exists; and if it does, the representation is barred. TENN. RULES OF PROF'L CONDUCT R. 1.7. It is the view of *amici* that the distinction between "potential" and "actual" conflicts is ultimately unhelpful and that this Court should set it aside in favor of an approach squarely based on the Rules of Professional Conduct: only a standard that includes prophylactic consideration of conflicts—and that is not constrained to hindsight knowledge—can protect clients *before* they are subjected to ineffective assistance of counsel.

Conflicts of interest are premised on *potential* harm to the client. A lawyer must withdraw from a representation, or obtain a knowing and voluntary waiver of the conflict from the client, if "the representation of that client *may* be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." TENN. RULES OF PROF'L CONDUCT R. 1.7 (emphasis added). In protecting clients from conflicts, the Rules of Professional Conduct are designed to ensure that the client not be the victim of harm before a lawyer must recuse him or herself. The potential for harm is sufficient to trigger the

prohibition of Rule 1.7. This is because the client has a right to unconflicted representation— not just a right to later remediate the effects of conflicted representation.[2]

Mr. Talman faced an impermissible conflict of interest, especially when one considers that Mr. Talman knew, even before his appointment, that he might soon face his very own criminal prosecution. No lawyer in Mr. Talman's position would likely want to anger the prosecution by voicing objections of any sort; no lawyer in his position could ignore the fact that he might soon be sitting in a prison cell; and no lawyer in his position could likely place the zealous representation of his client before sparing himself a prison sentence. The conflict here thus arose from "the existence of this undeniable uncertainty regarding [the attorney's] own liberty and financial interests before and during [defendant's] trial and [the attorney's] knowledge of this uncertainty". *Rugiero v. United States*, 330 F. Supp. 2d 900, 907 ( E.D. Mich. 2004). *Id.; See also United States v. Levy*, 25 F.3d 146 (2d Cir. N.Y. 1994); *Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir. 1992) (when "the criminal defendant's lawyer himself [is] under criminal investigation . . . it may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer."); *United States v. McLain*, 823 F.2d 1457, 1463-64 (11th Cir. 1987). Moreover, Ms. Pike could not waive this conflict because, as previously stressed, Mr. Talman could not have provided "competent and diligent representation" to her consistent with his self-interest. *Id.* R. 1.7(b).

[2] The Model Rules of Professional Conduct take this approach, in large part, because conflicts of interest infect the lawyer-client relationship in subtle ways, leaving the entire representation suspect. As the Supreme Court has recognized, a legal representation "contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are part of the record." *Young v. United States*, 481 U.S. 787, 812-13 (1987) (discussing the effect of a non-disinterested prosecutor). Unlike other ethical or representational failures, which are discrete and whose effects are manifest and readily measured, a conflict of interest casts a shadow over every aspect of the lawyer-client relationship. A breach of the duty of loyalty affects invisibly every decision in the representation. Depending on the conflict and the representation, this breach can blunt a lawyer's advocacy, undermine a lawyer's independent professional judgment, and inhibit a lawyer's creativity and zeal. While conflicts always cast these shadows on the representation, the problem is particularly acute in criminal representations, especially capital cases. There is no way to recreate what might have, could have, or should have happened if the accused were represented by a lawyer with undivided loyalty.

Mr. Talman's testimony that he believed that the threat of prosecution had disappeared by the time he was appointed does not erase the conflict. Given Mr. Talman's predicament, he would be the last person whose views on the subject should be considered persuasive. To avoid the bias that could easily affect the objectivity of the lawyer evaluating his or her own conflict of interest, the language of Rule 1.7 is objective; it is based on what a reasonable lawyer would believe, not on what any individual self-interested lawyer would believe. *See, e.g.*, *id.* R. 1.7(b) ("[A] lawyer may represent a client if . . . the lawyer *reasonably believes* that the lawyer will be able to provide competent and diligent representation to each affected client . . . .") (emphasis added). Even if Mr. Talman was no longer subject to criminal prosecution during his representation of Ms. Pike, the fact remained that he was still subject to serious disciplinary charges. He knew that, as a result of his disciplinary proceedings alone, he could lose his license to practice, either temporarily or permanently. *See* TENN. SUP. CT. R. 9, § 4.1-4.3. To say that Mr. Talman's personal interest in saving his career did not conflict with his ability to represent Ms. Pike would be antithetical to the robust duty of loyalty which this Court and many other courts have worked so vigorously to protect.

### B. This Court Should Adopt the ABA Guidelines As A Metric For Determining Whether Counsel Has Been Reasonably Competent

In determining whether counsel in a capital case has met his or her obligation to provide reasonably competent representation under *Strickland v. Washington*, 466 U.S. 668, 688 (1984), this Court should utilize—and should instruct the lower courts to utilize—the *American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*. The ABA first issued these guidelines in 1989 in an effort to ameliorate the poor representation generally provided to indigent defendants charged with capital offenses. As the commentary to the revised 2003 edition observes, the problem continues to exist and fester. *ABA*

*Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, reprinted with commentary in 31 HOFSTRA L. REV. 913, 928 (2003). "So profound and pervasive" is the deficient counsel for indigent capital defendants that three current United States Supreme Court justices have commented on it. *Id.* at 928-29. This Court also recognizes the need for skilled counsel. Supreme Court Rule 13 requires that a lawyer appointed lead counsel for a capital case must have previous capital experience. *See* TENN. SUP. CT. R. 13(3)(c)(3).

The ABA Guidelines are not aspirational; they are "'prevailing professional norms'" of reasonable conduct. *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (Nov. 9, 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). *Contra Chalmers v. State*, W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *25 (Tenn. Crim. App. June 25, 2008) (noting that the ABA Guidelines are aspirational and not binding on Tennessee trial courts, but still recognizing the need for "special skills . . . to assure adequate representation of defendants in death penalty cases"). Indeed, the ABA Guidelines are the clearest and best defined description of defense counsel's duties in a capital representation. *Hamblin v. Mitchell*, 354 F.3d 482, 488 (6th Cir. 2003). The Sixth Circuit has described the guidelines as "represent[ing] a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." *Id.* at 487. Thus, a court is not making "new law" when it relies on the ABA Guidelines to determine reasonable conduct. *Wiggins v. Smith*, 538 U.S. 510, 522 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 390 (2000)).

Pike's case presents this Court with an excellent opportunity to establish that these standards provide straightforward guideposts for trial courts' assessment of the competence of trial counsel. *Amici* are not here cataloguing all of the deficiencies of trial counsel in this particular case, as that is the role of Ms. Pike's counsel. Rather, *amici* seek to utilize aspects of

this case to demonstrate why lower courts' current ad hoc approach to determination of competency is flawed and why, therefore, adoption of the ABA Standards is critical.

Mr. Talman's failure to present compelling mitigation testimony by Dr. Diana McCoy arose because of Mr. Talman's violation of law and the applicable rules of professional conduct. But it also represented a clear violation of the Guidelines and serves as an excellent example of how the Guidelines can play an important role in evaluating the effectiveness of counsel.

### *1. Mr. Talman Lied to the Court*

Rule 3.3 of the Tennessee Rules of Professional Conduct makes clear that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal." TENN. RULES OF PROF'L CONDUCT R. 3.3(a)(1); TENN. SUP. CT. R. 8. But this is just what Mr. Talman did: he lied to the court about the date that he received Dr. McCoy's mitigation materials about Ms. Pike.

Mr. Talman received the mitigation materials from Dr. McCoy on March 24, 1996, yet he told the court and opposing counsel that he had not received them until the evening of March 28, 1996. The content of his telephone conversation with Dr. McCoy on March 29, 1996, makes this point clear. (PC XXV: 740) Yet even after Dr. McCoy refused to corroborate Mr. Talman's fabricated account at trial, Mr. Talman failed to correct his false statement of fact to the trial court.

As recently as 2009, this Court emphasized the importance of Rule 3.3 in the case of *Beard v. Board of Professional Responsibility*, 288 S.W.3d 838 (Tenn. 2009). In *Beard*, counsel made a misrepresentation to the trial court in a previous case[3] that neither he nor his client had received a certain court order. Even after having been alerted to its falsity by a third party, Mr. Beard refused to correct his false statement. In affirming discipline of the offending lawyer, this

[3] McGehee v. McGehee, No. E2003–01555–COA–R3–CV, 2004 WL 1801749 (Tenn. Ct. App. Aug. 12, 2004).

Court made clear that "once [the] misrepresentations were brought to [counsel's] attention, he had a duty to correct those misrepresentations." *Id.* at 856. To the extent that a lawyer fails to do so, he is rightly subject to disciplinary action. *Id.* Mr. Talman clearly failed to carry out that duty here.

### 2. *Mr. Talman Suborned Perjury*

On top of his own lie, Mr. Talman asked Dr. McCoy to lie to the court. Indeed, he suborned perjury, asking Dr. McCoy to testify that she delivered the mitigation materials to him five days later than she had actually provided them. In doing so, he committed yet another criminal act. TENN. CODE ANN. § 39-16-705 (West 2011) (designating subornation of perjury as a Class A misdemeanor and subornation of aggravated perjury as a Class E felony); *see Hicks v. State*, 191 Tenn. 214, 219 (1950). Moreover, Mr. Talman violated Rule 3.4 of the Rules of Professional Conduct, which provides that a lawyer shall not "counsel . . . a witness to offer false or misleading testimony," TENN. RULES OF PROF'L CONDUCT R. 3.4(b); TENN. SUP. CT. R. 8. These criminal and ethical violations alone are enough to demonstrate that Mr. Talman fell below even the lowest standard of competence.

### 3. *Mr. Talman Failed To Put the Key Witness on the Stand*

After she refused to validate his deceit to the court, Mr. Talman refused to put Dr. McCoy—the key witness in the mitigation proceedings—on the stand. This decision was not minor or inconsequential, for Ms. Pike's entire case to avoid conviction for capital murder rested on the evidence that Dr. McCoy was meant to present: the only mitigation evidence in the case. Thus, this critical error violated not only the Rules that require every lawyer to act competently and diligently, TENN. RULES OF PROF'L CONDUCT R. 1.1-1.3, but also the time-tested ABA Guidelines that stress the importance of a mitigation expert during a capital trial.

These Guidelines contemplate a team of four people appointed to assist an indigent capital defendant, including a mitigation expert, who ensures that details regarding the defendant's background are well-prepared, well-documented, and well-represented during the trial. *Guidelines Commentary*, 31 HOFSTRA L. REV. 913, 959 (2003). The assignment and use of a mitigation expert is part of the trial counsel's standard of care, which promotes "high quality investigation and preparation of the penalty phase." *Id.* at 960. Tennessee already recognizes this standard through its Supreme Court Rule 13, which details a routine authorization for paying mitigation experts in capital cases. *Id.* at 960 n. 107.

In addition, the Guidelines provide several responsibilities for lead counsel in the penalty phase. First, he or she must fully investigate any possible witnesses who could explain the defendant's offenses by testifying to "the defendant's history from conception to sentencing," as well as witnesses, whether expert or lay, who can provide background regarding the defendant's "medical, psychological, sociological, and cultural history." Counsel must then thoughtfully determine what evidence to present in mitigation and must consider "any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death." *Guidelines* 10.11(F); *Guidelines Commentary*, 31 HOFSTRA L. REV. 913, 1060-61.

Mr. Talman failed to follow these standards in his representation of Ms. Pike. Although he sought, received funds for and hired a mitigation expert, the importuned Dr. McCoy, he failed to utilize her in any manner during the penalty phase of the trial. This was despite the fact that Dr. McCoy had interviewed several individuals familiar with Ms. Pike and had prepared a three-volume report on Ms. Pike's psychological and social history. Mr. Talman made this decision without any possible strategic benefit *for Ms. Pike*; indeed, this decision was made to the

detriment of his client. Mr. Talman even admitted in the post-conviction hearing that, "looking back . . . [he] would have done it differently." PC Trans. Vol. 22, at 535.

Ms. Pike's right to present mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'" *Guidelines Commentary*, 31 HOFSTRA L. REV. 913, 927 (citing Louis D. Bilonis & Richard A. Rosen, *Lawyers, Arbitrariness, and the Eighth Amendment*, 75 TEX. L. REV. 1303, 1316 (1997) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Here, Mr. Talman rendered Ms. Pike's right to present mitigating evidence wholly meaningless.

## II. THE TRIAL COURT FAILED TO ABIDE BY THE DICTATES OF THIS COURT AND OF THE CODE OF JUDICIAL CONDUCT

The Tennessee Code of Judicial Conduct makes clear that "[o]ur legal system is based on the principle that an independent, fair, and competent judiciary will interpret and apply the laws that govern us." TENN. SUP. CT. R. 10, Preamble. A judge must avoid bias, conflict or even the appearance of bias or conflict. *Id.* at Canon 2. As the United States Supreme Court has stated, "[judicial] codes of conduct serve to maintain the integrity of the judiciary and the rule of law." *Caperton v. A.T. Massey Coal Co,* 129 S. Ct. 2252, 2266 (2009). The Court has further explained that judicial integrity is a "state interest of the highest order" because, "[c]ourts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity." *Republican Party of Minn. v. White*, 536 U.S. 765, 793 (2002) (Kennedy, J., concurring). The trial court violated the Judicial Code of Tennessee in this case by failing to provide Ms. Pike with representation consistent with professional standards and by denying her an impartial

tribunal. To reaffirm public confidence in the judicial system by showing that such a lack of integrity will not be tolerated, this Court must reverse the present case.

### A. The Trial Court Failed in Its Duty To Ensure a Fair Trial Because It Appointed a Clearly Incompetent and Conflicted Lawyer

This Court has recognized that trial courts have a duty to ensure that all proceedings are conducted within the ethical standards of the profession and to avoid the appearance of impropriety and impropriety itself. *See Frazier v. State*, 303 S.W.3d 674, 683 (Tenn. 2010). Tennessee law requires that, "[W]hen . . . the trial court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken. Otherwise, prejudice will be presumed." *Id.* (citations omitted). Here, the trial court was cognizant of Mr. Talman's theft, of the incompetence of Mr. Talman that his felonious act alone reflected, and the resulting conflict of interest, but did nothing to further examine the situation. The court, well aware that Mr. Talman had stolen more than $67,000 from the State and that he was subject to disciplinary proceedings and a criminal investigation, nonetheless, appointed him to represent Ms. Pike.

This appointment was even more inappropriate since, under the Tennessee Code of Judicial Conduct, judges have the duty to appoint counsel "on the basis of merit." Canon 3(c)(4) (2003) and the ABA Guidelines dictate that the overall goal in appointing capital counsel is to provide "'high quality legal representation,' not merely 'an adequate defense.'" R. 4.1, History of Guideline (2003). By appointing a defense counsel who had stolen money from a limited fund available for indigent defense, Judge Leibowitz disregarded her duty to provide Ms. Pike with competent defense counsel. This was exacerbated when she accepted—at face value, despite Mr. Talman's history—his false excuses regarding his failure to present mitigation evidence until the night before he produced it.

### B. Judge Leibowitz Should Have Recused Herself To Avoid an Appearance of Impropriety

Judge Leibowitz should have recused herself from post-conviction proceedings because one of the key issues to be adjudicated was her appointment of this particular incompetent lawyer, laboring under a clear conflict of interest, to represent Ms. Pike in that proceeding. While Tennessee courts have held that it is critical to maintain the public's confidence in an impartial judiciary, *see Board of Professional Responsibility v. Slavin*, 145 S.W.3d 538, 548 (Tenn. 2004), it is hard to imagine a more likely compromise of that principle than a judge judging the propriety of an appointment she made.

This Court has found appearance of impropriety to exist "in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." *State v. White*, 114 S.W.3d 469, 477 (Tenn. 2003) (citation omitted). As recognized by the Supreme Court in *Caperton v. A.T. Massey Coal Co., Inc.*, "[a]lmost every State . . . has adopted the American Bar Association's objective standard: 'A judge shall avoid impropriety and the appearance of impropriety.'" 129 S. Ct. 2252, 2266, (2009). Canon 2 of Rule 10 of the Tennessee Supreme Court Rules directly reflects the ABA's standards for judicial impropriety; the Tennessee Canon states, nearly identically to the ABA standard cited in *Caperton*, that "[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." TENN. SUP. CT. R. 10, Canon 2. Under the ABA's Model Code of Judicial Conduct, a judge is required to recuse herself "in any proceeding in which the judge's impartiality might reasonably be questioned." R. 2.11 (A). Judge Leibowitz should have recused herself during post-conviction hearings given the specter of impropriety caused by her

appointment of a conflicted and incompetent lawyer. This case illustrates how actual impropriety can follow when judges ignore the appearance of impropriety.

### C. Judge Leibowitz Should Have Recused Herself Because She Was a Potential Material Witness in the Proceedings

Furthermore, Judge Leibowitz should have recused herself because she was a key potential witness in the post-conviction proceedings. Much of defense counsel's activity occurred in off-record *in camera* conferences. All of the discussion about the date at which Mr. Talman received the mitigation materials from Dr. McCoy occurred off the record and in chambers. The only witnesses to those proceedings were Mr. Talman, the prosecutor and the trial judge. Judge Leibowitz was a necessary witness to prove the claim of false statements surrounding the expert report. The trial judge, in fact, was the only disinterested and unbiased witness to what was said during those meetings. As Canon 3(E) of Rule 10 of the Tennessee Supreme Court Rules states, "A judge shall disqualify . . . herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where . . . the judge . . . is to the judge's knowledge likely to be a material witness in the proceeding." TENN. SUP. CT. R. 10, Canon 3(E)(1)(d)(iv). In light of this principle, it is clear that Judge Leibowitz erred by not recusing herself.

Given the importance of maintaining an impartial and fair judiciary, Judge Leibowitz should have followed the Judicial Code of Tennessee. In this case, where defense counsel was incompetent and conflicted and the judge had the last clear chance to assure the integrity of the proceedings, Judge Leibowitz failed to correct the conflicts or to recuse herself where she was conflicted. This Court must take action to correct these egregious wrongs.

## CONCLUSION

The extraordinary circumstances of this case compelled *amici* to offer this brief to this Honorable Court. As noted earlier, *amici* have an abiding interest in two key principals: first, that all clients, all criminal defendants, but especially all capital defendants, be represented by counsel who fulfill all of the applicable rules of professional conduct, particularly those that assure competence, honesty and loyalty to the client's cause; second, that all judges who preside over trials, criminal trials, but especially capital criminal trials, act with integrity, impartiality and propriety, assuring that those who are the subjects of our justice system have confidence that these qualities are reflected in everything the judge does. Yet none of these principals were observed in the case of *Christa Pike*. And therefore it is critical that this Honorable Court grant permission to appeal in order to rectify all of the unfortunate events that have so far occurred. That will send a clear message to all that this Court's priorities are these important standards of conduct for lawyers and the judges before whom they appear.

Respectfully submitted,

**SUSAN L. KAY**, BPR #006630
Vanderbilt Legal Clinic
Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203-1181
615-322-4964

Counsel for *Amici Curiae*

KENT R. McKEEVER
(Specially admitted to practice
pursuant to Supreme Court Rule 7 § 10.03)

WHITNEY C. BOSHERS
(Specially admitted to practice
pursuant to Supreme Court Rule 7 § 10.03)

OF COUNSEL:

LAWRENCE J. FOX
George W. and Sadella D Crawford
Visiting Lecturer in Law,
Yale University Law School

Grant Bermann
Michael Drezner
Alexander Fenner
Adam Hockensmith
Ramya Kasturi
Lawrence Kornreich
Sarah Langberg
Alexander Ramey
Stephanie Turner
Carleen Zubrzycki

Students in the Ethics Bureau at Yale University Law School

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of November, 2011, a true and exact copy of this motion was mailed, first class postage prepaid, to Assistant Attorney General James Gaylord, Criminal Justice Division, PO Box 20207, Nashville, TN 37202-0207, and to Donald Dawson, Post-Conviction Defender, PO Box 198068, Nashville, TN 37219-8068.

Susan L. Kay