UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-CV-35** |
| | ) | **DEATH PENALTY CASE** |
| **DEBRA JOHNSON, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

**ADDENDUM 7**

**DOCUMENT 7**

---

# IN THE SUPREME COURT OF TENNESSEE
# AT KNOXVILLE

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | **C.C.A. No.: E2009-00016-CCA-R3-PD** |
| **Applicant-Appellant,** | ) | |
| | ) | **KNOX COUNTY** |
| **v.** | ) | **Case No. 68280** |
| | ) | |
| **STATE OF TENNESSEE,** | ) | **Post-Conviction** |
| | ) | |
| **Appellee.** | ) | **(CAPITAL CASE)** |

**ON APPLICATION FOR PERMISSION TO APPEAL FROM THE JUDGMENT OF THE TENNESSEE COURT OF CRIMINAL APPEALS**

---

## APPLICATION FOR PERMISSION TO APPEAL

---

**Donald E. Dawson, BPR # 010723**
**Post-Conviction Defender**

**Avram Frey, BPR # 028520**
**Assistant Post-Conviction Defender**

**Office of the Post-Conviction Defender**
**530 Church Street, Suite 600**
**P.O. Box 198068**
**Nashville, TN 37219-8068**
**Phone: (615) 741-9331**
**Fax: (615) 741-9430**

**Counsel for Christa Gail Pike**

# IN THE SUPREME COURT OF TENNESSEE
# AT KNOXVILLE

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE** | ) | |
| | ) | **C.C.A. No.: E2009-00016-CCA-R3-PD** |
| **Applicant-Appellant,** | ) | |
| | ) | **KNOX COUNTY** |
| **v.** | ) | **Case No. 68280** |
| | ) | |
| **STATE OF TENNESSEE,** | ) | **Post-Conviction** |
| | ) | |
| **Appellee.** | ) | **(CAPITAL CASE)** |

**ON APPLICATION FOR PERMISSION TO APPEAL FROM THE JUDGEMENT OF THE TENNESSEE COURT OF CRIMINAL APPEALS**

---

## APPLICATION FOR PERMISSION TO APPEAL

---

**Donald E. Dawson, BPR # 010723**
**Post-Conviction Defender**

**Avram Frey, BPR # 028520**
**Assistant Post-Conviction Defender**

**Office of the Post-Conviction Defender**
**530 Church Street, Suite 600**
**P.O. Box 198068**
**Nashville, TN 37219-8068**
**Phone: (615) 741-9331**
**Fax: (615) 741-9430**

**Counsel for Christa Gail Pike**

# TABLE OF CONTENTS


Table of Contents ........ ii

Table of Authorities ........ iii

Judgment Below ........ iv

Questions Presented for Review ........ v

Preliminary Statement ........ vi

References Used in This Brief ........ viii

Facts Relevant to Questions Presented ........ 1

A. Mr. Talman's Conflicts of Interest ........ 1

B. Facts Related to the Recusal of the Post-Conviction Court ........ 10

C. Facts Related to the Error of the CCA Regarding Juror Rutherford ........ 11

Reasons Supporting Review by the Supreme Court ........ 13

I. Ms. Pike Was Denied Her Right to the Effective Assistance of Unconflicted Counsel ........ 16

II. This Court Should Consider Whether the Post-Conviction Court Was Required to Recuse Itself ........ 27

III. The Court of Criminal Appeals Applied the Wrong Standard of Review In its Consideration of Ms. Pike's Claims Regarding Penalty Phase Ineffectiveness ........ 36

IV. This Court Should Determine that it is Unconstitutional under Tennessee Law to Execute the Severely Mentally Ill, Persons with Organic Brain Damage, Older Adolescents, or a Person Such as Petitioner, Who Was All of the Above at the Time of the Offense ........ 40

V. The Court of Criminal Appeals Misapplied the Law of *Wainwright v. Witt*, 469 U.S. 412 (1985) ........ 48

Conclusion ........ 55

Certificate of Service ........ 55




Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 4 of 142 PageID #: 9451

# TABLE OF AUTHORITIES

**Cases:**

*Adams v. Texas*, 448 U.S. 38 (1980) ........ 51,52,54

*Alley v. State*, 882 S.W.2d 810 (Tenn. Crim. App. 1994) ........ 30

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........ passim

*Bd. Of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538 (Tenn. 2004) ........ 30

*Burns v. State,* 2001 WL 912817 (Tenn. Crim. App. Aug 9, 2001) ........ 17,27

*Coker v. Georgia*, 433 U.S. 584 (1977) ........ 43

*Coleman v. State*, 2011 WL 1346932 (Tenn. April 11, 2011) ........ 42

*Cuyler v. Sullivan,* U.S. 335 (1980) ........ 17,18,21,32,36

*Davis v. State*, 598 S.W.2d 582 (Mo. Ct. App. 1980) ........ 35

*Disciplinary Counsel v. Holland,* 835 N.E.2d 361 (Ohio 2005) ........ 23

*Enmund v. Florida*, 458 U.S. 782 (1982) ........ 43

*Fields v. State*, 40 S.W.3d 450 (Tenn. 2001) ........ 15,37

*Ford v. Wainwright*, 477 U.S. 399 (1986) ........ 43,46

*Frazier v. State,* 303 S.W.3d 674 (Tenn. 2010) ........ passim

*Furman v. Georgia*, 408 U.S. 238 (1972) ........ 43

*Glutch v. State*, 1992 WL 24056 (Tenn. Crim. App. Feb. 12, 1992) ........ 27

*Goad v. State*, 938 S.W.2d 363 (Tenn. 1996) ........ 39,40

*Gray v. Mississippi*, 481 U.S. 648 (1987) ........ 49

*Gregg v. Georgia*, 428 U.S. 153 (1976) ........ 43,46

*Henderson v. State*, 2005 WL 1541855 (Tenn. Crim. App. June 28, 2005) ........ 35

*Hughes v. Board of Professional Responsibility,* 259 S.W.3d 631 (Tenn. 2008) ........ 13

*In re: Cameron*, 151 S.W. 64 (Tenn. 1912) ........ 13

*In re: Cameron*, 126 Tenn. 614 (1912) .......... 30

*In re: Bell*, __S.W. 3d__, 2011 WL 2304191 (Tenn. 2011) .......... 13

*Kansas v. Marsh*, 548 U.S. 163 (2006) .......... 43

*Kirby v. State*, 1994 WL 525086 (Tenn. Crim. App. Sept. 28, 1994) .......... 27

*Leighton v. Henderson*, 414 S.W.2d 419 (Tenn. 1967) .......... 30

*Lockett v. Ohio*, 438 U.S. 586 (1978) .......... 52

*McCullough v. State,* 144 S.W.3d 382 (Tenn. Crim. App. 2003) .......... 20,27

*Maitland v. Zanga*, 14 Wash. 92 (1896) .......... 35

*Martindale v. Pillow*, 1987 WL 11325 (Tenn. Crim. App. May 27, 1987) .......... 29

*Mills v. Maryland*, 486 U.S. 367 (1988) .......... 52

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .......... 43

*People v. Edebohls*, 944 P.2d 552 (Colo. Ct. App. 1997) .......... 23

*Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. April 25, 2011) .......... passim

*Roper v. Simmons,* 543 U.S. 551 (2005) .......... 15,42,44,45

*Rugiero v. United States*, 330 F. Supp. 2d 900 (E.D. Mich. 2004) .......... 23

*Smith v. State,* 1997 WL 658993 (Tenn. Crim. App. Oct. 23, 1997) .......... 25

*Sneed v. Board of Professional Responsibility*, 301 S.W.3d 603 (Tenn. 2010) .......... 13

*Solina v. United States*,709 F.2d 160 (2d Cir. 1983) .......... 23

*State v. Burns*, 6 S.W.3d 453 (Tenn. 1999) .......... 15

*State v. Cottle*, 194 N.J. 449 (2008) .......... 23

*State v. Pike*, 978 S.W.2d 904 (Tenn. 1998) .......... 4

*State v. Thompson*, 768 S.W.2d 239 (Tenn. 1989) .......... 52

*Strickland v. Washington*, 466 U.S. 668 (1984) .......... 36



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 6 of 142
PageID #: 9453

*Terrell v. United States*, 6 F.2d 498 (4 Cir. 1925) ....................35

*Thompkins v. Cohen*, 965 F.2d 330 (7th Cir. 1992)....................23

*Thompson v. Oklahoma,* 487 U.S. 815 (1988)....................43

*Tyler v. Swenson*, 427 F.2d 412 (8th Cir. 1970) ....................35

*United States v. Greig,* 967 F.2d 1018 (5th Cir. 1992)....................23

*United States v. Halley*, 240 F.2d 418 (2 Cir. 1957)....................35

*United States v. Levy*, 25 F.3d 146 (2d. Cir. 1994)....................23

*United States v. Lowry*, 971 F.2d 55 (7th Cir. 1992)....................23

*Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001).................... passim

*Vaughn v. Shelby Williams of Tennessee, Inc,* 813 S.W.2d 132 (Tenn. 1991)....................35

*Wainwright v. Witt*, 469 U.S. 412 (1985) .................... passim

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ....................50,51,52,54

*Wood v. Allen*, 130 S.Ct. 841 (2010) ....................38

*Wright v. Plate*, 117 S.W.3d 774 (Tenn. Ct. App. 2002)....................30

**Statutes and Rules**:

Tennessee Constitution, Article I, § 16....................42,45

United States Constitution, Eighth Amendment....................42,45

United States Constitution, Fourteenth Amendment ....................42

Tenn. Code Ann. § 39-2-204 ....................53

Tenn. Code Ann. § 39-14-105 ....................22

Tenn. Code Ann. § 40-2-101 ....................22

Tenn. Code Ann. § 40-13-112 ....................22

Tenn. R. App. P., Rule 9....................28

Tenn. R. App. P., Rule 11....................1



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 7 of 142 PageID #: 9454

Tenn. R. App. P., Rule 13(d) ....................................................................................15

Tenn. Sup. Ct. R. 8..............................................................................................20

Tenn. Sup. Ct. R. 10 Canon 3(E)(1)(a) ...................................................................34

**Other Authority**:

Drew, Kevin, "Executed Mentally Ill Inmate Heard Voices Until End," CNN, January 7, 2003 ...........................................................................47,48

Kaplan & Sadock's Comprehensive Textbook of Psychiatry 3038-40 (Benjamin J. Sadock et al eds., 8th ed., 2005) ...........................................................................46

Mansnerus, Laura, "Damaged Brains and the Death Penalty," New York Times, July 21, 2001 47,48

## JUDGMENT BELOW

On April 25, 2011, the Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief to Christa Gail Pike. *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. April 25, 2011)(Appendix-1). No petition for rehearing was filed. Therefore, this Application for Permission to Appeal pursuant to Rule 11, Tenn. R. App. P., is due on June 24, 2011.

## QUESTIONS PRESENTED FOR REVIEW

I. Was Ms. Pike Deprived of the Right to Unconflicted Counsel?

A. Did the possibility that Mr. Talman might be prosecuted for the theft of over $67.000 from the state create a potential conflict of interest.

B. Did Mr. Talman's having over billed the Indigent Defense Fund by at least $67,027 between 1990 and 1993 and the resultant Petition for Discipline by the Board of Professional Responsibility that was pending during the entirety of his representation of Ms. Pike create a potential conflict of interest?

C. Did Mr. Talman's lie to the Trial Court and Prosecutor about the date on which he had received materials from the mitigation specialist create a conflict of interest?

D. Did the trial court's knowledge of Mr. Talman's potential conflict due to his having grossly overbilled for his appointments to indigent cases require further inquiry on the record and that Ms. Pike be advised of the potential conflict and either be provided unconflicted counsel or enter a knowing and intelligent waiver on the record?

E. Did Mr. Talman further mislead the court by suggesting that it was the mitigation specialist's delay that made him unable to provide an answer to the State's query regarding the existence of a report or summary in the mitigation materials?

F. Is the existence of an actual conflict of interest proven by Mr. Talman's decision not to call his mitigation expert as a witness; thus forfeiting over 90% of his prepared sentencing phase proof?

G. Does the evidence preponderate against the finding of the Post-Conviction Court that the reasons Mr. Talman gave at post-conviction for not calling the mitigation specialist to testify were credible?

H. Did the appointment of an attorney with an active conflict known to the court at the time of appointment constitute a structural error that requires that Ms. Pike's conviction and sentence be vacated?

1. Did the appointment of an attorney with a pending petition for discipline for a highly publicized theft from the state indigent defense fund constructively deny Ms. Pike the right to counsel?

2. Does the appointment of Mr. Talman, under the known disabilities facing Mr. Talman "bear directly on the 'framework within which the trial proceeds,'" thereby rendering the entire trial a denial of due process?

II. Was the Post-Conviction Court required to recuse itself from hearing Ms. Pike's Petition for Post-Conviction Relief because the Court below had introduced structural error into Ms.

Pike's capital trial and because the court relied on its own un-cross-examined testimony on a critical issue?

A.. Did the appointment of an attorney with an active conflict known to the court at the time of appointment constitute a structural error that requires that Ms. Pike's conviction and sentence be vacated?

B. Did the appointment of an attorney with a pending petition for discipline for a highly publicized theft from the state indigent defense fund constructively deny Ms. Pike the right to counsel?

C. Does the appointment of Mr. Talman, under the known disabilities facing him "bear directly on the 'framework within which the trial proceeds,'" thereby rendering the entire trial a denial of due process?

III. Was Ms. Pike denied the effective assistance of counsel?

A. Did Trial Counsel's failure to present the mitigation evidence in their possession fall below the standards for performance required of defense counsel in a capital case?

1. Did Trial Counsel's plan of putting all of the mitigation evidence in through the mitigation specialist fall below the standards for performance required of defense counsel in a capital case?

2. Did deciding not to call the mitigation specialist or any other expert to explain Ms. Pike's past behavior as it related to her diagnosed mental illness fall below the standards for performance required of defense counsel in a capital case?

3. Did failure to present the vast majority of the information prepared by the mitigation specialist fall below the standards for performance required of defense counsel in a capital case?

B. Did Trial Counsel's failure to investigate various red flags showing brain damage fall below the standards for performance required of defense counsel in a capital case?

1. Did Trial Counsel's failure to investigate the cause of Ms. Pike's seizures as a young child or the abnormal EEG when she was fourteen months old constitute deficient performance?

2. Did failure to further investigate Ms. Pike's mother's alcohol ingestion during pregnancy with Ms. Pike constitute deficient performance?

3. Did failure to further investigate various indicia that something was wrong with Ms. Pike that came from other witnesses constitute deficient performance?

4. Did failure to further investigate for brain damage due to Ms. Pike's head going through the windshield in a car accident constitute deficient performance?

C. In light of the lack of explanation for Ms. Pike's behavior and for her seizures as a child, did Counsel fall below the standards for performance required of Defense Counsel in a capital case by failing to utilize the services of a medical doctor – particularly a neurologist – to examine Ms. Pike?

1. Was it reasonable for Trial Counsel to have accepted Dr. Engum's determination of no brain damage when they had not provided him with a thorough social history of Ms. Pike?

2. Should death penalty defense counsel have sufficient knowledge of mental health issues to know the limitations of a psychologist's expertise?

D. Was it deficient performance for Trial Counsel not to have learned that Ms. Pike suffered from PTSD and a Bipolar Disorder rather than Borderline Personality Disorder?

1. Since Bipolar Disorder requires a linear evaluation of an individual's conduct over time, was it deficient performance not to provide the psychologist with a complete social history?

2. Was it deficient performance not to secure the services of a medical doctor, either a neurologist or a psychiatrist to evaluate Ms. Pike?

3. Was it deficient performance not to have interviewed various staff members at the juvenile institutions in which Ms. Pike was housed and who had worked extensively with her?

E. Was counsel's performance in conducting voir dire deficient?

1. Was Trial Counsel's performance deficient in failing to object to the removal of a qualified juror for cause?

2. Was Trial Counsel's performance deficient in acquiescing in the removal of a qualified juror for cause

F. Did Trial Counsel's deficient performance prejudice the outcome of the sentencing phase of Ms. Pike's capital trial?

IV. Does the Constitutional understanding of the requirements for a categorical bar to execution set out by the Supreme Court in Atkins and Roper, require a categorical bar from the death penalty for Ms. Pike, an immature, mentally ill, brain damaged 18 year old?

A. Should older adolescents whose brains are still developing be included in the categorical bar?

B. Should seriously mentally ill defendants be included in the categorical bar?

C. Should older adolescents who are seriously mentally ill and who suffer brain damage affecting the

frontal lobe functions be excluded from the death penalty?

V. Did the striking of Mr. Rutherford, a *Witherspoon-Witt* qualified juror, for cause constitute a structural defect to Ms Pike's capital trial requiring the reversal of her conviction and sentence?

## PRELIMINARY STATEMENT

### Thefts, Lies and Other Mischief

This Court has often noted the importance of preserving the public's being able to have faith in the justice system. The instant case presents a number of conflicts and appearances of impropriety that undermine the integrity of the system and require this Court's intervention. The judicial process designed to protect Ms. Pike and her legal interests failed to do so.

By the time she was arrested and charges with first degree murder, Applicant, Christa Pike, was a brain damaged, mentally ill eighteen year old who had suffered substantial abuse and neglect during her childhood. Her parents had neglected her, abused her, and failed to protect her from abuse by others, including other family members. As a very young child she had been exposed to violent pornography and extremely violent horror films. As a toddler she played in the "gut bucket" of her grandfather's slaughter house. She was raped during her preteen years and again as a teenager. Her parents having failed in their primary duty to protect her, she now, brain damaged and mentally ill, entered the legal system, facing the State's vigorous advocacy for a death sentence.

Once again, the people who were sworn to protect her interests, the court and her appointed attorney, failed in this primary duty. Despite the fact that the trial judge recognized that Ms. Pike's case was a very high profile case and that she faced the death penalty, the court appointed William Talman as her advocate. A month earlier Mr. Talman had returned $67,027 that he had fraudulently taken from the fund designated to pay attorneys and experts for the representation of individuals who, like Ms. Pike, cannot afford counsel. An investigation by the Tennessee Comptroller's office revealed that Mr. Talman was one of the two most egregious perpetrators in overbilling for indigent criminal representation. He had previously been mentioned by name in local and state news reports concerning the investigation. He had never

tried a capital case and was known as a mediocre attorney. A few months earlier, law enforcement authorities had noted that Mr. Talman's overbilling stood out and suggested that he was one of the two attorneys for whom criminal prosecution should be considered. At the time of his appointment, there was a complaint against him pending before the Board of Professional Responsibility due to his theft from the indigent defense fund.[1] The trial/post-conviction judge acknowledged that she knew of Mr. Talman's billing problems and noted further that everyone in Knoxville knew. Yet the court never took steps to determine whether Ms. Pike knew that her attorney suffered under a conflict of interest or whether she waived that conflict.

After the verdict finding Ms. Pike guilty of first degree murder and before the sentencing phase of the trial, Mr. Talman found himself in yet another dilemma. When asked why he had waited until this point to provide his expert report regarding mitigation to the State, Mr. Talman lied. He told the court and the prosecutor that he had just received it the night before. When he asked the mitigation specialist who prepared the report to support this lie under oath, she refused. With a clear duty to zealously defend Ms. Pike and protect her from the State, Mr. Talman chose to protect himself by not presenting his planned mitigation case. Once again, a person legally required to protect Ms. Pike failed to do so.

In post-conviction Ms. Pike requested that the court recuse itself on the basis that having appointed an attorney with a conflict; thus undermining the fairness of her capital trial, the court could not sit in judgment of that decision due to at least an appearance of impropriety. As will be explained below, the post-conviction record now demonstrates that, in fact, the court was unable to set aside its subconscious bias in determining the issues. The Court of Criminal Appeals in denying relief (1) applied both incorrect standards of review and (2) misinterpreted

[1] Although he had self-reported, he had done so only at the suggestion of his attorney and after he had learned of the pending criminal investigation. In December, a district attorney involved in the investigation had inquired as to whether there was a complaint pending and recommended one be filed if it were not pending. (Apr. 08 Ex. 1 (Dec. 8, 94 Ltr Johnson to Nichols).)



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 15 of 142 PageID #: 9462

Tennessee law related to the duties of a court with knowledge that counsel suffers from a potential conflict. In particular the court below misunderstood this Court's holding in *Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010).

**REFERENCES USED IN THIS BRIEF**

References to the Record will be as follows:

The record to the capital trial will be referred to as T [Vol. No.]: [Page]

Exhibits from the capital trial will be referred to as Tr. Ex ____.

The post-conviction record will be referred to as PC [Vol. No.]: [Page].

Because the hearing occurred on three separate dates and the exhibits were not consecutively numbered: Post-conviction exhibits will be referred by the hearing date and exhibit number, i.e., [Month] [Year] Ex.__. The exhibit volume designated "Supplemental Exhibits" will be referred to as Supp. Ex. ___.

The Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit, is found in Supplement Exhibits, Exhibit 1 and will be referred to as 'Comptroller Report" and cited as CR: [Page].

The work of the mitigation specialist at trial, Dr. Diana McCoy, consisted of three volumes of materials. It has been divided into five volumes for this record and is located in PC Exhibits, January 2007, Ex. 1. In this Brief the 60 page social history will be referred to as "Social History." The records and memoranda of interviews will be referred to as "Mitigation Materials" and cited as M Mat Vol. ___ at ___.

Appellant will be referred to variously as Applicant, Petitioner, Ms. Pike, Christa Pike or Christa.

Appellee will be referred to as the State or prosecution.

The Opinon of the Court of Criminal Appeals, *Pike v. State*, No. E2009-00016-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. April 25, 2011) will be cited as: CCA Op. at ____.

## FACTS RELEVANT TO QUESTIONS PRESENTED

Pursuant to Tenn. R. App. P. 11(b), Applicant, Ms. Pike, elects to accept the facts as stated in the opinion of the Court of Criminal Appeals as correctly providing a general background to this case.[2] While Ms. Pike believes the court below omitted certain essential facts and placed other facts out of their proper context, she does not dispute the accuracy of the facts as related in the court's opinion. Consequently, Ms. Pike limits her factual presentation to those instances in which essential facts for this review were either omitted or require proper context to address the issues presented.

### A. Mr. Talman's Conflicts of Interest

#### 1. Theft from the Indigent Defense Fund

In 1994, the Tennessee Comptroller of the Treasury began an investigation into the billing practices by defense counsel in indigent criminal cases. (Supp Ex. 1, Special Report, Court System, Administrative Office of the Courts, Review of Improper Billings by Appointed Counsel, May 1995, State of Tennessee, Comptroller of the Treasury, Department of Audit, Division of State Audit (hereinafter "Comptroller's Report").) The Comptroller's Report uncovered an overbilling scandal and named William Talman as the second most egregious offender. Mr. Talman was required to repay the Indigent Defense Fund $67,027. (Comptroller's Report (CR): 9.)

The review by the Comptroller found that only 20 attorneys had received total payments in excess of $20,000 in 1993, and concluded that 7 of those 20 had billed excessive hours. (CR: 5.) The Comptroller's Report continued:

> The improper billings by two attorneys notably exceeded the billings of the other five. The two attorneys, Mr. David Poss and Mr. William Talman, were each paid **in excess of $100,000 for representing indigent clients in 1993**. In our review of fee petitions submitted for 1993, we found 148 days of apparently

[2] It should be pointed out that the Court of Criminal Appeals incorrectly refers to Ms. Pike's mother as Carissa Henson. Her actual name is Carissa Hanson.

> excessive billings for Mr. Poss and 81 days for Mr. Talman. Attorneys Poss. and **Mr. Talman frequently billed the state for over 24 hours of service in a single day.**

(CR at 5.) (emphasis added)

At the going rate for appointments in 1993, Mr. Talman's overbilling amounted to 3,333 hours (at 30 dollars per hour for in-court work) to 5,000 hours (at 20 dollars per hour for out-of-court work) billed for indigent defense in a single year. (*See* CR: 3.) To achieve this number of billable hours would require working 64 to 96 hours for each of the 52 weeks of the year *before* taking care of any private clients or handling any of the many non-billable hours required to run a law office. Significantly, in calculating the $67,027 restitution paid by Mr. Talman, only $17,295.00 of the over $100,000 billed in 1993 was considered to have "exceed the Comptroller's criteria." (Supp. Ex. 2-A (Petition for Discipline March 19, 1998).) Thus, under the "Comptroller's criteria" billing in excess of $83,000 at $30 per hour in-court and $20 per hour out-of-court, i.e., billing between 2,766 and 4,150 hours, was not even considered suspect. The Petition for Discipline indicates the following amounts by which Mr. Talman exceeded the "Comptroller's criteria" in the other years: 1990 – $20,123; 1991 – $11,147; 1992 – $18,462. (*Id.*)

All of the cases handled by Mr. Talman had fee caps per case. Since Mr. Talman primarily handled general sessions cases, the fee cap for most of his work was $500, a total he regularly exceeded. (CR: at 3-4.) The Comptroller found that "[t]he hours Mr. Talman reported on multiple fee petitions differed only slightly, **apparently to give the appearance of proration.**" (*Id.* at 9 (emphasis added).) The report also noted that many of the fee applications were signed by special judges, including other attorneys whose fee applications were questioned. (*Id.*)

After reviewing the Comptroller's Report and additional investigation by the Tennessee Bureau of Investigation, Mr. Talman was considered for prosecution. District Attorney General Torry Johnson noted, "It appears that William Talman and David Poss are the only two whose billing practices were so extreme as to warrant evaluation for prosecution." (Apr. 2008 Ex. 1, (December 8, 1994 letter from District Attorney General Torry Johnson to District Attorney General Randy Nichols).) Mr. Talman's knowledge of the criminal investigation is shown in his September 1994 letter to the Board of Professional Responsibility in which he asked for a delay in responding to the complaint citing the need to remain silent pending a decision on whether to prosecute. (Supp. Ex. 2A, (File of Board of Professional Responsibility, September 15, 1994, letter from Talman).)

Ultimately, on October 29, 1998, Mr. Talman entered a conditional guilty plea to the complaint being handled by the Board of Professional Responsibility. (Supp. Ex. 2-A.) The Petition for Discipline prepared by the Board had alleged violations of DR 1-102(A)(1)(5)(6); DR 2-106(A)(B) and DR 7-102(A)(8). (*Id.* (Petition for Discipline dated March 19, 1998).) DR 7-102(A)(8) states: "In his representation of a client, a lawyer shall not: … (8) Knowingly engage in other illegal conduct …." (*Id.*) The alleged violation of DR 2-106 was the Mr. Talman charged or collected an illegal or clearly excessive fee. (*Id.*) The Conditional Plea of Guilty entered by Mr. Talman admitted violation of DR 1-102(A)(1)(5)(6) and DR 2-106(A)(B). (Supp. Ex. 2-A (Conditional Guilty Plea, Oct. 29, 1998.) On November 24, 1998, the Court entered an order accepting Mr. Talman's Conditional Plea of Guilty and suspended his license to practice law for 11 months and 29 days which was all suspended after placing him on probation for 11 months and 29 days. (Supp. Ex. 2-A (Order of Enforcement Nov. 24, 1998.)

On May 23, 1995, the trial/post-conviction court appointed Mr. Talman to represent Ms. Pike. (T Vol. I at 8.) His representation of Ms. Pike in the state courts ended on November 23, 1998. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *rehearing denied* November 23, 1998.

### 2. Facts Related to the Decision to Scrub the Planned Sentencing Phase Evidence

Prior to and during the trial, forensic psychologist Dr. Diana McCoy acted as mitigation specialist in Ms. Pike's case. Dr. McCoy conducted extensive investigation and numerous interviews in order to assemble a case in the event of a sentencing phase. The substance of Dr. McCoy's work was contained in three volumes consisting of a 60 page social history (herein after "Social History"), numerous records she had collected and her memoranda of all of the interviews she had conducted with Ms. Pike, her family, friends, and a small number of juvenile court workers who had been assigned to Ms. Pike (herein after "Mitigation Materials"). From the beginning, Mr. Talman planned on presenting the mitigation case through Dr. McCoy. *(See* PC XX: 328-329; XXV: 715, 741; CCA Op. at *50.) As Mr. Talman testified at the post-conviction hearing:

> We planned to put Dr. McCoy on, and have her go through Christa's background and tie in with Dr. Engum's report. ... But our plan was to try and have Dr. McCoy bring all this stuff in, you know, about her background and tie it in with Dr. Engum's report. And that was the -- ... -- that was the plan in a nutshell.

(PC Vol. XX at 328-329.) On February 29, 1996, eighteen days prior to the start of Ms. Pike's trial, Mr. Talman filed a motion requesting additional funds for Dr. McCoy's services noting:

> That Dr. McCoy, in preparation for the trial, which is presently scheduled to begin on March 18, 1996, has exhausted the funds previously authorized by the Court since the preparation of this case has required Dr. McCoy to travel outside of the Knoxville, Tennessee area to gather data and interview informants necessary to the preparation of mitigation materials **relevant to her expected testimony** during the trial of this case.

(PC Apr. 2008 Ex. 22 (emphasis added).) Significantly, the defense did not subpoena any witnesses, further indicating the intention to rely on Dr. McCoy to present the mitigation evidence. (CCA Op. at * 50.)

At the close of the guilt/innocence phase of Ms. Pike's trial, after the jury had returned a conviction of murder in the first degree, the trial court called an *in camera* meeting with both parties. Defense counsel failed to request that this meeting be recorded, and because it took place out of the presence of the court reporter, it is not in the record. During the *in camera* meeting, Mr. Talman provided the prosecutor with Dr. McCoy's three-volume Mitigation Materials and Social History. (T XXIX: 2465.) Immediately after the meeting, once again in court and on the record, the prosecutor expressed agitation at having received voluminous materials pertinent to Dr. McCoy's testimony so near to her taking the stand. (*Id.* at 2465-69.) The trial court then recessed the penalty phase until the following morning to allow the prosecutor time to review Dr. McCoy's Mitigation Materials and Social History. (*Id.* at 2465.)

After leaving court, Mr. Talman contacted Dr. McCoy in a panic. He informed her that he had been pressed by the State as to why he had not yet turned over any of her materials, and in response, had lied to the trial court and prosecutor by saying he had only received the materials himself the prior evening, March 28, 1996. (PC XXV: 740.) He was also panicking because the prosecutor had complained it was all hearsay. (*Id.*) In point of fact, Dr. McCoy had repeatedly asked Mr. Talman when she should complete her materials and provide them to him. In response, Mr. Talman had continually answered that there was no rush, because he planned to provide any discoverable materials to the State only at the last possible instant. (PC XXIV: 676-77.) Ultimately, Dr. McCoy gave her Mitigation Materials and Social History to Mr. Talman on Sunday, March 24, *five days earlier than Mr. Talman had represented to the trial court and*

*prosecutor.*[3] (PC XXV: 740.) On the phone on March 29, Mr. Talman asked Dr. McCoy to corroborate his version of events in the course of her testimony by stating that she had just given him the materials. (*Id.*) Dr. McCoy told Mr. Talman on the telephone that she could not lie on the witness stand. After agreeing to get advice from attorneys Herb Moncier and Greg Issacs concerning the hearsay issue, Dr. McCoy called Mr. Talman back and informed him she was not able to reach either attorney. Mr. Talman told her that she would not be called to testify, and in fact, she was not. (PC XXV: 740-43.)

At the post-conviction hearing, Knoxville attorney Herb Moncier confirmed that shortly after Ms. Pike's trial, Dr. McCoy phoned him very upset. (PC XXVII: 1000.) He recalled advising her that although she had been asked to testify to something that was not true, the conversation was protected by the attorney/client privilege and attorney work product doctrines, and since the trial was over, she should not go immediately to Judge Leibowitz, but later, if Ms. Pike released the privilege, she could tell the court what happened. (PC XXVIII: 1002.) Knoxville attorney Greg Issacs confirmed that Dr. McCoy had also contacted him, after the trial, regarding Talman's request that she lie about when she had provided her report to him. (PC XXIX: 8.) The post-conviction court also found that in fact the relationship ended prior to Dr. McCoy's work on Ms. Pike's case. (PC V:60 n.20.)[4]

**a. Talman's purported rationales were post hoc.**

It is self-evident that within minutes of the time the court planned to begin hearing the evidence in the sentencing phase of Ms. Pike's trial, Mr. Talman was planning to present substantial proof through Dr. McCoy. The proof is that during the in-chambers meeting,

[3] Dr. McCoy presented receipts showing that she had picked up the photocopied and bound volumes of her Notes and Social History from Kinko's on March 20. (PC XXIV: 672-73; Apr 07 Ex. 23A.)

[4] The post-conviction court repeats this information at PC Vol. V p. 85 n.28, this time adding that Dr. McCoy confirmed that she had told Mr. Talman that she did not tell him earlier as she wanted to be on the case. This finding is not supported by the record as Dr. McCoy did not so testify.

immediately following the guilty verdict, all of Dr. McCoy's materials were provided to the State. In so doing, Mr. Talman provided materials that were only subject to discovery if Dr. McCoy were to testify. These materials included the memoranda from multiple interviews of Ms. Pike which were clearly protected by the attorney-client privilege, Dr. McCoy's social history, which was only be required if she were to be called to testify, and numerous records and witness statements that had no relevance outside her testimony.[5] (*See* PC Jan. 2007 Ex. 1 (Mitigation Materials).)

At post-conviction Mr. Talman presented three[6] post-hoc rationales for the decision to scrap the testimony of Dr. McCoy at the last minute despite having no substitute for her planned testimony. The excuses were: (1) Dr. McCoy could not support Dr. Engum's diagnosis of Borderline Personality Disorder; (2) Dr. McCoy had previously dated the prosecutor, William Crabtree; and (3) he was concerned about the negative information in Dr. McCoy's materials. (CCA Op. at *50.) Each of these stated reasons was rebutted not only by the testimony of Dr. McCoy, two Knoxville attorneys, and Mr. Crabtree himself, but also by documentary evidence. (PC XXVII: 1000, 1002; PC XXX 8:; CCA Op. at *31; PC Apr. 2008 Ex. 5, 6.) On March 15, 1996, three days before the start of the voir dire in Ms. Pike's trial, Dr. McCoy provided Mr. Talman a document setting out the mitigation themes they had been discussing. (PC XXIV: 649-650; Apr 08, Ex.6.) This document listed Borderline Personality Disorder as the first of the mitigation themes and explained how the information Dr. McCoy had found supported the diagnosis.

---

[5] For the purpose of the facts at this time, Ms. Pike ignores her prior argument that much of the mitigation materials should not have been turned over even if Dr. McCoy were called.

[6] Ms. Rice offered a fourth reason, i.e., that in court the next morning the State's copy of Dr. McCoy's Report and Materials were covered with "yellow stickies" indicating the State was prepared to cross-examine Dr. McCoy. This rationale is absurd on its face or gross deficient performance for failing to consider that the State would prepare. In addition the post-conviction court determined that Ms. Rice was not credible on this point as both Mr. Talman and Dr. McCoy had testifid that the decision was made the night before. (PC V: 87 n.29.)

**b. Dr. McCoy's testimony was planned around Dr. Engum's diagnosis.**

At the post-conviction hearing.Dr. McCoy discussed the relationship between the information she developed and provided in the 60 page Social History and borderline personality disorder. In fact, Dr. McCoy testified that the information she compiled for the Social History represented "a fairly powerful record" which described Ms. Pike as the "poster child" for Borderline Personality Disorder. (PC XXVI: 893-894.) She commented that while she had not intentionally geared her social history interviews and records collection toward supporting Dr. Engum's diagnosis of Borderline Personality Disorder, the material she found did mesh nicely with his diagnosis. (*Id.* at 892.) Prior to trial, Dr. McCoy provided a document to Mr. Talman titled "Mitigating Themes". The first item listed was "Borderline Personality Disorder" which illustrated several examples describing how the materials and information she had collected supported this diagnosis. (Apr. 2008 Ex. 6.)

**c. Dr. McCoy's dating relationship with the prosecutor had ended before she began her work on Ms. Pike's case.**

Assistant District Attorney William Crabtree confirmed that he had dated Dr. McCoy but testified that the relationship had ended before the Pike case. He stated that his first knowledge that Dr. McCoy was involved in the case came when he was told at the in-chambers meeting that she was going to testify. (PC XIX: 233-234.) Mr. Talman testified that he had known of the previous relationship for sometime prior to trial and that he trusted Dr. McCoy and liked the work she prepared. He stated "I never doubted Dr. McCoy's work. I never doubted Dr. McCoy's integrity. She assured me she had never talked to Mr. Crabtree about this case. I have no reason to doubt Mr. Crabtree's integrity." (PC XX: 355.) Dr. McCoy testified that the relationship had ended prior to her involvement in Ms. Pike's case but that, on the advice of Knoxville attorney Herbert Moncier, she advised Mr. Talman of the former relationship before

she began working on Ms. Pike's case. Mr. Moncier confirmed giving that advice to Dr. McCoy. (PC V: 60 n.20.)

**d. Dr. McCoy was prepared to explain how the negative material in Ms. Pike's social history was consistent with Dr. Engum's diagnosis.**

At the post-conviction hearing, she testified at length about both what she, as a psychologist, could have said about the criteria for a diagnosis of Borderline Personality Disorder, but also, the evidence from Ms. Pike's social history that supported that diagnosis. (PC Vol. XXIV at 688, 695-698, Vol. XXV at 765, 770, 773-774, 793, 795-796, Vol. XXVI at 809.) In summary, Dr. McCoy testified that her theory of the defense for the sentencing phase was that Ms. Pike suffered from Borderline Personality Disorder and that all of Ms. Pike's negative behavior was symptomatic of that mental illness. (PC XXIV: 677-78.) By scrubbing Dr. McCoy as a witness and providing all of the "negative" material to the State, Mr. Talman abandoned any possibility that he could explain the negative material he had provided to the State for use in cross-examining the only three defense witnesses who testified. He also abandoned any possibility of putting the negative information into the context of Ms. Pike's mental illness.

**3. Additional Mitigating Evidence**

At her post-conviction hearing, Ms. Pike presented three tiers of additional mitigation evidence that trial counsel failed to present: (1) the evidence that could have been presented through Dr. McCoy; (2) the evidence that was developed by Dr. McCoy that could have been presented through other witnesses she had identified (*see* Apr. 2008 Ex. 5 (Suggested Mitigation Witnesses)); and (3) evidence presented through a large number of witnesses including court appointed experts, professionals who had worked with Ms. Pike before her arrest on this case including teachers at Job Corps, and numerous lay witnesses including family members and

friends. To the extent this information is necessary to the decision regarding granting permission to appeal, Ms. Pike will rely on the facts contained in the CCA opinion.

### B. Facts Related to the Recusal of the Post-Conviction Court

The trial/post-conviction court was aware of the need for experienced, qualified, unconflicted counsel to represent Ms. Pike at trial. (Apr 07 Ex. 3 at 59) (Court acknowledges that Ms. Pike is charged with the "most serious offense ... and the most serious penalty she could face."); (T XXXI: 47-48 (court acknowledges that "[this was] obviously one of the most high profile cases that has hit the state of Tennessee ever.").[7] Ms. Pike's defense required counsel with the commitment and ability to present complex theories in defense, including the inability to form the requisite intent and mitigation phase proof of mental illness. (PC XX: 322-25.)

The trial court appointed Mr. Talman lead counsel on May 23, 1995 (PC XIX: 261-62), approximately *one month* after he had returned the $67,027 to the Indigent Defense Fund of the Administrative Office of the Courts (T I: 8; CR at 9). At the time of Mr. Talman's appointment as lead counsel, the trial court was well aware of his recent criminal conduct. All three criminal court judges in Knoxville were interviewed concerning the overbilling in either July or August 1994 or January 1995.[8] (PC XXXII: 113; CR: 15.) As the trial court admitted, "I knew; we all knew that Mr. Talman had his own problems." (PC XXXII: 114.)

---

[7] With regard to publicity, a large number of the prospective jurors reported that they remembered the media information on the case and that it was "gruesome." (*See, e.g.*, T IV: 90, 94 (Court notes only three out of the first 18 jurors had not heard something about the case and refers to case as having "been a publicized case and it is a obviously a very serious charge"); T V: 122-28 (prospective juror remembers three people involved, a piece of the skull, pentagram carved on chest, Ms. Pike is the one who committed crime); T XII: 881 (prospective juror remembers it was "brutal"); T XVI: 1270 (prospective juror remembers hearing murder was brutal).)

[8] Moreover, the overbilling scandal, as well as Mr. Talman's involvement, had been publicized in major Tennessee newspapers, including the Knoxville News Sentinel. (PC XIX: 255-58; (Apr 08 Ex. 1) (Knoxville News-Sentinel, Sunday, May 1, 1994, Sunday, May 8, 1994) (Talman specifically identified in two articles); (PC I: 67-69) (The Tennessean, June 7, 1995) (Talman specifically identified.)

The trial court was sufficiently concerned about problems created by Mr. Talman's theft from the indigent defense system to inquire about his status. Without further review or investigation, the court merely took his word that it had been worked out.

At the time of his appointment, Mr. Talman had never handled a death penalty case. (PC XIX: 255.) He was generally considered a mediocre lawyer among the Knox County defense bar. He was reliant on court appointments for his income and had never worked on a significant case. (PC XXVIII: 1009-10.) Mr. Talman's appointment was particularly perplexing in light of the renowned caliber of the Knoxville criminal defense bar. (*Id.* at 1003-08.)

**C. Facts Related to the Error of the CCA Regarding Juror Rutherford.**

During the initial phase of the voir dire in which the jurors were asked their views on the death penalty and about their knowledge of this case, Juror Rutherford indicated that he could consider all three possibilities for punishment should Ms. Pike be convicted of a death eligible offense. During this phase of the voir dire, the prosecutor asked each group of jurors whether there was anything about Ms. Pike as she sat there that would make them unable to consider all three possibilities of punishment. The prosecutor's questions specifically referenced her age and gender. Mr. Rutherford did not mention any disability in considering punishment.

After the completion of the *Witherspoon-Witt* and pretrial publicity qualification of the venire and immediately prior to the beginning of the general voir dire, prospective juror Mr. Rutherford, who had initially been determined to be death-qualified, told the Court that he was having difficulty with the idea of imposing the death penalty due to Ms. Pike's youth. (T XIX: 1510.) This exchange followed:

> **Court**: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I, I need you to tell me how you feel.
>
> **Mr. Rutherford**: I think it would make a big difference with her age whether or

> not, you know, she would get the death penalty or not.

(T XIX: 1510-11.) Mr. Rutherford then explained to the Court that he worked with "a lot of kids" and understood that due to their immaturity, they do impulsive things. (*Id.* at 1511.) The prosecutor then stated:

> **Mr. Crabtree**: . . . And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> **Mr. Rutherford**: I have problems just because of the death penalty.
>
> **Mr. Crabtree**: That's what we are talking about. I'm not talking about anything else now. I'm talking about the death penalty. Are you saying because of this individual's age you could not return a death penalty?
>
> **Mr. Rutherford**: I, I don't think I could.
>
> **Mr. Crabtree**: . . . So, let's see if we can make it clear – as far as her, the sole factor of her age, that would be something that you could not do?
>
> **Mr. Rutherford**: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem --
>
> **Mr. Crabtree**: – I understand you are saying that because of her age that one factor would keep you from returning the death penalty, is that correct?
>
> **Mr. Rutherford**: I think so.

(*Id.* at 1512-14.) At this point, Ms. Rice interjected:

> **Ms. Martin [Rice]**: Just one little clarification. Mr. Crabtree talked about that there is a possibility that age will be a mitigating factor, that the Judge may instruct you on that. And I just want to be clear. Are you saying that, are you saying that if there are aggravating factors and just this age mitigating factor you could not return a sentence of death?
>
> **Mr. Rutherford**: I don't think I could.

(*Id.* at 1514.) Thereafter, Mr. Talman conceded that Mr. Rutherford should be struck for cause, and the trial court excused Mr. Rutherford. (*Id.* at 1514-15.)

## REASONS SUPPORTING REVIEW BY THE SUPREME COURT

### Introduction

This Court has taken very seriously its duty to ensure the integrity of the justice system in Tennessee. *See In re Bell,* ___S.W.3d___, 2011 WL 2304191 (Tenn. 2011)(As a "direct creature of the Constitution [the Court] constitutes the supreme judicial tribunal of the state" and "has broad inherent authority of the Tennessee Judicial System.") The Court actively exercises its inherent power to protect the integrity of the justice system by setting rules and disciplining both the bench and the bar. *See, id.; Sneed v. Board of Professional Responsibility*, 301 S.W.3d 603, 618 (Tenn. 2010).

In *In re Cameron*, 151 S.W. 64, 76 (Tenn. 1912), the Court stated: "It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity." Similarly, in *Hughes v. Board of Professional Responsibility*, 259 S.W.3d 631, 646-651 (Tenn. 2008), this Court opined that "Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this rule requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct." *Id.* at 647. In reaching its conclusion that Mr. Hughes should not be reinstated to the bar, this Court cited the Preamble to the Code of Professional Responsibility which provides:

> The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual and the individual's capacity through reason for enlightened self-government. Law so grounded makes justice possible,



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 29 of 142 PageID #: 9476

> for only through such law does the dignity of the individual attain respect and protection. Without it, individual rights become subject to unrestrained power, respect for law is destroyed, and rational self-government is impossible.

*Id.* at 647n.12. This Court then reminded us that "Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this rule requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct."

*Id.* at 647.

The record of Ms. Pike's trial and post-conviction reflects errors, oversights, and incorrect application of the established law that undermine the integrity of the criminal justice system. Because the actions of trial counsel and the trial/post-conviction court dēmonstrate a systemic failure to protect Ms. Pike's rights to the assistance of counsel and a fair trial, this Court should grant permission to appeal and review this record.

**Additional Issues**

While the damage to the integrity of the system of justice stands out as the primary issue that compels this Court's involvement, Ms. Pike also raises additional issues in this application for permission to appeal. The court below used the wrong standard of review when determining whether trial counsel's representation denied Ms. Pike her right to the effective assistance of counsel. Also the court erred in determining whether error resulted from the trial court's striking a juror for cause who, though having no general belief or philosophy that would interfere with considering a death verdict, found the 39-13-204(j)(7), "the youth ... of the defendant" mitigating factor to be of ultimate importance.

Ms. Pike also raises an issue of first impression: whether, for the reasoning in *Van Tran, Atkins,* and *Roper*, Article I, section 16, of the Tennessee Constitution and the Eighth

Amendment to the United States Constitution require a categorical bar to the execution of a brain damaged, mentally ill, older adolescent.

Ms. Pike submits that the decisions of the courts below, if accepted as correct, demonstrate the *Catch 22* that she faced in this case. By using conflicting standards and analyses, the court below concludes that the evidence that counsel failed to present in mitigation was either irrelevant, a double edged sword or indistinguishable from that entered at trial. The court next finds that a categorical bar of the death penalty for a mentally ill and brain damaged older adolescent is unnecessary because the evidence supporting those findings, the very evidence it discounted in the ineffective assistance analysis, is standard mitigation evidence and therefore sufficient to protect the mentally damage older adolescent. Finally the court below concluded that any juror who would consider the status of the brain development of an older adolescent to be particularly valuable in deciding whether the death penalty was appropriate should be excluded for cause.

For the above stated reasons, as further developed below, this Court is compelled to grant permission to appeal and review Ms. Pike's case.[9]

**Applicable Standards of Review**

As this Court explained in *Fields v. State*, 40 S.W.3d 450, 456-457 (Tenn. 2001) the review on appeal in a post-conviction case is under Tenn. R. App. P. 13(d) which "requires a *de novo* review of a trial court's factual findings .... however, appellate courts are to accord those factual findings a presumption for correctness, which is overcome only when the preponderance of the evidence is contrary to the trial court's finding of fact." However, the "[r]eview of a trial court's application of the law to the facts of a particular case is de novo, with no presumption of correctness." *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The review of "mixed questions

of law and fact are subject to de novo review." *Id.* (citing *Harries v. State* 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997)). Because both deficient performance and prejudice are mixed questions of law and fact, review of claims of ineffective assistance of counsel are de novo. *Id.* (citing *Goad v. State*, 938 S.W.2d 363 (Tenn. 1996)).

Ms. Pike argues below that, in this instance, the fact findings of the post-conviction court should not be accorded the usual presumption of correctness. The post-conviction court suffered from a conflict in reviewing the actions of a lawyer that the court had appointed (1) with knowledge that the lawyer was working under a conflict and (2) yetfailed to take proper actions to protect Ms. Pike. The court's findings related to counsel's conflicts are tainted, not supported by the record, and demonstrate the court's subconscious bias.

## I. Ms. Pike Was Denied Her Right to the Effective Assistance of Unconflicted Counsel.

### A. The Court Below Misapplied Tennessee Precedent Concerning a Court's Responsibility to Protect an Individual From Representation by an Attorney Proceeding Under a Conflict of Interest. In Particular, the Court Ignored This Court's Decision in *Frazier v. State.*

#### 1. What Is the Proper Analysis Under *Frazierv. State*

Ms. Pike argued before the Court of Criminal Appeals ("CCA") that she was denied the right to unconflicted counsel at trial. When this Court released its opinion in *Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010), reaffirming Tennessee's commitment to protection of that right, Ms. Pike submitted supplemental briefing to the CCA, urging the court to analyze her claim under *Frazier*'s authority. In its opinion, the CCA responded, "[w]hile we do not dispute the Petitioner's interpretation of the *Frazier* holding, we find her reliance upon it misplaced." *Pike v. State*, 2011 WL 1544207, at *44 (Tenn. Crim. App. April 25, 2011). As discussed below,

[9] Ms. Pike does not waive any other issues presented to the Court of Criminal Appeals but, in the interest of brevity, will rely on those issues not directly raised herein being preserved for other review by Tenn. Sup. Ct. R. 39.

despite the CCA's statement to the contrary, the interpretations of *Frazier* presented by Ms. Pike and the CCA are quite different. Ms. Pike's reading of *Frazier* is truer to this Court's purpose of upholding procedural safeguards against conflicted representation. This Court should properly grant review of Ms. Pike's case to clarify what analysis is required under *Frazier* and to solidify the protections it endorsed in that holding.

**a. Ms. Pike's understanding of *Frazier***

Ms. Pike's interpretation of *Frazier* as presented to the CCA consists of three tenets with regard to the right to unconflicted counsel:

(1) Where a trial court is aware or should be aware of a potential attorney conflict of interest, the court has a duty to either seek waiver or appoint new counsel;

(2) A client's waiver of the right to unconflicted counsel is invalid unless obtained in compliance with the procedures employed in *Burns v. State*, 2001 WL 912817 (Tenn. Crim. App. Aug. 9, 2001); and

(3) A trial court's failure to either obtain a waiver in accordance with *Burns* or to appoint unconflicted counsel is structural error requiring reversal of any subsequent conviction and sentence.

**b. The CCA's understanding of *Frazier***

While the CCA expressed agreement with Ms. Pike's *Frazier* interpretation, its resolution of her claim belies a critical distinction: Ms. Pike and the CCA differ on what constitutes a "conflict" for purposes of triggering *Frazier*.

The distinction is apparent from the following. The CCA dismissed Ms. Pike's argument under *Frazier* finding, "[t]he premise in *Frazier* requires that trial counsel be operating under a conflict of interest. As expressed *infra*, that is not the case before us." *Pike v. State*, 2011 WL 1544207, at *44 (Tenn. Crim. App. April 25, 2011). In the section of the opinion directly addressing whether trial counsel was conflicted, the CCA relied upon a notion of "conflict" that incorporates "adverse affect." *Id.*, at *46 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980),

for the proposition that, "[i]n order to establish a violation of the Sixth Amendment, a [petitioner] who raises no objection at trial must demonstrate that an actual conflict of interest *adversely affected* his lawyer's performance." (emphasis added)). Crediting the post-conviction court's finding that "the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance," *id.*, at *47, the CCA found no conflict and subsequently declined to analyze Ms. Pike's claim under *Frazier*.

In this manner, the CCA's understanding of *Frazier* differs markedly from Ms. Pike's with regard to her first tenet, above. While Ms. Pike contends that a trial court's duty to seek waiver or to appoint new counsel is triggered whenever the trial court should be aware of a *potential* conflict of interest, the CCA finds no such duty unless the trial court should have been aware that an *actual conflict of interest adversely affected* trial counsel's performance. The CCA thus rejects Ms. Pike's interpretation that a potential conflict of interest is sufficient to trigger *Frazier*. In fact, the CCA suggested as much in a parenthetical following its reference to *Cuyler v. Sullivan*, citing with approval the "holding that the mere possibility of a conflict of interest is not enough. . . ." *Id.*, at *46.

**c. Ms. Pike's interpretation of *Frazier* is the corret one**

Ms. Pike's reading of *Frazier* is supported by the particular facts and disposition of that case, its plain language, and this Court's apparent purpose in reaching its decision.

The facts of *Frazier* were, briefly, as follows: Frazier filed a post-conviction petition that alleged ineffective assistance of counsel for, among other things, failure to file an application for permission to appeal with this Court. The post-conviction court granted the delayed permissive appeal and stayed the remaining post-conviction claims. Frazier then filed a permission to appeal with this Court, which was denied, and subsequently pursued his remaining claims in

post-conviction. After Frazier was denied post-conviction relief, he appealed and lost in the CCA.

> Afterward, the petitioner filed a pro se application for permission to appeal to this Court, arguing for the first time that the trial court had committed error by failing to sua sponte address a conflict of interest issue. The petitioner claimed that because [his post-conviction] attorney [] had represented him in the delayed appeal, [that attorney] should have been disqualified in the subsequent post-conviction proceeding and appeal.

*Frazier v. State*, 303 S.W.3d 674, 678 (Tenn. 2010).

What is significant about the facts of *Fraiser* is that, in his pro se permission to appeal to this Court, Frazier "contended that he should have been advised of the *potential* conflict of interest in advance of the evidentiary hearing and given the opportunity to either waive the issue or insist upon substitution of counsel." *Id.* (emphasis added). Indeed, at the stage of the post-conviction proceedings at which Frazier claimed he should have been advised by the post-conviction court, the conflict could only have been potential: Frazier claimed that his right – and the post-conviction court's corresponding duty – attached at the moment his delayed appeal counsel resumed his representation in post-conviction. At that stage, Frazier could not have shown any adverse affect because there had been no representation in his renewed post-conviction proceedings. In fact, Frazier never proved that his counsel failed to raise a colorable claim alleging ineffective assistance involving his handling of the application for permission to appeal. This Court agreed with Frazier and ordered the case remanded for determination of whether Frazier had waived his rights in accordance with *Burns*. As a result, the facts of *Frazier* and the remedy ordered by this Court indicate that the *Frazier* protections are triggered by a potential conflict of interest.

*Frazier*'s plain language suggests the same interpretation. In defining a conflict for purpose of triggering a court's duty of inquiry, the *Frazier* Court cited Tennessee Supreme Court Rule 8: "[a] lawyer shall not represent a client if the representation of that client *may be*

materially limited by . . . the lawyer's own interest." *Id.*, at 682 (citing Tenn. S. Ct. R. 8, RPC 1.7.) (emphasis added). That an attorney "may be" materially limited is the language of potential conflict. Clearly, an attorney "may be" materially limited by a personal interest at the outset of client representation, and yet, ultimately perform as though not limited at all.

Later in its opinion, the *Frazier* Court cited *McCullough v. State* for the proposition that a conflict is created whenever "[i]t is reasonable to *anticipate* that [counsel's] financial, business, and/or personal interests *may* affect his professional judgment," (emphasis added), or, alternatively, whenever "an attorney is placed in a position of divided loyalties." *Frazier*, 303 S.W.3d at 683 (citing *McCullough v. State*, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003)). This, too, suggests that *Frazier*'s provisions are triggered at the moment when loyalties are divided, such that future adverse affects may reasonably be anticipated – not, as the CCA would hold, at such future point when foreseeable adverse effects actually occur.

Finally, the "Conclusion" section of the *Frazier* opinion states directly that, "[w]hen a conflict of interest is *apparent*, the trial court has the duty to conduct an independent inquiry prior to the evidentiary hearing." *Id.*, at 684 (emphasis added). This concise statement of the holding makes manifest that a conflict *apparent* to the trial court is what triggers the *Frazier* protections – again, not the actual consequences which may follow later. Ultimately, nowhere does *Frazier* suggest the more stringent threshold requirement advanced by the CCA, that *Frazier* applies only where a trial court is aware of an actual conflict that has already adversely affected the client.

The third source of support for Ms. Pike's reading of *Frazier* comes from the obvious purpose of that decision. As discussed above with respect to the remedy in that case, this Court implemented a safeguard against a client's unknowing representation by a prospectively less-than-zealous advocate. The clear point would seem to be that a judge – constructively aware of a

potential issue – must notify the client and resolve the issue, either by overseeing an effective waiver or by assigning new counsel. In other words, *Frazier* reinforces that judges have a duty to warn under certain circumstances; the whole point of this duty would seem to be to forestall against adverse affects down the line.

By contrast, the CCA's interpretation would hold that a court is duty-bound only when it has constructive knowledge that a potential conflict has already actually impacted a client's representation negatively. Such a reading would render the *Frazier* decision meaningless. What purpose is served by a duty to warn that attaches only after the damage has already been done? Moreover, where an actual conflict adversely affects a lawyer's performance, the client's Sixth Amendment right is thereby violated. *Cuyler v. Sullivan,* 446 U.S. 335, 348-49 (1980). A criminal defendant is thus already entitled to relief under that circumstance, so the CCA's reading affords no additional protection *ex poste*. For these reasons, Ms. Pike believes that the CCA's understanding of *Frazier* is in clear conflict with the purpose of that decision, i.e., to give meaning to the idea that "courts have an independent duty to ensure that all proceedings are conducted within the ethical standards of the profession." *Frazier*, 303 S.W.3d at 683.

**2. Analysis of Ms. Pike's claim under the correct interpretation of *Frazier***

This Court has all the facts necessary to resolve Ms. Pike's *Frazier* claim on the merits. The facts demonstrate that Ms. Pike's trial counsel was operating under, at least, a very serious potential conflict of interest at the outset of the representation. The trial court was aware of this issue, but took remedial actions that fell short of those required by *Frazier*. Ms. Pike was never warned of the serious potential conflict her attorney faced, and was ultimately represented by conflicted counsel to deleterious affect. Accordingly, Ms. Pike's conviction and sentence must be vacated under Tennessee law.



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 37 of 142 PageID #: 9484

**a. Trial counsel was operating under a serious potential conflict**

It is undisputed that for a period of years in the early 1990's, Ms. Pike's lead counsel at trial, William Talman, overbilled the State Indigent Defense Fund for at least $67,000.[10] Mr. Talman's overbilling was discovered by the Tennessee Comptroller of the Treasury in the course of an investigation that exposed a pervasive, scandalous practice of which Mr. Talman was one of two leading offenders. The Comptroller's Report concluded on the basis of Mr. Talman's billing practices that his overbilling was a knowing, intentional fraud. (CR: 9.) As such, it was theft of property over $60,000, a Class B felony under Tennessee criminal law that carries a minimum sentencing range of 8 to 12 years. T.C.A. §§ 39-14-105, 40-13-112.

Upon learning of the investigation being conducted into the overbilling of the indigent defense fund through a press release in March 1994, Mr. Talman sought the advice of counsel. At his counsel's urging, Mr. Talman self-reported to the Tennessee Board of Professional Responsibility on March 30, 1994. (CR: 9-10.) As a result of Mr. Talman having retained counsel, the Comptroller's office was unable to interview him regarding the investigation. (*Id.*)

In April 1995, Mr. Talman returned $62,223 to the State through the Knox County District Attorney General. (CR: May 31, ltr to Gov. Sundquist, *et al.*; CR: 9.) The Administrative Office of the Courts had withheld an additional $4,804 for a total of $67,027 in restitution. (CR: 9.)

On May 23, 1995, the trial court appointed Mr. Talman lead counsel in Ms. Pike's case. At that time, Mr. Talman had received no assurance or documentation relieving him of criminal liability, and the statute of limitations for prosecution of his theft would remain open for several years. *See* T.C.A. §40-2-101 (Establishing 8 year statute of limitations for prosecution of Class B felony). Additionally, a decision as to professional sanctions remained outstanding on Mr.

[10] While the Comptroller's report concluded Mr. Talman overbilled $67,027, there is evidence to suggest, however, that Mr. Talman's overbilling was significantly in excess of that figure. The Report further notes the Talman billed the Indigent Defense Fund over $100,000 in 1993 alone and yet concluded that only $17,295 exceeded the criteria they had set out. (CR: 5, 14.)



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 38 of 142 PageID #: 9485

Talman's complaint with the Board of Professional Responsibility. As a result, the question of Mr. Talman's potential liability – both criminal and professional – was very much open at the time of his appointment to Ms. Pike's case.[11]

From the moment of his appointment, Mr. Talman faced a serious potential conflict of interest. An attorney facing prospective prosecution by the same office that is prosecuting his client is operating under a conflict of interest. *State v. Cottle*, 194 N.J. 449, 452 (2008); *People v. Edebohls*, 944 P.2d 552, 556 (Colo. Ct. App. 1997); *United States v. Levy*, 25 F.3d 146, 156 (2d. Cir. 1994); *United States v. Lowry*, 971 F.2d 55, 61 (7th Cir. 1992); *Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir. 1992); *Solina v. United States*,709 F.2d 160, 164 (2[d] Cir. 1983) *Rugiero v. United States*, 330 F. Supp. 2d 900 (E.D. Mich. 2004). This is because "[a] situation of this sort . . . may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer." *Thompkins,* 965 F.2d at 332; *accord Levy*, 25 F.3d at 156 ("[Counsel] may have believed he had an interest in tempering his defense of [defendant] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [defendant] would prompt the Government to pursue the case against [counsel] with greater vigor.").

Mr. Talman was also facing a serious potential conflict in light of the pending decision of the Board of Professional Responsibility. *See Disciplinary Counsel v. Holland,* 835 N.E.2d 361 (Ohio 2005) (attorney sanctioned for nearly identical conduct); *United States v. Greig,* 967 F.2d 1018, 1022 (5th Cir. 1992) (recognizing conflict where counsel was preoccupied with prospective loss of license). With a decision regarding his livelihood at stake, there was a real possibility that Mr. Talman would be motivated to defer to the trial court and prosecutor, lest

[11] It would remain open throughout Mr. Talman's representation of Petitioner at trial and on direct appeal.

Talman's complaint with the Board of Professional Responsibility. As a result, the question of Mr. Talman's potential liability – both criminal and professional – was very much open at the time of his appointment to Ms. Pike's case.[11]

From the moment of his appointment, Mr. Talman faced a serious potential conflict of interest. An attorney facing prospective prosecution by the same office that is prosecuting his client is operating under a conflict of interest. *State v. Cottle*, 194 N.J. 449, 452 (2008); *People v. Edebohls*, 944 P.2d 552, 556 (Colo. Ct. App. 1997); *United States v. Levy*, 25 F.3d 146, 156 (2d. Cir. 1994); *United States v. Lowry*, 971 F.2d 55, 61 (7th Cir. 1992); *Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir. 1992); *Solina v. United States*,709 F.2d 160, 164 (2[d] Cir. 1983) *Rugiero v. United States*, 330 F. Supp. 2d 900 (E.D. Mich. 2004). This is because "[a] situation of this sort . . . may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer." *Thompkins,* 965 F.2d at 332; *accord Levy*, 25 F.3d at 156 ("[Counsel] may have believed he had an interest in tempering his defense of [defendant] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [defendant] would prompt the Government to pursue the case against [counsel] with greater vigor.").

Mr. Talman was also facing a serious potential conflict in light of the pending decision of the Board of Professional Responsibility. *See Disciplinary Counsel v. Holland,* 835 N.E.2d 361 (Ohio 2005) (attorney sanctioned for nearly identical conduct); *United States v. Greig,* 967 F.2d 1018, 1022 (5th Cir. 1992) (recognizing conflict where counsel was preoccupied with prospective loss of license). With a decision regarding his livelihood at stake, there was a real possibility that Mr. Talman would be motivated to defer to the trial court and prosecutor, lest

[11] It would remain open throughout Mr. Talman's representation of Petitioner at trial and on direct appeal.

either express aggravation to the Board and make suspension or disbarment more probable. Deference of this kind is antithetical to the zealous representation required in capital defense.

Perhaps more generally, Mr. Talman was on very thin ice at the time of his appointment in Ms. Pike's case. He had been caught with his hand in the cookie jar, and the matter of his punishment was unresolved. Under these conditions, it would have been reasonable to anticipate that Mr. Talman might approach appointment to an indigent criminal defendant – a metaphorical return to the scene of the crime – with timidity, trepidation, and anxiety.[12] Ms. Pike was constitutionally entitled to fearless advocacy.

In sum, Ms. Pike argues that in considering whether Mr. Talman undertook representation of Ms. Pike under a serious potential conflict, this Court should be guided by an analysis recognizing the impact of this uncertainty:

> [Since counsel] was faced with an uncertain situation with respect to his own criminal liability, i.e., not knowing when, how, or if, the Government was going to prosecute him. . . .[counsel] went to trial with his freedom and livelihood in the balance. It is the existence of this undeniable uncertainty regarding [counsel's] own liberty and financial interests before and during Petitioner's trial and [counsel's] knowledge of this uncertainty that gives rise to the actual conflict in this case.

*Rugerio*, 330 F. Supp. 2d at 907.

**b. The trial court was aware of lead counsel's potential conflict**

It is undisputed that the trial court in Ms. Pike's case both should have known and had actual knowledge of the circumstances giving rise to Mr. Talman's potential conflict. As part of the investigation, the Comptroller's auditors had interviewed all of the criminal court judges in Knoxville. (CR: 15-16.) The Knoxville News Sentinel had named Mr. Talman as one of the two

[12] In addition, since Mr. Talman's primary income was from appointed cases and he had not taken appointed cases for several months due to the criminal investigation, he would have been compelled to ingratiate himself to the court to maintain this life blood of his livelihood.

most egregious perpetrators as early as May 1994. (Apr. 2008 Ex.1 (May 8, 1994 Knoxville News-Sentinal).)

As the trial court admitted during Ms. Pike's post-conviction evidentiary hearing, "I think it's pretty obvious that everyone in Knox County knew that Mr. Talman had problems with his billing," (PC Tr. Vol. XXXII at 113), and, "I knew; we all knew that Mr. Talman had his own problems" (TR PC Vol. XIX at 255). Additionally, the trial court noted that there remained, "[the] unresolved issue at the time of his appointment . . . related to his having self-reported to the Board of Professional Responsibility." (PC Tr. Vol. V at 646).

**c. The trial court fell short of its remedial duty under *Frazier***

Because the trial court was aware of the facts undergirding trial counsel's serious potential conflict, the court had a duty to inform Ms. Pike of the nature of the potential conflict and then either oversee a constitutional waiver or appoint Ms. Pike new counsel. The trial court did neither.

Instead, the trial court "inquired of Talman the status of the issue [of his overbilling] prior to his appointment." (PC Tr. V at 647). When, in response, "Talman assured the court [prior to Ms. Pike's trial] that the reimbursement had been paid in full" and that "he had informed [Ms. Pike] of the [overbilling] issue and that she actually liked him more because of it," (*id.* at 646), the trial court deemed the matter resolved and took no further action. This was insufficient as a matter of law.

The record below demonstrates that despite the trial court's knowledge of Mr. Talman's conflicts, it blatantly disregarded Ms. Pike's constitutional interests. In so doing, court erred in two ways.

First, the court's reliance on Mr. Talman's representations in finding no potential conflict was legal error. As the CCA held in *Smith v. State*, "[t]he statements of counsel are insufficient,

as a matter of law, to constitute a waiver of a potential conflict of interest." 1997 WL 658993, at *5 (Tenn. Crim. App. Oct. 23, 1997). This follows logically from the idea that the very problem in a potential conflict scenario is that the attorney may not be trusted to represent the client's best interests. As a result, Mr. Talman's representation that Ms. Pike "liked him more" because of the overbilling scandal[13] is a legal nullity, not, as the court found in its post-conviction order, a knowing and voluntary waiver of Ms. Pike's right to conflict-free counsel. (PC Tr. Vol. V at 646).

Second, the court acknowledged that it knew that Mr. Talman was facing serious potential sanctions, both legal and professional, and yet dismissed this as inconsequential. In doing so the court stated, "[Mr. Talman] too was presumed innocent until proven guilty. As it turned out he was never prosecuted . . . ." (PC Tr. Vol. XXXII at 113.) This demonstrates at least a subconscious bias by grossly understating a known problem. As discussed above, Mr. Talman was open to prosecution by the same office prosecuting Ms. Pike. This created a legally cognizable potential conflict. For purposes of this conflict, whether Mr. Talman was entitled to a presumption of innocence or whether he was ever prosecuted, is irrelevant.

What the trial court was required to do, as detailed in *Frazier*, was either to oversee a knowing and voluntary waiver from Ms. Pike, or disqualify Mr. Talman and appoint different counsel. *Frazier*, 303 S.W.3d at 684-85. *Frazier* delineated the long-held, requisite procedures for knowing and voluntary waiver of the right to conflict-free counsel in Tennessee. In order for a client to waive the right to unconflicted counsel, the client must:

> (1) be brought into open court; (2) be given a full explanation on the record how the potential conflict might affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the post-conviction court to determine his understanding of the matter and waiver; and (5) state under oath whether he desires to waive any appearance of impropriety.

---

[13] As a practical matter this appears likely to be a false statement from Talman and a post-hoc rationalization by the court. If Ms. Pike did infer this to Talman, one must remember that she was then a nineteen year old brain damaged mentally ill defendant facing a trial for her life.



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 43 of 142 PageID #: 9490

*Frazier*, 303 S.W.3d at 684 (quoting *Burns v. State*, 2001 WL 912817, at *6 (Tenn. Crim. App. Aug. 9, 2001)); *accord McCullough v. State*, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003); *Kirby v. State*, 1994 WL 525086, at *6 (Tenn. Crim. App. Sept. 28, 1994).

The trial court did not comply with these procedures, nor did it disqualify Mr. Talman. Indeed, the trial court took no measures to either inform or caution Ms. Pike regarding Mr. Talman's predicament as Ms. Pike approached the trial for her life.

**d. The trial court committed structural error requiring reversal and vacation of Ms. Pike's conviction and sentence**

Under Tennessee law, as reaffirmed in *Frazier*, "[w]hen . . . the trial court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken. *Otherwise, prejudice will be presumed*." *Frazier*, 303 S.W.3d at 683 (internal citations omitted) (emphasis added); *accord Glutch v. State*, 1992 WL 24056 (Tenn. Crim. App. Feb. 12, 1992). This language is corroborated by the remedy in *Frazier* itself. The *Frazier* Court remanded for determination of whether the Mr. Fraizer had waived his rights in accordance with *Burns*. *Id.* at 685. If not, the Court ordered, new counsel was to be appointed, the petitioner given leave to amend his petition, and any grounds for relief considered – in essence, the decision below was to be vacated. *Id.* In this manner, *Frazier* makes manifest that a trial court's failure to remedy a known potential conflict is structural error. In the opinion below, the CCA essentially conceded as much in noting that it did not dispute Ms. Pike's interpretation of *Frazier*. As a result, because the trial court in Ms. Pike's case did not remedy the potential conflict of which it was aware, Ms. Pike's capital trial was marked by structural error and her conviction and sentence must be set aside.

## II. This Court Should Consider Whether The Post-Conviction Court Was Required To Recuse Itself

Ms. Pike has maintained from the outset of her post-conviction proceedings that the trial court, Judge Leibowitz, was required to recuse itself from presiding over her post-conviction petition. This is for two reasons: (1) in light of the facts of the case and the nature of her post-conviction claims, there was a strong appearance of impropriety in the trial court ruling on Ms. Pike's petition; and (2) the trial court was a necessary witness to disputed facts underlying Ms. Pike's foremost claim on post-conviction.

Ms. Pike first argued these points in a motion to recuse, filed simultaneously with a subpoena to compel the trial court to testify in her post-conviction evidentiary hearing. The post-conviction court quashed the subpoena and denied the motion to recuse, but granted permission to appeal on this issue under Tenn. R. App. P. 9. (PC II: 206.) The CCA found the issue reviewable after final judgment and denied permission to appeal. (PC II: 208.) Ms. Pike then proceeded with her petition before Judge Leibowitz, who denied relief on her claims. Ms. Pike then raised the impropriety of the post-conviction court's failure to recuse on direct appeal to the CCA, arguing abuse of discretion. The CCA denied her relief on this claim in two sentences:

> The post-conviction court's comment [concerning Ms. Pike's motion to recuse] in no way leads us to conclude that it was harboring under a veil of impartiality with regard to the decision. Nor are we convinced that the court's mere presence at the meeting [which, according to Ms. Pike, rendered the court a necessary witness on post-conviction] is a sufficient reason to force the court's disqualification.

*Pike v. State*, 2011 WL 1544207, at *44 (Tenn. Crim. App. April 25, 2011).

The CCA abandoned its duty to secure Ms. Pike's right to a full and fair hearing on post-conviction. In its review of Ms. Pike's claim regarding the propriety of recusal, the CCA neglected to consider whether the trial court's failure to recuse created an appearance of impropriety, ruling only on the question of whether she had proven that the trial court was

actually biased.[14] This was a misapplication of the law. The CCA also applied the wrong standard in considering whether the trial court was a necessary witness to Ms. Pike's post-conviction hearing.

The CCA's application of improper legal standards compounded the error of the post-conviction court's failure to recuse, further depriving Ms. Pike of the right to fair adjudication of her post-conviction claims. But Ms. Pike's recusal claim concerns more than her individual case. Tennessee law recognizes that:

> Questions regarding a judge's impartiality not only concern the litigants and their lawyers in a particular case[;] they also involve the integrity of the judicial system in the eyes of the public. Justice Neil has noted:
>
>> It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future of our institutions in their integrity.

*Martindale v. Pillow*, 1987 WL 11325, at *16 (Tenn. Crim. App. May 27, 1987) (Koch, J. dissenting) (quoting *In re Cameron*, 126 Tenn. 614, 658-59 (1912). Ms. Pike's claim that she was entitled to a different judge on post-conviction thus goes to the public's confidence in the fairness of our judicial system, and for that reason as well, this Court should grant Ms. Pike permission to appeal on this issue.

**A. The CCA failed to consider whether the post-conviction court's refusal to recuse created an appearance of impropriety.**

In its order denying relief, the CCA found that the post-conviction court was not required to recuse itself because it found no evidence to suggest that the post-conviction court "was harboring under a veil of impartiality." *Pike*, 2011 WL 1544207, at *44. The CCA thus denied relief on the grounds that the record did not support the contention that the post-conviction court

[14] As shown below, the Court of Criminal Appeals also erred on the conclusion that there was no actual bias.



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 46 of 142 PageID #: 9493

was actually biased. What the CCA failed to consider, however, was whether there was at least an appearance of impropriety in the post-conviction court's failure to recuse. This was legal error.

A proper exercise of judicial discretion in considering a motion for recusal turns on "what a reasonable, disinterested person knowing all the relevant facts would think about the judge's impartiality." *Wright v. Plate*, 117 S.W.3d 774, 779 (Tenn. Ct. App. 2002) (citing *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). The test is thus not – as the CCA held – merely whether the judge is actually impartial, but also whether an ordinary person with full knowledge of the facts would be likely to find even an appearance of impartiality. *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) ("[A] trial judge must consider a motion to recuse objectively as well as subjectively."); *Bd. Of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538, 548 (Tenn. 2004). This is because "the appearance of bias is as injurious to the judicial system as actual bias." *Id.* (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)); *accord Leighton v. Henderson*, 414 S.W.2s 419 (Tenn. 1967); *In re. Cameron* 126 Tenn. 614 (1912).

There can be no doubt that an ordinary, prudent person with full knowledge of the facts would find an appearance of impartiality in the present case. In the years preceding Ms. Pike's trial, the trial court, Judge Leibowitz, was an unwitting accomplice in William Talman's fraudulent overbilling. The Comptroller's Report criticized the judges for failing to properly monitor and review the fee claims. (CR: Highlights.) An ordinary, prudent person would be reasonable in concluding that Mr. Talman's theft was thus an embarrassment to Judge Leibowitz – it occurred, in part, on her watch, and but for failures of diligence, she might have thwarted Mr. Talman's scheme.

After the overbilling scandal was discovered and widely publicized, the trial court appointed Mr. Talman to represent Ms. Pike. Ms. Pike's case was a high profile capital murder trial, and Mr. Talman was still threatened with professional and penal sanctions for the recently uncovered theft. Nonetheless, though the trial court knew of trial counsel's serious potential conflict, it permitted Mr. Talman to represent Ms. Pike in contravention of *Frazier v. State*.

These are the facts that preceded the trial court's presiding over Ms. Pike's post-conviction petition. On post-conviction, Ms. Pike raised, among others, the following claims: (1) that trial counsel was operating under a conflict of interest, and (2) that the trial court failed to remedy the conflict pretrial in accordance with the requirements of *Frazier*. An ordinary, prudent person would be reasonable to believe that, under the given circumstances, the post-conviction court would have a strong incentive to deny the existence of even a potential conflict of interest. Minimizing Mr. Talman's theft from the indigent defense fund – not to mention the effects of that theft for his representation going forward – would serve the post-conviction court the double purpose of (1) lessening its culpability for the initial theft itself, and (2) absolving the court of any wrongdoing under *Frazier*.

Furthermore, an ordinary, prudent observer might reasonably conclude that the post-conviction court's findings with respect to Ms. Pike's conflict claims in fact substantiate the appearance of judicial bias. The post-conviction court ultimately found that Mr. Talman was not conflicted by crediting his testimony regarding (1) the overbilling scandal, (2) his decision for shelving the testimony of Dr. McCoy, and (3) his reasons for turning Dr. McCoy's mitigation materials over to the State. The post-conviction court made these findings of fact in the face of credible testimony to the contrary from Dr. McCoy, Herb Moncier, Greg Isaacs, and even Assistant District Attorney Crabtree, as well as supporting documentary evidence. (PC XXVII: 1000, 1002; PC XXX: 8; CCA Op. at *31; PC Ex. Apr. 2008: 5, 6.) Notably, the post-conviction



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 48 of 142 PageID #: 9495

court provided no reason for discrediting the testimony of these four witnesses; instead, the post-conviction court simply ignored all testimony insofar as it contradicted that of Mr. Talman. In this manner, the post-conviction court's order denying relief contributed to the appearance of impartiality that, from an objective perspective, would reasonably have attached to the court pre-hearing.

For these reasons, this Court should grant permission to appeal on the issue of whether the post-conviction court abused its discretion in failing to recuse itself. Ms. Pike is entitled to an impartial hearing on her post-conviction petition, and the appearance that she has been denied such is an affront to the integrity of the justice system. Because the CCA deserted its responsibility to review the post-conviction court's decision under the appropriate legal standards, it is now this Court's duty to insure that Ms. Pike's rights and the public's confidence are properly upheld.

**B. The CCA failed to consider that the trial court was a necessary witness to Ms. Pike's post-conviction evidentiary hearing.**

As referenced in the first section of this Permission to Appeal, Ms. Pike raises post-conviction claims concerning her trial attorney's conflict of interest. Specifically, she alleges (1) that the trial court was aware of a potential conflict and failed to take the necessary remedial measures required under *Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010); and (2) that trial counsel's conflict of interest adversely affected his representation of Ms. Pike in violation of her rights under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The trial court was a necessary witness to both of these claims, and indeed, did ultimately "testify" on both issues.

With regard to the first claim, that the trial court committed structural error under *Frazier*, Ms. Pike was required to submit proof that the trial court knew or should have known of trial counsel William Talman's potential conflict. *Frazier*, 303 S.W.3d at 683 ("When, therefore, the trial court is aware or should be aware of a conflict of interest, there must be an

inquiry as to its nature and appropriate measures taken."). Indeed, though the post-conviction court quashed its own subpoena, it nonetheless provided critical testimony on this issue in the course of ruling on Ms. Pike's motion to recuse, stating, "[i]n this case I think it's pretty obvious that everyone in Knox County knew that [lead counsel] had problems with his billing. . . As it turned out he was never prosecuted in this case." (PC XXXII: 113.) In its Order denying post-conviction relief, the Court further recalled "having inquired of [lead counsel] Talman the status of the issue [of his overbilling] prior to his appointment." (PC V: 647.)

Ms. Pike's second claim, that trial counsel's conflict adversely affected his representation of her, similarly required the testimony of the trial court. Ms. Pike's claim of adverse affect centers on the disputed facts of an off-record, *in camera* hearing in the trial court's chambers.

In brief, Ms. Pike's version of the facts of the *in camera* meeting is as follows: immediately following the jury verdict of guilt in the first phase of trial, the court held an *in camera* meeting that was unrecorded. In that meeting, trial counsel announced that Dr. Diana McCoy would be testifying for the defense in the penalty phase. Assistant District Attorney William Crabtree was outraged; the defense was planning to put on an expert for whom no report had been submitted, and the penalty phase was already set to proceed. To spare himself any blame, trial counsel responded that he had only just received Dr. McCoy's report himself. This was a clear lie. Mr. Talman had specifically instructed Dr. McCoy to delay in submitting her report, but in any event, she had provided it to Mr. Talman several days before the time he represented to the court and prosecutor. To further alleviate Mr. Crabtree's ire, Mr. Talman then turned over to the State not only Dr. McCoy's report, but also three volumes of protected notes and privileged work product. Immediately following the *in camera* meeting, Mr. Talman called Dr. McCoy in a panic, telling her he had lied to the court and prosecutor and would need her to corroborate that lie in her testimony to protect him. When Dr. McCoy refused to perjure herself,

Mr. Talman made the abrupt decision not to call her, though she was the lone mitigation witness set to testify at that time. Ms. Pike contends that Mr. Talman effectively forfeited her mitigation case because of a personal conflict of interest. (CCA Op. at *37, 46.)

The facts of the *in camera* meeting were thus essential to determining Ms. Pike's claim of attorney conflict of interest. Because the *in camera* meeting was unrecorded, and because the trial court was one of only three witnesses to that meeting, it was imperative that Ms. Pike be given the opportunity to examine the trial court on its recollection of the facts in dispute. As it turned out, Ms. Pike was denied that opportunity, but as noted above, the court nonetheless expressed its recollection for the record as follows:

> I have no independent memory [of the unrecorded in camera meeting] other than that there was three volumes. I remember that there were volumes – and I'm not trying to testify; I'm just trying to – trying to make a ruling here—of mitigation materials. Those were turned over to the State as required after the verdict.
>
> The State had no – not enough time. And then – and I can't imagine why – why there would even be an issue about when Mr. Talman received those materials because they didn't go to the State anyway at that point. And maybe the State was arguing that they were entitled and I ordered them turned over.
>
> . . . .
>
> Again, for the purposes of your Motion for a Subpoena, a judge speaks through their rulings. So you can take those rulings and say, "Okay. These are the grounds for post-conviction petition." But you can't subpoena me to ask me what I thought or what I think or what I remember. I've told you as much as I can in order to make this case go forward.
>
> I remember that evening. I remember that verdict coming in. I remember us having a discussion, and I remember us discussing whether – when the State got its materials. And everything is spoken for through the transcript, I think. And if there isn't – and if there's anything else we're going to get it out of those transcripts that we have.

(PC XXXII: 118-119.)

Canon 3C of the Tennessee Code of Judicial Conduct requires that, "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including . . . instances where the judge has . . . personal knowledge of disputed

evidentiary facts concerning the proceeding . . . ." Tenn. Sup. Ct. R. 10 Canon 3(E)(1)(a). This is because, "a judge's continued role as presiding over a proceeding in which he or she is or is likely to become a witness is a course fraught with peril and should be avoided whenever possible." *Henderson v. State*, 2005 WL 1541855, at *28 (Tenn. Crim. App. June 28, 2005). As this Court held in *Vaughn v. Shelby Williams of Tennessee, Inc.*:

> Rule 605 of the Tennessee Rules of Evidence clearly prohibits a judge presiding over a trial from serving as a witness, and for good reason. Perhaps the most obvious one is that the system of justice does not appear to be impartial if the judge charged with the duty of adjudicating the litigation also acts as a source of evidence. Additionally, when the trial judge becomes a source of information, the parties may not be willing to cross-examine vigorously the judge whose goodwill is perceived to be important to the outcome of the case. Worse yet, the parties may not even get the opportunity to cross examine the judge to begin with.

813 S.W.2d 132, 133 (Tenn. 1991).

In Ms. Pike's case, the very problems foretold in *Vaughn* were realized. Ms. Pike was deprived of the opportunity to cross examine the trial court on its recollection of both the circumstances of lead counsel's potential conflict pretrial, and the events of the *in camera* meeting. This was unconstitutional in violation of Ms. Pike's rights to due process and the confrontation of witnesses. *See Davis v. State*, 598 S.W.2d 582, 585 (Mo. Ct. App. 1980); *Tyler v. Swenson*, 427 F.2d 412, 415 (8th Cir. 1970); *United States v. Halley*, 240 F.2d 418 (2 Cir. 1957); *Terrell v. United States*, 6 F.2d 498 (4 Cir. 1925); *Maitland v. Zanga*, 14 Wash. 92 (1896).

For these reasons, Ms. Pike argued to the CCA that the trial court's failure to recuse itself was an abuse of discretion. In denying her claim on this point, the CCA stated only that it was "[not] convinced that the court's mere presence at the meeting is a sufficient reason to force the court's disqualification." *Pike*, 2011 WL 1544207, at *44. Absent from the CCA's decision is any analysis of the trial court's discretion in light of the rules that a trial court is not to testify in a matter of which it presides, and that a litigant is entitled to cross-examine adverse witnesses. In

effect, the CCA summarily dismissed Ms. Pike's arguments with no reference to applicable standards in clear violation of its appellate duty. This Court should grant permission to appeal on this issue to uphold the appropriate standards and preserve Ms. Pike's right to a full and fair hearing on her post-conviction petition.

## III. The Court of Criminal Appeals Applied the Wrong Standard of Review in its Consideration of Ms. Pike's Claims Regarding Penalty Phase Ineffectiveness.

The crux of Ms. Pike's claims of ineffectiveness by trial counsel is the following undisputed fact: with literally a matter of hours before the start of the penalty phase, trial counsel scrapped his only sentencing phase witness. This witness, Dr. Diana McCoy, was prepared to testify in depth regarding Ms. Pike's history of abuse and neglect, her early and continued exposure to extreme violence and gore, her untreated mental illness, and myriad other mitigating features of Ms. Pike's social history. In a last ditch effort to present *something* at sentencing, trial counsel called instead the three members of Ms. Pike's family who happened to be present in the courtroom. This decision by trial counsel resulted in a failure to present approximately 90% of the mitigation proof of which counsel was aware. An avoidable unconstitutional verdict of death was the consequence of this error made by conflicted counsel to cover a lie.

Trial counsel's decision to withhold the bulk of Ms. Pike's mitigation proof was constitutionally ineffective under either of two theories: (1) the decision was motivated by trial counsel's personal interest and so constitutes proof of an actual conflict of interest in violation of *Cuyler v. Sullivan*, 446 U.S. 335 (1980); or (2) in the alternative, the decision was deficient performance that prejudiced Ms. Pike in violation of *Strickland v. Washington*, 446 U.S. 668 (1984).

The post-conviction court denied relief under both theories, and Ms. Pike appealed. The CCA, in turn, upheld the findings of the post-conviction court and denied relief. What is critical


Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 53 of 142
PageID #: 9500

for present purposes is that the CCA applied the wrong standard of review in its treatment of Ms. Pike's *Strickland* claim. For that reason, this Court should grant Ms. Pike permission to appeal on the question of whether trial counsel was ineffective for failing to present available mitigation.

**A. The appropriate standard of review in this instance was *de novo* with respect to the post-conviction court's conclusions of law.**

In *Fields v. State*, this Court clarified the rules for appellate review of claims of ineffective assistance of counsel:

> [A] trial court's conclusion as to whether a Petitioner has been denied the effective assistance of counsel is an issue that presents a mixed question of law and fact on appeal. . . . [T]his issue is one that is reviewed under a *de novo* standard of review, consistent with the standards set forth in the Rules of Appellate Procedure. As such, a trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. However, a trial court's *conclusions of law* – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a purely *de novo* standard, with no presumption of correctness given to the trial court's conclusions.

40 S.W.3d 450, 458 (Tenn. 2001).

Tennessee thus requires appellate courts to undertake two distinct analyses in their review of claims of attorney ineffectiveness: (1) deferential review of the facts underlying the claim using a preponderance of the evidence standard; and (2) *de novo* review of the application of ineffectiveness law to the applicable facts, with no deference to the findings below.

**B. The Court of Criminal Appeals neglected to conduct *de novo* review of the post-conviction court's conclusions of law.**

Under the law of *Fields*, the CCA was required to conduct *de novo* review of two legal questions: whether trial counsel's last minute decision to pull the testimony of Dr. McCoy was (a) deficient, and (b) whether the decision was prejudicial. Ultimately, the CCA conducted no

independent analysis of these questions, deferring instead to the legal conclusions of the post-conviction court below.

With regard to the first legal question, whether trial counsel's performance was deficient, the issue is whether the decision not to present the testimony of Dr. McCoy was a reasonable strategic one. The CCA's opinion recognized the centrality of this question and faithfully set out both Mr. Talman's stated reasons and Ms. Pike's counterarguments. In reaching a decision on this question, however, the CCA simply cited the factual findings of the post-conviction court below before concluding, "[t]he Petitioner has failed to carry her burden for relief." *Pike*, 2011 WL 1544207, at *52.

The problem with the CCA's analysis in this regard is that whether or not Mr. Talman's proffered reasons were reasonable strategy is ultimately a legal question. This point was clarified by the United States Supreme Court's recent decision in *Wood v. Allen*, 130 S.Ct. 841 (2010). In *Wood*, the Court made clear that whether counsel made a reasonable strategic decision is, in fact, two distinct questions. The first, threshold question is whether counsel made a strategic decision, as opposed to one based on "happenstance, inattention, or neglect." *Id.* at 850 n.3 (internal citation omitted). The second question is whether – assuming counsel's decision was strategic in the first place – that strategic decision was also *reasonable*. *Id.* at 850 n.3, 851. The distinction is critical because the first question is one of pure fact, but the second is one of law. *Id.* at 851. Accordingly, an appellate court in Tennessee must review *de novo*, with no presumption of correctness, a post-conviction court's determination that the proffered strategic decisions of counsel were reasonable as a matter of law. *See also Fields*, 40 S.W.3d at 458.

What this means in the present case is that the CCA was required to analyze Mr. Talman's stated reasons for declining to present Dr. McCoy's testimony. Mr. Talman testified

on post-conviction to a jumble of partial explanations and 'gut feelings' that, when parsed out and taken at their word, make no sense.[15] None of Mr. Talman's proffered reasons for pulling the testimony of Dr. McCoy is capable of withstanding even superficial scrutiny. To the contrary, each reason runs contrary to either the established record evidence or ordinary commonsense. In conducting *de novo* review, the CCA should have examined Ms. Pike's arguments to determine whether Mr. Talman's proffered strategy was, in fact, reasonable. Any such analysis or conclusion, however, is wholly absent from the CCA's opinion.

Similarly, the CCA failed to conduct the requisite analysis of the second legal question presented by Ms. Pike's ineffective claim – whether the failure to present Dr. McCoy's testimony was prejudicial. In its treatment of this question, the CCA did cite the appropriate legal standard, *Goad v. State*, 938 S.W.2d 363 (Tenn. 1996). *Goad* provides the framework for determination of prejudice in cases of failure to present mitigation evidence. However, after stating the conclusions of the post-conviction court below, the CCA abruptly concluded, "[f]ollowing review of the record, we cannot conclude that the Ms. Pike has put forth sufficient evidence to preponderate against the trial court's findings. The court made clear its findings on the record after applying the appropriate analysis, and we agree with the post-conviction court." *Pike*, 2011 WL 1544207, at *52. The CCA then later added, "[b]ased upon the clear finding by the trial court that the mitigation evidence which was omitted would not have outweighed the aggravating factors, Ms. Pike is essentially precluded from establishing prejudice." *Id.*

The CCA applied the wrong standard of review. Whether or not the evidence in the record preponderates against the findings of the post-conviction court is relevant only to

[15] It is Ms. Pike's position that Mr. Talman's testimony on the reasons for not presenting Dr. McCoy's testimony represents little more than a string of post-hoc rationalizations designed to cover for the true explanation – Mr. Talman's personal conflict of interest. In the face of stark evidence to the contrary, however, the trial court answered the first factual question under *Wood* by finding that Mr. Talman's stated reasons were indeed strategic, not manufactured. Petitioner disputes this finding and argues elsewhere in this Permission to Appeal that the post-

questions of *fact*. The question of prejudice is one of application of law to fact, and so requires *de novo* legal review. This means that the CCA was required to undertake its own analysis under *Goad*, not simply to rely on the post-conviction court's, as the above excerpts make clear that it did.

For these reasons, this Court should grant permission to appeal on the issue of whether or not trial counsel was ineffective for failing to present the testimony of Dr. McCoy. Ms. Pike has been denied the *de novo* appellate review of legal conclusions to which she is entitled on that issue.

## IV. This Court should determine that it is unconstitutional under Tennessee law to execute the severally mentally ill, persons with organic brain damage, older adolescents, or a person such as Ms. Pike, who was all of the above at the time of the offense.

The record in this case is uncontroverted that, at the time of the offense, Ms. Pike was very seriously cognitively impaired. She has damage in her frontal lobe that is visible to the naked eye on a photo from an MRI. (CCA Op. at *15) She suffers from Bipolar disorder. (*Id.* at *16, *39.) At the time of the offense, she was 18 years old, but because of a history of childhood abuse and neglect, her cognitive development was well behind that of a normal 18 year old.[16] These are characteristics that rendered Ms. Pike incapable of the sort of behavioral control that is required for a determination of full moral culpability. Both this Court and the United States Supreme Court have recognized as much in a number of decisions exempting particular classes from capital punishment.

Nonetheless, the CCA below found that:

---

conviction court had a vested interest in finding Mr. Talman credible and unconflicted, and that for this reason, the post-conviction court's factual findings were not entitled to deference on appeal.

[16] Throughout his testimony, Dr. Kenner, who was originally appointed as the court's expert, explained the way in which Ms. Pike's Bipolar illness, her frontal lobe damage and damage from her traumatic childhood, including neglect, overstimulation, abuse, rapes, etc., resulted in depressing the development of vital parts of her brain including the amygdala which controls the fight or flight reaction. (*See* PC Vols. XXIX and XXX.) This information was extensive and was omitted from the facts set out in the CCA opinion.

> While this court appreciates the unique circumstances of this Petitioner, this court declines to create a categorical bar to execution for persons exhibiting these specific traits. . . . These particular circumstances were not what was envisioned as being encompassed within a categorical bar. Rather, this specific grouping of traits is captured within the individualized sentencing mandate of the capital sentencing scheme. This is the purpose of the weighing of the mitigating and aggravating circumstances by the jury and the proportionality review by the courts of this state.

CCA Op. at *68. In short, the CCA held that Ms. Pike's only recourse was to convince the jurors and judges on the facts of her individual case.

Given that Ms. Pike's unique circumstances were unknown to both jurors and judges throughout her trial and direct appeal, the CCA's holding on this claim rings rather hollow. More to the point, however, the CCA's holding is directly at odds with the principles underlying this Court and the United States Supreme Court's decisions in categorical bar cases. Specifically, this Court and the United States Supreme Court have held that a categorical bar is necessary for classes of persons whose defining characteristics make them less capable of full moral culpability while simultaneously making them less likely to avoid death on the individual facts of their cases. In other words, there are classes of persons for whom the system is likely to fail.

It is already both Tennessee and federal law that the mentally retarded and persons under the age of 18 at the time of the offense are among such classes. Ms. Pike argues – and the CCA did not dispute – that the principles underlying those legal exemptions apply with equal force to older adolescents, persons with organic brain damage, the severely cognitively impaired, and certainly to individuals like Ms. Pike, who manifest all of the above. It is for this reason that this Court must expand the classes of persons categorically exempted from the death penalty to ensure that Tennessee does not execute Ms. Pike in violation of the criminal system's core value – the prohibition against cruel and unusual punishment.



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 58 of 142
PageID #: 9505

A. **This Court is uniquely disposed to protect particularly vulnerable classes of persons against imposition of the death penalty.**

This Court has a distinguished history of sensitivity to the problems facing the cognitively impaired in the capital context. In *Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001), this Court anticipated the decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), creating a categorical bar to execution of the intellectually disabled a year before the United States Supreme Court followed suit. Recently, in *Coleman v. State*, __S.W.3d__, 2011 WL 1346932 (Tenn. 2011), this Court held that a bright line rule requiring an I.Q. score of 70 or below was an overly restrictive burden of proof for the prospective *Van Tran/Atkins* exempt population, opting instead for a more flexible standard to be established through testing, established literature, and expert testimony. 2011 WL 1346932 (Tenn. April 11, 2011). In *Coleman*, this Court again expanded humanitarian protections against execution in advance of federal law.

This Court should apply the same humanitarian sensibility and moral courage in addressing Ms. Pike's claim that her execution must be categorically exempted. That Ms. Pike presents an issue of first impression is no moment. *Van Tran*, 66 S.W.3d at 800 n.12 ("[O]ne of the fundamental roles of this Court is often to confront and determine issues of first impression."). That federal law does not yet offer the parallel protections is similarly no impediment. *Id.* at 801 ("[I]t is axiomatic that this Court may extend greater protection under the Tennessee Constitution than is provided by the United States Supreme Court's interpretations of the federal Constitution."). Accordingly, this Court should examine Ms. Pike's claims in light of the spirit and principles of its decisions in *Van Tran* and *Coleman*, as well as the United States Supreme Court's decisions in *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005).

B. **The principles underlying existing law must be extended to provide categorical exemption to the death penalty for other groups of cognitively impaired individuals.**

The Eighth and Fourteenth Amendments to the United States Constitution and Article I § 16 of the Tennessee Constitution forbid "cruel and unusual punishment." In the context of capital punishment, one corollary of the prohibition against cruel and unusual punishment is that execution must be reserved for "the worst of the worst." *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Souter, J., dissenting) (citing *Roper v. Simmons*, 543 U.S. at 568 (2005)); *accord Furman v. Georgia*, 408 U.S. 238, 294-95 (1972) (Brennan, J., concurring).

The notion of who may be considered "the worst of the worst" was given a doctrinal foundation in *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), where the Supreme Court held that a capital punishment statute was non-arbitrary in its identification of who deserves execution so long as it: (1) reflected contemporary public values, as evidenced by objective indicia; (2) satisfied the proportionality requirement that the punishment fit the crime; and (3) entailed no unnecessary inflection of pain. Since the decision in *Gregg*, this three-factor analysis has been used to determine whether particular groups may be considered "the worst of the worst," or whether instead they merit categorical exception from capital statutes as applied. *See Coker v. Georgia*, 433 U.S. 584 (1977) (death penalty for defendant convicted of rape of adult woman unconstitutional); *Enmund v. Florida*, 458 U.S. 782 (1982) (death penalty for defendant convicted of felony murder unconstitutional where defendant did not kill, attempt to kill, or intend death or use of force); *Ford v. Wainwright*, 477 U.S. 399 (1986) (death penalty for insane at time of execution unconstitutional); *Thompson v. Oklahoma*, 487 U.S. 815 (1988), *overruled by Roper*, 543 U.S. 551 (death penalty for defendant under 18 at the time of offense unconstitutional); *Penry v. Lynaugh*, 492 U.S. 302 (1989), *overruled by Atkins*, 536 U.S. 304 (execution of intellectually impaired unconstitutional); *see also Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001) (preceding *Atkins* holding by one year).

In tandem with the expanding use of the *Gregg* analysis, the Tennessee and United States Supreme Courts have arrived at a more precise understanding of each of the three *Gregg* factors. Under the first factor, which calls for an assessment of public values, the courts look to legislation, polls, juror surveys, jury verdicts, positions taken by professional and advocacy organizations, and any other objective data to determine whether public sentiment disfavors execution of the group in question. *See Atkins*, 536 U.S. at 313-17; *Van Tran*, 66 S.W. 3d at 801-04. The second factor – proportionality analysis – entails judicial scrutiny of the prevailing scientific and social science literature with an eye towards evidence that the group in question may be physiologically incapable of full culpability. *See Roper*, 543 U.S. at 569-71. Third, and finally, in determining whether execution would result in the unnecessary infliction of pain or suffering, the courts ask whether execution of group members is likely to further either of the purposes of capital punishment in retribution and deterrence. *See id.*, at 571-72. Under this rubric, the Supreme Court has excluded adolescents under the age of 18 and the mentally retarded from the class of individuals who may be executed.

In arriving at the decision that certain groups must be categorically barred from capital punishment, the Tennessee and United States Supreme Courts explicitly found insufficient the prospect of group members defending against execution on a case by case basis. This was for the reason that existing means of fighting a death sentence – an insanity defense, or presentation of sentencing phase mitigation – provided insufficient protection. In *Van Tran*, the Tennessee Supreme Court held:

> [T]he jury's consideration of mental retardation as a mitigating factor is by itself insufficient to address the concerns protected under the Eighth Amendment or article I, § 16. In such circumstances, evidence of mental retardation would only be weighed in conjunction with one or more aggravating circumstances, such as the heinousness of the crime or a defendant's prior record. In our opinion, the weighing process would not sufficiently isolate the consideration given to the issue of mental retardation and would not provide reasonable assurance that an individualized decision will be made as to whether the death penalty was

> appropriate punishment for a particular mentally retarded offender . . . In sum, the limitations and impairments associated with mental retardation warrant more consideration than simply allowing the evidence to be weighed in the mix of aggravating and mitigating circumstances.

*Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001). The *Van Tran* opinion went on to find that the existence of an insanity defense was also an insufficient prophylactic, not only because it is rarely used and more rarely successful, but more fundamentally because it misses the point. *Id.* The question for purposes of the Eighth Amendment and Article I, § 16 is not whether legal guilt exists, but whether culpability is present to the degree required for a sentence of death. *Id.*

In *Atkins,* the Supreme Court provided additional reasons to distrust penalty phase mitigation with insulation of the mentally retarded:

> The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. . . . [M]oreover, reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury.

*Atkins*, 536 U.S. at 320-21 (internal quotation marks and citations omitted).

In *Roper*, the Supreme Court elaborated on the shortcomings of mitigation evidence in particular circumstances:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime could overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective maturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

*Roper*, 543 U.S. at 572-73.

From these decisions, a clear principle emerges: only categorical exception to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals. The availability of an insanity defense is insufficient in light of its high burden of proof, and presentation of mitigation evidence suffers from a variety of shortcomings. These shortcomings include (a) the prospect that the mitigating evidence will "get lost in the mix" or (b) be outweighed in the minds of jurors by a heinous crime; (c) the possibility that the characteristics of group members will lead to false confessions or (d) render them unable to assist counsel; (e) the possibility that the characteristics of group members will make them unsympathetic to jurors; and (f) the possibility that the very characteristics suggesting diminished culpability will function as aggravating evidence of future dangerousness.

In the following paragraphs, Ms. Pike briefly sets out only the most essential arguments in support of finding a categorical exemption for currently unprotected groups of the cognitively impaired, i.e. older adolescents, individuals suffering from severe mental illness or organic brain damage, and individuals like Ms. Pike, who suffer from all of the above. In the interest of brevity in this Permission to Appeal, Ms. Pike does not here present the full panoply of facts and arguments in support of her claim under the three *Gregg* factors. If given the opportunity to appeal on this issue, however, Ms. Pike avers that she can meet the applicable burden of proof.

**C. Execution of older adolescents must be categorically barred.**

Adolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty. It is for this reason that individuals under the age of 18 are immune from capital prosecution under both Tennessee and federal law. Yet, while the relevant case law draws a dividing line at age 18, adulthood doesn't happen all at once. Cognitive development is a process that spans years, reaching adult stages at some point between the late teens and early twenties. KAPLAN & SADOCK'S COMPREHENSIVE TEXTBOOK OF

PSYCHIATRY 3038-40 (Benjamin J. Sadock et al eds., 8th ed., 2005); (Testimony of Dr. Jonathan H. Pincus, PC Tr. Vol VIII, 248-48). As a result, a healthy individual raised in a stable environment may reach cognitive adulthood no sooner than 22 or 23. When the variables of mental illness or environmental abuse and neglect are factored in – as they often must be, when examining the class of capital defendants, and certainly are in the case of Ms. Pike – the probability of an individual's achieving near complete brain development by age 18 is significantly slimmer. There is thus a significant population of individuals who lack the requisite brain development to be fully culpable for their crimes, and yet who currently fall outside of the absolute bar to execution imposed by Tennessee and federal law. These older adolescents may have brains that are developmentally identical to, or less developed than, individuals who are shielded because of a difference in birth date of a few years, months, or even days.

**D. Under the three factor *Gregg* test, the cognitively impaired must be spared execution.**

The Tennessee and United States supreme courts have recognized that the mentally impaired require special protections in the capital arena. Mental illness may be raised to claim incompetency to stand trial and as an affirmative defense to guilt. Under *Ford v. Wainwright*, an individual must be mentally competent at the time of execution. 477 U.S. 399. Additionally, the mentally retarded are systematically shielded from capital prosecution under *Atkins*. 536 U.S. 304.

Ultimately, however, this patchwork provides incomplete protection for the cognitively impaired. In 2005, the American Civil Liberties Union reported that since 1983, over 60 people with mental illness or retardation had been executed, and that an estimated 5-10% of death row inmates suffered from serious mental illness. http://www.aclu.org/capital/mentalillness/10617 pub20050131.html. In 2006, Amnesty International issued a report on the execution of the mentally ill replete with case studies of severely impaired individuals who were nonetheless

executed. *See generally* http://www.amnesty.org/en/library/asset/AMR51/003/2006/en/ 73c0 b3fe-d46f-11dd-8743-d305bea2b2c7/amr510032006en.pdf. Additionally, media coverage has occasionally shed light on the woeful mental condition of criminal defendants put to death. *See, e.g.,* Laura Mansnerus, "Damaged Brains and the Death Penalty," New York Times, July 21, 2001; Kevin Drew, "Executed Mentally Ill Inmate Heard Voices Until End," CNN, January 7, 2003.

**E. Ms. Pike's particular combination of characteristics as a cognitively impaired older adolescent make her insufficiently culpable for imposition of the death penalty.**

As has been established in this Permission to Appeal, Ms. Pike suffers from a number of cognitive impairments. She has heterotopy of the frontal lobe that is so severe as to be visible on a brain scan photograph to the naked eye. She suffers from bipolar disorder from which she has gained some reprieve by taking lithium only since her conviction and sentence. Additionally, Ms. Pike is afflicted with PTSD resulting from an upbringing marked by systematic neglect, exposure to violence and gore at a young age, and physical and sexual abuse. At the time of her crime, Ms. Pike was 18 years old. At the time of her conviction and sentence, she was the youngest woman on death row in America.

When these factors are taken into consideration – Ms. Pike's age, organic brain damage, severe mental illness, and history of abuse – there can be no doubt that she was drastically limited in her abilities to think rationally, resist peer pressure stressful circumstances. As a result, Ms. Pike lacked the deg imposition of the death penalty. The United States and Tenn Pike be spared the prospect of execution.

## V. The Court of Criminal Appeals Misapplied the law of *Wainright v. Witt*, 469 U.S. 412 (1985)

A prospective juror in Ms. Pike's capital trial, Mr. Rutherford, was excluded for cause because of the following colloquy during voir dire:

Trial Court: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I need you to tell me how you feel.

Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.

. . .

General Crabtree: . . . And frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor. Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weight the aggravating circumstances against that?

Mr. Rutherford: I have problems just because of the death penalty.

General Crabtree: That's what we are talking about. I'm not talking about anything else now. I'm talking about the death penalty. Are you saying because of this individual's age you could not return a death penalty?

Mr. Rutherford: I, I don't think I could.

General Crabtree: . . . So let's see if we can make it clear – as far as her, the sole factor of her age, that would be something that you could not do?

Mr. Rutherford: **If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem –**

General Crabtree: I understand you are saying that because of her age that one factor would keep you from returning the death penalty, is that correct?

Mr. Rutherford: I think so.

*Pike v. State*, 2011 WL 1544207, at *58 (Tenn. Crim. App. April 25, 2011). Mr. Rutherford further explained to the court that he had worked with "a lot of kids" and understood that due to their immaturity, they do impulsive things. (T XIX: 1511.)

Mr. Rutherford was improperly excused for cause and, as a result, Ms. Pike is entitled to a new trial under *Gray v. Mississippi*, 481 U.S. 648 (1987). Mr. Rutherford's statements make clear that he had reservations about his ability to return a death verdict only in Ms. Pike's particular case. This was for the reason that, in light of Ms. Pike's age at the time of the offense, Mr. Rutherford was inclined to believe that Ms. Pike lacked sufficient culpability to be sentenced to death.

The CCA denied Ms. Pike relief on this claim under the authority of *Wainright v. Witt*, 469 U.S. 412 (1985), finding that, "the statements made by Mr. Rutherford indicate that his views would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and his oath." *Pike*, 2011 WL 1544207, at *58. For the reasons discussed below, the CCA's resolution of this issue was a misapplication of the relevant case law.

**A. *Witt* sets out the standard for prosecutorial exclusions for cause of persons with generalized objections to capital punishment.**

The law of so-called 'death qualification' for capital juries derives from *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In *Witherspoon*, the Court found that a capital defendant's rights under the Sixth and Fourteenth Amendments prohibit the exclusion for cause of prospective jurors who voice mere conscientious scruples regarding the death penalty. In essence, the Court held that "a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.'" *Witherspoon*, 391 U.S. at 521. Nonetheless, *Witherspoon* recognized the validity of State excusal for cause of persons whose opposition to the death penalty was such that it would prevent them from viewing the facts or applying the law

impartially. Accordingly, the Court found that State excusal for cause would be proper in the case of prospective jurors provided:

> (1) that they would automatically vote against the imposition of the capital punishment without regard to any evidence that might be developed at the trial of the case before them, or
> (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Id.* at 523 n.21. Additionally, *Witherspoon* held that a juror's indication of bias must be "unambiguous, or unmistakeably clear" to warrant excusal for cause. *Witt*, 469 U.S. at 419 (internal citations omitted).

In *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court retreated from the narrow standard announced in *Witherspoon*. In its place, the *Adams* Court stated, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 U.S. at 45. This standard was reaffirmed in *Witt*, where the Court noted that it had relaxed the requirements for permissible exclusion: "the requirement that a juror excluded only if he would never vote for the death penalty is now missing; gone too is the extremely high burden of proof." 469 U.S. at 421.

Significantly, however, neither *Adams* nor *Witt* expanded the class of jurors who could be rightfully excluded beyond the class of conscientious objectors to the death penalty. Untouched is the language from *Witherspoon* that:

> [prospective jurors] cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. . . . The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 68 of 142
PageID #: 9515

391 U.S. at 523 n.21. As a result, *Witherspoon* and its progeny speak only to the class of prospective jurors with generalized objections to the death penalty; with regard to such jurors, these cases hold that exclusion for cause is proper when the jurors statements during voir dire suggest an inability to perform in accordance with the law in light of personal bias.

**B. Mr. Rutherford voiced apprehension about the death penalty only in Ms. Pike's specific case, and only because of the fact of her age.**

Prospective juror Mr. Rutherford was not among the class of individuals identified by *Witherspoon*, *Adams*, and *Witt* as ripe for exclusion for cause. Mr. Witherspoon expressed trepidation about voting for death only in Ms. Pike's particular case, and only because of Ms. Pike's youth at the time of the offense. In fact, Mr. Witherspoon stated that he could consider the death penalty if the State were able to prove that, in spite of Ms. Pike's age, she possessed the requisite maturity for assignment of full culpability. Consequently, Mr. Witherspoon was not an individual with generalized opposition to the death penalty whose bias was likely to color his viewing of the facts or application of the law. Instead, Mr. Rutherford was an individual that indicated there was a certain kind of case in which he was unlikely to recommend capital punishment – exactly the sort of juror for whom *Witherspoon* forbids excusal for cause. *Witherspoon*, 391 U.S. at 523 n.21.

**C. Mr. Rutherford's views on the death penalty as applied to Ms. Pike were constitutionally and statutorily protected.**

The CCA's application of *Witt* to Mr. Rutherford was erroneous for another reason: Tennessee law gives every capital juror the right to give controlling weight to any particular mitigating factor. This is apparent from a number of authorities. Under *Lockett v. Ohio*, no juror may be precluded from considering any mitigating factor. 438 U.S. 586, 604 (1978). In *Mills v. Maryland*, the Supreme Court held that unanimity requirements may not be applied to mitigating factors, and therefore, that each individual juror is free to determine for him or herself what is

mitigating. 486 U.S. 367 (1988). The combined rule of *Lockett* and *Mills* is, consequently, that each individual capital juror is entitled to find any fact to be mitigating.

Tennessee is a weighing State that sets out the procedure for capital sentencing in T.C.A. § 39-2-204. Critically, Tennessee law imposes no rubric for the weighing of aggravating and mitigating factors, a fact that means that, "[e]ach juror has discretion to determine the degree to which the proof mitigates against the death penalty." *State v. Thompson*, 768 S.W.2d 239, 252 (Tenn. 1989). As a result, a Tennessee capital juror is free to assign any weight it chooses to a fact he or she finds mitigating, even dispositive weight. Notably, the CCA did not dispute this proposition in its opinion denying relief. *See Pike*, 2011 WL 1544207, at *59.

**D. A juror does not act in violation of his or her instructions or oath by doing something he or she is permitted to do.**

That the CCA misapplied *Witt* follows naturally from the principal discussed above, that every capital juror may give decisive weight to a particular mitigating factor. With regard to his comments on Ms. Pike's age, Mr. Rutherford merely intimated that he was likely, based on his personal beliefs and experiences, to assign great weight to the mitigating factor of youth. As discussed above, it was Mr. Rutherford's right to assign such weight to any mitigating fact of his choice. Furthermore, there can be no doubt that Tennessee recognizes age as a legitimate factor in a juror's consideration of the death penalty – youth is encoded as a statutory mitigator at T.C.A. §. 39-2-204(j)(7).

The question, then, is how Mr. Rutherford could have been impaired in his ability to serve on a capital jury by a belief that is *protected* among capital jurors? According to the CCA, the answer to this question is "that [Ms. Pike's] argument does not comport with the rationale in *Wainright* that the focus of *voir dire* is to determine potential bias." *Pike*, 2011 WL 1544207, at *59. The problem with this answer is that Mr. Rutherford's belief that youth is highly mitigating was not bias. Again, his belief in the importance of Ms. Pike's age was a reasonable one with a

constitutionally protected place in the penalty phase of a capital trial. There is simply no evidence in the record to suggest that Mr. Rutherford would have been unable to reach a reasoned decision in either phase of trial, and in finding to the contrary, the CCA misapplied *Witt.*

It bears noting that the CCA's understanding of *Witt* as applied to this case would yield untenable results. Writ large, the CCA's application of *Witt* suggests that the prosecution could preview the entire penalty phase during voir dire, then excuse for cause every prospective juror who said he or she could not vote for death under all of the given circumstances. This is precisely the avenue that was deliberately foreclosed in *Witherspoon* and left unchanged in the subsequent *Adams* and *Witt* decisions. This Court should grant permission to appeal to stem the tide of the CCA's erroneous application of *Witt.*

constitutionally protected place in the penalty phase of a capital trial. There is simply no evidence in the record to suggest that Mr. Rutherford would have been unable to reach a reasoned decision in either phase of trial, and in finding to the contrary, the CCA misapplied *Witt*.

It bears noting that the CCA's understanding of *Witt* as applied to this case would yield untenable results. Writ large, the CCA's application of *Witt* suggests that the prosecution could preview the entire penalty phase during voir dire, then excuse for cause every prospective juror who said he or she could not vote for death under all of the given circumstances. This is precisely the avenue that was deliberately foreclosed in *Witherspoon* and left unchanged in the subsequent *Adams* and *Witt* decisions. This Court should grant permission to appeal to stem the tide of the CCA's erroneous application of *Witt*.

**Conclusion**

For all of the above reasons, Applicant, Christa Pike, respectfully requests this Court to grant permission to appeal to address issues which are of primary importance to the integrity of the justice system and the courts and to correct the misapplication of standards for appellate review.

Respectfully submitted,

Donald E. Dawson, BPR No. 010723
Post-Conviction Defender

Avram D. Frey, BPR # 028520
Assistant Post-Conviction Defender

Office of the Post-Conviction Defender
530 Church Street, Suite 600
P.O. Box 198068
Nashville, TN 37219-198068
(615) 741-9331
(615) 741-9430 (Fax)

Counsel for Appellant, Christa Pike

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing Brief of the Appellant was sent via U.S. Mail, first-class postage pre-paid, to Frank Borger-Gilligan, Assistant Attorney General, Office of the Attorney General - Criminal Division, P.O. Box 20207, Nashville, TN 37202-0207 on this the 24th day of June 2011.

Donald E. Dawson

Appendix

*In re: Bell*,_S.W.3d_, 2011 WL 2304191 (Tenn. 2011)

*Pike v. State*, No. #2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. April 25, 2011)

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Tennessee,
at Nashville.
In re the Honorable John A. BELL, Judge, General Sessions Court of Cocke County, Tennessee.

No. M2010–01447–SC–R3–CJ.
May 11, 2011 Session Heard at Knoxville.
June 10, 2011.

**Background:** In judicial disciplinary proceedings, the Court of the Judiciary found that judge had committed various violations of Code of Judicial Conduct and rendered sanctions, including 90-day suspension without impairment of compensation. Judge appealed.

**Holdings:** The Supreme Court, Cornelia A. Clark, C.J., held that:
(1) delay of nine months in issuing judgment after trial on insured motorist's suit against insurer for underinsured motorist benefits violated Canon of Code of Judicial Conduct requiring judge to promptly and fairly dispose of all matters;
(2) Canon of Code of Judicial Conduct requiring judge to dispose of matters promptly and efficiently did not require proof that judge engaged in pattern of delay in resolving matters in multiple instances;
(3) disciplinary counsel was not precluded from asserting additional charges in formal charge that arose after initial notice of investigation was delivered to judge;
(4) trial court judge had no obligation under Code of Judicial Conduct to disclose to other driver that he had previously found driver 100% liable for insured motorist's injuries, in motorist's prior suit against insurer to recover underinsured motorist benefits;
(5) judge's telephone call to insured motorist who had filed complaint against judge, via retained attorney, to determine whether motorist would dismiss judicial complaint, while motorist's second suit against other driver and underinsured motorist insurer was pending before judge, constituted impermissible ex parte communication with party concerning pending proceeding and failed to promote public confidence in integrity and impartiality of judiciary;
(6) ex parte telephone call, together with judge's failure to disclose telephone call to driver and insurer, caused judge's impartiality to motorist to reasonably be questioned, warranting his disqualification; and
(7) suspension for 90 days without impairment of compensation, together with order to dispose of cases within 30 calendar days of hearing, and completion of judicial ethics training, was appropriate sanction for judge's violations of Code of Judicial Conduct.

Affirmed in part and reversed in part.

West Headnotes

**[1] Courts 106 ⚷1**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106I(A) In General
106k1 k. In General; Nature and Source of Judicial Authority. Most Cited Cases

**Courts 106 ⚷246**

106 Courts
106VI Courts of Appellate Jurisdiction
106VI(B) Courts of Particular States
106k246 k. Tennessee. Most Cited Cases

The Supreme Court of Tennessee is a direct creature of the Constitution and constitutes the supreme judicial tribunal of the state; accordingly, the Court has broad inherent authority over the Tennessee judicial system.

**[2] Judges 227 ⚷11(3)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(3) k. Jurisdiction or Authority to


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Remove or Discipline. Most Cited Cases

The Supreme Court has the inherent power to adopt the ethics rules for judges and to determine how judges should be disciplined for violation of those rules. Sup.Ct.Rules, Rule 10.

**[3] Judges 227 ⚿11(3)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(3) k. Jurisdiction or Authority to Remove or Discipline. Most Cited Cases

In Tennessee, current disciplinary authority over the judiciary is vested in the Court of the Judiciary.

**[4] Constitutional Law 92 ⚿2330**

92 Constitutional Law
92XX Separation of Powers
92XX(A) In General
92k2330 k. In General. Most Cited Cases

The Constitution of Tennessee does not prohibit the three branches of government from cooperating with each other; rather, the public welfare demands cooperation between the legislative and judicial branches of government, and an avoidance of unnecessary controversies between them. Tennessee Constitution article II, section 2.

**[5] Constitutional Law 92 ⚿2350**

92 Constitutional Law
92XX Separation of Powers
92XX(B) Legislative Powers and Functions
92XX(B)2 Encroachment on Judiciary
92k2350 k. In General. Most Cited Cases

Consistent with the state constitution, the General Assembly may enact statutes that aid the Supreme Court in the exercise of its inherent supervisory power; however, the General Assembly may not enact statutes that frustrate or are in direct conflict with the Court's exercise of its powers. Tennessee Constitution article II, section 2.

**[6] Judges 227 ⚿11(8)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(5) Proceedings and Review
227k11(8) k. Reference and Review. Most Cited Cases

In conducting de novo review of the Court of the Judiciary's decision in a judicial disciplinary proceeding, the Supreme Court first determines whether clear and convincing evidence establishes the judge's violation of the various canons of the Tennessee Code of Judicial Conduct; the Court then goes on to review de novo the appropriateness of the sanction. Tenn.Code Ann. § 17-5-310(b)(1).

**[7] Judges 227 ⚿11(2)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases

Judge's delay of nine months in issuing judgment after trial on insured motorist's claim for benefits under underinsured motorist policy violated Canon of Code of Judicial Conduct requiring judge to promptly and fairly dispose of all matters, despite judge's assertion that his computer crashed, which prevented research on question presented whether motorist had to sue other driver before pursuing claim against insurer, and that he had been involved in car accident which rendered him incapacitated for period of time; issue presented single, straightforward question of law, computer issue occurred more than three months after trial, and accident occurred seven months after trial. Canon 3(B)(8) of the Tennessee Code of Judicial Conduct.

**[8] Judges 227 ⚿11(2)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Canon of Code of Judicial Conduct requiring judge to dispose of matters promptly and efficiently did not require proof that judge engaged in pattern of delay in resolving matters in multiple instances. Canon 3(B)(8) of the Tennessee Code of Judicial Conduct.

**[9] Judges 227 🔑 11(5.1)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(5) Proceedings and Review
227k11(5.1) k. In General. Most Cited Cases

Notice to judge of investigation of alleged violation of Canon of Judicial Conduct arising out of extensive delay in judge's issuance of order in insured's motorist's suit against insurer for underinsured motorist benefits did not preclude disciplinary counsel from asserting additional charges in formal charge that arose after initial notice was delivered; initial notice stated that investigation could be expanded, if appropriate, and formal charges provided judge with adequate notice of additional charges. West's T.C.A. § 17-5-304(c)(1)(A).

**[10] Judges 227 🔑 11(2)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases

Trial court judge had no obligation under Code of Judicial Conduct to disclose to defendant driver that he had previously found driver 100% liable for insured motorist's injuries, in motorist's prior suit against insurer to recover underinsured motorist benefits. Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canon 3(E)(1)(a).

**[11] Judges 227 🔑 47(1)**

227 Judges
227IV Disqualification to Act
227k47 Acting as Counsel or Other Participation in Cause
227k47(1) k. In General. Most Cited Cases

A judge is in no way disqualified because he tried and made certain findings in previous litigation, and the mere fact that a judge has ruled adversely to a party or witness in prior judicial proceedings is not grounds for recusal.

**[12] Judges 227 🔑 49(1)**

227 Judges
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases

A judge's prior decision in a case does not, in and of itself, make the judge prejudiced against any particular party, as grounds for disqualification, including a party that enters the case for the first time following remand. Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canon 3(E)(1)(a).

**[13] Judges 227 🔑 11(2)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases

**Records 326 🔑 32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases

Prior proceedings and court file are a matter of public record, and the fact that a new party may be unrepresented by counsel and thus fail to investigate the history of the case does not impose additional duties of disclosure, much less an obligation of disqualification, on the judge hearing the case. Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canon 3(E)(1)(a).

**[14] Judges 227 🔑 11(2)**


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases

Judge's telephone call to insured motorist who had filed complaint against judge, via retained attorney, to determine whether motorist would dismiss judicial complaint against judge, while motorist's suit against other driver and underinsured motorist insurer was pending before judge, constituted impermissible ex parte communication with party concerning pending proceeding and failed to promote public confidence in integrity and impartiality of judiciary, in violation of Code of Judicial Conduct. Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canons 2(A), 3(B)(7).

**[15] Judges 227 ⚷49(1)**

227 Judges
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases

Judge's telephone call to insured motorist who had filed complaint against judge, via retained attorney, to determine whether motorist would dismiss judicial complaint against judge, while motorist's suit against other driver and underinsured motorist insurer was pending before judge, together with judge's failure to disclose telephone call to driver and insurer, caused judge's impartiality to motorist to reasonably be questioned, warranting his disqualification. Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canons 3(B)(7), 3(E)(1).

**[16] Judges 227 ⚷11(4)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(4) k. Grounds and Sanctions. Most Cited Cases

Suspension for 90 days without impairment of compensation, together with order to dispose of cases within 30 calendar days of hearing, and completion of judicial ethics training, was appropriate sanction for judge's violations of Code of Judicial Conduct by failing to issue orders promptly and efficiently, by engaging in ex parte communication with complainant to seek dismissal of judicial complaint while complainant's suit was pending before judge, failing to disclose ex parte communication to parties in complainant's underlying suit, and failure to disqualify himself from presiding over complainant's pending suit; there had been prior complaints against judge for delay in issuing orders, there was no evidence of judge's attempt to change or modify conduct, judge had failed to acknowledge nature and impropriety of his misconduct, and effect of misconduct had negative impact on integrity and respect for judiciary. West's T.C.A. § 17-5-301(f)(1, 2), (i); Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canons 2(A), 3(B)(7), 3(E)(1).

**[17] Judges 227 ⚷11(2)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases

The highest standards of judicial conduct are necessary to preserve the integrity and independence of the judiciary. Sup.Ct.Rules, Rule 10, Code of Jud.Conduct, Canon 2(A).

**[18] Judges 227 ⚷11(4)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(4) k. Grounds and Sanctions. Most Cited Cases

Discipline imposed for judicial misconduct is to be responsive to the gravity of the misconduct-the actual harm or threat of harm it posed to those using the court system and to the system itself.

**[19] Judges 227 ⚷11(1)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(1) k. In General; Constitutional and Statutory Provisions. Most Cited Cases


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Judicial discipline is not intended to punish the judge; it serves to protect the court system and those having recourse to it from further, similar abuses.

**[20] Judges 227 🔑11(1)**

227 Judges
227I Appointment, Qualification, and Tenure
227k11 Removal or Discipline
227k11(1) k. In General; Constitutional and Statutory Provisions. Most Cited Cases

It is the Supreme Court's responsibility, and the responsibility of every judge, to merit and maintain the public confidence in the integrity of the judicial system.

Direct Appeal from the Court of the Judiciary, No. 08–3508.W. Gordon Ball and W. Allen McDonald, Knoxville, Tennessee, for the appellant, Judge John A. Bell.

Timothy R. Discenza, Memphis, Tennessee, and Patrick J. McHale, Nashville, Tennessee, for the appellee, Court of the Judiciary.

CORNELIA A. CLARK, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

**OPINION**

CORNELIA A. CLARK, C.J.

***1** In this direct appeal of a judicial disciplinary proceeding, we are asked to review the Court of the Judiciary's decision that Cocke County General Sessions Court Judge John A. Bell violated various canons of the Tennessee Code of Judicial Conduct, resulting in sanctions that included a ninety-day suspension. The Court of the Judiciary found that Judge Bell violated the Code by taking nine months to decide the complainant's personal injury action, re-hearing the case without disclosing to a new party that he had previously made findings against the new party as to liability and damages, and contacting through an attorney the self-represented complainant while the complainant's case was still pending before him in General Sessions Court. We affirm the code violations with respect to the delay and the ex parte communication and affirm the sanctions.

*BACKGROUND*

John A. Bell was licensed to practice law in Tennessee in 1983 and has served as Cocke County General Sessions Judge since September of 1998. He was re-elected to his judicial office in 2006. This appeal arises out of a Complaint Against Judge Under Code of Judicial Conduct filed by David J. Pleau on July 14, 2008. After a full initial investigation, a three-judge investigative panel of the Court of the Judiciary found reasonable cause to believe that Judge Bell committed a judicial offense and directed disciplinary counsel to file formal charges against Judge Bell. *See* Tenn.Code Ann. § 17–5–304(d)(2)(A) (2009). The Court of the Judiciary heard the formal charges against Judge Bell on June 2–3, 2010. After deliberations, the court announced its decision on the record on June 3, 2010, and memorialized its decision in a written order filed on June 14, 2010. We take our recitation of the facts from the record of the proceedings before the Court of the Judiciary, including the exhibits admitted into evidence and the testimony offered at trial.

*Facts*

In December 2006, Pleau was involved in an automobile accident with Jo Ann Coleman, an uninsured motorist. On August 9, 2007, Pleau, acting pro se, filed a civil warrant in Cocke County General Sessions Court ("*Pleau I*"). The civil warrant named Merastar Insurance Company ("Merastar"), Pleau's uninsured motorist carrier, as a defendant, but did not name Coleman.

On September 18, 2007, Judge Bell heard *Pleau I.* After Pleau presented his case, Merastar's attorney submitted a written motion to dismiss. Merastar argued that Tennessee Code Annotated section 56–7–1206 (2008) required that Pleau first sue Coleman, the uninsured motorist, before he could name Merastar, his uninsured motorist carrier. At the end of the hearing, Judge Bell indicated that he would issue his decision in a week.

When no decision was rendered within a week's time, Merastar's counsel had his staff contact Judge Bell's office to check on the status of the case. On October 2, 2007, counsel emailed his client to report that Judge Bell's secretary "advised that [Judge Bell] has ruled but the Order has not yet been typed." Over

Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 80 of 142 PageID #: 9527
© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the following months, Pleau and staff for Merastar's counsel each regularly inquired about the status of the case, receiving reassurances that Judge Bell was working on the case.

***2** Judge Bell finally decided *Pleau I* on June 27, 2008, nine months after the trial. Judge Bell's order found that the "Other Driver" (Coleman) was 100% at fault and that Pleau's vehicle had sustained $4,726.78 in damages. However, because Pleau had failed to name Coleman as a defendant pursuant to section 56–7–1206, Judge Bell dismissed the action against Merastar without prejudice.

Due to an apparent oversight by the General Sessions Court Clerk, neither Pleau nor Merastar's counsel timely received a copy of the judgment. Merastar's counsel learned that the judgment had been filed during one of his staff's periodic inquiries regarding the status of the case. Merastar's counsel obtained a copy of the judgment on request via a fax from the clerk's office, and, concerned that Pleau also might not have received the judgment, sent him a copy of the judgment by certified mail, return receipt requested, on July 9, 2008. When Pleau went to the clerk's office on July 10, 2008, with a copy of the judgment, he intended to appeal Judge Bell's decision, only to discover that the ten-day period for filing an appeal had expired. Therefore, on July 14, 2008, Pleau filed a complaint against Judge Bell with the Court of the Judiciary. The substance of the single-issue complaint was that Judge Bell did not decide Pleau's civil case in a timely manner and that, once the judgment was entered, Pleau did not receive notice of the judgment until after the time for appeal had expired.

Disciplinary counsel for the Court of the Judiciary sent Judge Bell a copy of Pleau's complaint and asked Judge Bell to respond to the complaint. On July 17, 2008, Judge Bell responded with a sworn affidavit, asserting that he had "done nothing wrong or improper" and then describing the "extensive legal research" he had undertaken concerning Merastar's motion. In addition to researching all state and federal statutory and case law associated with the language found in section 56–7–1206, Judge Bell also asserted that he had conducted nationwide research on whether Merastar's failure to raise its motion before trial amounted to a waiver. Furthermore, Judge Bell explained that he had disposed of more than 12,000 cases while *Pleau I* was under advisement and had been temporarily disabled by an automobile accident in April 2008. At trial, Judge Bell testified that a computer crash during the Christmas 2007 holiday also set him back in deciding *Pleau I.*

While disciplinary counsel continued to exchange correspondence with Judge Bell concerning the ethics complaint, Pleau filed a second civil warrant on October 8, 2008, again seeking damages for the December 2006 accident ("*Pleau II* ").[FN1] The civil warrant in *Pleau II* named Coleman and subsequently Merastar as defendants.

On October 26, 2008, disciplinary counsel sent Judge Bell a letter notifying him that an investigative panel of the Court of the Judiciary had authorized a full investigation. Pursuant to statutory notice requirements, the letter informed Judge Bell of the identity of the complainant, the underlying factual allegations, the canons and rules allegedly violated, Judge Bell's duty to respond, and the opportunity to meet with disciplinary counsel. *See* Tenn.Code Ann. § 17–5–304(c)(1). The letter also stated, "This investigation can be expanded if appropriate."

***3** On December 15, 2008, Judge Bell sent a letter to disciplinary counsel, stating that the clerk's office had mistakenly failed to notify the parties of the filing of the judgment. Judge Bell also stated that he would conduct a hearing with the *Pleau I* parties on December 23, 2008 to correct the mistake by the clerk's office. By letter to disciplinary counsel dated December 29, 2008, Judge Bell explained what transpired at the December 23 hearing. Judge Bell apologized for the delay in deciding *Pleau I* and for the clerk's office's failure to mail the order. He provided both Pleau and Merastar's counsel with a copy of the June 27, 2008 judgment "for formal service." He also acknowledged that Pleau had filed *Pleau II,* which was set for trial on February 20, 2009. [FN2]

Judge Bell testified that, about a week after the December 23, 2008 hearing, he received an anonymous telephone call indicating that Pleau did not want to pursue the complaint he had filed in the Court of the Judiciary. During the same time frame, in a letter dated January 9, 2009, disciplinary counsel offered to settle the complaint against Judge Bell by issuance of a public letter of reprimand and informed him that, if he did not accept the reprimand, formal charges would be filed against him. Judge Bell testified that, before


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

he responded to disciplinary counsel's offer of a reprimand, he wanted to know Pleau's intent regarding the complaint.

Therefore, on February 2, 2009, Judge Bell approached Thomas J. Testerman, a local attorney, in the courthouse hallway and asked to meet with him in chambers. Judge Bell testified that he explained to Testerman that Pleau had filed two cases in General Sessions Court, one of which was still pending. He explained the nature of the ethical complaint filed against him. Judge Bell also explained to Testerman that disciplinary counsel had set a time frame for accepting the public reprimand and that Judge Bell had information that Pleau was not going to proceed with the judicial complaint. Judge Bell testified that he asked Testerman to represent him for the purpose of "find[ing] out simply whether or not Mr. Pleau was going to go forward with the [judicial] complaint." Testerman testified that the "gist" of the conversation was that Judge Bell believed it would not be appropriate for him to contact Pleau directly, but he wanted Pleau to be contacted. Judge Bell paid Testerman $1 for this representation.

Judge Bell testified that he did not tell Testerman that it would be inappropriate for Judge Bell to contact Pleau himself. Instead, Judge Bell testified that he sought out Testerman because he did not want to be unrepresented in the judicial complaint. Judge Bell testified that he did not believe the phone call from Testerman to Pleau would qualify as an ex parte communication by Judge Bell because the call was focused exclusively on the issue of whether Pleau intended to proceed with the judicial complaint and would not involve any details pertaining to *Pleau II.*

***4** Later in the day on February 2, 2009, Testerman called and reached Pleau at his home telephone number. Testerman and Pleau both testified that Testerman said he was calling because Judge Bell did not believe it would be appropriate to contact Pleau directly. Pleau indicated that he did not want to dismiss his judicial complaint against Judge Bell. Pleau testified that he told Testerman, "[M]y mind is on the civil suit right now and I don't want to be sidetracked into other issues." Testerman testified that, during the phone call, Pleau talked about the facts of the underlying accident, and Testerman participated in those discussions. After the phone conversation, Testerman contacted Judge Bell to report that Pleau would not withdraw his judicial complaint. Testerman and Judge Bell both testified that Testerman's representation of Judge Bell concluded once Testerman communicated Pleau's decision not to dismiss the judicial complaint.

Although the parties were cordial during the telephone conversation, Pleau testified negatively at trial before the Court of the Judiciary about the fact that Testerman had contacted him. According to Pleau's testimony, Testerman did not simply ask if Pleau intended to pursue his complaint against Judge Bell, but affirmatively requested that Pleau come to Testerman's office and sign paperwork dismissing the judicial complaint. Pleau testified that he "didn't like getting called by somebody telling me how to ... run my life." Pleau further testified that Testerman's call "kind of irritated me because I really didn't think it was any of his business what I was doing."

By letter dated February 6, 2009, Judge Bell turned down the public reprimand offer, maintaining that he could not accept it in good conscience because he had not committed any ethical violation in deciding *Pleau I.* Judge Bell did not inform disciplinary counsel of the anonymous phone call or Testerman's conversation with Pleau on Judge Bell's behalf.

Before the start of the February 20, 2009 *Pleau II* hearing, Pleau spoke with David LaRue, a special investigator for the Court of the Judiciary whom disciplinary counsel had assigned to investigate Pleau's complaint. Pleau described to LaRue the details of Testerman's phone call. After the hearing, LaRue accompanied Pleau to a local library, where Pleau prepared an affidavit that summarized his conversation with Testerman. LaRue and Pleau then went to a local attorney's office to have the affidavit notarized. Because he "felt like the information in the affidavit was significant enough," LaRue went immediately to the local district attorney's office and faxed the affidavit to disciplinary counsel.[FN3]

After several continuances, Judge Bell ultimately tried *Pleau II* on April 24, 2009. In the order entered on April 27, 2009, Judge Bell found that Coleman was 100% at fault and that Pleau's vehicle had sustained $4,726.78 in damages. [FN4] Both findings were identical to Judge Bell's findings in *Pleau I.* During the *Pleau II* proceedings, Judge Bell did not disclose to Coleman that he had previously heard testimony and made findings concerning the same accident in *Pleau*


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*I.* Nor did Judge Bell disclose to Coleman or Merastar that Testerman had communicated ex parte with Pleau on Judge Bell's behalf concerning the complaint Pleau filed with the Court of the Judiciary. Judge Bell testified that he did not believe that hearing the testimony in *Pleau I* disqualified him from hearing *Pleau II* because he had merely tried the case but did not have personal knowledge of the facts. He also testified that he did not disclose Testerman's contact with Pleau on his behalf because he thought the judicial complaint remained confidential prior to filing of formal charges and because he did not ask Testerman to communicate with Pleau about the *Pleau II* action.

*Charges and Findings of the Court of the Judiciary*

***5** On October 13, 2009, disciplinary counsel filed formal charges against Judge Bell. The formal charges contained three counts, each alleging violations of multiple canons of the Tennessee Code of Judicial Conduct.[FN5] Count I alleged that Judge Bell failed to decide *Pleau I* promptly because his decision came "some nine months after the presentation of the proof and the clear mandate of the law requiring a dismissal of the complaint." Count II alleged that Judge Bell, having already opined on liability and damages associated with the underlying automobile accident in *Pleau I,* was prejudiced against Coleman and required to disqualify himself from hearing *Pleau II.* Count III alleged that, while *Pleau II* was pending in his General Sessions Court, Judge Bell had initiated a prohibited ex parte communication by having Testerman contact Pleau about dismissing the complaint Pleau had filed in the Court of the Judiciary.

On June 2–3, 2010, an eight-member panel of the Court of the Judiciary heard the complaint against Judge Bell.[FN6] By written order filed June 14, 2010, the Court of the Judiciary issued its findings of fact and conclusions of law. As to Count I, the Court of the Judiciary found a violation of Canon 3(B)(8) of the Tennessee Code of Judicial Conduct.[FN7] Noting the admission that Judge Bell decided *Pleau I* nine months after its hearing, the Court of the Judiciary found that Judge Bell's testimony concerning the reasons for his delay was "not credible."

As to Count II, the Court of the Judiciary found a violation of Canon 3(E)(1).[FN8] In addition to the rule itself, the court quoted an excerpt from the canon commentary stating that "[a] judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." The Court of the Judiciary found that Judge Bell violated this canon by (1) failing to disclose to Coleman that he had previously tried the case in *Pleau I* and found her to be 100% at fault for the accident and (2) failing to disclose to Coleman or Merastar that he had communicated with Pleau through Testerman about the complaint pending before the Court of the Judiciary.

As to Count III, the Court of the Judiciary found a violation of Canons 2(A) and 3(B)(7),[FN9] finding that Pleau's litigation in General Sessions Court "was so entwined with the complaint filed by Mr. Pleau" before the Court of the Judiciary that Judge Bell's contacting Pleau through Testerman amounted to an ethical violation.

In determining the appropriate sanction, the Court of the Judiciary considered the factors set forth in Tennessee Code Annotated section 17–5–301(i) (2009) and found that the following factors applied: prior complaints about Judge Bell, including a prior warning for delay; [FN10] misconduct occurring both inside and outside the courtroom; no evidence of effort to change or modify conduct; misconduct occurring while acting in an official capacity; the failure to acknowledge the nature and impropriety of his actions; and the effect of his misconduct on the integrity of and respect for the judiciary. *See id.* § 17–5–301(i)(3)–(6), (8)-(9). The Court of the Judiciary suspended Judge Bell for ninety days without impairing his compensation,[FN11] required him to decide all future cases within thirty calendar days from the date of hearing, and ordered forty-two hours of judicial ethics training to be completed in 2010–12.

***6** Pursuant to Tennessee Code Annotated section 17–5–310(a) (2009), Judge Bell appealed the Court of the Judiciary's decision to this Court as a matter of right.

*AUTHORITY TO DISCIPLINE JUDGES*

[1][2] The Supreme Court of Tennessee is a "direct creature of the Constitution and constitutes the supreme judicial tribunal of the state." *Barger v. Brock,* 535 S.W.2d 337, 340 (Tenn.1976). Accordingly, the Court has broad inherent authority over the Tennessee judicial system. *Belmont v. Bd. of Law Exam'rs,* 511 S.W.2d 461, 463 (Tenn.1974) (quoting


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cantor v. Brading, 494 S.W.2d 139, 142 (Tenn.Ct.App.1973)). The General Assembly has recognized that this Court has "general supervisory control over all the inferior courts of the state," Tenn.Code Ann. § 16–3–501 (2009), and that this inherent, plenary power derives from the common law and not from the General Assembly. Tenn.Code Ann. §§ 16–3–502 to –503 (2009). In that role, the Supreme Court has the inherent power to adopt the ethics rules for judges and to determine how judges should be disciplined for violation of those rules. Tennessee Supreme Court Rule 10, the Code of Judicial Conduct, is the set of rules by which judicial conduct is to be determined. *Cf.* *Hughes v. Bd. of Prof'l Responsibility,* 259 S.W.3d 631, 640 (Tenn.2008) (describing this Court's "duty to regulate the practice of law" and "ultimate disciplinary responsibility for violations of the rules governing our profession").

[3][4][5] In Tennessee, current disciplinary authority is vested in the Court of the Judiciary.FN12 As we noted in *In re Williams:*

> The Court of the Judiciary was created by the Legislature to investigate and determine charges of judicial misconduct. The legislation provides a process by which sanctions may be imposed and a process for implementation of Article VI of the Tennessee Constitution by providing a procedure for the removal of Judges from office. Tenn.Code Ann. § 17–5–[311 (2009) ].

987 S.W.2d 837, 838 (Tenn.1998). While the Supreme Court has the authority to create its own separate process for all judicial discipline short of impeachment, the current legislation dealing with discipline as it relates to the ultimate possibility of impeachment has, at least to date, been deemed by the Court sufficient to facilitate the Court's exercise of its inherent disciplinary authority over the lower courts.FN13

*STANDARD OF REVIEW*

Disciplinary counsel must establish charges of misconduct by clear and convincing evidence. Tenn.Code Ann. § 17–5–308(d) (2009). We review the Court of the Judiciary's findings and conclusions de novo on the record made before that court. Tenn.Code Ann. § 17–5–310(b)(1); *see* *In re Williams,* 987 S.W.2d at 841. No presumption of correctness attaches to the Court of the Judiciary's findings or judgment. Tenn.Code Ann. § 17–5–310(b)(1).

[6] In conducting our de novo review of the Court of the Judiciary's decision in this case, we first determine whether clear and convincing evidence establishes Judge Bell's violation of the various canons of the Tennessee Code of Judicial Conduct. We then go on to review de novo the appropriateness of the sanction.

*ANALYSIS*

*Count I*

***7** [7] As to Count I, we agree with the Court of the Judiciary that Judge Bell's delay in deciding *Pleau I* violated Canon 3(B)(8) of the Tennessee Code of Judicial Conduct. Judge Bell cited a number of reasons for his delay. He asserted that he was required to do significant research on the underlying legal issues, that his heavy general sessions and juvenile court dockets prevented him from having time to research, that he had a computer failure in December 2007, and that, as a result of an April 2008 accident in which he was struck by a drunk driver, he was incapacitated for a period of time. The Court of the Judiciary specifically found Judge Bell's testimony concerning those reasons to be "not credible." We recognize that the Court of the Judiciary stands "in a better position to determine credibility issues and resolve conflicts in the evidence because it had the benefit of hearing the testimony and observing the demeanor of the witnesses firsthand." *In re Williams,* 987 S.W.2d at 841. Merastar's motion presented a straightforward question of law: whether Tennessee Code Annotated section 56–7–1206 precluded Pleau from suing Merastar without first naming Coleman as a defendant. Judge Bell initially told the parties that he would rule within a week of the hearing and responded to subsequent inquiries by promising a decision within similar periods of time. Indeed, about two weeks after the hearing, Judge Bell's secretary communicated to Merastar's counsel that Judge Bell had "ruled" but was still getting the order typed. The computer issue occurred more than three months after the case was heard. The accident involving Judge Bell did not occur until seven months after the hearing. In taking nine months to decide *Pleau I* without offering a credible explanation for his delay, clear and convincing evidence establishes that Judge Bell failed to decide the matter "promptly" and "efficiently," as Canon 3(B)(8) requires. *Cf.* Tenn. Sup.Ct. R. 11, § III(c) (limiting period for holding cases under advisement to no more


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

than sixty days and for holding motions under advisement to no more than thirty days, "absent the most compelling of reasons").

[8] We disagree with Judge Bell's contention that a single instance of delay is insufficient, as a matter of Tennessee law, to make out a violation of Canon 3(B)(8). Judge Bell points to Tennessee Code Annotated section 17–5–302(7) (2009), which states that the Court of the Judiciary may take cognizance of "[a] persistent pattern of delay in disposing of pending litigation." However, per subsection (3) of the same provision, the Court of the Judiciary may also address "[v]iolation of the code of judicial conduct as set out in Tenn. Sup.Ct. R. 10." Disciplinary counsel formally charged Count I as a violation of Canon 3(B)(8), rather than section 17–5–302(7). Nothing in the canon's language requires delay in more than one matter to establish that a judge has failed to "dispose of all judicial matters promptly, efficiently, and fairly." Because Canon 3(B)(8) does not require a "pattern" of delay, we do not need to decide whether Judge Bell's prior reprimand for delay and the current case make out a pattern.

*Notice*

***8** [9] Before we review the substance of the remaining counts, we consider Judge Bell's argument that we must dismiss those counts because disciplinary counsel failed to provide the required statutory notice as to those counts. In this case, the original notice dated October 26, 2008, advised Judge Bell that disciplinary counsel would investigate the single issue of Judge Bell's delay in deciding *Pleau I* and the parties' failure to receive the judgment until the time for appeal had expired. Indeed, at the time disciplinary counsel provided this notice, the other instances of alleged misconduct had not yet taken place. Our review of the record indicates that Judge Bell did not receive written notice of the other two counts until disciplinary counsel filed the formal charges on October 13, 2009.

The relevant statute directs disciplinary counsel, within thirty days of the investigative panel's authorization of a full investigation, to provide the judge by certified mail with "[a] specific statement of the allegations being investigated and the canons or rules being investigated and the canons or rules allegedly violated, with the provision that the investigation can be expanded if appropriate." Tenn.Code Ann. § 17–5–304(c)(1)(A). The October 26, 2008 notice in this case complied with the statute because it identified the factual allegations under investigation, cited the canons allegedly violated, and stated the investigation could be expanded, if appropriate. Here, disciplinary counsel expanded the investigation because counsel learned of additional allegations of misconduct that took place after counsel provided the initial notice. We do not interpret section 17–5–304(c) to prevent disciplinary counsel from investigating and formally charging additional violations arising from conduct taking place after disciplinary counsel provided the statutorily required notice. The formal charges provide adequate notice of the additional charges. Therefore, we decline to dismiss Counts II and III on notice grounds.

*Count II*

[10] The Court of the Judiciary's findings on Count II differ somewhat different from what disciplinary counsel alleged in the formal charges. In the formal charges, Count II was based on Judge Bell's alleged prejudice against Coleman in *Pleau II* because he had already decided fault and damages against her in *Pleau I*. The Court of the Judiciary's findings on Count II concluded that Judge Bell should have disqualified himself from *Pleau II* because of (1) his failure to disclose to Coleman his prior decision in *Pleau I* and, additionally, (2) his failure to disclose to Coleman or Merastar his ex parte communication with Pleau regarding the judicial complaint. For sake of clarity, we limit our analysis in this section to the first of the Court of the Judiciary's findings regarding the allegations in Count II. The legal analysis relevant to the ex parte communication, including the second finding that Judge Bell should have disqualified himself from *Pleau II* for failing to disclose that communication to Coleman and Merastar's counsel, is included under the umbrella of Count III.

***9** [11][12][13] To the extent that the Court of the Judiciary found that Judge Bell automatically should have recused himself from *Pleau II* solely on the basis that he decided *Pleau I* and failed to disclose that prior decision to Coleman, we disagree. Judges routinely hear the same matter on multiple occasions, for instance, when a case is non-suited or after the appellate court remands the case. "A judge is in no way disqualified because he tried and made certain findings in previous litigation," *State v. Hines*, 919 S.W.2d 573, 578 (Tenn.1995), and "the mere fact that a judge has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ruled adversely to a party or witness in prior judicial proceedings is not grounds for recusal." Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 565 (Tenn.2001). Therefore, a judge's prior decision in a case does not, in and of itself, make the judge prejudiced against any particular party, including a party that enters the case for the first time following remand. Nor does the fact that the judge previously heard the case give the court "personal knowledge of disputed evidentiary facts concerning the proceeding." Tenn. Sup.Ct. R. 10, Canon 3(E)(1)(a). Similarly, the history of the case does not qualify as "information ... the parties or their lawyers might consider relevant to the question of disqualification," *see* Tenn. Sup.Ct. R. 10, Canon 3(E)(1) cmt., at least insofar as that language assumes that such information is known only to the judge. The prior proceedings and court file are a matter of public record, and the fact that the new party may be unrepresented by counsel and thus fail to investigate the history of the case does not impose additional duties of disclosure, much less an obligation of disqualification, on the judge hearing the case. Judge Bell's failure to disclose to Coleman his prior decision in *Pleau I,* standing alone, is not a violation of Canon 3(E)(1).[FN14]

*Count III*

[14] As to the allegations in Count III, we agree with the Court of the Judiciary that Judge Bell's phone call to Pleau through attorney Testerman while *Pleau II* was still pending in General Sessions Court amounted to an ex parte communication concerning a pending proceeding, in violation of Canon 3(B)(7). Judge Bell testified that he had received an anonymous phone call stating that Pleau would not pursue the complaint against Judge Bell. At the time, Judge Bell had pending a time-sensitive settlement offer from disciplinary counsel for a public reprimand instead of the institution of formal charges. Judge Bell testified that he obtained Testerman's representation to contact Pleau and determine whether Pleau would go forward with the complaint. Although Judge Bell claimed that he contacted Pleau through counsel because he did not want to be self-represented in litigating the judicial complaint, Testerman testified that the "gist" of his conversation with Judge Bell was that Judge Bell did not believe it was appropriate to contact Pleau directly.

***10** Testerman's February 2, 2009 phone call on Judge Bell's behalf amounted to more than just an inquiry about Pleau's intentions. Per Pleau's affidavit and testimony, Testerman affirmatively requested that Pleau come to Testerman's office and sign paperwork dismissing the judicial complaint. Pleau testified that he "didn't like getting called by somebody telling me how to ... run my life." Pleau further testified that Testerman's call "kind of irritated me because I really didn't think it was any of his business what I was doing." In declining to dismiss his judicial complaint, Pleau testified that he told Testerman, "[M]y mind is on the civil suit right now and I don't want to be sidetracked into other issues." Furthermore, Testerman testified that he participated in a conversation with Pleau about the underlying facts of the accident.

Although Judge Bell had dismissed *Pleau I* by the time of this phone call, Pleau had already filed *Pleau II* and served the civil warrant on both Coleman, the new party, and Merastar. The parties were set to appear before Judge Bell on February 20, 2009, and Judge Bell was aware of that fact. Thus, *Pleau II* was "pending" at the time Judge Bell initiated the ex parte communication through Testerman. Furthermore, *Pleau II* arose from the same nucleus of facts as *Pleau I,* the case that had originally given rise to Pleau's filing a complaint with the Court of the Judiciary.

Based on the substance of the phone conversation and the interrelationship among *Pleau I,* Pleau's judicial complaint, and *Pleau II,* we are persuaded there is clear and convincing evidence that Testerman's phone call to Pleau on Judge Bell's behalf was an ex parte communication prohibited by Canon 3(B)(7). Judge Bell argues that he did not violate the canon because he asked Testerman to contact Pleau about the status of Pleau's complaint before the Court of the Judiciary, not the *Pleau II* case then-pending before the General Sessions Court. However, both Pleau and Testerman testified that *Pleau II* came up for discussion during the conversation. The fact that Judge Bell retained an attorney to contact Pleau instead of contacting Pleau directly is a distinction without a difference. *See* Link v. Wabash R.R. Co., 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); World Relief Corp. of Nat'l Ass'n of Evangelicals v. Messay, No. M2005–01533–COA–R3–CV, 2007 WL 2198199, at *5 (Tenn.Ct.App. July 26, 2007) (explaining that because lawyer is client's agent, "the acts and omissions of a lawyer undertaken during the course and in the scope of his or her representation ... are attributed to th[e] client").[FN15]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[15] Indeed, given that *Pleau II* was pending at the time, it is hard to fathom how any reasonable person would not view Testerman's phone call on Judge Bell's behalf as "concerning" *Pleau II.* Asking a litigant to drop a judicial complaint while the litigant still has a case pending before the judge creates the perception of a classic quid pro quo scenario. Pleau's reaction to the phone call predictably reflects the frustration that a litigant would feel toward this kind of unwarranted pressure from the judge who is adjudicating his case. Therefore, in addition to a prohibited ex parte communication, Judge Bell's initiation of a phone call asking Pleau to dismiss his judicial complaint manifestly fails to "promote[ ] public confidence in the integrity and impartiality of the judiciary." Tenn. Sup.Ct. R. 10, Canon 2(A). Clear and convincing evidence also supports the Court of the Judiciary's finding that Judge Bell violated Canon 2(A).

***11** Related to the ex parte communication is the Court of the Judiciary's finding (made as to Count II) that Judge Bell did not reveal to Coleman or Merastar's counsel his ex parte communication with Pleau. Clear and convincing evidence also supports this finding and the conclusion that, having failed to disclose the ex parte communication, Judge Bell violated Canon 3(E)(1) by failing to disqualify himself from *Pleau II.* While the mere filing of Pleau's complaint in the Court of the Judiciary did not mandate Judge Bell's recusal, *see* *State v. Parton,* 817 S.W.2d 28, 29–30 (Tenn.Crim.App.1991), Testerman's communication with Pleau on Judge Bell's behalf caused Judge Bell's impartiality to him to reasonably be questioned. Even if Judge Bell subjectively believed the communication provided no basis for disqualification, he should have disclosed on the record that, through counsel, he had inquired whether Pleau intended to proceed with his judicial complaint and had invited Pleau to counsel's office to sign dismissal paperwork. Similarly, the other parties were entitled to know about this communication. Judge Bell should have recognized that Coleman and Merastar's counsel might have considered this communication, as well as Pleau's decision to continue forward with the complaint, relevant to the question of disqualification. *See* Tenn. Sup.Ct. R. 10, Canon 3(E)(1) cmt. Having failed to disclose his communication to Coleman and Merastar's counsel, Judge Bell should have disqualified himself from hearing *Pleau II.* His failure to do so is clear and convincing evidence of a violation of Canon 3(E)(1).

In summary, we affirm the Court of the Judiciary's findings that Judge Bell's delay in deciding *Pleau I* violated Canon 3(B)(8) and that Judge's Bell ex parte communication through counsel violated Canons 2(A), 3(B)(7), and 3(E)(1). We do not affirm the finding that Judge Bell's failure to disclose to Coleman the findings in *Pleau I* violated Canon 3(E)(1).[FN16] We now proceed to review the penalty assessed by the Court of the Judiciary.

*Appropriateness of Penalty* [FN17]

[16][17][18][19][20] "Intrinsic" to the Code of Judicial Conduct "are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system." Tenn. Sup.Ct. R. 10, Preamble. Tennessee Supreme Court Rule 10, Canon 1(A) provides that "an independent and honorable judiciary is indispensable to justice in our society." Canon 2(A) provides in pertinent part that a judge shall "respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." These highest standards of conduct are necessary to preserve the integrity and independence of the judiciary. *In re Murphy,* 726 S.W.2d 509, 515 (Tenn.1987). As we previously observed in *In re Williams,* when a judge violates the Code of Judicial Conduct, it "reflect[s] poorly on the judicial system as a whole. Public confidence in the performance and impartiality of the judiciary is maintained only when judges rigorously adhere to the Code of Conduct. Violations of the Code, if left unaddressed, diminish public confidence and injure the entire judicial system." 987 S.W.2d at 844. Furthermore, as the Supreme Court of Wisconsin stated in affirming a ninety-day suspension as discipline for a judge's ex parte communications:

> ***12** Discipline imposed for judicial misconduct is to be responsive to the gravity of the misconduct—the actual harm or threat of harm it posed to those using our court system and to the system itself. Discipline is not intended to punish the judge; it serves to protect our court system and those having recourse to it from further, similar abuses....

....

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> Inevitably, members of the public will, from time to time, disagree with decisions of our courts, but that disagreement should never rest upon lack of confidence in the court's integrity. Public confidence in the integrity of the judicial system is essential. It is our responsibility, and the responsibility of every judge, to merit and maintain that confidence. The suspension we impose is a measure of the seriousness of [the judge's] actions and is designed to foster confidence in the integrity the public has every right to expect and demand of its judicial system.

*In re Disciplinary Proceedings Against Aulik,* 146 Wis.2d 57, 429 N.W.2d 759, 768 (Wis.1988).

According to the Preamble to our Code of Judicial Conduct:

> [w]hether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the text and should depend on such facts as the seriousness of the transgression, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system.

Tenn. Sup.Ct. R. 10, Preamble. By statute, the Court of the Judiciary has the power to impose an enumerated sanction (or combination of sanctions), including "[s]uspension without impairment of compensation" and "limitations and conditions on the performance of judicial duties." Tenn.Code Ann. § 17–5–301(f)(1)–(2) (2009). The statute also sets forth a list of criteria for the Court of the Judiciary to consider in determining the appropriate sanction(s). Tenn.Code Ann. § 17–5–301(i).

In this case, the Court of the Judiciary found that the following statutory criteria applied: prior complaints about Judge Bell, including a prior warning for delay; misconduct occurring both inside and outside the courtroom; no evidence of effort to change or modify conduct; misconduct occurring while acting in an official capacity; the failure to acknowledge the nature and impropriety of his actions; and the effect of his misconduct on the integrity of and respect for the judiciary. *See* Tenn.Code Ann. § 17–5–301(i)(3)–(6), (8)-(9). For Judge Bell's violations of the Code of Judicial Conduct, the Court of the Judiciary determined the appropriate sanctions to be a ninety-day suspension without impairment of compensation, a requirement to decide all future cases within thirty calendar days of the hearing, and the completion of judicial ethics training.FN18

The Court of the Judiciary carefully considered all the factors in imposing a penalty. Even though we disagree with one portion of the Court of the Judiciary's findings, we do not disagree with its conclusion about the serious nature of the other findings. To maintain the integrity of and public confidence in our judicial system and to discourage similar instances of misconduct in the future, we affirm the sanctions that the Court of the Judiciary has imposed on Judge Bell.

*Conclusion*

***13** For the reasons stated above, we affirm the Court of the Judiciary's judgment concerning the violations of the Code of Judicial Conduct arising from Judge Bell's delay in deciding *Pleau I* and his ex parte communication through attorney Testerman. For the reasons stated in the Count II analysis, we reverse the Court of the Judiciary's judgment concerning the violation arising from Judge Bell's failure to disclose to Coleman his prior decision in *Pleau I.* We also affirm the determination of sanctions, including the ninety-day suspension. Costs of this appeal are taxed to Judge John A. Bell and his surety, for which execution may issue, if necessary.

FN1. Because Cocke County has only one General Sessions judge, this case automatically was under Judge Bell's authority.

FN2. Judge Bell did not enter an order following the December 23, 2008 hearing. Coleman did not receive notice of the hearing and, therefore, did not attend. She was, however, subsequently given notice about the February 20, 2009 proceeding in *Pleau II,* and the transcript from that proceeding reflects that Coleman attended and participated.

FN3. Consistent with Pleau's trial testimony, the affidavit states that Testerman called Pleau on Judge Bell's behalf, began the conversation by saying that Judge Bell realized it would be inappropriate to call Pleau


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

directly, and asked Pleau to come to Testerman's office to sign dismissal paperwork. During the conversation, Pleau informed Testerman that he would not dismiss any pending action because he was focused on the upcoming civil suit.

> LaRue later arranged a meeting in Sevierville between Pleau and representatives of the Attorney General's Office and Tennessee Bureau of Investigation. At the direction of law enforcement, Pleau called Testerman's office and made an appointment to meet about dismissing the judicial complaint. During the meeting, Pleau asked repeatedly if dismissing the complaint would be to his advantage in *Pleau II*, and Testerman consistently responded that it would not affect the outcome one way or the other.

FN4. Merastar appealed Judge Bell's decision in *Pleau II* and ultimately settled the case for $500.

FN5. After filing the formal charges, disciplinary counsel later filed a motion to amend on February 10, 2010. By order dated May 14, 2010, the Court of the Judiciary granted the motion as to certain factual allegations but denied as to additional charges that disciplinary counsel had not first presented to the investigative panel. *See* Ct. of the Judiciary R. 6, § 3(b)-(c). In its order on the motion to amend, the Court of the Judiciary also struck sua sponte those allegations in the formal charges that Judge Bell had violated provisions outside of the Tennessee Code of Judicial Conduct, including various criminal statutes.

FN6. Circuit Court Judge Don Ash, presiding judge of the Court of the Judiciary, presided over the hearing. The other members of the panel were Criminal Court Judge Chris Craft; Municipal Judge Joe Fowlkes; Richard Manahan, a lay member; Circuit Court Judge Jean Stanley; attorney Paul DeHoff; Court of Appeals Judge D. Michael Swiney; and General Sessions Judge David Loughry.

FN7. Tennessee Supreme Court Rule 10, Canon 3(B)(8) provides: "A judge shall dispose of all judicial matters promptly, efficiently, and fairly."

FN8. Canon 3(E)(1) states, in pertinent part:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

FN9. Canon 2(A) provides: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

> Canon 3(B)(7) provides that, except in enumerated circumstances, "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding." The Court of the Judiciary found the violation of Canon 3(B)(7) by a vote of five to three. The findings of Judge Bell's violations of other canons were unanimous.
>
> Additionally, the Court of the Judiciary found that Judge Bell did not violate other canons set forth in the formal charges. We do not enumerate those canons because the findings of no violation are not at issue in this appeal.

FN10. Prior to the proceedings at issue in this case, Judge Bell was involved in two other disciplinary proceedings before the Court of the Judiciary. On September 25, 2005, Judge Bell received a warning from an investigative panel for delay in a case tried in September 2001 and decided in January 2003. He had


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

also been named in a formal complaint for allegations of misconduct involving his use of a private probation service that employed his brother-in-law. Disciplinary counsel and Judge Bell ultimately settled that complaint on September 23, 2008, with Judge Bell agreeing not to appoint or use a private probation service with an owner, director, agent or employee whose relationship to Judge Bell or his spouse would suggest nepotism or favoritism.

FN11. Pursuant to article VI, section 7 of the Tennessee Constitution, a judge's compensation "shall not be increased or diminished during the time" the judge has been elected to serve. *See* Tenn.Code Ann. § 17–5–301(h) (2009) (explaining that no sanction imposed by the Court of the Judiciary may violate this constitutional provision). Judge Bell has already served the suspension.

FN12. The other forty-nine states and the District of Columbia, like Tennessee, all have codified rules of judicial conduct and a judicial conduct commission to investigate judicial misconduct. *See Links of Interest,* American Bar Association Center for Professional Responsibility, http://www.americanbar.org/groups/professional_responsibility/resources/links_of_interest.html (last visited June 8, 2011) (links to judicial conduct rules); *Commission Membership,* American Judicature Society, http://www.ajs.org/ethics/pdfs/Commissionmembership.pdf (last updated March 2007) (listing names and composition of judicial conduct commissions) ("*Commission Membership* "). The commissions in all but three states have at least one judicial member who is elected or appointed by other judges or is entitled to a position on the commission by virtue of holding a particular judicial office. *See Commission Membership, supra.*

FN13. Tennessee Constitution article II, section 2 prohibits one branch of government from exercising powers properly belonging to another branch. However, the Constitution of Tennessee does not prohibit the three branches of government from cooperating with each other. As this Court noted over fifty years ago, "[t]he public welfare demands cooperation between the legislative and judicial branches of our Government, and an avoidance of unnecessary controversies between them." *Petition for Rule of Court Activating, Integrating & Unifying the State Bar of Tenn.,* 199 Tenn. 78, 282 S.W.2d 782, 787 (1955).

Consistent with the Constitution, the General Assembly may enact statutes that aid the Court in the exercise of its inherent supervisory power. *Belmont,* 511 S.W.2d at 464. However, the General Assembly may not enact statutes that frustrate or are in direct conflict with the Court's exercise of its powers. The creation of the Court of the Judiciary in 1979 is an example of inter-branch cooperation. *See* 1987 Op. Tenn. Atty. Gen. No. 87–02. It provided a single mechanism, acceptable to the Court, that facilitated the Court's exercise of its supervisory authority over the lower courts and, at the same time, facilitated the General Assembly's exercise of its authority over impeachment and removal.

In the case of *In re Murphy,* 726 S.W.2d 509 (Tenn.1987), we confronted the argument that the legislation creating the Court of the Judiciary unconstitutionally permitted the Court of the Judiciary, rather than the General Assembly itself, to recommend the removal of judges. There, a General Sessions Court judge facing a recommendation of removal from office argued that, since only the General Assembly could remove judges, the statutes empowering the Court of the Judiciary to investigate and recommend removal of judges violated the principle of separation of powers. *Id.* at 511. This Court disagreed, reasoning that the Constitution did not impose the duty of investigating or monitoring judicial conduct on the General Assembly and the General Assembly had the authority to enact legislation implementing its performance of its constitutional obligations in cooperation with the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

other two branches of government. *Id.* at 512–13.

FN14. Disciplinary counsel also maintains that Judge Bell should have disqualified himself from *Pleau II* because, at the December 23, 2008 hearing on *Pleau I,* Judge Bell discussed with Pleau and Merastar's counsel the upcoming trial of *Pleau II.* The transcript from that hearing reflected Judge Bell's knowledge that, although Coleman was absent on December 23, she had been served with the civil warrant in *Pleau II.* We do not address disciplinary counsel's argument because it exceeds the scope of the findings made by the Court of the Judiciary.

FN15. We also reject Judge Bell's argument that he did not violate Canon 3(B)(7) because he did not "consider" anything Testerman learned in the conversation with Pleau. Canon 3(B)(7) states that "[a] judge shall not initiate, permit, *or* consider ex parte communications" (emphasis added). The disjunctive phrasing means that simply initiating the ex parte communication is enough to establish a violation, regardless of the extent to which the judge "considers" the information obtained through the communication. *See Foster v. United States,* 615 A.2d 213, 216 (D.C.1992).

FN16. We are not persuaded by Judge Bell's other arguments for relief. Judge Bell claims that disciplinary counsel selectively prosecuted him because other judges have delayed decisions for much longer periods of time without being sanctioned. The examples that Judge Bell cites, however, are factually inapposite because they involve mere delay, and this case involves other misconduct in addition to delay.

Finally, Judge Bell argues that disciplinary counsel improperly refused to produce documents prepared and reviewed by its testifying investigator, James LaRue. With respect to this issue, however, Judge Bell fails to make any citation to the record or to offer meaningful argument. Therefore, this issue is waived. *See* Tenn. R.App. P. 27(a)(7); *Chiozza v. Chiozza,* 315 S.W.3d 482, 489 (Tenn.Ct.App.2009).

FN17. Since the General Assembly created the Court of the Judiciary in 1979, *see* Act of May 23, 1979, ch. 356, § 4, 1979 Tenn. Pub. Acts 833, 834, this Court has had relatively few opportunities to review the Court of the Judiciary's decisions. *See In re Williams,* 987 S.W.2d 837; *In re Brown,* 879 S.W.2d 801 (Tenn.1994); *In re Murphy,* 726 S.W.2d 509. In *In re Murphy,* we affirmed the recommendation that the General Assembly remove from office a General Sessions Court judge who was convicted in federal court on eleven counts of mail fraud, one count of perjury, and one count of obstruction of justice. 726 S.W.2d at 510, 515; *see* Tenn.Code Ann. § 17–5–311(a) (explaining that, where this Court affirms the Court of the Judiciary's recommendation of the judge's removal, the question of removal is forwarded to the General Assembly for a final decision). Later, in *In re Williams,* we again affirmed the recommendation of removal from office of a General Sessions Court judge who used a jail inmate for personal work (a class A misdemeanor), tried felony offenses over which the court lacked jurisdiction, and provided false testimony and responses to interrogatories in a federal proceeding. 987 S.W.2d at 838. In *In re Brown,* we affirmed the public reprimand of a Criminal Court judge who delayed seven months before responding to a judicial complaint. 879 S.W.2d at 807; *cf. United States v. Lanier,* 520 U.S. 259, 261, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (adjudicating appeal of Chancery Court judge who was convicted pursuant to federal criminal statute of violating victims' constitutional rights by sexually assaulting them).

FN18. The Court of the Judiciary's order allocated the judicial ethics training as follows: twenty-four hours in 2010, twelve hours in 2011, and six hours in 2012.

Tenn.,2011.
In re Bell
--- S.W.3d ----, 2011 WL 2304191 (Tenn.)


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**H**
Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Knoxville (Heard at Jackson).
**Christa** Gail **PIKE**
v.
**STATE** of Tennessee.

No. E2009–00016–CCA–R3–PD.
April 14, 2010 Session.
April 25, 2011.

Direct Appeal from the Criminal Court for Knox County, No. 68280 Mary; Beth Leibowitz, Judge.
Donald E. Dawson and Avram Frey, Nashville, Tennessee, for the appellant, Christa Gail Pike.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael Moore, Solicitor General; Frank Borger–Gilligan, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Leland Price and S. Jo Helm, Assistant District Attorneys General, for the appellee, State of Tennessee.

JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which NORMA McGEE OGLE and ALAN E. GLENN, JJ., joined.

**OPINION**

JOHN EVERETT WILLIAMS

***1** The Petitioner, Christa Gail Pike, appeals as of right the judgment of the Knox County Criminal Court denying her petition for post-conviction relief. A Knox County jury found the Petitioner guilty of premeditated first degree murder and conspiracy to commit first degree murder. The jury further found two statutory aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death"; and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." T.C.A. § 39–13–204(i)(5), (6) (2006). The jury further found that these two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. The jury then sentenced the Petitioner to death. The Petitioner's conviction and sentence were affirmed on direct appeal by the Tennessee Supreme Court. *State v. Pike,* 978 S.W.2d 904 (Tenn.1998), *cert. denied,* 526 U.S. 1147 (1999). On June 3, 1999, the Petitioner timely filed a *pro se* petition for post-conviction relief. In 2001, the Petitioner advised the trial court that she desired to withdraw her post-conviction petition. In 2002, the lower court dismissed the petition for post-conviction relief. The Petitioner then sought to reinstate her post-conviction petition. Litigation ensued, after which the Tennessee Supreme Court ultimately determined that the motion to vacate the dismissal order should be granted and remanded the matter to the lower court to reinstate the Petitioner's post-conviction petition. *Pike v. State,* 164 S.W.3d 257 (Tenn.2005). Evidentiary hearings were conducted in January 2007, July 2007, and August 2008. On December 10, 2008, the post-conviction court entered an order denying the Petitioner post-conviction relief. On appeal to this court, the Petitioner presents a number of claims that can be characterized in the following categories: (1) the post-conviction court should have recused itself; (2) the Petitioner's trial and appellate counsel were ineffective; (3) the Petitioner is ineligible for the death penalty; and (4) the death penalty is unconstitutional. Following a thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Facts Underlying the Petitioner's Convictions**

The following facts are excerpted from our supreme court's opinion affirming the Petitioner's conviction and sentence:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the [Petitioner], Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed [the Petitioner], along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp,

[the Petitioner's] boyfriend, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m ., Iloilo observed [the Petitioner], Peterson, and Shipp return to the Center. Slemmer was not with them.

***2** Later that night, [the Petitioner] went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. [The Petitioner] showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. [The Petitioner] told Iloilo that the victim had begged "them" to stop cutting and beating her, but [the Petitioner] did not stop because the victim continued to talk. [The Petitioner] told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. [The Petitioner] told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, [the Petitioner] said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that [the Petitioner] was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw [the Petitioner] at breakfast the next morning, she asked [the Petitioner] what she had done with the piece of the victim's skull. [The Petitioner] replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, [the Petitioner] made a similar statement to Stephanie Wilson, another Job Corps student. [The Petitioner] pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." [The Petitioner] then pulled a napkin from her pocket and showed Wilson a piece of bone which [the Petitioner] said was a piece of Slemmer's skull. [The Petitioner] also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. [The Petitioner] told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

Though neither Iloilo nor Wilson immediately reported [the Petitioner's] statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered Slemmer's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal. Upon closer inspection, he saw the victim's clothes and her nude breast and realized it was the body of a human female. He immediately notified law enforcement officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated. Johnson removed all civilians from the area and secured the scene surrounding the body.

***3** As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and broken foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle, with trampled bushes, hand and knee prints in the mud, and drag marks. A large pool of blood was found about 30 feet from the victim's body.

The victim's body was actually lying face down on a pile of debris. When officers turned the body over, they discovered that the victim's throat had been slashed. A bloody rag was around her neck. Detective Donald R. Cook, of the U.T. Police Department, accompanied the body to the morgue. He observed the body after it had been cleaned and noticed that a five pointed star in a circle, commonly known as a pentagram, had been carved onto the victim's chest.

Randy York, a criminal investigator with the Knoxville Police Department, began investigating this case on January 13, the day the victim's body was discovered. York separately interviewed the defendant and Shipp at the Knoxville Police Department on January 14th. Investigator York advised [the Petitioner] of her *Miranda* rights, but she chose to waive them and make a statement. [The Petitioner] explained in detail how the killing had occurred. [The Petitioner's] statement was tape-recorded and transcribed in some forty-six pages. Copies of the transcription were given to the jury, and

the jurors were allowed to listen to the tape through individual headphones.

In her statement, [the Petitioner] said that she and Slemmer had been having problems for some time. [The Petitioner] claimed to have awakened one night to find Slemmer standing over her with a box cutter. [The Petitioner] told Investigator York that Slemmer had been "trying to get [her] boyfriend" and had been "running her mouth" everywhere. [The Petitioner] said that Slemmer had deliberately provoked her because Slemmer realized that [the Petitioner] would be terminated from the Job Corps program the next time she became involved in a fight or similar incident.

[The Petitioner] claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, [the Petitioner] admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. [The Petitioner] said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to [the Petitioner], she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, [the Petitioner] told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though [the Petitioner] refused to name the other parties involved in the incident, she said the group began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, [the Petitioner] and Slemmer exchanged words. [The Petitioner] then began hitting Slemmer and banging Slemmer's head on her knee. [The Petitioner] threw Slemmer to the ground and kicked her repeatedly. According to [the Petitioner], as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report [the Petitioner] so she would be terminated from the Job Corps program, [the Petitioner] again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with [the Petitioner] caught Slemmer and pushed her to the ground.

*4 [The Petitioner] and the other person, who [the Petitioner] referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where [the Petitioner] cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," [the Petitioner] recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point [the Petitioner] said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, [the Petitioner] cut Slemmer's back, "the big long cut on her back." [The Petitioner] said Slemmer repeatedly tried to get up and run. [The Petitioner] recounted how Slemmer bargained for her life, begging [the Petitioner] to talk to her and telling [the Petitioner] that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. [The Petitioner] told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." [The Petitioner] said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked [the Petitioner] what she was going to do to her, at which point [the Petitioner] thought she heard a noise. [The Petitioner] left the scene to check out the surrounding area to make sure no one was around. When she returned, [the Petitioner] began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, [the Petitioner] cut Slemmer's throat several other times. [The Petitioner] said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that [the Petitioner] and the other person would push her back on the ground.

Slemmer attempted to run away again, and [the Petitioner] threw a rock which hit Slemmer in the back of the head. [The Petitioner] stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, [the Petitioner] continued to hit her. Eventually [the Petitioner] said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but [the Petitioner] "kept hitting her and hitting her and hitting her." [The Petitioner] eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, [the Petitioner] said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. [The Peti-

tioner] said the episode lasted "for about thirty minutes to an hour." [The Petitioner] admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. [The Petitioner] also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. [The Petitioner] denied carving a pentagram in the victim's chest but said that the other person had cut the victim on her chest.

***5** After disposing of Slemmer's body, [the Petitioner] and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and [the Petitioner] returned the miniature meat cleaver to the person at Job Corps from whom she had borrowed it. [The Petitioner] never identified that individual. [The Petitioner] told Investigator York that the bloodstained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. [The Petitioner] also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. [The Petitioner] gave Investigator York consent to search her room and then accompanied him to the Job Corps Center. From there [the Petitioner] retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that [the Petitioner] eventually directed him to the exact location where the victim's body was found.

After [the Petitioner's] statement was played for the jury, the State introduced pictures of [the Petitioner] and Shipp taken at the Knoxville Police Department on the day the statement was given, January 14, 1995, two days after the murder. In the pictures, both [the Petitioner] and Shipp were wearing pentagram necklaces.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had retrieved a pair of black gloves and two of Slemmer's I.D. cards from the Texaco station on Cumberland Avenue. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special Agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of [the Petitioner] and Shipp. Those items that he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that she had been unable to perform a DNA analysis on the blood taken from the shoes of [the Petitioner] and Shipp, but she had determined that the blood samples taken from the clothing of both [the Petitioner] and Shipp matched the DNA profile of the victim.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer, a nineteen-year-old Job Corps student. Dr. Elkins described the victim's body as covered with dirt and twigs. Slemmer was nude from the waist up [and] clothed only with jeans, socks, and shoes. After removing the victim's clothing and cleaning the body, Dr. Elkins had attempted to catalog the slash and stab wounds on the victim's torso by assigning a letter of the alphabet. There were so many wounds that eventually Dr. Elkins decided to catalog only the most serious and major wounds. Dr. Elkins explained that to catalog every wound she would have been required to go through the alphabet again, and stay in the morgue for "three days." Eventually, Dr. Elkins said she "basically threw up [her] hands and just said, enumerable [sic] more superficial slash wounds on the back, arms and chest." In addition, Dr. Elkins said the victim had purple contusions on her knees, indicating fresh bruising consistent with crawling, and defensive wounds on her right arm.

***6** Dr. Elkins described the major slash and stab wounds she had cataloged on the victim's back, arms, abdomen, and chest. She found a six-inch gaping wound across the middle of the victim's neck which had penetrated the fat and muscles of the neck. In addition, Dr. Elkins had found ten other slash wounds on the victim's throat. Other slash wounds were on the victim's face, and Dr. Elkins observed what appeared to be a pentagram carved onto the victim's chest. Because the area around each wound was red in appearance, Dr. Elkins concluded that the victim's heart had been beating when the wounds were inflicted, and she said the victim would not have been rendered unconscious by any of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the stab or slash wounds.

Dr. Elkins determined that the victim's death was caused by blunt force injuries to the head. The victim had suffered multiple and extensive skull fractures. From the autopsy, Dr. Elkins determined that the victim had sustained a minimum of four blows to her head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the victim's skull had been fractured as had the bridge of her nose. However, the major wound, labeled as injury "W", involved most of the left side of the victim's head. Dr. Elkins said that this injury, caused by blunt force to the left side of the victim's head while the right side of the victim's head was against a firm surface, also had fractured the right side of the skull and imbedded a portion of the skull into the victim's brain. Dr. Elkins found small divots in the victim's skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows. Finally, Dr. Elkins testified that blood in the victim's sinus cavity indicated she had been alive and probably conscious when the injuries were inflicted.

During her testimony, Dr. Elkins utilized the victim's skull to describe the injuries. She testified that in order to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had removed the top of the victim's skull in order to remove the brain. Embedded inside the victim's brain as a result of the blunt force were portions of the victim's skull. Dr. Elkins removed those embedded pieces and forwarded them to Dr. Marks. Dr. Marks reconstructed the skull, fitting those loose portions into the left side area of the skull. However, those pieces had not completely filled one area on the left side of the victim's skull. Dr. Elkins then showed the jury a piece of skull that had been given to her shortly before the trial and demonstrated that it fit perfectly into the remaining area of the victim's skull. The piece of skull utilized by Dr. Elkins had been taken from the pocket of a jacket which witnesses identified as belonging to [the Petitioner].

*7 [The Petitioner's] jacket had been turned over to law enforcement officials by Job Corps employees. Robert A. Pollock, orientation specialist at Knoxville Job Corps, testified that he had spoken with [the Petitioner] on January 13, 1995, concerning a misplaced I.D. card. After [the Petitioner] left his office, Pollock noticed a black leather jacket hanging on the chair where she had sat. The jacket had been hanging on the chair when Pollock locked the room at approximately 4:00 p.m. on January 13th, and it was still there when he returned at 7:30 a.m. on January 17th. Because he had heard over the weekend that [the Petitioner] was a suspect in this murder investigation, Pollock immediately turned the jacket over to the Job Corps' Safety and Security Captain, William Hudson. Hudson called the Knoxville Police Department and turned the jacket over to Officer Arthur Bohanan when he arrived a short time later.

Officer Bohanan identified the jacket, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the jacket and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which the victim's skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

Following the introduction into evidence of the victim's skull, numerous photographs, and items of the victim's clothing, the State rested its case-in-chief.

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the [Petitioner]. Dr. Engum described [the Petitioner] as an "extremely bright young woman." Dr. Engum explained that [the Petitioner] "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." [The Petitioner] had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that [the Petitioner] had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the [Petitioner] suffers from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the [Petitioner] is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals.


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

During direct examination, Dr. Engum opined that the [Petitioner] had not acted with deliberation or premeditation in killing Slemmer. Instead Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the [Petitioner's ]coat, Dr. Engum explained that the [Petitioner] actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the [Petitioner's] way of getting recognition, "no matter how distorted" the recognition.

***8** On cross-examination, Dr. Engum stated that there was no question that the [Petitioner] had killed Slemmer. He reiterated that in his opinion that once the attack began, [the Petitioner] had literally lost control. However, Dr. Engum admitted that [the Petitioner] had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that [the Petitioner's] act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that [the Petitioner] had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the [Petitioner] and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the [Petitioner] nor any of the other witnesses. Dr. Bernet admitted that he did not have enough information to offer an expert opinion as to whether [the Petitioner] acted with intent or premeditation in killing the victim.

Based on this evidence offered during the guilt phase of the trial, the jury found [the Petitioner] guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, [the Petitioner's] aunt as a witness. Ross testified that the [Petitioner] had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that [the Petitioner's] family has a history of substance abuse and that [the Petitioner's] maternal grandmother was an alcoholic who was verbally abusive to [the Petitioner]. Following the death of [the Petitioner's] paternal grandmother, [the Petitioner] was shuffled between her mother and father. According to Ross, [the Petitioner's] mother's home was very dirty. [The Petitioner's] mother set no rules for her, and on the occasions that [the Petitioner] had visited Ross, the [Petitioner] had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.

On cross-examination, Ross admitted that she had previously described [the Petitioner] as a pathological liar and that she had been afraid to allow [the Petitioner] to associate with her own children. Ross also admitted that [the Petitioner] had been out of control since she was twelve years old.

***9** Glenn Pike, the [Petitioner's] father, testified that he had kicked the [Petitioner] out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the [Petitioner] prior to her eighteenth birthday. On cross-examination, he admitted that he had forced [the Petitioner] to leave his home in 1989 because there had been an allegation that the [Petitioner] had sexually abused his two-year-old daughter from his second marriage. According to her father, [the Petitioner] had been disobedient, dishonest, and manipulative when she had lived with him.

The [Petitioner's] mother, Carissa Hansen, a licensed practical nurse, testified that [the Petitioner] had lived with her 95 percent of the time since her paternal grandmother's death. Hansen admitted that she had smoked marijuana with the [Petitioner] in order to "establish a friendship." Hansen related that the [Petitioner] had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped [the Petitioner] with a belt. Hansen had the


© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

boyfriend arrested.

On cross-examination, Hansen admitted that [the Petitioner's] behavior had been problematic for years. The [Petitioner] had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, [the Petitioner] had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that [the Petitioner] had wielded a "butcherknife" against the boyfriend, who had been arrested for whipping her. Hansen also said [the Petitioner] had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that [the Petitioner] had been out of control since she was eight years old. Following Hansen's testimony, the defense rested its case.

In rebuttal, the State presented the testimony of Harold James Underwood, Jr., a University of Tennessee police officer who was assigned to secure the crime scene on January 13, 1995. Underwood testified that the [Petitioner] came to the scene with three to five other females between four and five p.m. that day. [The Petitioner] asked Underwood why the area had been marked off and questioned him concerning the identity of the victim and whether or not the police had any suspects. None of the other females spoke during the fifteen minutes the group was there. Underwood said [the Petitioner] appeared amused and giggled and moved around. Underwood noticed that [the Petitioner] was wearing an unusual necklace in the shape of a pentagram. After learning at roll call on January 14, 1995, that the victim of the murder had a pentagram carved on her chest, he reported [the Petitioner's] strange behavior and unusual necklace to his superior officers.

Based on the proof submitted at the sentencing hearing, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." T.C.A. § 39–13–204(i)(5) and (6) (1997 Repl .). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced the [Petitioner] to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed.

***10** *Pike,* 978 S.W.2d at 907–14.

**Proof at the Post–Conviction Evidentiary Hearing**

At the post-conviction hearing, the Petitioner presented numerous witnesses in support of her case. First, Carissa Henson, the mother of the Petitioner, testified that, at the time of the Petitioner's arrest, Ms. Henson had been living in Cedar Grove, North Carolina. She stated that lead counsel represented the Petitioner and that she had spoken with him on the telephone and had met with him in Knoxville. Ms. Henson recalled meeting with lead counsel on only two occasions prior to trial, having one meeting in Knoxville and one meeting in Raleigh, North Carolina. However, Ms. Henson testified that she also spoke with Dr. Diana McCoy and Barry Rice, members of the defense team. Further, she explained that she had lunch with lead counsel and the other members of the defense team during the trial.

Ms. Henson testified that, during the guilt phase of the trial, she was the only family member present. However, during the penalty phase, Ms. Henson's husband, Gerard Hensen; the Petitioner's biological father, Glenn Pike; and the Petitioner's aunt, Carrie Ross, were also present. Ms. Henson, Glenn Pike, and Carrie Ross testified during the penalty phase. Ms. Henson testified that she did not learn that she was going to testify until the second week of the trial. She stated that she was advised that "they were going to make the family look bad because that would help [the Petitioner's] case." Ms. Henson explained, "[Lead counsel and co-counsel] told us to make it look as bad as we could, to exaggerate anything bad that was wrong with our family because the jury would—the jury would look at [the Petitioner] and think, 'The poor girl, she grew up in a family like this; no wonder she turned out the way she did.' So that's what we did."

Ms. Henson testified that she married Glenn Pike in 1975, and that the Petitioner was born in March 1976. Ms. Henson stated that the Petitioner had an older half-sister, Alicia. She testified she and Glenn Pike were married for two years, were divorced for a year, and then were remarried for two more years. The family lived in Beckley, West Virginia.

Ms. Henson, a licensed practical nurse, explained that, while pregnant with the Petitioner, she worked the

evening shift on a psychiatric unit. One evening, an alcoholic was admitted with delirium tremens. The patient "threw [Ms. Henson] through some double swinging doors and [she] landed on a supply cart...." Ms. Henson began leaking amniotic fluid after this incident and was not permitted to work. Ms. Henson testified that the Petitioner was born prematurely via Caesarean section. She was born with a condition known as hyaline membrane disease where the lungs are not fully developed and had bilateral hip dysplasias, which occurs when the hip sockets are not fully formed. The Petitioner was taken to Charleston Area Medical Center neonatal intensive care unit where she remained hospitalized for two weeks.

***11** In 1982, Ms. Henson moved to North Carolina but returned to West Virginia for two years to assist her ailing mother. After Ms. Henson's mother died in 1985, she moved back to North Carolina. Ms. Henson explained that her move was due to her marriage to Danny Thompson.

Ms. Henson testified that "during their growing-up years," the Petitioner and her half-sister, Alicia, spent a lot of time with their grandmother. She explained that when they moved to North Carolina, both girls were "really unhappy" and that both girls "ended up going back to West Virginia." The Petitioner moved back to North Carolina when she was in the fourth or fifth grade.

Ms. Henson testified that her oldest daughter, Alicia, got pregnant when she was fifteen years old. After the baby was born, Alicia and her fiance, Bryan Hammond, moved to North Carolina and lived with Ms. Henson. Alicia, her baby, and Hammond lived in Ms. Henson's home for two years. Ms. Henson testified that she was separated from Danny Thompson during this time period.

Ms. Henson testified that she had a relationship with Steve Kyaw when the Petitioner was twelve years old. She stated that the Petitioner never got along with Steve Kyaw. On one occasion, they went to court because Steve Kyaw "punched" the Petitioner. Ms. Henson denied knowledge of any other incidents of abuse by any of the Petitioner's other stepfathers.

Ms. Henson later married Gerard Henson. After this marriage, Ms. Henson learned that the Petitioner was pregnant. Ms. Henson testified that she also learned that the Petitioner was using cocaine. Ms. Henson told the Petitioner that, if she had the baby, she would have to get a job. Ms. Henson testified that the Petitioner had an abortion. She stated that did not know the identity of the baby's father. Ms. Henson also testified that she had smoked marijuana with the Petitioner and her friends on occasion when the Petitioner was seventeen years old. Ms. Henson denied that the Petitioner was pregnant at this time and denied that she encouraged the use of marijuana to develop the Petitioner's appetite.

Ms. Henson testified that, when the Petitioner was in the third grade, the Petitioner took an overdose of Tylenol. The Petitioner was placed in outpatient psychiatric treatment, and Ms. Henson was advised that the Petitioner was "depressed." The psychiatrist prescribed medicine that "made [the Petitioner] feel worse instead of better so she didn't take them." The therapist agreed to allow the Petitioner to discontinue the medication and eventually discharged her from treatment. However, Ms. Henson added that "over the course of the years, we saw therapists, psychologists after that."

Ms. Henson testified that the Petitioner reported being raped after school one day. This incident occurred during the same time period as the Petitioner's suicide attempt. Ms. Henson stated that, after being informed by the school about this incident, she did not observe anything unusual about the Petitioner. Ms. Henson recalled that Claude Davis was arrested for the incident, but the Petitioner was not able to identify him in the lineup so he was not charged. Ms. Henson also testified that the Petitioner reported being sexually molested when she sixteen years old. Ms. Henson stated that the Petitioner said she was walking to the store when a man grabbed her, pulled her into the woods, and sexually molested her. Ms. Henson could not recall whether this incident involved penetration.

***12** Ms. Henson testified that the Petitioner held various jobs, including positions at Waffle House and a steak house. She stated that the Petitioner dated a homeless young man, Brian Wilson, who lived at the Henson residence for a period of time. Ms. Henson stated that Brian Wilson did not live with them long because he was unable to obtain employment and was very sloppy. Ms. Henson and her husband made him leave. When Brian Wilson moved out of their home, the Petitioner moved out as well. The Petitioner and Brian Wilson rented a trailer together.

Ms. Henson testified that the Petitioner repeatedly ran away from school and home and that the Petitioner skipped school habitually. Ms. Henson testified that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Petitioner lived in a group facility on two different occasions. When the Petitioner was in the tenth grade, she was sent to Swannoa, a juvenile facility, for "about a year." After her return from Swannoa, the Petitioner became interested in the Job Corp Program. The Petitioner advised her mother and stepfather that the Job Corp Program would enable her to get her GED and would train her to be a nursing assistant. Ms. Henson and her husband decided to allow the Petitioner to participate in the Job Corp Program, and the Petitioner arrived there during the fall of 1994.

Ms. Henson testified that she visited the Petitioner at the Job Corp Program, meeting several of the Petitioner's friends and touring the school and the dormitory. Ms. Henson described the dormitories as "dirty."

> There was graffiti painted on the walls. There was blood on the walls, and [the Petitioner] told me that there had been a boy stabbed in the bathroom like the weekend before, I think, and the blood was still there. And that's when we tried to talk [the Petitioner] into coming home with us, but she wanted to stay.

Ms. Henson reported that, when the Petitioner was home for Christmas, she told her that a girl had been threatening her. The Petitioner told Ms. Henson that this girl would be "hovering over her bed at night with a knife or something threatening her." The Petitioner also told Ms. Henson that Tadaryl Shipp was her friend and would protect her. Ms. Henson testified that the Petitioner was not afraid to go back to the Job Corp Program.

On cross-examination, Ms. Henson did not deny that the Petitioner's life had been traumatic. She did deny, however, that there was an incident in which the Petitioner alleged that she had been sexually abused and that Ms. Henson had observed the blood on the Petitioner's person. Ms. Henson testified that her father, Chris Fotos, owned a meat packing plant and that the petitioner would have seen animals being slaughtered and processed.

Ms. Henson related an incident during which a man named Kenny Clyde telephoned her and told her that he was going to rape her. Ms. Henson's husband searched for him but could not find him. The Petitioner and a friend found him in the McDonald's parking lot and "beat him up with a stick." Ms. Henson did not dispute that the Petitioner was "always in some sort of trouble." She also characterized the Petitioner as "having had a bad temper." Ms. Henson described their home as a "continuous battle zone." She added that the Petitioner was notorious for lying. Regarding the incident with Steve Kyaw, Ms. Henson admitted that the Petitioner had chased Steve Kyaw with a butter knife. Ms. Henson related that the Petitioner's friend, Breanna, moved in with them for a period of time. Ms. Henson stated that Breanna, who came from an abusive home, and the Petitioner argued about something and that the Petitioner "beat Breanna up and pushed her down the stairs." After this altercation, Breanna moved out of their home.

***13** Ms. Henson reported that the Petitioner brought some crystals home with her on her Christmas break from the Job Corp Program. The Petitioner told her that Tadaryl Shipp "could make the clouds move and make the sky open up" with the crystals. Ms. Henson could not recall making a previous statement affirming that the Petitioner had told her that she was involved in a WICCA group. Ms. Henson admitted that she was aware that the Petitioner had a tattoo of the devil on her chest; however, she described the tattoo as a "cute little cartoon" and not as a wicked devil.

Gerard Henson, the Petitioner's stepfather, testified that he married Carissa Henson in 1992. Mr. Henson testified that entering the Job Corp Program was the Petitioner's idea. Mr. Henson and his wife visited the Petitioner at the Job Corp, but he was not permitted to enter the dormitory because he was a male. Mr. Henson described the Petitioner as "open and friendly." Mr. Henson stated that he did not testify at the Petitioner's trial.

Mr. Henson denied making statements that the Petitioner was out of control or that the Petitioner had pushed her friend Breanna down the stairs. He admitted that he made a statement that the Petitioner liked the attention she received as a result of her behavior.

Carrie Ross, the Petitioner's aunt, stated that she testified at the Petitioner's 1996 trial. At that time, Ms. Ross was employed as an intensive care unit nurse. She was currently certified in neonatal intensive care. Ms. Ross testified that, at the time of the Petitioner's birth, she worked in the pathology department as a histology technician and had not yet attended nursing school. In 1990, Ms. Ross earned her bachelor of science degree in nursing. When questioned about the circumstances of the Petitioner's birth, Ms. Ross stated that the Petitioner was born via caesarean section and had respiratory arrest. The Petitioner was moved to a neonatal intensive care unit at a different hospital where she was placed on a ventilator for

three to four days.

Ms. Ross testified that lead counsel visited her at work to ask her for background information on the Petitioner. Ms. Ross also met with Dr. McCoy a few months before trial. Ms. Ross stated that she was not subpoenaed as a witness but that "[lead counsel and cocounsel] suggested sort of that I be here."

Ms. Ross stated that she grew up in Beckley, West Virginia, and confirmed that her parents were Chris and Zola Fotos. She further confirmed that she had an aunt named Norma Privett. Ms. Ross stated that Norma Privett had often babysat her and her sister, Carissa Henson. Ms. Ross described Norma Privett as "abusive." She explained:

> She was always very nice to us when my mother was around. But as soon as she was left to babysit us, she would do things that ... she would pull me around by the hair ... literally, drag me through the house by my hair and very abusive personality, yes.

Ms. Ross testified that Norma Privett also babysat the Petitioner and her sister, Alicia. Eventually, Norma Privett stopped babysitting the Petitioner because Privett "was very abusive" and because Ms. Ross informed her sister of the abuse she suffered as a child.

***14** Chris Fotos, the father of Ms. Ross and Ms. Henson, owned a butcher shop and slaughter house. Ms. Ross and her sister spent a lot of time at their father's business, and this was not considered unusual. Ms. Ross testified that her father was addicted to Talwin for a long period of time. She stated that, while on the Talwin, her father "had no concept of who he was, where he was. He was just out of touch with reality." Ms. Ross related that he once pulled a gun on her. She related that, if someone "crossed" her father, "he would sort of bluster and threaten to kill them." Ms. Ross also related that her father was investigated by the Internal Revenue Service. Related to that investigation, her father took a gun into a federal courtroom and told the judge that he had the gun "to unseat him."

Ms. Ross testified that her mother was an alcoholic. She explained that her mother was very loving and nurturing toward Alicia. However, her mother resented having the Petitioner at her home. Ms. Ross explained that Alicia was the first grandchild and that, when the Petitioner was born, her mother's alcoholism was getting worse and she was drinking more. She explained that her mother was angry at Carissa for becoming pregnant with the Petitioner.

Ms. Ross testified that her sister, Carissa Henson, also threatened to harm people. She related that her sister would tell others that "she was going to whip their—butt." Ms. Ross explained that it was the accepted "cultural thing" that violence would solve "everything," "[t]he Hatfields and McCoys." Ms. Ross related that, when they were teenagers, she and her sister would sneak into bars, smoke marijuana, skip school, and "do whatever we could find to do, drugs, alcohol, whatever." Ms. Ross stated that she would now describe her sister as an alcoholic. She also described her sister as "very immature and irresponsible." Ms. Ross testified that she raised Alicia during the time that her sister was married to Danny Thompson because he did not like children. However, Ms. Ross stated that she could not afford to raise both Alicia and the Petitioner. Ms. Ross commented that "[Carissa's] children were never [Carissa's] first priority." She explained that her sister put "men" first and that Carissa Henson had been married five times.

Ms. Ross testified that "there was always a problem with [the Petitioner], because [the Petitioner] didn't seem to understand when you would tell her things." Ms. Ross stated that the Petitioner was a very difficult child to watch. She stated that the Petitioner "never could understand what the word 'no' meant." Ms. Ross testified that the Petitioner "had a very flat affect," explaining that "she showed little or no emotion." Ms. Ross recalled an incident when the Petitioner was in the first grade and drew a picture of a penis. Ms. Ross related that the Petitioner's teacher reported that the Petitioner had been drawing pornographic pictures in class and that there was a recommendation that the Petitioner see a counselor.

***15** Ms. Ross testified that the entire family thought that the Petitioner's joining the Job Corp Program was a good way for her to straighten out her life. However, Ms. Ross stated that, during the Petitioner's trip home for Christmas, the Petitioner indicated to her that she was afraid to return to the Job Corp Program. The Petitioner remarked, "Well, I want everybody to be proud of me, but people get hurt there." Ms. Ross stated that the Petitioner's family would not have approved of the Petitioner's relationship with Tadaryl Shipp because he was African–American.

Dr. Jonathan Henry Pincus, an expert in neurology,

testified that he was retained to examine the Petitioner in March 2001. Dr. Pincus reviewed her history and data, which was given to him. Dr. Pincus identified the components of his examination as: (1) the Petitioner's history; (2) a physical neurological examination; (3) neuropsychological testing; (4) tests of brain functions including an EEG; and (5) tests of the brain's structure, including an MRI. Dr. Pincus also conducted a physical examination of the Petitioner. Dr. Pincus reported that the physical examination was normal, "but there were certain abnormalities that I think can only be characterized as minor." Specifically, Dr. Pincus stated that "there was generalized hyperreflexia, that is to say her deep tendon reflexes were too active." He also noted that "[t]here was spooning of her outstretched hands," explaining that "her fingers extended at the metacarpal phalangeal joint in that manner." He noted that this was a "sign that there is something not quite right about the basal ganglia ... which are gray matter masses at the center of the brain that influence movement and to some degree thinking." The Petitioner also could not hold her fingers still. Dr. Pincus remarked that this also signaled that the basal ganglia were not working properly. Dr. Pincus testified that "there was a positive nuchocephalic reflex." He explained that this meant that "there is an interruption of fibers that are coming from the motor area—supplementary motor areas of the brain stem, possibly at the level of the basal ganglia...." Based on these observations, Dr. Pincus concluded that "there was subcortical dysfunction involving the basal ganglia and possibly the thalamus." Dr. Pincus further noted that the MRI "showed an abnormality that was just lateral to the ventricle in the frontal lobe." Dr. Pincus stated that "my physical examination with its minor abnormalities, the MRI, and the EEG are all pointing to the same place."

Dr. Pincus testified that the MRI revealed a small heterotopia. He explained that the brain is formed during fetal development. A heterotopia is caused by clumps of gray matter being located in the wrong part of the brain. He attributed the heterotopia to "some maternal factor. The mother was exposed to radiation or she was ill ." He stated that the most common cause of the heterotopia was a mother's exposure to alcohol. Dr. Pincus testified that mental retardation and epilepsy are associated with a heterotopia. Dr. Pincus related that this affected the frontal lobes and explained that a person could have an IQ of 120 or 130 and be a "social imbecile" due to frontal lobe disease. He stated that the Petitioner's "frontal lobes [are not] put together properly." Dr. Pincus related that it was significant that the Petitioner's heterotopia was visible on the MRI because most are invisible. He stated that an important feature of the frontal lobes is "moral and ethical standards." He explained that "human beings are not born with an ethical and moral sense." "[You are] born with a capacity to develop one, but they must be exposed to the right influences in order for that to happen."

***16** Dr. Pincus stated that the Petitioner had previously been diagnosed with epilepsy but that she no longer had epilepsy. He added that "people outgrow epilepsy." He explained that, at birth, the brain is almost completely unmyelinated. Myelin is a fatty substance that insulates nerves. He stated that the last part of the brain to become myelinated is the frontal lobe and that does not happen fully until a person's early twenties. Dr. Pincus related that an MRI was done on April 2, 2001, and the EEG was done when the Petitioner was fourteen months old. He stated that based on his assessment, the Petitioner had a damaged brain. Dr. Pincus testified that the fact that Dr. Engum had previously found that there was no brain damage did not negate or contradict his findings. He explained that the area in which the Petitioner's heretopia was located was "notoriously difficult to test."

Dr. Pincus stated that a common finding in his examination of convicted murderers is the "big triumvirate of brain damage, history of abuse, and presence of mental illness." Dr. Pincus stated that the Petitioner had a history of abuse. He explained that the Petitioner self-reported abuse, that there were scars present on her body, and that verification was made through interviews with the Petitioner's family members. Dr. Pincus also reported that the Petitioner had been raped by a neighbor. The incident involved the neighbor inserting sticks into her vagina and having his dog lick her genitals. The Petitioner reported the incident to her sister and mother, but neither believed her. Dr. Pincus stated that the Petitioner reported "boxes of pornography, sadistic pornography" in the home. She reported incidents of "wrestling" with her mother's boyfriend when she was thirteen or fourteen years old. Dr. Pincus stated that the Petitioner's mother acknowledged that there were pornographic videotapes but explained that "[a]ll men have those." The Petitioner reported an incident where her mother's boyfriend "twist[ed] her nipples painfully," and, in response, the Petitioner "twist[ed] his scrotum...." The Petitioner's mother denied that this happened. According to the Petitioner, this same boyfriend "slugged [the Petitioner] in full view of her neighbor." Criminal charges were filed as a result of this incident but were later dropped as a result of a negotiation that the boyfriend would move out of the home. Dr. Pincus stated that the Petitioner reported yet another rape when she was seventeen. The Petitioner reported that

Kenny Clyde began stalking her and later sexually assaulted her. The Petitioner searched for Kenny Clyde and beat him with a stick. Dr. Pincus noted that this incident should have been a red flag that the Petitioner could not control herself. Dr. Pincus related that this incident was a sign that the Petitioner's frontal lobes were not working.

Dr. Pincus stated that he found evidence to confirm Dr. Kenner's diagnosis of bipolar disorder. Specifically, he stated:

> ***17** [T]here's spending. She was working at one point two full-time jobs and a part-time job, and what did she spend money on? Candles, trinkets, shoes. She didn't have food! She would go days without eating. She would see other people eating. Sometimes the mother's boyfriend would come in with food and eat it with the mother and not give it to her. She had no appetite. That's what happens during periods of mania.
>
> She would go for two or three or four days without sleeping or sleeping [ninety] minutes here and [ninety] minutes there, sleeping on the ground, sleeping on the street. And it didn't bother her. Didn't wash ... she used drugs; she used alcohol. Those are signs of bipolar. She had periods of lots of sexual activity, and then long periods when she would be depressed of none, where she couldn't get out of bed for [fourteen to eighteen] hours a day and just would sit there.
>
> She lost a lot of school time because of depression.... Her weight fluctuated. She's been from 92 to 170.... That kind of weight fluctuation occurs in people with bipolar disorder.
>
> ....
>
> And she has periods when she can't get out of bed, and she can't move, and she's [fourteen to eighteen] hours a day in bed. And she's feeling crying, and she wants—is suicidal, two suicide attempts by over dosage. And a family history ... it is a hereditary disease, bipolar illness.
>
> Oh my God, that family history on the mother's side is spectacular! Maternal grandfather ... was addicted to Talwin by injection.... The [grand]mother ... was no great shakes either. She was an alcoholic who grew marijuana, died of cirrhosis of the liver.
>
> And there's a maternal great aunt, Norma, who attempted murder.... [A]nd there was a great aunt, Geraldine, who God spoke to. Maternal great ... great aunt, Nola, who went to a mental hospital.

Dr. Pincus stated that the Petitioner's sister, Alicia, was not brain damaged, although she suffered through the abuse. He stated that one of the components was not enough to be dangerous. He explained that if you put these things together, *i.e.,* the abuse, the brain damage, and the mental illness, you have a dangerous person.

Next, Dr. Pincus discussed the events preceding January 12, 1995. He explained that the Petitioner had not slept well for the three days prior to the 12th. The Petitioner was in an "excited period" and was very irritable and angry. The victim had reportedly been calling the Petitioner and saying that the Petitioner was a whore and a slut. Dr. Pincus stated that it was intolerable for the Petitioner to hear these words. Dr. Pincus opined that the Petitioner did not start out wanting to kill the victim. In his view, the Petitioner "lost control of herself and she did want to kill her and did do it." Dr. Pincus concluded that:

> [the Petitioner] was ... under the influence of a mental disease and defect that prevented her from being able to consider what she was doing, and to prevent herself from giving in to this impulse of killing.

***18** He stated that the origin of the mental disease occurred in utero and that the bipolar illness was hereditary. Finally, he stated that the Petitioner could not control the abuse. Dr. Pincus stated that evidence of all three of these factors: abuse, mental illness, and brain damage, were present in 1995.

On cross-examination, Dr. Pincus conceded that Dr. Eric Engum testified at the Petitioner's trial that there was no brain damage to the Petitioner. Dr. Engum had been retained by trial counsel. Dr. Pincus stated that Dr. Engum's diagnosis was wrong and that he had failed to obtain an MRI. Dr. Pincus stated that the trial attorneys may have been incompetent but that Dr. Engum was "just wrong."

Alicia Wills, the Petitioner's half-sister, testified that she and the Petitioner have the same mother but different fathers. When the Petitioner was born, Ms. Wills began spending more time with her grandmother and grandfather. She explained that she was raised by her maternal grandmother, Zola Fotos. Ms. Wills loved her grand-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

mother and knew that her grandmother loved her. She explained, however, that her grandmother physically disciplined the Petitioner. Ms. Wills also testified that her grandmother "drank every day," stating that she would start the day with whiskey in the morning. However, Ms. Wills explained that she was never aware that her grandmother was drunk. Ms. Wills stated that her grandmother's death impacted her tremendously. Ms. Wills explained that she felt that no one else cared for her the way her grandmother did. Ms. Wills stated that, at this point in her life, she started getting into fights and started using drugs. Ms. Wills testified that she was twelve or thirteen years old when her grandmother died.

Ms. Wills described her Grandfather Fotos as "fun." She stated that he would give the Petitioner and her candy and that he spoiled them. She denied any allegation that Grandfather Fotos mistreated the Petitioner. She conceded that he was a butcher and owned a slaughter house and that they visited the slaughter house. Ms. Willis stated that she did not feel that she had any emotional scars from witnessing the animal processing.

Ms. Wills testified that her mother announced one day that she was marrying Danny Thompson and that they were all moving to North Carolina. Ms. Willis stated that her new stepfather was "mean to us." She denied that he ever physically harmed her but stated that he would get fast food and eat it in front of them without offering them any. Ms. Wills stated that she was angry at her mother for "shack[ing] up with" this man and for pushing her own children to the side. Ms. Wills was also angry about the move to North Carolina, where she felt that she did not fit in. Ms. Wills testified that she "became completely depressed and extremely angry ." Ms. Wills stated that her mother placed her own pleasures and happiness before that of her children.

Ms. Wills also testified regarding her parents' marriage. She stated that, during the marriage, her father would lose his temper and hit her mother. However, she explained that "[her mother] was running around having affairs with men while she was supposed to be at church...." Ms. Wills also described her mother as an alcoholic. She stated that "parties were a big part of our life" and that her mother let her take "sips of her beer." On one occasion when Ms. Wills was in the second grade, her mother packed her lunch for school and included a beer. She stated that she could not recall ever sitting on her mother's lap or getting a hug from her mother. Ms. Wills testified that her mother's treatment of the Petitioner was probably similar, although she described their relationship as closer than her own with her mother. She described the relationship between the Petitioner and her mother as more of a friendship than a mother-daughter relationship. She added that she "always felt like [she] was the mother...." Ms. Wills testified that she never saw the Petitioner's father, Glenn Pike, physically discipline her.

***19** Ms. Wills testified that, when she was in the fifth grade, she and the Petitioner went to the mall and spent all of the child support money Glenn Pike had given to the Petitioner to give to her mother. She stated that, during the shopping spree, she had shoplifted one pair of earrings. Ms. Wills stated that the Petitioner, who was approximately six years old, had shoplifted at least twenty pieces of jewelry. Ms. Wills further testified that the Petitioner read horror stories, like Stephen King, when she was very young.

Ms. Wills stated that she liked to watch her mother and her friends get ready to go out to parties. She stated that this appealed to her because she looked forward to living a similar lifestyle. Ms. Wills admitted that she started smoking marijuana when she was twelve years old. Ms. Wills became pregnant at age fifteen and stopped smoking marijuana until she was seventeen.

Ms. Wills described the Petitioner as having a big heart and stated that the Petitioner "loves people." She added that the Petitioner had dreams of becoming a nurse. Ms. Wills testified that the Petitioner was "very messy" and would sometimes have a "blank look." Ms. Wills stated that, in retrospect, she could see that "there were things that were not normal about [the Petitioner]." Specifically, she acknowledged that the Petitioner would have episodes of sudden rage. Ms. Wills testified that the Petitioner loved Ms. Wills' son Keith and would act like his mother. Ms. Wills was unaware of any allegations that the Petitioner had abused her son. Ms. Wills stated that the Petitioner always wanted to give Keith a bath but that she was not comfortable with the Petitioner giving her son a bath. Ms. Wills testified that any statement that Dr. McCoy had made regarding allegations of the Petitioner's sexual abuse of Keith were untrue and unfounded.

Ms. Wills testified that she was aware that the Petitioner was "drawing dirty pictures at school at a very young age." However, she stated that she had no knowledge as to whether the Petitioner had been sexually abused. Ms. Wills stated that she did not believe the Peti-

tioner's accusations that a man had raped her.

Ms. Wills denied any allegation that she had abused the Petitioner. Ms. Wills specifically denied that she intentionally burned her sister with a curling iron. She explained that the girls were playing beauty shop when she accidentally burned the Petitioner with the curling iron. She further explained that the curling iron incident occurred when the Petitioner was three or four years old. Ms. Wills also denied slamming the Petitioner's fingers in a door. Ms. Wills denied holding the Petitioner down and scraping the bottom of her foot with an electric plug.

Ms. Wills testified that she was not subpoenaed by either the State or the defense team for the Petitioner's trial. She indicated that she had anticipated being called as a witness because the Petitioner was her sister. Ms. Wills testified that, in her opinion, the Petitioner "never had a [fair] shake from the day she was born." Ms. Wills stated that, at the time of the trial, she was living in Dallas, Texas, and that she currently had "a great life." She owned her own business and had been married for twelve years. She stated that she had "peace inside."

***20** Emil Glenn Pike, the Petitioner's father, stated that he testified during the 1996 penalty phase of the Petitioner's trial. He testified that he had been interviewed by Dr. Diana McCoy prior to his testimony. Mr. Pike stated that he was born and raised in Beckley, West Virginia. He related that his father had worked as coal miner and a plumber and that his mother was a housewife. He testified that his parents disciplined him by using a switch or a belt. As a result of this discipline, Mr. Pike "swore to never ... put a switch to my children." Mr. Pike testified that his father died when he was thirteen years old. After his father's death, the family moved to Indiana to find work. Mr. Pike testified that, in 1966, he was drafted and sent to Vietnam, where he contracted hepatitis and was wounded. Mr. Pike re-enlisted in the service in 1973, because he could not find a job in West Virginia. Mr. Pike testified that, during his time in Vietnam, he was exposed to agent orange. He was provided information that his exposure may cause birth defects in children, specifically, spina bifida.

Mr. Pike testified that in 1974, he married Joanne Lily. After their divorce, he married the Petitioner's mother in 1975. He stated that his social life with the Petitioner's mother involved drinking alcohol. Mr. Pike testified that the Petitioner's mother got pregnant soon after their marriage. After his discharge from the service, he returned to Beckley, West Virginia, and opened a motorcross race track on the family farm. Mr. Pike recalled the day the Petitioner was born. He stated that the Petitioner's mother had a caesarean section and that the Petitioner had hyaline membrane disease and was taken to a hospital in Charleston.

Mr. Pike reported that he began working road construction and was often away from home. When he learned that the Petitioner's mother was seeing other men during this time, the couple divorced. However, after the Petitioner's mother attempted suicide, the couple remarried. Afterward, the Petitioner's mother resumed her previous ways of partying, and the couple grew apart.

Mr. Pike related that his mother would often babysit the Petitioner. According to Mr. Pike, his mother loved the Petitioner and spent a lot of time with her. He testified, however, that his wife's mother did not appear to like either him or the Petitioner. He presumed that his mother-in-law felt that he was of a lower social class.

Mr. Pike stated that he would use either his hand or a belt to discipline the Petitioner. At most, he struck her with the belt three or four times in the same day. Mr. Pike denied that he ever made the Petitioner remove her clothing for the spankings and stated that any scars on the Petitioner's back were not the result of any spankings he gave her. He recalled that, after the Petitioner's mother married Danny Thompson, she contacted him regarding the Petitioner's behavior. The Petitioner's mother informed Mr. Pike that she was having disciplinary problems with the Petitioner and asked that he try to take care of her. He stated that the Petitioner would come live with him for a while, but then he would start having problems with the Petitioner and she would be returned to her mother.

***21** Mr. Pike testified that he later married Kathleen Almond and that they had two children together. He confirmed that there had been an allegation that the Petitioner had sexually abused his younger daughter. Mr. Pike stated that his wife had told the therapist she was seeing that his younger daughter had reported that the Petitioner had "licked her" and had pointed "towards her belly or towards her genitals and said, 'There?'." The therapist told Mr. Pike's wife that the Petitioner was not to be around the younger daughter. The Petitioner denied any wrongdoing, and Mr. Pike stated that he had never observed any inappropriate behavior between the Petitioner and his other children. He stated that he did not believe the Petitioner had molested his younger daughter.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. Pike stated that he was aware that the Petitioner spent time at a juvenile facility in North Carolina. He further stated that he did not visit her during her time at that facility. Mr. Pike testified that he was not aware that the Petitioner was entering the Job Corp Program until after she had already entered the program.

Mr. Pike denied that he had previously described the Petitioner as a manipulator but conceded that he had described her as a liar. He also admitted that on one occasion, the Petitioner had forged her teacher's name.

Faye Johnson Guy testified that she was a neighbor of the Petitioner's family and that she also worked with the Petitioner's mother. Ms. Guy testified that she frequently spent time with the Petitioner and her family on a social basis and observed that the Petitioner's mother, Carissa, abused alcohol. Ms. Guy related that Carissa was married to Danny Thompson when they first met. She stated that she met Danny Thompson only once or twice and that he was drunk and appeared violent on those occasions. After Carissa left Danny Thompson, she moved close to Ms. Guy. Ms. Guy stated that Carissa began seeing other men shortly after she separated from Danny Thompson. She stated that Carissa was involved with a married man. Ms. Guy also confirmed that Carissa dated a man named Steve Kyaw and that shortly after she began seeing him, Kyaw moved into her home.

Ms. Guy testified that she often included the Petitioner in her family's outings because the Petitioner was often left home alone. She stated that the Petitioner told her that she had access to pornographic movies that belonged to either her mother or to Steve Kyaw. Ms. Guy had also observed the Petitioner watch horror movies with her mother, Carissa. Ms. Guy stated that she had told Carissa that she felt that it was inappropriate for the Petitioner to be watching these horror movies. Ms. Guy recalled that Carissa just laughed and stated that the Petitioner enjoyed these movies and had been watching them since she was two or three years old. Ms. Guy testified that the Petitioner and Carissa had more of a friend relationship than a mother-daughter relationship. She stated that Carissa would discuss inappropriate things with the Petitioner, e.g., sex with her boyfriends.

***22** Ms. Guy testified that both the Petitioner and Carissa participated in her wedding. She recalled that, at the rehearsal dinner, Carissa was caught having sexual intercourse in the bathroom with Ms. Guy's future brother-in-law. Ms. Guy testified that, later that same evening, she again caught Carissa having sexual intercourse with her future brother-in-law, who was married. Ms. Guy stated that she and Carissa were friends with Ann Marie Hansen and her husband, Gerard. Ann Marie Hansen worked with Ms. Guy and Carissa. Carissa had an affair with Gerard Hansen. He eventually left his wife and moved in with Carissa. They later married. After this event, Ms. Guy began to sever her relationship with Carissa.

Ms. Guy testified that the Petitioner had mood swings. The Petitioner would be happy and cheerful and could quickly become sad and depressed. Ms. Guy initially thought that the mood swings were due to hormones. Ms. Guy later recognized the signs of bipolar disorder. She explained that her mother was bipolar and that the Petitioner's symptoms reminded her of her mother. Ms. Guy also testified that, in her opinion, the Petitioner's sister, Alicia, seemed to pick on the Petitioner.

Ms. Guy testified that she had met Carissa's father, Chris Fotos. She stated that Chris Fotos "scared me a bit," was very prejudiced against African–Americans, and often talked about violence.

Orlando Powell testified that he was formerly the manager of a Pizza Hut in Durham, North Carolina, where the Petitioner would come with her friends. He explained that "she grew towards me and the more she grew towards me, I just grew towards her." Mr. Powell explained that their relationship eventually became a romantic one. He stated that the Petitioner was with him most of the time. Mr. Powell met the Petitioner's mother, and he stated that he could tell there was not much of a relationship between the Petitioner and her mother.

Mr. Powell described the Petitioner as "a little fire ball." He stated that she had a temper. Mr. Powell testified that the Petitioner's temper would just erupt and that he "want[ed] to save [the Petitioner] because jail is not a place for her at this time." He also described her as being "wired" or full of energy. Mr. Powell stated that he knew the Petitioner smoked marijuana and drank alcohol. Mr. Powell stated that their relationship lasted a year to a year and a half. Mr. Powell stated that they were still dating when she made the decision to enter the Job Corp Program. He explained that, during her Christmas break from Job Corp, he tried to make her stay in North Carolina. Mr. Powell stated the Petitioner was never violent toward him; however, he did observe the Petitioner become violent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

toward others. Mr. Powell stated that no one from the Petitioner's defense team contacted him prior to her trial and that no one contacted him until 2000.

Carol Goehring testified that she first met the Petitioner when they were in the seventh grade. Ms. Goehring stated that she and the Petitioner became friends and that she had occasion to visit the Petitioner in her home. Ms. Goehring stated that Steve Kyaw was living with the Petitioner's mother at the time. During one visit, Steve Kyaw began yelling at the Petitioner. The Petitioner told Ms. Goehring to "go out back...." Ms. Goehring saw Steve Kyaw "nudge [the Petitioner] to the room." She then saw the Petitioner running from the room. Ms. Goehring heard bumping and yelling, and she then saw the Petitioner with "a knife in her hand and her face was all red and she was trying to adjust her pants." Ms. Goehring described the Petitioner as "very panicked." Ms. Goehring called her mother to come get her and the Petitioner. After this incident, Ms. Goehring was no longer permitted to visit the Petitioner's home. Ms. Goehring stated that, a month later, the Petitioner's mother moved and that she left Steve Kyaw. Ms. Goehring described the Petitioner as a very loyal person. She stated that the Petitioner was "very happy," "very energetic."

***23** Jamie Robinson testified that the Petitioner's ex-boyfriend, Brian Wilson, and her ex-boyfriend, Jeffrey Crank, were best friends. Ms. Robinson stated that the four of them ended up living on the streets for a while. Ms. Robinson explained that, in her situation, her parents did not approve of Jeffrey Crank and gave her an ultimatum. Ms. Robinson stated that the four of them would sleep in hospitals and hotels and would run the streets a lot of nights, just walking. She explained that Brian Wilson and Jeffrey Crank would often sell their plasma to get money for a hotel room. She recalled that there were times when they had nothing to eat except ketchup and hot sauce from packets.

Ms. Robinson stated that she spent the night at the Petitioner's home on one occasion, but she could not recall meeting the Petitioner's mother. She stated that, in her opinion, the Petitioner and her stepfather did not get along. Ms. Robinson observed that the Petitioner's parents had no food in the house. She also observed that the Petitioner did not have sheets on her bed. This same evening, the Petitioner and Ms. Robinson snuck Jeffrey Crank into the home, and the Petitioner's parents never knew he was there.

Ms. Robinson recalled an incident where she and the Petitioner shoplifted some shirts for Jeff Crank and Brian Wilson. The Petitioner told Ms. Robinson to run and took off running herself. Ms. Robinson stated that she did not run. Ms. Robinson was not arrested, but the Petitioner was arrested and placed in a police car. Ms. Robinson recalled that the Petitioner was laughing after she was caught. Ms. Robinson also recalled an incident where the security officers at the mall called their parents because they had been at the mall "a very long time." Ms. Robinson stated that the officers were on the telephone with her mother for a very long time. She stated that her mother asked the officers about Ms. Robinson's condition. Ms. Robinson related that the officers were only on the telephone with the Petitioner's mother for "two seconds."

Ms. Robinson related that the Petitioner "seemed to be okay with the way things were for her...." Ms. Robinson stated that she could not have dealt with the situation the way the Petitioner did. Ms. Robinson learned that the Petitioner had been raped. Ms. Robinson stated that the Petitioner "never showed any emotion." She did, however, acknowledge that the Petitioner and Brian Wilson fought a lot. Ms. Robinson recalled an incident where the Petitioner and a new boyfriend "beat Brian up pretty badly, and I remember [the Petitioner] throwing a beer bottle at him." This incident occurred after the Petitioner and Brian Wilson had ended their relationship and the four of them were no longer hanging around one another. Ms. Robinson stated that she was never contacted by the Petitioner's defense team.

Kerry Sherrill testified that she was a treatment worker for the Child Protective Services Unit of Orange County, North Carolina and that she was assigned the Petitioner's case following an allegation of child abuse and neglect. Ms. Sherrill testified that she observed that the Petitioner, who was in middle school at the time, was a "bright and warm young woman, easy to get along with, [and] enjoyed the attention of adults." Ms. Sherrill related that the initial allegation involved the Petitioner's mother's boyfriend, Steve Kyaw, and a report of inappropriate discipline. She reported that "the plan was to keep [the Petitioner] safe when she was in the home and if Steve [was] going to be present in the home." Ms. Sherrill reported that the Petitioner was eventually placed at Shaeffer House, due to the Petitioner's truancy and running away. She also reported that it appeared that the Petitioner's mother was "not doing what she needed to meet [the Petitioner's] needs." Ms. Sherrill testified that, while at Shaeffer House, the Petitioner wrote a letter to her friend,

Brandy, expressing that "she was very unhappy with her life and had made a plan to commit suicide...." The Petitioner enumerated her reasons for wanting to kill herself, including the assertion that she had been raped by Claude Davis. Ms. Sherrill stated that the Petitioner's case was closed after Steve Kyaw moved out of the family home.

***24** Peggy Hamlett testified that she is a counselor with the North Carolina Department of Juvenile Justice. Ms. Hamlett testified that the Petitioner was initially charged with a felony breaking and entering and larceny of a community center during which the Petitioner stole some candy. As a result of this incident, the Petitioner was adjudicated delinquent and was placed under Ms. Hamlett's supervision. Ms. Hamlett stated that the Petitioner's probation was later revoked and that she was sent to a juvenile detention center. Ms. Hamlett explained that the Petitioner's initial term in the facility would have been six months. However, the Petitioner was at the facility for more than a year because she kept receiving infractions. Ms. Hamlett testified that the Petitioner's juvenile records would have been destroyed when she reached the age of eighteen.

Ms. Hamlett described the Petitioner as a "smart girl" with "a lot of potential." She also stated that the Petitioner was "out of control." Ms. Hamlett stated that the Petitioner was drinking and "huffing" and, perhaps, doing other drugs. Ms. Hamlett described "huffing" as when one would "huff the fumes that come from an aerosol can ... and get high." She stated that huffing was very dangerous. Ms. Hamlett also stated that the Petitioner was not an aggressive person.

Ms. Hamlett testified that she was contacted by the Petitioner's counsel and by Dr. McCoy prior to the Petitioner's trial. However, she stated that she was not asked to attend the Petitioner's trial.

Debby Howell Burchfield was employed at the Juvenile Evaluation Center in Swannoa in the 1990s. Ms. Burchfield explained that the Juvenile Evaluation Center was a state training school for youths who had been committed by the courts due to delinquent behavior. She stated that she was the Petitioner's social worker. Ms. Burchfield explained that her office was in the living quarters for the girls, so she had direct contact with them every day. Ms. Burchfield testified that the Petitioner remained confined at Swannoa from November 1991 until March 1993. She stated that this was a longer period of time than usual but was because the Petitioner was unable to maintain or achieve the level of points necessary to be released. Ms. Burchfield described the Petitioner's actions as "sabotaging" herself.

Ms. Burchfield testified that, while at Swannoa, a juvenile could have one visit per week. She stated that the Petitioner was at Swannoa for about fifteen months; thus, she was eligible for sixty visits during that time period. The Petitioner received only eight visits during this time.

Ms. Burchfield testified that the Petitioner related that she never felt close to either of her parents. She stated that the Petitioner felt that she had been emotionally abused by her father and that her mother was not a real parent to her. Ms. Burchfield testified that there were incidents in which the Petitioner engaged in self-mutilation and tattooing of her body. She stated that the Petitioner had also reported being a victim of abuse by her older sister. She admitted that she had previously indicated to post-conviction counsel's investigator that the Petitioner "was known to have dabbled with devil worship. She would draw pictures and talk about that, and she also dressed in gothic." Ms. Burchfield also admitted that it was important for the Petitioner to get her way but explained that this was common in adolescents. Ms. Burchfield testified that, upon her release from Swannoa, the Petitioner planned to enroll at Almance Technical College to study nursing. The staff at Swannoa attempted to assist the Petitioner in reaching her goals. Ms. Burchfield noted that the Petitioner had completed the GED program and that the staff assisted in preparing her application to the Job Corp Program.

***25** Ms. Burchfield testified that, in 1996, she was contacted by a psychiatrist involved in the Petitioner's case. She stated that records were sent to the psychiatrist by her office.

Kristina Hargis, a social worker with the North Carolina Department of Juvenile Justice, testified that she was assigned to the Swannoa Youth Development Center as a house parent and counselor. She stated that she was with the juveniles eight hours a day. She added that she spent one hour a week with the Petitioner individually, talking about her feelings and problems. Ms. Hargis stated that she was not contacted by the Petitioner's trial attorneys.

Ms. Hargis described the Petitioner as "struggling" and "depressed." She stated that the Petitioner was upset that she got into trouble. She opined that the Petitioner could not understand why she was doing the things to get

herself in trouble. Ms. Hargis confirmed that the Petitioner was at Swannoa longer than she needed to be because she continued to get into trouble. She surmised that the Petitioner was intentionally sabotaging herself in order not to be released.

Ms. Hargis explained that Swannoa's student body was both male and female. She stated that there were 180 males and 45 females. Ms. Hargis stated that the juveniles had to do chores and attend school and treatment programs. The juveniles also had structured recreation programs. Ms. Hargis opined that there was little free time.

Frederic Marshall Muse testified that he was employed as a teacher at Swannoa during the 1990s and that the Petitioner was assigned to his class. Mr. Muse testified that the Petitioner was initially defiant in his class. However, when she learned who was in charge, her attitude changed, and she began to work. Mr. Muse recommended the Petitioner for various teacher aid positions. He stated that the Petitioner became a teacher's aide and remained in that position for the duration of her stay. He explained that the Petitioner had the "run of the campus" when she was running errands for the teacher. He described the Petitioner as being respectful. Mr. Muse remarked that he and the Petitioner developed a respectful relationship, and he described the Petitioner as having "a delightful sense of humor."

Mr. Muse stated that he could not recall telling the post-conviction investigator that the Petitioner "seemed to have two faces." He explained that the Petitioner had one of the higher intellects at Swannoa. He explained that the Petitioner could feign getting along and being happy when, in reality, she was not. Mr. Muse stated that he was not contacted by the Petitioner's trial team.

Andrew Drace was in the Job Corp with the Petitioner. He arrived at the center in October 1994, and was enrolled in the certified nursing assistant program. He stated that Swannoa was small and that "everyone knew everybody." Mr. Drace described the Job Corp Program as a "pretty rough, violent place." He stated that there were gangs and people who picked on other people. He stated that gang members would come into students' rooms, place sheets over them, and beat them up, mainly because they were white. There were less than ten white male students at the center. He stated that Tadaryl Shipp was one of the gang members and that he was "in fear of him on a daily basis." He stated that, on one occasion, Tadaryl Shipp attempted to throw him from a bridge near the center. Mr. Drace explained that, out of fear for their own safety, many students hid in their rooms.

***26** Mr. Drace testified that on the morning of January 12, 1995, he saw Colleen Slimmer, and she asked whether he had seen Tadaryl Shipp. This was the last time that Mr. Drace saw Ms. Slemmer. The next day, Mr. Drace and his friend Anthony purchased some liquor and were walking along Cumberland Avenue when they ran into the Petitioner. Mr. Drace stated that the Petitioner started drinking with them. He stated that the Petitioner drank two plastic fountain cups of Mad Dog 20/20. He stated that the Petitioner was definitely intoxicated when she left but had indicated that she wanted to drink some more.

After the murder of Ms. Slemmer, the center was placed on lockdown, and no one was permitted to leave. The students stopped going to their classes. Mr. Drace reported that he lost his job at Wendy's. He stated that they were all questioned. Mr. Drace later contacted the Petitioner's attorneys but observed that the Petitioner's attorney "didn't seem to care."

Mr. Drace testified that after the murder, the Job Corp Center closed and the students were "shipped" to Gulfport, Mississippi. He stated that he did not complete the program in Mississippi. He explained that he left because he was told that he would have to restart the entire program. He added that the group from Knoxville had the stigma of being "evil, terrible people."

Onas Perry was employed at the Juvenile Evaluation Center in Swannoa, North Carolina, in the 1990s. She stated that she supervised sixteen girls, including the Petitioner. Ms. Perry testified that the Petitioner would stay up at night and help clean. The Petitioner would also want to talk about her family problems. The Petitioner related that she wanted a better relationship with her mother and wished that her mother loved her more. Ms. Perry testified that the Petitioner reported verbal, physical, and sexual abuse. Ms. Perry stated that she believed the Petitioner's reports. Ms. Perry related that, in her opinion, the Petitioner sabotaged herself to be able to stay at Swannoa.

Ms. Perry testified that she had observed the Petitioner "in the hobby room doing some Satanic stuff I guess" with some of the other girls. Ms. Perry related that she noticed the light go off in the hobby room and that when she went to see what was going on, she observed the girls sitting down, holding hands, and chanting. She

did not understand what they were chanting. Ms. Perry also observed a pentagram on a piece of paper. Ms. Perry stated that she believed that the Petitioner "was just searching, experimenting or trying to find out who she was...." Ms. Perry stated that the Petitioner had different moods that were not normal. She explained that "[s]ometimes [the Petitioner] would be calm, and sometimes she would just be like just kind of out of control...."

William Joseph Mode testified that, in the fall of 1994, he was employed as an instructor at Job Corp on Rutledge Pike. Mr. Mode taught cultural awareness, reading, AODA (a class on drugs and alcohol), and parenting. Mr. Mode recalled that Colleen Slemmer was "a very sweet young lady." Mr. Mode testified that, although he was under the impression that the Job Corp students did not have violent criminal backgrounds, this impression was contradicted by the actions of the students. He described incidents of being slapped and hit by students. He also recalled an incident where a student threatened to kill him.

***27** Mr. Mode testified that Tadaryl Shipp often came to class high, hung over, or drunk, when he came at all. He described Tadaryl Shipp as disrespectful. He stated that there was little discipline by the Job Corp supervisors. He stated that, from what he had heard from the students, the Job Corp dormitories were unsafe. Mr. Mode stated that he knew Shadolla Peterson and the Petitioner and that he knew about the "devil worshiping business."

Jacqueline Olebe was employed at Knoxville Job Corp as a health instructor in 1994 and 1995. She described the Petitioner as a non-violent student who completed her course requirements. She noted that the Petitioner often slept in her classes but that she participated when she was awake. Ms. Olebe stated that the Petitioner was smart and wanted to be a nurse. She also testified that she came into contact with the Petitioner through her position on the Drug Abuse Panel and was aware that the Petitioner used marijuana and alcohol. She also acknowledged a conversation she had with the Petitioner regarding voodoo in which the petitioner told her that it worked.

Ms. Olebe testified that Mr. Shipp rarely attended her classes but when he did he was loud and disrespectful. She described the victim as very respectful and skilled. Finally, she stated that she was not contacted by anyone regarding the Petitioner until after the conviction.

Next to testify was Kim Rhodes, a fellow student in the Job Corp Program, who testified for the State at trial. Ms. Rhodes described the environment at the Job Corp as "scary," with a great deal of animosity between different groups. She also related that there was a lot of drug use at the Center.

Ms. Rhodes testified that she had a great relationship with the Petitioner and that she felt safe with her. She stated that both felt like they did not fit in with others. She specifically testified that she never saw the Petitioner act violent. She testified that she was shocked when the Petitioner made the statement to her that the victim had been killed. She also stated that after giving her statement in the case, she was informed by the State's attorney that she would not be allowed to see the Petitioner. She said that she missed her friend.

The next witness to testify was Judge Matthew Martin from North Carolina. Prior to becoming a judge, he represented the Petitioner, who was a juvenile at the time, on multiple occasions. Judge Martin testified that he felt that sending the Petitioner to training school was a mistake and that he had, in fact, found an alternative which he recommended to the sentencing judge. He felt that the Petitioner would have benefitted more from another type of service. Judge Martin testified that he believed the Petitioner was an abused child and that he was not surprised to learn that she was diagnosed with bipolar disorder. Finally, Judge Martin testified that after the Petitioner was charged in this case, he contacted trial counsel and supplied them with his file.

***28** Next, Tadaryl Shipp, the Petitioner's co-defendant and former boyfriend, was called to testify. He began his testimony by acknowledging his membership in the Gangster Disciples, as well as the membership of the third co-defendant Peterson. He testified that the Petitioner was not a member of the gang. Shipp also acknowledged his romantic involvement with the Petitioner and described her as his best friend. He stated that the Petitioner was a caring person but that she was "edgy" and had mood swings. Shipp testified that during her moods, she often hit him for no apparent reason. He testified that the Petitioner was like two different people depending on whether she was agitated or calm. He estimated that the mood swings could last from two to three minutes up to an hour. During these periods, the Petitioner just went into a rage. Shipp further indicated that the Petitioner was particularly agitated just prior to the murder.

Shipp testified that the Petitioner took the relationship more seriously than he did, and he acknowledged that he was seeing other girls at the time. He stated that he did not believe the Petitioner had been aware of that fact. He also testified that the Petitioner continued to write him three to four letters per week after the offense occurred.

Shipp acknowledged that he was the one who carved the pentagram on the victim's chest and stated that he did so because he felt like it. He acknowledged that this varied from his original statement to police that the Petitioner brought the weapons and helped carve the pentagram. Shipp further testified that he was unable to recall whose idea it had been to take the victim to the scene, although he acknowledged that he had previously indicated in a statement to police that it was the Petitioner's idea. Shipp stated, however, that he was intoxicated when he gave the statement and that the police were harassing him. Finally, Shipp testified that he would have testified for the Petitioner at trial if he had been asked, even if it conflicted with his own attorney's advice.

Tyrone Comfort also testified and stated he was at the Job Corp Center with the Petitioner and that she was one of his best friends. He indicated that the Petitioner would sometimes be "overly happy" and then suddenly very sad. He described one incident when he observed her in the hall crying, screaming, and pulling out her hair. Mr. Comfort indicated that he did not know Shipp well, but he did not like the way that Shipp treated the Petitioner. He testified that he heard the Petitioner and Shipp argue on multiple occasions, and he recalled seeing bruises and marks on the Petitioner at times. He indicated that Shipp was the one controlling the relationship, even going so far as to threaten Mr. Comfort.

The next two witnesses to testify, DeAndrea Gates and Amanda Robertson, were both former girlfriends of Shipp. Both indicated that he was abusive to them, as well as manipulative and controlling. Ms. Gates indicated that she believed that Shipp preyed on women he could control. She further indicated that she was not contacted by the Petitioner's defense team. Ms. Robertson said that she was not contacted until 1995 or 1996.

***29** Jermaine Bishop, another former student at the Job Corp, indicated that, at the time of the hearing, he was incarcerated for especially aggravated kidnapping and especially aggravated robbery. He testified that met Shipp in the program and described him as "weird." Mr. Bishop testified that he was aware that the Petitioner and Shipp were dating, and he felt that Shipp was in control of the relationship. He further testified that the Petitioner and Shipp fought often.

Co-counsel was the next witness, and she stated that she had been licensed to practice law since 1992, and that she had been appointed to the Petitioner's case on January 23, 1996. At the time, her practice consisted primarily of criminal cases. She also indicated that she had previously served as an assistance public defender and had handled felony and misdemeanor trials. Co-counsel acknowledged that the Petitioner's case was her first murder case. She indicated that her primary role in the case was research and the drafting of motions. She also stated that she was responsible for preparing voir dire, conducting some cross-examination in the guilt phase, and handling the family witnesses in the penalty phase.

Co-counsel testified that she was appointed to replace prior co-counsel and that much of the groundwork had already been done when she was appointed. She indicated that her initial thoughts upon reviewing the case were that it might be possible to prove second degree murder based upon "the frenzy" at the murder scene combined with the Petitioner's mental health issues. However, she noted that she saw sentencing as the critical phase and, from the beginning, began analyzing what proof would be needed.

Co-counsel stated that Dr. McCoy had been retained as the mitigation expert prior to co-counsel's own appointment. She met with Dr. McCoy and lead counsel in March and reviewed the materials which had been prepared by Dr. McCoy. Co-counsel further indicated that she presumed these materials were also shared with Dr. Engum, who had produced a diagnosis of severe borderline personality disorder.

Co-counsel testified that, in the penalty phase, the goal was to establish that the Petitioner came from a dysfunctional family with a history of drug and alcohol abuse. In hope of establishing this, the initial strategy was to call Dr. McCoy and to introduce her report. However, at the "ninth hour," a decision was made against having Dr. McCoy testify in the penalty phase. Co-counsel indicated that this decision was made because of several problems which arose with Dr. McCoy, namely her relationship with the prosecutor in the case and her statement that she was not in agreement with Dr. Engum's report. Despite the decision against calling Dr. McCoy, the defense team unsuccessfully attempted to get her report admitted into evidence, as well as the charts which had been pre-

pared. Co-counsel acknowledged that only three witnesses were called to testify and stated that it might have been more helpful to the case to call other lay witnesses. However, by the time the decision was made not to use Dr. McCoy, it was too late. Co-counsel said that she attempted to present their mitigation theme as well as she could using the lay witnesses but acknowledged that they had no expert "to connect the dots." However, she stated that she attempted to do so in her closing argument.

***30** Co-counsel testified that she was aware that much of the material contained in the report by Dr. McCoy, including the incidents of the Petitioner's prior violence, were a "two-edged sword." She stated that they felt the defense had to be careful about the type of mitigation evidence which was presented because some of the proof "could hurt them as much as it helped." She stated that they were faced with "a horrible case with horrible facts and someone that confessed *ad nauseam* and kept confessing over and over and over in letters that she was passing out."

Co-counsel acknowledged that they had filed a "don't ask/don't tell" motion regarding the death penalty issue with the jury. According to her, the strategy was to get one person on the jury who was totally opposed to the death penalty. She acknowledged that this decision involved the risk of getting twelve jurors who were all in favor of the death penalty. She also acknowledged that Dr. McCoy's entire report was given to the prosecution despite the fact that it contained information which would have been privileged, especially in light of the decision not to call Dr. McCoy to the stand. She further acknowledged that the prosecution's cross-examination of the witnesses, utilizing information contained in the report, was damaging to their case. However, she also testified that the decision not to call Dr. McCoy resulted in the State not being able to use many other damaging facts which were contained in the report. Co-counsel also testified that she could not recall why there was no objection made to the inconsistent theories utilized by the State based upon the charge of conspiracy and then the application of the aggravating factor that the killing was done, in part, to avoid arrest.

On cross-examination, co-counsel stated that she was aware of lead counsel's overbilling issues but did not discuss it with him. She testified that she did not think the issue affected lead-counsel's representation of the Petitioner and described him as very zealous. Co-counsel acknowledged that she and lead counsel had the Petitioner sign a release which would allow them to profit from the Petitioner's story. However, she explained that the document only referred to public aspects, not information protected by the attorney/client privilege. She testified that the main purpose of the document was to protect the Petitioner's rights and eliminate any ethical concerns. Co-counsel specifically testified that the release in no way affected any trial strategy or decision.

Co-counsel reiterated that the goal in the guilt phase was to try to convince the jury to convict the Petitioner of second degree murder based upon the frenzy of the scene and the controlling nature of the Petitioner's relationship with Shipp. However, she acknowledged that some witnesses, as well as the Petitioner's own statement, undercut the theory that Shipp had committed most of the acts during the murder. In addition, co-counsel stated that some aspects of Dr. McCoy's report also undermined this theory.

***31** Co-counsel testified that she had met with the Post–Conviction Defender's Office on one occasion in 1999 and had given them her entire file. She indicated that, despite requests to do so, she had not met with them again as she believed that everything had been covered.

Next, the Petitioner called William Crabtree to testify. General Crabtree testified that he had been employed as a District Attorney General for more than thirty years and had been the lead prosecutor in the Petitioner's trial. He also indicated that knew Dr. Diana McCoy, the mitigation expert employed by the defense team, and had dated her for a period of time. General Crabtree indicated that the relationship had occurred prior to the Petitioner's trial and that he and Dr. McCoy were not involved at all during the trial. Further, General Crabtree testified that he was not aware that Dr. McCoy was employed in the Petitioner's case until he received her notebooks and report during the penalty phase of the Petitioner's trial. He also indicated that he was not happy to get the large report so late in the proceeding. He was unable to recall what information was contained in the report or if he found specific information in it that he used to cross-examine the Petitioner's witnesses.

General Crabtree testified that he saw no reason to withdraw as the prosecutor because of his previous relationship with Dr. McCoy. He indicated that he did not see that a conflict of interest was created. He testified that he had prosecuted several other cases in which Dr. McCoy was involved. He indicated that only in one instance did

he withdraw and that was because he had generally discussed the facts of that case with her prior to learning of her involvement.

Next, the Petitioner's lead counsel at trial testified that he had been practicing law in Knoxville since 1986. He indicated that his practice was exclusively criminal defense at the time and that, prior to his appointment in the Petitioner's case, he had handled several murders cases but had not previously handled a capital case.

In 1993 or 1994, lead counsel learned from an article in the newspaper that the Comptroller's Office was conducting an audit of the indigent defense system and that he would likely be one of the attorneys involved in the audit. As a result, he conducted a "self-audit" and discovered that, in certain instances, he had billed more than twenty-four hours in a day. He self-reported to the Board of Professional Responsibility on the advice of counsel. In April of 1995, one month prior to his appointment in the Petitioner's case, he had to repay approximately $67,000 to the fund. Prior to repayment, he had refrained from taking any appointments and withdrew from some cases to avoid an appearance of impropriety. Lead counsel testified that he was not concerned that the investigation would affect his representation of the Petitioner because he had been "cleared to practice law" at the time of the appointment. Despite the fact that his name had been in the newspaper, he was not concerned about the issue affecting potential jurors during voir dire. At the time of the appointment, the only complaint pending was the disciplinary complaint, which he had self-reported. That issue was not resolved until 1998, and lead counsel never received an active suspension nor was his practice interrupted.

***32** Lead counsel testified that he had several murder cases prior to his involvement in the Petitioner's case. He estimated he had taken a dozen or more felony cases to jury trial. He could not recall whether he had called an expert witness to testify in those trials, but he did indicate that he often used investigators, pathologists, and psychologists. He also stated that, at some point prior to trial, he contacted the Capital Case Resource Center.

Lead counsel testified that early in his representation, he engaged Dr. Engum to do psychological testing on the Petitioner. He met with Dr. Engum on several occasions to discuss the findings. In the late summer or early fall of 1995, lead counsel also engaged the services of Dr. Diana McCoy as a mitigation specialist and indicated that he communicated with Dr. McCoy frequently. According to lead counsel, his strategy was that he and Dr. Engum would concentrate on the guilt phase where he knew they would "take a beating" and then Dr. McCoy would "come out and save the day" in the penalty phase. Lead counsel indicated that he looked at the social history as a tool to be used in the penalty phase because he wanted Dr. McCoy to take the social history and tie it back to Dr. Engum's report. However, he specifically recalled at least one meeting during trial preparation when both doctors were present.

Lead counsel also employed the services of Dr. Bernet, a psychiatrist, in the case, but he was not a "member of the team." He was hired solely for the purpose of giving background on the Satanic aspect of the case. He was to testify that the murder was not a ritualistic killing and that the Petitioner had just been a "kid dabbling in Satanism." Mr. Talman did not ask Dr. Bernet to conduct an evaluation.

Lead counsel indicated that co-counsel was appointed after previous co-counsel requested to withdraw. Lead counsel had not previously worked with co-counsel, but he was aware that she had previously handled criminal cases while with the Public Defender's Office. He indicated that he was aware that co-counsel had never been involved in a capital case, but he stated that he was not aware that she had never been involved in a murder case. Lead counsel testified that co-counsel handled the penalty phase of the case because he thought it might be better with a female attorney. Nonetheless, he stated that he was lead counsel and was involved personally in both phases of the trial.

Lead counsel indicated that he was aware that the case was complex. While the Petitioner was very cooperative, it was not a "who done it." The Petitioner had confessed to a "grizzly murder," and lead counsel indicated that going into trial, he was fairly certain that there would be a penalty phase. Therefore, in his mind, sentencing issues were the most important, and he would have considered it a victory if the Petitioner did not receive death. Lead counsel acknowledged that, in hindsight, there were things he wished he had done differently. While not specifically recalling a discussion with Dr. McCoy of which witnesses to call, he assumed that he did discuss this with her. Lead counsel also indicated that he was not dissatisfied with Dr. McCoy's work.

***33** Lead counsel testified that during the guilt phase

of the proceeding, he tried to attack the elements of intent and premeditation. The defense team attempted to "soften [the Petitioner] as best we could, make her a person." Lead counsel indicated that he spent a great deal of time investigating the case, even traveling to North Carolina to interview family and friends of the Petitioner.

According to lead counsel, the strategy of using Dr. McCoy during the penalty phase to give an overview of the Petitioner's life remained in place throughout the trial. He also indicated that he had planned to call the Petitioner's parents and aunt as witnesses. At the time, he believed that was a sufficient number of witnesses. Despite his intent to use Dr. McCoy as a witness, lead counsel made clear that there were certain things contained in her report that he had concerns about being admitted into evidence. According to lead counsel, the decision not to call Dr. McCoy was based on multiple reasons, with the primary reason being that she would not corroborate Dr. Engum's report because she did not personally conduct an evaluation of the Petitioner. He testified that, until that moment after the penalty phase when he spoke with Dr. McCoy about this, he had believed that the two doctors were in agreement.

Lead counsel also indicated that he was uncomfortable with Dr. McCoy's relationship with General Crabtree, although he did not doubt Dr. McCoy's integrity. Lead counsel testified that he had been aware of the relationship which, according to Dr. McCoy, had involved some anger and jealousy. The final decision not to use Dr. McCoy was a last minute decision, which lead counsel acknowledged "could" have been wrong. He testified that he wished that he had called additional witness, but he did not know if it would have made a difference in the outcome. Lead counsel could not recall exactly when the decision was made to proceed with only three witnesses.

Lead counsel was unable to recall when he received a copy of Dr. McCoy's final report, although Dr. McCoy's billing records indicate that the report was bound on March 20, after jury selection in the trial. Lead counsel testified that he did not recall reviewing the entire report before trial, but he stated that he had seen prior drafts. Lead counsel did recall an in-camera hearing during which he gave Dr. McCoy's report to the State. He recalled that General Crabtree was unhappy with the timing as it only gave the State one night to review the report prior to the opening of the penalty phase. He acknowledged that he turned over the final report, as well as the notes of interviews and other information contained in Dr. McCoy's folder, because he was still planned to use Dr. McCoy at that point. Lead counsel stated that, in retrospect, he probably should have just given the report only, as he did not plan to use the other supporting documents. At the time, he believed they were not protected under the privilege.

***34** Lead counsel testified that he made no challenge to the State using inconsistent theories with regard to the conspiracy conviction as opposed to the aggravator that the murder was done to avoid arrest. While at the time he did not see those as inconsistent theories, he now does.

Lead counsel further testified that, during voir dire, the publicity of the case was extensive and that almost all of the potential jurors had heard something about the case. Lead counsel acknowledged that his line of questioning may have reinforced the information the jurors had seen in the news. He also acknowledged the risk in pursuing the strategy of the "don't ask don't tell" with regard to death qualifying the jury. Lead counsel could not recall if he asked questions to "life qualify" the jury.

Lead counsel also testified that, after the case, he talked with the Petitioner's aunt, Carrie Ross, about the possibility of writing a book. However, nothing ever became of the idea. He specifically testified that he never profited from the Petitioner's story, although he acknowledged that a document had been signed by the Petitioner which would have allowed him to do so.

Lead counsel indicated that the State had offered the Petitioner a guilty plea deal to life without the possibility of parole. The Petitioner did not accept the offer because "she did not want to grow old in jail." During his testimony, lead counsel indicated that he probably should have pushed the Petitioner harder to accept the deal.

Lead counsel testified that he did not recall asking Dr. McCoy to lie. He did recall receiving an angry letter from her after trial alleging that he was responsible for her not being hired to work on another capital case.

Lead counsel acknowledged that the Petitioner did not receive a "perfect defense." He said that, in retrospect, there were things which could have been done differently. However, given the sheer brutality of case, he was unable to say that doing anything different would have resulted in a different outcome.

On cross-examination, lead counsel again addressed the overbilling issue and stated that he had considered the matter closed prior to his appointment in the Petitioner's case. A settlement had been reached, and he had paid it. The State was again paying him for appointments, and the Tennessee Supreme Court had appointed him in another case prior to his taking the Petitioner's case. There was no issue of criminal liability pending at the time. Furthermore, lead counsel testified that he had discussed the matter with the Petitioner, and she was not bothered by it. Lead counsel stated that the billing issue had no affect on his performance or zealousness in his representation of the Petitioner.

Lead counsel also testified to the reasoning behind the decision not to seek a continuance because of the short time that co-counsel had been on the case. He stated that a great deal of work had been done prior to her appointment and that co-counsel worked hard and felt prepared. Moreover, the decision was affected by their hope that the State would be unable to locate key witnesses against the Petitioner. Lead counsel also testified that he saw no specific legal reason to file a motion to suppress the statement given by the Petitioner. He also reiterated that the timing of Dr. McCoy's report had no bearing on the decision not to call her as a witness. Lead counsel stated that he felt that the damaging information in Dr. McCoy's report was too prejudicial to present to the jury if Dr. McCoy was not going to support Dr. Engum's diagnosis. Lead counsel acknowledged that the decision to give the State the report did allow some damaging information to be used on cross-examination; however, by not calling Dr. McCoy, other damaging evidence was kept out.

***35** Lead counsel indicated that neither Dr. Engum nor Dr. McCoy suggested involving another mental health professional in the case. Lead counsel acknowledged that, looking back, retaining the services of a psychiatrist might have been beneficial.

Following lead counsel's testimony, Carrie Ross, the Petitioner's aunt, was recalled to the stand. She indicated that, while she was in Knoxville for the trial, lead counsel had discussed with her the possibility of a book deal about the case. According to Ms. Ross, lead counsel also made the statement to her that there was no way the Petitioner would avoid receiving the death penalty but that he was leaving room for appeal or "leaving holes in the case."

Ms. Ross again reiterated the violent nature and various abuses of the Petitioner's parents and grandparents. She testified again as to the environment in which the Petitioner had grown up in, indicating violence was a way of life. She also indicated that in her opinion, the questions she was asked during the penalty phase of the trial did not allow her to convey the person the Petitioner really was.

The next witness to take the stand was Dr. Diana McCoy, the mitigation expert employed to handle the Petitioner's case at trial. She testified that her role in the case was to collect information by interviewing people and reviewing records and to analyze that information in order to develop themes for the attorneys to present in the penalty phase. She also testified that it was her responsibility to assist in choosing additional lay witnesses who would show the jury the Petitioner's human side during the penalty phase. However, she testified that, in this case, her job did not involve forming a diagnosis for any conditions from which the Petitioner might suffer. She indicated that she was retained by lead counsel in this case.

Dr. McCoy indicated that she recalled only one meeting between the entire defense team. She stated that most of her interaction was with lead counsel, with the record indicating at least fourteen face-to-face meetings and more than forty telephone conversations. She testified that they worked together a great deal and had good interaction. She indicated that she was specifically told to prepare a report, not an opinion, in the case. She testified that she provided the final bound version of her report to the attorneys on March 24, 1996, although she had previously gone over the material contained in the report with the attorneys. She stated that lead counsel was as familiar with the materials as she.

Dr. McCoy testified that she met with the Petitioner on nine occasions prior to trial in order to build a rapport with the Petitioner so that she might gain the entire truth of the Petitioner's life. She indicated that she was aware of Dr. Engum's diagnosis of borderline personality disorder and that she was in agreement with that diagnosis. Dr. McCoy testified that she reviewed her report with lead counsel and co-counsel on March 15, and that they had previously discussed who should be called to testify as lay witnesses. At this meeting, Dr. McCoy indicated to them that the final report would soon be done. According to Dr. McCoy, lead counsel indicated that there was no hurry, as he planned to wait till the last possible minute to give the report to the prosecution.

***36** She went on to note that, in her opinion, family

members alone would not be able to sufficiently explain who the Petitioner was and why she had committed the crime. Dr. McCoy indicated that although she was not specifically informed, she assumed that these witnesses had been subpoenaed or that arrangements had been made for them to be at the trial. She testified that several of the professionals from Swannoa and Shaeffer, who had worked with the Petitioner and liked her, would have been greatly beneficial to call as witnesses. She also testified that Matthew Martin and the Petitioner's aunt would be good witnesses, but the Petitioner's mother would not make a positive witness for the defense. Dr. McCoy testified that, as of March 14, she was under the impression that several lay witnesses would be called to testify and that she would then testify in order to tie the diagnosis together.

Dr. McCoy indicated that her work developed into a three-volume social history. She testified that she was in agreement with the diagnosis of borderline personality disorder and never told either attorney that she disagreed with the diagnosis. As part of her testimony, Dr. McCoy explained some of the characteristics of borderline personality disorder, such as fear of abandonment, unstable relationships, mood swings, unstable self-image, and impulsivity. Dr. McCoy had prepared various charts to show such things as substance abuse in the Petitioner's family, a family chart showing the large number of people in and out of the Petitioner's life, and the Petitioner's education history. She testified that all of these influences tied into the development of the Petitioner's borderline personality disorder, indicating that the Petitioner's fear of abandonment was the overriding concern. She also testified regarding the "tough girl image" which the Petitioner presented and opined that this was cultivated in order for the Petitioner to appear fearless when, in fact, she was just a "scared kid." Dr. McCoy also referenced the Petitioner's tendencies toward self-destruction, testifying with regard to specific instances in her history of self-sabotage and suicide attempts. She further testified regarding the unstable relationships experienced by the Petitioner and her drastic mood swings. Dr. McCoy discussed the Petitioner's acknowledged lying, which was usually done to make herself look better. She said this was an indication that the Petitioner was starved for attention, and she referenced the multiple witnesses who had indicated that if the Petitioner was ever shown attention, she would "talk and talk." Finally, Dr. McCoy discussed the poor parental role models which the Petitioner had while growing up. She indicated that the Petitioner grew up in an environment where drugs and alcohol were used, where sex was glamorized, where violence was seen as a solution to problems, and where no limits were set.

Next, Dr. McCoy discussed a March 24th meeting in which she was informed that she would be the only witness to testify during the penalty phase. She believed that the decision to rely strictly on her testimony was a bad one. Dr. McCoy testified that, in her opinion, the mitigation evidence which she had gathered was relatively strong, but she felt that she could not convey that alone. According to her, it would take a number of people to "paint the whole picture." She also opined that it was important to show the early physical and emotional abuse with the true depth of the problems. She indicated that it was important to include the negative aspects of the Petitioner's life and that the jury would not be expecting her to be a "girl scout" if she had already been convicted of first degree murder.

***37** Dr. McCoy also discussed the Petitioner's relationship with Shipp. She described the Petitioner as hungry for attention and very intense about the relationship, stating that it made her feel like somebody. She stated that the Petitioner basked in the glow of Shipp's attention. Dr. McCoy also opined that the Petitioner's prior rejections had led her to Shipp.

Dr. McCoy testified that she recommended that Dr. Bernet be used as an expert in regard to the Satanism aspect of the case. She testified that lead counsel had expressed some concern because of the reference to Satanism in the report from Swannoa. However, Dr. McCoy testified that she felt that it was fairly normal under the circumstances and that she saw the Petitioner as struggling with spirituality.

Dr. McCoy testified that she learned on Friday following the guilty verdict that she would not be called to testify. According to her, lead counsel, who was very upset, telephoned her after an in-camera conference with the trial court and the State. He informed her that the prosecutor had gone "ballastic" about receiving the mitigation report so late and that the prosecutor believed it was all hearsay. Dr. McCoy testified that lead counsel then asked her to lie and say she had just given him the report the previous day, but she refused. Dr. McCoy testified that she asked lead counsel if he would like her to call Herb Moncier, a local attorney, to ask his opinion. When Dr. McCoy was unable to reach Mr. Moncier, lead counsel informed her that he would not have her testify in the case.

Despite being informed that she would not be called to testify, she met with lead counsel later that evening to discuss the options. Dr. McCoy stated that they talked for several hours and that lead counsel was upset, saying they will "probably post-convict me on this." After their discussion, the decision was made to call three witnesses to testify, those being the Petitioner's parents and her aunt. Dr. McCoy met with the witnesses the next morning to prepare them to testify. Dr. McCoy stated that it was extremely important to show the reasons the Petitioner had turned out the way she had. She stated that it was impossible to do so by calling only three family members. She described the mitigation presented as "punnie and pathetic."

Dr. McCoy also testified regarding a situation which arose post-trial. She indicated that she was contacted by the victim's attorneys, who were asking for a copy of her report. She telephoned lead counsel for advice, and he advised her against disclosing the report. He later sent her a letter in which he questioned her ethics, and Dr. McCoy sought the advice of counsel. In order to set the record straight, her attorney helped her draft a letter in response to lead counsel. Lead counsel then telephoned her and stated that he just wanted to drop the issue, as they had previously gotten along.

Dr. McCoy also testified that she had engaged in a brief dating relationship with General Crabtree. She stated, however, that the relationship was over prior to her beginning to work on the Petitioner's case. She indicated that, early on in the case, she informed lead counsel of this fact, and he said he had no problem with it. When Dr. McCoy heard rumors that lead counsel and co-counsel were indicating she had withheld this information, leading to their decision not to call her as a witness, she contacted Herb Moncier. He advised her to let it go, as it would come out on post-conviction.

***38** Although Dr. McCoy was not asked to prepare an opinion for the trial, she did prepare one for the post-conviction hearing. She used charts and graphs to support the borderline personality diagnosis. Her general conclusions were:

(1) The Petitioner came from a highly dysfunctional family and that many of her subsequent developmental issues stemmed from this;

(2) The Petitioner experienced multiple traumatic events during her childhood and adolescence, including rapes and physical abuse by multiple parties, which also contributed to the exacerbation of her psychiatric problems;

(3) The Petitioner's parents did not sufficiently address and handle her emotional and psychological problems;

(4) The Petitioner had multiple psychological problems including:

(a) attachment issues which significantly contributed to her dysfunctional relationships;

(b) an inability to maintain emotional control, particularly during periods of stress, and a reliance on others to help her maintain control;

(c) a constant need for attention;

(d) an assumption of a tough-girl image to compensate for her lack of self-esteem and self-respect; and

(e) a need to please others and a willingness to be influenced by others, regardless of the cost to herself.

(5) The Petitioner was experiencing great stress at the time of the homicide, which contributed to her participation.

Dr. McCoy stated that, at the time of the murder, the Petitioner felt that her identity, which she felt centered around Shipp, was slipping away. She also opined that because of the Petitioner's problems at the Job Corp and her problems with the victim, the Petitioner felt that she was losing her sense of self-esteem and identity. Because of the Petitioner's borderline personality disorder, she felt frantic and experienced irrational anger. Dr. McCoy referenced and discussed prior times in the Petitioner's life when she became extremely angry and stated that the Petitioner simply did not have the control of a normal person.

On cross-examination, Dr. McCoy acknowledged that, although she had previous capital case experience as a mitigation specialist, she had never testified in any of those trials. She reiterated that she was comfortable with Dr. Engum's diagnosis and again stated that it was not her responsibility to reach a diagnosis in this case. She acknowledged that she did not necessarily look for things which would contradict Dr. Engum's conclusions. She

also testified that because Dr. Engum was a neuropsychologist, she assumed that if a neurologist was needed, he would have made that suggestion.

Herb Moncier, a Knoxville attorney, testified that he spoke with Dr. McCoy about her relationship with General Crabtree after she sought his advice on whether it created a problem with her working on the Petitioner's case. He informed her that it should not be a problem but that she should inform lead counsel. Mr. Moncier also testified that sometime after the trial began, Dr. McCoy called him, upset, and informed him that Mr. Talman had asked her to say something that was untrue. Mr. Moncier advised her not to lie and that the issue would be raised in post-conviction. Mr. Moncier also testified that Knoxville had an excellent bar and that any number of attorneys would have happily assisted lead counsel if he had asked.

***39** Gregory Isaacs, another local attorney, testified next. He stated that he had been involved in two capital cases and a number of homicide cases and that he had occasionally used Dr. McCoy. He testified that she was very competent and made a good witness. Mr. Isaacs also testified that he dealt with Dr. McCoy in a representative capacity following the Petitioner's trial. He testified that he assisted her in drafting a response to lead counsel's letter to Dr. McCoy questioning her ethics.

The final witness to testify was Dr. William Kenner, an expert in forensic psychiatry. He testified that he was appointed by the court in 2001 to conduct a competency evaluation of the Petitioner in order to see if she could waive her post-conviction appeals. In performing his evaluation for the court, Dr. Kenner met with the Petitioner on five occasions and, afterward, an additional two times. He testified that he also reviewed extensive records, including medical records of some of the Petitioner's family members. He ultimately diagnosed the Petitioner as suffering from:

| | |
|---|---|
| Axis I (active diagnosis) | Bipolar Disorder<br>hypomanic recurrent |
| Axis II (personality disorder) | Borderline Personality Disorder<br>Antisocial Personality Disorder |
| Axis III (active medical condition) | von Willibrand Disease |
| Alix IV (psychosocial stressors) | Problems with primary support group, social environment, incarceration |
| Axis V (global assessment) | 15 |

Dr. Kenner testified that in his first meeting with the Petitioner, there were some suggestions of bipolar disorder, but it "didn't sort of knock me over" that way. He opined that the diagnosis requires multiple observations over time because people with bipolar disorder cycle. Dr. Kenner indicated that his second meeting with the Petitioner was completely different and that it became clear that sleep deprivation affected her. In prison, it showed up as irritability. The Petitioner told Dr. Kenner that she did "stupid" stuff when she was not in prison.

In 2002, the Petitioner was prescribed Lithium, and her reaction to the drug was dramatic. According to Dr. Kenner, her major improvement after taking the drug is what would be expected from someone with bipolar disorder. Following another evaluation in 2002, he rediagnosed the Petitioner and concluded that she did not suffer from borderline personality disorder as he had previously concluded but rather it was part of her bipolar spectrum disorder. He acknowledged that bipolar disorder is an illness which "doesn't have terribly clear borders." Dr. Kenner also concluded that the Petitioner was not antisocial. Dr. Kenner further acknowledged an ongoing debate in the mental health community as to whether borderline personality disorder is misdiagnosed bipolar disorder or whether there is, in fact, borderline personality disorder. He also indicated that new diagnoses are con-

stantly emerging in this field.

***40** According to Dr. Kenner, he felt that there was data available at the time of trial which could have been discovered if a competent physician had conducted an examination of the Petitioner. He specifically noted that there was significant data to suggest early onset bipolar disorder, based upon the Petitioner's history. He indicated that it was critical to explain this to the jury, tying it back into the Petitioner's personal history. He explained that this was so important because, at the time of the murder, the Petitioner was experiencing a two-to-four day cycle of sleep deprivation with increasing irritability, which peaked at the time of the murder.

Dr. Kenner further testified that there were records available for raising the medical question of whether the Petitioner had brain damage, based upon her seizures, her abnormal test results, and the head injury she suffered as an adolescent. He suggested that medical testing, such as an MRI, should have been done on the Petitioner prior to a final diagnosis. Dr. Kenner acknowledged that, given the information the defense team possessed, borderline personality disorder was a reasonable diagnosis when the trial was held.

Dr. Kenner said that, in his opinion, the structure of the defense team was odd. He asserted that the lines of communication all went to lead counsel and that there appeared to be little expert information shared. He noted that Dr. Bernet never saw the Petitioner and that, from what he learned, Dr. Engum never reviewed Dr. McCoy's work. Dr. Kenner also noted that the fact that Mr. Talman attempted to solicit a medical opinion from Dr. Bernet, who had to then answer that he had not examined the Petitioner, made Dr. Bernet's entire theory seem more suspect to the jury.

After hearing the evidence presented, the post-conviction court, by written order, denied relief. The Petitioner has timely appealed.

**Analysis**

On appeal to this court, the Petitioner presents a number of claims that can be characterized in the following categories: (1) the post-conviction court should have recused itself; (2) the Petitioner's trial counsel were ineffective; (3) the Petitioner is ineligible for the death penalty; and (4) the death penalty is unconstitutional.

**Standard of Review for Post–Conviction Cases**

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A § . 40–30–103. The petition challenging the Petitioner's convictions is governed by the 1995 Post–Conviction Act, which requires that allegations be proven by clear and convincing evidence. *See* T.C.A. § 40–30–110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State,* 983 S.W.2d 240, 245 (Tenn.Crim.App.1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State,* 121 S.W.3d 652, 656 (Tenn.2003); *State v. Nichols,* 90 S.W.3d 576, 586 (Tenn .2002) (citing *State v. Burns,* 6 S.W.3d 453, 461 (Tenn.1999)). This court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. *Nichols,* 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id.* (citing *Henley v. State,* 960 S.W.2d 572, 579 (Tenn.1997), *reh'g denied,* (1998), *cert. denied,* 525 U.S. 830 (1998)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. *Clenny v. State,* 576 S.W.2d 12, 14 (Tenn.Crim.App.1978).

***41** Notwithstanding, determinations of whether counsel provided a petitioner constitutionally deficient assistance present mixed questions of law and fact. *Wallace,* 121 S.W.3d at 656; *Nichols,* 90 S.W.3d at 586. As such, the findings of fact are reviewed under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. *See Fields v. State,* 40 S.W.3d 450, 458 (Tenn.2001) (citations omitted). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). *Id.* at 456.

**I. Recusal of Post–Conviction Court**

The Petitioner contends that the post-conviction court, who also served as the trial court, committed constitutional error by failing to recuse itself from the post-conviction proceedings. Specifically, the Petitioner asserts that "the post-conviction court was disqualified from de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ciding [the] Petitioner's post-conviction claim because [the court] had personal knowledge of material facts in dispute." The Petitioner further contends that "in light of [the Petitioner's] post-conviction claims [, namely the asserted conflict of interest of trial counsel,] a reasonable person would have considered the post-conviction court incapable of impartial adjudication of [the Petitioner's] post-conviction petition."

At a hearing held on February 26, 2007, the Petitioner's post-conviction counsel argued that the post-conviction court had a duty to recuse itself because the post-conviction court had appointed lead counsel to represent the Petitioner, knowing of counsel's potential conflict created by the overbilling issue. Counsel for the Petitioner further asserted that the post-conviction court should recuse itself because there was an appearance of impropriety regarding the court's presiding over matters involving trial counsel and overbilling. Finally, counsel for the Petitioner argued that the court was a necessary witness at an unrecorded hearing in chambers after the return of the guilt phase verdict.

The post-conviction court made the following findings of fact and conclusions of law relative to the motion for recusal:

> ... it's discretionary ... with the statute. But a judge should hear their own petitions for post-conviction relief.... The reason why is because the judge knows better what happened in these cases than anybody else ... and can understand the issues better without having to go backwards and learn them.
>
> ...
>
> ....
>
> In this case I think it's pretty obvious that everyone in Knox County knew that [lead counsel] had problems with his billing. He also had been appointed ... by Judge Jenkins.... And he was a death-qualified attorney with an active law license without restrictions. He too was presumed innocent until proven guilty. As it turned out he was never prosecuted in this case.... And he kept his law license all the way through until you said there had been a suspension at some time later. But he did have a problem ... it was generally known in the courts in Knox County.
>
> ***42** Evidently, it was also generally known in the Supreme Court of Tennessee—... the Supreme Court appointed him to represent Mr. Irick in what was a death case. And he represented [the Petitioner]....
>
> Now, whether or not [lead counsel] had a cloud over him that so inhibited his ability to practice law that it affected [the Petitioner's] representation is an issue for post-conviction.... But I don't ... think that I had had or have now any interest in protecting my rulings, protecting myself that was placed above any interest to do justice in this case. So with respect to a mandatory disqualification, I don't think I'm obliged to be disqualified because I knew or ... we all knew that [lead counsel] had his own problems.
>
> ....
>
> ... And I don't think that there's any reason that I should recuse myself as a mandatory obligation based upon the Tennessee Constitution....
>
> ....
>
> Having a lot of knowledge about this case doesn't make me less than impartial. And when I say me this isn't a personal ruling as we've discussed. This is a judicial ruling.
>
> Now, as to whether or not there's an appearance of impropriety and, therefore, based upon the cannons I should recuse myself ... Miss Pike ... raised the issue of the appointment of [lead counsel] as discretionary issue. And ... I understand why the issue was raised....[I]t's not a personal issue.... If I have opinions or knowledge and, obviously, ... I have more knowledge of this case than anyone else in this room is not a ground to recuse myself....
>
> ....
>
> ... So I don't think I have any interest in the outcome other than to get this post-conviction petition on the road....
>
> ....
>
> I've been sitting here for seventeen years. I've been reversed. I've gone back and started again. In fact, I was reversed in Tadaryl Shipp's case as to sentencing....

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[T]hat doesn't give me any reason not to do my job in this case. I have thought very hard the last couple of weeks—whether or not my involvement in this case has taken me to the level that I should recuse. I don't find that to be the case.

....

And that's what a post-conviction petition is. It asks the Court to go back and review everything and make sure that it was done properly, and if it wasn't it is the duty of the Court to review and to overturn a conviction. It's my obligation; that's my job. And I don't see a reason why—and if I don't do that job properly, somebody else is going to reverse it. So I don't see a reason to recuse myself for that reason either.

On appeal, the Petitioner relates that her "foremost claim for post-conviction relief is that her trial counsel [, lead counsel,] was ineffective in light of a conflict of interest" created by his being under investigation by the Indigent Defense Fund and that he had disciplinary sanctions pending at the time of his representation of the Petitioner. She further relates that "as a result, it was in [lead counsel's] pecuniary and penological interest to avoid agitation of either the prosecutor or the trial court in the trial." Her argument with regard to the post-conviction court's recusal appears to center around the in-camera meeting held in the court's chambers, off the record, immediately preceding the penalty phase of the trial. The Petitioner contends that the events of that meeting substantiate a claim of conflict which mandates vacating her sentence based on her theory that lead counsel turned over the mitigation materials at that time to placate the State, a theory supported by the testimony of Dr. McCoy and two Knoxville attorneys. With regard to the present argument, the Petitioner contends that "what is critical is that the post-conviction court ... was a party to the unrecorded in camera meeting."

***43** It is not disputed that the post-conviction court was qualified to preside over the post-conviction proceedings and, generally, adjudication of a post-conviction petition by the same court which presided over a petitioner's trial is both proper and expedient. State v. Garrard, 693 S.W.2d 921, 922 (Tenn.Crim.App.1985); T.C .A. § 40–30–105(b) (1995). Nor is recusal automatically required when a judge is called upon to review their own order. Additionally, our supreme court has held that prior knowledge of facts about a case is not sufficient, in and of itself, to require disqualification. State v. Paul Dennis Reid, 213 S.W.3d 792, 815 (Tenn.2006). The Petitioner contends, however, that this case is distinguishable from the general because her claim "involves the court itself being instrumental in denying [the Petitioner] a fair trial," thus taking this claim "outside the normal presumption of impartiality that attaches to post-conviction adjudication by the same court that presided at trial."

The Petitioner centers her argument around statements made by the post-conviction court at the hearing in which she quashed the subpoena which had been issued to the court and denied the motion to recuse:

I have no independent memory [of the meeting] other than that there was three volumes. I remember that there were volumes—and I'm not trying to testify; I'm just trying to—trying to make a ruling here—of mitigation materials. Those were turned over to the State as required after the verdict.

The State had no—not enough time. And then—and I can't imagine why—why there would even be an issue about when [lead counsel] received those materials because they didn't go to the State anyway at that point. And maybe the State was arguing that they were entitled and I ordered them turned over.

....

Again, for the purposes of your Motion for a Subpoena, a judge speaks through their rulings. So you can take those rulings and say, "Okay. These are the grounds for post-conviction petition." But you can't subpoena me to ask me what I thought or what I think or what I remember. I've told you as much as I can in order to make this case go forward.

I remember that evening. I remember that verdict coming in. I remember us having a discussion, and I remember us discussing whether—when the State got its materials. And everything is spoken for through the transcript, I think. And if there isn't—and if there's anything else we're going to get it out of those transcripts that we have.

The Petitioner points to numerous alleged misstatements of law and a myriad of ways which these statements indicate the post-conviction court's knowledge of facts which would affect her decision on the merits of the Petitioner's claim. The Petitioner asserts that "because

[the post-conviction court] presided over [the Petitioner's] post-conviction petition as post-conviction court, [the court] served as witness, judge, and jury" in violation of the Petitioner's constitutional right to confront witnesses.

***44** We cannot agree with the Petitioner's contention that the post-conviction court should have recused itself based solely on the ground that the court was party to an in-camera meeting between the parties. The Petitioner puts forth mere allegations as to how this affected the court's impartiality with regard to deciding the conflict of interest claim. Nothing in the record supports the Petitioner's theory or supposition. The post-conviction court's comment in no way leads us to conclude that it was harboring under a veil of impartiality with regard to the decision. Nor are we convinced that the court's mere presence at the meeting is a sufficient reason to force the court's disqualification. The Petitioner has failed in her burden of establishing this claim.

As a separate, yet related argument, the Petitioner contends that, based upon the recent holding in *Frazier v. State*, 303 S.W .3d 674 (Tenn.2010), the Petitioner's conviction and sentence must be set aside because the trial court failed to follow the requisite procedures if it is aware that counsel is operating in a conflict of interest. The Petitioner contends that the failure results in structural error. While we do not dispute the Petitioner's interpretation of the *Frazier* holding, we find her reliance upon it misplaced. The premise in *Frazier* requires that trial counsel be operating under a conflict of interest. As expressed *infra*, that is not the case before us.

**II. Ineffective Assistance of Counsel**

**A. Standard of Review**

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." *Gideon v. Wainwright*, 372 U.S. 335, 350 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970); *see also Strickland v. Washington*, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir.2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

***45** *Strickland*, 466 U.S. at 687; *see also Combs*, 205 F.3d at 277.

The performance prong of the *Strickland* test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness, or "outside the range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Combs*, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.' " *Strickland*, 466 U .S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn.1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn.Crim.App.1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.' " *Burger v. Kemp*, 483 U.S. 776, 794 (1987). Notwithstanding, it is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the duty of this court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id. at 785.

**B. Denied Right to Unconflicted Counsel**

The Petitioner contends that she received ineffective assistance of counsel because of two distinct conflicts of interests. Specifically, the Petitioner claims that lead counsel was hampered by actual conflicts of interest in that he:

1. stole from the indigent defense fund and lied to the court.

2. procured a release of media rights from the Petitioner.

The Petitioner asserts that these two distinct conflicts of interest rendered the representation received constitutionally inadequate. She further contends that no showing of prejudice is required with regard to these claims.

**1. Defense Fund Investigation**

The Petitioner's first contention of a conflict is based upon the Comptroller's investigation into lead counsel's prior billings to the indigent defense fund. There is no dispute in the facts that lead counsel was investigated for overbilling the Indigent Defense Fund and repaid more than $60,000 to the fund. Nor is it disputed that lead counsel self-reported to the Board of Professional Responsibility and that the claim remained unresolved at the time of trial. Eventually, as a result, the Tennessee Supreme Court suspended lead counsel's license for eleven months, twenty-nine days. The sanction, however, was not entered until November 24, 1998, one day after the supreme court affirmed the Petitioner's conviction and sentence. Neither lead counsel nor any other attorney involved in the fraudulent billing was prosecuted criminally for their actions.

***46** The Petitioner's claim on appeal, although somewhat unclear, appears to be that lead counsel was conflicted between his representation of the Petitioner and his own fear of being prosecuted by the State. The argument centers around the in-camera meeting in which lead counsel turned over Dr. McCoy's report and, at least according to the testimony of Dr. McCoy, later asked her to lie about when the report was delivered to him because the State was "furious" at receiving the materials at the late date. The Petitioner contends this resulted in lead counsel not calling Dr. McCoy, the key mitigation witness, allegedly because of his own fear of angering the court or the State. The Petitioner also contends that any testimony by lead counsel regarding other possible reasons as to why Dr. McCoy was not called was not credible and not supported by the testimony of other witnesses. The Petitioner asserts that "given this understanding of the facts, [lead counsel's] penalty phase decisions must be considered as products of a conflict of interest."

A conflict of interest does not, in and of itself, constitute ineffective assistance of counsel. In order to establish a violation of the Sixth Amendment, a [petitioner] who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) (holding that the mere possibility of a conflict of interest is not enough to establish ineffective assistance of counsel where the defendant raised no objection to multiple representation at trial.) However, unless the petitioner establishes that counsel was burdened by an actual conflict of interest, he must prove both deficient performance and that he was prejudiced by the deficiency. Strickland v. Washington, 466 U.S. 668. Prejudice is presumed only if the petitioner demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 350. Until a petitioner shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim. Id.

Where an attorney is placed in a position of divided loyalties between himself and his client, an actual conflict is created. State v. Culbreath, 30 S.W.3d 309. 315 (Tenn.2000). Among the class of potentially conflicting interests are the personal interests of defense counsel. McCullough v. State, 144 S.W.3d 382, 385 (Tenn.Crim.App.2003). Yet another recognized conflicting interest is preoccupation with fear of instigating prosecution for one's own misdeeds. U.S. v. Montana, 199 F.3d 947, 949 (7th Cir .1992).

First, as an aside, the Petitioner contends that the post-conviction court erred in finding the conflict claims waived. The court found that "[lead counsel] testified that he had informed [the Petitioner] of the issue and that she actually liked him more because of it. No issue was raised either pretrial or at trial." As such, the court found the issue waived but, nonetheless, ruled on the issue and found it to be without merit. Likewise, we also elect to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

review the issue, so it is not necessary to rule on the issue of waiver.

***47** In denying relief on this claim, the post-conviction court found that the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance. The court entered multiple findings of fact, upon which it based this conclusion. Prior to the lead counsel's appointment to the Petitioner's case, the trial court inquired into the status of the investigation and discovered that the reimbursement had been paid in full. The actual investigation had concluded prior to lead counsel's appointment as the Petitioner's attorney. Lead counsel had been appointed by the Tennessee Supreme Court in another matter in March 1995, two months prior to his appointment in this case. Lead counsel remained a licensed attorney, in good standing, throughout the entire investigation. Lead counsel stated that he had deemed the matter concluded prior to his appointment in the Petitioner's case. Lead counsel further testified that he informed the Petitioner of the investigation and that she "seemed to like him more because of it."

The Petitioner has failed to provide any proof which preponderates against these findings. *See* Henley v. State, 960 S.W.2d at 579. The record simply fails to offer anything more than supposition that the overbilling issue affected lead counsel's representation of the Petitioner. All the evidence presented appears to support lead counsel's own testimony that the investigation was concluded and the matter settled prior to his appointment in this case. Lead counsel consistently testified that he considered the matter concluded prior to appointment in the case and that he never spoke with anyone in the district attorney's office regarding the matter. He further indicated that he never would have settled the matter civilly if there were potential criminal charges pending.

Moreover, the assertion that fear of prosecution led lead counsel to lie to the court at the in-camera meeting and then deciding not to call Dr. McCoy is mere supposition as the allegations rest on speculation and disputed testimony. Each witness who was present at the in-camera hearing testified that they were unable to recall what occurred in that meeting. Lead counsel testified that he had never asked Dr. McCoy to lie, and the court accredited this testimony. As noted, questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court. *Henley,* 960 S.W.2d st 579. This court does not reweigh such determinations. Lead counsel, along with co-counsel, testified that there were multiple reasons as to why the decision was made to not use Dr. McCoy as a witness, the primary one being that she could not corroborate the testimony of Dr. Engum. The post-conviction court also noted that the record did not support Dr. McCoy's testimony based upon a statement made on the record following the in-camera meeting in which lead counsel stated he had received the documentation from Dr. McCoy "earlier this week," not the day prior as Dr. McCoy indicated lead counsel wanted her to say.

***48** The Petitioner offers only speculation as the reason for "counsel's penalty phase collapse." This speculation as to what might have been the reason for the decisions made is not sufficient meet her burden of establishing that a conflict existed.

**2. Media Rights**

Next, the Petitioner asserts that a conflict of interest existed based upon a release of media rights from the Petitioner to lead counsel and co-counsel regarding the Petitioner's story. It is not disputed that lead counsel spoke with the Petitioner's aunt, Carrie Ross, about authoring a book with her about the Petitioner's life and criminal prosecution. Moreover, on May 1, 1996, after the Petitioner was found guilty and sentenced to death but prior to direct appeal, she signed a release giving the attorneys permission to retell her story. The release was "limited to information which is public information, *e.g.,* evidence at trial and in my court file, and their own personal experiences while working on [the Petitioner's] behalf." The release further acknowledged that the attorneys may "eventually gain a pecuniary benefit from the retelling on [the Petitioner's] story."

Rule 1.8(a) of the Tennessee Rules of Professional Conduct, dictates that "[a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest *adverse to a client* " unless there is full disclosure, the client is given the opportunity to seek independent counsel, and the agreement is in writing and signed. Tenn. Sup.Ct. R. 8, RPC 1.8(d). Generally, an agreement by which a lawyer acquires literary or media rights concerning the *conduct of the representation* creates a conflict of interest between the attorney and the client. (emphasis added). *See Id.* If such conflict is proven, it is still necessary "for [the] petitioner to establish that the conflict of interest adversely affected his counsel's performance." *Mickens v. Taylor,* 525 U.S. at 174.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On appeal, the Petitioner contends that "[lead counsel]'s discussions with Ms. Ross make evident his interest in profiting from [the Petitioner's] story from the earliest stages of his representation of [the Petitioner]. Because counsel handled [the Petitioner's] direct appeal, counsel's conduct in obtaining a waiver also occurred in the course of [the Petitioner's] trial. This conduct also casts a shadow backwards across [the Petitioner's] trial, suggesting that defense counsel were motivated by monetary gain throughout." The Petitioner further contends that because she established a conflict, the required showing again is adverse effect rather than prejudice. Finally, she asserts that the adverse effect is shown by the Petitioner's failure to seek a continuance when effective representation of the Petitioner mandated delay for two reasons. According to the Petitioner, trial counsel's failure to seek a continuance is consistent with their pecuniary interest in selling the story, which was generating a great deal of media attention at the time. Although contending that a showing of prejudice is not required, "the evidence of prejudice is immediately apparent; failure to gain a continuance resulted in poor preparation that undermined [the Petitioner's] defense in totality."

***49** The State counters that trial counsel did not enter into such an agreement with the Petitioner prior to or during trial. The State acknowledges that lead counsel did, in fact, have a discussion with Ms. Ross regarding the writing of the Petitioner's story; however, Ms. Ross had no legal rights to the Petitioner's story. The State contends, and the post-conviction court found, that there is no evidence to indicate that trial counsels entered into any agreement with the Petitioner prior to or during the trial. The State further asserts that as the only release at issue in this case was signed by the Petitioner after she was found guilty and sentenced, although prior to the direct appeal, "it is irrational to suggest that the [Petitioner] was adversely affected by the conduct of the attorneys during trial as a result of this post-trial agreement." We agree with the State.

The Petitioner did not put on any evidence which preponderates against the post-conviction court's findings. A mere discussion of a book, which even Ms. Rose was somewhat unclear on the timing of, is not sufficient to establish the existence of a conflict of interest. As noted by the State, at the time the waiver was signed by the Petitioner, which is the only firm indication that trial counsel was considering pursuing a book deal, which as an aside never occurred, the trial and sentencing phases were completed. The Petitioner may not now rely on something which occurred after the trial to establish a conflict which affected counsel's performance during the trial.

Though not specifically asserted by the Petitioner, with regard to counsel's representation of the Petitioner on appeal, we conclude that a possible conflict existed, as counsel continued the representation on direct appeal. However, contrary to the Petitioner's assertions, we conclude that a showing of prejudice is required in this case to establish ineffective assistance of counsel. Moreover, as did the post-conviction court, we conclude that no prejudice has been shown. Ms. Ross testified that the only reason presented to her for the book was so that others could see a different side of the Petitioner. Both attorneys denied any hopes of pecuniary gain. Co-counsel indicated that they had discussed doing a publication for a seminar on death penalty cases. Moreover, there is no indication from any party that anything was ever done to further the actual goal. After review, we conclude that the Petitioner has failed to show even adverse affect from these actions, let alone prejudice.

**C. Penalty Phase Deficiencies**

The Petitioner claims that trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. The Petitioner asserts that "[t]he penalty phase verdict was less an appropriate response to the facts than an indictment of the performance of defense counsel." She asserts that her death sentence was the direct result of counsel's: (1) failure to present mitigation evidence in their actual possession; (2) failure to discover relevant mitigation evidence; (3) counsel's surrender of privileged information to the State; (4) counsel's failure to make effective opening and closing arguments; (5) counsel's failure to conduct effective *voir dire;* and (6) counsel's failure to object to a legally inconsistent aggravator.

**1. Failure to Present Mitigation Evidence in Counsel's Possession**

***50** At the post-conviction hearing, trial counsel conceded that he should have called many of the individuals interviewed by Dr. McCoy, including the juvenile detention workers and the Petitioner's friends from Job Corps. Trial counsel further acknowledged that he did not, in fact, subpoena any lay witnesses to testify, planning instead to use Dr. McCoy as the only witness, presenting the social history of the Petitioner and utilizing the charts and materials she had prepared to support her testimony. The Petitioner first contends that trial counsel's strategy to



Case 1:12-cv-00035-HSM-SKL Document 13-7 Filed 08/01/12 Page 127 of 142
PageID #: 9574

use Dr. McCoy as the sole witness to present the Petitioner's social history was ineffective assistance of counsel because a social history is more properly presented through multiple lay witnesses. She further argues, however, that the decision not to utilize the testimony of Dr. McCoy compounded the problem and was separately ineffective.

The Petitioner acknowledges that trial counsel provided four alternative reasons for the decision not to have Dr. McCoy testify, but she asserts that each justification is implausible. With regard to counsel's asserted reason not to have Dr. McCoy testify because she could not corroborate Dr. Engum's diagnosis, the Petitioner asserts the reason is simply untrue as Dr. McCoy testified otherwise and her prepared report supported the diagnosis. With regard to the asserted reason that Dr. McCoy's materials contained "double-edged" information, the Petitioner contends that: trial counsel should have already been aware of this information from discussions with Dr. McCoy; the negative information could have been presented in a way to strengthen the mental illness diagnosis; and the decision to turn the materials over to the State allowed the information in anyway. With regard to trial counsel's third explanation for not calling Dr. McCoy, her relationship with General Crabtree, the Petitioner contends that trial counsel undermined his own justification by admitting his knowledge of the relationship months in advance. Finally, the Petitioner argues that the explanation that the decision was based in part on the fact that General Crabtree showed up that morning with the report covered in "yellow stickies" and appeared "loaded for bear" was not rational, as it was undisputed that the decision not to call Dr. McCoy was made the prior evening. The Petitioner argues that "[b]ecause each of counsel's proffered explanations fall flat, there is no reasonable strategic basis on which counsel could have decided to pull Dr. McCoy's testimony from the penalty phase."

When analyzing a claim of ineffective assistance as a result of failing to present mitigating evidence, the courts apply the three-pronged test set forth by our supreme court in Goad v. State, 938 S.W.2d 363, 371 (Tenn.1996):(1) the reviewing court must first analyze the nature and extent of the mitigating evidence that was available and not presented; (2) the court must then determine whether substantially similar mitigating evidence was presented to the jury during either the guilt phase or the sentencing phase of the proceedings; and (3) the court must consider whether there was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination. *Id.* at 371. In denying the Petitioner post-conviction relief on this issue, the post-conviction court properly analyzed the issue and supported its reasoning on the record.

***51** First, the post-conviction court analyzed the mitigating evidence known to the defense team at the time of trial, specifically, Dr. McCoy's report. Afterward, the court found that the first *Goad* factor had not been satisfied. In reaching its decision, the court recognized that:

> Dr. McCoy testified concerning various themes of mitigation that she thought should have been presented to the jury during ... the trial. While this court finds that there may have been mitigating evidence that was not presented to the jury, this court has previously discussed counsel's decision to limit some mitigation and the negative aspect of some of that evidence.

Review of the record reveals that the court had indeed earlier discussed, and found reasonable, lead counsel's decisions regarding the available evidence in light of the negative aspects. Next, the court looked to the evidence and found that the information in Dr. McCoy's report was substantially similar to mitigation evidence which was presented during the guilt and penalty phases of the trial. Specifically, the court stated:

> Much of the evidence presented by the petitioner here was presented to the jury in one of the phases of trial, but this court notes that it was not to the extent that the petitioner now asserts that she thinks it should have been. Some of the witnesses would have been redundant while others would have included some very negative information about the petitioner.

Finally, the post-conviction court determined that there was "such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination ." *See* Goad, 938 S.W.2d at 371. Additionally, the court made the following comments on the record.

> Considering all the circumstances and evidence, this court cannot fault counsel for having chosen not to use Dr. McCoy as a witness at the penalty phase of the petitioner's trial. [Lead counsel] was understandably uncomfortable with Dr. McCoy's statements and materials and while a different decision may seem best in hindsight, this court cannot judge counsel's decision with the situation with 20–20 hindsight and find fault merely because another choice may seem to be preferable today. Counsel's decision was not unreasonable.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The post-conviction court also noted in its order the problematic information that lay witnesses called to testify could put before the jury and noted that:

> With the potential for much of this plus other information to harm the petitioner's case in mitigation, counsel made a reasonable choice to try to limit what came before the jury and from whom. Counsel's original choice to have the information explained by an expert rather than lay witnesses who could not explain the petitioner's behavior was understandable. Once the exigent decision was made that Dr. McCoy would not testify, counsel strategically decided to have the petitioner's parents and aunt testify to bring out the petitioner's life history to be considered in combination with the information that had already been provided to the jury regarding her Borderline Personality Disorder.

***52** Following review of the record, we cannot conclude that the Petitioner has put forth sufficient evidence to preponderate against the trial court's findings. The court made clear its findings on the record after applying the appropriate analysis, and we agree with the post-conviction court.

The post-conviction court, again specifically accrediting lead counsel's testimony, stated that he did not call Dr. McCoy because she told him that she could not corroborate Dr. Engum's report. As previously noted, it is not the province of this court to reweigh such determinations. Lead counsel also testified that he had never been completely comfortable with the use of Dr. McCoy's materials as they contained a lot of material which he did not want the jury to hear. He explained that the decision was made to have Dr. McCoy testify, but some discomfort still remained with the decision. According to lead counsel, when he learned that Dr. McCoy would not corroborate the diagnosis, this was the final straw, and, when considered in combination with his original discomfort and other minor concerns, the decision was made. The court noted that while Dr. McCoy's testimony contradicted these statements, this could easily be explained as a misunderstanding between the two. With regard to lay witnesses who could possibly have been called, the court again, based on the testimony which was given, stated that the decision was a tactical one based on the negative nature of some of the statements. The Petitioner has failed to carry her burden for relief.

Based upon the clear finding by the trial court that the mitigation evidence which was omitted would not have outweighed the aggravating factors, the Petitioner is essentially precluded from establishing prejudice. Even trial counsel himself, while admitting that in hind sight he wished he had called more mitigation witnesses, stated that he was not sure it would have made a difference based upon the horrible facts of the case. However, as noted by the post-conviction court, these decisions cannot be judged in hindsight.

**2. Failure to Discover Relevant Mitigation Evidence**

The Petitioner also finds fault with trial counsel for failing to discover critical mitigation evidence in this case. Specifically, she asserts that trial counsel failed to discover evidence of the Petitioner's brain damage and Bipolar Disorder. Additionally, she asserts that trial counsel failed to discover numerous lay witnesses who could have testified in her defense. She contends that trial counsel was in possession of numerous "red flags" that should have alerted counsel of the need to discover and present evidence of the alleged brain damage.

The Petitioner bases her argument with regard to brain damage and mental illness on the testimony of Drs. Pincus and Kenner. Dr. Pincus testified that the most significant indication of the Petitioner's brain damage was her history of seizures dating from infancy. Dr. Kenner testified that because of the abnormal EEG done when the Petitioner was fourteen months old, the history of seizures, and the traumatic head injury at age fourteen, "ample evidence existed at the time of [the Petitioner's] trial to suggest the need for a neurological examination." Additionally, trial counsel was aware of lay witness testimony regarding the Petitioner's mother's alcoholism and the Petitioner's exposure in-utero, which can result in neurological impairment. The Petitioner asserts that, despite all this evidence which suggested brain damage, the defense team conducted no neurological investigation. As such, counsel failed to discover the Petitioner's neurological disabilities, namely, an abnormality in the brain that impairs her impulse control.

***53** The Petitioner contends that the psychological evaluation conducted by Dr. Engum was not sufficient for two reasons. First, she contends it is insufficient because Dr. Engum is a neuropsychologist, and the type of brain damage suffered by the Petitioner does not show up in neuropsychological testing. Dr. Pincus testified that no evidence of brain damage could have been discovered by Dr. Engum because of the type of testing he utilized. The Petitioner does not contend that trial counsel should be held to a standard of neurological knowledge on par with

Dr. Pincus, but argues that counsel should have known that: (1) the available evidence suggests physiological damage; and (2) Dr. Engum was not a medical doctor. "Competent counsel would have known that different areas of expertise are needed to conclude that there is no brain damage." The second reason the Petitioner contends that it was unreasonable for trial counsel to rely on Dr. Engum's opinion is that Dr. Engum provided no explanation for the myriad indications of brain damage. "Minimal diligence required a second opinion from a medical professional with a different specialty."

The Petitioner further asserts that the trial diagnosis of borderline personality disorder was incorrect. Rather, the proper diagnosis, as testified to at the post-conviction hearing, was bipolar disorder, as confirmed by her positive response to mood-stabilizing drugs. Additionally, she asserts that counsel failed to discover her post-traumatic stress disorder. The Petitioner contends this failure to discover the proper diagnosis was ineffective assistance because the diagnosis was readily discoverable at the time of trial. Dr. Kenner testified that reports of the Petitioner's family and friends of her behavior, the Petitioner's three suicide attempts, the Petitioner's belief that she was invincible, and her EEG at fourteen months of age were all indicators of bipolar disorder. Dr. Kenner acknowledged that there is a danger of misdiagnosing bipolar individuals as someone who has borderline personality disorder, and to achieve the correct diagnosis, repeated clinical interviews are necessary. He opined that Dr. Engum reached the wrong diagnosis because he met with the Petitioner only four times. The Petitioner further contends that Dr. Engum's diagnosis was wrong because he knew little about the Petitioner's life, a fact directly attributable to trial counsel because their team was structured so that their experts worked in isolation with respect to the others.

As a third assertion of failure to discover mitigation evidence, the Petitioner also asserts that trial counsel was in possession of numerous "red flags in the form of information obtained from prospective lay witnesses" that should have alerted counsel for the need to discover and present evidence of the alleged brain damage. She also faults counsel for failing to investigate witnesses who could testify to the Petitioner's family relationships and the institutions in which the Petitioner spent a great portion of her life.

*54 In denying relief on this issue, the post-conviction court made the following findings:

> Counsel relied upon the experience of Dr. Engum to perform the appropriate testing. When Dr. Engum indicated that there were no signs of brain damage, counsel relied on this information. Dr. Engum did not testify here and there is no indication that he advised that other experts were needed. [Lead counsel] testified that he did not recall either Dr. Engum or Dr. McCoy suggesting that a psychiatrist needed to evaluate the petitioner. Dr. McCoy also testified that because Dr. Engum was a neurophsychologist that she would have assumed he would have been the person to make the call if a neurologist was needed. This court finds no deficiency in counsel for not instructing the defense experts in how to do their jobs in areas to which they are supposed to be experts or for not having questioned their opinions.
>
> The experts at all the proceedings opined that the petitioner acted without premeditation. Drs. Engum, Pincus, and Kenner all testified that the petitioner lost control. Dr. Pincus specifically testified, as did Dr. Engum, to the petitioner's premeditation and deliberation in planning the beating, taking weapons, getting to the park, carving a pentagram, and delivering blows to the victim. They both opined that the petitioner had not, however, premeditatedly and deliberately murder the victim. They opined, as did Dr. Kenner, that once the beating began, she lost control and could not stop. Drs. Pincus and Engum also agreed that while they did not think a cooling off period had occurred, there had been time for that to occur. Dr. Pincus also admitted that the fact that the petitioner had told someone the day before the murder that she was going to kill the victim and then did in fact kill the victim makes it appear premeditated. This court will not fault counsel because the specific diagnosis by different experts differed. Counsel appropriately relied upon the retained expert's opinion. As made clear by Dr. Kenner's own testimony, the area of mental health is constantly changing. Dr. Kenner even had included borderline personality disorder in his diagnoses and stated that it was a reasonable diagnosis at the time with what the defense had.

Following a thorough review, we must agree with the post-conviction court. Trial counsel was not an expert in the field of psychology or neurology, and, as conceded by the Petitioner, such expertise is not required. Lead counsel retained multiple experts to examine the Petitioner, and a diagnosis was reached. A defense attorney is not required to question a diagnosis put forth by a professional expert in the field. Lead counsel was asked at the post-conviction

hearing if any of the retained experts had recommended additional testing, and he answered in the negative. Lead counsel specifically stated that if such recommendation had been made, he would have pursued it. Moreover, the court concluded that "no relief is warranted based on the fact that the opinions of Drs. Pincus and Kenner differed somewhat from that of Dr. Engum." While the actual diagnosis is somewhat varied, the essential facts, *i.e.,* the concession to premeditation, are very similar. And, as further noted, the Petitioner's own expert conceded that the diagnosis reached by Dr. Engum was reasonable at the time. This issue was properly denied by the post-conviction court, and the Petitioner has failed to demonstrate that the evidence preponderates against the court's findings.

**3. Disclosure of Protected Work Product to the Prosecution**

***55** The Petitioner next asserts that counsel's representation was ineffective because lead counsel turned three volumes of Dr. McCoy's work product over to the prosecutor immediately prior to the penalty phase. The Petitioner's argument first centers around whether counsel was ordered by the trial court to produce these documents. She asserts that because the record does not support the existence of a court order, then trial counsel was ineffective because he was not required to turn the documents over pursuant to Rules 16(b) and 26.2 of the Tennessee Rules of Criminal Procedure and Rule 705 of the Tennessee Rules of Evidence.

As noted by the State, the Petitioner's argument appears to rest solely on whether lead counsel was ordered by the court to turn over the documents. She notes the testimony of lead counsel during which he stated that he turned over the materials because "the Court said we had to give them to him." However, the Petitioner states that later statements by lead counsel cast doubt upon the existence of such an order. Namely, she noted that lead counsel later stated that he "could be mistaken as to whether it was actually a ruling" by the court. She also references a statement in which lead counsel stated, "in retrospect, I probably would not have given the entire thing and made the Court specifically order me to do that." Moreover, the Petitioner points out that no written order appears in the record ordering production of Dr. McCoy's work.

We must agree with the State and conclude that the Petitioner has failed to carry her burden of establishing either deficient performance or prejudice. The Petitioner is not asserting that lead counsel is duty bound to comply with the orders of a court. The Petitioner's argument is merely that the record does not establish that such an order existed. We disagree, however, with the Petitioner's interpretation of the evidence presented. In fact, the only evidence presented is basically the testimony of lead counsel, which appears to indicate that he would have turned the material over only upon order of the court. While lead counsel did not specifically recall such an order, the record still seems to indicate that the court, during the in-camera hearing, did, in fact, order production. Nothing in the testimony of General Crabtree, the only other person present during the meeting other than the trial court, contradicts the testimony of lead counsel. On this record, we cannot conclude that the Petitioner has carried her burden of showing that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *See Baxter v. Rose,* 523 S.W.2d at 936.

Additionally, the Petitioner has failed to prove that she was prejudiced by anything in the mitigation report that was turned over to the State. While some testimony was elicited at the post-conviction hearing with regard to the State utilizing some of the information contained therein in cross-examination of three witnesses who testified at the sentencing hearing, the Petitioner has not established that this affected the outcome of the trial or that a different result would have been reached absent the information. When questioned at the post-conviction hearing, General Crabtree was unable to recall what, if any, of the information he learned for the first time by reading the report, rather than it being information he was already in possession of from other sources. The Petitioner has simply failed to put forth any evidence which preponderates against the findings of the post-conviction court.

**4. Failure to Present Effective Penalty Phase Arguments**

***56** Next, the Petitioner contends that trial counsels' penalty phase arguments highlighted and compounded counsels' poor preparation. With regard to the opening statement, the Petitioner asserts that lead counsel failed to highlight the Petitioner's age at the time of the crime and that counsel neglected to explain that the Petitioner had acted in concert with two violent gang members who shared significant culpability for the crime. Moreover, he failed to discuss any of the evidence discovered by Drs. Engum and McCoy or to even mention the Petitioner's mental illness or history of abuse and neglect. With regard to the co-counsel's penalty phase closing argument, the Petitioner contends that she, likewise, was "equally fault

worthy" because she failed to allude to any of the mitigation themes of mental illness, lack of significant prior criminal activity, that the murder was committed under extreme mental or emotional disturbance, or the Petitioner's youth at the time. The State contends that this issue is being raised for the first time on appeal and is, therefore, waived.

Like the State, we can find nothing in the record to support that these arguments have been previously presented as the argument was not raised in either the Petitioner's post-conviction petition or argued before the post-conviction court. While some questions were asked of lead counsel and co-counsel with regard to their strategy and thinking during closing, no argument was made before the post-conviction court. Moreover, we can find nowhere in the post-conviction court's order of denial addressing the issue. As such, we must agree with the State that these claims are waived for the purposes of appellate review. *See* T.C.A. § 40–30–106(g) (a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"; *see also* *Workman v. State*, 868 S.W.2d 705, 709 (Tenn.Crim.App.1993).

**5. Failure to Conduct Meaningful *Voir Dire***

The Petitioner next contends that trial counsel was ineffective in failing to conduct meaningful *voir dire.* Specifically, she contends that counsel was ineffective for failing to object to the striking of a juror who indicated that he could not return a death sentence solely based on the Petitioner's age at the time of trial. The Petitioner also argues that counsel was ineffective for failing to adequately *voir dire* prospective jurors regarding racial biases or "fears or prejudices involving Satanism."

The United States Supreme court has examined the issue of capital juror selection in great detail and has refined it through several opinions. Tennessee courts have followed the Supreme Court's analysis. *See* *State v. Alley*, 776 S.W.2d 506, 518 (Tenn.1989), *cert. denied,* 493 U.S. 1036 (1989). The issue was first discussed at length in *Witherspoon v. Illinois*, 391 U.S 510 (1968). At the time of trial in *Witherspoon,* Illinois juries had complete discretion as to when to impose the death penalty, and the jury assessed punishment at the same time it rendered its verdict as to guilt. *Adams v. Texas*, 448 U.S. 38, 43–44 (1980). By statute, Illinois allowed unlimited challenges for cause by the State to any juror who stated that he had conscientious scruples against capital punishment or that he was opposed to capital punishment. *Witherspoon*, 391 U.S. at 513. In the trial at issue in *Witherspoon,* forty-seven members of the venire were successfully challenged for cause under the statute. *Id.* at 514. The court held that the selection process violated the defendant's Sixth Amendment right to a fair and impartial jury because the jury eventually selected was not representative of the community. *Id.* at 518. The Court found that much of the constitutional harm occurred because many of the jurors were excluded without knowing whether they could put their beliefs aside and still follow the law. *Id.* at 519–20. The Court held that by its statute providing for such challenges, Illinois had crossed the line of neutrality; the State could not entrust the determination of whether a man should live or die to a "tribunal organized to determine a verdict of death." *Id.* at 521.

***57** Later, the Court in *Wainwright v. Witt*, 469 U.S. 412 (1985), clarified some of the confusion that had arisen from *Witherspoon* and some of its other prior decisions on the matter. *Wainwright* involved a Florida capital case where one juror expressed personal opposition to the death penalty and further stated that she felt her view would influence her decision on guilt or innocence. That juror had been dismissed for cause on the basis of *Witherspoon.* The United State Supreme Court reversed the Eleventh Circuit, finding that the juror had been properly dismissed for cause. *Id.* In correcting some of the misapprehensions of the Eleventh Circuit, the Court lamented that, despite *Witherspoon's* limited holding, courts had applied it too broadly. *Id.* at 420–21.

The Court explained that *Witherspoon* had to be understood within the context of the issues presented. Much had changed in the field of capital litigation since the time of *Witherspoon.* Juries no longer had unlimited discretion in imposing capital punishment. Furthermore, *Witherspoon* dealt with circumstances under which jurors *could not* be excluded, but did not explain when jurors could properly be excluded. *Id.* at 422. The Court explained that *Witherspoon* had to be understood in accordance with the traditional reasons for excluding jurors. As Justice Rehnquist noted, there is nothing talismanic about juror exclusions under *Witherspoon* merely because it involves capital sentencing juries. *Id.* at 423. *Witherspoon* was not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment's right to a fair and impartial jury. *Id.* The key to the analysis is not what a juror believes about the death penalty, but whether, because of those beliefs, a

potential juror lacks impartiality. Id. at 423–24. Based on this understanding of its prior opinions, the Court announced that the standards for determining whether a juror could be properly excluded was whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Id. at 424.

The *Wainwright* standard does not require that a juror's bias be proven with "unmistakable clarity" because determinations of juror bias cannot be reduced to question and answer sessions that obtain results in the manner of a catechism. *Id.* Accordingly, the parties attempting to select the jury, as well as the trial judge, must be intently attuned to the jurors' responses to determine potential bias. As the *Wainwright* court noted, even when the printed record may not be particularly clear, there will be situations where the trial judge is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law. *Id.* at 425–26. For that reason, the Supreme Court demanded that deference be paid to the trial judge who sees and hears the potential jurors. *Id.* at 426. Thereafter, in Morgan v. Illinois, 504 U.S. 719, 728 (1992), the Court reiterated the standard: "[I]t is clear from *Witt and Adams,* the progeny of *Witherspoon,* that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."

***58** Applying these standards to the facts of this case, we must conclude that the trial court was acting entirely within its discretion when removing Prospective juror Mr. Rutherford for cause. The following exchange occurred on the record:

> Trial Court: Ah, are you telling me that you don't know if you can [give the death penalty], or you think you can, or you think you can't, I need you to tell me how you feel.
>
> Mr. Rutherford: I think it would make a big difference with her age whether or not, you know, she would get the death penalty or not.
>
> ...
>
> General Crabtree: ... And, frankly, one mitigating factor that the Court could choose to charge you on, that you could consider, is the age factor.
>
> Would that factor in and of itself alone make it difficult, or, in fact, impossible for you to weigh the aggravating circumstances against that?
>
> Mr. Rutherford: I have problems just because of the death penalty.
>
> General Crabtree: That's what we are talking about. I'm not talking about anything else now. I'm talking about the death penalty. Are you saying because of this individual's age you could not return a death penalty?
>
> Mr. Rutherford: I, I don't think I could.
>
> General Crabtree: ... So let's see if we can make it clear—as far as her, the sole factor of her age, that would be something that you could not do?
>
> Mr. Rutherford: If I felt like, you know, someone that was more mature and stuff like that I wouldn't have a problem with that, but the immaturity is a problem—
>
> General Crabtree: I understand you are saying that because of her age that one factor would keep you from returning the death penalty, is that correct?
>
> Mr. Rutherford: I think so.

The Petitioner argues that this colloquy indicates only that "Mr. Rutherford made clear that he could consider the death penalty for a mature defendant, but that he had reservations in light of [the Petitioner's] youth." We disagree with the Petitioner's analysis and her reliance on the statement made in *Morgan v. Illinois.* As previously stated, the Supreme Court in *Morgan* stated that "a juror who *in no case* would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." Morgan v. Illinois, 504 U.S. at 728 (emphasis added). According to the Petitioner, that statement stands for the proposition that if a potential juror could possibly impose the death penalty in some case, just not the instant case, then he should not be stricken for cause an impartial juror. We clearly disagree with that interpretation entirely and conclude that the statement should only be taken as a reiteration of the standard previously stated in *Wainwright* and *Adams* that a potential juror must have impartiality in the case he or she is presently involved with.

A reading of the colloquy which occurred with Mr.

Rutherford made clear that he could not impose the death penalty under any circumstances because of the Petitioner's age in this case. As such, the statements made by Mr. Rutherford indicate that his views would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and his oath. As such, we agree that he was appropriately struck for cause, and no objection by trial counsel was warranted. While we do agree that the statements do not necessarily indicate an unconditional bias against capital punishment entirely, as noted, that is not the required standard.

***59** The Petitioner also challenges Mr. Rutherford being struck for cause on grounds that a "juror is entitled to find that any one mitigating factor outweighs all aggravating evidence, and thus a juror could not have been disqualified" for stating he could not apply the death penalty because of age, *i.e.* the mitigating factor at issue. We agree with the State that this argument does not comport with the rationale in *Wainwright* that the focus of *voir dire* is to determine potential bias. Mr. Rutherford's remarks again clearly indicate that he was giving a definitive refusal in this case to impose the death penalty.

With regard to *voir dire,* the Petitioner further asserts that trial counsel were ineffective because they failed to tell the jury that the Petitioner's youth was a statutory mitigating factor; discuss and question the prospective jurors on the mitigation themes of mental illness, psychology, and mental health experts; and failed to question the prospective jurors with regard to their beliefs on interracial dating and Satanism. The Petitioner also contests counsels' failure to question the pool to ascertain their knowledge of the lead counsel's overbilling problem. However, we again must agree with the State, that the Petitioner has failed to put forth any evidence to show that any prospective juror harbored any bias or prejudice on these grounds or that anyone was improperly excluded in this regard. As such, the Petitioner has simply failed to meet her burden of establishing ineffective assistance of counsel for the aforementioned lack of discussion during *voir dire.* As noted by the post-conviction court:

> The length and scope of voir dire is an individual decision made by counsel on a case by case basis. The attorneys voiced no dissatisfaction with the jury ultimately selected. Petitioner also failed any proof that any particular juror was ... not qualified.

The Petitioner has failed to put forth evidence which preponderates against the findings of the post-conviction court.

**6. Failure to Object to Legally Inconsistent Aggravator**

The Petitioner next asserts that counsel was ineffective for failing to object to the State's use of a legally inconsistent aggravating factor. Specifically, the Petitioner contends that her "simultaneous convictions of conspiracy and capital murder using the avoid-the-arrest aggravator violated [her] rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and [Article] I, [sections] 8, 9, and 16, of the Tennessee Constitution." The Petitioner argues that because her convictions for premeditated first-degree murder and conspiracy to commit such is predicated on her forming intent prior to the acts, it is "legally inconsistent" to also find that she committed murder to avoid arrest. The State asserts that this is mistaken.

The question of whether trial counsel was ineffective for failing to object to this alleged inconsistency depends upon whether the use of the factor was, in fact, "legally inconsistent." In its order denying relief on this issue, the post-conviction court specifically found:

> ***60** While this court understands the petitioner's position, the evidence supported both the conspiracy charge as well as the factor that the petitioner committed the act to avoid arrest. By her own statement, the petitioner established proof of this factor. The law does not require that the petitioner's motive to avoid arrest be her sole motive. The evidence established that this motive was present at the time of the murder. Under these circumstances, clearly no prejudice has been established and the petitioner is not entitled to relief on this issue.

Following review of the record, we agree with the post-conviction court and conclude that nothing preponderates against these findings. To establish the applicability of the "avoid arrest" aggravating factor, the State is required to prove that the avoidance of prosecution or arrest was *one* of the purposes motivating the killing. *State v. Bush,* 942 S.W.2d 489, 504 (Tenn.1997); *State v. Smith,* 868 S.W.2d 561, 581 (Tenn.1993). Avoidance of arrest need not be the sole motive for the murder. *State v. Carter,* 714 S.W.2d 241, 250 (Tenn.1986).

The record sufficiently establishes the existence of two separate motives in this case at different times. Each is applicable based upon the evidence presented. Intent to commit the murder was established by telling a friend on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the day prior that she was going to kill the victim, luring the victim to the remote area, coming armed with weapons used to commit the murder, and attacking an unarmed victim with multiple weapons. Likewise, the conspiracy was supported by evidence of the petitioner leaving the Center with her two co-conspirators, the three accompanying the victim to the isolated area, and two of the three wearing pentagram necklaces. However, by her own admission, the Petitioner stated that during the murder she heard voices in her head telling her that she had to do something to keep the victim from going to the police. Thus, the "avoid arrest" aggravator is supported as one of the motives for the murder. Again, as noted *supra,* to use the aggravating factor does not require proof that it was the sole purpose for the killing. The Petitioner is not entitled to relief.

**D. Guilt Phase Deficiencies**

The Petitioner claims that trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, the Petitioner asserts that counsel denied her effective representation by breaching acceptable standards for capital representation at the guilt phase in that:

1. Trial counsel failed to present evidence to undermine a conviction of first degree murder.

2. Trial counsel failed to make effective arguments.

3. Trial counsel failed to make effective use of voir dire.

**1. Failure to Present Evidence to Undermine the Elements**

The Petitioner initially contends that the "killing of Ms. Slemmer was neither deliberate or premeditated. As [the Petitioner] proved on post-conviction, ... the facts establish that [the Petitioner] participated in Ms. Slemmer's killing in the midst of a hypomanic, psychotic break." The Petitioner asserts that counsel "failed to present an effective case to undermine the State's proof of deliberate and premeditated murder" The Petitioner contends that counsel failed to make appropriate use of expert witnesses and failed to discover relevant lay witness testimony, "the same fundamental errors that plagued [her] representation in the penalty phase."

***61** Specifically, the Petitioner contends that trial counsel presented "scant expert testimony with regard to [her] mental state surrounding the killing of Ms. Slemmer." The only expert proof presented was that of Dr. Engum, who testified that "she basically did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, Borderline Personality Disorder, which meant that she basically went out of control." The Petitioner asserts that Dr. Engum's testimony was "sufficiently on point," but was "insufficiently substantiated," as it was dependent solely upon self-reports of the Petitioner. The State, therefore, was able to diminish the weight of Dr. Engum's testimony considerably on cross-examination by pointing out that the factual basis for his opinion was limited to statements made by the Petitioner herself.

The Petitioner also asserts that had trial counsel introduced the testimony of lay witnesses to substantiate Dr. Engum's conclusion, Dr. Engum's opinion would have carried more weight. Additionally, the Petitioner argues that trial counsel was ineffective for presenting the testimony of Dr. Bernet. Dr. Bernet was called on to testify that Ms. Slemmer's killing was not a satanic ritual, but, rather, was consistent with a phenomenon called "collective aggression." The Petitioner asserts that Dr. Bernet's testimony offered no apparent benefit to the defense and was highly prejudicial in that it opened the door to a lengthy discussion of Satanism and the various details of the killing that bore satanic overtones.

Citing to no legal authority, the Petitioner has made the above contentions. Like the State and post-conviction court, we must conclude that she has failed to carry her burden of establishing her entitlement to relief. The Petitioner's main complaint with Dr. Engum's testimony, which she concedes was "sufficiently on point," was that it was not substantiated by lay witness testimony, which the Petitioner contends would have given it more weight before a jury. This is mere supposition. The Petitioner argues that lay witnesses interviewed by Dr. McCoy, as well as others, could have testified that the Petitioner had lost complete control in the past, nearly killing a man before she was held back. The Petitioner also asserts lay witnesses could have testified that the Petitioner was incapable of calming down on her own. Initially, we are somewhat unclear as to how these statements would have bolstered her defense, but, regardless, this argument is not sufficient to substantiate a claim for post-conviction relief. The Petitioner has failed to argue how any specific lay witness would have sufficiently substantiated the testimony in order to improve its weight before the jury, as much of the information was introduced through Dr. Engum. Absent such a showing, prejudice is not established.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

We must also reject the Petitioner's complaint that calling Dr. Bernet to the stand was "a wasted opportunity." Both lead counsel and Dr. McCoy stated that Dr. Bernet was not part of the defense team and was utilized in the case for one specific purpose. As previously noted, neither of the experts who were employed by the defense team recommended that another expert be retained. As such, we have previously concluded that trial counsel was not deficient for not having Dr. Bernet examine the Petitioner.

**2. Failure to Make Effective Arguments**

***62** The Petitioner next asserts that she was deprived of her right to effective assistance of counsel based upon trial counsel's failure to make effective opening and closing arguments to the jury. Specifically, she contends that the arguments "failed to address the only significant issue concerning [the Petitioner's] guilt for first degree murder: whether evidence of mental illness negated the State's assertion that the killing of Ms. Slemmer was deliberate and premeditated." She contends that neither lead counsel nor co-counsel put forth sufficient argument to negate the Petitioner's ability to form intent.

As discussed in the previous section with regard to the arguments presented during the penalty phase, we must again find this issue waived as it was not raised in the petition or addressed by the post-conviction court. *See* T.C.A. § 40–30–106(g) (a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"; *see also* Workman v. State, 868 S.W.2d 705, 709 (Tenn.Crim.App.1993).

3. **Failure to Make Effective use of *Voir Dire***

Finally, the Petitioner contends that she was denied the effective assistance of counsel based upon trial counsel's failure to make effective use of *voir dire.* However, her entire argument in this regard in this section is that:

> [The Petitioner] has demonstrated above that defense counsel squandered *voir dire* as an opportunity to select a jury sensitive to issues of mental illness, and without prejudice against [the Petitioner] or her counsel. These same deficiencies were equally detrimental to [the Petitioner's] defense during the guilt/innocence phase.

As such, we conclude that the Petitioner has raised no additional arguments other than those which were raised in the section regarding penalty phase deficiencies. As we have concluded *supra* that trial counsel was not deficient in this regard, we conclude that no additional review is required here.

**V. Petitioner is Ineligible for Death Penalty**

The Petitioner asserts that, under the constitutional understanding of the requirements for a categorical bar to execution established by *Atkins v. Virginia* and *Roper v. Simmons,* an immature, mentally ill, brain damaged eighteen-year-old is not eligible for the death penalty. The Petitioner's support of her argument relies upon the general consensus that the death penalty must be reserved for "the worst of the worst." Kansas v. Marsh, 548 U.S. 163 (2006) (Souter, J., dissenting) (citation omitted).

"Death is different." The penalty of death is qualitatively different from every other sentence, however long. Woodson v. North Carolina, 428 U.S. 280 (1976). Because of the qualitative difference, there exists the corresponding need in capital cases for reliability in the determination that death is the appropriate punishment in a specific case. Id. at 305. In *Furman v. Georgia,* Justice Stewart expressed what has come to be the longstanding view of the United States Supreme Court:

> ***63** The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejections of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

Furman v. Georgia, 408 U.S. 238 (Stewart, J., concurring). Justice Stewart concluded that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.*

The "death is different" principle led to the Court's cases condemning the mandatory imposition of the death penalty. *See, e.g.,* Roberts v. Louisiana, 431 U.S. 633 (1977) (per curiam); Woodson v. North Carolina, 428 U.S. 280 (1976) (plurality opinion). The "death is different" principle also led to the recognition that the arbitrary imposition of the death penalty violates the Eighth Amendment. *See, e.g.,* Zant v. Stephens, 462 U.S. 862, 874 (1983); Gregg v. Georgia, 428 U.S. 153 (1976). The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"death is different" principle established the guarantee of full consideration of mitigating evidence. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 428 U.S. 586 (1978) (plurality opinion). *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. That is, the sentence imposed "should reflect a reasoned moral response to the [petitioner's] background, character, and crime rather than mere sympathy or emotion." *California v. Brown,* 479 U.S. 538, 545–46 (1987) (O'Connor, J., concurring).

The "death is different" principle also led the Court to carve out exemptions from eligibility for capital punishment. In this regard, a national consensus may develop which holds that an immutable characteristic of the defendant so affects his individual responsibility and moral guilt that it precludes finding his "consciousness [is] materially more 'depraved' than that of any person guilty of murder," as is required for capital punishment to be lawful. *See Godfrey v. Georgia,* 446 U.S. 420, 433 (1980). A group of offenders may be excluded from capital punishment under the Eighth Amendment only if a national consensus barring the execution of such offenders exists. The United States Supreme Court set out four indicia to consider in determining the existence of such a consensus: (1) legislation enacted by the country's legislatures, including whether there is a pattern of movement towards precluding the execution of members of a particular group; (2) the decisions of sentencing juries, appellate courts, and governors about whether to execute defendants in that group; (3) where appropriate, other indicia of national and international opinion; and (4) the court's own judgment. *See Roper v. Simmons,* 543 U.S. 543 U.S. 551, 563–65 (2005). The United States Supreme Court has carved out exempted classes of persons from execution. *See, e.g., Roper,* 543 U.S. at 551 (2005) (execution of prisoners who were under eighteen years of age at time of crime barred by Eighth Amendment); *Atkins v. Virginia,* 536 U.S. 304 (2002) (execution of mentally retarded persons unconstitutional); *Ford v. Wainwright,* 477 U.S. 399 (1986) (Eighth Amendment prohibits execution of insane persons). Because the "national consensus" is temporally situated, the list of exempted classes is not stagnant and must be revisited under standards that currently prevail.

***64** The Petitioner now asks this Court to "carve out" another excepted class of persons exempted from the death penalty, *i.e.,* immature, mentally ill, brain damaged eighteen-year-olds. In support of her position, the Petitioner cites language in both opinions of the United States Supreme Court and the Tennessee Supreme Court to conclude that "only categorical exception to the death penalty can insure the protection against cruel and unusual punishment for certain groups of less culpable individuals." Appellant's brief at 113 (citing *Roper,* 543 U.S. at 572–73 (noting the shortcomings of mitigation evidence in circumstances of adolescent defendants); *Van Tran v. State,* 66 S.W.2d 790 (Tenn.2001) ("jury's consideration of mental retardation as a mitigating factor is by itself insufficient to address the concerns protected under the Eighth Amendment or article I, § 16.")). The Petitioner further asserts that "[a]dolescents lack sufficient cognitive capacities to achieve the requisite degree of culpability for imposition of the death penalty." The Petitioner states that "[eighteen] is an arbitrary number." In support of her assertion, the Petitioner relies upon evidence that development of the frontal lobe of the brain continues into the early twenties.

The State responds that the Petitioner's issue is waived as a result of the failure to raise the issue on direct appeal. Alternatively, the State asserts that the arguments are without merit. The State contends that the United States Supreme Court rejected her argument that "execution of older adolescents must be categorically barred." The State further avers that, to the extent that the Petitioner asserts that she is incompetent to be executed, the claim is not yet ripe.

**A. Execution of Older Adolescents**

The Petitioner argues that "[t]here is ... a significant portion of individuals who lack the requisite brain development to be fully culpable for their crimes, and yet currently fall outside of the absolute bar to execution imposed by Tennessee and federal law." She maintains that "[t]hese older adolescents may have brains that are developmentally identical to or even less developed than individuals who are shielded because of a difference in birth date of a few years, months, or even days."

The Petitioner asserts that Tennessee has long recognized the special status of young people with regard to the death penalty. Specifically, the Petitioner cites to Tennessee's recognition of youth as a statutory mitigating factor, Tennessee Code Annotated section 39–13–204(j)(7), and to Tennessee's statutory exemption of the death penalty to persons under the age of eighteen, Tennessee Code Annotated section 37–1–134(a)(1). Additionally, the Petitioner makes the following statements:

• Tennessee has not executed anyone who was younger

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

than twenty-three at the time of the offense (Coe, age 23; Alley, age 29; Workman, age 28; Holton, age 36; and Henley, age 31).

***65** • Only 7.7% of Tennessee's present death-sentenced inmates were nineteen or under at the time of the crime.

• Twenty-nine of thirty-seven states with the death penalty made youth a statutory mitigating factor by 1989.

• In Thompson v. Oklahoma, 487 U.S. 815 (1988), the United States Supreme Court concluded that it would violate the Eighth Amendment to execute an offender under the age of sixteen at the time of the offense.

• Capital Juror Project's South Carolina jury study suggests that jurors consider the youthfulness of a capital defendant to be "significantly mitigating." Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L.Rev. 1538, 1564 (1988).

• Science suggests that individuals lack the brain capacity of full culpability until they are in their early 20s.

In March 2005, the United States Supreme Court ruled that the death penalty for those who had committed their crimes at under eighteen years of age was cruel and unusual punishment and, hence, barred by the United States Constitution. *See* *Roper v. Simmons*, 543 U.S. at 551. Prior to this 2005 decision, the nation's highest court had previously determined that "our standards of decency do not permit the execution of any offender under the age of [sixteen] at the time of the crime." *Id.* at 561 (citing *Thompson*, 487 U.S. at 815 (1988)). In *Thompson*, the Court stressed that "[t]he reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." *Id.* at 835.

In 1989, the nation's highest court again addressed the issue of the execution of minors. In *Stanford v. Kentucky*, 492 U.S. 361 (1989), the Court referred to contemporary standards of decency in this country and concluded that the Eighth and Fourteenth Amendments did not proscribe the execution of juvenile offenders over fifteen but under eighteen. In so holding, the Court noted that twenty-two of the thirty-seven death penalty states permitted the death penalty for sixteen-year-old offenders, and, among these thirty-seven states, twenty-five permitted it for seventeen-year-old offenders. The Court concluded that there was no national consensus "sufficient to label a particular punishment cruel and unusual." *Id.* at 370–71.

At the time the Supreme Court was again presented with the issue of whether juveniles are exempt from the death penalty, thirty states had prohibited the juvenile death penalty, comprised of twelve that have rejected the death penalty altogether and eighteen that maintained it but, by express provision or judicial interpretation, excluded juveniles from its reach. *Roper*, 543 U.S. at 564. The Court further acknowledged the declining use of the death penalty from crimes committed by juveniles. *Id.* at 565. The Court held that "[a] majority of States have rejected the imposition of the death penalty on juvenile offenders under [eighteen], and we now hold this is required by the Eighth Amendment ." *Id.* at 567. In so holding, the Court recognized:

> ***66** Three general differences between juveniles under [eighteen] and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to conform, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." ... It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." ... In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under [eighteen] years of age from voting, serving on juries, or marrying without parental consent....
>
> The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. *Eddings*, ... at 115 ... ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment....
>
> The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

personality traits of juveniles are more transitory, less fixed....

Roper, 543 U.S. at 570 (internal citations omitted). The Court concluded that these three differences "render suspect any conclusion that a juvenile falls among the worst offenders." *Id.* The Court further determines that "neither retribution nor deterrence provide[d] adequate justification for imposing the death penalty on juvenile offenders." *Id.*

Next, the Court was faced with the determination of where to draw the line regarding the age at which a person remains a juvenile. Essentially, the same question is posed to this Court today. In this regard, the *Roper* Court wrote:

> Drawing the line at [eighteen] years of age is subject ... to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns [eighteen]. By the same token, some under [eighteen] have already attained a level of maturity some adults will never reach.... [H]owever, a line must be drawn. The plurality opinion in *Thompson* drew the line at [sixteen]. In the intervening years, the *Thompson* plurality's conclusion ... has not been challenged. The logic of *Thompson* extends to those who are under [eighteen]. The age of [eighteen] is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

***67** Roper, 543 U.S. at 574.

The Petitioner has failed to persuade this court that a new national consensus exists to extend the holding of *Roper* to persons over the age of [eighteen]. Furthermore, this court has not been able to discern that there is a national consensus to show that evolving standards of decency require a constitutional ban, under either the United States Constitution or the Constitution of the State of Tennessee, on executing persons who were between the ages of eighteen and the early twentys at the time of the offense. We decline to extend the holding of *Roper* to include such.

**B. Execution of Mentally Ill**

Both the federal courts and state courts have recognized that the mentally impaired require special protections in the capital arena. Mental illness may be raised to claim incompetency to stand trial and as an affirmative defense to guilt. Under *Ford v. Wainwright,* an individual must be mentally competent at the time of the execution. Moreover, the mentally retarded are systematically shielded from capital prosecution under *Atkins* and *Van Tran.* The Petitioner asserts that "[t]his patchwork provides incomplete protection for the cognitively impaired."

In *Atkins,* the Supreme Court found that mentally retarded individuals suffer significant disadvantages during legal proceedings, which increase their risk of wrongful execution. The Court found that mentally retarded defendants are more susceptible to situations generating false confessions, are unable to provide meaningful assistance to their counsel, have difficulty testifying on their own behalf, and create an unwarranted impression of lack of remorse for their crimes. The Petitioner asserts that the cognitively impaired exhibit the same disadvantages exhibited by the mentally retarded and that they are slipping through the cracks. The Petitioner makes the following statements in support of extending an exemption against the death penalty to persons with mental illness:

• Twelve U.S. states are abolitionist, and a thirteenth, New York, has a *de facto* moratorium on the death penalty. These states are not using the death penalty against anyone, let alone people with mental illness.

• Twenty-five of the thirty-seven death penalty states, as well as the federal government, have as statutory mitigating factors for consideration by capital juries at sentencing either of: (1) the defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform that conduct to the requirements of the law was impaired; or (2) the defendant was acting under extreme mental or emotional disturbance.

• In at least five states—Arizona, Florida, Mississippi, Ohio and Nevada—a number of inmates suffering from mental illness have been removed from death row under proportionality review.

• Of the death penalty states which permit defendants to plead "guilty but mentally ill," only four have passed death sentences in GBMI cases.

***68** • Two states have explicitly considered abolishing the death penalty for the severely mentally ill. Bills were presented in Illinois and North Carolina, but neither bill has been passed into law.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

- Congress passed the Mentally Ill Offender Treatment and Crime Reduction Reauthorization and Improvement Act of 2008.

- The Capital Juror Project singled out a defendant's history of mental illness as the most powerful type of mitigation evidence after evidence of mental retardation.

- The ABA passed Resolution 122A rejecting capital punishment for the severely mentally ill and those with similar symptoms resulting from serious brain injury.

We do not dispute the concerns that deficiencies and limitations inherent in those who are mentally retarded may also be found in those who, while not mentally retarded, are considered mentally ill or cognitively impaired. The majority of states with capital statutes permit the jury to consider the [petitioner's] capacity to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of the law. However, there is no consensus in state legislation supporting a categorical exclusion for the mentally ill. In fact, federal and state courts have consistently declined to extend *Atkins* to the mentally ill. *See, e.g., Joshua v. Adams,* 231 Fed. Appx. 592, 593 (9th Cir.2007); *In re: Neville,* 440 F.3d 220, 221 (5th Cir.2006); *Lawrence v. State,* 969 So.2d 294 (Fla.2007); *State v. Ketterer,* 855 N.E.2d 48 (Ohio 2006); *Matheny v. State,* 833 N.E .2d 454 (Ind.2005). Accordingly, we decline to extend the *Atkins* bar to the death penalty to persons who are cognitively impaired or suffering from mental illness. Additionally, we acknowledge, as does the State, that should the Petitioner seek exemption from execution based upon a condition of insanity, such claim is not yet ripe for review.

**C. Execution of Older Adolescents Who Are Cognitively Impaired**

The Petitioner asserts that an exception to the death penalty should be created for older adolescents who suffer from mental illness. The Petitioner asserts that the combination of these factors rendered the Petitioner unable to control her emotions and actions due to mental illness and brain damage. While this court appreciates the unique circumstances of this Petitioner, this court declines to create a categorical bar to execution specifically for persons exhibiting these specific traits. Such factors are of the nature of those envisioned as mitigating factors. The Petitioner's request to create a categorical exemption is merely an attempt to gain a second chance at proportionality review. While this court appreciates the novelty of the Petitioner's argument, practicality precludes its acceptance. The court can envision a multitude of specifically created exemptions based upon the unique circumstances of an individual capital defendant. These particular circumstances were not what was envisioned as being encompassed within a categorical bar. Rather, this specific grouping of traits is captured within the individualized sentencing mandate of the capital sentencing scheme. This is the purpose of the weighing of the mitigating and aggravating circumstances by the jury and by proportionality review by the courts of this state. Accordingly, we decline to create a specifically carved out exception for older adolescents who are cognitively impaired. The Petitioner is not entitled to relief on this ground.

**VI. Constitutional Challenges**

***69** The Petitioner challenges the legality and constitutionality of capital punishment generally and of lethal injection specifically. She also challenges the structure of Tennessee's capital sentencing system. The Petitioner both seeks relief on these grounds and raises them to preserve the issues for future review.

**A. Death Penalty Scheme is Unconstitutional**

The Petitioner asserts that Tennessee fails to ensure a meaningful proportionality review as required by state and federal law. Our supreme court has repeatedly upheld the comparative proportionality review undertaken by the appellate courts in this state as meeting state constitutional standards. *State v. Kiser,* 284 S.W.3d 227, 294 (Tenn.2009); *State v. Vann,* 976 S.W .2d 93, 118 (Tenn.1998) (appendix); *State v. Keen,* 926 S.W.2d 727, 743–44 (Tenn.1994); *State v. Barber,* 753 S.W.2d 659, 663–68 (Tenn.1988); *State v. Coleman,* 619 S.W.2d 112, 115–16 (Tenn.1981).

The Petitioner also contends that unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has also been rejected. *State v. Hines,* 919 S.W.2d 573, 582 (Tenn.1995). The Petitioner contends that the unlimited discretion of the thirty-one elected District Attorneys General violates principles set out in *Bush v. Gore,* 531 U.S. 98 (2000). This Court has previously considered and rejected this claim. *Tyrone Chalmers v. State,* No. W2006–00424–CCA–R3–PD (Tenn.Crim.App., at Jackson, June 25, 2008), *perm. app. denied* (Tenn. Dec. 22, 2008); *David Keen v. State,* No. W2004–02159–CCA–R3–PD (Tenn.Crim.App., at Jackson, June 5, 2006), *perm. app. denied* (Tenn. Oct. 30, 2006).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**C. Lethal Injection Protocol is Unconstitutional**

The Tennessee Supreme Court has considered this claim and determined that Tennessee's lethal injection protocol is consistent with contemporary standards of decency and with the overwhelming majority of lethal injection protocols used by other states and the federal government. *Abdur' Rahman v.* Bredesen, 181 S.W.3d 292, 306–07 (Tenn.2005). On April 16, 2008, the United States Supreme Court affirmed the use of the three-drug protocol used in Kentucky's lethal injection procedure. *Baze v. Rees,* 553 U.S. 35 (2008). Tennessee uses the same protocol as Kentucky. *Id.* (citing *Workman v. Bredesen,* 86 F.3d 896, 902 (6th Cir.2007)); *see also* *Harbison v. Little,* 571 F.3d 531 (6th Cir.2009), *cert. denied,* — U.S. — (2010). The Petitioner is not entitled to relief on this issue.

**C. Death Penalty Infringes upon Fundamental Right to Life**

The Petitioner argues that the death sentence is unconstitutional because it infringes upon her fundamental right to life and because the death penalty is not necessary to promote any compelling Tennessee state interest. This complaint, that her death sentence must be reversed because it violates his fundamental right to life, is contrary to settled precedent as reflected in *Cauthern v. State,* 145 S.W.3d 571, 629 (Tenn.Crim.App.2004) (citing *Nichols,* 90 S.W.3d at 604; *State v. Mann,* 959 S.W.2d 503, 536 (Tenn.1997) (Appendix); *State v. Bush,* 942 S.W.2d 489, 523 (Tenn.1997)). Accordingly, the Petitioner is not entitled to relief on this issue.

**D. Indictment returned by Grand Jury is Unconstitutional.**

***70** The Petitioner asserts that the imposition of the death penalty violates due process of law because the indictment failed to set forth the aggravating circumstance. The courts of this state have rejected the Petitioner's argument. Our supreme court has held that "[n]either the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." *State v. Dellinger,* 79 S.W.3d 458, 467 (Tenn.2002); *see also* *State v. Rice,* 184 S.W.3d 646, 686 (Tenn.2006); *State v. Holton,* 126 S.W.3d 845, 862–63 (Tenn.2004). In *Dellinger,* the court explained that the capital sentencing scheme in Tennessee is consistent with *Apprendi* because: (1) the holding in *Apprendi* applies only to enhancement factors used to impose a sentence above the statutory maximum; (2) the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly; and (3) Tennessee's capital sentencing procedure requires both that a jury find statutory aggravating circumstances based upon proof beyond a reasonable doubt and that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. *Dellinger,* 79 S.W.3d at 466–67. In *Holton,* the court addressed whether the holding in *Dellinger* was correct in light of the United States Supreme Court's decision in *Ring.* The Tennessee Supreme Court held that "*Ring* does not stand for the broad proposition that aggravating circumstances must be charged in the indictment to satisfy constitutional standards.... Therefore, *Ring* provides no relief to the defendant and does not invalidate this Court's holding in *Dellinger.*" *Holton,* 126 S.W.3d at 863 (citing *United States v. Bernard,* 299 F.3d 467, 488 (5th Cir .2002); *Porter v. Crosby,* 840 So.2d 981, 986 (Fla.2003); *Terrell v. State,* 572 S.E.2d 595, 602 (Ga.2002)); *see also* *State v. Carter,* 114 S.W.3d 895, 910 n. 4 (Tenn.2003) (applying *Dellinger* to reject a claim that *Ring* requires aggravating circumstances be included in the indictment). Accordingly, the Petitioner is not entitled to relief on this issue.

**CONCLUSION**

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

Tenn.Crim.App.,2011.
Pike v. State
Slip Copy, 2011 WL 1544207 (Tenn.Crim.App.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.