STATE OF TENNESSEE VS. Christa Gail PIKE
CASE NO. 68280 EXHIBIT NO. 14A
DATE 4-7-11-08 ID ____ Evd ✓

VOLUME I - PRETRIAL

# TOOLS FOR THE ULTIMATE TRIAL

THIRD EDITION/1992




FILED 67
APR 07 2009
Clerk of the Courts
Rec'd by ____

## The Tennessee Death Penalty Defense Manual

Prepared by Capital Case Resource Center of Tennessee ▲ Distributed by Tennessee Association of Criminal Defense Lawyers.

# TOOLS FOR THE ULTIMATE TRIAL: TENNESSEE DEATH PENALTY DEFENSE MANUAL© (VOLUME 1 - PRETRIAL)

**Copyright © 1997 by TACDL.**
All rights reserved.

The Tennessee Association of Criminal Defense Lawyers (TACDL)
207 Third Avenue North, Nashville, TN 37201-1605

Phone: 615/726-1225, Fax: 615/726-2560,
E-mail: tacdl@aol.com
Website: http//www.tncrimlaw.com/tacdl

# TOOLS FOR THE ULTIMATATE TRIAL

## Tennessee Death Penalty Defense Manual

Capital Case Resource Center of Tennessee
Tennessee Association of Criminal Defense Lawyers


## First Edition/1985

### EDITORIAL BOARD
Lionel Barrett
Jeff Blum
Neil P. Cohen
Joe B. Jones
Henry A. Martin
William P. Redick, Jr.
Larry Woods

### GENERAL EDITOR
Neil Cohen

### EXECUTIVE ASSISTANTS
Kevin Weaver
Laura Williams

### ASSISTANTS
Barbara Boulton
Scott Davis
Randall Kilby
Jane Lee
Dale Potter
Martha Zendlovitz

### CONTRIBUTORS
James A. H. Bell
Jeff Blum
James T. Bowman
Neil P. Cohen
Ralph Harwell
Joe B. Jones
Susan L. Kay
James D. Kopernak
William Marett, Jr.
Henry A. Martin
Sandra K. McCrea
Richard McGee
Mary Jo Middlebrooks
Hugh J. Moore, Jr.
David Raybin
William P. Redick, Jr.
William Shulman
Jerry H. Summers
Doug Trant
Robert Tucker
James L. Weatherly, Jr.
Richard Whitaker

### TYPISTS
Jeannie Emantel
Tina Jones
Kim Whittenbarger

## Second Edition/1987

### EDITORIAL BOARD
Jeff Blum
Gretchen Franklin
Joe B. Jones
Henry A. Martin
William P. Redick, Jr.

### GENERAL EDITOR
Gretchen Franklin

### TYPISTS
Ann Card
Deborah Hampton
Michele Munson

### LAYOUT AND DESIGN
Jeff Blum

# Third Edition / 1992


CONTIRIBUTORS
Jeff Blum
Isaiah Gant
Brock Mehler
Chris Minton
Paul Morrow
Bill Redick

GENERAL EDITOR
Gretchen Franklin

LAYOUT AND DESIGN
Jeff Blum
Juanita Pierce
Bill Redick

# SUMMARY TABLE OF CONTENTS

## Volume I - Pretrial


Preface ....... 1-3
1. History of the Death Penalty ....... 1.1-1.13
2. Effective Representation ....... 2.1-2.31
3. Overview ....... 3.1-3.17
4. The Defense Team ....... 4.1-4.17
5. Investigation ....... 5.1-5.45
6. Negotiation ....... 6.1-6.14
7. Constitutionality of T.C.A. § 39-13-204 & 206 ....... 7.1-7.19
8. Recurring Legal Issues ....... 8.1-8.73
9. Motions ....... 9.1-9.37
10. Venue ....... 10.1-10.21
11. Jury Composition ....... 11.1-11.17


## Volume II - Trial


12. Voir Dire ....... 12.1-12.40
13. Guilt Phase ....... 13.1-13.10
14. Sentencing Phase ....... 14.1-14.114
15. Post-Trial Jury Interviews ....... 15.1-15.15
16. Post-Trial Motions ....... 16.1-16.17


## Volume III - Appeals, Collateral Litigation and Appendices


17. Appeals in State Court ....... 17.1-17.28
18. Certiorari ....... 18.1-18.4
19. State Postconviction ....... 19.1-19.65
20. Coram Nobis ....... 20.1-20.7
21. Federal Habeas Corpus ....... 21.1-21.17
Manual Appendix ....... A-D
A. Trial Issue Index
B. Postconviction Issue Index
C. Supreme Court Cases
D. Court of Criminal Appeals Cases

# Table of Contents - Volume I

**Preface** .......... **1**

**1. History of the Death Penalty** .......... **1.1**
I. The Roots of Capital Punishment .......... 1.3
II. The Abolition Movement .......... 1.4
III. Abolition and Tennessee .......... 1.4
IV. Defining Those Who are Death Eligible .......... 1.5
V. Methods of Execution .......... 1.8
VI. The Heart of the Matter .......... 1.11
Appendices: .......... 1.13
Executions in Tennessee

**2. Effective Representation** .......... **2.1**
I. Death is Different .......... 2.4
A. Ambivalence About Death .......... 2.4
B. The Politics of Death .......... 2.4
1. The Political Dynamic .......... 2.5
2. The Political Challenge .......... 2.5
3. The Political Nature of the Prosecutor's Decision to Seek Death .......... 2.6
4. Political Pressure, Unfairness and Recusal Motions .......... 2.6
5. Forums Outside the Courtroom .......... 2.7
C. Team Defense .......... 2.9
D. Investigating and Presenting the Client's Life .......... 2.10
E. Death-Qualified Jury .......... 2.10
1. Avoid trial .......... 2.11
2. Importance of Jury Selection .......... 2.11
F. Constitutional Differences .......... 2.12
1. Heightened Due Process and Reliability .......... 2.12
2. Reliability, Fairness and Guided Discretion .......... 2.12
3. Preserving Federal Issues .......... 2.13
G. Pre-Trial Practice .......... 2.14
II. Certification and Performance .......... 2.14
A. The ABA Guidelines .......... 2.15
B. The Force of Law .......... 2.15
C. The Standard of Practice in Tennessee .......... 2.15
D. A Tool for the Practitioner .......... 2.16
E. The Appointment Guidelines .......... 2.16
1. Workload: Guideline 6.1 .......... 2.16
2. Monitoring and Removal: Guideline 7.1 .......... 2.16
3. Supporting Services: Guideline 8.1 .......... 2.16
4. Training: Guideline 9.1 .......... 2.16
5. Minimum Standards Not Sufficient: Guideline 11.2 .......... 2.17
F. The Performance Guidelines .......... 2.17
1. Determination that the Death Penalty is Being Sought Guideline 11.3 .......... 2.17
2. Investigation and Client Contact: Guideline 11.4 .......... 2.17

3. Pre-Trial Motions: Guideline 11.5 ........ 2.17
4. Plea Negotiations and Entry: Guideline 11.6 ........ 2.18
5. Trial Preparation, Jury Selection, and Error Preservation Guideline 11.7 ........ 2.18
6. The Sentencing Phase: Guideline 11.8 ........ 2.18
7. Post-Verdict - Appeal, Post-Conviction, and Clemency Guideline 11.9 ........ 2.19
III. Ineffective Assistance of Counsel ........ 2.21
A. The Legal Standard ........ 2.21
B. Successful IAC Claims Since Strickland ........ 2.24
1. Ineffectiveness Caused by Governmental Interference ........ 2.24
2. Depriving Defendant of a Constitutional Right ........ 2.25
3. Bad or Non-Existent Advice of Counsel ........ 2.25
4. Failure to Keep Out Evidence ........ 2.25
5. Counsel's Failure Denied the Presentation of a Defense ........ 2.27
6. Failure to Introduce Evidence of Mitigation ........ 2.28
7. Ineffectiveness on Appeal ........ 2.28
C. Practical Tips Concerning IAC Claims ........ 2.29
1. Deal With the IAC Claim Professionally ........ 2.29
2. Obligations Concerning Professional Rules, Codes, and Standards ........ 2.29
3. Understand Your Feelings About Your Client ........ 2.30
4. The Client's File ........ 2.30
5. When Counsel's Ineffectiveness is Being Alleged ........ 2.31
6. Prior Counsel as a State's Witness ........ 2.31
D. Conclusion ........ 2.31
Appendices:
A. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases
B. Motion to Prohibit the State from Seeking the Death Sentence
C. Discovery Motion No. 6: Motion to Compel the State to Publish Its Criteria for Seeking the Death Sentence and to Provide Data Concerning Prior Homicide Prosecutions in this Judicial District since the Promulgation of the Current Death Penalty Statute in 1977
D. Motion to Rescue
E. Notice of Heightened Standard of Due Process and Reliability

**3. Overview ........ 3.1**
I. Introduction ........ 3.3
A. A Practitioner's Manual
B. Using Manual at Different Procedural Stages
C. Chapter Appendices and Manual Appendices
D. Trial Checklist and Postconviction Checklist
E. Trial Notebook
II. Capital Trial Checklist ........ 3.5
A. Develop Skill as a Death Penalty Litigant ........ 3.5
B. Consult Others ........ 3.5
C. Client Contact ........ 3.5
D. Collecting Factual Information ........ 3.6
E. Negotiated Settlement ........ 3.6
F. The Defense Team ........ 3.7
G. Pre-trial Motions ........ 3.8
H. Revisit Tasks ........ 3.9

I. Trial Preparation .......... 3.9
J. Post-Trial Juror Interviews .......... 3.14
K. Post-Trial Considerations .......... 3.14
III. Trial Notebook .......... 3.15
A. Pre-trial .......... 3.15
B. Trial .......... 3.16
C. Post-trial .......... 3.17

**4. The Defense Team .......... 4.1**
I. Introduction .......... 4.3
II. The Assistance Needed .......... 4.4
A. Second Counsel .......... 4.4
B. Investigation .......... 4.4
C. Psychological Expertise .......... 4.5
D. Statistician .......... 4.6
E. Attorney Experts .......... 4.6
F. Other Forensic Experts .......... 4.6
III. Legal Authority for Support Services .......... 4.8
A. The Right to an Adequate Defense .......... 4.8
B. Right to an Ex Parte Hearing .......... 4.9
C. Right to a "Defense" Expert .......... 4.10
D. The Right to "Competent" Experts .......... 4.11
E. State and Federal Statutes and Rules .......... 4.12
1) State .......... 4.12
2) Federal .......... 4.12
F. Demonstration of Need .......... 4.13
G. Support Services in State Post-Conviction .......... 4.13
IV. Practical Tips .......... 4.14
A. Plan Carefully .......... 4.14
B. Demonstrating Need .......... 4.14
C. Preserving Confidentiality .......... 4.15
D. Return to Ask Again .......... 4.15
E. Establish Cost .......... 4.16
F. After a Request Is Denied .......... 4.16
G. Retained Counsel and Public Defenders .......... 4.16
Appendices:
A. Motion for *Ex Parte* Sealed Hearing
B. Court Ordered Mental Evaluation: The *Estelle* Issue in Tennessee
C. Tennessee Supreme Court Rule 13
D. T.C.A. § 40-14-207(b)
E. Mental Health Issues in Criminal Cases, The Advocate, August 1990, p. 42-47

**5. Investigation .......... 5.1**
I. The Importance of Investigation .......... 5.4
A. Gaining the Client's Perspective .......... 5.4
B. Building Rapport With the Client .......... 5.5
C. Level the Playing Field .......... 5.5
D. Make Your Case .......... 5.6
E. Establish a Mental Health Profile and Defense .......... 5.6
F. Encourage Negotiation .......... 5.6

II. Client Investigation and Evaluation ........ 5.8
A. What You're Trying To Find ........ 5.8
1. Family Background ........ 5.8
2. Marriages or Children ........ 5.10
3. School performance ........ 5.10
4. Medical History ........ 5.10
5. Psychological History ........ 5.11
6. Drugs and Alcohol ........ 5.12
7. Military Experience ........ 5.12
8. Work History ........ 5.12
9. Criminal Record ........ 5.12
10. Institutional Record ........ 5.12
11. Significant Others ........ 5.13
12. Religious Background ........ 5.13
13. Geography ........ 5.13
14. Particular Skills or Talents ........ 5.13
B. Once Is Not Enough ........ 5.14
C. Collecting Paper ........ 5.14
D. Family and Friends ........ 5.15
E. Previous Counsel ........ 5.16
F. The Victim's Family ........ 5.16
G. Putting It All Together ........ 5.17
1. Chronological Chart ........ 5.17
2. Social History ........ 5.17
3. Institutional Records ........ 5.18
4. Witness Book ........ 5.18
5. Family Tree ........ 5.18
6. Psychological Diagnosis and Expert Assistance ........ 5.18
III. Investigating The Facts of the Case ........ 5.20
A. The Goals ........ 5.20
1. Prove Innocence ........ 5.20
2. Diminished Responsibility / Lesser Degrees of Homicide ........ 5.20
3. Consistent Guilt and Sentencing Phase ........ 5.20
B. Areas of Investigation ........ 5.21
1. Crime Scene ........ 5.21
2. Objective Accounts ........ 5.24
3. Forensic Evidence ........ 5.25
4. Witnesses ........ 5.32
5. Victim ........ 5.36
6. Documents ........ 5.36
7. Confession ........ 5.36
8. Polygraph ........ 5.38
9. Hypnosis ........ 5.39
10. Wiretaps ........ 5.39
IV. Investigation of the Legal Process ........ 5.40
A. The Judge ........ 5.40
1. Legal Record ........ 5.40
2. Public Statements ........ 5.40
3. Social Connections ........ 5.40
4. Personal ........ 5.41
B. The Prosecutor ........ 5.41
1. Prosecution Profile ........ 5.41

2. Tactics ....................
3. Weaknesses .................... 5.41
C. The Jury .................... 5.42
1. First Day of Venire .................... 5.42
2. Juror Questionnaire .................... 5.42
3. Panel List .................... 5.43
Appendices: .................... 5.44
A. Mitigation Evaluation Form
B. Differential Diagnosis of Antisocial, Aggressive, Defiant, or Oppositional Behavior

**6. Negotiation .................... 6.1**
I. Understanding Negotiation .................... 6.1
A. Successful Negotiation .................... 6.3
B. The Impossible Case .................... 6.3
II. Negotiating Tools .................... 6.4
A. Integrity .................... 6.5
B. Preparation .................... 6.5
C. Attitude .................... 6.5
D. Communication .................... 6.5
E. Moral Strength, Commitment .................... 6.5
F. Hard Work, Sacrifice .................... 6.5
G. Ingenuity, Imagination .................... 6.6
H. Empathy .................... 6.6
III. Technique .................... 6.6
A. Principled vs. Positional Bargaining .................... 6.7
B. Parties: Who Are They? .................... 6.7
C. Parties: Understanding Their Interests and Perceptions .................... 6.7
D. Parties: Creating Options to Satisfy Their Concerns .................... 6.9
E. Using Objective Criteria .................... 6.10
F. Dealing with Alternatives: Determining Your BATNA .................... 6.10
IV. Toward the Yesable Position .................... 6.11
V. Conclusion .................... 6.13
.................... 6.14

**7. Constitutionality of T.C.A. § 39-13-204 & 206 .................... 7.1**
I. Introduction .................... 7.1
II. Heightened Degree of Reliability .................... 7.3
II. The Tennessee Death Penalty Statute .................... 7.4
IV. Conclusion .................... 7.6
Appendices: .................... 7.19
A. Motion to Dismiss
B. Memorandum of Law in Support of Motion to Dismiss

**8. Recurring Legal Issues .................... 8.1**
I. Reliability of Fairness .................... 8.1
II. Guided Discretion .................... 8.3
III. Requisite Intent .................... 8.4
IV. Narrowing & Double Counting Aggravators .................... 8.6
V. Burden Shifting .................... 8.7
VI. Ake Issues .................... 8.10
.................... 8.13

VII. Mitigating Evidence ........ 8.18
VIII. Sympathy ........ 8.23
IX. Lesser Included Offenses ........ 8.24
X. Caldwell Violations ........ 8.26
XI. Sentencing Information ........ 8.29
XII. Victim Impact ........ 8.31
XIII. Rebuttal ........ 8.33
XIV. Brady ........ 8.35
XV. Reveal the Deal ........ 8.38
XVI. Non-Stautory Aggravation ........ 8.40
XVII. Heinous, Atrocious, or Cruel ........ 8.42
XVIII. Avoiding Arrest ........ 8.46
XIX. Prior Conviction ........ 8.49
XX. Exclusion of Groups of Jurors ........ 8.51
XXI. Batson Issue ........ 8.53
XXII. Voir Dire on Racial Bias ........ 8.60
XXIII. Death Qualification ........ 8.62
XXIV. Reverse-Witherspoon Challenge ........ 8.66
XXV. Statements of Psych Examiner ........ 8.68
XXVI. Reliability of Confession ........ 8.72

**9. Motions ........ 9.1**

I. Introduction ........ 9.4
  A. Default and Waiver ........ 9.4
  B. State the Legal Basis for the Claim ........ 9.4
  C. Heightened Due Process and Reliability ........ 9.5
  D. Articulate issues in federal and state constitutional terms ........ 9.5
II. The Objectives of Motion Practice ........ 9.6
  A. Bargaining Lever for Negotiations ........ 9.6
  B. Gaining Time ........ 9.6
  C. Obtaining Resources ........ 9.7
  D. Discover the Case ........ 9.7
  E. Preserve Issues that May Be Won Later ........ 9.7
  F. Educate Yourself on Trial Strategy ........ 9.8
  G. Educate Others ........ 9.9
  H. Keep Out Damaging Evidence / Get In Good Evidence ........ 9.10
  I. Undermine Argument that Misconduct Was Inadvertent ........ 9.10
  J. Judicial Economy ........ 9.10
III. Form ........ 9.11
IV. Specific Motions ........ 9.13
  A. Pre-Trial Motions ........ 9.13
    1) Bail ........ 9.13
    2) Client's Physical and Mental Well-Being ........ 9.13
    3) Unconstitutionality of the Death Penalty Statute ........ 9.15
    4) Jury Composition ........ 9.15
    5) Change of Venue ........ 9.15
    6) Bill of Particulars ........ 9.15
    7) Continuances ........ 9.16
    8) Limit Media Coverage ........ 9.16
    9) Discovery ........ 9.16
    10) Jury Selection ........ 9.21

11) Witnesses ..... 9.23
12) Preliminary Hearing ..... 9.24
13) Daily Transcripts ..... 9.25
14) Pretrial Conference ..... 9.25
15) Disqualification of Parties ..... 9.25
16) Severance ..... 9.26
17) Speedy Trial ..... 9.27
18) Preclude Death Sentence due to Destruction of Exculpatory Evidence ..... 9.27
19) Proportionality, Discrimination, Arbitrariness ..... 9.27
20) Motions in Limine ..... 9.30
21) Jury Instructions ..... 9.31
22) Adoption of Co-Defendant's Motions ..... 9.31
B. Pre-Sentencing Hearing Motions ..... 9.32
1) Continuance ..... 9.32
2) Support Services ..... 9.32
3) Allocution by the Client ..... 9.32
4) Closing Argument of the Defense ..... 9.33
5) Restriction of Prosecution's Proof to Specific Aggravating Circumstances ..... 9.33
6) Aggravating Circumstances ..... 9.33
7) Waiver of Sentencing Jury ..... 9.34
8) Restrictions of Psychiatric Evidence at Sentencing ..... 9.35
9) Other Evidentiary Considerations ..... 9.35
10) Motions in Limine ..... 9.37
11) Requested Jury Instructions at Sentencing ..... 9.37
C. Post-Trial Motions ..... 9.37
1) Rule 35 Motion ..... 9.37
2) Evidentiary Hearing on Rule 12 Questionnaire ..... 9.37
Appendices:
A. Death is Different
B. Parallel Provisions of Federal and State Constitutions
C. Checklist for Specific Motions
D. Motion in Limine Regarding Argument of Prosecutor
E. State v. Irick Opinion

**10. Venue ..... 10.1**
I.Introduction ..... 10.3
II. The Legal Standards ..... 10.4
A. Trial ..... 10.4
B. Appellate Review ..... 10.6
C. Varieties of Prejudice ..... 10.6
1. Publicity ..... 10.7
2. Community Attitudes ..... 10.9
3. Tennessee Capital Cases ..... 10.10
D. Choice of Venue ..... 10.10
III. Strategy Decisions ..... 10.13
A. Pretrial Publicity ..... 10.13
B. Demographic Characteristics of Alternative Venues ..... 10.13
C. Preparing for Jury Selection ..... 10.13
D. Conditions of Confinement ..... 10.14

TABLE OF CONTENTS

E. Effect on Parties to the Litigation ........ 10.14
1. The Judge ........ 10.14
2. The Prosecutor ........ 10.14
3. The Victim ........ 10.14
4. Nature of the Case ........ 10.14
5. Witnesses ........ 10.14
6. Trial Counsel ........ 10.14
F. Other Remedies ........ 10.14
1. Individual Voir Dire ........ 10.15
2. Increased Number of Peremptory Challenges ........ 10.15
3. Continuance ........ 10.16
4. Restrictive Orders ........ 10.16
5. Discovery of Publicity Releases by Prosecution ........ 10.16
6. Sequestration, Admonition, and Polling of Jurors ........ 10.16
7. Exclusion of Media Before Trial and During Voir Dire ........ 10.17
IV. Procedure ........ 10.18
A. In the Trial Court ........ 10.18
1. Rules 21 and 22 ........ 10.18
2. Indigence ........ 10.18
3. Hearing and Record ........ 10.18
4. Evidence ........ 10.19
B. On Appeal ........ 10.19
Appendices: ........ 10.21
A. Direct Examination of a Defense Venue Witness
B. Cross Examination of a State's Venue Witness
C. Description of a Media Content Analysis
D. Media Content Report
E. Sample Public Opinion Questionnaire
F. Sample Public Opinion Survey Answer Sheet
G. Sample Charts of Public Opinion Survey
H. Summary and Evaluation of Public Opinion Survey

**11. Jury Composition ........ 11.1**
I. Introduction ........ 11.3
II. The Essence of the Challenge ........ 11.4
III. The Law of Composition Challenges ........ 11.5
A. The Constitutional Bases ........ 11.5
B. Cognizable Groups ........ 11.7
C. Measuring Disparity ........ 11.8
1. Absolute disparity ........ 11.8
2. Comparative disparity ........ 11.8
3. Statistical Significance ........ 11.8
D. Rebuttal ........ 11.8
Appendices: ........ 11.9
A. Motion to Distribute Questionnaire for Purpose of Evaluation of the Representation of the Cognizable Groups in Jury Venire

# OVERVIEW

# Table of Contents

I. Introduction .......... 3.3
A. A Practitioner's Manual .......... 3.3
B. Using Manual at Different Procedural Stages .......... 3.3
C. Chapter Appendices and Manual Appendices .......... 3.4
D. Trial Checklist and Postconviction Checklist .......... 3.4
E. Trial Notebook .......... 3.4
II. Capital Trial Checklist .......... 3.5
A. Develop Skill as a Death Penalty Litigant .......... 3.5
B. Consult Others .......... 3.5
C. Client Contact .......... 3.5
D. Collecting Factual Information .......... 3.6
E. Negotiated Settlement .......... 3.6
F. The Defense Team .......... 3.7
G. Pre-Trial Motions .......... 3.8
H. Revisit Tasks .......... 3.9
I. Trial Preparation .......... 3.9
J. Post-Trial Juror interviews .......... 3.14
K. Post-Trial Considerations .......... 3.14
III. Trial Notebook .......... 3.15
A. Pre-trial .......... 3.15
B. Trial .......... 3.16
C. Post-trial .......... 3.17

## A. A Practitioner's Manual

This is a litigation manual for a death penalty lawyer who is representing a Tennessee capital defendant. It is designed to be a practitioner's manual for attorneys, who are representing capital clients in the courts of original jurisdiction and the appellate courts in state and federal court in the primary tiers of litigation in capital crimes - state trial, state postconviction and federal habeas corpus.

## B. Using Manual at Different Procedural Stages

The Table of Contents of this manual, with its Chapter titles and subtitles, is a good outline of the contents of this manual. An attempt has been made to organize the chapters as a capital case would chronologically evolve. The chapters can further be divided and grouped according to the stage of the proceeding and the task for which the manual is being consulted. Such further grouping may be helpful in directing counsel to the appropriate portions of the manual. An attempt to group the chapters according to the procedural stage of the case follows:

1. Background and Overview ............Chap. 1. *History of the Death Penalty*
   Chap. 2. *Effective Representation*
   Chap. 3. *Overview*
2. Pre-Trial Preparation.......................Chap. 2. *Effective Representation*
   Chap. 4. *The Defense Team*
   Chap. 5. *Investigation*
   Chap. 6. *Negotiation*
   Chap. 7. *Constitutionality ...*
   Chap. 9. *Recurring Legal Issues*
   Chap. 10. *Motions*
   Chap. 11. *Venue*
   Chap. 12. *Jury Composition*
   Chap. 11 *Voir Dire*
3. Trial Preparation ..............................Chap.7 *Constitutionality of Statute*
   Chap. 8 *Recurring Legal Issues*
   Chap. 12 *Voir Dire*
   Chap. 13 *Guilt Phase*
   Chap. 14 *Sentencing Phase*
4. Post-trial, Pre-appeal.......................Chap. 15 *Post-Trial Juror Interviews*
   Chap. 16 *Post- Trial Motions*
5. State Court Appeals.........................Chap. 17 *Appeals in State Court*
6. Certiorari to U. S. Supreme Court .Chap. 18 *Certiorari to U. S. Supreme Court*
7. State Postconviction.........................Chap. 19 *State Postconviction*
   Chap. 20 *Coram Nobis*
8. Federal Habeas Corpus...................Chap. 21 *Federal Habeas Corpus*

## C. Chapter Appendices and Manual Appendices

Each Chapter in this manual may have an Appendix that includes materials relevant to the materials contained within the individual chapter. The manual itself has a lengthy Appendix at the end of Volume III, which includes the following:

Appendix A: Trial Issue Appendix - A breakdown of issues discussed in Tennessee capital cases on appeal from trial, since 1977 when the current statute was promulgated.

Appendix B: Postconviction Issue Index - A breakdown of issues discussed in Tennessee capital cases on appeal from postconviction relief hearing in trial court since 1977, when current statute was promulgated.

Appendix C: Supreme Court Cases - Summaries of Tennessee Supreme Court capital cases decided since 1977. Most cases are reported opinions and were on direct appeal from capital trials; a few of the opinions were on discretionary appeal from the Court of Criminal Appeals on postconviction.

Appendix D: Court of Criminal Appeals Cases - Summaries of Tennessee Court of Criminal Appeals capital cases decided since 1977. Most of these cases are not reported opinions, and were on direct appeal from hearings on postconviction. A few of the opinions were interlocutory appeals from capital pre-trial hearings.

## D. Trial Checklist and Postconviction Checklist

Following is a Trial Checklist, p. 3.3, which incorporates references to: (1) the chapters in this manual; and, (2) The *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, February 1989. Contained within this manual is another checklist that may be helpful: A Postconviction Checklist, see, Chap. 19 *State Postconviction*, Appendix.

## E. Trial Notebook

Next, and last in this chapter, are proposed divider labels for a Trial Notebook, p. 3.14.

# II. Capital Trial Checklist

Reference Sources: 1. "Chap." references are to chapters in this manual.
2. "Guideline" references are to the *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* with *Commentary*, which follow each Guideline, adopted February, 1989.

## A. Develop Skill as a Death Penalty Litigant

___ Familiarize yourself with death penalty specific statutes, judicial opinions and publications, such as this manual (for introduction to this manual, see: *Preface*, Chaps. 1 *History*, 2 *Effective Representation*, 3 *Overview* ); and, the *ABA Guidelines* and *Commentary*, (Guidelines 1.1 -10.1 *the "appointment" guidelines*, Guidelines 11.1 - 11.9.5 *the "performance" guidelines*.)
___ Obtain certification as a death penalty attorney, if it is available in the jurisdiction, in which you intend to practice
___ Take advantage of competent death penalty litigation continuing legal education
___ Consult experts qualified in the specialty of death penalty litigation
___ Build experience in general litigation and criminal litigation; sit as second counsel in a capital case before accepting retention or appointment as lead counsel

## B. Consult Others

___ Capital Case Resource Center of Tennessee (CCRC), 1225 17th Ave. S., Nashville, Tenn. 37212; (615) 327-8791
___ Southern Center for Human Rights (SCHR), 83 Poplar St. N.W., Atlanta, Ga. 30303-2122; (404) 688-1202
___ NAACP Legal Defense and Educational Fund, Inc. (LDF), Suite 1600, 99 Hudson Street, New York, N.Y. 10013; (212) 219-1900

## C. Client Contact

(Chap. 5 *Investigation*; Guidelines 11.4.1 *Investigation* and 11.4.2 *Client Contact*)

___ Advise client to speak to no one concerning anything relevant to the offense, specifically including: law enforcement or custodial agents, media representatives, cell-mates or other inmates, co-defendants, potential witnesses, anyone with criminal exposure
___ Establish relationship, build trust
___ Investigate optimal conditions of confinement or bail
___ Identify key crime witnesses or significant people from among defendant's family and friends; and, if client knew the victim, from among the victim's family and friends
___ Identify difficult and sensitive issues; begin to develop strategy for dealing with these issues
___ Collect information (about individuals and institutions involved with the client's life and the offense) needed to identify the support services that will be necessary to complete the defense team; and, if the client is indigent, the information that will be necessary to make a competent request for support services
___ Secure written authorization for release of institutional information (release of information forms)

## D. Collecting Factual Information

(Chaps. 2 *Effective Representation*, 5 *Investigation;* Guideline 11.4.1 *Investigation* and 11.4.2 *Client Contact*)

- ___ Sources of information
  - ___ Client
  - ___ Individuals and institutions that had contact with the client and/or involvement in the offense
  - ___ Media sources
  - ___ Community and political sources
  - ___ Victim's family and associates
- ___ Investigation
  - ___ Records search; investigator should collect all institutional records; complete record search as soon as possible - some records are difficult to locate and obtain, some records take time to obtain, often difficult to obtain complete records, sometimes subpoenas or court orders are required
  - ___ Interview witnesses; fit investigators to the tasks, see § F, supra
  - ___ Send investigator to any location where the client has had significant contact
  - ___ Withhold psychological evaluation until relevant investigation is complete; the investigation needs to be as complete as possible when the defense theory at guilt and sentence is finally formulated; the universe of the factual information needs be understood and hypothetical theories developed before the psychological component is given its direction and the evaluations are conducted; counsel needs to supervise communication between investigative component and psychological component or any other forensic service that requires input from the results of investigation, see § F, infra
- ___ Discovery
  - ___ Informal discovery
    - ___ Law enforcement agents (investigation)
    - ___ D.A. (investigation, seriousness about seeking the death sentence, sources of pressure for seeking the death sentence, potential aggravating circumstances)
    - ___ Coroner, emergency and medical personnel (scene of crime, autopsy and medical information)
    - ___ State experts e.g. T.B.I. crime laboratory
  - ___ Formal discovery, see, pre-trial motions, § G, H, infra
- ___ Court appearances
  - ___ Initial appearance before the committing magistrate
  - ___ Bond hearing
  - ___ Preliminary hearing
  - ___ Pretrial evidentiary hearings

## E. Negotiated Settlement

- ___ Begin to seek a negotiated settlement of less than death; identify the early operative factors for settlement (Chap. 6 *Negotiation;* Guidelines 11.6.1 *The Plea Negotiation Process*, 11.6.2 *The Contents of the Plea Negotiations*, 11.6.3 *The Decision to Enter a Plea of Guilty*); solicit the aid of others to whom the client will listen, if necessary, in order to aid the client in the exercise of good judgment in the consideration of settlement offers.

## F. The Defense Team

(Chap. 4 *The Defense Team*; Guideline 1.1 *Objective*, see *Commentary*)

- ___ Evaluate areas of preparation and litigation, in which the assistance of others - other attorneys, investigators, mental status experts, mitigation specialists and other forensic experts - is needed; aggressively look for areas, in which tasks can be assigned and delegated and expect to identify the best professional assistance available to perform these tasks
  - ___ If counsel is retained, hire the assistance needed
  - ___ If counsel is appointed (including a public defender with an inadequate budget); or if counsel is retained and client becomes indigent, i.e. the money runs out, prepare an initial request for support services pursuant to the authority of T.C.A. Section 40-14-207(b), Supreme Court Rule 13 (2)(B)(10) and Ake v Oklahoma and its progeny with supporting affidavits and memorandum; be sure that the factual foundation, i.e. the demonstration of need, is complete and detailed, Chap. 4 *The Defense Team*, Appendix B
- ___ Confer with others (e.g. CCRC) in the identification of qualified and appropriate expert assistance
- ___ At the very least, hire or obtain authorization for the expenditure of state funds to hire:
  - ___ Competent co-counsel - an additional competent capital litigator is always needed; given the drain of time resources and emotion that capital cases require, often even two is not enough
  - ___ An investigative component - even if the state has a lock on the guilt issue (which they rarely do on the question of degree of homicide - only those convicted of first degree are eligible for death), counsel will need experienced help on mitigation investigation far in excess of that which can be accomplished by counsel
  - ___ A psychological component - typically, a capital case will present mental health issues at the pre-trial and/or guilt stage, see: Chap.4 *The Defense Team*, footnote 5; but, irrespective of the need for psychological services at the guilt stage, counsel will need psychological assistance in the form of a mitigation specialist to present the mitigation proof in every capital trial
- ___ Look for the need for more than one expert in the same area, e.g. (1) case may require different investigator to investigate the guilt/innocence issues, the sentencing issues, the official misconduct issues, the defendant's family and associates, the victim's family and associates, and so on; (2) case may require psychologists or psychiatrists with different expertise as the evaluation and the consultation progress
- ___ Avoid court initiated state mental health evaluations, see: Chap. 4, *The Defense Team*, Appendix A; if competency is an issue or if mental status becomes an issue at the guilt stage, a court ordered state evaluation may not be avoidable; but counsel should not raise the issue of competency or insanity, etc. until an informed decision is made to do so after an evaluation by a defense expert, otherwise counsel unnecessarily runs the risk of compromising his client's right to counsel and privilege against self-incrimination as well as almost always inviting an unfavorable evaluation
- ___ Do not overlook other types of forensic expertise that are usually necessary in a capital case
- ___ Coordinate the organization of, and the communication between, related members of the defense team, e.g. the investigation of the client's life history and the evaluation by the psychologist/mitigation specialist

## G. Pre-Trial Motions

Raise and litigate all issues in federal and state constitutional terms; seek evidentiary hearings when strategically feasible (Chaps. 8 *Recurring Legal Issues*, 9 *Motions*; Guideline 11.5.1 *The Decision to File Pre-Trial Motions*); major categories of motions include:

- ___ Motions for support services; § F, supra
- ___ Discovery motions; perhaps your most important motions in terms of forcing a settlement as well as critical for pre-trial preparation purposes
- ___ Death penalty specific motions (Chaps. 8 *Recurring Legal Issues*, 7 *Constitutional Issues* ) including:
  - ___ Motion to challenge selected portions of T.C.A. Section 39-13-204 and 39-13-206
  - ___ Motion to challenge selected aggravating circumstances in their language and in their application to the specific case
  - ___ Death ineligibility motions: defendant a juvenile or mentally retarded
- ___ Jury motions; if a trial cannot be avoided, jury selection is the most important stage of the trial for defense counsel in a capital case (Chap. 10 *Venue*, 11 *Jury Composition*, 12 *Voir Dire*; Guideline 11.7.2 *Voir Dire and Jury Selection* )
- ___ Continuance motions
  - ___ Secure time for obtaining a disposition other than trial before a death-qualified jury
  - ___ Secure time in order to complete preparation for trial
  - ___ Secure time for passions of interested parties to cool and for the effect of pre-trial publicity on potential jurors to dissipate
- ___ Motions concerning the client's comfort; e.g. bond; special dietary requirements; clothing needs; comfort in confinement; visitation approval for family, friends, members of the defense team, etc. - the client needs to see counsel fighting for him/her; this is the way to build the client's confidence in counsel and to invite the client's cooperation
- ___ Eliminate or include, in every capital case:
  - ___ Motion to challenge the composition of the jury pool (Chap. 11 *Jury Composition*; Guideline 11.7.2 *Voir Dire and Jury Selection* )
  - ___ Motion for a change of venue (Chap. 10 *Venue* )
  - ___ Motions for recusal (Chap. 2 *Effective Representation* ); preliminarily, investigate the personalities, associates, prejudices and practices of the judge and the district attorney general, including relevant assistants
- ___ Case specific motions; consider strategic considerations concerning whether to argue the motions pre-trial or as motions in limine at the time of trial; and, concerning motions relating to the sentencing trial, whether to litigate the motions pre-trial or after the guilt trial immediately before the sentencing hearing in order to:
  - ___ Limit state's proof
  - ___ Expand defense's proof
  - ___ Force negotiations toward settlement
  - ___ Obtain favorable jury instructions
- ___ Subpoena motions
  - ___ Witnesses; early planning for out-of-state witnesses
  - ___ Media reports; t.v.(videos), radio (audio), newspaper articles, etc.
  - ___ Other ducus tecum subpoenas; documents, records, etc.
  - ___ Rule 17 subpoenas for documents pre-trial
  - ___ Rule 15 subpoenas for depositions pre-trial

## H. Revisit Tasks

___ Consult others, § B, supra; expect to periodically consult with others about unique problems

___ Client contact should be periodic and frequent, see § C, supra; perhaps different members of the team should have different assignments which require contact with the client; no matter what communication problems the client presents, his/her cooperation, understanding and comfort are important; and, if the client is to be properly represented in a capital sentencing trial, s/he must be understood unlike s/he has ever been understood before

___ Collecting information, § D, supra, never stops

___ The possibility of a negotiated settlement should continually be pursued, see § E, supra; a death qualified jury should be avoided at almost all costs, if possible; as the investigation and other preparation tasks near completion the defense will be armed with more information, e.g. mitigation information, of which the state was previously unaware, that may facilitate a negotiated settlement

___ The defense team may need additions, replacements or additional funding as the pre-trial preparation progresses, see § F, supra; set up schedule for periodic, regular (e.g weekly or biweekly) meetings of selected members of the defense team and prepare in stages, assigning tasks for defense team members

___ The litigation of pre-trial motions, particularly the discovery motions, and the information that is developed in the defense investigation will precipitate other sequential pre-trial motions that must be pursued, see categories of motions listed in § G, supra and Chaps. 8 *Recurring Legal Issues* and 9 *Motions*

## I. Trial Preparation

___ Learn the custom and practice in the trial of capital cases of the judge (jury selection, handling of evidence/witnesses/defendants/attorneys/jurors, jury instructions in previous cases, etc.) and of the prosecutor (trustworthiness concerning discovery, e.g. Brady and Giglio requests, tactics in prior capital trials, opening and closing argument in prior capital trials, etc.)

___ During trial preparation, as evidentiary issues are anticipated, maintain continuous awareness of the heightened standards of reliability and due process that apply in the capital trial pursuant to the "due process" and "cruel and unusual" clauses of both the state and federal constitutions; plan with the unique constitutional characteristics of capital cases in mind; and, be prepared, citing the state and federal constitution, to preserve any error committed at trial by either the court or the prosecution (Chaps. 2 *Effective Representation* and 8 *Recurring Issues*, Guideline 11.7.3 *Objection to Error and Preservation of Issues for Post Judgment Review* )

___ Jury issues - investigate, evaluate and litigate (Chaps.10 *Venue*, 11 *Jury Composition* and 12 *Voir Dire*; Guideline 11.7.2 *Voir Dire and Jury Selection* ), such as:

- ___ Jury pool composition challenge (Chap. 11)
- ___ Change of venue (Chap. 10)
- ___ Jury selection issues (Chap. 12), particularly individual voir dire - perhaps the most important pre-trial motion in a capital case, if the trial court does not automatically allow individual voir dire
- ___ Plan voir dire while mindful of the unique characteristics of jury selection in a capital case - e.g. remember that a juror who is unable or unwilling to consider mitigating circumstances demonstrated by the proof is subject to a challenge for cause; jury selection will most likely be the most important part of the trial for the defense - prepare for it carefully; give consideration to:

- ___ Trial court's selection practices
- ___ Prosecution's tactics
- ___ Information obtainable pretrial on prospective jurors
- ___ Jury selection expert
- ___ Pre-voir dire defense counsel statement to jury panel
- ___ Ideal juror profile
- ___ Pre-voir dire juror questionnaire
- ___ Voir dire questions
- ___ Extra peremptory strikes

___ During the jury selection process, develop a method of scoring the prospective jurors in order to be able to grade them for the purpose of intelligently exercising peremptory strikes; involve the appropriate members of the defense team in the jury selection process (your client, if possible), most importantly, a carefully chosen jury selection expert; and, keep a record of the following:

- ___ Cause challenges exercised, whether granted or not
- ___ Peremptory challenges exercised; note: erroneous denials by the trial court of defense challenges for cause are waived for the purpose of appeal unless the defense exhausts its peremptory challenges
- ___ Jurors who actually sat on the case, including alternates

___ Guilt trial preparation; (Chap. 13 *Guilt Phase*; Guideline 11.7.1 *General Trial Preparation* )

___ The theory of the defense at guilt trial and at sentencing trial should, if at all possible, be consistent with each other, otherwise the credibility of the defense will be compromised in the sentencing trial; intentionally review strategy in order to identify inconsistencies that may be perceived by the jury between the guilt stage and the sentencing stage and seek a strategy that will avoid a conflict between the two stages

___ Look for opportunities in the guilt stage to get evidence before the jury that will be helpful, but not available, at the sentencing stage, e.g. counsel may have an opportunity to cross-examine a state's witness during the guilt stage, who will not be called by the state at the sentencing stage and who the defense will not wish to call on direct, concerning mitigating circumstances that are within the personal knowledge of the state's witness and sometimes more persuasive because it is coming from a state's witness

___ Counsel must prepare for all stages in the guilt trial and organize the preparation for easy accessability; the areas of organization may fall into the following categories:

- ___ Motions in limine: challenges to the admissability of evidence anticipated to be introduced by the state
- ___ Motions in limine: defense of the admissability of evidence to be presented by the defense
- ___ Opening statement
- ___ State witnesses, state direct and defense cross
- ___ Motion for a judgment of acquittal on charged offenses
- ___ Defense witnesses, defense direct and state cross
- ___ State rebuttal
- ___ Defense surrebuttal
- ___ Objections to jury instructions
- ___ Proposed jury instructions
- ___ Closing argument

___ <u>Sentencing trial preparation</u> (Chap. 14 *Sentencing Phase*; Guidelines 11.8.1 *Obligation of Counsel at the Sentencing Phase of Death Penalty Cases*, 11.8.2 *Duties of Counsel Regarding Sentencing Options, Consequences and Procedures*, 11.8.3 *Preparation for the Sentencing Phase*, 11.8.4 *The Official Presentence Report* [not applicable in Tennessee], 11.8.5 *The Prosecutor's Case at the Sentencing Phase*

- ___ Complete preparation of the sentencing hearing a month or two weeks before the trial begins (while expecting necessary fine tuning during trial), before you turn your attention to the final preparation of the guilt phase; this may be a matter of personal preference, but has been found to be advisable, otherwise sentencing hearing preparation tends to get left incomplete and defense counsel may consequently be confronted with the unenviable position of facing a sentencing trial unprepared with the client's life at stake - it has happened many times before
- ___ Remember that the jury is death qualified - the jury has just found the client guilty of first degree murder and will be inclined toward imposing a death sentence; a per se argument against the death penalty is almost always ill-advised; the jury must be given a reason why not to impose the death penalty in this case as opposed to other death eligible cases;
- ___ The state has the burden of proof and is <u>twice</u> required to rise to the standard of proof beyond a responsible doubt: (1) proof that the aggravating circumstance(s) applies; and, (2) proof that the aggravating circumstance(s) outweighs the mitigating circumstances
- ___ The state's case in chief is limited to proof relevant to statutory aggravating circumstances; watch out for the state trying to rely on proof not in evidence (and sometimes not provable), e.g. deterrence of the death penalty; also, watch out for the state trying to present evidence, either on direct, cross or in rebuttal (or in argument) of nonstatutory aggravating circumstances, e.g. lack of remorse; by the same token, the defense must avoid "opening the door" to such proof or argument, a circumstance by which the state would be allowed to explore matters on cross-examination, in rebuttal or in argument that would otherwise be foreclosed to it
- ___ The defense has <u>no</u> standard of proof concerning mitigation; any proof of mitigation is relevant and admissable and, once presented into evidence, the court is required to give a jury instruction that the jury <u>must</u> consider that specific mitigating circumstance; all of this applies whether the mitigating circumstance is statutory or not; a mitigating circumstance is essentially anything that the defense thinks that it is and the court that cuts off the defense proof or jury instructions of mitigating circumstances or that makes any distinction between statutory and nonstatutory circumstances does so at risk of committing reversible error
- ___ The defense <u>must</u> present mitigating evidence; the current law (of questionable constitutionality) requires the court to instruct the jury that it mandatorily "shall" impose a sentence of death, if they believe that aggravating circumstances outweigh mitigating circumstances; therefore, if the jury finds that the aggravating circumstances outweigh the mitigating circumstances and the defense presents no evidence of mitigating circumstances, the court, in effect, directs a verdict of death - in other words, if the defense presents no evidence of mitigation, the jury, as a matter of law, has no choice but to enter a verdict of death; every case has significant mitigation - the problem is that of finding and understanding what the mitigation is in your case and figuring out how to articulate it to the jury; if counsel is unable to identify significant mitigation, s/he needs advice from

appropriate experienced death penalty trial counsel and/or the assistance of extra-legal capital expertise

___ Make hard decisions about how to deal with any residual, lingering or whimsical doubt that the jury may have about guilt; research shows that remaining doubt about guilt is far and away the most important operative factor in a jury's decision to impose a sentence of life, much more important than traditional mitigating circumstances - there may be some notion among juror's that someone can be convicted of murder by proof beyond a reasonable doubt, but a capital defendant cannot be executed except by proof beyond all doubt; also, if the client continues to maintain innocence in the sentencing stage, the transition between the guilt stage and the sentencing stage will not present credibility problems for the defense; on the other hand, the jury has just found the client guilty of first degree murder and, if the jury did not believe the client at guilt, they may punish the client for repeating the "lie" at sentence

___ Typically, the task of defense counsel will be to seize the initiative from the prosecution and shift the focus of sympathetic attention from the victim to the defendant by the presentation of a lengthy, detailed, personal and sympathetic life history of your client, i.e. by presenting lay testimony supplemented by institutional documentation, personal memorabilia (e.g. letters, photographs, diplomas, letters of commendation, etc.) and other documentary and demonstrative evidence with the overview perspective of a psychologist(s) and/or mitigation specialist(s) who explains the factual foundation in plain language - i.e. explaining the forces outside the client which contributed to the commission of the crime, which reduce the client's culpability and indicate that the homicide was not an act of the client's free volition; the mitigation hearing in a capital sentencing trial is a very sophisticated undertaking and involves much extra-legal expertise, take the time and get the help to do it correctly; avoid the "mom and pop show"

___ Categories of defense proof in the sentencing trial:

  ___ Crime-related evidence - remaining doubt about guilt, remorse, subordinate role in crime, "worse case cases than this" evidence, confusion, duress, cooperation with authorities, lesser sentences for equally culpable co-defendants, etc.

  ___ "Good Person" evidence - e.g. clean criminal record, caring deeds, good job history, school achievements, good military record, stable family and/or marriage, good child/husband/father, no significant substance abuse record, religious activities, cooperation with law enforcement, Skipper evidence (i.e. evidence of good behavior pre-verdict while in custody, e.g. lack of problems and good adjustment in custody, good deeds in custody, support of and from family, religious commitment in custody, useful work skills, continuing education, artistic expression, etc), etc.

  ___ External causation evidence - genealogical or inherited deficiencies, childhood deprivation (emotional, educational, nutritional), absence of parental attachment or bonding, family instability, physical abuse in formative years, neglectful or psychological abuse in formative years, parental (caretaker) and/or client substance abuse, institutional failure, peer or gang compulsion, dominance by others, intellectual deficiencies or learning disabilities, cultural/language/immigration problems, post-traumatic stress syndrome, fetal alcohol syndrome, organic brain damage, etc.; in order to be effective, the defense must

show how the causes contributed to the crime through expert (psychologist/mitigation specialist/etc.) proof followed by closing argument - it is not enough to describe the limitation or malady without identifying the relationship or cause between that and the crime.

- ___ Witnesses
  - ___ Categories of lay or fact witnesses to consider: investigators, friends and associates, family members, family historians, neighbors, teachers, contacts from work: employers/employees/co-workers, social workers, ministers or religious people, medical doctors, correctional custodians, etc.
  - ___ Categories of expert or opinion witnesses to consider: medical doctors, psychologists, psychiatrists, mitigation specialists, other case specific experts
- ___ Whether the client should testify at the sentencing trial is a different problem than the same question at the guilt trial; some hostile or disturbed clients, will frighten the jury and, therefore, will not be able to testify; if possible, however the jury needs to see and hear your client before making the life and death decision; a client's inability to testify is often due to a failure of the defense team to work sufficiently and competently with the client; it may help to solicit the aid of the psychological component in this regard; perhaps, consideration should be given in a difficult case to the exercise of the client's rights to allocution at sentencing as a method of avoiding cross- examination, but this strategy should be employed, if the court allows the client to do it, only with knowledge of the proper scope of allocution beyond which the defense opens the door to cross-examination and rebuttal
- ___ Jury instructions and prosecution argument (Chap. 14:§ VII, VIII) are a fertile field for reversal in capital cases
- ___ Counsel must prepare for all stages in the sentencing trial and organize the preparation for easy accessability; the areas of organization may fall into the following categories:
  - ___ Motions in limine: challenges to the admissability of evidence anticipated to be introduced by the state (e.g. (1) pre-trial hearings on the admissability of evidence relevant to improper aggravating circumstances, (2) challenges to the admissability of prior convictions on "cruel an unusual" grounds if challenge to the validity of the prior conviction through postconviction relief is unavailable)
  - ___ Motions in limine: defense of the admissability of evidence to be presented by the defense
  - ___ Opening statement by prosecution (anticipate objections)
  - ___ Opening statement by defense
  - ___ State witnesses, state direct and defense cross
  - ___ Motion for a judgment of acquittal on aggravating circumstances
  - ___ Defense witnesses, defense direct and state cross
  - ___ Anticipated state rebuttal

- ___ Defense surrebuttal
- ___ Objections to jury instructions
- ___ Proposed jury instructions
- ___ Closing argument by prosecution (anticipate objections)
- ___ Closing argument by defense

## J. Post-Trial Juror interviews

(Chap. 15 *Post-Trial Juror Interviews*); usually after a death sentence juror interviews are a good idea, but juror interviews should also be anticipated at the postconviction stage and jurors who have sentenced someone to death are understandably sensitive and often reluctant to be interviewed; the method of approach and the subject of the questions are matters that should be considered with care

## K. Post-Trial Considerations

(Chap. 16 *Post-Trial Considerations*, Guideline 11.9.1 *Duties of Trial Counsel in Post-Trial Proceedings*); counsel has important decisions to make post-trial and several alternative, cumulative and sequential courses of action from which to choose; it is an excellent chance to take advantage of the opportunities presented by a good trial judge; it is also an opportunity to complete an appellate record; in anticipation of the post-trial litigation before the trial court and the prospect of litigation before the appellate court, counsel should give a fresh look at the representation that is to be anticipated and determine if assistance should not be recruited; among the post-trial motions that should be filed, or at least considered, are the following:

- ___ To defer hearing until after completion of transcript
- ___ To set aside death sentence
- ___ For judgment of acquittal
- ___ In arrest of judgment
- ___ For new trial

The following are proposed file divider labels for a pre-trial, trial and post-trial (pre-appeal) notebook.

It is the suggestion of the authors that counsel start a trial notebook as soon as they begin the representation of a criminal defendant, who is charged with a capital eligible crime, i.e. murder in the first degree.

These proposed Trial Notebook file divider labels, contained on this and the following pages in outline form, are consistent with the Trial Checklist, immediately preceding, which incorporates and refers to: (1) the chapters of this manual; and, (2) the *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, a copy of which is enclosed in full, with *Commentary*, in this manual. The Trial Checklist should be consulted to understand the organization of the Trial Notebook outline.

Although the trial notebook for your individual case will vary depending on the circumstances and peculiarities of your case, the outline below may be a good starting place.

## A. Pre-trial

1. client contact
2. others consulted
3. defense team
4. negotiated settlement discussions
5. custom and practice of judge
6. custom and practice of prosecutor
7. motions
   a. recusal motions
   b. client comfort motions
   c. defense team motions
   d. discovery motions
   e. change of venue motions
   f. jury composition motions
   g. evidence admissability motions
   h. death penalty specific motions
   i. jury selections motions
   j. continuance motions
   k. other motions
8. state's motions
9. court's orders
10. investigation
11. expert information and reports
12. discovery received from the state
13. media reports
14. victim and victim's family
15. subpoenas
16. pre-trial - other

## B. Trial

1. jury selection
   a. trial court's selection practice
   b. prosecution tactics
   c. prospective jurors
   d. jury selection expert
   e. juror questionnaire
   f. pre-voir dire statement to panel
   g. ideal juror profile
   h. extra peremptory challenges
   i. voir dire questions
   j. cause challenges exercised
   k. peremptory challenges exercised
   l. jurors who sat
   m. jury selection -other
2. guilt trial
   a. motions in limine, challenges against state
   b. motions in limine, challenges against defense
   c. opening statement by state, anticipated objections
   d. opening statement by defense
   e. state's witnesses, state direct and defense cross
   f. motion for judgment of acquittal on charged offenses
   g. defense's witnesses, defense direct and state cross
   h. state rebuttal
   i. defense surrebuttal
   j. objections to jury instructions
   k. proposed jury instructions
   l. state's closing argument, anticipated objections
   m. defense's closing argument
   n. guilt trial - other
3. sentencing trial
   a. motions in limine, challenges against state
   b. motions in limine, challenges against defense
   c. opening statement by state, anticipated objections
   d. opening statement by defense
   e. state's witnesses, state direct and defense cross
   f. motion for judgment of acquittal on aggravating circumstances
   g. defense's witnesses, defense direct and state cross
   h. state's rebuttal
   i. defense's surrebuttal
   j. objections to jury instructions
   k. proposed jury instructions
   l. state's closing argument, anticipated objections
   m. defense's closing argument
   n. sentencing trial - other

## C. Post-trial

1. post-trial juror interviews
2. post-trial motions
   a. to set aside death sentence
   b. to defer pending completion of the trial transcript
   c. for judgment of acquittal
   d. in arrest of judgment
   e. for new trial
   f. post-trial motions - other
3. post-trial - other

# The Defense Team

# Table of Contents

I. Introduction ....................................................................................4.3
II. The Assistance Needed ......................................................................4.4
A. Second Counsel ..................................................................................4.4
B. Investigation ......................................................................................4.4
C. Psychological Expertise ......................................................................4.5
D. Statistician ........................................................................................4.6
E. Attorney Experts ................................................................................4.6
F. Other Forensic Experts ........................................................................4.6
III. Legal Authority for Support Services ...............................................4.8
A. The Right to an Adequate Defense ......................................................4.8
B. Right to an Ex Parte Hearing ...............................................................4.9
C. Right to a "Defense" Expert ................................................................4.10
D.The Right to "Competent" Experts .......................................................4.11
E.State and Federal Statutes and Rules ..................................................4.12
1) State .........................................................................................4.12
2) Federal .....................................................................................4.12
F. Demonstration of Need .......................................................................4.13
G. Support Services in State Post-Conviction ..........................................4.13
IV. Practical Tips .................................................................................4.14
A. Plan Carefully ....................................................................................4.14
B. Demonstrating Need ...........................................................................4.14
C. Preserving Confidentiality ...................................................................4.15
D. Return to Ask Again ...........................................................................4.15
E. Establish Cost ....................................................................................4.16
F. After a Request Is Denied ...................................................................4.16
G. Retained Counsel and Public Defenders ..............................................4.16
Appendices:
A. Motion for *Ex Parte* Sealed Hearing
B. Court Ordered Mental Evaluation: The *Estelle* Issue in Tennessee
C. Tennessee Supreme Court Rule 13
D. T.C.A. § 40-14-207(b)
E. Mental Health Issues in Criminal Cases, The Advocate, August 1990, p. 42-47

# I. Introduction

Every lawyer in a capital case needs help. The "lone wolf" approach doesn't work — a capital case involves too much to do and too much to know, and the skills required are too diverse for the solo defense attorney. At a minimum, you need death penalty experienced co-counsel, a psychological component, and a distinct investigative component. Counsel in a capital case is the manager of a multi-disciplinary defense team. You and your co-counsel have the enormous task of taking care of the legal end of things and managing the lawsuit, but you need other than legal assistance in providing necessary specialty services.

Counsel in a capital case is the manager of a multi-disciplinary defense team.

The goal of the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases is to ensure "quality legal representation" to "defendants eligible for appointment of counsel during all stages of the case." To satisfy this objective, counsel "must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence. . . . [U]tilization of experts has become the rule, rather than the exception, in proper preparation of capital cases." Guideline 1.1 and Commentary. See, Appendix A, Chapter 2.

Upon entering the case, make an initial, though detailed and careful, analysis of what needs to be done. See Chapter 2, Effective Capital Representation. Determine who is available and best qualified to do each task. Review the available written materials (starting with this manual), and consult numerous people — locally, state-wide and even nationally; draw on the experience of qualified people who have been through this before, to expand your horizons of what is possible.

If the client has the resources, hire the support needed to complete the team. If the client is (or becomes) indigent, demonstrate the needs of the defense to the court *ex parte* and request authorization of the funds necessary to satisfy these needs.

A sample *ex parte* request for authorization of funds is attached at the end of this chapter: Appendix A. It includes the following:

1. Motion for an *ex parte* hearing with memorandum.
2. *Ex parte* motion for defense services with attorney affidavit, mitigation specialists affidavit and memorandum.

At a minimum, you need death penalty experienced co-counsel, a psychological component, and a distinct investigative component

## A. Second Counsel [1]

A quick survey of this manual and its appendices should demonstrate why two lawyers are needed. Even an experienced litigator needs an experienced peer who is current on the status of the case, to help resolve complicated strategy decisions.[2] Pre-trial strategy and litigation are dramatically more complicated and time consuming than in non-capital cases. If you go to trial, in addition to the demands of legal strategy, you will need co-counsel's emotional and psychological support during the stress of courtroom combat with your client's life at stake.

## B. Investigation[3]

Every capital case requires an investigative component. You must investigate not only the homicide and all charged aggravators, but also the client's entire life, including a search for all relevant institutional records and any individuals with information relevant to your client's life and your theory of mitigation. If investigation is left to the lawyers, what needs to be done will not be done.

You may discover that you need more than one investigator — the best person available to investigate guilt/innocence, a well qualified criminal investigator, may not be the best choice to investigate for sentencing, which may require more sophisticated social and psychological investigative skills.

Even if the prosecutor has a confession and several eyewitnesses to the crime, thorough guilt-phase investigation is required. If the jury convicts of first-degree murder, any residual doubt may become mitigation at the sentencing hearing. The defense team must therefore develop and present any proof that tends to raise doubt on the question of guilt. The investigator may also be able to discover evidence reducing the degree of homicide or establishing a complete or limited mental state defense.

Most important, a separate investigative component is always necessary in order to prepare and present a proper sentencing hearing. The investigator can help accumulate the documentary evidence and live testimony that tell your client's life story in a way that shifts the focus of the jury's identification from the victim to the defendant. The investigator should work closely with you and the psychologist in developing the mitigation theory; you will need periodic strategy sessions with the investigator and the psychologist.

---

[1] See Tenn. Sup. Ct. R. 13(1): "In a capital case, two attorneys may be appointed for one defendant and each is eligible for compensation." See also ABA Guideline 5.1, which recommends lead and co-counsel on every capital case at trial, appeal, and post-conviction, and Guideline 6.1, which discourages counsel from accepting workloads beyond their capacity.

[2] "As a matter of practice, in our opinion, a trial judge should appoint more experienced counsel to represent persons against whom the death penalty is sought." State v. Simon, 635 S.W.2d 498, 503 (Tenn. 1982); see also ABA Guideline 5.1.

[3] See T.C.A. §40-14-207(b), Tenn. Sup. Ct. R. 13(2)(B)(10), and Chapters 3, Overview and 5, Investigation. See, also, Mason v. Arizona, 504 F2d 1345 (9th Cir, 1974).

## C. Psychological Expertise[4]

Mental state issues may be relevant at the pre-trial, guilt trial, and sentencing stages, and are always relevant in developing mitigation at sentencing.[5] In fact, the focus of the entire litigation may be on mental health. Counsel's failure to properly develop these issues is often the subject of collateral attack in state and federal court reviews.

In anticipation of a possible sentencing hearing, you must come to understand the client well enough to articulate his life and crime in a way that credibly explains to the jury the forces acting on the client that caused the crime to occur. The art of evaluating and explaining aberrant behavior is rapidly developing and little understood by the typical legal practitioner. Although the explanation primarily involves mental health issues, it also involves understanding the theory and practice of criminology and corrections and a particularly sensitive awareness of human development, psychopathology, and the causes and results of brain damage. See Chapter 14 Sentencing Phase, §V D .

Rarely do Tennessee state mental health institutions conduct adequate competency and sanity evaluations; never do state mental health professionals have the resources, training or opportunity to do the type of investigation and evaluation necessary to prepare them as experts in a capital mitigation hearing. No matter what the courts want to believe, the defense does not get neutral, competent evaluations from the state institutions. Furthermore, your client's Fifth and Sixth Amendment rights are jeopardized by the threat that her admissions may become the subject of testimony by the state evaluator. See, Mehler and Redick, Court-Ordered Mental Evaluations: The Estelle Issue in Tennessee, Appendix B, this chapter.

No matter what the courts want to believe, the defense does not get neutral, competent evaluations from the state institutions

It is incumbent on you, as the attorney/manager, to educate yourself about the necessary mental condition expertise, and obtain it for your client — all the while, avoiding a court-ordered evaluation by state supported institutions.

[4]Graham v. State, 547 S.W.2d 531 (Tenn 1971) is an adverse decision on the right to a private psychiatrist and psychologist; but, it predates Ake v. Oklahoma (see discussion infra) and is no longer controlling in this state. Also since Graham, T.C.A. §40-14-207(b) and Tenn. Sup Ct. R. 13(2)(B)(10) have been promulgated. Other favorable authority include: In re Allen, 506 A.2d 329 (N.H. 1986); and People v. Mencher, 245 N.Y.S. 2d 805 (N.Y. 1964)(right to psychiatrist on issue of waiver of Miranda rights); Perri v. State, 441 S.2d 606 (Fla. 1983); State v. Wood, 648 P.2d 71 (Utah 1982), cert. denied, 459 U.S. 989 (1982); State v. Gambrell, 347 S.E.2d 390 (N.C. 1986)(right to expert for presenting mitigation evidence).

[5]Pre-trial mental health issues may include prior offenses and convictions; confessions (voluntariness and Miranda warnings); and waiver of rights. Guilt phase issues include jury selection; competence; sanity; specific intent; premeditation; malice; diminished capacity; duress; accident; domination by co-participant; non-participation; unreliability of confession; and eyewitness identification. Mental health issues rendering a defendant ineligible for the sentence of death may include a lack of reckless disregard for human life (Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)), or retardation (T.C.A. § 39-13-203). Mental health issues may keep a death-sentenced inmate from being executed. Ford v. Wainwright, 477 U.S. 379, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

In litigating an IAC claim on collateral attack, counsel may need the testimony of an attorney with expertise in capital litigation

## D. Statistician [6]

A statistician may be needed to accumulate the record for various motions, including evaluations of the impact of media exposure on prospective jurors for motions to change venue, obtain individual voir dire, limit media access to the courtroom, or continue the trial date; challenges to the composition of the panel of prospective jurors; and proportionality, discrimination, or arbitrariness challenges. Depending on the issue, statistical expertise may have to be used in conjunction with psychological or sociological expertise.[7]

## E. Attorney Experts

In evaluating and litigating an ineffective assistance of counsel (IAC) claim on collateral attack, counsel may need the testimony of an attorney with expertise in capital litigation. Whether to call an attorney expert is a matter of strategy; considerations include the nature and strength of the IAC claim, the availability of a desirable expert (take care to consider the personalities and politics of the proposed expert and of the trial and appellate courts that review her testimony), and the need to educate the trial and appellate courts on what is minimally effective capital representation.

## F. Other Forensic Experts

The need for various types of forensic expertise depends on the facts of the case and is limited only by counsel's ability to evaluate and articulate the need. The possibilities are endless; areas include: ballistics and firearms,[8] blood spatter, cardiology,[9] criminal investigation, dental,[10] DNA, fingerprints,[11] handwriting,

---

[6] See State v. Anaya, 438 A.2d 892 (N.C. 1981), in which the court provided funds for experts in statistics and demography to analyze the composition of the grand jury.

[7] See Chapters 11, Jury Composition; 10, Venue; and 9, Motions.

[8] Commonwealth v. Bolduc, 411 N.E.2d 483 (Miss. Ct. App. 1980); Barnard v. Henderson, 514 F.2d 744, 746 (5th Cir. 1975); United States v. Pope, 251 F. Supp. 234 (D. Neb. 1966).

[9] People v. Gunnerson, 141 Cal. Rptr. 488 (Cal. App. 1977).

[10] Thornton v. State, 339 S.E.2d 241 (Ga. 1986).

[11] United States v. Patterson, 724 F.2d 1128 (5th Cir. 1984); United States v. Durant, 545 F2d 823 (2nd Cir. 1976); Bradford v. United States, 413 F2d 647 (5th Cir. 1969); United States v. Fogarty, 558 F. Supp. 856 at 857 (E.D. Tenn. 1982).

hypnosis,[12] interpreter,[13] microscopy, pathology,[14] polygraph,[15] documents,[16] serology,[17] tire tracks and footprints, voice prints, semantics and linguistics, toxicology and pharmacology,[18] dental expert,[19] EEG,[20] identification procedure,[21] physician in sex case.[22]

The need for various types of forensic expertise depends on the facts of the case and is limited only by counsel's ability to evaluate and articulate the need

[12]Little v. Armontrout, 835 F.2d 1240 (8th Cir. 1987) (en banc).

[13]United States v. Largan, 330 F. Supp. 296 (S.D.N.Y. 1971).

[14]Williams v. Martin, 618 F.2d 1021 (4th Cir. 1980); Arnold v. Higa, 600 P2d 1383 (Haw. 1979); Anderson v. Justice Court of San Benitz Co., 160 Cal. Rptr. 274 (Calif. 1979)

[15]Commonwealth v. Lockley, 408 N.E.2d 834, 838 (Mass. 1980); United States v. Penick, 496 F2d 1105 (7th Cir. 1974); 11 ALR 4th 733 (1982).

[16]United States v. Fogarty, 558 F. Supp. 856 (E.D. Tenn. 1982).

[17]Burns v. State, 312 S.E.2d 317 (Ga. 1984); Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1985); Bowen v. Eyman, 324 F. Supp. 339 (D. Ariz. 1970).

[18]Patterson v. State, 232 S.E.2d 233, 234 (Ga. 1977); State v. Coker, 412 N.W.2d 589, 592-593 (Iowa 1987); State v. Lippincott, 307 A.2d 657 (N.J. 1973); People v. Mencher, 248 N.Y.S.2d 805 (N.Y. Sup. Ct. 1964).

[19]Thornton v. State, 349 S.E. 2d 186 (Ga. 1986).

[20]United States v. Hartfield, 513 F2d 254 (9th Cir. 1975).

[21]United States v. Baker, 419 F2d 83 (2nd Cir. 1969).

[22]People v. Hatterson, 405 N.Y.S. 2d 297 (N.Y. 1978)

"An indigent defendant must be provided with the tools of an adequate defense when these tools are available for a price to other defendants.": State v. Elliott

## A. The Right to an Adequate Defense

The constitutional right to counsel includes a right to effective counsel. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.2d 158 (1932); McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In most capital cases, counsel alone cannot provide an adequate defense. The courts have therefore found a due process right to state funds for the expert services necessary to present an adequate defense.

> [W]hen a state brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle . . . derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. . . .
>
> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the state proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the court has not held that a state must purchase for the indigent defendant all of the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." . . .
>
> The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. Indeed, the host of safeguards fashioned by this court over the years to diminish the risk of erroneous conviction stands testament to that concern. The interest of the individual in the outcome of the state's efforts to overcome the presumption of innocence is obvious and weighs heavily in our analysis. Ake v. Oklahoma, 470 U.S. 68, 76-78, 105 S.Ct. 1087, 1093-94, 84 L.Ed.2d 53 (1985) (citations omitted).

Consistent with this theme, the Tennessee Supreme Court has provided:

> There is no question but that an indigent defendant in a criminal prosecution must be provided with the tools of an adequate defense or appeal when these tools are available for a price to other defendants. State v. Elliott, 524 S.W.2d 473, 475 (Tenn. 1975).[23]

[23]Before Ake, *supra*, Tennessee appellate decisions failed to recognize any right to support services. See, for example, Graham v. State, 547 S.W.2d 531 (Tenn. 1971); Couch v. State, 566 S.W. 2d 288 (Tenn. Crim. App. 1978); Matlock v. State, 566 S.W.2d 892 (Tenn. Crim. App. 1978); State v. Tyson, 603 S.W.2d 748 (Tenn. Crim. App. 1980). Furthermore, all of these cases also predate T.C.A. §40-14-207(b) and Tenn. Sup. Ct. R. 13(2)(B)(10).

Ake can be used as authority for the proposition that the federal constitution requires the trial court to authorize funds for support services when the subject for which the expertise is needed is "a significant factor", Ake, 470 U.S. at 82, 83 or "a substantial factor", Ake 470 U.S. at 86.

T.C.A. §40-14-207(b) requires the court to decide whether "investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected"; and, if such a determination is made, authorize the services "in a reasonable amount".

Any and all rights inuring to the benefit of criminal defendants have increased importance and are more carefully guarded in capital cases. Put the court on notice, as in Appendix E, Chapter 2, supra, arguing that a benefit of the doubt attaches to the defendant on close questions when she asserts rights inconsistent with the state's interest. Remind the court of the heightened standard of due process and reliability at every stage and on every issue in a capital case.

Powell and Ake were decided as a matter of "fundamental fairness" based on the due process clause of the Fourteenth Amendment, similar to the law of the land clause in Article I, §8 of the Tennessee Constitution. Other constitutional rights that are also implicated include equal protection,[24] effective assistance of counsel,[25] and compulsory process of witnesses.[26]

T.C.A. § 40-14-207(b) requires the court to provide an *ex parte* hearing in order to make this determination

## B. Right to an *Ex Parte* Hearing

T.C.A. § 40-14-207(b), Appendix C, this chapter, requires the court to provide an *ex parte* hearing in order to make this determination. See Gipson v. State, C.C.A. No. 1095, Hamilton County, decided August 25, 1989.[27] Every federal circuit that has recently addressed the issue has upheld the right to an *ex parte* hearing.[28] See also, Ake, 470 U.S. at 82-83.

All motions filed should be filed under seal, with no notice to the prosecution, and a request should be made in every pleading that the confidentiality be

[24] Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed.2d 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 811, 9 L.Ed.2d 811 (1963).

[25] U.S. Const., 6th Amendment; Tenn. Const., Art. I, § 9; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed.2d 1461 (1938); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

[26] U.S. Const., 6th Amendment; Tenn. Const., Art. I, § 9; see, e.g., People v. Watson, 221 N.E.2d 645 (* 1966), and United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

[27] 21 U.S.C. § 848(q)(4)(B)(9), as well as the preceding and currently subordinate authority in the Criminal Justice Act, 18 U.S.C. § 3006A(e)(1), have a similar mandatory requirement.

[28] See, e.g., United States v. Tate, 419 F.2d 131 (6th Cir. 1969), finding reversible error in denial of a request for a psychological expert without an *ex parte* hearing. If the *ex parte* hearing is denied, it should be the subject of an interlocutory appeal, as in Gipson.

The expert must be compatible with the defense theory and available to consult with the defense as a trusted ally before and during the trial

preserved of all pleadings, conversations, and orders entered in response to requests made. See § IV C, infra.

## C. Right to a "Defense" Expert

The opinion in Ake appeared to limit the right to a defense expert: "This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." 470 U.S. at 83. However, given the functions that the psychiatrist must perform, and the Ake opinion as a whole, a "defense compatible" expert, at the very least, is required. Addressing a situation in which the defendant's mental condition was seriously in question, Ake held that the defense was entitled at guilt and penalty phases to a psychiatrist:

- To conduct a competent professional exam on "issues relevant to the defense";
- To help determine whether insanity defenses are viable;
- To present testimony;
- To assist in preparing cross-examination of the state's psychiatrist;
- To aid in preparing the penalty phase;
- To rebut aggravating evidence; and
- To present mitigating evidence.

The appointed psychiatrist must also perform the traditional, valuable role of a psychiatrist:

> In this role, psychiatrists gather facts, both through professional examination, interviews, and elsewhere, that they will share with the judge and jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder or behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrist and how to interpret their answers. 470 U.S. at 80 [S.Ct. at 1095] (emphasis added).

At the very least, therefore, the expert must be compatible with the defense theory and available to consult with the defense as a trusted ally before and during the trial; otherwise, the mandate of Ake cannot be carried out, whether or not the defendant has a right to "choose" her expert.

The apparent trend in the lower courts is toward the right to a "defense" expert; but, some courts even recognize the defendant's right to choose an expert of her

liking.[29] The language of Rule 13(2)(B)(10) and T.C.A. §40-14-207(b) appear to make Tennessee consistent with the national trend; see Appendices C and D, this chapter.

The indigent defendant is due the assistance of an expert who will assist the defense competently.

## D. The Right to "Competent" Experts

Ake guarantees the right to a "competent" expert. 470 U.S. at 83. The indigent defendant, therefore, is due the assistance of an expert who will, not only assist the defense, as previously indicated, but, will also do so competently. Furthermore, it is not unusual for counsel on collateral attack to discover that trial-level services were deficient and that important information was not presented, or that the trier of fact was given misleading information. Such sub-standard performance on the part of court-appointed experts violates the rights to due process and effective assistance of counsel.

In the leading case in point, State v. Sireci, 536 So. 2d 231 (Fla. 1988), the Florida Supreme Court upheld an order granting a new sentencing hearing because the failure of two court-appointed psychiatrists to discover indications of organic brain disorder and order additional testing deprived the defendant of due process by denying him an opportunity to develop mitigating evidence. Thus far, the United States Supreme Court has not addressed whether the provision of incompetent expert services constitutes a denial of due process. But see dissent from denial of certiorari in Brown v. Dodd, 108 S.Ct. 33 (1987).

Although the issue of ineffective expert assistance can arise in as many contexts as there are areas of expertise, the most common context is a psychiatric evaluation that fails to discover significant impairment of mental or emotional functioning. More specifically, the issue will focus on whether the expert conducted an "appropriate" evaluation — that is, one that meets the "standard of care." A review of current literature suggests that an appropriate evaluation includes four components: reviewing criminal justice and mental health records; obtaining a social and family history from both the defendant and independent sources; conducting a mental status examination (with additional, appropriate psychological testing); and conducting a physical examination, with particular

[29]Holloway v. State, 361 S.E.2d 794 (Ga. 1987), held that a capital defendant who had been examined by a state psychologist and psychiatrist was entitled to an independent psychiatrist on the issues of criminal responsibility and mitigation of sentence. See also United States v. Sloan, 776 F.2d 926, 929 (10th Cir. 1985) ("The essential benefit [under Ake] of having an expert in the first place [is] denied . . . when the services of the doctor must be shared with the prosecution"); Lindsey v. State, 330 S.E.2d 563 (Ga. 1985); Commonwealth v. Plank, 478 A.2d 872, 874 n.3 (Pa. Super. 1984); Bernard v. Henderson, 514 F.2d 744 (5th Cir. 1975); Marshall v. United States, 423 F.2d 1315 (9th Cir. 1970); cf. State v. Gambrell, 347 S.E.2d 390 (N.C. 1986) (state doctor may fulfill obligation but did not in this case); and Granviel v. Lynaugh, 881 F.2d 185 (5th Cir. 1989) (right to assistance in preparing insanity defense is satisfied by appointment of psychiatrist whose report is available to both defense and prosecution).

Failure to adequately demonstrate the need for support services will result in preclusion of the issue on appeal, if the request is denied by the trial court

attention to any indications of brain damage that would call for additional testing.[30] Other considerations include whether the defendant was observed on an in-patient or out-patient basis, and whether the defendant was weaned from drugs or medication before, during or after the evaluation. See Blume, Mental Health Issues in Criminal Cases, The Advocate, August 1990, p 42-47, Appendix E.

## E.State and Federal Statutes and Rules

### 1) State

The trial court can appoint second counsel in a capital case. Tenn. Sup. Ct. R. 13(1). Tennessee trial courts do so almost without exception. The Supreme Court's expectation is that "a trial judge should appoint more experienced counsel to represent persons against whom the death penalty is sought." State v. Simon, 635 S.W.2d 498, 503 (Tenn. 1982).

The statute and rule require the trial court to hear requests for support services *ex parte*. See Appendices C and D. T.C.A. § 40-14-207(b) authorizes the court to "determine that investigative or expert services or other similar services are necessary to insure that the constitutional rights of the defendant are properly protected." Rule 13(2)(B)(10) requires a written motion, setting out specific information that must be included.

### 2) Federal

Before the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848, the Criminal Justice Act, 18 U.S.C. § 3006A, was the authority for provision of counsel and support services to indigent federal habeas corpus petitioners. The more recent Anti-Drug Abuse Act, which is specifically directed to provision of services in capital cases, is more favorable to the accused; any request for services should therefore be made pursuant to it. See Appendix F.

21 U.S.C. § 848(q) sets out minimal qualifications for appointed counsel and expectations concerning the proceedings through which counsel must represent the petitioner. It requires authorization of funds necessary for "investigative, expert, or other services" that are "reasonably necessary for the representation of the defendant, whether in conjunction with issues relating to guilt or sentence," and allows for "provision of and payment for such services *nunc pro tunc*," 21 U.S.C. §848(q)(9).

Attorneys and others are to be compensated "at such rates or amounts as the court determines to be reasonably necessary to carry out the requirements of paragraphs (4) through (9)." 21 U.S.C. § 848(q)(10). This

[30] See Schlossberg, "A Question of Competence: The Indigent Criminal Defendant's Right to Adequate and Competent Psychiatric Assistance After Ake v. Oklahoma," 14 Vermont L. Rev. 121 (1989); and Chapter 5 of this manual, Investigation.

is a significant improvement over prior law: fees are no longer limited as a matter of law. In 1989 the Sixth Circuit approved minimum hourly attorney's fees of $100 in capital habeas corpus cases.

## F. Demonstration of Need

Failure to adequately demonstrate the need for support services will result in preclusion of the issue on appeal, if the request is denied by the trial court. In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the trial court denied a request for ballistic and fingerprint experts; relief was granted on other grounds, but criminal defense attorneys were warned that "general" requests for experts are not adequate. 472 U.S. at 323 n.1 [105 S.Ct. at 2637]. Recent decisions increasingly tend to uphold the trial court's exercise of discretion and cite counsel's failure to demonstrate need for support services. Counsel must take great care to properly supplement the record with the appropriate demonstration of need for requested services.

Neither the statute nor the rule is limited to the trial level or precludes provision of expert services for state post-conviction proceedings

## G. Support Services in State Post-Conviction

Neither the statute nor the rule is limited to the trial level or precludes provision of expert services for state post-conviction proceedings. Recent dicta from the Court of Criminal Appeals, however, usually intermingled with findings that a need for support services was not demonstrated, suggest that the rule and statute do not apply in post-conviction.[31] These holdings fail to cite legal authority, and are to be discouraged. They are also disregarded by many state trial court judges. See Chapter 19, State Postconviction Litigation.

Investigative and psychological components are almost always a necessity on post-conviction. The investigative component is particularly needed if residual issues of guilt remain or if there is a substantial question of ineffective assistance of counsel, particularly at the sentencing stage. Review of the record and other investigation will usually reveal a need for a psychological component, particularly if mental heath issues predominated at trial or are indicated by interviews of the client. Counsel will normally have to obtain psychological experts to evaluate the competence of prior psychological evaluations.

The Advisory Commission to the Tennessee Supreme Court on Criminal Procedure has recommended a comprehensive certification of counsel rule in capital cases and has submitted the rule to the Supreme Court, which has taken no action as of the publication of this manual. The rule, in its present form, would require support services at trial and post-conviction without distinction, so long as counsel demonstrates need.

[31] See Caruthers v. State (Ct. Crim. App. at Knoxville, November 22, 1988); Teague v. State, 772 S.W.2d 915, 927 (Tenn. Crim. App. 1988); and State v. Laney at 7-8 (Ct. Crim. App. at Knoxville, December 14, 1989).

Approach your request for support services only after carefully planning and brainstorming with others

## A. Plan Carefully

1) Unless your trial judge will give you everything you ask for, approach your request for support services only after carefully planning and brainstorming with others.

2) Evaluate your judge's personality and politics to determine how to pitch the request.

3) Carefully search for potential appointees. Find the best expert at the least cost. Have the psychologist answer some hypothetical questions, review some records or, best of all, interview your client before you submit her name. Get references and investigate the expert before you commit to her.

4) Carefully plan the method by which to demonstrate need for the support services, and do the requisite preliminary investigation.

5) To the extent possible, determine all the services that will be needed; try to avoid presenting requests piece-meal.

## B. Demonstrating Need

If the trial court refuses to provide services, appellate relief will be available only if you have adequately demonstrated need. Caldwell v. Mississippi, 472 U.S. at 323, n. 1.

1) Detail the services requested: the name of the proposed expert or service; how, when, and where the examination is to be conducted or the services are to be performed; and the cost of the evaluation, report, and any other services, such as court appearances. See Tenn. Sup. Ct. R. 13(2)(B)(10).

2) File a supporting legal memorandum.

3) Set out the reasons why the service is necessary. Use affidavits, depositions or testimony from counsel, the proposed expert or investigator, and/or an expert in the relevant field (e.g., investigation, psychology, or sociology). Make it clear that this is more than a "fishing expedition" or "general request" — give specific reasons why a specific expert is needed in this case—the more reasons and the more supporting detail, the better.

4) Demonstrate the relevance of the information the support services will produce. Delineate the element of the defense to which the services are relevant, and show how denial of each service would prejudice the defendant and amount to a denial of fundamental fairness.

5) Demonstrate the admissibility of the evidence to be generated by citing other cases in which similar evidence was admitted.

6) Explain that the service has been used by, or is available to, the state; show that you only ask for an equal opportunity for the defendant.

7) If you do not get something that you ask for, prepare the judge for the fact that you will return with another, additional request.

8) If you have questions, contact experienced capital counsel.

## C. Preserving Confidentiality

If your request for support services is pled properly, there will be an abundance of sensitive materials in these pleadings that you do not wish the prosecution to see. Remember, the law provides for *ex parte* hearings because your client is indigent and these matters have to be brought to the attention of the court only because of his indigence.

An abundance of sensitive material that you do not want the prosecution to see should be in your pleadings if pled properly.

1) File all pleadings *ex parte* and under seal. T.C.A. § 40-14-207(b); 21 U.S.C. § 848(q)(4)(B). This includes not only motions and legal memoranda but, more importantly, any factual information about your case or experts.

2) All conversations with the court regarding these pleadings should be in private. In all verbal communications, correspondence, pleadings or proposed orders, refer to the *ex parte*, sealed and confidential nature of the proceedings.

3) Include no certificate of service on your correspondence or pleadings and send no copies of correspondence or pleadings to anyone, especially the prosecution.

4) Be careful that the trial court does not absentmindedly send any papers to clerk for inclusion in the public record. Suggest that the pleadings be kept under seal <u>in chambers</u> until the trial is completed. Once the case is disposed of at the trial level, of course, all *ex parte* matters would then become a part of the appellate record.

5) If it becomes apparent that the prosecution has seen the pleadings, demonstrate how you have been prejudiced thereby, thus preserving your appellate record.

## D. Return to Ask Again

You can come back and ask again; do so, if:

1) The court denies a request — find out the specific reasons why; correct the problems and return with an additional request. If, for example, the court has a problem with your proposed expert, propose an alternate who is compatible with your theory of defense but more acceptable to the court.

2) A requested expert does not work out for any reason.

Keep the request for funds as reasonable as possible without compromising an adequate defense.

3) An additional expert is needed after the initial expert's work is completed; for example, a psychological evaluation may turn up evidence that a neuropsychologist is needed.

4) You need more funds than were initially authorized.

## E. Establish Cost

For obvious reasons, keep the request for funds as reasonable as possible without compromising your ability to obtain the services that are necessary to present an adequate defense. What is "reasonable" and "adequate" are relative matters and vary with the skill and commitment of the advocate.

Do not take the expert's fee quotation at face value without any discussion. Negotiating a lower fee is often possible, and may be necessary in order to get the appointment. Know your audience; some judges may have no problem with a dollar amount to which other judges may object.

## F. After a Request Is Denied

The content and detail of the factual foundation supporting the request for support services is important, if the trial court won't give the defense what it asks for. The written, detailed request must particularly be made if it is denied. The denial of support services is an appealable issue. It may be the basis for avoiding a "previously determined" or "waived" ruling on post-conviction. On a federal habeas corpus petition, it can be the basis for an evidentiary hearing, or may prevent the court from "presuming correct" a state court finding of fact.

Anticipate an appeal; make sure the record is complete, and supplement it if necessary with an additional request including supplemental factual foundation further demonstrating the need. Be alert during the trial for evidence of resulting prejudice, and be certain that the record reflects it.

You may be able to obtain at least some of the requested services without the assistance of the court. At the trial level, it would probably be wise to do so, because of the difficulty of showing prejudice on appeal, and the importance of the jury's verdict. On post-conviction, however, failure of the court to provide services may provide a basis for an evidentiary hearing in federal court, and you may be well advised to leave the record as it is. Seek expert advice in this regard.

## G. Retained Counsel and Public Defenders

If you are a private attorney and are contacted about the possibility of being retained to represent someone on a homicide charge, anticipate that it may turn into a capital case. Before you quote your fee, calculate that extra burden.

Lawyers are usually retained by family members, not by the defendant. The family has no obligation to provide counsel or any other part of an adequate defense for their indigent family member. See, e.g., State v. Gardner, 626 S.W.2d 721 (Tenn. Crim. App. 1981). If the family does contribute to the defense, this

should be submitted to the court as a windfall for the state. If the compensation is insufficient to obtain the resources needed for an adequate defense, even retained counsel should move for funds for services.[32]

Public defenders would be well advised to evaluate the level of experience of the legal staff and the available resources, and determine whether the office can handle one or more capital cases. Public defenders are typically under-resourced and under-staffed; outside assistance may well be needed if the office is appointed in a capital case. It may even be impossible, given the present experience and resources, for the office to take the case at all. Do not be timid. As a matter of fact, the defender would probably be well advised to discuss the problem with the trial judges before it occurs. Perhaps members of the private bar could be appointed to take capital cases, or to assist the public defender. Even though the public defender has an in-house investigator, an additional investigator may be needed to assist in preparing a capital case; the staff investigator may lack enough time or the particular skills needed. Any other expertise will normally not be included in the public defender's budget and is a proper subject, need being demonstrated, for a request for support services.

Public defenders would be well advised to evaluate available experience and resources to determine whether the office can handle one or more capital cases

[32]See, e.g., State v. Manning, 560 A.2d 693 (N.J. Super. 1989); English v. Missildine, 311 N.W.2d 292 (Iowa 1981); Arnold v. Higa, 600 P.2d 1383 (Hawaii 1979); Anderson v. Justice Court of San Benito Co., 160 Cal. Rptr. 274 (Ct. App. 1979).

# INVESTIGATION

# Table of Contents

I. The Importance of Investigation .......... 5.4
A. Gaining the Client's Perspective .......... 5.4
B. Building Rapport With the Client .......... 5.4
C. Level the Playing Field .......... 5.5
D. Make Your Case .......... 5.5
E. Establish a Mental Health Profile and Defense .......... 5.6
F. Encourage Negotiation .......... 5.6
II. Client Investigation and Evaluation .......... 5.6
A. What You're Trying To Find .......... 5.8
1. Family Background .......... 5.8
2. Marriages or Children .......... 5.8
3. School performance .......... 5.10
4. Medical History .......... 5.10
5. Psychological History .......... 5.10
6. Drugs and Alcohol .......... 5.11
7. Military Experience .......... 5.12
8. Work History .......... 5.12
9. Criminal Record .......... 5.12
10. Institutional Record .......... 5.12
11. Significant Others .......... 5.12
12. Religious Background .......... 5.13
13. Geography .......... 5.13
14. Particular Skills or Talents .......... 5.13
B. Once Is Not Enough .......... 5.13
C. Collecting Paper .......... 5.14
D. Family and Friends .......... 5.14
E. Previous Counsel .......... 5.15
F. The Victim's Family .......... 5.16
G. Putting It All Together .......... 5.16
1. Chronological Chart .......... 5.17
2. Social History .......... 5.17
3. Institutional Records .......... 5.17
4. Witness Book .......... 5.18
5. Family Tree .......... 5.18
6. Psychological Diagnosis and Expert Assistance .......... 5.18
III. Investigating The Facts of the Case .......... 5.18
A. The Goals .......... 5.20
1. Prove Innocence .......... 5.20
2. Diminished Responsibility / Lesser Degrees of Homicide .......... 5.20
3. Consistent Guilt and Sentencing Phase .......... 5.20
B. Areas of Investigation .......... 5.20
1. Crime Scene .......... 5.21
2. Objective Accounts .......... 5.21
3. Forensic Evidence .......... 5.24
4. Witnesses .......... 5.25
5. Victim .......... 5.32
6. Documents .......... 5.36
7. Confession .......... 5.36
8. Polygraph .......... 5.37
5.38

9. Hypnosis ........ 5.39
10. Wiretaps ........ 5.39
IV. Investigation of the Legal Process ........ 5.40
A. The Judge ........ 5.40
1. Legal Record ........ 5.40
2. Public Statements ........ 5.40
3. Social Connections ........ 5.40
4. Personal ........ 5.41
B. The Prosecutor ........ 5.41
1. Prosecution Profile ........ 5.41
2. Tactics ........ 5.41
3. Weaknesses ........ 5.42
C. The Jury ........ 5.42
1. First Day of Venire ........ 5.42
2. Juror Questionnaire ........ 5.43
3. Panel List ........ 5.44
Appendices:
A. Mitigation Evaluation Form
B. Differential Diagnosis of Antisocial, Aggressive, Defiant, or Oppositional Behavior

# I. The Importance of Investigation

One of the most basic ground rules of capital litigation is that the defense attorney is the initial trier of fact

Despite claims to the contrary, a capital murder trial is not an exercise in discovering all that is truthful and factual about the offense, your client, and the individuals who facilitate the process as officers of the court and members of the jury.

The prosecution will do everything in its power to construe any available information into a scenario that will have your client malevolently in the middle of the worst crime in the history of your home county. State agents, witnesses and psychologists will paint your client as a product of his own evil intentions and beyond any reasonable redemption or use to society. All this will be played before a jury who will swear they know nothing about the case and that they will consider all mitigating factors and follow the law.

Truth and fact become irrelevancies that only complicate the ultimate goal of a sentence of death.

Defense investigation is the only weapon available to hinder the state's penchant for hyperbole and mendacity. Investigate in three areas:

1. Client Investigation and Evaluation -- Developing a comprehensive social, medical, legal, educational and psychological history of your client through personal interviews, scientific evaluation and records gathering.
2. Investigation of the Offense – Including elements of the crime, testimony of the witnesses, physical evidence, and other issues relevant to a criminal offense.
3. Investigation of the Legal Process – The social status, political leanings, racial and social bias and personality of those who will decide whether the client lives or dies.

Beyond gathering comprehensive information, investigation has numerous dividends specific to the unique nature of capital litigation:

## A. Gaining the Client's Perspective

One of the most basic ground rules of capital litigation is that the defense attorney is the initial trier of fact. Only if you believe your client is worthy of life do you stand a chance of convincing the jury to choose life over death. If you are hostile or even ambivalent toward your client, the jury will perceive this and a sentence of death will be inevitable.

As the defense team investigates the facts surrounding the offense and the defendant's life history and experiences, invariably you gain a greater understanding of who the client is, how events or handicapping conditions in his or her life brought the client to adopt a particular lifestyle, and how the specific circumstances surrounding the offense triggered an act of murder. The net effect will be a lowering of client culpability in the eyes of the defense team and a willingness to aggressively litigate the case to a sentence less than death.

This time spent with the client brings a perspective and understanding that permits counsel to articulate a credible explanation of the crime for the trier of fact. Even if the client is manipulative, deceitful or aberrational, it is incumbent upon counsel to understand the motivation and cause for these devices and coping mechanisms.

Access to the defendant and his or her knowledge of the crime and personal history is your greatest asset

## B. Building Rapport With the Client

Most of us see the world in dualistic terms: good and evil, friend and foe. The adversarial nature of our court system and the ultimate nature of the capital proceeding throw this duality into high relief.

Most lawyers are surprised to learn that clients do not see defense attorneys as being on their side of the struggle. You dress more like a prosecutor than like your client. You have never ridden a Harley, and have no tattoos. You share membership in the country club, Kiwanis or bar association with the district attorney. Your client has every reason to suspect that you are more a part of the machine trying to end his or her life than someone willing to go to the wall to save his life.

Investigation can change all that.

Investigation requires time. Time spent with your client reviewing the elements of the crime, exhaustive discussion of the client's life history, and interaction with the people your client considers to be family and friends. Investigation requires and demonstrates a level of caring your client has rarely experienced. Investigation confirms that you are taking an aggressive posture with the state: you are not one of them but are squarely in the client's corner.

The value of this rapport is threefold:

1. Should a settlement offer be made, a client who trusts his lawyer will be more likely to accept the negotiated plea.
2. The client will be more likely to share embarrassing or painful information that may be the key to mitigation.
3. Should the case go to trial, the jury will see a cooperative and human client capable of positive interaction with counsel.

## C. Level the Playing Field

The capital trial is seriously biased against the defense. The resources of the police and prosecution, the death qualification process and a general societal abhorrence of violent crime create an uphill battle for the defense.

The one defense advantage is access to the client – the only person who absolutely knows what, if any, role he or she played in the crime and is the primary source of information about the defendant's life history. Though having a capital client is a liability, access to the defendant and his or her

Though probably 95% of this manual concerns how to try a capital case, a capital case should never go to trial

knowledge of the crime and personal history is also your greatest asset – an asset that can be used only through aggressive investigation.

In terms of the jurors, the only way to bring fairness to the process is to learn more about them through investigation outside the courtroom than the prosecution can ever learn through voir dire. If you know more about the jury walking into the courtroom than the prosecution knows after an hour of questioning, the normally biased voir dire process may actually tilt in your favor.

### D. Make Your Case

Your client is innocent of capital murder.

Investigation will reveal whether your client is "absolutely, nowhere near the scene of the crime, don't know nothing about it, didn't bust a grape" innocent or simply guilty of a murder with enough mitigation to warrant a life sentence. The way you are persuaded through your investigation that your client is not guilty of capital murder should set the agenda for how you inform the jury that your client is not guilty of any degree of homicide, guilty of something less than first degree murder, or guilty of first degree murder but not worthy of death.

### E. Establish a Mental Health Profile and Defense

Psychological or neurological impairments may have a bearing on a wide range of legal issues, such as voluntariness of a confession, waiver of rights, specific intent to commit the offense, or competence to stand trial. A mentally retarded person cannot be sentenced to death in Tennessee. Mental health issues are usually of prime importance in both the guilt / innocence and sentencing hearings. Effective investigation of these possible mitigating circumstances may spell the difference between a verdict of life and a death sentence.

Reliance on experts is necessary to accurately assess the defendant's mental condition. Do not request a court-ordered evaluation at a state mental health facility; have defense experts appointed by the court. In order to make a reasoned decision as to what experts are needed, meet the threshold showing of need required for court-authorized support services pursuant to T.C.A. §40-14-207(b) and Supreme Court Rule 13, and maximize the services of the experts, you must first conduct your own investigation and preliminarily determine the nature and degree of the client's impairments.

### F. Encourage Negotiation

Though probably 95% of this manual concerns how to try a capital case, a capital case should never go to trial. Unless your client is innocent of any culpability, a negotiated plea to a sentence less than death is invariably the best possible result.

Aggressive investigation provides the defense team with knowledge and understanding of the case that the prosecution is incapable of achieving. In negotiations, knowledge is power. The more you learn about your case, the

more aggressive and secure you will be in your dealings with the court. When investigation reveals exculpatory evidence or new witnesses who contradict the state theory, the prosecution will be put on notice that a seemingly open and shut case is going to be a brawl. When the prosecution is faced with a potentially complex case in which a sentence of death is not assured, negotiation becomes a viable option and you can win your case without ever entering the courtroom. Remember, in a capital case, a sentence less than death is a win.

Remember, in a capital case, a sentence less than death is a win

# II. Client Investigation and Evaluation

The emphasis of your initial contact with the client should be on relationship building rather than information gathering

In a normal criminal case, the jury has to decide whether the defendant committed the crime. In a capital case the jury also has to decide why the client committed the crime and whether this reason makes that individual eligible for death in the Tennessee electric chair. Whereas a non-capital trial focuses on the offense, a capital trial focuses on the defendant. Investigation and evaluation is the process by which counsel can discover the answer to the question why.

The primary way to investigate is to interview the client and his or her family, friends, colleagues, and other significant people. From the very first encounter with the client, counsel should be building rapport and exploring some of the areas outlined below. At all times, the interviews should be conversational; counsel must avoid any techniques that resemble the interrogation the client has already endured by the police. Building trust and rapport is a means to extract more information, and the emphasis of your initial contact with the client should be on relationship building rather than information gathering.

## A. What You're Trying To Find

In your conversations with the client and others, you are trying to discover people, places and events:

- People who knew your client as he or she was growing up can help explain to the jury how a child who was born innocent developed into the person who committed this terrible crime.
- Places such as schools, rehabilitation programs, hospitals, prisons, summer camps, etc., harbor documents that chart your client's development and record physical or emotional problems, life changing events, specific needs, and professional recommendations.
- Events chart and explain a steady progression toward the type of behavior that resulted in an aggravated murder.

In a sense, the sentencing hearing of a capital case is an opportunity to tell the defendant's story, to humanize the person to the jury. You can do this only if you have the information to develop a comprehensive understanding of this individual's life.

### 1. Family Background

Have the client walk through his or her life, naming as many people and relating as many events as possible. Though you want the conversation to be free-flowing, steer the client toward particular topics and gather information in the following areas:

#### a. Criminal

Gather family information such as the parents', siblings', and grandparents' criminal records and social backgrounds.

**b. Marital**
Were the client's parents divorced? Did either spouse remarry? If so, how many times? How did the client relate to the step-parent? Who were other significant adults in the family?

**c. Domestic Violence**
Was there any violence in the home? Did the client witness physical or sexual abuse among parents or step-parents?

**d. Parental Drug and Alcohol Use**
What was the level of drug or alcohol use in the home? Were any parents or grandparents alcoholics, or die of alcohol related illnesses?

**e. Poverty and Neglect**
What was the economic level of the family? Were the parents able to provide an adequate living? Were there ever any allegations of neglect?

**f. Family Size**
How big was the family, and where did the defendant fit in the family structure? Was it a mixed family of stepchildren, and were some children treated better than others? Were the parents able to cope financially and emotionally with the family size?

**g. Abuse**
Abuse comes in many shapes and sizes. Be sensitive to the fact that this type of information will not be shared easily. Explore the following areas:

**(1) Physical Abuse**
Ask your client how she was disciplined, and by whom. Most clients will deny that they were abused if asked directly, because they don't see certain behavior as abuse: they may think that what they experienced is normal for children.

**(2) Psychological Abuse**
The client might have been punished in unusual ways — not by being beaten, but by being locked in a closet for extended periods or otherwise confined. Children with handicapping conditions or limited intelligence may have been belittled by parents (or teachers), and stepchildren may have been referred to as the "bastard" or ostracized from the family in some other manner.

**(3) Sexual Abuse**
Of all areas explored, this is the most sensitive. The client does not have to be a victim of abuse for it to have a significant impact on his life; sexual abuse of a sibling can profoundly affect the entire family, including the client.

Abuse comes in many shapes and sizes. Be sensitive to the fact that this type of information will not be shared easily

One of the most basic ground rules of capital litigation is that the defense attorney is the initial trier of fact

**h. Community Image**
How did the community view the client's family? Was the family ever reported to human services? Did the parents interact with teachers in a positive way? Were they viewed as outsiders or "white trash" and shunned by the neighbors?

**2. Marriages or Children**
If the client has established a family, discuss any marriages and children in depth. Establish the names, ages and degree of contact for each child.

**3. School performance**
Make a list of every school attended, every teacher remembered, the grades received, favorite courses and any extra-curricular activities. Pay special attention to any special education classes attended, or severe disciplinary procedures.

**4. Medical History**
Because neurological dysfunction is often the key to understanding your client's behavior, any information that might isolate the dysfunction will be helpful. Explore the following areas:

**a. Pre-natal or Birth Problems**
The defendant may have been told about the difficult time his mother had giving birth to him, or that he was a "blue baby" and had respiratory problems, was premature, or had to be kept in the hospital longer than is normal. Were forceps used during delivery or was there any oxygen deprivation? Get a copy of the birth certificate; pay particular attention to birth weight (under 6 lbs. indicates the infant was premature) and whether any of the mother's prior deliveries resulted in a stillborn child. Find out if the mother took drugs or alcohol during pregnancy, either of which can result in brain damage to the fetus (fetal alcohol syndrome). If the family was poor, ask about the mother's nutritional intake during pregnancy and whether or not she received pre-natal care.

**b. Major Illnesses**
Scarlet and rheumatic fever, pneumonia, meningitis, infections, and even measles can cause high fevers resulting in brain damage.

**c. Head Injuries**
Any head injury resulting in a loss of consciousness must be thoroughly investigated. Head injuries can result from accidents, abuse or fighting, or be self-inflicted. Get the hospital or medical records.

**d. Other Medical Trauma**
An illness or injury in early childhood may have had psychological effects. Medical trauma before the age of six disrupts normal emotional development. It may have required separation from the family during the critical period of bonding and attachment in the

first three years; this can have long-term negative effects on psychological development. The pain and fear associated with medical trauma are a lasting destabilizing influence. Also, the child may have become a scapegoat if the family is dysfunctional.

**e. Scars, Bumps and Indentations**
Learn about every serious illness or accident in your client's life; document them through medical records and interviews with family members and acquaintances. Ask to see any scars the client has, and ask how he got each one. Feel the client's head for any bumps or indentations. Look for any signs of asymmetry in facial features or physiognomy.

### 5. Psychological History

It is surprising how many times a capital defendant has gone through trial, appeal, state post-conviction, and a federal habeas petition before someone finally realizes that he has a history of psychiatric problems dating back to childhood. Explore the following areas with the client, family and friends:

**a. Prior Evaluation, Treatment or Institutionalization**
Prior psychological evaluations and institutional records contain some of the most valuable clues to why the client was turned into a violent individual. Review all records from schools, juvenile institutions, hospitals, court files, penal institutions (including county jails), and private mental health practitioners.

Prior psychological evaluations and institutional records contain some of the most valuable clues to why the client was turned into a violent individual

**b. Family Psychological History**
Some problems are inherited. Inquiries should include grandparents as well as parents, uncles and aunts, siblings, cousins, etc. Alcoholism, epilepsy, schizophrenia, dyslexia, learning disabilities and even antisocial personality disorder have been shown to have some connection to genetic inheritance. If a member of the defendant's family has been institutionalized, investigate the circumstances. Sometimes one or both of the client's parents will be described as "high strung" or "nervous," or will have been prescribed medication for "moodiness" or "bad temper." These are euphemisms for mental problems. A family member with neurological or psychological disorders not only signals the fact that impairment is in the client's gene pool, but also that the family may be dysfunctional.

**c. Symptoms**
The final part of the Mitigation Evaluation form (Appendix A, this chapter), contains a symptom checklist along with a glossary explaining what each symptom is and what kinds of impairment it may indicate. Familiarize yourself with this checklist, and use it to conclude your interview on mental health issues. It should take 30 to 60 minutes to go through the list, because you must explain each symptom in order to get accurate answers.

Chronic substance abuse can result in brain damage and psychological disorders

### 6. Drugs and Alcohol

Alcohol and drug abuse are prominent features in most forms of criminal behavior. Voluntary intoxication is not a defense to crime, but it can be a significant mitigating circumstance, particularly if the substance abuse started in childhood or adolescence, and even more so if the defendant's parents were substance abusers. Chronic substance abuse can result in brain damage and psychological disorders.

Ask about the types of drugs and alcohol the client has used, the amounts, the frequency, and any reactions, such as blackouts or mood changes. Establish the date, location and significant counselors or doctors involved in any rehabilitation program in which the client has participated.

Obviously, you want to know what substances the client ingested before committing the instant offense, and whether he was still high or in withdrawal when he was arrested or gave statements to the police.

### 7. Military Experience

If your client was in the military, establish whether he was in combat, the rank received, skills learned, where stationed, nature of duty, and the type of discharge received. Post World War II vets may have been exposed to atomic radiation during testing; Vietnam vets may have been exposed to Agent Orange or other hazardous chemicals: either could produce physical or psychological problems. Carefully investigate any form of recognition, either positive or negative, and any combat experience.

### 8. Work History

What kind of jobs has your client held? Has she been a productive member of society? Has her employment exposed her to hazardous chemicals or stress? Make a list of every job the client has ever held, the employer, and a contact person who knew your client.

### 9. Criminal Record

Carefully and comprehensively review this area, which will be critical to aggravation or mitigation. Using a rap sheet, establish the place, time, actors, legal disposition, and present status of each prior offense. If previous convictions resulted in probation, establish the name of the probation officer or other individuals involved in the case.

### 10. Institutional Record

Because the bottom line of any sentencing hearing is the choice between death and confinement for life, your client's performance during previous institutionalizations could be crucial. Establish dates, institutions, and personnel pertinent to the time of incarceration. How many disciplinary write-ups were received? What rehabilitative programs were completed?

How did the client exit from the system? Is there a staff person who would vouch that the client is a model prisoner and presents no threat to guards, inmates, or any other member of the prison community?

**11. Significant Others**
This is a broad heading that includes any number of people. It may be the scout master who knew the client as a child, or the aunt and uncle who stepped in when parental care was woefully inadequate. Often it will be a social worker, probation officer, or some other state-designated person who had a profound effect on the client at an especially difficult time. Don't think only in terms of positive people. The most significant person may be the relative who sexually abused the client or an older friend who manipulated him into committing crimes. Spend some time beating the bushes of your client's memory to flush out this person, who could be a real key.

**12. Religious Background**
Thinking that some minister will persuade the jury to save the client's life because of a religious conversion or because she is "basically a good kid" is a fantasy. It is important, however, to establish the client's religious background and churches attended, and identify any significant individuals in the client's life. Often, these witnesses can help shift some of the blame back onto the parents or someone else who stunted the client's moral development.

**13. Geography**
In gaining an adequate picture of the client's life and especially when trying to contact witnesses or gather documents, it is important to know where the client lived and when. Work out a careful chronology of the places where the client lived and the timing of the moves. When and why your client moved could be significant in understanding him. Beyond simply locating the sources of information, proof that the client's family was constantly moving can be a mitigator: it may indicate a terribly dysfunctional family, or the movement itself could have affected the client's development.

**14. Particular Skills or Talents**
The main thing the jury is going to know about your client is that he killed someone. Explore any of your client's interests that may humanize him to the jury. If a juror shares a particular interest or skill, she may have greater insight into your client as a human being.

As you converse with your client and explore these areas, "chase rabbits." If a sub-topic of interest surfaces, such as a particular childhood event, chase it down to its final conclusion. Even if it proves to be a dead end, it will help build rapport, and you will gain a broader understanding of the person whose life is in your hands.

Work out a careful chronology of the places where the client lived and the timing of the moves

Of all the things you carry into the initial conversation, the most important is a stack of information release forms

## B. Once Is Not Enough

Don't expect to find everything in one visit or one interview. Your probing questions will dislodge an avalanche of memories and feelings that will continue long after the interview ends. Go back a few days later, re-open areas of special concern, and probe deeper into areas that hold particular promise. Make sure the client can contact you whenever he remembers an incident or a helpful person; get clearance from custodial authorities for easy telephone or other access. Challenge the client in subsequent visits to unearth new information or to reinterpret information already shared.

Realize that certain information such as sexual abuse or drug problems will not be easily shared with a stranger. It may take weeks or months of intimate contact before the client shares some deep, painful secret that may be the key to understanding his violent or bizarre behavior. It is your job to nurture the environment of trust that will allow this sharing to take place.

## C. Collecting Paper

Of all the things you carry into the initial conversation, the most important is a stack of information release forms. While memory can be faulty or subjective, documents from schools, hospitals, drug programs, the military, community programs and other agencies, programs, and organizations can offer a concrete record of the client's past. In this age of cradle-to-the-grave documentation, you will be amazed at the volume of paper relating to your client, especially if he has had contact with the criminal justice or social service system.

The release forms must be signed and delivered to the proper agencies immediately. Bureaucratic organizations are notoriously slow at processing requests and providing information. Some agencies, such as the Veterans' Administration, require special forms.

Given that your client may have been involved with the agency fifteen or twenty years ago, the search through old files can take weeks, maybe months. Once you have filed the release forms, call the agencies weekly to make sure they are searching for the information; if it is a government agency, call your congressperson to help expedite matters. The last thing you want is to receive a document that diagnoses your client as brain damaged three weeks after he has been sentenced to die. Start collecting paper immediately.

Many institutions that have had contact with your client will have documentary records in different locations within the institution or the statewide or national system. The Tennessee Department of Corrections has records at the administrative offices and at each facility where the client was incarcerated. Individual custodial facilities have separate records for disciplinary proceedings, medical history, and program participation. Psychological records may or may not be included in the medical records. Whether it is the Tennessee DoC or some other monolithic institution, counsel must ferret out all records.

In some instances, subpoenas or court orders may be needed. Find out as soon as possible how to get all records, and get necessary court orders signed by the trial judge.

As the paper starts coming in, scour it for the names of people who have had a professional relationship with the client. Unlike family members, whose obviously biased testimony is suspect, the jury will listen to the testimony of a professional who brings a more objective perspective to the stand. Add these names to the list of people you get from the client during your interviews.

A convenient way to organize the documents is to punch holes and store them in a looseleaf folder in chronological order. It is also helpful to have the documents reviewed by a sympathetic person familiar with the particular institution's procedures. Programs or organizations often remove documents that are unflattering to the institution but may be invaluable to the client; careful review by an experienced eye will catch these omissions.

Though it is more convenient to have family members come to your office, your time will be more productive if you meet them in their homes

## D. Family and Friends

From the list of people gathered through conversations with your client and culled from the various records, make a list ranking people by their importance in the case. Family members are usually the primary source of helpful information, and should be interviewed as soon as possible.

Though it is more convenient to have family members come to your office, your time will be more productive if you meet them in their homes. Encourage several family members to meet with you at the same time in the home that has been the defendant's primary residence. This will not only save a great deal of time, but the dynamics of the family group will also give you insight into the way the family operates, and spur a greater flow of information. Relaxed among themselves, the family is more likely to speak freely about events and individuals than when interviewed separately. You are also more likely to get valid information, because people will often correct misinformation offered by other family members. And in the ambience of the home, surrounded by pictures and memorabilia of the family's past, you are more likely to stumble across valuable information while absorbing a feel for your client's history.

There are definite exceptions to conducting family interviews in this manner. Topics such as child abuse or sexual irregularities will not be freely discussed in the presence of the guilty party. Target a family member who seems particularly articulate or candid, and contact that person at a later date to explore sensitive topics. As with your client, you may need repeated interviews with some family members, especially if you may use them as witnesses to mitigation.

As you work your way through the family interviews and into interviews with other priority people on the list, be attentive to gathering names of other people or places that may provide information. You will not be able to interview every person mentioned, but constantly evaluate your priority rankings and work your way as far down the list as possible. Keep a looseleaf witness book with a

You will never know whether the victim's family is open to a sentence less than death without contacting them

face sheet on each person, notes from your interviews, and any other information or pertinent documents.

## E. Previous Counsel

To rebut an aggravating circumstance or gain additional insight into the client and his criminal behavior, contact all lawyers who have previously represented him. You may get ammunition to attack an infirm guilty plea underlying an aggravating circumstance. The actual facts of an aggravating crime may be much less onerous than the cold statutory classification of "manslaughter" or "armed robbery," and though it may not undermine the status of the offense as an aggravator it may diminish its impact on the jury. Prior counsel may have psychological evaluations, institutional records or insight into the family that will significantly reduce the amount of investigation required.

## F. The Victim's Family

All too often, counsel ignores the single most important entity that can save the defendant's life: the victim's family. In many cases the victim's family wants the defendant killed, but in a surprising number of cases, they will consider a less onerous sanction. There can be many reasons for the victim's family to desire a sentence less than death:

- There may be undesirable elements of the crime or the victim's lifestyle that the family does not want played out in the media.
- They may want to avoid the sordid details of how their loved one died.
- Some may want to avoid the protracted capital proceeding and put the matter behind them through a swift plea negotiation or a non-capital trial, whose litigation life is a fraction of that of the typical capital trial and appeal.
- A few may actually feel compassion or forgiveness for the defendant, and for humanitarian or religious reasons oppose the death penalty.

You will never know whether the victim's family is open to a sentence less than death without contacting them. Before trying contact, discreetly investigate the family. From the victim's obituary you can learn relatives' names, the name of a minister who may act as a mediary, and other pertinent information that will help you develop a strategy for establishing contact.

Though there are many ways to approach the victim's family, some suggest that the best way is to introduce yourself within the safety of the courthouse, explaining your role as defense counsel. The family may be unfamiliar with the legal system, and may see this overture as a normal part of the process. Do not try to discuss substantive issues in this initial encounter: just establish contact and begin putting the family at ease with talking with you.

The next contact should be by handwritten letter asking to meet with the family, personal contact, or through a mediary. If personal contact is attempted, do not call the family first (which would provide an opportunity to refuse contact or check with the prosecutor), but simply drop in at the family home and take advantage of the fact that people tend to be polite, or may welcome the opportunity to vent their frustration about the defendant, defense counsel or the whole criminal justice process.

Others use a strategy that includes circuitous contact through a minister or friend of the family. Though this approach is less threatening, it can also be less successful as many families will refuse contact if given the opportunity.

Regardless of the technique used, the initial contact should be made in a professional and compassionate manner with every expectation that it will be an uncomfortable and emotional encounter. It is better to let the family vent in the privacy of their own home than in an open courtroom. Be prepared to explain the role of the defense in a capital proceeding, and, through discussion, try to discern how they might be swayed to accept a sentence of life. Though the prosecutor is not bound by the family's wishes, their request that death not be considered will carry a great deal of weight and may result in a plea offer. If a plea is not offered, there have been cases in which the victim's family has testified during the sentencing hearing on behalf of the defendant.

It is better to let the family vent in the privacy of their own home than in an open courtroom

## G. Putting It All Together

As you proceed through your interviews and study the documentation you have gathered, you will find it necessary to order the wealth of material into some coherent form.

### 1. Chronological Chart

Construct a chart in which the various factors explored (medical, psychological, family, etc.) are listed in a vertical column on the left hand side of a wide sheet of paper. The years of the client's life are in a row on the bottom of the page from the column to the right side of the sheet. Events are recorded at the intersection of category and year. Listing information in this way will help you discern a pattern or a pivotal event that shaped the client's life. This chart can also be used as demonstrative evidence to show the jury how the defendant's life was shaped by a series of events.

### 2. Social History

Supplementing the chronological chart should be a detailed social history tracking and expanding upon the incidents documented on the chart. This social history is the beginning of the "story" you will present to the jury that explains who your client is, the events and people that have shaped her life, and how that unique shaping may have resulted in the murder for which she is on trial. The social history will also help you decide what types of psychological experts to employ, and will be invaluable to the experts evaluating your client.

If your client has had illnesses, accidents, or head injuries, or experienced seizures, blackouts, fainting spells, loss of balance, perceptual distortions, memory or attention problems, you must consider brain damage as a probable cause for his violent behavior

**3. Institutional Records**
Supplementing the social history should be a notebook containing all institutional records in chronological order. The social history can refer to specific sections of this archive and establish an objective and substantive "look" to the social history. By organizing documents in this way, you can begin making sense of the client's institutional pattern and formulating a strategy regarding which documents should be entered into evidence.

**4. Witness Book**
If the case has been investigated to its full potential, you should have voluminous notes and scores of witnesses. Organizing these notes into a witness book will facilitate access to the information needed when formulating a trial strategy. Some practitioners organize their notebook with a master list in the front identifying all witnesses, whether prosecution or defense, and a short blurb on the nature of their testimony. Within the notebook, witnesses are listed alphabetically or by topic, with a separate face sheet listing pertinent information. Behind the face sheet are filed interview notes, police statements and evidence that will assist in formulating a defense strategy or facilitate examination of the witness.

**5. Family Tree**
If hereditary mental health problems or severe family dysfunction develops as an issue, constructing a genealogy or family tree can be very helpful. Genealogists are readily available in the yellow pages; simple yet effective computer genealogy programs are also available. Showing that mental institutionalization is four generations deep or cuts a wide swath through several generations could demonstrate to the jury some of the handicaps faced by the client.

**6. Psychological Diagnosis and Expert Assistance**
Using the social history and the client's responses to the Symptom Checklist (Appendix A, this chapter), refer to the diagnostic "tree" for antisocial aggressive behavior (Appendix B, this chapter). The diagnostic tree is a tool for mental health professionals which is contained in the Diagnostic and Statistical Manual for Mental Disorders (the DSM). Its purpose is to "rule out" possible causes for antisocial or aggressive behavior. It is prioritized by causes that should be considered first as possible explanations for the behavioral problem.

**a. Organic Brain Disorder**
The first and most important is organic mental disorder, i.e., brain damage. If your client has had illnesses, accidents, or head injuries, or experienced seizures, blackouts, fainting spells, loss of balance, perceptual distortions, memory or attention problems, etc., you must consider brain damage as a probable cause for his violent

behavior. This means that the client must be evaluated by a neuropsychologist or neurologist; make the request pursuant to TCA § 40-14-207(b).

**b. Mental Retardation**
Similarly, if school records indicate a low I.Q., learning disabilities, or other cognitive impairments, you cannot rule out mental retardation as a possible cause, and you need to consult with an expert in that field.

**c. Psychotic**
If the defendant has experienced hallucinations, delusions, explosive outbursts of anger, unpredictable mood swings, suicidal tendencies, or bizarre behavior, you cannot rule out psychosis as a possible cause (especially if other family members have a history of mental illness), and you need the services of a clinical psychologist or psychiatrist.

**d. Personality Disorder**
If the defendant's childhood was beset with family problems such as described above, he may well suffer from a personality disorder. You must consult with a psychologist who is knowledgeable about childhood development and childhood disorders.

Conducting your own initial investigation of mental health issues allows you to identify the types of experts you need to consult with, and enables you to intelligently direct them in terms of the particular legal issues that are central to the defense (e.g., voluntariness of a confession, waiver of rights, specific intent, or mitigation for sentencing).

Give the expert a comprehensive social and medical history of the client before the evaluation. Put the expert in touch with significant people, such as family members, who can provide the data necessary for an accurate analysis.

You cannot simply hand the client over to the expert and sit back and wait for the results. The expert doesn't know what you, as a lawyer, need from him. You must participate and direct him to the important areas.

Developing mental health issues as evidence at trial is an ongoing process that requires participation by all members of the defense team—lawyer, investigator, and expert(s). Don't remain aloof from this effort. If this was a six-figure product liability case you would be learning all about the allegedly defective product and how it was designed, manufactured, and distributed. The "product" in a death penalty case is the defendant's mind, and you must familiarize yourself with the defects that contributed to his violent behavior.

You cannot simply hand the client over to the expert and sit back and wait for the results

The most valuable role fact investigation can play in a capital case is to bolster your sentencing defense

## A. The Goals

Investigating the facts in a capital murder goes far beyond the traditional goal of undermining the allegations of guilt. Fact investigation achieves three separate potential goals:

### 1. Prove Innocence

Innocent people do get indicted for capital murder and innocent people do end up on Death Row. The pressure to solve a high-profile murder case can become so intense that the police and prosecution will construct a case on flimsy, circumstantial evidence, questionable snitch testimony, or weak, coerced, or coached eyewitness identification. Though this questionable evidence might not persuade a normal jury, the process of death qualification, linked with what are probably the grotesque facts of the murder, almost ensure that the jury will accept the prosecution's case without question.

In the drive to make their case, the police and prosecution may ignore or suppress evidence that is inconsistent with their theory of the crime. Witnesses who have contradictory testimony, physical evidence that doesn't fit into the puzzle as they construct it, or time factors that would make it difficult for your client to have committed the crime are dismissed or even hidden. Only through your own careful fact investigation can this information be discovered and used to prove your client's innocence.

### 2. Diminished Responsibility / Lesser Degrees of Homicide

Though your client may be culpable in some measure for the crime that occurred, careful investigation can seriously diminish the degree of culpability.

Investigation may reveal that although your client was present, it was the co-defendant who instigated the crime and carried out the murder. Investigation may reveal that your client was under the influence of alcohol or drugs, that the murder resulted from a lover's quarrel, or that there was an element of self-defense in your client's decision to kill. Homicides in certain communities, such as prisons or complex drug cultures, often have elements not readily apparent to "freeworld" or "straight" members of society: what looks like an unprovoked, premeditated murder may have been a preemptive act of self-defense.

### 3. Consistent Guilt and Sentencing Phase

The most valuable role fact investigation can play in a capital case is to bolster your sentencing defense. For example, you may be able to prove that there was no underlying felony of rape or robbery, or rebut claims that the murder was committed for remuneration.

Information about how the crime occurred, the client's demeanor during the offense, or what he did afterward can also go toward mitigation. The specific series of events triggering the act of homicide may support a defense of post traumatic stress syndrome. The way the client was

influenced by others may demonstrate how his mental retardation makes him susceptible to adverse influence or domination. Though the fact investigation information does not prove the client innocent, or even diminish his responsibility vis-a-vis first degree murder, it can support or supplement mitigation.

A final dividend of fact investigation is the mitigating circumstance of lingering doubt. Though the jury may be convinced beyond a reasonable doubt that your client committed this terrible crime, there may be enough lingering doubt to persuade them to opt for a revocable sentence of life rather than the ultimate sentence of death. In a closely contested case, any doubt, no matter how minute, can result in a sentence of life.

Don't trust that the police gathered every piece of information... have revealed every piece of information they gathered... have interpreted information properly

## B. Areas of Investigation

Don't take anything for granted. Don't trust that the police gathered every piece of information. Don't trust that the police have revealed every piece of information they gathered. Don't trust that the police have interpreted information properly. Second guess them at every turn, go places they didn't go, and enlist your own experts in interpreting the physical evidence and testimony.

The remainder of this section is an annotated checklist of areas to consider in investigating your case. Though in many circumstances you will be in the role of rebutting or impeaching the testimony of a state witness regarding ballistics, blood spatter or some other forensic area, be prepared to go on the offensive and enlist your own expert to prove your client's innocence or minimal involvement in the offense.

### 1. Crime Scene

Though you probably will not be able to visit the crime scene immediately after the offense, do so early in the investigation. Beyond playing out the crime in your mind to see what versions may be consistent with the physical surroundings, pay attention to the following factors:

#### a. Site Security

Is the crime scene in an area where evidence was secure and protected from tampering or removal? What procedures did the police use to ensure site security?

#### b. Evidence Collection

Determine if the following areas were investigated, and whether your perceptions match the written report:

**(1) Doors**

Were they locked or bolted? Were there signs of forced entry? Is there a doorbell or knocker, and can it be heard inside the house or in a neighboring apartment?

Is the ashtrays' content consistent with the smoking habits of the residents, defendant or some other suspect

**(2) Windows**
What type of windows? Were they locked? Are there signs of forced entry? If the window was broken, by what, and is the glass inside or outside? What shape are the curtains or blinds in? Can someone see in from outside, or vice versa?

**(3) Lights**
Were lights on when officers arrived? Which ones? If the lights were off, were they checked for warmth? Can lights be seen from outside? Could identification be made under the lighting conditions?

**(4) Odors**
Was there any trace of gas, tobacco, alcohol, perfume, gun powder or other identifying odors?

**(5) Kitchen**
Was food being prepared or eaten? What kind, and does it correspond with food found in the victim's stomach? Was water running or the stove on? Was there a full or empty coffee pot or used utensils?

**(6) Temperature**
Was the heat or air conditioner running? If so, was it at an unusual setting? How would the temperature affect the temperature of the body and time of death estimation?

**(7) Signs of Party**
Does anything indicate the presence of more than one person – accumulation of bottles or cans, cigarette butts, cups, etc.?

**(8) Ashtrays**
Is the ashtrays' content consistent with the smoking habits of the residents, defendant or some other suspect? Any lipstick or other residue on butts or identifiable matchbooks? Any evidence of drugs such as marijuana butts or cocaine residue?

**(9) Wastebasket**
Has anyone rummaged through waste, and do the contents reveal anything about events leading up to the murder or the identity of people involved? Check papers for dates, addresses or other identifying characteristics.

**(8) TV /Radio**
Was either on when the body was discovered? Tuned to what station? Is it consistent with other witnesses' versions?

**(9) Clocks**
Establish the status of all time pieces and whether any are stopped at a particular time, plugs pulled, evidence of power loss (blinking digital clock), or an alarm set for a particular time.

**(10) Bath and Toilet Area**
Are any towels or rags blood or semen stained? Was something washed down the sink or commode? What were the contents of medicine cabinet, hamper and toilet bowl?

**(11) Weapons**
What weapons were found at the scene? Were they used in the offense? If not, were they available to the victim or defendant? Does the presence of a weapon indicate that the victim was armed, not afraid of the assailant, or instigated the violence? Did the defendant bring the weapon to the scene, indicating intent, or obtain it later?

**(12) Personal Effects**
Try to get access to the victim's phone directory, beneficiaries of life insurance policies, presence or absence of jewelry or other items that may indicate burglary, and pictures or other indicators of possible suspects or things that demonstrate a relationship between your client and the victim.

**c. Witness Interrogation**
Ask neighbors or merchants in the area what they heard or saw. Did the police interview them? Is their version consistent with the state's theory? Is the state going to use them as witnesses? Have they been coached, or did the police use leading questions or show pictures that pre-disposed them to identify the defendant? Could a language barrier influence the content of the interrogation? Are there tapes of the interview, and can you get them from the police?

**d. Photography/Sketches**
Photograph and sketch the area so you can talk about it with your client. A seemingly innocuous aspect of the physical setting may be significant to the client and support her version of events. When taking photos, include a person or a common object to demonstrate the size of items in the photo or the distance between two points. Compare your pictures or sketches with police renderings to ensure accuracy on their part. Using your diagram, illustrate the known testimony of the various witnesses to discover any contradiction or improbabilities to their testimony.

**e. Time of Day**
Visit the site at the time of the alleged crime. The lighting may cast doubt on eyewitness testimony, or you may discover a witness, such as a bus driver or mailman, who is only around at that particular time.

A seemingly innocuous aspect of the physical setting may be significant to the client and support her version of events

Clip all obituaries of the victim(s). These will reveal the next of kin, significant friends and a clergy person, who may become integral parts of your negotiation strategy

**f. Chain of Evidence**
Find out police procedures for gathering and marking evidence. Are the procedures endorsed by the TBI or FBI? Follow the chain of evidence to ensure that it was not broken regarding some critical piece of evidence.

**g. Other Acts**
If the prosecution is alleging other felonious acts such as robbery or rape, search for rebutting evidence or testimony. There may be evidence that the victim was a willing partner in the sex act and the murder grew out of a jealous quarrel that followed.

If the defendant may claim she was acting in self-defense or did not fire the lethal shot, a careful search of the crime scene and talking to witnesses may reveal discrepancies. Bullets that differ from the client's gun, or testimony concerning the victim's volatile temper and propensity for violence, may support a theory of self defense or non-triggerperson.

**2. Objective Accounts**
Newspapers and TV and radio stations have pertinent "facts." Reporters may have interviewed witnesses or made observations that conflict with the official "facts" supported by the police investigation. Videotapes may verify the location of the body or weapon or another important aspect of your theory.

You also need to be collecting media reports to bolster any change of venue request or to assess what types of (mis)information are being distributed.

**a. Newspapers**
Collect clippings and index them by evidence or witnesses mentioned. Pay special attention to diagrams and artists' renderings of the alleged perpetrator.

**b. Obituary**
Clip all obituaries of the victim(s). These will reveal the next of kin, significant friends and a clergy person, who may become integral parts of your negotiation strategy. They may also reveal a particular charity or interest of the victim that may show a predisposition against the death penalty.

**c. Videotapes**
Videotapes may contain an unsanitized version of events, before the police adjust the evidence to fit their theory. Most TV stations will provide a copy of any news report for the cost of a blank tape. Get a list of times the report was run on local TV.

> There used to be lies, damned lies, and statistics; now there are lies, damned lies, and forensic evidence.

**d. Magazine Articles**
A surprising number of murder cases "go national." The proliferation of pulp magazines results in articles being syndicated nationally, especially if the defendant has been on the run or the crime has gone unsolved for a long time.

**e. Radio Tapes**
Beyond basic news reports, your case may have been the topic of call-in talk shows. Someone may have called in with new, prejudicial, or erroneous information that could taint your jury pool.

**f. 911 Tapes**
In a recent Tennessee case, the defendant was convicted using a taped but muddled conversation between a police dispatcher and the victim; tape enhancement improved the quality enough that, the state argued, the victim could be heard calling the defendant's name. Though this may be a unique case, the time and content of 911 calls can reveal facts of the crime and the sequence of events. Obtain copies of all pertinent tapes and, if content is an issue, have them enhanced.

### 3. Forensic Evidence
There used to be lies, damned lies, and statistics; now there are lies, damned lies, and forensic evidence. Don't let the "scientific" evidence discourage you from investigating the case and questioning the validity of the supposedly scientific basis and procedure used in some forensic sciences.

On the other hand, if some element of forensic science supports the defense theory, don't hesitate to build a case using those experts who traditionally testify on behalf of the prosecution.

**a. Autopsy**
There is usually little probative value in an autopsy beyond allowing the prosecution to introduce shocking and grotesque pictures, diagrams, testimony and even body parts into the trial. Even if the autopsy is not going to play a major part in your trial, gather certain information:

**(1) Pathologist Credentials**
In many counties, autopsies are performed by people with little or no forensic training. Conclusions on time or cause of death may be totally uninformed speculation. Find out as much as possible about the pathologist's credentials, and try to keep the jury from hearing false or unprofessional information.

**(2) Procedures**
Were body temperature and other indices of time and death determined at the scene? Was the body tampered with or moved before pictures were taken? Was the standard autopsy procedure

Guilt may be brought into question if the weapon is more directly connected to another suspect or co-defendant

followed? Is there a different procedure for homicides? How are body tissue and fluid gathered and tested? What is the chain of evidence?

**(3) Time/Date of Death**
If the time of the offense is debatable and affects the client's alibi, the way it was established can be critical. Did the pathologist use only one factor, such as body temperature, or a combination of body temperature, rigor mortis and stomach contents? Was there any conflict between the various methods of measurement? Were there variables, such as the body being in water, that make time of death determination difficult? If the body was found after months of decomposition, what method was used to approximate the date and time of death?

**(4) Cause of Death**
Though this may be obvious in most cases, in some it may play a major role. Knowing that the victim died of strangulation before the body was mutilated may avert a claim of heinous, atrocious and cruel. The original autopsy may identify the murder weapon as something other than that claimed by the police. A usually non-fatal wound may indicate that the killing was not intentional, whereas multiple stab wounds or mutilation may indicate a grave psychosis justifying a defense of insanity or diminished capacity.

**(5) Other Activity**
Rape: Does the autopsy indicate rape? Was semen present? Does it match your client? Any sign of forcible entry?
Torture: Are there non-lethal injuries evidencing torture, or defensive wounds on the hands and arms? If the state is trying to prove child abuse, are there old bruises, burns or cuts, indicating a history of battery?
Mutilation: Mutilation can turn an ordinary murder into a capital case. Establish whether it is actual mutilation or damage done in disposing of the body or destroying evidence.

**b. Manner of Death**
The weapon and the way it was used can profoundly affect both the guilt / innocence and sentencing phases. Guilt may be brought into question if the weapon is more directly connected to another suspect or co-defendant. The jury may return a sentence of life if it perceives that a single gunshot wound did not constitute torture or prolonged premeditation, while administration of poison over a period of time may have the opposite effect.

(1) Guns

**Identification**

Establish ownership of the gun, how your client may or may not have had access to it, and valid reasons why your client had a gun.

**Ballistics**

Was this the gun used in the offense? Are the methods used to identify the murder weapon beyond reproach? Was a residue test done on your client or co-defendants? If so, who fired the gun? Is the type of bullet found consistent with the state theory of both why and how the murder was committed? (Would someone use a .22 instead of a .357 in a premeditated murder?)

**Path**

How far from the victim was the gun when the shot(s) were fired? Is the pathologist's or ballistics report consistent with other physical evidence or eyewitness testimony? Are the entry and exit wounds consistent with the alleged murder weapon and the state's theory? Could the wounds suggest some type of struggle, or rebut the allegation of an execution style killing? If the bullet passed through the body or there were missed shots, is the bullets' location consistent with the state theory?

(2) Knives

**Identification**

While one can match a bullet to a gun, alleging that a particular knife or other sharp instrument was the actual weapon without additional corroboration is suspect.

**Wound**

The nuances of a slashing versus a puncture wound may be lost if not carefully investigated. The nature of the wound may indicate a defensive struggle, an intent to maim or disable but not kill, that the wound was inflicted by a left or right handed person, that a person of the defendant's size could not have inflicted such a forceful blow, or torturous or repeated blows indicating a psychosis that requires in-depth psychological evaluation.

(3) Battering

**Weapon**

Was a weapon involved or was the wound inflicted by a hand or foot? If an instrument was used, is it something commonly thought capable of inflicting lethal wounds?

**Duration**

Is there valid evidence that the battering occurred over a long period? Are there old wounds or bruises, or previous complaints to police or human services? Does physical or documentary evidence suggest that anyone else was responsible?

The nature of the wound may indicate a defensive struggle, an intent to maim or disable but not kill, or that a person of the defendant's size could not have inflicted such a forceful blow

Investigate all aspects of how the fluids were gathered, the chain of evidence, the testing and typing process, and the experts' credentials

**(4) Poisoning/Overdose**

**Poison Type**

The type of poison may have been unavailable to the client, suggest a self-inflicted overdose, or indicate some other individual as the primary killer.

**Duration**

Some poisons are administered over a long period of time, indicating a degree of premeditation that may adversely affect claims of insanity or diminished capacity, or raise questions about the degree of the victim's suffering.

**(5) Asphyxia**

**Strangulation**

The manner of strangulation can influence a jury. Use of exotic materials such as panty hose or a coat hanger shows a degree of depravity that many jurors find worthy of death. It may also indicate a psychosis that could develop into valid mitigation. Manual strangulation requires strength, and may eliminate your client as the killer. In the strangulation of a friend, acquaintance, or solicitor of prostitution, consider sadistic or masochistic sex practices that sometimes use near strangulation to enhance the sexual experience. Some victims strangle on cloth or plastic put in the mouth during a robbery or rape; search for any clues that strangulation was unintentional.

**Hanging**

Questions of suicide vs. homicide often arise after a hanging, especially in institutional settings. Review any evidence that may indicate suicide.

**Drowning**

Most drownings, whether in the open ocean or the family tub, are accidental. Look for evidence of accident, such as the absence of bruises, wounds or other indicators of a struggle. Also establish the victim's history of water safety and practices that may have contributed to an accidental death, such as recklessness, intoxication or drug use.

**(6) Burning**

**Cause**

People rarely die from burning. They may die from smoke inhalation, or be tortured with cigarettes before death, or the body and evidence may be destroyed by fire. Establish the particular role of the burning in the death, and discredit those aspects that the jury will find most heinous.

**Accident**
Like drownings, most burning deaths are accidental. If there is limited or questionable evidence of foul play, seek those aspects of the death that indicate accident. If the client was responsible for setting the blaze, seek evidence diminishing the client's culpability or knowledge that a death would occur as a result of her actions.

**c. Blood/Semen**

**(1) Typing**
Investigate all aspects of how the fluids were gathered, the chain of evidence, the testing and typing process, and the experts' credentials. If a positive match is made with your client, establish the percentage of the population with similar blood type, and identify any other suspects who meet the criteria.

**(2) Drug/Alcohol level**
The drug and alcohol level of the victim's blood may be as informative as that of the defendant. Establish the time the blood was drawn, and the levels and types of drugs in the bloodstream.

**(3) Spatter/Stains**
Spatter and stain evidence is popular with prosecutors because it has the dividend of showing the jury gory evidence. A defense expert should investigate and evaluate this evidence, and its validity and evidentiary value should be questioned. Litigate the evidentiary questions pre-trial, to avoid use of the evidence in court.

**d. Trace Evidence**

**(1) Hair**
Except through the use of controversial and somewhat suspect DNA testing (see section *), hair cannot be individualized; no one can definitively say that a hair sample comes from a particular person. Even such basic factors as sex and age cannot be determined. What can be determined is:

- Whether the hair is human or animal;
- The person's race;
- Hair color;
- Originating area of the human body;
- Whether the hair is curly, straight, naturally or artificially waved, dyed or bleached (growth since procedure), tapered, square or split ends;
- Whether it fell or was pulled out, or was burned, crushed, singed or stretched;

Except through the use of controversial and somewhat suspect DNA testing, no one can definitively say that a hair sample comes from a particular person

Even if the defendant's print is found, but especially if it is not, ask for a positive identification of the prints that are in evidence and their relevance to the offense

- The presence of foreign substances such as blood, semen, sweat, vaginal secretions and environmental matter such as powder, dust, metal filings, etc.

**(2) Fiber**

**Animal Fibers**

Animal fibers such as wool have the same characteristics as human hairs and can be identified with the same degree of accuracy.

**Vegetable Fibers**

Hemp, cotton, and other vegetable fibers are significantly different from animal fibers and possess a unique cellular structure.

**Synthetic Fibers**

Rayon, nylon, acetate and polyesters are manufactured from non-fibrous substances processed into fiber form. Though they lack scales or cellular structure, their unique structural formations are easily visible through an electron microscope.

**(3) Soil**

Soil is often scraped from the defendant's shoes or the victim's body in an attempt to establish presence at a particular site. Soil is a complex mix of earth materials, fossils, contaminants, debris and other organic and inorganic materials, and can vary widely even at a single location. By sampling multiple areas of the locale, police may be able to positively match the sample soil to the scene of the crime. Any samples should be taken from the top quarter-inch of soil, and scientific analysis should include:

- Color comparison of sample and soil from the crime scene that have been equally dried;
- Microscopic analysis of the contents;
- Matching of proportion of elements of the evidence and comparison sample.

**(4) Nail Scrapings**

Soil, skin, paint and any number of other elements may be found under the victim's fingernails. Critical here is the viability of the testing procedures given the minute amount of physical evidence; explore how much of a particular substance would be required under normal laboratory conditions.

**e. Prints**

**(1) Fingerprints**

The fingerprint is the cornerstone of most forensic investigations. If the defendant's print is recovered, establish exactly where it was found, and consider how it might have gotten there or how it may diminish the defendant's culpability. Even if the defendant's print is found, but especially if it is not, ask for a positive identification of the prints that are in evidence and their relevance to the offense. This may shift the suspicion to someone

else or increase the culpability of a co-defendant. In all cases, make sure all proper procedures were followed in collecting and identifying the prints, and that all personnel are qualified.

**(2) DNA "Fingerprints"**
The topic of DNA typing is too extensive and controversial to be covered in the amount of space allotted. There are several areas to be considered:

**Age of Sample**
Exposure to heat, ultraviolet light and bacterial contamination can affect the quality of the sample (but may not necessarily affect the validity of the test).

**Amount of Sample**
The larger the sample, the more accurate the results. For example, although testing may be possible with the root of a single hair, laboratory procedures usually require a minimum of ten hairs.

**Laboratory Procedures**
As you might expect, the process for matching DNA types is extremely complex and susceptible to error. The Technical Working Group on DNA Analysis Methods has been established to set minimum standards for DNA analysis; make every effort to ensure that the testing in your case meets these standards.

**(3) Bite Marks**
The conviction obtained by matching Ted Bundy's bite to a wound on one of his victims popularized this form of identification. Recognize that many jurors will relate any bite mark evidence to a Bundy type killing, and will consciously or unconsciously be influenced by this issue. Beyond the victim's body, police may try to introduce bite mark evidence gathered from food, pencils, styrofoam cups, or broken teeth or dentures. Police have also positively identified the bite of a victim on a perpetrator.

The characteristics studied by a forensic dentist will include:

- Size of the teeth, indicating the person's age and size.
- Spacing that establishes a distinct pattern.
- Angle of position, which enhances any pattern already established through spacing and size.
- Missing or broken teeth, which may enhance the pattern or provide positive identification by matching a tooth fragment with the defendant or victim.

**(4) Tire and Shoe Prints**
Prints of this type will be in the form of either a residue print left on a hard surface or an impression made in dirt, sand, mud, or, in a truly grotesque case, the victim's body. Simply because the

Simply because the tread pattern matches the defendant's shoes does not necessarily implicate that person; thousands or millions of shoes may have been sold with the same pattern

Scientific studies have been unable to establish that police have any additional skill at eyewitness identification

tread pattern matches the defendant's shoes or tires does not necessarily implicate that person specifically; thousands or millions of shoes and tires may have been sold with the same pattern. Consider each of the following factors in identifying a print:

- Design or tread pattern, which should be matched to a particular manufacturer.
- Length and width, which may impart information concerning the size of the perpetrator or the automobile.
- Shape, which may indicate a particular type of shoe or vehicle or show the degree of wear.
- Depth of imprint may reveal the person's size and whether they were carrying something, or the weight of a vehicle.
- Distance between prints reveals the stride of the person, whether they were running or walking, or the wheelbase of the vehicle.
- Manufacturer name is often imprinted on the bottom of shoes.

## 4. Witnesses

### a. Eyewitness

#### (1) Identification Procedures

Investigate police policy regarding line-ups and photo books. Check that instructions were not leading and that the other individuals or pictures presented for comparison resembled your client. If some particular feature had caught the eye of the witness, such as a blue shirt or torn pants, make sure your client was not the only person with this distinguishing trait. If pictures of your client were publicized before the identification, establish whether the witnesses were exposed to them.

#### (2) Witness Factors

Numerous factors specific to the witness affect ability to make an accurate identification. Investigate and evaluate how the following factors may have affected the witness's ability to make an accurate identification:

**Anxiety**

How did the witness respond to the stress of the crime? Is there evidence of hysteria, fainting, or other indication of panic? Are there any elements of chronic anxiety in the witness's life, such as depression, mental illness or an unstable personal life?

**Weapon Focus**

It is not uncommon for the witness of a violent crime to focus on the weapon and pay little or no attention to the perpetrator.

**Cross-Racial Identification**
The inability to make cross-racial identifications does not indicate racism: studies have shown that it is a trait inherent in most people.

**Age**
Young children have limited ability to identify adults and little frame of reference when making decisions concerning height, weight or age. Older adults often suffer from short-term memory loss, and may allow the police to "refresh" their memory in a very directive way.

**Sex**
Though there is no clear-cut difference in the ability of men and women to describe events or identify people, gender does play a role in what a witness can accurately identify: men tend to be more accurate regarding the appearance of males and the surroundings, while women tend to be more accurate about the clothing or actions of women. Likewise, discrepancies occur in areas where the culture delineates male and female roles: men may more accurately describe guns, while women may be more accurate concerning the color of a car. If the witnesses disagree, you may be able to use this to your advantage.

**Training**
Often, police officers or other people are afforded extra credibility because they are considered trained in identification or accurate rendering of events. In reality, scientific studies have been unable to establish that police have any additional skill at identification, and there is no credible training program to increase their accuracy.

**Alcohol and Drug Use**
Drugs and alcohol can seriously diminish one's ability to perceive the world accurately. Investigate any possibility that a witness was under the influence at the time of the offense.

**Importance of Event**
One is less likely to be able to positively identify someone who was encountered under seemingly innocuous or unremarkable circumstance, such as passing while entering a convenience store. The witness may then be especially vulnerable to suggestion by the investigating officer.

**Expectation**
Research has demonstrated that witnesses often have expectations going into a particular situation. If unsure, a right-handed witness will say the assailant held the gun in the right hand; if racially biased and the lighting was bad, they may identify the assailant as a black man.

The primary task in questioning an alibi witness is to test how his or her testimony will stand up under cross-examination

Though the snitch's culpability may equal or exceed that of your client, he or she was the first to the police and the conviction-hungry police have made their deal

**(3) Event Factors**
Physical factors of the crime also enhance or detract from one's ability to accurately perceive events or people:

**Duration**
Violent acts usually occur rapidly and unexpectedly. The shorter the event, the less accurate will be the witnesses' perception.

**Degree of Violence**
While it is generally thought that witnessing a violent act is "unforgettable," in reality the emotion experienced during the event is unforgettable but important details were probably never noticed. Those who witness a violent event are much less able to relate details accurately than those involved in non-violent events.

**Lighting and Distance**
It is not uncommon for the prosecution to use a witness who viewed the crime from some distance or under questionable lighting. Usually, the description offered by this person is not accurate enough to identify the perpetrator, but should someone be identified by physical evidence or other witnesses, this person is used to corroborate the evidence. Identification or accurate perception of events is very difficult under these conditions. Reconstruct the conditions under which the witness viewed the offense and evaluate whether a credible identification could be made.

**b. Alibi Witness**
The primary task in questioning an alibi witness is to test how her testimony will stand up under cross-examination. Credibility is the one thing you want to carry into the sentencing phase. Presenting an incredible alibi seriously diminishes the chance of a positive outcome at the sentencing phase. However, if the alibi testimony is corroborated by physical evidence it may provide that measure of doubt that can result in an acquittal or sow enough lingering doubt to ensure a sentence of life in prison rather than death. When interviewing and investigating alibi witnesses, gather information concerning:

**(1) Criminal History**
Any criminal history will rapidly diminish the witness's credibility. Document any previous convictions and try to develop some type of mitigating information that lends credibility to the witness's testimony.

**(2) Social Stature**
The testimony of a bank president carries more weight than that of an unemployed high school drop-out; evaluate social stature impact before selecting the witnesses.

**(3) Bias**
The best alibi witness had never met the defendant before the day in question, and has no vested interest in the outcome of the trial; on the other hand, the defendant's mother testifying that the client was home watching TV will carry little weight. Also, using family members as alibi witnesses effectively eliminates them as mitigation witnesses if the jury rejects the alibi.

**(4) Witness Quality**
In a sense, this is a catch-all for the already mentioned issues. An upstanding citizen with no criminal record and no perceivable bias is a high quality witness and should be used even if her testimony is strongly contradicted by physical evidence. One may not want to use the defendant's brother who is incarcerated no matter how much evidence corroborates his testimony. Credibility is too precious to waste on a witness whom the jury will dismiss.

**c. Snitch/Co-Defendant**
Somewhere in almost every capital case lurks a snitch. Though his culpability may equal or exceed that of your client, he was the first to the police with his version, and the conviction-hungry police have made their deal. In investigating the snitch, work in three different areas:

**(1) Deal**
Reveal the deal. Just what is the reward for the snitch's testimony? What were the circumstances of the arrest and interrogation? Might threats or promises have elicited a false story in order to save the snitch's own hide?

**(2) Credibility**
How many different versions did the snitch give before finally embracing the current one? Explore his entire criminal record, paying special attention to any instances of perjury. Is there a prosecutor from another jurisdiction who can identify the snitch as a lying, cheating opportunist? A rap sheet stretching from your up-raised arm to the floor will go a long way in discrediting the snitch.

**(3) Culpability**
This is where all your other crime-specific investigation comes into play. Can the weapon be traced to the snitch rather than your client? Do the nature of the wounds indicate a strong, left-handed person like the snitch rather than your small, right-handed client? Does the snitch fit the description of the perpetrator better than your client, or has the snitch told family, friends or cellmates some other version of the offense?

Drugs, prostitution, organized crime or other illegal activities by the victim may explain some element of the crime and reduce the defendant's culpability

The prosecution often construes the innocuous contents of a letter into some demonic code relating directly to the offense

**5. Victim**

Most attorneys are reluctant to investigate the victim's background. Often, however, this is an integral part of the crime, and although murder is never justified, the jury may be swayed to accept a lesser offense, or choose life over death. Areas to investigate include:

**a. Family**

Explore possible reasons why some family member might have killed the victim, and any connection between family members and your client or illegal activity.

**b. Occupation**

Might some aspect of the victim's occupation lead someone else to want the victim dead? Was the victim's lifestyle consistent with his occupation, or could he have been involved in illegal activity?

**c. Illegal Activity**

Drugs, prostitution, organized crime or other illegal activities by the victim may explain some element of the crime and reduce the defendant's culpability. If the victim was working undercover for the police or snitching out other criminals, you may be able to shift the guilt from the defendant to other people with motives for murder.

**d. Relation to Defendant**

Establishing this relationship may show that the defendant had no motive to kill, that the victim trusted the defendant, or that the defendant had previously assisted or protected the victim from harm. Document any significant interactions either to support innocence or to rationalize the killing as a crime of passion, a terrible accident or a truly insane act.

**e. Sexual Preferences**

As sordid and prejudicial as it sounds, information about certain aspects of the victim's sexual preferences can influence the jury. If there is some evidence that the victim was a willing party to the pre-murder sex act, other evidence of promiscuity may undermine an aggravating circumstance of rape. If the victim frequented homosexual bars and regularly employed male prostitutes, it may explain how the client came to be in the victim's home and defeat an underlying felony of burglary or robbery.

**6. Documents**

Physical evidence in the form of documents is an integral part of many capital trials. Obtain copies and evaluate the validity of each document and the consistency of the contents with the state's theory.

**a. Letters**
There are people on Tennessee's Death Row who were convicted and sentenced to death primarily on the contents of letters. Through discovery, obtain copies of these letters and analyze them.

**(1) Handwriting**
Does the handwriting match that of the alleged author? Does it indicate any duress, psychological problems such as split personality, illiteracy or spatial / dyslexia problems resulting in reversed letters or chaotic writing?

**(2) Typewriter**
If a typewriter was used, does the type match any typewriters available to the alleged author?

**(3) Content**
The prosecution often construes the innocuous contents of a letter into some demonic code relating directly to the offense. Through the defendant or the recipient, establish the letter's actual meaning; if necessary, use a linguistics expert to demonstrate possible confusion in meaning.

**(4) Paper**
Was the type of paper available to the defendant, or does it indicate some other author? Is the paper watermarked or otherwise identifiable? Are there staple holes or photocopying marks indicating the existence of originals or attachments not included? Can fingerprints be lifted? What do they reveal?

**b. Checks and Contracts**
A murder committed for remuneration is an aggravated capital murder. Often the evidence of remuneration is a check or money order for an alleged contract killing or an insurance policy purchased shortly before the victim's untimely demise. Establishing valid reasons for the transfer of large sums of money or showing that the purchase of the insurance policy was congruent with the defendant's normal financial dealings may eliminate this motive or at least the aggravating circumstance. If the document's validity is in question, hire a documents analyst or graphologist.

## 7. Confession
The existence of a confession does not automatically preclude any claim of innocence. Under the duress of police interrogation or due to illegal taping procedures, innocent people have given seemingly voluntary confessions. Confessions can and must be investigated and attacked.

Under the duress of police interrogation or due to illegal taping procedures, innocent people have given seemingly voluntary confessions

A polygraph has also been used in the sentencing phase to support a defendant's allegation that he was not as culpable as the snitch who had already gotten a life sentence as part of a plead-and-testify deal.

**a. Miranda Warning**
The obvious place to begin is with admissibility of the statement. Document all aspects of the arrest and incarceration that may have violated Miranda. Find out whether the police involved have any history of Miranda violations or have been disciplined for improper interrogation procedure or technique.

**b. Competence and Police Tactics**
Investigation should already have established the client's state of mind and sobriety at the time of arrest and his inherent intelligence and mental capability. Given the tactics of interrogation, could an individual of your client's limited intelligence, degree of intoxication or mental instability have made a coherent statement or fully understood the voluntariness of his act?

**c. Voluntariness and Police Tactics**
Rubber truncheons may be passe, but the police still have means to extract seemingly voluntary confessions from involuntary people. Just as there are textbooks on cross-examination, there are texts on interrogation. Establish the methods used in this case and be prepared to demonstrate how they took unfair advantage of your client's limited intelligence, intoxication, language barrier or confusion. As in Miranda, investigate the records of the police officers involved and any disciplinary actions or lawsuits that have been brought against them.

**d. Form and Condition of Confession**
If the confession is handwritten, whose handwriting is it? Did the police write it and the defendant sign it? If written by the police, is it legible? Might it have been altered after signing? Did the defendant sign every page?

**e. Taped Confessions**
Serious questions have been raised in some Tennessee jurisdictions concerning taping procedures. Recorders are often turned off and on, and the questions may not fit the answers. Allegations have been made that some law enforcement authorities splice tapes. Play the tape and read the transcript to the defendant to discover any irregularities. If the defendant feels the tape has been altered, digital analysis can reveal tampering.

**8. Polygraph**
Though a polygraph may not be admissible in the guilt phase, it can be used pre-trial to shift the state's emphasis to a more culpable co-defendant. A polygraph has also been used in the sentencing phase to support a defendant's allegation that he was not as culpable as the snitch who had already gotten a life sentence as part of a plead-and-testify deal.

### 9. Hypnosis

When a client who is obviously guilty maintains complete innocence it may be a case of extreme denial: the client is so ashamed of her acts that she has blocked all memory of the murder, and honestly believes the claim of innocence.

Hypnosis, in conjunction with a polygraph and some form of "truth serum" that lowers inhibitions, can be used to break through to the subconscious and release information about the offense. Though this information will not support a claim of innocence, the actual facts of the offense may offer some mitigation. Rather than a client who claims innocence in the face of overwhelming evidence, you have someone whose remorse is so intense that she is unable to face the results of her acts.

On the other hand, if the hypnotized and drugged defendant still maintains innocence, a videotape of the session may help convince a prosecutor or jury that the defendant is innocent or marginally involved.

Hypnosis, in conjunction with a polygraph and some form of "truth serum" that lowers inhibitions, can be used to break through to the subconscious and release information about the offense.

### 10. Wiretaps

Technology has given us not only audio-taped statements but videotapes of Marion Barry smoking crack and John DeLorean handling a suitcase full of cocaine. Once the legality of the tapes has been established, investigate two areas:

#### a. Procedures

Review the procedures used in the surreptitious taping to ensure that tapes were run continuously and that there are no "out-takes" that might alter the overall understanding of the tapes.

#### b. Content

In the DeLorean tape, the defendant was recorded making a deal while sitting in a room with a suitcase full of cocaine. He was acquitted when a linguist was able to demonstrate that he was trying to solicit money for his auto plant and all references to the cocaine and drug money made by the informant were politely acknowledged and rebuffed. Informants will try to draw your client into making damning statements that the state will construe as clear evidence that he was the primary actor in the offense. By carefully evaluating and establishing the actual content with your client and then having a linguist analyze the tape, you may be able to defuse the seemingly damning evidence.

The only weapon against a biased process is to investigate the nature of the bias, develop a factual basis of its existence, and put the court on notice that all decisions will be scrutinized in light of this demonstrated bias.

It is a rare capital trial that is not heavily influenced by extra-legal, political factors. The race, sex and status of the defendant and the victim have a profound effect on the choice to seek a sentence of death. The proximity of the trial to the election of a judge or prosecutor also influences the process. There may even by an exchange of funds or favors from the victim's family or co-defendant's counsel that skews the process against your client.

Whereas these types of practices may be the status quo and generally accepted in non-capital cases, counsel must expose any factors not directly related to a fair legal process that influence the outcome of the capital trial.

## A. The Judge

The broad latitude afforded trial judges allows them to define the playing field upon which the contest will take place. A racist, classist, sexist or otherwise biased judge will have plenty of opportunity to give the prosecution advantages that will be considered "harmless" errors.

The only weapon against a biased process is to investigate the nature of the bias, develop a factual basis of its existence, and put the court on notice that all decisions will be scrutinized in light of this demonstrated bias.

On the other hand, if investigation reveals a judge truly sensitive to race, class bias, handicapping conditions or other issues you will be using in the defense, you may want to stress these areas in pre-trial motions and the trial. Only through investigation can the judge's true nature be established.

### 1. Legal Record

Document any instances of demonstrated bias as a judge or when practicing as a lawyer. If the judge made racial slurs while prosecuting a case or has made statements demonstrating a bias against capital defendants, or yours in particular, find court records or witnesses. Make sure that the judge has had no prior contact with your client or worked in an office that prosecuted the client on a previous charge. One man on Tennessee's Death Row had a judge who, in prosecuting him seven years earlier, had referred to him as a slimy river rat.

### 2. Public Statements

When running for office, judges say what people want to hear. If in a presentation to the Kiwanis Club the judge assured the assembly that all murderers would go to the electric chair, document this evidence. Any public statement about your case warrants recusal. Any demonstrated ambivalence about the death penalty may indicate an opportunity to negotiate a plea or gain special latitude for funding or discovery.

### 3. Social Connections

Can a judge who belongs to a country club or church that excludes blacks or other minorities be fair in a trial in which a black has killed a white? Though you don't know the answer, you can at least raise the question

in open court. You can also question the judge's relationship to the victim's family or membership in various political or social organizations. If organizational or religious affiliations include those traditionally opposed to capital punishment or that look favorably upon some element of your defense, it may shape your strategy.

**4. Personal**
In a PTSD case growing out of a Vietnam experience, how does the judge's term in Vietnam affect your case? If your client was a battered spouse, what about the allegations of abuse made by the judge's ex-wife during divorce proceedings? Will the judge's learning-disabled child make her more or less cooperative when you present a learning disability in mitigation? These questions have no pat answers, but the knowledge gained through investigating the judge will inform your strategic decisions.

The information garnered through investigation may make its way into pre-trial motions, press releases or settlement conferences, or may subtly influence the way certain types of evidence are presented or emphasized.

## B. The Prosecutor

The prosecutor is your adversary. Like a nation embarking on war, you must know your opponent as well as she can be known. Some of the information may be help to expose unfair practices, which may result in recusal or reversal. Other information will prepare you for certain tactics or tricks. Investigation may reveal the areas where the prosecutor may be vulnerable and assist in arriving at a negotiated plea.

In addition to each of the areas of investigation listed for judges, explore the following areas unique to the prosecution:

**1. Prosecution Profile**
Whereas the appearance of fairness is not as critical with the prosecutor, any instances of bias must be discovered and documented. A classic example of unfairness is the propensity to seek the death penalty during election years. It is fairly simple to document the frequency of capital prosecutions and their relation to elections. Likewise, documenting disparity in sentences in negotiated pleas between black and white defendants or the degrees of homicide / burglary / robbery charged for similar crimes by defendants of different races or against victims of different races may be revealing.

**2. Tactics**
A table at the local bar surrounded by experienced lawyers will provide ample examples of what to expect from the prosecution. If the prosecutor is a veteran of numerous capital trials, read transcripts and appellate briefs, which will indicate areas where the prosecutor is prone to commit

Like a nation embarking on war, you must know your opponent as well as she or he can be known

When jurors are questioned before an assemblage of lawyers, a judge, court personnel and spectators, they are more intent on saying the right thing than telling the truth

error or the types of argument he has effectively used. Pay special attention to voir dire tactics, including whether the prosecutor regularly strikes minority jurors, which can be used to bolster a Batson claim.

**3. Weaknesses**

**a. Deficiencies**

Investigation may reveal that the prosecutor relates poorly to a particular type of juror, cannot cross-examine expert witnesses, or performs pathetically against a particular lawyer you may want to recruit as co-counsel.

**b. Vulnerabilities**

The prosecutor may harbor true empathy for abused children, victims of racial discrimination, Vietnam vets, or other characteristics prevalent in your mitigation. Knowing these elements exist in your case may encourage a negotiated plea to a sentence less than death.

## C. The Jury

The judge sets the arena, the prosecutor is your adversary in the life and death struggle, but it is the jury that will ultimately turn thumbs up or down for your client. You must investigate the background of the people who will decide your client's fate.

When jurors are questioned before an assemblage of lawyers, a judge, court personnel and spectators, they are more intent on saying the right thing then telling the truth. They try to discern what the questioner or judge wants to hear, and offer that answer. This does little to inform counsel regarding the juror's propensity to kill the client.

The only way to learn unguarded and candid information is to conduct a preliminary investigation into the background of each member of the jury pool. Investigation not only reveals negative aspects that may not be revealed in open court, but also provides information that may be positive to the defense, without alerting the prosecution that the juror is sensitive to the defense case.

**1. First Day of Venire**

All jurors who will eventually sit on your jury have to come together on the first day of the term. At this time, citizens are informed of their duties as jurors and afforded the opportunity to say why they cannot fulfill their obligation. These proceedings can reveal the character of jurors and the relationships among members of the panel.

Have an observant investigator in the courtroom during this process. Use shorthand or a discreet tape recorder to take detailed notes on each juror. Pay attention to:

**a. Excuses**

Reasons for recusal, reactions when those excuses are dismissed, and general temperament.

**b. Cliques**
Cliques and informal pecking orders naturally develop among prospective jurors. The person who is the center of attention or assumes an informal leadership role will probably be the foreperson of your jury.

**c. Family**
Family relationships can be revealing. If children are present, note the parenting technique and any possible handicapping conditions or unique characteristics displayed by the child. Observe interactions between prospective jurors and their spouses.

**d. Court Personnel**
Watch to see if some jurors are overly familiar with court personnel, the prosecutor, the judge or members of law enforcement.

**e. Other**
Discreetly leave with the jurors, noting any distinguishing characteristics about their mode of transportation, including bumper stickers.

## 2. Juror Questionnaire

In the struggle to learn as much as possible about each juror, the questionnaire can be a potent weapon. Whereas people may be intimidated by voir dire, filling out a form in the privacy of one's home or quietly in the courtroom may result in more candid and accurate information.

The questionnaire's content can vary; two examples are included in the appendices (*). Use closed, information gathering questions rather than philosophical, open-ended questions. Ask not for opinion of the death penalty but for church and civic affiliations: the answer to the latter may provide a more candid answer to the former. Also, a form that is easy to complete will generate more answers and more accurate information. Use multiple choice, true / false and single answer questions.

There are two methods for distributing questionnaires, each with its own pros and cons.

**a. First Day of the Term: Judge Distributed**
Using a judicial economy rationale, counsel have convinced judges to distribute the form on the first day of the term rather than taking up court time asking the questions in voir dire. Because the forms are distributed by the judge, jurors are more inclined to complete the forms, and truthfully. And because many people do not enjoy filling out forms, or find them intrusive, it is to counsel's advantage not to be linked directly to the form.

The down side is that in most cases the judge will make counsel share the completed forms with the prosecution.

The person who is the center of attention or assumes an informal leadership role will probably be the foreperson of your jury

The nature of a house, how the property is maintained, the cars driven, the bumper stickers, the political signs in the yard, reveal volumes about the residents

**b. Defense Distributed Questionnaires**
Once the panel list has been established and judicial permission is received, counsel can mail a questionnaire to each prospective juror with an explanatory cover letter and a stamped, self-addressed envelope. Though the rate of return will be considerably lower than in a judge-ordered distribution, the argument can be made that it is attorney work product and not subject to discovery, state, giving you a distinct advantage over the prosecutor.

**3. Panel List**
In addition to observations made on the first day of the term and any questionnaire you distribute, the information on the basic panel list can be very helpful.

**a. Geographical Analysis**
Where one lives often indicates relative social status. In addition, jurors who live in high crime areas or in close proximity to the crime scene may be less sympathetic. The address may also indicate a relationship to some primary player in the process.

**b. Family and Friend Review**
As in all matters concerning the jury, discretion is advised, but circulate the panel list among your family, friends and colleagues for comment. Ask the reviewers to note any information they have, opinions concerning the person's views on crime or the death penalty, and any relationships the prospective juror has that might affect this case. Based on information concerning a person's particular religious views or experiences with the mental health community, you may choose to present or emphasize some specific type of mitigation.

**c. Attorney Comments**
Unless your case is early in the term, most of the jury panel will already have sat on one or more cases. Talk with defense lawyers who have picked juries from the panel, and make copies of their voir dire notes. Pay special attention to who has served as foreperson and that person's effect on the deliberative process.

**d. Drive-By**
The most controversial, potentially dangerous but possibly productive tactic is to drive by the jurors' homes. The nature of a house, how the property is maintained, the cars driven, the bumper stickers, the political signs in the yard and the dogs in the backyard all reveal volumes about the residents. This wealth of information can be gathered in a single, discreet drive by with an observer who quickly records information or surreptitiously photographs the property. Do not stop the car, make detailed inspections, take multiple pictures, or do anything else to arouse suspicion and anger the juror or juror's family.

**e. Simultaneous Investigation**
Investigation does not end when trial begins. Voir dire should be a team effort, with an investigator poised to rapidly investigate any tidbit of information revealed. If the juror mentions a particular lawyer or other accessible person, conduct phone interviews while the prospective juror is being questioned about other areas of interest.

**f. Hallway Hangers**
In some jurisdictions, the jury panel simply mills around the courthouse waiting their turn to be interviewed. They may learn prejudicial information about your client through observation or discussion with court personnel or reporters. This information can spread rapidly, and often with exaggerated details, through the entire panel. A seemingly idle person who sits in the hallway with the other jurors and reports any overheard conversation can provide information that will mandate the court to strike a particular juror or change the venue of the trial.

Voir dire should be a team effort, with an investigator poised to rapidly investigate any tidbit of information revealed

# NEGOTIATION

# 6.2

# NEGOTIATION

# Table of Contents

I. Understanding Negotiation ........ 6.3
  A. Successful Negotiation ........ 6.3
  B. The Impossible Case ........ 6.4
II. Negotiating Tools ........ 6.5
  A. Integrity ........ 6.5
  B. Preparation ........ 6.5
  C. Attitude ........ 6.5
  D. Communication ........ 6.5
  E. Moral Strength, Commitment ........ 6.5
  F. Hard Work, Sacrifice ........ 6.6
  G. Ingenuity, Imagination ........ 6.6
  H. Empathy ........ 6.6
III. Technique ........ 6.7
  A. Principled vs. Positional Bargaining ........ 6.7
  B. Parties: Who Are They? ........ 6.7
  C. Parties: Understanding Their Interests and Perceptions ........ 6.9
  D. Parties: Creating Options to Satisfy Their Concerns ........ 6.10
  E. Using Objective Criteria ........ 6.10
  F. Dealing with Alternatives: Determining Your BATNA ........ 6.11
IV. Toward the Yesable Position ........ 6.13
V. Conclusion ........ 6.14

# I. Understanding Negotiation

Odds are that if you go to trial with a death qualified jury you lose. Big.

There is no more important nor more neglected skill in the practice of law. Odds are that you have never had formal training in negotiation, either in or after law school. Your style was probably picked up by copying, consciously or subconsciously, techniques of those who practice around you. Much of what you do to negotiate a case is probably effective; equally likely is that much of what you do is ineffective or even counter-productive. The real art of negotiation is the ability to distinguish between the effective and the ineffective, to emphasize the former and eliminate the latter. There are several "methods" that can help you develop this skill. The first, and most important, is recognizing that negotiation is an art based on skills that can be learned. Further, it is more than just the time you spend in the courthouse or D.A.'s office trying to badger or beg your way to a settlement. Every contact with any person who can in any way influence the outcome of the case should be conducted with a view toward the impact the contact might have on achieving a settlement.

Concurrent with this recognition must be the determination to take a thoughtful and intentional approach to the resolution of a problem by means of negotiation. Given that recognition and determination, there are several ways to improve your skills. This chapter is intended to introduce you to some of these.

## A. Successful Negotiation

What is a successfully negotiated capital case? One in which the client receives a sentence of less than death, assuming that the case is a valid death case. What is a valid death case? Generally, one in which the prosecutor will be able to death-qualify a jury.

Why should you settle a capital case, knowing that the settlement in most cases will be a life sentence? Consider these propositions:

1. A death qualified jury is substantially more likely both to convict and to return a verdict of death than is a non-death qualified jury. Odds are that if you go to trial you lose. Big.

2. Reversal rates in Tennessee appeals of death cases are abysmally low. Although no Tennessee case has yet been decided on the merits in federal court, national trends are not encouraging. By the time you read this, Congressional and judicial action may have all but eliminated habeas corpus relief in capital cases. If the jury says death, odds are your client will in fact ultimately be electrocuted; the days when you could count on errors being corrected are of a past judicial age.

3. There is no groundswell of support for the abolition movement. For the time being, capital punishment is here to stay.

4. There is no tomorrow. If your case goes to trial, odds are high that your client will be killed by the state. That is an incredible burden for you to carry the rest of your life. Your client will not even have that luxury. The time is now to divert your client out of the death stream into the general

prison population, where errors can be corrected, parole can be granted, clemency can be considered (assuming Tennessee ever again has a chief executive with the courage to exercise such authority).

## B. The Impossible Case

What about the case that can not be negotiated? What if your prosecutor says "no deals"? What if your client says "I didn't do it and I'm not pleading to anything!"?

Your client may be innocent. Investigation will help answer this. This chapter is not focused upon ethics, except to say that you should explore settlement possibilities even here, perhaps involving a nolo contendere or best-interest plea, if you and your client eventually determine that no successful defense is available. It is also possible that the client does not yet trust you enough to admit to you that he is guilty, fearing that if he does so, you will not fight as hard for him. We've all felt that sense of mistrust before. It will be compounded geometrically in the capital case. It can be addressed in part by letting the client know that you are committed to his case and his welfare, that what he has or has not done is of no consequence to you. This obviously takes time and attention to the client's concerns. It may take months. It may require enlisting the help of the client's friends, family, charge partners, etc. The point is, just because the client tells you he is going to trial does not relieve you from the responsibility of negotiating a plea to a sentence less than death. Be prepared to negotiate as thoughtfully with the client as with the prosecutor.

As to the recalcitrant prosecutor, consider this: there is no case that cannot be negotiated to a sentence of less than death. Obviously that does not mean that you absolutely will be able to settle your case. It does mean that if your case does not settle, careful analysis of the circumstances and parties will probably reveal a person or a situation that if handled differently at a critical time would have resulted in a settlement.

A negotiated settlement is one that all parties view as a more satisfactory way to address their concerns than a trial. The challenge is to accurately identify each party and their interests and find a solution that addresses those interests in a way that makes settlement more attractive than trial.

The challenge is to accurately identify each party and their interests

Even the most unprincipled bully is wary of the little guy with the look in his eyes that says he is ready to go all the way if necessary

You already have many tools that are significant in negotiation, regardless of how you negotiate. The following list is not all inclusive, merely thought provoking.

### A. Integrity

Your integrity, their integrity, the integrity of the system. If any opportunity to advocate for your client's life is not taken, the integrity of the whole process suffers. They may not care. Make them.

### B. Preparation

Preparation, the ultimate "salve," includes both traditional case preparation, of guilt/innocence and mitigation issues, and preparation of negotiation strategy.

### C. Attitude

Do you need to adjust your own attitude about the case? As terrible as a death penalty case is, the Kirk Douglas complex ("it is just me standing here at the edge of the cliff, the lone protector of civilization against the hordes of Huns") in us may keep us from handling a case in the way most likely to result in settlement. Closing argument in a death case is the most charged experience for a trial lawyer. But you must insure that even subconsciously you are totally committed to avoiding a trial. Every move must be made with awareness of how it impacts on a potential settlement. You may have to do things that are uncomfortable, including groveling before a prosecutor who is not worthy of cleaning the cleats on your bowling shoes. "Adjusting" your attitude to this level will empower you.

### D. Communication

Are you listening to what each party is saying? Do they feel that you are listening? Do they believe you are open to persuasion? Are you? Are you attentive to their hidden messages? Try telling them what you are hearing them say to see if it is accurate. "I hear you say . . ." is more effective than "You are saying . . ." in clarifying messages without escalating tension. Similarly, "I am feeling pressured by what you say," rather than "you are pressuring me."

### E. Moral Strength, Commitment

You know, rhetoric aside, that you are on the side of the righteous in capital litigation. The system is not, and never will be, fair. You are truly the champion of the oppressed. They know it too if their feet touch the earth. Once they know that you will do anything to save your client's life, they will treat you differently. Even the most unprincipled bully is wary of the little guy with the look in his eyes that says he is ready to go all the way if necessary.

### F. Hard Work, Sacrifice

You are used to it. They may not be, and may not want to be. You can control how hard everyone has to work on the case by what you do. Make sure they remember that. Friday afternoon is a good time for this.

### G. Ingenuity, Imagination

We have it. They don't. Everyone knows that. Why else has Elmer Fudd never taken out Bugs?

### H. Empathy

No matter what you think about the prosecutor, the officer, or whoever may be aggressively trying to kill your client, remember that each one is a human being responding appropriately (if only in their own eyes) to the stimuli of the situation. Recognize this and treat them and their interests with respect. You do not have to agree with their philosophical framework, but you must be willing to acknowledge it and accept the fact that it is real and valid for them. The righteousness of what we do should give us the inner strength to keep up the fight; it should not make us hypocritical or judgmental of them as human beings.

Ingenuity. Why else has Elmer Fudd never taken out Bugs?

Positional bargaining is hard on relationships, tending to turn participants into bullies or beggars

## A. Principled vs. Positional Bargaining

To the extent that most of us have any system of negotiating our cases (or any other disputed matter) it is probably some variation of "positional bargaining." We decide what result we want to achieve, take a "position" more extreme than our ultimate goal and, using various techniques, engage in a give and take exchange with the adversary until some middle ground is reached, hopefully at or above our desired "position."

Some people are very effective using "positional bargaining"; some are not. Its results generally bear a closer relationship to the relative strength and willpower of the bargaining agents than to the merits of the issues at stake. Many people are ill equipped physically and emotionally to succeed at positional bargaining and their clients suffer accordingly. Positional bargaining is also hard on relationships, tending to turn participants into bullies or beggars. This is compounded where the system requires that you confront the same adversary time and time again. Particularly troubling is the pressure that can be brought to bear on a public defender or someone else regularly in the same court with the same prosecutor and judge by the implications for other clients if a particular case is handled in a certain way.

There are alternatives. One is an approach called "principled bargaining."

Principled bargaining focuses on issues, not positions. The negotiation process is a search for objective criteria by which to resolve disputed issues fairly and for alternative solutions through which all parties' interests can be addressed with the least injury to others – a "win-win" approach. Getting to Yes: Negotiating Agreement Without Giving In, by Roger Fisher, is 150 pages of easy reading, compelling logic on how to negotiate more effectively in any situation and is highly recommended. Much of what follows is based upon the teachings of Fisher and his colleagues at the Harvard Negotiation Project.

## B. Parties: Who Are They?

Millard Farmer, one of the pioneers of capital negotiation, contends that the list of "triers of fact" goes way beyond the judge and jury, and seeks to identify every actor who is in a position to influence the outcome of the case. All "triers of fact" in your case will be parties to your negotiation. Not all at once in some large conference room, of course, but at some time in your investigation, preparation, etc., you should come in contact with each party and be prepared to negotiate with them:

- The arresting officer(s)
- The police officer in charge of the investigation
- The assistant D.A.
- The D.A.
- The judge (what will a trial do to her docket?)
- The victim's family
- The victim's preacher
- Courtroom personnel (who do they talk to?)

- The mayor, county judge, county commission, council, etc. (what will a trial cost? who is going to pay for it?)
- The local newspaper reporter, editor; local radio d.j. (who is going to influence the community? who is going to influence the district attorney and the judge?)
- The jury commissioners (who will explain all the convictions that must be set aside if you establish discrimination in the composition of the county jury lists since creation?)

The list goes on and on and is limited only by your imagination. It also includes you: you must convince yourself of the need to settle the case and of the fairness of your client being allowed to live rather than being killed.

Perhaps the most important and least considered party is your client. An embarrassing number of residents of death row, and of boot hill, were offered an opportunity to settle their case for a sentence less than death. Too many times the lawyer was negligent in establishing a relationship with the client strong enough that the client could accept the lawyer's advice to agree to spend the rest of his life in prison. Even Ted Bundy had a chance to "cop to life" and declined. The offer may come at a time when the client does not have much time to consider the decision. Unless he is prepared for the possibility in advance, he may not be emotionally able to deal with the decision on a level necessary to accept the offer.

An embarrassing number of residents of death row, and of boot hill, were offered an opportunity to settle their case for a sentence less than death

The other key parties, with whom you <u>must</u> succeed in order to settle the case, are the district attorney, the assistant, and the victim's family. In some cases the judge and some law enforcement officer must be included in this select list. While this does not mean that you ignore the other "decision makers" or "triers of fact," it will determine how you marshall your resources.

Focus your primary negotiating energies on the select list, but keep the other parties in mind, taking advantage of any opportunity for contact to say or do something that increases the possibility of a settlement. For instance, while waiting for a hearing or a docket call, it might not hurt to let the arresting officers and court personnel know that your client was the victim of child abuse, was the grandson of a career officer, or played championship football until that time he ran into the goal post, to plant some seed that the client is a sympathetic person whose behavior can be explained, maybe even understood. Then perhaps when the D.A. is running the settlement by the officers, they will not be outraged.

Who should contact the "decision makers"? You should neither feel that you must personally contact all of them, nor shy away from contact just because it makes you uncomfortable and you know someone else can do it. Your investigator may know the officers involved, may have worked with them and be better able to approach them when their guard is down. Your preacher may be able to talk to the preacher of the victim's family and establish a line of communication that eventually will include your direct contact with the family.

While it is extremely uncomfortable, a personal visit with the family or some representative may be the key to settling the case. If you do nothing more than

Perhaps the single most important skill in effective negotiation is the ability to understand the other side

express your personal sadness at their loss, it will give them an opportunity to visualize you, and perhaps to vent whatever feelings they have about you (and your client) months before trial. If you can give them some understanding of what is going on in the case and what to expect, you may be doing more for them than the state will. Should you also have the opportunity to explain your client to them, all the better. Most victims' families want to know "why?"; if you can answer that, perhaps you can reduce the hostility that might otherwise prevent a settlement. It is critical, however, that any contact with the family be well thought out and conducted with absolute respect for their privacy. Any statements by you or your representative must be scrupulously accurate. Avoid any statement or conduct that could somehow be construed as threatening or intimidating. (The relationship with the victim's family is a complex and important subject, covered in more detail at Chapter 5, Investigation, §IIF.)

The timing of contact with the various decision makers is a product of both opportunity and strategy. Generally, the earlier your opportunity to shape how someone views the case, the more likely you will able to shape it in a way that eliminates seeking death. This is easiest before public commitments are made. However, you must have had enough time to infuse yourself with information about the case and outline your theory of the case, as to both guilt/innocence and mitigation issues. Just as you do not want to force others into taking public stands you will later try to change, you do not want to assert claims or theories that you can not support later.

## C. Parties: Understanding Their Interests and Perceptions

To construct a settlement package that "the other side" will accept, you must know what motivates them, what interests must be satisfied. Perhaps the single most important skill in effective negotiation is the ability to understand the other side: their concerns, strengths, weaknesses, etc. It greatly enhances your ability to create an acceptable settlement package, and persuade them to accept it. Old habits like prosecutor- and cop-bashing are hard to shake. If you have a long-standing relationship with the person to be influenced, you may know what it will take for them to want to settle. But if this is the first capital case you have had with them, they may be responding to different concerns than before.

If you do not know what their interests are, find out. You may be able to just ask; if you do, be aware that the way you ask may determine the answer. Asking for their position may generate the response, "Anything less than the death penalty is unacceptable." They will then have to defend that position. If you ask instead about their interests, concerns, and worries, you can save for later what disposition might satisfy them. Perhaps the best approach is to get them talking about the case informally and listen to what they say. Remember that most of us are poor communicators and are rarely able to say what we really mean. You must learn to deduce their real interests from what they say. If you can't ask or they won't answer, be more creative. Try to put yourself in their place. Use role-reversal game playing to effectively "get into" the other's mind set. The discussion below

about the "yesable" proposition also offers some thoughts on determining the other side's concerns.

Options you create may include pleading early, cooperation in other investigations; and not filing, or not litigating, a motion that would be troublesome or embarrassing

## D. Parties: Creating Options to Satisfy Their Concerns

At first blush, there are few options available in a death penalty case: not guilty, guilty of a lesser included, life sentence, death sentence. You may need more than this to settle. While you cannot rewrite the statute, you can bring some additional possibilities to the negotiating table. Options you create may include pleading early, waiving a motion or hearing, and other time and cost saving measures; cooperation in other investigations; and not filing, or not litigating, a motion that would be troublesome or embarrassing -- a meritorious jury composition challenge or motion to disqualify the prosecutor or judge for racial bias.

There is no way to anticipate every possible option; even if it were possible, it would not be wise. The creative process itself is constructive. Forcing yourself to be creative about options may lead you to a perspective, angle or approach that you would otherwise have missed that could lead to the key to settlement.

Assemble the defense team and set aside a time for creating options. If you prohibit critical comment for the initial period, the ideas will flow more freely; elimination, refinement and reality-checking will come later. You may need separate sessions for each of the major players with whom you must negotiate. Keep in mind that you will probably need to create options to address concerns that the other party may not even know they have yet. For example, if your prosecutor or judge has not yet had a death case, they may not know they need you to help settle the case to avoid incredible time, energy and money expenditure, until you have dropped the first round of motions by their office.

## E. Using Objective Criteria

No matter how inventive and intuitive you are in negotiating, you will probably still wind up with issues that cannot be reduced to a clear "win-win" resolution. The tendency will be to resort to old habits of positional bargaining: each side stating what it will or won't do and trying to force or beg the other to change their position. Such a battle of will is both costly and unlikely to produce a fair result that both sides will want to abide by. It is also extremely dependent on the willpower of the negotiator and thus not likely to produce consistent results. More likely to produce consistently fair results is the use of objective standards or procedures. Regardless what issues are disputed, try to find some pre-existing standards or practices that can be used to settle the difference without sacrificing someone's will. For example, if you are selling your car to someone with whom you want to maintain a relationship, you want to get the best price without the purchaser feeling gouged; you may agree to set the price by accepting the midpoint of the "blue book" price range. Settling a capital case is obviously more complex than selling a used car; there are no "blue books" for the value of the victim's or your client's life. But there may be objective criteria. For example, you might suggest a term of years equal to (or some multiple of)

If the words "death penalty" are not in the settlement offer, you should probably accept

the victim's life expectancy before she died, using life insurance mortality tables. Absurd? Perhaps; perhaps not, if it satisfies the prosecutor. If there are no remotely relevant standards, a fair procedure based on equitable principles could work as well. Could a third party, accepted by those in dispute as a fair-minded person, pick from among the alternatives submitted? Perhaps having the trial judge to decide certain issues at an informal settlement conference would produce a mutually acceptable result. Fisher suggests three basic points to remember:

1. Frame each issue as a joint search for objective criteria.
2. Reason and be open to reason as to which standards are most appropriate and how they should be applied.
3. Never yield to pressure, only to principle.

See Getting to Yes, chapter 5.

## F. Dealing with Alternatives: Determining Your BATNA

How do you know if you are being offered a settlement that you should recommend to your client? In most death cases, that is easy: if the words "death penalty" are not in the settlement offer, you should probably accept; if they are, you should not, unless they are preceded by a prominent "NO." However, for those ambiguous situations where the answer is not so clear, Professor Fisher and the Harvard Negotiation Project have developed a conceptual tool to help – the best alternative to a negotiated agreement, or BATNA. Your BATNA is the best result you can reasonably anticipate if you are unable to negotiate a settlement. To know this, obviously, you must know your case: what factual defenses you have; any existing or potential issues that could result in reversal, dismissal, mandatory lesser included conviction; etc. Generally your BATNA in a death case will not look very good. One of your objectives is to improve it, by investigation and preparation, both on guilt/innocence and mitigation issues. It might also be helpful to inventory your assets, which may include:

- Time, and the ability to control its use
- Persistence
- Element of surprise
- Integrity
- Morality
- Relationship with news media
- Commitment to client
- Client, client's family
- Continuing presence in system
- Threat of retrial for ineffective assistance of counsel
- Imagination
- Ability to control expenditure of public funds
- Cooperation, information
- Ability to create/abate discord, conflict

- Ability to grease or obstruct skids
- Paper, paper, paper
- Intellect creative to the point of perversity
- Sense of humor
- Empathy
- Burden of proof
- Presumption of innocence

Undoubtedly you can think of more, and you must, in an effort to balance the power equation. The option-creating exercise will point you in some of the same directions. The important lesson in both exercises is that we do have many resources and options that we have neglected to use, or have used poorly, because we have not thought of them as assets that we can control for our purposes.

Generally anything you can do to improve your bargaining status, will simultaneously reduce their strength

The BATNA concept is particularly helpful in evaluating and understanding the opposition. Whether the prosecutor knows it or not, she has a BATNA too. It may look a lot better than yours but it is there. Knowing your adversaries' BATNA tells you what they face as they approach the bargaining table. You may also know what you need to do to increase their incentive to negotiate. If you can't improve your BATNA, you might be able to make theirs less attractive. How? If the strength of their BATNA is a strong case, develop and demonstrate flaws in their proof: grounds for suppressing the statement; the arresting officer has a record of abusive incidents with arrestees; the victim's reputation for violence; etc. If the expected good press will enhance the prosecutor's reelection chances, a continuance until after the election or a motion to recuse the prosecutor might make a settlement more attractive. Generally anything you can do to improve your BATNA, to increase the strength of your bargaining status, will simultaneously reduce their strength, lessen their BATNA. An inventory of their assets will suggest points on which to focus your attack. Depleting their resources weakens their alternative to settlement. To the extent that you are aware of and anticipate these consequences you will significantly enhance the efficiency of your negotiation efforts.

# IV. Toward the Yesable Position

Your "yesable proposition" must be one that the prosecutor can not only buy but also sell to her constituents

Why do they say no? To what proposal could they say yes? How could they justify a yes to their constituency?

If you can answer these questions you will know how to settle your case. A helpful tool in analyzing your negotiation situation is the concept of the "yesable proposition" developed by the Harvard Negotiation Project. Sit down, preferably with someone who knows about your case, and write out the consequences if the prosecutor were to accept whatever proposition you want to tender. List the favorable and unfavorable consequences for her. Be objective and thorough. What will the balance of consequences tell the prosecutor to say? If the answer is no, reformulate the consequences until the balance would indicate a yes. Then devise a proposition that will result in this balance.

Assume that among the consequences of the current proposition is the fact that the prosecutor can always change his mind tomorrow or the next day and settle the case. Assume also that if that single factor were reversed the balance would tip to an affirmative answer. If you let him know that you will have to file the Motion to Disqualify with supporting affidavits from his ex-wives tomorrow, the answer may become affirmative. This example may be unrealistic. But if you understand the concept, you can apply it to the real case you have with a real prosecutor. While a light bulb may not suddenly appear above his head (or yours), you will use your time and energies more effectively if your approach to the bargaining table is systematic and thoughtful.

Even when you think you have come up with a proposition that the prosecutor will accept, do not lose sight of the constituencies to which the prosecutor is responsible. Your "yesable proposition" must be one that the prosecutor can not only buy but also sell to her constituents. You can more easily sell the proposition if you anticipate how she can announce it to the public, the victim's family, the court, the police chief, etc. If you have been "negotiating" with these other "decision makers," you may be in a position to assure their acceptance.

# V. Conclusion

A life sentence is a victory in a capital case. The best way to achieve that victory is by a negotiated settlement. It does not carry the emotional charge of hearing a jury report a life sentence, but it will keep you, your client and his family from hearing the jury report death. You are most likely to be in a position to settle for life if you approach the negotiation process as a critical area of representation, devoting to it the thought and preparation you would to the trial itself. If from the beginning of the representation you keep a settlement in mind, and if you have a thoughtful, integrated, negotiation strategy, hopefully your clients will serve their time in the general population and your afternoon siestas will not be interrupted by the specters of failed negotiations.

A life sentence is a victory in a capital case

# MOTIONS

# Table of Contents

I. Introduction ........ 9.4
A. Default and Waiver ........ 9.4
B. State the Legal Basis for the Claim ........ 9.4
C. Heightened Due Process and Reliability ........ 9.5
D. Articulate issues in federal and state constitutional terms ........ 9.5
II. The Objectives of Motion Practice ........ 9.6
A. Bargaining Lever for Negotiations ........ 9.6
B. Gaining Time ........ 9.6
C. Obtaining Resources ........ 9.7
D. Discover the Case ........ 9.7
E. Preserve Issues that May Be Won Later ........ 9.7
F. Educate Yourself on Trial Strategy ........ 9.9
G. Educate Others ........ 9.9
H. Keep Out Damaging Evidence / Get In Good Evidence ........ 9.10
I. Undermine Argument that Misconduct Was Inadvertent ........ 9.10
J. Judicial Economy ........ 9.10
III. Form ........ 9.11
IV. Specific Motions ........ 9.13
A. Pre-Trial Motions ........ 9.13
1) Bail ........ 9.13
2) Client's Physical and Mental Well-Being ........ 9.13
3) Unconstitutionality of the Death Penalty Statute ........ 9.15
4) Jury Composition ........ 9.15
5) Change of Venue ........ 9.15
6) Bill of Particulars ........ 9.15
7) Continuances ........ 9.16
8) Limit Media Coverage ........ 9.16
9) Discovery ........ 9.16
10) Jury Selection ........ 9.21
11) Witnesses ........ 9.23
12) Preliminary Hearing ........ 9.24
13) Daily Transcripts ........ 9.25
14) Pretrial Conference ........ 9.25
15) Disqualification of Parties ........ 9.25
16) Severance ........ 9.26
17) Speedy Trial ........ 9.27
18) Destruction of Exculpatory Evidence ........ 9.27
19) Proportionality, Discrimination, Arbitrariness ........ 9.27
20) Motions in Limine ........ 9.30
21) Jury Instructions ........ 9.31
22) Adoption of Co-Defendant's Motions ........ 9.31
B. Pre-Sentencing Hearing Motions ........ 9.32
1) Continuance ........ 9.32
2) Support Services ........ 9.32
3) Allocution by the Client ........ 9.32
4) Closing Argument of the Defense ........ 9.33
5) Restriction of Proof to Specific Aggravating Circumstances ........ 9.33
6) Aggravating Circumstances ........ 9.33
7) Waiver of Sentencing Jury ........ 9.34

8) Restrictions of Psychiatric Evidence at Sentencing ................................ 9.35
9) Other Evidentiary Considerations ................................ 9.35
10) Motions in Limine ................................ 9.37
11) Requested Jury Instructions at Sentencing ................................ 9.37
C. Post-Trial Motions ................................ 9.37
1) Rule 35 Motion ................................ 9.37
2) Evidentiary Hearing on Rule 12 Questionnaire ................................ 9.37
Appendices:
A. Death is Different
B. Parallel Provisions of Federal and State Constitutions
C. Checklist for Specific Motions
D. Motion in Limine Regarding Argument of Prosecutor
E. Right of Allocution
F. State v. Irick Opinion

# I. Introduction[1]

Preserve the record by including every imaginable appropriate issue

Motion practice is important in every field of litigation, but its significance is never greater than in a death penalty case. Obviously, the stakes are higher than in any other case. Furthermore, the case will be litigated as long as the defendant is facing a sentence of death, and ultimately will be litigated in federal court. This means that counsel must be aware of not only Tennessee law but also the law of the federal circuits and the U.S. Supreme Court. (Because no appeals have been taken from any of the federal district courts in Tennessee and virtually none from any of the four states in the Sixth Circuit, there is almost no Sixth Circuit death penalty law.)

Capital counsel must raise as many issues as possible in motions and objections, in constitutional terms as well as in terms of rules, statutes and judicial opinions. It is critical that trial counsel specifically cite both the state and federal constitutional provisions relied upon as a basis for relief.

## A. Default and Waiver

The essential pre-trial strategy is to preserve the record by including every imaginable appropriate issue. Several people have died in recent years because issues not raised before or during trial are lost forever. Two co-defendants appealed from trials suffering an identical jury composition defect in Smith v. Kemp, 715 F.2d 1459 (11th Cir. 1982), *cert. denied*, 464 U.S. 1003 (1983), and Machetti v. Linaham, 679 F.2d 236 (11th Cir. 1982), *cert. denied*, 459 U.S. 1127 (1983). Machetti's lawyers raised the issue in state court; Smith's did not. Machetti received relief, and is alive; Smith was executed.[2]

"Waiver" and "default" rules are encountered on state post-conviction and federal habeas corpus as the case winds its way through three tiers of litigation. It is critical that trial counsel understand this harsh reality while planning the strategy for filing appropriate motions and properly preserving the record.

## B. State the Legal Basis for the Claim

Some motions will be emphasized with forceful memoranda and argument; some will be filed merely to preserve the record. No matter how cursory the treatment, every motion must include a legal basis cited in a written pleading, including any applicable constitutional clause, rule, statute or judicial opinion. State the claim as broadly as possible, specifically explicating the alternative legal bases. For example, challenge to an involuntary confession may cite the

[1]The authors are indebted to several sources for ideas, including Farmer and Nursey, "The Building Blocks of Capital Cases: Motions and Objections," The Champion, p. 16 (March 1984); Kentucky 1989 Department of Public Advocacy Death Penalty Manual, Ch. IV; and Chapter 4 of the 1985 edition of this manual, written by James A.H. Bell, Neil Cohen, Ralph Harwell and Doug Trant.

[2]*See* Bright, "Death by Lottery — Procedural Bar of Constitutional Claims in Capital Cases Due to Inadequate Representation of Indigent Defendants," 92 W. Va. L. Rev. 679, 685-87 (1990), for a list of other people executed because their meritorious constitutional claims were barred by procedural default rules.

right against self-incrimination (5th Amendment; Art. I, § 9), the right to due process (5th Amendment; Art. I, § 8), and the right to counsel (6th Amendment; Art. I, § 9); raising just one ground may waive the others. As always in capital litigation, when there is the slightest doubt about which legal basis to choose, there is nothing to lose and everything to gain by articulating all possible legal theories.

## C. Heightened Due Process and Reliability

As you have heard and read repeatedly, the death penalty is different. Keep this in mind as you prepare the motions and present them to the court. See Appendix A, Death is Different. What may be acceptable police behavior and prosecution argument in a burglary case may be completely unacceptable in a death case. In addition to being aware of these higher standards, mention them in the lead paragraph of every motion. Use the extensive list of citations in Appendix A. This will not only educate the judge that the motion must be scrutinized in a different manner but, with the proper citations of law — federal as well as state — will "constitutionalize" all the issues raised.

The Eighth Amendment has special application in death penalty cases and focuses attention on the reliability of the selection of your client for the extreme punishment of death. Since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the debate has centered on the standards under which an individual can be singled out and put to death. The process must ensure that a narrowly defined class of individuals, who kill under circumstances established by objective standards, are tried under procedures that render the conviction reliable, with safeguards allowing the sentencer to give each defendant individualized consideration.

The Eighth Amendment focuses attention on the reliability of the selection of your client for the extreme punishment of death.

## D. Articulate issues in federal and state constitutional terms

The pleading must include the state and federal constitutional bases for the motion. The federal court must be able to see a clearly articulated federal constitutional claim in the state court before it may re-examine the issue. Before preparing the pre-trial motions, take time to revisit the Bill of Rights and state constitutional protections for criminal defendants. Approach this refresher with an open and creative mind, in order to raise not only obvious constitutional motions, but novel motions that appear to come within the gambit of the constitutional protections. Note and address differences in the state and federal language.

When in doubt, cite the 8th Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution, prohibiting cruel and unusual punishment, as well as the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article I, § 8 of the Tennessee Constitution. A table of parallel state and federal constitutional provisions is set out in Appendix B.

# II. The Objectives of Motion Practice

The primary objective is to avoid a death-qualified jury, at almost any cost

You must seize the initiative by aggressive motion practice. The train operated by the state will run over the defense unless you make a concerted effort to derail it, or at least send it down another track. Counsel must steer the litigation toward specific goals and, insofar as possible, guide the course of the trial. Favorable rulings will be gained only by force of preparation and superior effort.

The reasons for filing motions are as varied as the unique circumstances of each case and are limited only by the imagination of the practitioner. The worst a court can do is deny the motion. On the other hand, your client may suffer the extreme penalty if a claim is waived. Some of the more important objectives and rationales of motion practice are discussed below.

## A. Bargaining Lever for Negotiations

In most capital cases, the primary objective is to avoid a death-qualified jury, at almost any cost. Settlement discussions are therefore of the utmost importance. A heavy load of pre-trial motions, artfully drawn and defended, can be an effective lever to bring the prosecutor to the bargaining table. As many capital litigators have observed, your best — and sometimes only — weapons are the ability to cost the court and the prosecution time and money and creatively use techniques of conflict. (See Chapter 6, Negotiations, for a more detailed account of these techniques). If the state is going to single out your client from all other accused murderers for infliction of the death penalty, then everything that can be litigated must be litigated. There can be no "business as usual" or compromise with the prosecution to "move things along"; the court and the prosecutor must know that this extraordinary case is going to wreak havoc with everyone's calendar.

Motions can encourage negotiations in two ways. First, they can expose weaknesses in the government's case, problems with the jury composition or jury selection methods, or potentially reversible idiosyncrasies of the trial court. Second, motions that are truly challenging may encourage the state to avoid the considerable work that the defense is forcing upon them. Either way, the prosecutor may be persuaded to engage in serious settlement negotiations.

## B. Gaining Time

A by-product of a thorough motion practice is that it gives the defense more time to prepare its case. Because you cannot be an effective advocate by yourself, you will need time to assemble your team (see Chapter 4), and to prepare for and brief the unique legal issues involved in death cases.

The investigation of your client's life requires an enormous effort. At the sentencing phase, you will have to present an entire life, not just try to explain the instant of time consumed by the crime. The closest analog in litigation may be the personal injury case, in which the defense would like to focus on the event and avoid its effect. Likewise, in death penalty work, the state wants the jury to focus on the crime, not the defendant's life. In the sentencing hearing, you must

prepare and show the jury an entire "movie" of your client's life while the prosecution will try to focus attention on a single "snapshot" of the crime.

With that in mind, your client has to assist the team in gathering the essential evidence. Getting and keeping your client's trust can be accomplished only if you, your investigator and your psychological witness are able to spend a great deal of time with each other. Well thought out motions can buy the necessary time.

Counsel needs assistance in preparing an adequate defense

## C. Obtaining Resources

Everything we know about capital litigation teaches us that counsel needs assistance in preparing an adequate defense. You will need co-counsel, and one or more investigators to prepare for the guilt and sentencing hearings. In most capital cases, psychological considerations are paramount; usually the assistance of a psychologist or psychiatrist is needed. Psychological expertise is helpful not only in evaluating your client but also in selecting jurors, testing eyewitness identification, and preparing your witnesses and client to testify. Forensic experts of all types may be necessary. The possibilities are unlimited concerning the kinds of other support services that should be requested.

Do not overestimate your ability to carry the burden alone. Not only is your client's life is at stake with everything you do, but the pressure will mount as you approach trial and will be even greater during trial. The amount of factual and legal information that must be at your immediate disposal during hearings and the trial is intimidating. You need help and you need to fight vigorously to get it. (See the extensive discussion in Chapter 4, Team Defense.)

## D. Discover the Case

If this were a property damage suit, your client would have a right to discovery regarding any relevant and not privileged matter. When your client's life is at stake, you tend to get only a handful of specified information; when it comes to exculpatory evidence, the rules let the other side decide what is relevant. The barbarity of this system aside, a primary reason to file motions is simply to find out what the facts and testimony will be. Your goals are to obtain information and force hearings in order to determine strengths and weaknesses, pin down testimony, find out the state's theory and how it will be presented, set up other motions to file based on what you learn, and plan your strategy for presenting the case. For a discussion of the various motions that will result in discovery of some aspect of the case, see § IV, below, and Appendix C.

## E. Preserve Issues that May Be Won Later

One of the important goals of motion practice is to build a complete record that preserves all errors for appellate review. As a general rule, a motion may be considered to be waived if the record does not reflect that it was brought to the attention of the court and the court ruled on it.

Every motion filed will teach you something about the case

1. The court reporter should be present when an oral motion is made and when the judge addresses any motion.

2. Each motion, oral or written, should include both the ground supporting it and the relief sought.

3. Ask that the judge rule on each motion, and, if it is denied, state on the record the reasons why.

4. Once the trial is over, take all necessary steps to perfect the record.

While most motions can be reviewed only after the verdict, in unusual circumstances an interlocutory appeal may be pursued. T.R.A.P. 9 (a) provides for interlocutory appeal with the permission of both the trial and appellate courts, and lists the factors to be used in determining whether the appeal should be permitted. Several of these are especially appropriate in capital cases. For example, because capital cases tend to be lengthy, early review may be appropriate in order "to prevent needless, expensive and protracted litigation." Rule 9 (a) (2). On the other hand, because a sentence of death will be automatically reviewed by the Tennessee Supreme Court, it may be difficult to establish "irreparable injury" by the denial of the interlocutory appeal. See Rule 9 (a) (1).

T.R.A.P. 10 authorizes counsel in unusual cases to seek an interlocutory appeal directly in the appellate court. See, *e.g.*, State v. Gardner, 626 S.W.2d 721 (Tenn. Crim. App. 1981) (overturning trial court's ruling that the defendant was not indigent); State v. Irick, 11 TAM 17-17 (Ct. Crim. App. at Knoxville, April 18, 1986), PTA denied 7/28/86 (upholding a discovery order, in a capital case, that exceeded the scope of Rule 16); Gipson v. State, opinion on petition to rehear (Ct. Crim. App. at Knoxville, August 25, 1989) PTA denied 1/2/90, DCRO (Rule 10 appeal of denial of ex parte hearing on need for support services); and State v. Willoughby, 594 S.W.2d 388 (Tenn. 1980) (indicating situations in which interlocutory appeal may be appropriate). Interlocutory appeal may be uniquely appropriate in issues concerning bail and double jeopardy. See, e.g., State v. Cagle, 626 S.W.2d 719 (Tenn. Crim. App. 1981).

## F. Educate Yourself on Trial Strategy

Every motion filed will teach you something about the case. An unsuccessful motion tells you what may or may not be introduced into evidence. It also provides information on the judge's attitude and manner of presiding over the court, without the risk of a confrontation in the jury's presence. Motions can force the prosecution to reveal their theory, the contents of their files, and the evidence they intend to introduce, both favorable and unfavorable.

You need to know any weaknesses in your case as early as possible. You cannot arrive at an intelligent decision about whether your client will testify without knowing which prior offenses the court will allow in impeachment. You can best minimize damage from prejudicial evidence by knowing about it ahead of time. No civil attorney ever has to encounter a witness for the first time at trial; in capital cases, with life at stake, lawyers routinely do so. How can any coherent

strategy be formed without knowing what evidence and testimony is coming in? (If necessary to avoid disclosing defense strategy, oral argument may be waived on some motions. If the motion and supporting memorandum are filed, and a ruling is obtained, oral arguments are unnecessary to preserving the record for appeal.)

Let the court and the prosecution know that they are in for a fight

## G. Educate Others

Let the court and the prosecution know that they are in for a fight. Exhaustive motions force the state to use its resources on legal research, diverting it from its planned course to one dealing with important constitutional and procedural issues. At the very least, exhaustive motions slow down the state's momentum, whether or not they are granted. Your motions can educate the prosecutor by demonstrating that the trial will be costly and time consuming, with no certainty of victory for the state.

Determine how much the judge knows about the death penalty. Your motion outlining the difference of death and the heightened due process concerns can educate a judge who genuinely does not understand some of the important and very different evidentiary concepts. The court may not understand the scope of mitigation evidence or that it must charge non-statutory mitigation on request. By filing a motion correctly stating the law, you gain credibility and force the judge to think about issues that will come up at trial.

A riskier strategy would be to educate the public concerning, for example, some discriminatory aspect of your case. While it is not generally advisable to speak to the press about a death case, and certain ethical constraints must be recognized and observed, word can usually be gotten to the right media sources in an appropriate case.

Aggressive motion practice also educates your client that you mean business and will fight for him. Filing "personal" motions — for a cell transfer, visits, cigarettes, medicine — tells the client that you care. While rapport is always important in a capital case, due to the pressures and complicated litigation, it will be crucial if a plea bargain is offered, lest you work out the best deal possible only to find that your client will not accept it because he does not trust your judgment or believe that you have his best interests at heart.

The client may also benefit from participating in pre-trial proceedings, thus becoming familiar with court procedures. Some hearings can give the client practice as a witness, and let counsel assess the client's demeanor. This is especially important in death penalty cases, for a common defense tactic is to make the jury so familiar with the accused that sentencing him to death becomes too personal. The client's testimony should be carefully prepared, because he will be thoroughly cross-examined. Not all defendants present a respectable, warm and friendly image when testifying; the accused's participation in motion hearings allows the defense to assess the need for alternative methods of familiarizing the jury with the accused.

Pre-trial motions can also be used to broaden the scope of evidence

Exercise caution. In educating the judge on a legal doctrine, take care not to educate the prosecutor about your strategy any more than you have to.

## H. Keep Out Damaging Evidence / Get In Good Evidence

All ordinary objections to evidence, whether or not constitutional, are of course available in the capital trial. All too often, however, lawyers fight only half the battle. Even in the face of an adverse ruling you may be able to whittle down the amount of evidence used (redact a statement or reduce the number of photos of the deceased), or get an instruction limiting what the jury can do with the evidence (for impeachment only).

Pre-trial motions can also be used to broaden the scope of evidence — for example, by requesting that certain testimony be allowed in mitigation. You will then know in advance that you can mention that evidence in your opening statement without fearing a loss of credibility.

## I. Undermine Argument that Misconduct Was Inadvertent

You may create misconduct by putting the state on notice that certain conduct is improper or getting the scope of its evidence on the record. Some motions will be overruled as "premature"; if you move for a ruling that the prosecutor not be allowed to argue her opinion about guilt or that the death penalty deters crime, the court may respond that it cannot rule on something that has not happened. However, you will have put the court and the state on notice that such conduct or argument is unlawful and will not be tolerated. When the state later does the very thing outlined in your motion, there can be no excuse that it was inadvertent or that the state was not aware it was prohibited; you have set the stage for a mistrial, and have undercut the appellate ruling, "error, but harmless." See Appendix D for a motion in limine with citations on prosecution argument.

Motions to nail down the evidence and testimony are necessary because the state tends to put its case together at the last minute. While the state's disorganization may seem to be an advantage, you can count on the court allowing introduction of last-minute evidence and witnesses. Your pre-trial motions must put you in a position to argue for a continuance — <u>you</u> have been diligent in asking for all discoverable evidence and the state is playing last-minute games in a death case.

## J. Judicial Economy

Judge, if we don't argue this motion at this pre-trial hearing, we will simply have to argue it later in a jury-out hearing at trial when the state is paying for a sequestered jury and a courtroom full of officers; it would be more efficient to do it now. Also, the court will need to be familiar with the case law in order to make a proper ruling; pre-trial consideration of the issue will give the court time to review the cases and avoid later error. These arguments should appeal to any court.

Motions should be in writing unless the court permits otherwise or they are made during a trial or hearing; each motion must "state with particularity the grounds upon which it is made and shall set forth the relief or order sought." T.R.Cr.P. 47. Even if a verbal motion might be adequate, a written motion is advisable. Preparing a written motion in advance can crystallize counsel's thoughts and improve the presentation, including any considerations on the need for an evidentiary hearing. A pleading later filed to supplement an oral motion greatly enhances the record for review.

Preparing a written motion in advance can crystallize counsel's thoughts and improve the presentation

In "The Building Blocks of Capital Cases: Motions and Objections," The Champion, p. 16 (March 1984), Millard Farmer and Joe Nursey recommend some basic elements of each motion:

1. Headline/Title: Make it eye catching.

2. The "Can Opener": The opening phrase — simple, direct, and free of convoluted legalese.

3. The Lead: The next sentence or sentences, highlighting the important point you are making.

4. The Factual Basis, the heart of the motion — facts favorable to the accused and to the issues of the motion—an opportunity for unanswered advocacy.

5. The Instructive Element, a mixture of facts and law to persuade the court that the motion is based on reason, law and morality.

6. The Rule or Statutory Basis, stated concisely for persuasive impact and record preservation.

7. The Constitutional Bases, raising all issues to a constitutional level, both state and federal.

8. Relief: Seek to extend the law by the relief requested. Request both a remedy that it would be error to deny, and a remedy that aims for a more perfect level of justice but may not be granted under the current state of the law.

Avoid references to "the defendant." Refer to your client by name whenever possibly, reminding the court that the accused is a person with a name. Carefully select language that reminds the court and the jury that the client is only accused and must be treated as innocent until proven guilty beyond a reasonable doubt. Motions are aimed at ensuring fairness at the trial, and an accused probably has a greater psychological chance of fair treatment when he is thought of as more than a mere "defendant."

The extent of supporting proof requires strategic choices, based on the facts of the individual case. When in doubt, put on proof. Supporting evidence is especially important if the motion seeks to stretch the limits of the law. Chances of success increase if the motion includes as much authority and evidence as

Without any evidentiary support, preliminary motions provide no basis for reversible error

possible. When possible, a full evidentiary hearing should support each motion. It is more important to take advantage of an evidentiary hearing than to make oral argument; you are not only trying to persuade the trial court but also preserving the record.

If you know the trial court will not grant relief, and if necessary in order to make the offer of proof without being cut off, indulge in messages, perhaps subtle and often off the record, that the evidence is offered merely to supplement and protect the record for further review, not seriously anticipating relief from the trial court.

Counsel is often seeking to educate the trial and appellate courts on legal and social facts and issues with which they are unfamiliar. One commentator has observed that, without any evidentiary support, preliminary motions "(1) have little impact on the courts; (2) provide no basis for reversible error; (3) take little or no time to overrule; and (4) weaken the defense's credibility." Balske, "New Strategies for the Defense of Capital Cases," 13 Akron L. Rev. 331, 339 (1979-80).

## A. Pre-Trial Motions

Litigation of pre-trial motions is a most important tool, especially in capital cases, to gain an advantage in litigation. Counsel is limited only by imagination and commitment. The discussion that follows is only a starting point. It includes many motions that would be appropriate in non-capital cases, but obviously is not all inclusive. See Appendix C to this chapter for a more complete list of suggested motions.

Motions can help develop a relationship between lawyer and client

### 1) Bail

Bond must be set in criminal cases except for capital offenses where "the proof is evident or the presumption great." Tenn. Const., Art. I, § 15; T.C.A. § 40-11-102. Before indictment in a capital case, the burden is on the state to show why the accused should not be granted bail, State ex rel. Jefferson v. State, 436 S.W.2d 437 (Tenn. 1969); after indictment, the burden shifts to the accused to show facts warranting bail, Shaw v. State, 47 S.W.2d 92 (Tenn. 1932). A motion for bail will provide some discovery when the state is forced to establish that the presumption is great or the proof is evident. By the same token, consider what strengths and weaknesses of the defense case may be revealed at the bond hearing. Also consider the impact a hearing may have on the media.

If denied, the motion can be renewed throughout the litigation if counsel finds sufficient basis. Because denial of bail limits the client's ability to assist in preparing for trial, the rights to due process and effective assistance of counsel should be raised. U.S. Const., 14th and 6th Amendments; Tenn. Const., Art. I, § 9. The right to bail is found in the 8th Amendment to the U.S. Constitution. If an exorbitant property bond is set, a 14th Amendment equal protection argument may be raised if it can be demonstrated through the county tax assessor's office that the value and size of the divided property in the county would make it virtually impossible for the accused to make the bond set.

### 2) Client's Physical and Mental Well-Being

The client will be under considerable pressure as the case proceeds toward trial. Motions can help to ease that pressure, and develop a relationship between lawyer and client.

- Cigarettes — If your client smokes, make sure there is a steady supply. There is no better entry for a jailer or opportunistic cellmate than to engage the defendant in a conversation while the defendant is desperately seeking a cigarette; there is nothing more discouraging than to build an excellent defense and have it collapse in the face of "voluntary" statements given while the client was in jail.
- Health-promoting opportunities — exercise, out-of-cell time, special dietary or medical needs, etc.

It is important for the client to spend time with her family and other supportive people

- Visits — During trial preparation, the client will probably have to be evaluated by psychologists and doctors as well as interviewed by attorneys and investigators. It is also important for the client to spend time with her family and other supportive people. Consideration might also be given to preventing visits by certain people, e.g., the unindicted relative or amour that you suspect the client is trying to protect at great cost to the case.
- Motions may be made to avoid heightened security, particularly when a client is brought into public and most particularly when he may be in the view of prospective jurors or the media.
- Arrange access to proper clothing and the amenities, such as a barber, that will allow the client to be presented as well as possible.
- It is usually important to have the client near counsel and perhaps near the place of trial. Should a change of venue be sought, consider the conditions of confinement at the new venue. If the client is confined in a non-local facility, you might seek transfer to a more convenient one.
- Participation in defense—The state and federal constitutions confer a right to participate in the defense. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Move for the defendant's presence at all hearings; see T.R.Cr.P. 43. When the accused is in custody, especially if he is in a distant institution, arrangements should be made to insure his transportation to the location of the trial. Faretta is also authority for a request that the accused be allowed to act as co-counsel. See T.R.Cr.P. 44.[3]

In any motion regarding transfer or the conditions of confinement, file an affidavit setting out detailed reasons why the relief is necessary, and cite the rights to counsel, due process, and freedom from cruel and unusual punishment. See also Tenn. Const., Art. I, § 16 (no unnecessary rigor) and 32 (safe and comfortable prisons, humane treatment of prisoners).

[3] See also State v. Sanders, 237 S.E.2d 53 (S.C. 1977) ("defendant does have the right to the assistance of counsel, even if he or she is representing him/herself"); Ballard v. State, 366 So.2d 668 (Miss. 1979); and Currington v. State, 350 So.2d 711 (Ala. Crim. App. 1977).

**3) Unconstitutionality of the Death Penalty Statute**
Challenge any aspects of the statute that may be unconstitutional. Very often attorneys forget to peruse the state constitution for potential violations. The newly constituted Tennessee Supreme Court has let it be known that it is interested in state constitutional issues.[4]

While our Court has scrutinized the statute to some degree, the federal courts have not reviewed its interpretation of federal constitutional standards. Issues that appear to have been laid to rest by the state courts should still be raised, until they receive complete review by the federal courts and are explicitly overruled. Given the changing death penalty law since the statute was promulgated, there is a substantial likelihood that the Sixth Circuit or the U.S. Supreme Court may ultimately find portions of the statute unconstitutional. Consult Chapter 7 of this manual.

The newly constituted Tennessee Supreme Court has let it be known that it is interested in state constitutional issues

**4) Jury Composition**
Many jurisdictions in this state, especially the rural counties, are ripe for constitutional challenge on the selection of prospective jurors. A jury composition challenge should be investigated in every capital case, particularly in jurisdictions in which there has been no recent challenge. It is likely that the county jury commissioners and court clerks are not following the statutory requirements to the letter, and that constitutional mandates are not being met. See Chapter 11 of this manual, and The National Jury Project, Jurywork (1990), ch. 5.

**5) Change of Venue**
The right to a change of venue due to pre-trial publicity is based on the rights to a jury trial and an impartial jury, freedom from cruel and unusual punishment, and due process — especially in a capital case. U.S. Const., 6th, 8th and 14th Amendments; Tenn. Const., Art. I, §§ 9, 16 and 8. Denial of the motion may be fatal to the conviction and sentence; even an unsuccessful motion can produce leverage with which to obtain a continuance and individual, sequestered voir dire. See Chapter 12 of this manual.

**6) Bill of Particulars**
Helpful in any criminal case, in a capital case a bill of particulars may be used to expand on the state's notice of aggravating circumstances, forcing the state to describe details of the aggravation on which it intends to rely. See T.R.Cr.P. 7(c); State v. Hicks, 666 S.W.2d 54 (Tenn. 1984); and Fahringer, "The Battle for a Bill of Particulars," The Champion, vol. 14, no. 8, p. 8.

[4]For example, State v. Black, 815 S.W.2d 166 (Tenn. 1991).

The media cannot be relied upon to create a sympathetic public image; "loose lips sink ships"

### 7) Continuances

The court may be sympathetic to requests for continuance of a capital case, with its novel issues requiring extensive preparation and often involving witnesses, such as experts, whose availability requires some planning. Consider moving for more time in advance not only of the trial but also of hearings on motions, when necessary to adequate preparation. A continuance is also required if an interlocutory appeal is to be pursued, or to dissipate the effects of pre-trial publicity. Denials of a continuance may be helpful in demonstrating later that the defense did not receive a full opportunity to be heard at the trial level.

### 8) Limit Media Coverage

To avoid a media zoo, it may be advisable to request a limitation on exposure of the case to the media. For example, the court might find it reasonable to exclude cameras from inside the courthouse, limit the number of media personnel and allow attendance by representatives, prohibit photographs of the client in shackles, and otherwise protect the client as well as prospective jurors from media questions and photographs.

The accused has a greater right to limit the media exposure to pre-trial proceedings than to the trial itself. Gannett Co. v. Depasquale, 433 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608. The right to a public trial (6th Amendment; Art. I, § 9) is waived by the request for limited exposure.

Normally, any publicity about a death penalty case is bad for the defense. When in doubt, avoid attempts by the media to interview you, the client, witnesses, etc., or to cover the judicial proceedings. The experience of those involved in death penalty litigation is that the media cannot be relied upon to create a sympathetic public image; "loose lips sink ships."

### 9) Discovery

#### a. Rule 12.3(b)

If the prosecution has not yet given formal notice, the defendant has a right to discover whether the prosecution will seek death. If death is being sought, the accused is entitled to notice of the aggravating circumstances on which the state intends to rely, in writing, at least thirty days before trial. T.R.Cr.P. 12.3(b), (c).

Caution is required, as a request might prompt a notice of intent to seek death in a case in which the state might ultimately decline to do so. However, protect yourself from not being able to obtain unlimited compensation for working on a death penalty case pursuant to Tenn. Sup. Ct. R. 13(2). You may be able to demonstrate that the trial court considers this a death penalty case despite the lack of official notice, protecting yourself by seeking appointment of co-counsel and support services and hearings on pre-trial motions in which the defense of a death case is contemplated.

It goes without saying that thirty days notice before an impending death penalty trial is woefully inadequate. Allow plenty of time to prepare whether or not notice has been given; when in doubt, assume notice will eventually issue. If late notice prejudices the accused, object pursuant to the protections against cruel and unusual punishment and the rights to due process and fundamental fairness. (8th and 14th Amendments; Art. I, §§ 16 and 8.)

If the notice does not specify aggravating circumstances, immediately file a written motion for notice pursuant to Rule 12.3(b), or an order that the state will not be permitted to rely on any aggravating circumstances.

**b. Rule 16**

Request all evidence to which the defense is entitled under T.R.Cr.P. 16, consistent with the wisdom dictated by reciprocal discovery obligations. (If, for legitimate strategic reasons, you don't want to show them yours, don't ask for theirs!) The trial court has the authority to compel the prosecution to turn over any evidence that should be disclosed based on notions of fundamental fairness. In State v. Irick, supra, the court ruled that the trial court did not abuse its discretion by ordering pre-trial production of the criminal records of state's witnesses, a list of the defendant's bad acts or misconduct, and a list of witnesses with material knowledge of the defendant's bad acts — an order beyond the scope of Rule 16 — "in the interest of justice" in a death penalty case.

In State v. Irick, the trial court did not abuse its discretion by ordering pre-trial production of records beyond the scope of Rule 16 — "in the interest of justice"

**c. Brady**

Due process imposes on the prosecution an obligation to disclose favorable evidence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The law on the scope of the state's obligation, and the defense burden of requesting the information, is continuing to evolve. Brady held that withholding evidence favorable to the accused, after request, violates due process where the evidence is material to either guilt or punishment. It has been limited somewhat by United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1966) (test for materiality narrowed; no significant difference between cases in which a general request is made and no request, barring gross deprivation of fundamental fairness), and United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (impeachment evidence is producible under Brady, but conviction would stand absent proof of sufficient probability of different result based on disclosure of the evidence). See generally Greshman, Prosecutorial Misconduct (1986), ch. 5.

While many prosecutors are protective of their reputations, or still believe that Brady is the exclusive ruling on exculpatory evidence, be aware that a general motion will not suffice either to get the

Counsel must be provided, on request, with any evidence of a promise of lenience toward a state witness

information or to create error. Brady motions can and should become an aggressive, offensive weapon in the defense arsenal. Separate and repeated motions for different information throughout the case and, indeed, during the trial may be advisable.

**d. Disclosure of mitigation**

This motion is similar to a Brady motion but broader in scope. U.S. Supreme Court jurisprudence stands for the proposition that the defense is entitled to present any relevant evidence in mitigation at sentencing.[5]

> A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed.

California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

In Chaney v. Brown, 730 F.2d 1334 (10th Cir. 1984), a death sentence was vacated because the prosecutor failed to disclose evidence that the defendant was not the only participant in the murder. While not material to guilt, the evidence was relevant to whether the defendant was the more culpable participant — a question material to penalty.[6] Evidence of the accused's prior mental illness is often not disclosed. See Blake v. Kemp, 758 F.2d 523 (11th Cir. 1985) (vacating conviction because prosecution did not disclose a suicide note and confession that would have supported insanity defense). Even if there is no insanity defense, mental illness can usually be used in mitigation at sentencing.[7]

**e. Motion to reveal the deal**

Counsel must be provided, on request, with any evidence of a promise of lenience toward a state witness or someone known to the witness (e.g., a spouse). Such information is a legitimate basis for impeachment and is therefore relevant and favorable to the defense; failure to disclose it violates the rights to confront witnesses and to due process. (6th and 14th Amendments; Art. I, §§ 8 and 9.) Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

[5] See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); and Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

[6] *See* Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

[7] *See also* "The Capital Defendant's Right to Obtain Exculpatory Evidence from the Prosecution to Present in Mitigation Before Sentencing," 23 Am. Crim. L. Rev. 207 (1985).

**f. Declaration of prosecution's standards and criteria for seeking death**

The rights to due process and freedom from cruel and unusual punishment include protection from discriminatory, arbitrary or disproportionate imposition of death. (8th and 14th Amendments; Art. I, §§ 8 and 16.) In point of fact, the death penalty is consistently imposed in violation of that protection. Arguably, the accused should be able to ensure in advance that he will not be a victim of unconstitutional imposition of death.

One of the most common opportunities for the unfair exercise of discretion is in the prosecutor's decision whether or not to seek death. It is suspected that few, if any, of the district attorney general's offices in this state have specific criteria concerning which defendants should receive a death notice. There is clear evidence that death is sought by more prosecutors in some areas of the state than in others. Unfortunately, there is currently an insufficient data base to properly evaluate the unfairness created by these practices; because such information may be developed in the future, the issue should be raised pre-trial. At the very least, counsel should force the prosecution to state on the record what criteria they use or that they use none.

Counsel should force the prosecution to state on the record what criteria they use or that they use none

**g. Submission of prosecution files into the trial record**

If you know or strongly suspect that deals are being struck with witnesses or that there is other actual or potential misconduct by the police or the prosecution, move for a court order requiring the prosecution to submit its complete files, including police investigative files, under seal, and making them part of the record — especially if there is a realistic potential for Brady material. Request *in camera* inspection of the files to discovery whether they contain any evidence producible to the defense. CF., Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

If the exculpatory or material nature of the information is not obvious on its surface, consider filing, ex parte, a list of what you suspect the files contain. The prosecution has been poring over the case for months with a highly trained investigative force; they have accumulated mountains of information, from which they have picked the most damaging to the defendant, perhaps unaware of the significance of exculpatory information. Counsel should not be obliged to disclose the defense theory or the existence of any information, particularly if its source is protected by the attorney-client privilege. Furthermore, the information may be vital but seem innocuous to the uninformed eye. For example, the defense may know that the color of the getaway car given by a particular witness is crucial. Why should the defense have to disclose any of its case in order to obtain appropriate disclosure that is mandated by law?

Access to the state's files is crucial because the state's agents were on the scene first and probably talked to the important witnesses

This motion should be made pursuant to the rights to equal protection and due process (14th Amendment; Art. I, § 8); right to confront witnesses (6th Amendment; Art. I, § 9); and protection against cruel and unusual punishment (8th Amendment; Art. I, § 16). The equal protection argument is enhanced by the disparity of resources; the defendant frequently has to grovel for investigative help, while the state may spend as much or as little as it chooses in pursuing the case. Access to the state's files is also crucial because the state's agents were on the scene first and probably talked to the important witnesses. Anything found by the police that did not point to your client should be of special interest to the defense.

**h. Jury performance information**
Request equal access to any information the prosecution has concerning the prospective jurors, including their prior performance on juries, pursuant to the rights to a jury trial (6th Amendment; Art. I, § 9) and to due process (14th Amendment; Art. I, § 8).

**i. Informant's identity**
Pursuant to the rights to due process, to confront witnesses, and to protection from cruel and unusual punishment (14th, 6th and 8th Amendments; Art. I, §§ 8, 9 and 16), counsel may request the identity of informants. This is especially true if the informant was a witness to the crime. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Cite the heightened standard of due process required in death cases, along with State v. Irick, *supra*, to the effect that the prosecution should reveal the requested information "in the interest of justice." Ask for the informant's identity, where the informant can be located, any compensation the informant received, any statements by the accused about which the informant could testify, and any summaries, conversations, communications or written memoranda made by said informant relative to the accused.

**j. Rule 15 deposition**
Pre-trial depositions may be taken "whenever due to exceptional circumstances of the case it is in the interest of justice." T.R.Cr.P. 15. The deposition may then be used as substantive evidence if the witness is "unavailable" or gives inconsistent testimony at trial, or if "exceptional circumstances exist as to make it desirable in the interest of justice." Rule 15(e).

**k. Rule 17 subpoena**
The court may direct that books, papers, documents, or tangible things designated in [a] subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered into evidence and may upon their production permit them to be inspected by the parties and their attorneys.

T.R.Cr.P. 17. As discussed elsewhere, counsel must thoroughly search institutional records and any other documentary evidence relating to the client. Many records can be obtained on request, others require the client's written authorization, and some cannot be obtained without a subpoena or court order. Be prepared to take whichever measure is necessary. See Chapter 5, Investigation.

Requests for subpoenas or court orders should be made pursuant to the rights to compulsory process, a jury trial, due process, and freedom from cruel and unusual punishment. (6th, 8th and 14th Amendments; Art. I, §§ 9, 16 and 8.)

**1. "In the interest of justice"**

State v. Irick, *supra*, can be a powerful weapon. If the prosecution, police, or any state entity may have any information or evidence that may be helpful to the client, file a motion and affidavit showing how justice would be served by defense access. Cite the heightened standard of due process that applies in death cases and the degree of reliability of the conviction and sentence that is necessary to satisfy the Eighth Amendment. Counsel may wish to resort to this device when all else fails.

**10) Jury Selection**

Refer to Chapter 12 of this manual and its appendices for a discussion of jury selection in a capital case, before making final plans for filing the following pre-trial motions.

**a. Individual, sequestered voir dire**

Individual and sequestered voir dire should be requested in every capital case; Chapter 12 contains extensive discussion on this subject. While generally the conduct of voir dire is in the court's discretion, even in a death penalty case, there are some circumstances in which the court must grant individual voir dire. See State v. Claybrook, 736 S.W.2d 95 (Tenn. 1987) (reversing conviction and death sentence due to lack of individual voir dire where actual jurors knew about highly prejudicial information based on pre-trial publicity); see also State v. Furlough, 797 S.W.2d 631 (Tenn. Crim. App. 1990).

**b. Objection to death qualification**

Perhaps the greatest obstacle in a death trial is the fact that the jury is death qualified. Death qualification distorts the composition of the panel; the jurors who qualify are prosecution prone, not only as to sentence, but also as to guilt. The U.S. Supreme Court has upheld death qualification against a challenge on 6th Amendment fair cross-question grounds. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). However, because of the importance of the

Individual and sequestered voir dire should be requested in every capital case

Raise a challenge if any group is being excluded, including jurors opposed to death

issue, and to educate the court and the prosecution on the sensitivity of the jury selection process in a death case, the issue should be raised and preserved for the record.

**c. Preclude discriminatory use of peremptory challenges**

The law on Batson challenges (see Chapter 12), is still developing, and counsel should thoroughly research current cases to determine how to preserve the issue. Object at the earliest possible opportunity; after the jury is selected is probably too late. Important questions that remain open include which groups may be the basis for a discrimination charge, and whether the defendant must be a member of the group. Raise the challenge if any group is being excluded, including jurors opposed to death. According to sociological data, blacks and women tend to be more favorably disposed toward the defense and against the death penalty; discrimination against jurors opposed to death may also be racial or gender discrimination.

**d. Juror questionnaire and proposed questions**

Sample questionnaires are included in the appendices to Chapter 12. They are very helpful in jury selection, and can easily be sold to the court as a way to speed up selection by obtaining information that would otherwise have to be elicited in open court.

If the judge may find some questions problematic, court approval may be sought in the course of negotiating for individual voir dire. While the ground rules concerning what may and may not be discussed during jury selection are being hammered out, counsel could suggest that a great deal of time could be saved by simply adopting the defense questionnaire. Once again, these requests should be made under the rights to equal protection, due process, and trial by a fair and impartial jury.

**e. Increased number of prospective jurors**

Before trial, evaluate whether the panel will include enough people for death penalty voir dire. Predict the number of "no-shows," challenges for cause, and peremptory challenges, with advice from courthouse observers, the clerk, and sheriff's deputies who are serving notice on prospective jury members. If a shortage is anticipated, move to increase the size of the panel. Depletion of the panel may interrupt selection and add prospective jurors unknown to the defense team.

[8] *See, e.g.*, State v. Simon, 635 S.W.2d 498 (Tenn. 1982); Ellis v. State, 403 S.W.2d 293 (1966); State v. Wingard, 480 S.W.2d 915 (Tenn. 1972).

**f. Additional defense peremptory challenges**
The defense is entitled to fifteen peremptory challenges and the state to eight per defendant. T.R.Cr.P. 24 (d). Case law indicates, however, that the trial court has discretionary control over both the number and the methods of exercising peremptory challenges.[8] Counsel should not automatically seek additional peremptory challenges because it could backfire. One danger is that the state and not the defense could be given additional challenges.[9] More important, appellate review of excusals for cause requires that the defense have exhausted its peremptory challenges. As always, strategic considerations must be made concerning the judge and the prosecutor in order to determine whether the request is advisable.

Polls suggest that jurors would not favor the death penalty if the alternative were life without parole

**g. Permission to ask jurors about state parole law**
This is another request that must be considered carefully before it is made. As the law stands, neither counsel nor the court can discuss parole with the jurors. In King v. Lynaugh, 850 F.2d 2146 (5th Cir. 1988), a Texas court's refusal to allow the accused in a capital case to ask prospective jurors about their understanding of state parole law was held to violate the right to an impartial sentencing jury.

Although most people support the death penalty, polls suggest that they would not favor it if the alternative were life without parole. Some jurors may believe that a life sentence would result in an earlier release than it actually would; letting them know the actual meaning of "life" would help the defense. Others, however, may believe that life means life; discovering that it includes the possibility of release might sway them towards death.

In Tennessee, a life sentence results in parole eligibility after thirty-six years, which may be reduced to approximately 23 to 25 years, depending on when the crime was committed. Actual release, of course, is in the Parole Board's discretion. In short, no one really knows what a life sentence means in this state, a reality that makes it difficult to draft a meaningful instruction, but should not prohibit an inquiry into attitudes attitude about parole.

**11) Witnesses**

**a. Securing attendance of out-of-state witnesses**
File a motion under T.C.A. §§ 40-17-201, et seq., well before the time the witness will be needed; consult the statute for the necessary information.

**b. Compel witnesses to submit to interviews**
Some witnesses are reluctant to talk to the defense, especially state's witnesses and most especially law enforcement officers; sometimes the police or prosecution discourage witnesses from talking to the

[9]State v. Wingard, *supra*.

Ask the court to instruct the state or police to refrain from telling witnesses not to cooperate with the defense

defense. Furthermore, the grand jury subpoena power is unavailable to the defense, and is often used and abused by the prosecution to obtain witnesses' cooperation. Persuade the court that the defendant should at least have an opportunity equal to that of the prosecutor to prepare the case. Argue that the witness's very reluctance indicates the need for a defense interview. Pursuant to the rights to due process and freedom from cruel and unusual punishment, ask that the court order or encourage the witnesses to allow counsel to interview them.

In the end, the court may have no actual authority to order anyone to be interviewed. But if the court can be persuaded that justice would be served by the cooperation of potential witnesses, its influence can persuade witnesses to cooperate. The court's assistance may be more easily obtained if the state has given witnesses explicit or implicit instructions not to cooperate with the defense; counsel should also ask the court to instruct the offending party to refrain from giving such advice or instructions.

If the prosecutor has a statement by a witness who will not talk to the defense, also ask that counsel be provided with a copy.

**c. Immunity for potential defense witness**
If a potential defense witness refuses to cooperate as a result of possible criminal exposure, and wishes to assert the privilege against self-incrimination, seek a grant of immunity so the witness can testify free from the threat of prosecution. The request should be made pursuant to the rights to trial, to compulsory process, to fundamental fairness, and to present a defense, see Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). While there may be some question about the court's authority, trial courts have been reversed for refusing similar requests.[10]

## 12) Preliminary Hearing

A preliminary hearing may be requested pursuant to T.R.Cr.P. 5(e) if an indictment is returned before a hearing is held. If a preliminary hearing was held but a new one might provide more discovery or other advantage, consider requesting that the bind-over to the grand jury be set aside and

[10] *See* State v. Broady, 321 N.E.2d 890 (Ohio App. 1974); United States v. Herman, 589 F.2d 1191, 1204 (3d Cir. 1978); Government of the Virgin Islands v. Smith, 615 F.2d 964, 966 (3d Cir. 1980); and Note, "The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses," 91 Harv. L. Rev. 1266 (1978).

[11] See State v. Rushton, 15 TAM 25-22, CCAK, 5-11-90 (upholding dismissal of indictment and remand for second preliminary hearing, when first was not recorded and defendant had changed counsel; state argued no showing of prejudice, but court held that because there had been no trial the extent of prejudice was unknown).

[12] See McKelden v. State, 516 S.W.2d 82 (Tenn. 1974).

the case remanded for a new hearing. A new hearing should be held if (1) no court reporter was present and the electronic recording required by T.R.Cr.P. 5.1 is unavailable or so inaudible that it is useless;[11] (2) counsel at the preliminary hearing was incompetent, or had not been in practice for three years;[12] or (3) the judge at the original preliminary hearing refused to let the accused put on evidence, in violation of T.R.Cr.P. 5.1(a).

Motions for recusal of the trial court or disqualification of the prosecutor should be considered in every death penalty case

### 13) Daily Transcripts

If daily transcripts of the pre-trial hearings or the trial are needed, file a request, alleging that the trial will be lengthy and will involve complicated issues of fact and law, with the life of the accused at stake, and that consequently adequate trial preparation requires transcripts. Legal basis for the request lies in the rights to due process and freedom from cruel and unusual punishment. (If the state is to pay, it must also be alleged that the client is indigent.) Transcripts will, of course, be helpful if state's witnesses testify in more than one hearing; they may be helpful to the prosecution for the same reasons.

### 14) Pretrial Conference

T.R.Cr.P. 17.1 authorizes a pre-trial conference at any time after indictment. A conference may provide discovery, clarify issues, and accomplish any number of things depending upon the individual case. If counsel can defend it, the motion should demonstrate how a conference would simplify the issues, encourage stipulations, identify witnesses to be called, and anything else that would facilitate the trial. The trial court should always be willing to entertain overtures that suggest a process economizing and streamlining use of the court's resources. Cite T.R.Cr.P. 17.1 as well as the right to due process, right to a fair and impartial trial, and protection against an unreliable process resulting in cruel and unusual punishment.

### 15) Disqualification of Parties

Motions for recusal of the trial court or disqualification of the prosecutor or prosecutor's office are infrequently made, but should at least be considered in every death penalty case. If there is some colorable basis, the offending prosecutor or judge will be forced to create at least the appearance of legality and propriety, and may face close appellate scrutiny. Even if the motion is not granted, it may improve the trial atmosphere.

---

[13]See Tenn. Sup. Ct. R. 8; Code of Professional Responsibility, Canon 5, E.C. 5-9, 5-10; United States v. Hobson, 672 F.2d 825 (11th Cir. 1982); United States v. Cunningham, 672 F.2d 1064 (10th Cir. 1982); Lee v. Todd, 555 F. Supp. 628 (W.D. Tenn. 1982).

[14]See Mattress v. State, 564 S.W.2d 678 (Tenn. Crim. App. 1977); *but see* Autry v. State, 430 S.W.2d 808 (Tenn. Crim. App. 1967).

Rule 14 also contemplates severance when "necessary to achieve a fair determination of the guilt or innocence of one more defendants"

A motion to disqualify the district attorney general may be filed if the prosecutor is likely to be a witness,[13] for example if she or one of her assistants was instrumental in obtaining a statement from the defendant, was involved in a search in which evidence was seized, was present at the crime scene shortly after the crime, or viewed the victim's remains.

The prosecutor may also be disqualified if he previously represented the defendant.[14] Another basis for seeking disqualification is an allegation that the prosecutor has arbitrarily, disproportionately or discriminatorily selected cases in which to seek death. While the motion should of course not be filed unless it has a colorable basis, it can provide an opportunity to supplement the record with testimony about the prosecutor's criteria and standards used in determining whether to seek death. A motion to disqualify a judicial officer should be considered where there is any potential for serious conflict.[15]

These motions involve obvious strategic concerns, but all the chips are on the table in a death case; never err as a result of timidity. If the motion succeeds, the prosecution's momentum could be seriously disrupted. And the subsequent prosecutor or judge may not have the same personal interest in the outcome of the case, or suffer from whatever bias led to recusal.

### 16) Severance

#### a. Parties — T.R.Cr.P. 14 (c)

Severance should be considered when any co-defendant has made a statement implicating your client, use of which violates the right to confront witnesses.[16] Rule 14 also contemplates severance when "necessary to achieve a fair determination of the guilt or innocence of one more defendants." Once again, there are serious strategic considerations. As a general rule, severance is to the advantage of the client with the stronger defense, because it can help avoid contamination by the more culpable co-defendant; on the other hand, keeping the weaker defendant in may give the jury a contrast,

[15]Steve Bright of the Southern Center for Human Rights, 185 Walton Street, Atlanta, Georgia 30303, (404) 688-1202, has had recused a trial judge with a demonstrable record of racism. See Tenn. Sup. Ct. R. 10; Code of Judicial Conduct, Canon 3(c).

[16]See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); and Lee v. Illinois, 39 Cr. L. Rev. 3121 (198*). See also United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), concerning request for severance and harmless error analysis.

[17]See also T.R.Cr.P. 8 on permissive joinder of offenses and defendants.

[18]See also T.R.Cr.P. 8 (b) on permissive joinder of offenses.

and perhaps let it vent its anger on the more guilty party. If your client has the weaker defense, it may be to your advantage to keep the trials joined.[17]

**b. Counts — T.R.Cr.P. 14 (b)**
Severance of offenses is required on motion "unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others," or in order to achieve or promote a fair determination of the defendant's guilt or innocence of each.[18]

Counsel is entitled to samples of the evidence in order to subject it to testing

**17) Speedy Trial**
Undue delay before arrest implicates due process if it results in denial of fundamental fairness; delay after arrest or indictment brings into play provisions of the federal and state constitutions.[19] In Tennessee, a homicide must be tried within 150 days of arraignment, absent a statutorily specified exception. T.C.A. § 40-18-103. However, the time limit is only directory. The court may dismiss the indictment, presentment, information or complaint based on "unnecessary delay" in presenting the charge to a grand jury or bringing the accused to trial. T.R.Cr.P. 48 (b). While the rule does not require prejudice, dismissal is unlikely without it.

This motion will be rare in a death case. First, it is difficult to demonstrate that the right to a speedy trial has been denied. Second, it is usually the defense that needs delay in order to prepare for trial, and to dissipate the effect of prejudicial publicity and the zeal of the prosecutor and victim.

**18) Preclude Death Sentence due to Destruction of Exculpatory Evidence**
Counsel is entitled to samples of the evidence in order to subject it to testing. State v. Gaddis, 530 S.W.2d 64 (Tenn. 1975). Aggressive use of Gaddis motions can expose sloppy handling of evidence, and may even reveal that the prosecution allowed evidence to be destroyed or to decay such that testing is precluded. A motion for samples must be filed at the earliest opportunity. If your client's indigence will delay testing until funds can be sought from the court, file a motion demanding that any and all evidence be preserved in a way that will allow later testing.

Any time there is official misconduct in collecting, developing or presenting the state's case, consider the elimination of death as a remedy. Argue that by its own misconduct, the state has forfeited its privilege to seek death—i.e., destruction of evidence violates the heightened standard

[19]See Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); State v. Bishop, 493 S.W.2d 81 (Tenn. 1973); and State v. Northcutt, 568 S.W.2d 636, 638 (Tenn. Crim. App. 1978).

If the prosecution's decision to prosecute or the jury's decision to convict and sentence is tainted by any arbitrariness, file a written motion

of due process and the requirement that the process be especially reliable. Set out the factual basis in affidavits or testimony, and cite the federal and state constitutional authority.

**19) Proportionality, Discrimination, Arbitrariness**
The central theme of the cases that resulted in the rewriting of the death penalty statutes throughout the country was that the fact-finder's discretion must be guided and limited by established standards that narrow the class of death-eligible defendants. This was supposed to ensure that death would be reserved for special categories of individuals who meet carefully defined aggravating criteria and whose culpability exceeds that necessary to find the elements of first-degree murder. Further, the criteria were supposed to be unrelated to the accused's sex, race, economic status, etc.

Systematic challenges in recent years have attempted to demonstrate that the system is incapable of imposing death sentences that are free from arbitrary, discriminatory and disproportionate factors. Attorneys have often raised similar allegations relating to particular cases. Attempts are being made to accumulate a Tennessee data base sufficient to evaluate the extent to which death is being imposed in accordance with constitutional principles. Until this information is accumulated, it is important that counsel continue to preserve the issues so they can be evaluated on the merits at a later date.

If the prosecution's decision to prosecute, the jury's decision to convict and sentence, or the judge's approval of the verdict is tainted by any disproportionality, discrimination, or arbitrariness, file a written motion or make a verbal objection and supplement the record with all evidence of the constitutional violation.

**a. Proportionality review**
In reviewing the sentence of death for murder in the first degree, the Tennessee Supreme Court shall determine whether:

> (4) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the nature of the crime and the defendant.

T.C.A. § 39-13-206 (c). Trial courts submit the Rule 12 forms to the clerk, and one assumes that copies are made available to the members of the Supreme Court. Other than that, what exactly the Tennessee State Supreme Court does to review the proportionality of death sentences is a mystery.

In Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court held that the 8th Amendment does not require a comparative proportionality review of death sentences. The California statute at issue did not require proportionality review. Because the Tennessee statute does, Pulley is not dispositive; by creating a statutory requirement, the state has created a constitutional right that the proportionality review be conducted consistent with the elements of due process. A protected liberty interest is created when substantive limitations are placed on official discretion.[20]

Move for an order compelling the prosecution to reveal its standards and criteria for seeking death. It is anticipated that the Tennessee data base will demonstrate not only racial and sexual but also geographical discrimination (preliminary information indicates that death is imposed more often in East Tennessee than in any other part of the state). No matter what class your client belongs to, if you suspect discrimination in the prosecution's choice to seek death make every effort to demonstrate the discrimination. Present the issue as a violation of the due process and cruel and unusual punishment provisions of the state and federal constitutions.

Most recently, racial discrimination in imposing death was defeated as a systematic challenge in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), denying relief because the record did not demonstrate purposeful discrimination. What is interesting, perhaps from a political as opposed to legal standpoint, is that the majority opinion acknowledged demonstrable discrimination in imposing death in Georgia, related to the race of the victim.

**The 8th Amendment prohibits execution of those who aid and abet in felonies resulting in murders, but do not themselves kill, attempt to kill or intend that a killing result**

---

[20] Constitutionally enforceable due process rights are created by a procedural scheme upon which the defendant can base a "substantial and legitimate expectation" that liberty will be lost only in accordance with that scheme. Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). *See also* Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); Connecticut Board of Pardons v. Dumshat, 452 U.S. 458, 101 S.Ct. 2450, 69 L.Ed.2d 138 (1981); Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Creation of a right can also beget other rights to procedures essential to the realization of the parent right. *See* Meachum v. Fano, 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *see also* Mayes v. Trammell, 751 F.2d 175 (6th Cir. 1984) (constitutionally protected liberty interest created by Tennessee's mandatory parole procedures); Beard v. Livesay, 798 F.2d 874, 878-79 (6th Cir. 1986).

[21] See Porter, "May an Accomplice Receive the Death Penalty? The Tison v. Arizona Answer," The Champion, August 1987, p. 24.

A motion in limine is a proper method of raising evidentiary and legal issues before trial in order to save time and ensure correct rulings

No matter what the current state of the law, evaluate the circumstances in order to identify any discrimination against a cognizable group to which the accused belongs, and articulate an objection on those grounds.

**b. Defendant's Culpability**
In Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the Court held that the 8th Amendment prohibits execution of those who aid and abet in felonies resulting in murders, but do not themselves kill, attempt to kill or intend that a killing result. However, in Tison v. Arizona, 481 U.S. 137, 109 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Court found that an accomplice to a felony-murder can be executed if the state proves major participation in the felony and "reckless indifference to human life."[21]

Whether your client is death eligible under Enmund and Tison may depend on facts in dispute that cannot be resolved until after the trial begins. However, if the proof is sufficiently developed, or the parties enter a stipulation, the question may be addressed before the jury is selected. This would obviously be to your advantage, as it would avoid determination of guilt by a death-qualified jury.

**20) Motions in Limine**
Motions in limine can be as varied as counsel's imagination permits. A motion in limine is a proper method of raising evidentiary and legal issues before trial in order to save time and ensure correct rulings. United States v. Cook, 608 F.2d 1175, 1186 (9th Cir. 1979) (*en banc*). Some substantive motions can be termed "in limine" simply because they give the court an opportunity to rule in advance on a subject that will be a source of contention at trial. Others merely serve a housekeeping function. Typical motions in limine include:

a. Avoiding references to evidence unconstitutionally seized or otherwise inadmissible. If state witnesses may testify — solicited or unsolicited by the prosecution — about hearsay or other inadmissible evidence, ask that the court admonish them, or instruct the prosecution to do so, before they testify.

b.Admissibility of "prior bad acts" of the accused as substantive evidence in the prosecution's case in chief. The single most important change in the law made by T.R.E. 404 may be that introduction of such evidence does not depend on the defendant testifying. On request, the court must hold a hearing, without the jury, when the state seeks to introduce evidence of other crimes, wrongs or acts. The state must prove that the evidence is relevant to a "material issue" other than conduct conforming to a character trait. Admission of the evidence will affect the traditional strategy of keeping the client off the stand to avoid evidence of prior bad acts.

T.R.E. 608 sets out the type of evidence that may be introduced to attack the character and conduct of witnesses, and contains the usual restrictions on use of extrinsic evidence to prove specific instances of conduct. Rule 608 (b) (3) requires written notice of impeaching conduct to be used against the defendant. If the court rules such evidence admissible for impeachment, the accused need not testify in order to preserve a challenge.

While witnesses can now give their opinion of one's reputation, cross-examination on specific instances of conduct is limited. On request, the state must show at a jury-out hearing that specific criteria exist. The prosecutor cannot ask witnesses, "Have you heard that the defendant was arrested for X," without a jury-out hearing and a substantial reason to do so. See T.R.E. 405.

The state must give written notice before trial of prior convictions

c. Admissibility of prior convictions to impeach the defendant's testimony. T.R.E. 609 basically tracks State v. Morgan, 541 S.W.2d 385 (Tenn. 1976). Note that the state must give written notice before trial. If the court rules that the conviction can be used, the accused need not testify to preserve a challenge.

d. Objections to conduct or argument of the prosecution or any state agent. These objections are obviously broad in scope and endless in number. For a detailed citation of law on prosecutorial argument, see Appendix D to this chapter. This kind of motion is especially effective if you know that a prosecutor typically engages in objectionable behavior or argument. In addition to objecting to prejudicial arguments, motions may be filed concerning:

(1) Objections to evidence calculated to illicit passion and inflame the jury, such as testimony from the victim's family or friends, or circumstances surrounding the victim's death, which is irrelevant to an element of the offense.

(2) Stipulations to avoid sensational or inflammatory evidence.

(3) Avoiding reference to prejudicial or misleading facts such as nicknames, incidental occurrences or facts, personal characteristics of the accused or counsel, etc.

(4) Objection to the prosecution calling expert witnesses who have spoken with the accused, citing the privilege against self incrimination. *See* McCormick, *Evidence* § 133 (2d ed. 1972), Estelle v. Smith, 451 US 454, 101 S.Ct. 1866, 68 L. Ed. 2d, 359 (1981), and Chapter 8, Recurring Issues.

e. Objection to use of photographs and other tangible evidence that is more prejudicial to the accused than probative in the prosecution's case. *See* State v. Banks, 564 S.W.2d 947 (Tenn. 1978).

Counsel must consider when to file motions that affect the sentencing hearing

**21) Jury Instructions**
See Chapter 14 for a detailed discussion of jury instructions.

**22) Adoption of Co-Defendant's Motions**
Obviously, counsel should always be alert for an opportunity to raise valid issues wherever they may be found. In a multi-defendant case, counsel must be aware of motions filed on behalf of other defendants; if they would also be helpful to the client, counsel is advised to file an original motion raising the issue and preserving the record. At the very least, file a written motion specifically adopting the other defendant's motion. There may be strategic reasons for letting a co-defendant take the lead or vice versa on various issues.

## B. Pre-Sentencing Hearing Motions

Because death trials contemplate a bifurcated proceeding if the defendant is found guilty of first degree homicide, counsel must consider when to file motions that affect the sentencing hearing. Any motion that might eliminate the possibility of death should be litigated before trial, to avoid a death-qualified jury. On the other hand, some motions may not be ripe until after the verdict; in others, counsel may wish to limit the time for the prosecution to respond. The motions themselves should, if possible, be prepared before trial; counsel can always change course as circumstances dictate. Before preparing the sentencing hearing motions, review Chapter 14 and its appendices.

**1) Continuance**
If you reach that unfortunate stage when the jury returns a verdict of guilty of first degree murder, you must try to postpone the sentencing hearing. The trial court will be inclined to move straight to sentencing, partly because the court must consider the sequestered jury that has already been kept from its normal routine for several days or weeks. Emphasize the importance of the sentencing hearing and the heightened standard of due process. Also point out specific reasons why a continuance is needed, i.e., to marshal evidence or witnesses, especially those reasons that are beyond the control of the accused.

In a non-capital case, a convicted defendant can often expect thirty days between trial and sentencing. T.C.A. § 40-35-209 (a). The convicted defendant should at least have some time to prepare for a sentencing hearing in a capital case. A continuance for a week, or even one day, in certain circumstances could save a defendant's life.

Make every attempt to limit the proof of aggravation

### 2) Support Services

Review Chapter 4 and the previous discussion in this chapter of support services. Assuming that a prior request was made, additional services may be needed to adequately defend the client at sentencing. As a practical matter, there will probably not be a significant time between the guilt and sentencing stages; while hopefully those needs that could have been anticipated were already addressed, if a need suddenly presents itself, file the motion.

### 3) Allocution by the Client

In addition to the pre-trial motion for participation as co-counsel, a motion may be filed requesting that the court permit the client to address the jury at sentencing. The primary advantage of allocution is that it is not subject to cross-examination and may humanize an otherwise mute defendant. The client may give part or all of the opening statement, or simply tell the jury about his remorse or say why he believes he deserves a chance to live. (The defendant can not comment on the facts of the case without opening himself up to cross-examination.) Thoroughly prepare the client for this, long before he enters the courtroom.[22] See Appendix E for extensive authority on the right of allocution.

### 4) Closing Argument of the Defense

#### a. Motion for both counsel to argue

Assuming that two lawyers represent the accused, it may be to the client's advantage to split the time for argument. The motion should be based on the state and federal constitutional rights to counsel.

#### b. Defense to argue last

This motion flies in the face of traditional procedure, and clearly addresses itself to the discretion of the trial court. However, at an ordinary trial the accused has no burden of production or proof, and is protected by the presumption of innocence. At the sentencing hearing, the accused has an obligation to prove mitigation. Counsel can argue that because of this the defendant should have the last word on why she should not die. Cite the heightened standards of due process and reliability required by the state and federal constitutions, as well as the right to be heard.[23]

### 5) Restriction of Prosecution's Proof to Specific Aggravating

[22] This may be a subject of dispute with a client who believes that she will never be convicted and is being betrayed by counsel's contemplation of defeat at the guilt stage. Even if the client can try to deny the possibility, counsel can not. Whether or not the client is aware of it, counsel should make an early and ongoing evaluation of the client's capability to allocute.

[23] Tenn. Const., Art. I, § 9; T.R.Cr.P. 29.1; Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

Statutory aggravation must "genuinely narrow the class of persons eligible for the death penalty"

**Circumstances**

In Cozzolino v. State, 584 S.W.2d 765, 767-68 (Tenn. 1979), the Court held that evidence is admissible only if it is relevant to an aggravating circumstance raised by the state or to a mitigating factor raised by the accused.

**6) Aggravating Circumstances**

Consult Chapter 14 on the various statutory aggravating circumstances and their construction by appellate courts; also review the Appendix to this manual, indexing Tennessee cases on individual aggravators. Consider the following objections:

**a. Aggravators that duplicate and overlap**

Make every attempt to limit the proof of aggravation, especially the number of aggravating circumstances on which the state can rely at sentencing. Aggravating circumstances often duplicate and overlap. For example, a robbery might be interpreted as supporting a finding of both "murder for remuneration" and murder during a robbery. Examine the facts and the aggravating circumstances cited by the state to determine whether there is any overlap. See Chapter 8, Recurring Issues.

**b. Constitutionality of the language and application of individual aggravators**

This issue is thoroughly explored in Chapter 7. Especially vulnerable to attack are the circumstances of creation of risk to multiple people, "heinous, atrocious and cruel," avoiding arrest, during felony, and mass murder.[24]

**c. "Narrowing"**

The prosecution must establish two separate elements before a defendant is eligible for the death penalty. First, the defendant must be found legally guilty of intentional murder.[25] Second, the prosecution must prove — by proving the application of a statutory

[24]See Collins v. Lockhart, 754 F.2d 258 (8th Cir. 1985); Provence v. State, 337 So.2d 783 (Fla. 1976); State v. Oliver, 274 S.E.2d 183 (N.C. 1981); People v. Harris, 36 Cal.3d 36 (1984); Thomas v. State, 373 So.2d 1149 (Ala. Crim. App. 1979); State v. Stewart, 250 N.W.2d 849 (Neb. 1977).

[25]Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); Eberheart v. Georgia, 433 U.S. 917, 97 S.Ct. 29, 94, 53 L.Ed.2d 1104 (1977).

[26]Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978).

[27]Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

[28]*See* California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring) (purpose of penalty trial is to determine moral culpability of defendant); *see also* Collins v. Lockhart, 754 F. 2d 258 (8th Cir. 1985).

aggravating circumstances — that the defendant is more culpable than the larger class of defendants who are simply guilty of first degree murder.[26] The phrase "narrowing" refers to the requirement that statutory aggravation "genuinely narrow the class of persons eligible for the death penalty."[27] The issue surfaces most often in felony murders, where the felony is used both to convict of first-degree murder and to support an aggravating circumstance. At the sentencing hearing, the prosecution can rest on the evidence adduced at the guilt phase, and the jury can then deliberate and return a death verdict without narrowing the class of felony murderers who are eligible for death. The constitution, however, requires both that the class of murderers be narrowed, but also that the line be drawn on the basis of a factor related to the moral culpability of the individual defendant.[28]

The U.S. Supreme Court has consistently upheld the defendant's right to present all mitigation in the sentencing hearing

**7) Waiver of Sentencing Jury**

Although it places a considerable amount of pressure on the trial court, if the court is sympathetic and is known to have a favorable philosophical position on the death penalty, consider waiving the jury. Of course, if the court happens to be favorably disposed, the prosecution will likely object. (Consent of the court and prosecution is necessary. T.C.A. § 39-13-205.) If a jury is waived, the guilt-phase jury would not be death qualified.

**8) Restrictions of Psychiatric Evidence at Sentencing**

If a defendant is subjected to psychiatric or psychological evaluation, there is a risk that any incriminating statements will be the subject of testimony. However, that testimony would violate the right against self-incrimination if the defendant was not advised of this possibility before the evaluation.[29] The rule may be different when the defense asserts insanity and presents psychiatric evidence, which can open the door to

[29]Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (also finding violations of the right to silence and to counsel); concerning Sixth Amendment rights during psychological evaluation, *see also* Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). See Chapter 7, Recurring Issues, § 7.61.

[30]See Riles v. McCotter, 799 F.2d 947 (5th Cir. 1986), and Williams v. Lynaugh, 809 F.2d 1063 (5th Cir. 1987).

[31]Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 944 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

[32]Nashville attorney Henry Martin has successfully introduced the results of a polygraph examination at the sentencing hearing of a Tennessee death penalty trial.

The strongest mitigating circumstance is doubt

impeachment.[30] Scour the records of a testifying psychological witness to ensure that the client's 5th and 6th Amendment rights have been protected.

**9) Other Evidentiary Considerations**

As a background for what follows, it is helpful to remember that the U.S. Supreme Court has consistently upheld the defendant's right to present all mitigation in the sentencing hearing, and has rejected attempts to limit proof in mitigation. The constitution requires that the sentencing entity have enough information that it can consider the character and individual circumstances of a defendant before voting for death.[31]

**a. "Inadmissible" evidence**

In Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the court allowed in the penalty phase proof about guilt or innocence that was inadmissible in the guilt stage. The results of a polygraph examination are inadmissible on the issue of guilt and innocence but may be admissible on the question of sentence.[32]

**b. Lingering doubts about guilt**

If counsel attempts to introduce evidence tending to prove innocence at the sentencing phase, the prosecution may object on the basis that the issue was laid to rest by the verdict of guilt. The practice should be approached cautiously, because the jury may be insulted that you would seek to persuade them of the accused's innocence once they have found guilt. Nevertheless, many death penalty attorneys believe that the strongest mitigating circumstance is doubt.[33]

---

[33]This is a delicate area to argue and takes some sophisticated analysis of conflicting case law. *See* State v. McKay, 680 S.W.2d 447, 451 (Tenn. 1984) (appears to approve defense evidence that killing was accidental at sentencing), *cert. denied*, 470 U.S. 1034 (1985); People v. Thompson, 753 P.2d 37, 67-68, 45 Cal.3d 86 (Cal.), *cert. denied*, 109 S.Ct. 404 (1988); State v. Stewart, 341 S.E.2d 789, 790-91 (S.C. 1986); Blankenship v. State, 308 S.E.2d 369, 371 (Ga. 1983); State v. Bartholomew, 683 P.2d 1079, 1088-89 (Wash. 1984); State v. Buell, 489 N.E.2d 795 (Ohio 1986); cf. Franklin v. Lynaugh, 487 U.S. 164, 172-74, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality expresses serious doubts that there is a federal constitutional right to an instruction on reasonable doubt as a mitigator); Smith v. Wainwright, 741 F.2d 1248, 1255 (11th Cir. 1983), *reh'g denied*, 747 F.2d 1468 (1984), *cert. denied*, 470 U.S. 1088 (1985); Smith v. Balcom, 660 F.2d 573, 580-81 (5th Cir.), *modified*, 677 F.2d 20 (1981), *cert. denied*, 459 U.S. 882 (1982); State v. Hartman, 703 S.W.2d 106 (Tenn. 1985), cert. denied, 478 U.S. 1010 (1986) (guilt or innocence irrelevant to sentence); State v. Adkins, 725 S.W.2d 660, 6634 (Tenn.), cert. denied, 482 U.S. 909 (1987) (jury could not consider proof of innocence as mitigation); and State v. Teague, 656 S.W.2d 392, 399 (Tenn. 1983) (jury may not reconsider guilty verdict at sentencing). Green v. Georgia stands for the proposition that evidence relevant to guilt or innocence that would be inadmissible at an ordinary trial is admissible at sentencing. *See generally* Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

**c. Nature and effect of electrocution**
In dissent to denial of petition for writ of certiorari in Glass v. Louisiana, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985), Justice Brennan set out in graphic detail reasons why electrocution violates the prohibition against cruel and unusual punishment. In Gregg v. Georgia, the court found it "desirable for the jury to have as much information before it as possible when it makes the sentencing decision." 428 U.S. at 203-204. *See also* Jurek v. Texas, 428 U.S. 262, 271, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) ("A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed").

The court's responses on the Rule 12 report may be critical on the direct appeal and in collateral attacks

Logically, if the jury is to decide between life and death, it should be advised about the method by which death will be imposed. Counsel may wish to introduce written accounts of other electrocutions, or affidavits of people who have witnessed them. Most effective would be the live testimony of anyone who has actually witnessed an execution.

In the recent case of State v. Black, 815 S.W.2d 166 (Tenn. 1991), the majority opined that the manner of execution was a legislative and not a legal problem. The majority also held that such evidence was irrelevant to the sentencing decision. However, the two dissenting Justices would have remanded the case for the taking of proof concerning electrocution as a means of carrying out the sentence. Since exclusion of this kind of evidence is based on a bare majority of the Court, counsel is encouraged to continue raising this issue.

**10) Motions in Limine**
See the prior discussion of motions in limine, and the motion concerning prosecution argument in Appendix D.

**11) Requested Jury Instructions at Sentencing**
Review Chapter 14.[34] Issues about the constitutionality of the statute that are raised by the standard instructions should be reiterated, and objections to the offending instructions should be noted in the record. Be sure to request instructions on all mitigation, statutory or not, raised by the evidence.

[34] See also Ellman, "Cases-Instructions on Death: Guiding the Jury's Sentencing Discretion in Capital Cases," The Champion, April 1986, p. 20.

[35] See, e.g., Roach v. Moore, 550 S.W.2d 256 (Tenn. Crim. App. 1977); State v. Hudson, 562 S.W.2d 416 (Tenn. 1978); State v. McDowell, 567 S.W.2d 159 (Tenn. 1978); Harris v. State, 576 S.W.2d 588 (Tenn. Crim. App. 1978).

Counsel may want to request an evidentiary hearing in which to introduce proof to persuade the court to a more favorable version

## C. Post-Trial Motions

See Chapter 16, in which post-trial motions, including the motion for judgment of acquittal, motion in arrest of judgment, and the motion for new trial are dealt with in some detail.

### 1) Rule 35 Motion

If the jury imposes death, consider a request that the trial court reduce the sentence to life. While the motion is typically filed with the sentencing court, and the jury imposes death in the capital trial, authority pre-dating the 1984 promulgation of Rule 35 suggests that the trial court retains inherent authority to alter, adjust, amend, or reduce a sentence imposed by a jury.[35]

### 2) Evidentiary Hearing on Rule 12 Questionnaire

Tenn. Sup. Ct. R. 12 requires the trial court to complete and file with the Supreme Court a questionnaire about the trial. The court's responses may be critical on the direct appeal and in collateral attacks. Rule 12 also provides:

> The reports shall be submitted to the defendant's counsel for such comments as he desires to make concerning the factual accuracy of the report. If counsel desires his or her comments in response shall be attached to the report.

In addition to supplementing the report, if there is a realistic prospect for altering the court's observations, counsel may want to request an evidentiary hearing in which to introduce proof to persuade the court to a more favorable version.