STATE OF TENNESSEE VS. Christa Gail PIKE
CASE NO. 68280 EXHIBIT NO. 14B
DATE 4-7-11-08 ID____ Evd ✓

VOLUME II - TRIAL

# TOOLS FOR THE ULTIMATE TRIAL

THIRD EDITION/1992





FILED (68)
APR 07 2009
Clerk of the Courts
Rec'd by____


## The Tennessee Death Penalty Defense Manual


Prepared by Capital Case Resource Center of Tennessee ▲ Distributed by Tennessee Association of Criminal Defense Lawyers.

# TOOLS FOR THE ULTIMATE TRIAL: TENNESSEE DEATH PENALTY DEFENSE MANUAL©
# (VOLUME 2 - TRIAL)

**Copyright © 1997 by TACDL.**
All rights reserved.

The Tennessee Association of Criminal Defense Lawyers (TACDL)
207 Third Avenue North, Nashville, TN 37201-1605

Phone: 615/726-1225, Fax: 615/726-2560,
E-mail: tacdl@aol.com
Website: http//www.tncrimlaw.com/tacdl

# Third Edition / 1992


CONTIRIBUTORS

Jeff Blum
Isaiah Gant
Brock Mehler
Chris Minton
Paul Morrow
Bill Redick

GENERAL EDITOR

Gretchen Franklin

LAYOUT AND DESIGN

Jeff Blum
Juanita Pierce
Bill Redick

# SUMMARY TABLE OF CONTENTS

## Volume I - Pretrial


Preface ..... 1-3
1. History of the Death Penalty ..... 1.1-1.13
2. Effective Representation ..... 2.1-2.31
3. Overview ..... 3.1-3.17
4. The Defense Team ..... 4.1-4.17
5. Investigation ..... 5.1-5.45
6. Negotiation ..... 6.1-6.14
7. Constitutionality of T.C.A. § 39-13-204 & 206 ..... 7.1-7.19
8. Recurring Legal Issues ..... 8.1-8.73
9. Motions ..... 9.1-9.37
10. Venue ..... 10.1-10.21
11. Jury Composition ..... 11.1-11.17


## Volume II - Trial


12. Voir Dire ..... 12.1-12.40
13. Guilt Phase ..... 13.1-13.10
14. Sentencing Phase ..... 14.1-14.114
15. Post-Trial Jury Interviews ..... 15.1-15.15
16. Post-Trial Motions ..... 16.1-16.17


## Volume III - Appeals, Collateral Litigation and Appendices


17. Appeals in State Court ..... 17.1-17.28
18. Certiorari ..... 18.1-18.4
19. State Postconviction ..... 19.1-19.65
20. Coram Nobis ..... 20.1-20.7
21. Federal Habeas Corpus ..... 21.1-21.17
Manual Appendix ..... A-D
- A. Trial Issue Index
- B. Postconviction Issue Index
- C. Supreme Court Cases
- D. Court of Criminal Appeals Cases

# Table of Contents - Volume II

**12. Voir Dire ........ 12.1**
Introduction ........ 12.3
I. Individual and Sequestered Voir Dire ........ 12.4
A. The Motion ........ 12.4
B. The Memorandum of Law ........ 12.4
C. The Evidentiary Hearing ........ 12.6
D. Individual Voir Dire on Specific Issues ........ 12.6
E. Sequestration ........ 12.7
II. Death Prone Juries ........ 12.8
III. Jury Selection and Racial Prejudice ........ 12.10
IV. Jury Selection Motions ........ 12.12
A. Motion for Individual and Sequestered Voir Dire ........ 12.12
B. Motion to Prohibit Death Qualification of the Guilt Jury ........ 12.12
C. Motion to Prohibit State from Excluding Any Cognizable Group ........ 12.12
D. Motion for Authorization of Funds to Retain Juristic Psychologist or Jury Selection Expert ........ 12.12
E. Motion for Access to Juror Forms ........ 12.12
F. Motion for Discovery of Information Concerning Prospective Jurors ........ 12.13
G. Motion for Juror Questionnaire ........ 12.13
H. Motion for Pre-Voir Dire Instruction ........ 12.13
I. Motion to Allow Counsel to Address Jury Panel ........ 12.13
J. Motion for Struck Selection System ........ 12.14
V. Investigation and Preparation ........ 12.15
A. The Team Approach ........ 12.15
B. Ideal Juror Profile ........ 12.15
C. Know the Community ........ 12.15
D. Know the Panel Before Trial ........ 12.16
E. Broad Scope Voir Dire ........ 12.16
F. Evaluating Jurors During Voir Dire ........ 12.16
VI. Juror Questionnaire ........ 12.17
VII. The Basic Rules of Voir Dire ........ 12.18
A. Do Not Bore the Jury ........ 12.18
B. Educate the Jury (or Someone) ........ 12.18
C. Prepare the Jury ........ 12.18
D. Be Candid and Honest ........ 12.18
E. Be Relaxed and Conversational ........ 12.18
F. Be Patient ........ 12.18
III. Challenges for Cause ........ 12.19
A. Legal Exclusion ........ 12.19
B. Factual Challenges for Cause ........ 12.19
C. Factual Challenges for Cause – Death Qualification ........ 12.20
1. United States Supreme Court Decisions ........ 12.20
2. Rehabilitating the Death-Scrupled Juror ........ 12.22
3. Eliminating the Death Penalty Supporter ........ 12.28
IX. Peremptory Challenges ........ 12.34
X. Defendant's Participation ........ 12.40
Appendices:
A. Checklist Questions

B. Juror Questionnaire
C. State v. Butler Opinion

## 13. Guilt Phase ........ 13.1
I. Introduction ........ 13.3
II. Higher Constitutional Standards ........ 13.4
III. Preserving Issues for Review ........ 13.5
IV. Anticipating a Sentencing Hearing ........ 13.6
A. Theories of Defense ........ 13.6
1. Denial ........ 13.6
2. Justification ........ 13.7
3. Lack of Intent ........ 13.7
B. Counsel's Demeanor ........ 13.8
C. State's Witnesses ........ 13.9
1. Elicit Facts Favorable and Relevant to Sentencing ........ 13.9
2. Blunt the Effect of Inflammatory Evidence ........ 13.9
D. Testimony of the Defendant ........ 13.10

## 14. Sentencing Phase ........ 14.1
I. Philosophy ........ 14.5
A. Basic Philosophy ........ 14.5
B. General Strategy ........ 14.6
1. Team Defense ........ 14.6
2. Advance Preparation ........ 14.7
3. A Consistent Theme ........ 14.7
4. Shift Focus from Victim and Humanize the Defendant ........ 14.8
5. Give the Jury Reasons Not to Kill the Defendant ........ 14.11
6. Motions ........ 14.12
7. The Death Penalty Jury ........ 14.12
8. Create Constitutional Issues ........ 14.13
9. Minimize Aggravating Circumstances ........ 14.13
10. Accentuate Mitigating Circumstances ........ 14.13
11. Scrutinize Prosecutor's Argument ........ 14.14
12. Request Jury Instructions ........ 14.14
II. Opening Statements ........ 14.16
III. Prosecutions's Case ........ 14.17
IV. Motion for Directed Verdict ........ 14.18
V. Defense Case ........ 14.19
A. The Rules of the Game ........ 14.20
1. Two-Tiered Burden of Proof Beyond a Reasonable Doubt ........ 14.20
2. Defense Has No Burden of Proof ........ 14.20
3. Mitigation is Mandatory ........ 14.21
4. The Scope of Mitigation is Broad ........ 14.21
5. No Distinction Between Statutory and Non-Statutory Mitigation ........ 14.21
6. Juveniles and the Mentally Retarded Cannot be Sentenced to Death ........ 14.25
B. Jurors' Goals at Sentencing ........ 14.25
1. Punishing the Defendant ........ 14.25
2. Protecting Society ........ 14.25

3. Fulfilling Their Civic Duty .......... 14.26
4. Responding to Peer Pressure and Community Expectations .......... 14.26
C. Defense Goals at Sentencing .......... 14.26
1. Humanize the defendant .......... 14.26
2. Factors influencing development of defendant's character .......... 14.26
3. Diminish voluntary aspect of defendant's behavior .......... 14.26
4. This case does not deserve death .......... 14.27
5. A life sentence will punish defendant and protect society .......... 14.27
6. Empower individual juror to vote their consciences .......... 14.27
D. Categories of Mitigation .......... 14.27
1. Neurological Impairment .......... 14.29
2. Psychological Disorders .......... 14.32
3. Dysfunctional Family .......... 14.37
4. Substance Abuse .......... 14.39
5. Social and Cultural Factors .......... 14.41
6. "Positive Prisoner" Evidence .......... 14.43
7. Offense Factors .......... 14.45
8. "Good Person" Evidence .......... 14.47
9. Victim Related Factors .......... 14.50
E. Witnesses .......... 14.52
1. The Defendant's Birth Family .......... 14.52
2. The Defendant's Marriage Family .......... 14.53
3. Teachers .......... 14.54
4. Neighborhood Witnesses and Friends .......... 14.55
5. Social Workers .......... 14.55
6. Mental Health Experts .......... 14.56
7. Rehabilitation Witnesses .......... 14.58
8. Rebuttal Witnesses .......... 14.59
9. Demonstrative Evidence .......... 14.60
10. The Defendant .......... 14.62
F. Mitigating the Deliberation Process .......... 14.64
1. Supporting the Hold-Out .......... 14.64
2. Defendant Demeanor .......... 14.64
3. Body Language .......... 14.64
4. Community Support .......... 14.64
5. Facilitating Comfort .......... 14.64
6. Facilitating the Process .......... 14.64
VI. Rebuttal .......... 14.66
A. General Scope of Rebuttal .......... 14.66
B. Impermissible Rebuttal .......... 14.66
1. Evidence That Does Not Contradict .......... 14.66
2. Multiple Defendants .......... 14.66
C. Rebuttal in Tennessee Capital Cases .......... 14.67
D. Surrebuttal .......... 14.68
E. Conclusion .......... 14.68
VII. Closing Argument .......... 14.69
A. Prosecution .......... 14.69
1. In General .......... 14.69
2. Specific Forbidden Arguments .......... 14.70
4. General Forbidden Arguments .......... 14.72
4. Practice Tips .......... 14.74
5. Conclusion .......... 14.75

B. Defense ........ 14.75
1. What the Jury Should Know as They Deliberate ........ 14.75
2. Achieving the Goals You Have Set ........ 14.76
3. Preparing and Delivering the Closing Argument ........ 14.82
VIII. Jury Instructions ........ 14.85
A. Requesting Instructions ........ 14.86
B. Tennessee Pattern Instructions ........ 14.87
1. Too Little Discretion To Opt For Life ........ 14.87
2. Burden of Proof ........ 14.89
3. Aggravation ........ 14.90
4. Non-Statutory Mitigation ........ 14.90
5. Weighing Aggravation and Mitigation ........ 14.92
6. Inadequate Instruction for Dissenting Jurors ........ 14.93
C. Guilt Phase Instructions ........ 14.93
1. Lesser Included Offenses ........ 14.94
D. Proposed Instructions ........ 14.94
1. Right Not to Testify – Sentencing ........ 14.95
2. Burden of Proof ........ 14.95
3. Life Means Life, Death Means Death ........ 14.96
4. Jury Has Responsibility for Final Decision ........ 14.97
5. Decision to be Made by Individual Jurors ........ 14.97
6. Aggravating Factors ........ 14.98
7. Crime in Society, Deterrence, Cost ........ 14.104
8. Mitigation ........ 14.105
9. Weighing Aggravating and Mitigating Factors ........ 14.110
10. Doubt Inures to the Benefit of the Defendant ........ 14.111
11. Sympathy and Mercy ........ 14.111
12. The Jury May Impose Life ........ 14.114
13. Prior Offenses and Impeachment ........ 14.116
14. Fairness, Proportionality – Co-defendants Not on Trial ........ 14.118
15. Lingering Doubt ........ 14.119
16. Jury Verdict – Inability To Agree ........ 14.120
17. Parole ........ 14.120
18. Miscellaneous Instructions ........ 14.121
Appendices:
A. Motion for Individual Jury Instructions on Mitigating Evidence
B. Jury Instructions: Mitigation List

**15. Post-Trial Juror Interviews ........ 15.1**
I. Introduction ........ 15.3
II. When to Interview Jurors ........ 15.4
A. Motion for a New Trial ........ 15.4
B. Postconviction ........ 15.4
III. Juror Interviews and the Law ........ 15.5
A. Permission from the Trial Court ........ 15.5
B. Admissibility of Juror Testimony ........ 15.5
1. Tennessee Rules of Evidence 606(b) ........ 15.5
2. Permitted Testimony ........ 15.6
3. Precluded Testimony ........ 15.7
C. Fertile Areas of the Law ........ 15.9
1. Erroneous Statements of Law ........ 15.9

2. Racial Prejudice ........ 15.10
D. Harmless Error ........ 15.10
1. U.S. Supreme Court Cases. ........ 15.10
2. Harmless Error Analysis in Capital Sentencing. ........ 15.12
3. "Death Is Different." ........ 15.14
VI. Conducting Juror Interviews ........ 15.16
A. Timing and Preparation ........ 15.16
B. Personnel ........ 15.16
C. Sample Questions ........ 15.16

## 16. Post-Trial Motions ........ 16.1

I. Introduction1 ........ 16.3
II. Post-Trial Motions ........ 16.4
A. Motion for the Trial Court to Set Aside the Sentence of Death ........ 16.4
1. Rule 33(f) Motion ........ 16.4
2. Rule 35(b) Motion ........ 16.5
C. Motion to Defer the Hearing and the Motion for New Trial until after the Transcript of Evidence is Prepared ........ 16.5
D.The Motion for Judgment of Acquittal3 ........ 16.6
E. Motion in Arrest of Judgment ........ 16.9
F. Motion for New Trial ........ 16.10
1. Court Trial ........ 16.10
2. Motion as Jurisdictional ........ 16.10
3. Waiver ........ 16.10
4. Form of Motion ........ 16.10
5. Amendments to Motion ........ 16.12
6. Affidavits in Support of Motion ........ 16.13
7. Hearing on Motion ........ 16.14
8. Ruling on Motion ........ 16.15
9. Retrials and Double Jeopardy ........ 16.15

# VOIR DIRE

# Table of Contents

I. Introduction .......... 12.3
II. Individual and Sequestered Voir Dire .......... 12.4
A. The Motion .......... 12.4
B. The Memorandum of Law .......... 12.4
C. The Evidentiary Hearing .......... 12.6
D. Individual Voir Dire on Specific Issues .......... 12.6
E. Sequestration .......... 12.7
III. Death Prone Juries .......... 12.8
IV. Jury Selection and Racial Prejudice .......... 12.10
V. Jury Selection Motions .......... 12.12
A. Motion for Individual and Sequestered Voir Dire .......... 12.12
B. Motion to Prohibit Death Qualification of the Guilt Jury .......... 12.12
C. Motion to Prohibit State from Excluding Any Cognizable Group .......... 12.12
D. Motion for Authorization of Funds for Jury Selection Expert .......... 12.12
E. Motion for Access to Juror Forms .......... 12.12
F. Motion for Discovery of Information Concerning Prospective Jurors .......... 12.13
G. Motion for Juror Questionnaire .......... 12.13
H. Motion for Pre-Voir Dire Instruction .......... 12.13
I. Motion to Allow Counsel to Address Jury Panel .......... 12.13
J. Motion for Struck Selection System .......... 12.14
VI. Investigation and Preparation .......... 12.15
A. The Team Approach .......... 12.15
B. Ideal Juror Profile .......... 12.15
C. Know the Community .......... 12.15
D. Know the Panel Before Trial .......... 12.16
E. Broad Scope Voir Dire .......... 12.16
F. Evaluating Jurors During Voir Dire .......... 12.16
VII. Juror Questionnaire .......... 12.17
VIII. The Basic Rules of Voir Dire .......... 12.18
A. Do Not Bore the Jury .......... 12.18
B. Educate the Jury (or Someone) .......... 12.18
C. Prepare the Jury .......... 12.18
D. Be Candid and Honest .......... 12.18
E. Be Relaxed and Conversational .......... 12.18
F. Be Patient .......... 12.18
IX. Challenges for Cause .......... 12.19
A. Legal Exclusion .......... 12.19
B. Factual Challenges for Cause .......... 12.19
C. Factual Challenges for Cause – Death Qualification .......... 12.20
1. United States Supreme Court Decisions .......... 12.20
2. Rehabilitating the Death-Scrupled Juror .......... 12.22
3. Eliminating the Death Penalty Supporter .......... 12.28
X. Peremptory Challenges .......... 12.34
XI. Defendant's Participation .......... 12.40
Appendices
A. Checklist Questions
B. Juror Questionnaire
C. <u>State v. Butler</u> Opinion

# I. Introduction

The quality of voir dire may well determine whether your client lives or dies. But you can expect any attempt to probe any issue in depth (obvious or subtle) to be met with a resounding objection, sustained by the court. You will be accused of asking irrelevant, compound, complicated and confusing questions geared toward causing delay. The court and prosecutor will tire of the open-ended and exploratory questions that invite rambling and revealing responses. Every effort to get to the root of a prospective juror's feelings will prompt an admonition: "We're not going to spend all day picking this jury – now, let's move on!"

Jury selection in a capital case, therefore, requires that you PUT ON YOUR ASBESTOS DRAWERS, because you are going to catch a lot of heat. DO NOT BE INTIMIDATED! Be polite, but firm in your resolve to pick YOUR jury. Be aggressive, persistent, and tenacious, but always diplomatic.

Jury selection in a capital case requires that you PUT ON YOUR ASBESTOS DRAWERS, because you are going to catch a lot of heat

As you know, jury selection is largely a matter of discretion for the trial courts and there is a considerable amount of diversity in their flexibility. If you are persuaded of the importance of voir dire and willing to spend the time necessary to convince a judge, you may well obtain some improvement in conditions. Understanding and implementing the principles underlying the process are the keys to conducting effective voir dire. This chapter is intended to alert counsel to the most significant aspects of jury selection in a capital case. The National Jury Project's Jurywork: Systematic Techniques (1989) contains an excellent, detailed discussion of voir dire; pages 10-85 through 10-102 focus on capital cases. Another helpful source is Voir Dire for Capital Cases, published by the Southern Poverty Law Center's Death Penalty Project. Tennessee resources include T.R.Cr.P. 24, and Raybin, 10 Tennessee Practice, Criminal Practice and Procedure (1985), ch. 25.

# II. Individual and Sequestered Voir Dire

Many courts have accepted the proposition that individual voir dire promotes candor and have indicated that it might be required when there has been pre-trial publicity

Many experienced capital lawyers believe that a motion for individual, sequestered voir dire is the most important single motion that can be filed. There is probably no reason not to file it immediately after arraignment or as soon as it is clear that the state intends to treat the case as capital. You need to know well in advance of trial whether individual voir dire will be allowed in order to plan properly.

## A. The Motion

The motion should set out the factual reasons why individual voir dire is necessary, for example:

1. The publicity surrounding the case has polluted the community with information that is inaccurate, misleading or prejudicial.

2. People are less self-conscious and more open and honest if questioned individually.

3. Private responses on publicity or death qualification will be less likely to contaminate other jurors.

4. Prospective jurors are less likely to get the impression that opposing the death penalty is "wrong."

5. People will not discover that they can get out of jury service just by saying they oppose the death penalty.

6. Jurors will not be repeatedly exposed to the questions asked of others.

The more factual detail you can allege the better; detailed recitations of information contained in media reports may be advisable.

## B. The Memorandum of Law

Initially, remind the court of the heightened standard of due process and reliability that is required in capital cases. When in doubt, the benefit should go to the defendant on questions of procedure.

The inhibiting effect of the presence of a large group of jurors upon the questioning of a prospective juror is well stated in Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

> No doubt each juror was sincere when he said that he would be fair and impartial... but the psychological impact of requiring such a declaration before one's fellows is often its father.

Many courts have accepted the proposition that individual voir dire promotes candor and have indicated that it might be required when there has been pre-trial publicity.

It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial.

Coppedge v. United States, 272 F.2d 504, 508 (D.C. Cir. 1959).[1]

In the leading Tennessee case on prejudicial publicity and individual, sequestered voir dire, the defendant had been convicted of first degree murder and sentenced to death; the Tennessee Supreme Court reversed. State v. Claybrook, 736 S.W.2d 95 (Tenn. 1987). The jury heard circumstantial proof that Claybrook bludgeoned the victim to death and robbed him at his home near Maury City in September, 1983. The defense had moved for individual voir dire, citing extensive prejudicial publicity, including articles mentioning Claybrook's prior conviction of second-degree murder and acquittal on another murder. The trial court refused to allow individual voir dire of prospective jurors who knew something about the case, as eighty percent did. At the hearing on the motion for new trial, three of the chosen jurors said that at the time of guilt-innocence deliberations they already knew of Claybrook's "prior conviction or trouble with the law." All three were chosen after the defendant had exhausted peremptory challenges.

Under Sommerville v. State, 521 S.W.2d 792 (Tenn. 1982), whenever there is "a significant possibility" that a jury has been exposed to "potentially prejudicial material" the "examination of each juror with respect to his exposure, shall take place outside the presence of other chosen and prospective jurors." The court in Claybrook found this rule "imperative" in a trial at which life is at stake, and found prejudice because Claybrook "was unable to discover what information was within the knowledge of each individual juror without risking the exposure of all other potential jurors to prejudicial information," in violation of the Sixth and Fourteenth Amendments.

Sommerville itself involved a retrial and possible knowledge of the previous jury's verdict, and arguably created a presumption of individual, sequestered voir dire in a retrial situation. Other "potentially prejudicial material" might include, for example, knowledge that the defendant is black and the victim was white; individual, sequestered voir dire should then be allowed on the issue of race.

Because capital cases almost always have substantial media coverage, the right to individual, sequestered voir dire on the prejudicial subject matter should almost always attach

The more pre-trial prejudicial publicity there is, the more significant is the possibility of exposure to "potentially prejudicial material." Because capital cases almost always have substantial media coverage, the right to individual, sequestered voir dire on the prejudicial subject matter should almost always

[1] *See also* Coleman v. Kemp, 778 F.2d 147 (11th Cir. 1985); United States v. Hawkins, 658 F.2d 279 (5th Cir. 1981); United States v. Davis, 583 F.2d 190, 196-98 (5th Cir. 1978); United States v. Dellinger, 472 F.2d 340, 374-77 (7th Cir. 1972), cert. denied, 410 U.S. 970 (1973); Patriarca v. United States, 402 F.2d 314, 318 (1st Cir. 1968), cert. denied, 393 U.S. 1022 (1969); Silverthrone v. United States, 400 F.2d 627, 639 (9th Cir. 1968), cert. denied, 400 U.S. 1022 (1971); United States v. Starks, 515 F.2d 112, 125 (3d Cir. 1975); United States v. Bryant, 471 F.2d 1040, 1043-45 (D.C. Cir. 1972), cert. denied, 409 U.S. 1112 (1973); United States v. Milanovich, 303 F.2d 626, 629 (4th Cir. 1962); United States v. Lord, 565 F.2d 831, 838-39 (2d Cir. 1977); United States v. Polizzi, 500 F.2d 856, 880 (9th Cir. 1974).

If you anticipate that the judge will resist complete individual voir dire, do not argue the motion without an evidentiary hearing

attach. Counsel bears the responsibility to raise the issue, lay the foundation, and take advantage of the promising opportunity to individually question people who are asked to sit in judgment of a death penalty case. Individual, sequestered voir dire invites an intimacy that is impossible in the group setting. The strategic considerations abound, varying considerably with each juror's values and personality. But see, Mu'Min v. Viginia, ___U.S. ___, 111 S. Ct. 1899, 114 L.Ed.2d 493 (1991) (Where jurors have assured court that they could put aside what they have read about the case, the Sixth Amendment does not require that the jurors be asked about the content of those articles).

## C. The Evidentiary Hearing

If you anticipate that the judge will resist complete individual voir dire, do not argue the motion without an evidentiary hearing.

1. Consult Jurywork: The National Jury Project (1990) as a primary source for strategy, demonstration of need and legal authority.

2. Subpoena and introduce media reports – newspaper articles, video and audio tapes of TV and radio news or editorial reports. Identify and emphasize those portions that are inaccurate, misleading, inadmissible or otherwise prejudicial.

3. Introduce witnesses from the community, perhaps prominent or influential individuals who can talk about the community's widespread knowledge about the case.

4. Make an ex parte request[2] for a qualified sociologist or statistician to poll the community, evaluate the media reports and their impact on the pool of potential jurors, and testify about the findings. Contact CCRC for any needed assistance in identifying an appropriate expert and presenting expert testimony.

5. If the court refuses to appoint the expert, make an offer of proof on the record about what the expert could have provided; demonstrate, then or later, how the defendant is prejudiced by the lack of expert assistance. Use lay people to conduct the polls; if the state contests the reliability of polls conducted by non-experts, the burden should lay on the state to repudiate any reports offered by the defense.

6. Use treatises or articles to supplement expert testimony or to substitute for it if it is unavailable.

## D. Individual Voir Dire on Specific Issues

Individual voir dire should be sought on all issues. Emphasize that part group and part individual voir dire can be very confusing. It can make successful sequestration difficult, and allows exchange of prejuducial information between

[2]Pursuant to T.C.A. § 40-14-207(b) and Tenn. Sup. Ct. R. 13(2)(B)(10).

examined and unexamined jurors and other contamination. Try to persuade the court that the extent to which group voir dire is conducted is directly proportional to the extent to which the panel will be contaminated.

If complete individual voir dire is denied, seek partial individual voir dire. Even a reluctant judge may be persuaded to allow individual questioning on the most sensitive issues in which prejudice is most likely. Potential areas include the death penalty, publicity, rape, race, and so on, limited primarily by counsel's imagination of and ability to define sensitive issues in the case -- the more, the better. Do not give up easily; individual voir dire is too important. See State v. Melson, 638 S.W.2d 342 (Tenn. 1982), and State v. Caruthers, 676 S.W.2d 935 (Tenn. 1984), recognizing the appropriateness of voir dire on selected issues in capital cases. A checklist of possible questions is included in Appendix A, this chapter.

The extent to which group voir dire is conducted is directly proportional to the extent to which the panel will be contaminated

## E. Sequestration

Request that the prospective panel be separated from others, and that the panel be sequestered from jurors who are being questioned. Whether voir dire is group or individual, questions should not be asked in the presence of other jurors to whom the questions are not being posed. Jurors who have been questioned should be sequestered from those who have not. And of course, the panel selected to sit in judgment should be sequestered from all outside influence.

T.C.A. § 40-18-116 requires sequestration in capital cases. State v. McKay, 680 S.W.2d 447 (Tenn. 1984), held, however, that sequestration is not required until after the jury has been sworn. The court of course has the authority to sequester jurors who have been questioned from those who have not, and the risk of contamination renders sequestration at all stages the better practice.

While the arguments against it may ultimately prove meritorious, death qualification is a present reality, and has always been upheld by the Tennessee Supreme Court

Numerous studies have consistently shown that death-qualified juries are more likely to convict than non-death qualified juries – they tend to trust and rely upon the state's argument and witnesses, especially police officers, and not to trust and rely upon defense arguments and witnesses, especially the defendant. See Symposium, 8 Law & Hum. Behav. 1 (1984), collecting and discussing studies. Not only does death qualification remove those who are most likely to acquit, find a lesser degree of homicide, or give a life sentence, but, by focusing on punishment, the process implies guilt and reinforces the social acceptability of death as a sentence.

Unfortunately, the new Witt standard may exacerbate this effect by allowing exclusion for cause of borderline jurors, who, under Witherspoon, would have been rehabilitated and could have been excused only by peremptory challenge. Witt allows the state to alter its strategy for using peremptory challenges, saving them for other types of jurors (such as college graduates or women). Thus, death-qualified juries under Witt are especially prone to convict and sentence to death. (See discussion of legal standards, § 12.20 C, below.)

Death qualification can be attacked through pre-trial motions seeking to prohibit it, under the Sixth, Eighth, and Fourteenth Amendments. Some attorneys recommend silence until the prosecution actually commences the process during voir dire, at which point strenuous objection should be made.

While the arguments against it may ultimately prove meritorious, death qualification is a present reality, and has always been upheld by the Tennessee Supreme Court. In Tennessee, the state is entitled to an impartial jury that can follow the law — which is all, the argument goes, that death qualification assures.[3]

The U.S. Supreme Court has held that death qualification does not violate due process and the Sixth Amendment. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), overruling Grigsby v. Mabry, 758 F.2d 226 (8th Cir. 1985). The Court found the social science studies flawed, that excluded jurors are not a distinctive group for fair cross-section purposes, and that death qualification results in an impartial jury able to apply the law. In brief, the "issue has now been settled," State v. Bobo, 727 S.W.2d 945 (Tenn. 1987), at least for the time being.

[3]Houston v. State, 693 S.W.2d 267 (Tenn. 1980). See also State v. Strouth, 620 S.W.2d 467 (Tenn. 1981) (death-qualified jury will not ignore presumption of innocence, nor be pro-state); State v. Melson, 638 S.W.2d 342 (Tenn. 1982) (impartial trial and equal protection rights not violated); State v. McKay, 680 S.W.2d 447 (Tenn. 1984) (short answer in Tennessee is that U.S. Supreme Court has upheld it); State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985) (there is no need for two juries).

Grigsby suggested several procedures that might be used to avoid that result: separate juries, in a bifurcated trial; replacing anti-death jurors with alternates at the sentencing hearing; having the judge impose the sentence; or using an advisory panel to make a non-unanimous sentencing recommendation.

Ultimately, of course, the courts' position may change — either in Tennessee or at the federal level. And the motion to prohibit death qualification may still persuade some trial courts. Funds for an expert qualified to testify on the subject may be requested.

The motion should be decided early in the case, so that enough time remains to move for individual, sequestered voir dire and for pre-voir dire instructions. These arguments may most effectively be made in a single motion, for the argument and evidence presented on the impact of death qualification may influence the judge to grant individual and sequestered voir dire and pre-voir dire instructions.

The motion should be decided early in the case, so that enough time remains to move for individual, sequestered voir dire and for pre-voir dire instructions

# IV. Jury Selection and Racial Prejudice

Inquiry is required when racial issues are inextricably intertwined with a charge or defense in the case

Voir dire is intended to remove from the jury box those who harbor biases and prejudices detrimental to your client – including racial prejudice. The Supreme Court has found that due process requires inquiry into racial bias in cases involving special circumstances, but has stopped short of requiring such questioning in all cases in which minority defendants request it.

Inquiry is required when racial issues are inextricably intertwined with a charge or defense in the case. In Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), for example, the defense theory was that the defendant, a black man who was well known for his civil rights activities, had been framed by the police in retaliation for those activities. The Court held that "[t]he Fourteenth Amendment required the judge in this case to interrogate the jurors upon the subject of racial prejudice." 409 U.S. at 527. The Court reaffirmed, however, the broad discretion of the trial judge in determining the form and number of questions pertaining to racial prejudice.

The Court could have read Ham, as have several lower courts, as requiring questioning of racial prejudice whenever a case involves a minority defendant and a non-minority victim.[4] In Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), however, the Court held that questions designed to reveal racial prejudice were required in Ham only because "[u]nder all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be [impartial]." 424 U.S. at 596. Questioning directed to racial prejudice was not constitutionally required in Ristaino, the Court concluded, because the defendant was not raising issues that presented a real threat of racial bias. Nevertheless, "[t]he wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant." Id. at 597.

In Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), the Court addressed the same issue in the context of a capital case. On the issue of guilt, a plurality reaffirmed the Ristaino court's conclusion that the mere fact that the defendant was black and the victim white was not a special circumstance mandating race-related questions. In regard to sentencing, however, a majority held that a difference in race was such a special circumstance. Concurring in the vacation of the sentence, but dissenting from the refusal to reverse the conviction, Justices Brennan and Marshall argued that the special circumstance test is met in any case involving an interracial, violent crime. 476 U.S. at 38-39. Some state courts have adopted this approach.[5] At least one state requires inquiry into racial

[4] *See, e.g.*, State v. Marsh, 362 A.2d 523 (Conn. 1975); Reid v. State, 200 S.E.2d 454, 455 (Ga. 1973); People v. Wray, 212 N.W.2d 78 (Mich. 1973); People v. Williams, 41 A.2d 611, 340 N.Y.S.2d 504 (1973).

[5] *See, e.g.*, Holmes v. State, 501 A.2d 76 (Md. App. 1985) (inquiry must be allowed when black defendant is accused of attempting to murder a white victim); Commonwealth v. Young, 517 N.E.2d 130 (Mass. 1987) [401 Mass. 390] (inquiry required when defendant is accused of murdering person of a different racial group); Commonwealth v. Holland, 444 A.2d 1179 (Pa. Super. 1982) (as a matter of state law, trial court abused discretion in refusing to inquire into racial prejudice where victim, jury, and all state witnesses were white, and defendant and all defense witnesses were black).

bias whenever the defendant requests it. See State v. Jones, 486 N.E.2d 179 (Ohio 1984) (racial bias is a proper subject of voir dire; trial court abused its discretion in completely foreclosing voir dire in that area).

The only Tennessee case directly addressing this issue is Butler v. State, C.C.A. No. 1163, Knox County (June 23, 1988). The issue arose in review of the denial of a petition for post-conviction relief, alleging ineffective assistance of trial counsel based, in part, on counsel's ineffective attempt at voir dire on racial prejudice. [*] In exceptionally well-reasoned opinions, including the concurrence and dissent, the court granted post-conviction relief. The Tennessee Supreme Court reversed, State v. Butler, 789 S.W.2d 898 (Tenn. 1990), but elected not to address the claim regarding voir dire, which was held waived by omission from the petition at the trial court level. The Tennessee Supreme Court thus left the language in the court of criminal appeals' opinion undisturbed; that opinion remains the only "definitive" statement by a Tennessee appellate court on the propriety of voir dire concerning racial prejudice. See Appendix C to this chapter.

In Butler v. State, the issue arose in review of the denial of a petition for post-conviction relief, alleging ineffective assistance of trial counsel based on counsel's ineffective attempt at voir dire on racial prejudice

The following pre-trial motions are designed to create the jury selection procedures most beneficial to the defendant

The following pre-trial motions are designed to create the jury selection procedures most beneficial to the defendant. In addition to any other authority cite the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8, 9 and 16 of the Tennessee Constitution in each motion.

### A. Motion for Individual and Sequestered Voir Dire

As was stated earlier, this may be the most important motion to be heard in the case. See § I, this chapter.

### B. Motion to Prohibit Death Qualification of the Guilt Jury

See § 12.8, this chapter; see also Jurywork, Ch. 3.

### C. Motion to Prohibit State from Excluding Any Cognizable Group

Use of peremptory challenges to exclude African-American prospective jurors is discussed extensively below, in § 12.36, this chapter. Batson v. Kentucky, 476 U.S. 79, 104 S.Ct. 339, 82 L.Ed.2d 69 (1986), prohibits the state from using its challenges to exclude black jurors for discriminatory reasons if the defendant is black. The same logic has general application. For example, counsel should object to using peremptory challenges to exclude death-scrupled jurors who survived the state's challenge for cause. See Jurywork, § 3.06[3] and Ch. 4.

### D. Motion for Authorization of Funds to Retain Juristic Psychologist or Jury Selection Expert

Authority for this motion is provided by T.C.A. § 40-14-207(b) and Tenn. Sup. Ct. R. 13(2)(B)(10); see also Chapter 4 of this manual, Team Defense. For assistance in locating an expert or outlining a strategy for the evidentiary hearing to obtain appointment of an expert, consult the Resource Center. This request should be made *ex parte*, and all the considerations referred to in Chapter 4 concerning the presentation of an *ex parte* request should be adhered to or intentionally rejected.

### E. Motion for Access to Juror Forms

Criminal court clerks, circuit court clerks, jury commissioners, sheriff's officers, etc., keep information on prospective jurors. Locate these pools of information in the county where your case is pending. Sometimes prospective jurors complete questionnaires or information sheets; some deputy sheriffs keep records on subpoenas requested and served, or reasons why they were not served, on prospective jurors. Practices vary from county to county; investigate and use them.

## F. Motion for Discovery of Information Concerning Prospective Jurors

Move for a court order that the prosecution disclose any information it has concerning prospective jurors that is relevant to the jury selection process. Often, the district attorney general's office will collect information on prospective jurors and, especially in rural counties, it is not uncommon for members of the district attorney general's office to know something about prospective jurors. This motion is especially helpful if it is discovered during the trial that the district attorney general's office had allowed a prospective juror to remain on the jury panel having reason to think that the juror would be prejudiced against the defendant. It also puts the state on notice that no such advantage can be gained without putting any future conviction in jeopardy.

Even if the judge refuses the proposed instruction, she may consider its contents and adjust her approach to the jury

## G. Motion for Juror Questionnaire

See § VII, this chapter. It should not be difficult to convince the court that a questionnaire saves time, is convenient for the court, and aids in selecting an impartial jury. A sample juror questionnaire is set out in Appendix B to this chapter.

## H. Motion for Pre-Voir Dire Instruction

Take this as an opportunity to control the mood with which the selection process begins. Draft non-controversial instructions that are completely in accord with existing law, but that prepare the prospective jurors (and, for that matter, the judge) for a lengthy, important, and perhaps difficult questioning process in which the jurors are obligated to cooperate and do their best to be truthful. Discuss other preliminary matters that set the stage for the kind of voir dire counsel seeks. This may also be an early opportunity to gauge which portions of the defense voir dire the judge may resist. Even if the judge refuses the proposed instruction, she may consider its contents and adjust her approach to the jury. See Jurywork, § 2.05[2].

## I. Motion to Allow Counsel to Address Jury Panel

This is similar to the motion suggested in § H, above, except that this is an address by counsel, rather than the court. Because it will probably be more difficult to obtain, counsel should be circumspect and cautious in the contents of the proposed address. With careful preparation, there should be nothing controversial about the proposal and the court should grant it. The address provides an opportunity to increase counsel's status in the eyes of the jurors, build rapport with them, and exert some control, or create the impression of control, over the process.

The address would introduce counsel and the client, make some general comments about the role of counsel, the court, and the prosecutor. The jurors' oaths might be discussed, pointing out that the first oath is to answer questions truthfully, while the second is to try the case fairly if selected as a juror. The

Using this selection system, counsel knows the complete pool of jurors before any jurors are stricken

importance, limits and some important aspects of voir dire might also be mentioned.

## J. Motion for Struck Selection System

Using this selection system, no peremptory challenges are made until a large number of prospective jurors have been questioned and qualified for cause. Counsel therefore knows the complete pool of jurors and who will be left to fill a seat before any jurors are stricken. However, the court may be reluctant to use it, because it will inevitably take more time. See Jurywork, § 2.09[1].

# VI. Investigation and Preparation

The only way to do effective voir dire, and to select a favorable jury, is to plan it. Start thinking about voir dire as soon as you enter the case. The preliminary investigation and planning fall into four main areas: developing the defense theory; learning about the community and the prospective jurors; seeking the most extensive voir dire from the court; and preparing the defense team to execute the voir dire.

Start thinking about voir dire as soon as you enter the case

## A. The Team Approach

As in every other aspect of a capital case, counsel must approach voir dire as the manager of a lawsuit rather than a lone wolf litigator. If possible, the psychological component of the defense team should include a juristic psychologist or a jury selection expert. A local attorney who is familiar with the jury pool may also be of assistance. Recruit and employ anyone who will be helpful in selecting the jury. See the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 2.1.

## B. Ideal Juror Profile

Identify the ideal characteristics of a potential juror – age, sex, race, education, employment, geographic location, economic status, political preferences, etc. Consider these questions, in light of your defense theory: What kind of person will want to convict my client? What kind of person will be willing to accept the defense evidence and theory? What kind of juror will be able to relate to the client and the defense team? Who will be most likely to vote against the death penalty?

## C. Know the Community

Exhaustively investigate the community from which the jurors will be selected. If you are unfamiliar with the area, start with a leisurely visit of one or two days, trying to determine the general flavor and sentiment of the community. Read the local papers, visit the scene of the incident and the area of the courthouse and city hall, eat and browse in the areas where people congregate. In general stores, barbershops, bus or train stations, and news stands, engage people in small talk. This approach is particularly helpful just before trial.

Is the area urban or rural? What are the percentages of minority groups and young people? How well educated are the people? What religions are they? What is the history of the community for race relations, oppression of women, and tolerance of religious minorities? Answers to these questions are often obvious, but may also be learned from local inhabitants such as your client, his family, local ministers, and other sympathetic people.

An analysis of the community profile will help you develop the defense theory, and select people who can most easily agree with it and are most likely to vote for life rather than death. If time and money permit, a scientific survey may be made to get a reliable profile of the community and its attitudes toward crime, the death penalty, and your case.

A carefully planned and executed voir dire will give you a jury better prepared to hear and accept your theory of the case

## D. Know the Panel Before Trial

Obtain a jury list and other relevant information about prospective jurors well before trial. Learn as much as possible about the neighborhoods in which the jurors live, their marital status, age, number of children, political affiliation, place of employment, extent of education, hobbies, and how they spend their leisure time. Again, a wealth of information can be obtained from local lawyers and other residents who may know the prospective juror. Court clerks and other personnel are often an invaluable source of information.

## E. Broad Scope Voir Dire

Start at the earliest stages of the case to seek the most extensive voir dire possible. Before filing the voir dire motion, thoroughly analyze which facts of this case make individual, sequestered voir dire absolutely critical to the selection of an impartial and untainted jury.

At a defense team meeting, analyze all the information, discuss the defense theory and the client's role, and have each person articulate the kind of juror who would be best for the case. From this discussion, determine what kind of information counsel needs to get out of the prospective jurors.

Neglect no aspect of the law or evidence that will confront the jurors in the guilt and penalty phases. Include questions about your guilt-phase defense theory, the presumption of innocence and burden of proof, specific mitigating factors, the reality of the death penalty, the presumption that a death verdict will kill the client, the client's testimony or silence, etc. Decide whether to discuss inflammatory and prejudicial evidence, in order to desensitize the jury. A carefully planned and executed voir dire will give you a jury better prepared to hear and accept your theory of the case.

## F. Evaluating Jurors During Voir Dire

Before voir dire, devise a system for evaluating prospective jurors. Probably the most common system is one in which each team member rates each prospective juror numerically, either after each juror is questioned or at the end of the day. Then the team reviews each other's ratings and arrives at a collective rating, identifying the jurors that the prosecution is most likely to strike and finding the best of the rest.

Of course, certain judges will allow only limited voir dire. The same principles apply, even if it means having quick discussions at defense table as peremptory challenges are made. Know what you are trying to accomplish, include as many people as possible in the selection process, and insist on having enough time to fairly execute the process. Be constantly alert to ways to demonstrate for the record that limitations on the selection process are prejudicing the defendant.

# VII. Juror Questionnaire

Submit a questionnaire for distribution to potential jurors before the in-court selection process begins. The questionnaire is intended to elicit as much background information as possible, revealing factual information that sheds light on any bias, prejudice, sympathy or personal experience without embarrassing the juror before the court, public and other prospective jurors. The privacy of a questionnaire encourages people who may be embarrassed by public responses to be more candid and self-revealing in discussing sensitive subjects such as political and religious preferences or a limited educational background. From the written responses counsel can decide in advance how far to question the juror in each area.

The privacy of a questionnaire encourages people to be more candid and self-revealing

Courts tend to be very responsive to the request, because a questionnaire will ultimately save time and conserve resources. Anticipate that the court will expect the questionnaires to be shared with the prosecution; refusal to share the information is usually the only thing that would prompt the court to deny the request. Determine whether it is more advantageous to circulate the questionnaire before trial or on the first day of jury selection. Better responses may be obtained if the questionnaires are distributed to the panel on the day they report to court. If the questionnaire is circulated by mail before the first day of trial, arrangements will have to be made for the cost of postage and the time consumed in distributing and collecting the questionnaires.

Include instructions, explaining that the purpose of the questionnaire is to shorten the voir dire process, for the convenience of the jurors and everyone else. The jurors should be asked to answer the questionnaire under oath, and should not confer with each other or anyone else about the questions and answers.

Appendix B, this chapter contains a sample questionnaire, which should be altered to fit your individual case. Counsel should prepare the questionnaire in advance, lest its preparation be left to the prosecution.

# VIII. The Basic Rules of Voir Dire

Simply stated, the primary purpose of voir dire is to educate someone

## A. Do Not Bore the Jury

Be interested and interesting. Acknowledge the jurors. Be courteous and respectful. Engage jurors in intermittent (no staring) but frequent eye contact.

## B. Educate the Jury (or Someone)

Simply stated, the primary purpose of voir dire is to educate someone – first of all yourself and secondarily the jurors, the court, and the prosecution. Educate the jury about the law, yourself, your client, your defense at guilt, your mitigation proof. Remember that the most important person you're educating is yourself: while you will not significantly change the opinions or preconceptions that the jurors brought to the courtroom, it is your primary goal to find out who these people are, what they think and care about, so that you will know which ones to let sit in judgment of your client. Also use this opportunity to educate the judge, and maybe even the prosecution.

## C. Prepare the Jury

Try to avoid shocking or surprising the jurors in your transition from one subject to another. They are being questioned concerning sensitive matters and it is probably difficult for them to respond. Approach subjects carefully and sometimes obliquely and subtly.

## D. Be Candid and Honest

Don't try to trick or manipulate people. Be self-revealing. Introduce yourself and your client. Identify with the jurors when possible. Tell the jurors how you identify with them and particularly how you share their biases and prejudices.

## E. Be Relaxed and Conversational

Engage the jurors; don't ask questions, make conversation. You are the interested interviewer. Don't be tied to the lectern. Sometimes let prospective jurors control or lead the conversation.

## F. Be Patient

Listen to everything people say. Never, never, never interrupt. Use silence and pauses to invite elaboration. Encourage it, often. When an open-ended question is appropriate, invite and expect a rambling and revealing response.

# IX. Challenges for Cause

The potential for debilitating predispositions is endless and often limited only by counsel's imagination

## A. Legal Exclusion

Each juror must be at least 18 years old, a U.S. citizen, and a resident of the county for 12 months preceding the date of the summons. No one is qualified who is a convicted felon, of unsound mind, not in full possession of the senses of hearing and seeing, or a habitual drunk; has a suit pending trial at the same term of court; served as a juror for one term within the past two years; is a bail bondsman who secured the bond for the defendant; belongs to certain organizations; or is related to either party within the sixth degree of kinship.[6]

## B. Factual Challenges for Cause

The factual challenge for cause goes to any interest or bias that renders a person incompetent to serve in a given case; that is, any predisposition that will interfere with the person's ability to serve as a fair and impartial juror, or "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). To establish a challenge for cause in fact, counsel lays the foundation demonstrating the debilitating predisposition and the court determines the validity of the challenge within its discretion. Examples include:

- People who know the judge, counsel, parties, court officials or witnesses, in a way that would detrimentally affect their impartiality.
- People who are unable to follow the law. Because the constitution requires that jurors consider facts introduced in mitigation, the search for this type of disqualification gives counsel an opportunity to test the mitigation proof on prospective jurors.
- Negative predispositions that would affect impartiality, such as attitudes towards law enforcement, the criminal justice system in general or the duties expected of jurors.
- Revulsion or strong feelings about any facts or characteristics of the case. It is often a good idea to tell jurors of profanity, the use of weapons, and the blood and gore or horrible photographs that the state will introduce in evidence.
- Direct relationships or close associations with law enforcement.

Again, the potential for debilitating predispositions is endless and often limited only by counsel's imagination. A study of specific capital trials, conducted by Jury Services, Inc., revealed that fifty percent of the prospective jurors had strong predispositions that subjected them to challenges for cause. Ten to fifteen percent said they would automatically impose the death penalty against anyone convicted of premeditated murder; twenty-five percent would automatically impose

[6] *See* T.C.A. §§ 22-1-101 et seq., 22-3-103, 22-3-104, 40-12-102, 40-18-105, and 40-20-112; see also Toombs v. State, 770 S.W.2d 649 (1954), on the kinship disqualification, an especially fertile area for challenges in rural counties -- the sixth degree of kinship is very remote and not at all uncommon.

Always be mindful of the dangers of the death qualification process

death for anyone convicted of a premeditated murder that included other aggravating characteristics, such as multiple murder, repeat offender, victim was a child, youth or elderly person, victim begged for mercy, murder was particularly brutal or heinous, drug related, or involved rape, kidnapping, robbery, handgun, etc.; ten to fifteen percent had predispositions concerning parole eligibility and the cost of litigation; and five to twenty-five percent were subject to exclusion for cause as a result of scruples against the death penalty.

## C. Factual Challenges for Cause – Death Qualification

Always be mindful of the dangers of the death qualification process. It can make the death decision easier by creating an assumption in the jurors' minds that they will convict your client of first-degree murder in order to get to the sentencing hearing. Endless conversation about the death decision may desensitize the jurors and de-mystify the penalty. While some attorneys have speculated whether the subject should be avoided because of these risks, the fact is that the court and prosecutor will raise the issue even if counsel does not. Counsel has no choice but to engage the issue; a decision not to do so usually indicates nothing more than a failure to understand the importance of the process and a lack of preparation for voir dire.

### 1. United States Supreme Court Decisions

#### a. Witherspoon v. Illinois

In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 30 L.Ed.2d 776 (1968), the Court held that the death penalty cannot be imposed if the jury was chosen "by excluding veniremen for cause simply because they voiced general objections or expressed conscientious scruples against its infliction. 391 U.S. at 522. The Court permitted exclusion for cause of:

> Those who made [it] unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Id. at 522 n.21 (emphasis in original).

According to Witherspoon, the Sixth and Fourteenth Amendments guarantee an "impartial" jury, *i.e.*, a jury that is not "organized to return a verdict of death." Id. at 521. Where a juror is excluded because of only a general opposition to the death penalty, the resulting death penalty is void. See, e.g., Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969). Thus, Witherspoon allowed excusal of some anti-death penalty jurors, but the standard was very high.[7]

[7] Tennessee cases addressing Witherspoon issues include Beaver v. State, 475 S.W.2d 557, 559 (Tenn. Crim. App. 1971); Hunter v. State, 496 S.W.2d 900 (Tenn. 1972); State v. Workman, 667 S.W.2d 44 (Tenn. 1984); and State v. Harrington, 627 S.W.2d 345 (Tenn. 1982).

b. Adams v. Texas
In 1980, the Supreme Court held:

> A juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Adams did not repeat Witherspoon's key words, such as "automatically" and "unmistakably clear." The standard of certainty was lowered. In addition, Adams merged the two prongs of Witherspoon into one test that did not distinguish between decisions on guilt and punishment. Although Adams did not specifically overrule Witherspoon, it clouded the standard for exclusion by relying upon a test that was inconsistent with Witherspoon.

c. Wainwright v. Witt
In 1985, in order to "clarify" Witherspoon and "reaffirm" Adams, the Court altered the traditional Witherspoon test, stating the standard as:

> Whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with Witherspoon's reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." Wainwright v. Witt, 469 U.S. 412, 425, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Witt broadened the standards by which a trial judge may exclude jurors due to their opinions or beliefs about the death penalty. The trial judge now can excuse a juror based on a definite impression that the juror would be unable to faithfully and impartially apply the law, specifically with reference to the imposition of the sentence of death.

Witt increases the number of people who can be excluded for cause because of their opposition to the death penalty. At the same time, however, it increases the number of people excluded based on support for the death penalty. Witt is thus a sword available to defense and prosecution alike. In addition to identifying and challenging those who would "automatically" impose the death penalty in any first-degree murder case, counsel must establish a basis for challenging those whose support for the death penalty would prevent them from following the law on sentencing issues – *e.g.*, unwillingness to consider various types of evidence that might be presented in mitigation.

Witt increases the number of people excluded based on support for the death penalty

Counsel's antennae should be fully extended when any juror begins to indicate reservations about imposing death

## 2. Rehabilitating the Death-Scrupled Juror

Counsel's antennae should be fully extended when any juror begins to indicate reservations about imposing death. Be poised to rehabilitate, to "save" the prospective juror from a cause challenge. Witt has rendered this task more difficult. Even if you suspect that the juror cannot be rehabilitated, the effort must be made; do not give up until it is absolutely certain that the juror cannot be regained. If the court seeks to cut you short, argue that the defendant must be afforded the right to rehabilitate prospective jurors.

### a. The Right to Rehabilitate

In Witt, the Court found it "noteworthy that . . . defense counsel did not see fit to object to juror Colby's excusal, or to attempt rehabilitation." 469 U.S. at 431 [105 S.Ct. at 855] (emphasis added). "[C]ounsel chose not to question Colby himself, or to object to the trial court's excusing her for cause. This questioning might have resolved any perceived ambiguities in the questions. . . ." Id. at 435 [105 S.Ct. 857]; see also J. Stevens' concurring opinion, id. at 437 [105 S.Ct. at 858-59] ("Defense counsel . . . made no attempt, either by cross-examination or in colloquy with the court, to demonstrate that she could properly serve as a juror, or that defendant wanted her to serve."

Tennessee cases make even clearer the defense right to rehabilitate. Where there is any ambiguity in a juror's answers, the court can cut short further questioning only when it is clear that the answers leave no "leeway for rehabilitation." State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981). In State v. Alley, 776 S.W.2d 506 (Tenn. 1989), a juror said he thought he could follow the law and consider the death penalty but that his mind would not rest easy on a sentence of death; later he said he would spend a lot of sleepless nights and was not sure he could consider both death and life. The trial court said, "in viewing the juror as I sit here on the bench, he's having a very difficult time dealing with the questions," and excused the juror, over objection to excusal without voir dire by the defense. Id. at 517. The Supreme Court held that the questioning by the prosecution and the trial court had not reached the requisite point: "The questioning by the prosecuting attorney produced ambiguous results, and the trial judge's refusal to allow defendants to voir dire the prospective juror when there appears to have been 'leeway for rehabilitation' are matters of grave concern." Id. at 518.

Denial of the right to rehabilitative questioning may lead to reversal on appeal. O'Connell v. State, 480 So.2d 1284 (Fla. 1986). Jurors' views must be fully developed before excusal is proper. Fuselier v. State, 468 So.2d 45 (Miss. 1985). Counsel must object on the record, in order to preserve the issue.

**b.Approaching Rehabilitation**
The effort to rehabilitate death-scrupled jurors can be difficult and frustrating. Capital counsel have developed the "two-stage trial," "citizen's duty," "fair cross-section," and "heinous crime" approaches. Which one to take depends on the juror's reservations. Usually, effective rehabilitation requires a combination of approaches.

Begin by acknowledging the juror's concern – thank her for being open, tell her the defense shares her concerns, reassure her that others feel as she does, and acknowledge that the decision will be difficult. Remind her that as a person who will carefully evaluate the evidence in the guilt and penalty phases, she is especially suited to be a juror in a serious case.

Explain the purpose of death qualification, reassuring the juror that the goal is not to convince her to change her opinion. Explain that the questions apply to a hypothetical situation in which a defendant is convicted of first degree murder, that a hypothetical situation is being used because the jury in this case may very well decide that the defendant is not guilty, and never even reach the penalty phase.

Tailor all follow-up questions to show the juror that her opinions need not preclude service on the case.

**(1) The "Two-Stage Trial" Approach**
Most people will not understand the two-stage process even after it has been explained several times; most jurors assume that conviction for a capital crime leads to automatic imposition of a death sentence. Review the two-stage trial. Explain that the question of penalty may never be reached and that, even if it is, under no circumstances is a death sentence ever required. This approach is especially important for the juror whose hesitation about the death penalty and confusion about the trial process have led him to feel that he will be confronted with a very difficult choice: to vote against death or to follow the law. The judge's and prosecutor's questions often reinforce this impression. Correct this misconception and demonstrate that hesitation about a death sentence does not mean that the prospective juror cannot follow the law.

Questions should be open ended and geared toward educating the juror. Be sincere, solicitous and conversational. Consider this line of questioning:

> The purpose of these questions is to find out if you can consider the evidence presented by both sides, discuss the evidence with other jurors, apply the instructions provided by law, and render a verdict based on a thorough examination of the evidence.

Explain the purpose of death qualification, reassuring the juror that the goal is not to convince her to change her opinion

Counsel must emphasize repeatedly that the juror will never be required to impose a death sentence

The law of Tennessee provides for a two-stage trial in cases in which the death penalty may be an issue. In the first phase, the jury's job is the same as it would be in any other case – to decide whether (client's name) is guilty or not guilty. Do you think you can be a fair juror for the first phase of this trial and listen to evidence and fairly decide whether (client's name) is guilty or not guilty?

Only if the jury decides in the first phase of the trial that (client's name) is guilty of first degree murder does the jury then have the task of considering sentence. In that event, the jury will sit on a second phase of the trial and hear new evidence. The defense and the prosecution will present new evidence as to whether (client's name) should live or die. I don't think we'll get to a second phase in this case, but if we do, do you think you can sit as a juror and fairly consider all the evidence?

Do you understand that this is a two-stage process?

Do you understand that you may never have to consider the question of sentencing?

If the jury does have to decide on a sentence, your decision is not made in a vacuum. The law provides instructions to help you decide. The law allows you to vote for a life sentence if you believe a life sentence is the proper punishment. The most important point for you as a juror to understand is that the law provides you with a choice. Do you understand that the law will never require you to vote for one sentence or the other?

Do you understand that your vote is to be based on you own evaluation of the evidence?

You could follow the judge's instructions on the law regarding sentencing, couldn't you?

The questions must be asked slowly and clearly, giving the juror an opportunity to absorb this new information about her role and qualifications as a juror in a capital case. Counsel must emphasize repeatedly that the juror will never be required to impose a death sentence but merely to consider all the evidence and consider both sentencing alternatives.

**(2) The "Citizen's Duty" Approach**
This approach is designed to demonstrate to the person who has strong feelings against death that he would be neglecting his civic duty if he did not serve. It enables the juror to evaluate his feelings about the death penalty in light of the duty he feels, as a good citizen, to serve on a jury. After establishing that the juror understands the two-stage trial process, ask a series of questions designed to highlight his characteristics as a good citizen:

- For how long have you been a registered voter?
- Do you vote regularly?
- Are you a member of any local civic organizations?
- Have you served on a jury before?
- Do you keep up with local news on events of importance to this community?
- Are you concerned about this community and its civic affairs?
- Would you say you feel the same way about jury service?

The next questions elicit information about the juror's responsibility to follow the judge's instructions:

- Considering what you've already told us about your opinions about the death penalty, do you believe you could be a fair juror for the first phase of this trial, the guilt or innocence phase?
- Do you understand that it is every citizen's duty to serve as a juror?
- And that every defendant has a right to a jury that is fairly representative of the community?
- Do you know that there is a fairly sizable group of people in the population who, like you, would hesitate about imposing the death penalty?
- Do you see how difficult it would be for (client's name) if this group of people were excluded from sitting in his case simply because they said they wouldn't consider the death penalty as a possible punishment?
- Do you understand that the question of punishment won't even arise unless (client's name) is found guilty of first degree murder in the first phase of the trial?
- Do you understand that in order for a jury to return a death sentence, every juror must vote for death? And that one single juror who votes for life will cause (client's name) not to be sentenced to death?
- Do you understand that to qualify to sit as a juror in this case, the law requires only that you be willing to fairly evaluate the evidence in the second stage if (client's name) is found guilty of first degree murder in the first stage?

After establishing that the juror understands the two-stage trial process, ask a series of questions designed to highlight his characteristics as a good citizen

The importance of a fair cross-section of attitudes can be compared to the importance of a fair cross-section of backgrounds on the jury

**(3) The "Fair Cross-Section" Approach**
This approach is designed for the juror whose reasons for opposing death relate to the discriminatory nature of its application, and focuses on the importance of having a wide range of community attitudes represented on the jury. These people are usually members of demographic groups – blacks, women, or youth – that have been historically under-represented on juries. Questions can be framed to remind the juror that some groups have been denied access to the jury system. The importance of a fair cross-section of attitudes can be compared to the importance of a fair cross-section of backgrounds on the jury.

- Do you understand that a defendant is entitled to a jury chosen from a group representing all the people in the community: women, men; young, elderly; black and white?
- I'm sure you remember that not too long ago women (or blacks, or poor people, depending on what kind of discrimination the juror is most likely to be familiar with) were not permitted to serve on juries? Do you think it would be fair for (client's name) to be tried by a jury that didn't represent the community in background and attitudes?
- We are concerned here with obtaining a jury that represents a cross-section of the community's views about the death penalty. The state feels that it would not be fair to have a jury composed of people who could not even consider evidence in favor of the death penalty. Do you think it would be fair to have a jury composed of people who could not consider a life sentence?
- You understand that if the jury finds (client's name) not guilty, the death penalty may never be an issue in this case at all?
- If a sentencing stage were required, could you listen to the evidence presented from both sides?
- Could you follow the instructions provided by law and consider both sentencing alternatives, a sentence of death or a life sentence?

**(4) The "Heinous Crime" Approach**
This approach tests the limits of the juror's opposition to the death penalty and identifies extreme circumstances under which she might consider imposing death. It is used with the prospective juror who indicates strong opposition to the death penalty. By focusing on a crime situation that the juror believes to be truly heinous and cruel, the juror may come to realize that her scruples against the death penalty might be modified if shocking evidence were presented.

Traditionally, counsel have asked questions about willingness to consider imposing death in a case involving a specifically described heinous criminal or crime. The problem with that approach is that for the true death penalty opponent, the factual situation posed by counsel is far too similar to the factual situation posed to her by some death penalty proponent at the last cocktail party she attended. She has a "pat" set of answers justifying not imposing a sentence of death, disclosure of which may well give the prosecutor grounds for a cause challenge.

Successful rehabilitation of a death-scrupled prospective juror usually requires a combination approach

The better approach is to ask the juror to imagine and describe a murder she considers to be truly atrocious and cruel, and to explain what features make it truly atrocious. With these details in mind, ask the juror:

- Isn't that the type of murder where you might consider the death penalty to be an appropriate punishment?
- If the juror responds in the affirmative, questioning can continue as follows:
- It would be fair to say that there may be circumstances under which you would be willing to consider the death penalty?
- And since you don't really know about the circumstances surrounding this case, you can't say before hearing any evidence that you could not consider both sentencing alternatives, can you?
- Suppose you heard facts in this case that made you feel as angry and afraid as the other case you just described. Isn't it true that in a situation where you felt that way you would be able to evaluate both penalties objectively?
- Knowing that the law will never require you to impose a sentence that you don't feel is warranted by the evidence, isn't it true that you can be a fair juror in this case?
- In the event that this should reach a penalty phase, wouldn't you be able to listen to all the evidence and fairly consider that evidence and the sentencing alternatives in deliberations?

If the juror says she cannot think of a truly horrible crime, suggest a hypothetical example and inquire whether the juror might consider the death penalty in a case involving the torture killing of a small baby, for example, or a family member, a rape and torture murder, Klan atrocities against a black person, or Nazi genocide.

Each rehabilitation approach can be used in combination with the others. Because successful rehabilitation of a death-scrupled prospective juror usually requires correction of misconceptions about death penalty trials, a combination approach is usually most effective.

Lockett and its progeny require the sentencer to consider evidence presented in mitigation

**c. A Final Note**
Do everything possible to maintain control of the prospective juror until you have sealed every crack in his ability to fairly and impartially listen and consider all the evidence and the sentencing alternatives. Maintaining this control requires that you anticipate the direction from which the judge or prosecutor is going to undo what you have done. All too often, after counsel relinquishes control the judge or prosecutor will ask one or two questions that take the juror right back to square one. It will happen at least a half dozen times in every capital case. Don't become frustrated or discouraged. If you've conducted the rehabilitation along the lines suggested above, you will have made a record sufficient enough for a court of review to grant relief.

**3. Eliminating the Death Penalty Supporter**
You are in court, in the first day of jury selection. You have completed your investigation and carefully mapped out your voir dire. The judge has completed her preliminary remarks; the prosecutor questions the first juror, who asserts his firm belief in capital punishment. You determine that this juror must go because he will vote for death automatically on a finding of guilty of first degree murder.

Not all answers will be so crystal-clear, but at some point in the process, you will determine that you wish to exclude various jurors because they are inclined to kill your client. Having a limited number of peremptory challenges, you would like to have them all excused for cause. Just as Witt makes it easier for prosecutors to exclude death-scrupled jurors, it also makes it easier for the defense to exclude those inclined toward death. By using "reverse Witherspoon/Witt" questions, you should be able to challenge the jurors for cause.

In their simplest terms, Lockett and its progeny require the sentencer to consider evidence presented in mitigation. A juror who will automatically vote for death cannot follow the law requiring her to consider facts introduced in mitigation, and is therefore excludable for cause. In fact, her predisposition violates your client's right under the Eighth Amendment to individualized sentencing. Likewise, a juror who harbors strong views against certain kinds of mitigating evidence would be prevented from or substantially impaired in performing her duties as a juror in accordance with the instructions and oath.

Begin with an attempt to find out in what kind of cases the juror believes a death sentence should be imposed.

Q. You've indicated that you are a firm believer in capital punishment.

A. Yes.

Q. In what kind of cases do you think the death penalty should be given?

A. In all premeditated, heinous or brutal crimes.

If the juror waffles enough to evade a challenge for cause based on automatic imposition of death for anyone convicted of first-degree murder, parade before her the aggravators that you know the state will be able to prove, until the juror cannot take it any longer. For example, she may admit a compulsion to kill if she is told that the case involves multiple murders, a repeat offender who has been previously convicted of another murder or violent offense, a victim who was elderly, youthful or begged for mercy, rape, kidnaping, drugs, a handgun, or death by burning. At the point at which the juror would be unable to consider evidence of mitigation, she is excludable for cause.

As you then began to run through a list of mitigating circumstances that you will seek to introduce, in order to determine that the juror would be unaffected by them, the state is likely to object, perhaps on the basis that you are arguing your case. The judge will probably be looking for a way to cut you short due to the consumption of time and perhaps the appearance of belaboring the prospective jurors. Counsel's typical response is:

> Your Honor, case after case from the United States Supreme Court have made it abundantly clear that the jury must be able to consider facts in mitigation given the circumstances of the crime proven at guilt. (Cite authority.) How can we determine whether or not the jurors can consider the facts in mitigation in view of the aggravating circumstances of the crime unless we ask? It would violate the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution to prohibit this line of questioning.

With the facts of your case in mind, you now change to close-ended questions in order to induce the juror into conceding that this premeditated, heinous or brutal crime is a case in which she would automatically vote for death.

Try to accomplish this as indirectly as possible. For example, you probably do not want to begin your question with: "If the evidence in this case shows . . ." It may not only tip off the juror but also draw an objection (valid or not), distracting you and giving the juror time to think of an appropriate answer.

Q. As I'm sure you are aware, a great number of citizens in our community feel that individuals who commit murder during a robbery should receive the sentence of death. Are you aware of such a commonly held opinion?

You now change to close-ended questions in order to induce the juror into conceding that this is a case in which she would automatically vote for death

Emphasize that a truthful answer is the only criterion; there is no right or wrong answer

A. Yes.

Q. There may particularly be some feeling in the community that such a sentence would be appropriate if the victim in the robbery-murder was unarmed, isn't that right?

A. That's right.

Q. Do you tend to share that opinion with others?

A. Yes, I suppose I would be more inclined under those circumstances to impose the sentence of death.

Q. What if in addition to the fact that the murder was committed during a robbery and the victim was unarmed, you were to know that the assailant was a convicted felon and therefore any firearm that he possessed would be possessed unlawfully and that the defendant in this case shot and killed the victim during the course of this robbery with a handgun, a Saturday night special?

A. Well, I would sure understand if someone would feel compelled to impose the sentence of death in those circumstances.

Q. Under those circumstances, if you were sitting as a juror in this case and you were to hear those facts, that is, that the defendant committed the murder during a robbery, that the victim was unarmed, and that the defendant, a convicted felon, shot the victim with a Saturday night special, which he had no lawful right to possess, would you be able then to consider in mitigation the fact that he was young and the fact that he had been abused as a child?

A. I don't think it would make much difference to me how old he was or what his childhood was like if those were the facts.

Q. It would be difficult for you to consider anything that the defendant might present in mitigation if those were the facts of the case, wouldn't it?

A. Yes, I guess it would.

Q. In fact, it would probably be impossible?

A. There ain't no probably to it, it would be impossible.

The juror appears to be beyond rehabilitation and, absent extraordinary circumstances, if the court refuses to strike the juror for cause, you probably have error.

Always encourage and support the juror. Emphasize that a truthful answer is the only criterion; there is no right or wrong answer. Where possible, use the juror's own words. Avoid indicating disapproval

or displeasure. Zero in on the challenge conversationally, but without diversion. Pin the juror down as much as possible. For example:

Q. If you found the defendant had premeditated the murder, during the course of a robbery in which the victim was unarmed and the defendant was a convicted felon, I guess that's the kind of case where you'd vote for the death penalty. Isn't that right?

A. Right.

Q. Despite anything else that you might hear about him.

A. That's right.

Q. And that's an individual, moral position for you, is it not?

A. Yes.

Q. I assume that since you feel that such a murder deserves the death penalty, you'd vote to impose death as a punishment in all such cases, isn't that right?

A. That's right.

Q. In the face of such proof concerning the circumstances of the murder, it would not matter to you if you heard any other evidence intended to show that the defendant was not an otherwise bad person or that tended to minimize the wrongfulness of his act, would you?

A. No, that wouldn't matter to me at all.

At this point, your challenge for cause is stronger than ever. If the juror is going your way and you want to put the final nail in coffin, ask the juror as follows:

Q. Do you think these views might affect your ability to reserve judgment in this case until after hearing all the evidence?

A. Yeah, there's no doubt about that.

Q. Do you think these views would prevent or substantially impair the performance of your duties as a juror in accordance with the court's instruction or the oath that will be given to you?

A. There's no doubt about it.

A direct admission of unfairness is not required – difficulty in being fair should be enough – but it is the icing on the cake. Be careful, however, because going for the "final nail" may head you into one question too many.

Another example of inability to consider facts presented in mitigation, could go as follows:

A direct admission of unfairness is not required -- difficulty in being fair should be enough -- but it is the icing on the cake

Determine if the juror is a classic automatic death juror and weave into your questioning aggravating characteristics that invite the juror to close his mind to further evidence

Q. One of the things we're going to be talking about in the penalty phase, if there is one, is the defendant's abusive childhood and drug addiction. Now, I assume that you would be able to listen to what we had to say, right?

A. Yes.

Q. As a fair-minded person, you could listen?

A. That's correct.

Q. At some point, if you are selected as a juror in this case, you'll be asked to go back in the jury room and consider all the evidence, including the new evidence presented at the penalty phase of the trial and make a decision. Now, feeling like you do about premeditated murderers deserving the death penalty, you'll naturally start out feeling that the death penalty is the appropriate punishment, won't you?

A. Yes, I probably will.

Q. His honor will instruct you that when you decide punishment you can consider any of the background evidence that is presented, such as child abuse and drug addiction. He will tell you that you must be honest about how you feel about that evidence.

A. Well, in all honesty, I don't think what happened to him when he was a kid should have much to do with it.

Q. And that's because the factors that would determine your decision would be the nature of the crime and your own opinion about all premeditated murderers deserving the death penalty, isn't that right?

A. That's right.

To pin down the juror who would be unable to keep an open mind through the close of proof and consider all the evidence presented in mitigation before reaching a decision to impose the sentence of death, use the following approach:

(1) determine if the juror is a classic automatic death juror, who would impose the sentence of death against anyone convicted of first degree murder;

(2) weave into your questioning conceded aggravating characteristics about the case that would increasingly invite the juror to close his mind to further evidence before voting for death;

(3) in the face of the aggravating characteristics of this first degree murder, establish that the juror would be unable to consider facts in mitigation that you know you will be able to present in your case.

An extra benefit to this procedure is the opportunity to elicit information that will help you fine tune your mitigation presentation. Every person who ends up in the jury box will have gone through this question and answer process and will have informed you how they will react to proof that you expect each side to present. You should therefore have a good idea, before the first witness is called in sentencing, how each person will probably react to the evidence presented.

The obvious danger is that if the juror is not excused for cause, she has been led into a mind set that is predisposed toward death. Remember that you will be able to strike these jurors peremptorily, as long as you have challenges remaining. Also continually remind jurors that the second stage will not be reached unless the jury finds the defendant guilty of first degree murder in the first stage.

Every person who ends up in the jury box will have informed you how they will react to proof that you expect each side to present

A failure to exhaust peremptory challenges waives claims made on appeal regarding any challenges for cause

Although peremptory challenges are exercised after challenges for cause, the interrelationship between peremptory and cause challenges should never be forgotten. A failure to exhaust peremptory challenges waives claims made on appeal regarding any challenges for cause.[8] In the converse, an erroneous refusal to excuse for cause cannot be raised if the defense peremptorily challenged the juror. See Swain v. State, 407 S.W.2d 452 (Tenn.1966).

As a rule of thumb peremptory challenges should be exercised one at a time. Removing two jurors at once increases the risk of getting rid of someone who, regardless of how bad he is, is better than the next person.

If you find that you have three or four strong, leader-type jurors on the panel who you conclude are pro-defense or pro-life, you may wish to gamble that the state will not exercise any peremptory strikes and pass up an opportunity to enter any strikes early in the process in the hope of freezing the selection process. Of course, if the state then uses a peremptory strike, the selection process will continue and the formula will change concerning the next opportunity to exercise peremptory challenges. Always remember, if the jury is accepted at any time before all peremptory strikes are used, no later challenges can be made to the trial court's erroneous decisions on excusals for cause.

Systematic exclusion by the state of prospective jurors who are black in a case involving a black defendant violates the U.S. Constitution. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 59 (1986). In People v. Wheeler, 583 P.2d 748 (Cal. 1978), the California Supreme Court held that the state's use of peremptory challenges to exclude a cognizable group violates the California constitution. This holding was followed in Commonwealth v. Soares, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881 (Mass. 1979), and has been addressed in numerous state courts. Although such a rule has not been adopted in Tennessee, any systematic exclusion should draw an objection and be raised on appeal, in case new law develops pursuant to either the state or federal constitution with reference to cognizable groups other than race. Tennessee courts have gone so far as to caution that systematic exclusion may be unlawful, see Drew v. State, 588 S.W.2d 562 (Tenn. Crim. App. 1979), leading to the inescapable conclusion that error should be noted in the event that the state tries to exclude any cognizable group.

Racial minorities have long been under-represented on juries in the United States. Although most overt forms of racial discrimination in jury selection have been prohibited, continuing under-representation is largely attributable to current methods of jury selection and prosecutorial abuse of peremptory challenges. Most states use procedures that limit the participation of minorities at each stage of the process, from the initial stage of generating under-

[8] *See*, e.g., Sommerville v. State, 521 S.W.2d 792 (Tenn. 1975); State v. Crawford, 620 S.W.2d 543 (Tenn. Crim. App. 1981); Underwood v. State, 604 S.W.2d 875 (Tenn. Crim. App. 1979); and Prince v. State, 529 S.W.2d 729 (Tenn. Crim. App. 1975). In a capital case, the defense is entitled to fifteen peremptory challenges and the state is entitled to eight per defendant. T.R.Cr.P. 24(d).

representative source lists to the granting of excuse requests to potential minority jurors. Although peremptory challenges are designed to remove racial bias from juries, prosecutors use them to prevent minorities from serving on juries. The result is that, in spite of the constitutional guarantee that a jury be drawn from a fair cross-section of the community, Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), defendants are judged by juries that are often too homogeneous to recognize and confront their own racial prejudice.

Defendants are judged by juries that are often too homogeneous to recognize and confront their own racial prejudice

Selection procedures have been challenged as excluding racial minorities under the equal protection clause and the Sixth Amendment. When a minority group is excluded consistently over time, members of the excluded group have standing, either as defendants or as citizens excluded from jury service, to bring an equal protection challenge. The standing requirement of the Sixth Amendment is less stringent; the Court has allowed defendants who are not members of the excluded group, as well as those who are, to challenge exclusion of the group from jury service. See, e.g., Taylor v. Louisiana, supra (man has standing to challenge exclusion of women); Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (white has standing to challenge exclusion of blacks). Members of an under-represented group can also use the Sixth Amendment to vindicate their right to serve as jurors. See Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

The equal protection clause was first used to challenge racially discriminatory jury selection in Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880), involving a statute making blacks ineligible to serve. The Court said that a defendant of a particular race or color could not be tried before a petit jury or under an indictment issued by a grand jury from which all persons of his race or color had been excluded solely because of their race or color.

Until 1986, the use of peremptory challenges was governed by Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which, recognizing the institutional force and value of allowing prosecutors to retain discretion in exercising peremptories, rejected an equal protection challenge to the prosecutor's peremptory exclusion of blacks from the jury. Presuming that in any given case a prosecutor uses peremptories in order to obtain a fair and impartial jury, Swain concluded that a prima facie case was not shown because there was no proof that blacks had been excluded from all criminal juries, including those hearing cases in which defendants were not black. By requiring a demonstration of systematic exclusion, Swain imposed a nearly insurmountable burden on defendants trying to prove an equal protection violation in the use of peremptory challenges.

In response, some state courts took the lead in making the system of peremptory challenges responsive to the needs of racial equality. Relying on both state constitutions and the Sixth Amendment, state courts adopted standards that made it easier for defendants to prove discrimination.[9] Some federal courts

[9] *See*, e.g., People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 148 Cal. Rptr. 890 (1978); Commonwealth v. Soares, 387 N.E.2d 499 (Mass. 1979); State v. Crespin, 612 P.2d 716 (N.M. 1980); State v. Neil, 457 So.2d 481 (Fla. 1984); and State v. Gilmore, 489 A.2d 1175 (N.J. Super. 1985).

When it appears that the prosecutor is excluding black prospective jurors or any other cognizable group, object

similarly avoided the Swain result by using the Sixth Amendment to regulate the use of peremptory challenges. See, *e.g.*, McCray v. Abrams, 750 F.2d 1113 (2d Cir. 1983), *vacated*, 478 U.S. 1001 [106 S.Ct. 3289] (1986).

In Batson v. Kentucky, 476 U.S. 79, 104 S.Ct. 339, 82 L.Ed.2d 69 (1986), the Supreme Court finally overruled Swain and demonstrated some willingness to displace traditionally valued features of jury selection systems. In concluding that the equal protection clause precludes the exercise of peremptory challenges based solely on race, the Court adopted an analysis that resembled the reasoning of jury venire cases. See, Powers v. Ohio, ___U.S. ____, 111 S.Ct. 1364 (1991) (under the equal protection clause, a criminal defendant may object to race-based exclusions of jurors through peremptory challenges whether or not the defendant and the excluded jurors share the same race) and Edmonson v. Leesville Concrete Co. Inc., ___U.S. ____, 111 S.Ct. 2077 (1991) (private litigant in a civil case may not use peremptory challenges to exclude jurors on account of their race, since race-based exclusion violates equal protection rights of the challenged juror). To make out a *prima facie* case of purposeful discrimination, the defendant must show that he is a member of a cognizable group, members of which were peremptorily excluded from the venire. The defendant can rely on the fact that peremptory challenges provided an opportunity to discriminate. Proof of these elements and "other relevant circumstances" create an inference that the prosecutor has used peremptory challenges to exclude jurors because of race. The state must then give an explanation for the challenges, which must be neutral but need not rise to the level justifying a challenge for cause. It is left to the trial court to determine whether there was purposeful discrimination. See Bell v. State, 745 S.W.2d 858, *after remand*, 759 S.W.2d 651 (1988).

When it appears that the prosecutor is excluding black prospective jurors or any other cognizable group, object. Because each side only has a limited number of peremptory challenges, the exclusion of one or more black prospective jurors or other cognizable group members may create the necessary inference.[10] In Batson, four peremptory challenges were used to exclude black prospective jurors and, on appeal, Batson won! If the prosecutor excludes several blacks or other

[10] See State v. Peters, 12 TAM 14-21, 1987 WL 6943 (Tenn. Crim. App. 2/24/87) ("the prosecutor's use of peremptory challenges to excuse the only black jurors on the venire, and no others, might well raise a *prima facie* case of purposeful racial discrimination that, upon timely objection, could be difficult to defend, under the constitutional principles announced in Batson"); United States v. Battle, 836 F.2d 1084, 1086 (8th Cir. 1987) ("The striking of a single black juror for racial reasons violates the equal protection clause, even when there are valid reasons for the striking of some black jurors"); and United States v. Chalan, 812 F.2d 1302, 1313 (10th Cir. 1987) ("the additional fact that the Government used its peremptory challenges to strike the last remaining juror of defendant's race is sufficient to 'raise an inference' that the juror was excluded on 'account of [his] race,' thereby satisfying the final portion of the Batson test"); but see State v. Bell II, 759 S.W.2d 651, 653 (Tenn. 1988) ("It is not unconstitutional, without more, to strike one or more blacks from the jury"); and State v. Thompson, 768 S.W. 2d 239, 247 (Tenn. 1989) ("Whether [the challenge of the only black venireman] is a pattern of strikes sufficient to establish a *prima facie* case we need not decide because the State provided a satisfactory explanation").

members of a cognizable group of prospective jurors but allows several to remain, is a Batson challenge still valid? Yes![11]

Most Batson challenges raised on appeal fail because of an insufficient record

Objection is followed by a motion to dismiss the venire or for a mistrial. The motion to dismiss the venire must be made calculatedly, however. If the venire contains a good number of blacks or other members of the cognizable group – more than the prosecutor can excuse because of her limited number of peremptory challenges – the motion might prudently not be made. If there are none, or so few that the prosecutor can excuse them, it might be wise to make this effort to get a new venire with more blacks or other cognizable group members in it.

The motion to dismiss the venire will probably be denied. You then move for a mistrial. That too, in all likelihood, will be denied. But don't stop! Each time thereafter that the prosecutor challenges a black or other cognizable group member, go through the same ritual. Timeliness is crucial. The motion for a mistrial must be made after voir dire is completed and before the jury is sworn. State v. Peck, *supra*. The issue cannot wait until the motion for a new trial is filed;[12] failure to proceed in this manner will result in waiver of the issue on appeal. State v. Johnson, 762 S.W.2d 110 (Tenn. 1988).

Most Batson challenges raised on appeal fail because of an insufficient record. See, *e.g.*, State v. Johnson. At a minimum, your record should consist of the following:

> Your honor, the defense respectfully moves for a mistrial. (Client's name) is black. The prosecution has excluded three black prospective jurors peremptorily. No black prospective jurors have been able to avoid being peremptorily challenged by the prosecution. For the record, the black jurors excluded by the prosecution are (list the names and juror numbers if available, address, marital status, number of children, education level, and employment). Because the black jurors excluded by the prosecution are, except for their race, similar to the white jurors

[11]State v. Butler, 15 TAM 10-21, 1990 WL 6622 (Tenn. Crim. App. 2/1/90) ("While the trial's court observation that the jury included two members of the defendants race and the state had peremptory challenges remaining which it could have exercised to exclude them is an important factor, *e.g.*, United States v. Sangineto-Miranda, 859 F.2d 1501, 1522 (6th Cir. 1988), that fact alone does not insulate the state's action from a due process challenge"); see also Jackson v. State, 45 Cr.L. 2149 (Va. Ct. App., No. 1467-86-2, 5/2/89) ("The presence of some blacks on a jury panel following the exercise of all peremptory challenges does not, of itself, prevent a black defendant from establishing a *prima facie* case of discrimination in the exercise of peremptories"); and United States v. Young-Bey, 893 F.2d 178, 180 (8th Cir. 1990) ("Of course, the fact that blacks are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson"); but see State v. Peck, 719 S.W.2d 553, 556 (Tenn. Crim. App. 1986) ("However, the prosecuting attorney did not use his peremptory challenges to remove all members of the defendant's race from the jury. A black woman was left on the panel and [the] prosecution had one challenge left.").

[12]State v. Peters, supra; State v. Fishback, 13 TAM 37-14, 1988 WL 77886 (Ct. Crim. App. 7/28/88); State v. Cole, 14 TAM 50-24, 1989 WL 134724 (Ct. Crim. App. 11/7/89).

State the Batson claim in the context of both a Sixth and Fourteenth Amendment violation as well as the equivalent state constitutional grounds

accepted by the prosecution, it is clear that the prosecution is using peremptory challenges to exclude citizens for racial reasons. (List the white prospective jurors accepted, by name and juror number if available, and any and all information about them that is comparable to that of any black prospective juror challenged by the prosecution.) This deprives (client's name) of his right to equal protection under the Fourteenth Amendment of the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution, and his right to a fair and impartial jury drawn from a fair cross section of the community under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

Although the Batson court granted relief on equal protection grounds, always state the claim in the context of both a Sixth and Fourteenth Amendment violation as well as the equivalent state constitutional grounds.

If the judge agrees that you have established a *prima facie* case, she must order the prosecutor to give reasons for his exclusions. Be careful to argue, except in the most unusual case, that the prosecutor's reasons are not constitutionally sufficient. For example, if the prosecutor says, "I excused Mrs. Robinson because she was unemployed and I felt that she didn't like me," object! Once the trial judge has allowed you to proceed to that point the prosecutor must have "a legitimate basis 'related to the particular case to be tried.'" State v. Peters, *supra*, slip op. at 2.

Bear in mind that even if the prosecutor "sufficiently explains" in a non-racial way the exclusion of all but one of the black prospective jurors excluded, you win! Put another way, if the prosecutor fails to give sufficient, non-racial reasons for the exclusion of ALL prospective jurors who are black or members of the cognizable group at issue, it is conclusively presumed that the peremptory challenge was discriminatory.

Batson has given the defense a potent weapon in the war to eliminate racial discrimination in the jury selection process. Counsel can now control the flow of the voir dire, put the prosecution (and sometime the judge) on the defensive, sensitize non-minority venire members to the unfairness of the prosecutor's conduct and thereby obtain fairer juries, and win cases on appeal. Batson, however, will only be as effective as the technique of those who rely upon it.

Finally, a word of caution: "reverse Batson" lies on the horizon; be prepared to justify the exercise of your peremptory challenges. Former Chief Justice Burger, in his dissenting opinion in Batson, viewed as inevitable the extension of the Batson rule to the defense.

The highly publicized "Howard Beach" case in New York [People v. Kern, 45 Cr.L. 2345 (N.Y. Sup. Ct., App. Div., 2d Dept., Nos. 3802E etc., 7/31/89)] is a case in point. Three white men were convicted of manslaughter, assault, and other crimes arising out of a confrontation between a group of white teenagers and three young black men, during which one black man died and another was

severely beaten. On appeal, the defendants argued that the trial court erred in requiring the defense to articulate a race-neutral explanation for its peremptory strikes of black jurors. The convictions were affirmed, the state high court holding that under the circumstances of that case the procedure was appropriate.

While New York City is a long way from Tennessee, sounds are already being made that seem to forecast the onset of "reverse Batson" in Tennessee. In State v. Bell II, 759 S.W.2d 651, 654 (Tenn. 1988), the court expressed these thoughts concerning defense counsel's Batson challenge: "It was defense counsel's intent in this case, by use of their challenges, to stack the jury with as many members of defendant's race as possible. A defendant is no more entitled to a jury containing members of his race than is the State to engage in purposeful exclusion by the use of peremptory challenges." But see, State v. McCollum, 405 S.E.2d 688 (Ga.1991) ("Bearing in mind the long history of jury trials as an essential element of the protection of human rights, this court declines to diminish the free exercise of peremptory strikes by a criminal defendant").

It has been said, "Every thought is like dough; you have only to knead it well -- you can make anything you like out of it."

Sounds are already being made that seem to forecast the onset of "reverse Batson" in Tennessee

# XI. Defendant's Participation

People are far more likely to want to spare someone's life if they can see him as a living, talking, emoting human being

For a number of reasons, direct client participation in voir dire is a tactic that should be considered with care in every capital case. If done properly, this participation will not impede the process and will permit the defendant to assist counsel's decisions.

Ask the defendant whether he wants particular questions asked, and what he thinks about the exercise of each peremptory challenge. While the accused should not make a final decision on challenges, if counsel finds it difficult to decide which of two possible jurors to strike, and the defendant feels very strongly about one of them, counsel might be well advised to follow the client's instincts.

The defendant's contact with counsel and opportunity to state his feelings will help the jury see him as a human being. People are far more likely to want to spare someone's life if they can see him as a living, talking, emoting human being. Allowing the accused to participate by asking a few questions or make some introductory remarks may also enhance rapport with the jury. Almost any client can get up at the beginning of voir dire and address the jury with something like:

> Good morning ladies and gentlemen, my name is I.M. Innocent and, as you know, I'm on trial for murder. These are my lawyers, L.A. Law and R.U. Fare. We also have a law clerk at counsel table, West Law. Because my lawyers are more trained at this than I am, they'll conduct the jury selection. Sometimes the questions asked may be kind of hard, and this whole process kind of long, but I ask you to bear with us. Thank you.

Even this brief appearance begins to give the jury the needed exposure to the client. The court's permission is of course necessary. And obviously the decision to involve the client personally in voir dire depends on the client's demeanor and personality. Counsel may decide that an address to the prospective jurors may appear contrived and elect not to use it.

# Table of Contents

I. Introduction ........ 13.3
II. Higher Constitutional Standards ........ 13.4
III. Preserving Issues for Review ........ 13.5
IV. Anticipating a Sentencing Hearing ........ 13.6
A. Theories of Defense ........ 13.6
1. Denial ........ 13.6
2. Justification ........ 13.7
3. Lack of Intent ........ 13.7
B. Counsel's Demeanor ........ 13.8
C. State's Witnesses ........ 13.9
1. Elicit Facts Favorable and Relevant to Sentencing ........ 13.9
2. Blunt the Effect of Inflammatory Evidence ........ 13.9
D. Testimony of the Defendant ........ 13.10

# I. Introduction

The Tennessee Supreme Court has recognized that only experienced counsel should be appointed in capital cases. State v. Simon, 635 S.W.2d 498, 503 (Tenn. 1982). This chapter is not a primer in general trial tactics; a more general treatise should be consulted concerning non-capital specific issues that may arise. This chapter focuses instead on the ways in which the guilt-innocence phase of a capital murder trial, from opening statement through the verdict, is affected by the fact that the trial is a capital case with a death-qualified jury and with potential for a capital sentencing hearing to follow.

The guilt-innocence phase of a capital murder trial is affected by the fact that the trial is a capital case with a death-qualified jury

# II. Higher Constitutional Standards

All evidentiary and procedural questions have potential "due process" or "cruel and unusual" implications

As is repeatedly referred to in this manual, capital cases are constitutionally different. The heightened standard of due process and reliability means that all evidentiary and procedural questions have potential "due process" or "cruel and unusual" implications -- at the guilt-innocence stage as at any other stage. The heightened standard also means that close evidentiary and procedural questions should go in favor of the defendant in a capital case. Counsel must understand this difference and consider it with every strategic decision made -- every item of proof offered or opposed and every motion or objection offered or opposed.

Citing, at a minimum, the Eighth and Fourteenth Amendments of the United States Constitution and Article I, §§ 16 and 8 of the Tennessee Constitution, every evidentiary proffer or procedural distinction should be argued as a constitutional issue. If any other constitutional protection is implicated, cite it as well; when in doubt, cite the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

These precautions may seem unnecessary but they are very important. Capital cases will be litigated for years, possibly decades after the trial. Death penalty jurisprudence is highly volatile and subject to change -- if your client receives the death penalty, new constitutional issues will most assuredly develop before final disposition of the case. It is a challenge to trial counsel's creativity to anticipate these developments.

Although the Tennessee Supreme Court has not been consistent in its application of a contemporaneous objection rule in capital cases,[1] it may preclude review of errors that are not contemporaneously objected to or raised in the Motion for New Trial. Issues not properly raised at trial and on direct appeal may be considered "waived" on state post-conviction, T.C.A. §§ 40-30-111 and 112(b)(1), and federal habeas corpus, Wainwright v. Sykes, 433 U.S. 72, 92 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Only constitutional issues are cognizable on state post-conviction, T.C.A. §40-30-103 (federal and state issues), and federal habeas corpus, 28 U.S.C. §2254(a) (federal issues only). The federal courts can also refuse to hear any issue not preserved as a federal constitutional violation in the state court. See, e.g., Anderson v. Harless, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). It is important, however, to raise state constitutional issues as well, because our Tennessee Supreme Court may be a more receptive forum than federal courts as they are presently constituted.

If the constitutional basis for claimed error is not initially raised, supplement the record later with a cite to the constitutional authority. Written citations of authority are helpful, even if they merely supplement a past objection, because they preserve the issue in the technical record as well as in the transcript.

It is important to raise state constitutional issues because our Tennessee Supreme Court may be a more receptive forum than federal courts

[1]See, e.g., State v. Moore, 614 S.W.2d 348 (Tenn. 1981); State v. Strouth, 620 S.W.2d 467 (Tenn. 1981); State v. Duncan, 698 S.W.2d 63 (Tenn. 1985); State v. Martin, 702 S.W.2d 560 (Tenn. 1985); State v. Pritchett, 671 S.W.2d 127 (Tenn. 1981); State v. Caldwell, 671 S.W.2d 459 (Tenn. 1984); and State v. King (Tommy), 694 S.W.2d 941 (Tenn. 1985).

# IV. Anticipating a Sentencing Hearing

Certain unique strategic decisions have significant impact on the sentencing phase

Certain unique strategic decisions have significant impact on the sentencing phase. For that reason, both phases of the trial must always be viewed as a whole. The guilt-innocence theory of defense must be consistent with the mitigation theory. Likewise, the state's case must always be analyzed for its potential impact at sentencing.

The jury can use all relevant evidence introduced at the guilt-innocence phase in determining the sentence; counsel must decide whether and to what extent to address sentencing issues during the guilt-innocence phase. Aggravating factors involving the nature of the killing may be addressed in order to desensitize the jury and take the sting out of the prosecutor's plan to save this inflammatory evidence for the sentencing hearing. However, if there is a realistic possibility of an acquittal or a lesser degree of homicide, or if the defense is predicated on lack of involvement in the offense, lengthy cross-examination of witnesses on potential aggravating circumstances may confuse the jurors and distract them from more helpful issues. If the jurors decide that counsel is just using the guilt-innocence phase to defuse the negative aspects of the offense, they may well decide that the only issue is life or death and automatically convict the client of first degree murder.

Consider whether to object to any effort to introduce aggravating factors that have nothing to do with guilt or the degree of homicide on the grounds of irrelevance and prejudice. If a sentencing hearing will probably be held, the impact of the offered evidence may not be as damaging at sentencing if the jury has already heard it.

## A. Theories of Defense

Selecting a theory that will insulate the defense from a major credibility crisis should the case proceed to sentencing requires a realistic and pragmatic determination. Critically analyze the facts to determine which of the recognized (or novel) defenses is the most plausible. Determine which aggravating and mitigating circumstances will be supported by the evidence, and advance at guilt-innocence the defense that is most consistent with the anticipated sentencing proof.

### 1. Denial

Denial of the commission of the offense – misidentification or alibi – is without a doubt the most difficult defense to reconcile with a penalty phase defense. Unsuccessfully advancing such a defense invariably creates a major credibility problem. Even if pre-trial investigation reveals a relatively strong denial defense, counsel may decide to forgo it in lieu of a defense that is factually weaker but will be consistent with the mitigation theory at sentencing. Take special care in considering whether your alibi witnesses are subject to attack based on bias (e.g., the client's family and friends) or general credibility (e.g., they were indulging in drugs or alcohol at the relevant time, or have prior convictions).

If the jury convicts despite your efforts to convince them that your client was not involved in the offense, you will confront a dilemma. Should you continue to assume the client's innocence and put on only "good guy" evidence at sentencing, hoping that the jury harbors some residual doubts about guilt, or should you abandon that theory and offer a mitigating explanation of why the client committed the crime? Only a thorough analysis of the evidence adduced at the guilt-innocence phase as well as available sentencing evidence will permit a meaningful answer to this question.

Justification defenses are uniquely suited to fashioning consistent theories throughout the guilt-innocence and penalty phases

### 2. Justification

Justification defenses – self-defense, defense of another, defense of property, necessity, and public duty – are uniquely suited to fashioning consistent theories throughout the guilt-innocence and penalty phases. They relieve the jury of the onerous task of determining whether the client "did it," and the jury knows from the outset that a reason for the killing is going to be offered. A justification defense also builds trust for the client, who is willing to admit having committed the offense, and the jury will not feel compelled to punish the defendant for perjury and lack of remorse as well as murder. It also often means that the defendant was provoked or that the victim "deserved it."

A justification defense also leaves counsel free to cross-examine the state's witnesses to develop mitigation without fear of losing credibility. Jurors who convict the defendant of first degree of murder may have rejected the justification as a complete defense but still harbor doubts that could be your strongest mitigating circumstance.

### 3. Lack of Intent

Lack of intent or mental defenses – insanity, diminished capacity, lack of specific intent, intoxication, accident, mistake or ignorance of fact, entrapment, duress – are also easier to reconcile with a potential sentencing hearing. Of these, insanity, diminished capacity, intoxication and accident are most frequently advanced in capital cases. They have "built-in" consistency with the mitigation theory. Once again, counsel should be free to cross-examine the state's witnesses to elicit evidence that is more relevant to mitigation than guilt without fear of being inconsistent with the potential sentencing hearing.

These defenses also lend themselves to expert testimony, especially in capital cases. Consider whether the guilt or penalty phase is the most opportune time to present witnesses, expert and otherwise, in support of such a defense. Relevant considerations include (1) the possibility of obtaining a verdict of less than first degree murder; (2) the strength and the number of other witnesses to call at the sentencing hearing (at which time you must take away the prosecution's momentum by putting on

The jury may perceive every aggressive act of counsel as an extension of the defendant's conduct

numerous witnesses and building your client's "life story"); and (3) the relevance of the testimony depending on the specific issue for which its offered, e.g., specific intent or mitigation.

Some witnesses may be called at both stages of the trial. Be careful, however, not to use too much of the mitigation proof at the guilt phase. If you seek to introduce a witness called in the guilt stage, be prepared to convince the court that new, not cumulative or repetitive, testimony will be elicited. Plan carefully in order to make it clear that new testimony is being offered, or that it is being offered for a different purpose than at the guilt phase.

## B. Counsel's Demeanor

A capital jury is a "prosecution" jury. In a non-capital murder trial, the defense usually approaches every aspect of the trial in an aggressive mode. Every ruling by the court, every slip by the prosecutor, regardless of its magnitude, is challenged vehemently. Every witness for the state is viewed as the enemy. Such an approach is often disastrous in a capital trial. The death-qualified jury already, for the most part, believes that the defendant is guilty. It has been culled of its most humane prospective members, of people who are prone to resolve doubts about guilt in the defendant's favor.[2] In fact, prosecutors sometimes seek the death penalty in order to get a death-qualified jury and thus increase the probability of a conviction.[3]

The jury may perceive every aggressive act of counsel as an extension of the defendant's conduct. This is not to suggest that capital counsel should not be an aggressive advocate. On the contrary, counsel should be the most potent advocate possible precisely because it is a capital trial. Take care, however, not to overreach. The jury is prosecution-prone and probably does not share the same values as defense counsel. Pay heed to the jury selection process and come to know what you can realistically expect from the jury; pitch the defense argument in a way that preserves credibility with the jurors and does not alienate them.

---

[2]See Oberer, "Does Death Qualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?," 39 Tex. L. Rev. 545.549 (1961), quoted in Jarrow, "New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process," 84 Harv. L. Rev. 567, 568 (1970-71); see also Beohm, "Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques To The Problem of Jury Bias," 1968 Wis. L. Rev. 734; Goldberg, "Toward an Expansion of Witherspoon: Capital Scruples, Jury Bias, And The Use of Psychological Data To Raise Legal Presumptions," 5 Harv. Civ. Rights / Civ. Lib. L. Rev. 53 (1970); and Chapters 6 and 7 of this manual.

[3]See Bronson, "On the Conviction Proneness and Representativeness of the Death Qualified Jury: An Empirical Study of Colorado Veniremian," 42 Colo. L. Rev. 1 (1970).

## C. State's Witnesses

### 1. Elicit Facts Favorable and Relevant to Sentencing

The guilt-innocence phase provides a golden opportunity to use state witness to lay the groundwork for the mitigation theory and to blunt the effect of inflammatory evidence. Determine in advance how to maximize the mitigating aspects of the testimony. Often state witnesses will be recalled in the sentencing stage, but counsel cannot rely upon that eventuality and probably will not want to call them as defense witnesses. Elicit favorable mitigation testimony from them through cross-examination during the guilt phase.

Almost every state witness in the guilt-innocence phase has something to say that will advance your theory of mitigation if you spend a little time looking for it. Adroit, non-aggressive cross-examination of the arresting officer or the eyewitness to the murder can reveal crucial mitigation, unbeknownst to the witness. For example, first-degree murder requires premeditation; lack of premeditation may be established by showing intoxication, passion, heat of anger, or excitement with adequate provocation. Emotional disturbance of any kind is a mitigating factor, and passion is judicially defined as an emotional state which includes fear, terror, excitement or nervousness. Capps v. State, 478 S.W.2d 905 (Tenn. Crim. App. 1972). Testimony elicited on cross-examination that the defendant appeared intoxicated, emotionally disturbed, afraid, excited or nervous can both negate premeditation or specific intent and establish mitigation.

Resist the temptation to impeach this type of witness, unless it is absolutely crucial to the success of the defense. Impeachment of a witness who can provide favorable mitigating evidence is a mistake, especially if it is accomplished with a prior inconsistent statement. If a sentencing hearing becomes necessary, you are going to ask the jury to believe what this same witness has said that was favorable to your theory of mitigation.

### 2. Blunt the Effect of Inflammatory Evidence

Inflammatory physical evidence shown to the jury for the first time in the penalty phase has a devastating effect. The sight of the bloody photographs or the Uzi assault weapon incites such passion in the jury that it can literally seal your client's fate. The seasoned prosecutor knows this and will always forego introducing some such evidence in the case-in-chief. Make every effort to keep this type of evidence from being exhibited to the jury, but if devastating evidence is going to come in, get it out in the open – through the coroner, crime scene technician, ballistics expert or some civilian witness with special knowledge about the piece of physical evidence. Of course, counsel should weigh this consideration against the potential damage of having the jury see it twice.

Almost every state witness in the guilt-innocence phase has something to say that will advance your theory of mitigation if you spend a little time looking for it

The defendant's guilt phase testimony may have a significant effect on the sentencing hearing

## D. Testimony of the Defendant

Along with the numerous considerations involved in advising any defendant whether to testify, the unique features of a capital case make certain additional factors relevant. The defendant's guilt phase testimony may have a significant effect on the sentencing hearing. Fabricated testimony will destroy credibility; jurors may react strongly to an obviously preposterous story evidencing a complete lack of remorse. If the defendant has a convincing account and a persuasive demeanor, both of which can stand up to cross-examination, the jurors should know this. Jurors are suspicious of a non-testifying defendant, and even if the testimony adds nothing to what is shown by other evidence, they will want to hear from the accused. If you are presenting a denial defense, however, it may be more advisable than in a non-capital case to keep your client off the stand during the guilt phase. Denial of involvement may prevent the defendant from testifying persuasively, or at all, at the sentencing hearing; the defendant's testimony concerning his background, plea for lenience, or expression of remorse may be ineffective if the client earlier denied guilt. It is not infrequent for the defendant to withhold testimony at guilt but take the stand at sentencing. Because the defendant's credibility must be preserved, if he cannot testify consistently at guilt and at sentencing, perhaps he should not testify at either stage.

# Sentencing Phase

# Sentencing Phase

# Table of Contents

Sentencing Phase ....... 14.1
I. Philosophy ....... 14.7
A. Basic Philosophy ....... 14.7
B. General Strategy ....... 14.8
1. Team Defense ....... 14.8
2. Advance Preparation ....... 14.9
3. A Consistent Theme ....... 14.9
4. Shift Focus from Victim and Humanize the Defendant ....... 14.10
5. Give the Jury Reasons Not to Kill the Defendant ....... 14.13
6. Motions ....... 14.14
7. The Death Penalty Jury ....... 14.14
8. Create Constitutional Issues ....... 14.15
9. Minimize Aggravating Circumstances ....... 14.15
10. Accentuate Mitigating Circumstances ....... 14.15
11. Scrutinize Prosecutor's Argument ....... 14.16
12. Request Jury Instructions ....... 14.16
II. Opening Statements ....... 14.17
A. Defense ....... 14.17
B. Prosecution ....... 14.23
1. In General ....... 14.23
2. Specific Objections ....... 14.23
III. Prosecution's Case ....... 14.27
A. Introduction ....... 14.27
1. Burden of Proof ....... 14.27
2. Notice and Discovery ....... 14.27
3. Evidentiary Rules ....... 14.27
4. Relevance ....... 14.29
B. Non-Statutory Aggravation ....... 14.29
1. Parole Eligibility ....... 14.29
2. Deterrence ....... 14.30
3. Cost of Death vs. Cost of Life Sentence ....... 14.30
4. Lack of Remorse ....... 14.30
5. Victim Impact and Character of Victim ....... 14.30
C. Qualitative Sentencing ....... 14.30
D. Statutory Aggravating Circumstances ....... 14.32
1. § (i)(1): Victim under 12, and defendant at least 18. ....... 14.33
2. § (i)(2): Prior conviction of a felony involving "the use of violence to the person." ....... 14.33
3. § (i)(3): Knowing creation of "a great risk of death to two or more persons, other than the victim murdered, during [the] act of murder." ....... 14.38
4. § (i)(4): Defendant committed or employed another to commit the murder for remuneration or the promise thereof. ....... 14.39
5. § (i)(5): Murder that is "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." ....... 14.40

6. § (i)(6): Murder "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." ..... 14.42
7. § (i)(7): Murder "committed while the defendant was engaged in committing or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb." ..... 14.44
8. § (i)(8): Murder "committed by the defendant while he was in lawful custody or in a place of lawful confinement or during his escape from lawful confinement . . . lawful custody or place of lawful confinement." ..... 14.47
9. § (i)(9): Murder of a "law enforcement officer, corrections official, corrections employee or fireman, [whom the defendant knew or reasonably should have known] was engaged in the performance of his duties." ..... 14.48
10. §§ (i)(10), (11): Murder of public officials. ..... 14.49
11. § (i)(12): "[M]urder of three or more persons within . . . Tennessee within . . . 48 months, and perpetrated in a similar fashion, in a common scheme or plan." ..... 14.49

IV. Motion for Directed Verdict ..... 14.50

V. Defense Case ..... 14.51

A. The Rules of the Game ..... 14.52
1. Two-Tiered Burden of Proof Beyond a Reasonable Doubt ..... 14.52
2. Defense Has No Burden of Proof ..... 14.53
3. Mitigation is Mandatory ..... 14.53
4. The Scope of Mitigation is Broad ..... 14.53
5. No Distinction Between Statutory and Non-Statutory Mitigation ..... 14.54
6. Juveniles and the Mentally Retarded Cannot be Sentenced to Death 14.58

B. Jurors' Goals at Sentencing ..... 14.58
1. Punishing the Defendant ..... 14.58
2. Protecting Society ..... 14.58
3. Fulfilling Their Civic Duty ..... 14.58
4. Responding to Peer Pressure and Community Expectations ..... 14.59

C. Defense Goals at Sentencing ..... 14.59
1. Humanize the defendant ..... 14.59
2. Factors influencing development of defendant's character ..... 14.59
3. Diminish voluntary aspect of defendant's behavior ..... 14.59
4. This case does not deserve death ..... 14.59
5. A life sentence will punish defendant and protect society ..... 14.60
6. Empower individual juror to vote their consciences ..... 14.60

D. Categories of Mitigation ..... 14.60

E. Witnesses ..... 14.61
1. The Defendant's Birth Family ..... 14.61
2. The Defendant's Marriage Family ..... 14.63
3. Teachers ..... 14.63
4. Neighborhood Witnesses and Friends ..... 14.64
5. Social Workers ..... 14.65
6. Mental Health Experts ..... 14.66
7. Rehabilitation Witnesses ..... 14.68
8. Rebuttal Witnesses ..... 14.68
9. Demonstrative Evidence ..... 14.69
10. The Defendant ..... 14.71

VI. Rebuttal .......... 14.74
A. General Scope of Rebuttal .......... 14.74
B. Impermissible Rebuttal .......... 14.74
1. Evidence That Does Not Contradict .......... 14.74
2. Multiple Defendants .......... 14.74
C. Rebuttal in Tennessee Capital Cases .......... 14.75
D. Surrebuttal .......... 14.76
E. Conclusion .......... 14.76
VII. Closing Argument .......... 14.77
A. Prosecution .......... 14.77
1. In General .......... 14.77
2. Specific Forbidden Arguments .......... 14.79
3. General Forbidden Arguments .......... 14.83
4. Objecting to Arguments .......... 14.87
5. Conclusion .......... 14.88
B. Defense .......... 14.88
1. Preliminary Considerations .......... 14.89
2. Main Themes .......... 14.90
3. Making Your Client's Behavior Understandable .......... 14.93
4. Explain That Life in Prison Is Punishment. .......... 14.96
5. Powerful (but potentially damaging) Arguments .......... 14.96
6. Preparing and Delivering the Closing Argument .......... 14.97
VIII. Jury Instructions .......... 14.100
A. Requesting Instructions .......... 14.101
B. Tennessee Pattern Instructions .......... 14.102
1. Too Little Discretion To Opt For Life .......... 14.102
2. Burden of Proof .......... 14.104
3. Aggravation .......... 14.105
4. Non-Statutory Mitigation .......... 14.105
5. Weighing Aggravation and Mitigation .......... 14.107
6. Inadequate Instruction for Dissenting Jurors .......... 14.108
C. Guilt Phase Instructions .......... 14.108
1. Lesser Included Offenses .......... 14.109
D. Proposed Instructions .......... 14.109
1. Right Not to Testify – Sentencing .......... 14.110
2. Burden of Proof .......... 14.110
3. Life Means Life, Death Means Death .......... 14.111
4. Jury Has Responsibility for Final Decision .......... 14.112
5. Decision to be Made by Individual Jurors .......... 14.112
6. Aggravating Factors .......... 14.113
7. Crime in Society, Deterrence, Cost .......... 14.119
8. Mitigation .......... 14.120
9. Weighing Aggravating and Mitigating Factors .......... 14.125
10. Doubt Inures to the Benefit of the Defendant .......... 14.126
11. Sympathy and Mercy .......... 14.126
12. The Jury May Impose Life .......... 14.129
13. Prior Offenses and Impeachment .......... 14.131
14. Fairness, Proportionality – Co-defendants Not on Trial .......... 14.133

15. Lingering Doubt ........ 14.135
16. Jury Verdict – Inability To Agree ........ 14.135
17. Parole ........ 14.135
18. Miscellaneous Instructions ........ 14.136
IX. The Deliberation Process ........ 14.138
A. Supporting the Hold-Out ........ 14.138
B. Defendant Demeanor ........ 14.138
C. Body Language ........ 14.138
D. Community Support ........ 14.138
E. Facilitating Comfort ........ 14.138
F. Facilitating the Process ........ 14.138

## A. Basic Philosophy

The choice for the jury is life imprisonment or death and the goal for the defense is life imprisonment. Because the state's proof-in-chief is limited to the statutory aggravating circumstances and the evidence to be presented by the defense in mitigation is basically unlimited, as long as it is relevant to the offender and the offense, the capital sentencing hearing is typically an opportunity for the defense to gain, for the first time in the case, the initiative and the momentum from the state and to focus sympathetic attention toward the defendant rather than the victim.

The victim cannot be brought back to life. The defendant has been convicted and a life sentence, at the very least, is unavoidable. Given this background, it is the obligation of defense counsel to demonstrate to the jury why it should not kill the defendant.

Other than limiting and rebutting the state's proof, it is the defendant's opportunity to tell his/her story - a story calculated to "emphasize the positive", i.e., the "good guy" evidence, and to "explain the negative", i.e., the reasons outside the defendant's free volition describing why s/he committed this crime and possibly other bad acts.

Typically, there is more negative to explain and less positive to emphasize. Emphasizing the positive is easier than explaining the negative; and, consequently, it is not unusual for counsel to neglect to explain the negative as it should be done - but the jury wants to know and the explanation of the negative may involve substantial mitigation evidence that should be presented. The explanation of the negative typically requires more commitment and creativity from defense counsel, sometimes has the potential for inviting damaging cross-examination in rebuttal from the state, which must be avoided, and involves extra-legal medical, psychological and sociological expertise and an intensive investigation - thus the need for the "team" approach and specialized expertise in capital cases.

Evidence of aggravating factors may be kept out; individual aggravating factors may be attacked for insufficiency of evidence and "double counting," i.e. two aggravating circumstances based on the same facts. Mitigating factors may be expanded, both in quantity and in weight, to the limits of counsel's imagination, until they outweigh the aggravation. Counsel should begin to plant the seeds of mitigation, and of only doubtful aggravation, in the guilt phase; the sentencing hearing is where those seeds must come to fruition. While theoretically the state must prove the case for death the defense can never afford to perceive its burden as anything less than proving the case for life.

The bulk of the work should be done well before the trial begins. Indeed, the penalty phase should probably be planned before the guilt phase is fine-tuned, particularly if there is a chance to win on the issue of guilt. Thus, it may be a good idea to set a timetable to conclude preparation for the sentencing phase a month, or two weeks at the very least, before the trial date. Of course, counsel will have to "fine tune" as the sentencing hearing approaches, but the witnesses should be

ready to go and the Motion in Limine, proposed jury instructions, etc, should be prepared well before trial. Many trial lawyers have relied too heavily on the guilt defense and found themselves confronted with a sentencing hearing for which they were not prepared.

In formulating a philosophy for the sentencing hearing, counsel should start with the premise that the jury will be predisposed to impose the death penalty. Having been death-qualified, thus prosecution-oriented and more inclined toward guilt than innocence as well as death rather than life, the jury will be leaning heavily toward death, particularly after hearing the gruesome facts of the case. The bottom line of the sentencing philosophy is that everything defense counsel does is designed to make the jury not want to kill the accused. Counsel must tell the jury how to let the accused live and give those few members of the jury, who are so persuaded, the tools with which to defend their position, and perhaps convince others, in the deliberation room.

## B. General Strategy

What follows is not a checklist of steps that must be followed, but a series of points to be considered in preparing each case. It is based on the collective experiences of those who prepared this manual and others across the country.

### 1. Team Defense

The attitude or approach that counsel must take at the outset of preparation as "manager" of a defense "team" is a first consideration. Many criminal defense attorneys have difficulty with this; but, considering the volatile nature of death penalty-related jurisprudence and the rapidly increasing body of knowledge and areas of investigation concerning relevant extra-legal forensic considerations, counsel cannot afford to do otherwise. See, Chapter 5, Team Defense.

The early task of counsel is to make an initial determination of (1) what needs to be done, legal and extra-legal, in preparation on the client's behalf; (2) who is the best available attorney, investigator or forensic expert to do what needs to be done; (3) how can the services of the "best available" attorney, investigator or forensic expert be acquired to accomplish the designated task.

If retained, counsel should contract for the assistance needed; or, if appointed, whether as public defender or private counsel, counsel should convince the Court to authorize the expenditure of funds for the necessary services. See, Chapter 4, The Defense Team. If seeking authorization for funds from the court, counsel should lay the factual foundation, demonstrating the need for the requested services. If counsel anticipates a denial of the requested funds by the trial court (or, if the denial has already been made by the trial court and counsel needs to bolster the foundation previously laid with supplemental information), counsel should file written motions, affidavits and memoranda, which demonstrate the basis for the need and the necessity for the provision of

the services in order for counsel to be able to protect the client's constitutional rights and in order to present an adequate defense. Counsel should, thereby, look beyond the trial court and build an appellate record. As the litigation ensues on the trial level, counsel should be alert for opportunities to demonstrate, for the purpose of the appellate record, ways in which the defendant has been prejudiced by the court's denial of the services requested.

### 2. Advance Preparation

The one immutable fact of sentencing strategy is that it requires a great deal of advance preparation. Probably the most common mistake made in trying a capital case is the failure to do anything about the sentencing hearing until it is too late. Counsel must begin preparing for the sentencing phase as soon as he or she agrees to represent the accused. During the weeks or months (or years) before trial, counsel should be thinking about that hearing, and how everything else that is done will impact upon it.

Crucial to this preparation is a thorough investigation of the client's background. Initially, this is a fishing expedition for potential witnesses and documentary evidence that can be used to help the jury understand the defendant's life and actions. The documentary search should begin immediately; counsel should seek to obtain copies of all institutional and personal records that make any reference to the client or that otherwise confirm any aspect of the guilt or the mitigation defense. Witnesses include anyone who can contribute to the client's life story—family, friends and associates; clergy and counselors who can talk about the client, as well as redemption and remorse; teachers and social workers; medical doctors, psychiatrists or psychologists; investigators; mitigation specialists and other forensic experts. This process requires the sharing of information and coordination between different forensic experts covering related areas of preparation; it also requires money, time, travel and contribution of some or all of these factors from members of the defense team, institutions and potential witnesses.

### 3. A Consistent Theme

Every case must have a theme. Thus, in a capital trial, there must be a sentencing theme. If at all possible, it should be consistent with the guilt/innocence theme; if there is no issue of guilt or innocence, the sentencing theme will be the trial theme. The theme need not, and often will not, be related to a particular legal defense or mitigating circumstance. Several weeks may pass before the theme becomes apparent, and there is no easy answer to how to ascertain it. It may be the answer to the question, what would you tell the jury if you could tell them only one thing? Or, what is the case really about, in one or two sentences? It may be the one thing about the case that most convinces the defense lawyer, or an associate or friend, that "this person should not be killed." There may, of course, be

several themes, as long as they are not inconsistent or irreconcilable, but there must be at least one. The theme should not only make trial preparation more logical and orderly, but also give counsel confidence in the case and hope for a successful conclusion. Once the theme becomes apparent to those involved in the case, including the defendant, it becomes the cornerstone around which the rest of the case is built. Questions about who does what, when, and how will always be answered with an eye toward how it serves the theme. For instance, a particular line of cross-examination that at first seems fruitful may be abandoned because it is inconsistent with or detracts from the sentencing theme.

The capital trial must be a consistent whole. From voir dire through closing argument in the sentencing phase, counsel must, if at all possible, present a unified defense. No jury is going to believe that someone who claimed total innocence at the guilt phase is remorseful during the sentencing hearing about having been involved in the crime. Similarly, at the guilt phase final argument, defense counsel may want to refer to facts that will later be used to prove mitigating circumstances.

Voir dire must be conducted so as to serve the sentencing goals. See, Chapter 12, Voir Dire. Counsel should educate the jury about the meaning of aggravation and mitigation, and in particular about the nature of the mitigation proof to be offered. Voir dire can sensitize the jury to the proof, both bad and good, that may come out in either phase of the trial. For instance, in an especially brutal homicide, it may be wise to begin at this early stage to take the sting out of the state's reliance on the brutality of the crime. Counsel should also use voir dire to learn about how the jurors view the death penalty: why they favor it, and under what circumstances they would or would not impose it. This will aid in presenting the sentencing proof and in planning sentencing arguments.

### 4. Shift Focus from Victim and Humanize the Defendant

The proof in a capital sentencing hearing should focus attention in a favorable manner on the defendant and away from the victim. See § V C and E Mitigation, infra. The guilt stage of the trial tends to focus sympathetic attention on the plight of the victim and invite the jury to identify with the victim's survivors. The capital sentencing hearing is an opportunity for defense counsel to take the initiative away from the state and to present a series of witnesses who can in anecdotal fashion invite the juror's sympathetic attention to be focused on your client.

It is essential that the jurors be made to see the defendant as a real, multi-faceted human being. A jury is less likely to impose death on a "person" than on a "vicious animal". The process of humanizing a client is best accomplished in subtle ways.

Throughout the trial, counsel should talk about the defendant as a person, not as an object. One technique is to refer to the accused by name, rather than as "the defendant" or "my client". Whenever possible, counsel should present witnesses who talk about the defendant in expansive terms, giving detail information about background, including personality, poverty, lack of education or sophistication, and the fact (if it exists) that the accused played a minor role in the planning or execution of the crime.

Body language can tell the jury that counsel thinks of the client as a human being. Whatever comes naturally is what will be most effective. The lawyer may stand behind the client, hands on the client's shoulders, when addressing the jury. Counsel may put a hand on the client's shoulder when talking to the client in the presence of the jury, pat the client on the back, etc. This behavior will be effective if - and only if - it is and appears to be sincere. Otherwise, it will seem patronizing at best. If counsel has trouble relating to his or her client, counsel should recognize this early in the prosecution, well before trial, and make the necessary adjustments. The mere fact that the lawyer is seen listening attentively to the defendant can communicate as much to the jury as anything counsel says about his or her feelings for the accused. Similarly, the entire defense team should be seen treating the accused with respect.

The jury will be watching the defendant throughout the trial, so physical appearance is something to which attention must be paid. Clothing must be consistent with the solemnity of the courtroom, conservative attire that tends to minimize the sordid aspects of the alleged crime. The client should also be encouraged to modify his or her appearance, if necessary, to look more conservative and less threatening to the average juror. Wild, long, or unruly haircuts should be trimmed to a more conservative length and style; facial hair should be trimmed. Of course, taking this too far may make the jurors think the defendant is being insincere and manipulative, or even trying to fool the identification witnesses.

Another way to humanize a client is by the way the testimony is elicited from witnesses called on his behalf. If a witness is on the stand who personally knows the accused, it is recommended that anecdotal (factual, not conclusory) testimony be elicited from the witness. When a witness describes events in the defendant's life which obviously amount to an unaffected recitation of events remembered, the life of the defendant begins to take form for the jury. The more testimony of this nature that is elicited from witnesses, the more substance the defendant's life begins to take and the more difficulty the juror will have in making the decision to impose the sentence of death. It is this type of testimony, more than any other in most cases, that will save your client's life. In the process of eliciting "humanizing" testimony from witnesses, of course, counsel should intentionally preplan the development of specific mitigating evidence. It is also recommended that as many witnesses as possible

who can testify about relevant events in the defendant's life should be called. If the trial court attempts to limit the presentation of witnesses, the judge is running the risk of creating error by limiting mitigation evidence offered by the defendant.

When family members or others support the defendant, it is a good idea to demonstrate this support in the courtroom by ways in addition to calling witnesses to the stand. Have supporters, not subject to the witness exclusion rule, sit together and as near to the defendant as possible in the courtroom. Have supporters come forward at the first opportunity when possible during recesses in the court proceedings and mingle and visit with the defendant when security permits. In some situations, in which the defendant has no significant family support, counsel may attempt to demonstrate sympathetically that the individual on trial is a person that "no one cares about". This alternative could, however, invite the jury to allow the defendant to be executed because "nobody cares anyway". Counsel should proceed with caution.

The defendant's social, educational and work history may be important. Counsel may have to explain how and why the client arrived in the situation that led to the homicide. It may be possible to develop traumatic episodes in the client's life and present them to the jury. Family members may be able to recount meaningful episodes, such as the client's witness of the death of a parent or a violent episode(s) at an early age, such as physical or psychological abuse or traumatic physical injury, particularly to the head.

A significant part of this goal may include evidence on the client's mental and emotional condition. Indeed, this type of evidence may be the focus of the entire sentencing hearing. When presenting evidence of mental condition, however, great care should be taken not to dehumanize the client. In the mitigation hearing, psychological diagnosis is not important— psychological labeling has a tendency to have a dehumanizing effect. What is important is the explanation of the cause and effect of the "fact" of the defendant's mental condition that resulted in this crime.

In presenting these arguments, counsel must take care not to be seen as trying to excuse the defendant's conduct -- a theory that, in addition to being legally insupportable, is not terribly popular.

A related issue may arise when the client has been medicated in order to achieve competency to stand trial. The medicated client's demeanor and condition should fit the strategy, while respecting the defendant's constitutional right to be present and participate in the trial.

Finally, the accused's personal participation in the trial will give the jury the feeling that the defendant really is a person rather than a thing. The defendant may serve as co-counsel and conduct part of the voir dire or

make a short statement to the jury. A more common technique is to have the client testify, at least at the sentencing hearing. The accused may be able to talk (or cry) his or her way out of the electric chair. Genuineness and sincerity are critically important here.

**5. Give the Jury Reasons Not to Kill the Defendant**

In presentation of the mitigation proof on behalf of the defendant, counsel should continuously avoid the temptation to be limited somehow by the statutory mitigating circumstances. The defendant's life is one seamless whole and is not divided up into "mitigating circumstances", although it will be necessary for counsel to identify specific mitigating circumstances in order to invite the court to make proper jury instructions to the jury and in order to most persuasively present the case to the jury in argument. Nevertheless, counsel should attempt to make the mitigating proof one continuous mosaic in which the subparts are a series of chronological, continuous and consistent mitigating factors. See § V, infra.

After considering all the gruesome evidence of guilt, the jurors often will need no additional reasons to impose death. They are naturally outraged at the crime, and a good prosecutor will have brought them to identify with the victim. They must be given persuasive reasons not to kill the defendant, with an argument tailored to the specific facts as they relate to this client. Obviously, any mitigating factors must be advanced and sold to the jury.

Counsel must remember that there is more than one reason not to kill the client. Jurors are different and they may be swayed by different reasons. A properly conducted individual voir dire will educate the attorney as to what mitigation proof should be emphasized with the jury. Counsel should consider various alternatives and the possibility of developing one or several "favorable" jurors during voir dire.

Remind jurors in voir dire and in closing argument, that, while the individual jurors should consider during deliberation the opinions of other jurors, the sentencing decision is an individual decision and the jurors should make their decision based only on the dictates of their own individual, personal conscience. Remind them, and invite the court to remind them in the jury instructions, that they have an obligation, as well as a right, to vote their individual conscience and to withstand any pressure to do otherwise.

Counsel can also try to introduce evidence that the death penalty serves no valid purpose — that other countries and states do not have a death penalty, and that there are significant religious and moral objections to the death penalty. However, some of this evidence will probably be deemed irrelevant. See, e.g., State v. Groseclose, 615 S.W.2d 142 (Tenn. 1981); Houston v. State, 593 S.W.2d 267 (Tenn.1980); State v. Johnson (Cecil), 632 S.W.2d 542 (Tenn. 1982) (moral and ethical standards of

western civilization, and deterrent effect of death penalty, are irrelevant to mitigation); see also index of Tennessee death penalty cases, Appendix *.

**6. Motions**

Several of the pre-trial motions discussed in Chapter 9 are geared toward the sentencing hearing and calculated to obtain discovery relevant to the sentencing hearing, expand the defense proof, limit the state's proof and resolve legal issues in order to set the stage for the sentencing hearing in the manner most favorable to the defense. These motions will also let the state and the court know that counsel is taking the case seriously and that they are in for a fight.

Counsel should also have some of the pre-sentencing hearing motions prepared in advance, but not filed until after the return of the conviction. The late filing may give additional time to shift gears and orchestrate the sentencing presentation and may also catch the prosecution (as well as the court) off guard without an opportunity to prepare. When sentencing hearing motions should be filed and argued is a matter of strategy to be anticipated and resolved by counsel.

**7. The Death Penalty Jury**

Primarily because of the distinct advantage that the state has with a death-qualified jury, both with relation to guilt issues and sentencing issues, it is generally agreed among capital practitioners that jury selection is the most important stage in a capital trial - more important than cross-examination of the state's witnesses or even defense counsel's closing argument. In this regard, See, Chapter 12, Voir Dire.

At every opportunity, from voir dire to closing argument, counsel should educate (and be educated by) the jury on aggravation and mitigation. Jurors tend to confuse aggravation and mitigation with guilt and innocence. Unless counsel clarifies the issues, many jurors will never grasp the distinction between a legal excuse to a criminal offense and a mitigating circumstance. Many will also find it difficult to distinguish between an acquittal based on insanity and a life sentence based on a mental disease or defect.

Throughout preparation and trial, but most importantly during the sentencing hearing, defense counsel must recognize and deal with the jurors' anger at the client's conduct, sympathy for the victim and the victim's family, acceptance of the morality of capital punishment, and inclination to impose that punishment unless they are convinced otherwise.

Counsel must ensure that the jury recognizes and faces the absolute irrevocability of the imposition of the death penalty. See, Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Counsel should persuade the jury that the jury should require the state to show

that the crime was the absolute responsibility of the client. If the defendant is not solely and absolutely responsible for the murder, then is it right to impose the absolute and ultimate penalty?

**8. Create Constitutional Issues**

Virtually anything that happens in a capital sentencing hearing has constitutional implications, particularly pursuant to the "due process" clause (14th Amendment, United States Constitution; Article I, § 8 and § 17, Tennessee Constitution) and the "cruel and unusual punishment" clause (8th Amendment, United States Constitution; Article I, § 16, Tennessee Constitution). See, Chapter 8, Recurring Legal Issues; Chapter 7, Constitutionality of T.C.A. § 39-13-204 and 206. Even questions that may be non-constitutional issues at the guilt stage, concerning the admissability of hearsay evidence, for example, take on constitutional proportions in a capital sentencing hearing. Counsel must be alert to this and respond accordingly.

**9. Minimize Aggravating Circumstances**

One sentencing goal is to minimize the aggravating circumstances. See, § III, Prosecution's Case, infra. This can be done through motions to limit or exclude aggravating circumstances or evidence relating to them, and, after the close of the state's sentencing proof, by a motion for judgment of acquittal as to certain aggravating circumstances. Both in the investigation and at trial, counsel should test the state's ability to prove each aggravating circumstance. (For instance, does the state have admissible proof of a prior conviction. i.e. is the prior conviction valid, and is that conviction admissible under the death penalty statute?) To the extent possible, counsel should try to take the sting out of the gruesome or shocking aspects of the offense by dealing with it candidly, openly and early in the trial, perhaps even in the voir dire, so that it has lost its shock value by the time of the sentencing hearing.

**10. Accentuate Mitigating Circumstances**

Counsel must accentuate the mitigating circumstances. See, § V Defense Case, infra. This can be done by increasing the number of mitigating factors and by imaginatively characterizing anything as a mitigating factor if it is something on which a person could conceivably rely in voting against death. By the length of the defense proof and the number of witnesses called, contrasted with those called by the state, the defense may be able to dominate the sentencing hearing and effectively shift the focus from the gruesome crime to the defendant's pathetic life and circumstances. Counsel can use demonstrative evidence, such as charts and diagrams, to bring the mitigating circumstances home to the jurors. Another valuable device is to make sure that the jury understands the unlimited categories of mitigating circumstances.

**11. Scrutinize Prosecutor's Argument**

A prime potential source of error in capital trials is improper argument by the prosecution. See, § VII A, infra. Counsel must prevent this when possible and preserve all objections. The scope should be limited in advance through motions in limine to preclude argument on deterrence or other non-statutory aggravating circumstances that are not supported by adequate proof. Defense lawyers must be zealous in scrutinizing the prosecutor's argument and making timely and specific objections. On the defense team, one attorney (probably the one who will not argue next) may take primary responsibility for objecting to the prosecution's argument; the objector can take the brunt of juror displeasure with the objections, while the non-objector concentrates on the upcoming argument.

**12. Request Jury Instructions**

Another prime potential source of error in capital trials is erroneous instructions by the court. Counsel should invest a considerable amount of time well in advance of the trial in the preparation of proposed jury instructions for the court at the sentencing hearing. See, § 15.09, Jury Instructions, infra. Counsel should request carefully drawn special jury instructions listing the mitigating circumstances that have been raised by the evidence. Obviously, proposed jury instructions should be in understandable, simple language and avoid the legal jargon of pattern instructions. See, §VIII, infra.

Give the jury a reason not to kill.

Both the attorney for the state and the attorney for the defendant are entitled to make an opening statement in the sentencing proceeding and the waiver by one party of the opening statement does not preclude the opening statement of the other party. T.C.A. §39-13-204(b). Legal standards call for the lawyer's opening statement to be confined to a brief statement of the issues in the case and evidence he intends to offer which the lawyer believes in good faith will be available and admissible. American Bar Association, Standards Relating to the Defense Function §4-7.4(19).

However, the question of whether someone should die is "by its very nature an emotional one, a moral one, [and] a religious one. Yet jurors continually say that they want to approach the question analytically, not emotionally, not morally, not religiously."[1] Perhaps what jurors want most is guidance. A good opening statement can set the tone for the rest of the sentencing proceeding and provide the jurors with enough of an analytical structure that each of them will feel safe to bring their emotions and their compassion to bear on the case.

### A. Defense

The jurors agreed during the voir dire that they can kill your client and they have just convicted him of first degree murder. What can counsel for the defense say or do now that will persuade the jury not to kill this defendant for this crime? Because an opening statement must be based on the evidence, this manual can only make general suggestions. However, some general principles have evolved.

In both opening and closing statements, counsel needs to (1) recognize and address to some degree the jury's concerns, (2) present the defendant as a human being with positive qualities, (3) attempt some explanation of the crime in light of the defendant's history, (4) rebut the aggravating circumstances that the state has attempted to prove and (5) present evidence that this defendant, in this community, under these circumstances should not die. Counsel needs to (re)acquaint the jury with the view, grounded in the requirements of the law and presented to them in the voir dire, that this is a new trial with new issues for them to decide.

The most important thing to do is in one sense very simple, but yet very difficult: give the jury a reason not to kill. It is your job to introduce mitigating factors -- reasons not to kill – in such a way that they will persuade and move the jury. The jurors probably already believe that people have reasons for their behavior, perhaps reasons they do not understand from causes deep in their past. They are waiting for you to tell them how the defendant got to the point in time where the crime was committed. One experienced death penalty attorney put it this way:

[1] *Constructing a Penalty Phase Final Argument*, by Deana Dorma Logan, J.D., Ph.D., California Appellate Project, San Francisco (available by request from CCRC).

Tell your client's story.

> [T]ell the story. All of our clients have a story to tell. [H]elp the jury step inside [the] client as he was growing up and experience the world his way, to see the world through his eyes [s]o the jury can begin to understand what it is to be like this person from the inside out. [I]t is important to be able to show the jury who this person is and who this person has been. . . . Obviously, that does not mean life in toto, but important, memorable, forming moments, which in many cases, in the eyes of our clients, are instances of damage, injury and abuse. . . . To be able to understand and appreciate the world in some sense as they have, helps us see that we live in a world of common values and concerns that unite us, where they have failed but we can understand their failure. And if we can understand their failure, I think we are a step closer.
>
> There are judgment calls that have to be made [but] [u]ltimately . . . the aim of final argument is to tell the jury the truth. There may be more than one truth and the truths may be in conflict, but I believe that it is our responsibility to tell our client's story . . . whether [the client] knows it or not.[2]

The United States Supreme Court has opened the door to virtually any mitigating circumstance:

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (emphasis in original). See also, Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

Tennessee "places no evidentiary hurdle in the way of establishing mitigating facts," State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989), *cert. denied*, ___ U.S. ___, 110 S.Ct. 3288 (1990)., *i.e.*, the mitigating factors do not have to be established by a preponderance of evidence but rather can be established by any evidence. In addition, the Tennessee death penalty statute specifically requires the trial judge to charge nonstatutory mitigation. T.C.A. §39-13-204(e). Therefore, opening argument presents a first opportunity to acquaint the jury with the mitigating evidence that will be presented and to invoke the power of the court that will instruct them that they must listen, consider and weigh it.

It has been suggested that jurors have four major concerns during the penalty phase of a capital case. "Both personally and as representatives of their

[2] *Interview: Bryan Sheckmeister* by James S. Thomson, CACJ/Forum, July/August 1991, p. 38 *et seq.*

communities, they want to make a decision that will (1) protect society, (2) punish the defendant, (3) serve justice, and (4) follow the law.... [I]n order to effectively persuade the members of the jury to vote for life, the first three of those juror concerns must be honored, not attacked. The lawyer must show that all of those concerns can be met within the law without imposition of the death penalty."[3] While the facts of each case will dictate what is said and themes of lingering doubt complicate matters considerably, the following are examples of some themes that might be helpful in your case in explicating the client's story and addressing the jury's concerns:

Use the power of the court's jury instructions to support your client's case.

* Acceptance of verdict of jury. Acceptance does not mean agreement with the verdict, only that we have to respect it. It is possible to accept the jury's finding of guilt without conceding that your client should die, e.g. "I can't deny my disappointment in your decision to convict [client's name], but I respect you for conscientiously arriving at a result which you believe to be correct. But now the question before you is totally different . . ." Obviously, if there is some residual doubt regarding culpability in your case, this theme should be handled with great delicacy.

* Punishment. The death-qualified jury sat through days or weeks of vivid testimony which probably included exhibits related to the heinous nature of the crime. They have already voted to condemn your client's behavior and you need to address their concern that the perpetrator of this terrible act be punished. This can be done by explaining that this is a proceeding to determine punishment, i.e., you, the jurors, are being asked which of the two most extreme punishments our society provides will be inflicted.

* Reasons to kill, reasons to live. One of the simplest ways of conveying to the jury what the legal terms mean is to say that aggravating circumstances are reasons to kill, mitigating circumstances are reasons to live. The jury may have already heard it put this way in your voir dire and it should be repeated. Studies show that juries frequently do not understand what mitigating evidence is nor their mandatory duty to consider it.

* Jury instructions. Use the power of the court to support your client's case. This can be done in both opening statement and closing argument, however, providing a framework for the evidence they are about to hear is in order. Help them "follow the law" while, at the same time, emphasizing those instructions that can be favorable to the defense. Juries are routinely confused about how they are to consider and weigh mitigating and aggravating factors. Lockett v. Ohio requires the sentencer

[3] *Pleading for Life; An analysis of Themes in 21 Penalty Arguments by Defense Counsel in Recent Capital Cases* by Deana Dorma Logan, J.D., Ph.D., California Appellate Project, San Francisco (available by request from CCRC).

The Court is required to charge all requested non-statutory mitigation supported by the evidence.

to listen to the mitigation, 438 U.S. at 115, n.10. See also, Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence."); State v. Knighton, 436 So.2d 1141, 1159 (La. 1983) (Trial court instructed jury that, if aggravators were found, "you may also consider any mitigating circumstances." The instruction was improper and, though cured by later instructions. "This is not a correct statement of the law although there was no objection raised. The jury must consider mitigating circumstances...." *Id.* (emphasis in original)). Counsel should make sure that the jury is so instructed.

The Court is required by statute to charge all nonstatutory mitigation that you request which is supported by any evidence. Tell the jury that they will hear the Court instruct them at the conclusion of the case that they must listen and take this evidence into account when they weigh the aggravating circumstances against the mitigating circumstances. Counsel will undoubtedly want to argue this point in much greater detail and with even more force in closing argument.

Some other themes (mentioned below in further detail) which are related to jury instructions include arguing that: it is each individual juror's responsibility and authority to decide what evidence is, in fact, mitigating; it is each individual juror's responsibility and authority to decide what weight to give each individual aggravating and mitigating circumstance; and, that the law instructs them that they do not all have to agree on mitigation in order for it to be weighed in their individual calculation. See, Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); McKoy v. North Carolina, 494 U.S. ___, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Consideration should be given as to how these themes utilizing the power of the jury instructions may be introduced in the opening statement and driven home in closing argument.

* Weight not numbers. Juror's task is not to add up factors but to assign the weight to be given to each consideration. There should be a jury instruction to this effect and counsel should use the authority of the court to make this point to the jury. There is one caveat with this argument. Remember that the prosecution is bound by the statutory aggravating circumstances unless the defense case opens the door to others. Since the defense is not bound by the statutory mitigating factors and may request unlimited instructions based on nonstatutory mitigating evidence that is introduced at either the guilt or sentencing phase, the tendency may be to simply play a numbers game. This may operate against the defendant unless counsel explains, through evidence and argument, in a coordinated and coherent fashion why each mitigating factor should weigh in the juror's calculations.

* No automatic death penalty. The fact that someone has been convicted of murder, standing by itself, is not a reason to give somebody the death penalty. Counsel should have educated the jury to this on voir dire and may want to emphasize it again at both opening and final argument. If the law required all persons convicted of first degree murder with aggravating circumstances to die, there would be no decision to make, and jurors would not be needed. However, the law says that they are needed for a very human calculation which each must do in response to his or her own conscience.

What are the "important, memorable, forming moments" in your client's life?

* Acceptance of responsibility. If your client can genuinely accept responsibility, he probably should. However, unless the defendant brings it up, lack of remorse should be a prohibited prosecution argument (see below for further discussion).[4]

* An explanation, not an excuse for what he did. The prosecution invariably attempts to denigrate the power of life history explanations by saying that it offers no excuse for what the proof shows the defendant did. The defense doesn't need to offer excuses; it does, however, need to address some of the real questions that the jury has: who is this person that committed this act and how did he get to the point where he did what he did? You may want to describe some of the mitigation witnesses you will put on, e.g., we will tell you through family members and/or through expert witnesses who the client is. But his childhood/background is not an excuse for what he did. Such evidence is presented to show you that he was not dealt a full hand at birth or that he wasn't dealt the hand that you and I were dealt in terms of intelligence, the capacity to cope with life, and the ability to withstand the slings and arrows of outrageous fortune, etc.

* We will tell the life story from the start. What are the "important, memorable, forming moments" in your client's life? Some common ones are listed immediately below:

Pre-birth problems? Genetic problems? Fetal Alcohol Syndrome? Malnutrition? Intelligence level/mental ability of client: retarded? slow? brain damage? How did mental ability manifest itself? How may that have affected his life?

A witness to violence? Recipient of violence?

Broken family/dysfunctional family, divorce, domestic violence, threats, arguments (describe), infidelity, client's parental role models. Absenteeism of parents, reasons: worked long hours, job that took parent away from home (trucking), no one in charge in the house, etc.

[4] Counsel should not overlook the possibility that a medical/psychological reason (e.g., organic brain damage, borderline personality disorder, other psychosis, certain kinds of mental retardation, etc.) why your client cannot express remorse may exist.

Verify family difficulties by references to "objective" evidence that will be introduced.

May want to weave in sibling love, e.g., client tried to protect sibling or vice-versa, client loved sibling or vice-versa or, on the other hand, refer to the criminal pattern of close family members (inappropriate role models for client)

Alcoholism/drug dependency in family

Moved a lot - had to make and break bonds.

How was the client treated by others when young? Ridiculed - for poverty? for slow learning? for physical/mental problem (stuttering)

Poverty - malnutrition? poor clothes/shoes? other deprivations

Etc., etc.

* What common denominators that we had that the client didn't have. E.g., love, protection, guidance, values, respect, human dignity, etc. The purpose here is twofold: to show how we all are alike and how twists of fate (influences beyond the power of the defendant to control) make us different. The more that a jury is able to identify something in common with the defendant and his background and, perhaps, to see that "there but by the grace of God go I," the less likely that it will vote to kill.

* Objective verification of client's story. Verify family difficulties by references to "objective" evidence that will be introduced, e.g., relatives, neighbors, friends, social services, counsellors, school personnel, hospital reports, police reports, etc.

* Undercutting choice. This is the subtext of many of the themes above. The prosecution's argument will virtually always mention choice; the defendant chose to do what he did as evidenced by a series of actions accomplished by the exercise of judgment. The prosecution will try to focus the jury's attention on the defendant's criminal acts to illustrate his unfettered free will or to say that he's "just plain mean." Show the jury a movie of your client's life, where the snapshot of the crime will be only part of the story. Tell the jury about the "important, memorable, forming moments, which in many cases, in the eyes of our clients, are instances of damage, injury and abuse" over which the defendant had no control.

* Somebody loves him. I.e., he is capable of being loved someone will be hurt if you kill him.

* Aggravating circumstances. Concessions by the defense concerning aggravating circumstances, e.g., that a crime is indeed heinous, atrocious or cruel, are dangerous and usually unnecessary in the opening statement. It is better to counter punch on final argument than lead with your client's chin. If you are certain that an aggravating circumstance will absolutely be established by the evidence beyond a reasonable doubt, and you feel compelled to refer to it in opening statement, then it might

be mentioned in general terms related to the weighing process, i.e., as one factor to be weighed with all of the other legitimate factors in mitigation that the jury will hear. On the other hand, if one or more aggravating circumstance can be undermined, then opening statement is the place to plant the seed of doubt.

The defense must attempt to limit the prosecutor's opening statement in both guilt and penalty phases.

## B. Prosecution

### 1. In General

The defense attorney must attempt to limit the prosecutor's opening statement in both guilt and penalty phases. Besides being acutely aware of the limits of the opening statement and prepared to object to an improper statement, counsel should consider filing a motion in limine specifically addressed to the prosecutor's opening statement. See United States v. Hearst, 412 F.Supp. 877, 879 (N.D. Ca. 1976), *affirmed.*, 563 F.2d 1331 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000 (1978). A sample motion is reproduced in Appendix D, Chapter 9, Motions. This motion can prevent the prosecutor from inflaming the jury before the guilt phase and from shifting the focus of the sentencing phase away from the defendant as a human being and back to the facts underlying the conviction. It can educate the court as to the law of opening statements and impress upon the court and the district attorney that counsel will demand strict compliance with the law. And it can support an argument on appeal that any improper statement by the district attorney cannot be tolerated, as both the court and the district attorney were on notice regarding the proper scope.

### 2. Specific Objections

#### a. Exceeds scope and purpose

The purpose of the opening statement of the prosecution is to outline broadly the facts of the case so that the jury will understand the evidence as it unfolds. The opening statement should not be used to poison the minds of the jury against the defendant before the jury has heard the evidence, or to improperly prejudice the defendant in the eyes of the jurors, or destroy his credibility. United States v. Signer, 482 F.2d 394, 398 (6th Cir.), cert. denied, 414 U.S. 1092 (1973).

See also, United States v. Hampton, 458 F.2d 29, 30 (10th Cir. 1972) ("the trial court may ... control the scope and extent of the opening statement"); Virgin Islands v. Turner, 409 F.2d 102, 103 (3d Cir. 1969) ("the purpose of an opening statement is to give the broad outlines of the case to enable the jury to comprehend it").

#### b. Inflammatory

Closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." State v. Sutton, 562 S.W.2d 820, 823-24 (Tenn. 1978). See also, Watkins v. State, 140 Tenn. 1, 203 S.W. 344, 345-46 (1918). It is improper "to appeal to the passions and prejudices of

Be on guard against mention of any prior or other offense not specifically previously enumerated as supporting an aggravating circumstance.

the jurors.... The depicting of Signer as a thief looting a building and loan association, could not help but prejudice him in the eyes of the jury." United States v. Signer, *supra*, 482 F.2d at 400; United States v. Perez, 491 F.2d 167, 174 (9th Cir. 1974); Virgin Islands v. Turner, *supra*, 409 F.2d at 103. Brooks v. Francis, 716 F.2d 780, 788 (11th Cir. 1983) (A prosecutor may not incite the passions of a jury when a person's life hangs in the balance); *accord*, Tucker v. Zant, 724 F.2d 882, 888 (11th Cir. 1984); and, Hance v. Zant, 696 F.2d 940, 951 (11th Cir.), *cert. denied*, 463 U.S. 1210 (1983). ABA Prosecution Standards, Stds. 3-5.8 (e) ("The prosecutor should not use arguments calculated to inflame the passions or the prejudices of the jury.").

**c. Argumentative**

"An opening statement has a narrow purpose and scope. It is to state what evidence is to be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument." United States v. Dinitz, 424 U.S. 600, 612, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (Burger, C.J., concurring); see also Leonard v. United States, 277 F.2d 834, 841 (9th Cir. 1960); Burns v. State, 591 S.W.2d 780, 784 (Tenn. Cr. App. 1977).

**d. Character of Defendant**

United States v. McLister, 608 F.2d 785, 790 (9th Cir. 1979) (defense opening statement and testimony by defendant about his legitimate means of support did not place his character in issue); United States v. Tomaiolo, 249 F.2d 683, 689 (2d Cir. 1957) ("opening statement of counsel for defendant could not have put the defendant's character in issue"). See also, Final Argument, Prosecution, this Chapter, VII A 2(a), Characterizing the Accused.

**e. Defendant's Other Crimes**

"[T]he government should not have mentioned appellants' prior offenses in its opening statement. Such mention irretrievably puts before a jury the fact that a defendant has been involved in prior criminal activity." United States v. Bailey, 505 F.2d 417, 420 (D.C. Cir. 1974), *cert. denied*, 420 U.S. 961 (1975); Virgin Islands v. Turner, *supra*, 409 F.2d at 103. Counsel should be on guard against mention of any prior or other offense not specifically previously enumerated as supporting an aggravating circumstance. It should be prohibited as nonstatutory aggravation. See generally, Tennessee Rules of Evidence (T.R.E.), Rule 609; State v. Morgan, 541 S.W.2d 385, 387-90 (Tenn. 1976).

**f. Anticipating Defenses**

United States v. Lord, 565 F.2d 831 (2d Cir. 1977) (reversible error for prosecutor to state during voir dire that a government witness had been stabbed forty-five times, even if prosecutor believed that evidence would be admissible pursuant to Rule 404(b)); United States

The prosecution case-in-chief evidence in the sentencing phase is strictly limited to statutory aggravating circumstances.

v. Hearst, *supra*, 563 F.2d at 1337-38 (where it was clear that defendant would raise the defense of duress, admission of evidence of other crimes as part of the government's direct case was not error). Note that this decision does not justify admission of such statements during the government's opening statement.

**g. Arguing or Suggesting Law**
See United States v. Dinitz, *supra*, 424 U.S. at 612 (Burger, C.J., concurring); *accord*, Leonard v. United States, *supra*, 277 F.2d at 841 (9th Cir. 1960). See also, Burns v. State, 591 S.W.2d 780, 784 (Tenn. Cr. App. 1977).

**h. Personal Opinion**
See United States v. Dinitz, *supra*; Berger v. United States, 295 U.S. 78, 88-89, 55 S.Ct. 629, 79 L.Ed.2d 1314 (1935); United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed. 2d 1 (1985); State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. pending* (Objection sustained and trial judge admonished prosecutor not to inject his beliefs); Sneed v. State, 546 S.W.2d 254, 261 (Tenn. Cr. App. 1976); United States v. Burse, 531 F.2d 1151, 1152 (2d Cir. 1976). Re witnesses: State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976); King v. State, 1 Tenn. Crim. App. 101, 430 S.W.2d 810, 812 (1968) ("He's [the witness'] trying to hoodwink the jury"); United States v. DiLoreto, 888 F.2d 996, 999 (3rd Cir. 1989) (A prosecutor may not opine that the defendant or his witnesses are "liars."). Re punishment: State v. Payne, 791 S.W.2d 10, 20 (Tenn. 1990), *affirmed in part, Payne v. Tennessee*, 501 U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (Statement by prosecution that "I could not agree with [the witness] more, if this isn't a case for death by electrocution, then I don't know what is . . ." condemned by Court as "a violation of the Code of Professional Responsibility, DR 7-106(c)(4) for lawyers engaged in trial to express their personal opinion about any issue involved in the justice of the cause they represent." It is "unprofessional." Under facts of case, however, harmless error.). ABA Standards Relating to the Prosecution Function § 5.8 ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant"); Standards Relating to the Defense Function § 7.8; ABA Model Code of Professional Responsibility, Canon 7, DR 7-106(c)(4).

**i. Facts Other Than Aggravating Circumstances**
Although the defense has a broad area with which to work because of the way the courts have interpreted mitigating circumstances, prosecution case-in-chief evidence in the sentencing phase is strictly limited to statutory aggravating circumstances. See, Cozzolino v. State, 584 S.W.2d 765, 767-68 (Tenn. 1979); State v. Teague, 645 S.W.2d 392, 399 (Tenn. 1983); State v. Adkins, 653 S.W.2d 708, 715 (Tenn. 1983). If the district attorney's opening statement indicates to the that the jury should render a verdict of death for any reason other than

because they will be shown proof beyond a reasonable doubt of the existence of statutory aggravating circumstances, it should be responded to by an objection, a request for a jury-out hearing, and a motion for mistrial. If that motion is overruled, counsel should demand that the statement be stricken from the record, and that the jury be given a curative instruction immediately. Counsel should also argue that the prosecutor has waived the right to continue with the opening statement. Statement and argument are a privilege, whose control is entirely within the court's discretion; once that privilege is abused, it should be relinquished.

## A. Introduction

Too often defense attorneys are so concerned about presenting evidence of mitigation that they ignore important and perhaps improper evidence introduced by the state. While mitigating evidence must of course be prepared, a successful attack on proof of aggravation will lighten the burden, perhaps even making defense proof unnecessary.

### 1. Burden of Proof

The jury may impose the death penalty only upon finding, beyond a reasonable doubt, that (1) one or more statutory aggravating circumstances have been proven and (2) outweigh mitigation. TCA § 39-2-203(f). (Older instructions did not specify the burden on the weight of aggravation versus mitigation, and required that aggravation "not be outweighed by" mitigation; while the Tennessee Supreme Court rejected challenges to this formulation, it has been changed.) The jury must consider each case separately and individually, including any aggravation and mitigation of which proof is presented. State v. Groseclose, 615 S.W.2d 142 (Tenn.), cert. denied, 454 U.S. 882 (1981). The jury must be instructed that it can consider only those aggravating factors set forth in the statute and charged by the court. State v. Melson, 638 S.W.2d 342 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983).

### 2. Notice and Discovery

At least thirty days before trial, the state must file written notice of intent to seek the death penalty, specifying the aggravating circumstances on which it intends to rely. T.R.Cr.P. 12.3(b); but see State v. Porterfield, 746 S.W.2d 441 (Tenn.) (notice of particular aggravators given on day of trial; defendants knew throughout trial preparation that state would seek death, failure to move for continuance waived time requirement, and no indication of surprise or prejudice), cert. denied, 486 U.S. 1017 (1988). Counsel should strenuously object to any attempt to prove aggravating circumstances not specified in the notice.

The rules of discovery apply to the sentencing hearing, and the state must notify the defense of all witnesses it intends to call at the sentencing hearing. State v. Buck, 670 S.W.2d 600 (Tenn. 1984).

### 3. Evidentiary Rules

The statute allows admission of evidence that would normally be inadmissible. T.C.A. § 39-13-203(c). While this provision should apply to defense evidence, see Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), ordinarily inadmissible state evidence should be vehemently opposed on the grounds of unreliability, prejudice, due process, and violation of the right to confront and cross-examine witnesses. "An important element of a fair trial is that a jury consider only relevant and competent evidence." Bruton v. United States, 391 U.S. 123, 131 n.6, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Even greater reliability is needed to support death than any other verdict. Woodson v. North Carolina, 428

U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The rules of evidence operate to exclude evidence that, for a variety of reasons, is unreliable or overly prejudicial; their suspension is unconscionable when it operates to the detriment of a capital defendant. As the California court has pointed out, the presumption of prejudice attached to the use of inadmissible evidence becomes even stronger. People v. Hogan, 647 P.2d 93 (Cal. 1982); see also State v. Gardner, 480 So.2d 91 (Fla. 1985) (police testimony at sentencing regarding accomplice's statement violated due process and right to confront and cross-examine witnesses); People v. Devin, 444 N.E.2d 102 (Ill. 1982) (use of hearsay without adequate limiting instructions required reversal, despite counsel's failure to request instructions or to appeal the point); Porter v. State, 578 S.W.2d 742 (Tex. Crim. App. 1979) (hearsay violated right to confront and cross-examine witnesses; evidence was within hearsay exception, but lacked sufficient indicia of reliability). Constitutional safeguards simply cannot be legislated away. See State v. Bartholomew, 683 P.2d 1079, (Wash. 1984) (limiting similar statute's application to defense evidence); and Lightbourne v. Dugger, 829 F.2d 1012, 1027 (11th Cir. 1987) (hearsay evidence should never serve as the basis for a death sentence), cert. denied, 109 S.Ct. 329 (1988); see generally Weinheimer and Millman, Legal Issues Unique to the Penalty Trial, 8 The Champion 33 (1984); cf. State v. West, 767 S.W.2d 387 (Tenn. 1989) (if defendant used hearsay statement of co-defendant, state could use directly contradictory statements by the same person).

Several Tennessee cases have rejected constitutional attacks on this provision; in none of them, apparently, was inadmissible hearsay actually introduced by the state. See, e.g., Houston v. State, 593 S.W.2d 267 (Tenn.), cert. denied, 449 U.S. 891 (1980); State v. Harries, 657 S.W.2d 414 (Tenn. 1983); and State v. Johnson (Erskine), 762 S.W.2d 110 (Tenn. 1988); see also discussion in the Index, § V.D.2. In State v. Teague, 680 S.W.2d 785 (Tenn. 1984) (Teague II), no objection to three hearsay statements was made below, and objection to a fourth was sustained.

On the other hand, several Tennessee death cases have applied normal evidentiary propositions. For example, in State v. Adkins, 653 S.W.2d 708 (Tenn. 1983) (Adkins I), improper hearsay proof of the defendant's prior record impelled a reversal; see also State v. Buck, 670 S.W.2d 600 (Tenn. 1984). State v. Workman, 667 S.W.2d 44 (Tenn.), cert. denied, 469 U.S. 873 (1984), found improper (but harmless) a question requiring the witness to answer the ultimate question before the jury.

Failure to object may constitute waiver. But see State v. Duncan, 698 S.W.2d 63 (Tenn. 1985) (no waiver of error directed to admissibility of evidence when defendant is under death sentence), cert. denied, 475 U.S. 1031 (1986); State v. Johnson (Donnie), 743 S.W.2d 154 (Tenn. 1987) (considering [and rejecting] various errors despite lack of objection), cert. denied, 485 U.S. 994 (1988); State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989) (reversing based

on Miranda violation not raised at trial or on appeal), cert. denied, 110 S.Ct. 1922 (1990); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (considering [and rejecting] challenge to admission of evidence that had drawn no objection at trial).

Evidence remains inadmissible if it was secured in violation of the federal or state constitution – for example, in an unlawful search or seizure, or through violation of the rights to silence and to counsel. TCA § 39-2-203(c); Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

### 4. Relevance

The state can present any evidence that is relevant, reliable, and not overly prejudicial. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Because Tennessee precludes as aggravation any factor not statutorily enumerated, evidence is relevant to the state's case in chief only if it is probative of a statutory aggravating factor (of which pretrial notice was given). Cozzolino v. State, 584 S.W.2d 765 (Tenn. 1979); Black (Byron) v. State, 815 S.W.2d 166, 179 (Tenn. 1991). While the state may attack defense evidence in its rebuttal case, it cannot try to anticipate any defense evidence or arguments before they are actually advanced. Id.; but see State v. Bates, 804 S.W.2d 868 (Tenn. 1991) (theory outlined in defense opening, and later introduction of supporting evidence, rendered harmless introduction of proof in the state's case in chief that could have been used in rebuttal). Overly prejudicial information may never be used. Zant v. Stephens.

## B. Non-Statutory Aggravation

The state can only rely on statutory aggravating circumstances, i.e. those sentencing enhancing circumstances specifically set out at T.C.A. § 39-13-204 (i), as the basis for the jury to impose a sentence of death. Cozzolino, supra; Black (Byron), supra. Defense counsel should be alert to the state's attempt to rely on non-statutory aggravation. Furthermore, jurors may also assume erroneous facts that amount to non-statutory aggravation. Defense counsel should object to any attempt by the state to rely upon non-statutory aggravation and should attempt, during voir dire, to ferrett out the juror's misconceptions that could have the same affect as non-statutory mitigating circumstances. Defense counsel should also give consideration to these problems in the preparation of proposed jury instructions at sentencing phase. Possible examples of non-statutory aggravation:

### 1. Parole Eligibility

Jurors may assume that inmates convicted of murder in the State of Tennessee are eligible for parole much earlier than they actually are. See, Paduano & Smith, Deathly Errors: Juror Misperceptions Concerning

Parole and the Imposition of the Death Penalty, 18 Columbia Human Rights L.Rev. 211 (1987) and see, Chapter 7, Constitutionality of T.C.A. § 39-13-204 and 206, Appendix A; Chapter 14, Sentencing Phase, § D.17.

**2. Deterrence**

Prosecution may intimate, and jurors may assume, that the death penalty operates as a general deterrent to other crime. Research does not indicate that this is true. See, for example, Gregg v. George, 428 U.S. 184-186, 96 S.Ct. 2930, n. 31; and, Acker and Walsh, Challenging the Death Penalty Under State Constitution, 42 Vanderbilt L.Rev., p. 1333, n. 160 (1989).

**3. Cost of Death vs. Cost of Life Sentence**

Prosecution may intimate, and jurors may assume, that it costs more to lock somebody up for life than to execute them. Inconsistent with this preconception, the Tennessee Sentencing Commission has concluded the opposite to be true. See, Cain, Economic Impact of Death Penalty, The Tennessee Sentencing Commission Review, May 1988.

**4. Lack of Remorse**

An example of the type of subject that the prosecution may impermissibly argue in an effort to aggravate the offense is that the defendant has no remorse for the offense that he committed. "Lack of remorse" is not only not a statutory aggravating circumstance, it may also be impermissible for the prosecution to comment on it because it would amount to prosecutorial comment on the defendant's right to remain silent. Defense counsel should particularly be alert to this eventuality, if the defendant fails to testify.

**5. Victim Impact and Character of Victim**

Until recently, this type of evidence was not admissible in a capital sentencing hearing. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (victim impact); South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1990) (victim of character). But, Payne v. Tennessee, 501 U.S. _, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) has reversed this rule of law. Victim impact and victim character evidence is now admissible in a capital sentencing hearing under the Federal Constitution. It may not, however, be admissible under the State Constitution. See, Chapter 8, Recurring Legal Issues, § XII.

## C. Qualitative Sentencing

The law envisions capital sentencing as a qualitative process. Yet it is difficult to imagine that a jury would find several aggravators, but not accord some separate weight to each. Consider this scenario: a relationship between a man and a woman turns violent. He shoots her estranged husband, and is convicted of malicious wounding. Two years later, he comes into her house, where she and her two children are sleeping. He shoots the woman and one daughter in their sleep, then goes into the next room and shoots the other daughter. In mitigation, the man is generally responsible and non-violent; he has serious psychological

problems, but is a model prisoner with no other criminal history, and his only violence in life has been focused on this family. Statutory aggravators lead the jury to focus not on the incident and the man's history with the family, weighed against the rest of the his life, but on multiple aspects of this incident: (1) two years after a previous shooting, the defendant (2) shot a child, who (3) potentially witnessed another felony, and (4) was killed during another felony, as (5) the third person killed, in what was a (6) heinous act, because she was a child, and was conscious (having been awakened by the other shots) (and therefore being a potential witness) (to another felony) (i.e., two other murders), and was shot twice. See State v. Black, 815 S.W.2d 166 (Tenn. 1991). (Had he left her to bleed to death rather than shooting her the second time, would that not have been more heinous? And compare Payne, in which the prosecutor was allowed to argue that the ongoing trauma to a surviving child demonstrated how heinous the killing was.)

Tennessee courts have found it irrelevant that two aggravating factors are part of one chain of acts. See State v. Carter, 714 S.W.2d 241 (Tenn.), cert. denied, 479 U.S. 1046 (1986), pointing out that killing to avoid arrest and killing during a felony are not identical; one may be true without the other also being true. So far as the reported decisions reveal, Carter is the only case in which use of multiple factors was challenged on such grounds. The Tennessee court has not yet addressed an argument that two circumstances supported by precisely the same facts should count as one aggravating factor.

The Eighth Circuit has held that counting one aspect of the defendant's conduct twice violates the Eighth and Fourteenth Amendments. Collins v. Lockhart, 754 F.2d 258 (8th Cir.), cert. denied, 474 U.S. 1013 (1985); cf. State v. Smith (Leonard), 755 S.W.2d 757 (Tenn. 1988) (rejecting Collins argument). Repeating an element of the crime — the felony in felony-murder — cannot narrow the class of murderers to those who ought to be death-eligible, as an aggravating circumstance must, and makes the robbery-murderer enter sentencing with one circumstance already found. While artificial inflation of aggravation through double-counting is not technically a "narrowing" issue, and has not been squarely presented to the Tennessee Supreme Court, the concerns are similar: one ought not to be counted eligible for death twice, based on a single fact or identical set of facts. See, Chapter 8, Recurring Legal Issues, Section IV.

California disallows artificial inflation of aggravation, and requires that the jury be instructed to consider two overlapping circumstances as one. People v. Harris, 679 P.2d 433 (Cal. 1984) (burglary and robbery; indivisible course of conduct, one principal criminal purpose). (Because the California jury finds existence of aggravating factors at the guilt phase, it can be instructed at the penalty phase which to use as one for sentencing purposes.) Florida bars the use of both robbery and pecuniary gain aggravating factors, because they involve one aspect of conduct, and because all robbery-murderers would start out with two strikes against them. Provence v. State, 337 So.2d 783 (Fla. 1976) (but larceny and rape would be separate). Florida requires that the two overlapping circumstances, based on the same essential feature of the defendant's conduct, Thomas v. State,

456 So.2d 454 (Fla. 1984), be merged into one for sentencing purposes. Griffin v. State, 474 So.2d 777 (Fla. 1985). Alabama goes further, prohibiting use in aggravation of an element of the offense (of felony murder). Reed v. State, 407 So.2d 153 (Ala. Cr. App. 1980). See also State v. Cherry, 257 S.E.2d 551 (N. C. 1979), rejected in State v. Pritchett, 621 S.W.2d 127 (Tenn. 1981). North Carolina has pointed out that any error should be in favor of the defendant — when there is doubt whether two circumstances are based on the same evidence, they should be used as one. State v. Goodman, 257 S.E.2d 569 (N.C. 1979) (avoiding arrest and hindering law enforcement). But see Wiley v. Mississippi, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986) (denying certiorari in case raising Collins issue); and Glass v. Blackburn, 791 F.2d 1165 (5th Cir. 1986) (rejecting Collins).

The issue should be raised at trial in two contexts. First, via a motion in limine, the state should be precluded from relying on two duplicative circumstances -- for example, killing to avoid arrest and killing in the course of a felony. Second, through instruction or argument, the jury should be persuaded not to weigh one fact twice – to give independent weight to each of two aggravators, or to rely on facts underlying one in order to find another. But see Black, upholding death sentence in face of dissenting argument that the appellate court used the victim's youth, an independent aggravator, to find that the killing was heinous.

As currently interpreted and applied, the legislative formulation is entirely arbitrary. While the law contemplates sentencing as a qualitative process, it is difficult to imagine that juries devalue aggravators because of their overlap. Yet an armed robbery, committed perhaps twenty or thirty years previous, is as aggravating as two murders committed in the last two years. Or, as in Black, what is essentially a single factual scenario supports multiple aggravators. The jury must be persuaded not to take this view — to look (if they find aggravating circumstances) at each one separately, according it varying weight according to its seriousness. Three Tennessee inmates are on death row only because of prior convictions, no other aggravation having been found – in one, the conviction was in 1968. State v. Martin, 702 S.W.2d 560 (Tenn. 1985); see also Adkins II (aggravated assault, and a 1965 second-degree murder); and State v. Caldwell, 671 S.W.2d 459 (Tenn.), cert. denied, 469 U.S. 873 (1984) (first-degree murder). That all three involved prior murders may mean that juries are refusing to impose death based on less serious prior convictions when no other aggravation is shown.

## D. Statutory Aggravating Circumstances

The statute lists twelve aggravating factors that open the door to imposition of the death penalty. TCA § 39-2-203(i). The list is exclusive; no other aggravating factors can be considered. Discussed here are the 81 cases reviewed by the Tennessee Supreme Court in which the death penalty has been imposed under the 1977 law, through November, 1991. The Court has remanded eighteen times – thirteen for resentencing, and five for retrial; only four of these have reappeared in the Supreme Court following rehearing. Two cases required partial remand for reconsideration of evidentiary issues. In two cases the Court reduced the

sentence to life, and one decision upheld a trial court remand for resentencing on a motion for new trial. In brief, twenty-eight percent of the court's decisions have recognized at least potentially reversible error; numerous others have found "harmless" errors.

Aggravating factors may be attacked on several fronts. The evidence may be insufficient to support each element. The factor may be inappropriate as applied to the facts of the case (really a restatement of the insufficient evidence argument). Finally, many factors may be attacked for being unconstitutional in various respects.

Two of the statutory aggravators were substantively amended in 1989. In the fifth aggravator, "depravity" has been replaced by "serious physical abuse beyond that necessary to produce death"; in the second, prior convictions now qualify only if the statutory elements involve the "use of violence to the person." As of this writing, neither amendment has received appellate attention. For more detail and cases on the issues discussed below, see § I of the Index to Tennessee death penalty cases.

### 1. § (i)(1): Victim under 12, and defendant at least 18.

This factor has been found in at least three cases to date, but discussed in none. Arguably, a necessary element is that the defendant knew that the victim was under twelve. Unlike statutory rape, as to which generally the defendant's mistake as to the victim's age is not a defense, death-penalty murder is not a strict liability offense. W. LaFave, Criminal Law 262 (1972).

At a minimum, the state must prove the age of both the victim and the defendant. Counsel should also be aware of Rogers v. State, 455 S.W.2d 182 (Tenn. Crim. App. 1970), a rape case in which the defense inadvertently established the victim's age through cross-examination.

### 2. § (i)(2): Prior conviction of a felony involving "the use of violence to the person."

This factor, which has been found in thirty-seven cases resulting in a death sentence, raises the questions of what kind of criminal history is involved, what is a "prior" conviction, which felonies involve violence, which convictions are valid, and how the state can prove the convictions' existence.

#### a. Use of violence

Until November 1989, the statute permitted aggravation with any felony that involved "the use or threat of violence." The state was permitted to supplement statutory definitions with testimony by previous complainants; conversely, the defense was entitled to prove that a potentially violent offense did not actually involve violence. Qualifying felonies now are only those "whose elements

involve the use of violence to the person." (See, Vol. III, Manual Appendix A, Trial Issue Index, § I.B.1., for cases in which the state tried to prove actual violence under the pre-amendment statute.)

Whether elements of an offense involve the use of violence to the person may remain at issue. In Florida, "violence" requires direct, life-threatening contact with a person. Lewis v. State, 398 So.2d 432 (Fla. 1981). See also State v. Moore, 614 S.W.2d 348 (Tenn.) (burglary and arson of empty building not violent by definition), cert. denied, 454 U.S. 970 (1981). Arguably, cases under the pre-amendment law permitting testimony to prove violence may also demonstrate that a given felony does not by definition involve the use of violence. See Smith (Leonard) (indictment used to show violence in prior robberies); State v. Adkins, 725 S.W.2d 660 (Tenn.) (Adkins II) (victim testified to violence in prior aggravated assault), cert. denied, 482 U.S. 909 (1987); cf. State v. Taylor (Richard), 771 S.W.2d 387 (Tenn. 1989) (state need not prove underlying facts of robbery, given that an element is putting the victim in fear).

Improper introduction of non-violent felony convictions has led to reversal in Moore; Cozzolino (which involved four other aggravating factors); State v. Johnson (Walter) I, 661 S.W.2d 854 (Tenn. 1983) (grand larceny, attempted auto burglary; reversed despite presence of murder conviction as well, which alone supported finding of circumstance at second trial, State v. Johnson (Walter) II, 698 S.W.2d 631 (Tenn. 1985), cert. denied, 476 U.S. 1130 (1986); and Adkins I (larceny from the person). The conviction in Buck was reversed because of use in aggravation of a non-violent conviction, together with numerous other errors. In State v. Campbell, 664 S.W.2d 281 (Tenn.), cert. denied, 469 U.S. 920 (1984), however, the penalty was affirmed despite use in aggravation of two non-violent felonies; one violent conviction was proven, along with two other circumstances.

**b. Felony convictions**

Arrests and misdemeanors are irrelevant. While they may be used to rebut a mitigating factor raised by the defense (e.g., lack of significant criminal history), they cannot be used in aggravation. See Cozzolino. Some prosecutors persist in introducing evidence of prior arrests and other criminal activity. In Adkins I, the court held, "One need only read the statute . . . to learn that it is only convictions, not mere accusations . . . which qualify as an aggravating circumstance under the statute. Thus, it was clearly error for the trial court to permit evidence of [a] pending accusation." 653 S.W.2d at 715. The same error occurred in Buck and in State v. Miller (David), 674 S.W.2d 279 (Tenn. 1984) (Miller (David) I).

The Indiana Supreme Court has pointed out that admission of an unproven prior charge violates due process; because it would have to be proven beyond a reasonable doubt, the jury would in effect hear a second trial for an unrelated crime. State v. McCormick, 397 N.E.2d 276 (Ind. 1979) (circumstance properly dismissed before trial). Juvenile history should likewise be excluded; see State v. Beal, 319 S.E.2d 557 (N.C. 1984).

Extreme care must be exercised to avoid admission of prior arrests to rebut defense proof. For example, in State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984), an expert testified that the death sentence would not deter persons of a background similar to the defendant's. The prosecutor cross-examined on knowledge of the defendant's prior arrests; the court reversed the sentence because the prosecutor described the facts underlying the prior arrests. Had the arrests changed the witness's opinion, the fact, but not the details, of the arrests would have been admissible. In Buck, the defendant admitted a prior conviction; the state persuaded the judge to admit his prior record in order to rebut the supposed favorable inference that it represented his only contact with the law. The Supreme Court disagreed, and reversed. However, in Workman, the defense sought to argue in mitigation that the defendant had no significant criminal history, pointing out that he had admitted only one conviction, to which the prosecutor's statement that the defendant had not been asked if he had other convictions (which he did) was a proper response. See also Harries (non-violent conviction brought to jury's attention by defense during guilt phase; precisely because it was immaterial to any aggravating circumstance, given that the jury did not find any prior violent felony convictions, its introduction in sentencing phase was harmless).

**c. "Prior" convictions**

A conviction is considered "prior" if it was entered before the sentencing hearing, even if the crime was actually committed after this one. Caldwell; State v. King (Terry), 718 S.W.2d 241 (Tenn. 1986); State v. Coleman, No. 31, 9 TAM 34-10 (Tenn. Crim. App. 1984) (convictions for crime committed after instant murder are relevant to character, i.e., capacity for violence). See also Teague II, in which the "prior" conviction was entered after the first sentencing hearing, but before the post-remand hearing.

The statute is ambiguous, and the Tennessee interpretation is facially logical. However, "prior" may also — and perhaps more reasonably — refer to the defendant at the time of the killing. Several other states have adopted this interpretation. People v. Balderas, 711 P.2d 480 (Cal. 1985) ("prior" means conviction entered before commission of this murder); State v. Rust, 250

N.W.2d 867 (Neb.), cert. denied, 434 U.S. 912 (1977) ("history" means before this killing); State v. Goodman, 257 S.E.2d 569 (N.C. 1979) ("prior" means based on conduct before this murder).

**d. Invalid convictions**

The case of Raymond Teague illustrates the point that the prior conviction must be valid. Teague was sentenced to death for allegedly killing a witness to a previous murder. His sentence was vacated, and the case was remanded for rehearing. In the interim, Teague entered a nolo plea to the earlier homicide, counsel having advised him that a nolo plea could not be used in aggravation in the capital case. The plea was used as a conviction (which it was), Teague was again sentenced to death, and this time the Supreme Court upheld the sentence. In a post-conviction proceeding, Teague persuaded the Court of Criminal Appeals that counsel's advice was unconstitutionally defective; the sentence was vacated. See Teague v. State, 772 S.W.2d 932 (Tenn. Crim. App. 1989) (finding ineffective assistance of counsel), and 772 S.W.2d 915 (reversing denial of post-conviction relief as to sentence). See also Zant v. Stephens (prior conviction must be valid).

A conviction that has not exhausted its direct review will probably be admitted, but its later reversal may void the aggravating factor and therefore result in reversal of the death penalty; the state uses the prior at its peril. See Frazier v. State, 485 S.W.2d 877 (Tenn. Crim. App. 1972) (under habitual criminal statute, conviction admissible if still pending on appeal, but might constitute reversible error if it were later reversed); cf. State v. Bey, 477 A.2d 315 (N.J. 1984) ("conviction" means direct review has been exhausted); Oats v. State, 446 So.2d 90 (Fla. 1984) (reversed conviction cannot be used). The point has not come up in a Tennessee death penalty appeal; the requisite heightened reliability of a death penalty trial should require adoption of the New Jersey and Florida rule.

The most obvious example of an invalid conviction is one where the defendant was unrepresented and the record does not show an affirmative waiver of counsel. See State v. Shaw, 631 S.W.2d 477 (Tenn. Crim. App. 1982). Thus, in State v. O'Brian, 666 S.W.2d 484 (Tenn. Crim. App. 1984), the state failed to establish that the defendant had been represented by counsel in his prior convictions; an enhanced driving under the influence conviction was therefore reversed.

Tennessee law is apparently very restrictive on other collateral attacks on the validity of prior convictions. In State v. Evans, 669 S.W.2d 708 (Tenn. Crim. App. 1984), the defendant contended that his prior convictions could not be used (under the habitual

criminal statute) because they were based on invalid guilty pleas. The court held that facially valid convictions could be attacked only through post-conviction proceedings. Counsel might therefore file post-conviction petitions in all the previous convictions and attempt to invalidate one or more of them. Counsel should examine the prior record to determine whether the convictions are accurate and whether the accused was represented by counsel, and to discover other defects that would render such documents inadmissible. See People v. Sumstine, 687 P.2d 904 (Cal. 1984).

If counsel challenges the prior conviction through the post-conviction litigation process in the court in which the prior conviction was entered, it may be necessary to continue the capital trial in order to resolve the collateral litigation; or, as in the case of convictions on appeal, the state will rely on the aggravator at the risk that it may later be set aside. Furthermore, the issue of whether the prior conviction is valid, which, according to Tennessee law, must be litigated in the court of conviction on post-conviction relief, is one question while the issue of whether the prior conviction is admissible, "valid" or not, in a capital sentencing hearing is another question. Counsel may be able to successfully contend that admissibility is a "due process/cruel and unusual" issue in the capital sentencing hearing and thus a proper issue to be resolved before the capital trial court. This approach should work particularly if the statute of limitations, T.C.A. § 40-30-102, has run on filing a petition for post-conviction relief in the court in which the prior conviction was previously entered.

Use of remote convictions has not yet been challenged. The statute contains no time limit, and the court probably will follow the rulings under the habitual criminal statute, allowing the most remote convictions. See State v. Sullivan, 644 S.W.2d 429 (Tenn. Crim. App. 1982). Remote convictions have been involved in at least two cases. See Adkins II (1965 second-degree murder) and State v. Caruthers, 676 S.W.2d 935 (Tenn.) (1968 armed robbery), cert. denied, 469 U.S. 1197 (1984).

**e. Manner of proof and evidentiary use**

Proof must be through authentic, certified copies of the convictions. See Miller (David) I. Hearsay or an F.B.I. rap sheet is unacceptable, see Buck, as is the indictment itself, which may contain unadjudicated charges and other prejudicial information, see State v. Jones, 789 S.W.2d 545 (Tenn. 1990). The sentence is not admissible. State v. Williams (Laron), 657 S.W.2d 405 (Tenn. 1983) (sentence would not be admissible, except that the defense had stipulated to it), cert. denied, 465 U.S. 1073 (1984).

Traditional impeachment rules may admit a prior conviction that does not qualify as an aggravating factor. See State v. Morris, 641 S.W.2d 883 (Tenn. 1982), cert. denied, 460 U.S. 1047 (1983). If that happens, the judge should give a very clear charge on the purpose for which it is introduced. The jury must not be allowed to use it in aggravation. If there is a serious risk that the jury might use the conviction in aggravation, its prejudicial impact outweighs its ability to prove the defendant's lack of credibility, and the court should not permit impeachment.

Finally, counsel must make every effort to limit the collateral prejudice resulting from introduction of the prior record, whether as impeachment, in rebuttal of mitigating evidence, or as an aggravating circumstance.

**3. § (i)(3): Knowing creation of "a great risk of death to two or more persons, other than the victim murdered, during [the] act of murder."**

Each element of this circumstance leaves it open to attack. The defendant must know that a great risk of death to two or more persons is created; the risk of death must be great, and real; and the risk must be created during the act of murder. Interpreting the section for the first time in State v. Cone, 665 S.W.2d 87, 95 (Tenn.), cert. denied, 467 U.S. 1210 (1984), the court pointed out that it "does not contemplate an extended criminal episode, but . . . either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based," noting that qualifying situations might include a hostage-taking or hijacking. The two-day crime spree in Cone did not qualify. (The conviction, however, was not reversed, due to findings of other circumstances.)

The other cases in which the circumstance was found all involved a shooting with several people present; in Cozzolino, Workman, State v. Johnson (Cecil), 632 S.W.2d 542 (Tenn.), cert. denied, 459 U.S. 882 (1982), and Johnson (Erskine) shots were fired at more than one person, but in State v. King (Tommy), 694 S.W.2d 941 (Tenn. 1985), there was more of a threat than a risk – one of two shots was fired into the ceiling, and the other killed the murder victim.

In none of these cases was the circumstance challenged. In Workman, in the course of discussing whether one invalid finding impelled a reversal, the court stated that this circumstance was supported by the evidence that "at the time" the defendant killed the victim, he wounded a second and shot a third person.

Persuasive authority in other jurisdictions suggests that this kind of reasoning should fall if directly attacked. In White v. State, 403 So.2d 331 (Fla. 1981), six people were killed in one course of conduct, but each was killed with a single shot, which itself did not endanger the others, and the circumstance was held inapplicable. Nebraska limits the circumstance to such things as a bombing or indiscriminate shooting into a group or at a number of people. State v. Simants, 250 N.W.2d 881 (Neb. 1977). Louisiana, which requires intent to inflict great bodily harm on someone other than the person killed, toyed with the Florida interpretation, State v. English, 367 So.2d 815 (La. 1979) (doubting whether circumstance applied when each of three victims was killed by a separate, distinct act), but ultimately rejected it, State v. Williams, 480 So.2d 721 (La. 1985). Louisiana does require that either the killing be such as English contemplated or a person other than the murder victim be actually harmed. State v. Welcome, 458 So.2d 1235 (La. 1984).

The circumstance has been upheld where the defendant drove recklessly while struggling with the murder victim, Delap v. State, 440 So.2d 1242 (Fla. 1983); shot the victim on a street, hitting one passerby and endangering others, State v. Griffin, 662 S.W.2d 854 (Mo. 1983); knew that two people were in the front seat of a car and fired a shotgun from two or three feet away, State v. Moose, 313 S.E.2d 507 (N.C. 1984) (statute requires risk to one other person); or engaged in a barroom shooting spree, Jones v. State, 648 P.2d 1251 (Okla.Cr. 1982).

**4. § (i)(4): Defendant committed or employed another to commit the murder for remuneration or the promise thereof.**

This contract-killing circumstance, directed at both the person who hired and the one who was hired, has been applied in six cases. Its validity has been attacked, but upheld by the court, on the ground that death is a disproportionate sentence for one who is not present at a killing.

Proof of the circumstance may raise problems for the state. Thus, in State v. Adams, 631 S.W.2d 392 (Tenn. 1982), the defendant at first confessed that he was hired to kill the victim. He testified at trial, however, admitting his involvement but denying that he had been paid money to kill. His uncorroborated confession provided insufficient evidence for the finding, and the sentence was reduced to life.

Adams stands for the broad proposition that a defendant's statement must be corroborated if used to substantiate an aggravating circumstance. Lack of corroboration of an accomplice's testimony may likewise be grounds for finding insufficient evidence. (Of course, statements by the defendant and an accomplice may sufficiently corroborate one another, and any physical evidence bearing out details of a confession will probably be seen as sufficient corroboration; see further discussion in next section).

**5. § (i)(5): Murder that is "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death."**

Until November 1989, a killing could be found heinous if it appeared to the jury that it involved "torture or depravity of mind." The dissent in Black demonstrated at length the difficulty of defining "depravity," which could arguably be found in virtually every first-degree murder. In 1989, the legislature replaced that amorphous phrase with the more concrete requirement that the killing involve "torture or serious physical abuse beyond that necessary to produce death."

It required close scrutiny to discover a semblance of a method in the madness of the application of this circumstance as previously written; the appellate courts have yet to construe the new language. This circumstance has been found in forty-three, and rejected by the jury in at least twelve, of the death penalty cases reviewed to date. Predictably, the earliest cases were less atrocious; as the court reviewed more heinous killings, the standards became correspondingly refined. Older cases now provide little guidance for what is or is not heinous.

Early on, two defendants received death penalties in separate trials for their involvement in killing a shopkeeper; a single blow to the head rendered him unconscious, after which his throat was slit. Dicks and State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), cert. denied, 455 U.S. 983 (1982). In neither of these was the finding directly attacked; however, in Dicks the court stated that "the nature of the slitting of the victim's throat" was heinous. Also in this early group was Houston, in which the victim was shot in the mouth, then again in the heart and abdomen while lying on the floor.

Then, in Pritchett, the court followed the lead of Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The instantaneous death in Pritchett (two shotgun blasts to the back of the neck), like the one in Godfrey, was not a heinous murder. Pritchett began to develop standards for this rather vague circumstance. The killing must involve either (1) torture before death, or (2) acts evidencing depravity, either of which must be (3) heinous, atrocious, or cruel. "Depravity" referred to the defendant's mental state at the time of the killing; the killer must be materially more depraved than the ordinary murderer; and the killer's acts must show that depravity. The next year, in Melson, the court explained that the circumstance is not unconstitutionally vague and overbroad, because the murder must include a conscienceless or pitiless act that is unnecessarily torturous or evidences depravity. (As the California court has pointed out, this definition assumes the possibility of both a murder with conscience or pity, and "necessary" torture. People v. Superior Court (Engert), 647 P.2d 76 (Cal. 1982).)

In State v. Williams (Stephen), 690 S.W.2d 517 (Tenn. 1985), the court stressed that the murder must be especially heinous, atrocious, or cruel. That case also held that depravity may be shown by conduct soon after the killing, including mutilation of the body. Two days after the victim was shot four times, his house was bombed and set on fire; that manner of disposing of the body, did not show depravity at the time of the killing. Williams points out that most normal people would find any murder heinous; the jury must be instructed to dispel that preconception, with careful definitions of the relevant legal terms. See also State v. Hines, 758 S.W.2d 515 (Tenn. 1988) (failure to define terms, in light of other errors, reversible error, where victim was stabbed multiple times in the chest and vagina).

Pre-amendment cases held that "torture" could be psychological, as in State v. Cooper, 718 S.W.2d 256 (Tenn. 1986) (victim was taunted and terrorized for hours, then shot at four times while helplessly trapped in a small building), cert. denied, 479 U.S. 1101 (1987); State v. Henley, 774 S.W.2d 908 (Tenn. 1989) (prosecutor's reference to victims' fear not improper because mental torture is relevant to whether crime is heinous). The decision in Black marks a low-water point for mental torture, upholding the aggravator based on the fear of the victim, who had probably heard shots that killed her mother and sister, and was a defenseless six-year-old. Cooper and especially Black are overbroad applications, as they would apply to almost any killing in which the victim is conscious before death.

As a review of the Index (§ I.E) will reveal, most cases finding that the murder was heinous involved death by beating or stabbing — and, in truth, many present situations that are almost inarguably "especially" atrocious and cruel. The court has noted, however, that

not every death by beating is necessarily or as a matter of law ... "especially heinous, atrocious or cruel," but the infliction of heavy, repeated and vicious blows to a helpless but conscious elderly victim may easily be found by a trier of fact to fall in that category." State v. McNish, 727 S.W.2d 490, 495 (Tenn.), cert. denied, 484 U.S. 873 (1987).

Defensive injuries figure largely in several of the cases; on the other hand, a review of the cases in which the murder was not found to be heinous shows that, at least since 1981, a murder by shooting alone will not ordinarily fall in that category — no matter how many times the victim is shot.

Presumably, the recent Tennessee amendment imposes the higher — less vague, and more constitutional — burden previously required in other states. California requires an intent to inflict pain. People v.

Davenport, 710 P.2d 861 (Cal. 1985) (provision enacted after torture statute ruled unconstitutional in Engert, supra). Florida has consistently required more violence than what is necessary to kill; see Menendez v. State, 368 So.2d 1278 (Fla. 1979); Kampff v. State, 371 So.2d 1007 (Fla. 1979); Demps v. State, 395 So.2d 501 (Fla. 1981); Simmons v. State, 419 So.2d 316 (Fla. 1982); Herzog v. State, 439 So.2d 1372 (Fla. 1983). Where the Florida court has been lax, the Eleventh Circuit has (at least once) filled the breach, finding a single stab wound not heinous. Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir. 1982), cert. denied, 464 U.S. 1002 (1983). Florida has also pointed out that mere presence at the site of the killing cannot be heinous enough to support this circumstance. Riley v. State, 366 So.2d 19 (Fla. 1978). Georgia requires that more pain be inflicted than what is necessary to kill. Phillips v. State, 297 S.E.2d 217 (Ga. 1982); Whittington v. State, 313 S.E.2d 73 (Ga. 1984). In Louisiana, a murder is not heinous if all the wounds were inflicted with an intent to kill, not to torture or cause unnecessary pain. State v. English, 367 So.2d 815 (La. 1979); see also State v. Culberth, 390 So.2d 847 (La. 1980) (five stab wounds, not heinous); State v. Monroe, 397 So.2d 1258 (La. 1981) (brutal stabbing, death not instantaneous; not heinous). Nebraska has distinguished a heinous and atrocious method of sexual gratification from the killing itself. State v. Simants, 250 N.W.2d 881 (Neb. 1977) (victim tied and gagged, strangled into unconsciousness; defendant then masturbated on her, before drowning her in tub). North Carolina has rejected the finding where it was based on hearsay evidence, and the trial court's instructions emphasized the defendant's own actions as an example of heinous behavior. State v. Oliver, 307 S.E.2d 304 (N.C. 1983).

**6. § (i)(6): Murder "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another."**

Witness elimination occurs in almost every felony murder. In theory, then, this aggravator can duplicate aggravator seven – killing during a felony. Presumably, the legislature intended each factor to provide some independent justification for imposing death. According to the author of the recent amendments to the Tennessee statute, aggravator seven is intended to apply to felony murders in which a victim of or witness to the felony is killed, thus "seek[ing] to deter 'witness killings.'" Raybin, New Death Penalty Statute Enacted for Tennessee, Judicial Newsletter, University of Tennessee College of Law (May 1977), quoted in State v. Terry, 813 S.W.2d 420 (Tenn. 1991). If aggravator six has any independent reason for existing, a finding of this factor should require evidence of a motive to avoid arrest or prosecution, apart from the mere commission of a felony.

Other jurisdictions have interpreted similar provisions as applying only when the victim was a potential witness in a prosecution involving a separate crime, or there was direct evidence of the defendant's motive to kill the victim in order to avoid prosecution.[1] Tennessee has adopted the interpretation most dangerous to the defense, allowing the aggravator to apply in virtually any case of felony murder. See State v. Coe, 655 S.W.2d 903, 913 (Tenn. 1983) (rape victim's alleged ability to identify defendant gave him a motive for killing her); State v. Smith (Ricky), 695 S.W.2d 954 (Tenn. 1985) (because citizen may arrest for offense committed in his presence, charge not without foundation in record); and State v. McCormick, 778 S.W.2d 48 (Tenn. 1989) (section need not be interpreted as applying only to victim or witness of crime, or to arrests or prosecutions already under way), cert. denied, 110 S.Ct. 1503 (1990). The "could have identified the perpetrator theory" significantly expands the scope of this aggravator, and defeats its ability to operate as aggravation separate from the felony-murder aggravator.

[1] In Alabama, the factor applies to an authorized person attempting lawful arrest, not to a victim killed to prevent disclosure of a concurrent felony. Ex parte Johnson, 339 So.2d 873 (Ala. 1979). California requires that arrest be imminent, rejecting an inference of motive to prevent disclosure as totally speculative, and an unreasonably expansive reading that would cause extensive overlap with the felony-murder circumstance. People v. Bigelow, 691 P.2d 380 (Cal. 1985) (arrest must be imminent; basis in inference of motive to keep victim from reporting crime is totally speculative, and unreasonably expansive reading causing extensive overlap with felony-murder circumstance). In Florida, either the victim must be a police officer, or avoiding arrest must be the sole or dominant motive for the killing, and proven by very strong evidence. Menendez v. State, 368 So.2d 1278 (Fla. 1979); Rembert v. State, 445 So.2d 337 (Fla. 1984) (insufficient evidence where defendant did not make sure victim was dead before fleeing); Rivers v. State, 458 So.2d 762 (Fla. 1984) (finding speculative where defendant shot victim as she turned to run); Troedel v. State, 462 So.2d 392 (Fla. 1984) (motive in going to victim's house was to kill); Caruthers v. State, 465 So.2d 496 (Fla. 1985) (victim knew defendant, but defendant said he killed because he was scared); Griffin v. State, 474 So.2d 777 (Fla. 1985) (victim shot during robbery); cf. Routly v. State, 440 So.2d 1257 (Fla. 1983) (defendant knew victim could identify him, and had no other motive for taking victim to secluded place for the killing); Bottoson v. State, 443 So.2d 962 (Fla. 1983) (defendant said a dead witness was the best witness); Riley v. State, 366 So.2d 19 (Fla. 1978) (killed after accomplice pointed out that victim could identify them). Illinois courts have pointed out that if the legislature intended this aggravator to apply to all felony murders, or perhaps even all murders, it could say so more directly. People v. Brownell, 404 N.E.2d 181 (Ill. 1980). Louisiana agrees. State v. Byrne, 483 So.2d 564 (La. 1986). Nebraska requires substantial evidence of intent to avoid arrest. State v. Rust, 250 N.W.2d 867 (Neb.) (wearing a mask does not show murder committed in attempt to conceal crime), cert. denied, 434 U.S. 912 (1977); State v. Stewart, 250 N.W.2d 849 (Neb. 1977) (defendant stated motive to conceal theft; insufficient evidence); State v. Hunt, 371 N.W.2d 708 (Neb. 1985) (purpose in killing was to have sex with dead body; "mere truism" that a dead victim is not a witness does not support aggravator). North Carolina requires sufficient evidence from which to infer a motive to avoid detection. State v. Goodman, 257 S.E.2d 569 (N.C. 1979) (defendant expressed that victim would tell police); cf. State v. Williams, 284 S.E. 2d 437 (N.C. 1981) (after killing, defendant expressed desire to avoid detection; could have been for the murder, not the other crime).

A well-reasoned argument may at some point persuade the Tennessee court to follow the other states' example. Even though a citizen is entitled to arrest for an offense committed in his or her presence, Smith (Ricky), the evidence should at least show that the citizen in fact was attempting to exercise this right. The Index, § I.F.3, lists cases in which the evidence could have supported the circumstance as defined by the Tennessee court but the jury rejected it, showing that juries have tended to demand more from the state in the way of proof of actual motive than the Supreme Court might require. Some juries have rejected this factor even in felony murders. See, e.g., Smith (Ricky) (robbery victim killed during a struggle). In ten of the nineteen cases in which this factor was found, the evidence seems to support the circumstance even if it is given the more narrow interpretation. Eight involved a victim who was a witness in a pending prosecution of the defendant, had expressed an intent to expose the defendant's participation in a crime closely linked to the murder itself, or was a police officer attempting to arrest the defendant; in two others, the defendant expressed an intent to kill in order to cover up a crime.

Even under the current interpretation, the circumstance involves the motive for the killing — a motive that must be proven, not inferred through conjecture and speculation on what might have been a motive, or the absence of some rational reason for the crime. It need be only one motive, see Carter — but it must actually exist. Compare State v. Bell, 745 S.W.2d 858 (Tenn. 1988) (circumstance erroneously given to jury where several people in burglarized home were shot at, and one was killed), with State v. Thompson, 768 S.W.2d 239 (Tenn. 1989) (no other motive shown, and victim might have identified defendant if she had survived).

**7. § (i)(7): Murder "committed while the defendant was engaged in committing or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb."**

If any aggravating circumstance is the "killer," this is it; over two thirds of the cases involve its application. Due to its marked similarity to the felony-murder rule, it creates a virtually automatic death penalty. However, numerous constitutional attacks on its validity for that reason, and on other grounds, including vagueness and imposition of double jeopardy, have been rejected. See Cauthern (no Eighth Amendment violation); Smith (Leonard) (same); State v. Poe, 755 S.W.2d 41 (Tenn. 1988) (double jeopardy protection not violated), cert. denied, 490 U.S. 1085 (1989); and Pritchett, rejecting State v. Cherry, 257 S.E.2d 551 (N.C. 1979). Cherry held that a felony-murder conviction merges the felony into the murder, of which it becomes an element; it cannot then be used as an aggravating circumstance. Otherwise, there would be a higher

probability of the death sentence for felony-murder than for premeditated murder. Accord, State v. Goodman, 257 S.E.2d 569 (N.C. 1979) (no further punishment based on element of charge already convicted).

The court has found death not disproportionate for a felony murder in which no other aggravation is found. See Smith (Ricky) (a deliberate, wanton murder committed during a robbery warrants the death penalty if the jury finds absolutely no mitigation; presumably, it might be disproportionate if the killing were not "deliberate" and "wanton," but in Smith, the fatal shots were fired during a struggle between the robber and the victim.)

The court has required only minimal evidence to support the finding. In McNish, the fact that the defendant was short of money and wanted to get some from the victim (whom he knew) was enough to give the circumstance to the jury (which rejected it). Cf. State v. Wright, 756 S.W.2d 669 (Tenn. 1988) (in double murder, speculative expert testimony erroneously admitted in effort to show sequence, hence that one was shot to avoid arrest based on other's death); People v. Tiller, 447 N.E.2d 174 (Ill. 1982) (insufficient evidence of the use of violence as a means of robbing); People v. Taylor, 463 N.E.2d 704 (Ill. 1984) (defendant leaned over body, victim had no property left; inconclusive circumstantial evidence that defendant took anything); Cruz v. State, 629 S.W.2d 852 (Tex. App. 1982) (fact that defendant had victim's watch was equally consistent with innocence or guilt of robbery; no evidence of intent).

When the defense asserted that this circumstance could result in the death penalty for an unpremeditated killing, the court replied that it is the court's responsibility to ensure that does not happen. See Pritchett. However, the court has let the penalty stand where the defendant claimed accident and there was no evidence to rebut that contention. See Houston, Harries, and State v. Simon, 635 S.W.23 498 (Tenn.), cert. denied, 459 U.S. 1055 (1982). Neither has the court looked askance at the death penalty for a killing that took place during a struggle between the killer and the victim. See Smith (Ricky).

One defense proposition has been accepted: one killing cannot aggravate itself — where the underlying crime is murder, the state must prove a nexus between two killings. See Pritchett. Note, too, that in Johnson (Cecil), two murders committed during flight from another killing were not used to aggravate the first murder.

In addition, the jury must be instructed on only felonies supported by the evidence. See Pritchett. Furthermore, the judge must define for the jury the specific felony on which the state relies. See Hines (robbery was defined

at guilt phase, but rape was not, and proof raised issue whether dead person can be raped), Moore, Buck, and State v. Laney, 654 S.W.2d 383 (Tenn.), cert. denied, 464 U.S. 1003 (1983).

The nexus between the felony and the murder has been a source of concern in other states' courts, if not in Tennessee. Many have refined the circumstance to require a felonious purpose independent of the murder. Thus, in Washington, a kidnaping must be more than a restraint of the victim's movement incidental to the killing. State v. Green, 616 P.2d 628 (Wash. 1980). The California court has been especially vigilant. A case in which the victim's belongings and clothing were removed to obscure her identity was a robbery in the course of a murder, not the other way around; the clear motive for the murder was either revenge or jealousy, not robbery. People v. Green, 609 P.2d 468 (Cal. 1980). See also Ario v. Superior Court, 124 Cal. App. 3d 285 (1981) (Green violation, kidnap in order to kill); People v. Weidert, 705 P.2d 380 (Cal. 1985) (kidnap in order to kill, insufficient evidence of independent purpose). In Arizona, the taking involved in the "pecuniary gain" circumstance (and, by implication, in the robbery circumstance), must be the cause or motivation, not the result, of the murder. State v. Gillies, 662 P.2d 1007 (Ariz. 1983). See also State v. Irwin, 282 S.E.2d 439 (N.C. 1981) (no kidnap as aggravation where "asportation" consisted of making victim go from front to back of store, to get drugs; barred by double jeopardy provision; victim was exposed to no greater danger by this "kidnap"); State v. Logan, 397 N.E.2d 1345 (Ohio 1979) (kidnaping has independent significance, and can aggravate, only if it involves prolonged restraint, secretive confinement, or substantial movement). See Dycus v. State, 440 So.2d 246 (Miss. 1983), for a correct instruction on the nexus between felony and murder. (Several Tennessee cases have involved both kidnaping and murder. In some, the kidnaping was only incidental to the murder — that is, it was intended to facilitate the murder; in none was the finding challenged on this ground. See, e.g., Moore (victim abducted, taken to remote location, and killed).)

Similarly, many courts have paid closer attention to the sequence of events. Thus, the circumstance is inapplicable if the killing preceded the felony, Moody v. State, 418 So.2d 989 (Fla. 1982), or the felony was an afterthought, Parker v. State, 458 So.2d 750 (Fla. 1984). Although the killing and felony occur in the same course of conduct, the felony cannot aggravate a murder that took place some time later. Jones v. Superior Court, 176 Cal. Rptr. 30 (Cal. App. 1981) (including rape, kidnap, and killing; however, pre-trial writ will not strike allegation that killing was committed during flight from rape, whose proof involves defendant's motives and intent, and would not be precluded by victim accompanying defendant during flight). But see Wright (in double murder, speculative expert testimony erroneously admitted to show sequence in which victims were shot, in attempt to show that one was shot to avoid arrest

for other, but time sequence of two killings committed within very short period of time implicitly held irrelevant to whether one was committed while trying to commit or fleeing from the other).

In at least one Tennessee case, the finding of murder committed during a felony was obviously erroneous; the decision did not address the issue, possibly because the conviction was reversed on other grounds. The jury found that the murder was committed during robbery, arson and bombing; however, the arson and bombing came two days after the killing. Williams (Stephen). The court may also have thought the robbery alone sufficient to support the finding; the decision does not reflect whether it considered the circumstance at all. Cf. Terry (insufficient nexus between larceny completed four days before murder, committed in part of defendant's attempt to stage his own death and assume a new identity).

Other states have also paid more attention to the defendant's precise intent in committing the various acts involved in a killing and felony. Thus, where the defendant took car keys from the victim with an intent to escape, not to steal, the Florida court found the circumstance "for pecuniary gain" inapplicable. Peek v. State, 395 So.2d 492 (Fla. 1981).

Perhaps one of the most important ways in which other states have surpassed the Tennessee analysis is in the level of the defendant's participation in the felony. The Illinois legislature is responsible for the requirement that a felony can be used in aggravation only if the defendant killed intentionally or knowing that his or her actions would create a strong probability of death or great bodily injury. People v. Owens, 464 N.E.2d 261 (Ill. 1984). In California, the court supplied the missing element of intent to kill, construing what it found to be uncertain language. Carlos v. Superior Court, 672 P.2d 862 (Cal. 1983). In Dicks, on the other hand, the Tennessee court upheld the circumstance because there was no evidence that Dicks was not inside the store that was robbed, and his admitted use of some of the proceeds of the robbery made him an active participant. Arguably, Dicks should fall even under Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1986), requiring both recklessness as to whether life will be taken, and major participation in the felony. See also State v. Stokes, 304 S.E.2d 184 (N.C. 1983) (defendant might have been look-out; reversed under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (requiring that defendant intend or attempt to kill, or actually kill)).

**8. § (i)(8): Murder "committed by the defendant while he was in lawful custody or in a place of lawful confinement or during his escape from lawful confinement . . . lawful custody or place of**

**lawful confinement."**

To date, this circumstance has been applied in four cases. In Workman, two police officers had the gunman in their grasp when he broke free and killed one of them. This was held to be sufficient evidence that the defendant was in custody — and if it was not, the other aggravating factors were sufficient to support the verdict in light of the "paucity of evidence of mitigating circumstances." And in State v. Hartman, 703 S.W.2d 106 (Tenn. 1985), cert. denied, 478 U.S. 1010 (1986), the defendant, a trusty at the county jail, was given a car to drive to another location; during that drive, the victim was kidnaped and killed. The circumstance was not challenged; had it been, the court might have replied that the defendant was either in or escaping from custody at the time of the killing. An inmate and a guard were killed in, respectively, State v. Sutton, 761 S.W.2d 763 (Tenn. 1988), and Taylor (Richard), finding no impermissible multiplication of aggravation in the use of this factor along with the findings of a prior conviction and killing a correctional officer.

"During" escape is ambiguous. It should be limited to those escapees who have not yet reached a place of safety, at which point the escape is complete. See People v. Bigelow, 691 P.2d 994 (Cal. 1984). The circumstance was — quite properly — not found in Cozzolino, where the defendant had left a minimum security institution before the attempted robbery during which the killing took place.

Arizona has held that the "in custody" circumstance was intended to protect guards, and does not apply to a defendant on work furlough. State v. Gillies, 662 P.2d 1007 (Arizona 1983). Tennessee, however, has a separate factor for killing a guard (see below).

**9. § (i)(9): Murder of a "law enforcement officer, corrections official, corrections employee or fireman, [whom the defendant knew or reasonably should have known] was engaged in the performance of his duties."**

This circumstance has been applied three times -- twice when the victim was a police officer trying to arrest the defendant, Cozzolino and Workman, and once to the killing of a guard, Taylor (Richard). None of the cases discussed its validity or application to the facts. The requirement that the defendant know the victim's status, and know that the victim was performing the duties attached to that status, were probably met in these cases. However, the circumstance should not apply where the defendant had no reason to know the victim's status or performance of duties — as, for example, in the killing of an off-duty or undercover officer. See Fortenberry v. State, 579 S.W.2d 482 (Tex. 1979) (death penalty

set aside for failure to instruct jury that accomplice's testimony must be corroborated on specific elements that make the offense capital, i.e., that the accused knew the victim was a peace officer).

**10. §§ (i)(10), (11): Murder of public officials.**

To date, no reported Tennessee case has considered either of these aggravating circumstances, which have two important qualifications. First, the defendant must know that the victim occupied this particular office. Second, the killing must be inspired by the victim's exercise of official duty or status. In other words, there must be a relationship between the victim's position and the homicide, such as killing a judge because of an unfavorable ruling. The mere fact that the victim occupied a specific position would not be sufficient.

**11. § (i)(12): "[M]urder of three or more persons within . . . Tennessee within . . . 48 months, and perpetrated in a similar fashion, in a common scheme or plan."**

This circumstance is obviously directed to mass killings such as the Atlanta child murders or the "Son-of-Sam" homicides. Added in 1981, it has been found in two cases, and reversed in one. In State v. Bobo, 727 S.W.2d 945 (Tenn.), cert. denied, 484 U.S. 872 (1987), in the interest of fundamental fairness and due process, and to avoid circumventing the requirements of the prior-conviction circumstance, the court held that only convictions can be used to support this aggravating factor. The sentencing phase cannot be turned into a trial for separate and factually distinct murders. (One of the two other murders had not resulted in a

At the conclusion of the state's proof in the sentencing hearing, the defendant should move for a judgment of acquittal as to those aggravating circumstances which have not been established beyond a reasonable doubt and to a moral certainty. In Reed v. State, 581 S.W.2d 145 (Tenn.Cr.App. 1979), the defendant was convicted of shoplifting. In a sentencing hearing for "enhanced" punishment, the state tried to prove that she was a multiple offender, but introduced no credible evidence of any prior convictions. The defendant argued on appeal that the trial court should have directed a verdict of not guilty with respect to the second part of the indictment, because of insufficient proof, and that there were variances between the indictment and the proof. The court agreed and dismissed the enhanced punishments because double jeopardy barred a retrial. Reed has been applied essentially the same way in a capital sentencing hearing.

In Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the first jury had rejected the death penalty, imposing a life sentence. The conviction was later reversed, and the state then obtained the death penalty. Bullington held that the earlier life sentence constituted an acquittal of the aggravating factors necessary to impose death, and a death sentence on retrial based on the same aggravating circumstances amounted to double jeopardy. It stands for the proposition that under a system such as Tennessee's, the aggravating circumstance is an "element of the offense" with respect to the sentence which must be imposed. A motion for a judgment of acquittal is therefore appropriate whenever the state fails to establish its proof of that element beyond a reasonable doubt. If the judge decides, even erroneously, that an aggravating circumstance should not apply, it can no longer be used against the defendant in any further proceeding. See Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).

In Bullington v. Missouri, *supra*, and Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that, for all practical purposes, a capital sentencing proceeding is the same as an ordinary trial. At least with regard to aggravating circumstances, the prosecution should be held to its strict burden of proof of the circumstances it has alleged. During this proceeding advantage should be taken of every evidentiary proposition. If aggravating circumstances can be reduced in number, or their significance mitigated, the jury may be less likely to condemn the defendant to the electric chair.

Behind every homicide are two tragic stories.

The first is fairly simple. Someone was killed, usually without justification. Left behind are grieving family and friends.

The second is more complex. It may be the story of:

- A child who suffered from undiagnosed neurological damage, was branded as "stupid" or an "underachiever," and dropped out of school into a life of drug abuse and crime.
- A child whose sexual identity was blurred by a series of sexual assaults by family members and whose understanding of reality was shaped by the abject poverty of life as the child of a migrant worker.
- One of eight children of a single mother living in the projects, with crack houses, substandard schools, daily violence, no significant male role model, and a racist society that crushed any attempt to move beyond this dunning environment.
- A normal childhood, positive adolescence and promising future interrupted by a tour in Vietnam, moral ambiguity, senseless violence and recurring psychological trauma.
- A woman caught in a cycle of domestic violence and dependency who fears for her life if she stays with her abusive husband or tries to leave him.

The prosecution will tell the first story during the guilt phase, and reiterate it at sentencing through the introduction of aggravating circumstances. Defense counsel will tell the second story to explain why the first story occurred.

Many lawyers believe that mitigating circumstances are "good things about the client" or "excuses" for why the offense was committed. Ideally, mitigation is the story that simultaneously humanizes the defendant, explains his behavior, diminishes culpability for the crime, and assures the jury that a sentence of life in prison will both punish the defendant and protect society. Though this story may include elements of "good person" evidence, it is more likely that it will explain why your client is not necessarily "good," but is worthy of life.

The defendant was probably exposed to a series of unfortunate, life shaping circumstances. Concerned parents would do everything in their power to protect a child from such circumstances. The client, through parental absence, inability, ignorance, neglect or malice, was not protected; obvious and serious impairment resulted. It is counsel's job to discover and explain the relationship between the client's life circumstances, the ensuing impairment, and the instant offense.

Often, the sentencing phase consists of a string of seemingly "minor" lif circumstances that help explain the defendant's behavior and mitigate th offense. A coherent sentencing theory must explain how the cumulative effec of these circumstances is greater than their sum: a synergy occurs when povert is piled on top of learning disability on top of neurological damage on top c dysfunctional family. In and of themselves, no one factor is a major mitigator o explains the offense; considered together, they make understandable the client' aberrant behavior.

## A. The Rules of the Game

In its case in chief, the prosecution can introduce only evidence relevant t statutory aggravation. Defense evidence is virtually unlimited, so long as it i specific to the defendant, the offense or rebuttal of the prosecution's proof.[1] Th procedural rules in the sentencing hearing are not supposed to be evenl balanced – they are purposefully weighted in favor of the defense, as require by the U.S. Supreme Court's interpretation of the constitution.

This advantage is necessary. A death-qualified jury has just found the defendan guilty of first degree murder; counsel is at bat with two strikes and th prosecutor is winding up to fire the third. Counsel must take the initiative methodically capture the momentum and focus the jury's sympathetic attentio on the defendant rather than the victim. To do this counsel must exploit ever procedural advantage.

Anticipate any rebuttal. See Chapter 14, § VI. Although the state's case in chie is limited to proof of aggravation, it can and will use available evidence to rebu mitigation.

### 1. Two-Tiered Burden of Proof Beyond a Reasonable Doubt

The state has the burden of proving beyond a reasonable doubt that statutory aggravating circumstances (1) exist and (2) outweigh the mitigating circumstances. In other words, the state twice has the burden of proof beyond a reasonable doubt, assuming the defense presents mitigating evidence. T.C.A. § 39-13-204(f) and (g).[2] However, because a prosecution-prone, death-qualified jury has just convicted your client of first degree murder, assume that the momentum and presumptions are with the state. Develop creative ways to remind and persuade the jury that the state has not one but two burdens of proof. Address the burden in voir dire, and emphasize it in closing argument.

[1] See T.C.A. §39-13-204(c); State v. Zagorski, 701 S.W.2d 808, 815 (Tenn. 1985); State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986); Houston v. State 593 S.W.2d 267, 274 n.1 (Tenn. 1980); State v. Dicks 615 S.W.2d 126, 131 (Tenn. 1981).

[2] The predecessor statute, T.C.A. §§ 39-2-404(f) and (g) and 39-2-203(f) and (g), did not specify a burden of proof, and, by requiring the jury to find that mitigation outweighed aggravation, implied that the burden of proving weight was on the defense.

**2. Defense Has No Burden of Proof**
There is no standard by which mitigation must be proven, and the jury has complete freedom to determine what weight to give to mitigating circumstances.

T.C.A. § 39-2-203 places no evidentiary hurdle in the way of establishing mitigating facts. . . .

> Each juror has discretion to determine the degree to which the proof mitigates against the death penalty.
>
> State v. Thompson, 768 S.W. 2d 239, 252 (Tenn. 1989).

Counsel has only to present "some" evidence of mitigation in order for the proof to get to the jury.

**3. Mitigation is Mandatory**
If the defense presents no mitigation, no mitigation will be presented; there will be no independent pre-sentence investigation report, and the court will instruct the jury that it "shall" impose death. In other words, the court will direct a verdict of death. From a defense perspective, therefore, mitigation proof is mandatory.

**4. The Scope of Mitigation is Broad**
T.C.A. § 39-13-204(c) provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the Court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the Court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Tennessee.

[4] Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (sentencing judge's refusal to consider family history as mitigation violated the Eighth Amendment requirement that all relevant factors be considered); Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (sentencer cannot refuse to consider or be prohibited from considering evidence of non-statutory mitigation); Mills v. Maryland, 486 U.S. ___, 108 S.Ct. 1860, 100 L.E.2d 384 (1988) (instructions that could have led jury to believe they had to unanimously find mitigating circumstances violated Eighth Amendment); Penry v. Lynaugh, 492 U.S. ___, 109 S.Ct. 2934, 106 L.Ed.2d 284 (1989) (unconstitutional refusal to instruct jury that it could consider evidence of mental retardation as mitigation).

T.C.A. § 39-13-204(c). The jury is not only allowed but required to consider evidence in mitigation.[4] If the prosecution's objections or arguments, the court's rulings or instructions, the verdict form, or anything else prevents or discourages the jury from considering facts in mitigation, it is constitutional error.

**5. No Distinction Between Statutory and Non-Statutory Mitigation**
The scope of mitigation is essentially unlimited as long as it is relevant to the offender and the offense. What can be considered mitigation is as broad as counsel's imagination. The statute and case law provide that the defendant may not be limited to the statutory mitigating factors.[5]

> The trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either guilt or sentencing hearing or both which shall include but not be limited to those circumstances set forth in subsection (j). No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the State or the defense to be instructed to the jury. These instructions and the manner of arriving at a sentence shall be given in the oral charge and in writing to the jury for its deliberations. (Emphasis added.)
>
> T.C.A. § 39-13-204 (e).[6]

Identify all applicable mitigation, statutory and non-statutory, and introduce the mitigating evidence. See Appendix B, this chapter, for a partial list of possible mitigation. Request instructions on each mitigating factor, and instruction that the jury must consider all mitigating

[5]State v. Zagorski, 701 S.W.2d 808, 815 (Tenn. 1985); State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986); Houston v. State, 593 S.W.2d 267, 274 n.1 (Tenn. 1980); State v. Dicks, 615 S.W.2d 126, 131 (Tenn. 1981).

[6]Many trial courts have refused to instruct on non-statutory mitigation, and their refusal has not been found to be error. See, e.g., State v. Wright, 756 S.W.2d 669, 674 (Tenn. 1988); State v. Thompson, 768 S.W.2d 239, 250 (Tenn. 1989); State v. Melson, 772 S.W.2d 417, 420 n.3 (Tenn. 1989). The inevitable result is that juries have the impression that non-statutory mitigation is, at best, a lower class of mitigation. Counsel should view this as constitutional error. Hopefully, the problem has been cured by the 1989 amendment to the statute (formerly § 39-2-203 (e)).

circumstances, without distinction. Counsel need only present "some" evidence in mitigation, and, having laid the foundation, is entitled to instruction that the jury must consider it.

Your client's life is seamless; any attempt to divide its mitigating characteristics into parts is artificial, and the potential for fitting mitigation into statutory containers is always remote. Lockett and its progeny make it clear that to limit proof to statutory mitigation would be a significant disservice to the client. Mitigation should initially be defined without reference to the statute, and then compared to the statutory circumstances to ascertain any overlap or omissions.

Some statutory circumstances contain limiting language, such as "extreme" and "substantially." Any proof of mental or emotional disturbance, duress or impairment is mitigating, and the jury must consider it even if it is not "extreme" or "substantial." Be prepared to convince the court that the statute does not prevail over the standards of T.C.A. §39-13-204 (c) and the U.S. Supreme Court precedents. (Evidence of statutory mitigation should of course be presented if it is available.)

**a. Non-Statutory Mitigation**
Review Appendix B, this chapter, and Appendix A, this manual, for appellate cases approving non-statutory mitigators similar to yours. No citation of authority is necessary to warrant an instruction, but it may be helpful with a reluctant trial judge who is slow to give up the habit of refusing to instruct on non-statutory factors. (See further discussion in § D, below, of categories of mitigation.)

**b. Statutory Mitigation**

**(j)(1) No significant history of criminal activity**
This factor is frequently relied upon. See State v. Groseclose, 615 S.W.2d 142 (Tenn. 1981) (no criminal record); State v. Simon, 635 S.W.2d 498 (Tenn. 1982) (no prior convictions). It may, however, open the door to otherwise inadmissible rebuttal evidence, such as arrest reports, indictments or other criminal accusations. State v. McNish, 727 S.W.2d 490, 495 (Tenn. 1987); State v. Miller, 674 S.W.2d 279, 284 (Tenn. 1984). "Neither the prosecution nor the defense is limited under this statutory provision to proof of prior convictions." State v. Matson, 666 S.W.2d 41 (Tenn. 1984) (rejecting argument that no significant criminal history was shown by defendant's admitted conviction and various charges); Cozzolino v. State, 584 S.W.2d 765 (Tenn. 1979); State v. Workman, 667 S.W.2d 44 (1984) (defense argued that defendant's sole admitted burglary conviction was not a significant history; prosecution countered that defendant had not been asked if he had other convictions, which he did).

The lack of a bad reputation does not imply the presence of a good one; an insignificant criminal history and a respectable personal history should be presented as separate mitigating factors. "Good character imports more than simply the absence of criminal convictions." State v. Johnson, 257 S.E.2d 597 (N.C. 1979).

**(j)(2) Under the influence of extreme mental or emotional disturbance**

This factor contemplates the client's condition only at the time of the offense. State v. Alley, 776 S.W.2d 506, 516 (Tenn. 1989). Given the developmental and ongoing nature of most mental disorders, the defendant was probably suffering then from any currently diagnosed impairments. Another way to look at this factor would be in terms of the particular situational stress at the time of the offense – job loss, marital break-up, death of a loved one, etc. Usually, the offense was triggered by a combination of mental or emotional impairments and specific situational stress.

**(j)(3) Victim's participation or consent**

This factor might apply if a co-criminal was killed during a robbery. (In State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985), the defendant was not permitted to argue the victims' participation in the drug deal that preceded the killings.)

**(j)(4) Reasonable belief in moral justification**

The notion that the defendant reasonably believed that her conduct was morally justified should be used only when it is consistent with the guilt-phase arguments. If the client claimed innocence, advancing this mitigating factor during the sentencing phase may well persuade the jury that she was lying.

In State v. King, 694 S.W.2d 785 (Tenn. 1984), the defendant attempted to argue moral justification from the fact that the victim had not paid him for certain merchandise, along with an argument that the shooting was accidental. In addition to the possibility that the jury may have seen these two assertions as mutually contradictory, they may have resented the attempt to blame the victim for what was probably seen as at best an overreaction.

A more plausible context might be the battered spouse or other traumatic-stress-disorder defense, where the defendant acted from a perceived danger to herself or others (e.g., children) due to a mental disorder arising from prior traumatic events, which may or may not have involved the victim.

**(j)(5) Accomplice liability**
A co-defendant may try to show that his participation in the murder was minor relative to the conduct of an accomplice, that he is less blameworthy and therefore does not deserve the ultimate penalty. See State v. Groseclose, 615 S.W.2d 142, 149 (Tenn. 1981).

**(j)(6) Duress and domination by another**
The fact that the defendant acted under extreme duress or the substantial domination of another person was used successfully by one of the co-defendants in Groseclose. That decision recites some of the evidence of domination, providing a good example of what might be shown in order to establish it. See also Goodwin v. State, 405 So.2d 170 (Fla. 1981), and State v. West, 767 S.W.2d 387 (Tenn. 1989).

**(j)(7) Age – youth or elderly**
The co-defendant in Groseclose argued his age (19) with apparent success. This argument was unsuccessful in State v. Simon, supra (defendant age 19); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (age 29); State v. Campbell, 664 S.W.2d 281 (Tenn. 1984) (age 24); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (age 27); and State v. Poe, 755 S.W.2d 41 (Tenn. 1988) (age 18). In State v. Irick, 762 S.W.2d 121 (Tenn. 1988), the court held that a 26-year-old who was not particularly immature for his age was not entitled to the instruction. The court indicated that trial judges may consider the defendant's emotional or intellectual maturity on whether the instruction is warranted. In State v. Thompson, 768 S.W.2d 239, 249 (Tenn. 1989), the court held that generalized survey evidence that young people are less likely to control violent activity was inadmissible.

**(j)(8) Substantially impaired capacity to appreciate wrongfulness or conform conduct due to mental defect or intoxication**
Some unscrupulous prosecutors attempt to misrepresent this factor as being synonymous with the insanity defense – setting up a straw man that they then knock down by "proving" that the defendant knew right from wrong. Be prepared to object to any such attempt to confuse a mitigating factor with an absolute defense. This factor was argued in State v. Goad, 707 S.W.2d 846 (Tenn. 1986) (post-traumatic stress syndrome); State v. Coe, 655 S.W.2d 905 (Tenn. 1983) (prior hospitalization for mental illness); and State v. Harries, 657 S.W.2d 414 (Tenn. 1983) (intoxication).

### 6. Juveniles and the Mentally Retarded Cannot be Sentenced to Death

The law prohibits execution of anyone who was under eighteen at the time of the offense or who suffers from mental retardation. T.C.A. §§ 39-1-134, 39-13-203. If you can prove one of these, you can quickly remove the threat of death for your client.

A retarded client may not operate at the level of a small child; a "mildly retarded" person, who is exempt from capital prosecution, can develop coping mechanisms and appear "normal but a little slow." Because the deficiency can be effectively masked, especially to an untrained eye, eliminate this option only after careful consideration. Review the social history for indicators such as a history of special education or tests that place the client's IQ in the 70 range. When in doubt investigate and test using a carefully chosen expert.

Though age seems a relatively cut and dried issue, there may be doubt about the client's age or the date of the offense. By mistake (due to poverty, adoption or foreign birth) or intention (when an under-age client was trying to join the army or become a citizen), the age may have been incorrectly recorded. The date of the offense may be unknown, as when the body is found months or years after the death; if you can move the time back to when your client was a juvenile, your client can escape death.

## B. Jurors' Goals at Sentencing

Post-trial interviews reveal that most jurors have four basic concerns when deliberating a capital case:

### 1. Punishing the Defendant

Throughout the guilt phase, the jury is exposed to evidence that makes them want to punish your client. They strongly identify with the victim and the victim's family, and foremost in their minds is the desire to severely punish the individual responsible for so much pain.

### 2. Protecting Society

Second to the desire to punish the defendant is the need to protect society from this individual ever committing another violent act. If the defendant has a history of violent acts, or incarceration and parole or escape, the jury will be more inclined to opt for the final sanction.

### 3. Fulfilling Their Civic Duty

Most jurors take their oath very seriously and struggle to follow the law. This is not only the "right" thing to do, but it can relieve them of any feelings of ultimate responsibility. Jurors understand little about the law, are confused by the terms "aggravation" and "mitigation," and get

little meaningful guidance from instructions. They are very attentive to the judge's verbal and non-verbal cues and try to do what they perceive is the desire of the judge.

**4. Responding to Peer Pressure and Community Expectations**
Deliberations do not occur in a vacuum. Peer pressure is extreme and deliberations can deteriorate into violent arguments and even physical assaults. What jurors face in the community once they have delivered their verdict, especially in small towns, can be equally traumatic. How each juror fulfills the other three goals will be strongly influenced by the amount and nature of the pressure experienced during deliberations or that the juror expects once the trial is over.

## C. Defense Goals at Sentencing

Given the jurors' goals, it is easy to see why this manual stresses negotiating a plea agreement whenever possible. But if counsel has no other choice than to take a capital case into a sentencing hearing, the defense goal is to address jurors' concerns and provide a complete understanding of the client and the offense, methodically shifting the jury's sympathetic attention from the victim to the defendant in a way that avoids damaging cross-examination and rebuttal.

**1. Humanize the defendant**
The jury must be brought to the point of knowing and to some degree understanding the defendant as a fellow human being. If the client's life story is presented effectively, by counsel who demonstrates her own concern for the client, the jury will begin to see the client as a human being.

**2. Factors influencing development of defendant's character**
A person's character develops over time; it represents the interaction of genetic inheritance with a host of social, psychological, educational, and neurological factors, each of which must be explained and given its proper role in the story of the defendant's life. This may diminish the defendant's blameworthiness in the jurors' eyes, and thus diminish the degree of punishment.

**3. Diminish voluntary aspect of defendant's behavior**
More immediate factors may have a causal relationship to the offense. Explaining the role of a dominant co-defendant, intoxication or a wrongly perceived threat of danger may diminish the voluntary nature of the crime in the jurors' eyes.

**4. This case does not deserve death**
The ultimate expression of the jury fulfilling its civic duty is the determination that this is not a capital case. Identify the unique characteristics of this offense and this client that distinguish it as a non-death penalty case; death should be reserved for more egregious cases than this one.

**5. A life sentence will punish defendant and protect society**
A life sentence must be revealed for what it is: an extremely long period of time in a high security institution separated from loved ones and the freedoms of citizenship. Only relative to the barbaric sentence of death does life seem lenient; in reality, life in prison is an extremely onerous sanction.

**6. Empower individual juror to vote their consciences**
One person for life triumphs over eleven for death. Empower each juror to personally determine the weight given to mitigating and aggravating factors. Nullify peer pressure through a sense of duty or compassion, or encourage it by exposing the juror to people of personal influence who support a sentence of life.

## D. Categories of Mitigation

Myriad factors may have influenced your client's development, and qualify a mitigating circumstances:

Neurological impairment – brain dysfunction caused by physical damage or chemical imbalance that handicaps the client's ability to think.

Psychological syndromes – non-organic mental disorders that make it difficult for the client to control his actions or operate effectively in society.

Dysfunctional family – aspects of the client's upbringing adversely affecting her development, behavior or ability to function in society.

Substance abuse – drugs, alcohol and other substances that the client may have a predisposition to use and that adversely affect his ability to function in society and exacerbate pre-existing psychological or neurological problems.

Social and cultural factors – poverty, age or race may have adversely affected the client's opportunities to develop or have exacerbated mental or physical problems.

Positive prisoner – indications that the prison environment is healthy for both the client and society; evidence that the client can be productive within the prison society and presents no threat to guards or other people in the community where she will spend the rest of her life.

Offense factors – aspects of the crime that either explain how a person with the client's particular social, mental, or physical handicapping conditions may have thought his actions justified, or diminish the client's direct culpability for the act.

Good person – aspects of the client's life indicating a basic goodness or an ability to be productive and make a contribution to society.

Victim related evidence – information indicating that the victim must bear some responsibility for the events leading to his death, or testimony from members of the victim's family that they do not want the defendant to be killed.

Available through the Capital Case Resource Center of Tennessee, 1225 17th Avenue South, Nashville, Tennessee 37212 is a "Mitigation Workbook". The Workbook describes each of these various forms of mitigation in depth and provides a comprehensive checklist of factors you may find operative in your client's life. The checklist will refer counsel to the section of the workbook that deals most specifically with that possible mitigating circumstance. By following the steps outlined in the Workbook, reviewingthe checklist, reading the appropriate chapter, and following through to the specific sections, counsel should be able to develop a coherent outline for the sentencing phase.

## E. Witnesses

Perfectly investigated and substantiated mitigation is absolutely useless without credible, coherent witnesses who can bring the information before the jury. As mitigation begins taking shape, identify witnesses and begin the process of preparing them for trial.

Carefully screen the substance of each witness's testimony for consistency, coherence and substance. Ideally, the testimony should either integrate into a narrative recounting the life of the client or interpret the effect of specific life events upon the client. Though spontaneity is important in maintaining credibility, there should be no surprises on direct examination. Enlist the aid of an experienced colleague familiar with the prosecutor and subject the prospective witness to withering cross-examination. This is especially important when the client may testify.

Weigh the value of any piece of testimony against the impact of possible rebuttal; if the value of a witness is minimal or important aspects of the testimony can be introduced through other witnesses, consider not using the witness who will open the door.

The following are some of the kinds of witnesses that can be used. This is by no means an exhaustive list. The defendant's "life story" is literally that, and witnesses can come from every walk of life.

### 1. The Defendant's Birth Family

This type of witness allows the jury to see the defendant in the context of the family that raised him. In some cases, the level of dysfunction will speak for itself once the jury sees the defendant's parents and siblings.

**a. Advantages**

**(1) Traumatic Experiences**

Who better than the birth family to relate traumatic experiences such as the death of a parent or sibling, natural calamity, serious accident or illness or other profound event that may have shaped the defendant's life?

**(2) Abuse or Neglect**

Relating how the client suffered abuse at the hands of a parent, step-parent, or guardian has made the critical difference in several capital trials. A sibling or parent may also be able to relate the degree of neglect caused by parent disinterest, poverty, or some other social or cultural factor.

**(3) Anecdotal Information**

Stories relating events, formative experiences, and acts of kindness in the defendant's life serve the very important function of humanizing the defendant and showing the jury that there are people who love the client and care about what happens to her.

**b. Disadvantages**

**(1) Open Door**

Unfocused testimony from a family member that the defendant is a "good person" or "never really hurt anybody" can open the door to a slew of non-statutory aggravation in rebuttal.

**(2) Normal Family**

The prosecutor may argue that the defendant is very different from the other, "normal" members of the family, and had every opportunity to be a law-abiding citizen but chose not to be. Though these arguments can be answered by proof of the defendant's individual vulnerabilities -- neurological and psychological impairments, his particular role in the family, limited intelligence, and experiences that were unique or uniquely perceived by the client – it is dangerous territory.

**(3) Dysfunctional Family**

A family rife with social problems and criminal behavior may be used by the prosecution to drive home a bad seed argument. The evil inherent in the client runs so deep that it can be eradicated only through death.

**(4) Missing Family Members**

The prosecutor may be able to elicit damaging testimony why certain members of the family will not testify on their "loved one's" behalf.

**(5) Nothing Good to Say**
A less than enthusiastic parent or sibling who can testify to nothing more than a love based on family ties may do more harm than good.

**2. The Defendant's Marriage Family**
Many capital defendants do not have a cohesive nuclear family; often there is string of failed relationships and abandoned children. The existence of a viable family can be mitigation in and of itself.

**a. Children**
A loving child can sway the jury by talking about specific acts of kindness and the love and care felt for the defendant-parent. Step-children whom the client has loved and cared for can be especially effective.

**b. Spouse**
A spouse can often testify to how inconsistent the crime was with other behavior, offer a rational explanation of the circumstances leading up to the crime, or detail the traumatic events or symptoms of psychological or neurological disorders witnessed living daily with the defendant.

**c. In-Laws**
In-laws often see the defendant from a more objective, yet informed perspective. Not as emotionally involved as the birth family, spouse, or children, the in-law can talk about observations made as a peripheral member of the family and the effect a sentence of death would have on spouse and children.

Though this type of mitigation may be seen as a blatant attempt to tug on the jurors' heartstrings, it should not be ruled out on that account. We are all emotional creatures and potentially responsive to this kind of presentation. It is important to show that some people truly love the defendant; take care to ensure that it does not appear to be a cynical ploy for sympathy, which the jurors would resent.

**3. Teachers**
Few witnesses are as credible as a teacher who experienced the defendant as a child and can testify about learning disabilities or traumatic experiences during the defendant's life at school.

**a. Dysfunctional Family**
Teachers often have clear insight into the family. They can relate that the child came to school dirty, underfed, ill-clothed or suffering from other evidence of abuse or neglect. Teachers can also testify to the importance of a supportive home environment to successful education, and to the very detrimental effects of failure at school to the all-important efforts to "socialize" children and prepare them for a role in the adult world.

**b. Traumatic Events**
If the mitigation evidence points to a particular life changing event such as head trauma or the violent death of a parent, a teacher can chart the changes in the client's behavior.

**c. Mental Deficiency**
Teachers can talk about the absence of remedial programs that might have helped the client with a mental deficiency, had they been available.

**d. Emotional Problems**
They can testify to the emotional problems created by the defendant's disabilities, as well as to the concern and involvement, or lack thereof, of the defendant's family in the defendant's schooling.

**e. Worst Case Description**
A teacher can place the child within a spectrum of other children and describe how this was a "worst" case of neglect, abuse, learning disabilities or childhood trauma.

As a general rule, teachers are good witnesses because they are respected, credible members of the community. As with all witnesses, they must be screened and carefully prepared to avoid potential cross-examination or rebuttal evidence of the defendant's suspensions, fights, and other disruptive behavior at school. (This type of rebuttal testimony is potentially damaging, but might also be useful evidence of childhood psychological disorders. Showing that the defendant was disturbed from an early age and had no real chance to overcome his handicap could be an integral part of the defense strategy.)

**4. Neighborhood Witnesses and Friends**
Neighbors and friends may also have first-hand knowledge of important events that affected the defendant, her family, or the community in which they lived.

**a. Long-Term Friends**
Though more subjective than a disinterested observer, a long-term neighbor or friend can have keen insight into family or personal dynamics not readily available to the defendant or family members. These witnesses can testify to the effects of certain events or identify significant forces in the life of the client; they can also testify to the client's good acts, and demonstrate love, understanding, or compassion that may get transferred to the jury.

**b. Hostile Neighbors**
It is not uncommon for the defendant's family to be the "black sheep" of the neighborhood. Hostile neighbors may be able to testify to poor parental supervision, domestic violence, or the parents' association

with disreputable characters. If these neighbors have sympathy for the defendant and can articulate the chaotic home life provided by the parent, they may be excellent mitigation witnesses.

**c. Good Neighbors**
Despite aberrant behavior in other areas, the client may have been a good neighbor. The client may have provided services to the elderly or intervened to assist someone in an emergency. Being a good neighbor will offer the jury insight into the defendant.

**d. Neighborhood Professionals**
The cop on the beat, the grocer, the mail carrier and the minister may all have specific recollections of your client. Mine these memories for information that enhances your theory of mitigation, or transform your theory to include this information.

Beyond information, neighbors and friends provide a humanizing quality to the mitigation hearing and afford an opportunity to introduce pictures of the defendant's home or childhood.

**5. Social Workers**
If the defendant comes from a dysfunctional or single-parent family, there was probably contact with social agencies (either government or private). Case workers can testify very effectively to the adverse environmental factors in your client's life as a child. Even if no specific intervention occurred, social workers and sociologists can investigate the defendant's background and testify to the kinds of circumstances that adversely affected her psychosocial development, such as:

- Poverty
- Lack of medical care
- Lack of educational opportunities
- Disrupted parent-child relationships
- Inadequate parenting in an overburdened, unsupportive home environment
- Effects of witnessing or experiencing domestic violence and neighborhood violence
- Effects of frequent moving and relocations
- Effects of unemployment and a depressed local economy
- Alcoholic or drug dependent parents
- Pernicious effects of racism

The prosecutor's argument that not every member of the family or community grew up to commit murder can be answered by stressing the client's individual vulnerabilities. Fatal diseases only prove fatal to some people.

**6. Mental Health Experts**

These witnesses include psychologists, psychiatrists, neurologists, pharmacologists, specialists in mental retardation, learning disabilities, childhood trauma, and numerous other fields related to mental development, impairment, and behavior.

**a. Defendant Specific Experts**

The mental health experts who have personally examined the defendant are subject to cross-examination about the facts on which they relied in forming their opinions. This means that counsel must carefully screen the expert from damaging information, such as prior bad acts that would not otherwise be admissible. If the door will be opened, prepare the expert for this cross-examination.

Any reports prepared by the experts must be turned over to the prosecution when they testify. Be very careful about what is included in the reports; consider having the experts not write a report at all, but simply testify using notes that have been kept in the course of the evaluation. On the other hand, it is sometimes advisable to help the experts write a very detailed report covering every part of their proposed testimony and having them read that report to the jury (and then pass copies of it for the jurors to read themselves). While diminishing the spontaneity of the testimony, this insures that every point is covered and that no inadvertent or ill-chosen remarks are made (experts who are not experienced witnesses sometimes react badly to the pressures of testifying and become nervous and inarticulate).

The role of mental health experts is to pull together and interpret the threads of testimony of the other witnesses, and lend scientific authority to the overriding message: this case presents sufficient mitigation to warrant a life sentence. The experts should have spent enough time interviewing and testing the defendant to lend credibility to their conclusions. Their testing instruments should be appropriate to their diagnoses, and they should be well-versed in the facts of the defendant's background.

Direct examination should establish the experts' qualifying credentials, the materials reviewed as part of their understanding of the defendant and the case (prior psychological reports, social history, police reports, interviews with witnesses and family members, etc.), the diagnostic tests administered, and their interviews and personal contact with the defendant.

The diagnosis explains each mental defect or impairment from which the client suffers, and how each affects behavior. In the mitigation hearing, unlike the guilt stage, it is not necessary to be preoccupied with labeling the malady. Jurors need to hear common sense descriptions of the client's mental status.

The expert should review the factors and events in the defendant's life that contributed to or caused impairment. Elicit testimony regarding the synergistic quality of these factors and impairments, how they affect and amplify each other to produce an effect greater than the sum of its parts. The life narrative is an opportunity for the expert to get away from labels and talk about historical cause and effect in lay terms. It is also an opportunity for the expert to give meaning to the testimony of other witnesses. Consider asking for waiver of the rule of exclusion on the basis that the expert is not a fact witness. If the expert is allowed to sit in the courtroom and observe the testimony of mitigation witnesses, she can comment on its significance in the context of the life narrative.

Finally, the expert should explain how the defendant's mental and emotional impairment relate to the facts of the crime, and the defendant's redeeming qualities that make it likely that he can successfully adjust to prison and lead a constructive, albeit restricted, life.

Also prepare the experts for cross-examination and redirect. This is especially important when there are state psychiatric or other evaluations whose conclusions and diagnoses conflict with those of the defense experts.

If the defendant was previously diagnosed as a sociopath or anti-social personality, counsel and experts should be prepared to address the issue head-on. The same holds true for other pejorative labels that may have attached to the client over the course of her life. On redirect, counsel can elicit testimony with respect to the inadequacy of prior evaluations and show how serious impairments were overlooked or misdiagnosed.

**b. General Impairment / Issue Experts**

Experts who have had no personal contact with the defendant are also valuable witnesses. They can educate the jury about particular aspects of the defendant's mental condition that have been established by the experts who have had personal contact. Moreover, they are "safe" witnesses.

Mental health issues are complex and require some explanation and foundation before they can be fully grasped, even in simplified form, by a non-expert. The use of this kind of experts can also lend weight to the case – it is not simply "one person's opinion," but that of several experts in their respective fields. Most cases require input from various disciplines – neurological impairment affects psychological development; genetic predisposition contributes to alcohol and drug addiction; learning disabilities affect emotional growth. The experts' testimony can be based, in part, on hypothetical

questions – given a person with certain impairments, in certain circumstances, involving certain facts, what outcome would you predict?

Jurors often greet expert testimony with skepticism, and few things are worse than a pompous, uncommunicative expert who merely offers his conclusions in technical jargon that jurors cannot understand. On the other hand, an expert who is an interesting and authoritative speaker can be a great asset. Mental health issues are almost always of critical importance in a capital case and well worth the time needed to make an effective presentation.

### 7. Rehabilitation Witnesses

Jail and prison guards, counselors, ministers, wardens and assistants, and even fellow inmates who have personal knowledge of the defendant's good deeds or conduct while incarcerated (either on a previous conviction or while awaiting trial) can make effective witnesses. The goal is to demonstrate that the defendant is redeemable and not a danger to others in a controlled setting. Psychologists who have had experience working in a prison and can testify to the type of individual likely to live successfully behind bars also make excellent witnesses.

As with all witnesses, consider the possible danger of opening the door to the defendant's history of violent conduct or write-ups. In addition, in one Tennessee capital case, an associate warden under cross-examination had to admit that individuals serving life sentences do escape and that one such person was presently on escape and had killed someone just a few days before the trial. Counsel objected, but neither the trial judge nor the Tennessee Supreme Court considered this reversible error.

Be wary of anyone who may be perceived as a "kook." Prisons and jails invariably draw large numbers of people with religious or personal agendas that include working with prisoners. Many of these people are well-meaning and effective in their work; some have serious psychological problems and can only hurt you if the jury does not find them credible.

### 8. Rebuttal Witnesses

Be prepared to proffer evidence to rebut testimony or statements by the prosecution. Try both to soften the sting at trial and to preserve the issue for appellate review.

#### a. Disproportionality

If the prosecution makes statements to the effect that this is the worst murder case he can imagine and definitely deserves death, offer evidence of similar crimes in which a sentence of life resulted.

#### b. Willingness to Plea

If the prosecution attempts to blame the defense for the protracted proceedings or lack of cooperation, prove that the defendant was willing to accept a plea bargain to substantial time.

**c. Cost of the Death Penalty**
If the prosecution alludes to the expense of supporting the defendant for life, move to enter evidence that a death penalty costs substantially more than a life sentence.

**d. Deterrence**
The death penalty has no demonstrable deterrent effect. If the prosecution alludes to deterrence, provide evidence that executions do not deter crime in general or homicides in particular, and may actually increase the murder rate. Be prepared for the classic surrebuttal that "at least this person will be deterred from killing again."

**e. Parole Eligibility**
Tennessee's life sentence is now thirty years to parole eligibility. Though one can work this down to approximately twenty years with good and honor time, it is still a substantial period before one is even eligible for parole consideration. In addition, it is the rare capital case that does not have other sentences for armed robbery, burglary or rape stacked on top of the homicide sentence. If the prosecution opens this door, be prepared to put on a full-blown hearing on this issue.

**f. Morality and Religion**
The prosecution will try to take the moral high ground. Ministers, ethicists, theologians and countless other credible witnesses can be enlisted to demonstrate the moral ambiguity, or even bankruptcy, of capital punishment.

**g. Victim's Family**
If counsel has successfully approached the victim's family and they do not desire the death penalty, but the judge has refused to allow their testimony, rebuttal may be the only avenue for exposing the jury to it. Be attentive to any misstatement by the prosecution concerning what society demands or what would provide justice for the victim.

### 9. Demonstrative Evidence
A capital case in which counsel is trying to educate the jury to very complex and confusing series of events, legal issues and procedures on the strength of words alone is a schoolroom without a blackboard. A capital case demands demonstrative evidence.

**a. Pictures or Video Tape**
Every prosecutor knows that his strongest card is the gruesome crime scene pictures of the victim – often juxtaposed with a gold-framed high school graduation picture of the victim. Counsel must use pictures or video in the defense of the client.

**(1) Medical Infirmities**
Medical technology can produce a "picture" of the human brain. If your client's neurological impairment can be made visible, you may want to enter it into evidence.

**(2) Defendant as Child**
Pictures of the defendant as a child may show either how normal the child was before traumatic, life changing events, or demonstrate the symptoms of fetal alcohol syndrome or some other handicapping condition. Family movies can be transferred to videotape, and, with editing and narration – either taped or testimonial – present a coherent life story.

**(3) Environmental Conditions**
Family pictures may vividly display the abject poverty in which the client was raised, or the defense investigator may be able to photograph or videotape the deplorable circumstances as they now exist.

**(4) Crime Scene**
Pictures or a videotape of the crime scene may demonstrate some aspect of the crime that diminishes client culpability.

**(5) Electric Chair or Prison**
Some attorneys have used a picture of the Tennessee electric chair to remind the jury of the ultimate nature of their decision. Videotapes of the maximum security institutions, replete with razor wire, bars and guard dogs, where the client will spend the rest of her life may impress upon the jury that prison is a secure and harsh form of punishment.

**b. Charts and Diagrams**
Though charts and diagrams may not have the air of objectivity of a picture, they can be used effectively to instruct the jury on elements of the offense or client personal history.

**(1) Life History**
A chart tracking events in the client's life and demonstrating how the confluence of several different events irreparably impaired the individual's ability to function in society can be compelling.

**(2) Annotated Genealogy**
A carefully crafted genealogy can display that the client's family tree is rife with mental illness, neurological impairment or substance abuse disorders, graphically illustrating the handicap faced by the defendant even before he was born.

**(3) Confusing Terms**
A chart carefully defining specific legal, psychological or neurological terms will help jurors understand and retain critical information.

**(4) Aggravators and Mitigators**
Just how many mitigating circumstances are there? How do they stack up against the aggravators? What are the cumulative events that influenced the client's life? A comprehensive chart will answer these questions.

**(5) Crime Scene**
If some aspect of the offense mitigates the client's culpability, a diagram of the crime scene may be in order.

**(6) Graphs**
If your client's impairment places her in some very small minority of society, use a graph to demonstrate the disadvantage.

Many firms specialize in preparing demonstrative evidence. University art, medical, and psychology departments might also provide assistance. Photos can be introduced as exhibits through the testimony of teachers, family members, social workers, or any other relevant witness.

## 10. The Defendant

While there may be significant reasons for the client not to testify in the guilt-innocence phase, the reasons diminish in both number and importance once a defendant has been convicted of first-degree murder. If possible, the jury should be given an opportunity to hear from the client in the sentencing hearing.

**a. Reasons the Client Should Testify**

- There is no better way to "humanize" the client than to let her speak.
- More often than not, the client is in the best position to tell about his life and background.
- The client is the only one who can convince the jury that she is remorseful for the crime.
- The state can not cross-examine the defendant on the circumstances of the offense if he does not testify about them. State v. McKay, 680 S.W.2d 447, 451 (Tenn. 1984).

**a. Assessing a Client's Witness Quality**
Many capital defendants do not initially give the impression that they will make good witnesses. They are often inarticulate and prone to emotional outbursts. Consider the following factors in deciding whether or not the defendant should testify:

**(1) Sincerity**
Can the client sincerely and honestly communicate her good and bad qualities, and will the jury believe her?

**(2) Remorse**
Is the client sorry and able to genuinely express remorse? Is this remorse a recent development or is it supported by events at the time of the offense?

**(3) Opening the Door**
What prior offenses would be admissible only if the client testifies? What effect will they have on the jury?

**(4) Rebuttal**
What rebuttal testimony would become admissible and what effect will it have upon the jury?

**(5) Retrial**
What would the defendant's testifying now do to any retrial strategies? Will information divulged in the client's testimony seriously undermine a future trial?

**(6) Testimony Value**
What will the defendant testify to that other witnesses won't express? If all the pertinent information is already in evidence, is the risk of the client testifying worth it?

**(7) Jury Response**
How will the sentencers feel about the client not testifying? Have the jurors shown any indication that they expect the client to testify? Will they perceive silence as an indicator of no remorse? Did you voir dire the jury on this subject?

**(8) Playing the Odds**
What are the chances for a non-death verdict without the client testifying? Is the case already won and testifying will only endanger what looks to be a positive verdict? Is the case already lost and there is nothing more to lose? Is the case borderline and testifying has the potential of swinging the case one direction or the other?

**(9) Cross Examination**
How will the client handle cross-examination in terms of content and demeanor? Has the prosecutor been mean to the client's mother on cross-examination or adept at angering the client? Will the client break down under cross and become angry or violent?

**(10) Humanization**
How successful will the other methods of humanizing be, and is testifying necessary to establish the client's humanity?

**(11) Sympathy**
Will the defendant be viewed more sympathetically if she does not testify? If the client testifies and is seen as articulate and intelligent, will it undercut your neurological dysfunction or limited intelligence defense?

**c. Allocution**
If the defendant is unable to testify, or the strategic reasons for keeping him off the stand are substantial, there is another route by which he can address the jury and express remorse: the right of allocution.

The right of allocution is a common law right of the defendant to address the sentencer before sentence is imposed. In Tennessee, it is conferred by statute in a judge-sentencing context. T.C.A. § 40-35-210(b)(6). The defendant may tell the jury that she is sorry for what she has done and will try to rehabilitate herself if they give her a life sentence, and then sit down.

The state cannot cross-examine the defendant (although the prosecutor may be permitted to argue to the jury the lack of cross-examination). The right to allocute in a capital trial in Tennessee is untested; however, it has been upheld in other jurisdictions. <u>See</u>, Chapter 9, Motions, Appendix E. If the attorney wishes the client to have a chance to briefly address the jury, a pre-trial motion should be filed. Logically, the defendant would speak after both sides rest and before closing arguments begin.

In rebuttal, the state can present any evidence contradicting defense evidence of mitigation or lack of aggravation. TCA § 39-13-203(c). Because only evidence relevant to statutory aggravation is admissible in the case-in-chief, TCA § 39-13-203(i), prosecutors often rely on proof admitted during the guilt phase and save ammunition for rebuttal of mitigation. See State v. Matson, 666 S.W.2d 41, 44 (Tenn.), cert. denied, 469 U.S. 873 (1984). The defense may "open doors" to a wide range of damning and otherwise inadmissible evidence. See, e.g., Booth v. Maryland, 482 U.S. 496, 507 n.10, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (victim impact statement potentially admissible to rebut defense argument); State v. (David) Miller, 674 S.W.2d 279, 284 (Tenn. 1984) (Miller (David) I).

## A. General Scope of Rebuttal

Once a party has closed its case, the court has discretion to allow it to introduce further proof to rebut or contradict a point raised by the other side. State v. Greene, 613 S.W.2d 229, 234 (Tenn. Crim. App. 1980). Rebuttal evidence is that which tends to explain or controvert evidence produced by an adverse party. Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1981).

## B. Impermissible Rebuttal

### 1. Evidence That Does Not Contradict

New matter may be introduced only if it contradicts or explains a point raised by the other side. Cozzolino, 584 S.W.2d at 768. While orderly procedure would suggest that the state should put its whole case in evidence in chief, and reserve only its rebuttal testimony to meet the defense case, the trial judge need not reject testimony in rebuttal that more properly should have been presented in the opening of the case. Hughes v. State, 126 Tenn. 40, 75, 148 S.W. 543, 551 (1912); see also State v. Cone, 665 S.W.2d 87, 93 (Tenn.) (rebuttal evidence proper because it was in direct contrast to defense proof, even though defendant contended witnesses should have been presented in state's case-in-chief), cert. denied, 467 U.S. 1210 (1984).

### 2. Multiple Defendants

When more than one person is on trial, rebuttal evidence cannot be used to implicate a defendant whose proof it does not rebut. State v. Lunati, 665 S.W.2d 739, 747 (Tenn.), cert. denied, 466 U.S. 938 (1984). In State v. Eberhardt, 659 S.W.2d 807 (Tenn. Crim. App. 1983), a co-defendant testified about his confession; his confession, introduced in rebuttal, implicated the defendant. Because the court gave limiting instructions on the use of the confession, and the co-defendant had testified, there was no error as to the defendant. A contrary result would be reached where the accomplice was not on trial or had not testified, presenting a violation of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, the U.S. Supreme Court has upheld use of such a confession for the limited purpose of rebutting the defendant's contention that his confession was a coerced imitation of his accomplice's confession,

which the police had read to him, holding that the accomplice's testimony would have been pointless because the issue raised by the defense revolved around similarities and differences between the two confessions. Tennessee v. Street, 471 U.S. 409, 416, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).

## C. Rebuttal in Tennessee Capital Cases

Tennessee opinions addressing rebuttal evidence in the sentencing phase of capital cases highlight the problem of opening doors, alluded to above. Carefully review every area of testimony by each potential witness to determine what damaging but otherwise inadmissible evidence may become admissible to challenge, impeach, or rebut. (That the problem is not exclusively one of formal rebuttal is demonstrated by the recent decision in State v. Jones, 789 S.W.2d 545, 550 (Tenn. 1990), in which Jones' sentencing-phase testimony, trying to cast an innocent light on the fact that he had committed the homicide, opened the door to what would otherwise have been unconstitutional cross-examination; see also State v. McKay, 680 S.W.2d 447 (Tenn. 1984) (defendant's testimony to innocence raised non-statutory mitigation, inviting cross-examination on circumstances of crime), cert. denied, 470 U.S. 1034 (1985); and State v. McNish, 727 S.W.2d 490 (Tenn.) (McNish's testimony that he had never before been in trouble invited cross-examination on juvenile arrest), cert. denied, 484 U.S. 873 (1987).)

Potential rebuttal evidence varies with each case, depending on the type of mitigation presented and the information available to the state. Most often at issue is evidence relevant to the defendant's mental state or history of involvement with the criminal justice system. See, e.g., State v. Thompson, 768 S.W.2d 239, 248-49 (Tenn. 1989) (report prepared during pre-trial evaluation of competence and mental state was rendered admissible by testimony that Thompson was non-violent, cooperative, and responsible until he joined the Navy, including testimony by a clinical psychologist who testified that Thompson seemed remorseful, was not a malingerer, and did not have an anti-social personality); State v. Simon, 635 S.W.2d 498 (Tenn.) (juvenile crimes rebut evidence of no prior convictions), cert. denied, 459 U.S. 1055 (1982); and State v. Matson, 666 S.W.2d 41 (Tenn.) (state can introduce arrests, ordinarily irrelevant to aggravation, to rebut argument that Matson had no significant history of criminal activity), cert. denied, 469 U.S. 873 (1984); cf. State v. Moore, 614 S.W.2d 348 (Tenn.) (conviction reversed where prior convictions rebutted evidence of no violent tendencies, but jury was instructed to use them in aggravation), cert. denied, 454 U.S. 970 (1981); State v. Teague, 645 S.W.2d 392 (Tenn. 1983) (conviction reversed where Teague's prior arrest was irrelevant to statutory aggravation or any mitigation raised by defense); and State v. Sheffield, 676 S.W.2d 542, 553 (Tenn. 1984) (testimony that killing Sheffield would not deter others with similar backgrounds, and that Sheffield's problems resulted from emotional deprivation, did not open door to cross-examination that included detailed accounts of Sheffield's prior arrests).

The statute permits use at the sentencing phase of evidence that is inadmissible under the normal rules of evidence. TCA § 39-13-203(c). In most of the cases in

which the Tennessee Supreme Court has purported to uphold this provision, the state did not actually use any hearsay. The cases squarely presenting the issue have involved rebuttal, and the Court has incorporated concepts of fairness. Thus, in State v. West, 767 S.W.2d 387 (Tenn. 1989), West wanted to introduce a tape of the co-defendant incriminating himself and exculpating West; the Court upheld a trial court order that if he did, the state would be permitted to use a tape of the co-defendant incriminating West, on the ground that it would be "fundamentally unfair" to let a defendant use favorable hearsay and preclude the state from using directly contradictory statements by the same person, whom neither party could cross-examine.

Through an in limine ruling counsel can ascertain in advance what creatures may slip through a door opened by a line of defense evidence. For example, in State v. Miller (David), 771 S.W.2d 401 (Tenn. 1989) (Miller (David) II), the trial court ruled in limine that proof of Miller's religious conversion would open door to proof that a previous jury had sentenced him to death, as part of the circumstances of the conversion. See also West, supra. Only with such a ruling will counsel be in a position to weigh the costs and benefits of going forward with the evidence.

Because of the fact-specific nature of rebuttal evidence, counsel is advised to review with care the relevant Tennessee capital decisions, indexed in Appendix A, Trial Issue Index, at the end of this manual.

## D. Surrebuttal

Any state rebuttal creates an equal right to introduce surrebuttal or impeachment. Beasley v. State, 539 S.W.2d 820, 824 (Tenn. Crim. App. 1976).

## E. Conclusion

Rebuttal proof is very broad. The court can allow any rebuttal of mitigation, or absence of aggravation, that it deems probative on the issue of penalty. After thorough investigation, the defense should know what damning evidence the state is holding back for rebuttal; anticipate it in deciding what defense proof to offer. Ask narrow questions of defense witnesses, and confine the issues, to avoid ending the hearing with damaging prosecution evidence. Presenting maximum evidence with minimum fall-out is possible only through thorough review of each witness's testimony before presenting it.

## A. Prosecution

Improper, misleading or prejudicial final argument by the state is a fertile area for challenge on appeal. Where emotions run high, mistakes are likely to be made. The ABA Standards, the Code of Professional Responsibility and numerous cases address the standards by which the prosecution must abide. However, in the usual case, the defense must preserve the issue by an appropriately timed objection. Defense counsel should know in advance the types of arguments that courts construe as error.

The defense must preserve issues related to prosecutorial argument by timely objection.

Filing a motion in limine before argument setting out the forbidden areas and requesting an order that the prosecutor not be permitted to argue those themes can be an effective tool in educating the court as to the parameters of permissible argument. See, Appendix D, Motions Chapter. The motion should stress that certain types of argument may require automatic reversal; one may assume that the trial court is interested in preventing costly retrials. Also, a ruling favorable to the defense on the motion in limine enhances the probability that prohibited argument will be held prejudicial if it is later advanced by the prosecutor. This is especially true if the motion is tailored to the particular district attorney trying the case. It is suggested that the defense obtain and review any arguments in previous death penalty cases that have been argued by opposing counsel. Prosecutors often re-use arguments, especially successful ones; review can give counsel a sense of what to expect.

### 1. In General

The prosecutor acts as:

> "... the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> [T]he average jury ... has confidence that these obligations ... will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Cr. App. 1976), quoting Berger v. United States, 295 U.S. at 88 (per Daughtrey, J.).

Although the Judge language appears to circumscribe the state's argument, courts will frequently say that argument is a valuable privilege, and that both sides should have wide latitude in arguing their case to the

The question is whether the prosecutor's argument could have affected the verdict to the prejudice of the defendant.

jury. A trial judge's discretionary control of argument will not ordinarily be reversed. State v. Sutton, 562 S.W.2d 820 (Tenn. 1978); Russell v. State, 5232 S.W.2d 268 (Tenn. 1976); Shockley v. State, 585 S.W.2d 645 (Tenn. Cr. App. 1978).

In determining whether prosecutor's improper argument mandates a reversal, the court must determine whether it could have affected the verdict to the prejudice of the defendant. Judge v. State, *supra*. Judge sets forth a test involving five factors for a reviewing court to consider: 1. the conduct complained of, viewed in context and in light of the facts and circumstances of the case; 2. curative measures by the court and the prosecution; 3. the prosecutor's intent in making the improper statement; 4. the cumulative effect of the conduct and any other errors in the record; and 5. the relative strength or weakness of the case. *Id.*, at 344. See also, State v. Payton, 782 S.W.2d 490, 496-497 (Tenn. Cr. App. 1989).

Along with the Judge test, counsel should keep in mind that the ABA Standards Relating to the Prosecution Functions § 5.8 (argument to the jury) have been adopted in Tennessee:

> (a) The prosecutor may argue all the reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> (b) [T]he prosecutor [may not] express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> (c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> (d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

See, State v. Benson, 645 S.W.2d 423, 425 (Tenn. Cr. App. 1983).

Likewise, by approving Rule 8, the Tennessee Supreme Court adopted Canon 7, DR 7-106(C)(4) of the Code of Professional Responsibility:

In appearing in his professional capacity before a tribunal, a lawyer shall not: ... Assert his personal opinion as to the justness of a cause, as to the credibility of a witness ... or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.

**2. Specific Forbidden Arguments**

The appellate courts have found improper he following specific kinds of improper argument:

The prosecution cannot refer to aggravation not statutorily enumerated.

(a) referring to aggravation not statutorily enumerated or to which no evidence relates.

State v. Black, 815 S.W.2d 166 (Tenn. 1991), citing Cozzolino v. State, 584 S.W.2d 765, 767-68 (Tenn. 1979); State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___ (1991) (denied 10-7-91) (such evidence irrelevant); State v. Teague, 645 S.W.2d 392, 399 (Tenn. 1983); State v. Adkins, 653 S.W.2d 708, 715 (Tenn. 1983); State v. Irick, 762 S.W.2d 121, 129-31 (Tenn. 1988), *cert. denied*, 489 U.S. 1072 (1989). T.C.A. §39-13-204 (i); § 39-13-204 (g). See also, Recurring Issues, Chapter __, *infra;*

(b) diminishing the jury's sense of responsibility in imposing death.

Caldwell v. Mississippi, 472 U.S. 320, 336, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (prosecutor's argument to the effect that the jury's decision was not final minimized the jury's role and tended to diminish its responsibility in violation of the Eighth Amendment); State v. West, 767 S.W.2d 387, 398-99 (Tenn. 1989), *cert. denied*, ___ U.S. ___, 110 S.Ct. 3254 (1990); Sparks v. State, 563 S.W.2d 564, 568-69 (Tenn. Cr. App. 1978) (Pre-*Caldwell* case condemning denigration of jury's responsibility when considering death penalty). Prosecutor may not imply that because the grand jurors saw fit to charge a capital crime, the jury's verdict of death has already been ratified by their decision. Darden v. Wainwright, 477 U.S. 168, 183 n.15, 106 S.Ct.2464, 91 L.Ed.2d 144 (1986) (Caldwell prohibits prosecution from trying to diminish jury's responsibility in any way). People v. Farmer, 47 Cal. 3d 888, 924 31, 254 Cal. Rptr. 508, 765 P.2d 940 (1989), *cert. denied*, 109 S.Ct. 3158 (1989) (Statements made by the prosecutor that the jurors' responsibility was only to determine whether the aggravating factors outweighed the mitigating factors and that the law would determine whether the defendant would be sentenced to life imprisonment or death misled the jury as to it discretion and responsibility during sentencing; judgment as to penalty reversed); People v. Milner, 45 Cal. 3d 227, 253 58, 246 Cal. Rptr. 713, 753 P.2d 669 (1988) (Where prosecutor urged jurors during closing argument of the sentencing phase to "stick within the protection of the law" and weigh aggravating and mitigating factors without considering their own personal conclusions from the evidence concerning the appropriateness of the alternative penalties, the jury was misled as to its discretion and responsibility during sentencing, death sentence reversed); State v. Ramseur, 106 N.J. 123, 524 A.2d 188 (1987) (Trial court's supplemental instructions to the jury during sentencing that the jurors' responsibility was "merely to determine the presence or absence of aggravating and mitigating factors" and to weigh them diminished the jury's sense of

A prosecutor should not refer to the deterrent value of the death penalty.

responsibility for sentencing and constituted prejudicial error. Reversed and remanded for resentencing.). Cf., Johnson v. State, 797 S.W.2d 578 (Tenn. 1990);

(c) commenting on the qualities of the victim.

Since the decision in Payne v. Tennessee, 501 U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that the Eighth Amendment did not prohibit the jury considering, at the sentencing phase of a capital trial, victim impact evidence relating to a victim's personal characteristics and the emotional impact of the victim's family, this has become primarily a state law issue. In Tennessee, in its case-in-chief at sentencing, the prosecution can present only evidence that is relevant to statutory aggravation. See subsection (a) above for authorities. *But see*, State v. Payne, 491 S.W.2d 10, 17-19 (Tenn. 1990), *affirmed in part, Payne v. Tennessee, supra* (Prosecutor's argument regarding surviving child's loss and child's projected questions concerning "what type of justice was done" relevant to personal responsibility and moral guilt. Note: Question of whether this evidence was non-statutory aggravation not raised or addressed.). Cf., State v. Alley, 776 S.W.2d 506, 511-13 (Tenn. 1989), *cert. denied*, ___ U.S. ___, 110 S.Ct. 758 (1990);

(d) referring to the deterrent value of the death penalty.

State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___ (1991) (denied 10-7-91) ("Generally, in Tennessee the issue of specific deterrence should be avoided by the State in closing argument at a capital sentencing hearing"); State v. Henley, 774 S.W.2d 908, 913 (Tenn. 1989), *cert. denied*, ___ U.S. ___, 110 S.Ct. 3291 (1990); State v. Irick, 762 S.W.2d 121, 129-31 (Tenn. 1988), *cert. denied*,, 489 U.S. 107 (1989);

(e) arguing that the accused showed no regret or remorse (unless there is a specific evidentiary basis).

Lesko v. Lehman, 925 F.2d. 1527 (3rd Cir. 1991) (reversed because of prosecutor's reference, during closing arguments of penalty phase, to fact that accused failed to express remorse during testimony he gave at the penalty phase); Owens v. State, 656 S.W.2d 458, 459-60 (Tex. 1983) (prosecutor's punishment phase argument on defendant's failure to express remorse or sorrow was unconstitutional comment on failure to testify), *accord*, Trawick v. State, 473 So.2d 1235 (Fla. 1985); Colina v. State, 570 So.2d 929, 932 (Fla. 1990) (lack of remorse not an aggravating factor); Jones v. State, 569 So.2d 1234, 1240 (Fla. 1990) (evidence and argument about defendant's lack of remorse were improper); Patterson v. State, 513 So.2d 1263 (Fla. 1987) (lack of remorse, impact and views of survivors not proper aggravation); McClellan v. Commonwealth, 715 S.W.2d 464, 471 (Ky. 1986), *cert. denied*, 479 U.S. 1057 (1987) (prosecutor's implication defendant

lacked remorse improper absent any evidence); State v. Arthur, 350 S.E.2d 187, 191 (S.C. 1986) (comment on silence and lack of remorse). *See also*, State v. Brown, 347 S.E.2d 882, 886-87 (S.C.1986) (prosecutor implied self-representation indicated lack of remorse); Thompson v. Aiken, 315 S.E.2d 110, 110-11 (S.C. 1984) (insinuation that not guilty plea shows lack of remorse improper);

(f) hindering the jury's consideration of any mitigation, including non-statutory mitigation.

Hitchcock v. Dugger, 481 U.S. 393, 398, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-17, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978);

(g) indicating that mitigating evidence should be considered in aggravation.

Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 2949, 106 L.Ed.2d 256 (1989); see also, Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983);

(h) limiting the jury's consideration of sympathy for the defendant based on the evidence.

California v. Brown, 479 U.S. 538, 541-43, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Wilson v. Kemp, 777 F.2d 621, 623-24 (11th Cir. 1985), *cert. denied*, 476 U.S. 1153 (1986); Potts v. Zant, 734 F.2d 526, 535-36 (11th Cir. 1984); Buttrum v. Black, 721 F.Supp. 1268, 1318 (N.D. Ga. 1989); Kubat v. Thieret, 867 F.2d 351, 373, n. 19 (7th Cir. 1989) ("A juror might be disposed to grant mercy on other factors, such as a humane perception of the defendant developed during trial."); Legare v. State, 302 S.E.2d 351 (Ga. 1983) (Anti-sympathy instruction may have confused jury as to mercy option.). *But see*, State v. Boyd, 797 S.W.2d 589 (Tenn. 1990), *cert. denied* (1-22-91), ___ U.S. ___, ___ S.Ct. ____ (1991); State v. Payne, 791 S.W.2d 10, 20 (Tenn. 1990), *affirmed in part*, Payne v. Tennessee, 501 U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991);

(i) that jurors should kill the defendant because he is an enemy of society.

State v. Plath, 284 S.E.2d 221, 230 (S.C. 1981); Brooks v. Kemp, 762 F.2d 1383, 1412-13 (11th Cir. 1985) (*en banc*); Hance v. Zant, 696 F.2d 940, 952-53 (11th Cir.), *cert. denied*, 463 U.S. 1210 )1983);

(j) arguing about the need to kill the defendant in order to maintain law and order and safe streets.

Gregg v. Georgia, 428 U.S. 153, 188-89, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (jury must focus on individualized nature of crime and defendant's characteristics rather than amorphous distractions such

A prosecutor should not hinder the jury's consideration of any mitigation.

A prosecutor should not indicate that it would be cheaper to kill the defendant than to imprison him for life.

as crime in the streets); Wilson v. Kemp, 777 F.2d 621, 624-25 (11th Cir. 1985) (improper to say that Supreme Court endorses death penalty as "essential in an ordered society"), *cert. denied*, 476 U.S. 1153 (1986);

(k) that imposing death is the jurors' "civic duty."

Brooks v. Kemp, 762 F.2d 1383, 1412-13 (11th Cir. 1985) (*en banc*) (statement that jurors were soldiers in war on crime and should kill defendant because he was part of criminal element improper), *vacated on other grounds*, 478 U.S. 1016 (1986); Tucker v. Zant, 724 F.2d 882, 888 (11th Cir. 1984);

(l) indicating that it would be cheaper to kill the defendant than to imprison him for life.

Brooks v. Kemp, 762 F.2d at 1412; Tucker v. Zant, 724 F.2d at 890;

(m) telling the jury to give the defendant the same justice he gave the victim.

People v. Jackymiak, 46 N.E.2d 50, 54-55 (Ill. 1943);

(n) talking about the number of death sentences the prosecutor has sought, or that the prosecutor will never again seek death if this jury does not vote for it.

State v. Harries, 657 S.W.2d 414, 421 (Tenn. 1983); Strouth v. State, No. 684, 11 TAM 51-30 (Tenn. Cr. App. 1986); Brooks v. Kemp, 762 F.2d at 1410; Tucker v. Zant, 724 F.2d at 889; State v. Plath, 284 S.E.2d at 230;

(o) telling the jury that this is the cruelest, worst, etc. crime the prosecutor has seen, that he wouldn't have sought death unless he or the judge hadn't concluded that aggravation existed.

Hooks v. State, 534 So.2d 329, 354-55 (Ala. Cr. App. 1987); Ex parte Tomlin, 540 So.2d 668 , 669-70 (Ala. 1988);

(p) making religious arguments or referring to the Bible.

Zant v. Stephens, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982); State v. Harrington, 627 S.W.2d 345, 350 (Tenn. 1981), *cert. denied*, 457 U.S. 1110 (1982); State v. Moose, 313 S.E.2d 507 (N.C. 1984); United States v. Steinkoetter, 633 F.2d 719, 720 (6th Cir. 1980) (Calling accused "Pontius Pilate" and "Judas Iscariot" condemned). References to the Bible also raises constitutional issues concerning the separation of church and state;

(q) inviting speculation on what other crimes the defendant will commit if he is not executed.

Wallace v. Kemp, 581 F.Supp. 1471, 1481-82 (M.D. Ga. 1984), *reversed on other grounds*, 757 F.2d 1102 (11th Cir. 1985); Smith v. State, 527 S.W.2d 737, 738-39 (Tenn. 1975);

(r) refering to the possibility of the defendant's escape and/or the safety of the prison guards and their families.

State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___ (1991) (denied 10-7-91) (usually irrelevant; not error here because argument was in response to defense theory of mitigation); Hance v. Zant, 696 F.2d 940, 952-53 (11th Cir.), *cert. denied*, 463 U.S. 1210 (1983);

(s) intimating that the defendant will someday be released even if given life without parole [Note: LWOP is currently not the law in Tennessee but reference to release is analogous to arguing that a life sentence does not mean life].

Ex parte Rutledge, 482 So.2d 1262, 1263-65 (Ala. 1984);

(t) that a vote for life is a victory for the criminal element.

United States v. Wiley, 534 F.2d 659, 665 (6th Cir.), *cert. denied*, 425 U.S. 995 (1976);

(u) arguing that the defendant has not proven himself worthy of life.

United States v. Smith, 500 F.2d 293, 294-98 (6th Cir. 1974); Ledford v. State, 568 S.W.2d 113, 117-18 (Tenn. Cr. App. 1978);

(v) minimizing significance of death penalty.

State v. (Leonard) Smith, 755 S.W.2d 757 (Tenn. 1988) (reversing on other grounds); and

(w) playing on the passions of the jury.

Tucker v. Zant, 724 F.2d at 888; Hance v. Zant, 696 F.2d at 951-53.

**3. General Forbidden Arguments**

Of course, remarks forbidden in the ordinary arguments are likewise forbidden in the sentencing argument. Examples include:

(a) referring to other crimes by the defendant that were not properly introduced into evidence.

State v. Alley, 776 S.W.2d 506 (Tenn. 1989), *cert. denied*, ___ U.S. ___, 110 S.Ct. 758 (1990) (reference to non-existent prior charge reprehensible, intolerable, and unprofessional); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); Dishman v. State, 460 S.W.2d 855, 858 (Tenn. Cr. App. 1970);

A prosecutor should not refer to other crimes by the defendant not properly in evidence.

A prosecutor should not comment on the defendant's failure to testify or call witnesses.

(b) vouching for or giving an opinion on a witness's reliability or credibility.

United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); United States v. Dinitz, 424 U.S. 600, 612, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (Burger, C.J., concurring); State v. Henley, 774 S.W.2d 908, 910-11 (Tenn. 1989), *cert. denied,* ___ U.S. ___, 110 S.Ct. 3291 (1990); King v. State, 430 S.W.2d 810, 812 (Tenn. Cr. App. 1968); United States v. Causey, 834 F.2d 1277, 1283 (6th Cir. 1987), *cert. denied,* 486 U.S. 1034 (1988); United States v. Wiley, 534 F.2d 659, 664-65 (6th Cir.), *cert. denied,* 425 U.S. 795 (1976); United States v. DiLoreto, 888 F.2d 996, 998-99 (3rd Cir. 1989);

(c) commenting on the defendant's silence at the time of arrest.

Doyle v. Ohio, 426 U.S. 610, 616-20, 96 S.Ct. 2240, 48 L.Ed.2d 91 (1976); Braden v. State, 534 S.W.2d 657, 660-61 (Tenn. 1976);

(d) commenting on the defendant's failure to testify or call witnesses.

Griffin v. California, 380 U.S. 609, 613-15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); United States v. Smith, 500 F.2d 293, 294-98 (6th Cir. 1974); State v. Hale, 672 S.W.2d 201 (Tenn. 1984) (prosecutor may not comment on the failure of the defendant to testify even merely to remind the jury not to consider it; court finds prejudice to the judicial process); Turner v. State, 216 Tenn. 714, 394 S.W.2d 635 (1950); Smithson v. State, 155 S.W. 133, 134-35 (Tenn. 1913); Shockley v. State, 585 S.W.2d 645, 651-52 (Tenn. Cr. App. 1978); State v. Dodson, slip opinion, CCAK, No. 161, February 8, 1989 (Improper to argue that there has been no rebuttal or nothing to controvert the proof. In addition, when prosecutor suggested that defendant "had his opportunity" to "tell his side of the story" and "didn't tell [the jury] one thing," he far exceeded the bounds of legitimate commentary." at 3-4). Cf., State v. House, 743 S.W.2d 141, 146-47 (Tenn. 1987); State v. Sutton, 562 S.W.2d 820, 826 (Tenn. 1978), *cert. denied,* ___ U.S. ___, 110 S.Ct. 3287 (1990);

(e) commenting on the defendant's silence at a former trial of the same case.

Braden v. State, 534 S.W.2d at 660-61; Smithson, 155 S.W. at 134-35;

(f) commenting on the reliability or credibility of the defendant's testimony.

United States v. Young, 470 U.S. at 18-19; Berger v. United States, 295 U.S. at 88-89; State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. denied,* ___ U.S. ___, ___ S.Ct. ___ (1991) (denied 10-7-91); Sneed v. State, 546 S.W.2d 254, 261 (Tenn. Cr. App. 1976); Tenn. Sup. Ct. R. 8, DR 7-106(c)(4); ABA Standards Relating to the Prosecution Function and the Defense Function, § 3-5.8 (b);

(g) opining as to the punishment the accused should receive.

United States v. Young, 470 U.S. at 17-19; United States v. Bess, 593 F.2d 749, 754-57 (6th Cir. 1979); State v. Payne, 791 S.W.2d 10, 20 (Tenn. 1990), *affirmed in part, Payne v. Tennessee*, 501 U.S. ___, 111 S.Ct. 2597 (1991) (error but harmless); Tenn. Sup. Ct. R. 8, DR 7-106 (c)(4);

(h) appealing to racial prejudice.

Manning v. State, 257 S.W.2d 6, 8-9 (Tenn. 1953); Vines v. State, 190 Tenn. 644, 231 W.2d 332 (1950) (prosecutor attacked the defense attorney for asking white female complainant whether she had been holding hands with the black male defendant); Hiller v. State, 50 S.W.2d 225, 227 (Tenn. 1932); Sparks v. State, 563 S.W.2d 564, 567-69 (Tenn. Cr. App. 1978); United States v. Grey, 422 F.2d 1043 (6th Cir.), *cert. denied*, 400 U.S. 967 (1970); Withers v. United States, 602 F.2d 124, 125-27 (6th Cir. 1979);

(i) referring to a generalized drug problem in the community.

Brown v. State, 557 S.W,2d 926 (Tenn. Cr. App. 1977);

(j) about what the prosecutor would do if the victim were someone the prosecutor knew.

Lauterbach v. State, 179 S.W. 130, 131 (Tenn. 1915);

(k) characterizing the accused or his actions in a hyperbolic or prejudicial manner.

State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. pending* ("[P]atently improper" for prosecutor to call defendant a "rabid dog."); Darden v. Wainwright, 477 U.S. 168, 178-83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (accused called an "animal" who "shouldn't be out of his cell unless he has a leash on him"); State v. Tyson, 603 S.W.2d 748, 754-55 (Tenn. Cr. App. 1980) (defendant compared to rat); United States v. Steinkoetter, 633 F.2d 719, 720 (6th Cir. 1980); State v. Tyson, 603 S.W.2d 748, 754 (Tenn. Cr. App. 1980); Bishop v. State, 582 S.W.2d 86, 91 (Tenn. Cr. App. 1979); State v. Payne, 791 S.W.2d 10 (Tenn. 1990), *affirmed in part, Payne v. Tennessee*, 501 U.S. ___, (1991) (Prosecutor demonstrated "what he did to [mother and daughter]," approached diagram of body of child and stabbed hole through it with murder weapon, butcher knife. Improper and unprofessional); United States v. Barker, 553 F.2d 1013, 1024-25 (6th Cir. 1977) (defendants were undesirable people and the kind to do crime); United States v. Love, 534 F.2d 87 (6th Cir. 1976) (defendants linked with organized crime); Stephan v. United States, 133 F.2d 87, 98 (6th Cir.) (accused called a "blackhearted traitor."), *cert. denied*, 318 U.S. 781 (1943); Volkmor v. United States, 13 F.2d 594, 595 (6th Cir. 1926) (accused called a "cheap, scaly, slimy crook" condemned);

A prosecutor should not characterize the defendant in a hyperbolic or prejudicial manner.

A prosecutor should not misstate the evidence.

(l) opining that the defendant represents a criminal minority while the jury represents the rest of society.

Smith v. State, 527 S.W.2d 737, 738-39 (Tenn. 1975);

(m) appealing to the jurors' patriotism.

Viereck v. United States, 318 U.S. 236, 247-48 n.3, 63 S.Ct. 561, 87 L.Ed.2d 734 (1943);

(n) appealing to the jurors as parents.

Heffelfinger v. Thompson, 444 F.Supp. 309, 310 (E.D. Tenn. 1977); People v. Clemons, 369 N.Y.S.2d 445, 446 (N.Y.A.D. 1975);

(o) referring to matters outside the record.

State v. Sutton, 562 S.W.2d 820, 823-24 (Tenn. 1978); State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Cr. App. 1976); ABA Standards for Criminal Justice, § 3-5.8(a), 3-5.9 (Supp. 1986);

(p) referring to matters discussed in a jury-out hearing.

State v. Elliott, 703 S.W.2d 171, 176-77 (Tenn. Cr. App. 1985);

(q) indicating that the prosecution had additional evidence that it did not present.

Delk v. State, 590 S.W.2d 435, 438-39 (Tenn. 1979); United States v. Narciso, 446 F.Supp. 252, 321-22 (E.D. Mich. 1977);

(r) suggesting that the defendant is guilty merely because he has been indicted.

Grand Jury proceedings do not constitute evidence at trial. T.P.I., Cr. 1.05. United States v. Bess, 593 F.2d 749, 753-54 (6th Cir. 1979), quoted in State v. Dodson, slip opinion, CCAK, No. 161, February 8, 1989; *See*, State v. Onidas, 635 S.W.2d 516 (Tenn. 1982); State v. Hicks, 618 S.W.2d 510 (Tenn. Cr. App. 1981);

(s) attempting to reduce the state's burden of proving guilt beyond a reasonable doubt.

Ledford v. State, 568 S.W.2d 113 (Tenn. Cr. App. 1978);

(t) misstating evidence.

Judge v. State, 539 S.W.2d at 344-45; ABA Standards for Criminal Justice, Standard 3-5.8(a) (Supp. 1986);

(u) impugning defense counsel's honesty or integrity.

Russell v. State, 532 S.W.2d 268, 270-71 (Tenn. 1976) (intimating that defense counsel fabricated evidence); Watkins v. State, 140 Tenn. 1, 203 S.W. 344, 345-46 (1910); Hull v. State, 553 S.W.2d 90, 94 (Tenn. Cr. App. 1977); McCracken v. State, 489 S.W.2d 48, 50 (Tenn. Cr. App. 1972); Dupree v. State, 410 S.W.2d 890, 891-92 (Tenn. 1967);

(v) implying that the prosecutor is impartial while the defense's only duty is to get the accused off.

Moore v. State, 159 Tenn. 112, 17 S.W.2d 30 (1929);

(w) denigrating defense counsel's objections.

State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___ (1991) (denied 10-7-91);

(x) comparing defendant's case to another.

Davis v. State, 161 Tenn. 23, 28 S.W.2d 993, 997 (1930); Drake v. Kemp, 727 F.2d 990, 995-96 (11th Cir. 1984), *aff'd en banc*, 762 F.2d 1449 (1985), *cert. denied*, 478 U.S. 1020 (1986) (error for prosecutor to refer to Gary Gilmore).

### 4. Objecting to Arguments

Do not be timid about objecting to improper argument.

Do not be timid about objecting to improper argument, especially if you have filed an motion in limine and the prosecutor has just argued in violation of the authorities contained in that motion. The unwritten rule that many lawyers follow of not interrupting opposing counsel's argument in exchange for like consideration is applicable, if at all, only to kinder, gentler litigation. The defense not only has the right to rebut misleading and/or prejudicial prosecution argument but the duty to do so.

If the prosecutor does argue, for example, that the death penalty should be imposed because it will deter others or because it is less costly than life imprisonment, immediately request permission to reopen the defense case and present rebutting evidence. If this request is denied, request a specific instruction that such statements are factually incorrect, and ask permission to reopen closing argument to rebut them.

Improper prosecutorial argument regarding sentencing issues or the consequence of the jury not agreeing on a verdict can be especially damaging. Remember that two of the central concerns of the jury are to protect society and punish the defendant. If the prosecutor is allowed the last word on those subjects and the information conveyed suggests that a vote for life or failure to agree means that the defendant will soon be back on the street, the weighing process has been seriously skewed.

The State's sentencing argument must not tempt the jury to be influenced by any arbitrary factors, nor incite the jury's passion.

Numerous studies[1] have shown that many jurors erroneously believe a life sentence actually means that the defendant will serve five to seven years and some believe that failure to agree on a verdict will mean that the defendant will be acquitted and somehow go free. If the defendant was already serving a significant sentence when the crime was committed or multiple offenses were committed in the present case for which separate convictions were obtained, some prosecutors will argue or imply that the defendant should get the death penalty because he "can't get any more time" than he has or that the failure to vote for the death penalty denigrates the multiple harm done. Counsel should object, request an opportunity to rebut and request a specific instruction setting out accurate sentencing information.

Also, remember that if the State argues last, its closing argument is in the nature of rebuttal. "[T]he State's closing argument shall be limited to the subject matter covered in the State's opening argument and the defendant's intervening argument." Rule 29.1(b), Tenn. R. Crim. Pro. Venturing outside of those parameters should entitle the defense to surrebuttal and/or an appropriate instruction.

Counsel should consider requesting a break following the prosecutor's initial argument in closing and, while the jury is out, file a motion in limine (which can be prepared well in advance of the time for argument) outlining the subject matter of the defense argument and asking the court to prohibit the prosecution on rebuttal from venturing outside of "the subject matter covered in the State's opening argument and the defendant's intervening argument."

### 5. Conclusion

A capital case requires a higher level of due process and involves Eighth Amendment concerns for the *reliability* of the selection of your particular client for the extreme punishment of death. The state's sentencing argument is more closely scrutinized than are other closing arguments. It must not tempt the jury to be influenced by any arbitrary factors, nor incite the jury's passion when a life hangs in the balance. Brooks v. Francis, 716 F.2d 780, 788 (11th Cir. 1983).

## B. Defense

Probably the most intense experience a criminal defense lawyer will encounter is rising to give a closing argument at the sentencing phase of a capital trial. The jurors have heard and probably seen worse evidence than was introduced in the guilt phase and the prosecution has undoubtedly informed them that the law

[1] See, Paduano and Stafford-Smith, *Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty*, 18 Colum. Hum. Rts. L. Rev. 211 (1987); Notes, *The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing*, 75 Va. L. Rev. 1605 (1989).

says that this evidence, if found by the jury to exist beyond a reasonable doubt, provides sufficient reason to single out this murderer for the death penalty. The jurors are death qualified and believe death is appropriate in some cases. Plan the argument with an appreciation for the jury's negative feelings toward your client. Counsel will feel, perhaps rightfully, that he or she stands between the client and execution.

If *you* don't care if this person lives or dies, why should the jury.

### 1. Preliminary Considerations

#### a. Credibility of the Defense Team

Closing argument is no time to lose credibility. A well crafted argument will not have to rely on obvious omission or deceit. A blatantly emotional plea can insult jurors who understand the gravity of their responsibility and resent any attempt to persuade through actual (or what they may perceive as contrived) emotion. Also, "[e]quating the imposition of the death penalty with murder is likely to backfire as an argument in favor of life. . . . To suggest that what the law asks them to consider doing is in any way analogous to what the defendant has done is likely to outrage them and lead them to deny the plea for life." Logan, *Pleading for Life, supra.*

Whereas the guilt phase is a search for objective facts, the sentencing phase is an individualized, particularized examination of who your client is and whether he is deserving of the most extreme punishment that society can impose. As Bryan Shechmeister has pointed out, *supra*, final argument is a quest for truth. There may be more than one truth and the truths may be in conflict but one thing is certain, people's *opinion* of what the truth is is filtered through their subjective perspective. As long as the jury understands that any differences in opinion are not attempts at deceit but valid issues of differing perception upon which reasonable people can disagree, credibility will not be lost. Contrived emotion, religiosity, or outright deceit will shatter any rapport between counsel and the jury.

#### b. Be Sincere

As the jury looks for guidance through the legal, factual and moral labyrinth, and it has to decide in which of these two guides, the defense attorney or the prosecutor, will I place more confidence? A jury will simply not embrace the proposition that an interested advocate can be relied on to present the case impartially. They expect and assume that you will put your client's case in the best light. But they are likely to ask themselves if the advocate really cares. "How deeply they will listen and trust and believe you is in direct proportion to their perception of your level of caring."[2] If *you* don't care if this person lives or dies, why should they? Give an argument that is compatible with, and strengthened by, your personal style, emotions, and feelings about the case, and by the client and the conduct of the case to that point.

[2] What Makes Juries Listen, by Sonja Hamlin (Law and Business, Inc., Clifton, N.J. 1985), p. 112.

The jury wants to: protect society, punish the defendant, serve justice, and follow the law.



**c. Face the Facts**
You cannot ignore damaging facts but how you deal with them is of great consequence. Introduction or first mention of such evidence *by the defense* amounts to an implicit admission that the harmful matter is material to the resolution of the verdict, and, therefore, should generally be avoided. Once mentioned or introduced *by the prosecution*, however, they are at issue. The defense must then deal with important harmful facts and advance any strong arguments to show why they are not material to the verdict. If the harmful facts involve inflammatory evidence or evidence that would naturally draw sympathy toward the victim or the victim's family, e.g., the gruesome details of the crime, then mention of it should be linked to the strongest specific mitigation evidence that is in the case.

For instance, the defendant may have committed the crime in a certain (gruesome) way because of a specific mental disease or defect, e.g., he stabbed her forty-times not because he is mean and vicious but because that part of the brain that controls impulse behavior and can inhibit repetitive action is damaged. Or, the fact that the defendant committed prior offenses of a violent nature shows us not that he is incorrigible and too dangerous to others to live but that no one ever cared enough or took the time to understand that the defendant desperately needed a rigid structure imposed on his life. He will find that rigid structure in prison and no longer be a danger to others.

## 2. Main Themes

Dr. Deana Logan, who has analyzed the themes in numerous defense penalty phase arguments, suggests a focus on three things in closing argument: giving guidance regarding the aggravating and mitigating circumstances, making understandable the defendant's behavior, and demonstrating the severity of life in prison. As mentioned previously in the discussion of opening statements, the jury has certain concerns that counsel should consider addressing, namely that the jury wants to: protect society, punish the defendant, serve justice, and follow the law. With those things in mind, the following discussion is offered.

**a. Giving Guidance Regarding the Aggravating and Mitigating Circumstances**

- **Explain what aggravating and mitigating circumstances are; reasons to kill, reasons to live**

Each juror should fully understand the meaning of "aggravation" and "mitigation" and how they should be considered in this particular case. Explain both the general meaning of these terms and how they apply in this case. Jurors should think of mitigation not just as "good" things, but as any factor that aids in understanding the offense or diminishes culpability. One way to

bring the definition home is, after relating the defendant's "story," go back to the points of mitigation, stress each one separately, and lead the jury to accord independent weight to each.

• **Explain and elaborate on burdens and standards of proof** The burdens and standards of proof work to your advantage, and should be emphasized. Not only does the prosecution have the burden of proving aggravators beyond a reasonable doubt, it also has the burden of proving beyond a reasonable doubt that the aggravation that is found outweighs the mitigation. In addition, the jury must consider any mitigation raised by any evidence. The defense has no burden of production or proof, and the proof need not rise to any particular standard before the jury is required to consider it. This may sound to jurors like legal mumbo jumbo, but you can argue that it reflects a presumption in the law against death sentences, and that the prosecution has a great obstacle to overcome in order to obtain the sentence. (For legal authority for these propositions, see Chapter 14, Section VIII, Proposed Jury Instructions.)

Jurors should also be reminded of what defense counsel has told them in voir dire and in the opening statement; there is no automatic death penalty. Even if a raft of aggravating circumstances are found, the jury is not obligated to vote for death.

Each juror should know that he or she is individually responsible for a personal decision concerning life or death, and is obliged to make that decision without intimidation by other jurors concerning the imposition of this, the most brutal and ultimate, sanction that society extracts. In trying to achieve this goal, recognize that a critical tension must be maintained.

On the one hand, you want to empower the jury by explaining the deliberative process, the role of aggravators and mitigators, the jurors' duty to vote their individual consciences, and the fact that a single mitigating circumstance can outweigh any number of aggravators. On the other hand, you do not want the deliberative process to become a rote legal exercise where the jurors check their emotions at the door and follow a set of rules diminishing their responsibility. They must understand that they will ultimately decide whether a particular human being will live or die. While standards "guide" their actions, the ultimate decision is completely at the discretion of each individual juror.

To allow either aspect to dominate the deliberations will result in a diminishing of responsibility that allows people to kill your client, or a collapse into emotional anarchy that can be equally deadly. The tension must be recognized, identified and affirmed.

Each juror should know that he or she is individually responsible for a personal decision concerning life or death.

Tell the jury that the law requires that they listen, take into account and weigh the mitigating evidence in the case.

**• Emphasize and elaborate upon instructions**
To most jurors, instructions are unintelligible. Take the time to reduce the substance of the law into a coherent description of the task that lies before the jury. Remember to use the power of the court to support your client's case and tell them that the law requires that they listen, take into account and weigh the mitigating evidence in the case. As you go through each of the mitigating factors with the jury, emphasize that the Court will give them an instruction that they must consider it.

Instructions should also empower each individual juror to decide what evidence is, in fact, mitigating. As you have told the jurors in the opening statement and as they should be instructed, their job is not to add up the number of factors on each side in making the decision, but to assign the weight to be given each consideration.

Hold the prosecution to the letter of the instructions concerning aggravating circumstances, and differentiate your client's acts from the statutory definition. Make sure that the jury knows and is instructed that it cannot consider any non-statutory factor (unless the defense has legitimately opened the door). Stress the statutory instruction that each aggravating circumstance must be found unanimously but that mitigating factors do not.

**• Stress each juror's individual responsibility**
Each juror must be made to feel responsible for the ultimate decision. The death penalty cannot be imposed unless each juror individually makes that decision; they cannot say they merely went with the majority. They are obligated to consider other jurors' opinions, but they are individually bound to vote their own conscience.

**• Question whether the aggravators have been proven or apply**
If there is insufficient evidence to prove that an aggravator exists, highlight that failure. Even if the prosecution has proven that an aggravator exists, use the closing argument to diminish its impact on the deliberative process. Try to inject ambiguity and doubt into the deliberations.

Your investigation will have uncovered aspects of the crime that are inconsistent with the aggravators charged. A police officer may have been killed, but he was off duty and out of uniform. An underlying felony of rape may be alleged, but the snitch's testimony is uncorroborated by any physical evidence. Closing argument allows you to review your rebuttal evidence, inject ambiguity or doubt, and provoke reasonable doubt that a particular aggravator was established.

> People are less severe in their punishment if they can comprehend the causes of the transgression.

Though some aggravators are objective, i.e., the victim's age or occupation, some are very subjective — for example, just what constitutes heinous, atrocious or cruel behavior, whether there was actual endangerment to others, or whether the murder was committed to eliminate a witness. If the prosecution alleges endangerment, the defense may show that the defendant had every opportunity to kill others but chose restraint, suggesting either that the killing was accidental or that witness elimination was unintended since other witnesses were left unharmed.

## Making Your Client's Behavior Understandable

### a. Know the Story of the Client's Life and Perceive Him as Human

"There are very few human beings who receive the truth, complete and staggering, by instant illumination. Most of them acquire it fragment by fragment, on a small scale, by successive developments, cellularly like a laborious mosaic."[3] Family, friends and experts have introduced bits and pieces of the client's life. Closing argument blends this mosaic into a coherent story. And, as noted, the care and emotion you display for the defendant during argument can deeply affect the jury's perception.

If capital trial proceedings were televised, they would be compelling drama. The story would be interspersed with cuts to vignettes outside the courtroom, informing and educating about the events underlying the trial. Emotion would be heightened by elements humanizing the characters and enhancing the understanding that this is a life and death struggle. The story would blur the boundaries between good and evil, right and wrong. Effective presentation of testimony and argument would alter, to the defendant's advantage, the viewers' concept of criminal culpability or criminal responsibility, at least in this case. Common sense is supported by scientific inquiry on this point, "Research clearly shows that people are less severe in their punishment if they can comprehend the causes of the transgression." Logan, *Pleading for Life, supra.*

Telling the story and establishing the defendant's humanity will either encourage the juror who wants to vote for life or perplex the juror who is prone to choose death. Either result could be the difference between life and death.

### b. Tell the Defendant's Story

People remember better, and are more affected by, story than any other medium. The core of the argument should be a detailed and annotated reiteration of the evidence on the client's life, in the form of a story. The story should continue through the crime right to the moment of argument, including all mitigation, indications of remorse, activities in prison, and behavior during the trial. This approach can make counsel, as narrator, the best defense witness.

[3] Anaïs Nin, The Diary of Anïas Nin, Vol. III, Fall 1943.

Mitigation is most effective when it helps explain why the defendant committed this crime.

**c. Differentiate Successful Siblings.**
If there are siblings who "made it," you may need to distinguish them from the defendant; why they made it and the defendant did not. Those differences may be: e.g., in sex/age; size of client (older sibling(s) large enough to fight off parent(s)/abuser); that the client was at home and siblings were not; that the contrast with the siblings only made things worse for the client; that the parent(s) picked on client rather than other sibling(s); that incidents of violence directed mostly at client and not other sibling(s); that the role of client in family such that it brought different treatment (momma's protector); that the client did not have a relative/friend or family/school counsellor/teacher/coach, etc. take an interest in him as they did with the sibling(s); etc. The theme is either that, unlike the client's situation, someone intervened in the sibling's case or that the client is profoundly different than his sibling(s) for concrete, demonstrable reasons.

**d. Explain How Mitigation is Linked to the Offense**
Mitigation is, perhaps, most effective when it helps explain why the defendant committed this crime. Closing argument is the time to carefully weave the evidence into a coherent explanation (not excuse) of why the client killed this person in this manner. The argument must be tailored to the particular circumstances of the case, the client, the jury, the prosecutor, and the defense team.

You will have introduced evidence of numerous mitigating circumstances. Too often, counsel leaves these unrelated to the offense and the jury considers them only as random events meant to elicit sympathy. Though your witnesses may have already made these links, the jury may not have fully understood the events' and disabilities' cumulative effect on the client, and how that relates to the offense. One effective argument is that the death penalty is an absolute punishment, and is not appropriate for a person who is not absolutely responsible.

Listed below are some common mitigating circumstances and ways that they can be linked to an offense:

**The client is of limited intelligence**
Explain how the defendant's limited intelligence makes him susceptible to domination by others, leaving him predisposed to manipulation by a co-defendant to commit the crime.

**The client was sexually abused as a child**
Tie together evidence of the abuse with psychological testimony on its effect on the individual, to explain why the client was predisposed to sexual activity most would find depraved.

**The client huffed gasoline or glue**
Describe how particularized brain damage caused by this activity limits the client's ability to control his impulses, especially when intoxicated, and this profile is consistent with the impulsive nature of the crime.

**The client has an outstanding institutional record**
The client's prison record demonstrates that the structure and supervision of a prison setting allow her to control her impulses and live productively and nonviolently, whereas the drug ridden and unstructured nature of her life at the time of the offense predisposed her to criminal acts.

**e. Treat the Defendant as a Human Being**
Rather than talking about "the death penalty being imposed upon the defendant," say "John Doe will be killed," "will be electrocuted." Refer to your client as someone with whom you are familiar and about whom you care. At least once when this is said, stand behind John, with both hands on his shoulders to indicate that this person is a human being to you, someone you care about, are unafraid to touch. And do it as if you mean it. To reiterate, if you don't care, how can you expect the jury to care?

**f. Redemptive Possibilities.**
You may or may not want to mention the word "redemption" but it can be a powerful subtext in closing argument. Is this person so beyond redemption that he should be eliminated altogether from the human community? Perhaps, you can demonstrate that this is a person who has loved or protected anyone or who can perform in structured environment like prison. Evidence of prior or present good behavior while incarcerated, especially if the defendant helped someone else (e.g., taught them how to read, protected them from attack) can also be used to suggest that you client's life does and can continue to have some meaning.

**g. Let the Defendant Speak**
Consider having the client make some of the closing argument. This of course depends on the client's ability to present an effective plea for his or her life. One possible format, if permitted by the court, is to have the defendant introduce counsel's argument. This is known as the right of allocution and the primary advantages are that it is not subject to cross-examination and may humanize an otherwise mute defendant (the defendant may not comment on the facts of the case without opening him/herself up for cross-examination). The accused can say that counsel will discuss the factors involved, but that he or she only wants to say again that he is sorry for what he did, that he has something (wife, child, etc.) to live for, and to please let him live.

Consider having the client make some of the closing argument.

The jury is looking for a way to vent anger. Let them, by showing that life imprisonment *is* punishment.

If you believe that your defendant is capable of allocuting to the jury, then, obviously, your client must be thoroughly prepared in advance. See, Motions Chapter, Appendix ___, for extensive authority on the right of allocution.

**4. Explain That Life in Prison Is Punishment.**

**a. Death penalty as ultimate punishment**

Consider telling the jury that the death penalty is the absolute punishment, and should be reserved for the most extreme cases, in which responsibility is absolute and certain.

The jurors have not only given an oath that they can impose the death penalty but most of them probably support capital punishment. They are likely to abhor what the defendant has done, are afraid of the client, feel more sympathy for the victim's family than for the defendant or the defendant's family, are angry about what has happened, and are looking for a way to vent their anger. Do not try to dissuade them from these views through direct criticism or statements that they "shouldn't feel that way." Affirm their feelings but carry them beyond feelings by softening them up with facts, confusing their rigid stand by introducing ambiguity, and shaping the argument to meet the needs expressed by jurors during voir dire.

**b. Explain that the defendant will still be severely punished if they vote for life**

Regardless of what the jurors decide, the defendant will spend the rest of his life incarcerated in a high security penal institution: they are only deliberating whether he will die at the hands of the state or by natural causes. Each juror should be convinced that the defendant will, in fact, spend the rest of his life incarcerated in a high security penal institution.

If the severity of life in jail can be effectively presented (without creating the impression that a life sentence in prison is so onerous that it is not worth living at all, i.e., killing the defendant may be the humane thing to do to save him all that misery), then the jurors may be persuaded that by voting for a life sentence they have fulfilled their collective and personal responsibility to see that this actor suffer the consequences of his actions.

**5. Powerful (but potentially damaging) Arguments**

Some arguments are so potent that they have the potential to do either amazing good or irreparable harm. Under most circumstances they should be avoided unless you can carefully research and craft each issue to diminish its aggravating potential and enhance its mitigating value. If handled properly, you will greatly enhance your client's chance at a life sentence. If handled improperly, the first victim will be your credibility with the jury and the second victim will be your client.

Where present, use lingering doubt as "mitigation."

**a. Concern for the Victims**
If the client has demonstrated some degree of remorse and his demeanor during the trial supports this perception, talk about it. If the nature of the crime shows total disregard for humanity, or the client has acted less than remorseful at trial, don't invite the jury's scorn by raising this issue.

**b. Religion**
Handle religious references with great care. Most religious tracts can be quoted to support either side of any proposition. If using biblical quotes, persuade the jury that while the prosecutor can cite apparently contradictory passages, the passage just quoted is the most appropriate. More important, be wary of urging a religious proposition that does not have personal meaning to you. A hypocritical sermon is unpersuasive and destroys credibility.

**b. Cruelty of the Death Penalty**
The death penalty process is cruel and brutal, and when confronted with the facts most people will find it abhorrent. However, most will also think that whatever is done to the defendant is less abhorrent than what the defendant did to the victim (and the prosecutor will be grateful for the opportunity to remind the jury of this contrast). A positive strategy for overcoming this war of abhorrence is to challenge the jury to measure their conduct by standards other than those of the defendant.

**c. Doubt**
If the jury deliberated at length on the issue of guilt, stress any doubt as to whether the defendant was in fact the perpetrator or whether it is really first degree murder. While there may have been enough proof to convict, there may be some lingering doubt that can be used subtly to avoid the irreversible finality of death. Some believe that this is the strongest mitigation, but don't insult a jury for whom guilt is a certainty by trying to revive issues of innocence.

**d. The Jury's Courage to Act Responsibly**
This is a two edged sword. The prosecution often challenges the jury to have the courage to impose death; you may counter that it takes more courage to vote for life. If you initiate the subject, you may get the converse argument from the prosecution.

### 6. Preparing and Delivering the Closing Argument

Being a natural orator can be either a help or a hindrance in arguing the sentencing phase. Don't be intimidated if your oratory is less than perfect. Some natural orators depend too heavily on natural talent and neglect the necessary preparation. Others excel because they can detach themselves emotionally and speak eloquently unencumbered by feelings. Though good oratory may entertain some jurors, a carefully planned and

You can't convince the jury of something you don't personally believe.

sincerely delivered closing argument is much more convincing than a hastily constructed, yet beautifully delivered, impassioned plea. Listed below are some very basic ground rules:

**a. Do Not Waive Closing**
Because the state cannot properly reserve any significant point not already discussed by the parties for its summation, it is foolhardy to waive final argument in order to deny the prosecutor the opportunity to fire a closing salvo. If you have done a good job, you will be able to make an effective argument that can both give the jury some reason not to kill the defendant and take the sting out of the prosecutor's summation.

**b. Get in Touch with Your Own Feelings**
Whatever you say to the jury has to come from you — not from someone else's expectations of what should be said. If you are ambivalent about the client or actually believe that aggravators outweigh mitigators and the client deserves to die, don't simply proceed because you are an advocate and it is expected. If co-counsel can be a more effective advocate, let her close. You can't convince the jury of something you don't personally believe.

On the other hand, you may be so invested in your client that you have lost the ability to see the case through the jury's eyes. Your emotions may take control and interfere with your ability to deliver a coherent or consistent explanation of why the client should live. You may display anger toward the district attorney or even the jury and inject an adversarial tone *with the jury* that can only work to your client's detriment.

Emotion and feeling are important elements of argument, but only if they are controlled and consistent with the substance of the argument.

**c. Be Prepared, Not Rehearsed**
From the beginning of your involvement in the case, give periodic thought to the closing argument, recording ideas in a separate note pad or file folder. The amount of time devoted to preparation will increase as the time for argument approaches. Try to anticipate the day of final argument and set aside three or four hours of the preceding day to prepare an outline, to ensure that all issues are covered.

The preparation period will also provide time to mold the argument to fit the personalities of the courtroom players. While the argument should be practiced so that each thought is followed through to its logical conclusion, it should not be so well rehearsed or memorized that it becomes a recitation. By preparing the argument a day or more in advance, counsel can use free time on the day of argument to get

in the proper mood and to respond, if necessary, to the prosecutor's opening remarks. This preparation should allow you to ride with — yet control — your emotions.

**d. End on a high note**

End on a note filled with emotion, hope, and confidence. Not just emotion toward your client, but an emotional recognition of the entire tragic event, the pain of the victim's family, the responsibility the defendant must carry for a lifetime.

Not hope that the jury will simply spare the life of your client, but hope that all will be served by a merciful judgement that curtails the cycle of violence.

Not confidence that you will "win" this case, but confidence that the truth is finally known and that it indicates that a sentence of life is more appropriate than death.

If you hit this level before the scheduled end of the argument, and all necessary points have been covered, consider stopping right then. It is better to leave a few thoughts unsaid than to close unemotionally on the end of the prepared comments.