STATE OF TENNESSEE VS. Christa Gail PIKE
CASE NO. 68280 EXHIBIT NO. 14C
DATE 4-7-11-08 ID____ Evd ✓

VOLUME III - APPEALS, COLLATERAL LITIGATION, & APPENDICES

# TOOLS FOR THE ULTIMATE TRIAL

THIRD EDITION/1992




FILED (69)
APR 07 2009
Clerk of the Courts
Rec'd by________

## The Tennessee Death Penalty Defense Manual

Prepared by Capital Case Resource Center of Tennesee ▲ Distributed by Tennessee Association of Criminal Defense Lawyers.

# TOOLS FOR THE ULTIMATE TRIAL: TENNESSEE DEATH PENALTY DEFENSE MANUAL©
# (VOLUME 3 - APPEALS, COLLATERAL LITIGATION, & APPENDICES)

**Copyright © 1997 by TACDL.**
All rights reserved.

The Tennessee Association of Criminal Defense Lawyers (TACDL)
207 Third Avenue North, Nashville, TN 37201-1605

Phone: 615/726-1225, Fax: 615/726-2560,
E-mail: tacdl@aol.com
Website: http//www.tncrimlaw.com/tacdl

# Third Edition / 1992


CONTIRIBUTORS
Jeff Blum
Isaiah Gant
Brock Mehler
Chris Minton
Paul Morrow
Bill Redick

GENERAL EDITOR
Gretchen Franklin

LAYOUT AND DESIGN
Jeff Blum
Juanita Pierce
Bill Redick

# TOOLS FOR THE ULTIMATATE TRIAL
## Tennessee Death Penalty Defense Manual

Capital Case Resource Center of Tennessee
Tennessee Association of Criminal Defense Lawyers

## First Edition/1985

### EDITORIAL BOARD
Lionel Barrett
Jeff Blum
Neil P. Cohen
Joe B. Jones
Henry A. Martin
William P. Redick, Jr.
Larry Woods

### GENERAL EDITOR
Neil Cohen

### EXECUTIVE ASSISTANTS
Kevin Weaver
Laura Williams

### ASSISTANTS
Barbara Boulton
Scott Davis
Randall Kilby
Jane Lee
Dale Potter
Martha Zendlovitz

### CONTRIBUTORS
James A. H. Bell
Jeff Blum
James T. Bowman
Neil P. Cohen
Ralph Harwell
Joe B. Jones
Susan L. Kay
James D. Kopernak
William Marett, Jr.
Henry A. Martin
Sandra K. McCrea
Richard McGee
Mary Jo Middlebrooks
Hugh J. Moore, Jr.
David Raybin
William P. Redick, Jr.
William Shulman
Jerry H. Summers
Doug Trant
Robert Tucker
James L. Weatherly, Jr.
Richard Whitaker

### TYPISTS
Jeannie Emantel
Tina Jones
Kim Whittenbarger

## Second Edition/1987

### EDITORIAL BOARD
Jeff Blum
Gretchen Franklin
Joe B. Jones
Henry A. Martin
William P. Redick, Jr.

### GENERAL EDITOR
Gretchen Franklin

### TYPISTS
Ann Card
Deborah Hampton
Michele Munson

### LAYOUT AND DESIGN
Jeff Blum

# SUMMARY TABLE OF CONTENTS

## Volume I - Pretrial


Preface ........ 1-3
1. History of the Death Penalty ........ 1.1-1.13
2. Effective Representation ........ 2.1-2.31
3. Overview ........ 3.1-3.17
4. The Defense Team ........ 4.1-4.17
5. Investigation ........ 5.1-5.45
6. Negotiation ........ 6.1-6.14
7. Constitutionality of T.C.A. § 39-13-204 & 206 ........ 7.1-7.19
8. Recurring Legal Issues ........ 8.1-8.73
9. Motions ........ 9.1-9.37
10. Venue ........ 10.1-10.21
11. Jury Composition ........ 11.1-11.17


## Volume II - Trial


12. Voir Dire ........ 12.1-12.40
13. Guilt Phase ........ 13.1-13.10
14. Sentencing Phase ........ 14.1-14.114
15. Post-Trial Jury Interviews ........ 15.1-15.15
16. Post-Trial Motions ........ 16.1-16.17


## Volume III - Appeals, Collateral Litigation and Appendices


17. Appeals in State Court ........ 17.1-17.28
18. Certiorari ........ 18.1-18.4
19. State Postconviction ........ 19.1-19.65
20. Coram Nobis ........ 20.1-20.7
21. Federal Habeas Corpus ........ 21.1-21.17
Manual Appendix ........ A-D
A. Trial Issue Index
B. Postconviction Issue Index
C. Supreme Court Cases
D. Court of Criminal Appeals Cases

# Table of Contents - Volume III

## 17. Appeals in State Court ........ 17.1

I. Introduction ........ 17.3
II. Rule 12 of the State Supreme Court ........ 17.5
III. Standards for Appellate Counsel ........ 17.6
  A. Higher Standards ........ 17.6
  B. It Takes Two to Do It Right ........ 17.7
  C. Eligibility to Handle Death Penalty Appeals ........ 17.8
  D. Workload ........ 17.9
III. The Non-Death Appellate Process ........ 17.10
IV. How Death is Different ........ 17.11
  A. Raise All Errors on Appeal, Whether or Not Raised Below ........ 17.12
  B. Shotgun the issues; do not use a rifle ........ 17.14
  C. The horizon does not end at the Tennessee Supreme Court ........ 17.14
  D. Constitutionalize all issues, using state and federal cases and constitutions ........ 17.15
  E. Maximize the time involved in the direct appeal ........ 17.17
    1. Why ........ 17.17
    2. How ........ 17.18
  F. Be prepared to argue that each error is not "harmless" ........ 17.21
  G. File a reply brief ........ 17.23
  H. Oral argument ........ 17.23
  I. File a petition to rehear after any adverse decision ........ 17.25
  J. File a petition for a writ of certiorari to the United States Supreme Court ........ 17.25
V. Miscellaneous Procedural Aspects ........ 17.26
  A. Make Sure It Is in the Record ........ 17.26
  B. Statement of the Issues ........ 17.26
  C. Statement of the Case ........ 17.26
  D. Statement of Facts ........ 17.27
  E. Argument ........ 17.27
  F. Briefs ........ 17.27

## 18. Certiorari to the U.S. Supreme Court ........ 18.1

Writ of Certiorari Basics ........ 18.3
  A. When to File a Cert Petition ........ 18.3
  B. Appointment of Counsel ........ 18.3
  C. Guidelines for Filing a Cert Petition ........ 18.3
  D. The Danger of Cert Petitions ........ 18.3
  E. The Necessity of Cert Petitions ........ 18.4
  F. Strategic Decisions ........ 18.4
  Appendices:
    A. Motion for Stay of Execution
    B. Order Granting Stay of Execution
    C. Motion for Leave to Proceed in Forma Pauperis
    D. Affidavit in Support of Motion to Proceed in Forma Pauperis
    E. Affidavit
    F. Application for Extension of Time in Which to File Petition for Certiorari

G. Petition for Writ of Certiorari to the Supreme Court of Tennessee
H. Affidavit of Mailing Petition for Certiorari

## 19. State Postconviction ........................................ 19.1

I. Introduction ........................................ 19.4
II. The ABA Guidelines ........................................ 19.5
III. The Goal: A "Full and Fair Hearing" ........................................ 19.6
IV. Trying the Case that Wasn't Tried ........................................ 19.9
A. Consult and Listen to the Client ........................................ 19.9
B. Let the Reinvestigated Facts Dictate the Issues ........................................ 19.9
C. Time ........................................ 19.10
D. Money ........................................ 19.11
E. Team Effort ........................................ 19.11
V. Investigation ........................................ 19.12
VI. Investigation Checklist ........................................ 19.13
VII. The Tennessee Public Records Act ........................................ 19.15
A. Introduction - Statutory and Constitutional Rights ........................................ 19.15
B. What is a Public Record? ........................................ 19.16
C. Standing ........................................ 19.17
D. Exclusions ........................................ 19.17
E. TPRA and Rule 16 of the Tenn.R.Crim.P. ........................................ 19.18
F. In Which Court Do You File An Action For Access To Records? ........................................ 19.20
G. Procedure ........................................ 19.20
H. TBI Records ........................................ 19.21
I. Summary and Conclusion ........................................ 19.22
VIII. Asking for Help ........................................ 19.24
A. Constitutional Right to Support Services, Generally ........................................ 19.24
B. "Back Door" Due Process and the Right to Counsel ........................................ 19.25
C. Ake v. Oklahoma and Due Process ........................................ 19.27
D. Equal Protection ........................................ 19.28
E. Meaningful Access to the Courts ........................................ 19.29
F. Tennessee Rules ........................................ 19.30
G. Statutory Right to Support Services ........................................ 19.30
H. The Suspension Clause ........................................ 19.33
IX. What to Ask For Under Ake ........................................ 19.35
A. The necessity of ex parte proceedings ........................................ 19.35
B. The Mechanics of Ex Parte ........................................ 19.37
C. Types of Support Services ........................................ 19.38
X. Waiver & Previous Determination ........................................ 19.40
A. Waiver ........................................ 19.40
1. The issue is not waived because the Tennessee Supreme Court has a statutory duty to review all claims in a case with a sentence of death ........................................ 19.42
2. The issue is not waived because there is new law on the subject that did not exist at the time of trial and/or direct appeal. ........................................ 19.42
3. The issue is not waived because there are newly discovered facts pertaining to the claim that have never been considered by any court. ........................................ 19.45
4. The issue is not waived because the petitioner did not

TABLE OF CONTENTS


personally and knowingly decide to give up the claim ........ 19.45
5. The issue is not waived because there has been no full and fair opportunity to raise it ........ 19.45
6. The issue was not waived because previous counsel was ineffective ........ 19.46
7. The issue is not waived because the state effectively prevented the claim from being raised ........ 19.46
8. The issue is not waived because the state, in its mandatory answer, failed to allege waiver ........ 19.46
B. Obtaining a Hearing on the Question of Waiver ........ 19.47
C. Burden of Pleading and Proof ........ 19.47
XI. Ineffective Assistance of Counsel ........ 19.48
A. Approaching Prior Counsel ........ 19.48
B. Deposing the Trial Attorney ........ 19.49
C. The Applicable Standards ........ 19.49
D. Undercutting claim that decisions were "strategic" or "tactical" ........ 19.50
E. Failure to introduce proof at the sentencing phase ........ 19.51
F. Getting the complete case file from uncooperative counsel ........ 19.53
1. Cooperative counsel ........ 19.53
2. Uncooperative counsel ........ 19.53
3. Privileges ........ 19.54
4. Between attorney and client, the file is not subject to a work-product claim ........ 19.55
5. Litigating the turnover of the file ........ 19.56
6. Obtaining the file at a hearing on the merits ........ 19.57
G. "Habit" evidence ........ 19.58
H. Specific suggestions and techniques of cross-examination ........ 19.58
1. Time Records ........ 19.58
2. Duces Tecum the File ........ 19.59
3. Support Services ........ 19.59
4. Attorney Fees ........ 19.59
5. Investigation ........ 19.59
6. Witnesses ........ 19.60
7. Client Contact ........ 19.60
8. Client Arrest Record ........ 19.60
9. Client's Family Contact ........ 19.60
10. Community Contact ........ 19.61
11. Prior Residences ........ 19.61
12. School Records ........ 19.61
13. Past Employment ........ 19.61
14. Religious Background ........ 19.61
15. Substance Abuse ........ 19.61
16. Constitutionality of the Death Penalty ........ 19.61
17. Pre-Trial Publicity ........ 19.62
18. Change of Venue ........ 19.62
19. Incriminating Statements ........ 19.62
20. Jury Instructions ........ 19.62
21. Sentencing Phase ........ 19.63
22. Aggravating Circumstances ........ 19.63
23. Sentencing Experts ........ 19.63
24. Closing Argument ........ 19.64
XII. Preparing for Federal Review ........ 19.65

Appendices:
- A. Postconviction Basics
- B. Death is Different
- C. Indigent's Right to Expert When Reasonable Showing of Need
- D. Tennessee Cases Rejecting Support Services
- E. Federal Circuits Granting Support Services
- F. State Postconviction Checklist

## 20. Coram Nobis ........ 20.1

I. Introduction ........ 20.3
II. Statutory Provisions ........ 20.4
III. Procedure ........ 20.5
IV. The Statute of Limitations ........ 20.6
- A. When Does the Statute of Limitations Begin to Run? ........ 20.6
- B. Tolling the Statute ........ 20.6
  - 1. Petitioner Under Disability ........ 20.6
  - 2. Fraudulent Concealment ........ 20.6
  - 3. Cruel and Unusual Clause ........ 20.7
  - 4. Due Process ........ 20.7
  - 5. Open Courts ........ 20.7

## 21. Federal Habeas Corpus ........ 21.1

I. Introduction ........ 21.3
II. The Habeas Statutes ........ 21.4
- A. Jurisdiction and Venue ........ 21.4
- B. Procedure ........ 21.4
- C. Cognizable Claims ........ 21.4

III. Barriers to Presenting Claims ........ 21.5
- A. Teague v. Lane ........ 21.6
- B. Procedural Default ........ 21.6
  - 1. State Must Rely on Procedural Default ........ 21.7
  - 2. State Procedure Rule Must Be "Adequate" ........ 21.8
  - 3. State Procedural Rule Must Be Independent ........ 21.9
  - 4. Cause and Prejudice ........ 21.9
  - 5. Manifest Miscarriage of Justice ........ 21.10
- C. Exhaustion of remedies ........ 21.11
- D. Stone v. Powell ........ 21.11
- E. Presumption of Correctness Afforded State Court Findings of Fact ........ 21.13
- F. Habeas Rule 9 ........ 21.14

III. Relief ........ 21.16
........ 21.17

Appendices:
- A. Presumption of Corrections and Questions of Law and Fact

## Manual Appendix ........

- A. Trial Issue Index ........ 1-93
- B. Postconviction Issue Index ........ 1-27
- C. Supreme Court Cases ........ 1-45
- D. Court of Criminal Appeals Cases ........ 1-20

# Table of Contents

I. Introduction ........ 17.3
II. Rule 12 of the State Supreme Court ........ 17.5
III. Standards for Appellate Counsel ........ 17.6
  A. Higher Standards ........ 17.6
  B. It Takes Two to Do It Right ........ 17.7
  C. Eligibility to Handle Death Penalty Appeals ........ 17.8
  D. Workload ........ 17.9
III. The Non-Death Appellate Process ........ 17.10
IV. How Death is Different ........ 17.11
  A. Raise All Errors on Appeal, Whether or Not Raised Below ........ 17.12
  B. Shotgun the issues; do not use a rifle ........ 17.14
  C. The horizon does not end at the Tennessee Supreme Court ........ 17.14
  D. Constitutionalize issues, using state/federal cases and constitutions ........ 17.15
  E. Maximize the time involved in the direct appeal ........ 17.17
    1. Why ........ 17.17
    2. How ........ 17.18
  F. Be prepared to argue that each error is not "harmless" ........ 17.21
  G. File a reply brief ........ 17.23
  H. Oral argument ........ 17.23
  I. File a petition to rehear after any adverse decision ........ 17.25
  J. File a petition for a writ of certiorari to the U. S. Supreme Court ........ 17.25
V. Miscellaneous Procedural Aspects ........ 17.26
  A. Make Sure It Is in the Record ........ 17.26
  B. Statement of the Issues ........ 17.26
  C. Statement of the Case ........ 17.26
  D. Statement of Facts ........ 17.27
  E. Argument ........ 17.27
  F. Briefs ........ 17.27

# I. Introduction

"The function of an appellate court is to go out on the battlefield after it is all over and shoot the wounded."

– Attributed to an unnamed federal appellate judge.

There is no more devastating verdict that can be rendered than a sentence of death, for the lawyer as well as the client. Death penalty cases are physically, emotionally and, usually, financially draining. It is common for the trial attorneys to handle the direct appeal regardless of their experience, desire or aptitude for appellate work. Still reeling from the jury's pronouncement, counsel must shift gears and think like an appellate lawyer -- crafting the presentation of legal issues to a (more or less) learned panel of attorneys rather than factual and emotional arguments to a lay jury. Of course, trial counsel should present all issues with an eye to their resonance on appeal, but the focus at trial is on winning the case by obtaining a verdict of something other than first degree murder or avoiding the ultimate penalty.

Death penalty appellate work calls for the highest degree of skill to ferret out all conceivable issues under the law as it is, should be, or might be. Appellate counsel

> must be completely conversant with federal constitutional decisions of the state and federal courts throughout the nation. The lawyer also must keep abreast of developments in all of the federal circuits, the state appellate courts and the writings of commentators. This is necessary so that counsel will be aware of all issues that are "percolating" in those courts, recognize the "tools to construct [the] constitutional claim" and then raise and present all issues long before they achieve general acceptance in the courts.[1]

Most trial attorneys raise every conceivable issue in the motion for new trial, on the correct theory that issues not raised may be waived on appeal, and the reasonable premise that few such motions are granted[2] and there is nothing to lose in presenting a laundry list of all errors. In a death penalty case, this common wisdom is not only good practice but absolutely essential.[3] All issues must be raised in both state and federal constitutional terms if any is to have a chance of being reviewed at a later time. An important battle may have been lost, but the war is far from over.

All issues must be raised in both state and federal constitutional terms if any is to have a chance of being reviewed at a later time

[1]Bright, "Death by Lottery – Procedural Bar of Constitutional Claims in Capital Cases Due to Inadequate Representation of Indigent Defendants," 92 W. Va. L. Rev. 679, 687-88 (1990).

[2]Do not entirely discount the possibility of prevailing on a motion for new trial; several have been granted in recent Tennessee death penalty cases, e.g., the John David Terry case, tried in Davidson County in 1989, and J.B. McCord case, tried in Coffee County in 1988.

[3]See § IV,A, below, on the duty of the Tennessee Supreme Court to review all errors raised on appeal, whether or not raised below. Even though this duty appears clear, counsel can not allow the Court an opportunity to avoid a full and complete review.

You will have to consider the consequences of the direct appeal on later litigation

As a death penalty appellate attorney, you will find yourself having to consider strategies and tactics that may be foreign to you. You will have to consider the consequences of the direct appeal on later litigation (state post-conviction and federal habeas corpus) in a manner never before required. You should also plan from the start to file a petition for a writ of certiorari to the U.S. Supreme Court, and to link your issues with any pending review at the Court. Exactly *what* can be litigated at any stage beyond direct appeal is crucial to consider *now*, as it will depend on the pleadings you file.

# II. Rule 12 of the State Supreme Court

One overlooked weapon in the defense attorney's arsenal is Rule 12 of the Tennessee Supreme Court Rules. As the Chief of the Tennessee Supreme Court, Justice Reid, noted in a recent case:

> With the aid of the information available under our Supreme Court Rule 12, this Court can assure by a rigorous and thorough comparative review of each capital case that the death penalty is rationally, and therefore constitutionally, imposed in those few cases in which the people of this state agree that the ultimate sanction is warranted.

State v. Black, 815 S.W.2d 166, 194 (Tenn. 1991) (Reid, CJ, dissent).

The Rule 12 form is counsel's chance to comment on the overall fairness of the process

Rule 12 requires that the trial judge list certain information and gives an opportunity to both the trial judge and the attorneys to make comments. Rule 12 forms, completed by the trial court list in all first degree murder cases in which life imprisonment or a sentence of death is imposed are, as noted in Black, supra, the primary tool for the Supreme Court to determine the proportionality of death sentences. See, T.C.A. § 39-13-206 (c)(1).

The form must also be submitted to the attorneys for the parties for "such comments as either desire[s] to make concerning its factual accuracy." This is counsel's chance to comment on the choice of this defendant among all others similarly situated for the punishment of death (e.g., comments on the application of aggravating factors to murder cases in your jurisdiction), to comment on the overall fairness of the process (e.g., denial of investigative, psychological or other support services; racial, sexual or cultural bias), to document anything affecting the trial that may have fallen outside the record; and to make any other appropriate comments, observations or additions to the record. This opportunity may allow counsel on appeal or in collateral proceedings to raise issues in a way that would not otherwise be possible.

Appellate counsel should be thoroughly familiar with the ABA Guidelines

The state must provide counsel for indigent appellants;[4] the standard for appointed counsel is the same as for retained counsel.[5] The minimum standards require counsel to provide reasonably effective assistance; it is left to the legal profession to define the standards by which counsel should be judged.

> The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions.

Strickland, 466 U.S. at 688.

Appellate counsel should be thoroughly familiar with the ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases.[6] Even though they were adopted in 1989, there is solid authority for the proposition that the Guidelines, and the various standards and guidelines that preceded them, have been adopted by reference in Tennessee.

> Trial courts and defense counsel should look to and be guided by the American Bar Association's Standards relating to the Administration of Justice in general, and specifically to those portions of the Standards which relate to the Defense Function.

Baxter v. Rose, 523 S.W.2d at 936.

## A. Higher Standards

The ABA Guidelines hold counsel to higher standards than the bare minimum:

> 1. Minimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for non-capital cases, should not be adopted as sufficient for death penalty cases.
>
> 2. Counsel in death penalty cases should be required to perform at the level of an attorney reasonably skilled in the specialized practice of capital representation, zealously committed to the capital case, who has had adequate time and resources for preparation.
>
> Guideline 11.2.

[4]Evitts v. Lucey, 469 U.S. 353, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

[5]Culyer v. Sullivan, 466 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The minimum standards for trial or appellate counsel's performance are stated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975).

[6]Copies are available from the ABA or CCRC.

The pressure on trial and appellate counsel to do it right the first time has increased dramatically due to recent rulings by the U.S. Supreme Court. While it may be unconscionable that an attorney's oversight or ignorance should result in the death of a client, it is an increasing reality. Failure *of counsel* to raise or preserve an issue may prevent that issue, whatever its merits, from ever being heard by a court. It is a bitter fact that in some instances, one co-defendant has been saved by an issue preserved while the other co-defendant, with exactly the same issue, was executed because the issue was "waived."[7] Standards of appellate counsel must therefore be of the highest order.

Failure of counsel to raise or preserve an issue may prevent that issue, whatever its merits, from ever being heard by a court

## B. It Takes Two to Do It Right

"In cases where the death penalty had been imposed, two qualified appellate attorneys should be assigned to represent the defendant." Guideline 2.1. A California commentator has noted that the typical death penalty appellate record there has 5,000 pages and defense briefs of 200 or more pages; estimated attorney time is frequently 800 to 900 hours.[8] Be assured that there are Tennessee death cases with as many transcript pages and even longer briefs have been filed in our Supreme Court. While the length of the trial and briefs is no guarantor of the quality of litigation, it does give one a sense of how hard death cases are fought.

If you were trial counsel, consider whether your experience extends to the appellate arena. Some trial attorneys should not be attempting appeals (and vice versa). Frequently, when two attorneys are paired, one has more expertise doing the "paper" and one has more classic trial skills. Is the "paper" lawyer going to shoulder virtually the entire burden on appeal? Is either trial attorney experienced and capable of researching and filing a brief on the myriad complex issues that are always present in death cases? If you have any doubt about whether you are suited for appellate work, or if one attorney intends to play a passive role because the other agrees to handle virtually the entire appeal, serious thought should be given to withdrawing from the case[9] in favor of a more appropriate attorney. This may require some soul searching if you genuinely believe in the justice of the cause, or would like to believe that nothing is beyond your capabilities.

---

[7]Two co-defendants appealed in Smith v. Kemp, 715 F.2d 1459 (11th Cir. 1982), cert. denied, 464 U.S. 1003 (1983), and Machetti v. Linaham, 679 F.2d 236 (11th Cir. 1982), cert. denied, 459 U.S. 1127 (1983). Machetti's lawyers challenged the jury composition in state court; Smith's lawyers did not. Machetti ultimately received relief and lived; Smith was executed. See Bright, "Death by Lottery," 92 W. Va. L. Rev. at 685-87 for other executed defendants with meritorious constitutional claims barred by procedural default rules.

[8]Statement of Michael G. Millman, Executive Director of the California Appellate Project, in letter to attorneys inquiring about appointment in indigent capital appeals. See also Guideline 2.1, Commentary, n.3.

[9]See Guideline 11.9.1 (C): "Trial counsel should not cease acting on the client's behalf until subsequent counsel has entered the case or trial counsel's representation has been formally terminated."

Lead counsel should have demonstrated the proficiency and commitment that exemplify the quality of representation appropriate to capital cases

If withdrawal is not an option that can or should be considered then, by all means, seek appropriate help and advice from experienced counsel. It takes two full-time appellate attorneys to give a death case the attention it deserves and to do it right.

## C. Eligibility to Handle Death Penalty Appeals

In order to be *eligible* to handle death penalty appellate work, lead counsel should, under Guideline 5.1 (II) (A):

Be admitted to practice in the jurisdiction;

Be an experienced and active trial and appellate practitioner with at least three years of experience in criminal defense;

Have handled at least (a) one death penalty and three other serious felony appeals, including one murder, or (b) six felony appeals, including two murders, within the last three years;

Be familiar with the practice and procedure of the appellate courts of the jurisdiction;

Have attended and successfully completed, within one year before appointment, a training or educational program on criminal advocacy focusing on capital appeals; and

Have demonstrated the proficiency and commitment that exemplify the quality of representation appropriate to capital cases.

Requirements for co-counsel status are somewhat lower, and there are alternate procedures for appointment of counsel who do not meet the stated requirements:

Experience in the trial or appeal of death penalty cases which does not meet the levels detailed above;

Specialized post-graduate training in the defense of those accused of capital crimes; and

Availability of ongoing consultation support from experienced death penalty counsel.

Guidelines 5.1 (II) (B) and (II) (C).

Counsel is encouraged to consult with CCRC at every juncture. CCRC can provide consultation, research on various issues, sample briefs, advice on issues pending at the United Supreme Court, and references to attorneys with particularized knowledge, and can facilitate a moot court for the appellate argument.

Your client must be approached, consulted and informed

## D. Workload

The ABA Guidelines state what should be obvious: "Capital counsel should not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations." Guideline 6.1. One study suggests considering the following factors: the quality of representation, speed of turnover of cases, percentage of cases tried, extent to which support services are available, court procedures, other complex litigation the attorney may have, and other activities that could interfere with devoting the necessary time.[10]

Assuming that the average attorney has approximately 2000 billable/work hours per year, a capital appellate attorney in Tennessee should be on notice that the case will take one-forth to one half of those hours while doing nothing else to complete.[11]

## E. Client Contact

Appellate counsel should maintain close contact with the client throughout the preparation of the appeal. See Guidelines 11.9.2 (B) and (C) and 11.4.2. Relations with the client tend to be strained at this point in the litigation, and the client may or may not be pleased with trial counsel's representation. How the client feels about appellate counsel may turn more on whether trial counsel showed the client some care and effort, making the client feel that someone was on his side and fought as hard as possible, than on the result. If appellate counsel is new to the case, there is still the problem of being one of "them" – the ones who put the client on death row.

Assuming your client is competent, he must be approached, consulted and informed, if for no other reason than to keep his spirits up and keep him from "volunteering" for the electric chair out of despair. In addition to the ethical duty to inform your client of pending legal matters, your client may be of incalculable aid in preparing the appeal. You simply won't know until you take the time to listen. If the client shows signs of incompetence, regular visits while the case is on appeal will be necessary to document his behavior for later presentation to a court. See Guidelines 11.9.1, 11.9.5, and accompanying Commentary.

[10] "An Exemplary Project," 1 Law Enforcement Assistance Administration, 13-14 (1974); see also Guideline 6.1, n. 6.

[11] In a recent comparative study of Tennessee and other states, *average* expended time for an attorney doing a capital appeal was reported at 500 hours. See, p.21, "A Study of the Tennessee District Public Defenders Conference," June 1991, commissioned by the ABA Bar Information Program and prepared by The Spangenberg Group, Massachusetts.

Appellate courts are not concerned with guilt or innocence so long as there is sufficient evidence to support a finding of guilt

In a non-death penalty case, counsel might advise a client that there are two and a half chances to win a case or improve a plea offer: one before trial, by way of vigorous motion practice, another at trial, by having the trier of fact render a verdict of not guilty, and half a chance of winning on appeal, because the appellant is then presumed guilty. Appellate courts are not concerned with guilt or innocence so long as there is sufficient evidence to support a finding of guilt. They are not there to "second guess" either the attorneys or the trial court. Their concern is solely whether the accused got a *fair* trial under the applicable law and rules.

To prepare a normal appeal, counsel would review the transcripts, her notes and memories of the trial proceedings, and the motion for new trial, wading through the chaff and picking the three or four essential issues on which to rely on appeal. A good appellate attorney would not obfuscate a viable issue with clear losers, and would use a rifle instead of a shotgun approach. The legal horizon would end at the highest state court, for the practical reason that if the client were indigent you would not be appointed to handle further proceedings, and if you were retained the client's resources would be exhausted by the direct appeal. Also, it might simply be that you do not practice very much in federal court and have never had to consider the consequences of state appellate decisions in federal habeas corpus. And your client, who would probably be incarcerated, would want a speedy resolution of the case.

The United States Supreme Court, in the recent case of Parker v. Dugger,[12] reiterated the "crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally. . . . It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record. 'What is important . . . is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.'[13]" Parker, *supra*, 111 S.Ct. at 739-40.

Appellate review is crucial in ensuring that the death penalty is not imposed arbitrarily or irrationally

Appellate practice is no exception to the rule that "death is different." An immediate difference is that, barring a grant of relief or a client who "volunteers" for execution, the case will be litigated three distinct times: (1) at trial, direct appeal and certiorari to the U.S. Supreme Court; (2) on state post-conviction, appeal and certiorari; and (3) on federal habeas corpus, appeal and certiorari.[14] It is no surprise that death penalty litigants are usually not in a hurry to have their cases reach the final stage of the appeals.

Some of the rules of this perverse game are precisely the opposite of the norm:

1. Raise all errors on appeal, whether or not raised below.
2. Shotgun the issues; do not use a rifle.
3. The horizon does not end at the Tennessee Supreme Court.
4. Constitutionalize all issues using both state and federal cases and constitutions.
5. Maximize the time involved in the direct appeal.
6. Be prepared to argue that each error is not "harmless."
7. File a reply brief.

---

[12] 498 U.S. ___, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). The Court in Parker, supra, decided that the Florida Supreme Court acted arbitrarily and capriciously by failing to treat adequately the nonstatutory mitigating evidence. The State court held that trial judge found no mitigating circumstances to exist at all to outweigh the aggravating circumstances.. From its independent (!) review of the record, the United States Supreme Court held that the Florida Supreme Court conclusion was not fairly supported by the record and that it erred in concluding that trial judge found no mitigating circumstances and, *i.e.*, erred in its analysis of appellant's sentence. Therefore, the State Supreme Court affirmance of the sentence based upon nonexistent findings was invalid because it deprived the appellant of the individualized treatment to which he is entitled under the Constitution.

[13] [Quoting] Zant v. Stephens, 462 U.S. 862, 879 [, 103 S.Ct. 2733, 77 L.Ed.2d 235] (1983). See also, Clemons [v. Mississippi, 494 U.S. ___, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)] . . .; Barclay v. Florida, 463 U.S. 939, 958 [, 103 S.Ct. 3418, 77 L.Ed.2d 1134] (1983) (plurality opinion).

[14] The direct appeal is to the Tennessee Supreme Court, where "the sentence of death shall be automatically reviewed." T.C.A. § 39-13-206 (a) (1). Appeal from denial of post-conviction relief is to the Court of Criminal Appeals. T.C.A. § 40-30-122.

The Tennessee Supreme Court must consider any alleged error, whether called to the trial court's attention or not

8. Do not waive oral argument.

9. File a petition to rehear.

10. File a petition for a writ of certiorari to the U.S. Supreme Court.

## A. Raise All Errors on Appeal, Whether or Not Raised Below

The Tennessee Supreme Court must review certain issues in a death case despite the failure to raise them below.[15]

> (a) (1): Whenever the death penalty is imposed . . . [t]he sentence of death shall be automatically reviewed by the Tennessee supreme court. . . .
>
> (c) (1): In reviewing the sentence of death . . . the Tennessee supreme court shall determine whether:
>
> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

T.C.A. § 39-13-206 (effective November 1, 1989).[16] The Court interpreted the predecessor statute as requiring "this court to consider any alleged error, whether called to the trial court's attention or not." State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985), cert. denied, 475 U.S. 1031 (1986) (no waiver of error on propriety of admitting certain evidence) (emphasis added). Later, the Court held that, "[i]n death penalty cases . . . this Court is required by statute to review the sentence and to consider *significant* errors whether or not called to the attention

[15]For appeals filed before July 1981, T.C.A. § 40-3409 provided that, "No assignment of error . . . is necessary in criminal cases taken to the Supreme Court, but the court shall render such judgment on the record as the law demands." The Court considered itself "solemnly enjoined by § 40-3409," Miller v. State, 584 S.W.2d 758, 760 (Tenn. 1979), to "consider any errors . . . committed [at] trial," Davidson v. State, 443 S.W.2d 457, 464 (Tenn. 1969), including "errors to which no exception has been taken" either at trial or on appeal, Manning v. State, 500 S.W.2d 913, 914 (Tenn. 1973). § 40-3409 was repealed July 1, 1981.

[16]This section is virtually identical to § 39-2-205, effective 1977; case law interpreting the latter should therefore control. See State v. Henley, 774 S.W.2d 908, 914-15 (Tenn. 1989); Hamby v. McDaniel, 559 S.W.2d 774, 776-77 (Tenn. 1977).

of the trial court" State v. Martin, 702 S.W.2d 560, 564 (Tenn. 1985) (considering constitutional instructional error not previously raised) (emphasis added).[17]

If an error is not called to the attention of the *appellate* court, the Court must at least review the issues enumerated above, which are relevant in every death case.[18] Other issues concerning the propriety of the sentence, however, will arise under the individual facts of each case. In ordinary cases, these would be waived if not raised at trial or in the new trial motion.[19] The few exceptions to this rule depend on the grace of the appellate court.[20] Arguably, the statute requires the Court to review all issues surrounding the propriety of the death sentence whether or not they were raised even on appeal. Whatever the merits of an argument that the Court is bound to review the entire record, failure to raise an issue at least on *appeal* may be fatal.

Do not rely on the largesse of the Court to find and consider issues that are not brought to its attention. If you fail to breathe life into an issue by not raising it on appeal, consider what your client will have to argue later on collateral review – although there was no objection at trial, and the error was not raised in the new trial motion, and was ignored on direct appeal, please do not consider the issue waived!

Do not rely on the largesse of the Court to find and consider issues that are not brought to its attention

Take time to review the trial transcript with great care, with a view to including every conceivable issue. Invite others who, perhaps, are more experienced in death cases to review the case and the transcript, to keep alive the maximum number of issues.

---

[17]The statute should make a claim of waiver unavailable in capital cases as long as the error is asserted on direct appeal. See Duncan, 698 S.W.2d at 68. Cases reviewing issues notwithstanding lack of objection include State v. Williams, 657 S.W.2d 405 (Tenn. 1983), cert. denied, 459 U.S. 1073 (1984) (improper prosecutorial argument); State v. Melson, 638 S.W.2d 342 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983) (Fourth Amendment and "qualifications of experts" issues at guilt phase); State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), cert. denied, 455 U.S. 983 (1982) (improper comments in voir dire on defendant's expected election not to testify).

[18]See, *e.g.*, State v. Johnson, 762 S.W.2d 110, 120 (Tenn. 1988); State v. Sutton, 761 S.W.2d 763, 767-68, 770 (Tenn. 1988); and State v. Matson, 666 S.W.2d 41, 44 (Tenn.), cert. denied, 469 U.S. 873 (1984).

[19]T.R.A.P. 3(e), 36(a); State v. Frahm, 737 S.W.2d 799, 801 (Tenn. Crim. App. 1987).

[20]See, e.g., Veach v. State, 491 S.W.2d 81, 83 (Tenn. 1973) (constitutional issues may be raised and considered at any stage of the proceedings); and State v. Ogle, 666 S.W.2d 58 (Tenn. 1984) (considering Bruton violation that was waived due to procedural default). In general, an appellate court may consider an issue in order to prevent (a) needless litigation, (b) injury to the interests of the public, (c) prejudice to the judicial process, or when necessary to do substantial justice. T.R.A.P. Rule 13 (b); T.R.Cr.P., Rule 52 (b); State v. Goins, 705 S.W.2d 648, 650 (Tenn. 1986) (considering double jeopardy issue not raised before application for permission to appeal); State v. Davis, 613 S.W.2d 218, 219 (Tenn. 1981); State v. Valentine, 659 S.W.2d 27, 29 (Tenn. Crim. App. 1983).

A death penalty case requires you not merely to know the law as it is, but to be on the cutting edge of new issues

## B. Shotgun the issues; do not use a rifle

As of this writing, no federal court has yet addressed the constitutionality of the Tennessee death penalty statute or the manner in which it is applied. Unless you are clairvoyant, you cannot know what a federal court may consider important several months or years down the road. You must therefore *preserve all issues* for later federal review.

"Appellate counsel should seek, when perfecting the appeal, to present all arguably meritorious issues, including challenges to any overly restrictive appellate rules." Guideline 11.9.2 (D). In the context of capital litigation, an issue is "arguably meritorious" even if it has been rejected by the Tennessee court or might appear frivolous to the uninformed. A death penalty case requires you not merely to know the law as it is, but to be on the cutting edge of new issues. Unless the U.S. Supreme Court has spoken directly and unequivocally, assume and argue that it still has merit. The discussion of Teague in § E, below, applies here as well.

The way a claim is raised in one court may affect availability of review in another court.[21] The legal and factual basis must be properly asserted; a reviewing court may decline to consider a different legal theory or factual basis than was previously asserted.[22]

Present every alternative legal theory: a Miranda violation implicates the Fifth and Sixth Amendments; a motion for funds for support services may involve the equal protection and due process clauses, and the Sixth Amendment rights to compulsory process and to confront and cross-examine witnesses.

You need not present oral argument on all issues that are raised in the brief. However, you should file a motion to waive the 50-page limit on appellate briefs[23] -- you will need the space.

## C. The horizon does not end at the Tennessee Supreme Court

"Appellate counsel should be familiar with all state and federal appellate and post-conviction options available to the client, and should consider how any tactical decision might affect later options." Guideline 11.9.2 (A). Failure to learn the essentials of state post-conviction waiver rules and federal habeas corpus procedural default doctrine can be fatal to your client's health.

[21]See An Introductory Primer on Raising and Preserving Error at Trial and Direct Appeal, Southern Prisoner's Defense Committee, Atlanta, Georgia, (404) 688-1202.

[22]See, *e.g.*, Anderson v. Harless, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (court refuses to consider claim based on federal due process clause because claim was previously based solely on state due process clause); Francis v. Spraggins, 720 F.2d 1190 (5th Cir. 1983); Vela v. Estelle, 708 F.2d 954 (5th Cir. 1983).

[23] See, Rule 27 (i), Tennessee Rules of Appellate Procedure

Briefly, in state post-conviction, a claim is waived if the "petitioner knowingly and understandingly failed to present [it] for determination in any [prior] proceedings." A "prior proceeding" can include the trial, the motion for new trial, the appeal, and any prior post-conviction proceeding. There is a rebuttable presumption "that a ground for relief not raised in any such proceeding . . . was waived." T.C.A. §§ 40-30-111 and 40-30-112 (b) (1), (b) (2).

Under the procedural default doctrine, failure at trial or on direct appeal to assert a federal constitutional right in the manner required by state law, coupled with a state court's reliance on that failure to bar consideration of the claim, precludes a federal court from considering the claim.[24] The rationale is that failure to object or assert timely a federal constitutional violation is an adequate and independent state ground upon which the conviction rests; comity, the respect one court gives another, persuades federal courts to respect such a ground as the basis for a decision by a state court.[25]

When in doubt cite at least the Sixth, Eighth and Fourteenth Amendments

## D. Constitutionalize all issues, using state and federal cases and constitutions

"[C]ounsel should take steps where appropriate to preserve, on all applicable state and Federal grounds, any question given for review." Guideline 11.7.3. By citing state case law, the state constitution, federal cases and the federal constitution for each proposition of law, you will diminish the opportunity for the state to claim that an issue is waived or procedurally defaulted. Again, the discussion of Teague in § E, below, is relevant here.

Concentrate on constitutionalizing issues using the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; when in doubt cite at least the Sixth, Eighth and Fourteenth Amendments.

While all ordinary constitutional claims are of course viable, Sixth, Eighth and Fourteenth Amendment claims permeate capital litigation for good reason. The Sixth Amendment guarantees several key rights beyond the right to competent counsel. Among them is the right to an impartial jury, including a host of jury selection issues – the right to a fair cross section of jurors, under-representation of groups, Witherspoon-Witt exclusion problems, and reverse Witherspoon exclusion problems. The Sixth Amendment right to confrontation may include the right to challenge the reliability of a confession and reliance on hearsay.

The due process clause obviously applies to a plethora of death penalty issues from very fundamental ones related to the concept of fairness – "guided discretion," narrowing, etc. – to more sophisticated issues involving burden shifting, presumptions, mitigation evidence, and the right to support services. In addition, be sure to remind the court repeatedly that the Fourteenth

[24]See Wainwright v. Sykes, 433 U.S. 72, 97, S.Ct. 2497, 53 L.Ed.2d 594 (1977); Murray v. Carrier, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

[24]See Harris v. Reed, 489 U.S. 255, 109 S.Ct. 1038, 1041-42, 103 L.Ed.2d 308 (1989); Reed v. Ross, 468 U.S. 1, 10-11, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

The state constitution may offer more protection than the U.S. constitution

Amendment requires a heightened standard of due process.[26] The list of issues that can involve the Fourteenth Amendment is bound only by your imagination.

Eighth Amendment concepts concerning the reliability of the process are paramount. The prohibition of cruel and unusual punishment has special application in death cases, and focuses attention on the reliability of the selection of your client for the extreme punishment of death. Since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 8 L.Ed.2d 758 (1972), the debate has centered on the standards under which an individual can be singled out from others and be put to death. The trio of cases that reinstated the death penalty[27] found the statutory schemes constitutional because the process supposedly insured that a narrow class of defined individuals, who killed under circumstances established by objective, definable standards, were tried under procedures that rendered the conviction reliable, with safeguards requiring the sentencer to give the defendant individualized consideration.

Any statute or procedure that does not narrow the class of defined individuals, that does not set up objective, definable standards for deciding which murder cases should be elevated to death eligible status, that does not insure that a complete consideration can be made of whether death should be inflicted on *this particular* individual, is unconstitutional. Eighth Amendment reliability concerns should be on the tip of counsel's tongue at every turn in a death penalty case.

In this time of contracting federal constitutional law, the state constitution may offer more protection than the U.S. constitution. While Tennessee law can not restrict the defendant's rights more than the U.S. constitution permits, it can impose higher standards and stronger protections.[28] In fact, since the emergence of the Rehnquist majority and the retreat from the federal courts' ability to enforce individual rights, many states have taken a fresh look at their own constitutional provisions.[29]

[26] See Chapter 19, Post-Conviction; and Radin, "Cruel Punishment and Respect for Persons: Super Due Process for Death," 53 So. Cal. L. Rev. 1143 (1980).

[27] Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 105 S.Ct. 2960, 49 L.Ed.2d 913 (1976); and Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

[28] Miller v. State, 584 S.W.2d 758 (Tenn. 1979); see also State v. Jacumin, 778 S.W.2d 430 (Tenn. 1989); State v. Lakin, 588 S.W.2d 544 (Tenn. 1979); Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); and Wurtz, "Tennessee Criminal Constitutional law from 1974-1980: A Survey and Analysis," 12 Mem. St. L. Rev. 249, 302-309 (1982).

[29] See Acker & Walsh, "Challenging the Death Penalty Under State Constitutions," 42 Vand. L. Rev. 1299-1363 (1989); and Jones, The New Federalism: Using the Tennessee Constitution and Bill of Rights to Protect the Rights of the Accused, presented at a TACDL seminar, August 20, 1988, available from TACDL, P.O. Box 24477, Nashville, Tennessee, 37202, (615) 327-1225.

## E. Maximize the time involved in the direct appeal

### 1. Why

Recent, complex U.S. Supreme Court decisions impose a narrow and rigid notion of the retroactivity of "new rules" of law. A client with a sentence of death may not be able to take advantage in federal court of any rule promulgated by the U.S. Supreme Court later in federal court unless the rule arose while his direct appeal (from notice of appeal through petition for writ of certiorari) was pending.

In Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Court repeated that "new rules" of law should always be applied to cases on direct review, but should generally not be applied retroactively to cases on collateral review, unless the rule (1) announces a "watershed" rule of criminal justice,[30] or involves procedures implicit in the concept of ordered liberty; or (2) places a person's conduct beyond the power of the law to proscribe, e.g., decriminalizing certain conduct. Before Teague, the federal courts routinely viewed important Supreme Court pronouncements on constitutional law in death penalty cases as applying to death cases in habeas corpus, regardless of the date the direct appeal was final. Teague, however, extended the narrow retroactivity analysis to include federal claims raised in federal habeas corpus. To make the impact of this ruling clear, close to half the death-row litigants in the federal circuits in some jurisdictions have been granted relief based on developing constitutional jurisprudence![31]

Teague stated that a rule of law is "new" if it breaks new ground, imposes a new obligation on state or federal government, or is not dictated by precedent existing at the time the defendant's conviction became final. Butler v. McKellar, 489 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), made evident the Court's broad view of what is "dictated"; a 1988 holding that the police can not initiate interrogation following a request for counsel in the context of a separate investigation was viewed as a new rule, inapplicable to cases on collateral review under Teague and Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The case at issue, Arizona v. Roberson, 486 U.S. 678, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), had expressly stated that it directly relied on the *precedent* of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If this could be termed "new law," then even the slightest deviation from a prior case would justify calling the later case "new."

The devastating effect on federal habeas corpus practice of Teague and Butler cannot be overemphasized.

A death row inmate may not be able to take advantage in federal court of any new rules of law decided while his direct appeal was pending

[30] E.g., Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (establishing the right to counsel in all felonies).

[31] Tabak, "The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty in the 1980s," 14 N.Y.U. Rev. L. & Soc. Change, at 830 n.233.

All conceivable issues must be raised at trial, fiercely litigated at all stages, and preserved for review on direct appeal

> Today, under the guise of fine-tuning the definition of "new rule," the Court strips state prisoners of virtually any meaningful federal review of the constitutionality of their incarceration. A legal ruling sought by a federal habeas petitioner is now deemed "new" as long as the correctness of the rule, based on precedent existing when the petitioner's conviction became final, is "susceptible to debate among reasonable minds." Ante, at 7. Put another way, a state prisoner can secure habeas relief only by showing that the state court's rejection of the constitutional challenge was so clearly invalid under the then-prevailing legal standards that the decision could not be defended by any reasonable jurist. With this requirement, the Court has finally succeeded in its thinly veiled crusade to eviscerate Congress' habeas corpus regime.... [T]he majority today limits federal court's habeas corpus function to reviewing State court's legal analysis under the equivalent of a "clearly erroneous" standard of review.

Butler, 110 S.Ct. at 1219 (Brennan, J., dissenting; emphasis in original). Whether Justice Brennan is unduly alarmist or correct, the lesson for counsel is clear – all conceivable issues must be raised at trial, fiercely litigated at all stages, and preserved for review on direct appeal through the filing of a petition for a writ of certiorari. Further, the appeal process must be protracted as much as possible in order to introduce or take advantage of the pronouncement of a "new rule" of law. Later federal review may consist solely of determining whether a state court's ruling on a constitutional issue was reasonable, not whether the ruling was wrong.

**2. How**

**a. Request a transcript before the hearing on the new trial motion**

Request time for preparation of the transcript before the hearing on the motion for a new trial, and any appropriate extensions after preparation to allow the defense team time to review the transcripts. (If the client is indigent, ask for transcript preparation at the state's expense.)

Early transcript preparation will, first, enhance the reliability of the proceedings (addressing an Eighth Amendment concern) by allowing all parties to work from the actual record rather than their imperfect memories, and second, will expedite the appellate process by preparing in advance that which will be required for review.

It has the added advantage of being governed by the trial court's schedule and not the mandatory times (with possible extensions) for appellate review that begin when a notice of appeal is filed. Also, the overworked court reporter will find it easier to ask the trial court for extensions of time to type a voluminous record than to formally ask the appellate court for the same favor.

It is the defendant who determines what portions of the proceedings are to be transcribed

**b. Request extensions of time to prepare the (amended) motion for new trial**

Extension of time should usually be requested in order to prepare the assignments of error for the new trial motion. While the motion itself must be filed within thirty days of when the order of sentence is entered, T.R.Cr.P. 33 (b), liberal amendments are to be allowed until the day of the hearing on the motion. A timely filed motion covering as many bases as possible should satisfy Rule 33 until there is time to review the entire record.

**c. Fight for preparation of the entire record that the *defense* deems necessary**

Delay may occur if all parties do not agree on which portions of the record should be prepared. The court or prosecution may opine that a segment of the record is not relevant to any particular assignment of error and should therefore not be made a part of the record or not transcribed at state expense. In a death penalty case, the defense should welcome such a challenge.

A defendant with money would obtain a complete record and comb it for all errors that the trial court could correct before an expensive and protracted appeal. Neither the prosecutor nor the court would have the opportunity to second guess the need for particular parts of the record.

However, if your client is indigent, the court must order the court reporter to prepare whatever is requested at state expense. Some judges and prosecutors, simply do not understand that it is the defendant who determines what portions of the proceedings are to be transcribed. State v. Draper, 800 S.W. 2d 489, 495 (Tenn. Cr. App. 1990).

It is the appellant's responsibility to convey "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." T.R.A.P. 24 (a). The defense must specifically designate which portions of the transcript are to be included in the record on appeal, and the trial court must certify accuracy. Any portion of the record not prepared and certified will not be available for review at the appellate court.

In Draper, the court took the trial court to task for deciding what portions of the record were or were not needed on appeal:

> When the issues "make out a colorable need for a complete record," the State is required to provided the defendant with a complete verbatim transcript of the evidence and proceedings. If the State contends that a verbatim transcript of only a portion of the proceedings, or . . . a statement of the evidence will suffice, the State has the burden or onus of showing that a partial transcript

The person questioning the need for a transcript has the burden of showing that the designated proceedings are not relevant or necessary

> or a statement of the evidence is sufficient for the defendant to effectively present the issues or have them determined by the appellate court on the merits. . . .
>
> [T]he defendant, not the trial judge, determines what portions of the proceedings are to be transcribed. . . . Consequently, it is error for a trial judge to question defense counsel initially, make a determination as to the validity of the issues, and provide the defendant with a transcript limited in scope to the issues the trial judge determines to have merit. . . .
>
> When a party in interest questions the necessity of transcribing certain portions of the proceedings designated by defense counsel, the trial judge must hold a hearing to determine whether the portion of the proceedings in question should be transcribed. The person questioning the need for a transcript . . . has the burden of showing that the designated proceedings are not relevant to or necessary for a determination of the issues. As a general rule, the defendant is entitled to a transcript of the proceedings relevant to the issues raised in his motion for new trial if counsel asserts that the issues will be raised in the appellate court.

If your client was able to retain counsel through the trial of the case but is indigent for purposes of appeal, file a motion for an order declaring indigence. See Draper.

id., 800 S.W.2d at 494-496. If the court or prosecutor interferes with preparation of all transcripts the defense deems necessary, consider an interlocutory appeal under T.R.A.P. 9 and 10, which would substantially delay the appeal on the merits.

**d. Ask for extensions of time**

Never be reticent in asking for time in which to file any pleadings, up to and including the petition for a writ of certiorari; death cases are time consuming and complex and require sophisticated strategic thinking, and you will always need the extra time.[32] Transcripts in death cases are usually very long, the law is complex and the rules change frequently; you may need an extension of time simply to analyze the impact of a new U.S. Supreme Court opinion. There is virtually never a time when you have done all that can be done with someone's life at stake. Note that the Tennessee Supreme Court itself routinely takes anywhere from six to ten months to decide death penalty cases.

[32]Direct appeals in capital cases are handled by the Tennessee Supreme Court. On post-conviction, the appeal is to the Court of Criminal Appeals; extensions of time are then governed by Tenn. Ct. Cr. App. R. 8, which sounds ominous when it comes to the prospects of getting an extension granted: "[M]otions which delay the disposition of an appeal in this court are looked upon with disfavor." Counsel should still vigorously pursue necessary continuances, but should always expect the worst and prepare to submit briefs within the time set by rule.

## F. Be prepared to argue that each error is not "harmless"

Demonstrate in the brief the harm caused by each error. Both state and federal courts increasingly uphold verdicts tainted by error if they find that it did not affect the outcome.[33] However, recently the Supreme Court breathed a bit more life into the Chapman standard by actually reversing an accomplice-murder death penalty case where the state court had applied the wrong harmless error standard when considering a Sandstrom error. Yates v. Evatt, 500 U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991). In analyzing whether an error is harmless, a court must take two distinct steps. First, it must ask what evidence the jury actually considered in reaching its verdict and, second, it must then weigh the probative force of the evidence as against the probative force of the presumption standing alone. "To satisfy Chapman's reasonable doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under Chapman is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." 111 S.Ct. at 1893.

A reviewing court must look to whether the error affected the juror's view of the evidence

Since there is a certain amount of confusion regarding the Chapman standard, argue the Yates standard. The assumption in many opinions applying the Chapman rule is that the harmlessness of an error is to be judged after a review of the entire record. However, for many courts, harmless error analysis has degenerated into a sort of "sufficiency of the evidence" test without regard to the type of constitutional error under review. According to Yates, a harmless error analysis requires more than merely reviewing the record and then deciding whether the jury could have rendered its verdict beyond a reasonable doubt without relying on the error. A reviewing court must look to whether the error affected the juror's view of the evidence.

[33]Harmless error as applied to federal constitutional matters has developed only in the last thirty years. See Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (positing test of "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction"); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (some constitutional errors may be so unimportant that they are harmless, but prosecution must show harmlessness); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (Bruton error harmless if there was "overwhelming support for the conviction"); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (court should consider record on its own, as well as from the standpoint of the jury); Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (central purpose of a criminal trial is to decide the factual question of guilt or innocence; errors to which Chapman does not apply are the exception rather than the rule). The author acknowledges a debt of gratitude for some of the ideas and material here to a presentation by Charles Fels, Harmless Constitutional Error It Is; Harmless It Ain't, in April 1988, available from TACDL, Nashville, Tennessee, (615) 327-1225.

Marshall the facts to show how the error changed or affected the case

Various arguments can be used to show that an error is not harmless, among them:

- "Heightened due process" standards in death cases must be met and, of course, the Eighth Amendment demands *reliability* in the selection process of who is to die.
- Marshall the facts to show how the error changed or affected the case, demonstrating not only the harm at the time of the error but also how the error affected the later introduction or jury's perception of the evidence.
- The standard of review for error is not what would affect the appellate court's decision had it been sitting as a trier of fact, but what reasonably might have affected the verdict of a jury of the defendant's peers.[34] This is especially important in a sentencing context, because each juror must decide individually what weight, if any, to put on each aggravating and mitigating circumstance.
- Even if evidence of guilt may be overwhelming, there can never be a presumption that a person should die. The sentencing hearing must be individualized -- does this defendant deserve death based on who he is as a person. Capital sentencers have broad discretion to hear mitigating evidence and impose life despite aggravation. Therefore, the appellate court cannot meaningfully conclude that an error did not affect a death sentence.[35]
- The Tennessee sentencing statute requires that the jury weigh aggravators against mitigators. Different jurors will attribute different weight. There is no way to determine how close the scales were to being balanced by each juror when the sentencing decision was made and what would or would not have made a difference in the result.[36]

---

[34] See, Yates v. Evatt, supra, 111 S.Ct. at 1893.

[35] See Scoville, "Deadly Mistakes: Harmless Error in Capital Sentencing," 54 U. Chicago L. Rev. 740 (1987); cf. Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

[36] See, State v. Terry, 813 S.W.2d 420 (Tenn. 1991) (After affirming the trial court's finding that one of two aggravating circumstances was invalid, a unanimous Court declined to find harmless error beyond a reasonable doubt citing the heightened need for reliability in death cases and the presence of several mitigating factors.); State v. Black, 815 S.W.2d 166 (Tenn. 1991) (Reid, CJ, dissent) (The majority found any error in the finding of one - out of six - aggravating circumstances harmless. Dissent accuses majority of engaging in a quantitative analysis of aggravating and mitigating circumstances which ignores the procedure by which a jury reaches its determination of whether death is an appropriate sentence. The process is not one of simply tallying aggravating and mitigation circumstances but of weighing their qualitative values. Where one or more of the aggravating circumstances are invalid the dissent would find it impossible for an appellate court to reweigh them.) Cf. Clemons v. Mississippi, 494 U.S. ___, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

- The burden of review is special; the appellate court must be concerned not only with the channelled discretion of the jury in choosing a sentence, but also with procedural regularity in order to avoid arbitrary or unfair application of the penalty.
- The reviewing court should also be concerned with the sentence given to other defendants in similar circumstances in order to avoid arbitrary or unfair application of the penalty. Meaningful comparisons are made difficult, if not impossible, unless there are rigorous standards of review of constitutional error.
- Some errors can never be harmless because they render a trial fundamentally unfair, e.g., trial by a biased judge, denial of counsel, and double jeopardy.[37]
- If the breach is clear but the evidence is overwhelming, the doctrine effectively becomes a presumption rather than an exception.
- The doctrine assumes that the decision only affects the litigant; it doesn't. Society has a legitimate interest in important constitutional rights and the values they represent.
- To hold a constitutional error harmless, the court must conclude that it is harmless beyond a reasonable doubt.

To hold a constitutional error harmless, the court must conclude that it is harmless beyond a reasonable doubt

## G. File a reply brief

In contrast to the initial brief, the reply should be direct and focused on a few points; the issues have already been preserved in the exhaustive initial brief. Point out any important misstatement of the factual record or the law that affects the few issues you will argue orally, and rebut any important additional argument by the state not covered by your brief.

Avoid the temptation to make the appeal a personal contest with the government. Ignore the person behind the state's brief and concentrate on the handful of issues you need to argue.

File a motion to waive the 25-page limit. See T.R.A.P. 27 (i).

## H. Oral argument

Having raised all issues in your brief, pick the best ones to argue. You will of course argue those issues where there is a chance of prevailing on the law, but successful death penalty litigation frequently turns on basic or "gut" concepts of fairness. Keep in mind what former Governor Roemer of Louisiana said when he commuted the death sentence of Ronald Monroe, whom he personally

[37] See, State v. Bobo, 814 Tenn. 353 (Tenn. 1991) (trial by jury); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judge); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 799 (1963) (denial of counsel); Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (double jeopardy); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (fair trial); Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946) (jury instruction on unconstitutional presumption).

Look for "dead fish in the pocket" issues -- issues that involve fairness or invoke sympathy, ones that begin to emit a foul odor the longer they fester

believed was guilty: "In an execution in this country, the test ought not to be reasonable doubt. The test ought to be is there any doubt."

It will not be possible (or desirable) to argue all the issues in the case; deciding which few are the strongest or most persuasive is crucial. Although one cannot always know what will interest the court, by consulting with other attorneys who have argued before the court, understanding the previous decisions, personalities and politics of each judge, and remaining current on all the subtle, continuing changes in death penalty law, you should get a good idea of which issues have the best chance of catching the court's ear.

Be prepared for permutation challenges from the court -- what if this; what if that; assume that this or that fact is different, would your answer be different? Perhaps the most important challenge is, what will happen to other death penalty cases if the court rules for you? Many "generic" challenges (issues that would affect large numbers of death row inmates) have been defeated in both state and federal court. Supreme courts are always concerned with how their rulings will affect other cases. They may not be as inclined to grant relief in your client's case if in doing so an entire segment of death row will have to be retried or resentenced. While not ignoring an appropriate "generic" challenge, you may need to particularize your case based on its unique facts and argue that relief would not necessarily affect any other case on death row. Being questioned well in advance of oral argument by someone who knows both the court and death penalty law is helpful.

Ask for more than thirty minutes to argue; cf. T.R.A.P. 35. The issues in any death penalty case merit far more time than that. Note that this will have to be done long before the appointed day for argument, and should be done in a motion filed with the appellant's brief. If no order is forthcoming within a reasonable time, renew the motion.

Look for "dead fish in the pocket" issues -- issues that involve fairness or invoke sympathy, may not require reversal under current law, but begin to emit a foul odor the longer they fester in the court's consideration. Choose issues that strike at the reliability of the process that selected your client to die -- prosecutorial misconduct, mental issues, guilt/innocence issues, relative culpability, etc.

Practice your argument in front of a panel of experienced appellate and death penalty attorneys. CCRC will be happy to facilitate assembling a moot court panel upon request.

If the court seems interested in a point not previously briefed, request permission to submit additional authority. Also file any appropriate citations of supplemental authorities after oral argument. Follow the restrictions of T.R.A.P. 27 (d), and make the state do the same.

## I. File a petition to rehear after any adverse decision

Be careful, however, about giving the court an opportunity that it didn't take in the main opinion to say that an error was "harmless." (See discussion above of the need to maximize the time involved in the direct appeal process.)

Don't be reticent about asking for remand for further evidence if the court lacked a sufficient factual predicate for its ruling or has presumed to sit as a trier of fact on an important matter.

## J. File a petition for a writ of certiorari to the United States Supreme Court

Consider adding any previously unraised federal issue in a rehearing petition.[33] File a motion for stay of execution pending the outcome of the petition. Before writing the petition, carefully review all cases pending at the U.S. Supreme Court, especially any case where the Court has granted certiorari on an issue that might be linked to your case. Linking your writ to one granted for review, even if relief is ultimately denied, can substantially extend the time the case is pending.

Be careful about giving the court an opportunity to say that an error was "harmless"

[33] See Stern & Gressman, Supreme Court Practice at 795-96 (5th ed. 1978) ("Questions not presented in the original petition are not foreclosed upon rehearing, even though the statutory period for filing a petition for certiorari may have expired in the meantime").