IN THE CRIMINAL COURT FOR KNOX COUNTY, DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

STATE OF TENNESSEE )
VS. ) CASE NO. 58183
CHRISTA GAIL PIKE )

TRANSCRIPT OF THE EVIDENCE

Pretrial Motion Hearings

Volume I of II Volumes

APPEARANCES:

THE HONORABLE MARY BETH LEIBOWITZ, PRESIDING JUDGE

FOR THE STATE:

Mr. William H. Crabtree
Ms. S. Jo Helm
Assistant District Attorneys General
District Attorney General's Office
400 Main Avenue
City-County Building
Knoxville, Tennessee 37902

FOR THE DEFENDANT:

Mr. William Talman
Ms. Julie Martin
Mr. William Brown
Attorneys at Law
Knoxville, Tennessee 38902

TABLE OF CONTENTS


| Volume I | Page |
| --- | --- |
| May 23rd, 1995 Arraignment | 1 |
| September 7th, 1995 Continuance | 8 |
| October 5th, 1995 Continuance | 11 |
| October 19th, 1995 Continuance | 23 |
| November 6th, 1995 Continuance | 30 |
| November 30th, 1995 Motion Proceedings | 36 |
| January 19th, 1996 Motion Proceedings: | 40 |
| Motion to Restrict Media Coverage of Pretrial Proceedings | |
| Mr. William Brown Withdrew | |
| January 23rd, 1996 Motion Proceedings | 69 |
| February 15th, 1996 Motion Proceedings: | 97 |
| Makeup for Ms. Pike Discussed | |
| **Volume II** | |
| February 15th, 1996 Motion Proceedings: (CONT.) | 101 |
| Motion for Individual Voir Dire | |
| Motion to Strike Alias | |
| Motion to Instruct the Jury Regarding State's Right to Open and Conclude Closing Arguments | |
| Motion in Limine | |
| Motion for Exclusion of Witnesses | |
| Continuing Motion for Witness Statements | |

TABLE OF CONTENTS

Volume II (Continued) Page

February 15th, 2006 Motion Proceedings: (Cont.) 110

Request of District Attorney General for Discovery or in the Alternative Motion to Compel Disclosure of Discovery

Motion to Suppress Skull from being Introduced into Evidence

Motion to Suppress Various Body Parts and Soft Tissue Samples from being Introduced

Motion to Suppress Defendant's Conversation with Counsel at Preliminary Hearing Allegedly Overheard by Court Security

Motion for Disclosure of Impeaching Information

Request for Notice of Introduction for Evidence

Motion in Limine Preventing Photographs Alleged to be of the Victim Taken at the Scene

TABLE OF CONTENTS


Volume II (Continued) Page

February 15th, 2006 Motion Proceedings: (Cont.) 111

Motion for Order Prohibiting the Sheriff's Department from Reviewing or Reading the Defendant's Privileged Legal Correspondence

Motion for an Order Directing the State to Add Prospective Witnesses to the Indictment by a Date Certain

February 26th, 1996 Continuance Off the Record 145

February 29th, 1996 Motion Proceedings: 145

Motion for Change of Venue

Trial Date Confirmed

Jury Selection Discussed

March 14th, 1996 Motion Proceedings: 157

State's Motion for Reciprocal Discovery

Motion for Change of Venue

Jury Selection Discussed

Court Reporter's Certificate 172

IN THE CRIMINAL COURT FOR KNOX COUNTY, DIVISION III

KNOXVILLE, TENNESSEE

SIXTH JUDICIAL DISTRICT

STATE OF TENNESSEE )
VS. ) CASE NO. 58183
CHRISTA GAIL PIKE )

This case came on to be heard and was heard on the 23rd day of May, the 7th day of September, the 5th and 19th days of October, the 6th and 30th days of November, 1995, the 19th and 23rd days of January, the 15th and 29th days of February and the 14th day of March, 1996, before the Honorable Mary Beth Leibowitz, Judge, holding the Criminal Court for Knox County, Division III, at Knoxville, Tennessee, when the following proceedings were had, to-wit:

(Whereupon, this case came on to be heard on the 23rd day of May, 1995, when the following proceedings were had, to-wit)

MR. TALMAN: May we approach for a minute?

THE COURT: Yes, ma'am (sic).

(Whereupon, a bench conference was held; however, only the Court could be heard primarily

as follows:)

MR. TALMAN: I just want to make sure that beyond the hearing of this--(Inaudible statement)--I could maybe work on this.

THE COURT: Do you have a problem? What I'm going to do--I was going to tell you this; that's why I called Lynn over here. I'm going to have to wait until I clear out most of these people.

MR. TALMAN: That's fine. I told her it would take awhile.

THE COURT: And it's going to be awhile. Are you going to stay?

MR. TALMAN: Yeah, I'll stay with her.

THE COURT: Okay. I'll do that in the courtroom with the officers present for just a few minutes--

MR. TALMAN: That'd be fine.

THE COURT: --let her talk to her.

MR. TALMAN: Maybe around 10:30 or so, you think?

THE COURT: Maybe before, if I can get through all of this--

MR. TALMAN: That's fine. I can--

THE COURT: --because I want to get these

guys ready to do whatever they're going to do.

MR. TALMAN: I've got--(Inaudible phrase) --it would be after you cleared out the docket.

THE COURT: Most of it. I don't want to do that with this many people here.

MR. TALMAN: Yeah, that'd be fine. I just wanted to know.

THE COURT: Now, are we setting this for trial?

MS. HELM: What I suggested to him was, since nobody has a calendar for 1996, why don't we consolidate and hear some of the motions--

THE COURT: Uh-huh (Affirmatively). And then set it then?

MS. HELM: --because she's in the pen. The--(Indiscernible phrase)--she's competent.

THE COURT: Is she going to waive her right to a speedy trial?

MR. TALMAN: I think she will. I'll talk to her and make sure she understands that. We've talked about that before, but I wanted to draw something up.

MS. HELM: And, you know, if something happens with one of the other two cases, then we could have his trial.

THE COURT: That's fine. Okay.

THE CLERK: I ripped this off if you need '96. Do you need that?

THE COURT: But I don't know what we're going to do yet. I mean I haven't even thought--

THE CLERK: I marked the holidays off.

THE COURT: Yes. Hang onto it.

(Whereupon, said bench conference was concluded. The Court disposed of other unrelated cases on the docket before continuing with this case as follows?)

THE COURT: Okay. Are you all prepared at this time?

MR. TALMAN: Yes, your Honor.

THE COURT: I need to have Ms. Pike sworn. Ms. Pike, would you please stand and raise your right hand to be sworn.

(Whereupon, the defendant was sworn to tell the truth by the clerk and responded affirmatively.)

THE COURT: Ms. Pike, are the statements that you've made on this affidavit that you filled

out partially at least true and correct to the best of your knowledge?

DEFENDANT: Yes, ma'am.

THE COURT: And how old are you now, ma'am?

DEFENDANT: Nineteen.

THE COURT: Okay. Ms. Pike is found indigent. Mr. Talman, if you would, take lead counsel in this case. As I understand it, Mr. Brown had participated in Ms. Pike's defense previously and you have as well and that you have discussed this with Mr. Brown.

MR. TALMAN: That's correct, your Honor.

THE COURT: Okay.

MR. TALMAN: I have no problem doing that. We can go ahead and go forward with the arraignment.

THE COURT: Yes, sir.

MR. TALMAN: We would waive formal reading of the indictment, reserve entry of a plea, and I believe we're going to set this on that September 7th motion date.

THE COURT: Yes, sir.

MR. TALMAN: Is that correct?

THE COURT: I think--assuming that

Ms. Pike understands her rights to a speedy trial--

MR. TALMAN: We went over that.

THE COURT: --and understands that she may be waiving that to some extent at this point, I would rather do it then--

MR. TALMAN: We went over that.

THE COURT: --because after two trials we're certainly going to have to flush out a jury panel. We won't be able to pick a jury--

MR. TALMAN: Certainly.

THE COURT: --if we don't.

MS. HELM: Your Honor, I know the Court recognizes this but--by appointing two counsel, but we will be filing a death penalty notice in this case probably before the close of business today.

THE COURT: Upon the filing of a death penalty notice, I will be appointing Mr. Brown to assist Mr. Talman if that's all right.

MS. HELM: I had planned to have it ready this morning, but I had the wrong attorney--

THE COURT: I see.

MS. HELM: --attorney for the defendant.

THE COURT: Okay. We can take care of that by order, but that's what I intend to do. If there is a problem with it, tell me now.

MR. TALMAN: I have no problem.

MS. HELM: No problem.

THE COURT: Thank you. Is there anything else with regard to Ms. Pike that we need to take up?

MR. TALMAN: No, your Honor, except the matter I think we--we discussed with the speedy trial and at this point she understands it. We went over it before court today and also again today.

THE COURT: Okay.

MR. TALMAN: We're not going to be standing on that.

THE COURT: Please hold Ms. Pike up here for a little while.

MR. TALMAN: Thank you, Judge. Thanks, Jo.

THE COURT: General, you're going to be filing that today?

MS. HELM: Yes.

(Whereupon, the Court briefly conferred with the clerk.)

MS. HELM: We had the wrong attorney on the certificate of service.

THE COURT: I understand. That's no

problem.

(Whereupon, this case came
on to be heard further on
the 7th day of September,
1995, when the following
proceedings were had, to-wit:)

THE COURT: Is Mr.--are you here for Mr. Stephens on this case? That just occurred to me.

PUBLIC DEFENDER (FEMALE VOICE): On which case?

THE COURT: Shadolla Peterson.

PUBLIC DEFENDER (FEMALE VOICE): (Inaudible comment)

THE COURT: Okay.

PUBLIC DEFENDER (FEMALE VOICE): And he's --(Inaudible word)

THE COURT: Yes, I realize that. That's why--

PUBLIC DEFENDER (FEMALE VOICE): (Inaudible comment)

THE COURT: I understand General Helm still has some information she's waiting for, and until we get to that point in the--in the Job Corp cases there's not a lot of point in doing motions.

Which--do you want me to bring out the defendants? I think--

MS. HELM: Judge, we've got some motions that maybe could have been--could be argued today and there are some that we're not going to oppose. In terms of anything substantive I'm not in a position to tell the defense anything until I get results back from the TBI Lab on the DNA. I anticipate that eventually in time, but I don't have it at the present time. And, consequently, some of the requests that have been made of us, I'm just not in a position to say yes, no, maybe, anything at this point.

THE COURT: Well, the first trial is Mr. Shipp's; and when is that set?

MS. HELM: November 6th, I think, or November 4th. Shipp is the 6th.

THE COURT: 6th. And we have an older murder case on the docket. The defendant in that case, Izetta McGhee, is not in custody at this point, but it's very old.

Do you want another motion date?

MS. HELM: I think we need one late-- either later this month or early in October.

THE COURT: I have three post-convictions

on October the 5th already set. I don't think any of them will be very long, and I think this is a little more important to deal with than those at this point. I was saving that time for Mr. Jenkins, but I've been told by counsel that they don't need that particular time. So I'll be glad to put this back on October the 5th if you all want to--to do that. The only other problem is we need to let Mr. Talman know, Mr. Brown.

MR. BROWN: I will, your Honor.

THE COURT: And he should be here shortly anyway. You've got another matter.

MS. HELM: Hopefully by then we will be in a position to resolve a number of issues.

THE COURT: Okay. Would you all--if you want me to, I'll bring out the defendants. I'll be glad to do that. Would you all please not--are they in the dock?

COURT OFFICER: Yes.

THE COURT: Would you please go back there and tell them what's going on. I don't want anybody to feel like they don't know in this particular instance. Thank you, gentlemen.

Thank you, General.

MS. HELM: Thank your Honor.

(Whereupon, this case came on to be heard further on the 5th day of October, 1995, and the following proceedings were had, to-wit:)

THE COURT: Mr. Talman, are you and Mr. Brown ready to proceed at this point?

MR. TALMAN: Yes, your Honor. We're ready to argue a few of our motions. I don't think the State is ready to proceed on some of them.

THE COURT: Well, I just want to know if everybody is ready to get in court and hear what we are going to do.

MR. TALMAN: Sure.

MS. HELM: Judge, we're basically in the same posture we were in the last time we were here. The TBI Lab has not sent in the results of the DNA testing. We don't have a trial date on Ms. Pike.

THE COURT: We need to set one.

MS. HELM: And I think we need to do that and then set a firm motion day to see where we are. Some of the motions that Mr. Talman may want to argue might be moot by DNA results. For instance, we might not choose to use certain evidence depending on what the-

MR. TALMAN: Well, your Honor, that's--

THE COURT: Let me ask you this first before we get into that. Do you have a problem with waiting to do these motions or--

MR. TALMAN: Well, the only problem I have in particular is the--we filed a discovery request. Now, General Helm and I have talked about it and she's told me that she will provide some more discovery that they've got. But a lot--discovery has been slow in this case. They've provided some and we're grateful for that. But a lot of the discovery we've found we've done through our own investigation.

It's our understanding that General Helm has some records from Job Corp. Now, we've obtained some records on our own from Job Corp, and she's told me I could come by and we'd look through those and see what's discoverable. And she's agreed to do that.

We've also asked for written responses, and she's agreed to provide those. So I don't think we have a real particular problem today. And I think General Helm has always been--

THE COURT: But you are needing to get on with it; I understand that.

MR. TALMAN: But we--

THE COURT: And I think the General understands that too.

MR. TALMAN: Well, I'm just concerned, you know, if we're going to go ahead and set this case for trial. And it probably ought to be set for trial because she's being held in custody.

THE COURT: Do you want--do you all want your clients out here?

MR. TALMAN: Yes, she probably needs to be out here.

THE COURT: Well, let me ask you all to look at your calendar while they're coming out for March the 18th. That is the first Monday that I have on my calendar that is absolutely clear, and that will give us sufficient time prior to the Easter holiday, I think, and prior to Judicial Conference and all of those other things we get into.

MR. TALMAN: March 18, Judge?

THE COURT: Yes, sir.

MR. TALMAN: As far as I know--

THE COURT: April 5th is Good Friday and that's--

MR. TALMAN: Pardon me?

THE COURT: --two full weeks to get a--April 5th would be Good Friday. So that gives us two and some weeks if it should take that long to try this case.

MR. TALMAN: That's fine. As far as I know that April 18 day is good, Judge. I don't--

THE COURT: No, sir. March 18.

MR. TALMAN: Excuse me. March 18th. I'm sorry.

THE COURT: All right. I want to go ahead right now and set Ms. Pike's case for March 18th--

MR. TALMAN: That'll be fine.

THE COURT: --if the General's calendar is clear.

MS. HELM: That's fine, Judge.

COURT OFFICER: Do you want Shipp out?

THE COURT: Yes. You want Mr. Shipp brought out? Okay.

MR. STEPHENS: Did you set motions on Ms. Pike's case?

THE COURT: No. All I've done so far is just set the trial date.

MS. HELM: What I am more concerned about at the present time is the dwindling time between now and November the 6th and whether--I don't know

what Mr. Coffee is going to want to do, pending on what the results are.

MR. COFFEY: Well--

MS. HELM: I don't know if he's going to want any testing or not. If he does, we're in trouble on that trial date.

MR. COFFEY: Yes, I filed some motions pertaining to the possibility of having some of this stuff examined myself by people that we choose to have examine it which there's no way we'd be able to do it by November 7th.

THE COURT: No, that's true.

MR. COFFEY: But I don't know what's going to come back.

THE COURT: And we don't know when--you have no--you've not been given any date when TBI will be done with that information?

MS. HELM: No, I haven't. I was going to call this morning and, of course, they're an hour behind so--

THE COURT: Okay.

MS. HELM: --they're probably just now getting started.

MR. TALMAN: Judge, maybe we could hang by for 45 minutes or so and let her call.

THE COURT: Do you want to try doing that?
MS. HELM: I can do that.
THE COURT: If we cannot get all of the work done by that trial date, we can turn that trial date into a motion date.
MS. HELM: Uh-huh. (Affirmatively)
THE COURT: But I don't know how, in the order of things that you're dealing with, you would want to do with it. And that is November 6th. So that would give you at least--it would give Mr. Stephens a month. It would give you at least several months prior to your trial date to at least know where--what discovery you've been availed of. I don't know what else to do right at the moment unless you'd like--do you want to try to call them here in about ten minutes and we'll--
MS. HELM: Well, I can do that--
THE COURT: --be glad to wait.
MS. HELM: --or I can tell--
THE COURT: I don't mind.
MS. HELM: I can tell the Court this. I'm going to be handling the Court's docket on the 19th of October.
THE COURT: You are?
MS. HELM: Uh-huh. (Affirmatively)

THE COURT: Oh.

MS. HELM: I have been assigned.

THE COURT: To the Boyd and Collier Motions to Suppress you are?

MS. HELM: No, that will be somebody else, but I'm handling the **other** docket.

THE COURT: There's two PCs and a bunch of other stuff.

MS. HELM: But we could check back then.

THE COURT: Do you want to do that, check back and see where we are and decide what to do with that trial date?

MR. TALMAN: Your Honor, I've got a vehicular homicide case in Carter County on the 18th. I think we're probably going to have that resolved, but I'm hesitant to go ahead and set a date on this. Of course, Mr. Brown could always check back.

THE COURT: Yes. I mean this is basically a checkpoint.

MS. HELM: Yes.

MR. TALMAN: That'd be fine.

THE COURT: That's fine. Mr. Brown, is that okay? You can be here.

MR. BROWN: That's fine.

THE COURT: Okay.

MR. COFFEY: I would suggest at least on Mr. Shipp that we make November 6th a motion day because there's a lot--

THE COURT: Well, let's get to the 19th. I'll understand we're going to have a--a squeeze of time, but I'd like to--I'd like to make sure everything keeps moving in this matter. I understand that, Mr. Coffey, and I--and I realize you're going to have to have appropriate time to do your own testing so--if that's what you choose to do. But let's see what the results are as far as you all are concerned. I don't care what comes --I mean I'm not asking you to report to me what the results are but just so everybody is satisfied they have enough time to do the things that have to be done with the evidence.

MR. TALMAN: Your Honor, as far as waiting on the State's results on the DNA, I don't really see--my understanding of what they're waiting for concerns primarily Ms. Peterson and Mr. Shipp. I don't think it really concerns--

MS. HELM: Well, it concerns your client too.

MR. TALMAN: Okay. Well, I stand

corrected.

THE COURT: I don't--I don't want to get into it till I have to. Let me put it like that.

MR. TALMAN: That's fine, Judge. We did--like I say we did file a Motion to Suppress Introduction of the Skull and suppress certain Body Parts that were retained by the State. And we--

THE COURT: Well, the State has said it has something to do with that as well, apparently, so--I realize that. And those motions are going to need to be resolved pretty early on, I would think.

MR. TALMAN: Well, we cert--we want to resolve everything that we can as quickly as we can, Judge, because if interlocutory appeals are necessary, we certainly want to have the time to do that.

THE COURT: If they're necessary.

MR. TALMAN: If they're necessary. So the way I understand it we're going to check back on October 19th--

THE COURT: Yes, sir.

MR. TALMAN: --and then follow up on November 6th?

THE COURT: If the Gen--and hopefully, General, between now and then you'll know if you

don't have what you're going to get--

MS. HELM: Uh-huh. (Affirmatively)

THE COURT: --and when you're going to get it, please.

MS. HELM: At least I ought to know when I'm going to get it.

THE COURT: Yes.

MR. TALMAN: Well, Judge, let me ask a question. And I guess it really doesn't pertain too much to my client. But is November 6th still his trial date right now?

THE COURT: Right now it is, yes, sir--

MR. TALMAN: So--

THE COURT: --for Mr. Coffey's client.

MR. TALMAN: --so he won't know whether he's going to trial till the 19th?

THE COURT: That's right and that's what he just discussed with me.

MR. TALMAN: Okay. All right. Well--

MR. COFFEY: I appreciate your concern.

(Whereupon, the parties laughed.)

MR. TALMAN: I just wanted to make sure I had it right on my calendar. Thank you, Judge.

THE COURT: Mr. Stephens, is there anything you'd like to say with regard to this

matter.

MR. STEPHENS: I just want the record to reflect Ms. Peterson is not in the courtroom. That's been at my request. I didn't--I waived her appearance with the Court's permission. And I'm just tickled to be here. Everything seems to be fine in terms of the report back.

THE COURT: Do you have that, Mr. North? He's tickled to be here. Okay.

(Whereupon, the parties laughed.)

THE COURT: Then we are all going to reassemble on the 19th, Ms. Pike and Mr. Shipp and Ms. Peterson, if you want them too. Obviously, they need to be here.

MR. TALMAN: So is October 19th just a report back? We don't need to be pre--

THE COURT: It is a report back. Should we fine that she has the reports back and Mr. Coffey, because he's the first one in line, wishes to test the evidence, then November 6th, obviously, is going to be out and that will turn into a real motion day for everybody.

MR. TALMAN: Okay.

THE COURT: Otherwise, I'm going to find a real motion day somewhere.

MR. TALMAN: So as of right now we don't have a real motion date to subpoena witnesses?

THE COURT: Not until we know where that evidence is.

MR. TALMAN: Okay. Thank you, Judge.

THE COURT: I don't see the point because all we're going to do is drag you guys around and make these people--

MR. TALMAN: Well, I've got some motions I'd like to argue, and I need to bring some witnesses in for that.

THE COURT: I understand.

MR. TALMAN: And I don't want to unnecessarily bring them in.

THE COURT: I don't want you to either. I'm going to give you a date for testimony.

MR. TALMAN: But when I bring them I'd like to be sure we're going to proceed.

THE COURT: Yes, sir, I understand that.

MR. TALMAN: Thank you, Judge.

THE COURT: You will know in advance.

MR. TALMAN: Thank you.

THE COURT: You also have to realize that there is another much older first degree murder case on that date, Izetta--

MR. TALMAN: Pardon me, Judge?

THE COURT: On the date November 6th there is a much older first degree murder case which if it is ripe for trial will go to trial that day and I expect it will--something will happen. It's Mr. Stephens' case. You can talk to him about it.

MR. TALMAN: Okay. Thank you, Judge.

THE COURT: Okay. Thank you.

(Whereupon, this case came on to be heard further on the 19th day of October, 1995, and the following proceedings were had, to-wit:)

THE COURT: Now, does anybody else have something brief they would like to take up?

MR. TALMAN: Your Honor, I just wanted to let the Court know I'm here on Ms. Pike. I don't think the other lawyers are here. So I'll just hang around and get a cup of coffee.

THE COURT: Mr. Carpenter, are you going to speak for Mr. Stephens as to Ms. Peterson?

MR. CARPENTER: Yes, your Honor.

THE COURT: Are we waiting for General Helm or--

ASSISTANT DISTRICT ATTORNEY FRED BRIGHT:

Well, she's in combined Divisions I and II at the present time which Judge Jenkins is handling. If we're just confirming the trial date on Pike--

MR. TALMAN: I think we were going to confirm about the DNA results. That's the reason we're here on a report-back.

THE COURT: Right. And Mr. Coffey has been running around because he keeps telling me he's getting ready to get married and what are we going to do? So I sure would like to see if we can find Mr. Coffey and General Helm. Maybe they've talked to each other.

MR. TALMAN: Well, Judge, I'll see if I can find Mr. Coffey and then we'll--

THE COURT: Okay. If you want to just find out what it is she would like to do, then we can take it from there. I don't--she doesn't even need to come down if we're just confirming things.

MR. TALMAN: Well, your Honor, the only thing, I do want to make a Motion to Preserve Evidence as far as the DNA or the blood samples and stuff that the TBI has for their analysis so if we choose to have an independent analysis done that it would be preserved. And I think General Helm may want to be here for that. So I don't care to stick

around a while.

THE COURT: That's fine.

MR. TALMAN: Thank you, Judge.

THE COURT: Thank you.

(Whereupon, the Court took up an unrelated case on its docket before continuing in this case as follows:)

MS. HELM: I'm here in a dual role.

THE COURT: General, I understand you're here in a triple role. You're handling I, II and III today.

MS. HELM: Well, yes, but I'm here in a dual role because I'm sort of representing Chris Coffey.

MR. TALMAN: Can I get Christa Pike out here?

THE COURT: That's what I thought. Mr. Coffey was bouncing about yesterday saying, "I'm getting ready to get married." So--

MR. TALMAN: Pike. (To court officer)

THE COURT: --I thought perhaps somebody might. Do you want Ms. Peterson brought out or not?

MR. CARPENTER: Yes, please.

MS. HELM: I don't want Mr. Shipp brought out.

COURT OFFICER: She is not here.

THE COURT: You can keep Mr. Shipp back there. He's not up here?

COURT OFFICER: Peterson is not here.

THE COURT: Okay. That's fine. I think they did that on purpose. That's what we did the last time we were here. I don't know if you were present so-- Okay. All right.

MS. HELM: Judge, I spoke to Mr. Coffey yesterday, one of the moments when he was earth bound, and--

THE COURT: That wasn't very many moments yesterday.

MS. HELM: No. He found me in DUI court, and we discussed his matter. And I understand the dilemma he's in.

I have received an oral report from the TBI that I do not wish to discuss in open court in case I misheard something.

THE COURT: You've not received anything yet in writing?

MS. HELM: I have not received anything in writing. I checked the mail again this morning. She assured me it would be here by the end of this

week or the first of next week at the earliest.

I conveyed that to Mr. Coffey, and I understand his dilemma. He--if he wants to test this material, he will not have time before the 19th--or the--what is it, the 6th of November?

MR. TALMAN: The 6th of November.

THE COURT: The 6th of November.

MS. HELM: In that regard I agree with him that perhaps we should turn November 6th into a motion day.

THE COURT: For everyone?

MS. HELM: For anybody who wants one.

MR. TALMAN: That would be fine.

THE COURT: Now, Mr. Talman has expressed some concern about preservation of evidence.

MR. TALMAN: We've agreed on that, your Honor.

MS. HELM: We've got an agreed order.

THE COURT: That's fine.

MR. TALMAN: I've got an order I can tender to the Court this morning.

THE COURT: That would be the order of the Court anyway, and I'm sure that's no problem. I'm sure all of you have the same position on this.

MS. HELM: Yes.

THE COURT: Okay. So what we're going to do is turn Mr. Coffey's trial date into a motions-only date for everyone so--

MS. HELM: That's right.

THE COURT: So subpoenas do not have to issue--well--

MS. HELM: Well, if subpoenas need to issue I think we ought to request specific subpoenas for specific persons--

THE COURT: Yes, please.

MS. HELM: --as opposed to the subpoenas for the trial.

THE COURT: Okay.

MR. TALMAN: Your Honor, we may need a motion date again a little further off.

THE COURT: I understand that, and we'll do whatever we need--we can possibly get done on the 6th.

MR. TALMAN: We've got several motions we can argue on the 6th, but there's a couple we're going to have to file that we're going to need to bring in witnesses. And I don't know if we've got enough time to get those here by the 6th.

THE COURT: Okay. Now--

MS. HELM: The other--

THE COURT: --that will render Mr. Shipp's case--

MS. HELM: Unset.

THE COURT: --unset for trial, but hopefully on the 6th we can do something.

MS. HELM: Well, I've discussed with Mr. Stephens and Mr. Carpenter their trial date. And at this point we would ask just to confirm their trial date and to confirm Ms. Pike's trial date.

THE COURT: Okay. Mr.--Ms. Pike's trial date is March 18th, '96. Ms. Peterson's trial date is December 4th, 1995?

MS. HELM: Ms. Peterson's, yes.

THE COURT: Ms. Peterson rather. And Mr. Shipp's, of course, is going to become a motion date.

MS. HELM: Yes. And on that day if we don't have anything to tell the Court, then we'll--we'll pick another trial date for Mr. Shipp.

THE COURT: Okay. Maybe Mr. Coffey will have floated at least far enough down so you all can hold onto him while we're doing that.

MR. TALMAN: Your Honor, if I could approach, I'd tender this order on preservation of

the--

THE COURT: That would be fine. Thank you, sir.

MS. HELM: If your Honor wishes, we would have no objection to that applying to all defendants.

THE COURT: That's fine.

MR. CARPENTER: Thank your Honor.

THE COURT: Thank you.

MR. TALMAN: Thank you, Judge.

THE COURT: Thank you.

(Whereupon, this case came on to be heard further on the 6th day of November, 1995, when the following proceedings were had, to-wit:)

THE COURT: Mr. Coffey, are--well, there's Mr. Talman and Mr. Brown. Who are we missing? Mr. Stephens? He'll be here shortly anyway.

(Whereupon, the Court took up an unrelated case before continuing in this case as follows:)

THE COURT: Has anybody seen Mr. Stephens this morning?

MS. NASSIOS: He is upstairs on the Torrez

(Phonetically) matter is what I heard at the office.

THE COURT: Okay. Mr. Talman, other than Ms. Pike do you all have anything else, either one of you?

MR. TALMAN: I think Mr. Brown does upstairs.

MR. BROWN: No. Oh, I have something upstairs.

THE COURT: Okay. I mean down here.

(Whereupon, the Court disposed of other unrelated cases on its docket before it recessed for a bomb threat; afterwards, the following proceedings were had, to-wit:)

THE COURT: Now, I know Mr. Talman is around somewhere. I don't know if he's here in the building. He was out there waiting before. What would you all like to do with your motions? I have not had any of the prisoners brought up so--

MS. HELM: I guess we just need to find a date.

THE COURT: Do we need to reset Mr. Shipp's case at this point?

MS. HELM: Yes.

THE COURT: Is Mr. Talman coming? Okay. Ms. Peterson's case is scheduled for December the 4th.

MR. STEPHENS: I thought is was the 6th.

THE COURT: No, sir. It's a Monday, December the 4th.

MR. STEPHENS: You're right; I've got it on the 4th.

THE COURT: We're all doing really well; aren't we? (Laughing) Okay. So we need a motion date before then?

MR. STEPHENS: Yes, ma'am.

MS. HELM: Yes. And if your Honor wants to, just hold up until the motion day to set Shipp.

MR. TALMAN: Hello, Mark.

MR. STEPHENS: We're getting a new motion day.

THE COURT: (Pause) Tuesday, November 21st has Ginger Reed's motions.

MS. HELM: I'm not available that entire week, your Honor.

THE COURT: Okay. So I've got to back up. (Pause) This is going to be hard because this is a short week this week, and I presume we may be

coming to a trial tomorrow or the next day.

MS. HELM: Can I have just a second, your Honor?

THE COURT: Sure.

MR. TALMAN: Your Honor, I would like to note I'm here and ready to argue my motions.

THE COURT: I understand that. But right at the moment I'm not even sure I can get Ms. Pike up here.

MR. TALMAN: Well, I understand the Court's--

THE COURT: I'm sorry. Under the circumstances I realize that you've been waiting, and I've seen you waiting outside. But--

MR. TALMAN: I understand, Judge.

THE COURT: --it's a little difficult right at the moment. I don't mind trying to set these in the next few days and trying to get something done, just however you want to approach it.

MR. TALMAN: Your Honor, what we could do is set the motions for Monday, December 4th, with the understanding that we may need to start Ms. Peterson's trial on the 5th or 6th, depending on how long those motions go.

THE COURT: I'm not going to be able to hold a trial on the 6th or 7th because Ms. Burroughs is going to be gone to a--to be recertified, and there is no one at the moment to take her place. So I have no clerk on those two days.

MS. HELM: The Monday either.

MR. STEPHENS: Right. Well, then if that's the case we couldn't start her--if you did the motions before the 4th, we couldn't do it on the 4th anyway.

THE COURT: Probably not.

MR. STEPHENS: Because this is going--this--

THE COURT: So why don't we set the motions on the 4th, and we can reset everything at that point. Is that okay? Mr. Coffey, is that okay with you?

MR. COFFEY: That's perfect for me, your Honor.

MR. TALMAN: December 4 if fine, Judge.

THE COURT: I guess I could move--I wasn't going to hold trials that last week, but I guess it's possible. I don't know how long--

MR. TALMAN: Thank you.

THE COURT: Do you really want to try it on the 11th?

MR. STEPHENS: I think probably the only thing we could do at this--the only option we've got at this point is to move those motions to the 4th. I'm not sure we've got any other available days.

THE COURT: Okay. Let's move all of the motions then, all the cases, to the 4th for motions and try to do those motions at that point.

MR. TALMAN: Thank you, Judge.

THE COURT: Okay. I'm putting everybody's case on that day for motions; is that right?

(Whereupon, the parties spoke among themselves.)

THE COURT: Mr. Talman, do we know where Mr. Brown is and are you going to notify him of that or--

MR. TALMAN: I'll notify him of that date, your Honor. I haven't seen him since this morning, since the great Exodus.

THE COURT: Well, I hear somebody got locked up upstairs. That's what you told me anyway.

MR. TALMAN: I keep hoping it was Billy

Brown. (Laughing)

THE COURT: No, don't hope so. Okay.

MR. TALMAN: Thank you, Judge.

THE COURT: Okay. Thank you. At this time only Ms. Pike's case is set for trial. That's right.

MR. STEPHENS: Peterson.

THE COURT: Peterson's case is now not set for trial.

MR. STEPHENS: Mine was the only--you're right.

THE COURT: Only Ms. Pike's case is set for trial, right.

MR. TALMAN: As far as I know, your Honor.

THE COURT: All right.

(Whereupon, this case came on to be heard further on the 30th day of November, 1995, and the following proceedings were had, to-wit:)

THE COURT: Mr. Talman, what do you have, sir?

MR. TALMAN: Your Honor, may I approach?

THE COURT: Yes, sir.

(Whereupon, a bench conference

was held as follows:)

MR. TALMAN: On Christa Pike's case--

THE COURT: Do we have something on today?

MR. TALMAN: No, it's on for Monday.

THE COURT: Oh, yes.

MR. TALMAN: I have to be at Vanderbilt Hospital Monday with my mother. She will be in for a lung transplant.

THE COURT: Okay.

MR. TALMAN: And I spoke with General Helm, and she had no problem with hearing a motion date.

THE COURT: Well, we have everybody docketed that day even though it just says Christa.

MS. HELM: Why don't we just move Christa, and I think the others will understand.

MR. TALMAN: I told--(Indiscernible phrase)

THE COURT: Where Christa goes you go. Okay. Well, if--

MR. TALMAN: Christa was out in the hall--

THE COURT: Ms. Nassios, could you handle something for Mr. Stephens here for just a second.

(Whereupon, Ms. Leslie Nassios approached the bench.)

THE COURT: Bill has to skip Monday's motion day with Shadolla Peterson.

MS. NASSIOS: Uh-huh. (Affirmatively)

THE COURT: And that means everybody probably wants to skip the motion day. When do you--do you want to put it on--January 3rd is the first day we're back, but I have almost nothing there. Is that too fast, too long?

MS. HELM: It may be because those are the holidays. There may be some motions on the codefendants, and if there is we're all--(Indiscernible phrase)--for that.

THE COURT: Okay.

MS. HELM: I--(Inaudible phrase)--the 18th.

THE COURT: I may have to go back to Nashville on the 18th. We could put it on Friday, the 19th, which is a motion day or the next week.

MS. HELM: Can we go to 1:30 so we don't sit down here during the time we shouldn't.

THE COURT: That's fine.

MS. NASSIOS: I'll tell Mark. If he's got a problem, I'll have him call you.

THE COURT: Friday, the 19th of January. Docket--

MS. NASSIOS: Shadolla Peterson.

THE COURT: Yes. --58183 all defendants at 1:30 on Friday, January the 19th. Okay. Good luck. Hope things work out.

MR. TALMAN: Thank you.

THE CLERK: For motions?

THE COURT: For motions, right.

MR. TALMAN: Thank you.

THE COURT: Yes, sir. Do there need to be subpoenas issued at this point, General, or do you all want to take that up--

MS. HELM: I think probably counsel needs to issue subpoenas for the specific people they want--

MR. TALMAN: I'll take care of mine.

THE COURT: Okay.

MS. HELM: --because there are, obviously, people on that indictment that don't need to be here for a motion day.

MR. TALMAN: I'll issue my subpoenas, Judge.

THE COURT: Mr. Bundren will take care of it for you, General.

MS. HELM: Thank you.

THE COURT: I don't know how he got at

counsel table, but he needs to--

MS. HELM: I guess he got demoted.

THE COURT: I reckon.

(Whereupon, this case came on to be heard further on the 19th day of January, 2006, when the following proceedings were had, to-wit:)

THE COURT: For the purposes of the media, Mr. Patrick, I'm going to take up another matter before I take up the Job Corp cases. I'm going to instruct you that until I either say you can take pictures or I say you can't--can't take any because I intend to bring the defendant's out so they can hear the proceeding on whether or not there should be photography done in the courtroom. So if you'll bear with me, I'll let you know.

MR. PATRICK: Okay.

(Whereupon, the Court disposed of other unrelated cases on its docket before discussing Shadolla Peterson's case with Mr. Chris Coffey and proceeding in this case as follows:)

THE COURT: Let's bring out the

defendants.

MS. HELM: I think we need to pick a trial date; don't you, on Mr. Shipp?

THE COURT: Before you do that, General, I have got to tell these good people whether or not they can--

MS. HELM: Let me withdraw that request for a trial date--

THE COURT: Okay.

MS. HELM: --for the moment--

THE COURT: For the moment.

MS. HELM: --because of something that's going to happen shortly.

THE COURT: Well, Mr. Talman, when Ms. Pike and Mr. Shipp are out and seated, if you will articulate the reasons why you are--you have filed a motion to keep the photographer from making pictures.

MR. TALMAN: Certainly.

THE COURT: Mr. Coffey, why don't you sit down and let me let Mr. Talman address that. You have already done so.

(Whereupon, the defendants were
brought into open court, and the
following proceedings were had,

to-wit:)

THE COURT: Okay. Ms. Pike and Mr. Shipp are both in the courtroom. And I believe you have--hold on a second--you filed a Motion to Restrict Media Coverage of Pretrial Proceedings filed January the 19th which was this morning. You filed that this morning?

MR. TALMAN: Yes, your Honor.

THE COURT: Okay. I have that in front of me, Mr. Talman, if you want to go forward with that argument.

MR. TALMAN: Yes, your Honor. It's my understanding that *The News Sentinel* had given written notice to the Court pursuant to the--

THE COURT: They have complied with the--

MR. TALMAN: --newly revised Supreme Court Rule 30.

THE COURT: --media guideline. That's correct.

MR. TALMAN: And that photography--they was wanting to do photography in the case.

THE COURT: And to that end I permitted Mr. Patrick to set up his camera, as you know, and this morning there was photography in the courtroom. And Mr. Patrick, pursuant to my

instructions, will wait until I give him an order nay or yeah before he'll take pictures so go ahead.

MR. TALMAN: Yes, your Honor. Your Honor, as Mr. Coffey had--had mentioned, there has been a lot of publicity about this case. He has filed a Motion for Change of Venue. We anticipate or contemplate whether that's a necessity in our case, whether we need to file a Motion for Change of Venue or not.

And I think if we agreed to media coverage or didn't make an objection to pretrial media coverage that we would be in a difficult situation to later come back and try to argue for a change of venue when we've either agreed or at least acquiesced to their--to the media coverage.

Your Honor, we feel that trying to pick a jury is going to be difficult enough in this case given the issues and the facts and the publicity it's already had. To go ahead and have more publicity and more sensational type publicity, such as photography or television coverage or something of that nature, is only going to make it more difficult to try and find a pool of prospective Knox County citizens that can sit on this jury that can honestly say they've not heard of the case or

have not formed any type of opinion. And based on that is the real reason for our motion.

Our motion covers pretrial publicity. We're not addressing trial publicity at this point. We're just addressing the pretrial publicity. And that's essentially our motion in the nutshell, Judge.

THE COURT: Mr. Coffey, is there anything you want to add to that?

MR. COFFEY: No, your Honor.

THE COURT: General, is there anything you want to get into on this issue or--

MR. TALMAN: Judge, if I could add one thing before the General starts--

MS. HELM: All right.

MR. TALMAN: It has nothing to do with reporters personally or any of the local press. I generally have no objections with the local press per se individually. But, you know, my job here is to represent my client; it's not to educate or entertain the public so--to that end.

MS. HELM: Your Honor, I'm not here in any respect to represent any member of the media or espouse their position, whatever that may be. However, I would point out that coverage of this

case is going to continue whether there's cameras in the courtroom or not. The only thing different might be a different photograph.

I don't think that the State can stand here and say that there won't be publicity, and I don't see that having cameras in the courtroom is going to have any significant impact on the panel of jurors in this case given the amount of publicity that there has already been. I don't think we can speculate on what it would do to a prospective jury panel, and I think we'll have to wait until he try to choose the jury.

I don't see where whatever your decision is that it's going to have any particular impact anymore that what's already gone before.

THE COURT: Do you want to respond to that?

MR. TALMAN: Well, your Honor, I respectfully disagree. I think when you have photographs on the front page or you have television coverage where there's intensive discussion about what transpired in court and you have sound bites of what the attorneys and assistant Attorney Generals are saying and the Court's ruling and facial expressions of the

defendants or anything of that nature I think, your Honor, that **does** give more of a soap opera type situation to--to the--to the proceedings. And, your Honor, I have to stand on my objection to the extensive coverage in the case to keep from tainting the prospective jury pool.

THE COURT: Well, ladies and gentlemen, Supreme Court Rule 30 Media Guidelines is basically an experiment of the Supreme Court, I think, in which they have authorized media coverage, including television media--and today we're not really dealing with television media--subject to the authority of the presiding judge to control the proceedings, to maintain decorum, to guarantee the safety of the participants, and to insure the fair and impartial administrative--administration of justice.

This is--I had really hoped that this issue would come up not at pretrial proceedings but at a trial proceeding which makes this a little bit more difficult and different.

We are dealing with a case in this situation where at least one of these defendants has had a notice given that the State is seeking the death penalty. We are also dealing with

extremely young defendants. We are dealing with a case in which there will be, at least during trial and potentially in the pretrial proceedings, some discussion, demonstration and display of some rather gruesome evidence. And as to the pretrial coverage I have no idea what it is you are going to be presenting.

I don't even know if today we're going to get into anything because I know there are some matters that are going to come up that may limit our ability to go forward with certain motions.

Obviously, the media are always welcome in this court at all times. The taking of the trial is a little bit different because I know what types of proof are going to come up. But in this situation I really am not too sure that there is a problem with the taking of photography except as it impacts finding a jury pool.

This case has been extensively covered already. The pictures of these defendants have been presented in the media already, and continuing to present them will occur whether or not I permit Mr. Patrick or any other reporter or photographer to take pictures. I'm not sure I can prevent continuing publicity if that's our reason and,

therefore, prevent the gathering of a fair jury pool by not allowing Mr. Patrick to take photographs.

So for purposes of this hearing--and this is the only hearing that I have been noticed that they wish to take photographs; that was the notice that was given was just as of today--I am going to permit Mr. Patrick to take photographs. But I state further that it is only for this hearing and any other hearings that we have as to suppression and other things you will have to request that again.

Where there is--and I'll tell you now--where there is evidence that will be presented, where there's going to be certain proof discussed, I will limit the media and the photographs. And I--and I am not trying to prejudge this, but I'm going to--but I'm going to be very careful, especially about a case such as this, about media coverage.

I don't have any problems with photographs at this point where the lawyers are simply arguing their motions or their motion to continue or whatever is about to happen. But, Mr. Patrick, I do want to limit it.

MR. CRABTREE: May I say something, your Honor?

THE COURT: Yes, sir.

MR. CRABTREE: I don't know how valid this particular issue is, but I want to point something out to the Court and bring it out. I don't know if this occurred in--anyway. But I was noticing the attire of these individuals today. And I know that when we are picking a jury or we are dealing with a jury trial, we are very careful to make sure that it--the individuals are not seen in their jail clothing. I don't know whether or not having their photographs made in court in this attire would have any effect or not. But I think it is something that the Court should certainly consider, and if these--

THE COURT: Are Mr. Shipp and Ms. Pike being held downstairs?

MR. COFFEY: Yes.

THE COURT: Do they have street clothes downstairs?

MR. COFFEY: No.

MR. TALMAN: Do you?

DEFENDANT PIKE: (Nodding)

THE COURT: And no one--no one has

anticipated that. See, that's what I thought was going to get raised this morning, frankly. When Mr. Ganya (an unrelated defendant) came out he was dressed in his court clothes.

MR. CRABTREE: But he had on--and this--that's the only issue that I see here, and I think the Court needs to take that into consideration also.

THE COURT: That is a very important issue because in any other circumstance I would--where there is a jury here or a jury pool to be picked or evidence to be given, I--and I was gone yesterday to Nashville to a commission meeting and I didn't even think about it. But I would have otherwise ordered that they be given dress clothes to wear.

MR. TALMAN: Your Honor, this is the first time that we have ever dealt with--

THE COURT: That's--I'm sorry. That is an important issue. Now, that is not to say that if we continue this matter and hold these hearings that I would not permit Mr. Patrick to take photographs. The problem is the clothing.

And I don't know if the media understands that, but when a jury is present they never see a prisoner go in and out. They don't--that taints

the jury pool. I'd have to dismiss the jury.

In fact, it happened one time when a prisoner was let back into the dock without--while the jurors were still in the courtroom or let out from the dock, and it tainted the jury pool and we had to mis-try the case. That's--

General, you are quite right about that. But for that--

MR. CRABTREE: May I make a suggestion?

THE COURT: But for that--

MR. CRABTREE: May I make a suggestion?

THE COURT: Yes.

MR. CRABTREE: I may be entirely wrong, but I think that these proceedings today are going to be fairly limited in some of the things that are being anticipated or occurring. And I don't want to do anything to cut Mr. Patrick off from taking his pictures. He takes very good pictures. But with what's going on today and trying to get these people dressed and everything, I don't know what we have to gain; whereas, when we have a proceeding where we actually have something that there's going to be some substance to, it may be a different issue.

THE COURT: Let's do it this way. I'm

going to request that Mr. Patrick not take pictures today for the purpose of these limited hearings. At the next motion hearing--and there will be another one--I will look with favor upon Mr. Patrick's application. He's going to have to redo it because we don't know how else to do this in these new guidelines. And I will require that street clothing be obtained for and brought to these defendants and allow them to dress appropriately so that they--when the picture is taken it doesn't appear that they're incarcerated necessarily.

MR. TALMAN: Your Honor, the way I understood your ruling, am I correct in understanding that I can renew my objection--

THE COURT: Yes, sir.

MR. TALMAN: --at a later date?

THE COURT: Yes, sir.

MR. TALMAN: Okay.

THE COURT: I'm saying that a new application is going to have to be made. I'm sorry I'm going to reverse what I just said, Mr. Patrick, and require that we don't take pictures today because of their clothing. Frankly, it hadn't occurred to me. And we're going to have to begin every time

that there is a request to ask that prisoners have clothing brought to them.

MR. TALMAN: This is a little bit unusual because this is the first time I've ever been in a Tennessee courtroom where I no longer have a discretion in whether the media is present, that I can't veto that.

THE COURT: Neither have I.

MR. TALMAN: And I understand that it's a new rule.

THE COURT: But I don't want to--I don't want to cut off the media without a valid reason.

MR. TALMAN: I understand, your Honor.

THE COURT: The Supreme Court, obviously, wants this considered seriously by the judges and not be haphazard about it. And I'm trying to understand where to draw lines that need to be drawn. That's why I'm talking about the--when we're talking about the evidence, I may be much more restrictive than--

MR. CRABTREE: Certainly.

THE COURT: --than I am when we're talking about continuances and other things.

MR. TALMAN: Does your Honor want me to renew written motions each time there is a request

or is an oral motion satisfactory?

THE COURT: The truth of the matter is that I prefer everything be done in writing up until the time when we get used to this system and understand what's going on so that everyone has notice that there may be an objection.

MR. TALMAN: That's fine, your Honor. I just wanted to make sure. I didn't want to paper you unnecessarily.

THE COURT: Oh, I'm always papered unnecessarily.

MR. TALMAN: (Laughing) So I guess it's--

THE COURT: So, therefore, Mr. Patrick, you can't take pictures, but you're welcome to stay and report.

MR. TALMAN: Your Honor, as to--while we're on the question of media coverage, it's my understanding from the revised Supreme Court Rule 30 that if more than one media request is made, such as *The Sentinel* makes a request and Channel 10 makes a request and Channel 6 and Channel 8 also make a request, it's my understanding that that is limited to one pool photographer; is that correct?

MR. CRABTREE: Your Honor, if I may, we have taken care of this issue today. Let's wait

and see if anyone files anything else, and then we will deal with these when they come up. And let's get on to the next motion.

THE COURT: There are instructions in the media guidelines as to how a pool photographer is selected and what happens to that photographer.

MR. TALMAN: That will be fine.

THE COURT: So I think it's all set forth.

MR. TALMAN: While I hate to do it, I'm forced to agree with General Crabtree. Probably what I'm saying is it's probably a bit premature.

THE COURT: Let's go onto our motions because that's what we're here for today, and it is getting rather late. Okay. Now, I guess I should begin with Mr. Coffey; would that--I guess I should let the General tell me what order you want to do this in.

MR. CRABTREE: Mr. Coffey.

MS. HELM: Mr. Coffey.

MR. COFFEY: I've got--I filed several, several, several motions all about different things. And the General and I have talked about some discovery, and she's given me some discovery. And I think the Police Department has some discovery which we agree that I'm probably entitled

to do. We need to look at it. But that's going to facilitate the filing of some more motions probably and--

MS. HELM: What we need to do is look at things that can't be stored in my office--

MR. COFFEY: Right.

MS. HELM: --pieces of physical evidence, and we just need to do that together. I can tell him what it is we intend to use, what we don't intend to use, and then he can respond appropriately.

MR. COFFEY: That's right. So we're basically--maybe give us--

THE COURT: So where do we want to go now? Do you want a new motion date, a trial date?

MS. HELM: A motion day. Okay, now Ms. Pike's case is presently set for March--

MS. HELM: March 18th.

MR. TALMAN: March the 18th, Judge.

THE COURT: And Mr. Shipp's case is not set at this time. And Ms. Peterson's case is--has been--her motion arguments anyway have been continued to February the 29th, right?

MS. HELM: I didn't write it down but I think that's correct.

THE COURT: I believe that's correct. I know. Is Mr. Carpenter here? Is he behind you?

MR. CARPENTER: Yes, your Honor. Good morning, your Honor.

THE COURT: Is that correct, sir?

MR. CARPENTER: Yes, your Honor.

THE COURT: Okay. Do you want those motions at different times?

MS. HELM: Is that at 9:00 or 1:30?

THE COURT: That would be at 9:00 o'clock. There are two cases on the docket that day and I don't think much will come of either. Okay.

MS. HELM: Why don't we put them both that day?

THE COURT: Okay. (Pause) Is there anything else we can take up for Mr. Shipp?

MR. COFFEY: I don't think there is anything else at this time.

THE COURT: You are not standing on your speedy trial rights, I gather, at this time.

MR. COFFEY: I'm not.

THE COURT: Okay. All right. Now, Mr. Shipp can go back down if you're ready for that. And we can take up Ms. Pike's matter.

I have a second case on Ms. Pike I just

guess I need to remind everybody about.

MR. TALMAN: Pardon me, Judge.

THE COURT: There's a--

MR. BROWN: A shoplifting.

THE COURT: --theft charges, yes. I don't think that we need to do anything with it. I just wanted to remind you it was there.

MS. HELM: Judge, just move it to the 18th.

THE COURT: When?

MR. BROWN: March 18.

THE COURT: March 18th. Okay. And I'm going to continue that matter to March 18th. Mr. Brown.

MR. BROWN: Yes, your Honor. I'm in a position this morning to--or this afternoon to--

THE COURT: It's afternoon already.

MR. BROWN: Right. --to ask to withdraw from Ms. Pike's case. Over the last couple of months Ms. Pike and I have had some communication problems and for whatever reason I think that--I've spoken with Ms. Pike and she and I are both in agreement that it would be in everyone's best interest to have me withdraw from the case and have new counsel appointed to represent her.

THE COURT: Ms. Pike is obviously charged with the most serious offense that she could face and the most serious penalty she could face.

Ms. Pike, you have talked to Mr. Talman and Mr. Brown. And for your information they have talked to both myself and the Attorney General about this matter.

General, did you want to respond to that?

MR. CRABTREE: Yes, your Honor. I just want to--I think the Court is aware of it, but I just want to remind the Court that an individual--I understand counsel is appointed in this case. An individual doesn't have the right to select their own appointed counsel--

THE COURT: I understand that.

MR. CRABTREE: --and--

THE COURT: I was about to address Ms. Pike about--

MR. CRABTREE: I apologize, your Honor--

THE COURT: --issues and reasons.

MR. CRABTREE: --if I didn't--

THE COURT: Okay.

MR. CRABTREE: I didn't mean--but I just didn't want the Court to get by me without me saying something.

THE COURT: I think that in some since this is Mr. Brown's motion as well as Ms. Pike's; is that fair to say?

MR. CRABTREE: Well, be that as it may, the State's concern is the fact that we have a date set.

THE COURT: Yes, you do.

MR. CRABTREE: And we would like to maintain that date if at all possible.

THE COURT: And if the change of counsel is going to affect that date, then we would be in opposition to counsel. I think the Court needs to keep in mind this is not a situation where this is the **only** counsel involved. Apparently, from what I understand there--no difficulty exists as far as Mr. Talman is concerned.

THE COURT: Well, from what I understand preparation for--for this trial is going forward as smoothly as both sides can--can get it to go.

Ms. Pike, let me ask you whether or not--as I said, you've talked to Mr. Brown about this and Mr. Talman?

DEFENDANT PIKE: Yes, ma'am.

THE COURT: And is what Mr. Brown has said a fair representation of how you feel about this

matter?

DEFENDANT PIKE: Yes, ma'am.

THE COURT: And do you understand that Mr. Brown has been appointed along with Mr. Talman to represent you in this case, and that it's really my choice as to who your attorney is? Some people tend to want to pick and choose by coming up and complaining or whatever. You have not directly asked me for this relief at any point. Are you asking me to appoint other counsel other than Mr. Brown at this time?

DEFENDANT PIKE: Yes, ma'am, I am.

THE COURT: It is not my intention to continue this case for this purpose, and I will have to obtain new counsel to work with Mr. Talman. I am going to let Mr. Brown withdraw. I know Mr. Brown has a number of major felony cases that are involved, and it is my intention--I have a couple of names in mind of people who I will try to discuss this with and with General Helm and Mr. Talman and General Crabtree in an effort to maintain that date.

MR. CRABTREE: Your Honor, if I might--

THE COURT: And I understand Mr. Talman is actively preparing so it shouldn't slow anything

down other than to get somebody up to speed at this point.

MR. CRABTREE: If I may make a suggestion, I think counsel--the Count indicated it was allowing Mr. Brown to withdraw. Could the Court withhold ruling on that particular issue until the Court finds whether or not someone can be found who can replace him without effecting the trial date?

THE COURT: I can do that, General, if you'd like me to.

MR. CRABTREE: I think that would--and we can set--pick a day next week and come--

THE COURT: That's fine. I'll do this Monday or Tuesday if you like.

MR. CRABTREE: Tuesday?

THE COURT: I don't want to delay it very far because every day that goes by makes it harder for new counsel. Would that be okay?

MR. CRABTREE: Tuesday?

MS. HELM: Tuesday--

MR. TALMAN: Tuesday would be a good day.

THE COURT: Mr. Talman, would you accept--Mr. Brown is listed as the representative on this other charge. Would you have objection to my just substituting you as counsel on that case?

MR. TALMAN: No. I think that's--probably the least of Ms. Pike's concerns is that case.

THE COURT: It is. I wonder if after we're finished today counsel would discuss this, including Mr. Brown, discuss this with me and let me come up with a couple of names I'm going to throw at you and see if you think that that would be okay.

MR. TALMAN: Yes, your Honor. Also, I would like to address General Crabtree. I have to respond to him a little bit. I like to argue with him every once in a while.

As to the being ready for trial on the March the 18th, I do not anticipate a change in second chair should affect being ready for March the 18th. And I have no problems making that representation. But I do want to make clear that I'm not agreeing to the point of if there's a problem that develops in discovery--and thus far we've not had one--but if we do have a problem, I don't want to waive an argument or a motion later.

MR. CRABTREE: If something--(Indiscernible phrase).

THE COURT: I will never let you all waive an argument or a motion in a death penalty case

where it affects this client's right to have--affect you client's right to have everything on the table and have an opportunity. And I think you're safe.

MR. TALMAN: Well, I understand that. And it will be our intention to be ready to go to trial in March unless something unforeseen develops.

THE COURT: Well, to that end is there anything else we can take up as to motions at this point?

MR. CRABTREE: I think we probably need to get these other motions--just move those over until two--not to be heard until she gets a new counsel so they can all be done with the same people.

MR. TALMAN: Your Honor, could we go ahead and look tentatively at your--at your calendar sometime for--

THE COURT: I'm looking at it.

MR. TALMAN: --mid February for a motion day or--

THE COURT: Well, see if I really didn't like the media, which I do actually, I'd put it on Monday because they wouldn't have time to give me two business days. I'm not going to do that to them. (Pause) Thursday is a bad day simply

because we have about twelve DUIs and two of them want trials.

MR. CRABTREE: What date are we looking for?

THE COURT: Wednesday is probably all right.

MR. TALMAN: What week are we looking for, Judge?

THE COURT: Next week.

MR. CRABTREE: Are we talking about putting--

MS. HELM: No. We--I mean we're talking about these motions.

MR. CRABTREE: We want to put the matter on for the new attorney on for Tuesday; can we do that?

MR. TALMAN: Yes.

MR. CRABTREE: And then that date we'll pick a date--

THE COURT: For motions?

MR. CRABTREE: --for the other motions.

MR. TALMAN: That would be fine.

MR. CRABTREE: And that way we'll have everyone involved--

THE COURT: Okay.

MR. CRABTREE: --and we'll have everyone's calendar.

THE COURT: Okay. Keeping in mind that--let me point out that if--(Pause) We could probably find an entire Thursday motion day that we could devote to this maybe or part of one anyhow or a half a day. I think I could probably work that out.

MR. TALMAN: If it takes that long.

MR. CRABTREE: A whole half of day? A couple of hours.

MR. TALMAN: Yes. Depends on who shows up.

THE COURT: Okay. Let's put this on Tuesday and see if we can have--new counsel hopefully will be present at that point. And Mr. Brown, I'm not going to relieve you until--until I've secured that so that Ms. Pike has sufficient coverage.

MR. TALMAN: Your Honor, does Mr. Brown need to be present on Tuesday?

THE COURT: I think that would be a wise thing if he can be present.

MS. HELM: If we can't find somebody else--

THE COURT: If we can't find somebody else, Mr. Brown isn't withdrawing on Tuesday. So that would be January 23rd.

MR. TALMAN: Yes, your Honor.

MS. HELM: Yes.

THE COURT: Is there anything else you want to take up at this point?

MR. TALMAN: Your Honor, if you could address--I won't have time to get a written motion and an order prepared for street clothing on Tuesday.

THE COURT: If--you don't need to. If you would, have Ms. Pike's family, if they're available, to get her her--

MR. TALMAN: They all live out of state, your Honor.

THE COURT: --personal appropriate clothing. They would of had to do that anyway at some point.

MR. TALMAN: Will the media have two business days by Tuesday? Wouldn't they have to file it today?

THE COURT: I will still--I'll regard this as that if they wish to do it. If you would--I think it would probably be smart to have that

available to Ms. Pike from here on anyhow.

MR. TALMAN: If we can get them here by Tuesday. That will be certainly difficult.

THE COURT: When Ms. Pike was picked up, was there clothing that was put in storage for her? I don't know.

MS. HELM: That which was not confiscated was stored by Job Corp, but it was subsequently dispersed to--(Pause)

THE COURT: Anything else, counsel?

MR. TALMAN: Your Honor, Ms. Pike tells me that the phone in the--

THE COURT: I know; it's broken.

MR. TALMAN: --is broken--

THE COURT: I've already heard.

MR. TALMAN: --and wants to know if it's okay if I give her a quarter to make a call to call home, and I'm going to do that unless the Court has an objection.

THE COURT: You need a quarter to call home?

(Whereupon, Ms. Pike briefly conferred with Mr. Talman.)

MR. TALMAN: Or let her use a phone call so she--can you order that she gets a phone call

and that they let her use a phone?

THE COURT: Yes, that I can do.

MR. TALMAN: Okay.

THE COURT: I can arrange that.

MR. TALMAN: All right.

THE COURT: Mr. Bates, please tell them that when Ms. Pike gets downstairs she needs to make a phone call and she needs to be able to contact her family on my order.

Anything else?

MS. HELM: Do you still want us?

THE COURT: Yes, but I might as well adjourn so the officers can go home. They've been here all day. Court's adjourned until 9 o'clock Monday morning.

(Whereupon, this case came on to be heard further on the 23rd day of January, 1996, when the following proceedings were had, to-wit:)

THE COURT: All right. Have we carried on a conversation and are we ready to go forward on Ms. Pike's matter?

MR. TALMAN: Yes, your Honor.

THE COURT: Is she up?

MR. TALMAN: She is.
MR. GARRETT: Ms. Helm is--
THE COURT: Okay. Yes, I guess I need General Helm.
MR. TALMAN: We--also we want to address the issue of the photographer in the courtroom.
THE COURT: I understand that.
MR. TALMAN: Okay. Prior to taking any photographs.
THE COURT: I understand that too.
MR. TALMAN: Thank you, Judge.
(Whereupon, the Court took up other unrelated cases on its docket before proceeding in this case as follows:)
THE COURT: Ms. Martin, I presume you know why you've been asked to join us this morning.
MS. MARTIN: Yes, your Honor.
THE COURT: Are you willing to go forward in this matter? Are you willing to take appointment in this case?
MS. MARTIN: Yes, I am.
THE COURT: Okay.
MS. MARTIN: I talked to Mr. Talman about

the offense of Ms. Pike and I am willing.

THE COURT: Okay. Let me get everybody in one place and we'll do it officially then.

MS. MARTIN: Okay.

(Whereupon, the Court took up other unrelated cases on its docket before proceeding in this case as follows:)

THE COURT: Do we need Mr. Brown back?

MR. TALMAN: If your Honor needs him. He had somewhere to go.

THE COURT: Well, I'd kind of like him to be present so that he knows that it's taken care of.

(To court officer) Would you just step down the hall--I think he was a couple of doors down--and see if he's available to come back over here for a minute?

(Whereupon, the Court disposed of other unrelated cases on its docket before proceeding in this case as follows:)

THE COURT: Are to ready to bring Ms. Pike out? What happened to my camera man? That's all

right. I've lost Mr. Patrick; however--there's Mr. Patrick. Okay.

Now, Mr. Talman, I understand you would like to voice some concerns regarding photography again this morning.

MR. TALMAN: Yes, your Honor.

THE COURT: And I might note for the record, since the record doesn't take pictures, that Ms. Pike is dressed as any other lady in the courtroom. So go ahead.

MR. TALMAN: Your Honor, I'm assuming that this is a continuation of the motion from Friday--

THE COURT: It is.

MR. TALMAN: --since I received no further notice that *The News Sentinel* has filed written--

THE COURT: And I have informed *The News Sentinel* that I regard this as a continuation of that motion and their notice was in effect. They were here and were told to be present today.

MR. TALMAN: That's fine. Your Honor, again, I need to ask the Court to reconsider the objection that I logged regarding cameras in the courtroom. It's our argument that cameras, especially television cameras, but any type of cameras draw undo attention to a case where

somebody may or may not read the article but see a picture, and it certainly draws attention to it.

Our purpose for making this motion is to help us to avoid the necessity of asking for a change of venue so that we can select a--a jury pool that is comprised of Knox County citizens that have not heard of this case, that have not formed any opinion regarding this case.

As your Honor knows there are several issues in this case that would undoubtedly draw attention of the general public and their fascination.

THE COURT: I think those issues have already drawn the attention of the general public or the photographer wouldn't be here.

MR. TALMAN: That's correct, your Honor.

THE COURT: And, of course, as to the jury pool, it's not a requirement that the jury pool not ever have heard of this case. It's simply that they've formed no opinion.

MR. TALMAN: Well, again, your Honor, we--we voice our objection and we take exception--exception to your ruling to preserve the issue. And we'd further note that for your Honor or for the State to argue and for your Honor to--to agree

that because there has already been pretrial publicity that additional pretrial publicity is not going to hurt it, I object to that. I think that that's incorrect.

THE COURT: I don't know whether additional pretrial publicity will harm this matter or not. Although, I think that there will be additional publicity regardless of whether or not the photographer is present in the courtroom.

This is--this is probably one of the most publicized cases, other than for instance zoo man, in Knox County.

I just think that I have little choice unless there is some reason regarding proof or whatever to not do this. And I think we've expressed all these things earlier.

MR. TALMAN: Yes.

THE COURT: Obviously, your concerns about venue are serious concerns. You're not just standing up here doing this, and I--I don't think at this point that that's going to mitigate against the photographer--

MR. TALMAN: Well--

THE COURT: --for the same reasons that I ruled earlier. I don't know if the Attorney

General wants to address the issue.

MR. TALMAN: I would like to finish making my record--

THE COURT: Sure.

MR. TALMAN: --before you--

THE COURT: Go ahead.

MR. TALMAN: --make a definitive ruling. Your Honor, we would submit that television cameras especially or any still photography camera is going to increase the notoriety of this case. Having an article in the paper, which we can't avoid that--most cases have articles in the paper. Most murder cases or high profile cases are going to have articles in different newspapers. They're going to have a limited amount of television coverage.

But to have blow by blow action of what happened in today's proceedings or sound bites of what was argued in court or what was said in court or what the defendant looked like in court today or just different stuff, what the prosecutor looked like, the defense attorney, that stuff, I mean--and I draw attention to the media circus in California with the O. J. Simpson trial, your Honor. I don't want to turn this case into that. I'm making the record early on. We don't want that. I've not

commented to the press. I will not comment to the press for that reason.

To go out and make a statement to a television camera about problems about this case or our arguments or our position would just defeat the whole purpose of making this motion in the first place. And we ask your Honor to seriously reconsider.

I would also call attention to the fact that some legislators have filed a bill in the Legislature to create a law that would make television cameras and cameras in the courtroom illegal in Tennessee in criminal cases. And we realize that's not law at this point, but we think your Honor should consider this and should reconsider your Honor's position.

Additionally, if your Honor is going to overrule our objection and allow the media into the cov--into the proceeding, then I think the ques--the question ought to be decided: are they allowed to cover the proceeding or are they not allowed to cover the proceeding? This objecting every time we have a hearing, every time we've got something coming up to have to renew a motion or redo all this stuff, just doesn't make any sense.

The whole purpose for the argument in the first place is to protect our jury panel, to protect this. And if the press is going to be allowed to cover it, they ought to be allowed to cover it or they shouldn't be allowed to cover it. And I think to say, "Well, we're not going to let them hear certain things but we're going to let them hear other things," that just doesn't make sense respectfully, your Honor. And I just don't think they--they should be present, and that's what we're asking your Honor to do.

In the alternative if your Honor does overrule this, we have objections for the placement of the camera. We don't think the media should be given any preferential treatment or any better treatment than any other spectator in the courtroom. Any member of society that wants to come in and watch this trial--it's an open courtroom--they have the right to do so. The media has the right to be present. If they're going to be allowed to take photographs, they ought to be in the back of the courtroom where any other spectator would be. And that's no reflection on Mr. Patrick personally; it's just a matter of cameras in general. And that's our objection.

THE COURT: I'll address that in--when we get down to that.

MR. TALMAN: Thank you.

THE COURT: General.

MS. HELM: Well, Mr. Talman and I agree on one thing. I hope we don't have to revisit this issue every time we come into court. I think your Honor ruled Friday. I think your Honor is bound by what the Supreme Court has said. They've obviously considered all of the issues raised by Mr. Talman and found, obviously, against him at this point. What the Legislature might do is of no moment at this point. I think your Honor's hands are tied, and I don't think we ought to relitigate this every time we have a motion.

MR. TALMAN: Your Honor, briefly, I would like to respond to that. The Supreme Court has not definitively decided this issue. I would note that this proposed--or this Supreme Court Rule 30 is a one year test project. And this is too serious of a case to be a test for the Supreme Court. With all due respect to this Court and to the Supreme Court, this is too serious a case.

The rule says the trial court, that is your Honor, has the discretion to decide in each

case whether the media is going to be present or not be present. We ask your Honor to decide in this particular circumstance, this particular case, it's not appropriate.

THE COURT: But you're asking me to make a decision today about the entire proceedings of this entire case. That's what you said; isn't it, Mr. Talman?

MR. TALMAN: Just as to photo-- photographers and cameras and television cameras and that stuff, yes, your Honor.

THE COURT: And you're asking me--

MR. TALMAN: Yes, your Honor.

THE COURT: --to do that today?

MR. TALMAN: Yes, your Honor, I am.

THE COURT: Well, it's like this. First of all, I think for the reasons that I set out on Friday and for a couple of the reasons which both you and Ms. Helm have articulated, this Court's hands are somewhat tied.

Although a legislator has seen fit to introduce a bill, I frankly think that there is some constitutional problem with such a concept. The Constitution of the United States, which I am sworn to uphold, and the Constitution of Tennessee

say that there shall be freedom of the press. The one year experiment, so to speak, of the Supreme Court is. nevertheless, an order that has been put down to the trial judges.

And my initial ruling that--that in this case, as in all other cases, the press can report on anything it chooses and what parts of it it chooses to report and I have no control over that anymore than anyone else does. I have previously ruled that if Ms. Pike was properly dressed for the Court--and she is today--that I would permit the camera and I will.

Don't take any pictures yet, Mr. Patrick. Let me finish my ruling if you would, please.

Where the camera is located is, as I understand it, entirely within the discretion of the trial judge. The reason I located the camera where it sits today and where it sat on Friday is because there were 130 cases in here on Friday and many, many people. The jury box was being used by our probation officers. And for security of the court and the people in it and for the flow of traffic, I located the camera over here. (Indicating)

And I don't--during a trial I would have

to locate it up there (Indicating) so it would be away from the jurors. I don't have any problem with it here. (Indicating) And I guess this spot and that one are the only two that I really would have a reason--reasonable angle on, but I'm no camera person so--

MR. TALMAN: Your Honor, if I could note, since the record can't reflect your gesturing--

THE COURT: Would you please go ahead.

MR. TALMAN: You are referring up to the area up next to the jury box--

THE COURT: To my immediate--

MR. TALMAN: --and the witness stand--

THE COURT: To my immediate right.

MR. TALMAN: --as opposed to the--behind the bar.

THE COURT: And as we all know, this is a courtroom that there's a great deal of difficulty in hearing and seeing altogether. And there have been motions from the very beginning, at least of my stay here, the very first trial I had, Anthony, where Mr. Stephens objected to the courtroom and its layout and that was one of the issues in Anthony. There's not a whole lot that I can do about that at this point.

Now, while, Mr. Talman, I have previously voiced my opinion to the Supreme Court that I do not think cameras in the courtroom is a wise thing, I think that I am bound by their dictate. And I think that, based upon what I have, this case is no different than others.

The reason why I earlier suggested that I would make a ruling as to each phase was basically for your benefit, and that was to protect photography in the event that we are talking about some issues that may be somewhat ghoulish or gruesome to the general public, various things like that.

But if you want me to make a ruling as to this entire case based upon what little I already know about it, I'll make that ruling. Are you sure you want me to do that?

MR. TALMAN: Well, your Honor, I think that's the appropriate ruling for you to make because it's not my place and respectfully it's not the Court's place to protect what *The News Sentinel* or any other reporter reports. If they have a--

THE COURT: But you're not going to protect them anyway whether the cameras are in or out of the courtroom because they're going to report anyway. And the sound bites are going to

occur anyway whether they're in or out of the courtroom.

MR. TALMAN: What they are allowed to cover, quite frankly, is up to their ethical standards, if they're allowed to cover the proceeding and photograph it. What concerns me, your Honor, there are a lot of other issues that I need to deal with with this case and the--

THE COURT: Well, I know and I don't--

MR. TALMAN: --State needs to deal with and--

THE COURT: --and I don't know what they are. That's part of the problem.

MR. TALMAN: And to have to every time we come into court have to reargue the issue of whether the media is here--

THE COURT: Here's what I'm going to do.

MR. TALMAN: --or they're not here--

THE COURT: I doing to--I'm not going to set a date at this point, but I want you all to file something noting all of the objections you've got based upon the evidence that you know exists, which I don't know about yet, and if you want to--I don't know--maybe you can do that under seal--I don't know how to do this; this is, as you say, an

experiment--

MS. HELM: Your Honor, may we approach?

THE COURT: --and hold this hearing once more and be done with it. Yes, sure.

(Whereupon, a bench conference was held as follows:)

MS. HELM: I don't think that's--(Inaudible phrase)

THE COURT: Okay. But I don't have a reason at this very minute to say, "You can't take pictures." And I don't want to make--

MS. MARTIN: Well, you don't have any reason to under the--

THE COURT: But once I rule they can permanently, then you've got a battle on your hands if you don't want it to happen for some reason.

MR. TALMAN: Well, Judge, my principle concern is protecting the jury. The prospective jurors would be--

THE COURT: I understand that.

MR. TALMAN: --once you--(Indiscernible word)--a reason for what they cover.

MS. MARTIN: (Inaudible comment)

THE COURT: Well, then I'll let you take pictures. I mean I'm trying to give you an out.

If you don't want one, I'm not going to give it to you.

MR. TALMAN: I'm probably going to renew my objection every time, but I'm not going to go into the arguments every time. I feel like--

THE COURT: Well, there may be certain portions that during the course of the things if you ask me to I can shut them off because I think the rule contemplates that.

(Whereupon, Ms. Helm and Mr. Talman spoke simultaneously and indiscernibly.)

MS. HELM: --put it in writing.

MR. TALMAN: --by discretion. It says you can use discretion.

MS. HELM: But if we're going to get the wide lens--(Indiscernible phrase)

THE COURT: Well, the only--the only people who have asked, you understand, is The *News Sentinel*--

MR. TALMAN: So far.

THE COURT: --in proper form. I've received **nothing** from anyone else.

MR. TALMAN: There is one other thing I have to put on the record. (Inaudible phrase)--

someone made comments about--(Inaudible phrase)

THE COURT: Really. Okay.

(Whereupon, said bench conference was concluded.)

THE COURT: Okay. Mr. Talman, there were a couple other matters you said you would like to address before we conclude this part of this hearing anyway.

MR. TALMAN: Your Honor, I would like to note respectfully that your Honor in enunciating part of your ruling has said that your Honor does not think it's a wise decision to have cameras in the courtroom, and that's a personal decision that you--

THE COURT: That's correct.

MR. TALMAN: --a personal feeling that you have but you feel that you--

THE COURT: I think I--I'm know I'm bound by the order of the Supreme Court and its dictates.

MR. TALMAN: Well, your Honor, I would respectfully submit that the order says the trial court has the discretion. And I would think that if your Honor does not feel it is in--the best for this case--it's the best thing for this case, then your Honor should exercise that discretion. And if

The *News Sentinel* or any other area of the media doesn't like it, then let them take the issue to the appropriate forum. And that is what we would ask, your Honor.

THE COURT: Mr. Talman, of course, with respect--and I would have said the same thing you just said if I was standing in your place--I think that that discretion must have some sound reasoning. I can't just use that discretion to--for no reason exclude news media. Again, there is some constitutional basis involved.

And I think that if that's--if that's where we are, the only news media who has made a proper formal request that I'm aware of to photograph this proceeding is *The Knoxville News Sentinel*. No media has yet requested to photograph any other proceedings.

If you are asking me whether or not--if you're asking me to go ahead and make a ruling that if anybody requests that I let them do it, I can do that.

MR. TALMAN: Well, I'm not saying--

THE COURT: If you want to wait and see if anybody bothers, I'll be glad to do that.

MR. TALMAN: Well, I suppose we need to

wait and see who asks to cover it.

THE COURT: I suspect we do, and also I suspect that since this is a new method of proceeding the judges in Knox County are going to have to sit down and come up with some local rules as to how we do this. I'm sorry this is an experiment, but I'm not going to make a ruling as to the--

MR. TALMAN: Well, because this is unplowed ground--

THE COURT: So to speak.

MR. TALMAN: --I'm trying to make sure the record is fully preserved for anyone that may look at it later.

I would also like to note that while your Honor has made a certain constitutional decision regarding the media's rights to cover the proceeding that it's not necessarily--with respect it's not necessarily this Court's position to ensure the media's rights. It's--it's--we think it outweighs--

THE COURT: It is the defendant's rights, I understand--

MR. TALMAN: --the defendant's rights.

THE COURT: --that are outweighed.

MR. TALMAN: And if the news media is somehow aggrieved by the actions of this Court, then, of course, they have proper recourse to another forum and--

THE COURT: Well, at this point I'm going to permit Mr. Patrick to take his photographs today.

MR. TALMAN: I understand that, Judge.

THE COURT: And we'll deal with that issue somewhat later on. But I--it should and is now properly raised for the record.

MR. TALMAN: Thank you.

THE COURT: Mr. Patrick, you may photograph the rest of this proceeding is you wish.

MR. TALMAN: Your Honor, I--also I had my --I had an objection as to the location of the camera and I renew that objection. The courtroom does not have 130 cases here today, and any photographer shouldn't have any other better position than any other spectator of the public. So we renew that objection and would like a ruling on that.

THE COURT: The Court notes your objection for the record and, as I said, during the course of a trial I would very likely require that the camera

be placed back in the audience to protect the jurors. We have no jurors today.

MR. TALMAN: So is that to interpret by--by supposition that your Honor is going to allow the media to be in the front of the courtroom during all phases of the pretrial proceedings? Is that a correct statement or is that something that needs to be addressed each morning before court?

THE COURT: (Pause) Well, General, do you want to--

MS. HELM: Your Honor, you've ruled.

THE COURT: Yes, I don't--I don't.

MS. HELM: And, you know, we keep revisiting the same issue over and over and over.

MR. TALMAN: You ruled that they can take pictures.

THE COURT: I understand that I have ruled that they can take pictures, and I also understand that--

MS. HELM: You've ruled he can be right there. (Indicating)

THE COURT: --that I ruled that he can be right here. (Indicating) During most motion hearings we will have a considerable number of people in the courtroom. And there will be times

when this camera is here, and there will times when it's there and there will be times when it's there. (Indicating) I think it makes little difference at this point and--

MR. TALMAN: Your Honor, if we call witnesses then--

THE COURT: --I'm going to allow them--

MR. TALMAN: --quite frankly, Mr. Patrick would be in the way.

THE COURT: They will have to move; that's correct.

MR. TALMAN: Okay.

THE COURT: I took it that there would be no witnesses called today; am I correct?

MR. TALMAN: Also, we have a certain--

THE COURT: Are there witnesses to be called today?

MR. TALMAN: No, not today, your Honor.

THE COURT: Okay.

MR. TALMAN: But we do also note an objection that there are bailiffs guarding Ms. Pike sitting behind her right now at this angle; whereas, at the other angle--I mean it's obvious that they're sitting here guarding her.

THE COURT: That's no problem.

MR. TALMAN: It's obvious--

THE COURT: Mr. Bates, would you please move over to the chair behind General Helm, and I have no problem with one officer sitting behind Ms. Pike.

MR. TALMAN: Which just happens to be a uniformed officer.

THE COURT: We have done this before. Well, we have done this before in other proceedings and for the jury's benefit, but officers belong in courtrooms. There's no--Ms. Pike is not shackled.

MR. TALMAN: We've--we've noted our objection, your Honor.

THE COURT: Ms. Pike is not handcuffed. There is no reason for there to be a problem.

MR. TALMAN: That's fine.

THE COURT: All right.

MR. TALMAN: Your Honor, I'm not trying to be argumentative. I'm just trying to make sure we preserve the record.

THE COURT: Mr. Talman, I'd be doing the same thing you're doing if I was over there, like I said earlier.

Now, we need to deal first with the issue of substitution of counsel. Ms. Martin--(Pause)

MR. TALMAN: Your Honor--

THE COURT: Wait a minute, Mr. Talman.

Ms. Martin, you have discussed this matter with Mr. Talman and with Mr. Brown and I take it with Ms. Pike; is that correct?

MS. MARTIN: Yes, I have, your Honor.

THE COURT: And are you willing to take appointment in substitution for Mr. Brown, based upon his Motion to Withdraw and the Court's previous ruling?

MS. MARTIN: Yes, I am, your Honor.

THE COURT: I'm going to appoint Ms. Martin.

MS. HELM: Your Honor, there's one other issue that you said you wanted answered before you relieve Mr. Brown.

THE COURT: Right.

MS. HELM: And I don't believe we've heard an answer to that question yet.

THE COURT: Ms. Martin, are you going to be available on March the 19th; is it?

MR. TALMAN: 18th.

MS. HELM: 18th.

THE COURT: 18th?

MS. MARTIN: The 18th I believe I have--

THE COURT: Free and clear.

MS. MARTIN: I only have one trial in March and it's not on that date.

THE COURT: Okay. That was something we're concerned about since this is, as you know, a very serious felony and Ms. Pike has been in custody so--

MR. TALMAN: Your Honor, I would also note while the State has a concern about being ready for trial by the 18th, if the State will comply with discovery by the 18th, we will be ready for trial by the 18th.

MS. HELM: No problem.

THE COURT: Okay.

MR. TALMAN: Is that for the record, General?

MS. HELM: Everything I said is on the record, Mr. Talman.

THE COURT: Yes, it is.

MR. TALMAN: Thank you.

THE COURT: All right. Now, are there any other issues you'd like to raise? Do you want another motion date?

MS. HELM: Yes, please, your Honor.

THE COURT: This is one that we, I take

it, will need some time with.

MS. HELM: I don't think we're going to need an entire day--

THE COURT: Okay.

MS. HELM: --at least not based on what's filed so far.

MR. TALMAN: There will be some additional filings, your Honor.

THE COURT: How long do you think you need before you can get everything together to hear it? I have--I have one PC that won't take too long on Thursday, February the 8th. I have nothing at this point set on February 15th, except for Dr. McIntyre's course which we will be doing in the afternoon so we could do it the morning of February 15th.

MR. CRABTREE: February the 4--15th looks great, Judge. Would you want to do it in the morning or would you want an afternoon docket?

THE COURT: Oh, no, in the morning. I don't--as I say, I don't think there's much of anything unless there are arraignments or brief matters set on that morning. So it's yours basically.

MR. TALMAN: The 15th is fine with me if

it's okay with the State.

MS. HELM: It's all right with me--

MR. TALMAN: Ms. Martin?

MS. HELM: --subject to consulting with--

THE COURT: General Bright?

MS. HELM: No. --General Crabtree.

THE COURT: General Crabtree. That's fine. He was here a few minutes earlier, but he's not here now.

MS. HELM: Yes, we've managed to miss each other.

MR. TALMAN: Is that okay with you? (To Ms. Martin)

MS. MARTIN: That's fine. I'll have to do a little bit of court hopping because I'm due in another court, but I can arrange that.

THE COURT: Are there any other matters you want to take up at this point? (Pause)

Ms. Beiber, would you please instruct the Jail to see to it that Ms. Pike's clothing is put away properly so that she has it available to her in the future for court.

I would like to express another opinion which I wasn't asked for. And that is that if it's possible I think that all prisoners should be

permitted to dress out for whatever court proceedings. But that's so cumbersome it never happens.

MR. TALMAN: Your Honor, if it's possible as to the storing of Ms. Pike's clothing, if the Jail can be instructed to hang this up as opposed to fold it back up and put it in a box--

THE COURT: Well, that's what I'm asking Ms. Beiber to tell them, to properly--well, I don't know how they're going to do it. And they're going to store it whatever way they ordinarily would. But I'm going to ask Ms. Beiber to see to it that they understand I'd like it to be put properly so that it will be all right.

MR. TALMAN: Thank you, Judge.

THE COURT: Thank you. Okay.

(Whereupon, this case came on to be heard further on the 15th day of February, 1996, and the following proceedings were had, to-wit:)

THE COURT: Ms. Martin.

MS. MARTIN: Yes, your Honor, I believe Mr. Talman spoke with you yesterday about assisting Ms. Pike--

THE COURT: Uh-huh. (Affirmatively)

MS. MARTIN: --getting ready, and I am prepared to do that at this time if your Honor so allows.

THE COURT: You all come on up.

(Whereupon, a bench conference
was held in the presence of the
jury but out of the hearing of
the jury as follows:)

THE COURT: No. What I told him was that you could carry a lipstick back there and let her put on some lipstick. She's not going to dress--(Inaudible phrase due to dock door closing)--and you can't carry the makeup bag back there.

MS. MARTIN: Okay.

THE COURT: And I'm not going to let her do that at any point. I'll let her put on a little bit of lipstick. I talked to the Jail about it, and they said you could do that in the dock. That's fine as long as you hold the lipstick. But I don't want--I'm not letting her paint her self up back there with eye shadow and all that stuff.

MS. MARTIN: Okay.

THE COURT: Okay. I'm sorry. I can't--I just can't let all that stuff go back there.

MS. MARTIN: That's fine. That's not what I was told.

MS. HELM: I'm just--I mean I knew nothing about this.

THE COURT: I know. He called up--well, they called me yesterday--

MS. HELM: (Indiscernible comment due to simultaneous speaking)

THE COURT: --and asked me whether or not they could--

MS. HELM: --conversation is about.

THE COURT: Well, you should be. But they asked me if they could--

MS. MARTIN: (Inaudible comment)

THE COURT: --get her some clothes. They asked me and I said yes and I called the Jail. And they asked me whether or not they could bring her a lipstick, and I said only if Ms. Martin holds onto it. And that was the whole substance of the whole thing. Don't carry that makeup case back there.

MS. MARTIN: Okay.

THE COURT: Okay.

MS. MARTIN: That's fine. I did not realize that.

THE COURT: Are we going to go forward

here in just a few minutes and how long do you all think it will take?

MS. HELM: I have no idea.

THE COURT: Okay.

MS. HELM: I saw Rick Hollow here. He's going to want to be heard about *The Sentinel*.

MS. MARTIN: I think we've worked that out. I'm not sure.

THE COURT: I told Tom Chester yesterday that *The Sentinel* had previously given notice for these same hearings so--

MS. HELM: Well, they're fighting the subpoena.

THE COURT: Oh, okay.

MR. TALMAN: Judge, may I approach?

THE COURT: Yes, you can but I think we're done.

(Whereupon, the parties laughed.)

THE COURT: Okay.

MR. TALMAN: Can we--

THE COURT: Why don't you wait just a few minutes and let me deal with the rest of my docket, and we'll take a break and you can go back and do that.

MS. MARTIN: That's fine.