**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| **v.** | ) | Case No. 1:12-cv-35 |
| | ) | Judge Mattice/Lee |
| **VICKI FREEMAN**, Warden, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

---

## PETITIONER'S POST-EVIDENTIARY HEARING BRIEF

---

Now comes Petitioner Christa Pike, through undersigned counsel, and pursuant to this Court's Order (R.83) submits her Post-Evidentiary Hearing Brief. This Court requested briefing so that the parties may "address whether or not the Court should consider the evidence presented during the evidentiary hearing, in light of the 28 U.S.C. § 2254(d)(1) limitation and *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)." (R.83, PageID# 12978). Petitioner Pike will also address how the evidence presented at the hearing demonstrates her right to habeas corpus relief. In order to establish a context for the arguments in this brief, Petitioner hereby incorporates the Statement of Facts from her Memorandum in Support of Petitioner's Motion for Partial Summary Judgment. (R.46, PageID# 10600-635).

This Court may consider the evidence presented at the evidentiary hearing because a careful review of the State court record shows that the State court's findings of fact that formed the foundation of its resolution of the issues in Claims

Two and Six are "unreasonable determinations of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Once this Court has reached that conclusion, it may consider the new evidence presented at the hearing held May 26-27, 2015. That evidence, along with the evidence already in the record, demonstrates Christa Pike's right to habeas relief on Grounds Two and Six.

## I. Because the State court's decisions on Grounds Two and Six were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court was permitted to conduct a federal evidentiary hearing.

Petitioner Pike moved this Court for an evidentiary hearing on her claims that trial counsel labored under a conflict of interest that affected critical decisions he made regarding the presentation of her case. (Grounds for Relief Two and Six, R.19, Habeas Petition, PageID# 9683-90; PageID# 9703-04). These claims were adjudicated on the merits in State court proceedings. *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *47-49 (Tenn. Crim. App. Apr. 25, 2011). Because the claims were adjudicated on the merits, 28 U.S.C. § 2254(d) applies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Under 28 U.S.C. § 2254(d), habeas relief may be proper when the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Petitioner meets the (d)(2) standard. Because the State court's factual findings on the conflict of interest claims are unreasonable and are not supported by the State court record, or the State court failed to actually resolve factual disputes, this Court may consider evidence presented at the evidentiary hearing to resolve these issues.

*Pinholster* does not limit this Court's ability to hold a hearing in this case. The *Pinholster* Court held simply that any analysis under (d)(1) is limited to the evidence that was before the State court. *Pinholster*'s holding was expressly limited to (d)(1): "We now hold that review under § 2254(d)(1) is limited to the record that was before the State court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398. Here, the State court factual findings are unreasonable in light of the State court record as a whole. 28 U.S.C. § 2254(d)(2).

The Supreme Court's analysis in *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), decided just this term, as well as the Court's analysis in *Miller-El v. Dretke*, 125 S. Ct. 2317 (2005), are instructive. In those cases, the Court analyzed the application of (d)(2) where the habeas petitioner argued that the State court denied relief based on an unreasonable resolution of the facts that formed the basis for applying the law. In both cases, the Court closely reviewed the State court factual findings and found they did not withstand scrutiny. The same conclusion is warranted here.

To show that the State court's findings are unreasonable, Petitioner will rely on evidence contained in the State court record. *See Pinholster*, 131 S. Ct. at 1398 (§ 2254(d) analysis is limited to the record that was before the State court). Relying

solely on that record, Petitioner Pike will demonstrate that the facts found by the State court concerning the conflict of interest are not supported by the record and, in fact, sometimes directly contradict it. Habeas relief is warranted because the State courts rendered "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Where Petitioner shows by "clear and convincing evidence" that the State court's findings of fact are not supported by the record, this Court may disregard those findings, *see* 28 U.S.C. § 2254(e)(1). This Court may then consider the evidence presented at the habeas hearing and grant habeas relief on these claims.

### A. In order to assess the reasonableness of the State court's findings of fact, this Court must engage in a close review of the record to determine if the State court factual determinations are reasonable in light of the State court record as a whole.

The Supreme Court directs habeas courts to look at the record as a whole to determine if factual determinations are "unreasonable." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Although the Federal court must give substantial deference to State court fact-finding, such:

> deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a State court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Id.* at 340.

The issue currently before this Court is much like the issue before the Supreme Court in *Miller-El v. Dretke*, 545 U.S. 231 (2005). In *Dretke*, the Supreme Court considered whether the race-neutral explanations for peremptory strikes advanced by the prosecutor (that had been accepted by the State court) were reasonable in light of the entire state-court record:

> Miller-El may obtain relief only by showing the Texas conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)(2). Thus, we presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.' § 2254(e)(1). The standard is demanding but not insatiable; as we said the last time this case was here, '[d]eference does not by definition preclude relief.'

*Id.* at 240 (citing *Cockrell*, 537 U.S. at 340).

The Court's analysis in *Dretke* is instructive and serves as a model for this Court's analysis. At the outset, the *Dretke* Court noted that the prosecution used peremptory challenges to exclude 91% of the eligible African-American jurors and noted that "'[h]appenstance is unlikely to produce this disparity.'" *Id.* at 241 (quoting *Cockrell*, 537 U.S. at 342). Then, the Court went on to look at the prosecutor's specific reasons for their peremptory strikes and showed why each one was inconsistent with other evidence presented. In examining the record and assessing credibility, the Court explained that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" *Id.* at 247 (quoting *Cockrell*, 537 U.S. at 339). This Court must undertake the same

examination to determine the credibility of explanations offered by Attorney Talman for why he never called his mitigation expert, Dr. Diana McCoy, to testify during the penalty phase of Christa Pike's trial--even after he turned over her Social History and supporting documentation to the prosecution. Just as in *Dretke*, this Court must consider, at the outset, that it would be unlikely for a defense attorney to build his penalty phase strategy around his mitigation expert only to decide at the last minute not to present the findings from her lengthy investigation. This is especially true where, as here, that attorney has turned over the findings of her work to the prosecution in anticipation of calling her as a witness.

This Court's analysis must start with 28 U.S.C. § 2254(d)(2). This is because "[t]he prisoner bears the burden of rebutting the state court's factual findings by 'clear and convincing evidence.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (citing 28 U.S.C. § 2254(e)(1)).[1] In *Burt*, even though the Court found that the State court's factual bases were reasonable, the Court nonetheless conducted a careful probe of all evidence presented to the State court. *See id.* at 16-18. This scrutiny, the same as was conducted in *Dretke*, is necessary because the habeas court must not limit its review to crediting factual findings that are simply "possible" but must consider whether those findings are "reasonable." *Cash v. Maxwell*, 132 S. Ct. 611, 612 (2012) (Sotomayor, J., respecting the denial of certiorari). Where the findings are

[1]Just this term, the Supreme Court noted that it has never resolved the issue of the exact interplay between 2254(d)(2) and (e)(1). *Brumfield*, 135 S. Ct. at 2282. However, for purposes of this pleading, Petitioner will assume that she must rebut the State court's factual findings by clear and convincing evidence.

not reasonable in light of all of the evidence, the habeas petitioner has met her burden under § 2254(d)(2).

The present case is also similar to one decided just this summer by the Supreme Court. In *Brumfield v. Cain*, the State court applied the correct Federal law, but the Supreme Court found that the factual determinations were unreasonable under 2254(d)(2). Just as in *Dretke*, the Court closely and carefully examined "the . . . underlying factual determinations on which the trial court's decision was premised. . . ." *Brumfield*, 135 S. Ct. at 2276. After finding that those factual conclusions were unreasonable based on evidence in the State court record, the Supreme Court concluded that the habeas court was authorized to hold a hearing and grant relief. *Id.* at 2283.

If a petitioner demonstrates a constitutional violation and shows § 2254(d)(1) or (d)(2) is met or otherwise inapplicable, this Court may either grant relief or grant an evidentiary hearing. *See Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring in part) ("Like the Court, I believe that its understanding of 28 U.S.C. § 2254(d)(1) does not leave AEDPA's hearing section, § 2254(e), without work to do."). The *Brumfield* Court recognized that "federal habeas courts may 'take new evidence in an evidentiary hearing' when § 2254(d) does not bar relief." *Brumfield*, 135 S. Ct. at 2276 (quoting *Pinholster*, 131 S. Ct. at 1401).

The rule to be derived from these cases is that the Federal court must determine if the Petitioner has met the requirements of § 2254(d). If she has, as

Petitioner argues in Part B, infra, then *Pinholster* does not bar an evidentiary hearing.

### B. The State court's decision to credit trial counsel's testimony is objectively unreasonable and unworthy of any deference by this Court.

The Tennessee court's legal conclusion that Attorney William Talman's representation of Christa Pike was not affected by any conflict of interest is unreasonable because it is based on findings of fact that are objectively unreasonable. The crux of Petitioner's argument in State court was that, because Talman was under the cloud of serious ethical violations and the possibility of criminal prosecution, he was conscious of the need to protect his own interests and placed those interests before his client's. Petitioner also presented evidence to show that Talman decided not to call Dr. McCoy because he had asked her to lie and she had refused. (R.9-25, Add.5, Doc.20, PCT, PageID# 6413). Further evidence tended to show that Talman feared that a successful hearsay objection from the prosecution would exclude all of her testimony. (*Id.*, PageID# 6413-14). The evidence supporting these allegations demonstrates that accepting Talman's *post hoc* rationale was objectively unreasonable.

The Tennessee Court of Criminal Appeals' recitation of State and Federal law was correct in that it recognized that a constitutional conflict of interest may be present where an attorney puts his personal interests ahead of those of his client. *Pike*, 2011 WL 1544207, at *46 (Tenn. Crim. App. Apr. 25, 2011) (citing *McCullough*

*v. State*, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003)).[2] The State court correctly recognized that prejudice is presumed only if the petitioner demonstrates that counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Pike,* 2011 WL 1544207, at *46 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).[3] However, the State court's decision to credit Talman's testimony was unreasonable. The court found no conflict of interest (as well as no deficient performance for purposes of Petitioner's *Strickland* claim) based on Talman's testimony. Because the record demonstrates that this conclusion was unreasonable, this Court must re-examine that question.

The State court record demonstrates (and there is no dispute) that Talman hired Dr. McCoy as his mitigation specialist in this case and that she conducted a wide-ranging mitigation investigation where she gathered evidence to present in the penalty phase of Christa Pike's capital trial. (R.9-19, Add.5, Doc.14, Talman PCT, PageID# 5935, 5938-39; R.9-24, Add.5, Doc.19, McCoy PCT, PageID# 6290-91). There is also no dispute that Dr. McCoy prepared a "Social History" of Christa Pike in which she summarized her findings and attempted to explain how Christa's unique personal history led to her involvement in the murder of Colleen Slemmer.

---

[2] This Court must evaluate the reasonableness of the last reasoned State court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-02 (1991). In this case, that would be the Court of Criminal Appeals opinion from the post-conviction appeal. *Pike*, 2011 WL 1544207.

[3] The *Cuyler v. Sullivan* standard was the correct standard to apply during the state post-conviction process and would be the correct standard for this Court to assess the reasonableness of the State court decision under § 2254(d)(1).

(*Id.*, PageID# 5938-39). That Social History was supported by medical records and summaries of the interviews that Dr. McCoy conducted with witnesses who had actual knowledge of Christa's history. (R.9-24, Add.5, Doc.19, McCoy, PCT, PageID# 6291, 6328-30). Because Talman intended to call Dr. McCoy as a witness during the penalty phase, he turned over the Social History and its supporting documentation to the prosecution after the jury rendered its guilty verdict--just prior to the beginning of the penalty phase. (R.9-20, Add.5, Doc.15, Talman, PCT, PageID# 6031-32).

On the afternoon before the penalty phase began, it was Talman's plan to call Dr. McCoy during the penalty phase. (*Id.*, PageID# 5995-96). Yet when the penalty phase began the next morning, he did not do so. Talman changed his mind about calling Dr. McCoy as a witness between Friday afternoon, when he turned over Dr. McCoy's materials to the prosecution, and Saturday morning, when the penalty phase presentation began. If that change of heart was based on Talman's interests over Petitioner Pike's, then a conflict of interest adversely affected Talman's performance at Pike's trial.

During State post-conviction proceedings, Talman offered several justifications for not calling Dr. McCoy: (1) Dr. McCoy could not corroborate Dr. Engum's diagnosis of borderline personality disorder; (2) that Dr. McCoy's testimony would have been "double-edged" with some negative information coming in; (3) Dr. McCoy had previously had a dating relationship with General Crabtree, the lead prosecutor in the case; and (4) "General Crabtree showed up that morning

with the report covered in 'yellow stickies'" and seemed to be very prepared to cross-examine Dr. McCoy. *See Pike*, 2011 WL 1544207, at *50 (summarizing Talman's reasons for not calling Dr. McCoy). The state post-conviction court of criminal appeals credited Talman's testimony and accepted these reasons. *Id.* at *52.

In analyzing whether the State court was reasonable in accepting these justifications, this Court must be mindful of the Supreme Court's command that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" *Dretke*, 545 U.S. at 247 (quoting *Cockrell*, 537 U.S. at 339). Furthermore, this Court must disregard a State court's "*post hoc* rationalization of counsel's conduct" as opposed to "an accurate description of their deliberations prior to sentencing." *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003). Under these standards, the State court's decision to credit Talman's justifications was objectively unreasonable.

The most important of Talman's justifications, that he called "the final straw," was his testimony that Dr. McCoy refused to corroborate Dr. Engum's diagnosis of Petitioner Pike, that she suffered from borderline personality disorder. According to Talman's testimony at the post-conviction hearing, he decided not to call Dr. McCoy right after she delivered this news: "it was just one of these little huddles outside during a break or something, you know–we're going to start this phase, going to put this witness on, going to put you on. To Dr. McCoy, 'I'm going to have you corroborate Dr. Engum's report and go through things.' And she said, 'I

can't do that; I didn't conduct an evaluation of Miss Pike.' And that point is when I made the decision." (R.9-20, Add.5, Doc. 15, PageID# 6010).[4]

Talman's rendition of Dr. McCoy's refusal to corroborate Dr. Engum's diagnosis is highly improbable because it is rebutted by other evidence in the record. First of all, the record contains a document written by Dr. McCoy and sent to Talman entitled "Mitigating Themes," where the first theme she suggested presenting was "Borderline Personality Disorder." (R.11-2, PC Exh.6, PageID# 7340-47). If Dr. McCoy disagreed with Dr. Engum's diagnosis or felt that she could not testify about it since she had not tested Petitioner, then it seems highly unlikely that she would suggest it as the leading theme in mitigation to Talman.

Also, shortly before trial, Dr. McCoy wrote a letter to defense counsel explaining that some of Petitioner Pike's behavior was "exacerbated by her borderline personality condition resulting from her unstable life and failure to bond." (R.11-2, PC Exh.24, PageID# 7416). Again, this demonstrates that she agreed with the diagnosis and was seeking further evidence to support it. In addition to this documentary evidence, Dr. McCoy testified at post-conviction that she never disagreed with Dr. Engum's diagnosis. (R.10-11, Add.5, Doc.21, PCT, PageID# 6517).

---

[4] The trial court concluded that the decision not to call Dr. McCoy was made the evening before the penalty phase. (R.9-5, Add.4, Doc.5, Findings of Fact and Conclusions of Law, PageID# 4473). If that is correct, Mr. Talman's recollection of a "huddle" during a break could not be accurate since they were not in court that evening.

Other factors suggest Talman's testimony was unreliable because it was "improbable" or a *post hoc* rationalization. Both he and Dr. McCoy testified that they worked together extensively on this case and consulted with each other on many occasions. (R.9-19, Add.5, Doc.14, Talman, PCT, PageID# 5937; R.9-24, Add.5, Doc.19, McCoy, PCT, PageID# 6293). It defies reason to believe that they never discussed the psychological diagnosis that Talman planned to present at both the guilt and penalty phase. Furthermore, if Dr. McCoy had suddenly announced her disagreement just before Talman was to put her on the stand, it is unfathomable that Talman would not ask for a recess to discuss and clarify the situation when the documents she had provided him demonstrated her agreement. The State court noted that "this could easily be explained as a misunderstanding between the two." *Pike*, 2011 WL 1544207, at *52.[5] However, if any such misunderstanding occurred at such a critical juncture in the case, it is implausible that the attorney would not seek to immediately clear it up by discussing it further with his expert witness.

Indeed, the State court record shows that Dr. McCoy spent 173 hours and was paid $14,108.61 for her work. (R.11-2, Add.6, Doc.2, PC Exh.30, Final Statement of Dr. McCoy, PageID# 7435-40). Both she and Talman testified to working closely together on the preparation of the penalty phase. Would it be

[5] The State court's tentative assessment that "this could easily be explained as a misunderstanding" is a non-finding of fact. It *could* be explained that way, but is that indeed the finding of the court?

reasonable for the attorney to plan his mitigation case around her testimony and then discard it all based on her answer to one question in a hallway huddle? Yet, according to Talman, this was the main reason for his decision.

As for Talman's second explanation, that Dr. McCoy's testimony was "double edged," the State court record demonstrates that Talman knew or should have known the content of Dr. McCoy's proposed testimony long before he turned over her Social History to the prosecutor. Both he and Dr. McCoy testified that they collaborated extensively as they prepared for trial. He had a copy of the report several days before the close of the guilt phase and was comfortable enough with it to give it to the prosecuting attorneys. At that point, all of the "negative" information was given over.[6] It would hardly seem logical to decide not to call the expert witness once all of the "negative" information had been given over. This decision would certainly not have a "basis in accepted trial strategy." *Cockrell*, 537 U.S. at 339.

As for the third rationale–that Dr. McCoy had briefly dated the prosecutor in this case–the evidence suggests this was more of an afterthought rather than a real basis for the decision. Talman himself said that he "never doubted Dr. McCoy's integrity." (R.9-20, Add.5, Doc.15, PCT, PageID# 6013). If he never questioned her integrity, then why would this factor worry him? Indeed the post-conviction trial

[6] And indeed, the prosecutor presented some of the negative information, outside of any mitigating context, while cross-examining Petitioner Pike's family members during their penalty phase testimony.

court found that his initial reaction upon learning this information was, "so what?" (R.9-5, Add.4, Doc.5, PageID# 4446 fn.20). If he believed there was some sort of *per se* problem, he never brought the situation to General Crabtree's attention and he never said anything to the trial court. He could have even made a motion that his expert be cross-examined by the other prosecuting attorney. Furthermore, although Talman could not remember exactly when he learned of this relationship, it is certain that he knew before he gave over Dr. McCoy's Social History. According to Dr. McCoy, whose testimony was corroborated by Attorney Herbert Moncier, Dr. McCoy told Talman about the relationship near the beginning of her involvement in the case. (R.9-25, Add.5, Doc.20, McCoy, PCT, PageID# 6420-21; R.10-2, Add.5, Doc.22, Moncier, PCT, PageID# 6679). It is implausible that if he "never doubted her integrity," that he would suddenly become worried about this previous relationship the day before he meant to put her on the stand, particularly after he had given her work over to the State.

As for the prosecutor arriving with lots of little yellow stickies, even the state trial court concluded that this fact could not serve as a justification for not calling Dr. McCoy because the decision to not call Dr. McCoy was made in the evening before anyone could have seen Crabtree arrive at court with his "stickies." *Pike*, 2011 WL 1544207, at *50. Even if Crabtree has arrived with lots of "stickies" on Dr. McCoy's Social History, it would seem normal, and hardly surprising, that the prosecuting attorney would arrive prepared to cross-examine the defense's mitigation expert.

Since none of these explanations provides a reasonable basis for deciding not to call Dr. McCoy after turning over her Social History, this Court must consider other explanations contained in the State court record. Dr. McCoy testified that Talman called her in a panic just after he turned over her Social History to the prosecution. According to Dr. McCoy, he expressed two reasons for this panic: the prosecution had "gone ballistic" about the timing of his disclosure and had threatened to exclude all of this material because it was hearsay. (R.9-25, Add.5, Doc.20, McCoy, PCT, PageID# 6413). She further testified that Talman asked her to lie about when she had delivered her work to him in order to placate the prosecutor. (*Id.).* Dr. McCoy also testified that she offered to call two other attorneys she knew to get help on the potential hearsay problem. (*Id.).* When Dr. McCoy told Talman she could not reach them, Talman told her that he would not use her as a witness. (*Id.*, PageID# 6414).

Unlike Talman's explanations, Dr. McCoy's testimony conforms exactly with other evidence in the record. The trial transcript shows that Crabtree was complaining about the length of the materials he had just received. (R.8-10, Add.2, Doc.25, TT, PageID# 3030, 3033). Talman agreed that Crabtree was "particularly unhappy." (R.9-20, Add.5, Doc.15, PageID# 6032). Dr. McCoy's recollection of a hearsay objection seems highly probable since her Social History contained no expert opinion that might allow her report and testimony to constitute an exception to the hearsay rule. Indeed, both the judge and the prosecutor were looking for her opinion in the Social History immediately after receiving it. *See* R.8-10, Add.2,

Doc.25, Crabtree, TT, PageID# 3033 ("Your Honor, in the brief time that we have had to review the three volume report that we were provided, being the report of Dr. McCoy, we have been unable to find a conclusion, or a summary, or an opinion rendered by Dr. McCoy."); *Id.*, Judge Leibowitz, PageID# 3034. ("I did not see one in my very quick perusal, also."). It also explains the timing of the decision not to call her that was made that evening *after* Talman had already turned over the Social History, but *before* the penalty phase presentation had begun.

Furthermore, in finding Talman's testimony to be credible, the State court completely ignored his proven record for dishonesty. Talman pleaded guilty to charges from the Board of Professional Responsibility that he had over billed the Indigent Defense Fund for more than $60,000. (R.12-3, Add.6, Doc.8, PC Exh.2A, BPR Records, PageID# 8471). These charges involved instances where Talman had billed the Fund for more than 24 hours in one day. (R.9-19, Add.5, Doc.14, Talman, PCT, PageID# 5911; R.12-3, Add.6, Doc.8, PC Exh.1, Comptroller's Rpt., PageID# 8451). Because of this dishonesty, he eventually received a suspended sentence of a suspension from the practice of law for eleven months and 29 days. (R.12-3, Add.6, Doc.8, PC Exh.2A, BPR Records, PageID# 8515; *id.*, PageID# 8487). Nonetheless, at the time he gave his post-conviction testimony, he showed a tendency to minimize the seriousness of his own misconduct: "There was [sic] some questions and ambiguities in that rule." (R.9-21, Add.5, Doc.16, Talman, PCT, PageID# 6118).

The State court never explained its decision to credit the testimony of this witness with such a history of dishonesty. Nor was there any account taken of Talman's own interest in not being found to be an ineffective attorney. The State court unreasonably ignored these reasons to doubt his testimony.

Furthermore, the Court of Criminal Appeals downplayed the significance of the cloud of ethical charges that were hanging over Talman's head at the time of Pike's trial. That court unreasonably found that "[a]ll of the evidence presented appears to support lead counsel's own testimony that the investigation was concluded and the matter settled prior to his appointment in this case." *Pike*, 2011 WL 1544207, at *47. This finding is simply wrong. The record is unambiguous that the matter was pending before the Board of Professional Responsibility and that, at the very least, Talman's ability to practice law was in serious jeopardy.[7] Indeed, the very day after Pike's conviction and sentence became final, Talman's law license was suspended. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *r'hg denied*, Nov. 23, 1998.[8] The State court unreasonably found that the matter was "concluded" even though there is no ambiguity that those charges were hanging over Talman's head

---

[7]Although Talman testified that the matter of a possible criminal charge was also concluded (R.9-21, Add.5, Doc.16, Talman, PCT, PageID# 6123-24), the statute of limitations for such charges had not run and prosecution from his adversary in the Pike case was still technically a possibility.

[8]The Order of Enforcement in *In re: William C. Talman*, No. 98-1037-2-SG, was entered on November 24, 1998. (R.12-3, Add.6, Doc.8, PC Exh.2A, BPR Records, PageID# 8487).

during the entire time that he represented Christa Pike in her capital case. The only support for Talman's claim is his own self-serving testimony.

Even if Talman "considered the matter concluded," (R.9-21, Add.5, Doc.16, Talman, PCT, PageID# 6118), the evidence in the record shows that it was not. The State court's factual conclusion is therefore rebutted by the record. Only after Pike's case was over was Talman finally suspended from the practice of law for almost a year as a penalty for his dishonest conduct. Even though the enforcement of the suspension was suspended, this was a harsh punishment and censure. The fact that punishment for Talman's dishonest billing had yet to be fixed and that he potentially faced losing his ability to exercise his profession could not have been an insignificant worry for him. The State courts' failure to consider this in determining that the matter was settled and in assessing Talman's credibility was unreasonable.

Talman's tendency to practice very close to ethical limits was also apparent during Petitioner Pike's trial. Talman presented the testimony of Dr. Bernet as an expert witness during the guilt phase of the trial. (R.8-8, Add.2, Doc.23, Bernet, TT, PageID# 2827). Rather than adhere to the rules of discovery and turn over a report of his expert's opinions to the prosecution as required by Tennessee Rule of Criminal Procedure 16, Talman instructed his expert that there was no need to prepare a report. (R.8-9, Add.2, Doc.24, Bernet, TT, PageID# 2882). This angered the prosecution and led to numerous disruptions during Dr. Bernet's testimony while the prosecution tried to figure out the basis of Dr. Bernet's opinion.

Eventually, this caused the court to order that all of Dr. Bernet's notes and materials be turned over to the prosecution for review. (*Id.*, PageID# 2890-91).

The fact that Talman had already gotten into trouble for disregarding the discovery rules had to affect the decisions he made when he was, once again, confronted by a prosecutor who was angry about when he received the report of the expert witness he planned to present in the penalty phase in this case. (R.9-20, Add.5, Doc.15, Talman, PCT, PageID# 6032). He was also faced with the prosecutor's assessment that all of Dr. McCoy's proposed testimony was hearsay. (R.9-25, Add.5, Doc.20, Dr. McCoy, PCT, PageID# 6413-14). Even if the Tennessee courts discounted Dr. McCoy's testimony that he asked her to lie for him, Talman would still have a motivation to cover up his own incompetent and dishonest handling of Dr. McCoy's role in the mitigation case. The State courts unreasonably failed to consider this strong motivating factor.

The State court also failed to offer any explanation for its decision to discount Dr. McCoy's testimony. The record discloses no apparent motivation for her to testify falsely and, contrary to Talman, she had no reputation of ethical problems. (R.10-4, Add.5, Doc.24, Isaacs, PCT, PageID# 6743-44).

The only reasonable conclusion that explains Talman's decision to not call Dr. McCoy after building his case around her, is that he put his own interests ahead of those of his client. The record demonstrates that the prosecutor was angry about the timing of his disclosure of Dr. McCoy's work and the trial court chose to delay the beginning of the penalty phase because of it. (R.8-10, Add.2, Doc.25, TT,

PageID# 3029-35). This would give him a reason to ask Dr. McCoy to lie about when he received it from her. Also, Dr. McCoy's Social History contained no expert opinion, a fact he knew or should have known since he had worked so closely with her and had ample opportunity to review her work. The prosecutor's threat to exclude it would have been very real and could have seriously undermined or entirely excluded Dr. McCoy's potential testimony. This would have been personally and professionally humiliating for Talman in this highly-publicized case. The anger and threats were also coming from a prosecutor who was well-aware of Talman's ethical and potential legal difficulties. Because these facts are well-supported by the record, the only reasonable, and certainly the most likely, explanation is that Talman abandoned his plan to call Dr. McCoy in order to protect his own professional and personal interests.

Although the State court found that "[t]he record simply fails to offer anything more than supposition that the overbilling issue affected lead counsel's representation of the Petitioner," *Pike*, 2011 WL 1544207, at *47, there is much more than mere supposition and speculation. Talman's reputation had been publicly sullied and he did not yet know the outcome of the pending ethical charges against him. He had been playing fast and loose with the rules of discovery and had incited the anger of the prosecuting attorney. He had turned over the work product of his mitigation expert even though he had never asked her to reach any expert conclusions. He would have to deal with a serious hearsay problem if he followed through with his plans and presented Dr. McCoy as his only mitigation

witness. Faced with these problems, the easiest thing for him to do to avoid more trouble was to not call Dr. McCoy. Therefore, he did not.

Also pertinent to this claim is the fact that Talman obtained a release from his client so that he could retell her story and profit from it (Ground Two B). The State court recognized that "[g]enerally, an agreement by which a lawyer acquires literary or media rights concerning the *conduct of the representation* creates a conflict of interest between the attorney and the client." *Pike*, 2011 WL 1544207, at *48 (emphasis in original) (citing Tenn. Sup. Ct. R. 8, RPC 1.8(d)). The court further recognized that this conflict of interest continued during the direct appeal. *Id.* at *49. While the State court found that Petitioner could not show that this affected Talman's representation, it completely ignored the fact that Talman was again skirting the bounds of proper representation and that this must affect any assessment of his credibility. Furthermore, where the record shows that Talman and his client were involved in media projects while he represented her, it can be readily inferred that his interest in media exposure affected his decisions while he represented her.

Petitioner Pike's allegations of conflict of interest are based on more than mere speculation or supposition. The facts established in the State court record all point in the same direction: Talman was in a precarious position, and he placed his own interests above those of his client. That conflict of interest affected his decision making when he abandoned his penalty phase strategy at the last minute in order to protect himself. Because of this, the State court's decision to credit his testimony

is objectively unreasonable. Where the State court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (28 U.S.C. § 2254(d)(2)), habeas relief is available.

### C. Where Petitioner was diligent in developing the facts during State court proceedings and the State court's findings of fact are unreasonable in light of the State court record as a whole, the habeas court may hold an evidentiary hearing.

Petitioner moved this Court for an evidentiary hearing on her claims that trial counsel labored under a conflict of interest when he made critical decisions on the presentation of her case. (Grounds for Relief Two and Six). In support of these claims, Petitioner has alleged facts that, if proven, establish violations of her constitutional rights. The State court addressed these claims on the merits. *Pike*, 2011 WL 1544207, at *47-48. However, as shown in the preceding section, that analysis was based on unreasonable fact finding. Because the State court's findings of fact are unreasonable and because Petitioner was diligent in developing her claims in State court, this Court was permitted to hold an evidentiary hearing and may consider the evidence presented there, along with the evidence already in the record, in deciding to grant habeas relief.

In *Townsend v. Sain,* 372 U.S. 293 (1963), the Supreme Court noted six different bases for granting an evidentiary hearing:

> (1) the merits of the factual dispute were not resolved in [State court]; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the State court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material

> facts were not adequately developed [in State court]; or (6) for any reason it appears that the [State court] did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313-18. *Townsend* was overruled in part on other grounds in *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5-6 (1992), where the Supreme Court set forth the cause-and-prejudice standard as the correct standard, rather than the deliberate-bypass standard, for excusing a habeas petitioner's failure to develop material facts in State court proceedings. *Tomayo-Reyes* was later codified in 28 U.S.C. § 2254(e)(2) as part of the Anti-Terrorism and Effective Death Penalty Act (AEDPA). AEDPA, which was enacted after *Townsend*, does not bar an evidentiary hearing unless this Court finds a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000) (interpreting 28 U.S.C. § 2254(e)(2)).

In addition to the requirements of *Townsend*, this Court always retains the discretion to hold a hearing under Habeas Rule 8(a). That rule provides that "the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Habeas Rule 8(a). The Supreme Court has reaffirmed this principle: "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). The review mandated by Habeas Rule 8

further supports an evidentiary hearing before this Court. *See also* 28 U.S.C. § 2246 (evidence may be taken at the court's discretion).

The Supreme Court has discussed the standard for granting an evidentiary hearing when the petitioner contends he is entitled to relief under 28 U.S.C. § 2254. *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). In *Pinholster*, the Court determined that a federal hearing was not appropriate because the petitioner in that case could not meet the standards of § 2254(d). 131 S. Ct. 1401. In this way, *Pinholster* is consistent with *Townsend* in that it contemplates a hearing where a claim was not adjudicated on the merits in State court so that § 2254 would not apply, or where one of the two prongs § 2254(d) is satisfied. *Id. see supra.* Furthermore, in *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), the Court affirmed the ability of the federal court to conduct an evidentiary hearing where the State court's findings of fact were unreasonable.

Petitioner Pike has demonstrated that the facts found by the State court concerning the conflict of interest are not supported by the record and in fact, sometimes directly contradict it. (See Section I.B., *supra*). The lengthy post-conviction hearing record also shows that she was diligent in developing the State court record to support her claims. None of the factors that could prevent this Court from considering evidence at an evidentiary hearing are present here. Under the first and second factors of *Townsend*, the Court was authorized to hold a hearing

and to consider the evidence from that hearing in determining that Petitioner Pike has demonstrated her right to habeas corpus relief.

## II. Because her trial attorney's performance was adversely affected by a conflict of interest, Petitioner Pike is entitled to relief on Grounds Two and Six of her habeas petition.

Conflicts of interest negatively affected Talman's representation of Petitioner Pike. First, Talman protected his own interests ahead of those of his client who was on trial for her life. Second, Talman procured a release of media rights from Pike that authorized defense counsel to use or sell her story for pecuniary gain. (R.11-2, Add.6, Doc.2, PC Exh.13, Release, PageID# 7365). Because Talman's performance was adversely affected by conflict of interest, clearly established Supreme Court precedent mandates that this Court grant habeas relief for Petitioner Pike.

### A. *Cuyler v. Sullivan*, 446 U.S. 335 (1980), presents the proper standard for determining whether to grant habeas relief on a conflict-of-interest claim.

To prove a violation of the Sixth Amendment right to counsel due to a conflict of interest, a defendant must demonstrate that an "actual" conflict "adversely affected" counsel's representation at trial. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). "Adverse effect" entails a lesser burden of proof than prejudice under *Strickland*. *Cuyler*, 446 U.S. at 350. Whereas prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington*, 466 U.S. 668, 694 (1984), adverse effect requires only that defense counsel "actively represented conflicting interests." *Cuyler*, 446 U.S. at 350.

The State court correctly identified *Cuyler* as the binding precedent for analyzing these claims, but it unreasonably found that Petitioner had failed to establish "an actual conflict of interest which adversely affected lead counsel's performance." *Pike*, 2011 WL 1544207, at *47. As argued in Section I.B., *supra*, the State court reached this conclusion because it had made unreasonable findings of fact in light of the entire State court record. 18 U.S.C. § 2254(d)(2). It is therefore appropriate for this Court to apply *Cuyler* to the evidence in the state court record along with the evidence presented at Petitioner's Federal evidentiary hearing to determine that she is entitled to habeas relief on Grounds Two and Six.

Counsel for Petitioner has recently become aware of Sixth Circuit precedent interpreting dicta from *Mickens v. Taylor*, 535 U.S. 162, 175 (2002), to support the position that *Cuyler* is not clearly established federal law in the context of an attorney putting personal interests ahead of those of his client. In *Stewart v. Wolfenberger*, 468 F.3d 338, 350 (6th Cir. 2006), the Circuit Court mistakenly ruled that the *Mickens* Court held that "the presumed prejudice standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation." However, *Mickens* presents no clearly established federal law as to the scope of *Cuyler*'s applicability.

In *Williams v. Taylor*, 529 U.S. 362, 412 (2000), the Supreme Court held that "'clearly established Federal law' . . . refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions . . . ." "Dicta" refers to judicial comments that are

"unnecessary to the decision in the case," whereas "holding" refers to "[a] court's determination of a matter of law pivotal to its decision." Black's Law Dictionary, 15(c), 18(c) (10th ed. 2014), available at Westlaw BLACKS. Thus, a federal court cannot dismiss a habeas petition on the grounds that a state court's adjudication of a claim was not contrary to Supreme Court dicta.

The dicta from *Mickens*, relied on by the court in *Wolfenbarger*, ignores earlier Supreme Court case law that ordered lower courts to apply the *Cuyler* standard in resolving an issue of conflict of interest in a context outside of concurrent joint representation. In *Wood v. Georgia*, 450 U.S. 261 (1981), the Supreme Court ordered that the court below apply the *Cuyler* standard for ineffective assistance of counsel when petitioner's trial counsel likely labored under a conflict of interest because a third-party paid him, namely the petitioner's employer whose interests may have been different. *Wood*, 450 U.S. at 271-73. The Court reasoned that petitioner's counsel's "divided loyalties" created a high probability that counsel was conflicted as to whether he should protect his payer's interests or his client's interests. *Id*. at 263. Thus, because of the "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party," the Court remanded the case with instructions that the lower courts decide whether petitioner received ineffective assistance. *Id*. at 268-69, 273. Notably, the *Wood* Court cited to *Cuyler* and to *Holloway v. Arkansas*, 435 U.S. 475 (1978), in discussing the likely conflict of interest in *Wood*. *Wood*, 450 U.S. at 271.

In doing this, the Court mandated that the *Cuyler* rule is applicable when a "personal interest" conflict of interest arises.

*Wood v. Georgia*, *supra*, was published in 1981, long before the Tennessee Court of Criminal Appeals considered Petitioner Pike's claim of conflict of interest and its application of *Cuyler* demonstrates that *Cuyler* was clearly established law at that time. The dicta from *Mickens* that questions the applicability of *Cuyler* in contexts outside of instances of concurrent representation ignores that fact. Furthermore, it is dicta, and is therefore not binding precedent on this Court. Since it was not necessary to resolve the issue in *Mickens*, it is not controlling authority here.

Most importantly, the Tennessee Court of Criminal Appeals recognized that *Cuyler* controlled the claim of alleged conflict of interest. The Court of Criminal Appeals considered Petitioner Pike's allegations under *Cuyler*. *Pike*, 2011 WL 1544207, at *44. Furthermore, that court was aware of the Supreme Court's dicta in *Mickens* because it cited to the *Mickens* case. *Id.* at *48 (quoting *Mickens*, 525 U.S. at 174). Despite *Mickens*' dicta doubting the applicability of the *Cuyler* standard outside of instances of concurrent representation, the State court cited to *Cuyler* as controlling authority on this issue.

However, if this Court should find that *Cuyler* does not constitute clearly established constitutional law to be applied in a habeas case, it must resolve the claim raised here under the *Strickland* standard. Under *Strickland*, the habeas

court must grant relief where the defendant shows that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Any showing that counsel made an important decision about the presentation of the case based on his own personal interests would certainly constitute deficient performance. As for prejudice, Petitioner Pike has argued that counsel's failure to present evidence found by Dr. McCoy's investigation resulted in significant prejudice in the penalty phase and this argument was presented in her Motion for Summary Judgment. (R.46, Memo in Support of Motion for Partial Summary Judgment, PageID# 10648-55). Should this Court consider the present claim under the *Strickland* standard, Petitioner would incorporate that prejudice argument by reference here.

### B. The evidence from the State court record along with the evidence from the federal evidentiary hearing demonstrates that Talman acted to protect his own interests when he decided not to present evidence from his mitigation specialist during the penalty phase of Petitioner Pike's trial.

All of the evidence now before this Court leads to one conclusion: Attorney William Talman was trying to protect his own interests when he made the last-minute decision not to present evidence from his mitigation specialist, Dr. Diana McCoy. Following an extensive mitigation investigation, Talman turned over Dr. McCoy's Social History and supporting documentation to the prosecution and the

trial court because he intended to call her as a witness. (R.84, Hrg. Tr. Vol.I p.50).[9] However within a few hours of turning over this material, he had decided that he would not put her on the stand. Talman's explanations for why this happened have changed over time, are inconsistent with other evidence in the record, and defy common sense. On the other hand, Dr. McCoy's explanation for what happened has never varied and is corroborated by other evidence in the record. Her testimony shows that Talman made his decision to protect himself and the record amply demonstrates why he needed this protection.

Petitioner presented limited evidence at the federal evidentiary hearing in this case held May 26-27, 2015, before this Court. The evidence was limited because the issue this Court must decide is discrete: Did Talman decide not to call Dr. McCoy to protect his own interests? If so, then her death sentence was procured in violation of her right to conflict-free counsel.

Talman's explanations for why he changed his mind about calling Dr. McCoy as a witness have changed over the years and lack credibility. Before this Court, Talman's first stated reason for not calling Dr. McCoy was her relationship with the lead prosecutor, William Crabtree. (R.84, Hrg. Tr. Vol.I p.51). He says he learned of this after a "team meeting" where someone mentioned that Crabtree was dating

[9] Transcripts of the hearing held before this Court on May 26-27, 2015, will not be available via CM/ECF until September 10, 2015, therefore, references to the hearing transcript will be indicated by the docket entry number and the actual transcript page number assigned by the court reporter, *i.e.*, R.__, Hrg. Tr.___ Vol.__ p.___.

someone. (*Id.*). Talman thought this team meeting "a week or two before trial." (*Id.*). Talman thought the relationship was ongoing at the time of the trial. (*Id.*, p.52). However, both Dr. McCoy and Crabtree testified that the relationship had been terminated well before the Pike trial. (R.9-19, Add.5, Doc.14, Crabtree, PCT, PageID# 5887-88; R.9-25, Add.5, Doc.20, McCoy, PCT, PageID# 6420). Talman admitted he may have been mistaken about this. (R.84, Hrg. Tr. Vol.I p.93). However, the most important fact is that Talman knew about this before turning over her Social History to the prosecution. (R.84, Hrg. Tr. Vol.I p.52). He said he never questioned her integrity or said anything about it to the judge or Crabtree. (R.84, Hrg. Tr. Vol.I p.53). He still planned to call her as an expert witness on the afternoon prior to the beginning of the penalty phase. There is therefore no dispute that when he found out about this relationship, he did not alter his plans for the penalty phase presentation. Nor did he think it was significant enough to talk to Crabtree about it or bring it to the Court's attention. (R.84, Hrg. Tr. Vol.I pp.52-53).

Talman also said that another reason he decided not to call Dr. McCoy is because she spoke on the news about jury selection. (*Id.*). In addition, he said she was worried about an upcoming vacation. (*Id.,* p.54). These reasons were not even mentioned by the Court of Criminal Appeals in post-conviction. Furthermore, if these were true, Talman knew about them well before he turned over her Social History at which time he still intended to call her as a witness.

Before this Court, Talman testified that the "clinch pin" in his decision to not call Dr. McCoy occurred "when I seen [sic] Mr. Crabtree that next day, he had been through the report, he had about a million stickies, little sticky notes, in the report." (*Id.*). At post-conviction, the trial court did not consider this factor because of testimony that indicated the decision had been made the night before. (R.9-5, Add.4, Doc.5, Finding of Fact and Conclusions of Law, PageID# 4473). More importantly, the fact that the prosecutor arrived in court prepared to cross-examine the defense mitigation expert seems like something any competent attorney would anticipate. Rather than a genuine reason for not calling his mitigation expert, this seems more like a "*post hoc* rationalization." *Wiggins*, 539 U.S. at 526. It would not be "'accepted trial strategy,'" *Dretke*, 545 U.S. at 247 (quoting *Cockrell*, 537 U.S. at 339), to abandon a plan formulated over several months of investigation simply because the prosecutor showed up prepared for cross-examination.

Finally, Talman offered that he made an in-court assessment that Dr. McCoy's testimony was unnecessary. After the family members had testified, Talman "felt at that point I had got everything out that I could hopefully get that would show what kind of life Christa had had growing up." (R.84, Hrg. Tr. Vol.I p.62). This assessment is belied by the fact that defense witness testimony in the penalty phase covers only 60 pages of transcript. In addition, the trial transcript shows that the trial court excluded testimony about the family's history of substance abuse because there was no expert testimony on the issue. (R.8-10, Add.2, Doc.25, TT, PageID# 3058). Furthermore, no testimony had been offered

about how Christa's history was related to a diagnosis of borderline personality disorder. Not a single witness uttered the words "borderline personality disorder" during the penalty phase because lay witnesses from Christa's family could not present such testimony. On the other hand, the prosecution had used Dr. McCoy's Social History to point out negative things family members had said about her. *See, e.g.*, R.8-11, Add.2, Doc.26, Ross, TT, PageID# 3074. Any assessment that the family members brief testimony had given a complete story of "what kind of life Christa had had growing up," ignores what an expert witness such as Dr. McCoy could have presented in mitigation.

Talman's decisive reason for not calling Dr. McCoy was different in his post-conviction testimony. At the time of the post-conviction hearing, Talman's chief reason was his recollection that Dr. McCoy could not corroborate Dr. Engum's diagnosis of borderline personality disorder. (R.9-20, Add.5, Doc.15, PCT, PageID# 6016). However, at the hearing before this Court, that was the last reason Talman recalled and he only mentioned it after being questioned about it by counsel. (R.84, Hrg. Tr. Vol.I p.55). In post-conviction, Talman testified that he decided he could not put her on the stand after she told him she could not corroborate Dr. Engum. That was "the crucial decider." (R.9-20, Add.5, Doc.15, PCT, PageID# 6016). Before this Court, he said the "clinch pin" was Crabtree's stickies. (R.84, Hrg. Tr. Vol.I p.54). These inconsistencies undermine the reliability of his testimony.

Talman's testimony about Dr. McCoy being unable to corroborate Dr. Engum's diagnosis of borderline personality disorder is similarly lacking in

reliability. He testified in post-conviction that his plan for the penalty phase was "to put Dr. McCoy on, have her go through Christa's background and tie in with Dr. Engum's report." (R.9-20, Add.5, Doc.15, PCT, PageID# 5986). Before this Court, he testified "that was my whole idea." (R.84, Hrg. Tr. Vol.I p.55). And yet, he says he found out at the last minute that she did not agree with Dr. Engum's diagnosis.

Talman's testimony lacks credibility because Dr. McCoy has consistently testified that she never disagreed with Dr. Engum's diagnosis of borderline personality disorder. Records of pretrial communications between Dr. McCoy and Talman bear this out. When Dr. McCoy prepared a list of suggested mitigation themes, the first one listed was "Borderline Personality Disorder." (Petitioner's Exhibit 2, attached hereto as Attachment A).[10] She had also written Talman a letter that shows she was finding evidence to support such a theme. (Petitioner's Exhibit 4, attached hereto as Attachment B). These records corroborate Dr. McCoy's testimony that she never disagreed with Dr. Engum's diagnosis. (R.10-1, Add.5, Doc.21, PCT, PageID# 6517; R.84, Hrg. Tr. Vol.I pp.112-14, 115).

In contrast to Talman's testimony, Dr. McCoy's testimony about her involvement in the Pike case and her interaction with Talman has never varied. Like Talman, she has always testified about a good working relationship where she and Talman shared information as they found it. (R.9-24, Add.5, Doc.19, PCT,

---

[10] Petitioner's Exhibits 2 and 4, were admitted into evidence at the evidentiary hearing on May 26, 2015. (R.82, Exhibit and Witness List, PageID# 12977). For the Court's convenience Petitioner's Exhibits referenced in this brief are attached hereto.

PageID# 6293; R.84. Hrg. Tr. Vol.I p.115). She has consistently testified that Talman did not want her to express an expert opinion or diagnosis for Petitioner Pike and this is corroborated by the fact that no such diagnosis is expressed in her Social History. (R.9-25, Add.5, Doc.20, PCT, PageID# 6433; R.84, Hrg. Tr. Vol.I p.120). During post-conviction, she testified this made her feel like "a fish out of water." (R.10-1, Add.5, Doc.21, PCT, PageID# 6503). Before this Court, she testified that the Pike case was "the first time in my career before or since that I had ever submitted a report that didn't have opinions." (R.84, Hrg. Tr. Vol.I pp.119-20). She testified that Talman and his co-counsel Julie Martin-Rice had an opportunity to review a near-final draft of her Social History, which contained no diagnosis and neither one questioned her about the lack of opinion at this time, rather she asked them about it. (*Id.)*.

Talman acknowledged to this Court that any expert opinion should have been in her report and the lack of one would give rise to a hearsay objection. (*Id.,* p.72). He also acknowledged that it was his job to fashion the mitigation presentation in compliance with the Rules of Evidence. (*Id.*, p.36). For this reason, he acknowledged that he could give direction to Dr. McCoy to ensure that what was turned over to the prosecution was acceptable. (*Id.*, p.45). Therefore, any question that the Social History or Dr. McCoy's testimony could be excluded on hearsay grounds would have been an indication of Talman's incompetence, and not a reflection on Dr. McCoy's work.

Dr. McCoy has also consistently testified that Talman told her he was going to call her as his only witness in the penalty phase. (R.9-25, Add.5, Doc.20, PCT, PageID# 6388; R.84, Hrg. Tr. Vol.I p.122). This is corroborated by the fact that the record of the trial shows no subpoenas were issued for other witnesses. Dr. McCoy had recommended calling a number of people from out-of-state who could testify about Christa's teenage years as well as her time in North Carolina juvenile facilities. (R.11-2, Add.6, Doc.2, PC Exh.5, Suggested Mitigation Witnesses, PageID# 7336-38). She had identified witnesses who could talk about Christa's history of sexual abuse. She had identified professionals who had been involved with Christa and who recognized her family's extreme dysfunction, her mother's lack of supervision along with her failure to follow through with social services. (*Id.*). Her family would be unable to testify about some periods in Christa's life because they were not involved with her at that time or they had been identified as the source of the problems. None of these other suggested witnesses were called to testify and none were under subpoena. The only reasonable conclusion is that Talman expected Dr. McCoy to present testimony on these periods of Christa's life.

Dr. McCoy's testimony about what Talman told her following the jury's guilty verdict and before the beginning of the penalty phase has also remained entirely consistent and is corroborated by other evidence. She testified that a distraught Talman called her saying that Crabtree was upset because the Social History had only just been turned over the prosecution. (R.9-25, Add.5, Doc.20, PCT, PageID# 6413; R.84, Hrg. Tr. Vol.I p.124). She also testified that Talman told her Crabtree

was saying that everything in the Social History was hearsay. (*Id.*). This is corroborated by Talman's testimony saying that Crabtree was angry which made him upset. (R.84, Hrg. Tr. Vol.I p.48). Furthermore, Talman acknowledged before this Court that without an expert diagnosis the Social History was subject to a hearsay objection. (*Id.*, pp.48, 71-72). The prosecution's potential objection is also corroborated by the trial transcript in which both Crabtree and the trial judge ask Talman whether Dr. McCoy reached any conclusions or expressed her opinion in her report. (R.8-10, Add.2, Doc.25, TT, PageID# 3033-35). Dr. McCoy has also consistently testified that in response to the fact that Crabtree was so upset about the late disclosure that Talman asked McCoy to lie about when he received the Social History from her. (R.9-25, Add.5, Doc.20, PCT, PageID# 6413; R.84, Hrg. Tr. Vol.I p.124).

Dr. McCoy wrote Talman a letter just one year after these events took place in which she described Talman's distress because Crabtree "was objecting to [her] report on the grounds it was hearsay and the judge agreed with him." (R.11-2, Add.6, Doc.2, PC Exh.8, PageID# 7351). The second point of the letter was that Crabtree was upset because he had gotten the report late so that Talman asked her to lie about when she had given it to him. (*Id.*). This letter is entirely consistent with Dr. McCoy's testimony.

Dr. McCoy has also consistently testified about meeting with Talman that evening between the guilty verdict and the penalty phase in order to try to come up with a strategy for the penalty phase now that he had decided not to call her as a

witness. (R.9-25, Add.5, Doc.20, PCT, PageID# 6415; R.84, Hrg. Tr. Vol.I pp.125-26). Talman's billing records corroborate this evening meeting. (R.12-6, Add.6, Doc.11, PC Exh.18, PageID# 8864). Dr. McCoy also testified that Talman asked her if she could meet with the family members early the next morning to help them prepare for their testimony. (R.9-25, Add.5, Doc.20, PCT, PageID# 6415-16; R.84, Hrg. Tr. Vol.I p.126). Again, Talman's billing records corroborate their meeting with the family members the next morning. (R.12-6, Add.6, Doc.11, PC Exh.18, PageID# 8864). Given that the penalty phase was the most important part of this trial, Dr. McCoy's testimony about meeting with Talman is much more logical than Talman's testimony that he "went home and went to bed." (R.84, Hrg. Tr. Vol.I p.62).

In response to questioning from this Court, Talman agreed that he "had just sort of had enough of Dr. McCoy[.]" (*Id.*, pp.105-06). However, all of his reasons for this were things he knew before he turned over her Social History with the intent of calling her as a witness. Rather than true reasons for changing his penalty phase presentation, these sound like the "*post hoc* rationalization[s]" the Supreme Court has instructed habeas courts to be wary of. *Wiggins*, 539 U.S. at 526.

The real reasons that led Talman to decide not to call Dr. McCoy can be found in Dr. McCoy's testimony, particularly in light of the ethical predicament Talman found himself in at that time. He turned over Dr. McCoy's Social History at a time the prosecutor thought was late and he admitted that the judge tended to agree with that. (R.84, Hrg. Tr. Vol.I p.47). Because of this, the prosecutor was

furious. (*Id.*). Talman described this prosecutor as "bullying." (*Id.*, p.48). Furthermore, this same prosecutor could influence the outcome of the ethical charges Talman was facing and even the potential criminal charges. For this reason, Talman asked Dr. McCoy to lie for him to give him some cover on the timing of his disclosure. (R.9-25, Add.5, Doc.20, PCT, PageID# 6413; R.84, Hrg. Tr. Vol.I p.124).

The other problem for Talman was that Crabtree was threatening to object and exclude Dr. McCoy's report because she had provided no expert diagnosis. Her Social History contains no diagnosis or opinion, something which Talman had the time and the opportunity to correct before turning it over. (R.84, Hrg. Tr. Vol.I p.45). Without these opinions, her report and even her testimony was subject to a hearsay objection. This problem was the direct result of Talman's incompetent handling of this issue. Since there were no witnesses under subpoena to testify at the penalty phase, this created the risk of the entire presentation falling apart. Talman realized this when he told Dr. McCoy, "they are probably going to post-conviction me on this." (*Id.*, p.126). Putting her on the stand only to have her excluded after a hearsay objection would have been professionally and personally humiliating in this highly publicized case. Furthermore, if the prosecution and judge found out that he had asked her to lie, this may have had negative consequences on proceedings before the Board of Professional Responsibility. Talman was not prepared to accept this. It was much easier just to call the family

members who happened to be present, so he decided not to call Dr. McCoy in order to protect his own interests.

It is very significant in assessing Talman's actions that all of these events occurred while Talman was under the cloud of very serious ethical charges. Talman acknowledged that these proceedings were pending at this time. (*Id.*, p.24). Petitioner's expert, Mr. William Hunt, a former disciplinary counsel from the Tennessee Board of Professional Responsibility, confirmed the seriousness of these charges that included the potential loss of Talman's ability to practice law. (R.85, Hrg. Tr. Vol.II pp.21-22). Furthermore, although Talman believed that no criminal charges would be brought against him, those criminal charges were still a real possibility because the statute of limitations had not expired for possible charges. (*Id.*, pp.23-24). The ethical charges were not resolved until after Talman completed his representation of Petitioner Pike. (*Id.*, p.19). Therefore, it was on Talman's mind as he acknowledged before this Court: "I guess in the back of your mind, you always have–if there's something pending." (R.84, Hrg. Tr. Vol.I p.24). Although he indicated that his primary concerns were relieved when he believed he would not be criminally prosecuted, there is no dispute that his ability to practice law was potentially threatened.

Nonetheless, even before this Court, Talman sought to downplay the significance of his own conduct saying that "Rule 13 was a little ambiguous back in the early nineties;" and "It's not as clear and succinct as it is today." (*Id.*, p.18). He sought safety in numbers and testified that the investigation "caught a lot of

lawyers across the state," because those lawyers "were caught in the same billing practices." (*Id.*, p.20). Although he acknowledged that there were some days where he had billed for more than 24 hours in a day, he minimized this by saying there were other days when he knew he was in court "that we hadn't billed anything." (*Id.*). Although he ostensibly took responsibility for the overbilling he also minimized his role by saying he, "delegated those tasks to office staff." (*Id.*). This tendency to downplay the seriousness of his own misconduct should inform this Court's assessment of his testimony.

Before this Court Talman described Crabtree as "a bully" or "bullying." (*Id.*, pp.48, 58). Talman had good reason to fear Crabtree. Had Crabtree told the Board of Professional Responsibility that Talman was not diligent in his discovery obligations in this case, that could have had a negative impact on Talman's pending case. (R.85, Hrg. Tr. Vol.II p.25). Even more ominously, had Crabtree found out that Talman asked Dr. McCoy to lie under oath, tried to induce perjury, "that might have enabled the Board to seek an immediate summary suspension." (*Id.*, p.25). Crabtree was a "bully" that Talman had personal reasons to be wary of.

Finally, the hearing before this Court demonstrated that Talman put his own interest ahead of his client's in drawing up, and having her sign, a release that gave him the right to profit from her story. (R.11-2, Add.6, Doc.2, PC Exh.13, Release, PageID# 7365). Talman testified that he was interested in writing a book that

would tell "the human side of Christa." (R.84, Hrg. Tr. Vol.I p.74).[11] This is a tacit acknowledgment that Talman knew his own mitigation presentation had been incomplete. Although he tried to deflect responsibility for media contact onto his client, he admitted that he participated in television interviews from shows like "Hard Copy" and "Death Row Diaries." (R.84, Hrg. Tr. Vol.I pp.77-78). Despite the fact that he never actually profited as he had the right to under the Release, he did participate in sensationalized media projects while representing Petitioner Pike.

At this hearing, Petitioner has shown that a conflict of interest adversely affected counsel's performance at her capital trial. *Cuyler v. Sullivan*, 446 U.S. 335 (1980). He decided not to put Dr. McCoy on the stand in order to cover up his own incompetence and to ensure that no one knew he had asked her to lie for him. This Court must consider all of the evidence presented as well as the credibility and demeanor of the witnesses to reach that conclusion. Even if this Court should determine that the *Strickland* standard applies to this claim, it is obvious that Talman's performance was deficient and that Petitioner Pike suffered prejudice at her capital trial.

---

[11] In post-conviction, Talman testified that he wanted "to tell kind of another side of her that didn't come out at trial." (R.9-21, Add.5, Doc.16, PCT, PageID# 6136).

## CONCLUSION

For the reasons stated in this Brief, as well as the evidence contained in the State court record and the evidence presented at the May 26-27, 2015 evidentiary hearing, this Court must find that a conflict of interested caused Attorney Talman to put his own personal interests ahead of those of his client, Christa Pike. That conflict of interest "adversely affected" the performance of his duties at her capital trial. The Court must grant the writ of habeas corpus on Grounds Two and Six of Pike's Petition for Writ of Habeas Corpus.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: /s/Stephen A. Ferrell
Stephen A. Ferrell
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2015, notice of this filing was sent by operation of the Court's electronic filing system to:

Shannon Poindexter, Asst. Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-3486
Shannon.Poindexter@ag.tn.gov

Jennifer Smith, Deputy Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-3487
Jennifer.Smith@ag.tn.gov

All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/Stephen A. Ferrell
Stephen A. Ferrell