UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| CHRISTA GAIL PIKE, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | No:    1:12-cv-35 |
| v. | ) | |
| | ) | Judge Mattice |
| | ) | |
| VICKI FREEMAN, Warden, | ) | |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner Christa Gail Pike ("Petitioner") is a Tennessee death row inmate incarcerated in the Tennessee Prison for Women. The matter is now before the Court on Respondent's motion for summary judgment (Doc. 42), and Petitioner's cross motion for partial summary judgment (Doc. 45). Petitioner has filed a response to Respondent's motion and a reply to Respondent's response (Docs. 51, 56), and Respondent has filed a corresponding response and reply (Doc. 50, 55). Petitioner also filed a motion for an evidentiary hearing (Doc. 51), which this Court granted (Doc. 58), and a hearing was held on May 26th, 2015 and May 27th, 2015 (Doc. 81). For the reasons that follow, Petitioner's motion for partial summary judgment (Doc. 45) will be **DENIED**, and Respondent's motion for summary judgment (Doc. 42) will be **GRANTED**. The petition for habeas corpus relief will be **DENIED.**

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Respondent has provided the Court with copies of the relevant documents as to Petitioner's trial, direct appeal, and post-conviction proceedings (Docs. 7–13).

Petitioner was convicted by a Knox County, Tennessee jury of conspiracy to commit the murder of Colleen Slemmer, and the first degree murder of Colleen Sleemer. Petitioner was sentenced to death for the murder charge, and a consecutive twenty-five year prison sentence for the conspiracy charge. Petitioner's conviction and sentence were affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA") and the Tennessee Supreme Court ("TSC"). *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *cert denied*, 526 U.S. 1147 (1999). The facts that led to the conviction of Petitioner are set forth in detail in the opinion of the TSC:

> The proof presented by the State at the guilt phase of the trial established that on January 11, 1995, the [Petitioner], Christa Gail Pike, a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, Pike's boyfriend, walking away from the Job Corps center toward 17th Street. At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center. Slemmer was not with them.
>
> Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head. Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk. Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into smaller pieces, she had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that Pike was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw Pike at breakfast the next morning she

asked Pike what she had done with the piece of the victim's skull. Pike replied that it was in her pocket and then said, "And yes, I'm eating breakfast with it."

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of Slemmer's skull. Pike also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. Pike told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

Though neither Iloilo nor Wilson immediately reported Pike's statements to police, on the day after the murder, January 13, at approximately 8:05 a.m., an employee of the University of Tennessee Grounds Department, discovered Slemmer's semi-nude, slashed, and badly beaten body near the greenhouses on the agricultural campus. He testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal. Upon closer inspection, he saw the victim's clothes and her nude breast and realized it was the body of a human female. He immediately notified law enforcement officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing. The victim's head had been bludgeoned. Multiple cuts and slashes appeared on her torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated. Johnson removed all civilians from the area and secured the scene surrounding the body.

As other officers arrived, they began securing the crime area. As officers discovered other areas of blood, articles of clothing, footprints, and broken foliage, the crime scene tripled in size, eventually encompassing an area 100 feet long by 60 feet wide. The crime scene was wet and muddy, and there was evidence of a scuffle, with trampled bushes, hand

and knee prints in the mud, and drag marks. A large pool of blood was found about 30 feet from the victim's body.

The victim's body was actually lying face down on a pile of debris. When officers turned the body over, they discovered that the victim's throat had been slashed. A bloody rag was around her neck. Detective Donald R. Cook, of the U.T. Police Department, accompanied the body to the morgue. He observed the body after it had been cleaned and noticed that a five pointed star in a circle, commonly known as a pentagram, had been carved onto the victim's chest.

Randy York, a criminal investigator with the Knoxville Police Department, began investigating this case on January 13, the day the victim's body was discovered. York separately interviewed the [Petitioner] and Shipp at the Knoxville Police Department on January 14th. Investigator York advised [Petitioner] Pike of her *Miranda* rights, but she chose to waive them and make a statement. Pike explained in detail how the killing had occurred. Pike's statement was tape-recorded and transcribed in some forty-six pages. Copies of the transcription were given to the jury, and the jurors were allowed to listen to the tape through individual headphones.

In her statement, Pike said that she and Slemmer had been having problems for some time. Pike claimed to have awakened one night to find Slemmer standing over her with a box cutter. Pike told Investigator York that Slemmer had been "trying to get her boyfriend" and had been "running her mouth" everywhere. Pike said that Slemmer had deliberately provoked her because Slemmer realized that Pike would be terminated from the Job Corps program the next time she became involved in a fight or similar incident.

Pike claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. Pike said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to Pike, she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, Pike told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though Pike refused to name the other parties

involved in the incident, she said the group began walking toward the U.T. Campus. Upon arriving at the steam plant on U.T.'s agricultural campus, Pike and Slemmer exchanged words. Pike then began hitting Slemmer and banging Slemmer's head on her knee. Pike threw Slemmer to the ground and kicked her repeatedly. According to Pike, as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threated to report Pike so she would be terminated from the Job Corps program, Pike again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with Pike caught Slemmer and pushed her to the ground.

Pike and the other person, who Pike referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where Pike cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," Pike recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point Pike said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, Pike cut Slemmer's back, "the big long cut on her back." Pike said Slemmer repeatedly tried to get up and run. Pike recounted how Slemmer bargained for her life, begging Pike to talk to her and telling Pike that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. Pike told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." Pike said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked Pike what she was going to do to her, at which point Pike thought she heard a noise. Pike left the scene to check out the surrounding area to make sure no one was around. When she returned, Pike began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, Pike cut Slemmer's throat several other times. Pike said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that Pike and the other person would push her back on the ground.

Slemmer attempted to run away again, and Pike threw a rock which hit Slemmer in the back of the head. Pike stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, Pike continued to hit her. Eventually Pike said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but Pike "kept hitting her and hitting her and hitting her." Pike eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, Pike said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. Pike said the episode lasted "for about thirty minutes to an hour." Pike admitted that she and the other person had forced the victim to remove her blouse and her bra during the incident to keep Slemmer from running away. Pike also admitted that she had removed a rag from her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking. Pike denied carving a pentagram in the victim's chest, but said that the other person had cut the victim on her chest.

After disposing of Slemmer's body, Pike and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter, and Pike returned the miniature meat cleaver to the person at the Job Corps from whom she had borrowed it. Pike never identified that individual. Pike told Investigator York that the bloodstained jeans she had worn during the incident were still in her room. She said they were covered in mud because she had rubbed the mud from the bottom of her shoes onto the jeans to conceal the blood. Pike also admitted to Investigator York that she had discarded two forms of identification belonging to the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. Pike gave Investigator York consent to search her room and then accompanied him to the Job Corps center. From there Pike retraced her steps, describing what had occurred on the night of the killing. Investigator York testified that Pike eventually directed him to the exact location where the victim's body was found.

After Pike's statement was played for the jury, the state introduced pictures of Pike and Shipp taken at the Knoxville Police Department on the day the statement was given, January 14, 1995, two days after the murder. In the pictures, both Pike and Shipp were wearing pentagram necklaces.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had retrieved a pair of black gloves and two of Slemmer's I.D. cards from the Texaco station on Cumberland Avenue. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of Pike and Shipp. Those items that he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that she had been unable to perform a DNA analysis on the blood taken from the shoes of Pike and Shipp, but she had determined that the blood samples taken from the clothing of both Pike and Shipp matched the DNA profile of the victim.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer, a nineteen-year-old Job Corps student. Dr. Elkins described the victim's body as covered with dirt and twigs. Slemmer was nude from the waist up clothed only with jeans, socks, and shoes. After removing the victim's clothing and cleaning the body, Dr. Elkins had attempted to catalog the slash and stab wounds on the victim's torso by assigning a letter of the alphabet. There were so many wounds that eventually Dr. Elkins decided to catalog only the most serious and major wounds. Dr. Elkins explained that to catalog every wound she would have been required to go through the alphabet again, and stay in the morgue for "three days." Eventually, Dr. Elkins said she "basically threw up her hands and just said, [innumerable] more superficial slash wounds on the back, arms and chest." In addition, Dr. Elkins said the victim had purple contusions on her knees, indicating fresh bruising consistent with crawling, and defense wounds on her right arm.

Dr. Elkins described the major slash and stab wounds she had cataloged on the victim's back, arms, abdomen, and chest. She found a six inch gaping wound across the middle

of the victim's neck which had penetrated the fat and muscles of the neck. In addition, Dr. Elkins had found ten other slash wounds on the victim's throat. Other slash wounds were on the victim's face, and Dr. Elkins observed what appeared to be a pentagram carved onto the victim's chest. Because the area around each wound was red in appearance, Dr. Elkins concluded that the victim's heart had been beating when the wounds were inflicted and she said the victim would not have been rendered unconscious by any of the stab or slash wounds.

Dr. Elkins determined that the victim's death was caused by blunt force injuries to the head. The victim had suffered multiple and extensive skull fractures. From the autopsy, Dr. Elkins determined that the victim had sustained a minimum of four blows to her head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the victim's skull had been fractured as had the bridge of her nose. However, the major wound, labeled as injury "W", involved most of the left side of the victim's head. Dr. Elkins said that this injury, caused by blunt force to the left side of the victim's head while the right side of the victim's head was against a firm surface, also had fractured the right side of the skull and imbedded a portion of the skull into the victim's brain. Dr. Elkins found small divots in the victim's skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows. Finally, Dr. Elkins testified that blood in the victim's sinus cavity indicated she had been alive and probably conscious when the injuries were inflicted.

During her testimony, Dr. Elkins utilized the victim's skull to describe the injuries. She testified that in order to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had removed the top of the victim's skull in order to remove the brain. Embedded inside the victim's brain as a result of the blunt force were portions of the victim's skull. Dr. Elkins removed those embedded pieces and forwarded them to Dr. Marks. Dr. Marks reconstructed the skull, fitting those loose portions into the left side area of the skull. However, those pieces had not completely filled one area on the left side of the victim's skull. Dr. Elkins then showed the jury a piece of skull that had been given to her shortly before the trial and demonstrated that it fit perfectly into the remaining area of the victim's skull. The piece of

8

skull utilized by Dr. Elkins had been taken from the pocket of a jacket which witnesses identified as belonging to Pike.

Pike's jacket had been turned over to the law enforcement officials by Job Corps employees. Robert A. Pollock, orientation specialist at Knoxville Job Corps, testified that he had spoken with Pike on January 13, 1995, concerning a misplaced I.D. card. After Pike left his office, Pollock noticed a black leather jacket hanging on the chair where she had sat. The jacket had been hanging on the chair when Pollock locked the room at approximately 4:00 p.m. on January 13th, and it was still there when he returned at 7:30 a.m. on January 17th. Because he had heard over the weekend that Pike was a suspect in this murder investigation, Pollock immediately turned the jacket over to the Job Corps' Safety and Security Captain, William Hudson. Hudson called the Knoxville Police Department and turned the jacket over to Officer Arthur Bohanan when he arrived a short time later.

Officer Bohanan identified the jacket, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the jacket and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which the victim's skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

Following the introduction into evidence of the victim's skull, numerous photographs, and items of the victim's clothing, the State rested its case-in-chief.

Dr. Eric Engum, a clinical psychologist, testified for the defense and stated that he had conducted a clinical interview and had administered a battery of tests to the [Petitioner]. Dr. Engum described Pike as an "extremely bright young woman." Dr. Engum explained that Pike "is excellent in problem solving, reasoning, analysis, ah, can pay attention, sustains concentration, can sequence, ah, has excellent receptive and expressive language skills." Pike had a full scale IQ score of 111 which is in the 77th percentile and which was characterized as "remarkable" by Dr. Engum since she had only completed the ninth grade. According to Dr. Engum, the tests unequivocally showed that Pike had no symptoms of brain damage and that she was not insane. However, Dr. Engum concluded that the [Petitioner] suffers

from a very severe borderline personality disorder and exhibits signs of cannabis (marijuana) dependence and inhalant abuse. He testified that the [Petitioner] is not so dysfunctional that she needs to be institutionalized, but instead opined that she has a multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals.

During direct examination, Dr. Engum opined that the [Petitioner] had not acted with deliberation or premeditation in killing Slemmer. Instead, Dr. Engum said she had acted in a manner consistent with his diagnosis of borderline personality disorder; she had lost control. He explained that she had danced around when relating the murder to Iloilo because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the [Petitioner's] coat, Dr. Engum explained that the [Petitioner] actually has no identity and the action of taking and displaying a piece of Slemmer's skull to her friends was the [Petitioner's] way of getting recognition, "no matter how distorted" the recognition.

On cross examination, Dr. Engum stated that there was no question that the [Petitioner] had killed Slemmer. He reiterated that his opinion that once the attack began, Pike had literally lost control. However, Dr. Engum admitted that Pike had deliberately enticed Slemmer to the park, carved a pentagram onto Slemmer's chest, bashed Slemmer's head against the concrete, and beaten Slemmer's head with the asphalt. Dr. Engum agreed that Pike's act of carrying weapons with her indicates deliberation. Finally, Dr. Engum conceded that Pike had time to calm down and consider her actions when she left Slemmer during the attack to investigate a noise and determine whether anyone else was in the area.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statements of the [Petitioner] and Kimberly Iloilo and the reports of Dr. Engum, Dr. Elkins, and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in

some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the [Petitioner] nor any of the other witnesses. Dr. Bernet admitted that he did not have enough information to offer an expert opinion as to whether Pike acted with intent or premeditation in killing the victim.

Based on this evidence offered during the guilt phase of the trial, the jury found Pike guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. The defense, in mitigation, called Carrie Ross, Pike's aunt as a witness. Ross testified that the [Petitioner] had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross said that Pike's family has a history of substance abuse and that Pike's maternal grandmother was an alcoholic who was verbally abusive to Pike. Following the death of Pike's paternal grandmother, Pike was shuffled between her mother and father. According to Ross, Pike's mother's home was very dirty. Pike's mother set no rules for her, and on the occasions that Pike had visited Ross, the [Petitioner] had behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin.

On cross examination, Ross admitted that she has previously described Pike as a pathological liar and that she had been afraid to allow Pike to associate with her own children. Ross also admitted that Pike had been out of control since she was twelve years old.

Glenn Pike, the [Petitioner's] father, testified that he had kicked the [Petitioner] out of his house twice, the last time in 1989. He admitted that he had signed adoption papers for the [Petitioner] prior to her eighteenth birthday. On cross-examination, he admitted that he had forced Pike to leave his home in 1989 because there had been an allegation that the [Petitioner] had sexually abused his two-year old daughter from his second marriage. According to her father, Pike had been disobedient, dishonest, and manipulative when she had lived with him.

The [Petitioner's] mother, Carissa Hansen, a licensed practical nurse, testified that Pike had lived with her 95 percent of the time since her paternal grandmother's death.

Hansen admitted that she had smoked marijuana with the [Petitioner] in order to "establish a friendship." Hansen related that the [Petitioner] had attempted suicide by taking an overdose shortly after the death of her paternal grandmother. Hansen also testified that one of her boyfriends had whipped Pike with a belt. Hansen had the boyfriend arrested.

On cross-examination, Hansen admitted that Pike's behavior had been problematic for years. The [Petitioner] had begun growing marijuana in pots in her home at age nine. After threatening to run away from home and live on the street, Pike had been allowed to have a live-in boyfriend at age fourteen. Hansen admitted that Pike had wielded a "butcher-knife" against the boyfriend, who had been arrested for whipping her. Hansen also said Pike had lied to her and stolen from her on numerous occasions and had quit high school. Hansen conceded that Pike had been out of control since she was eight years old. Following Hansen's testimony, the defense rested its case.

In rebuttal, the State presented the testimony of Harold James Underwood, Jr., a University of Tennessee police officer who was assigned to secure the crime scene on January 13, 1995. Underwood testified that the [Petitioner] came to the scene with three to five other females between four and five p.m[.] that day. Pike asked Underwood why the area had been marked off and questioned him concerning the identity of the victim and whether or not the police had any suspects. None of the other females spoke during the fifteen minutes the group was there. Underwood said Pike appeared amused and giggled and moved around. Underwood noticed Pike was wearing an unusual necklace in the shape of a pentagram. After learning at roll call on January 14, 1995, that the victim of the murder had a pentagram carved on her chest, he reported Pike's strange behavior and unusual necklace to his superior officers.

Based on the proof submitted at the sentencing hearing, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) "the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and (2) "the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." In addition, the jury found that the State had proven that the

> aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced the [Petitioner] to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed.

*Pike*, 978 S.W.2d at 907–14. (internal citations omitted).

After reviewing the record and considering Petitioner's claims on appeal, The TSC found that the evidence supported the conviction and sentence, and affirmed the TCCA's decision. *Id.* at 914. Petitioner next field a petition for post-conviction relief, which was denied after an evidentiary hearing. The TCCA affirmed the denial of post-conviction relief, *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207 (Tenn. Crim. App. Apr. 25, 2011), and the TSC denied Petitioner's application for permission to appeal. Petitioner then filed the pending motion for federal habeas corpus relief.

## II. STANDARD OF REVIEW

Respondent argues that one of Petitioner's claims is procedurally defaulted. As to the remaining claims, Respondent argues that she is entitled to judgment as a matter of law based on the findings of the Tennessee Courts. Petitioner conversely argues that she is entitled to summary judgment on many of her claims because the state courts' decisions were unreasonable.[1]

### A. Procedural Default

Procedural default is an extension of the exhaustion doctrine. A federal court cannot grant a state prisoner's petition for a writ of habeas corpus unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total of exhaustion. *Rose v. Lundy*, 455 U.S.

---

[1] Petitioner did not seek summary judgment on two of her claims; instead, Petitioner requested an evidentiary hearing on these claims, which the Court granted [Docs. 51, 58].

13

509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (stating that exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Furthermore, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

Here, Petitioner has exhausted her state remedies because there is no other procedure under Tennessee law for her to present her claims challenging her convictions and sentence. *See* Tenn. Code Ann. 40-30-102(a). It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977); *accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.")

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Therefore, to excuse her procedural default, Petitioner must first demonstrate cause for her failure to present an issue to the state courts. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

## B.     § 2254(d): State Court Findings

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the jurisdiction of a federal court to consider and grant habeas corpus relief to prisoners is significantly limited." Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a state petitioner may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct, and a petitioner may rebut this presumption of correctness only by clear and convincing evidence. 28 U.S.C. § 2254(e).

A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision "involves an unreasonable application of clearly established federal

law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

A state petitioner seeking federal habeas relief must meet a very high bar under the standard set by AEDPA. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2001)). "[A] habeas court must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 102. The Supreme Court acknowledges that this is a very high standard. "If this standard is difficult to meet, that is because it was meant to be." *Id.*; *see also Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."); *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) (citing *Richter*, 562 U.S. at 101–02) ("[T]he Supreme Court has very recently made abundantly clear that the review granted by AEDPA is even more constricted than AEDPA's plain language already suggests.").

### C. Motion for Summary Judgment

It is well established that a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is applicable to habeas corpus proceedings and allows the court to assess the need for an evidentiary hearing on the merits of the habeas petition. *See Blackledge v. Allison*, 431 U.S. 63, 80–81 (1977). Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of establishing that no genuine issues of material fact exits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 924 (6th Cir. 2002). "When reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Once the moving party presents evidence sufficient to support a motion for summary judgment, the non-moving party is not entitled to a trial merely on the basis of allegations. The non-moving party must present some significant probative evidence to support its position. *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943–44 (6th Cir. 1990), *overruled on other grounds by Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 217 n.4 (6th Cir. 1992); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

Summary judgment should not be disfavored and may be an appropriate avenue for the "just, speedy and inexpensive determination" of an action. *Celotex Corp.*, 477 U.S. at 327. The moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## III.   EVIDENTIARY HEARING

The Court held an evidentiary hearing on May 26th, 2015 and May 27th, 2015 (Doc. 81). The hearing was restricted to evidence concerning Petitioner's claims of ineffective assistance of counsel based on a possible conflict of interest stemming from the investigation into lead counsel's billings to the Indigent Defense Fund, and trial counsel's procurement of media rights to Petitioner's story (Doc. 58). During the hearing, the Court stated that it had yet to determine whether Petitioner has cleared the limitations to receiving new evidence under 28 U.S.C. § 2254(d); however, out of the abundance of caution and because of the highly extraordinary nature of the punishment involved, the Court decided to hold the hearing and determine later if the evidence received would be considered or not (Doc. 84 p. 6).

A federal habeas petition containing claims that have been adjudicated on the merits in state proceedings must meet the § 2254(d) restriction which prohibits relief unless the adjudication of that claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). In *Cullen v.*

*Pinholster*, 563 U.S. 170 (2011), the Supreme Court, while reinforcing that the district court still retains the discretion to grant an evidentiary hearing, held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. "[T]his means that when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Id.* at 183 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). As it applies to this case, until Petitioner has overcome the § 2254(d) limitation, the Court is not required to consider any "new" evidence introduced at the evidentiary hearing.

After a thorough review of the state record, the facts, and Supreme Court precedent applicable to counts two and six of Petitioner's petition, the Court finds that the state court's adjudication of those claims did not involve an unreasonable determination of the facts in light of the evidence before the court. The Court also notes that in any event, the evidence presented at the evidentiary hearing did not differ in any significant way from what was presented to the state court with regard to these claims.[2] A more in-depth analysis of these claims will be presented in turn with Petitioner's other claims for relief.

## IV. CLAIMS FOR RELIEF

The Court will consider Petitioner's claims for relief in the order she has presented them in her petition for a writ of habeas corpus, and in light of the pending motions for summary judgment.

---

[2] The Court finds Petitioner's allegations regarding inconsistencies in William Talman's testimony before the state post-conviction court and before this Court at the May, 2015 evidentiary hearing to be irrelevant and immaterial to the issues before the court on this petition.

**A.  Petitioner's attorneys were constitutionally ineffective during the penalty phase of her capital trial and her rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated.**

Petitioner alleges that her trial counsel were ineffective during the penalty phase of her trial, and that this ineffectiveness led to her eventual death sentence. Particularly, Petitioner claims that counsel failed to uncover and present a wealth of mitigating evidence, and made last-minute decisions that negatively affected the quality of their penalty phase arguments.

1.  *Applicable Law*

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." In *Strickland v. Washington*, the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel. 466 U.S. 668 (1984). To bring a successful claim of ineffective assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

Under the first part of the *Strickland* test, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Id.* at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged to not have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of

counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). It is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

A finding of serious attorney incompetence will not justify setting aside a conviction or sentence, however, absent prejudice to the defendant so as to render the conviction or sentence unreliable. *Id.* at 691–92. The question with prejudice is whether counsel's performance "was so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). Here, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Moss v. United States*, 232 F.3d 445, 454 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Moss*, 323 F.3d at 454–55. Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would have won." *Morrow*, 977 F.2d at 229. The focus here, however, should not be solely on outcome determination:

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell*, 506 U.S. 364, 369–70 (1993).

2.    _Discussion_

Petitioner challenged the effectiveness of her trial counsel during the penalty phase, arguing to the TCCA that the penalty phase verdict was less an appropriate response to the facts than an indictment of the performance of defense counsel. _Pike_, 2011 WL 1544207, at *49. The TCCA, applying _Strickland_, concluded that Petitioner had not met her burden of proving deficient performance or prejudice. _Id._ at *49–60. Accordingly, the task before the Court is to determine whether the state court's application of _Strickland_ to the facts of Petitioner's case was unreasonable, in light of Petitioner's claims of ineffective assistance of counsel at the penalty phase of her trial.

a.    Failure to present mitigating evidence uncovered during investigation.

Petitioner first alleges that trial counsel's abrupt decision to change their penalty phase plans, and not call their mitigation specialist, Dr. McCoy, led them to present a very limited case for mitigation and abandon the compelling mitigation evidence that had already been discovered.

Failure to present mitigating evidence at sentencing generally constitutes ineffective assistance of counsel. _See, e.g., Williams v. Taylor_, 529 U.S. 362, 393 (2000) ("[I]t is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."); _Skaggs v. Parker_, 235 F.3d 261, 269 (6th Cir. 2000) ("We find that Skaggs's counsel acted below an objective standard of reasonableness at sentencing, essentially providing no legitimate mitigating evidence on Skaggs's behalf, and that this failure severely undermines our confidence in the just outcome of this

22

proceeding."); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997) (holding that the failure of trial counsel "to investigate and present any mitigating evidence during the sentencing phase so undermined the adversarial process that Austin's death sentence was not reliable.").

The state did not present any evidence during the penalty phase of Petitioner's trial; rather, they chose to rest on the evidence that had been presented during the guilt phase (Addendum No. 2, Doc. 25, Vol. 25, pp. 2481–83). Petitioner's evidence consisted of the testimony of her aunt, her mother, and her father. Petitioner's aunt, Carrie Ross, testified that Petitioner did not have a relationship with her mother right from birth, and was primarily raised by her paternal grandmother until her grandmother's death in 1988 (*Id.* at 2487; Addendum No. 2, Doc. 26, Vol. 26, pp. 2503–05). Ms. Ross also testified that Petitioner's mother did not enact any disciplinary rules with Petitioner, and that she always put her personal interests ahead of Petitioner's (Addendum No. 2, Doc. 25, Vol. 25, pp. 2499–2500). Petitioner's father, Glenn Pike, testified that he was not around a lot, and that he had a long-distance relationship with Petitioner (Addendum No. 2, Doc. 26, Vol. 26, pp. 2512–13). Mr. Pike also testified that on more than one occasion, he effectively rejected Petitioner, once telling her she was no longer welcome in his home, another time sending her back to live with her mother, and signing papers for her to be adopted at one point (*Id.* at 2513–16).

Finally, Petitioner's mother, Carissa Hansen, testified that Petitioner spent majority of her childhood with her paternal grandmother and first attempted suicide after her grandmother's death in 1988 (*Id.* at 2526, 2528–29). Ms. Hansen also testified that on one occasion she chose her new husband over Petitioner, and sent Petitioner off to live with her father because Petitioner did not get along with the new husband (*Id.* at

2525). Ms. Hansen also admitted to smoking marijuana with Petitioner, in an attempt to get closer to her and be her friend, and also to allowing Petitioner's boyfriend to move into her home when Petitioner was fourteen years old (*Id.* at 2527, 2537).

After Petitioner's mother testified, the Petitioner rested her case. The state then called a rebuttal witness, Harold Underwood, a police officer with the University of Tennessee, to testify to Petitioner's demeanor on the day following the murder. Officer Underwood testified that Petitioner came to the crime scene with between three and five other girls and asked questions about who the victim was, and if any suspects had been identified (*Id.* at 2551–52). Officer Underwood also testified that Petitioner appeared amused, and was giggling and moving around (*Id.* at 2252).

In her petition, Petitioner alleges that her lead counsel initially intended to call Dr. McCoy as the only witness during the sentencing phase, planning for her to bring in all the evidence of Petitioner's background that she had uncovered, and tie it in with their medical expert, Dr. Engum's, diagnosis (Doc. 19, p. 49). However, after the guilty phase, lead counsel turned over Dr. McCoy's entire mitigation report to the prosecution in and *in camera* proceeding that was not put on the record, and subsequently decided not to call Dr. McCoy to testify during the penalty phase (*Id.* at 50). Petitioner alleges that as a result of this abrupt change in plans, the mitigation evidence prepared was not properly presented to the jury, the prosecution was able to use information from Dr. McCoy's report to impeach the lay witnesses on cross examination, and counsel's planned mitigation plan completely unraveled (*Id.*). Petitioner further alleges that none of the reasons provided by counsel for their decision to abandon their mitigation plan at the last minute was supported by the record (*Id.* at 51).

Dr. McCoy testified at the post-conviction evidentiary hearing that her role as a mitigation expert was to "collect information, interview people, get records and analyze all of this information in an effort to develop certain themes that the attorneys would present to a jury in sentencing[,] and also to identify lay witnesses who could come and talk to the jury and show them the human side of [Petitioner] and familiarize them with her history and basically help them see that life would be an option for her" (Addendum No. 5, Doc. 18, Vol. 6B, p. 621). Dr. McCoy also testified that it would have been detrimental to Petitioner's case to only have family members and lay witnesses testify to Petitioner's background, without any testimony from an expert about how it connects to Petitioner's psycho pathology (*Id.* at 638–39).

Petitioner's trial co-counsel, Julie Martin Rice, testified during the post-conviction evidentiary hearing that their decision not to call Dr. McCoy during the penalty phase of Petitioner's trial was based on several theories that were floating around, but that she was not sure which one precipitated the ultimate decision (Addendum No. 5, Doc. 12, Vol. 1, p. 77). Ms. Rice testified that at some point, Dr. McCoy said she could not support part of Dr. Engum's testimony or report (*Id.);* that they had discovered Dr. McCoy was dating the lead prosecutor on the case, and that she thought it to be an on-going relationship (*Id.*; Addendum 5, Doc. 13, Vol. 2, p. 197); that Dr. McCoy had also told her at some point that Petitioner was a liar, and that she did nothing but lie (Addendum No. 5, Doc. 13, Vol. 2, p. 113); and that on the morning the penalty phase was set to begin, the prosecutor had "stickified" Dr. McCoy's report (Addendum No. 5, Doc. 12, Vol. 1, p. 77).

Trial lead counsel, Bill Talman, also testified during Petitioner's post-conviction hearing. Mr. Talman testified that the primary reason they decided not to call Dr.

McCoy to testify at the sentencing phase of Petitioner's trial was because she would not corroborate Dr. Engum's testimony (Addendum No. 5, Doc. 15, Vol. 4, p. 348). Mr. Talman also testified that after he received Dr. McCoy's report, he was already teetering with whether he wanted to use it or not because of all the negative things the report contained about Petitioner's history (*Id.* at 345). According to Mr. Talman, it became a question of weighing whether he wanted to have all of the negative things in Dr. McCoy's report come into the record over putting Dr. McCoy on the stand, when all she would testify to was that she spoke to a number of people (*Id.* at 348–49). Mr. Talman testified that he believed they could get substantially the same testimony in through the family members (*Id.* at 349). Mr. Talman admitted that the decision not to call Dr. McCoy as a witness was "one of those last minute decisions that . . . you just [make]," and that the decision was, to the best of his knowledge, made the morning right before the penalty phase began while they were in "one of those little huddles outside during a break" (*Id.* at 351–52).

    In addition, Mr. Talman testified that another reason he was hesitant to call Dr. McCoy as a witness was because they had found out shortly before trial that she was involved in a romantic relationship with William Crabtree, the lead prosecutor on Petitioner's case (*Id.* at 352). According to Mr. Talman, when he asked Dr. McCoy why she had not initially disclosed the relationship, she told him that she did not think that it made a difference, and that she knew that he would not have retained her as an expert witness on the case if she had revealed the relationship to him (*Id.* at 352; Addendum No. 5, Doc. 16, Vol. 5, pp. 444–45). Mr. Talman stated that he did not call attention to the issue when he first found out because he never doubted Dr. McCoy's work or Mr. Crabtree's integrity, that Dr. McCoy assured him that she had never talked to Mr.

Crabtree about the case, and that they had already spent a lot of money on Dr. McCoy's work at that point (Addendum No. 5, Doc. 15, Vol. 4, p. 355). Even further, Mr. Talman testified that he was angered by Dr. McCoy's actions during jury selection when she appeared on local television stations talking about jury selection, although not specifically about the facts of Petitioner's case (*Id.* at 357). Mr. Talman also testified that he did not recall ever asking Dr. McCoy to lie about the date he received her report, and that he could not ever imagine asking a witness to lie (Addendum No. 5, Doc. 16, Vol. 5, p. 440).

With respect to the claim that trial counsel failed to present the mitigating evidence they had in their possession, the TCCA agreed with the finding of the trial court that Petitioner failed to establish ineffective assistance of counsel. The trial court accredited lead counsel's testimony that he did not call Dr. McCoy because she could not corroborate Dr. Engum's report, and also that he felt uncomfortable with the use of Dr. McCoy's materials, as they contained a lot of information which he did not want the jury to hear. The TCCA also agreed with the finding of the trial court that Petitioner could not prove prejudice because the mitigation evidence which was omitted would not have outweighed the aggravating factors. *Pike v. State*, 2011 WL 1544207, at *52.

The Sixth Circuit has found ineffective assistance of counsel in cases where counsel wholly failed to present any mitigation evidence at trial. *See, e.g., Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995) (finding that trial counsel rendered deficient performance where "the jury was given virtually no information on [defendant's] history, character, background and organic brain damage—at least no information of a sort calculated to raise reasonable doubt as to whether [he] ought to be put to death."); *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (finding ineffective assistance where

counsel did not present any mitigating evidence because he did not think that it would do any good).

These cases, however, are sufficiently distinguishable from Petitioner's case. At the outset, trial counsel did not fail to present any evidence in mitigation. Rather, counsel chose to use testimony from Petitioner's family members in support of mitigation, in place of their original plan to call Dr. McCoy. While the Court notes that counsel admitted that the decision to forgo Dr. McCoy's testimony was a last-minute decision and may not have been the best choice, the Court is counseled by *Strickland*'s direction to focus on counsel's perspective at the time. *See Strickland*, 466 U.S. at 689. As such, the Court cannot find that the TCCA's conclusion that counsel's decision was a tactical one is an unreasonable determination of the facts. Even further, the record supports the TCCA's finding that much of the evidence that Dr. McCoy would have provided was presented in some form in either the guilt phase or through the family members in the sentencing phase. *Pike*, 2011 WL 1544207, at *51–52.

Furthermore, the Court cannot find that the state court's conclusion that Petitioner could not establish prejudice is an unreasonable determination. Under *Strickland*, a petitioner challenging a death sentence must show that there is a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695. A petitioner cannot establish prejudice by claiming his counsel failed to present cumulative mitigation evidence—that is, evidence that was already presented to the jury. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (citing *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)). As previously noted, most of the evidence that Petitioner claims was not presented by counsel was presented in

some form during either the guilt or penalty phase, perhaps just not in as comprehensive a way as Petitioner contends it should have been. Regardless, Petitioner cannot meet her burden of showing prejudice.

Accordingly, the court finds that the state court's decision that Petitioner has failed to demonstrate ineffective assistance of counsel for failure to present mitigating evidence was neither contrary to, nor did it involve an unreasonable application of, federal law.

b.   Failure to discover relevant and compelling mitigation evidence.

Petitioner next alleges that trial counsel were ineffective for failing to investigate, discover, and present evidence of Petitioner's organic brain damage and its effects, along with evidence that Petitioner suffers from bipolar disorder and post-traumatic stress disorder (Doc. 19). Petitioner also claims that trial counsel failed to interview many witnesses from her background that would have provided mitigating evidence of her positive traits, and witnesses from the Job Corps program that would have testified to the dangerous and violent atmosphere there (Doc. 19).

As previously stated, "failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment." *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001). Dr. Pincus, a neurologist, testified as an expert at Petitioner's post-conviction evidentiary hearing. Dr. Pincus testified that Petitioner suffers from brain damage and that essentially, "her frontal lobes aren't put together properly" (Addendum No. 5, Doc. 3, Vol. 3, p. 243). According to Dr. Pincus, an important function of the frontal lobe is moral and ethical standards, "the ability to say, 'No, don't say that; no, don't do that' to

yourself" (*Id.*). As such, Dr. Pincus surmised that Petitioner was under the influence of a mental disease and defect that prevented her from being able to consider what she was doing, and was unable to prevent herself from giving in to the impulse to kill (*Id.* at 278). Dr. Pincus further testified that while Dr. Engum performed all the right tests for the frontal lobe, the type of frontal lobe damage that Petitioner suffers is not visible on those tests (*Id.* at 285). Dr. Pincus testified that Dr. Engum's error was concluding that there was no brain damage based merely on the tests performed, and that trial counsel, in his opinion, had a duty to seek further opinions to put together a credible defense (*Id.* at 283–84).

Dr. William Kenner, a specialist in psychiatry, child psychiatry, and psychoanalysis, also testified on Petitioner's behalf. According to Dr. Kenner, there was significant data at the time of Petitioner's trial to suggest early onset bipolar disorder (Addendum No. 5, Doc. 24, Vol. 1, p. 35). Dr. Kenner testified that there was also data to help the jury understand the impact of early layered trauma on Petitioner's development, as well as Petitioner's congenital brain abnormality (*Id.*). Dr. Kenner also testified that there was data suggestive of dissociative symptoms that was available to a psychiatrist back in 1995 and 1996 (*Id.* at 37–38). Dr. Kenner opined that the structure of Petitioner's defense team at trial was odd because all the lines of communication were to lead counsel, but there was little to no "cross talk," especially among the experts (*Id.* at 30). According to Dr. Kenner, this caused problems for Petitioner's defense because it limited the psychiatrist, Dr. Bernet, from testifying to the depth and extent of his knowledge (*Id.* at 31).

Based on the testimonies of Drs. Pincus and Kenner, as well as testimony from several lay witnesses from Petitioner's background and the Job Corps program,

Petitioner alleges that trial counsel should have conducted further investigations into Petitioner's mental health and presented such mitigation evidence to the jury, and trial counsel should have investigated the lay witnesses and presented their testimony. In reaching its decision to deny relief on this claim, the TCCA agreed with the post-conviction trial court that trial counsel was not required to question the diagnosis reached by the multiple experts he retained to examine Petitioner. *Pike*, 2011 WL 1544207, at *54.

Sixth Circuit jurisprudence has "distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008).

> The cases where [the Sixth Circuit] has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have *totally* failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the *degree* of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Id.* (quoting *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001)).

Petitioner's trial counsel did not *totally* fail to conduct a mitigation investigation. The record indicates the opposite is the case-trial counsel engaged the services of three different expert witnesses to assist the defense in different ways. Dr. Engum, particularly, evaluated Petitioner and at no time did he recommend that counsel retain any additional expert for further testing. Dr. McCoy also testified that it was her belief that if any additional testing was required, Dr. Engum would make the call. This Court

cannot now fault counsel for relying on the diagnosis and advice of the expert he retained to evaluate Petitioner. Furthermore, as the TCCA noted, even Drs. Pincus and Kenner agreed that the diagnosis reached by Dr. Engum was reasonable based on the tests he performed and that bipolar disorder was often mistaken for borderline personality disorder. The TCCA also noted that "[w]hile the actual diagnosis is somewhat varied, the essential facts, i.e., the concession to premeditation, are very similar." *Pike*, 2011 WL 1544207, at *54. The record also indicates that trial counsel interviewed a number people from Petitioner's background, even travelling to North Carolina to investigate and interview witnesses (Addendum No. 5, Doc. 15, Vol. 4, pp. 339–40). Petitioner has not presented any evidence to overcome the strong presumption that counsel's decision not to call any of these lay witnesses was anything other than a strategic decision. *See Strickland*, 466 U.S. at 689.

As such, the Court cannot find that Petitioner has demonstrated ineffective assistance of counsel for failure to investigate mitigating evidence. The decision of the TCCA was neither contrary to, nor did it involve an unreasonable application of federal law, and Petitioner is not entitled to relief on this claim.

c.       Disclosure of protected work product to the prosecution

Petitioner's next claim of ineffective assistance of counsel alleges that her trial counsel were ineffective for turning over all three volumes of Dr. McCoy's work product, without ensuring that the record reflected the possible issuance of a court order requiring disclosure and ensuring that the material turned over did not include privileged attorney work product (Doc. 19, p. 61). Petitioner argues that she was prejudiced by trial counsel's failure to protect this privileged information because the

prosecution used information from Dr. McCoy's report to cross-examine the witnesses that testified during the penalty phase of her trial (*Id.* at 62).

In considering this claim, the TCCA found that Petitioner had not carried her burden of proof establishing either deficient performance or prejudice. *Pike*, 2011 WL 1544207, at *55. Particularly, the TCCA found that the essence of Petitioner's claim was that the record did not establish that the trial court ordered trial counsel to turn over the reports to the prosecution. *Id.* However, the TCCA held that its interpretation of the facts did not support Petitioner's theory; rather, the record seemed to indicate that the trial court did in fact order disclosure. *Id.* Furthermore, the TCCA found that Petitioner failed to prove prejudice because even the trial prosecutor could not recall whether his cross-examination of Petitioner's witnesses during the penalty phase was based on evidence he obtained from Dr. McCoy's reports, or whether they were obtained independently. *Id.* Additionally, the TCCA found that Petitioner did not establish that the result of her trial would have been different absent the testimony elicited by the prosecution. *Id.*

Petitioner now argues that the TCCA's decision was unreasonable because the issue was not whether trial counsel was required to comply with the orders of the court (Doc. 46, p. 80). Rather, Petitioner contends that counsel was required to make a reasonable argument that discovery was to be conducted according to procedural rules, and further ensure that an appropriate objection was on the record and preserved for appellate review (*Id.*). According to Petitioner, under the Tennessee Rules of Evidence, Dr. McCoy's mitigation report and social history was not discoverable until and unless she testified, and even if she did testify, only upon an order from the court after the court had reviewed the reports (*Id.* at 78).

On post-conviction, trial counsel testified that he did not recall the exact details of how Dr. McCoy's reports were turned over the to the Prosecution, but that he did remember the in-chambers conference where he turned over the reports (Addendum No. 5, Doc. 15, Vol. 4, p. 374). According to Mr. Talman, he believed that they had a discussion about whether the prosecution was entitled to the reports, and also believed that he was ordered to turn them over to the state, although he equivocated, stating that he could be wrong (*Id.* at 374–75). Lead prosecutor in Petitioner's trial, William Crabtree, also testified that he did not recall what objections may have been made during the in-chambers conference where trial counsel turned over Dr. McCoy's reports, but that he thought that the prosecution should have been entitled to them under reciprocal discovery (Addendum No. 5, Doc. 14, Vol. 3, pp. 238–40).

As previously noted, § 2254(d) is a very difficult standard to meet; the Supreme Court has found that it "stops just short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Combined with the highly deferential standard of *Strickland*, the burden is even more formidable. Based on the Court's review of the record, the Court cannot find that the TCCA's decision was an unreasonable determination of the facts. The record is certainly unclear as to what exactly happened during the in-chambers conference, and it is not within the Court's province to speculate as to what may or may not have happened. While trial counsel testified that in retrospect he should have ensured that there was a court reporter present in chambers and that he should not have turned over the entirety of Dr. McCoy's report, *Strickland* counsels that every effort should be made to assess counsel's performance "from counsel's perspective at the time," and not in hindsight. 466 U.S. at 689. Both trial counsel and the prosecutor

thought, at the time, that Dr. McCoy's reports should have been discoverable. While this belief might have been erroneous, the Court must note that "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 687).

For these reasons, the Court finds that Petitioner is not entitled to relief on this issue because the TCCA's decision was neither an unreasonable application of federal law, nor was it an unreasonable determination of the facts in light of the record before the court.

> d. <u>Failure to present effective penalty phase arguments to the jury</u>

Petitioner's next ineffective assistance of counsel claim alleges that trial counsel failed to present effective penalty phase arguments because counsel never argued to the jury to spare Petitioner because of her youth, nor did they discuss any of the mental health evidence presented by Dr. Engum (Doc. 46, p. 81). Petitioner also argues that counsel was ineffective for failing to mention Petitioner's mental illness or her history of abuse and neglect (*Id.*). The TCCA found that this claim had been waived because Petitioner failed to present it to the post-conviction trial court. *Pike*, 2011 WL 1544207, at *56. Petitioner now argues that the TCCA's review of the post-conviction trial court record was erroneous because the claim that counsel was ineffective for failing to mention mental health evidence during their penalty phase closing argument was actually presented, and in the alternative, that Petitioner is entitled to review of this claim under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

Under the procedural default doctrine, a federal court cannot grant a state prisoner's petition for habeas relief unless each and every claim set forth in the habeas

petition has been fairly presented to the state courts. *Satterlee v. Wolfenbarger*, 453 F.3d 362, 365 (6th Cir. 2006) (citing *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)). The petitioner must present the same claim under the same theory presented to the state courts. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009). Based on its review of the record, the Court cannot find that this claim was fairly presented to the state post-conviction trial court. While Petitioner alluded to counsel's failure to present the jury with evidence of her mental illness, the remainder of the facts asserted under this claim were not presented to the state court under the theory for which Petitioner now seeks relief. As such, the claim is procedurally defaulted.

To overcome a procedural default, a petitioner must show cause and actual prejudice to excuse the failure to present the claim in state court. *See Gray v. Netherland*, 518 U.S. 152, 162 (1996). In *Martinez*, the Supreme Court created a "narrow exception" to the general rule of *Coleman v. Thompson* that a habeas petitioner cannot use ineffective assistance of collateral review counsel as cause to excuse a procedural default. 501 U.S. 722, 756–57 (1991). The Sixth Circuit, in *Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014), held that *Martinez*, as expanded by *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013), applies in Tennessee. *Martinez* permits a petitioner to establish cause to excuse a procedural default of an ineffective assistance of trial counsel claim by showing that he received ineffective assistance by post-conviction counsel. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). This holding, however, does not dispense with the "actual prejudice" requirement established by the Supreme Court in *Coleman*. 501 U.S. at 750. To successfully establish cause and prejudice under *Martinez*, a petitioner must show a substantial underlying claim of ineffective assistance of trial counsel. *See Trevino*, 133 S. Ct. at 1918; *Martinez*, 132 S. Ct. at 1318–19.

As part of showing a substantial claim of ineffective assistance of counsel, the petitioner must prove prejudice under *Strickland. See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under *Trevino*, [petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under *Strickland*, a petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The "actual prejudice" requirement of *Coleman* and the prejudice requirement of *Strickland* overlap such that

> in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

*Thorne v. Hollway*, No. 3:14-CV-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014)

Petitioner claims that her trial counsel was ineffective in their penalty phase arguments (Doc. 19). Petitioner points to counsel's statements during his penalty phase opening statement that

> Ms. Pike has a personality that she derives and gains her self-esteem, her self-worth from those around her. If you sentence her to life in prison I would suggest that what you do, that you turn her into just any other inmate doing a life sentence for first degree murder. If, on the other hand, by

37

turning her into any other inmate serving a life sentence that what you take from her is her notoriety. You take her fame. She will be just another inmate serving a life sentence. And we suggest that if you impose a sentence of death, or life without the possibility of parole, you will thrust her into a spot light, a national spot light, and I would suggest that you consider these points.

(Addendum No. 2, Doc. 25, Vol. 25, pp. 2480–81). Petitioner argues that this argument conceded that Petitioner was deserving of the worst punishment they could imagine (Doc. 19). Even further, Petitioner argues that trial counsel failed to emphasize statutory mitigating factors like youth, and her mental illness in their argument.

Counsel's statements here, when taken in isolation, may not appear to be the most appealing arguments counsel could have made; however, these statements must be viewed in the context of counsel's entire argument. *See Moore v. Mitchell*, 708 F.3d 760, 790 (6th Cir. 2013) (citing *United States v. Lostia*, 20 F. App'x 501, 502 (6th Cir. 2001)). Based on the review of counsel's entire opening statement, as well as co-counsel's closing argument, the Court cannot find that each statement was not a part of the constitutionally protected strategy that counsel chose to adopt. Counsel alluded to the availability of statutory mitigating circumstances by reference to the state's argument that mentioned Petitioner's youth as a mitigating factor. Furthermore, co-counsel, in her closing argument, emphasized that the jury were entitled take into account everything they had heard in both the guilt phase and sentencing phase in reaching their decision to not sentence Petitioner to death (Addendum No. 2, Doc. 26, Vol. 26, p. 2564).

While Petitioner may not believe that counsel's arguments were as stirring, eloquent, or comprehensive as they could have been, the decision on how to present the available evidence in their arguments was a matter of trial strategy which this Court will not second guess. As such, the Court finds that Petitioner's claim that counsel failed to

38

present effective penalty phase arguments is not "substantial" for the purposes of *Martinez*.

> e.     <u>Failure to conduct meaningful *voir dire* of potential jurors</u>

Petitioner's final claim of ineffective assistance of counsel alleges that trial counsel failed to rehabilitate or object to the dismissal of potential juror Rutherford, whose *voir dire* showed that he was qualified to serve (Doc. 19). Petitioner also claims that counsel was ineffective for failing to tell potential jurors that her youth was a statutory mitigating factor, and failed to *voir dire* jurors on other prospective mitigation themes, such as mental illness and mental health experts, in order to strike jurors who could not consider certain mitigation evidence (Doc. 19). Applying the standards for jury qualification espoused by the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985), the TCCA considered and rejected this claim.

> The Petitioner argues that [the] colloquy indicates only that "Mr. Rutherford made clear that he could consider the death penalty for a mature defendant, but that he had reservations in light of the Petitioner's youth." We disagree with Petitioner's analysis and her reliance on the statement made in *Morgan v. Illinois*. As previously stated, the Supreme Court in *Morgan* stated that "a juror who *in no case* would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause. [*Morgan v. Illinois*, 504 U.S. 719, 728 (1992)]. According to the Petitioner, that statement stands for the proposition that if a potential juror could possibly impose the death penalty in some case, just not the instant case, then he should not be stricken for cause an impartial juror. We clearly disagree with that interpretation entirely and conclude that the statement should only be taken as reiteration of the standard previously stated in *Wainwright* and *Adams* that a potential juror must have impartiality in the case he or she is presently involved in.

A reading of the colloquy which occurred with Mr. Rutherford made clear that he could not impose the death penalty under any circumstances because of the Petitioner's age in this case. As such, the statements made by Mr. Rutherford indicate that his views would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and his oath. As such, we agree that he was appropriately struck for cause, and no objection by trial counsel was warranted. While we do agree that the statements do not necessarily indicate an unconditional bias against capital punishment entirely, as noted, that is not the required standard.

*Pike*, 2011 WL 1544207, at *58. The Court agrees entirely with the TCCA's exhaustive and comprehensive review of this issue.

With respect to Petitioner's claim that trial counsel failed to question the potential jurors about any possible bias related to mental illness, psychologists, and mental health experts, the TCCA found that Petitioner failed to present any evidence that any juror harbored bias or prejudice on these grounds. *Id.* at *59. The decision by the TCCA was neither contrary to, nor did it involve an unreasonable application of, federal law. Petitioner is not entitled to relief on this claim.

**B.      Petitioner was deprived of the right to unconflicted counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

Petitioner's second claim for relief alleges that she was denied the right to unconflicted counsel because her trial counsel were burdened by a two conflicts—i.e., Mr. Talman's legal and ethical troubles caused by his overbilling practices, and the release of media rights that counsel procured from Petitioner authorizing counsel to use or sell Petitioner's story for pecuniary gain.

### 1.    *Applicable Law*

As a general rule, claims of ineffective assistance of counsel under the Sixth Amendment are governed by *Strickland*, and a petitioner must prove deficient performance and prejudice in order to bring a successful claim.  466 U.S. at 687. When dealing with ineffective assistance due to a conflict of interest, "to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 466 U.S. 335, 348 (1980). "A defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50. However, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim or ineffective assistance." *Id.* at 350.  Absent this showing, the *Strickland* standard applies. *See Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir. 2006).

### 2.    *Discussion*

Petitioner argued on state post-conviction appeal to the TCCA that her lead trial counsel was conflicted between his fear of being prosecuted by the state—which likely involved the district attorney's office prosecuting her case—and his representation of Petitioner. *Pike*, 2011 WL 1544207, at *46. Petitioner further argued that counsel's agreement to profit from Petitioner's story presented a conflict of interest because it signified that counsel was motivated by monetary gain throughout their representation of Petitioner. *Id.* at *48. The TCCA, applying the *Strickland* and *Cuyler* standards, concluded that Petitioner did not meet her burden of showing that an actual conflict of

interest which adversely affected her representation existed, and that Petitioner could not prove prejudice. *Id.* at *48–49.

a.    <u>Conflict from investigation into counsel's billing practices to the Indigent Defense Fund.</u>

Petitioner's first claim of conflict of interest arises from Mr. Talman's involvement in an overbilling investigation by the State of Tennessee. According to Petitioner, counsel still faced the possibility of ethical and criminal charges during the period in which he represented her. Petitioner points to evidence that counsel abandoned his pans to call Dr. McCoy as the sole mitigation witness at the last minute as an indication that counsel's alleged conflict adversely affected her representation. Petitioner argues, based on Dr. McCoy's testimony that counsel asked her to lie about when she turned in her mitigation reports after the prosecutor complained about receiving the large three-volume report so late in the proceeding, that counsel was operating under his fear of further angering the prosecution. Petitioner further claims that all the explanations counsel offered for his decision not to call Dr. McCoy are implausible. In dismissing this claim, the TCCA found that Petitioner failed to offer more than mere speculation as to the reason behind counsel's actions and, as such, did not meet her burden of establishing that an active conflict of interest existed.

The record indicates that between 1993 and 1994, Mr. Talman learned that the state of Tennessee Comptroller's Office was conducting an audit of the indigent defense system for lawyers that had possibly overbilled the fund (Addendum No. 5, Doc. 14, Vol. 3 p. 256). After determining that he might be one of the attorneys implicated in the investigation, Mr. Talman self-reported to the Board of Professional Responsibility and conducted an internal audit (*Id.* at 257). Mr. Talman subsequently repaid approximately

42

$67,000 to the indigent defense fund shortly before he was appointed as counsel in Petitioner's case (*Id.* at 259, 61). The record further indicates that the complaint from Mr. Talman's self-reporting was still pending before the Board of Professional Responsibility during the time he represented Petitioner, and was not fully resolved until the day after the Tennessee Supreme Court affirmed Petitioner's conviction and sentence, when Mr. Talman's license was suspended for eleven months and twenty-nine days (*Id.* at 263–64); *Pike*, 2011 WL 1544207, at *45. Mr. Talman testified that as far as he was concerned, the matter was closed and completed before he accepted the appointment to Petitioner's case (*Id.* at 263). According to Mr. Talman, he had begun receiving appointments in other cases and the state had resumed paying him in his other cases (*Id.*). Mr. Talman also testified that he did not believe the investigation affected his representation of Petitioner (*Id.*).

A petitioner claiming ineffective assistance of counsel due to a conflict of interest must prove that counsel was actually burdened by a conflict which adversely affected the lawyer's performance. *Cuyler*, 446 U.S. at 348.  In the absence of this, the petitioner must prove deficient performance and prejudice under *Strickland*. The TCCA found that prior to Mr. Talman's appointment, the trial court inquired into the status of the investigation and learned that it had been concluded, and that Mr. Talman remained licensed and in good standing. *Pike*, 2011 WL 1544207, at *47. The TCCA also credited the post-conviction court's finding that Mr. Talman deemed the matter concluded prior to his appointment to Petitioner's case. *Id.*

The Court cannot find that this decision was contrary to, or an unreasonable application of, federal law. Petitioner points to the prosecution's anger at receiving Dr. McCoy's mitigation reports just before the penalty phase began as causing Mr. Talman

to fear further angering the prosecution or the court and placing his interest ahead of Petitioners (Doc. 19 p. 68). While it is unclear to the Court why Dr. McCoy's reports, which would arguably have been rendered unnecessary by a not-guilty verdict, would have been discoverable to the prosecution before the close of the guilt phase, the Court cannot find that the TCCA's decision that Petitioner's allegations are mere speculation was unreasonable in light of the record before it. Furthermore, Petitioner appears to argue that regardless of counsel's belief that the overbilling investigation was concluded, the truth is that there remained the possibility of criminal and ethical charges. Petitioner's burden under *Cuyler* requires a showing that counsel was burdened by an actual conflict of interest. It does not follow that Mr. Talman could have been burdened by the possibility of criminal and ethical charges if he genuinely believed that the matter had been concluded as the TCCA found.

Because Petitioner has failed to show that her trial counsel was burdened by an actual conflict of interest stemming from the State of Tennessee's investigation into his billing practices, Petitioner must prove deficient performance and prejudice under *Strickland*. *See Stewart*, 468 F.3d at 381. The Court has previously found that that state court's decision that Petitioner failed to demonstrate ineffective assistance of counsel for failure to present mitigating evidence was not unreasonable. Petitioner is not entitled to relief.

b. <u>Conflict from counsel's procurement of a release of media rights from Petitioner</u>

Petitioner's second claim of conflict of interest alleges that counsel was conflicted by their interest in monetary gain from selling Petitioner's story, based on the waiver releasing all media rights to her story signed by Petitioner (Doc. 19 p. 69). Petitioner

argues that the adverse effect to her representation is evidenced by counsel's failure to seek a continuance of Petitioner's trial date after lead counsel had only been on the case for ten months, and co-counsel for less than two months (*Id.* at 70). Petitioner further argues that this failure to seek a continuance aligns with counsel's pecuniary interest in having a rapid trial so as to capitalize on Petitioner's story while it was still publicly relevant (*Id.* at 71). The TCCA dismissed this claim, agreeing with the state that because the release at issue was not signed until after Petitioner had been found guilty and sentenced, it was unreasonable to suggest that Petitioner had been adversely affected by the post-trial agreement. *Pike*, 2011 WL 1544207, at *49. The TCCA also found that although a conflict of interest existed during counsel's of Petitioner on appeal, Petitioner failed to show either an adverse effect or prejudice. *Id.*

Mr. Talman testified during the sate post-conviction hearing that at some point after the trial, he discussed with Petitioner's aunt, Carrie Ross, the possibility of writing a book on Petitioner's case; however, nothing was ever done about it (Addendum No. 5, Doc. 16, Vol. 5, p. 410). According to Mr. Talman, in a follow-up from his discussion with Ms. Ross, they obtained the media release from Petitioner (*Id.* at 141). Mr. Talman testified that his intent was to show that there was a whole other side of Petitioner that people did not really get to see (*Id.* at 411). Ms. Rice also testified that the intention behind obtaining the release from Petitioner was not particularly for pecuniary gain; rather, they believed that the public aspects of Petitioner's trial could have been useful in the future as a teaching tool (Addendum No. 5, Doc. 13, Vol. 2, p. 159). Ms. Rice further testified that the purpose of the agreement was to make sure that things were clear and that Petitioner understood that if a story about the trial was eventually told, no

attorney-client privileged information would be used, just public information (*Id.* at 159–60).

As previously noted, *Cuyler* requires a petitioner to show that an actual conflict of interest adversely affected his lawyer's performance. 446 U.S. at 348. The Supreme Court has held that "the mere possibility of a conflict is insufficient to impugn a criminal conviction." *Id.* at 350. Like the TCCA, the Court cannot find that Petitioner has carried her burden of proving that an actual conflict of interest affected her trial counsel's performance. As an initial matter, the TCCA's decision that it is improbable that a media release agreement signed after the completion of Petitioner's trial and sentencing could somehow have affected counsel's decisions during the trial is not an unreasonable determination of the facts. Any suggestion from Petitioner that the potential pecuniary benefit counsel could get from re-telling her story affected the adequacy of counsel's representation is merely speculative and such a "possibility" is not sufficient to meet the constitutional standard under *Cuyler*. In the absence of proving a conflict of interest under *Culyer*, the Court also agrees with the TCCA that Petitioner cannot show prejudice to meet her burden of proving ineffective assistance of counsel under *Strickland*. Because the TCCA did not incorrectly apply federal law, nor unreasonably determine the facts from the record before it, Petitioner is not entitled to habeas relief on this claim.

      **C.**    **Petitioner's attorneys were constitutionally ineffective during the guilt/innocence phase of her capital trial for failing to present evidence that Petitioner did not form the requisite *mens rea* for first-degree murder, and her rights under the Sixth, Eight, and Fourteenth Amendments to the United States Constitution were violated.**

Petitioner's next claim for relief alleges that trial counsel were ineffective for failing to present an effective case to undermine the state's proof of deliberate and premediated murder. Petitioner argues that this was as a result of two fundamental errors—to wit, failure to make appropriate use of expert witnesses, and failure to discover relevant lay testimony.

### 1. *Applicable Law*

As previously stated, the Supreme Court has set forth the test required to bring a successful ineffective assistance of counsel claim in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner claiming ineffective assistance of counsel under the Sixth Amendment must show that counsel's performance was deficient, and that this deficient performance prejudiced the defense. *Id.* at 687.[3]

### 2. *Discussion*

Petitioner challenged her trial counsel's effectiveness during the guilt phase of her trial to the TCCA, arguing that counsel presented scant evidence of her mental state during the crime only through Dr. Engum, and that his testimony was insufficiently substantiated. According to Petitioner, had trial counsel presented lay witness testimony, as well as provided Dr. Engum with Petitioner's social history, his testimony would have carried more weight with the jury. Petitioner also argued that counsel was ineffective for presenting Dr. Bernet as a witness because his testimony offered no apparent benefit to the defense. *Pike*, 2011 WL 1544207, at *61. In dismissing this claim, the TCCA found that Petitioner failed to carry her burden of establishing entitlement to relief. *Id.* Particularly, the TCCA held that Petitioner's argument that the jury would have credited Dr. Engum's testimony if it was supported by lay testimony was mere

---

[3] *See supra* Part III.A.1.

supposition, and was "not sufficient to substantiate a claim for post-conviction relief," because Petitioner "failed to argue how any specific lay witness would have sufficiently substantiated the testimony in order to improve its weight before the jury." *Id.*

Under *Strickland*, a petitioner claiming ineffective assistance of counsel must show both deficient performance and prejudice. 466 U.S. at 687–88. "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). To show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693 (internal citations omitted). Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 394. "A reasonable probability is something more than a 'conceivable effect' on the verdict but 'a probability to undermine confidence in the outcome.'" *Payne v. Warden, Lebanon Corr. Inst.*, 543 F. App'x 435, 489 (6th Cir. 2013) (citing *Strickland*, 466 U.S. at 693).

The TCCA held that Petitioner failed to show that she suffered prejudice because there was no evidence that supporting Dr. Engum's testimony with lay witnesses would have carried more sway with the jury. This decision is neither contrary to, nor an unreasonable application of, federal law. This is not a case where Petitioner's conviction was only weakly supported by the record; rather, in light of the compelling evidence supporting Petitioner's conviction in the record, the state court did not violate clearly

48

established federal law in rejecting Petitioner's ineffective assistance claim for lack of prejudice. Because Petitioner has failed to show prejudice under *Strickland*, the Court need not reach the issue of deficient performance. *See Strickland*, 466 U.S. at 697 (concluding that since both the prejudice and performance prongs must be met, if a petitioner cannot satisfy one prong, the other need not be examined). Petitioner is not entitled to relief on this claim.

### D. Imposition of the death penalty on Petitioner violates the Eighth Amendment to the U.S. Constitution because Petitioner is an immature, mentally ill, and brain-damaged eighteen-year old.

In her next claim for relief, Petitioner contends that *Roper v. Simmons*, 543 U.S. 551 (2005) and *Atkins v. Virginia*, 536 U.S. 304 (2002) support a categorical bar to the death penalty for immature, mentally ill, and brain-damaged eighteen year olds (Doc. 19). Petitioner argues that immature, mentally ill, and brain-damaged eighteen year olds face the same culpability limitations that the Supreme Court has found to plague minor and mentally retarded defendants and, as such, the same exemption should be extended to them.

In addressing and dismissing this claim, the TCCA engaged in an extensive examination of applicable Supreme Court precedent, including *Roper* and *Atkins*. *See Pike*, 2011 WL 1544207, at *62–68. The TCCA found that Petitioner failed to persuade the court that a new national consensus exists to extend the holding of *Roper* to persons over the age of eighteen, or that there is a consensus in state legislation supporting a categorical exclusion for the mentally ill. *Id.* at *67–68. In conclusion, the TCCA stated:

> While this court appreciates the novelty of the Petitioner's argument, practicality precludes its acceptance. The court can envision a multitude of specifically created exemptions based upon the unique circumstances of an individual defendant. These particular circumstances were not what

was envisioned as being encompassed within a categorical bar. Rather, this specific grouping of traits is captured within the individualized sentencing mandate of the capital sentencing scheme.

*Id.* at *68.

As previously outlined, a federal court may not grant habeas relief under § 2254(d) unless the petitioner shows that the "state court's decision was contrary to federal law then clearly established in the holdings of [the Supreme Court]; or that it involved an unreasonable application of such law; or that it was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (internal citations and quotation marks omitted). This standard is highly deferential and difficult to meet. *Id.* at 102. Having found that the TCCA identified the proper governing Supreme Court precedent, the Court must determine whether the TCCA's decision was an unreasonable application of the law, or an unreasonable determination of the facts. The proper inquiry here is not whether the state court's decision was merely erroneous or incorrect, but whether it was "objectively unreasonable." *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004) (citing *Middleton v. McNeil*, 541 U.S. 433 (2004)).

While a state court's unreasonable refusal to extend a legal principle from Supreme Court precedent to a new context may be considered an unreasonable application of § 2254(d), *see Williams v. Taylor*, 529 U.S. 3632, 407 (2000), that is not the case here. The TCCA engaged in a thorough analysis of the law and the facts in the record before it. Its decision was neither an unreasonable application of the law, nor was it an unreasonable determination of the facts. Petitioner is, therefore, not entitled to relief on this claim.

**E.  Trial court's dismissal of a qualified juror denied Petitioner of her right to trial by a fair jury.**

Petitioner's next claim alleges that her right to a fair jury was violated because the trial court dismissed potential juror Rutherford for cause even though he was qualified to serve (Doc. 19). Petitioner's claim here is based on the same facts under which she alleged ineffective assistance of counsel for trial counsel's failure to object to Juror Rutherford's dismissal. According to Petitioner, Juror Rutherford never said that he would be unable to follow instructions and conscientiously follow the law, and that the trial court never told Juror Rutherford that Petitioner's youth was a statutory mitigating factor (*Id.*). Furthermore, Petitioner argues that Juror Rutherford's hesitation to impose the death penalty here was constitutionally permissible because he could accord as much weight as he desired to Petitioner's age and immaturity as mitigating factors (*Id.*).

The TCCA addressed this claim together with Petitioner's claim for ineffective assistance of counsel for failure to conduct a meaningful *voir dire* of potential jurors. Analyzing *Witherspoon* and *Wainwright*, the TCCA found that Juror Rutherford was properly excused for cause. In *Witherspoon v. Illinois*, the Supreme Court held that a state cannot strike a potential juror merely because that juror has a conscientious or religious opposition to capital punishment, or all who opposed it on principle, if that juror could, nevertheless, consider the punishment. 391 U.S. 510, 520–23 (1968). In *Wainwright v. Witt*, the Court clarified its holding in *Witherspoon*, and stated that the "standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. 412, 424 (1985) (internal quotation marks omitted). The Court further stated that "the quest is for jurors who will conscientiously apply the law and find the facts.

That is what an 'impartial' jury consists of, and we do not think, simply because a defendant is being trying for a capital crime, that he is entitled to a legal presumption or standard that allows juror to be seated who quite likely will be biased in his favor." *Id.* at 423.

During the *voir dire* of Juror Rutherford, the trial court explained to him that he would be instructed as to the factors he may consider, which may include age, and that he would be instructed on the mitigating and aggravating circumstances (Addendum No. 2, Doc. 16, Vol. 16, p. 1511). The court then asked him if the one issue of Petitioner's age would keep him from following the court's instructions (*Id.*). In follow up, the state asked if he absolutely could not return a sentence of death solely because of Petitioner's age, and he answered that he did not think he could (*Id.* at 1512). In an attempt to clarify his stance, Petitioner's trial counsel asked juror Rutherford if regardless of any aggravating circumstance that was proven in this case, he would still not be able to vote for the death penalty (*Id.* at 1514). Juror Rutherford answered that he did not think he could (*Id.*).

Based on the standard set forth in *Wainwright*, the TCCA did not unreasonably determine the facts based on the record before it. While Juror Rutherford did not express a hesitation to impose the death penalty in every single case, he implied on more than one occasion that he could not follow the court's instructions to weigh the aggravating circumstances against the mitigating circumstances to reach a decision on the applicability of the death penalty in this case. In certain cases, "it does not make sense to require simply that a juror not 'automatically' vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory

scheme." *Wainwright*, 469 U.S. at 422. As the Court previously found with respect to Petitioner's ineffective assistance of counsel claim, the TCCA's decision was not an unreasonable application of clearly established law; therefore, Petitioner is not entitled to relief on this claim.

### F. Appointment of counsel with active conflict of interest known to trial court violated Petitioner's Sixth Amendment right to counsel.

Next, Petitioner alleges that the state court's appointment of Mr. Talman, knowing that he had a high risk of a conflict of interest, constitutes a structural error and requires that her conviction and sentence be set aside (Doc. 19 p. 84). Petitioner appears to argue that the TCCA, by finding that no conflict of interest existed because of Petitioner's failure to show prejudice, failed to address the structural nature of the claim (*Id.* at 85). Petitioner further argues that although this claim has not been procedurally defaulted, there is no state court decision to defer to, and the Court must address it *de novo* (*Id.*).

Petitioner is correct that where a petitioner has demonstrated that an actual conflict of interest exists, that petitioner need not demonstrate prejudice because the conflict itself demonstrates a denial of the right to have ineffective assistance of counsel. *Glasser v. United States*, 315 U.S. 60, 72 (1942). However, Petitioner incorrectly states that the TCCA dismissed her claim based solely on her failure to show prejudice. In its opinion, the TCCA clearly credited the post-conviction court's finding that the proof did not establish an actual conflict of interest which adversely affected lead counsel's performance. *Pike*, 2011 WL 1544207, at *47. The TCCA went on to state that "Petitioner offers only speculation as the reason for 'counsel's penalty phase collapse.' This speculation as to what might have been the reason for the decisions made is not

sufficient [to] meet her burden of establishing that a conflict excused." *Id.* at *48. It is clear from the TCCA's opinion that it directly addressed the merits of Petitioner's structural claim by finding that no actual conflict of interest existed.

As the Court has previously found, this decision is not contrary to or an unreasonable application of clearly established federal law, and was reasonably supported by the evidence presented to the state court. Petitioner is not entitled to habeas relief on this claim.

> **G.  Allowing television and photographic coverage of the pretrial proceedings violated Petitioner's rights to due process under the Fourteenth Amendment to the U.S. Constitution.**

Petitioner next argues that her due process rights were violated because the trial court allowed television and photographic coverage of the pretrial proceedings in her case (Doc. 19). According to Petitioner, this extensive pretrial publicity, which continued throughout the trial, made jury selection extremely difficult and resulted in a jury panel that was already familiar with the facts of the case as reported by the media (*Id.*). Petitioner presented this claim to the TCCA and the TSC on direct appeal.

Petitioner now argues that the TSC failed to engage in a fact-specific analysis of the effect of continuing media coverage in her trial, and that to the extent that it did, its analysis was unreasonable (*Id.*). The TSC found that Petitioner failed to point to any portion of the record or offer specific evidence indicating how witness testimony was affected or the proceedings disrupted, that Petitioner did not explain how media coverage of the crime would have been less intense had cameras been excluded from the courtroom, and that there was generally no indication from the transcripts that the media coverage itself was disruptive or that any disruptive events occurred during the proceedings. *Pike*, 978 S.W.2d at 917. Citing to *Chandler v. Florida*, 449 U.S. 560, 581–

82 (1981), the TSC concluded that Petitioner failed to show either that the media coverage of the pretrial and trial proceedings impaired the jurors' ability to decide the case on the evidence alone, or adversely impacted one or more of the trial participants. *Pike*, 978 S.W.2d at 917.

In *Chandler*, the Supreme Court refused to promulgate a *per se* constitutional ban on photographic or broadcast coverage of criminal trials, finding that "[a]n absolute ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter." 449 U.S. at 575. Rather, the Court held that a defendant must show that media coverage compromised the ability of the jury to judge him fairly, or in the alternative, that the "broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 581.

As the state court noted, Petitioner has not pointed to any evidence that leads the Court to infer that the media coverage had an adverse impact on her trial. "To demonstrate prejudice in a specific case, a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters." *Id.* Petitioner has not done so here. Petitioner further argues that the state court's reliance on *Chandler* is misguided because the Supreme Court limited its holding in that case to the authority of the Florida Supreme Court to promulgate the rule allowing media coverage of judicial proceedings, and did not examine the application of such a rule to specific facts (Doc. 19). While the Supreme Court noted its limitation with exercising supervisory jurisdiction over state courts, *Chandler*, 449 U.S. at 570, the Court did not limit its holding to the extent Petitioner contends it did. Rather, the Court set out the

55

standard for determining whether a petitioner has shown prejudice from media presence during pretrial and trial proceedings, which the state court correctly applied in Petitioner's case. The TSC decision was not an unreasonable application of clearly established federal law; as such, Petitioner is not entitled to relief on this claim.

### H. Trial court's denial of Petitioner's motion for a change of venue denied Petitioner of her right to a fair and impartial jury.

Petitioner's eighth ground for habeas relief asserts that the trial court erred by failing to grant her motion for a change of venue (Doc. 19). Petitioner argues that the extensive pretrial publicity generated in her case exposed an overwhelming majority of the prospective jurors to detailed information about the case, and that *voir dire* indicated that many of the jurors remembered specific details (*Id.*). Petitioner presented this claim on direct appeal to the TCCA and TSC. Although the TSC did not specifically address the claim, it expressly adopted the findings of the TCCA. *Pike*, 978 S.W.2d at 923. The TCCA, citing to *Irwin v. Dowd*, 366 U.S. 717 (1961), found that every juror who admitted to familiarity with the case said that he or she could disregard the reports and make an impartial decision. *Pike*, 978 S.W.2d at 924. The TCCA also found that Petitioner had failed to cite any specific response from any seated juror that was troublesome. *Id.*

The decision of the state court was neither contrary to, nor did it involve an unreasonable application of, federal law. In *Irwin*, the Supreme Court found that because of the "pattern of deep and bitter prejudice shown to be present throughout the community," very little weight could be given to each juror's declaration to remain impartial. *Irwin*, 366 U.S. at 727–28. Regardless, the Court acknowledged that in general,

> [i]t is not required, however, that the jurors be totally
> ignorant of the facts and issues involved. In these days of
> swift, widespread and diverse methods of communication, an
> important case can be expected to arouse the interest of the
> public in the vicinity, and scarcely any of those best qualified
> to serve as jurors will not have formed some impression or
> opinion as to the merits of the case. This is particularly true
> in criminal cases. To hold that the mere existence of any
> preconceived notion as to the guilt or innocence of an
> accused, without more, is sufficient to rebut the presumption
> of a prospective juror's impartiality would be to establish an
> impossible standard. It is sufficient if the juror can lay aside
> his impression or opinion and render a verdict based on the
> evidence presented in court.

*Irwin*, 366 U.S. at 722.

The TCCA found that all potential jurors who said they could not disregard the reports were excused for cause. The Court cannot find that this decision was an unreasonable determination of the facts based on the record before the TCCA. While Petitioner alleges that several potential jurors remembered specific facts about her case, she has not shown the "actual existence of such an opinion in the mind of [a] juror as will raise the presumption of partiality." *Id.* at 723. As such, Petitioner is not entitled to relief on this claim.

I.    **The new law concerning the number of peremptory challenges awarded to the State constituted an *ex post facto* change in violation of Petitioner's right to a fair and impartial jury.**

Petitioner next argues that her right to an impartial jury was violated because the trial court applied a new law that gave the prosecution the same number of peremptory challenges as the defense. According to Petitioner, because this law was not in effect at the time the crime was committed, its application to her case constituted an *ex post facto* violation. The TCCA addressed this claim on direct appeal and found that there

was no *ex post facto* violation, because the law was a procedural change and did not affect Petitioner's substantial rights.

In *Dobbert v. Florida*, the Supreme Court held that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." 432 U.S. 282, 293 (1977); *see also Miller v. Florida*, 482 U.S. 423, 433 (1987), *abrogated on other grounds by Peugh v. United States*, 133 S. Ct. 2072 (2013) ("[N]o *ex post facto* violation occurs if the change in the law is merely procedural and does not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt."). Applying *Dobbert*, the TCCA found that the trial court merely applied a procedural rule that had been amended after the commission of the crimes in question. *Pike*, 378 S.W.2d at 926.

The law giving the prosecution the same number of peremptory strikes as the defense was a procedural rule that merely implicated the number of jurors the prosecution could strike without cause. The law did not effect a change in the quantum of punishment attached to Petitioner's crime. The Court finds that the TCCA's decision denying this claim was neither contrary to, nor was it an unreasonable application of clearly established law.

**J.     The Tennessee death penalty scheme violates the Eighth Amendment to the United States Constitution.**

      1.      *Tennessee's death penalty scheme fails to meaningfully narrow the class of death eligible defendants.*

      2.      *The death penalty is imposed capriciously and arbitrarily under the Tennessee statute*

      3.      *Execution by Tennessee's protocol for lethal injection would violate Petitioner's rights under the Eighth and Fourteenth Amendments*

4. *The death sentence is unconstitutional because it infringes on Petitioner's fundamental right to life, and imposition of the death penalty is not necessary to promote any compelling state interest.*

5. *The indictment returned by the Grand Jury was unconstitutional*

Petitioner contends that Tennessee's death penalty scheme is unconstitutional for the foregoing reasons. However, she has failed to cite any authority holding the Tennessee Death Penalty Act unconstitutional and the Court notes that the Sixth Circuit has held that Tennessee's death penalty statute is constitutional. *Workman v. Bell*, 178 F.3d 759, 778 (6th Cir. 1998); *see also Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990) (holding that the Eighth Amendment is satisfied by a scheme that mandates a death penalty if a jury finds one aggravating circumstance and no mitigating ones or none that outweigh it).

The TCCA rejected Petitioner's allegations that the death penalty scheme is unconstitutional, finding that the TSC has repeatedly upheld Tennessee's proportionality review as meeting constitutional standards, that Tennessee's lethal injection protocol is consistent with contemporary standards of decency, and that the United States Constitution does not require the state to charge aggravating factors to be relied upon in the indictment. *Pike*, 2011 WL 1544207, at * 69–70. This decision is not contrary to clearly established law; Petitioner is not entitled to relief on this claim.

**K. The cumulative effect of all the errors which occurred during Petitioner's trial constituted a denial of her due process rights.**

Petitioner's final claim alleges that the cumulative effect of the errors that occurred during her trial demonstrates a fundamental denial of due process of law. This claim lacks merit.

The Supreme Court has not held that a district court may look to the cumulative effects of trial courts in deciding whether to grant habeas corpus relief. *See Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may be it binds us."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."). As such, Petitioner is not entitled to relief on this claim.

## V.    CONCLUSION

For the reasons stated above, the Court finds that Petitioner is not entitled to relief under 28 U.S.C. § 2254 and her motion for partial summary judgment (Doc. 45) will be **DENIED**. Respondent's motion for summary judgment (Doc. 42) will be **GRANTED**, and the petition for a writ of habeas corpus (Doc. 19) will be **DENIED**.

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a Certificate of Appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a petitioner has made a showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). Where a claim has been dismissed on

the merits, a substantial showing is made if reasonable jurists could conclude that the issues raised are adequate to deserve further review. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim has been dismissed on procedural grounds, a substantial showing is demonstrated when it is shown that reasonable jurists would debate whether a valid claim has been stated and whether the court's procedural ruling is correct. *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that reasonable jurists could not conclude that Petitioner's claims are adequate to deserve further review, nor would reasonable jurists debate the correctness of the Court's procedural ruling. As such, because Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.


**A SEPARATE JUDGMENT ORDER WILL ISSUE**.


                               */s/ Harry S. Mattice, Jr.*
                               HARRY S. MATTICE, JR.
                               UNITED STATES DISTRICT JUDGE