**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 1:12-CV-35** |
| **v.** | ) | |
| | ) | **DEATH PENALTY CASE** |
| **JORDAN CLARK, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**THIS IS A CAPITAL CASE.**
**MS. PIKE IS SCHEDULED TO BE EXECUTED**
**SEPTEMBER 30, 2026 at 10:00 a.m. CDT**

---

# MOTION TO REOPEN JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)

---

COMES NOW the Petitioner in the above-styled case and hereby respectfully moves this Court to reopen the judgment in this case pursuant to Fed. R. Civ. P. 60(b)(6).

## I. INTRODUCTION

This is an extraordinary case. On August 13, 2026, the State of Tennessee conceded for the first time in thirty years that Ms. Christa Pike had been the victim of child sexual abuse and rape, stating: "The State does not dispute the terrible things that Ms. Pike suffered. I think everybody in this courtroom wishes that those things had never happened to Ms. Pike. I think we all wish that we were not here today and that she was not on death row…. And so it's certainly not the State's intention to try to minimize the suffering that Ms. Pike has experienced." Expedited Transcript of

the Evidence at 82–83, *Tennessee v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. Aug. 13, 2026). This is the first time in the history of Ms. Pike's case that the State has conceded her history of child sexual abuse and rape. Indeed, the State called Ms. Pike a "pathological liar" in earlier proceedings in this case, 1 Transcript of the Evidence at 300, *Pike v. Tennessee*, No. 68280 (Tenn. Crim. App. Apr. 25, 2011) [hereinafter "PC Tr."], and argued that she had fabricated her account of rape by Claude Davis. *Id*. at 305-311.

The State's recent concession is diametrically opposed to the arguments it put forward in prior proceedings—arguments that directly contributed to this court's decision to reject Ms. Pike's ineffective assistance of counsel claim. Combined with the documentary evidence and reports on the nature, consequences, and impact of the gender-based violence experienced by Ms. Pike, the State's concession erodes the foundation of the state post-conviction court's 2008 judgment rejecting her ineffective assistance of counsel claim, as well the opinions of the Tennessee Court of Criminal Appeals and Tennessee Supreme Court that relied upon those findings. It also vitiates the decision of this Court to deny her ineffective assistance of counsel challenge, the affirmance by the Court of Appeals for the Sixth Circuit, and the decision by the U.S. Supreme Court to deny certiorari.

For the reasons set forth below, Ms. Pike respectfully moves this Court to grant relief under Rule 60(b)(6) and reopen its judgment denying habeas relief.

## II. RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A. Procedural History

In 1996, a jury convicted Ms. Pike of first-degree murder and sentenced her to death. *State v. Pike*, 978 S.W.2d 904, 913-14 (Tenn. 1998). The Supreme Court of Tennessee at Nashville affirmed her conviction and sentence on direct appeal. *Id*. at 914. Ms. Pike sought post-conviction

relief on the grounds, *inter alia*, that her trial and appellate counsel were ineffective because of their failure to present readily available information about Ms. Pike's history of abuse and neglect, including her childhood sexual abuse and rapes. Appellant's Merits Brief to Tennessee Criminal Court of Appeals, at 37-39, 93, 105-6, *Pike v. Tennessee*, E2009-00016-CCA-R3-PD (Tenn. Crim. App. Sept. 28, 2009).

The post-conviction court rejected Ms. Pike's claim of ineffective assistance of trial and appellate counsel. Findings of Fact and Conclusions of Law, *Pike v. Tennessee*, No. 68280, at 76, 89-91 (Knox Cnty. Crim. Ct. Dec. 10, 2008). As detailed below, the court discredited Ms. Pike's history of repeated, severe child sexual abuse and rape after the state repeatedly called Ms. Pike a "pathological liar" and suggested that she was making up her history of sexual abuse and rape. The Tennessee Court of Criminal Appeals affirmed the denial of state post-conviction relief, *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *1 (Tenn. Crim. App. Apr. 25, 2011), *cert. denied*, 568 U.S. 827 (2012), based on the post-conviction court's findings.

This Court denied relief, *Pike v. Freeman,* No. 1:12-CV-35, 2016 WL 1050717 (E.D. Tenn. Mar. 11, 2016), and the United States Court of Appeals for the Sixth Circuit affirmed. *Pike v. Gross*, 936 F.3d 372, 374-75 (6th Cir. 2019), *cert. denied*, 590 U.S. 978 (2020). In adjudicating Ms. Pike's ineffective assistance of counsel claim, this Court presumed the correctness of the state court's decision and found that it was neither contrary to nor involved an unreasonable application of federal law. *See Pike v. Freeman*, 2016 WL 1050717 at **9, 15; 28 U.S.C. §§ 2254(d); 2254(e)(1).

On September 30, 2025, the Tennessee Supreme Court issued an order setting Ms. Pike's execution for September 30, 2026. Order, *State v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. Sept. 30, 2025).

On June 12, 2026, Ms. Pike filed a "Motion and Request to Appoint a Special Master Pursuant to Tenn. Sup. Ct. R. 12(4)(E)," raising facial and as-applied challenges to Tennessee's lethal injection protocol. The Tennessee Supreme Court appointed a special master to conduct an evidentiary hearing and make findings of fact and conclusions of law on five specified issues. Order, *State v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. July 10, 2026). At the conclusion of the two and a half days' hearing, the State made an extraordinary admission conceding for the first time that Ms. Pike has been the victim of childhood sexual abuse and rape. Expedited Transcript of the Evidence at 82–83, *Tennessee v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. Aug. 13, 2026).

The special master issued his report on August 20, 2026. After Ms. Pike filed objections to the report on August 27, 2026, the parties submitted briefing on the remaining issues. Despite the State's concession, on September 23, 2026, the Tennessee Supreme Court denied Ms. Pike a stay of execution because it concluded she is unlikely to succeed on her facial and as-applied challenges to the lethal injection protocol. Order, *Tennessee v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. September 23, 2026). Ms. Pike filed a petition for certiorari in the United States Supreme Court seeking review of the Tennessee's Supreme Court's decision. Petition for writ of certiorari, *Pike v. Tennessee*, No. 26-5696 (U.S. Supreme Court Sept. 25, 2026).

## B. Factual History

### 1. The State of Tennessee Now Concedes the Following Facts Regarding Ms. Pike's History of Child Sexual Abuse and Rape.

From August 11–13, 2026, a Special Master appointed by this Court pursuant to Rule 12 held an evidentiary hearing about the state's lethal injection protocols as applied to Ms. Pike. During the hearing, the Special Master heard testimony and received reports from Dr. Bethany Brand, an expert on the traumatic impact of sexual violence and adverse childhood experiences.

*See* R. 12 Tr. Vol. 4 (Aug. 12, 2026); Exs. 16 (Forensic Psychological Evaluation, July 29, 2023), 17 (Addendum Report, June 1, 2026), and 18 (Second Addendum, August 4, 2026). Dr. Brand's testimony, report, and addenda established the following facts.

Dr. Brand testified that rape and sexual abuse pervaded Christa's childhood and adolescence. By the time she was seventeen, Christa had been raped by four different men and sexually abused by another. R. 12 Tr. Vol. 4 at 324–26, 330, 335; Ex. 16 at 23. These men eroded her sense of safety and irrevocably damaged her mental health. Ex. 16 at 22, 28, 35.

Christa was just a toddler when her paternal grandmother's boyfriend, Ernest Johnson, sexually assaulted her for the first time. R. 12 Tr. Vol. 4 at 324. His sexual abuse continued for years, escalating to oral rape when she was in preschool. *Id.* He ensured Christa's silence by threatening to kill her beloved pets and her grandmother. *Id.* He once thrust her into a chicken coop, locked the door, and left her huddled in the dark while spiders crawled over her skin and bit her. *Id.*; Ex. 16 at 10.

To her child's eyes, Ernest's genitalia seemed monstrous. In elementary school, a teacher asked the children to draw what they did at home. Christa drew a man with "a huge penis and demon face." Ex. 16 at 10. Alarmed, Christa's teachers took her to the principal and called her parents, but no one investigated further.[1] *Id.*; R. 12 Tr. Vol. 4 at 325. To this day, Christa can recall the smell of Ernest Johnson's genitalia. *Id.* at 330. At the hearing, Dr. Brand described the significance of this sensory memory:

> I actually saw with my own eyes that she dissociates to this day because of the earlier traumas. I also saw signs of disgust when I asked about trauma exposure.

---

[1] Christa's drawing was a red flag signaling sexual abuse. Today, Tennessee trains mandatory reporters—including teachers—that children who are preoccupied by sexually explicit images may be experiencing sexual abuse at home. *See* Tenn. Dpt. of Children's Services, Mandated Reporter Training Video, at 5:03 (available at https://www.tn.gov/dcs/program-areas/training/cw-resources/mandated-reporter-training.html).

> She told me about what Ernest did, and trauma memories are different than regular memories. They present with sensory intensity and fragments. So as she talked about what Ernest did to her as a very little girl, she didn't tell me the whole coherent story. Instead she showed a disgust response, like I--I'm imitating it. She said, "I can still smell his genitals." And she had this look of utter disgust on her face. That is demonstrated PTSD reactivity and the intrusiveness of the sensory memory of trauma.

*Id.* at 330–31.

At age 11, Christa was in fifth grade at Carrboro Elementary School. On November 3, 1987, the school bus dropped Christa off near her mother's home. When Christa arrived, her mother was at work and the house was empty. McCoy Social History Vol. 1, *Tennessee v. Pike* 7472, 7479, No. 68280, Knox Cnty. Crim. Ct. (2007); Exhibit 5 (Claude Davis Criminal Court records), *Pike v. Tennessee*, No. 68280, Knox Cnty. Crim. Ct. (2007) [hereinafter "PC Tr. Exhibit 5"]. As she was walking to the mailbox, a 37-year-old neighbor named Claude Davis grabbed her, held her down, and raped her. Ex. 16 at 12; PC Tr. Exhibit 5. Davis was arrested and eventually pleaded "no contest" to "assault on a child under twelve years of age." PC Tr. Exhibit 5. He received a sentence of two years' imprisonment, which was suspended for a term of five years. *Id.* After the rape, Christa was afraid and hypervigilant. "I thought he'd get me again," Christa told Dr. Brand. Ex. 16 at 12.

At the time Davis raped her, Christa was already struggling with the consequences of long-term sexual abuse by Ernest Johnson. She had developed a series of behavioral issues that all experts today would recognize as symptomatic of such abuse. She wet the bed every night until she was in first grade. Ex. 16 at 8. She had trouble concentrating in school and began acting out.[2] *Id.* at 14.

---

[2] This is commonplace in survivors of childhood sexual abuse, which—as Supreme Court Justice Samuel Alito recognized—is "grossly intrusive in the lives of children." *Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) (Alito, J., dissenting) (citation modified). The U.S. Department of Health and Human Services explains: "Abused and neglected children sometimes get the reputation for

After she was raped by Davis, her symptoms worsened. Christa began to regularly use marijuana and alcohol to numb her feelings of despair. *Id.* at 13. She began cutting herself. *Id.* She attempted suicide. *Id.* at 14.[3] By late adolescence, she was running away from home for extended periods and was occasionally living on the streets.[4] Ex. 16 at 16.

On January 14, 1994, Christa was walking to the store at night, alone, when she was grabbed by a stranger, thrown to the ground, and raped. Ex. 16 at 17; Ex. 17 (Brand Addendum) at 225A; Ex. 19 (Carrboro Police records); Ex. 20 (Univ. of North Carolina Hospital Records). She was 17 years old. Ex. 16 at 17; Ex. 17 at 225A. Christa fought him as hard as she could. Ex. 16 at 17. He tore her clothes off and forced himself on her so violently that he bruised and scraped her entire body. Ex. 20; Ex. 17 at 225A–226A. As he was raping her, Christa managed to escape. Ex. 16 at 17. Christa immediately went to a friend's house, who called the police and took her to a hospital, where the staff collected a rape kit and documented bruising on Christa's upper inner thigh and abrasions on her chest and knee. Ex. 17 at 225A; Ex. 20. Weeping and hysterical, she

---

being 'bad kids' or extremely difficult to control or understand. Research suggests that challenging behavior is often a cry for help that concerned adults need to learn to decode." Health & Hum. Serv., *The Role of Educators in Preventing and Responding to Child Abuse and Neglect* 13 (2003), https://www.icmec.org/wp-content/uploads/2015/10/Role-of-EducatorsPrevention-Booklet-US.pdf.

[3] Tennessee's Department of Children's Services teaches mandatory reporters that suicidal ideation and self-injury/cutting are symptoms of sexual abuse in children. *See* Tenn. Dpt. of Children's Services, Mandated Reporter Training Video, *supra* note 1, at 5:09.

[4] Experts have long observed that abused children are apt to engage in "risky behaviors." Paradoxically, these symptoms of abuse leave them vulnerable to repeated victimization. Moreover, research has shown that "sexual violence [is] a risk for girls throughout their lives, though particularly during adolescence." Human Rights Project for Girls, *The Sexual Abuse to Prison Pipeline: The Girls' Story* 9 (2015), https://genderjusticeandopportunity.georgetown.edu/report/the-sexualabuse-to-prison-pipeline-the-girls-story/ (citation omitted).

told the police what happened, but the perpetrator was never identified or caught. *Id.*; Ex. 20 (noting that Ms. Pike was "[t]earful, very upset while telling story").

The State did not contest this evidence during the hearing. After the testimony concluded, the State expressed sympathy and concern for Ms. Pike and stated unequivocally that it "does not dispute the terrible things that Ms. Pike suffered." R. 12 Tr. Vol. 1 at 82–83 (Aug. 13, 2026). As detailed below, this concession is a marked departure from the litigation position taken by the state during state post-conviction proceedings.

**SUMMARY OF ARGUMENT**

Ms. Pike's death sentence is the product of the following series of extraordinary events:

1. Ms. Pike's attorney failed to present *any* evidence of Ms. Pike's childhood sexual abuse and rapes during the sentencing phase of her trial proceedings. Before she was eighteen, she would be violently raped by three different men. Two of the three rapes are documented by record evidence.

2. In state post-conviction proceedings, the state vigorously contested Ms. Pike's documented history of sexual violence, calling her a "pathological liar," characterizing her as a sexually promiscuous teenager, and repeatedly suggesting that she either invented or invited the rapes she experienced.

3. The post-conviction court embraced the state's characterization of Ms. Pike's childhood sexual abuse and rapes when making its factual determinations, dismissing the conclusions of mental health experts because their opinions were based on what Ms. Pike told them, erroneously finding that a perpetrator of one rape was "arrested but not convicted," highlighting that Ms. Pike was "promiscuous," and describing information about Ms. Pike's

childhood sexual abuse as "problematic" because her family members did not believe her. These arguments invoked now-debunked notions about sexual assault victims.

4. These factual findings formed the basis for the post-conviction court's unreasonable legal conclusion that Ms. Pike had failed to establish a violation of *Strickland v. Washington,* 466 U.S. 668 (1984). The post-conviction court unreasonably concluded that the evidence of Ms. Pike's rapes was double-edged, and that trial counsel's decision not to present the evidence was not reasonable.

5. Ms. Pike then raised her ineffective assistance of counsel claims in her federal habeas proceedings. The Supreme Court and the Sixth Circuit have held that the failure to present evidence of child sexual abuse and rape constitutes ineffective assistance counsel. *See Wiggins v. Smith,* 539 U.S. 510, 535 (2003) (finding counsel ineffective for failing to present "powerful" mitigating evidence of "sexual molestation" and "repeated rape"); *Foust v. Houk*, 655 F.3d 524, 543 & n.9 (6th Cir. 2011) (finding that trial counsel was ineffective for failing to present evidence of child sexual abuse in home and that such evidence was not cumulative). This Court, however, deferred to the unreasonable findings of the post-conviction court that were tainted by the state's (now abandoned) litigation posture.

6. In rejecting Ms. Pike's ineffective assistance of counsel claim, this Court further held that evidence adduced during the state post-conviction hearing—including the documented evidence of her child sexual abuse and rape—was cumulative of evidence presented during trial. *Pike v. Freeman*, 2016 WL 1050717 at *15. Yet in *Foust*, the Sixth Circuit held that evidence of sexual abuse in the home—even in the case of a defendant who was not a direct victim of such abuse—was not cumulative of other mitigating evidence. 655 F.3d at 543 & n.9.

7. On August 13, 2026, the state for the first time conceded that Ms. Pike had been the victim of childhood sexual abuse and rapes, stating unequivocally that "[t]he State does not dispute the terrible things that Ms. Pike suffered" and "it's certainly not the State's intention to try to minimize the suffering that Ms. Pike has experienced."

8. As a result of the State's invocation of false and gendered tropes during state post-conviction proceedings, buttressed by the post-conviction court's misreading of documentary evidence, no court has fairly considered the import of trial counsel's failure to present Ms. Pike's history of extreme sexual violence to the jury. As a result, the courts have upheld her death sentence notwithstanding the clear directives of the Supreme Court and the Sixth Circuit in *Wiggins* and *Foust.* Executing Ms. Pike in the absence of such review would be a grave and irreparable miscarriage of justice.

## II. FED. R. CIV.P. 60(b) IS THE APPROPRIATE PROCEDURAL MECHANISM FOR THE LITIGATION OF MS. PIKE'S CLAIM

### A. Ms. Pike's Motion Asserts a Defect in the Integrity of the Federal Habeas Proceeding.

District courts have jurisdiction to consider Rule 60(b) motions in habeas proceedings when such motions "attack[ ] not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceeding." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). In this motion, Petitioner asks the Court to reopen and set aside its earlier judgment based on the State's now-abandoned litigation posture, a posture that tainted the integrity of the state court record that undergirds this Court's judgment.

Rule 60(b)(6) allows a party to seek relief "from a final judgment, order, or proceeding" and request reopening of a case for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This Rule "vests power in courts … to enable them to vacate judgments whenever such action is

appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 615 (1949); *see also Henness v. Bagley*, 766 F.3d 550, 554 (6th Cir. 2014) ("'The decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts.'" (*quoting McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 750 (6th Cir.2013), cert. denied, 571 U.S. 1161 (2014)). Indeed, Rule 60(b)(6) "reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)); *see also Tanner v. Yukins*, 776 F.3d 434, 438 (6th Cir. 2015); *Johnson v. Bell*, 605 F.3d 333, 336 (6th Cir. 2010) (stating that Rule 60(b) "is inherently equitable in nature," and "empowers district courts to revise judgments when necessary to ensure their integrity").

Ms. Pike's Rule 60(b)(6) motion meets this jurisdictional prerequisite. In her state post-conviction petition, Ms. Pike alleged that her trial counsel was ineffective for failing to present extensive mitigating evidence, including documented evidence of Ms. Pike's prior rapes. Under 28 U.S.C. § 2254(e)(1), federal courts must defer to state court adjudications on the merits. AEDPA's instructions are unequivocal:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e)(1). Moreover, under 28 U.S.C. § 2254(d), federal courts must not disturb state court rulings on the merits of claims brought in post-conviction proceedings unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Thus, AEDPA imposes barriers to federal court review of state court merits decisions in habeas proceedings that are mandatory and unequivocal. These barriers foreclose federal habeas review much like the procedural bars cited by the Court in *Gonzalez,* 545 U.S. at 532 n.4 (holding that a petitioner's 60(b) motion does not raise a new "claim" when he "merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar").

**B. This Court Denied Ms. Pike's Ineffective Assistance of Counsel Claim Because it was Required to Defer to the State Post-conviction Court's Tainted Findings Under AEDPA.**

Under AEDPA, this Court accorded a presumption of correctness to factual findings and conclusions of law tainted by specious arguments that the State of Tennessee has now abandoned. To understand the extent to which the state's litigation posture affected the post-conviction court's findings, it is necessary to briefly recount the evidence and argument presented during a hearing held by the state post-conviction court in 2007.

During the state evidentiary hearing, Ms. Pike presented evidence recounting the physical abuse, sexual abuse and rapes she endured throughout her childhood and adolescence. Dr. Jonathan Pincus testified in detail about the sexual violence Ms. Pike experienced and concluded that Ms. Pike had developed Post-Traumatic Stress Disorder as a result. *See* PC Tr. Vol. 3 at 257–59, 263–65, 268, 295–96.

The state vigorously contested Dr. Pincus' conclusions during its cross-examination, repeatedly calling Ms. Pike a "pathological liar." "[Ms. Pike] has lied from day one and she's been a pathological liar," counsel argued. *Id.* at 288. "And yet you're relying on that pathological liar

to render your opinion, isn't that true, Dr. Pincus?" *Id.* at 300. The state then engaged in a lengthy and heated debate with Dr. Pincus about whether Christa was actually raped by Claude Davis when she was 11 years old. *See* PC Tr. Vol. 4 at 304–11.

The state began by casting doubt on children's credibility: "You're aware, are you not, that any child can come forward and allege things and cause a warrant to be taken out, but there has to be some finding to conclude that it actually happened?" *Id.* at 307. The State questioned whether she was penetrated, asking if there was "any other physical evidence that corroborated [Ms. Pike's] story." *Id.* at 308–09. Finally, the State argued that Davis's guilty plea to a lesser crime indicated that no rape took place. *Id.* at 309. In a lengthy colloquy, the State sought to convince Dr. Pincus and the court that the plea—and the light sentence imposed by the court—disproved the eleven-year-old's account of what happened.

> Q: Would it disturb you to know that he never spent a day in prison for this crime?
>
> A: Was he found guilty and given a suspended sentence for two years?
>
> Q: He received a suspended sentence, exactly.
>
> A: Oh! He was found guilty!
>
> Q: No, he was –
>
> A: A suspended sentence is a sentence.
>
> Q: -he was actually allowed—he was found guilty of sexual assault. He was not found guilty of the sexual penetration . . . that you say conclusively happened, Dr. Pincus.
>
> A: He was found guilty of a sexual assault and give [sic] two years suspended sentence, and you won't agree—you don't agree that that happened?
>
> . . .

> Q: I'm agreeing that he was found guilty of a sexual assault, but that's not what Christa Pike said happened. She said she was raped.
>
> A: . . . I'm not a sophisticated lawyer and I don't know the difference between rape, sexual assault, and whatever else it is.
>
> Q: Let me tell you, Dr. Pincus, there is a huge difference.
>
> A: But if somebody is found guilty of sexual assault and given a suspended sentence of two years on the basis of what this child said happened, then it happened. And for her mother to have mocked her for claiming this. . . at that time. . . was an outrage!

PC Tr. Vol. 4 at 310–11.

The State continued its attack on Ms. Pike's credibility in its cross-examination of Dr. McCoy, a psychologist who had compiled a social history of Ms. Pike before trial. The State characterized Ernest Johnson's sexual abuse and rape as "rumors and gossip of the family," PC Tr. Vol. 9 at 856 (April 10, 2008). The State then queried whether it was sexual abuse when Christa's mother's boyfriend twisted her nipples. *Id*. The state suggested that it was "interesting" that Christa had not told her friends about one of her rapes. *Id.* at 878. Then the State insinuated that Ms. Pike had brought on the abuse, commenting that "from a very early age she was drawn [to] and ran with the wrong kind of people." *Id.* at 878–79. In its cross-examination of Dr. Kenner, a psychologist who had been appointed by the court to evaluate Ms. Pike's mental health, the State suggested that Ms. Pike was promiscuous, highlighting the number of sexual partners she had reported. PC Tr. Vol. 2 at 193 (April 11, 2008).

In short, the State used every opportunity to cast doubt on Ms. Pike's experiences of sexual violence and abuse. In doing so, it invoked tropes that court actors have used for decades to discredit survivors of gender-based violence. *See* Sandra Babcock and Nathalie Greenfield,

*Gender, Violence, and the Death Penalty*, 53 Cal. W. Int'l L.J. 327, 382-391 (2023) (discussing a range of tactics prosecutors use "to discredit women's accounts [of gender-based violence] and minimize the relevance of the violence they endured"); Suzanne St. George Coble, Emily Denne & Stacia N. Stolzenberg, *Blaming Children: How Rape Myths Manifest in Defense Attorneys' Questions to Children Testifying About Child Sexual Abuse*, 37 J. Interpersonal Violence 17–18 (2022) (providing an overview of rape myths and their invocation by defense attorneys in sexual assault cases involving children). For example, the State suggested that without corroboration, the post-conviction court could not trust a child's account of sexual abuse and rape. PC Tr. Vol. 4 at 308-09. Advocates for sexually abused children have long fought to overcome this trope, which places an unfair burden on child victims of violence to produce corroboration of their abuse. *See* Babcock and Greenfield, *supra,* at 383. The suggestion that a child survivor of rape cannot be trusted to tell the truth about her experiences of sexual violence is particularly noxious and can infect a factfinder's view of her credibility. *See* Suzanne St. George, Katelin Bliesner, and Stacia N. Stolzenberg, *Memory, Suggestibility, Consistency, and Plausibility: Examining the Effects of Credibility Dimensions on Jury Verdicts in a Mock Child Sexual Abuse Trial*, Psych., Public Policy, & L. 1, 2 (2026).

In addition, the State argued that that Claude Davis would never have been given such a light sentence if he had actually raped Christa. In fact, "sexual assault and domestic violence cases experience high attrition rates—meaning cases are often declined for prosecution or dismissed." Sarah Anderson and Lisel Petis, *From Victim to Defendant: How Justice Falls Short for Women* (Oct. 28, 2025), https://www.rstreet.org/research/from-victim-to-defendant-how-justice-falls-short-for-women/. A recent NBC News investigation based on data gathered from eight major cities concluded that "[l]ess than 4% of reported rapes, sexual assaults, and child sex

abuse allegations" resulted in a sex crime conviction. Lucia Walinchus, Katy Smyser, and Joe Murphy, *A Vanishingly Small Number of Violent Sex Crimes End in Conviction, NBC News Investigation Shows* (Jan. 10, 2025), https://www.nbcnews.com/specials/sex-assault-convictions/. The reasons for this are complex, but the bottom line is that "only a tiny fraction" of sex crimes result in any sentence for the perpetrator. *Id.*

Finally, the State elicited testimony that Ms. Pike was "promiscuous" and had multiple sex partners as a teenager. This was a deliberate attempt to suggest that Ms. Pike was less credible because she was sexually active—a tactic that has been used for time immemorial to slander the character of rape victims. *See* Nathalie Greenfield and Sandra Babcock, *Sex on Trial,* 46 Col. J. Gender & L. 219, 228, 278 (2026) (discussing how prosecutors seek to undermine women's accounts of sexual violence by portraying them as sexual aggressors and noting that such tactics have been used for hundreds of years). Undermining a victim's credibility by portraying her as hypersexual reduces empathy for her as a crime victim and "dehumanizes [her] in the eyes of the decisionmaker." *Id.* at 285. Paradoxically, the characterization of teenaged Christa as "promiscuous" transformed a common symptom of child sexual abuse into an aggravating factor.[5]

The State's persistent attempt to undermine Ms. Pike's credibility as a survivor of child rape during post-conviction proceedings paid off. First, the post-conviction court expressed

---

[5] Research shows that women and girls who experience child sexual abuse are more likely to have multiple sexual partners and engage in risky sexual activity. *See* American College of Obstetricians & Gynecologists, *Adult Manifestations of Child Sexual Abuse* (Aug. 2011), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2011/08/adult-manifestations-of-childhood-sexual-abuse (noting that women survivors of child sexual abuse are more likely to "have had 50 or more intercourse partners, have had a sexually transmitted infection, and engage in risk-taking behaviors that place them at risk of contracting human immunodeficiency virus (HIV)").

skepticism about the conclusions of Dr. Pincus and Dr. Kenner because they were based largely on what Ms. Pike told them—and Ms. Pike could be lying:

> This court also note that experts must rely on what the client says as well. The evaluations performed have tests to determine if someone is malingering but in part it is up to the professional to determine if someone is lying or telling the truth or partially lying, etc. Dr. Kenner relied upon what the petitioner told him in making his diagnoses and testimony. Dr. Pincus specifically stated that he had relied upon what the petitioner had told him related to the offense and that it was the basis for his opinion related to her state of mind at the time of the offense. He admitted that if she were lying that his would change his opinion as to whether she had premeditated but not as to her diagnosis.

PC Tech. R. Vol. 5 at 74–75 (Findings of Fact and Conclusions of Law, Dec. 10, 2008).

Second, notwithstanding the documentary evidence that corroborated Ms. Pike's account of her rapes, the post-conviction court adopted the State's characterization of the Claude Davis rape, erroneously finding that "Claude Davis was arrested but not convicted." *Id.* at 13. This was untrue. Court records established that Davis pleaded "no contest" to assault charges and ultimately received a suspended sentence. *See* App. 1.

Third, the post-conviction court echoed the prosecution's characterization of Ms. Pike as "promiscuous" and noted that she had had multiple sexual partners. *Id.* at 35. As noted above, this characterization was highly prejudicial. Indeed, since the post-conviction court's evidentiary hearing in this case, Tennessee has passed a rule of evidence prohibiting evidence of a sex crime victim's sexual history in recognition of the prejudicial impact of such evidence.[6] Tenn. R. Evid. 412 (effective July 1, 2022).

---

[6] The Editor's Notes to Rule 412 specify that the rule was passed "to minimize the likelihood that evidence of the alleged victim's sexual history may cause the jury to be unfairly prejudiced against the victim" as well as avoid unnecessary embarrassment of the victim. Tenn. R. Evid. 412 (Editor's Notes).

In habeas proceedings, this Court deferred to the Tennessee courts' findings on ineffective assistance of counsel, as required by AEDPA. *Pike v. Freeman*, 2016 WL 1050717 at *14.

**C. Ms. Pike's Case Presents Extraordinary Circumstances Warranting the Relief She Seeks.**

Because Ms. Pike's Rule 60(b)(6) motion is jurisdictionally proper, the question is whether she has shown "'extraordinary circumstances' justifying the reopening of a final judgment." *Gonzalez*, 545 U.S. at 535 (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)). In evaluating extraordinariness, "it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 866 (1988). This fact-intensive inquiry also involves an assessment of the applicant's diligence, the probable merit of the underlying claims, the interest in finality, and other equitable considerations. *See* 8 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2857 (3d ed. 1998 and Supp. 2026); *Gonzalez*, 545 U.S. at 540 (Stevens, J., dissenting) (collecting relevant factors). Because the facts and circumstances of Ms. Pike's case are uniquely extraordinary, she is entitled to relief under Rule 60(b)(6) to prevent manifest injustice. *Klapprott v. United States*, 335 U.S. 601, 615 (1949); *Henness*, 766 F.3d at 554.

1. The Risk of Injustice to the Parties and the Merits of the Underlying Claim

The risk of injustice to Ms. Pike is obvious. She faces the prospect of execution after a death penalty trial and post-conviction proceedings that failed to give *any* weight to her documented childhood sexual abuse and rape. The risk of injustice to the State is inconsequential by comparison. Indeed, the State has an interest in the fair administration of justice. While the State certainly has an interest in finality of its judgments, that interest pales in comparison to the

harm that would be occasioned by executing a survivor of sexual violence based on specious arguments and unreasonable legal reasoning.

There is also reason to believe that Ms. Pike would prevail if the Court granted her 60(b) motion.

The post-conviction court's findings were clearly unreasonable. As an initial matter, the post-conviction court erroneously found that Claude Davis was never convicted, a finding that rested on the state's misleading characterization of his prosecution during the evidentiary hearing—and ignored the court records that establish his guilt and corroborate Ms. Pike's account of sexual assault. Moreover, this Court's conclusion that Ms. Pike's history of child sexual abuse and rape was cumulative of other mitigating evidence contravenes binding Sixth Circuit precedent.

The Sixth Circuit has confirmed that a survivor's experiences of child sexual abuse are powerfully mitigating in a case involving a youthful offender like Ms. Pike. *See Foust v. Houk*, 655 F.3d 524, 543 & n.9 (6th Cir. 2011) (finding that trial counsel was ineffective for failing to present evidence of child sexual abuse in home and that such evidence was not cumulative). The Sixth Circuit has also clearly held that such evidence is not merely "cumulative" of other mitigating evidence presented in a capital case. *Id.* at 527. This is because child sexual abuse and rape are uniquely devastating. In *Kennedy v. Louisiana*, 554 U.S. 407 (2008), Justice Alito underscored that while "the rape of any victim inflicts great injury, "'[t]he immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped.'" *Id.* at 468 (quoting Meister, Murdering Innocence: The Constitutionality of Capital Child Rape Statutes, 45 Ariz. L. Rev. 197, 208-209 (2003)); *see also Wharton v. Chappell*, 765 F.3d 953 (9th Cir. 2014) (finding that unpresented evidence of childhood

sexual abuse was different from presented childhood physical abuse and therefore not cumulative and that failure to find and present that evidence may constitute ineffective assistance).

The Sixth Circuit's decision in *Foust* is consistent with precedent from the U.S. Supreme Court. *See Wiggins*, 539 U.S. at 510 (finding ineffective assistance of counsel because counsel failed to present evidence that the defendant was repeatedly molested and raped by his foster father before the age of 16); *Sears v. Upton*, 561 U.S. 945 (2010) (remanding to determine *Strickland* prejudice because trial counsel portrayed defendant's home life as stable when defendant had been sexually abused).

2. The Risk That Denial of Relief Will Produce Injustice in Other Cases

There is a significant risk that denying Ms. Pike's motion will produce injustice in the cases of survivors of sexual violence who have long battled against the tendency of the legal system to minimize their suffering.

3. Ms. Pike Has Exercised Diligence in Bringing this Claim

The grounds for this petition emerged slightly more than one month ago, during a hearing in which the State of Tennessee made an unprecedented concession that Ms. Pike had no way of anticipating. This motion is timely filed.

4. The Risk of Undermining the Public's Confidence in the Judicial Process

It is inconceivable that in the 21st century, the criminal justice system is poised to execute a survivor of rape and child sexual abuse whose jury never had the opportunity to consider those facts in weighing the defendant's moral culpability. The public expects that courts will be fair and reasoned, and that death sentences will be carried out only after a process that guarantees that the person facing execution receives effective legal representation and fair consideration of all of the

evidence weighing for and against the appropriateness of capital punishment. That did not happen here.

Hundreds of women's rights organizations that have spent decades calling for justice for survivors of sexual violence have decried the injustice of Ms. Pike's death sentence. *See* Appendix 1 (Letters from Advocates for Women). The injustice of Ms. Pike's sentence is compounded by her youth at the time of the crime. Scientific research has proven that the brains of adolescents do not fully develop until their mid-20s. *See* Appendix 2 (Letters from Youth Justice Advocates). Ms. Pike committed her crime on the one-year anniversary of a violent rape, after which she received no therapy or victim support services, at a time when she had the brain of an impulsive and immature teenager struggling with untreated bipolar disorder and post-traumatic stress disorder. That the courts would allow her execution to proceed without giving full weight to these facts is unfathomable.

Ms. Pike's execution would stain the justice system and undermine the public's confidence in its integrity.

## CONCLUSION

This Court was compelled to rely on the post-conviction court's demonstrably false findings of fact and the continuing consequences of a litigation position that has now been abandoned by the State at the eleventh hour. Rule 60(b) affords relief under precisely these circumstances. It will prevent the irreversible injustice of the state executing a woman based upon incorrect facts and a litigation position that the State has not only abandoned, but which cannot be reconciled with modern research on the impact of childhood sexual abuse. For all of the reasons stated above, Ms. Pike moves this Court to reopen its judgment.

DATED this 29th day of September, 2026.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: s/Stephen A. Ferrell

Stephen A. Ferrell, BPR #025170
Assistant Federal Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Phone: (865) 637-7979
Facsimile: (865) 637-7999
Stephen_Ferrell@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document was filed and served via the Court's electronic filing system on the 29th day of September 2026.

/s/ *Stephen A. Ferrell*
Stephen A. Ferrell